## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, <br><br> AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS-HARVARD FACULTY CHAPTER, <br><br> AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS AT NEW YORK UNIVERSITY, <br><br> RUTGERS AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS-AMERICAN FEDERATION OF TEACHERS, and <br><br> MIDDLE EAST STUDIES ASSOCIATION, <br><br>         Plaintiffs, <br><br>    v. <br><br> MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, and the DEPARTMENT OF HOMELAND SECURITY, <br><br> TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement, <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, and <br><br> UNITED STATES OF AMERICA, <br><br>         Defendants. | Civil Action No. 1:25-cv-10685 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.    Implementing executive orders issued by President Trump in January, the defendant agencies have announced that they intend to carry out large-scale arrests, detentions, and deportations of noncitizen students and faculty who participate in pro-Palestinian protests and other related expression and association (the "ideological-deportation policy"). The defendant agencies arrested Mahmoud Khalil, a recent Columbia University graduate and a legal permanent resident, pursuant to this policy earlier this month; they revoked the visas of at least four others, one of whom fled to Canada in fear of arrest; they supplied universities with the names of other students they intend to target under the policy; and they launched new social media surveillance programs aimed at identifying still others. After federal agents seized Khalil in the lobby of his university-owned student housing, President Trump warned: "This is the first arrest of many to come."

2.    While President Trump and other administration officials have described pro-Palestinian campus protests as "pro-Hamas," they have stretched that label beyond the breaking point to encompass any speech supportive of Palestinian human rights or critical of Israel's military actions in Gaza. They have left no doubt that their new policy entails the arrest, detention, and deportation of noncitizen students and faculty for constitutionally protected speech and association. In an interview twelve days ago on NPR's *Morning Edition*, Deputy Secretary of Homeland Security Troy Edgar responded this way to questions from journalist Michel Martin about the arrest of Mahmoud Khalil:

> **Edgar:** This is a person that came in under a visa. And again, the secretary of state at any point can take a look and evaluate that visa and decide if they want to revoke it.

> **Martin:** He's a legal permanent resident. I have to keep insisting on that. He is a legal permanent resident. So what is the standard? Is any criticism of the Israeli government a deportable offense?

**Edgar:** Like I said, I think that at this point when he entered into the country on a student visa, at any point we can go through and evaluate what his status is.

**Martin:** Is any criticism of the United States government a deportable offense?

**Edgar:** Like I said, if you go through the process and you're a student and you're here on a visa and you go through it, at any point . . .

**Martin:** Is any criticism of the government a deportable offense?

**Edgar:** Let me put it this way, Michel, imagine if he came in and filled out the form and said, "I want a student visa." They asked him, "What are you going to do here?" And he says, "I'm going to go and protest." We would have never let him into the country.

3.      By design, the agencies' policy has created a climate of repression and fear on university campuses. Out of fear that they might be arrested and deported for lawful expression and association, some noncitizen students and faculty have stopped attending public protests or resigned from campus groups that engage in political advocacy. Others have declined opportunities to publish commentary and scholarship, stopped contributing to classroom discussions, or deleted past work from online databases and websites. Many now hesitate to address political issues on social media, or even in private texts. The agencies' policy, in other words, is accomplishing its purpose: it is terrorizing students and faculty for their exercise of First Amendment rights in the past, intimidating them from exercising those rights now, and silencing political viewpoints that the government disfavors.

4.      Plaintiffs are associations whose members include thousands of faculty and students at universities across the country. They commence this action because the ideological-deportation policy, and the repressive climate it has engendered, has far-reaching implications for the expressive and associational rights of their U.S. citizen members, and for Plaintiffs themselves. The policy prevents or impedes Plaintiffs' U.S. citizen members from hearing from, and associating with, their noncitizen students and colleagues. It makes it practically impossible for

them to organize with those students and colleagues and to participate in political expression alongside them. It also makes it more difficult for them to benefit from those individuals' insights and scholarship and to collaborate with them on academic projects. Plaintiffs themselves have also been harmed because they are no longer able to learn from and engage with noncitizen members to the extent they once did, and because they have had to divert resources from other projects to address the all-too-real possibility that their noncitizen members will be arrested, imprisoned, and deported for exercising rights that the Constitution guarantees.

5.     The First Amendment protects the rights of Plaintiffs and their U.S. citizen members to hear from, and associate with, noncitizen students and faculty. Because the ideological-deportation policy abridges these rights without adequate justification, the policy is unconstitutional. Plaintiffs respectfully request that the Court declare that the policy violates the First and Fifth Amendments, as well as the Administrative Procedure Act, and enjoin Defendants from further implementation of it. They also seek a declaration that Defendants' campaign of coercive threats to arrest, detain, and deport noncitizen students and faculty based on their pro-Palestinian expression and association violates the First Amendment.

## JURISDICTION AND VENUE

6.     The Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331, 5 U.S.C. § 702, the First and Fifth Amendments, and Article III of the U.S. Constitution.

7.     The Court has authority to issue the requested relief pursuant to 5 U.S.C. § 706(2), 28 U.S.C. §§ 2201–2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the Court's inherent equitable powers. The Court has authority to award costs and attorneys' fees pursuant to 28 U.S.C. § 2412.

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1).

## PLAINTIFFS

9.      Plaintiff American Association of University Professors ("AAUP") is a nonprofit membership association and labor union of faculty, graduate students, and other academic professionals with chapters at colleges and universities throughout the country. The AAUP's mission is to advance academic freedom and shared governance; to define fundamental professional values and standards for higher education; to promote the economic security of faculty, academic professionals, graduate students, postdoctoral fellows, and all those engaged in teaching and research in higher education; to help the higher education community organize to accomplish their goals; and to ensure higher education's contribution to the common good. Founded in 1915, the AAUP has helped to shape American higher education by developing the standards and procedures that maintain quality in education and academic freedom in the country's colleges and universities. The AAUP is headquartered in Washington, DC.

10.      Plaintiff AAUP-Harvard Faculty Chapter ("Harvard-AAUP") is a nonprofit membership association of faculty across Harvard University's many departments and schools, and it is a chapter of the AAUP. Harvard-AAUP advocates for meaningful and democratic shared university governance, for academic freedom, and for the economic security of those who perform the institution's core instructional work. Harvard-AAUP is headquartered in Cambridge, Massachusetts.

11.      Plaintiff AAUP at New York University ("NYU-AAUP") is a membership association of faculty across NYU's many schools and campuses, and it is a chapter of the AAUP. NYU-AAUP is focused on defending academic freedom, encouraging participation in university governance, and advancing the interests of NYU faculty, students, and staff. NYU-AAUP is headquartered in New York City, New York.

12.     Plaintiff Rutgers AAUP-American Federation of Teachers ("Rutgers AAUP-AFT") is a membership association representing more than 5,000 full-time faculty, graduate workers, postdoctoral associates, and Education Opportunity Fund counselors at Rutgers University, and it is a chapter of the AAUP. Rutgers AAUP-AFT is one of the oldest higher education unions in the country, negotiating collective bargaining agreements for full-time faculty since 1970 and graduate workers since 1972. Rutgers AAUP-AFT's mission includes promoting the well-being of its unit members; protecting and improving the university's teaching, research, and service activities as a public good; promoting the development of the intellectual capacities and economic interests of students, the public, and workers at the university; advancing academic freedom and shared governance within the university; and building community and labor coalitions to achieve educational and economic justice. Rutgers AAUP-AFT is headquartered in New Brunswick, New Jersey.

13.     Plaintiff Middle East Studies Association ("MESA") is a 501(c)(3) nonprofit membership association of scholars, educators, and those interested in the study of the Middle East (including Southwest Asia, the Arab world, and North Africa). MESA's mission is to foster the study of the Middle East; to promote high standards of scholarship and teaching; and to encourage public understanding of the region and its peoples through programs, publications, and services that enhance education, further intellectual exchange, recognize professional distinction, and defend academic freedom. MESA is incorporated in Arizona and its principal place of business is in Washington, DC.

**DEFENDANTS**

14.     Defendant U.S. Department of State is a cabinet-level department of the Executive Branch of the federal government and is an "agency" within the meaning of 5 U.S.C. § 551(1).

15.     Defendant Marco Rubio is the Secretary of State and has ultimate authority over the operations of the State Department. In that capacity and through his agents, Defendant Rubio has broad authority over the operation and enforcement of the immigration laws. Defendant Rubio and the department he leads have adopted and begun implementing the ideological-deportation policy. Defendant Rubio is sued in his official capacity.

16.     Defendant U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the Executive Branch of the federal government and is an "agency" within the meaning of 5 U.S.C. § 551(1). DHS includes various component agencies, including U.S. Immigration Customs and Enforcement ("ICE").

17.     Defendant Kristi Noem is the Secretary of Homeland Security and has ultimate authority over DHS. In that capacity and through her agents, Defendant Noem has broad authority over the operation and enforcement of the immigration laws. Defendant Noem and the department she leads have adopted and begun implementing the ideological-deportation policy. Defendant Noem is sued in her official capacity.

18.     Defendant Todd Lyons is the Acting Director of ICE and has authority over the operations of ICE. In that capacity and through his agents, Defendant Lyons has broad authority over the operation and enforcement of the immigration laws. Defendant Lyons and the agency he leads have adopted and begun implementing the ideological-deportation policy. Defendant Lyons is sued in his official capacity.

19.     Defendant Donald J. Trump is President of the United States. He issued Executive Order 14,161 and Executive Order 14,188 (together, the "Executive Orders"), which the defendant agencies have cited as the basis for the ideological-deportation policy. He is sued in his official capacity.

20.    Defendant United States of America includes all other government agencies and departments responsible for the promulgation and implementation of the ideological-deportation policy.

## FACTUAL BACKGROUND

### *The 2023 and 2024 Campus Protests*

21.    Following the Hamas-led attacks on Israel of October 7, 2023, and Israel's subsequent bombing and invasion of Gaza, students and faculty organized protests on campuses across the United States. Many of the pro-Palestinian protests included calls for a ceasefire and for humanitarian aid to displaced or wounded Palestinians. Others centered on calls for institutional divestment from Israel. Many included criticism or condemnation of Israel's campaign in Gaza; and some included denunciations of Zionism. Others featured calls for a "free Palestine" and included chants—such as "from the river to the sea, Palestine will be free" and "intifada revolution"—that protesters said were calls for liberation and justice but that some listeners interpreted as calls for discrimination or violence. A small minority of protesters and counter-protesters engaged in violence and property damage, but the protests were overwhelmingly peaceful, even when they violated universities' rules.

22.    The pro-Palestinian protests on campus took different forms. They included teach-ins, sit-ins, walk-outs, marches, exhibitions, vigils, encampments, and in some instances the occupation of buildings. On April 17, 2024, student protesters at Columbia University erected a "Gaza Solidarity Encampment" on the university's Morningside campus, and more than one hundred solidarity encampments were established at universities across the United States in the weeks thereafter. Some universities eventually persuaded student protesters to dismantle their encampments; others immediately called in the police. At Columbia University, police arrested more than a hundred students in an effort to clear the encampment on April 18, 2024, the day after

the encampment was established. Later, after a smaller group of protesters broke into and occupied Hamilton Hall—a building that students had also occupied in earlier protests relating to the Vietnam War and Apartheid South Africa—Columbia's administration called in the police again.

23.    The students and faculty who participated in the pro-Palestinian protests on campus came from diverse backgrounds and held a wide range of political views. Some protesters viewed their participation as an extension of an American protest tradition, encompassing the anti-war and anti-apartheid protests of the 1960s, 70s, and 80s. Some protesters were Palestinians whose family members had been killed in or displaced by the war. Some protesters were Jewish, and many of them joined the protests to express their opposition to what they viewed as the displacement and even genocide of Palestinians in their name. While most of the protesters were likely U.S. citizens, many foreign citizens with visas or green cards joined the protests, and sometimes even led them.

24.    Despite the diversity of the protesters and the wide range of views they expressed, President Trump repeatedly characterized the protests as "pro-Hamas," "pro-terrorist," "antisemitic," and "anti-American" during his 2024 campaign. He also promised that, if elected, he would deport the noncitizen students and faculty who had participated in the protests. At an event in May 2024, for example, he told donors to his campaign: "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."

### The Executive Orders

25.    The defendant agencies adopted the ideological-deportation policy challenged here to implement two executive orders that President Trump issued shortly after taking office. President Trump issued Executive Order No. 14,161, titled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," on January 20, 2025.

He issued Executive Order No. 14,188, titled "Additional Measures to Combat Anti-Semitism," on January 29, 2025.

26.    Executive Order 14,161 states that it is the policy of the United States to protect its citizens from noncitizens who "espouse hateful ideology," and to ensure that noncitizens who are already present in the United States "do not bear hostile attitudes towards its citizens, culture, government, institutions, or founding principles" and "do not advocate for, aid, or support designated foreign terrorists and other threats to [America's] national security." The order directs the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to promptly "vet and screen" all noncitizens who are already inside the United States "to the maximum degree possible."

27.    Executive Order 14,188 states that it is the policy of the United States "to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." It reaffirms Executive Order 13,899, issued during the first Trump administration, which adopted a definition of antisemitism that encompasses constitutionally protected criticism of Israel and Israeli policies. (The definition encompasses, for example, speech that claims that Israel "is a racist endeavor," speech that holds Israel to standards "not expected or demanded of any other democratic nation," and speech that compares contemporary Israeli policies to those of the Nazis.) The order directs the head of each executive department or agency, within 60 days, to submit a report to the President "identifying all civil and criminal authorities or actions within the jurisdiction of that agency" that might be used "to curb or combat anti-Semitism." It also directs the Secretary of State, the Secretary of Education, and the Secretary of Homeland Security to include in their reports "recommendations for familiarizing institutions of higher education with

the grounds for inadmissibility under 8 U.S.C. § 1182(a)(3) so that such institutions may monitor for and report activities by alien students and staff relevant to those grounds and for ensuring that such reports about aliens lead, as appropriate and consistent with applicable law, to investigations and, if warranted, actions to remove such aliens."

28.    The "grounds for inadmissibility under 8 U.S.C. § 1182(a)(3)" are the security and related grounds of inadmissibility, including various terrorism- and foreign policy–related provisions, 8 U.S.C. § 1882(a)(3)(B), (a)(3)(C), which also serve as grounds for deportation, *see* 8 U.S.C. § 1227(a)(4)(B), (C). Under the terrorism-related provisions, noncitizens who have engaged in or incited terrorist activity are inadmissible to the country, *id.* § 1182(a)(3)(B)(i)(I), (III); the same is true of noncitizens who "endorse[] or espouse[] terrorist activity or persuade[] others to endorse or espouse terrorist activity or support a terrorist organization," *id.* § 1182(a)(3)(B)(i)(VII), or who are representatives of "a political, social, or other group that endorses or espouses terrorist activity," *id.* § 1182(a)(3)(B)(i)(IV)(bb) (together, the "endorse or espouse" provisions). The foreign policy provision renders inadmissible any noncitizen "whose entry or proposed activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States." *Id.* § 1182(a)(3)(C)(i). This provision also states, however, that individuals may not be excluded based on "past, current, or expected beliefs, statements, or associations [that] would be lawful within the United States" unless "the Secretary of State personally determines that the [noncitizen]'s admission would compromise a compelling United States foreign policy interest," *id.* § 1182(a)(3)(C)(iii), and provides timely notice of that determination to Congress, *id.* § 1182(a)(3)(C)(iv).

29.     After President Trump signed Executive Order 14,188, the White House released a fact sheet about the order "promis[ing]" to "Deport Hamas Sympathizers and Revoke Student Visas." The fact sheet included this warning from the President:

> To all the resident aliens who joined in the pro-jihadist protests, we put you on notice: come 2025, we will find you, and we will deport you. I will also quickly cancel the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before.

### *The Ideological-Deportation Policy*

30.     To implement the two executive orders described above, the defendant agencies adopted the ideological-deportation policy challenged here, announcing that they intend to carry out large-scale arrests, detentions, and deportations of noncitizen students and faculty who participate in pro-Palestinian protests and other related expression and association. Pursuant to this policy, they arrested Mahmoud Khalil, a recent Columbia University graduate and a legal permanent resident, earlier this month; they revoked the visas of at least four others, one of whom fled to Canada in fear of arrest; they supplied universities with the names of other students they intend to target under the policy; and they launched new social media surveillance programs aimed at identifying still others.

31.     On March 6, 2025, Secretary of State Rubio posted to X: "Those who support designated terrorist organizations, including Hamas, threaten our national security. The United States has zero tolerance for foreign visitors who support terrorists. Violators of U.S. law— including international students—face visa denial or revocation, and deportation." A news report published that same day revealed that the State Department had already launched a new social media surveillance program, called "Catch and Revoke," to identify noncitizen students for deportation pursuant to the new policy of ideological deportation. According to senior State Department officials cited by *Axios*, the program involves "AI-assisted reviews of tens of

thousands of student visa holders' social media accounts" to find "evidence of alleged terrorist sympathies expressed after Hamas' [October 7] attack on Israel." According to the report, "[i]f officials find a social media post from a foreign national that appears to endorse the [October 7] attack on Israel and looks 'pro-Hamas,' . . . that could be grounds for visa revocation."

32.     Two days later, on March 8, 2025, ICE agents arrested Mahmoud Khalil, a 30-year-old legal permanent resident and recent Columbia graduate, at his Columbia University student housing. The agents initially told Khalil that they were detaining him because his student visa had been revoked by the State Department, but when Khalil's lawyer informed the agents that Khalil was a green card holder, the agents responded that the State Department had revoked Khalil's green card, too. The deportation notice later filed by the government cites the foreign policy provision and states: "The Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States."

33.     Khalil has not been charged with any crime, and an administration official stated to *The Free Press* that "[t]he allegation here is not that he was breaking the law." Instead, the administration has made clear that it arrested Khalil because of his role in organizing protests that the administration characterizes as pro-Hamas. In a post made to X on March 9, 2025, DHS asserted that Khalil had led activities "aligned to" Hamas, and that ICE had arrested Khalil "in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State." At a news briefing on March 11, 2025, Press Secretary Karoline Leavitt stated that "Mahmoud Khalil was an individual who was given the privilege of coming to this country to study at one of our nation's finest universities and colleges. And he took advantage of that opportunity, of that privilege by siding with terrorists." She asserted that "pro-Hamas

propaganda" fliers had been distributed at a protest that Khalil had led, though she did not provide any evidence that Khalil had produced, distributed, or even known about them.

34.    When Deputy Secretary of Homeland Security Troy Edgar appeared on NPR's *Morning Edition* two days later, he indicated even more clearly that the government had targeted Khalil for deportation based on his political speech. Edgar initially stated that the State Department revoked Khalil's green card "for supporting a terrorist type organization," namely Hamas. But when asked to clarify how Khalil had supported Hamas, Edgar pointed to his involvement in pro-Palestinian protests generally: "Well, I think you can see it on TV, right? This is somebody that we've invited and allowed the student to come into the country, and he's put himself in the middle of the process of basically pro-Palestinian activity." When asked if that meant any criticism of Israel or the United States is "a deportable offense," he said: "Let me put it this way, . . . imagine if he came in and filled out the form and said, 'I want a student visa.' They asked him, 'What are you going to do here?' And he says, 'I'm going to go and protest.' We would have never let him into the country."

35.    On March 17, 2025, after Khalil had challenged the State Department's decision to revoke his green card on the basis of his speech, ICE filed an additional (and transparently pretextual) justification for the State Department's decision. This additional charge alleged that Khalil had, at the time of his adjustment of status in March 2024, sought to procure an immigration benefit by fraud because he failed to disclose that he was "a member" of the United Nations Relief and Works Agency for Palestine Refugees ("UNWRA") and Columbia University Apartheid Divest ("CUAD"), and that he had continued working for the British government.

36.    The State Department has revoked the visas of at least four other students and faculty pursuant to the ideological-deportation policy.

37.    On March 5, 2025, the State Department revoked the student visa of Ranjani Srinivasan, an Indian national, doctoral student at Columbia University, and Adjunct Assistant Professor of Urban Planning at NYU's Robert F. Wagner Graduate School of Public Service, also under the foreign policy provision. Three federal immigration agents showed up at her apartment looking for her two days later, but she did not open the door. They showed up again the following night, just hours before Khalil was arrested, but she was not home because, fearing arrest, she had already fled the United States for Canada. On March 13, 2025, agents returned to her home with a judicial warrant. DHS released a statement characterizing Srinivasan as a terrorist sympathizer and accused her of advocating violence and being "involved in activities supporting Hamas," but the agency has not provided any evidence for its allegations, and Srinivasan disputes them. Srinivasan appears to be active, however, in protesting what she believes to be human rights violations in Gaza, and in December 2023 she signed an open letter published by the Society of Architectural Historians in support of "Palestinian liberation."

38.    On March 8, 2025, ICE signed an arrest warrant for Yunseo Chung, a 21-year-old legal permanent resident and Columbia University student who has lived in the United States since she was seven. A few days earlier, Ms. Chung protested outside a Barnard College building where pro-Palestinian student demonstrators were holding a sit-in. She was arrested by police officers, given a desk ticket by the New York City Police Department for "obstruction of governmental administration," and released. On March 10, a federal law enforcement official advised Ms. Chung's attorney that her legal permanent resident status had been revoked. On March 13, federal law enforcement agents executed a judicial search warrant at Ms. Chung's dormitory. The warrant appears to have been issued in connection with an investigation of Columbia University for an alleged violation of the federal harboring statute.

39.    On March 17, 2025, ICE arrested Badar Khan Suri, an Indian national and postdoctoral fellow at the Alwaleed Bin Talal Center for Muslim-Christian Understanding, which is part of Georgetown University's School of Foreign Service. Suri's student visa was revoked pursuant to the foreign policy provision. In a statement given to *Fox News*, DHS asserted that Suri had "spread[] Hamas propaganda," "promot[ed] antisemitism on social media," and had "close connections to a known or suspected terrorist, who is a senior advisor to Hamas." Suri has no criminal record and has not been charged with a crime. DHS's allegations appear to reference the fact that Suri's father-in-law, Ahmed Yousef, is a former advisor to Ismael Haniyeh, the Hamas leader assassinated by Israel last year in Iran. But Yousef left his position in the Hamas-run government in Gaza more than a decade ago and has publicly criticized Hamas's decision to attack Israel on October 7, 2023. DHS has not alleged that Suri himself has taken any action on behalf of Hamas.

40.    On March 21, 2025, the Justice Department wrote to counsel for Momodou Taal, a student visa holder and doctoral candidate in Africana Studies at Cornell University, to convey ICE's intention to serve a deportation notice on Taal and request that Taal voluntarily "surrender to ICE custody." Taal is a prominent and outspoken pro-Palestinian advocate. The Justice Department wrote to Taal's lawyers after Taal sought a temporary restraining order to enjoin DHS from attempting to detain, remove, or otherwise enforce the Executive Orders against him, and while that application remained pending. In response to that application, the government informed the court that the State Department had revoked Taal's student visa.

41.    Defendants and other administration officials have made clear that they intend to target other foreign students and faculty for arrest, detention, and deportation under the policy.

42.     On March 9, 2025, the Secretary of State shared a news story about Khalil's arrest on X and warned: "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported." The same day, DHS posted to X: "ICE and the Department of State are committed to enforcing President Trump's executive orders and to protecting U.S. national security."

43.     The next day, President Trump posted on Truth Social:

Following my previously signed Executive Orders, ICE proudly apprehended and detained Mahmoud Khalil, a Radical Foreign Pro-Hamas Student on the campus of Columbia University. This is the first arrest of many to come. We know there are more students at Columbia and other Universities across the Country who have engaged in pro-terrorist, anti-Semitic, anti-American activity, and the Trump Administration will not tolerate it. Many are not students, they are paid agitators. We will find, apprehend, and deport these terrorist sympathizers from our country — never to return again. If you support terrorism, including the slaughtering of innocent men, women, and children, your presence is contrary to our national and foreign policy interests, and you are not welcome here. We expect every one of America's Colleges and Universities to comply. Thank you!

44.     The White House Press Secretary Karoline Leavitt reiterated this message at the news briefing she gave on March 11, 2025. When asked how many arrests the administration planned to make, she said that she did not have an estimate, but that DHS "is actively working on it." She stated that DHS had gathered "very good intel" "at the direction of the President's executive order, which made it very clear . . . that engaging . . . in anti-American, anti-Semitic, pro-Hamas protests will not be tolerated." This intelligence was, she said, aimed at "identify[ing] individuals on our nation's colleges and universities, on our college campuses who have engaged in such behavior and activity, and especially illegal activity." She also added that "Columbia University has been given the names of other individuals who have engaged in pro-Hamas activity, and they are refusing to help DHS identify those individuals on campus." She concluded: "We expect all America's colleges and universities to comply with this administration's policy."

17

45.    On March 12, 2025, the *New York Times* reported that "[i]nvestigators from a branch of [ICE] that typically focuses on human traffickers and drug smugglers [had] scoured the internet for social media posts and videos that the administration could argue showed sympathy toward Hamas" and "handed over reports on multiple protesters to the State Department."

46.    On March 13, 2025, Vice President J.D. Vance gave an interview on Fox News in which he commented on Khalil's arrest, stating: "This is not fundamentally about free speech. And to me, yes, it's about national security, but it's also more importantly about who do we as an American public decide gets to join our national community. And if the Secretary of State and the President decide this person shouldn't be in America, and they have no legal right to stay here, it's as simple as that." Asked whether he saw "more such deportations happening," he said "I think we'll certainly see some people who get deported on student visas if we determine that it's not in the best interests of the United States to have them in our country, so yeah, I don't know how high that number is going to be, but you're going to see more people."

47.    On March 16, 2025, Secretary of State Rubio gave an interview on CBS's *Face the Nation* in which he promised that the administration would continue enforcing its policy of ideological deportation: "[W]e're going to do more. In fact, every day now we're approving visa revocations, and, if that visa led to a green card, the green card process as well."

### A Climate of Fear and Repression for Noncitizen Students and Faculty

48.    The ideological-deportation policy has created a climate of fear and repression on university campuses across the country and forced many noncitizen students and faculty into silence. Out of fear that pro-Palestinian expression might lead to arrest, detention, and deportation, many noncitizen students and faculty are no longer willing to participate in, or even attend, public political protests. Some have stepped back from leadership roles and participation in groups that engage in advocacy related to Israel and Palestine. Some are abstaining from public writing or

scholarship that they would otherwise have pursued. Others have attempted to purge their earlier public writings, including online articles, blog posts, and social media posts. Some students have stopped contributing to classroom discussions of Israel and Palestine; others are skipping class altogether. Some faculty have even fled their cities of residence, effectively forced to abandon their academic communities.

49.    The chill on university campuses flows directly from the policy challenged here, as well as from Defendants' threats to arrest, detain, and deport noncitizen students and faculty based on their lawful expressive and associational activities.

50.    Plaintiffs all have noncitizen faculty and student members who have been compelled to curtail their exercise of expressive and associational rights in the ways described above. Some of these members are described below. These individuals have been anonymized because they fear that their connection to this lawsuit could lead to them being targeted for arrest, detention, and deportation. Some noncitizen members interviewed by undersigned counsel were too fearful even to have their experiences described anonymously.

51.    **AAUP Member A.** AAUP Member A is a legal permanent resident, a member of the AAUP, and a lecturer at a university in the Northeast whose research interests include race and migration.

52.    Before the administration adopted the ideological-deportation policy, AAUP Member A regularly posted on social media and engaged in other public advocacy on issues related to Israel and Palestine. Because of the policy, however, and the fear that they will be targeted for deportation based on their writing and advocacy, AAUP Member A has taken down previously published social media posts about Israel and Palestine and stopped assigning materials about Palestine in the courses they teach.

53.    They have also been chilled from engaging in peaceful political protest and assembly. AAUP Member A previously participated in pro-Palestinian protests and public demonstrations regularly and still wishes to gather with others to engage in pro-Palestinian speech and advocacy. They no longer participate in these activities because of the fear that they will be arrested and deported for doing so.

54.    **AAUP Member B.** AAUP Member B is a legal permanent resident, a member of the AAUP, and a professor at a university in the Northeast.

55.    Although AAUP Member B's academic work has obvious relevance to issues relating to Israel and Palestine, they have decided to forgo opportunities to write about these issues due to concerns that they may face immigration consequences stemming from the policy. They also decided against teaching a class they have offered in the past because the class syllabus would necessarily have included materials related to Palestine. AAUP Member B made this decision out of concern that including that material would put them at risk of deportation under the policy.

56.    AAUP Member B has also been chilled from associating with AAUP colleagues. AAUP Member B has worked for over a year with university faculty across the United States, including other AAUP members, on a national organization addressing the concerns of Jewish faculty, including on issues related to Israel and Palestine. Due to the ideological-deportation policy, AAUP Member B no longer feels comfortable having their name associated with the prospective organization or doing any public-facing work for the prospective organization.

57.    AAUP Member B has also been chilled from engaging in peaceful political protest and assembly. They previously participated in pro-ceasefire protests and other public demonstrations but no longer do so because of the fear that their lawful advocacy will lead to arrest and deportation.

58.    **AAUP Member C.** AAUP Member C is a legal permanent resident, a member of the AAUP, and a professor at a university in the Northeast.

59.    Before the administration adopted the ideological-deportation policy, AAUP Member C regularly published their writing and participated in public advocacy on issues related to academic freedom. Now, due to fears that they will be targeted for deportation based on that writing and advocacy, AAUP Member C has felt compelled to remove previously published writing and scholarship from the internet, and to turn down opportunities to speak at academic talks and other public-facing events that they would otherwise have accepted.

60.    The individual has also been chilled from associating with colleagues at their local AAUP chapter. AAUP Member C values the ability to engage in collective action with other chapter members, but because they fear that public association with the chapter could expose them to deportation, they have forgone leadership opportunities within the chapter, reduced their participation in the chapter's public-facing work, and declined to participate in political organizing with the chapter.

61.    AAUP Member C has also been chilled from engaging in peaceful political protest and assembly. Although they would like to gather with others to engage in pro-Palestinian advocacy, they no longer do so out of fear of arrest and deportation for lawful political speech.

62.    **AAUP Member D.** AAUP Member D is a legal permanent resident, a member of the AAUP, and a professor at a university in the Northeast.

63.    AAUP Member D recently withdrew from presenting on a topic related to Israel and Palestine at an academic conference out of concern that this could expose them to deportation under the policy. Also due to the concern about the policy, they have stopped traveling abroad for academic conferences.

64.     The individual has also been chilled from associating with colleagues at their local AAUP chapter and colleagues nationally. AAUP Member D no longer signs their name to open letters that their colleagues circulate—including open letters related to Israel and Palestine—for fear of being targeted for deportation. For the same reason, they have also ruled out pursuing a leadership position at their local AAUP chapter.

65.     The individual has also been chilled from engaging in peaceful political protest and assembly. AAUP Member D wishes to gather with others to engage in pro-Palestinian speech and advocacy, but now fears that they will be deported for doing so. They do not plan to attend future protests, but, if they do attend, they intend to wear a mask and other clothing to obscure their identity.

66.     **AAUP member E.** AAUP Member E is a legal permanent resident, a member of the AAUP, and a professor in at a university in the Northeast. As a noncitizen, AAUP Member E was already hesitant to speak about political issues on social media. The ideological-deportation policy has made them reluctant to participate in protests and to engage in expressive or associational activities that require them to disclose their name. As a result of the policy, AAUP Member E no longer feels that they can safely exercise their free speech rights in the United States and will be spending most of the Spring semester outside of the country. Although they are able to conduct research abroad, an extended stay would substantially disrupt their professional activities and daily life.

67.     **MESA Member A.** MESA Member A is a legal permanent resident, a member of MESA, and a professor at a university in the southern United States whose research interests include topics related to Israel and Palestine.

68.     Before the administration adopted the ideological-deportation policy, MESA Member A regularly posted on social media about Israel and Palestine, including on topics related to their area of academic expertise, and engaged in other public advocacy on issues related to Israel and Palestine. Other MESA members followed MESA Member A on social media and frequently engaged with their posts. Because of the policy, however, and the fear that they will be targeted for deportation based on their writing and advocacy, MESA Member A has significantly reduced their engagement on social media, and feels compelled to self-censor when posting about Israel and Palestine.

69.     The policy has also interfered with MESA Member A's academic research and writing. Out of concern that their current immigration status could be revoked at any moment based on their past expressive activity, MESA Member A now refrains from traveling internationally. This has prevented them from engaging in key aspects of their research, including conducting interviews with people abroad and accessing research materials that are available only abroad. It has disrupted MESA Member A's ability to conduct research for a new book project that relies on those methods. MESA Member A also had to cancel plans to travel to academic conferences in Europe that they otherwise would have attended, preventing them from associating with their colleagues, including other MESA members.

70.     They have also been chilled from engaging in peaceful political protest and assembly. MESA Member A previously participated in pro-Palestinian protests and public demonstrations regularly and still wishes to gather with others to engage in pro-Palestinian speech and advocacy. They no longer participate in these activities because of fear that they will be arrested and deported for doing so.

71.    **MESA Member B.** MESA Member B is a legal permanent resident, a member of MESA and the AAUP, and a professor at a university in the Northeast whose research interests include gender studies and Middle East studies.

72.    Before the administration adopted the ideological-deportation policy, MESA Member B regularly organized workshops, teach-ins, and meetings related to Palestine and shared information about Palestine-related events on social media. Now, due to fears that these activities could lead to deportation, they have declined opportunities to chair academic committees, refrained from publishing work related to Palestine, stopped going to protests or demonstrations, and taken down all their social media posts about events related to Palestine.

73.    MESA Member B has also forgone research grants and opportunities that would have required them to travel to the Middle East, due to the risk of being denied reentry based on their pro-Palestinian expression and association. This has harmed their ability to pursue their scholarship, which requires traveling abroad to interview people and attend cultural events that are the subject of their research.

74.    **Noncitizen Student A.** Noncitizen Student A is a student visa holder and a graduate student who studies history and has been involved in pro-Palestinian advocacy at a university in the Northeast. They have worked closely with members of their local AAUP chapter in academic and political settings.

75.    Before the administration adopted the ideological-deportation policy, Noncitizen Student A regularly posted on social media, including about their academic work related to Israel and Palestine. Following the policy, however, Noncitizen Student A deleted their account on the social media platform X out of concern that their posts related to Palestine would make them a target for ideological deportation. They used their X account primarily for academic purposes; X

had been an important forum for them to publicize their academic work, to learn about research findings and opportunities in their discipline, and to network with other scholars, including members of the AAUP, their local AAUP chapter, and MESA. They also removed information about the content of their work from university-hosted websites.

76.    Noncitizen Student A has also been chilled from associating publicly with their peers and colleagues, including members of the AAUP, their local AAUP chapter, and MESA. Because of the ideological-deportation policy, they have declined to give speeches at campus protests and stayed away from rallies where law enforcement could be present; decided to pull out of a film screening and panel discussion related to indigenous studies that they had previously agreed to moderate; and cancelled their plans to attend a conference at which they had planned to speak on a panel about pro-Palestinian student movements.

### *Expressive and Associational Harms to Plaintiffs and their U.S. Citizen Members*

77.    The chill resulting from the ideological-deportation policy has caused significant harm to Plaintiffs and their U.S. citizen members.

<u>Plaintiffs</u>

78.    **<u>AAUP.</u>** Founded in 1915, the AAUP is one of the nation's oldest and largest membership associations and is dedicated to the advancement of higher education and academic freedom. Today, the AAUP has over 44,000 members, including faculty, graduate students, and other academic professionals based at universities across the country. These members are the lifeblood of the organization. The AAUP's leadership operates through a democratic process of engaging with its members in developing its positions and priorities and carrying out its initiatives. Throughout the year, the AAUP hosts in-person and virtual gatherings to facilitate discussions with its members about pressing topics in higher education and academic freedom. The gatherings

often draw hundreds of members. The leadership relies on these conversations in making virtually every decision of substance about the organization's work.

79.    The ideological-deportation policy has dramatically undermined the AAUP's ability to pursue its mission by deterring noncitizen members from participating in AAUP events. Many noncitizen members have also stayed away from AAUP gatherings over the last few weeks, particularly those that touch upon the Trump administration's efforts to deport pro-Palestinian students and to investigate universities for their handling of campus protests over the last eighteen months. The AAUP has heard directly from some of these noncitizen members, who explained that their decisions to disengage were based on fear. Noncitizen members who have nonetheless attended recent AAUP events on these topics have generally been silent. All of this has deprived the AAUP of the input of a significant segment of its membership, undermining the ability of the organization to learn from those members and represent their interests in the organization's policymaking, report writing, and public advocacy.

80.    For example, the AAUP recently hosted the first of a series of member gatherings to discuss the destruction of schools in Gaza. The purpose of the series was to inform the AAUP's position on and advocacy relating to the allegation that Israel has engaged in "scholasticide." Crucial to that purpose was hearing from a diverse range of the AAUP's membership, but some noncitizen members did not attend out of fear that the government might target them for their association with the event, and most of the noncitizen members who did appear kept their videos off and voices muted. The AAUP has had similar experiences with a range of other events, including conversations organized to allow discussion of academic freedom and Israel and Palestine, and an event last week at Columbia University directed at students and focused on the Trump administration's attacks on the university and how the AAUP should respond.

81.    The ideological-deportation policy has also required the AAUP to divert resources that it would otherwise devote to its mission. Its leadership has spent a significant percentage of its time counseling its noncitizen members on the risks of deportation for participating in pro-Palestinian protests and connecting noncitizen members with immigration attorneys. At the same time, the policy has caused many noncitizen leaders at AAUP chapters to step back from leadership positions and public appearances out of fear that they will be labeled as pro-Hamas or pro-terrorist and targeted for deportation on that basis.

82.    **Harvard-AAUP.** Harvard-AAUP is a membership association of Harvard faculty and researchers, with approximately 70 members, that advocates for meaningful and democratic shared university governance, academic freedom, and the economic security of those who perform the university's core instructional work. Harvard-AAUP seeks to advance that mission through organizing, advocacy, and coalition-building at Harvard, as well as by working with other AAUP chapters and the AAUP on issues of broad concern across the higher education sector.

83.    The ideological-deportation policy has impaired Harvard-AAUP's ability to pursue its mission by deterring noncitizen faculty and students from joining Harvard-AAUP. Harvard-AAUP has learned that some noncitizens who would have been eligible to become members of Harvard-AAUP have declined to join the organization out of fear that their membership and association with Harvard-AAUP could put them at risk of deportation. The participation of noncitizen members in Harvard-AAUP is uniquely important to the organization's mission. Given the large population of international faculty and students within the Harvard University community, noncitizen member participation contributes to Harvard-AAUP's strategic decision-making, event planning, recruiting, and engagement with the university. The ideological-deportation policy has deprived Harvard-AAUP of opportunities to hear from and associate with

an important segment of the community it serves, undermining the ability of the organization to learn from those prospective members and to represent their interests in pursuing the organization's goals.

84.     The ideological-deportation policy has also diverted the resources and attention that the Harvard-AAUP would otherwise use to focus on its core mission. Prior to the policy, Harvard-AAUP focused primarily on promoting more robust shared governance at the university, advancing the economic justice and institutional security of academic workers, and preserving academic freedom. Now, Harvard-AAUP devotes significant attention to advising and engaging the concerns of noncitizens on Harvard's campus who fear immigration consequences stemming from the ideological-deportation policy. For instance, Harvard-AAUP has worked with other groups at Harvard to organize information security trainings to help members of the university community protect against potential surveillance of their expressive activities online.

85.     **NYU-AAUP.** NYU-AAUP is a membership association made up of faculty across NYU's schools and campuses, with over 100 individual members. NYU-AAUP is dedicated to defending academic freedom at NYU and throughout the academy, encouraging participation in shared governance at NYU, and advancing the professional interests of NYU faculty and researchers. To fulfill its mission, NYU-AAUP holds two full membership meetings a semester, where members communicate and collaborate with one another on addressing important issues in higher education. Throughout the year, NYU-AAUP also hosts events open to the broader NYU community focused on advancing academic freedom. As a reflection of NYU's large population of international and noncitizen faculty and students, NYU-AAUP's membership includes many noncitizen members, who play a vital role in fulfilling NYU-AAUP's goals.

86.     The ideological-deportation policy has impaired NYU-AAUP's ability to advocate for its interests in concert with noncitizen faculty and students at NYU. For example, members of NYU-AAUP recently delivered a petition to the NYU administration urging the university to drop disciplinary charges against students who had engaged in pro-Palestinian activism. NYU-AAUP members felt the need to remove the names of all the signatories from the petition due to concerns that noncitizen signatories, including both faculty and students, could be targeted for deportation or visa revocation based on their decision to participate. The NYU administration discounted the petition in part because it lacked the names of the signatories. This undermined NYU-AAUP's ability to effectively advocate before the NYU administration, one of the organization's primary missions.

87.     The ideological-deportation policy has also required NYU-AAUP to divert resources that it would otherwise have used to pursue its core mission. NYU-AAUP's primary goals are to advance academic freedom and better facilitate faculty-university relations at NYU. But since the policy began, NYU-AAUP has been forced to devote increasing attention and resources to addressing the potential immigration consequences of the policy for noncitizen faculty and students. For example, NYU-AAUP is devoting resources to preparing "know your rights" materials related to immigration enforcement on NYU's campus. NYU-AAUP members and others in the NYU community have asked NYU-AAUP for immigration consultations, and it now often falls on NYU-AAUP to connect and guide members through NYU's immigration resources. Additionally, the policy has had an impact on the content of NYU-AAUP's events. For instance, NYU-AAUP recently hosted a faculty town hall to discuss the state of the university. The organizers of the event intended to spend much of the event discussing how federal funding freezes and executive orders targeting diversity, equity, and inclusion programs would impact life at NYU.

In the end, a significant part of the town hall focused on the threat of deportation noncitizen faculty and students face under the policy.

88.    **Rutgers AAUP-AFT.** Rutgers AAUP-AFT is a union representing more than 5,000 full-time faculty, graduate workers, postdoctoral associates, and Education Opportunity Fund counselors at Rutgers University. Rutgers AAUP-AFT is one of the oldest higher education unions in the country. It is also a chapter of the AAUP.

89.    The ideological-deportation policy has undermined Rutgers AAUP-AFT's ability to represent all bargaining unit members. Rutgers AAUP-AFT's research, pedagogy, and outreach depend on creating academic and community spaces where all members of its community, whether citizen or noncitizen, can fully participate. Noncitizen members, however, have shared with leadership that they are concerned that engaging on some research topics, such as racism and Israel and Palestine, could expose them to deportation. Many have also refrained from speaking out publicly or taking political action on these topics within the union because of the threat of deportation. Some noncitizen bargaining unit members have also expressed fears about joining the union because they are concerned it could invite targeting. When noncitizens do not join or speak out in the union, it becomes more difficult for Rutgers AAUP-AFT to represent the needs and priorities of all bargaining unit members, including by involving all union members in union leadership and decision making.

90.    The ideological-deportation policy has also required Rutgers AAUP-AFT to divert resources it would otherwise dedicate to its mission. Rutgers AAUP-AFT has had to devote time and resources to support noncitizen members who fear deportation, including by spending time organizing trainings, finding legal support for individual members, and engaging with university management to ensure that the university is taking appropriate action.

91.    **MESA.** MESA is a 501(c)(3) non-profit membership association that fosters the study of the Middle East, promotes high standards of scholarship and teaching, and encourages public understanding of the region and its peoples. Today, MESA has over 2,000 individual members, including faculty and students at universities across the country. MESA provides its members with programs, publications, and services that enhance research and education, recognize professional distinction, and defend academic freedom. MESA hosts an annual meeting that is the premiere conference for scholars who research the Middle East. The conference, which is the largest such gathering in the world, consists of four days of academic programming, professional development, job market interviews, networking, and special events. For MESA's members, the annual meeting is a critical forum for scholarship, intellectual exchange, and pedagogical innovation. MESA also publishes the *International Journal of Middle East Studies*, the leading peer-reviewed scholarly journal on the region, the *MESA Review of Middle East Studies*, a biannual newsletter, and frequent advocacy letters.

92.    The ideological-deportation policy has substantially harmed MESA's ability to pursue its mission by deterring noncitizen scholars of the Middle East from joining MESA or participating in MESA's events. A substantial portion of MESA's members are interested in studying the Middle East because of their own personal or family background in the region, which makes them invaluable members of MESA's academic community. Due to their personal connections, heritage, and language skills, these members are often the most effective ethnographers and most skilled archival researchers working in the discipline. Many of these members are also noncitizens who, due to fears of being targeted for deportation based on the content of their scholarship, have scaled back their participation in MESA's events and projects. This chill has undermined MESA's core function as a scholarly association that facilitates the

exchange of pedagogical insights, academic expertise, and novel research between its members and advocates for their academic freedom.

93.    For example, noncitizen members of MESA have expressed concern about attending MESA's annual meeting, which is scheduled to take place in November 2025 in Washington, DC, for fear that their attendance at the conference will expose them to the attention of immigration authorities. As described above, MESA's annual meeting is a landmark conference in the discipline and is MESA's marquee event. Each year, MESA solicits paper proposals for the conference by mid-February. This year, after the administration's adoption of the ideological-deportation policy, a number of scholars who would usually submit proposals informed MESA that they were unable to meet the deadline, or afraid of attending the meeting, due to its location. In particular, international members outside of the United States expressed fears that they would be denied entry or harassed because of the policy of ideological deportation. Noncitizen members also reported being overwhelmed and unable to focus on making medium-term plans because of their fear that their scholarship and speech about the Middle East might become the basis for targeting by the government. Because submissions at the initial deadline were almost 40 percent below where they should have been, based on past meetings in Washington, DC, MESA granted an across-the-board extension. After MESA extended the deadline, there was still a sharp drop in the number of submissions compared to prior years. At present, participation in the 2025 annual meeting is projected to fall 10 percent below the expected level. Due to its members' fears of ideological deportation, including harassment by officials based on their scholarly activities, MESA's annual meeting will have lower attendance, garner fewer contributions to the scholarly field, and provide a less effective opportunity for intellectual exchange. Moreover, members' reports of self-censorship in research and scholarship for fear of being targeted by the government

is expected to depress participation in the meeting and reduce submissions to MESA's publications, particularly concerning Israel and Palestine.

94.     The ideological-deportation policy has also required MESA to divert resources it would otherwise devote to its mission. The annual meeting is a key recruitment vehicle for MESA, and reduced attendance means fewer dues-paying MESA members. MESA's leadership, staff, and volunteer faculty now spend more time and energy responding to crises stemming from the policy than on scholarship. For example, MESA's Committee on Academic Freedom and MESA's Task Force on Civil and Human Rights have both been inundated with requests for assistance from noncitizen members who fear ideological deportation. Before the policy, these advocacy committees addressed each member's request for assistance individually. Now, they spend time developing triage criteria for prioritizing certain requests. MESA leadership has worked to develop new and different programming, such as know your rights workshops and meetings with legal services groups, that would not typically fall under the purview of a scholarly association. Because so many MESA members are fearful of ideological deportation, MESA is beginning a new monthly message to provide members with resources and information about MESA's response to the policy. As a result, MESA has far fewer resources available for its regular academic programming.

Plaintiffs' Members

95.     **Aslı Bâli.** Aslı Bâli is a professor of law at Yale Law School. Bâli's scholarship and teaching focus on international human rights law and comparative constitutional law. She is a U.S. citizen, a member of the AAUP and MESA, and the president of MESA.

96.     The ideological-deportation policy has harmed Bâli's ability to hear from and engage with her noncitizen colleagues and students. As the president of MESA, Bâli is receiving a cascade of requests for advice and assistance from noncitizen students and colleagues who fear

that they will be targeted for deportation based on their speech. Many of these individuals have deleted their social media profiles, removed online references to their involvement in campus groups that have supported Palestinian rights, and taken down previously public writing about Palestine. One noncitizen colleague is considering declining an offer to chair their department out of concern that they might be limited in what they could say or do in the role without making themselves a target for deportation. Bâli has lost the benefit of these colleagues' and students' participation in events and programming and is no longer able to freely communicate with them about their views and opinions.

97.     The policy has also limited Bâli's ability to associate with noncitizen members of the AAUP and MESA, and it has undermined her academic work. Because of her noncitizen colleagues' fears of ideological deportation, Bâli now hesitates to approach noncitizens to be co-authors, which harms her ability to produce scholarly work. Additionally, Bâli recently felt she had to propose moving the participation of some colleagues in a conference scheduled to take place in April at Yale Law School entirely online because of concerns for the safety of noncitizen participants. This change would mean that participants will no longer be together in the same space to mingle and discuss ideas, which significantly reduces the value of an academic conference.

98.     **Beth Baron.** Beth Baron is a distinguished professor of History at the City University of New York. Baron's scholarship focuses on the history of medicine in Egypt. She is a U.S. citizen and a member of MESA.

99.     The ideological-deportation policy has harmed Baron's ability to receive information from her noncitizen students. Several of Baron's noncitizen students, some of whom are members of MESA, are now afraid to travel abroad to visit archives and libraries that have historical sources critical to their research because they fear they will not be allowed back into the

country. This fear of travel due to the policy significantly limits the set of topics Baron's students can research or write about, which diminishes her own, and her department's, ability to benefit from these students' work. Baron has also heard from noncitizen students who have removed content from their social media accounts, taken down images and content from websites, and who are self-censoring in their teaching, especially on topics related to Israel and Palestine and U.S. foreign policy. These students have taken these actions out of a fear that their speech could lead to them being targeted for deportation. Baron has been deprived of these students' insights and experiences, which she otherwise would have valued engaging with.

100.    The policy has also limited Baron's ability to associate and assemble with noncitizen colleagues and students. Baron recently attended an academic event related to Palestine that was accessible only in-person because the organizers decided not to allow people to access the event remotely, out of fear that doing so would expose noncitizen participants to deportation. Prior to the policy, Baron attended anti-war demonstrations with noncitizen students and colleagues. Now, many of those individuals have stopped attending protests because they are afraid of being deported.

101.    **Patricia Dailey.** Patricia Dailey is an associate professor of English and Comparative Literature at Columbia University. She specializes in medieval literature and critical theory. Dailey is a U.S. citizen and a member of the AAUP.

102.    The ideological-deportation policy has harmed Dailey's ability to hear perspectives she values as a member of her university community, and to associate with other members of the AAUP. Dailey was a member of an independent and long-running online community made up of Columbia faculty and staff, including other AAUP members. The goal of this community was to share information about the university and facilitate collective organizing. Dailey relied on the

community to engage with other members of the Columbia community, including AAUP members, and to stay informed about university-related topics as well as political issues, including issues related to Israel and Palestine. Fearing that the community's content about Israel and Palestine could now jeopardize the immigration status of noncitizen members, however, the organizer of the online community, who is a noncitizen, recently decided to delete it. As a result, Dailey has lost access to views and information she found valuable, and she is no longer able to engage with other AAUP members as she once did.

103.    **Nadia Abu El-Haj.** Nadia Abu El-Haj is a professor of anthropology at Barnard College, Columbia University and the Co-Director of the Center for Palestine Studies ("CPS") at Columbia University. Abu El-Haj's scholarship focuses on Zionism, Israel, and Palestine. She is a U.S. citizen and a member of MESA and the AAUP.

104.    The ideological-deportation policy has harmed Abu El-Haj's ability to hear from and associate with her noncitizen colleagues and students. One of her noncitizen students, who previously contributed to many events on campus and posted useful updates from Arabic language news reports on social media, has now ceased participating in events and deleted their social media accounts for fear of losing their student visa. Another noncitizen student, who was once a leading pro-Palestinian voice on campus, has stopped speaking publicly and has gone into hiding since Khalil's arrest, out of fear that ICE might arrest or detain them. In response to her noncitizen students' and colleagues' concerns about ICE raids at campus events, Abu El-Haj cancelled a CPS event that was scheduled to take place in February. She is considering cancelling another upcoming CPS event for the same reason. The policy has thus impaired Abu El-Haj's ability to learn from and meet with these students and to host CPS events.

105.    **Noura Erakat.** Noura Erakat is a professor of Africana studies and Criminal Justice at Rutgers University. Her research and teaching focus on international law, including human rights law. She is a U.S. citizen and a member of MESA.

106.    The ideological-deportation policy has harmed Erakat's ability to hear from her noncitizen colleagues and students. Noncitizen colleagues with whom Erakat collaborates closely have paused work on ongoing projects related to Palestine out of concern that they will be targeted for ideological deportation. One colleague, for example, paused their contributions to a legal research project that they are drafting in collaboration with Erakat after learning of Khalil's arrest. Erakat has also observed that noncitizens students are less willing to speak in class and in public about Palestine or related issues, even if those issues relate to their personal experiences. Because her scholarship relies on narratives from conflict zones, her work suffers when noncitizens are chilled from sharing their experiences.

107.    **Joseph Howley.** Joseph Howley is an associate professor of Classics and the Paul Brooke Program Chair for Literature Humanities at Columbia. Howley's current scholarship and teaching focus on the history of the book and Greek and Latin literature, among other topics. He is a U.S. citizen and a member of the AAUP.

108.    The ideological-deportation policy has limited Howley's ability to hear from and engage with his noncitizen colleagues and students, and it has undermined his teaching. As program chair of the year-long Literature Humanities course in Columbia's Core Curriculum, Howley supervises graduate students who instruct weekly seminars with undergraduate students to discuss significant works from a range of perspectives across time and cultures. In his regular teaching sessions with instructors, he has observed that many noncitizen instructors have stopped attending in recent weeks, and that those who do attend are preoccupied with fears of deportation

and unable to focus on the course material. One noncitizen instructor told Howley they feared deportation based on their attendance merely as a bystander at a protest last year. Howley has also heard from noncitizen colleagues that are considering not teaching topics related to Israel and Palestine or political activism that they might otherwise have taught.

109.    The policy has also harmed Howley's right to assemble with his noncitizen colleagues and students to engage in public advocacy. Howley joined other faculty and staff members in de-escalation efforts outside the Columbia solidarity encampment in April 2024. Following the police sweep of the encampment on April 18, he appeared alongside Mahmoud Khalil and other speakers at an emergency press conference, to criticize the school president's decision to have police arrest students at the encampment. On April 22, Howley joined hundreds of citizen and noncitizen faculty at Columbia in a walkout protesting that same decision. But when he spoke at a press conference convened by the AAUP following Khalil's arrest this month, he was backed only by citizen members of faculty and staff. He understood that noncitizen members who previously would have joined him were too afraid to do so now, given the threat of deportation under the policy. It is now much more difficult for Howley to coordinate de-escalation efforts with noncitizen colleagues, including one who is now afraid to move freely around the Columbia campus and surrounding neighborhood.

110.    **Maya Jasanoff.** Maya Jasanoff is a professor of History at Harvard. Jasanoff's scholarship and teaching focus on the history of the British empire. She is a U.S. citizen and a member of Harvard-AAUP and the AAUP.

111.    The ideological-deportation policy has harmed Jasanoff's ability to hear from her noncitizen colleagues and students. She has recently observed that noncitizen colleagues and students are reluctant to speak publicly about politics and world affairs out of concern that they

will be targeted for ideological deportation. The silencing of noncitizen colleagues and students directly impacts Jasanoff's work. Because she studies the British empire, which covered nearly a quarter of the globe at its peak, she relies on the perspectives of students and colleagues from around the world to inform her scholarship and teaching.

112.    **Lauren Kaminsky.** Lauren Kaminsky is an associate senior lecturer and the director of studies for the Committee on Degrees in History and Literature at Harvard. Kaminsky's scholarship and teaching focus on European history. She is a U.S. citizen and a member of Harvard-AAUP and the AAUP.

113.    The ideological-deportation policy has harmed Kaminsky's ability to hear from, as well as associate and assemble with, her noncitizen colleagues and students. She has observed that noncitizen colleagues—even those who previously felt secure in their immigration status—have recently refrained from teaching classes or speaking publicly on increasingly politicized topics, including Palestine, and noncitizen colleagues and students have recently refrained from writing on these topics. Kaminsky is also aware of several noncitizens who have declined to join Harvard-AAUP in recent weeks out of fear that their membership could put them at risk. She has observed that noncitizen colleagues have been less willing to attend political gatherings in recent weeks.

114.    **Rebecca Karl.** Rebecca Karl is a professor of History at NYU. Karl's research and teaching focus on modern Chinese history, as well as the history of social theory, feminism, Mao Zedong Thought and Marxism, and global revolution. Karl is a U.S. citizen, a member of the AAUP, and a former president and now member-at-large of NYU-AAUP.

115.    The ideological-deportation policy has limited Karl's ability to hear and engage with perspectives and scholarship she values. As a student of and researcher on histories of repressive regimes, Karl is interested in the multiple ways in which marginalized people

understand their lives and worlds. As a Jew, she is particularly interested in the history of antisemitism and Zionism and has helped organize educational events at NYU on those topics. In doing so, she has sought out and engaged with the views of citizen and noncitizen colleagues. Following the adoption of the policy, however, some noncitizen colleagues have been forced to take down research and scholarly work that was previously available online, and have ceased speaking publicly about issues related to Israel and Palestine; others have declined public speaking opportunities.

116.    The policy has undermined Karl's ability to assemble with noncitizen faculty and students to engage in public advocacy. Over the last year and a half, Karl has regularly engaged in pro-Palestinian protests and public advocacy at NYU. Since the implementation of the policy, however, Karl has noticed a significant decrease in the participation of noncitizen faculty and students in pro-Palestinian expression, including petition-signing and public letter signing.

117.    **Chenjerai Kumanyika.** Chenjerai Kumanyika is an assistant professor at NYU's Arthur L. Carter Journalism Institute. He specializes in using audio journalism to critically investigate the way Americans understand issues such as race, the Civil War, and policing. He is also the Peabody Award–winning host of the *Empire City* podcast, which focuses on the history of the New York Police Department. Kumanyika is a U.S. citizen, a member of the AAUP and NYU-AAUP, and an elected at-large council member of the AAUP.

118.    The ideological-deportation policy has limited Kumanyika's ability to hear and engage with perspectives and scholarship critical to his work. Kumanyika has collaborated in his research and scholarship with scholars across the university working on interdisciplinary initiatives that address issues of inequality and justice in the U.S. and transnationally. These scholars include noncitizens who have concerns about the public visibility of their research and scholarship because

of the ideological-deportation policy. Some of these scholars have removed research and scholarship from the internet because they fear this research and scholarship could expose them to deportation.

119.    **David Kurnick.** David Kurnick is a professor of English at Rutgers University. His research and teaching interests include the history and theory of the novel, narrative theory, and sexuality and gender, with an emphasis on the nineteenth century. He is a U.S. citizen and a member of the AAUP and Rutgers AAUP-AFT.

120.    The ideological-deportation policy has limited Kurnick's ability to associate with his noncitizen colleagues and students. Several graduate and undergraduate students that Kurnick associates with have informed him that they have decided to refrain from signing anything related to Israel and Palestine, and to refrain from participating in any pro-Palestinian marches or demonstrations, out of fear of being targeted for deportation. Kurnick has also abstained from any public discussion of matters relating to Israel and Palestine with his noncitizen students. Instead, he has limited his communications with noncitizen students to in-person conversations. Kurnick is also responsible for the English Department's graduate admissions process this year, and some admitted students outside the U.S. have expressed hesitation about coming to study inside the United States because of concerns that the ideological-deportation policy would force them to self-censor.

121.    **Zachary Lockman.** Zachary Lockman is a professor of Middle Eastern and Islamic Studies and of History at NYU. His research and teaching focus on the modern history of the Middle East. He is a U.S. citizen and a member of the AAUP, NYU-AAUP, and MESA. He chairs the subcommittee of MESA's Committee on Academic Freedom that seeks to address threats to academic freedom in the United States and Canada.

122.    The ideological-deportation policy has harmed Lockman's ability to hear from and engage with his noncitizen colleagues and students. Lockman relies on the perspectives of noncitizen colleagues and students to enrich his work in Middle East studies. Some of his noncitizen colleagues in MESA have recently declined invitations to speak at academic events, however, due to concern that increased visibility could lead to their deportation. Others have censored their syllabi for the same reason. Lockman has also observed that noncitizen students are less willing to speak in class and in public about Palestine or related issues, even if those issues relate to their countries of origin. And he is aware of noncitizen graduate students who have altered their research plans to avoid international travel because they fear having their visas or green cards revoked based on their pro-Palestinian expression or association. As a result, Lockman and his colleagues are deprived of the results of this research.

123.    **Vasuki Nesiah.** Vasuki Nesiah is a professor of practice at NYU's Gallatin School of Individualized Study, and faculty director of the Gallatin Global Fellowship in Human Rights. Nesiah's scholarship and teaching focus on human rights and international law. She is a U.S. citizen and a member of the AAUP and NYU-AAUP.

124.    The ideological-deportation policy has limited Nesiah's ability to hear from and engage with her noncitizen colleagues and students, and it has undermined her teaching. Prior to the policy's adoption, Nesiah frequently talked with noncitizen colleagues about Israel and Palestine and academic freedom to discuss these and other sensitive issues. Since the policy's implementation, Nesiah's noncitizen colleagues have become increasingly unwilling to discuss these topics in public or private. In a recent academic panel that Nesiah participated in, for example, the panel was simply advertised as a conversation without the names of the panelists or their institutional affiliations because another panelist feared retaliation under the policy. These

measures reduced attendance and hindered the dialogue and sharing of research that is critical to Nesiah's academic work. Similarly, many of her noncitizen colleagues who live outside of the United States are now unwilling to attend academic events inside the country for fear that they will be detained and deported. For instance, several colleagues who typically attend the Law and Society Association Annual Meeting (to be held in Chicago in May 2025) have informed her that they will not attend for this reason. Because her field of international law is particularly engaged with the work of scholars who live abroad, these withdrawals hamper Nesiah's research. The policy has also chilled student discussion on campus, with many noncitizen students now avoiding the topic of Israel and Palestine out of fear that they will be targeted for deportation if they discuss it. Some noncitizen students have also expressed concern about even showing up to class, and there have been conversations among her colleagues about conducting classes over Zoom, which Nesiah considers to be a poor substitute for in-person teaching.

125.     The policy has also limited Nesiah's ability to associate with noncitizen colleagues. For example, a noncitizen colleague who had signed an open letter related to academic freedom that Nesiah and her colleagues had recently organized asked that their name be removed from the letter, because they feared that signing the letter would make them a target for deportation under the policy.

126.     **Sonya Posmentier.** Sonya Posmentier is an associate professor of English at NYU and the director of graduate studies in the NYU English department. Her research and teaching interests include African American and Black Diasporic literature and culture, poetry and poetics, and abolition. She is a U.S. citizen, a member of the AAUP and NYU-AAUP, and a member of NYU-AAUP's executive committee.

127.    The ideological-deportation policy has limited Posmentier's ability to hear and engage with perspectives and scholarship critical to her work. For example, Posmentier had planned to attend a conference concerning Israel and Palestine to hear a noncitizen scholar deliver a talk in their area of expertise, but that individual was forced to pull out of the conference due to a fear of deportation under the policy. As a result, Posmentier missed an opportunity to engage with and learn from that scholar, distorting Posmentier's academic community, which depends on the exchange of ideas and information between scholars. In addition, the NYU chapter of a pro-Palestinian faculty group recently removed all videos of teach-ins and public-facing events since October 2023 out of a fear that leaving the videos up would expose noncitizen colleagues featured in the videos to deportation. These videos focus on a range of topics, including definitions of antisemitism, the global university, and scholasticide. The removal of these videos prevents Posmentier and many others from listening to and learning from those conversations, as well as using them as a resource in research and teaching.

128.    The policy has limited Posmentier's ability to associate with her noncitizen colleagues and students. Posmentier has been working with her students on a collaborative publication about abolition movements that addresses the intersection of the incarceration of Black and Brown Americans, immigrant detention in the United States, the war in Gaza and the Israeli occupation, and the criminalization of pro-Palestinian protest on university campuses. The group had planned to publish and distribute the publication and hold a launch event including readings and performance. In consultation with her students, however, Posmentier has decided not to move forward with this plan because of student fears that it could lead to noncitizen contributors to being targeted for deportation. This deprives the entire department of the contributors' many valuable insights.

129.    **Judith Surkis.** Judith Surkis is a professor of History at Rutgers University and Director of Graduate Studies in the History Department. She specializes in Modern European History, with an emphasis on France and the French Empire, gender and sexuality, and intellectual, cultural, and legal history. She is a U.S. citizen and a member of the AAUP and Rutgers AAUP-AFT.

130.    The ideological-deportation policy has limited Surkis's ability to associate with her noncitizen colleagues and students. As a member of Rutgers Faculty for Justice in Palestine, she has witnessed a radical decline in public engagement by noncitizen students and faculty on the question of Palestine since the announcement of the ideological-deportation policy. She has also noticed that noncitizen faculty are more hesitant to speak about or even attend events that address Palestine. The inability of noncitizen students and faculty to freely participate in these events deprives Surkis of their experiences and insights.

131.    The policy has also forced Surkis to modify how she advises noncitizen graduate students in her department. Surkis previously encouraged students to travel abroad to conduct the necessary field research to write their seminar papers, devise their dissertation topics, and ultimately write their dissertations. Now, she is reluctant to recommend that they travel for their studies, because she fears some of these students may be denied re-entry, detained, and even stripped of their visas on return.

132.    **Kirsten Weld.** Kirsten Weld is a professor of History at Harvard. Weld's research focuses on modern Latin America and explores struggles over inequality, justice, historical memory, and social inclusion. She is a U.S. citizen and a member of the AAUP and Harvard-AAUP. She also serves as Harvard-AAUP's president.

45

133.     Weld has observed that following the administration's adoption of the ideological-deportation policy, many noncitizen students, staff, and faculty colleagues, particularly those who had been involved in pro-Palestinian organizing, have retreated from ordinary university life. Rather than engaging with the university community and participating in educational and developmental activities, noncitizen students, staff, and faculty have devoted significant attention and resources to preparing for potential immigration consequences that may result from their past expressive activities. Additionally, some noncitizen students who had previously spoken or written publicly about Israel and Palestine have now ceased participating publicly on those issues out of fear that doing so will lead to deportation. Weld valued hearing from noncitizen students on these topics, and is now deprived of receiving the speech of those who have been chilled by the policy.

## CAUSES OF ACTION

### COUNT I
### The ideological-deportation policy
### violates the First Amendment

134.     The ideological-deportation policy violates the First Amendment because it entails the arrest, detention, and deportation of noncitizen students and faculty on the basis of, or in retaliation for, their political viewpoints; because it burdens the rights of Plaintiffs and their U.S. citizen members to hear from, and associate with, those noncitizen students and faculty; and because the policy is not narrowly tailored to any compelling governmental interest.

135.     To the extent Defendants rely on the security and related grounds of inadmissibility, including the endorse and espouse and foreign policy provisions, as the basis for carrying out the policy, those provisions violate the First Amendment as applied for substantially the same reasons.

## COUNT II
### Defendants' threats to punish constitutionally protected speech
### violate the First Amendment

136.    Defendants' threats to arrest, detain, and deport noncitizen students and faculty based on their political viewpoints violates the First Amendment because the threats are coercive and would chill individuals of ordinary firmness from exercising their expressive and associational rights.

## COUNT III
### The ideological-deportation policy
### violates the Fifth Amendment

137.    The ideological-deportation policy violates the Fifth Amendment because it invites arbitrary and discriminatory enforcement.

138.    To the extent Defendants rely on the security and related grounds of inadmissibility, including the endorse and espouse and foreign policy provisions, as the basis for carrying out the policy, those provisions violate the Fifth Amendment as applied because they invite arbitrary and discriminatory enforcement; and because they fail to give noncitizen students and faculty fair warning as to what speech and association the government believes to be grounds for arrest, detention, and deportation.

## COUNT IV
### The ideological-deportation policy
### violates the APA

139.    The ideological-deportation policy violates the APA because it is arbitrary, capricious, an abuse of discretion, and contrary to constitutional right, and because it exceeds Defendants' statutory authority. 5 U.S.C. § 706(2)(A)–(C).

### REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court:

A.    Declare that the ideological-deportation policy violates the First and Fifth Amendments and the APA, and set the policy aside.

B.    Enjoin Defendants from implementing or enforcing the ideological-deportation policy—including, without limitation, through investigation, surveillance, arrest, detention, deportation, or any other adverse action.

C.    Declare that Defendants' threats to arrest, detain, and deport noncitizen students and faculty based on their political viewpoints violates the First Amendment, and enjoin Defendants from continuing to make those threats.

D.    To the extent Defendants rely on the security and related grounds of inadmissibility, including the endorse and espouse and foreign policy provisions, as the basis for carrying out the policy, declare that those provisions violate the First and Fifth Amendments as applied, and enjoin Defendants from applying those provisions.

E.    Award Plaintiffs reasonable costs and attorneys' fees incurred in this action.

F.    Grant such other and further relief as the Court may deem just and proper.


March 25, 2025                                    Respectfully submitted,

 /s/ Edwina Clarke                                  /s/ Ramya Krishnan
Edwina Clarke, BBO 699702              Ramya Krishnan*
Zimmer, Citron & Clarke, LLP           Carrie DeCell*
130 Bishop Allen Drive                       Xiangnong Wang*
Cambridge, MA 02139                        Talya Nevins**
(617) 676-9423                                    Jackson Busch*
edwina@zimmercitronclarke.com     Alex Abdo*
                                                            Jameel Jaffer*
                                                            Knight First Amendment Institute
                                                              at Columbia University
                                                            475 Riverside Drive, Suite 302
                                                            New York, NY 10115
                                                            (646) 745-8500

ramya.krishnan@knightcolumbia.org

Ahilan T. Arulanantham* (SBN 237841)
Professor from Practice
UCLA School of Law
385 Charles E. Young Dr. East
Los Angeles, CA 90095
(310) 825-1029
arulanantham@law.ucla.edu

*Counsel for Plaintiffs*

\**pro hac vice* application forthcoming
\*\*admission to the bar pending