# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, | |
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS-HARVARD FACULTY CHAPTER, | Civil Action No. 1:25-cv-10685-WGY |
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS AT NEW YORK UNIVERSITY, | |
| RUTGERS AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS-AMERICAN FEDERATION OF TEACHERS, and | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |
| MIDDLE EAST STUDIES ASSOCIATION, | |
| Plaintiffs, | |
| v. | |
| MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, | |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security, and the DEPARTMENT OF HOMELAND SECURITY, | |
| TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement, | |
| DONALD J. TRUMP, in his official capacity as President of the United States, and | |
| UNITED STATES OF AMERICA, | |
| Defendants. | |

# Table of Contents

Table of Authorities ................................................................................................ ii

Introduction .......................................................................................................... 1

Factual Background .............................................................................................. 2

Argument .............................................................................................................. 7

    I.    Plaintiffs have standing. ......................................................................... 7

        A.    Plaintiffs have associational standing to assert the rights of their U.S. citizen members. .......................................................................... 7

        B.    Plaintiffs have organizational standing. .......................................... 9

    II.    Plaintiffs are likely to succeed on the merits. .................................... 11

        A.    The ideological-deportation policy violates the First Amendment. ............... 11

        B.    Defendants' coercive threats independently violate the First Amendment. ................................................................................. 14

        C.    The ideological-deportation policy violates the Fifth Amendment. .............. 15

        D.    The ideological-deportation policy violates the APA. ..................... 16

            1.    The ideological-deportation policy is subject to review under the APA. ............................................................................. 16

            2.    The ideological-deportation policy is contrary to constitutional right and arbitrary and capricious. ..................................... 18

    III.    The other preliminary injunction factors support relief. ...................... 19

Conclusion .......................................................................................................... 20

## Table of Authorities

**Cases**

*Abourezk v. Reagan*, 592 F. Supp. 880 (D.D.C. 1984), *vacated and remanded on other grounds*, 785 F.2d 1043 (D.C. Cir. 1986) .................................................. 13, 18

*Allende v. Shultz*, 605 F. Supp. 1220 (D. Mass. 1985), *aff'd*, 845 F.2d 1111 (1st Cir. 1988) .............................................................................................................. 13

*Am. Acad. of Religion v. Chertoff*, 463 F. Supp. 2d 400 (S.D.N.Y. 2006), *aff'd sub. nom. Am. Acad. of Religion v. Napolitano*, 573 F.3d 115 (2d Cir. 2009) ...................... 14

*Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045 (9th Cir. 1995) ...................... 11, 13

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) ........................................................ 14, 15

*Bennett v. Spear*, 520 U.S. 154 (1997) ................................................................................ 17

*Berge v. Sch. Comm. of Gloucester*, 107 F.4th 33 (1st Cir. 2024) ................................................ 14

*Berner v. Delahanty*, 129 F.3d 20 (1st Cir. 1997) .............................................................. 9

*Biden v. Texas*, 597 U.S. 785 (2022) ..................................................................................... 17

*Bridges v. Wixon*, 326 U.S. 135 (1945) ................................................................................ 11

*Cook Cnty. v. Wolf*, 962 F.3d 208 (7th Cir. 2020) .............................................................. 2

*CSL Plasma Inc. v. CBP*, 33 F.4th 584 (D.C. Cir. 2022) ..................................................... 18

*Elrod v. Burns*, 427 U.S. 347 (1976) ..................................................................................... 19

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) .................................................... 19

*Gentile v. State Bar of Nev.*, 501 U.S. 1030 (1991) ............................................................ 11

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) .............................................................. 16

*Harper v. Werfel*, 118 F.4th 100 (1st Cir. 2024) ................................................................. 17

*Harvard Law Sch. Forum v. Shultz*, 633 F. Supp. 525 (D. Mass. 1986), *vacated without opinion*, 852 F.2d 563 (1st Cir. 1986) ................................................... 13

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ...................................................... 10

*Hill v. Lappin*, 630 F.3d 468 (6th Cir. 2010) ....................................................................... 15

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ................................................... 12, 19

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) ................................................ 7

*In re Fin. Oversight and Mgmt. Bd. for P.R.*, 110 F.4th 295 (1st Cir. 2024) ............................... 7

*Kleindienst v. Mandel*, 408 U.S. 753 (1972) ................................................................... 8, 13

*Kwong Hai Chew v. Colding*, 344 U.S. 590 (1953) ............................................................ 11

*Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965) ............................................................. 8

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ........................... 17

*Louis v. Saferent Sols., LLC*, 685 F. Supp. 3d 19 (D. Mass. 2023) ....................................... 10

*Mangual v. Rotger-Sabat*, 317 F.3d 45 (1st Cir. 2003) ..................................................... 9

*Massieu v. Reno*, 915 F. Supp. 681 (D.N.J. 1996), *rev'd on other grounds*, 91 F.3d 416 (3d Cir. 1996) ........................................................................................ 16

*Melone v. Coit*, 100 F.4th 21 (1st Cir. 2024) ............................................................ 18

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) ................................................. 14

*Nken v. Holder*, 556 U.S. 418 (2009) ..................................................................... 19

*Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18 (1st Cir. 2007) ................................. 18

*Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003) ........................................................ 15

*Parcham v. INS*, 769 F.2d 1001 (4th Cir. 1985) .......................................................... 12

*Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500 (D.C. Cir. 2016) ....................................... 19

*Ragbir v. Homan*, 923 F.3d 53 (2d Cir. 2019), *cert. granted, judgment vacated on other grounds sub nom. Pham v. Ragbir*, 141 S. Ct. 227 (2020) .................................... 11, 12

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ........................................................... 8

*Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ............................ 12

*Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, 123 F.4th 1 (1st Cir. 2024) ......... 16, 17

*Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1 (1st Cir. 2012) ............. 19, 20

*Stanley v. Georgia*, 394 U.S. 557 (1969) ................................................................ 8

*Suarez Corp. Indus. v. McGraw*, 202 F.3d 676 (4th Cir. 2000) .......................................... 15

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) .................................................. 12

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) ................................................ 17

**Statutes**

5 U.S.C. § 704 ............................................................................................................................. 16

5 U.S.C. § 705 ......................................................................................................................... 2, 18

5 U.S.C. § 706 ............................................................................................................................. 18

8 U.S.C. § 1101 ........................................................................................................................... 18

## Introduction

Plaintiffs are associations of faculty and students, including both citizens and noncitizens, at universities across the country. They have watched with alarm as the defendant agencies have implemented a policy of revoking the visas of and arresting, detaining, and deporting noncitizen students and faculty who participate in pro-Palestinian protests and other related expression and association (the "ideological-deportation policy"). Pursuant to this policy, the agencies have sought to deport a fast-growing number of students and faculty based on lawful political expression. After federal agents seized one of these individuals—Mahmoud Khalil, a recent Columbia University graduate and a lawful permanent resident—President Trump warned: "This is the first arrest of many to come."

Plaintiffs now move this Court for preliminary relief. They are likely to succeed on the merits of their claims: the policy violates the First Amendment because it targets individuals on the basis of lawful political speech, and it violates the Fifth Amendment because it is impermissibly vague; Defendants' attendant threats independently violate the First Amendment because they are coercive and retaliatory; and the policy violates the Administrative Procedure Act ("APA") because it is contrary to constitutional right and arbitrary and capricious. Absent preliminary relief, Plaintiffs and their U.S. citizen members will continue to suffer the irreparable injury of being denied the ability to hear from and associate with the many noncitizen students and faculty the policy has cowed into silence. The public interest and balance of equities also favor preliminary relief because the government's interest mirrors the public interest, and here, the public's interest is in lifting the pall of fear that now hangs over the nation's university campuses, and in hearing from noncitizen students and faculty on issues that are the subject of intense public debate.

For these reasons, Plaintiffs move the Court for an order preliminarily enjoining the policy and the administration's attendant campaign of threats against noncitizen students and faculty based on their pro-Palestinian expression and association; and for an order staying the policy under the APA, 5 U.S.C. § 705; *see Cook Cnty. v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020) (applying same standard for stay under § 705 as for preliminary injunction).

## Factual Background

### *The Ideological-Deportation Policy*

To implement two executive orders that President Trump issued shortly after taking office, the defendant agencies announced that they would carry out large-scale visa revocations, arrests, detentions, and deportations of noncitizen students and faculty who have participated in pro-Palestinian protests and other related expression and association. Compl. ¶¶ 25–29; Krishnan Decl. Exs. B, C, D. Pursuant to the policy, the agencies have attempted to deport at least five people and they have made clear that they intend to target many more.

One of the first people targeted under the policy was Mahmoud Khalil, a recent Columbia University graduate whom ICE agents arrested at his university-owned housing on March 8. Krishnan Decl. Ex. K at 1–2. In explaining their decision to target Khalil, the agencies emphasized that "[t]he allegation here is not that he was breaking the law," *id.* Ex. K at 1, but rather that he participated in pro-Palestinian protests that the administration deemed pro-Hamas. In a post made to X on March 9, DHS asserted that Khalil had led activities "aligned to" Hamas, and that ICE had arrested Khalil "in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State[.]" *Id.* Ex. H. In an interview two days later, Deputy Secretary of Homeland Security Troy Edgar made it even clearer both that the administration was equating "pro-Palestinian" with "pro-Hamas" and that the agencies had targeted Khalil based on

his political speech. *Id.* Ex. N. When asked to clarify how Khalil had supported Hamas, Edgar pointed only to his involvement in pro-Palestinian protests: "Well, I think you can see it on TV, right? This is somebody that we've invited and allowed the student to come into the country, and he's put himself in the middle of the process of basically pro-Palestinian activity." *Id.* Ex. N at 4–5. When asked if that meant any criticism of Israel or the United States is "a deportable offense," he said: "Let me put it this way, . . . imagine if he came in and filled out the form and said, 'I want a student visa.' They asked him, 'What are you going to do here?' And he says, 'I'm going to go and protest.' We would have never let him into the country." *Id.* Ex. N at 5.

The defendant agencies have made clear that they intend to target other noncitizen faculty and students under the policy. The day after Khalil's detention, Secretary of State Rubio shared a news story about Khalil's arrest on X and warned: "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported." *Id.* Ex. I. That same day, DHS posted to X: "ICE and the Department of State are committed to enforcing President Trump's executive orders and to protecting U.S. national security." *Id.* Ex. H. President Trump himself posted on Truth Social the next day announcing that Khalil's was "the first arrest of many to come," *Id.* Ex. J, and on March 16, Rubio reiterated this message, stating: "[W]e're going to do more. In fact, every day now we're approving visa revocations, and, if that visa led to a green card, the green card process as well.*" Id.* Ex. R at 7.

Since Khalil's arrest, the defendant agencies have revoked the visas (and purported to "revoke" the green cards) of multiple other students and faculty based on their pro-Palestinian advocacy. They include Ranjani Srinivasan, a doctoral student at Columbia University and Adjunct Assistant Professor of Urban Planning at New York University ("NYU"); Yunseo Chung, a legal permanent resident and Columbia University student who has lived in the United States

since she was seven; Badar Khan Suri, a postdoctoral fellow at Georgetown University's Alwaleed Bin Talal Center for Muslim-Christian Understanding; Momodou Taal, a doctoral candidate in Africana Studies at Cornell University; and Rümeysa Öztürk, a doctoral student in child study and human development at Tufts University, who appears to have been targeted because she wrote an op-ed critical of Israel. *Id.* Exs. Q, S, T, U, V, W, Y, Z. Srinivasan and Taal have since fled the country in fear of arrest. *Id.* Exs. Q, II.

The agencies have also supplied some universities with the names of other students they intend to target under the policy, *id.* Ex. L at 14, and they are actively seeking to identify still others. The Department of Education, for instance, has demanded that universities disclose the names and nationalities of students involved in pro-Palestinian protests. *Id.* Ex. X. The State Department and ICE have launched new social media surveillance programs aimed at identifying noncitizen students and faculty with alleged "terrorist sympathies." *Id.* Ex. F at 2. And on March 25, Secretary of State Rubio ordered consular offices to review the social media accounts of student visas applicants, including those in the United States seeking renewal, to identify people that they deem to "bear[] a hostile attitude towards U.S. citizens or U.S. culture."[1] *Id.* Ex. DD at 6.

### A Climate of Fear and Repression for Noncitizen Students and Faculty

The ideological-deportation policy and Defendants' attendant threats have created a climate of fear and repression on university campuses across the country. Many noncitizen students and faculty, including some who are members of the plaintiff organizations, are abstaining

---

[1] The directive provides that "evidence that an applicant advocates for terrorist activity, or otherwise demonstrates a high degree of public approval or public advocacy for terrorist activity or a terrorist organization" may be grounds for visa rejection under the terrorism-related grounds of inadmissibility, and that "[t]his may be evident in conduct that bears a hostile attitude towards U.S. citizens or U.S. culture (including government, institutions, or founding principles)." Krishnan Decl. Ex. DD at 5–6; *see also id.* Ex. EE at 1–2.

from public writing or scholarship that they would otherwise have pursued. *See, e.g.*, Dubal Decl. ¶¶ 50, 53, 62, 65; Bâli Decl. ¶¶ 9, 16. Some are taking down previously published writing and scholarship from the internet. *See, e.g.*, Dubal Decl. ¶¶ 52–55, 64–67 (describing AAUP Members B and C). Some have turned down opportunities to speak at academic and other public events that they would otherwise have accepted. *See, e.g.*, *id.* ¶¶ 53, 57 (describing AAUP Members C and D). Some faculty have adjusted their teaching plans due to fears that including materials related to Palestine would put them at risk of deportation under the policy, *see, e.g.*, *id.* ¶¶ 62, 65 (describing AAUP Members A and B), and others have decided to forgo significant collaborations with their colleagues, *see, e.g.*, *id.* ¶ 66 (describing AAUP Member B). Some students and faculty have stopped traveling abroad for conferences or research activities out of concern they may not be able to reenter the country. *See, e.g.*, *id.* ¶ 57 (describing AAUP Member D); Bâli Decl. ¶¶ 13, 17 (describing MESA Members A and B).

The ideological-deportation policy is also deterring noncitizen students and faculty from other public engagement on issues related to Israel and Palestine. Because of fears of ideological deportation, some noncitizen students and faculty are no longer willing to participate in pro-Palestinian or anti-war protests. *See, e.g.*, Dubal Decl. ¶¶ 52–59, 61–63 (describing AAUP Members A, C, and D); Bâli Decl. ¶¶ 14, 16 (describing MESA Members A and B). Some noncitizen students and faculty have also substantially changed how they use social media, with some no longer posting about Israel and Palestine and others taking down past posts for fear that they might lead to official retaliation. *See, e.g.*, *id.* ¶ 62 (describing AAUP Member A); Bâli Decl. ¶¶ 12, 16 (describing MESA Members A and B). Some noncitizen students and faculty have forgone leadership opportunities or stepped back from public participation in groups that engage in advocacy related to Israel and Palestine. *See, e.g.*, Dubal Decl. ¶¶ 52–59 (describing AAUP

Members C and D). Others have left the United States after concluding they cannot safely exercise their free speech rights here. *See, e.g.*, *id.* ¶ 68 (describing AAUP Member E).

### The Effect of the Policy on Plaintiffs and their U.S. Citizen Members

That so many noncitizen faculty and students are now fearful of engaging in lawful political speech has far-reaching implications for the plaintiff organizations. Plaintiffs are impeded in their ability to further their missions because many of their noncitizen members are no longer participating in their public-facing work or attending their events. *See* Dubal Decl. ¶ 15; Bâli Decl. ¶¶ 36–42. Some have even declined to join Plaintiffs due to their fears of ideological deportation. *See* Dubal Decl. ¶ 14. Hearing noncitizen members' views and insights is crucial to Plaintiffs' ability to work effectively, but many of those noncitizen members are no longer able to speak freely because of the threat of arrest, detention, and deportation. *See* Dubal Decl. ¶¶ 50–68; Bâli Decl. ¶¶ 20, 37, 42. Plaintiffs have all also been forced to divert significant resources to addressing their members' concerns related to the ideological-deportation policy, including by connecting them with legal counsel. *See* Dubal Decl. ¶¶ 11, 13; Bâli Decl. ¶¶ 44–47.

Plaintiffs' U.S. citizen members have also been seriously harmed by the policy and its broad chilling effect on the expressive and associational activities of noncitizen faculty and students. U.S. citizen members have been deprived of opportunities to hear from and engage with their noncitizen colleagues and students at public events and in the classroom on issues related to Israel and Palestine. *See* Dubal Decl. ¶¶ 28, 31, 37, 39, 41, 44, 46, 49 (describing Profs. Jasanoff, Kaminsky, Karl, Kurnick, Nesiah, Posmentier, Surkis, and Weld); Bâli Decl. ¶¶ 21–22, 26, 29, 31, 33 (describing Profs. Bâli, Baron, Abu El-Haj, Erakat, and Lockman). Some members have reported that noncitizen students and colleagues are increasingly unwilling to discuss these topics even in private. *See, e.g.*, Dubal Decl. ¶ 28 (describing Prof. Nesiah); Bâli Decl. ¶ 20 (describing Prof. Bâli). U.S. citizen members have also been prevented from accessing public writings and

social media posts that their noncitizen colleagues and students have taken down because of the policy. *See* Dubal Decl. ¶¶ 26, 35, 41 (describing Profs. Dailey, Karl, and Kumanyika); Bâli Decl. ¶ 26 (describing Prof. Baron). The policy has restricted some citizen members from collaborating on academic projects with their noncitizen colleagues and students, *see* Dubal Decl. ¶¶ 31–32 (describing Prof. Posmentier); Bâli Decl. ¶¶ 21, 31 (describing Profs. Bâli and Erakat), and others have had to significantly adjust their teaching and advising to account for their noncitizen colleagues' and students' fears related to the policy, *see* Dubal Decl. ¶¶ 23, 47 (describing Profs. Howley and Surkis); Bâli Decl. ¶ 26 (describing Prof. Baron). Finally, some members can no longer stand shoulder-to-shoulder at protests or in public advocacy with noncitizen students and faculty who have withdrawn from these activities due to the policy. *See* Dubal Decl. ¶¶ 24, 29, 42 (describing Profs. Howley, Karl, and Nesiah); Bâli Decl. ¶ 27 (describing Prof. Baron).

**Argument**

## I.    Plaintiffs have standing.

### A.    Plaintiffs have associational standing to assert the rights of their U.S. citizen members.

Plaintiffs have associational standing because the interests Plaintiffs seek to protect are germane to their scholarly and academic missions, *see* Dubal Decl. ¶¶ 2–3; Bâli Decl. ¶¶ 5–7; because it is plain that neither the claims asserted nor the relief requested requires the participation of Plaintiffs' individual members in the lawsuit; and because Plaintiffs' U.S. citizen members "would otherwise have standing to sue in their own right." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *In re Fin. Oversight and Mgmt. Bd. for P.R.*, 110 F.4th 295, 309 (1st Cir. 2024) (applying *Hunt*). Plaintiffs' U.S. citizen members would have standing to sue "in their own right" because the ideological-deportation policy burdens their right to hear from,

7

and associate with, noncitizen students and faculty; and because this injury is traceable to the policy and would be redressed by the requested relief.

It is well-established that the First Amendment protects the right to hear no less than it protects the right to speak. *See, e.g.*, *Kleindienst v. Mandel*, 408 U.S. 753, 762–65 (1972); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965). The ideological-deportation policy burdens Plaintiffs' U.S. citizen members' right to hear because it deters noncitizen faculty and students from sharing information and insights with them. The record is replete with examples. Prof. Abu El-Haj has had to cancel three events at the Center for Palestine Studies, which she co-directs at Columbia, because of her noncitizen students' and colleagues' fears that ICE would raid the center's events. Bâli Decl. ¶ 29. Prof. Lockman at NYU has been denied the perspectives and insights of noncitizen colleagues in MESA who have recently declined invitations to speak at academic events because of similar concerns that increased visibility could lead to their deportation. Bâli Decl. ¶ 33. Profs. Karl and Kumanyika, also at NYU, have been harmed by the decision of noncitizen colleagues to take down research and scholarship that was previously available online. Dubal Decl. ¶¶ 26, 41.

The policy also burdens the right of Plaintiffs' U.S. citizen members to associate with their noncitizen students and colleagues. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) ("[W]e have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others."). Here, again, the record includes many examples. Prof. Howley at Columbia used to coordinate de-escalation efforts with noncitizen colleagues, but those colleagues are now too afraid of arrest to work with him. Dubal Decl. ¶ 24. Many of the people with whom Prof. Baron at the City University of New York once attended anti-war demonstrations have stopped attending because they fear ideological deportation. Bâli

Decl. ¶ 27. In addition, some of Plaintiffs' U.S. citizen members have had to suspend or end scholarly collaborations with noncitizen faculty and students because of shared concerns about official retaliation. For instance, Prof. Erakat at Rutgers University had been collaborating with a noncitizen colleague on a legal research project related to Palestine, but that colleague paused their contributions out of fear their work could expose them to deportation. Bâli Decl. ¶ 31.

Importantly, these harms to Plaintiffs' U.S. citizen members are not the result of subjective or irrational fear. To the contrary, they are the ideological-deportation policy's entirely foreseeable consequence. Noncitizen students and faculty are being deterred from participating in pro-Palestinian protests and related expression and association because they face "a credible threat that the [policy] will be enforced" against them if they do. *Mangual v. Rotger-Sabat*, 317 F.3d 45, 57 (1st Cir. 2003) (quoting *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 14 (1st Cir. 1996)). The First Circuit has instructed that courts should "assume" a threat of enforcement is credible "in the absence of compelling contrary evidence." *Id.* (quoting *N.H. Right to Life PAC*, 99 F.3d at 15); *see also id.* (stating that "the evidentiary bar" for establishing a credible threat of enforcement in First Amendment cases "is extremely low"); *Berner v. Delahanty*, 129 F.3d 20, 24 (1st Cir. 1997) ("[A] realistic risk of future exposure to [a] challenged policy . . . is sufficient to satisfy" constitutional and prudential standing requirements.). Here, the threat is credible because the agencies have announced that they intend to revoke the visas of and arrest, detain, and deport noncitizens who have engaged in pro-Palestinian expression; they have already targeted at least five individuals under the policy; and they have said that they intend to target many more. *See supra* pp. 2–4.

## B.    Plaintiffs have organizational standing.

The plaintiff organizations also have standing to sue on their own behalf because the policy has caused a "concrete and demonstrable injury to [their] activities." *Havens Realty Corp. v.*

*Coleman*, 455 U.S. 363, 379 (1982); *see Louis v. Saferent Sols., LLC*, 685 F. Supp. 3d 19, 32 (D. Mass. 2023) ("[O]nly a perceptible impairment of an organization's activities is necessary" (citation omitted)). To begin, the policy has substantially harmed Plaintiffs' ability to pursue their missions by deterring noncitizen faculty and students from joining their organizations and from participating in their events. Many noncitizen members have avoided AAUP events or stepped back from leadership positions and public appearances with AAUP chapters out of fear of being associated with the organization's public advocacy on topics related to academic freedom and Israel and Palestine, and of being targeted for deportation on that basis. Dubal Decl. ¶¶ 7–10. Some noncitizens have declined to join AAUP chapters at all out of similar fears. *Id.* ¶ 14 (explaining that this harm is particularly acute for the relatively new Harvard-AAUP chapter). Many noncitizen MESA members have also scaled back their participation in MESA's events and projects, including the organization's flagship annual meeting, out of fear that they will targeted for deportation based on their political and scholarly engagement related to Israel and Palestine. Bâli Decl. ¶¶ 36–41. MESA anticipates that some members will allow their memberships to lapse as a result of not attending the annual meeting, and that others who might have joined MESA to attend the annual meeting will not do so, imposing serious financial burdens on the organization, which relies on dues-paying members for its annual operation budget. *Id.* ¶ 43.

The policy has also forced Plaintiffs to divert resources from other projects to address their noncitizens' reasonable fears that they will be targeted under the policy. For example, the AAUP's and MESA's leadership and staff have spent a significant percentage of their time counseling noncitizen members on the risks of deportation, and connecting noncitizen members with immigration attorneys, since the introduction of the policy. Dubal Decl. ¶ 11; Bâli Decl. ¶¶ 44–47. AAUP chapters including Harvard-AAUP are similarly having to devote time and resources to

10

support their noncitizen members, including by organizing trainings, preparing "know your rights" materials, and finding legal support for individual members. Dubal Decl. ¶ 13.

## II.    Plaintiffs are likely to succeed on the merits.

### A.    The ideological-deportation policy violates the First Amendment.

The ideological-deportation policy violates the First Amendment because it suppresses protected expression based on its viewpoint.

As an initial matter, the speech at issue here—criticism of Israel's policies, criticism of our own government's policies relating to the Middle East, and advocacy of Palestinian rights—is at the very core of the First Amendment's protection. This speech "is at the heart of current political debate among American citizens," *Ragbir v. Homan*, 923 F.3d 53, 69 (2d Cir. 2019), *cert. granted, judgment vacated on other grounds sub nom. Pham v. Ragbir*, 141 S. Ct. 227 (2020), and accordingly the ideological-deportation policy "trenches upon an area in which the importance of First Amendment protections is at its zenith," *id.* at 70 (quoting *Meyer v. Grant*, 486 U.S. 414, 421–22, 425 (1988)); *see also Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991).

That the speakers here are noncitizens does not change the analysis. As explained above, Plaintiffs assert the rights of their U.S. citizen members to receive information and ideas, and also assert their own rights as U.S.-based organizations. Plaintiffs and their U.S. citizen members are unquestionably entitled to the full scope of First Amendment protections. In any case, it is well-settled that noncitizens living in the United States "are entitled to the full panoply of First Amendment rights." *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1063–66 (9th Cir. 1995); *see also Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and of press is accorded aliens residing in this country."); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (the First and Fifth Amendments do not "acknowledge[] any distinction between citizens

and resident aliens"); *Parcham v. INS*, 769 F.2d 1001, 1004 (4th Cir. 1985) ("It has long been held that aliens residing in this country enjoy the protection of the First Amendment."); *Ragbir*, 923 F.3d at 73 (holding that the First Amendment protects noncitizens who are threatened with deportation as a result of their protected speech).[2]

It is equally clear that the policy targets speech on the basis of viewpoint. Indeed, the defendant agencies have said this themselves, emphasizing repeatedly that the policy targets noncitizen faculty and students not because they committed crimes or because they engaged in any activity that would independently subject them to deportation, but rather because they have engaged in lawful expressive and associational activities that show them to be, in the agencies' view, "aligned to" Hamas or "siding with terrorists." Krishnan Decl. Exs. H, L. This is paradigmatic viewpoint discrimination, and it is plainly unconstitutional. *See, e.g.*, *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994) (stating that viewpoint discrimination is presumptively unconstitutional because it "pose[s] the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas" or to "manipulate the public debate").

The invocation of foreign policy and national security concerns cannot render this viewpoint-discriminatory policy constitutional. Courts have repeatedly recognized that the government's foreign policy and national security powers are subject to First Amendment constraints. *See, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010) ("[C]oncerns of

---

[2] Some lowers courts have recognized narrow exceptions to this rule—for example, noncitizens who are not lawful permanent residents cannot contribute to election campaigns—but these exceptions are not relevant here.

national security and foreign relations do not warrant abdication of the judicial role. We do not defer to the Government's reading of the First Amendment, even when such interests are at stake."); *AADC*, 70 F.3d at 1056 (foreign policy concerns do not deprive the courts of their "essential function in ensuring that aliens are not targeted by the INS in retaliation for exercising their acknowledged constitutional rights"). The government's foreign policy and national security powers are broad, but the government's objectives in these spheres, as in all others, must be achieved with means that do not discriminate on the basis of political viewpoint.

Indeed, multiple courts have made clear that the First Amendment limits the government's power to act on the basis of viewpoint even when it seeks to *exclude* a foreign citizen who has *not yet been admitted* to the country—a context in which Congress's power is "plenary," the only First Amendment rights at issue are the listener interests of U.S. citizens, and the courts' role is narrowly circumscribed. *Mandel*, 408 U.S. at 769. In this context courts have repeatedly emphasized that, while the government can exclude invited foreign citizens from the United States for many reasons, it cannot constitutionally do so based on their viewpoints alone. *See, e.g.*, *Abourezk v. Reagan*, 592 F. Supp. 880, 888 & n.23 (D.D.C. 1984) ("[A]lthough the government may deny entry to aliens altogether, or for any number of specific reasons, it may not, consistent with the First Amendment, deny entry solely on account of the content of speech."), *vacated and remanded on other grounds*, 785 F.2d 1043 (D.C. Cir. 1986); *Allende v. Shultz*, 605 F. Supp. 1220, 1225 (D. Mass. 1985) (quoting relevant language from *Abourezk*, 592 F. Supp. at 887, approvingly), *aff'd*, 845 F.2d 1111 (1st Cir. 1988); *Harvard Law Sch. Forum v. Shultz*, 633 F. Supp. 525, 531 (D. Mass. 1986) ("[T]he Secretary's reason . . . is not facially legitimate [because it] is directly related to the suppression of a political debate with American citizens."), *vacated without opinion*, 852 F.2d 563 (1st Cir. 1986); *see also Am. Acad. of Religion v. Chertoff*, 463 F. Supp. 2d 400, 415–16, 419 (S.D.N.Y.

2006), *aff'd sub. nom. Am. Acad. of Religion v. Napolitano*, 573 F.3d 115 (2d Cir. 2009). The argument that noncitizens are second-class citizens for First Amendment purposes is foreclosed by precedent, as explained above, but the upshot of the cases involving exclusion (as distinguished from deportation) is that the ideological-deportation policy would be unconstitutional even if the targeted noncitizen faculty and students had no First Amendment rights at all.

### B.    Defendants' coercive threats independently violate the First Amendment.

The government's threats to deport noncitizens for engaging in protected speech and association independently violate the First Amendment rights of the plaintiff organizations and their U.S. citizen members. This is true whether the threats are analyzed under the test for coercion or the test for retaliation.

In *Bantam Books, Inc. v. Sullivan*, the Supreme Court held that a government agency's "threat of invoking legal sanctions and other means of coercion" to indirectly "achieve the suppression" of protected speech violates the First Amendment. 372 U.S. 58, 67 (1963). Threats of this kind violate the First Amendment because they amount to a "system of prior restraints," imposed without the required procedural protections. *Id.* at 70. The critical question in analyzing a claim under *Bantam Books* is whether the government engaged in "permissible attempts to persuade" or, instead, "impermissible attempts to coerce." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024).

The test for First Amendment retaliation is overlapping. To succeed on a claim of First Amendment retaliation, a plaintiff must demonstrate "that he engaged in First Amendment–protected conduct, that he suffered an adverse action, and that his protected conduct played a 'substantial or motivating' part in the adverse action." *Berge v. Sch. Comm. of Gloucester*, 107 F.4th 33, 37 n.4 (1st Cir. 2024). As many courts have recognized, "[e]ven the threat of an adverse

action can satisfy [the second] element if the threat is capable of deterring a person of ordinary firmness from engaging in the protected conduct." *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010); *see also, e.g.*, *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003); *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 687 (4th Cir. 2000).

In this case, there is no question that the government is engaging in both unconstitutional coercion and unconstitutional retaliation. The government is targeting noncitizen faculty and students based on speech that the First Amendment protects. *See supra* Section II.A. And the government's threats are highly coercive (under *Bantam Books*) and "capable of deterring a person of ordinary firmness" (under the retaliation framework). The government's own statements establish every step of this test. Indeed, rarely have government officials been as explicit about their censorial intent as they have been here. A White House fact sheet contains an explicit threat of retaliation, repeating President Trump's campaign promise to find "all the resident aliens who joined in the pro-jihadist protests" and to "deport [them]." Krishnan Decl. Ex. D at 2. The President has repeated that threat, as have other agency officials responsible for carrying out the ideological-deportation policy, even as they have made clear that they view a broad range of pro-Palestinian and anti-war speech to fall within the policy. *See, e.g.*, *id.* Exs. J, N. And as the evidence in the record shows, the administration has largely "succeeded in its aim," *Bantam Books*, 372 U.S. at 67, by causing noncitizen faculty and students to withdraw from public discourse and advocacy for fear of being targeted for their speech.

### C.    The ideological-deportation policy violates the Fifth Amendment.

The First Amendment injuries caused by the policy have been exacerbated by its vagueness. Because the policy fails to give fair warning of which viewpoints the defendant agencies consider to be unacceptably pro-Palestinian, it encourages "arbitrary and discriminatory

enforcement," in violation of the Fifth Amendment. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *cf. Massieu v. Reno*, 915 F. Supp. 681, 700 (D.N.J. 1996) (Barry, J.) (concluding that the foreign policy provision is unconstitutionally vague because it fails to give noncitizens "a sufficiently definite warning" as to the conduct that could render them deportable (cleaned up)), *rev'd on other grounds*, 91 F.3d 416 (3d Cir. 1996). Although Defendants have said they are targeting individuals "for [s]upporting Hamas," Krishnan Decl. Ex. P at 1, they have interpreted this category of speech extremely broadly, with one student having been detained, it seems, for publishing an op-ed in her university's newspaper, another for having been at a protest at which a leaflet with a Hamas logo was distributed, and another for having participated in a sit-in to protest the sanctions that her university had imposed on other student protesters. One agency official suggested that the policy was directed at students and faculty who "protest," *id.* Ex. N at 5, and another suggested (after the Complaint in this case was filed), that it was targeted at students who "participate in movements" that "creat[e] a ruckus," *id.* Ex. CC at 7. In other words, Defendants have articulated *no* standards by which speakers can determine whether their speech might run afoul of the policy. Whatever the policy's true aim, it has had the predictable effect of chilling a broad range of constitutionally protected speech, including criticism of Israel's policies, criticism of the United States' policies, and advocacy for Palestinians. *See supra* pp. 4–6. This, in turn, has deprived Plaintiffs and their U.S. citizen members of valuable insights they would otherwise hear.

**D.    The ideological-deportation policy violates the APA.**

**1.    The ideological-deportation policy is subject to review under the APA.**

Plaintiffs are entitled to APA review of the ideological-deportation policy because it is final agency action, *see* 5 U.S.C. § 704, and because their claims fall within the relevant zone of interests, *see Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, 123 F.4th 1, 20 (1st Cir. 2024).

The policy is final agency action because it "mark[s] the consummation of the agency's decisionmaking process—it [is] not . . . of a merely tentative or interlocutory nature," and it is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up); *see Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024). The defendant agencies have definitively—not tentatively—declared their policy of deporting noncitizen students and faculty based on their participation in pro-Palestinian protests and related expression and association. *See, e.g.*, Krishnan Decl. Ex. I (Defendant Rubio stating: "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported[.]"); *id.* Ex. N at 4–5 (Deputy Secretary of DHS equating support for Hamas with "pro-Palestinian activity"); *id.* Ex. L at 13 (White House Press Secretary describing this as "th[e] administration's policy"). The policy also determines the right of noncitizen students and faculty to remain in this country, conditioning it on their willingness to relinquish their First Amendment freedoms, and the policy plainly has legal consequences. Defendants have already targeted multiple students and faculty for visa revocation, arrest, detention, and deportation under the policy, and they have promised that more revocations, arrests, detentions, and deportations are to come. *See supra* pp. 3–4. The policy therefore meets the APA's "pragmatic" finality test. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598–99 (2016) (citation omitted); *see Biden v. Texas*, 597 U.S. 785, 808–09 (2022).

Plaintiffs also have prudential standing to challenge the policy because their claims "arguably fall[] within the zone of interests to be protected or regulated by the underlying statute"—here, the Immigration and Nationality Act ("INA"). *Seafreeze Shoreside, Inc.*, 123 F.4th at 20. The zone of interests test is "lenient," and "the benefit of any doubt goes to the plaintiff." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (cleaned up).

Plaintiffs meet this test because their organizational injuries "bear[] a 'plausible relationship to the policies underlying" the relevant statute. *CSL Plasma Inc. v. CBP*, 33 F.4th 584, 593 (D.C. Cir. 2022) (cleaned up). The INA includes visa classifications that enable foreign students, scholars, and others to study and work at U.S. universities, *e.g.*, 8 U.S.C. § 1101(a)(15)(F), (J), and Congress "presumably" intended those visa holders to "benefit the people" and organizations that work with them, including Plaintiffs and their U.S. citizen members. *CSL Plasma Inc.*, 33 F.4th at 590; *see Abourezk*, 785 F.2d at 1047, 1050–51 (holding that organizations that invited foreign nationals to attend meetings or address audiences in the United States were within the INA's zone of interests); *see also Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 29 (1st Cir. 2007) (holding that plaintiffs fell within Leasing Act's zone of interests where their interests would be adversely affected by the challenged lease's impacts).

> ### 2.     The ideological-deportation policy is contrary to constitutional right and arbitrary and capricious.

The ideological-deportation policy violates the APA and it should therefore be stayed pending review, *see* 5 U.S.C. § 705, and ultimately held unlawful and set aside, 5 U.S.C. § 706(2)(A), (B).

First, the ideological-deportation policy is contrary to constitutional right because it violates the First and Fifth Amendments. *See supra* Section II.A, C.

Second, the policy is arbitrary and capricious and an abuse of discretion. A decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Melone v. Coit*, 100 F.4th 21, 29 (1st Cir. 2024) (cleaned up). The defendant agencies have offered no cogent explanation in support of the policy. Defendant Rubio has stated that "[t]hose who support designated terrorist

organizations, including Hamas, threaten our national security," Krishnan Decl. Ex. E, but as explained above, Defendants have interpreted this category of speech to include *any* "pro-Palestinian" and even "protest" activity, *see id.* Ex. N at 5 (interview with Deputy Secretary of DHS); *see also id.* Ex. CC at 7 (Defendant Rubio threatening to "kick . . . out" anyone who "come[s] into the United States as a visitor and create[s] a ruckus for us"). In any event, Defendants have not explained how independent advocacy (as distinct from activities coordinated with or controlled by foreign terrorist groups) threatens national security. *See Holder*, 561 U.S. at 17–18, 23–24. And the government has no legitimate interest in suppressing protests or other expressive activities on the basis of viewpoint, whether that viewpoint is "pro-Palestinian" or "pro-Hamas." *See supra* Section II.A. The policy is therefore neither "reasonable" nor "reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

## III.    The other preliminary injunction factors support relief.

The First Circuit presumes irreparable injury "upon a determination that the movants are likely to prevail on their First Amendment claims." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 11 (1st Cir. 2012). Plaintiffs therefore satisfy the second preliminary injunction factor because they have demonstrated a likelihood of success on their First Amendment claim. *Id.*; *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

The two remaining preliminary injunction factors—the balance of the equities and the public interest—also strongly favor relief. As the Supreme Court has observed, these two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[T]he government's interest *is* the public interest." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (emphasis in original). And the public's interest in hearing from, and

associating with, noncitizen students and faculty on such an important matter of public concern is substantial. As the First Circuit has recognized, "the suppression of political speech harms not only the speaker, but also the public to whom the speech would be directed[.]" *Sindicato Puertorriqueño de Trabajadores*, 699 F.3d at 15 (1st Cir. 2012). "To deprive [noncitizen students and faculty] of the right to speak will therefore have the concomitant effect of depriving 'the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration.'" *Id.* (quoting *Citizens United v. FEC*, 558 U.S. 310, 341 (2010)). This deprivation is especially significant given the public's ongoing debate about Israel's military campaign in Gaza, and the role of the United States in supporting it. Noncitizen students and faculty have valuable insights and perspectives to share on these and related issues.

## Conclusion

For the reasons stated, Plaintiffs respectfully request that the Court enter an order (1) preliminarily enjoining Defendants from implementing or enforcing the ideological-deportation policy—including, without limitation, through investigation, surveillance, visa revocation, arrest, detention, deportation, or other adverse action; (2) preliminarily enjoining Defendants from threatening to arrest, detain, and deport noncitizen students and faculty based on their lawful political expression; and (3) staying the policy under the APA.

April 1, 2025                                    Respectfully submitted,

/s/ Edwina Clarke                               /s/ Ramya Krishnan
Edwina Clarke, BBO 699702                        Ramya Krishnan*
Zimmer, Citron & Clarke, LLP                     Carrie DeCell*
130 Bishop Allen Drive                           Xiangnong Wang*
Cambridge, MA 02139                              Talya Nevins**
(617) 676-9423                                   Jackson Busch*
edwina@zimmercitronclarke.com                    Alex Abdo*
                                                 Jameel Jaffer*

Knight First Amendment Institute
 at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
ramya.krishnan@knightcolumbia.org

Ahilan T. Arulanantham*** (SBN 237841)
Professor from Practice
UCLA School of Law
385 Charles E. Young Dr. East
Los Angeles, CA 90095
(310) 825-1029
arulanantham@law.ucla.edu

*Counsel for Plaintiffs*

*admitted *pro hac vice*
**admission to the bar pending
****pro hac vice* application forthcoming