**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS,<br><br>AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS-HARVARD FACULTY CHAPTER,<br><br>AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS AT NEW YORK UNIVERSITY,<br><br>RUTGERS AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS-AMERICAN FEDERATION OF TEACHERS, and<br><br>MIDDLE EAST STUDIES ASSOCIATION,<br><br>        Plaintiffs,<br><br>    v.<br><br>MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE,<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, and the DEPARTMENT OF HOMELAND SECURITY,<br><br>TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement,<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, and<br><br>UNITED STATES OF AMERICA,<br><br>        Defendants. | Civil Action No. 1:25-cv-10685 (WGY) |

<u>**DECLARATION OF VEENA DUBAL**</u>

I, Veena Dubal, declare and state as follows:

1.    I am a professor of law at the University of California, Irvine School of Law and the general counsel of the American Association of University Professors ("AAUP"). I am over the age of eighteen. I have personal knowledge of the facts stated in this declaration, and, if called to testify, I could and would competently do so under oath.

**Background**

2.    The AAUP is a nonprofit membership association and labor union of faculty, graduate students, and other academic professionals. Founded in 1915, the AAUP seeks to promote academic freedom and shared governance at the nation's colleges and universities.

3.    The AAUP has campus chapters at colleges and universities around the country. Among those chapters are the AAUP-Harvard Faculty Chapter ("Harvard-AAUP"), AAUP at New York University ("NYU-AAUP"), and Rutgers AAUP-American Federation of Teachers ("Rutgers AAUP-AFT").

4.    I have served as the AAUP's general counsel since October 2024. In that role, I provide legal advice to the organization and monitor legal developments that are relevant to the AAUP and its members. I am also a member of the AAUP.

5.    In the past few weeks, I have closely followed the Trump administration's policy of arresting, detaining, and deporting students for their pro-Palestinian expression and association (the "ideological-deportation policy"). Because of the policy's effects on the AAUP and its members—described in more detail below—I regularly discuss it with my colleagues in the AAUP's national leadership, leaders of AAUP campus chapters, and AAUP members around the country.

**Harm to the AAUP**

6.      In my role as the general counsel of the AAUP, I have observed firsthand two principal ways in which the ideological-deportation policy has impeded and continues to impede the AAUP from carrying out its mission.

7.      *Reducing participation in AAUP events.* The ideological-deportation policy has deterred noncitizen members from participating in AAUP events. Many noncitizen members have stayed away from AAUP gatherings over the last few weeks, particularly those that touch upon the Trump administration's efforts to deport pro-Palestinian students and faculty or to investigate universities for their handling of campus protests relating to Israel and Palestine. I have heard directly from noncitizen members, who explained that they were interested in attending AAUP events addressing these topics but decided not to for fear of being associated with advocacy related to the topics and targeted for deportation on that basis. Noncitizen members who have nonetheless attended recent AAUP events on these topics have generally refrained from speaking.

8.      For example, the AAUP recently hosted the first of a series of member gatherings to discuss the destruction of schools in Gaza. The purpose of the series was to inform the AAUP's position on and advocacy relating to the allegation that Israel has engaged in "scholasticide." Crucial to that purpose was hearing from a diverse range of the AAUP's membership, but some noncitizen members did not attend out of fear that the government might target them for their association with the event, and most of the noncitizen members who did appear kept their voices muted. Similarly, the AAUP attempted to organize a virtual event about the threats its noncitizen members face of being targeted under the ideological-deportation policy. But I heard directly from multiple noncitizen members that they would not attend unless the virtual meeting software could anonymize their identities. Because anonymity directly undermined the purpose of the event—

which was to hear the experiences of noncitizen members—the AAUP dropped the idea of member participation and conversation in this event.

9.    My colleagues in the AAUP's national leadership and I have had similar experiences with a range of other events, including member discussions about academic freedom and Palestine and a recent event at Columbia University focused on the Trump administration's attacks on the university and how the AAUP should respond. For example, I had hoped to have an open conversation with the membership about the repression of pro-Palestinian speech on campuses, but I heard from many chapter leaders that too many of their citizen and noncitizen chapter members would be afraid to attend, leading to a one-sided conversation.

10.    Reduced participation in AAUP events directly frustrates the AAUP's mission. The AAUP's over 44,000 members are the lifeblood of the organization. AAUP leadership engages with members through a democratic process to develop its positions and priorities and carry out its initiatives. Throughout the year, the AAUP hosts in-person and virtual gatherings to discuss academic freedom and other pressing topics in higher education. The gatherings often draw hundreds of members. My colleagues in the AAUP's national leadership and I rely on these conversations to make virtually every decision of substance about the organization's work. When members are afraid to participate in AAUP events, it prevents us from representing their interests in the organization's policymaking, report writing, and public advocacy.

11.    *Diverting resources*. The ideological-deportation policy has also forced the AAUP to divert resources that it would otherwise devote to its core mission. AAUP leadership has spent a significant percentage of its time counseling noncitizen members on the risks of deportation for participating in pro-Palestinian protests and connecting noncitizen members with immigration attorneys. I, for example, now devote at least 50 percent of the time that I allot to my AAUP

leadership position to these activities, regularly fielding calls and emails from AAUP members and chapters related to the policy. These activities are not ones that the AAUP or its leadership typically engage in, and they leave me and my colleagues in the AAUP's national leadership with less time to focus on the organization's core mission. For example, I have almost no time to discuss or advise on broader issues of shared governance at the university level or on state legislative attacks on tenure. Many of our members have lost their federal grant funding, and my attention to this critical problem and its implications for academic freedom has been limited.

### Harm to AAUP Campus Chapters

12.    As the AAUP's general counsel, I routinely speak with leaders of AAUP campus chapters, including leaders of Harvard-AAUP, NYU-AAUP, and Rutgers AAUP-AFT. In these conversations, chapter leaders have relayed three principal ways in which the ideological-deportation policy has impeded and continues to impede their chapters from carrying out the AAUP's mission.

13.    *Diverting resources*. Much like the AAUP's national organization, all three of the above-mentioned chapters have diverted resources away from their core missions and towards advising noncitizens who fear that they will be punished under the ideological-deportation policy. For example, Harvard-AAUP has redirected resources from its work promoting shared governance and economic justice to respond to the ideological-deportation policy. Because noncitizen members expressed concern that they could be flagged for deportation based on their social media activity or other online communications, the chapter expended significant effort organizing trainings for faculty seeking to avoid government surveillance of their expressive activities online. NYU-AAUP and Rutgers AAUP-AFT have similarly diverted chapter resources to organize trainings or prepare training materials related to the ideological-deportation policy. NYU-AAUP, for instance, is preparing "know your rights" materials related to immigration enforcement on

NYU's campus. NYU-AAUP and Rutgers AAUP-AFT are also spending time guiding noncitizen members through university immigration resources and connecting them with individual legal support.

14.    *Suppressing membership and participation*. The ideological-deportation policy has also chilled noncitizens from joining and participating fully in all three of the above-mentioned chapters, preventing these chapters from advocating for the interests of their full constituencies. This harm is particularly acute for Harvard-AAUP, a relatively new chapter that is attempting to recruit members and build its presence on campus. Its leaders recently learned that some noncitizens who would have been eligible to become members have declined to join the organization out of fear that their membership could put them at risk of deportation. Many Harvard faculty, staff, and graduate students are noncitizens, so losing their participation deprives Harvard-AAUP of opportunities to hear from and associate with an important segment of the community it serves.

15.    In a similar vein, I have learned that the ideological-deportation policy has caused noncitizen leaders at AAUP chapters around the country to step back from leadership positions and public appearances out of fear that they will be falsely labeled as "pro-Hamas" and targeted for deportation on that basis. As an organization, the AAUP has been heavily involved in advocacy relating to academic freedom, the suppression of student and faculty discussion of Israel and Palestine on campus, the Trump administration's efforts to punish universities for not suppressing these discussions even more aggressively than they have, and the Trump administration's recent efforts to arrest, detain, and deport noncitizen students and faculty who have participated in pro-Palestinian protests. The leaders at our many chapters around the country participate in this advocacy, but noncitizen leaders are now terrified of being publicly associated with it because of

the risk that the Trump administration will identify them and target them for deportation. I have heard directly from one noncitizen member who has withdrawn from a chapter leadership position, and several additional members who have refrained from making public statements on behalf of their chapter. Chapter leaders have also told me that noncitizen members have declined to attend in-person meetings and events. This has deprived AAUP chapters of experienced leaders and prevented them from engaging in effective advocacy on their campuses.

16.     *Impeding campus advocacy*. The ideological-deportation policy has likewise prevented some of the above-mentioned chapters from advocating for their interests on campus in concert with noncitizen faculty and students. For example, members of NYU-AAUP recently delivered a petition to the NYU administration urging the university to drop disciplinary charges against students who had engaged in pro-Palestinian activism. NYU-AAUP members felt compelled to remove the names of all the signatories from the petition due to concerns that noncitizen signatories, including both faculty and students, could be targeted for deportation based on their decision to participate. The NYU administration discounted the petition in part because it lacked the names of the signatories. This undermined NYU-AAUP's ability to effectively advocate before the NYU administration, one of the organization's primary missions.

**Harm to the AAUP's Members**

17.     As AAUP's general counsel, I also routinely speak with individual members of AAUP chapters around the country, including members of Harvard-AAUP, NYU-AAUP, and Rutgers AAUP-AFT. In these conversations, members have explained how the ideological-deportation policy has harmed and continues to harm them. I have also received reports of additional AAUP members who have been and continue to be harmed by the ideological-deportation policy.

*U.S. Citizen Members*

18.      I have heard from U.S. citizen members that the ideological-deportation policy prevents them from hearing their noncitizen students' and colleagues' perspectives. Members have told me about noncitizen colleagues and students who have ceased speaking or writing publicly about Palestine, withdrawn from academic events, or altered their research or teaching plans out of fear that their expression will lead to deportation.

19.      In our conversations, U.S. citizen members have underscored how valuable to their scholarship, teaching, and public engagement they find the speech that the ideological-deportation policy suppresses. Some AAUP members I have spoken with study the world outside the United States and rely on noncitizens' perspectives to add texture to their academic work. Others collaborate closely with noncitizen colleagues and students in their teaching or research. U.S. citizen members have had to cancel events—including talks and conferences—and postpone or stop their plans to write grants, conduct research, and produce scholarship with noncitizen members who fear immigration consequences because of the ideological-deportation policy.

20.      I have also heard from U.S. citizen members that the ideological-deportation policy prevents them from associating with noncitizen members. U.S. citizen members have conveyed that their noncitizen colleagues and students have stopped attending protests and other public gatherings related in any way to Israel and Palestine, including AAUP events, because they fear that attending these gatherings could mark them for deportation.

21.      By way of example, I have spoken directly with some of the U.S. citizen members named in the complaint who have been injured by the ideological-deportation policy. I describe their circumstances below.

22.      *Joseph Howley.* Joseph Howley is an associate professor of Classics and the Paul Brooke Program Chair for Literature Humanities at Columbia. Howley's current scholarship and

teaching focus on the history of the book and Greek and Latin literature, among other topics. He is a U.S. citizen and a member of the AAUP.

23.    The ideological-deportation policy has limited Howley's ability to hear from and engage with his noncitizen colleagues and students, and it has undermined his teaching. As program chair of the year-long Literature Humanities course in Columbia's Core Curriculum, Howley supervises graduate students who instruct weekly seminars with undergraduate students to discuss significant literary works from a range of perspectives across time and cultures. In his regular teaching sessions with instructors, he has observed that many noncitizen instructors have stopped attending in recent weeks, and that those who do attend are preoccupied with fears of deportation and unable to focus on the course material. One noncitizen instructor told Howley they feared deportation based on their attendance merely as a bystander at a protest last year related to Israel and Palestine. Howley has also heard from noncitizen colleagues that are considering not teaching topics related to Israel and Palestine or political activism that they might otherwise have taught.

24.    The policy has also harmed Howley's right to assemble with his noncitizen colleagues and students to engage in public advocacy. Howley joined other faculty and staff members in de-escalation efforts outside the Columbia solidarity encampment in April 2024. Following the police sweep of the encampment on April 18, he appeared alongside Mahmoud Khalil and other speakers at an emergency press conference, to criticize the school president's decision to have police arrest students at the encampment. On April 22, Howley joined hundreds of citizen and noncitizen faculty at Columbia in a walkout protesting that same decision. But when he spoke at a press conference convened by the AAUP following Khalil's arrest this month, he was joined only by citizen members. He understood that noncitizen members who previously

would have joined him were too afraid to do so now, given the threat of deportation under the policy. It is now much more difficult for Howley to coordinate de-escalation efforts with noncitizen colleagues, including one who is now afraid to move freely around the Columbia campus and surrounding neighborhood.

25.     *Chenjerai Kumanyika.* Chenjerai Kumanyika is an assistant professor at NYU's Arthur L. Carter Journalism Institute. He specializes in using audio journalism to critically investigate the way Americans understand issues such as race, the Civil War, and policing. He is also the Peabody Award–winning host of the *Empire City* podcast, which focuses on the history of the New York Police Department. Kumanyika is a U.S. citizen, a member of the AAUP and NYU-AAUP, and an elected at-large council member of the AAUP.

26.     The ideological-deportation policy has limited Kumanyika's ability to hear and engage with perspectives and scholarship critical to his work. Kumanyika has collaborated in his research and scholarship with scholars across the university working on interdisciplinary initiatives that address issues of inequality and justice in the U.S. and transnationally. These scholars include noncitizens who have concerns about the public visibility of their research and scholarship because of the ideological-deportation policy. Some of these scholars have removed research and scholarship from the internet because they fear this research and scholarship could expose them to deportation.

27.     *Vasuki Nesiah.* Vasuki Nesiah is a professor of practice at NYU's Gallatin School of Individualized Study, and faculty director of the Gallatin Global Fellowship in Human Rights. Nesiah's scholarship and teaching focus on human rights and international law. She is a U.S. citizen and a member of the AAUP and NYU-AAUP.

28.    The ideological-deportation policy has limited Nesiah's ability to hear from and engage with her noncitizen colleagues and students, and it has undermined her teaching. Prior to the policy's adoption, Nesiah frequently talked with noncitizen colleagues about Israel and Palestine and academic freedom to discuss these and other sensitive issues. Since the policy's implementation, Nesiah's noncitizen colleagues have become increasingly unwilling to discuss these topics in public or private. In a recent academic panel that Nesiah participated in, for example, the panel was simply advertised as a conversation without the names of the panelists or their institutional affiliations because another panelist feared retaliation under the policy. These measures reduced attendance and hindered the dialogue and sharing of research that is critical to Nesiah's academic work. Similarly, many of her noncitizen colleagues who live outside of the United States are now unwilling to attend academic events inside the country for fear that they will be detained and deported. For instance, several colleagues who typically attend the Law and Society Association Annual Meeting (to be held in Chicago in May 2025) have informed her that they will not attend for this reason. Because her field of international law is particularly engaged with the work of scholars who live abroad, these withdrawals hamper Nesiah's research. The policy has also chilled student discussion on campus, with many noncitizen students now avoiding the topic of Israel and Palestine out of fear that they will be targeted for deportation if they discuss it. Some noncitizen students have also expressed concern about even showing up to class, and there have been conversations among her colleagues about conducting classes over Zoom, which Nesiah considers to be a poor substitute for in-person teaching.

29.    The policy has also limited Nesiah's ability to associate with noncitizen colleagues. For example, a noncitizen colleague who had signed an open letter related to academic freedom that Nesiah and her colleagues had recently organized asked that their name be removed from the

letter, because they feared that signing the letter would make them a target for deportation under the policy.

30.     *Sonya Posmentier.* Sonya Posmentier is an associate professor of English at NYU and the director of graduate studies in the NYU English department. Her research and teaching interests include African American and Black Diasporic literature and culture, poetry and poetics, and abolition. She is a U.S. citizen, a member of the AAUP and NYU-AAUP, and a member of NYU-AAUP's executive committee.

31.     The ideological-deportation policy has limited Posmentier's ability to hear and engage with perspectives and scholarship critical to her work. For example, Posmentier had planned to attend a conference concerning Israel and Palestine to hear a noncitizen scholar deliver a talk in their area of expertise, but that individual was forced to pull out of the conference due to a fear of deportation under the policy. As a result, Posmentier missed an opportunity to engage with and learn from that scholar, distorting Posmentier's academic community, which depends on the exchange of ideas and information between scholars. In addition, the NYU chapter of a pro-Palestinian faculty group recently removed all videos of teach-ins and public-facing events since October 2023 out of a fear that leaving the videos up would expose noncitizen colleagues featured in the videos to deportation. These videos focus on a range of topics, including definitions of antisemitism, the global university, and scholasticide. The removal of these videos prevents Posmentier and many others from listening to and learning from those conversations, as well as using them as a resource in research and teaching.

32.     The policy has limited Posmentier's ability to associate with her noncitizen colleagues and students. Posmentier has been working with her students on a collaborative publication about abolition movements that addresses, among other topics, the criminalization of

pro-Palestinian protest on university campuses. The group had planned to publish and distribute the publication and hold a launch event including readings and performance. In consultation with her students, however, Posmentier has decided not to move forward with this plan because of student fears that it could lead to noncitizen contributors to being targeted for deportation. This deprives the entire department of the contributors' many valuable insights.

33.      In addition to the U.S. citizen members I've spoken with directly, I have received reports about several other U.S. citizen AAUP members who have been injured by the ideological-deportation policy. I describe their circumstances below.

34.      *Patricia Dailey.* Patricia Dailey is an associate professor of English and Comparative Literature at Columbia University. She specializes in medieval literature and critical theory. Dailey is a U.S. citizen and a member of the AAUP.

35.      The ideological-deportation policy has harmed Dailey's ability to hear perspectives she values as a member of her university community, and to associate with other members of the AAUP. Dailey was a member of an independent and long-running online community made up of Columbia faculty and staff, including other AAUP members. Dailey relied on the community to engage with other members of the Columbia community, including AAUP members, and to stay informed about university-related topics as well as political issues, including issues related to Israel and Palestine. Fearing that the community's content about Israel and Palestine would jeopardize the immigration status of its noncitizen members, however, the organizer of the online community, who is a noncitizen, recently decided to delete it. As a result, Dailey has lost access to views and information she found valuable, and she is no longer able to engage with other AAUP members as she once did.

36.    *Maya Jasanoff.* Maya Jasanoff is a professor of History at Harvard. Jasanoff's scholarship and teaching focus on the history of the British empire. She is a U.S. citizen and a member of Harvard-AAUP and the AAUP.

37.    The ideological-deportation policy has harmed Jasanoff's ability to hear from her noncitizen colleagues and students. She has recently observed that noncitizen colleagues and students are reluctant to speak publicly about politics and world affairs out of concern that they will be targeted for ideological deportation. The silencing of noncitizen colleagues and students directly impacts Jasanoff's work. Because she studies the British empire, which covered nearly a quarter of the globe at its peak, she relies on the perspectives of students and colleagues from around the world to inform her scholarship and teaching.

38.    *Lauren Kaminsky.* Lauren Kaminsky is an associate senior lecturer and the director of studies for the Committee on Degrees in History and Literature at Harvard. Kaminsky's scholarship and teaching focus on European history. She is a U.S. citizen and a member of Harvard-AAUP and the AAUP.

39.    The ideological-deportation policy has harmed Kaminsky's ability to hear from, as well as associate and assemble with, her noncitizen colleagues and students. She has observed that noncitizen colleagues—even those who previously felt secure in their immigration status—have recently refrained from teaching classes or speaking publicly on increasingly politicized topics, including Palestine, and noncitizen colleagues and students have recently refrained from writing on these topics. Kaminsky is also aware of several noncitizens who have declined to join Harvard-AAUP in recent weeks out of fear that their membership could put them at risk. She has observed that noncitizen colleagues have been less willing to attend political gatherings in recent weeks.

40.     *Rebecca Karl.* Rebecca Karl is a professor of History at NYU. Karl's research and teaching focus on modern Chinese history, as well as the history of social theory, feminism, Mao Zedong Thought and Marxism, and global revolution. Karl is a U.S. citizen, a member of the AAUP, and a former president and now member-at-large of NYU-AAUP.

41.     The ideological-deportation policy has limited Karl's ability to hear and engage with perspectives and scholarship she values. As a student of and researcher on histories of repressive regimes, Karl is interested in the multiple ways in which marginalized people understand their lives and worlds. As a Jewish person, she is particularly interested in the history of antisemitism and Zionism and has helped organize educational events at NYU on those topics. In doing so, she has sought out and engaged with the views of citizen and noncitizen colleagues. Following the adoption of the policy, however, some noncitizen colleagues have felt compelled to take down research and scholarly work that was previously available online, and have ceased speaking publicly about issues related to Israel and Palestine; others have declined public speaking opportunities.

42.     The policy has undermined Karl's ability to assemble with noncitizen faculty and students to engage in public advocacy. Over the last year and a half, Karl has regularly engaged in pro-Palestinian protests and public advocacy at NYU. Since the implementation of the policy, however, Karl has noticed a significant decrease in the participation of noncitizen faculty and students in pro-Palestinian expression, including petition-signing and public letter signing.

43.     *David Kurnick.* David Kurnick is a professor of English at Rutgers University. His research and teaching interests include the history and theory of the novel, narrative theory, and sexuality and gender, with an emphasis on the nineteenth century. He is a U.S. citizen and a member of the AAUP and Rutgers AAUP-AFT.

44.     The ideological-deportation policy has limited Kurnick's ability to associate with his noncitizen colleagues and students. Several graduate and undergraduate students that Kurnick associates with have informed him that they have decided to refrain from signing anything related to Israel and Palestine, and to refrain from participating in any pro-Palestinian marches or demonstrations, out of fear of being targeted for deportation. Kurnick has also abstained from any public discussion of matters relating to Israel and Palestine with his noncitizen students. Instead, he has limited his communications with noncitizen students to in-person conversations. Kurnick is also responsible for the English Department's graduate admissions process this year, and some admitted students outside the U.S. have expressed hesitation about coming to study inside the United States because of concerns that the ideological-deportation policy would force them to self-censor.

45.     *Judith Surkis.* Judith Surkis is a professor of History at Rutgers University and Director of Graduate Studies in the History Department. She specializes in Modern European History, with an emphasis on France and the French Empire, gender and sexuality, and intellectual, cultural, and legal history. She is a U.S. citizen and a member of the AAUP and Rutgers AAUP-AFT.

46.     The ideological-deportation policy has limited Surkis's ability to associate with her noncitizen colleagues and students. As a member of Rutgers Faculty for Justice in Palestine, she has witnessed a radical decline in public engagement by noncitizen students and faculty on the question of Palestine since the announcement of the ideological-deportation policy. She has also noticed that noncitizen faculty are more hesitant to speak about or even attend events that address Palestine. The inability of noncitizen students and faculty to freely participate in these events deprives Surkis of their experiences and insights.

47.    The policy has also forced Surkis to modify how she advises noncitizen graduate students in her department. Surkis previously encouraged students to travel abroad to conduct the necessary field research to write their seminar papers, devise their dissertation topics, and ultimately write their dissertations. Now, she is reluctant to recommend that they travel for their studies, because she fears some of these students may be denied re-entry, detained, and even stripped of their visas on return.

48.    *Kirsten Weld.* Kirsten Weld is a professor of History at Harvard. Weld's research focuses on modern Latin America and explores struggles over inequality, justice, historical memory, and social inclusion. She is a U.S. citizen and a member of the AAUP and Harvard-AAUP. She also serves as Harvard-AAUP's president.

49.    Weld has observed that following the administration's adoption of the ideological-deportation policy, many noncitizen students, staff, and faculty colleagues, particularly those who had been involved in pro-Palestinian organizing, have retreated from ordinary university life. Rather than engaging with the university community and participating in educational and developmental activities, noncitizen students, staff, and faculty have devoted significant attention and resources to preparing for potential immigration consequences that may result from their past expressive activities. Additionally, some noncitizen students who had previously spoken or written publicly about Israel and Palestine have now ceased participating publicly on those issues out of fear that doing so will lead to deportation. Weld valued hearing from noncitizen students on these topics, and is now deprived of receiving the speech of those who have been chilled by the policy.

### *Noncitizen Members*

50.    These accounts conform with those I have heard directly from the AAUP's noncitizen members. Many noncitizen members I have spoken to are deeply fearful that they will be targeted for arrest, detention, and deportation based on their expression and association relating

to Israel and Palestine. I have heard directly from noncitizen members who have withdrawn from academic conferences and pulled scholarly articles relating to Israel and Palestine because of these fears. I have also heard from one noncitizen member who has left the United States and plans to fulfill their academic responsibilities remotely for the rest of the semester. Some noncitizen members expressed concern to me that being named or even described in this lawsuit could put them at risk of retaliation under the policy.

51.    By way of example, I have spoken directly with noncitizen members—referred to in the complaint as AAUP Member C and D—who have been injured by the ideological-deportation policy. I describe their circumstances below.

52.    *AAUP Member C.* AAUP Member C is a legal permanent resident, a member of the AAUP, and a professor at a university in the Northeast.

53.    Before the administration adopted the ideological-deportation policy, AAUP Member C regularly published their writing and participated in public advocacy on issues related to academic freedom. Now, due to fears that they will be targeted for deportation based on that writing and advocacy, AAUP Member C has felt compelled to remove previously published writing and scholarship from the internet, and to turn down opportunities to speak at academic talks and other public-facing events that they would otherwise have accepted.

54.    The individual has also been chilled from associating with colleagues at their local AAUP chapter. AAUP Member C values the ability to engage in collective action with other chapter members, but because they fear that public association with the chapter could expose them to deportation, they have forgone leadership opportunities within the chapter, reduced their participation in the chapter's public-facing work, and declined to participate in political organizing with the chapter.

55.    AAUP Member C has also been chilled from engaging in peaceful political protest and assembly. Although they would like to gather with others to engage in pro-Palestinian advocacy, they no longer do so out of fear of arrest and deportation for lawful political speech.

56.    *AAUP Member D.* AAUP Member D is a legal permanent resident, a member of the AAUP, and a professor at a university in the Northeast.

57.    AAUP Member D recently withdrew from presenting on a topic related to Israel and Palestine at an academic conference out of concern that this could expose them to deportation under the policy. Also due to the concern about the policy, they have stopped traveling abroad for academic conferences.

58.    The individual has also been chilled from associating with colleagues at their local AAUP chapter and colleagues nationally. AAUP Member D no longer signs their name to open letters that their colleagues circulate—including open letters related to Israel and Palestine—for fear of being targeted for deportation. For the same reason, they have also ruled out pursuing a leadership position at their local AAUP chapter.

59.    The individual has also been chilled from engaging in peaceful political protest and assembly. AAUP Member D wishes to gather with others to engage in pro-Palestinian speech and advocacy, but now fears that they will be deported for doing so. They do not plan to attend future protests, but, if they do attend, they intend to wear a mask and other clothing to obscure their identity.

60.    In addition to the noncitizen members I've spoken with directly, I have received reports about several other noncitizen AAUP members—referred to in the complaint as AAUP Member A, B, and E—who have been injured by the ideological-deportation policy. I describe their circumstances below.

61.    *AAUP Member A.* AAUP Member A is a legal permanent resident, a member of the AAUP, and a lecturer at a university in the Northeast whose research interests include race and migration.

62.    Before the administration adopted the ideological-deportation policy, AAUP Member A regularly posted on social media and engaged in other public advocacy on issues related to Israel and Palestine. Because of the policy, however, and the fear that they will be targeted for deportation based on their writing and advocacy, AAUP Member A has taken down previously published social media posts about Israel and Palestine and stopped assigning materials about Palestine in the courses they teach.

63.    They have also been chilled from engaging in peaceful political protest and assembly. AAUP Member A previously participated in pro-Palestinian protests and public demonstrations regularly and still wishes to gather with others to engage in pro-Palestinian speech and advocacy. They no longer participate in these activities because of the fear that they will be arrested and deported for doing so.

64.    *AAUP Member B.* AAUP Member B is a legal permanent resident, a member of the AAUP, and a professor at a university in the Northeast.

65.    Although AAUP Member B's academic work has obvious relevance to issues relating to Israel and Palestine, they have decided to forgo opportunities to write about these issues due to concerns that they may face immigration consequences stemming from the policy. They also decided against teaching a class they have offered in the past because the class syllabus would necessarily have included materials related to Palestine. AAUP Member B made this decision out of concern that including that material would put them at risk of deportation under the policy.

66.    AAUP Member B has also been chilled from associating with AAUP colleagues. AAUP Member B has worked for over a year with university faculty across the United States, including other AAUP members, on a national organization addressing the concerns of Jewish faculty, including on issues related to Israel and Palestine. Due to the ideological-deportation policy, AAUP Member B no longer feels comfortable having their name associated with the prospective organization or doing any public-facing work for the prospective organization.

67.    AAUP Member B has also been chilled from engaging in peaceful political protest and assembly. They previously participated in pro-ceasefire protests and other public demonstrations but no longer do so because of the fear that their lawful advocacy will lead to arrest and deportation.

68.    *AAUP member E.* AAUP Member E is a legal permanent resident, a member of the AAUP, and a professor in at a university in the Northeast. As a noncitizen, AAUP Member E was already hesitant to speak about political issues on social media. The ideological-deportation policy has made them reluctant to participate in protests and to engage in expressive or associational activities that require them to disclose their name. As a result of the policy, AAUP Member E no longer feels that they can safely exercise their free speech rights in the United States and will be spending most of the Spring semester outside of the country. Although they are able to conduct research abroad, an extended stay would substantially disrupt their professional activities and daily life.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: April 1, 2025        _____
                                               Veena Dubal