UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS,<br><br>AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS-HARVARD FACULTY CHAPTER,<br><br>AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS AT NEW YORK UNIVERSITY,<br><br>RUTGERS AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS-AMERICAN FEDERATION OF TEACHERS, and<br><br>MIDDLE EAST STUDIES ASSOCIATION,<br><br>      Plaintiffs,<br><br>  v.<br><br>MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE,<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, and the DEPARTMENT OF HOMELAND SECURITY,<br><br>TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement,<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, and<br><br>UNITED STATES OF AMERICA,<br><br>      Defendants. | Civil Action No. 1:25-cv-10685 |

## DECLARATION OF ASLI Ü. BÂLİ

I, Aslı Ü Bâli, declare:

1.      I am the current President of the Middle East Studies Association of North America ("MESA"), a plaintiff in the above-captioned case. I have held that position since November 6, 2023. In my capacity as President, I regularly communicate with and respond to the interests and concerns of MESA members. I have spoken to and heard reports from many MESA members who have been directly and seriously harmed by the Trump administration's policy of targeting noncitizen faculty and students for arrest, detention, and deportation on the basis of their participation in pro-Palestinian protests and related expression and association (the "ideological-deportation policy").

2.      I am a U.S. citizen, and am myself a member of MESA. I am also a member of the American Association of University Professors, another plaintiff in this case.

3.      In addition to my role within MESA, I am the Howard M. Holtzmann Professor of Law at Yale Law School. My research and teaching interests include public international law, particularly human rights law and the law of the international security order, and comparative constitutional law, with a focus on the Middle East. As a scholar, I have written on the nuclear non-proliferation regime, humanitarian intervention, the roles of race and empire in the interpretation and enforcement of international law, the role of judicial independence in constitutional transitions, federalism and decentralization in the Middle East, and constitutional design in religiously divided societies.

4.      My declaration is based on my experience leading MESA, one of the premier academic and advocacy-oriented organizations that focuses on the study of the Middle East; my conversations with and reports I have received about members of MESA; and my own experience as a scholar who engages in research and teaching about the Middle East. I have personal

knowledge of the facts stated in this declaration, and, if called to testify, I could competently do so under oath.

## MESA

5. MESA is a 501(c)(3) nonprofit membership association of faculty, students, and researchers interested in the study of the Middle East (including Southwest Asia, the Arab world, and North Africa). Founded in 1966, MESA's mission is to foster the study of the Middle East, promote high standards of scholarship and teaching, and encourage public understanding of the region and its peoples.

6. MESA accomplishes these goals by organizing programs, publications, and services that enhance education, further intellectual exchange, recognize professional distinction, and defend academic freedom. For instance, MESA hosts for its members an annual meeting, which is the premiere conference for scholars who research the Middle East. MESA also publishes the *International Journal of Middle East Studies*, the leading peer-reviewed scholarly journal on the region, and the *MESA Review of Middle East Studies*. In addition to its academic programming, MESA advocates on behalf of its members through its Committee on Academic Freedom and its Task Force on Civil and Human Rights, which work on issues that are central to MESA's mission of promoting high standards of scholarship and teaching, defending academic freedom, and supporting civil and human rights.

7. MESA has over 2,000 individual members, including faculty and students at universities across the country who work in the field of Middle East studies, as well as more than 50 institutional members and 36 affiliated institutions. MESA's membership is made up of U.S. citizens as well as many noncitizens, and includes members who live outside of the U.S. or who

frequently travel abroad as part of their academic work—all of whom contribute invaluably to the scholarly community MESA seeks to foster.

**The Effect of the Ideological-Deportation Policy on MESA's Members**

8.  I and other members of MESA have been directly and seriously harmed by the Trump administration's ideological-deportation policy. The policy, along with the Trump administration's attendant threats, has created a climate of fear and repression that has caused significant and lasting damage to the community of scholars—both U.S. citizens and noncitizens alike—that MESA represents.

9.  Since the ideological-deportation policy began, I have heard from many MESA members who feel the need to self-censor out of fear that their speech and expression could put them at risk of arrest, detention, or deportation. For instance, I know that some noncitizen MESA members have deleted their social media profiles or decided to take down posts that could be interpreted as advocating for pro-Palestinian positions. Some have removed public indicia of their involvement with pro-Palestinian groups on campus. Noncitizen MESA members have told me that they are afraid to organize even ordinary academic programming and events that touch on the issue of Palestine. Similarly, I have spoken to noncitizen members who are concerned that simply teaching about Israel and Palestine in class might put them at risk for arrest, detention, or deportation. As a result of the policy, many noncitizen members of MESA are now terrified of engaging in critical aspects of their research, teaching, and public advocacy, especially when those activities touch on Israel or Palestine.

10.  For example, I have spoken with two noncitizen MESA members—whom the complaint refers to as MESA Member A and MESA Member B—who have drastically limited

4

their scholarly and public engagement because of the ideological-deportation policy. I describe their circumstances below.

11.  **<u>MESA Member A.</u>** MESA Member A is a legal permanent resident, a member of MESA, and a professor at a university in the southern United States whose research interests include topics related to Israel and Palestine.

12.  Before the administration adopted the ideological-deportation policy, MESA Member A regularly posted on social media about Israel and Palestine, including on topics related to their area of academic expertise, and engaged in other public advocacy on issues related to Israel and Palestine. Other MESA members followed MESA Member A on social media and frequently engaged with their posts. Because of the policy, however, and the fear that they will be targeted for deportation based on their writing and advocacy, MESA Member A has significantly reduced their engagement on social media, and feels compelled to self-censor when posting about Israel and Palestine.

13.  The policy has also interfered with MESA Member A's academic research and writing. Out of concern that their current immigration status could be revoked at any moment based on their past expressive activity, MESA Member A now refrains from traveling internationally. This has prevented them from engaging in key aspects of their research, including conducting interviews with people abroad and accessing research materials that are available only abroad. It has disrupted MESA Member A's ability to conduct research for a new book project that relies on those methods. MESA Member A also had to cancel plans to travel to academic conferences in Europe that they otherwise would have attended, preventing them from associating with their colleagues, including other MESA members.

14. They have also been chilled from engaging in peaceful political protest and assembly. MESA Member A previously participated in pro-Palestinian protests and public demonstrations regularly and still wishes to gather with others to engage in pro-Palestinian speech and advocacy. They no longer participate in these activities because of fear that they will be arrested and deported for doing so.

15. **MESA Member B.** MESA Member B is a legal permanent resident, a member of MESA and the AAUP, and a professor at a university in the Northeast whose research interests include gender studies and Middle East studies.

16. Before the administration adopted the ideological-deportation policy, MESA Member B regularly organized workshops, teach-ins, and meetings related to Palestine and shared information about Palestine-related events on social media. Now, due to fears that these activities could lead to deportation, they have declined opportunities to chair academic committees, refrained from publishing work related to Palestine, stopped going to protests or demonstrations, and taken down all their social media posts about events related to Palestine.

17. MESA Member B has also forgone research grants and opportunities that would have required them to travel to the Middle East, due to the risk of being denied reentry based on their pro-Palestinian expression and association. This has harmed their ability to pursue their scholarship, which requires traveling abroad to interview people and attend cultural events that are the subject of their research.

18. The experiences of MESA Member A and B are just two examples. I have heard from and know of many more noncitizen MESA members who have sharply limited their speech and expression on issues relating to Israel and Palestine, out of fear that they may be targeted for arrest, detention, or deportation based on those activities. Indeed, some noncitizen members

6

expressed concern that even being named or described in connection with this lawsuit could put them at risk under the ideological-deportation policy. Others informed me that they were deeply concerned about having their specific experiences described at all in the lawsuit, even anonymously.

19. The climate of fear and repression created by the ideological-deportation policy has not only harmed noncitizen MESA members, it has also had a direct and significant impact on MESA members who are U.S. citizens by preventing them from engaging with and hearing from their noncitizen colleagues and students.

20. I rely greatly on the insights of my noncitizen colleagues in MESA. As President of MESA, it is important for me to understand the breadth of interests represented in the organization to ensure that I am able to address the most pressing priorities for MESA's membership. Being able to freely communicate with noncitizen members of MESA about their views and opinions is vital to achieving that goal. Because of the ideological-deportation policy, however, many noncitizen members of MESA are concerned about communicating with me about topics relating to Israel and Palestine, especially in writing or over email, even though those topics are salient to their scholarship or to MESA's work defending the academic freedom of its members. Many noncitizen members have also retreated from public engagement on issues relating to Israel and Palestine, which is a crucial area of Middle East study, making it harder for me to stay on top of scholarly and other developments in the field that are important to my role as President of MESA.

21. The policy has also seriously undermined my academic work. I am a legal scholar whose research and teaching focuses on the Middle East. My work has often placed special attention on Palestine. For instance, I have written about and discussed publicly the United

Nations' unique role in the Israeli-Palestinian conflict and the application of international law to Israel and Palestine. I have organized conferences and events on human rights in Israel and Palestine and engaged with colleagues and students about their views on the topic. Because many noncitizen MESA members have restricted their expressive and academic activities out of fear that they may be targeted for arrest, detention, or deportation, I have lost the benefit of many of my colleagues' research and expert views on the issues I am interested in studying, particularly where they relate to Israel and Palestine. Because I understand that my noncitizen colleagues now fear deportation based on their scholarly work, I hesitate to approach them to collaborate on public projects that might put them at risk. For instance, I am reluctant to coauthor blog posts, essays, or articles with noncitizen graduate students or untenured colleagues that touch on issues related to Israel and Palestine for fear of putting these potential coauthors at risk of ideological deportation. These are partnerships I would have enthusiastically pursued prior to the ideological-deportation policy.

22.     Additionally, I have become increasingly concerned about the participation of some of my noncitizen colleagues in a conference scheduled to take place in April at Yale Law School. Although I and others have spent over a year organizing this conference and expected the event to take place in-person, I recently proposed moving the conference entirely or partially online due to concerns that noncitizens would not participate in light of the ideological-deportation policy. Some participants have decided to limit their participation by joining virtually rather than risk potential deportation if they traveled to attend in person. This change has already diminished the value I and the other organizers hoped to gain from the conference. Should more participants decide to join exclusively online it would be devastating to the conference, which was intended to bring the participants together in the same space to network and exchange ideas in-person.

23. I also know of, or have heard from colleagues about, noncitizen students who have been significantly harmed by the ideological-deportation policy. Noncitizen students have removed posts from their social media, taken down previously published writing, and removed references to published writing from their own profiles, particularly if the content of the posts or writings touch on Palestine. This is especially damaging for any students who wish to become academics, as it prevents them from developing a public profile of scholarly work in the field. Noncitizen students have also withdrawn from student organizations on campus in order to distance themselves from events relating to Israel and Palestine, because of the fear that being associated with the events could have consequences for their immigration status. The chill that the ideological-deportation policy has produced on student speech directly and adversely affects my own work because my research agenda is ordinarily informed and enriched by ideas and novel issue areas that I develop or learn about in conversation with my students.

24. My experiences are not unique. I have spoken with at least four of my MESA colleagues, whom I describe in more detail below. These members, and many more, have been seriously harmed by the ideological-deportation policy and the broad chilling effect it has had on the expressive and associational activities of noncitizen faculty and students who do work or advocacy related to the Middle East.

25. **Beth Baron.** Beth Baron is a distinguished professor of History at the City University of New York. Baron's scholarship focuses on the history of medicine in Egypt. She is a U.S. citizen and a member of MESA.

26. The ideological-deportation policy has harmed Baron's ability to receive information from her noncitizen students. Several of Baron's noncitizen students, some of whom are members of MESA, are now afraid to travel abroad to visit archives and libraries that have

9

historical sources critical to their research because they fear they will not be allowed back into the country. This fear of travel due to the policy significantly limits the set of topics Baron's students can research or write about, which diminishes her own, and her department's, ability to benefit from these students' work. Baron has also heard from noncitizen students who have removed content from their social media accounts, taken down images and content from websites, and who are self-censoring in their teaching, especially on topics related to Israel and Palestine and U.S. foreign policy. These students have taken these actions out of a fear that their speech could lead to them being targeted for deportation. Baron has been deprived of these students' insights and experiences, which she otherwise would have valued engaging with.

27. The policy has also limited Baron's ability to associate and assemble with noncitizen colleagues and students. Baron recently attended an academic event related to Palestine that was accessible only in-person because the organizers decided not to allow people to access the event remotely, out of fear that doing so would expose noncitizen participants to deportation. Prior to the policy, Baron attended anti-war demonstrations with noncitizen students and colleagues. Now, many of those individuals have stopped attending protests because they are afraid of being deported.

28. **Nadia Abu El-Haj.** Nadia Abu El-Haj is a professor of anthropology at Barnard College, Columbia University and the Co-Director of the Center for Palestine Studies ("CPS") at Columbia University. Abu El-Haj's scholarship focuses on Zionism, Israel, and Palestine. She is a U.S. citizen and a member of MESA and the AAUP.

29. The ideological-deportation policy has harmed Abu El-Haj's ability to hear from and associate with her noncitizen colleagues and students. One of her noncitizen students, who previously contributed to many events on campus and posted useful updates from Arabic language

news reports on social media, has now ceased participating in events and deleted their social media accounts for fear of losing their student visa. Another noncitizen student, who was once a leading pro-Palestinian voice on campus, has stopped speaking publicly and has gone into hiding since Khalil's arrest, out of fear that ICE might arrest or detain them. In response to her noncitizen students' and colleagues' concerns about ICE raids at campus events, Abu El-Haj cancelled a CPS event that was scheduled to take place in February. She has since felt compelled to cancel two more upcoming CPS events in April for the same reason. The policy has thus impaired Abu El-Haj's ability to learn from and meet with these students and to host CPS events.

30.     **Noura Erakat.** Noura Erakat is a professor of Africana studies and Criminal Justice at Rutgers University. Her research and teaching focus on international law, including human rights law. She is a U.S. citizen and a member of MESA.

31.     The ideological-deportation policy has harmed Erakat's ability to hear from her noncitizen colleagues and students. Noncitizen colleagues with whom Erakat collaborates closely have paused work on ongoing projects related to Palestine out of concern that they will be targeted for ideological deportation. One colleague, for example, paused their contributions to a legal research project that they are drafting in collaboration with Erakat after learning of Khalil's arrest. Erakat has also observed that noncitizens students are less willing to speak in class and in public about Palestine or related issues, even if those issues relate to their personal experiences. Because her scholarship relies on narratives from conflict zones, her work suffers when noncitizens are chilled from sharing their experiences.

32.     **Zachary Lockman.** Zachary Lockman is a professor of Middle Eastern and Islamic Studies and of History at NYU. His research and teaching focus on the modern history of the Middle East. He is a U.S. citizen and a member of the AAUP, NYU-AAUP, and MESA. He chairs

the subcommittee of MESA's Committee on Academic Freedom that seeks to address threats to academic freedom in the United States and Canada.

33. The ideological-deportation policy has harmed Lockman's ability to hear from and engage with his noncitizen colleagues and students. Lockman relies on the perspectives of noncitizen colleagues and students to enrich his work in Middle East studies. Some of his noncitizen colleagues in MESA have recently declined invitations to speak at academic events, however, due to concern that increased visibility could lead to their deportation. Others have censored their syllabi for the same reason. Lockman has also observed that noncitizen students are less willing to speak in class and in public about Palestine or related issues, even if those issues relate to their countries of origin. And he is aware of noncitizen graduate students who have altered their research plans to avoid international travel because they fear having their visas or green cards revoked based on their pro-Palestinian expression or association. As a result, Lockman and his colleagues are deprived of the results of this research.

34. In addition to these four MESA members, I have heard from many more U.S. citizen members of MESA who have lost the benefit of hearing from and engaging with their noncitizen colleagues and students due to the ideological-deportation policy. Some members have reported that they are now required to take on more public-facing work in their departments or other groups due to their noncitizen colleagues' decisions to step back from this work out of fear that they may be targeted under the policy. Some have expressed increasing concern about approaching noncitizen colleagues to collaborate on or co-author any kind of public writing. Others have described canceling or altering planned events out of fear that they might place noncitizen colleagues or students at risk. The result of the ideological-deportation policy has been

to significantly limit the ability of citizen members of MESA to work with and learn from their noncitizen colleagues and students.

**The Effect of the Ideological-Deportation Policy on MESA**

35. The Trump administration's ideological-deportation policy has also seriously harmed MESA itself.

36. In line with the experiences described above, many noncitizen members of MESA have scaled back their participation in MESA's events and projects due to their fears of being targeted for arrest, detention, or deportation based on their political and scholarly engagement related to Israel and Palestine.

37. Noncitizen members play an especially critical role in the academic community MESA seeks to foster. They often possess unique insights, personal connections, and skills—including heritage language skills—that allow them to become among the most effective ethnographers and researchers working in the discipline. This also gives many noncitizen members special insight into how an academic and advocacy organization like MESA can best serve its community of scholars. Noncitizen members of MESA make invaluable contributions to the organization. That the ideological-deportation policy has compelled many noncitizen members of MESA to step back their engagement with MESA undermines MESA's goal of facilitating the exchange of pedagogical insights, academic expertise, and novel research among its members.

38. The policy has also had a significant negative impact on participation in MESA's annual meeting. As part of its mission to grow and support the academic community that studies the Middle East, MESA hosts an annual meeting, which is the premier academic conference for those who study the Middle East. The meeting consists of four days of academic programming, professional development, networking, and special events. Participants in the annual meeting

attend research workshops, participate in joint projects that help advance the study of the Middle East, form research collaborations, and discuss the issues most pertinent to their work. The meeting is a critical forum for scholarship, intellectual exchange, and pedagogical innovation, and for many MESA members, the annual meeting is the highlight event of the year.

39. Unfortunately, there will be a decline in participation this year as a result of the policy. I have heard from noncitizen members of MESA who are concerned about attending MESA's annual meeting, which is scheduled to take place in November 2025 in Washington, DC. Members have told me that they fear that their attendance at the conference could put them at risk for arrest, detention, deportation, or other immigration consequences. Each year, in preparation for the annual meeting, MESA solicits paper proposals for the conference in mid-February. After the administration's adoption of the ideological-deportation policy, I have noticed a meaningful decline in submissions. This year, the initial deadline for submitting paper proposals was on February 13, 2025. However, a number of scholars who ordinarily submit paper proposals informed me that they were unable to meet the deadline for submissions. Some expressed concerns about attending the meeting, due to its location. In particular, members outside of the U.S. expressed fears that they would be denied entry or harassed because of the administration's ideological-deportation policy. Noncitizen members also reported feeling overwhelmed and unable to focus on making plans for the annual meeting because of their fear that scholarship and speech about the Middle East, the entire focus of their academic careers, might become the basis for being targeted by the government.

40. Submissions at the initial deadline this year were almost 40 percent below where they should have been, based on my estimates from past MESA annual meetings in Washington, DC. Given that sharp decline in submissions by that deadline, MESA's leadership decided to grant

an across-the-board extension to February 20, 2025, something that the organization has rarely done in its history. After we extended the deadline for submissions, there was still a marked decrease in the total number of submissions compared to prior years. Based on the number of submissions, participation in the 2025 annual meeting is projected to fall 10 percent below the level we expected.

41.     Due to our members' fears of ideological deportation, MESA's annual meeting will have lower attendance, garner fewer contributions to the scholarly field, and provide a less effective opportunity for intellectual exchange. Additionally, noncitizen members' reports of self-censorship in their research, scholarship, and advocacy based on their fear of being targeted by the government is expected to reduce overall engagement in the annual meeting and reduce submissions to MESA's scholarly publications, particularly on issues concerning Israel and Palestine.

42.     The absence of these noncitizen members' voices will have a substantial impact on the annual meeting, depriving MESA and its other members of the important insights, information, and views these scholars would have contributed. Academic conferences, especially ones like MESA's annual meeting, are most effective when a wide-range of backgrounds and viewpoints are represented. Reduced attendance or engagement at the annual meeting will limit the information and ideas shared at the meeting and the opportunities for networking and intellectual exchange that would otherwise be available in the absence of the policy. It will take away from the vibrancy of the conversation and community MESA seeks to foster at its annual meeting, and it will greatly impair MESA's ability to pursue its mission of fostering the study and public understanding of the Middle East.

43. Reduced attendance at the annual meeting will also impose serious financial burdens on MESA. A significant portion of MESA's budget is funded through the registration fees connected to attendance at the annual meeting. Based on the sizable reduction in the number of academic papers submitted for the meeting, which has previously been a reliable predictor of attendance, I anticipate that registrations for the next annual meeting will be seriously reduced, meaning MESA will collect substantially fewer registration fees. Additionally, because the annual meeting is the premier event of the year for MESA members, I anticipate that some individuals who cannot or will not attend the meeting due to concerns relating to the ideological-deportation policy will allow their memberships to lapse, and others who might have joined MESA to attend the annual meeting will not do so due to fears of the potential immigration consequences stemming from the ideological-deportation policy. This would impose an even greater financial cost on MESA given its reliance on dues-paying members for its annual operation budget.

44. The ideological-deportation policy has also required MESA to divert resources to managing and addressing the consequences of the policy for its members, that it would otherwise devote to its core mission. I and other members of MESA's leadership, staff, and volunteer faculty are now required to spend substantial time and attention responding to crises stemming from the ideological-deportation policy, which takes away from MESA's ability to develop and foster scholarship.

45. For instance, MESA's Committee on Academic Freedom and MESA's Task Force on Civil and Human Rights have recently been inundated with requests for assistance from noncitizen MESA members who fear arrest, detention, and deportation under the policy. Before the policy, these advocacy committees addressed each member's request for assistance individually. Now, they spend time developing triage criteria for prioritizing certain requests. The

16

committees have also needed to shift their focus from addressing threats to MESA's members from foreign governments to addressing threats stemming from the U.S. government's ideological-deportation policy. For example, in past years, a significant portion of the Committee on Academic Freedom's work involved advocacy outside the United States. Now, the committee is forced to devote most of its attention to addressing the concerns of noncitizen MESA members who fear potential immigration consequences stemming from the ideological-deportation policy. Between November 2018 and November 2024, the committee produced 211 letters, of which 85 (or 40 percent) concerned North America. In the first few months of 2025, 80 percent of the letters produced by the committee have concerned North America.

46. MESA leadership has also been required to develop new and different programming aimed at addressing members' concerns related to the ideological-deportation policy. For example, MESA developed and held a know your rights workshop on March 27, which addressed details about the legal options available to noncitizen students and colleagues should they be affected by the ideological-deportation policy, as well as best practices to address risks to our members during travel. MESA has another similar workshop planned for April 1. These are events that MESA leadership believed were necessary to help protect its members from the ideological-deportation policy. MESA leadership is also facilitating meetings between its members and legal services groups on April 9 to respond to member concerns relating to travel and digital security. This is programming that MESA would not typically arrange for its members, and is not the kind of service that a scholarly association regularly provides for its members.

47. Additionally, because so many MESA members are fearful of the immigration consequences stemming from the ideological-deportation policy, MESA has begun to distribute a new monthly message to members to provide them with resources and information about MESA's

17

response to the ideological-deportation policy. For instance, on February 10 and March 21, MESA's leadership sent members information about threats to academic freedom and MESA's mission arising from the ideological-deportation policy. As a result of this significant shift in focus and attention, MESA has had fewer resources to dedicate to its regular academic programming. This includes supporting the program committee's work in selecting proposals to include in our annual meeting in November 2025, with our usual timeline having had to be pushed back to accommodate new demands on our resources. In addition, more staff time is now dedicated to messaging and communications around the threats to academic freedom and freedom of association in the U.S. due to the ideological-deportation policy.

48. I declare under penalty of perjury that the forgoing is true and correct.

Respectfully submitted,

_____
Aslı Ü Bâli

April 1, 2025