# EXHIBIT GG

*DRAFT - Attorney Work Product – Deliberative Process Privilege*

## Constitutional Considerations Relating to Proposed Enhanced Vetting of Aliens in the United States for Counterterrorism Purposes

This paper addresses the constitutional framework governing agencies' efforts to support the counterterrorism vetting of aliens in the United States, including lawful permanent residents (LPRs),[1] on an initial and recurrent basis. We assume that any vetting program would entail querying information in the government's possession to determine whether an alien is associated with terrorist activity. We also assume that, in appropriate cases, the government would take lawful action to address the alien's status (*e.g.*, to remove the individual from the United States or to revoke immigration benefits).

### Executive Summary

The caselaw is unsettled on important questions regarding the extent to which Congress's broad power to regulate immigration is limited by the constitutional rights of aliens in the United States. The principles developed in the caselaw, however, offer the following guidance in assessing the scope of any enhanced efforts to vet aliens who are inside the United States or who have been admitted to the United States:

(1) The proposals under consideration should be assessed on the assumption that aliens admitted to the United States are generally protected by the Constitution. Aliens in the United States have due process rights and can challenge the use of information to take actions that deprive them of cognizable liberty and property interests, including revocation of immigration benefits. And aliens here can also invoke protections under the First Amendment and the Equal Protection Clause. The scope of an alien's constitutional rights may vary depending on the context of the challenge and status of the alien. A court will likely scrutinize measures that apply to lawful permanent resident aliens most closely, because they will probably be treated by the courts as having many of the constitutional rights possessed by U.S. citizens.

(2) However, Congress has broad power in the Constitution to regulate immigration. The scope of that power, even as to aliens in the United States who have certain constitutional rights, would almost certainly encompass reasonable efforts to query the full range of already-acquired government information to assess whether aliens pose terrorism-related risks to the country. While it is conceivable that collection of certain types of information from aliens in the United States to facilitate counterterrorism vetting could face First Amendment challenges, the government likely has considerable discretion to do so provided it has legitimate reasons. Constitutional issues are more likely to be presented with respect to any actions taken against the alien based on any information discovered in the vetting process.

---

[1] Specifically, we have been asked to analyze the constitutional restrictions pertinent to vetting visa holders within the United States, aliens admitted to the United States, and other beneficiaries under our immigration laws within the United States (but not naturalized U.S. citizens). We have not been asked to analyze constitutional restrictions applicable to those who are outside the United States or those applicable to aliens who are not lawfully in the United States.

1

*DRAFT - Attorney Work Product – Deliberative Process Privilege*

(b)(5)

2

*DRAFT - Attorney Work Product – Deliberative Process Privilege*

Because the parameters of the enhanced vetting program are not settled, we cannot assess concrete proposals, but below we set out the constitutional considerations that should be taken into account, including the areas of greatest litigation risk.[3] We first address whether aliens admitted to the United States can invoke constitutional rights to limit the government's authority to collect, access, or use the information about them to take actions affecting their rights. We then address the potential constitutional implications of significantly expanding the retention, dissemination, or use of certain types of intelligence information.

## I. The Constitutional Framework for Assessing the Vetting Proposal: Aliens' Rights and Immigration Authority

### A. Constitutional Rights of Aliens Inside the United States

While the law in this area is evolving and fact-sensitive, a few principles can be gleaned from the relevant cases. First, lawful permanent residents would probably be treated by the courts as having many of the constitutional rights possessed by U.S. citizens; these rights may even be recognized when lawful permanent residents are outside the country, at the very least, to the extent they are being vetted for purposes of determining whether they may reenter the country. *See Landon v. Plasencia*, 459 U.S. 21, 32 (1982) (holding that a permanent resident alien can invoke the Due Process Clause when attempting to return to the United States from abroad); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 600 (1953) (resident alien entitled to procedural due process rights after being denied reentry into the country); *cf.* Exec. Order No. 13,780, Fed. Reg. 13209, 13,214 (Mar. 6, 2017) (excepting "any lawful permanent resident of the United States" from the scope of a temporary ban on entry of certain aliens into the United States).[4]

Second, even aliens who are not LPRs who enter the United States and develop substantial connections to this country gain some rights guaranteed by the Constitution. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) ("[A]liens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country."); *Almeida-Sanchez v. United States*, 413 U.S. 266, 273 (1973) (holding that a Mexican citizen with a valid United States work permit enjoyed Fourth Amendment protections and that border agents violated his Fourth Amendment rights when, lacking reasonable suspicion and acting in the United States and far from the border, they seized and searched his car); *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950) ("The alien . . . has been accorded a generous and ascending scale of rights as he increases his identity with our society.") Additionally, courts have held that those rights may apply, depending on the

---

[3] The law in this area is also somewhat unsettled. This memorandum contributes to an ongoing interagency discussion of an evolving vetting process; it is not a final agency position.

[4] The Supreme Court has suggested, at least in dicta, that there may be cases in which an LPR's absence from the United States may be so prolonged and present such circumstances that it could be fairly determined that the alien abandoned his due process interest in retaining his or her LPR status. *See Plasencia*, 459 U.S. at 33-34.

3

*DRAFT - Attorney Work Product – Deliberative Process Privilege*

circumstances and constitutional right at issue, to certain aliens while they are outside the United States or seeking to reenter the United States. *See Ibrahim v. DHS*, 669 F.3d 983, 995 (9th Cir. 2012) (student visa holder who had studied at Stanford for 4 years, was mistakenly placed on the No Fly List, and was prevented from returning to the United States had "significant voluntary connection" with the United States sufficient to "assert claims under the First and Fifth Amendments") What is a "substantial connection" to this country for constitutional purposes is not well-defined in the caselaw.

Third, an alien's presence within U.S. territory is generally a sufficient connection to confer constitutional rights, particularly outside of the immigration context. For example, the Supreme Court has suggested that all persons within the United States, including aliens, have due process protections, *see Mathews v. Diaz*, 426 U.S. 67 (1976) ("There are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these persons from deprivation of life, liberty, or property without due process of law."); *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."), though what process is due to any particular individual may well vary based on the circumstances. The government's authority to search and seize an alien's property inside the United States is limited by the Fourth Amendment. *See Yanez-Marquez v. Lynch*, 789 F.3d 434, 468 (4th Cir. 2015) (finding that execution of search warrant against illegal aliens' residence outside of hours authorized in warrant was a Fourth Amendment violation but not one egregious enough to merit suppression in removal hearing); *Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 626 (5th Cir. 2006) (finding Fourth Amendment violation in alien's arrest and agent's use of excessive force). Aliens here can also invoke equal protection rights. *See Plyler v. Doe*, 457 U. S. 202, 210 (1982). And aliens here can invoke First Amendment rights. *See Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and of press is accorded aliens residing in this country").

Fourth, aliens outside the United States generally lack constitutional rights. *Verdugo*, 494 U.S. at 271. Vetting measures taken against aliens outside the United States are, as a general matter, unlikely to raise constitutional concerns, at least with respect to aliens other than LPRs and those with substantial ties to this country asserting a right to reenter the country. It should be noted, however, that United States citizens with cognizable constitutional claims could challenge measures imposed on aliens outside the United States to the extent those measures affect the U.S. citizens' constitutional rights, although their ability to get relief has been limited. Even aliens abroad may be able to assert the rights of third-party U.S. citizens themselves in limited circumstances. *See Kerry v. Din*, 135 S. Ct. 2128 (2015) (Kennedy, J., concurring in judgment) (assuming, without deciding, that U.S. citizen had procedural due process right to an explanation of the grounds for the denial of alien husband's visa application, right was satisfied); *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972) (holding that U.S. citizens could challenge denial of discretionary waiver of visa ineligibility to an alien invited to speak, but finding visa denial was valid exercise of authority); *Morales-Santana*, 137 S. Ct. at 1689 (alien had third-party standing to challenge alleged denial of equal protection rights of U.S. citizen father, although remedy did not provide relief to alien); *see also Am. Academy of Religion v. Napolitano*, 573 F.3d 115, 125 (2d Cir. 2009) (holding that court could review alien's visa denial, which was based on

4

*DRAFT - Attorney Work Product – Deliberative Process Privilege*

terrorism-related grounds, under *Mandel* based on plaintiff organizations' First Amendment rights).

Fifth, "aliens seeking initial entry to the country or who [are] apprehended immediately after entry," generally lack the full panoply of rights afforded to aliens who have resided in the country for a significant period of time, or who have entered lawfully. *Castro v. U.S. Dep't of Homeland Sec.*, 835 F.3d 422, 447-48 (3d Cir. 2016) (Suspension Clause did not apply to such aliens); *see also Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953) ("Courts have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control."); *Castro v. Cabrera*, 742 F.3d 595, 599-600 (5th Cir. 2014) (aliens detained and aggressively questioned while being denied entry to the United States lacked Fourth Amendment rights because the law treated them as if outside the United States); *cf. United States ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1924) (finding arriving alien seeking initial admission to the United States outside the protection of the First Amendment). The preclusion of certain constitutional claims for such aliens seeking entry involves the "entry fiction" that an alien who has not been admitted—even if he is present in the United States—is "treated for constitutional purposes, 'as if stopped at the border.'" *Zadvydas*, 533 U.S. at 693, *quoting Mezei*, 345 U.S. at 213, 215. There are limits to this "entry fiction," and aliens stopped at the border can assert constitutional rights in certain instances, especially against claims of violations of bodily integrity. For instance, the Fifth Circuit has explained that while it applies the "entry fiction" in the immigration context to preclude Fourth Amendment claims for aliens who have been denied entry, the fiction will not apply if there are claims of "gross physical abuse" or claims outside the immigration context. *Cabrera*, 742 F.3d at 600; *see also Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 623 (5th Cir. 2006) (declining to apply "entry fiction" to preclude alien's challenge to use of excessive force).

In short, it seems likely that at least a large fraction of those aliens located in the United States who would be the subject of the vetting would be able to assert various constitutional rights. We therefore recommend assessing proposals being considered on the assumption that the aliens within the United States are generally protected by the Constitution. To the extent that they challenge immigration measures that regulate who is entitled to be in this country, review may be under a deferential standard of review, as explained below.

### B. Political Branches' Authority Over Immigration

Although aliens inside the United States may be able to assert a range of constitutional rights, the power of the political branches over immigration matters has been accorded extraordinary judicial deference. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952). Indeed, in the exercise of its broad power over immigration, "Congress regularly makes rules that would be unacceptable if applied to citizens." *Reno v. Flores*, 507 U.S. 292, 305-06 (1993); *see also Din*, 135 S. Ct. at 2140 (Kennedy, J., concurring in judgment) (plurality rejected a Fifth Amendment due process challenge brought by a U.S. citizen against the denial of her spouse's visa; citing "the congressional power to make rules for the exclusion of aliens, and the ensuing power to delegate authority to the Attorney General to exercise substantial discretion in that field"); *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) ("[J]udicial deference to the Executive Branch is especially appropriate in the immigration context where officials exercise especially

5

sensitive political functions that implicate questions of foreign relations.") (quotation marks and citation omitted).  Despite the wide deference afforded in the immigration context, however, "Congress may not ignore [aliens' constitutional rights] in the exercise of its 'plenary' power of deportation." *Bridges*, 326 U.S. at 161 (Murphy, J., concurring) (finding alien's detention for removal because of communist affiliation to be unlawful); *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1693 (2017) (acknowledging "Congress' 'exceptionally broad power' to admit or exclude aliens" but declining to defer to the Executive Branch in an equal protection challenge to a citizenship-granting statute).  Government action taken against aliens should not be arbitrary and should not discriminate on bases that cannot be justified.  *See Shahla v. INS*, 749 F.2d 561, 563 n.2 (9th Cir. 1984) ("the judicial branch may examine whether the political branches have used a foreign policy crisis as an excuse for treating aliens arbitrarily").

## II. Potential Constitutional Issues

### A. Constraints on Vetting

The Constitution does not generally restrict the government's ability to use aliens' identifiers to query data it already holds in order to determine whether the alien has connections to terrorism.  However, mistaken inclusion of individuals on watchlists has given rise to constitutional and other claims.  *See, e.g., Abdelfattah v. Dep't Homeland Sec'y*, 787 F.3d 524 (D.C. Cir. 2015) (alien sought expungement of his information from U.S. Customs and Border Protection's TECS database, but court found no constitutional violation that could be the basis for the requested relief); *Menard v. Saxby*, 498 F.2d 1017, 1030 (D.C. Cir. 1974) (remanding for entry of an order to FBI to expunge record of unlawful arrest from criminal files, citing constitutional avoidance as well as statutory interpretation grounds). Such claims generally come to light and have the potential to be actionable once an adverse action is taken against the target. *See Ibrahim v. DHS*, 62 F. Supp. 3d 909, 930 (N.D. Cal. 2014) (ordering government to remove alien's name from various watchlists to which it was added in error, but noting that "until concrete, reviewable adverse action occurs against a nominee, the Executive Branch must be free to maintain its watchlists in secret").

There may also be claims against programs related to vetting that are targeted against particular individuals or groups, alleging that the targeting itself is on an impermissible basis. For instance, the government after 9/11 instituted a program (that has since been discontinued) requiring non-LPR males over the age of 16 from designated countries—including Muslim majority states and North Korea—to appear for registration and fingerprinting.  Courts upheld the program against equal protection challenges.  *See Rajah v. Mukasey*, 544 F.3d 427, 439 (2d Cir. 2008) (stating that the court "join[s] every circuit that has considered the issue in concluding that [National Security Entry-Exit Registration System (NSEERS)] does not violate Equal Protection guarantees," and noting the absence of evidence that the program was motivated by animus on account of religion, ethnicity, gender or race) (citing cases).  The courts have applied the principle that "Congress may permissibly set immigration criteria based on an alien's nationality or place of origin" to conduct deferential review of such challenges.  *See Kandamar v. Gonzales*, 464 F.3d 65, 72 (1st Cir. 2006).

Aliens have also raised selective enforcement claims as defenses to deportation, claiming that they were targeted because they were members of a particular group.  However, the Supreme Court has effectively closed the door to such claims, stating that "[a]s a general matter . . . an alien unlawfully in this country has no constitutional right to assert selective enforcement

as a defense against his deportation." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 488 (1999). The Court left open "the possibility of a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations [that allowing selective enforcement claims would result in delayed removals, chill law enforcement efforts, and require courts to evaluate foreign policy] can be overcome." *Id.* at 491.

### B. Constraints on Collection

It is possible that aliens in the United States may challenge the collection through immigration forms of identity information revealing their political views or associations or infringing on their privacy.[5] While aliens legally present inside the United States may invoke First Amendment or equal protection rights, previous information collections have nevertheless withstood constitutional scrutiny based on the executive's broad authority to regulate immigration. The INA has long required aliens to register and be fingerprinted if they remain in the United States for thirty days or more. The statutes also gives the government broad authority to ask questions in that process. 8 U.S.C. §§ 1302 (requiring registration and fingerprinting), 1304 (requiring registration forms that may include questions on "such additional matters as may be prescribed"), 1305(a) (permitting Attorney General, with 10 days' notice, to require aliens who must be registered to provide current address and other information). *See Rajah*, 544 F.3d at 439 (2d Cir. 2008) (upholding NSEERS registration, which required certain aliens to register, be fingerprinted, and present immigration-related paperwork); *see also United States v. Sacco*, 428 F.2d 264, 271 (9th Cir. 1970) (registration statute did not violate right against self-incrimination).

The statutory authority for the Secretary of Homeland Security to require certain reporting is more limited for LPRs than for non-LPR aliens. The Secretary may "prescribe special regulations and forms for the registration and fingerprinting" of "special groups" of non-resident aliens other than those "lawfully admitted to the United States for permanent residence." 8 U.S.C. § 1303(a). LPRs may be nonetheless required to provide, upon ten days' notice, their current address and "furnish such additional information as the [Secretary] may require," although the nature and extent of the additional information that may be required under this provision is untested. 8 U.S.C. § 1305(b).[6]

---

[5] We assume for purposes of this memorandum that the "collection" of information at issue would be the collection of identity-related information that immigrants or visitors provide via on immigration or travel forms. As such, it would not involve a search or a seizure within the meaning of the Fourth Amendment. *See Rajah*, 544 F.3d at 441 ("the government does not violate the Fourth Amendment by obtaining documents or statements in the course of an alien's compliance with a statutorily authorized registration program"). Different issues may be presented if the information collection were unrelated to the purposes or went beyond the scope described. *See id.* ("The Fourth Amendment does provide protection against random or gratuitous questioning related to an individual's immigration status.").

[6] Some residual statutory references to the Attorney General that pertain to the transferred functions of the former INS are now deemed to refer to the Secretary. *See* 6 U.S.C. §§ 251, 271(b), 557; 6 U.S.C. § 542 note; 8 U.S.C. § 1551 note.

*DRAFT - Attorney Work Product – Deliberative Process Privilege*

Although there has long been statutory authority to require all aliens to provide information to the government on a recurring basis, the constitutional limits of that authority are unsettled. The Second Circuit has cautioned that this statutory authority to request information might not "authorize the gathering of information whose collection, in itself, might raise constitutional questions." *Rajah*, 544 F.3d at 436 n.9. There may be relevancy limits on the type of information that may be requested. *See United States v. Witkovich*, 353 U.S. 194, 195 (1957) (construing a grant of authority to the Attorney General to ask aliens whatever questions he "deem[s] fit and proper" as limited to questions "reasonably calculated to keep the Attorney General advised regarding the continued availability for departure of aliens whose deportation is overdue," and rejecting questions about alien's memberships in clubs and societies).

Accordingly, although the standard for balancing federal immigration-related authority against the constitutional rights of aliens is not entirely clear and potentially leaves significant room for government regulation, any measures to collection information should be assessed to determine whether they are supported by legitimate reasons. The case of recurrent vetting for LPRs may present the most issues, particularly if changes in the process were imposed retroactively on those who already have their status.

One collection warranting particular scrutiny is the proposed expansion of the collection of social media identifiers through immigration or travel-related forms or INA-authorized updates.[7] Currently social media identifiers are collected on a voluntary basis from visitors who travel using the Electronic System for Travel Authorization (ESTA). ESTA is the automated system for determining the eligibility of travelers from countries participating in the Visa Waiver Program (VWP) to travel here. There are proposals to expand this collection of social media identifiers and to make it compulsory.

Aliens in the United States might raise First Amendment challenges if the collection of social media identifiers reveals their views or associations—*e.g.*, if the identifier itself reveals an association with a viewpoint-based group or expressed a political view. Similar claims have failed when the government has a legitimate reason for the collection. For example, the Ninth Circuit upheld a requirement that an LPR applying for naturalization list all organizations with which he had ever been affiliated. *Price v. INS*, 962 F.2d 836, 842-44 (9th Cir. 1992) (acknowledging First Amendment right but applying deferential standard to limit review to whether the requirement was "facially legitimate and bona fide"); *but see id.* at 844-45 (Noonan, J., dissenting) (arguing that LPR had same constitutional rights as citizens and thus more exacting First Amendment scrutiny should be applied), even though the same requirement had been struck down when applied to (citizen) teachers. *See Shelton v. Tucker*, 364 U.S. 479 (1960) (holding unconstitutional a requirement that teachers in public schools, as a condition of

---

[7] We are not analyzing the constitutional issues that might be presented if the government also compelled the disclosure of passwords or had a policy of analyzing and collecting the content of aliens' social media posts. For instance, the Privacy Act prohibits the collection and maintenance of any record describing how an individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7). The Department of Homeland Security has drafted a paper on the Privacy Act implications for recurrent vetting.

*DRAFT - Attorney Work Product – Deliberative Process Privilege*

employment, disclose annually all organizations to which they belonged or regularly contributed within the preceding five years).

Aliens may also argue that required disclosure of social media identifiers compromises a right to anonymous speech recognized as a protected form of free expression. *See, e.g., McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341-42 (1995) ("[A]n author's decision to remain anonymous . . . is an aspect of the freedom of speech protected by the First Amendment"); *Watchtower Bible & Tract Soc'y v. Vill. of Stratton*, 536 U.S. 150, 166 (2002) ("The requirement that a canvasser must be identified in a permit application filed in the mayor's office and available for public inspection necessarily results in a surrender of [constitutionally protected] anonymity"). Requiring individuals to disclose their social media identifiers might reveal their authorship of otherwise anonymous speech and thereby chill the aliens' expression. Indeed, cases have recognized that a law that has a chilling effect on speech may be problematic under the First Amendment more broadly. *See Arizona Free Enterprise Club v. Bennett*, 564 U.S. 721, 746 (2011) (a law that does not directly restrict speech may nonetheless infringe on protected speech by creating a chilling effect); *see also Presbyterian Church v. United States*, 870 F.2d 518, 522-23 (9th Cir. 1989) (finding cognizable claim that INS covert surveillance in churches as part of an investigative of a sanctuary movement to aid refugees chilled participants from participating in worship activities).

A key factor in how courts will rule on such challenges is the standard of review that they adopt, which itself may be affected by the type of challenge and the alien's status. Courts have frequently adopted a deferential standard of review in the immigration context, *see, e.g., Price*, 962 F.2d at 842 (applying deferential standard to alien's First Amendment challenge to denial of petition for naturalization), but that standard is not certain, particularly for LPRs. *See Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1065 (9th Cir. 1995) (rejecting deferential standard for alleged infringement of First Amendment rights in deportation decision).[8]

Finally, we note that non-LPR aliens outside the United States do not enjoy First Amendment rights, and presumably much information collected in the immigration system comes from applications filled out by aliens abroad. *See Turner*, 194 U.S. at 292 (excludable arriving alien is not entitled to First Amendment rights because he has not yet become part of "the people" protected under the First Amendment). However, the legal analysis applicable to handling or uses of such information that is still retained after an alien becomes an LPR (or citizen) would change, so, for purposes of retaining and managing records, it may be important to identify the point in time when an alien's status changes.

---

[8] In addition, the collection of social media identifiers might also be challenged as an invasion of a constitutional right to information privacy. Challenges to collection of drug treatment and prescription data as violating a right to privacy were considered (though rejected) in *NASA v. Nelson*, 562 U.S. 134 (2011), and *Whalen v. Roe*, 429 U.S. 589 (1977), which assumed for purposes of discussion that the Constitution protects a general right to informational privacy that could result in close judicial scrutiny. The Supreme Court has reserved the question whether such a right exists, but if it does, the collection would have to be a reasonable use of government powers, and the court would also consider provisions that protect against the public disclosure of the information.

*DRAFT - Attorney Work Product – Deliberative Process Privilege*

### C.     Constraints on Use

Aliens are generally entitled to due process rights before immigration benefits can be terminated or revoked, or the alien can be removed. To the extent that actions taken based on vetting results affect other applicable constitutional rights such as the freedoms of expression and association, aliens may litigate those uses as well. In any of those challenges, the government may be required to disclose sensitive information to justify its actions.

#### 1. Due process rights in immigration proceedings

As explained above, aliens in the United States have due process rights. *See Zadvydas*, 533 U.S. at 693. The nature and extent of those due process rights may vary, depending on the alien's status and the type of proceeding. *See id.* at 693-94. Typically, due process requires that the government provide a person with notice of the deprivation and an opportunity to be heard before a neutral party. In most instances in the context of termination of immigration benefits, immigration statutes and agency regulations provide aliens a right to notice of intent to terminate immigration benefits, and an opportunity to present opposing evidence to an immigration judge. *See, e.g.*, 8 C.F.R. § 205.2 (revocation of approval of certain petitions); 8 C.F.R. § 208.24(c) (termination of asylum or withholding of removal); 8 C.F.R. § 246.1 (rescission of adjustment of status). When the government seeks to remove aliens from the United States, aliens must have "a reasonable opportunity" to examine the government's evidence, to present evidence on their own behalf, and to cross-examine witnesses against them. 8 U.S.C. § 1229a(b)(4)(B); *see* 8 C.F.R. § 1240.10(a)(4) (same). Aliens who have LPR status are, for example, entitled to robust due process protections before removal. *See Rafeedie v. INS*, 880 F.2d 506, 520-23 (D.C. Cir. 1989).

In contrast, where aliens are pursuing a new application for immigration benefits to which they do not have an entitlement—such as an employment-based nonimmigrant status or adjustment of status to that of an LPR—even if the alien is already present in the United States, due process protections generally do not apply, because aliens have no liberty interest in discretionary benefits to which they have no entitlement. *See Jay v. Boyd*, 351 U.S. 345, 354 (1956). However, depending upon the particular immigration benefit, certain agency guidelines and regulations may extend process rights that are not constitutionally required.

One due process right is the right to be informed of the evidence being used against the alien. If in litigation a court finds that an alien is entitled to know the basis for an action, the government may be required to disclose sensitive information in order to proceed with the case. Agencies contributing information to the vetting program should be aware of this risk. Aliens may also attempt to challenge the adequacy and accuracy of that information. Nonetheless, the right to examine and challenge national security information is limited in certain immigration-related processes. For example, although aliens must be afforded a reasonable opportunity to examine evidence against them in removal proceedings before an immigration court, aliens are not entitled to examine national security information proffered by the Government in opposition to their admission or in connection with a request for discretionary

*DRAFT - Attorney Work Product – Deliberative Process Privilege*

relief from removal. 8 U.S.C. § 1229a(b)(4)(B); *see also, e.g.*, 8 C.F.R. §§ 103.2(b)(16); 1003.46; 1240.11(a)(3), (c)(3)(iv).[9]

### 2. Due process rights associated with other uses

If the enhanced vetting results are used for other purposes, such as watchlisting or credentialing decisions, the same issues that are currently being litigated for those uses would apply to the use of the enhanced vetting results. Aliens may be able to raise constitutional issues, depending on the right infringed as well as the alien's status and the use. In the watchlisting context, for instance, several courts have held that certain aliens had constitutionally protected liberty interests such as in traveling internationally by air that were affected by their purported placements on the No Fly List and that triggered the protections of procedural due process. *See, e.g., Latif v. Holder*, 28 F. Supp. 3d 1134, 1149-50 (D. Or. 2014) (LPRs placed on No Fly List had constitutionally protected liberty interests in traveling internationally by air and in their reputations); *see also Ibrahim*, 62 F. Supp. 3d 909 (nonimmigrant alien who came to U.S. on student visa was erroneously placed on No Fly List, which affected her right to travel, right to be free from incarceration, and right to be free from the stigma and humiliation of a public denial of boarding and incarceration). Plaintiffs in the terrorism watchlisting context have in due process challenges contested the adequacy of the procedures, the reasonableness of the standards for listing, and the adequacy and accuracy of the information for individual decisions. *Latif*, 28 F. Supp. 3d at 1161, 1162 (holding that then-applicable redress procedures for the No Fly List fell "far short of satisfying the requirements of due process," which required that plaintiffs be provided "with notice regarding their status on the No-Fly List and the reasons for placement on that List"); *see also Latif v. Lynch*, 2016 WL 1239925 (D. Or. Mar. 28, 2016).

If the results of vetting were used to take actions that restricted an alien's constitutionally protected interests, then aliens would likely bring challenges similar to those being litigated in the watchlisting context. For new uses of this information, agencies would need to build a record in the administrative phase to support the action taken. In subsequent litigation, aliens might challenge the information used to list them, the standards or thresholds required for the action, and the adequacy of the process. There could be due-process-based obligations to disclose information that the government used in its decision to take action. For these reasons, any administrative process that would involve the use of the vetting results should be carefully designed.

### 3. First Amendment limitations on use

The government's use of an alien's expressive or associational information, such as information concerning association with certain groups, to deny or rescind an immigration benefit may be challenged based on the Free Speech Clause, the Free Exercise Clause, the Establishment Clause, or the First Amendment's protections for the freedom of association. There may also be restrictions on government action, even against aliens outside the United States, designed to discriminate on the basis of religion. *Cf. Int'l Refugee Assistance*

---

[9] The Alien Terrorist Removal Court, a special court composed of U.S. district court judges to review applications for the removal of alien terrorists, which has never been used, provides for the use of undisclosed classified information in a removal case. 8 U.S.C. § 1534; *see also* 8 U.S.C. § 1225(c) (allowing for removal of certain arriving aliens based on undisclosed confidential information).

11

*Project v. Trump*, 857 F.3d 554 (4th Cir.), *as amended* (May 31, 2017), *as amended* (June 15, 2017) (holding that because the second travel ban executive order's "primary purpose is to exclude persons from the United States on the basis of their religious beliefs" it likely violates the Establishment Clause), *vacated and remanded*, 138 S. Ct. 353 (2017).

While the Supreme Court has stated that "[f]reedom of speech and of press is accorded aliens residing in this country," *Bridges*, 326 U.S. at 148, Congress's plenary power over immigration has meant that a lower level of judicial scrutiny typically applies in immigration-related proceedings, and immigration statutes implicating First Amendment protections have historically withstood constitutional scrutiny. The immigration statutes have long required the exclusion, deportation, and removal (in some circumstances) of aliens based upon their association with organizations advocating communism or the overthrow of the United States government, and the Supreme Court has repeatedly upheld these statutes as constitutional. *See, e.g., Harisiades*, 342 U.S. at 592 (rejecting First Amendment challenge to deportation for membership in Communist Party by referring to constitutionality of anti-Communist criminal statutes); *Galvan v. Press*, 347 U.S. 522, 529 (1954) (upholding deportation of a former member of a Communist organization who did not personally advocate the violent overthrow of the Government); *Carlson v. Landon*, 342 U.S. 524 (1952).

Aliens have tried to challenge immigration actions as discriminating on the basis of aliens' protected speech. However, so long as there is a legitimate basis for removing an alien— *e.g.*, a disqualifying conviction or non-compliance with immigration law—courts have been reluctant to second-guess the government's motives. In 1999, the Supreme Court rejected another challenge involving an associational bar in the immigration law. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999) (*AAADC*). The Ninth Circuit had upheld on First Amendment grounds a preliminary injunction against selective deportation of aliens whom the government alleged were members of an organization that advocated communism and terrorism. They were also charged with status violations such as overstaying a visa. *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1055-56 (9th Cir. 1995) ("the foreign policy powers which permit the political branches great discretion to determine which aliens to exclude from entering this country do not authorize those political branches to subject aliens who reside here to a fundamentally different First Amendment associational right"). While the case was pending, Congress amended the law to limit judicial review to final orders of removal, thereby precluding adjudication of the plaintiffs' lawsuit. The Supreme Court rejected plaintiffs' argument that the Court should exercise jurisdiction notwithstanding the review-limiting statute because the government had selectively prosecuted them based on their affiliation with an unpopular group. The Court explained that "[w]hen an alien's continuing presence in this country is in violation of the immigration laws, the Government does not offend the Constitution by deporting him for the additional reason that it believes him to be a member of an organization that supports terrorist activity." *AAADC*, 525 U.S. at 491-92.

The same statute limiting judicial review has also been construed to limit aliens' ability to mount First Amendment challenges to certain immigration actions outside of direct review of a removal order. *See Humphries v. Various Fed. USINS Emps.*, 164 F.3d 936, 945 (5th Cir. 1999) ("Pursuant to [8 U.S.C.] § 1252(g), we therefore have no jurisdiction to entertain [plaintiffs'] allegations [in *Bivens* suit] that the INS excluded him in violation of the First Amendment"); *but see Kwai Fun Wong v. United States*, 373 F.3d 952, 964-65 (9th Cir. 2004) (holding that § 1252(g) did not bar foreign religious leader's *Bivens* actions against INS officials alleging First

*DRAFT - Attorney Work Product – Deliberative Process Privilege*

and Fifth Amendment violations in relation to detention, adjustment of status denial, and revocation of parole). Despite the restrictions on judicial review, First Amendment challenges to actions taken based on an alien's speech or association can be expected to continue.

Despite these hurdles to First Amendment challenges, First Amendment interests might still be implicated when the government regulates core First Amendment activity. *Rowoldt v. Perfetto*, 355 U.S. 115 (1957) (imposing a higher standard of proof and requiring government to show "meaningful association" with the Communist Party); *Immigration Laws and Iranian Students*, 4A Op. O.L.C. 133, 138 (1979) (explaining that "[w]e have serious doubt whether the identification of the class of deportable persons could be made to turn on" whether aliens had participated in marches or advocated for the death of the Shah but also opining that "the Attorney General could determine that the presence of [aliens] severely injures the ability of this country to conduct foreign policy and threatens maintenance of the public order"); *cf. Rafeedie*, 880 F.2d at 517 (recognizing that summary exclusion proceeding could have chilling effect if alien is not provided with evidence used against him, since he may fear that he is being excluded "for his legitimate activities as an outspoken critic of the Government's foreign policy").

### 4. Other rights

Depending on the uses that are made of vetting information, aliens may also bring challenges based on other constitutional rights. Aliens have also brought equal protection claims under the Due Process Clause to challenge immigration actions, but they have met with little success. The equal protection guarantee does apply to aliens within the United States, but federal authority in the areas of immigration and naturalization is plenary, so classifications among groups of aliens or on account of nationality drawn as a basis for determining their eligibility to enter or remain in the United States have been upheld against an equal protection challenge when there was a facially legitimate and bona fide reason for the classification. *See, e.g., Rajah*, 544 F.3d at 438; *Resendiz–Alcaraz v. U.S. Att'y Gen.*, 383 F.3d 1262, 1271 (11th Cir. 2004). Courts may only apply the deferential standard to these classifications if the distinctions are properly characterized as arising out of an exercise of the federal government's power to regulate the presence of aliens in this country. *See Morales-Santana*, 137 S. Ct. at 1689 (invalidating a provision of the INA that did not involve that power "under the heightened scrutiny that now attends all gender-based classifications" (internal citations omitted)).

### III. Fourth Amendment Considerations Related to Querying or Disseminating Information Lawfully Collected Under Foreign Intelligence Authorities

New and expanded systematic use and dissemination of personal information held by the government may require reexamination of whether some of the government's collection of the information complies with the Fourth Amendment's requirement of reasonableness, where the information was lawfully obtained under foreign intelligence authorities such as FISA or Executive Order 12333. Courts considering Fourth Amendment challenges to the collection of FISA information have recognized that "the Fourth Amendment does not apply to searches and seizures by the United States against a non-resident alien in a foreign country." *United States v. Mohamud*, 843 F.3d 420, 439 (9th Cir. 2016) (internal quotation marks omitted), *cert. denied*, __ S. Ct. __, 2018 WL 311442 (Jan. 8, 2018). Collection targeting a non-resident alien outside the

13

*DRAFT - Attorney Work Product – Deliberative Process Privilege*

United States, however, may result in incidental collection on U.S. persons[10] or on persons located in the United States who, for example, may be communicating with the non-resident alien target. The fact of such incidental collection does not itself render the collection violative of the Fourth Amendment. Nor would the sharing of information acquired through such incidental collection necessarily violate the Fourth Amendment. *See, e.g., id.* at 439-40, 443; *In re Directives Pursuant to Sec. 105B of For. Intelligence Surveillance Act*, 551 F.3d 1004, 1015 (FISA Ct. Rev. 2008).

However, intelligence collection programs must be reasonable under the Fourth Amendment, an inquiry that takes into account post-collection handling, dissemination, and use of the information. *See, e.g., Mohamud*, 843 F.3d at 443. Under the vetting proposal, queries might be run against a large number of telephone numbers and social media identifiers. The results might reveal, and subject to review, communications to, from, and about U.S. persons that the government possesses but does not currently examine. Many of the communications likely would have nothing to do with the purpose of the proposal. The extent of the intrusion on U.S. persons would increase if the numbers or identifiers of LPRs are included in the queries, particularly in the absence of any suspicion that the LPR is associated with terrorist activity or that the query will return foreign intelligence information. The Ninth Circuit has held that, under section 702 of the Foreign Intelligence Surveillance Act (FISA), "[a]n important component of the reasonableness inquiry is whether the [Foreign Intelligence Surveillance Court]-approved targeting and minimization measures sufficiently protect the privacy interest of U.S. persons." *Mohamud*, 843 F.3d at 443; *see also [Caption Redacted]*, 2011 WL 10945618, at *27 (FISA Ct. Oct. 3, 2011) ("[t]he [FISA] Court of Review and this Court have recognized that the procedures governing retention, use, and dissemination bear on the reasonableness under the Fourth Amendment of a program for collecting foreign intelligence information.").

In this context, the volume of Fourth Amendment protected information collected and how it is protected and disseminated are key considerations. When the Ninth Circuit evaluated the collection of FISA Section 702 information used in a criminal prosecution, the court found "the most troubling aspect of this 'incidental' collection" was "its volume, which is vast, not *de minimis*." *Mohamud*, 843 F.3d at 440. In evaluating the constitutionality of the program, that vast volume increased "the importance of minimization procedures [governing retention and dissemination of information] once the communications are collected." *Id.*; *see also [Caption Redacted]*, 2011 WL 10945618. Indeed, the Foreign Intelligence Surveillance Court found that one program in which NSA collected "Multicommunication Transactions" (MCTs) was not reasonable under the Fourth Amendment because the procedures governing retention, use, and dissemination did not adequately address Fourth-Amendment protected information. Both the volume of domestic communications collected and the nature of the intrusion—personal communications of U.S. persons and persons in the United States—factored into the court's analysis. *[Caption Redacted]*, 2011 WL 10945618, at *26-28.

If enhanced vetting changes the nature or volume of the retention, use, or dissemination of information about U.S. persons that had been collected through intrusive means under different foreign intelligence authorities such as FISA, courts may need to re-evaluate the reasonableness under the Fourth Amendment of the procedures that are applied to protect Fourth

---

[10] Under FISA, a U.S. person includes both citizens and LPRs (as well as certain corporations). 50 U.S.C. § 1801(i).

14

*DRAFT - Attorney Work Product – Deliberative Process Privilege*

(b)(5)

15