# EXHIBIT HH

FOR OFFICIAL USE ONLY / PRE-DECISIONAL
ATTORNEY WORK PRODUCT / ATTORNEY-CLIENT PRIVILEGED

**Inadmissibility Based on Endorsing or Espousing Terrorist Activity: First Amendment Concerns**

1. **Introduction**

This paper discusses First Amendment concerns that may arise in applying the security-related ground of inadmissibility under section 212(a)(3)(B)(i)(VII) of the Immigration and Nationality Act (INA), as amended, which renders inadmissible any alien who "endorses or espouses" terrorist activity.[1] That ground of inadmissibility is applied exceedingly rarely, but is considered available for use in compelling circumstances. Whether use of ~~this~~ that inadmissibility ground raises First Amendment concerns will depend on a number of factors, including whether the individual is entitled to First Amendment protection, whether a U.S. citizen has a First Amendment interest in hearing from the alien, and whether the speech itself is protected by the First Amendment. Lastly, this paper will briefly discuss alternative inadmissibility grounds that

(b)(5)

range along a spectrum, depending on the aliens' contacts with the United States and the character of the speech at issue. On one end of the spectrum, Supreme Court decisions appear to establish that the government may exclude aliens whose advocacy or beliefs pose a threat to the national security of the United States or the security of its nationals. On the other end, lawful permanent residents very likely could not be excluded or removed for expressing mere philosophical support for terrorism or for endorsing the activities of groups whose activities do not implicate the foreign policy interests of the United States.

2. **INA Ground of Inadmissibility**

    a. Scope

INA § 212(a)(3)(B)(i)(VII) specifies that any alien who "endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization" is inadmissible.[2] The terms "endorse" and "espouse" are not defined in the INA or relevant

---

[1] This paper does not discuss the security-related deportability provisions under INA § 237(a)(4)(B), which incorporate by reference the grounds of inadmissibility under INA §§ 212(a)(3)(B) and (F). The First Amendment implications discussed in this paper, however, are applicable to the use of the security-related deportability ground under INA § 237(a)(4)(B).

[2] Pursuant to INA § 212(a)(3)(B)(iii), "terrorist activity" includes "any activity which is unlawful under the laws of the place where it is committed" and which involves any of the listed activities under INA §§ 212(a)(3)(B)(iii)(I)-(VI). INA § 212(a)(3)(B)(vi) provides for three types of terrorist organizations. Two of these – -INA

FOR OFFICIAL USE ONLY / PRE-DECISIONAL
ATTORNEY WORK PRODUCT / ATTORNEY-CLIENT PRIVILEGED

(b)(5)

(b)(5)

b. Statutory History

The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT Act) of 2001 created the INA's first "endorse or espouse" provision, establishing that an alien who "used [his or her] *position of prominence within any country to endorse or espouse terrorist activity, or to persuade others to support terrorist activity or a terrorist organization, in a way that the Secretary of State has determined undermines United States efforts to reduce or eliminate terrorist activities*" is inadmissible. Pub. L. No. 107-56, § 411, 115 Stat. 272, 346 (2001) (emphasis added); INA § 212(a)(3)(B)(i)(VI) (2004). The REAL ID Act of 2005 broadened the provision, lifting the restriction that, *inter alia*, the alien be a person of prominence in order to be found inadmissible or removable. Pub. L.

(b)(5)

(b)(5)

3. The Applicability of the First Amendment

It is a well-established principle that aAliens abroad generally enjoy no constitutional right of entry into the United States, and Congress enjoys plenary authority to determine what categories of aliens are inadmissible. *See Kerry v. Din*, 135 S. Ct. 2128, 2131 (2015) ("[A]n unadmitted and nonresident alien … has no right of entry into the United States, and no cause of action to press in furtherance of his claim for admission"). In *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972), the Supreme Court upheld the Attorney General's denial of a discretionary waiver of ineligibility for admission for a self-described revolutionary Marxist visa applicant who was a non-resident, and outside the United States and found inadmissible on the basis of his politics. Yet, Congress's authority is not unfettered, and it can exercise its plenary power over

---

§§ 212(a)(3)(B)(vi)(I) and (II) – involve Secretary of State designations, and the third is for an "undesignated" group pursuant to INA § 212(a)(3)(B)(vi)(III).
[3] *Endorse*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/endorse (last accessed Apr. 17, 2017).
[4] *Espouse*, Black's Law Dictionary (10th ed. 2014).
[5] *Espouse*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/espouse (last accessed Apr. 17, 2017).

FOR OFFICIAL USE ONLY / PRE-DECISIONAL
ATTORNEY WORK PRODUCT / ATTORNEY-CLIENT PRIVILEGED

immigration only if it "does not offend some other constitutional restriction." See INS v. Chadha, 462 U.S. 919, 941 (1983) (citation omitted).

The Supreme Court has made some sweeping statements about Congress's power to exclude or deport aliens for reasons that would otherwise violate the constitutional rights of citizens. The Court has stated, for example, that "the power to exclude aliens is inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers – a power to be exercised exclusively by the political branches of government." Mandel, 408 U.S. at 765-66. It has observed that "over no conceivable subject is the legislative power of Congress more complete than it is over" the admission of aliens. Oceanic Steam Navigation Co. v. Stranahan, 214 U.S. 320, 339 (1909); accord Fiallo v. Bell, 430 U.S. 787, 792 (1977). "Any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power and maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." Harisiades v. Shaughnessy, 342 U.S. 580, 588–89 (1952); see also Galvan v. Press, 347 U.S. 522, 531 (1954) ("that the formulation of these policies is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government"). Moreover, the "Court has firmly and repeatedly endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens." Demore v. Kim, 538 U.S. 510, 522 (2003). The Court has thus permitted the government to exclude aliens on the basis of "political beliefs, sex, and illegitimacy," and permitted the government to "deport resident aliens on the basis of political beliefs," "affiliation," and even "conduct that wholly antedated the relevant prohibitory regulation." Constitutionality of Closing the Palestine Information Office, an Affiliate of the Palestine Liberation Organization, 11 Op. O.L.C. 104, 109 (1987).

There is nevertheless reason to doubt the breadth of some of those characterizations, because aliens in the United States do enjoy some constitutional protections. See generally Bluman v. Fed. Election Comm'n, 800 F. Supp. 2d 281, 286 (D.D.C. 2011) (three-judge court) (Kavanaugh, J.) ("We know from more than a century of Supreme Court case law that foreign citizens in the United States enjoy many of the same constitutional rights that U.S. citizens do."), aff'd, 565 U.S. 1104 (2012). Within the United States, the First Amendment confers a fundamental right to express and receive ideas. Stanley v. Georgia, 394 U.S. 557, 564 (1969). The Government ordinarily may not restrict expression because of its message: "Congress shall make no law…abridging the freedom of speech, or of the press." U.S. Const. amend. I. And, notwithstanding the broad statements quoted above, the Supreme Court has flatly stated that "[f]reedom of speech and of press is accorded aliens residing in this country." Bridges v. Wixon, 326 U.S. 135, 148 (1945) (citing Bridges v. California, 314 U.S. 252 (1941)).

Reconciling the two lines of authority – acknowledging both that Congress's power is at its apex when exercised to control the admission of aliens and that aliens have some, albeit unique and possibly circumscribed, constitutional rights – is difficult. The case law does, however, establish some landmarks that help to guide analysis of the relevant issues.

FOR OFFICIAL USE ONLY / PRE-DECISIONAL
ATTORNEY WORK PRODUCT / ATTORNEY-CLIENT PRIVILEGED

2018-ICLI-00001 39609

FOR OFFICIAL USE ONLY / PRE-DECISIONAL
ATTORNEY WORK PRODUCT / ATTORNEY-CLIENT PRIVILEGED

When addressing First Amendment-type activities of aliens, a threshold issue is whether or not the First Amendment applies to a particular alien, based on the alien's location and existing links to the United States. *See, e.g., United States v. Verdugo-Urquidez,* 494 U.S. 259, 271 (1990) (explaining that aliens "receive constitutional protections ~~are protected by the Constitution~~ "when they have come within the territory of the United States and developed substantial connections with this country"); *Plyler v. Doe,* 457 U.S. 202, 210-12 (1982) (holding that illegal aliens are protected by the Equal Protection Clause in the context of public education); *Mathews v. Diaz,* 426 U.S. 67, 77 (1976) (holding that the Fifth and Fourteenth Amendments protect all aliens within the jurisdiction of the United States, even those "whose presence in this country is unlawful, involuntary, or transitory," from "deprivation of life, liberty, or property without due process of law"). According to longstanding Supreme Court precedent, courts should apply a territorial test to distinguish between aliens residing within the United States and aliens abroad who apply for visas or seek admission at the U.S. border in determining their ~~C~~constitutional rights. Courts also have applied constitutional protections in cases where an alien had significant U.S. contacts, and in cases where a U.S. citizen challenged a visa denial to an alien based on the U.S. citizen's First Amendment rights.[6]

These standards ~~are (primarily?) derived~~ derive from case law in light of the specific factual circumstances presented. Thus, while this paper discusses general considerations that would apply in determining the applicability of First Amendment protections for aliens, it is impossible to identify bright-line rules that would consistently predict the outcome of litigation against the United States for having found inadmissible an alien based on statements that endorse or espouse terrorist activity.

   a. <u>Limitations Based on a Alien's Status and Location</u>

Generally, aliens who reside within the territory of the United States stand on equal footing with U.S. citizens to assert First Amendment liberties, whereas aliens abroad, including visa applicants at U.S. embassies and consulates and applicants for admission at U.S. ports of entry, lack this constitutional protection.[7] However, even aliens outside the United States with significant U.S. contacts (including aliens who are lawful permanent residents of the United States) may be entitled to First Amendment protections.

---

[6] The United States also has an international human rights obligation to ensure that "[e]veryone shall have the right to freedom of expression" under Article 19 of the International Covenant on Civil and Political Rights (ICCPR). Th~~at is~~ treaty obligation, however, applies only to ~~all~~ individuals who are within the territory of the United States and subject to its jurisdiction. *See* ICCPR, Article 2(1).

[7] An exhaustive discussion of particular scenarios in which application of the inadmissibility ground could be challenged on First Amendment grounds is beyond the scope of this paper. For example, a case where the alien made his or her speech *within* the United States, subsequently departed, and later sought reentry or admission would involve a complex First Amendment analysis on the use of INA § 212(a)(3)(B)(i)(VII).

FOR OFFICIAL USE ONLY / PRE-DECISIONAL
ATTORNEY WORK PRODUCT / ATTORNEY-CLIENT PRIVILEGED

4

FOR OFFICIAL USE ONLY / PRE-DECISIONAL
ATTORNEY WORK PRODUCT / ATTORNEY-CLIENT PRIVILEGED

### i. Aliens in the Interior of the United States

Aliens within the borders of the United States and who have developed other significant ties to the United States receive constitutional protections. . See ~~United States v.~~ *Verdugo-Urquidez*, 494 U.S. ~~259,~~ at 271 ~~(1990) ("[A]liens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country.")~~; *see also Rafeedie v. INS*, 795 F. Supp. 13, 21 (D.D.C. 1992) (finding a lawful resident alien enjoyed the same First Amendment rights as citizens). Regardless of immigration status, once an alien enters and resides in the United States, he or she ~~becomes invested with~~gains at least some of the rights guaranteed by the Constitution, including those protected by the First Amendment. *See Bridges v. Wixon*, 326 U.S. ~~135,~~ at 148 ~~(1945)~~ ("Freedom of speech and of press is accorded aliens residing in this country.") (citations omitted).

<u>Even so, at least some First Amendment protections apply differently to aliens than to citizens. In the realm of campaign finance, for example, the government may bar aliens from engaging in issue advocacy that is permitted for citizens. *See Bluman*, 565 U.S. 1104, *aff'g* 800 F. Supp. 2d 281; *see also Citizens United v. FEC,* 558 U.S. 310, 419-424 & n.51 (2010) (Stevens, J., joined by Ginsburg, Breyer, and Sotomayor, JJ., concurring in part and dissenting in part) ("The Government routinely places special restrictions on the speech rights of … foreigners …. Although we have not reviewed them directly, we have never cast doubt on laws that place special restrictions on campaign spending by foreign nationals."). Moreover, the Supreme Court held, albeit long ago, that the First Amendment does not protect aliens from deportation because of membership in the Communist Party, *see Harisiades*, 342 U.S. at 591-92, nor because they are anarchists, whether political or merely philosophical, *United States ex rel. Turner v. Williams*, 194 U.S. 279, 294 (1904) (explaining that even "[i]f the word 'anarchists' should be interpreted as including aliens whose anarchistic views are professed as those of political philosophers, innocent of evil intent, it would follow that Congress was of opinion that the tendency of the general exploitation of such views is so dangerous to the public weal that aliens who hold and advocate them would be undesirable additions to our population, whether permanently or temporarily, whether many or few; and, in the light of previous decisions, the act, even in this aspect, would not be unconstitutional, as applicable to any alien who is opposed to all organized government.").</u>

<u>Given their broadest reading, these cases suggest that Congress could exclude and deport aliens on the basis of their advocacy and beliefs merely because "Congress was of opinion that the tendency of the general exploitation of such views is so dangerous to the public weal that aliens who hold and advocate them would be undesirable additions to our population, whether permanently or temporarily, whether many or few." *Williams*, 194 U.S. at 294. Somewhat less expansively, one could interpret the cases as standing for the proposition that the government may limit the speech of aliens – and perhaps exclude or expel them – because its "historical power to exclude aliens from participation in its democratic political institutions [is] part of the sovereign's obligation to preserve the basic conception of a political community." *Foley v. Connelie*, 435 U.S. 291, 295 (1978). Finally, at their narrowest, these cases could be read as indicating that T</u>the First Amendment extends its privileges equally to citizens and resident

FOR OFFICIAL USE ONLY / PRE-DECISIONAL
ATTORNEY WORK PRODUCT / ATTORNEY-CLIENT PRIVILEGED

5

FOR OFFICIAL USE ONLY / PRE-DECISIONAL
ATTORNEY WORK PRODUCT / ATTORNEY-CLIENT PRIVILEGED

aliens. *Bridges v. Wixon*, 326 U.S. ~~Id.~~ at 161 (Murphy, J., concurring), and that any limitations on First Amendment activities of *resident* aliens must therefore be consistent with the protections afforded to U.S. citizens. The Court's recent embrace of the view that removal from the United States should be seen as "a particularly severe penalty," *Lee v. United States*, No. 16-327, 2017 WL 2694701, at *9 (U.S. June 23, 2017) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 265 (2010)), rather than merely a "withdrawal of the privilege of remaining in the United States," *Constitutionality of Closing the Palestine Information Office*, 11 Op. O.L.C. at 109, further suggests that the Court will treat aliens already present in the United States as having First Amendment protections against removal. On the latter view, to the extent the government seeks to regulate the content of the speech of aliens through its power to exclude or expel, its laws must meet the dictates of strict scrutiny – that is, be narrowly tailored to achieve a compelling government interest.

### ii. Aliens Outside the United States or at a Port of Entry

The Supreme Court has long held that the rights guaranteed by the Constitution do not extend to aliens seeking admission for the first time to the United States: "The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores." *See Bridges v. Wixon*, 326 U.S. at 161 (Murphy, J., concurring).

Lawful permanent resident aliens, however, ~~are considered to~~ have ~~C~~constitutional rights, even when they are at ~~the~~ a port of entry seeking to reenter the United States. *See Landon v. Plasencia*, 459 U.S. 21 (1982); *Kwong Hai Chew v. Colding*, 344 U.S. 590 (1953). In addition, ~~C~~some courts have ~~recently~~ found that aliens abroad who are not lawful permanent residents but who have otherwise developed substantial connections to the United States, may have sufficient ties to assert at least some ~~C~~constitutional rights. *See Ibrahim v. DHS*, 669 F.3d 983, 995-96 (9th Cir. 2012) (holding that Ibrahim, although abroad at the time of her suit, ~~had~~ previously established significant voluntary connections with the United States during her residence in California that permitted her to assert claims under the First and Fifth Amendments) (collecting cases).

### iii. Rights of U.S. Citizens to Hear and Assemble with Aliens Outside the United States

While the First Amendment does not apply to aliens seeking initial admission to the United States, the Supreme Court has recognized a limited right of U.S. citizens to "hear, speak, and debate with" a visa applicant. *Kleindienst v. Mandel*, 408 U.S. ~~753,~~ at 762 ~~(1972)~~; *see also Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("It is now well established that the Constitution protects the right to receive information and ideas."). Consequently, citizens have been found to have standing to challenge the Government's exclusion of aliens who ~~otherwise~~ lack standing to assert First Amendment protections on their own. *See, e.g., Amer. Acad. of Religion v. Napolitano*, 573 F.3d 115 (2d Cir. 2009).

FOR OFFICIAL USE ONLY / PRE-DECISIONAL
ATTORNEY WORK PRODUCT / ATTORNEY-CLIENT PRIVILEGED

2018-ICLI-00001 39612

**FOR OFFICIAL USE ONLY / PRE-DECISIONAL**
**ATTORNEY WORK PRODUCT / ATTORNEY-CLIENT PRIVILEGED**

Even so, the fact that citizens have a First Amendment interest in receiving the speech of aliens sufficient to confer standing is not tantamount to saying that the interest is significant enough to give rise to a freestanding basis for challenging an alien's exclusion or deportation. However, tThe Court has limited its inquiry into inadmissibility or visa ineligibility determinations on the basis of listeners' rights to whether the Government provided a "facially legitimate and bona fide" reason for its action. *See Mandel*, 408 U.S. at 776, 770 (declining to balance the asserted First Amendment interests of U.S. citizens in the denial of a nonimmigrant visa waiver for a revolutionary Marxist speaker against "Congress' 'plenary power to make rules for the admission of aliens….'") (citation omitted); *see also Kerry v. Din*, 576 U.S. ___, 135 S. Ct. 2128, at 2139-140 (2015) (Kennedy, J. and Alito, J., concurring) (stressing that the reasoning of *Mandel* is particularly applicable "where national security is involved").[8]

Dozens of cases have challenged Executive Orders 13769 and 13780 on First Amendment grounds and involved arguments based on *Din* and *Mandel*. *See, e.g., Washington v. Trump*, 847 F.3d 1151, 1162 (9th Cir. 2017) (finding that *Mandel* applies to individual visa adjudications by a consular officer and not to the Executive's decisions on immigration policy). The outcomes of these cases, – including appeals currently before the Fourth and Ninth Circuits, may impact potential disposition by the Supreme Court, *see Trump v. International Refugee Assistance Project*, 137 S. Ct. 2080 (2017) (granting certiorari in cases from Fourth and Ninth Circuits) – may shed further light on the assessments presented here.

    b. <u>General Limitations on Speech</u>

If a particular alien enjoys constitutional protections, the inquiry turns to whether the speech subjecting the alien to the inadmissibility ground is protected speech within the scope of the First Amendment. Given that the inadmissibility ground at INA § 212(a)(3)(B)(i)(VII), on its face, is a content-based regulation, if the speech is protected speech, the statute would likely be subject to strict scrutiny standard of review.

    *i. Speech Not Protected Under the First Amendment*

The Supreme Court has established that certain kinds of speech are unprotected by the First Amendment because the speech – as a category – is of such slight social value that any benefit

---

[8] Recently, the Seventh Circuit in *Hazama v. Tillerson*, 851 F.3d 706, 708 (7th. Cir. 2017), suggested that review of visa refusal decisions beyond the facially legitimate and bona fide standard may be available: "In general, courts have no authority to second-guess the Executive's decisions—rulings that are typically made by consular officers of the Department of State. *See Samirah v. Holder*, 627 F.3d 652, 662 (7th Cir. 2010). That said, the Court has never entirely slammed the door shut on review of consular decisions on visas." 851 F.3d at 708. The Seventh Circuit further noted that, "as the final allusion to the First Amendment [in *Mandel*] implies, some courts have held that if a visa denial affects the constitutional rights of American citizens, then it may be reviewable. *Cardenas v. United States*, 826 F.3d 1164, 1169 (9th Cir. 2016); *see also Din*, 135 S.Ct. at 2141–42 (dissenting opinion of Breyer, J., joined by Ginsburg, Sotomayor, and Kagan, JJ., recognizing this right); *Id.* at 2139 (concurrence in judgment of Kennedy, J., joined by Alito, J., assuming arguendo that such a right exists)." *Hazama*, 851 F.3d at 709.

**FOR OFFICIAL USE ONLY / PRE-DECISIONAL**
**ATTORNEY WORK PRODUCT / ATTORNEY-CLIENT PRIVILEGED**

2018-ICLI-00001 39613

FOR OFFICIAL USE ONLY / PRE-DECISIONAL
ATTORNEY WORK PRODUCT / ATTORNEY-CLIENT PRIVILEGED

that may be derived from speech of the relevant kind is clearly outweighed by the social interest in order and morality. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 383 (1992). The recognized categories of unprotected speech are ~~permitted regulations on speech in certain, limited circumstances, including~~ obscenity, defamation, fraud, incitement to violence, and speech integral to criminal conduct. *See United States v. Stevens*, 559 U.S. 460, 468 (2010) (citations

(b)(5)

directed at inciting "imminent lawless action" ~~and~~ that is likely to produce such action. *Brandenburg v. Ohio*, 395 U.S. 444, 447-48 (1969).[9] The Court in *Bradenburg* did not define "imminent"; there have been varied interpretations of the term. *See id.* at 446 (finding the "mere abstract teaching … of moral propriety or even moral necessity for a resort to force and violence is not the same as preparing a group for violent action) (citation omitted); *see also Hess v. Indiana*, 414 U.S. 105, 108-09 (1973) (per curium) (finding defendant's shouting "[we'll] take the [expletive] street later" at an anti-war rally was protected speech because it called for illegal action at "some indefinite future time" and was not directed to any person or group of persons); *cf. People v. Rubin,* 96 Cal. App. 3d 968, 978 (Cal. Ct. App. 1979) (finding defendant's statement offering money to anyone who harms a Nazi Party member during planned march in five weeks was "imminent").

Imminent violence is not the only basis courts have used to find that speech may be proscribed ~~is unprotected~~. The U.S. Court of Appeals for the Fourth Circuit has held that where a speaker acts with the purpose of assisting in the commission of a crime, the First Amendment does not insulate the speaker from responsibility for his actions simply because he may have disseminated his message to a wide audience. *Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233, 250 (4th Cir. 1997) (noting that the First Amendment did not protect "teaching of the technical methods of criminal activity - in this case, the technical methods of murder"), *cert. denied* 523 U.S. 1074 (1998).

(b)(5)

### ii. Restricting Protected Speech and Heightened Standard of Review

The government may place restrictions on protected speech under certain circumstances; however, when a statute restricts speech based on its content, courts generally apply strict scrutiny to determine whether the government has proven that the statute is narrowly tailored to serve a compelling government interest. *See Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2228 (2015) ("A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech.") (citation omitted). For instance, the Court has found content that is generally considered undesirable or disturbing to be protected speech. *See United*

---

[9] This test evolved from the "clear and present danger" standard in *Schenck v. United States*, 249 U.S. 47, 52 (1919). *See also Dennis v. United States*, 341 U.S. 494, 509 (1951) (relying on the *Schenck* standard to find that speech advocating the overthrow of U.S. government was not protected under First Amendment).

FOR OFFICIAL USE ONLY / PRE-DECISIONAL
ATTORNEY WORK PRODUCT / ATTORNEY-CLIENT PRIVILEGED

FOR OFFICIAL USE ONLY / PRE-DECISIONAL
ATTORNEY WORK PRODUCT / ATTORNEY-CLIENT PRIVILEGED

*States v. Stevens,* 559 U.S. 460 (2010) (holding that a statute criminalizing depictions of animal cruelty was overbroad because it captured content far beyond the government's assertion that it would ~~only~~ be applied only where there was a compelling ~~-~~government interest, namely cases of extreme animal cruelty); *Miller v. California,* 413 U.S. 15, 23-24 (1973) ("[S]tatutes designed to regulate obscene materials must be carefully limited."); *Jenkins v. Georgia,* 418 U.S. 153, 161 (1974) (finding that explicit material was not obscene). It is rare for a content-based law that regulates protected speech to survive strict scrutiny. See *Williams-Yulee v. Fla. Bar,* 135 S. Ct. 1656, 1666 (2015) (finding that prohibiting judges from soliciting campaign donations served to maintain public confidence in the integrity of the judicial system, and that the importance of this effort meant that such a prohibition "is therefore one of the rare cases in which a speech restriction withstands strict scrutiny").

Recently, however, the Court has found that the federal statute criminalizing the provision of material support for terrorist activities in the form of speech that is "coordinated with" a designated Foreign Terrorist Organization (FTO) is permissible under the First Amendment. *See Holder v. Humanitarian Law Project,* 561 U.S. 1, 36 (2010) (finding that the prohibition on material support provided in the form of "training" and "expert advice" did not violate the First Amendment, even when that support was to promote the terrorist organizations' nonviolent acts). Because it ~~The Court~~ found that 18 U.S.C. § 2339B prohibited not only conduct but also content-based speech ~~and, as a result,~~ it applied "a more demanding standard" of review, *i.e.* strict scrutiny. *Id.* at 28 (noting the standard of review in *United States v. O'Brien,* 391 U.S. 367 (1968) – -intermediate scrutiny – did not provide the applicable standard for reviewing content-based regulation of speech under 18 U.S.C. § 2339B). The Court concluded that 18 U.S.C. § 2339B was "drawn to cover only a narrow category of speech to, under the direction of, or in coordination with" FTOs, rather than "independent advocacy" of such groups, and thus achieved the government's interest in combatting terrorism and protecting national security, an "urgent objective of the highest order." *Id.* at 26-28.

Courts may be open to a broader interpretation of what it means to direct speech to, coordinate with, or act under the direction of a FTO, so as to constitute material support under the criminal statutes. In *United States v. Mehanna,* the First Circuit upheld a material support conviction under 18 U.S.C. § 2339B for a defendant accused of providing support to Al-Qaeda by traveling to Yemen in an unsuccessful attempt to join the group, as well as translating from Arabic to English publicly available Al-Qaeda-generated propaganda and posting the translations on a website sympathetic to Al-Qaeda. 735 F.3d 32 (1st Cir. 2013), *cert. denied*, 135 S. Ct. 49 (2014). The defendant argued that his translations were First Amendment-protected speech demonstrating "independent advocacy" on behalf of the FTO, and that the jury was improperly instructed regarding what it means "to coordinate" with a FTO under the statute. In finding no legal error with the jury instruction, the First Circuit relied on *Humanitarian Law Project* to find the defendant's translations were "in coordination" with a FTO because "a direct link" between the defendant and the FTO was not required for material support to occur. *Id.* at 49-50. It may be possible to argue, therefore, that certain forms of speech-related activity may be considered material support to a terrorist organization, even if an individual has not had direct contact with the FTO.

FOR OFFICIAL USE ONLY / PRE-DECISIONAL
ATTORNEY WORK PRODUCT / ATTORNEY-CLIENT PRIVILEGED

2018-ICLI-00001 39615

FOR OFFICIAL USE ONLY / PRE-DECISIONAL
ATTORNEY WORK PRODUCT / ATTORNEY-CLIENT PRIVILEGED

### 4. Endorsing or Espousing Terrorist Activity

Courts have not addressed the constitutionality of INA § 212(a)(3)(B)(i)(VII). Should there be a plaintiff with standing, whether First Amendment protections would apply and, if so, whether the strict scrutiny standard could be the appropriate test could be assessed only in light of the

(b)(5)

(b)(5)

law indicates court cases have shown, the analysis will be highly fact specific. If the speech at issue is determined to be "protected," then INA § 212(a)(3)(B)(i)(VII) is likely to be considered a content-based regulation and thus subject to strict scrutiny. In this such cases, the government would need to articulate the rationale for excluding individuals who have endorsed or espoused terrorist activity, so that a court may determine whether INA § 212(a)(3)(B)(i)(VII) is narrowly tailored to that government interest.

Taken together, several Supreme Court decisions appear to provide reasonably strong support for the proposition that the government has a compelling government interest in excluding or expelling nonresident aliens whose endorsement or espousal of terrorism threatens the security of United States nationals or the national security of the United States. In *Humanitarian Law Project*, the Court held that the "Government's interest in combating terrorism is an urgent objective of the highest order," and that preventing the provision of material support to "an entity [designated] a 'foreign terrorist organization'" was tailored to achieve that interest. 561 U.S. at 9, 28. An entity's designation as an FTO requires a finding by the Secretary of State that it is foreign, engages in "terrorist activity" or "terrorism," and thereby "threatens the security of United States nationals or the national security of the United States." *Id.* at 9. The Court held that even U.S. citizens could be prevented from providing material support to such organization "in the form of speech." *Id.* at 28.

*Mandel*, *Harisades*, *Bridges*, and *Williams* also point to the conclusion that aliens may be excluded or expelled on the basis of speech or beliefs that pose a threat to the security of the United States. In *Mandel*, the parties conceded that Congress could enact a blanket prohibition against entry of aliens who advocated "world communism or the establishment in the United States of a totalitarian dictatorship." 408 U.S. at 755, 767. In *Harisades*, the Court explained that the First Amendment does not protect aliens from deportation on account of their membership in the Communist Party because the government has the authority to deport individuals who engage in the "teaching of violence" as a means of bringing about a "change in the existing order." 342 U.S. at 591-92. In *Bridges*, the Court suggested that the United States could likely deport an individual for advocating the violent overthrow of the government. 326 U.S. at 147-48, 164. And in *Williams*, the Court explained the excluding anarchists is permissible because "as human governments endure they cannot be denied the power of self-preservation." 194 U.S. at 293-94. In each case, the ideology underlying the speech in question

FOR OFFICIAL USE ONLY / PRE-DECISIONAL
ATTORNEY WORK PRODUCT / ATTORNEY-CLIENT PRIVILEGED

10

FOR OFFICIAL USE ONLY / PRE-DECISIONAL
ATTORNEY WORK PRODUCT / ATTORNEY-CLIENT PRIVILEGED

could be characterized as posing a threat to the United States government itself, rather than as merely representing ideas with which the government disagreed.

In light of those decisions, the application of INA § 212(a)(3)(B)(i)(VII) is most likely to be defensible in circumstances where a nonresident alien has endorsed or supported not terrorist activity of any kind, but terrorist activities that can reasonably be characterized as posing a threat to the national security of the United States or the security of its nationals. As a result, any regulations or policies implementing that provision should be tailored to ensure that all – or at least the great majority – of its applications will involve such circumstances rather than aliens who have expressed support for terrorism at a more abstract level or in contexts that would not implicate the security of the United States or its nationals.

5. **Alternative Inadmissibility Grounds**

Evidence relevant to an analysis of the "endorse or espouse" inadmissibility ground in a particular case may support raising other terrorism-related inadmissibility grounds or bars to relief under INA § 212(a)(3)(B), including those which courts have already deemed constitutional. Certain online speech and/or conduct may fall within the realm of other types of terrorist activity, such as solicitation of an individual to engage in terrorist activity or becoming a member of a terrorist organization. See INA § 212(a)(3)(B)(iv)(V). *But see Daneshvar v. Ashcroft*, 355 F.3d 615, 627-28 (6th Cir. 2004) (holding that the Board erred in deciding whether applicant was inadmissible due to solicitation for membership in an undesignated terrorist organization because the inadmissibility ground requires consideration of the applicant's requisite state of mind). Knowingly providing material support to a terrorist organization may also provide an alternative security-related ground of inadmissibility. See INA § 212(a)(3)(B)(iv)(VI). The INA's list of acts qualifying as material support is not exhaustive. *See Singh-Kaur v. Ashcroft*, 385 F.3d 293, 298 (3d Cir. 2004) ("No language in the [INA] limits 'material support' … [because] Congress intended to illustrate a broad concept rather than narrowly circumscribe a term with exclusive categories."). In addition, the immigration material support provision is broader than the criminal material support provisions because the INA encompasses material support to undesignated terrorist organizations as well as FTOs. See INA §§ 212(a)(3)(B)(iv)(VI)(dd), (vi)(III) (extending the prohibition on the provision of "material support" to acts perpetrated by "a group of two or more individuals, whether organized or not, which engages in" terrorist activity).

6. **Conclusion**

The security-related inadmissibility ground for endorsing or espousing terrorist activity targets speech that demonstrates a degree of public approval or public advocacy for terrorist activity. Depending on an alien's immigration status, contacts with the United States, and location, First Amendment concerns may limit use of this inadmissibility ground.

In cases involving aliens within the United States interior, lawful permanent residents either inside or outside the United States, or aliens outside the United States who have significant U.S.

FOR OFFICIAL USE ONLY / PRE-DECISIONAL
ATTORNEY WORK PRODUCT / ATTORNEY-CLIENT PRIVILEGED

11

2018-ICLI-00001 39617

**FOR OFFICIAL USE ONLY / PRE-DECISIONAL**
**ATTORNEY WORK PRODUCT / ATTORNEY-CLIENT PRIVILEGED**

contacts, First Amendment protections could apply. If the restricted speech meets the *Brandenburg* test as speech inciting "imminent and lawless" activity, a court will likely find such speech to be ~~unprotected by the~~ proscribable, notwithstanding the First Amendment. If the speech is found to be protected, the application of the INA's content-based restriction on speech will likely be subject to a heightened standard of review. While it is rare for a statute to survive strict scrutiny, the Court in *Humanitarian Law Project* found the criminalization of material support for terrorist activity in the form of speech to be constitutional where that speech was "coordinated with" a designated FTO. This could be relevant to whether application of this inadmissibility ground would pass strict scrutiny. -Even if the speech is made by an individual who is not entitled to First Amendment protections, the refusal of a visa or denial of entry may impact the First Amendment rights of U.S. citizens to hear and assemble with the alien.

Overall, the constitutionality of the application of this inadmissibility ground will be highly dependent on the speaker's circumstances, the content of the speech, the intent and influence of the speaker relative to the audience.