# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, et al.,<br><br>                          Plaintiffs,<br>    v.<br><br>MARCO RUBIO, in his official capacity, and the DEPARTMENT OF STATE, et al.,<br><br>                          Defendants. | Case No. 1:25-cv-10685-WGY<br><br>**[PROPOSED] AMICI CURIAE BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

## TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................... 1

II.   INTEREST OF AMICI ............................................................................. 2

III.  DISCUSSION ........................................................................................... 2

    A.    Democracy and the Advancement of Academic Inquiry and
        Knowledge Require Ample Breathing Room ......................................... 3

    B.    The Ideological-Deportation Policy Severely Harms Amici's
        Research and Educational Missions, and Campus Activities
        Related to Speech and Expression .......................................................... 9

        1.    Harm to Academic Research .................................................... 9

        2.    Harm to the Educational Mission ........................................... 14

        3.    Harm to Campus Speech and Expressive Activity ................. 16

IV.   CONCLUSION ........................................................................................ 17

APPENDIX A: LIST OF 30 AMICI ........................................................... 19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Buchanan v. Alexander*,
  919 F.3d 847 (5th Cir. 2019) .................................................................................... 4

*Grutter v. Bollinger*,
  539 U.S. 306 (2003) ................................................................................................. 3

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
  385 U.S. 589 (1967) .............................................................................................. 4, 5

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972) ................................................................................................ 12

*Meriweather v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) .................................................................................... 4

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984) ................................................................................................ 12

*Rust v. Sullivan*,
  500 U.S. 173 (1991) .................................................................................................. 5

*Sweezy v. New Hampshire*,
  354 U.S. 234 (1957) ......................................................................................... 3, 4, 8, 9

*Villanueva v. Wellesley College*,
  930 F.2d 124 (1st Cir. 1991) ............................................................................. 3, 7, 8

*W. Va. State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) .................................................................................................. 3

**Federal Statutes**

8 U.S.C. § 1101(a)(15)(F)(i) ....................................................................................... 6

8 U.S.C. § 1101(a)(15)(J) ............................................................................................ 6

20 U.S.C. § 1132-2 ..................................................................................................... 5

20 U.S.C. § 7907(a) ..................................................................................................... 5

20 U.S.C. § 9572(b)-(c) .............................................................................................. 5

42 U.S.C. § 12645f(a)-(b) ........................................................................................... 5

**Federal Regulations**

Fulbright-Hays Act of 1961, Pub. L. 87–256, 75 Stat. 527, § 101 ............................. 6

# I.     INTRODUCTION[1]

Academic freedom forms the backbone of a healthy democracy and pluralistic society, and is thus an important aspect of the First Amendment's protections. Academic freedom encourages innovation by allowing researchers to test the boundaries of human knowledge. It promotes critical thinking by holding that no idea is beyond examination, interrogation, or reconsideration. And it protects the search for truth by ensuring that research and scholarly work are free from political, social, and economic interference.

To be credible, academics must be able to pursue their work based on the standards of their disciplines, not based on whether their findings align with commercial interests, religious doctrine, partisan ideology, or the shifting preferences of government authorities. If they are unable to do so because of arbitrary interference, a cloud of doubt inevitably follows their work, and it ceases to provide value to the public. Who would give weight to a professor who says or publishes a thing only because they are compelled by law to do so? Who would trust the rigor and completeness of research if the law forbids the researcher from receiving or imparting certain information or considering particular viewpoints? And how can the public benefit when academics are pressured to remain silent on issues of public significance for fear of retribution, depriving the public of their knowledge and expertise?

Amici are associations of faculty from both public and private institutions around the country, representing diverse academic disciplines and viewpoints. But they are united in their view that the federal government's campaign to single out noncitizen scholars and students for their views, associations, or expression poses an existential threat to the aims and functions of the American university, and to our society's traditions of free thought and expression. The government pronouncements and actions challenged by Plaintiffs in this litigation—referred to there and here as the "Ideological-Deportation Policy" or the "Policy"—have had an in terrorem effect at every institution of higher learning in the country, changing the way departments schedule

---

[1] No party or party's counsel authored this brief in whole or in part, or contributed money that was intended to fund preparing or submitting the brief. No person, other than amicus curiae, their members, or their counsel, contributed money intended to fund preparing or submitting this brief.

their programming, limiting research projects and plans, interfering with the types of lectures and panels faculty will participate in, and harming universities' ability to invite, host, and fruitfully engage with noncitizen scholars and students.

The government's program not only betrays basic democratic values, but also undermines the standing of American universities in the world and subjects the entire system of higher education in the United States to a shock that threatens serious and lasting damage. Our universities are world leaders in research. Maintaining that position requires them to be able to attract world-class talent. Defendants' actions threaten the ability of American universities to do so. Indeed, just last weekend, several amici were forced to respond to reports that dozens of international students throughout California had had their student visas and records summarily terminated by Defendants.[2] The program of ideological exclusion challenged by Plaintiffs must be stopped to avoid further irreparable harm to the nation's universities, educators, and students.

## II.    INTEREST OF AMICI

Amici are identified in the attached Appendix A. All are faculty and academic associations that represent the interests of their members at their respective institutions, including on issues related to academic freedom and campus expression. They have a strong interest in the outcome of this case, including Plaintiffs' pending motion for preliminary injunction, in light of the impact the challenged conduct is having on their teaching and research duties.

## III.    DISCUSSION

In Section III.A, Amici first discuss the purpose of academic freedom and its special place in First Amendment jurisprudence. Then, in Section III.B, Amici present reports they have

---

[2] *See* Council of University of California Faculty Associations and University Council-AFT Local 1474, *CUFCA & AFT call upon UC to immediately address Student Visa Revocations* (Apr. 6, 2025), https://cucfa.org/2025/04/address-revocation-of-visas-and-deportations/; Jaweed Kaleem, *Caught off-guard, California colleges scramble to determine scope of student visa cancellations*, L.A. TIMES (Apr. 7, 2025), https://www.latimes.com/california/story/2025-04-07/ucla-california-universities-concerns-cancellations-student-visas (UCLA "confirmed that federal authorities last week revoked the visas of 12 community members," "UC Santa Cruz said that the visas of three of its students had been terminated," "Other UC campuses — Berkeley, Davis, San Diego, and Riverside — and Stanford announced student visa cancellations Friday through Monday").

gathered from their members specifically for this brief demonstrating the deleterious impact of the Ideological-Deportation Policy on their campuses to date.

### A.    Democracy and the Advancement of Academic Inquiry and Knowledge Require Ample Breathing Room

Courts have long been "hesitant to intrude upon academic freedom, which, 'although not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment.'" *Villanueva v. Wellesley College*, 930 F.2d 124, 129 (1st Cir. 1991). *Accord Grutter v. Bollinger*, 539 U.S. 306, 329 (2003) ("We have long recognized that, given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition."). The basis of this concern is a deeply established recognition that academic freedom is a precondition for a healthy democracy. Even in primary and secondary schools, the Supreme Court has observed that "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (striking down local school board regulation requiring students to salute the flag).

Those concerns have greater significance, and more protections, in the higher-education context. When a state attorney general summoned a university professor and attempted to compel him to answer questions about the contents of lectures concerning Marxism and his knowledge of the organizational affiliations of other persons, the Supreme Court sided with the professor:

> The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes. Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.

*Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). Similar themes were expressed in Justice Frankfurter's concurring opinion:

> For society's good—if understanding be an essential need of society—inquiry into [social science] problems, speculations about them, stimulation in others of reflection upon them, must be left as unfettered as possible. Political power must abstain from intrusion into this activity of freedom, pursued in the interest of wise government and the people's well-being, except for reasons that are exigent and obviously compelling. These pages need not be burdened with proof . . . of the dependence of a free society on free universities. This means the exclusion of governmental intervention in the intellectual life of a university. It matters little whether such intervention occurs avowedly or through action that inevitably tends to check the ardor and fearlessness of scholars, qualities at once so fragile and so indispensable for fruitful academic labor.

*Id.* at 262 (Frankfurter, J., concurring). The "four essential freedoms" of a university were then understood to include the university's right "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Id.* at 263 (citation and quotation omitted).

A decade later, when New York implemented laws to prevent "subversive" persons from being employed at the state university, the Supreme Court scrutinized the vagueness and overbreadth of the prohibitions insofar as they reached "mere statement[s] about abstract doctrine," observing that "[i]t would be a bold teacher who would not stay as far as possible from utterances or acts which might jeopardize his living by enmeshing him in th[e] intricate machinery [of the law's enforcement scheme]." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 599, 601 (1967). "The result must be to stifle 'that free play of the spirit which all teachers ought especially to cultivate and practice," *id.* at 601, even though "[o]ur Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned," *id.* at 603. Indeed, "[t]hat freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Id.*

Although these ideals appear in cases dating back nearly a century, courts have continued to re-affirm them to the present day. *See*, *e.g.*, *Meriweather v. Hartop*, 992 F.3d 492, 505 (6th Cir. 2021) (holding that "*Sweezy* and *Keyishian* establish that the First Amendment protects the free-speech rights of professors when they are teaching"); *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019) (recognizing that "academic freedom is 'a special concern of the First Amendment'" and that 'classroom discussion is protected activity'" when it serves an academic purpose). The foundational nature of these norms is also reflected in several statutes that prohibit

federal authorities from meddling in curricular content, an homage to the "four freedoms" discussed above—including the freedom of educational institutions to determine, on academic grounds, what is taught and how. *See*, *e.g.*, 20 U.S.C. § 1132-2 (in re: Higher Education Act, "Nothing in this subchapter shall be construed to authorize the Secretary [of Education] to mandate, direct, or control an institution of higher education's specific instructional content, curriculum, or program of construction."); 20 U.S.C. § 7907(a) ("Nothing in this chapter shall be construed to authorize an officer or employee of the Federal Government, including through a grant, contract, or cooperative agreement, to mandate, direct, or control a State, local educational agency, or school's curriculum, program of instruction . . . ."); *id*. § 7907(b) ("Notwithstanding any other provision of Federal law, no funds provided to the Department [of Education] under this chapter may be used by the Department, whether through a grant, contract, or cooperative agreement, to endorse, approve, develop, require, or sanction any curriculum . . . ."); 20 U.S.C. § 9572(b)-(c) (similar); 42 U.S.C. § 12645f(a)-(b) (similar).  The purpose of these prohibitions is to prevent federal authorities from misusing their funding powers to interfere with the mission of education.  *Cf. Rust v. Sullivan*, 500 U.S. 173, 200 (1991) (Rehnquist, J.) ("[W]e have recognized that the university is a traditional sphere of free expression so fundamental to the functioning of our society that the Government's ability to control speech within that sphere by means of conditions attached to the expenditure of Government funds is restricted by the vagueness and overbreadth doctrines of the First Amendment." (citing *Keyishian*, *supra*)).

    None of these principles or values pertains only to U.S. citizen scholars and students. Knowledge is a global pursuit, and the United States has been able to establish itself as a world leader in research only through the influx of world-class intellectuals from all corners of the world. Famously, many of the last century's most notable scientists and thinkers fled Hitler's ascendance to power and came to the United States, where they made fundamental contributions to many fields of knowledge, from physics to philosophy and beyond—Albert Einstein, Hannah Arendt, and Theodor Adorno, to name just a few.  Notably, many of these thinkers were also outspoken critics of certain United States domestic and foreign policies—and their perspectives now are regarded as assets to American intellectual life, not liabilities.

That tradition of welcoming students, thinkers, and teachers from around the world has continued to the present. Pursuant to the Fulbright-Hays Act of 1961, Congress established a statutory scheme to facilitate the ability of scholars from around the world to participate in, learn from, and contribute to American universities on J-1 visas. *See* 8 U.S.C. § 1101(a)(15)(J) (classification for a nonimmigrant "who is a bona fide student, scholar, trainee, teacher, professor, research assistant, specialist, or leader in a field of specialized knowledge or skill . . . who is coming temporarily to the United States . . . for the purpose of teaching, instructing or lecturing, studying, observing, conducting research, consulting, demonstrating special skills, or receiving training . . . ."). Congress has also created the F-1 visa for students from around the world to study in the United States. 8 U.S.C. § 1101(a)(15)(F)(i).

Faculty and students who are citizens, and the public at large, benefit from unrestrained intellectual engagement with noncitizen colleagues, students, and classmates at their universities. Indeed, the purpose of these visa categories was:

> to enable the Government of the United States to increase mutual understanding between the people of the United States and the people of other countries by means of educational and cultural exchange; to strengthen the ties which unite us with other nations by demonstrating the educational and cultural interests, developments, and achievements of the people of the United States and other nations, and the contributions being made toward a peaceful and more fruitful life for people throughout the world; to promote international cooperation for educational and cultural advancement; and thus to assist in the development of friendly, sympathetic, and peaceful relations between the United States and the other countries of the world.

Fulbright-Hays Act of 1961, Pub. L. 87–256, 75 Stat. 527, § 101. Since 2019, the United States has issued nearly 2 million F-1 student visas and over 1 million J-1 visas.[3] In 2023 alone, J-1 visas were issued to people from approximately 200 countries, with over 13,000 issued to people from Africa, over 77,000 to people from Asia, over 125,000 to people from Europe, over 37,000 to

---

[3] *See* U.S. Dept. of State, *Table XV(B) Nonimmigrant Visas Issued by Classification (Including Border Crossing Cards), Fiscal Years 2019-2023*, https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2023AnnualReport/FY2023_AR_TableXVB.pdf.

people from North & Central America, over 58,000 to people from South America, and over 4,000 to people from Oceania.[4] All these programs are threatened by the Ideological-Deportation Policy.

In addition to causing immense harm to targeted faculty, students, and the institutions they teach and learn at, Defendants' ideologically motivated deportation policy eviscerates the purpose of such visa programs, as well as the United States' global reputation. Long a destination for many of the world's most talented people, the United States' viability as a center of intellectual advancement, scientific innovation, and free inquiry is sharply undermined by Defendants' actions. The ability of Americans to benefit from the enriching perspectives and contributions of millions of foreign-born individuals already in the United States pursuant to these programs is seriously threatened by the continuation of Defendants' policies. As the anecdotes below demonstrate, this harm is already being felt on campuses around the country.

The precepts of academic freedom are not confined to the library, the laboratory, or the classroom. Academic freedom protects scholars' academic pursuits as well as their non-scholarly speech and expressive activity from interference by the university. The latter is often described as "freedom of extramural expression" and refers to "speech that is typically about matters of public concern and that is unrelated to either scholarly expertise or institutional affiliation." Matthew W. Finkin & Robert C. Post, *For the Common Good: Principles of American Academic Freedom* 127 (2009). While this is a right that academics hold against their universities rather than against the government, it is the byproduct of the pressure that universities sometimes face from government actors and others to take punitive action against academics or students based on disagreement with their views or expressive activities. In an environment where scholars appear to be arbitrarily targeted for saying or supporting the wrong ideas, "[f]aculty members in general might . . . sagaciously conclude that they cannot afford the luxury of ranging thought and bold speech. Our campuses would then lose the stimulus of clashing opinions and would become havens of cautious mediocrity." *Id.* at 142-43 (quotation and citation omitted). "The suppression of extramural

---

[4] *See* U.S. Dept. of State, *FY2023 Nonimmigrant Visas Issued*, available at https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY23NIVDetailTable.pdf.

speech can thus establish an atmosphere of caution and fear that is inconsistent with the fulfillment of the academic mission to promote new knowledge and to model independent thought." *Id.* at 143. Universities face the same threat—perhaps an even greater one—to their missions if the government targets scholars or students for removal from the university environment based on non-scholarly expressive activities. As Justice Frankfurter cautioned, "[t]his kind of evil grows by what it is allowed to feed on . . . . 'It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure.'" *Sweezy*, 354 U.S. at 263-64 (Frankfurter, J., concurring) (citation omitted).

Finally, although the earliest targets of Defendants' program appear to be people whom the government believes harbor certain views regarding Israel, Palestine, Gaza, and the United States' relationship thereto, they are not its only victims. The impact of Defendants' actions is far-reaching. As explained below, students and scholars of different political viewpoints and affiliations, whose scholarship or expression focuses on unrelated issues, have also been directly affected and are modifying their behavior accordingly. Once Defendants are allowed to target supporters of the Palestinian cause or critics of the United States' policies regarding Israel/Palestine for removal, they will be free to target whomever they choose for ideological reasons. For example, those who oppose Russia's invasion of Ukraine may be threatened with arrest and deportation as the administration's policy towards that conflict shifts. Foreign students or scholars who question the administration's approach to economic tariffs, public health, or climate change will face the same fate, whether they approach it from a right or left perspective.[5] A future administration could use the same tools against its own ideological opponents, whatever the issue may be. The result will be an ever present "atmosphere of suspicion and distrust"

---

[5] The French government reports, for example, that a French scientist was denied entry to the United States based on material on his phone that "expressed a personal opinion on the Trump administration's research policy." *See French scientist denied entry into the US, French government says*, REUTERS (Mar. 20, 2025), https://www.reuters.com/world/french-scientist-denied-entry-into-us-french-government-says-2025-03-20/.

incompatible with the free exchange of ideas and robust academic discourse.  *Sweezy*, 354 U.S. at 250.  That cannot be allowed to pass.

> **B.** **The Ideological-Deportation Policy Severely Harms Amici's Research and Educational Missions, and Campus Activities Related to Speech and Expression**

Amici are associations of faculty at 30 universities across the country, from coast to coast. Each of their home institutions provides critical support to the United States' strength as a nation through research and education, and as sites of expressive activity outside the classroom.  As described in this section, the Ideological-Deportation Policy is inflicting irreparable harm on each of these critical societal functions.  The Policy harms noncitizen faculty and students, citizen faculty and students, and the general public these universities serve, and violates Amici's members' First Amendment rights.

> **1.**    <u>**Harm to Academic Research**</u>

Amici's universities operate as research centers on which the United States relies to maintain its preeminent position as a global leader in numerous areas of human endeavor, including the sciences, technology, energy, public health, the humanities, economic competitiveness, and cultural/historical understanding.  Critically, academic research is performed in a collaborative international arena in which U.S. scholars interact closely with scholars around the globe to achieve groundbreaking discoveries, exchange diverse perspectives, address global challenges, and drive innovation across disciplines.  Technology enables only a small degree of collaboration at a distance: the most productive collaboration requires in-person conversation and in situ work.

The Ideological-Deportation Policy is causing irreparable harm to academic research in two primary ways.  First, it is preventing foreign scholars and students from performing important research at Amici's institutions.  Foreign scholars within the United States are curtailing their research and considering leaving the country. Second, the Policy interferes with Amici's members' ability to conduct collaborative research, organize international conferences and recruit highly qualified foreign scholars to work and study in the United States, as scholars outside the United States are increasingly reluctant to enter the country.

a.    **The Ideological-Deportation Policy is undermining academic research by interfering with the work and the careers of faculty and students.**

An overwhelming number of Amici members report that faculty and foreign scholars working in the United States are seriously considering leaving the country and abandoning their research in the United States.  One scholar reports that he is actively exploring whether he can seek asylum in Mexico so that he can continue his research should he become a target of the Ideological-Deportation Policy.[6]  Another member reports:

> I have . . . helped to place students in top jobs in the US.  Some of those students are now planning on leaving the US because of the chill in their ability to conduct research.  A non-US graduate student whom I have talked with says that she has decided not to do fieldwork she had planned, because she fears difficulties re-entering the US.  She has removed published writing from online archives that could be construed as critical of either the US or Israel.

Many Amici members report that noncitizen scholars and students are not only curtailing their scholarship, but are avoiding coming onto campus altogether to avoid becoming a target of Defendants' Policy.  An Amici member states:

> I am a faculty member in the sciences.  My own research involves decidedly non-"political" topics.  However, I have observed several direct impacts to members of my department.  (i) A graduate student from our department who is currently undergoing visa renewal decided to cancel a public talk about their research because it touches on topics related to diversity.  This immediately impacts their career progress; they are considering a shift in research topics which would set them back at least two years, without any promise of funding from the university or department.  (ii) A graduate student from our department who has been accepted to a prestigious postdoctoral fellowship is currently afraid to return to their campus housing because their visa renewal process is mysteriously delayed and they are concerned that past social media statements against the current president may lead to silent cancellation of their visa and abduction by ICE as has happened to several other students around the country.  They cannot rely on their on-campus housing as a safe place to reside.

A member at a University of California medical school who coordinates a program supporting visiting foreign scholars and students reports that participants have been advised not to leave the country if possible, and that they should refrain from participating in any activities which

---

[6]  Numerous Amici members referenced here are noncitizen permanent residents subject to deportation under the Policy, as was Mahmoud Khalil.  Amici do not identify members' names or give evidence from which their identities can be inferred, due to concern that they could experience the same treatment.  Indeed, some noncitizen faculty and students declined to share information relevant to this brief out of concern for retaliation.

might remotely be considered political, such as conferences or rallies. Participants' level of anxiety is "through the roof," and they are suffering from sleeplessness and depression.

Another Amici member reports that foreign graduate students are "paralyzed with fear" and unable to prepare for their qualifying exams, and that former graduate students in the sciences who have been offered prestigious postdoctoral fellowships are unable to accept due to fear of the current administration's policies.

Yet another citizen faculty member reports that after asking a noncitizen faculty member to offer remarks as part of regular discussion programming, the noncitizen member responded that she would be happy to offer her expertise but for her fear that her green card would be revoked if she were reported to have presented on any topic connected to Palestine. Other noncitizen members are changing the scope and topics of their research projects, and some are entirely abandoning research that may be viewed as being too political or sufficiently contrary to the current federal administration's agenda. Noncitizen faculty even report reluctance to attend such events as audience members.

Similarly, many of Amici's noncitizen members report that they have had to cancel international research trips. Several noncitizen members have canceled summer research plans due to the risk of green card revocation upon re-entry, and one cancelled fieldwork in Asia under the advice of their campus's international office, even though they had already received a fellowship to perform the work. Another noncitizen faculty member who has taught in the U.S. for nearly a decade and recently cancelled two international trips due to the risks associated with re-entry, comments: "The new administration's actions make me feel deeply vulnerable and in fact unwanted in this country that I came to [many] years ago when I began my PhD. I wake up from nightmares about ICE knocking on my door."

As a result of the Executive Orders and the resulting climate of fear interrupting academic work at the Amici universities, research in many different fields, including research in subjects that are not obviously political like the physical sciences, has been severely curtailed. A consequence of these fears is that citizen faculty are unable to hear, think with, or engage with noncitizen scholars' ideas. There is no serious question that both noncitizen and citizen Amici

members are being deprived of their First Amendment right to hear from and associate with their noncitizen colleagues. *See Kleindienst v. Mandel*, 408 U.S. 753, 762-65 (1972); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).

> **b.** **The Policy is infringing on international research and collaboration, and is hampering efforts to recruit foreign scholars to work and study in the United States**

Equally detrimental to the vitality of academic research in the United States, foreign scholars are increasingly reluctant or unwilling to come to the United States to participate in academic conferences or pursue collaborative work. Academic conferences are important opportunities for faculty to showcase their research, connect with fellow researchers, and stay up to date with the latest developments in their field. But the Ideological-Deportation Policy is significantly undermining opportunities to organize those conferences and arrange for collaborative work inside the United States. As a result, many Amici members have been forced to abandon or extensively revise longstanding research projects that are impossible to continue without the ability to guarantee international visiting scholars a reasonable measure of security.

A University of California Amici member states that the premier Latin American Studies Association Conference, an annual conference that has been held each year since 1966 and which typically brings between 6,000 to 10,000 participants, is scheduled to take place in May in San Francisco. The member was asked to participate in a roundtable discussion with other scholars about Latin American history and recently learned that his co-panelist, a scholar from Mexico, had dropped out of the panel due to fear of coming to the United States. Other members have similarly reported that projected attendance at international conferences in their fields has dwindled as conference panelists pull out due to concerns about their safety and security. One Amici member reports:

> I work frequently with international scholars and help to plan international conferences. Many European scholars are now unwilling to attend those conferences, either at all or in person, because of fears of entry denial or visa consequences. This is a serious harm to my research, including my ability to disseminate that research.

Amici members have many stories of their international colleagues cancelling planned trips to come to the U.S. to speak at conferences and declining to participate in workshops or pursue in-

person collaborative research projects because of the risks of entering the country and travel warnings from their own universities and governments. Numerous planned conferences, workshops and other events at the universities where Amici members work have been canceled or degraded to Zoom meetings, dramatically reducing their effectiveness. As one member writes, "I am really heartbroken by this as I write, and ashamed at what my country has done to wall itself off intellectually from the world."

For the same reasons, efforts to recruit foreign scholars to come to universities in the United States have been stymied. In one recent case, a lengthy search for a senior faculty member resulted in the selection of a prominent foreign scholar who ultimately declined to accept an offer for fear of being unable to safely enter and exit the United States. While Amici members were formerly flooded with inquiries from foreign scholars seeking to apply for highly competitive academic positions, these inquiries have now "slowed to a trickle." As one member reports, "faculty's ability to recruit the best graduate students from across the globe has become a major challenge." For example, "[a] graduate student recruit who is currently located in the UK but is from a third country, and who had been contacting me to work in my lab for over a year, decided against our offer of admission because they are afraid of the current administration's visa policies."

The fear experienced by international scholars working in the United States is warranted: Amici members report that colleagues and students entering or re-entering the U.S. have been subject to multiple inspections for detailed questioning about their research and those with whom they collaborate, forced searches of cell phones, and threats of visa revocation. The problem has become so severe that several countries have issued warnings to their citizens about travel to the United States, and universities outside the United States have created programs to enable American scholars at risk to relocate.

This harm to Amici universities' ability to maintain their preeminence in global research is severe and irreparable. The harm falls most directly on noncitizen faculty and students, who face deportation as a consequence of non-violent speech or association. But the harm radiates out from there, damaging the ability of citizen faculty and students to engage in competitive, productive research. And ultimately, the harm is inflicted on U.S. society generally, as the

Ideological-Deportation Policy denies its universities the ability to engage in international research necessary for the U.S. to remain competitive in the world economy.

### 2. Harm to the Educational Mission

Discussion and debate about hotly disputed issues, including even contentious disagreements about the Israeli/Palestinian conflict, have long been present on many U.S. campuses, including in the classrooms of Amici members. That open dialogue, the hallmark of academic freedom, has dampened on campuses today following highly publicized reports of the Ideological-Deportation Policy's brutal enforcement against noncitizen faculty and students. The Policy has cast a pall over these campuses, chilling the robust campus dialogue essential to these universities' mission.

The chilling effect is due, in large part, to the extraordinary vagueness and overbreadth of the Executive Orders. An Amicus member notes that, although the Israeli/Palestinian conflict and alleged antisemitism are presently the focus of the Policy's enforcement, the academic community understands that the Executive Orders are vague and susceptible to being applied to many other issues. For example, one Amicus member notes that Executive Order 14,161 states that it is the policy of the United States to protect citizens from noncitizens who "espouse hateful ideology," and who "bear hostile attitudes toward [U.S.] citizens, culture, government institutions or founding principles." Given this broad, vague, and subjective language, noncitizens at his university cannot know what language or conduct they might engage in that could subject them to detention and deportation. Would statements or class work on disease, climate change, abortion, immigration, or cultural and political developments across the globe fall in that category? Amici report that the only prudent response is to say or do nothing that could remotely be considered a "hostile attitude" in the mind of the present administration.

The Policy has profound effects in the classroom. Several members report that noncitizen students have approached them to express apprehension that their comments in class, or participation in events on campus, could get them deported. One Amici member noted that usually diligent and studious noncitizen students stopped engaging with the class content and had lower

attendance once the administration's threat of deportation was announced, negatively impacting classroom discussions.

Similarly, another noncitizen faculty member reported that, after reports that ICE officers may be on campus, several students expressed serious distress and fear that they could not leave their homes to attend class; instead of completing coursework, both citizen and noncitizen students spent hours checking in with classmates to investigate reports of ICE officers' presence on campus and trying to comfort one another, consult with attorneys, and prepare for an emergency, leading to a change in students' performance. Still another member reports that he does not record classroom discussions for absent students to review, for fear that a recording may be surveilled and put foreign students at risk. Another has resorted to requiring that term papers be submitted on paper only, because students are concerned that online submissions can be surveilled by artificial intelligence for comments that might be deemed to run afoul of the Policy. Whether that fear is accurate or not, it is a telling example of how the Policy has chilled speech on campus.

Amici members report that classroom discussions around the subject of the Israel/Palestine conflict used to be vigorous and even contentious. But since the detention of Mahmoud Khalil and others, those discussions have often become stilted and awkward—or avoided altogether. A member who teaches a graduate seminar attended by numerous foreign students and which necessarily touches on the Israeli/Palestinian conflict reports that:

> [S]tudents who I know from previous classes who were very talkative are now silent in the seminar. No one in the class (including one student who is a Palestinian activist) is willing to even discuss issues related to Israeli law and constitutionalism. Non-US students in the class have told me that they are choosing topics for their papers that are much less interesting to them (and to me) than they would prefer to write about. This harms the quality of a seminar profoundly, because a seminar depends on the ways discussion brings about surprising and interesting perspectives on current issues. The students are harmed because they do not get the benefit of each other's views, and they are wasting their time writing on topics that do not inspire them because they are "safe."

Numerous other Amici members report similar examples of chilled speech in the classroom, including that noncitizen students are often visibly upset when the Israel/Palestine conflict comes up, but are reluctant to speak for fear they could be deported. Amici members have

revised course syllabi and assignments to avoid addressing this conflict, and steer classroom discussion away from it to avoid risky, stilted discussion.  For example, one noncitizen Amici faculty member reports: "I recently submitted changes to remove Palestine from my course description.  Additionally, I organized two panels in a recent conference where Palestine was to be discussed.  Two speakers canceled because they were afraid to travel to the US.  This inhibited the ability of everyone attending, and myself, to learn from them and engage in scholarly discussion about Palestine."

The Ideological-Deportation Policy has also emboldened students who disagree with Amici's members' course curricula.  One Amici member reported that, at his campus, a student has made veiled threats to faculty that, should the student disapprove of class discussion or course content, the student might choose to report the Amici member to the federal government.

The harm from this chilled speech in and outside the classroom is severe and irreparable.  Students—citizens and noncitizens alike—are denied the opportunity for a full and complete education.   And faculty—citizens and noncitizens alike—are denied the ability to fully engage in their educational mission, which includes not only teaching the subject matter of their classes but also creating an atmosphere in which students are exposed to and learn to interact with fellow citizens from different backgrounds and with different interests and opinion.

### 3.    Harm to Campus Speech and Expressive Activity

Amicis' universities are not simply research centers and educational classrooms.  They also serve a vital function in U.S. society as cultural, artistic, and political gathering places for the community.  And that public forum is an essential part of Amici members' and their students' campus life, essential to participating in and developing students as democratic citizens.  This is particularly true at Amicis' campuses, many of which have a strong historical commitment to free speech and public assembly, where urgent issues facing our society are vigorously debated.

Amici members report that this public function has also been harmed under the Ideological-Deportation policy.  The Policy imposes a severe chilling effect on political gatherings on campus, discouraging speech at peaceful and non-disruptive gatherings simply because they could be deemed to fall within the extraordinarily broad prohibition of any speech by noncitizens which

could be deemed to "espouse hateful ideology" or "bear hostile attitudes toward [U.S.] citizens, culture, government institutions or founding principles."

Amici members report that since the detention and potential deportation of Mahmoud Khalil, campus rallies have substantially diminished. Moreover, Amici members report that the Ideological-Deportation policy has caused noncitizen Amici members and noncitizen students to avoid participating in rallies altogether, for fear that simply attending or observing one could get them deported. One member reports that "a number of students in the class have told me that they would like to join protests for academic freedom but do not feel safe." Foreign students and scholars are also afraid to engage in social media or participate in cultural activities that might be considered political.

One particularly poignant example of how repressed the atmosphere has become is from one of Amici's members who teaches at the University of California, who reported: "Some Chinese students in my class have remarked that they loved the experience of being at Berkeley in the fall semester, when they saw what a free political culture is like, and they are saddened by the atmosphere now."

The Ideological-Deportation Policy inflicts severe harm on the rights of noncitizen faculty and students to freely associate and speak on issues that may have great urgency for them. The absence of their voices—as well as their presence—at such rallies also harms the ability of citizens to hear their views, and to have full appreciation for all stakeholders in controversial matters.

## IV.    CONCLUSION

Amici support Plaintiffs' request for a preliminary injunction in full, and they respectfully request that it be granted.

Respectfully submitted,

Dated:  April 8, 2025

/s/ Joshua M. Daniels
Joshua M. Daniels (BBO# 673034)
THE LAW OFFICE OF JOSHUA M. DANIELS
P.O. Box 300765
Jamaica Plain, MA 02130
Tel: (617) 942-2190
Fax: (617) 507-6570
JDaniels@DanielsAppeals.com

Yaman Salahi (*pro hac vice* forthcoming)
SALAHI PC
yaman@salahilaw.com
505 Montgomery St., 11th Floor
San Francisco, California 94111
Tel: (415) 236-2352

Arthur Liou (*pro hac vice* forthcoming)
Julia Lum (*pro hac vice* forthcoming)
Philip Monrad (*pro hac vice* forthcoming)
Peter Saltzman  (*pro hac vice* forthcoming)
LEONARD CARDER LLP
1999 Harrison Street, Suite 2700
Oakland, California 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

*Counsel for Amici*

## APPENDIX A: LIST OF 30 AMICI

1. The **Council of UC Faculty Associations (CUCFA)** exists to further the professional and scholarly values held by the faculty of the University of California (UC), to protect those privileges and responsibilities traditionally reserved to the faculty for the purpose of maintaining and improving the academic quality of the University, to support the principles of University governance embodied in the Academic Senate, and to improve the economic status and general welfare of the faculty. CUCFA is an umbrella organization for UC Faculty Associations, which are independent, dues-supported associations on the UC campuses that are composed of members of the Academic Senate.

2. The **Berkeley Faculty Association (BFA)** is an independent representative of the Berkeley faculty, legally empowered to provide a voice to faculty outside the regular channels of the Academic Senate and University administration. BFA believes maintaining the public mission of the University of California is vital to ensure that world class faculty can deliver the highest quality teaching and research for all Californians. BFA advocates for faculty rights and welfare, including academic freedom.

3. The **Davis Faculty Association** is an independent organization composed of members of the Academic Senate. It was established in 1979 and furthers the faculty's professional and scholarly values, protects privileges and responsibilities traditionally reserved to the faculty for the purpose of maintaining and improving the academic quality of the campus, and improves the economic status and general welfare of the faculty.

4. The **Irvine Faculty Association** is a voluntary faculty association affiliated with CUCFA. The mission of the Irvine Faculty Association is to keep its members informed of matters of concern to UC faculty and to represent UC Irvine faculty to the University of California, Office of the President, and the state legislature through CUCFA. As an independent, dues-paying association, the Irvine Faculty Association is able to represent faculty concerns in coordination with the Irvine Academic Senate or in divergence from the Academic Senate. As an independent group, the Irvine Faculty Association may also take political positions, protected by the First Amendment, without restriction by university guidelines.

5. The **UC Merced Faculty Association** is an independent faculty advocacy group dedicated to representing and advocating for the interests of faculty members at UC Merced. The association works towards fostering a supportive academic environment and addressing faculty concerns. The UCMFA addresses a wide range of issues, including but not limited to academic policies, working conditions, and representation.

6. The **Riverside Faculty Association (RFA)** is a voluntary membership organization of Senate and non-Senate faculty that is affiliated with CUCFA. The RFA has existed since 1975 and works to safeguard the welfare of the faculty, to support principles of shared governance and to further the scholarly and professional values held by the faculty. The RFA provides faculty with an independent instrument for representing faculty interests and for supporting public education in California.

7. The **San Diego Faculty Association (SDFA)** is a voluntary, dues-supported organization comprised of Academic Senate members dedicated to the improvement of the economic status and general welfare of the UCSD faculty. SDFA is the only organization at UCSD solely dedicated to protecting and improving the faculty's basic employment rights, including academic freedom and shared governance.

8. The **UCSF Faculty Association (UCSF FA)** is a voluntary, dues-supported organization comprised of UCSF faculty members across all the UCSF health professions schools and the Graduate Division. The UCSF FA is dedicated to the protection and improvement of the UCSF faculty's working conditions and rights through advocacy for basic employment rights, including salary and benefits, academic freedom, shared governance, and ability to fulfill our academic mission and provide high quality patient care. In partnership with the UCSF Academic Senate, the UCSF FA advocates on behalf of the UCSF faculty with the UCSF Administration. The UCSF FA also addresses policy and regulatory issues of concern to the UCSF faculty through state and federal legislative advocacy.

9. The **UC Santa Barbara Faculty Association (SBFA)** is a voluntary, dues-supported organization comprised of Academic Senate members dedicated to the improvement of the economic status and general welfare of the UCSB faculty. SBFA is the only organization at UCSB solely dedicated to protecting and improving the faculty's basic employment rights, including academic freedom and shared governance.

10. The **University of California Los Angeles Faculty Association (UCLA FA**) represents UCLA faculty on employment and academic freedom issues and advocates for a vibrant and well-funded system of public higher education in California. The association coordinates research and advocacy efforts with faculty on other UC campuses through its affiliation with CUCFA.

11. The **Santa Cruz Faculty Association (SCFA)** is an independent union and the official bargaining unit that represents all UC Santa Cruz Senate faculty members. SCFA is separate from, but partners with, the campus Academic Senate and strengthens the promise of shared governance by backing it with the power of collective bargaining. SCFA advocates for faculty rights and welfare, and believes that higher education is a vital social good that deserves robust public funding.

12. The **University Council – American Federation of Teachers (UC-AFT) Local 1474** represents over 6,800 teaching faculty and librarians working throughout the University of California system. Members include writers and architects, scientists and world-class musicians, nurses and lawyers, librarians and archivists, scholars and artists, K-12 instructors and supervisors of teacher education. UC-AFT labor makes the educational mission of the university possible, teaching some 30-40% of credit hours at UC, providing crucial mentorship and support to its most marginalized and historically underserved student populations. UC-AFT members are stewards of the largest library system in the world, protecting California's vital records and its cultural heritage.

13. The **Boston University AAUP Chapter** is a vehicle for faculty, graduate student workers, and other instructional and research employees to raise their collective voices to organize for and promote shared governance, academic freedom, and a diverse, equitable and

inclusive Boston University. The chapter arose out of faculty recognition of a need for a new, independent voice for all instructional and research employees at BU, including tenure-line, contract and adjunct faculty, and graduate students and workers.

14. The **Brown University Chapter of the AAUP** represents faculty across all disciplines. The organization is committed to realizing the mission of the AAUP on our campus: "to advance academic freedom and shared governance; to define fundamental professional values and standards for higher education; to promote the economic security of faculty, academic professionals, graduate students, post-doctoral fellows, and all those engaged in teaching and research in higher education; to help the higher education community organize to make our goals a reality; and to ensure higher education's contribution to the common good."

15. **Concerned Stanford Faculty** are a group of Stanford University faculty advocating for academic freedom, many of whom are dues-paying members of the Stanford chapter of the American Association of University Professors, which is being reestablished at the university.

16. The **Dartmouth College Chapter of the AAUP** advocates for faculty governance, academic freedom, administrative transparency, and improved working conditions for faculty, grad students, postdocs and all campus workers. Given these organizational priorities, the chapter actively supports campus unions and the First Amendment right to free speech – a right that applies to everyone resident in our country and thus to everyone on our campus community regardless of immigration status.

17. The **Del Mar College Chapter of the AAUP-AFT** is dedicated to the concepts of academic freedom and shared governance. Our members are faculty members from an open enrollment community college located in the southern part of Texas. Our group is affiliated with the Texas AFT which represents educators and staff from across the state.

18. The **Massachusetts Institute of Technology Chapter of the AAUP** is for faculty of all political orientations who believe in academic freedom, shared governance, economic security, and the contributions of higher education to the common good. The organization's core mission has been to advance academic freedom and shared governance; to define fundamental professional values and standards for higher education; to promote the economic security of faculty, academic professionals, graduate students, postdoctoral fellows, and all those engaged in teaching and research in higher education; to help the higher education community organize to make our goals a reality; and to ensure higher education's contribution to the common good.

19. **AAUP Princeton** is a group of faculty advocating to uphold the principles of academic freedom, meaningfully shared governance, and due process. We work to ensure adherence to AAUP standards at Princeton University and across the academy.

20. The **Rice University Advocacy Chapter of the AAUP** facilitates the cooperation of teachers and research scholars in universities and colleges, and in professional schools of similar grade, for the promotion of the interests of higher education and research, and in general to increase the usefulness and advance the standards, ideals, ethics, and welfare

of the profession. The organization also defends academic freedom at Rice University and throughout academe, encourages faculty participation in governance at Rice University, protects and advances the professional status and interests of all faculty, and facilitates the dissemination of information on higher education principles and practices.

21. The **Tufts University Chapter of the AAUP** represents the interests of the faculty of Tufts University both inside the university and to outside organizations or governmental bodies whose actions impact the interest of Tufts faculty and the Tufts community. It advocates for appropriate working conditions, a strong system of shared governance, due process, and academic freedom and freedom of speech.

22. The **University of Houston Chapter of the AAUP** advocates for academic freedom, shared governance, due process, and tenure for faculty and other employees with a teaching role. It is affiliated with the Texas AFT, a statewide union with 66,000 members including K-12 and community college educators, support staff, and retirees.

23. The **John Hopkins University Chapter of the AAUP** facilitates the cooperation of teachers and research scholars in universities and colleges, and in professional schools of similar grade, for the promotion of the interests of higher education and research, and in general to increase the usefulness and advance the standards, ideals, ethics, and welfare of the profession. The organization also defends academic freedom at John Hopkins University and throughout academe, encourages faculty participation in governance at John Hopkins University, protects and advances the professional status and interests of all faculty, and facilitates the dissemination of information on higher education principles and practices.

24. The **University of Minnesota Twin Cities Chapter of the AAUP** represents the interests of faculty who teach and undertake research at the University of Minnesota, including with respect to academic freedom, faculty governance, and due process issues.

25. The **Northwestern University Chapter of the AAUP** promotes academic freedom, shared governance, and advocates for adherence to AAUP standards in higher education. The chapter has members from numerous disciplines of the Weinberg College of Arts and Sciences, as well as the Pritzker School of Law, the Feinberg School of Medicine, and the Medill School For Journalism, Media & Integrated Marketing Communications.

26. The **University of Dallas Chapter of the AAUP** is organized and operated to facilitate the promotion of the interests of higher education and to advance the standards, ideals, and welfare of the profession of university teacher and scholar at the University of Dallas. The organization's purpose is to defend academic freedom and to encourage faculty participation in governance at the University of Dallas, to protect and advance the professional status and interests of all faculty, and to foster reflection on the meaning and vocation of a Catholic university dedicated to both the liberal arts and professional education.

27. The **AAUP Advocacy Chapter at the University of Texas at Austin** advocates for academic freedom, shared governance, due process, and tenure for faculty and other employees with a teaching role. It is affiliated with the Texas AFT, a statewide union with

66,000 members including K-12 and community college educators, support staff, and retirees.

28. The **AAUP Advocacy Chapter at the University of Texas at Dallas** champions, on behalf of faculty and students, the freedom to think, speak, and learn; constitutional due process rights; exercise of authority and responsibility in university policies on teaching and research; and adherence to tenure and other contractual employment guarantees.

29. The **Yale University Chapter of the AAUP** organizes and advocates for the needs and interests of Yale faculty, in connection with students and members of the profession nationally, and in service to the public. It is dedicated to advocating for shared interests and concerns as they relate to working conditions, faculty governance, and academic freedom—the things that unite faculty as a profession—and is collaborating with other AAUP chapters across Connecticut and nationally to realize its goals. The chapter advocates for transparency in administration, faculty involvement in decision-making processes, the creation of conditions and policies that protect academic freedom and promote the mission of higher education, and the fair treatment of all workers at Yale.

30. The **Wesleyan University Chapter of the AAUP** advocates for the interests and welfare of all faculty and staff on campus. The organization promotes administrative transparency, defends academic freedom, and encourages faculty and staff representation and participation in the governance of the institution. It works collectively to transform the campus climate and create a diverse, equitable, and inclusive Wesleyan.