UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, et al., <br><br> Defendants. | CIVIL ACTION NO. 1:25-cv-10685-WGY |

**<u>BRIEF OF THE COMMONWEALTH OF MASSACHUSETTS AND THE STATES OF WASHINGTON, ARIZONA, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, HAWAI'I, ILLINOIS, MAINE, MARYLAND, MICHIGAN, MINNESOTA, NEW JERSEY, NEW YORK, OREGON, RHODE ISLAND, VERMONT & THE DISTRICT OF COLUMBIA AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION</u>**
<u>(Leave to File Granted on April 10, 2025)</u>

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*

Tasha J. Bahal, BBO 675935
*Deputy State Solicitor*
Elizabeth D. Matos, BBO 671505
*Chief, Civil Rights Division*
David R. Rangaviz, BBO 681430
Jonathan T. Burke, BBO 673472
David Ureña, BBO 703076
Brett M. Gannon, BBO 713938
*Assistant Attorneys General, Civil Rights Division*
One Ashburton Place
Boston, MA 02108
617-963-2816
david.rangaviz@mass.gov

*[additional counsel listed on signature page]*

**TABLE OF CONTENTS**

I.      INTRODUCTION AND INTERESTS OF AMICI ...............................................1

II.     BACKGROUND.........................................................................................3

        A.   The Ideological Deportation Policy ...........................................................3

        B.   Noncitizen Residents, Students, and Faculty Benefit Amici States.............................8

III.    THE IDEOLOGICAL DEPORTATION POLICY INFLICTS SEVERE AND
        IRREPARABLE HARM ON AMICI STATES AND IS CONTRARY TO THE
        PUBLIC INTEREST ....................................................................................12

        A.   The Ideological Deportation Policy Inflicts Educational and Institutional Harm
             on Colleges and Universities Within Amici States....................................................12

        B.   The Ideological Deportation Policy Harms Public Safety, Public Health, and
             Religious Worship in Amici States..............................................................19

IV.     CONCLUSION ..........................................................................................20

# TABLE OF AUTHORITIES

## Cases

*Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*,
  794 F.3d 168 (1st Cir. 2015).................................................................................. 12

*Cramp v. Bd. of Pub. Instruction of Orange Cnty.*,
  368 U.S. 278 (1961).......................................................................................... 13

*Everett J. Prescott, Inc. v. Ross*,
  383 F. Supp. 2d 180 (D. Me. 2005) .................................................................. 12

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972)....................................................................................... 15-16

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
  385 U.S. 589 (1967).......................................................................................... 13

*Martin v. City of Struthers*,
  319 U.S. 141 (1943).......................................................................................... 15

*Ng Fung Ho v. White*,
  259 U.S. 276 (1922).......................................................................................... 16

*Ozturk v. Hyde*,
  No. 1:25-cv-10695-DJC, 2025 WL 942731 (D. Mass. Mar. 28, 2025)...................... 5

*Ozturk v. Hyde*,
  No. 1:25-cv-10695-DJC, 2025 WL 1009445 (D. Mass. Apr. 4, 2025) ............... 5, 6, 7

*Reno v. ACLU*,
  521 U.S. 844 (1997)............................................................................................ 1

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995).......................................................................................... 15

*Snyder v. Phelps*,
  562 U.S. 443 (2011).......................................................................................... 13

*Sweezy v. State of N.H. ex rel. Wyman*,
  354 U.S. 234 (1957).......................................................................................... 14

*Taal v. Trump*,
  No. 3:25-cv-00335, 2025 WL 926207 (N.D.N.Y. Mar. 27, 2025)............................ 4

*Trump v. J.G.G.*,
   604 U.S. __, 2025 WL 1024097 (2025) .................................................................. 8

*United States v. Verdugo-Urquidez*,
   494 U.S. 259 (1990) .............................................................................................. 1

*United States v. Zenon*,
   711 F.2d 476 (1st Cir. 1983) ................................................................................ 12

*W. Va. State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) .............................................................................................. 1

<u>Statutes</u>

8 U.S.C. § 1182 (a)(3)(C)(iii) ..................................................................................... 4

8 U.S.C. § 1201(i) ...................................................................................................... 5

8 U.S.C. § 1227(a)(4)(C)(i) ........................................................................................ 4

<u>Other Authorities</u>

ACLU, *The Excluded: Ideological Exclusion and the War on Ideas* (2007),
   https://www.aclu.org/documents/excluded-ideological-exclusion-and-war-ideas ................... 5

Aidan Enright, et al., *International Students: Poorly Suited Immigration Pathways Stymie Formation of High Growth Businesses* 4, Pioneer Institute, (July 2024),
   https://files.eric.ed.gov/fulltext/ED656349.pdf .......................................................... 9

American Immigration Council, *Immigrants in California*,
   https://map.americanimmigrationcouncil.org/locations/california/ ............................................. 9

American Immigration Council, *New Americans in Massachusetts* (2023),
   https://map.americanimmigrationcouncil.org/locations/massachusetts/ .................................... 9

Americans for the Arts, *Arts Impact Explorer Fact Sheet: Arts + Immigration* (July 2024),
   https://ww2.americansforthearts.org/sites/default/files/2025-01/Arts%20%2B%20Immigration.pdf .......................................................................... 10

Andy J. Semotiuk, *Silencing Dissent: U.S. Moves To Deport Kremlin Critic Kseniia Petrova*, Forbes (Mar. 30, 2025),
   https://www.forbes.com/sites/andyjsemotiuk/2025/03/30/silencing-dissent-us-moves-to-deport-kremlin-critic-kseniia-petrova/ ................................................ 7

Anvee Bhutani, *US student journalists go dark fearing Trump crusade against pro-Palestinian speech*, The Guardian (Apr. 7, 2025), https://www.theguardian.com/us-news/2025/apr/07/student-journalists-remove-stories-trump ................................................. 16

Aurelien Breeden, *U.S. Turned Away French Scientist Over Views on Trump Policies*, N.Y. Times (Mar. 20, 2025), https://www.nytimes.com/2025/03/20/world/europe/us-france-scientist-entry-trump-messages.html ....................................................................... 7

Benjamin Bardman, *Trump Immigration Actions are Likely to Have a Chilling Effect on Online Speech*, Vanderbilt J. of Ent. & Tech. L. (Mar. 31, 2025), https://www.vanderbilt.edu/jetlaw/2025/03/31/trump-immigration-actions/ .......................... 16

Brian D. Smedly, et al., Institute of Medicine (US) Committee on Understanding and Eliminating Racial and Ethnic Disparities in Health Care, *Unequal Treatment: Confronting Racial and Ethnic Disparities in Healthcare*, at 123 (2003), https://www.ncbi.nlm.nih.gov/books/NBK220358/pdf/Bookshelf_NBK220358.pdf ............. 10

Chris Yiu, et al., *A research and policy agenda for the post-pandemic world*, Future Healthcare J. (July 2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC8285152/ .................... 14

C-SPAN, *Secretary Rubio Defends Revoking Turkish Student's Visa*, Mar. 27, 2025, https://www.c-span.org/clip/news-conference/secretary-rubio-defends-revoking-turkish-students-visa/5158479 ................................................................................................ 6

Edward Wong, *Rubio Orders U.S. Diplomats to Scour Student Visa Applicants' Social Media*, N.Y. Times (Mar. 25, 2025), https://www.nytimes.com/2025/04/01/us/politics/student-visas-social-media.html ........... 5, 15

Eilis O'Neill, et al., *ICE detains leader of farmworker union in northwest Washington state*, KUOW (Mar. 26, 2025), https://www.kuow.org/stories/ice-detains-farmworker-activist-in-northwest-washington-state ........................................................................ 7

Emma Johnson, *'SCARED TO LEAVE MY HOUSE' Mavericks react to ICE-detained student, what's being done*, The Reporter (Apr. 8, 2025), https://www.msureporter.com/2025/04/08/scared-to-leave-my-house/ ................................. 16

Exec. Order 14,161, 90 Fed. Reg. 8451 (Jan. 20, 2025)................................................................. 3

Exec. Order 14,188, 90 Fed. Reg. 8847 (Jan. 29, 2025)........................................................ 3, 5, 6

Inside Higher Ed, *International Student Visas Revoked*, (April 11, 2025), https://www.insidehighered.com/news/global/international-students-us/2025/04/07/where-students-have-had-their-visas-revoked ............................................ 5, 17

Jack Healy & Jazmine Ulloa, *'We Finally Got You.' Immigrant-Rights Advocate Arrested in Colorado*, N.Y. Times (Mar. 18, 2025), https://www.nytimes.com/2025/03/18/us/immigrant-arrest.html................................................. 7

Jeff Tollefson, *International PhD students make emergency plans in fear of US immigration raids*, Nature (Apr. 4, 2025), https://www.nature.com/articles/d41586-025-01056-5 ................................................................................................................. 16

John P. Moore & Ian A. Wilson, *Decades of basic research paved the way for today's 'warp speed' Covid-19 vaccines*, Stat (Jan. 5, 2021), https://www.statnews.com/2021/01/05/basic-research-paved-way-for-warp-speed-covid-19-vaccines/ ................................................................................................................. 14

Josh Dawsey, et al., *Trump told donors he will crush pro-Palestinian protests, deport demonstrators*, Washington Post (May 27, 2024), https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors/ ........ 6

Judit Kende, et al., *Social and institutional inclusion in multi-ethnic schools enable better intergroup relations for majority youth and higher school achievement for minority youth*, 103 Int'l J. of Intercultural Rels. (Nov. 2024), https://www.sciencedirect.com/science/article/pii/S0147176724001573 ............................... 11

L.E. Gomez & Patrick Bernet, *Diversity improves performance and outcomes*, 111 J. Nat'l Med. Ass'n 383, 391 (Aug. 2019), https://www.sciencedirect.com/science/article/abs/pii/S0027968418303584?via%3Dihub.... 10

Lexi Lonas Cochran, *Trump crackdown casts chill over international student programs*, The Hill (Apr. 3, 2025), https://thehill.com/homenews/education/5226292-trump-immigration-crackdown-international-students-college-campus-protests-ice-rubio-deportation-khalil/................................................................................................................. 16

Liam Knox, *'Palpable Fear' Hangs Over International Students*, Inside Higher Ed (Mar. 18, 2025), https://www.insidehighered.com/news/global/international-students-us/2025/03/18/international-students-navigate-escalating-threats........................................... 16

Liam Knox, *International Enrollment's Precarious Moment*, Inside Higher Ed (Mar. 19, 2025), https://www.insidehighered.com/news/global/international-students-us/2025/03/19/colleges-fear-decline-international-student ...................................... 18

Liam Knox, *Student Visa Dragnet Reaches Small Colleges*, Inside Higher Ed (Apr. 8, 2025), https://www.insidehighered.com/news/global/international-students-us/2025/04/08/trump-admin-broadens-scope-student-visa...................................................... 19

M. Gessen, *Unmarked Vans. Secret Lists. Public Denunciations. Our Police State Has Arrived.*, N.Y. Times (Apr. 2, 2025), https://www.nytimes.com/2025/04/02/opinion/trump-ice-immigrants.html ............................ 8

Marisa Kabas, *State Dept. demands 'enhanced' social media vetting of student visa applicants*, The Handbasket (Mar. 26, 2025), https://www.thehandbasket.co/p/state-dept-enhanced-social-media-vetting-student-visa-applicants ........................................................... 15

Meg Anderson, *Police say ICE Tactics are eroding public trust in local law enforcement*, NPR (Mar. 30, 2025), https://www.npr.org/2025/03/30/nx-s1-5304236/police-say-ice-tactics-are-eroding-public-trust-in-local-law-enforcement ..................................................... 20

Miri Yemini, *Bridging Borders: Toward Equity in International Research Collaborations* NAFSA (Nov./Dec. 2024), https://www.nafsa.org/professional-resources/research-and-trends/trends-insights/bridging-borders-novdec24 ................................................. 14

Mission of the California State University, https://www.calstate.edu/csu-system/about-the-csu/Pages/mission.aspx ......................................................................................... 13

Morhaf Al Achkar, et al., *Integrating Immigrant Health Professionals into the U.S. Healthcare Workforce: Barriers and Solutions*, J. Immigr. Minor Health, (Apr. 2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10119818/ ............................................. 10

New American Economy, *The Contributions of New Americans in Massachusetts* (Aug. 2016), https://www.newamericaneconomy.org/wp-content/uploads/2017/02/nae-ma-report.pdf ........................................................................................................ 9

Nicole Lou, *Over 350K Health Workers Face Deportation Risk*, MedPageToday.com (Apr. 3, 2025), https://www.medpagetoday.com/publichealthpolicy/workforce/114947 ........ 20

Olivia Ebertz, *Deportations and detainments are having a chilling effect at Brown*, Rhode Island PBS (Mar. 27, 2025), https://thepublicsradio.org/education/deportations-and-detainments-are-having-a-chilling-effect-at-brown/ ............................................... 16

Paul N'Dri Konan, et al., *Cultural Diversity in the Classroom and its Effects on Academic Performance: A Cross-National Perspective*, 41 Soc. Psych. 230-37 (2010) .......................... 11

Robin Hattersley, *Visa Revocations Leave Hundreds of International College Students in Limbo*, Campus Safety Magazine (Apr. 8, 2025), https://www.campussafetymagazine.com/news/visa-revocations-leave-international-college-students-in-limbo/169053/ .......................................................................... 18

Rümeysa Öztürk, et al., *Op-ed: Try again, President Kumar: Renewing calls for Tufts to adopt March 4 TCU Senate resolutions*, The Tufts Daily (Mar. 26, 2024), www.tuftsdaily.com/article/2024/03/4ftk27sm6jkj ..................................................... 7

Sean Cotter, et al., *Lawyers spar over court jurisdiction in case of Rümeysa Öztürk, detained Tufts student*, Boston Globe (Apr. 3, 2025) https://www.bostonglobe.com/2025/04/03/metro/ozturk-hearing-in-boston-federal-court/ ...... 2

*See* NAFSA: Association of International Educators, *NAFSA International Student Economic Value Tool* (2023-24), https://www.nafsa.org/policy-and-advocacy/policy-resources/nafsa-international-student-economic-value-tool-v2 ................................................. 11

Steven A. Holmes, *Legislation Eases Limits on Aliens*, N.Y. Times (Feb. 2, 1990), https://www.nytimes.com/1990/02/02/us/legislation-eases-limits-on-aliens.html ................. 4-5

The White House, *Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism*, (Jan. 30, 2025), https://www.whitehouse.gov/fact-sheets/2025/01/fact-sheet-president-donald-j-trump-takes-forceful-and-unprecedented-steps-to-combat-anti-semitism/ .......................................... 4

Tufts University, *University Declaration for Rümeysa Öztürk* (Apr. 2, 2025), https://www.tufts.edu/president/speeches-and-messages/04022025-university-declaration-for-rumeysa-ozturk ................................................................................ 17

UMass Amherst, *Global Partnerships*, https://www.umass.edu/global-affairs/global-partnerships .................................................................................................................... 11

University of Illinois System, *International Partnerships*, https://www.uillinois.edu/about/international_partnerships .................................................... 11

University of Washington, *A Global University*, https://www.washington.edu/global/ ............... 11

Vanessa G. Sánchez & Daniel Chang, *Immigration crackdowns disrupt caregivers. Families are paying the price.*, NBC News (Apr. 3, 2025), https://www.nbcnews.com/health/health-news/trump-immigration-crackdowns-threaten-health-caregiving-us-families-rcna199383 ............................................................................. 20

<u>Constitutional Provisions</u>

U.S. Const. amend. I ................................................................................................. 1, 13, 15, 16

## I.    INTRODUCTION AND INTERESTS OF AMICI

The Commonwealth of Massachusetts and the States of Washington, Arizona, California, Colorado, Connecticut, Delaware, Hawaiʻi, Illinois, Maine, Maryland, Michigan, Minnesota, New Jersey, New York, Oregon, Rhode Island, Vermont, and the District of Columbia (Amici States) submit this brief in support of Plaintiffs' motion for a preliminary injunction and in opposition to the "Ideological Deportation Policy." This policy, which strips noncitizen students and faculty of their lawful immigration status, threatens our academic institutions, economic prosperity, and global leadership in education and scientific innovation.

The Trump Administration weaponizes immigration enforcement by targeting residents of Amici States with lawful immigration status based on their protected expression and beliefs. On its face, the Ideological Deportation Policy violates the First Amendment's protection of free speech, which the Supreme Court has repeatedly affirmed extends to noncitizen residents within the United States. *See, e.g.*, *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) (noting that "resident [noncitizens] have First Amendment rights" (citation omitted)). Indeed, this policy strikes at the heart of what the First Amendment prohibits. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Yet the Administration is doing precisely that—prescribing orthodoxy and punishing noncitizens who dissent through the severe sanctions of arrest, detention, and deportation. The Ideological Deportation Policy is antithetical to the principle of free expression that is supposed to define American higher education. It creates a pernicious dynamic whereby noncitizens may self-censor for fear of losing their immigration status and campus community members are thereby deprived of hearing their voices. *See Reno v. ACLU*, 521 U.S. 844, 845 (1997)

("The vagueness of such a content-based regulation . . . raise[s] special First Amendment concerns because of its obvious chilling effect on free speech."). Amici States have a strong interest in ensuring these basic constitutional protections for all our residents.

The Ideological Deportation Policy inflicts concrete, measurable harm on Amici States. As detailed *infra*, noncitizen students and faculty make substantial economic contributions to the Amici States. But their importance transcends economics; they enrich our academic discourse, strengthen our research capabilities, and enhance our global competitiveness. When students and faculty fear deportation for expressing certain viewpoints, the entire academic experience suffers. Classroom discussions become less robust, research questions go unexplored, and the pursuit of truth—the very purpose of higher education—is compromised. And the Ideological Deportation Policy sends a chilling message to talented students and faculty around the world: that they risk detention, deportation, and an end to their academic career in the United States if they express a viewpoint that displeases the Executive Branch. This message weakens Amici States' position in the global competition for talent.

Amici States thrive by attracting a diversity of talent from around the world. The Trump Administration's systematic program of targeted ideological deportations threatens not just our economies but our identities as Amici States, who value freedom of thought and expression. In the words of detained Tufts student Rümeysa Öztürk, "the world is a more beautiful and peaceful place when we listen to each other and allow different perspectives to be in the room."[1] Amici States have a profound interest in protecting our noncitizen students and faculty, the institutions they enrich, and the communities that realize far-reaching benefits from their decision to study in the

---

[1] Sean Cotter, et al., *Lawyers spar over court jurisdiction in case of Rümeysa Öztürk, detained Tufts student*, Boston Globe (Apr. 3, 2025), https://www.bostonglobe.com/2025/04/03/metro/ozturk-hearing-in-boston-federal-court/.

United States. We urge this Court to recognize these benefits—and the corresponding concrete harms this policy inflicts—by enjoining a policy that targets our noncitizen residents for investigation, surveillance, arrest, detention, and deportation based upon their beliefs and expression.

## II.     BACKGROUND

### A.     The Ideological Deportation Policy

The Trump Administration, through two executive orders, laid the groundwork for deporting noncitizens with whom it politically disagrees. *First*, Executive Order 14161 entitled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," directs federal agencies to "vet and screen to the maximum degree possible" foreign nationals seeking admission to (or already present in) the United States based not only on security concerns but also vague ideological grounds. Exec. Order 14,161, § 2, 90 Fed. Reg. 8451 (Jan. 20, 2025). The Executive Order targets those who "espouse hateful ideology" and who "bear hostile attitudes toward [America's] citizens, culture, government, institutions, or founding principles." *Id.*, § 1. *Second*, Executive Order 14188 entitled "Additional Measures to Combat Anti-Semitism," intensifies this ideological vetting by urging particular scrutiny and potential removal of noncitizens affiliated with universities who engage in speech the Trump Administration deems anti-Semitic. This includes protected political expression, such as criticisms of the government and its position on the war in Gaza. Exec. Order 14,188, 90 Fed. Reg. 8847 (Jan. 29, 2025). A White House fact sheet accompanying the second order makes its ideological purpose clear: it targets "leftist, anti-American colleges and universities," applies to all "resident aliens who joined in the pro-jihadist protests," and represents a "promise" that the government "will find

3

you . . . and deport you."[2] In effect, the first order authorizes an expansive regime of ideological deportations that the second order then aims at noncitizens attending colleges and universities who express pro-Palestinian viewpoints. Combined, these orders empower the federal government to monitor, investigate, and deport noncitizens, not for actions that pose direct threats to national security of public safety but for expressions of political opinion. The Executive Orders thus direct the use of immigration laws to police dissent and chill First Amendment-protected speech.

To implement these Executive Orders, the Department of Homeland Security (DHS) "proactively review[ed] open-source information to identify individuals[.]"[3] Such "open-source information," the government says, consists of "unclassified information that has been published or broadcast in some manner to the general public."[4] DHS then communicated that open-source information to the Department of State, which makes a decision about visa or other status revocation in "reli[ance] upon the underlying information and assessment provided by DHS/ICE."[5] In some cases, revocations that follow have been alleged to be rooted in the Secretary of State's statutory authority under 8 U.S.C. § 1227(a)(4)(C)(i), which authorizes deportation when the Secretary "has reasonable ground to believe [the individual's presence in the United States] would have potentially serious adverse foreign policy consequences for the United States."[6] More often,

---

[2] The White House, *Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism*, (Jan. 30, 2025), https://www.whitehouse.gov/fact-sheets/2025/01/fact-sheet-president-donald-j-trump-takes-forceful-and-unprecedented-steps-to-combat-anti-semitism/.

[3] Decl. of Unit Chief Roy M. Stanley, Doc. 30-2 at ¶ 5, *Taal v. Trump*, No. 3:25-cv-00335, 2025 WL 926207 (N.D.N.Y. Mar. 27, 2025).

[4] *Id.*

[5] Decl. of John Armstrong, Doc. 30-3 at ¶ 5, *Taal*, 2025 WL 926207.

[6] Ironically, that statutory authority was meant to *eliminate* the McCarthy-era practice of ideological exclusion. *See* 8 U.S.C. § 1182 (a)(3)(C)(iii) (prohibiting exclusion "because of the alien's past, current, or expected beliefs, statements, or associations . . . unless the Secretary of State personally determines that the alien's admission would compromise a compelling United

the government has relied on the Secretary of State's discretionary revocation authority. *See* 8 U.S.C. § 1201(i). To date, this "open-source" process has resulted in the revocation of more than 800 visas of noncitizen students, visitors, and residents—many of whom studied and lived in Amici States.[7]

Consistent with Executive Order 14188, many of the revocations have focused on supporters of Palestinian rights on college campuses. As just one example, on March 25, plain-clothes ICE agents surrounded Rümeysa Öztürk—an international Ph.D. student at Tufts University—and took her into immigration custody, apparently for co-authoring an op-ed in the school newspaper.[8] Other students have either been taken into ICE custody or self-deported after the revocation of their lawful status, all for expressing their support for Palestinian rights. *See* Comp. ¶¶ 32-40 (collecting cases).

---

States foreign policy interest"); Steven A. Holmes, *Legislation Eases Limits on Aliens*, N.Y. Times (Feb. 2, 1990), https://www.nytimes.com/1990/02/02/us/legislation-eases-limits-on-aliens.html ("In yet another sign of diminishing world tensions, the Senate this week gave final Congressional approval to repealing a provision of a McCarthy-era law that bars foreigners from visiting the United States because of their political beliefs."); *see also* ACLU, *The Excluded: Ideological Exclusion and the War on Ideas* at 6 (2007), https://www.aclu.org/documents/excluded-ideological-exclusion-and-war-ideas.

[7] *See* Inside Higher Ed, *International Student Visas Revoked*, https://www.insidehighered.com/news/global/international-students-us/2025/04/07/where-students-have-had-their-visas-revoked (last visited April 11, 2025). Secretary of State Rubio has also ordered diplomats overseas to scrutinize social media content of some applicants for student and other types of visas, as well as some current visa holders, "in an effort to bar those suspected of criticizing the United States and Israel from entering the country, U.S. officials say." Edward Wong, *Rubio Orders U.S. Diplomats to Scour Student Visa Applicants' Social Media*, N.Y. Times (Mar. 25, 2025), https://www.nytimes.com/2025/04/01/us/politics/student-visas-social-media.html. This new scrutiny appears to be tied to the start of the war in Gaza, as it applies to any applicants who previously held a student or exchange visa between October 7, 2023, and August 31, 2024, or had their visa terminated between October 7, 2023, and now. *Id.*

[8] Öztürk filed a petition for a writ of habeas corpus in the U.S. District Court for the District of Massachusetts. *See Ozturk v. Hyde*, No. 1:25-cv-10695-DJC (D. Mass. Mar. 28, 2025). The Court initially ordered that she not be removed from the United States, *see Ozturk v. Hyde*, 2025 WL 942731, Doc. 16, and later transferred the case to Vermont. *See Ozturk v. Hyde*, 2025 WL 1009445, Doc. 42.

Each of these students was targeted for enforcement as part of a systematic effort by the Trump Administration—via the explicit directive of Executive Order 14188—to use federal immigration laws to punish noncitizen students (and others) associated with pro-Palestinian beliefs. *See Ozturk v. Hyde*, No. 1:25-cv-10695-DJC, 2025 WL 1009445, Doc. 42 at 7-8 (D. Mass. Mar. 28, 2025) (Casper, J.) ("Ozturk's case is one of several cases in which the Trump Administration has implemented these Executive Orders by revoking the immigration status of non-citizens who expressed support for Palestine."). In a typical case involving the revocation of a student visa it might have required lengthy discovery to uncover ICE's viewpoint discrimination and retaliatory motive, but this Administration has made no effort to disguise the reasons for its actions. The Executive Orders themselves are explicit. And even before the inauguration, President Trump repeatedly threatened to deport any pro-Palestinian student protesters, saying: "Any student that protests, I [will] throw them out of the country."[9]

Senior members of the Administration have echoed this ideological motive. For example, when asked about Öztürk's detention, Secretary of State Marco Rubio announced the revocation of her visa, explaining, "we gave you a visa to come and study and get a degree, not to become a social activist that tears up our university campuses."[10] There is no evidence that Öztürk "tore up" anything at Tufts; indeed, the only "open-source" reason for her arrest appears to be her authorship of an op-ed in her school newspaper—written with three fellow students and endorsed by 32 others—addressed to Tufts University administrators, arguing that their response to a resolution

---

[9] Josh Dawsey, et al., *Trump told donors he will crush pro-Palestinian protests, deport demonstrators*, Washington Post (May 27, 2024), https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors/.

[10] C-SPAN, *Secretary Rubio Defends Revoking Turkish Student's Visa*, Mar. 27, 2025, https://www.c-span.org/clip/news-conference/secretary-rubio-defends-revoking-turkish-students-visa/5158479.

passed by student government concerning the war in Gaza had been inadequate.[11] Her detention is a transparent attack on free speech.[12]

The aggressive tactics employed to enforce the Ideological Deportation Policy lay bare its true intent: intimidating noncitizens into silence. A sudden loss of a visa or status may result in the individual being immediately deportable. But ICE is not merely initiating deportation proceedings. Instead, ICE is resorting to alarming displays of power. Öztürk, for example, was walking to a friend's house to share a meal to end her Ramadan fast when she was physically restrained by six plain-clothes federal officers (most of them masked), handcuffed, placed in an unmarked vehicle, and quickly driven away and out of state.[13] These dramatic actions were neither required by

---

[11] *See* Rümeysa Öztürk, et al., *Op-ed: Try again, President Kumar: Renewing calls for Tufts to adopt March 4 TCU Senate resolutions*, The Tufts Daily (Mar. 26, 2024), www.tuftsdaily.com/article/2024/03/4ftk27sm6jkj.

[12] The Ideological Deportation Policy may have started with those expressing pro-Palestinian beliefs, but it will not end with them. *See* Andy J. Semotiuk, *Silencing Dissent: U.S. Moves To Deport Kremlin Critic Kseniia Petrova*, Forbes (Mar. 30, 2025), https://www.forbes.com/sites/andyjsemotiuk/2025/03/30/silencing-dissent-us-moves-to-deport-kremlin-critic-kseniia-petrova/; Jack Healy & Jazmine Ulloa, *'We Finally Got You.' Immigrant-Rights Advocate Arrested in Colorado*, N.Y. Times (Mar. 18, 2025), https://www.nytimes.com/2025/03/18/us/immigrant-arrest.html; Eilis O'Neill, et al., *ICE detains leader of farmworker union in northwest Washington state*, KUOW (Mar. 26, 2025), https://www.kuow.org/stories/ice-detains-farmworker-activist-in-northwest-washington-state; Aurelien Breeden, *U.S. Turned Away French Scientist Over Views on Trump Policies*, N.Y. Times (Mar. 20, 2025), https://www.nytimes.com/2025/03/20/world/europe/us-france-scientist-entry-trump-messages.html.

[13] Öztürk was seized at 5:49 P.M. in Somerville, Massachusetts, about 15 miles from the nearest ICE Field Office in Burlington, Massachusetts. *See* Decl. of Acting Deputy Field Office Director David T. Wesling, *Ozturk v. Trump*, No. 1:25-cv-10695-DJC, Doc. 19-1 at ¶ 10 (D. Mass. Apr. 4, 2025). But she was taken to Lebanon, New Hampshire within an hour of her arrest (at 6:36 P.M.). She then sat in Lebanon for 2 1/2 hours, *id.* at ¶¶ 11-12, before being processed at the ICE Field Office in St. Albans, Vermont, over 230 miles from Somerville. *Id.* at ¶¶ 12-13. The government claims that this circuitous route was followed because of "operational necessity and considerations." *Id.* at ¶ 7. The next day Öztürk was flown to Louisiana, where she remains detained. *Id.* at ¶ 18. *See Ozturk v. Hyde*, 2025 WL 1009445, Doc. 42 at 18-22 (Casper, J.) (citing the government's "furtiveness" and the "irregularity" of her transfer process "coupled with the failure to disclose Ozturk's whereabouts even after the government was aware that she had counsel and the Petition was filed in this Court").

national security nor justified by any conceivable risk the student posed. Rather, the point *is* fear. The calculated use of the arrest power and arbitrary detention thousands of miles away from their homes sends a powerful message: the federal government seeks to punish noncitizens for exercising their constitutionally protected speech and to instill pervasive fear that suppresses dissent.[14] The Administration's actions reflect the unconstitutional use of immigration enforcement to deport noncitizens for expressing opinions with which the government disagrees.

### B.    Noncitizen Residents, Students, and Faculty Benefit Amici States

Noncitizen residents contribute substantially to the economic, cultural, and intellectual vitality of Amici States. In their communities, these residents generate significant tax revenue, fill critical workforce gaps, and start businesses that create jobs. In the educational context, international students and faculty enrich campus life through their diverse perspectives and contributions to innovation and research advancements that help maintain the competitiveness and prestige of our colleges and universities. Their presence deepens relationships and ties that create

---

[14] These ideological deportations are just one of many actions taken by the Trump Administration meant to terrify immigrants across the country. It has admitted to deporting at least one person in error, taken a Massachusetts defendant from state court mid-trial, and bragged about shipping noncitizens en masse to a "notoriously brutal" prison in El Salvador where they will "face immediate and intentional life-threatening harm" and "egregious human rights abuses." *Trump v. J.G.G.*, 604 U.S. __, 2025 WL 1024097 (2025) (Sotomayor, J., dissenting). The Administration has also been accused of ignoring federal court orders meant to ensure noncitizens receive due process; it has argued that, even when it does make a mistake, it cannot retrieve people from the foreign prisons to which it sends them. *See id*. These actions have had their intended effect. *See generally* M. Gessen, *Unmarked Vans. Secret Lists. Public Denunciations. Our Police State Has Arrived.*, N.Y. Times (Apr. 2, 2025), https://www.nytimes.com/2025/04/02/opinion/trump-ice-immigrants.html ("It's the chilling stories that come by word of mouth. ICE is checking documents on the subway. ICE is outside New York public libraries that hold English-as-a-second-language classes. ICE agents handcuffed a U.S. citizen who tried to intervene in a detention in Harlem. ICE vehicles are parked outside Columbia. ICE is coming to your workplace, your street, your building. ICE agents are wearing brown uniforms that resemble those of UPS—don't open the door for deliveries. Don't leave the house. The streets in the New York neighborhoods with the highest immigrant populations have emptied out.").

long-term advantages for Amici States' economic development, cultural enrichment, and international standing.

Noncitizen residents contribute to the Amici States' economies, labor forces, and communities in several important ways. Immigrant-led households in Massachusetts, for example, earned over 15% of all income earned in the Commonwealth in 2014.[15] "With those earnings, the state's foreign-born households were able to contribute more than one in every seven dollars paid by Massachusetts residents in state and local tax revenues, payments that support important public services such as public schools and police."[16] Immigrants make up a large portion of the Massachusetts labor force (21.9%) and a disproportionate share of the Commonwealth's entrepreneurs (27%), STEM workers (29.3%), and health aides (38.6%).[17] California has over 880,000 immigrant entrepreneurs, who contribute $28.4 billion in business income; 28 Fortune 500 companies in California were founded by immigrants or the children of immigrants.[18] Simply put, the contributions of these residents strengthen our states' fiscal health and global competitiveness. In the community, noncitizen residents revitalize neighborhoods by introducing

---

[15] New American Economy, *The Contributions of New Americans in Massachusetts* (Aug. 2016), https://www.newamericaneconomy.org/wp-content/uploads/2017/02/nae-ma-report.pdf. Note that 53% of immigrants in Massachusetts are naturalized citizens. *See* American Immigration Council, *New Americans in Massachusetts* (2023), https://map.americanimmigrationcouncil.org/locations/massachusetts/ (last visited Apr. 9, 2025).

[16] *The Contributions of New Americans in Massachusetts*, *supra* note 15.

[17] *The Contributions of New Americans in Massachusetts*, *supra* note 15. *See generally*, Aidan Enright, et al., *International Students: Poorly Suited Immigration Pathways Stymie Formation of High Growth Businesses* 4, Pioneer Institute, (July 2024), https://files.eric.ed.gov/fulltext/ED656349.pdf ("A significant body of research has found that immigrants are more likely to start businesses than those born in the U.S., and the propensity of international students to concentrate in STEM fields indicates enormous potential for economic contributions.").

[18] American Immigration Council, *Immigrants in California*, https://map.american immigrationcouncil.org/locations/california/ (last visited Apr. 9, 2025).

diverse arts, cuisine, and traditions that strengthen community bonds.[19] In healthcare settings, noncitizen professionals often provide care to medically underserved communities and bridge critical language gaps.[20] The presence of noncitizen residents promotes multilingualism and cultural competency among native-born residents, preparing future generations for success in an increasingly interconnected world.[21]

Beyond these economic and community impacts, noncitizen residents are vital to the success of Amici States' academic institutions. International students and faculty are invaluable members of our campus communities. During the 2023 to 2024 school year, Amici States hosted nearly 640,000 international students who supported more than 235,000 jobs and contributed approximately $27.5 billion annually to our economies through tuition, living expenses, and

---

[19] *See* Americans for the Arts, *Arts Impact Explorer Fact Sheet: Arts + Immigration* (July 2024), https://ww2.americansforthearts.org/sites/default/files/2025-01/Arts%20%2B%20Immigration.pdf (noting that "[f]ifty-seven percent of Americans believe that immigrants improve the quality of the food, music, and arts in the United States").

[20] *See* Morhaf Al Achkar, et al., *Integrating Immigrant Health Professionals into the U.S. Healthcare Workforce: Barriers and Solutions*, J. Immigr. Minor Health, (Apr. 2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10119818/ ("Immigrant health professionals play essential roles in today's health system. Not only do immigrant health professionals help relieve workforce shortages, especially in under-resourced areas, they also bring awareness of and sensitivities to the needs and health challenges of their communities."); L.E. Gomez & Patrick Bernet, *Diversity improves performance and outcomes*, 111 J. Nat'l Med. Ass'n 383, 391 (Aug. 2019), https://www.sciencedirect.com/science/article/abs/pii/S0027968418303584?via%3Dihub (compiling research on the healthcare industry and concluding that "[d]iversity can help organizations improve both patient care quality and financial results")

[21] *See, e.g.*, Brian D. Smedly, et al., Institute of Medicine (US) Committee on Understanding and Eliminating Racial and Ethnic Disparities in Health Care, *Unequal Treatment: Confronting Racial and Ethnic Disparities in Healthcare*, at 123 (2003), https://www.ncbi.nlm.nih.gov/books/NBK220358/pdf/Bookshelf_NBK220358.pdf, ("Racial and ethnic diversity of health professions faculty and students helps to ensure that all students will develop the cultural competencies necessary for treating patients in an increasingly diverse nation.").

related spending.[22] These students and faculty members bring diverse perspectives that enhance Amici States' educational environments, with international students and scholars fostering global awareness and cross-cultural understanding in classrooms and research settings.[23] For many students, campus life is the first time they are living with and studying alongside students from different countries and cultures. These interactions expand students' worldviews, build cultural empathy, and help develop them into global leaders.

Amici States' public colleges and universities are deeply committed to global engagement, partnering with international counterparts to facilitate research projects and academic programs all over the world. UMass Amherst alone has partnerships in 36 countries.[24] The University of Washington has over 200 partnerships spanning 47 countries.[25] Public colleges and universities in Amici States have intentionally fostered these connections because international collaboration benefits communities at the local, national, and international level.[26] Amici States' public colleges and universities also have a long tradition of hosting foreign students and scholars. These programs reflect the reciprocal benefits conferred by foreign exchange: Amici States gain and grow

---

[22] *See* NAFSA: Association of International Educators, *NAFSA International Student Economic Value Tool* (2023-24), https://www.nafsa.org/policy-and-advocacy/policy-resources/nafsa-international-student-economic-value-tool-v2 (last visited Apr. 11, 2025).

[23] Empirical research suggests that academic performance improves as the percentage of immigrant students increases. *See* Paul N'Dri Konan, et al., *Cultural Diversity in the Classroom and its Effects on Academic Performance: A Cross-National Perspective*, 41 Soc. Psych. 230-37 (2010). *See also* Judit Kende, et al., *Social and institutional inclusion in multi-ethnic schools enable better intergroup relations for majority youth and higher school achievement for minority youth*, 103 Int'l J. of Intercultural Rels. (Nov. 2024), https://www.sciencedirect.com/science/article/pii/S0147176724001573.

[24] UMass Amherst, *Global Partnerships*, https://www.umass.edu/global-affairs/global-partnerships (last visited Apr. 10, 2025).

[25] *See* University of Washington, *A Global University*, https://www.washington.edu/global/ (last visited Apr. 10, 2025).

[26] *See*, *e.g.*, University of Illinois System, *International Partnerships*, https://www.uillinois.edu/about/international_partnerships.

economically, socially, and culturally from the presence of noncitizen students and faculty while the international community benefits immensely by the knowledge-sharing and global problem-solving these exchanges allow.

In short, noncitizen residents are indispensable to Amici States. They launch businesses that create jobs for citizens and noncitizens alike. They advance research that addresses pressing challenges. They are drivers of innovation and entrepreneurship. They are neighbors, friends, and pillars of our communities. The benefits they afford the Amici States cannot be overstated.

## III.    THE IDEOLOGICAL DEPORTATION POLICY INFLICTS SEVERE AND IRREPARABLE HARM ON AMICI STATES AND IS CONTRARY TO THE PUBLIC INTEREST

To obtain a preliminary injunction, Plaintiffs must demonstrate a likelihood of success on the merits, a likelihood of irreparable harm in the absence of relief, that the balance of equities is in their favor, and that injunctive relief is consistent with the public interest. *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 171 (1st Cir. 2015). Amici States support plaintiffs' arguments in favor of all four factors relevant to a preliminary injunction but write here to explain the irreparable harm inflicted on Amici States by the Administration's Ideological Deportation Policy, as well as how the public interest favors injunctive relief. In cases like this one, which affect many non-parties (including Amici States), the hardship to third parties is integral to the public interest analysis. *See Everett J. Prescott, Inc. v. Ross*, 383 F. Supp. 2d 180, 193 (D. Me. 2005) (citing *United States v. Zenon*, 711 F.2d 476 (1st Cir. 1983)).

### A.    The Ideological Deportation Policy Inflicts Educational and Institutional Harm on Colleges and Universities Within Amici States

When noncitizen students and faculty face potential deportation based on their expressed viewpoints, every aspect of the academic ecosystem is damaged. Classroom discussions become artificially constrained, as international participants either stop attending altogether or self-censor

to avoid expressing perspectives on issues that might be deemed controversial, especially on topics of public interest and import. In fact, speech on topics of public interest enjoys greater constitutional protection, not less.[27] That heightened protection is most necessary in the classroom, where students must challenge one another's assumptions, broaden one another's perspectives, and ultimately educate one another through the collision of diverse viewpoints.[28] That is why the First Amendment simply "does not tolerate laws that cast a pall of orthodoxy over the classroom" because "[t]he classroom is peculiarly the 'marketplace of ideas.'" *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (citation omitted).

The Ideological Deportation Policy defrauds that marketplace and degrades the educational experience: from one of authentic intellectual exploration to a stilted performance where certain voices remain deliberately silent. Student organizations, publications, and campus activism—all training grounds for democratic participation—are now divided between students who can speak freely and those who cannot (because they fear retaliation under the Ideological Deportation Policy). This division creates a separate and unequal educational environment, including at Amici States' public colleges and universities, in which some students can participate in campus life and develop their intellectual identities while others fear reprisal for expressing certain viewpoints. Where even a small number of students self-censor, the educational experience for all suffers. This

---

[27] *See Snyder v. Phelps*, 562 U.S. 443, 452 (2011) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." (citation omitted)).

[28] *See, e.g.*, Mission of the California State University, https://www.calstate.edu/csu-system/about-the-csu/Pages/mission.aspx (last visited Apr. 10, 2025) ("[T]he California State University . . . [e]ncourages free scholarly inquiry and protects the University as a forum for the discussion and critical examination of ideas, findings, and conclusions.").

harm is exacerbated by the arbitrariness of the government's Ideological Deportation Policy.[29] Though crystal clear in its ideological and censorial nature, the policy does not specify what particular views will subject students to it.

Beyond the classroom, "[s]cholarship cannot flourish in an atmosphere of suspicion and distrust." *Sweezy v. State of N.H. ex rel. Wyman*, 354 U.S. 234, 250 (1957). Academic inquiry is compromised when scholars must weigh immigration consequences alongside intellectual pursuits. International academics might abandon promising areas of research, decline to challenge prevailing orthodoxies, or temper their findings to avoid conclusions that might be dissatisfactory to the federal government.[30] Such constraints will stifle innovation. The rapid development of COVID-19 vaccines, for example, illustrates the importance of open dialogue to scientific achievement, as "[r]esearchers developed ad hoc research collaborations across disciplines, institutions and borders."[31] Universities played an important role in that global effort.[32] Self-censorship also undermines the peer review process, which depends on honest and robust critique. And academic conferences—essential for the exchange of ideas on campuses—lose their vitality when international participants must either cancel or temper their contributions. Spontaneous

---

[29] *See Cramp v. Bd. of Pub. Instruction of Orange Cnty.*, 368 U.S. 278, 287 (1961) ("The vice of unconstitutional vagueness is further aggravated where, as here, the [policy] . . . inhibit[s] the exercise of individual freedoms affirmatively protected by the Constitution.").

[30] *See* Miri Yemini, *Bridging Borders: Toward Equity in International Research Collaborations* NAFSA (Nov./Dec. 2024), https://www.nafsa.org/professional-resources/research-and-trends/trends-insights/bridging-borders-novdec24 ("International research collaborations have become essential tools in advancing knowledge, offering benefits to researchers, practitioners, higher education institutions, nation-states, international organizations, and funding agencies.").

[31] Chris Yiu, et al., *A research and policy agenda for the post-pandemic world*, Future Healthcare J. (July 2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC8285152/.

[32] *See* John P. Moore & Ian A. Wilson, *Decades of basic research paved the way for today's 'warp speed' Covid-19 vaccines*, Stat (Jan. 5, 2021), https://www.statnews.com/2021/01/05/basic-research-paved-way-for-warp-speed-covid-19-vaccines/ (noting that the technology used in the vaccines "emerged during the past decade from university laboratories").

exchanges are replaced with sanitized interactions. This not only deprives the academic community of diverse insights but also sends a message that certain perspectives are unwelcome as part of the intellectual discourse on college campuses within Amici States.

Censorship thus threatens the First Amendment rights of both speaker and audience, as "[t]he right of freedom of speech . . . . necessarily protects the right to receive it." *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943). Indeed, this is precisely the reason why "[v]iewpoint discrimination is . . . an egregious form of content discrimination" and "[t]he government *must* abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (emphasis added). That holds true whether those viewpoint-based restrictions on speech are achieved through explicit government censorship, a deliberately ambiguous enforcement policy, or the more insidious mechanism of selective vulnerability of the speaker to government retaliation.

Here, the ambiguity of the Ideological Deportation Policy deepens its chilling effect. For example, Secretary of State Rubio's recent diplomatic cable requiring enhanced social media vetting procedures for certain visa holders and applicants (referenced *supra* note 7) tells diplomats to look for "conduct that bears a hostile attitude toward U.S. citizens or U.S. culture (including government, institutions, or founding principles)."[33] The astonishing breadth of this description of the speech prohibited—which readily includes *any* criticism of "U.S. citizens or U.S. culture"— combined with the government's relentless assertion of pretexts every time it enforces the policy, has left its contours completely ill-defined. And "[u]ncertain meanings inevitably lead citizens to

---

[33] Marisa Kabas, *State Dept. demands 'enhanced' social media vetting of student visa applicants*, The Handbasket (Mar. 26, 2025), https://www.thehandbasket.co/p/state-dept-enhanced-social-media-vetting-student-visa-applicants.

steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (cleaned up). In the face of such ambiguity, noncitizen students and faculty are left to guess at what speech might trigger their deportation, creating a chilling effect on speech and scholarship that extends far beyond what even the policy itself might have been intended to proscribe. Here, that repressive chill is especially profound because speakers may face punishment as grave as deportation, which can mean the loss "of all that makes life worth living." *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922).

Although these harms derive from core First Amendment principles, they are not abstract. International students and faculty across Amici States fear the Ideological Deportation Policy, leading to censorship in their expression, studies, and research.[34] According to a declaration filed by Tufts University in support of Rümeysa Öztürk's habeas petition, "[t]he University has heard from students, faculty and staff who are forgoing opportunities to speak at international conferences and avoiding or postponing international travel. In the worst cases, many report being

---

[34] Countless news articles have documented this chilling effect. *See* Emma Johnson, *'SCARED TO LEAVE MY HOUSE' Mavericks react to ICE-detained student, what's being done*, The Reporter (Apr. 8, 2025), https://www.msureporter.com/2025/04/08/scared-to-leave-my-house/; Anvee Bhutani, *US student journalists go dark fearing Trump crusade against pro-Palestinian speech*, The Guardian (Apr. 7, 2025), https://www.theguardian.com/us-news/2025/apr/07/student-journalists-remove-stories-trump; Jeff Tollefson, *International PhD students make emergency plans in fear of US immigration raids*, Nature (Apr. 4, 2025), https://www.nature.com/articles/d41586-025-01056-5; Lexi Lonas Cochran, *Trump crackdown casts chill over international student programs*, The Hill (Apr. 3, 2025), https://thehill.com/homenews/education/5226292-trump-immigration-crackdown-international-students-college-campus-protests-ice-rubio-deportation-khalil/; Benjamin Bardman, *Trump Immigration Actions are Likely to Have a Chilling Effect on Online Speech*, Vanderbilt J. of Ent. & Tech. L. (Mar. 31, 2025), https://www.vanderbilt.edu/jetlaw/2025/03/31/trump-immigration-actions/; Olivia Ebertz, *Deportations and detainments are having a chilling effect at Brown*, Rhode Island PBS (Mar. 27, 2025), https://thepublicsradio.org/education/deportations-and-detainments-are-having-a-chilling-effect-at-brown/; Liam Knox, *'Palpable Fear' Hangs Over International Students*, Inside Higher Ed (Mar. 18, 2025), https://www.insidehighered.com/news/global/international-students-us/2025/03/18/international-students-navigate-escalating-threats.

fearful of leaving their homes, even to attend and teach classes on campus."[35] Similarly, at some Massachusetts state colleges and universities faculty members have decided not to attend international conferences out of fear of re-entry denial, and at least one international panelist has withdrawn from a domestic conference. International students report that they are afraid to speak up in class out of concern that they will be reported to ICE; others have asked to attend classes virtually to reduce the possibility of contact with ICE; and some are so afraid that they have chosen to withdraw from their classes altogether and relocate. Student groups have stopped hosting events for fear that individual student members might be targeted. When events do go forward, Massachusetts schools have seen a noticeable decline in international student attendance. Doctoral students have requested that their dissertations be embargoed and shielded from public release out of fear that their topic of study will be used as a basis for ideologically-based immigration action. University of Washington officials report that this anxiety extends even to noncitizen medical trainees who are concerned about their ability to continue training in the United States or obtain future positions due to immigration changes. And in New York, State University of New York (SUNY) institutions report a reduced willingness among international scholars to teach, engage in public discourse at SUNY, or participate in any United Stated-based research. As visa revocations accelerate across the Amici States every day, these chilling effects continue to multiply.[36]

If international students and faculty are afraid to speak freely in the United States, they will not want to come here. The perception (and reality) of ideological targeting undermines the

---

[35] *See* Tufts University, *University Declaration for Rümeysa Öztürk* (Apr. 2, 2025), https://www.tufts.edu/president/speeches-and-messages/04022025-university-declaration-for-rumeysa-ozturk.

[36] Massachusetts has seen nearly 100 such revocations in its public and private colleges, with little or no explanation. See Inside Higher Ed, *International Student Visas Revoked*, *supra* note 7. To date, the University of Washington has seen nine such revocations. *Id*. In California, the federal government has revoked 140 student visas (and counting). *Id*.

essential academic freedom that has historically made the United States a global beacon. Talented scholars will instead now view our country as an unpredictable and potentially hostile educational environment, driving them toward opportunities in peer countries with more inclusive policies.[37] Indeed, a number of public colleges and universities in Amici States are already experiencing significant declines in enrollment interest from international students as compared to 2024. For example, one Massachusetts public university estimates—based on analysis undertaken since the challenged policy went into effect—that there will be a 21% drop in prospective international students for the 2025 to 2026 academic year. Another reports that completed applications for first-year international students are down 12%. SUNY institutions are reporting similarly significant declines in international applications, visa approvals, and continued enrollment by students. One SUNY campus is reporting a significant reduction in new and continuing international enrollments in its Master's degree programs for the Fall 2025 semester as compared to the same date last year. These recruitment and retention challenges will result in a "brain drain" from the United States that will reverberate through our economy and society.[38] The exodus of current talent means a loss of future innovation. If allowed to continue, the Ideological Deportation Policy will create a legacy of international distrust that could take generations to repair.

Our schools themselves will be devastated. The loss of prospective students—and current students who abandon their studies—will severely weaken American universities' global competitiveness, research capabilities, and financial stability. As discussed *supra*, international

---

[37] *See* Liam Knox, *International Enrollment's Precarious Moment*, Inside Higher Ed (Mar. 19, 2025), https://www.insidehighered.com/news/global/international-students-us/2025/03/19/colleges-fear-decline-international-student.

[38] Robin Hattersley, *Visa Revocations Leave Hundreds of International College Students in Limbo*, Campus Safety Magazine (Apr. 8, 2025), https://www.campussafetymagazine.com/news/visa-revocations-leave-international-college-students-in-limbo/169053/.

students contribute billions of dollars annually to the U.S. economy while bringing unique perspectives to the classroom that enrich the educational experience for everyone. Loss of these contributions will cause declining research output, diminished global rankings, and significant budget shortfalls that could trigger program cuts, reduce scholarships, and increase tuition (for native and international students alike).[39] The Ideological Deportation Policy will also jeopardize existing international collaborations, study abroad programs, and faculty exchange initiatives—as it already has—because partner institutions in other countries will hesitate to engage with a system where students or faculty fear speaking their minds. The long-term consequence will be catastrophic: the erosion of America's position as a global leader in higher education.[40]

### B. The Ideological Deportation Policy Harms Public Safety, Public Health, and Religious Worship in Amici States

The threat of ideological deportation extends beyond academia and free speech, impacting other vital public interests—such as public health, public safety, and free religious worship.

From a public safety perspective, the Ideological Deportation Policy will cause noncitizens to avoid cooperating with law enforcement if they fear deportation, hampering crime reporting,

---

[39] *See* Liam Knox, *Student Visa Dragnet Reaches Small Colleges*, Inside Higher Ed (Apr. 8, 2025), https://www.insidehighered.com/news/global/international-students-us/2025/04/08/trump-admin-broadens-scope-student-visa ("Many of the small colleges struggling to respond to student visa revocations have come to rely on international tuition dollars to support flagging revenue from shrinking domestic enrollment or declines in state funding.").

[40] The short-term consequence has been chaos on campuses across Amici States. Specifically, institutions of higher education are expending significant time and effort attempting to advise and support noncitizen students and faculty. For example, colleges and universities are: advising individual students about possible changes to their academic plans due to actual or potential changes in visa status, reviewing students' visa statuses more frequently than usual to determine which students may be at risk, attempting to understand the federal government's evolving visa requirements, and responding to increased mental health concerns (e.g., anxiety) associated with uncertainty about individuals' continued presence in the United States. Individual institutions have likely spent hundreds of personnel hours attempting to navigate these issues—time that is taken away from managing the regular operations of a campus including, but not limited to, instruction.

witness participation, and community policing.[41] From a public health perspective, Amici States depend on noncitizen healthcare workers who, like other immigrants, are forced to live in a climate of fear—nationwide over one million immigrants work in healthcare, including 40% of home health aides and 18% of nursing home staff.[42] Finally, the Ideological Deportation Policy undermines religious worship, as many religious beliefs have ideological components. Freedom of worship requires free speech: the right to articulate beliefs, share religious teachings, and conduct discussions. Religious freedom would be nullified if certain religious beliefs become grounds for deportation or exclusion. Noncitizens will hesitate to speak freely at (or even attend) religious ceremonies. Houses of worship—historically sanctuaries for honest expression—will become spaces of suspicion and fear, particularly affecting minority religious groups. When free expression is attacked, many aspects of the public interest suffer alongside it.

In sum, the Ideological Deportation Policy has echoed across nearly all domains in Amici States. This Court should enjoin a policy that will make our states less safe, less healthy, and less free.

## IV.   CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion for a preliminary injunction.

---

[41] Meg Anderson, *Police say ICE Tactics are eroding public trust in local law enforcement*, NPR (Mar. 30, 2025), https://www.npr.org/2025/03/30/nx-s1-5304236/police-say-ice-tactics-are-eroding-public-trust-in-local-law-enforcement.

[42] Nicole Lou, *Over 350K Health Workers Face Deportation Risk*, MedPageToday.com (Apr. 3, 2025), https://www.medpagetoday.com/publichealthpolicy/workforce/114947; Vanessa G. Sánchez & Daniel Chang, *Immigration crackdowns disrupt caregivers. Families are paying the price.*, NBC News (Apr. 3, 2025), https://www.nbcnews.com/health/health-news/trump-immigration-crackdowns-threaten-health-caregiving-us-families-rcna199383.

Respectfully submitted,

ANDREA JOY CAMPBELL
  *Attorney General*
  *Commonwealth of Massachusetts*

/s/ *David Rassoul Rangaviz*
Tasha J. Bahal, BBO # 675935
  *Deputy State Solicitor*
Elizabeth D. Matos, BBO # 671505
  *Chief, Civil Rights Division*
David R. Rangaviz, BBO # 681430
Jonathan T. Burke, BBO # 673472
David Ureña, BBO # 703076
Brett M. Gannon, BBO # 713938
  *Assistant Attorneys General*
  *Civil Rights Division*
One Ashburton Place
Boston, MA 02108
617-963-2816
david.rangaviz@mass.gov

NICHOLAS W. BROWN
  *Attorney General*
  *State of Washington*

Marsha Chien, WSBA 47020
Kelly A. Paradis, WSBA 47175
Cristina Sepe, WSBA 53609
  *Deputy Solicitors General*
Niya Tawachi, WSBA 60350
  *Assistant Attorney General*
1125 Washington Street SE
PO Box 40100
Olympia, WA  98504-0100
360-753-6200

KRIS MAYES
  *Attorney General*
  *State of Arizona*
2005 N. Central Ave.
Phoenix, AZ 85004

ROB BONTA
  *Attorney General*
  *State of California*
1300 I Street
Sacramento, CA 95814

PHILIP J. WEISER
  *Attorney General*
  *State of Colorado*
1300 Broadway
Denver, CO 80203

AARON M. FREY
  *Attorney General*
  *State of Maine*
6 State House Station
Augusta, ME 04333-0006

ANTHONY G. BROWN
  *Attorney General*
  *State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

DANA NESSEL
  *Attorney General*
  *State of Michigan*
P.O. Box 30212
Lansing, MI 48909

[*Signatures Continued on Following Page*]

WILLIAM TONG
  *Attorney General*
  *State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
  *Attorney General*
  *State of Delaware*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801

BRIAN L. SCHWALB
  *Attorney General*
  *District of Columbia*
400 6th Street, NW, Suite 8100
Washington, DC 20001

ANNE E. LOPEZ
  *Attorney General*
  *State of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
  *Attorney General*
  *State of Illinois*
115 South LaSalle Street
Chicago, IL 60603

KEITH ELLISON
  *Attorney General*
  *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

MATTHEW J. PLATKIN
  *Attorney General*
  *State of New Jersey*
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

LETITIA JAMES
  *Attorney General*
  *State of New York*
28 Liberty Street
New York, NY 10005

DAN RAYFIELD
  *Attorney General*
  *State of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
  *Attorney General*
  *State of Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
  *Attorney General*
  *State of Vermont*
109 State Street
Montpelier, VT 05609

## <u>CERTIFICATE OF SERVICE</u>

I, David Rangaviz, hereby certify that I have this day, April 11, 2025, served the foregoing document upon all parties of record, by electronically filing to all ECF-registered parties and by sending a copy, first-class mail, postage prepaid to all unregistered parties.

/s/ *David Rangaviz*
David Rangaviz
