## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| | ) | |
| AMERICAN ASSOCIATION OF | ) | |
| UNIVERSITY PROFESSORS, ET AL., | ) | Civil Action No. 1:25-cv-10685-WGY |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARCO RUBIO, in his official capacity | ) | |
| as Secretary of State, and the | ) | |
| DEPARTMENT OF STATE, ET AL., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ............................................................................................... 2

   I.   Plaintiffs' Lawsuit ................................................................................. 2

   II.   The President's Executive Orders .......................................................... 3

ARGUMENT ................................................................................................... 4

   I.   This Court Lacks Jurisdiction ............................................................... 4

      A.   This Motion Is Foreclosed by 8 U.S.C. § 1252(f) ......................... 4

      B.   This Motion Is Foreclosed by 8 U.S.C. § 1252(g)........................... 6

      C.   Plaintiffs Lack Standing.............................................................. 7

   II.   Plaintiffs' Constitutional And APA Claims Are Meritless .................... 12

      A.   First Amendment........................................................................ 12

      B.   Fifth Amendment ....................................................................... 15

      C.   APA ........................................................................................... 16

   III.  The Remaining Factors Disfavor a Preliminary Injunction.................. 19

      A.   Irreparable Harm........................................................................ 19

      B.   Balance of Equities and Public Interest ...................................... 19

   IV.  Any Injunction Should Exclude The President and Require Bond...................... 20

CONCLUSION................................................................................................ 20

# TABLE OF AUTHORITIES

## CASES

*A. A. C. P. v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982) ........................................................................... 13

*AFL-CIO v. Allbaugh*,
  295 F.3d 28 (D.C. Cir. 2002) ............................................................ 13

*Already, LLC v. Nike, Inc.*,
  568 U.S. 85 (2013) .............................................................................11

*Beckles v. United States,*
  580 U.S. 256 (2017) ........................................................................... 16

*Bennett v. Spear*,
  520 U.S. 154 (1997) ..................................................................... 16, 17

*Biden v. Texas*,
  597 U.S. 785 (2022) ............................................................................. 5

*Bluman v. Fed. Election Comm'n*,
  800 F. Supp. 2d 281 (D.D.C. 2011) .................................................. 14

*Bridges v. Wixon*,
  326 U.S. 135 (1945) ........................................................................... 14

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) .......................................................... 19

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ............................................................................... 9

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ........................................................................9, 11

*Dept. of State v. Munoz*,
  602 U.S. 899 (2024) ........................................................................... 15

*DSE, Inc. v. United States*,
  169 F.3d 21 (D.C. Cir. 1999) ............................................................ 20

*E.F.L. v. Prim,*
   986 F.3d 959 (7th Cir. 2021) ............................................................ 6

*FCC v. Prometheus Radio Project,*
   592 U.S. 414 (2021) ...................................................................... 18

*FDA v. All. for Hippocratic Med.,*
   602 U.S. 367 (2024) ..................................................................11, 13

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) ...................................................................... 18

*Galvan v. Press,*
   347 U.S. 522 (1954) ...................................................................... 14

*Garland v. Aleman Gonzalez,*
   596 U.S. 543 (2022) .................................................................... 4, 5

*Graham v. Richardson,*
   403 U.S. 365 (1971) ...................................................................... 14

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972) ...................................................................... 16

*Guerrero-Lasprilla v. Barr,*
   589 U.S. 221 (2020) ...................................................................... 18

*Harisiades v. Shaughnessy,*
   342 U.S. 580 (1952) .................................................................. 13, 14

*Holder v. Humanitarian Law Project,*
   561 U.S. 1 (2010) ..................................................................... 13, 19

*Humphries v. Various Fed. USINS Emps.,*
   164 F.3d 936 (5th Cir. 1999) ............................................................ 7

*Lujan v. Def. of Wildlife,*
   504 U.S. 555 (1992) ........................................................................ 7

*Lujan v. National Wildlife Federation,*
   497 U.S. 871 (1990) .................................................................. 16, 17

*Massieu v. Reno,*
   915 F. Supp. 681 (D.N.J. 1996) ...................................................... 16

iii

*Moody v. NetChoice,*
    603 U.S. 707 (2024) ........................................................................... 12

*Murthy v. Missouri,*
    603 U.S. 43 (2024) ......................................................................... 8, 10

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................................... 19

*NRA v. Vullo,*
    602 U.S. 175 (2024) ........................................................................... 15

*Pleasant Grove City v. Summum,*
    555 US 460 (2009) ............................................................................. 12

*Rauda v. Jennings,*
    55 F.4th 773 (9th Cir. 2022) ............................................................... 7

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
    525 U.S. 471 (1999) ............................................................... 6, 7, 14, 15

*Roe v. Healey,*
    78 F.4th 11 (1st Cir. 2023) .................................................................. 8

*State of Mississippi v. Johnson,*
    71 U.S. 475 (1866) ............................................................................. 20

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ............................................................................. 8

*Tazu v. Att'y Gen. United States,*
    975 F.3d 292 (3d Cir. 2020) ................................................................ 6

*Trump v. Hawaii,*
    585 U.S. 667 (2018) ........................................................................... 15

*Turner v. Williams*
    194 U.S. 279 (1904) ........................................................................... 14

*U.S. v. Hansen,*
    599 U.S. 762 (2023) ........................................................................... 12

*United States v. Texas,*
    599 U.S. 670 (2023) ....................................................................... 9, 20

iv

*Warth v. Seldin*,
    422 U.S. 490 (1975) ............................................................................ 8

*Wills v. Pszczolkowski*,
    125 F. 4th 534 (4th Cir. 2025) ........................................................... 16

## STATUTES

5 U.S.C. § 551(3) .................................................................................... 17

8 U.S.C. § 1201(i) ................................................................................... 17

8 U.S.C. §§ 1221-1232 ............................................................................ 4

8 U.S.C. § 1252(a)(5) .............................................................................. 17

8 U.S.C. § 1252(b)(9) .............................................................................. 17

8 U.S.C. § 1252(f) ..................................................................................... 4

8 U.S.C. § 1252(f)(1) ................................................................................ 4

8 U.S.C. § 1252(g) ......................................................................... 6, 7, 17

## INTRODUCTION

Plaintiffs bring a First Amendment challenge to a "policy" of their own creation. They do not try to locate this program in any statute, regulation, rule, or directive. They do not allege that it is written down anywhere. And they do not even try to identify its specific terms and substance. That is all unsurprising, because no such policy exists. Plaintiffs nonetheless demand that this Court broadly pass on its legality, on the rationale that this "policy" *might* be applied in the future against *third parties* in a manner that *may* have downstream effects on Plaintiffs or their members. None of that is the stuff of an Article III case or controversy. This Court should reject this effort.

Foremost, this Court lacks jurisdiction. Plaintiffs demand an injunction barring certain immigration enforcement against an entire class of persons ("noncitizen students and faculty"). But the federal immigration laws strip review over those sorts of programmatic pre-enforcement claims twice over—as the Supreme Court has squarely held in very similar cases (which go uncited by Plaintiffs, let alone rebutted). More, Plaintiffs lack standing: Their suit rests on incidental harms incurred as a result of how a vague initiative may possibly affect the choices of third parties. That does not work. Article III gives federal courts jurisdiction to review discrete governmental actions in the context of real, defined disputes. This Court cannot broadly pass upon the legality of the "policy" here any more than it can hear a suit against the Administration for being "pro-business."

Even excusing all of that, Plaintiffs' challenge—which in its best light, is a facial challenge to two recent executive orders—fails. Most of all, it rests on a basic misunderstanding of the First Amendment, which under binding Supreme Court precedent applies differently in the immigration context than it otherwise does domestically. Regardless, the equities cut against the sprawling relief sought here—which seeks to disable all immigration enforcement actions in the country, so long as they are secretly done pursuant to a nonexistent policy. The motion should be denied.

**BACKGROUND**

I.      **Plaintiffs' Lawsuit**

Plaintiffs are faculty and student associations, comprised of citizen and noncitizen members. They allege that federal agencies have "implemented" an "ideological deportation policy," which they describe as a "large-scale" policy of "arresting, detaining, and deporting" noncitizen students and faculty engaged in "pro-Palestinian protests" and related "expression and association." Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction, Dkt. 14 ("PI Mem.") at 1; Complaint for Declaratory and Injunctive Relief, Dkt. 1 ("Compl.") ¶ 1.

Plaintiffs do not locate this "policy" in any statute, rule, regulation, or directive. They do not allege it is written down or explain how it possesses the force of law. Plaintiffs instead cobble together this policy from certain public statements, two Executive Orders, and Plaintiffs' view of a handful of recent immigration enforcement proceedings. Compl. ¶¶ 25-47; PI Mem. 2-4.

Plaintiffs do not allege that this supposed policy has been enforced against them. Nor do Plaintiffs allege that it has been enforced against any of their members. But Plaintiffs nonetheless insist they have been harmed by this policy, on the ground that it has chilled the speech of third parties—who would apparently make certain statements, attend certain protests, or participate in certain events, but for the specter of immigration enforcement. PI Mem. at 8. Plaintiffs insist that this impairs their own "right to hear" and "right to associate" with those who have chosen to self-censor. *Id.* at 8-9. They also insist it causes certain organizational harms. *Id.* at 9-11.

Plaintiffs assert this clandestine policy violates the First and Fifth Amendments, and the APA. *See* Compl. ¶¶ 134-39. They now seek wide-ranging preliminary injunctive relief by asking the Court to enjoin Defendants (1) from "implementing or enforcing" this supposed "ideological deportation policy," (2) from "threatening to arrest, detain, and deport" *any* "noncitizen student

and faculty" based on this policy, and (3) to stay the policy in general. Plaintiffs' Motion for Preliminary Injunction, Dkt. 13 ("PI Mot.") at 1.

## II.    The President's Executive Orders

Plaintiffs challenge a "policy" that has not been codified in any form or formalized in any manner. And that is not surprising, because it does not exist. Armstrong Decl. ¶14; Watson Decl. ¶10. Instead, as the declarations from the Departments of State and Homeland Security make clear, those agencies have used their existing authority to implement the President's agenda, as captured in one of two recent executive orders. *E.g.*, Armstrong Decl. ¶¶ 5-7 ("One of the tools in place to ensure maximum vetting of visa applicants and visa-holders, including students, is the Department's long-standing continuous vetting program."); ICE Decl. ¶ 10 ("Enforcement actions carried out against aliens within the purview of E.O. 14188 occur pursuant to ICE's existing civil immigration authority under the INA."). Plaintiffs invoke these two EOs at places. Compl. ¶¶ 25-27; PI Mem. at 2; PI Exs. B, C. And in its best light, their suit is a challenge to them.

As for the first, on January 20, 2025, the President signed Executive Order 14161: *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats* ("EO1"). 90 Fed. Reg. 9451. The EO declares the United States' policy to "protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes." EO1, Sec. 1(a). It further declares the need to ensure that aliens "do not advocate for, aid or support designated foreign terrorists and other threats to our national security." EO1, Sec. 1(b). EO1 calls for executive departments and agencies to "identify resources" (Sec. 2(a)(i)), "determine information needed" (Sec. 2(a)(ii)), "submit . . . report[s]" (Sec. 2(b)(i)), "evaluate" existing policies, programs, and guidance (Sec. 3(a), (c), (f))), and "recommend" actions (Sec. 3(g)). To the extent that EO1 requires departments or agencies to act in furtherance of its policy goals (*see,*

*e.g.,* Sec. 2(b)(iii), 2(b)(iv), 3(a), 3(b), 3(e)), Section 4 makes express that any such action must be done consistent with all applicable law.  EO1, Sec. 4(a)(i)-(ii).

As for the second, on January 29, 2025, the President signed Executive Order 14188, *Additional Measures to Combat Anti-Semitism* ("EO2").  90 Fed. Reg. 8847.  EO2 calls for stepped up federal enforcement in the wake of an "unprecedented wave" of antisemitic "discrimination, vandalism, and violence" against citizens and "especially in our schools and on our campuses." EO2, Sec. 1.   EO2 directs executive agencies to use "all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." *Id.*, Sec. 2.  As above, however, EO2 makes express that any such action must be taken "consistent with applicable law," and affirms that "agencies shall not diminish or infringe upon any right protected under Federal law or under the First Amendment."  *Id.*, Sec. 4(b); Executive Order 13899, Sec. 2(b), 84 Fed. Reg. 68779 (affirmed in EO2, Sec. 1).

**ARGUMENT**

## I.    This Court Lacks Jurisdiction

### A.    This Motion Is Foreclosed by 8 U.S.C. § 1252(f)

Plaintiffs ask this Court to "enjoin" Defendants from taking any action to "arrest, detain, and deport" *any* "noncitizen students and faculty" pursuant to the alleged "ideological deportation policy." PI Mot. at 1.  In other words, Plaintiffs ask this Court to enjoin certain enforcement actions against a class of people—all noncitizen students and faculty across the country.  That sort of sprawling relief is squarely barred by 8 U.S.C. § 1252(f)(1).

Section 1252(f)(1) provides that "no court (other than the Supreme Court) shall have jurisdiction to enjoin or restrain the operation of the provisions of part IV of this subchapter … other than with respect to the application of such provisions to an individual alien whom proceedings under such part have been initiated."  Those referenced provisions (Part IV) include

4

all the main provisions (8 U.S.C. §§ 1221-1232) that govern "the inspection, apprehension, examination and removal of aliens." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549-50 (2022).

Plaintiffs' request for an injunction concerns those very actions. And nobody thinks this lawsuit involves the discrete application of one of those provisions to a specific individual. Indeed, Plaintiffs have disclaimed as much, not only expressly seeking an injunction covering an entire *class* of persons (noncitizen students and faculty), but also affirmatively stating that no individual participation is even necessary for this suit to proceed. *See* PI Mem. at 7. Put together, that is fatal: This Court does not "have jurisdiction" to take the actions that Plaintiffs expressly seek.

Indeed, the Supreme Court confirmed as much just a few years ago. In *Aleman Gonzales*, the Court held § 1252(f)(1)'s bar on injunctive relief "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Id.* at 548-50. That is, it bars the lower federal courts from entering any "injunctive relief on behalf of an entire class of aliens," *id.* at 550—*i.e.*, all "noncitizen students and faculty" within the United States, PI Mot. at 1. And that is so, moreover, whether or not the Federal Government has "properly interpreted" the immigration laws; those "unlawful" actions instead need to be resolved via individual adjudication, not through non-individualized injunctive relief. *Id.* at 552; *see also Biden v. Texas*, 597 U.S. 785, 797 (2022) (holding order enjoining Migrant Protection Protocols "violated" Section 1252(f)(1)).

Plaintiffs do not even cite *Aleman Gonzales*—or for that matter, § 1252(f)(1)—let alone try to explain how they can get out from under this jurisdictional bar. Nor could they. *Aleman Gonzales* does not permit Plaintiffs to dictate how Defendants exercise their existing authority and discretion in the "implementation and enforcement" of the immigration laws, *id.* at 549-50, much less enjoin "without limitation" Defendants' "implementing or enforcing" of EO1 and EO2,

including the alleged "investigation, surveillance, visa revocation, arrest, detention, deportation, or other adverse action" pursuant to those EOs. *See* PI Mem. at 20. In short, Plaintiffs' motion seeks relief that this Court is affirmatively barred from providing; that alone warrants rejection.

### B.    This Motion Is Foreclosed by 8 U.S.C. § 1252(g)

Plaintiffs' motion independently runs headlong into another jurisdictional bar—as well as a stunningly similar (and also uncited) Supreme Court case enforcing it. Section 1252(g) provides that "notwithstanding any other provision of law (statutory or nonstatutory) . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to [1] commence proceedings, [2] adjudicate cases, or [3] execute removal orders against any alien," except through a petition for review from a final order of removal filed in a court of appeals. Though this section "does not sweep broadly," *Tazu v. Att'y Gen. United States*, 975 F.3d 292, 296 (3d Cir. 2020), its "narrow sweep is firm," *E.F.L. v. Prim*, 986 F.3d 959, 964-65 (7th Cir. 2021). Courts "cannot entertain challenges to the enumerated executive branch decisions or actions" outside a petition for review. *E.F.L.*, 986 F.3d at 964.

In *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999) ("*AADC*"), a group of aliens—also members of the Popular Front for the Liberation of Palestine—brought a suit challenging their deportations. *Id.* at 473-75. The aliens claimed they were being targeted for their beliefs and expression, and even pointed to a specific statement by the "INS regional counsel" indicating as much. *Id.* at 474. They alleged that being deported "because of their affiliation with a politically unpopular group" was unlawful, in violation of the First and Fifth Amendments. *Id.*

The Supreme Court held such suit jurisdictionally barred. The Court reasoned that the "decision to 'commence proceedings'" against an alien (or group of aliens) fit exactly within the plain text of § 1252(g)—in fact, a "challenge" to such an action was "precisely" what Congress had "in mind" when enacting that provision. *Id.* at 487. Such a challenge to one's removal (be it

on constitutional grounds, or any other) must be channeled into a petition for review, once an order of removal has been issued. *See, e.g.*, *Rauda v. Jennings*, 55 F.4th 773, 777-78 (9th Cir. 2022).

This case follows *a fortiori*. If aliens *themselves* cannot bring this sort of suit against the Federal Government "for allegedly targeting them for deportation because of their affiliation with a politically unpopular group," *id.* at 472-73, then third parties (*e.g.*, professors) cannot bring such a suit on the ground that they wish to listen to or associate with these aliens. Otherwise, the INA's jurisdictional bars would be meaningless, circumvented in every case by a family member, colleague, or friend who wishes to readily hear from the person being deported. No court has ever indulged such a theory. *Cf. Humphries v. Various Fed. USINS Emps.*, 164 F.3d 936, 945 (5th Cir. 1999) (1252(g) bars jurisdiction in district court to review alien's claim that "INS agents conspired to [deport him] in retaliation for the exercise of his First Amendment rights"). For good reason.

## C.    Plaintiffs Lack Standing

Separate and apart from these statutory bars, Plaintiffs also lack Article III standing. As the parties invoking federal jurisdiction, Plaintiffs bear the burden of establishing the three elements that constitute the "irreducible constitutional minimum of standing,"—namely that they have (1) suffered an "injury in fact"—an invasion of a legally protected interest which is "concrete and particularized," "actual or imminent" and not "conjectural" or "hypothetical" that is (2) "fairly traceable" to the challenged conduct of Defendants, and will (3) "likely" be redressed by a favorable decision. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560-61 (1992). This they cannot do.

<u>Associational Standing.</u> Plaintiffs' main theory of standing is on behalf of their members. Plaintiffs do not allege the "policy" they identify has been enforced against any of their members. Nor do they allege that it has actually been enforced against anyone whom their members know— let alone wish to hear from, or associate with. Instead, Plaintiffs allege that the specter of this

policy has caused *other people* to self-censor in various forms, out of fear it *may* be wrongfully enforced against them in the future—and as a result, Plaintiffs have been *derivatively* harmed.

The "one-step-removed, anticipatory nature" of this suit flunks Article III. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). When a party's theory of standing turns on "the independent action of some third party not before the court"—such as an alien student or faculty member—that party must make a "clear showing" that it faces "a real and immediate threat" of concrete harm, which would be alleviated by some sort of judicial remedy. *Id.* at 57-58; *see also See Warth v. Seldin*, 422 U.S. 490, 499 (1975). Plaintiffs do not come close to clearing this rather towering bar.

*First*, Plaintiffs' allegations are definitionally speculative. They assert a number of third parties have opted out of speaking or attending events, out of a fear this "policy" would be enforced against them. But Plaintiffs fail to make the sort of concrete, specific allegations needed for this sort of claim to support standing: They do not connect the dots between the *particular* speech of *particular* speakers, and why that speech would invite impending immigration enforcement. *See, e.g.*, *Roe v. Healey*, 78 F.4th 11, 21 (1st Cir. 2023). Instead, they rest on the naked claim that this supposed policy has "deterred" certain speech. PI Mem. at 9. But that is not enough. Simply opting out of speaking is insufficient; one must refrain from speech out of a credible fear of imminent enforcement action. And to make *that* sort of showing, the *sine qua non* is a tight connection between the particular speech, and a specific enforcement initiative. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014). Nowhere do Plaintiffs do that: Instead, they rely entirely on the *ipse dixit* assertions that certain people are broadly concerned, because they are interested in speaking on a general subject matter that falls within the general ambit of a vague policy of the Plaintiffs' own definition and creation. *Murthy*, 603 U.S. at 75.

None of that is enough for standing, even if this suit was brought by the would-be speakers. But it is *certainly* not enough for standing, in a suit brought by their would-be listeners. Indeed, if this passed muster, it is impossible to see what federal enforcement initiative a group of professors could *not* challenge—all on the ground it would inevitably impact a student whom they wish to hear from. *See, e.g., City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

*Second*, third parties like Plaintiffs cannot bring "challenges to the Executive Branch's exercise of enforcement discretion over whether to arrest or prosecute" other people. *United States v. Texas*, 599 U.S. 670, 677 (2023). Indeed, only a couple years ago, the Supreme Court faced a similar theory of standing, where a group of states sought to challenge how the immigration laws were enforced, because of incidental monetary harms they suffered as a result of that enforcement. The Supreme Court made clear that such suits do not rest on a redressable Article III injury, because they "run up against the Executive's Article II authority to enforce federal law," *id.* at 678, and "courts generally lack meaningful standards for assessing the propriety of enforcement choices" with respect to arrest and detention, given the needs of the Executive Branch to weigh "resource constraints and regularly changing public-safety and public-welfare needs" when devising policy, *id.* at 679-80. Consequently, "federal courts lack Article III jurisdiction over suits that challenge the Executive's enforcement decisions." *Id.* at 685; *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). So much so here: Just as Texas cannot sue to compel one mode of immigration enforcement to combat downstream financial harms, Plaintiffs cannot sue to forbid one mode of immigration enforcement to combat incidental constitutional harms.

*Third*, even if Plaintiffs had a cognizable injury, they have not shown causation. For this sort of "sprawling" suit—one that challenges a host of agencies, taking a host of actions, implementing an undefined policy, against an undefined set of people—a plaintiff must show

"specific causation" (*i.e.*, he must tie some particular governmental act, to an identified personal harm). *Murthy*, 603 U.S. at 60-62. Nowhere do Plaintiffs even attempt to do this. Again, the "policy" at issue is largely a combination of various public statements made in the press and social media, and a handful of enforcement actions filtered through the lens of Plaintiffs' perception. *See*, *e.g.*, PI Mem. at 3 (citing the Secretary of State's social media post stating that the agency would be revoking visas of "Hamas supporters in America"). Plaintiffs say that certain third parties are *generally* deterred, because of the *sum total* of these disparate actions. But that is precisely what the Supreme Court held in *Murthy* did not satisfy Article III: A plaintiff needs to trace a specific injury to a specific action, not rest on its general aggregate. 603 U.S. at 61-62. So much so here.

*Fourth*, Plaintiffs do not show how their incidental injuries would be redressable. All of Plaintiffs' associational injuries stem from *other people* choosing to refrain from certain speech or activity. But even on Plaintiffs' account, the "policy" does not vest Defendants with any additional authority; nor do the President's EOs, which are directions for how subordinates should wield their *existing* power. Instead, the entire "chill" that Plaintiffs invoke is attributable to how third parties *perceive* the Government is using those otherwise valid authorities. And nowhere do Plaintiffs explain why that chill would thaw from the sort of injunction contemplated here. Plaintiffs do not ask this Court to disable Defendants from exercising their independent and existing statutory authority over immigration; nor do they ask this Court to issue a general gag order on Defendants to prevent them from commenting on issues related to Israel. For good reason; neither proposal would be lawful. But given those limits, and given Plaintiffs' downstream injuries are exclusively attributable to how third parties *perceive* the Federal Government's enforcement priorities, it is impossible to see how the proposed injunction would redress those harms.

Organizational Standing.  Plaintiffs' theory for organizational standing fails for many of the same reasons as their theory for associational standing.  Plaintiffs do not claim that Defendants are regulating them directly; or that the policy, whatever its precise contours, reaches them directly.  Instead, Plaintiffs complain about downstream harms from others' actions—*e.g.*, they are less likely to attract members, or attendees for their events.  PI Mem. at 6.  But these incidental harms are just as speculative as those above.  Indeed, more so.  Nowhere do Plaintiffs attempt to explain with any detail why joining one of their organizations, or attending one of their events, will result in imminent immigration enforcement—and of course, Plaintiffs do not recount any example of this happening in the real world.  PI Mem. at 9-10.  This is precisely the sort of *ipse dixit* anxiety that does not give rise to an Article III injury.  *Already, LLC v. Nike, Inc*., 568 U.S. 85, 97 (2013).[1]

As a last resort, Plaintiffs claim that the alleged policy has caused them to "divert resources from other projects to address their noncitizens' reasonable fears that they will be targeted."  PI Mem. at 10.  But that theory is expressly foreclosed by Supreme Court precedent.  *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024).  As the Court put it: "[A]n organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action."  *Id.*  That is this case: Where Plaintiffs are not themselves regulated, but decide to reallocate their budget to respond to an event directly affecting others in the world, that sort of voluntary decision does not give rise to an Article III injury.  *See also Clapper*, 568 U.S. at 402, 415-16.

---

[1] *See, e.g.,* Bâli Decl. ¶¶ 38-39 (alleging anticipated reduced participation in MESA's annual meeting because of fewer submitted papers for the conference, due to noncitizen members "feeling overwhelmed and unable to focus" for fear of being targeted for deportation); Dubal Decl. ¶ 10 (AAUP cancelled a virtual event because "multiple noncitizen members" feared participation without being anonymous); id. at ¶ 14 (Harvard AAUP leaders learned "some noncitizens" decided not to become members out of fear membership might "put them at risk of deportation").

**II.      Plaintiffs' Constitutional And APA Claims Are Meritless**

**A.      First Amendment**

Plaintiffs bring a facial First Amendment challenge to a "policy" of their own creation. Plaintiffs' alleged "ideological deportation policy" is not any formal directive, or codified program. It is amalgamated from: (1) news articles, PI Exs. A, K, N, O, S, T, V-Z, AA-FF, II; (2) social media posts, PI Exs. E, H, I, J; (3) fact sheets, PI Ex. D; (4) press briefings or releases, PI Exs. L, P, R, CC; and (5) immigration enforcement actions involving five individual aliens, PI Exs. G, M, Q, S-V, Y.  PI Mem. at 1-4, 11-14.  That sort of patchwork "policy" is not amenable to a First Amendment challenge at all.  The Government has the right to speak on its own, even if that speech has incidental effects elsewhere; a plaintiff cannot caption that speech a "policy," and then attempt to silence it through a broadside challenge.  *Pleasant Grove City v. Summum,* 555 US 460, 467-68 (2009).  And more fundamental, Plaintiffs cannot bring a First Amendment challenge to squelch a political initiative or generic commitment—any more than a constitutional challenge against an Administration's stated desire to be "pro-business" would be amenable to a lawsuit.

In its best light, Plaintiffs' suit is a challenge to the President's EOs—the actual policy directives issued by the President, for how Defendants are supposed to exercise their delegated executive power.  But even on these terms, Plaintiffs' facial challenge fails badly.  For the First Amendment, a facial challenge—*i.e.*, a challenge that seeks to strike down a policy in full, versus as-applied in a given circumstance—requires a plaintiff to demonstrate that a law lacks any "plainly legitimate sweep."  *Moody v. NetChoice*, 603 U.S. 707, 744 (2024); *U.S. v. Hansen*, 599 U.S. 762, 784 (2023).  So long as a policy has at least a core of lawful applications, then a facial challenge to it must fail.  And the EOs here obviously meet that standard.

<u>Conduct.</u>  Any facial challenge to the EOs is a nonstarter, because by their terms, the EOs target unlawful conduct, not protected speech.  Specifically, they direct agencies to take action

against those who (i) aid or support designated terrorist groups (EO1 Sec. 1(b)), or (ii) engage in "unlawful anti-Semitic harassment and violence." (EO2, Sec. 2). Neither of those activities are protected under the First Amendment. *See Holder v. Humanitarian Law Project,* 561 U.S. 1, 28 (2010); *N. A. A. C. P. v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982). And as a result, the core of the EOs involves no constitutional interest at all. That alone defeats any facial challenge.[2]

Enforcement. Even putting unlawful conduct to the side, Plaintiffs' facial challenge still would fail. This is because under both the federal immigration laws and well-established Supreme Court precedent, the Government is able to take adverse immigration action for certain expression.

Start with the INA. The federal immigration laws offer multiple bases for removing an alien based on their political activity. Most relevant, an alien may be removable for his "beliefs, statements, and associations" so long as "the Secretary of State personally determines that the alien's admission would compromise a compelling United States foreign policy interest." 8 U.S.C. § 1182(a)(3)(C)(iii). Likewise, § 1182(a)(3)(B)(i) specifically deems inadmissible any alien who is a representative of a "terrorist organization" or "political, social, or other group that endorses or espouses terrorist activity," or who himself "endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization."

Plaintiffs do not argue these provisions are unconstitutional. Nor could they, because the Supreme Court has held otherwise. In *Harisiades v. Shaughnessy*, for instance, the Court held that the First Amendment was no "barrier" to the United States deporting aliens for being members of the Communist Party. 342 U.S. 580, 591-92 (1952); *see id.* at 382-83 (explaining petitioners had

---

[2] Moreover, both EOs expressly state that any actions thereunder must be taken in accordance with all applicable law, which includes the First Amendment. E.O. 14161, Sec. 4(b); E.O. 14188, Sec. 4(b). When the President directs agencies to pursue a general policy within the bounds of the law, that is quite obviously not an illegal act—let alone one that is susceptible to a facial challenge. *AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002).

been in country for decades).  Similarly, in *Turner v. Williams*, the Court held that there was no First Amendment impediment to the Government deporting an alien, because of his anarchist beliefs and advocacy.  194 U.S. 279, 293 (1904); *see also Graham v. Richardson*, 403 U.S. 365, 377 (1971) ("The national government has broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization.").

For their part, Plaintiffs fundamentally misunderstand how the First Amendment applies in this context: They conflate the fact that the First Amendment applies *at all* to aliens, with the First Amendment applying *in full* to them.  But as the above makes plain, that is simply not the law. While "[f]reedom of speech and of press is accorded aliens residing in this country," *Bridges v. Wixon*, 326 U.S. 135, 148 (1945), these rights are "less robust than those of citizens in certain discrete areas," *Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281, 287 (D.D.C. 2011) (three-judge panel) (Kavanaugh, J.) (citing *Harisiades*, 342 U.S. at 591–92), *aff'd*, 565 U.S. 1104 (2012).

Selectivity.  To gild the lily, even on its own terms, Plaintiffs' argument does not work.  The gravamen of Plaintiffs' suit is that Defendants are engaged in ideological targeting—*i.e.*, they are enforcing the immigration laws with an eye to viewpoint.  But even that is foreclosed.  To start, as explained, the Court has already rejected a First Amendment challenge to a governmental effort to deport communists for being communists—*i.e.*, an effort to prioritize immigration enforcement to combat a given political viewpoint.  *Harisiades*, 342 U.S. at 592; *see also Galvan v. Press*, 347 U.S. 522, 529 (1954).  There is no constitutional difference to an effort to expel Hamas supporters. More, "as a general matter … an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation" at all.  *AADC*, 525 U.S. at 488. Those being deported cannot raise a selective enforcement claim; their audiences cannot either.

Further, even if individual aliens could challenge their removals on one of these grounds, those claims would need to proceed on an *individualized* basis under a *highly deferential* standard of review. *See Dept. of State v. Munoz*, 602 U.S. 899, 908 (2024); *see also, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 702 (2018). Plaintiffs cannot pretermit that individualized process through a preemptive challenge to stop an entire category of removal actions. That is plainly improper.[3]

<u>*Vullo.*</u>  Plaintiffs also raise a First Amendment claim under *Vullo* (and *Bantam Books*), but they misunderstand the doctrine. A *Vullo* claim is premised on the point that the Government cannot accomplish indirectly what it cannot do directly: It cannot suppress one party's speech by coercing a third party to censor. *NRA v. Vullo*, 602 U.S. 175, 191 (2024). That is not this case— even on Plaintiffs' telling. Here, the alleged governmental actions are occurring directly against the would-be speakers. No third party is being used as an intermediary. To be sure, Plaintiffs fail to allege any First Amendment violative conduct, as detailed above (let alone enough to justify a facial challenge). But in all events, nothing here fits within the mold of *Vullo*.

### B.    Fifth Amendment

Plaintiffs' passing Fifth Amendment vagueness challenge is baseless. For starters, a set of plaintiffs cannot independently stitch together and define a perceived "policy," and then fault the Government for its terms being too vague. As emphasized, Plaintiffs challenge a policy of their own creation; any defects with it are not attributable to Defendants, or constitutionally actionable.

Regardless, if Plaintiffs' challenge is understood as one primarily pegged to the EOs, that would fail just as badly. The EOs do not regulate private conduct at all: They are internal directives

---

[3] In *AADC*, even as some Justices disagreed whether aliens could bring selective enforcement challenges in some circumstances, *everyone* agreed that any such a challenge would need to be raised in an individual petition for review—*not* in some pre-final-order suit, let alone one (indirectly) on behalf of an entire class of aliens. *Id*. at 492 (Ginsburg, J., concurring in part and concurring in the judgment); *id.* at 499 (Stevens, J., concurring in the judgment).

to executive agencies, about how to exercise their existing authority.  The President's instructions to his subordinates do not implicate the Fifth Amendment at all.  If they are unclear, that is a matter for internal administration; no different than if the instructions came orally at a cabinet meeting.  *Cf. Wills v. Pszczolkowski*, 125 F. 4th 534, 539 (4th Cir. 2025).

Unsurprisingly, Plaintiffs have failed to cite to a single case where a court declared an EO or similar guidance void for vagueness.  *See* PI Mem. at 16; *Grayned v. City of Rockford*, 408 U.S. 104 (1972) (involving a city anti-noise ordinance); *Massieu v. Reno*, 915 F. Supp. 681 (D.N.J. 1996) (involving statutory removal provision).  And for its part, the Supreme Court has refused to extend the vagueness doctrine beyond the statutory context.  *See, e.g.*, *Beckles v. United States*, 580 U.S. 256, 263 (2017) (refusing to apply the void for vagueness doctrine to the sentencing guidelines).  This is because, again, the vagueness doctrine applies to legal rules that *bind* private parties.  But the EOs do nothing like that.  Instead, the federal immigration laws remain unchanged.  Plaintiffs do not even attempt to argue that *those* rules are vague; and they cannot collaterally attack them on the ground that Defendants' *internal* policies about how to enforce them should be clearer.

Finally, even putting all that aside, the EOs are not vague.  As explained, the EOs either track well-established concepts of unlawful conduct (like harassment), or political activity that would otherwise run afoul of existing immigration law (like aiding a designated foreign terrorist organization).  None of that leaves a reasonable person at sea—it is a distillation of existing law.

### C.    APA

Plaintiffs' APA claim has no likelihood of success.  To obtain APA review, Plaintiffs must challenge an "agency action" that is "final," *see Lujan v. National Wildlife Federation*, 497 U.S. 871, 882 (1990), and "for which there is no other adequate remedy."  *Bennett v. Spear*, 520 U.S. 154, 157 (1997).  Plaintiffs fail both prongs.

Agency Action.  The APA defines "agency action" as including "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(3).  An action is considered "final" only when it is "one by which rights and obligations have been determined" or from which "legal consequences will flow."  *Bennett*, 520 U.S. at 177-78.  In attacking the alleged "ideological deportation policy," Plaintiffs fail to identify agency action—let alone final agency action—on which to base their APA claim.

Indeed, this case is on all fours with *Lujan*, another case that Plaintiffs do not even cite, let alone try to distinguish.  There, the plaintiffs sought to challenge a general "land withdrawal review program," which (as here) was "not derived from any authoritative text," or captured in any "order or regulation."  497 U.S. at 890.  It was "simply the name by which petitioners have occasionally referred to the continuing (and thus constantly changing) operations of the BLM in reviewing withdrawal revocation applications."  *Id.*  That is exactly this case.  Under the self-imposed caption of a "policy," Plaintiffs are attacking how Defendants are generally going about enforcing the immigration laws.  *See, e.g.*, Compl. ¶¶ 1-2, 29, 31, 34, 42-44, 46-47; PI Mem. at 17.  That is "no more an identifiable 'agency action'—much less a 'final agency action'—than a 'weapons procurement program' of the Department of Defense or a 'drug interdiction program' of the Drug Enforcement Administration."  *Lujan*, 497 U.S. at 890.  Plaintiffs' APA claim is foreclosed.

Adequate Remedy.  As discussed, Plaintiffs' suit is at bottom a challenge to certain removal decisions on the part of the Federal Government.  But those decisions are not reviewable under the APA at all, and instead must be channeled through the exclusive administrative scheme that Congress designed for immigration.  *See* 8 U.S.C. §§ 1252(a)(5), (b)(9), (g); *see also* 8 U.S.C. § 1201(i).  That process—where immigration courts pass on a removal in the first instance, later reviewable by a court of appeals through a single petition for review—is the exclusive means for

someone to challenge the legal and factual basis for their removal. *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 230 (2020). Given that scheme, antecedent APA review is unavailable.

Executive Orders. Construing Plaintiffs' challenge as one against the President's EOs would not help here at all. EOs may not be challenged under the APA, because the President is not an "agency" under that statute. *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).

Merits. Even excusing these many threshold defects, Plaintiffs' challenge would also fail on the merits. Their constitutional challenges are baseless, as detailed. And the substantive policy decisions captured in the EOs (and reflected in practice) are hardly arbitrary and capricious. *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) ("agency action must be reasonable and reasonably explained"). The EOs respond to an unprecedented surge of antisemitic harassment that gripped the country—and campuses, in particular—after October 7. EO 14161, Sec. 1(a); EO 14188, Sec. 1.[4] Those actions inured to the benefit of foreign terrorist organizations like Hamas, contrary to the national security of the United States. Tim O'Connor, *Hamas Slams US Crackdown on Pro-Palestinian College Protests*, NEWSWEEK, Apr. 26, 2024.[5] It would be deeply unreasonable for the Executive *not* to take action; if anything, this was long overdue.

---

[4] *See, e.g.*, PI Ex. K at 3 (article describing how "protestors physically impeded" students from attending classes); PI Ex. R at 8 (discussing how protestors were involved in "tak[ing] over" and "vandaliz[ing]" buildings and "acts of rebellion and riots on campus"); PI Ex. V at 4 (noting how protesters have been "arrested by police officers" and charged with "obstructing governmental administration") ; PI Ex. Z at 2 (noting how individuals have been "suspended. . . for alleged disruptive protest activities) ; PI Ex. BB at 3 (Secretary Rubio discussing removals for "vandalizing universities, harassing students, taking over buildings, [and] creating a ruckus").

[5] *Available at* https://www.newsweek.com/hamas-slams-us-crackdown-pro-palestinian-college-protests-1893962.

### III.    The Remaining Factors Disfavor a Preliminary Injunction

#### A.    Irreparable Harm

Plaintiffs do not attempt to independently show irreparable harm.  PI Mem. at 19.  Instead, they rely solely on their claimed likelihood of success in showing a First Amendment violation. *Id*.  As explained above, *supra* at 12-15, there is no First Amendment violation here.  But, even so, a preliminary injunction is an extraordinary remedy, where a plaintiff must show a "clear and present need for equitable relief" to guard against an "imminen[t]" injury.  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  Accordingly, even if Plaintiffs' speculative theory of standing is enough for Article III, it is nonetheless insufficient for immediate injunctive relief.  For irreparable harm, a plaintiff must demonstrate a concrete, identifiable, and imminent injury—attributable to a discrete governmental action that can be redressed by a court. Plaintiffs have not done so here, resting instead on the possible actions of others, responding to a perceived general governmental policy that has little mooring in reality.

#### B.    Balance of Equities and Public Interest

When the Government is the defendant, the final two factors—the public interest and the balance of equities—merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  If nothing else, these equitable factors strongly cut against the sprawling remedy proposed by Plaintiffs.

Plaintiffs seek an injunction that would extend over immigration enforcement against all "noncitizen students and faculty" in the country.  PI Mot. 1.  That is unjustifiable.  For one, it makes no effort to tailor relief to Plaintiffs' alleged harms—*i.e.*, it makes no effort to limit itself to campuses where Plaintiffs' members teach, or speakers whom Plaintiffs' members wish to hear. Such unsubstantiated nationwide relief is not in the public interest.  *See Humanitarian Law Project*, 561 U.S. at 28.  More important, Plaintiffs' proposed relief is unworkable.  Because Plaintiffs' suit rests on an unwritten "policy," enjoining all immigration enforcement based upon this supposed

policy would do nothing except make this court the superintendent of the nation's removal proceedings. Every removal would be possible fodder for contempt, with every alien coming to this Court saying their proceedings were *really* the product of this nefarious policy.

That not only presents practical problems, but also constitutional ones. Subjecting the Executive to a pre-clearance regime for immigration enforcement would severely infringe on the President's Article II authority. *U.S. v. Texas*, 599 U.S. 670, 679 (2023) (Article II "enforcement discretion" applies in "the immigration context, where the Court has stressed that the Executive's enforcement discretion implicates not only 'normal domestic law enforcement priorities' but also 'foreign-policy objectives.'"). That sort of intrusion is directly contrary to the public interest.

## IV.    Any Injunction Should Exclude the President and Require Bond

Should the Court disagree, at least two measures are necessary. First, any injunction should not reach the President—who is not a proper party to this suit in the first place. *State of Mississippi v. Johnson*, 71 U.S. 475, 501 (1866). Second, if the Court grants Plaintiffs' requested preliminary injunction—which it should not for all of the foregoing reasons—it should order security. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). If the Court issues a preliminary injunction here, it should require Plaintiffs to post an appropriate bond commensurate with the scope of any injunction. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999).

## CONCLUSION

Plaintiffs' request for a preliminary injunction should be denied.

Respectfully Submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

LEAH B. FOLEY
*United States Attorney*

SHAWNA YEN
*Assistant United States Attorney*
*District of Massachusetts*

*Dated: April 14, 2025*

/s/ Ethan B. Kanter
ETHAN B. KANTER
*Chief, National Security Unit*
*Office of Immigration Litigation*
*P.O. Box 878, Ben Franklin Station*
*Washington, D.C. 20001*
Telephone: (202) 616-9123
Email: ethan.kanter@usdoj.gov

BENJAMIN MARK MOSS
*Senior Litigation Counsel*
*Office of Immigration Litigation*

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*Date: April 14, 2025*

By:    */s/ Ethan Kanter*
ETHAN B. KANTER
U.S. Department of Justice