UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
AMERICAN ASSOCIATION OF                 )
UNIVERSITY PROFESSORS,                  )
                                        )
AMERICAN ASSOCIATION OF                 )
UNIVERSITY PROFESSORS -- HARVARD        )
FACULTY CHAPTER,                        )
                                        )
AMERICAN ASSOCIATION OF                 )
UNIVERSITY PROFESSORS AT NEW            )
YORK UNIVERSITY,                        )
                                        )    CIVIL ACTION NO.
RUTGERS AMERICAN ASSOCIATION OF         )    25-10685-WGY
UNIVERSITY PROFESSORS-AMERICAN          )
FEDERATION OF TEACHERS, and             )
                                        )
MIDDLE EAST STUDIES ASSOCIATION,        )
                                        )
                    Plaintiffs,         )
                                        )
          v.                            )
                                        )
MARCO RUBIO, in his official            )
capacity as Secretary of State,         )
and the DEPARTMENT OF STATE,            )
                                        )
KRISTI NOEM, in her official            )
capacity as Secretary of Homeland       )
Security, and the                       )
DEPARTMENT OF HOMELAND SECURITY,        )
                                        )
TODD LYONS, in his official             )
capacity as Acting Director of          )
U.S. Immigration and                    )
Customs Enforcement,                    )
                                        )
DONALD J. TRUMP, in his official        )
Capacity as President of                )
the United States, and                  )
                                        )
UNITED STATES OF AMERICA,               )
                                        )
                    Defendants.         )
_____)

YOUNG, D.J.                                    April 29, 2025

## MEMORANDUM AND ORDER

The right of free speech enshrined in the Bill of Rights in the First Amendment to the Constitution "[a]s a general matter, . . . means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." <u>United States</u> v. <u>Stevens</u>, 559 U.S. 460, 468 (2010). It "is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, . . . in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests," and "safeguards an individual's right to participate in the public debate through political expression and political association." <u>McCutcheon</u> v. <u>Federal Election Comm'n</u>, 572 U.S. 185, 203 (2014) (quoting <u>Cohen</u> v. <u>California</u>, 403 U.S. 15, 24 (1971)). Indeed, "[p]olitical speech is the primary object of First Amendment protection and the lifeblood of a self-governing people." <u>Id.</u> at 228 (Thomas, J., dissenting). This case raises the issue of whether certain Public Officials can enforce a policy of arresting, detaining and deporting non-citizens who are otherwise here legally based

solely upon their pro-Palestine or anti-Israel political speech. Here, the American Association of University Professors (the "AAUP"), the AAUP-Harvard Faculty Chapter, the AAUP at New York University, the Rutgers AAUP-American Federation of Teachers, and the Middle East Studies Association (collectively, "the Plaintiffs") sue Secretary of State Marco Rubio in his official capacity, the Department of State, Secretary of Homeland Security Kristi Noem in her official capacity, the Department of Homeland Security, Acting Director of U.S. Immigration and Customs Enforcement Todd Lyons in his official capacity, President Donald J. Trump in his official capacity,[1] (collectively, "the Public Officials"), and the United States of America[2] based on the Public Officials' alleged policy of targeting noncitizens who engage in pro-Palestinian or anti-Israel speech and association for arrest, detainment, and deportation (the so-called "ideological-deportation policy"). Compl., ECF No. 1.

---

[1] The President, who is sued in his official capacity, is not a proper party to this suit at least as to injunctive relief, and is dismissed to the extent that such relief is sought against him. See State of Miss. v. Johnson, 71 U.S. 475, 501 (1866); Franklin v. Massachusetts, 505 U.S. 788, 802-03 (1992); Trump v. United States, 603 U.S. 593, 639-40 (2024).

[2] The United States of America is dismissed as a party from this action inasmuch as it is, in the context of this action, the living embodiment of the Constitution, and the claims for declaratory and injunctive relief against the Public Officials are in their official capacities.

The Plaintiffs bring four counts: (1) a claim based upon the First Amendment to the Constitution, challenging the ideological-deportation policy itself; (2) a claim based upon the First Amendment to the Constitution, challenging the Public Officials' threats to punish noncitizens' constitutionally protected speech;, (3) a claim based upon the Fifth Amendment to the Constitution, alleging that the ideological-deportation policy invites arbitrary and discriminatory enforcement; and (4) a violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)-(C), also based on the ideological-deportation policy. Compl. ¶¶ 134-39.  The Plaintiffs seek declaratory and injunctive relief, and an award of costs and attorneys' fees. Id. 47-48.

The Public Officials move to dismiss[3] on the grounds that: (1) this Court lacks jurisdiction because the Plaintiffs seek class-wide relief against immigration enforcement actions, which

---

[3] At the April 23, 2025, hearing on the Plaintiffs' Motion for Preliminary Injunction, ECF No. 13, the Court collapsed the motion into a trial on the merits pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, which is this Court's usual practice.  The Court construed the Public Officials' opposition to the Motion for a Preliminary Injunction as a motion to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), and the Plaintiffs' Reply, ECF No. 69, as the opposition to the motion. The parties were offered an opportunity to adjourn until a later date to argue the motion to dismiss, but were content with having their motion to dismiss arguments heard forthwith.  The Court heard argument and took the matter under advisement. Elec. Clerk's Notes, ECF No. 72.

is barred by two provisions of the federal immigration laws; (2) the Plaintiffs lack standing because they allege only incidental harms based on the possible choices of third parties in response to a vaguely defined policy, rather than the concrete and imminent harm that constitutional standing requires; (3) the Plaintiffs' First Amendment claims fail because this Amendment applies differently in the immigration context, and the Plaintiffs challenge an ill-defined policy that is really a generic political initiative, which challenge is foreclosed by the rule against selective deportation claims and in any case must be dealt with on an individual basis; (4) the Plaintiffs' Fifth Amendment claim fails because only statutes can be challenged as unconstitutionally vague; and (5) the Plaintiffs' APA claim fails because, given the ill-defined nature of the policy and the exclusive administrative scheme through which removal challenges must be channeled, the Plaintiffs point to no final agency action for which there is no other adequate remedy.

For the reasons stated below, the motion to dismiss is ALLOWED in part as to count three, and DENIED in part, as to counts one, two, and four.  A case management conference is set for Tuesday, May 6, 2025 at 10 a.m.

I.    **INTRODUCTION**

 A.    **Procedural History**

  The Plaintiffs filed suit against the Public Officials on March 25, 2025.  See Compl.  On April 1, 2025, the Plaintiffs moved for a preliminary injunction to enjoin the Public Officials and their agents from implementing or enforcing the ideological-deportation policy, and from threatening to arrest, detain, or deport noncitizen students and faculty based on political expression, and requested that this Court stay the policy under the Administrative Procedure Act, 5 U.S.C. § 705. Pls.' Mot. Prelim. Inj. & Expedited Briefing Sched., ECF No. 13. This motion was fully briefed.  Mem. Law. Supp. Pls.' Mot. Prelim. Inj. ("Pls.' Mem."), ECF No. 14; Defs.' Opp'n Pls.' Mot. Prelim. Inj. ("Defs.' Opp'n"), ECF No. 65; Pls.' Reply Supp. Pls.' Mot. Prelim. Inj. ("Pls.' Reply"), ECF No. 69.[4]

  This Court promptly scheduled a hearing on the preliminary injunction motion.  As set forth above, see supra n.2, the motion for preliminary injunction was collapsed into a trial on the merits pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, the opposition to the motion was construed as a motion to dismiss, and the Plaintiffs' reply was construed as an

---

 [4] The Court also received submissions from amici. The Court is grateful for these helpful, educational submissions.

opposition.  The Court heard argument on the motion to dismiss and took the matter under advisement.

### B.  Facts Alleged

The Court takes the following facts alleged in the Complaint as true for purposes of the motion to dismiss.

The Plaintiffs allege that the Public Officials have announced and begun to carry out an "ideological-deportation policy" entailing "large-scale arrests, detentions, and deportations of noncitizen students and faculty who participate in pro-Palestinian protests and other related expression and association."  Compl. ¶ 1.  Pursuant to this policy, the agents of these Public Officials have arrested recent Columbia University graduate and lawful permanent resident Mahmoud Khalil ("Khalil") and revoked the visas of at least four others, supplied universities with the names of other students they intend to target, and launched new social media surveillance programs to identify other targets.  Id.  While occasionally referring to "pro-Hamas" speech, officials have in fact "stretched that label beyond the breaking point to encompass any speech supportive of Palestinian human rights or critical of Israel's military actions in Gaza," thus squarely targeting "constitutionally protected speech and association."  Id. ¶ 2.

The Plaintiffs allege that this policy "has created a climate of repression and fear on university campuses," such

that some noncitizen students and faculty have stopped attending
protests, resigned from politically-oriented groups, declined
opportunities to publish commentary and scholarship, stopped
contributing to classroom discussions, deleted past work from
the internet, and in general now hesitate to speak on political
issues in public or even in private text messages.  Id. ¶ 3.
The Plaintiffs allege that this shows the policy "is
accomplishing its purpose: it is terrorizing students and
faculty for their exercise of First Amendment rights in the
past, intimidating them from exercising those rights now, and
silencing political viewpoints that the government disfavors."
Id.  The Plaintiffs' counsel confirmed at oral argument that the
ideological-deportation policy here is limited to speech related
to Palestine and Israel.

### 1. The Plaintiffs

The Plaintiffs are associations whose members include
thousands of faculty and students at universities across the
country.  Id. ¶ 4.  They allege that the ideological-deportation
policy prevents their citizen members from hearing from and
associating with their noncitizen students and colleagues, to
organize with them or engage in political speech with them, to
benefit from their insights and scholarship, and to collaborate
with them on academic projects.  Id.  The organizations
themselves have also been harmed because they cannot learn from

and engage with noncitizen members like they once did, and must divert resources to address the possibility that their noncitizen members will be arrested, imprisoned, and deported for exercising their First Amendment rights.  Id.

The AAUP is a nonprofit membership association and labor union of faculty, graduate students, and other academic professionals with chapters at universities across the country. Id. ¶ 9.  Its mission is to advance academic freedom and shared governance and to help the academic community organize to accomplish its goals, among other things.  Id.

The AAUP-Harvard Faculty Chapter is the AAUP chapter for Harvard faculty, headquartered in Cambridge, Massachusetts, the AAUP at New York University is the AAUP chapter for NYU faculty, headquartered in New York City, New York, and the Rutgers AAUP-American Federation of Teachers is the Rutgers AAUP chapter for at Rutgers University, headquartered in New Brunswick, New Jersey.  Id. ¶ 10-12.

The Middle East Studies Association ("MESA") is a nonprofit membership association of scholars, educators, and those interested in the study of the Middle East, whose mission is "to foster the study of the Middle East; to promote high standards of scholarship and teaching; and to encourage public understanding of the region and its peoples" through programs, publications, and services.  Id. ¶ 13.

## 2. The Ideological-Deportation Policy

The Plaintiffs trace the origins of the policy to the wave of pro-Palestinian protests that occurred across campuses in the wake of the October 7, 2023 Hamas-led attacks on Israel and Israel's subsequent bombing of Gaza, including the widely publicized encampment at Columbia University in mid-April 2024. Id. ¶¶ 21-23. They point out that, during his 2024 presidential campaign, President Trump characterized these protests as "pro-Hamas," "pro-terrorist," "antisemitic" and "anti-American," and promised to deport noncitizen students and faculty who participated, including a statement to donors in May 2024 that, "any student that protests, I throw them out of the country." Id. ¶ 24.

The Plaintiffs allege that "[t]he defendant agencies adopted the ideological-deportation policy . . . to implement two executive orders" issued by President Trump shortly after he took office: Executive Order No. 14,161, issued on January 20, 2025 and titled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," which states that it is the policy of the United States to protect citizens from noncitizens who "espouse hateful ideology" and to ensure that noncitizens "do not bear hostile attitudes towards its citizens, culture, government, institutions, or founding principles" and "do not advocate for,

aid, or support designated foreign terrorists and other threats
to national security," and which directs the Secretary of State
promptly to "vet and screen" all noncitizens "to the maximum
degree possible," id. ¶¶ 25-26; and Executive Order 14,188,
which states that it is the policy of the United States "to
combat anti-Semitism vigorously" and "to prosecute, remove, or
otherwise hold to account the perpetrators of unlawful anti-
Semitic harassment and violence," and directs each agency or
executive department head to identify all authorities or actions
that might be used "to curb and combat anti-Semitism," including
"recommendations for familiarizing institutions of higher
education with the grounds for inadmissibility under 8 U.S.C. §
1182(a)(3)" so that universities and colleges "may monitor for
and report activities by alien students and staff relevant to
those grounds" and ensure "that such reports about aliens lead,
as appropriate and consistent with applicable law, to
investigations and, if warranted, actions to remove such
aliens," id. ¶ 27.  This second Order also reaffirms Executive
Order 13,899, issued during the first Trump administration,
which adopted a definition of antisemitism that includes
constitutionally protected speech, such as claiming that Israel
is "a racist endeavor," holding Israel to standards "not
expected or demanded of any other democratic nation," or
"comparing Israeli policies to those of the Nazis."  Id.

The "grounds for inadmissibility" referred to in Executive Order 14,188 are the security and related grounds, including terrorism-related provisions rendering noncitizens who engage in or incite terrorist activity, or endorse or espouse or persuade others to endorse or espouse the same, or represent "a political, social, or other group" that endorses or espouses such activity, inadmissible under 8 U.S.C. § 1182(a)(3)(B); and a foreign policy provision rendering inadmissible any noncitizen "whose entry or proposed activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States"; provided that, if such belief is grounded on beliefs, statements, or associations that are otherwise lawful, the Secretary of State must "personally determine[] that the [noncitizen]'s admission would compromise a compelling United States foreign policy interest" and provide timely notice of this determination to Congress, id. § 1182(a)(3)(C).  Compl. ¶ 28.

The Plaintiffs also cite a White House fact sheet about Executive Order 14,188, which "promise[s]" to "Deport Hamas Sympathizers and Revoke Students Visas," and which included a warning from the President that resident aliens who "joined in the pro-jihadist protests" would be found and deported "come 2025," and that "student visas of all Hamas sympathizers on

[12]

college campuses, which have been infested with radicalism like
never before," would be canceled.  Id. ¶ 29.

   As an example of the direct impact of the alleged policy,
Plaintiffs cite the arrest of Mahmoud Khalil, a lawful permanent
resident and recent Columbia graduate who was arrested at his
Columbia student housing and had his green card revoked, whose
deportation notice cites the foreign policy provision, and whom
officials have stated was leading activities "aligned to" Hamas
or that were "pro-Palestinian" but was not breaking the law; the
revocation of at least four other student or faculty visas; the
government's supplying universities with the names of other
students to be targeted; and the launch of a new social media
surveillance campaign to identify new targets.  Id. ¶¶ 30, 32-
34, 36.  The Plaintiffs allege that the subsequent justification
for revoking Khalil's green card, namely that he failed to
disclose he was a member of the United Nations Relief and Works
Agency for Palestine Refugees and Columbia University Apartheid
Divest, and that he had continued to work for the British
government, was pretextual.  Id. ¶ 35.

   The Plaintiffs also recount the stories of four other
students and faculty whose visas have been revoked on
ideological grounds: Columbia doctoral student and NYU adjunct
professor Ranjani Srinivasan, who fled the United States when
threatened with arrest, including ICE agents' showing up at her

[13]

apartment after her student visa was revoked, and who was later
accused (without evidence, as alleged) of being a terrorist
sympathizer who advocated violence, but who is active in
protesting human rights violations in Gaza and signed an open
letter in support of Palestinian liberation, id. ¶ 37; Columbia
student and lawful permanent resident Yunseo Chung, who engaged
in a pro-Palestinian protest and sit-in where she was arrested
by police and given a ticket for obstructing governmental
administration, and whose lawful permanent resident status was
subsequently revoked after ICE issued a warrant for her arrest,
id. ¶ 38; Georgetown University postdoctoral fellow Badar Khan
Suri, who was arrested and whose student visa was revoked
pursuant to the foreign policy provision, based on spreading
"Hamas propaganda" and promoting antisemitism on social media
and for having connections to a senior advisor to Hamas, despite
those connections' being greatly attenuated, id. ¶ 39; and
Cornell University doctoral candidate Momodou Taal, who is a
prominent pro-Palestinian advocate, and whose student visa was
revoked after he refused a request to "surrender to ICE
custody," id. ¶ 40.[5]

---

[5] In their subsequent briefs, the Plaintiffs also refer to
Rümeysa Öztürk, a doctoral student at Tufts University who was
detained and whose visa was revoked, allegedly for writing an
op-ed critical of Israel, Pls.' Mem. 3, and to Mohsen Mahdwani,
a Columbia student and lawful permanent resident who led pro-

The Plaintiffs also cite a number of statements from executive officials, including Secretary of State Rubio's statement on X (formerly Twitter) referring to a "zero tolerance" policy for foreign students who "support terrorists," notice of a new social media surveillance program called "Catch and Revoke," which uses Artificial Intelligence to find relevant evidence to support visa revocations, and statements expressing a clear intent to target more foreign students and faculty, including Vice President J.D. Vance's statement that Khalil's arrest was not about free speech or even fundamentally about national security, but about the American people's deciding who "gets to join our national community" and Secretary Rubio and the President's deciding "this person shouldn't be in America," and Secretary Rubio's statement that "every day now" the government is approving more visa revocations, id. ¶¶ 31, 41-47.

As a result of this policy, the Plaintiffs allege, many noncitizen students and faculty no longer participate in public protests, some have stepped back from leadership roles or participation in advocacy groups related to Palestine, some abstain from public writing or scholarship and have purged past writing and online posts, some skip class or classroom discussion, and some faculty have fled their home cities in the

---

Palestinian demonstrations at Columbia and whom DHS has now detained and seeks to deport, Pls.' Reply 2; id., Ex. H.

United States.  Id. ¶ 48.  "This chill," the Plaintiffs allege,
"flows directly from the policy challenged here," and from the
Public Officials' "threats" to arrest, detain, and deport
noncitizen students and faculties based on their lawful
expression and association.  Id. ¶ 49.  "Plaintiffs all have
noncitizen faculty and student members who have been compelled
to curtail their exercise of expressive and associational
rights" in these ways.  Id. ¶ 50.

     In support of these allegations, the Plaintiffs describe
the chill experienced by five anonymous members of the AAUP, two
anonymous members of MESA, and one anonymous student who has
worked closely with their AAUP chapter.  Id. ¶¶ 51-76.  AAUP
Members A-E are lawful permanent resident professors or
lecturers who have, variously, taken down social media posts and
previously published writing and scholarship, stopped assigning
material about Palestine in class, withdrawn from a conference
presentation, ceased traveling abroad for conferences, ceased
engaging in political protest and assembly in which they
previously participated, ceased teaching a course they
previously taught, and foregone opportunities to write and speak
at public events, to continue planning a national organization
addressing issues related to Palestine, and to take on
leadership opportunities within their AAUP chapter.  Id. ¶¶ 51-
66.  MESA Members A-B are lawful permanent resident professors

who have, variously, reduced their engagement on social media
and self-censored on issues related to Palestine, refrained from
traveling internationally for key research including on a new
book project that requires it, canceled travel plans for
conferences and thus foregone associating with colleagues
including other MESA members, ceased protesting activity in
which they formerly engaged, declined opportunities to chair
academic committees and publish work, and foregone research
grants and scholarship opportunities that would have required
travel -- all of which harms their scholarship, which depends on
travel for interviews and attendance at cultural events that
they study. Id. ¶¶ 67-73. Noncitizen Student A is a graduate
student and student visa holder who has worked closely with
local AAUP chapter members, and who recently deleted their
social media account, which they used for academic and
networking purposes, and removed information about their work
from university websites due to concern about material related
to Palestine, and who has been chilled from associating publicly
with colleagues, including AAUP members, and has declined to
give speeches at protests or to appear at rallies and a
previously planned film screening and panel discussion and a
conference at which they had planned to speak. Id. ¶¶ 74-76.

In addition to the harms to these anonymous noncitizen
teachers and students, the Plaintiffs allege direct harms to

their organizations, which all advocate for academic freedom and
related causes, and to their citizen members: deterred
noncitizen participation in AAUP events and leadership roles,
and diverted resources to counsel noncitizen members on
immigration issues, id. ¶¶ 78-81; similar harms, including
reduced noncitizen membership joining, to Harvard-AAUP, id. ¶¶
82-84; similar harms, including a member-prepared petition
related to pro-Palestine protesting that the NYU administration
discounted in part because members felt compelled to remove
their names out of fear, to the NYU-AAUP, id. ¶¶ 85-87; similar
harms to Rutgers AAUP-AFT, id. ¶¶ 88-90; and similar harms to
MESA, including the reduced participation of noncitizen scholars
whose expertise is uniquely vital to MESA due to their "personal
connections, heritage, and language skills," significantly
reduced anticipated participation in MESA's landmark annual
meeting in Washington, DC in November 2025 due to fear, and
leadership and staff's specifically spending "more time and
energy responding to crises stemming from the policy than on
scholarship," id. ¶¶ 91-94.

The Plaintiffs also recount the experiences of several
citizen member professors, including the President of MESA Asli
Bâli, a professor at Yale Law School, who have been contacted by
noncitizen students who are scrubbing the internet of any
evidence of Palestine-related speech or scholarship, avoiding

traveling abroad for critical research or speaking at academic events, or changing research topics and syllabi, and who themselves now hesitate to or are unable to coordinate or organize with, work with, or otherwise communicate with noncitizen members and other faculty and students as they once did, and who have canceled events, had online communities shut down, and witnessed noncitizens' ceasing participating in class, refraining from teaching or speaking on political topics, or even going into hiding, and who in some cases have significantly curtailed their own speech with noncitizens.  Id. ¶¶ 95-133. The citizen member professors argue that these fear-based restraints have significantly harmed their research and teaching and negatively impacted their rights to hear from and to associate with the threatened noncitizens.  Id.

## II.  ANALYSIS

### A. Standard of Review

Pursuant to Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint "that states a claim for relief must contain . . .  a short and plain statement of the claim showing that the pleader is entitled to relief."  To test the sufficiency of the pleading, a defendant can file a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), and to test the subject matter jurisdiction of the Court, a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1). "When faced with motions

to dismiss under both 12(b)(1) and 12(b)(6), a district court, absent good reason to do otherwise, should ordinarily decide the 12(b)(1) motion first." Katz v. Pershing, LLC, 806 F. Supp. 2d 452, 456 (D. Mass. 2011) (Stearns, J.), aff'd, 672 F.3d 64 (1st Cir. 2012). Whether a motion is brought under Rule 12(b)(1) or 12(b)(6), "the reviewing court must take all of plaintiff's allegations as true and must view them, along with all reasonable inferences therefrom, in the light most favorable to plaintiff." Verlus v. Experian Info. Sols., Inc., No. 23-CV-11426-DJC, 2025 WL 836588, at *1 (D. Mass. Mar. 17, 2025) (Casper, J.). The complaint must include sufficient factual allegations that, accepted as true, "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Courts "draw every reasonable inference" in favor of the plaintiff, Berezin v. Regency Sav. Bank, 234 F.3d 68, 70 (1st Cir. 2000), but they disregard statements that "merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action," Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (cleaned up). Accordingly, the Court addresses the jurisdictional issues first, and then proceeds to the merits arguments.

**B. This Court Has Subject Matter Jurisdiction**

"For much of U.S. history, the federal courts have not laid down clear principles governing the relationship between the

First Amendment's commitment to freedom of speech and the
immigration laws." Jennifer Lee Koh, Executive Discretion and
First Amendment Constraints on the Deportation State, 56 Ga. L.
Rev. 1473, 1482 (2022). Part of the reason may be
jurisdictional. Here, the Public Officials argue the Court has
no jurisdiction to test the merits for two reasons: first, 8
U.S.C. § 1252(f) ("Section 1252(f)") provides that no court
other than the Supreme Court has jurisdiction "to enjoin or
restrain the operation" of the federal laws governing
deportation except as pertains to an individual alien against
whom proceedings have been initiated, and the Supreme Court has
interpreted this to mean that courts such as this one may not
grant injunctive relief ordering federal officials "to take or
to refrain from taking actions to enforce, implement, or
otherwise carry out" the deportation provisions, whether or not
those officials have properly interpreted the laws, Garland v.
Aleman Gonzalez, 596 U.S. 543, 549-52 (2022); Defs.' Opp'n 4-6;
and, second, 8 U.S.C. § 1252(g) ("Section 1252(g)") provides
that no court has jurisdiction to hear a claim "by or on behalf
of any alien arising from" the Attorney General's decision to
commence proceedings, adjudicate cases, or execute removal
orders, except through a petition for review from a final order
of removal filed in a court of appeals, and the Supreme Court
has interpreted this to mean that selective prosecution claims

are jurisdictionally barred once an order of removal has been issued, see Reno v. American-Arab Anti-Discrim. Comm., 525 U.S. 471 (1999) ("AADC")[6] -- which rule, the Public Officials argue, applies a fortiori to third party claims, or else associates could always make an end run around the jurisdictional bar, Defs.' Opp'n 6-7.

### 1. Section 1252(f) Bars Only Injunctive Relief as to Certain Claims

The Public Officials first argue that to the extent that the "Plaintiffs ask this Court to 'enjoin' [the] Defendants from taking any action to 'arrest, detain, and deport' **any** 'noncitizen students and faculty' pursuant to the alleged 'ideological deportation policy,'" they ask for an injunction of "certain [immigration] enforcement actions against a class of people -- all noncitizen students and faculty across the country." Defs.' Opp'n 4. Such injunctive relief, say the Public Officials, has been jurisdictionally stripped by Congress from imposition by lower federal courts (though not the Supreme Court) by 8 U.S.C. § 1252(f)(1) ("Section 1252"), which provides:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this

_____

[6] Most courts and commentators use AADC, or some acronym variation, as a short form, so it is adopted here.

subchapter, as amended by the Illegal Immigration
Reform and Immigrant Responsibility Act of 1996, other
than with respect to the application of such
provisions to an individual alien against whom
proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1).

The Supreme Court recently reviewed the contours of Section 1252(f) in Aleman Gonzalez, 596 U.S. at 543. In that case, the lower courts certified and entered class-wide relief to provide aliens detained under 8 U.S.C. § 1231(a)(6) with bond hearings. Id. at 546. The government appealed, and the Ninth Circuit affirmed. Id.

The Supreme Court granted certiorari and ordered the parties to address whether Section 1252(f)(1) "deprived the District Courts of jurisdiction to entertain respondents' requests." Id. The Supreme Court held that Section 1252(f)(1) "deprived" the district court "of jurisdiction to entertain . . . requests for class-wide injunctive relief." Id.

The Supreme Court explained that Section 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions," except "with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." Id. at 550 (quoting Section 1252(f)(1)).

[23]

As Justice Sotomayor observed in her partial concurrence, the Court's "holding risks depriving many vulnerable noncitizens of any meaningful opportunity to protect their rights." Id. at 569 (Sotomayor, J., concurring in part). That being said, Aleman Gonzalez "does not purport to hold that § 1252(f)(1) affects courts' ability to 'hold unlawful and set aside agency action, findings, and conclusions' under the Administrative Procedure Act, 5 U.S.C. § 706(2)," nor does it "bar[] even classwide declaratory relief." Id. at 571; see National TPS All. v. Noem, No. 25-CV-01766-EMC, 2025 WL 957677, at *11 (N.D. Cal. Mar. 31, 2025) ("The Court also bears in mind that the Supreme Court has, to date, declined to address the issue of whether § 1252(f)(1) is a bar to a court issuing relief pursuant to the APA.").

The Supreme Court subsequently read the provision as not brushing up against subject matter jurisdiction over an action at all, but rather merely "depriv[ing] courts [other than the Supreme Court] of the power to issue a specific category of remedies: those that 'enjoin or restrain the operation of' the relevant sections of the statute." Biden v. Texas, 597 U.S. 785, 798 (2022) (citation omitted). Indeed, the limitation is only on the authority of an inferior federal court to enter injunctive remedies. Id. at 799. Said differently, and more to the point, "the question whether a court has jurisdiction to

grant a particular remedy is different from the question whether
it has subject matter jurisdiction over a particular class of
claims." Id. at 801.  While the dissenting Justices in Biden v.
Texas questioned the jurisdiction-versus-remedy holding with
respect to injunctive relief, the only present bar is on
injunctive relief.  Id. at 821, 838-839.  Indeed, Justice
Barrett questions:

> Does [Section 1252(f)(1)] mean that the restriction on
> remedial authority is subject to waiver or forfeiture,
> so that a lower court can sometimes properly enter
> non-individual injunctive relief that this Court can
> then review?  That a district court has the authority
> to enter some kinds of non-individual relief (for
> example, a classwide declaratory judgment) and that
> this Court can enter different relief (for example, a
> classwide injunction) on review of that judgment?  Or
> that this Court can enter an injunction on appeal if
> the district court could have entered at least one
> form of relief, even if it actually entered only
> relief that exceeded its authority?  Or perhaps the
> parenthetical serves the very different purpose of
> clarifying that § 1252(f)(1) does not disturb any pre-
> existing authority this Court has under the All Writs
> Act or other sources. These are difficult questions,
> yet the Court does not address any of them.

Id. at 838-39.  The First Circuit presciently concluded, pre-
Aleman Gonzalez, "that declaratory relief remains available
under section 1252(f)(1)" and "[i]n so holding . . . reach[ed]
the unremarkable conclusion that Congress meant only what it
said -- and not what it did not say."  Brito v. Garland, 22 F.
4th 240, 252 (1st Cir. 2021).

The Public Officials argue that the requested relief falls squarely within the injunction-bar as interpreted by the Supreme Court in Aleman Gonzales. Defs.' Opp'n 5. The Public Officials incorrectly assert, however, that Section 1252(f)(1) is a "jurisdictional" bar. It is not.

The Plaintiffs argue that: (1) the provision does not bar injunctive relief vis-à-vis the ideological-deportation policy as opposed to specific immigration law provisions; (2) an injunction would only be barred as to "Part IV" of the Immigration and Nationality Act as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"); and (3) the remaining relief would not be injunctive relief (i.e. a stay under the APA or an injunction against threats). Pls.' Reply 8-10. All three of these arguments are problematic.

Nevertheless, at the motion to dismiss stage, this Court need not rule on this issue since the contours of the relief requested remain unclear. See Immigrant Defs. L. Ctr. v. United States Dept. of Homeland Sec., No. CV 21-0395, 2021 WL 4295139, at *7 (C.D. Cal. July 27, 2021) ("Because the precise form of plaintiffs' requested injunctive relief is not clearly defined at this stage of the case, it is premature to rule on whether § 1252(f) applies at this time.").

Accordingly, the motion to dismiss based on this Court's subject matter jurisdiction is DENIED without prejudice, subject to renewal as to the issue of authorized remedies if -- and only if -- liability is first established.

### 2. Section 1252(g) Does Not Divest This Court of Jurisdiction Over the Plaintiffs' Ideological-Deportation Policy Claims

The Public Officials argue that even to entertain consideration of the alleged ideological-deportation policy is an end-around of Section 1252(g). The Plaintiffs respond that their claims are brought neither by nor on behalf of an alien, nor do they arise from any deportation proceeding subject to the narrow jurisdictional bar; rather, the Plaintiffs attack an allegedly unconstitutional, overarching policy. Pls.' Reply 4.

Section 1252(g) is a jurisdiction-stripping clause applicable to aliens or those bringing claims on their behalf in three distinct phases of the removal process:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim **by or on behalf of any alien** arising from the **decision or action** by the Attorney General **to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.**

8 U.S.C. § 1252(g) (emphasis added).

As an initial matter, the statutory bar applies to "any cause or claim **by or on behalf of any alien**." Id. (emphasis added). The parties agree that Section 1252(g) is not all-encompassing, but rather is "narrow[]" in scope; it does not "cover[] the universe of deportation claims." AADC, 525 U.S. at 482; see Defs.' Opp'n 6; Pls.' Reply 4. Rather, the Supreme Court is clear that Section 1252(g) "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to '[(1)] commence proceedings, [(2)] adjudicate cases, or [(3)] execute removal orders.'" Id. (brackets added).

A quarter century ago, in AADC, eight members of the Popular Front for the Liberation of Palestine, "a group characterized by the government as an international and terrorist organization," were charged under the now-repealed (and repealed at the time of the AADC decision) McCarran-Walter Act, which permitted the deportation of aliens who 'advocat[ed] . . . world communism.'" AADC, 525 U.S. at 473. Six of the eight were also charged with overstaying their visas and failing to maintain their student status. Id.

The aliens filed suit against the government to prevent their deportation, "challenging the anticommunism provisions of the McCarran-Walter Act and seeking declaratory and injunctive relief against the Attorney General, the INS, and various

[28]

immigration officials in their personal and official
capacities." Id.

The advocacy-of-communism charges were dropped. Id. The
"technical violation charges against the six temporary residents
[were retained] and [] Hamide and Shehadeh, who were permanent
residents, [were charged] under a different section of the
McCarran-Walter Act, which authorized the deportation of aliens
who were members of an organization advocating 'the duty,
necessity, or propriety of the unlawful assaulting or killing of
any [government] officer or officers' and 'the unlawful damage,
injury, or destruction of property.'" Id. at 474 (quoting 8
U.S.C. §§ 1251(a)(6)(F)(ii)-(iii)). Furthermore, the "INS
regional counsel William Odencrantz said at a press conference
that the charges had been changed for tactical reasons but the
INS was still seeking respondents' deportation because of their
affiliation with the PFLP." Id. The aliens "amended their
complaint to include an allegation that the INS was selectively
enforcing immigration laws against them in violation of their
First and Fifth Amendment rights." Id.

The case wound its way through the courts, and eventually
the district court preliminarily enjoined the aliens'
deportation. Id. at 475. The district court held "that [the
six temporary aliens] were likely to prove that the INS did not
enforce routine status requirements against immigrants who were

[29]

not members of disfavored terrorist groups and that the
possibility of deportation, combined with the chill to their
First Amendment rights while the proceedings were pending,
constituted irreparable injury." Id.  The two permanent
residents lost at summary judgment.  The Ninth Circuit affirmed
the injunction as to the six and reversed as to the two
permanent residents.  Id.  The matter was remanded to the
district court.  Id.

     At that point, IIRIRA was passed by Congress, which
enacted, among other things, Section 1252(g). Id.  The Attorney
General appealed, claiming this new section stripped the courts
of jurisdiction.  Id.  The Ninth Circuit disagreed, the Attorney
General appealed again, and the Supreme Court granted
certiorari.  Id. at 476.

     The Supreme Court rejected the parties' competing
arguments, and held that Section 1252(g) "applies only to three
discrete actions that the Attorney General may take:" her
"decision or action" to "**commence** proceedings, **adjudicate** cases,
or **execute** removal orders." Id. at 482.  As the Supreme Court
explained, Congress' precision decidedly omitted "many other
decisions or actions that may be part of the deportation process
-- such as the decisions to open an investigation, to surveil
the suspected violator, to reschedule the deportation hearing,
to include various provisions in the final order that is the

product of the adjudication, and to refuse reconsideration of
that order." Id. As the Supreme Court reasoned, "it is
implausible that the mention of three discrete events along the
road to deportation was a shorthand way of referring to all
claims arising from deportation proceedings. Not because
Congress is too unpoetic to use synecdoche, but because that
literary device is incompatible with the need for precision in
legislative drafting." Id. at 482.

To be sure, as argued by the Public Officials, **"many**
provisions of IIRIRA are aimed at protecting the Executive's
discretion from the courts -- indeed, that can fairly be said to
be the theme of the legislation," such as inspections of aliens,
denials of discretionary relief, and limiting review of asylum
determinations. Id. at 486. Section 1252(g) is limited,
however, to the discrete "subset of deportation claims" of three
specific claims outline above. Id. at 487. Turning to the
aliens' challenge to the commencement of deportation
proceedings, the Supreme Court held that Section 1252(g)
squarely applied. Id.

The aliens argued that the doctrine of constitutional doubt
required the Supreme Court "to interpret § 1252(g) in such
fashion as to permit immediate review of their selective-
enforcement claims." Id. at 488. The Supreme Court stated that
it did "not believe that the doctrine of constitutional doubt

[31]

has any application here" and held that "[a]s a general matter -
- and assuredly in the context of claims such as those put
forward in the present case -- **an alien unlawfully in this
country has no constitutional right to assert selective
enforcement as a defense against his deportation**." Id. at 488
(emphasis added).

The Supreme Court was sensitive, in the context of
perceived selective enforcement, to the independence of the
Executive Branch:

> What will be involved in deportation cases is not
> merely the disclosure of normal domestic law
> enforcement priorities and techniques, but often the
> disclosure of foreign-policy objectives and (as in
> this case) foreign-intelligence products and
> techniques.  The Executive should not have to disclose
> its "real" reasons for deeming nationals of a
> particular country a special threat -- or indeed for
> simply wishing to antagonize a particular foreign
> country by focusing on that country's nationals -- and
> even if it did disclose them a court would be ill
> equipped to determine their authenticity and utterly
> unable to assess their adequacy.

Id. at 490-91.  The Supreme Court was clear that a continued
violation of the law need not be countenanced because an alien
is improperly selected for deportation:

> In many cases (for six of the eight aliens here)
> deportation is sought simply because the time of
> permitted residence in this country has expired, or
> the activity for which residence was permitted has
> been completed.  Even when deportation is sought
> because of some act the alien has committed, in
> principle the alien is not being punished for that act
> (criminal charges may be available for that separate
> purpose) but is merely being held to the terms under

[32]

> which he was admitted.  And in all cases, deportation
> is necessary in order to bring to an end an ongoing
> violation of United States law.  **The contention that a
> violation must be allowed to continue because it has
> been improperly selected is not powerfully appealing.**
>
> To resolve the present controversy, **we need not
> rule out the possibility of a rare case in which the
> alleged basis of discrimination is so outrageous that
> the foregoing considerations can be overcome.  Whether
> or not there be such exceptions,** the general rule
> certainly applies here.  **When an alien's continuing
> presence in this country is in violation of the
> immigration laws, the Government does not offend the
> Constitution by deporting him for the additional
> reason that it believes him to be a member of an
> organization that supports terrorist activity.**

AADC, 525 U.S. at 491-92 (emphasis added).  In sum, it does not

violate the Constitution for the government to commence removal

proceedings against an alien that is in the United States in

violation of the law for the **additional** reason that the alien is

a member of an organization that supports terrorist activity.

Here the Plaintiffs challenge the applicability of the

statute to them inasmuch as they are not bringing their claims

on behalf of an alien or in relation to a deportation

proceeding, and argue that the narrow grounds of Section 1252(g)

are not applicable.  The Plaintiffs' reliance on NWDC Resistance

v. Immigration & Customs Enf't, 493 F. Supp. 3d 1003, 1006 (W.D.

Wash. 2020) is persuasive authority that the Plaintiffs can

pursue their own rights and do not fall within the narrow

jurisdictional bar of Section 1252(g).  Pls.' Reply 4.

[33]

In <u>NWDC Resources</u>, two immigration activist organizations sued ICE, its then-acting-director, and the then acting-Secretary of the Department of Homeland Security, claiming that "ICE ha[d] a policy and practice of targeting undocumented immigration activists in retaliation for their protected speech" but clarifying that they did "not seek to intervene in any particular removal proceeding, or to reverse any specific removal decision, but instead ask[ed] the Court to enjoin ICE's 'selective enforcement' policy as unconstitutional." <u>Id.</u> at 1006. Specifically, the plaintiffs plausibly pled the following facts that echo the allegations in the instant complaint:

> ICE has engaged in a policy and practice of targeting outspoken activists who publicly criticize U.S. immigration law, policy and enforcement. [The plaintiffs'] operative First Amended Complaint includes numerous examples of such targeting. Maru Mora-Villalpando is the president of La Resistencia. The FAC and Mora-Villalpando's Declaration establish that she was issued a Notice to Appear because of her "anti-ICE protests." La Resistencia and Maru Mora-Villalpando claim that such tactics are discriminatory and unconstitutional, and that they have had the perhaps intended effect of disrupting and discouraging member activists and their speech. Plaintiffs plausibly claim that they rely on family members for information about detainees, and that as the result of ICE's practice, those family members are afraid to speak. Plaintiffs argue that the fear caused by selective enforcement has forced them to cancel events, limit interactions with the media, and required them to divert resources from activism to defending members facing removal proceedings.

<u>Id.</u> at 1007. ICE's primary argument was that Section 1252(g) barred the action because the claim was really a selective

[34]

enforcement claim against the immigrants, relying on the Supreme
court's decision in AADC.  Id. at 1008-09.  For their part, the
plaintiffs in that case argued that Section 1252(g) did not
apply to their claims, which did not "challenge any specific
removal decision, but rather the constitutionality of a policy
of selectively enforcing immigration laws against aliens who
speak about immigration issues."  Id. at 1010.

The district court agreed with the plaintiffs that Section
1252(g) did not bar the claim:

> The Plaintiff organizations challenge the
> constitutionality of ICE's "policy choice" to target
> outspoken aliens.  They do not seek to stop, delay,
> reverse or otherwise interfere with any of the three
> discrete actions described in Section 1252(g), as to
> any specific alien or any particular proceeding.  None
> of the authorities upon which ICE relies supports its
> claim that such actions are barred by that statute's
> "limited scope;" every case it cites involved a claim
> by an individual challenging the motives behind
> removal proceedings commenced against him or her.
>
> Unlike the plaintiffs in those cases, the
> organizational Plaintiffs here are not aliens seeking
> to undo or prevent removal proceedings commenced
> against them.  A narrow reading of Section 1252(g)
> does not apply to constitutional challenges brought by
> one who is not the alien subject to the three discrete
> decisions articulated in that statute, or one who is
> not bringing a challenge to such actions on the
> alien's behalf.

Id. at 1011.

So it is here.  The NWDC Resistance decision, while
somewhat a lone voice in the wilderness, is virtually
indistinguishable from the larger picture in this case: the

Plaintiffs plausibly allege harm from a policy driven purely by
the Public Officials' displeasure with pro-Palestinian speech --
not even membership in an organization or espousing violence.

Whether the Plaintiffs will be successful on the merits is,
of course, another matter entirely, but the Plaintiffs in the
instant action are not barred by Section 1252(g), at least to
the extent the relief is construed consistent with attacking the
ideological-deportation policy.[7]  This Court agrees that the
Plaintiffs' claims based upon the ideological-deportation policy
are not brought "by or on behalf of any alien arising from" an
enumerated deportation decision, and therefore this Court is not
stripped of jurisdiction.  See Section 1252(g).

Though the Court rules that Section 1252(g) does not apply
to the Plaintiffs' claims, it nevertheless addresses the
applicability of the so-called "outrageousness" exception under
AADC, being fully cognizant that "[t]his argument is based on
dicta in [AADC] where the Supreme Court commented that a rare
case might present a constitutional violation that is so
outrageous that the doctrine of constitutional doubt might be
employed to overcome the jurisdictional prohibitions of Section

---

[7] In fact, the plaintiffs in NWDC Resistance ultimately lost
at summary judgment in January 2024.  See Jan. 4, 2024 Order
Granting Summary Judgment and Vacating the Trial Date, ECF No.
191, NWDC Resistance v. Immigration & Customs Enforcement, Civ.
No. 3:18-cv-05860-JLR.  There was no hearing, and the Order is
unclear as to the reasoning; a written opinion is pending.  Id.

1252(g)." <u>Oldaker</u> v. <u>Giles</u>, 724 F. Supp. 3d 1315, 1338 (M.D. Ga. 2024). While at least one court has viewed the exception as a possible avenue for relief in an appropriate case, <u>see</u> <u>Ragbir</u> v. <u>Homan</u>, 923 F.3d 53, 69–73 (2d Cir. 2019) (reversing jurisdiction-based dismissal of habeas claim, on basis that outrageousness exception to Section 1252(g) had been pleaded), **cert. granted, judgment vacated on other grounds sub nom**. <u>Pham</u> v. <u>Ragbir</u>, 141 S. Ct. 227 (2020), it is unclear whether it is applicable here. The Plaintiffs seem to recognize the tenuous nature of its applicability, devoting only a single sentence in a footnote:

> Even if § 1252(g) applied, [the] Defendants' policy is so egregious a violation of the First Amendment that it would come within the exception recognized in <u>AADC</u> for outrageous government conduct.

Pls.' Reply 5 n. 3 (citations omitted). As the Court views it, the Plaintiffs have successfully argued the inapplicability of Section 1252(g), and thus this Court has no basis for ruling on the applicability of the outrageousness exception. Put another way, Section 1252(g)'s jurisdictional bar applies narrowly to claims by aliens or brought on their behalf in relation to the deportation decisions enumerated in the statute, but the Supreme Court has left the door ajar to an even narrower exception even as to **those** claims.

In any event, Section 1252(g) does not bar the Plaintiffs' claims, and its claims as to the ideological-deportation policy as pleaded plausibly will proceed as to most of the counts here. The Public Officials' motion to dismiss on this ground is DENIED.

### C. Standing

"As Justice Scalia memorably said, Article III requires a plaintiff to first answer a basic question: '"What's it to you?"'"  Food and Drug Admin. v. Alliance for Hippocratic Med., 602 U.S. 367, 379 (2024) (quoting Antonin Scalia, The Doctrine of Standing as an Essential Element of the Separation of Powers, 17 Suffolk U. L. Rev. 881, 882 (1983)).  As the Supreme Court recently explained, "[f]or a plaintiff to get in the federal courthouse door and obtain a judicial determination of what the governing law is, the plaintiff cannot be a mere bystander, but instead must have a 'personal stake' in the dispute," and "courts do not opine on legal issues in response to citizens who might 'roam the country in search of governmental wrongdoing.'" Id. (first quoting TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021); and then quoting Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 487 (1982)).  "In particular, the standing requirement means that the federal courts decide some contested legal questions later rather than sooner, thereby allowing issues to

percolate and potentially be resolved by the political branches in the democratic process," and as to some "the standing requirement means that the federal courts may never need to decide some contested legal questions." <u>Id.</u> at 380. Indeed, "'[o]ur system of government leaves many crucial decisions to the political processes,' where democratic debate can occur and a wide variety of interests and views can be weighed.'" <u>Id.</u> (quoting <u>Schlesinger</u> v. <u>Reservists Comm. to Stop the War</u>, 418 U.S. 208, 227 (1974)).

Here, the Public Officials argue that the Plaintiffs lack standing under both of the theories that they advance: associational and organizational standing. Defs.' Opp'n 7-11.

In order to establish standing, plaintiffs must show that they have suffered an "injury in fact" that is "concrete and particularized," and, if based on future action, "actual or imminent" rather than "conjectural" or "hypothetical"; (2) "fairly traceable" to the alleged conduct of the defendant; and (3) "likely" redressable by a favorable decision." <u>Lujan</u> v. <u>Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992). "The plaintiff 'bears the burden of establishing standing as of the time [s]he brought th[e] lawsuit and maintaining it thereafter," and "must support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" <u>Murthy</u> v. <u>Missouri</u>, 603 U.S. 43, 57 (2024)

(alterations in original) (first quoting Carney v. Adams, 592
U.S. 53, 59 (2020); and then quoting Lujan, 504 U.S. at 561).
"'[P]laintiffs must demonstrate standing for each claim that
they press' against each defendant, 'and for each form of relief
that they seek.'" Id. at 61 (quoting TransUnion LLC, 594 U.S.
at 431). "At the pleading stage, [the Court] 'appl[ies] [to
questions of standing] the same plausibility standard used to
evaluate a motion under Rule 12(b)(6)"; the Plaintiffs "'need
not definitively prove [their] injury or disprove . . .
defenses' but need only 'plausibly plead on the face of [their]
complaint' facts supporting standing." In re Fin. Oversight &
Mgmt. Bd. for Puerto Rico, 110 F.4th 295, 307 (1st Cir. 2024)
(first quoting Gustavsen v. Alcon Lab'ys, Inc., 903 F.3d 1, 7
(1st Cir. 2018); and then quoting Tyler v. Hennepin Cnty., 598
U.S. 631, 637 (2023)).

### 1. Associational Standing

Associational standing allows an organization to sue on
behalf of its members when "(a) its members would otherwise have
standing to sue in their own right; (b) the interests it seeks
to protect are germane to the organization's purpose; and (c)
neither the claim asserted nor the relief requested requires the
participation of individual members in the lawsuit." Hunt v.
Washington State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977);
see also In re Fin. Oversight & Mgmt. Bd. for P.R., 110 F. 4th

at 308.  The first prong, which is the only one that has been challenged here, requires only "that at least **one** of the group's members have standing as an individual."  Draper v. Healey, 827 F.3d 1, 3 (1st Cir. 2016).

"Where a litigant seeks to challenge governmental action as violative of the First Amendment, two types of injuries may confer Article III standing without necessitating that the challenger have been subjected to [penalty]."  Thayer v. City of Worcester, 979 F. Supp. 2d 143, 151 (D. Mass. 2013) (Hillman, J.).  The first, which the Plaintiffs have not alleged, arises when "the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution."  Id. (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)).  The second occurs when "the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences.  In such situations the vice of the statute is its pull toward self-censorship."  Id. (quoting New Hampshire Right to Life PAC v. Gardner, 99 F.3d 8, 13-14 (1st Cir. 1996)).[8]  Both injuries "depend on 'the existence of a

---

[8] Similarly, "[w]hen it comes to the freedom of association, the protections of the First Amendment are triggered not only by actual restrictions on an individual's ability to join with others to further shared goals.  The risk of a chilling effect

credible threat that the challenged law will be enforced,'" or, put differently, require that "the fear of prosecution must be 'objectively reasonable.'"  Mangual v. Rotger-Sabat, 317 F.3d 45, 57 (1st Cir. 2003) (first quoting N.H. Right to Life, 99 F.3d at 14; and then quoting Rhode Island Ass'n of Realtors, Inc. v. Whitehouse, 199 F.3d 26, 30 (1st Cir. 1999)).  At least in the criminal context, the evidentiary bar to show a credible threat of enforcement is "extremely low," and will be assumed "in the absence of compelling contrary evidence."  Id. (quoting N.H. Right to Life, 99 F.3d at 15).

The problem of evaluating allegedly objective chills on First Amendment rights has been analyzed recently in a number of campus speech code cases.  See Speech First, Inc. v. Cartwright, 32 F. 4th 1110, 1120 (11th Cir. 2022) (collecting cases).  In a recent dissent from a denial of certiorari in one such case, Justice Thomas described the state of the law on this issue:

> It is well settled that plaintiffs may establish standing based on "the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights."  And, in assessing whether an "objective chill" exists in a particular case, courts must "look through forms to the substance" of the government's "informal sanctions," . . . .

on association is enough, '[b]ecause First Amendment freedoms need breathing space to survive.'"  Americans for Prosperity Found. v. Bonta, 594 U.S. 595, 618-19 (2021) (quoting National Ass'n for Advancement of Colored People v. Button, 371 U.S. 415, 433 (1963)).

> Common features of [campus] bias response
> policies suggest that they may cause "'students [to]
> self-censor, fearing the consequences of a report to
> [the bias response team] and **thinking that speech is
> no longer worth the trouble**.'"  . . . .  [T]he
> challenged bias response program combines a definition
> of bias that "appears limitless in scope" with a
> "threshold for reporting [that] is intentionally low."
> . . . .  And, the threat that the bias response team
> may refer a report to other university officers for
> further action is **a "weighty consequenc[e]" that
> "'lurks in the background.'"**

Speech First, Inc. v. Whitten, 145 S. Ct. 701, 703 (2025)

(Thomas, J., dissenting from denial of certiorari) (emphasis

added) (citations omitted).  As the Eleventh Circuit has framed

its version of the objective chill test, "to determine whether a

First Amendment plaintiff has standing, we simply ask whether

the 'operation or enforcement,' of the government policy would

cause a reasonable would-be speaker to 'self censor[],' -- even

where the policy 'fall[s] short of a direct prohibition against

the exercise of First Amendment rights.'"  Cartwright, 32 F. 4th

at 1120 (alterations in original) (citations omitted).

     The Public Officials argue that the alleged policy has not

been enforced against any of the Plaintiffs' members or even

anyone their members know, so the Plaintiffs cannot show that

their members face an immediate threat of harm that a judicial

remedy could alleviate, or, put differently, that any particular

speech of a particular speaker will invite deportation.  Id. at

7-8.  Were the Plaintiffs' associational standing theory to pass

[43]

muster, the Public Officials warn, any group of professors could challenge any federal enforcement initiative that might impact students.  Id. at 9.  They also point to a more general bar against challenging the Executive Branch's exercise of enforcement discretion, premised on the principle that courts lack meaningful standards to assess enforcement choices, and argues that Plaintiffs cannot show causation because both the policy and the class of persons impacted are ambiguously defined.  Id. at 9-10.  Finally, the Public Officials argue that the Plaintiffs have not shown that any incidental injuries to the Plaintiffs and their members are redressable, because the alleged chill depends on the actions of others (that is, noncitizens) who feel threatened, and even the requested injunction would in no way reduce the authority of the government to exercise its immigration authority or prevent governmental authorities from commenting on issues related to Israel and Palestine.  Id.

On balance, drawing all factual inferences in their favor, at least the AAUP and MESA have associational standing to challenge the allegedly objective chill on their noncitizen members' speech.  Although they have downplayed this standing argument in their supporting briefs, the Plaintiffs have alleged facts supporting a plausible inference that reasonable noncitizen members of the Plaintiff organizations would self-

censor in response to the challenged policy based on a credible threat of enforcement, which amounts to an objective chill. Compl. ¶¶ 51-76; see Cartwright, 32 F. 4th at 1120; see Laird v. Tatum, 408 U.S. 1, 11 (distinguishing between cases where chill "arise[s] merely from the individual's knowledge that a governmental agency was engaged in certain activities," such as the army surveillance program challenged there, and, based on those activities, "might in the future take some other and additional action," and cases where the governmental power exercised "was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to" it); Susan B. Anthony List v. Driehaus, 573 U.S. 149, 164-66 (2014) (finding risk of future enforcement sufficiently substantial where there was history of past enforcement, broad authority to file complaints triggering enforcement, enforcement proceedings were not rare, and proceedings could trigger criminal prosecution).

The experiences of five anonymous AAUP members and two anonymous MESA members, all lawful permanent residents and professors or lecturers, are described in the complaint, with particularized allegations that these members have stopped assigning materials or teaching formerly-offered classes touching on Israel and Palestine, turned down opportunities to write and speak on related matters, canceled conference and

[45]

other plans, removed related previously published writing and
scholarship from the internet, declined leadership and event
opportunities within their organizations, ceased traveling
abroad or departed the country, and stopped associating or
protesting, all out of fear of potential retaliatory deportation
if they engage in political speech.  Compl. ¶¶ 51-73.  The
complaint alleges, moreover, that "Plaintiffs all have
noncitizen faculty and student members who have been compelled
to curtail the exercise of expressive and associational rights,"
that only "some" of these members have described their
experiences in detail, and that they are "anonymized because
they fear that their connection to this lawsuit could lead to
them being targeted," and that some noncitizen members who were
interviewed by counsel "were too fearful even to have their
experiences described anonymously."  Compl. ¶ 50.  Contrary to
the Public Officials' assertions, this alleged chill bears a
close connection to the Plaintiffs' allegations that the Public
Officials have announced an intent to carry out large-scale
arrests and deportations of noncitizen students and faculty who
participate in pro-Palestinian protests and related speech, have
made good on this promise by initiating arrests and revoking
student visas, have supplied the names of other students to be
targeted to universities, and have launched a social media
surveillance program to identify more targets.  Compl. ¶ 30.

Although the Plaintiffs may be required to name at least one of these would-be speakers, see Summers v. Earth Island Inst., 555 U.S. 488, 498-99 (2009); Draper v. Healey, 827 F.3d 1, 3 (1st Cir. 2016), these chilled noncitizen members of the Plaintiffs' organizations would have standing to assert their First Amendment rights on their own behalf, so the associations of which they are members also have standing to sue.

Instead of emphasizing the chill on their noncitizen members' speech, the Plaintiffs have stressed their citizen members' right to hear from and associate with noncitizens, citing Kleindenst v. Mandel, 408 U.S. 753, 762-65 (1972) for the proposition that the right to hear and to receive information and ideas is protected by the First Amendment. The Plaintiffs are not wrong to invoke their citizen members' right to hear and to receive information, particularly given that the First Amendment is "nowhere more vital than in our schools and universities," Mandel, 408 U.S. at 763, nor of course their right to associate, see Bonta, 594 U.S., but they point to no authority for the extension of what amounts to a kind of right-to-consortium claim to the right to hear from and associate with potential deportees. Mandel involved an individual would-be speaker who was invited to speak by particular would-be hearers and refused entry, 408 U.S. at 756-60, lending support to the Public Officials' argument that the harm to the citizen members'

[47]

rights is too attenuated because no specific member is alleged
to have been deprived by the government of the opportunity to
hear from or associate with a specific noncitizen, Defs.' Opp'n
9.  The Plaintiffs' "right to hear" argument, therefore, while
non-frivolous, asks this Court to take an apparently
unprecedented creative leap: to rule that one may sue for being
deprived of the right to hear from another, due to an objective
chill on another's speech.  Without ruling that such a theory,
or a similar theory based on freedom of association, could not
properly be advanced, this Court instead rests its ruling that
the AAUP and MESA have associational standing on the Plaintiffs'
own noncitizen members' objectively chilled speech.

The Public Officials' redressability argument likewise
fails at this stage.  Although "Article III requires some
minimum likelihood that the relief sought actually does or could
matter," at the same time, "declaratory relief alone may be
sought where it may have some meaningful effect." Neely v.
Benefits Review Bd., 139 F.3d 276, 279 (1st Cir. 1998).  This
Court may grant the Plaintiffs declaratory relief, or a stay
under the Administrative Procedure Act, even if injunctive
relief is barred.  See Brito, 22 F. 4th at 252.  The Supreme
Court has found the redressability requirement satisfied where,
for instance, "it would seem . . . 'substantially likely that
the President and other executive and congressional officials

[48]

would abide by an authoritative interpretation of the census statute and constitutional provision,'" even in circumstances where it was not entirely clear how an agency would or must respond to a court's determination on a given issue. <u>Utah</u> v. <u>Evans</u>, 536 U.S. 452, 463-64 (2002) (quoting <u>Franklin</u> v. <u>Massachusetts</u>, 505 U.S. 788, 803 (1992) (opinion of O'Connor, J.)); <u>see also</u> <u>Antilles Cement Corp.</u> v. <u>Fortuno</u>, 670 F.3d 310, 318 (1st Cir. 2012) ("To carry its burden of establishing redressability, [plaintiff] need only show that a favorable ruling could potentially lessen its injury . . . ."). The Public Officials are incorrect, moreover, in asserting that the Plaintiffs' claims necessarily depend on the actions or inaction of others; rather, the Plaintiffs allege that their members' own speech is being chilled.

## 2. Organizational Standing

Because the Plaintiffs' standing theories may affect the relief this Court can offer, this Court proceeds to analyze organizational standing as well.

Organizational standing allows an organization to sue when, like an individual, it has "alleged . . . a personal stake in the outcome of the controversy," because the challenged actions have caused "concrete and demonstrable injury to the organization's activities," with a "consequent drain on the organization's resources" that is "more than simply a setback to

the organization's abstract social interests." Havens Realty
Corp. v. Coleman, 455 U.S. 363, 379 (1982) (quoting Arlington
Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 261
(1977)). Although "only a perceptible impairment of an
organization's activities is necessary for there to be an injury
in fact," Louis v. Saferent Solutions, LLC, 685 F. Supp. 3d 19,
32 (D. Mass. 2023) (Kelley, J.), the Supreme Court has cautioned
that "an organization that has not suffered a concrete injury
caused by a defendant's action cannot spend its way into
standing simply by expending money to gather information and
advocate against the defendant's action," and thus "has been
careful not to extend the Havens [organizational standing]
holding beyond its context," Food & Drug Admin. v. Alliance for
Hippocratic Med., 602 U.S. 367, 370 (2024); see also Equal Means
Equal v. Ferriero, 3 F. 4th 24, 29-31 (1st Cir. 2021)
(collecting cases); African Cmtys. Together v. Trump, No. 19-
10432, 2019 WL 5537231, at *4 (D. Mass. Oct. 25, 2019) (Hillman,
J.) (injury-in-fact requirement satisfied where plaintiff
organization alleged it had diverted resources to protect
particular African immigrants facing imminent removal);
Massachusetts v. United States Dept. of Health & Hum. Servs.,
923 F.3d 209, 222 (1st Cir. 2019) (noting that, "[i]n this
circuit, '[i]t is a bedrock proposition that "a relatively small
economic loss -- even an identifiable trifle -- is enough to

confer standing"'" (quoting <u>Katz</u> v. <u>Pershing, LLC</u>, 672 F.3d 64, 76 (1st Cir. 2012))).

The Public Officials argue that the Plaintiffs do not have organizational standing because they do not claim that they are being regulated directly, but rather focus on downstream harms from others' actions, such as noncitizens' declining to become members of their organizations.  Defs.' Opp'n 11.  It is entirely speculative, the Public Officials contend, whether associating with the Plaintiff organizations would lead to deportation, and the Plaintiffs have not alleged that it has; they have only alleged "<u>ipse dixit</u> anxiety."  <u>Id.</u>  Likewise, because organizations may not spend their way into standing, these organizations' decisions to divert resources toward addressing fears of deportation is not a cognizable Article III injury.  <u>Id.</u>

The Plaintiffs argue that they have organizational standing because the policy has caused concrete injury to their activities, such as by deterring noncitizen faculty and students from joining their organizations and participating in their events, including members' stepping back from AAUP leadership positions and skipping AAUP and MESA events and projects, including MESA's flagship annual meeting, which has significantly lower-than-usual registration numbers at this time of year.  Pls.' Mem. 9-10.  The Plaintiffs also argue that they

have diverted resources from other projects, spending significant portions of their time counseling noncitizen members on deportation risks and connecting them with legal help.  Id.

This Court rules that at least MESA has organizational standing to sue based on its own injuries.  The Middle East Studies Association, after all, exists to "foster the study of the Middle East," Compl. ¶ 91, and the Plaintiffs allege that the Public Officials are intentionally targeting noncitizens who speak about an important controversy affecting the Middle East and chilling speech related to it, see Compl. ¶¶ 13, 91-94.  This is a far cry from Alliance for Hippocratic Med., where the plaintiff medical associations alleged only that they were incurring costs to oppose the FDA's actions with respect to mifepristone, such as sponsoring studies to inform citizens of the drug's risk.  602 U.S. at 394.  The case at bar seems closer to Havens, where, as described in Alliance for Hippocratic Med., "[c]ritically, [the plaintiff] not only was an issue-advocacy organization, but also  operated a . . . service [that was] . . . 'perceptibly impaired'" by the defendant's actions, that is, where the plaintiff's core service of providing accurate housing information were harmed by the defendant's giving its employees false information.  Id. at 395 (quoting Havens, 455 U.S. at 379).  With the caution that the Supreme Court has deemed Havens to be "an unusual case," id. at 396, then, MESA at least

[52]

plausibly alleges that the Public Officials' "actions directly affect[] and interfere[]" with its "core . . . activities," id. at 395, such as by deterring noncitizen members -- whom MESA alleges are among its most valuable members due to their backgrounds and linguistic capacities, Compl. ¶ 92 -- from participating in core organization activities, and by perceptibly impairing its core mission of fostering the study of and dialogue about the Middle East.

Given the AAUP's core mission of advancing "academic freedom" in higher education, at least some of this reasoning applies to the AAUP and its chapters as well.  Compl. ¶ 78. Considering the broader sweep of this mission, however, the AAUP's organizational standing argument is somewhat less particularized than MESA's.  But see The Presbyterian Church (U.S.A.) v. United States, 870 F.2d 518, 521-22 (9th Cir. 1989) (organizational standing to sue based on plaintiff church's allegation that Immigration and Naturalization Service surveillance caused members to "withdraw from active participation in the churches" and led to cancellation of a bible study group, to clergy time being diverted from regular duties, and to a general decline in support and congregant engagement and speech); NWDC Resistance, 493 F. Supp. 3d at 1015-16 (collecting First Amendment cases supporting capacious view of organizational standing).

[53]

"So long as one plaintiff has standing to seek a particular form of global relief, the court need not address the standing of other plaintiffs seeking the same relief." Comfort v. Lynn Sch. Comm., 418 F.3d 1, 11 (1st Cir. 2005) (en banc).  This Court therefore declines to rule on whether the AAUP and its chapters have organizational standing to sue at this stage.  The motion to dismiss on standing is DENIED, and the Court proceeds to the merits.

### D. The First Amendment (Counts One and Two)

As to the Plaintiffs' First Amendment claims, the Public Officials argue: (1) that a "policy" cobbled together from news articles and social media posts is not amenable to First Amendment challenge, but is protected by the Public Officials' own rights to speech and to coordinate political initiatives, Defs.' Opp'n 12; (2) a facial challenge to the Executive Orders themselves is foreclosed because they have a plainly legitimate sweep, and these orders address unlawful conduct such as supporting terrorist groups, not protected speech, id. at 12-13; (3) under the federal immigration laws and Supreme Court precedent, the President and the Secretary of State may take action against noncitizens based on expression, such as speech that would compromise a compelling United States foreign policy interest or that endorses or espouses terrorist activity or persuades others to do so, or Communist party membership,

because First Amendment protections are less robust for noncitizens, id. at 13-14; (4) aliens unlawfully in the United States cannot raise a selective enforcement defense against their deportations, so their would-be hearers cannot raise what is in essence one either and, to the extent that noncitizens can bring such claims, they must do so individually, id. at 14-15; and (5) the Plaintiffs cannot bring a claim based on National Rifle Ass'n of Am. v. Vullo, 602 U.S. 175, 191 (2024), because they do not allege that the Public Officials are suppressing their or their members' speech by coercing a third party to censor them, but rather that the Public Officials are acting directly against the would-be speakers, id. at 15.

Although this case raises novel First Amendment issues and the precise scope of the ideological-deportation policy challenged by the Plaintiffs is not yet clear, at the motion to dismiss stage the Plaintiffs' First Amendment claims survive. It is well established that noncitizens have at least some First Amendment rights, see Bridges v. Wixon, 326 U.S. 135, 148 (1945), and political speech is "at the core of what the First Amendment is designed to protect," Virginia v. Black, 538 U.S. 343, 365 (2003). Although case law defining the scope of noncitizens' First Amendment rights is notably sparse, the Plaintiffs have at least plausibly alleged that noncitizens, including lawful permanent residents, are being targeted

specifically for exercising their right to political speech.
See American-Arab Anti-Discrim. Comm. v. Reno, 70 F.3d 1045,
1063-64 (9th Cir. 1995), rev'd on other grounds, 525 U.S. 471
("The Supreme Court . . . has accorded to aliens living in the
United States those protections of the Bill of Rights that are
not, by the text of the Constitution, restricted to citizens.");
OPAWL – Building AAPI Feminist Leadership v. Yost, 118 F. 4th
770, 776 (6th Cir. 2024) ("Lawful permanent residents have First
Amendment rights. . . . [T]hey have developed sufficient
connections with the United States to be considered part of the
national community: They live and work here lawfully, and they
can serve in the military."); United States v. Verdugo-Urquidez,
494 U.S. 259, 271 (1990) ("[A]liens receive constitutional
protections when they have come within the territory of the
United States and developed substantial connections with this
country."); but see Price v. United States Immigr. &
Naturalization Serv., 962 F.2d 836, 841-42 (9th Cir. 1991).  The
Plaintiffs have also clarified that they do not mean to bring a
selective prosecution challenge, but rather contend "that
Defendants are deporting people on the basis of their viewpoints
alone."  Pls.' Reply 6.

Contrary to what the Public Officials contend, this Court
cannot agree that this alleged conduct would be constitutional.
See Abourezk v. Reagan, 592 F. Supp. 880 (D.D.C. 1984) ("[Public

Officials] may not, consistent with the First Amendment, deny
[noncitizens] entry solely on account of the content of their
speech."), vacated on other grounds, 785 F.2d 1043 (D.C. Cir.
1986).  The Public Officials' reliance on case law from the
height of the second Red Scare era, such as Harisiades v.
Shaughnessy, 342 U.S. 580 (1952), is misplaced, and this Court
assumes instead that noncitizens lawfully present in the United
States have at least the core rights protected by the First
Amendment, chief among them the right to speak on political
subjects at least where such speech poses no immediate threat to
others.  See American Arab Anti-Discrim. Comm. v. Meese, 714 F.
Supp. 1060, 1074-82 (C.D. Cal. 1989) (collecting cases holding
that noncitizens have First Amendment rights, holding that
noncitizens retain these rights in the deportation setting, and
observing that in Harisiades, "the Supreme Court applied to
aliens the same First Amendment test then applicable to
citizens," which has since changed), aff'd in part, rev'd in
part sub nom. American-Arab Anti-Discrim. Comm. v. Thornburgh,
970 F.2d 501 (9th Cir. 1991); see also Erwin Chemerinsky, The
First Amendment 137-39 (3rd ed. 2024) (observing that, following
the era in which Harisiades was decided, "by the mid-1960s, the
Court appeared to be much more protective of speech," and
describing the since-developed "incitement test" requiring "a
likelihood of imminent harm"); Keyishian v. Board of Regents,

[57]

385 U.S. 589 (1967) (holding a state law denying employment to members of subversive organizations, without requiring proof of knowledge and intent respecting the organizations' illegal objectives, unconstitutional); Holder v. Humanitarian L. Project, 561 U.S. 1, 39 (2010) (upholding application of statute criminalizing material support of terrorism to groups providing any material support to designated terrorist groups, including legal training and political advocacy done in coordination with them, but noting that the Court "in no way suggest[s] that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations").

Although there is some superficial appeal to the Public Officials' argument that the Plaintiffs have raised no more than "generalized complaints about agency behavior," Greater Boston Legal Servs. v. United States Dept. of Homeland Sec., No. 21-cv-10083, 2022 WL 138629, at *6 (D. Mass. Jan. 14, 2022) (Casper, J.) (quoting Cobell v. Kempthorne, 455 F.3d 301, 307 (D.C. Cir. 2006)), First Amendment challenges may be brought against unwritten policies, and at this stage the existence of the policy the Plaintiffs allege is a factual issue on which this Court must draw all reasonable inferences in their favor, see, e.g., Hoye v. City of Oakland, 653 F.3d 835, 855 (9th Cir. 2011) (noting that "[a]n unwritten policy . . . is usually harder to

[58]

establish," but less so when "the [Public Officials'] own pronouncements definitively articulate a content-discriminatory enforcement policy")[9]; see also Schmitt v. Murphy, No. 05-11348, 2010 WL 3813648, at *7 n.13 (D. Mass. 2010) (Gertner, J.) ("The existence of an oral, rather than written, policy does not

---

[9] In Hoye, the Ninth Circuit describes the First Circuit's identification of a "second kind of as-applied challenge," which challenges a neutral law that is being "enforced selectively in a viewpoint-discriminatory way," and which the Ninth Circuit characterizes instead as a "selective enforcement equal protection claim[]" rather than an as-applied challenge. 653 F.3d 835, 854-55 (9th Cir. 2011) (quoting McGuire v. Reilly, 386 F.3d 45, 62 (1st Cir. 2004)). The Public Officials construe the Plaintiffs' claims as a facial challenge to the relevant Executive Orders, but the Plaintiffs consistently state that they instead challenge a discriminatory policy implementing these orders. See Compl. ¶ 1. To make a selective enforcement claim of the kind described in McGuire, "some showing of intent on the part of government officials probably is necessary." 386 F.3d 45, 63 (1st Cir. 2004). Insofar as this can be construed as a facial challenge, the Public Officials are wrong to suggest that Plaintiffs must show that the challenged law or policy lacks any "plainly legitimate sweep," Moody v. NetChoice, 603 U.S. 707, 744 (2024); Defs.' Opp'n 12. Rather, "[t]o 'provide[] breathing room for free expression,'" a facial challenge under the First Amendment requires plaintiffs to show that "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" Moody, 603 U.S. at 723 (first quoting United States v. Hansen, 599 U.S. 762, 769 (2023); and then quoting Bonta, 594 U.S. at 615)). Since the Plaintiffs allege intent, this Court need not decide the exact scope of their First Amendment challenge at this stage. See also Tipton v. University of Haw., 15 F.3d 922, 927 (9th Cir. 1994) (describing attack on "unwritten policy as manifested in the [defendant's] application of its written policy," which may be described as either facial or as-applied, and which focuses on "the **systematically unconstitutional operation** of a [written policy]" (quoting Bowen v. Kendrick, 487 U.S. 589, 608 (1988) (Blackmun, J., dissenting))).

appear to implicate the Constitution.  The Supreme Court
discusses regulations or 'practice.'" (quoting Procunier v.
Martinez, 416 U.S. 396, 413 (1974)).  This makes intuitive
sense, because a speech code that is unwritten or vague but
enforced with harsh penalties would seem more likely to chill
broad swaths of speech than one that clearly defines what is
forbidden.  See Speech First, Inc. v. Sands, 69 F. 4th 184, 207
(4th Cir. 2023) (Wilkinson, J., dissenting) ("With a definition
this loose and rambling, almost anything could be framed as a
[bias violation].").  This is what the Plaintiffs have alleged:
a not-clearly-articulated policy against speech that could be
construed as pro-Palestinian or anti-Israel, and that may be
enforced by arrest, detainment, and deportation, including
arrests at one's home or on the street by masked officers.  It
is hard to imagine a policy more focused on intimidating its
targets from practicing protected political speech.

Given the broadness of these allegations, this Court
declines to analyze counts one and two separately at this stage.
The law against speech-chilling governmental pressure, which
more clearly applies to count two's alleged campaign of "threats
to punish constitutionally protected speech," Compl. ¶ 136, is
in some ways clearer than the law regarding rules or policies
that work an objective chill, because there is on-point Supreme
Court precedent establishing that the government may not exert

undue pressure against First Amendment rights through a regime of "thinly veiled threats" and "informal censorship," <u>Bantam Books, Inc.</u> v. <u>Sullivan</u>, 372 U.S. 58, 66-67 (1963), but the former may ultimately collapse into the latter, <u>see</u> <u>Whitten</u>, 145 S. Ct. at 703 (Thomas, J., dissenting), and the more recent case law regarding the former is more obviously applicable to the ideological-deportation policy that is challenged in count one, Compl. ¶¶ 134-35; <u>see</u> <u>Cartwright</u>, 32 F. 4th.[10]

This Court rules that the Plaintiffs have plausibly alleged the existence of both an ideological-deportation policy targeting protected political speech and a more informal campaign of censorship through threats.  The motion to dismiss counts one and two is therefore DENIED.

**E. The Fifth Amendment (Count Three)**

As to the Plaintiffs' Fifth Amendment claim, the Public Officials argue that the Plaintiffs cannot challenge a cobbled-together unwritten "policy" as unconstitutionally vague; that, even if the Plaintiffs challenge the relevant Executive Orders,

---

[10] Count two also faces unique challenges because it implicates government speech, <u>see</u> <u>Pleasant Grove City, Utah</u> v. <u>Summum</u>, 555 U.S. 460, 467 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."), and must also reckon with the free speech rights of the individual government actors whose speech the Plaintiffs view as threatening, <u>see</u> <u>Goldstein</u> v. <u>Galvin</u>, 719 F.3d 16, 30 (1st Cir. 2016) ("Not only do public officials have free speech rights, but they also have an obligation to speak out about matters of public concern.").

this challenge is foreclosed, because these Orders do not
regulate private conduct; that there is no precedent for
extending Fifth Amendment vagueness doctrine beyond the
statutory context; and, in any case, the Orders track well-
established concepts of unlawful conduct such as harassment and
aiding terrorism, so they are not vague.  Defs.' Opp'n 15-16.

The Plaintiffs' counterargument is confined to a footnote,
stating the general proposition that policies such as this one
may be challenged on vagueness grounds, and that the Plaintiffs
are not, as the Public Officials contend, challenging the
Executive Orders themselves.  Pls.' Reply 7 n.5.  The cases
cited for this proposition address written rules and
regulations, not unwritten policies.  <u>See, e.g.</u>, <u>Wagner</u> v. <u>City
of Holyoke</u>, 100 F. Supp. 2d 78, 86 (D. Mass. 2000) (Ponsor, J.)
("Even if **the rule** might be vague as applied . . . , it belies
common sense to suppose that this plaintiff was not aware that
his conduct fell within the purview of **the regulation**."
(emphasis added)).  The Plaintiffs draw this Court's attention
to a Due Process challenge to the foreign policy provision of
the INA that the government has invoked to argue that it may
take adverse immigration action based on expression, <u>see</u> <u>Massieu</u>
v. <u>Reno</u>, 915 F. Supp. 681, 698-703 (D.N.J. 1996) (Barry, J.)
(holding INA foreign policy provision void for vagueness), <u>rev'd</u>

on other grounds, 91 F.3d 416 (3d Cir.); Defs.' Opp'n 13, but do not challenge this provision themselves.

Because Due Process-based vagueness challenges have not been extended beyond the statutory sphere or, at most, to written rules and regulations, the motion to dismiss count three is ALLOWED.

### F. The APA (Count Four)

As to the Plaintiffs' APA claim, the Public Officials argue that the Plaintiffs have not challenged a final agency action or one for which there is no other adequate remedy, because (1) the alleged policy has not determined rights and obligations or triggered legal consequences, but is instead at most a general executive program not captured in any order or regulation, Defs.' Opp'n 16-17, and (2) challenges to removal decisions must be channeled through the exclusive administrative scheme established for immigration review, so there is another adequate remedy, id. at 17-18. In addition, the Public Officials argue that Executive Orders may not be challenged under the APA because the President is not an agency, and that the Plaintiffs' APA challenge would fail on the merits in any case because the "substantive policy decisions captured in the EOs (and reflected in practice)" are not arbitrary or capricious, but rather represent a rational response to a surge of antisemitic harassment after the October 7 attack that benefited terrorist

organizations such as Hamas to the detriment of the United States' national security.  Id. at 18.

In response, the Plaintiffs argue that there is a strong presumption in favor of judicial review of agency action, that agency action may be final even if it not reduced to writing, and that the Plaintiffs do lack any other adequate remedy because their claims are not reviewable through removal proceedings and their harms would not be relieved by future review of potential deportees' claims.  Pls.' Reply 7-8.

For an agency action to be reviewable under the APA, it must be "final" action, Lujan, 497 U.S. at 882, and there must be "no other adequate remedy" for the alleged harm, Bennett v. Spear, 520 U.S. 154, 157 (1997).  To be final, agency action must be "one by which rights and obligations have been determined" or from which "legal consequences will flow." Bennett, 520 U.S. at 177-78.

Particularly given that this Court must draw all reasonable inferences in the Plaintiffs' favor at this stage, including "inferences that support the existence of an official policy," Amadei v. Nielsen, 348 F. Supp. 3d 145, 165 (E.D.N.Y. 2018), the Plaintiffs have plausibly alleged final agency action.  Agency action "need not be in writing to be judicially reviewable as a final action," as "[a] contrary rule 'would allow an agency to shield its decisions from judicial review simply by refusing to

[64]

put those decisions in writing.'" Aracely, R. v. Nielsen, 319
F. Supp. 3d 110, 139 (D.D.C. 2018) (quoting Grand Canyon Tr. v.
Public Serv. Co. of N.M., 283 F. Supp. 2d 1249, 1252 (D.N.M.
2003)).  This rule has been applied, for instance, where
plaintiffs challenged an unwritten Department of Homeland
Security policy that "direct[ed] ICE officers to consider
deterrence of mass migration as a factor in their custody
determinations," leading to the increased detention of Central
American mothers and children.  R.I.L-R. v. Johnson, 80 F. Supp.
3d 164, 174 (D.D.C. 2015).  Where "Defendants have repeatedly
stated that there is a policy," moreover, they "cannot, now,
have their cake and eat it too," and the Plaintiffs have pointed
to several examples of high-level agency officials at least
arguably "saying that they were following a policy" of targeting
those who have engaged in pro-Palestinian advocacy for
deportation.  Amadei, 348 F. Supp. 3d at 165; see, e.g., Compl.
¶ 29.

    As the Plaintiffs argue, the Public Officials' analogy to
Lujan, where the plaintiffs challenged a constellation of Bureau
of Land Management actions announcing its intent to grant
permission to certain activities, to decline to interfere with
others, and to take other action if requested, is inapposite,
because the Plaintiffs allege a specific "policy of revoking the
visas and green cards of faculty and students engaged in pro-

[65]

Palestinian advocacy," not a constellation of independent decisions or a general drift in agency priorities. Pls.' Reply 7-8; Lujan, 497 U.S. at 892. This case is closer to Johnson than Lujan: here the Plaintiffs allege that the Public Officials are targeting noncitizens who engage in pro-Palestinian advocacy for visa revocation and deportation, not that they have become anti-Palestinian or suppressive of speech in some general way.

The Plaintiffs have also plausibly argued that their harms are not otherwise redressable than through the APA. If, as discussed supra, the Plaintiffs may be unable to obtain an injunction based on their freestanding First Amendment claims, then it is unclear how their harms may otherwise be redressed than by the stay they request under the APA. Likewise, "even if an individual noncitizen challenges the Agencies' [action], that review does not address the broader injury alleged by Plaintiffs here," Greater Boston Legal Servs. 2022 WL 138629, at *5 -- that is, the chill on noncitizen members' speech, the harm to citizen members' ability to hear from and associate with noncitizen colleagues and students, and the direct harm to the organizations' core missions of supporting academic freedom and to their core activities and spending. The Public Officials argue that the INA broadly precludes APA review of decisions affecting immigration, Defs.' Opp'n 17-18, but, as Justice Sotomayor noted in her Aleman Gonzalez concurrence, the Supreme

Court has not addressed whether the INA restrains courts from setting aside agency action under the APA, 596 U.S. at 571 (Sotomayor, J., concurring in part), and the Plaintiffs point to instances where courts have held or assumed that it does not, Pls.' Reply 10; see National TPS All. v. Noem, No. 25-cv-01766, 2025 WL 957677, at *11-14 (N.D. Cal. Mar. 31, 2025).

Therefore, this Court DENIES the motion to dismiss count four.[11]

---

[11] The Plaintiffs argued the prudential standing requirement that their claims must be within the "zone of interests" of the statute governing the challenged actions for them to bring a claim regarding implementations of the statute under the APA, pointing to cases where employers benefiting from visa programs and organizations inviting noncitizens to speak were held to fall within the zone of interests of the INA.  Pls.' Mem. 17-18. The Public Officials do not challenge this characterization. This issue is underdeveloped now.  "As long as the constitutional standing requirements are satisfied, the court may evaluate the case's merits before resolving thorny prudential standing questions," and so this Court does here. Labor Rels. Div. of Constr. Indus. of Mass. v. Healey, No. 15-10116, 2015 WL 4508646, at *5 (July 9, 2015) (Zobel, J.).

## III. CONCLUSION

For the reasons stated above, the Motion to Dismiss is ALLOWED in part as to count three and DENIED in part as to counts one, two, and four.  A case management conference is set for Tuesday, May 6, 2025 at 10 a.m.


**SO ORDERED.**

                                  /s/ William G. Young
                                  WILLIAM G. YOUNG
                                       JUDGE
                                      of the
                                  UNITED STATES[12]

---

[12] This is how my predecessor, Peleg Sprague (D. Mass 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 47 years.