```
 1                    UNITED STATES DISTRICT COURT

 2                    DISTRICT OF MASSACHUSETTS (Boston)

 3                              No. 1:25-cv-10685-WGY

 4

 5   AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
               Plaintiffs

 6

 7   vs.

 8

 9   MARCO RUBIO, in his official capacity as
     Secretary of State, et al,
10               Defendants

11                         *********

12

13

                           For Hearing Before:
14                        Judge William G. Young

15

          Preliminary Injunction/Motion to Dismiss
16

17                        United States District Court
                          District of Massachusetts (Boston.)
18                        One Courthouse Way
                          Boston, Massachusetts 02210
19                        Wednesday, April 23, 2025

20

                              ********
21

22

                  REPORTER: RICHARD H. ROMANOW, RPR
23                       Official Court Reporter
                       United States District Court
24       One Courthouse Way, Room 5510, Boston, MA 02210
                          rhr3tubas@aol.com
25
```

1                    A P P E A R A N C E S

2


3    RAMYA KRISHNAN, ESQ.
     JAMEEL JAFFER, ESQ.
4    TALYA NEVINS, ESQ.
     CAROLINE DeCELL, ESQ.
5        Knight First Amendment Institute at Columbia University
         475 Riverside Drive, Suite 302
6        New York, NY 10115
         (646) 745-8500
7        E-mail: Ramya.krishnan@knightcolumbia.org
         For Plaintiffs

8


9    HARRY GRAVER, ESQ.
     SHAWNA YEN, ESQ.
10       DOJ - Civ
         950 Pennsylvania Avenue NW
11       Washington, DC 20530
         (202) 514-2000
12       Email: Harry.graver@usdoj.gov
         For Defendants

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            P R O C E E D I N G S
 2         (Begins, 10:00 a.m.)
 3         THE CLERK:  Now hearing Civil Action 25-10685, the
 4    American Association of University Professors, et al
 5    versus Marco Rubio, et al.
 6         THE COURT:  Good morning.  Before we begin, let me
 7    say that I have authorized internet access to this
 8    proceeding and so I should address those folks who are
 9    accessing the proceeding via the internet.
10         You should understand that the rules of court
11    remain in full force and effect, and that is to say you
12    must keep your microphone mooted at all times, there is
13    no taping, streaming, rebroadcast, screen shots, or
14    other transcription of these proceedings.
15         With that said, would counsel introduce themselves
16    starting with the plaintiffs' counsel.
17         MS. KRISHNAN:  Good morning, your Honor, Ramya
18    Krishnan for the plaintiffs.
19         THE COURT:  Good morning.
20         MR. JAFFER:  Good morning, your Honor, Jameel
21    Jaffer for the plaintiffs, and I'll introduce my
22    colleagues as well.
23         THE COURT:  Sure.
24         MR. JAFFER:  Talya Nevins and Cary DeCell.  All of
25    us are at the Knight Institute in New York.
```

```
1          THE COURT:  And good morning to all of you.
2          And for the defense?
3          MR. GRAVER:  Good morning, your Honor, Harry
4    Graver for the United States.
5          MS. YEN:  And Shawna Yen for the United States,
6    your Honor.
7          THE COURT:  And good morning to you all and
8    welcome.
9          I've read all the papers to prepare for this
10   hearing and I've scheduled a hearing on the plaintiffs'
11   motion for a preliminary injunction.  I need some help
12   here and I --
13         Well you don't have to jump up first.
14         MS. KRISHNAN:  Okay.
15         (Laughter.)
16         THE COURT:  Simply because I want to set the
17   stage, and I'm going to ask some discrete questions,
18   primarily for the plaintiffs, but maybe for the defense,
19   and then we'll see where we're going with this case.
20         I can see that this is an important free speech
21   case.  The freedom of speech is guaranteed to all
22   persons by the Constitution.  It is a freedom to think
23   and to speak, to believe, not to believe, um, without
24   retribution from the government.  It's probably the
25   strongest guarantee in American democracy.
```

1          So, you know, you could say, "Well, that makes

2     this a simple case," but it's anything but simple,

3     because our duly-elected government has the right,

4     indeed the duty, to secure the borders, to, um,

5     proscribe crimes, to proscribe acts of discrimination

6     based upon religious belief or nonbelief, based upon

7     race, gender, ethnic background.  It has an important

8     governmental interest in preventing assault and threats

9     of a sort.  So it's anything but simple.

10          And I don't mean this critically, but I have

11     various issues, um, the defense properly has raised them

12     in their motion about the complaint, the vehicle, that

13     brings us all together this morning.  And it's that I

14     want to ask a few questions about.

15          When I look at what you're -- I'm talking the

16     plaintiffs here.  When I look at what the plaintiffs are

17     seeking for the redressability issue, um, I -- I have

18     some real doubt about this Court's ability -- "ability"

19     is the wrong word, this Court's, um, the propriety of

20     this Court, its subject matter jurisdiction, to enter

21     injunctive relief in the manner that the plaintiffs

22     seek, and, um, certainly against the President of the

23     United States.  Those are matters to which Congress has

24     spoken and this Court of course scrupulously will follow

25     the law.  But if I -- if I look at the gravamen of the

1    complaint that the plaintiffs have drafted, um, I

2    believe I understand it, and that's what I -- that's

3    where my questions are going to.

4        To understand how I can best manage this case, I'm

5    going to ask the plaintiffs some questions about what in

6    fact they've alleged and perhaps the limits.  So you

7    frame something that you call an "ideological

8    deportation process," the -- you say it exists, the

9    defendants deny that.  It's a factual issue.  But it --

10   and don't take it from me, it's your complaint, but as I

11   read it, it alleges, if I have this correctly, that the

12   zealous, you would say, plaintiffs would say

13   "overjealous" enforcement of the laws relating to

14   noncitizens who are found here in the United States

15   chills the, um, First Amendment rights not only of those

16   individuals, but also of the various associations whom

17   you represent.  Is that accurate?  And if it's not, I

18   invite you to correct me.  Not argue.  We'll get to that

19   if necessary.

20       Have I got that right?

21       MS. KRISHNAN:  So just to be clear, your Honor,

22   you know what we challenge in this case is the adoption

23   and implementation of defendants' policy of --

24       THE COURT:  Well they say there is no policy or no

25   unconstitutional policy.

```
 1        MS. KRISHNAN:  Well we don't think that the
 2   existence of the policy is a close call.  With the press
 3   and the public, defendants have been clear that this
 4   policy exists, that they are --
 5        THE COURT:  Well, respectfully, um, this Court
 6   deals with evidence and it isn't adjudicated on the
 7   basis of what the press might think.  So I've
 8   actually -- I really have tried to identify, with a
 9   little more precision, the policy that you're
10   challenging -- or policies.
11        A plaintiff has their own complaint, they're the
12   "master of their own complaint" is the way we usually
13   say it.  I'm not trying to cabin you in, I'm trying to
14   understand.
15        So I passed out to everyone, um, two documents
16   that seem that they're authentic -- I think they're
17   authentic, but defense counsel has every right to
18   challenge it.  But one of them -- and I'm not really
19   quiveling over Homeland Security checking people's
20   social media, but the explanation by the agent of
21   Homeland Security about why they're going about this,
22   um, looks to me like a policy.  And then, because I have
23   this, um, society, this Middle Eastern Society, whom you
24   represent, I -- and I'm not -- I don't want to drift
25   into the Harvard litigation, it's not my case, I'm not
```

1  speaking to it, but more recently there's this letter,

2  which happens to be to Harvard, but I've seen cases like

3  this, I've drawn one of them, where noncitizens have

4  their status, their F-1 visa or the documents that

5  support that abrogated, and in the second document I

6  passed out to you, Homeland Security says, in that

7  letter, one of the defendants here, she says, um,

8  "Unless you do certain things by August -- by April

9  30th, students at Harvard anyway, who are noncitizens,

10 are likely or may have their status changed."  So that

11 might be another aspect of a policy.

12       Are those policies -- are those the policies of

13 which you complain?

14       MS. KRISHNAN:  Well I think they're evidence of

15 the agency's implementation of the executive orders and

16 all the policy, but I do think the policy is broader

17 than that articulated in the two documents that we've

18 seen.  If I could just clarify what we think the policy

19 is and what evidence we rely upon.

20       You know the policy --

21       THE COURT:  I will get to what evidence you rely

22 on, that's argument, but what you think the policy is, I

23 do very much want to hear you.  Go ahead.

24       What's the policy that you challenge here?

25       MS. KRISHNAN:  The policy is of revoking the visas

1    of and arresting, detaining, and deporting, noncitizen

2    students and faculty based on their protected

3    pro-Palestinian advocacy, that's the policy we

4    challenge.

5         (Pause.)

6         THE COURT:  So the existential issue in the real

7    world that the policy is focused on is pro-Palestinian

8    advocacy?

9         MS. KRISHNAN:  Yes.  And then defendants have used

10   a variety of terms to describe the --

11        THE COURT:  No, no, I asked you, and you've

12   answered it.  You've answered it.  So let me -- and I'm

13   not looking for trouble here, but you made mention of

14   the press and the public.

15        Bringing these allegations, there's a darker, um,

16   inference that one could draw from it.  You'd have to

17   read your complaint generously to get there, but I've

18   done that at least to ask this question.

19        You could read this -- and I've read all the

20   submissions of the Amici too, as, um, being only a piece

21   of a broader, um, concerted conduct on the part of these

22   defendants, to, um, abrogate First Amendment rights for

23   some of them that inures more power to the President and

24   the senior executive officials.  You didn't say that.

25   I'm not asking you to say it.  But should I, can I read

1     your complaint that broadly?

2          MS. KRISHNAN:  (Pause.)  I don't think we --

3     suddenly, you know, there is a broader pattern of

4     conduct here by defendants that we think implicates

5     broadly the First Amendment rights of not only students,

6     but universities.  But to be clear, what we are

7     challenging in this case is this policy of deporting

8     students and faculty based on their political viewpoint.

9          THE COURT:  Well -- and more specifically their

10    pro-Palestinian expressions?

11         MS. KRISHNAN:  That's right.

12         THE COURT:  Fine.  And now -- and I'm not asking

13    for the proof, but you think you can prove that in a

14    court of law -- this court?

15         MS. KRISHNAN:  Yes, we do.

16         THE COURT:  Are you ready to?

17         MS. KRISHNAN:  Yes.

18         THE COURT:  All right.

19         Pursuant to Federal Rule of Civil Procedure 65(a),

20    further hearing on the motion for a preliminary

21    injunction is combined with trial on the merits.

22         When do you want to go to trial?  Trial.

23         MS. KRISHNAN:  Well I don't think we have to go to

24    trial, I think on this preliminary injunction motion --

25         THE COURT:  No.  No.  Ma'am -- Ma'am, I'm

1    authorized to do what I routinely just did.  I'm looking

2    for a trial, a trial on evidence with witnesses.

3            MS. KRISHNAN:  Okay.

4            THE COURT:  And the Rules of Evidence, so that

5    facts may be found, not simple affidavits or advocacy,

6    no matter how eloquent.  I'm looking for proof by a fair

7    preponderance of the evidence.  I'm authorized to do

8    that.  I just did it.  I'm not saying that it has to

9    start tomorrow, indeed you'd call my bluff if you said

10   you were ready to start tomorrow, because I don't think

11   I'm ready.

12           (Laughter.)

13           But -- and I'm trying to be transparent, and I

14   intend to be throughout this entire proceeding.  But a

15   trial we're going to have.  And if injunctive relief is

16   appropriate at all, it will follow that trial.  So one

17   imagines you want it fairly promptly, but you want some

18   time to prepare for the trial.

19           Now I haven't even looked at the defense, and

20   there's much to their motion, which I'm going to treat

21   now as a motion to dismiss.  So we'll get to them.  But

22   assume that your case is still standing after they've

23   been heard, today or at an appropriate time.  Assuming

24   we've got something to try, as you have framed it, and I

25   appreciate that, when do you want to try it?

```
1          MS. KRISHNAN:  Your Honor, could you give me one
2     moment?
3          THE COURT:  Of course.
4          (Pause.)
5          MS. KRISHNAN:  I think we can be ready within 6
6     weeks.
7          THE COURT:  All right.
8          MS. KRISHNAN:  I do -- I do just want to, um, make
9     a plea, your Honor, um, for urgent relief in this case.
10         THE COURT:  You see -- look, you filed this
11    complaint.  When you first filed the complaint, you
12    didn't even ask for a preliminary injunction.  So I have
13    no basis for invoking the Rule of Civil Procedure I just
14    invoked, which happens to be my common practice.  Have
15    you checked?  All right, so we've waited, because you
16    didn't ask me to do anything.
17         Now you filed a motion.  You -- with agreement of
18    the defendants, you figured out a briefing schedule
19    that's satisfactory to you.  I adopted it.  Just as soon
20    as that briefing schedule was over, I have convened this
21    hearing.
22         Now the Court is here to serve -- not serve you to
23    the exclusion of the interests of the defendants, but to
24    serve these litigants, that's my duty, and I'm going to
25    do it.  The best way to get at truth is through a trial.
```

1      Now I'll give you a trial -- not tomorrow, and

2   I'll give you a trial in 6 weeks, if that's what it

3   takes, but it's not "Now we get relief and then we're

4   all on affidavits going around about what the judge

5   said," no, no, no, let's get evidence.  Let me be

6   specific, just to point out a problem here and why I so

7   favor a trial.

8      In support of your motion for a preliminary

9   injunction, there's -- there's this whole montage of

10   various news clippings, in essence, um, which I'll

11   presume that they're accurate, but you're going to have

12   to prove that they're accurate, and they, under the

13   Rules of Evidence, constitute admissions by the various

14   senior executive officials and indeed the President of

15   the United States.  Here's the problem with them.  Again

16   trials are for you to try, not for me, but I don't know

17   that they're complete.  I don't know that we have the

18   fullest statement of the particular public official.  I

19   don't know that they pass evidentiary muster.  I expect

20   that.  Not that you have to call these people, I don't

21   expect any of them to be called, though the defense

22   could call them.  But I'm not going to, um, require it,

23   certainly they're busy people.  And I will accept their

24   admissions as evidence once I know that they are both

25   authentic and complete.  That's just one problem.  So

1   you've got some work to do to prepare it for trial.

2       Also, this business about "chilling the rights of

3   American citizens," well I expect some evidence of that.

4   I expect witnesses to tell me that.  And those witnesses

5   are subject to cross-examination.  That's what trials

6   are.  Trials reach out for justice in the best way

7   that -- you see my bias here, in the best way that human

8   kind knows.  That's what I want, I want a trial.  You've

9   given me the basis to order one.  I am.  Just as fast as

10  you want it.

11      6 weeks?  We can tinker with that.  But is that

12  reasonable?

13      MS. KRISHNAN:  I think so.  But we will need to

14  consult with --

15      THE COURT:  Of course, but I'm going to propose --

16  I haven't allowed the defense at all.  But you go ahead

17  and consult.

18      And, Mr. Graver, I'm on pretty firm ground on the

19  Rules of Civil Procedure so far, but now, when you do

20  this, am I making stuff up?  And, um, again I think

21  you'll find me fairly transparent.

22      You're -- there's much to be said about your brief

23  -- much to be said about your brief favorably, I'm

24  favorably impressed by your brief.  I propose, since

25  I've collapsed everything with the trial and I've

1    explained why I think it's significant, I'm going to

2    treat your brief like a motion to dismiss, in whole or

3    in part, and we'll give a hearing on that motion to

4    dismiss.  You think the whole thing can be dismissed.

5    Don't think I've -- I've made up my mind.  I've got

6    problems with that and I'm presuming that something

7    survives.

8        When do you want to be heard on the opposition --

9    well let me start like this.  You're okay with that,

10   treating it as a motion to dismiss, I'll give you an

11   oral hearing on it and resolve it?  Does that make

12   sense?

13       MR. GRAVER:  That's right, your Honor.  So I think

14   that for discussing the possibility of a trial, we

15   obviously want a full hearing on the motion to dismiss.

16       THE COURT:  And I propose to give you a full

17   hearing.

18       MR. GRAVER:  And I think that those -- in our view

19   the complaint suffers from fundamental legal defects

20   that would avoid the need for a trial.  But putting that

21   all to the side --

22       THE COURT:  It's not the time to argue it, but I'm

23   not surprised you're saying that.

24       Okay.  So when would you like to be heard on that?

25       MR. GRAVER:  We're prepared to litigate that now.

```
 1   But in any event, I think we can coordinate with
 2   plaintiffs' counsel on an agreeable schedule.
 3        THE COURT:  I'm fine with that.  I'm fine with
 4   that, um, and now we're talking the language with which
 5   I'm familiar.  I work for Ms. Belmont.  So it's all very
 6   well for you folks to coordinate, but I have other cases
 7   and I deal with them.  So, um, the, um -- excuse me.
 8   You'd best propose to her a time for a hearing.
 9        Now my own sense is a half an hour a side for
10   argument.  I'll allow further briefing.  And I'll be
11   prepared.
12        So is that enough guidance to work out when you'd
13   like to be heard?
14        MR. GRAVER:  Yes, absolutely.
15        THE COURT:  All right.
16        It seems to me we ought to start there, so we know
17   what if anything we're going to try.
18        MS. KRISHNAN:  Um, generally, your Honor.  And I
19   am prepared to address the jurisdictional arguments
20   today if the government wants to proceed on its motion
21   to dismiss.
22        THE COURT:  Well the question is do you want to
23   have a little more time to think about it in its current
24   posture or argue it now?  I'm prepared too.  But it's
25   not a question of lack of preparedness, it's do you want
```

 1    to discuss and pick a time when we focus just on that,

 2    treating their opposition as a motion to dismiss?  You

 3    tell me.

 4          (Pause.)

 5          MS. KRISHNAN:  I think I'm prepared to move

 6    forward now.

 7          THE COURT:  The government?

 8          MR. GRAVER:  Yeah, absolutely.

 9          THE COURT:  Very well.

10          So here's what we'll do.  We'll take a brief

11    recess, 10 minutes.  We'll treat this as a motion to

12    dismiss.  The defendants will argue first, then the

13    plaintiffs will argue, and I will see what I think.

14    We'll stand in recess for 10 minutes.

15          We'll recess.

16          THE CLERK:  All rise.

17          (Recess, 10:30 a.m.)

18          (Resumed, 10:40 a.m.)

19          THE COURT:  All right.  You'll understand I have

20    read all the papers.  Mr. Graver, I will hear you, sir.

21          MR. GRAVER:  Thank you, your Honor.

22          So switching to a motion to dismiss hearing, I

23    think that -- well what I want to emphasize is four --

24    or I think at least three fundamental defects that I see

25    in the complaint that I think obviates the need for a

1    trial and that counsels in favor of dismissing the

2    complaint now.

3         First and foremost is the INA.  And taking a step

4    back, at a high level the entire purpose of the INA's

5    many jurisdiction-stripping provisions is that the

6    federal courts do not interfere with immigration

7    proceedings until those proceedings have completed, they

8    have culminated in a single petition for review, that

9    then goes not to the District Courts, but to the Court

10   of Appeals.

11        THE COURT:  I'm familiar with that.

12        MR. GRAVER:  That's all still table-setting for

13   the moment.

14        THE COURT:  No, it's perfectly all right.  When

15   the Real ID Act was passed, I wrote a case, you might

16   look at it, *Inwanhu vs. Shirtak.*  I do know what the law

17   is.  At least generally.

18        MR. GRAVER:  So speaking from a 30,000 foot

19   account of the law, the big problem here that I at least

20   see is that every single aspect of this suit is

21   essentially a collateral attack on those proceedings in

22   conflict with the jurisdiction-stripping regime that

23   Congress established.  Here the plaintiffs seeks

24   categorical relief, they seek relief with respect to an

25   innumerable class of aliens, whereas the INA insist on

1   individualized adjudications and individualized

2   remedies.

3        The other piece is that the complaint too -- the

4   only way in which I think this works for addressability

5   purposes is essentially asking this Court for a

6   prophylactic injunction, that's the only way in which

7   they have Article III standing.  That if you enjoin a

8   whole class of immigration proceedings from even taking

9   place, or even starting in the first place, that runs

10  headlong into the INA's jurisdictional bars.

11       So I think that in order for the suit to make

12  sense, in order for it to go forward, this Court needs

13  to then run through a number of hurdles that the INA has

14  established.  So the INA, I think, is Category Number 1.

15       Category Number 2 is Article III standing.  We

16  raise a number of arguments in the brief.  One of which

17  I think maybe warrants a little bit more attention is

18  the *United States vs. Texas* point.  And I think that is

19  taking all the allegations as true, forget the facts,

20  the evidence at trial, there's just a fundamental legal

21  problem with their path of standing.

22       And that problem is what Texas held is that third-

23  parties do not have a cognizable Article III interest in

24  how the executive branch structures its enforcement

25  priorities.  So there -- and just cut me off if this is

1    also recabining, but what Texas challenged was actually

2    enumerated enforcement guidelines that they said

3    unlawfully prioritized enforcement against a certain

4    class of aliens.  Without even reaching the merits, the

5    Supreme Court held that claim ends for Article III

6    reasons alone.  And I think the exact same thing is true

7    here.

8         Again what my friends are not challenging is any

9    actual source of legal authority, they're not

10   challenging the INA, at least in the complaint that's

11   the theory, they're not directly challenging the

12   President's executive orders, they disclaim that in

13   their papers.  Instead what they're challenging is

14   whatever you define this amorphous policy to be, it's an

15   enforcement priority, it's how you structure and how you

16   use your existing resources to fulfill whatever the

17   agenda is of the executive.

18        THE COURT:  Well isn't it, um -- not so much as

19   priorities, the President's priorities, but the effect

20   of the conduct of the President and his senior executive

21   officers' agents in implementing them, the manner in

22   which they implement them, the manner in which they

23   apply it.  And can they not challenge that?

24        MR. GRAVER:  And that's the square holding of

25   *Texas*.  I mean the point that you were just raising is

1    exactly what Justice Alito emphasized in dissent.  There

2    everyone agrees that the canonical Article III injury is

3    pocketbook harm.

4         Texas was suffering and no one doubted that Texas

5    was suffering significant financial incidental harms as

6    a result of how -- as a result of the enforcement

7    guidelines that the executive branch then chose to

8    adopt.  But the Supreme Court held that those incidental

9    harms, albeit real, are not cognizable Article III

10   injuries in this context.

11        The exact same thing is true here even though the

12   incidental harm has a constitutional dimension.  There's

13   no Article III difference there.  So I think this just

14   runs straight through *United States vs. Texas*, the 2023

15   version, I realize there are many.

16        THE COURT:  Okay.

17        MR. GRAVER:  So those are the two, I think,

18   jurisdictional difficulties that this Court has to go

19   through before we get to -- into the realm of a trial.

20        The other piece of this -- and this goes a little

21   bit more to the merits, is that the way in which the

22   present complaint is structured -- and if they want to

23   amend it, that would be their prerogative.  But the way

24   in which the present complaint is structured is a facial

25   challenge to whatever this amorphous policy may be.  And

 1    I read the complaint the same way that I think that your
 2    Honor did, or at least as you were walking it through
 3    before, which is that you have this general policy that
 4    seems to be focused on pro-Palestinian or pro-Hamas
 5    political activity, and in some instances what you have
 6    is, as you put it, "overzealous" enforcement,
 7    essentially excesses of a policy in some manner, but
 8    that is almost by definition not what is amenable to a
 9    facial challenge, not amenable to an across-the-board
10    challenge.
11         What the Supreme Court explained in *NetChoice* is
12    that for the kind of First Amendment claim they have
13    chosen to bring here, what plaintiffs' burden is -- and
14    this is a legal burden, not a factual burden, is showing
15    that the policy at issue has no legitimate sweep, no
16    legitimate sweep, and I think that's impossible here for
17    the reasons we detailed in the papers.
18         First and foremost is that, as you identified in
19    the -- where is it?  The Homeland Security memorandum,
20    as is true in the cites that my friends put in their
21    complaint, as is in our declarations, as is in the
22    President's executive order, what these policies or
23    actions or guidance target, within their four corners,
24    is unlawful conduct, it's antisemitic harassment, it's
25    violence, and you can see that again and again and again

1    in the papers you printed for us.  That lawful core is

2    sufficient, which no one I think contests, no one says

3    it's unlawful, and that defeats the --

4        THE COURT:  I - I -- I understand we're drifting

5    into the meat of the complaint, but, um, I did note the

6    difference in "tone," if you will -- not in "tone," the

7    difference in language, the plain and ordinary meaning

8    of the language of the President's executive orders, and

9    the, um, the documents that I posited were examples of

10   Homeland Security's policy.

11       The difference between that and the, um -- and I

12   want to choose my language with care, the sometimes more

13   strident language of the senior executive officers, or

14   their agents, which don't seem so tethered.  You follow

15   that what I'm saying.  That are not tethered to violent

16   antiseminism, but just talk about it generally.  And,

17   um, they're evidence that, when that comes from these

18   senior officers of our government -- and not to exclude

19   the President himself, um, that that unconstitutionally,

20   with all circumstances -- this is a motion to dismiss,

21   all the circumstances, that that chills the speech of

22   Americans.

23       MR. GRAVER:  So I think --

24       THE COURT:  Can't they come into court and have

25   that adjudicated?

1          MR. GRAVER:  So I think two points, your Honor,

2     um, maybe one first on standing and one on the merits.

3          The first on, at least the standing point, is what

4     I would caution against, is exactly what the Supreme

5     Court cautioned against in **Murthy**, which is not to

6     "treat the government as a monolith," and that's Justice

7     Barrett's phrase.

8          And essentially what happened there is the states

9     pressed a very similar theory of standing.  They

10    collected statements by someone over here, actions by

11    another person over there, something else by a third,

12    bundled that all together and said the collective force

13    of this is having downstream effects on speech.

14         What Justice Barrett said is that that does not

15    work especially in the third-party standing context

16    here, you need what she called "specific causation," you

17    need to target -- identify a specific injury traceable

18    to a discrete identifiable governmental act.  So I would

19    caution against the impulse, which I think this

20    complaint rests on, which is bundling it all together

21    and resting it there at 30,000 feet.

22         The other point -- and this is something too that

23    I think, um, this more goes to the merits, but something

24    too that had been pulled out of the papers, if we had

25    more space, is that there's a fundamental mismatch here

1    between I think the right that Americans are able to

2    raise in this context and the remedy that plaintiffs

3    need in order to have standing.  And the key points -- I

4    would point to the Supreme Court's decision in *Munoz*

5    from 2024 which clarified its prior decision in *Mandell*.

6         What the Supreme Court said is that, yes, it is

7    possible that Americans have substantive -- wait a

8    minute, Americans' substantive constitutional rights may

9    be burdened by immigration proceedings, much as they may

10   be burdened, for that matter, by a criminal trial, or

11   something of that sort.  But the Court says they're very

12   concerned about essentially allowing those incidental

13   injuries to collaterally attack and upend the entire

14   immigration system, which I think is pretty intuitive

15   how that might happen if that theory of standing became

16   boundless.

17        So what the Court established in *Mandell*,

18   reiterated in *Trump vs. Hawaii,* and held in *Munoz*, is

19   that what American citizens whose First Amendment rights

20   are burdened are entitled to is a facially legitimate

21   and bonified explanation, which as the Court clarified

22   in *Trump vs. Hawaii* is limited to a statutory cite

23   alone.

24        I think that is significant for present purposes,

25   for jurisdictional purposes, because the redress that my

1    friends need in order to have Article III standing

2    extends well well well beyond what their constitutional

3    right entitles them to.  Their constitutional right

4    entitles them to at most a facially legitimate and

5    bonified explanation.  What they're asking for is a

6    prophylactic injunction that shuts down much of the

7    immigration system as applied to a certain class of

8    people.  So I think that's just another, um, again

9    fundamental defect that rests with the complaint.

10           The theme -- the last point I just wanted to make

11   is I think these are not necessarily issues that get

12   ironed out by factual developments, these are legal

13   defects, because I think the complaint -- and to borrow

14   something that Judge Casper said in one of -- and this

15   is in *Greater Boston Legal Services*, one of the cases my

16   friends cite, is that, um, what -- yes, here we go, I'll

17   get the quote.

18           (Turns pages.)

19           You know it's a good quote and I had it, but now

20   it's gone.

21           (Pause.)

22           Okay, here we go.  "A plaintiff cannot attach a

23   policy label to their own amorphous description of

24   agency practices and create a case and controversy."  I

25   think that is the fundamental defect of this complaint,

1    I think that permeates each aspect of it.  To the extent

2    that the plaintiffs want to bring as-applied challenges

3    to what they deem are excesses of this amorphous policy,

4    that is the proper way that these can get adjudicated,

5    and we can fight about that there, but I think this

6    rests at too high a level of generality and involves too

7    many jurisdictional hurdles to merit going any further

8    than a motion to dismiss.

9         THE COURT:  Thank you.

10        Counsel?

11        MS. KRISHNAN:  Thank you, your Honor.

12        THE COURT:  I should call you by name, and forgive

13   me.  Your name again?  I'm sorry.

14        MS. KRISHNAN:  Not at all.  It's Ms. Krishnan.

15        THE COURT:  Yes, Ms. Krishnan.  I'll hear you.

16        MS. KRISHNAN:  The government started with the

17   INA, so that's where I will start as well.

18        I don't think your Honor has to resolve the

19   1252(f)(1) question on the motion to dismiss.  The

20   Supreme Court made clear, in *Biden vs. Texas,* that

21   (f)(1) is not a limit on jurisdiction, it goes only to

22   the scope of relief the District Courts and Circuit

23   Courts can afford in any particular case.  So it doesn't

24   go to jurisdiction.

25        And as to the government's complaint that 1252(g)

1    controls, and as our reply brief explained, we think

2    there are three reasons why 1252(g) is not a bar to

3    plaintiffs' claims in this case.

4         The first is that the claims are not by or on

5    behalf of an alien.  Plaintiffs here assert the First

6    Amendment rights of their citizen members and of the

7    organizations themselves, and the Supreme Court has made

8    clear that listener rights under the First Amendment are

9    distinct from and independent of any rights that a

10   willing speaker might possess.

11        THE COURT:  Is he not right though that

12   fundamentally this is an attack on the operations of the

13   INA?

14        MS. KRISHNAN:  I don't think so.  What the Court

15   has made clear about 1252(g) is that it strips

16   jurisdiction only over the three specific enforcement

17   actions mentioned in the declaration.  So the AD's

18   decision to commence proceedings, the decision to

19   adjudicate cases, and the decision to execute removal

20   orders.  And that's what the Court said in *Vullo*, that's

21   what a plurality of the Court said in *Jennings*.

22        And what the Court has made clear, and what the

23   First Circuit I think has also made clear in cases since

24   then, is that 1252(g) does not bar challenges to, for

25   example, policy choices, like the one at issue in this

1    case that we've alleged in our complaint, and even where

2    those policy choices might have downstream consequences

3    for removal.

4         So I think the Supreme Court's decision in **Regents**

5    is directly on point here, um, that involved a

6    rescission of DACA.  And the government made a similar

7    argument in that case, an argument that the memorandum

8    rescinding DACA in that case should be construed as an

9    initial decision to commence proceedings, and that was

10   an argument that the Court effectively rejected in

11   holding that 1252(g) did not control.

12        And one final point I want to mention on 1252(g),

13   is that I think that a cannon of constitutional

14   avoidance counsels strongly in favor of rejecting the

15   government's claim here.

16        The government argues that any claims here should

17   be bundled into a petition for review, um, that could

18   ultimately be heard by the Court of Appeals.  But that's

19   just not an avenue that is open here, because plaintiffs

20   are asserting the First Amendment rights of their

21   citizen members and their own rights as U.S.-based

22   organizations.  So if they can't raise their claims

23   here, they have no forum to raise those -- in which they

24   can raise those claims.

25        And what the Court has -- the Supreme Court has

said in cases like *Underbasin* is that a serious
constitutional question would arise if an agency statute
were interpreted to foreclose all judicial review of a
colorable constitutional claim of the kind that we
raised here.  And so for those reasons we don't think
1252(g) applies in this case.

On standing, um, my friend mentioned *Murthy*.  The
plaintiff's theory of standing in that case faltered for
two reasons, neither of which I think applies in this
case.

So the first reason is that the plaintiff in that
case didn't identify any specific speakers from which
they wanted to hear from.  We have.  The record is
replete with examples of plaintiff citizen members being
denied the inside suspected engagement of specific
noncitizens on topics related to Israel and Palestine.

The second reason that my friend alluded to was
that there wasn't a clear chain of causation in that
case, it was highly attenuated by the fact that the park
homes in that case had independent incentives to
moderate the content at issue.  And there was good
evidence in fact that the park homes would continue
taking down this content whether or not the government
pressured them to do so, and that was fatal in that
case.

1          Here there is a clear chain of causation.  The

2     noncitizen speakers that we pointed to have stopped

3     speaking because of the policy, and that is the entirely

4     predictable effect of the policy that we've alleged.  So

5     *Murthy* we don't think controls.

6          On *United States vs. Texas*, that case is not

7     apposite, that case was about nonenforcement decisions,

8     it involved claims that the executive branch should make

9     more arrests, more prosecutions, and the majority in

10    that case said, "Well this is a standing question that

11    almost never arises."  And so this is not -- that case

12    we don't make any claim that the government should be

13    making more arrests, more prosecutions, since we're not

14    intruding on its discretion in the way that the state's

15    claims in that case did.

16         Um --

17         THE COURT:  Is that -- that's how you distinguish

18    it?

19         MS. KRISHNAN:  Well I think that that is the way

20    to distinguish it.

21         THE COURT:  I accept that you do.  I mean I just

22    -- I'm asking.  Go ahead.

23         MS. KRISHNAN:  The majority there made clear that,

24    um, the case there was rare, it was a set of

25    circumstances that almost never arises, because what

```
1   they were challenging was nonenforcement decisions.  And
2   I think that that does distinguish this case.
3        And my friend then -- and I would also just
4   mention, before I move on, that I think accepting the
5   government's broader interpretation of that case would
6   foreclose any challenge to immigration enforcement
7   policies, and that's quite obviously not the case.  I
8   mean you could even see the *Regents* case as a challenge
9   to an immigration policy.  But the Court didn't hold
10  that the plaintiffs there lacked standing, um, because
11  it would intrude on enforcement priorities.
12       So now I want to just touch on the merits because,
13  um, because my friend touched on the merits too.
14       And so on this question of whether the policy
15  exists -- obviously now we're on a motion to dismiss.
16  We think we've done enough to plausibly allege the
17  existence of this policy.  We think that the Court can
18  take into consideration the, um, the various public
19  statements, um, judicial notice of the public statements
20  made in the news clippings that we have appended to the
21  --
22       THE COURT:  I'm not so sure that's right.  But,
23  um, I think I would say it in a different way.  I'm not
24  so sure I can take judicial notice of news clippings.  I
25  do think that the statements of senior executive
```

1    officials, and the President, who are in their official

2    capacities named as defendants here, and others acting

3    under their authority and at their direction, um, are so

4    closely intertwined with your complaint that on a motion

5    to dismiss I am prepared to accept that these people

6    said at least these -- I raised an issue when I was

7    talking about completeness, but I'm prepared to accept

8    that these people, as identified in the press, said

9    these things.  It's as though you allege that in your

10   complaint.  I think that's different than judicial

11   notice.  But, um, that's a minor point.  So, yes, as I

12   reflect on this, those will be before me.

13       Go ahead.

14       MS. KRISHNAN:  Thank you, your Honor.

15       So the government has denied the existence of the

16   policy.  That denial isn't credible.  There are a

17   mountain of statements of the kind that --

18       THE COURT:  But I can't make credible -- I can't

19   make credibility determinations.  I just said that I'm

20   going to accept that you pled that the people you have

21   named, in their official capacities, have said the

22   things that I have before me, and their agents -- and

23   I'm drawing inferences, but they're reasonable

24   inferences in favor of the plaintiffs, have likewise

25   said things.

1          Let me jump to a concern that I have that you
2     haven't addressed.
3          I have real problems with your claim of lack of
4     due process in the absence of statute or regulation to
5     which you can -- against which you can press.  I'm not
6     finding cases that guide me here.
7          MS. KRISHNAN:  Our due process claims, the
8     vagueness claims that we, um, make in the complaint is
9     intertwined I think with our First Amendment claim.
10    There are cases where courts have applied the void-for-
11    vagueness doctrine to agency policies, we've cited some
12    of those in our reply brief.  And the Court --
13         THE COURT:  But really it's hard for me to say,
14    "Well this policy is void for vagueness" when the
15    responsible official says "Well there is no policy."  So
16    the policy they deny is void for vagueness?
17         MS. KRISHNAN:  Well on a motion to dismiss, I mean
18    I -- we think we've done enough to plausibly allege the
19    existence of this policy.  So assuming that's true, um,
20    our argument on vagueness is that, um -- and again the
21    policy here is of deporting students and faculty on the
22    basis of their pro-Palestinian advocacy.  The outer
23    limits of what defendants here consider to be
24    pro-Palestinian advocacy of the kind that might subject
25    you to deportation I think is insufficiently unclear,

1    particularly given the First Amendment rights, the

2    important First Amendment interests at stake here, and

3    that is just the core of a void-for-vagueness claim.

4        And so just to, um, make -- to support our

5    argument that defendants have -- sorry, that we have

6    plausibly alleged the existence of a policy, the

7    statements that we would point to -- and some of these

8    are alleged in our complaint, um, is we think the

9    initial statement of the policy was made by Secretary

10   Rubio on March 9th when he tweeted, quote, "We would be

11   revoking the visas and/or green cards of Hamas

12   supporters in America so they can be deported."

13       In a series of statements that have been made

14   since then -- again many of them are included in our

15   complaint, they've made clear that they regard a broad

16   spectrum of pro-Palestinian speech, including antiwar

17   speech, to constitute support for Hamas.

18       And so you have, for example, the March 13th

19   interview given by the Deputy Secretary of DHS, Troy

20   Edgar, in which he was asked "Why Manuel Pelio was

21   deported?"  And he initially said "Support for Hamas."

22   When asked, "How did Pelio support Hamas?"  Edgar said,

23   "he put himself in the middle of basically

24   pro-Palestinian activity."

25       And then on March 28th, Secretary Rubio provided

1    -- um, made remarks to, um, "Meet the Press," in which

2    he was asked whether all recent student revocations

3    were, quote, "related to pro-Palestinian protest"?  And

4    at that time I think around 300 student visas had been

5    revoked.  And Rubio said in response, quote, "I think

6    there might be a few that are not, some are unrelated to

7    protest and are just having to do with criminal

8    activity."  And we think that that statement too was a

9    clear acknowledgement that they are revoking visas and

10   green cards on the basis of pro-Palestinian speech.

11       But of course we don't just point to statements

12   that have been made by defendant officials, we also

13   point to actions that they have taken that we allege

14   show that they are implementing the policy.

15       So we point to, for example, the fact that they've

16   attempted to deport many students and faculty explicitly

17   based on their, um, perceived pro-Palestinian or

18   anti-Israel expression.  We point to the fact that

19   they're supplying universities with the names of

20   students that they want to target.  We've also pointed

21   to the fact that they're trying to identify additional

22   targets including by launching new social media

23   surveillance and asking some number of university

24   students for the names and nationalities of

25   pro-Palestinian protesters.  And so we think that we've

1    done enough in the complaint to plausibly allege the

2    existence of this policy.

3          On the question of, um, whether we have, um,

4    plausibly alleged a First Amendment -- stated a First

5    Amendment claim, the government argues that we haven't,

6    largely I think based on this misassumption that what

7    we're challenging in this case are the two executive

8    orders that have been issued by the President.  That's

9    not what we're challenging, we're challenging the policy

10   that defendant agencies have adopted to implement those

11   executive orders.  And the policy, as we've stated it,

12   is about targeting people based on political viewpoint.

13         So I think, you know, it's clear that if you

14   accept, um, on the motion to dismiss, that we've

15   plausibly alleged that policy, um, then I don't see how

16   the government can possibly show, um, that that policy

17   had any plain illegitimate sweep.  We've certainly done

18   enough to show that it's unconstitutional in a

19   substantial number of its applications, which is the

20   test that applies when the First Amendment is at issue.

21         And --

22         THE COURT:  Do you wish to say a bit about

23   standing here?

24         MS. KRISHNAN:  Yes.

25         So I mean earlier I distinguished, um, *Murthy*,

1   which I think is the case that they primarily rely upon

2   to show that, um, we lack standing in this case.  And we

3   think that the complaint includes, um, lengthy

4   allegations which establish that plaintiffs and their

5   citizen members are experiencing real serious and

6   concrete harms.  We've identified 16 citizen members by

7   name, each of those citizen members identify specific

8   noncitizens that they have been unable to hear from and

9   engage with because of the policy.

10        And with respect to the plaintiff organizations,

11  um, we have alleged that, um, they have been harmed both

12  by having to divert resources away from their core

13  mission of promoting academic freedom and posturing

14  scholarly engagement, to instead, um, protecting their

15  member safety, for example, by connecting individual

16  noncitizen members with, um, legal support, because they

17  fear or are at imminent risk of deportation because of

18  their speech.

19        We also point to the fact that, um, many

20  noncitizens have been deterred from joining these

21  organizations in the first place, and that particularly

22  harms chapters like the Harvard Chapter, which is a new

23  chapter, and that many members have been deterred from

24  participating in events which, um, then disable these

25  organizations from being able to represent effectively

```
 1    the interests of all of their members.  And that is
 2    sufficient to establish their standing as organizations
 3    themselves.
 4         THE COURT:  Thank you.
 5         I do thank you both, this has been very helpful to
 6    the Court.  I deeply appreciate your skill and
 7    professionalism, both of you, in stepping up so
 8    promptly.  I'm taking the matter under advisement.
 9         So let's just analyze for a moment at least the
10    possibilities that occur to me.  You should take no --
11    draw no inference from this whatsoever.
12         I can see, um, three possibilities under the Rules
13    of Civil Procedure.  One, treating this as a motion to
14    dismiss, I can grant the motion and dismiss the case
15    with prejudice.  The plaintiffs of course have the right
16    then to appeal to the Court of Appeals.
17         I can, um, dismiss the case, but without
18    prejudice, and the plaintiffs then, consistent with the
19    Rule 11 good-faith pleading, could have the opportunity
20    to amend to deal with issues that the Court thinks are
21    at least addressable.
22         I could, third, um -- well I guess there are four.
23    I could allow the motion in part and deny it in part.
24         Or I could deny the motion.
25         For the moment it's appropriate to say, with the
```

1    motion to dismiss, "sub judice," as they say, "under

2    advisement," um, there'd be no discovery.  Again, having

3    collapsed this proceeding with trial on the merits, um

4    -- and this is another one, Mr. Graver, I'm making up,

5    the parties will understand that I will take it that the

6    defendant officials have denied -- without the necessity

7    of filing a particular pleading, though you're welcome

8    to, have denied all the substantive factual allegations

9    of the complaint.  So everything that is a substantive

10   factual allegation is taken to be denied.

11       If any of this survives -- and the Court will

12   enter a written order, that order will be followed by a

13   prompt status conference, because we need to discuss, as

14   professionals, how we're going to address the issues of

15   a trial.  In my mind they're not insurmountable at all,

16   but we need a case-management conference.  I'm not

17   signaling anything, but if you get an order and anything

18   survives, it will be immediately followed by a status

19   conference and we can talk further.

20       I was going to say that I look forward to working

21   with you, but that may tip the Court's hand, and I do

22   not mean that in any respect, so I'll say thus far it

23   has been a pleasure.  And I mean that professionally,

24   working with you, your arguments have been helpful to

25   the Court professionally.  I deeply appreciate them.  I

```
 1    take the matter most seriously and I will be working on
 2    it.
 3            But before I recess, are there any questions as to
 4    where we stand here?  I'm taking it under advisement.
 5            Ms. Krishnan?
 6            MS. KRISHNAN:  No, I don't think so.  Thank you.
 7            THE COURT:  Mr. Graver?
 8            MR. GRAVER:  No, your Honor.
 9            THE COURT:  And thank you.  Thank you all.
10            I appreciate it.  We'll take it under advisement.
11    We'll recess.
12            THE CLERK:  All rise.
13            (Ends, 11:15 a.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

1                    C E R T I F I C A T E

2

3          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

4     hereby certify that the forgoing transcript of the

5     record is a true and accurate transcription of my

6     stenographic notes, before Judge William G. Young, on

7     Wednesday, April 23, 2025, to the best of my skill and

8     ability.

9

10

11

12
      /s/ Richard H. Romanow 04-30-25
13    _____
      RICHARD H. ROMANOW  Date
14

15

16

17

18

19

20

21

22

23

24

25