# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

Badar KHAN SURI,

     *Petitioner-Plaintiff,*

v.

Donald J. TRUMP, in his official capacity
as President of the United States;

Russell HOTT, in his official capacity as
Field Office Director of Washington,
Immigration and Customs Enforcement;

Jeffrey CRAWFORD, in his official
capacity as Warden of Farmville Detention
Center;

Todd LYONS, in his official capacity as
Acting Director, U.S. Immigration and
Customs Enforcement;

Kristi NOEM, in her official capacity as
Secretary of the United States Department
of Homeland Security;

Marco RUBIO, in his official capacity as
Secretary of State; and

Pamela BONDI, in her official capacity as
Attorney General, U.S. Department of
Justice,

     *Respondents-Defendants.*

Case No. 1:25-cv-480

## AMENDED[1] PETITION FOR WRIT OF HABEAS CORPUS
## AND COMPLAINT

---

[1] Petitioner-Plaintiff files this Amended Petition and Complaint as a matter of course pursuant to
Fed. R. Civ. P 15(a)(1).

## INTRODUCTION

1.      This case concerns the government's targeted, retaliatory apprehension, detention, transfer, and attempted deportation of a postdoctoral fellow at Georgetown University based on his family connections, constitutionally protected speech, imputed speech, religion, and national origin. Petitioner-Plaintiff Dr. Badar Khan Suri ("Dr. Khan Suri") is a citizen and national of India and is in the United States in lawful status as a visiting scholar. The Trump administration has openly expressed its intention to weaponize immigration authorities to punish noncitizens whose views are deemed critical of U.S. policy as it relates to Israel. In this case, Respondents-Defendants are targeting Dr. Khan Suri due in part to his protected speech on this issue, but also because of his U.S. citizen wife's Palestinian origins, her constitutionally protected speech, her father's former employment, and his and his wife's Muslim religion, culminating, without reason or process, in Dr. Khan Suri's apprehension, arrest, and detention.

2.      On March 17, 2025, Dr. Khan Suri, a J-1 visa holder, was arrested, detained, and charged with removability under 8 U.S.C. §1227(a)(4)(C), a rarely-used provision of immigration law that allows the government to seek the deportation of an individual "whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States."

3.      This was done pursuant to a federal government policy ("the Policy") to retaliate against and punish noncitizens like Dr. Khan Suri who Respondents perceive to be supportive of Palestinian rights or critical of Israel because of their actual or imputed protected speech, viewpoint, religion, national origin, or associations—including associations with Palestinians.

4.      Under the Policy, Respondents, including Respondent Marco Rubio, the Secretary of State, identify such noncitizens. Once identified, the Department of Homeland Security

("DHS") apprehends and detains them, then transfers them to immigration jails far away from their families and attorneys to jurisdictions that Respondents perceive to be more favorable to them, and seeks to deport them from the United States.

5.      In this instance, pursuant to the Policy, Respondent Rubio identified Dr. Khan Suri and sought to apprehend, detain, transfer, and deport him. Respondent Rubio purportedly made a determination (the "Rubio Determination") that Dr. Khan Suri's presence or activities in the United States would compromise a compelling United States foreign policy interest ("Foreign Policy Ground"). Upon information and belief, Respondent Rubio made this purported determination based on Dr. Khan Suri's actual or imputed protected speech, viewpoint, religion, national origin, or protected associations, as well as his wife's protected speech, familial relationships, religion, and national origin. Based on the purported Rubio Determination, DHS agents arrested and detained Dr. Khan Suri, although not required to under immigration law. They then almost immediately transferred him to far-away immigration jails, and placed him in removal proceedings.

6.      The purported Rubio Determination and the government's subsequent actions, including its ongoing detention of Dr. Khan Suri 1,300 miles away from his home, in the same manner as the government did in the cases of Mahmoud Khalil, Leqaa Kordia, and Rumeysa Ozturk, isolating him from his wife, children, community, and legal team, are plainly intended as retaliation and punishment for Dr. Khan Suri's actual or imputed protected speech, viewpoint, religion, national origin, and associations, all in violation of the First and Fifth Amendments. Indeed, contemporaneous and subsequent statements by administration officials expressly confirm that Respondents targeted Dr. Khan Suri on these unlawful bases. The purported Rubio Determination and Dr. Khan Suri's unjustified detention and transfer also violate his due process

rights by targeting him pursuant to an unduly vague Policy and Determination and subjecting him to unlawfully punitive civil detention. Respondents' targeting of Dr. Khan Suri based on their discriminatory animus towards his wife's national origin constitutes intentional discrimination in violation of the Equal Protection guarantee of the Fifth Amendment. Finally, the government's unlawful Policy of targeting noncitizens, including Dr. Khan Suri, is arbitrary and capricious and contrary to law in violation of the Administrative Procedure Act, and carried out in violation of DHS's own policies in violation of the *Accardi* doctrine. Accordingly, this Court should enjoin the government's implementation of its unlawful Policy and order Dr. Khan Suri's immediate release.

## **PARTIES**

7.      Petitioner Badar Khan Suri is a citizen and national of India, and is in the United States in J-1 status as a visiting scholar and postdoctoral fellow. He was duly admitted to the United States on this visa in December 2022. He is married to a U.S. citizen, with whom he has three children: a nine-year-old son and five-year-old twins—a boy and a girl. He and his wife are practicing Muslims. At the time of his arrest, he was teaching a course as an adjunct professor on Majoritarianism & Minority Rights in South Asia at Georgetown University. He hopes to become a university professor and embark on a career in academia and teaching.

8.      Respondent Donald J. Trump is named in his official capacity as the President of the United States. In this capacity, he is responsible for the policies and actions of the executive branch, including the Department of State and Department of Homeland Security. Respondent Trump's address is the White House, 1600 Pennsylvania Ave. NW, Washington, DC 20500.

9.      Respondent Russell Hott is named in his official capacity as the Acting Field Office Director of the Washington Field Office for Immigration and Customs Enforcement ("ICE") within the United States Department of Homeland Security. In this capacity, he is responsible for the

administration of immigration laws and the execution of detention and removal determinations within the Washington Field Office's area of responsibility, including overseeing decisions to apprehend, detain, release, and transfer individuals in ICE custody. Respondent Hott was, upon information and belief, Petitioner's custodian at the time he filed his original habeas petition. Respondent Hott's address is Washington ICE ERO Field Office, 14797 Murdock St., Chantilly, VA 20151.

10.     Respondent Jeffrey Crawford is the Director of the Farmville Detention Center where, upon information and belief, Petitioner was detained when Petitioner's initial Petition for Writ of Habeas Corpus and Complaint was filed. Respondent Crawford's address is Farmville Detention Center, 508 Waterworks Dr., Farmville, VA 23901.

11.     Respondent Todd Lyons is the Acting Director of ICE. As the Senior Official Performing the Duties of the Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States; routinely transacts business in the Eastern District of Virginia; is legally responsible for pursuing any effort to remove the Petitioner; and as such is a custodian of the Petitioner. His address is ICE, Office of the Principal Legal Advisor, 500 12th St. SW, Mail Stop 5900, Washington, DC 20536-5900.

12.     Respondent Kristi Noem is named in her official capacity as the Secretary of Homeland Security in the United States Department of Homeland Security. In this capacity, she is responsible for the administration of the immigration laws pursuant to Section 103(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1103(a); routinely transacts business in the Eastern District of Virginia; is legally responsible for pursuing any effort to detain and remove the Petitioner; and as such is a custodian of the Petitioner. Respondent Noem's address is U.S.

Department of Homeland Security, Office of the General Counsel, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528-0485.

13.     Respondent Marco Rubio is named in his official capacity as the United States Secretary of State. In this capacity, among other things, he has the authority to determine, based on "reasonable" grounds, that the "presence or activities" of a noncitizen "would have serious adverse foreign policy consequences for the United States." Following such a determination, DHS may initiate removal proceedings under 8 U.S.C. § 1227(a)(4)(C)(i). In addition to his legal responsibilities under Section 237(a)(4)(C)(i), he routinely transacts business in the Eastern District of Virginia and as such is a custodian of the Petitioner. His address is United States Department of State, 2201 C Street, NW, Washington, DC 20520.

14.     Respondent Pamela Bondi is the Attorney General of the United States. In this capacity, she routinely transacts business in the Eastern District of Virginia; is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA; and as such is a custodian of the Petitioner. Respondent Bondi's address is U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001.

## **JURISDICTION AND VENUE**

15.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2241, Article I, §9, cl. 2 (the Suspension Clause) and Article III of the U.S. Constitution, the Administrative Procedure Act, 5 U.S.C. §701 et seq.; and 28 U.S.C. § 2201 (Declaratory Judgment).

16.     An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant declaratory and injunctive relief. *Id*. §§ 2201, 2202. The Court has additional remedial authority under the All Writs Act, 28 U.S.C. § 1651.

17.     Venue is proper in this district and division pursuant to 28 U.S.C. § 2241(c)(3) and 28 U.S.C. § 1391(b)(2) and (e)(1) because a substantial part of the events or omissions giving rise to this action occurred and continue to occur at ICE's Washington Field Office in Chantilly, Virginia within this district. The Washington Field Office directed Dr. Khan Suri's arrest and detention in Rosslyn, Virginia; told Dr. Khan Suri and his wife that he was being taken to the ICE Washington Field Office located in Chantilly, Virginia and then told Dr. Khan Suri that he was being taken to the Farmville Detention Center in Farmville, Virginia. Farmville Detention Center is Dr. Khan Suri's "original place of incarceration," *see United States v. Poole*, 531 F.3d 263, 275 (4th Cir. 2008), and his last known location at the time this habeas action was filed. To the extent the Washington Field Office and Respondents moved Dr. Khan Suri to Richmond, Virginia, and then to an airport and across the country to Louisiana around the time the original petition was filed, the Washington Field Office prevented Dr. Khan Suri from communicating this information to his wife and counsel.

## FACTS

### *Dr. Khan Suri's Background*

18.     Dr. Khan Suri is an Indian national who grew up in Uttar Pradesh, India. He obtained his undergraduate degree in Humanities, Geography, History and English from Jamia Millia Islamia in New Delhi, India, and his master's degree in Peace and Conflict Studies from the same university. In 2020, he completed his Ph.D. in Peace and Conflict Studies at the Nelson Mandela Center for Peace and Conflict Resolution at the same university.

19.     During the time he was in his master's program, Dr. Khan Suri traveled with a group of fellow students and prominent members of civil society to Gaza in 2011 as a humanitarian aid convoy. There, he met his future wife, Mapheze Saleh, who was volunteering along with other

college students as a translator for foreign delegations. Dr. Khan Suri returned to India after this trip, but continued to communicate with Ms. Saleh.

20. Ms. Saleh is a United States citizen of Palestinian descent who was born in Missouri. She lived in the United States until she was five years old. At that time, she moved to Gaza with her mother, but returned to the United States every summer to visit her father, who continued to reside in the United States.

21. Ms. Saleh's father is Ahmed Yousef, who is the director of the House of Wisdom and is a Professor of International Relations at the Islamic University of Gaza. Mr. Ahmed Yousef is an academic. Between 2006 and until he retired from civil service in 2010, he worked as a political advisor to the Prime Minister of Gaza and as deputy foreign minister in Gaza. The House of Wisdom works towards peace and conflict resolution in Gaza.

22. In 2013, Dr. Khan Suri returned to Gaza to ask for Ms. Saleh's hand in marriage. At that time, Dr. Khan Suri met Ms. Saleh's father for the first time, and asked for his blessing to marry Ms. Saleh. The couple became engaged, and Dr. Khan Suri again returned to India. He has not traveled to Gaza since, or seen his father-in-law in person since.

23. Since marrying Ms. Saleh, Dr. Khan Suri would speak by phone with his father-in-law every once in a while about family matters and his academic pursuits. They would usually speak annually on Eid—the two main annual Islamic holidays—to exchange pleasantries. Since Dr. Khan Suri's wife and children arrived in the United States in 2023, he has not spoken directly with his father-in-law.

24. In 2013, Ms. Saleh moved to New Delhi, India and she and Dr. Khan Suri were married. They remained in New Delhi, where they had three children, until Dr. Khan Suri moved to the United States in late 2022, and his wife and children reunited with him there in 2023.

8

25.     After completing his Ph.D., Dr. Khan Suri applied for and received a postdoctoral fellowship at Georgetown University at the Alwaleed Bin Talal Center for Muslim-Christian Understanding. Dr. Khan Suri and his wife wished to move to the United States because it ensures religious freedom for all, and they wanted to raise their children in a society that values religious tolerance.

26.     On December 10, 2022, Dr. Khan Suri arrived in the United States on a J-1 exchange visa to begin his fellowship at Georgetown, which began in January 2023. His wife and children arrived in the United States in November 2023. His children were admitted to the United States on derivative J-2 visas, and thus are dependent on their father's status to enter and remain in the country. He fears that his detention and threatened removal could put them at risk as well. The family lived together in Rosslyn, Virginia until Dr. Khan Suri's arrest.

27.     After the war in Gaza began in October 2023, Ms. Saleh lost several family members and friends and she began posting on social media, sharing information about the events occurring in Gaza.

28.     On not more than a handful of occasions, Dr. Khan Suri also made social media posts expressing support for the Palestinian people, criticizing the death toll in Gaza, affirming international law principles, and criticizing U.S. support for Israel's war in Gaza.

29.     Because of Ms. Saleh's identity as a Palestinian, her father's former role in the Gazan government, and the couple's social media posts, both Dr. Khan Suri and his wife have recently been doxxed. In February, Dr. Khan Suri and Ms. Saleh began seeing smear campaigns by Camera.org ("The Committee for Accuracy in Middle East Reporting and Analysis"), a lobbying and media monitoring group that spreads misinformation and seeks to discredit American

Muslims. Social media users have made comments on CAMERA's posts tagging federal agencies and law enforcement accounts.

30.    The couple have also been smeared by the Canary Mission, which runs an anonymous blacklisting website that creates profiles of individuals perceived to support Palestinian rights. This website is infamous for bullying, slandering, and defaming academics and students. Ms. Saleh is featured on the Canary Mission website with her photograph, academic affiliation, and former volunteer work. The Canary Mission page dedicated to Ms. Saleh identifies Dr. Khan Suri as her husband. The couple has also been the subject of several articles by Middle East Forum's Campus Watch project, an extremist, American conservative think tank.

***The Trump Administration's Hostile Campaign Against Noncitizens It Perceives as Supporting Palestinian Rights***

31.    Respondents' retaliation against Dr. Khan Suri is one application of Respondents' Policy to apprehend, detain, transfer, and deport noncitizens whom Respondents perceive are supportive of Palestinian rights or critical of Israel, because of their actual or imputed speech, viewpoint, religion, national origin, or protected associations, including associations with Palestinians.

32.    In the fall of 2023, thousands of students across the United States from a wide range of racial, ethnic, religious, and socioeconomic backgrounds began organizing on their campuses, many criticizing what they saw as the steadfast support of their universities and the U.S. government for Israel's policies in Gaza. Like Dr. Khan Suri and Ms. Saleh, these students expressed concern about the death toll in Gaza as a result of Israel's military operations.

33.    These campus protests resulted in opponents of these students' messages—including President Donald J. Trump—mischaracterizing campus speech in favor of Palestinian rights or critical of Israel as inherently supportive of Hamas and antisemitic. For example, in

several instances, President Trump described a Jewish lawmaker who had criticized Israeli Prime Minister Benjamin Netanyahu as "a proud member of Hamas" and "a Palestinian," using "Palestinian" as a slur.[2]

34.     During his campaign for re-election, President Trump repeatedly vowed to use visa revocations as a tactic to pursue his policy of silencing activities on university campuses that were supportive of Palestinian rights or critical of Israel.

35.     For example, at a rally in Las Vegas on October 28, 2023, Trump pledged to "terminate the visas of all of those Hamas sympathizers, and we'll get them off our college campuses, out of our cities, and get them the hell out of our country."[3]

36.     In the spring of 2024, Trump promised campaign donors that he would deport students advocating for Palestinian rights to get them to "behave." Upon information and belief, at a round table event in New York, he stated, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."[4]

37.     Similarly, in a social media post on his official X account on October 15, 2023, then-Senator Marco Rubio, referring to ongoing student protests in support of Palestinians, stated

---

[2] Niha Masih, *Trump draws condemnation for using 'Palestinian' as a slur against Schumer*, Washington Post (Mar. 13, 2025), https://www.washingtonpost.com/politics/2025/03/13/trump-schumer-palestinian-slur/.
[3] Andrea Shalal & Susan Heavey, *Trump administration to cancel student visas of pro-Palestinian protesters*, Reuters (Jan. 29, 2025), https://www.reuters.com/world/us/trump-administration-cancel-student-visas-all-hamas-sympathizers-white-house-2025-01-29/.
[4] Josh Dawsey, Karen DeYoung and Marianne LeVine, *Trump told donors he will crush pro-Palestinian protestors*, Washington Post (May 27, 2024), https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors/.

the U.S. should "cancel the visa of every foreign national out there supporting Hamas and get them out of America."[5]

***Respondents Adopt Unlawful Policy to Apprehend, Detain, Transfer, and Deport Noncitizens Whose Speech and Associations It Finds Objectionable***

38.     Shortly after assuming office on January 20, 2025, President Trump signed two executive orders aimed at fulfilling the above campaign promises: Executive Order 14161, titled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," signed on January 20, 2025, and Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism," signed on January 29, 2025.

39.     Executive Order 14161 states that it is the United States' policy to "protect its citizens" from noncitizens who "espouse hateful ideology." It further articulates the administration's desire to target noncitizens who "advocate for, aid, or support designated foreign terrorists and other threats to our national security," those who hold "hateful" views, and those who "bear hostile attitudes toward [America's] citizens, culture, government, institutions, or founding principles." The order's overly broad framing of "hostile attitudes" towards the American government could encompass any form of political dissent, including advocacy for Palestinian human rights.

40.     Executive Order 14188 states that, in order to "combat campus anti-Semitism," the administration will target for investigation "post-October 7, 2023, campus anti-Semitism." The order adopts a definition of antisemitism that includes constitutionally protected criticism of the

---

[5] Marco Rubio, *X* (Oct. 15, 2023, 4:24 p.m.), *available at* https://x.com/marcorubio/status/1713652113098539120. In the CNN interview he included as part of the same post, then-Senator Rubio stated that "people marching at universities" were "supporters of Hamas" and "need to go."

Israeli government and its policies.[6] In a fact sheet accompanying Executive Order 14188, the White House described the measure as "forceful and unprecedented," specifically targeting "leftist, anti-American colleges and universities." It framed the order as a "promise" to "deport Hamas sympathizers and revoke student visas," sending a clear message to all "resident aliens [sic] who participated in pro-jihadist protests" that the federal government "will find you… and deport you." The fact sheet did not clarify what would result in a noncitizen being categorized as a "Hamas sympathizer." In response to these Executive Orders and as part of an escalating attack on the core political speech at issue, certain groups opposed to Palestinian rights protests began publicizing the names of individuals they wanted the government to deport. Specifically, these groups compiled lists of students and faculty who had engaged in Palestine-related advocacy and, upon information and belief, submitted these lists to ICE's tip line, or publicly flagged names to U.S. Government official accounts.

41.    For example, organizations like the Middle East Forum, a rightwing, extremist American conservative think tank, have indicated that they are sharing information with the government based on their investigations into "national security issues."

42.    Canary Mission, an organization dedicated to targeting students, student organizations, and faculty who advocate for Palestinian rights, has similarly proclaimed it has identified "suspected foreign nationals" at U.S. universities that it would like to see deported.

---

[6] Executive Order 14188 refers to Executive Order 13899 for "interpretative assistance" regarding antisemitism. That Executive Order was issued by President Trump in 2019, 84 Fed. Reg. 68779 (Dec. 11, 2019), and it refers to the International Holocaust Remembrance Alliance's ("IHRA") definition of antisemitism. The IHRA definition of antisemitism includes criticism of Israel that is clearly protected under the First Amendment, such as "drawing comparisons of contemporary Israeli policy to that of the Nazis" or "claiming that the existence of a State of Israel is a racist endeavor." International Holocaust Remembrance Alliance, *Working definition of antisemitism*, available at: https://holocaustremembrance.com/resources/working-definition-antisemitism.

43.     Betar USA, an extremist rightwing group who has claimed credit for sharing information that led to the arrest by ICE of a Columbia student who had engaged in protected expression related to Palestine, has said that it has submitted to the Trump Administration a list of "thousands of names" of students and faculty from various universities whom they believe to be on visas, seeking to target them for detention and deportation.[7]

44.     In March 2025, media reports described widespread fear of retaliation for speech supportive of Palestinian rights among noncitizen students, faculty, and other university affiliates, noting that the executive orders "already appear to be chilling political activism."[8]

45.     On or before March 5, 2025, Respondents adopted the Policy by which they would retaliate against and punish noncitizens like Dr. Khan Suri.

46.     On March 6, 2025, the Department of State announced a program called "Catch and Revoke," an artificial intelligence driven effort to "cancel the visas of foreign nationals who appear to support Hamas or other designated terror groups."[9] Respondents would conduct an AI-assisted review of "tens of thousands of student visa holders' social media accounts," to look for evidence of "alleged terrorist sympathies."[10] The announcement did not clarify how the government would determine someone held "terrorist sympathies."

---

[7] Anna Betts, *Pro-Israel group says it has 'deportation list' and has sent 'thousands' of names to Trump officials*, The Guardian (Mar. 14, 2025), https://www.theguardian.com/us-news/2025/mar/14/israel-betar-deportation-list-trump.

[8] Ray Sanchez, CNN, *'Rules aren't clear anymore': Trump crackdown on student protestors send shock waves across US universities* (Mar. 18, 2025) available at https://www.cnn.com/2025/03/16/us/mahmoud-khalil-columbia-protests-free-speech/index.html.

[9] Marc Caputo, *Scoop: State Dept. to use AI to revoke visas of foreign students who appear "pro-Hamas,"* Axios (Mar. 6, 2025), https://www.axios.com/2025/03/06/state-department-ai-revoke-foreign-student-visas-hamas.

[10] *Id*.

47.     Under the Policy, the Trump Administration, including Respondent Rubio, would identify noncitizen students or faculty who they perceived were supportive of Palestinian rights or critical of Israel, based on their speech, imputed viewpoint, religion, or protected associations. Once identified, Respondent Rubio would purportedly make a determination, under 8 U.S.C. § 1227(a)(4)(C)(i), that he had "reasonable grounds to believe" that a noncitizen's presence or activities in the United States "would have potentially serious foreign policy consequences for the United States" ("Foreign Policy Ground"). Although not required under the Immigration and Nationality Act, e.g., 8 U.S.C. § 1226(c), DHS would apprehend and detain such individuals and transfer them in violation of ICE Policy 11022.1, in an effort to deport them quickly and thwart jurisdiction in states perceived to be less desirable in defending against challenges to the Policy. Under 8 U.S.C. § 1182(a)(3)(C)(iii), the Secretary of State's decision to refuse entry or deport a noncitizen on this ground cannot be based on the noncitizens "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless he "personally determines that" the noncitizens admission or continued presence in the United States "would compromise a compelling United States foreign policy interest."  He then has to notify certain members of Congress regarding this determination. 8 U.S.C. § 1182(a)(3)(C)(iv).[11]

***Application of the Policy and the Foreign Policy Ground to Noncitizens Whose Views the Trump Administration Finds Objectionable***

48.     On the evening of March 8, 2025, DHS agents first implemented the Policy when they arrested Mahmoud Khalil in New York under the Foreign Policy Ground and transferred him

---

[11] These requirements, which appear under the INA section on grounds of inadmissibility, are incorporated into the INA's foreign policy deportability ground by reference. *See* 8 U.S.C. § 1227(a)(4)(C)(ii).

to New Jersey and then to an immigration jail in Louisiana. Khalil is a student at Columbia University in New York who had been involved in the protests at the University against Israel's military actions in Gaza.

49.     The next day, on March 9, Secretary of State Marco Rubio stated, "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported."

50.     On March 10, President Trump issued a social media statement confirming that Khalil was targeted for his activism and vowed that other student protesters would be targeted as well: "ICE proudly apprehended and detained Mahmoud Khalil, a Radical Foreign Pro-Hamas Student on the Campus of Columbia University. This is the first arrest of many to come. We know there are more students at Columbia and other Universities across the Country who have engaged in pro-terrorist, anti-Semitic, anti-American activity . . . We will find, apprehend, and deport these terrorist sympathizers from our country — never to return again."

51.     On March 12, Secretary of State Rubio stated at a press conference, "if you tell us that you are in favor of a group like this [Hamas], and if you tell us . . . I intend to come to your country as a student, and rile up all kinds of anti-Jewish . . . antisemitic activities . . . we're gonna kick you out."

52.     In the days since Mr. Khalil's arrest, there have been reports of other instances of application of the apprehend, detain, transfer, and deport Policy.

53.     On March 13, Secretary of Homeland Security Kristi Noem announced that Leqaa Kordia, who had also participated in student protests and had been arrested on Columbia's campus in April 2024, was arrested by ICE in New Jersey and transferred to the same immigration jail in Alvarado, Texas where Dr. Khan Suri is being held.

54. On March 26, 2025, six plainclothes ICE officers arrested Rumeysa Ozturk, a Turkish Ph.D. student at Tufts University, who DHS alleges, "engaged in activities in support of Hamas." Ms. Ozturk co-authored an op-ed in her university's newspaper criticizing the university's response to students' call to divest from companies with ties to Israel's military action in Gaza. She was transferred to an immigration jail in Louisiana.

55. On March 27, in response to a question about Rumeysa Ozturk, Respondent Rubio said that the State Department may have revoked more than 300 visas, saying "Every time I find one of these lunatics, I take away their visas."

***Dr. Khan Suri's Retaliatory Apprehension, Detention, and Transfer***

56. On the evening of March 17, 2025, Dr. Khan Suri was coming back home from teaching and attending iftar (the evening meal eaten to break the daily fast during the holy month of Ramadan). He noticed a dark-colored vehicle that appeared to be following him and several other black, unmarked cars near his apartment building. As he was about to enter the building, a man wearing a face covering and dark military-like clothing approached him and asked if he was Badar. Dr. Khan Suri answered that he was. He noticed that several other officers were present nearby.

57. Dr. Khan Suri called his wife and asked her to come downstairs because he was being detained. After his wife arrived and asked the officers who they were, they responded they were from "Homeland Security." When he was in the car, Dr. Khan Suri asked that his wife be allowed to bring his passport and documents from inside the home. Ms. Saleh brought the documents, but the officers did not allow her to hand them to Dr. Khan Suri. Instead, the officers took Dr. Suri's passport and DS-2019 form.

58.     The officers then handcuffed Dr. Khan Suri in front of his wife and put him into one of the unmarked vehicles.

59.     Dr. Khan Suri repeatedly asked why he was being arrested. An officer told him that his student visa had been revoked. Dr. Khan Suri clarified that he had an exchange visa, not a student visa. The officer told him it was the same thing, and that it was also revoked. Once he was in the car, one of the officers stated to Dr. Khan Suri that he was being arrested because of his "social media," and that someone at a very high level at the Secretary of State's office does not want him there. One of the officers told him that he was going to be deported to his country. When Dr. Khan Suri asked when he would be deported, the officer responded: "today."

60.     Dr. Khan Suri was first taken to the ICE Washington Field Office in Chantilly, Virginia, where officers took his fingerprints and DNA swabs and completed paperwork. The ICE officers told Dr. Khan Suri that they were aware that he was not a criminal and had not done anything bad. They informed him that he would be transferred to the detention center in Farmville, Virginia, where he would be held, and that he had a hearing in immigration court in Texas on May 6. They allowed him to call his wife to relay this information.

61.     Dr. Khan Suri was then driven to the Farmville Detention Center, where he arrived in the middle of the night. He was under the impression that he would remain there until he was either deported or released.

62.     He was then moved to the ICE office in Richmond, Virginia, where he arrived around 6:00 a.m. on March 18. There, he was put in a cell and made to sit on a small bench, shackled, and was refused food and water, despite his repeated requests. He was also denied permission to call his wife.

63.     Later that day, Dr. Khan Suri was transported to an airport and loaded on an airplane. He was kept shackled at the hands, waist and ankles. The plane was old, and the flight turbulent. When using the bathroom on the plane, he was not permitted to close the door or remove his shackles. He was distressed and confused, and terrified that the plane might crash. He was not told where he was being flown, and feared he was being deported.

64.     The plane landed in Louisiana, and he was taken to the Alexandria, Louisiana Staging Facility, where he was held for three days. While in Louisiana, he expected to be deported soon, as multiple deportation flights were departing daily from Alexandria. One officer referred to the facility as a "super deportation center" and said that he should expect to be deported at any time.

65.     On the evening of March 20, an officer told Dr. Khan Suri that he would be sent to New York the next day.

66.     On March 21, he was then driven from Alexandria, Louisiana to Texas. He arrived at Prairieland Detention Center in Alvarado, Texas at around 8:00 p.m. Because he had fasted throughout the day in observance of Ramadan, he asked for food, but was denied.

67.     When he arrived in Texas, Dr. Khan Suri was not assigned to a bed in a dorm. Instead, he was housed in the "TV room," a common room where the television is on every day from 5:00 a.m. to 2:00 a.m. He was given a plastic frame that rests on the floor with a thin plastic mattress to sleep on, called a "boat bed," and no pillow. Due to these conditions, Dr. Khan Suri had pain in his ribs and was unable to sleep.

68.     Dr. Khan Suri requested religious accommodations, including Halal food, Ramadan fasting accommodations, a Quran, and a prayer mat. The only book available to him was the Bible. After approximately five days, he finally received Halal food. On April 2, officers came and told

19

him that he had complained through his lawyer about his religious accommodations and asked him for more details. After Dr. Khan Suri reaffirmed his needs, he was given a prayer mat, a Quran, and provided a space on a bed in the dorm, outside of the TV room.

69.     Dr. Khan Suri was issued a bright red uniform, usually reserved for detained individuals classified as high security based on their criminal history, alleged affiliations to criminal organizations, or institutional record. When he inquired about the reason for this, he was informed that he is classified as high-security based on his association with a known criminal group—presumably based on Respondents' unfounded claims of his connections to Hamas.

70.     Due to his classification and security protocols at the facility, Dr. Khan Suri is only permitted two hours per week of recreation. His movement within the facility is severely limited— he is not permitted to work or spend more time outside his dorm.

71.     Dr. Khan Suri and other individuals detained in Prairieland Detention Center are given used, dirty underclothing to wear and fed inadequate, unhealthy food.

72.     Dr. Khan Suri's detention has had profound negative impacts on his family. His wife and children miss him dearly and suffer every day that he is absent from their home. His children keep asking their mother when their father will come home. Dr. Khan Suri normally holds his older son every night at bedtime, helping him fall asleep. Lately, his son has been crying uncontrollably and has stopped speaking. He is worried especially about his older son.

73.     As a result of his detention, Dr. Khan Suri has been unable to speak freely about matters of public importance, including about Palestinians in Gaza and the federal government's targeting of noncitizens associated with Palestinian advocacy. He has also been prevented from freely associating with his wife and family.

*DHS's Apprehension of Dr. Khan Suri is Part of a Campaign to Suppress Protected Speech Through Arrest, Detention, Transfer, and Deportation*

74.     On March 19, Tricia McLaughlin, the DHS Assistant Secretary for Public Affairs, misleadingly posted on X that "Suri was a foreign exchange student at Georgetown University actively spreading Hamas propaganda and promoting antisemitism on social media. Suri has close connections to a known or suspected terrorist, who is a senior advisor to Hamas. The Secretary of State issued a determination on March 15, 2025 that Suri's activities and presence in the United States rendered him deportable under INA section 237(a)(4)(C)(i)."

75.     She did not specify what social media posts she was referring to; what "close connection" she was referring to; or who the "known or suspected terrorist" was.

76.     The purported Rubio Determination was exclusively motivated by Dr. Khan Suri's protected and imputed speech, viewpoint, religion, national origin, and protected associations. Public statements by government officials, up to and including the President and Secretary of State in cases for similarly situated noncitizens, invoking the same charge under 8 U.S.C. 1227(a)(4)(C)(i), establish that Respondents are punishing and attempting to silence Dr. Khan Suri by apprehending, transferring, and detaining him.

77.     When Dr. Khan Suri was booked at Chantilly, an ICE officer who was involved in his booking informed him that they knew he was not a criminal and did not do anything bad. He was also told by the arresting officer that someone at a very high level at the Secretary of State's office "does not want you here," confirming that Dr. Khan Suri was being targeted in a retaliatory manner pursuant to the Policy. The Foreign Policy Ground expressly prohibits the Secretary of State from excluding or conditioning entry based on a noncitizen's "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless the Secretary personally certifies to Congress that admitting the

individual would compromise a compelling U.S. foreign policy interest. *See id.* (citing INA § 212(a)(3)(C)(iii)). Upon information and belief, Secretary Marco Rubio has not provided any certifications regarding a determination under the Foreign Policy Ground concerning Dr. Khan Suri to the chairs of the House Foreign Affairs, Senate Foreign Relations, and House and Senate Judiciary Committees, as required by 8 U.S.C. § 1182(a)(3)(C)(iv).

78.     Nor could he. Legislative history reveals that Congress intended to limit the Executive's authority to exclude noncitizens based on their speech or beliefs. When the Moynihan Amendment was passed in 1987, the Senate Committee warned that "[f]or many years, the United States has embarrassed itself by excluding prominent foreigners from visiting the United States solely because of their political beliefs." The amendment was intended "to take away the executive branch's authority to deny visas to foreigners solely because of the foreigner's political beliefs or because of his anticipated speech in the United States," while affirming "the principles of the First Amendment." (S. Rep. No. 100–75 at 11, 100th Cong., 1st Sess. (1987), reprinted in 133 Cong. Rec. S2326 (1987)).

79.     Congress further evinced its intent to restrict the Executive's ability to exclude foreign speakers by asserting that such exclusions should not be based solely on "the possible content of an alien's speech in this country," that the Secretary's authority to determine that entry would compromise foreign policy interests should be used "sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies," and that the "compelling foreign policy interest" standard should be applied strictly. (H.R. Conf. Rep. No. 101-955, 101st Cong., 2nd Sess. (1990), reprinted in 1990 U.S.C.C.A.N. 6784, 6794). As an example, the same House Report on the amendment shared the case of the Shah of Iran as an illustration of where his "mere entry into the United States could [have resulted] in imminent harm

to lives or property of United States persons abroad or to property of the United States government abroad." *Id.*

80.     Respondents' failure to follow the procedures specified in the law they relied on to arrest Dr. Khan Suri, along with the statements by Respondents and other government officials, clearly demonstrate that the sole reason for Dr. Khan Suri's apprehension, transfer, and detention is his actual and imputed protected speech, viewpoint, religion, national origin, and protected associations.

***DHS Policies Related to First Amendment Activity and Transfers***

81.     DHS has issued a number of directives and policies that relate to First Amendment-protected activity and to transfers. Upon information and belief, these directives and policies were still operative when Dr. Khan Suri was detained and transferred.

82.     On May 17, 2019, during the first Trump Administration, DHS Acting Secretary Kevin McAleenan issued guidance to all DHS employees that "DHS does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights."

83.     On September 30, 2021, then-Secretary of Homeland Security Alejandro Mayorkas issued guidance to ICE providing that "[a] noncitizen's exercise of their First Amendment rights . . . should never be a factor in deciding to take enforcement action."

84.     ICE Policy 11022.1, "Detainee Transfers," prohibits the transfer of individuals from one Field Office's area of responsibility to another if, inter alia, they have immediate family, an attorney of record, pending or ongoing removal proceedings within the area, or if they have been granted bond or scheduled for a bond hearing, unless a Field Office Director or their designee deems the transfer necessary for one of the seven specific reasons identified in the policy.

85.     The policy states that "[t]he Immigration Officer will conduct a review to determine whether any of these factors exist. Before a transfer is made in a case where one or more of these factors exist, the transfer must be approved at the Assistant Field Office Director level or higher, and the reasons for the transfer must be documented in the detainee's A-File."

86.     The policy also states that ICE is required to notify the attorney of record that the individual "is being transferred and include the reason for the transfer and the name, location, and telephone number of the new facility as soon as practicable on the day of the transfer, but in no circumstances later than twenty-four (24) hours after the transfer occurs."

87.     Additionally, ICE Directive 11064.3, "Interests of Noncitizen Parents and Legal Guardians of Minor Children or Incapacitated Adults" requires the Field Office Director to refrain from transferring detained noncitizens outside of the Field Office's area of responsibility where their child or children are located unless dictated by exceptional circumstances or court order. Even when transfer is dictated, the Field Office Director must place the noncitizen as close as practicable to the minor child or children.

88.     At the time of his transfer to Louisiana and then Texas, Dr. Khan Suri had a wife and three young children, and an attorney of record, in Virginia.

89.     Upon information and belief, there was no justification provided for the transfers to Louisiana and Texas, and the transfers were not necessary. Virginia has two large, dedicated ICE facilities, Farmville Detention Center[12] and Caroline Detention Facility,[13] with collectively over 900 beds.

---

[12] ICE, Farmville Detention Center, *Memorandum of Record* (June 6, 2022), https://ica-farmville.com/wp-content/uploads/2022/06/2021-Annual-Review.pdf. ("The facility has 732 general population housing unit beds").
[13] Caroline Detention Facility, *Home* (2025), https://carolinedf.org/#:~:text=The%20Caroline%20Detention%20Facility%20(CDF,a%20part%

90.     Both facilities were operating nowhere near capacity at the time of Petitioner's apprehension. On March 17, 2025, the day of Dr. Khan Suri's arrest, ICE's bimonthly report to Congress demonstrates that the average daily population at Farmville Detention Center and Caroline Detention Facility was 488 and 284,[14] with capacities of 732 and 336, respectively. Farmville was only using 66% of its capacity and Caroline was only using 84% of its capacity.

91.     Upon information and belief, and contrary to the above directives and policies, DHS has issued a directive that all individuals who are subject to the Policy be transferred to detention centers in the south of the United States to jurisdictions that Respondents perceive will be more favorable to them, and where they will be far away from their families and attorneys, and therefore unable to promptly challenge their detention. Consistent with such a directive, three other individuals – Mahmoud Khalil, Leqaa Kordia, and Rumeysa Ozturk – were transferred under similar rushed circumstances from New York, New Jersey, and Massachusetts, respectively, to Louisiana and Texas.

## **CLAIMS FOR RELIEF**

### **FIRST CLAIM**

**Violation of the First Amendment to the United States Constitution**
***Freedom of Speech and Religious Exercise***

92.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition-Complaint as if fully set forth herein. The First Amendment to the United States Constitution provides in part that "Congress shall make no law . . . prohibiting the

---

20of%20the%20installation. ("The Caroline Detention Facility (CDF) is a 336-bed correctional facility").

[14] TRAC Reporting, (March 17, 2025)
https://tracreports.org/immigration/detentionstats/facilities.html.

free exercise [of religion] . . . or abridging the freedom of speech . . . or the right of the people . . .

to petition the Government for a redress of grievances." U.S. Const. Amend. I.

93.     The First Amendment protects past, present, and future speech, including speech

by noncitizens. *Bridges v. Wixon*, 326 U.S. 135, 148 (1945). "Speech critical of the exercise of the

State's power lies at the very center of the First Amendment." *Gentile v. State Bar of Nev.*, 501

U.S. 1030, 1034 (1991). Government discrimination against a particular viewpoint on a given

subject matter is an "egregious" First Amendment violation that "is presumptively

unconstitutional." *Matal v. Tam*, 582 U.S. 218, 248 (2017) (cleaned up). "The First Amendment

right of free speech includes not only the affirmative right to speak, but also the right to be free

from retaliation by a public official for the exercise of that right." *Constantine v. Rectors & Visitors

of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005). As noted *infra*, the First Amendment,

along with the Fifth Amendment, also protects the right to expressive and intimate association.

94.     The purported Rubio Determination and Policy and Dr. Khan Suri's targeting,

apprehension, transfer, and ongoing detention violate the First Amendment because they: retaliate

against and punish Dr. Khan Suri for his or his wife's past protected speech, or speech imputed to

him or his wife as a result of his family relationship, and for his religious exercise as a practicing

Muslim; prevent him from freely speaking and exercising his religion now (through detention);

attempt to chill (through past punishment and ongoing threat) or prevent (through eventual

removal) his future speech in the United States; deprive audiences of his present and future speech

on matters of public concern; and chill other individuals who express support for Palestinian rights.

95.     These speech-related consequences are not side effects of an action with some other

purpose; they are, instead, the point of the purported Determination and the government's

subsequent actions against Dr. Khan Suri and those similarly situated, in government officials'

own telling, the result of their disagreement with his religious exercise and his protected speech and the viewpoint it expresses.

## SECOND CLAIM

### Violation of the First Amendment and the Due Process Clause of the Fifth Amendment to the United States Constitution
### *Freedom of Association*

96.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

97.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." This means "[i]n our jurisprudence guilt is personal" such that "when the imposition of punishment on a status or on conduct can only be justified by reference to the relationship of that status or conduct… that relationship must be sufficiently substantial to satisfy the concept of personal guilt in order to withstand attack under the Due Process Clause of the Fifth Amendment." *Scales v. United States*, 367 U.S. 203, 224–25 (1961). Simply put, "guilt by association is a philosophy alien to the traditions of a free society." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 932 (1982).

98.    Respondents' invocation of the Foreign Policy Ground to apprehend, transfer, and continue detaining Dr. Khan Suri rests largely—and impermissibly—on his association with his wife, her protected speech, her national origin, and her familial background. Respondents are retaliating against and punishing Dr. Khan Suri based on an attenuated chain of familial associations: his marital tie to his wife, her familial tie to her father, and her father's former role in the government of Gaza.

99. Mere association is insufficient grounds to impart liability precisely because the Fifth Amendment's Due Process clause mandates a deprivation of liberty must be premised on a finding of "personal guilt." *Scales v. United States*, 367 U.S. at 224; *see also United States v. Hammoud*, 381 F.3d 316, 328 (4th Cir. 2004), *vacated and remanded on other grounds*, 543 U.S. 1097 (2005).

100. The Constitution protects both expressive association—the "right to associate for the purpose of engaging in those activities protected by the First Amendment"—and intimate association—*i.e.*, one's "choices to enter into and maintain certain intimate human relationships [that] must be secured against undue intrusion by the State." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984). Freedom of intimate association is a "fundamental element of personal liberty" guaranteed by the Due Process Clause. *Id*. It also stems from the First Amendment right to freedom of association. *See Rucker v. Harford Cnty., Md.*, 946 F.2d 278, 282 (4th Cir. 1991). Marriage is the paradigmatic example of intimate association. *Obergefell v. Hodges*, 576 U.S. 644, 646 (2015) ("Decisions about marriage are among the most intimate that an individual can make").

101. DHS' allegation that Dr. Khan Suri maintains "close connections with... Hamas" is premised, if on any facts at all, solely on his intimate association—his marriage—with his wife, and her national origin and parentage. Thus Dr. Khan Suri has no "personal guilt" necessary to deprive him of his rights under the Due Process Clause. To determine that Dr. Khan Suri's fact of marriage establishes a "sufficiently substantial" relationship to his wife's *constitutionally protected* speech—or *any* of his father-in-law's alleged beliefs, statements, activities, or associations—to manifest "personal guilt" justifying his deportation is guilt by association in direct contravention of the First and Fifth Amendments.

28

## THIRD CLAIM

### Violation of the Due Process Clause of the Fifth Amendment
### to the United States Constitution
### *Unlawful Civil Detention*

102.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

103.     The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

104.     The government's detention of Dr. Khan Suri is wholly unjustified. The government has not demonstrated that Dr. Khan Suri—a husband to a U.S. citizen, a father of three young children, and with no criminal history—needs to be detained. *See Zadvydas*, 533 U.S. at 690 (finding immigration detention must further the twin goals of (1) ensuring the noncitizen's appearance during removal proceedings and (2) preventing danger to the community). There is no credible argument that Dr. Khan Suri cannot be safely released back to his family.

105.     Moreover, Dr. Khan Suri's detention is punitive as it bears no "reasonable relation" to any legitimate government purpose. *Zadvydas*, 533 U.S. at 690 (finding immigration detention is civil and thus ostensibly "nonpunitive in purpose and effect"). The sole basis of his detention— the Foreign Policy Ground and the purported Rubio Determination—are unlawful for the reasons discussed *supra*. Here, there is every indication that his "detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Demore v. Kim*, 538 U.S. 510, 532-33 (2003) (Kennedy, J., concurring).

106.     The punitive nature of Dr. Khan Suri's detention is compounded by the degrading and harmful conditions in which he is being confined: he has extremely limited access to recreation

and contact with the outside world; he was initially denied the ability to practice his faith; until recently, he was forced to sleep on the floor of an overcrowded TV room, deprived of all but a few hours of sleep; he is being denied clean undergarments and adequate nutrition; and he is being subjected, with no valid basis whatsoever, to more severe restrictions and treatment than other detained individuals despite posing no danger to others.

## FOURTH CLAIM

### Violation of the Due Process Clause of the Fifth Amendment
### to the United States Constitution
### *Void for Vagueness*

107.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

108.    The Policy and the purported Rubio Determination violate Dr. Khan Suri's right to due process. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

109.    The government's policy of detaining, transferring to immigration jails in the South, and seeking to deport noncitizens who they perceive to hold views supportive of Palestinian rights or critical of Israeli or U.S. government policy based on those noncitizens' protected speech, imputed viewpoint, religion, or protected association is unconstitutionally vague.

## FIFTH CLAIM

### Violation of the Due Process Clause of the Fifth Amendment to the United States
### Constitution
### *Equal Protection*

110.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

111.    The Due Process Clause of the Fifth Amendment to the United States Constitution prohibits the Federal Government from denying equal protection of the laws to all persons within its jurisdiction, to the same extent as the Equal Protection Clause of the Fourteenth Amendment. *Adarand Constructors Inc. v. Pena*, 515 U.S. 200, 201 (1995).

112.    Respondents targeted Dr. Khan Suri for apprehension, detention, transfer, and deportation in part because of their discriminatory animus towards his wife's Palestinian origin and her connection to Palestine.

113.    Respondents thereby intentionally discriminated against Dr. Khan Suri on account of the national origin of his wife, in violation of the Equal Protection component of the Due Process Clause of the Fifth Amendment.

## SIXTH CLAIM

### Violation of the Administrative Procedure Act and the *Accardi* Doctrine

114.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein. The government has adopted a policy of targeting noncitizens for apprehension, detention, transfer, and removal based on First Amendment-protected speech advocating for Palestinian rights, imputed viewpoint, national origin, religion, and protected association. This policy, and its application to Dr. Khan Suri, is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C), and violates the *Accardi* doctrine and federal agencies' own rules, including its rules related to First Amendment protected activity and its rules related to transfers. *See Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

115.    In addition, the purported Rubio Determination that Dr. Khan Suri's "presence or activities would potentially have serious adverse foreign policy consequences for the United

States" and "would compromise a compelling United States foreign policy interest" is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C).

## SEVENTH CLAIM

### Release on Bail Pending Adjudication

116.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

117.    Under 28 U.S.C. § 2241, federal district courts are granted broad authority, "within their respective jurisdictions," 28 U.S.C. § 2241(a), to hear applications for writs of habeas corpus filed by persons claiming to be held "in custody in violation of the Constitution or laws or treaties of the United States." *Timms v. Johns*, 627 F. 3d 525 (4th Cir. 2010).

118.    This petition raises numerous substantial constitutional and statutory claims challenging Dr. Khan Suri's retaliatory detention. Extraordinary circumstances exist that make Dr. Khan Suri's release essential for the remedy to be effective. His detention prevents him from adequately litigating his removal proceedings.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Petitioner respectfully requests that this Court:

a.      Assume jurisdiction over this matter;

b.      Enjoin Respondents from applying the unlawful Policy of targeting noncitizens for apprehension, detention, and transfer based on First Amendment-protected speech advocating for Palestinian rights, their actual or imputed viewpoint in support of Palestinian rights, or their actual or imputed religion, national origin, or protected associations to Petitioner;

c.      Declare the Respondents' Policy of targeting noncitizens for apprehension, detention, and transfer based on First Amendment-protected speech advocating for Palestinian rights, their actual or imputed viewpoint in support of Palestinian rights, or their actual or imputed religion, national origin, or protected associations is unlawful;

d.      Order Respondents to transfer Petitioner back to the jurisdiction of this District pending these proceedings;

e.      Order the immediate release of Petitioner pending these proceedings;

f.      Order the release of Petitioner;

g.      Declare that Respondents' actions to apprehend and detain Petitioner violate the First Amendment, the Due Process Clause of the Fifth Amendment, the Equal Protection protections of the Fifth Amendment, and the APA;

h.      Award reasonable attorneys' fees and costs for this action; and

i.      Grant such further relief as the Court deems just and proper.


Dated: April 8, 2025                          Respectfully submitted,

                                              s/*Eden B. Heilman*
                                              Eden B. Heilman, VSB No. 93554
                                              Sophia Leticia Gregg, VSB No. 91582
                                              Vishal Agraharkar, VSB No. 93265
                                              Geri Greenspan, VSB No. 76786
                                              AMERICAN CIVIL LIBERTIES UNION
                                              FOUNDATION OF VIRGINIA
                                              P.O. Box 26464
                                              Richmond, VA 23261
                                              Tel: (804) 523-2152
                                              eheilman@acluva.org
                                              sgregg@acluva.org
                                              vagraharkar@acluva.org
                                              ggreenspan@acluva.org

Hassan Ahmad (VSB #83428)
THE HMA LAW FIRM, PLLC
6 Pidgeon Hill Dr, Suite 330
Sterling, VA 20165
T: 703.964.0245
hma@hmalegal.com

Nermeen Saba Arastu*
THE IMMIGRANT & NON-CITIZEN RIGHTS
CLINIC
MAIN STREET LEGAL SERVICES, INC.
CUNY SCHOOL OF LAW
2 Court Square, 5th Floor
Long Island City, NY 11101
Tel: (202) 246-0124
nermeen.arastu@law.cuny.edu

Diala Shamas**
Astha Sharma Pokharel**
Samah Sisay**
Baher Azmy**
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th floor
New York, NY 10012
Tel: (212) 614-6464
dshamas@ccrjustice.org
ssisay@ccrjustice.org
asharmapokharel@ccrjustice.org
bazmy@ccrjustice.org

Jessica Myers Vosburgh**
CENTER FOR CONSTITUTIONAL RIGHTS
P.O. Box 486
Birmingham, AL 35201
Tel: (212) 614-6492
jvosburgh@ccrjustice.org


* admitted *pro hac vice*
** *pro hac vice* application forthcoming

*Counsel for Petitioner*

**<u>VERIFICATION</u>**

Undersigned counsel submits this verification pursuant to 28 U.S.C. § 2242 on behalf of the Petitioner. Undersigned counsel has discussed with Petitioner the events described in this Amended Petition for Writ of Habeas Corpus and Complaint and, on the basis of those discussions, verifies that the statements in the Amended Petition and Complaint are true and correct to the best of our knowledge.

Dated: April 8, 2025                          *s/ Eden B. Heilman*_____

                                              Eden Heilman

                                              *Counsel for Petitioner Badar Suri Khan*

# **Exhibit B**

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF VERMONT

|  |  |
|---|---|
| MOHSEN MAHDAWI,<br><br>         *Petitioner*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; PATRICIA HYDE, in her official capacity as Acting Boston Field Office Director; Vermont Sub-Office Director of Immigration and Customs Enforcement; TODD M. LYONS, in his official capacity as Acting Director for U.S. Immigration and Customs Enforcement; KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; MARCO RUBIO, in his official capacity as Secretary of State; and PAMELA BONDI, in her official capacity as Attorney General of the United States,<br><br>         *Respondents*. | Case No. 2:25-cv-00389<br><br>**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR RELEASE UNDER *MAPP v. RENO***<br><br>**ORAL ARGUMENT REQUESTED** |

## MOTION FOR RELEASE UNDER *MAPP v. RENO*

Petitioner Mohsen Mahdawi respectfully moves for immediate release pursuant to this Court's inherent authority, detailed in the accompanying memorandum and exhibits. Mr. Mahdawi—a lawful permanent resident—has been imprisoned solely for engaging in protected speech. His continued detention is unconstitutional, inflicts irreparable harm, and chills free expression; prompt release is necessary to ensure meaningful habeas review and uphold core constitutional rights.

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

FACTS ............................................................................................................................... 1

   I.   ICE detained Mr. Mahdawi in retaliation for his speech advocating for Palestinian
      human rights ........................................................................................................... 1

   II.  Mr. Mahdawi's arrest and detention are part of a policy intended to silence and chill the
      speech of those who advocate for Palestinian human rights ............................................ 5

   III. Mr. Mahdawi is a long-time lawful permanent resident and a beloved member of the
      communities he has lived and studied in. ......................................................................... 7

   IV. This Court has authority to grant Mr. Mahdawi immediate release pending the
      adjudication of this habeas petition. ........................................................................... 9

   ARGUMENT ................................................................................................................. 9

     I. Mr. Mahdawi satisfies the requirements for release under *Mapp* ................................ 10

       A. Mr. Mahdawi raises substantial claims for habeas relief. ................................ 10

          1. First Amendment. ........................................................................................ 10

          2. Due Process. ................................................................................................. 12

          3. APA and *Accardi* Doctrine ...................................................................... 13

       B. The chilling of First Amendment protected speech is an extraordinary
         circumstance ................................................................................................ 14

       C. That Mr. Mahdawi is not a flight risk or danger to the community further
         bolsters that these are extraordinary circumstances. ....................................... 16

       D. These extraordinary circumstances make the grant of bail necessary to make
         the habeas remedy effective. ........................................................................ 17

       E. No INA Provision Bars this Court from Ordering Mr. Mahdawi's Release. ... 18

   CONCLUSION ............................................................................................................. 22

# TABLE OF AUTHORITIES

## Cases

*Aguilar v. U.S. Imm.& Customs Enforcement Div. of Dep't of Homeland Sec'y*, 510 F.3d 1 (1st Cir. 2007)...................................................................................................................20

*Arias v. Decker*, 459 F. Supp. 3d 561 (S.D.N.Y. 2020)......................................................18

*Avendaño Hernandez v. Decker*, 450 F. Supp. 3d 443 (S.D.N.Y. 2020) ......................9, 10

*Bello-Reyes v. Gaynor*, 985 F.3d 696 (9th Cir. 2021)....................................................11, 12

*Black v. Decker*, 103 F.4th 133 (2d Cir. 2024) ......................................................................12

*Boumediene v. Bush*, 553 U.S. 723 (2008)...........................................................................22

*City of Houston, Tex. v. Hill,* 482 U.S. 451 (1987) ...............................................................12

*Connick v. Myers*, 461 U.S. 138 (1983) ................................................................................10

*Coronel v. Decker*, 449 F. Supp. 3d 274 (S.D.N.Y. 2020) ...................................................10

*D'Alessandro v. Mukasey*, No. 08- CV-914, 2009 WL 799957 (W.D.N.Y. Mar. 25, 2009)...9, 14, 16

*Demore v. Kim*, 538 U.S. 510 (2003)...............................................................................13, 19

*E.O.H.C. v. Secretary U.S. Dep't of Homeland Sec'y*, 950 F.3d 177 (3d Cir. 2020) ......................20

*Elkimya v. Dep't of Homeland Sec.*, 484 F.3d 151 (2d Cir. 2007).........................................9

*German Santos v. Warden Pike Cnty. Corr. Facility*, 96 5 F.3d 203 (3d Cir. 2020)......................13

*Kiadii v. Decker*, 423 F. Supp. 3d 18 (S.D.N.Y. 2018)...................................................9, 14

*Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001)...................................................1, 9, 18, 22

*Matal v. Tam*, 582 U.S. 218 (2017).......................................................................................11

*Ozturk v. Trump*, 2:25-cv-00374-wks (D.Vt. April 18, 2025), Doc. # 104,  slip op at 29-32............19

*Ragbir v. Homan*, 923 F.3d 53 (2d Cir. 2019) ....................................................................11

*Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999)................................21

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) .............................11

*S.N.C. v. Sessions*, No. 18 Civ. 7680, 2018 WL 6175902 (S.D.N.Y. Nov. 26, 2018)......................9

*Smith v. Campbell*, 782 F.3d 93 (2d Cir. 2015) ..............................................................11

*Velasco Lopez v. Decker*, 978 F.3d 842 (2d Cir. 2020) ................................................................... 19

**Statutes**

5 U.S.C. § 706(2)(A)-(C) ................................................................................................................... 13

8 U.S.C. § 1182(a)(3)(C)(iii) ............................................................................................................. 4

8 U.S.C. § 1226(e) ............................................................................................................................. 19

8 U.S.C. § 1252(g) ............................................................................................................................. 20

# **INTRODUCTION**

On April 14, 2025, Petitioner Mohsen Mahdawi—a lawful permanent resident for 10 years—was forcefully detained by masked agents after his naturalization interview solely on the basis of his speech. Evidence provided by the government establishes that his incarceration is based on nothing else. The Supreme Court has held that "[o]fficial reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'" *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citing *Crawford-El v. Britton*, 523 U.S. 574, 588 n. 10 (1988)). Mr. Mahdawi has been imprisoned for one week as a result of his speech, and the government's retaliatory conduct has led to a chill in the speech of others.

This Court has the power, pursuant to its inherent authority, to release Mr. Mahdawi pending the adjudication of his habeas petition. *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001). The authority to release a habeas petitioner *pendente lite* ensures that the writ of habeas corpus remains an effective remedy under extraordinary circumstances. *Id.* at 230. And extraordinary circumstances have defined every aspect of Mr. Mahdawi's case—from his apprehension after his naturalization interview, to his detention for his constitutionally- protected speech. Moreover, Mr. Mahdawi is not a flight risk or danger to the community—rather, Mr. Mahdawi has deep community ties, a long history of being actively invested in the peace process, and nearly 80 individuals who can attest to his character. (Droubi Decl. Exs. 1-A–1-CA.**)** This Court should grant Mr. Mahdawi's immediate release.

# **FACTS**

I.    **ICE detained Mr. Mahdawi in retaliation for his speech advocating for Palestinian human rights**

Mr. Mahdawi was born and raised in Al-Fara'a refugee camp in the West Bank. (Mahdawi Decl. ¶4). There, he witnessed the deaths of friends, relatives, and community members due to Israeli

military violence. (*Id.* ¶ 4). At age 15, he was shot in the left leg by an Israeli soldier. (*Id.* ¶ 4.) He immigrated to the U.S. and transferred to Columbia University in 2021. (Id. ¶7.) Throughout his time at Columbia University, Mr. Mahdawi exercised his advocacy in different forms: public speeches, community engagement with people who held differing beliefs, and storytelling initiatives. (Mahdawi Del. ¶ 15; Droubi Decl. Exs. 1-A–1-CA.) Following Israel's military campaign in Gaza, which began in fall of 2023, Mr. Mahdawi felt compelled to speak up in support of the Palestinian people, in opposition to all forms of violence and war. (Mahdawi Decl. ¶¶ 4, 15.) Mr. Mahdawi attended protests opposing Israel's military campaign in Gaza and supporting Palestinian human rights. Id. He gave speeches at several of these protests. Id. In these speeches, Mr. Mahdawi advocated for respect for international law, a permanent ceasefire, and a peaceful resolution that affirmed the human dignity of all. Id. In February of 2024, Mr. Mahdawi applied for U.S. citizenship. (Mahdawi Decl. ¶ 6.)

Following the election of President Trump in November of 2024, individuals and groups that opposed human rights for Palestinians began to publicly demand that ICE detain Mr. Mahdawi for his speech on Palestinian rights and his involvement in advocacy efforts at Columbia. (*See, e.g.*, Petition ¶¶ 41, 49.) Many of these same groups targeted Mahmoud Khalil, another Palestinian lawful permanent resident, in the months leading up to Mr. Khalil's arrest and detainment by ICE. Id. at 40. Mr. Mahdawi was fearful of what appeared to be the Trump Administration's willingness to target and detain individuals on the basis of their speech. On January 30, 2025, one group posted on X that "Mohsen Mahdawi is on our deport list." In the weeks between Mr. Khalil's arrest and his own, Mr. Mahdawi stayed inside and said little publicly. (Mahdawi Decl. ¶ 21.) In a press conference on March 12, 2025, Secretary of State Rubio stated, "if you tell us that you are in favor of a group like this [Hamas], and if you tell us . . . I intend to come to your country as a student, and rile up all kind of anti-Jewish, anti-semitic activities, and "if you end up having a green card . . . we're going to kick

you out." Mr. Mahadawi understood these comments to be a statement of intent by the Administration to target people speaking out for Palestinian rights (Mahdawi Decl. ¶¶ 21.) Two days later, the same group posted that Mr. Mahdawi was "next and also on the deport list." He felt physically unsafe walking around New York. His speech had been effectively chilled and his physical safety compromised. (Mahdawi Decl. ¶ 21.)

On March 27, 2025 Mr. Mahdawi was notified by the United States Citizenship and Immigration Services ("USCIS") that his naturalization interview had been scheduled for April 14, 2025 in Colchester, Vermont. (Mahdawi Decl. ¶ 22.) This interview marked the final stage in Mr. Mahdawi's naturalization process, after ten years of living in the United States as a lawful permanent resident. (Mahdawi Decl. ¶ 23.) During those ten years, Mr. Mahdawi always complied with the conditions of his status. (Mahdawi Decl. ¶ 24.) This instance was no different. *Id.* Though he was concerned it might be a trap, Mr. Mahdawi appeared promptly in Vermont to complete his naturalization interview. (*Id.* ¶¶ 24-25.)

On April 14, 2025, Mr. Mahdawi attended the interview. (*Id.* ¶ 25.) He raised his right hand, answered all the questions that were asked of him truthfully, and signed a document that he was willing to "defend the Constitution and laws of the United States of America against all enemies, foreign, and domestic." (Mahdawi Decl. ¶¶ 27, 29.)

It was a trap. At approximately 12:00 P.M., the USCIS official informed Mr. Mahdawi that he needed to "check" on some information and would be right back. ICE agents, masked and visibly armed, entered the interview room and shackled Mr. Mahdawi. (Mahdawi Decl. ¶¶ 30-33.) He was separated from his immigration attorney, placed into a car, and the government immediately initiated the process of transferring him across state lines, over a thousand miles away, to Louisiana. (*Id.* ¶¶ 34-38.) Despite the government's attempts at a rapid transfer, at approximately 3:11 P.M., the Honorable Judge William K. Sessions III granted an Emergency Motion for a Temporary Restraining

Order enjoining the transfer or removal of Mr. Mahdawi from the District of Vermont or from the United States. *See* ECF No. 6. At approximately 5:57 P.M., the automated case information system for the Executive Office for Immigration Review still listed the venue of Mr. Mahdawi's Master Calendar Hearing to be in Louisiana under Judge Sherron Ashworth. (Droubi Decl. Ex. 1-CC.)

At the time of this motion, Mr. Mahdawi is being detained in the Northwest State Correctional Facility in St. Albans, Vermont, although the venue of his immigration proceeding is still listed as Louisiana in the Executive Office for Immigration Review Case Portal, which shows Mr. Mahdawi's next hearing date as being in Louisiana on May 1, 2025. (Isaacson Decl., Ex. 1.) The Notice to Appear served on Mr. Mahdawi by DHS charges that he is removable from the United States under section 237(a)(4)(C) of the Immigration and Nationality Act, 8 U.S.C. § 1227(a)(4)(C), because, it alleges, "The Secretary of State has determined that your presence and activities in the United States would have serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest." (Mahdawi Decl., Ex. 1., ¶¶ 1, 4.)

The phrase "compelling U.S. foreign policy interest" comes from a related provision, 8 U.S.C. § 1882(a)(3)(C)(iii), which requires the Secretary of State to make such a "determination" when Mr. Mahdawi's "beliefs, statements, or associations" would otherwise be "lawful within the United States." 8 U.S.C. § 1182(a)(3)(C)(iii), cited in 8 U.S.C. § 1227(a)(4)(C)(ii). Form I-213, which DHS attached to the version of the Notice to Appear filed in the proceedings, confirms this "determination," stating in relevant part that "[t]he determinations [made by the Secretary of State] are based on information provided by DHS/ICE/HSI that MAHDAWI, through his leadership and involvement in disruptive protests at Columbia University, has engaged in anti-Semitic conduct through leading pro-Palestinian protests and calling for Israel's destruction." (Isaacson Decl., Ex. 2, at 9; Form I-213 at 2.) Notwithstanding the falsehoods in these baseless allegations, these documents (1) constitute the only evidence presented by the government for his detainment, and (2) make clear

that the basis for Mr. Mahdawi's detention is his "lawful" speech and associations.

We ask this Court to suspend this unlawful retaliation and slow the grave threat to free speech posed by his continued detainment by releasing Mr. Mahdawi on bail.

## II.    Mr. Mahdawi's arrest and detention are part of a policy intended to silence and chill the speech of those who advocate for Palestinian human rights.

Mr. Mahdawi's arrest, transport, and detention are part of an effort by the Trump Administration to silence and chill speech supportive of the rights of Palestinians and critical of Israel's war in Gaza, especially on university campuses. Opponents of such speech, including President Trump, have mischaracterized it as inherently supportive of Hamas or antisemitic. On the campaign trail, President Trump promised to "terminate the visas of all those Hamas sympathizers and . . . get them the hell out of our country," and stated that foreign students would "behave" because "any student that protests, I throw them out of the country." (Petition ¶ 32.)

In January 2025, President Trump signed two Executive Orders to begin to fulfill his campaign promise of freezing speech in support of Palestinians. First, Executive Order 14161 declares the need to "ensure" that noncitizens in the United States "do not . . . advocate for, aid, or support designated foreign terrorists and other threats to our national security."[1] The Second Executive Order was published alongside a fact sheet, wherein White House promised "[i]mmediate action" to "investigate and punish anti-Jewish racism in leftist, anti-American colleges and universities."[2] The sheet "promises" to noncitizens "who joined in the pro-jihadist protests" that the government "will find you, and . . . deport you."[3] The President further promised to "quickly cancel

---

[1] Presidential Actions: *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats*, THE WHITE HOUSE (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-united-states-from-foreign-terrorists-and-othernational-security-and-public-safety-threats/.
[2] Fact Sheet: *President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism*, THE WHITE HOUSE (Jan. 30, 2025), https://www.whitehouse.gov/fact- sheets/2025/01/fact-sheet-president-donald-j-trump-takes-forceful-and-unprecedented-steps-to-combat-anti-semitism/.
[3] *Id.*

the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before."[4]

In early March 2025, the Trump Administration began targeting students who had spoken in support of Palestinians for visa revocation, removal, and arrest and detention. On March 7, DHS agents attempted to arrest a Columbia doctoral student Ranjani Srinivasan who had posted on social media and signed open letters related to Israel's war in Gaza. DHS released a statement characterizing her as being "involved in activities supporting Hamas."[5] In the ensuing days and weeks, ICE arrested Mahmoud Khalil, Rumeysa Öztürk, and Dr. Badar Khan Suri, and promptly sent all three to Louisiana detention facilities. The government also sought unsuccessfully to detain Yunseo Chung and Momodou Taal. A court temporarily prohibited Ms. Chung's detention[6] and Mr. Taal decided to depart the United States after being denied the same protection.[7]

By targeting Mr. Mahdawi in this draconian manner, the government has sent a chilling message nationwide: lawful permanent residents who exercise their right to free expression risk detention and deportation if their views diverge from those of the current administration.

Mr. Mahdawi was targeted for arrest, detention, transfer, and attempted deportation pursuant to the Trump administration's policy of targeting students for any speech about Palestine. After Mr. Mahdawi's arrest, the *New York Times* published portions of an unreleased memorandum by Secretary of State Marco Rubio ("the Rubio Memorandum"), that states that Mr. Mahdawi had been detained because the protests of the type that Mr. Mahdawi has been involved in could allegedly

---

[4] *Id.*

[5] VIDEO: Columbia University Student Whose Visa Was Revoked for Supporting Hamas and Terrorist Activities Used CBP Home App to Self-Deport, DEP'T OF HOMELAND SEC. (Mar. 14, 2025), https://www.dhs.gov/news/2025/03/14/video-columbia-university-student-whose-visa- was-revoked-supporting-hamas-and.

[6] Patrick Smith and Doha Madani, *Judge rules Columbia protester Yunseo Chung can't be detained as she fights deportation*, March 25, 2025, https://www.nbcnews.com/news/us-news/columbia-protester-yunseo-chung-sues-trump-administration-prevent-depo-rcna197927.

[7] Gloria Pazmino & Amanda Musa, Cornell student activist chooses to leave US after judge denies bid to immediately block deportation (Apr. 2, 2025), https://www.cnn.com/2025/03/31/us/cornell-student-activist-deportation/index.html.

undermine the Middle East peace process.[8] The Rubio Memorandum also asserted, without elaborating, that Mr. Mahdawi had "engaged in threatening rhetoric and intimidation of pro-Israeli bystanders," and that his actions had undermined efforts to protect Jewish students from violence.[9] In fact, the language "threatening rhetoric and intimidation" appears to come directly from a statement issued by Columbia University about the student protests, which was later retracted. (Droubi Decl. E.. 1-V.)  The government has yet to produce any evidence beyond its *ipse dixit* for these claims, which contradict Mr. Mahdawi's long and documented commitment to peaceful advocacy and to combating antisemitism. Clearly, the Defendants' claims are a façade to target clearly protected speech related to Palestinian human rights.

### III.  Mr. Mahdawi is a long-time lawful permanent resident and a beloved member of the communities he has lived and studied in.

Mr. Mahdawi has earned deep respect as a pillar of his Vermont and Columbia University communities, a top student, a trusted friend, a dedicated Buddhist, and a committed peacemaker. Ninety declarations attest to his character and contributions. (Droubi Decl. Exs. 1-A–1-CA.) He is set to graduate from Columbia University in May 2025, just one month after this motion. (Mahdawi Decl. ¶7-8.) Following his graduation, Mr. Mahdawi intends to return to Columbia University in the fall of 2025 to pursue a Master's at the School of International and Public Affairs ("SIPA") to study international conflict resolution and peacebuilding. (Mahdawi Decl.  ¶ 10; Droubi Decl. Ex. 1-CB.)

While living in Vermont, Mr. Mahdawi frequently invited his neighbors and others over for dinner, led outdoor hikes, and helped neighbors dig cars out from the snow. (Droubi Decl. Ex. 1-BX; 1-CA.) He was a member of the First Unitarian Church or Hartland Services where he sought unity and helped bridge political divides. (Droubi Decl. Exs. 1-BF; 1-BY; 1-BW.) In his community in

---

[8] Hamed Aleaziz and Jonah E. Bromwich, *U.S. Cites Mideast Peace Process to Justify Move to Deport Student,* New York Times (April 15, 2025), https://www.nytimes.com/2025/04/15/nyregion/rubio-mahdawi-deportation-letter.html.
[9] *Id.*

Vermont, he is known to "espouse[] and practice[] peace and co-existence." (Droubi Decl. Ex. 1-BV.)

As a student at Columbia University, Mr. Mahdawi served as the President of the Columbia Buddhist Association and co-founded the Palestinian Student Union ("Dar"). (Petition ¶ 25.) He spent his years at Columbia University working to create dialogues "to spread a call for a non-violent sustainable plan, . . . drafted jointly by Palestinians and Israelis." (Droubi Decl. Ex. 1-N.)  He made students, including those in the Jewish and Zionist communities at the University "fe[el] entirely safe and respected". (Droubi Decl. Exs. 1-K; 1-L; 1-T.) He "eased tensions on campus, not increased them", and "striv[ed] for reconciliation and peace". (Droubi Decl. Exs. 1-K; 1-P; 1-Q.)

In fact, University colleagues write, Mr. Mahdawi's "consideration for the individual humanity of others is unwavering" (Droubi Decl. Ex. 1-AF.). He is a "a bridge-builder and a man of peace." (Droubi Decl. Ex. 1-BE.) Numerous professors at Columbia note his focus on "peaceful change" (Droubi Decl. Ex. 1-AA.). After taking a Peace Making and Negotiations course at Columbia, Mr. Mahdawi worked with an Israeli student and their professor to organize a 4-to-5-day seminar retreat in the summer of 2024. (Droubi Decl. Ex. 1-W.) As an academic, Mr. Mahdawi is a "sophisticated thinker and theorist who sought to bring the academic tools he was acquiring in the classroom to bear on one of the most vexing contemporary political problems of his generation and mine: the Israeli-Palestinian conflict." (Droubi Decl. Ex. 1-V.)

Mr. Mahdawi "believes that overcoming injustice requires a deep commitment not only to non-violence, but to a holistic and transformative movement, rooted in loving kindness, that cares for the others' well-being." (Droubi Decl. Ex. 1-BI.) "Mohsen's respect for others, including Jewish students, [is] unmistakable." (Droubi Decl. Ex. 1-U.) "Of all the people I have had the pleasure of meeting, no one else inspires me so deeply. No one else commands so much of my admiration and my respect. No one else is as worthy of calling this land their home." (Droubi Decl. Ex. 1-L.)

As a Buddhist, Mr. Mahdawi believes in the "need to collectively come together as a global community with peace as the ultimate mission." (Droubi Decl. Ex. 1-D.) Mr. Mahdawi "took these precepts and values to heart," practicing meditation "to transmute anger into patience and hatred into forgiveness and love." (Droubi Decl. Ex. 1-F.) Mr. Mahdawi was known in the Buddhist community as "a dedicated and gifted community leader devoted to Buddhist values of mutual respect and understanding." (Droubi Decl Ex. 1-E.)

## ARGUMENT

**I.      This Court has authority to grant Mr. Mahdawi immediate release pending the adjudication of this habeas petition.**

This Court should release Mr. Mahdawi on personal recognizance, or alternatively on bail, pending adjudication of his petition pursuant to the Court's inherent habeas authority. *See Mapp*, 241 F.3d at 231; *Elkimya v. Dep't of Homeland Sec.*, 484 F.3d 151, 154 (2d Cir. 2007).

Numerous courts within this circuit have already ordered release pursuant to *Mapp* in contexts involving challenges to detention, removal, or a combination of both. *See, e.g.*, *Avendaño Hernandez v. Decker*, 450 F. Supp. 3d 443 (S.D.N.Y. 2020); *D'Alessandro v. Mukasey*, No. 08- CV-914, 2009 WL 799957 (W.D.N.Y. Mar. 25, 2009); *S.N.C. v. Sessions*, No. 18 Civ. 7680, 2018 WL 6175902 (S.D.N.Y. Nov. 26, 2018); *Kiadii v. Decker*, 423 F. Supp. 3d 18 (S.D.N.Y. 2018). This Court should do the same.

Under *Mapp*, "a court considering a habeas petitioner's fitness for bail" must analyze (1) whether the habeas petition raises "substantial claims" and (2) whether "extraordinary circumstances" exist "that make the grant of bail necessary to make the habeas remedy effective." 241 F.3d at 230 (cleaned up). To raise a substantial claim, "the Second Circuit does not require that the petitioner convince every court, let alone the court considering the bail application, that he *will* succeed; rather, he need only show that his claims are 'substantial.'" *D'Alessandro*, 2009 WL 799957, at *3 (emphasis in original). This standard is largely akin to demonstrating a "likelihood of

9

success." *See e.g.*, *id.* at \*3; *Kiadii,* 423 F. Supp. 3d at 20. At the same time, a broad range of circumstances may qualify as "extraordinary," including lack of flight risk or dangerousness, health issues, and the nature of the government behavior giving rise to the habeas claim. *See, e.g.*, *Coronel v. Decker*, 449 F. Supp. 3d 274, 289 (S.D.N.Y. 2020); *D'Alessandro*, 2009 WL 799957, at \*3. Where, as here, the petitioner would face "the very outcome they seek to avoid" if they remained in detention pending determination of the merits, release is necessary to make the habeas remedy effective. *See Coronel*, 449 F. Supp. 3d at 289.

## II.      Mr. Mahdawi satisfies the requirements for release under Mapp.

This Court should grant Mr. Mahdawi's motion for release on recognizance, or alternatively grant his release on bail. Mr. Mahdawi is, by the government's own admission, being held on the basis of his lawful speech. *See Avendaño Hernandez*, 450 F. Supp. 3d at 447. Each day Mr. Mahdawi remains in detention harms his education, hurts his community, stifles his speech, and rewards the government for its unconstitutional attempt to punish and chill those who speak about Palestinian human rights. Releasing Mr. Mahdawi pending final adjudication of his petition is necessary to preserve the effectiveness of the habeas remedy.

### A.  Mr. Mahdawi raises substantial claims for habeas relief.

Through his habeas corpus petition, Mr. Mahdawi seeks to protect his rights under the First Amendment, the Due Process Clause of the Fifth Amendment, the Administrative Procedure Act, and the *Accardi* doctrine.

1. *First Amendment.*   Mr. Mahdawi's substantial claim that he was arrested after his naturalization interview and detained because of views he expressed implicates the heart of the First Amendment.

Speech on "public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal

quotation marks omitted). Because "[i]t is a fundamental principle of the First Amendment that the government may not punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys," viewpoint discrimination is "an egregious form of content discrimination, which is presumptively unconstitutional." *Matal v. Tam*, 582 U.S. 218, 248 (2017) (Kennedy, J., concurring in part) (cleaned up); *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

Mr. Mahdawi's arrest and detention violate these core First Amendment principles as unconstitutional retaliation based on his protected speech. To succeed on his First Amendment retaliation claim, Mr. Mahdawi must show that: "(1) [he] has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by [the petitioner's] exercise of that right, [and] (3) the defendant's actions caused [the petitioner] some injury." *Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015) (cleaned up); *see also Bello-Reyes v. Gaynor*, 985 F.3d 696, 700 (9th Cir. 2021) ("A plaintiff making a First Amendment retaliation claim must allege that (1) [s]he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct.") (internal quotation marks omitted). Mr. Mahdawi easily satisfies this standard.

First, noncitizen speakers are protected by the First Amendment. *See Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and press is accorded aliens residing in this country.") This protection readily applies to Mr. Mahdawi's speech and advocacy in support of Palestinian human rights. The speech of a noncitizen on an issue central to "current political debate among American citizens and other residents" lies "'at the heart of First Amendment protection' and 'occupies the highest rung of the hierarchy of First Amendment values.'" *Ragbir*

11

*v. Homan*, 923 F.3d 53, 70 (2d Cir. 2019) (quoting *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011)), *cert. granted, remanded, and vacated sub nom. on other grounds*, *Pham v. Ragbir*, 141 S. Ct. 227 (2020)). Courts in this and other circuits have made clear that the First Amendment protects noncitizens who are detained and threatened with deportation because of their protected speech. *See, e.g.*, *id.*; *Bello-Reyes*, 985 F.3d at 698; *Gutierrez-Soto v. Sessions*, 317 F. Supp. 3d 917, 921 (W.D. Tex. 2018).

Second, there is no question that Mr. Mahdawi's speech was a substantial factor in the government's decision to arrest and detain him—indeed, the only justification that the government has provided since his arrest relates to his association with protests in support of Palestinian human rights and his "rhetoric."[10] "To allow this retaliatory conduct to proceed would broadly chill protected speech" of other noncitizens engaged in pro-Palestinian advocacy, extending the unconstitutional impact of Mr. Mahdawi's arrest and detention. *Ragbir*, 923 F.3d at 71.

Finally, the government's actions did injure, and continue to injure, Mr. Mahdawi. Indeed, few government actions could be more chilling on speech than a federal agency choosing to abruptly arrest and jail a person who had just finished the final stage of his naturalization process, who is a mere month away from graduating from college. *Cf. City of Houston, Tex. v. Hill,* 482 U.S. 451, 462-63 (1987) ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."). Both the fact and the nature of Mr. Mahdawi's arrest and detention are jarring, as the public outcry in response to the situation makes clear.

2.  *Due Process.*   Mr. Mahdawi's due process claims are also substantial. The Constitution

---

[10] Hamed Aleaziz and Jonah E. Bromwich, *U.S. Cites Mideast Peace Process to Justify Move to Deport Student,* New York Times (April 15, 2025), https://www.nytimes.com/2025/04/15/nyregion/rubio-mahdawi-deportation-letter.html.

establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Black v. Decker*, 103 F.4th 133, 143 (2d Cir. 2024) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690. Immigration detention is civil, not criminal, and thus only justified when necessary to ensure a noncitizen's appearance during removal proceedings and to prevent danger to the community. *See Black*, 103 F.4th at 143 (citing *Zadvydas*).

The government's detention of Mr. Mahdawi is wholly unjustified, as the government has not demonstrated that Mr. Mahdawi—a well-loved member of the communities that he belongs to and a man with no criminal record—is either a flight risk or a danger. *Cf. Zadvydas*, 533 U.S. at 690; Droubi Decl. Exs. 1-A–1-CA. Rather, Mr. Mahdawi's detention bears no "reasonable relation" to any nonpunitive government purpose. *See Zadvydas*, 533 U.S. at 690. Here, there is every indication that Mr. Mahdawi's "detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons," which violates the due process clause. *Demore v. Kim*, 538 U.S. 510, 532-33 (2003) (Kennedy, J., concurring); *see also German Santos v. Warden Pike Cnty. Corr. Facility*, 96 5 F.3d 203, 211 (3d Cir. 2020) ("[I]f an alien's civil detention . . . looks penal, that tilts the scales toward finding the detention unreasonable.").

3. *APA and* Accardi *Doctrine.* Finally, Mr. Mahdawi's APA and *Accardi* claims regarding his arrest and detention are substantial. The government has adopted an unconstitutional and unlawful policy of targeting noncitizen students for arrest, transport, and detention based on First Amendment-protected speech advocating for Palestinian rights. This policy is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. *See* 5 U.S.C. § 706(2)(A)-(C). Moreover, the government's actions present a classic violation of the

13

*Accardi* doctrine, as the government is violating its regular processes and rules, including those pertaining to First Amendment activity, in order to detain and deport Mr. Mahdawi. *Cf. Accardi v. Shaughnessy,* 347 U.S. 260 (1954) (agency may not violate its own rules and processes simply because Attorney General singled him out for deportation); *see also, e.g.*, DHS, Memorandum of Kevin McAleenan (May 17, 2019) (stating DHS "does not profile, target, or discriminate against any individual for exercising his or her First Amendment Rights").[11]

### B. The chilling of First Amendment protected speech is an extraordinary circumstance.

That Mr. Mahdawi was apprehended solely on the basis of his speech is an extraordinary circumstance warranting his immediate release. Courts look at the scope of the constitutional deprivation that a petitioner has experienced and the nature of the government's behavior surrounding a petitioner's detention to support a finding of extraordinary circumstances. *See, e.g.*, *D'Alessandro*, 2009 WL 799957, at *3 (listing "grossly defective" immigration custody reviews and petitioners unconstitutionally prolonged detention as two circumstances that qualified the case as extraordinary and exceptional). Mr. Mahdawi's case is extraordinary in every respect: he was detained during his naturalization interview, targeted solely for his protected speech, incarcerated for his speech, and faces additional irreparable harm to his education and liberty. *See, e.g.*, *Kiaddii*, 423 F. Supp. 3d at 20-21 ("Indeed, the Court wonders if the Mapp court could have imagined circumstances more extraordinary than the detention of a woman credibly claiming United States citizenship by none other than the immigration authorities. The Government's arguments that the habeas petition does not present an 'extraordinary circumstance' or support it with evidence is so mystifying that it practically shocks the conscience.")

And here, the government's motivations for Mr. Mahdawi's arrest and detention, and the

---

[11] *Available at* https://www.dhs.gov/sites/default/files/publications/info_regarding_first_amendment_protecte d_activities_as1_signed_05.17.2019.pdf.

14

way in which they implemented these actions, constitute extraordinary circumstances. With respect to the former, as described *supra*, the government targeted Mr. Mahdawi, a lawful permanent resident, solely because of his speech. No other justification has been offered besides Mr. Mahdawi's lawful expression relating to his beliefs. And as discussed *supra*, this justification plainly violates the First Amendment.

The manner in which the government effectuated Mr. Mahdawi's arrest and detention further underscores the existence of extraordinary circumstances justifying his release. The government's conduct in this case has been highly unusual, to put it mildly. *See, e.g.,* Heather Yountz Decl., Pl's Motion for Release, *Ozturk v. Trump*, No. 2:25-cv-00374, ECF No. 82, Ex. 4 ("In my 17 years of immigration practice . . . [t]he fastest transfer I recall seeing was 24 hours after initial placement."). Mr. Mahdawi was arrested at the end of his naturalization interview, with masked and armed ICE agents entering the room and rushing him into a black van and to the airport with a clear plan to ship him to Louisiana. (Mahdawi Decl. ¶¶ 29-39; Droubi Decl. at Ex. 1-CC.) In addition to chilling speech protected by the First Amendment, the government's actions also have the potential to prevent individuals from seeking naturalization. Non-citizens may view status check-ins or interviews with immigration officials as opportunities for them to be detained or arrested for their speech. Lawful permanent residents may opt not to seek naturalization at all for fear of landing in detention as retaliation for their speech or protest activity.

The government's attempts to rapidly transfer Mr. Mahdawi to Louisiana following his arrest heightened the extraordinary circumstances. *See, e.g.,* Jill Martin Diaz Decl., Pl's Motion for Release, *Ozturk v. Trump*, No. 2:25-cv-00374, ECF No. 82, Ex. 6 ("It is extraordinary for a Vermont detainee to be transferred from custody in the northeast to custody outside of the northeast."). In fact, the venue of Mr. Mahdawi's immigration proceeding has always been listed as Louisiana, demonstrating a prior intent to detain Mr. Mahdawi there. (Droubi Decl. Ex. 1-CC.) Had this Court

not issued a TRO enjoining his transfer, Mr. Mahdawi would likely now be detained in Louisiana, over a thousand miles away from his community and legal team. Indeed, the government followed this pattern in the arrests of students Mahmoud Khalil, Dr. Badar Khan Suri, Leqaa Kordia, and Rumeysa Öztürk: targeting them for their protected speech, ambushing them without notice, and rushing them to Louisiana to be detained far from home.

### C. That Mr. Mahdawi is not a flight risk or danger to the community further bolsters that these are extraordinary circumstances.

Courts consider a lack of evidence that a petitioner is a flight risk or a danger to the community to establish extraordinary circumstances. *See, e.g.*, *D'Alessandro*, 2009 WL 799957, at *3. In this case, "there is no evidence whatsoever" that Mr. Mahdawi poses such risks. *Id.* Rather, all evidence demonstrates Mr. Mahdawi's deep ties to his academic and social community and is an asset to his communities rather than a danger.

Vermont is Mr. Mahdawi's physical home, and Columbia University is Mr. Mahdawi's intellectual home. He poses no flight risk. Mr. Mahdawi is a month away from receiving his undergraduate degree at Columbia University. (Mahdawi Decl. ¶47.). He plans to begin a master's program at Columbia in fall of 2025. *Id.* ¶49. Declarant after declarant has sworn to Mr. Mahdawi's deep connectivity to the Columbia University campus and surrounding areas in the East Coast. (Droubi Decl. Exs. 1-A–1-CA.) Indeed, Mr. Mahdawi maintains a permanent residence in White River Junction, Vermont, which he shares with a roommate. (Mahdawi Decl. ¶ 2; Droubi Decl. Ex. 62.) In a statement published following Mr. Mahdawi's arrest, the city council of Hartford, Vermont affirmed that Mr. Mahdawi is "a neighbor, and a friend to many. He has added value as an educator, mediator, and relationship builder, and has an outpouring of support from his home of Hartford."[12]

Beyond Vermont and the Columbia campus, Mr. Mahdawi has no other home. He has spent

[12] https://www.hartford-vt.org/CivicAlerts.aspx?AID=815.

16

the last ten years building a life here in the United States. (Mahdawi Decl. ¶ 45.) Mr. Mahdawi has already demonstrated a history of compliance with immigration proceedings. (*Id.* ¶ 24.) He voluntarily appeared at his naturalization interview in Vermont, despite knowing that groups opposed to Palestinian rights had been targeting him and reporting his name to authorities. (Petition ¶¶ 41, 49.) Mr. Mahdawi is a cherished member of his community, not a danger to it. He has no criminal record, has demonstrated at every turn a commitment to peaceful advocacy, and has fostered friendships with individuals from all walks of life. (Droubi Decl. Ex. 1-J.) He has spoken up against antisemitism just as he has spoken up in support of Palestinian human rights. (Droubi Decl. Exs. 1-V; 1-K; 1-P; 1-Q.). His belief in the preciousness of human life extends to all people, regardless of their race, religion, national origin, or ethnicity, as numerous people have attested to. (Droubi Decl. Exs. 1-AQ; 1-F; 1-B.)

In sum, from start to finish, the circumstances of Mr. Mahdawi's case have been extraordinary and merit his release.

### D. These extraordinary circumstances make the grant of bail necessary to make the habeas remedy effective.

In light of what is described above, release pending the litigation of Mr. Mahdawi's petition is necessary to secure him an effective habeas remedy.

Mr. Mahdawi's challenge to the constitutionality of the government's decision to arrest and detain him is a significant part of the First Amendment injury at the center of this litigation. Even if Mr. Mahdawi is ultimately released at the conclusion of what could be protracted litigation, he will have been prevented from speaking freely all the while and the message to others will be received loud and clear: speak at your own peril. Allowing Mr. Mahdawi to remain in detention would ratify the chilling effect that the government intends to create. *Cf. Arias v. Decker*, 459 F. Supp. 3d 561, 580 (S.D.N.Y. 2020) (granting bail to avoid "precisely the harm their petition seeks to avert"). This is different from *Mapp*, where bail was ultimately denied because "[t]he relief

17

sought by petitioner" did not "guarantee[] . . . his release from detention" but only involved allowing him to apply for a particular waiver of deportation, and "the effectiveness of this form of relief [wa]s wholly independent of the question of whether Mapp [wa]s incarcerated while the [waiver] hearing [wa]s pending." *Mapp*, 241 F.3d at 230-231. Here, relief from the chilling effect on speech is indeed dependent on whether Mr. Mahdawi remains incarcerated. "The loss of First Amendment freedoms, for even minimal periods of time, constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Release is also necessary to avoid what is a devastating punitive consequence of Mr. Mahdawi's continued detention, namely, the disruption of his education. Mr. Mahdawi is expected to graduate from Columbia University in May of 2025, but his graduation is contingent on the completion of two classes that he is currently enrolled in. (Droubi Decl., Ex. 1-CB.) Every day that Mr. Mahdawi spends in captivity is a day that he is prevented from working towards his degree. And if he is prevented from graduating from his bachelor's degree program, he will also be prevented from beginning his master's degree at Columbia SIPA this coming fall. (Droubi Decl. Ex. 1-CB.)

### E.  No INA Provision Bars this Court from Ordering Mr. Mahdawi's Release

The INA[13] does not bar this Court from releasing Mr. Mahdawi, and could not do so without violating the Suspension Clause of the U.S. Constitution. At the very least, Mr. Mahdawi is sufficiently likely to prevail on the jurisdictional question that interim release is appropriate under *Mapp*.

To start, 8 U.S.C. § 1226(e) does not deprive this Court of jurisdiction to order Mr. Mahdawi's release. That section provides that "[t]he Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any

---

[13] Immigration and Nationality Act of 1952, 8 U.S.C. Ch. 12 (INA).

action or decision by the Attorney General under this section regarding the detention of any alien or the revocation or denial of bond or parole." 8 U.S.C. § 1226(e). The Court of Appeals for the Second Circuit has made clear, however, that this provision does not "limit habeas jurisdiction over constitutional claims or questions of law." *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020). Indeed, "Section 1226(e) contains no explicit provision barring habeas review" at all. *Demore v. Kim*, 538 U.S. 510, 517 (2003). This petition and this motion do not ask for review of a discretionary determination, but rather for habeas review of Mr. Mahdawi's unconstitutional detention and other constitutional claims and questions of law. Thus, under *Demore* and *Velasco Lopez*, § 1226(e) does not strip this Court of jurisdiction. Another judge of this Court recently so held with regard to a similar habeas petition filed by nonimmigrant student Rumeya Ozturk. *See Ozturk v. Trump*, 2:25-cv-00374-wks (D.Vt. April 18, 2025), Doc. # 104, slip op at 29-32.

Nor does 8 U.S.C. § 1252(a)(5), which provides that "a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter," 8 U.S.C. § 1252(a)(5), and which (unlike § 1226(e)) specifically precludes habeas review, have any bearing here. Mr. Mahdawi has not been ordered removed, and he does not seek review of any order of removal. As the District Court in *Ozturk* explained just days ago, 1252(a)(5) does not apply under these circumstances. *See Ozturk*, Doc. # 104, slip op. at 35-37.

For similar reasons, 8 U.S.C. § 1252(b)(9), though it also addresses habeas review, does not bar this action nor Mr. Mahdawi's interim release on recognizance or bail when it states that

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.

8 U.S.C. § 1252(b)(9). As Judge Sessions explained in *Ozturk*, constitutional questions relating to detention do not "aris[e] from" removal proceedings simply because the detention occurs during

the removal proceedings. *See Ozturk*, Doc. # 104, slip op. at 37-39.  The First Circuit, as well, has held that despite § 1252(b)(9), "district courts retain jurisdiction over challenges to the legality of detention in the immigration context."[14] This is an example of the general rule that "[w]hen a detained alien seeks relief that a court of appeals cannot meaningfully provide on petition for review of a final order of removal, § 1252(b)(9) does not bar consideration by a district court." *E.O.H.C. v. Secretary U.S. Dep't of Homeland Sec'y*, 950 F.3d 177, 180 (3d Cir. 2020).  A court of appeals cannot meaningfully provide, on petition for review of a final order of removal, review of whether someone should have been detained during removal proceedings, both because there may never be a removal order, and because if there is, the court of appeals cannot travel back in time and order that the person not be detained during the proceedings. *See id.* at 186.

Nor does 8 U.S.C. § 1252(g) pose a jurisdictional problem here. That section generally denies courts, outside of the petition for review process, "jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g). As the Supreme Court has clarified, however, section 1252(g) is not "a sort of 'zipper' clause" but rather "applies only to three discrete actions that the Attorney General may take: her "decision or action" to "commence proceedings, adjudicate cases, or execute removal orders." *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 482 (1999) ("*AADC*"). Mr. Mahdawi does not challenge, in this litigation, the government's decision to commence or adjudicate the proceedings against him, which the government could have done without detaining him; rather, he challenges the government's decision to detain him in violation

---

[14] *Aguilar v. U.S. Imm.& Customs Enforcement Div. of Dep't of Homeland Sec'y*, 510 F.3d 1, 11 (1st Cir. 2007). The legislative history of the REAL ID Act of 2005, which amended § 1252(b)(9), so states.  *See Aguilar*, 510 F.3d at 11; H.R.Rep. No. 109–72, *available at* https://www.congress.gov/congressional-report/109th-congress/house-report/72/1, at 175 (amendment "would not preclude habeas review over challenges to detention that are independent of challenges to removal orders").

of the Constitution. He is not challenging the execution of a removal order against him, since no such removal order exists. As Mr. Mahdawi is not challenging any of the "three discrete actions" implicated by § 1252(g), *AADC*, 525 U.S. at 482, that section plays no role.

Finally, we note that, if any provision of the INA did purport to preclude this Court from ordering the release of a lawful permanent resident detained on account of protected speech in violation of his right to due process of law, it would be—in a word—unconstitutional. This is not a case involving the rule that "Congress has the authority to detain aliens suspected of entering the country illegally pending their deportation hearings," *Reno v. Flores*, 507 U.S. 292, 296 (1993), because no one suggests that Mr. Mahdawi has entered the country illegally. He is a lawful permanent resident. He is being subjected to removal proceedings not based on any criminal conviction,[15] but solely based on the Secretary of State's arbitrary assessment of adverse foreign policy consequences, and that assessment in turn is based on activities protected by the First Amendment. Under those circumstances, the Suspension Clause of the United States Constitution protects Mr. Mahdawi's right to habeas review of his detention, and none of the relevant INA provisions purport to be a suspension of the writ.

The Suspension Clause provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. Art. I, Sec. 9, Cl. 2. Its protection extends to noncitizens without formal immigration status even when detained in Guantanamo Bay. *Boumediene v. Bush*, 553 U.S. 723 (2008). Surely its protection extends to Mr. Mahdawi, a lawful permanent resident detained in Vermont. Mr. Mahdawi seeks (among other relief) simple release from custody.

The possibility of a petition for review at the conclusion of removal proceedings is not "an

---

[15] *Cf. Demore v. Kim*, 538 U.S. 510, 522-531 (2003) (upholding mandatory detention of deportable "criminal aliens" for "the limited period necessary for their removal proceedings").

adequate substitute for habeas corpus," *Boumediene*, 553 U.S. at 771, with respect to the question of detention during these removal proceedings (whether or not it would also be inadequate in other contexts), since it would occur only in the event of a final removal order and only after that detention had already taken place.. *Cf. E.O.H.C.*, 950 F.3d at 186 (engaging in similar analysis as a matter of statutory interpretation). Thus, the Suspension Clause would not allow Mr. Mahdawi to be denied habeas review, and told instead to await review by a Court of Appeals of his detention on petition for review of a final removal order.

The Suspension Clause and the First Amendment would not allow Congress to prescribe the detention of lawful residents for their protected speech and eliminate judicial review of that detention. If the INA were construed to attempt to do so—which, for the reasons discussed above, it should not be—it would be unconstitutional. Thus, on both statutory and Constitutional bases, the Court has authority to order Mr. Mahdawi's release. That this is only a request for interim release, not a final ruling, changes nothing. No "specific statutory provisions," *Mapp*, 241 F.3d at 229, bar interim release here. The real question is who should bear the risk if the Court's first judgment on jurisdiction or the merits proves wrong. Where there is no flight risk or danger, that burden should fall on the government—not on Mr. Mahdawi, a lawful permanent resident jailed for his protected speech.

## CONCLUSION

For these reasons, the Court should grant this motion and order Mr. Mahdawi's immediate release. Release will end the extraordinary harms of his detention, restore the status quo, and ensure that habeas relief remains meaningful by allowing full and fair consideration of the serious constitutional issues at stake.

Dated: April 21, 2025
      Barre, Vermont

                            Respectfully submitted,

_____
Andrew B. Delaney
MARTIN DELANEY & RICCI LAW GROUP
100 North Main Street
Barre, Vermont 05641
andrew@mdrvt.com
P: 802-479-0568

Luna Droubi*
Matthew Melewski**
BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue, PH/26th Floor
New York, New York 10016
P: (212) 277-5875
F: (212) 277-5880

Cyrus D. Mehta*
David A. Isaacson
CYRUS D. MEHTA & PARTNERS PLLC
One Battery Park Plaza, 9th Floor
New York, New York 10004
P: 212-425-0555
F: 212-425-3282

CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.
Ramzi Kassem***
Naz Ahmad***
Mudassar Hayat Toppa***
Shezza Abboushi Dallal***
CUNY School of Law
2 Court Square, 5th Floor
Long Island City, NY 11101
Tel.: (718) 340-4558
ramzi.kassem@law.cuny.edu
naz.ahmad@law.cuny.edu
mudassar.toppa@law.cuny.edu
shezza.dallal@law.cuny.edu

*Attorneys for Petitioner*

\*Pro Hac Vice

\*\*Pro Hac Vice application pending

\*\*\*Pro Hac Vice application forthcoming

# Exhibit C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

MOHSEN MAHDAWI,

*Petitioner*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States; PATRICIA HYDE,
in her official capacity as Acting Boston Field Office
Director; Vermont Sub-Office Director of
Immigration and Customs Enforcement; TODD M.
LYONS, in his official capacity as Acting Director
for U.S. Immigration and Customs Enforcement;
KRISTI NOEM, in her official capacity as Secretary
of the United States Department of Homeland
Security; MARCO RUBIO, in his official capacity
as Secretary of State; and PAMELA BONDI, in her
official capacity as Attorney General of the United
States,

*Respondents*.

Case No. 2:25-cv-00389

## MOTION FOR LIMITED DISCOVERY

Petitioner Mohsen Mahdawi respectfully seeks leave to obtain targeted discovery from
Respondents—specifically, documents and testimony concerning the policy and decisions
underlying his detention—because his petition sets forth specific allegations of unconstitutional
retaliation. Good cause exists, and due process requires this discovery to adequately develop the
facts supporting his claims.

### BACKGROUND

On April 14, 2025, Mr. Mahdawi, a lawful permanent resident of the United States, was

arrested after a scheduled naturalization interview in Vermont. Dkt. No. 54 at 5. Unbeknownst to him, two weeks earlier, Respondent U.S. Secretary of State Marco Rubio had secretly issued a memorandum, pursuant to 8 U.S.C. § 1227(a)(4)(C)(ii), declaring Mr. Mahdawi deportable for his lawful speech and associations. Dkt. No. 42-1. Upon Mr. Mahdawi's arrest, the government began what it intended to be a journey to immigration detention in Louisiana. Dkt. No. 54 at 5–6. Before that could happen, Mr. Mahdawi's lawyers filed the underlying Petition for a Writ of Habeas Corpus and sought and received a temporary restraining order enjoining Respondents from removing him from the District of Vermont or the United States. Dkt. Nos. 1, 6, 34. On April 30, 2025, this Court released Petitioner on bail pursuant to *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001), determining that his petition raised substantial claims, and that this case presented extraordinary circumstances. Dkt. No. 54.

In his Petition, Mr. Mahdawi challenges the government's unconstitutional retaliation against him for his lawful speech protected by the First Amendment, by arresting and detaining him pursuant to a government policy to punish noncitizens for their speech and expressive conduct related to Palestine and Israel (the "Policy"). Dkt. No. 1. Under the Policy, Respondent Rubio issued determinations that particular noncitizens—including college students like Mr. Mahdawi—who protested against or criticized the Israeli government or who advocated in favor of Palestinians were, through their very presence, activities, or lawful speech inside the country, causing "potentially serious adverse foreign policy consequences for the United States" or "would compromise a compelling United States foreign policy interest." Dkt. No. 1 ¶ 4.

Mr. Mahdawi's Petition, *inter alia*, alleges that Respondents have targeted and detained him on the basis of his past protected speech, in violation of the First Amendment. The Petition also alleges that Mr. Mahdawi was detained without any legitimate government purpose, to punish him for his speech and to chill the speech of others, in violation of the Fifth Amendment's Due Process

2

Clause. Mr. Mahdawi now seeks leave from this Court to seek limited discovery from Respondents as to facts related to the Policy, the Rubio determinations, Mr. Mahdawi's detention, and other allegations in Mr. Mahdawi's Petition.

## MEMORANDUM OF LAW

This Court should grant leave for Mr. Mahdawi to seek discovery from Respondents because the specific allegations in Mr. Mahdawi's complaint show that additional facts will likely demonstrate that Mr. Mahdawi is entitled to relief in his habeas petition.[1]

### I.    STANDARD OF REVIEW

A district court may order discovery in a habeas case upon a showing of "good cause." *Bracy v. Gramley,* 520 U.S. 899, 904 (1997); *Drake v. Portuondo*, 321 F.3d 338, 346 (2d Cir. 2003); *Pizzuti v. United States*, 809 F. Supp. 2d 164, 175–76 (S.D.N.Y. 2011).  If a Petitioner makes "specific allegations" that provide "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Bracy*, 520 U.S. at 908-09 (cleaned up); *Drake,* 321 F.3d at 345-46.

This standard is reflected in Rule 6 of the Rules Governing Section 2254 and the Rules Governing Section 2255 Proceedings in the United States District Courts ("Habeas Rules"). Rule 6, 28 U.S.C.A. foll. § 2254; Rule 6, 28 U.S.C.A. foll. § 2255. Although the Habeas Rules specifically govern § 2254 and § 2255 cases, they also provide that a district court may apply these rules "to a habeas corpus petition not covered by" them. Habeas Rules 1(b). Courts routinely apply Rule 6 in § 2241 actions. *See, e.g.*, *Razzoli v. Fed. Bureau of Prisons*, 2013 U.S. Dist. LEXIS 99257, at *3

---

[1] The discovery requests that Petitioner seeks to serve on Respondents are attached as exhibits to this motion. As mentioned, *infra*, Petitioner also reserves the right to seek leave for additional depositions and/or discovery as the case progresses.

(S.D.N.Y July 9, 2013); *Toolasprashad v. Tryon*, 2013 U.S. Dist. LEXIS 52832, *5 (W.D.N.Y. April 11, 2013); *Annamalai v. Warden*, 760 F. App'x 843, 849–50 (11th Cir. 2019); *Gomes v. U.S. Dep't of Homeland Sec.,* 559 F. Supp. 3d 8, 11-12 (D.N.H. 2021). Unlike most cases governed by the Habeas Rules, however, here there is no underlying record or previous opportunity for discovery, *see Gomes*, 559 F. Supp. at 11, making discovery all the more important.

## II. THERE IS GOOD CAUSE FOR DISCOVERY

Mr. Mahdawi has made specific allegations that demonstrate he is likely entitled to relief. He should now be granted discovery to prove those allegations. The government's outrageous conduct and prior statements provide further evidence that factual discovery will support Mr. Mahdawi's claims.

### A. Mr. Mahdawi Has Made Specific Allegations That Provide Reason to Believe The Requested Discovery Will Support His Habeas Petition.

Mr. Mahdawi has alleged that the government has adopted a Policy to punish noncitizens for their speech and expressive conduct, and that the government specifically targeted and detained Mr. Mahdawi on the basis of activities protected by the First Amendment. The government detained Mr. Mahdawi, he alleges, to punish him for his speech and chill other speech, in violation of the First Amendment, and without due process in violation of the Fifth Amendment. These specific allegations, if proven, will demonstrate that Mr. Mahdawi should prevail on his First and Fifth Amendment claims.

In granting Mr. Mahdawi's motion for release under *Mapp,* 241 F.3d, this Court determined that Mr. Mahdawi has raised a "substantial claim" of First Amendment retaliation and Fifth Amendment due process violations. Dkt. No. 54 at 20, 22-23. This alone demonstrates the requisite "good cause" necessary to grant discovery. *See Williams v. Menifee*, 331 F. App'x. 59, 61 (2d Cir. 2009) (suggesting that "good cause" can be "based on the relative strength of [petitioner's]

constitutional claims"); *Salvagno v. Dir.*, 2017 U.S. Dist. LEXIS 233034, at *3 (D. Conn. 2017)

("Good cause may be found when a petition for habeas corpus relief establishes a prima facie claim

for relief.").

Furthermore, the nature of Mr. Mahdawi's claims suggest that additional facts are likely to

support Mr. Mahdawi's entitlement to relief. The Court has explained the factual showing Mr.

Mahdawi will have to make to prevail on his First and Fifth Amendment claims. In order to succeed

on his First Amendment claim, the Court explained that Mr. Mahdawi must prove "that the

government detained him in retaliation for his protected speech or to chill the speech of others."

Dkt. No. 54 at 19. He will succeed on his Fifth Amendment claim "if he demonstrates *either* that

the government acted with a punitive purpose *or* that it lacks any legitimate reason to detain him."

*Id.* at 22 (emphasis in original).

Each of these conclusions that Mr. Mahdawi must prove or demonstrate relates to the *intent*

or *motive* of the government in arresting and detaining him and/or the *evidentiary basis* for Mr.

Mahdawi's detention (or lack thereof). These are inherently fact-based inquiries, and Respondents

should be obligated to produce discovery related to these issues because, after such fact discovery,

Mr. Mahdawi may be able to demonstrate that he is entitled to relief. For example, additional facts

may provide further support to the allegation that Mr. Mahdawi was targeted specifically because

of his protected speech, and that he was detained to punish him or to chill the speech of others.

Additional factual discovery may show that the government adopted the Policy to suppress the

speech of noncitizens and detain them without any legitimate government purpose.

**B.    Respondents' Conduct And Statements Provide Reason to Believe The
Requested Discovery Will Support Petitioner's Habeas Petition**

Mr. Mahdawi's limited discovery requests, *see* Exhibits 1-5, seek to expand on publicly

available evidence supporting his claims. As Mr. Mahdawi explained in his Petition, and as this

5

Court recognized, there is already public evidence "of retaliatory intent." Dkt. No. 54 at 20. This evidence will help fully develop the facts, bolstering Mr. Mahdawi's ability to demonstrate that he is entitled to relief. *See Drake*, 321 at 346 (identifying prosecutorial behavior as sufficient evidence to grant discovery on whether prosecutors knew of perjured testimony).

For example, Executive Orders 14161 and 14188 explicitly target the content and viewpoint of noncitizens' speech. Section 2 of Executive Order 14161 directs Respondents to create a list of noncitizens to be deported. Exec. Order No. 14161, __ C.F.R. __, Sec. 2(b)-(c) (2025) ("the Secretary of Homeland Security shall take immediate steps to exclude or remove that alien"). Executive Order 14188's accompanying fact sheet states the government's intent to "punish anti-Jewish racism in leftist, anti-American colleges and universities" and to deport "Hamas-sympathisers on college campuses."[2] To comply with these policies, Respondents were directed to "identify" individual noncitizens, "submit" reports, and "recommend" further actions, all of which likely generated discoverable information.

Respondents should be obligated to produce discovery related to and derived from these Executive Orders because they explicitly state a Policy of targeting and punishing noncitizens like Mr. Mahdawi because of their constitutionally protected speech. Such discovery will likely show that Mr. Mahdawi is entitled to relief because he was targeted specifically because of his protected speech, and that he was detained without any legitimate government purpose, but rather to punish him and to chill the speech of noncitizens.

Prior to and since the presidential election, Respondents have repeatedly stated, in news reports, public statements, and on social media, their intent to target, detain, and deport noncitizens,

---

[2] "Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism," The White House (Jan. 30, 2025), available at https://www.whitehouse.gov/fact-sheets/2025/01/fact-sheet-president-donald-j-trump-takes-forceful-and-unprecedented-steps-to-combat-anti-semitism/.

specifically students, for speech the government does not like. For example, speaking in reference to Palestine-related protests, President Trump told donors: "Any student that protests, I throw them out of the country." Dkt. No. 1 ¶ 32. On social media site X, Secretary of State Marco Rubio wrote that the Trump administration "will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported." Dkt. No. 1 ¶ 44. In a press conference on March 12, 2025, Secretary of State Rubio stated, "if you tell us . . . I intend to come to your country as a student, and rile up all kind of anti-Jewish, anti-semitic activities, and "if you end up having a green card . . . we're going to kick you out." Dkt. No. 1 ¶ 48. These statements strongly suggest that Respondents discussed, made plans, solicited information, created lists and internal reports, and sought and received directives regarding green card and visa holders whose speech the government disfavors. That information will likely demonstrate that Mr. Mahdawi is entitled to relief, and the Court should order discovery accordingly.

The Rubio Memorandum filed by Respondents shows that Respondents possess facts that will likely demonstrate that Mr. Mahdawi is entitled to relief. The memorandum explains that the basis of the determination under INA § 237(a)(4)(C) is Mr. Mahdawi's "past, current or expected beliefs, statements, or associations that are otherwise lawful." Dkt. No. 42-1. In other words, First Amendment-protected activity. This also forms the basis of the Notice to Appear and the I-213. Dkt. No. 19-2. The Rubio Memorandum further provides that this determination is based on "information provided by DHS/ICE/HSI," and it includes a list of "[a]ttachments," including a "DHS Letter on Mohsen Mahdawi" and an "HSI Subject Profile of Mohsen Mahdawi," but those attachments have not been filed by the government in this case. Dkt. No. 42-1. Respondents should be ordered to disclose "the past, current or expected beliefs, statements, or associations" and the "information provided by DHS/ICE/HSI" (including the identified attachments to the Rubio Memorandum) because that information represents the factual basis for Mr. Mahdawi's detention and is likely to

further show that he is entitled to relief. *See* Exhibit 1 at Doc. Demand No. 3. Petitioner should also have the opportunity to question Respondent Rubio directly about the basis for and motivations behind his determinations. *See* Exhibit 2.

Other facts that support a finding of improper retaliatory motive will likely be elucidated through discovery. For example, the speed with which Respondents attempted to transfer Petitioner out of Vermont on a commercial flight to Louisiana, *see* Dkt. No. 54 at 5–6, is highly unusual; discovery will shed light on the details and motivation for the government's action. Similarly, the temporal proximity of Betar US posting on social media that "Mohsen Mahdawi is next and also on the deport list," Dkt.No. 1, ¶49, and Petitioner's arrest and detention, suggests that Betar's identification of Petitioner for his speech played a role in motivating Respondents' retaliatory action. Discovery will reveal the degree to which Respondents relied on Betar's communications and thus will bear on Petitioner's entitlement to relief. *See* Exhibit 1 at Doc. Demand No. 5; Exhibit 4 at Dep. Topic No. 4-5.

### III. THE SCOPE OF DISCOVERY IS LIMITED TO RELEVANT INFORMATION THAT WILL SUPPORT THE ESSENTIAL ELEMENTS OF PETITIONER'S CLAIMS

The scope and extent of discovery are committed to the discretion of the district court. *Bracy,* 520 U.S. at 909. Petitioner's discovery requests, attached hereto, seek only limited and relevant information that would support the essential elements of his claims.

### A. The Requested Discovery Supports The Essential Elements of Petitioner's Claims

Mr. Mahdawi seeks discovery to support the essential elements of his First and Fifth Amendment claims. The Court has previously identified the factual showing necessary to establish the essential elements of those claims. Dkt. No. 54 at 19-22; *supra* at Section II(A); *see Bracy,* 520 U.S. at 904 ("Before addressing whether petitioner is entitled to discovery under this Rule . . . we must first identify the 'essential elements' of that claim."). Consistent with that determination, the

attached discovery requests seek information tending to prove that: (1) the government detained Mr. Mahdawi in retaliation for his protected speech, (2) the government detained him to chill the speech of others, (3) the government acted with a punitive purpose, and/or (4) the government lacks any legitimate reason to detain him. More specifically, the discovery requests seek information concerning the Policy to punish noncitizens for their speech and expressive conduct related to Palestine and Israel, records that demonstrate Defendants' motivation and basis for invoking the Policy against Mr. Mahdawi, information related to the Rubio Memorandum, and records related to Mr. Madhawi's arrest, detention, and attempted removal from Vermont.

### B. The Requested Discovery Is Appropriately Limited to Relevant Information

Mr. Mahdawi seeks only limited discovery regarding his detention and the Policy that is relevant and reasonable in scope. As reflected in the proposed discovery requests attached hereto, he seeks, for example, limited records mentioning him by name or A-number, records concerning the Policy to punish noncitizens for their speech and expressive conduct related to Palestine and Israel, records that demonstrate Defendants' motivation and basis for invoking the Policy against Mr. Mahdawi, and records related to his arrest, detention and attempted removal from Vermont. The discovery requests are time-limited as well, seeking records from only the last five months. He requests only one Respondent deposition and one agency deposition. (*See, e.g.*, Exhibit 1 at Doc. Demand Nos. 1–4 and Schedule B ¶ 1; Exhibits 2 and 4.)

Further, Mr. Mahdawi asks the Court to order Respondents to provide responsive documents, admissions, and information within 14 days of entry of an order permitting discovery. There is good cause to permit discovery on this timeline, as it will allow the Court to move expeditiously toward final resolution of the habeas petition, including claims of current and ongoing chilling of Mr. Mahdawi's and other noncitizens' exercise of First Amendment-protected speech and association. *See Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 327 (S.D.N.Y. 2005) (applying "flexible standard

of reasonableness and good cause" to request for expedited discovery); *L.T. v. Zucker*, No. 1:21-CV-1034, 2021 WL 4775215, at *12 (N.D.N.Y. Oct. 13, 2021) (granting expedited discovery in First Amendment case under "reasonableness and good cause" standard). Additionally, the requested discovery overlaps substantially with ongoing discovery in a case involving similar claims, meaning that the additional burden on the government in complying with Petitioner's discovery requests here will be slight. *See* Order, *Am. Assoc. of Univ. Professors. v. Rubio* ("*AAUP*"), No. 25-cv-10685 (D. Mass. May 22, 2025) (Dkt. No. 98); Tr. of May 6, 2025, Hearing at 17:19–18:2, 18:23–19:2, 20:15–23, *AAUP,* No. 25-cv-10685 (Dkt. No. 87) (ordering discovery into retributive detention of Mr. Mahdawi and other noncitizens and specifying expectation that "the government . . . be absolutely fulsome in its disclosure of contemporaneous documents," including production of "every contemporaneous document that exists up and down the chain of command within the government bureaucracy that bears on [the issue of government retribution]"). Mr. Mahdawi also seeks leave to take one Respondent deposition and one 30(b)(6) agency deposition, reserving the right to seek leave to take additional depositions. (Exhibits 2 and 4.) Mr. Mahdawi asks the Court to order Respondents to complete depositions within 14 days of service of notice.

## CONCLUSION

For the foregoing reasons, the Court should find that good cause exists to grant Petitioner leave to conduct limited discovery.

Dated:      June 11, 2025                    Respectfully submitted,
            S. Woodbury, Vermont


/s/ Lia Ernst                                _____
Monica H. Allard                             Andrew B. Delaney
Hillary A. Rich                              **MARTIN DELANEY & RICCI LAW**
**ACLU FOUNDATION OF VERMONT**               **GROUP**
P.O. Box 277                                 100 North Main Street
Montpelier, VT 05601                         Barre, Vermont 05641
P: (802) 223-6304                            andrew@mdrvt.com
lernst@acluvt.org                            P: 802-479-0568


Nathan Freed Wessler*                        Luna Droubi*
Brett Max Kaufman*                           Matthew Melewski*
Brian Hauss*                                 **BELDOCK LEVINE & HOFFMAN LLP**
Esha Bhandari*                               99 Park Avenue, PH/26th Floor
Noor Zafar*                                  New York, New York 10016
Sidra Mahfooz*                               P: (212) 277-5875
**AMERICAN CIVIL LIBERTIES**                 F: (212) 277-5880
**UNION FOUNDATION**                         ldroubi@blhny.com
125 Broad Street, 18th Floor                 mmelewski@blhny.com
New York, NY 10004
P: (212) 549-2500
nwessler@aclu.org


Ramzi Kassem***                              Cyrus D. Mehta*
Naz Ahmad***                                 David A. Isaacson
Mudassar Hayat Toppa***                      **CYRUS D. MEHTA & PARTNERS PLLC**
Shezza Abboushi Dallal*                      One Battery Park Plaza, 9th Floor
**CLEAR PROJECT**                            New York, New York 10004
**MAIN STREET LEGAL SERVICES, INC.**         P: 212-425-0555
CUNY School of Law                           F: 212-425-3282
2 Court Square, 5th Floor
Long Island City, NY 11101                   *Attorneys for Petitioner*
Tel.: (718) 340-4558
ramzi.kassem@law.cuny.edu                    *Pro Hac Vice
naz.ahmad@law.cuny.edu
mudassar.toppa@law.cuny.edu                  ***Pro Hac Vice application forthcoming
shezza.dallal@law.cuny.edu

# Exhibit D

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

RÜMEYSA ÖZTÜRK,

*Petitioner*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States; PATRICIA HYDE,
in her official capacity as the New England Field
Office Director for U.S. Immigration and
Customs Enforcement; MICHAEL KROL, in his
official capacity as HSI New England Special
Agent in Charge, U.S. Immigration and Customs
Enforcement; TODD LYONS, in his official
capacity as Acting Director, U.S. Immigration and
Customs Enforcement; KRISTI NOEM, in her
official capacity as Secretary of the United States
Department of Homeland Security; and MARCO
RUBIO, in his official capacity as Secretary of
State,

*Respondents*.

Case No. 1:25-cv-10695-DJC

**FIRST AMENDED PETITION FOR
WRIT OF HABEAS CORPUS
AND COMPLAINT**

## <u>INTRODUCTION</u>

1.    Rümeysa Öztürk is an international PhD student who was arrested on March 25,

2025 when six plain-clothes federal officers surrounded her on the street just outside her home in

Somerville, MA. Rümeysa screamed as a man in a hooded sweatshirt grabbed her. Several other

officers encircled her and soon covered their faces with masks. Rümeysa was handcuffed and

escorted with an officer holding each arm into an unmarked vehicle. For more than 20 hours, her

friends, family and legal counsel could not locate or contact her. After an exhaustive search, they

learned that she had ultimately been removed from Massachusetts and sent more than 1,300

miles away to an ICE detention facility in Louisiana.

1

2.      Rümeysa has not been charged with any crime. Nor has there been any allegation that she is dangerous or a flight risk. Her arrest and detention appear to be based solely on her co-authorship of an op-ed in her school newspaper, *The Tufts Daily*, in March 2024. The piece criticized the University's dismissal of several resolutions that had been adopted by the undergraduate student Senate as "a sincere effort to hold Israel accountable for clear violations of international law." It articulated the goals of the resolutions and the disappointment of the authors before concluding with a request that the administration "trust in the Senate's rigorous and democratic process" and "meaningfully engage with and actualize the resolutions passed by the Senate."[1]

3.      Rümeysa's arrest and detention are designed to punish her speech and chill the speech of others. Indeed, her arrest and detention are part of a concerted and systemic effort by Trump administration officials to punish students and others identified with pro-Palestine activism. When asked about Rümeysa's case, Secretary of State Marco Rubio confirmed revoking her visa, adding, "we gave you a visa to come and study and get a degree, not to become a social activist that tears up our university campuses."[2]

4.      The Department of Homeland Security's website informs international students and the schools that host them that the termination of student status may result in a requirement to immediately depart the United States and may lead ICE agents to investigate whether a student has in fact departed. It makes no mention of arresting or detaining students based solely

---

[1] Rümeysa Öztürk, et al., *Op-ed: Try again, President Kumar: Renewing calls for Tufts to adopt March 4 TCU Senate resolutions*, THE TUFTS DAILY (Mar. 26, 2024), www.tuftsdaily.com/article/2024/03/4ftk27sm6jkj.
[2] *Secretary Rubio Defends Revoking Turkish Student's Visa*, C-SPAN (Mar. 27, 2025), https://www.c-span.org/clip/news-conference/secretary-rubio-defends-revoking-turkish-students-visa/5158479.

on the loss of status. In this case, however, DHS grabbed, arrested, and detained Rümeysa before she had received any notice of the revocation of her student visa or her student status.

5.  Rümeysa's arrest and detention are not a necessary or usual consequence of the revocation of a visa. But like the revocation of her visa, her arrest and detention are designed to silence her, punish her for her speech, and ensure that other students will be chilled from expressing pro-Palestinian viewpoints. Her continued detention is therefore unlawful. Because the government's arrest and detention violate the First and Fifth Amendments to the United States Constitution and the Administrative Procedure Act, Rümeysa should be released.

## **JURISDICTION**

6.  This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 2241 (habeas corpus); Art. I, § 9, cl. 2 of the United States Constitution (Suspension Clause); and 28 U.S.C. § 2201 (declaratory judgment).

7.  Venue is proper because Petitioner had been detained in the District of Massachusetts by Immigration and Customs Enforcement (ICE) in Massachusetts and under the custody and control of ICE officials in Massachusetts at the time of the filing of this petition. Defendant Patricia Hyde is the Director of the Boston Field Office of ICE Enforcement and Removal Operations (ICE ERO), with authority over ICE ERO's operations and detainees in New England. Additionally, Defendant Michael Krol is the Special Agent in Charge for the Boston office of ICE Homeland Security Investigations (HSI), with authority over HSI operations and detainees in New England. At the time this petition was filed, and when the Court issued an order requiring notice prior to any transfer of the petitioner out of Massachusetts, ECF No. 3, Rümeysa had only recently been arrested in Massachusetts and had not left the custody

and control of Defendants Hyde and/or Krol in Massachusetts.[3] Sometime after receiving that order, ICE officials transferred Rümeysa to Louisiana without notifying the Court, her counsel, or Department of Justice counsel on this case. Meanwhile, Respondents withheld information about Rümeysa's location from Petitioner's counsel (and apparently, from Department of Justice attorneys on this case) until nearly 24 hours after she had been detained. On information and belief, the movement of Petitioner to other states is consistent with, and part of, ICE's pattern and practice of moving people detained for their speech to distant locations incommunicado and in secret to frustrate the ability of counsel to file habeas petitions on their behalf.

## **PARTIES**

8.      Petitioner Rümeysa Öztürk is a PhD student at Tufts University.  She resides in Somerville, Massachusetts. Rümeysa entered the United States on an F-1 nonimmigrant student visa.

9.      Respondent Donald J. Trump is named in his official capacity as the President of the United States. In this capacity, he is responsible for the policies and actions of the executive branch, including the Department of State and Department of Homeland Security.

10.      Respondent Patricia Hyde is named in her official capacity as the New England Field Office Director for U.S. Immigration and Customs Enforcement.

11.      Respondent Michael Krol is named in his official capacity as the New England Special Agent in Charge for Homeland Security Investigations for U.S. Immigration and Customs Enforcement.

---

[3] Counsel for the government has stated that he "has been informed that Petitioner was detained outside of Massachusetts at the time the Petition was filed," but has not provided evidence of Rümeysa's location at the time the petition was filed, or suggested that she was not in the custody and control of ICE officials in Massachusetts, ECF No. 9 at 1 n.1.

12.     Respondent Todd Lyons is named in his official capacity as the Acting Director for U.S. Immigration and Customs Enforcement. As the Senior Official Performing the Duties of the Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States and is legally responsible for pursuing any effort to remove the Petitioner; and as such is a custodian of the Petitioner.

13.     Respondent Kristi Noem is named in her official capacity as the Secretary of Homeland Security. In this capacity, she is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(a) (2007); is legally responsible for pursuing any effort to detain and remove the Petitioner; and as such is a custodian of the Petitioner.

14.     Respondent Marco Rubio is named in his official capacity as the United States Secretary of State. In this capacity, among other things, he has the authority to determine, based on "reasonable" grounds, that the "presence or activities" of a noncitizen "would have serious adverse foreign policy consequences for the United States." Following such a determination, DHS may initiate removal proceedings under 8 U.S.C. § 1227(a)(4)(C)(i).

## FACTS

### *Rümeysa Öztürk*

15.     Rümeysa is a doctoral candidate in Child Study and Human Development at Tufts University. Rümeysa received a master's degree from Columbia University on a Fulbright scholarship.

16.     On March 26, 2024, almost exactly one year before her arrest, Rümeysa co-authored an op-ed in *The Tufts Daily*. The piece criticized Tufts University's response to several student Senate resolutions concerning human rights violations in Gaza. The authors urged

meaningful engagement by the University administration with the Senate resolutions.

17.     In February 2025, the website Canary Mission published a profile on Rümeysa, including her photograph, claiming she "engaged in anti-Israel activism in March 2024 . . . ." The profile describes Rümeysa as "a supporter of the Boycott, Divestment, Sanctions (BDS) movement." Its sole support for the contention that Rümeysa "engaged in anti-Israel activism" was a link and screenshots of the March 2024 opinion piece.

18.     Canary Mission's publication caused Rümeysa to fear for her safety.

### *Rümeysa's Arrest Near Her Home and Continued Detention in Louisiana*

19.     On March 25, 2025 at approximately 5:15 p.m., a hooded, plainclothes officer approached Rümeysa near her Somerville apartment.[4]

20.     The hooded officer grabbed Rümeysa by her wrists as she screamed. Additional officers surrounded Rümeysa as she pleaded with them. The officers placed Rümeysa in handcuffs and took her away in an unmarked vehicle.

21.     Rümeysa's friends frantically tried to find out more information about what had happened to her. At approximately 10:02 p.m., counsel for Rümeysa filed a petition for writ of habeas corpus in this Court.

22.      At approximately 10:55 p.m., the Court ordered that Rümeysa not be moved outside the District of Massachusetts without 48 hours' notice.

23.     For more than 24 hours after her arrest, Rümeysa's friends, family and legal counsel did not hear from her and could not speak to her.

24.     Because Rümeysa suffers from asthma, her family and friends worried that she

---

[4] WCVB Channel 5 Boston, *Surveillance shows Tufts graduate student detained*, YouTube (Mar. 26, 2025), https://www.youtube.com/watch?v=PuFIs7OkzYY.

6

could become ill without access to her medication.

25.     On the evening of her arrest, and on the following day, counsel made numerous attempts to locate Rümeysa.

26.     These efforts included contacting the offices of ICE ERO and ICE HSI. Counsel received no response to these inquiries. Counsel also called all major known ICE detention facilities in New England but were informed that Rümeysa was not there. Counsel attempted to locate her whereabouts through ICE's Online Detainee Locator System. Although the Detainee Locator indicated that Rümeysa was in ICE custody, the field for "Current Detention Facility" remained blank.

27.     A representative of the Turkish consulate went personally to ICE offices in Burlington, Massachusetts and was reportedly informed that Rümeysa was not in that office and that ICE could not provide further information about her whereabouts. Department of Justice counsel on this matter also informed counsel for Rümeysa that they could not locate her.

28.     Fearing Rümeysa could have had a medical episode, counsel contacted numerous area hospitals.

29.     At around 3 p.m. on March 26, counsel moved this Court for an order requiring Respondents to report on Rümeysa's whereabouts and permit her counsel to speak with her.

30.     Shortly thereafter, Department of Justice counsel informed Rümeysa's counsel that she had been moved to a staging facility in Alexandria, Louisiana to be transferred to South Louisiana.

31.     Counsel was finally able to speak to Rümeysa late in the evening of March 26. Counsel learned that she had suffered an asthma attack while en route to Louisiana.

7

*Rümeysa's Visa Revocation and Removal Proceedings*

32.     ICE uses the Student and Exchange Visitor Information System ("SEVIS") to maintain information on students who attend designated educational programs.

33.     A letter dated March 25, 2025, and addressed but not provided to Rümeysa stated that her SEVIS designation "has been terminated pursuant to 237(a)(1)(C)(i) and/or 237(a)(4)(C)(i) of the Immigration and Nationality Act."[5] *See* **Exhibit A**. On information and belief, a copy of the letter was provided to Tufts University.

34.     A Notice to Appear ("NTA") functions as a charging document for removal proceedings. *See* 8 U.S.C. § 1229(a).

35.     On March 25 ICE provided Rümeysa with an NTA. *See* **Exhibit B**. The NTA alleges, in part, that Rümeysa's visa "was revoked by the United States Department of State" on March 21, 2025. The NTA charges Rümeysa as deportable under INA § 237(a)(1)(B).[6]  The NTA provides no other basis for Rümeysa's removal.

36.     On information and belief, Rümeysa received no notice that her visa had been revoked prior to her arrest or the service of the NTA.

37.     The NTA indicates that Rümeysa is scheduled for an initial hearing on April 7, 2025 at 8:30 a.m.

---

[5] Section 237(a)(1)(C)(i) provides: "Any alien who was admitted as a nonimmigrant and who has failed to maintain the nonimmigrant status in which the alien was admitted . . . or to comply with the conditions of any such status, is deportable." 8 U.S.C. § 1227(a)(1)(C)(i). Section 237(a)(4)(C)(i) provides: "An alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." 8 U.S.C. § 1227(A)(4)(c)(i).
[6] Section 237(a)(1)(B) provides: "Any alien who is present in the United States in violation of this chapter or any other law of the United States, or whose nonimmigrant visa (or other documentation authorizing admission into the United States as a nonimmigrant) has been revoked under section 1201(i) of this title, is deportable." 8 U.S.C. § 1227(a)(1)(B).

***Rümeysa's Arrest and Detention are Part of the Trump Administration's Policy of Retaliating Against Noncitizens Who Advocate for Palestinian Rights***

38.     Rümeysa's arrest and detention reflect and are a part of the Trump administration's concerted effort to silence protected political speech.

39.     In the fall of 2023, thousands of students across the U.S. from a wide range of racial, ethnic, religious, and socioeconomic backgrounds began organizing on their campuses, many criticizing what they saw as the steadfast support of their universities and the United States government for Israel's policies. Opponents of these students' messages—including President Trump—have characterized their message in favor of Palestinian rights as inherently supportive of Hamas and antisemitic.

40.     During his campaign for re-election, President Trump repeatedly vowed to use visa revocations as a tactic to pursue his policy of silencing pro-Palestinian activities on university campuses.

41.     For example, at a rally in Las Vegas on October 28, 2023, Trump pledged to "terminate the visas of all of those Hamas sympathizers, and we'll get them off our college campuses, out of our cities, and get them the hell out of our country."

42.     In the spring of 2024, Trump promised campaign donors that he would deport pro-Palestinian student demonstrators to get them to "behave." Upon information and belief, at a round table event in New York, he stated, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."

43.     Similarly, in a social media post on his official X account on October 15, 2023, then-Senator Marco Rubio, referring to ongoing student protests in support of Palestinians, stated

the U.S. should "cancel the visa of every foreign national out there supporting Hamas and get them out of America."

### *The Trump Administration Announces its Policy to Target Speech of Noncitizens*

44.     Shortly after assuming office on January 20, 2025, President Trump signed two executive orders aimed at fulfilling the above campaign promises: Executive Order 14161, titled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," signed on January 20, 2025, and Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism," signed on January 29, 2025.

45.     Executive Order 14161 states that it is the United States' policy to "protect its citizens" from noncitizens who "espouse hateful ideology." It further articulates the administration's desire to target noncitizens who "advocate for, aid, or support designated foreign terrorists and other threats to our national security," those who hold "hateful" views, and those who "bear hostile attitudes toward [America's] citizens, culture, government, institutions, or founding principles." The order's overly broad framing of "hostile attitudes" towards the American government could encompass any form of political dissent, including advocacy for Palestinian human rights.

46.     Executive Order 14188 states that, in order to "combat campus anti-Semitism," the administration will target for investigation "post-October 7, 2023, campus anti-Semitism." The order adopts a definition of antisemitism that, applied to speech, would punish constitutionally protected criticism of the Israeli government and its policies. In a fact sheet accompanying Executive Order 14188, the White House described the measure as "forceful and unprecedented," specifically targeting "leftist, anti-American colleges and universities." It framed the order as a "promise" to "deport Hamas sympathizers and revoke student visas,"

sending a clear message to all "resident aliens [sic] who participated in pro-jihadist protests" that the federal government "will find you… and deport you."

47.     In or around February 2025, Respondents began implementing a policy by which they would retaliate against and punish noncitizens like Rümeysa for their constitutionally protected speech (the Policy). Under the Policy, Secretary of State Marco Rubio would revoke the visas or green cards of individuals who expressed support for Palestinian rights. These revocations would then permit the Department of Homeland Security to arrest, detain and deport such individuals.

48.     On March 6, 2025, Secretary Rubio posted to X: "Those who support designated terrorist organizations, including Hamas, threaten our national security. The United States has zero tolerance for foreign visitors who support terrorists. Violators of U.S. law—including international students—face visa denial or revocation, and deportation."

49.     Additionally, certain groups began publicizing the names of pro-Palestinian activists they wanted the government to deport. Specifically, these groups compiled lists of students and faculty who had engaged in Palestine-related advocacy and, upon information and belief, submitted these lists to ICE's tip line, or publicly flagged names to U.S. Government official accounts.

50.     As illustrated *infra*, one way that Secretary Rubio is implementing the Policy is by wrongly invoking 8 U.S.C. § 1227(a)(4)(C)(i) (hereinafter "the Foreign Policy Ground"), which provides that "An alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." This Provision expressly prohibits the Secretary of State from excluding or conditioning entry based on a noncitizen's "past, current, or

expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless the Secretary personally certifies to Congress that admitting the individual would compromise a compelling U.S. foreign policy interest. *See* 8 U.S.C. § 1227(a)(4)(C)(ii) (citing 8 U.S.C. § 1182(a)(3)(C)(iii)).

51.     Legislative history makes clear that Congress intended to limit the Executive's authority to exclude noncitizens based on their speech or beliefs. When the Moynihan Amendment was passed in 1987, the Senate Committee warned that "[f]or many years, the United States has embarrassed itself by excluding prominent foreigners from visiting the United States solely because of their political beliefs." The amendment was intended "to take away the executive branch's authority to deny visas to foreigners solely because of the foreigner's political beliefs or because of his anticipated speech in the United States," while affirming "the principles of the First Amendment." (S. Rep. No. 100–75 at 11, 100th Cong., 1st Sess. (1987), reprinted in 133 Cong. Rec. S2326 (1987)).

52.     Congress further evinced its intent to restrict the Executive's ability to exclude foreign speakers by asserting that such exclusions should not be based solely on "the possible content of an alien's speech in this country," that the Secretary's authority to determine that entry would compromise foreign policy interests should be used "sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies," and that the "compelling foreign policy interest" standard should be applied strictly. (H.R. Conf. Rep. No. 101-955, 101st Cong., 2nd Sess. (1990), reprinted in 1990 U.S.C.C.A.N. 6784, 6794).

***The Government Begins to Implement its Policy of Intimidation and Retaliation***

53.      On March 5, 2025, the State Department revoked the student visa of Ranjani Srinivasan, an Indian national and doctoral student at Columbia, under the Foreign Policy Ground. Srinivasan had previously expressed support for the rights of Palestinians. Two days later, federal immigration agents showed up at her apartment looking for her, but she did not open the door. They showed up again the following night, but she was not home. On March 13, 2025, agents returned to her home with a judicial warrant. DHS released a statement characterizing Srinivasan as a terrorist sympathizer and accused her of advocating violence and being "involved in activities supporting Hamas," but the agency has not provided any evidence for its allegations, and Srinivasan disputes them.

54.      On March 8, 2025, ICE agents in plain clothes arrested Mahmoud Khalil, a legal permanent resident and recent Columbia University graduate, at his Columbia University student housing. Khalil had previously expressed support for the rights of Palestinians. The agents initially told Khalil that they were detaining him because his student visa had been revoked by the State Department, but when Khalil's attorney informed the agents that he was a green card holder, the agents responded that the State Department had revoked Khalil's green card, too. The Notice to Appear later issued by the government to Khalil cites the Foreign Policy Ground as the basis for his arrest and removal. The agents handcuffed Khalil and placed him in an unmarked vehicle. Over the course of that evening and into the early hours of the following morning, Khalil would first be taken to an ICE field office in Manhattan and then to a detention facility in New Jersey, returning to New York to board a flight to Texas and finally to Louisiana. To date, Khalil remains detained in Louisiana.

55.     On March 8, 2025, ICE signed an administrative arrest warrant for Yunseo

Chung, a legal permanent resident and Columbia University student who has lived in the United

States since she was seven. Chung had previously expressed support for the rights of

Palestinians. On March 10, a federal law enforcement official advised Chung's attorney that her

legal permanent resident status had been revoked. On March 13, federal law enforcement agents

executed a judicial search warrant at Chung's dormitory. Chung filed a complaint and petition

for habeas corpus in the United States District Court for the Southern District of New York, and

sought, among other things, a temporary restraining order preventing immigration enforcement

officials from taking her into custody or transferring her out of the district. On March 25, 2025,

the court issued such an order. *Chung v. Trump et al.*, Case No. 25-cv-02412, ECF 19

(S.D.N.Y.).

56.     On March 17, 2025, ICE arrested Badar Khan Suri, an Indian national and

postdoctoral fellow at Georgetown University's School of Foreign Service. Suri's student visa

was revoked pursuant to the Foreign Policy Ground. In a statement given to Fox News, DHS

asserted that Suri had "spread[] Hamas propaganda," "promot[ed] antisemitism on social media,"

and had "close connections to a known or suspected terrorist, who is a senior advisor to Hamas."

Suri has no criminal record and has not been charged with a crime. DHS's allegations appear to

reference the fact that Suri's father-in-law, Ahmed Yousef, is a former advisor to Ismael

Haniyeh, the Hamas leader assassinated by Israel last year in Iran. But Yousef left his position in

the Hamas-run government in Gaza more than a decade ago and has publicly criticized Hamas's

decision to attack Israel on October 7, 2023. DHS has not alleged that Suri himself has taken any

action on behalf of Hamas. To date, Suri remains in immigration detention.

14

57.     On March 21, 2025, the Justice Department wrote to counsel for Momodou Taal, a student visa holder and doctoral candidate at Cornell University, to convey ICE's intention to serve a deportation notice on Taal and request that Taal voluntarily surrender to ICE custody. Taal had previously expressed support for the rights of Palestinians. The Justice Department wrote to Taal's lawyers after Taal sought a temporary restraining order to enjoin DHS from attempting to detain, remove, or otherwise enforce the Executive Orders against him. In response to that application, the government informed the court that the State Department had revoked Taal's student visa.

***High-Level Government Officials Confirm Rümeysa Was Targeted Because of Her Speech***

58.     Multiple government officials, including Secretary of State Marco Rubio, have confirmed that Rümeysa was targeted for arrest and detention solely because of her actual or perceived First Amendment activity.

59.     On March 21, 2025, the day Rümeysa's visa was revoked according to her NTA, Secretary Rubio announced on X.com: "We will continue to cancel the visas of those whose presence or activities have potentially serious adverse foreign policy consequences for our country . . . And we will continue to use every legal means available to remove alien enemies."

60.     After Rümeysa's arrest, a DHS spokesperson stated, "DHS and ICE investigations found Öztürk engaged in activities in support of Hamas, a foreign terrorist organization that relishes the killing of Americans . . . . A visa is a privilege, not a right. Glorifying and supporting terrorists who kill Americans is grounds for visa issuance to be terminated. This is commonsense security."[7]

---

[7] Mike Toole & Beth Germano, *Tufts University student taken into immigration custody by federal agents in Massachusetts* (Mar. 27, 2025), https://www.cbsnews.com/boston/news/tufts-university-graduate-student-somerville-ice/.

61.     In a March 27 news conference, Secretary Rubio reaffirmed that the reason for Rümeysa's arrest and detention washer actual and perceived pro-Palestinian speech and political activity.[8] At the conference, a member of the media asked Secretary Rubio to explain the specific actions that led to Rümeysa's visa being revoked. The Secretary responded "oh, we revoked her visa," and continued:

> We gave you a visa to come and study and get a degree not to become a social activist that tears up our university campuses. And if we've given you a visa and then you decide to do that we're going to take it away. [. . .] We don't want it. We don't want it in our country. Go back and do it in your country. But you're not going to do it in our country."

62.     Secretary Rubio added: "Every time I find one of these lunatics I take away their visa," suggesting that hundreds of visas have been revoked in furtherance of the administration's Policy of targeting noncitizens for their pro-Palestinian speech.[9]

### DHS Did Not Follow Ordinary Procedure

63.     DHS maintains a website, titled "Study in the States," which "explains the student visa process, enhances coordination among government agencies, and keeps international students and the U.S. academic community better informed about pertinent rules and regulations." *About*, Study in the States, U.S. Dep't of Homeland Sec'y (last accessed Mar. 27, 2025), https://studyinthestates.dhs.gov/footer/about.

64.     According to Study in the States, student visa holders must maintain their status, which means "Fulfilling the purpose for why the Department of State issued you your visa" and

---

[8] *Secretary Rubio Defends Revoking Turkish Student's Visa*, C-SPAN (Mar. 27, 2025), https://www.c-span.org/clip/news-conference/secretary-rubio-defends-revoking-turkish-students-visa/5158479.

[9] *See* Madeline Halpert, *Marco Rubio says US revoked at least 300 foreign students' visas*, BBC (Mar. 27, 2025), https://www.bbc.com/news/articles/c75720q9d7lo; *see also Secretary of State Marco Rubio Remarks to the Press*, U.S. Dep't of State (March 28, 2025), https://www.state.gov/secretary-of-state-marco-rubio-remarks-to-the-press-3/.

"Following the regulations associated with that purpose." *Maintaining Status*, Study in the

States, U.S. Dep't of Homeland Sec'y (last accessed Mar. 27, 2025),

https://studyinthestates.dhs.gov/students/maintaining-status. For F-1 student visa holders, that

purpose is "to study." *Id.*

65.     The Study in the States website lists consequences that can occur "[w]hen an F-

1/M-1 SEVIS record is terminated," including, the student "loses all on-and/or off-campus

employment authorization," the student "cannot re-enter the United States on the terminated

SEVIS record," and ICE agents "may investigate to confirm the departure of the student."

*Terminate a Student*, Study in the States, U.S. Dep't of Homeland Sec'y (last accessed Mar. 27,

2025), https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-

terminations/terminate-a-student. Termination may require an F-1 visa holder to immediately

depart the United States. *Id.*

66.     DHS does not indicate on its Study in the States website that loss of student status

may result in immediate arrest and detention. DHS departed from these expected procedures in

arresting Rümeysa without warning or notice about the change in her student status.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### Violation of the First Amendment to the United States Constitution

67.     Petitioner repeats and re-alleges the allegations contained in the preceding

paragraphs of this Complaint-Petition as if fully set forth herein.

68.     The First Amendment to the United States Constitution provides in part that

"Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people .

. . to petition the Government for a redress of grievances." U.S. Const. Amend. I. The First

Amendment protects past, present, and future speech, including speech by noncitizens.

69. The Policy, and the government's implementation of the Policy as to Rümeysa—specifically, the government's targeting, arrest, transfer, and ongoing detention of Rümeysa—violate the First Amendment because they:

      a. retaliate against and punish Rümeysa's past protected speech;

      b. prevent her from speaking now (through detention);

      c. attempt to chill (through past punishment and ongoing threat) or prevent (through eventual removal) her future speech in the United States;

      d. deprive those with whom she would speak of her present and future speech on matters of public concern; and

      e. chill other individuals who express support for Palestinian rights.

70. These speech-related consequences are not side effects of an action with some other purpose; they are, instead, the purpose of the Policy and the government's actions implementing the Policy as to Rümeysa and those similarly situated. In government officials' own telling, the Policy is intended to silence viewpoints with which the Trump administration disagrees.

## SECOND CLAIM
## Violation of Fifth Amendment Right to Due Process

71. Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

72. The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

73. The government's detention of Rümeysa is unjustified. The government has not

18

demonstrated that Rümeysa—who has no criminal history, has close ties in the Tufts community, and wishes to complete her doctoral degree at Tufts—needs to be detained. *See Zadvydas*, 533 U.S. at 690 (finding immigration detention must further the twin goals of (1) ensuring the noncitizen's appearance during removal proceedings and (2) preventing danger to the community). There is no credible argument that Rümeysa cannot be safely released back to her community.

74.    Rümeysa's detention is also punitive and bears no "reasonable relation" to any legitimate purpose for detaining her. *Jackson v. Indiana*, 406 U.S. 715, 738 (1972) ("nature and duration" of civil confinement must "bear some reasonable relation to the purpose for which the individuals is committed"); *Zadvydas*, 533 U.S. at 690 (finding immigration detention is civil and thus ostensibly "nonpunitive in purpose and effect"). Her "detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Demore v. Kim*, 538 U.S. 510, 532-33 (2003) (Kennedy, J., concurring).

75.    Rümeysa's arrest and detention under the Policy violate due process limitations on civil detention because they are designed to punish and silence her speech with which the government disagrees, and to chill others from expressing these viewpoints—impermissible bases for taking away individual liberty.

76.    The Policy and its implementation as to Rümeysa violate her right to due process for additional reasons as well. The government's policy of applying the Foreign Policy Ground to make such determinations concerning people like Rümeysa—who was in valid F-1 status, living peacefully in the country—is unconstitutionally vague where it is due to constitutionally protected speech.

## THIRD CLAIM
### Violation of the Administrative Procedure Act and the *Accardi* Doctrine

77.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

78.     The government has adopted a policy of targeting noncitizens for arrest, detention and removal based on First Amendment-protected speech advocating for Palestinian rights. This policy is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C. § 706 (2)(A), (B), (C), and violates the *Accardi* doctrine and federal agencies' own rules, *see Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

79.     In addition, Rümeysa's SEVIS termination notice invoked the Foreign Policy Ground.

80.     In order to be invoked in an instance involving a noncitizen's past statements, the Foreign Policy Ground requires the Secretary of State to determine that a person's "presence or activities would potentially have serious adverse foreign policy consequences for the United States" and "would compromise a compelling United States foreign policy interest."

81.     Here, there is no indication that the Secretary of State ever made such a determination.

82.     To the extent the Secretary of State failed to make such a determination, the invocation of the Foreign Policy Ground is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C § 706 (2)(A), (B), (C).

83.     To the extent the Secretary of State purported to make such a determination, it is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C § 706 (2)(A), (B), (C).

## FOURTH CLAIM
### Release on Bail Pending Adjudication

84.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

85.     Federal courts sitting in habeas possess the "inherent power to release the petitioner pending determination of the merits." *Savino v. Souza*, 453 F. Supp. 3d 441, 454 (D. Mass. 2020) (quoting *Woodcock v. Donnelly*, 470 F.2d 93, 94 (1st Cir. 1972) (per curiam)); *see also Da Graca v. Souza*, 991 F.3d 60 (1st Cir. 2021). Federal courts "have the same inherent authority to admit habeas petitioners to bail in the immigration context as they do in the criminal habeas case." *Id.* (quoting *Mapp v. Reno*, 241 F.3d 221, 223 (2d Cir. 2001)). "A court considering bail for a habeas petitioner must inquire into whether the habeas petition raise[s] substantial claims and [whether] extraordinary circumstances exist[ ] that make the grant of bail necessary to make the habeas remedy effective." *Id.* (quoting *Mapp*, 241 F.3d at 230) (cleaned up).

86.     This petition raises substantial constitutional and statutory claims challenging Rümeysa's retaliatory detention. Furthermore, extraordinary circumstances exist that make Rümeysa's release essential for the remedy to be effective. Even if she is ultimately freed, as long as Rümeysa remains in ICE's physical custody, she will be prevented from speaking freely and openly and her unlawful detention will serve to chill others. In addition, Rümeysa has asthma and has already suffered an asthma attack while in ICE custody, raising concerns about future asthma attacks. Finally, Rümeysa's confinement in Louisiana prevents her from

adequately litigating her removal proceedings by impeding her access to counsel and evidence located within the District of Massachusetts.

**PRAYER FOR RELIEF**

Wherefore, Petitioner respectfully requests this Court to grant the following:

1) Assume jurisdiction over this matter;

1) Require Respondents to return Petitioner to this District pending these proceedings;

2) Order the immediate release of Petitioner pending these proceedings;

3) Declare that Respondents' actions to arrest and detain Petitioner violate the First Amendment and the Due Process Clause of the Fifth Amendment;

4) Vacate and set aside Respondents' unlawful Policy of targeting noncitizens for arrest, detention and removal based on First Amendment-protected speech advocating for Palestinian rights;

5) Restore Petitioner's SEVIS record;

6) Enjoin Respondents from taking any enforcement action against Petitioner arising directly or indirectly from an investigation into the applicability of the Foreign Policy Ground;

7) Award reasonable attorneys' fees and costs for this action; and

8) Grant such further relief as the Court deems just and proper.

Respectfully submitted,

[signature block on next page]

22

/s/ *Jessie J. Rossman*
Jessie J. Rossman (BBO #670685)
Adriana Lafaille (BBO #680210)
Rachel E. Davidson (BBO #707084)
Julian Bava (BBO #712829)
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
jrossman@aclum.org
alafaille@aclum.org
rdavidson@aclum.org
jbava@aclum.org

Mahsa Khanbabai (BBO #639803)
115 Main Street, Suite 1B
North Easton, MA 02356
(508) 297-2065
mahsa@mk-immigration.com

Brian Hauss*
Esha Bhandari*
Brett Max Kaufman*
Noor Zafar*
Sidra Mahfooz*
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, Floor 18
New York, NY 10004
(212) 549-2500
bhauss@aclu.org
ebhandari@aclu.org
bkaufman@aclu.org
nzafar@aclu.org
smahfooz@aclu.org

*Counsel for Petitioner*

*\*Pro hac vice application forthcoming*

Dated: March 28, 2025

23

**CERTIFICATE OF SERVICE**

I hereby certify that on March 28, 2025, a true copy of the above document was filed via

the Court's CM/ECF system and that a copy will be sent automatically to all counsel of record.

March 28, 2025                                        */s/ Jessie J.Rossman*
                                                     Jessie J.Rossman

# Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

RÜMEYSA ÖZTÜRK,
*Petitioner*

No. 2:25-cv-00374

*v.*

**Oral Argument Requested**

DONALD J. TRUMP, et al.,
*Respondents*

## Motion to Conduct Limited Discovery in Advance of Habeas Hearing

### INTRODUCTION

On May 15, 2025, the Court held a status conference to evaluate proposed conditions of release for Petitioner Rümeysa Öztürk and to establish a schedule in this proceeding, including a plan for discovery before the ultimate merits hearing on Ms. Öztürk's habeas petition, which is anticipated to take place in several months' time. *See* May 15, 2025 Tr. 27:17-28:25.

There is good cause to conduct discovery here, where the government's motivation for targeting, arresting, and detaining Ms. Öztürk is key to adjudicating the unconstitutionality of both the government's arrest and detention of Ms. Öztürk and of the government's policy of targeting and punishing noncitizens based on their First Amendment-protected activities. Discovery should proceed expeditiously on Ms. Öztürk's claims, and the Court should order Respondents to (1) respond within 21 days of this motion's resolution to Ms. Öztürk's requests for production, interrogatories, and requests for admission, attached to this motion, and (2) make available for deposition a limited number of witnesses after document discovery is completed, with no more than 7 depositions to occur.

1

**BACKGROUND**

Ms. Öztürk's claims that her arrest and detention were retaliatory and punitive "have been largely unrebutted by the government." May 16, 2025 Op. & Order ("Bail Op.") at 27. So far, the only documentation before the Court that might offer any hypothetical explanation for why Ms. Öztürk was targeted for arrest and detention is a reference to a March 21, 2025 DHS assessment that she "had been involved in associations that 'may undermine U.S. foreign policy . . . ' including co-authoring an op-ed" that did not violate Tufts University policy or any law, and which was singled out as the basis for punishment because of its viewpoint on the war in Gaza. *See* ECF 91 at 6; Bail Op. at 7. "To date, the government has neither rebutted the argument that retaliation for Ms. Ozturk's op-ed was the motivation for her detention nor identified another specific reason for Ms. Ozturk's detention," Bail Op. at 16, even though—just as an example—the government possesses two memoranda about its purported rationale for revoking Ms. Öztürk's visa and detaining her that it has not produced to her or to the Court, *see* April 14, 2025 Tr. 84:13-87:10 (discussing government memoranda about Ms. Öztürk); ECF 95 & 95-1 (Washington Post article describing those memoranda). And, as the Court has observed, Defendant Secretary of State Marco Rubio has insinuated—without providing any support or citation—that "the government had more evidence than the op-ed to support Ms. Ozturk's detention." April 18, 2025 Op. & Order ("Transfer Op.") at 50.

In response to the government's unsupported public claims that there are justifications for its actions beyond Ms. Öztürk's speech, the Court "invite[d] an immediate submission of any such evidence." Transfer Op. at 57. To date, the government has refused to produce any such evidence, and has indicated that it does not

want such evidence to come forward. *See* May 15, 2025 Tr. 27:3-7. To facilitate the

Court's merits review of Ms. Öztürk's habeas petition, the government should produce

any evidence as to its motivation for targeting, arresting, and detaining her and other

noncitizens who advocate for Palestinian human rights.

**ARGUMENT**

## I.    Ms. Öztürk has already presented significant evidence that the government targeted, arrested, and detained her for her speech.

"When intent is an element of a constitutional violation," as it is here, "the

primary focus" in determining the impropriety of the government's motivation is to

establish whether the government intended, for instance, to "disadvantage all members

of a class that includes the plaintiff, or to deter public comment on a specific issue of

public importance." *Crawford-El v. Britton*, 523 U.S. 574, 592 (1998). "Specific proof of

improper motivation" is important beyond the motion-to-dismiss stage. *Curley v.*

*Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001). Such proof "may include expressions

by the officials involved regarding their state of mind, circumstances suggesting in a

substantial fashion that the plaintiff has been singled out, or the highly unusual nature

of the actions taken." *Blue v. Koren*, 72 F.3d 1075, 1084 (2d Cir. 1995). *Cf. Cobb v. Pozzi*,

363 F.3d 89, 108 (2d Cir. 2004) (holding, in the employment context, that "a plaintiff

may not rely on conclusory assertions of retaliatory motive," but rather must produce

"some tangible proof").[1]

---

[1] The Court has invited further briefing on, among other issues, the appropriate standard for First Amendment retaliation claims in civil immigration habeas proceedings prior to final disposition. Bail Op. at 17 n.2. Ms. Öztürk intends to address this issue in full briefing at a later date. For purposes of this motion, Ms. Öztürk maintains her position as set forth in ECF 122 at 2-7, but regardless of whether *Nieves v. Bartlett*, 587 U.S. 391 (2019), or *Mt. Healthy Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977), governs, discovery into the government's motives is plainly appropriate here.

As previously briefed, Ms. Öztürk has already provided substantial evidence of the government's unconstitutional motive in targeting, arresting, and detaining her and other noncitizens who advocate for Palestinian human rights. This includes: public statements from government officials that Ms. Öztürk's speech motivated their conduct; a March 21, 2025 Memorandum from the Department of State to ICE ("DOS Memorandum"), which cited only the op-ed to support Ms. Öztürk's visa revocation (and, presumably, her detention) and further directed that the revocation be "silent" for "ongoing ICE operational security"; the temporal proximity of the Canary Mission's February 2025 posting of Ms. Öztürk's profile, which mentioned her op-ed, to her arrest, transport, and detention in March 2025; the unusual fact of her detention itself after her visa was revoked; the location, timing, and secrecy of her transfers from Boston to New Hampshire, Vermont, and ultimately Louisiana; and the Trump Administration's pattern of retaliating against noncitizens who advocate for Palestinian rights. *See* ECF 122 at 5-7.

## II. Further discovery into the government's motives and conduct is appropriate in this habeas proceeding.

In contrast to the considerable evidence Ms. Öztürk has advanced of the unconstitutionality of the government's conduct, "the government has neither rebutted the argument that retaliation for Ms. Ozturk's op-ed was the motivation for her detention nor identified another specific reason for Ms. Ozturk's detention." Bail Op. at 16. The government has refused to produce either the memorandum sent "from senior DHS official Andre Watson to senior State Department official John Armstrong" before Ms. Öztürk's detention stating that "OZTURK engaged in anti-Israel activism in the wake of the Hamas terrorist attacks on Israelis on October 7, 2023," or the March 2025

4

memorandum from an office within the U.S. Department of State which "determined that the Trump administration had not produced any evidence showing that she engaged in antisemitic activities or made public statements supporting a terrorist organization, as the government has alleged."[2] *See* ECF 103 at 4-6 (improperly invoking deliberative process privilege as shield against production of these memoranda). The Court has "offered the government the opportunity to rebut Ms. Ozturk's evidence showing that her op-ed is the but-for cause of her detention. The government has not done so," Bail Op. at 17—even as the government insists publicly that additional evidence supporting Ms. Öztürk's detention will be presented "if necessary."[3]

As this case proceeds towards a merits hearing and the ultimate adjudication of Ms. Öztürk's claims, the government cannot be allowed to defend the legality of its actions towards her while continuing to withhold documentary or testimonial proof. And if there is no such evidence, then Ms. Ozturk is entitled to discovery to definitively establish that fact and/or to seek adverse inferences based on the lack of any such evidence. *See, e.g.*, *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002) (court may impose an adverse inference "under its inherent power to manage its own affairs" for non-production of evidence where legal standard is met); *Pace v. Nat'l R.R. Passenger Corp.*, 291 F. Supp. 2d 93, 98 (D. Conn. 2003) (setting forth standard for adverse inference instruction based on spoliation or non-production of evidence).

---

[2] *See* John Hudson, *No evidence linking Tufts student to antisemitism or terrorism, State Dept. office found*, Wash. Post (Apr. 13, 2025), https://www.washingtonpost.com/national-security/2025/04/13/tufts-student-rumeysa-ozturk-rubio-trump/.

[3] U.S. Dep't of State, *Secretary of State Marco Rubio Remarks to the Press* (Mar. 28, 2025), https://www.state.gov/secretary-of-state-marco-rubio-remarks-to-the-press-3/.

To the extent the Court finds that the Rules Governing Section 2254 Cases in the United States District Courts ("Habeas Rules") apply to Ms. Öztürk's case, the good-cause standard for discovery is readily met.[4] Under Rule 6, the party seeking discovery must demonstrate "good cause." Habeas Rule 6(a)-(b). "Good cause" exists where "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that [she] is . . . entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (internal quotation marks omitted). As explained above, Ms. Öztürk has presented specifically supported and substantial First Amendment and Fifth Amendment claims that the government has so far failed to refute. She has also brought claims based on the Administrative Procedure Act and the *Accardi* doctrine regarding the government's unconstitutional and unlawful policy of targeting noncitizens for arrest, transport, and detention based on their First Amendment-protected speech advocating for Palestinian human rights, *see* ECF 82-1 at 14, which the Court has not yet evaluated, *see* Bail Op. at 14 n.1, and the government has also failed to refute.

---

[4] Ms. Öztürk does not concede that the Habeas Rules apply here, for two reasons. First, Ms. Öztürk pleaded her claims in a hybrid petition and complaint, and it is the Federal Rules of Civil Procedure that "govern the procedure in all civil actions and proceedings." Fed. R. Civ. P. 1. Second, to the extent the Court construes this request for discovery as made in the habeas context, Section 2254 and 2255 proceedings take place under very different circumstances than those at bar: 2254 and 2255 petitioners have, by the nature of their claims, taken part in criminal proceedings, which have certain procedural and substantive protections (e.g., *Brady*) not available to Ms. Öztürk. And, of course, there is a record of the criminal proceeding, so it makes good sense that a 2254 or 2255 petitioner seeking a habeas writ would need to make a certain showing to get discovery beyond the record that already exists. *Cf. Toolasprashad v. Tryon*, No. 12-cv-734, 2013 WL 1560176, at *3 (W.D.N.Y. Apr. 11, 2013) ("In habeas proceedings, the record before the institution that decided the petitioner's fate is fixed, hence usually there is no need for discovery."). But for purposes of this motion, even if the Habeas Rules apply, Ms. Öztürk satisfies their standard. *See, e.g.*, *Gomes v. U.S. Dep't of Homeland Sec., Acting Sec'y*, 559 F. Supp. 3d 8, 11-12 (D.N.H. 2021) (applying Habeas Rule 6 to grant 2241 petitioners' motion for discovery where petitioners demonstrated good cause for discovery and the discovery sought was "reasonably calculated" to bear on petitioners' claim and live issue in case).

At bottom, if the government has evidence contradicting Ms. Öztürk's claims, it should produce it. There is good cause for discovery in this case because any evidence supporting the government's actions—or the lack thereof—is important to "fully develop[]" the record so that Ms. Öztürk can demonstrate her entitlement to relief. *Bracy*, 520 U.S. at 908.; *see Gomes v. U.S. Dep't of Homeland Sec., Acting Sec'y*, 559 F. Supp. 3d 8, 11-12 (D.N.H. 2021) (granting 2241 petitioner's "reasonably calculated" discovery request); *Phouk v. Warden, Stewart Det. Ctr.*, 378 F. Supp. 3d 1209, 1213 (M.D. Ga. 2019) (same, where petitioner made "specific allegations that are both capable of further factual development and fundamental to the merits of his claim for relief"). *Cf., e.g.*, *Yosef v. Killian*, 646 F. Supp. 2d 499, 504 n.4 (S.D.N.Y. 2009) (denying discovery in § 2241 proceeding where it would not affect the petitioner's eligibility for habeas relief and where respondents had *already provided all relevant documents*).

## III. Ms. Öztürk seeks limited and focused discovery that is directly relevant to her claims.

Other than her request for bail pending adjudication, Ms. Öztürk has asserted the following claims: (1) First Amendment retaliation; (2) violation of the Fifth Amendment right to due process; and (3) violation of the Administrative Procedure Act and the *Accardi* doctrine. All three are based both on the government's policy of retaliating against and punishing noncitizens for constitutionally protected speech (the "Policy") and on the government's implementation of that Policy as to Ms. Öztürk herself through her targeting, arrest, transfer, detention, and termination of her SEVIS status. *See* ECF 12 at 17-21.

To establish entitlement to relief on those claims, Ms. Öztürk seeks discovery relevant to the following categories of information:

- Respondents' basis and rationale for developing and implementing the Policy, and for implementing the Policy specifically as to Ms. Öztürk;

- Respondents' basis and rationale for initiating an investigation into Ms. Öztürk, whether independently or in response to a request, and for the conclusions reached about Ms. Öztürk (e.g., as described in the memoranda the government has refused to produce);

- Any Respondent's decision to terminate Ms. Öztürk's SEVIS record, including any underlying decision by Respondents to invoke the Foreign Policy Ground in doing so; and

- Respondents' decision and plan to arrest, transfer, and detain Ms. Öztürk, including her transfer out of New England after a court order was issued to prevent her transfer out of Massachusetts.

Requests for production, interrogatories, and requests for admission regarding those categories of information are attached to this motion. Additionally, Ms. Öztürk seeks to take a limited number of depositions, no more than 7, to take place after document discovery concludes and after Ms. Öztürk has a stronger sense of which government witnesses will be best equipped to respond to her questions. Ms. Öztürk's discovery requests are circumscribed and tailored to the needs of this proceeding.

## CONCLUSION

For the foregoing reasons, this Court should grant Ms. Öztürk's request for discovery and order Respondents to (1) respond within 21 days of this motion's resolution to Ms. Öztürk's requests for production, interrogatories, and requests for admission, and (2) make available for deposition no more than 7 witnesses after document discovery is completed.

/s/ Monica Allard
    Lia Ernst

Hillary Rich
ACLU Foundation of Vermont
PO Box 277
Montpelier, VT 05601
(802) 223-6304
mallard@acluvt.org
lernst@acluvt.org
hrich@acluvt.org

Jessie J. Rossman*
Adriana Lafaille*
Rachel E. Davidson*
Julian Bava*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
jrossman@aclum.org
alafaille@aclum.org
rdavidson@aclum.org
jbava@aclum.org

Mahsa Khanbabai*
115 Main Street, Suite 1B
North Easton, MA 02356
(508) 297-2065
mahsa@mk-immigration.com

Brian Hauss*
Esha Bhandari*
Brett Max Kaufman*
Michael K. T. Tan*
Noor Zafar*
Sidra Mahfooz*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, Floor 18
New York, NY 10004
(212) 549-2500
bhauss@aclu.org
ebhandari@aclu.org
bkaufman@aclu.org
m.tan@aclu.org
nzafar@aclu.org
smahfooz@aclu.org

*Counsel for Petitioner*
Dated: June 16, 2025

Ramzi Kassem*
Naz Ahmad*
Mudassar Toppa*
CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.
CUNY School of Law
2 Court Square
Long Island City, NY 11101
(718) 340-4558
ramzi.kassem@law.cuny.edu
naz.ahmad@law.cuny.edu
mudassar.toppa@law.cuny.edu

Matthew D. Brinckerhoff*
Katherine Rosenfeld*
Vasudha Talla*
Sonya Levitova*
EMERY CELLI BRINCKERHOFF ABADY WARD &
MAAZEL LLP
One Rockefeller Plaza, 8th Floor
New York, NY 10020
212-763-5000
mbrinckerhoff@ecbawm.com
krosenfeld@ecbawm.com
vtalla@ecbawm.com
slevitova@ecbawm.com

*Admitted pro hac vice

# Exhibit F

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

        *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P. JOYCE,
in his official capacity as Acting Field Office
Director of New York, Immigration and Customs
Enforcement; Yolanda PITTMAN, in her official
capacity as Warden of Elizabeth Contract Detention
Facility; Caleb VITELLO, Acting Director, U.S.
Immigration and Customs Enforcement; Kristi
NOEM, in her official capacity as Secretary of the
United States Department of Homeland Security;
Marco RUBIO, in his official capacity as Secretary of
State; and Pamela BONDI, in her official capacity
as Attorney General, U.S. Department of Justice,

        *Respondents*.

Case No. 25-cv-01963
(MEF-MAH)

**THIRD AMENDED
PETITION FOR
WRIT OF HABEAS CORPUS
AND COMPLAINT**

## <u>INTRODUCTION</u>

1.     This case concerns the government's targeted, retaliatory detention and attempted

removal of a student protestor because of his constitutionally protected speech. Petitioner

Mahmoud Khalil is Palestinian, a lawful permanent resident of the United States, and a recent

graduate student at Columbia University. Over the last year and a half, Mr. Khalil has been a

mediator, an active participant in, and at times the public face of, student protests on Columbia's

campus related to Israel's military campaign in Gaza. The Trump administration has made no

secret of its opposition to those protests and has repeatedly threatened to weaponize immigration

law to punish noncitizens who have participated.

2.     On or before March 8, 2025, Respondents adopted a policy ("the Policy") to

retaliate against and punish noncitizens like Mr. Khalil for their participation in protests concerning Israel's military campaign in Gaza. Under the Policy, Respondent Marco Rubio, the Secretary of State, would make determinations that the protestors' presence or activities in the United States would have potentially serious foreign policy consequences for the United States and would compromise a compelling United States foreign policy interest. These determinations would then permit the Department of Homeland Security to seek to detain and deport the protestors.

3.      Pursuant to the Policy, Respondent Rubio, the Secretary of State, purportedly made such a determination as to Mr. Khalil (the "Rubio Determination"). Secretary Rubio made this determination based on Mr. Khalil's lawful activity protected by the First Amendment: his participation in protests and his statements regarding Palestine and Israel.

4.      Neither Secretary Rubio nor any other government official has alleged that Mr. Khalil has committed any crime or, indeed, broken any law whatsoever.

5.      Pursuant to the Rubio Determination, the Department of Homeland Security decided to arrest Mr. Khalil, detain him, and place him in removal proceedings. On the evening of March 8, 2025, agents from the Department of Homeland Security ("DHS") arrested Mr. Khalil with no prior notice at his home and initiated proceedings to remove him from this country. After repeatedly transferring him across jurisdictions, the government ultimately detained Mr. Khalil in Louisiana, a thousand miles from his attorneys and his wife, who is a U.S. citizen and due to give birth next month.

6.      During his arrest, the agents stated first that Mr. Khalil's "student visa" was being "revoked." After learning that he was in fact a lawful permanent resident, they instead stated that status was being "revoked" too.

7.      It later came to light that the Department of Homeland Security was charging Mr. Khalil with being removable based on Section 237(a)(4)(C)(i) of the Immigration and Nationality Act (the "Foreign Policy Ground") and the Rubio Determination.

8.      The Rubio Determination and the government's subsequent actions, including its ongoing detention of Mr. Khalil in rural Louisiana, isolating him from his wife, community, and legal team, are plainly intended as retaliation and punishment for Mr. Khalil's protected speech and intended to silence, or at the very least restrict and chill, his speech now and in the future, all in violation of the First Amendment. Indeed, contemporaneous and subsequent statements by administration officials expressly characterize the invocation of this rarely used provision as punishment for Mr. Khalil's lawful and protected speech. The Rubio Determination and Mr. Khalil's unjustified detention also violate his due process rights. Finally, the government's unlawful Policy of targeting noncitizens for removal based on protected speech is arbitrary and capricious and contrary to law in violation of the Administrative Procedure Act, and viewpoint discriminatory in violation of the First Amendment. Accordingly, this Court should vacate the Rubio Determination and the Policy, order Mr. Khalil's immediate release, and set aside the government's unlawful policy.

## **PARTIES**

9.      Petitioner Mahmoud Khalil is a Palestinian, born in a refugee camp in Syria, who holds Algerian citizenship. He is married to a U.S. Citizen, a soon-to-be father, a lawful permanent resident of the United States with no criminal history, and a Palestinian human rights activist on Columbia University's campus. In May 2025, he will graduate with a master's degree in public administration from the Columbia University's School of International and Public Affairs ("SIPA"), where he has been a student since January 2023. Mr. Khalil and his wife, who is eight months

pregnant, live in Columbia's residential housing in New York City.

10.     Respondent Donald J. Trump is named in his official capacity as the President of the United States. In this capacity, he is responsible for the policies and actions of the executive branch, including the Department of State and Department of Homeland Security.  Respondent Trump's address is the White House, 1600 Pennsylvania Ave. NW, Washington, D.C. 20500.

11.     Respondent William P. Joyce is named in his official capacity as the Acting Field Office Director of the New York Field Office for Immigration and Customs Enforcement ("ICE") within the United States Department of Homeland Security. In this capacity, he is responsible for the administration of immigration laws and the execution of detention and removal determinations and is a custodian of Petitioner. Respondent Joyce's address is New York ICE Field Office, 26 Federal Plaza, New York, New York 10278.

11a. Respondent Yolanda Pittman is named in her official capacity as the Warden of Elizabeth Contract Detention Facility, also referred to as Elizabeth Detention Center. As Warden, she is responsible for the operations of Elizabeth Detention Center, including overseeing the people in the facility's custody, and as such she is a custodian of the Petitioner. Respondent Pittman's office address is Elizabeth Detention Center, 625 Evans St, Elizabeth, New Jersey, 07201.

12.     Respondent Caleb Vitello is the Acting Director of ICE. As the Senior Official Performing the Duties of the Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States; routinely transacts business in the Southern District of New York; is legally responsible for pursuing any effort to remove the Petitioner; and as such is a custodian of the Petitioner. His address is ICE, Office of the Principal Legal Advisor, 500 12th St. SW, Mail Stop 5900, Washington, DC 20536-5900.

13.     Respondent Kristi Noem is named in her official capacity as the Secretary of Homeland Security in the United States Department of Homeland Security. In this capacity, she is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(a) (2007); routinely transacts business in the Southern District of New York; is legally responsible for pursuing any effort to detain and remove the Petitioner; and as such is a custodian of the Petitioner. Respondent Noem's address is U.S. Department of Homeland Security, Office of the General Counsel, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528-0485.

14.     Respondent Marco Rubio is named in his official capacity as the United States Secretary of State. In this capacity, among other things, he has the authority to determine, based on "reasonable" grounds, that the "presence or activities" of a noncitizen "would have serious adverse foreign policy consequences for the United States." Following such a determination, DHS may initiate removal proceedings under 8 U.S.C. § 1227(a)(4)(C)(i) (INA § 237(a)(4)(C)(i).) In addition to his legal responsibilities under Section 237(a)(4)(C)(i), he routinely transacts business in the Southern District of New York and as such is a custodian of the Petitioner. His address is United States Department of State, 2201 C Street, NW, Washington, D.C. 20520.

15.     Respondent Pamela Bondi is Attorney General of the United States. In this capacity, she routinely transacts business in the Southern District of New York; is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(g) (2007); and as such is a custodian of the Petitioner. Respondent Bondi's address is U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530- 0001.


## JURISDICTION & VENUE

16.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C.

§ 2241, Article I, § 9, cl. 2 (the Suspension Clause) and Article III of the U.S. Constitution, the Administrative Procedure Act, 5 U.S.C. § 701 et seq.; and 28 U.S.C. § 2201 (Declaratory Judgment).

17.     An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant declaratory and injunctive relief. *Id.* §§ 2201, 2202. The Court has additional remedial authority under the All Writs Act, 28 U.S.C. § 1651.

18.     Venue is proper in the District of New Jersey under 28 U.S.C. § 2241 and 28 U.S.C. § 1391. At the time Mr. Khalil filed his original petition, he was physically detained in this judicial district at the direction and under the authority of the Respondents at the Elizabeth Contract Detention Facility, in Elizabeth New Jersey. Respondent Yolanda Pittman is the director of Elizabeth Contract Detention Facility, where Mr. Khalil was physically held at the time of the time of filing, and resides in the District of New Jersey. Respondent William P. Joyce is the Acting Field Office Director of the New York Field Office, whose officers under his authority initially arrested Mr. Khalil, communicated that he was being taken to 26 Federal Plaza in New York, arranged for Mr. Khalil's detention in this District, transported Mr. Khalil to and from this District, and directed the ICE Online Detainee Locator to show Mr. Khalil's location as 26 Federal Plaza in New York, which was the location specified for Mr. Khalil at the time of filing. Respondents Pittman and Joyce also denied Petitioner's requests to call his attorney or family members during the period immediate preceding, during, and following the filing of this petition, including during Mr. Khalil's transport to, detention in, and transport from this District.

## FACTS

*Mr. Khalil's Background*

19.     Petitioner Mahmoud Khalil is Palestinian, but he grew up in a Palestinian refugee camp in Syria because his grandparents were forcibly removed from their ancestral home in

Tiberias, Palestine. When war broke out in Syria, his family was again displaced and are now dispersed throughout Europe and West Asia.

20.    Mr. Khalil entered the United States on a student visa in or around December 2022 to pursue a Master's degree in Public Administration from the Columbia University's School of International and Public Affairs ("SIPA"). Mr. Khalil completed his program in December 2024, and has an anticipated graduation date of May 2025.

21.    Mr. Khalil became a Lawful Permanent Resident in 2024. Mr. Khalil and his wife, a U.S. citizen, are expecting their first child next month, in April 2025. Together, they live in an apartment building owned and operated by Columbia University.

***Mr. Khalil's Student Activism and Speech on Matters of Public Concern***

22.    As a Palestinian, Mr. Khalil has felt compelled to be an outspoken advocate for Palestinian human rights and, since October 2023, has spoken repeatedly about Israel's military operation in Gaza. Mr. Khalil has called Israel's actions in Gaza a genocide and criticized Columbia University for, in his view, financing and in other ways facilitating such violence. Mr. Khalil is committed to peaceful protest and being a voice for his people.

23.    That commitment has taken on many forms. For example, in April 2023, Mr. Khalil became co-president of the Palestine Working Group at the School of International and Public Affairs (SIPA), where he helped organize educational events and lectures on Palestine. In the fall of 2023, Mr. Khalil became president of the Palestinian Student Society at Columbia (DAR), which "serves to engage with and celebrate Palestinian culture, history, and identity."

24.    Additionally, Mr. Khalil has acted as a mediator and negotiator, facilitating dialogue between Columbia University's administration and its students. In this role, Mr. Khalil has advocated for his peers to be treated humanely and fairly by the university, while helping to ensure student safety and the smooth functioning of the university. For example, in the Spring of

2024, Mr. Khalil facilitated negotiations between members of the Gaza Solidarity Encampment[1] and the university administration. Indeed, Mr. Khalil was approached to take on this role because of his prior work at a British Embassy overseas, an internship with the United Nations in New York, as well his established relationships with the university administration.

25.     Mr. Khalil stated in a CNN interview in Spring of 2024 that "as a Palestinian student, I believe that the liberation of the Palestinian people and the Jewish people are intertwined and go hand-by-hand and you cannot achieve one without the other."   Mr. Khalil also explained that the student movement "is a movement for social justice and freedom and equality for everyone."[2]

26.     Mr. Khalil's prominence as an outspoken student activist, along with Columbia University's position as a national focal point of student protests against Israel's military campaign in Gaza over the past year and a half, has propelled Mr. Khalil into the public eye. His visibility has been further amplified through his continued participation in interviews with national and international media outlets, including the BBC and CNN, as well as local press conferences.

27.     Mr. Khalil's speech regarding international law, the obligations that the U.S. and Columbia University have under that law, the human rights of the Palestinian people, and related matters is speech protected by the First Amendment, including because it is speech on matters of public concern and is political speech at the core of the protection of the First Amendment.

---

[1] *See* Isha Banerjee, *Timeline of the Gaza Solidarity Encampment*, Columbia Spectator (May 2, 2024), *available at* https://www.columbiaspectator.com/news/2024/05/02/timeline-the-gaza-solidarity-encampment/.

[2] Chelsea Bailey, *Who is Mahmoud Khalil? Palestinian activist detained by ICE over Columbia University protests*, CNN (March 11, 2025), *available at*: https://www.cnn.com/2025/03/11/us/mahmoud-khalil-columbia-ice-green-card-hnk/index.html. Chelsea Bailey, *Who is Mahmoud Khalil? Palestinian activist detained by ICE over Columbia University protests*, CNN, *available at*: https://www.cnn.com/2025/03/11/us/mahmoud-khalil-columbia-ice-green-card-hnk/index.html.

28.     Like many student activists advocating for Palestinian rights, Mr. Khalil has endured immense scrutiny and personal attacks by private actors, including doxing and harassment. But until recently, he understood that because of the First Amendment, the government would not be able to retaliate against or punish him for his speech, or silence him by locking him up or banishing him from the country, even if powerful government officials disagreed with what he had to say.

**The Federal Government's Hostile Campaign Against Palestinian Rights Advocacy: A Concerted Effort to Silence Protected Political Speech**

29.     In the fall of 2023, students from diverse racial, ethnic, religious, and socioeconomic backgrounds—including Mr. Khalil—began to mobilize on their campuses, many criticizing what they characterized as their universities' and the United States government's unwavering support for Israel's policies. These protests included Jewish students who sought to convey the message that such policies were "not in our name." In response, opponents of these students' messages—including President Donald J. Trump—frequently characterized peaceful protest and any speech in favor of Palestinian rights as inherently supportive of Hamas and antisemitic. For example, in several instances, he President Trump described a Jewish lawmaker who had criticized Israeli Prime Minister Benjamin Netanyahu as "a proud member of Hamas" and "a Palestinian," using "Palestinian" as a slur.[3]

30.     During his campaign for re-election, President Trump repeatedly vowed to revoke the visas of international students engaged in pro-Palestinian protests or who publicly criticized

---

[3] Niha Masih, *Trump draws condemnation for using 'Palestinian' as a slur against Schumer*, Washington Post (March 13, 2025), https://www.washingtonpost.com/politics/2025/03/13/trump-schumer-palestinian-slur/. Indeed, in his first term, President Trump also issued Executive Order 13899, titled "Combating Anti-Semitism," which, among other things, adopted a definition of antisemitism that includes plainly protected criticism of Israel and its policies. *See* 84 Fed. Reg. 68779 (Dec. 11, 2019) (including as an example of antisemitism "drawing comparisons of contemporary Israeli policy to that of the Nazis").

Israel's actions.

31.     For example, at a rally in Las Vegas on October 28, 2023, Trump pledged to "terminate the visas of all of those Hamas sympathizers, and we'll get them off our college campuses, out of our cities, and get them the hell out of our country."[4]

32.     While the Gaza Solidarity encampments at college campuses took place in the Spring of 2024, Trump promised campaign donors that he would deport pro-Palestinian student demonstrators to get them to "behave." Upon information and belief, at a round table event in New York, he stated, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."[5]

33.     Similarly, in a social media post on his official X account on October 15, 2023, then-Senator Marco Rubio, referring to ongoing student protests in support of Palestinians, stated the U.S. should "cancel the visa of every foreign national out there supporting Hamas and get them out of America."[6]

***President Trump Issues Executive Orders to Target Speech of Noncitizen Protestors***

34.     Shortly after assuming office on January 20, 2025, President Trump signed two executive orders aimed at fulfilling the above campaign promises: Executive Order 14161, titled "Protecting the United States from Foreign Terrorists and other National Security and Public Safety

---

[4] Andrea Shalal and Susan Heavey, *Trump administration to cancel student visas of pro-Palestinian protesters*, Reuters (Jan. 29, 2025), available at: https://www.reuters.com/world/us/trump-administration-cancel-student-visas-all-hamas-sympathizers-white-house-2025-01-29/.29, 2025), available at: https://www.reuters.com/world/us/trump-administration-cancel-student-visas-all-hamas-sympathizers-white-house-2025-01-29/

[5] *Trump told donors he will crush pro-Palestinian protestors*, Washington Post, available at: https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors/.

[6] Twitter, *available at*: https://x.com/marcorubio/status/1713652113098539120. In the CNN interview he included as part of the same post, then-Senator Rubio stated that "people marching at universities" were "supporters of Hamas" and "need to go."

Threats," signed on January 20, 2025, and Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism," signed on January 29, 2025.

35.    Executive Order 14161 states that it is the United States' policy to "protect its citizens" from noncitizens who "espouse hateful ideology." It further articulates the administration's desire to target noncitizens who "advocate for, aid, or support designated foreign terrorists and other threats to our national security," those who hold "hateful" views, and those who "bear hostile attitudes toward [America's] citizens, culture, government, institutions, or founding principles." The order's broad framing of "hostile attitudes" towards the American government could encompass any form of political dissent, including Palestinian rights advocacy.

36.    Executive Order 14188 states that, in order to "combat campus anti-Semitism," the administration will target for investigation "post-October 7, 2023, campus anti-Semitism." The order adopts a definition of antisemitism that includes constitutionally protected criticism of the Israeli government and its policies.[7] In a fact sheet accompanying Executive Order 14188, the White House described the measure as "forceful and unprecedented," specifically targeting "leftist, anti-American colleges and universities." It framed the order as a "promise" to "deport Hamas sympathizers and revoke student visas," sending a clear message to all "resident aliens who participated in pro-jihadist protests" that the federal government "will find you… and deport you."

***The Government Responds to Groups Identifying Noncitizen Protestors for Deportation By Adopting the Unlawful Policy***

37.    In response to these Executive Orders and as part of an escalating attack on the core political speech at issue, prominent groups at Columbia University opposed to Palestinian rights protests began publicizing names of individuals they wanted the government to deport. Specifically,

---

[7] *See supra* note 3 (describing definitions adopted in Executive Order 13899, titled "Combating Anti-Semitism," 84 Fed. Reg. 68779 (Dec. 11, 2019), and reaffirmed in Executive Order 14188).

these groups compiled lists of students who had engaged in Palestine-related advocacy and, upon information and belief, submitted these lists to ICE's tip line.[8]

38.     For example, Betar USA—a self-described "Zionist activist organization"[9]—has published lists of Columbia student protestors, urging ICE to deport them under the executive orders. In a statement to a media outlet, Betar stated that it had "already submitted names of hundreds of terror supporters to the Trump administration."[10]

39.     Betar identified Mr. Khalil, specifically, as one of its targets for deportation, including him on their "deport list." On January 29, the organization posted on social media that ICE is "aware of his home address and whereabouts" and confirmed that they "have provided all his information to multiple contacts."[11]

40.     Media reports in March of this year described widespread fear of retaliation for pro-Palestine speech among noncitizen students, noting that the executive orders "already appear to be chilling political activism."[12]

41.     Then, the week beginning Monday, March 3, 2025, ICE was spotted on Columbia's campus, increasing fears and further chilling students' ability to speak freely.

42.     That same week, pro-Israel activists reportedly met with members of Congress as well as Secretary of State Rubio, specifically seeking Mr. Khalil's deportation.[13]

---

[8] https://theintercept.com/2025/02/15/columbia-alumni-israel-whatsapp-deport-gaza-protesters/

[9]     https://betarus.org/;    https://www.middleeasteye.net/explainers/betar-who-is-far-right-jewish-american-group-blood-gaza

[10] Nicholas Liu, *A pro-Israel group says it gave the Trump administration a list of students to deport*, Salon.com (Jan. 31, 2025), *available at* https://www.salon.com/2025/01/31/pledged-to-deport-pro-palestine--and-a-pro-israel-group-has-already-made-a-list/.

[11] https://x.com/Betar_USA/status/188479668020550930. This social media post falsely accused Mr. Khalil of saying inflammatory statements. *See id. See also* https://zeteo.com/p/scoop-emails-show-mahmoud-khalil-ask-columbia-protection-ice

[12]     https://www.npr.org/2025/03/03/nx-s1-5307187/trump-executive-order-visa-pro-palestinian-foreign-students-protests-hamas-hezbollah-israel

[13] https://forward.com/news/703018/mahmoud-khalil-columbia-cuad-ice/

43.     On March 7, 2025, Mr. Khalil emailed the Columbia University interim president writing that, "I haven't been able to sleep, fearing that ICE or a dangerous individual might come to my home."[14]

44.     On or before March 8, 2025, Respondents adopted the Policy by which they would retaliate against and punish noncitizens like Mr. Khalil for their participation in protests concerning Israel's military campaign in Gaza. Under the Policy, Respondent Rubio, the Secretary of State, would make determinations that the protestors' presence or activities in the United States would have potentially serious foreign policy consequences for the United States and would compromise a compelling United States foreign policy interest. These determinations would then permit the Department of Homeland Security to seek to detain and deport the protestors

**DHS Arrests Mr. Khalil as a First Implementation of the Policy and a "Blueprint" for Future Investigations and Deportations of Prominent Student Activists**

45.     On the evening of March 8, 2025, at approximately 8:30 p.m., Mr. Khalil and his wife were returning to their apartment from an Iftar[15] dinner at a friend's home.

46.     When Mr. Khalil and his wife arrived at their apartment building, two individuals in plain clothes followed them into the lobby of the apartment building, which is owned and operated by Columbia University.

47.     The individuals approached Mr. Khalil and asked, "Are you Mahmoud Khalil?" When Mr. Khalil answered in the affirmative, the men identified themselves as being with the Department of Homeland Security ("DHS") and announced that they had to take Mr. Khalil into custody. Mr. Khalil heard them announce on a radio, "he's here," at which point Mr. Khalil noticed two other individuals approach from inside of the building. Based on their location, they would

---

[14] https://zeteo.com/p/scoop-emails-show-mahmoud-khalil-ask-columbia-protection-ice
[15] Iftar is the name of the evening meal eaten at sunset by Muslims to break their fast during the holy month of Ramadan.

have required a key or otherwise been given permission to enter the building.

48.     Mr. Khalil asked whether the agents had a warrant and they said that they had one on the phone and that they would show it to him. However, the agents never showed him a warrant. Mr. Khalil asked why they were here and they asserted that Mr. Khalil's visa was revoked. Mr. Khalil explained that he has a green card. At this point, the agents were creating a barrier between Mr. Khalil and his wife. The agents threatened Mr. Khalil's wife that she would also be arrested if she did not comply.

49.     Mr. Khalil called his attorney, Amy Greer.  Attorney Greer spoke with an agent who identified himself as Special Agent Elvin Hernandez. Agent Hernandez stated they had an administrative warrant and that Mr. Khalil's student visa had been revoked by the U.S. Department of State and therefore they were detaining him.  Despite several requests by Mr. Khalil to see the warrant, the agents never showed him the administrative warrant.

50.     Mr. Khalil's wife then went to the apartment to retrieve Mr. Khalil's immigration documents. She saw another individual in plain clothes on their floor of the apartment building holding a radio.

51.     Attorney Greer advised Agent Hernandez that Mr. Khalil is a lawful permanent resident and has the right to due process.  Agent Hernandez responded that the Department of State had revoked Mr. Khalil's green card, too, and that he would be brought in front of an immigration judge.  Agent Hernandez stated that he would be taking Mr. Khalil to 26 Federal Plaza, the location of the ICE Field Office in Manhattan, New York. When Attorney Greer began to ask more questions, Agent Hernandez hung up on her. When Mr. Khalil requested to call her back, Agent Hernandez refused to allow Mr. Khalil to speak to his attorney again.

52.     Mr. Khalil's wife presented the DHS agents with documents confirming Mr.

Khalil's status as a lawful permanent resident, handing them to an agent who was speaking on the phone. The agent looked confused when he saw the documents and said, "He has a green card" to the individual with whom he was on the phone. Mr. Khalil's wife heard the agent repeat that they were being ordered to bring Mr. Khalil in anyway.

53.    ==The agents then handcuffed Mr. Khalil and brought him outside where there were multiple unmarked vehicles waiting.==  Mr. Khalil's wife asked for the names of the agents, their contact information, and how to reach them to follow up on her husband's detention, but they only advised her that Mr. Khalil would be taken to 26 Federal Plaza and otherwise refused to speak with her.  They left her no business card or any information at all as to how to find out where her husband would be taken, on what grounds, or who she could contact.

54.    The night of the arrest, Attorney Greer checked the ICE Detainee Locator ("ICE Locator") several times to confirm her client's location. She first checked the locator at 10:00 p.m. on Saturday, March 8th and found that Mr. Khalil was not yet listed in the system. She checked again at 1:35 a.m. on Sunday, March 9th, and saw that Mr. Khalil was listed as being in custody in New York. The ICE Locator entry also included an instruction to contact the New York field office. At 4:29 a.m. on Sunday, March 9,[16] Attorney Greer checked the locator once more, and the information remained the same. Shortly thereafter, at around 4:40 a.m. on Sunday, March 9th, Attorney Greer filed the original habeas corpus petition in in this case (ECF 2) in the Southern District of New York, based on information and belief that ICE was still holding Mr. Khalil at 26 Federal Plaza. During this time, Mr. Khalil made continuous requests to contact his attorney, including when agents asked him to sign several documents, but he was repeatedly denied.

55.    The next morning, around 8:30 a.m. on Sunday, March 9, the ICE locator indicated

---

[16] Daylight Saving time began on March 9, meaning that clocks moved forward from 1:59am to 3am over the course of these events.

that Mr. Khalil was still in New York. Sometime after 9 a.m. on Sunday, the ICE locator changed to say that Mahmoud was detained in Elizabeth, New Jersey, at the Elizabeth Contract Detention Facility, a detention center privately owned and operated by the corporation CoreCivic. At 9:29 am, Mr. Khalil's immigration attorney attempted to call the Elizabeth facility twice, but no one answered. Around 11:20 a.m., Mahmoud's wife went to the Elizabeth Detention Center to see him, but she was told that Mahmoud was not showing up in the system.

56.    At 1:47 p.m. on Sunday, March 9, after counsel had submitted a G-28 and sent a 1:22 p.m. email to ICE asking to be connected with him immediately, ICE responded by email informing that Mr. Khalil was in the process of being transferred to a detention facility within the New Orleans ERO Field Office, over 1,000 miles away.[17] Counsel emailed the U.S. Attorney's Office for the Southern District of New York, which confirmed that Mr. Khalil was en route to Louisiana. Counsel requested Mr. Khalil's immediate return, but was told that ICE would not consent to his return absent a court order. When Mr. Khalil's counsel attempted to schedule a telephone call with Mr. Khalil—a process that typically occurs the same day or the next day in New York—authorities in the Louisiana ICE detention facility offered a date ten days away.

57.    Mr. Khalil's wife, who is 8-months pregnant, is unable to travel to Louisiana to see Mr. Khalil.

***Mr. Khalil's Experience being Transferred Repeatedly and in Detention in Louisiana***

58.    While at 26 Federal Plaza on the night of March 8, the ICE agents took Mr. Khalil's biometrics. As they did so, Mr. Khalil saw an agent approach Agent Hernandez and say, "the White House is requesting an update."

---

[17] According to the copy of the NTA that Mr. Khalil's Counsel received on March 11, ICE was already preparing to transfer Mr. Khalil to the Central Louisiana ICE Processing Center while he was still detained at 26 Federal Plaza a few hours after his arrest.

59.     Mr. Khalil was subsequently presented with several documents and asked to sign them, including a Notice to Appear ("NTA") for removal proceedings and a Custody Determination document. Mr. Khalil reviewed the NTA and Custody Determination and, because he did not fully understand the implications of signing them, he requested to speak with his lawyer before doing so. The ICE agent denied his request, prompting Mr. Khalil to refuse to sign.

60.     The copy of the NTA states "YOU ARE ORDERED to appear before the immigration judge of the United States Department of Justice at: 830 Pinehill Rd, Jena, LA, 71342, LASALLE DETENTION FACILITY on March 27, 2025 at 8:30 AM to show why you should not be removed from the United States based on the charges set forth above." The copy is dated March 9, 2025, timestamped at 12:40 a.m., and signed by Supervisory Special Agent Timothy Moran at 26 Federal Plaza, New York, NY.

61.     At some point in the night, Mr. Khalil was transported in handcuffs and shackles to Elizabeth Detention Center in New Jersey ("Elizabeth") but was not allowed to take his belongings—his shoes, jacket, and belt—with him. When Mr. Khalil asked about his belongings, he was told that he would be coming back to 26 Federal Plaza tomorrow, but that he could not spend the night there.

62.     While at Elizabeth, Mr. Khalil again requested to speak with his lawyer, to which the officers responded that he would be allowed to do so after he was processed. Mr. Khalil spent the night in the cold waiting room for processing. Mr. Khalil requested a blanket but was denied. The next morning, as Mr. Khalil reached the front of the line to be processed, he was informed that processing would not be completed because ICE was coming from New York to transport him.

63.     Around 12 p.m., ICE officers—one of whom Mr. Khalil believes he recognized from the night before at 26 Federal Plaza—handcuffed and shackled Mr. Khalil and placed him in

a van. The van had Mr. Khalil's belongings inside that were kept in 26 Federal Plaza. Mr. Khalil was told he was then going to JFK without further clarification.

64.    At JFK, he was transferred to other government agents. None of the agents identified themselves or provided their badge information. At one point, Mr. Khalil noticed one of the agents received a text message instructing not to let his escort, Mr. Khalil, use his phone.

65.    Mr. Khalil took an American Airlines flight from JFK around 2:45 p.m. to Dallas, Texas. During that flight, Mr. Khalil saw one of the officers receive a text message that instructed him not to let Mr. Khalil have a phone call.

66.    Mr. Khalil arrived in Dallas, Texas around 5:30 p.m. and remained there until 9:30 p.m., at which time he was placed on another American Airlines flight—this time to Alexandria, Louisiana.

67.    Mr. Khalil arrived in in Alexandria, Louisiana around 1:00 a.m. on Monday March 10. Upon his arrival, he saw between about four to five agents waiting for him. He was again shackled and placed in handcuffs. He was then placed in an ICE car, driven for about a minute, and then placed in a police car. The agents drove him to Jena, Louisiana.

68.    Throughout this process, Mr. Khalil felt as though he was being kidnapped. He was reminded of prior experience fleeing arbitrary detention in Syria and forced disappearance of his friends in Syria in 2013. It was shortly after this that Mr. Khalil left Syria.

69.    At no time throughout this process did any of the agents identify themselves.

70.    Mr. Khalil then arrived at the Louisiana Detention Facility, where he was processed again. During his initial medical examination in Elizabeth, Mr. Khalil notified agents that he has an ulcer and needs to take his medication for it every day. Despite this, he was not given access to his medication until Tuesday evening. He sleeps in a bunker without a pillow or blanket. He continues

to worry about the wellbeing of 8-month pregnant wife and what will happen to them. He's also very concerned about missing the birth of his first child.   In fact, Mr. Khalil turned down job offers that would have required him to miss the birth of his child.  Throughout his wife's pregnancy, Mr. Khalil has been present for her doctor appointments.

71.     Mr. Khalil also recently secured a coveted job position after four months of searching, and was scheduled to start this role in April of this year. In addition to fearing the loss of his expected salary, Mr. Khalil and his wife planned to obtain medical insurance through this role in order to cover health care costs, including for the birth and care of their expected child. Mr. Khalil continues to worry about the loss of income and health care, especially so close to the expected birth of his child.

72.     It is very important to Mr. Khalil to be able to continue his protected political speech, advocating and protesting for the rights of Palestinians—both domestically and abroad. Indeed, Mr. Khalil was recently invited to go to Copenhagen to attend the premiere of a documentary in which he is featured and to speak on the panel after the premiere.

***The Government Confirms that Mr. Khalil was Targeted for Deportation Because of His Protected Political Speech, in the First Implementation of their Policy***

73.     On March 9, President Trump issued a statement on Truth Social applauding ICE for arresting Mr. Khalil, whom he described as a "Radical Foreign Pro-Hamas Student on the campus of Columbia University." The President warned that Mr. Khalil's arrest was "the first of many to come," declaring that his administration would not tolerate "students at Columbia and other universities across the country who have engaged in pro-terrorist, anti-Semitic, anti-American activity," while promising to "find, apprehend, and deport these terrorist sympathizers from our country."[18]

---

[18] https://truthsocial.com/@realDonaldTrump/posts/114139222625284782

74.    The White House reposted President Trump's statement on the social media platform X, accompanied by a mug-style graphic featuring an image of Mr. Khalil. Surrounding the photo were the words "ARRESTED BY ICE ON MARCH 9, 2025" and "LED ACTIVITIES ALIGNED TO HAMAS." The White House caption included the phrase "SHALOM, MAHMOUD" before quoting the President's statement.[19]

75.    Secretary of State Marco Rubio stated, "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported."[20]

76.    The following day, the Department of Homeland Security issued a statement through its social media account, X, confirming Mr. Khalil's arrest by ICE was carried out "in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State." The statement also accused Mr. Khalil of having "led activities aligned to Hamas, a designated terrorist organization" and asserted that both "ICE and the Department of State are committed to enforcing President Trump's executive orders and to protecting U.S. national security."[21]

77.    In a statement to The Free Press on March 10, a White House official stated that Mr. Khalil was a 'threat to the foreign policy and national security interests of the United States' and that the federal government's "basis" for targeting Mr. Khalil was being used "as a blueprint for investigations against other students."[22]

78.    On March 11, in response to an inquiry from the NY Times regarding Mr. Khalil's arrest, a spokesperson for the administration reportedly stated that "United States' foreign policy

---

[19] https://x.com/WhiteHouse/status/1899151926777749618
[20] https://x.com/marcorubio/status/1898858967532441945
[21] https://x.com/DHSgov/status/1898908955675357314;
https://www.columbiaspectator.com/news/2025/03/10/department-of-homeland-security-confirms-arrest-of-palestinian-activist-mahmoud-khalil-sipa-24/
[22] https://www.thefp.com/p/the-ice-detention-of-a-columbia-student

includes combating antisemitism across the globe and that Mr. Khalil's residency in the nation undermines that policy objective."[23]

79.    At a White House Press Briefing on March 11, Press Secretary Karoline Leavitt responded to questions about the arrest, asserting that the Secretary of State has "the right to revoke a green card or a visa for individuals who serve or are adversarial to the foreign policy and national security interest" and accusing Mr. Khalil of "siding with terrorists."[24]

80.    In a press conference regarding this case on March 12, 2025, Secretary of State Rubio stated, "if you tell us that you are in favor of a group like this [Hamas], and if you tell us . . . I intend to come to your country as a student, and rile up all kinds of anti-Jewish . . . anti-Semitic activities," and "if you end up having a green card . . . we're going to kick you out."[25]

81.    On March 13, 2025, when asked to justify the government's actions, Troy Edgar, the Deputy Secretary of DHS, did not dispute that Mr. Khalil had not broken any laws and instead asserted that he was "agitating and supporting Hamas" by "put[ting] himself in the middle of the process of basically pro-Palestinian activity." When asked directly if "any criticism of the Israeli government [is] a deportable offense," if "any criticism of the United States [is] a deportable offense," if "any criticism of the government [is] a deportable offense," and if "protesting [is] a deportable offense," Deputy Secretary Edgar did not dispute any of those statements.[26]

***DHS Invokes the INA's Foreign Policy Ground against Mr. Khalil, in violation of the INA and the Constitution***

82.    Mr. Khalil's counsel did not receive DHS's asserted legal basis for his arrest and

[23] https://archive.ph/rD4sk#selection-1147.0-1159.428
[24] https://www.c-span.org/program/white-house-event/white-house-daily-briefing/657022 (timestamp 10:16)
[25] http://state.gov/secretary-of-state-marco-rubio-remarks-to-press/
[26] NPR, *Morning Edition* (March 13, 2025), *available at* https://www.npr.org/2025/03/13/nx-s1-5326015/mahmoud-khalil-deportation-arrests-trump.

detention until the afternoon of Tuesday, March 11, pursuant to an agreement with counsel for the government. His NTA states "the Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States." Citing Section 237(a)(4)(C)(i) of the Immigration and Nationality Act (the Foreign Policy Ground), the NTA further states "the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States."

83.     The Rubio Determination was exclusively motivated by Mr. Khalil's lawful, constitutionally-protected past, current, or expected beliefs, statements, or associations. Public statements by government officials, up to and including the President and Secretary of State, establish that Respondents are punishing, detaining, and attempting to silence Mr. Khalil because of his constitutionally-protected past, current, or expected beliefs, statements, or associations.

84.     The Foreign Policy Bar expressly prohibits the Secretary of State from issuing a policy to exclude or condition entry based on a noncitizen's "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless the Secretary personally certifies to Congress that admitting the individual would compromise a compelling U.S. foreign policy interest. *See id.* (citing INA § 212(a)(3)(C)(iii)).   Upon information and belief, Secretary Marco Rubio has not provided any certifications regarding a determination under the Foreign Policy Ground concerning Mr. Khalil to the chairs of the House Foreign Affairs, Senate Foreign Relations, and House and Senate Judiciary Committees, as required by 8 U.S.C. § 1182(a)(3)(C)(iv).

85.     Nor could he. Legislative history reveals that Congress intended to limit the Executive's authority to exclude noncitizens based on their speech or beliefs. When the Moynihan

Amendment was passed in 1987, the Senate Committee warned that "[f]or many years, the United States has embarrassed itself by excluding prominent foreigners from visiting the United States solely because of their political beliefs." The amendment was intended "to take away the executive branch's authority to deny visas to foreigners solely because of the foreigner's political beliefs or because of his anticipated speech in the United States," while affirming "the principles of the First Amendment." (S. Rep. No. 100–75 at 11, 100th Cong., 1st Sess. (1987), reprinted in 133 Cong. Rec. S2326 (1987)).

86.     Congress further evinced its intent to restrict the Executive's ability to exclude foreign speakers by asserting that such exclusions should not be based solely on "the possible content of an alien's speech in this country," that the Secretary's authority to determine that entry would compromise foreign policy interests should be used "sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies," and that the "compelling foreign policy interest" standard should be applied strictly. (H.R. Conf. Rep. No. 101-955, 101st Cong., 2nd Sess. (1990), reprinted in 1990 U.S.C.C.A.N. 6784, 6794).

87.     In the decades since the Foreign Policy Ground was enacted, it appears to have been rarely invoked and reserved for cases involving high-ranking government officials or an alleged terrorist removable on other grounds and subject to high-profile prosecutions in their country of origin. It does not appear to have ever been applied to any person for engaging in First Amendment protected speech.

### *The government adds new allegations and a charge of removability pursuant to the Policy and in further retaliation for Mr. Khalil's speech and initiation of this lawsuit*

88.     One week after Mr. Khalil filed the present action, the government engaged in further retaliatory action. On March 17, 2025, the government amended Mr. Khalil's NTA to include new—false—allegations that Mr. Khalil engaged in "fraud" and "willfully misrepresent[ed]

a material fact" on his application for adjustment of status process (the "Post-hoc Charge"). *See* ECF 90-1 (basing these allegations on purported employment and associations not reported or reported incorrectly on an application which were, and still are, immaterial as to his eligibility for lawful permanent residency).

89.     The Post-hoc Charge is meritless, pretextual, and further evidence of the government's unlawful Policy of targeting for detention and removal noncitizens who engage in protected expressive activity in support of Palestinian rights or critical of Israel. Like the Rubio Determination, the government added the Post-hoc Charge pursuant to this Policy as applied to Mr. Khalil. The Post-hoc Charge is retaliation for Mr. Khalil's speech and initiation of this lawsuit.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### Violation of the First Amendment to the United States Constitution

90.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein. The First Amendment to the United States Constitution provides in part that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I. The First Amendment protects past, present, and future speech, including speech by noncitizens.

91.     The Rubio Determination, Policy, and Post-hoc Charge, Mr. Khalil's targeting, arrest, transfer, and ongoing detention violate the First Amendment because they:

•       retaliate against and punish Mr. Khalil for his past protected speech;

•       prevent him from speaking now (through detention);

•       attempt to chill (through past punishment and ongoing threat) or prevent (through eventual removal) his future speech in the United States;

• deprive audiences of his present and future speech on matters of public concern; and

• chill other individuals from expressing views sympathetic to Palestinians.

92.     These speech-related consequences are not side effects of an action with some other purpose; they are, instead, the point of the Determination and the government's subsequent actions against Mr. Khalil and are, in government officials' own telling, the result of their disagreement with his protected speech and the viewpoint it expresses.

## SECOND CLAIM
### Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution

93.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

94.     The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Black v. Decker*, 103 F.4th 133, 143 (2d Cir. 2024) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)).

95.     The government's detention of Mr. Khalil is wholly unjustified. *See Black*, F.4th at 157 (collecting cases stating that "[w]here an individual's liberty is at stake, the Supreme Court has consistently required the government to justify continued detention by clear and convincing evidence."). The government has not demonstrated that Mr. Khalil—a husband to a U.S. citizen, soon-to-be father to a U.S. citizen, and lawful permanent resident with no criminal history—needs to be detained. *See Zadvydas*, 533 U.S. at 690 (finding immigration detention must further the twin goals of (1) ensuring the noncitizen's appearance during removal proceedings and (2) preventing danger to the community). There is no credible argument that Mr. Khalil cannot be safely released

back to his family.

96.    Moreover, Mr. Khalil's detention is punitive as it bears no "reasonable relation" to any legitimate government purpose. *Zadvydas*, 533 U.S. at 690 (finding immigration detention is civil and thus ostensibly "nonpunitive in purpose and effect"). The sole basis of his detention—the Foreign Policy Ground and the Rubio Determination—are unlawful for the reasons discussed *supra*. Here, there is every indication that his "detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Demore v. Kim*, 538 U.S. 510, 532-33 (2003) (Kennedy, J., concurring).

97.    The Policy and the Rubio Determination also violate Mr. Khalil's right to due process. The government's policy of targeting people like Mr. Khalil—lawful permanent residents, living peacefully in the country who engage in speech advocating for Palestinian rights—is unconstitutionally vague.

### THIRD CLAIM
**Violation of the Administrative Procedure Act and the *Accardi* Doctrine**

98.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein. The government has adopted a policy of targeting noncitizens for removal based on First Amendment protected speech advocating for Palestinian rights. This policy is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C), and violates the *Accardi* doctrine and federal agencies' own rules, *see Accardi v. Shaughnessy*, 347 U.S. 260 (1954). In addition, the Secretary of State's determination that Mr. Khalil's "presence or activities would potentially have serious adverse foreign policy consequences for the United States" and "would compromise a compelling United States foreign policy interest"

is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C).

## FOURTH CLAIM
### Release on Bail Pending Adjudication

99.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

100.    This Court has the "inherent authority" to grant bail to habeas petitioners like Mr. Khalil. *See Mapp v. Reno*, 241 F.3d 221, 230 (2d Cir. 2001) (holding that federal courts have inherent authority to set bail pending the adjudication of a habeas petition when the petition has raised substantial claims and extraordinary circumstances "make the grant of bail necessary to make the habeas remedy effective"). In considering a petitioner's fitness for bail, courts assess (1) "whether the petition raises substantial claims" and (2) "whether extraordinary circumstances exist that make the grant of bail necessary to make the remedy effective." *Elkimya v. Dep't of Homeland Sec.*, 484 F.3d 151, 154 (2d Cir. 2007) (cleaned up).

101.    This petition raises numerous substantial constitutional and statutory claims challenging Mr. Khalil's retaliatory detention. As for the second factor, extraordinary circumstances exist here that make Mr. Khalil's release necessary to make the remedy effective. As long as Mr. Khalil remains in ICE custody, he will be prevented from speaking freely and openly—instead, his speech is severely curtailed and controlled by DHS. And it is effectively impossible for him to speak to the broader public at all. His detention is also preventing him from adequately litigating his removal proceedings, which the government has chosen to justify only in the press. Moreover, Mr. Khalil's wife is eight months pregnant with their first child. Not only is she unable to visit him where ICE has chosen to detain him, in Louisiana, but his continued detention prevents

him from caring for her at a critical time and will cause him to miss the birth of his first child. *See, e.g.*, *S.N.C. v. Sessions*, No. 18-CV-7680, 2018 WL 6175902, at *6 (S.D.N.Y. Nov. 26, 2018) (ordering immediate release of petitioner pending consideration of her claim that her abrupt deportation would violate her due process right to an opportunity to be heard on her application and in order to care for her children).

## **PRAYER FOR RELIEF**

WHEREFORE, Petitioner respectfully requests that this Court:

1) Assume jurisdiction over this matter;

2) Vacate and set aside Respondents' unlawful Policy of targeting noncitizens for removal based on First Amendment protected speech advocating for Palestinian rights, including as applied to Mr. Khalil through the Rubio Determination and the Post-Hoc Charge;

3) Vacate and set aside the Rubio Determination;

4) Enjoin Respondents from transferring the Petitioner from the jurisdiction of this District pending these proceedings;

5) Order the immediate release of Petitioner pending these proceedings;

6) Order the release of Petitioner;

7) Declare that Respondents' actions to arrest and detain Petitioner violate the First Amendment and the Due Process Clause of the Fifth Amendment;

8) Award reasonable attorneys' fees and costs for this action; and

9) Grant such further relief as the Court deems just and proper.

Dated: May 1, 2025  
Newark, NJ

NEW YORK CIVIL LIBERTIES UNION

Respectfully submitted,  
 /s/ Jeanne LoCicero  
AMERICAN CIVIL LIBERTIES UNION  
OF NEW JERSEY FOUNDATION

FOUNDATION
Amy Belsher*
Robert Hodgson*
Veronica Salama*
Molly Biklen *
125 Broad Street, 19th Floor
New York, NY 10004
Tel: (212) 607-3300

CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.
Ramzi Kassem*
Naz Ahmad
Shezza Abboushi Dallal*
Mudassar Toppa*
CUNY School of Law
2 Court Square
Long Island City, NY 11101
Tel: (718) 340-4558

VAN DER HOUT LLP
Marc Van Der Hout**
Johnny Sinodis**
Oona Cahill**
360 Post St., Suite 800
San Francisco, CA 94108
Tel: (415) 981-3000

WASHINGTON SQUARE LEGAL
SERVICES, INC.
IMMIGRANT RIGHTS CLINIC
Alina Das*
245 Sullivan Street, 5th Floor
New York, NY 10012
Tel: (212) 998-6430

Jeanne LoCicero
Farrin R. Anello
Molly K.C. Linhorst
570 Broad Street, 11th Floor
Newark, NJ 07102
Tel: (973) 854-1715

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Omar Jadwat*
Noor Zafar*
Sidra Mahfooz*
Brian Hauss*
Brett Max Kaufman*
Esha Bhandari*
Vera Eidelman*
Tyler Takemoto*
125 Broad Street, Floor 18
New York, NY 10004
Tel: (212) 549-2500

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy
Samah Sisay*
Diala Shamas*
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6464

DRATEL & LEWIS
Amy E. Greer
29 Broadway, Suite 1412
New York, NY 10006
Tel: (212)732-8805

*Counsels for Petitioner*
*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing filing was

served on counsel of record via this Court's CM/ECF system on May 8, 2025

pursuant to the Court's verbal ruling of May 2, 2025 granting Petitioner's motion

to amend the petition.

_/s/Jeanne LoCicero_
Jeanne LoCicero
AMERICAN CIVIL LIBERTIES UNION OF
NEW JERSEY FOUNDATION
570 Broad Street, 11th Floor
Newark, New Jersey 07102
973-854-1715

_Counsel for Petitioner_