# EXHIBIT C

```
 1                  UNITED STATES DISTRICT COURT

 2                  DISTRICT OF MASSACHUSETTS (Boston)

 3                            No. 1:25-cv-10685-WGY

 4

 5   AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
                  Plaintiffs
 6

 7   vs.

 8

 9   MARCO RUBIO, in his official capacity as
     Secretary of State, et al,
10                  Defendants

11
                            *********
12

13

14                      For Hearing Before:
                       Judge William G. Young
15
                          Motion Hearing
16

17                     United States District Court
                       District of Massachusetts (Boston.)
18                     One Courthouse Way
                       Boston, Massachusetts 02210
19                     Monday, June 2, 2025

20
                            ********
21

22
                   REPORTER: RICHARD H. ROMANOW, RPR
23                       Official Court Reporter
                      United States District Court
24       One Courthouse Way, Room 5510, Boston, MA 02210
                           rhr3tubas@aol.com
25
```

```
 1                    A P P E A R A N C E S

 2

 3   CAROLINE DeCELL, ESQ.
     ALEXANDER ABDO, ESQ.
 4      Knight First Amendment Institute at Columbia
        University
 5      475 Riverside Drive, Suite 302
        New York, NY 10115
 6      (646) 745-8500
        E-mail: Carrie.decell@knightcolumbia.org
 7   and
     COURTNEY GANS, ESQ.
 8      Sher Tremonte LLP
        90 Broad Street, 23rd Floor
 9      New York, NY 10004
        (212) 540-0675
10      Email: Cgans@shertremonte.com
        For Plaintiffs
11

12   ETHAN B. KANTER, ESQ.
     WILLIAM KANELLIS, ESQ.
13      DOJ-Civ
        P.O. 878
14      Ben Franklin Station
        Washington, DC 20044
15      (202) 616-9123
        Email: Ethan.kanter@usdoj.gov
16   and
     SHAWNA YEN, ESQ.
17      United States Attorney's Office
        1 Courthouse Way, Suite 9200
18      Boston, MA 02210
        Email: Shawna.yen@usdoj.gov
19      For Defendants

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S

 2         (Begins, 12:00 p.m.)

 3         THE CLERK:  Civil Action 25-10685, the American

 4    Association of University Professors, et al versus Marco

 5    Rubio, et al.

 6         THE COURT:  Good morning.  The Court has permitted

 7    internet access to this hearing.  That being so, I

 8    remind you that if you are attending the hearing

 9    remotely, that the rules of court remain in full force

10    and effect, that is to say you must keep your microphone

11    muted.  There's no taping, streaming, screen shots,

12    rebroadcast, or transcription of these proceedings.

13         With that stated, there are two preliminary

14    matters.  We -- well excuse me.

15         (Pause.)

16         THE COURT:  The motion dealing with the timing of

17    the filing of the administrative record, I've allowed

18    that motion.  Then there is the assented-to motion

19    provisionally to file portions of the administrative

20    record as sealed, and in fact it has been so filed.

21         I haven't yet looked at anything in the redacted

22    portion of the record, but the motion seems to me to

23    make sense.

24         Have you agreed upon a protective order here?  And

25    since we may have different people arguing, perhaps you
```

```
 1   could introduce yourself when first you speak.
 2        MS. GANS:  This is Courtney Gans for the
 3   plaintiffs.
 4        We have not yet reached an agreement on the
 5   protective order, but we're expecting to meet and confer
 6   this week and we'll hopefully have an agreement in short
 7   order.
 8        THE COURT:  All right.
 9        MS. GANS:  And we do agree that they could
10   provisionally file under seal.
11        THE COURT:  I have no doubt about the accuracy of
12   the representation.  It would be helpful to know what
13   the administrative record is.  So we'll leave things in
14   that lie.
15        This is the motion filed by the defendants.  I
16   said I would hear it.  I've read all the papers.  I
17   think that about 10 minutes a side will be sufficient.
18   And it's the government's motion, and I'll hear the
19   government.
20        MR. KANTER:  Thank you, your Honor.  May it please
21   the Court.  My name is Ethan Kanter and I'm representing
22   the government defendants in this case.
23        THE COURT:  Mr. Kanter, welcome back.
24        MR. KANTER:  Thank you very much.  I was here
25   virtually on the last round and you suggested I show up
```

1    in person, and I think that was a good -- a good

2    judgment.

3         (Laughs.)

4         So this is how I'd like to begin.  You have our

5    motion raising two objections.  One, the record rule

6    that, um, the case should proceed based on an

7    administrative record.  But this is an APA case --

8         THE COURT:  Not entirely.

9         MR. KANTER:  Well that's a very good point, your

10   Honor, the plaintiffs have asserted constitutional

11   claims as well, um, under the First Amendment.  And as

12   you -- you would know, and I'll sort of fast-forward

13   here, the APA expressly provides for asserting claims of

14   constitutional right, power, privilege, immunity.  I

15   mean Congress really is trying to make that point, that,

16   yes, okay, through the APA framework, nevertheless --

17   and plaintiffs have cited this in their letter brief to

18   the Court, there are some exceptions which have been

19   noted, generally speaking.  And then the First Circuit,

20   in *The Commonwealth of Puerto Rico vs. FBI* case, has

21   drilled down on exactly what the exceptions are.  And so

22   I want to talk about that, um, and get into those

23   exceptions.

24        I also want to reach our second objection, which

25   relates to the application in this context of the

facially-legitimate and bonified review standard, which

was announced first and applied in the immigration

context really by the ***Kleindienst vs. Mandel*** case, and I

refer to that as **"*Mandel.*"**  Plaintiffs have rejected

both objections and this is where I'd like to begin,

because the rejection of both is pretty unequivocal.

With regard to the record rule, the plaintiffs

say, on the first page of their brief, that it is

entirely without merit.  Entirely.

With regard to the facially-legitimate and

bonified review standards application here, they are

equally unequivocal.  It has no application.

Your Honor, the purity of extremes, it is

something that I think can be questioned on its face,

especially in our profession.  There are exceptions.

There are general propositions and then how it's

applied.

With regard to, um, the First Amendment.  To say,

I believe, that this case is only about the First

Amendment in a vacuum, divorced from the immigration

context, which is so apparent on every single page of

the plaintiffs' complaint and every single page of their

PI motion, they use the word "targeted" more than 30

times in those papers.  Targeted by whom?  By the

immigration agencies.

1          To say that this case can be viewed about the

2      First Amendment in a vacuum is too simple, and it's

3      simply -- it's incompatible with a number of things,

4      because it's obvious that this case involves both the

5      First Amendment and noncitizens.  It's obvious that this

6      case involves, um, as has been pled, um, reticent

7      enforcement or the targeting for enforcement.

8          The primary distinction of my friends, um, of the

9      *Kleindienst's* line of cases and the facially-legitimate

10     and bonified standard, is this outside/inside, right?

11     Um, *Kleindienst* --

12          THE COURT:  I'm trying to follow you here.

13          MR. KANTER:  Okay.

14          THE COURT:  And, you see, I have been following

15     you and I have looked at the redacted administrative

16     record and, um, I've looked at the proper rationale for,

17     um, the government action by immigration authorities.

18     Now, um, on that record, standing alone, um, the Court

19     would be warranted -- though I've been very careful to

20     say I've meant to draw no conclusions in anybody's -- in

21     any other case, because the people who have standing

22     here are not parties to those cases and have brought

23     their independent case, but I do say this.  I would be

24     warranted in thinking that, um, the reason for those

25     actions by immigration authorities is simply the speech

1    of the individuals against whom those actions were

2    taken.  And if I understand their complaint, they're

3    saying that's retribution for that speech.  And the

4    analysis would proceed, um, thereby.

5         Really I -- I am curious to find out -- and I

6    still am, whether there's something more, something that

7    I don't know about?  And so that's how I approach this.

8         Go ahead.

9         MR. KANTER:  And I, um -- your Honor said

10   something similar in the first, um, status conference,

11   that the case boils down to retaliation that, um,

12   plaintiffs have pled that --

13        THE COURT:  Not just that.

14        MR. KANTER:  Okay.

15        THE COURT:  You see retaliation as to various

16   people with one of the reasons to chill the speech of

17   the group that this Court has afforded standing.  I

18   still think that's what this case is about.

19        Go ahead.

20        MR. KANTER:  Okay, well they're -- so it's in the

21   mix.  Whether it's the one reason or they're being

22   targeted for, um, immigration enforcement, because of

23   immigration violations, but I want to take both head on.

24   Because, um -- and this is where I believe my friends

25   have misread *Kleindienst* and that line of cases, and

1    ***Kerry vs. Dinn, Munoz, Trump vs. Hawaii***, which

2    construed, um, an executive order very similar to the

3    one in our case, because it's about vetting, screening.

4    Plaintiffs have cited one sentence in that executive

5    order to support their view that they're being targeted

6    improperly.

7        But at its core, ***Kleindienst*** is about executive

8    discretion.  It was a discretionary waiver.  The

9    resolution of the case and the analysis therein followed

10    a discourse in which, um, the Court -- I believe it was

11    Justice Blackmon, talked about the prior cases about

12    Congressional plenary authority in immigration,

13    familiar, um, holdings that I think may, you know, sort

14    of echo in our minds.  Like over no conceivable subject

15    is the legislative power of Congress over immigration

16    more complete.  And that the plenary Congressional power

17    is not only respecting the entry of aliens to the United

18    States, but the terms and conditions of their stay and

19    their right to remain.  ***Kleindienst*** is not simply about

20    denying the admission into the United States of aliens

21    outside.  And so the primary distinction of my friends,

22    I think, doesn't apply.  What ***Kleindienst*** focuses on is

23    executive discretion.

24        Interestingly, that in ***Kleindienst*** the plaintiffs

25    brought a nondelegation claim.  They argued that, "Wait,

1  the power that Congress, according to the government,

2  has delegated to the executive, it can't be that broad,

3  it must violate the nondelegation principle."  That was

4  rejected.  It was underscored that, no, here you have

5  coordinated branches of government, legislative and

6  executive --

7      THE COURT:  But you're arguing propositions with

8  which I agree.

9      MR. KANTER:  Okay.

10      THE COURT:  I agree to those propositions.  And

11  indeed my agreement, as Judge Selya would say, is

12  superogatory, you're quoting from decisions from the

13  Supreme Court of the United States.  I am sworn to agree

14  with them.  Of course I do.  And I'm familiar with them

15  and I agree.

16      MR. KANTER:  Then let me connect the dots as it

17  were, because the plaintiffs are the masters of their

18  complaint, and as I noted, the word "targeting" appears

19  again and again and again.  They are attacking this

20  alleged retaliation, this alleged improper selection of

21  these individuals because they engaged in

22  pro-Palestinian advocacy.  That the executive branch,

23  these agencies are somehow abusing their enforcement

24  discretion, or more to the point, they're attacking the

25  prosecutorial discretion of the agency.

1        In this way it is very much squarely what

2    *Kleindienst* is about because that case said when --

3    virtually the government's argument was that it can deny

4    for any reason and no reason at all.

5        THE COURT:  You have another 5 minutes.

6        MR. KANTER:  Okay.

7        And the Court didn't reach that and said, "No, we

8    don't have to reach that argument because the executive

9    has provided a facially-legitimate and bonified" --

10    (Zoom interruption.)  It's about -- their case is about

11    targeting that is fundamentally discretionary, um,

12    *Kleindienst*, and their other distinction.  It's about

13    aliens outside the United States attempting to enter,

14    not those like their membership, um, noncitizen members

15    who are in the United States.

16        THE COURT:  I'm not sure they go this far.

17        MR. KANTER:  Yes.

18        THE COURT:  Let me put this to you.

19        Suppose that within these public officials, senior

20    public officials, they are concerned about

21    pro-Palestinian speech and they flat-out say -- and I'm

22    not sure they have to prove this, they flat-out say,

23    "You know the way to cut down on this protest, the way

24    to cut down on this speech is simply to" -- "we'll use

25    the regulations we have now and we'll start, um,

1    revoking visas, deporting for green cards, and, um,

2    excluding people under our admitted powers to do that,

3    and with the goal of they'll quiet down then."  Now

4    suppose that.  I do not suggest that.  I haven't seen

5    evidence of -- direct evidence of that.  But suppose

6    that.

7        If that were so, doesn't that violate the First

8    Amendment rights of the group to which I've afforded

9    standing here?

10       MR. KANTER:  Well that is a very direct and

11   challenging question for which my answer -- it's a

12   perfect pivot to the record rule argument and process.

13   And let me explain.

14       In the Department of Commerce --

15       THE COURT:  You've got 3 minutes.  Go ahead.

16       MR. KANTER:  I think I can do it in 2 1/2.

17       The Department of Commerce case, which the Supreme

18   Court -- the census case, which enforced the APA-record

19   rule requirement, which held that the District Court's

20   authorization of discovery was premature and erroneous,

21   even though it ended up reviewing that information on

22   appeal, um, contains information about what your Honor

23   is asking me.  Because they talk about how the executive

24   may have both stated and unstated reasons.  In commerce,

25   they had to show the only reason was pretext, and that

1    was the basis upon which the decision turned.

2         As to the stated/unstated, the Court wrote,

3    "Agency policymaking is not a rarified technocratic

4    process unaffected by political considerations or the

5    presence of Presidential power."

6         THE COURT:  Mr. Kanter, I -- again I interrupt you

7    only because if you -- and you're not expected to read

8    everything that this lowly-court writes --

9         MR. KANTER:  (Laughs.)  I found that especially

10   compelling that I wanted to quote it.

11        THE COURT:  Oh, you have every right to, as I

12   quoted it most recently in one of these NIH cases also

13   before this Court.  I'm well-aware of that language.

14   I -- I want to ask them about it being the only reason.

15   I understand your argument and respect it.

16        All right.  Who argues for the plaintiffs here?

17        MR. KANTER:  Thank you, your Honor.

18        THE COURT:  Thank you.

19        MS. DECELL:  Good afternoon, your Honor, may it

20   please the Court, my name is Caroline DeCell on behalf

21   of the plaintiffs.

22        THE COURT:  Yes, Ms. DeCell.

23        MS. DECELL:  Thank you.

24        So I will address both points that the government

25   makes with respect to the record rule and the ***Mandel***

1    standard, but I think one overarching concern applies to

2    both, and that is that the government disputes the

3    existence of the policy that we challenge in this case,

4    and they have not explained how an administrative record

5    compiled for the purpose of demonstrating that the

6    challenged policy does not exist would facilitate

7    judicial review or how the **Mandel** standard would apply

8    to a lack of justifications or a lack of coherent policy

9    with respect to the challenged actions.

10         THE COURT:  How do you deal -- how do you deal

11   with the commerce case?  He quoted that language, um,

12   which I most recently quoted.  What -- when he says to

13   me, "It has to be the only reason that the government

14   officials have taken this action," that seems to be a,

15   um, a row so long that I find it difficult to think you

16   could ever hoe it.  I push back on his argument saying,

17   "Well suppose this" and "Wouldn't I be warranted with

18   that?"  And now he cites me the Supreme Court case and

19   from that he derives the only reason for pardoning these

20   other people who are -- about whom I have nothing to

21   say, except what I can infer from what happened to them,

22   to the group that you represent, that's what this case

23   is about.  And he says, "The only reason has got to be

24   the chilling of protected speech."

25         What about that?

1     MS. DECELL:  And so, your Honor, that is quite the

2  whittling down of the claims in this case, but remember

3  -- so first I'd just like to quote the full language

4  from the **Department of Commerce** case, which is that the

5  Supreme Court concluded that, um, in invoking the

6  bad-faith exception to the record rule and ordering

7  extra-record discovery, um, the District Court's order

8  was premature, but I quote, "We think it was ultimately

9  justified in light of the expanded administrative

10 record."  So they're certainly not beyond considering

11 the extra-record discovery there.

12     THE COURT:  All right.  And I've read the case

13 carefully, having just cited it.

14     Go ahead.

15     MS. DECELL:  And that speaks to a case in which

16 the record -- the administrative record was the basis

17 for the proceedings there, and the question was whether

18 or not there was discovery allowed outside the record to

19 kind of supplement the record?  There's a body of

20 case law in this circuit and elsewhere, um, that

21 determines the ability of plaintiffs to seek discovery

22 to supplement the record, um, or to complete the record.

23     And in the former case, the bad faith requirement

24 applies, although the District Court may also allow

25 discovery to supplement the record for purposes of

1    facilitating judicial review, if in the absence of that

2    discovery, um, judicial review would be frustrated.  And

3    that's with respect to supplementing the administrative

4    record.

5         And then in order to complete the record, um, no

6    such bad faith showing is required.  And we pointed to a

7    few cases in the District of Massachusetts that lay out

8    this delineation quite clearly.

9         But as an initial matter, as your Honor noted at

10   the beginning, we raise not only APA claims in this

11   case, but also constitutional claims.  And there are

12   other courts in this District that have concluded that

13   independent constitutional claims merit independent

14   discovery outside of the administrative record.  And

15   that's particularly important here with respect to one

16   set of claims that, um, upon which we raise no APA

17   claims whatsoever.

18        So we have challenged, and the Court agreed that

19   we have plausibly alleged, um, a campaign of censorship

20   through coercive threats, and we raise no APA claims

21   against that campaign of censorship, and it's not clear

22   to what extent an administrative record could be

23   compiled, um, on the basis of which we could litigate

24   those claims.  And so for that reason alone, this extra-

25   record discovery will be required in this case.

1         Even with respect to the APA claims, um, the cases

2    that the government relies on involve situations in

3    which the constitutional claims overlap almost entirely

4    with the APA claims at issue, and the courts in those

5    cases have analyzed the APA claims and the

6    constitutional claims to determine the extent of that

7    overlap, and ultimately concluded that it would be the

8    most effective way to proceed on the basis of an

9    administrative record in those cases.  So not offering a

10   bright-line rule saying that whenever the APA comes into

11   play, there is no discovery allowed outside of the

12   administrative record, but really just accessing the

13   value of proceeding, um, with discovery outside of the

14   administrative record in those cases.

15        But here, as I mentioned at the outset, the

16   government disputes the existence of the policy that we

17   challenge, again putting aside the challenges to the

18   campaign of threats, um, and --

19        THE COURT:  Well the policy -- let me interrupt

20   you, because I have the responsibility of administering

21   the case.  So I posited to him what in my mind

22   conceptually is the smoking gun here.

23        You agree with that, don't you?

24        MS. DECELL:  That certainly would be --

25        THE COURT:  That's what they were thinking, you

1    agree with that, that's the essence of your case?  I

2    mean -- look, I won't say anything, go ahead, but I've

3    got that right?

4        MS. DECELL:  Well I would just say that, yes, that

5    is certainly a core component of our case.  We also

6    think that the policy, as we've alleged it, is facially

7    unconstitutional because it's, um -- to arrest, detain,

8    and deport people on the basis of their political

9    speech.  But, um, it's particularly with our allegations

10   with respect to the --

11       THE COURT:  Well you say "facially," they

12   certainly don't say that?

13       MS. DECELL:  And that's in part because they

14   dispute, um, coming back to my previous point, the

15   existence of this policy -- to be clear, they dispute it

16   in this courtroom, but not in public, um, they proclaim

17   this policy left and right.  But here they dispute that

18   --

19       THE COURT:  Language like "We don't want people

20   creating a ruckus"?

21       MS. DECELL:  Yes, that would go -- certainly that

22   would go to our claims, your Honor.

23       But here there are courts that have concluded that

24   where defendants deny the existence of the policy in

25   question, um, the plaintiffs cannot be constrained by

administrative record as to that policy.  It simply

makes no sense.  And here the declarations that

defendants submitted in connection with the

administrative record in this case, um, speaks to the

purpose of the record as demonstrating the absence of

the policy.  So there's just a fundamental disconnect

between the administrative record they have compiled and

the policy that we're challenging.

There are analogous circumstances in APA cases in

which the Court proceeds with ordinary discovery outside

of an administrative record.  For example, when

plaintiffs challenge agency inaction and delay, there

may be a number of relevant materials, but that don't

coalesce into some administrative record.

But more importantly, in other cases challenging

policies that the defendants dispute the existence of,

the courts have permitted discovery.  One case that we

point to is the **Allotoyloto v. Mayorkas** case in the

Southern District of California, um, where no

administrative record was filed, it proceeded on the

basis of discovery.  And the **Greater Boston Legal**

**Services** case in this District where, um, discovery was

permitted to complete the administrative record.

THE COURT:  I recognize that.  Most recently

within the past 6 months, over the objection of the

1    Coast Guard, I allowed testimony about the rebuilding of
2    a fish boat in an Administrative Procedure Act case.
3    He's citing to me decisions by the Supreme Court of the
4    United States.  You've answered as to those.  While I
5    certainly respect all my District Court colleagues, um,
6    I am bound, and happily bound -- I'm not construing any
7    decision of the Supreme Court of the United States
8    narrowly, or skeptically, that's not given to me.  I'm a
9    United States District Judge, I'll exercise all the
10   authority of a United States District Judge.
11          Go ahead.
12          MS. DECELL:  Thank you, your Honor.
13          Well speaking of the Supreme Court, I would just
14   point to, um, one other piece of evidence that the Court
15   does not consider discovery with respect to
16   constitutional claims, even in cases that also raise APA
17   challenges, um, as inappropriate, and this would be
18   Justice Sotomayor's concurrence in the Department of
19   *Homeland Security vs. Regents* case, where she agreed
20   with the majority that DHS had violated the APA in
21   rescinding the DACA program, but explained that she
22   would have permitted respondents to pursue factual
23   development on their equal protection claims on remand.
24   So a clear indication, we think, that the Supreme Court
25   itself, or at least certain justices, consider discovery

1    on constitutional claims appropriate even when APA

2    claims are raised alongside them.

3           And there are other cases of course that we have

4    pointed to in our opposition in which the, um, District

5    Court here has concluded that, um -- and now I quote,

6    "Limiting the scope of review to the administrative

7    record makes little sense in the context of an inquiry

8    into illicit animus in the context of an equal

9    protection claim," but here too, as your Honor has

10   recognized, intent is a core component of some of our

11   claims.  That's the **Boston Alliance of Gay Lesbian**

12   **Bisexual and Transgender Youth** case that we cite in our

13   opposition.  And there are more.

14          But I will turn to the **Mandel** point, unless your

15   Honor has further questions?

16          THE COURT:  Please.  You have 5 minutes left.  Go

17   ahead.

18          MS. DECELL:  Thank you, your Honor.

19          So with respect to **Kleindienst vs. Mandel** and, um,

20   the progeny of that case, those cases simply do not

21   apply outside the context of final inadmissibility

22   decisions.  And I will -- if you'll indulge me, quote

23   from recent Supreme Court decisions, um, applying that

24   standard and from **Mandel** itself.

25          In the **Munoz** case, that defendants point to, the

1  Supreme Court said that, quote, "The Immigration and

2  Nationality Act does not authorize judicial review of a

3  consular officer's denial of a visa.  Thus, as a rule,

4  the federal courts cannot review those decisions."  And

5  that's referred to as the "Consular Nonreviewability

6  doctrine."

7       Then the Court proceeds to say "That we have

8  assumed that a narrow exception to this bar exists,"

9  quote, "when the denial of a visa allegedly burdens the

10 constitutional rights of a U.S. citizen, and in that

11 event the Court has considered whether the executive

12 gave a," quote, "facially legitimate and bonified

13 reason."  And so in the Supreme Court's own articulation

14 of the *Mandel* standard, it is tied very closely with

15 denials of a visa.

16      And the *Hawaii* -- the *Trump v. Hawaii* case is in

17 line with the Doctrine of Consular Nonreviewability and

18 the application of *Mandel* as an exception to that

19 doctrine.  And in fact in *Mandel* itself, in putting

20 forth the standard that defendants rely on here, um, if

21 you read the beginning of the quoted -- the quoted

22 standard, the Court says, um, that when an alien is

23 excludable under the relevant statutory provision, um,

24 excludable in the first instance, and that person is

25 denied a visa, Congress has delegated to conditional

1    exercise of the exclusion power to the executive, and

2    then we hold that when the executive exercises this

3    power negatively on the basis of a facially-legitimate

4    and bonified reason, the courts will neither look behind

5    the exercise of that discretion, nor testify balancing

6    its justifications against the First Amendment.  And so

7    again, any articulation of the standard is connected to

8    the visa denial context.

9         Moreover, as I mentioned earlier, the government

10   offers no clear explanation of how the **_Mandel_** standard

11   would even apply in this case given that they have

12   offered no coherent set of justifications for the

13   actions that, um, we have identified in support of the

14   policy.

15        THE COURT:  Well wait a minute.  Yes, they have.

16        MS. DECELL:  They have offered different

17   justifications in different cases.

18        THE COURT:  Yes.

19        MS. DECELL:  Um, but to date we have not seen a

20   coherent explanation from the government across the

21   board --

22        THE COURT:  Well when you say "coherent" and

23   "across the board," um, I have looked at the

24   administrative record that's been prepared and, um, it's

25   the basis for my question to Mr. Kanter, when I said,

```
 1    "Well I would be warranted in thinking they have nothing
 2    beyond what is in the administrative record."  But
 3    what's in the administrative record is reference to
 4    regulations which say that conduct -- unspecified, but
 5    conduct, embarrasses the foreign policy of the United
 6    States.  That's there.  And again, that's in the
 7    administrative -- that's in the immigration context.
 8    And this Court is not going to say, "Well you know the
 9    judge in this case -- in that case should do this or
10    that or was right to do this or that."  That's not this
11    Court's business.  All I'm going to do is -- if it went
12    your way, was to say, um, on the totality of the record,
13    whatever we figure it out to be, what was going on here
14    was to chill the free speech of your clients.
15         Do you understand procedurally what I am trying to
16    do?
17         MS. DECELL:  I believe so, your Honor, yes.  So
18    taking the government's statement --
19         THE COURT:  Okay, well then let's -- I'll ask you,
20    and I'm asking sincerely, have I got the procedure right
21    in your view?
22         MS. DECELL:  Um, so just to confirm that I
23    understand this.
24         So what the government has put forward in the
25    administrative record, um, is a -- I think an assertion
```

1    that, um -- they, um -- they claim the authority to

2    deport people from this country, including legal

3    permanent residents, um, and other visa holders, based

4    on speech that they identify as perhaps related to some

5    of the statutory provisions that they have identified in

6    the administrative record.  And so typically there's one

7    statutory provision that the Court can look to and

8    determine whether or not it's a facially-legitimate

9    basis for the challenged action.  Here, um, as put forth

10   in the administrative record, there are a handful of

11   provisions.  So that complicates things a little bit.

12       But to the extent the government, um, kind of

13   induces from those provisions a broader authority to

14   exclude people on, um, the basis of speech, which I

15   understand they're contesting -- I guess my difficulty

16   here is that it's not clear to me what their overarching

17   justification is.  But even if --

18       THE COURT:  Thank you.  No, no, I'm understanding

19   what you're saying, and I'll say it back, because it's

20   important that I do understand.

21       You're saying, "Well here are these various

22   justifications from their regulations and the like which

23   touch on speech, but coupled with their, um, bellicose

24   public pronouncements about the policies that they are

25   following generally," you're now going to say to me,

1    "the Court must infer they're trying to chill the speech

2    of your clients."

3         Have I got it right?

4         MS. DECELL:  Yes, that's the policy from our

5    perspective, your Honor, and that is what we were

6    challenging.  We're not challenging the --

7         THE COURT:  I understand that.

8         MS. DECELL:  We're not challenging the individual

9    actions against particular people.

10        THE COURT:  But when we were having that

11   case-management conference -- you know the government

12   has the power, and indeed it has the First Amendment

13   right to speak in a bellicose fashion, to chill the

14   weaker, um, less-heard parts of society, more vulnerable

15   parts of society, because they may not be United States

16   citizens.  The government has every power to -- First

17   Amendment power to scare those people, at least I think

18   they do.  But what they cannot do is visit retribution

19   on those people for speaking -- and then you say, they

20   have, in order to chill the others.  That's how I frame

21   it.  And you say that's part of it.

22        But you would, in fairness -- and I -- well you

23   tell me, but in fairness you're saying more, that I

24   should go further than that.  That's where you say it's

25   facially incompatible with the First Amendment and this

```
 1   Court should so declare, and that's my responsibility so
 2   to declare.
 3           MS. DECELL:  That's right, your Honor.  And that
 4   goes to, um, your Honor's recognition that there are
 5   First Amendment rights in play here, that the lawful
 6   permanent residents and other noncitizens who are in
 7   this country do have First Amendment rights.  And for
 8   that reason other courts have concluded that the **Mandel**
 9   standard does not apply in the deportation context, and
10   certainly with respect to a broad policy of deportation,
11   um, we believe that standard is inappropriate.  And here
12   in particular, if First Amendment rights mean anything,
13   they mean that you cannot be arrested and thrown in jail
14   and then deported on the basis of your political speech.
15           THE COURT:  And I'm sensitive to it.
16           All right, thank you for the argument.  The
17   argument was helpful.
18           MS. DECELL:  Thank you.
19           THE COURT:  As a case-management matter, well I
20   must make rulings and I will make them.
21           Looking at the entirety of the complaint here and
22   looking and giving full effects to the controlling
23   cases, I do agree that there is no bright-line rule and
24   this Court has the authority to supplement the record,
25   and need not make some determination that the
```

1  government's proffered views are pretextual, and I

2  certainly make no such determination.  And that being

3  so, the government's motion -- the motion of public

4  officials is denied, and the case will proceed to trial

5  allowing the discovery, which I have allowed, and

6  maintaining the trial date that we have.

7          Which is the 6th of July, is that correct?

8          MS. DECELL:  I believe it's July 7th, your Honor.

9          THE COURT:  The 7th of July.

10         Now things -- we go by day by day and things

11 happen.  The Court takes judicial notice of the public

12 announcements by certain of the public officials.  As to

13 a pause in, um, granting visas to other noncitizens who

14 seek admission to the United States and, um, the

15 explanation for the pause being a careful scrutiny of

16 the social media records of such applicants, the Court

17 has no discord, expresses no challenge whatsoever to the

18 power of the Secretary of State and his agents to engage

19 in, one, such a cause, and, two, such an examination, an

20 examination, which if visited upon citizens of the

21 United States, would no doubt cause some outcry that

22 privacy rights were being violated.  But I -- I will say

23 I would like to see the protocol that has been issued to

24 these consular officers as to what they are looking for.

25         Now I would treat that as a law enforcement

1    document, it may be submitted to the Court in camera,

2    not for any public docketing, but I'd like to see what

3    instructions are today being given, um, in order to

4    enforce the law, because it's relevant to the issues --

5    the issues of intent, among other things, that are

6    germane in this case.

7         Now having said that, I'll ask only if there

8    are -- I think we've done what I came to the hearing to

9    do.  Are there questions?  And we'll start with the

10   plaintiff.

11        Any questions relevant at this time?  This is not

12   argument.  Questions.

13        MS. GANS:  No questions, your Honor.  Thank you.

14        THE COURT:  Questions?  Not argument.

15        MR. KANTER:  Yes, um, we do have a question, and

16   I'd like to have my colleague, Mr. Kanellis, raise that

17   question to your Honor.

18        THE COURT:  And he may.

19        Mr. Kanellis?

20        MR. KANELLIS:  Thank you, your Honor.  May it

21   please the Court.

22        The Court has set a trial date for -- pardon me,

23   for July 7th, and let me say that in conjunction with

24   this, um, motion for a protective order, we have, in

25   good faith, engaged with the plaintiffs in responding to

1    discovery --

2         THE COURT:  I have no suggestion to the contrary.

3    I always like to congratulate you when you're agreeing,

4    and I speak to all of you.

5         Go ahead.

6         MR. KANELLIS:  Of course, but unfortunately I

7    regret that this is the first time that I've appeared

8    before your Honor because I have, um, somewhat bad --

9    bad news to share regarding our ability to comply with

10   the discovery requests as had been propounded by the

11   plaintiffs in this case.

12        THE COURT:  Make motions.

13        MR. KANELLIS:  Well we may, your Honor, but I've

14   been -- and we of course seek to contour any discovery

15   to the limited -- as your Honor has acknowledged in the

16   prior hearings, the very limited scope of this.  We will

17   make those motions.  However, I just wanted to advise

18   the Court that at least one of our clients finds it very

19   challenging to -- even if we limit it to the 5

20   noncitizens, even if we contour discovery in that

21   respect, to comply with the discovery schedule that

22   would allow us to go to trial on July 7th.

23        We of course will file, um --

24        THE COURT:  Well I've already said, though these

25   top public officials have every right to dissipate,

1    testify, I'm not requiring it, and I'm not requiring

2    depositions of any of them.  So they will have agents,

3    employees.  I think there's plenty of people to comply

4    with the discovery as I understand it, and I expect it

5    to be complied with.  And the last time we met I said,

6    um, any motion would be dealt with as on an emergency

7    basis, 3 business days and I decide it, once the

8    opposition came in, um, within that time.

9          What more guidance can I give?

10          MR. KANELLIS:  Well the guidance that would help

11    contour what discovery is proper is what is the factum

12    probandum at trial?

13          THE COURT:  I, um --

14          MR. KANELLIS:  Is it --

15          THE COURT:  I took Latin, but, um, my Latin

16    teacher told me -- she was elderly, but she told me that

17    my mother was much better than I.

18          (Laughter.)

19          THE COURT:  So what are you talking about?

20          MR. KANELLIS:  What is the "fact to be proved."

21    As I understand your Honor, I --

22          THE COURT:  Well that is the question, and I'm

23    happy to engage in that.

24          I see their case as a circumstantial evidence

25    case.  I've thrown out what, um, from their point of

```
1    view, I would think would be a smoking gun.  I have said
2    in my case-management conference that I recognize a
3    government privilege.  And so you can -- you need not
4    discover discussions among government officials at any
5    level, the highest down to the lowest -- like let's
6    take, for example, Rumeysa Ozturk, just because she's
7    been in the news a lot, and that's all I'm going on.
8    And so if discovery was sought about her, um, the form
9    of her apprehension and detention.

10        So usually when there's that many people involved,
11   the law enforcement agents get together and they work
12   out a plan.  I think that's privileged under the
13   governmental privilege.  But when the plan's over, the
14   agent in charge says, "This is what we're going to do,"
15   and they explain, and "This is why we're going to do
16   it."  Well that's not privileged.  And indeed I said
17   from the beginning, I'm interested in those things, as I
18   think anyone would be.

19        Why so many officers?  Why masked?  Why, um --
20   just a -- is it protocol to handcuff people with their
21   hands behind their backs?  Maybe.  Why is that?  Is
22   there a manual that says to do that?  Is there a manual
23   that says something about these people wearing these
24   masks that cover their faces?  I'm not accustomed to, um
25   -- and I'm talking as a citizen now, I'm not accustomed
```

1   to law enforcement officers without identification, um,

2   approaching individuals masked and, um, you know not

3   having a warrant or being able to display a warrant,

4   having only an administrative warrant.

5       Let me -- so there's an example.  And then go to

6   the highest, go to the identified Cabinet Secretary.

7   The Cabinet Secretary meets with people, um, which is

8   privileged.  Somebody make minutes of that and something

9   comes out of that.  Does the -- I'm not interested at

10  all in the grant or denial of any particular visa, but

11  I've already expressed my interest in what's the

12  protocol that was sent to these consular officers?

13  "When you're looking at social media, look for this,

14  look for that."  I'd be interested to see that.  I don't

15  think that's privileged.  But using that example, that

16  is law enforcement, so I'll get to see that.  But nobody

17  else gets to see that.  Because I'm certainly not going

18  to compromise in any way the law enforcement, internally

19  in the United States or externally.  Absolutely not.

20      Is that helpful?

21      MR. KANELLIS:  Yes, your Honor, it is.  And if

22  you'll indulge me one follow-up question?

23      THE COURT:  Yes.

24      MR. KANELLIS:  From my read of the transcript and

25  the Court's order on what you fashioned a "motion to

```
 1    dismiss," there is an open question as to whether -- I
 2    believe it's the AAUP plaintiffs have standing, and I
 3    think you left that --
 4         THE COURT:  No, I -- I, um -- well to be clear, I
 5    think the noncitizen AAUP plaintiffs have standing.  I
 6    think the citizen AAUP plaintiffs do not have standing.
 7         Does that answer your question?
 8         MR. KANELLIS:  Um, that is very helpful.  So the
 9    question that follows from that, the last one, is
10    whether --
11         THE COURT:  Well I'm not -- your questions are
12    fine.  We're going to try this case, unless you settle
13    it.
14         MR. KANELLIS:  We have refrained from engaging in
15    discovery for reasons Mr. Kanter has articulated, and
16    that is because we believe there should be a record
17    review.  Your Honor has ruled on it.  So would that
18    allow the government to propound its own discovery?
19         THE COURT:  Now that -- that phrase is in the
20    subjunctive form.  I don't give advisory opinions.  It's
21    a case or controversy.  I don't have a case or
22    controversy yet.  I've answered your question.  Thank
23    you.
24         MR. KANELLIS:  Thank you, sir.
25         THE COURT:  And again, to the extent you can work
```

1    things out -- at some stage they're talking about, or

2    they did, um, say, "Well you can take witnesses out of

3    order?"  I said, "Yes."  "Well we may have some expert

4    who can't be there at this date, but could come in late

5    June."  And then I said, "Well not a problem, I'm

6    around, we can take witnesses out of order."  And I'm

7    thinking to myself, "An expert?  An expert who?  What's

8    an expert going to tell me?  Who is this expert?"  You

9    people ought to be talking about this.

10          Now the ball is back to Mr. Kanter, who argued

11    very well, um, I said that -- I suggest no pretext, but

12    I think, given the nature of the case, there must be

13    extra-record discovery and I authorized it.  Limited.

14    And I -- and I took my limitations to be vague.  But

15    within the limitations, and I'm repeating myself, I

16    expect fulsome discovery and cooperation.

17          Do my answers to their questions raise questions

18    on the plaintiffs' side?

19          MS. DECELL:  No, thank you, your Honor.

20          THE COURT:  Hearing no further questions, it's

21    always good to see you.  We'll recess.

22          We'll probably meet -- I'm not saying that now

23    they're going to start filing motions and you'll file

24    motions.  I don't give oral hearings on discovery

25    motions and we know a fair amount about this case.  But

```
 1    we ought be thinking of a time late June to have a
 2    pretrial conference and at that time, um, again, because
 3    I've collapsed this with a preliminary injunction, so
 4    this is all expedited.
 5          But again, I'm going to want to know what -- why
 6    -- we'll have the record, and I imagine you're able to
 7    agree on that, I want to know what live testimony you
 8    want?  And the same on the part of the public officials.
 9    If any.
10          And I should also say, because your questions are
11    very good, that should you seek discovery, should you
12    proffer live testimony, your rights are saved as to the
13    argument that I should not allow any -- and I say to the
14    public officials, so the record is clear, you're not
15    waiving anything should you now put on live testimony.
16    Of course not.
17          All right, thank you all.
18          We'll recess.
19          (Ends, 1:00 p.m.)
20
21
22
23
24
25
```

```
1                    C E R T I F I C A T E

2

3        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

4    hereby certify that the forgoing transcript of the

5    record is a true and accurate transcription of my

6    stenographic notes, before Judge William G. Young, on

7    Monday, June 2, 2025, to the best of my skill and

8    ability.

9

10

11

12
     /s/ Richard H. Romanow 06-05-25
13   _____
     RICHARD H. ROMANOW  Date
14

15

16

17

18

19

20

21

22

23

24

25
```