# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN ASSOCIATIONS OF UNIVERSTIY PROFESSORS, ET AL.,<br><br>*Plaintiffs*,<br><br>v.<br><br>MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, ET AL.,<br><br>*Defendants*. | No. 1:25-cv-10685-WGY<br><br>RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY |

## INTRODUCTION

The Court should deny the motion to compel.  Plaintiffs are proceeding as though this were a standard civil case, rather than the expedited preliminary injunction proceeding—consolidated with a trial on the merits within eight weeks—for which they committed to being ready. The Court was clear: full discovery is neither feasible nor permitted in this compressed timeframe. *See* May 6, 2025, Tr. at 16:7-15:8 ("I am not expecting full discovery. We don't have much time)

Despite that, Plaintiffs seek to compel responses that have largely been (or are currently being) satisfied, overstating purportedly "dilatory" conduct that amounts to mere days—which, in any case, are "delays" only in the sense they arise from deadlines they unilaterally imposed. They also seek information which Defendants have properly withheld as privileged, in accordance with this Court's own instructions and guidance. Defendants have produced responsive information across all categories while shouldering the burden of protecting sensitive data and national security information, expediting the multi-step protocols and requirements for shielding privileged information, and devising work-arounds that enabled the more expeditious review by Plaintiffs' counsel of non-public information, whenever feasible. Defendants are continuing to meet the substance of most requests. In short, the motion disregards the Court's clear limitations and practical realities of the accelerated schedule Plaintiffs requested, and it should be denied.

## BACKGROUND

Plaintiffs served their initial discovery requests on Defendants on May 13, 2025. Declaration of Ethan Kanter (Kanter Decl.) ¶2; Exh. A (Plfs' Requests for Production (RFPs)); Exh. B (Plfs' Interrogatories). They amended their requests on May 19, 2025.  Kanter Decl. ¶3; Exh. C (Plfs' Amended RFPs); Exh. D (Plfs' Amended Interrogatories). During a May 22, 2025, status conference the Court reduced the number of "targeted noncitizens" about whom Plaintiffs could seek discovery from nine down to five.  Dkt. # 102 at 7, 9-10.

On May 21, 2025, Defendants moved for a protective order to limit the Court's review to an administrative record, Dkt. # 94. The Court heard argument on the motion on June 2, 2025, and denied it that day. Dkt. # 112. In authorizing Plaintiffs to seek discovery, Dkt. # 115 at 28, the Court set forth some important parameters:  (1) it recognized that information subject to the law enforcement or deliberative process privilege could be withheld from disclosure, Dkt. 115 at 27-28, 32; and (2) it admonished against discovery into high-ranking agency officials, Dkt. # 115 at 30-31.

The government subsequently filed both sealed and public versions of the certified administrative record with the Court on May 29, 2025. Dkt. #105 & 106. On June 11, 2025, it also lodged an in camera, ex parte submission of privileged and law enforcement sensitive documents. Dkt. # 131. On June 13, 2025, Defendants served on Plaintiffs responses and objections to Plaintiffs' amended RFPs, along with their first production volume of responsive documents. Kanter Decl. ¶4; Wilkens Decl. Exh. 2 (sealed) (Defs' RFP Responses); Exh. E (June 13, 2025, Transmittal Email). On June 21, 2025 (not June 22, 2025, as Plaintiffs claim, Mot. at 6), Defendants served responses and objections to Plaintiffs' interrogatories. Kanter Decl. ¶5; Exh. G (June 21, 2025, Transmittal Email); Wilkens Decl. Exh. 10 (sealed) (Defs' ROG Responses).

Meanwhile, Defendants have made, or intend to make, the following officials available to Plaintiffs for depositions:  Andre Watson, Assistant Director, National Security Division, Homeland Security Investigations (HSI), deposed on June 11, 2025; John Armstrong, Senior Bureau Official, Bureau of Consular Affairs, U. S. Department of State, deposed on June 12, 2025; Stuart Wilson, Deputy Assistant Secretary for Visa Services, Bureau of Consular Affairs, U.S. Department of State, deposed on June 24, 2025; Peter Hatch, Assistant Director, Office of Intelligence, Homeland Security Investigations, Department of Homeland Security, deposed on June 25, 2025; Andrew Veprek, Senior Advisor, Office of the Counselor, U.S. Department of State, to be deposed on June 20, 2025; and Jessica Norris, Managing Director for Visa Services, Bureau

2

of Consular Affairs, U.S. Department of State, to be deposed on July 1 & 3, 2025. Kanter Decl. ¶¶

6-11. Defendants also have identified various Immigration and Customs Enforcement agents and

will make them available for depositions to the extent that schedules allow. *Id.* Kanter Decl. ¶ 12.

Plaintiffs ask the Court to compel "(1) the production of documents that Plaintiffs have

identified as missing from Defendants' productions, (2) complete answers to Plaintiffs'

interrogatories, with all objections deemed waived due to Defendants' untimely and deficient

responses, which have caused substantial prejudice to Plaintiffs, (3) the production of documents

improperly withheld as privileged, and (4) the reappearance of John Armstrong, a State Department

official who was previously deposed, for a continued deposition on questions that he was instructed

not to answer based on improper assertions of privilege." Mot. (Dkt. # 153, filed under seal) at 1-2.

For the reasons set forth below, the Court should deny Plaintiffs' motion.

## ARGUMENT

### I.    The Information Plaintiffs Seek To Compel Are Unresponsive Or Do Not Exist

Plaintiffs allege that Defendants improperly omitted the documents listed below from their

production, claiming they are responsive to Plaintiffs' RFPs 1 & 2. Mot. at 2-5.  These requests

seek information "showing the planning, execution and implementation of your decision to take

any adverse action against a Targeted Noncitizen Student or Faculty Member," and "requesting or

recommending the taking of, and memorializing, explaining, or justifying the decision to take any

adverse action against a Targeted Noncitizen Student or Faculty Member." Exh. C at 5-6.

- Documents and communications concerning the DHS/DOS Student Visa Working Group. *See* DEF-077.
- Documents and communications concerning the interagency working group that focused on the revocation of student visas and that included White House Deputy Chief of Staff Stephen Miller and officials from several agencies, including the Department of State, Department of Homeland Security, and Department of Defense. *See* Wilkens Decl. Ex. 8 (Armstrong Tr. at 203–210).
- Security advisory opinions sought with respect to any of the five Targeted Noncitizens.

Mot., Exh. B. Plaintiffs have not shown – and make no effort to explain, *see* Mot. at 4 – how broad communications or documents from interagency working groups are responsive to RFPs 1 & 2, which concern nine specific individuals, which the Court limited to five. Dkt. # 125. Of those five, only one, Ms. Ozturk, had a visa revoked.  Defendants have not identified any documents or communications concerning the DHS/DOS Student Visa Working Group referencing Ms. Ozturk.

Additionally, the cited portions of Armstrong's deposition transcript do not reflect any "interagency working group." *See* Wilkens Decl. Exh**.** 8 at 203-209 (describing phone calls involving the White House and representatives from multiple executive departments discussing the revocation of non-immigrant visas, including student visas). Nor have Defendants been able to verify that one exists. Thus, Defendants have identified nothing responsive to these requests. Finally, Defendants have not identified no security advisory opinion for any of the five specific individuals into whom the Court has permitted discovery. Dkt. # 102 at 7, 9-10.

Plaintiffs, next, demanded production of various State Department cables as being responsive to their **RFP 5**, which sought information "concerning the inspection, review, monitoring, or surveillance of noncitizens' social media accounts or activity for pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, pro-Jihadist, or anti-Israel speech or activity." Exh. C at 8-9. In response to this request, Defendants will produce two State Department cables with law enforcement redactions: 25 STATE 52014, "ACTION REQUEST - Enhanced vetting for All Nonimmigrant Visa Applicants Traveling to Harvard University," and 25 STATE 50220, "Action Request: Expanding Screening and Social Media Vetting for Visa Applicants - Part 1."

The remaining cables that Plaintiffs demand are not responsive to RFP 5 because they do not concern social media review and do not address the speech or activity referenced in that RFP. Should the Court disagree, Defendants will produce them with appropriate redactions for privilege.

4

Plaintiffs also demand production of nonpublic provisions of the State Department's Foreign Affairs Manual and Foreign Affairs Handbook. *See* Mot., Exh. B at 1. Defendants have reviewed these provisions and determined that only 9 FAM 402.5-5(C) contains responsive material. Defendants will produce the provision, with appropriate redactions for privilege.

Additionally, Plaintiffs have requested Department of State policy materials, guidance, or instructions, which they claim are also responsive to RFP 5. *See* Mot., Exh. B at 1-2. Defendants have no record of the documents below, however, and therefore cannot produce them.

- Any finalized "3(C) policy" developed in response to E.O. 14,161 and/or E.O. 14188 or that otherwise addresses antisemitic or terrorist activity.
- Any "action memo" presented to the Secretary of State seeking the approval of such a policy.

To the extent that Plaintiffs also seek a "3(C) policy" being developed in response to E.O. 14,161, *see* Sealed Exh. G (Armstrong Tr. at 33-47), Defendants will endeavor to identify whether such a policy is being developed and, if so, will produce it with appropriate redactions for privilege.

Plaintiffs also request "Any additional documents embodying the guidance given to consular officers regarding social media vetting protocols." Mot., Exh. B at 2. Defendants have already provided 25 STATE 26168, "Enhanced Screening and Social Media Vetting for Visa Applicants" (*see* CAR-012-017), as well as a PowerPoint presentation on social media vetting (*see* DEF-064-083). They will also provide, as reflected above, 25 STATE 52014, "Enhanced vetting for All Nonimmigrant Visa Applicants Traveling to Harvard University," and 25 STATE 50220, "Expanding Screening and Social Media Vetting for Visa Applicants - Part 1and are not aware of any further guidance. Defendants continue to investigate whether there is anything further and will produce any other responsive documents, subject to appropriate privileges, as they are identified.

Regarding Plaintiffs' request for guidance related to EOs 14,161 and 14, 188 "found on CAWeb," *see* Mot., Exh. B at 2, Defendants have reviewed CAWeb for any responsive guidance

that has not already been produced and found none. Defendants have already produced 25 STATE 26168 (*see* CAR-012-017), which pertains to social media vetting and is located on CAWeb.

Plaintiffs also request the "guidance [for] what to consider when submitting revocation requests and tips" that is referenced on DEF-086. Mot., Exh. B at 2. The guidance references State Department Cable 5914, "THE IMPORTANCE OF SECURITY AND VIGILANCE IN VISA ADJUDICATIONS," which is not responsive to RFP 5. Should the Court disagree, Defendants will provide that to Plaintiffs subject to privilege review.

Through their **RFP 6(b)**, Plaintiffs request "Communications from the State Department to Covered Institutions directing them to report international students for participating in "proscribed antisemitic actions," "terrorist activity," or "endorsing or espousing terrorism," Mot., Exh. B at 2. The State Department has not found any such communications so cannot produce them.

Plaintiffs request documents based on their reading of Stuart Wilson's deposition rough transcript on June 24, 2025, which references "3(C) Policies." Add. at 1-2 (Dkt. #162). It is unclear what documents are being referenced, as Defendants have not identified any such "3(C) Policies." As Mr. Wilson's deposition remains open, his continued testimony may clarify his remarks.

## II.    Defendants' Responses And Objections To Plaintiffs' Interrogatories Were Proper

While Defendants' substantial compliance by itself warrants denial of Plaintiffs' motion, Plaintiffs' effort to impose routine discovery standards in this expedited proceeding is misplaced. The Court should decline to find that Defendants have waived their objections. Plaintiffs' waiver argument underscores this fundamental mismatch. Defendants' objections to Plaintiffs' interrogatories were served while responding to discovery requests on multiple fronts in the abbreviated timeframe necessary to enable the expedited trial date. With Plaintiffs' consent and representation that they would be prepared for trial within six weeks, the Court consolidated a hearing on Plaintiffs' preliminary injunction motion with a trial on the merits. April 23, 2025, Tr. at

10:19-10:21, 11:23-12:6.  This consolidated proceeding has required the government to simultaneously negotiate agreements with Plaintiffs' counsel to ensure the protection of sensitive information, *see, e.g.,* Dkt. ## 133, 135, 137, 143; negotiate stipulations of fact, Dkt. ## 126, 130; respond to their RFPs and interrogatories; search for, collect and review documents for responsiveness and privilege and produce them to Plaintiffs with privilege logs; identify documents appropriate for inclusion in the certified administrative record, Dkt. ## 98, 106; identify yet other documents appropriate only for in camera, ex part consideration; defend depositions of multiple government witnesses; propound their own discovery requests; and depose Plaintiffs' reluctantly proffered witnesses. All within the span of eight weeks.  Meanwhile, Plaintiffs largely have yet to respond to Defendants' RFPs and have provided no responses to Defendants' interrogatories.

No discovery schedule has been set by the Court. And, shortly after receiving Plaintiffs' amended interrogatories on May 19, 2025, the government moved for a protective order on May 21, 2025, which the Court agreed to hear on June 2, 2025. Dkt # 112. While the Court denied the government's request, it clarified the scope of discovery. Dkt. # 115 at 28. Defendants served their responses on June 21, 2025, within three weeks of the Court's ruling. Plaintiffs point to no authority requiring that objections be deemed waived when provided 39 days after being served in the context of a Rule 65(a)(2) expedited proceeding and only 19 days after the Court detailed discovery scope. The 30-day deadline should not apply in the context of a Rule 65(a)(2) proceeding, given its summary nature. *See Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 15 (1st Cir. 2009) (observing that Rule 65(a)(2) proceedings implicate "real hazards inherent in fully disposing of cases in such an expedited fashion-among them incomplete coverage of relevant issues and failure to present all relevant evidence.") (quotations marks omitted).

Even assuming a standard civil proceeding where the thirty-day deadline applied; Plaintiffs cite no case establishing objections are waived when they are filed nine days late. *See* Mot. at 7.

7

Instead, courts in this circuit have found objections to interrogatories waived when they are significantly untimely. *See, e.g., NLRB v. Pan Am. Grain*, 2022 WL 17494323, *7 (D. P.R. Dec. 7, 2022) (six months late); *Krewson v. City of Quincy*, 120 F.R.D. 6, 7 (D. Mass. 1988) (45 days late); *Katz v. Liberty Power Corp., LLC*, 2021 WL 3616073 (D. Mass. Mar. 29, 2021) (53 days late).

This minimal delay is excusable because promptly responding to Plaintiffs' interrogatories was neigh impossible when viewed in concert with other discovery demands – all of which Defendants accomplished in an unusually compressed time frame and notwithstanding the myriad layers of approvals and privilege reviews needed from two different executive agencies. Despite these obstacles, Defendants filed a 48-page certified administrative record, Dkt. # 106, produced 98 pages of document discovery to Plaintiffs, and submitted 99 pages of documents in camera. Defendants have also facilitated the depositions of two State Department officials and two DHS ICE officials, and have arranged for additionally depositions next week. Given the expansive discovery that has already taken place in a tight six-week period, Plaintiffs' claim that they have been prejudiced by Defendants' 39-day response is unpersuasive and it ignores the potential for serious harm arising from the inadvertent release of privileged information. *See* Section 3.

As for the merits of the government's objections, they are grounded in this Court's rulings and guidance on discovery parameters. The Court limited Plaintiffs' discovery into immigration enforcement actions against specific noncitizens to five individuals. Dkt. # 125. It also stated that Plaintiffs are not entitled to deliberative process or law enforcement privileged information. *See* June 2, 2025, Hearing Tr. at 27-28; May 6, 2025, Hearing Tr. at 19-20. And, the Court admonished that discovery into high-ranking officials was off limits. May 6, 2025, Tr. at 16:11-16:17 ("I'm not going to permit any direct discovery of the President or the high executive officials that you have named and sued in their official capacity. I'm not going to require that they answer interrogatories or, um, submit themselves to discovery at all . . . ."); *see also* April 23, 2025, Hearing Tr. at 12.

As to the individual Interrogatories, Defendants' responses were sufficiently complete, reasonable, and in line with the Court's guidance. For **Interrogatories 1-3**, Defendants provided the names of multiple agency officials with the requested relevant knowledge. *See* Wilkens Decl. Ex. 10  at 6-9. Plaintiffs have already deposed State Department official John Armstrong and were permitted to question him about specific enforcement actions. *See* Sealed Exh. G (Armstrong Deposition Tr. at 211-15, 217-35). Plaintiffs' expectation that Secretary of State Marco Rubio be listed among Defendants' responses directly contradicts this Court's guidance against discovery into high-level officials. May 6, 2025, Tr. at 16:11-16:17; *see also* April 23, 2025, Tr. at 12.

**Interrogatories 4-5**, asked for the identities of individuals involved in communications with universities concerning noncitizen believed to have engaged in antisemitic speech or activities and who were targeted as a result. Defendants have identified nothing responsive.[1]

Plaintiffs also fault Defendants for providing "limited responses" to **Interrogatories 6-10** and **12-14**, but they provide no argument for why Defendants' responses are insufficient. Defendants provided Plaintiffs the details that could be shared without risking the disclosure of sensitive information, and submitted additional information to the Court to review in camera. Sharing the full information contained in the documents submitted in camera would impermissibly information that has not even been shared in the litigation involving the identified noncitizens. In response to Interrogatory 13, Defendants provided government declarations describing the details of the transfers, as requested. In response to Interrogatories 12 and 14, Defendants provided documents setting forth the procedures and policies for orchestrating immigration-related arrests.

Plaintiffs' complaint of prejudice is unavailing. In agreeing to Rule 65(a)(2) proceedings, Plaintiffs should largely be deemed ready to present their case without the need for extensive

---

[1]  While Defendants initially declined to answer Interrogatories 4 & 5 and instead stood on their objections, they will update their responses to reflect that they have identified nothing responsive.

discovery. *See* May 6, 2025, Tr. at 16:7-15:8 ("I am not expecting full discovery. We don't have much time); Fed. R. Civ. P. 65(a)(2) (advisory committee's note to 1966 amendment noting that the court's authority under this provision "can be exercised with particular profit when it appears that a substantial part of the evidence offered on the application will be relevant to the merits and will be presented in such form as to qualify for admission on the trial proper."); *see also Doe v. Prosecutor, Marion Cnty., Indiana*, 705 F.3d 694, 696 (7th Cir. 2013) (In assenting to a Rule 65(a)(2) hearing, "the parties further agreed no additional discovery was required and there would be no live evidence at trial," and bench trial consisted of just four affidavits and counsel' arguments).

Plaintiffs' complaint that they "had to spend substantial portions" of the Armstrong and Watson depositions "attempting to obtain information sought by the interrogatories" is unpersuasive. Mot. at 7. While the lead-up to a standard civil trial enables traditional sequencing, so that interrogatory responses are received before depositions begin, this is not possible to do in eight weeks. Indeed, the parties have jointly submitted their *final* pretrial memo, though depositions continue, and production of new information will continue up to the date of trial. That is not standard sequencing, and Plaintiffs' selective effort to impose it here is wholly inappropriate.

Plaintiffs also assert that the government has failed to produce the names of individuals identified by Messrs. Watson and Armstrong during their depositions. Yet, they fail to cite those names in their motion or explain their relevance to this case. While Plaintiffs are apparently dissatisfied with Defendants' responses, more than mere dissatisfaction is necessary for them to show that a grant of their motion to compel is warranted. *See Gravley v. Tretnik*, 2011 WL 13578683, *1 (W.D. Pa. Dec. 28, 2011) ("Plaintiff's general dissatisfaction" insufficient "to compel general redrafts of Defendants' responses to his discovery requests").

III.    **The Court Should Uphold Defendants' Privilege Assertions**

      A.     In Camera Documents

Defendants have provided the Court, for in camera ex parte review, ten law enforcement sensitive documents relating to the five identified noncitizens who are in active litigation in other courts because those documents had not been produced there. *See* June 11, 2025, Notice of Sealed Sub. of Docs. for In Camera, Ex Parte Review ("Notice of Sealed Docs."), Dkt. 131, Exh. B-K; *see also* May 6, 2025, Hearing Tr. at 21:3-5 (cautioning that the Court "in no way is going to retry immigration proceedings or judicial proceedings in another district"). By connection, interrogatory numbers 6, 7, & 10, may require reference to those documents so Defendants limited their answers accordingly. As the Court reiterated at Thursday's pretrial conference it would review those documents and give notice if it makes some difference to the Court's determination. *See* June 6, 2025, Tr. at 8:5-10:9. So, Plaintiffs do not have a great need for the documents.[2]

      B.     Unchallenged Redactions

Plaintiffs do not challenge the redactions to the Arrest Procedures Handbook, DEF 36-63, or the Memorandum of Agreement Between USCIS and ICE, DEF 95-98, so Defendants do not address them here. Defendants request an opportunity to respond to an untimely challenge.

      C.     The Defendants' Assertion of Privileges

Except for the Presidential Communications Privilege, *see infra*, the government bears the initial burden of showing a privilege applies. *See Stamps v. Framingham*, 38 F. Supp. 3d 134, 140

---

[2] In re-reviewing these documents to respond to Plaintiffs' motion, Defendants learned shortly before filing that at least one contains information owned by a third-party agency that implicates law enforcement privilege and four others contain third-party information that may implicate the privilege. *See* Notice of Sealed Docs., Exh. G. Although the Government views asserting the privilege is unnecessary while the documents are in camera, it will prepare to invoke the privilege over at least one document, and possibly all five, but given the late discovery, it will require more time. Should the Court deem formal invocation necessary, Defendants respectfully request permission to supplement their opposition.

(D. Mass. 2014). Accordingly, Defendants provided agency declarations. *See Huntleigh USA Corp. v. United States*, 71 Fed. Cl. 726, 727 (2006); *Marriott Int'l Resorts, L.P. v. United States*, 437 F.3d 1302, 1306 (Fed. Cir. 2006) (following majority in holding that the head of the agency need not invoke the privilege). Those declarations are from William H. Walker, Acting Deputy Executive Assistant Director for HSI who has been delegated authority by the Acting Director of ICE to assert the privileges. *See* Exh. I at ¶ 1. Gary Lawkowski Deputy Assistant and Deputy Counsel to the President is responsible for matters involving the invocation of the presidential communications privilege. *See* Exh. J at ¶ 1. John Armstrong, Senior Bureau Official within the U.S. Department of State's Bureau of Consular affairs, who is authorized to assert the deliberative process and law enforcement privileges, Exhs. H at ¶ 6 & K at ¶ 6.

      1.     The Deliberative Process Privilege

Plaintiffs challenge almost every assertion of the deliberative process privilege and audaciously claim that the privilege should not apply at all. *See* Mot. at 11-19. The Court, however, in denying Defendants' protective order did so based on its understanding that Plaintiffs were *not* seeking deliberative documents. *See* Electronic Order, Dkt. 125 ("The plaintiffs nowhere seek governmental deliberations"). And Defendants have proceeded in a good faith understanding of this Court's directives concerning the deliberative process privilege. *See* May 6, 2025, Tr. at 19:16-19:20, 28:2-28:18. Plaintiffs, nevertheless, insist on the production of deliberative information.

The deliberative process privilege protects "agencies from being 'forced to operate in a fishbowl,'" and "shields from disclosure 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated[.]'" *U.S. Fish and Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 267 (2021) (internal citations omitted). To qualify for the privilege, documents must be both *predecisional* and *deliberative*. *See Providence J. Co. v. U.S. Dep't of Army*, 981 F.2d 552, 557 (1st

Cir. 1992). They "are 'predecisional' if they were generated before the agency's final decision" and "they are 'deliberative' if they were prepared to help the agency formulate its position." *U.S. Fish & Wildlife Svc. v. Sierra Club. Inc.*, 592 U.S. 261, 268 (2021). Advice and recommendations can still be privileged even if no decision results. *See Judicial Watch, Inc. v. Clinton*, 880 F. Supp. 1, 13 (D. D.C. 1995) (citing *Access Reports v. USDOJ*, 926 F.2d 1192, 1196 (D.C. Cir. 1991)).

The Documents Plaintiffs specifically challenge are four State Department action memos concerning the deportability of the five identified noncitizens. *See* Notice of Sealed Submission, Exh. L-O. Plaintiffs suggest that any facts would be segregable and should be disclosed. *See* Mot. at 12. However, not only are the documents pre-decisional containing *recommendations* of visa revocations but also disclosing their contents would expose facts the Secretary finds significant and provide a roadmap of decision making to potential targets of investigation. *See* Exh. H at ¶ 11. In any event, Defendants provided those action memos to the Court for in camera ex parte review because those documents, too, have not yet been produced in the litigation where those noncitizens are bringing their claims. So, the Court will be able to consider the documents, after notice, as described at the final pretrial conference. *See* June 26, 2025, Tr. at 8:5-10:9.

HSI has asserted the deliberative process privilege (and the law enforcement privilege) over select deposition testimony of its deponent Assistant Director Andre R. Watson for National Security. *See* Exh. I at ¶ 7(c). Mr. Walker explained the reasons for both the assertion of law enforcement and deliberative process privileges at ¶ 8, 12-13. Of particular note, the deposition questions sought information on type and content of recommendations ICE might send to the State Department. These proposals are predecisional as the State Department would be the one to act and deliberative as they are part of the decision-making process, not the final decision.

The Department of State has also asserted the deliberative process privilege over questions Mr. Armstrong was asked in his deposition concerning interagency and Presidential

13

communications. *See* Exh. H at ¶ 7(ii). The types of questions are more fully discussed under the presidential communications privilege section, but the Department lays out its reasons for asserting the deliberative process privilege. *See* Exh. H. at ¶¶ 8-12. The Department also invokes the privilege over questions concerning the "catch and revoke" policy. *See* id. at ¶ 7(iii) And sets out its reasons for doing so. *See id.* at ¶¶ 8-12. And asserts it over questions concerning the discussions leading up to the decisions involving the five identified noncitizens and provides its reasons, which are plainly predecisional as they do not embody the decision itself. *See id.* at ¶¶ 7(iv), 8-12.

Additionally, the Department asserts the privilege over predecisional documents—action memoranda providing recommendations to the Secretary of State. *See id.* ¶ 7(v). The documents only recommend decisions but do not embody the final decision.  Finally, the Department asserted the privilege over the eport on Authorities to Counter Anti-Semitism and Recommendations for Familiarizing Institutions of Higher Education with the Security and Related Grounds for Visa Admissibility ("State Authorities Report"). *See* Exh. H at ¶ 7(i). The White House has also asserted the Presidential Communications privilege over it, so this document is discussed more fully below.

Once the government carries its initial burden, the issue is whether the privilege should be overcome by Plaintiffs' need. The deliberative process privilege is qualified so in deciding whether it should be overcome, a court "should consider, among other things, the interests of the litigants, society's interest in the accuracy and integrity of factfinding, and the public's interest in honest, effective government." *In re Pharm. Industry Average Wholesale Price Litig.*, 254 F.R.D. 35, 40 (D. Mass. 2008) (quoting *Texaco Puerto Rico, Inc. v. Dep't of Consumer Affs.*, 60 F.3d 867, 885 (1st Cir. 1995)). "The Court must balance the public interest in the protection of the deliberative process against the movant's particularized need for the information." *Id.* (citations omitted).

Plaintiffs seek to side-step this analysis entirely by claiming that because the Defendant agencies' decision making is at issue, the privilege categorically does not apply. *See* Mot. at 12.

They cite *In re Subpoena Duces Tecum Served on Off. of Comptroller of Currency*, 145 F.3d 1422, 1424 (D.C. Cir. 1998) in support. That court's decision, however, is not the majority view. The Court of Federal Claims said it will continue to use a "case-by-case analysis to determine whether or not a plaintiff's need for particular evidence can overcome the government's interest in maintaining" confidentiality. *First Heights Bank, FSB v. United States*, 46 Fed. Cl. 312, 321-22 (2000) (declining to follow *In re Subpoena Duces Tecum*), clarified by 46 Fed. Cl. 827 (2000).

Indeed, in this circuit, the discretionary balancing test applies. In *Texaco*, the court noted that where documents sought may shed light on malfeasance the privilege is routinely denied. *See Texaco*, 60 F.3d at 885. But denial is not automatic as the court affirmed the district court as there was a "'strong showing' of arbitrariness and discriminatory motives" and the trial court concluded the agency "acted in bad faith over a lengthy period of time." *Id.* Plaintffs have not made a strong showing here. Ultimately, the court upheld the decision based on the trial court's *weighing* the interests; it did not rule the privilege categorically inapplicable. *See id.* at 885. Also, the cases from this District Plaintiffs cite, both used discretionary balancing. *See Velazquez v. City of Chicopee*, 226 F.R.D. 31, 33-34 (D. Mass. 2004); *Williams v. City of Bos.*, 213 F.R.D. 99, 100 (D. Mass. 2003) ("courts are obliged to balance conflicting interests on a case-by-case basis") (cleaned up).

Plaintiffs appear to challenge the assertions of privilege en mass and are dismissive of the government's interests in the privilege. But the declarations set out the government's strong equities. *See* Exh. H at ¶¶ 8-13; Exh. I ¶¶ 8, 12 & 13. But, aside from the interests typical with the deliberative process privilege, they are are stronger here as the deliberations being protected concern policies toward noncitizens, which "is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations" and "such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Mathews v. Diaz*, 426 U.S. 67, 81 n.17 (1976) (quotations and citations

omitted). Additionally, the ICE and State Department information Plaintiffs seek involves the collaborative relationship between ICE and the State Department and exposing predecisional correspondence undermines that collaboration. *See United States v. Farley*, 11 F.3d 1385, 1389 (7th Cir. 1993) (holding referral memorandum from FTC to DOJ was predecisional and deliberative).

In addition to their misplaced reliance on *In re Subpoena Duces Tecum*, Plaintiffs also cite *Montrevil v. Decker*, No. 20 CV 264(WFK)(LB), 2021 WL 11690690 (E.D.N.Y. July 19, 2021). In that case the Judge pierced the deliberative process and law enforcement privileges because the movant was challenging the government's actions against him in deporting him. *See id.* at 5. Meaning, the critical evidence to his claim was the privileged information targeting *him*. The Plaintiffs here are in a inapposite position where there are other sources of evidence they could rely on. Additionally, unlike in *Montrevil*, none of Plaintiffs are the noncitizens claiming to have been "targeted." Those "targeted" persons are pursuing their own claims in other courts. So, the actual "targeted" noncitizen would have a greater interest in the documents. Additionally, there is an outlet in this case which reduces Plaintiffs' need; rather than resisting the production of documents in camera, given the exigencies of a Rule 65(a)(2) case, the government provided several documents for the Court, which also made clear at the pretrial conference that it would review such documents and how it would use them at trial. *See* June 26, 2025, Tr. at 8:5-10:9.

2.    Presidential Communications Privilege

The presidential communications privilege works differently from the others. Before the White House needs to formally invoke the PCP, the party making the discovery request must show "a heightened need for the information sought." *See Dairyland Power Co-op. v. United States*, 79 Fed. Cl. 659, 662 (2007) (citing *Cheney v. U.S. District Court for the District of Columbia*, 542 U.S. 367 (2004) and *In re Sealed Case*, 121 F.3d 729 (D.C. Cir.1997)). Although Plaintiffs have not made the required showing of a heightened need, given the pace of this litigation the White

House has preemptively asserted the privilege. *See* Exh. J; *In re United States*, 678 F. App'x 981, 992 (Fed. Cir. 2017) (holding the President himself need not invoke the privilege especially in a civil case where the materials were not necessarily viewed by him).

> The presidential communications privilege, a "presumptive privilege for [p]residential communications," *United States v. Nixon*, 418 U.S. 683, 708 [94 S.Ct. 3090, 41 L.Ed.2d 1039] (1974), preserves the President's ability to obtain candid and informed opinions from his advisors and to make decisions confidentially, *see Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1112 (D.C. Cir. 2004). As such, the privilege protects "communications directly involving and documents actually viewed by the President," as well as documents "solicited and received" by the President or his "immediate White House advisers [with] ... broad and significant responsibility for investigating and formulating the advice to be given the President." *Id.* at 1114. The privilege covers documents reflecting "presidential decision making and deliberations," regardless of whether the documents are predecisional or not, and it covers the documents in their entirety.

*Karnoski v. Trump*, 926 F.3d 1180, 1203 (9th Cir. 2019) (quoting *Loving v. Dep't of Defense*, 550 F.3d 32, 37-38 (D.C. Cir. 2019)). Unlike the deliberative process privilege, there is no exception allowing for segregation and partial disclosure of documents. *See id.* (citing *Army Times Publ'g Co. v. Dep't of Air Force*, 998 F.2d 1067, 1071 (D.C. Cir. 1993)).

First, While Plaintiffs do not challenge the assertion of the presidential communications privilege over the State Authorities Report, *see* Mot. to Compel at 15-16, they mention it summarily in their recitation of the documents. *See id.* at 8. So, in an abundance of caution, the White House has formally asserted the presidential communications privilege over it. *See* Exh. J ¶¶ 4, 6. This is core presidential communications as it was solicited by the president, received by his advisors, and used for decision making. *See id.* at 6, 11; *Karnoski*, 926 F.3d at 1203.

Second, Plaintiffs challenge the lack of produced documents relating to a purported interagency working group dealing with the revocation of student visas. *See* Mot. to Compel at 16. But as discussed above, Defendants have identified no responsive information and Plaintiffs misrepresent deposition testimony. *See, supra*, § I. Plaintiffs do seek to reopen Mr. Armstrong's

deposition to inquire further about the phone call communications among representatives of the White House, State Department, Defense Department, and DHS. The White House has formally invoked the presidential communications privilege over such information. *See* Exh. J at ¶ 7-11. Again, these are core presidential communications. Mr. Armstrong's testimony could include interagency telephonic meeting regarding creating immigration policy involving White House and cabinet-level officials. *See id.* at ¶ 9. The communications were both solicited and received by senior presidential advisors or their staff. *See id.* at ¶ 10. And the communications were use in formulating advice to the President to inform decision making on immigration policy. ¶ 11.

Mr. Lawkowski assessed that without the protection of the presidential communications privilege, "Presidential advisors and their staffs would be chilled from having candid conversations with senior officials in cabinet agencies, gathering relevant information, exploring alternatives, and providing fully informed recommendations regarding the performance of the President's duties.

3.    Law Enforcement Privilege

The purpose of the law enforcement privilege "is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *Puerto Rico v. United States*, 490 F.3d 50, 63 (1st Cir. 2007) (citation omitted); *accord Gulluni v. Levy*, 85 F.4th 78, 85 (1st Cir. 2023). "[A]n investigation need not be ongoing for the law enforcement privilege to apply as 'the ability of a law enforcement agency to conduct *future investigations* may be seriously impaired if certain information is revealed.'" *MacNamara v. New York*, 249 F.R.D. 70, 79 (S.D.N.Y. 2008) (citations omitted). The privilege applies where the government demonstrates that the disclosure of information would "jeopardize future criminal investigations." *Puerto Rico*, 490 F.3d at 64. Like the deliberative process privilege, the law enforcement privilege is a qualified privilege subject to

18

balancing the federal government's interest in preserving the confidentiality of sensitive law enforcement techniques against the requesting party's interest in disclosure. *See id.*

Defendants' DHS ICE and the State Department provided agency declarations asserting the privilege and explaining its basis. *See* Exh. I & K. HSI identified areas of questioning at Assistant Director Watson's depositions that would elicit law enforcement privileged information. *See* ¶ 7(a)-(c). This includes information transmitted as part of recommendations made to the Department of State concerning the five identified noncitizens, internal analyses and internal deliberative communications about decisions to take actions against noncitizens. *See id.* That information includes collaborations between ICE and DHS critical to law enforcement efforts and would be hampered by breeching confidentiality. *See* ¶ 8. The questions also seek information on what evidence is relevant in taking enforcement action and revealing it could undermine enforcement efforts, confidential investigative techniques, methods, and procedures not widely known. *See* ¶ 9-10. And if the subjects of investigations obtain LEP, they could identify behaviors, information, and methods relevant to enforcement and alter their conduct to avoid detection. *See* ¶ 11.

The State Department asserted the law enforcement privilege over redacted portions of Department guidance to field posts, including the webinar presentation, social media vetting, security in visa adjudications, visa ineligibilities, and visa qualifications. *See* Exh. K at ¶ 7(i). The Department also invoked the privilege over deposition questions about the process to reach final decisions concerning the five identified noncitizens. *See id.* ¶ 7(ii). Finally, it invoked the privilege over the nonpublic versions of the Foreign Affairs Manual and Foreign Affairs Handbook involving visa ineligibilities. *See id.* at ¶ 7(iii). And the interrogatories relating to the above information. *See id.* at ¶ 7(iv). The Department laid out the law enforcement reasons for withholding the documents. *See id.* at ¶ 8-12. And concluded that there are not precautions that would allow the department to safely release the information. *See id.* at 13.

Given the application of the privilege, the question for decision is whether the government's interest in preserving the confidentiality of the law enforcement information outweighs Defendants' interest in disclosure. *See Puerto Rico*, 490 F.3d at 64. The declarants set out the government's interests. *See* Exh. I at ¶ 8-11; Exh. K at ¶ 8-11.

Plaintiffs argue the DHS ICE documents including HSI reports of analysis and DHS ICE action summaries should be disclosed. Defendants discuss those items, which have been produced to the court in camera, above in section III.A. Plaintiffs reference a webinar slide deck and State Department cables that have been redacted. Presumably they mean those produced directly to Plaintiffs (DEF 64-84, DEF 88-94, DEF 84-87) and the cable included in the administrative record at CAR12-17. *See* Mot at 9, 19. Plaintiffs do not make an argument as to why, in the law enforcement privilege context, the government's interest in preserving the confidentiality of the redacted portions is less than their interest in their disclosure. So, Defendants rest on the declaration, Exh. K showing the need for redacting those cables.

Plaintiffs also argue that the government should produce an unredacted version of one of the cables because a leaked version showed that the Department mandated the review of social media accounts of student-visa applicants who were present in the United States from October 7, 2023 to August 31, 2024, and that fact is directly relevant to Plaintiffs' claims. *See* CAR 12-17 and Mot. at 19. But the analysis does not end at a showing of relevance to the Plaintiffs claims. The government has a strong interest in maintaining the law enforcement privilege of these redactions. Disclosure of the information would reveal highly sensitive screening and vetting techniques that could allow visa applicants to avoid fraud detection or national security review. *See* Exh. K at ¶ 9-11. Disclosing such information "could ultimately provide bad actors with the information they need to evade" or thwart U.S. law enforcement or national security efforts. *Cf. Mathews*, 426 U.S. at 81 n.17. So the Court should not compel disclosure of the law enforcement privileged material.

20

Respectfully Submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

LEAH B. FOLEY
*United States Attorney*

SHAWNA YEN
*Assistant United States Attorney*
*District of Massachusetts*


*Dated: June 27, 2025*

WILLIAM KANELLIS

*Ethan B. Kanter*
ETHAN B. KANTER
*Chief, National Security Unit*
*Office of Immigration Litigation*
*P.O. Box 878, Ben Franklin Station*
*Washington, D.C. 20001*


*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically

to the registered participants as identified on the Notice of Electronic Filing.


*Date: June 27, 2025*                                          By: _Ethan B. Kanter_____
                                                               ETHAN B. KANTER
                                                               *Chief, National Security Unit*
                                                               *Office of Immigration Litigation*
                                                               *P.O. Box 878, Ben Franklin Station*
                                                               *Washington, D.C. 20001*