*AAUP v. Rubio*
1:25-cv-10685 (D. Mass.)

**INDEX OF EXHIBITS
PLAINTIFFS' PRETRIAL BRIEF**

International Holocaust Remembrance Alliance, "Working Definition of antisemitism" ..................................................................................1

Second Supplemental Declaration of Acting Field Office Director William P. Joyce, *Khalil v. Joyce*, No. 25-cv-01963, ECF No. 72 (S.D.N.Y. Mar. 17, 2025)...........................................................................2

███████████████████████████████ ...........................3

███████████████████████ ...............................4

███████████████████████ ...............................5

█████████████████████ ........................6

████████████████ .........................................7

██████████████████████ ...................................8

Declaration of Unit Chief Roy M. Stanley, *Taal v. Trump*, No. 3:25-cv-335, ECF No. 30-2 (N.D.N.Y. Mar. 22, 2025)...................................9

███████████████████████ ...............................10

███████████████████████████████ .........................11

5 FAM 1200 ...........................................................................12

███████████████████████████████ .............13

Cable 25 State 59756, *Action Request: Expanding Screening and Vetting for FMJ Applicants* (June 18, 2025) ..................................14

U.S. Department of State, Foreign Affairs Manual, Homepage ..........................15

9 FAM 402.5 ..........................................................................16

9 FAM 302.6 .............................................................................17

9 FAM 403.11 ...........................................................................18

Letter from Kristi Noem to Harvard University, *Student and Exchange
    Visitor Program Student Records Request* (Apr. 17, 2025) ............................19

Press Release, Department of Homeland Security, *100 Days of Fighting
    Fake News* (Apr. 30, 2025) ........................................................20

# EXHIBIT 1



Working Definitions & Charters

# Working definition of antisemitism

Read the full text of the IHRA's non-legally binding working definition of antisemitism and learn more about this important tool with the related resources and FAQs below.

Our working definitions are available in multiple languages. While we try to ensure the accuracy of all of our translations, in the event of any discrepancies, the English translation takes precedence.



**What is the IHRA?**

**Explore all IHRA Resources**

In the spirit of the Stockholm Declaration that states: "With humanity still scarred by … antisemitism and xenophobia the international community shares a solemn responsibility to fight those evils" the committee on Antisemitism and Holocaust Denial called the IHRA Plenary in Budapest 2015 to adopt the following working definition of antisemitism.

On 26 May 2016, the Plenary in Bucharest decided to:

> **Adopt the following non-legally binding working definition of antisemitism:**
>
> **"Antisemitism is a certain perception of Jews, which may be expressed as hatred toward Jews. Rhetorical and physical manifestations of antisemitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities."**

To guide IHRA in its work, the following examples may serve as illustrations:

Manifestations might include the targeting of the state of Israel, conceived as a Jewish collectivity. However, criticism of Israel similar to that leveled against any other country cannot be regarded as antisemitic. Antisemitism frequently charges Jews with conspiring to harm humanity, and it is often used to blame Jews for "why things go wrong." It is

expressed in speech, writing, visual forms and action, and employs sinister stereotypes and negative character traits.

Contemporary examples of antisemitism in public life, the media, schools, the workplace, and in the religious sphere could, taking into account the overall context, include, but are not limited to:

- Calling for, aiding, or justifying the killing or harming of Jews in the name of a radical ideology or an extremist view of religion.

- Making mendacious, dehumanizing, demonizing, or stereotypical allegations about Jews as such or the power of Jews as collective – such as, especially but not exclusively, the myth about a world Jewish conspiracy or of Jews controlling the media, economy, government or other societal institutions.

- Accusing Jews as a people of being responsible for real or imagined wrongdoing committed by a single Jewish person or group, or even for acts committed by non-Jews.

- Denying the fact, scope, mechanisms (e.g. gas chambers) or intentionality of the genocide of the Jewish people at the hands of National Socialist Germany and its supporters and accomplices during World War II (the Holocaust).

- Accusing the Jews as a people, or Israel as a state, of inventing or exaggerating the Holocaust.

- Accusing Jewish citizens of being more loyal to Israel, or to the alleged priorities of Jews worldwide, than to the interests of their own nations.

- Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor.

- Applying double standards by requiring of it a behavior not expected or demanded of any other democratic nation.

- Using the symbols and images associated with classic antisemitism (e.g., claims of Jews killing Jesus or blood libel) to characterize Israel or Israelis.




◆ Drawing comparisons of contemporary Israeli policy to that of the Nazis.

◆ Holding Jews collectively responsible for actions of the state of Israel.

**Antisemitic acts are criminal** when they are so defined by law (for example, denial of the Holocaust or distribution of antisemitic materials in some countries).

**Criminal acts are antisemitic** when the targets of attacks, whether they are people or property – such as buildings, schools, places of worship and cemeteries – are selected because they are, or are perceived to be, Jewish or linked to Jews.

**Antisemitic discrimination** is the denial to Jews of opportunities or services available to others and is illegal in many countries.

## Featured download



26 May 2016

# IHRA non-legally binding working definition of antisemitism

Adopted by the IHRA Plenary in Bucharest

Download the full text of the IHRA's working definition of antisemitism.

**Download file**

## Related resources



### Recommendations for Dealing with Antisemitism at Universities with Teacher Education

This resources provides recommendations for dealing with antisemitism at universities with teacher education.

**Find out more**



### The IHRA Working Definition of Antisemitism: A Guide to Implementation for Sporting Institutions

Helping combat antisemitism in and through sport.

**Find out more**



## EU handbook for the practical use of the IHRA working definition of antisemitism

Illustrating good practices in the application of the IHRA working definition of antisemitism.

**Find out more**

## Frequently asked questions

**Why was the IHRA working definition of antisemitism developed?**    ⌄

**How did the IHRA adopt the working definition of antisemitism?**    ⌄

**What has its impact been?**    ⌄

**Who has adopted the working definition of antisemitism?**    ⌄



**Download the IHRA working definition of antisemitism**



# Related content

22 Apr 2024

## Intersectional Insights: Combating Antisemitism in 2024 with KIgA

Established over 20 years ago, the Kreuzberger Initiative gegen Antisemitismus (KIgA) was one of the first organizations focused on combating antisemitism in Germany and this year won funding under the IHRA Grant Program.

Read More

03 May 2024

## Combating Antisemitism: The Never Again Association's Enduring Battle

In the early '90s, amid the promise of Poland's transition to democracy, a group of young visionaries were also witnessing the alarming rise of extreme right-wing ideologies. Inspired by the courage of those who resisted the Nazis, they founded the Never Again Association.

Read More

☒ Other

## IHRA Toolkit Against Holocaust Distortion

Take steps towards recognizing and countering Holocaust distortion with the practical tools, guidance, and example activities included in this online Toolkit.

View

# Sign up to our newsletter to receive the latest updates

Email address

**Sign up**

By signing up to the IHRA newsletter, you agree to our Privacy Policy

## About the IHRA

The International Holocaust Remembrance Alliance (IHRA) is an intergovernmental organization with 35 Member Countries. We were founded in 1998 to address challenges related to the Holocaust and genocide of the Roma.

**Find out more**

---

**Useful Pages**

Press Room

Member Countries

Working Definitions

Resources for Education Professionals

Focus Areas

Annual Report

**Company**

Contact Us

Careers

Login for IHRA Delegates

---

**Sign up to our newsletter to receive monthly updates on our work**

Email address

**Sign up**



  

© IHRA 2025     Privacy Policy

# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

MAHMOUD KHALIL,

                            Petitioner,

              v.

WILLIAM P. JOYCE, *et al.*,

                         Respondents.

No. 25 Civ. 1935 (JMF)

SECOND SUPPLEMENTAL DECLARATION OF ACTING FIELD OFFICE DIRECTOR WILLIAM P. JOYCE

### SECOND SUPPLEMENTAL DECLARATION OF WILLIAM P. JOYCE

I, WILLIAM P. JOYCE, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.     I am an Acting Field Office Director ("(A)FOD") in the New York City Field Office of Enforcement and Removal Operations ("ERO New York") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS").

2.     I am aware that Mahmoud Khalil ("Khalil") has filed an Amended Petition for a Writ for Habeas Corpus before this Court.

3.     As the (A)FOD, I am responsible for, among other things, oversight of the civil immigration arrest and detention of aliens in the New York City area. In my role as the (A)FOD, I have access to records maintained in the ordinary course of business by ICE, including documentary records concerning ERO New York and the alien detainees who fall within its responsibility.

1

4.      I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business.

5.      Khalil is a native of Syria and citizen of Algeria who entered the United States under a F1 visa on December 20, 2022.

6.      On November 16, 2024, Khalil obtained Lawful Permanent Resident ("LPR") status as the spouse of a United States citizen.

7.      On March 8, 2025, Special Agents from the ICE Homeland Security Investigations ("HSI") Office of the Special Agent in Charge for the New York Area of Responsibility ("AOR") arrested Khalil at 8:35 p.m. at 195 Claremont Avenue in Manhattan, New York, for the purpose of placing him in removal proceedings.  HSI transported him to 26 Federal Plaza at 8:44 p.m. and arrived at 9:20 p.m.  While at 26 Federal Plaza, HSI served Khalil with a Notice to Appear ("NTA"), which charged him as removable pursuant to 8 U.S.C. § 1227(a)(4)(C)(i), in that the Secretary of State has reasonable grounds to believe that his presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States ("Exhibit A"). HSI also served Khalil with a Notice of Custody Determination, notifying Khalil that his detention was governed by 8 U.S.C. § 1226(a) (immigration custody during removal proceedings).

8.      Due to the lack of available detention space available to ERO New York, aliens arrested by ICE in that AOR are often detained at facilities in other AORs. This is an operational necessity to prevent overcrowding in ICE facilities.

9.      Orange County Jail in Goshen, New York did not have available detention space to accommodate Khalil and many ICE detention facilities throughout the Northeastern United States

are near or at capacity and engaged in efforts to relocate detained aliens to regions with available bedspace.

10.     Between March 8, 2025, and March 9, 2025, ERO New York transported sixteen detained aliens, including Khalil, from ERO New York's AOR to New Orleans Field Office of Enforcement and Removal Operations ("ERO New Orleans") AOR. Most of these transfers were for ongoing detention, while a small number were being staged for removal.  ERO New Orleans has administrative control of eight different detention facilities, meaning that AOR is often able to accommodate transfers when other AORs are not.

11.     Newark Field Office of Enforcement and Removal Operations ("ERO Newark") indicated that Elizabeth Detention Facility in Newark, New Jersey was experiencing and continues to experience a bedbug issue that prevented them from accepting detainees as full transfers. ERO New York did not request bed space from Philadelphia Field Office of Enforcement and Removal Operations ("ERO Philadelphia") or Buffalo Field Office of Enforcement and Removal Operations ("ERO Buffalo") based on awareness of general paucity of bedspace in those AORs compared to the known availability of bedspace in ERO New Orleans' AOR, as well as the need for those AORs to accommodate their own ongoing operations.

12.     While Khalil was at 26 Federal Plaza, ERO sought and obtained bedspace for Khalil from the ERO New Orleans Field Office.  The bedspace request for Khalil was made at 10:49 p.m. on March 8, 2025.  The travel packet for Khalil and his escorting officers was finalized at 3:57 a.m. on March 9, 2025, with a flight scheduled for 2:35 p.m. on March 9, 2025.

13.     ERO New York was responsible for locating bed space to detain Khalil and made its decisions on where to detain him based solely on operational considerations.

14.     ERO New York did not receive any directives or instructions pertaining to Khalil's detention.

15.     ICE's facility at 26 Federal Plaza is a Hold Room facility used for detention of individuals awaiting removal, transfer, EOIR hearings, medical treatment, intra-facility movement, or other processing into or out of a facility and it does not have beds or overnight medical staff. ICE ERO policy number 11087.2 dictates that absent exceptional circumstances, no detainee should be housed in a Hold Room facility for longer than 12 hours.

16.     In compliance with this policy, upon completion of initial processing, Khalil departed 26 Federal Plaza at 1:40 a.m. and ICE transported Khalil to Elizabeth Detention Facility in Newark, New Jersey, where he was physically present and booked into the detention facility at 2:20 a.m. Eastern Standard Time (3:20 a.m. Eastern Daylight Time) on March 9, 2025. Elizabeth Detention Facility has comprehensive overnight accommodations for detainees such as beds and 24-hour medical staff. As stated above, Khalil could not be housed at Elizabeth Detention Facility long-term due to the bedbug issue, so he remained there only until his flight to New Orleans.

17.     At the time Khalil filed a petition for a writ of habeas corpus in the Southern District of New York, he was detained at Elizabeth Detention Facility in Newark, New Jersey.

18.     On March 9, 2025, Khalil departed Elizabeth Detention Facility at 11:30 a.m. and was brought to the airport to be transported to the Central Louisiana ICE Processing Facility in Jena, Louisiana.

19.     On March 10, 2025, Khalil was booked into the Central Louisiana ICE Processing Facility at 12:33 a.m., Central Time and he has been detained at that detention facility since that time. ICE has no current plans or intentions to transfer Khalil from ERO New Orleans' AOR during the pendency of removal proceedings.

20.     Except for this ongoing lawsuit, ERO New York is not involved in Khalil's immigration removal proceedings which are pending before the LaSalle Immigration Court in Jena, Louisiana.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17 day of March 2025.

WILLIAM P
JOYCE

Digitally signed by WILLIAM P JOYCE
DN: cn=WILLIAM P JOYCE, o=U.S.
Government, ou=People,
email=William.P.Joyce@ice.dhs.gov,
c=US
Date: 2025-03-17T15:18:35-0400

William P. Joyce
Acting Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

# Exhibit A

DEPARTMENT OF HOMELAND SECURITY

# NOTICE TO APPEAR

DOB: ▮

Event No: ▮

---

**In removal proceedings under section 240 of the Immigration and Nationality Act:**

Subject ID: ▮  FINS: ▮  File No: ▮

In the Matter of:

Respondent: MAHMOUD KHALIL _____ currently residing at:

▮

| (Number, street, city, state and ZIP code) | (Area code and phone number) |

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of SYRIA and a citizen of ALGERIA;

3. You were admitted to the United States at unknown place on or about unknown date as a unknown manner;ORYour status was adjusted to that of a lawful permanent resident on November 2024 under section 212 (a)(3)(C) of the Act;

4. The Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(4)(C)(i) of the Immigration and Nationality Act, as amended, in that the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to:  ☐ 8CFR 208.30  ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

830 PINEHILL RD JENA LA 71342. LASALLE DETENTION FACILITY
_____
*(Complete Address of Immigration Court, including Room Number, if any)*

on ___March 27, 2025___ at ___8:30 AM___ to show why you should not be removed from the United States based on the
   *(Date)*          *(Time)*

charge(s) set forth above.  TIMOTHY MORAN - Supervisory Special Agent  TIMOTHY M MORAN JR

Digitally signed by TIMOTHY M. MORAN JR
Date: 2025.03.09 09:46:11 -05'00'
_____
*(Signature and Title of Issuing Officer)*

Date: ___March 9, 2025___   26 Federal Plaza, New York, NY
_____
*(City and State)*

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at www.uscis.gov/i-589. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at http://www.ice.gov/contact/ero, as directed by the DHS and regulated by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

## Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____

_____  
*(Signature of Respondent)*

_____  
*(Signature and Title of Immigration Officer)*

Date: _____

## Certificate of Service

This Notice To Appear was served on the respondent by me on  March 9, 2025 , in the following manner and in compliance with section 239(a)(1) of the Act.

[X] in person    [ ] by certified mail, returned receipt # _____ requested    [ ] by regular mail  
[ ] Attached is a credible fear worksheet.  
[ ] Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the _____ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

(X) *Refused to sign* (B)  
*(Signature of Respondent if Personally Served)*

TIMOTHY M MORAN JR  Digitally signed by TIMOTHY M MORAN JR. Date: 2025.03.09 16:41:28 -05'00'  
TIMOTHY MORAN - Supervisory Special Agent  
*(Signature and Title of officer)*

## Privacy Act Statement

**Authority:**

The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**

You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**

For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**

Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

DHS Form I-862 (6/22)

# EXHIBIT 3
# (REDACTED)

# EXHIBIT 4
# (REDACTED)

# EXHIBIT 5
# (REDACTED)

# EXHIBIT 6
# (REDACTED)

# EXHIBIT 7
# (REDACTED)

# EXHIBIT 8
# (REDACTED)

# EXHIBIT 9

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| MOMODOU TAAL*., et al.*, | |
| Plaintiffs, | |
| v. | No. 3:25-cv-335 (ECC/ML) |
| DONALD J. TRUMP, *et al.*, | |
| | Declaration of Unit Chief Roy M. Stanley III |
| Defendants. | |

## DECLARATION OF UNIT CHIEF ROY M. STANLEY

I, Roy M. Stanley III pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.  I am Unit Chief of the Counterterrorism Intelligence Unit within U.S. Immigration and Customs Enforcement ("ICE") Homeland Security Investigations ("HSI") Office of Intelligence. I have held a supervisory position within ICE since September 2018. I also have over thirty-five years of intelligence and operations experience as a senior U.S. Air Force officer and Department of Defense ("DoD") civilian employee with multiple assignments to Iraq, Afghanistan, Pakistan, Qatar, and on the Joint Staff. I retired at the rank of O-6, and my last assignment in uniform was as a Director, Joint Intelligence and Operations Center, CENTCOM HQ. As a DoD civilian, I worked for the Joint Warfare and Analysis Center, Joint Improvised Explosive Device Defeat Organization in Afghanistan, served as a CENTCOM rep at DEA Special Operations Division and the CBP National Targeting Center.

2.      HSI is a component of ICE that conducts significant and complex criminal investigations into individuals and international criminal networks that violate U.S. laws. HSI focuses its efforts on combating the transnational criminal networks that pose the greatest threats to the security of the United States. HSI has more than 10,000 employees stationed in more than 235 U.S. cities and more than 50 countries worldwide. The HSI workforce is made up of special agents, criminal analysts, intelligence analysts, and support personnel who live and work in the communities they are sworn to protect and serve.

3.      I am aware of the above-captioned lawsuit. I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other Department of Homeland Security (DHS) employees, and information portals maintained and relied upon by DHS in the regular course of business.

4.      On January 29, 2025, President Trump issued Executive Order 14188, *Additional Measures to Combat Anti-Semitism* (Executive Order). ICE is steadfast in its commitment to enforcing the Executive Order prohibiting anti-Semitism and safeguarding national security. ICE conducts targeted analysis to substantiate aliens' alleged engagement of antisemitic activities.

5.      To implement this Executive Order, the HSI Office of Intelligence proactively reviews open-source information to identify individuals subject to the Executive Order. Open-source information is defined as unclassified information that has been published or broadcast in some manner to the general public, could be lawfully seen or observed by a casual observer, is made available at a meeting open to the public, or is obtained by visiting any place or attending any event that is open to the public.

6.      Mr. Taal was identified as a student at Cornell University and a prominent pro-Palestinian activist involved in protests and disruption of university events. In one incident that

led to the University suspending him, he failed to comply with University directives to remove an unauthorized encampment, cease unreasonably loud chants and behavior, and disperse.

7.     Mr. Taal faced suspension on more than one occasion due to his disorderly behavior and long-term pattern of disregarding the rights of other students and the general public and was in fact banned from campus for a period of time while one suspension was being reviewed. This was due to, per a Senior Associate Dean, his "demonstrated a pattern of escalating, egregious behavior and a disregard for the university policies that exist to protect and response the rights of all members of the community." Mr. Taal posted emails with these and other, similar sentiments to the online magazine *Inside Higher Ed*.

8.     In or about March of 2025, HSI Office of Intelligence identified open-source records that indicated the Cornell University campus police determined that Mr. Taal had engaged in "disruptive conduct" that violated the university's code of conduct in multiple ways, including, for instance, knowingly following individuals who had used force – pushing aside Cornell University Police Officers – to gain access to an off-campus University event at the Ithaca Statler Hotel on September 18, 2024, and failing to follow University directives and campus police orders. Noise from the resulting protest was so loud that bystanders reported medical complaints and possible hearing loss. The University's Interim President contemplated pursuing both administrative and criminal charges following this event.

9.     Mr. Taal's involvement in certain protests at Cornell University align with the Executive Order's focus on deporting individuals who perpetrate "unlawful anti-Semitic harassment." His involvement in these disruptive protests creates a hostile environment for Jewish students.

10. Because of Mr. Taal's conduct, HSI referred Mr. Taal's case to the U.S. Department of State, which has the authority to determine whether the alien's presence or activities within the United States compromise a compelling U.S. foreign policy interest and potentially have serious adverse foreign policy consequences, as outlined in Section 237(a)(4)(C) of the Immigration and Nationality Act (INA), codified at 8 U.S.C. § 1227(a)(4)(C).

11. I am aware of the Court's order of March 21, 2025, directing the Government to address "whether the portions of the Executive Orders challenged in the Complaint, Dkt. No. 1 , are a basis for Mr. Taal's anticipated 'surrender to [U.S. Immigration and Customs Enforcement] custody' as stated in the March 21, 2025 electronic mail message from the Government to Plaintiffs' counsel."  Dkt. No. 27.  HSI's March 14, 2025 referral of Mr. Taal's case to the Department of State referred to the Executive Order. The Department of State revoked Mr. Taal's visa the same day. That is the extent of HSI's provision of information related to the Executive Order in question.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of March 2025.

_____
Roy M. Stanley III
Unit Chief
Homeland Security Investigations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

EXHIBIT 10
(REDACTED)

# EXHIBIT 11
# (REDACTED)

EXHIBIT 12

**UNCLASSIFIED (U)**

# 5 FAM 1200
# STATE MESSAGING AND ARCHIVE RETRIEVAL TOOLSET (SMART)

## 5 FAM 1210
## PURPOSE AND SCOPE

*(CT:IM-323;   06-20-2024)*
*(Office of Origin:  DT/ES/MCS/GMS)*

## 5 FAM 1211  PURPOSE AND SCOPE

*(CT:IM-272;   03-02-2020)*

a. This subchapter establishes policy for the State Messaging and Archive Retrieval Toolset (SMART) application.  This policy applies to all Department personnel, contractors, and other U.S. Government agency personnel (referred to as "users") who are authorized access to Department facilities and networks (domestically and abroad).

b. All users of SMART must follow the policy in this subchapter and the associated Telecommunications Handbook ([5 FAH-2](#)) when using SMART.

## 5 FAM 1212  AUTHORITIES

*(CT:IM-127;   03-05-2012)*

The authorities for this policy are found in [1 FAM 271.5](#) and [5 FAM 113.](#)

## 5 FAM 1213  DEFINITIONS

*(CT:IM-300;   06-06-2023)*

**Allied Communications Publication (ACP)**:  One of several publications that regulate the use of allied government transmission facilities.  ACPs are identified by a numerical suffix, ACP-127, ACP-131, etc.

**Addressee**:  The post, collective, individual, or distribution list to whom a message is directed by the originator.  Addressees are indicated as either action or info (information).

**Approver**:  An individual who has the authority (or to whom the authority has been delegated) to authorize release of a message or document that carries the authority of the Department of State, including reporting, policy formulation, and management.

**Archive message**:  Department messages that have long-term record value and are stored in the SMART archive.  SMART has two archive message types: cables and record emails.

**Archive:**  The official Department database of all archive messages sent to and received by SMART.  Users can search the archive for messages, save searches, and opt to enable notifications for when messages that meet their interests are added to the archive.  Access to the archive is controlled by role-based access control (RBAC) restrictions.

**Captions:**  Acronyms or phrases used to provide handling or distribution instructions for a cable or record email.  A caption denotes the expected audience of a SMART message, thereby targeting distribution and limiting archive access.  Captions take precedence over all other handling instructions.  Refer to 5 FAH-2 H-440 for more information.

**Classified message**:  In SMART, an archive message that is marked as Confidential or Secret and can only be received and retrieved from the archive by individuals with an appropriate security clearance.

**Clearer**:  An individual who reviews and concurs with message text or substance. SMART messages can have more than one clearer.

**Collective**:  A distribution list of several posts, agencies, and/or organizations grouped for a specific purpose or type of cable traffic.  There are two types of collectives:

   (1) **Department-originated**: Only the domestic designated organizations or bureaus within the Department may originate cable traffic to these collectives (i.e., the originator post must be SECSTATE WASHDC); and

   (2) **Field-originated**: Only overseas designated posts may originate a cable to these collectives.  Agencies outside the Department are not authorized to use collectives.

**Critical Intelligence (CRITIC):**  A handling symbol and precedence for specially formatted cables, per the Defense Special Security Communications System Operating Instructions [DOI 103] conveying national security information that must be routed to the National Security Agency [NSA] and then delivered to the highest levels of the U.S. Government as fast as possible.  Overseas personnel may only send CRITIC messages via SMART from a classified workstation.

**Dissemination rules:**  Descriptive logic directives that determine message distribution based on logical expressions of the Department's business rules.  Dissemination rules direct SMART to perform actions based on the properties or metadata of a message, the keyword contents of the message, and job roles assigned to a user.  These rules allow messages to be distributed to

necessary recipients through derived addresses rather than only to direct addresses.

**Enclave**:  The Department's two enterprise networks:  ClassNet for processing up to SECRET level information, and OpenNet for processing up to Sensitive but Unclassified (SBU) information.  SMART processes and archives only unclassified and SBU messages on OpenNet.  Both unclassified and classified messages are processed and archived on ClassNet.  With the exception of the United States Department of Agriculture, cable traffic originating from outside agencies is processed on ClassNet.  Almost all unclassified traffic originating from other agencies passes through an electronic cross domain security guard for access on OpenNet.

**Main State Messaging Center (MSMC) administrator**:  An administrator at SMART's central site, the Department's Messaging Center.

**Metadata:**  Descriptive information about the content of a SMART message including, but not limited to, precedence, classification, TAGS, captions, special handling and passing instructions, drafters, clearers and approvers, and addressees.

**Microsoft Outlook:**  The software application on which the SMART Client runs.

**Originator:**  The post or organization that initiates a message.

**Personally identifiable information (PII):**  (as defined by OMB M-07-16) Information that can be used to distinguish or trace an individual's identity; such as their name, Social Security number, biometric records, etc., alone, or when combined with other personal or identifying information, which is linked or linkable to a specific individual, such as date and place of birth, mother's maiden name, etc.  Refer to 5 FAM 460 for more information.

**Plain language address (PLA):**  A unique readable name for use in the address component of a Command, Control, and Communications (C3) system message (i.e., cable).  A PLA is an organizational address that identifies an organization or a group of organizations (e.g., SECSTATE WASHDC, AMEMBASSY ABUJA, AMCONSUL DURBAN, ALL EUROPE COLLECTIVE).

**Precedence:**  A designation assigned to a cable by the drafter to indicate the relative urgency of the cable's subject matter to the addressee.  The selected precedence dictates the message processing path and alerts addressees to the level of action required.  Generally, there are two precedence categories:

(1)  Standard; and

(2)  High.

**Recipient:**  Someone that SMART delivers a message to based on derived or direct addressing.

**Releaser:**  A user who sends an archive message.  In SMART, a user must be provisioned with release authority to send a cable.  Any user with a SMART account can send a record email.

**Rolebased access control (RBAC):**  A method of restricting information access based on the roles of individual users within an organization.  Users have access rights only to the information they need to do their jobs.  In SMART, RBAC is enforced using captions, traffic analysis by geography and subject (TAGS), sensitivity, assigned post, employee type, and classification.  RBAC is enforced when messages are disseminated and when users search the SMART archive.

**Sensitive but unclassified (SBU) message:**  Information that is not classified for national security reasons, but that warrants a degree of protection and administrative control that meets the criteria for exemption from public disclosure set forth under Sections 552 and 552a of Title 5, United States Code: the Freedom of Information Act and the Privacy Act.  See 12 FAM 540 for details on SBU.

**SMART message:**  Electronically transmitted official and unofficial correspondence known as cables and record emails.

**SMART post administrator:**  The local system administrator at a post abroad or at some domestic offices in the Department who manages the SMART users, messages, and post within their purview.

**State Messaging and Archive Retrieval Toolset (SMART)**:  The Department's cable and record email application designed as a simple, secure, and user-driven system to support the conduct of diplomacy through modern messaging, dynamic archiving, and information sharing.  SMART enables users to send and receive organizational authority messages and other messages with long-term value on both OpenNet and ClassNet.  These messages are stored and searchable in the SMART Archive.

**Traffic analysis by geography and subject (TAGS):**  Abbreviations that aid in identifying subject content, world locations, and programs in communications disseminated throughout the Department and posts.  These markings are metadata that factor into message dissemination, message retrieval, and disposition in the archive.  TAGS types include: subject, geographical, program, organizational, and personal.  SMART requires at least one subject TAGS on archive messages.

# 5 FAM 1214  MESSAGE TYPES AND THEIR USAGE

## 5 FAM 1214.1  Archive Messages

*(CT:IM-300;   06-06-2023)*

a. There are two types of SMART archive messages: cables and record emails.  See 5 FAM 1214.2 and 5 FAM 1214.3 for definitions of these message types.

b. When drafting, approving, and/or releasing archive messages, a user must comply with 5 FAM 400, 5 FAM 1200, 5 FAH-1, 5 FAH-2, 12 FAM 500, 12 FAM

[600](#), [12 FAH-6 H-540](#) and any other Department requirements concerning records management, correspondence, and information security.

c. Other agencies must comply with Department standards and procedures when using the Department's communications systems.  At post, the messaging regulations for other agencies will be followed only when they do not conflict with or adversely impact the Department's systems and requirements.

d. Include at least one subject TAGS (see [5 FAH-1 H-140)](#) and an appropriate subject line on all Department archive messages.  SMART automatically applies Executive Order 13526 information to Department archive messages.

e. All archive messages must be marked accordingly using the appropriate sensitivity marking category designator (see [12 FAM 540).](#)

# 5 FAM 1214.2  CABLES

*(CT:IM-300;   06-06-2023)*

a. Cables are official records of Department of State policies, program activities, post operations, and personnel management.  Cables are archive messages that are sent to organizational addressees (SECSTATE, AMEMBASSY, AMCONSUL, etc.) and are disseminated according to system rules and user profiles.  Cables are always cleared and approved, either directly or through delegation, and carry organizational authority.

b. Cables contain official evidence of the Department's business.

c.  Cables require a PLA in the line.

d. Cables may be addressed to individuals in the info line.

e. Cables must have precedence, TAGS, and classification defined.

f.  Cables may contain captions to restrict dissemination and archive access.

g. Cables may be marked 'Addressee Only' to limit search access to the releaser and message addressees, subject to RBAC permissions.

h. Cables may carry the privacy/PII marking as a reminder to safeguard the content appropriately.  This marking must be used in conjunction with a restrictive caption or SMART's 'Addressee Only' option to limit dissemination and/or search access.

i. Cables must display the signature of the designated principal in charge as the authority for release at the end of the cable.

j. Cables must have message reference numbers as unique identifiers.

k. Cables are saved to the archive.

l. Cables can be searched and retrieved from the archive depending on user RBAC permissions. Unclassified ALDAC messages, without restrictions, are accessible to all authenticated cleared personnel regardless of a SMART account.

# 5 FAM 1214.3  Record Email

*(CT:IM-300;   06-06-2023)*

a. A record email is a message, or an email converted to an archive message, whose content adds to a proper understanding of the formulation and execution of basic policies, decisions, actions, or responsibilities of Department offices and posts abroad, and as such is stored in the SMART archive for its long-term record value.  Record emails may be analogous to memos, correspondence, important meeting notes, and other documents with long-term value.  There are two types of record email:

   (1)  Message directly addressed (MDA), and

   (2)  For the record (FTR).

b. MDA record emails are addressed to individuals or distribution lists and assigned a unique identifier as a MDA (e.g., 21 MDA 12345).

c.  FTR emails are addressed to the archive and assigned a unique identifier as a message "For the Record" (e.g., 21 FTR 4567).

d. Record emails must have a TAGS and classification defined.

e. Record emails may contain captions to restrict dissemination and archive access.

f.  Record emails may be marked 'Addressee Only' to limit search access to the releaser and message addressees, subject to RBAC permissions.

g. Record emails may carry the Privacy/PII marking as a reminder to safeguard the content appropriately.  This marking must be used in conjunction with a restrictive caption or SMART's 'Addressee Only' option to restrict dissemination and/or search access.

h. SMART does not require record emails to have a clearer or approver.

i.  Record emails will not display the signature of the designated principal in charge as the authority for release at the end of the email.

j.  Record emails can be searched and retrieved from the archive, depending on user RBAC permissions.


# 5 FAM 1215  REPORTING SMART PROBLEMS

*(CT:IM-272;   03-02-2020)*

Domestic users experiencing problems with SMART should contact the IT Service Center at ITServiceCenter@state.gov or 202-647-2000.  Users abroad experiencing problems with SMART should contact their local information management (IM) staff.

# 5 FAM 1216  SMART SYSTEM ADMINISTRATOR TRAINING

*(CT:IM-272;   03-02-2020)*

a. SMART post administrators are required to complete annual SMART system administrator training.  For current SMART system administrator course offerings and schedules, please see the FSI OpenNet site.

b. A "Post Administrator Training Report" in SMART's Full Reporting can assist post administrators with tracking their training due date.  SMART also sends reminder emails when training is due.

# 5 FAM 1217  THROUGH 1219  UNASSIGNED

**UNCLASSIFIED (U)**

# EXHIBIT 13
# (REDACTED)

# EXHIBIT 14



| | |
|---|---|
| **From:** | SMART Core |
| **Sent:** | Wednesday, June 18, 2025 1:47 PM |
| **Cc:** | |

**Subject:**    Action Request:  Expanding Screening and Vetting for FMJ Applicants

**<span style="color:green">UNCLASSIFIED</span>**

SBU

| | |
|---|---|
| **Action Office:** | |
| **Info Office:** | ALDACS |

| | |
|---|---|
| **MRN:** | 25 STATE 59756    Reply |
| **Date/DTG:** | Jun 18, 2025 / 181737Z JUN 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| **E.O:** | 13526 |
| **TAGS:** | CMGT, CVIS, KFRD |
| **Captions:** | SENSITIVE |
| **Reference:** | A) 25 STATE 5914 |
| | B) 25 STATE 26168 |
| | C) 25 STATE 50220 |
| **Subject:** | Action Request:  Expanding Screening and Vetting for FMJ Applicants |

1. (U) This is an action request.  See paras. 26-29.

## INTRODUCTION AND SUMMARY

2. (SBU) In ref A, the Department directed consular officers to maintain extra vigilance and to comprehensively review and screen every visa applicant for potential security and non-security related ineligibilities including to assess whether the applicant poses a threat to U.S. national security.  In ref B, consular officers were instructed to conduct expanded social media screening and vetting for certain F, M, and J nonimmigrant visa (FMJ) applicants.  In ref C, the Department directed consular sections to temporarily suspend scheduling FMJ cases pending further guidance on FMJ vetting.  This guidance supersedes ref B, which was limited to social media vetting for certain FMJ applicants.

3. (SBU) This updated guidance requires consular officers to conduct a comprehensive and thorough vetting of all FMJ applicants, including online presence, to identify applicants who bear hostile attitudes toward our citizens, culture, government, institutions, or founding principles; who advocate for, aid, or support designated foreign terrorists and other threats to U.S. national security; or who perpetrate unlawful antisemitic harassment or violence.  <u>Consular sections should resume scheduling FMJ appointments but should consider the effect of this guidance on workload and schedule accordingly.</u>  **Posts should prioritize expedited FMJ appointment requests as described in para 29.**  Posts should implement these vetting procedures within five business days.

**WHY ARE WE DOING THIS?**

4. (U) E.O. 14161, Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats, directs us to ensure that foreign nationals admitted to the United States do not bear hostile attitudes toward the citizens, culture, government, institutions, or founding principles of the United States, and that they do not advocate for, aid, or support designated foreign terrorists and other threats to U.S. national security.  E.O. 14188, Additional Measures to Combat Anti-Semitism, establishes U.S. policy to combat antisemitism vigorously, using all available legal tools to hold to account perpetrators of unlawful antisemitic harassment and violence, including on university campuses.

5. (U) Removing foreign nationals from the United States, even when they have clearly violated our laws, is a lengthy, expensive, and difficult process.  Therefore, we must be vigilant during the visa issuance process.  We must ensure that aliens seeking admission

to the United States are screened and vetted to the maximum extent possible and that they will respect the terms of their admission to the United States. As Secretary Rubio said, "a visa is a privilege, not a right."

6. (SBU) Such pre-admission vetting is particularly important for long-stay NIV holders, and acutely for FMJ cases. The FBI has long warned that foreign powers seek access to American higher education institutions to, among other things, steal technical information, exploit U.S. research and development, and spread false information for political or other reasons. In addition, a recent CA/FPP study suggested that almost half of international students seek to remain in the United States, whether legally or illegally.

**WHICH CASES ARE COVERED?**

7. (SBU) This guidance for consular officers covers **all FMJ applicants,** <u>new or</u> <u>returning</u>. This updated guidance supersedes that in ref B, which was limited to social media vetting for certain FMJ applicants.

**HOW DO I HANDLE THESE CASES?**

8. (SBU) Post should conduct intake and interviews in accordance with standard procedures. Once you determine an FMJ applicant is otherwise eligible for the requested nonimmigrant status, you must refuse the case under INA 221(g). Inform the applicant that his case is refused and requires additional administrative processing to establish his eligibility for the visa. Request that the applicant set all of his social media accounts to "public" and remind the applicant that limited access to, or visibility of, online presence could be construed as an effort to evade or hide certain activity.

**WHO DOES THE VETTING?**

9. (SBU) The <u>same</u> consular officer who interviews the applicant should perform the vetting described below.  This "caseworker" approach is a best practice that allows a single decisionmaker to consider the whole applicant and the totality of facts surrounding the application.  It also permits better detection of potentially derogatory information and inconsistencies.  Other consular staff may perform discrete portions of the vetting that cannot be performed by the interviewing officer.  For example, if only FPU staff have access to LexisNexis, FPU staff may conduct that check and return the results to the interviewing consular officer.

10. (SBU) **Vetting is not a fraud assessment.**  Do not refer a case to post FPU for vetting or for any portion of the vetting.  However, you might discover information during vetting that leads to an FPU referral.  Posts should handle such cases according to their FPU referral SOPs and 7 FAH-1 H-940, Overseas FPU Responsibilities.

11. (SBU) To promote thorough vetting of visa applicants, and to promote quality decision-making generally, consular managers shall not maintain or establish any formal or informal production or processing quotas or targets for consular officers or those involved in administrative processing of visa cases.  Rather consular officers shall take the time necessary to satisfy themselves that visa applicants qualify for the visas they seek, and personnel involved in back-office processing shall take the time necessary to perform their tasks thoroughly.

**WHERE DO I LOOK?**

12. (SBU) You must conduct a comprehensive and thorough vetting of each FMJ applicant who is otherwise issuable (i.e. overcomes 214(b)).  Vetting means examining all aspects of the case, including the application, supporting evidence, and information you gather during the interview.  You should review these in light of your personal knowledge, your expertise, and all sources of information available to you.  It should include a review of the applicant's entire online presence -- not just social media activity -- using any appropriate search engines or other online resources.  It also should include a check of any databases to which the consular section has access (e.g., LexisNexis or local equivalents).

13. (SBU) Consular sections may consult LE staff and Public Diplomacy sections to understand the social media environment at post and which search engines and techniques are best for comprehensively exploring an applicant's online presence.  LE

staff can help provide context, including when assessing the credibility of applicants who apparently lack any online presence or who did not provide social media identifiers.

14. (SBU) If it is necessary to sign in to an account to view all of an applicant's activity on a particular social media platform (e.g., Instagram), you must do so using an official account that is publicly attributable to the Department.  <u>Consular sections may create such accounts in accordance with the platform's Terms of Service.</u>  Do not use accounts that are used for public communication.  Follow the guidance on social media use in 7 FAH-1 H-945.4, Social Media Rules of Conduct in Fraud Assessments, but recall that **vetting is not a fraud assessment,** so you should not track such vetting activities in ECAS.

15. (SBU) If you are unable to review any aspect of an applicant's online presence because social media accounts are set to "private" or otherwise limited, you should treat the case as any other where an applicant fails to provide certain information on request.  **You must consider whether such failure reflects evasiveness or otherwise calls into question the applicant's credibility.**

**WHAT AM I LOOKING FOR?**

16. (U) During the vetting, you simply are looking for any potentially derogatory information about the applicant.  You must review any such information to ensure it does not indicate an ineligibility under INA 212(a) or 214(b).  For example, during an online presence search, you might discover in local media that an applicant had been arrested and charged with a serious crime, a possible 2A1 ineligibility, that he did not disclose on his application.  In such a case, you could request additional information from the applicant to help you determine whether he is ineligible.

17. (U) You should consider as potentially derogatory any indications of hostility toward the citizens, culture, government, institutions, or founding principles of the United States; of advocacy for, aid, or support for designated foreign terrorists and other threats to U.S. national security; or of support for unlawful antisemitic harassment or

violence. You must review any such indicators to ensure they do not indicate an ineligibility under INA 212(a). For example, during an online presence search, you might discover on social media that an applicant endorsed Hamas or its activities, a possible 3B ineligibility, that he did not disclose on this application.

18. (SBU) You also should be alert to any inconsistencies between what you discover during vetting and how the applicant presented himself in his application, in his supporting evidence, or during the interview. You must explore all such inconsistencies to ensure they do not indicate visa ineligibilities. **Even when such inconsistencies do not point to an INA 212(a) ineligibility, they can call into question the applicant's credibility.**

19. (U) You must document the results of your vetting in detailed case notes, including all potentially derogatory information and inconsistencies. If you find any relevant information online, take screenshots to preserve the record against possible later alteration or loss of the information and upload those screenshots to the applicant's case record in the CCD.

## DOES THE APPLICANT STILL OVERCOME INA 214(B)?

20. (U) INA 214(b) requires an applicant to show credibly that all activities in which he is expected to engage in while in the United States are consistent with the specific requirements of his visa classification. That is, **if you are not completely satisfied (1) that the applicant is credible and (2) that, during his time in the United States, the applicant will engage only in activities consistent with his nonimmigrant visa status, you should refuse the visa under INA 214(b).** That is true even in cases where the applicant has convinced you that he is not an intending immigrant, and even in cases where the applicant is also ineligible under another section of the law.

21. (SBU) Even if inconsistencies or potentially derogatory information you uncover during vetting do not rise to the level of an INA 212(a) ineligibility, you must consider whether they undermine the applicant's credibility or suggest that the applicant will not

respect the terms of his admission to the United States. For example, while vetting applicants, many posts have discovered evidence online that those applicants had worked illegally while in the United States previously, thus seriously undermining their credibility in subsequent visa applications.

22. (SBU) In the same way, indications of hostility toward the citizens, culture, government, institutions, or founding principles of the United States; of advocacy for, aid, or support for designated foreign terrorists and other threats to U.S. national security; or of support for unlawful anti-Semitic harassment or violence might not lead to an INA 212(a) ineligibility. However, you must consider whether applicants who express such strong animus are likely to respect the terms of their admission to the United States, including respecting all of its laws.

23. (SBU) Likewise, for applicants who demonstrate a history of political activism, especially when it is associated with violence or with the views and activities described above, you must consider the likelihood they would continue such activity in the United States and, if so, whether such activity is consistent with the nonimmigrant visa classification they seek. As Secretary Rubio has said, we do not seek to import activists who will disrupt and undermine scholarly activity at U.S. universities.

## IS THE APPLICANT INELIGIBLE UNDER INA 212(a)(3)?

24. (SBU) If you uncover information that might lead to an INA 212(a)(3) ineligibility, you should follow the instructions in 9 FAM 304.2 to request an SAO. This includes but is not limited to ineligibilities under:

- INA 212(a)(3)(A)(ii), where an applicant is traveling solely, principally, or incidentally to engage in any unlawful activity (9 FAM 302.5-4).
- INA 212(a)(3)(A)(iii), where an applicant seeks to engage solely, principally, or incidentally in any activity, a purpose of which is the opposition to, or the control or overthrow of, the U.S. government by force, violence, or other unlawful means (9 FAM 302.5-5).
- INA 212(a)(3)(B), where an applicant engages in certain terrorist activities, including espousing such activities, or has provided any form of material support to a terrorist organization (9 FAM 302.6).

25. (SBU) In any case where an applicant:

- expresses hostile attitudes toward the citizens, culture, government, institutions, or founding principles of the United States;
- **OR** advocates for, aids, or supports designated foreign terrorists and other threats to U.S. national security;
- **OR** expresses support for or perpetrates unlawful anti-Semitic harassment or violence;
- **AND** overcomes INA 214(b);
- **AND** is not ineligible under any other provision of INA 212(a)(3);
- **THEN** you should pursue a finding that the applicant is ineligible under INA 212(a)(3)(C), where an applicant's entry or proposed activities would have potentially serious foreign policy consequences or compromise a compelling U.S. foreign policy interest.  Only the Secretary can make such a finding, which requires an SAO.  See 9 FAM 302.14-2 for details.

**ACTION REQUESTS**

26. (U) Posts should implement these vetting procedures within five business days.

27. (U) In addition, posts should work with their Public Diplomacy Sections on any public announcements for appropriate social media platforms and/or in local press.  Cleared social media content for posts to translate for this purpose will be available on the Consular Affairs Outreach Hub, and cleared press guidance will be available on CAWeb.  The GSS Program Team will instruct vendors to update GSS websites.

**RESUMING FMJ SCHEDULING**

28. (U) Posts should resume regular scheduling of FMJ visa applications once these actions requests are implemented.  However, posts should consider overall scheduling volume and the resource demands of appropriate vetting; posts might need to schedule fewer FMJ cases than they did previously.

29. (SBU) Posts may resume processing of FMJ Referrals and Priority Appointment Requests (PARs), as well as FMJ expedited appointment requests.  However, among expedited appointment requests for FMJs, posts should prioritize the following groups:

- J-1 physicians
- F-1 students seeking to study at a U.S. university where international students constitute 15 percent or less of the total student population, according to the U.S. Department of Education.  CA will post a list of such schools on CAWeb.

## APPLICATION PROCESS CONSIDERATIONS

30. (U) For FMJ cases currently in "open" status that have not yet been interviewed or, in the case of interview waiver cases, otherwise adjudicated, posts should request that applicants make their social media accounts "public," then conduct the vetting described in this cable.  If no potentially derogatory information is found, post can adjudicate the case to completion.  If potentially derogatory information is found, post should refuse the case under the appropriate refusal code; or, if needed, post should call the applicant back for a follow-up interview.

31. (U) For FMJ cases that were interviewed before the release of ref C and are otherwise approvable but currently in INA 221(g) status, posts should request that applicants make their social media accounts "public," then conduct the vetting described in this cable.  If no potentially derogatory information is found, post can adjudicate the case to completion.  If potentially derogatory information is found, post should refuse the case under the appropriate refusal code; or, if needed, post should call the applicant back for a follow-up interview.

# EXHIBIT 15

The **Foreign Affairs Manual (FAM)** and associated **Handbooks (FAHs)** are a single, comprehensive, and authoritative source for the Department's organization structures, policies, and procedures that govern the operations of the State Department, the Foreign Service and, when applicable, other federal agencies. The FAM (generally policy) and the FAHs (generally procedures) together convey codified information to Department staff and contractors so they can carry out their responsibilities in accordance with statutory, executive and Department mandates.



Enter Search Text | Search

# FAM Volume Listing

## 1 FAM Organization and Functions
Policy Manual

View Table of Contents

View Changes

## 2 FAM General
Policy Manual

View Table of Contents

View Changes

## 3 FAM Personnel
Policy Manual

View Table of Contents

View Changes

## 4 FAM Financial Management
Policy Manual

View Table of Contents

View Changes

## 5 FAM Information Management

Policy Manual

[View Table of Contents](#)

[View Changes](#)

## 6 FAM General Services

Policy Manual

[View Table of Contents](#)

[View Changes](#)

## 7 FAM Consular Affairs

Policy Manual

[View Table of Contents](#)

[View Changes](#)

## 8 FAM FAM Passports and Consular Reports of Birth Abroad

Policy Manual

[View Table of Contents](#)

[View Changes](#)

## 9 FAM Visas

Policy Manual

[View Table of Contents](#)

[View Changes](#)

## 10 FAM Public, Educational, and Cultural Affairs

Policy Manual

[View Table of Contents](#)

[View Changes](#)

## 11 FAM Legal and Political Affairs

Policy Manual

[View Table of Contents](#)

[View Changes](#)

## 12 FAM Diplomatic Security

Policy Manual

[View Table of Contents](#)

[View Changes](#)

## 13 FAM Training and Professional Development

Policy Manual

[View Table of Contents](#)

[View Changes](#)

## 14 FAM Logistics Management

Policy Manual

[View Table of Contents](#)

[View Changes](#)

## 15 FAM Overseas Buildings Operations

Policy Manual

[View Table of Contents](#)

[View Changes](#)

## 16 FAM Medical

Policy Manual

[View Table of Contents](#)

View Changes

## 18 FAM Programs, Practices, and Planning

Policy Manual

View Table of Contents

View Changes

## 19 FAM Cybersecurity Guidance

Policy Manual

View Table of Contents

View Changes

## 20 FAM Data and Artificial Intelligence

Policy Manual

View Table of Contents

View Changes

© 2025 - Department of State: FAM Website    STATE.GOV    USA.GOV    Privacy and Disclaimers    Contact

# EXHIBIT 16

UNCLASSIFIED (U)

# 9 FAM 402.5

# (U) STUDENTS AND EXCHANGE VISITORS – F, M, AND J VISAS

*(CT:VISA-2150;   04-29-2025)*
*(Office of Origin:  CA/VO)*

## 9 FAM 402.5-1  (U) STATUTORY AND REGULATORY AUTHORITY

### 9 FAM 402.5-1(A)  (U) Immigration and Nationality Act

*(CT:VISA-1;   11-18-2015)*

**(U)** INA 101(a)(15)(F) (8 U.S.C. 1101(a)(15)(F)); INA 101(a)(15)(J) (8 U.S.C. 1101(a)(15)(J)); INA 101(a)(15)(M) (8 U.S.C. 1101(a)(15)(M)); INA 212(a)(6)(C) (8 U.S.C. 1182(a)(6)(C)); INA 212(e) (8 U.S.C. 1182(e)); INA 212(j) (8 U.S.C. 1182(j)); INA 214(b) (8 U.S.C. 1184(b)); INA 214(l) (8 U.S.C. 1184(l)), INA 214(m) (8 U.S.C. 1184(m)).

### 9 FAM 402.5-1(B)  (U) Code of Federal Regulations

*(CT:VISA-1;   11-18-2015)*

**(U)** 22 CFR 41.61; 22 CFR 41.62; 22 CFR 41.63; 22 CFR Part 62.

## 9 FAM 402.5-2  (U) OVERVIEW

*(CT:VISA-1970;   04-22-2024)*

**(U)** Except for incidental, short-term courses permitted under a B visa (see 9 FAM 402.5-5(I)(3)-(4)), a noncitizen must have a student visa to study in the United States. The course of study and type of school they plan to attend determines whether they need an F-1 visa (academic) or an M-1 visa (nonacademic, vocational). Exchange visitor (J-1) visas are for individuals approved to participate in exchange visitor programs in the United States, which can range from student to research scholar to camp counselor to physician, among other programs.  Students and exchange visitors must be accepted by their schools or program sponsors before applying for visas.

## 9 FAM 402.5-3  (U) Categories of F, J, and M Visas

*(CT:VISA-1828;   09-12-2023)*

**(U)** 22 CFR 41.12 identities the following F, J, and M visas classifications for noncitizens engaged in study or participation in exchange programs:

| F1 | Student in an Academic or Language Training Program |
|----|----|
| F2 | Spouse or Child of F1 |
| F3 | Canadian or Mexican National Commuter Student in an Academic or Language Training Program |
| J1 | Exchange Visitor |
| J2 | Spouse or Child of J1 |
| M1 | Vocational Student or Other Nonacademic Student |
| M2 | Spouse or Child of M1 |
| M3 | Canadian or Mexican National Commuter Student (Vocational Student or Other Nonacademic Student) |

# 9 FAM 402.5-4  (U) STUDENT AND EXCHANGE VISITOR PROGRAM (SEVP)

## 9 FAM 402.5-4(A)  (U) Background on SEVP

*(CT:VISA-3012;   12-11-2024)*

a. **(U)** The Student and Exchange Visitor Information System (SEVIS) is designed to monitor the academic progress, movement, etc. of foreign students and exchange visitors from entry into the United States to departure. The Student and Exchange Visitor Program (SEVP) manages SEVIS.  SEVP is under the auspices of the National Security Investigations Division of ICE.

b. **(U)** SEVIS monitors schools and programs, students, exchange visitors, and their dependents throughout the duration of approved participation within the U.S. education system.  You can access the SEVIS record associated with the student through the CCD SEVIS report.

c.  **(U)** Contact the Education and Tourism Division CA/VO/F/ET with policy and procedural questions related to F, M, and J visas.

## 9 FAM 402.5-4(B)  (U) Student and Exchange Visitor Information System (SEVIS) Record is Definitive Record

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** While applicants must still present a paper Form I-20 (F or M visa) or Form DS-2019 (J visa) to qualify for a visa, the SEVIS record is the definitive

record of student or exchange visitor status and visa eligibility.  You must always check an applicant's SEVIS status before issuing an F, M, or J visa, for two reasons:  (1) You must verify that the SEVIS fee has been paid (see following paragraph); and (2) While presentation of a valid Form I-20 or Form DS-2019 generally indicates that an individual is eligible to apply for a visa, the electronic SEVIS record in the CCD, not the paper form, is the definitive record.

b. **(U)** The electronic SEVIS record will indicate the applicant's current SEVIS status.  You should issue F, M, or J visas only to visa applicants whose SEVIS record indicates a SEVIS status of "initial" or "active."

c.  **(U)** On occasion, you may encounter an applicant who presents a hard copy Form I-20 or Form DS-2019 but you are unable to locate the SEVIS record in the CCD.  This may occur because records were not "swept" into the CCD from the SEVIS database as usual.  If the applicant is otherwise qualified, refuse the visa under INA 221(g) for administrative processing and alert the Visa Office F/M/J portfolio holder(s) listed in the CAWeb "Who's Who" in VO for assistance in verifying the record.

## 9 FAM 402.5-4(C)  (U) The Student and Exchange Visitor Information System (SEVIS) Fee

*(CT:VISA-2048;   08-15-2024)*

**(U)** All students and exchange visitors, except those exchange visitors who are sponsored by the U.S. government (programs with a serial number that begins with the prefix G-1, G-2, G-3, or G-7 on the Form DS-2019), must pay the I-901 SEVIS fee at FMJFee.com before the visa interview.  You must verify SEVIS fee payment through the SEVIS CCD report.  If the applicant's CCD SEVIS record does not show the fee was paid but the applicant states it was, you can easily and accurately verify the SEVIS payment by entering the SEVIS number, the last name of the applicant, and the applicant's date of birth into the FMJfee.com website.  Applicants who cannot demonstrate that they have paid the SEVIS fee should be refused under INA 221(g).  Questions about SEVIS fee payment should be directed to the Visa Office F/M/J portfolio holder(s) listed in the CAWeb "Who's Who".  Additional details and FAQs on the SEVIS fee can be found on the ICE website and on DHS's Study in the States website.

# 9 FAM 402.5-5  (U) STUDENTS: ACADEMIC AND NONACADEMIC – F AND M VISAS

# 9 FAM 402.5-5(A)  (U) Related Statutory and Regulatory Authorities

## 9 FAM 402.5-5(A)(1)  (U) Immigration and Nationality Act

*(CT:VISA-1;   11-18-2015)*

INA 101(a)(15)(F) (8 U.S.C. 1101(a)(15)(F)); INA 101(a)(15)(M) (8 U.S.C. 1101(a)(15)(M)); INA 212(a)(6)(C) (8 U.S.C. 1182(a)(6)(C)); INA 214(b) (8 U.S.C. 1184(b)); INA 214(l) (8 U.S.C. 1184(l)), INA 214(m) (8 U.S.C. 1184(m)).

## 9 FAM 402.5-5(A)(2)  (U) Code of Federal Regulations

*(CT:VISA-1;   11-18-2015)*

22 CFR 41.61.

# 9 FAM 402.5-5(B)  (U) Overview

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** An F or M visa is usually required for individuals to enter the United States to attend university or college, public or private secondary school, private elementary school, seminary, conservatory, other academic institution, including a language training program, or vocational or other recognized nonacademic institution.  Also see 9 FAM 402.5-6 below regarding the J visa for exchange visitors, some of whose programs include attendance at a U.S. school.

b. **(U)** Citizens of VWP participating countries who intend to study cannot travel on the VWP or on visitor (B) visas, except to undertake recreational study incidental to their visit.

c.  **(U)** Study leading to a degree or certificate conferred by either a U.S. or foreign educational institution is not permitted on a visitor (B) visa, even if it is for a short duration.  For example, distance learning which requires a period on the institution's U.S. campus requires a student visa.

d. **(U)** B-2 visa appropriate for certain students: See 9 FAM 402.5-5(R)(3) below for information on appropriate issuance of B-2 visas to prospective students, 9 FAM 402.5-5(I)(3) on students pursuing a short course of study, and 9 FAM 402.5-5(J)(2) below, 9 FAM 402.1-3 paragraph a, and 9 FAM 402.1-5(C) for derivative children applying for B-2 status.

# 9 FAM 402.5-5(C)  (U) Qualifying for a Student Visa (F-1/M-1)

*(CT:VISA-2150;   04-29-2025)*

a. **(U)** An applicant applying for a student visa under INA 101(a)(15)(F)(i) or INA 101(a)(15)(M)(i) must meet the following requirements to qualify for a

student visa:

(1) **(U)** Acceptance at a school as evidenced by a Form I-20 (see 9 FAM 402.5-4(B) above and 9 FAM 402.5-5(D) below);

(2) **(U)** Intent to enter the United States solely to pursue a full course of study at an approved institution *(see 9 FAM 402.5-5(C)(1) below)*;

(3) **(U)** Present intent to leave the United States at conclusion of approved activities (see 9 FAM 402.5-5(E) below);

(4) **(U)** Possession of sufficient funds to meet the individual's financial needs (see 9 FAM 402.5-5(G) below); and

(5) **(U)** Preparation for course of study (see 9 FAM 402.5-5(H) below).

b. **(U)** If an applicant fails to meet one or more of the above criteria, the appropriate ground of refusal is INA 214(b).

## *9 FAM 402.5-5(C)(1) (U) Intent to Solely Pursue a Full Course of Study*

*(CT:VISA-2150;   04-29-2025)*

*a. Unavailable*

*b. Unavailable*

   *(1) Unavailable*

   *(2) Unavailable*

   *(3) Unavailable*

*c. Unavailable*

   *(1) Unavailable*

   *(2) Unavailable*

   *(3) Unavailable*

# 9 FAM 402.5-5(D)  (U) Form I-20 Certificate of Eligibility for Nonimmigrant (F-1) Student Status - For Academic and Language Students

## 9 FAM 402.5-5(D)(1)  (U) Form I-20 Required

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** A prospective student must have a Form I-20, Certificate of Eligibility for Nonimmigrant Student Status, issued by an SEVP-certified school to be issued an F-1 or M-1 student visa.  Only an SEVP-certified school can issue a Form I-20 to students who have been accepted for enrollment.  The Form I-20 constitutes proof of acceptance at an SEVP-certified school and allows the holder to apply for a visa or change of status and admission into the United

States.  The Form I-20 has the student's unique SEVIS identification (ID) number on the upper left-hand side with the visa class printed on the top right-hand side.  New forms do not have a bar code.  SEVIS ID numbers are an N followed by 9 digits.  Old Forms I-20 with a bar code ceased to be issued as of June 26, 2015, and became invalid for visa issuance on July 1, 2016.

b. **(U)** An F-1 or M-1 visa may be issued only to an applicant who presents a properly completed and valid Form I-20 from the institution the student will attend and who is otherwise eligible for a visa.  These forms are issued only in the United States by approved institutions to students who will pursue a full course of study.

c.  **(U)** F and M visa applicants must present a signed Form I-20 and J Visa applicants a Form DS-2019 before visa issuance.  If there are minor errors on the form (e.g., a program start date that is off by one day) you can process the case using that form.  However, if the form indicates an unrealizable program start date, or has a typographic error in the biographic data, you must verify that the information is correct in SEVIS.  The SEVIS record is the definitive record of student status and visa eligibility.  In most cases, the electronic record can be corrected by the institution without requiring issuance of a new hard copy Form I-20 or Form DS 2019.  You must verify that the SEVIS status is either "initial" or "active".  Make a case note that the electronic record contains corrections, and that the traveler will present the Form I-20 at the POE.  CBP accesses the electronic record using the SEVIS number.

d. **(U)** A Form I-20 must bear the signature of the designated school official (DSO) certifying that:

   (1)  **(U)** The student's application for admission has been fully reviewed and is approved;

   (2)  **(U)** The student is financially able to pursue the proposed course of study;

   (3)  **(U)** Page 1 of the Form I-20 was completed and verified to be accurate before signature; and

   (4)  **(U)** If the student will be attending a public high school on an F-1 visa, the school indicates that the student has paid the unsubsidized cost of the education (see INA 214(m)) and the amount submitted by the student for that purpose.

e.  **(U)** On November 1, 2021, SEVP published policy guidance outlining the new procedure for the use of electronic signatures and transmission of the Form I-20, "Certificate of Eligibility for Nonimmigrant Student Status."  This guidance permits designated school officials (DSOs) to electronically sign and transmit the Form I-20 to initial and continuing international students and their dependents, using software programs or applications or by using electronically reproduced copies of a signature.  Additionally, school officials may scan and email or electronically transmit the Form I-20 via a secure platform, such as a school portal or other secure site, to F and M students

and their dependents. DSOs may also choose to still physically sign and mail the Form I-20 to students.

f. **(U)** A Form I-20 issued by a school system must indicate the specific school within the system that the student will attend.

g. **(U)** If the applicant submits a Form I-20 that does not contain all the required information, you must refuse the visa under INA 221(g) and require that the missing information be submitted.

## 9 FAM 402.5-5(D)(2)  (U) Student Must Present Form I-20 at Port of Entry (POE)

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** At the time of admission to the United States, a student must present the entire Form I-20, properly filled out and signed by the DSO and the student. Thus, after the visa interview or after an F-1 or M-1 visa has been issued, you must return the completed Form I-20, together with all supporting financial evidence, to the individual for presentation to the U.S. immigration officer at the POE.  Upon the student's arrival, the immigration officer will examine the documentation and return the financial evidence to the individual.

b. **(U)** The student must always retain the Form I-20 while in the United States.

## 9 FAM 402.5-5(D)(3)  (U) Suspension of Cases Involving Unrealizable Reporting Dates

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** Action on the application must be suspended if the program start date specified in the applicant's Form I-20 or Form DS-2019 is already past or you believe that the applicant will be unable to meet that date.  The officer must review the SEVIS record in the CCD to determine whether the DSO (for F and M visas) or responsible officer (J visas) has amended the SEVIS record to change the program start date.  If this has not already been done, the applicant must ask the official to enter a new program start date in SEVIS - one that the applicant can meet.  You may then issue the visa based on the electronic record.

b. **(U)** You may issue an F or M visa to an applicant who is otherwise qualified, was previously admitted in F or M status, and is seeking to renew the visa to continue participation in a student program, if the status of the individual's SEVIS record is "active."

c. **(U)** Do not renew F or M visas for individuals whose SEVIS status is in any status other than active, regardless of presentation of a hard copy Form I-20 that may appear to be valid on its face.

## 9 FAM 402.5-5(D)(4)  (U) Fraud Related to Form I-20

*(CT:VISA-2048;   08-15-2024)*

**(U)** Fraud, as it relates to F and M cases, often involves the submission of false records to institutions to secure a Form I-20.  You may also observe unusual patterns of Form I-20 issuance from a particular institution.  If any type of fraud is suspected, refuse the visa under INA 221g and refer the case to the Fraud Prevention Manager through ECAS and to CA/FPP.  In addition, notify CA/FPP/ATD student visa portfolio holder and the F/M/J portfolio manager(s) in CA/VO/F/ET.  If a fraud investigation confirms fraud or misrepresentation of a material fact on the part of the applicant, you must consider an ineligibility under INA 212(a)(6)(C).  Questions concerning an applicant's ineligibility under INA 212(a)(6)(C) must be addressed to L/CA.

## 9 FAM 402.5-5(D)(5)  (U) F-1 Form I-20 Sample

*(CT:VISA-432;   08-08-2017)*

**(U)** See Form I-20 Sample.

# 9 FAM 402.5-5(E)  (U) Residence Abroad

## 9 FAM 402.5-5(E)(1)  (U) Residence Abroad Required

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** INA 101(a)(15)(F)(i) and INA 101(a)(15)(M)(i) both require that an F-1 or M-1 applicant possess a residence in a foreign country they have no intention of abandoning.  You must be satisfied that the applicant intends to depart upon completion of the approved activity; specifically, they must:

   (1)  **(U)** Have a residence abroad;

   (2)  **(U)** Have no immediate intention of abandoning that residence; and

   (3)  **(U)** Intend to depart from the United States upon completion of approved activities.

b. **(U)** Adjudicating student visa applications differs from those of other short-term visitors in that the residence-abroad requirement should be looked at differently.  Typically, students lack the strong economic and social ties of more established visa applicants, and they plan longer stays in the United States.  The statute assumes that the natural circumstances of being a student do not disqualify the applicant from qualifying for a student visa. You should consider the applicant's present intent in determining visa eligibility, not what they might do after a lengthy stay in the United States.

c. **(U)** If a student visa applicant is residing with parents or guardians, they are maintaining a residence abroad if you are satisfied that the applicant has the present intent to depart the United States at the conclusion of their studies. The fact that this intention may change is not sufficient reason to deny a

visa. In addition, the present intent to depart does not imply the need to return to the country from which they hold a passport. It means only that they must intend to leave the United States upon completion of their studies. Given that most student visa applicants are young, they are not expected to have a long-range plan and may not be able to fully explain their plans at the conclusion of their studies. You must be satisfied when adjudicating the application that the applicant possesses the present intent to depart at the conclusion of their approved activities.

## 9 FAM 402.5-5(E)(2) (U) Relationship of Education or Training Sought to Existence of Ties Abroad

*(CT:VISA-1970; 04-22-2024)*

a. **(U)** The fact that a student's proposed education or training would not appear to be useful in their homeland is not a basis for refusing an F-1 or M-1 visa. This remains true even if the applicant's proposed course of study seems to be impractical. For example, if a student visa applicant from a developing country wishes to study nuclear engineering simply because they enjoy it, they may no more be denied a visa because there is no market for a nuclear engineer's skills in their homeland than they may be denied a visa for the study of philosophy or Greek simply because they do not lead to a specific vocation.

b. **(U)** The fact that education or training like that which the applicant plans to undertake is apparently available in their home country is not in itself a basis for refusing a student visa. An applicant may legitimately seek to study in the United States for various reasons, including a higher standard of education or training. Furthermore, the desired education or training in the applicant's homeland may be only theoretically available; openings in local schools and institutions may be already filled or reserved for others.

## 9 FAM 402.5-5(E)(3) (U) Returning Students

*(CT:VISA-2048; 08-15-2024)*

**(U)** Some students must apply for visa renewals if they go home or travel during their period of study. Where applicable, returning students may be eligible to apply under an interview waiver authority (see 9 FAM 403.5-4(A)(1)). You should usually issue visas to returning students who are qualified unless circumstances have changed significantly since the previous issuance. Students should be encouraged to travel home during their studies to maintain ties to their country of origin. If students feel they will encounter difficulties in seeking a new student visa or that they will not be issued a visa to continue their studies, they may be less inclined to leave the United States during their studies and hence may distance themselves from their family and homeland. Facilitate the reissuance of student visas so that these students can travel freely back and forth between their homeland and the United States and thereby maintain their ties.

# 9 FAM 402.5-5(F)  (U) Knowledge of English

## 9 FAM 402.5-5(F)(1)  (U) Notation on Form I-20

*(CT:VISA-1628;  09-13-2022)*

a. **(U)** If the individual's Form I-20 indicates that proficiency in English is required for pursuing the selected course of study and no arrangements have been made to overcome any English-language deficiency, you must determine whether the visa applicant has the necessary proficiency.  To this end, the officer must conduct the visa interview in English and may require the applicant to read aloud from an English-language book, periodical, or newspaper, and to restate in English in the applicant's own words what was read.  The applicant may also be asked to read aloud and explain several of the conditions set forth in the Form I-20.  A student must demonstrate English language proficiency only if an admitting institution has made English language ability a requirement for the intended course of study.

b. **(U)** If a school has admitted an applicant based on the applicant's TOEFL, IELTS, or other English language test scores, the officer must not reevaluate the school's admission decision, even if the applicant seems to know less English than the TOEFL or IELTS score indicates, unless the officer suspects the applicant obtained the results through fraud.  Many students do well on the TOEFL or IELTS but seem to falter in their English when confronted with a face-to-face interview.  Since 2018, hundreds of colleges and universities have started accepting the Duolingo English Test scores as part of their admissions process.

c.  **(U)** If the school is aware of a student's lack of English proficiency and has arranged for the student to study English before enrolling in regular courses, then the lack of English skills is not relevant.

## 9 FAM 402.5-5(F)(2)  (U) Courses for Students Taught in a Language Other than English in which the Student Is Proficient

*(CT:VISA-1;  11-18-2015)*

**(U)** Proficiency in English is not required of a student if the enrolling institution conducts the course in a language in which the visa applicant is proficient.

## 9 FAM 402.5-5(F)(3)  (U) English as a Second Language (ESL)

*(CT:VISA-2048;  08-15-2024)*

**(U)** The fact that an ESL or other education program is available locally is not in itself grounds for refusing an applicant.  Many students find language learning enhanced by living in the country where the language is spoken. Students who intend to study in ESL-only programs must present a valid Form I-20 and be found qualified for an F visa.  Postsecondary institutions that require English

proficiency for a student to matriculate use a variety of mechanisms, and such arrangements must be evident on the visa applicant's Form I-20.  Contact VO's F/M/J portfolio holder(s) listed in the CAWeb "Who's Who" in VO for additional guidance, as required.

# 9 FAM 402.5-5(G)  (U) Adequate Financial Resources

## 9 FAM 402.5-5(G)(1)  (U) Determining Financial Status of F-1 and M-1 Students

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** The sponsoring school is required to verify the availability of financial support before issuing the Form I-20.  Schools may not be as well-versed in local documentation or cultural practices as you may be; therefore, you must still ensure that the student has sufficient funds to successfully study in the United States without being forced to resort to unauthorized employment.

b. **(U) F-1 Student:**  The phrase "sufficient funds to cover expenses" referred to in 22 CFR 41.61(b)(1)(ii) means the applicant must have sufficient funds to successfully study in the United States without resorting to unauthorized U.S. employment for financial support.  An applicant must provide evidence that sufficient funds are, or will be, available to defray all expenses during the entire period of anticipated study.  In addition to personal funds, sources of funding may include scholarships, assistantships, fellowships, and approved on-campus employment.  This does not mean the applicant must have cash immediately available to cover the entire period of intended study, which may last several years.  You must, however, establish, usually through credible documentary evidence, that the applicant has enough readily available funds to meet all expenses for the first year of study.  A student could potentially satisfy this requirement by presenting evidence of an existing student loan, but the mere intention to obtain a loan would be insufficient.  Likewise, a student's plan to use curricular practical training (CPT) or optional practical training (OPT) to cover first-year expenses would be insufficient.  You also must be satisfied that, barring unforeseen circumstances, adequate funds will be available for each additional year of study from the same source or from one or more other specifically identified and reliable financial sources.  Funds derived from CPT or OPT may be considered for returning students, who are authorized to participate.  Mere eligibility and/or intent to engage in CPT or OPT is speculative, both in terms of the amount of money that might be earned and whether authorization to work will be granted and may not be sufficient to demonstrate the necessary funds.  See 9 FAM 402.5-5(N) below for more information on employment for F-1 and M-1 students.

c. **(U) M-1 Student:**  All applicants for M-1 visas must establish that they have immediately available to them funds or assurances of support necessary to pay all tuition and living costs for the entire period of intended stay.

## 9 FAM 402.5-5(G)(2)  (U) Adequate Medical Insurance

*(CT:VISA-1292;   05-27-2021)*

**(U)** F and M students and their dependents are not required to have U.S. medical or travel insurance to qualify for a visa.

## 9 FAM 402.5-5(G)(3)  (U) Funds from Source(s) Outside the United States

*(CT:VISA-2048;   08-15-2024)*

**(U)** When an applicant indicates financial support from a source outside the United States (for example, from parents living in the country of origin), determine whether there are restrictions on the transfer of funds from the country concerned.  If so, you must require acceptable evidence that these restrictions will not prevent the funds from being made available during the period of the applicant's projected stay in the United States.

## 9 FAM 402.5-5(G)(4)  (U) Affidavits of Support or Other Assurances by an Interested Party

*(CT:VISA-1;   11-18-2015)*

**(U)** Various factors are important in evaluating assurances of financial support by interested parties:

   (1)  **(U)** Financial support to a student is not a mere formality to facilitate the applicant's entry into the United States, nor does it pertain only when the individual cannot otherwise provide adequate personal support.  Rather, the sponsor must ensure that the applicant will not become a public charge nor be compelled to take unauthorized employment while studying in the United States.  This obligation commences when the visa holder enters the United States and continues until the visa holder's completion of their program of study and departure.

   (2)  **(U)** You must resolve any doubt that the financial status of the person giving the assurance is sufficient to substantiate the assertion that financial support is available to the applicant.

   (3)  **(U)** You must also carefully evaluate the factors that would motivate a sponsor to honor a commitment of financial support.  If the sponsor is a close relative of the applicant, there may be a greater probability that the commitment will be honored than if the sponsor is not a relative. Regardless of the relationship, you must be satisfied that the reasons prompting the offer of financial support make it likely the commitment will be fulfilled.

## 9 FAM 402.5-5(G)(5)  (U) Funds from Fellowships and Scholarships for F-1 Student

*(CT:VISA-1837;   09-26-2023)*

**(U)** A college or university may arrange for a nonimmigrant student to engage in research projects, give lectures, or perform other academic functions as part of a fellowship, scholarship, or assistantship grant, if the institution certifies that the student will also pursue a full course of study.

## 9 FAM 402.5-5(G)(6)  (U) Post-Doctoral Research Grants for F-1 Student

*(CT:VISA-1;   11-18-2015)*

**(U)** A visa applicant may be issued an F-1 visa for post-doctoral research even if the college or university provides compensation to the individual in the form of a grant.

# 9 FAM 402.5-5(H)  (U) Educational Qualifications for F-1 and M-1 Students

## 9 FAM 402.5-5(H)(1)  (U) Consular Role in Determining Educational Qualifications

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** The Form I-20 and SEVIS record are evidence that a school has accepted the applicant as a student.  You should normally not go behind the Form I-20 or SEVIS record to assess the applicant's qualifications as a student for that institution.  If you have reason to believe that the applicant engaged in fraud or misrepresentation to garner acceptance into the school, then that information is an important factor to consider in determining if the applicant has a bona fide intent to engage in study in the United States.

b. **(U)** You are not expected to assume the role of guidance or admissions counselor to determine whether an applicant for an F-1 or M-1 visa is qualified to pursue the desired course of study.  You must, however, be alert to three specific factors when determining whether the applicant qualifies for a student visa:

(1) **(U)** The applicant has successfully completed a course of study equivalent to that normally required of a U.S. student seeking enrollment at the same level;

(2) **(U)** Cases in which an applicant has submitted forged or altered transcripts of previous or related study or training which the institution has accepted as valid; and

(3) **(U)** Cases in which an institution has accepted an applicant's alleged previous course of study or training as the equivalent of its normal

requirements when, in fact, such is not the case.

c.  **(U)** Through its school certification process, SEVP evaluates the qualifications of a school to issue Forms I-20.  This process includes a determination as to whether the school is a bona fide, established institution of learning which possesses the necessary facilities, personnel, and finances to conduct instruction in recognized courses of study.  Evaluation also involves an on-site visit.  If you have reason to question the authenticity of a school or exchange program, contact the (CA/VO/F/ET) F/M/J portfolio holder and the Office of Fraud Prevention Programs (CA/FPP) so inquiries to ECA or SEVP are appropriately coordinated through CA.

d.  **(U)** Many U.S. colleges and universities do not require foreign students to submit SAT, ACT, or other standardized admission test scores, and not all schools require specific grade point averages (GPAs) for admission.  Therefore, you may not require that applicants provide admission test scores, or that applicants have a certain grade point average.  SEVP does not have a role in dictating admissions practices to the schools they approve to issue Form I-20.

## 9 FAM 402.5-5(H)(2)  (U) Choice of Academic Institution

*(CT:VISA-1494;   02-28-2022)*

**(U)** Which school a student chooses is not nearly as important as why they choose it.  The United States has over 4,700 accredited colleges and universities of all types and sizes.  Accreditation is the process that ensures a program or institution meets a certain level of academic standard.  Schools may be public or private; non-profit or for-profit; large or small.  A plan that includes initial attendance at a community college or English language program, and then a transfer to a four-year college is common, for reasons such as affordability, to fulfill academic prerequisites, and due to the flexibility and wide array of options available in the U.S. higher education system.  Some students may seek only to study at community colleges or do short-term programs such as Intensive English Programs (IEP), or pursue studies at specialized institutions, such as medical, business, technology-related, or fine arts schools, which typically award most degrees in a single field.  Attendance at a lesser-known college or university is not a ground of ineligibility and applicants cannot be refused a visa for this reason.  Faced with growing international competition for international students, promoting U.S. colleges and universities is a priority for the Department to ensure that the United States continues to be the top receiver of international students globally.  The Department's EducationUSA network of educational advising centers actively promotes all accredited U.S. colleges and universities, maintaining over 430 advising centers in over 175 countries and territories.  EducationUSA advisers assist international students in identifying accredited U.S. colleges and universities where they may be best positioned for success. There is no legal difference between SEVP-certified community colleges, English language schools, and four-year institutions in terms of their

authorization to issue Form I-20.  Resources to identify which institutions are accredited can be found at Understanding U.S. Accreditation.

# 9 FAM 402.5-5(I)  (U) Full Course of Study

## 9 FAM 402.5-5(I)(1)  (U) F-1 Academic Student

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** DHS regulations (8 CFR 214.2(f)(6)(i)) specify that "Successful completion of the full course of study must lead to the attainment of a specific educational or professional objective."  Those regulations state that a "full course of study" as required by INA 101(a)(15)(F)(i) means:

   (1) **(U)** Postgraduate study or postdoctoral study at a college or university, or undergraduate or postgraduate study at a conservatory or religious seminary, certified by a designated school official (DSO) as a full course of study;

   (2) **(U)** Undergraduate study at a college or university, certified by a school official to consist of at least 12 semester or quarter hours of instruction per academic term in those institutions using standard semester, trimester, or quarter hour systems, where all undergraduate students who are enrolled for a minimum of twelve semester or quarter hours are charged full-time tuition or are considered full time for other administrative purposes, or its equivalent (as determined by the district director in the school approval process), except when the student needs a lesser course load to complete the course of study during the current term;

   (3) **(U)** Study in a postsecondary language, liberal arts, fine arts, or other non-vocational program at a school which confers upon its graduates recognized associate or other degrees or has established that its credits have been and are accepted unconditionally by at least three institutions of higher learning which are either:

      (a) **(U)** A school (or school system) owned and operated as a public educational institution by the United States or a State or political subdivision thereof; or

      (b) **(U)** A school accredited by a nationally recognized accrediting body, and which has been certified by a DSO to consist of at least twelve clock hours of instruction a week, or its equivalent as determined by the district director in the school approval process;

   (4) **(U)** Study in any other language, liberal arts, fine arts, or other non-vocational training program, certified by a DSO to consist of at least eighteen clock hours of attendance a week if the dominant part of the course of study consists of classroom instruction, or to consist of at least twenty-two clock hours a week if the dominant part of the course of study consists of laboratory work; or

(5) **(U)** Study in a curriculum at an approved private elementary or middle school or public or private academic high school which is certified by a DSO to consist of class attendance for not less than the minimum number of hours a week prescribed by the school for normal progress towards graduation.

b. **(U)** Notwithstanding paragraphs 8 CFR 214.2(f)(6)(i)(A) and 8 CFR 214.2 (f)(6)(i)(B), a noncitizen who has been granted employment authorization pursuant to the terms of a document issued by USCIS under paragraphs 8 CFR 214.2(f)(9)(i) or 8 CFR 214.2(f)(9)(ii) and published in the Federal Register shall be deemed to be engaged in a "full course of study" if they remain registered for no less than the number of semester or quarter hours of instruction per academic term specified by the Commissioner in the notice for the validity period of such employment authorization.

c. **(U) Institution of Higher Learning:**  Under DHS regulations (8 CFR 214.2(f)(6)(ii)), "a college or university is an institution of higher learning which awards recognized associate, bachelor's, master's, doctorate, or professional degrees."  DHS holds that schools that devote themselves exclusively or primarily to vocational or business schools are not included in the category of colleges or universities but are categorized as M-1 schools.

d. **(U) Reduced Course Load:**  The DSO may advise an F-1 student to engage in less than a full course of study due to initial difficulties with the English language or reading requirements, unfamiliarity with U.S. teaching methods, or improper course level placement.  An F-1 student authorized to reduce course load by the DSO in accordance with the provisions of 8 CFR 214.2(f)(6)(iii) is maintaining status.  On-campus employment pursuant to the terms of a scholarship, fellowship, or assistantship is deemed to be part of the academic program of a student otherwise taking a full course of study.

## 9 FAM 402.5-5(I)(2)  (U) M-1 Nonacademic Student

*(CT:VISA-1090;   06-24-2020)*

**(U)** DHS regulations (8 CFR 214.2(m)(9)) specify that "successful completion of the course of study must lead to the attainment of a specific educational or vocational objective."  Those regulations state that a "full course of study" as required by INA 101(a)(15)(M)(i) means:

(1) **(U)** Study at a community college or junior college, certified by a school official to consist of at least twelve semester or quarter hours of instruction per academic term in those institutions using standard semester, trimester, or quarter-hour systems, where all students enrolled for a minimum of twelve semester or quarter hours are charged full-time tuition or considered full time for other administrative purposes, or its equivalent (as determined by the district director) except when the student needs a lesser course load to complete the course of study during the current term;

(2) **(U)** Study at a postsecondary vocational or business school, other than in a language training program except as provided in 8 CFR 214.3(a)(2) (iv), which confers upon its graduates recognized associate or other degrees or has established that its credits have been and are accepted unconditionally by at least three institutions of higher learning which are either:

    (a) **(U)** A school (or school system) owned and operated as a public educational institution by the United States or a State or political subdivision thereof; or

    (b) **(U)** A school accredited by a nationally recognized accrediting body; and which has been certified by a designated school official (DSO) to consist of at least twelve hours of instruction a week, or its equivalent as determined by the district director;

(3) **(U)** Study in a vocational or other nonacademic curriculum, other than in a language training program except as provided in 8 CFR 214.3(a)(2)(iv), certified by a DSO to consist of at least eighteen clock hours of attendance a week if the dominant part of the course of study consists of classroom instruction, or at least twenty-two clock hours a week if the dominant part of the course of study consists of shop or laboratory work; or

(4) **(U)** Study in a vocational or other nonacademic high school curriculum, certified by a DSO to consist of class attendance for not less than the minimum number of hours a week prescribed by the school for normal progress towards graduation.

## 9 FAM 402.5-5(I)(3)  (U) B-2 Visa for Visitor Who Will Engage in a Short Course of Study

*(CT:VISA-2048;  08-15-2024)*

a. **(U)** Individuals whose principal purpose of travel (see 9 FAM 402.1-3) is tourism, but who also engage in a "short course of study" while in the United States, are properly classified for B-2 visas.  If the student will earn academic credit toward completion of an academic program, then it is not a "short course of study", and B-2 is not the appropriate visa class.  This guidance applies regardless of whether it is a U.S. or foreign educational institution that will grant academic credit for completion of the short course of study.  You should not advise applicants to obtain an I-20 but should refuse the visa under INA 214(b) as not approvable for the planned activities.

b. **(U)** An individual whose principal purpose of travel is non-credit-bearing avocational/recreational study, which can itself be touristic in nature, may be properly classified B-2 visas.  See 9 FAM 402.2-4(B)(9).

c. **(U)** Individuals traveling to the United States to attend seminars or conferences that are required to earn a degree (i.e., the applicant cannot complete the requirements for the degree unless they complete the proposed

seminar or conference in the United States) are not eligible for B visa classification.  This  includes students engaged in an online course of study traveling to the United States for academic consultations or to take examinations.  In the case of a noncitizen traveling to the United States to attend seminars and conferences for credit toward a degree, the study is neither incidental to a tourist visit, avocational, nor recreational.

d. **(U)** Individuals traveling to attend professional education, seminars, or conferences that do not result in academic credit may qualify for a B-1 per 9 FAM 402.2-5(B).

e. **(U)** It is common for U.S. colleges, universities, and private organizations to offer summer programs tailored for high school or college-aged students.  Though these programs are for academic enrichment and are marketed as "study" and the participants attend "classes" the activities do not meet the definition of "full" or "part-time" course of study and therefore do not qualify for issuance of an I-20.  You may not advise applicants to obtain an I-20 for these programs.  In most cases, the activity, which is more like a summer camp with an academic focus, can be undertaken in B-2 status.  Consult L/CA for an AO on the appropriate visa classification.

# 9 FAM 402.5-5(I)(4)  (U) F-1 or M-1 Visa for Visitor Who Will Engage in a Short-Term Program

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** Only applicants who present a valid Form I-20 should be adjudicated as F or M applicants.  Do not advise applicants who do not present a Form I-20 to obtain one and return for further adjudication.  Instead, applicants without a Form I-20 should be adjudicated in the most logical category that allows the proposed activities in the United States.  In most cases, this will be a B visa.  Consult with L/CA if it is unclear whether the activities proposed are permissible on a B visa.

b. **(U)** An individual may be issued a Form I-20 by a school only if they will engage in a full course of study.

c. **(U)** If a student is receiving academic credit for the program of study or the program of study is required for their degree, the student must qualify for an F-1 or M-1 visa.  8 CFR 214.2(b)(7) prohibits an individual from enrolling in a course of study on a B-1 or B-2 visa.  See 9 FAM 402.5-5(J)(2) below, 9 FAM 402.1-3 paragraph a, and 9 FAM 402.1-5(C) for possible limited exceptions.

d. **(U)** Students may enroll in online degree programs that allow them to reside overseas but that may require them to travel to the United States for short programs required for their degree.  Such students should apply for F-1 or M-1 visas and should present a properly executed Form I-20 indicating appropriate program dates for this limited period of school attendance on their U.S. campus.

# 9 FAM 402.5-5(J)  (U) Special Types of Students

## 9 FAM 402.5-5(J)(1)  (U) Students Destined to Schools Which are Avocational or Recreational in Character

*(CT:VISA-2048;  08-15-2024)*

**(U)** DHS cannot approve schools which are avocational or recreational in character for issuance of Form I-20, Certificate of Eligibility for Nonimmigrant Student Status.  Students coming to study in such schools may be eligible for B-2 visas if the purpose of attendance is recreational or avocational.  When the nature of a school's program makes determining its character difficult, consult with L/CA on the appropriate visa classification.

## 9 FAM 402.5-5(J)(2)  (U) Elementary School Students

*(CT:VISA-2048;  08-15-2024)*

a. **(U)** Only children qualified for a derivative nonimmigrant classification through a principal parent may attend a publicly funded elementary school. No public elementary schools or school systems are approved by SEVP to issue Form I-20 for attendance in F-1 nonimmigrant status by children in kindergarten through grade eight.  However, any school age student (kindergarten through grade 12) who is otherwise qualified may receive an F-1 visa under INA 101(a)(15)(F)(i) to attend a private school.

b. **(U)** Occasionally, you may encounter situations in which an American citizen/LPR friend or relative, or an institution in the United States, may offer to accept guardianship of a child to provide an indeterminate period of free schooling at a public school.  You may determine that a parent appears to be seeking a B visa for a child or children to facilitate this arrangement.  Keep in mind that study is usually not allowed on a B visa and that even legal guardianship does not constitute a qualifying family relationship for residence in the United States.  See 9 FAM 402.5-5(K)(4) below.  Separately, see 9 FAM 402.1-3 paragraph a and 9 FAM 402.1-5(C) for situations in which a child applies for a B-2 visa to accompany a parent who is the principal applicant.

## 9 FAM 402.5-5(J)(3)  (U) Candidates for Religious Orders

*(CT:VISA-1;  11-18-2015)*

**(U)** Individuals desiring to enter a convent or other institution for religious training of a temporary nature are classifiable as F-1 students under INA 101(a)(15)(F) if the institution has been approved as a place of study and the applicant will return abroad after concluding the course of study or training.

## 9 FAM 402.5-5(J)(4)  (U) Student Destined to U.S. Military Training Facility

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** Military cadets accepted by any of the U.S. military service academies must be classified as A-2 if attendance is on behalf of a non-NATO foreign government or as NATO-2 if the attendance is on behalf of a NATO country. Military cadets whose attendance is not on behalf of a foreign government are classifiable as F-1 students are required to present Form I-20 and pay the SEVIS fee.

b. **(U)** Military personnel coming to the United States for education or training at any armed forces training facility are to be classified as foreign government officials and issued A-2 visas for non-NATO member military personnel, or NATO-2 for NATO member military personnel.

## 9 FAM 402.5-5(J)(5)  (U) Graduate of Foreign Medical School

*(CT:VISA-1628;   09-13-2022)*

a. **(U)** Foreign medical graduates seeking to enter temporarily in connection with their profession are not eligible for F-1 visas.  Such applicants must apply and qualify for IV*s* or for exchange visitor (J) or temporary worker (H) visas.  See 9 FAM 402.5-6(B) below and 9 FAM 402.10-4(B).

b. **(U)** At least one school has been approved to issue Forms I-20 to foreign medical graduates for a review-type continuing education course of study in preparation for taking tests in the field of medicine.  Foreign medical graduates seeking to enter the United States to take such a review-type course of study who present a Form I-20 from an approved school are classifiable as F-1 students.

## 9 FAM 402.5-5(J)(6)  (U) Entering the United States for Nursing Training

*(CT:VISA-1628;   09-13-2022)*

**(U)** DHS has approved several hospital-affiliated nurses' training schools for nonimmigrant students.  In cases where a school has been approved, the application may be considered under INA 101(a)(15)(F).

## 9 FAM 402.5-5(J)(7)  (U) Aviation Training

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** All flight training for initial training or subsequent training that will result in a certificate or rating must be undertaken on an F or M visa.  This includes FAA, EASA, and other equivalent certificates.

b. **(U)** Recurrent or refresher training (training related to an aircraft for which the applicant has already received certification) may be undertaken on a B-1.

Recurrent training is the training required for crewmembers to remain adequately trained and currently proficient for each aircraft crewmember position, and type of operation in which the crewmember serves.  It often consists of flight simulator training but may also entail classroom training to update pilots on such things as recent safety issues, trends in aviation, and modifications to aircraft configuration or operating procedures. This assumes that the applicant's employer is covering the recurrent training costs, incidental costs, and that the applicant does not receive a salary or perform labor in the United States.

# 9 FAM 402.5-5(K)  (U) Applying INA 214(m)

## 9 FAM 402.5-5(K)(1)  (U) Public Primary School or a Publicly Funded Adult Education Program

*(CT:VISA-1628;   09-13-2022)*

**(U)** Congress imposed limitations on noncitizen attendance in publicly funded institutions in the 1996 immigration legislation.  As of November 30, 1996, F-1 visas cannot be issued to persons seeking to enter the United States to attend a public primary school or a publicly funded adult education program. See INA 214(m).  This does not, however, bar a dependent of a nonimmigrant in any classification, including F-1, from attendance at a public primary school, an adult education program, or another public educational institution, as appropriate. Under INA 214(m), primary school means kindergarten through 8th grade.

## 9 FAM 402.5-5(K)(2)  (U) Secondary School

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** INA 214(m) restricts, but does not prohibit, the issuance of F-1 visas to students seeking to attend public high schools.  Secondary school is deemed to be grades 9-12.  As of November 30, 1996, two new additional criteria were imposed on intending F-1 students at public high schools:

   (1)  **(U)** They cannot attend such school for more than 12 months; and

   (2)  **(U)** They must repay the school system for the full, unsubsidized, per capita cost of providing the education to them.

b. **(U)** You may not issue an F-1 visa for attendance at a public high school if the length of study indicated on the Form I-20 exceeds the 12-month cumulative period permitted under INA 214(m).  F-1 visas issued to attend public secondary schools must be limited to 12 months and payment of the full, unsubsidized, per capita cost must be demonstrated before visa issuance.

c.  **(U)** It is important to remember that public secondary school attendance in a status other than F-1 (including unlawful status) does not count against the 12-month limit, nor does attendance in F-1 status before November 30, 1996.

## 9 FAM 402.5-5(K)(3)  (U) Reimbursement

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** A public school system issuing a Form I-20 for attendance at a secondary school must indicate on the Form I-20 that such payment has been made and the amount of such payment.  School districts may not waive or otherwise ignore this requirement.  If the Form I-20 does not include the requisite information, the student must have a notarized statement stating the payment has been made and the amount from the designated school official (DSO) who signed the Form I-20.  If not, the visa must be refused, under INA 221(g), until the applicant provides the necessary documentation.

b. **(U)** Although the per capita costs vary from one school district to another (and sometimes from one school to another within the same district), the averages across the country have ranged from about $8,000 to more than $20,000.  They run somewhat less than that in Puerto Rico and U.S. territories.  These figures are guidelines only and must not be taken as absolutes.  If, however, a Form I-20 indicates a repaid cost radically different (for example, something less than $7,000), contact the F/M/J portfolio holder(s) in CA/VO/F/ET to coordinate an inquiry through SEVP.

## 9 FAM 402.5-5(K)(4)  (U) Noncitizens Under Legal Guardianship of American Citizen Relatives

*(CT:VISA-1292;   05-27-2021)*

**(U)** Schools sometimes advise relatives to declare themselves as the noncitizen's legal guardian.  The school then admits the foreign student as a resident, wrongfully assuming this would exempt the student from the INA 214(m) requirements.  The student's status as a resident of the school district is irrelevant.  Likewise, the fact that the student's U.S. sponsor has paid local property/school taxes does not fulfill the reimbursement requirement of INA 214(m).

## 9 FAM 402.5-5(K)(5)  (U) Student Visa Abusers

*(CT:VISA-1628;   09-13-2022)*

**(U)** INA 212(a)(6)(G) provides sanctions against foreign students who fail to comply with the INA 214(m) requirements.  A noncitizen in F-1 status who violates INA 214(m) is excludable until they have been outside the United States for a continuous period of five years after the date of the violation (see 9 FAM 302.9-9).  Noncitizens who are not subject to INA 214(m) are not subject to INA 212(a)(6)(G).

# 9 FAM 402.5-5(L)  (U) Period of Stay

## 9 FAM 402.5-5(L)(1)  (U) For F-1 Applicants

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** An individual entering as an F-1 student or granted a change to that status is usually admitted or given an extension of stay for the duration of status.  Duration of status means the time during which the student is pursuing a full course of study and any additional periods of authorized practical training, plus 60 days following completion of the course or practical training within which to depart.  Since November 30, 1996, however, the duration of status of an F-1 student in a publicly funded secondary school cannot exceed an aggregate of 12 months schooling (see 9 FAM 402.5-5(K)(2) above).

b. **(U)** An academic student is in status during the summer between terms, if eligible and intending to register for the next term.  The student is expected to resume a full course of study at the commencement of the next term. A student compelled by illness or other medical condition to interrupt or reduce studies is in status until their recovery.  The student is expected to resume a full course of study upon recovery.

c. **(U)** DHS amended its regulations to permit the DHS Secretary to waive the usual limitations, including hours of coursework, on employment for students faced by unexpected severe economic circumstances.  Such circumstances could include substantial fluctuations in exchange rates, loss of on-campus employment, loss of other financial assistance through no fault of the student, etc.  Students granted such waivers are deemed to be in status until the economic emergency is over and the necessity for such reduced studies has passed.

## 9 FAM 402.5-5(L)(2)  (U) For M-1 Applicants

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** The period of stay for an M-1 student, whether from admission or through a change of nonimmigrant classification, is the time necessary to complete the course of study indicated on Form I-20 plus 30 days within which to depart, not to exceed one year.

b. **(U)** An M-1 student may be granted an extension of stay if it is established that the student:

  (1)  **(U)** Is a bona fide nonimmigrant currently maintaining student status;

  (2)  **(U)** Is able to, and in good faith intends to, continue to maintain that status for the period for which the extension is granted; and

  (3)  **(U)** Has compelling educational or medical reasons which resulted in a delay to the course of study.  Delays caused by academic probation or

suspension are not acceptable reasons for program extension. Cumulative extensions are limited to three years.

# 9 FAM 402.5-5(M)  (U) Spouse and Child of F-1 or M-1 Student

## 9 FAM 402.5-5(M)(1)  (U) Refusals of Spouse and Child of F-1 or M-1 Student

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** Before issuing an F-2 or M-2 visa to a spouse or child of a principal F-1 or M-1 student, you must be satisfied that the relationship between the principal applicant and the spouse or child exists, and that the spouse or child can be expected to depart from the United States upon completion of approved activities by the F-1 or M-1 principal applicant.  See 9 FAM 402.5-5(E) above. Keep in mind that coming to a different conclusion about family members entitled to a derivative nonimmigrant classification and the principal should be rare.  See 9 FAM 402.1-4(A).  If the derivative F-2 or M-2 is seeking to join an F-1 or M-1 principal applicant already in the United States, you must confirm that the derivative F-2 or M-2 applicants have the requisite nonimmigrant intent and that the family's circumstances have not changed in a way to alter the intent of the principal applicant, to conclude the applicants overcome INA 214(b).  See 9 FAM 402.1-4(C).

b. **(U)** If you doubt an F-1 or M-1 student's intent to return abroad, the student cannot satisfy your doubts by offering to leave a child, spouse, or other dependent abroad.  See 9 FAM 402.2-2(B) paragraph b.

## 9 FAM 402.5-5(M)(2)  (U) Separate Form I-20 and SEVIS Registration Required for Accompanying Spouse and/or Minor, Unmarried Child of F-1 or M-1 Student

*(CT:VISA-2048;   08-15-2024)*

**(U)** Each F-2 or M-2 dependent is required to have their own properly executed Form I-20 and their own unique SEVIS ID number.  It is not possible to issue dependent F-2 or M-2 visas based on the principal's Form I-20.  The F-2 or M-2 must present this evidence to both you and the immigration officer at the POE. F-2 or M-2 dependents are not required to pay a separate SEVIS fee.  Additional details on the SEVIS fee can be found on the SEVP page at the ICE website.

## 9 FAM 402.5-5(M)(3)  (U) Classification of Spouse or Child Who Will Attend School in the United States

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** A spouse qualified for an F-2, M-2, or any other derivative nonimmigrant classification may only study if those studies are incidental to the primary purpose of travel:  to accompany their spouse to the United States.  A spouse in F-2 status, therefore, may only participate in avocational or recreational programs.  A spouse of an F-1 visa holder may only enroll in a full-time course of study if they independently qualify under INA 101(a)(15)(F)(i) as a nonimmigrant student.

b. **(U)** A child qualified for an F-2, M-2, or any other derivative nonimmigrant classification is not required to qualify under INA 101(a)(15)(F)(i) as a nonimmigrant student even though the child will attend school while accompanying the principal (see 9 FAM 402.1-5(C)).  Moreover, a child in F-1 status could not qualify to attend a public primary school and would be limited to 12 months of attendance at a public high school.  See 9 FAM 302.9-9(B)(1).

## 9 FAM 402.5-5(N)  (U) Employment of F-1 and M-1 Student, Spouse, and Children

### 9 FAM 402.5-5(N)(1)  (U) On-Campus Employment for F-1 Student

*(CT:VISA-1292;   05-27-2021)*

**(U)** An F-1 student may accept on-campus employment with the approval of the designated school official (DSO) in an enterprise operated by or on behalf of the school.  The work must take place either at the school or at an educationally affiliated (associated with the school's established curriculum or part of a contractually funded research project at the postgraduate level) off-campus location.  Work that takes place at the school location could be for an on-campus commercial business, such as a bookstore or cafeteria, if the work directly provides services for students.  Employment located on-campus that does not directly involve services to students (such as construction work) does not qualify as on-campus employment.  Work with an employer that is educationally affiliated with the school is on-campus employment even if the work site is not located on the campus (such as a research lab affiliated with the school).  Such on-campus employment must not displace an American citizen or LPR.  The employment may not exceed 20 hours a week while school is in session but may be full time when school is not in session.  The student must be maintaining status.  An F-1 student who finishes a program, such as a bachelor's degree, and starts another program of study at the same campus may continue on-campus employment if the student plans to enroll in the new program of study for the next term.

## 9 FAM 402.5-5(N)(2)  (U) Off-Campus Employment for F-1 Student

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** An F-1 student may not accept off-campus employment without first applying to U.S. Citizenship and Immigration Services (USCIS) for employment authorization.  An F-1 student may be eligible to apply for off-campus employment authorization after completing one full academic year in F-1 status.  A student who receives authorization from USCIS for off-campus employment may not work more than 20 hours a week when school is in session.  Such employment authorization is automatically terminated if the student fails to maintain status.  A designated school official (DSO) must request off-campus employment for an F-1 student in SEVIS in support of the Form I-765 which must be filed with USCIS, and the request will appear in the electronic SEVIS record.  To recommend off-campus employment, the DSO must certify that:

(1)  **(U)** The student has been in F-1 status for one full academic year;

(2)  **(U)** The student is in good standing and carrying a full course of study;

(3)  **(U)** The student has established that acceptance of employment will not interfere with the full course of study; and

(4)  **(U)** The prospective employer has submitted a labor and wage attestation, or the student has established a severe economic necessity for employment due to unforeseen circumstances beyond the student's control.

b. **(U)** A student who has received approval from USCIS for off-campus employment will have an employment authorization document (EAD) showing the duration of the employment authorization, which may be up to one year at a time.  The student's electronic SEVIS record will also show approval for off-campus employment.

c.  **(U)** If a student who has been granted off-campus employment authorization temporarily leaves the country during the period when employment is authorized, such employment can be resumed upon return.  The student must, however, be returning to the same school.

## 9 FAM 402.5-5(N)(3)  (U) Employment as Part of Curricular or Alternate Work/Study Practical Training for F-1 Student

*(CT:VISA-1757;   04-17-2023)*

**(U)** A student enrolled in a college or other academic institution having alternate work/study courses as part of the curriculum within the student's program of study may participate in and be compensated for such practical training when authorized for curricular practical training (CPT) by the designated school official (DSO).  Students may not begin such training before endorsement of their electronic SEVIS record by the DSO with such authorization.  Periods of actual

off-campus employment in a work/study program are considered practical training.  Students who have engaged in a full year of full-time CPT will not receive authorization to engage in optional practical training (OPT) after completion of the course of study.

## 9 FAM 402.5-5(N)(4)  (U) Practical Training

*(CT:VISA-1757;   04-17-2023)*

a. **(U)** Students are eligible for practical training only after they have completed a full academic year in an approved college-level institution, except for graduate students whose program requires them to participate immediately in curricular practical training (CPT).  Students in English language training programs are ineligible for practical training.  Optional practical training (OPT) is training that is directly related to an F-1 student's major area of study.  It is intended to provide a student with practical experience in their field of study during or upon completion of a degree program and is authorized through the recommendation of the designated school official (DSO) and the filing of Form I-765 with USCIS and subsequent issuance of an Employment Authorization Document (EAD) by USCIS.  CPT is employment that is an integral part of a student's specified curriculum.  In most cases, CPT involves internships and similar work experience specifically required by the student's program of study.  The DSO must authorize CPT before the student begins work.  See the SEVP website for more information on practical training.

b. **(U)** Any authorization for employment for purposes of practical training is suspended in the event of a certified strike or other labor dispute involving a work stoppage at the place of employment.

## 9 FAM 402.5-5(N)(5)  (U) Optional Practical Training

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** An F-1 student may apply for OPT in a job related to their major area of study.  OPT may be authorized pre- and post-completion and on a full-time or part-time basis.  During school vacations, either part-time or full-time OPT is permissible. When school is in session, OPT may not exceed 20 hours per week.  An F-1 student may request post-completion OPT after completion of all course requirements not including thesis or equivalent, or after completion of all requirements for graduation.  Post-completion OPT must be full time.  Such training must be completed within 12 months, although certain F-1 students may be eligible for an extension of post-completion OPT based on their major field of study or a pending change of status to H-1B.  In addition to a DSO's request for OPT which will appear in the student's electronic SEVIS record, the student must apply to USCIS using Form I-765 for an Employment Authorization Document (EAD).  If the student makes a brief trip abroad during a period of post-completion OPT, a valid F-1 visa, the unexpired EAD, the endorsed Form I-20, and the electronic SEVIS record will be required for reentry to complete the training.  A letter of employment may

also be required.  F-1 students may also travel abroad during the period following the completion of their academic programs while they have a pending request for OPT, which will appear in their electronic SEVIS record, but such travel should be undertaken with caution. USCIS may send a request for evidence to the U.S. address on the OPT application while the applicant is away. Additionally, if USCIS approves the application, the applicant will be expected to have the EAD in hand to reenter the United States. Like a request for evidence, USCIS can only send the EAD to a U.S. address.

b. **(U)** OPT is different from curricular practical training (CPT), which is part of a student's degree curriculum and can only be authorized during a student's course of study.  OPT, by contrast, can be authorized during the student's degree program, as well as after graduation.

## 9 FAM 402.5-5(N)(6)  (U) Extension of OPT for Science, Technology, Engineering, or Mathematics (STEM) Students, and H-1B Beneficiaries ("Cap Gap")

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** Effective May 10, 2008, until May 9, 2016, USCIS could grant an OPT extension of 17 months, for a maximum of 29 months, to an eligible F-1 student on post-completion OPT with a degree in a DHS-approved science, technology, engineering, or mathematics (STEM) field.

b. **(U)** Effective May 10, 2016, an F-1 student with a bachelor's or higher degree in a DHS-approved STEM field who is already in a period of approved post-completion OPT may apply to USCIS to extend that period by 24 months, for a maximum of 36 months.  Eligibility for this extension is based upon the Classification of Instructional Programs (CIP) code *f*or the student's degree program as indicated on the Form I-20, on an official transcript, or as shown in SEVIS (including for eligibility based on a previously obtained degree) and whether the CIP code for the degree program is included on the DHS-approved list of qualifying degree program categories for the extension, which can be found on the SEVP website.  Students are also required to complete Form I-983, Training Plan for STEM OPT Students, with their employer and submit it to the DSO.  See the SEVP website for more information on Form I-983.  The DSO must verify the student's eligibility, including ensuring that Form I-983 has been properly completed and executed, recommend the extension through SEVIS, and provide the student with a Form I-20 annotated with the recommendation.  Once the DSO recommends the extension, the student must submit a Form I-765, Application for Employment Authorization, and all appropriate fees to USCIS.  Additional information can be found on the USCIS website.

c. **(U)** F-1 students on post-completion OPT must report all employment and periods of unemployment to their DSOs, who then report the information in SEVIS on the student's record.  F-1 students participating in post-completion OPT are initially allowed an aggregate period of unemployment of 90 days.

Students on a 24-month STEM OPT extension are allowed an additional 60 days of unemployment, for a total of 150 days.  This measure allows time for job searches or a break when switching employers.  See the SEVP OPT policy guidance on the SEVP website for more information on how unemployment is counted.

d.  **(U)** If the F-1 student has filed a Form I-765 for a 24-month extension in a timely manner before their end of regular post-completion OPT, then the student's OPT employment authorization is automatically extended for 180 days.  This extension ends once USCIS adjudicates the STEM OPT application.  If USCIS approves the STEM OPT extension the student is provided with a new EAD reflecting the extension dates.  If the petition is denied, the student's period of OPT ends.

e.  **(U)** As the STEM OPT extension is automatic for the first 180 days following regular post-completion OPT (when the student has properly filed Form I-765), the student may not necessarily have a renewed EAD.  Therefore, any students having automatically authorized employment through filing for the STEM OPT extension may not be able to present a valid EAD when they apply to renew their visa.  However, F-1 students in this situation can request an updated Form I-20 from the DSO, annotated for the STEM OPT extension, as well as proof that the I-765 petition was filed in a timely manner.  You must confirm that the student's electronic SEVIS record contains the same information as the updated hard copy Form I-20 before issuing a visa.

f.  **(U)** The STEM Designated Degree Program List provides degree program categories approved for the 24-month STEM OPT extension and significant additional information.

g.  **(U)** If an F-1 student is the intended beneficiary of a timely filed Form I-129 petition for a cap-subject H-1B visa to start on October 1, the F-1 status and any OPT authorization held on the eligibility date is automatically extended to dates determined by USCIS that allow for receipt or approval of the petition, up to September 30.  The Cap Gap OPT Extension is automatic, and USCIS will not provide the student with a renewed EAD.  However, F-1 students in this situation can request an updated Form I-20 from the DSO, annotated for the Cap Gap OPT Extension, as well as proof that the Form I-129 petition was timely filed.  Verify that the electronic SEVIS record has also been updated before issuing a visa.

## 9 FAM 402.5-5(N)(7)  (U) Practical Training for M-1 Student

*(CT:VISA-2048;   08-15-2024)*

**(U)** Except for temporary employment for practical training as set forth herein, an M-1 student may not accept employment.  Practical training may only be authorized at the completion of an M-1 course of study.  An M-1 student who desires temporary employment for practical training must apply to USCIS by filing Form I-765.  If approval is granted, DHS will endorse the student's Form I-20 with the dates the authorization for practical training begins and ends.  Because M-1 students are admitted until a certain date, an M-1 student may

need to also file Form I-539, Application to Extend/Change Nonimmigrant Status, to apply for an extension of M-1 status in conjunction with the application for employment authorization.  Verify that the electronic SEVIS record has been updated before issuing a new visa.

## 9 FAM 402.5-5(N)(8)  (U) Temporary Absence of F-1 or M-1 Student with Pending or Granted Practical Training

*(CT:VISA-1757;   04-17-2023)*

a. **(U)** An F-1 or M-1 student authorized to accept employment for practical training who leaves the country temporarily may be readmitted for the remainder of the authorized period.  The student must be returning solely to perform the authorized training.  Additionally, a student may travel abroad and be readmitted while the request for practical training is pending with USCIS, but such travel should be undertaken with caution.  USCIS may send a request for evidence to the U.S. address on the application while the applicant is away.  Additionally, if USCIS approves the practical training application, the applicant will be expected to have the Employment Authorization Document (EAD) in hand to reenter the United States.  Like a request for evidence, USCIS can only send the EAD to a U.S. address.

b. **(U)** A valid F-1 or M-1 visa, the Form I-20, EAD (if issued), and an accurate electronic SEVIS record are required to reenter the United States for practical training purposes.  A letter of employment may also be required.  For individuals attempting to travel abroad and be readmitted while an application for the STEM OPT extension is pending, the Form I-20 should be endorsed for reentry by the DSO within the last six months.

## 9 FAM 402.5-5(N)(9)  (U) Employment of F-2 and M-2 Spouse and Children

*(CT:VISA-1;   11-18-2015)*

**(U)** The F-2 spouse and children of an F-1 student may not accept employment. The M-2 spouse and children of an M-1 student may not accept employment.

## 9 FAM 402.5-5(O)  (U) F-3 and M-3 Nonimmigrant Visa Classifications

*(CT:VISA-1757;   04-17-2023)*

a. **(U)** The Border Commuter Student Act of 2002 (Public Law 107-274), which was signed into law on November 2, 2002, amended INA 101(a)(15)(F) and (J) to create the F-3 and M-3 NIV categories for Canadian and Mexican citizens and residents who commute to the United States for study at a DHS-approved school located within 75 miles of the U.S. border.  These students are permitted to study on either a full-time or part-time basis.  Until further notice, applicants applying to study in the U*nited* S*tates* who present a valid

Form I-20, have an electronic SEVIS record in INITIAL or ACTIVE status, and will commute to school; i.e., not reside in the United States while attending classes, are to be processed as F-1/M-1 students, and the annotation "border commuter" placed on the visa foil.

b. **(U)** The family members of border commuter students are not entitled to derivative F-2 or M-2 status, given that these students do not reside in the United States.

# 9 FAM 402.5-5(P)  (U) Temporary Absence

## 9 FAM 402.5-5(P)(1)  (U) Applicants Who Apply While Abroad for an F-1 or M-1 Visa

*(CT:VISA-1628;   09-13-2022)*

**(U)** Except as provided below, a student making a short trip abroad during an authorized period of study, who needs to obtain a new visa during such absence, must present their Form I-20, properly executed and endorsed.  You must verify that the SEVIS record of the applicant is in ACTIVE status.  If otherwise qualified, the applicant may be issued the appropriate visa.

## 9 FAM 402.5-5(P)(2)  (U) Temporary Absence of Applicants Applying Abroad for Attendance at School Other than Listed on the Visa

*(CT:VISA-2048;   08-15-2024)*

**(U)** A student temporarily abroad who intends to return to study at a United States institution other than the one for which the original visa was issued may seek admission with the original visa, if still valid, and the Form I-20 from the new school.  If the student wishes to apply for a new visa, however, they must present proof that the transfer has been completed and the student is in "initial" or "active" status at the new school.  Verify that the applicant has a valid SEVIS record showing the applicant is in INITIAL or ACTIVE status at the new institution and that the SEVIS fee has been paid on the new record before issuing a new student visa.

## 9 FAM 402.5-5(P)(3)  (U) Renewing F or M Visas for Returning Students

*(CT:VISA-2048;   08-15-2024)*

**(U)** Where applicable, returning students may be eligible to apply under interview waiver authority (see 9 FAM 403.5-4(A)(1)). You usually should renew F or M visas to returning students who have remained in status and have not had any significant changes in either their academic program or their personal circumstances.  When a foreign student engaged in study takes a short trip abroad and requires a visa to return to the United States, you are encouraged to

issue visas, if the student is otherwise qualified, to allow the student to complete their study.  Verify that the student's SEVIS record is in ACTIVE status before issuing a new visa.

# 9 FAM 402.5-5(Q)  (U) Processing F and M Visas

## 9 FAM 402.5-5(Q)(1)  (U) Issue Full Validity Student Visas

*(CT:VISA-2143;   03-26-2025)*

**Unavailable**

## 9 FAM 402.5-5(Q)(2)  (U) Maintenance of Status and Departure Bond

*(CT:VISA-432;   08-08-2017)*

**(U)** See 9 FAM 403.9-8.

## 9 FAM 402.5-5(Q)(3)  (U) Automatic Extension of Validity of Visa

*(CT:VISA-432;   08-08-2017)*

**(U)** See 9 FAM 403.9-4(E).

# 9 FAM 402.5-5(R)  (U) Visa Annotations

## 9 FAM 402.5-5(R)(1)  (U) Name of School and SEVIS ID

*(CT:VISA-2048;   08-15-2024)*

**(U)** An initial F-1 or M-1 visa must be annotated with the SEVIS ID and the name of the institution the student will initially attend.  Ensure that the SEVIS ID is correctly annotated on the visa foil.  Inform an applicant who has been accepted by more than one institution that the visa application will be considered only based on the Form I-20 issued by the school which the applicant will attend.  Also advise the applicant that the immigration inspector at the POE can refuse admission for a student seeking an initial entry with a Form I-20 from a school other than the one named on the visa or if the student indicates an intention to attend a different institution.

## 9 FAM 402.5-5(R)(2)  (U) Entry of Student Before Enrollment

*(CT:VISA-2048;   08-15-2024)*

a. **Unavailable**

b. **(U)** A student who wants to travel to the United States more than 30 days in advance of their program start date must obtain a visa in a different

classification and seek admission under that other visa.

c. **(U)** If a B-2 visa is issued, advise the applicant that, if admitted to the United States as a B-2 visitor, they are required to obtain a change of nonimmigrant status from USCIS to that of an F, M, or J student, as applicable, before their program start date.

## 9 FAM 402.5-5(R)(3)  (U) Entry When School Not Selected

*(CT:VISA-1090;   06-24-2020)*

**(U)** A prospective student applicant who has neither been issued a Form I-20 nor made a final selection of a school may wish to travel to the United States for the primary purpose of selecting a school.  If the applicant qualifies for a visitor visa, and would appear to qualify for a student visa, a B-2 visa may be issued for this purpose of travel.

## 9 FAM 402.5-5(R)(4)  (U) Admitted Student Traveling Without Form I-20

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** A signed hard copy Form I-20 must be presented at the POE for a student to be admitted in F or M status.

b. **(U)** When a student has documentary evidence that admission to a school has been granted, and when circumstances warrant visa issuance before the hard copy Form I-20 has been received, you may issue an F-1 visa based on the electronic SEVIS record.  The electronic SEVIS record must show that the visa applicant is in INITIAL or ACTIVE student status and that the SEVIS I-901 fee has been paid.  Enter a case note stating that you have reviewed the electronic SEVIS record and advised the student to carry the hard copy Form I-20 when travelling.

# 9 FAM 402.5-6  (U) EXCHANGE VISITORS – J VISAS

## 9 FAM 402.5-6(A)  (U) Statutory and  Regulatory Authorities

### 9 FAM 402.5-6(A)(1)  (U) Immigration and Nationality Act

*(CT:VISA-1;   11-18-2015)*

**(U)** INA 101(a)(15)(J) (8 U.S.C. 1101(a)(15)(J)); INA 212(e) (8 U.S.C. 1182(e)); INA 212(j) (8 U.S.C. 1182(j)); INA 214(b) (8 U.S.C. 1184(b)); INA 214(l) (8 U.S.C. 1184(l)).

## 9 FAM 402.5-6(A)(2)  Code of Federal Regulations

*(CT:VISA-1;   11-18-2015)*

**(U)** 22 CFR 41.62; 22 CFR 41.63; 22 CFR Part 62.

# 9 FAM 402.5-6(B)  (U) The Exchange Visitor Program

## 9 FAM 402.5-6(B)(1)  (U) Overview

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** The purpose of the Exchange Visitor Program (J visa program) is to further the foreign policy interests of the United States by increasing the mutual understanding between the people of the United States and the people of other countries by means of mutual educational and cultural exchanges.  The goal is to meet this purpose while protecting the health, safety, and welfare of the foreign nationals participating in the Program as exchange visitors.  Only organizations that have been designated by ECA, may participate.

b. **(U)** The Exchange Visitor Program is administered under the oversight of the Deputy Assistant Secretary for Private Sector Exchange.  The Office of Private Sector Exchange Designation, the Office of Exchange Coordination and Compliance, and the Office of Private Sector Exchange Administration are located at:

> Bureau of Educational and Cultural Affairs
> Department of State
> State Annex SA-4E
> 2430 E Street, NW
> Washington, DC  20522

c.  **(U)** Detailed guidance can be found on the Exchange Visitor Program at j1visa.state.gov.

## 9 FAM 402.5-6(B)(2)  (U) Mandatory Exchange Visitor Classification in Certain Cases

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** Participants in exchange visitor programs sponsored by USAID (program serial numbers G-1 and G-2, respectively) are supported by U.S. government funding.  These participants must be documented as exchange visitors (J visa) rather than in another visa category (such as F-1 student), even if they qualify for that visa category.  Participants in exchange visitor programs sponsored by other U.S. government agencies (program serial number G-3) or participants in a federally funded national research and development center program (program serial number G-7), must also be documented as exchange visitors if participation is directly financed in whole or in part by the sponsoring agency.  The only exception to these rules requiring J classification is for an applicant who would otherwise qualify for an A-1 or A-2 visa.  Such

applicants must always be issued A visas, rather than J visas, regardless of the funding of their travel.  See 9 FAM 402.3-4(A) regarding the rule that there is no alternative to A or G visa classification.  Contact CA/VO/F/ET for additional guidance, if required.

b. **(U)** You may receive visa applications from individuals seeking to participate in exchange program*s* or conferences that will be funded by a U.S. government agency, but the applicant does not present a Form DS-2019 as the program does not have ECA designation.  As such, these applications cannot qualify for J-1 classification.  You must determine whether the applicant qualifies for another visa classification appropriate for the purpose of travel, usually a B visa.  See 9 FAM 402.2-5(B).  Do not instruct applicants that they must apply for a J-1 visa, even if the planned travel is funded by the U.S. government, if the program does not have an ECA designation.  Contact L/CA with classification-specific questions.

# 9 FAM 402.5-6(C)  (U) Qualifying for an Exchange Visitor Visa (J-1)

*(CT:VISA-2048;   08-15-2024)*

**(U)** An applicant applying for a visa under INA 101(a)(15)(J) must meet the following requirements to qualify for an exchange visitor visa:

(1) **(U)** Acceptance to a designated exchange visitor program, as evidenced by presentation of Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status (see 9 FAM 402.5-6(D) below);

(2) **(U)** Sufficient funds, or adequate arrangements made by a host organization, to cover expenses;

(3) **(U)** Sufficient proficiency in the English language to participate in their program and compliance with the requirements of INA 212(j) (see 9 FAM 402.5-6(G) below);

(4) **(U)** Present intent to leave the United States at conclusion of program (see 9 FAM 402.5-6(F) below);

(5) **(U)** Possession of qualifications for the program offered (see 9 FAM 402.5-6(E) below); and

(6) **(U)** Compliance with INA 212(e) if applicable (see 9 FAM 302.13-2 and 22 CFR 41.63).  Annotate the Form DS-2019 (see 9 FAM 402.5-6(D)(2) paragraph b below and annotate the visa (see 9 FAM 402.5-6(I)(6) below) accordingly.

# 9 FAM 402.5-6(D)  (U) Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-Nonimmigrant) Status

## 9 FAM 402.5-6(D)(1)  (U) The Basic Form

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-Nonimmigrant) Status, is the document required to support an application for an exchange visitor visa (J-1).  It is a two-page document which can only be produced through SEVIS.  SEVIS is the DHS database developed to collect information on F, M, and J visa holders (see 9 FAM 402.5-4 above and 9 FAM 402.5-6(J) below).  The prospective exchange visitor's signature on page one of the Form DS-2019 is required.  Page two of Form DS-2019 consists of instructions and certification language relating to participation.  Form DS-2019 is generated with a unique identifier known as a "SEVIS ID number" in the top right-hand corner, which consists of an "alpha" character (N) and 10 numerical characters (e.g., N0002123457).

b. **(U)** ECA/EC/D designates U.S. organizations to conduct exchange visitor programs.  These organizations are known as program sponsors.  Designated sponsors have access to SEVIS and the capability of generating Form*s* DS-2019 from SEVIS.  Effective April 27, 2023, designated sponsors are permitted to use digital signatures and electronically transmit Form DS-2019 directly to exchange visitors. As of this date, consular sections should accept printed versions of the digitally signed copy of Form DS-2019 for all J applicants.  Sponsors also may print, physically sign paper forms in any color ink, and continue to mail the forms or scan the signed forms (e.g., into portable document format (PDF) files) and transmit them electronically. Sponsors may also digitally sign and electronically transmit Forms DS-2019 to eligible J-2 spouses or children of an exchange visitor.

c. **(U)** J visa applicants must continue to present a signed paper Form DS-2019 at their visa interview and at the POE when they travel to the United States. If there are minor errors on the form (e.g., a program begin date that is off by one day), you can process the case using that form.  You must verify the applicant's SEVIS record in the SEVIS report in CCD.  If corrections are needed, they may be made electronically; there is no need to request a new hard copy of the Form DS-2019.  Make a case note to alert CBP that the electronic record has been updated.  Once the visa is issued, however, the SEVIS record cannot be updated until the participant's program is validated ("Active" in SEVIS).  See 22 CFR 62.13(a).  The sponsor is required to update the SEVIS record upon the exchange visitor's entry and no corrections to the record can be made until that time.  In addition, in the event a visa is needed for a spouse or a minor child and the primary's J-1 visa has already been issued, the system will not permit new Forms DS-2019 to be created until after the sponsor validates the primary applicant's SEVIS record.

# 9 FAM 402.5-6(D)(2)  (U) Processing of Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status

*(CT:VISA-1741;   03-30-2023)*

a. **(U)** The Form DS-2019, also known as Certificate of Eligibility for Exchange Visitor (J-1) Status, indicates the visa applicant understands all conditions of the stay in the United States in J status and understands also that a consular or immigration officer will make a preliminary determination as to whether the applicant is subject to the two-year home country physical presence requirement.  Before the visa is issued, the applicant must sign the bottom of page one of the Form DS-2019 certifying they agree to comply with that requirement if it is determined to be applicable.

b. **(U)** A consular or immigration officer makes the preliminary determination regarding the applicability to the two-year home country physical presence requirement under INA 212(e) after a personal interview with the individual unless personal appearance has been waived under 9 FAM 403.5-4(A).  The consular or immigration officer signs page one of Form DS-2019 indicating the determination made by the officer.  The Department*'s* Waiver Review Division (CA/VO/DO/W) reserves the authority to make the final determination whether to issue a favorable recommendation to DHS to waive the two-year requirement under INA 212(e).

# 9 FAM 402.5-6(D)(3)  (U) Serial Numbers of Designated Exchange Visitor Programs

*(CT:VISA-2048;   08-15-2024)*

**(U)** When ECA/EC/D designates an organization or agency as a sponsor, it is enrolled in SEVIS and assigned a unique program serial number (referred to as the program number) that is used to identify the specific program.  The sponsor number is assigned based upon the following series:

(1) **(U)** G-1—Department of State;

(2) **(U)** G-2—U.S. Agency for International Development (USAID);

(3) **(U)** G-3—Other U.S. Federal agencies;

(4) **(U)** G-4—International agencies or organizations in which the U.S. government participates;

(5) **(U)** G-5—Other national, State, or local government agencies;

(6) **(U)** G-7—Federally funded national research and development center or a U.S. Federal laboratory;

(7) **(U)** P-1—Educational institutions, e.g., schools, colleges, universities, seminaries, libraries, museums, and institutions devoted to scientific and technological research;

(8) **(U)** P-2—Hospitals and related institutions;

(9)  **(U)** P-3—Nonprofit organizations, associations, foundations, and institutions (academic institutions conducting training programs can be classified as a P-3 if they are nonprofit); and

(10) **(U)** P-4—For-profit organizations (business and industrial concerns).

## 9 FAM 402.5-6(D)(4)  (U) Requirement for Form DS-2019 in Case of Spouse and/or Minor, Unmarried Children

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** Each accompanying J-2 spouse or child of a principal J-1 is required to have a separate Form DS-2019 issued by the program sponsor and will have their own unique SEVIS ID number.  You may not issue dependent J-2 visas based on the principal's (J-1's) Form DS-2019.

b. **(U)** A minor, unmarried child qualified for J-2 status is not required to qualify under INA 101(a)(15)(F)(i) as a nonimmigrant student even though the child will attend school while accompanying the principal J-1.  See 9 FAM 402.1-5(C).

c.  **(U)** The J-2 applicant must present their Form DS-2019 to you during the visa interview, and to the U.S. Customs and Border Protection (CBP) officer at the POE.

d. **(U)** Participants in the Summer Work Travel, camp counselor, au pair, and high school exchange programs are not expected to be accompanied by dependents.  If you receive a Form DS-2019 supporting a J-2 visa application from an individual claiming such status, contact CA/VO/F/ET for guidance.

## 9 FAM 402.5-6(D)(5)  (U) Processing of Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status, at Port of Entry (POE)

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** After a J-1 visa has been issued, return the completed Form DS-2019 to the exchange visitor.  Inform the exchange visitor that they must carry Form DS-2019 on their person for presentation to the CBP officer at the U.S. POE.  At each admission to the United States, an exchange visitor must present the Form DS-2019 along with the visa to the CBP officer.  Upon the exchange visitor's arrival in the United States, the CBP officer will examine the visa, the Form DS-2019, and any supporting documentation and return the documents to the exchange visitor.

b. **(U)** If the exchange visitor is admitted, DHS will return the Form DS-2019 to the individual.  The exchange visitor must always safeguard the form.  If the exchange visitor loses the Form DS-2019, they must obtain a replacement from the designated sponsor.

## 9 FAM 402.5-6(D)(6)  (U) Sample Form DS–2019

*(CT:VISA-1090;   06-24-2020)*

a. **(U) J-1 Principal Applicant Sample:**  For a sample of a properly completed DS-2019 for a J-1 Principal, click here, Sample DS-2019 for J-1.

b. **(U) J-2 Dependent Sample:**  For a sample of a properly completed DS-2019 for a J-2 dependent click here, Sample DS-2019 for J-2.

## 9 FAM 402.5-6(D)(7)  (U) Form DS-7002, Training/Internship Placement Plan

*(CT:VISA-1837;   09-26-2023)*

a. **(U)** The Form DS-7002, Training/Internship Placement Plan (T/IPP), is designed to standardize applications in the Trainee, Intern, and College and University Student Intern categories and to increase transparency and accountability and curb potential abuse by having all three concerned parties— the exchange visitor, the U.S. sponsor, and the entity providing the training or internship sign the Form DS-7002 acknowledging the program plan and their regulatory responsibilities.

b. **(U)** You may wish to use the Form DS-7002 to help in formulating interview questions, but you are not required to verify the contents of the form.

c. **(U)** Electronic signatures (including faxed signatures) are permissible on Form DS-7002, and you should accept these as they adjudicate applications.

d. **(U)** The form requires each participant to have U.S. contact information.  As some prospective exchange program participants may not have this information at the visa interview, you may accept the contact details for the participant's host organization in the United States instead.

## 9 FAM 402.5-6(D)(8)  (U) Sample Form DS-7002

*(CT:VISA-1741;   03-30-2023)*

**(U)** To see the Form DS-7002 see myData.

# 9 FAM 402.5-6(E)  (U) Categories of Exchange Visitors

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** At present, the Department has 15 exchange categories in which foreign nationals may participate.  Participants may only engage in activities authorized for their program.

b. **(U)** The following sections list these categories in alphabetical order with a brief description of key points.

c. **(U)** The presentation of a valid Form DS-2019 by the visa applicant constitutes evidence that the individual was determined by the designated U.S. program sponsor to be qualified to participate in the specific exchange

program.  Verify the Form DS-2019 in the electronic SEVIS report in the CCD and determine that the applicant's record is in either INITIAL or ACTIVE status and that the SEVIS I-901 fee has been paid.  Also note the program end date as it appears in the electronic record and ensure that the J visa is issued with a validity that corresponds to the program end or to the reciprocity schedule for the country of the applicant's nationality, whichever is shorter.  See 9 FAM 402.5-6(I)(6).

## 9 FAM 402.5-6(E)(1)  (U) Noncitizen Physician

*(CT:VISA-1628;   09-13-2022)*

a. **(U) Noncitizen Physician:**  This category is for foreign national medical graduates pursuing American medical board certification through graduate education and training at accredited U.S. schools of medicine or other U.S. institutions through a clinical exchange program.

b. **(U)** The Educational Commission for Foreign Medical Graduates (ECFMG) is the only program sponsor authorized to use this category.  Foreign medical graduates under this category must successfully complete examinations administered by ECFMG that measure their command of English and the medical sciences.

c.  **(U)** All foreign medical graduates sponsored in the category of Alien Physician are subject to the 2-year home-country physical presence requirement.  See 9 FAM 402.5-6(L) below.

d. **(U) Exception to ECFMG sponsorship:**  A foreign physician may be sponsored by a designated sponsor other than ECFMG (e.g., a U.S. university, academic medical center, school of public health, or other public health institution) as a "research scholar" only if the dean of the accredited U.S. medical school or their designee certifies the following 5 points, and such certification is appended to the Form DS-2019 issued to the prospective exchange visitor Alien Physician:

(1)  **(U)** The program is predominantly involved with observation, consultation, teaching, or research;

(2)  **(U)** Any incidental patient contact will be under the direct supervision of a U.S. citizen or LPR physician who is licensed to practice medicine in the State in which the activity is taking place;

(3)  **(U)** The foreign national physician will not be given final responsibility for the diagnosis and treatment of patients;

(4)  **(U)** Any activities will conform fully with the State licensing requirements and regulations for medical and health care professionals in the State in which the program is being pursued; and

(5)  **(U)** Any experience gained will not be credited towards any clinical requirements for medical specialty board certification.  In such cases, the program sponsor's letter of designation will explicitly authorize the sponsor to issue Form DS-2019 using the Research Scholar category.

The duration of participation as a Research Scholar is limited to 5 years unless the Department approves a program extension for a G-7-sponsored exchange visitor.

e. **(U) Duration:**  The duration of participation is limited to seven years, unless specifically authorized by the Department (ECA/EC).  Such authorization will be indicated by an active SEVIS status with the same SEVIS number and an extended program end date.

f. **(U)** Exchange Visitor Program Regulation**:**  See 22 CFR 62.27.

## 9 FAM 402.5-6(E)(2)  (U) Au Pair

*(CT:VISA-1837;   09-26-2023)*

a. **(U) Au Pair:**  This category is for a foreign national age 18-26 entering the United States for a period of one year to reside with an American host family, or the family of an LPR, while participating in their home life and providing limited childcare services.  Au Pair applicants who are 26 years of age at the time of the program start date are eligible to participate in the Au Pair program.  The Au Pair is also required to enroll and attend classes offered by an accredited U.S. postsecondary institution for not less than 6 semester hours of academic credit, or the equivalent.  As a condition of participation, host-families must agree to facilitate the enrollment and attendance of the Au Pair and to pay the cost of such academic course work in an amount not to exceed $500.  Au Pairs may enroll in appropriate course work after they arrive on the program and are not required to have a plan in place at the time of visa interview for the course work they intend to enroll in. Failure to adhere to the education component is grounds for termination of the Au Pair from the program by the sponsor.

b. **(U) EduCare:**  The regulations governing the Au Pair category were amended to create a subcategory called EduCare.  This component is specifically designed for families with school-aged children requiring limited childcare assistance.  Au Pairs participating in the EduCare component may not be placed with families having pre-school-aged children unless alternative arrangements are in place for these children.  EduCare participants may not work more than 10 hours a day/30 hours a week.  They must complete a minimum of 12 semester hours of academic credit, or its equivalent, during their program.  Host families provide the first $1,000 to the Au Pair toward the cost of the educational component.  EduCare Au Pairs may enroll in appropriate course work after they arrive on the program and are not required to have a plan in place at the time of visa interview for the course work, they intend to enroll in.

c. **(U) No Family Placement:**  Au Pairs are not to be placed in the homes of family/relatives, irrespective of the distance in relations (e.g., third cousin, great aunt and/or uncle, etc.).

d. **(U) Duration:**  The duration of participation is limited to one year/one sponsor only, unless specifically authorized by the Department (ECA/EC).

Such authorization will be indicated by an active SEVIS status with the same SEVIS number as the applicant's initial Au Pair program, and an extended program end date.

e. **(U) Extension of program:**  Designated Au Pair sponsors may request that an Au Pair be granted an extension of program participation beyond the original twelve months.  Au Pair sponsors may request an Au Pair be granted an additional 6-, 9-, or 12-month extension of program participation.  The applicant's age is not a barrier to program extension if they were 18-26 years of age at the time of the initial program start date.

f. **(U) Repeat Participation:**  A foreign national who successfully completed an Au Pair program is eligible to participate again as an Au Pair, including a participant who was granted an extension of an initial program, if they had resided outside the United States for at least two years following completion (program end date) of their initial Au Pair program.  The repeat participant must qualify as an Au Pair under the same rules as an initial participant.

g. **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.31.

## 9 FAM 402.5-6(E)(3)  (U) Camp Counselor

*(CT:VISA-1628;   09-13-2022)*

a. **(U) Camp Counselor:**

  (1)  **(U)** This category is for a foreign national selected to be a counselor in an accredited U.S. summer camp (during the U.S. summer months) who imparts skills to American campers and information about their country or culture.

  (2)  **(U)** Foreign nationals who apply for this program must be bona fide youth workers, students, teachers, or individuals with specialized skills.

  (3)  **(U)** While the minimum age of the foreign national is 18 years, there is no maximum age for this category.

  (4)  **(U)** While it is recognized that some non-counseling chores are an essential part of camp life for all counselors, this program is not intended to assist American camps in bringing in foreign nationals to serve as administrative personnel, cooks, nurses, physicians, or menial laborers, such as dishwashers or janitors.

b. **(U) Duration:**  The duration of participation must not exceed 4 months.

c.  **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.30.

## 9 FAM 402.5-6(E)(4)  (U) Government Visitor

*(CT:VISA-1;   11-18-2015)*

a. **(U) Government Visitor:**  This category is for a foreign national who is recognized as an influential or distinguished person in their own country, and who is selected by a Federal, State, or local government agency to participate

in observation tours, discussions, consultations, professional meetings, conferences, workshops, and travel.

b. **(U)** This category is for the "exclusive use" of United States Federal, State, and local government agencies.

c. **(U) Duration:** The duration of participation must not exceed 18 months.

d. **(U)** Exchange Visitor Program **Regulation:** See 22 CFR 62.29.

## 9 FAM 402.5-6(E)(5)  (U) Intern

*(CT:VISA-2058;   08-29-2024)*

a. **(U) Intern:**

(1) **(U) The Intern category aims:** to strengthen U.S. public diplomacy by expanding opportunities for substantive programming for foreign students and professionals; to enhance the skills and expertise of exchange visitors in their academic or occupational fields; to improve participants' knowledge of American techniques, methodologies, and technologies; and to increase participants' understanding of American society and culture.  The requirements in the Intern program regulations are designed to distinguish between a period of work-based learning in the intern's academic field, which is permitted, and casual and unskilled labor, which is not.

(2) **(U)** This category is for a foreign national who is either currently enrolled in and pursuing studies at a degree- or certificate-granting postsecondary academic institution outside the United States or who graduated from such an institution no more than 12 months before their exchange visitor program start date, and who enters the United States to participate in a structured and guided work-based internship in their specific academic field.

c. **(U) Duration:** The duration of participation must not exceed twelve months.

d. **(U) Program exclusions:** Sponsors must not:

(1) **(U)** Place Interns in unskilled or casual labor positions; in positions that require or involve childcare or elder care; or in clinical or any other kind of work that involves patient care or contact, including any work that would require them to provide therapy, medication, or other clinical or medical care (e.g., sports or physical therapy, psychological counseling, nursing, dentistry, veterinary medicine, social work, speech therapy, or early childhood education;

(2) **(U)** Place Interns in the field of aviation;

(3) **(U)** Place Interns in positions, occupations, or businesses that could bring the Exchange Visitor Program or the Department into notoriety or disrepute;

(4) **(U)** Engage or otherwise cooperate or contract with a domestic staffing/employment agency in the United States to recruit, screen,

orient, place, evaluate, or train Trainees or Interns, or in any other way involve such agencies in an Exchange Visitor Program training or internship program.

e. **(U) Program requirements:**  Sponsors must:

   (1) **(U)** Ensure that the duties of Trainees or Interns as outlined in a Trainee/Internship Placement Plans (T/IPP Form DS-7002) will not involve more than 20 percent clerical work, and that all tasks assigned to Trainees or Interns are necessary for the completion of training and internship program assignments; and

   (2) **(U)** Ensure that all "hospitality and tourism" training and internship programs of 6 months or longer contain at least 3 departmental or functional rotations.

f. **(U) Program Fees:**  Program regulations do not address the fee amount that a program sponsor may charge an exchange visitor to participate in Intern programs, and each program sponsor may set its fees based on its business model.

g. **(U) Training/Internship Placement Plan (T/IPP):**  Sponsors must complete and obtain requisite signatures for a Form DS-7002, Training/Internship Placement Plan, for each intern before issuing a Form DS-2019.  Upon request, visa applicants must present their fully executed Form DS-7002 to the adjudicator during the visa interview.  See 9 FAM 402.5-6(D)(7) above for information on the T/IPP.

h. **(U) Repeat Participation:**

   (1) **(U)** A foreign national can participate in additional internship programs to develop more advanced skills or in a different field of expertise if they maintain student status or begin a new internship program within 12 months of graduation from an academic institution outside the United States.

   (2) **(U)** Participants who have successfully completed an internship program and no longer meet the selection criteria for internship programs may participate in a training program after a two-year period of residency outside the United States following their internship program.  This two-year period should not be confused with the two-year home-country physical presence requirement under INA 212(e) (9 FAM 402.5-6(L) below).

i. **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.22.

j. **(U) Twelve Month Intern Work and Travel (IWT) Program:**

   (1) **(U)** The IWT program began on October 31, 2008, following signing of a Memorandum of Understanding (MOU) by the governments of the United States and Ireland.  IWT was a pilot program initially.  In December 2016, pilot status was lifted.  In January 2023, the MOU was amended to extend the program until January 30, 202*8*.

(2) **(U)** Citizens of Ireland, who have completed Level VI of the Irish Higher Education System, may participate in the IWT Program, which is governed by existing Intern category regulations in 22 CFR 62.22 and applicable program rules, except for participant placement.  A participant must be a bona fide postsecondary student (i.e., an Irish citizen who will commence their program in the United States within 12 months of the conferring date indicated on their scroll) and provide evidence from the appropriate postsecondary institution to this effect.

(3) **(U)** IWT Program participants are not required to have site of activity placement before entering the United States, and as such, applicants without placement will not have a Form DS-7002, Training/Internship Placement Plan, at the time of visa interview.  Program sponsors must ensure that participants have placement within 90 days of arrival. Sponsors must enter "IWT Program" in the Subject Field Remarks box (box #4) of Form DS-2019.

(4) **(U)** Vocational students pursuing studies at a tertiary level accredited academic institution are not eligible for participation unless such vocational study is part of a structured program leading to a degree or other credential recognized as equivalent to Level VI of the Irish Higher Education System and unless at least 50 percent or their coursework is academic.

(5) **(U)** The maximum program length is 12 months.  No program extensions are permitted.

(6) **(U)** IWT Program participants are not permitted to be accompanied by a spouse or dependent children.

k. **(U) Twelve Month Intern Trainee Program - Austria**

(1) **(U)** The Professional Development and Cultural Exchange Program with the Republic of Austria began on January 31, 2024, following signing of a Memorandum of Understanding (MOU) by the governments of the United States and the Republic of Austria;

(2) **(U)** Austrian exchange visitors will be placed as Interns or Trainees for periods of between six (6) and twelve (12) months at up to two U.S. private companies or non-profit institutions;

(3) **(U)** Austrian exchange visitors must have at least two rotations in their program, evenly divided over the length of their program. The second rotation must build upon the exchange visitor's field of study, a closely related field, or previous rotation and must give the exchange visitor more responsibility than in the first rotation.  The second rotation may be at the same placement institution as the first rotation;

(4) **(U)** Program participants must be citizens of the Republic of Austria, be 18 to 30 years of age, and have a working knowledge of English. Austrian exchange visitors are permitted to be currently enrolled in or have recently completed (within 12 months of graduation) studies in an

Austrian-accredited post-secondary or dual/vocational education program outside the United States;

(5) **(U)** Austrian exchange visitors are required to have a placement before entering the United States. Upon request, applicants must provide a fully executed copy of Form DS-7002, Training/Internship Placement Plan, at the time of visa interview;

(6) **(U)** The maximum length of program is 12 months. No program extensions are permitted, nor may participants take part in an additional J-Visa training program unless in accordance with 22 CFR 62.22(n); and

(7) **(U)** Austrian participants are not permitted to be accompanied by a spouse or dependent children unless the dependents also are J-1 visa exchange visitors.

## 9 FAM 402.5-6(E)(6) (U) International Visitor

*(CT:VISA-1628; 09-13-2022)*

a. **(U) International Visitor:** This category is for the exclusive use of the U.S. Department of State. It is for an individual who is a recognized or potential leader in their own country and is selected by the Department to participate in observation tours, discussions, consultation, professional meetings, conferences, workshops, and travel.

b. **(U) Duration:** The duration of participation must not exceed one year.

c. **(U)** Exchange Visitor Program **Regulation:** See 22 CFR 62.28.

## 9 FAM 402.5-6(E)(7) (U) Professor

*(CT:VISA-1741; 03-30-2023)*

a. **(U) Professor:** This category is for an individual who is engaged primarily in teaching, lecturing, observing, or consulting at accredited post-secondary academic institutions, museums, libraries, or similar institutions. The professor may also conduct research and participate in occasional lectures if authorized by the program sponsor.

b. **(U)** The professor's appointment to a position must be temporary, even if the position itself is permanent. The individual must not be a candidate for a tenure-tracked position.

c. **(U) Duration:** The duration of participation must not exceed five years unless the participant is directly sponsored by a federally funded national research and development center or a U.S. federal laboratory (program serial number G-7).

d. **(U) Repeat Participation:** Exchange visitors who have participated in Professor or Research Scholar exchange programs and who have completed their programs are not eligible to participate in another Professor or Research Scholar programs for a period of two years following the program end date, as governed by regulation set forth in 22 CFR 62.20(i)(2). This regulation

differs from the two-year home-country physical presence requirement to which certain former exchange visitors are subject under INA 212(e). See 9 FAM 402.5-6(L) below.

e. **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.20.

## 9 FAM 402.5-6(E)(8)  (U) Research Scholar

*(CT:VISA-1837;   09-26-2023)*

a. **(U) Research Scholar:**  This category is for an individual whose primary purpose of travel is to conduct research, observe, or consult in connection with a research project at research institutions, corporate research facilities, museums, libraries, post-secondary accredited academic institutions, or similar institutions.  The Research Scholar may also teach or lecture, unless disallowed by the sponsor.  The Research Scholar's appointment to a position must be temporary, even if the position itself is permanent.  The individual must not be a candidate for a tenure-tracked position.

b. **(U)** Minimum qualifications for this category are a bachelor's degree with appropriate experience in the field in which research is to be conducted.

c. **(U) Duration:**  The duration of participation must not exceed 5 years unless the participant is directly sponsored by a federally funded national research and development center or a U.S. federal laboratory (program serial number G-7).

d. **(U) Repeat Participation:**  Exchange visitors who have participated in Professor or Research Scholar programs and who have completed their programs are not eligible to participate in another Professor or Research Scholar program for a period of two years following the program end date, as governed by regulation set forth in 22 CFR 62.20(i)(2).  This regulation differs from the two-year home-country physical presence requirement to which certain former exchange visitors are subject under INA 212(e). See 9 FAM 402.5-6(L).

e. **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.20.

## 9 FAM 402.5-6(E)(9)  (U) Short-Term Scholar

*(CT:VISA-1837;   09-26-2023)*

a. **(U) Short-Term Scholar:**  This category is for a foreign national who is a professor, research scholar, or person with similar education or accomplishments coming to the United States on a short-term visit to lecture, observe, consult, train, or demonstrate special skills at research institutions, museums, libraries, post-secondary accredited academic institutions, or similar institution.

b. **(U)** Exchange visitors who have recently participated in an exchange program as a Professor or Research Scholar in the United States are not expected to attempt to reenter the United States as a Short-Term Scholar to rejoin their

original sponsor as this would be a continuation of their original program objective.

c. **(U) Duration:**  The duration of participation must not exceed 6 months.  No program extensions are permitted.

d. **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.21.

## 9 FAM 402.5-6(E)(10)  (U) Specialist

*(CT:VISA-2069;   09-16-2024)*

a. **(U) Specialist:**  This category is for a foreign national who is an expert in a field of specialized knowledge or skill coming to the United States to observe, consult, or demonstrate their special skills except as:

(1)  **(U)** Research Scholars and Professors, who are governed by regulations set forth in 22 CFR 62.20;

(2)  **(U)** Short-Term Scholars, who are governed by regulations set forth in 22 CFR 62.21; and

(3)  **(U)** Alien Physicians in graduate medical education or training, who are governed by regulations set forth in 22 CFR 62.27.

b. **(U) Duration:**  Participation must not exceed one year.  Within the Specialist category there are nine program numbers with approved exceptions to this one-year duration.

(1)  **(U)** The first eight excepted program numbers are for: Israeli Specialists under the Jewish Agency-American Section Inc. (P-3-37641) and the World Zionist Organization (P-3-04530); Japanese language Specialists under the Laurasian Institute (P-3-05588) and the Institute of International Education (P-3-14039); Specialists under the East-West Center (P-3-10434); Specialists under the Middle East Broadcasting Network (P-3-13019); Specialists under the U.S. Agency for Global Media (G-3-00366) and Specialists under the U.S. Department of Energy (G-3-00348).  For these eight excepted program numbers, the duration of participation is three years, and the visa should usually be issued for the full three years.  Note: the program dates listed on the Form DS-2019 in Box 3 will be one year in length.  However, both the Form DS-2019 and the SEVIS record will include a notation that the program has a three-year duration.  The visa should be set to expire two years after the program end date listed in Box 3 on the Form DS-2019.

(2)  **(U)** The ninth excepted program is the German American Partnership Program (GAPP) (P-3-43541).  Participation in the GAPP must not exceed three years and the visa should usually be issued for three years as stated in Box 3 on the Form DS-2019.

(3)  **(U)** Specialists under the GAPP (P-3-43541), Middle East Broadcasting Network (P-3-13019), and U.S. Agency for Global Media(G-3-00366) are permitted one three-year repeat of program.

c.  **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.26.

## 9 FAM 402.5-6(E)(11)  (U) Students

*(CT:VISA-2048;   08-15-2024)*

a. **(U) Secondary School Student:**

(1)  **(U)** This category affords foreign secondary school students an opportunity to study for an academic semester or an academic year in a U.S. accredited public or private secondary school while living with an American host family or residing at an accredited U.S. boarding school. Participants in this category must meet the following requirements:

  (a)  **(U)** Be a secondary school student in their home country who has not completed more than 11 years of primary and secondary study excluding kindergarten; or

  (b)  **(U)** Be at least the age of 15 but not more than 18-1/2 years of age as of the program start date; and

  (c)  **(U)** Has not previously participated in an academic year or semester Secondary School Student exchange program in the United States or attended school in the United States in either F-1 or J-1 visa status. Screening by the program sponsor of factors such as English language proficiency, maturity, character, and scholastic aptitude are critical.

(2)  **(U)** Sponsors are required to secure host family placement before the student's departure from their home country.  This does not need to happen before visa issuance because it may occur after the student's visa interview.  As a result, the student's Form DS-2019 may list the sponsor's contact information instead of the host family's contact information.

(3)  **(U) Duration:**  Participation is a minimum of one academic semester or a maximum of one academic year.  Sponsors are permitted to issue a Form DS-2019 for an academic semester or academic year.  When a student is from a country whose school calendar is opposite that of the United States, a sponsor can issue a Form DS-2019 for a calendar year cycle.

b. **(U) College and University/Students:**

(1) To participate, a foreign individual must intend to:

  (a)  **(U)** Pursue a full course of study leading to or culminating in the award of a U.S. degree from a post-secondary accredited academic institution; or engage full-time in a prescribed course of study in a non-degree program of up to 24 months duration conducted by a post-secondary accredited academic institution; or

  (b)  **(U)** Engage in English language training at a post-secondary accredited academic institution, or an institute approved by or

acceptable to the post-secondary accredited academic institution where the college or university student is to be enrolled upon completion of the language training.  A Form DS-2019 for language training can only be issued if the student is fully funded by the student's home government.

(2) **(U)** Exchange visitors participating in the College and University Student category must be supported substantially by funding from any source other than personal or family funds.

(3) **(U) Duration:**  Duration of participation is determined by whether the exchange visitor is a degree or non-degree student.  An explanation of each is provided in paragraphs c and d below.

c.  **(U) Degree Students:**  College and University Students who are in degree programs ("Student Associate," "Student Bachelors," "Student Masters," or "Student Doctorate," as stated on the Form DS-2019 and in SEVIS) may be authorized to participate in the Exchange Visitor Program for an unlimited length of time, if they are either:

(1) **(U)** Studying at the post-secondary accredited academic institution listed on their Form DS-2019 and are:

(a) **(U)** Pursuing a full course of study as set forth in 22 CFR 62.23(e); and

(b) **(U)** Maintaining satisfactory advancement towards the completion of their academic program; or

(2) **(U)** Participating in an authorized academic training program as permitted in 22 CFR 62.23(f).

d.  **(U) Nondegree Students:**  College and University Students who are nondegree students may be authorized to participate in the Exchange Visitor Program for up to 24 months, if they are either:

(1) **(U)** Studying at the post-secondary accredited academic institution listed on their Form DS-2019 and are:

(a) **(U)** Participating full time in a prescribed course of study; and

(b) **(U)** Maintaining satisfactory advancement towards the completion of their academic program; or

(2) **(U)** Participating in an authorized academic training program as permitted in 22 CFR 62.23(f).

e.  **(U) Student Intern Subcategory:**

(1) **(U)** Department-designated U.S. colleges and universities can administer internship programs substantially like those detailed herein under their J-1 College/University Student designation.

(2) **(U)** The Student Intern must be in good academic standing with the postsecondary academic institution outside the United States where they are enrolled and pursuing a degree.

(3) **(U)** The Student Intern will return to her/his academic program and fulfill and obtain a degree from such academic institution after completion of the student internship program.

(4) **(U)** The program sponsor must fully complete and obtain requisite signatures for a Form DS-7002 for each Student Intern before issuing a Form DS-2019.  The sponsor must provide to each signatory an executed copy of the Form DS-7002.  Upon request, a Student Intern must present her/his fully executed Form DS-7002 to the you during the visa interview.

(5) **(U)** Several colleges and universities currently hold J-1 training designations and can be expected to issue Form DS-2019 and Form DS-7002 to applicants as Trainees per the current rulemaking and the program guidelines described herein.

(6) **(U)** The category of Trainee will be reflected on the Form DS-2019 if the sponsor is authorized for this category.

f. **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.25 and 22 CFR 62.23.

# 9 FAM 402.5-6(E)(12)  (U) Summer Work Travel (SWT)

*(CT:VISA-2143;   03-26-2025)*

a. **(U) Qualifying for SWT:**  A participant is defined as a bona fide post-secondary student in the applicant's own or another foreign country if the applicant is currently enrolled and participating full time at an accredited post-secondary classroom-based academic institution at the time of the application, or as that status is defined by the educational system of the country.  Final year students are eligible to take part in this program during the school's major academic break immediately following their graduation if they apply to participate in the program before graduation.

(1) **(U)** An applicant must have completed at least one semester, or the quarter or trimester equivalent, of postsecondary education to be eligible to participate in this program.

(2) **(U)** Participants must demonstrate sufficient proficiency in English to enable them to not only carry out their job duties but also to interact effectively with law enforcement authorities and medical personnel, read rental agreements, carry on non-work-related conversations, etc.  It is appropriate to conduct SWT visa interviews in English to assess the applicant's proficiency.  U.S. sponsors may use video teleconferencing to conduct interviews with potential participants but assertions by the sponsor that an applicant meets the English language requirement are not alone sufficient to meet the burden of proof for this program requirement.

(3) **(U)** Unless they are final year students, participants must demonstrate that they are bona fide students who are maintaining student status and

are actively pursuing their degree per their local educational system.

(4) **(U)** Unless the participant is a final year student, they must demonstrate that they will resume activities as a student after participation in the SWT program.

(5) **(U)** It is not necessary for the student to be enrolled in the same institution both before and after participating in SWT.  Students may participate if they are transferring from one school to another, if they have finished an academic program at one school and are going on to another full-time program, or if they are continuing to graduate school. Documentation, satisfactory to you, that applicants have been accepted for and will commence studies upon their return may be accepted to establish status as a continuing student.

(6) **(U)** Students attending vocational schools are usually not eligible for participation in the SWT program unless they can demonstrate that study in the vocational school will ultimately lead to a degree from a full-time post-secondary academic institution.

(7) **(U)** Students may participate in the program every year that they meet the definition of bona fide student but participation each year is limited to the shorter of four months or the length of the long break between academic years at the school they attend.

(8) **(U)** In no case should there be more than one SWT period per year identified in any country without the concurrence of both the Visa Office and ECA's Office of Private Programs.

b. **(U) SWT Sponsor Obligations:**

(1) **(U)** Designated U.S. sponsors of SWT exchange programs must not place program participants in jobs as described in 22 CFR 62.32(h).

(2) **(U)** U. S. sponsors must ensure that 100 percent of their non-Visa Waiver Program country participants have a confirmed, vetted job placement.  Job placements may be secured directly by the U.S. sponsor or through self-placement by the participant.  See Program Date Chart.

(3) **(U)** For SWT participants from Visa Waiver Program (VWP) countries for whom employment has not been pre-arranged, sponsors must:

(a) **(U)** Ensure that participants have sufficient financial resources to support themselves during their search for employment;

(b) **(U)** Provide participants with pre-departure information that explains how to seek employment and secure lodging in the United States;

(c) **(U)** Maintain and provide a roster of bona fide jobs that includes at least as many job listings as the number of participants entering the United States with pre-arranged and confirmed employment;

(d) **(U)** Undertake reasonable efforts to secure suitable employment for participants unable to find jobs on their own after 2 weeks of commencing the job search; and

(e) **(U)** Vet the job placement selected by the participant ***before*** the commencement of employment.

(4) **(U)** All SWT participants should be cautioned to comply with their responsibility to inform their U.S. sponsor of their arrival and commencement at work and keep the sponsor informed of their whereabouts, should they change locations.  SWT participants who wish to change jobs or to accept an additional job must inform their U.S. sponsor of the desired job placement and wait for the sponsor to perform the same vetting and approval process as for the initial employment **before** beginning work.

c. **(U) Duration of SWT Program:**

(1) **(U)** The duration of participation in the SWT program must not exceed four months.  These four months must coincide with the exchange visitor's official academic school break between school years.  *W*hile the program may not be longer than four months, you are permitted to issue visas valid before the program start date.

(2) **(U)** SWT programs are only permitted once a year during the long break between academic years.

d. **(U) SWT Outreach and Fraud Prevention Measures:**

(1) **(U)** Designated U.S. sponsors are responsible for conducting the SWT program under the regulations at 22 CFR 62.32.  The U.S. sponsors play a vital outreach role by explaining to audiences of the receiving state the SWT program's purpose, how it is structured, its economic imperatives, and the checks in place to safeguard the welfare of foreign youth while in the United States.  You should seek to develop a good working relationship with U.S. sponsors, which will allow you to better reach local audiences and deal with any problems that come up later, after program participants have entered the United States; but ECA is responsible for managing the administrative relationship with the U.S. sponsors and will officially notify U.S. sponsors of their compliance responsibilities.

(2) **(U)** The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("Wilberforce Act") requires you to ensure that applicants applying for J visas are made aware of their legal rights under U.S. Federal immigration, labor, and employment laws.  This includes information on the illegality of slavery, peonage, trafficking in persons, sexual assault, extortion, blackmail, and worker exploitation in the United States.  This information is available in the form of a physical "Know Your Rights" information pamphlet or a Quick Response (QR) code, which permits applicants to access an online version of the information pamphlet by scanning the code with their smartphone camera.  During the NIV interview, you must ask applicants if they prefer the QR code, the physical pamphlet, or both, and confirm that the information prepared by the Department has been received, read, and understood by the applicant.  Enter a case note in the NIV system stating the QR code and/or pamphlet was provided, and the applicant has

acknowledged receipt and understanding of the pamphlet.  See 9 FAM 402.3-9(C)(1) for more information about Wilberforce Act enforcement.

(3)  **(U)** It is important to ensure your fraud prevention measures stay within the parameters established by regulations.  You must allow any applicant with a valid Form DS-2019 to apply for a visa.  Each local SWT third-party contractor (foreign agent, recruiter, or partner) operating overseas must have executed a written agreement with the designated U.S. sponsor that explains the relationship between the sponsor and the contractor and identifies their respective obligations.  These agreements must include annually updated price lists for the services provided to the U.S. sponsors and confirm that they will not outsource any core programmatic functions or pay or provide other incentives to U.S. host employers.  ECA has created a "Foreign Entity Report" SharePoint site listing, by country, the designated U.S. sponsors and their affiliated local SWT third-party contractors. Sponsors are required to maintain a current listing of all third-party contractors on the Foreign Entity Report.  The Report must contain the names, addresses, and contact information (i.e., telephone numbers and email addresses) of all third-party contractors that assist the sponsors in fulfilling the provision of core program services.  Share information about misconduct by local third-party contractors with the relevant portfolio holders in CA/FPP and CA/VO/F (see the Who's Who pages on the CAWeb).  In turn, they will work with ECA's Office of Coordination and Compliance so that ECA can review and take appropriate action.

(4)  **(U)** When you receive applications from previous SWT participants who failed to return in time for the start of their university classes, this fact may call into question their eligibility (whether they are in fact "bona fide students") for future J-1 visas.  That is the case even when the applicant departed the United States within 30 days of the completion of their exchange program and did not incur a U.S. immigration violation.  Each of these cases must be evaluated on its own merits.

e. **(U) Sample Handout for SWT Participants:**

Congratulations on your acceptance as an Exchange Visitor Program participant in a Summer Work Travel program.  This program is a cultural exchange, and your eligibility for program participation is based on your status as a foreign college/university student.  It is therefore very important that the program does not interfere with your studies and that you return to school in time for the first day of your classes.  Please take a moment to read the following information to ensure that you are familiar with certain requirements of the program.

What do the program BEGIN and END dates on my Form DS-2019 mean?

The program begin and end dates indicate when you may begin work and when you must stop working.  You may begin working at any point on or after the program start date, but you must end your work by the end date of the program.  Working beyond the program end date will impact your ability to participate in the program in future years.

How long before the program begin date may I enter the United States?

You may enter the United States up to 30 days in advance of your program begin date but may not begin working until the program begin date is reached.  Please remember that participation in the program cannot prevent you from attending any scheduled classes or taking exams at your university.  If you miss any classes due to participation in the program, you will greatly jeopardize your chances of participating in the program.

How long after the program end date may I stay in the United States?

You have 30 days following the end date of your program to travel and/or to arrange for your return home.  You are not permitted to work during these 30 days, and if you leave the United States during this grace period, you will not be permitted to re-enter the United States on your J-1 visa because you will no longer be in J status.  Please keep in mind that it is your responsibility to return home in time for the start of your scheduled classes, no matter what your program end date is.

Can I switch jobs once I am in the United States?

Please check with your U.S. sponsor before making any changes in your employment.  If you change employment without the permission of your U.S. sponsor your status in the program may be terminated.

If your program is terminated, you must leave the United States immediately.

Can I work more than one job in the United States?

The Exchange Visitor Program regulations do not prohibit a participant from accepting a second job.  However, you must check with your U.S. sponsor before accepting a second job.  Your U.S. sponsor agency must approve and vet all jobs.

What if I have a complaint about the U.S. sponsor or my employer in the United States?

You may register complaints with the Department of State at jvisas@state.gov.  However, your U.S. sponsor has primary responsibility for your program.  If you have a complaint about your employer, you should first contact your U.S. sponsor for assistance.  Contact information for your U.S. sponsor can be found in Box #7 of your Form DS-2019.

What if I have a difficult time finding a job placement once I arrive in the United States, or have concerns about the work conditions?

If you have questions or are experiencing difficulty in finding employment, or have concerns about the work conditions, you should first contact your U.S. sponsor for assistance.  You also may contact the Department of State (jvisas@state.gov).  You may also wish to contact your country's nearest Embassy or Consulate.

If you have other questions not answered here, please consult the following Web page:

J1visa.state.gov or write to the Department of State at jvisas@state.gov.

## f.  (U) SWT Pilot Programs for Citizens of Australia and New Zealand:

(1)  **(U)** In September 2007, the U.S. government signed memorandums of understanding (MOUs) with Australia and New Zealand launching 12-month SWT pilot programs.  The MOU with New Zealand became effective on September 10, 2007; the MOU with Australia became effective on October 31, 2007.  The MOUs allow certain Australian, New Zealand, or U.S. citizens who are bona fide postsecondary students or recent graduates (within 12 months of graduation) from postsecondary

schools to work and travel in Australia, New Zealand, or in the United States, respectively, for up to 12 months.

(2) **(U)** The guidance for the Australia and New Zealand pilot programs differs from other J-1 SWT guidance (see paragraph a above) in the following respects:  Participants are not required to return home in time for the school year to begin, and qualified postsecondary students can enter the United States at any time.

(3) **(U) Duration:**  The duration of participation in this category must not exceed 12 months.  No extensions of program are permitted.

## 9 FAM 402.5-6(E)(13)  (U) Teacher

*(CT:VISA-2020;   07-03-2024)*

a. **(U) Teacher:**  This category is for an individual teaching full time in a primary or secondary accredited academic institution.  A foreign national must satisfy all the following:

(1) **(U)**

    (a) **(U)** Meet the qualifications for teaching at the primary (including pre-kindergarten) or secondary levels in schools in their home country; is working as a teacher in their home country at the time of initial application to the sponsor; and has at least two years of full-time teaching experience; or

    (b) **(U)** If not working as a teacher in their home country at the time of application, but otherwise meets the qualifications for teaching at the primary (including pre-kindergarten) or secondary levels in schools in the home country has had at least two years of full-time teaching experience within the past eight years; and, within 12 months of their application submission date for the program, has or will have completed an advanced degree (beyond a degree equivalent to a U.S. bachelor's degree) in education or in an academic subject matter that they intend to teach or that is directly related to their teaching subject field;

(2) **(U)** Possess, at a minimum, a degree equivalent to a U.S. bachelor's degree in either education or the academic subject field in which they intend to teach;

(3) **(U)** Satisfy the teaching eligibility standards of the U.S. state in which they will teach (e.g., meets minimum educational requirements, has passed teacher training coursework at a sufficiently proficient level, has provided an evaluation of foreign teaching preparation coursework, has demonstrated the requisite prior teaching experience), to include any required criminal background or other checks;

(4) **(U)** Be of good reputation and character; and

(5) **(U)** Agree to come to the United States temporarily as a full-time teacher of record in an accredited primary or secondary school. Exchange visitor Teachers may teach a variety of subjects and levels at their host school or schools, if qualified, but at the pre-kindergarten level, may teach only in language immersion programs.

b. **(U) Extension of program:** Designated Teacher program sponsors may request that an exchange Teacher be granted an extension of program participation beyond the original 3 years. Teacher program sponsors may request an exchange Teacher be granted up to a 2-year extension. Extensions will not exceed June 30th of any given year to coincide with the U.S. teaching cycle and December 31st for the year-round cycle discussed above. A Teacher from Germany may be extended an additional 3 years per an agreement between the Department and the government of Germany.

c. **(U)** Exchange Visitor Program **Regulation:** See 22 CFR 62.24.

## 9 FAM 402.5-6(E)(14)  (U) Trainee

*(CT:VISA-1628;   09-13-2022)*

a. **(U) The Trainee category aims:** to strengthen U.S. public diplomacy by expanding opportunities for substantive programming for foreign students and professionals; to enhance the skills and expertise of exchange visitors in their academic or occupational fields; to improve participants' knowledge of U.S. techniques, methodologies, and technologies; and to increase participants' understanding of U.S. society and culture. The requirements in the Trainee regulations are designed to distinguish between bona fide training, which is permitted, and merely gaining additional work experience, which is not permitted.

b. **(U)** This category is for a foreign national who has either a degree or professional certificate from a postsecondary academic institution outside the United States and at least one year of prior related work experience in their occupational field acquired outside the United States; or five years of work experience outside the United States in their occupational field.

c. **(U) Program fees:** Program regulations do not address the fee amount that program sponsors may charge exchange visitors to participate in Trainee programs, and each program sponsor may set its fees based on its business model.

d. **(U) Program exclusions:** Sponsors must not:

(1) **(U)** Place Trainees in unskilled or casual labor positions, in positions that require or involve childcare or elder care, or in clinical or any other kind of work that involves patient care or contact, including any work that would require them to provide therapy, medication, or other clinical or medical care (e.g., sports or physical therapy, psychological counseling, nursing, dentistry, veterinary medicine, social work, speech therapy, or early childhood education;

(2) **(U)** Place Trainees in positions, occupations, or businesses that could bring the Exchange Visitor Program or the Department into notoriety or disrepute;

(3) **(U)** Engage or otherwise cooperate or contract with a domestic staffing/employment agency in the United States to recruit, screen, orient, place, evaluate, or train Trainees, or in any other way involve such agencies in an Exchange Visitor Program training program; nor

(4) **(U)** Place trainees in the field of aviation.

(5) **(U)** Designated sponsors must ensure that the duties of Trainee as outlined in the T/IPP will not involve more than 20 percent clerical work, and that all tasks assigned to Trainees are necessary for the completion of training program assignments.

(6) **(U)** Sponsor must also ensure that all "Hospitality and Tourism" training programs of six months or longer contain at least three departmental or functional rotations.

e. **(U) Form** DS-7002**, Training/Internship Placement Plan (T/IIP):** Sponsors must complete and obtain requisite signatures on this form for each trainee before issuing Form DS-2019.  Upon request, a J-1 Trainee visa applicant must present a fully executed Form DS-7002 to the adjudicator during the visa interview (see 9 FAM 402.5-6(D)(7) for more information on the T/IPP).

f. **(U) Repeat Participation:**  Trainees can participate in additional training programs that address the development of more advanced skills or a different field of expertise after a 2-year period of residency outside the United States following their training program.  This two-year period should not be confused with the two-year home-country physical presence requirement under INA 212(e) (see 9 FAM 402.5-6(L) below).

g. **(U) Exchange Visitor Program Regulation:**  See 22 CFR 62.22.

## 9 FAM 402.5-6(E)(15)  (U) Intern and Trainee Programs with a Management or Supervisory Focus

*(CT:VISA-1292;   05-27-2021)*

a. **(U)** The occupational category of Management, Business, Commerce, and Finance is up to 18 months for any type of management training, which may include hotel or restaurant management, turf management, office management, etc.  The duration of a trainee's or intern's participation in a training or internship program must be established before a sponsor issues a Form DS–2019.  Except as noted below, the maximum duration of a training program is 18 months, and the maximum duration of an internship program is 12 months.

b. **(U)** For training programs in the "Hospitality and Tourism" occupational category, the maximum duration is 12 months and must not have less than three departmental or functional rotations for "Hospitality and Tourism"

training and internship programs of six months or longer.  Training programs in the field of agriculture are permitted to last a total of 18 months, if in the development of the training plan, as documented in the T/IPP, the additional six months of the program consist of classroom participation and studies.  Program extensions are permitted only within maximum durations if the need for an extended training and internship program is documented by the full completion and execution of a new Form DS–7002.

c.  **(U)** Typical rotational programs offered in hotels or restaurants in a variety of related functions leading to a final rotation in a single supervisory position, such as front desk supervisor or manager, floor supervisor, lead chief or room service manager, would fall under the "Hospitality and Tourism" occupational category and be limited to 12 months.

d.  **(U)** Non-management placements on farms or other production facilities fall under 'Agriculture' and are limited to 12 months, or 18 months providing that six months of the program consists of classroom participation and studies.

# 9 FAM 402.5-6(F)  (U) Residence Abroad

*(CT:VISA-2048;   08-15-2024)*

a.  **(U)** The INA requires that a J visa applicant possess a residence in a foreign country they have no intention of abandoning.  You must be satisfied that the applicant has present intent to depart the United States upon completion of their exchange visitor program.  Consequently, you must be satisfied when adjudicating the visa that the applicant:

(1)  **(U)** Has a residence abroad;

(2)  **(U)** Has no immediate intention of abandoning that residence; and

(3)  **(U)** Intends to depart from the United States upon completion of the program.

b.  **(U)** The context of the residence abroad requirement for exchange visitor visas inherently differs from the context for B visitor visas or other short-term visas.  The statute clearly presupposes that the natural circumstances and conditions of being an exchange visitor do not disqualify the applicant from obtaining a J visa.  It is natural that the exchange visitor proposes an extended absence from their home country (see 9 FAM 401.1-3(E)(2) paragraph a).  Nonetheless, you must be satisfied when adjudicating the visa application that an applicant possesses the present intent to depart the U.S. at the conclusion of their program.  That this intention is subject to change is not a sufficient reason to refuse a visa.  Although exchange visitors may apply to change or adjust status in the United States in the future, this is not a basis to refuse a visa application if the exchange visitor's present intent is to depart at the conclusion of their program.

# 9 FAM 402.5-6(G)  (U) Knowledge of English

*(CT:VISA-1628;   09-13-2022)*

**(U)** A prospective exchange visitor must have sufficient proficiency in the English language to undertake the anticipated program successfully.  Successful participation in exchange programs requires that participants interact with Americans both at the participants' sites of activity and in the broader context of daily life, to achieve the cultural goals of these programs.  Some exchange visitor programs provide for an interpreter, and this may be noted on the Form DS-2019.  Participants may not avoid the English language requirement by claiming that their site of activity offers a work environment in their native language.  If the applicant lacks the English skills described above, but the Form DS-2019 is not annotated to reflect the use of an interpreter, and you are unable to determine whether the program permits use of an interpreter, contact the CA/VO/F F/M/J portfolio holder.  Exchange visitors who are deaf or hard of hearing, and who rely on signing, must be proficient in American Sign Language (ASL) or another signing language widely used in the United States.

# 9 FAM 402.5-6(H)  (U) Employment

## 9 FAM 402.5-6(H)(1)  (U) Employment - In General

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** An exchange visitor may receive compensation for employment when such activities are part of the exchange visitor's program.

b. **(U)** DHS is responsible for authorizing the employment of the spouse and any minor unmarried children (J-2 visa holders) of the exchange visitor (J-1 visa holder).  The dependent must file Form I-765, Application for Employment Authorization, requesting permission to work from USCIS.

## 9 FAM 402.5-6(H)(2)  (U) College/University Student Employment

*(CT:VISA-1292;   05-27-2021)*

a. **(U) There are two types of employment authorizations available for College/University Students with J status:**

(1)  **(U)** Student employment (see 22 CFR 62.23(g) for more information on student employment); or

(2)  **(U)** Academic training (see 22 CFR 62.23(f) for more information on academic training).

b. **(U)** In both situations, the responsible officer (RO) must approve the exchange visitor's participation in the activity.

c.  **(U)** College/University Students (degree and non-degree) granted permission for student employment (22 CFR 62.23(g)) are limited to twenty (20) hours

per week, except during school breaks and annual vacation, unless authorized for economic necessity.

d. **(U) Some examples of student employment and academic training are:**

   (1) **(U) Scholarship, fellowship, or assistantship:**  If the employment is required because of a scholarship, fellowship, or an assistantship, such activity usually occurs on campus with the school as the employer.  In certain circumstances, however, the work can be done elsewhere for a different employer.  For example, an exchange visitor may work in a government or private research laboratory if the exchange visitor's major professor has a joint appointment at one of those locations and the employment is supervised and counts towards the exchange visitor's degree;

   (2) **(U) On campus:**  The Exchange Visitor Program regulations allow for jobs on-campus, whether the job is related to the course of study.

   (3) **(U) Off campus:**  Exchange visitors may be authorized off-campus employment by the program's responsible officer (RO) when "necessary due to serious, urgent and unforeseen economic circumstances" that have arisen since the exchange visitor's sponsorship on the J visa.

## 9 FAM 402.5-6(H)(3)  (U) Summer Employment for College/University Students Transferring to Another Program Sponsor

*(CT:VISA-1292;   05-27-2021)*

**(U)** If a College/University Student intends to transfer sponsors during the summer months but wants to remain at the current program to work during the summer, the current sponsor must delay the transfer procedure until after the period of employment.  To permit the student to stay in the current program, the period of employment must be included in the exchange visitor's program noted on the Form DS-2019.

# 9 FAM 402.5-6(I)  (U) Visa Application Procedures and Conditions

## 9 FAM 402.5-6(I)(1)  (U) Applicant Qualifications

*(CT:VISA-2150;   04-29-2025)*

a. **(U)** Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status, is the basic document required to support an application for an exchange visitor visa and for maintaining valid exchange visitor program participant status.  The electronic SEVIS record in the CCD will indicate the applicant's current SEVIS status.  Verify that the applicant's SEVIS record is in either INITIAL or ACTIVE status.

b. **(U)** On occasion, you will see applicants who claim they have followed the established procedure, but you cannot locate their SEVIS records in the CCD. When this occurs, contact the F/M/J portfolio holder(s) in CA/VO/F/ET for assistance.  It is important that CA/VO/F/ET and CA/VO/I be made aware of any failure of the records to replicate so that efforts to correct the problem are appropriately coordinated with DHS/ICE/SEVP.

c.  **(U)** Ensure the applicant's information is correct in the electronic SEVIS record (see 9 FAM 402.5-6(J)), and that the SEVIS fee has been paid.  You can also verify SEVIS fee payment at FMJfee.com.

d. **(U)** If you are uncertain as to whether the applicant's qualifications or planned activities fit within the Exchange Visitor Program or have concerns that the sponsor is not in compliance with sponsor regulations, you should refuse the visa application under INA 221(g) and notify the F/M/J portfolio holder(s) in CA/VO/F/ET who will coordinate with ECA to provide guidance.

e.  **(U)** When an applicant applies for a J-2 visa to follow-to-join a principal J-1 applicant already in the United States, or when a J-2 applicant applies to renew their visa when the principal J-1 applicant is already in the United States, you must be satisfied that the principal applicant is maintaining J-1 status before issuing the visa.  The J-1 principal applicant's SEVIS record is the official record of whether the J-1 principal applicant is maintaining their status.  In some cases, the J-1 applicant's visa may have expired but if the J-1 applicant was approved for an extension of their program, and the dates in SEVIS reflect this program extension, the J-1 applicant has maintained status for the sake of the J-2 visa applicant's eligibility for a visa.

f. *Unavailable*

g. *Unavailable*

    (1) *Unavailable*

    *(2) Unavailable*

    *(3) Unavailable*

h. *Unavailable*

    *(1) Unavailable*

    *(2) Unavailable*

i. *Unavailable*

# 9 FAM 402.5-6(I)(2)  (U) Cases Involving Unrealizable Reporting Dates

*(CT:VISA-1837;   09-26-2023)*

**(U)** If the program start date specified in the applicant's Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status, is already past or there is reason to believe the applicant will be unable to meet that date, you may assume the applicant may encounter difficulty at POE.  You should determine

whether the sponsor has amended the electronic SEVIS record to change the program start date, and make a case note to that effect to alert CBP.  If this has not been done, you should direct the visa applicant to alert the designated U.S. program sponsor.  You should not intervene directly with program sponsors on behalf of visa applicants.

## 9 FAM 402.5-6(I)(3)  (U) Entry of Exchange Visitor Program Participants Before Program Start Date

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** You may issue an exchange visitor visa to an applicant at any time before the program start date if the SEVIS record is in INITIAL or ACTIVE status.  However, the exchange visitor may not enter the United States earlier than 30 days before the program start date.  Applicants continuing an Exchange Visitor Program are not subject to this travel restriction.

b. **(U)** An exchange visitor who desires an earlier entry must obtain a B-2 visitor visa.  If the applicant enters on a B visa, however, they must first obtain a change of status from USCIS, from B status to J status to participate in the exchange program.  The applicant is not allowed to begin the exchange visitor program until USCIS has approved the change of status.  The process to change status may be lengthy and may impact the ability of the applicant to participate in the program.

## 9 FAM 402.5-6(I)(4)  (U) Consecutive Exchange Programs

*(CT:VISA-2048;   08-15-2024)*

**(U)** An exchange visitor may participate in consecutive exchange programs unless otherwise limited or prohibited by the Exchange Visitor Regulations.  Do not issue an individual two separate J-1 visas for two different programs that will run back-to-back (e.g., Au Pair then Trainee; or Summer Work Travel then College University Student).  Following completion of the first program, the exchange visitor is usually expected to return home and may apply for another J-1 visa for the subsequent program.  The exception to this is an exchange visitor who receives approval for a change of exchange visitor category (22 CFR 62.41) while in the United States, allowing him or her to begin the second program without returning to the home country.  Exchange visitors with questions about a change of category should be directed to their program sponsors.

## 9 FAM 402.5-6(I)(5)  (U) 30-Day Post-Completion Period

*(CT:VISA-1628;   09-13-2022)*

a. **(U)** Exchange visitors are no longer issued a paper Form I-94, Arrival and Departure Record, marked "D/S" (Duration of Status) upon entry into the United States.  CBP now gathers travelers' arrival/departure information automatically from their electronic travel records.  However, CBP will still

issue a paper Form I-94 at land border ports of entry.  Visa holders may download a copy of their electronic I-94 at www.cbp.gov/I94.

b. **(U)** The initial period of admission of the exchange visitor will not exceed the period specified on the Form DS-2019 (the start and end dates), plus a period of 30 days "for the purpose of travel" (see 8 CFR 214.2(j)).  DHS established this 30-day period at the successful completion of the program to use for domestic travel and/or to prepare for and depart from the United States, and for no other purpose.  A program extension and/or transfer cannot be done if an exchange visitor's record in SEVIS is not in active status during this period.

c. **(U)** Any validation study of return rates for J travelers must take this authorized grace period into account.

## 9 FAM 402.5-6(I)(6)  (U) Annotation and Visa Validity

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** A J-1 or J-2 visa must be annotated to show the program number, program dates, and sponsor name of the applicant's exchange program, as well as the SEVIS number of the individual.  The J visa must also state whether the applicant is subject to INA 212(e).  Keep in mind that you are making a preliminary determination of the applicability of INA 212(e).  An exchange visitor cannot use a J visa for a program other than that specified on the annotation, unless the exchange visitor transfers to another sponsor while on program in the United States.  In this case, the visa remains valid under the same SEVIS ID and the exchange visitor may exit and re-enter the United States on an unexpired J-visa with the current Form DS-2019.  The new Form DS-2019 will include a new program number and a travel validation signature, which may be electronic.

b. **(U)** A new visa is required following the transfer of program when:

   (1) **(U)** the exchange visitor travels internationally; and

   (2) **(U)** the J-visa has already expired or will expire before the date of U.S. re-entry.

   **(U)** Exchange visitors approved for a change of category must obtain a new J-1 visa if/when they exit and want to re-enter the U.S. to continue their exchange program in the new program category.

c. **Unavailable**

d. **Unavailable**

e. **(U)** J-1 visas must be issued for the program dates listed on the Form DS-2019, except as described in para d below or in 9 FAM 402.5-6(E)(10) above or where visa reciprocity only allows for a shorter validity period.  J-2 derivatives are subject to the same visa validity as the J-1 principal applicant unless visa reciprocity only allows for a shorter validity period.

f. **Unavailable**

g. **(U)** For those exceptions noted in 9 FAM 402.5-6(E)(10), you are authorized to issue with a visa validity extending for three years.  The visa should be set to expire two years after the listed program end date found in Box 3 on the Form DS-2019.

## 9 FAM 402.5-6(I)(7)  (U) Renewing J Visas for Returning Exchange Visitors

*(CT:VISA-2048;   08-15-2024)*

**(U)** Where applicable, returning J applicants may be eligible for an interview waiver (see 9 FAM 403.5-4(A)(1)).  You usually should renew J visas to returning exchange visitors who have remained in valid program status and have not had any significant changes in either their program or their personal circumstances.  When an exchange visitor engaged in a program takes a short trip abroad and requires a visa to return to the United States, you are encouraged to issue the visa, if the exchange visitor is otherwise qualified, to allow the individual to complete their program if the status of the electronic record in SEVIS is ACTIVE.

# 9 FAM 402.5-6(J)  (U) The Student and Exchange Visitor Information System (SEVIS)

## 9 FAM 402.5-6(J)(1)  (U) Student and Exchange Visitor Information System (SEVIS) - In General

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** For an overview of the Student and Exchange Visitor Program and SEVIS see 9 FAM 402.5-4 above.

b. **(U)** SEVIS is an internet-based database that tracks students and exchange visitors in F, M, and J visa status while in the United States.  Using SEVIS, designated Exchange Visitor Program sponsors enter information into the individual SEVIS record for a prospective exchange visitor, and that information can then be printed on the Form DS-2019.

c. **(U)** ECA) authorizes designated U.S. sponsor officials - referred to as responsible officers (ROs) and alternate responsible officers (AROs) - access to SEVIS so that they may create and update official records on exchange visitors and their dependents.  SEVIS enables exchange program sponsors to transmit electronic information and event notifications, via the Internet, to the Department and to DHS throughout an exchange visitor's stay in the United States.  The information in SEVIS is updated, as needed, and supersedes information on the printed Form DS-2019.  The SEVIS record is the definitive record of exchange visitor eligibility and you must check it for each applicant.

d. **(U)** Exchange Visitor Program sponsors designated by ECA must use SEVIS.  Only a Form DS-2019 that has been issued through SEVIS, and contains a

unique SEVIS identification number, may be accepted in support of a J visa application.  The Form DS-2019 must be signed in any color ink by the RO (or ARO).  Digital signatures are also acceptable.  However, the definitive record is the electronic SEVIS record in the CCD (or directly in SEVIS, usually accessible by your FPU).  CBP can also access the electronic record at POE.

## 9 FAM 402.5-6(J)(2)  (U) Responsible and/or Alternate Responsible Officers

*(CT:VISA-1090;   06-24-2020)*

a. **(U)** Exchange Visitor Program sponsors designate individuals to perform the duties attendant to designation.  The responsible officer (RO) is the primary person appointed as being responsible and thoroughly familiar with the Exchange Visitor Program regulations, policies, and SEVIS requirements.  An alternate responsible officer (ARO) is an individual appointed to assist the RO in administering the program.

b. **(U)** The RO (or ARO) is required to ensure that the exchange visitor obtains sufficient advice and assistance to facilitate the successful completion of their exchange program.  ROs and AROs are also responsible for the security of SEVIS.  Only ROs and AROs are authorized access to SEVIS to issue Form DS-2019.

# 9 FAM 402.5-6(K)  (U) J Visa Fees

## 9 FAM 402.5-6(K)(1)  (U) SEVIS I-901, Fee Remittance for Certain J Nonimmigrants, Fee

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** The SEVIS I-901 fee is a one-time fee for persons applying for J-1 visas.  The fee covers the costs of administering SEVIS and related enforcement efforts.  Only principal J-1s must pay the SEVIS I-901 fee.  Even though J-2 derivative applicants have a unique SEVIS ID number, they are not subject to this fee.

b. **(U)** Applicants must pay the SEVIS fee before their visa interviews.  Applicants may schedule interview appointments before paying the fee.  While consular sections must verify that the SEVIS fee has been paid, they are not responsible for collecting it.  Applicants should be referred to FMJFee.com to pay the SEVIS I-901 fee.

c. **(U)** You can verify SEVIS I-901 fee payment through the CCD SEVIS report.  You can also verify SEVIS I-901 fee payment at FMJFee.com if the fee payment information has not yet replicated to the CCD.

d. **(U)** Most exchange visitors will pay the full fee; however, the fee is reduced for some, including those in Summer Work Travel, Camp Counselor, and Au Pair categories.

e. **(U)** Exchange visitors and their spouses and/or dependents sponsored by a government program (program serial numbers G-1, G-2, G-3, and G-7) are not required to pay the SEVIS fee.  Publicize and explain on post's website how an exchange visitor participating in one of these government-sponsored programs can reach the consular section to schedule a visa interview appointment without paying either the nonrefundable MRV fee or the SEVIS fee (see 9 FAM 402.5-6(K)(2) below).

## 9 FAM 402.5-6(K)(2)  (U) Fee Waivers for Certain Exchange Visitors

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** J-1 visa applicants are exempted from the machine readable visa (MRV) fee if they are participating in a USAID, or other federally funded educational and cultural exchange program.  Exchange programs eligible for the MRV exemption have a program serial number that begins with the prefix G-1, G-2, G-3, or G-7 on the Form DS-2019.  J-2 derivatives of these J-1 applicants are also exempted from the MRV fee.  All other applicants with U.S. Government funding must pay the MRV processing fee.  You must ensure that post's website provides clear guidance to these visa applicants on how to obtain a visa interview appointment without paying the MRV fee, because the fee, once paid, is usually not refundable (see 7 FAH-1 H-728*)*.

b. **(U)** Applicants participating in a U.S. government-sponsored exchange visitor program who are exempt from the MRV fee as described above in paragraph a, are also exempt from any applicable visa reciprocity fee.

# 9 FAM 402.5-6(L)  (U) INA 212(e)

*(CT:VISA-3009;   12-09-2024)*

**(U)** INA 212(e) and implementing regulations prohibits certain exchange visitors from applying for an IV or for adjustment of status to that of a*n* LPR or from changing status to or receiving a visa as a temporary worker (H),  fiancé (K), or intracompany transferee (L) until the applicant has established that they have resided and been physically present in the country of nationality or last legal permanent residence for an aggregate of at least two years following departure from the United States.

## 9 FAM 402.5-6(L)(1)  (U) Subject to INA 212(e)

*(CT:VISA-3009;   12-09-2024)*

a. **(U)** An individual admitted as an exchange visitor under INA 101(a)(15)(J) or who acquires such status after admission is subject to the two-year home-county physical presence requirement under INA 212(e) if:

(1)  **(U)** The program in which the individual is participating was financed in whole or in part, directly or indirectly, by:

(a) **(U)** A U.S. Government Agency, or

(b) **(U)** The government of the country of the noncitizen's nationality or last legal permanent residence;

(2) **(U)** The noncitizen is a national or legal permanent resident of a country that has been designated as clearly requiring their field of specialized knowledge or skill as shown in the 2024 Exchange Visitor Skills List; or

(3) **(U)** The individual entered the United States, or acquired such status, to receive graduate medical education or training.

b. **(U)** Individuals participating in the Au Pair and Summer Work Travel exchange visitor program categories are not subject to INA 212(e).

## 9 FAM 402.5-6(L)(2)  (U) Waiver of INA 212(e) Requirement

*(CT:VISA-3009;   12-09-2024)*

a. **(U)** A noncitizen may seek a waiver of the two-year home-country physical presence requirement if:

(1) **(U)** A U.S. government agency makes such a request for a noncitizen who is actively and substantially involved in a program sponsored by or of interest to that U.S. government agency; (see 9 FAM 302.13-2(D)(4));

(2) **(U)** In the case of an individual who entered the United States, or acquired such status, to receive graduate medical education or training: A U.S. state's Department of Public Health makes such a request (see 9 FAM 302.13-2(D)(5)).

(3) **(U)** The noncitizen establishes exceptional hardship to a U.S. citizen or LPR spouse or child, or probable persecution on account of race, religion, or political opinion (see also 9 FAM 302.13-2(D)(3)); and

(4) **(U)** The noncitizen has received a statement of "no objection" from their country of nationality or last legal permanent residence (see 9 FAM 302.13-2(D)(1)).

b. **(U)** You should refer former exchange visitors who wish to learn more about applying for a waiver of INA 212(e) to Waiver of the Exchange Visitor Two-Year Home-Country Physical Presence Requirement.

## 9 FAM 402.5-6(L)(3)  (U) Department's Policy on Extension of Program Participation While a Waiver of the Two 2-Year Home-Country Physical Presence Requirement Is Pending

*(CT:VISA-3009;   12-09-2024)*

**(U)** Once WRD has recommended a waiver and forwarded to DHS, an exchange visitor is no longer eligible for an extension of program beyond the end date shown on the current Form DS-2019 even though they may not have completed the maximum duration of participation permitted for the category.  If a waiver request was denied, however, and the exchange visitor is still within the

maximum duration of participation established by the regulations, an extension may be issued by the sponsor up to the maximum duration of time permitted for that category.

# 9 FAM 402.5-6(M)  (U) Exchange Visitor Skills Lists

## 9 FAM 402.5-6(M)(1)  (U) Exchange Visitor Skill List, 2024

*(CT:VISA-3009;   12-09-2024)*

**(U)** See: 2024 Exchange Visitor Skills List.

## 9 FAM 402.5-6(M)(2)  (U) Exchange Visitor Skill List, 2009

*(CT:VISA-3009;   12-09-2024)*

**(U)** See:  2009 Exchange Visitor Skills List.

## 9 FAM 402.5-6(M)(3)  (U) Exchange Visitor Skill List, 1997

*(CT:VISA-3009;   12-09-2024)*

**(U)** See:  1997 Exchange Visitor Skills List.

## 9 FAM 402.5-6(M)(4)  (U) Exchange Visitor Skill List, 1984

*(CT:VISA-3009;   12-09-2024)*

**(U)** See:  1984 Exchange Visitor Skills List.

## 9 FAM 402.5-6(M)(5)  (U) Exchange Visitor Skills List, 1972

*(CT:VISA-3009;   12-09-2024)*

**(U)** See:  1972 Exchange Visitor Skills List.

**UNCLASSIFIED (U)**

EXHIBIT 17

UNCLASSIFIED (U)

# 9 FAM 302.6

# (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1735

*(CT:VISA-2150;   04-29-2025)*
*(Office of Origin:  CA/VO)*

## 9 FAM 302.6-1  (U) STATUTORY AND REGULATORY AUTHORITY

### 9 FAM 302.6-1(A)  (U) Immigration and Nationality Act

*(CT:VISA-1;   11-18-2015)*

**(U)** INA 101(b)(1) (8 U.S.C. 1101(b)(1)); INA 212(a)(3)(B)(8 U.S.C. 1182(a)(3)(B)); INA 212(a)(3)(F) (8 U.S.C. 1182(a)(3)(f)); INA 212(d)(3)(A) (8 U.S.C. 1182(d)(3)(A)); INA 212(d)(3)(B) (8 U.S.C. 1182(d)(3)(B)); INA 219 (8 U.S.C. 1189).

### 9 FAM 302.6-1(B)  (U) United States Code

*(CT:VISA-55;   02-23-2016)*

**(U)** 18 U.S.C. 2339D(c)(1); 22 U.S.C. 2723.

### 9 FAM 302.6-1(C)  (U) Public Laws

*(CT:VISA-1;   11-18-2015)*

**(U)** Foreign Relations Authorization Act, Fiscal Years 1992 and 1993, Public Law 102-138, section 128; Homeland Security Act of 2002, Public Law 107-296; Consolidated Appropriations Act, 2008, Public Law 110-161, at section 691 of Title VI of Division J (the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2008); An Act to Remove the African National Congress from Treatment as a Terrorist Organization for Certain Acts or Events, Provide Relief for Certain Members of the African National Congress Regarding Admissibility, and for Other Purposes, Public Law 110-257.

# 9 FAM 302.6-2  (U) TERRORIST ACTIVITIES - INA 212(A)(3)(B)

## 9 FAM 302.6-2(A)  (U) Grounds

*(CT:VISA-2014;   06-20-2024)*

**(U)** INA 212(a)(3)(B)(i) renders ineligible any applicant who**:**

(1)  **(U)** has engaged in a terrorist activity;

(2)  **(U)** you know, or have reason to believe, is engaged in or is likely to engage after entry in any terrorist activity;

(3)  **(U)** has, under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity;

(4)  **(U)** is a representative of:

   (a)  **(U)** a terrorist organization; or

   (b)  **(U)** a political, social, or other group that endorses or espouses terrorist activity;

(5)  **(U)** is a member of a designated terrorist organization;

(6)  **(U)** is a member of an undesignated terrorist organization, unless the applicant can demonstrate by clear and convincing evidence that the applicant did not know, and should not reasonably have known, that the organization was a terrorist organization;

(7)  **(U)** endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization;

(8)  **(U)** has received military-type training from or on behalf of any organization that, when the training was received, was a terrorist organization; or

(9)  **(U)** is the spouse or child of an applicant who is ineligible, if the activity causing the applicant to be found ineligible occurred within the last 5 years.

## 9 FAM 302.6-2(B)  (U) Application

### 9 FAM 302.6-2(B)(1)  (U) Summary

*(CT:VISA-2150;   04-29-2025)*

a.  **(U)** INA 212(a)(3)(B) describes visa ineligibilities related to terrorism.  The ineligibilities hinge on terrorism-related definitions that were significantly expanded by post-9/11 legislation, most significantly, the USA PATRIOT Act (2001) and the REAL ID Act (2005).  Due to these expansions, the scope of activities covered by the phrase "engage in terrorist activity" is broad.  As defined in INA 212(a)(3)(B)(vi), the term "terrorist organization"

encompasses both organizations that have been designated previously by the Department as terrorist organizations and organizations that have never been so designated by the Department or any other U.S. Government agency, but that have engaged in any of the activities listed in INA 212(a)(3)(B)(iv)(I)-(IV).  Because terms in INA 212(a)(3)(B) are defined broadly, elicit as much pertinent information from visa applicants as possible, including the names of all groups potentially covered by these provisions with which the applicant may be linked, for example, by current membership or past financial contributions or other support.  Inquire into the nature and activities of those organizations, bearing in mind the definition of "terrorist organization" in INA 212(a)(3)(B)(vi), described in 9 FAM 302.6-2(B)(3) paragraph i below and other FAM provisions referenced therein.

b. **Unavailable**

c. ***Unavailable***

# 9 FAM 302.6-2(B)(2)  (U) Background

*(CT:VISA-2014;   06-20-2024)*

a. **(U)** The Immigration Act of 1990 (Public Law 101-649) amended INA 212(a) by replacing the previous 43 classes of excludable applicants with nine broad classes, each with subclasses.  New INA 212(a)(3)(B), "Terrorist Activities," incorporated aspects of former 212(a)(27) and 212(a)(29).

b. **(U)** The Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104-132) expanded the scope of INA 212(a)(3)(B) to make ineligible representatives and members of organizations designated by the Secretary under INA 219 as Foreign Terrorist Organizations (FTOs).

c. **(U)** The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (Public Law 104-208) amended INA 212(a)(3)(B)(i) again to make ineligible any applicant who, "under circumstances indicating an intention to cause death or serious bodily harm," incited terrorist activity.  The new provision applied retroactively to all such incitement activities, regardless of when they occurred.

d. **(U)** The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act") (Public Law 107-56), enacted after the terrorist attacks on September 11, 2001, expanded the scope of INA 212(a)(3) in several important respects:

(1) **(U)** It gave the Secretary of State new authority to designate organizations as terrorist organizations for purposes of INA 212(a)(3)(B) if certain criteria are met.  Organizations so designated are listed on the "Terrorist Exclusion List" or "TEL";

(2) **(U)** It defined "terrorist organization" for the first time, creating three categories.  The first category is FTOs designated under INA 219 (see INA 212(a)(3)(B)(vi)(I)) (Tier I); the second is entities designated under

the Terrorism Exclusion List (TEL) authority included in the USA PATRIOT Act (Tier II) (see INA 212(a)(3)(B)(vi)(II)).  The third category, referred to as "undesignated terrorist organizations," includes entities that engage in specified "terrorist activities" listed in the INA, but that have not been designated under FTO or TEL authorities (Tier III) (see INA 212(a)(3)(B)(vi)(III)); and

(3)  **(U)** It created INA 212(a)(3)(F), "Association with Terrorist Organizations," which made applicants who have been associated with a terrorist organization, and who are engaged or likely to engage in certain activities that endanger the United States, ineligible under certain circumstances.

e.  **(U)** The Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief of 2005 ("REAL ID Act") (Public Law 109-13) at sections 103 and 104 of Division B further expanded the scope of INA 212(a)(3)(B) by:

(1)  **(U)** Broadening "terrorist organization" to capture undesignated groups with subgroups that "engage in terrorist activity";

(2)  **(U)** Making it harder for an applicant suspected of "engaging in terrorist activities" to escape ineligibility based on an alleged lack of knowledge concerning an undesignated terrorist organization or how any contribution of material support might be used by a terrorist organization (see (5), (6), and (8) below);

(3)  **(U)** Making ineligible "representatives" of all three types of terrorist organizations, regardless of applicant's knowledge or intent.  Previously, only representatives of groups designated under INA 219 (Tier I) were specified;

(4)  **(U)** Making ineligible all representatives of "a political, social, or other group that endorses or espouses terrorist activity."  Previously the Secretary of State had to find that the group's public endorsement of acts of terrorist activity undermines U.S. efforts to reduce or eliminate terrorist activities;

(5)  **(U)** Eliminating the knowledge defense to ineligibility for members of entities designated for the TEL (Tier II) and raising the standard to "clear and convincing evidence" for an applicant to avoid ineligibility for being a member of an undesignated terrorist organization on the grounds that they did not know, and should not reasonably have known, that the organization was a terrorist organization;

(6)  **(U)** Raising the standard to "clear and convincing evidence" for an applicant to avoid ineligibility for soliciting funds or members for an undesignated terrorist organization on the grounds that they did not know, and should not reasonably have known, that the organization was a terrorist organization;

(7)  **(U)** Expanding the "material support" bar to admissibility for knowingly providing support to any terrorist organization or its members, except,

6/30/25, 3:18 PM   9 FAM 302.6 INELIGIBILITIES BASED ON SECURITY AND RELATED GROUNDS—INA 212(A)(3) AND 8 U.S.C. 1...

Case 1:25-cv-10685-WGY   Document 179-1   Filed 07/01/25   Page 137 of 185

with respect to undesignated terrorist organizations, where an applicant presents "clear and convincing evidence" that the applicant lacked knowledge of any terrorist activity.  The amendment eliminated the requirement that the applicant intended to support terrorist activity;

(8) **(U)** Making ineligible any applicant who commits an act the applicant knows or reasonably should know provides material support to an undesignated terrorist organization or a member of an undesignated terrorist organization, unless the applicant can demonstrate "by clear and convincing evidence" that they did not know, and should not reasonably have known, that the organization was a terrorist organization.  Before amendment, the provision did not include material support afforded to a member of an undesignated terrorist organization.  The REAL ID Act added the "clear and convincing evidence" standard for an applicant attempting to prove lack of knowledge of an undesignated group's terrorist activity;

(9) **(U)** Making ineligible any applicant who "endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization."  Before amendment, the provision covered only persons who used their position of prominence to endorse or espouse terrorist activity or to persuade others to support terrorist activity or a terrorist organization in a way the Secretary of State determined undermines U.S. efforts to reduce or eliminate terrorist activities;

(10) **(U)** Making ineligible any applicant who has "received military-type training" from or on behalf of a terrorist organization; and

(11) **(U)** Applying the terrorism provisions of the REAL ID Act amendments to actions taken by an applicant before, on, or after the date of enactment, May 11, 2005.

f. **(U)** The Consolidated Appropriations Act, 2008, Public Law 110-161, 121 Stat. 1844, at section 691 of Title VI of Division J (the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2008) amended the discretionary authority of the Secretary of Homeland Security and the Secretary of State, under INA 212(d)(3)(B)(i), to exempt an applicant from most of the terrorism-related bars to admissibility under INA 212(a)(3)(B) and to exempt a group from treatment as an undesignated terrorist organization under INA 212(a)(3)(B)(vi)(III).  The amendment also provided that certain groups should not be considered terrorist organizations based on any act or event occurring before the amendment's enactment on December 26, 2007, and that the Taliban must be considered to be a designated foreign terrorist organization, under INA 212(a)(3)(B)(vi)(I), for immigration purposes.  See 9 FAM 302.6-2(B)(3) paragraph i below.  The amendments were effective upon enactment and apply to acts before or after enactment.

# 9 FAM 302.6-2(B)(3)  (U) Definitions

*(CT:VISA-2014;   06-20-2024)*

a. **(U)** This section explains terms used in INA 212(a)(3)(B) in alphabetical order.  Where listed terms are specifically defined in the statute, the statutory reference follows immediately after the term.

b. **(U) CLEAR AND CONVINCING EVIDENCE:**

   (1)  **(U)** The phrase "clear and convincing evidence" appears several times in INA 212(a)(3)(B) with reference to undesignated terrorist organizations. The INA places the burden of proof on the applicant to establish that they did not know, or should not have reasonably known, that the undesignated terrorist organization was, in fact, a terrorist organization. (Applicants are deemed to know that designated terrorist organizations are terrorist organizations, regardless of their actual knowledge or belief).

   (2)  **(U)** Consider the following in determining whether a visa applicant can demonstrate by "clear and convincing evidence" that they did not know, and should not reasonably have known, that an undesignated organization was a terrorist organization:

      (a)  **(U)** Facts specific to the individual, such as residence, profession, education, and people with whom and groups with which the applicant has associated;

      (b)  **(U)** The public availability of information about the organization and more specifically, about the activities that make it a terrorist organization under the INA's broad definition; and

      (c)  **(U)** The extent to which the organization is actively and overtly engaged in the activities that make it a terrorist organization under the INA.

   (3)  **Unavailable**

c.  **(U) ENDORSING OR ESPOUSING TERRORISM:**

   (1)  **(U)** An applicant is ineligible under INA 212(a)(3)(B)(i)(VII) if the applicant endorses or espouses terrorist activity or persuades others to endorse or support terrorist activity or a terrorist organization.

   (2)  **Unavailable**

d. **Unavailable**

   (1)  **(U)** A safe house;

   (2)  **(U)** Transportation;

   (3)  **(U)** Communications;

   (4)  **(U)** Funds;

   (5)  **(U)** Transfer of funds or other material financial benefit;

(6) **(U)** False documentation or identification;

(7) **(U)** Weapons including chemical, biological, or radiological weapons;

(8) **(U)** Explosives; or

(9) **(U)** Training.

e. **(U) MEMBER OF A TERRORIST ORGANIZATION:**

(1) **(U)** Applicants who are members of designated FTOs or entities on the Terrorism Exclusion List are ineligible. The INA does not require the applicant to know that the organization has been designated.  Members of undesignated terrorist organizations are ineligible, but there is a narrow exception based on lack of knowledge (see 9 FAM 302.6-2(B)(3) paragraph i below).

(2) **(U)** Evidence of membership in a terrorist organization might include the individual's taking of an oath or performance of some act that is a prerequisite of membership.  A formal induction is not necessary for a finding of membership.

(3) **(U)** Membership is determined by considering all relevant facts, including, but not limited to, the following:

(a) **(U)** Acknowledgment of membership;

(b) **(U)** Frequent association with other members;

(c) **(U)** Participation in the organization's activities, even if lawful;

(d) **(U)** Actively working to further the organization's aims and methods in a way suggesting close affiliation constituting membership;

(e) **(U)** Occupying a position of trust in the organization, past or present;

(f)  **(U)** Receiving financial support from the organization, e.g., scholarships, pensions, salary;

(g) **(U)** Contributing money to the organization;

(h) **(U)** Determination of membership by a competent court;

(i)  **(U)** Voluntarily displaying symbols of the organization; or

(j)  **(U)** Receiving honors and awards given by the organization.

(4) **(U)** No single factor necessarily determines that an applicant was a member of an organization.

(5) **Unavailable**

(6) **Unavailable**

(7) **(U)** Former members will still be ineligible if they have previously provided material support (such as membership fees), raised money, or solicited members for the organization.

f. **(U) INCITEMENT OF TERRORISM:**

(1) **(U)** "Incitement with intent to cause death or serious bodily harm" renders an applicant ineligible under INA 212(a)(3)(B)(i)(III) if they have incited terrorist activity under circumstances indicating an intention to cause death or serious bodily harm.

(2) **(U)** "Incited" in the context of INA 212(a)(3)(B) is speech that induces or otherwise moves another person to undertake terrorist activity. Normally speech will not rise to the level of "inciting" unless there is a clear link between the speech and an actual effort to undertake the terrorist activity. It connotes speech that is not merely an expression of views but that directs or induces action, typically in a volatile situation.

(3) **(U)** The applicant may have incited terrorist activity even if a terrorist attack does not actually occur (e.g., because an attempt to commit such activity was thwarted).

(4) **(U)** An applicant who has "incited" terrorist activity must also have acted in circumstances indicating an intention to cause death or serious bodily harm to be ineligible under INA 212(a)(3)(B). In other words, the applicant's speech must not only have induced others to undertake terrorist activity but was also made with the specific intent that such activity would result in death or serious bodily injury.

(5) **(U)** Incitement and the requisite intent to cause bodily harm could be inferred in the following situations:

   (a) **(U)** Widespread opposition to Country A's policies and actions lead to a series of protests, some violent, outside Country A's embassy in Country B. The applicant goes to the embassy, stands on a box, and shouts to the crowd to join them in standing up to Country A and humiliating it. Shortly afterwards, when they see an embassy vehicle approaching, they yell: "Don't let them in! Make them pay for what they have done!" The crowd blocks the car and removes occupants (including a diplomat working at Country A's embassy), from the car, beating them severely and taking them hostage.

   (b) **(U) Analysis:** Diplomatic hostage-taking and violent attacks on diplomats are terrorist activities. Given the applicant's urging the crowd to stop the embassy vehicle and "make them pay," you would have reasonable ground to believe that the applicant's speech incited terrorist activity. The applicant's "make them pay" statement, when viewed against the backdrop of previous violent protests and their general comments about standing up to Country A and humiliating it, would provide you with reasonable ground to believe that the applicant intended to cause death or serious bodily harm.

   (c) **(U)** The applicant is an ardent nationalist whose opinions voiced to an audience regularly blame "foreigners" for their country's problems and who argues that the only solution to these problems is that "foreigners" should be driven out of the country. Press reports say that some of those in the targeted audience have been purchasing weapons and seeking to obtain and manufacture explosives. Police

notify the applicant or those associated with the applicant that they are investigating several of those in the targeted audience for weapons-related offenses. At the end of a week of strong anti-foreign sentiment, the applicant gives a special speech entitled "A Call to Action." With the knowledge that those under investigation are in the audience, the applicant begins their speech with: "The time has come for action!" They then reiterate throughout their speech that "The only solution to the country's problems is to purge our great land of these foreigners once and for all through whatever means necessary." Shortly thereafter, some of those in the target audience detonate a truck bomb outside a restaurant frequented by foreign nationals, killing several foreign nationals and injuring many restaurant employees.

(d) **(U) Analysis:** The use of any explosive with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property is a terrorist activity. In the example, the applicant helps foster anti-foreign sentiments and then, during an especially tense period, urges students to act to drive "foreigners" from the country "through whatever means necessary." Under these circumstances, you would have reason to believe that the applicant's speech incited terrorist activity. The fact that the applicant knew that several students likely had access to weapons and/or explosives and that those students attended their special lecture would provide you with reason to believe that the applicant intended to cause death or serious bodily harm.

(e) **(U)** The USA PATRIOT Act amended INA 212(a)(3)(B)'s definition of "engaging in terrorist activity" also to include incitement (see INA 212(a)(3)(B)(iv)(I)). As a result, a person who is ineligible under INA 212(a)(3)(B)(i)(III) for inciting terrorist activity will also now be ineligible under INA 212(a)(3)(B)(i)(I) for engaging in a terrorist activity.

g. **(U) REPRESENTATIVE:** A "representative" is defined in INA 212(a)(3)(B)(v) as "an officer, official, or spokesman of an organization, and any person who directs, counsels, commands, or induces an organization or its members to engage in terrorist activity."

h. **(U) SUBGROUP:** A group (Group X), even if not organized, can be a "subgroup" of another organization (Group Y) if there are reasonable grounds to believe that either (1) Group X as a whole or (2) the members of Group X are affiliated with Group Y. If a subgroup engages in terrorist activities, then both groups are terrorist organizations. See 9 FAM 302.6-2(B)(3) paragraph i(1)(c) below. A subgroup relationship may be found where there are reasonable grounds to believe that Group X is subordinate to, or affiliated with, Group Y and Group X is dependent on, or otherwise relies upon, Group Y in whole or in part to support or maintain its operations. As an example, Group X would be a subgroup of Group Y if the latter establishes rules or

guidelines that Group X generally follows and Group X relies on Group Y as a source of funds for Group X operations.

i. **(U) TERRORIST ORGANIZATION:**

(1) **(U)** "Terrorist organization," as defined in INA 212(a)(3)(B)(vi), includes both designated terrorist organizations (paragraphs (a) and (b), below) and undesignated terrorist organizations (paragraph (c), below):

(a) **(U)** An organization designated by the Secretary of State as a "foreign terrorist organization" (FTO) under INA 219. This designation has implications beyond the INA, including penalties under U.S. criminal law. Applicants who engage in certain activities in connection with these organizations can be rendered ineligible under the INA. Organizations currently designated as FTOs and information about the designation process can be found on the J/CT website.

(b) **(U)** An organization designated by the Secretary of State for inclusion in the Terrorist Exclusion List (TEL), pursuant to INA 212(a)(3)(B)(vi)(II). The TEL designation is for immigration purposes only. Information about the designation process can be found on the J/CT website.

(c) **(U)** An organization that has not been designated but is a group of two or more individuals, whether organized or not, which engages in, or has a subgroup (see 9 FAM 302.6-2(B)(3) paragraph h above) which engages in, terrorist activities described in the INA 212(a)(3)(B)(iv)(I) – (VI). With respect to undesignated terrorist organizations:

(i) **Unavailable**

(ii) **Unavailable**

(iii) **(U)** Where a finding of ineligibility would involve an undesignated terrorist organization, the applicant may overcome the finding by demonstrating, by clear and convincing evidence (see 9 FAM 302.6-2(B)(3) paragraph b above), that the applicant did not know, and should not reasonably have known, that the organization was a terrorist organization (except with respect to representatives of undesignated terrorist organizations, those who persuade others to support an undesignated terrorist organization, and those who receive military-type training on behalf of an undesignated terrorist organization, for whom there is no such defense); and,

(2) **(U)** Pursuant to section 691(b) of the Consolidated Appropriations Act, 2008, the following groups are not terrorist organizations under INA 212(a)(3)(B)(vi) for acts or events that occurred before December 26, 2007:

- **(U)** Karen National Union/Karen Liberation Army (KNU/KNLA)
- **(U)** Chin National Front/Chin National Army (CNF/CNA)
- **(U)** Chin National League for Democracy (CNLD)
- **(U)** Kayan New Land Party (KNLP)
- **(U)** Arakan Liberation Party (ALP)
- **(U)** Tibetan Mustangs
- **(U)** Cuban Alzados
- **(U)** Karenni National Progressive Party
- **(U)** "Appropriate groups affiliated with" the Hmong
- **(U)** "Appropriate groups affiliated with" the Montagnards

(3) **(U)** As a result of this legislation, an applicant who did any of the following before December 26, 2007, is no longer ineligible on account of the following terrorism-related grounds of ineligibility:

- **(U)** Solicited funds or other things of value on behalf of one of these named groups (INA 212(a)(3)(B)(iv)(IV)(cc))
- **(U)** Solicited an individual for membership in one of these named groups (INA 212(a)(3)(B)(iv)(V)(cc))
- **(U)** Committed an act that provided material support, including transfer of funds, false documentation, weapons, or training to one of these named terrorist groups (INA 212(a)(3)(B)(iv)(VI)(dd))
- **(U)** Is a representative of one of these named groups (INA 212(a)(3)(B)(i)(IV)(aa))
- **(U)** Is a member of one of these named terrorist groups (INA 212(a)(3)(B)(i)(VI))
- **(U)** Persuaded others to endorse or support one of these named terrorist groups (INA 212(a)(3)(B)(i)(VII))
- **(U)** Received military-type training from one these named terrorist groups (INA 212(a)(3)(B)(i)(VIII))
- **Unavailable**

(4) **(U)** Pursuant to 691(d) of Division J of the Consolidated Appropriations Act, 2008 as of December 26, 2007, the Taliban is a designated terrorist organization described in INA 212(a)(3)(B)(vi)(I) for purposes of immigration law.

(5) **(U)** Public Law No. 110-257, codified at 8 U.S.C. 1182 note, added the African National Congress to the list of groups in subparagraph b, above, that are not terrorist organizations.

(6) **(U)** In determining whether an organization may be an undesignated terrorist organization; i.e., that it "engaged in terrorist activities" as described in INA 212(a)(3)(B)(iv)(I) – (VI).  Evaluate information obtained in the visa interview, take advantage of available local resources, as appropriate, and check relevant databases, including:

(a) **(U)** The United Nations 1267 Committee's list of individuals and entities belonging or related to the Taliban, Osama Bin Laden, and the Al-Qaida organization.

(b) **(U)** Terrorists and groups identified under E.O. 13224.

(c) **Unavailable**

# 9 FAM 302.6-2(B)(4)  (U) Ineligibility Under INA 212(a)(3)(B)

*(CT:VISA-2014;   06-20-2024)*

a. **(U) OVERVIEW:**

(1) **(U)** INA 212(a)(3)(B) generally identifies as grounds for ineligibility "engaging in terrorist activities" and having certain links to "terrorist organizations."  The standards apply even if the relevant acts or associations preceded enactment of the law and regardless of any link to an actual terrorist attack.  The section defines "terrorist activities" to include a broad range of violent acts (see INA 212(a)(3)(B)(iii)), while also making ineligible representatives and members of groups engaging in listed activities; those endorsing, espousing, or promoting terrorism; those who have received military-type training from terrorist organizations; and immediate family members of any covered persons – with certain exceptions.

(2) **(U)** It also explicitly makes PLO officers, officials, representatives, and spokesmen ineligible.  INA 212(a)(3)(B) next defines "engaging in terrorist activities," which covers a broad range of activities that support or promote the commission of terrorist activities or groups that engage in them (see INA 212(a)(3)(B)(iv)).  See 9 FAM 302.6-2(B)(4) paragraph b below for more detail.

b. **Unavailable**

(1) **Unavailable**

(2) **Unavailable**

(3) **Unavailable**

(4) **Unavailable**

(5) **Unavailable**

(6) **Unavailable**

c. **(U) ENGAGED IN TERRORIST ACTIVITY:**

(1)  **(U)** After defining the violent acts that constitute terrorist activity (see INA 212(a)(3)(B)(iii)), the INA identifies the acts that render applicant's ineligible because of their connections to those violent acts or to those who commit them.  See definition of "engage in terrorist activity" INA 212(a)(3)(B)(iv).

(2)  **(U)** An applicant is ineligible on any of the grounds identified below if either the applicant has engaged in terrorist activity in the past or you or the Secretary of Homeland Security or the Attorney General knows or has reason to believe that the applicant currently is engaged in, or likely after entry to engage in, a terrorist activity.  See INA 212(a)(3)(B)(i)(I)-(II).

(3)  **(U)** An applicant is ineligible for "engaging in terrorist activity" if the applicant acts, as an individual or as a member of a group, to:

(a)  **(U)** Commit or incite to commit a terrorist activity, under circumstances that indicate an intention to cause death or serious bodily injury;

(b)  **(U)** Prepare or plan a terrorist activity;

(c)  **(U)** Gather information on potential targets for terrorist activity;

(d)  **(U)** Solicit funds or other things of value for a terrorist activity or terrorist organization.  If the terrorist organization is undesignated when the solicitation for membership occurred, see 9 FAM 302.6-2(B)(3) paragraph i(3);

(e)  **(U)** Solicit any individual to engage in terrorist activity, or for membership in a terrorist organization.  If the terrorist organization is undesignated when the solicitation for membership occurred, see 9 FAM 302.6-2(B)(3) paragraph i(3) above;

(f)  **(U)** Commit an act that the actor knows, or reasonably should know, affords material support for the commission of a terrorist activity;

(g)  **(U)** Commit an act that the actor knows, or reasonably should know, affords material support to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity; or

(h)  **(U)** Commit an act that the actor knows, or reasonably should know, affords material support to an entity that was a terrorist organization (i.e., engaged in terrorist activity) when the material support was provided or to a member of a terrorist organization, without regard to how the contribution was to be used.  If the terrorist organization was undesignated when material support was provided, (see 9 FAM 302.6-2(B)(3) paragraph i(3) above).

(4)  **Unavailable**

(5)  **(U)** Current representatives of the following are ineligible:

(a) **(U)** A terrorist organization (designated or undesignated; there is no defense based on lack of knowledge concerning the organization's activities); or

(b) **(U)** A political, social, or other similar group that endorses or espouses terrorist activity, regardless of whether the group's endorsement or espousing undermines U.S. efforts.

(6) **(U)** Current members of a terrorist organization are ineligible. See 9 FAM 302.6-2(B)(3) paragraph e above. If the terrorist organization is undesignated, the applicant is not inadmissible if the applicant can demonstrate "by clear and convincing evidence" that they did not know, and should not reasonably have known, that the organization was a terrorist organization. See 9 FAM 302.6-2(B)(3) paragraph b above.

(7) **(U)** Endorsing or espousing terrorist activity or persuading others to endorse or espouse terrorist activity or support a terrorist organization, whether designated or undesignated renders an applicant is ineligible. See 9 FAM 302.6-2(B)(3) paragraph c above.

(8) **(U)** Military-type training, received from or on behalf of any organization that, when the training was received, was a terrorist organization, makes an applicant ineligible. "Military-type training," as defined in 18 U.S.C. 2339D(c)(1), includes training in means or methods that can cause death or serious bodily injury, destroy or damage property, or disrupt services to critical infrastructure, or training on the use, storage, production, or assembly of any explosive, firearm or other weapon, including any weapon of mass destruction.

d. **(U) PALESTINE LIBERATION ORGANIZATION (PLO) AND OTHER PALESTINIAN ENTITIES:**

(1) **(U)** Any applicant who is an officer, official, representative, or spokesperson of the PLO is engaged in terrorist activity and therefore ineligible. See INA 212(a)(3)(B)(i). This provision applies only to those individuals who are currently PLO officers, officials, representatives, or spokespersons. Although not covered by the PLO-specific provisions, past officers, officials, representatives, or spokespersons likely would be ineligible under the other provisions of INA 212(a)(3)(B). "PLO Officials" would be individuals with substantive or policy-making responsibility in the PLO. Members of the PLO Executive Committee, PLO Representatives at Missions around the world, and PLO Representatives to the United Nations and other International Organizations clearly would be ineligible under this provision.

(2) **(U)** Applicants who no longer occupy official positions with the PLO and persons who may be viewed as current or former members or employees, but are not officers, officials, representatives, or spokespersons, are not ineligible under the PLO-specific provision. Be alert to the possibility that applicants with present or past associations with the PLO may be ineligible under INA 212(a)(3)(B) for other reasons.

(3) **Unavailable**

(4) **(U) Composition of the Palestine Liberation Organization (PLO):**

    (a) **Unavailable**

    (b) **Unavailable**

    (c) **Unavailable**

        (i)    **Unavailable**

        (ii)   **Unavailable**

        (iii)   **Unavailable**

        (iv)  **Unavailable**

        (v)   **Unavailable**

        (vi)  **Unavailable**

        (vii)  **Unavailable**

        (viii) **Unavailable**

        (ix)  **Unavailable**

        (x)   **Unavailable**

        (xi)  **Unavailable**

        (xii)  **Unavailable**

(5) **(U) Implications for Other Palestinian Entities:**

    (a) **Unavailable**

    (b) **Unavailable**

    (c) **Unavailable**

e. **(U) SPOUSE AND CHILDREN OF AN INELIGIBLE APPLICANT:**

(1) **(U)** Spouses and children of applicants found ineligible under INA 212(a)(3)(B) are also ineligible if the activity causing the applicant to be ineligible occurred within the last five years.  However, there are exceptions to this ineligibility.  See statutory exceptions for spouses and children at INA 212(a)(3)(B)(ii) and paragraph (6) below.

(2) **Unavailable**

(3) **(U)** This ground only applies to spouses who are currently married to applicants found ineligible under INA 212(a)(3)(B).  It does not include those whose marriage has ended due to divorce or the death of the ineligible applicant.

(4) **(U)**This ineligibility only applies to an applicant who is a child at the time of visa issuance.  INA 101(b)(1) defines "child" as an unmarried person under twenty-one years of age.  A child remains the child of an applicant found ineligible under INA 212(a)(3)(B) even after the death of the

6/30/25, 3:18 PM    9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B) OR (F) AND 8 U.S.C. 1...

Case 1:25-cv-10685-WGY   Document 179-1   Filed 07/01/25   Page 148 of 185

ineligible applicant parent, assuming they continue to meet the definition of a child.

(5) **Unavailable**

(6) **(U)** This ineligibility does not apply to a spouse or child who did not know or should not reasonably have known of the applicant's activity that caused the applicant to be found ineligible.  It also does not apply if you or the Secretary of Homeland Security finds that there are reasonable grounds to believe the spouse or child has renounced the activity causing the applicant to be found ineligible.  The statutory exception to spouse and child ineligibility applicable in cases where the spouse or child didn't know of the terrorist activity or renounced the activity is found in INA 212(a)(3)(B)(ii).

(7) **Unavailable**

## 9 FAM 302.6-2(B)(5)  (U) Exemptions

*(CT:VISA-2014;   06-20-2024)*

a. **(U) EXEMPTION VERSUS WAIVER:** Both discretionary authorities allow an applicant to receive an immigration benefit, even though the applicant would not otherwise qualify for the benefit.  One significant difference is that when using a waiver authority, the Department first determines that the applicant is not qualified to receive a benefit (e.g., a visa) and then follows the applicable procedures for obtaining a waiver of the disqualification from DHS.  The waiver authority, found in INA 212(d)(3)(A), is available only for NIVs.  In contrast, when exemption authority is exercised, the Secretary, following interagency consultations, determines that the disqualification (which must arise under the INA's terrorism-related grounds for ineligibility) "shall not apply" in that case.  Exemptions are available for both NIV and IV cases, as well as other immigration-related benefits.  These authorities are discussed below.

b. **(U) EXEMPTION AUTHORITY FOR INDIVIDUALS UNDER** INA 212(d)(3) (B)(i)**:**

(1) **(U)** Under INA 212(d)(3)(B)(i), the Secretaries of Homeland Security and State, in consultation with each other and the Attorney General, each are authorized to conclude that almost any of the terrorism-related provisions under INA 212(a)(3)(B) should not apply to an applicant.  If the applicant is in the United States, however, and removal proceedings have commenced, only the Secretary of Homeland Security has the authority to apply the exemption.

(2) **(U)** INA 212(d)(3)(B)(i) exemptions cannot be granted to:

(a) **(U)** Applicants for whom there are reasonable grounds to believe are engaged in (present activities) or likely to engage after entry in (future activities) terrorist activity (INA 212(a)(3)(B)(i)(II));

(b) **(U)** Members of Tier I and Tier II terrorist organizations (designated by the Department) (INA 212(a)(3)(B)(i)(V));

(c) **(U)** Representatives of Tier I and Tier II terrorist organizations (designated by the Department) (INA 212(a)(3)(B)(i)(IV)(aa));

(d) **(U)** Applicants who voluntarily and knowingly engaged in terrorist activity on behalf of a Tier I or Tier II group (INA 212(a)(3)(B)(i)(I), as defined by INA 212(a)(3)(B)(iv));

(e) **(U)** Applicants who voluntarily and knowingly endorsed or espoused terrorist activity or persuaded others to do so on behalf of a Tier I or Tier II group (INA 212(a)(3)(B)(i)(VII));

(f) **(U)** Applicants who voluntarily and knowingly received military-type training from a Tier I or II terrorist organization (INA 212(a)(3)(B)(i) (VIII)).

(3) **(U)** Regarding past activities, the limitations on the exemption authority relate only to applicants with ties to designated (Tier I and Tier II) terrorist organizations.  The exemption potentially may overcome ineligibility for any past terrorist activity associated with an undesignated (Tier III) terrorist organization.

(4) **(U)** By including "voluntarily or knowingly" in the statute, Congress made clear that exemptions may be used to overcome ineligibility for past terrorist activity associated with a designated (Tier I or II) terrorist organization if the applicant acted under duress or without the relevant knowledge.

(5) **(U)** Although exercises of the exemption authority require action by the Secretary following interagency consultations and, therefore, will not be commonplace, you may recommend that the Department pursue an exemption from provisions of INA 212(a)(3)(B) for an NIV applicant, if politically justified, or an IV applicant.  Submit such requests to the Department with a detailed assessment explaining why an exemption is appropriate and any balancing considerations.

(6) **Unavailable**

c. **(U) EXEMPTION AUTHORITY FOR INDIVIDUALS ASSOCIATED WITH THE AFRICAN NATIONAL CONGRESS:**

(1) **(U) In General:**

(a) **(U)** Under Public Law No. 110-257, codified at 8 U.S.C. 1182 note, the Secretaries of State and Homeland Security, in consultation with each other and the Attorney General, each are authorized to determine, in their sole and unreviewable discretion, that (2)(A)(i) (I), (2)(B), and (3)(B) (other than clause (i)(II)) of INA 212(a), does not apply to an applicant with respect to activities undertaken in association with the African National Congress in opposition to apartheid rule in South Africa.  This authority operates the same as the general individual exemption authority described in 9 FAM 302.6-

2(B)(5) paragraph b, above but for activities that may fall within the scope of this law, only this exemption should be considered.  An exemption under the Public Law may cover both terrorism-related and some of the criminal-related grounds of ineligibility.  The same law also establishes that the ANC must not be treated as a terrorist organization, for purposes of INA 212(a)(3)(B), based on past actions.  See 9 FAM 302.6-2(B)(3) paragraph i above.

(b) **(U)** Effective March 30, 2011, the Secretary of State, following consultations with the Secretary of Homeland Security and the Attorney General, exercised their discretionary authority under Public Law 110-257 to determine that INA 212(a)(2)(A)(i)(I), INA 212(a)(2)(B), and INA 212(a)(3)(B) (other than clause (i)(II)) "shall not apply" to individuals for activities undertaken in association with the African National Congress (ANC) in opposition to apartheid rule in South Africa (the "ANC categorical exemption").  The ANC categorical exemption sets out conditions for eligibility, described below, that must be applied by consular officers and other relevant U.S. Government officials in accordance with the procedures below.

(2) **Unavailable**

    (a) **Unavailable**

    (b) **Unavailable**

    (c) **Unavailable**

    (d) **Unavailable**

(3) **(U) Requirements for ANC Exemptions:**

    (a) **Unavailable**

        (i) **Unavailable**

        (ii) **Unavailable**

    (b) **Unavailable**

    (c) **Unavailable**

    (d) **Unavailable**

        (i)    **Unavailable**

        (ii)    **Unavailable**

(4) **Unavailable**

    (a) **Unavailable**

    (b) **Unavailable**

    (c) **Unavailable**

    (d) **Unavailable**

        (i)    **Unavailable**

6/30/25, 3:18 PM 9 FAM 302.6 (U) INADMISSIBILITIES BASED ON SECURITY AND RELATED GROUNDS - INA 212(A)(3) AND 8 U.S.C. 1…

Case 1:25-cv-10685-WGY Document 179-1 Filed 07/01/25 Page 151 of 185

(ii)  **Unavailable**

(iii)  **Unavailable**

(iv)  **Unavailable**

(e)  **Unavailable**

**Unavailable**

(f)  **Unavailable**

(i)  **Unavailable**

(ii)  **Unavailable**

(A)  **Unavailable**

(B)  **Unavailable**

(C)  **Unavailable**

(1) **Unavailable**

(2) **Unavailable**

· **Unavailable**

· **Unavailable**

· **Unavailable**

· **Unavailable**

(3) **Unavailable**

(iii)  **Unavailable**

(iv)  **Unavailable**

d. **(U) EXEMPTION AUTHORITY FOR INDIVIDUALS WHO HAVE PROVIDED MATERIAL SUPPORT UNDER DURESS TO A TERRORIST ORGANIZATION:**

(1)  **(U) In General:**

(a)  **(U)** On October 26, 2015, the Secretary of State exercised his authority under INA 212(d)(3)(B)(i) to determine that INA 212(a)(3)(B)(iv)(VI) shall not apply with respect to material support provided under duress to a terrorist organization.  This Material Support Under Duress exemption sets out conditions for eligibility, described below, that may be applied by consular officers in accordance with the procedures below.

(b)  **(U)** As an example, USCIS guidance indicates that material support under duress could include providing money or a service (such as transporting fighters and supplies) to a rebel group when threatened at gunpoint to comply with such a demand.

(2)  **Unavailable**

(a)  **Unavailable**

(b) **Unavailable**

   (i)    **Unavailable**

   (ii)   **Unavailable**

   (iii)   **Unavailable**

   (iv)  **Unavailable**

(c) **Unavailable**

   (i)    **Unavailable**

   (ii)   **Unavailable**

   (iii)   **Unavailable**

   (iv)  **Unavailable**

(d) **Unavailable**

   (i)    **Unavailable**

   (ii)   **Unavailable**

   (iii)   **Unavailable**

   (iv)  **Unavailable**

   (v)   **Unavailable**

   (vi)  **Unavailable**

(e) **Unavailable**

(3) **Unavailable**

(a) **Unavailable**

(b) **Unavailable**

(c) **Unavailable**

(d) **Unavailable**

(e) **Unavailable**

(4) **Unavailable**

(a) **Unavailable**

(b) **Unavailable**

(5) **Unavailable**

e. **(U) EXEMPTION AUTHORITY FOR KURDISTAN DEMOCRATIC PARTY, IRAQI NATIONAL CONGRESS, AND PATRIOTIC UNION OF KURDISTAN:**

(1) **(U) Background:**

(a) **Unavailable**

(b) **Unavailable**

6/30/25, 3:18 PM    9 FAM 302.6 (U) INELIGIBLES BASED ON TERRORIST-RELATED GROUNDS—INA 212(A)(3)(B) AND 8 U.S.C. 1...

Case 1:25-cv-10685-WGY    Document 179-1    Filed 07/01/25    Page 153 of 185

  (c) **Unavailable**

   **Unavailable**

  (d) **Unavailable**

  (e) **Unavailable**

(2) **(U) In General:** In September 2009, the Secretary of Homeland Security and Secretary of State granted an exemption under INA212(d)(3)(B)(i) covering the category of individuals who meet certain conditions, as determined by consular or DHS officials, as appropriate, from certain ineligibility grounds in INA 212(a)(3)(B) of the INA with respect to any activities or associations related to the Kurdistan Democratic Party (KDP), the Patriotic Union of Kurdistan (PUK) or the Iraqi National Congress (INC) (hereinafter the "categorical exemption").

(3) **(U) Procedures:**

  (a) **Unavailable**

  (b) **Unavailable**

  (c) **Unavailable**

  (d) **Unavailable**

  (e) **Unavailable**

  (f)  **Unavailable**

  (g) **Unavailable**

(4) **Unavailable**

  (a) **Unavailable**

   (i)  **Unavailable**

   (ii)  **Unavailable**

   (iii)  **Unavailable**

   (iv)  **Unavailable**

   (v)  **Unavailable**

   (vi)  **Unavailable**

   (vii)  **Unavailable**

   (viii) **Unavailable**

   (ix)  **Unavailable**

   (x)  **Unavailable**

  (b) **Unavailable**

f. **(U) APPLICATION OF EXEMPTION FOR INDIVIDUALS ASSOCIATED WITH KOSOVO LIBERATION ARMY (KLA):**

(1) **Unavailable**

       (a) **Unavailable**

       (b) **Unavailable**

       (c) **Unavailable**

       (d) **Unavailable**

       (e) **Unavailable**

  (2) **Unavailable**

       (a) **Unavailable**

       (b) **(U)** The applicant is seeking a benefit or protection under the INA, which may include an NIV, and is otherwise eligible for the benefit or protection.

       (c) **Unavailable**

       (d) **(U)** The applicant has fully disclosed, to the best of their knowledge, in all relevant applications and interviews with U.S. government representatives and agents, the nature and circumstances of activities or associations falling within the scope of INA 212(a)(3)(B).

       (e) **Unavailable**

       (f)  **(U)** The applicant has not participated in, or knowingly provided material support to, terrorist activities that targeted noncombatant persons or United States interests.  For further information on material support, see [9 FAM 302.6-2(B)(3)](#) above.

       (g) **(U)** The applicant has established to your satisfaction that they pose no danger to the safety and security of the United States.

       (h) **(U)** The applicant warrants an exemption from the relevant ineligibility provisions in the totality of the circumstances.  The exemption gives you broad latitude to consider any relevant factors and determine that an applicant who might otherwise appear eligible for the exemption should not benefit based on the totality of circumstances.

       (i) **Unavailable**

       (j) **Unavailable**

  (3) **Unavailable**

       (a) **Unavailable**

          (i)    **Unavailable**

          (ii)    **Unavailable**

          (iii)    **Unavailable**

          (iv)    **Unavailable**

       (b) **Unavailable**

  (4) **Unavailable**

(a) **Unavailable**

(b) **Unavailable**

(c) **Unavailable**

(d) **Unavailable**

(e) **Unavailable**

(f) **Unavailable**

(g) **Unavailable**

(5) **Unavailable**

(6) **Unavailable**

g. **Unavailable**

(1) **(U)** In addition to those listed in paragraphs d through f above, exemptions have been created for certain individuals associated with or activities related to the following groups:

(a) **(U)** The All-Burma Student's Democratic Front (ABSDF);

(b) **(U)** The All-India Sikh Student's Federation - Bittu (AISSF-Bittu);

(c) **(U)** the Democratic Movement for the Liberation of Eritrean Kunam (DMLEK);

(d) **(U)** The Eritrean Liberation Front (ELF);

(e) **(U)** The Ethiopian People's Revolutionary Party (EPRP);

(f) **(U)** The Farabundo Marti para la Liberation National (FMLN) and Nationalist Republican Alliance (ARENA);

(g) **(U**)The Oromo Liberation Front (OLF);

(h) **(U)** The Tigray People's Liberation Front (TPLF);

(i) **(U)** Certain Burmese Groups; and/or

(j) **(U)** 10 groups named in the Consolidated Appropriations Act, 2008 (see 9 FAM 302.6-2(B)(3) paragraph i(2) above.

(2) **Unavailable**

(a) **(U)** Solicitation or Military-Type Training Under Duress (see 9 FAM 302.6-2(B)(5) paragraph d above);

(b) **(U)** Voluntary Medical Care;

(c) **(U)** Participation in the Iraqi Uprisings;

(d) **(U)** Certain Limited or Insignificant Material Support;

(e) **Unavailable**

(f) **Unavailable**

(g) **Unavailable**

6/30/25, 3:18 PM    9 FAM 302.6 INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B) AND 8 U.S.C. 1...

Case 1:25-cv-10685-WGY    Document 179-1    Filed 07/01/25    Page 156 of 185

## 9 FAM 302.6-2(B)(6)  (U) Reports to Congress

*(CT:VISA-1798;   07-12-2023)*

a. **(U) Report on 3B Denials:**  Section 128 of Public Law 102-138 of October 28, 1991, added to the law a permanent requirement that the Secretary of State report, on a timely basis, to the Judiciary Committees of the House and Senate, the House Foreign Affairs Committee, and the Senate Foreign Relations Committee every denial of a visa "on grounds of terrorist activity," along with a brief description of the factual basis for the denial.

b. **(U) Report on 3B Waivers:**  The Secretary of State also must report on all applicants found ineligible under INA 212(a)(3)(B) to whom the Department issued a visa or failed to object to the issuance of a visa.  This report, required by section 51 of the State Department Basic Authorities Act, as amended by Section 231 of the Foreign Relations Authorization Act, Fiscal Year 2003, must be submitted to appropriate committees on a semi-annual basis. The requirement for these reports may be found at 22 U.S.C. 2723.

c. **(U) Report on Exemptions under** INA 212(d)(3)(B)**:**  Not later than 90 days after the end of each fiscal year, the Secretaries of State and Homeland Security must submit a report to specified congressional committees on all individuals exempted under INA 212(d)(3)(B)(i).  Exemptions for groups must be reported within one week (INA 212(d)(3)(B)(ii)).

## 9 FAM 302.6-2(C)  Unavailable

## 9 FAM 302.6-2(C)(1)  Unavailable

*(CT:VISA-2014;   06-20-2024)*

a. **Unavailable**

b. **Unavailable**

c.  **Unavailable**

d. **Unavailable**

e. **Unavailable**

f.  **Unavailable**

g. **Unavailable**

   (1)  **Unavailable**

   (2)  **Unavailable**

   (3)  **Unavailable**

h. **Unavailable**

i.  **Unavailable**

j.  **Unavailable**

6/30/25, 3:18 PM    9 FAM 302.6 (U) INELIGIBILITIES BASED ON LABOR AND RELATED GROUNDS — INA 212(A)(5)(A), INA 212(A)(5)(C), AND 8 U.S.C. 1...

Case 1:25-cv-10685-WGY    Document 179-1    Filed 07/01/25    Page 157 of 185

## 9 FAM 302.6-2(C)(2)  Unavailable

*(CT:VISA-2014;   06-20-2024)*

a. **Unavailable**

   (1) **Unavailable**

   (2) **Unavailable**

   (3) **Unavailable**

   (4) **Unavailable**

   (5) **Unavailable**

b. **Unavailable**

   (1) **Unavailable**

      (a) **Unavailable**

      (b) **Unavailable**

      (c) **Unavailable**

   (2) **Unavailable**

      (a) **Unavailable**

      (b) **Unavailable**

      (c) **Unavailable**

      (d) **Unavailable**

      (e) **Unavailable**

      (f) **Unavailable**

## 9 FAM 302.6-2(C)(3)  Unavailable

*(CT:VISA-1798;   07-12-2023)*

a. **Unavailable**

b. **Unavailable**

c. **Unavailable**

d. **Unavailable**

e. **Unavailable**

f. **Unavailable**

g. **Unavailable**

h. **Unavailable**

i. **Unavailable**

## 9 FAM 302.6-2(C)(4)  (U) Exemption Authority for Individuals or Activities Associated with the Kosovo Liberation Army (KLA)

*(CT:VISA-2014;   06-20-2024)*

a. **(U)** On June 4, 2012, DHS Secretary Napolitano, following consultations with the Secretary of State and the Attorney General, exercised her authority under INA 212(d)(3)(B)(i), not to apply certain ineligibility grounds under INA 212(a)(3)(B) for certain activities or associations relating to the Kosovo Liberation Army (KLA).  There are several issues that must be considered before applying this "exemption" to a visa applicant.  These are described below and differ for NIV and IV applicants.

b. **(U)** The exemption cannot be applied to any NIV or IV applicant you know or have reasonable grounds to believe is engaged in or is likely to engage after entry into the United States in any terrorist activity, as defined in INA 212(a)(3)(B)(iv).

# 9 FAM 302.6-2(D)  (U) Waivers

## 9 FAM 302.6-2(D)(1)  (U) Waivers for Immigrants

*(CT:VISA-1798;   07-12-2023)*

**(U)** No waiver is available for an IV applicant found ineligible under INA 212(a)(3)(B).

## 9 FAM 302.6-2(D)(2)  (U) Waivers for Nonimmigrants

*(CT:VISA-2014;   06-20-2024)*

a. **(U)** You may request a finding of INA 212(a)(3)(B) ineligibility be waived for a nonimmigrant found ineligible under INA 212(a)(3)(B).  The waiver request must be submitted to the Department with a detailed assessment explaining why a waiver is appropriate and any balancing considerations.  Where appropriate, the Department will forward the request with a recommendation to DHS to grant the waiver.  Do not request waivers from DHS attachés at post.

b. **(U)** The Department may request a waiver from DHS on its own initiative if it believes a waiver is appropriate under the circumstances in a case.  The Department will advise you whenever a waiver has been approved, and you must annotate the visa in accordance with 9 FAM 403.9-5.

## 9 FAM 302.6-2(E)  Unavailable

### 9 FAM 302.6-2(E)(1)  Unavailable

*(CT:VISA-2014;   06-20-2024)*

**Unavailable**

### 9 FAM 302.6-2(E)(2)  Unavailable

*(CT:VISA-218;   10-20-2016)*

**Unavailable**

# 9 FAM 302.6-3  (U) ASSOCIATION WITH TERRORIST ORGANIZATIONS - INA 212(A)(3)(F)

## 9 FAM 302.6-3(A)  (U) Grounds

*(CT:VISA-1351;   08-27-2021)*

**(U)** INA 212(a)(3)(F) renders ineligible any applicant who the Secretary of State, after consultation with the Secretary of Homeland Security, determines has been associated with a terrorist organization and intends while in the United States to engage solely, principally, or incidentally in activities that could endanger the welfare, safety, or security of the United States.

## 9 FAM 302.6-3(B)  (U) Application

### 9 FAM 302.6-3(B)(1)  (U) Background and Summary

*(CT:VISA-1351;   08-27-2021)*

a. **(U)** INA 212(a)(3)(F) was added by Section 411(a)(2) of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of October 26, 2001 (Public Law 107-56) (USA PATRIOT ACT).  Enacted after the terrorist attacks on September 11, 2001, it was proposed by the Executive Branch and modeled in part on former INA 212(a)(27) and (28) to expand the scope and provide a flexible legal basis for denying entry to applicants who have been associated with terrorist organizations and whose travel to the United States would be inconsistent with the welfare, safety, or security of the United States.

b. **(U)** INA 212(a)(3)(F) applies only if the Secretary of State, after consultation with the Secretary of Homeland Security, or Secretary of Homeland Security after consultation with the Secretary of State, determines that the applicant has been associated with a terrorist organization and intends while in the

United States to engage solely, principally, or incidentally in activities that could endanger the welfare, safety, or security of the United States.  The Secretary of State's authority to make such a determination has not been delegated to consular officers.  Therefore, this provision can be used to deny visas only when such use is approved by the Department after a determination is made by the Secretary or an official to whom the Secretary's authority has been delegated.

# 9 FAM 302.6-3(B)(2)  (U) Recommending a Finding

*(CT:VISA-2014;   06-20-2024)*

a. **(U)** The authority to determine whether an applicant is ineligible under INA 212(a)(3)(F) rests with the Secretary of State and the Secretary of Homeland Security, each in consultation with the other.  Accordingly, if you believe that an individual may be ineligible under this provision, you must refer the matter back to the Department for a decision.

b. **(U) Address the following in any request for a determination of ineligibility under this provision:**

   (1)  **(U) Terrorist organization(s) involved:**

     (a)  **(U)** If the organization involved has been designated as a foreign terrorist organization under INA 219 as a Terrorist Exclusion List (TEL) organization under INA 212(a)(3)(B)(vi)(II), under Executive Order 13224, or has been defined by INA 212(a)(3)(B)(vi)(III) as a Tier III terrorist organization, provide the name of the organization and note the relevant designation(s).  If an organization has not been designated under any of these authorities, you must explain why the organization is a terrorist organization and provide as much information as possible regarding the nature and structure of the organization and its activities.  Include information on the nature, timing, and relevant circumstances surrounding the organization's terrorist activities;

     (b)  **(U)** "Terrorist Organization" is defined in INA 212(a)(3)(B)(vi) and references the definition of "engaged in terrorist activity" under INA 212(a)(3)(B)(iv);

   (2)  **(U) Nature of the applicant's association:**  The association must be meaningful for an applicant to be ineligible under INA 212(a)(3)(F), so information concerning the following should be provided:

     (a)  **(U)** The frequency, duration, and level of the applicant's contacts with the organization;

     (b)  **(U)** The nature and purpose of the applicant's contacts with the organization; and

     (c)  **(U)** The applicant's awareness of association.  Because terrorist organizations often operate in secret, you must provide your assessment of:

(i) **(U)** Whether the applicant knew or should have known that the terrorist organization (see <u>9 FAM 302.6-2(B)(3)</u> paragraph e above for relevant factors to consider);

(ii) **(U)** Whether the applicant knew or should have known that the person(s) with whom the applicant had contact was a member, representative, or affiliate of a terrorist organization; and

(iii) **(U)** Whether the applicant knew or should have known that the person(s) with whom the applicant had contact was engaged in terrorist activity;

(3) **(U) Timeframe:** INA 212(a)(3)(F) applies to an applicant who "has been" associated with a terrorist organization, regardless of when that association occurred. Therefore, an applicant whose association with a terrorist group occurred before enactment of INA 212(a)(3)(F) could be found ineligible. On the other hand, the ineligibility can be triggered only if the applicant intends while in the United States to engage in activities that could endanger the welfare, safety, or security of the United States.

(4) **(U) Applicant's activities in the United States:** Provide as much information as possible regarding the applicant's proposed activities in the United States and explain why these activities are cause for concern – i.e., why the determination required under subsection F should be made; and

(5) **Unavailable**

## 9 FAM 302.6-3(B)(3) (U) Findings

*(CT:VISA-2014; 06-20-2024)*

a. **(U)** To find an applicant ineligible under INA 212(a)(3)(F), the Secretary of State or Secretary of Homeland Security, each in consultation with the other (or their delegates), must find:

(1) **(U)** That the applicant has been associated with a terrorist organization; and

(2) **(U)** That the applicant intends while in the United States to engage solely, principally, or incidentally in activities that could endanger the welfare, safety, or security of the United States.

b. **(U)** Within the Department, CA will normally take the lead in coordinating the necessary interagency consultations and ensuring that a determination, if made, is made by an appropriate Department official with delegated authority. Generally, a determination will be made only if INA 212(a)(3)(B) is not applicable.

c. **(U)** The Department believes that "associated with" requires a meaningful association. Generally, to be found ineligible, an applicant must have had contact over time with individuals who the applicant knew or should have

known were members or representatives of a terrorist organization.  A single meeting with a terrorist operative could be sufficient for finding that an applicant has been "associated with" a terrorist organization, however. However, the Department would most likely find an applicant was associated with a terrorist organization if the applicant had made a commitment at a single meeting with a known recruiter for a terrorist organization to act on the organization's behalf.

d. **(U)** A finding that an applicant "intends while in the United States to engage in activities that could endanger the welfare, safety, or security of the United States" can be made in appropriate cases by inferring the necessary intent from the relevant facts and circumstances.  For example, an applicant who has extensive knowledge of explosives who has been meeting regularly with well-known members of a terrorist organization and seeks to travel to the United States could be found ineligible under INA 212(a)(3)(F).  Similarly, an applicant who has received flight training or has received counter-surveillance training from a terrorist organization (as defined in INA 212(a)(3)(B)(vi)) could be found to have such an intent based on these and other relevant facts, and therefore be found ineligible under INA 212(a)(3)(F).

e. **(U)** It is not necessary that the applicant intend to engage in activities that would be illegal or otherwise prohibited under the laws and regulations in the United States for the Department to find the applicant ineligible under INA 212(a)(3)(F).  For example, an applicant who intends to attend flight school in the United States – a lawful activity – could be found ineligible under INA 212(a)(3)(F) if the facts are sufficient to permit the Secretary or their delegate to determine that the applicant has been associated with a terrorist organization and that the applicant's attendance at the flight school could endanger the security of the United States.

## 9 FAM 302.6-3(B)(4)  (U) Not a Permanent Bar

*(CT:VISA-1351;   08-27-2021)*

**Unavailable**

## 9 FAM 302.6-3(C)  Unavailable

*(CT:VISA-2014;   06-20-2024)*

**Unavailable**

# 9 FAM 302.6-3(D)  (U) Waivers

## 9 FAM 302.6-3(D)(1)  (U) Waivers for Immigrants

*(CT:VISA-1798;   07-12-2023)*

**(U)** No waiver is available for an IV applicant found ineligible under INA 212(a)(3)(F).

## 9 FAM 302.6-3(D)(2)  (U) Waivers for Nonimmigrants

*(CT:VISA-1798;   07-12-2023)*

**(U)** An INA 212(d)(3)(A) waiver is available for an NIV applicant found ineligible under INA 212(a)(3)(F).

## 9 FAM 302.6-3(E)  Unavailable

### 9 FAM 302.6-3(E)(1)  Unavailable

*(CT:VISA-1351;   08-27-2021)*

**Unavailable**

### 9 FAM 302.6-3(E)(2)  Unavailable

*(CT:VISA-218;   10-20-2016)*

**Unavailable**

# 9 FAM 302.6-4  (U) SECTION 306 OF THE ENHANCED BORDER SECURITY AND VISA ENTRY REFORM ACT OF 2002 - 8 U.S.C. 1735 APPLICANTS FROM A STATE SPONSOR OF TERRORISM

## 9 FAM 302.6-4(A)  (U) Grounds

*(CT:VISA-1586;   07-26-2022)*

**(U)** Section 306 of the Enhanced Border Security and Visa Entry Reform Act of 2002 ("section 306"), 8 U.S.C. 1735, prohibits issuance of visas to NIV applicants from a state sponsor of terrorism unless the Secretary of State determines the applicant does not pose a threat to the safety and security of the United States.

## 9 FAM 302.6-4(B)  (U) Application

*(CT:VISA-2014;   06-20-2024)*

a. **Unavailable**

b. **Unavailable**

c. **Unavailable**

   (1)  **Unavailable**

(2) **Unavailable**

(3) **Unavailable**

    (a) **Unavailable**

    (b) **Unavailable**

(4) **Unavailable**

    (a) **Unavailable**

    (b) **Unavailable**

    (c) **Unavailable**

    (d) **Unavailable**

# 9 FAM 302.6-4(C)   Unavailable

*(CT:VISA-1586;   07-26-2022)*

a. **Unavailable**

b. **Unavailable**

    (1) **Unavailable**

    (2) **Unavailable**

c. **Unavailable**

# 9 FAM 302.6-4(D)   (U) Waivers

## 9 FAM 302.6-4(D)(1)   (U) Waivers for Immigrants

*(CT:VISA-1586;   07-26-2022)*

**(U)** IV applicants are not subject to Section 306.

## 9 FAM 302.6-4(D)(2)   (U) Waivers for Nonimmigrants

*(CT:VISA-1798;   07-12-2023)*

**(U)** No waiver is available for an NIV applicant ineligible under Section 306.

# 9 FAM 302.6-4(E)   Unavailable

## 9 FAM 302.6-4(E)(1)   Unavailable

*(CT:VISA-2014;   06-20-2024)*

**Unavailable**

6/30/25, 3:18 PM  9 FAM 302.6-4 (U) INELIGIBILITIES BASED ON DOCUMENTATION-RELATED GROUNDS - INA 212(A)(7) - INA 212(AF) AND 8 U.S.C. 1...

Case 1:25-cv-10685-WGY  Document 179-1  Filed 07/01/25  Page 165 of 185

## 9 FAM 302.6-4(E)(2)  Unavailable

*(CT:VISA-664;   08-22-2018)*

**Unavailable**

UNCLASSIFIED (U)

# EXHIBIT 18

**UNCLASSIFIED (U)**

# 9 FAM 403.11
# (U) NIV REVOCATION

*(CT:VISA-2150;   04-29-2025)*
*(Office of Origin:  CA/VO)*

# 9 FAM 403.11-1  (U) STATUTORY AND REGULATORY AUTHORITIES

## 9 FAM 403.11-1(A)  (U) Immigration and Nationality Act

*(CT:VISA-1;   11-18-2015)*

**(U)** INA 221(i) (8 U.S.C. 1201(i)).

## 9 FAM 403.11-1(B)  (U) Code of Federal Regulations

*(CT:VISA-1;   11-18-2015)*

**(U)** 22 CFR 41.122.

# 9 FAM 403.11-2  (U) NIV REVOCATION

*(CT:VISA-1;   11-18-2015)*

**(U)** Regulations no longer distinguish between invalidation and revocation in cases when it is determined that the bearer of a visa is ineligible.  The visa should be revoked in accordance with INA 221(i), 22 CFR 41.122 and this subchapter.

# 9 FAM 403.11-3  (U) WHEN TO REVOKE A VISA

## 9 FAM 403.11-3(A)  (U) When You May Revoke Visas

*(CT:VISA-1948;   03-07-2024)*

**(U) There are four circumstances under which you may revoke a visa:**

(1) **Unavailable**

(2) **(U)** The individual is not eligible for the visa classification (this includes ineligibility under INA 214(b));

   (3)  **(U)** The visa has been physically removed from the passport in which it was issued; or

   (4)  **(U)** The individual is subject to an IDENT Watchlist record in System Messages for an arrest or conviction of driving under the influence, driving while intoxicated, or similar arrests/convictions (DUI) that occurred within the previous five years, pursuant to 9 FAM 403.11-5(B) paragraph c, below.

## 9 FAM 403.11-3(B)  (U) When You May Not Revoke A Visa

*(CT:VISA-1463;   02-01-2022)*

a. **(U)** You do not have the authority to revoke a visa based on a suspected ineligibility or based on derogatory information that is insufficient to support an ineligibility finding, other than a revocation based on driving under the influence (DUI).  A consular revocation must be based on an actual finding that the individual is ineligible for the visa.

b. **(U)** Under no circumstances should you revoke a visa when the individual is in the United States, or after the individual has commenced an uninterrupted journey to the United States, other than a revocation based on driving under the influence (DUI).  Outside of the DUI exception, revocations of individuals in, or en route to, the United States may only be done by the Department's Visa Office of Screening, Analysis, and Coordination (CA/VO/SAC).

# 9 FAM 403.11-4  (U) REVOCATION PROCEDURES

## 9 FAM 403.11-4(A)  (U) Visa Revocations by Consular Officers

*(CT:VISA-2088;   10-02-2024)*

**(U)** Although the decision to revoke a visa is a discretionary one, you should not use this authority arbitrarily.  When practicable:

   (1)  **(U)** Notify the individual of the intention to revoke the visa;

   (2)  **(U)** Allow the individual the opportunity to show why the visa should not be revoked; and

   (3)  **(U)** Request the individual to present the travel document in which the visa was issued.

## 9 FAM 403.11-4(A)(1)  (U) Required Procedures

*(CT:VISA-2088;   10-02-2024)*

a. **(U) Informing Individual of Intent to Revoke Visa:**

(1) **(U)** Notify the individual of the intent to revoke a visa if such notification is practicable.  The notice of intent to revoke a visa affords the individual the opportunity to demonstrate why the visa should not be revoked.  An after-the-fact notice that the visa has already been revoked is not sufficient unless prior notice of intent to revoke was not practicable.

(2) **(U)** A prior notification of intent to revoke a visa would not be practicable if, for instance, you do not know the whereabouts of the individual, or if the individual's departure is believed to be imminent.  In cases where the individual can be contacted and travel is not imminent, prior notice of intent to revoke the visa is normally required, unless you have reason to believe that a notice of this type would prompt the individual to attempt immediate travel to the United States.

b. **(U) Physical Cancellation of Visa:**  If a decision to revoke the visa is reached after the case has been reviewed, print or stamp the word "REVOKED" in large block letters across the face of the visa.  Also date and sign this action.  If you are at a post other than the one where the visa was issued, the title and location of your post should be written below the signature.

c. **(U) If the Individual Possesses Another Valid U.S. Visa:**  When you have taken action to revoke a visa, you should determine whether the individual holds another current U.S. visa in the same or another passport. You should revoke that visa as well, if the grounds for revoking the first visa apply to any other visa the individual may hold, or if independent grounds for revocation apply.  In the latter case, if practicable, give the individual an opportunity to rebut or overcome that ground(s) of ineligibility.

d. **Unavailable**

e. **Unavailable**

# 9 FAM 403.11-4(A)(2)  (U) When to Notify Department Regarding Revocation

*(CT:VISA-1948;   03-07-2024)*

a. **(U)** If a visa is physically cancelled before the individual's departure to the United States, then there is no need to report the revocation to the Department, except in cases involving A, G, C-2, C-3, or NATO visas.

b. **(U)** L/CA, the Diplomatic Liaison Division (CA/VO/DO/DL), the Chief of Protocol (S/CPR), and the appropriate country desk should be promptly notified whenever any diplomatic or official visa, or any visa in the A, G, C-2, C-3, or NATO classification is revoked.

c.  **(U)** See 9 FAM 403.11-4(C)(1) below for more information about notifying the Department of visa revocations that may have political, public relations, or law enforcement consequences.

# 9 FAM 403.11-4(B)  Unavailable

*(CT:VISA-2088;   10-02-2024)*

a. **Unavailable**

b. **Unavailable**

c.  **(U)** See [9 FAM 402.8-8](#), Procedures to be Followed When Derogatory Information Received.

# 9 FAM 403.11-4(C)  (U) Revoking Visas in Sensitive Cases

## 9 FAM 403.11-4(C)(1)  (U) Keeping Department Informed in High Profile Cases

*(CT:VISA-1948;   03-07-2024)*

a. **(U)** You should be alert to the political, public relations, and law enforcement consequences that can follow a visa revocation and should work with the Department to ensure that all legally available options are fully and properly assessed.  The revocation of the visa of a public official or prominent local or international person can have immediate and long-term repercussions on our political relationships with foreign powers and on our public diplomacy goals in a foreign state.  The visa laws must be applied to such persons like any others, recognizing that certain visa categories, particularly A's and G's, are not subject to the same standards of ineligibility as others. Hasty action, however, must be avoided in such high-profile visa cases and you should seek the Department's guidance before any visa revocation unless unusual and exigent circumstances prevent such a consultation.  Consultation both within the mission and with the Department may result in a decision that the Department, rather than the consular officer, should undertake the revocation, since Department revocations pursuant to the Secretary's revocation authority provide more flexibility in managing the relevant issues.

b. **(U) When to Consult with the Department:**

(1)  **(U)** You are responsible for keeping the Department (CA/VO/SAC, CA/VO/F, L/CA, and the appropriate country desk) informed of visa actions that may affect our relations with foreign states or our public diplomacy, or that may affect or impede ongoing or potential investigations and prosecutions by U.S. and other cooperating foreign law enforcement agencies.

(2)  **(U)** This is particularly true when you use the power granted under INA 221(i) as implemented in 22 CFR 41.122 and this section, to revoke the visas of officials of foreign governments, prominent public figures, and subjects or potential subjects of U.S. and foreign criminal investigations.

(3)  **(U)** In such cases, you should seek the Department's guidance before any visa revocation unless unusual and exigent circumstances prevent such a consultation.  In the rare cases in which advance consultation is not possible, you should inform the Department immediately after the revocation.

c.  **Unavailable**

# 9 FAM 403.11-4(C)(2)  (U) Diplomatic and Official Visas

*(CT:VISA-1650;  11-21-2022)*

**(U)** You must keep in mind that most A, G, C-2, C-3, and North Atlantic Treaty Organization (NATO) visa categories are exempt from most INA 212(a) ineligibility provisions per 22 CFR 41.21(d).  Precipitant action must be avoided in cases involving foreign government officials and other prominent public figures.  Consultations at post and with the Department might result in the decision that the Department, rather than the consular officer, should undertake the revocation.  The Department's revocation authority provides more flexibility in managing relevant issues.  For example, Department revocations may be undertaken prudentially, rather than based on a specific finding of ineligibility and are not subject to the 22 CFR 41.122 requirement with respect to notification to the individual.

# 9 FAM 403.11-4(C)(3)  (U) When Revocation Subject is Subject of Criminal Investigation

*(CT:VISA-2088;  10-02-2024)*

a. **(U)** In cases in which the individual whose visa is revocable is also the subject of a criminal investigation involving U.S. law enforcement agencies, action without prior Department consultation and coordination could:

(1)  **(U)** Jeopardize an ongoing investigation;

(2)  **(U)** Prejudice an intended prosecution;

(3)  **(U)** Preclude apprehension of the subject in the United States;

(4)  **(U)** Put informants at risk; or

(5)  **(U)** Damage cooperative law enforcement relationships with foreign police agencies.

b. **Unavailable**

c.  **(U)** In deciding what cases to report in advance to the Department, err on the side of prudence.  It is always better to report cases requiring no Department action rather than having to inform the Department after the fact in a case that has adverse consequences for U.S. law enforcement or diplomatic interests.  Contact CA/VO/SAC and other functional bureaus, as appropriate.

# 9 FAM 403.11-5  (U) REVOCATION OF VISAS BY THE DEPARTMENT

*(CT:VISA-1948;   03-07-2024)*

a. **(U)** When the Department revokes a visa, when possible, a revocation notice will be sent to the consular section by email furnishing a point of contact in the Visa Office.  You must follow the instructions in the revocation notice.

b. **(U)** Although the Department is not required to notify an individual of a revocation done pursuant to the Secretary's discretionary authority, you should do so unless instructed otherwise, especially in cases where the revoked visa was issued to a government official.

## 9 FAM 403.11-5(A)  (U) Notice to Department of Presence in United States

*(CT:VISA-2150;   04-29-2025)*

a. **Unavailable**

b. **(U)** Upon receipt of your report, the Department will decide whether the visa should be revoked.  Alternatively, the Department may inform DHS of the data submitted and give DHS an opportunity to initiate proceedings under the pertinent provisions of INA 237.  If the latter course is followed, the Department will request that DHS advise the Department of the individual's date of departure and destination, so the individual's *visa may be physically canceled after their* departure from the United States.

## 9 FAM 403.11-5(B)  (U) Prudential Revocations

*(CT:VISA-2150;   04-29-2025)*

a. **(U)** Although you usually may revoke a visa only if the individual is ineligible under INA 212(a), or INA 214(b), or is no longer entitled to the visa classification, the Department may revoke a visa if an ineligibility or lack of entitlement is suspected, when an individual would not meet requirements for admission, or in other situations where warranted.  This is known as a "prudential revocation."  In addition to the conditions described in 9 FAM 403.11-5(A) above, the Department may revoke a visa when it receives derogatory information directly from another U.S. Government agency, including a member of the intelligence or law enforcement community.  These requests are reviewed by CA/VO/SAC/RC, which forwards an electronic memo requesting revocation to a duly authorized official in the Visa Office, along with a summary of the available intelligence and/or background information and any other relevant documentation.  When prudential revocation is approved, the subject's name is entered into CLASS, the visa case status is updated to "Revoke", and the revocation is communicated within the Department and to other agencies by the following means:

(1) **Unavailable**

(2) **Unavailable**

(3) **Unavailable**

b. **Unavailable**

c. **(U) Prudential Revocation for Driving Under the Influence:** Either the consular section or the Department has the authority to prudentially revoke a visa based on a potential INA 212(a)(1)(A) ineligibility when an IDENT Watchlist Record appears in System Messages for a CJIS Search of US-VISIT or a CJIS Search of OBIM record.  Before doing so, re-send the fingerprints to NGI to obtain a RAP sheet for an arrest or conviction of driving under the influence, driving while intoxicated, or similar arrests/convictions (DUI) that occurred within the previous five years.  This does not apply when the arrest has already been addressed within the context of a visa application; i.e., the individual has been through the panel physician's assessment due to the arrest.  This does not apply to other alcohol related arrests such as public intoxication that do not involve the operation of a vehicle.  Unlike other prudential revocations, you do not need to refer the case to the Department but can prudentially revoke on your own authority.  Process the revocation from the Spoil tab NIV and add P1A3 and VRVK lookouts from the Refusal window.

## 9 FAM 403.11-5(C)  Unavailable

*(CT:VISA-2150;   04-29-2025)*

a. **Unavailable**

b. **Unavailable**

c.  **Unavailable**

(1)  **Unavailable**

(2)  **Unavailable**

(3)  **Unavailable**

d. **Unavailable**

e. **Unavailable**

# 9 FAM 403.11-6  (U) RECONSIDERATION OF REVOCATIONS

# 9 FAM 403.11-6(A)  (U) Reinstatement Following Revocation

*(CT:VISA-2088;   10-02-2024)*

Unavailable

(1)  **Unavailable**

(2)  **(U) If Visa Has Been Revoked and Physically Canceled:** If a visa has been revoked and the revoked visa physically canceled, the individual may apply for a new visa; however, they may not travel on the physically cancelled visa.

(3)  **Unavailable**

(4)  **Unavailable**

# 9 FAM 403.11-7  (U) ACTIONS BY DHS

## 9 FAM 403.11-7(A)  (U) Cancellation of Visas by Immigration Officers Under 22 CFR 41.122(e)

*(CT:VISA-2088;   10-02-2024)*

a.  **(U) When a visa is canceled by a DHS officer, one of the following notations will normally be entered in the individual's passport:**

(1)  **(U)** Canceled.  Adjusted;

(2)  **(U)** Canceled.  Excluded. DHS (Office) (Date);

(3)  **(U)** Canceled.  Application withdrawn. DHS (Office) (Date);

(4)  **(U)** Canceled.  Final order of deportation/voluntary departure entered DHS (Office) (Date) Canceled.  Departure required.  DHS (Office) (Date);

(5)  **(U)** Canceled.  Waiver revoked. DHS (Office) (Date); and

(6)  **(U)** Canceled.  Presented by impostor.  DHS (Office) (Date).

b.  **(U)** Except when a visa is canceled after the individual's status has been adjusted to that of a permanent resident, DHS will inform the consular section that issued the visa of the cancellation action.  The I-275, Withdrawal of Application/Consular Notification form, will be used to inform consular officers at the issuing office of the cancellation action.  The I-275 form and any other attached forms should not be released to individuals or their representatives.

# 9 FAM 403.11-7(B)  (U) Voidance of Counterfeit Visas

*(CT:VISA-1275;   05-10-2021)*

**(U)** When DHS has determined through examination that a visa has been altered or is counterfeit, it will void the visa by entering one of the following notations on the visa page, together with the action officer's signature, title, and office location:

(1)  **(U)** Counterfeit visa per testimony of individual (file number); or

(2)  **(U)** Counterfeit visa per telecon, letter, e-mail from U.S. Embassy (U.S. Consul).

**UNCLASSIFIED (U)**

EXHIBIT 19

Secretary
**U.S. Department of Homeland Security**
Washington, DC 20528



April 16, 2025

Maureen Martin
School Code: BOS214F00162000
Harvard University
c/o Harvard International Office
1350 Massachusetts Ave., Rm. 864
Cambridge, MA 02138
Maureen_Martin@Harvard.edu

### Student and Exchange Visitor Program
### Student Records Request

It is a privilege to have foreign students attend Harvard University, not a guarantee. The United States Government understands that Harvard University relies heavily on foreign student funding from over 10,000 foreign students to build and maintain their substantial endowment. At the same time, your institution has created a hostile learning environment for Jewish students due to Harvard's failure to condemn antisemitism. As a reminder, President Donald J. Trump issued Executive Order 14188, which specifies that "[i]t shall be the policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." EO 14188 (Jan 29, 2025).

The Student and Exchange Visitor Program (SEVP) regularly monitors SEVP-approved schools to determine their compliance with governing regulations, and to ensure the accuracy of information in the Student and Exchange Visitor Information System (SEVIS) for such institutions, and for the nonimmigrant students and exchange visitors attending school. Your continued SEVP certification is contingent upon meeting the requirements of the U.S. Department of Homeland Security (DHS), set out in *Title 8 Code of Federal Regulations* (*8 CFR*). SEVP may request information regarding nonimmigrant students from certified schools under *8 CFR § 214.3(g)(1)*. Your school must submit the following information to our office on or before April 30, 2025:

1. Provide relevant information regarding each student visa holder's known illegal activity, and whether the activity occurred on campus.
2. Provide relevant information regarding each student visa holder's known dangerous or violent activity, and whether the activity occurred on campus.
3. Provide relevant information regarding each student visa holder's known threats to other students or university personnel, and whether the activity occurred on campus.
4. Provide relevant information regarding each student visa holder's known deprivation of rights of other classmates or university personnel, and whether the activity occurred on campus.

5.  Provide relevant information on whether any student visa holders have left Harvard University due to dangerous or violent activity or deprivation of rights, and whether the activity occurred on campus.
6.  Provide relevant information on whether any student visa holders have had disciplinary actions taken as a result of making threats to other students or populations or participating in protests, which impacted their nonimmigrant student status.
7.  Provide relevant information regarding each student visa holder's obstruction of the school's learning environment.
8.  Provide relevant information regarding each student visa holder's maintenance of at least the minimum required coursework to maintain nonimmigrant student status.

Providing materially false, fictitious, or fraudulent information may subject you to criminal prosecution under *18 USC § 1001*. Other possible criminal and civil violations may be applicable.

SEVP uses the school's Principal Designated School Official (PDSO) as the main point of contact on any issues that relate to the school's compliance with the regulations, per *8 CFR § 214.3(l)(1)(ii)*. Therefore, any requests from SEVP with relation to compliance with the recordkeeping, retention, reporting and other requirements of paragraphs *(f)*, *(g)*, *(j)*, *(k)*, and *(l)* of *8 CFR § 214.3* must be submitted by the PDSO who must also sign the attached attestation statement. The attestation statement will certify the evidence was submitted by the PDSO.

Failure to comply with this Student Records Request will be treated as a voluntary withdrawal, per *8 CFR § 214.3(h)(3)(vii)*. Therefore, in the event the school fails to respond to this request within the timeframe provided above, SEVP will automatically withdraw the school's certification. The withdrawal will not be subject to appeal.

**Harvard University must confirm receipt of this request immediately via email at** SupportSEVP@ice.dhs.gov**.**

Any questions regarding this request may be sent to SEVP Support at SupportSEVP@ice.dhs.gov, subject line: **Question: Harvard University - BOS214F00162000 – Student Records Request.**

All requested evidence must be submitted at one time via e-mail to SupportSEVP@ice.dhs.gov, subject line: **Attention: Harvard University - BOS214F00162000 – Student Records Request**. SEVP cannot accept any documentation from a third-party server such as Dropbox or Google Drive. All documents submitted to SEVP should be in a Portable Document Format (PDF). Please visit this website for guidelines to submitting PDF documents.

Sincerely,

Kristi Noem
Secretary of Homeland Security

Page 3 of 3
Harvard University- BOS214F00162000

### Evidence Attestation Statement

I, _____ , Primary Designated School Official (PDSO) of
_____ , an institution certified by the Student and Exchange
Visitor Program (SEVP), attest the following is true:

As PDSO, I am the point of contact for any issues that relate to the school's compliance with the
regulations relating to nonimmigrant students and SEVP-certified schools per 8 CFR § 214.3(l)(1)(ii). I
understand SEVP may review my institution's certification at any time and may request documentation
to establish my institution's eligibility for certification as well as review evidence and records for
compliance with the regulations. I am responsible for any requests for documentation or evidence in
connection with an out-of-cycle review on behalf of my institution.

Additionally, I attest:

- I have read, understood, and will comply with all federal regulations relating to nonimmigrant
  students;
- I am a citizen / lawful permanent resident of the United States and maintain copies of a passport,
  birth certificate and/or green card for myself and all DSOs employed by my institution.
  Additionally, copies of these documents are readily accessible and are available to the SEVP
  upon request;
- I understand that willful misstatements may constitute perjury (18 USC § 1621);
- I understand that providing materially false, fictitious, or fraudulent information may subject me
  to criminal prosecution under 18 USC § 1001. Other possible criminal and civil violations may
  also be applicable; and
- I prepared the evidence sent to SEVP in response to its Request for Student Records dated April
  16, 2025.


_____          _____
Printed name of PDSO                     Signature of PDSO


_____
Date

EXHIBIT 20


U.S. Department of Homeland Security

# 100 Days of Fighting Fake News

**Release Date:** April 30, 2025

*From Stories on Criminals to Statistics, DHS has been Holding the Media Accountable for Spreading Disinformation to the American people*

WASHINGTON— During President Trump's 100 days in office, the Department of Homeland Security published a non-exhaustive list of facts, to help set the record straight on numerous false and misleading stories that have spread around news coverage and social media.

The list can be found below:

## The Facts on Noteworthy Individuals Deported or Prevented from Entering the U.S.

- **The Deportation Of American Citizens**
  - The media has FALSELY claimed that ICE is deporting US citizen children of illegal aliens. This is false.
  - In both cases the mother made the determination to take her children with her back to Honduras.
  - DHS takes our responsibility to protect children seriously and will continue to work with federal law enforcement to ensure that children are safe and protected.
  - The Trump Administration is giving parents in this country illegally the opportunity to self-deport and take control of their departure process with the potential ability to return the legal, right way and come back to live the American dream. The CBP Home app is a free and easy way to self deport.
- **Kilmar Abrego Garcia - The "Maryland Man"**
  - Garcia is NOT an American citizen. He is a citizen of El Salvador who had been living in the country illegally.
  - In 2019, two courts – an immigration court and an appellate immigration court – ruled that he was not only a member of MS-13, but that he was in our country illegally. There was a deportation order for him dating back to 2019.
  - Further details about Garcia's history prove that he is far from innocent.
    - In 2020, his wife filed a petition for protection citing three separate instances of violence
    - In 2021, his wife filed for a restraining order against him due to domestic violence.
    - In 2022, Garcia was pulled over by Tennessee Highway Patrol with 8 people crammed into one car. Despite telling the officers that they were going on a trip from Houston, Texas to Temple Hills, Maryland, there was no sign of luggage in the car.
    - It was later revealed that the vehicle Garcia was driving during this stop was registered to another illegal alien who had been convicted of human trafficking, Jose Ramon Hernandez Reyes.
  - The media further claimed that the Supreme Court ordered the Trump Administration to return Garcia to the United States. This is another falsehood.
  - The Supreme Court unanimously overturned that judge's ruling but instead said that the United States should "facilitate" Garcia's return. This would only be possible if the government of El Salvador decided to return him, in which case the United States would have to provide transportation.
  - It's up to Salvadoran President Nayib Bukele and the government of El Salvador if they want to return him. But as President Bukele said during his Oval Office visit with President Trump, he has no intention of releasing a terrorist and sending him back to the United States.
  - When President Trump declared MS-13 a foreign terrorist organization, Abrego Garcia became no longer eligible for any form of immigration relief in the United States. He had a valid deportation order.
  - Furthermore, the Supreme Court also held that EVEN IF El Salvador returned this MS-13 member to the United States, we could deport him a second time. NO version of this legally ends with him ever living in the U.S., because he is a citizen of El Salvador.
  - The foreign policy of the United States is conducted by the President – not by a court – and no court in the United States has the power to conduct the foreign policy of the United States.
- **Dr. Rasha Alawieh - "The Brown University Assistant Professor"**
  - Dr. Rasha Alawieh was an assistant professor at Brown University. She was in the United States with an H-1B visa.
  - She was deported back to her home country of Lebanon after she admitted to attending the funeral of Hassan Nasrallah, a brutal terrorist who led Hezbollah and was responsible for killing hundreds of Americans.

- The media tried to portray Alawieh's case as an example of a "lawful immigrant" being deported. But they completely ignored her direct and alarming ties to radical Islamic terrorism, including her veneration of a dead terrorist leader.
- **Alfredo "Alex" Orellana - "The Caregiver"**
  - Alfredo "Alex" Orellana has multiple charges on his record from 2012 to 2019, including: distributing drugs, drug possession, assault and battery, failure to appear to court (twice), theft at the second degree, and larceny.
  - He has since been arrested and faces deportation.
  - The New York Times wrote a lengthy article on Orellana's case. Their article painted a picture of a loving 31-year-old caregiver who was the "best friend" of a 28-year-old autistic man. They also pointed to the fact that Orellana had a green card. The press tried to paint him as a victim who was a caretaker, despite violent charges on his record.
- **Jerce Reyes Barrios - "The Venezuelan Soccer Player"**
  - Jerce Reyes Barrios was in the United States illegally. He was a member of the vicious Tren de Aragua gang, and he was deported to El Salvador.
  - He has tattoos that are consistent with those indicating membership in the vicious Tren de Aragua gang.
  - His own social media indicates that he is a Tren de Aragua member.
  - That hasn't stopped the media, however. They tried to whip up a frenzy over this deported criminal gang member, publishing wild claims that he was deported because of a tattoo of a soccer team on his arm.
  - The facts are the facts. Our intelligence assessments go beyond just social media and tattoos. We are confident in our findings.
- **Nascimento Blair - "The Ex-Con"**
  - Blair was an illegal alien living in the United States who was tried and convicted for kidnapping and sentenced to 15 years in prison.
  - The New York Times published a fawning profile about this criminal illegal alien.
  - In 2008, he was ordered removed out of the country. However, because of the Biden administration's open border policies, this criminal illegal alien was released onto the streets of New York.
  - The Trump administration is putting the American people first by getting this criminal illegal alien off the streets and out of our country.
- **"The French Scientist Denied Entry Over His Political Views"**
  - In March, a French scientist was denied entry into the United States.
  - The researcher in question was in possession of confidential information on his electronic device from Los Alamos National Laboratory.
  - This was in clear violation of a non-disclosure agreement - something he admitted to taking without permission and attempted to conceal to authorities.
  - The mainstream media ran with the baseless narrative that this individual was blocked from entering the U.S. because of social media posts that were critical of President Trump.
  - This lie was even echoed by France's Minister for Higher Education, Philippe Baptiste.
  - His political beliefs were not considered at all in his removal.
- **Marie Lepère and Charlotte Pohl – "German Tourists Turned Away on Vacation"**
  - Two German tourists were denied entry after attempting to enter the U.S. under false pretenses.
  - Both claimed they were touring California but later admitted that they intended to work.
  - One used a Visitor visa, while the other used the Visa Waiver Program. Under U.S. immigration laws, work is prohibited for these visas.
  - The media version of events depicted two young women who tried to go on a five-week backpacking trip through the United States. The media claimed that the two – aged 18 and 19 – were "deported" because they simply wanted to go on a fun, loosely-planned trip.
  - These travelers weren't deported—they were denied entry. And the reason for their removal was visa fraud, not because of the planning nature of their so-called "vacation."
- **Jose Hermosillo – "The American Citizen Detained by Border Patrol"**
  - Hermosillo turned himself in to immigration authorities on April 8. He approached Border Patrol in Tucson, Arizona and declared that he had entered the U.S. illegally.
  - He completed a sworn statement identifying as a Mexican citizen who had entered unlawfully. He was processed and appeared in court on April 11. Afterwards, he was held by the U.S. Marshals in Florence, Arizona.
  - A few days later, his family presented documents showing U.S. citizenship. The charges were dismissed, and he was released to his family.
  - The media, instead of reporting the facts, created a false and baseless story that an American citizen was illegally detained.
  - Hermosillio's arrest was the direct action of his own actions and statements. When his citizenship was confirmed, he was promptly released back to his family.
- **Kseniia Petrova - "The Russian Scientist Trying to Cure Cancer"**
  - Kseniia Petrova, a Russian researcher working for Harvard University, was lawfully detained after lying to federal officers about carrying substances into the country. A subsequent K9 inspection uncovered undeclared petri dishes, containers of unknown substances, and loose vials of embryonic frog cells, all without proper permits.
  - Messages found on her phone revealed she planned to smuggle the materials through customs without declaring them.
  - She knowingly broke the law and took deliberate steps to evade it.
  - But upon her detainment, the media rushed to defend her by claiming that her research could help to cure cancer.

- The facts of the matter are simple: Petrova broke the law and actively planned to do so. Her research does not make her exempt from the laws of our country.

- **Renato Subotic – "The MMA Coach"**
  - Subotic is an MMA coach who entered the United States under a visa waiver program that prohibits compensation – only travel reimbursements are allowed.
  - When Subotic was detained under American law, the media claimed that he was thrown in prison and deported for no real reason. Here are the facts: Subotic couldn't meet the requirement to prove he wasn't being compensated for participating at a high-dollar, multi-day event.
  - The law is clear: the burden of proof is on the traveler. Since he couldn't provide detailed answers or the necessary documentation for compensation related to the work event, he was held until the next available flight out the following day.

- **Ricardo Jesus Prada Vasquez – The "Disappearing" Delivery Driver**
  - Yet again, the media has manufactured a fake controversy on behalf of a terrorist gang member and criminal illegal alien.
  - Ricardo Jesus Prada Vasquez is a Venezuelan national and confirmed member of Tren De Aragua. He entered the United States illegally on November 29, 2024 at the Brownsville, Texas Port of Entry via the CBP One App.
  - The Biden administration, like it did with so many other dangerous criminals, released Prada Vasquez back into the United States.
  - On January 15th, Prada was encountered trying to enter the U.S. from Canada. He was detained, investigated, and confirmed as a member of TDA and a public safety threat. On February 27, a judge ordered him removed from the U.S. He was then removed to El Salvador.
  - The media, however, has falsely claimed that Prada Vasquez was an innocent delivery driver who was "disappeared" by the government.
  - Prada Vasquez was living and working in the U.S. illegally, he was a member of a criminal gang designated as a terrorist organization, and was deported with full compliance with American law.

- **Jeanette Vizguerra – "The Activist Who Needed Sanctuary"**
  - Jeanette Vizguerra is a convicted criminal alien from Mexico who has a final order of deportation issued by a federal immigration judge. She illegally entered the United States near El Paso, Texas, on Dec. 24, 1997, and has received legal due process in U.S. immigration court.
  - The media, however, has tried to turn her into a martyr. They claim she was an "activist" who needed "sanctuary." In reality, she getting famous and making money for breaking the law.
  - Under President Trump, this is a nation of laws. We will find, arrest, and deport illegal aliens, no matter how famous the media thinks they are.
  - Vizguerra was in the United States illegally. She was convicted of breaking the law. She was deported.
  - If you come to our country illegally, we will deport you, and you will never return. The safest option for illegal aliens is to self-deport, so they still have the opportunity to return and live the American dream.

## The Facts on Those Who Have Abused The Privilege of a Student Visa

- **Yunseo Chung – "The Columbia Student"**
  - Yunseo Chung, who was born in South Korea, is a Columbia University student who engaged in concerning conduct on-campus. This includes her being arrested by NYPD during a pro-Hamas protest at Barnard College.

- **Mahmoud Khalil - "The Activist Leader at Columbia"**
  - Mahmoud Khalil, a former Columbia University graduate student from Syria, is one of the ringleaders of the vicious, anti-American, anti-Semitic protests at Columbia University. His activities are aligned with Hamas, a designated terrorist organization.
  - On March 9, 2025, in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State, U.S. Immigration and Customs Enforcement arrested Khalil.
  - But upon his arrest, radical student protesters at Columbia and across the country have attempted to turn him into a martyr, waving signs and banners bearing his likeness.
  - Taking over private buildings, inciting violence, harassing Jewish students, defacing buildings, and passing out terrorist propaganda do not constitute free speech.
  - A judge ruled that Khalil's deportation can move forward. He will be removed from our country.

- **Mohsen Mahdawi – "The Palestinian at Columbia University"**
  - Mahdawi is a Palestinian who has been living in the United States on a visa while he was studying at Columbia University.
  - Like many other anti-Israel student protesters, supporters in the media tried to claim that Mahdawi was a victim of political persecution. But his rhetoric on the war in Israel proves his terrorist sympathies.
  - In the wake of October 7, Mahdawi said he could empathize with Hamas's attack on Israel.
  - He appeared on "60 Minutes" justifying the massacre.
  - He organized and led pro-Hamas protests on Columbia University's campus, harassed Jewish students, and openly displayed his support for a terrorist organization.

- **Leqaa Kordia – "The Palestinian at Columbia University"**

- Leqaa Kordia was another Columbia Student who actively participated in anti-American, pro-terrorist activities on campus.
- However, her arrest had nothing to do with her radical activities.
- Kordia was arrested for immigration violations due to having overstayed her F-1 student visa, which had been terminated on January 26, 2022 for lack of attendance
- **Dogukan Gunaydin - "The University of Minnesota Student"**
  - Dogukan Gunaydin, a graduate student at the University of Minnesota, was arrested after a visa revocation by the State Dept. related to a prior criminal history for a DUI.
  - Contrary to the mainstream media's quick speculation that he was arrested due to his involvement in student protests, his protest activity had nothing to do with his detainment.
- **Badar Khan Suri – "The Georgetown Foreign Exchange Student"**
  - Suri was a foreign exchange student at Georgetown University actively spreading Hamas propaganda and promoting antisemitism on social media.
  - The media calls him a "scholar" who was innocent of any wrongdoing, even though he was married to the daughter of a senior advisor for to Hamas terrorist group.
- **Momodou Taal – "The Cornell University Student"**
  - Taal was unapologetic in his pro-terrorist views.
  - Taal, a foreign student studying at Cornell University, participated in pro-Hamas protests on campus.
  - He has a pinned post on his X profile that talks about a so-called "Zionist genocide," and also states "Long live the student intifada!"

## Other Fake News Narratives Corrected

- **The Biden Administration's inflated deportation numbers**
  - DHS uncovered what should be a massive scandal: the Biden administration was cooking the books on ICE arrest data. They were purposefully misleading the American public by categorizing individuals processed and released into the interior of the United States as ICE arrests.
  - Of course, the media ignored this fact. Instead, they falsely claimed that the Biden administration had carried out more arrests than the Trump administration.
  - Tens of thousands of cases recorded as "arrests" were, in fact, instances where illegal aliens were simply processed and released into American communities.
  - Many of these were violent criminals and gang members.
  - The previous administration counted these as arrests even though no immigration enforcement action was taken.
  - During fiscal year 2024, ICE made 113,431 arrests but the vast majority of those were what we call "pass-through" arrests.
  - They are called pass-through arrests because ICE didn't take enforcement actions against these aliens. They just passed through ICE before they were released in the U.S. interior and told to report to an ICE office.
  - None of the arrests made by ICE since January 20th are pass-through arrests.
  - The difference between recent arrests and those from Biden's last year is that, now we're taking enforcement actions against each and every illegal alien arrested.
- **ICE Boston Militia rumors:**
  - The media eagerly fed and spread a false social media rumor that an ICE agent who conducted arrests of criminal illegal aliens in New England was a "militia leader" from Arizona.
  - The reality? He is a federal law enforcement office who has worked with ICE to help keep New England communities safe for years.
  - This claim was not only false, but also inflammatory and places the safety of federal officers in jeopardy.
  - Our ICE officers are facing 300% increase in assaults while carrying out enforcement operations.
- **Due process and treatment rumors in CECOT:**
  - These aliens HAVE had due process – we have a stringent law enforcement assessment in place that abides by due process under the U.S. Constitution.
  - The reality is that prison isn't supposed to be fun. It's a necessary measure to protect society and punish bad guys. It is not meant to be comfortable.
  - What's more: prison can be avoided by self-deportation. CBP Home makes it simple and easy.
  - If you are a criminal alien and we have to deport you, you could end up in Guantanamo Bay or CECOT. Leave now.
- **DOGE and ICE allegedly collecting sensitive data from the Centers for Medicare and Medicaid Services**
  - The Biden administration flooded the U.S. with tens of millions of illegal immigrants, many of which are exploiting the American taxpayer by illegally getting Medicare and other benefits meant for law-abiding Americans.
  - President Trump consistently promised to protect Medicare for eligible beneficiaries.
  - To keep that promise, DOGE, CMS, and DHS are exploring an initiative to ensure that illegal aliens are not receiving these benefits not meant for them.

- The media claimed that ICE is working with the Department of Government Efficiency (DOGE) to access sensitive personal information in order to identify illegal aliens. These claims are meant to frighten the American people, when in reality this process is working to keep them and their benefits safe from exploitation by illegal aliens.

- **ICE HSI presence at schools**
  - ICE's Homeland Security Investigations (HSI) works relentlessly to protect Americans, especially children, who are put in danger by illegal alien activity. This includes investigations into potential child sex trafficking.
  - But the media has tried to spin their investigative work into the idea that they are going to elementary schools to arrest children.
  - **HD Cooke Elementary School, Washington D.C.**
    - At the HD Cooke Elementary School in Washington D.C., ICE did not conduct any enforcement action at the school. HSI agents were present at the school unrelated to any kind of enforcement action.
  - **Russel Elementary and Lillian Elementary in Los Angeles:**
    - At two different elementary schools in Los Angeles, California, HSI officers were conducting wellness checks on children who arrived unaccompanied at the border. It had nothing to do with immigration enforcement.
  - DHS is leading efforts to conduct welfare checks on these children to ensure that they are safe and not being exploited, abused, and sex trafficked.
  - Unlike the previous administration, President Trump and Secretary Noem take the responsibility to protect children seriously and will continue to work with federal law enforcement to reunite children with their families.
  - In less than 70 days, Secretary Noem and Secretary Kennedy have already reunited nearly 5,000 unaccompanied children with a relative or safe guardian.

- **Immigrant children detained at Old McDonald Farm in New York**
  - In early April, a raid was carried out on a dairy farm in New York after the execution of a federal criminal warrant for an illegal alien in possession of + distributing child sexual abuse materials.
  - Upon the execution of the search warrant at Old McDonalds Farm in Sackets Harbor, New York, authorities encountered seven additional illegal aliens on the premises, including a mother and her three children. We immediately began conducting an investigation to ensure these children are not being sexually exploited.
  - But rather than address the very real evidence of child sexual abuse, the media chose to focus on the fact that a woman and her three children were taken into custody.
  - DHS takes its responsibility to protect children seriously and our ICE officers are working every day to remove pedophiles from American communities.

- **TDA members being identified via tattoos**
  - Some have claimed that DHS' assessments of TDA and other gang memberships are based solely on the tattoos that certain illegal aliens have.
  - DHS intelligence assessments go well beyond just gang affiliate tattoos and social media.
  - Tren De Aragua is one of the most violent and ruthless terrorist gangs on planet earth. They rape, maim, and murder for sport. President Trump and Secretary Noem will not allow criminal gangs to terrorize American citizens.
  - We are confident in our law enforcement's intelligence, and we aren't going to share intelligence reports and undermine national security every time a gang member denies he is one. That would be insane.

## Topics

BORDER SECURITY (/TOPICS/BORDER-SECURITY)    HOMELAND SECURITY ENTERPRISE (/TOPICS/HOMELAND-SECURITY-ENTERPRISE)
HUMAN TRAFFICKING (/TOPICS/HUMAN-TRAFFICKING)    IMMIGRATION AND CUSTOMS ENFORCEMENT (/TOPICS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT)

## Keywords

BORDER SECURITY (/KEYWORDS/BORDER-SECURITY)    BORDER WALL (/KEYWORDS/BORDER-WALL)
CUSTOMS AND BORDER PROTECTION (CBP) (/KEYWORDS/CUSTOMS-AND-BORDER-PROTECTION-CBP)
DEPARTMENT OF GOVERNMENT EFFICIENCY (DOGE) (/KEYWORDS/DEPARTMENT-GOVERNMENT-EFFICIENCY-DOGE)
DEPARTMENT OF HOMELAND SECURITY (DHS) (/KEYWORDS/DEPARTMENT-HOMELAND-SECURITY-DHS)    DEPORTATION (/KEYWORDS/DEPORTATION)
HOMELAND SECURITY INVESTIGATIONS (HSI) (/KEYWORDS/HOMELAND-SECURITY-INVESTIGATIONS-HSI)
IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) (/KEYWORDS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT-ICE)

Last Updated: 05/27/2025