**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---

AMERICAN ASSOCIATION OF UNIVERSITY
PROFESSORS, ET AL.,

                Plaintiffs,

      v.

MARCO RUBIO, ET AL.,

                Defendants.

---

Case No. 1:25-cv-10685 (WGY)

**PLAINTIFFS' PRETRIAL BRIEF**

**Table of Contents**

Table of Authorities...................................................................................................iii

Introduction ............................................................................................................1

Statement of Facts ..................................................................................................3

I.    The Executive Orders .................................................................................3

II.   The Ideological Deportation Policy..........................................................5

      A.    Defendants Describe the Policy........................................................6

      B.    Defendants Implement the Policy .....................................................8

      C.    Defendants Enforce the Policy .......................................................14

III.  Expressive and Associational Harms to Plaintiffs and their Noncitizen and Citizen Members ....................................................................................16

      A.    Harms to Plaintiffs' Noncitizen Members.......................................17

            1.    Nadje Al-Ali ........................................................................17

            2.    Cinzia Arruzza ....................................................................19

            3.    Megan Hyska .......................................................................20

            4.    Bernhard Nickel....................................................................21

      B.    Harms to Plaintiffs' Citizen Members.............................................22

            1.    Nadia Abu El-Haj ................................................................22

      C.    Harms to Plaintiffs AAUP and MESA ...........................................24

            1.    AAUP ..................................................................................24

            2.    MESA .................................................................................25

Argument ...............................................................................................................26

I.    Plaintiffs AAUP and MESA have standing...............................................26

      A.    The AAUP and MESA have associational standing to assert the rights of their noncitizen and citizen members..........................................27

      B.    The AAUP and MESA have organizational standing. ....................32

II.     The ideological deportation policy violates the First Amendment. ............................34

        A.     Defendants have an ideological deportation policy.............................34

        B.     The ideological deportation policy is unconstitutional because it
               discriminates on the basis of viewpoint.............................................36

        C.     The ideological deportation policy is unconstitutionally retaliatory...............41

III.    Defendants' coercive threats independently violate the First Amendment................43

IV.     The ideological deportation policy violates the APA....................................47

        A.     The policy is subject to review under the APA. ...............................47

        B.     The ideological deportation policy is contrary to constitutional right
               and arbitrary and capricious. ........................................................51

Conclusion.........................................................................................................51

## Table of Authorities

**Cases**

*AAUP v. Rubio*, No. 25-cv-10685, 2025 WL 1235084 (D. Mass Apr. 29, 2025)..................passim

*Abourezk v. Reagan*, 592 F. Supp. 880 (D.D.C. 1984) ...............................................................40

*Abourezk v. Reagan*, 785 F.2d 1043 (D.C. Cir. 1986) ....................................................38, 40, 50

*Aditya W. H. v. Trump*, No. 25-CV-1976, 2025 WL 1420131 (D. Minn. May 14, 2025)....................................................................................................................................40, 43

*Al Otro Lado, Inc. v. Nielsen*, 327 F. Supp. 3d 1284 (S.D. Cal. 2018) ........................................50

*Allende v. Shultz*, 605 F. Supp. 1220 (D. Mass. 1985) .................................................................40

*Allende v. Shultz*, 845 F.2d 1111 (1st Cir. 1988).........................................................................40

*Am. Acad. of Religion v. Chertoff*, 463 F. Supp. 2d 400 (S.D.N.Y 2006)....................................40

*Am. Acad. of Religion v. Napolitano*, 573 F.3d 115 (2d Cir. 2009) .............................................41

*Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045 (9th Cir. 1995)............................39

*Amadei v. Nielsen*, 348 F. Supp. 3d 145 (E.D.N.Y. 2018)....................................................35, 48

*Aracely v. Nielsen*, 319 F. Supp. 3d 110 (D.D.C. 2018) .............................................................35

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) .............................................................44, 45

*Bennett v. Spear*, 520 U.S. 154 (1997).......................................................................................47

*Berner v. Delahanty*, 129 F.3d 20 (1st Cir. 1997).......................................................................29

*Biden v. Texas*, 597 U.S. 785 (2022)...........................................................................................51

*Bridges v. Wixon*, 326 U.S. 135 (1945).......................................................................................39

*CSL Plasma Inc. v. CBP*, 33 F.4th 584 (D.C. Cir. 2022) ...........................................................50

*Diamond Alt. Energy v. EPA*, No. 24-7, 2025 WL 1716141 (U.S. June 20, 2025) ...............32, 34

*Doe v. U.S. Immigr. & Customs Enf't*, 490 F. Supp. 3d 672 (S.D.N.Y. 2020) ............................50

*Dream Defs. v. Governor of the State of Fla.*, 57 F.4th 879 (11th Cir. 2023) .............................30

*Elec. Priv. Info. Ctr. v. DHS*, 653 F.3d 1 (D.C. Cir. 2011) .........................................................35

*Ercelik v. Hyde*, No. 1:25-CV-11007, 2025 WL 1361543 (D. Mass. May 8, 2025)...............40, 43

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) .............................................................51

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) .............................................................30

*Gattineri v. Town of Lynnfield, Mass.*, 58 F.4th 512 (1st Cir. 2023) ...........................................41

*Gentile v. State Bar of Nev.*, 501 U.S. 1030 (1991) .....................................................................38

*Goldstein v. Galvin*, 719 F.3d 16 (1st Cir. 2013) .........................................................................44

*Greater Bos. Legal Servs. v. DHS*, 2022 WL 138629 (D. Mass. Jan. 14, 2022)...............35, 47, 49

*Harvard L. Sch. Forum v. Shultz*, 633 F. Supp. 525 (D. Mass. 1986) .........................................40

*Harvard L. School Forum v. Shultz*, 852 F.2d 563 (1st Cir. 1986) ..............................................40

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)...............................................................33

*Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010)...............................................................38

*Hoye v. City of Oakland*, 653 F.3d 835 (9th Cir. 2011) ..............................................................35

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977)..............................................27

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995) .......................32

*In re Fin. Oversight and Mgmt. Bd. for P.R.*, 110 F.4th 295 (1st Cir. 2024) ...............................27

*Khedkar v. U.S. Citizenship & Immigr. Servs.*, 552 F. Supp. 3d 1 (D.D.C. 2021).......................50

*Kleindienst v. Mandel*, 408 U.S. 753 (1972) ........................................................................31, 40

*Kwong Hai Chew v. Colding*, 344 U.S. 590 (1953) .....................................................................39

*Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965)......................................................................31

*Larson v. Valente*, 456 U.S. 228 (1982) .....................................................................................30

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) .............................50

*Louis v. Saferent Sols., LLC*, 685 F. Supp. 3d 19 (D. Mass. 2023)..............................................33

*Lozman v. City of Riviera Beach, Fla.*, 585 U.S. 87 (2018)........................................................41

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .........................................................................28

*Mahdawi v. Trump*, No. 2:25-CV-389, 2025 WL 1243135 (D. Vt. Apr. 30, 2025) ..............40, 42

*Mangual v. Rotger-Sabat*, 317 F.3d 45 (1st Cir. 2003) ................................................... 29

*Massachusetts v. E.P.A.*, 549 U.S. 497 (2007) ............................................................... 30

*Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 923 F.3d 209 (1st Cir. 2019) ......................................................................................................................... 33

*Melone v. Coit*, 100 F.4th 21 (1st Cir. 2024) ................................................................. 51

*Mohammed H. v. Trump*, No. 25-CV-1576, 2025 WL 1692739 (D. Minn. June 17, 2025) ........................................................................................................................ 40, 43

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ..................... 51

*Murthy v. Missouri*, 603 U.S. 43 (2024) ........................................................................ 31

*N.H. Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8 (1st Cir. 1996) ............................. 28

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243 (D. Md. 2025) .................................................................................................................. 30

*Nat'l Educ. Ass'n v. United States Dep't of Educ.*, No. 25-CV-091-LM, 2025 WL 1188160 (D.N.H. Apr. 24, 2025) ............................................................................ 30, 46

*NRA v. Vullo*, 602 U.S. 175 (2024) ..................................................................... 44, 45, 46

*Öztürk v. Trump*, No. 2:25-CV-374, 2025 WL 1145250 (D. Vt. Apr. 18, 2025) ................... 40, 42

*Parcham v. INS*, 769 F.2d 1001 (4th Cir. 1985) ............................................................ 39

*Perkins Coie LLP v. U.S. Dep't of Just.*, No. 25-716, 2025 WL 1276857 (D.D.C. May 2, 2025) ....................................................................................................... 44

*Pham v. Ragbir*, 141 S. Ct. 227 (2020) ......................................................................... 38

*Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009) .......................................... 44

*President & Fellows of Harvard Coll. v. DHS.*, No. 25-cv-11472, 2025 WL 1737493 (D. Mass. June 23, 2025) ................................................................... 46

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ............................................................. 39

*R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) ............................................ 47, 48

*Ragbir v. Homan*, 923 F.3d 53 (2d Cir. 2019) .......................................................... 37, 40

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015) ..................................................... 36

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) .............................................................. 31

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ...............................36, 38

*Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, 123 F.4th 1 (1st Cir. 2024)...............47, 49

*Sierra Club v. Trump*, 929 F.3d 670 (9th Cir. 2019)........................................................49

*Velesaca v. Decker*, 458 F. Supp. 3d 224 (S.D.N.Y 2020) .....................................47, 49

*Venetian Casino Resort LLC v. EEOC,* 530 F.3d 925 (D.C. Cir. 2008) .......................................48

*Virginia v. Black*, 538 U.S. 343 (2003) ..............................................................37

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015)...........................44

**Statutes**

5 U.S.C. § 704 ....................................................................................................47

8 U.S.C. § 1101 ...................................................................................................50

8 U.S.C. § 1182 ..............................................................................................4, 5

8 U.S.C. § 1184 ...................................................................................................11

8 U.S.C. § 1227 ...........................................................................................4, 6, 10

**Other Authorities**

Executive Order No. 13,899, *Combating Anti-Semitism*, 84 Fed. Reg. 68779 (Dec. 11, 2019)....................................................................................................4

Executive Order No. 14,161, *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats*, 90 Fed. Reg. 8451 (Jan. 20, 2025) ..........................................................................................3

Executive Order No. 14,188, *Additional Measures to Combat Anti-Semitism*, 90 Fed. Reg. 8847 (Jan. 29, 2025).........................................................................3, 4

**Introduction**

In response to Executive Orders issued by President Trump shortly after taking office, Defendants adopted a policy of revoking the visas and green cards of, and arresting, detaining, and deporting noncitizen students and faculty who engage in pro-Palestinian advocacy (the "ideological deportation policy"). The intent of this policy was to suppress the protests that spread on college campuses following the Hamas-led attacks on Israel of October 7, 2023, and the subsequent bombing and invasion of Gaza. The policy's effects have been swift. Noncitizen students and faculty across the United States have been terrified into silence. Students and faculty are avoiding political protests, purging their social media, and withdrawing from public engagement with groups associated with pro-Palestinian viewpoints. They're abstaining from certain public writing and scholarship they would otherwise have pursued. They're even self-censoring in the classroom.

In public, Defendants have described their policy, defended it, and taken political credit for it. It is only now that the policy has been challenged that they say, incredibly, that the policy does not actually exist. But the evidence at trial will show that the policy's existence is beyond cavil. Defendants have described the policy at length in official statements made to the public. They have implemented the policy in a variety of ways, including: by issuing formal guidance relating to the revocation of visas and green cards; by establishing processes for identifying those engaged in pro-Palestinian advocacy; and by establishing processes for then revoking the visas or green cards of their targets. Defendants have also enforced the policy against potentially hundreds of noncitizen students and faculty, including most prominently Mahmoud Khalil, Rümeysa Öztürk, Mohsen Mahdawi, Yunseo Chung, and Badar Khan Suri.

The ideological deportation policy is unlawful. The policy violates the First Amendment because it is impermissibly viewpoint discriminatory and, separately, because it was adopted to retaliate against protected speech. And it violates the Administrative Procedure Act because it is contrary to constitutional right and arbitrary and capricious. Defendants' campaign of threats against noncitizen students and faculty who engage in pro-Palestinian advocacy independently violates the First Amendment because it crosses the line from legitimate government speech into impermissible coercion. While the government can generally say what it wishes—even forcefully—it may not threaten legal sanctions to silence protected speech.

Plaintiffs American Association of University Professors ("AAUP") and Middle East Studies Association ("MESA") have standing to raise these claims. The AAUP and MESA are associations whose members include tens of thousands of faculty and students across the country. They brought this action because the ideological deportation policy, and the repressive climate it has engendered on college campuses, has far-reaching implications for the expressive and associational rights of their noncitizen and citizen members, and for Plaintiffs themselves. The AAUP's and MESA's noncitizen members have been harmed because the policy has forced them into silence. The AAUP's and MESA's citizen members have been harmed in their ability to hear from, and associate with, their noncitizen students and colleagues. The AAUP and MESA have also suffered organizational harm because they are no longer able to learn from and engage with noncitizen members to the extent they once did and because they have had to divert resources from other projects to address the all-too-real possibility that their noncitizen members will be arrested, detained, and deported simply for exercising rights the Constitution guarantees.

**Statement of Facts**

## I.    The Executive Orders

The defendant agencies adopted the ideological deportation policy challenged here in response to two executive orders that President Trump issued shortly after taking office: Executive Order No. 14,161, titled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," 90 Fed. Reg. 8451 (Jan. 20, 2025); and Executive Order No. 14,188, titled "Additional Measures to Combat Anti-Semitism," 90 Fed. Reg. 8847 (Jan. 29, 2025) (collectively, the "Executive Orders").

Executive Order 14,161 states that it is the policy of the United States to protect its citizens from noncitizens who "espouse hateful ideology," and to ensure that noncitizens who are already present in the United States "do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles" and "do not advocate for, aid, or support designated foreign terrorists and other threats to [America's] national security." 90 Fed. Reg. 8451 (Jan. 20, 2025). The order directs the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to promptly "vet and screen" all noncitizens who are already inside the United States "to the maximum degree possible." *Id.*

Executive Order 14,188 states that it is the policy of the United States "to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." 90 Fed. Reg. 8847 (Jan. 29, 2025). It reaffirms Executive Order 13,899, issued during the first Trump administration, which adopted a controversial and highly contested definition of antisemitism issued by the International Holocaust Remembrance Alliance that encompasses constitutionally protected criticism of Israel and Israeli policies. *Id.* This definition includes, for example, speech

that claims that the existence of the State of Israel "is a racist endeavor," speech that holds Israel to standards "not expected or demanded of any other democratic nation," and speech that compares contemporary Israeli policies to those of the Nazis. *See* Ex. 1, International Holocaust Remembrance Alliance, *Working Definition of antisemitism*, https://perma.cc/4AZG-VV7T; Executive Order No. 13,899, *Combating Anti-Semitism*, 84 Fed. Reg. 68779 (Dec. 11, 2019).

Executive Order 14,188 directs the head of each executive department or agency, within sixty days, to submit a report to the President "identifying all civil and criminal authorities or actions within the jurisdiction of that agency" that might be used "to curb or combat anti-Semitism." 90 Fed. Reg. 8847 (Jan. 29, 2025). It also directs the Secretary of State, the Secretary of Education, and the Secretary of Homeland Security to include in their reports "recommendations for familiarizing institutions of higher education with the grounds for inadmissibility under 8 U.S.C. § 1182(a)(3) so that such institutions may monitor for and report activities by alien students and staff relevant to those grounds and for ensuring that such reports about aliens lead, as appropriate and consistent with applicable law, to investigations and, if warranted, actions to remove such aliens." *Id.* at 8848.

The "grounds for inadmissibility under 8 U.S.C. § 1182(a)(3)" are the security and related grounds of inadmissibility, including various terrorism- and foreign policy-related provisions, 8 U.S.C. § 1182(a)(3)(B), (a)(3)(C), which also serve as grounds for deportation, *see* 8 U.S.C. § 1227(a)(4)(B), (C). Under the terrorism-related provisions, noncitizens who have engaged in or incited terrorist activity are inadmissible to the country, *id.* § 1182(a)(3)(B)(i)(I), (III); the same is true of noncitizens who "endorse[] or espouse[] terrorist activity or persuade[] others to endorse or espouse terrorist activity or support a terrorist organization," *id.* § 1182(a)(3)(B)(i)(VII), or who are representatives of "a political, social, or other group that endorses or espouses terrorist

activity," *id.* § 1182(a)(3)(B)(i)(IV)(bb) (together, the "endorse or espouse" provisions). The foreign policy provision renders inadmissible any noncitizen "whose entry or proposed activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States." *Id.* § 1182(a)(3)(C)(i). This provision also states, however, that individuals may not be excluded based on "past, current, or expected *beliefs, statements, or associations [that] would be lawful within the United States*" unless (1) "the Secretary of State personally determines that the [noncitizen]'s admission would compromise a compelling United States foreign policy interest," *id.* § 1182(a)(3)(C)(iii) (emphasis added), and (2) the Secretary provides timely notice of that determination to Congress, *id.* § 1182(a)(3)(C)(iv).

After President Trump signed Executive Order 14,188, the White House released a fact sheet about the order "promis[ing]" to "Deport Hamas Sympathizers and Revoke Student Visas." The fact sheet included this warning from the President:

> To all the resident aliens who joined in the pro-jihadist protests, we put you on notice: come 2025, we will find you, and we will deport you. I will also quickly cancel the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before.

Stip. ¶ 22, ECF No. 130.

## II.    The Ideological Deportation Policy

The evidence will show that the State Department and DHS responded to the Executive Orders by adopting a policy of revoking the visas and green cards of, and arresting, detaining, and deporting noncitizen students and faculty based on their pro-Palestinian advocacy—i.e., the ideological deportation policy.[1] The evidence will also show that it is only in this litigation that

---

[1] In describing the ideological deportation policy, Defendants have referred to "revoking" the green cards of lawful permanent residents. *See infra* SOF Part II.A. Defendants cannot "revoke"

Defendants dispute the existence of the ideological deportation policy; Defendants have described this policy at length to the American public, they have taken political credit for it, and they are implementing and enforcing it.[2]

### A.    Defendants Describe the Policy

The evidence will show that the defendant agencies first described the policy to the public shortly before the arrest of recent Columbia University graduate and lawful permanent resident Mahmoud Khalil in March 2025. Mr. Khalil is an outspoken advocate for Palestinian human rights who served as a negotiator and spokesperson for Columbia student protestors during the campus protests of 2023 and 2024. *See infra* SOF Part III.B.1. On March 6, 2025, Secretary of State Rubio posted to X: "Those who support designated terrorist organizations, including Hamas, threaten our national security. The United States has zero tolerance for foreign visitors who support terrorists. Violators of U.S. law—including international students—face visa denial or revocation, and deportation." Stip. ¶ 1. Two days later, Mr. Khalil was arrested at his Columbia University student housing. Ex. 2, Second Supp. Decl. Of Acting Field Off. Director William P. Joyce, *Khalil v. Joyce*, No. 25-cv-01963, ECF No. 72, (S.D.N.Y. Mar. 17, 2025). In a post published to X the next day, Secretary Rubio commented on Mr. Khalil's arrest: "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported." Stip. ¶ 3. DHS quickly followed suit, asserting in another post on X that Mr. Khalil had led activities "aligned to" Hamas, and that ICE had arrested him "in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State." Stip. ¶ 2.

---

the green card of a lawful permanent resident; however, the Secretary of State may determine that such an individual is removable, 8 U.S.C. § 1227(4)(C), which can serve as the basis for removal proceedings.

[2] Plaintiffs are still seeking discovery. Accordingly, the following description of the ideological deportation policy's implementation and enforcement is necessarily incomplete.

In a series of public statements since, the defendant agencies have repeated this policy and made clear that they view a broad spectrum of pro-Palestinian and anti-war speech to constitute support for Hamas or antisemitic activity. For example, in an interview given to NPR on March 13, Deputy Secretary of Homeland Security Troy Edgar was asked repeatedly how Mr. Khalil supported Hamas. His answer: "Well, I think you can see it on TV, right? This is somebody that we've invited and allowed the student to come into the country, and he's put himself in the middle of the process of basically *pro-Palestinian* activity." Stip. ¶ 7 (emphasis added). On March 16, Secretary Rubio stated in an interview, "[i]f [Mr. Khalil] had told us, I'm going over there and I'm going over there to become the spokesperson and one of the leaders of a movement that's going to turn one of your allegedly elite colleges upside down," "we never would have let him in," and "now that he's doing it and he's here, he's going to leave and so are others." Stip. ¶ 10. And on March 28, Secretary Rubio stated that his department was revoking the visas of students engaged in "pro-Palestinian protests" because "they're taking activities that are counter to our foreign [policy]." Stip. ¶ 13.

The evidence will show that the statements of officials of the defendant agencies and other public officials are not empty bluster, but rather an accurate description of agency policy. The evidence will show, for example, that the State Department treats the public statements, including social media posts, of Secretary Rubio in this context as "guidance"—in fact, several of these statements are quoted and treated as authoritative in State Department cables and training materials implementing the policy. *See, e.g.*, AAUP C.A.R.012, ECF No. 106 (State Department cable 25 STATE 5914, titled "Action Request: Enhanced Screening and Social Media Vetting for Visa Applicants," referring to Rubio's statements during the above-quoted March 16, 2025 *Face the Nation* interview as "guidance"); Ex. 3, DEF-067 (State Department training webinar referring to

7

Rubio's statements made during the same March 16 interview as "guidance"); *see also* Stip. ¶ 10. In determining whether a noncitizen is deportable pursuant to the foreign policy provision, the State Department applies Secretary Rubio's understanding of U.S. foreign interests, including as articulated in public speeches and press interviews, and on social media. Ex. 4, Wilson Tr. 121:10–122:9; Ex. 5, Armstrong Tr. 260:8–261:7. This includes his publicly stated position that noncitizens admitted to the U.S. should not be permitted while here to engage in expression or association that is deemed antisemitic, pro-Hamas, or pro-terrorist. *See* Armstrong Tr. 260:8–261:7.

### B.     Defendants Implement the Policy

The evidence will show that the defendant agencies have implemented the policy in at least the following ways.

***First*, DHS is investigating noncitizen students and faculty who are believed to have engaged in pro-Palestinian advocacy.** The evidence will show that a group of senior leadership in DHS's Homeland Security Investigations ("HSI") convened in February or March 2025 following the issuance of the Executive Orders. The group—which called itself the "Tiger Team"—met to discuss the student protests following October 7, 2023. Ex. 6, Hatch Tr. 172:3–6. At that meeting, HSI's Office of Intelligence was instructed to produce "reports of analysis" on noncitizen students and faculty engaged in pro-Palestinian protests for the purpose of identifying individuals whose visas or green cards should be revoked pursuant to the policy. Hatch Tr. 149:11–22.

Following this meeting, the Acting Executive Associate Director of HSI provided the Office of Intelligence with a list of student protesters to investigate on a rolling basis. Hatch Tr. 118:7–12. The vast majority of these names came from the website of Canary Mission, *id.* 178:24–

8

25, an organization that describes its mission as "document[ing] individuals and organizations that promote hatred of the USA, Israel and Jews." Ex. 7, Canary Mission, *Our Mission*, https://perma.cc/QCG3-QM5F. Some names also came from Betar, Hatch Tr. 179:16–180:4, a group the Anti-Defamation League has labeled as extremist, because it "openly embraces Islamophobia and harasses Muslims online and in person." Ex. 8, Anti-Defamation League, *Betar USA*, https://perma.cc/VW5F-ZV5X.

Pursuant to the policy, the Office of Intelligence also "proactively reviews open-source information to identify individuals" engaged in activity Defendants deem antisemitic or pro-Hamas. *See* Decl. of Andre Watson ¶ 7, AAUP C.A.R.007–011; Ex. 9, Decl. of Roy M. Stanley ¶ 5, *Taal v. Trump*, No. 3:25-cv-335, ECF No. 30-2 (N.D.N.Y. Mar. 22, 2025); Ex. 10, Andre Watson Tr. 137:16–25; 138:9–16; 143:6–13; Hatch Tr. 142:13–19. The Assistant Director of the Office of Intelligence testified at his deposition that he personally reviewed "approximately 100" reports of analysis on student protesters that "mentioned Israel and Palestine." Hatch Tr. 83:17–84:12. These include the reports of analysis produced on Mr. Khalil, Mr. Mahdawi, Ms. Öztürk, Ms. Chung, and Mr. Khan Suri. Hatch Tr. 84:12; *see also* Defendants' Index Related to the Sealed, *In Camera, Ex Parte*, Submission of Documents, ECF No. 131 (exhibits C, E, G, I, & K); Hatch Tr. 223:18–224:8 (confirming that the attachment to Mr. Rubio's determination of removability concerning Mr. Khalil, titled "HSI Subject Profile of Mahmoud Khalil," is the report of analysis prepared in Mr. Khalil's case). The Assistant Director of the Office of Intelligence also testified that the Tiger Team meets on a regular basis to discuss the findings included in the Office of Intelligence's reports of analysis on student protesters. Hatch Tr. 151:22–152:9.

**Second**, DHS is coordinating with the State Department to revoke the visas and green cards of, and to arrest and detain, students and faculty engaged in lawful pro-Palestinian

**advocacy.** The evidence will show, for example, that once HSI's Office of Intelligence prepares a report of analysis on a student or faculty member, the Office shares that report with the National Security Division of HSI, which in turn refers certain cases to the State Department with a recommendation that the State Department revoke the individual's visa and/or make a determination under 8 U.S.C. § 1227(4)(C)—the foreign policy provision—that a green card holder is deportable. Referrals include the Office of Intelligence's report of analysis, together with an accompanying letter. Watson Tr. 190:17–22; AAUP C.A.R.019, 027, 042, 045. Visa revocation decisions may be made by a consular officer in the Bureau of Consular Affairs. AAUP C.A.R.003. Foreign policy determinations must be made by the Secretary of State personally. AAUP C.A.R.018, 026. In either case, the State Department's decision is conveyed to ICE, which in turn effectuates arrest and detention. AAUP C.A.R.009–010. The evidence will show that, although the referral process may have been in place before 2025, it was not used until after the defendant agencies' adoption of the ideological deportation policy. Hatch Tr. 207, 11 (noting that the process has not been used in the "six years" he had been at HSI prior to 2025); Watson Tr. 223 (describing process as "new").

*Third*, **the State Department has issued formal guidance to facilitate the revocation of students' and faculty members' visas based on speech or activity deemed "pro-Hamas, "pro-terrorist," or "antisemitic."** For example, the evidence will show that:

1. On February 28, Secretary Rubio issued diplomatic cable 25 STATE 17178, titled "Catch and Revoke: National Security Through Timely Processing of Visa Systems Messages," which cites E.O. 14161 and provides that visa holders who "engage in conduct that poses a threat to U.S. national security, *or otherwise misuse their visas* should have their visas revoked under INA 221(i) [8 U.S.C. § 1201(i)]." Ex. 11, DEF-088–89 (the "Catch and Revoke Cable," 25 STATE 17178) (emphasis

added).[3] The cable stated that "[e]ven if an alien has not yet been convicted of a crime," consular officers must evaluate whether the visa should be revoked because of "INA 214(b) [8 U.S.C. § 1184(b)]," DEF-091, which presumes that a nonimmigrant visa applicant is an intending immigrant (i.e., a person who seeks to move to the U.S. *permanently*) unless they establish to the satisfaction of the consular officer that they satisfy the requirements of the nonimmigrant visa category they applied for. 8 U.S.C. § 1184(b). It further stated that visas holders "may no longer [] overcome [the presumption in] 214(b) if they engage in activities that are inconsistent with the claimed nonimmigrant status." DEF-091. A May 15, 2025 cable titled "Caught and Revoked: Updated Guidance on Systems Messages" stated that the "focused work" on implementing the Caught and Revoked cable resulted in "an immediate doubling in visa revocations for aliens who no longer qualify for their visas, and a sustained 150 percent increase in visa revocations as compared to March 1–April 15, 2024." Ex. 13, DEF-084–86.

2.  On March 25, Secretary Rubio issued diplomatic cable 25 STATE 26168, titled "Action Request: Enhanced Screening and Social Media Vetting for Visa Applicants," which cited both Executive Orders and required enhanced vetting of student visa applicants (the "Enhanced Screening Cable"). AAUP C.A.R.012. The cable provided that "an applicant applying for an F-1 or M-1 [student] visa must demonstrate an intent to enter the United States solely to pursue a full course of study at an approved institution," and that consular officers must consider any information that suggests the applicant intends to engage in activities that are inconsistent with the visa status. AAUP C.A.R.013; *see also* DEF-068. The cable provided that consular officers must refer certain new or returning F-1, M-1, or J-1 visa applicants to the Fraud Prevention Unit (FPU) for a mandatory social media check, AAUP C.A.R.014, that "look[s] for *any* information that impacts the applicant's eligibility for the visa." DEF-075 (emphasis added); *see also* DEF-068. The cable also provided that as part of screening cases for potential ineligibilities, "consular officers MUST ADDRESS any derogatory information indicating that a visa applicant may be subject to the terrorism-related ineligibility grounds of the [INA]," including the endorse or espouse provisions. AAUP C.A.R.012–13. The cable stated that derogatory information included "[e]vidence that an applicant advocates for terrorist activity, or otherwise demonstrates a degree of public approval or public advocacy for terrorist activity or a terrorist organization. AAUP C.A.R.015.

3.  On June 18, Secretary Rubio issued diplomatic cable 25 STATE 59756, titled "Action Request: Expanding Screening and Vetting for FMJ Applicants," which purported to supersede the March 25 cable and required consular officers to "conduct a comprehensive and thorough vetting of each [new or returning] FMJ

---

[3] Diplomatic cables are official communications between the State Department and U.S. embassies and consulates abroad that memorialize the conduct of foreign policy. *See* Ex. 12, 5 FAM 1214.2 (defining cables as "official records of Department of State policies" that are "always cleared and approved, either directly or through delegation, and carry organizational authority").

applicant who is otherwise issuable," including by reviewing "the applicant's entire online presence — not just social media activity" (the "Expanded Screening Cable"). Ex. 14, Secretary Rubio, *Action Request: Expanding Screening and Vetting for FMJ Applicants,* aboutblaw.com, https://perma.cc/99T3-ZZS2; Wilson Tr. 129:18–25. The cable stated that the purpose of this vetting is to "look[] for any potentially derogatory information about the applicant" and "to ensure it does not indicate an ineligibility under INA 212(a) [8 U.S.C. § 1183(a)] or 214(b) [8 U.S.C. § 1184(b)]." Expanded Screening Cable, 5. The cable instructs officers to "consider as potentially derogatory *any indications of hostility* towards the citizens, culture, government, institutions, or founding principles of the United States; *of advocacy for, aid, or support for* designated foreign terrorists and other threats to U.S. national security; *or of support for* unlawful antisemitic harassment or violence." Expanded Screening Cable, 5–6 (emphasis added). In relation to potential ineligibility under 8 U.S.C. § 1184(b), the cable states that "for applicants who demonstrate a history of political activism, especially when it is associated with violence *or the views and activities [just] described []*," officers "must consider the likelihood they would continue such activity in the United States." Expanded Screening Cable, 7 (emphasis added). In relation to potential ineligibility under 8 U.S.C. § 1183(a)(3) (i.e., the security and related grounds) the cable provides that where an applicant expresses the disfavored views and overcomes 8 U.S.C. § 1184(b), officers "should pursue a finding that the applicant is ineligible under [the foreign policy provision], where an applicant's entry or proposed activities would have potentially serious foreign policy consequences." Expanded Screening Cable, 8.[4]

Under the State Department's new guidance, engaging in pro-Palestinian advocacy is grounds for revoking a student visa, both because it is purportedly inconsistent with the purpose of a student visa, and because it is evidence of potential ineligibility under the endorse and espouse and foreign policy provisions. *See, e.g.*, AAUP C.A.R.013 (the Enhanced Screening Cable quoting

---

[4] Each of these State Department cables refers consular officers to the Foreign Affairs Manual ("FAM") for further instruction. The FAM is an authoritative source of State Department policy for staff and contractors of the department, the Foreign Affairs Service, and, when applicable, other federal agencies. Ex. 15, U.S. Department of State, *Foreign Affairs Manual*, https://perma.cc/M74S-V5QK. Several of the FAM provisions referenced in the cables were revised on April 29, 2025, but have been partially or fully redacted from the publicly available version of the FAM. *See, e.g.*, Ex. 16, 9 FAM 402.5-5(C)(1) (addressing what constitutes "Intent to Solely Pursue a Full Course of Study"); Ex. 17, 9 FAM 302.6-2(B)(1)(c) (addressing visa ineligibilities related to terrorism); 9 FAM 402.5-6(I)(1)(f)–(i) (addressing student visa applicant procedures); Ex. 18, 9 FAM 403.11-5(A)–(C) (addressing nonimmigrant visa revocations). Plaintiffs have sought, but have not received, the unredacted versions of these provisions.

12

Rubio's March 16 statement to CBS News: "[I]f you tell us when you apply for visa, 'I'm coming to the U.S. to participate in pro-Hamas events,' that runs counter to the foreign policy interest of the United States . . . if you had told us you were going to do that, we never would have given you the visa.'");[5] DEF-067 (training slides prepared by the Visa Office about that cable including the same quote); "Expanding Screening and Vetting for FMJ Applicants," 25 STATE 59756, https://perma.cc/99T3-ZZS2 (the Expanded Screening Cable noting: "As Secretary Rubio has said, we do not seek to import activists who will disrupt and undermine scholarly activity at U.S. universities."); *id.* at 5–6 (noting that being seen to "endorse[] Hamas or its activities" on social media is a potential inadmissibility under the endorse and espouse provisions); Armstrong Tr. 139–144 (stating that the March 25 cable's guidance relating to the "endorse or espouse" provisions covers a range of pro-Palestinian and anti-war statements). The evidence will also show that the State Department and DHS are sharing information about, and coordinating action on, student visa revocations based on pro-Palestinian advocacy, including through an inter-agency Student Visa Working Group. DEF-077.

**Fourth, the agencies have provided universities with the names of student protesters, and have demanded that universities provide the names of still others to identify additional targets.** For example, the evidence will show that on March 11, 2025, White House Press Secretary Karoline Leavitt stated at a news briefing that DHS had provided a list of names to Columbia University of "individuals who have engaged in pro-Hamas activity," Stip. ¶ 5, and on April 16, 2025, Secretary of Homeland Security Kristi Noem wrote to Harvard University citing E.O. 14,188 and demanding that Harvard provide, among other things, "relevant information on whether any

---

[5] Training slides prepared by the Visa Office also refer to this statement by Rubio as "guidance." DEF-067.

student visa holders have had disciplinary action taken as a result of making threats to other students or populations *or participating in protests*." Ex. 19, *Letter From Kristi Noem to Harvard*, N.Y. Times (April 17, 2025), https://perma.cc/2AWY-DHNH (emphasis added).

### C.    Defendants Enforce the Policy

The defendant agencies have enforced the ideological deportation policy against numerous—and potentially hundreds—of noncitizen students and faculty. They have admitted this in statements to the public. As noted above, on March 28, Secretary Rubio publicly acknowledged that most of the administration's first 300 visa revocations took place under the ideological deportation policy. When asked whether "all of those [revocations] related to pro-Palestinian protests," he responded that there were "a few that are not," signaling that most of the revocations to that point were in fact based on pro-Palestinian advocacy. Stip. ¶ 13. And since then, senior administration officials have said publicly that Defendants intend to continue deportations under the policy. On March 16, 2025, for example, Secretary Rubio gave an interview on CBS's *Face the Nation* in which he stated: "We're going to do more. In fact, every day now we're approving visa revocations, and, if that visa led to a green card, the green card process as well." Stip. ¶ 10. And on May 8, 2025, Tricia McLaughlin, the DHS Assistant Secretary for Public Affairs, posted online that "If you are pushing Hamas propaganda, glorifying terrorists that relish the killing of Americans, harassing Jews, taking over buildings, or other anti-American actions that we have seen lately on these campuses, you can book yourself a ticket home. You can expect your visa will be revoked." Stip. ¶ 21.

These public accounts of Defendants' enforcement of the ideological deportation policy are consistent with the facts in the five cases of the "Targeted Noncitizens" as to which the Court has permitted discovery. While Defendants have turned over precious little about these cases, the

evidence to be presented at trial shows that, in each case, the government retaliated against constitutionally protected speech.

Specifically, the government cited constitutionally protected speech in each case as a justification for deportation. In the cases of Khalil, Mahdawi, Chung, and Khan Suri, the government relied on the foreign policy provision that allows deportation based on "past, current, or expected *beliefs, statements, or associations that are otherwise lawful*." AAUP C.A.R. 018–19, 026–27, 041–42, 044–45 (emphasis added). And in each case, Secretary Rubio made the personal determination required by that provision of the INA by citing, in part, constitutionally protected expression. *See id.* at 018–19 (pointing to "the participation and roles of . . . Khalil in antisemitic protests"); *id.* at 026–27 (relying on the assertion "that Mahdawi, through his leadership and involvement in disruptive protests at Columbia University, has engaged in anti-Semitic conduct through leading pro-Palestinian protests and calling for Israel's destruction," and that "protests of the type led by Mahdawi potentially undermine the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the region[] and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict"); *id.* at 041–42 (pointing to "the participation and roles of Chung . . . in antisemitic protests"); *id.* at 044–45 (relying on the assertion that Khan Suri "actively spreads [Hamas's] propaganda and promotes antisemitism on social media"). In revoking Öztürk's visa, Defendants relied on a different provision of the INA—8 U.S.C. § 1201(i)—but in her case, too, the government justified its decision by pointing to constitutionally protected speech, namely, the fact that she had written an "op-ed that found common cause with an organization that was later temporarily banned from campus." *Id.* at 034–35.[6]

---

[6] Each of the five documents cited in this paragraph expressly relies on other official assessments, but the government has not produced those documents to Plaintiffs despite Plaintiffs'

The government's public statements about these cases also confirm that Defendants have attempted to deport these individuals based on constitutionally protected speech. For instance, the Deputy Secretary of DHS defended the decision to target Mr. Khalil by stating that "[t]his is somebody that we've invited and allowed the student to come into the country, and he's put himself in the middle of the process of basically pro-Palestinian activity." Stip. ¶ 7; *see also* Stip. ¶ 5 (White House Press Secretary justifying Khalil's detention by arguing that he "organized group protests" and that "this administration is not going to tolerate individuals having the privilege of studying in our country and then siding with pro-terrorist organizations"); Ex. 20, *Press Release: 100 Days of Fighting Fake News*, Department of Homeland Security (Apr. 30, 2025), https://perma.cc/QB3E-BQHS (describing Mahdawi as "one of the ringleaders of the vicious, anti-American, anti-Semitic protests at Columbia University"); Stip. ¶ 13 (Secretary Rubio stating that Öztürk met the "standard" for visa revocation because she was "supportive of movements that run counter to the foreign policy of the United States"); Stip. ¶ 11 (DHS Assistant Secretary for Public Affairs stating that "[Khan] Suri was a foreign exchange student at Georgetown University actively spreading Hamas propaganda and promoting antisemitism on social media"). In sum, each of the cases of the five targeted noncitizens are instances of Defendants enforcing the ideological deportation policy.

### III.    Expressive and Associational Harms to Plaintiffs and their Noncitizen and Citizen Members

The evidence will show that the policy challenged here, together with Defendants' campaign of threats, has created a climate of fear and repression on university campuses across

---

repeated requests. *See, e.g.*, AAUP C.A.R.019 (listing attachments, including "DHS Letter on Mahmoud Khalil" and "HSI Subject Profile of Mahmoud Khalil"); *id.* at 027 (same for Mahdawi); *id.* at 042 (same for Chung); *id.* at 045 (same for Suri); *id.* at 034 (stating that Öztürk's visa had been revoked based on "a request from DHS/ICE and the assessment from DHS/ICE").

the country and forced many noncitizen students and faculty into silence. The evidence will show that this has caused grave harm to Plaintiffs, their noncitizen members, and their citizen members. Plaintiffs will elicit testimony from four noncitizen member witnesses, who will address the ways they personally have been chilled from engaging in protected expressive and associational activities as a result of the policy; one citizen member witness, who will address the harms she has experienced to her ability both to engage in her own expressive activities and to hear from noncitizens with whom she wishes to associate; and two organizational witnesses, who will address the harms that the AAUP and MESA have suffered as a consequence of the policy.

### A.    Harms to Plaintiffs' Noncitizen Members

The evidence will show that Plaintiffs have noncitizen members who have been compelled to curtail their expression and association because of the policy. Some are no longer willing to participate in, or even attend, public political protests. Some have stepped back from leadership roles and participation in groups that are likely to engage in advocacy related to Israel and Palestine. Some are abstaining from public writing or scholarship that they would otherwise have pursued. Some have purged their earlier public writings, including on social media. Plaintiffs' noncitizen member witnesses have all experienced a range of these harms and will testify to these injuries at trial.

### 1.    Nadje Al-Ali

Nadje Al-Ali is the Robert Family Professor of International Studies and a Professor of Anthropology and Middle East Studies at Brown University whose research interests include gender studies and Middle East studies. She was born in Germany and is a German citizen. In January 2019, she moved to Providence, Rhode Island, to teach at Brown, and has been a lawful

17

permanent resident since 2021. From 2021 to 2024, she was the Director of the Center for Middle East Studies at Brown. Prof. Al-Ali is a member of MESA and the AAUP.

Prof. Al-Ali will testify that, before Defendants adopted the ideological deportation policy, she regularly engaged in speech and association related to Palestine. In her capacity as Director of the Center for Middle East Studies at Brown, she organized workshops, teach-ins, and meetings on topics related to the Middle East, including Israel and Palestine. She taught courses on gender and sexuality in the Middle East and transnational feminism, through which she assigned readings about feminist activism in Israel and Palestine. Although Prof. Al-Ali's scholarly work has focused on Egypt, Iraq, Turkey, and Lebanon, she wrote about topics related to Israel and Palestine through her work on feminism and the Middle East. As recently as January through March of 2025, she had started work on a new academic article making a feminist critique of Hamas. Prof. Al-Ali also shared information about Palestine-related events on social media.

Prof. Al-Ali will also testify that, since the initiation of the ideological deportation policy and particularly the arrest and detention of Mr. Khalil, she has felt compelled to abandon many of her prior expressive and associational activities due to fears that those activities could lead to her deportation. She stopped work on her planned academic article making a feminist critique of Hamas even though it would have been critical of both Hamas and the Israeli occupation of Gaza— because expressing any nuanced view related to Israel and Palestine feels too dangerous to her.

Prof. Al-Ali has also forgone research grants and opportunities that would have required her to travel to the Middle East. For instance, although she had been invited to serve as a fellow at the German Orient Institute in Beirut, Lebanon, she relinquished that opportunity due to the risk of being denied reentry based on her association with pro-Palestinian speech. She also received funding through the Watson Institute for International and Public Affairs at Brown to conduct

research in Baghdad, Iraq, but declined to go for the same reason. Her fear of being denied reentry impacts her ability to pursue her scholarship, which requires traveling abroad to the Middle East to interview people and attend cultural events that are the subject of her research. Prof. Al-Ali has also stopped going to protests or demonstrations, and has unfollowed social media accounts that post about events related to Palestine.

### 2.    Cinzia Arruzza

Cinzia Arruzza is a professor of philosophy and classical Greek studies at Boston University. Her areas of scholarship include the history of Greek and Roman philosophy, ethics, feminist philosophy, and contemporary political and social philosophy. She is a citizen of Italy, is a legal permanent resident in the United States, and a member of the AAUP.

Prof. Arruzza will testify that, prior to the ideological deportation policy, she engaged in significant public advocacy expressing pro-Palestinian viewpoints. She signed public statements supporting Palestinian human rights and criticizing the Israeli government's policies related to Gaza. And she posted content to her Instagram account about Palestine. In her courses, Prof. Arruzza sometimes discussed Palestine when engaging with her students about current events, particularly when teaching about ethics and justice. During her tenure at her former university, Prof. Arruzza drafted statements and organized events related to Israel and Palestine and coordinated a divestment resolution that was passed by the faculty Senate.

Prof. Arruzza will testify that the ideological deportation policy has chilled her expression. After learning of Mr. Khalil's arrest and detention and the attempted deportation of other noncitizen students and faculty, Prof. Arruzza became concerned about her public advocacy related to Israel and Palestine. She stopped posting about Palestine on social media and changed the username on her Instagram account to make the account less visible to the public. Prof. Arruzza

also stopped signing public statements about Palestine and has not been involved in activism at Boston University to the extent she was at her prior university. Prof. Arruzza has also refrained from discussing Palestine in the classroom.

### 3.    Megan Hyska

Megan Hyska is an assistant professor of philosophy at Northwestern University with research interests in political communication and organizing and how they contribute to social movements. She grew up in Canada and moved to the United States to pursue a Ph.D. at the University of Texas at Austin. She is a legal permanent resident and a member of the AAUP.

Prof. Hyska will testify that, before Defendants adopted the ideological deportation policy, she engaged in political expression and association, including related to Israel and Palestine. Prof. Hyska was active in the steering committee of her local chapter of the Democratic Socialists of America ("DSA"), which has publicly expressed pro-Palestinian viewpoints. She has a history of participating in protests, and has attended protests that included advocacy related to Israel and Palestine. She also signed an open letter in support of students engaged in pro-Palestinian protest. In addition to her scholarly work, she published popular writing about topics related to authoritarianism and political propaganda.

Prof. Hyska will testify that the ideological deportation policy has chilled her expression and association. Although she initially intended to become more active in political organizing after President Trump's inauguration, the arrest and detention particularly of Mr. Khalil and Ms. Öztürk for their speech made Prof. Hyska concerned about engaging in public activism, especially because she is, like Mr. Khalil, a green card holder. Prof. Hyska wrote an op-ed about organizing resistance to the Trump Administration's policies, but she ultimately decided not to publish it because she feared that it would raise her profile and put her at risk of arrest, detention, and deportation. A

significant factor in her decision was the fact that Ms. Öztürk had been targeted for co-authoring an op-ed.

Although Prof. Hyska had previously served on leadership positions in her local chapter of the DSA, she decided to forgo running for any leadership positions, including declining to take the opportunity to represent the chapter at a national DSA meeting, out of fear it would make her a target for deportation. She has also curtailed her participation in protest, attending only one since Mr. Khalil's arrest and, for the first time, wearing a mask to shield her identity, and declining to attend additional protests though she wanted to do so. She has also refrained from traveling outside the country and has considered applying to jobs in Canada if the ideological deportation policy continues. Although she has been on a research leave from teaching, she has plans to revisit her syllabi before she begins teaching again, to consider whether to modify her curriculum to avoid discussion of any topics related to the Israeli–Palestinian conflict.

### 4.    Bernhard Nickel

Bernhard Nickel is a professor of philosophy and, for the last three years, has been the chair of the philosophy department at Harvard University. His research and teaching focus on the philosophy of language, including the language of stereotypes. He is a German citizen and has lived in the United States for thirty years. He is a legal permanent resident whose wife and daughter are both American citizens. He is a member of AAUP and Harvard-AAUP.

Prof. Nickel will testify that, prior to the administration's ideological deportation policy, he was engaged in expression and association related to Israel and Palestine. He signed public letters and statements in support of Palestinian human rights and students' rights to engage in pro-Palestinian protest. He attended protests on a range of political issues, and, in the Spring of 2024,

frequently visited the pro-Palestinian encampment at Harvard to support the expressive activities of the students there.

Prof. Nickel will testify that, because of the ideological deportation policy, he has withdrawn from these previous activities. He now does not sign public statements about Palestine. He has also curtailed his participation in protests, last attending a demonstration in support of Mr. Khalil shortly after his arrest but declining to attend more recent gatherings. Prof. Nickel planned to travel to Europe in May 2025 to visit his brother, who is terminally ill. He canceled the trip, however, for fear of being detained at the border and denied reentry based on his past statements in support of Palestinian human rights and his support of pro-Palestinian student protesters.

## B.    Harms to Plaintiffs' Citizen Members

The evidence will also show that Plaintiffs have citizen members who have been injured by the ideological deportation policy. Because the policy has created a climate of fear and repression that has forced many noncitizen students and faculty into silence, it burdens the ability of Plaintiffs' citizen members to hear from and associate with their noncitizen students and colleagues. And, in some cases, the ideological deportation policy has had a direct impact on Plaintiffs' citizen members' speech, compelling them to change their own expressive and associational activities out of fear that noncitizens could be implicated in those activities. Plaintiffs plan to put on one citizen witness who has experienced both these forms of injury.

### 1.    Nadia Abu El-Haj

Nadia Abu El-Haj is a professor of anthropology at Barnard College, Columbia University and the Co-Director of the Center for Palestine Studies ("CPS") at Columbia University. Prof. Abu El-Haj's scholarship focuses on Zionism, Israel, Palestine, and U.S. Militarism and the post 9/11 wars. She is a U.S. citizen and a member of MESA and the AAUP.

Prof. Abu El-Haj will testify that the ideological deportation policy has harmed her ability to hear from and associate with her noncitizen colleagues and students. For example, since October 2023, during the period prior to their arrest and detention, Prof. Abu El-Haj spoke with and sought to hear from Messrs. Khalil and Mahdawi. Prof. Abu El-Haj knew Mr. Khalil as an outspoken advocate for human rights and one of the principal negotiators and spokespeople for the students during the protests that took place on Columbia's campus in the 2023 to 2024 academic year, and she knew Mr. Mahdawi as a leading pro-Palestinian voice at the university. After Mr. Khalil's arrest and detention, Abu El-Haj lost not only the ability to hear from Mr. Khalil, but she observed that Mr. Mahdawi had also stopped speaking publicly and went into hiding. Mr. Mahdawi was later arrested at his citizenship interview and detained, and Prof. Abu El-Haj also lost the ability to engage with him directly. Because Messrs. Khalil and Mahdawi were both influential leaders on campus, the loss of their specific voices significantly impaired conversations about Palestine on campus that were important to Prof. Abu El-Haj.

Prof. Abu El-Haj will also testify that the ideological deportation policy has harmed her ability to organize events through the CPS. After Mr. Khalil's arrest and detention, Prof. Abu El-Haj became concerned that CPS events could become the target of immigration raids or bring participants in CPS events to ICE's attention. As a result, Prof. Abu El-Haj felt compelled to cancel two CPS events she had already substantially organized addressing topics related to Palestine because holding the events would pose an unacceptable risk to most of the invited speakers and members of the CPS community. As a result, Prof. Abu El-Haj has been unable to host educational events that would advance the mission and expressive activities of the academic center she directs.

C.    **Harms to Plaintiffs AAUP and MESA**

The evidence will show that the chill resulting from the ideological deportation policy has caused significant harm to the AAUP and MESA by causing noncitizen members to withdraw from events and by forcing the AAUP and MESA to divert resources away from other important projects in order to address noncitizen members' reasonable fears concerning the ideological deportation policy.

1.    **AAUP**

Veena Dubal, a professor of law at the University of California, Irvine School of Law and the general counsel of the AAUP, will testify as to the mission and purpose of the AAUP and explain how the ideological deportation policy has significantly undermined the organization's ability to pursue its mission of advancing academic freedom and principles of shared governance. Founded in 1915, the AAUP is one of the nation's oldest and largest membership associations and is dedicated to the advancement of higher education and academic freedom. The AAUP has over 44,000 members, including faculty, graduate students, and other academic professionals based at universities across the country. The AAUP's mission is to advance academic freedom and shared governance. This includes protecting the rights of faculty and academic professionals to engage in extramural expression, association, and advocacy.

Prof. Dubal will testify that the ideological deportation policy has deterred noncitizen members from participating in the AAUP's events, particularly those that relate to the Trump Administration's immigration policies and actions toward universities. This has deprived the AAUP of the critical input of a significant segment of its membership, undermining the ability of the organization to hear from and engage with those noncitizen members and to represent their interests in the organization's policymaking, report writing, and public advocacy.

Prof. Dubal will also testify that the ideological deportation policy has required the AAUP to divert substantial resources to addressing the impact of the policy on the AAUP's membership. Since Defendants adopted the policy, Prof. Dubal, in her role as general counsel, has spent a significant percentage of her time counseling the AAUP's noncitizen members on the risks of deportation for participating in pro-Palestinian protests, and connecting noncitizen members with immigration attorneys. The AAUP has also been compelled to organize new kinds of events in response to the ideological deportation policy, most notably two town halls focused on immigration issues, which addressed urgent questions that many AAUP members had about the policy.

### 2.      MESA

Jeffrey Reger, the executive director of MESA, will testify to the background and purpose of MESA and explain how the ideological deportation policy has substantially impaired MESA's ability to pursue its mission. MESA is a 501(c)(3) non-profit membership association whose mission is to foster the study of the Middle East, promote high standards of scholarship and teaching, and encourage public understanding of the region and its peoples. The organization has over 2,000 individual members, including faculty and students at universities across the country. MESA provides its members with an annual meeting that is the premier conference for scholars who research the Middle East, as well as programming, publications, and services that enhance research and education, recognize professional distinction, and defend academic freedom.

Dr. Reger will testify that the policy has deterred noncitizen scholars of the Middle East from joining MESA or participating in MESA's events. This has undermined MESA's core function of facilitating the exchange of pedagogical insights, academic expertise, and novel research between its members, and advocating for their academic freedom. In particular,

noncitizen members of MESA have expressed concern about traveling to attend MESA's annual meeting, which is scheduled to take place in November 2025 in Washington, DC, for fear that they will be denied entry and that a denial will affect their ability to reenter in the future. For those noncitizen members of MESA who are already inside the United States, some are afraid to travel domestically because they are concerned about being targeted by or coming to the attention of immigration authorities in transit hubs. Additionally, some MESA members are afraid to attend MESA's annual meeting for fear of drawing attention to themselves, separate from their fear of traveling to the meeting. As a result, there was a sharp drop in the number of paper proposal submissions to the annual meeting as compared to most prior years, and participation in the 2025 annual meeting is projected to fall short of the expected level.

Dr. Reger will also testify that the ideological deportation policy has required MESA to divert resources it would otherwise devote to its other programs. MESA's leadership, staff, and volunteer faculty now spend significant time and energy responding to crises stemming from the policy. MESA reactivated its Task Force on Civil and Human Rights in January of 2025, which has expanded its workload and responsibilities in response to the policy. MESA leadership has worked to develop new and different programming, such as know your rights workshops and meetings with legal services groups, that would not typically fall under the purview of a scholarly association. As a result, MESA has far fewer resources available for its regular academic programming.

## Argument

### I.    Plaintiffs AAUP and MESA have standing.

The evidence adduced at trial will establish that the AAUP and MESA have standing for three distinct reasons: (1) they have associational standing to sue on behalf of their *noncitizen*

members who have been chilled by the ideological deportation policy; (2) they have associational standing to sue on behalf of their *citizen* members who have been burdened in their ability to hear from and associate with the noncitizens chilled by the policy, or who have had to alter their own speech because of the policy; and (3) they have organizational standing to sue on their own behalf because of the expressive and organizational harm that the policy has caused them.

A.    **The AAUP and MESA have associational standing to assert the rights of their noncitizen and citizen members.**

The AAUP and MESA have associational standing—to sue on behalf of their noncitizen members and their citizen members—because the interests they seek to protect are germane to their scholarly and academic missions; neither the claims asserted nor the relief requested requires the participation of Plaintiffs' individual members in the lawsuit; and Plaintiffs' members "would otherwise have standing to sue in their own right." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *In re Fin. Oversight and Mgmt. Bd. for P.R.*, 110 F.4th 295, 309 (1st Cir. 2024) (applying *Hunt*).

As an initial matter, the expressive and associational interests of the AAUP's and MESA's members are germane to the organizations' missions. MESA's mission is to foster the study of the Middle East, including by encouraging public understanding of the region and its peoples. The ability of its members to engage in expression and association on issues related to Israel and Palestine connects directly with that mission. That is true when MESA's members engage in scholarly expression and association related to Israel and Palestine, and it is also true when they engage in "extramural" speech by, for instance, posting on social media, signing public statements, or otherwise contributing to public discourse about Israel and Palestine.

Similarly, the AAUP members' speech and associational interests are clearly germane to the AAUP's mission of advancing academic freedom and shared governance. For instance, Prof.

Al-Ali, a member of both the AAUP and MESA, will testify that she conducts scholarly work and has organized events that touch on Israel and Palestine. *See* SOF Part III.A.1. Prof. Hyska will testify that she teaches courses on social movements that include discussions of Israel and Palestine. And Prof. Arruzza will testify that her philosophy courses sometimes touch on Israel and Palestine when she discusses ethics and justice. *See* SOF Part III.A.2. The participation of AAUP members in extramural speech and association is likewise relevant to the AAUP's mission. As Prof. Dubal will testify, the AAUP has had a longstanding interest in protecting the ability of faculty and academic professionals to engage in extramural speech, including their rights to speak, advocate, and join groups outside of their areas of disciplinary expertise, because protecting the speech of faculty and academic professionals as members of the broader society is critical to academic freedom. *See* SOF Part III.C.1.[7]

**Noncitizen members.** The AAUP's and MESA's noncitizen members would have standing to sue in their own right because the ideological deportation policy chills their speech and expressive activities and because their injuries are fairly traceable to the policy and would likely be redressed by Plaintiffs' requested relief. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). In the First Amendment context, "an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences." *N.H. Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 13 (1st Cir. 1996). In those circumstances, the "vice" of the government action "is its pull toward self-censorship." *Id.* at 14. As described above, Plaintiffs' noncitizen witnesses will explain how they have each been

---

[7] Additionally, there is no dispute that the claims asserted and the relief requested do not require the participation of the AAUP's or MESA's individual members.

pulled to various forms of self-censorship due to fear that they may be arrested, detained, or deported pursuant to the policy. *See, e.g.*, SOF Part III.A.

These harms are not the result of subjective or irrational fear. Rather, the AAUP's and MESA's noncitizen members are being deterred from participating in pro-Palestinian protests and related expression and association because they face "a credible threat that the [policy] will be enforced" against them if they do. *Mangual v. Rotger-Sabat*, 317 F.3d 45, 57 (1st Cir. 2003) (quoting *N.H. Right to Life PAC*, 99 F.3d at 14). The First Circuit has instructed that courts should "assume" a threat of enforcement is credible "in the absence of compelling contrary evidence." *Id.* (quoting *N.H. Right to Life PAC*, 99 F.3d at 15); *see also id.* (stating that "the evidentiary bar" for establishing a credible threat of enforcement in First Amendment cases "is extremely low"); *Berner v. Delahanty*, 129 F.3d 20, 24 (1st Cir. 1997) ("[A] realistic risk of future exposure to [a] challenged policy . . . is sufficient to satisfy" constitutional and prudential standing requirements.). Here, the threat is credible because Defendants have publicly stated—over and over again—that they intend to arrest, detain, and deport noncitizens who have engaged in pro-Palestinian expression; they have targeted an untold number of those noncitizens already (Secretary Rubio's public remarks indicated that they had targeted close to 300 for visa revocation by the end of March, Stip. ¶ 13); and they have declared that they will target many more. *See* SOF Part II.

The injury to these noncitizen members is also fairly traceable to the policy and would be redressed by Plaintiffs' requested relief. As Plaintiffs' noncitizen witnesses will testify, they each engaged in a range of expressive and associational activities prior to the ideological deportation policy, but made the decision to reduce or stop those activities altogether once they learned of the policy and the actions Defendants have taken pursuant to it. Profs. Al-Ali, Arruzza, Nickel, and Hyska will all testify that the arrest, detention, and attempted deportation of Mr. Khalil specifically

motivated their decisions to self-censor. *See, e.g.*, SOF Part III.A.1–34. Finally, Plaintiffs' requested relief would provide redress because these injuries flow directly from the policy. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("If a defendant's action causes an injury, enjoining the action . . . will typically redress that injury."). As Plaintiffs' noncitizen witnesses will testify, they would be willing to engage in the expressive and associational activities they once did if Defendants were to abandon the ideological deportation policy. In any event, all Plaintiffs need show is that the "risk would be reduced to some extent if [Plaintiffs] received the relief they seek." *Massachusetts v. E.P.A.*, 549 U.S. 497, 526 (2007); *see also Larson v. Valente*, 456 U.S. 228, 244, n.15 (1982) (stating that a plaintiff "need not show that a favorable decision will relieve his *every* injury"). Plaintiffs easily clear that bar. *See, e.g.*, *Dream Defs. v. Governor of the State of Fla.*, 57 F.4th 879, 888 (11th Cir. 2023) (holding that organizations that lead protests had associational standing to challenge a riot law which caused their members to abstain from protests for fear of being arrested and charged with rioting); *Nat'l Educ. Ass'n v. United States Dep't of Educ.*, No. 25-CV-091-LM, 2025 WL 1188160, at *12–14 (D.N.H. Apr. 24, 2025) (finding that an education union had associational standing to raise First Amendment claims based on its members' reasonable decisions to self-censor following the issuance of a Department of Education letter addressing diversity, equity, and inclusion); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 269 (D. Md. 2025) (reasoning that the AAUP, among other plaintiffs, had associational standing to challenge executive orders aimed at ending diversity, equity, and inclusion programs because it had members who reasonably feared that their academic activities could subject them to punishment under the executive orders).

**Citizen members.** The AAUP's and MESA's citizen members likewise would have standing to sue in their own right, because the policy burdens their right to hear from and associate

with specific noncitizens and directly injures their *own* expressive interests; and because their injuries are fairly traceable to the policy and would likely be redressed by Plaintiffs' requested relief.

It is well-established that the First Amendment protects the right to hear no less than it protects the right to speak. *See, e.g.*, *Kleindienst v. Mandel*, 408 U.S. 753, 762–65 (1972); *Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965). The ideological deportation policy injures the AAUP's and MESA's citizen members because it prevents those members from hearing from and engaging with specific noncitizens who have been reasonably chilled by the policy. For instance, because of the policy, Prof. Abu El-Haj has been denied the ability to hear the perspectives and insights of Messrs. Khalil and Mahdawi, two of the leading pro-Palestinian voices on Columbia's campus. *See* SOF Part III.B. There is thus a "concrete, specific connection" sufficient for standing between Prof. Abu El-Haj and the specific individuals with whom she wishes to engage. *Murthy v. Missouri*, 603 U.S. 43, 75 (2024).[8]

Moreover, the policy has injured the AAUP's and MESA's citizen members directly by forcing them to alter their own speech and expressive activities. Prof. Abu El-Haj, for example, has had to cancel planned and fully organized events at CPS, the center she co-directs at Columbia, because she feared that those events could become targets for immigration raids and imperil the invited noncitizen speakers. Because the events were designed around specific invited speakers, Prof. Abu El-Haj felt compelled to forgo the events entirely rather than alter the events to include speakers who were less vulnerable to the policy. *See* SOF Part III.B; *cf. Hurley v. Irish-Am. Gay,*

---

[8] The policy also burdens the right of Plaintiffs' U.S. citizen members to associate with their noncitizen students and colleagues. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) ("[W]e have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others.").

*Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 570 (1995) (explaining that "[t]he selection of contingents to make a parade is entitled to [First Amendment] protection").

These injuries to the AAUP's and MESA's citizen members are fairly traceable to the policy and would be redressed by Plaintiffs' requested relief for the same reasons as stated above— namely, because they are directly caused by the ideological deportation policy. *See Diamond Alt. Energy v. EPA*, No. 24-7, 2025 WL 1716141, at *7 (U.S. June 20, 2025) (holding that where causation and redressability depend on "how regulated third parties not before the court will act in response to the government regulation or judicial relief," a court need conclude only "that 'third parties will likely react' to the government regulation (or judicial relief) 'in predictable ways' that will likely cause (or redress) the plaintiff's injury" (citation omitted)).

**B.     The AAUP and MESA have organizational standing.**

The AAUP and MESA also have standing to sue on their own behalf because the policy has caused them expressive, associational, and organizational harms.

First, the policy has deterred noncitizen faculty and students from participating in the AAUP's and MESA's events. As described above, Prof. Dubal will testify that noncitizen members have avoided AAUP events, including virtual events, out of fear that they might be identified at the events. *See* SOF Part III.C.1. And Dr. Reger will testify that noncitizen MESA members have also scaled back their participation in MESA's events and projects, including the organization's flagship annual meeting, out of fear that they will be targeted for deportation based on their political and scholarly engagement related to Israel and Palestine. *See* SOF Part III.C.2. Dr. Reger anticipates that some members will allow their memberships to lapse as a result of not attending the annual meeting, and that others who might have joined MESA to attend the annual meeting will not do so, imposing serious financial burdens on the organization, which relies on

dues-paying members for its annual operation budget. *Id.* That economic injury alone suffices to establish standing—and would do so whether or not the Court viewed the AAUP and MESA as advancing an "organizational" standing theory. As the First Circuit has made clear, "[i]t is a bedrock proposition that a relatively small economic loss—even an identifiable trifle—is enough to confer standing." *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 923 F.3d 209, 222 (1st Cir. 2019).

Second, the policy has forced AAUP and MESA to divert resources from other projects to address their noncitizen members' reasonable fears that they will be targeted under the policy. One way in which an organization can demonstrate standing is by pointing to a "concrete and demonstrable injury to the organization's activities," with a "consequent drain on the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also Louis v. Saferent Sols., LLC*, 685 F. Supp. 3d 19, 32 (D. Mass. 2023) ("[O]nly a perceptible impairment of an organization's activities is necessary" (citation omitted)). The evidence at trial will demonstrate a significant diversion and drain to both the AAUP's and MESA's resources. As explained above, Prof. Dubal will testify that she and other members of the AAUP's leadership have spent considerable time and resources on addressing members' concerns related to the policy, including in her role as general counsel advising members of their rights and connecting them with immigration attorneys. *See* SOF Part III.C.1. Likewise, Dr. Reger will testify that MESA's leadership, staff, and volunteer faculty spend much more time and energy responding to crises stemming from the policy, reducing their ability to work on scholarly pursuits. *See* SOF Part III.C.2. MESA's leadership has also been compelled to develop new and different programming for members—including know your rights workshops and meetings with legal services groups— that would not typically fall under the purview of a scholarly association. *Id.*

These injuries are fairly traceable to the ideological deportation policy and would be redressed by the relief Plaintiffs seek. The evidence will show that noncitizen members have withdrawn from the AAUP's and MESA's events precisely because they are concerned that they could be targeted under the policy, and that the AAUP and MESA were forced to react to the policy and its anticipated impact on their members by diverting resources away from existing priorities to address concerns related to the policy. Were Defendants to abandon the ideological deportation policy, the AAUP and MESA would no longer be forced to devote significant resources to protecting their members from the policy, and their noncitizen members would feel less concerned about attending their events that address Israel and Palestine. *See Diamond Alt. Energy*, 2025 WL 1716141, at *7 (holding that to demonstrate causation and redressability, "the plaintiff must simply 'show a predictable chain of events' that would likely result from judicial relief and redress the plaintiff's injury" (citation omitted)).

## II.    The ideological deportation policy violates the First Amendment.

The ideological deportation policy violates the First Amendment because it suppresses protected speech based on its viewpoint. It also violates the First Amendment because it imposes sanctions on individuals in retaliation for their protected expression.

### A.    Defendants have an ideological deportation policy.

The evidence at trial will make clear that Defendants have a policy of revoking the visas and green cards of, and arresting, detaining, and deporting noncitizen students and faculty based on their pro-Palestinian advocacy. As explained at greater length above, *see* SOF Part II, Defendants have described this ideological deportation policy publicly in official statements, which senior agency officials understand to constitute "guidance" and have incorporated into their own internal guidance to lower-ranking agency employees. Defendants have implemented the

policy in a variety of ways, including by issuing formal guidance and establishing processes for identifying international students and faculty engaged in pro-Palestinian expression to target under the policy. And they have enforced the policy against an untold number of students, including the five Targeted Noncitizens who have been the focus of Defendants' limited productions in discovery.

In this Court, however, Defendants deny the policy's existence, arguing that there is "not any formal directive, or codified program." Gov't PI Opp'n 12, ECF No. 65. That argument ignores the many ways in which the policy is codified in official statements, formal guidance, and the processes established to implement it, as explained above. But even if the policy were entirely unwritten, this Court was correct in observing that "First Amendment challenges may be brought against unwritten policies." *AAUP v. Rubio*, No. 25-cv-10685, 2025 WL 1235084, at *19 (D. Mass Apr. 29, 2025); *see also Aracely v. Nielsen*, 319 F. Supp. 3d 110, 138–39, 145–49 (D.D.C. 2018) (collecting cases); *Greater Bos. Legal Servs. v. DHS*, 2022 WL 138629, at *7 (D. Mass. Jan. 14, 2022). A contrary rule would insulate a broad array of official conduct from review, which is why courts have not adopted it. *Aracely*, 319 F. Supp. 3d at 139.[9]

---

[9] When addressing challenges to unwritten policies, courts routinely treat the public statements of government officials as *evidence* of a policy's existence. *See, e.g.*, *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 165 (E.D.N.Y. 2018) ("Defendants have repeatedly stated that there is a policy and even pointed to regulations that purportedly authorize such a policy."); *Hoye v. City of Oakland*, 653 F.3d 835, 856 (9th Cir. 2011) (noting that public officials' statements that "acknowledge" or "definitively articulate a content-discriminatory enforcement policy" can be evidence of that policy's existence); *Elec. Priv. Info. Ctr. v. DHS*, 653 F.3d 1, 7 (D.C. Cir. 2011) (explaining that, in the APA context, it is "clear that an agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding" (quoting *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002))).

**B.    The ideological deportation policy is unconstitutional because it discriminates on the basis of viewpoint.**

As explained above, the evidence at trial will establish that the ideological deportation policy discriminates against noncitizen students and faculty based on their pro-Palestinian expression and association. This violates the First Amendment's prohibition on viewpoint discrimination.

The First Amendment framework that applies is straightforward: if a regulation of speech discriminates based on content or viewpoint, then the regulation is "presumptively unconstitutional" unless the government demonstrates that it is "narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015); *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (characterizing viewpoint discrimination as an "egregious form of content discrimination"); *id.* at 828 ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."). A regulation of speech is content- or viewpoint-based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. Importantly, if a regulation of speech is viewpoint-based, it "is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* at 165 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)). In other words, if a policy regulates speech on the basis of its content or viewpoint, strict scrutiny applies no matter the government's intent, and the "party opposing the government need adduce no evidence of an improper censorial motive." *Id.* at 165 (quoting *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 117 (1991) (internal quotation marks omitted)).

36

It is beyond serious question that the ideological deportation policy is viewpoint based. As explained above, *see* SOF Part II, Defendants have openly proclaimed their policy of targeting individuals based on expression that Defendants deem to be "antisemitic," "pro-Hamas," "pro-terrorist," or "pro-Palestinian." *See* SOF Part II.A. They have established processes for identifying students and faculty who engage in this expression. *See* SOF Part II.B. They acknowledge having enforced the policy against potentially hundreds of student protesters, including the five Targeted Noncitizens, and have said they will enforce it against others. *See* SOF Part II.C. Tellingly, with respect to the five Targeted Noncitizens, Defendants have cited—in support of their legal authority to act—the fact that each individual expressed constitutionally protected viewpoints. *See id.* & n.6. Defendants' explanations to the public confirm that this was the basis for their actions. *See id.* This is textbook viewpoint discrimination.

Because the ideological deportation policy is viewpoint-discriminatory, it must be invalidated unless it survives strict scrutiny—but it cannot. To begin with, the policy challenged here is especially offensive to First Amendment values for at least two reasons.

First, the speech targeted by the policy—criticism of Israel's policies, criticism of our own government's policies relating to the Middle East, and advocacy of Palestinian rights—is "at the core of what the First Amendment is designed to protect." *Virginia v. Black*, 538 U.S. 343, 365 (2003). As the Court noted at the final pretrial conference, "statements concerning the policies of the State of Israel are political expression and are among the most protected statements under the First Amendment." June 26, 2025 Tr. 24:14–16, ECF No. 165. Accordingly, the ideological deportation policy "trenches upon an area in which the importance of First Amendment protections *is at its zenith*," *Ragbir v. Homan*, 923 F.3d 53, 70 (2d Cir. 2019) (quoting *Meyer v. Grant*, 486

U.S. 414, 421–22, 425 (1988)), *cert. granted, judgment vacated on other grounds sub nom. Pham v. Ragbir*, 141 S. Ct. 227 (2020); *see also Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991).

Second, the policy challenged here regulates speech in the university setting, a setting in which the First Amendment's protections are especially important. As the Supreme Court has recognized, regulations of speech on campus pose the acute danger of "chilling [the] individual thought and expression . . . that is at the center of our intellectual and philosophic tradition." *Rosenberger*, 515 U.S. at 835. And as this Court has already explained, "the First Amendment is 'nowhere more vital than in our schools and universities.'" *AAUP*, 2025 WL 1235084, at *16 (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 763 (1972)); *see also Rosenberger*, 515 U.S. at 836 ("For the [state] University, by regulation, to cast disapproval on particular viewpoints of its students risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses.").

Defendants have sought to defend the ideological deportation policy by pointing to national security and foreign policy interests, but the mere incantation of these interests cannot satisfy the First Amendment's requirements. *See, e.g.*, *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010) ("[C]oncerns of national security and foreign relations do not warrant abdication of the judicial role. We do not defer to the Government's reading of the First Amendment, even when such interests are at stake."); *Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986) ("The Executive has broad discretion over the admission and exclusion of aliens, but that discretion is not boundless. . . . It is the duty of the courts, in cases properly before them, to say where [the] statutory and constitutional boundaries lie.").

While the government does of course have a legitimate interest in addressing antisemitism and other forms of invidious discrimination, the policy challenged here conflates antisemitism with

criticism of the Israeli government's policies and general expressions of support for Palestinian human rights and self-determination, and by doing so implicates a broad swath of political speech that falls within the core of the First Amendment's protection. Even a policy that focused more narrowly on the suppression of antisemitic or racist speech would likely still run afoul of the First Amendment. *See, e.g.*, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395–96 (1992) (viewpoint-discriminatory ordinance is not "narrowly tailored to serve compelling state interests" when the ordinance is meant to "display[] the [government's] special hostility" toward that viewpoint). The policy challenged here, which sweeps far more broadly, plainly cannot be reconciled with settled First Amendment doctrine.

That the speakers targeted by the policy are noncitizens does not change the analysis. As this Court recognized in denying Defendants' motion to dismiss, "[i]t is well established that noncitizens have at least some First Amendment rights." *AAUP*, 2025 WL 1235084, at *19; *see also Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and of press is accorded aliens residing in this country."); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (similar); *Parcham v. INS*, 769 F.2d 1001, 1004 (4th Cir. 1985) ("It has long been held that aliens residing in this country enjoy the protection of the First Amendment."). And while other courts have reasoned that noncitizens in the United States have "full" First Amendment rights, *see, e.g.*, *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1063–66 (9th Cir. 1995), this Court need not delineate the outer bounds of noncitizens' First Amendment rights to resolve this case, because whatever the scope of their rights, they encompass at the very least the right not to be arrested and deported from the country for engaging in political speech that supports a disfavored viewpoint. *Am.-Arab Anti-Discrimination Comm.*, 70 F.3d at 1056 (foreign policy concerns do not deprive the courts of their "essential function in ensuring that aliens are not targeted by the INS in

retaliation for exercising their acknowledged constitutional rights"); *Ragbir*, 923 F.3d at 73 (holding that the First Amendment protects noncitizens who are threatened with deportation as a result of their protected speech).[10]

Indeed, the policy challenged here would be unconstitutional even if noncitizens had no First Amendment rights. As Plaintiffs observed in opposing Defendants' motion to dismiss, multiple courts have made clear that the First Amendment limits the government's power to act on the basis of viewpoint even when it seeks to *exclude* a foreign citizen who has *not yet been admitted* to the country—a context in which Congress's power is "plenary," the only First Amendment rights at issue are the listener interests of U.S. citizens, and the courts' role is narrowly circumscribed. *Mandel*, 408 U.S. at 769; *Abourezk v. Reagan*, 592 F. Supp. 880, 887 & n.23 (D.D.C. 1984) ("[A]lthough the government may deny entry to aliens altogether, or for any number of specific reasons, it may not, consistent with the First Amendment, deny entry solely on account of the content of speech."), *vacated and remanded on other grounds*, 785 F.2d 1043 (D.C. Cir. 1986); *Allende v. Shultz*, 605 F. Supp. 1220, 1225 (D. Mass. 1985) (quoting relevant language from *Abourezk*, 592 F. Supp. at 887, approvingly), *aff'd*, 845 F.2d 1111 (1st Cir. 1988); *Harvard L. Sch. Forum v. Shultz*, 633 F. Supp. 525, 531 (D. Mass. 1986) ("[T]he Secretary's reason . . . is not facially legitimate [because it] is directly related to the suppression of a political debate with American citizens."), *vacated without opinion*, 852 F.2d 563 (1st Cir. 1986); *see also Am. Acad. of Religion v. Chertoff*, 463 F. Supp. 2d 400, 415–16, 419 (S.D.N.Y 2006), *aff'd sub. nom. Am.*

---

[10] In a string of recent cases, courts have treated this proposition as axiomatic. *See, e.g.*, *Mohammed H. v. Trump*, No. 25-CV-1576, 2025 WL 1692739, at *3 (D. Minn. June 17, 2025); *Aditya W. H. v. Trump*, No. 25-CV-1976, 2025 WL 1420131, at *10 (D. Minn. May 14, 2025); *Ercelik v. Hyde*, No. 1:25-CV-11007, 2025 WL 1361543, at *10 (D. Mass. May 8, 2025); *Mahdawi v. Trump*, No. 2:25-CV-389, 2025 WL 1243135, at *9 (D. Vt. Apr. 30, 2025); *Öztürk v. Trump*, No. 2:25-CV-374, 2025 WL 1145250, at *18 (D. Vt. Apr. 18, 2025).

*Acad. of Religion v. Napolitano*, 573 F.3d 115 (2d Cir. 2009). The upshot of the cases involving exclusion (as distinguished from deportation) is that the ideological deportation policy would be unconstitutional even if the targeted noncitizen faculty and students had no First Amendment rights at all.

### C.    The ideological deportation policy is unconstitutionally retaliatory.

The ideological deportation policy is unconstitutional for the additional reason that it is impermissibly retaliatory—that is, it reflects a decision to take adverse action against individuals based in substantial part on their constitutionally protected speech. The very same evidence that establishes the policy's existence and enforcement, *see supra* SOF Part II, makes clear that the policy is an effort to retaliate against protected speech.

Ordinarily, when an individual plaintiff alleges First Amendment retaliation, the plaintiff must show that (1) they "engaged in constitutionally protected conduct"; (2) that they were "subjected to an adverse action" by the defendant; and (3) that "the protected conduct was a substantial or motivating factor in the adverse action." *Gattineri v. Town of Lynnfield, Mass.*, 58 F.4th 512, 514 (1st Cir. 2023) (quoting *Falmouth Sch. Dep't v. Doe on behalf of Doe*, 44 F.4th 23, 47 (1st Cir. 2022) (internal quotation marks omitted)). Here, Plaintiffs challenge a policy, rather than any individual instance of retaliation. The Supreme Court has explained that "[a]n official retaliatory policy is a particularly troubling and potent form of retaliation, for a policy can be long term and pervasive, unlike an ad hoc, on-the-spot decision by an individual [government official]." *Lozman v. City of Riviera Beach, Fla.*, 585 U.S. 87, 100 (2018). To demonstrate that the ideological deportation policy is retaliatory, Plaintiffs will show that (1) the policy targets a category of individuals engaged in constitutionally protected expression and association, (2) the policy entails the taking of adverse actions against that category of individuals, and (3) Defendants' motivation

for the policy was to punish individuals for their constitutionally protected expression and association.

First, as explained above, the evidence will show that Defendants established and implemented a policy of targeting noncitizen students and faculty engaged in constitutionally protected pro-Palestinian expression. S*ee* SOF Parts II.A–B. Second, the evidence will show that, pursuant to the policy, Defendants have targeted (and continue to target) such individuals with multiple adverse actions, including visa and green card revocation, arrest, detention, and deportation. *See* SOF Parts II.A–C. Finally, the evidence will show that Defendants are targeting these individuals *because of* their constitutionally protected speech. The evidence in this regard will include, among other things: Defendants' public statements describing the policy, which straightforwardly acknowledge their motive to retaliate against pro-Palestinian expression, *see* SOF Part II.A; Defendants' investigation of students and faculty engaged in such expression, *see* SOF Part II.B; Defendants' internal policy guidance, which directs government officials to screen the speech and social media accounts of visa applicants for pro-Palestinian viewpoints that are disfavored by the government, *see id.*; and the actual enforcement of the policy against the five Targeted Noncitizens, in which the government has cited each individual's pro-Palestinian speech or protest activity as a justification for taking adverse action, *see* SOF Part II.C.

Many other courts, relying on narrow slices of the evidence described above, have concluded that Defendants retaliated against specific students for their pro-Palestinian expression and advocacy. *See, e.g.*, *Mahdawi v. Trump*, No. 2:25-cv-389, 2025 WL 1243135, at *10 (D. Vt. Apr. 30, 2025) (relying on same public statements as here in concluding that "this evidence is sufficient for Mr. Mahdawi's present purpose of raising a 'substantial claim' of First Amendment retaliation"); *Öztürk v. Trump*, No. 2:25-cv-374, 2025 WL 1145250, at *19 (D. Vt. Apr.18, 2025)

(in allowing Ms. Öztürk's retaliation claim to proceed, observing that "[a]dministration officials have identified her speech as the reason her visa was revoked"); *Ercelik v. Hyde*, No. 1:25-CV-11007, 2025 WL 1361543, at *11 (D. Mass. May 8, 2025) (concluding that "every fact points to Petitioner's [pro-Palestinian expression] as the substantial or motivating factor for Respondents' pursuit of detention"); *Aditya W.H. v. Trump*, No. 25-cv-1976, 2025 WL 1420131, at *11 (D. Minn. May 14, 2025) (concluding that the evidence "evince[s] an Executive policy to target noncitizen students located in the United States based on the expression of viewpoints about matters of public concern disfavored by the government," including pro-Palestinian expression); *Mohammed H. v. Trump*, No. 25-cv-1576, 2025 WL 1692739, at *4 (D. Minn. June 17, 2025) ("The more plausible inference, supported by timing, context, and the Government's own public statements, is that Petitioner was arrested and detained because he expressed pro-Palestinian views and criticized violence in Gaza."). The much broader array of evidence available to this Court in this case will show that the cases of individual students were instances of a broader policy. That broader policy entails retaliation against noncitizen students and faculty for expression and association protected by the First Amendment.

## III.   Defendants' coercive threats independently violate the First Amendment.

Defendants' public statements help establish the existence and scope of the ideological deportation policy—a policy that is unconstitutional for the reasons explained above. But these statements also violate the First Amendment in themselves, because they are part of a campaign of threats aimed at suppressing pro-Palestinian speech and advocacy. Of course, the government is entitled to speak on matters of public concern, including in ways that might deter disfavored political views, as this Court observed at earlier hearings in this case. *See, e.g.*, May 6, 2025 Tr., ECF 87. But the government's threats to arrest, detain, and deport noncitizen students and faculty

for their protected expression and associations—and their subsequent actions making good on those threats—go far beyond legitimate government speech. They are unconstitutional attempts to intimidate noncitizens into silence. The evidence at trial will show that Defendants' high-profile roundup of student protestors and their public statements accompanying that conduct are unconstitutionally "coercive threats aimed at punishing or suppressing disfavored speech." *NRA v. Vullo*, 602 U.S. 175, 197 (2024) (cleaned up).

The Supreme Court has made clear that government speech has its limits. Of course, government officials must be able to speak—sometimes forcefully—to do their jobs. "Indeed, it is not easy to imagine how government could function if it lacked this freedom." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009); *see also Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015) ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."); *Goldstein v. Galvin*, 719 F.3d 16, 30 (1st Cir. 2013) ("Not only do public officials have free speech rights, but they also have an obligation to speak out about matters of public concern."). But "[t]his does not mean that there are no restraints on government speech." *Pleasant Grove*, 555 U.S. at 468.

Most importantly here, the Supreme Court held in *Bantam Books, Inc. v. Sullivan* that the First Amendment forbids government officials from using the "threat of invoking legal sanctions and other means of coercion" to "achieve the suppression" of protected speech. 372 U.S. 58, 67 (1963). As the Court explained just last Term in reaffirming *Bantam Books*, this rule ensures "that a government official cannot do indirectly what she is barred from doing directly." *Vullo*, 602 U.S. at 190; *see also Perkins Coie LLP v. U.S. Dep't of Just.*, No. 25-716, 2025 WL 1276857, at *26 (D.D.C. May 2, 2025) ("[T]hreats of retaliation to effectuate viewpoint discrimination [are] uniquely harmful to a free and democratic society." (cleaned up)).

The constitutional line that *Bantam Books* and *Vullo* draw is between permissible efforts to persuade and impermissible efforts to coerce. In *Bantam Books*, a state commission with authority to investigate violations of the state's obscenity laws sent letters to a book distributor explaining that "certain designated books or magazines" were, in the commission's view, "objectionable" and "reminding" the distributor of the commission's "duty to recommend to the Attorney General prosecution of purveyors of obscenity." 372 U.S. at 60–62. When the publishers of the books sued, the Supreme Court held that the commission had impermissibly used the threat of legal sanctions to suppress disfavored publications. *Id.* at 67. Similarly, in *Vullo*, a financial regulator "brought a variety of insurance-law violations to [an insurer's] . . . attention during a private meeting," but suggested that "she would be less interested in pursuing these infractions so long as [the insurer] ceased providing insurance to gun groups, especially the NRA." 602 U.S. at 192 (cleaned up). The Court held that the official was free to criticize the NRA, but that she had impermissibly used the power of the state to coerce suppression of the organization's gun-promotion advocacy. *Id.* at 194. The line drawn by these cases seeks to give appropriate breathing space to the government's authority and obligation to speak on issues of public significance, while foreclosing speech that is intended to scare individuals into silence. *See id.* at 188.

To prevail on a coercion claim under *Bantam Books* and *Vullo*, the Supreme Court has said that a plaintiff must show that government officials engaged in "conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Id.* at 191. Courts must consider the totality of the circumstances in applying this test, including factors like "'(1) word choice and tone; (2) the existence of regulatory authority; (3) whether the speech was perceived as a threat; and, perhaps most importantly, (4) whether the speech refers to adverse consequences." *Id.* at 189 (quoting *NRA v.*

45

*Vullo*, 49 F.4th 700, 715 (2d Cir. 2022)), *vacated and remanded*, 602 U.S. 175 (2024)); *see also President & Fellows of Harvard Coll. v. DHS.*, No. 25-cv-11472, 2025 WL 1737493, at *21 (D. Mass. June 23, 2025) (citing a threatening statement by a government spokesperson as evidence that the government was "us[ing] the power of the State to punish or suppress disfavored expression").

 The evidence at trial will amply demonstrate that Defendants' campaign of threats was coercive.

Plaintiffs will introduce evidence showing that Defendants repeatedly threatened to revoke the visas and green cards of, and to arrest, detain, and deport noncitizens based on their political speech. *See* SOF Part II.A. These statements called out a particular group that had engaged in protected political speech; they threatened specific adverse consequences; they came from officials with the regulatory authority to carry out the threat; and, the evidence will show, they were understood by Plaintiffs' noncitizen members as the clear threats that they were. *Cf. Vullo*, 602 U.S. at 193 (evaluating the effect of the allegedly coercive threats on the recipient); *Nat'l Educ. Ass'n*, 2025 WL 1188160, at *26 (same). The evidence will also show that Defendants then effectuated this campaign of coercive threats through more than just words. Specifically, it will show that Defendants implemented processes to identify individuals who engage in the pro-Palestinian expression targeted by Defendants' threats, *see* SOF Part II.B, and that they enforced the policy against potentially hundreds of individuals, including the five Targeted Noncitizens, *see* SOF Part II.C. Plaintiffs' noncitizen witnesses will testify that they understood these actions as threats and were intimidated as a result. *See* SOF Part III.A.

While there is no question that the President and members of his administration enjoy the bully pulpit, Defendants statements and actions went well beyond that prerogative and entered the

impermissible terrain of coercive threats. As this Court observed in its opinion denying Defendants' motion to dismiss, "[i]t is hard to imagine a policy more focused on intimidating its targets from practicing protected political speech." *AAUP*, 2025 WL 1235084, at *19.

## IV. The ideological deportation policy violates the APA.

Finally, the evidence will demonstrate that Plaintiffs have more than met their burden to establish that the ideological deportation policy violates the APA.

### A. The policy is subject to review under the APA.

Plaintiffs are entitled to APA review of the ideological deportation policy because it is a "final agency action" for which there is "no other adequate remedy," 5 U.S.C. § 704, and because their claims fall within the relevant zone of interests, s*ee Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, 123 F.4th 1, 20 (1st Cir. 2024).

In its opinion denying in part Defendants' motion to dismiss, this Court correctly held that, based on the allegations in the complaint, the ideological deportation policy constituted final agency action. To reach this conclusion, the Court acknowledged two key legal principles. First, the standard for finality is broad. To be final, an agency action must be "one by which rights and obligations have been determined" or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). Second, and relatedly, the standard for finality is flexible; a policy need not be written down to be final. *See, e.g. Greater Bos. Legal Servs.*, 2022 WL 138629, at *7 ("Failure to allege a written policy is not fatal to Plaintiffs' [APA] claim."); *Velesaca v. Decker*, 458 F. Supp. 3d 224, 243 (S.D.N.Y 2020) (explaining that "finality can be gleaned from agency action and the effects thereof and does not require any written evidence"); *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) (similar). And while final agency action must be more than "a constellation of independent decisions or a general drift in agency

priorities," *AAUP*, 2025 WL 1235084, at *21, finality is "interpreted pragmatically" and not susceptible to bright-line requirements, *R.I.L-R*, 80 F. Supp. 3d at 184 (cleaned up); *see Venetian Casino Resort LLC v. EEOC,* 530 F.3d 925, 929 (D.C. Cir. 2008) (permitting review of an unwritten policy where "the record" as a whole "leaves no doubt" that a policy exists, even though "the details . . . are still unclear"). Applying these principles to the allegations in the complaint, this Court held that Plaintiffs had plausibly alleged final agency action: a policy of "targeting noncitizens who engage in pro-Palestinian advocacy for visa revocation and deportation." *AAUP*, 2025 WL 1235084, at *21.

The evidence at trial will confirm this conclusion. Plaintiffs will introduce multiple statements from senior government officials and the agencies themselves proclaiming Defendants' policy of revoking the visas and green cards of, and arresting, detaining, and deporting noncitizens based on their pro-Palestinian advocacy. *See* SOF Part II.A; *see also Amadei v. Nielsen*, 348 F. Supp. 3d 145, 165 (E.D.N.Y. 2018) ("Defendants have repeatedly stated that there is a policy and . . . cannot, now, have their cake and eat it too."). And documentary evidence and witness testimony will show that the policy evidenced by these statements was clarified through formal agency guidance and was then operationalized down the agency chain of command and enforced with concrete legal consequences for the five Targeted Noncitizens and others. *See* SOF Part II.B–C.

The evidence likewise supports the Court's conclusion that there is no adequate alternative remedy. *AAUP*, 2025 WL 1235084, at *21. Evidence at trial will substantiate the harms Plaintiffs alleged in the complaint: "the chill on noncitizen members' speech, the harm to citizen members' ability to hear from and associate with noncitizen colleagues and students, and the direct harm to the organizations' core missions of supporting academic freedom and to their core activities and

48

spending." *Id.* And, as this Court has already concluded, these harms cannot be redressed through individual removal proceedings. *Id.* Many of the AAUP and MESA members harmed by the policy will never (and in many cases could never) be placed in removal proceedings, and in any event the harms caused by these First Amendment violations will come to pass well before many removal proceedings are resolved. *See Velesaca*, 458 F. Supp. 3d at 243 (explaining that a challenge to a broader policy "rather than [Plaintiffs'] individual custody findings" made it "improbable that Plaintiffs can receive an adequate remedy by appealing to an IJ or the BIA"); *Greater Bos. Legal Servs.*, 2022 WL 138629, at *5 (finding no adequate alternative remedy where plaintiffs were "not parties to the individual challenges between a noncitizen facing removal and the [a]gencies," and individual review could "not address the broader injury alleged by" plaintiffs).

Finally, to the extent the "zone of interests" requirement applies to Plaintiffs' claims, it is satisfied here. It is unclear, as an initial matter, whether the requirement applies to Plaintiffs' claim that the policy is contrary to constitutional right. As the Ninth Circuit observed recently, the test focuses "on *Congress's intent* in creating statutory causes of action, casting doubt on [the] argument that a zone of interests test has any role to play . . . where Plaintiffs' theory derives from the Constitution." *Sierra Club v. Trump*, 929 F.3d 670, 702 (9th Cir. 2019). Even if the test applies to Plaintiffs' constitutional claims, however, Plaintiffs' interests clearly fall within the zone of interests of the First Amendment. *See id.* at 702–03 (noting that the zone-of-interests test focuses on the underlying cause of action, "not any zone of interests of the APA itself").

Plaintiffs' arbitrary-and-capricious claim also plainly falls—though it need only "arguably fall[]"—within "the zone of interests to be protected or regulated by the underlying statute"—in this case, the Immigration and Nationality Act ("INA"). *Seafreeze Shoreside, Inc.*, 123 F.4th at 20. The zone of interests test is "lenient," with all doubts resolved in the plaintiff's favor. *Lexmark*

*Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014). It "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized the plaintiff to sue." *Id.* (cleaned up).

The interests of Plaintiffs and their members "bear[] a plausible relationship to the policies underlying" the INA. *CSL Plasma Inc. v. CBP*, 33 F.4th 584, 593 (D.C. Cir. 2022) (cleaned up). Plaintiffs' noncitizen members, of course, have a direct interest in the lawful enforcement of the INA, because their immigration status is determined by that statute. *See Al Otro Lado, Inc. v. Nielsen*, 327 F. Supp. 3d 1284, 1301 & n.7 (S.D. Cal. 2018) ("Other district courts have found that organizational plaintiffs like Al Otro Lado can fall within the INA's zone of interests when it has members or clients targeted by the government action."); *Doe v. U.S. Immigr. & Customs Enf't*, 490 F. Supp. 3d 672, 685 (S.D.N.Y. 2020) ("Defendants do not contest that [the noncitizen plaintiff] falls within the INA's zone of interests."); *Khedkar v. U.S. Citizenship & Immigr. Servs.*, 552 F. Supp. 3d 1, 11 (D.D.C. 2021) (concluding that a visa holder fell within the INA's zone of interests and rejecting the argument that "Congress was completely indifferent to the interests of the 'qualified immigrants' themselves"). Plaintiffs and their citizen members also fall within the INA's zone of interests, because the INA includes visa classifications that enable foreign students, scholars, and others to study and work at U.S. universities, *see, e.g.*, 8 U.S.C. § 1101 (a)(15)(F), (J), and Congress "presumably" intended those visa holders to "benefit the people" and organizations that work with them. *CSL Plasma Inc.*, 33 F.4th at 590; *see Abourezk*, 785 F.2d at 1047, 1050–51 (holding that organizations that invited foreign nationals to attend meetings or address audiences in the United States were within the INA's zone of interests). Accordingly, the ideological deportation policy is subject to review under the APA.

**B.    The ideological deportation policy is contrary to constitutional right and arbitrary and capricious.**

The ideological deportation policy violates the APA in two ways. First, and most straightforwardly, it is contrary to constitutional right because, for the reasons explained above, it contravenes the First Amendment. *See supra* Part II.

Second, the policy is arbitrary and capricious and an abuse of discretion. An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Melone v. Coit*, 100 F.4th 21, 29 (1st Cir. 2024) (cleaned up). Ultimately, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). This is so even though agencies enjoy significant discretion in immigration enforcement. *See Biden v. Texas*, 597 U.S. 785, 806–07 (2022) ("[U]nder the APA, DHS's exercise of discretion within [the INA's] statutory framework must be reasonable and reasonably explained."). Here, Defendants have not articulated any legitimate interest in suppressing the broad category of pro-Palestinian expression targeted by the policy, and there is none. The policy is therefore neither "reasonable" nor "reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Accordingly, it violates the APA.

## Conclusion

The evidence presented at trial will demonstrate that the ideological deportation policy violates the First Amendment and the APA, and that Defendants' coercive threats independently violate the First Amendment.

July 7, 2025                              Respectfully submitted,

                                          /s/ Ramya Krishnan

Edwina Clarke (BBO 699702)                Ramya Krishnan
David Zimmer (BBO 692715)                 Alex Abdo
Zimmer, Citron & Clarke, LLP              Carrie DeCell
130 Bishop Allen Drive                    Xiangnong Wang
Cambridge, MA 02139                       Talya Nevins
(617) 676-9423                            Jackson Busch
edwina@zimmercitronclarke.com             Scott Wilkens
                                          Jameel Jaffer
Noam Biale                                Knight First Amendment Institute
Michael Tremonte                            at Columbia University
Alexandra Conlon                          475 Riverside Drive, Suite 302
Courtney Gans                             New York, NY 10115
Sher Tremonte LLP                         (646) 745-8500
90 Broad Street, 23rd Floor               ramya.krishnan@knightcolumbia.org
New York, New York 10004
(212) 202-2603                            Ahilan T. Arulanantham (SBN 237841)
mtremonte@shertremonte.com                Professor from Practice
nbiale@shertremonte.com                   UCLA School of Law
                                          385 Charles E. Young Dr. East
                                          Los Angeles, CA 90095
                                          (310) 825-1029
                                          arulanantham@law.ucla.edu

                                          *Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, the undersigned counsel, certify that on July 7, 2025, I electronically filed the foregoing

motion in the United States District Court for the District of Massachusetts using the CM/ECF

system. I certify that all participants in the case are registered CM/ECF users and that service

will be accomplished by the CM/ECF system.

Dated: July 7, 2025

/s/ Ramya Krishnan
Ramya Krishnan