**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, ET AL., | |
| Plaintiffs, | Case No. 1:25-cv-10685 (WGY) |
| v. | |
| MARCO RUBIO, ET AL., | |
| Defendants. | |

**EXHIBITS TO PLAINTIFFS' PRETRIAL BRIEF**

*AAUP v. Rubio*
1:25-cv-10685 (D. Mass.)

**INDEX OF EXHIBITS
PLAINTIFFS' PRETRIAL BRIEF**

International Holocaust Remembrance Alliance, "Working Definition of antisemitism" ...................................................................................1

Second Supplemental Declaration of Acting Field Office Director William P. Joyce, *Khalil v. Joyce*, No. 25-cv-01963, ECF No. 72 (S.D.N.Y. Mar. 17, 2025)...............................................................................2

Defendant's Production DEF-064–83, Office of Visa Services, *Enhanced Vetting and Social Media Screening of Visa Applicants*, April 3–4, 2025.......................................................................................3

Transcript of Deposition of Stuart Wilson (June 24, 2025) ....................................4

Transcript of Deposition of John Armstrong (June 12, 2025) ................................5

Transcript of Deposition of Peter Hatch (June 25, 2025) ......................................6

Canary Mission, "Our Mission" ............................................................................7

Anti-Defamation League, "Betar USA" Chapter webpage ....................................8

Declaration of Unit Chief Roy M. Stanley, *Taal v. Trump*, No. 3:25-cv-335, ECF No. 30-2 (N.D.N.Y. Mar. 22, 2025)...................................................9

Transcript of Deposition of Andre Watson (June 11, 2025)..................................10

Defendant's Production DEF-088–94, Cable 25 State 17178, *Catch and Revoke: National Security Through Timely Processing of Visa System Messages* (Feb. 28, 2025) ...............................................................11

5 FAM 1200 ...........................................................................................................12

Defendant's Production DEF-084–87, Cable 25 State 45612, *Caught and Revoked: Updated Guidance on Systems Messages* (May 15, 2025)..............13

Cable 25 State 59756, *Action Request: Expanding Screening and Vetting for FMJ Applicants* (June 18, 2025) ................................................................14

U.S. Department of State, Foreign Affairs Manual, Homepage ...........................15

9 FAM 402.5 ..........................................................................................................16

9 FAM 302.6 ...........................................................................................17

9 FAM 403.11 .........................................................................................18

Letter from Kristi Noem to Harvard University, *Student and Exchange
Visitor Program Student Records Request* (Apr. 17, 2025) ............................19

Press Release, Department of Homeland Security, *100 Days of Fighting
Fake News* (Apr. 30, 2025) ........................................................................20

# EXHIBIT 1



INTERNATIONAL
**HOLOCAUST**
**REMEMBRANCE**
ALLIANCE

‹ **Back**                                                    **Share** ⦸

**Language: English**                                                    ∧

Arabic

Bulgarian

Croatian

Czech

Danish

Dutch

English

Estonian

Finnish

French

German

✎ Working Definitions & Charters

# Working definition of antisemitism

Read the full text of the IHRA's non-legally binding working definition of antisemitism and learn more about this important tool with the related resources and FAQs below.

Our working definitions are available in multiple languages. While we try to ensure the accuracy of all of our translations, in the event of any discrepancies, the English translation takes precedence.



**What is the IHRA?**

**Explore all IHRA Resources**

In the spirit of the Stockholm Declaration that states: "With humanity still scarred by … antisemitism and xenophobia the international community shares a solemn responsibility to fight those evils" the committee on Antisemitism and Holocaust Denial called the IHRA Plenary in Budapest 2015 to adopt the following working definition of antisemitism.

On 26 May 2016, the Plenary in Bucharest decided to:

> **Adopt the following non-legally binding working definition of antisemitism:**
>
> **"Antisemitism is a certain perception of Jews, which may be expressed as hatred toward Jews. Rhetorical and physical manifestations of antisemitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities."**

To guide IHRA in its work, the following examples may serve as illustrations:

Manifestations might include the targeting of the state of Israel, conceived as a Jewish collectivity. However, criticism of Israel similar to that leveled against any other country cannot be regarded as antisemitic. Antisemitism frequently charges Jews with conspiring to harm humanity, and it is often used to blame Jews for "why things go wrong." It is

expressed in speech, writing, visual forms and action, and employs sinister stereotypes and negative character traits.

Contemporary examples of antisemitism in public life, the media, schools, the workplace, and in the religious sphere could, taking into account the overall context, include, but are not limited to:

- Calling for, aiding, or justifying the killing or harming of Jews in the name of a radical ideology or an extremist view of religion.

- Making mendacious, dehumanizing, demonizing, or stereotypical allegations about Jews as such or the power of Jews as collective — such as, especially but not exclusively, the myth about a world Jewish conspiracy or of Jews controlling the media, economy, government or other societal institutions.

- Accusing Jews as a people of being responsible for real or imagined wrongdoing committed by a single Jewish person or group, or even for acts committed by non-Jews.

- Denying the fact, scope, mechanisms (e.g. gas chambers) or intentionality of the genocide of the Jewish people at the hands of National Socialist Germany and its supporters and accomplices during World War II (the Holocaust).

- Accusing the Jews as a people, or Israel as a state, of inventing or exaggerating the Holocaust.

- Accusing Jewish citizens of being more loyal to Israel, or to the alleged priorities of Jews worldwide, than to the interests of their own nations.

- Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor.

- Applying double standards by requiring of it a behavior not expected or demanded of any other democratic nation.

- Using the symbols and images associated with classic antisemitism (e.g., claims of Jews killing Jesus or blood libel) to characterize Israel or Israelis.

 Drawing comparisons of contemporary Israeli policy to that of the Nazis.

 Holding Jews collectively responsible for actions of the state of Israel.

**Antisemitic acts are criminal** when they are so defined by law (for example, denial of the Holocaust or distribution of antisemitic materials in some countries).

**Criminal acts are antisemitic** when the targets of attacks, whether they are people or property – such as buildings, schools, places of worship and cemeteries – are selected because they are, or are perceived to be, Jewish or linked to Jews.

**Antisemitic discrimination** is the denial to Jews of opportunities or services available to others and is illegal in many countries.

## Featured download



Download the full text of the IHRA's working definition of antisemitism.

**Download file**

## Related resources



### Recommendations for Dealing with Antisemitism at Universities with Teacher Education

This resources provides recommendations for dealing with antisemitism at universities with teacher education.

**Find out more**



### The IHRA Working Definition of Antisemitism: A Guide to Implementation for Sporting Institutions

Helping combat antisemitism in and through sport.

**Find out more**



## EU handbook for the practical use of the IHRA working definition of antisemitism

Illustrating good practices in the application of the IHRA working definition of antisemitism.

**Find out more**

## Frequently asked questions

### Why was the IHRA working definition of antisemitism developed?    ⌄

### How did the IHRA adopt the working definition of antisemitism?    ⌄

### What has its impact been?    ⌄

### Who has adopted the working definition of antisemitism?    ⌄



**Download the IHRA working definition of antisemitism**



# Related content

22 Apr 2024

## Intersectional Insights: Combating Antisemitism in 2024 with KIgA

Established over 20 years ago, the Kreuzberger Initiative gegen Antisemitismus (KIgA) was one of the first organizations focused on combating antisemitism in Germany and this year won funding under the IHRA Grant Program.

**Read More**

03 May 2024

## Combating Antisemitism: The Never Again Association's Enduring Battle

In the early '90s, amid the promise of Poland's transition to democracy, a group of young visionaries were also witnessing the alarming rise of extreme right-wing ideologies. Inspired by the courage of those who resisted the Nazis, they founded the Never Again Association.

**Read More**

⌄ Other

## IHRA Toolkit Against Holocaust Distortion

Take steps towards recognizing and countering Holocaust distortion with the practical tools, guidance, and example activities included in this online Toolkit.

View

# Sign up to our newsletter to receive the latest updates

Email address

**Sign up**

By signing up to the IHRA newsletter, you agree to our Privacy Policy

## About the IHRA

The International Holocaust Remembrance Alliance (IHRA) is an intergovernmental organization with 35 Member Countries. We were founded in 1998 to address challenges related to the Holocaust and genocide of the Roma.

**Find out more**

---

**Useful Pages**

Press Room

Member Countries

Working Definitions

Resources for Education Professionals

Focus Areas

Annual Report

**Company**

Contact Us

Careers

Login for IHRA Delegates

---

**Sign up to our newsletter to receive monthly updates on our work**

Email address

**Sign up**



  

© IHRA 2025     <u>Privacy Policy</u>

# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>

MAHMOUD KHALIL,

                Petitioner,

v.

WILLIAM P. JOYCE, *et al.*,

                Respondents.

</td><td>

No. 25 Civ. 1935 (JMF)

SECOND SUPPLEMENTAL DECLARATION OF ACTING FIELD OFFICE DIRECTOR WILLIAM P. JOYCE

</td></tr>
</table>

### SECOND SUPPLEMENTAL DECLARATION OF WILLIAM P. JOYCE

I, WILLIAM P. JOYCE, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am an Acting Field Office Director ("(A)FOD") in the New York City Field Office of Enforcement and Removal Operations ("ERO New York") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS").

2.      I am aware that Mahmoud Khalil ("Khalil") has filed an Amended Petition for a Writ for Habeas Corpus before this Court.

3.      As the (A)FOD, I am responsible for, among other things, oversight of the civil immigration arrest and detention of aliens in the New York City area. In my role as the (A)FOD, I have access to records maintained in the ordinary course of business by ICE, including documentary records concerning ERO New York and the alien detainees who fall within its responsibility.

4.    I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business.

5.    Khalil is a native of Syria and citizen of Algeria who entered the United States under a F1 visa on December 20, 2022.

6.    On November 16, 2024, Khalil obtained Lawful Permanent Resident ("LPR") status as the spouse of a United States citizen.

7.    On March 8, 2025, Special Agents from the ICE Homeland Security Investigations ("HSI") Office of the Special Agent in Charge for the New York Area of Responsibility ("AOR") arrested Khalil at 8:35 p.m. at 195 Claremont Avenue in Manhattan, New York, for the purpose of placing him in removal proceedings.  HSI transported him to 26 Federal Plaza at 8:44 p.m. and arrived at 9:20 p.m.  While at 26 Federal Plaza, HSI served Khalil with a Notice to Appear ("NTA"), which charged him as removable pursuant to 8 U.S.C. § 1227(a)(4)(C)(i), in that the Secretary of State has reasonable grounds to believe that his presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States ("Exhibit A"). HSI also served Khalil with a Notice of Custody Determination, notifying Khalil that his detention was governed by 8 U.S.C. § 1226(a) (immigration custody during removal proceedings).

8.    Due to the lack of available detention space available to ERO New York, aliens arrested by ICE in that AOR are often detained at facilities in other AORs. This is an operational necessity to prevent overcrowding in ICE facilities.

9.    Orange County Jail in Goshen, New York did not have available detention space to accommodate Khalil and many ICE detention facilities throughout the Northeastern United States

are near or at capacity and engaged in efforts to relocate detained aliens to regions with available bedspace.

10.     Between March 8, 2025, and March 9, 2025, ERO New York transported sixteen detained aliens, including Khalil, from ERO New York's AOR to New Orleans Field Office of Enforcement and Removal Operations ("ERO New Orleans") AOR. Most of these transfers were for ongoing detention, while a small number were being staged for removal.  ERO New Orleans has administrative control of eight different detention facilities, meaning that AOR is often able to accommodate transfers when other AORs are not.

11.     Newark Field Office of Enforcement and Removal Operations ("ERO Newark") indicated that Elizabeth Detention Facility in Newark, New Jersey was experiencing and continues to experience a bedbug issue that prevented them from accepting detainees as full transfers. ERO New York did not request bed space from Philadelphia Field Office of Enforcement and Removal Operations ("ERO Philadelphia") or Buffalo Field Office of Enforcement and Removal Operations ("ERO Buffalo") based on awareness of general paucity of bedspace in those AORs compared to the known availability of bedspace in ERO New Orleans' AOR, as well as the need for those AORs to accommodate their own ongoing operations.

12.     While Khalil was at 26 Federal Plaza, ERO sought and obtained bedspace for Khalil from the ERO New Orleans Field Office.  The bedspace request for Khalil was made at 10:49 p.m. on March 8, 2025.  The travel packet for Khalil and his escorting officers was finalized at 3:57 a.m. on March 9, 2025, with a flight scheduled for 2:35 p.m. on March 9, 2025.

13.     ERO New York was responsible for locating bed space to detain Khalil and made its decisions on where to detain him based solely on operational considerations.

14.     ERO New York did not receive any directives or instructions pertaining to Khalil's detention.

15.     ICE's facility at 26 Federal Plaza is a Hold Room facility used for detention of individuals awaiting removal, transfer, EOIR hearings, medical treatment, intra-facility movement, or other processing into or out of a facility and it does not have beds or overnight medical staff. ICE ERO policy number 11087.2 dictates that absent exceptional circumstances, no detainee should be housed in a Hold Room facility for longer than 12 hours.

16.     In compliance with this policy, upon completion of initial processing, Khalil departed 26 Federal Plaza at 1:40 a.m. and ICE transported Khalil to Elizabeth Detention Facility in Newark, New Jersey, where he was physically present and booked into the detention facility at 2:20 a.m. Eastern Standard Time (3:20 a.m. Eastern Daylight Time) on March 9, 2025. Elizabeth Detention Facility has comprehensive overnight accommodations for detainees such as beds and 24-hour medical staff. As stated above, Khalil could not be housed at Elizabeth Detention Facility long-term due to the bedbug issue, so he remained there only until his flight to New Orleans.

17.     At the time Khalil filed a petition for a writ of habeas corpus in the Southern District of New York, he was detained at Elizabeth Detention Facility in Newark, New Jersey.

18.     On March 9, 2025, Khalil departed Elizabeth Detention Facility at 11:30 a.m. and was brought to the airport to be transported to the Central Louisiana ICE Processing Facility in Jena, Louisiana.

19.     On March 10, 2025, Khalil was booked into the Central Louisiana ICE Processing Facility at 12:33 a.m., Central Time and he has been detained at that detention facility since that time. ICE has no current plans or intentions to transfer Khalil from ERO New Orleans' AOR during the pendency of removal proceedings.

20.     Except for this ongoing lawsuit, ERO New York is not involved in Khalil's immigration removal proceedings which are pending before the LaSalle Immigration Court in Jena, Louisiana.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17 day of March 2025.



William P. Joyce
Acting Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

# Exhibit A

DEPARTMENT OF HOMELAND SECURITY

# NOTICE TO APPEAR

DOB: ▮▮▮▮▮

Event No: ▮▮▮▮▮▮

In removal proceedings under section 240 of the Immigration and Nationality Act:

Subject ID: ▮▮▮▮▮

FINS: ▮▮▮▮▮

File No: ▮▮▮▮▮

In the Matter of:

Respondent: MAHMOUD KHALIL _____ currently residing at:

▮▮▮▮▮▮▮

(Number, street, city, state and ZIP code)                    (Area code and phone number)

[ ] You are an arriving alien.

[ ] You are an alien present in the United States who has not been admitted or paroled.

[X] You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of SYRIA and a citizen of ALGERIA;

3. You were admitted to the United States at unknown place on or about unknown date as a unknown manner;ORYour status was adjusted to that of a lawful permanent resident on November 2024 under section 212 (a)(3)(C) of the Act;

4. The Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(4)(C)(i) of the Immigration and Nationality Act, as amended, in that the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.

[ ] This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

[ ] Section 235(b)(1) order was vacated pursuant to:   [ ] 8CFR 208.30   [ ] 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

830 PINEHILL RD JENA LA 71342. LASALLE DETENTION FACILITY

(Complete Address of Immigration Court, including Room Number, if any)

on ___March 27, 2025___ at ___8:30 AM___ to show why you should not be removed from the United States based on the

    (Date)          (Time)

charge(s) set forth above.

TIMOTHY MORAN - Supervisory Special Agent   TIMOTHY M MORAN JR  _Digitally signed by TIMOTHY M MORAN JR Date: 2025.03.09 09:41:11 -05'00'_

(Signature and Title of Issuing Officer)

Date: ___March 9, 2025___   ___26 Federal Plaza, New York, NY___

                                           (City and State)

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations which may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at www.uscis.gov/i-589. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at http://www.ice.gov/contact/ero, as directed by the DHS and regulated by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

## Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____    _____
                                                          *(Signature of Respondent)*

_____    Date: _____
*(Signature and Title of Immigration Officer)*

## Certificate of Service

This Notice To Appear was served on the respondent by me on March 9, 2025 , in the following manner and in compliance with section 239(a)(1) of the Act.

[X] in person   [ ] by certified mail, returned receipt # _____ requested   [ ] by regular mail
[ ] Attached is a credible fear worksheet.
[ ] Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the _____ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

(X) Refused to sign (B)    TIMOTHY M MORAN JR *Digitally signed*
*(Signature of Respondent if Personally Served)*    TIMOTHY MORAN - Supervisory Special Agent
                                                                                  *(Signature and Title of officer)*

DHS Form I-862 (6/22)    Page 2 of 3

**Privacy Act Statement**

**Authority:**

The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**

You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**

For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**

Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

EXHIBIT 3



_____ – welcome to VO Webinar on…

Introduce self + participants (MD▮▮▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮▮▮▮ of CA/LE ▮▮▮▮▮▮▮▮▮ of VO/SAC, ▮▮▮▮▮ [Thurs]/▮▮▮▮▮▮▮▮▮ [Fri] of L/CA)

First/second of two identical webinars, will not be recorded

As a reminder, please be sure you are muted.

## Agenda

- Opening Remarks
- Overview of Policy Guidance in 25 STATE 26168
- Conducting and Documenting Social Media Reviews
- Assessing Student Credibility
- Assessing Potential  Ineligibilities
- Q&A

SENSITIVE BUT UNCLASSIFIED



████ to run through agenda

I know there are a lot of questions about this process and we hope to answer many of them along the way.

turn it over to MD ████



MD ▮▮▮▮

DEF-066

3

## Secretary Rubio – March 16, 2025

"If you tell us when you apply for a visa, 'I'm coming to the U.S. to participate in pro-Hamas events,' that runs counter to the foreign policy interests of the United States…We don't want people in our country that are going to be committing crimes and undermining our national security or the public safety. It's that simple."

SENSITIVE BUT UNCLASSIFIED



This guidance is part of our implementation of Executive Orders 14161 and 14188 aimed at protecting the U.S. from foreign terrorists, supporters, and other threats as well as combating antisemitism. As Secretary Rubio has said, engaging in activities that advocate for terrorist activity or organizations is contrary to our foreign policy and national interests.

4

## 25 STATE 26168

- **Purpose:** Protect national security through enhanced vetting of student visa applicants.

- **Key Actions:**

  - Mandatory social media reviews for certain student (F-1, M-1, certain J-1) visa applicants.
  - Enhanced screening for indicators of intent to engage in activities prohibited under ▇LE▇ or inconsistent with the requested visa class.

SENSITIVE BUT UNCLASSIFIED



▇▇▇

The guidance that we put out in 25 STATE 26168 is the preventative piece of this policy – ensuring that we address any derogatory information related to intent to engage in prohibited activities or those that are inconsistent with the visa status. Any applicant who has not demonstrated to your satisfaction that they meet **all** of the standards required by their visa classification should be refused.

As part of this screening effort, Consular officers must refer specific student visa applicants to the ▇LE▇▇▇▇ for social media checks. Consular officers should then use the information obtained by the checks as part of their assessment of the totality of the applicant's circumstances.

In the next slide, we'll discuss which students are included in this requirement.



By "students" we mean F-1, M-1, and J-1 applicants in the "student" category of exchange programs as noted at the bottom of the slide.  The social media review is not mandatory for J-1 applicants who *happen* to be students but are applying for other exchange programs such as au pair or SWT.

So, this universe of students, who are otherwise eligible and meet one or more of the three criteria:



Remember that social media reviews are only for applicants who are otherwise eligible for the visa.  If you've already determined they don't overcome 214(b), that's the end of the road for them.

Now moving on from which applicants to review, we'll talk about how to conduct and document the review.  I'll turn it over to ███████ from ██.







## Conducting Social Media Reviews

**For Adjudicators**
- Do not refer ▌LE▐ any applicant that would not otherwise overcome 214(b)
- **Then** consider the criteria for the mandatory social media review
- If one or more of the criteria is met, refer the case ▌LE▐ ▌LE▐ ▌LE▐

CA/



CA/



CA/

## Documenting Social Media Reviews

### Road ahead

- Refining guidance for searching specific social media platforms

- Want to hear your best practices

- Reach to ████ LE ████ LE ████ with any questions about conducting or documenting social media reviews



SENSITIVE BUT UNCLASSIFIED

CA/

## Assessing Student Credibility

**Consider how the applicant's activity reflects:**

- Intent and ability to solely pursue a full course of study.
- Intent to engage in unlawful activities or those inconsistent with student status.

**Has the applicant credibly shown that *all* activities in which he or she is expected to engage are consistent with FMJ status?**

SENSITIVE BUT UNCLASSIFIED



█████ Now, turning to what consular officers should do with the results of the social media review.

We've received a few questions about what activity should or should not be considered derogatory. Broadly speaking, you should look for any information that impacts the applicant's eligibility for the visa — ███████████████ LE ██████████████████



The FAM requires that an F-1 or M-1 applicant must demonstrate intent to enter the United States solely to pursue a full course of study. Relatedly, J-1 applicants for student programs are required to pursue a full course of study.



For applicants whose activities may rise to a higher level, I'll turn to ████████████████ of L/CA and ██████████ of VO/SAC to talk about assessing applicants for ███ LE ███ ineligibilities.



L/CA and SAC

## USG Coordination

- E.O. 14161 requires all relevant agencies to:

  - "vet and screen to the maximum degree possible all aliens who intend to be admitted, enter, or are already inside the United States."

  - "Evaluate and adjust all existing regulations, policies, procedures, and provisions...or guidance of any kind pertaining to each of the grounds of inadmissibility listed in sections 212(a)(2)-(3) of the INA"

SENSITIVE BUT UNCLASSIFIED

We received a few questions related to DHS's involvement in the enhanced vetting procedures, whether that's through screening at the POE or in the removal process. EO14161 tasks all relevant agencies to evaluate their policies and procedures to ensure maximum vetting.

We have been working closely with DHS on several lines of effort related to vetting and information sharing. As one example, we've established a Student Visa Working Group to facilitate information flow and coordinate actions on individuals with derogatory information.

While we won't get into depth today on these efforts, we wanted to reassure you that CA is not doing this alone – we are closely coordinating with our partner agencies on enhanced vetting efforts.

14



We're going to dig into the Q&A portion of the webinar, starting with questions that were submitted by posts ahead of time. Similar questions have been combined in the interests of time.







2. VO/F ▮▮▮▮▮▮: You aren't limited to conducting social media checks for only student visa applicants.  While the social media check is mandatory for student visa applicants who fall into the criteria, if you have doubts about any applicant's activities during their previous stay as a student, and you otherwise intend to issue, post should conduct a social media review to help you assess the totality of the applicant's circumstances.

## Questions

- Can LE Staff conduct the social media review?

- What social networks are we allowed to check? Is Tiktok ok?

- What if the account is set to private?

SENSITIVE BUT UNCLASSIFIED



Back over to ▮▮▮▮ for a few questions about the social media review process.

17

## Questions

- How should we handle applicants who don't provide accurate/any social media information?

SENSITIVE BUT UNCLASSIFIED



VO/F████:

1. 

## Questions

- Will Consular Sections need to shift resources ▮LE▮ ▮LE▮ due to these changes?

- Is there a push from DC ▮▮▮▮LE▮▮▮▮ ▮▮▮▮LE▮▮▮▮?

SENSITIVE BUT UNCLASSIFIED



1. VO/F ▮▮ : ▮▮▮▮▮▮▮ LE ▮▮▮▮▮▮▮
   LE

2. VO/F ▮▮ : ▮▮▮▮▮▮▮ LE ▮▮▮▮▮▮▮
   LE



EXHIBIT 4

```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 2      - - - - - - - - - - - - - - x
        AMERICAN ASSOCIATION OF        :
 3      UNIVERSITY PROFESSORS, ET
        AL,                            :
 4
                Plaintiffs,            :   Case No.
 5
           v.                          :
 6                                         1:25-cv-10685 (WGY)
        MARCO RUBIO, ET AL,            :
 7
                Defendants.            :   CONFIDENTIAL
 8
        - - - - - - - - - - - - - - x
 9

10           Videotaped deposition of STUART WILSON,

11      taken on behalf of the Plaintiffs, beginning at

12      10:11 a.m., on Tuesday, June 24, 2025, at the

13      law offices of Kellogg, Hansen, Todd, Figel &

14      Frederick, P.L.L.C., 1615 M Street, NW, Suite

15      400, Washington D.C. 20036, before Okeemah S.

16      Henderson, RRP, CaseViewNet Realtime Reporter,

17      and Notary Public for the District of Columbia.

18

19       (REPORTER'S NOTE: All quotations from exhibits

20      are reflected in the manner in which they were

21      read into the record and do not necessarily

22      denote an exact quote from the document.)

23

24

25      Reported by: Okeemah S. Henderson, RPR
```

Deposition of Stuart Wilson                                    AAUP, et al. v. Rubio, et al.

```
 1    APPEARANCES OF COUNSEL

 2

 3       ON BEHALF OF THE PLAINTIFFS:

 4            ALEXANDRA CONLON, ESQUIRE

 5            SHER TREMONTE, LLP

 6            90 Broad Street

 7            23rd Floor

 8            New York, NY 10004

 9            Aconlon@shertremonte.com

10            (212) 202-2600

11

12

13       ON BEHALF OF THE PLAINTIFFS:

14             SCOTT WILKENS, ESQUIRE

15             RAMYA KRISHNAN, ESQUIRE

16             KNIGHT FIRST AMENDMENT INSTITUTE AT

17             COLUMBIA UNIVERSITY

18             475 Riverside Drive

19             Suite 302

20             New York, NY 10115

21             Scott.wilkens@knightcolumbia.org

22             (646) 745-8500

23

24

25    APPEARANCES OF COUNSEL (Continued)
```

```
 1        ON BEHALF OF THE DEFENDANTS:

 2            JESSICA STROKUS, ESQUIRE

 3            NANCY SAFAVI, ESQUIRE

 4            U.S. DEPARTMENT OF JUSTICE/CIVIL DIVISION

 5            Benjamin Franklin Station

 6            PO BOX 878

 7            Washington, DC 20044

 8            E-mail: Jessica.strokus@usdoj.gov

 9            (202) 616-8779

10

11        ON BEHALF OF THE DEFENDANTS:

12            ALINA ELDRED, ESQUIRE

13            SARAH TALKOVSKY, ESQUIRE

14            U.S. DEPARTMENT OF STATE

15            OFFICE OF THE ASSISTANT LEGAL ADVISER

16            FOR CONSULAR AFFAIRS

17            600 19th Street, NW

18            Washington, DC 20006

19            (202) 616-8779

20

21        ALSO PRESENT:

22            JON RASSON, VIDEO OPERATOR

23

24

25
```

```
 1                    INDEX OF EXAMINATION

 2

 3     WITNESS: STUART WILSON                      PAGE

 4

 5     DIRECT EXAMINATION

 6          By Ms. Conlon                          6

 7

 8

 9                     INDEX OF EXHIBITS

10

11     EXHIBITS                                    PAGE

12     Exhibit 1    Article with photograph of
                    Mahmoud Khalil                 125
13
       Exhibit 2    Cable MRN 25 State 59756       129
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S
 2              THE VIDEOGRAPHER:  We are now on the
 3   record.  Today's date is June 24, 2025 and the
 4   time is 10:11 a.m. Eastern daylight time.  This
 5   is the recorded video deposition of Stuart
 6   Wilson in the Matter of American Association of
 7   University Professors, et al versus Marco
 8   Rubio, et al, in the United States District
 9   Court, District of Massachusetts.  Civil Action
10   No. 125-CV 10685.
11         This deposition is being held at 1615 M
12   Street, Northwest, Washington, D.C.  My name is
13   John Rasson from Everest Court Reporting and
14   I'm the video specialist.  The court reporter
15   is Okeemah Henderson also from Everest Court
16   Reporting.
17         All counsel appearing today will be
18   noted on the stenographic record.  Will the
19   court reporter please swear in the witness.
20              STUART WILSON,
21   was called as a witness, and having been first
22   duly sworn, was examined and testified as
23   follows:
24
25              THE WITNESS:  I swear.
```

Deposition of Stuart Wilson                                    AAUP, et al. v. Rubio, et al.

```
 1                    EXAMINATION

 2   BY MS. CONLON:

 3          Q.   My name is Alex Conlon.  I'm a

 4   lawyer from Sher Tremonte.  I'm here with my

 5   colleague, Scott Wilsen and Ramya Krishnan, and

 6   actually before we start questioning, if every

 7   counsel who is here wouldn't mind just putting

 8   their appearances on the record?

 9          MS. STROKUS:  Jessica Strokus from

10   DOJ.

11          MS. SAFAVI:  Nancy Safavi, DOJ.

12          MS. TALKOVSKY:  Sarah Talkovsky, the

13   Department of State.

14          MS. ELDRED:  Alina Eldred, Department

15   of State.

16   BY MS. CONLON:

17          Q.   Because Ms. Henderson is taking

18   down everything that we say, please give verbal

19   responses.  If you don't understand a question,

20   let me know, and I will do my best to rephrase

21   it.

22          If you want to take a break at any

23   point we can absolutely do that.  If there is a

24   question pending that's been put to you, I will

25   ask you to answer before we break.
```

```
 1              But if you need to confer with counsel
 2      for any reason about privilege or anything else
 3      which has come up in some of these, let us
 4      know.
 5              Okay.  So before we get into the real
 6      meat of it.  I have to ask, are you taking any
 7      medications that could affect your ability to
 8      testify truthfully today?
 9              A.   No.
10              Q.   Is there any reason why you
11      can't provide truthful testimony today?
12              A.   No.
13              Q.   Have you ever given sworn
14      testimony before?
15              A.   No.
16              Q.   So this is your first rodeo
17      deposition.  Okay.  Are you represented in your
18      -- well, withdrawn.
19              Do you understand that counsel that's
20      here to represent to you in your capacity as an
21      employee of the State Department or in your
22      person capacity?
23              A.   In my capacity as a State
24      Department employee.
25              Q.   Before joining us today, did
```

```
1    you speak with anyone about your testimony?

2              A.    Yes.

3              Q.    Who did you speak with?

4              A.    The team here.

5              Q.    Did you speak with anyone

6    that's not a lawyer about your testimony?

7              A.    No.

8              Q.    Did you review any documents to

9    prepare for your testimony today?

10             A.    I did not.

11             Q.    Some of your colleagues -- at

12   least one of your colleagues has testified in

13   this matter.  Have you spoken to Mr. John

14   Armstrong about testifying in this case?

15             A.    I have not, no.

16             Q.    Have you spoken with Andre

17   Watson about testifying in this case?

18             A.    No.

19             Q.    Okay.  So what is your current

20   title?

21             A.    I'm the Deputy Assistant

22   Secretary for Visa office and Consular Affairs.

23             Q.    How long have you been in that

24   role.

25             A.    Since February 13th.
```

| | |
|---|---|
| 1 | Q.   And what was your role before |
| 2 | that? |
| 3 | A.   I was the consular general in |
| 4 | Moscow. |
| 5 | Q.   So you just came back from |
| 6 | Moscow in February? |
| 7 | A.   Correct. |
| 8 | Q.   How long were you in Moscow |
| 9 | for? |
| 10 | A.   Approximately, a year and a |
| 11 | half. |
| 12 | Q.   Do you have a particular rank |
| 13 | in the State Department? |
| 14 | A.   FEOC.  Senior Foreign Service. |
| 15 | Q.   Senior Foreign Service? |
| 16 | A.   Right. |
| 17 | Q.   Okay.  And how long have you |
| 18 | been in the Senior Foreign Service for? |
| 19 | A.   1991. |
| 20 | Q.   You work in the front office of |
| 21 | the Visa -- or withdrawn.  The front office of |
| 22 | the Bureau of the Consular Affairs; is that |
| 23 | correct. |
| 24 | A.   That's correct. |
| 25 | Q.   The Visa office sits within the |

1    Bureau of Consular Affairs?

2            A.    That's correct, right.

3            Q.    Who else works in the front

4    office with you?

5            A.    John Armstrong is our senior

6    bureau official, Matt Pierce is our acting

7    principal deputy assistant secretary.  Do -- it

8    depends on how deep you want to go.

9            Q.    The other officials -- senior

10    officials who sit in the front office with you,

11    if you wouldn't mind?

12            A.    Jessica Norris is the managing

13    director in the Visa office, and as far as our

14    front office where we're situated physically

15    that's all we have.

16            Q.    In terms of relative seniority,

17    is Ms. Norris senior or junior to you?

18            A.    She's junior to me.

19            Q.    Who do you report to?

20            A.    John Armstrong.

21            Q.    Now, as the -- I want to get

22    your title right.  One second.  Okay.

23        As the deputy assistant secretary for

24    the Visa office what are your job duties?

25            A.    I oversee the Visa operations

1    for the State Department both domestically and

2    oversees, that the short kind of description.

3              Q.    Do you oversee anyone in your

4    role other than Ms. Norris?  Do you oversee

5    anyone directly?

6              A.    I had to think about it for a

7    minute.  Everybody -- all the directors report

8    to her.  She reports to me.

9              Q.    The directors of what?

10             A.    The director it sounds

11   factious, that's how the office -- these

12   offices divided into directorates.

13             Q.    What are the directorates of

14   the Visa office?

15             A.    We have overseas operations, we

16   have domestic operations, we have security and

17   vetting, we have the technical side, the

18   information side, and that's it.

19             Q.    So you oversee Ms. Morris who

20   oversees all of the directors of the Visa

21   office; is that correct?

22             A.    That's correct.

23             Q.    What does the security and

24   vetting director of the Visa office do?

25             A.    He coordinates all the vetting

1    that we do for Visa applicants so that would

2    include coordination of databases, interagency

3    databases.

4              Q.   Who is the -- what's the

5    director or the proper term --

6              A.   That's right.

7              Q.   Who is the director of security

8    and vetting director?

9              A.   Rob Jachim.

10             Q.   I'm sorry.

11             A.   Bob.  Robert Jachim.

12             Q.   And how long has he been in his

13   role?

14             A.   I do not know.

15             Q.   Do you know if he's been in his

16   role since before 2025?

17             A.   I do not know.

18             Q.   What does the domestic

19   operations directorate do?

20             A.   Exactly how it sounds.  It's

21   responsible for the Visa operations that are

22   within the United States.  So that would

23   include the National Visa Center and the

24   Kentucky Consular Center.

25             Q.   And who is the director of the

1    domestic operations directorate?

2                A.    Brenda -- Brenda -- her name

3    escapes me.

4                Q.    Now, does the security and

5    vetting directorate have anything to do with

6    current Visa holders or does it only deal with

7    Visa applicants?

8                A.    It is typically people applying

9    for Visas.

10                Q.    What about the domestic

11    operations directorate, do they have anything

12    to do with current Visa holders or only

13    applicants?

14                A.    Applicants we are -- our

15    responsibility is for the Visa applicant prior

16    to them being issued a Visa.

17                Q.    When you say "our

18    responsibility", do you mean the Visa office's

19    responsibility?

20                A.    Correct.

21                Q.    The Visa office is also

22    responsible for returning applicants; is that

23    correct?

24                A.    Yes.

25                Q.    So a person who is a Visa

1    holder who needs to renew their Visa, for

2    example, that falls under the prerogative of

3    the Visa office?

4              A.   Yes.  Sorry.

5              Q.   Now, you talked about Visas,

6    what involvement does the Visa office have with

7    the issuance or decisions regarding green cards

8    and lawful permanent residents?

9              A.   Nothing, actually.  That's a

10   Homeland Security issue.

11             Q.   Does the -- sorry.  Does the

12   Visa office have any responsibilities relating

13   to lawful permanent residents?

14             A.   No.

15             Q.   Does the Visa office have a

16   counter part within the Department of State

17   that deals with or is responsible for lawful

18   permanent residents?

19             A.   No.

20             Q.   What part of the Department of

21   Homeland Security do you understand to be

22   responsible for lawful permanent residents?

23             A.   USCIS.

24             Q.   Now, focusing on the Visa

25   office, the Visa office decides when a Visa

1    should issue, correct?

2              A.   Correct.

3              Q.   Whether a Visa should be

4    renewed?

5              A.   Correct.

6              Q.   Whether a Visa should be

7    revoked?

8              A.   It can be the case.

9              Q.   Is there another office apart

10   from the Visa office that can decide that a

11   Visa should be revoked?

12             A.   No.

13             Q.   So when you say that "it can be

14   the case," is there any circumstance under

15   which that's not the case?

16             A.   I'm thinking it's a large

17   question, and I need to pause and think of the

18   circumstances that we revoke Visas.

19             Q.   Take your time.

20             A.   Revoking Visas is the VO's

21   responsibility.

22             Q.   What role does the Visa office

23   play, if any, in setting procedures relating to

24   Visa revocation?

25             A.   Setting the procedures, I can't

```
 1   answer that.
 2           Q.   Is procedure -- am I using sort
 3   of the wrong term?  Is there a word you would
 4   use --
 5           A.   No, no, that's correct.  It's
 6   just that I'm too new to be familiar with how
 7   those procedures were developed.
 8           Q.   I see.  Does the Visa office
 9   develop policies generally relating to Visas?
10           A.   The Visa office is a
11   fact-finding -- has a fact-finding mission to
12   find facts behind things.  Policy is generally
13   set by the 7th floor or the higher up
14   executives.
15           Q.   Who is the on the 7th floor?
16           A.   Secretary Rubio.
17           Q.   So you said policy is usually
18   set by the 7th floor, meaning Secretary Rubio,
19   or higher up executives.  Is there a particular
20   level of executive that sets policy relating to
21   Visas apart from Secretary Rubio?
22           A.   It can come out the White
23   House, the President.
24           Q.   Anyone other than Secretary
25   Rubio or the White House that can set Visa
```

```
 1   policy?
 2                A.   National Security counsel or
 3   Homeland Security counsel.
 4                THE COURT REPORTER:  What was the
 5   second one?
 6                A.   Homeland Security counsel?
 7   BY MS. CONLON:
 8                Q.   Anyone else?
 9                A.   Typically, no, you could have a
10   case where the Deputy Secretary of State has a
11   voice in that.  It's very high level.
12                Q.   Does the Visa office have a
13   role in creating guidance about Visa
14   revocations?
15                A.   Yes.
16                Q.   What is the Visa office --
17                MS. STROKUS:  Objection.  Form.
18   BY MS. CONLON:
19                Q.   Okay.  What is the Visa
20   office's role in creating guidance for Visa
21   revocations?
22                MS. SAFAVI:  Objection.  Form.
23                MS. CONLON:  You can answer the
24   question.
25                THE WITNESS:  I could?
```

```
 1              MS. STROKUS:  Yes, you can answer the

 2   question.

 3              MS. CONLON:  Mm-hmm.  You can answer

 4   the question.

 5              A.   I have not been part of the

 6   creation of any policy for Visa revocations,

 7   again, because of my just arriving at post.

 8   BY MS. CONLON:

 9              Q.   Do you have an understanding of

10   what the Visa office's rule is in issuing, if

11   any -- in issuing guidance about Visa

12   revocations?

13              MS. STROKUS:  Objection.

14   Speculation.

15              A.   The guidance as far as I know

16   has been established -- is long time

17   established.

18   BY MS. CONLON:

19              Q.   You said the guidance as far as

20   you know has been established for a long time?

21              A.   Right.

22              Q.   Guidance about Visa

23   revocations?

24              A.   Correct.

25              Q.   In your overseas rules, most
```

1    recently Russia, what was your personal

2    involvement in Visa issuance, renewals or

3    revocation?

4              A.   I had no -- well, I did not

5    have any direct interactions with Visa

6    revocations.  We did have revocations that were

7    sent from the department for cases where

8    somebody had misused a Visa or something that

9    would require them to be revoked.

10              Q.   So sometimes a post will

11    receive guidance from the front office about a

12    particular Visa applicant at the post; is that

13    correct?

14              A.   That's correct.  Happens very

15    frequently.

16              Q.   Happens frequently.  And you

17    were in Moscow until February?

18              A.   That's correct, yes.

19              Q.   What date did you leave?

20              A.   I left the 10th.

21              Q.   Of February?

22              A.   Of February.  And I started the

23    13th here.

24              Q.   Through your overseas roles

25    have you developed familiarity with the

1    policies and procedures around the issuance of

2    Visas?

3                A.    Yes.

4                Q.    Around the revocation of Visas?

5                A.    Not typically, no.

6                Q.    Why do you have more experience

7    with issuances than revocations?

8                A.    It depend on my

9    responsibilities within the consular section.

10   I largely work with American citizen issues, so

11   my experience has been that.  For 10 years

12   prior I was not in a consular role.

13               Q.    So your experience in the field

14   with Visa revocations includes receiving

15   guidance from the front office to make

16   revocation; is that correct?

17               A.    I've never received guidance in

18   particular about revocations.

19               Q.    You said that the State

20   Department will give a direction to a field

21   office about a revocation for a particular

22   person, right?

23               MS. STROKUS:  Objection.  Form.

24   BY MS. CONLON:

25               Q.    Correct?

1          A.    Yes.

2          Q.    So when you say that you've

3    never received guidance, you mean you

4    personally haven't received guidance about a

5    Visa revocation while working in the field?

6          A.    That's correct.

7          Q.    Did you have a very senior role

8    in Moscow?

9          A.    I was consular general, yes.

10         Q.    The most senior role in Moscow?

11         A.    Yes.

12         Q.    Okay.  So you oversaw other

13   people who had to make decisions about Visa

14   revocations; is that right?

15         A.    We were a nonVisa issuing post.

16   They suspended Visa operations.

17         Q.    Have you at any point in your

18   career overseen other people whose job it was

19   to make decisions about revoking Visas?

20         A.    Not immediately.

21         Q.    Not immediately meaning what?

22         A.    Several lawyers down, perhaps.

23         Q.    In other words, you were in a

24   more senior role than the person making the

25   decision about a revocation?

```
 1              A.   Yes.

 2              Q.   Do revocations at posts in the

 3    field get run up the flag pole to a more senior

 4    person?

 5              MS. STROKUS:  Objection.  Form.

 6              MS. CONLON:  I'm sorry.  You can --

 7              A.   Do they get run up the flag

 8    pole?

 9    BY MS. CONLON:

10              Q.   Yes.  To a more senior person

11    who's at a post?

12              A.   As I understand it, and I've

13    actually never done one in the field, as I

14    understand it, there are messages that are sent

15    to the adjudicating officer, whoever is working

16    the Visas who can then revoke -- enter that the

17    Visa's revoked in the system.

18              Q.   But you're talking about our

19    systems messages, right?

20              A.   Correct.

21              Q.   In other words, a Visa

22    applicant comes to the window and that consular

23    official puts their name into a system and a

24    message automatically pops up with information

25    about the applicant, correct?
```

```
 1              A.   That's a name check.

 2              Q.   That's a name check.  Okay.  So

 3    what is a system message?

 4              A.   Messages that are sent for

 5    whatever reason that we need to revoke a Visa.

 6    Visas are revoked for if the person is no

 7    longer in the -- qualifies for that particular

 8    Visa, to be brief.

 9              Q.   And who sends the messages?

10              MS. STROKUS:  Objection.  Law

11    enforcement privilege.

12              THE WITNESS:  It is, indeed.

13              MS. STROKUS:  I instruct you not to

14    answer the question.

15    BY MS. CONLON:

16              Q.   What is the role, I'm not

17    asking for the particular name, but what is the

18    role a person has -- who sends system messages

19    to consular posts?

20              MS. STROKUS:  Objection.  Form.

21              MS. SAFAVI:  Objection.  Form and

22    privilege.

23              MS. CONLON:  Thank you.  Okay.  I'm

24    going to pause.  I'm totally happy to have

25    another lawyer defend at the next deposition
```

1    but I would prefer if just one lawyer was

2    defending this deposition.

3         So if we can -- we can pause for

4    conferring, but if it's going to be you, that

5    would.

6              MS. SAFAVI:  Sure.  Can we take a

7    break?

8              MS. CONLON:  Yes, of course.  We can

9    take a break.

10             THE VIDEOGRAPHER:  The time is 10:30

11   and we are off the record.

12        (A break was taken at 10:30 a.m.)

13             THE VIDEOGRAPHER:  The time is 10:40

14   and we're back on the record.

15   BY MS. CONLON:

16        Q.   Before we took a break, we were

17   talking about systems messages.

18        Whose job is it to input system

19   messages for consular posts about Visa

20   applicants?

21             MS. STROKUS:  Objection.  Law

22   enforcement privilege.

23   BY MS. CONLON:

24        Q.   Without saying the name of the

25   person who has that role, can you tell me what

1    the title is or would that -- what the title is

2    of the person who does that function?

3              MS. STROKUS:  Objection.  Law

4    enforcement privilege.  Do not answer.

5    BY MS. CONLON:

6              Q.   Is there a particular part of

7    the Visa office that's responsible for entering

8    system messages?

9              MS. STROKUS:  Objection.  Law

10   enforcement privilege.  Do not answer.

11   BY MS. CONLON:

12             Q.   Does the Department of Homeland

13   Security have the ability to enter systems

14   messages that are received by consular posts?

15             MS. STROKUS:  Objection.  Law

16   enforcement privilege.  Do not answer.

17   BY MS. CONLON:

18             Q.   Have you seen a systems message

19   before?

20             A.   Yes.

21             Q.   Have you entered a systems

22   message before?

23             MS. STROKUS:  Objection.  Law

24   enforcement privilege.  Do not answer.

25   BY MS. CONLON:

```
 1              Q.   Are you aware of whether --

 2    withdrawn.

 3          When a Visa is revoked at a consular

 4    post, what kind of record is created at the

 5    revocation?

 6              MS. STROKUS:  Objection.  He lacks

 7    personal knowledge of this subject.  I believe

 8    he stated before that he has not personally

 9    been involved with Visa revocations at a

10    consular post.

11              MS. CONLON:  Ms. Strokus, I'm going

12    to ask you not to make speaking objections.

13    BY MS. CONLON:

14              Q.   Mr. Wilson, if you know what

15    kind of record is created when a Visa is

16    revoked at a consular post?

17              A.   I can only speculate.

18              Q.   You've never seen a record of a

19    Visa revocation before?

20              MS. STROKUS:  Objection.

21    Speculation.  You can answer.

22    BY MS. CONLON:

23              Q.   Have a you ever seen a record

24    of Visa revocation before?

25              A.   Yes.
```

1          Q.   When?

2          A.   Long time ago, 10 years ago

3    speculation or estimation.

4          Q.   Are you familiar with the

5    recordkeeping system used for Visa revocations?

6          A.   No.

7          Q.   What agencies, if any, apart

8    from State play a role in Visa revocations?

9          THE WITNESS:  It's law enforcement

10   information.

11         MS. CONLON:  I see you looking at

12   your counsel to see if they're going to object.

13   I don't hear an objection.  Is there an

14   objection?

15         MS. STROKUS:  Yeah, there's a law

16   enforcement privilege objection to the extent

17   you can answer without revealing law

18   enforcement privilege materials, you may answer

19   it.

20         A.   The information comes from

21   multiple sources.

22   BY MS. CONLON:

23         Q.   Well, the question is what

24   agencies, if any, apart from the Department of

25   State play a role in Visa revocations?  That's

 1    the question.  Is there an objection to that

 2    question?

 3             MS. SAFAVI:  I guess that's fine.

 4             MS. STROKUS:  I think that, you know,

 5    to the extent he can answer without revealing

 6    law enforcement privileged materials, he can

 7    answer.

 8    BY MS. CONLON:

 9        Q.   Okay.  So what's the answer?

10             THE WITNESS:  Can I take a break?

11             MS. CONLON:  Well --

12             MS. SAFAVI:  Well, we can't leave it

13    unanswered, so.

14             MS. TALKOVSKY:  (Inaudible) the

15    instruction if he thinks his answer --

16             (Simultaneous talking.)

17             MS. CONLON:  I'm just going to pause

18    and say, for the record, like, one, we've

19    deposed other people from the Department of

20    Homeland Security and the Department of State.

21        So I can just directly ask him is the

22    Department of Homeland Security involved or we

23    can do this all day, but the question is the

24    name of agencies.

25             This is publically available

```
 1    information, so I'm not sure why we're getting

 2    law enforcement objections to this question.

 3          So I'm going to ask again.  Answer to

 4    the extent you can consistent with the

 5    instructions your counsel gives you.

 6    BY MS. CONLON:

 7          Q.   What other agencies apart from

 8    the Department of State play a role in Visa

 9    revocations?

10          MS. STROKUS:  Objection.  Form.

11    BY MS. CONLON:

12          Q.   You can answer, it's a form

13    objection.

14          A.   I can only speculate.  If you

15    would like that, I can do that.

16          Q.   Mr. Wilson, I know you're new

17    to your role.  What agencies have you had

18    contact with in your role regarding Visa

19    revocations?

20          A.   Homeland Security.

21          Q.   Any other agencies?

22          A.   Regarding revocations?  FBI.

23          Q.   Any other agencies?

24          A.   To my knowledge, that's it.

25          Q.   What about the White House?
```

1           A.    No.

2           Q.    Do you know whether the

3    Department of State works with the White House

4    in any capacity around Visa revocations?

5           A.    Well, the Secretary of State

6    has the authority to revoke a Visa and that can

7    be done by a recommendation from the Department

8    of Homeland Security.

9           Q.    And my question is:  Whether

10   the Department of State works with the White

11   House in any capacity around Visa revocations?

12          A.    I do not know.

13          Q.    Apart from the Department of

14   Homeland Security and the FBI, are you aware of

15   any other agencies that work with the State

16   Department around Visa revocations?

17          A.    No.

18          Q.    What about the Department of

19   Defense?

20          MS. STROKUS:  Objection.  Calls for

21   speculation.

22          MS. CONLON:  You can answer.

23          A.    Not to my knowledge.

24   BY MS. CONLON:

25          Q.    Now, you said the Secretary of

1    State has the authority to revoke a Visa based

2    on recommendation from the Department of

3    Homeland Security, correct?

4                MS. STROKUS:   Objection.   Form.

5    BY MS. CONLON:

6                Q.   That's what your testimony is,

7    right?

8                A.   Yes.

9                Q.   What are the circumstances

10   under which the Secretary of State can revoke a

11   Visa based on a recommendation from Homeland

12   Security?

13               A.   For this I would go to my legal

14   team at the office which we have done.

15               Q.   Who is your legal team at the

16   office?

17               A.   Part of the LCA.

18               Q.   LCA is the legal --

19               A.   Legal bureau.

20               Q.   Okay.   Office of Legal Counsel

21   or Legal Consular Affairs?

22               A.   I don't know how they title

23   themselves.

24               Q.   And you said -- withdrawn.   Are

25   you saying that you collaborate with the legal

```
 1    team on Visa revocations?
 2              A.   I'm sorry.  I had to think
 3    about that one.  We get -- essentially in the
 4    Visa office we are the fact finders and we
 5    forward what information we have goes up the
 6    chain.
 7         And the Secretary has -- reserves the
 8    right to revoke the Visa of somebody who is as
 9    I understand it -- whose actions are contrary
10    to foreign policy.
11              Q.   Okay.  A lot to unpack there.
12    I'm going to start with a few questions about
13    what you said.
14         Does anybody apart from the Secretary
15    have the right to revoke a Visa?
16              MS. STROKUS:  Objection.  Form.
17              A.   For which capacity?  There are
18    different reasons to revoke Visas.
19    BY MS. CONLON:
20              Q.   Well, you said that, "The Visa
21    office is the fact finders and you forward the
22    information you have and go up the chain and
23    the Secretary reserves the right to revoke the
24    Visa of somebody whose actions are contrary to
25    foreign policy."
```

Deposition of Stuart Wilson                                    AAUP, et al. v. Rubio, et al.

1              So my question is:  Does anyone other

2      than the Secretary have a right to revoke the

3      Visa of someone whose actions are contrary to

4      foreign policy?

5                    A.   Well, Visas can be revoked for

6      different reasons, yes.

7                    Q.   For a Visa that's being revoked

8      as contrary to foreign policy, can anyone other

9      than the Secretary of State make that

10     revocation?

11                   A.   Absolutely, no.

12                   Q.   Now, you said in the Visa

13     office you are fact finders.  How do you go

14     about your fact-finding?

15                   MS. STROKUS:  I'm going to make a

16     quick objection law enforcement privilege.  To

17     the extent you can answer the question without

18     revealing privileged information, you may

19     answer.

20                   A.   Okay.  All right.  We find

21     facts, we find information available through

22     any -- any of our various databases on

23     individuals.  Individuals of interest.

24     BY MS. CONLON:

25                   Q.   Now, sticking with the

```
1    fact-finding for a moment, does the Visa office

2    do any fact-finding apart from running names

3    through databases?

4                 MS. STROKUS:  I'm going to repeat the

5    objection on law enforcement.  To the extent

6    you can answer without revealing privileged

7    materials, you may answer.

8                 A.   Right.  We get our information

9    from different places.  It can be letters from

10   employers, there's all kinds of things we can

11   get information from.

12   BY MS. CONLON:

13                Q.   Can you give me some other

14   examples that are non database means of

15   investigating?  You said letters from

16   employers; what else?

17                MS. STROKUS:  Objection.  Law

18   enforcement privilege.  To the extent you can

19   answer without revealing privileged materials

20   or information.

21                A.   Right.  Could be any number of

22   things, school records, bank records that the

23   applicant has shared with us.

24   BY MS. CONLON:

25                Q.   In other words, reviewing the
```

1   applicant's application materials?

2              A.    Well, I would consider anything

3   that we've requested to be part of the

4   application materials, yes.

5              Q.    Anything that the Department

6   has requested meaning sometimes the Department

7   can ask an applicant for further documentation,

8   right?

9              A.    That's correct.

10             Q.    So the department -- the Visa

11  office reviews not only the original materials

12  submitted by the applicant, but anything that

13  the applicant has supplemented that application

14  with at the request of the State Department; is

15  that right?

16             A.    If I could summarize anything

17  that the applicant has provided us, yes,

18  that's -- that can be part of the application.

19             Q.    So apart from the application

20  and databases, what other fact-finding does the

21  Visa office do?

22             MS. STROKUS:  Objection to the extent

23  it calls for law enforcement privileged

24  materials.  To the extent it does not call for

25  that, you can answer.

1          A.    We get information sometimes

2     from the 7th floor, Secretary's office, and of

3     course the law enforcement elements.

4     BY MS. CONLON:

5          Q.    Does the Visa office request

6     information from law enforcement agencies about

7     each applicant that comes to it for

8     fact-finding?

9          MS. STROKUS:   Objection.   Law

10    enforcement privileged.   Do not answer.

11    BY MS. CONLON:

12         Q.    Does the Visa office request

13    information from the 7th floor about the

14    applicant's for whom it's doing fact-finding?

15         MS. STROKUS:   Same objection to the

16    extent you can answer without revealing

17    privileged materials, you may answer.

18         A.    In my experience that -- we've

19    never -- the Visa office has never asked for

20    information from the 7th floor.

21    BY MS. CONLON:

22         Q.    How does the 7th floor become

23    aware of a particular applicant that the Visa

24    office is investigating?

25         A.    I do not know.

 1              Q.   So from your experience,

 2    sometimes the Visa office receives just

 3    unsolicited information from the 7th floor

 4    about an applicant?

 5              MS. STROKUS:  Objection.  Form.  You

 6    can answer.

 7              A.   That's correct.

 8    BY MS. CONLON:

 9              Q.   And you have no understanding

10    of why a particular applicant -- you have no

11    understanding of why you are receiving

12    information about a particular applicant from

13    the 7th floor; is that correct?

14              MS. STROKUS:  Same objection.  Form.

15              A.   That would depend on the case.

16    Typically, we don't know.  There are cases in

17    which we do.  I have to have a more specific.

18    BY MS. CONLON:

19              Q.   How often has the 7th floor

20    provided information to the Visa office about

21    an applicant, since you took over your role in

22    February?

23              A.   I can only guess, I don't have

24    a definite number, but --

25              Q.   Guessing is fine for this.

```
 1                 A.    -- very small.

 2                 Q.    A handful of cases?

 3                 A.    Correct.

 4                 Q.    Was there anything those cases

 5     appear to have in common?

 6                 MS. STROKUS:  Objection.  Calls for

 7     speculation.

 8                 A.    I was not directly involved.

 9     This was at the time where I was being brought

10     on board, so I didn't have much involvement

11     with it; so I'm not sure how to answer.

12     BY MS. CONLON:

13                 Q.    Going back for a moment, you

14     said that the 7th floor has been in the time

15     you've been in your role only given input about

16     these applicants a handful of times.

17            Would you say fewer than 10 times?

18                 A.    Yes.

19                 Q.    Fewer than 5 times?

20                 A.    I could say it's less than 10.

21                 Q.    In any of those instances, was

22     the applicant seeking a student Visa?

23                 MS. STROKUS:  Objection.  Calls for

24     speculation.

25                 MS. CONLON:  You can answer, if you
```

```
 1    know.
 2              A.   Not aware, no.
 3    BY MS. CONLON:
 4              Q.   You're -- I'm sorry.  Have you
 5    seen the materials for any applicant for whom
 6    you've received input from the 7th floor?
 7              A.   Not that I'm aware of.
 8              Q.   When the 7th floor sends
 9    information to the Visa office, who do they
10    send it to?
11              A.   Senior bureau official would
12    usually get that.
13              Q.   John -- John Armstrong?
14              A.   Right.
15              Q.   What does John Armstrong do
16    with that information?
17              MS. STROKUS:  Objection.  Calls for
18    speculation.
19              A.   He sends it to a person to take
20    action.
21    BY MS. CONLON:
22              Q.   Aren't you the person who has
23    to take the action?
24              A.   Not necessarily, no.
25              Q.   Have you ever been the person
```

```
 1   who has to take the action?
 2              A.   I don't know how to answer
 3   that.  I've been -- yes, there were time if
 4   information had come, but that's just
 5   hypothetical.
 6              Q.   Well, I'm asking you directly,
 7   not hypothetically.
 8         Have you taken action on any Visa
 9   application where the 7th floor has given you
10   unsolicited input about the applicant?
11              A.   I don't believe so, no.
12              Q.   Is there anyone else in the
13   Visa office who is in a position to take action
14   on a Visa application based on information from
15   the 7th floor besides you?
16              A.   Yes.
17              MS. STROKUS:  Objection.
18   Speculation.
19   BY MS. CONLON:
20              Q.   Who else?
21              A.   Managing director.
22              Q.   Ms. Norris?
23              A.   Yes.
24              Q.   Anybody besides you and Ms.
25   Norris?
```

Deposition of Stuart Wilson                                      AAUP, et al. v. Rubio, et al.

```
 1              A.   Take action?  You could go --
 2    if Ms. Norris is not available, for example,
 3    you could go to someone else, but that would be
 4    the call of the senior bureau official.
 5              Q.   Now, you're senior to Ms.
 6    Norris, right?
 7              A.   Correct.
 8              Q.   When Ms. Norris recommends a
 9    Visa revocation, does she give that
10    recommendation to you?
11              A.   I'm having to think does she
12    recommend these revocations -- I.
13              MS. STROKUS:  Objection.  Calls for
14    speculation.
15    BY MS. CONLON:
16              Q.   What does Ms. Norris do?
17              A.   She manages the directors.
18              Q.   Does Ms. Norris have any role
19    in making decisions about Visa revocations?
20              MS. STROKUS:  Objection.  Calls for
21    speculation.
22              A.   Directly, no.
23    BY MS. CONLON:
24              Q.   Indirectly?
25              A.   Indirectly, she would supervise
```

```
 1   the office that does basic revocations.

 2           Q.   And which office is that?

 3           A.   CASAC.

 4           Q.   What does that stand for?

 5           A.   It's security and vetting.

 6           THE COURT REPORTER:  Security --

 7           A.   And vetting.

 8   BY MS. CONLON:

 9           Q.   So the security and vetting

10   directorate makes an initial decision about a

11   Visa revocation; is that correct?

12           MS. STROKUS:  Objection.  Form.

13   BY MS. CONLON:

14           Q.   You can answer.

15           A.   Makes a decision -- I don't

16   know how decisions are made.

17           Q.   When the Department of Homeland

18   Security sends a referral to the Department of

19   State proposing a Visa revocation, which part

20   of the Department of State receives the

21   referral?

22           MS. STROKUS:  Objection.  Calls for

23   speculation.

24           A.   That's a law enforcement issue.

25           MS. CONLON:  Well, your counsel can
```

 1    insert -- assert an objection for law

 2    enforcement privilege, if your counsel thinks

 3    it's privileged.

 4    BY MS. CONLON

 5            Q.   The question is:  Which part of

 6    the Visa office receives the referral from the

 7    Department of Homeland Security for a Visa

 8    revocation?

 9            A.   It's CASAC.

10            Q.   The SAC?

11            A.   The CASAC, security and vetting

12    directorate.

13            MS. CONLON:  Okay.  Sorry.  My real

14    time -- I see it now.  Thank you.

15    BY MS. CONLON:

16            Q.   The security and vetting

17    director receives it, and who is in charge --

18    -- remind me who the director is of that

19    directorate?

20            A.   Robert Jachim.

21            Q.   And when Mr. Jachim receives

22    the referral from the Department of Homeland

23    Security, where does the referral go after

24    Mr. Jachim receives it?

25            MS. STROKUS:  Objection.  Calls for

```
 1    speculation.

 2    BY MS. CONLON:

 3            Q.   I would like to understand the

 4    chain of people who are tasked with reviewing a

 5    referral from the Department of Homeland

 6    Security.

 7         So that's just a frame for you.  This

 8    is what my questions are meant to get at.  It

 9    comes from the Department of Homeland Security

10    to Mr. Jachim.  What is Mr. Jachim's task when

11    he receives it?

12            MS. STROKUS:  Objection.  Calls for

13    speculation.

14            A.   So Homeland Security sends us

15    information.  I can't go into what they send

16    us.  I mean --

17            MS. STROKUS:  Objection.

18            MS. CONLON:  Objection to what?  It's

19    the witness answering.  Let me just level set

20    here by saying we have deposed other people.

21    These objections were not asserted in those

22    depositions, it's obviously you're not bound by

23    that.

24            MS. SAFAVI:  Okay.  Can we take a

25    break.  He just answered the question, right,
```

```
 1   and you haven't asked the next question.

 2              MS. CONLON:  No, he didn't he said

 3   law enforcement privilege, right --

 4              MS. SAFAVI:  He indicated that it

 5   would be law enforcement privilege, so that's

 6   the basis of the objection here.  To the extent

 7   he can answer --

 8              MS. CONLON:  The privilege, that's

 9   your job.  It's not his job to make objections.

10   So --

11              MS. SAFAVI:  Yes, our witness brought

12   to -- he brought it up that he cannot answer

13   law enforcement privilege.

14        So I'm calling an objection to your

15   question to the extent he can't answer

16   something that's not privilege that does

17   not include -- to the extent he can't -- he's

18   not going reveal privileged information, he may

19   continue to answer the question or you could

20   rephrase your question.

21              MS. CONLON:  I couldn't even tell you

22   what the question is at this point.

23              MS. SAFAVI:  Can we take a break?

24              MS. STROKUS:  He has to finish

25   answering the question before we break.
```

```
 1              MS. CONLON:  Let me just scroll up

 2    and see if there even is a pending question.

 3    There may not be.  So let me just -- if you

 4    give me just one second, I will look.

 5              Okay.  I'm just going to tell you what

 6    it says so we can all be on the same page.

 7              I said, [As read] "What is Mr. Jachim's

 8    task when he receives a referral from Homeland

 9    Security?  Ms. Strokus objected calling for

10    speculation.

11              Mr. Wilson said, [As read] "Homeland

12    Security sends us information.  I can't go into

13    what they send us."  Law enforcement.  And then

14    Ms. Strokus objected on the basis of the

15    witness' answer.

16              So I think there is not a pending

17    question at this point because you've objected

18    for law enforcement privilege.

19              So we can go off the record now for

20    everybody, but before we take a -- can I say --

21    once we're off the record, I want to address

22    before we take a break

23              MS. SAFAVI:  Yeah, that's fine.

24              MS. CONLON:  I just want to make sure

25    we're off the record.
```

```
 1              THE VIDEOGRAPHER:  The time is 11:03
 2     and we are off the record.
 3              (A break was taken at 11:04 a.m.)
 4               THE VIDEOGRAPHER:  The time is 11:30
 5     and we're back on the record.
 6              MS. CONLON:  Okay.  So before we go
 7     back to questions, I just want to -- sorry.  I
 8     just -- I had eluded during the break off the
 9     record to our view of these assertions of law
10     enforcement privilege, and I'd like to put it
11     on the record.
12          At one of the conferences in front of
13     Judge Young, he said, and I quote, "I expect
14     every contemporaneous document that exists up
15     and down the chain of command within the
16     Government bureaucracy that bears on that
17     evidence and that was with respect to evidence
18     of retaliation."
19          He said that he expected for some
20     cooperation from the Government.  He directed
21     us to focus on the procedure around revocation.
22           So, you know, that's the basis for this
23     line of questioning.  I would also emphasize
24     that there is a protective order in place now.
25     I understand that the Government is seeking to
```

    1    relitigate parts of it, but there is a

    2    protective order to protect the kind of

    3    information that we're seeking to elicit.

    4            I don't want to have to, like, call the

    5    Court or make a fuss, and not get this done in

    6    the limited time that we have.  So just putting

    7    that on the table before I attempt to resume

    8    some of these questions.

    9            If you still have an objection, we will

   10    not challenge a standing objection as

   11    insufficiently articulated so at least that can

   12    help us move along.  Okay.  Anything you guys

   13    want to add?

   14            MS. STROKUS:  I think we're set.

   15            MS. CONLON:  Okay.

   16    BY MS. CONLON:

   17        Q.  So a referral comes from the

   18    Department of Homeland Security to the

   19    Department of State and is initially received

   20    by the security and vetting directorate of the

   21    Visa office; is that correct?

   22            MS. STROKUS:  Objection.  Form.

   23        A.  I wouldn't characterize -- to

   24    my knowledge I wouldn't characterize these as

   25    referrals for revocation.

```
 1    BY MS. CONLON:

 2              Q.   How would you characterize

 3    them?

 4              A.   The only lists I've seen are

 5    lists of Visa holders who have law enforcement

 6    infractions.

 7              Q.   When you say, "lists you've

 8    seen", when did you see a list of law -- Visa

 9    holders with law enforcement infractions?

10              A.   I have on several occasions

11    over the course of -- since I've been in the

12    position, any way.

13              Q.   What kinds of law enforcement

14    infractions did the Visa holders on the list

15    that you've seen have?

16              A.   They varied.

17              Q.   Can you give me some examples?

18              A.   Drunk driving.

19              Q.   Anything apart from driving

20    under the influence?

21              A.   I don't have personal knowledge

22    of it.  I wasn't the individual who was looking

23    these up.

24              Q.   But you received the list?

25              A.   Yes.
```

1        Q.    You reviewed the list?

2        A.    No.

3        Q.    You received the list and did

4    what with it?

5        A.    Opened it up, saw that indeed

6    there were names with law infractions and then

7    forwarded that to the SAC office.

8        Q.    Why were you given this list?

9        A.    It was a Homeland Security

10   list.

11       Q.    But why are you the person who

12   it ws sent to?

13       A.    Because I'm the contact for the

14   DHS person who put the list together or his

15   office compiled the list.

16       Q.    And which DHS person is that?

17       A.    Andrea Watson.

18       Q.    You said that you gave a list

19   of Visa holders with law enforcement

20   infractions to the SAC office.  What's the SAC

21   office?

22       A.    Again, that's SAC.

23       Q.    Oh, I keep missing it?

24       A.    Right.

25       Q.    It's the security and --

```
 1                    A.   Vetting.

 2                    Q.   And vetting, right.  Who in the

 3      SAC office did you give the list to?

 4                    A.   I would forward that down to

 5      Bob Jachim.

 6                    Q.   Were any of the infractions, if

 7      you recall, for anything like obstructing

 8      Governmental administration of justice?

 9                    MS. STROKUS:  Objection calls for

10      speculation.

11                    A.   I can't say.

12      BY MS. CONLON:

13                    Q.   You don't remember what any of

14      the infractions were except for drunk driving?

15                    A.   I -- I did not.

16                    MS. STROKUS:  Objection.  Asked and

17      answered.

18                    MS. CONLON:  Go ahead.

19                    A.   I did not look at any of the

20      infractions apart from a few that I noticed.

21      Drunk driving was one that stands out.  The

22      others I don't -- I'm not aware of.

23      BY MS. CONLON:

24                    Q.   Only drunk driving stands out?

25                    A.   Mm-hmm.
```

1      Q.   So Mr. Watson gave you on at

2   least one occasion a list of Visa holders with

3   law enforcement infractions.  Did he do that on

4   more than one occasion?

5           MS. STROKUS:  Objection.  Form.

6           A.   He -- his lists were going to

7   the senior bureau official, and the senior

8   bureau official asked me to pass them to the

9   correct authority.

10  BY MS. CONLON:

11          Q.   So Mr. Watson gave a list of

12  Visa holders with law enforcement infractions

13  to Mr. Armstrong?

14          A.   Correct.

15          Q.   Mr. Armstrong asked you to pass

16  it down to Mr. Jachim?

17          A.   Correct.  He asked me to be the

18  point of contact for Mr. Watson.

19          Q.   Okay.  What was the impetus for

20  the creation of the list from Mr. Watson, if

21  you know?

22          MS. STROKUS:  Objection.  Calls for

23  speculation.

24          A.   I don't know.

25  BY MS. CONLON:

```
 1              Q.   About how many times did that
 2    happen?
 3              A.   Three or four.
 4              Q.   Do you know whether any of the
 5    people on the list were student Visa holders?
 6              MS. STROKUS:  Objection.  Calls for
 7    speculation.
 8              A.   I believe they were, yes.
 9    BY MS. CONLON:
10              Q.   Were all the people on the list
11    student Visa holders?
12              MS. STROKUS:  Objection.  Calls for
13    speculation.
14              A.   I didn't -- I didn't look at
15    the individuals on the list, so I didn't look
16    at their Visas.
17    BY MS. CONLON:
18              Q.   What was your understanding of
19    the collection of people on the list in terms
20    of types of people Visas's that they have?
21              A.   That they would --
22              MS. STROKUS:  Objection.  Calls for
23    speculation.
24              THE COURT REPORTER:  I'm sorry.  We
25    will have to do one at a time because I cannot
```

 1    get everyone talking all at the same time.  Can

 2    you say your question again?

 3    BY MS. CONLON:

 4          Q.   What was your understanding of

 5    the people on the list in terms of the types of

 6    Visas they had?

 7          MS. STROKUS:  Objection.  Calls for

 8    speculation.

 9    BY MS. CONLON:

10          Q.   And you can answer.

11          A.   I understood them to be

12    students.

13    BY MS. CONLON:

14          Q.   When you say law enforcement

15    infractions, do you mean criminal charges or

16    something else?

17          A.   Yes, my understanding is that

18    there were criminal charges.

19          Q.   Do you know if there was a name

20    for the initiative that led to the creation of

21    these lists?

22          MS. STROKUS:  Objection.  Calls for

23    speculation.

24          A.   I'm not aware of a name.

25    BY MS. CONLON:

1          Q.   Do you know whether colleges or

2    universities contributed to the list?

3          MS. STROKUS:   Objection calls for

4    speculation.

5          A.   I'm not aware.

6    BY MS. CONLON:

7          Q.   Do you know whether the

8    Department of Education contributed to the

9    list?

10          MS. STROKUS:   Objection.  Form and

11    calls for speculation.

12          A.   I'm not aware.

13    BY MS. CONLON:

14          Q.   Do you know whether the lists

15    of student Visa holders with law enforcement

16    infractions were provided to colleges or

17    universities.

18          MS. STROKUS:   Objection.  Calls for

19    speculation.

20          A.   I'm not aware.

21    BY MS. CONLON:

22          Q.   Earlier you said you wouldn't

23    call what you received from Mr. Watson

24    referrals.

25          Have you received referrals from the

1    Department of Homeland Security?

2              MS. STROKUS:  Objection.  Form.

3              A.   Referrals, I would have to say,

4    no.

5    BY MS. CONLON:

6              Q.   Okay.  Give me one second.

7    While I'm looking for a document, Mr. Wilson.

8              A.   Mm-hmm.

9              Q.   What do you call it when the

10   Department of Homeland Security sends you

11   information about a Visa holder and recommends

12   that the State Department revoke that person's

13   Visa; what's that called?

14             MS. STROKUS:  Objection.  Form.

15             A.   Sorry.  Repeat one more time,

16   please?

17   BY MS. CONLON:

18             Q.   Yes, of course.  I said:  What

19   do you call it when the Department of Homeland

20   Security sends the State Department information

21   about a Visa holder and recommends that State

22   revoke that person's Visa?

23             A.   Well, I was looking at this

24   from the point of view where I'm relaying

25   information from Homeland Security that needs

1    to run through our SAC office to see if those

2    infractions warrant revocations.

3          Q.   Okay.  But what I'm saying is

4    set aside completely this list of students and

5    their alleged infractions.  I understand the

6    term "referral" to mean a package that's sent

7    from the Department of Homeland Security to

8    State about a Visa holder recommending

9    revocation of their Visa.

10         Is that also your understanding of the

11   term "referral" in this context?

12         MS. STROKUS:  Objection to form.

13         A.   I could say you could call it

14   referral, but we didn't refer to that when we

15   received the list from Andre Watson.

16   BY MS. CONLON:

17         Q.   So I'm going to ask you again

18   to set the list aside because I think we're

19   talking about different things.

20         A.   Mm-hmm.

21         Q.   You're aware that Mr. Armstrong

22   has given deposition testimony in this case,

23   right?

24         A.   Mm-hmm.

25         Q.   Mr. Armstrong said, [As read]

```
 1    "I know that DAS Wilson has received

 2    recommendations, information from DHS as

 3    regarding possible revocations as has managing

 4    Director Norris."

 5         What is the name for that package of

 6    information that comes from DHS to you?  What

 7    do you call that?

 8              MS. STROKUS:  Objection.  Form.

 9    Hearsay.

10              A.   It would come as an e-mail, and

11    I can't recall how he labeled that.  Sorry.

12    BY MS. CONLON:

13              Q.   So you've never heard the term

14    referral in your work at -- as referencing a

15    recommendation from DHS to State that a

16    particular person's Visa should be revoked?

17              A.   No, I've heard the term, yes.

18              Q.   Then I'm not sure where we're

19    misunderstanding each other.

20         When you have received -- well,

21    withdrawn.  Is there any term other than

22    referral that I should use that would seem --

23    you know, comport better with your

24    understanding of the process?

25              A.   No.  I'm sorry.  The name was
```

1    not so essential.  We were dealing with a list

2    of the law enforcement infractions.

3            Q.    So just to help redirect you to

4    the purpose of this deposition, we are not

5    asking about or even interested in the student

6    list with infractions.

7            We are asking about and interested in

8    revocations recommended by the Department of

9    Homeland Security on the basis of two executive

10   orders that were issued by President Trump this

11   year.

12           An executive order concerning

13   anti-Semitism and an executive order concerning

14   terrorism and national security.  So set aside

15   this list of law enforcement --

16           A.    I see.  I see.  I see.

17           Q.    So when you received a package

18   from the Department of Homeland Security

19   recommending a Visa revocation on the basis of

20   those executive orders, what is that called?

21           MS. STROKUS:  Objection.  Form.

22           A.    I think you're eluding to the

23   action memo for the Secretary.

24   BY MS. CONLON:

25           Q.    Okay.  Maybe I am, if that's

1    what you think of it as.

2         Is the action memo something that the

3    State Department compiles for Secretary Rubio?

4              A.   Yes.

5              Q.   Recommending that Secretary

6    Rubio take a particular action with respect to

7    a specific Visa holder?

8              A.   From -- as I understand the

9    process, Homeland Security's information is

10   formed into a recommendation that goes to the

11   Secretary.

12             Q.   What is State's role when it

13   receives the recommendation from Homeland

14   Security before it goes to Secretary Rubio?

15             MS. STROKUS:  Objection.  Calls for

16   speculation.

17             A.   To make sure the information is

18   accurate to the best of our knowledge.

19   BY MS. CONLON:

20             Q.   And how does the State

21   Department do that?

22             MS. STROKUS:  Objection.  Calls for

23   speculation.

24             A.   We check with law enforcement

25   database.

```
 1    BY MS. CONLON:

 2              Q.   In a context where the

 3    recommendation for revocation is not based on

 4    criminal activity, but on something else, how

 5    does State verify the information in the

 6    referral?

 7              MS. STROKUS:  Objection.  Calls for

 8    speculation.

 9              A.   It depends on the information.

10    BY MS. CONLON:

11              Q.   Where the allegation is that a

12    student protester expressed anti-Semitic views,

13    how does the State Department investigate that

14    referral?

15              MS. STROKUS:  Objection.  Calls for

16    speculation.

17              A.   I wouldn't characterize us as

18    investigating that.

19    BY MS. CONLON:

20              Q.   What is State's job when it

21    gets that referral?

22              A.   To forward the information to

23    the Secretary.

24              Q.   Does State -- does anyone in

25    the Visa office do anything other than receive
```

1      the information from Homeland Security and

2      forward it on to the Secretary?

3              MS. STROKUS:  Objection.  Calls for

4      speculation.

5              A.   I would have to speculate.

6      This is a -- this is a time where I was very

7      new in the job, I think, when we had a few of

8      these cases.

9      BY MS. CONLON:

10             Q.   My understanding is that these

11     cases are new as well, so we will take your

12     knowledge, whatever it is.

13             So when State receives a referral from

14     the Department of Homeland Security in this

15     context concerning a student who's engaged in

16     activity that is not unlawful, but may in

17     State's view be a basis for revocation, what

18     does State do with that information before

19     passing it on to the Secretary?

20             MS. STROKUS:  Objection.  Calls for

21     speculation.

22             A.   We write up the case, what we

23     received from Homeland Security and we forward

24     that for a decision.

25     BY MS. CONLON:

 1              Q.   And when you write it up,

 2    that's in an action memo?

 3              A.   I'm not certain about that.

 4              Q.   Have you ever been the person

 5    to write up something for the Secretary about

 6    this?

 7              A.   I have not.

 8              Q.   Who actually writes up this

 9    report for the Secretary?

10              A.   That's typically Bob Jachim.

11              Q.   So Bob Jachim in the security

12    and vetting directorate receives the

13    information from Homeland Security and then he

14    passes it directly on to the Secretary --

15              MS. STROKUS:  Objection.  Form.

16    BY MS. CONLON:

17              Q.   -- or Secretary's office?

18              MS. STROKUS:  Objection.  Form.

19              A.   There's a process --

20    BY MS. CONLON:

21              Q.   That's what I want to know

22    about.  What's the process from when Mr. Jachim

23    gets the information from Homeland Security?

24              A.   He passes it to the managing

25    director and to myself for review plus a peer

```
 1    reviewed depending on what the circumstances of

 2    the case are.

 3              Q.    And what does he give you to

 4    review?

 5              A.    A memo.

 6              Q.    And is that an action memo?

 7              A.    I believe it's an action memo,

 8    yes.

 9              Q.    Does Mr. Jachim give you or

10    managing director anything other than a memo to

11    review?

12              A.    There can be -- I guess, if

13    you're talking about a specific case or --

14              Q.    So the answer is it depends on

15    the case?

16              A.    Correct.

17              Q.    Who writes the memo that Mr.

18    Jachim gives to you to review?

19              A.    Bob writes that.

20              Q.    When you receive the memo, what

21    do you review it for?

22              A.    If the content is correct to

23    the best of my knowledge.

24              Q.    How do you determine whether

25    the content is correct?
```

```
 1                  A.   If it's what Homeland Security

 2     told us.

 3                  Q.   In other words, Mr. Jachim's

 4     memo should accurately summarize the

 5     information that State received from Homeland

 6     Security; is that right?

 7                  MS. STROKUS:  Objection.  Form.

 8                  A.   Yes.

 9     BY MS. CONLON:

10                  Q.   Does State have any process for

11     verifying the information provided by Homeland

12     Security --

13                  MS. STROKUS:  Objection --

14     BY MS. CONLON:

15                  Q.   -- to Mr. Jachim?

16                  MS. STROKUS:  Objection.  Calls for

17     speculation.

18                  A.   We have database of our Visas

19     we can check.

20     BY MS. CONLON:

21                  Q.   A database of your Visas?

22                  A.   Mm-hmm.

23                  Q.   What kind of information is

24     contained in the Visa database that you would

25     check to verify the information provided by
```

 1    Homeland Security?

 2              MS. STROKUS:  Objection.  Law

 3    enforcement privilege.  You can only answer to

 4    the extent it does not include privileged

 5    information.

 6              A.   Anything on any previous Visa

 7    applications we can see.

 8    BY MS. CONLON:

 9              Q.   Does State obtain from any

10    source other information about the Visa

11    applicant before passing along the information

12    from the Homeland Security to the Secretary?

13              MS. STROKUS:  Objection.  Same

14    objection.  You can answer to the extent that

15    you don't divulge privileged information.

16              A.   Right.  It's done at the level

17    that I don't see that where it's done.

18    BY MS. CONLON:

19              Q.   What level is that done at?

20              A.   The same office I referred to,

21    the SAC office.

22              Q.   And the SAC office is part of

23    the Visa office?

24              A.   Mm-hmm.  That's correct.

25              Q.   Now, we talked about -- a

```
 1   little bit about the information that State

 2   receives from DHS.  Does State receive from DHS

 3   any of the underlying evidence that DHS

 4   reviewed in reaching its recommendation?

 5           A.   Not to my knowledge, no.

 6           Q.   When you receive material from

 7   Mr. Jachim -- did I get his name right, Jachim?

 8           A.   Yes.

 9           Q.   When you receive materials from

10   Mr. Jachim, does he provide you with the

11   materials he received from State or from

12   Homeland Security -- sorry?

13           MS. STROKUS:  Objection.  Form.

14           A.   I don't know how to answer

15   these.  They're very rare and I think I saw

16   them earlier on when I was in the job, and I

17   just can't recall.

18   BY MS. CONLON:

19           Q.   Around what period of time were

20   you receiving these kinds of referrals from Mr.

21   Jachim?

22           A.   March or April.

23           Q.   That feels like a distant

24   memory at this point I bet?

25           A.   It feels like years ago.
```

Case 1:25-cv-10685-WGY    Document 88-11    Filed 07/07/25    Page 114 of 863
CONFIDENTIAL
Deposition of Stuart Wilson                                    AAUP, et al. v. Rubio, et al.

```
 1              Q.   What is your understanding of

 2    why you were receiving them in March and April?

 3              A.   Receiving what?

 4              Q.   These referrals from Mr.

 5    Jachim?

 6              A.   These referrals -- I'm a little

 7    confused as to what we're talking about.

 8              Q.   Sure.  I understand you to be

 9    saying that in March and April there was a time

10    where you received referrals for revocation for

11    student Visa holders based on noncriminal

12    activity that is described in the executive

13    orders issued by President Trump.

14         And I'm asking you what your

15    understanding is of why you received a increase

16    or influx of these in March and April and it's

17    dropped off since.  What's your understanding

18    of the reason for that?

19              MS. STROKUS:  Objection.  Form and

20    speculative.

21              A.   I think there were very few to

22    begin with, and I just don't recall the

23    information that was in them.  I'm sorry.

24    BY MS. CONLON:

25              Q.   About how many do you think you
```

```
 1   received?
 2              A.   I think we discussed this
 3   before --
 4              Q.   I'm sorry.  I don't --
 5              A.   It might be -- I'd say 5.
 6              Q.   You think you received 5
 7   referrals from Homeland Security for the
 8   revocations of student Visas for noncriminal
 9   activity?
10              MS. STROKUS:  Objection.  Form.
11              A.   No.
12   BY MS. CONLON:
13              Q.   Okay.  Tell me what I have
14   wrong there?
15              A.   My memory, I cannot recall what
16   the names were, what the issues were, why they
17   were revoked, recommended for revocation.  This
18   is too new in my tenure.
19              Q.   Okay.  So you recall that you
20   received approximately 5 referrals from
21   Homeland Security concerning revocations for
22   student Visas, but you don't recall for who or
23   on what basis?
24              MS. STROKUS:  Objection.  Form.
25              A.   I don't believe there were 4
```

```
 1    student Visas.  The ones we're talking about,
 2    some were -- there are various reasons why they
 3    could be revoked.  Gang members, gang members
 4    from Haiti, for example, different things.
 5    BY MS. CONLON:
 6              Q.   Just a moment.  So the
 7    questions I've been asking you were concerning
 8    a student engaged in activity that is not
 9    unlawful, but in the Government's view might be
10    a basis for revocation.
11         That's -- that's what I'm asking you
12    about.  I want to make sure I understand
13    correctly what you've now said.
14          Did you receive recommendations for
15    revocation from Homeland Security for students
16    based on noncriminal activity described in
17    President Trump's executive orders in March and
18    April?
19              A.   It's possible.
20              Q.   You said that the referrals you
21    received from Mr. Jachim came to you very
22    rarely.
23         How are they different from other
24    packages of information you receive on Visa
25    applicants from Homeland Security?
```

```
 1                 MS. STROKUS:  Objection.  Form.
 2                 A.   Well, it depends if they
 3      were -- if they were for revocations by the
 4      Secretary, and he has a special authority
 5      depending on what -- what section of the INA
 6      we're talking about.
 7      BY MS. CONLON:
 8                 Q.   Are you familiar with the
 9      section of the INA that gives the Secretary
10      special authority to make a revocation based on
11      a foreign policy in just the United States?
12                 A.   Yes.
13                 Q.   And do you understand that --
14      one second.
15            Do you understand that -- actually
16      withdrawn.
17            When we're talking about the provision
18      that gives the Secretary special authority to
19      revoke a Visa based on a foreign policy in just
20      the United States, we are referring to INA
21      Section 212; is that correct?
22                 A.   That's correct.
23                 Q.   Which is also codified in US --
24      8 USC 1182, correct?
25                 A.   I believe so.
```

 1              Q.   Is this policy internally

 2   referred to in the State Department as a 3C

 3   policy or is that something different?

 4              MS. STROKUS:  Objection.  Calls for a

 5   legal conclusion.

 6   BY MS. CONLON:

 7              Q.   What do you understand the 3C

 8   policy of the State Department to refer to?

 9              A.   3C policy I understand to be

10   several different -- actually quite a few

11   different baskets, if you will.

12              Q.   Tell me about the baskets?

13              MS. STROKUS:  Objection.  Form.

14              A.   I can tell you that it's very

15   complicated, and that I consult with colleagues

16   when I have to go through them.

17   BY MS. CONLON:

18              Q.   Is there a 3C policy

19   concerning -- is there a 3C policy concerning

20   the Secretary's special authority to revoke on

21   the basis of foreign policy concerns of the

22   United States?

23              MS. STROKUS:  Objection.  Calls for

24   speculation.

25              A.   I believe so, yes.

```
 1   BY MS. CONLON:
 2          Q.   Are there any 3C policies that
 3   were issued in response to -- well, withdrawn.
 4          To make sure we're talking at the same
 5   thing, you're familiar with the executive
 6   orders issued by President Trump concerning
 7   Visas and Visa revocations, right?
 8          A.   Yes.
 9          Q.   And you are specifically
10   familiar with Executive Order 14161?
11          A.   Yes.
12          Q.   And 14188, right?
13          A.   Yes.
14          Q.   Are there any 3C policies that
15   have been issued in response to either of those
16   executive orders?
17          MS. STROKUS:   Objection.  Calls for
18   speculation.
19          A.   There are, I believe.
20          Q.   Sorry.  I wasn't sure if you
21   were finished with your answer.
22          A.   Right.  I was -- it's
23   complicated.  I would not be able to summarize
24   right now.
25   BY MS. CONLON:
```

1    Q.   Okay.  When a 3C policy is

2    developed, where is it memorialized?

3    A.   Our legal team puts them

4    together.

5    Q.   And how do they provide it to

6    you after they have put it together?

7    A.   They send us their opinion,

8    their guidance.  I'm not sure of the other ways

9    to do it.

10    Q.   And after receiving their

11    guidance, how does their guidance get

12    transmitted to the people who have to implement

13    the policy?

14    MS. STROKUS:  Objection.  Form.

15    A.   I know we have several

16    different ways we can send cables out to the

17    field or we can do webinars and such for

18    sharing the new information.

19    BY MS. CONLON:

20    Q.   Apart from cables and webinars,

21    is there any other method for conveying a 3C

22    policy to members of the State Department?

23    A.   Changed FAM.

24    THE COURT REPORTER:  Changed --

25    A.   FAM, Foreign Affairs Manual.

```
 1   BY MS. CONLON:
 2          Q.   Apart from cables, webinars and
 3   changes to the Foreign Affairs Manual, is there
 4   any other method for conveying a 3C policy to
 5   members of the State Department?
 6          A.   That's all that come to mind at
 7   the moment.
 8          Q.   I understand you to be saying
 9   that legal advisors to the State Department may
10   help develop the 3C policy.  Who approves the
11   3C policy?
12          MS. STROKUS:  Objection.  Form.
13          A.   Approves a 3C policy?
14          MS. STROKUS:  Also calls for
15   speculation.
16          A.   Right.  I can't say.
17   BY MS. CONLON:
18          Q.   Have you ever approved a 3C
19   policy?
20          A.   A policy?  I remember a
21   discussion of one very little.  I don't recall
22   if I was actually signing off on that or not.
23          Q.   When you say "signing off," are
24   you referring to the clearance process?
25          A.   Correct.
```

Deposition of Stuart Wilson                                            AAUP, et al. v. Rubio, et al.

```
 1              Q.   Does the Visa office

 2    participate in the clearance process for 3C

 3    policies?

 4              A.   Yes.

 5              Q.   Who from the Visa office does

 6    the clearing for the office on a 3C policy?

 7              A.   For the Visa office typically

 8    that would be me or my position, I should say.

 9              Q.   Okay.  And have you -- what 3C

10    policies, if any, have you cleared since

11    starting your role?

12              A.   Gosh, I don't recall any.  I'm

13    sorry.  I can't recall at the moment.

14              Q.   Have you approved any 3C

15    policies relating to anti-Semitism?

16              MS. STROKUS:  Objection.  Asked and

17    answered and --

18              A.   No, I can't recall if I was the

19    approver.

20    BY MS. CONLON:

21              Q.   Are you aware of any 3C

22    policies relating to anti-Semitism?

23              A.   I'm aware that there is one.

24              Q.   Can you describe it?

25              MS. STROKUS:  Objection.
```

```
 1    Speculation.

 2              A.   I cannot.

 3    BY MS. CONLON:

 4              Q.   Who developed the 3C policy on

 5    anti-Semitism?

 6              MS. STROKUS:   Objection.

 7    Speculation.

 8              A.   I don't know.   The date would

 9    be helpful.   I probably wasn't in the office.

10    BY MS. CONLON:

11              Q.   Are you aware of whether a 3C

12    policy relating to anti-Semitism has been

13    issued since you joined the office?

14              A.   I believe we have one, yes.

15              Q.   When approximately was that one

16    issued?

17              A.   March perhaps, speculation.

18              Q.   Letting me know that you're

19    approximating?

20              A.   Yes.

21              Q.   Have you consulted the March

22    approximately 3C policy on anti-Semitism in

23    making -- in reviewing action memos on

24    particular Visa applicants?

25              A.   I must have, yes.
```

```
 1              Q.   Do you know whether the 3C

 2    policy relating to anti-Semitism issued around

 3    March is a public document?

 4              A.   No.

 5              Q.   Where is that policy reduced to

 6    writing?

 7              A.   Initially we have a cable that

 8    goes out to the field.

 9              Q.   Have you seen the cable that

10    went out to the field concerning the 3C policy

11    on anti-Semitism for March?

12              A.   I don't recall but I likely

13    would have, yes.

14              Q.   Did you contribute to the

15    content of that cable?

16              MS. STROKUS:  Objection.  Asked and

17    answered.

18              A.   I did not.

19    BY MS. CONLON:

20              Q.   Did you contribute to the

21    content of that cable?

22              A.   I did not contribute to the

23    content.  I may have cleared it though.

24              Q.   Do you know who did contribute

25    to the content for the cable on the 3C policy
```

1    on anti-Semitism developed in March?

2            A.   I couldn't say with certainty,

3    no.

4            Q.   The 3C policy on anti-Semitism

5    from March was developed -- was it developed in

6    response to E.O. 14188 on combatting

7    anti-Semitism?

8            MS. STROKUS:  Objection.  Calls for

9    speculation.

10           A.   My understanding, yes.

11   BY MS. CONLON:

12           Q.   Do you know who within State

13   was tasked with managing the Department's

14   response to E.O. 14188?

15           A.   I do not.

16           Q.   Who from the Visa office was

17   responsible for developing a response to E.O.

18   14188?

19           A.   I can't identify a particular

20   person.

21           Q.   Were you part of developing a

22   response to E.O. 14188 for the Visa office?

23           A.   I was not actively involved in

24   that.

25           Q.   Who was actively involved?

Deposition of Stuart Wilson                                    AAUP, et al. v. Rubio, et al.

1           A.   Well, like I say, I may have

2   cleared that document.  I can speculate who it

3   might be.

4           Q.   It would be helpful -- and I'm

5   not asking about names really to understand

6   which functions were involved.

7           MS. STROKUS:  Objection.  Form.

8           A.   Typically this would be a

9   managing director.  These questions you're

10  asking are of that level and knowledge and in

11  particular at the time where I was coming

12  onboard, I was not present in the office much,

13  just with moving in and trips that I had to

14  make outside of the office, so that explains

15  why it's a little confusion.

16  BY MS. CONLON:

17          Q.   What took you outside the

18  office when you were first starting in your

19  role?

20          A.   I was there on temporary orders

21  only.  I had to return to Moscow.

22          Q.   Oh, you did?

23          A.   Yes.

24          Q.   When did you return to Moscow?

25  Approximately is fine.

```
 1                 A.    That would have been April.
 2     Late April, early May.
 3                 Q.    And when did you come back from
 4     Moscow?
 5                 A.    May 2nd.
 6                 Q.    You were just back, relatively
 7     speaking.
 8                 A.    Yes.  I was also in Seoul and I
 9     had to go to Korea.
10                 Q.    When was that?
11                 A.    A month ago about.
12                 Q.    And how long were you there
13     for?
14                 A.    A week, 10 days.
15                 Q.    When you are traveling out of
16     the country, is there someone who covers your
17     post in state?
18                 A.    Jessica Norris.
19                 Q.    I see.  Do you know whether Ms.
20     Norris was in her role before you were in
21     yours?
22                 A.    Yes.
23                 Q.    Do you have any sense of how
24     long she's been in her role?
25                 A.    I believe she been there since
```

```
 1    last summer.
 2              Q.   We'll get to the cable in a
 3    moment about anti-Semitism, but are you aware
 4    of any 3C policies issued since you took over
 5    your role relating to the other E.O. we talked
 6    about, 14161, on foreign terrorist
 7    organizations and like.
 8              A.   Foreign terrorist organizations
 9    yes, there is one on that.
10              Q.   Were you involved in developing
11    the 3C policy that is responsive to E.O. 14161?
12              A.   I didn't contribute actively to
13    the creation of any of these policies.
14              Q.   Have you reviewed that policy?
15              A.   I know that I've read it.  So
16    it's possible I cleared it.
17              Q.   Have you ever consulted a 3C
18    policy developed in response to E.O. 14161 when
19    reviewing an action memo on a Visa applicant?
20              A.   Well, if I'm reviewing a memo,
21    I would make sure that it conformed with that
22    policy.  Excuse me.
23              Q.   Do you know who helped to
24    develop the 3C policy that is responsive to
25    E.O. 14161?
```

```
 1                MS. STROKUS:  Objection.  Calls for
 2    speculation.
 3                A.   It would be several different
 4    people I mention all falling under Jessica
 5    Norris.
 6    BY MS. CONLON:
 7                Q.   Did you clear that policy?
 8                A.   I may have.
 9                Q.   Do you know approximately when
10    that policy was issued?
11                A.   I do not.
12                Q.   Some time in March?
13                MS. STROKUS:  Objection.  Calls for
14    speculation.
15                A.   I don't know.
16    BY MS. CONLON:
17                Q.   Do you know whether it was
18    issued in the last two weeks?
19                MS. STROKUS:  Objection.  Calls for
20    speculation.
21                A.   It was not.
22    BY MS. CONLON:
23                Q.   It was not.  It was issued some
24    time before the last two weeks, correct?
25                MS. STROKUS:  Objection.  Calls for
```

```
 1   speculation.  Form.
 2               A.   You're talking about the 3C
 3   policy, correct?
 4   BY MS. CONLON:
 5               Q.   Yes, sir.  The 3C policy that
 6   is responsive to E.O. 14161.
 7               MS. STROKUS:  Objection.  Form.
 8               A.   Much earlier.
 9   BY MS. CONLON:
10               Q.   Early in your tenure at the
11   State Department, correct ?
12               A.   Uh-huh.
13               Q.   That was a "yes", just for the
14   record for Ms. Henderson.  Was that a yes?  I
15   heard a uh-huh but I'm just clarifying the
16   record.
17               A.   Oh, pardon.  Yes.
18               Q.   Have you seen any 3C policies
19   issued in response to either E.O. 14161 or
20   14188 concerning Israel or Palestine?
21               MS. STROKUS:  Objection.  Calls for
22   speculation.
23               A.   I believe there is one which I
24   went through.
25   BY MS. CONLON:
```

```
 1            Q.   Do you know when that 3C policy
 2   concerning Israel or Palestine was issued?
 3            A.   I do not.  You'll have to
 4   forgive me for the timeline.
 5            Q.   That's okay.  And I'm not
 6   looking for specific dates.  Was it issued
 7   early in your time in your role?
 8            MS. STROKUS:  Objection.  Calls for
 9   speculation.
10            A.   It could have been or like I
11   said, it could have been when I returned from
12   abroad or was going.  It's hard to say.  It's
13   very confusing those few months.
14   BY MS. CONLON:
15            Q.   Was it issued -- can you tell
16   me whether it was issued at least some time
17   before the month of June that we are in now?
18            MS. STROKUS:  Objection.  Calls for
19   speculation.
20            A.   Oh, yes.
21   BY MS. CONLON:
22            Q.   Do you recall the content of
23   the 3C policy relating to Israel or Palestine
24   issued in response to the executive orders?
25            A.   I do not recall specifically
```

1   what's in it.

2                Q.    Do you know who helped to

3   develop it?

4                A.    Yes.  Certainly that would be

5   Jessica.

6                Q.    And any idea who apart from Ms.

7   Norris helped to develop that 3C policy?

8                A.    That 3C policy -- no.

9                Q.    Do you know where the 3C policy

10  concerning Israel and Palestine issued in

11  response to the executive orders is

12  memorialized?

13               MS. STROKUS:  Objection.  Calls for

14  speculation.

15               A.    No.

16  BY MS. CONLON:

17               Q.    Have you seen any cables

18  concerning that 3C policy?

19               A.    Yes.

20               Q.    How many?

21               A.    Gosh, I don't know.

22               Q.    More than one?

23               MS. STROKUS:  Objection.  Calls for

24  speculation.

25               A.    I don't know if it's been more

```
 1    than one.

 2    BY MS. CONLON:

 3            Q.   Have you seen any cables

 4    concerning the 3C policy responsive to E.O.

 5    14161?

 6            MS. STROKUS:  Objection.  Form.

 7            A.   No.  Again, it's very much a

 8    blur.  I apologize.

 9    BY MS. CONLON:

10            Q.   That's okay.  What is generally

11    the purpose of a 3C policy for the State

12    Department?  Why is it issued?

13            A.   A 3C policy is a method for

14    allowing the Secretary to control more of the

15    foreign policy.

16            Q.   Does a 3C policy separate

17    guidance or how to apply INA 212?

18            MS. STROKUS:  Objection.  Form.

19            A.   Yes, it can.

20            MS. CONLON:  Because we don't have

21    those policies for me to show you, I'm going to

22    talk about them quickly.  So this question is

23    with respect to 3C policies regarding executive

24    orders 14161, 14188.

25    BY MS. CONLON:
```

```
 1              Q.   Do any of those 3C policies set

 2    forth guidance about how to implement the

 3    executive orders?

 4              MS. STROKUS:  Objection.  Calls for

 5    speculation.

 6              A.   My understanding, yes.

 7    BY MS. CONLON:

 8              Q.   Do any of the 3C policies set

 9    forth guidance about how to define the terms in

10    the executive orders?

11              MS. STROKUS:  Objection.  Calls for

12    speculation.

13              A.   Yes.  They are related directly

14    to the executive orders is my understanding.

15    BY MS. CONLON:

16              Q.   Do you have any idea overall

17    approximately how many 3C policies have been

18    issued in response to the two executive orders?

19              A.   I do not have a sense.

20              Q.   We have talked so far about a

21    3C policy on anti-Semitism, a 3C policy on

22    Israel or Palestine and a 3C policy regarding

23    advocacy or support for foreign terrorist

24    organizations.

25              Can you think of any other 3C policies
```

Deposition of Stuart Wilson                                                                    AAUP, et al. v. Rubio, et al.

1    issued in response to the two executive orders?

2              MS. STROKUS:  Objection.  Form.

3              A.   Yes, there is a policy -- 3C

4    policy aimed at human trafficking.

5    BY MS. CONLON:

6              Q.   And that was issued in response

7    to one of the two executive orders?

8              A.   14161, I believe.

9              Q.   Can you think of any other 3C

10   policies issued in response to either order?

11             A.   I cannot right off, no.

12             Q.   In the 3C policies issued in

13   response to the two executive orders, is there

14   a description of the foreign policy of the

15   United States?

16             MS. STROKUS:  Objection.  Calls for

17   speculation, also form.

18             A.   I can't say.

19   BY MS. CONLON:

20             Q.   I've asked you about 3C

21   policies concerning Israel and Palestine; have

22   you seen any 3C policy that specifically

23   mentions Hamas?

24             A.   That's difficult.  I can't say

25   for certain that Hamas has been referred to

1   directly.

2            Q.   Is that difficult -- why is

3   that -- why is it difficult to recall that?

4            MS. STROKUS:  Objection.  Form.

5            A.   Because I don't remember what

6   was in the text and I see lots of text, so it's

7   difficult to remember which is which.

8   BY MS. CONLON:

9            Q.   Do you recall any 3C policies

10  regarding student protesters?

11           A.   Yes.

12           Q.   Does the 3C policy issued in

13  response to the executive orders concerning

14  Israel and Palestine also address student

15  protesters?

16           MS. STROKUS:  Objection.  Form.

17           A.   I believe support for terrorist

18  groups is mentioned.

19  BY MS. CONLON:

20           Q.   In other words, the 3C policy

21  that mentions Israel and Palestine is

22  responsive to the E.O. 14161; is that correct?

23           MS. STROKUS:  Objection.  Form.

24  Calls for speculation.

25           A.   I would have to look at those

```
 1   two again.
 2            MS. CONLON:  So I will tell you, I
 3   don't have them, and I will discuss with the
 4   Government whether we can get them and show
 5   them to you because I don't like asking you
 6   without putting stuff in front of you but we
 7   have not received them.
 8            THE WITNESS:  Fair.  Fair.
 9   BY MS. CONLON:
10        Q.   Do you recall whether any of
11   the 3C policies reference anti-American
12   activities or views?
13            MS. STROKUS:  Objection.  Form.
14        A.   I'm feeling pretty certain they
15   did.
16   BY MS. CONLON:
17        Q.   We talked about one way 3C
18   policies can be memorialized is in cables and
19   we'll get to cables in a second.  You also
20   mentioned changes to the Foreign Affairs
21   Manual.
22        A.   Correct.
23        Q.   Do you have any involvement in
24   changes made to the Foreign Affairs Manual?
25        A.   I do not.
```

1      Q.   Who to your understanding does?

2      A.   I understand this to be in

3  collaboration with the legal team LCA we call

4  the office.  It could be a variety of different

5  people depending on the subject.  3C could be

6  Bob Jachim, Jessica Norris.

7      Q.   Do you review proposed changes

8  to the Foreign Affairs Manual concerning 3C

9  policies before they are actually implemented?

10     A.   I have not yet, but I can.

11     Q.   And that's not something you

12 are asked to clear in your role?

13     A.   I have not to date, no.

14     Q.   Are you aware of whether there

15 have been changes made to the Foreign Affairs

16 Manual on the basis of 3C policies issued in

17 response to the two executive orders?

18     A.   I believe so.

19     Q.   Any idea how many provisions of

20 the FAM have changed as a result?

21          MS. STROKUS:  Objection.  Calls for

22 speculation.

23     A.   I wouldn't be able to say.

24 BY MS. CONLON:

25     Q.   Do you consult the FAM in

1    reviewing an action memo about a particular

2    Visa applicant relating to 3C policy?

3            A.    I have not but it's an option

4    available.

5            Q.    We talked about webinars for a

6    minute.  Have you delivered any webinars

7    concerning a 3C policy developed in response to

8    either of the executive orders?

9            A.    I have not personally, no.

10           Q.    Have you observed any performed

11   by somebody else?

12           A.    We've done several, and I

13   believe one was related to 3C, at least one.  I

14   don't remember the content which makes me think

15   I wasn't there for it.

16           Q.    Do you know -- withdrawn.  Is

17   there a particular person in the Visa office

18   responsible for developing webinars on new 3C

19   policies?

20           A.    It would be -- right, it would

21   be collaboration which is usually the case in

22   developing these things.  Again, it's the usual

23   legal office, we'd have legal input, we would

24   have the security and vetting office would

25   contribute to that and of course the managing

1    director would contribute to that.

2                Q.    Would you contribute to that?

3                A.    Typically, no, I have not.

4                Q.    Would you review it before it

5    was delivered or published to employees of the

6    State Department?

7                A.    For the webinar, not

8    necessarily, no, usually I'm watching it live

9    when I've seen them.

10                Q.    You said you believe there have

11    been several concerning 3C policies responsive

12    to the two executive orders; is that correct?

13                MS. STROKUS:  Objection.  Form.

14                A.    Yeah, that's just my memory

15    approximately.

16    BY MS. CONLON:

17                Q.    Have you seen more than one?

18                A.    3C policies?

19                Q.    Have you seen more than one

20    webinar --

21                A.    Oh, webinar.

22                Q.    -- concerning 3C policies

23    responsive to the two executive orders?

24                A.    I can't say.

25                Q.    Just a minute.

```
 1              MS. SAFAVI:  Is now a good time to
 2   break?
 3              MS. STROKUS:  Can we ask if now is a
 4   good time to break or do you have a few more
 5   minutes of questions.
 6              MS. CONLON:  I was thinking of
 7   getting out a document.  I think better to,
 8   like, take a break now before we switch gears.
 9   That would be great.
10              THE VIDEOGRAPHER:  Off the record.
11              MS. CONLON:  Can we stay on the
12   record for one moment.  Could we excuse Mr.
13   Wilson for just one second so that we can speak
14   to you on the record.
15              MS. STROKUS:  Sure.
16              MR. WILKENS:  We just don't need to
17   have legal argument in front of the witness.
18              MS. CONLON:  Sorry for kicking you
19   out, Mr. Wilson.  We just need one minute with
20   your lawyers.
21                   (Witness excused.)
22              MS. CONLON:  I'm just going to make
23   our record and then if you want a break before
24   you respond, that's fine, but what I wanted to
25   say is that we want the 3C policies that we
```

1    have been asking Mr. Wilson about that appear

2    to me to be directly relevant to the discovery

3    that Judge Young discussed in status

4    conferences and that we sought in our request

5    for production which we have -- and to my

6    knowledge, nothing we have received reflects

7    what Mr. Wilson is talking about. So we are

8    asking for them.

9         We're asking that you make them

10   available to us today so we can review them

11   with him.  Thursday is also fine, since we're

12   coming back then and I appreciate that you'll,

13   I'm sure, need to discuss this with your

14   colleagues, but we'd like the chance to ask him

15   about them.  We don't want to receive them

16   after we can't speak to him about it anymore.

17   So I want to put that on the record.

18             MR. WILKENS:  Can we just add one

19   thing to that.

20             MS. SAFAVI: Of course.

21             MR. WILKENS:   We need to know the

22   answer to whether you're going to produce them

23   today because if you're not going to, I think

24   we're going to have to move to compel

25   immediately because of the trial coming up.  We

```
 1    can't just wait to find out Wednesday.  So if

 2    you can please get back to us because these

 3    items are, I mean, maybe the most relevant

 4    items and they should have been produced a long

 5    time ago and yeah, it's very troubling.

 6              MS. CONLON:  Just relatedly he

 7    mentioned cables communicating 3C policies, we

 8    have received certain cables.  The cables we

 9    have received all make references to ref A, ref

10    B, ref C listing at the beginning of the cable

11    other cables, and the cables we received

12    discussed the implementation of or revisions to

13    those cables which, based on the content of

14    what we have, appear to refer to this two 3C

15    policies.

16              So we don't -- in other words, it's my

17    understanding that we do not have all of the

18    relevant cables, including those he just

19    discussed.  I'm going to get into cables with

20    him so we can have a clear understanding of

21    what we do and don't have, but I want to flag

22    that for you now.  Our view is that those are

23    essential, they are communicating guidance of

24    how to implement these policies, so we also

25    would like the cables.
```

```
 1              MS. STROKUS:  And just to clarify,
 2      you mean the cables that are referenced and the
 3      cables that you already have.
 4              MS. CONLON:  Both the cables that are
 5      referenced and cables we already have but also
 6      cables he's discussing to the extent that they
 7      are not the same as those, right, like, I can't
 8      know because I haven't seen the ones I don't
 9      have.  So you can know and I cannot, but the
10      cables that Mr. Wilson is talking about and
11      also the cables referenced in the cables we've
12      received, yes.
13              And then lastly, he has mentioned
14      updates to the Foreign Affairs Manual.  I'm
15      going to go through some sections of the
16      Foreign Affairs Manual with him.  We have not
17      received any of the Foreign Affairs Manual from
18      all of you but have locked online to the extent
19      it's public but have noticed of course there
20      are revisions from 2025 from the past two
21      months that are not public.  To the extent that
22      they relate to the allegations in the
23      complaint, we also are asking for those.
24              MS. SAFAVI:  Anything else?
25              MS. CONLON:  (Inaudible) Christmas.
```

```
 1   To the extent that there are privilege concerns

 2   or other sensitivities, we would be open to

 3   receiving things on an AEO basis, particularly

 4   if that would expedite your ability to provide

 5   them to us.  So I will note that as well.

 6   Okay.  That's it.  That was our record.  So you

 7   know what, how long would you like to break

 8   for?  And how long --

 9            MS. SAFAVI: For lunch?

10            MS. CONLON:  -- do you think Mr.

11   Wilson would like to break for?

12            MS. SAFAVI:  45 minutes.

13            MR. WILKENS:  I don't know if you

14   saw, I sent you all an e-mail.  If you don't --

15   it's 102.  You can order food to be delivered

16   here on the fourth floor, elevator.  So yeah, I

17   mean you have a break out room, so that might

18   be -- I don't know how long it will take but it

19   might be better than --

20            MS. STROKUS:  That would be ideal

21   because it's about 100 degrees outside.

22            MS. CONLON:  Ms. Henderson, we can be

23   off the record for this.

24            MR. WILKENS: Oh, sorry.  We're still

25   on.
```

```
 1              THE VIDEOGRAPHER:  The time is 12:29
 2    and we are off the record.
 3         (A break was taken at 12:29 p.m.)
 4              THE VIDEOGRAPHER: The time is 13:49
 5    and we're back on the record.
 6    BY MS. CONLON:
 7              Q.   Good afternoon.  Okay.  So we
 8    have been talking about policies relating to
 9    Visa revocations.  Are you familiar at all with
10    policies relating to determinations of
11    removability for lawful permanent residents
12    based on foreign policy concerns?
13              A.   No.
14              Q.   Have you ever heard of a 4C
15    policy?
16              A.   I've heard of 4C policy, yeah.
17              THE COURT REPORTER: I'm sorry.  4 --
18              MS. CONLON:  C.
19              THE WITNESS: C.
20    BY MS. CONLON:
21              Q.   What do you understand that to
22    refer to?
23              A.   4C my understanding is that it
24    refers to the secretary's authority to remove
25    an individual based on foreign policy concerns.
```

```
 1                Q.   And do you understand 4C to

 2    extend the Secretary's authority to the removal

 3    of lawful permanent residents for foreign

 4    policy concerns?

 5                A.   I don't -- that's Homeland

 6    Security issue on that side.  We don't dive

 7    into it.

 8                Q.   Is it your testimony that the

 9    Visa office does not receive referrals from

10    Homeland Security recommending the -- a

11    determination of removability for a lawful

12    permanent resident on the basis of foreign

13    policy concerns?

14                MS. STROKUS:  Objection.  Form.

15                A.   I would not be able to say with

16    certainty.

17    BY MS. CONLON:

18                Q.   Just a minute.  Just for

19    clarity, have any of the cases that have been

20    referred to the Visa office in the time you've

21    been there from the Department of Homeland

22    Security involve lawful permanent residents?

23                MS. STROKUS:  Objection.  Form.

24    Speculation.

25                A.   Yes, there was.   There was a
```

 1   case relating to an individual who was a legal

 2   permanent resident.

 3   BY MS. CONLON:

 4           Q.   You can recall only a single

 5   case?

 6           A.   There may have been others.  I

 7   recall one.

 8           Q.   What case do you recall?

 9           A.   I don't remember the name.

10   Someone associated with a university.

11           Q.   A student who was a lawful

12   permanent resident?

13           A.   I believe so, yes.

14           Q.   Was the student make Mahmoud

15   Khalil?

16           MS. STROKUS:  Objection. Calls for

17   speculation.

18           A.   I believe it was, yes.

19   BY MS. CONLON:

20           Q.   At least with respect to Mr.

21   Khalil, the State Department received a

22   referral from Homeland Security recommending a

23   removability determination be made by Secretary

24   Rubio; is that correct?

25           MS. STROKUS:  Objection.  Form.

```
 1   Calls for speculation.
 2             A.   I'm not sure how that
 3   transpired between Homeland Security and the
 4   State.
 5   BY MS. CONLON:
 6             Q.   Have you had any involvement at
 7   all in Mr. Khalil's case?
 8             A.   I don't recall.  I do remember
 9   seeing the case.
10             Q.   In what context did you see it?
11             A.   I remember seeing the name and
12   that there was a question about the authority
13   for LPR status with the -- whereas it relates
14   to the Secretary, and I don't know what the
15   resolution of that was.
16             Q.   What was the question?
17             A.   That it fell within the
18   Homeland Security Department.
19             Q.   In other words, who has the
20   authority to make the determination of
21   removability for a lawful permanent resident?
22             MS. STROKUS:  Objection.  Form.
23             A.   I can't say for certain.
24   BY MS. CONLON:
25             Q.   What was the -- withdrawn.  You
```

 1    said you remember seeing his name.  Did you see

 2    his name on a list of other names?

 3            A.   I believe I saw his name in a

 4    memo for the Secretary.

 5            Q.   Was it an action memo?

 6            A.   It may have been.

 7            Q.   Who gave you the memo?

 8            A.   I think I saw it electronically

 9    as it was being worked on.

10            Q.   And do you recall who provided

11    it to you electronically?

12            A.   No, I don't think it was

13    attributed to one individual, it was a shared

14    document.

15            Q.   Do you know who else in the

16    Visa office worked on it?

17            A.   I know it went to -- I believe

18    it went to our senior bureau official.

19            Q.   Do you know who worked on it

20    before it went to Mr. Armstrong?

21            A.   I do not.

22            Q.   It was not you?

23            A.   It was not me.

24            Q.   Do you recall the

25    recommendation from the Department of Homeland

```
 1    Security with respect to Mr. Khalil?
 2               MS. STROKUS:  Objection.  Calls for
 3    speculation.
 4               A.   I remember very little details
 5    about the case.
 6    BY MS. CONLON:
 7               Q.   What do you recall?
 8               A.   I recall that Mr. Khalil was a
 9    legal permanent resident, I think a former
10    student and if I'm not mistaken, he had an
11    American citizen wife or permanent resident
12    wife.
13               Q.   Do you recall anything else
14    about it?
15               A.   I do not.
16               Q.   Do you recall why it was
17    referred to State Department if it's something
18    ordinarily handled by Homeland Security?
19               MS. STROKUS:  Objection.  Calls for
20    speculation.
21               A.   I do not recall reading the
22    direct purpose, no.
23    BY MS. CONLON:
24               Q.   What's your understanding of
25    why it was being referred to the State
```

1    Department?

2              MS. STROKUS:  Objection.  Calls for

3    speculation.

4              A.   Speculating -- well, I can say

5    for certain it was a foreign policy concern of

6    the Secretary.

7              Q.   That Mr. Khalil's case was

8    being referred to state -- to raise foreign

9    policy concerns to Secretary Rubio; is that

10   correct?

11             MS. STROKUS:  Objection.  Form.

12             A.   Sorry.  I didn't understand.

13   BY MS. CONLON:

14             Q.   Your understanding is that Mr.

15   Khalil's case was referred to the State

16   Department because of foreign policy concerns

17   that needed to be raised to Secretary Rubio; is

18   that correct?

19             A.   I don't know if it was that

20   direction that we were raising it to Secretary

21   Rubio or if it was something Secretary Rubio

22   had suggested, I don't know.

23             Q.   I see.  Do you know for sure

24   that Mr. Khalil's case was brought to the

25   attention of the State Department by Homeland

1    Security?

2                MS. STROKUS:  Objection.  Calls for

3    speculation.

4                A.   I can't recall the details.

5    I'm sorry.

6    BY MS. CONLON:

7                Q.   That's okay.  If you recall,

8    was Mr. Khalil's case one of the cases brought

9    down by the 7th floor?

10               MS. STROKUS:  Objection.  Calls for

11   speculation.

12               A.   I do not know where it

13   originated.

14   BY MS. CONLON:

15               Q.   So you are aware of Mr.

16   Khalil's case as an example of State

17   Department's involvement in a removability

18   determination for a lawful permanent resident.

19   Do you have any reason to believe that Mr.

20   Khalil's the only lawful permanent resident

21   that the State has had involvement with in this

22   way?

23               MS. STROKUS:  Objection.  Form.

24               A.    Not sure how to answer that.

25   Am I aware of any other cases that are --

 1    involve legal permanent residents?

 2    BY MS. CONLON:

 3          Q.    Well, that's part one.  Are you

 4    aware?

 5          A.    I'm not, no.

 6          Q.    Is there anything about his

 7    case that you're aware of that would explain

 8    why it was referred to State as opposed to all

 9    other cases of other lawful permanent

10    residents?

11          A.    You know, I don't know why it

12    was referred to the Secretary.  I know that it

13    was a concern someone at some point in the

14    process considered it to be a concern.  And

15    unfortunately, that's about all I can say.

16          Q.    Do you know whether the process

17    was any different on State side for assessing

18    Mr. Khalil's situation than it is in the

19    ordinary course for assessing a Visa holder's

20    situation?

21          MS. STROKUS:  Objection. Calls for

22    speculation.

23          A.    To my knowledge, the 4C

24    authority is consistent with how it originally

25    was intended.

Deposition of Stuart Wilson                                    AAUP, et al. v. Rubio, et al.

```
 1    BY MS. CONLON:

 2           Q.   In other words, 4C is like the

 3    3C equivalent but for lawful permanent

 4    residents?

 5           MS. STROKUS:  Objection.  Form.

 6    Calls for speculation.

 7           A.   No.  It's -- I'm not a lawyer.

 8    It's a different authority my understanding is.

 9    BY MS. CONLON:

10           Q.   Sorry.  Were you involved in

11    clearing the decision for Mr. Khalil?

12           MS. STROKUS:  Objection. Speculation

13    and form.

14           A.   I may have been.  It was a

15    shared document that I saw.

16    BY MS. CONLON:

17           Q.   And the document that you saw,

18    was that the referral from Homeland Security or

19    a report of action -- action report for

20    Secretary Rubio?

21           A.   I can't say for certain.

22           Q.   Sticking with 4C for a moment.

23    We talked about 3C policies created in response

24    to executive orders 14161 and 14188.  Do you

25    know whether any 4C policies have been created
```

1    in response those executive orders?

2              A.    None to my knowledge, and if I

3    may, I thought considerably on the 3C issue.

4    The only 3C policy I'm certain that was done

5    during my time is the 3C policy that was

6    related to illegal trafficking and illegal

7    immigration.

8         And the other we talked about -- we

9    talked about Hamas, and I believe I'm getting

10   this information from the designation of

11   terrorist organizations.  The administration

12   was very active on that with different ones in

13   Mexico and in Haiti, and there was a

14   designation of two Haitian gangs that I was

15   part of clearing that process, and I would just

16   like to clarify.

17             Q.    Okay.  I guess I want to think

18   about what you have just said.  You have said

19   the only 3C policy I'm certain that was done

20   during my time is the 3C policy related to

21   illegal trafficking; is that correct?

22             A.    That's correct.  It's a 3C

23   policy.

24             Q.    So the other 3C policies we

25   discussed you are not certain of when they were

 1    enacted; is that correct?
 2            A.   There were no others to my
 3    knowledge.  There were discussions of making
 4    policies and how to react on the executive
 5    orders, but looking back at it, I don't see
 6    that there's anything that was finalized or
 7    even got high enough to be at a decision point.
 8            Q.   What has altered your
 9    recollection in the last hour and a half when
10    we were on break?
11            A.   I checked state.gov to see the
12    records.
13            Q.   You're saying you looked at a
14    public website and that affected your view of
15    whether a policy existed within the State
16    Department?
17            A.   That's correct.
18            Q.   In your experience, are 3C
19    policies published to the state.gov website?
20            A.   I'm not aware of one.
21            Q.   Right.  In fact, there's never
22    been a 3C policy published on the state.gov
23    website, correct?
24            MS. STROKUS:  Objection.  Calls for
25    speculation.

```
 1              A.   I don't know.

 2    BY MS. CONLON:

 3              Q.   What else did you do to refresh

 4    your recollection that has led to this change

 5    in your testimony in the last 90 minutes

 6    besides look at the state.gov website?

 7              A.   I look at that website only.

 8              Q.   Did you speak with anyone who

 9    you work with who is not a lawyer?

10              A.   No.  For the record, I sat in

11    the back room there and didn't go out for lunch

12    or anything.

13              MS. CONLON:  I'm sorry to hear that,

14    although it's pretty gross outside.

15    BY MS. CONLON:

16              Q.   Now, you have had to yourself

17    make determinations about a Visa revocation on

18    the basis of these executive orders and to

19    review decisions made by other people on that

20    basis.  And you've testified that you've done

21    so by consulting 3C policies; was that

22    incorrect?

23              MS. STROKUS:  Objection.  Form.

24    Mischaracterization of testimony.

25    BY MS. CONLON:
```

Deposition of Stuart Wilson                                          AAUP, et al. v. Rubio, et al.

```
 1             Q.   I can read it back to you but
 2   that is my recollection of your testimony, Mr.
 3   Wilson so --
 4             A.   I think what I mean here is
 5   that any 3C policy that related to a case I was
 6   working on, I would review the policy.
 7             Q.   Right.  And so when you have
 8   reviewed cases relating to the topics we've
 9   discussed; student protesters, anti-Israel
10   Semitism, proPalestinian sentiment, even just
11   sticking with these three topics, I suppose,
12   what 3C policy did you review?
13             MS. STROKUS:  Objection.  Form.
14             A.   I don't believe I've dealt with
15   any student protesters.
16   BY MS. CONLON:
17             Q.   You have not received a single
18   referral from the Department of Homeland
19   Security or the 7th floor concerning the
20   student protester for a Visa revocation; is
21   that your testimony?
22             A.   If I can ask --
23             MS. STROKUS:  Object to form.
24             A.   If I could ask for
25   clarification.  Are you asking me if someone
```

1    was revoked because they were a protester or

2    are you asking where they happen to be a

3    protester.

4    BY MS. CONLON:

5              Q.    I'm not asking you for any

6    causal characterization.  I'm asking whether

7    you have received any referrals for a person

8    who was a student protester either from the 7th

9    floor or the Department of Homeland Security in

10   your time, in your role?

11             A.    So I would not be aware if they

12   were student protesters.  The cases I was --

13   the students that I was looking at actually had

14   law enforcement infractions and protesting

15   would not be one of those.

16             Q.    It's your testimony that every

17   referral you have reviewed involving a Visa

18   holder who is a student has involved an

19   allegation of criminal conduct?

20             MS. STROKUS:  Objection.  Form.

21             A.    Yes, I believe so.

22   BY MS. CONLON:

23             Q.    What was Mr. Khalil's criminal

24   conduct?

25             MS. STROKUS:  Objection.  Calls for

1    speculation.

2              A.   That was a determination by the

3    Secretary.

4    BY MS. CONLON:

5              Q.   No.  I'm saying -- withdrawn.

6    You're testifying that the people whose cases

7    have been sent to you to review who happen to

8    be students, student protesters even, also have

9    law enforcement infractions, and I'm asking you

10   what were Mr. Khalil's law enforcement --

11             MS. STROKUS:  Objection.  Law

12   enforcement privileged materials and I instruct

13   the witness not to answer.

14   BY MS. CONLON:

15             Q.   To your knowledge, has Mr.

16   Khalil been charged with any crime?

17             A.   To my knowledge, no.

18             Q.   Mr. Khalil's name was not on

19   any of the lists of student Visa holders

20   referred to your office because they have law

21   enforcement infractions, correct?

22             MS. STROKUS:  Objection.  Form.

23   Calls for speculation.

24             A.   I don't know if that's the

25   reason why.  I don't believe he was on the list

1    of students.

2    BY MS. CONLON:

3            Q.   He was referred to you

4    separately, correct?

5            MS. STROKUS:  Objection.  Form.

6            A.   I think he was referred to the

7    Visa office and I may have that wrong.

8    Actually, he may have been referred to the

9    senior bureau official.

10            Q.   He may have been referred by

11    the 7th floor to the senior bureau official?

12            MS. STROKUS:  Object.  Form.  Calls

13    for speculation.

14            A.   I don't know where it came

15    from.

16    BY MS. CONLON:

17            Q.   Just a moment.

18            MS. SAFAVI:  Actually, can we take a

19    quick break.  Can we have a quick break please.

20            MS. CONLON:  Sure.

21            MS. SAFAVI:  We'll limit it to 5

22    minutes.

23            MS. CONLON:  No, I wasn't going to

24    put a timer on it.  That's fine.

25            MS. SAFAVI:  Oh, I want to put a

```
 1   timer on it.
 2             THE VIDEOGRAPHER:  The time is 2:08.
 3   We are off the record.
 4        (A break was taken at 2:08 p.m.)
 5             THE VIDEOGRAPHER:  The time is 14:18
 6   and we're back on the record.
 7   BY MS. CONLON:
 8             Q.   Without speaking about any 3C
 9   policies that could relate to this case, so
10   just in the abstract, when you're reviewing a
11   proposed action to take on the basis of the 3C
12   policy, do you usually review the relevant 3C
13   policy?
14             A.   Sorry for hesitating.
15             Q.   That's okay.
16             A.   I'm contemplating if I ever had
17   a 3C designation to do exactly that with.  I
18   can speak hypothetically that if I had a case
19   that was related to a 3C policy, that I would
20   look at that policy.
21             Q.   Well, you have people who are
22   junior to you in the Visa office who receive
23   recommendations of action on the basis of a 3C
24   policy.  Who trains them?
25             MS. STROKUS:  Objection.  Form.
```

Deposition of Stuart Wilson                                  AAUP, et al. v. Rubio, et al.

```
 1    BY MS. CONLON:

 2              Q.   I wasn't done asking my

 3    question.

 4              MS. STROKUS:  Sorry.

 5              MS. CONLON:  But you can object again

 6    when I finish.

 7    BY MS. CONLON:

 8              Q.   Who trains them on how to

 9    implement the relevant 3C policy?

10              MS. STROKUS:  Objection.  Form.

11              A.   No idea.

12    BY MS. CONLON:

13              Q.   Who gives guidance to employees

14    of the Visa office who receive referrals from

15    Homeland Security that involve a 3C policy?

16              MS. STROKUS:  Objection.  Calls for

17    speculation.  Form.

18              A.   Who gives the workers guidance.

19              MS. CONLON:  That's right.

20              A.   Well, they're trained in our

21    general consular courses on how to read the FAM

22    and apply the guidance, the policies.  So I

23    wouldn't say there's necessarily an active

24    person telling them how to do things.

25    BY MS. CONLON:
```

Deposition of Stuart Wilson                                    AAUP, et al. v. Rubio, et al.

1              Q.    When a new 3C policy is arrived

2     at, who explains it to the workers in the Visa

3     office?

4              A.    That would likely be the

5     director or the managing director.

6              Q.    And you're not the director?

7              A.    That's correct.

8              Q.    Who is -- the managing director

9     is Ms. Norris?

10             A.    Correct.

11             Q.    So when you say it would be the

12    director or the managing director?

13             A.    Right.  The director of the

14    office the employee is in or the managing

15    director.  There's many different layers, we're

16    talking about a very large office.

17             Q.    The Visa office is a very large

18    office?

19             A.    Yes, there's hundreds.

20             Q.    Are there any circumstances

21    under which the Visa office proposes an action

22    to the Secretary on a Visa without referring to

23    a 3C policy?

24             A.    I don't know.

25             Q.    In your experience, have you

```
 1   ever seen that?

 2              A.   I've seen cases go to the

 3   Secretary that are 3C or 4C.

 4              Q.   Have you seen any cases go to

 5   the Secretary that were not 3C or 4C?

 6              A.   I don't believe so, no.

 7              Q.   Okay.  One other thing, 3C and

 8   4C concern United States foreign policy

 9   interests, right?

10              MS. STROKUS:  Objection.  Form.

11   BY MS. CONLON:

12              Q.   So how does somebody in the

13   Visa office determine what -- determine whether

14   the recommended action comports with U.S.

15   foreign policy interest?

16              MS. STROKUS:  Objection.  Calls for

17   speculation.  Form.

18              A.   Could you reword that maybe?

19   BY MS. COLON:

20              Q.   Sure.  The Visa office

21   receives referrals recommending action on the

22   basis of a 3C or 4C policy implicating the U.S.

23   foreign policy interest.  How did anyone in the

24   Visa office know whether there is a relevant

25   U.S. foreign policy interest at stake based on
```

1    that action?

2            MS. STROKUS:  Objection to form.

3            A.   I don't know how it's analyzed.

4    BY MS. CONLON:

5            Q.   Who determines what the U.S.

6    foreign policy interests are for purposes of 3C

7    and 4C?

8            A.   Well, it's a decision to the

9    Secretary.

10           Q.   How is his decision about what

11   U.S. foreign policy interests are for 3C and 4C

12   conveyed to the Visa office?

13           A.   There's different types of

14   input we can receive as to what the Secretary

15   is interested in.

16           Q.   How do you receive -- what are

17   the different -- sorry. Withdrawn.  What are

18   the ways that you can receive information --

19           A.   It could be a -- it could be

20   public speech, it can be a Tweet, something

21   published on a website.  There's different ways

22   of determining what the Secretary's interest

23   is.

24           Q.   And how do you stay abreast of

25   his public statements to understand what his

1    interests are for 3C and 4C purposes?

2              A.    Well, speeches and such or

3    public affairs would notify us of any

4    statements the Secretary's made.

5              Q.    Do you receive daily press

6    clippings; for example, concerning the

7    Secretary's public statements that are relevant

8    to your work?

9              A.    I have access to them.

10             Q.    Is there someone in the Visa

11   office, not just public affairs, who tracks his

12   public statements for the purposes of 3C and 4C

13   policy work?

14             A.    Not specifically.

15             Q.    So if the Secretary announces a

16   new foreign policy interest relevant to the 3C

17   and 4C work you do, how do you become aware of

18   it?

19             A.    There's many different ways.

20   We have our staff meetings and somebody usually

21   picks up on the information whether it be a

22   press clip or a speech and we discuss it.

23             Q.    Are those meetings like on a

24   daily basis?

25             A.    No.

1          Q.   Weekly basis?

2          A.   Weekly basis typically for our

3    staff meeting, yes.

4          Q.   If the Secretary has made an

5    important speech or post online about a new

6    policy, does a meeting get convened by the Visa

7    office to understand its relevance to your

8    work?

9          MS. STROKUS:  Objection.  Form.

10         A.   I can speak theoretically.

11   BY MS. COLON:

12         Q.   Well, in your experience has

13   that happened?

14         A.   The Secretary making a

15   statement that we need to address immediately

16   with -- I haven't been part of that since I've

17   been here, no.

18         Q.   The Secretary -- you're aware.

19   Withdrawn.  Are you aware that since you have

20   joined the State Department, Secretary Rubio

21   has made many public statements about

22   anti-Semitism as a U.S. foreign policy

23   interest?

24         A.   Consistent with 14188 executive

25   order.

1           Q.   Yes.

2           A.   Yes.

3           Q.   How have Secretary Rubio's

4    public statements about the U.S. foreign policy

5    interest in anti-Semitism consistent with

6    executive order 14188 been conveyed to you?

7           A.   I can recall seeing press

8    clips.  Then I remember a Tweet that I can't

9    recall the content of that related to that

10   subject.

11          Q.   Do you recall any particular

12   statements by Secretary Rubio concerning

13   anti-Semitism that you have had to respond to

14   in your work?

15          A.   I can recall statements that

16   relate to Visa holders not complying with their

17   Visa but not nothing in particular regarding

18   anti-Semitism.

19          Q.   When you say statements

20   relating to Visa holders not complying with

21   their Visas, are you referring to student Visa

22   holders?

23          A.   I think it could relate to

24   anyone; perhaps it was related to students in

25   particular.

Deposition of Stuart Wilson                                    AAUP, et al. v. Rubio, et al.

```
 1            Q.   What statements relating to

 2   Visa holders not complying with their Visas

 3   stick out in your mind as affecting your work?

 4            MS. STROKUS:  Objection.  Calls for

 5   speculation.  Form.

 6            A.   I can remember a particular

 7   quote where he said a Visa is a privilege, not

 8   a right.

 9   BY MS. CONLON:

10            Q.   How has that affected your

11   work?

12            MS. STROKUS:  Objection.  Form.

13            A.   It is -- I think it has allowed

14   us to look at the Visa -- a violation of the

15   terms of a Visa in a more -- in a way that we

16   can control that Visa in a sense that we could

17   revoke it if the person has acted not compliant

18   with the terms of the Visa.

19            MS. CONLON:  I'm going to pass you a

20   document that I would like marked as Exhibit 1.

21            (Exhibit 1 was marked.)

22   BY MS. CONLON:

23            Q.   You just received a document

24   marked as Exhibit 1 from Ms. Henderson.  What

25   does it appear to be?
```

```
 1              MS. STROKUS:  Objection.

 2   Speculation.

 3              A.   So we have a Palestinian

 4   activist, according to the caption, who's been

 5   arrested and the implication is that this is a

 6   Visa or green card holder and Hamas supporter.

 7   BY MS. CONLON:

 8              Q.   Do you recognize the person in

 9   the picture?

10              A.   I believe that's Khalil.

11              Q.   And you see where -- you agree

12   that @marcorubio is Mr. Rubio or Secretary

13   Rubio's handle on social media on the platform

14   X?

15              A.   I would assume so, yes.

16              Q.   And you see where he writes [As

17   read] "We will be revoking the Visas and/or

18   green cards of Hamas supporters in America so

19   they can be deported."  Right?

20              A.   Yes.

21              Q.   Secretary Rubio here addresses

22   the revocation not only of Visas but also of

23   green cards, correct?

24              A.   No, I'm not qualified to answer

25   that.
```

1          Q.    Is this a statement that was

2     brought to your attention as part of your work

3     on 3C policies relating to the two executive

4     orders?

5          A.    I have not seen this before.

6          Q.    Okay.  Have you seen any press

7     clippings where Secretary Rubio has expressed

8     the sentiment that the State Department will be

9     revoking the Visas and/or green cards of Hamas

10    supporters?

11         A.    I can't recall.  I have a

12    problem with the use of green cards, revoking

13    green cards.  That's not Secretary State's

14    authority to my knowledge.

15         Q.    Yes, and I see that.  Put aside

16    green cards for a moment.

17         A.    Okay.

18         Q.    Have you seen any public

19    statements of Secretary Rubio's that have

20    informed your work concerning the revocation of

21    Visas of Hamas supporters?

22         A.    I can't recall anything

23    specifically that I can recite for you.

24         Q.    We're not asking you to recite

25    it.  Have you seen -- has that information been

 1    provided to you in the course of your work?

 2              A.    Either -- yes, either a message

 3    from either the President or Secretary Rubio.

 4              Q.    And are messages --

 5              (Phone interruption)

 6              MS. CONLON:   Everyone okay?  Okay.

 7    BY MS. CONLON:

 8              Q.    Are messages from the President

 9    concerning Visa revocations that are in public

10    statements of equal import in informing your

11    work of statements by Secretary Rubio?

12              A.    Well, of course, as the

13    executive it's very important to us but our

14    immediate supervisor, if you will, is the

15    Secretary.

16              Q.    Now, you said that you recall a

17    statement by Secretary Rubio about revoking

18    Visas from people whose activities are

19    inconsistent with the purpose of their Visa; is

20    that correct?

21              A.    That's correct.

22              Q.    Have you received any guidance

23    from someone senior to you in the State

24    Department about how to apply that sentiment to

25    your work?

```
 1              MS. STROKUS:  Objection.  Form.

 2              A.   Actually, no.

 3  BY MS. CONLON:

 4              Q.   Have you seen any cables

 5  expressing that notion?

 6              MS. STROKUS:  Objection.  Form.

 7              A.   I can't recall.  There have

 8  been a lot of cables since the newest

 9  administration came on board.

10  BY MS. CONLON:

11              Q.   Okay.  I'm going to give you

12  another document.  I'm passing this document to

13  Ms. Henderson.  Ms. Henderson, were you able to

14  mark that --

15              THE COURT REPORTER:  Two.

16                (Exhibit 2 was marked.)

17  BY MS. CONLON:

18              Q.   I have just handed you a

19  document marked as Exhibit 2.  Do you recognize

20  this as a cable from the State Department?

21              A.   Yes.  Yes, I do.  I have read

22  this before.

23              Q.   And you're talking for the

24  record about MRN 25 State 59756, right?

25              A.   MRN 59756.
```

1          Q.   Oh, did I say it wrong?  I

2    might have.  Thank you.  Now.  Were you

3    involved in the development of this cable?

4          A.   Well, this cable was by and

5    large drafted by C Staff.

6          Q.   Who are C Staff what does C

7    Staff mean?

8          A.   Mike Needham, counselor state

9    foreign counselor.

10         Q.   C Staff is -- no, I still don't

11   know.  What does it stand for, if we know?

12         A.   Counselor as opposed to

13   consular.  The legal wing of the 7th floor.

14         Q.   Did anybody from the Visa

15   office work on this with Mr. Needham?

16         A.   We had a draft that was sent

17   over to him and he revised it to the point

18   where it's by and large an original kit in many

19   ways.

20         Q.   And who prepared the draft?

21         A.   I don't know.

22         Q.   Did you review the draft before

23   it went to Mr. Needham?

24         A.   I did see the draft, yes.

25         Q.   And in any event, this is the

1   final version issued by Mr. Needham, correct?

2          A.   That's correct.

3          Q.   Now, I would like to ask you

4   first on the first page of it, there's

5   references A, B, and C to other cables,

6   correct?

7          A.   That's right.  Reference

8   cables, yes.

9          Q.   So reference cables are cables

10  that are referred to in the instant cable,

11  right?

12         A.   They can be or they can just be

13  cables that are related in theme subject.

14         Q.   Do you recall the theme or

15  subject of the cables listed here as A through

16  C on page 1 of Exhibit 2?

17         A.   No, I have no clue.

18         Q.   When you talk about these

19  cables internally, how would you refer to them?

20  Do you use the MRN number?

21         A.   Right.  We would say State

22  5194.

23         Q.   Is there a short title that's

24  used so that somebody knows the subject of it

25  as opposed to just it's identifying number?

```
 1              A.    Just the subject line.

 2              Q.    So the subject line here is

 3    Expanding Screening and Vetting For FMJ

 4    Applicants, right?

 5              THE COURT REPORTER: I'm sorry.

 6    Expanding...

 7              MS. CONLON:  Screening and Vetting

 8    For FMJ Applicants, right?

 9              A.    Correct.

10    BY MS. CONLON:

11              Q.    Was Mr. -- oh, gosh, I'm going

12    to get his name wrong, Jachim.  Jachim from

13    screening and vetting involved in the

14    development of this cable?

15              MS. STROKUS:  Objection.  Calls for

16    speculation.

17              A.    I do not know for sure.  It's

18    likely.

19    BY MS. CONLON:

20              Q.    Where it says -- let me back

21    up.  This cable speaks only of FMJ applicants,

22    right?

23              A.    Right.

24              Q.    Now, is there a corresponding

25    cable that addresses lawful permanent
```

1    residents?

2            MS. STROKUS:  Objection.  Calls for

3    speculation.

4            A.   No, to my knowledge.  No.

5    BY MS. CONLON:

6            Q.   Is there any corresponding

7    guidance contained not within a cable but

8    another form for lawful permanent resident?

9            MS. STROKUS:  Objection.  Form.

10   Calls for speculation.

11           A.   No, we wouldn't separate out

12   lawful permanent residents.  It doesn't fall

13   within a Visa category.  This is for people who

14   are applying for Visas.

15           Q.   And to be clear, it's also for

16   people who are returning, right, if you look --

17           A.   Renewing.  Renewing Visa is

18   included in that, right.

19           Q.   So this includes Visa holders

20   at every stage, correct?

21           A.   At every stage.  Application

22   stage.

23           Q.   Yes.

24           A.   Yes.

25           Q.   If you'll turn to page 5

```
 1    please.  I take it back -- given the time, I
 2    understand you have to walk out the door at 3;
 3    is that right?
 4              A.   Sorry, yes.
 5              Q.   No, it's okay.  Let's jump
 6    ahead to page 7 if you wouldn't mind, and I'd
 7    like to draw your attention to paragraph 23.
 8    Now, the last sentence of paragraph 23 says [As
 9    read] "As Secretary Rubio has said, we do not
10    seek to import activists who will disrupt and
11    undermise scholarly activities at U.S.
12    universities."
13         Do you understand that to be a
14    reference to one of Secretary Rubio's public
15    statements?
16              A.   That would be my understanding.
17    Correct.
18              Q.   What is your understanding of
19    the directive in that statement about not
20    importing activists?
21              MS. STROKUS:  Objection.  Calls for
22    speculation.
23              A.   So my interpretation of this is
24    that we would look for people who are serious
25    about their studies and are going to show us
```

```
 1    that they want to study full time as opposed to
 2    be activists who would be taken away from their
 3    studies to pursue political measures.
 4              Q.   Can a student who carries a
 5    full course load also engage in any amount of
 6    political activism while still acting
 7    consistent with their Visa?
 8              MS. STROKUS:  Objection.
 9    Speculation.  And I have a further objection to
10    this document to begin with.  I don't believe
11    that this was produced to plaintiff's in
12    discovery and no foundation has been laid of
13    its authenticity, if it's a true and accurate
14    copy of this cable.
15              MS. CONLON:  Okay.  Your objection is
16    noted.
17    BY MS. CONLON:
18              Q.   So you were saying -- oh, I
19    asked you can a student carry a full course
20    load while also engaging in any amount of
21    global activism in a manner that is consistent
22    with the contours of a student Visa?
23              MS. STROKUS:  Objection.  Calls for
24    speculation.
25              A.   I'm not sure I can answer that.
```

```
 1    BY MS. CONLON:

 2              Q.   Well, it says here that the

 3    State Department is to determine whether the

 4    student's activity or the nonVisa holder's

 5    activity is consistent with the nonimmigrant

 6    Visa classification they seek?

 7              A.   Right.

 8              Q.   So in the context of a student

 9    Visa, can activism ever be consistent with the

10    classification of that Visa?

11              MS. STROKUS:  Objection.  Calls for

12    speculation.

13              MS. SAFAVI:  Oh, and actually, can we

14    take a break with the witness not here?

15              MS. CONLON:  Sure.  We do only have

16    15 minutes left and I don't want to lose Mr.

17    Wilson for that whole period.  So is this

18    something we can do after Mr. Wilson is gone?

19    Is there a reason it has to be done now?

20              MS. SAFAVI:  Okay.  So we're going to

21    break in 15 more minutes and then he can leave.

22              MS. CONLON:  He can leave and then

23    you can make whatever record.

24              MS. SAFAVI:  Okay. Great.

25              MS. CONLON:  Is that okay for you?
```

1              MS. SAFAVI:  Yeah.

2              MS. CONLON: We can even say it was as

3      to this moment in time but just so that I don't

4      lose the time with Mr. Wilson.

5              MS. SAFAVI:  Okay.

6              MS. CONLON:  Thank you.

7      BY MS. CONLON:

8              Q.   Mr. Wilson, the State

9      Department is required to determine whether a

10     person's activity is consistent with the type

11     of nonimmigrant Visa classification they seek,

12     correct?

13             MS. STROKUS:  Objection.  Calls for

14     speculation.

15     BY MS. CONLON:

16             Q.   You can answer.

17             A.   Yes.

18             Q.   Has the Visa office been given

19     any guidance about how to determine whether a

20     student's activism is consistent with their

21     student Visa?

22             MS. STROKUS:  Objection.  Calls for

23     speculation.

24             A.   No.

25     BY MS. CONLON:

```
 1              Q.   Have you --

 2              A.   It's still under discussion.

 3   BY MS. CONLON:

 4              Q.   Okay.  What is -- well,

 5   withdrawn.  What is your understanding of the

 6   kinds of activities that are inconsistent with

 7   a student's Visa classification?

 8              MS. STROKUS:  Objection.  Form.

 9   Calls for speculation.

10              A.   My understanding is that

11   students would be viewed in a negative light if

12   they were coming to universities and instead of

13   studying actually to be activists and

14   participate in activities that might prohibit

15   others from studying or create a hostile

16   environment on the campus.

17   BY MS. CONLON:

18              Q.   Are there any other examples

19   you can think of of ways in which a student's

20   activity could be inconsistent with the purpose

21   of their Visa?

22              MS. STROKUS:  Objection.  Calls for

23   speculation.

24              A.   There's lots of those.  I mean,

25   if you don't have permission to work on your
```

1    Visa and you're working, there's -- or you're

2    drunk driving we talked about earlier, there's

3    plenty of different ways you can violate the

4    terms of the Visa.

5    BY MS. CONLON:

6              Q.    This directive in the first

7    sentence of paragraph 23 directs the Visa

8    office to consider a person's history --

9              THE COURT REPORTER:   Consider a

10   person's...

11             MS. CONLON:   History of political

12   activism, right?

13             MS. STROKUS:   Objection.   Calls for

14   speculation.

15   BY MS. CONLON:

16             Q.    You used the phrase hostile

17   environment just moments ago when discussing

18   activities a student could engage in that might

19   be inconsistent with their student Visa;

20   creating a hostile environment on campus.   Does

21   that phrase, "hostile environment," come from

22   any State Department document?

23             MS. STROKUS:   Objection.   Form.

24             A.    Not that I'm aware of, no.

25   BY MS. CONLON:

1          Q.    That phrase "hostile

2    environment" at times appears in quotation

3    marks in various documents maintained by the

4    State Department.  Do you understand that to be

5    a term of art that the State Department uses?

6               MS. STROKUS:   Objection.  Form and

7    calls for speculation.

8               A.    I understand it to be more of a

9    legal term.  We talk about harassment in the

10   workplace, for example, sexual harassment, that

11   could be a hostile environment.

12   BY MS. CONLON:

13          Q.    Are you aware of any guidance

14   apart from this cable regarding hostile

15   environments on college campuses?

16              MS. STROKUS:   Objection.  Form and

17   calls for speculation.

18              A.    No, I'm not aware.

19   BY MS. CONLON:

20          Q.    You said earlier you haven't

21   received guidance on how to determine whether a

22   student's activities are inconsistent with the

23   purpose of their student Visa.  So how does the

24   Visa office make that determination?

25              MS. STROKUS:   Objection.  Form.

Deposition of Stuart Wilson                                    AAUP, et al. v. Rubio, et al.

```
 1              A.   This is a determination to
 2    consular officers in the field as they're
 3    reviewing the cases.  They would develop what
 4    they consider to be inappropriate use of Visa.
 5    BY MS. CONLON:
 6              Q.   But what about for Visa holders
 7    who are in the United States?
 8              MS. STROKUS:  Objection.  Form.
 9              A.   Go on.
10    BY MS. CONLON:
11              Q.   Who would make -- who makes the
12    determination that a Visa holder presently in
13    the United States is behaving in a way that's
14    inconsistent with the terms of their Visa?
15              A.   As far as I'm aware, if there's
16    no -- I mean, if there's a legal infraction,
17    then you have something to base the abuse of
18    the Visa on.  If it's more of a foreign policy
19    issue, then you're going to go to the tools
20    that the Secretary can use, mainly 3C and 4C.
21              Q.   So a 3C or 4C determination can
22    be made based on a student Visa holder acting
23    in a manner inconsistent with the terms of
24    their student Visa; is that correct?
25              A.   I'm sorry.  Say it one more
```

1    time.

2            Q.    Sure.    A 3C or 4C determination

3    could be made based on a person's conduct being

4    inconsistent with the terms of their Visa; is

5    that correct?

6            MS. STROKUS:    Objection.    Calls for a

7    legal conclusion.

8            A.    Right.    I mean, the purpose

9    would be the larger foreign policy issue.

10   BY MS. CONLON:

11           Q.    I see.    The purpose of it being

12   brought to the Secretary's attention would be

13   the larger foreign policy issue; is that

14   correct?    Is that a yes?    Sorry.    I'm just

15   thinking --

16           A.    That's me contemplating.

17           Q.    Contemplate away.

18           A.    Yes, I would agree with that.

19           Q.    So you haven't received

20   guidance on -- withdrawn.    Have you had any

21   involvement in Visa revocations for activism as

22   described in paragraph 23?

23           MS. STROKUS:    Objection.    Calls for

24   speculation.

25           A.    No, I haven't.

Case 1:25-cv-10685-WGY    Document 88-1    Filed 07/07/25    Page 189 of 863
CONFIDENTIAL
Deposition of Stuart Wilson                                          AAUP, et al. v. Rubio, et al.

```
 1   BY MS. CONLON:

 2           Q.   Do you know who in the Visa

 3   office, if anyone, has had involvement with

 4   Visa revocations for activism as described in

 5   paragraph 23?

 6           MS. STROKUS:  Objection.  Calls for

 7   speculation.

 8           A.   I'm not aware of anyone, no.

 9   BY MS. CONLON:

10           Q.   Just a moment.  Okay.  Is it

11   your understanding that there are particular

12   types of activism that are relevant to the

13   application of this cable?

14           MS. STROKUS:  Objection.  Calls for

15   speculation.

16           A.   No.

17   BY MS. CONLON:

18           Q.   Do you have any understanding

19   about whether paragraph 23 could be applied to

20   an person whose activism is in favor of the

21   actions of Israel?

22           MS. STROKUS:  Objection.  Calls for

23   speculation.

24           A.   No.  It's not dependent on --

25   well, let me clarify.  Could you rephrase the
```

```
 1    question, please.

 2    BY MS. CONLON:

 3           Q.   I'm just looking for a better

 4    understanding from you of how to determine what

 5    a person's history of political activism is

 6    relevant to whether they should get to have a

 7    Visa?

 8           A.   Well, when we interview an

 9    applicant overseas their not in the U.S. yet

10    and we want to make sure they're actually the

11    people we want in the U.S. So if you are

12    vetting them and you see they have a history of

13    being violent or aggressive towards people,

14    something along those natures, that causes you

15    to pause and examine that case and look for

16    other factors to see if wholistically you can

17    determine if you want this person in the U.S.

18    or not.

19           Q.   But isn't paragraph 23 broader

20    than that; wouldn't it include activism that

21    doesn't involve violence or aggressiveness?

22           MS. STROKUS:  Objection.  Calls for

23    speculation.

24           A.   Wouldn't it include?  What do

25    you mean?
```

 1    BY MS. CONLON:

 2              Q.   Well, doesn't it include?

 3              MS. STROKUS:   Objection.

 4    Argumentative.

 5              A.   I don't see that.

 6    BY MS. CONLON:

 7              Q.   When is political activism

 8    inconsistent with a student Visa?

 9              MS. STROKUS:   Objection.   Calls for

10    speculation.

11              A.   Well, when it's contrary to the

12    Secretary's foreign policy and undermines his

13    ability to conduct foreign policy when it

14    infringes upon the rights of the citizens of

15    the U.S. would be two examples.

16    BY MS. CONLON:

17              Q.   And what kind of student

18    activism could be inconsistent with a U.S.

19    foreign policy interest?

20              MS. STROKUS:   Objection.   Calls for

21    speculation.

22              A.   I don't know.   That would be

23    above my pay grade.

24    BY MS. CONLON:

25              Q.   Have you seen any examples of

1    U.S. student activism that's inconsistent with

2    a foreign policy interest of the United States?

3            A.    Have I seen some?

4            MS. STROKUS:    Objection.    Form.

5            A.    Is this in my opinion or is

6    this an opinion of the State Department?

7    BY MS. CONLON:

8            Q.    This is as you understand it in

9    your role as an official at the State

10   Department.

11           A.    As an official at the State

12   Department that is supported terrorist

13   organizations is something that we would frown

14   upon obviously.

15           Q.    What about activism that

16   doesn't involve any particular terrorist

17   organization?

18           A.    I would need more details on

19   the case.

20           Q.    We talked about the importance

21   of Secretary Rubio's statements on foreign

22   policy interest.    Has Secretary Rubio made any

23   statements relevant to political activism as

24   contrary to U.S. foreign policy to your

25   knowledge?

```
 1              MS. STROKUS:  Objection.  Calls for

 2    speculation.

 3              A.   Political activism.  No, I

 4    wouldn't characterize it that way.

 5              MS. CONLON:  Sorry.  My real time is

 6    giving out.  One second.  You are not aware of

 7    any statements by Secretary Rubio concerning

 8    student political activism and U.S. foreign

 9    policy interests.

10              MS. STROKUS:  Objection

11    mischaracterization testimony.  Form and

12    speculation.

13              A.   Any statement -- sorry.

14              MS. CONLON:  One at a time, I think.

15    Do you have any other objections?  Okay.  Go

16    ahead.

17              THE WITNESS:  Want to reiterate the

18    question?

19              MS. CONLON:  Sure.

20    BY MS. CONLON:

21              Q.   Is it your understanding that

22    student activism that's perceived to be

23    anti-Semitism is contrary to U.S. foreign

24    policy interest?

25              MS. STROKUS:  Objection.  Form.
```

Deposition of Stuart Wilson                                    AAUP, et al. v. Rubio, et al.

1          A.    Again personally or are you

2     talking about Government official.  I can't say

3     if it doesn't have the terrorism connection

4     then it's a more complex question.

5     BY MS. CONLON:

6          Q.    How do you resolve that complex

7     question?

8          A.    You look at the totality of the

9     information that you can get.  It takes

10    considerable amount of time.

11         Q.    So in the allegation concerning

12    a person's activism is that it relates in any

13    way to terrorism that is more straightforward

14    presumably than if it relates to something that

15    can be deemed anti-Semitism; is that correct?

16         MS. STROKUS:  Objection.  Form.

17         A.    I'm sorry.  Rephrase again.

18    BY MS. CONLON:

19         Q.    Sure.  I'm just -- I'm trying

20    to understand the kinds of activism of students

21    that could be contrary to U.S. foreign policy

22    interest.  So I'm giving you examples and

23    asking you about them.  So student activism

24    that's perceived to be supportive of Hamas,

25    would that be contrary to U.S. foreign policy

1   interest as you understand it?

2            A.   I think your questions are for

3   more the Secretary because the Secretary has

4   the authority to make these decisions, we

5   don't.

6            Q.   Well, I'm actually interested

7   in your view as the person who has to help

8   implement the decisions because as I understand

9   it, those recommendations come to Secretary

10  Rubio from the Visa office.  So appreciating

11  that he has the last word on all of this and

12  that you cannot speak for him about his

13  opinion, focussing on your understanding as the

14  leader of an office that has to implement this

15  cable related cables, what are the kinds of

16  student activism that you understand to be

17  contrary to a U.S. foreign policy interest?

18            MS. STROKUS:  Objection.  Form.

19            A.   I believe that's what we were

20  already discussing about the perhaps violence,

21  perhaps and infringing on U.S. citizen rights,

22  hostile workplace or campus, those type things.

23            MS. STROKUS:  I'm sorry.  I have to

24  interrupt.  We do have a 3 p.m. stop and it is

25  3 p.m.

```
 1              MS. CONLON:  Sorry.  Just one last
 2     question possibly.  Okay.  This is my last
 3     question and thank you for indulging me.
 4     BY MS. CONLON:
 5              Q.   For your assessment, whether a
 6     person's activism creates a hostile environment
 7     such that it can be contrary to U.S. foreign
 8     policy interest, does it matter whether the
 9     individual activists' behavior created the
10     environment or is it simply a question of
11     whether the activist participated in an
12     environment where that was taking place?
13              MS. STROKUS:  Objection.  Form and
14     calls for speculation.
15              A.   Yeah, I'm sorry, it's a bit too
16     hypothetical for me.  I would need details.
17              MS. CONLON:  If we had more time, I
18     would do that with you.  Okay.  Well, thank you
19     for your time you've given us.
20              THE WITNESS:  I appreciate that.
21              MS. CONLON:  We can go off the
22     record.  I just want to know about what time on
23     Thursday.
24              THE VIDEOGRAPHER: Time is 15:00 and
25     we're off the record.
```

```
 1                    (Off record discussion.)

 2            THE VIDEOGRAPHER:  The time is 15:04

 3     and we're back on record.

 4            MS. CONLON:  The person to be

 5     defending it is the person who makes the

 6     objections.

 7            MS. STROKUS:  That's what we were

 8     trying to ask, so then I actually need a

 9     minute.

10            MS. CONLON:  Okay.  Sorry.

11            THE VIDEOGRAPHER: Going off the

12     record at 15:05 p.m.

13          (Deposition concluded at 3:05 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                              –  –  –

 2                    E R R A T A   S H E E T

 3                              –  –  –

 4

 5      PAGE         LINE         CHANGE

 6      _____       _____       _____

 7      _____       _____       _____

 8      _____       _____       _____

 9      _____       _____       _____

10      _____       _____       _____

11      _____       _____       _____

12      _____       _____       _____

13      _____       _____       _____

14      _____       _____       _____

15      _____       _____       _____

16      _____       _____       _____

17      _____       _____       _____

18      _____       _____       _____

19      _____       _____       _____

20      _____       _____       _____

21      _____       _____       _____

22      _____       _____       _____

23      _____       _____       _____

24      _____       _____       _____

25      _____       _____       _____
```

```
 1                ACKNOWLEDGMENT OF DEPONENT

 2

 3          I,                        , do hereby

 4    certify that I have read the foregoing pages and

 5    that the same is a correct transcription of the

 6    answers given by me to the questions therein

 7    propounded, except for the corrections or

 8    changes in form or substance, if any, noted in

 9    the attached Errata Sheet.

10

11

12

13

14

15    _____    _____
      Date          Signature

16

17

18

19

20

21

22

23

24

25
```

Deposition of Stuart Wilson                                                                    AAUP, et al. v. Rubio, et al.

1                        CERTIFICATE

2

3              I, Okeemah S. Henderson, RPR, the officer before

4     whom the foregoing deposition was taken, do hereby certify

5     that the foregoing transcript is a true and correct record

6     of the testimony given; that said testimony was taken by me

7     stenographically and thereafter reduced to typewriting

8     under my direction; that reading and signing was not

9     requested; and that I am neither counsel for, related to,

10    nor employed by any of the parties to this case and have no

11    interest, financial or otherwise, in its outcome.

12             IN WITNESS WHEREOF, I have hereunto set my hand

13    and affixed my notarial seal this 25th day of June, 2025.

14    My commission expires:

15    September 30, 2029

16

17

18

19                    _Okeemah S. Henderson_
                       Okeemah S. Henderson, RPR
20                     Official Court Reporter

21

22

23

24

25

## WORD INDEX

**< 1 >**
**1** 4:*12* 125:*20, 21, 24* 131:*16*
**1:25-cv-10685** 1:*6*
**10** 20:*11* 27:2 38:*17, 20* 81:*14*
**10:11** 1:*12* 5:*4*
**10:30** 24:*10, 12*
**10:40** 24:*13*
**100** 99:*21*
**10004** 2:*8*
**10115** 2:*20*
**102** 99:*15*
**10685** 5:*10*
**10th** 19:*20*
**11:03** 47:*1*
**11:04** 47:*3*
**11:30** 47:*4*
**1182** 71:*24*
**12:29** 100:*1, 3*
**125** 4:*12*
**125-CV** 5:*10*
**129** 4:*12*
**13:49** 100:*4*
**13th** 8:*25* 19:*23*
**14:18** 117:*5*
**14161** 73:*10* 82:6,*11, 18, 25* 84:6,*19* 87:5, *24* 89:*8* 90:22 109:*24*
**14188** 73:*12* 79:6,*14, 18, 22* 84:20 87:24 109:*24* 123:*24* 124:6
**15** 136:*16, 21*
**15:00** 150:*24*
**15:04** 151:2
**15:05** 151:*12*
**1615** 1:*14* 5:*11*
**1991** 9:*19*
**19th** 3:*17*

**< 2 >**
**2** 4:*12* 129:*16, 19* 131:*16*
**2:08** 117:2,*4*
**20006** 3:*18*
**20036** 1:*15*

**20044** 3:*7*
**202** 3:*9, 19*
**202-2600** 2:*10*
**2025** 1:*12* 5:*3* 12:*16* 98:*20* 154:*13*
**2029** 154:*15*
**212** 2:*10* 71:*21* 87:*17*
**23** 134:7,*8* 139:*7* 142:22 143:*5, 19* 144:*19*
**23rd** 2:*7*
**24** 1:*12* 5:*3*
**25** 4:*12* 129:*24*
**25th** 154:*13*
**2nd** 81:*5*

**< 3 >**
**3** 134:2 149:*24, 25*
**3:05** 151:*13*
**30** 154:*15*
**302** 2:*19*
**3C** 72:2,*7, 9, 18, 19* 73:2,*14* 74:*1, 21* 75:4,*10, 11, 13, 18* 76:2,*6, 9, 14, 21* 77:4,*11, 22* 78:*1, 10, 25* 79:*4* 82:4,*11, 17, 24* 84:2,*5, 18* 85:*1, 23* 86:7,*8, 9, 18* 87:4,*11, 13, 16, 23* 88:*1, 8, 17, 21, 22, 25* 89:3,*9, 12, 20, 22* 90:9,*12, 20* 91:*11, 17* 92:5,*8, 16* 93:2,*7, 13, 18* 94:*11, 18, 22* 95:25 97:7,*14* 109:*3, 23* 110:3,*4, 5, 19, 20, 22, 24* 111:*18, 22* 112:*21* 113:5,*12* 117:*8, 11, 12, 17, 19, 23* 118:9,*15* 119:*1, 23* 120:3,*5, 7, 22* 121:6,*11* 122:*1, 12, 16* 127:3 141:*20, 21* 142:2

**< 4 >**
**4** 69:*25* 100:*17*
**400** 1:*15*

**45** 99:*12*
**475** 2:*18*
**4C** 100:*14, 16, 23* 101:*1* 108:*23* 109:2, *22, 25* 120:3,*5, 8, 22* 121:7,*11* 122:*1, 12, 17* 141:*20, 21* 142:2

**< 5 >**
**5** 38:*19* 69:5,*6, 20* 116:*21* 133:25
**5194** 131:22
**59756** 4:*12* 129:*24, 25*

**< 6 >**
**6** 4:*6*
**600** 3:*17*
**616-8779** 3:*9, 19*
**646** 2:22

**< 7 >**
**7** 134:6
**745-8500** 2:22
**7th** 16:*13, 15, 18* 36:2,*13, 20, 22* 37:*3, 13, 19* 38:*14* 39:6,*8* 40:9,*15* 107:*9* 113:*19* 114:*8* 116:*11* 130:*13*

**< 8 >**
**8** 71:*24*
**878** 3:*6*

**< 9 >**
**90** 2:*6* 112:*5*

**< A >**
**a.m** 1:*12* 5:*4* 24:*12* 47:*3*
**ability** 7:*7* 25:*13* 99:*4* 145:*13*
**able** 73:*23* 92:*23* 101:*15* 129:*13*
**abreast** 121:*24*
**abroad** 85:*12*
**absolutely** 6:*23* 33:*11*
**abstract** 117:*10*

**abuse** 141:*17*
**access** 122:*9*
**accurate** 60:*18* 135:*13*
**accurately** 65:*4*
**ACKNOWLEDGMENT** 153:*1*
**Aconlon@shertremont e.com** 2:*9*
**acted** 125:*17*
**acting** 10:6 135:6 141:*22*
**Action** 5:*9* 39:*20, 23* 40:*1, 8, 13* 41:*1* 59:*23* 60:2,*6* 63:2 64:6,*7* 77:*23* 82:*19* 93:*1* 104:*5* 109:*19* 117:*11, 23* 119:*21* 120:*14, 21* 121:*1*
**actions** 32:9,*24* 33:3 143:*21*
**active** 110:*12* 118:*23*
**actively** 79:*23, 25* 82:*12*
**activism** 135:6,*21* 136:*9* 137:*20* 139:*12* 142:*21* 143:4,*12, 20* 144:5,*20* 145:7,*18* 146:*1, 15, 23* 147:*3, 8, 22* 148:*12, 20, 23* 149:*16* 150:*6*
**activist** 126:*4* 150:*11*
**activists** 134:*10, 20* 135:2 138:*13* 150:*9*
**activities** 91:*12* 128:*18* 134:*11* 138:6, *14* 139:*18* 140:22
**activity** 61:*4* 62:*16* 68:*12* 69:*9* 70:8,*16* 136:4,*5* 137:*10* 138:*20*
**add** 48:*13* 96:*18*
**address** 46:*21* 90:*14* 123:*15*
**addresses** 126:*21* 132:25
**adjudicating** 22:*15*
**administration** 51:*8* 110:*11* 129:*9*

**ADVISER** 3:*15*
**advisors** 75:*9*
**advocacy** 88:*23*
**AEO** 99:*3*
**AFFAIRS** 3:*16* 8:*22*
9:*22* 10:*1* 31:*21*
74:*25* 75:*3* 91:*20*, *24*
92:*8*, *15* 98:*14*, *16*, *17*
122:*3*, *11*
**affect** 7:*7*
**affixed** 154:*13*
**afternoon** 100:*7*
**agencies** 27:*7*, *24*
28:*24* 29:*7*, *17*, *21*, *23*
30:*15* 36:*6*
**aggressive** 144:*13*
**aggressiveness** 144:*21*
**ago** 27:*2* 67:*25*
81:*11* 97:*5* 139:*17*
**agree** 126:*11* 142:*18*
**ahead** 51:*18* 134:*6*
147:*16*
**aimed** 89:*4*
**AL** 1:*3*, *6* 5:*7*, *8*
**Alex** 6:*3*
**ALEXANDRA** 2:*4*
**ALINA** 3:*12* 6:*14*
**allegation** 61:*11*
114:*19* 148:*11*
**allegations** 98:*22*
**alleged** 57:*5*
**allowed** 125:*13*
**allowing** 87:*14*
**altered** 111:*8*
**AMENDMENT** 2:*16*
**America** 126:*18*
**AMERICAN** 1:2 5:6
20:*10* 105:*11*
**amount** 135:*5*, *20*
148:*10*
**analyzed** 121:*3*
**and/or** 126:*17* 127:*9*
**Andre** 8:*16* 57:*15*
**Andrea** 50:*17*
**announces** 122:*15*
**answer** 6:*25* 16:*1*
17:*23* 18:*1*, *3* 23:*14*
25:*4*, *10*, *16*, *24* 26:*21*
27:*17*, *18* 28:*5*, *7*, *9*,
*15* 29:*3*, *12* 30:*22*

33:*17*, *19* 34:*6*, *7*, *19*
35:*25* 36:*10*, *16*, *17*
37:*6* 38:*11*, *25* 40:*2*
42:*14* 45:*7*, *12*, *15*, *19*
46:*15* 54:*10* 64:*14*
66:*3*, *14* 67:*14* 73:*21*
96:*22* 107:*24* 115:*13*
126:*24* 135:*25*
137:*16*
**answered** 44:*25*
51:*17* 76:*17* 78:*17*
**answering** 44:*19*
45:*25*
**answers** 153:*6*
**anti-American** 91:*11*
**anti-Israel** 113:*9*
**anti-Semitic** 61:*12*
**anti-Semitism** 59:*13*
76:*15*, *22* 77:*5*, *12*, *22*
78:*2*, *11* 79:*1*, *4*, *7*
82:*3* 88:*21* 123:*22*
124:*5*, *13*, *18* 147:*23*
148:*15*
**anybody** 32:*14*
40:*24* 130:*14*
**anymore** 96:*16*
**apart** 15:*9* 16:*21*
27:*7*, *24* 29:*7* 30:*13*
32:*14* 34:*2* 35:*19*
49:*19* 51:*20* 74:*20*
75:*2* 86:*6* 140:*14*
**apologize** 87:*8*
**appear** 38:*5* 96:*1*
97:*14* 125:*25*
**APPEARANCES** 2:*1*,
*25* 6:*8*
**appearing** 5:*17*
**appears** 140:*2*
**applicant** 13:*15*
19:*12* 22:*22*, *25*
34:*23* 35:*7*, *12*, *13*, *17*
36:*7*, *23* 37:*4*, *10*, *12*,
*21* 38:*22* 39:*5* 40:*10*
66:*11* 82:*19* 93:*2*
144:*9*
**applicants** 12:*1* 13:*7*,
*13*, *14*, *22* 24:*20*
38:*16* 70:*25* 77:*24*
132:*4*, *8*, *21*

**applicant's** 35:*1*
36:*14*
**application** 35:*1*, *4*,
*13*, *18*, *19* 40:*9*, *14*
133:*21* 143:*13*
**applications** 66:*7*
**applied** 143:*19*
**apply** 87:*17* 118:*22*
128:*24*
**applying** 13:*8* 133:*14*
**appreciate** 96:*12*
150:*20*
**appreciating** 149:*10*
**approved** 75:*18*
76:*14*
**approver** 76:*19*
**approves** 75:*10*, *13*
**Approximately** 9:*10*
69:*20* 77:*15*, *22*
80:*25* 83:*9* 88:*17*
94:*15*
**approximating** 77:*19*
**April** 67:*22* 68:*2*, *9*,
*16* 70:*18* 81:*1*, *2*
**argument** 95:*17*
**Argumentative** 145:*4*
**Armstrong** 8:*14*
10:*5*, *20* 39:*13*, *15*
52:*13*, *15* 57:*21*, *25*
104:*20*
**arrested** 126:*5*
**arrived** 119:*1*
**arriving** 18:*7*
**art** 140:*5*
**Article** 4:*12*
**articulated** 48:*11*
**aside** 57:*4*, *18* 59:*14*
127:*15*
**asked** 36:*19* 45:*1*
51:*16* 52:*8*, *15*, *17*
76:*16* 78:*16* 89:*20*
92:*12* 135:*19*
**asking** 23:*17* 40:*6*
59:*5*, *7* 68:*14* 70:*7*,
*11* 80:*5*, *10* 91:*5*
96:*1*, *8*, *9* 98:*23*
113:*25* 114:*2*, *5*, *6*
115:*9* 118:*2* 127:*24*
148:*23*

**assert** 43:*1*
**asserted** 44:*21*
**assertions** 47:*9*
**assessing** 108:*17*, *19*
**assessment** 150:*5*
**ASSISTANT** 3:*15*
8:*21* 10:*7*, *23*
**associated** 102:*10*
**ASSOCIATION** 1:2
5:6
**assume** 126:*15*
**attached** 153:*9*
**attempt** 48:*7*
**attention** 106:*25*
127:*2* 134:*7* 142:*12*
**attributed** 104:*13*
**authenticity** 135:*13*
**authority** 30:*6* 31:*1*
52:*9* 71:*4*, *10*, *18*
72:*20* 100:*24* 101:*2*
103:*12*, *20* 108:*24*
109:*8* 127:*14* 149:*4*
**automatically** 22:*24*
**available** 28:*25*
33:*21* 41:*2* 93:*4*
96:*10*
**aware** 26:*1* 30:*14*
36:*23* 39:*2*, *7* 51:*22*
54:*24* 55:*5*, *12*, *20*
57:*21* 76:*21*, *23*
77:*11* 82:*3* 92:*14*
107:*15*, *25* 108:*4*, *7*
111:*20* 114:*11*
122:*17* 123:*18*, *19*
139:*24* 140:*13*, *18*
141:*15* 143:*8* 147:*6*

**< B >**
**back** 9:*5* 24:*14*
38:*13* 47:*5*, *7* 81:*3*, *6*
96:*12* 97:*2* 100:*5*
111:*5* 112:*11* 113:*1*
117:*6* 132:*20* 134:*1*
151:*3*
**bank** 34:22
**base** 141:*17*
**based** 31:*1*, *11* 40:*14*
61:*3* 68:*11* 70:*16*
71:*10*, *19* 97:*13*

100:*12, 25*  120:*25*
141:*22*  142:*3*
**basic**  42:*1*
**basis**  45:6  46:*14*
47:*22*  59:*9, 19*  62:*17*
69:*23*  70:*10*  72:*21*
92:*16*  99:*3*  101:*12*
112:*18, 20*  117:*11, 23*
120:*22*  122:*24*  123:*1,
2*
**baskets**  72:*11, 12*
**bears**  47:*16*
**beginning**  1:*11*  97:*10*
**behalf**  1:*11*  2:*3, 13*
3:*1, 11*
**behaving**  141:*13*
**behavior**  150:*9*
**believe**  26:7  40:*11*
53:8  64:7  69:*25*
71:*25*  72:*25*  73:*19*
77:*14*  81:*25*  84:*23*
89:8  90:*17*  92:*18*
93:*13*  94:*10*  102:*13,
18*  104:*3, 17*  107:*19*
110:*9*  113:*14*  114:*21*
115:*25*  120:6  126:*10*
135:*10*  149:*19*
**Benjamin**  3:*5*
**best**  6:*20*  60:*18*
64:*23*
**bet**  67:*24*
**better**  58:*23*  95:7
99:*19*  144:*3*
**bit**  67:*1*  150:*15*
**blur**  87:8
**board**  38:*10*  129:9
**Bob**  12:*11*  51:5
63:*10, 11*  64:*19*  92:6
**bound**  44:*22*
**BOX**  3:6
**break**  6:*22, 25*  24:7,
*9, 12, 16*  28:*10*  44:*25*
45:*23, 25*  46:*22*  47:*3,
8*  95:*2, 4, 8, 23*  99:*7,
11, 17*  100:*3*  111:*10*
116:*19*  117:4  136:*14,
21*
**Brenda**  13:*2*
**brief**  23:8

**Broad**  2:6
**broader**  144:*19*
**brought**  38:9  45:*11,
12*  106:*24*  107:8
127:*2*  142:*12*
**Bureau**  9:22  10:*1, 6*
31:*19*  39:*11*  41:*4*
52:7, 8  104:*18*  116:9,
11
**bureaucracy**  47:*16*

**< C >**
**Cable**  4:*12*  78:7, *9,
15, 21, 25*  82:2  97:*10*
129:*20*  130:*3, 4*
131:*10*  132:*14, 21, 25*
133:7  135:*14*  140:*14*
143:*13*  149:*15*
**cables**  74:*16, 20*
75:2  86:*17*  87:*3*
91:*18, 19*  97:7, 8, *11,
13, 18, 19, 25*  98:2, *3,
4, 5, 6, 10, 11*  129:*4, 8*
131:5, *8, 9, 13, 15, 19*
149:*15*
**call**  35:*24*  41:*4*  48:*4*
55:*23*  56:9, *19*  57:*13*
58:7  92:*3*
**called**  5:*21*  56:*13*
59:*20*
**calling**  45:*14*  46:9
**Calls**  30:*20*  35:*23*
38:6, *23*  39:*17*  41:*13,
20*  42:*22*  43:*25*
44:*12*  51:9  52:*22*
53:6, *12, 22*  54:7, *22*
55:*3, 11, 18*  60:*15, 22*
61:7, *15*  62:*3, 20*
65:*16*  72:*4, 23*  73:*17*
75:*14*  79:8  83:*1, 13,
19, 25*  84:*21*  85:8, *18*
86:*13, 23*  88:*4, 11*
89:*16*  90:*24*  92:*21*
102:*16*  103:*1*  105:*2,
19*  106:2  107:*2, 10*
108:*21*  109:6  111:*24*
114:*25*  115:*23*
116:*12*  118:*16*
120:*16*  125:*4*  132:*15*
133:*2, 10*  134:*21*

135:*23*  136:*11*
137:*13, 22*  138:9, *22*
139:*13*  140:7, *17*
142:6, *23*  143:6, *14,
22*  144:*22*  145:9, *20*
147:*1*  150:*14*
**campus**  138:*16*
139:*20*  149:*22*
**campuses**  140:*15*
**capacity**  7:*20, 22, 23*
30:*4, 11*  32:*17*
**caption**  126:*4*
**card**  126:6
**cards**  14:7  126:*18,
23*  127:9, *12, 13, 16*
**career**  21:*18*
**carries**  135:*4*
**carry**  135:*19*
**CASAC**  42:*3*  43:9,
11
**Case**  1:*3*  8:*14, 17*
15:8, *14, 15*  17:*10*
37:*15*  57:22  62:22
64:*2, 13, 15*  93:*21*
102:*1, 5, 8*  103:7, 9
105:5  106:7, *15, 24*
107:8, *16*  108:7
113:5  117:9, *18*
144:*15*  146:*19*
154:*10*
**cases**  19:7  37:*16*
38:2, *4*  62:8, *11*
101:*19*  107:8, *25*
108:9  113:8  114:*12*
115:6  120:2, *4*  141:*3*
**CaseViewNet**  1:*16*
**category**  133:*13*
**causal**  114:6
**causes**  144:*14*
**Center**  12:*23, 24*
**certain**  63:*3*  89:*25*
91:*14*  97:8  103:*23*
106:5  109:*21*  110:*4,
19, 25*
**Certainly**  86:*4*
**certainty**  79:2  101:*16*
**CERTIFICATE**
154:*1*
**certify**  153:*4*  154:*4*

**chain**  32:6, *22*  44:*4*
47:*15*
**challenge**  48:*10*
**chance**  96:*14*
**change**  112:*4*  152:*5*
**Changed**  74:*23, 24*
92:*20*
**changes**  75:*3*  91:*20,
24*  92:7, *15*  153:8
**characterization**
114:6
**characterize**  48:*23,
24*  49:2  61:*17*  147:*4*
**charge**  43:*17*
**charged**  115:*16*
**charges**  54:*15, 18*
**check**  23:*1, 2*  60:*24*
65:*19, 25*
**checked**  111:*11*
**Christmas**  98:*25*
**circumstance**  15:*14*
**circumstances**  15:*18*
31:9  64:*1*  119:*20*
**citizen**  20:*10*  105:*11*
149:*21*
**citizens**  145:*14*
**Civil**  5:*9*
**clarification**  113:*25*
**clarify**  98:*1*  110:*16*
143:*25*
**clarifying**  84:*15*
**clarity**  101:*19*
**classification**  136:6,
*10*  137:*11*  138:7
**clear**  83:7  92:*12*
97:*20*  133:*15*
**clearance**  75:*24*  76:2
**cleared**  76:*10*  78:*23*
80:2  82:*16*
**clearing**  76:6  109:*11*
110:*15*
**clip**  122:*22*
**clippings**  122:6  127:7
**clips**  124:*8*
**clue**  131:*17*
**codified**  71:*23*
**collaborate**  31:*25*
**collaboration**  92:*3*
93:*21*
**colleague**  6:*5*

colleagues  8:*11*, *12*
72:*15*  96:*14*
collection  53:*19*
college  140:*15*
colleges  55:*1*, *16*
COLON  120:*19*
123:*11*
Columbia  1:*17*  2:*17*
combatting  79:*6*
come  7:*3*  16:*22*
40:*4*  58:*10*  75:*6*
81:*3*  139:*21*  149:*9*
comes  22:*22*  27:*20*
36:*7*  44:*9*  48:*17*
58:*6*
coming  80:*11*  96:*12*,
*25*  138:*12*
command  47:*15*
commission  154:*14*
common  38:*5*
communicating  97:*7*,
*23*
compel  96:*24*
compiled  50:*15*
compiles  60:*3*
complaint  98:*23*
completely  57:*4*
complex  148:*4*, *6*
compliant  125:*17*
complicated  72:*15*
73:*23*
complying  124:*16*, *20*
125:*2*
comport  58:*23*
comports  120:*14*
concern  106:*5*
108:*13*, *14*  120:*8*
concerning  59:*12*, *13*
62:*15*  69:*21*  70:*7*
72:*19*  73:*6*  78:*10*
84:*20*  85:*2*  86:*10*, *18*
87:*4*  89:*21*  90:*13*
92:*8*  93:*7*  94:*11*, *22*
113:*19*  122:*6*  124:*12*
127:*20*  128:*9*  147:*7*
148:*11*
concerns  72:*21*  99:*1*
100:*12*, *25*  101:*4*, *13*
106:*9*, *16*
concluded  151:*13*

conclusion  72:*5*
142:*7*
conduct  114:*19*, *24*
142:*3*  145:*13*
confer  7:*1*
conferences  47:*12*
96:*4*
conferring  24:*4*
CONFIDENTIAL  1:*6*
conformed  82:*21*
confused  68:*7*
confusing  85:*13*
confusion  80:*15*
CONLON  2:*4*  4:*6*
6:*2*, *3*, *16*  17:*7*, *18*, *23*
18:*3*, *8*, *18*  20:*24*
22:*6*, *9*  23:*15*, *23*
24:*8*, *15*, *23*  25:*5*, *11*,
*17*, *25*  26:*11*, *13*, *22*
27:*11*, *22*  28:*8*, *11*, *17*
29:*6*, *11*  30:*22*, *24*
31:*5*  32:*19*  33:*24*
34:*12*, *24*  36:*4*, *11*, *21*
37:*8*, *18*  38:*12*, *25*
39:*3*, *21*  40:*19*  41:*15*,
*23*  42:*8*, *13*, *25*  43:*4*,
*13*, *15*  44:*2*, *18*  45:*2*,
*8*, *21*  46:*1*, *24*  47:*6*
48:*15*, *16*  49:*1*  51:*12*,
*18*, *23*  52:*10*, *25*  53:*9*,
*17*  54:*3*, *9*, *13*, *25*
55:*6*, *13*, *21*  56:*5*, *17*
57:*16*  58:*12*  59:*24*
60:*19*  61:*1*, *10*, *19*
62:*9*, *25*  63:*16*, *20*
65:*9*, *14*, *20*  66:*8*, *18*
67:*18*  68:*24*  69:*12*
70:*5*  71:*7*  72:*6*, *17*
73:*1*, *25*  74:*19*  75:*1*,
*17*  76:*20*  77:*3*, *10*
78:*19*  79:*11*  80:*16*
83:*6*, *16*, *22*  84:*4*, *9*,
*25*  85:*14*, *21*  86:*16*
87:*2*, *9*, *20*, *25*  88:*7*,
*15*  89:*5*, *19*  90:*8*, *19*
91:*2*, *9*, *16*  92:*24*
94:*16*  95:*6*, *11*, *18*, *22*
97:*6*  98:*4*, *25*  99:*10*,
*22*  100:*6*, *18*, *20*
101:*17*  102:*3*, *19*

103:*5*, *24*  105:*6*, *23*
106:*13*  107:*6*, *14*
108:*2*  109:*1*, *9*, *16*
112:*2*, *13*, *15*, *25*
113:*16*  114:*4*, *22*
115:*4*, *14*  116:*2*, *16*,
*20*, *23*  117:*7*  118:*1*, *5*,
*7*, *12*, *19*, *25*  120:*11*
121:*4*  125:*9*, *19*, *22*
126:*7*  128:*6*, *7*  129:*3*,
*10*, *17*  132:*7*, *10*, *19*
133:*5*  135:*15*, *17*
136:*1*, *15*, *22*, *25*
137:*2*, *6*, *7*, *15*, *25*
138:*3*, *17*  139:*5*, *11*,
*15*, *25*  140:*12*, *19*
141:*5*, *10*  142:*10*
143:*1*, *9*, *17*  144:*2*
145:*1*, *6*, *16*, *24*  146:*7*
147:*5*, *14*, *19*, *20*
148:*5*, *18*  150:*1*, *4*, *17*,
*21*  151:*4*, *10*
connection  148:*3*
consider  35:2  139:*8*,
*9*  141:*4*
considerable  148:*10*
considerably  110:*3*
considered  108:*14*
consistent  29:*4*
108:*24*  123:*24*  124:*5*
135:*7*, *21*  136:*5*, *9*
137:*10*, *20*
CONSULAR  3:*16*
8:*22*  9:*3*, *22*  10:*1*
12:*24*  20:*9*, *12*  21:*9*
22:*22*  23:*19*  24:*19*
25:*14*  26:*3*, *10*, *16*
31:*21*  118:*21*  130:*13*
141:*2*
consult  72:*15*  92:*25*
consulted  77:*21*
82:*17*
consulting  112:*21*
contact  29:*18*  50:*13*
52:*18*
contained  65:*24*
133:*7*
Contemplate  142:*17*
contemplating  117:*16*
142:*16*

contemporaneous
47:*14*
content  64:*22*, *25*
78:*15*, *21*, *23*, *25*
85:*22*  93:*14*  97:*13*
124:*9*
context  57:*11*  61:*2*
62:*15*  103:*10*  136:*8*
continue  45:*19*
Continued  2:*25*
contours  135:*22*
contrary  32:*9*, *24*
33:*3*, *8*  145:*11*
146:*24*  147:*23*
148:*21*, *25*  149:*17*
150:*7*
contribute  78:*14*, *20*,
*22*, *24*  82:*12*  93:*25*
94:*1*, *2*
contributed  55:*2*, *8*
control  87:*14*  125:*16*
convened  123:*6*
conveyed  121:*12*
124:*6*
conveying  74:*21*  75:*4*
cooperation  47:*20*
coordinates  11:*25*
coordination  12:*2*
copy  135:*14*
Correct  9:*7*, *23*, *24*
10:*2*  11:*21*, *22*  13:*20*,
*23*  15:*1*, *2*, *5*  16:*5*
18:*24*  19:*13*, *14*, *18*
20:*16*, *25*  21:*6*  22:*20*,
*25*  31:*3*  35:*9*  37:*7*,
*13*  38:*3*  41:*7*  42:*11*
48:*21*  52:*9*, *14*, *17*
64:*16*, *22*, *25*  66:*24*
71:*21*, *22*, *24*  75:*25*
83:*24*  84:*3*, *11*  90:*22*
91:*22*  94:*12*  102:*24*
106:*10*, *18*  110:*21*, *22*
111:*1*, *17*, *23*  115:*21*
116:*4*  119:*7*, *10*
126:*23*  128:*20*, *21*
131:*1*, *2*, *6*  132:*9*
133:*20*  134:*17*
137:*12*  141:*24*  142:*5*,
*14*  148:*15*  153:*5*

Case 1:25-cv-10685-WGY     Document 108-1     Filed 07/07/25     Page 205 of 863
CONFIDENTIAL
Deposition of Stuart Wilson                                    AAUP, et al. v. Rubio, et al.

154:*5*
**corrections** 153:*7*
**correctly** 70:*13*
**corresponding**
132:*24* 133:*6*
**COUNSEL** 2:*1, 25*
5:*17* 6:*7* 7:*1, 19*
17:*2, 3, 6* 27:*12* 29:*5*
31:*20* 42:*25* 43:*2*
154:*9*
**counselor** 130:*8, 9, 12*
**counter** 14:*16*
**country** 81:*16*
**course** 24:*8* 36:*3*
49:*11* 56:*18* 93:*25*
96:*20* 98:*19* 108:*19*
128:*1, 12* 135:*5, 19*
**courses** 118:*21*
**COURT** 1:*1* 5:*9, 13,*
*14, 15, 19* 17:*4* 42:*6*
48:*5* 53:*24* 74:*24*
100:*17* 129:*15* 132:*5*
139:*9* 154:*21*
**covers** 81:*16*
**create** 138:*15*
**created** 26:*4, 15*
109:*23, 25* 150:*9*
**creates** 150:*6*
**creating** 17:*13, 20*
139:*20*
**creation** 18:*6* 52:*20*
54:*20* 82:*13*
**crime** 115:*16*
**criminal** 54:*15, 18*
61:*4* 114:*19, 23*
**current** 8:*19* 13:*6, 12*

**< D >**
**D.C** 1:*15* 5:*12*
**daily** 122:*5, 24*
**DAS** 58:*1*
**database** 34:*14*
60:*25* 65:*18, 21, 24*
**databases** 12:*2, 3*
33:*22* 34:*3* 35:*20*
**date** 5:*3* 19:*19* 77:*8*
92:*13* 153:*15*
**dates** 85:*6*
**day** 28:*23* 154:*13*

**daylight** 5:*4*
**days** 81:*14*
**DC** 3:*7, 18*
**deal** 13:*6*
**dealing** 59:*1*
**deals** 14:*17*
**dealt** 113:*14*
**decide** 15:*10*
**decides** 14:*25*
**decision** 21:*25* 42:*10,*
*15* 62:*24* 109:*11*
111:*7* 121:*8, 10*
**decisions** 14:*7* 21:*13,*
*19* 41:*19* 42:*16*
112:*19* 149:*4, 8*
**deemed** 148:*15*
**deep** 10:*8*
**defend** 23:*25*
**Defendants** 1:*6* 3:*1,*
*11*
**defending** 24:*2* 151:*5*
**Defense** 30:*19*
**define** 88:*9*
**definite** 37:*24*
**degrees** 99:*21*
**delivered** 93:*6* 94:*5*
99:*15*
**denote** 1:*22*
**DEPARTMENT** 3:*4,*
*14* 6:*13, 14* 7:*21, 24*
9:*13* 11:*1* 14:*16, 20*
19:*7* 20:*20* 25:*12*
27:*24* 28:*19, 20, 22*
29:*8* 30:*3, 7, 10, 13,*
*16, 18* 31:*2* 35:*5, 6,*
*10, 14* 42:*17, 18, 20*
43:*7, 22* 44:*5, 9*
48:*18, 19* 55:*8* 56:*1,*
*10, 12, 19, 20* 57:*7*
59:*8, 18* 60:*3, 21*
61:*13* 62:*14* 72:*2, 8*
74:*22* 75:*5, 9* 84:*11*
87:*12* 94:*6* 101:*21*
102:*21* 103:*18*
104:*25* 105:*17* 106:*1,*
*16, 25* 111:*16* 113:*18*
114:*9* 123:*20* 127:*8*
128:*24* 129:*20* 136:*3*
137:*9* 139:*22* 140:*4,*
*5* 146:*6, 10, 12*

**Department's** 79:*13*
107:*17*
**depend** 20:*8* 37:*15*
**dependent** 143:*24*
**depending** 64:*1* 71:*5*
92:*5*
**depends** 10:*8* 61:*9*
64:*14* 71:*2*
**DEPONENT** 153:*1*
**deported** 126:*19*
**deposed** 28:*19* 44:*20*
**deposition** 1:*10* 5:*5,*
*11* 7:*17* 23:*25* 24:*2*
57:*22* 59:*4* 151:*13*
154:*4*
**depositions** 44:*22*
**Deputy** 8:*21* 10:*7,*
*23* 17:*10*
**describe** 76:*24*
**described** 68:*12*
70:*16* 142:*22* 143:*4*
**description** 11:*2*
89:*14*
**designation** 110:*10,*
*14* 117:*17*
**details** 105:*4* 107:*4*
146:*18* 150:*16*
**determination** 101:*11*
102:*23* 103:*20*
107:*18* 115:*2* 140:*24*
141:*1, 12, 21* 142:*2*
**determinations**
100:*10* 112:*17*
**determine** 64:*24*
120:*13* 136:*3* 137:*9,*
*19* 140:*21* 144:*4, 17*
**determines** 121:*5*
**determining** 121:*22*
**develop** 16:*9* 75:*10*
82:*24* 86:*3, 7* 141:*3*
**developed** 16:*7*
19:*25* 74:*2* 77:*4*
79:*1, 5* 82:*18* 93:*7*
**developing** 79:*17, 21*
82:*10* 93:*18, 22*
**development** 130:*3*
132:*14*
**DHS** 50:*14, 16* 58:*2,*
*6, 15* 67:*2, 3*

**different** 32:*18* 33:*6*
34:*9* 57:*19* 70:*4, 23*
72:*3, 10, 11* 74:*16*
83:*3* 92:*4* 108:*17*
109:*8* 110:*12* 119:*15*
121:*13, 17, 21* 122:*19*
139:*3*
**difficult** 89:*24* 90:*2,*
*3, 7*
**DIRECT** 4:*5* 19:*5*
105:*22*
**directed** 47:*20*
**direction** 20:*20*
106:*20* 154:*8*
**directive** 134:*19*
139:*6*
**directly** 11:*5* 28:*21*
38:*8* 40:*6* 41:*22*
63:*14* 88:*13* 90:*1*
96:*2*
**director** 10:*13* 11:*10,*
*24* 12:*5, 7, 8, 25*
40:*21* 43:*17, 18* 58:*4*
63:*25* 64:*10* 80:*9*
94:*1* 119:*5, 6, 8, 12,*
*13, 15*
**directorate** 12:*19*
13:*1, 5, 11* 42:*10*
43:*12, 19* 48:*20*
63:*12*
**directorates** 11:*12, 13*
**directors** 11:*7, 9, 20*
41:*17*
**directs** 139:*7*
**discovery** 96:*2*
135:*12*
**discuss** 91:*3* 96:*13*
122:*22*
**discussed** 69:*2* 96:*3*
97:*12, 19* 110:*25*
113:*9*
**discussing** 98:*6*
139:*17* 149:*20*
**discussion** 75:*21*
138:*2* 151:*1*
**discussions** 111:*3*
**disrupt** 134:*10*
**distant** 67:*23*
**DISTRICT** 1:*1, 17*

5:8, *9*
**dive** 101:*6*
**divided** 11:*12*
**DIVISION** 3:*4*
**divulge** 66:*15*
**document** 1:*22*
47:*14* 56:7 78:*3*
80:2 95:7 104:*14*
109:*15, 17* 125:20, *23*
129:*12, 19* 135:*10*
139:22
**documentation** 35:7
**documents** 8:8 140:*3*
**doing** 36:*14*
**DOJ** 6:*10, 11*
**domestic** 11:*16*
12:*18* 13:*1, 10*
**domestically** 11:*1*
**door** 134:2
**draft** 130:*16, 20, 22,*
*24*
**drafted** 130:*5*
**draw** 134:7
**Drive** 2:*18*
**driving** 49:*18, 19*
51:*14, 21, 24* 139:2
**dropped** 68:*17*
**Drunk** 49:*18* 51:*14,*
*21, 24* 139:2
**duly** 5:22
**duties** 10:*24*

**< E >**
**E.O** 79:6, *14, 17, 22*
82:*5, 11, 18, 25* 84:*6,*
*19* 87:*4* 90:22
**Earlier** 55:22 67:*16*
84:8 139:2 140:*20*
**early** 81:2 84:*10*
85:7
**Eastern** 5:*4*
**Education** 55:8
**either** 73:*15* 84:*19*
89:*10* 93:8 114:8
128:*2, 3*
**ELDRED** 3:*12* 6:*14*
**electronically** 104:*8,*
*11*
**elements** 36:*3*

**elevator** 99:*16*
**elicit** 48:*3*
**eluded** 47:*8*
**eluding** 59:22
**E-mail** 3:8 58:*10*
99:*14*
**emphasize** 47:*23*
**employed** 154:*10*
**employee** 7:*21, 24*
119:*14*
**employees** 94:5
118:*13*
**employers** 34:*10, 16*
**enacted** 111:*1*
**enforcement** 23:*11*
24:22 25:*4, 10, 16, 24*
27:*9, 16, 18* 28:6
29:2 33:*16* 34:5, *18*
35:23 36:*3, 6, 10*
42:24 43:2 45:*3, 5,*
*13* 46:*13, 18* 47:*10*
49:*5, 9, 13* 50:*19*
52:*3, 12* 54:*14* 55:*15*
59:*2, 15* 60:*24* 66:*3*
114:*14* 115:*9, 10, 12,*
*21*
**engage** 135:5 139:*18*
**engaged** 62:*15* 70:8
**engaging** 135:*20*
**enter** 22:*16* 25:*13*
**entered** 25:*21*
**entering** 25:7
**environment** 138:*16*
139:*17, 20, 21* 140:*2,*
*11* 150:6, *10, 12*
**environments** 140:*15*
**equal** 128:*10*
**equivalent** 109:*3*
**Errata** 153:*9*
**escapes** 13:*3*
**ESQUIRE** 2:*4, 14, 15*
3:*2, 3, 12, 13*
**essential** 59:*1* 97:*23*
**essentially** 32:*3*
**established** 18:*16, 17,*
*20*
**estimation** 27:*3*
**ET** 1:*3, 6* 5:*7, 8*
**event** 130:*25*
**Everest** 5:*13, 15*

**Everybody** 11:7
46:*20*
**evidence** 47:*17* 67:*3*
**exact** 1:22
**Exactly** 12:*20* 117:*17*
**EXAMINATION** 4:*1,*
*5* 6:*1*
**examine** 144:*15*
**examined** 5:22
**example** 12 41:2
70:*4* 107:*16* 122:6
140:*10*
**examples** 34:*14*
49:*17* 138:*18* 145:*15,*
*25* 148:22
**Excuse** 82:22 95:*12*
**excused** 95:*21*
**executive** 16:*20* 59:*9,*
*12, 13, 20* 68:*12*
70:*17* 73:5, *10, 16*
85:24 86:*11* 87:*23*
88:*3, 10, 14, 18* 89:*1,*
*7, 13* 90:*13* 92:*17*
93:8 94:*12, 23*
109:*24* 110:*1* 111:*4*
112:*18* 123:24 124:6
127:*3* 128:*13*
**executives** 16:*14, 19*
**Exhibit** 4:*12* 125:20,
*21, 24* 129:*16, 19*
131:*16*
**exhibits** 1:*19* 4:9, *11*
**existed** 111:*15*
**exists** 47:*14*
**Expanding** 132:*3, 6*
**expect** 47:*13*
**expected** 47:*19*
**expedite** 99:*4*
**experience** 20:6, *11,*
*13* 36:*18* 37:*1*
111:*18* 119:*25*
123:*12*
**expires** 154:*14*
**explain** 108:7
**explains** 80:*14* 119:2
**expressed** 61:*12*
127:7
**expressing** 129:*5*
**extend** 101:2

**extent** 27:*16* 28:*5*
29:*4* 33:*17* 34:*5, 18*
35:22, *24* 36:*16* 45:6,
*15, 17* 66:*4, 14* 98:*6,*
*18, 21* 99:*1*

**< F >**
**fact** 32:*4, 21* 33:*13*
111:*21*
**fact-finding** 16:*11*
33:*14* 34:*1, 2* 35:*20*
36:*8, 14*
**factious** 11:*11*
**factors** 144:*16*
**facts** 16:*12* 33:*21*
**Fair** 91:8
**fall** 133:*12*
**falling** 83:*4*
**falls** 14:2
**FAM** 74:*23, 25*
92:20, *25* 118:*21*
**familiar** 16:6 27:*4*
71:8 73:5, *10* 100:*9*
**familiarity** 19:*25*
**far** 10:*13* 18:*15, 19*
88:*20* 141:*15*
**favor** 143:*20*
**FBI** 29:22 30:*14*
**February** 8:25 9:6
19:*17, 21, 22* 37:22
**feeling** 91:*14*
**feels** 67:*23, 25*
**fell** 103:*17*
**FEOC** 9:*14*
**fewer** 38:*17, 19*
**field** 20:*13, 20* 21:*5*
22:*3, 13* 74:*17* 78:8,
*10* 141:2
**Figel** 1:*13*
**final** 131:*1*
**finalized** 111:6
**financial** 154:*11*
**find** 16:*12* 33:20, *21*
97:*1*
**finders** 32:*4, 21*
33:*13*
**fine** 28:*3* 37:25
46:*23* 80:25 95:24
96:*11* 116:24

finish 45:*24* 118:*6*
finished 73:*21*
FIRST 2:*16* 5:*21*
  7:*16* 80:*18* 131:*4*
  139:*6*
flag 22:*3*, *7* 97:*21*
Floor 2:*7* 16:*13*, *15*,
  *18* 36:2, *13*, *20*, *22*
  37:*3*, *13*, *19* 38:*14*
  39:*6*, *8* 40:*9*, *15*
  99:*16* 107:*9* 113:*19*
  114:*9* 116:*11* 130:*13*
FMJ 132:*3*, *8*, *21*
focus 47:*21*
focusing 14:*24*
focussing 149:*13*
follows 5:*23*
food 99:*15*
foregoing 153:*4*
  154:*4*, *5*
Foreign 9:*14*, *15*, *18*
  32:*10*, *25* 33:*4*, *8*
  71:*11*, *19* 72:*21*
  74:25 75:*3* 82:6, *8*
  87:*15* 88:*23* 89:*14*
  91:*20*, *24* 92:8, *15*
  98:*14*, *16*, *17* 100:*12*,
  *25* 101:*3*, *12* 106:*5*, *8*,
  *16* 120:8, *15*, *23*, *25*
  121:*6*, *11* 122:*16*
  123:*22* 124:*4* 130:*9*
  141:*18* 142:*9*, *13*
  145:*12*, *13*, *19* 146:*2*,
  *21*, *24* 147:*8*, *23*
  148:*21*, *25* 149:*17*
  150:*7*
forgive 85:*4*
Form 17:*17*, *22*
  20:*23* 22:5 23:*20*, *21*
  29:*10*, *12* 31:*4* 32:*16*
  37:*5*, *14* 42:*12* 48:*22*
  52:*5* 55:*10* 56:*2*, *14*
  57:*12* 58:8 59:*21*
  63:*15*, *18* 65:*7* 67:*13*
  68:*19* 69:*10*, *24* 71:*1*
  72:*13* 74:*14* 75:*12*
  80:*7* 84:*1*, *7* 87:*6*, *18*
  89:*2*, *17* 90:*4*, *16*, *23*
  91:*13* 94:*13* 101:*14*,
  *23* 102:25 103:*22*

106:*11* 107:*23* 109:*5*,
  *13* 112:*23* 113:*13*, *23*
  114:*20* 115:22 116:*5*,
  *12* 117:*25* 118:*10*, *17*
  120:*10*, *17* 121:*2*
  123:*9* 125:*5*, *12*
  129:*1*, *6* 133:8, *9*
  138:8 139:*23* 140:6,
  *16*, *25* 141:8 146:*4*
  147:*11*, *25* 148:*16*
  149:*18* 150:*13* 153:*8*
formed 60:*10*
former 105:*9*
forth 88:*2*, *9*
forward 32:*5*, *21*
  51:*4* 61:22 62:2, *23*
forwarded 50:*7*
foundation 135:*12*
four 53:*3*
fourth 99:*16*
frame 44:7
Franklin 3:5
Frederick 1:*14*
frequently 19:*15*, *16*
front 9:*20*, *21* 10:*3*,
  *10*, *14* 19:*11* 20:*15*
  47:*12* 91:6 95:*17*
frown 146:*13*
full 135:*1*, *5*, *19*
function 25:2
functions 80:6
further 35:*7* 135:*9*
fuss 48:*5*

< G >
Gang 70:*3*
gangs 110:*14*
gears 95:8
general 9:*3* 21:9
  118:*21*
generally 16:*9*, *12*
  87:*10*
getting 29:*1* 95:*7*
  110:*9*
give 6:*18* 20:*20*
  34:*13* 41:*9* 46:*4*
  49:*17* 51:*3* 56:6
  64:*3*, *9* 129:*11*
given 7:*13* 38:*15*
  40:*9* 50:8 57:*22*

134:*1* 137:*18* 150:*19*
  153:*6* 154:*6*
gives 29:5 64:*18*
  71:9, *18* 118:*13*, *18*
giving 147:6 148:*22*
global 135:*21*
go 10:*8* 31:*13* 32:22
  33:*13* 41:*1*, *3* 43:*23*
  44:*15* 46:*12*, *19* 47:6
  51:*18* 72:*16* 81:*9*
  98:*15* 112:*11* 120:*2*,
  *4* 141:*9*, *19* 147:*15*
  150:*21*
goes 32:5 60:*10*, *14*
  78:8
going 23:*24* 24:4
  26:*11* 27:*12* 28:*17*
  29:*3* 32:*12* 33:*15*
  34:*4* 38:*13* 45:*18*
  46:5 52:6 57:*17*
  85:*12* 87:*21* 95:22
  96:*22*, *23*, *24* 97:*19*
  98:*15* 116:*23* 125:*19*
  129:*11* 132:*11*
  134:*25* 136:*20*
  141:*19* 151:*11*
good 95:*1*, *4* 100:*7*
Gosh 76:*12* 86:*21*
  132:*11*
Government 47:*16*,
  *20*, *25* 91:*4* 148:*2*
Governmental 51:*8*
Government's 70:*9*
grade 145:*23*
great 95:*9* 136:*24*
green 14:7 126:*6*, *18*,
  *23* 127:*9*, *12*, *13*, *16*
gross 112:*14*
groups 90:*18*
guess 28:*3* 37:*23*
  64:*12* 110:*17*
Guessing 37:*25*
guidance 17:*13*, *20*
  18:*11*, *15*, *19*, *22*
  19:*11* 20:*15*, *17* 21:*3*,
  *4* 74:*8*, *11* 87:*17*
  88:*2*, *9* 97:*23* 118:*13*,
  *18*, *22* 128:*22* 133:*7*
  137:*19* 140:*13*, *21*

142:*20*
guys 48:*12*

< H >
Haiti 70:*4* 110:*13*
Haitian 110:*14*
half 9:*11* 111:*9*
Hamas 89:*23*, *25*
  110:*9* 126:*6*, *18*
  127:*9*, *21* 148:*24*
hand 154:*12*
handed 129:*18*
handful 38:2, *16*
handle 126:*13*
handled 105:*18*
Hansen 1:*13*
happen 53:2 114:2
  115:*7*
happened 123:*13*
Happens 19:*14*, *16*
happy 23:*24*
harassment 140:*9*, *10*
hard 85:*12*
hear 27:*13* 112:*13*
heard 58:*13*, *17*
  84:*15* 100:*14*, *16*
Hearsay 58:*9*
held 5:*11*
help 48:*12* 59:*3*
  75:*10* 149:*7*
helped 82:*23* 86:*2*, *7*
helpful 77:*9* 80:*4*
Henderson 1:*16*, *25*
  5:*15* 6:*17* 84:*14*
  99:*22* 125:*24* 129:*13*
  154:*3*, *20*
hereunto 154:*12*
hesitating 117:*14*
high 17:*11* 111:*7*
higher 16:*13*, *19*
history 139:*8*, *11*
  144:*5*, *12*
holder 14:*1* 56:*11*,
  *21* 57:8 60:*7* 114:*18*
  126:6 141:*12*, *22*
holders 13:*6*, *12*
  49:*5*, *9*, *14* 50:*19*
  52:*2*, *12* 53:*5*, *11*
  55:*15* 68:*11* 115:*19*

Case 1:25-cv-10685-WGY     Document 108-11     Filed 07/07/25     Page 208 of 863

Deposition of Stuart Wilson                                    CONFIDENTIAL                                    AAUP, et al. v. Rubio, et al.

124:*16*, *20*, *22*   125:2
133:*19*   141:6
**holder's**   108:*19*
136:4
**Homeland**   14:*10*, *21*
17:*3*, *6*   25:*12*   28:*20*,
*22*   29:*20*   30:8, *14*
31:*3*, *11*   42:*17*   43:7,
*22*   44:5, *9*, *14*   46:8,
*11*   48:*18*   50:9   56:*1*,
*10*, *19*, *25*   57:7   59:9,
*18*   60:9, *13*   62:*1*, *14*,
*23*   63:*13*, *23*   65:*1*, *5*,
*11*   66:*1*, *12*   67:*12*
69:7, *21*   70:*15*, *25*
101:5, *10*, *21*   102:22
103:*3*, *18*   104:25
105:*18*   106:25
109:*18*   113:*18*   114:9
118:*15*
**hostile**   138:*15*
139:*16*, *20*, *21*   140:*1*,
*11*, *14*   149:22   150:6
**hour**   111:9
**House**   16:*23*, *25*
29:25   30:*3*, *11*
**human**   89:4
**hundreds**   119:*19*
**hypothetical**   40:5
150:*16*
**hypothetically**   40:7
117:*18*

**< I >**
**idea**   86:6   88:*16*
92:*19*   118:*11*
**ideal**   99:*20*
**identify**   79:*19*
**identifying**   131:*25*
**illegal**   110:6, *21*
**immediate**   128:*14*
**immediately**   21:*20*,
*21*   96:25   123:*15*
**immigration**   110:7
**impetus**   52:*19*
**implement**   74:*12*
88:2   97:*24*   118:9
149:8, *14*
**implementation**   97:*12*

**implemented**   92:9
**implicating**   120:22
**implication**   126:5
**import**   128:*10*
134:*10*
**importance**   146:*20*
**important**   123:5
128:*13*
**importing**   134:*20*
**INA**   71:5, *9*, *20*   87:*17*
**inappropriate**   141:4
**Inaudible**   28:*14*
98:25
**include**   12:2, *23*
45:*17*   66:4   144:*20*,
*24*   145:2
**included**   133:*18*
**includes**   20:*14*
133:*19*
**including**   97:*18*
**inconsistent**   128:*19*
138:6, *20*   139:*19*
140:22   141:*14*, *23*
142:4   145:8, *18*
146:*1*
**incorrect**   112:22
**increase**   68:*15*
**INDEX**   4:*1*, *9*
**indicated**   45:4
**Indirectly**   41:*24*, *25*
**individual**   49:22
100:25   102:*1*   104:*13*
150:9
**individuals**   33:23
53:*15*
**indulging**   150:*3*
**influence**   49:*20*
**influx**   68:*16*
**information**   11:*18*
22:*24*   27:*10*, *20*   29:*1*
32:5, *22*   33:*18*, *21*
34:8, *11*, *20*   36:*1*, 6,
*13*, *20*   37:*3*, *12*, *20*
39:*9*, *16*   40:4, *14*
44:*15*   45:*18*   46:*12*
48:*3*   56:*11*, *20*, *25*
58:2, *6*   60:9, *17*   61:5,
*9*, *22*   62:*1*, *18*   63:*13*,
*23*   65:5, *11*, *23*, *25*
66:5, *10*, *11*, *15*   67:*1*

68:*23*   70:*24*   74:*18*
110:*10*   121:*18*
122:*21*   127:25   148:9
**informed**   127:*20*
**informing**   128:*10*
**infraction**   141:*16*
**infractions**   49:6, *9*, *14*
50:6, *20*   51:6, *14*, *20*
52:*3*, *12*   54:*15*   55:*16*
57:*2*, *5*   59:*2*, *6*
114:*14*   115:9, *21*
**infringes**   145:*14*
**infringing**   149:*21*
**initial**   42:*10*
**initially**   48:*19*   78:7
**initiative**   54:*20*
**input**   24:*18*   38:*15*
39:6   40:*10*   93:23
121:*14*
**insert**   43:*1*
**instances**   38:*21*
**instant**   131:*10*
**INSTITUTE**   2:*16*
**instruct**   23:*13*   115:*12*
**instruction**   28:*15*
**instructions**   29:5
**insufficiently**   48:*11*
**intended**   108:25
**interactions**   19:5
**interagency**   12:2
**interest**   33:23
120:*15*, *23*, *25*   121:22
122:*16*   123:23   124:5
145:*19*   146:2, *22*
147:*24*   148:22   149:*1*,
*17*   150:8   154:*11*
**interested**   59:5, *7*
121:*15*   149:6
**interests**   120:9   121:6,
*11*   122:*1*   147:9
**internally**   72:*1*
131:*19*
**interpretation**   134:*23*
**interrupt**   149:*24*
**interruption**   128:5
**interview**   144:8
**investigate**   61:*13*
**investigating**   34:*15*
36:*24*   61:*18*

**involve**   101:22   108:*1*
118:*15*   144:*21*
146:*16*
**involved**   26:9   28:22
38:8   79:*23*, *25*   80:6
82:*10*   109:*10*   114:*18*
130:*3*   132:*13*
**involvement**   14:6
19:2   38:*10*   91:*23*
103:6   107:*17*, *21*
142:*21*   143:*3*
**involving**   114:*17*
**Israel**   84:*20*   85:2, *23*
86:*10*   88:22   89:*21*
90:*14*, *21*   143:*21*
**issuance**   14:7   19:2
20:*1*
**issuances**   20:7
**issue**   14:*10*   15:*1*
42:*24*   101:6   110:*3*
141:*19*   142:9, *13*
**issued**   13:*16*   59:*10*
68:*13*   73:*3*, *6*, *15*
77:*13*, *16*   78:2   82:4
83:*10*, *18*, *23*   84:*19*
85:2, *6*, *15*, *16*, *24*
86:*10*   87:*12*   88:*18*
89:*1*, *6*, *10*, *12*   90:*12*
92:*16*   131:*1*
**issues**   20:*10*   69:*16*
**issuing**   18:*10*, *11*
21:*15*
**items**   97:*3*, *4*
**its**   67:4   123:7
135:*13*   154:*11*

**< J >**
**Jachim**   12:9, *11*
43:*20*, *21*, *24*   44:*10*
51:5   52:*16*   63:*10*, *11*,
*22*   64:9, *18*   65:*15*
67:7, *10*, *21*   68:5
70:*21*   92:6   132:*12*
**Jachim's**   44:*10*   46:7
65:*3*
**JESSICA**   3:2   6:9
10:*12*   81:*18*   83:4
86:5   92:6
**Jessica.strokus@usdoj.**
**gov**   3:8

**job** 10:*24* 21:*18*
24:*18* 45:*9* 61:*20*
62:*7* 67:*16*
**John** 5:*13* 8:*13*
10:*5, 20* 39:*13, 15*
**joined** 77:*13* 123:*20*
**joining** 7:*25*
**JON** 3:*22*
**Judge** 47:*13* 96:*3*
**jump** 134:*5*
**June** 1:*12* 5:*3* 85:*17*
154:*13*
**junior** 10:*17, 18*
117:*22*
**justice** 51:*8*
**JUSTICE/CIVIL** 3:*4*

**< K >**
**keep** 50:*23*
**Kellogg** 1:*13*
**Kentucky** 12:*24*
**Khalil** 4:*12* 102:*15,*
*21* 105:*1, 8* 109:*11*
115:*16* 126:*10*
**Khalil's** 103:*7* 106:*7,*
*15, 24* 107:*8, 16, 20*
108:*18* 114:*23*
115:*10, 18*
**kicking** 95:*18*
**kind** 11:*2* 26:*4, 15*
48:*2* 65:*23* 145:*17*
**kinds** 34:*10* 49:*13*
67:*20* 138:*6* 148:*20*
149:*15*
**kit** 130:*18*
**KNIGHT** 2:*16*
**know** 6:*20* 7:*4*
12:*14, 15, 17* 18:*15,*
*20* 26:*14* 28:*4* 29:*16*
30:*2, 12* 31:*22* 36:*25*
37:*16* 39:*1* 40:*2*
42:*16* 47:*22* 52:*21,*
*24* 53:*4* 54:*19* 55:*1,*
*7, 14* 58:*1, 23* 63:*21*
67:*14* 74:*15* 77:*8, 18*
78:*1, 24* 79:*12* 81:*19*
82:*15, 23* 83:*9, 15, 17*
85:*1* 86:*2, 9, 21, 25*
93:*16* 96:*21* 98:*8, 9*
99:*7, 13, 18* 103:*14*

104:*15, 17, 19* 106:*19,*
*22, 23* 107:*12* 108:*11,*
*12, 16* 109:*25* 112:*1*
115:*24* 116:*14*
119:*24* 120:*24* 121:*3*
130:*11, 21* 132:*17*
143:*2* 145:*22* 150:*22*
**knowledge** 26:*7*
29:*24* 30:*23* 48:*24*
49:*21* 60:*18* 62:*12*
64:*23* 67:*5* 80:*10*
96:*6* 108:*23* 110:*2*
111:*3* 115:*15, 17*
127:*14* 133:*4* 146:*25*
**knows** 131:*24*
**Korea** 81:*9*
**KRISHNAN** 2:*15*
6:*5*

**< L >**
**labeled** 58:*11*
**lacks** 26:*6*
**laid** 135:*12*
**large** 15:*16* 119:*16,*
*17* 130:*5, 18*
**largely** 20:*10*
**larger** 142:*9, 13*
**lastly** 98:*13*
**Late** 81:*2*
**law** 1:*13* 23:*10*
24:*21* 25:*3, 9, 15, 23*
27:*9, 15, 17* 28:*6*
29:*2* 33:*16* 34:*5, 17*
35:*23* 36:*3, 6, 9*
42:*24* 43:*1* 45:*3, 5,*
*13* 46:*13, 18* 47:*9*
49:*5, 8, 9, 13* 50:*6, 19*
52:*3, 12* 54:*14* 55:*15*
59:*2, 15* 60:*24* 66:*2*
114:*14* 115:*9, 10, 11,*
*20*
**lawful** 14:*8, 13, 17,*
*22* 100:*11* 101:*3, 11,*
*22* 102:*11* 103:*21*
107:*18, 20* 108:*9*
109:*3* 132:*25* 133:*8,*
*12*
**lawyer** 6:*4* 8:*6*
23:*25* 24:*1* 109:*7*

112:*9*
**lawyers** 21:*22* 95:*20*
**layers** 119:*15*
**LCA** 31:*17, 18* 92:*3*
**leader** 149:*14*
**leave** 19:*19* 28:*12*
136:*21, 22*
**led** 54:*20* 112:*4*
**left** 19:*20* 136:*16*
**LEGAL** 3:*15* 31:*13,*
*15, 18, 19, 20, 21, 25*
72:*5* 74:*3* 75:*9* 92:*3*
93:*23* 95:*17* 102:*1*
105:*9* 108:*1* 130:*13*
140:*9* 141:*16* 142:*7*
**letters** 34:*9, 15*
**Letting** 77:*18*
**level** 16:*20* 17:*11*
44:*19* 66:*16, 19*
80:*10*
**light** 138:*11*
**limit** 116:*21*
**limited** 48:*6*
**line** 47:*23* 132:*1, 2*
152:*5*
**list** 49:*8, 14, 24* 50:*1,*
*3, 8, 10, 14, 15, 18*
51:*3* 52:*2, 11, 20*
53:*5, 10, 15, 19* 54:*5*
55:*2, 9* 57:*4, 15, 18*
59:*1, 6, 15* 104:*2*
115:*25*
**listed** 131:*15*
**listing** 97:*10*
**lists** 49:*4, 5, 7* 52:*6*
54:*21* 55:*14* 115:*19*
**little** 67:*1* 68:*6*
75:*21* 80:*15* 105:*4*
**live** 94:*8*
**LLP** 2:*5*
**load** 135:*5, 20*
**locked** 98:*18*
**long** 8:*23* 9:*8, 17*
12:*12* 18:*16, 20* 27:*2*
81:*12, 24* 97:*4* 99:*7,*
*8, 18*
**longer** 23:*7*
**look** 46:*4* 51:*19*
53:*14, 15* 90:*25*
112:*6, 7* 117:*20*

125:*14* 133:*16*
134:*24* 144:*15* 148:*8*
**looked** 111:*13*
**looking** 27:*11* 49:*22*
56:*7, 23* 85:*6* 111:*5*
114:*13* 144:*3*
**lose** 136:*16* 137:*4*
**lot** 32:*11* 129:*8*
**lots** 90:*6* 138:*24*
**LPR** 103:*13*
**lunch** 99:*9* 112:*11*

**< M >**
**Mahmoud** 4:*12*
102:*14*
**maintained** 140:*3*
**making** 21:*24* 41:*19*
77:*23* 111:*3* 123:*14*
**manages** 41:*17*
**managing** 10:*12*
40:*21* 58:*3* 63:*24*
64:*10* 79:*13* 80:*9*
93:*25* 119:*5, 8, 12, 14*
**manner** 1:*20* 135:*21*
141:*23*
**Manual** 74:*25* 75:*3*
91:*21, 24* 92:*8, 16*
98:*14, 16, 17*
**March** 67:*22* 68:*2, 9,*
*16* 70:*17* 77:*17, 21*
78:*3, 11* 79:*1, 5*
83:*12*
**MARCO** 1:*6* 5:*7*
**marcorubio** 126:*12*
**mark** 129:*14*
**marked** 125:*20, 21,*
*24* 129:*16, 19*
**marks** 140:*3*
**MASSACHUSETTS**
1:*1* 5:*9*
**material** 67:*6*
**materials** 27:*18* 28:*6*
34:*7, 19* 35:*1, 4, 11,*
*24* 36:*17* 39:*5* 67:*9,*
*11* 115:*12*
**Matt** 10:*6*
**Matter** 5:*6* 8:*13*
150:*8*
**mean** 13:*18* 21:*3*
44:*16* 54:*15* 57:*6*

97:*3* 98:2 99:*17*
113:*4* 130:7 138:*24*
141:*16* 142:8 144:*25*
**meaning** 16:*18*
21:*21* 35:6
**means** 34:*14*
**meant** 44:*8*
**measures** 135:*3*
**meat** 7:*6*
**media** 126:*13*
**medications** 7:7
**meeting** 123:*3*, 6
**meetings** 122:*20*, 23
**members** 70:*3* 74:22
75:5
**memo** 59:*23* 60:2
63:2 64:*5*, 6, 7, *10*, *17*,
*20* 65:*4* 82:*19*, *20*
93:*1* 104:*4*, *5*, 7
**memorialized** 74:2
86:*12* 91:*18*
**memory** 67:*24* 69:*15*
94:*14*
**memos** 77:*23*
**mention** 83:*4*
**mentioned** 90:*18*
91:*20* 97:7 98:*13*
**mentions** 89:*23*
90:*21*
**message** 22:*24* 23:*3*
25:*18*, *22* 128:*2*
**messages** 22:*14*, *19*
23:*4*, *9*, *18* 24:*17*, *19*
25:*8*, *14* 128:*4*, *8*
**method** 74:*21* 75:*4*
87:*13*
**Mexico** 110:*13*
**Mike** 130:*8*
**mind** 6:7 10:*11*
75:6 125:*3* 134:6
**minute** 11:7 93:6
94:*25* 95:*19* 101:*18*
151:*9*
**minutes** 95:5 99:*12*
112:*5* 116:*22* 136:*16*,
*21*
**Mischaracterization**
112:*24* 147:*11*
**missing** 50:*23*

**mission** 16:*11*
**mistaken** 105:*10*
**misunderstanding**
58:*19*
**misused** 19:*8*
**Mm-hmm** 18:*3*
51:*25* 56:8 57:*20*, *24*
65:*22* 66:*24*
**moment** 34:*1* 38:*13*
70:6 75:7 76:*13*
82:*3* 95:*12* 109:*22*
116:*17* 127:*16* 137:*3*
143:*10*
**moments** 139:*17*
**month** 81:*11* 85:*17*
**months** 85:*13* 98:*21*
**Morris** 11:*19*
**Moscow** 9:*4*, 6, 8
19:*17* 21:*8*, *10* 80:*21*,
*24* 81:*4*
**move** 48:*12* 96:*24*
**moving** 80:*13*
**MRN** 4:*12* 129:*24*,
*25* 131:*20*
**multiple** 27:*21*

**< N >**
**name** 5:*12* 6:*3* 13:2
22:*23* 23:*1*, *2*, *17*
24:*24* 28:*24* 54:*19*,
*24* 58:*5*, *25* 67:7
102:*9* 103:*11* 104:*1*,
*2*, *3* 115:*18* 132:*12*
**names** 34:2 50:6
69:*16* 80:5 104:2
**NANCY** 3:*3* 6:*11*
**National** 12:*23* 17:2
59:*14*
**natures** 144:*14*
**necessarily** 1:*21*
39:*24* 94:8 118:*23*
**need** 7:*1* 15:*17* 23:*5*
95:*16*, *19* 96:*13*, *21*
123:*15* 146:*18*
150:*16* 151:*8*
**needed** 106:*17*
**Needham** 130:*8*, *15*,
*23* 131:*1*
**needs** 14:*1* 56:*25*

**negative** 138:*11*
**neither** 154:*9*
**never** 20:*17* 21:*3*
22:*13* 26:*18* 36:*19*
58:*13* 111:*21*
**New** 2:*8*, *20* 16:6
29:*16* 62:7, *11* 69:*18*
74:*18* 93:*18* 119:*1*
122:*16* 123:5
**newest** 129:*8*
**non** 34:*14*
**noncriminal** 68:*11*
69:8 70:*16*
**nonimmigrant** 136:*5*
137:*11*
**nonVisa** 21:*15* 136:*4*
**Norris** 10:*12*, *17*
11:*4* 40:22, *25* 41:*2*,
*6*, *8*, *16*, *18* 58:*4*
81:*18*, *20* 83:5 86:7
92:6 119:*9*
**Northwest** 5:*12*
**notarial** 154:*13*
**Notary** 1:*17*
**NOTE** 1:*19* 99:*5*
**noted** 5:*18* 135:*16*
153:*8*
**noticed** 51:*20* 98:*19*
**notify** 122:*3*
**notion** 129:*5*
**number** 34:*21* 37:*24*
131:*20*, *25*
**NW** 1:*14* 3:*17*
**NY** 2:*8*, *20*

**< O >**
**object** 27:*12* 113:*23*
116:*12* 118:*5*
**objected** 46:*9*, *14*, *17*
**Objection** 17:*17*, *22*
18:*13* 20:*23* 22:*5*
23:*10*, *20*, *21* 24:*21*
25:*3*, *9*, *15*, *23* 26:*6*,
*20* 27:*13*, *14*, *16* 28:*1*
29:*10*, *13* 30:*20* 31:*4*
32:*16* 33:*16* 34:*5*, *17*
35:*22* 36:*9*, *15* 37:*5*,
*14* 38:*6*, *23* 39:*17*
40:*17* 41:*13*, *20*
42:*12*, *22* 43:*1*, *25*

44:*12*, *17*, *18* 45:*6*, *14*
48:*9*, *10*, *22* 51:*9*, *16*
52:*5*, *22* 53:*6*, *12*, *22*
54:*7*, *22* 55:*3*, *10*, *18*
56:*2*, *14* 57:*12* 58:*8*
59:*21* 60:*15*, *22* 61:*7*,
*15* 62:*3*, *20* 63:*15*, *18*
65:*7*, *13*, *16* 66:*2*, *13*,
*14* 67:*13* 68:*19*
69:*10*, *24* 71:*1* 72:*4*,
*13*, *23* 73:*17* 74:*14*
75:*12* 76:*16*, *25* 77:6
78:*16* 79:*8* 80:7
83:*1*, *13*, *19*, *25* 84:*7*,
*21* 85:*8*, *18* 86:*13*, *23*
87:*6*, *18* 88:*4*, *11*
89:*2*, *16* 90:*4*, *16*, *23*
91:*13* 92:*21* 94:*13*
101:*14*, *23* 102:*16*, *25*
103:*22* 105:*2*, *19*
106:*2*, *11* 107:*2*, *10*,
*23* 108:*21* 109:*5*, *12*
111:*24* 112:*23*
113:*13* 114:*20*, *25*
115:*11*, *22* 116:*5*
117:*25* 118:*10*, *16*
120:*10*, *16* 121:*2*
123:*9* 125:*4*, *12*
126:*1* 129:*1*, *6*
132:*15* 133:2, *9*
134:*21* 135:*8*, *9*, *15*,
*23* 136:*11* 137:*13*, *22*
138:*8*, *22* 139:*13*, *23*
140:*6*, *16*, *25* 141:*8*
142:*6*, *23* 143:*6*, *14*,
*22* 144:*22* 145:*3*, *9*,
*20* 146:*4* 147:*1*, *10*,
*25* 148:*16* 149:*18*
150:*13*
**objections** 26:*12*
29:*2* 44:*21* 45:*9*
147:*15* 151:*6*
**observed** 93:*10*
**obstructing** 51:7
**obtain** 66:*9*
**obviously** 44:*22*
146:*14*
**occasion** 52:2, *4*
**occasions** 49:*10*

**OFFICE** 3:*15* 8:22
9:*20*, *21*, *25* 10:4, *10*,
*13*, *14*, *24* 11:*11*, *14*,
*21*, *24* 13:*21* 14:3, *6*,
*12*, *15*, *25* 15:9, *10*, 22
16:8, *10* 17:*12*, *16*
19:*11* 20:*15*, *21* 25:7
31:*14*, *16*, *20* 32:4, *21*
33:*13* 34:*1* 35:*11*, *21*
36:2, *5*, *12*, *19*, *24*
37:2, *20* 39:9 40:*13*
42:*1*, *2* 43:6 48:*21*
50:7, *15*, *20*, *21* 51:3
57:*1* 61:25 63:*17*
66:*20*, *21*, *22*, *23* 76:*1*,
*5*, *6*, *7* 77:*9*, *13* 79:*16*,
22 80:*12*, *14*, *18* 92:4
93:*17*, *23*, *24* 101:*9*,
*20* 104:*16* 115:*20*
116:7 117:22 118:*14*
119:*3*, *14*, *16*, *17*, *18*,
*21* 120:*13*, *20*, *24*
121:*12* 122:*11* 123:7
130:*15* 137:*18* 139:8
140:*24* 143:*3* 149:*10*,
*14*
**officer** 22:*15* 154:*3*
**officers** 141:2
**offices** 1:*13* 11:*12*
**office's** 13:*18* 17:*20*
18:*10*
**official** 10:6 22:*23*
39:*11* 41:4 52:7, *8*
104:*18* 116:*9*, *11*
146:*9*, *11* 148:2
154:*21*
**officials** 10:*9*, *10*
**Oh** 50:*23* 80:22
84:*17* 85:*20* 94:*21*
99:*24* 116:*25* 130:*1*
132:*11* 135:*18*
136:*13*
**Okay** 7:*5*, *17* 8:*19*
9:*17* 10:22 17:*19*
21:*12* 23:*2*, *23* 28:9
31:*20* 32:*11* 33:*20*
43:*13* 44:*24* 46:5
47:6 48:*12*, *15* 52:*19*
56:6 57:*3* 59:25
69:*13*, *19* 74:*1* 76:9

85:5 87:*10* 99:6
100:7 107:7 110:*17*
117:*15* 120:7 127:6,
*17* 128:6 129:*11*
134:5 135:*15* 136:*20*,
*24*, *25* 137:5 138:4
143:*10* 147:*15* 150:2,
*18* 151:*10*
**Okeemah** 1:*15*, *25*
5:*15* 154:*3*, *20*
**onboard** 80:*12*
**once** 46:*21*
**ones** 70:*1* 98:8
110:*12*
**online** 98:*18* 123:5
**open** 99:2
**Opened** 50:5
**operations** 10:*25*
11:*15*, *16* 12:*19*, *21*
13:*1*, *11* 21:*16*
**OPERATOR** 3:22
**opinion** 74:7 146:*5*,
6 149:*13*
**opposed** 108:8
130:*12* 131:25 135:*1*
**option** 93:*3*
**order** 47:24 48:2
59:*12*, *13* 73:*10*
89:*10* 99:*15* 123:25
124:6
**orders** 59:*10*, *20*
68:*13* 70:*17* 73:6, *16*
80:20 85:24 86:*11*
87:24 88:*3*, *10*, *14*, *18*
89:*1*, *7*, *13* 90:*13*
92:*17* 93:8 94:*12*, *23*
109:*24* 110:*1* 111:5
112:*18* 127:4
**ordinarily** 105:*18*
**ordinary** 108:*19*
**organization** 146:*17*
**organizations** 82:7, *8*
88:*24* 110:*11* 146:*13*
**original** 35:*11* 130:*18*
**originally** 108:*24*
**originated** 107:*13*
**outcome** 154:*11*
**outside** 80:*14*, *17*
99:*21* 112:*14*

**overall** 88:*16*
**oversaw** 21:*12*
**overseas** 11:*15* 18:25
19:24 144:9
**oversee** 10:*25* 11:*3*,
*4*, *19*
**overseen** 21:*18*
**oversees** 11:2, *20*

**< P >**
**P.L.L.C** 1:*14*
**p.m** 100:*3* 117:4
149:*24*, *25* 151:*12*, *13*
**package** 57:6 58:5
59:*17*
**packages** 70:*24*
**PAGE** 4:*3*, *11* 46:6
131:4, *16* 133:25
134:6 152:5
**pages** 153:*4*
**Palestine** 84:*20* 85:2,
*23* 86:*10* 88:22
89:*21* 90:*14*, *21*
**Palestinian** 126:*3*
**paragraph** 134:7, *8*
139:7 142:22 143:*5*,
*19* 144:*19*
**pardon** 84:*17*
**part** 14:*16*, *20* 18:5
25:6 31:*17* 35:*3*, *18*
42:*19* 43:5 66:22
79:*21* 108:*3* 110:*15*
123:*16* 127:2
**participate** 76:2
138:*14*
**participated** 150:*11*
**particular** 9:*12*
16:*19* 19:*12* 20:*18*,
*21* 23:7, *17* 25:6
36:*23* 37:*10*, *12*
58:*16* 60:6 77:*24*
79:*19* 80:*11* 93:*1*, *17*
124:*11*, *17*, *25* 125:6
143:*11* 146:*16*
**particularly** 99:*3*
**parties** 154:*10*
**parts** 48:*1*
**pass** 52:8, *15* 125:*19*
**passes** 63:*14*, *24*

**passing** 62:*19* 66:*11*
129:*12*
**pause** 15:*17* 23:24
24:*3* 28:*17* 144:*15*
**pay** 145:*23*
**peer** 63:25
**pending** 6:*24* 46:2,
*16*
**people** 13:8 21:*13*,
*18* 28:*19* 44:4, *20*
53:5, *10*, *19*, *20* 54:5
74:*12* 83:4 92:5
112:*19* 115:6 117:*21*
128:*18* 133:*13*, *16*
134:24 144:*11*, *13*
**perceived** 147:22
148:24
**performed** 93:*10*
**period** 67:*19* 136:*17*
**permanent** 14:8, *13*,
*18*, 22 100:*11* 101:*3*,
*12*, 22 102:2, *12*
103:*21* 105:9, *11*
107:*18*, *20* 108:*1*, 9
109:*3* 132:25 133:8,
*12*
**permission** 138:*25*
**person** 7:22 13:25
20:22 21:24 22:*4*, *10*
23:6, *18* 24:25 25:2
39:*19*, 22, 25 50:*11*,
*14*, *16* 63:4 79:20
93:*17* 114:7 118:*24*
125:*17* 126:8 143:*20*
144:*17* 149:7 151:*4*,
5
**personal** 19:*1* 26:7
49:*21*
**personally** 21:*4* 26:8
93:9 148:*1*
**person's** 56:*12*, 22
58:*16* 137:*10* 139:8,
*10* 142:*3* 144:5
148:*12* 150:6
**Phone** 128:5
**photograph** 4:*12*
**phrase** 139:*16*, *21*
140:*1*
**physically** 10:*14*

picks  122:2*1*
picture  126:9
Pierce  10:6
place  47:24  150:12
places  34:9
**Plaintiffs**  1:*3*, *11*  2:*3*, *13*
plaintiff's  135:11
platform  126:13
play  15:*23*  27:8, *25*  29:8
please  5:*19*  6:*18*  56:*16*  97:2  116:*19*  134:*1*  144:*1*
plenty  139:*3*
plus  63:*25*
**PO**  3:6
point  6:*23*  21:*17*  45:22  46:*17*  52:*18*  56:*24*  67:*24*  108:*13*  111:7  130:*17*
pole  22:*3*, *8*
policies  16:9  20:*1*  73:2, *14*  76:*3*, *10*, *15*, *22*  82:4, *13*  84:*18*  87:*21*, *23*  88:*1*, *8*, *17*, *25*  89:*10*, *12*, *21*  90:9  91:*11*, *18*  92:9, *16*  93:*19*  94:*11*, *18*, *22*  95:*25*  97:7, *15*, *24*  100:8, *10*  109:*23*, *25*  110:*24*  111:*4*, *19*  112:*21*  117:9  118:22  127:*3*
**Policy**  16:*12*, *17*, *20*  17:*1*  18:6  32:*10*, *25*  33:*4*, *8*  71:*11*, *19*  72:*1*, *3*, *8*, *9*, *18*, *19*, *21*  74:*1*, *13*, *22*  75:*4*, *10*, *11*, *13*, *19*, *20*  76:6  77:*4*, *12*, *22*  78:2, *5*, *10*, *25*  79:4  82:*11*, *14*, *18*, *22*, *24*  83:7, *10*  84:*3*, *5*  85:*1*, *23*  86:7, *8*, *9*, *18*  87:*4*, *11*, *13*, *15*, *16*  88:*21*, *22*  89:*3*, *4*, *14*, *22*  90:*12*, *20*  93:*2*, *7*  100:*12*, *15*, *16*, *25*  101:*4*, *13*  106:*5*, *9*, *16*  110:*4*, *5*, *19*, *20*, *23*

111:*15*, *22*  113:*5*, *6*, *12*  117:*12*, *13*, *19*, *20*, *24*  118:*9*, *15*  119:*1*, *23*  120:8, *15*, *22*, *23*, *25*  121:6, *11*  122:*13*, *16*  123:6, *22*  124:*4*  141:*18*  142:9, *13*  145:*12*, *13*, *19*  146:2, *22*, *24*  147:9, *24*  148:*21*, *25*  149:*17*  150:8
political  135:*3*, *6*  139:*11*  144:5  145:7  146:*23*  147:*3*, *8*
pops  22:*24*
position  40:*13*  49:*12*  76:8
possible  58:*3*  70:*19*  82:*16*
possibly  150:2
**post**  18:7  19:*10*, *12*  21:*15*  22:*11*  26:*4*, *10*, *16*  81:*17*  123:5
posts  22:2  23:*19*  24:*19*  25:*14*
prefer  24:*1*
prepare  8:9
prepared  130:*20*
prerogative  14:2
**PRESENT**  3:*21*  80:*12*
presently  141:*12*
**President**  16:23  59:*10*  68:*13*  70:*17*  73:6  128:*3*, *8*
press  122:5, *22*  124:7  127:6
presumably  148:*14*
pretty  91:*14*  112:*14*
previous  66:6
principal  10:7
prior  13:*15*  20:*12*
privilege  7:2  23:*11*, *22*  24:22  25:*4*, *10*, *16*, *24*  27:*16*, *18*  33:*16*  34:*18*  43:2  45:*3*, *5*, *8*, *13*, *16*  46:*18*  47:*10*  66:*3*  99:*1*  125:7
privileged  28:6  33:*18*  34:*6*, *19*  35:*23*

36:*10*, *17*  43:*3*  45:*18*  66:*4*, *15*  115:*12*
probably  77:9
problem  127:*12*
procedure  16:2  47:*21*
procedures  15:*23*, *25*  16:7  20:*1*
process  58:*24*  60:9  63:*19*, *22*  65:*10*  75:*24*  76:2  108:*14*, *16*  110:*15*
produce  96:22
produced  97:4  135:*11*
production  96:5
**PROFESSORS**  1:*3*  5:7
prohibit  138:*14*
proPalestinian  113:*10*
proper  12:5
proposed  92:7  117:*11*
proposes  119:*21*
proposing  42:*19*
propounded  153:7
protect  48:2
protective  47:*24*  48:2
protester  61:*12*  113:*20*  114:*1*, *3*, *8*
protesters  90:*10*, *15*  113:9, *15*  114:*12*  115:8
protesting  114:*14*
provide  7:*11*  67:*10*  74:5  99:4
provided  35:*17*  37:*20*  55:*16*  65:*11*, *25*  104:*10*  128:*1*
provision  71:*17*
provisions  92:*19*
**Public**  1:*17*  78:*3*  98:*19*, *21*  111:*14*  121:*20*, *25*  122:*3*, *7*, *11*, *12*  123:*21*  124:*4*  127:*18*  128:9  134:*14*
publically  28:*25*
published  94:*5*  111:*19*, *22*  121:*21*

purpose  59:4  87:*11*  105:22  128:*19*  138:*20*  140:*23*  142:*8*, *11*
purposes  121:6  122:*1*, *12*
pursue  135:*3*
**put**  6:*24*  47:*10*  50:*14*  74:6  96:*17*  116:*24*, *25*  127:*15*
puts  22:*23*  74:*3*
putting  6:7  48:6  91:6

**< Q >**
qualified  126:*24*
qualifies  23:7
question  6:*19*, *24*  15:*17*  17:*24*  18:2, *4*  23:*14*  27:*23*  28:*1*, *2*, *23*  29:2  30:9  33:*1*, *17*  43:5  44:25  45:*1*, *15*, *19*, *20*, *22*, *25*  46:2, *17*  54:2  87:22  103:*12*, *16*  118:*3*  144:*1*  147:*18*  148:*4*, *7*  150:*2*, *3*, *10*
questioning  6:6  47:23
questions  32:*12*  44:8  47:7  48:8  70:7  80:9  95:5  149:2  153:6
quick  33:*16*  116:*19*
quickly  87:22
quite  72:*10*
quotation  140:2
quotations  1:*19*
quote  1:22  47:*13*  125:7

**< R >**
raise  106:8
raised  106:*17*
raising  106:*20*
**RAMYA**  2:*15*  6:5
rank  9:*12*
rare  67:*15*
rarely  70:22
**RASSON**  3:22  5:*13*

**reaching** 67:*4*
**react** 111:*4*
**read** 1:2*1* 46:7, *11*
57:25 82:*15* 113:*1*
118:*21* 126:*17*
129:2*1* 134:9 153:*4*
**reading** 105:2*1* 154:8
**real** 7:5 43:*13* 147:5
**really** 80:*5*
**Realtime** 1:*16*
**reason** 7:2, *10* 23:5
68:*18* 107:*19* 115:25
136:*19*
**reasons** 32:*18* 33:6
70:2
**recall** 51:7 58:*11*
67:*17* 68:22 69:*15*,
*19*, 22 75:2*1* 76:*12*,
*13*, *18* 78:*12* 85:22,
*25* 90:*3*, 9 91:*10*
102:4, 7, 8 103:8
104:*10*, 24 105:7, 8,
*13*, *16*, *21* 107:4, 7
124:7, 9, *11*, *15*
127:*11*, 22 128:*16*
129:7 131:*14*
**receive** 19:*11* 61:25
64:20 67:2, 6, 9
70:*14*, 24 96:*15*
101:9 117:22 118:*14*
121:*14*, *16*, *18* 122:5
**received** 20:*17* 21:*3*,
4 25:*14* 39:6 48:*19*
49:24 50:*3* 55:23, *25*
57:*15* 58:*1*, 20 59:*17*
62:23 65:5 67:*11*
68:*10*, *15* 69:*1*, 6, 20
70:2*1* 91:7 96:6
97:8, 9, *11* 98:*12*, *17*
102:2*1* 113:*17* 114:7
125:23 128:22
140:2*1* 142:*19*
**receives** 37:2 42:20
43:6, *17*, 2*1*, 24 44:*11*
46:8 60:*13* 62:*13*
63:*12* 67:2 120:2*1*
**receiving** 20:*14*
37:*11* 67:20 68:2, *3*
74:*10* 99:*3*
**recite** 127:23, *24*

**recognize** 126:8
129:*19*
**recollection** 111:9
112:*4* 113:2
**recommend** 41:*12*
**recommendation**
30:7 31:2, *11* 41:*10*
58:*15* 60:*10*, *13* 61:*3*
67:*4* 104:25
**recommendations**
58:2 70:*14* 117:23
149:9
**recommended** 59:8
69:*17* 120:*14*
**recommending** 57:8
59:*19* 60:5 101:*10*
102:22 120:2*1*
**recommends** 41:8
56:*11*, 2*1*
**record** 1:2*1* 5:*3*, *18*
6:8 24:*11*, *14* 26:4,
*15*, *18*, 23 28:*18*
46:*19*, 2*1*, 25 47:2, 5,
9, *11* 84:*14*, *16* 95:*10*,
*12*, *14*, 23 96:*17* 99:6,
23 100:2, 5 112:*10*
117:*3*, 6 129:24
136:23 150:22, *25*
151:*1*, *3*, *12* 154:5
**recorded** 5:5
**recordkeeping** 27:5
**records** 34:22 111:*12*
**redirect** 59:*3*
**reduced** 78:5 154:7
**ref** 97:9, *10*
**refer** 57:*14* 72:8
97:*14* 100:22 131:*19*
**reference** 91:*11*
131:7, 9 134:*14*
**referenced** 98:2, 5, *11*
**references** 97:9
131:5
**referencing** 58:*14*
**referral** 42:*18*, 2*1*
43:6, 22, 23 44:5
46:8 48:*17* 57:6, *11*,
*14* 58:*14*, 22 61:6, *14*,
2*1* 62:*13* 102:22
109:*18* 113:*18*
114:*17*

**referrals** 48:*25*
55:2*4*, *25* 56:*3* 67:20
68:*4*, 6, *10* 69:7, 20
70:20 101:9 114:7
118:*14* 120:2*1*
**referred** 66:20 72:2
89:25 101:20 105:*17*,
*25* 106:8, *15* 108:8,
*12* 115:20 116:*3*, 6, 8,
*10* 131:*10*
**referring** 71:20
75:24 119:22 124:2*1*
**refers** 100:24
**reflected** 1:20
**reflects** 96:6
**refresh** 112:*3*
**regarding** 14:7
29:*18*, 22 58:*3* 87:23
88:22 90:*10* 124:*17*
140:*14*
**reiterate** 147:*17*
**relate** 98:22 117:9
124:*16*, 23
**related** 88:*13* 93:*13*
110:6, 20 113:5
117:*19* 124:9, *24*
131:*13* 149:*15* 154:9
**relatedly** 97:6
**relates** 103:*13*
148:*12*, *14*
**relating** 14:*12* 15:23
16:9, 20 76:*15*, 22
77:*12* 78:2 82:5
85:23 93:2 100:8, *10*
102:*1* 113:8 124:20
125:*1* 127:*3*
**relative** 10:*16*
**relatively** 81:6
**relaying** 56:2*4*
**relevance** 123:7
**relevant** 96:2 97:*3*,
*18* 117:*12* 118:9
120:2*4* 122:7, *16*
143:*12* 144:6 146:23
**relitigate** 48:*1*
**remember** 51:*13*
75:20 90:5, 7 93:*14*
102:9 103:8, *11*
104:*1* 105:*4* 124:8

125:6
**remind** 43:*18*
**removability** 100:*11*
101:*11* 102:23
103:2*1* 107:*17*
**removal** 101:2
**remove** 100:24
**renew** 14:*1*
**renewals** 19:2
**renewed** 15:*4*
**Renewing** 133:*17*
**repeat** 34:*4* 56:*15*
**rephrase** 6:20 45:20
143:25 148:*17*
**report** 10:*19* 11:7
63:9 109:*19*
**Reported** 1:25
**Reporter** 1:*16* 5:*14*,
*19* 17:*4* 42:6 53:2*4*
74:2*4* 100:*17* 129:*15*
132:5 139:9 154:2*1*
**REPORTER'S** 1:*19*
**Reporting** 5:*13*, *16*
**reports** 11:8
**represent** 7:2*0*
**represented** 7:*17*
**request** 35:*14* 36:5,
*12* 96:*4*
**requested** 35:*3*, 6
154:9
**require** 19:9
**required** 137:9
**reserves** 32:7, 23
**resident** 101:*12*
102:2, *12* 103:2*1*
105:9, *11* 107:*18*, 20
133:8
**residents** 14:*8*, *13*, *18*,
22 100:*11* 101:*3*, 22
108:*1*, *10* 109:*4*
133:*1*, *12*
**resolution** 103:*15*
**resolve** 148:6
**respect** 47:*17* 60:6
87:23 102:20 105:*1*
**respond** 95:2*4*
124:*13*
**response** 73:*3*, *15*
79:6, *14*, *17*, 22 82:*18*
84:*19* 85:2*4* 86:*11*

88:*18*  89:*1*, *6*, *10*, *13*
90:*13*  92:*17*  93:7
109:*23*  110:*1*
**responses**  6:*19*
**responsibilities**  14:*12*
20:*9*
**responsibility**  13:*15*,
*18*, *19*  15:*21*
**responsible**  12:*21*
13:22  14:*17*, *22*  25:7
79:*17*  93:*18*
**responsive**  82:*11*, *24*
84:6  87:4  90:22
94:*11*, *23*
**result**  92:*20*
**resume**  48:7
**retaliation**  47:*18*
**return**  80:*21*, *24*
**returned**  85:*11*
**returning**  13:22
133:*16*
**reveal**  45:*18*
**revealing**  27:*17*  28:5
33:*18*  34:6, *19*  36:*16*
**review**  8:8  63:*25*
64:*4*, *11*, *18*, *21*  92:7
94:*4*  96:*10*  112:*19*
113:6, *12*  115:7
117:*12*  130:22
**reviewed**  50:*1*  64:*1*
67:*4*  82:*14*  113:8
114:*17*
**reviewing**  34:*25*
44:*4*  77:23  82:*19*, *20*
93:*1*  117:*10*  141:*3*
**reviews**  35:*11*
**revised**  130:*17*
**revisions**  97:*12*  98:*20*
**revocation**  15:*24*
19:*3*  20:*4*, *16*, *21*
21:5, *25*  26:5, *19*, *24*
33:*10*  41:9  42:*11*, *19*
43:8  47:*21*  48:*25*
57:9  59:*19*  61:*3*
62:*17*  68:*10*  69:*17*
70:*10*, *15*  71:*10*
112:*17*  113:*20*
126:22  127:*20*
**revocations**  17:*14*, *21*
18:6, *12*, *23*  19:6

20:7, *14*, *18*  21:*14*
22:2  26:9  27:5, *8*, *25*
29:9, *19*, 22  30:4, *11*,
*16*  32:*1*  41:*12*, *19*
42:*1*  57:2  58:*3*  59:8
69:8, *21*  71:*3*  73:7
100:*9*  128:9  142:*21*
143:*4*
**revoke**  15:*18*  22:*16*
23:5  30:6  31:*1*, *10*
32:8, *15*, *18*, *23*  33:2
56:*12*, 22  71:*19*
72:*20*  125:*17*
**revoked**  15:7, *11*
19:9  22:*17*  23:6
26:*3*, *16*  33:5, 7
58:*16*  69:*17*  70:*3*
114:*1*
**Revoking**  15:*20*
21:*19*  126:*17*  127:9,
*12*  128:*17*
**reword**  120:*18*
**Right**  9:*16*  10:2, *22*
12:6  18:*21*  20:22
21:*14*  22:*19*  31:7
32:8, *15*, *23*  33:2, *20*
34:8, *21*  35:8, *15*
39:*14*  41:6  44:*25*
45:*3*  50:*24*  51:2
57:23  65:6  66:*16*
67:7  73:7, *12*, 22, *24*
75:*16*  89:*11*  93:*20*
98:7  111:*21*  113:7
118:*19*  119:*13*  120:9
125:8  126:*19*  129:*24*
131:7, *11*, *21*  132:4, *8*,
*22*, *23*  133:*16*, *18*
134:*3*  136:7  139:*12*
142:8
**rights**  145:*14*  149:*21*
**Riverside**  2:*18*
**Rob**  12:9
**Robert**  12:*11*  43:*20*
**rodeo**  7:*16*
**role**  8:*24*  9:*1*  11:4
12:*13*, *16*  15:22
17:*13*, *20*  20:*12*  21:7,
*10*, *24*  23:*16*, *18*
24:25  27:8, *25*  29:8,
*17*, *18*  37:*21*  38:*15*

41:*18*  60:*12*  76:*11*
80:*19*  81:*20*, *24*  82:5
85:7  92:*12*  114:*10*
146:9
**roles**  19:*24*
**room**  99:*17*  112:*11*
**RPR**  1:*25*  154:*3*, *20*
**RRP**  1:*16*
**RUBIO**  1:6  5:8
16:*16*, *18*, *21*, *25*  60:*3*,
*6*, *14*  102:24  106:9,
*17*, *21*  109:*20*  123:*20*
124:*12*  126:*12*, *21*
127:7  128:*3*, *11*, *17*
134:9  146:22  147:7
149:*10*
**Rubio's**  124:*3*
126:*13*  127:*19*
134:*14*  146:*21*
**rule**  18:*10*
**rules**  18:25
**run**  22:*3*, 7  57:*1*
**running**  34:2
**Russia**  19:*1*

**< S >**
**SAC**  43:*10*  50:7, *20*,
22  51:*3*  57:*1*  66:*21*,
22
**SAFAVI**  3:*3*  6:*11*
17:22  23:*21*  24:6
28:*3*, *12*  44:24  45:*4*,
*11*, *23*  46:23  95:*1*
96:*20*  98:24  99:9, *12*
116:*18*, *21*, *25*  136:*13*,
*20*, *24*  137:*1*, *5*
**SARAH**  3:*13*  6:*12*
**sat**  112:*10*
**saw**  50:5  67:*15*
99:*14*  104:3, *8*
109:*15*, *17*
**saying**  24:24  31:25
44:*20*  57:*3*  68:9
75:8  111:*13*  115:5
135:*18*
**says**  46:6  132:*20*
134:*8*  136:2
**scholarly**  134:*11*
**school**  34:22
**SCOTT**  2:*14*  6:5

Scott.wilkens@knightc
olumbia.org  2:*21*
**Screening**  132:*3*, *7*, *13*
**scroll**  46:*1*
**seal**  154:*13*
**second**  10:22  17:5
46:*4*  56:6  71:*14*
91:*19*  95:*13*  147:6
**Secretary**  8:22  10:7,
*23*  16:*16*, *18*, *21*, *24*
17:*10*  30:5, *25*  31:*10*
32:7, *14*, *23*  33:2, 9
59:23  60:*3*, *5*, *11*, *14*
61:*23*  62:2, *19*  63:5,
*9*, *14*  66:*12*  71:*4*, *9*,
*18*  87:*14*  102:*23*
103:*14*  104:4  106:6,
*9*, *17*, *20*, *21*  108:*12*
109:*20*  115:*3*  119:22
120:*3*, 5  121:9, *14*
122:15  123:4, *14*, *18*,
*20*  124:*3*, *12*  126:*12*,
*21*  127:7, *13*, *19*
128:*3*, *11*, *15*, *17*
134:9, *14*  141:*20*
146:*21*, 22  147:7
149:*3*, 9
**Secretary's**  36:2
63:*17*  72:*20*  100:*24*
101:2  121:22  122:*4*,
7  142:*12*  145:*12*
**section**  20:*9*  71:*5*, *9*,
*21*
**sections**  98:*15*
**security**  11:*16*, *23*
12:7  13:*4*  14:*10*, *21*
17:*2*, *3*, *6*  25:*13*
28:*20*, 22  29:*20*  30:8,
*14*  31:*3*, *12*  42:5, *6*, *9*,
*18*  43:7, *11*, *16*, *23*
44:6, *9*, *14*  46:9, *12*
48:*18*, *20*  50:9, *25*
56:*1*, *10*, *20*, *25*  57:7
59:9, *14*, *18*  60:*14*
62:*1*, *14*, *23*  63:*11*, *13*,
*23*  65:*1*, *6*, *12*  66:*1*,
*12*  67:*12*  69:7, *21*
70:*15*, *25*  93:24
101:6, *10*, 22  102:22
103:*3*, *18*  105:*1*, *18*

Case 1:25-cv-10685-WGY    Document 188-1    Filed 07/07/25    Page 215 of 863

Deposition of Stuart Wilson                                CONFIDENTIAL                          AAUP, et al. v. Rubio, et al.

107:*1* 109:*18* 113:*19*
114:*9* 118:*15*
**Security's** 60:*9*
**see** 16:*8* 27:*11, 12*
43:*14* 46:*2* 49:*8*
57:*1* 59:*16* 66:*7, 17*
81:*19* 90:*6* 103:*10*
104:*1* 106:*23* 111:*5,*
*11* 126:*11, 16* 127:*15*
130:*24* 142:*11*
144:*12, 16* 145:*5*
**seeing** 103:*9, 11*
104:*1* 124:*7*
**seek** 134:*10* 136:*6*
137:*11*
**seeking** 38:*22* 47:*25*
48:*3*
**seen** 25:*18* 26:*18, 23*
39:*5* 49:*4, 8, 15* 78:*9*
84:*18* 86:*17* 87:*3*
89:*22* 94:*9, 17, 19*
98:*8* 120:*1, 2, 4*
127:*5, 6, 18, 25* 129:*4*
145:*25* 146:*3*
**Semitism** 113:*10*
**send** 39:*10* 44:*15*
46:*13* 74:*7, 16*
**sends** 23:*9, 18* 39:*8,*
*19* 42:*18* 44:*14*
46:*12* 56:*10, 20*
**Senior** 9:*14, 15, 18*
10:*5, 9, 17* 21:*7, 10,*
*24* 22:*3, 10* 39:*11*
41:*4, 5* 52:*7* 104:*18*
116:*9, 11* 128:*23*
**seniority** 10:*16*
**sense** 81:*23* 88:*19*
125:*16*
**sensitivities** 99:*2*
**sent** 19:*7* 22:*14*
23:*4* 50:*12* 57:*6*
99:*14* 115:*7* 130:*16*
**sentence** 134:*8* 139:*7*
**sentiment** 113:*10*
127:*8* 128:*24*
**Seoul** 81:*8*
**separate** 87:*16*
133:*11*
**separately** 116:*4*

**September** 154:*15*
**serious** 134:*24*
**Service** 9:*14, 15, 18*
**set** 16:*13, 18, 25*
44:*19* 48:*14* 57:*4, 18*
59:*14* 88:*1, 8* 154:*12*
**sets** 16:*20*
**setting** 15:*23, 25*
**sexual** 140:*10*
**shared** 34:*23* 104:*13*
109:*15*
**sharing** 74:*18*
**Sheet** 153:*9*
**SHER** 2:*5* 6:*4*
**short** 11:*2* 131:*23*
**show** 87:*21* 91:*4*
134:*25*
**side** 11:*17, 18* 101:*6*
108:*17*
**Signature** 153:*15*
**signing** 75:*22, 23*
154:*8*
**simply** 150:*10*
**Simultaneous** 28:*16*
**single** 102:*4* 113:*17*
**sir** 84:*5*
**sit** 10:*10*
**sits** 9:*25*
**situated** 10:*14*
**situation** 108:*18, 20*
**small** 38:*1*
**social** 126:*13*
**somebody** 19:*8* 32:*8,*
*24* 93:*11* 120:*12*
122:*20* 131:*24*
**sorry** 12:*10* 14:*4, 11*
22:*6* 32:*2* 39:*4*
43:*13* 47:*7* 53:*24*
56:*15* 58:*11, 25*
67:*12* 68:*23* 69:*4*
73:*20* 76:*13* 95:*18*
99:*24* 100:*17* 106:*12*
107:*5* 109:*10* 112:*13*
117:*14* 118:*4* 121:*17*
132:*5* 134:*4* 141:*25*
142:*14* 147:*5, 13*
148:*17* 149:*23* 150:*1,*
*15* 151:*10*
**sort** 16:*2*

**sought** 96:*4*
**sounds** 11:*10* 12:*20*
**source** 66:*10*
**sources** 27:*21*
**speak** 8:*1, 3, 5* 95:*13*
96:*16* 112:*8* 117:*18*
123:*10* 149:*12*
**speaking** 26:*12* 81:*7*
117:*8*
**speaks** 132:*21*
**special** 71:*4, 10, 18*
72:*20*
**specialist** 5:*14*
**specific** 37:*17* 60:*7*
64:*13* 85:*6*
**specifically** 73:*9*
85:*25* 89:*22* 122:*14*
127:*23*
**speculate** 26:*17*
29:*14* 62:*5* 80:*2*
**Speculating** 106:*4*
**Speculation** 18:*14*
26:*21* 27:*3* 30:*21*
38:*7, 24* 39:*18* 40:*18*
41:*14, 21* 42:*23* 44:*1,*
*13* 46:*10* 51:*10*
52:*23* 53:*7, 13, 23*
54:*8, 23* 55:*4, 11, 19*
60:*16, 23* 61:*8, 16*
62:*4, 21* 65:*17* 72:*24*
73:*18* 75:*15* 77:*1, 7,*
*17* 79:*9* 83:*2, 14, 20*
84:*1, 22* 85:*9, 19*
86:*14, 24* 88:*5, 12*
89:*17* 90:*24* 92:*22*
101:*24* 102:*17* 103:*1*
105:*3, 20* 106:*3*
107:*3, 11* 108:*22*
109:*6, 12* 111:*25*
115:*1, 23* 116:*13*
118:*17* 120:*17* 125:*5*
126:*2* 132:*16* 133:*3,*
*10* 134:*22* 135:*9, 24*
136:*12* 137:*14, 23*
138:*9, 23* 139:*14*
140:*7, 17* 142:*24*
143:*7, 15, 23* 144:*23*
145:*10, 21* 147:*2, 12*
150:*14*
**speculative** 68:*20*

**speech** 121:*20*
122:*22* 123:*5*
**speeches** 122:*2*
**spoken** 8:*13, 16*
**staff** 122:*20* 123:*3*
130:*5, 6, 7, 10*
**stage** 133:*20, 21, 22*
**stake** 120:*25*
**stand** 42:*4* 130:*11*
**standing** 48:*10*
**stands** 51:*21, 24*
**start** 6:*6* 32:*12*
**started** 19:*22*
**starting** 76:*11* 80:*18*
**STATE** 3:*14* 4:*12*
6:*13, 15* 7:*21, 23*
9:*13* 11:*1* 14:*16*
17:*10* 20:*19* 27:*8, 25*
28:*20* 29:*8* 30:*3, 5,*
*10, 15* 31:*1, 10* 33:*9*
35:*14* 42:*19, 20*
48:*19* 56:*12, 20, 21*
57:*8* 58:*15* 60:*3, 20*
61:*5, 13, 24* 62:*13, 18*
65:*5, 10* 66:*9* 67:*1, 2,*
*11* 72:*2, 8* 74:*22*
75:*5, 9* 79:*12* 81:*17*
84:*11* 87:*11* 94:*6*
102:*21* 103:*4* 105:*17,*
*25* 106:*8, 15, 25*
107:*16, 21* 108:*8, 17*
111:*15* 123:*20* 127:*8*
128:*23* 129:*20, 24*
130:*8* 131:*21* 136:*3*
137:*8* 139:*22* 140:*4,*
*5* 146:*6, 9, 11*
**state.gov** 111:*11, 19,*
*22* 112:*6*
**stated** 26:*8*
**statement** 123:*15*
127:*1* 128:*17* 134:*19*
147:*13*
**statements** 121:*25*
122:*4, 7, 12* 123:*21*
124:*4, 12, 15, 19*
125:*1* 127:*19* 128:*10,*
*11* 134:*15* 146:*21, 23*
147:*7*
**STATES** 1:*1* 5:*8*
12:*22* 71:*11, 20*

72:22  89:15  120:8
141:7, 13  146:2
**State's**  60:12  61:20
62:17  127:13
**Station**  3:5
**status**  96:3  103:13
**stay**  95:11  121:24
**stenographic**  5:18
**stenographically**
154:7
**stick**  125:3
**sticking**  33:25
109:22  113:11
**stop**  149:24
**straightforward**
148:13
**Street**  1:14  2:6  3:17
5:12
**STROKUS**  3:2  6:9
17:17  18:1, 13  20:23
22:5  23:10, 13, 20
24:21  25:3, 9, 15, 23
26:6, 11, 20  27:15
28:4  29:10  30:20
31:4  32:16  33:15
34:4, 17  35:22  36:9,
15  37:5, 14  38:6, 23
39:17  40:17  41:13,
20  42:12, 22  43:25
44:12, 17  45:24  46:9,
14  48:14, 22  51:9, 16
52:5, 22  53:6, 12, 22
54:7, 22  55:3, 10, 18
56:2, 14  57:12  58:8
59:21  60:15, 22  61:7,
15  62:3, 20  63:15, 18
65:7, 13, 16  66:2, 13
67:13  68:19  69:10,
24  71:1  72:4, 13, 23
73:17  74:14  75:12,
14  76:16, 25  77:6
78:16  79:8  80:7
83:1, 13, 19, 25  84:7,
21  85:8, 18  86:13, 23
87:6, 18  88:4, 11
89:2, 16  90:4, 16, 23
91:13  92:21  94:13
95:3, 15  98:1  99:20
101:14, 23  102:16, 25
103:22  105:2, 19

106:2, 11  107:2, 10,
23  108:21  109:5, 12
111:24  112:23
113:13, 23  114:20, 25
115:11, 22  116:5, 12
117:25  118:4, 10, 16
120:10, 16  121:2
123:9  125:4, 12
126:1  129:1, 6
132:15  133:2, 9
134:21  135:8, 23
136:11  137:13, 22
138:8, 22  139:13, 23
140:6, 16, 25  141:8
142:6, 23  143:6, 14,
22  144:22  145:3, 9,
20  146:4  147:1, 10,
25  148:16  149:18, 23
150:13  151:7
**STUART**  1:10  4:3
5:5, 20
**student**  38:22  53:5,
11  55:15  59:5  61:12
62:15  68:11  69:8, 22
70:1, 8  90:10, 14
102:11, 14  105:10
113:9, 15, 20  114:8,
12, 18  115:8, 19
124:21  135:4, 19, 22
136:8  137:21  139:18,
19  140:23  141:22, 24
145:8, 17  146:1
147:8, 22  148:23
149:16
**students**  54:12  57:4
70:15  114:13  115:8
116:1  124:24  138:11
148:20
**student's**  136:4
137:20  138:7, 19
140:22
**studies**  134:25  135:3
**study**  135:1
**studying**  138:13, 15
**stuff**  91:6
**subject**  26:7  92:5
124:10  131:13, 15, 24
132:1, 2
**submitted**  35:12

**substance**  153:8
**suggested**  106:22
**Suite**  1:14  2:19
**summarize**  35:16
65:4  73:23
**summer**  82:1
**supervise**  41:25
**supervisor**  128:14
**supplemented**  35:13
**support**  88:23  90:17
**supported**  146:12
**supporter**  126:6
**supporters**  126:18
127:10, 21
**supportive**  148:24
**suppose**  113:11
**Sure**  24:6  29:1
38:11  46:24  58:18
60:17  68:8  70:12
73:4, 20  74:8  82:21
95:15  96:13  103:2
106:23  107:24
116:20  120:20
132:17  135:25
136:15  142:2  144:10
147:19  148:19
**suspended**  21:16
**swear**  5:19, 25
**switch**  95:8
**sworn**  5:22  7:13
**system**  22:17, 23
23:3, 18  24:18  25:8
27:5
**systems**  22:19  24:17
25:13, 18, 21

**< T >**
**table**  48:7
**take**  6:22  15:19
24:6, 9  28:10  39:19,
23  40:1, 13  41:1
44:24  45:23  46:20,
22  60:6  62:11  95:8
99:18  116:18  117:11
134:1  136:14
**taken**  1:11  24:12
40:8  47:3  100:3
117:4  135:2  154:4, 6
**takes**  148:9

**talk**  87:22  131:18
140:9
**talked**  14:5  66:25
82:5  88:20  91:17
93:5  109:23  110:8, 9
139:2  146:20
**talking**  22:18  24:17
28:16  54:1  57:19
64:13  68:7  70:1
71:6, 17  73:4  84:2
96:7  98:10  100:8
119:16  129:23  148:2
**TALKOVSKY**  3:13
6:12  28:14
**task**  44:10  46:8
**tasked**  44:4  79:13
**team**  8:4  31:14, 15
32:1  74:3  92:3
**technical**  11:17
**tell**  24:25  45:21
46:5  69:13  72:12, 14
85:15  91:2
**telling**  118:24
**temporary**  80:20
**tenure**  69:18  84:10
**term**  12:5  16:3  57:6,
11  58:13, 17, 21
140:5, 9
**terms**  10:16  53:19
54:5  88:9  125:15, 18
139:4  141:14, 23
142:4
**terrorism**  59:14
148:3, 13
**terrorist**  82:6, 8
88:23  90:17  110:11
146:12, 16
**testified**  5:22  8:12
112:20
**testify**  7:8
**testifying**  8:14, 17
115:6
**testimony**  7:11, 14
8:1, 6, 9  31:6  57:22
101:8  112:5, 24
113:2, 21  114:16
147:11  154:6
**text**  90:6

**Thank** 23:*23* 43:*14*
130:2 137:6 150:*3*,
*18*
**theme** 131:*13*, *14*
**theoretically** 123:*10*
**thing** 73:5 96:*19*
120:7
**things** 16:*12* 34:*10*,
22 57:*19* 70:4 93:22
99:3 118:*24* 149:22
**think** 11:6 15:*17*
28:4 32:2 41:*11*
46:*16* 48:*14* 57:*18*
59:22 60:*1* 62:7
67:*15* 68:2*1*, *25* 69:2,
6 88:25 89:9 93:*14*
95:7 96:*23* 99:*10*
104:8, *12* 105:9
110:*17* 113:*4* 116:6
124:*23* 125:*13*
138:*19* 147:*14* 149:2
**thinking** 15:*16* 95:6
142:*15*
**thinks** 28:*15* 43:2
**thought** 110:*3*
**Three** 53:*3* 113:*11*
**Thursday** 96:*11*
150:*23*
**time** 5:4 15:*19*
18:*16*, 20 24:*10*, *13*
27:2 38:9, *14* 40:*3*
43:*14* 47:*1*, *4* 48:6
53:25 54:*1* 56:*15*
62:6 67:*19* 68:9
80:*11* 83:*12*, *24* 85:7,
*16* 95:*1*, *4* 97:5
100:*1*, *4* 101:2*0*
110:5, *20* 114:*10*
117:2, *5* 134:*1* 135:*1*
137:3, *4* 142:*1* 147:5,
*14* 148:*10* 150:*17*, *19*,
22, *24* 151:2
**timeline** 85:*4*
**timer** 116:*24* 117:*1*
**times** 38:*16*, *17*, *19*
53:*1* 140:2
**title** 8:2*0* 10:22
25:*1* 31:22 131:*23*
**today** 5:*17* 7:8, *11*,

25 8:9 96:*10*, *23*
**Today's** 5:*3*
**Todd** 1:*13*
**told** 65:2
**tools** 141:*19*
**topics** 113:8, *11*
**totality** 148:8
**totally** 23:24
**tracks** 122:*11*
**trafficking** 89:*4*
110:6, *21*
**trained** 118:2*0*
**trains** 117:*24* 118:8
**transcript** 154:5
**transcription** 153:5
**transmitted** 74:*12*
**transpired** 103:*3*
**traveling** 81:*15*
**TREMONTE** 2:5 6:*4*
**trial** 96:*25*
**trips** 80:*13*
**troubling** 97:5
**true** 135:*13* 154:5
**Trump** 59:*10* 68:*13*
73:6
**Trump's** 70:*17*
**truthful** 7:*11*
**truthfully** 7:8
**trying** 148:*19* 151:8
**Tuesday** 1:*12*
**turn** 133:25
**Tweet** 121:2*0* 124:8
**two** 59:9 83:*18*, *24*
88:*18* 89:*1*, *7*, *13*
91:*1* 92:*17* 94:*12*, *23*
97:*14* 98:2*0* 110:*14*
127:*3* 129:*15* 145:*15*
**type** 137:*10* 149:22
**types** 53:2*0* 54:5
121:*13* 143:*12*
**typewriting** 154:7
**typically** 13:8 17:9
20:5 37:*16* 63:*10*
76:7 80:8 94:*3*
123:2

**< U >**
**U.S** 3:*4*, *14* 120:*14*,
22, *25* 121:5, *11*
123:22 124:*4* 134:*11*

144:*9*, *11*, *17* 145:*15*,
*18* 146:*1*, *24* 147:8,
*23* 148:2*1*, *25* 149:*17*,
*21* 150:7
**Uh-huh** 84:*12*, *15*
**unanswered** 28:*13*
**underlying** 67:*3*
**undermines** 145:*12*
**undermise** 134:*11*
**understand** 6:*19*
7:*19* 14:2*1* 22:*12*, *14*
32:9 44:*3* 47:25
57:5 60:8 68:8
70:*12* 71:*13*, *15* 72:7,
*9* 75:8 80:5 92:2
100:2*1* 101:*1* 106:*12*
121:*25* 123:7 134:2,
*13* 140:4, 8 146:8
148:2*0* 149:*1*, 8, *16*
**understanding** 18:9
37:9, *11* 53:*18* 54:*4*,
*17* 57:*10* 58:24
62:*10* 68:*1*, *15*, *17*
79:*10* 88:6, *14* 92:*1*
97:*17*, *20* 100:*23*
105:24 106:*14* 109:8
134:*16*, *18* 138:5, *10*
143:*11*, *18* 144:*4*
147:2*1* 149:*13*
**understood** 54:*11*
**unfortunately** 108:*15*
**UNITED** 1:*1* 5:8
12:22 71:*11*, 20
72:22 89:*15* 120:8
141:7, *13* 146:2
**universities** 55:2, *17*
134:*12* 138:*12*
**UNIVERSITY** 1:*3*
2:*17* 5:7 102:*10*
**unlawful** 62:*16* 70:9
**unpack** 32:*11*
**unsolicited** 37:*3*
40:*10*
**updates** 98:*14*
**USC** 71:*24*
**USCIS** 14:2*3*
**use** 16:*4* 58:22
127:*12* 131:2*0* 141:*4*,
20

**uses** 140:5
**usual** 93:22
**usually** 16:*17* 39:*12*
93:2*1* 94:8 117:*12*
122:2*0*

**< V >**
**varied** 49:*16*
**variety** 92:*4*
**various** 33:22 70:2
140:*3*
**verbal** 6:*18*
**verify** 61:5 65:25
**verifying** 65:*11*
**version** 131:*1*
**versus** 5:7
**vetting** 11:*17*, *24*, *25*
12:8 13:5 42:5, *7*, *9*
43:*11*, *16* 48:2*0* 51:*1*,
*2* 63:*12* 93:*24* 132:*3*,
*7*, *13* 144:*12*
**VIDEO** 3:22 5:5, *14*
**VIDEOGRAPHER**
5:2 24:*10*, *13* 47:*1*, *4*
95:*10* 100:*1*, *4* 117:2,
*5* 150:24 151:2, *11*
**Videotaped** 1:*10*
**view** 47:9 56:24
62:*17* 70:9 97:22
111:*14* 149:7
**viewed** 138:*11*
**views** 61:*12* 91:*12*
**violate** 139:*3*
**violation** 125:*14*
**violence** 144:2*1*
149:2*0*
**violent** 144:*13*
**Visa** 8:22 9:2*1*, *25*
10:*13*, *24*, *25* 11:*14*,
*20*, *24* 12:*1*, *21*, *23*
13:6, *7*, *12*, *15*, *16*, *18*,
*21*, *25* 14:*1*, *3*, *6*, *12*,
*15*, *24*, *25* 15:*3*, *6*, *10*,
*11*, *22*, *24* 16:8, *10*, *25*
17:*12*, *13*, *16*, *19*, *20*
18:6, *10*, *11*, *22* 19:2,
*5*, *8*, *12* 20:*14* 21:5,
*13*, *16* 22:2*1* 23:5, *8*
24:*19* 25:7 26:*3*, *9*,
*15*, *19*, *24* 27:5, *8*, *25*

Case 1:25-cv-10685-WGY    Document 108-11    Filed 07/07/25    Page 218 of 863
Deposition of Stuart Wilson                                    AAUP, et al. v. Rubio, et al.

CONFIDENTIAL

29:8, 18   30:4, 6, 11,
16   31:1, 11   32:1, 4, 8,
15, 20, 24   33:3, 7, 12
34:1   35:10, 21   36:5,
12, 19, 23   37:2, 20
38:22   39:9   40:8, 13,
14   41:9, 19   42:11, 19
43:6, 7   48:21   49:5, 8,
14   50:19   52:2, 12
53:5, 11   55:15   56:11,
13, 21, 22   57:8, 9
58:16   59:19   60:7
61:25   65:24   66:6, 10,
23   68:11   70:24
71:19   73:7   76:1, 5, 7
77:24   79:16, 22
82:19   93:2, 17   100:9
101:9, 20   104:16
108:19   112:17
113:20   114:17
115:19   116:7   117:22
118:14   119:2, 17, 21,
22   120:13, 20, 24
121:12   122:10   123:6
124:16, 17, 20, 21
125:2, 7, 14, 15, 16, 18
126:6   128:9, 19
130:14   133:13, 17, 19
135:7, 22   136:6, 9, 10
137:11, 18, 21   138:7,
21   139:1, 4, 7, 19
140:23, 24   141:4, 6,
12, 14, 18, 22, 24
142:4, 21   143:2, 4
144:7   145:8   149:10
**Visas**   13:9   14:5
15:18, 20   16:9, 21
20:2, 4   21:19   22:16
23:6   32:18   33:5
53:16   54:6   65:18, 21
69:8, 22   70:1   73:7
124:21   125:2   126:17,
22   127:9, 21   128:18
133:14
**Visa's**   22:17
**Visas's**   53:20
**voice**   17:11
**VO's**   15:20

**< W >**
**wait**   97:1
**walk**   134:2
**want**   6:22   10:8, 21
46:21, 24   47:7   48:4,
13   63:21   70:12
95:23, 25   96:15, 17
97:21   110:17   116:25
135:1   136:16   144:10,
11, 17   147:17   150:22
**wanted**   95:24
**warrant**   57:2
**Washington**   1:15
3:7, 18   5:12
**watching**   94:8
**Watson**   8:17   50:17
52:1, 11, 18, 20   55:23
57:15
**way**   49:12   91:17
107:22   125:15
141:13   147:4   148:13
**ways**   74:8, 16
121:18, 21   122:19
130:19   138:19   139:3
**webinar**   94:7, 20, 21
**webinars**   74:17, 20
75:2   93:5, 6, 18
**website**   111:14, 19,
23   112:6, 7   121:21
**Wednesday**   97:1
**week**   81:14
**Weekly**   123:1, 2
**weeks**   83:18, 24
**well**   7:18   19:4
27:23   28:11, 12   30:5
32:20   33:5   35:2
40:6   42:25   56:23
58:20   62:11   71:2
73:3   80:1   82:20
99:5   106:4   108:3
117:21   118:20   121:8
122:2   123:12   128:12
130:4   136:2   138:4
143:25   144:8   145:2,
11   149:6   150:18
**went**   78:10   84:24
104:17, 18, 20   130:23
**we're**   10:14   24:14
29:1   46:21, 25   47:5
48:3, 14   57:18   58:18

68:7   70:1   71:6, 17
73:4   96:9, 11, 24
99:24   100:5   117:6
119:15   127:24
136:20   150:25   151:3
**we've**   28:18   35:3
36:18   93:12   98:11
113:8
**WGY**   1:6
**WHEREOF**   154:12
**White**   16:22, 25
29:25   30:3, 10
**wholistically**   144:16
**wife**   105:11, 12
**WILKENS**   2:14
95:16   96:18, 21
99:13, 24
**Wilsen**   6:5
**WILSON**   1:10   4:3
5:6, 20   26:14   29:16
46:11   56:7   58:1
95:13, 19   96:1, 7
98:10   99:11   113:3
136:17, 18   137:4, 8
**window**   22:22
**wing**   130:13
**withdrawn**   7:18
9:21   26:2   31:24
58:21   71:16   73:3
93:16   103:25   115:5
121:17   123:19   138:5
142:20
**WITNESS**   4:3   5:19,
21, 25   17:25   23:12
27:9   28:10   44:19
45:11   46:15   91:8
95:17, 21   100:19
115:13   136:14
147:17   150:20
154:12
**word**   16:3   149:11
**words**   21:23   22:21
34:25   65:3   90:20
97:16   103:19   109:2
**work**   9:20   20:10
30:15   58:14   112:9
122:8, 13, 17   123:8
124:14   125:3, 11
127:2, 20   128:1, 11,

25   130:15   138:25
**worked**   104:9, 16, 19
**workers**   118:18
119:2
**working**   21:5   22:15
113:6   139:1
**workplace**   140:10
149:22
**works**   10:3   30:3, 10
**write**   62:22   63:1, 5
**writes**   63:8   64:17, 19
126:16
**writing**   78:6
**wrong**   16:3   69:14
116:7   130:1   132:12
**ws**   50:12

**< Y >**
**Yeah**   27:15   46:23
94:14   97:5   99:16
100:16   137:1   150:15
**year**   9:10   59:11
**years**   20:11   27:2
67:25
**York**   2:8, 20
**Young**   47:13   96:3

## WORD LIST

**< 1 >**
**1** *(5)*
**1:25-cv-10685** *(1)*
**10** *(5)*
**10:11** *(2)*
**10:30** *(2)*
**10:40** *(1)*
**100** *(1)*
**10004** *(1)*
**10115** *(1)*
**102** *(1)*
**10685** *(1)*
**10th** *(1)*
**11:03** *(1)*
**11:04** *(1)*
**11:30** *(1)*
**1182** *(1)*
**12:29** *(2)*
**125** *(1)*
**125-CV** *(1)*
**129** *(1)*
**13:49** *(1)*
**13th** *(2)*
**14:18** *(1)*
**14161** *(12)*
**14188** *(10)*
**15** *(2)*
**15:00** *(1)*
**15:04** *(1)*
**15:05** *(1)*
**1615** *(2)*
**1991** *(1)*
**19th** *(1)*

**< 2 >**
**2** *(4)*
**2:08** *(2)*
**20006** *(1)*
**20036** *(1)*
**20044** *(1)*
**202** *(2)*
**202-2600** *(1)*
**2025** *(5)*
**2029** *(1)*
**212** *(3)*
**23** *(7)*
**23rd** *(1)*

**24** *(2)*
**25** *(2)*
**25th** *(1)*
**2nd** *(1)*

**< 3 >**
**3** *(3)*
**3:05** *(1)*
**30** *(1)*
**302** *(1)*
**3C** *(111)*

**< 4 >**
**4** *(2)*
**400** *(1)*
**45** *(1)*
**475** *(1)*
**4C** *(20)*

**< 5 >**
**5** *(6)*
**5194** *(1)*
**59756** *(3)*

**< 6 >**
**6** *(1)*
**600** *(1)*
**616-8779** *(2)*
**646** *(1)*

**< 7 >**
**7** *(1)*
**745-8500** *(1)*
**7th** *(20)*

**< 8 >**
**8** *(1)*
**878** *(1)*

**< 9 >**
**90** *(2)*

**< A >**
**a.m** *(4)*
**ability** *(4)*
**able** *(4)*
**abreast** *(1)*
**abroad** *(1)*
**absolutely** *(2)*

**abstract** *(1)*
**abuse** *(1)*
**access** *(1)*
**accurate** *(2)*
**accurately** *(1)*
**ACKNOWLEDGMENT** *(1)*
**Aconlon@shertremonte.com** *(1)*
**acted** *(1)*
**acting** *(3)*
**Action** *(25)*
**actions** *(4)*
**active** *(2)*
**actively** *(3)*
**activism** *(24)*
**activist** *(2)*
**activists** *(5)*
**activities** *(7)*
**activity** *(10)*
**add** *(2)*
**address** *(3)*
**addresses** *(2)*
**adjudicating** *(1)*
**administration** *(3)*
**ADVISER** *(1)*
**advisors** *(1)*
**advocacy** *(1)*
**AEO** *(1)*
**AFFAIRS** *(16)*
**affect** *(1)*
**affixed** *(1)*
**afternoon** *(1)*
**agencies** *(9)*
**aggressive** *(1)*
**aggressiveness** *(1)*
**ago** *(6)*
**agree** *(2)*
**ahead** *(3)*
**aimed** *(1)*
**AL** *(4)*
**Alex** *(1)*
**ALEXANDRA** *(1)*
**ALINA** *(2)*
**allegation** *(3)*
**allegations** *(1)*
**alleged** *(1)*
**allowed** *(1)*
**allowing** *(1)*

**altered** *(1)*
**AMENDMENT** *(1)*
**America** *(1)*
**AMERICAN** *(4)*
**amount** *(3)*
**analyzed** *(1)*
**and/or** *(2)*
**Andre** *(2)*
**Andrea** *(1)*
**announces** *(1)*
**answer** *(51)*
**answered** *(4)*
**answering** *(2)*
**answers** *(1)*
**anti-American** *(1)*
**anti-Israel** *(1)*
**anti-Semitic** *(1)*
**anti-Semitism** *(19)*
**anybody** *(3)*
**anymore** *(1)*
**apart** *(15)*
**apologize** *(1)*
**appear** *(4)*
**APPEARANCES** *(3)*
**appearing** *(1)*
**appears** *(1)*
**applicant** *(22)*
**applicants** *(12)*
**applicant's** *(2)*
**application** *(9)*
**applications** *(1)*
**applied** *(2)*
**apply** *(3)*
**applying** *(2)*
**appreciate** *(2)*
**appreciating** *(1)*
**approved** *(2)*
**approver** *(1)*
**approves** *(2)*
**Approximately** *(8)*
**approximating** *(1)*
**April** *(7)*
**argument** *(1)*
**Argumentative** *(1)*
**Armstrong** *(10)*
**arrested** *(1)*
**arrived** *(1)*
**arriving** *(1)*
**art** *(1)*

Article *(1)*
articulated *(1)*
aside *(4)*
asked *(11)*
asking *(22)*
assert *(1)*
asserted *(1)*
assertions *(1)*
assessing *(2)*
assessment *(1)*
ASSISTANT *(4)*
associated *(1)*
ASSOCIATION *(2)*
assume *(1)*
attached *(1)*
attempt *(1)*
attention *(4)*
attributed *(1)*
authenticity *(1)*
authority *(15)*
automatically *(1)*
available *(5)*
aware *(31)*

< B >
back *(17)*
bank *(1)*
base *(1)*
based *(14)*
basic *(1)*
basis *(20)*
baskets *(2)*
bears *(1)*
beginning *(2)*
behalf *(5)*
behaving *(1)*
behavior *(1)*
believe *(29)*
Benjamin *(1)*
best *(3)*
bet *(1)*
better *(4)*
bit *(2)*
blur *(1)*
board *(2)*
Bob *(6)*
bound *(1)*
BOX *(1)*
break *(27)*

Brenda *(2)*
brief *(1)*
Broad *(1)*
broader *(1)*
brought *(7)*
Bureau *(11)*
bureaucracy *(1)*

< C >
Cable *(20)*
cables *(34)*
call *(9)*
called *(3)*
calling *(2)*
Calls *(85)*
campus *(3)*
campuses *(1)*
capacity *(6)*
caption *(1)*
card *(1)*
cards *(7)*
career *(1)*
carries *(1)*
carry *(1)*
CASAC *(3)*
Case *(32)*
cases *(16)*
CaseViewNet *(1)*
category *(1)*
causal *(1)*
causes *(1)*
Center *(2)*
certain *(10)*
Certainly *(1)*
certainty *(2)*
CERTIFICATE *(1)*
certify *(2)*
chain *(4)*
challenge *(1)*
chance *(1)*
change *(2)*
Changed *(3)*
changes *(6)*
characterization *(1)*
characterize *(5)*
charge *(1)*
charged *(1)*
charges *(2)*
check *(5)*

checked *(1)*
Christmas *(1)*
circumstance *(1)*
circumstances *(4)*
citizen *(3)*
citizens *(5)*
Civil *(1)*
clarification *(1)*
clarify *(3)*
clarifying *(1)*
clarity *(1)*
classification *(4)*
clear *(4)*
clearance *(2)*
cleared *(4)*
clearing *(3)*
clip *(1)*
clippings *(2)*
clips *(1)*
clue *(1)*
codified *(1)*
collaborate *(1)*
collaboration *(2)*
colleague *(1)*
colleagues *(4)*
collection *(1)*
college *(1)*
colleges *(2)*
COLON *(2)*
Columbia *(2)*
combatting *(1)*
come *(8)*
comes *(6)*
coming *(4)*
command *(1)*
commission *(1)*
common *(1)*
communicating *(2)*
compel *(1)*
compiled *(1)*
compiles *(1)*
complaint *(1)*
completely *(1)*
complex *(2)*
compliant *(1)*
complicated *(2)*
complying *(3)*
comport *(1)*
comports *(1)*

concern *(4)*
concerning *(27)*
concerns *(8)*
concluded *(1)*
conclusion *(2)*
conduct *(4)*
confer *(1)*
conferences *(2)*
conferring *(1)*
CONFIDENTIAL *(1)*
conformed *(1)*
confused *(1)*
confusing *(1)*
confusion *(1)*
CONLON *(247)*
connection *(1)*
consider *(4)*
considerable *(1)*
considerably *(1)*
considered *(1)*
consistent *(10)*
CONSULAR *(20)*
consult *(1)*
consulted *(2)*
consulting *(1)*
contact *(3)*
contained *(2)*
Contemplate *(1)*
contemplating *(2)*
contemporaneous *(1)*
content *(10)*
context *(5)*
continue *(1)*
Continued *(1)*
contours *(1)*
contrary *(11)*
contribute *(8)*
contributed *(2)*
control *(2)*
convened *(1)*
conveyed *(2)*
conveying *(2)*
cooperation *(1)*
coordinates *(1)*
coordination *(1)*
copy *(1)*
Correct *(74)*
corrections *(1)*
correctly *(1)*

corresponding  (2)
COUNSEL  (15)
counselor  (3)
counter  (1)
country  (1)
course  (12)
courses  (1)
COURT  (16)
covers  (1)
create  (1)
created  (5)
creates  (1)
creating  (3)
creation  (4)
crime  (1)
criminal  (5)
current  (3)

< D >
D.C  (2)
daily  (2)
DAS  (1)
database  (5)
databases  (5)
date  (5)
dates  (1)
day  (2)
daylight  (1)
days  (1)
DC  (2)
deal  (1)
dealing  (1)
deals  (1)
dealt  (1)
decide  (1)
decides  (1)
decision  (8)
decisions  (8)
deemed  (1)
deep  (1)
defend  (1)
Defendants  (3)
defending  (2)
Defense  (1)
define  (1)
definite  (1)
degrees  (1)
delivered  (3)
denote  (1)

DEPARTMENT  (82)
Department's  (2)
depend  (2)
dependent  (1)
depending  (3)
depends  (4)
DEPONENT  (1)
deported  (1)
deposed  (2)
deposition  (10)
depositions  (1)
Deputy  (4)
describe  (1)
described  (4)
description  (2)
designation  (3)
details  (4)
determination  (10)
determinations  (2)
determine  (9)
determines  (1)
determining  (1)
develop  (6)
developed  (9)
developing  (5)
development  (2)
DHS  (8)
different  (21)
difficult  (4)
DIRECT  (3)
directed  (1)
direction  (3)
directive  (2)
directly  (9)
director  (23)
directorate  (9)
directorates  (2)
directors  (4)
directs  (1)
discovery  (2)
discuss  (3)
discussed  (6)
discussing  (3)
discussion  (3)
discussions  (1)
disrupt  (1)
distant  (1)
DISTRICT  (5)
dive  (1)

divided  (1)
DIVISION  (1)
divulge  (1)
document  (16)
documentation  (1)
documents  (2)
doing  (1)
DOJ  (2)
domestic  (4)
domestically  (1)
door  (1)
draft  (4)
drafted  (1)
draw  (1)
Drive  (1)
driving  (6)
dropped  (1)
Drunk  (5)
duly  (1)
duties  (1)

< E >
E.O  (12)
Earlier  (5)
early  (3)
Eastern  (1)
Education  (1)
either  (8)
ELDRED  (3)
electronically  (2)
elements  (1)
elevator  (1)
elicit  (1)
eluded  (1)
eluding  (1)
E-mail  (3)
emphasize  (1)
employed  (1)
employee  (3)
employees  (2)
employers  (2)
enacted  (1)
enforcement  (43)
engage  (2)
engaged  (2)
engaging  (1)
enter  (2)
entered  (1)
entering  (1)

environment  (9)
environments  (1)
equal  (1)
equivalent  (1)
Errata  (1)
escapes  (1)
ESQUIRE  (7)
essential  (2)
essentially  (1)
established  (3)
estimation  (1)
ET  (4)
event  (1)
Everest  (2)
Everybody  (2)
evidence  (3)
exact  (1)
Exactly  (2)
EXAMINATION  (3)
examine  (1)
examined  (1)
example  (6)
examples  (6)
Excuse  (2)
excused  (1)
executive  (33)
executives  (2)
Exhibit  (8)
exhibits  (3)
existed  (1)
exists  (1)
Expanding  (2)
expect  (1)
expected  (1)
expedite  (1)
experience  (8)
expires  (1)
explain  (1)
explains  (2)
expressed  (2)
expressing  (1)
extend  (1)
extent  (18)

< F >
fact  (4)
fact-finding  (8)
factious  (1)
factors  (1)

facts  (2)
Fair  (2)
fall  (1)
falling  (1)
falls  (1)
FAM  (5)
familiar  (6)
familiarity  (1)
far  (5)
favor  (1)
FBI  (2)
February  (6)
feeling  (1)
feels  (2)
fell  (1)
FEOC  (1)
fewer  (2)
field  (9)
Figel  (1)
final  (1)
finalized  (1)
financial  (1)
find  (4)
finders  (3)
fine  (7)
finish  (2)
finished  (1)
FIRST  (7)
flag  (3)
Floor  (22)
FMJ  (3)
focus  (1)
focusing  (1)
focussing  (1)
follows  (1)
food  (1)
foregoing  (3)
Foreign  (56)
forgive  (1)
Form  (85)
formed  (1)
former  (1)
forth  (2)
forward  (6)
forwarded  (1)
foundation  (1)
four  (1)
fourth  (1)
frame  (1)

Franklin  (1)
Frederick  (1)
frequently  (2)
front  (10)
frown  (1)
full  (3)
function  (1)
functions  (1)
further  (2)
fuss  (1)

< G >
Gang  (2)
gangs  (1)
gears  (1)
general  (3)
generally  (3)
getting  (3)
give  (11)
given  (10)
gives  (6)
giving  (2)
global  (1)
go  (22)
goes  (4)
going  (30)
good  (3)
Gosh  (3)
Government  (5)
Governmental  (1)
Government's  (1)
grade  (1)
great  (2)
green  (8)
gross  (1)
groups  (1)
guess  (4)
Guessing  (1)
guidance  (27)
guys  (1)

< H >
Haiti  (2)
Haitian  (1)
half  (2)
Hamas  (8)
hand  (1)
handed  (1)
handful  (2)

handle  (1)
handled  (1)
Hansen  (1)
happen  (3)
happened  (1)
Happens  (2)
happy  (1)
harassment  (2)
hard  (1)
hear  (2)
heard  (5)
Hearsay  (1)
held  (1)
help  (4)
helped  (3)
helpful  (2)
Henderson  (11)
hereunto  (1)
hesitating  (1)
high  (2)
higher  (2)
history  (4)
holder  (9)
holders  (19)
holder's  (2)
Homeland  (59)
hostile  (9)
hour  (1)
House  (5)
human  (1)
hundreds  (1)
hypothetical  (2)
hypothetically  (2)

< I >
idea  (4)
ideal  (1)
identify  (1)
identifying  (1)
illegal  (3)
immediate  (1)
immediately  (4)
immigration  (1)
impetus  (1)
implement  (6)
implementation  (1)
implemented  (1)
implicating  (1)
implication  (1)

import  (2)
importance  (1)
important  (2)
importing  (1)
INA  (4)
inappropriate  (1)
Inaudible  (2)
include  (7)
included  (1)
includes  (2)
including  (1)
inconsistent  (11)
incorrect  (1)
increase  (1)
INDEX  (2)
indicated  (1)
Indirectly  (2)
individual  (5)
individuals  (3)
indulging  (1)
influence  (1)
influx  (1)
information  (58)
informed  (1)
informing  (1)
infraction  (1)
infractions  (19)
infringes  (1)
infringing  (1)
initial  (1)
initially  (2)
initiative  (1)
input  (6)
insert  (1)
instances  (2)
instant  (1)
INSTITUTE  (1)
instruct  (2)
instruction  (1)
instructions  (1)
insufficiently  (1)
intended  (1)
interactions  (1)
interagency  (1)
interest  (17)
interested  (4)
interests  (5)
internally  (2)
interpretation  (1)

interrupt  *(1)*
interruption  *(1)*
interview  *(1)*
investigate  *(1)*
investigating  *(3)*
involve  *(5)*
involved  *(11)*
involvement  *(9)*
involving  *(1)*
Israel  *(9)*
issuance  *(3)*
issuances  *(1)*
issue  *(8)*
issued  *(29)*
issues  *(2)*
issuing  *(3)*
items  *(2)*
its  *(4)*

**< J >**
Jachim  *(23)*
Jachim's  *(3)*
JESSICA  *(7)*
Jessica.strokus@usdoj.
gov  *(1)*
job  *(8)*
John  *(7)*
joined  *(2)*
joining  *(1)*
JON  *(1)*
Judge  *(2)*
jump  *(1)*
June  *(4)*
junior  *(3)*
justice  *(1)*
JUSTICE/CIVIL  *(1)*

**< K >**
keep  *(1)*
Kellogg  *(1)*
Kentucky  *(1)*
Khalil  *(8)*
Khalil's  *(11)*
kicking  *(1)*
kind  *(6)*
kinds  *(6)*
kit  *(1)*
KNIGHT  *(1)*
know  *(80)*

knowledge  *(19)*
knows  *(1)*
Korea  *(1)*
KRISHNAN  *(2)*

**< L >**
labeled  *(1)*
lacks  *(1)*
laid  *(1)*
large  *(5)*
largely  *(1)*
larger  *(2)*
lastly  *(1)*
Late  *(1)*
law  *(46)*
lawful  *(17)*
lawyer  *(6)*
lawyers  *(2)*
layers  *(1)*
LCA  *(3)*
leader  *(1)*
leave  *(4)*
led  *(2)*
left  *(2)*
LEGAL  *(22)*
letters  *(2)*
Letting  *(1)*
level  *(6)*
light  *(1)*
limit  *(1)*
limited  *(1)*
line  *(4)*
list  *(29)*
listed  *(1)*
listing  *(1)*
lists  *(7)*
little  *(5)*
live  *(1)*
LLP  *(1)*
load  *(2)*
locked  *(1)*
long  *(13)*
longer  *(1)*
look  *(13)*
looked  *(1)*
looking  *(8)*
lose  *(2)*
lot  *(2)*
lots  *(2)*

LPR  *(1)*
lunch  *(2)*

**< M >**
Mahmoud  *(2)*
maintained  *(1)*
making  *(5)*
manages  *(1)*
managing  *(12)*
manner  *(3)*
Manual  *(9)*
March  *(12)*
MARCO  *(2)*
marcorubio  *(1)*
mark  *(1)*
marked  *(5)*
marks  *(1)*
MASSACHUSETTS  *(2)*
material  *(1)*
materials  *(13)*
Matt  *(1)*
Matter  *(3)*
mean  *(14)*
meaning  *(3)*
means  *(1)*
meant  *(1)*
measures  *(1)*
meat  *(1)*
media  *(1)*
medications  *(1)*
meeting  *(2)*
meetings  *(2)*
members  *(4)*
memo  *(16)*
memorialized  *(3)*
memory  *(3)*
memos  *(1)*
mention  *(1)*
mentioned  *(4)*
mentions  *(2)*
message  *(5)*
messages  *(11)*
method  *(3)*
Mexico  *(1)*
Mike  *(1)*
mind  *(5)*
minute  *(6)*
minutes  *(6)*

Mischaracterization  *(2)*
missing  *(1)*
mission  *(1)*
mistaken  *(1)*
misunderstanding  *(1)*
misused  *(1)*
Mm-hmm  *(7)*
moment  *(12)*
moments  *(1)*
month  *(2)*
months  *(2)*
Morris  *(1)*
Moscow  *(9)*
move  *(2)*
moving  *(1)*
MRN  *(4)*
multiple  *(1)*

**< N >**
name  *(21)*
names  *(5)*
NANCY  *(2)*
National  *(3)*
natures  *(1)*
necessarily  *(4)*
need  *(11)*
needed  *(1)*
Needham  *(4)*
needs  *(2)*
negative  *(1)*
neither  *(1)*
never  *(8)*
New  *(12)*
newest  *(1)*
non  *(1)*
noncriminal  *(3)*
nonimmigrant  *(2)*
nonVisa  *(2)*
Norris  *(17)*
Northwest  *(1)*
notarial  *(1)*
Notary  *(1)*
NOTE  *(2)*
noted  *(3)*
noticed  *(2)*
notify  *(1)*
notion  *(1)*
number  *(4)*

Deposition of Stuart Wilson                                              AAUP, et al. v. Rubio, et al.

NW  *(2)*
NY  *(2)*

**< O >**
object  *(4)*
objected  *(3)*
Objection  *(190)*
objections  *(6)*
observed  *(1)*
obstructing  *(1)*
obtain  *(1)*
obviously  *(2)*
occasion  *(2)*
occasions  *(1)*
OFFICE  *(107)*
officer  *(2)*
officers  *(1)*
offices  *(2)*
office's  *(3)*
official  *(13)*
officials  *(2)*
Oh  *(11)*
Okay  *(52)*
Okeemah  *(5)*
onboard  *(1)*
once  *(1)*
ones  *(3)*
online  *(2)*
open  *(1)*
Opened  *(1)*
operations  *(8)*
OPERATOR  *(1)*
opinion  *(4)*
opposed  *(4)*
option  *(1)*
order  *(9)*
orders  *(27)*
ordinarily  *(1)*
ordinary  *(1)*
organization  *(1)*
organizations  *(5)*
original  *(2)*
originally  *(1)*
originated  *(1)*
outcome  *(1)*
outside  *(4)*
overall  *(1)*
oversaw  *(1)*
overseas  *(4)*

oversee  *(4)*
overseen  *(1)*
oversees  *(2)*

**< P >**
P.L.L.C  *(1)*
p.m  *(6)*
package  *(3)*
packages  *(1)*
PAGE  *(8)*
pages  *(1)*
Palestine  *(8)*
Palestinian  *(1)*
paragraph  *(7)*
pardon  *(1)*
part  *(15)*
participate  *(2)*
participated  *(1)*
particular  *(24)*
particularly  *(1)*
parties  *(1)*
parts  *(1)*
pass  *(3)*
passes  *(2)*
passing  *(3)*
pause  *(5)*
pay  *(1)*
peer  *(1)*
pending  *(3)*
people  *(23)*
perceived  *(1)*
performed  *(1)*
period  *(2)*
permanent  *(21)*
permission  *(1)*
person  *(28)*
personal  *(3)*
personally  *(4)*
person's  *(10)*
Phone  *(1)*
photograph  *(1)*
phrase  *(3)*
physically  *(1)*
picks  *(1)*
picture  *(1)*
Pierce  *(1)*
place  *(2)*
places  *(1)*
Plaintiffs  *(4)*

plaintiff's  *(1)*
platform  *(1)*
play  *(4)*
please  *(7)*
plenty  *(1)*
plus  *(1)*
PO  *(1)*
point  *(10)*
pole  *(2)*
policies  *(44)*
Policy  *(122)*
political  *(8)*
pops  *(1)*
position  *(3)*
possible  *(3)*
possibly  *(1)*
post  *(10)*
posts  *(4)*
prefer  *(1)*
prepare  *(1)*
prepared  *(1)*
prerogative  *(1)*
PRESENT  *(2)*
presently  *(1)*
President  *(7)*
press  *(4)*
presumably  *(1)*
pretty  *(2)*
previous  *(1)*
principal  *(1)*
prior  *(2)*
privilege  *(23)*
privileged  *(12)*
probably  *(1)*
problem  *(1)*
procedure  *(2)*
procedures  *(4)*
process  *(10)*
produce  *(1)*
produced  *(1)*
production  *(1)*
PROFESSORS  *(2)*
prohibit  *(1)*
proPalestinian  *(1)*
proper  *(1)*
proposed  *(2)*
proposes  *(1)*
proposing  *(1)*
propounded  *(1)*

protect  *(1)*
protective  *(2)*
protester  *(5)*
protesters  *(6)*
protesting  *(1)*
provide  *(4)*
provided  *(7)*
provision  *(1)*
provisions  *(1)*
Public  *(16)*
publically  *(1)*
published  *(4)*
purpose  *(8)*
purposes  *(3)*
pursue  *(1)*
put  *(8)*
puts  *(2)*
putting  *(3)*

**< Q >**
qualified  *(1)*
qualifies  *(1)*
question  *(37)*
questioning  *(2)*
questions  *(9)*
quick  *(3)*
quickly  *(1)*
quite  *(1)*
quotation  *(1)*
quotations  *(1)*
quote  *(3)*

**< R >**
raise  *(1)*
raised  *(1)*
raising  *(1)*
RAMYA  *(2)*
rank  *(1)*
rare  *(1)*
rarely  *(1)*
RASSON  *(2)*
reaching  *(1)*
react  *(1)*
read  *(11)*
reading  *(2)*
real  *(3)*
really  *(1)*
Realtime  *(1)*
reason  *(7)*

| | | | |
|---|---|---|---|
| **reasons** *(3)* | **remind** *(1)* | **revocation** *(30)* | **seeing** *(4)* |
| **recall** *(39)* | **removability** *(5)* | **revocations** *(37)* | **seek** *(3)* |
| **receive** *(16)* | **removal** *(1)* | **revoke** *(16)* | **seeking** *(3)* |
| **received** *(37)* | **remove** *(1)* | **revoked** *(13)* | **seen** *(26)* |
| **receives** *(13)* | **renew** *(1)* | **Revoking** *(6)* | **Semitism** *(1)* |
| **receiving** *(7)* | **renewals** *(1)* | **reword** *(1)* | **send** *(5)* |
| **recite** *(2)* | **renewed** *(1)* | **Right** *(57)* | **sends** *(9)* |
| **recognize** *(2)* | **Renewing** *(2)* | **rights** *(2)* | **Senior** *(20)* |
| **recollection** *(3)* | **repeat** *(2)* | **Riverside** *(1)* | **seniority** *(1)* |
| **recommend** *(1)* | **rephrase** *(4)* | **Rob** *(1)* | **sense** *(3)* |
| **recommendation** *(10)* | **report** *(5)* | **Robert** *(2)* | **sensitivities** *(1)* |
| **recommendations** *(4)* | **Reported** *(1)* | **rodeo** *(1)* | **sent** *(8)* |
| **recommended** *(3)* | **Reporter** *(12)* | **role** *(33)* | **sentence** *(2)* |
| **recommending** *(6)* | **REPORTER'S** *(1)* | **roles** *(1)* | **sentiment** *(3)* |
| **recommends** *(3)* | **Reporting** *(2)* | **room** *(2)* | **Seoul** *(1)* |
| **record** *(40)* | **reports** *(1)* | **RPR** *(3)* | **separate** *(2)* |
| **recorded** *(1)* | **represent** *(1)* | **RRP** *(1)* | **separately** *(1)* |
| **recordkeeping** *(1)* | **represented** *(1)* | **RUBIO** *(27)* | **September** *(1)* |
| **records** *(3)* | **request** *(4)* | **Rubio's** *(5)* | **serious** *(1)* |
| **redirect** *(1)* | **requested** *(3)* | **rule** *(1)* | **Service** *(3)* |
| **reduced** *(2)* | **require** *(1)* | **rules** *(1)* | **set** *(11)* |
| **ref** *(3)* | **required** *(1)* | **run** *(3)* | **sets** *(1)* |
| **refer** *(5)* | **reserves** *(2)* | **running** *(1)* | **setting** *(2)* |
| **reference** *(4)* | **resident** *(9)* | **Russia** *(1)* | **sexual** *(1)* |
| **referenced** *(3)* | **residents** *(12)* | | **shared** *(3)* |
| **references** *(2)* | **resolution** *(1)* | **< S >** | **sharing** *(1)* |
| **referencing** *(1)* | **resolve** *(1)* | **SAC** *(9)* | **Sheet** *(1)* |
| **referral** *(21)* | **respect** *(5)* | **SAFAVI** *(26)* | **SHER** *(2)* |
| **referrals** *(15)* | **respond** *(2)* | **SARAH** *(2)* | **short** *(2)* |
| **referred** *(16)* | **response** *(20)* | **sat** *(1)* | **show** *(3)* |
| **referring** *(4)* | **responses** *(1)* | **saw** *(7)* | **side** *(4)* |
| **refers** *(1)* | **responsibilities** *(2)* | **saying** *(9)* | **Signature** *(1)* |
| **reflected** *(1)* | **responsibility** *(4)* | **says** *(4)* | **signing** *(3)* |
| **reflects** *(1)* | **responsible** *(7)* | **scholarly** *(1)* | **simply** *(1)* |
| **refresh** *(1)* | **responsive** *(7)* | **school** *(1)* | **Simultaneous** *(1)* |
| **regarding** *(9)* | **result** *(1)* | **SCOTT** *(2)* | **single** *(2)* |
| **reiterate** *(1)* | **resume** *(1)* | **Scott.wilkens@knightc** | **sir** *(1)* |
| **relate** *(4)* | **retaliation** *(1)* | **olumbia.org** *(1)* | **sit** *(1)* |
| **related** *(11)* | **return** *(2)* | **Screening** *(3)* | **sits** *(1)* |
| **relatedly** *(1)* | **returned** *(1)* | **scroll** *(1)* | **situated** *(1)* |
| **relates** *(3)* | **returning** *(2)* | **seal** *(1)* | **situation** *(2)* |
| **relating** *(18)* | **reveal** *(1)* | **second** *(8)* | **small** *(1)* |
| **relative** *(1)* | **revealing** *(6)* | **Secretary** *(73)* | **social** *(1)* |
| **relatively** *(1)* | **review** *(15)* | **Secretary's** *(10)* | **somebody** *(7)* |
| **relaying** *(1)* | **reviewed** *(6)* | **section** *(4)* | **sorry** *(38)* |
| **relevance** *(1)* | **reviewing** *(8)* | **sections** *(1)* | **sort** *(1)* |
| **relevant** *(11)* | **reviews** *(1)* | **security** *(73)* | **sought** *(1)* |
| **relitigate** *(1)* | **revised** *(1)* | **Security's** *(1)* | **sounds** *(2)* |
| **remember** *(12)* | **revisions** *(2)* | **see** *(27)* | **source** *(1)* |

sources *(1)*
speak *(9)*
speaking *(3)*
speaks *(1)*
special *(4)*
specialist *(1)*
specific *(4)*
specifically *(5)*
speculate *(4)*
Speculating *(1)*
Speculation *(95)*
speculative *(1)*
speech *(3)*
speeches *(1)*
spoken *(2)*
staff *(6)*
stage *(3)*
stake *(1)*
stand *(2)*
standing *(1)*
stands *(2)*
start *(2)*
started *(1)*
starting *(2)*
STATE *(81)*
state.gov *(4)*
stated *(1)*
statement *(5)*
statements *(17)*
STATES *(11)*
State's *(4)*
Station *(1)*
status *(2)*
stay *(2)*
stenographic *(1)*
stenographically *(1)*
stick *(1)*
sticking *(3)*
stop *(1)*
straightforward *(1)*
Street *(4)*
STROKUS *(196)*
STUART *(4)*
student *(43)*
students *(9)*
student's *(5)*
studies *(2)*
study *(1)*
studying *(2)*

stuff *(1)*
subject *(8)*
submitted *(1)*
substance *(1)*
suggested *(1)*
Suite *(2)*
summarize *(3)*
summer *(1)*
supervise *(1)*
supervisor *(1)*
supplemented *(1)*
support *(2)*
supported *(1)*
supporter *(1)*
supporters *(3)*
supportive *(1)*
suppose *(1)*
Sure *(26)*
suspended *(1)*
swear *(2)*
switch *(1)*
sworn *(2)*
system *(7)*
systems *(5)*

< T >
table *(1)*
take *(22)*
taken *(9)*
takes *(1)*
talk *(3)*
talked *(11)*
talking *(18)*
TALKOVSKY *(4)*
task *(2)*
tasked *(2)*
team *(6)*
technical *(1)*
tell *(8)*
telling *(1)*
temporary *(1)*
tenure *(2)*
term *(9)*
terms *(10)*
terrorism *(3)*
terrorist *(7)*
testified *(3)*
testify *(1)*
testifying *(3)*

testimony *(16)*
text *(2)*
Thank *(6)*
theme *(2)*
theoretically *(1)*
thing *(3)*
things *(9)*
think *(33)*
thinking *(3)*
thinks *(2)*
thought *(1)*
Three *(2)*
Thursday *(2)*
time *(50)*
timeline *(1)*
timer *(2)*
times *(5)*
title *(6)*
today *(7)*
Today's *(1)*
Todd *(1)*
told *(1)*
tools *(1)*
topics *(2)*
totality *(1)*
totally *(1)*
tracks *(1)*
trafficking *(3)*
trained *(1)*
trains *(2)*
transcript *(1)*
transcription *(1)*
transmitted *(1)*
transpired *(1)*
traveling *(1)*
TREMONTE *(2)*
trial *(1)*
trips *(1)*
troubling *(1)*
true *(2)*
Trump *(3)*
Trump's *(1)*
truthful *(1)*
truthfully *(1)*
trying *(2)*
Tuesday *(1)*
turn *(1)*
Tweet *(2)*
two *(17)*

type *(2)*
types *(4)*
typewriting *(1)*
typically *(9)*

< U >
U.S *(24)*
Uh-huh *(2)*
unanswered *(1)*
underlying *(1)*
undermines *(1)*
undermise *(1)*
understand *(33)*
understanding *(31)*
understood *(1)*
unfortunately *(1)*
UNITED *(11)*
universities *(4)*
UNIVERSITY *(4)*
unlawful *(2)*
unpack *(1)*
unsolicited *(2)*
updates *(1)*
USC *(1)*
USCIS *(1)*
use *(6)*
uses *(1)*
usual *(1)*
usually *(6)*

< V >
varied *(1)*
variety *(1)*
various *(3)*
verbal *(1)*
verify *(2)*
verifying *(1)*
version *(1)*
versus *(1)*
vetting *(19)*
VIDEO *(3)*
VIDEOGRAPHER *(13)*
Videotaped *(1)*
view *(7)*
viewed *(1)*
views *(2)*
violate *(1)*
violation *(1)*

violence  (2)
violent  (1)
Visa  (210)
Visas  (29)
Visa's  (1)
Visas's  (1)
voice  (1)
VO's  (1)

< W >
wait  (1)
walk  (1)
want  (24)
wanted  (1)
warrant  (1)
Washington  (4)
watching  (1)
Watson  (8)
way  (7)
ways  (8)
webinar  (3)
webinars  (6)
website  (6)
Wednesday  (1)
week  (1)
Weekly  (2)
weeks  (2)
well  (36)
went  (6)
we're  (26)
we've  (6)
WGY  (1)
WHEREOF  (1)
White  (5)
wholistically  (1)
wife  (2)
WILKENS  (6)
Wilsen  (1)
WILSON  (20)
window  (1)
wing  (1)
withdrawn  (14)
WITNESS  (20)
word  (2)
words  (8)
work  (19)
worked  (3)
workers  (2)
working  (4)

workplace  (2)
works  (3)
write  (3)
writes  (4)
writing  (1)
wrong  (5)
ws  (1)

< Y >
Yeah  (8)
year  (2)
years  (3)
York  (2)
Young  (2)

# EXHIBIT 5

```
 1            UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
 2     - - - - - - - - - - - - - - x
       AMERICAN ASSOCIATION OF          :
 3     UNIVERSITY PROFESSORS, ET
       AL,                              :
 4
             Plaintiffs,                :    Case No.
 5
          v.                            :
 6                                           1:25-cv-10685 (WGY)
       MARCO RUBIO, ET AL,              :
 7
             Defendants.                :
 8
       - - - - - - - - - - - - - - x
 9

10           Videotaped deposition of JOHN

11     ARMSTRONG, taken on behalf of the Plaintiffs,

12     beginning at 10:18 a.m., on Thursday, June 12,

13     2025, at the law offices of Kellogg, Hansen,

14     Todd, Figel & Frederick, P.L.L.C., 1615 M

15     Street, NW, Suite 400, Washington D.C. 20036,

16     before Okeemah S. Henderson, RRP, CaseViewNet

17     Realtime Reporter, and Notary Public for the

18     District of Columbia.

19     Everest Job No. 41659

20       (REPORTER'S NOTE: All quotations from exhibits

21     are reflected in the manner in which they were

22     read into the record and do not necessarily

23     denote an exact quote from the document.)

24

25     Reported by: Okeemah S. Henderson, RPR
```

```
 1   APPEARANCES OF COUNSEL

 2

 3      ON BEHALF OF THE PLAINTIFFS:

 4           ALEXANDRA CONLON, ESQUIRE

 5           COURTNEY GANS, ESQUIRE

 6           SHER TREMONTE, LLP

 7           90 Broad Street

 8           23rd Floor

 9           New York, NY 10004

10           Aconlon@shertremonte.com

11           (212) 202-2600

12

13

14      ON BEHALF OF THE PLAINTIFFS:

15            SCOTT WILKENS, ESQUIRE

16            RAMYA KRISHNAN, ESQUIRE

17            KNIGHT FIRST AMENDMENT INSTITUTE AT

18            COLUMBIA UNIVERSITY

19            475 Riverside Drive

20            Suite 302

21            New York, NY 10115

22            Scott.wilkens@knightcolumbia.org

23            (646) 745-8500

24

25
```

```
 1   APPEARANCES OF COUNSEL (Continued)

 2      ON BEHALF OF THE DEFENDANTS:

 3          VICTORIA SANTORA, ESQUIRE

 4          WILLIAM KANELLIS, ESQUIRE

 5          JESSICA STROKUS, ESQUIRE

 6          U.S. DEPARTMENT OF JUSTICE/CIVIL DIVISION

 7          Benjamin Franklin Station

 8          PO BOX 878

 9          Washington, DC 20044

10          E-mail: Victoria.santora@usdoj.gov

11          (202) 616-8779

12

13      ON BEHALF OF THE DEFENDANTS:

14          TAYLOR W. BEAUMONT, ESQUIRE

15          SARAH TALKOVSKY, ESQUIRE

16          U.S. DEPARTMENT OF STATE

17          OFFICE OF THE ASSISTANT LEGAL ADVISER

18          FOR CONSULAR AFFAIRS

19          600 19th Street, NW

20          Washington, DC 20006

21          E-mail: Beaumonttw@state.gov

22          (202) 616-8779

23

24      ALSO PRESENT:

25          ADAM NUDELMAN, VIDEO OPERATOR
```

1                    INDEX OF EXAMINATION

2

3    WITNESS: JOHN ARMSTRONG                          PAGE

4

5    DIRECT EXAMINATION

6        By Ms. Conlon                                6

7

8                    INDEX OF EXHIBITS

9            (Attached to the transcript)

10

11    EXHIBITS                                         PAGE

12    Exhibit 1    Declaration of John Armstrong      15

13    Exhibit 2    8 USC 1182 Inadmissible aliens
                    document                           69
14
     Exhibit 3    Certified Administrative record      85
15

16
     Exhibits 4-6 were referenced but not marked.
17

18

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S

 2              THE VIDEOGRAPHER: This is Media Unit

 3    No. 1 in the videotaped deposition of John

 4    Armstrong in the matter of American Association

 5    of University Professors, et al., versus Marco

 6    Rubio, et al in the U.S. District Court for the

 7    District of Massachusetts.  Case No.

 8    1:25-CV-108 -- I'm sorry -- -10685.

 9              Today's date is June 12, 2025.

10    Time on the record is 10:18 a.m.  This

11    deposition is taking place at the offices of

12    Kellogg Hansen, Todd, 1615 M Street Northwest,

13    Washington, D.C.  The videographer today is

14    Adam Nudelman with Everest.

15              Would all attorneys present please

16    identify themselves, state whom they represent,

17    beginning with the party noticing this

18    proceeding.

19              MS. CONLON:  Okay.  I'll start.  I'm

20    Alexandra Conlon with Sher Tremonte

21    representing the plaintiffs.

22              MR. WILKENS: Scott Wilkens with the

23    Knight First Amendment Institute representing

24    the plaintiffs.

25              MS. KRISHNAN: Ramya Krishnan also
```

1    with the Knight Institute representing the

2    plaintiffs.

3            MS. GANS: And Courtney Gans with Sher

4    Tremonte representing the plaintiffs.

5            MS. SANTORA: Victoria Santora,

6    Department of Justice representing defendants.

7            MR. BEAUMONT:  Taylor Beaumont,

8    Department of State, counsel for defendants.

9            MS. TALKOVSKY:  Sarah Talkovsky

10   counsel for Department of State, the

11   defendants.

12           MS. STROKUS:  Jessica Strokus from

13   DOJ representing the defendants.

14           THE VIDEOGRAPHER: Court reporter

15   today Okeemah Henderson also with Everest will

16   now administer the oath.  You can proceed.

17                   JOHN ARMSTRONG,

18   was called as a witness, and having been first

19   duly sworn, was examined and testified as

20   follows:

21                   EXAMINATION

22   BY MS. CONLON:

23           Q.   Good morning.

24           A.   Good morning.

25           Q.   Have you been deposed before?

 1              A.    Yes.

 2              Q.    Recently?

 3              A.    No.

 4              Q.    I'm just going to review

 5     deposition basics for one moment so we are on

 6     the same page.  Because Ms. Henderson, our

 7     court reporter, is taking down everything you

 8     say, please give verbal responses so they're

 9     reflected in the transcript.

10          If you don't understand the question

11     that I ask, please let me know, and I will do

12     my best to rephrase.

13          If you want a break at any point also

14     just let us know.  If a question is pending

15     I'll ask that you answer it before then, but we

16     can break any time.

17              I have to ask this every time.  Are you

18     taking any medication that could affect your

19     ability to testify truthfully today

20              A.    No.

21              Q.    Is there any reason why you

22     couldn't provide truthful testimony today?

23              A.    No.

24              Q.    Okay.  Great so Mr. Armstrong,

25     you said you have been deposed before, can you

```
 1   tell me approximately when that was?

 2             A.   Approximately ten years ago.

 3             Q.   Did it have anything to do with

 4   your work?

 5             A.   Yes.

 6             Q.   Do you recall what case that

 7   was in?

 8             A.   No.

 9             Q.   Have you ever testified in a

10   court?

11             A.   Yes.

12             Q.   When was that?

13             A.   Approximately 12 years ago.

14             Q.   Not since then?

15             A.   No.

16             Q.   Was that also in connection

17   with your work?

18             A.   Yes.

19             Q.   Today you're here with a number

20   of attorneys, and I'm sure they'll advise you

21   about what to answer and what not to, but I

22   just want to start with asking whether you

23   spoke with anyone about your testimony here

24   today before coming to testify?

25             A.   Yes.
```

```
 1                Q.   Who did you speak with?

 2                A.   I spoke with the attorneys from

 3      the Government.  I spoke with my wife.  I

 4      mentioned it to many colleagues at work.  I

 5      don't know -- recall all of them, but they need

 6      to know are I am.

 7                Q.   Did you discuss the expected

 8      substance of your testimony with any of your

 9      colleagues from work?

10                A.   With the attorneys.

11                Q.   With anyone who wasn't a

12      lawyer?

13                A.   Yes.

14                Q.   Who did you speak about the

15      likely subject matter of your testimony with

16      from work?

17                A.   The ones that I recall to the

18      best of my recollection are my deputy; one of

19      the other people who works in the front office,

20      Stuart Wilson; and a person who works for

21      Stuart, Jessica Norris, who is the managing

22      director.

23                Q.   Who is your deputy?

24                A.   Matthew Pierce.

25                Q.   And you mentioned that Mr.
```

1    Wilson works in the front office.  What does

2    "front office" mean?

3              A.   It's the part of the Bureau of

4    Consular Affairs where the leadership works.

5              Q.   Is that where you also work?

6              A.   Yes.

7              Q.   Did you speak with any of your

8    colleagues about the likely subject of your

9    testimony apart from Mr. Piece, Mr. Wilson and

10   Ms. Norris?

11             A.   I don't remember.

12             Q.   Please describe the

13   conversation you had with Mr. Pierce about the

14   testimony you expected to give today?

15             A.   That would I would be

16   testifying and that it would involve the

17   revocation of Visas or being deposed.

18             Q.   Did you have a brief

19   discussion, lengthy discussion?

20             A.   Could you define.

21             MS. SANTORA:  Objection.  Form.

22   BY MS. CONLON:

23             Q.   Sure.  How long did you speak

24   with Mr. Piece about that for?

25             A.   In my recollection perhaps two

1    minutes.

2            Q.    Okay.  Well, I would describe

3    that as brief.  How long did you speak with Mr.

4    Wilson about your testimony here today?

5            A.    About the same as with

6    Mr. Pierce.

7            Q.    And what about with Ms. Norris?

8            A.    Maybe three minutes, four,

9    three to four minutes.

10           Q.    Appreciate your precision.  Did

11    any of the three people that you spoke to about

12    your testimony here today give you any input --

13    withdrawn.

14        Did any of people who you spoke with

15    that we just discussed give you any

16    instructions about topics you should or

17    shouldn't address in your testimony?

18           A.    I'm not sure I understand the

19    question.

20           Q.    Sure.  What was the response

21    that Mr. Pierce gave you in the conversation

22    that you had about your testimony?

23           A.    He understood that he would

24    have to cover my duties because I cannot do my

25    duties while I'm here.  As my deputy.

```
 1              Q.    What was Mr. Wilson's response

 2     in the conversation that you had about your

 3     testimony today?

 4              A.    He wished me luck.

 5              Q.    Anything else?

 6              A.    No.

 7              Q.    What about Ms. Norris?

 8              A.    Ms. Norris also wished me luck.

 9              Q.    Did she say anything else in

10     response to you telling her that you would be

11     testifying today about Visa revocations?

12              A.    She advised me not to drink a

13     lot of caffeine before the testimony.

14              Q.    Good advice.  Now, your

15     attorneys may object to this question, but not

16     all of your conversations with lawyer are

17     privileged, so to the extent that you can

18     answer, what did you discuss with your lawyers

19     about testifying here today?

20              MS. SANTORA:  Objection.  Calls for

21     information covered by the attorney-client

22     privilege.

23     BY MS. CONLON:

24              Q.    I'm specifically trying to

25     exclude that, but, as you know, not all
```

 1    conversations between a lawyer and their client

 2    are privileged, so to the extent you can answer

 3    if there's anything you can say I would be

 4    interested in hearing it.

 5            MS. SANTORA:  So I just want to

 6    clarify.  You're asking about conversations

 7    with attorneys that were not about the legal --

 8            MS. CONLON:  Not the advice, not the

 9    advice that was given.  So I can be more

10    concrete.

11    BY MS. CONLON:

12            Q.   How many times did you meet

13    with the lawyers for the government before

14    coming to testified to?

15            A.   To my recollection, once.

16            Q.   And when was that?

17            A.   I believe it was on Tuesday.

18            Q.   This week?

19            A.   Yes.  I believe it was this

20    week.

21            Q.   And how long was that meeting?

22            A.   According to my recollection, I

23    believe the meeting lasted approximately two

24    hours and 45 minutes, give or take.

25            Q.   In the course of that meeting

1    or any other conversations with your lawyers,

2    were you reviewing any documents to prepare to

3    testify?

4            A.    Documents were shown to me.

5    That is what I recall.

6            Q.    Do you recall which documents

7    were shown to you?

8            MS. SANTORA:    Objection.    Calls for

9    information that's privileged by the

10   attorney-client privilege.

11   BY MS. CONLON:

12           Q.    Regardless of whether they were

13   shown to you by your lawyers or not, what

14   documents did you review to prepare to

15   testified today?

16           MS. SANTORA:    Objection.    Form.

17   Objection.    Foundation.

18   BY MS. CONLON:

19           Q.    What documents did you review,

20   if any, to prepare to testified today?

21           A.    I reviewed briefly what my

22   lawyers showed me or the government lawyers

23   showed me.

24           Q.    Do you recall submitting a

25   declaration in this case?

```
 1                A.   I recall submitting

 2   declarations in a number of cases.

 3                Q.   If I were to give you a copy of

 4   your declaration would that refresh your

 5   recollection?

 6                A.   It might.

 7                Q.   I have a copy for you, and this

 8   is a copy for Ms. Henderson.

 9                (Exhibit 1 was marked.)

10                THE WITNESS:  I would like to review

11   the document.

12                MS. CONLON:  Take your time.

13   BY MS. CONLON:

14                Q.   Have you had a chance to review

15   this document?

16                A.   Yes, I have.

17                Q.   Do you recognize this?

18                A.   I do.

19                Q.   And what do you recognize it to

20   be?

21                A.   The one part I don't recognize

22   is the first page that was added to it.  It is

23   a declaration that I signed involving a court

24   case.

25                Q.   Is this a true and accurate
```

1    copy of the declaration that you signed?

2                A.    I believe it is a true and

3    accurate copy.

4                Q.    Okay.  And it's been marked as

5    Exhibit 1.  Sorry.  Thank you.

6                A.    Sorry.

7                Q.    Before we get into the

8    substance of your declaration did any of the

9    documents that you reviewed before testifying

10   help refresh your recollection about the events

11   at issue?

12               A.    As I recall, the discussion

13   that took place on Tuesday, there were

14   documents that did help refresh my

15   recollection.

16               Q.    Do you recall which documents

17   helped refresh your recollection?

18               A.    No.

19               Q.    When is the last time that you

20   saw the declaration in this case?  Exhibit 1.

21               A.    Thank you for clarifying.  I

22   don't recall exactly.

23               Q.    Okay.  So let's turn to your

24   declaration and use that to talk about your

25   work.  So in the first paragraph it states that

1    you are [As read] "the senior bureau official

2    within the U.S. Department of State Bureau of

3    Consular Affairs."

4          Can you tell me what the Bureau of

5    Consular Affairs is responsible for within the

6    State Department?

7              A.   Yes, I can.

8              Q.   Please do.

9              A.   The Bureau of Consular Affairs

10   is responsible for the issuance of Visas

11   abroad, for the issuance of passports

12   domestically, and also for looking out for the

13   welfare and whereabouts of American citizens

14   abroad.

15             Q.   Those three functions you have

16   described, do they overlay to the Office of

17   Oversee Citizen Services, the Office of

18   Passport Services and the Office of Visa

19   services?

20         THE COURT REPORTER:  I'm sorry.  Can

21   you say that again please?

22             MS. CONLON:  Sure.

23   BY MS. CONLON:

24             Q.   I'll take them one at a time.

25         You said that the Bureau of Consular

 1    Affairs -- I'll use your words -- is

 2    responsible for the issuance of Visas abroad.

 3    Is that handled by the Office of Visa services?

 4              A.   Yes, largely.

 5              Q.   And you said that the Bureau of

 6    Consular Affairs looks out for the welfare of

 7    American citizens abroad.  Is that handled by

 8    the Office of Overseas Citizen Services?

 9              A.   Yes, principally.

10              Q.   And the off -- I'm sorry.  You

11    said that the Bureau of Consular Affairs is

12    also responsible for the issuance of passports.

13    Is that handled by the Office of Passport

14    Services?

15              A.   Yes, largely.

16              Q.   Are there any other offices

17    within the Bureau of Consular Affairs apart

18    from the three I just mentioned?

19              A.   It is my recollection that

20    there is also the Office of Fraud Prevention,

21    the Office of Congressional and Public Affairs,

22    the comptroller's Office, the executive

23    director's office, a personnel office.  There

24    is also an Office of Career Development called

25    1CA.  There's the front office, where I work.

```
 1          Those are all the offices I remember.
 2   There may be others.  I do not have the
 3   organizational chart in front of me.
 4          Q.   And who else works in the front
 5   office with you?
 6          A.   Mr. Pierce; Mr. Wilson;
 7   Elizabeth Gracon, who's a deputy -- acting
 8   deputy to assistant secretary; Vlad Lipschutz,
 9   who is also an acting -- is a deputy assistant
10   secretary; Maureen Smith, who is a senior
11   advisor; Jaffar Dias, who is chief of staff,
12   functionally chief of staff.
13          Q.   Okay.  I'm sorry.  Go ahead.
14          A.   Would you like me to finish?
15          Q.   Yes.  Please.
16          A.   There are also four staff --
17   staffers.  Marci, Noe, JP, Rachel, and I have a
18   scheduler temporarily, Zoran Milotvic (ph).
19   Normally, it's Amanda, and I forgot her last
20   name.  Oh, one more person, Joe.  And he's new,
21   I don't remember his last name.  He's a White
22   House fellow political appointee.
23          Q.   Thank you.  So in terms of your
24   role, you specifically for the Bureau of
25   Consular Affairs oversee the Office of Oversea
```

```
 1    Citizen Services, Passport Services and Visa
 2    Services; is that correct?
 3              A.   Partly correct.
 4              Q.   What part of that is incorrect?
 5              A.   I oversee the operations of
 6    whole bureau, and I'm responsible for all of
 7    it.
 8              Q.   You oversee the operations of
 9    the whole bureau, but you are specifically
10    assigned to those three offices, or do you
11    oversee every office you mentioned?
12              A.   I'm responsible for the
13    complete operations of the bureau.  The top
14    dog, the head honcho.
15              Q.   You're the boss.
16              A.   Yes.
17              Q.   Of the offices you mentioned,
18    do any of the offices play a role in the
19    issuance after revocation of Visas apart from
20    the Office of Visa Services?
21              A.   It is possible, depending on
22    the circumstances of a particular case, that
23    the fraud prevention program would have a role
24    in researching information.
25              Q.   Can you tell me more about what
```

```
 1    the fraud prevention program does generally?

 2                MS. SANTORA:  Objection.  Vague.

 3    BY MS. CONLON:

 4                Q.   What is the fraud prevention

 5    program?

 6                A.   It is responsible for

 7    preventing fraud in Visas and passports and any

 8    other operations.

 9                Q.   When you say, "any operations,"

10    can you be more specific?

11                A.   Yes.  If there were documents,

12    say consular reports of birth, issued

13    fraudulently abroad, that is not a passport.

14    It is not a Visa.

15                Q.   Okay.  You may not recall, but

16    when you drafted this declaration or signed it,

17    it says [As read] "I base this declaration on

18    my review of Department of State records."

19         Do you recall which Department of State

20    you records reviewed?

21                A.   No.

22                Q.   Your declaration states you

23    also [As read] "based your declaration on

24    discussion with other Department of State

25    employees."
```

```
 1              Who did you speak with?

 2                  A.   I do not remember exactly who I

 3      spoke with.

 4                  Q.   Who do you -- withdrawn.

 5              You've prepared declarations for other

 6      cases as well?

 7                  A.   It is my recollection that I

 8      have.

 9                  Q.   Who do you ordinarily speak

10      with before you prepare a declaration?

11                  MS. SANTORA:  Objection.  Form.

12      BY MS. CONLON:

13                  Q.   Who have you spoken to in the

14      past before preparing a declaration?

15                  A.   It is my recollection that I

16      would speak to people who are involved in Visa

17      revocations.

18                  Q.   And who would that be?

19                  A.   It could be but not limited to

20      Ms. Morris, previously mentioned; DAS, Deputy

21      Assistant Secretary Wilson, previously

22      mentioned; the previous acting principal deputy

23      assistant secretary, Shane Myers; Senior

24      Advisor Smith, previously mentioned; Taylor

25      Beaumont could be a person in that group.
```

```
 1              There could be other staff.  I don't
 2     remember everyone I spoke to.
 3              Q.   You mentioned Senior Advisor
 4     Smith.  What does the senior advisor do?
 5              A.   Senior Advisor Smith takes part
 6     in the leadership discussions, advises and
 7     handles special projects.
 8              Q.   Do any of Senior Advisor
 9     Smith's special projects relate to Visa
10     revocations?
11              MS. SANTORA:  Objection.  Foundation.
12     BY MS. CONLON:
13              Q.   You can still answer a question
14     that she's objected to for form or foundation.
15              MS. SANTORA:  You can answer.
16              THE WITNESS:  Am I required to answer
17     the question?
18              MS. SANTORA:  You are required to
19     answer the question.
20              THE WITNESS:  Thank you, Counsel.
21              A.   It is my recollection that some
22     of her duties have dealt with Visa revocations.
23     BY MS. CONLON:
24              Q.   What particular duties of hers
25     have dealt with Visa revocations?
```

 1              A.   It is my recollection that it
 2    involved specific cases, but I don't recall
 3    exactly which ones.
 4              Q.   What was her role in the cases
 5    that she was involved in?
 6              A.   It is my recollection that she
 7    would review the cases, the grounds for
 8    revocation.
 9              THE WITNESS:  How's that coffee
10    doing?
11              MR. WILKENS:  This is Scott Wilkens.
12    I just want to put one thing on the record.
13    I've just been noticing most times that you,
14    Mr. Armstrong, before you answer a question
15    that's been asked, you look at Mr. Beaumont,
16    counsel for the State Department, and you look
17    to see if there's a nod or there's an objection
18    from him, and then you answer.  And I just want
19    to put on the record that that's completely
20    improper.  It's basically coaching the witness,
21    and I would ask that that stop and that you
22    allow the witness to answer the question
23    without your nod and say-so.
24    BY MS. CONLON:
25              Q.   You said that Ms. Smith has

```
 1    reviewed cases --
 2                THE WITNESS:  Just a moment.  I'd
 3    like to talk to my counsel or the Government
 4    counsel.
 5                MS. CONLON:  Do you want to take a --
 6                THE WITNESS:  I'll take your
 7    question.
 8                MS. CONLON:  Oh, no, no.  It's okay.
 9    I haven't even asked it yet.  It's totally
10    fine.  We can take a break.
11                MS. SANTORA:  Yes.  We may go to our
12    break room.
13                MS. CONLON:  Yes.  That's okay.
14                THE VIDEOGRAPHER: Off the record at
15    10:47 a.m.
16        (A break was taken at 10:47 a.m.)
17         (Proceedings resumed at 11:01 p.m.)
18                THE VIDEOGRAPHER:  We are back on the
19    record, 11:01.
20    BY MS. CONLON:
21           Q.   Okay.  Before we went off the
22    record we were discussing Ms. Smith, a senior
23    advisor's work on Visa revocations, so I want
24    to return to that.
25                A.   Yes.
```

```
 1              Q.   You mentioned that one of her

 2    special projects has involved reviewing cases

 3    on the grounds for revocation; is that correct?

 4              A.   That is my recollection.

 5              Q.   Is there any particular type of

 6    cases she was assigned to review?

 7              A.   I do not recall.

 8              Q.   Do you recall whether any of

 9    the cases she has reviewed as part of that

10    project involved student protestors?

11              A.   I do not recall.

12              Q.   Who assigned Ms. Smith a

13    special project related to Visa revocations?

14              A.   It would have either been

15    myself, then acting deputy assistant -- I'm

16    sorry -- then acting principal deputy assistant

17    secretary Shane Myers and possibly deputy

18    assistant secretary Wilson, Stuart Wilson.

19              Q.   Just is to keep the cast of

20    characters straight, is Mr. Myers still in the

21    State Department?

22              A.   It is my understanding he is

23    preparing for his retirement, but at this

24    moment he is actually still a State Department

25    employee.  He is no longer in the position he
```

```
 1    was in.
 2              Q.    Do you know what position he is
 3    in now?
 4              A.    I do not.
 5              Q.    Okay.  So you said that you,
 6    Mr. Myers or Mr. Wilson likely assigned
 7    Ms. Smith the special project relating to Visa
 8    revocations; is that right?
 9              A.    Yes.  That is my recollection.
10              Q.    Do you recall what the purpose
11    of the project was?
12              A.    To determine whether a
13    revocation was in order.
14              Q.    When was this project assigned
15    to her, approximately?
16              A.    Sometime between March 1st
17    through the end of May.
18              Q.    Sorry.  You're saying that the
19    project began sometime after March 1st?
20              A.    Yes.  That is my recollection.
21              Q.    Do you recall what prompted the
22    creation of the project?
23              MS. SANTORA:  Objection.  Form.
24    Objection.  Foundation.
25    BY MS. CONLON:
```

1           Q.    Why was the project created?

2           A.    Because there was a need to

3    review a case.

4           Q.    There was a need to review a

5    single case?

6           A.    I'm not sure if it's single or

7    multiple.

8           Q.    I know you're not sure who

9    assigned the project to Ms. Smith, but who

10   called for the creation of the project?

11          A.    I'm not sure.  One of those

12   three people.  Ms. Smith has many special

13   projects.

14          Q.    Does she have any other special

15   projects relating to Visa revocations?

16          A.    She has other special projects

17   relating to Visas.

18          Q.    Do those other projects relate

19   to revocations?

20          A.    To my knowledge -- I don't

21   know.  I don't know.  I do not know all the

22   details of every project Ms. Smith is working

23   on.

24          Q.    Does Ms. Smith have a direct

25   supervisor?

 1          A.    Supervision is shared between

 2    myself and whoever is in the position of the

 3    principal deputy assistant secretary.

 4          Q.    And that was Mr. Myers, and

 5    remind me, who is it now?

 6          A.    Since last Friday it is Matthew

 7    Pierce.

 8          Q.    Do you recall if there was a

 9    particular type of Visa that she was reviewing

10    for revocation?

11          A.    No.  I do not recall what type

12    of Visa.  I -- it seems to me based on my

13    knowledge that it would have been a

14    nonimmigrant Visa, also known as NIV.

15          Q.    What types of Visas are covered

16    by the category of nonimmigrant Visa?

17          A.    Visas for temporary stays in

18    the United States.

19          Q.    Does that include student

20    Visas?

21          A.    Yes.

22          Q.    To your knowledge, is

23    Ms. Smith's project relating to Visa

24    revocations ongoing?

25          A.    It seems to me it is -- it was

 1    completed.

 2              Q.    Do you know when it was

 3    completed?

 4              A.    Sometime between the beginning

 5    of March and the end of May.  She has had many

 6    ongoing -- many special projects.

 7              Q.    You mentioned she had other

 8    projects relating to Visas.  Do you know what

 9    any of the other Visa-related projects are?

10              A.    Am I required to answer that

11    question?

12              Q.    Yes.

13              A.    I know some of them.  Some of

14    them are classified.

15              Q.    As to the nonclassified Visa

16    projects that Ms. Smith works on, what do you

17    know about them?

18              MS. SANTORA:  Objection.  Form.

19    BY MS. CONLON:

20              Q.    You can answer.

21              A.    Am I required to answer?

22              Q.    Unless your counsel invokes a

23    privilege, you are generally required to

24    answer?

25              MS. SANTORA:  I will also object on

1    the grounds that to the extent the response

2    calls for privileged or classified information,

3    do not answer.

4              A.    That is difficult.

5         Excuse me.  I'm going to have to take a

6    break.

7              Q.    Well, let me just repeat the

8    question in case that makes it clearer as to

9    Ms. Smith's nonclassified Visa projects.

10   What -- well, withdrawn.

11        What do you know about Ms. Smith's

12   nonclassified Visa projects?

13             MS. SANTORA:  I'll repeat the

14   Objection to form and also object on the

15   grounds to the extent that your response would

16   call for even information that's privileged, to

17   not answer.

18             MS. CONLON:  For the record, can you

19   just state what kind of information -- what

20   kind of privilege you're talking about in this

21   objection.

22             MS. SANTORA:  Would be the law

23   enforcement privilege.

24   BY MS. CONLON:

25             Q.    Okay.  Let's try this another

 1    way.  Without saying what it is, do you have

 2    familiarity with any of the other Visa projects

 3    that Ms. Smith works on?

 4            A.   Yes.  I have familiarity with

 5    some of the other Visa projects that Ms. Smith

 6    works on.

 7            Q.   Do you work on any of those

 8    projects with her?

 9            A.   I advise -- yes.  Yes.  I do

10    work on some of those projects with her and

11    with other people.

12            Q.   What are the -- speaking about

13    the projects that you work on with her, what

14    are the topics of those projects to the extent

15    they are not classified?

16            MS. SANTORA:  Also object.  To the

17    extent that the response would call for

18    nonclassified but privileged information that

19    are law enforcement or deliberative in nature,

20    do not answer.

21            A.   I'm sorry.  I need to ask a

22    question of counsel.

23            MS. CONLON:  I was going to say, it

24    seems like -- I appreciate that having --

25    asking the witness to decide if it is

 1    privileged puts the witness in a difficult

 2    position.  If you want to confer before you

 3    respond, we don't have a problem with that.

 4                THE WITNESS:  I would like to confer.

 5                MS. CONLON:  Okay.

 6                THE VIDEOGRAPHER:  Off the record,

 7    11:10.

 8          (A break was taken at 11:10 a.m.)

 9          (Proceedings resumed at 11:22 p.m.)

10

11                THE VIDEOGRAPHER:  We're back on the

12    record, 11:22.

13    BY MS. CONLON:

14          Q.   Mr. Armstrong, did you have an

15    opportunity to confer with counsel about the

16    question I posed before the break?

17          A.   Yes, I did.  Thank you very

18    much.

19          Q.   So I'll ask it again.  What are

20    the projects, special projects that you work on

21    with Ms. Smith regarding Visas to the extent

22    they're not classified?

23          A.   The projects that I work with

24    with special advisor Maureen Smith, to the best

25    of my recollection that they're not classified

 1    or revealing law enforcement or deliberative

 2    information would be involving Visas, some

 3    immigrant Visas.  Looking at the use of the 3-C

 4    policy, possibility to do a Visa bond for NIV.

 5    Am I going too fast?

 6              MS. CONLON:  No.  It's catching up.

 7    I have a transcript from Ms. Henderson.  Well,

 8    it's not too fast for me.  Ms. Henderson is the

 9    person to ask.

10              A.    Diversity Visas.

11              Q.    What are diversity Visas?

12              A.    My understanding of the

13    diversity Visa program was it's also known as

14    the Visa lottery.  Are you familiar with that?

15              Q.    I am not.

16              A.    It's a program where people

17    from different countries can apply like in a

18    lottery to be drawn, be picked randomly to

19    receive the opportunity to immigrate to the

20    United States.

21         And I believe, as I understand it, it's

22    called diversity Visa -- it's existed three

23    decades, maybe a little more, maybe a little

24    less -- because it was based on bringing

25    diversity to the U.S. population by -- and

1    there may be a formula for this, I do not know.

2    And I do not want to put out suppositions on

3    what countries based on previous immigration

4    levels can partake.

5          And not every country receives the same

6    number of spots.  It's in part based on

7    population.  For example, a small country like

8    the Bahamas, where I worked previously, may

9    only receive ten spots.  A large country like

10   Ukraine may receive 2000 spots

11          Q.    You mentioned something called

12   the 3C policy.  What are you referring to?

13          A.    If I remember correctly,

14   it's -- 3C refers to the section of the

15   Immigration and Naturalization Act which

16   describes this policy that gives the Secretary

17   of State the authority to deny Visas to certain

18   classes or types of an aliens based on various

19   criteria, what they have done.

20          Q.    Before we move on, was there

21   any other type of -- did I interrupt you -- was

22   there any other type of project you were trying

23   to mention?

24          A.    Not that I recall.

25          Q.    So with respect to the 3C

```
 1    policy, is that -- withdrawn.
 2          You said that it comes from a statutory
 3    provision in the INA; is that right?
 4          A.   That's my understanding, yes,
 5    and that's where the name comes from.
 6          Q.   Is that known as the foreign
 7    policy provision?
 8          A.   There's a couple of actual
 9    foreign policy provisions.  I'm not sure
10    whether it's 3C or -- I'm sorry.  I don't want
11    to speculate.
12          Q.   No, it's okay.  Is the 3C
13    policy project a special project run by
14    Ms. Smith?
15          A.   She is one of people who works
16    on it.
17          Q.   And who else works on it
18    besides her?
19          A.   I work on it with her, DAS
20    Wilson, previously mentioned.  Andrew Veprek I
21    believe works on it with her to some degree.
22          Q.   Anybody else?
23          A.   The previous principal deputy
24    assistant secretary acting, Mr. Myers, may have
25    worked on it with her.  I believe so, but I'm
```

```
 1    not 100 percent sure.  My recollection is not

 2    fully clear in that area.

 3              Q.    Anybody else?

 4              A.    Not that I recall.

 5              Q.    So to the best of your

 6    knowledge the people who work on the 3C policy

 7    project are that Mr. Wilson, Mr. Veprek,

 8    potentially Mr. Myers and yourself?

 9              A.    I believe that's a different

10    question.  You asked who works on it with Ms.

11    Smith.  There may be other people working on it

12    that I am not aware of.

13              Q.    To the best of your knowledge

14    those are the only people working on it?

15              A.    Yes.

16              Q.    What is Mr. Veprek's role?

17              A.    He is -- he works for the

18    counselor, Mr. Needham, Michael Needham.

19              Q.    You said the counselor?

20              A.    The counselor.  It's a

21    position.

22              Q.    Okay.  Is that a position in

23    the Bureau of Consular Affairs?

24              A.    No.  It's counselor in the

25    since of counsel rather than consular.
```

1           Q.   He works for the Department of
2    State.
3           A.   Yes.
4           Q.   Is he the lead counsel for the
5    Department of State?
6           A.   I do not know.  I do not
7    believe so.  I believe that's the legal
8    advisor.  Legal colleagues from the department
9    may be able to answer that.
10          Q.   Okay.  With respect to the 3C
11   policy, when did that special project begin?
12          A.   Perhaps in March.
13          Q.   When you said earlier that Ms.
14   Smith has a special project related to Visa
15   revocations, were you referring to the 3C
16   policy project?
17          A.   No.
18          Q.   What project -- withdrawn.
19       What is the difference between the 3C
20   policy project and the special project relating
21   to Visa revocations?
22          MS. SANTORA:  Objection.  Calls for
23   information privileged under the deliberative
24   process privilege.
25          THE WITNESS:  Am I required to

```
 1    answer?

 2              MS. SANTORA:  No.

 3    BY MS. CONLON:

 4              Q.   What is the purpose of the 3C

 5    policy project?

 6              MS. SANTORA:  Objection.  Calls for

 7    information privileged under the deliberative

 8    process privilege.

 9              MS. CONLON:  Are you instructing your

10    witness not to answer, just to be clear for the

11    record?

12              MS. SANTORA:  Yes.

13              MS. CONLON:  I have a series of

14    questions about it that I will ask,

15    understanding that you may object, so you

16    should wait for your counsel to object.

17              A.   I will wait.

18              Q.   Okay.  What is the scope of the

19    3C policy project?

20              MS. SANTORA:  Objection.  Calls for

21    information privileged under the deliberative

22    process privilege and instruct the witness not

23    to answer.

24    BY MS. CONLON:

25              Q.   Has the 3C policy been
```

 1    finalized by the Department of State?

 2              THE WITNESS:  May I answer the

 3    question?

 4              MS. SANTORA:  No objection.  You can

 5    answer.

 6              A.   There are many 3C policies in

 7    existence.

 8    BY MS. CONLON:

 9              Q.   Has the 3C policy -- has the 3C

10    policy special project that Ms. Smith works on

11    with you been finalized.

12              A.   No.

13              Q.   Do you have an understanding of

14    when it is likely to be finalized?

15              A.   Soon.

16              Q.   What does its finalization

17    depend on?

18              MS. SANTORA:  Object.  Calls for

19    information privileged under the deliberative

20    process privilege.  I'm instructing the witness

21    not to answer.

22    BY MS. CONLON:

23              Q.   When did the 3C policy that is

24    part of the special project with Ms. Smith

25    begin to be developed?

```
 1              A.   It seems to me, to the best of

 2    my recollection, in March, but I may have been

 3    earlier because I only entered in my job on

 4    February 27th, and my knowledge of events

 5    before that time is limited.

 6              Q.   Who was in your role before

 7    you, before February, 27?

 8              A.   Julie Stufft.

 9              Q.   What will role does she have

10    now?

11              A.   I believe that she is the

12    executive secretary at the national security

13    counsel.

14              Q.   Did you have any discussions

15    with Ms. Stufft before taking on her role about

16    the 3C policy project?

17              A.   I do not know.  I do not

18    recall.

19              Q.   Has the 3C policy that's part

20    of Ms. Smith's special project been applied?

21              THE WITNESS:  Am I required to

22    answer?

23              MS. SANTORA:  Yes.

24              A.   The part that Ms. Smith is

25    working on has not been finalized, therefore it
```

1    has not been applied.

2    BY MS. CONLON:

3         Q.   Is there -- withdrawn.

4         You said the part that Ms. Smith is

5    working on has not been finalized.  What -- is

6    there a part of the 3C policy project that has

7    been finalized?

8         A.   There are many 3C policies in

9    existence that have been finalized for various

10   things.  The specific policy that Ms. Smith has

11   been working on has not been finalized and

12   remains deliberative.

13        Q.   Does the 3C policy project that

14   Ms. Smith been working on address when the

15   Secretary of State can exercise authority under

16   3C?

17             MS. SANTORA:  Objection.  Calls for

18   information under the deliberative process

19   privilege.  I instruct the witness not to

20   answer.

21   BY MS. CONLON:

22        Q.   Does the 3C policy address --

23   well withdrawn.

24        Does the 3C policy call for the

25   creation of any new processes in the State

```
 1    Department?
 2             MS. SANTORA:  Same objection.  I
 3    instruct the witness not to answer.
 4             MS. CONLON:  Just one second.
 5    BY MS. CONLON:
 6             Q.    Does the 3C policy establish
 7    any standard or criteria for the application of
 8    the foreign policy provision?
 9             MS. SANTORA:  Same objection.  I
10    instruct the witness not to answer.
11    BY MS. CONLON:
12             Q.   Does the 3C policy set forth
13    what the United States foreign policy interests
14    are with respect to the application of 3C?
15             MS. SANTORA:  Same objection.  I
16    instruct the witness not to answer.
17    BY MS. CONLON:
18             Q.   The questions that I have asked
19    you that your counsel has objected to, without
20    answering any of them, for the record can you
21    tell us whether you know the answers?
22             A.   I do not remember the questions
23    that were asked.
24             MS. SANTORA:  Objection form.
25    Foundation.  Can you repeat --
```

```
 1                GOVERNMENT COUNSEL:  I'll ask.
 2     BY MS. CONLON:
 3          Q.   Do you know whether the 3C
 4     policy project that Ms. Smith is working on
 5     establishes a standard or criteria for the
 6     application of the foreign policy provision?
 7     Just do you know.
 8          A.   Do I know what?
 9          Q.   Whether it establishes any
10     standard or criteria for the application of the
11     foreign policy provision?
12          A.   I do not know with certainty.
13          Q.   Do you have information about
14     that?
15          A.   About my certainty or about the
16     3C policy?
17          Q.   Let me say it another way.
18        Without telling us about it, are you
19     familiar with the substance of the work on the
20     3C policy project that Ms. Smith is doing?
21          A.   Yes.
22          Q.   Are you familiar with the aims
23     of the 3C policy project?
24          MS. SANTORA:  Objection.  Form.
25     BY MS. CONLON:
```

```
 1                Q.    You can answer.

 2                MS. SANTORA:   You can answer.

 3                A.    Could you repeat the question,

 4       please.

 5       BY MS. CONLON:

 6                Q.    Sure.  Are you familiar with

 7       the aims of the 3C policy project?

 8                A.    Yes.

 9                Q.    Are you familiar with the

10       particular grounds for revocation that the 3C

11       policy project focuses on?

12                MS. SANTORA:   Objection.  Foundation.

13                MS. CONLON:   You can answer.

14                MS. SANTORA:   You can answer.

15                A.    Yes.

16       BY MS. CONLON:

17                Q.    Do you know whether the 3C

18       policy project addresses the application of the

19       foreign policy provision in USC 1182(a)(3)?

20                A.    I would have to see the section

21       of the law.

22                Q.    You have your declaration in

23       front of you as Exhibit 1.  Could you please

24       turn to page 2 of the declaration and just

25       review paragraph 6.
```

```
 1            Let me know when you have had a chance
 2    to review it.
 3            A.    My answer is no.  I don't know.
 4            Q.    I'm sorry.  I haven't asked you
 5    a  question.
 6            A.    Oh, I'm sorry.  I thought you
 7    did, and I asked I'd have to see the section --
 8            Q.    Oh, no, no.  In paragraph 6
 9    your declaration mentioned 8USC 1182(a)
10    subsection 3, right?
11            A.    That is what it says.
12            Q.    Are you familiar with that
13    statute?
14            MS. SANTORA:  Objection.  Form.
15            MS. CONLON:  You can answer.
16            MS. SANTORA:  You can answer.
17            A.    I have seen it, but I do not
18    have it memorized.
19    BY MS. CONLON:
20            Q.    Just asking if you're familiar
21    with it.
22            A.    I have some familiarity.
23            Q.    Okay.  Could you please flip to
24    page 3 of your declaration, paragraph 12.
25    Please take a moment to read it.
```

```
 1              A.    I have read the paragraph.
 2              Q.    Do you know whether the 3C
 3    policy project addresses the grounds for
 4    removability discussed in paragraph 12 of your
 5    declaration?
 6              A.    Yes.
 7              Q.    You'll object, but I will ask.
 8    Does the 3C project address the grounds in
 9    paragraph 12 of your declaration?
10              MS. SANTORA:   Objection.  Calls for
11    information privileged under the deliberative
12    process privilege.  I instruct the witness not
13    to answer.
14    BY MS. CONLON:
15              Q.    You mentioned that there were
16    other 3C policies within the State Department.
17    Are any of them finalized?
18              A.    Yes.
19              Q.    Please describe the finalized
20    3C policy from the State Department.
21              MS. SANTORA:   Objection.  Foundation.
22    BY MS. CONLON:
23              Q.    You can answer.
24              A.    There are many 3C policies.  I
25    do not -- have memorized every single one.  An
```

 1    example of a 3C policy was one that was brought

 2    in recently against government, foreign

 3    government officials who support or facilitate

 4    illegal migration to the United States.

 5         An earlier 3C policy was brought in

 6    against private business people who facilitate

 7    illegal migration to the United States.

 8              I have heard of but have less

 9    familiarity with 3C policies that are against

10    persons who are gross violators of human rights

11              Q.   Are those the only 3C policies

12    that you can remember as you sit here?

13              A.   Yes.  Those are the only 3C

14    policies that I can remember at this moment.

15              Q.   Now, what makes these finalized

16    3C policies?

17              A.   When they are approved by the

18    Secretary of State, which has not happened in

19    the case of this project.

20              Q.   And in what form are the 3C

21    policies you have mentioned presented to the

22    Secretary of State?

23              MS. SANTORA:  Objection.  Foundation.

24    Objection form.

25                   Go ahead.

```
 1              A.   To my knowledge, they're

 2   presented as an action memo.

 3   BY MS. CONLON:

 4              Q.   What is an action memo?

 5              A.   An action memo is a memo that

 6   calls for action or an action being a decision.

 7              Q.   And are action memos written by

 8   people in particular roles within the State

 9   Department?

10              A.   I don't understand the

11   question.  Could you clarify?

12              Q.   Sure.  Have you written an

13   action memo?

14              A.   I have drafted and I have also

15   approved many.

16              Q.   Are -- is an action memo

17   required to ask the Secretary of State to adopt

18   a policy?  Is that how that works?

19              MS. SANTORA:  Objection.  Form.

20              MS. CONLON:  That's fine.  I'll

21   withdraw it.

22   BY MS. CONLON:

23              Q.    When is a person who works

24   for the Department of State required to draft

25   an action memo?
```

```
 1              A.    When there's a decision for the
 2    Secretary of State to make or another
 3    principal.
 4              Q.    Who are the other relevant
 5    principals that you're referring to?  Like what
 6    level of official?
 7              A.    It can go secretary, deputy
 8    secretary -- there's two -- one of the under
 9    secretaries, assistant secretaries, and in some
10    cases deputy assistant secretaries, or people
11    who are encumbering those positions.
12              Q.    Encumbering?
13              A.    Are in that chair.
14              Q.    The 3C policies that you
15    described, starting with the first one you
16    mentioned against foreign government officials
17    who support illegal migration, that was
18    presented to the secretary first in an action
19    memo?
20              A.    Yes.  That is my understanding
21    that it was finalized by the secretary when he
22    signed the action memo for that.
23              Q.    And were you --
24              A.    And it's only final at that
25    point, when the secretary has made the
```

 1    decision.

 2              Q.   Do you know whether with

 3    respect to the 3C project Ms. Smith is working

 4    on whether an action memo has been created yet?

 5              A.   No.

 6              Q.   You don't know whether --

 7              A.   I do know.  I do know.

 8              Q.   You do know.

 9              A.   Wait.  Please -- I'm sorry.

10    Please rephrase the question.

11              Q.   Yeah.  No, no.  Of course.  The

12    question is do you know whether an action memo

13    has been created for Ms. Smith's 3C special

14    project?

15              A.   The question is about my

16    knowledge.

17              Q.   Correct.

18              A.   Yes.  I do know.

19              Q.   Okay.  And now I will ask you

20    has it been created?

21              MS. SANTORA:  Objection.  Calls for

22    information privileged under the deliberative

23    process privilege, and I instruct the witness

24    not to answer.

25    BY MS. CONLON:

```
 1              Q.    In the Bureau of Consular
 2    Affairs is there anyone working on the 3C
 3    special project with Ms. Smith besides you,
 4    Deputy Assistant Secretary Wilson, Andrew
 5    Veprek, Mr. Myers and -- nope.  That's it.
 6    Anybody else?
 7              A.    At the present time Acting
 8    Principal Deputy Assistant Secretary Pierce
 9    because he replaced then act -- yes, Mr. Myers.
10    To my knowledge, those are the only people
11    working on it.
12              Q.    Is there any other component of
13    the State Department working on the 3C special
14    project?
15              A.    Wait.  There is one other
16    possible person.
17              Q.    Who?
18              A.    Lloyd.
19              Q.    Lloyd who?
20              A.    I do not know Lloyd's last
21    name.  He works for Mr. Veprek.
22              Q.    Do you know what his role is?
23              A.    I know he works for Mr. Veprek,
24    and he may be working on this.  I do not fully
25    know.  I -- he does not report to me.  He's in
```

```
 1    the counselor's office where Mr. Needham is.
 2            Q.   So is there any other component
 3    of the State Department working on the 3C
 4    special project?
 5            A.   To my knowledge, no.
 6            Q.   Is there any component of the
 7    Department of Homeland Security working on the
 8    3C special project?
 9            MS. SANTORA:  Objection.  Calls for
10    information privileged under the deliberative
11    process privilege.  I instruct the witness not
12    to answer.
13    BY MS. CONLON:
14            Q.   Is the 3C special project
15    interagency project?
16            MS. SANTORA:  Objection.  Calls for
17    information privileged under the deliberative
18    process privilege.  I instruct the witness not
19    to answer.
20    BY MS. CONLON:
21            Q.   Without telling me the answer,
22    do you know whether any component of the
23    Department of Homeland Security works on the 3C
24    special project?
25            A.   I do not know.
```

```
 1              Q.   Do you know whether any other

 2   agency works on the 3C special project?

 3              A.   I do not know.

 4              Q.   Do you know whether the White

 5   House is involved in the 3C special project?

 6              A.   I do not know.

 7              Q.   Do you know whether the 3C

 8   special project involves anti-Semitism?

 9              A.   I do not know.

10              Q.   Do you know whether the 3C

11   special project relates in any way to student

12   protests?

13              A.   Could you repeat the question?

14              Q.   Sure.  Do you know whether the

15   3C special project relates in any way to

16   student protests?

17              A.   I do.

18              Q.   Do you know whether the 3C

19   special project relates in any way to colleges

20   and universities?

21              A.   I do.

22              Q.   Do you know whether the 3C

23   special project relates in any way to

24   provisions of the INA regarding support for

25   foreign terrorist organizations?
```

```
 1              A.   Could you repeat the question,

 2    plea.

 3              Q.   Sure.  Do you know whether the

 4    3C special project relates in any way to

 5    provisions of the INA regarding support for

 6    foreign terrorist organizations?

 7              A.   I do.

 8              Q.   Do you know whether the

 9    special -- the 3C special project relates in

10    any way to concerns regarding Hamas?

11              A.   I do.

12              MS. CONLON:  Just one second.

13           BY MS. CONLON:

14              Q.   I expect your counsel will

15    instruct you not to answer the next series of

16    questions, so I'm going to let you make sure

17    you get a chance to pause.  We're going to go

18    through what I just asked you.  Okay.

19              Does the 3C special project relate in

20    any way to anti-Semitism?

21              MS. SANTORA:  Objection.  Calls for

22    information privileged under the deliberative

23    process privilege.  I instruct the witness not

24    to answer.

25              THE COURT REPORTER:  I'm sorry.  Say
```

1    it one more time.

2           MS. SANTORA:  Objection.  Calls for

3    information privileged under the deliberative

4    process privilege.  I instruct the witness not

5    to answer.

6    BY MS. CONLON:

7           Q.   Does the 3C special project

8    relate in any way to student protests?

9           MS. SANTORA:  Same objection.  I

10   instruct the witness not to answer.

11   BY MS. CONLON:

12          Q.   Does the 3C special project

13   relate in any way to colleges or universities?

14          MS. SANTORA:  Same objection.  I

15   instruct the witness not to answer.

16   BY MS. CONLON:

17          Q.   Does the 3C project relate in

18   any way to INA provisions regarding support for

19   foreign terrorist organizations?

20          MS. SANTORA:  Same objection.  I

21   instruct the witness not to answer.

22   BY MS. CONLON:

23          Q.   Does the 3C special project

24   relate in any way to INA provisions regarding

25   those who espouse or endorse -- who espouse or

1    endorse support for foreign terrorist

2    organizations?

3            MS. SANTORA:  Same objection.  I

4    instruct the witness not to answer.

5    BY MS. CONLON:

6            Q.   Does the 3C special project

7    relate in any way to concerns regarding Hamas?

8            MS. SANTORA:  Same objection.  I

9    instruct the witness not to answer.

10   BY MS. CONLON:

11           Q.   Was the special project created

12   in response to the executive orders that you

13   mentioned in your declaration?

14       And for the record, those are Executive

15   Order 14161 and Executive Order 14188?

16           A.   I do not know off the top of my

17   head the subject of those executive orders, so

18   I cannot answer the question.

19           Q.   Okay.

20           A.   So I do not know.

21           Q.   Executive Order 14161 is titled

22   [As read] "Protecting the United States from

23   foreign terrorists and other national security

24   and public safety threats."

25       Are you familiar with that executive

 1    order?

 2              A.    Yes.

 3              Q.    Executive Order 14188 is titled

 4    [As read] "Additional measures to combat

 5    anti-Semitism."

 6          Are you familiar with that executive

 7    order?

 8              A.    Yes.

 9              Q.    To your knowledge does the 3C

10    special project relate to either of those

11    executive orders?

12              A.    To my knowledge, yes, either.

13              Q.    Does the 3C special project

14    relate to both of those executive orders?

15              A.    To my knowledge?

16              Q.    Yes.

17              A.    To my knowledge, no.

18              Q.    Which of two executive orders

19    does the 3C special project relate to?

20              A.    It is my recollection that it

21    relates to the first one that you mentioned.

22              Q.    Executive Order 14161

23    "Protecting United States from foreign

24    terrorists and other national security and

25    public safety threats"?

```
 1              A.   Yes.

 2              Q.   To your knowledge the 3C

 3    special project does not relate to the

 4    Executive Order 14188 additional measures to

 5    combat anti-Semitism?

 6              A.   That is correct, to my

 7    recollection.

 8              Q.   When an action memo is sent to

 9    secretary Rubio with a policy and he signs off

10    on it, how does that policy get published to

11    the public, if at all?

12              MS. SANTORA:  Objection.  Foundation.

13    Objection.  Form.  You can answer.

14              A.   To my knowledge, after the

15    Secretary of State -- regardless of who it is,

16    long-standing procedure -- makes the positive

17    decision and signs the action memo, the policy

18    is made public in a statement.

19    BY MS. CONLON:

20              Q.   Are you finished answering?

21              A.   Yes, I am.

22              Q.   When you say it's "made public

23    in a statement," is that in a formal press

24    release?

25              A.   It is a statement that is open
```

 1    to the public.  It may come from the

 2    spokesperson's office or the people who handle

 3    that.  I do not work in those areas.  I'm not

 4    expert on them.

 5              Q.   Do you know whether the final

 6    policy after it's signed by the secretary is

 7    published to the department's website?

 8              A.   I do not know.

 9              Q.   What we're discussing is the

10    formal policy process, policy-making process of

11    the State Department; is that fair?

12              A.   Perhaps I misunderstood your

13    question.  You asked how it was made public.

14              Q.   Yes.  Sorry.  So once a policy

15    has been reached by the State Department

16    internally, the last step is that it is

17    announced to the public and published; is that

18    right?

19              MS. SANTORA:  Objection.  Form.

20              A.   It is also -- in regard to 3C

21    there is usually a cable sent to missions

22    abroad in the form of an ALDAC.

23              Q.   In the form of a what?  I'm

24    sorry.

25              A.   ALDAC.

```
 1                    Q.   What is that?

 2                    A.   All Diplomatic and Consular

 3   posts, usually with a precedence of immediate.

 4                    Q.   Got it.  This will seem maybe

 5   like a silly question but are the ALDAC and

 6   consular posts, they are under the guise of the

 7   Bureau of Consular Affairs?

 8                    A.   No, not fully.

 9                    Q.   What other office of the State

10   Department do they fall under?

11                    A.   They also fall under the

12   regional bureaus.

13                    Q.   The regional bureaus of the

14   State Department?

15                    A.   Yes.

16                    Q.   Which are distinct from the

17   Bureau of Consular Affairs?

18                    A.   Yes.

19                    Q.   But the Bureau of Consular

20   Affairs can develop policies that are conveyed

21   to the ALDAC?

22                    A.   Through the ALDAC.

23                    Q.   Through the ALDAC.

24                    A.   Through the ALDAC.

25                    Q.   Okay.
```

```
 1                A.    That is correct.

 2                Q.    Back to how final policies by

 3     the State Department are made public, to your

 4     knowledge has the Secretary of State ever made

 5     public a final policy of the State Department

 6     in a press conference?

 7                A.    I do not know.

 8                Q.    To your knowledge has the

 9     Secretary of State ever made public any final

10     policy of the State Department on social media?

11                A.    I do not know.

12                Q.    To your knowledge has the

13     Secretary of State ever made public a finalized

14     policy of the State Department in news media?

15                A.    I do not know for sure.

16                Q.    To your knowledge has the

17     Secretary of State made public statements about

18     the finalized policy of the State Department on

19     social media?

20                A.    I do not know for sure.

21                Q.    Is there a person in the State

22     Department who is -- who is responsible for

23     monitoring the Secretary of State's public

24     statements?

25                A.    I do not know.
```

```
 1              MS. SANTORA:  Objection.  Form.

 2    BY MS. CONLON:

 3          Q.   Are you aware of any finalized

 4    3C policies regarding Executive Order 14161

 5    protecting the United States from foreign

 6    terrorists and other national security and

 7    public safety threats?

 8          A.   Any 3C policies?

 9          Q.   Yes, sir.

10          A.   So that means they would have

11    come in after the executive order.

12          Q.   Yes.

13          A.   I'm not sure.

14          Q.   Are you aware of any 3C

15    policies developed by the State Department

16    consistent with Executive Order 14188,

17    Additional Measures to Combat Anti-Semitism?

18              MS. SANTORA:  Objection.  Form.

19          A.   I'm not sure.

20    BY MS. CONLON:

21          Q.   Do you know whether the State

22    Department has developed any policies

23    consistent with either of the two executive

24    orders?

25              MS. SANTORA:  Objection.  Form.
```

```
 1              A.   I'm not sure.  I don't know.
 2    BY MS. CONLON:
 3              Q.   Are all of the action memos --
 4    well, withdrawn.
 5         Do you receive copies of action memos
 6    submitted to the secretary with proposed policy
 7    for the State Department?
 8              MS. SANTORA:  Objection.  Form.
 9    BY MS. CONLON:
10              Q.   You can answer.
11              A.   At what point?
12              Q.   At some point before they go to
13    the secretary.
14              A.   Yes, but not all.
15              Q.   Do you receive action memos
16    regarding Visa revocation policy before they
17    are sent to the secretary?
18              A.   I do not recall an action memo
19    on Visa revocation policy.
20              Q.   You don't recall ever receiving
21    one?
22              A.   What do you mean by "Visa
23    revocation policy"?
24              Q.   Do you receive action memos
25    regarding Visa revocations before they are sent
```

```
 1   to the secretary?

 2              A.   Under what part of the INA?

 3              Q.   Any part.

 4              A.   Yes.  I have received memos to

 5   the secretary on that under various parts of

 6   the INA.

 7              Q.   Have you received memos to the

 8   secretary under the part of the INA described

 9   in your declaration in paragraph 1, "Security

10   and Related Grounds of Inadmissibility"?

11              A.   Yes.

12              Q.   Your answer is yes?

13              A.   Yes.  Yes.  My answer is yes.

14              Q.   Do you receive memos to the

15   secretary under the related provision of the

16   INA related to what you cite in paragraph 12

17   but for removability?

18              MS. SANTORA:  Objection.  Foundation.

19   BY MS. CONLON:

20              Q.   You can answer if you know.

21              A.    It is my understanding that the

22   Department of State can remove no one, only DHS

23   can remove people or other deputized law

24   enforcement.

25              Q.   The Department of State makes
```

1    determinations about removability, correct?

2            A.    We make determinations about

3    Visa status.    Visa status.

4            Q.    Including a determination that

5    a person's Visa should be revoked, correct?

6            A.    Yes.

7            Q.    Including the determination

8    that a person is removable under the INA,

9    correct?

10           A.    I don't know.    I am not a

11    lawyer.

12           Q.    Have you received action memos

13    to the secretary regarding whether a person is

14    removable for a security or related ground

15    under the INA of any provision?

16           A.    I do not recall.

17           Q.    Now, you also mention in your

18    declaration another provision of the I&A on

19    page 2 at paragraph 8.    Can you please turn to

20    that page?

21           A.    What was the page?

22           Q.    Page 2.

23           A.    And the paragraph?

24           Q.    Paragraph 8.

25           A.    Thank you.

1           Q.   If you could just take a moment

2    to look at that first full sentence.  I just

3    need you to look at the first sentence.  Have

4    you read that?

5           A.   Section 221(i).

6           Q.   Yes, that's the section cited

7    there?

8           A.   Okay.  Would you repeat the

9    question please.

10          Q.   I haven't asked it so you

11   didn't miss it.

12          A.   Sure.

13          Q.   Don't worry.

14          A.   Well, I thought there was a

15   question, too, and I was supposed to refer to

16   this.

17          Q.   It's coming.  Have you received

18   any memos to the secretary with a determination

19   of inadmissibility or removability under the

20   provision cited in paragraph 8 of your

21   declaration?

22          A.   Yes.

23          Q.   Do you know whether the 3C

24   special policy project also concerns the

25   provision of the INA at paragraph 8 of your

1    declaration?

2              A.    Yes.

3              Q.    And does it concern that

4    provision?

5              MS. SANTORA:   Objection.   Calls for

6    information privileged under the deliberative

7    process privilege.   I instruct the witness not

8    to answer.

9    BY MS. CONLON:

10             Q.    In terms of finalized receipt

11   policies from the State Department, are you

12   aware of any that address concerns around

13   anti-Semitism?

14             A.    I cannot say with certainty.

15             Q.    Is there anything in particular

16   that you're thinking of that makes you unsure?

17             A.    There are so many 3C policies,

18   I do not know them all.

19             Q.    A 3C policy is 3C because it

20   falls under 1182(a)(3)(c).   Is that what you

21   mean when you say 3C?

22             A.    It's a section of the INA.

23             MS. CONLON:   Just one second.   I

24   think perhaps this will make it easier.   I'm

25   going to pass you all a document.   Let me just

```
 1    make sure they're the identical number of
 2    pages.  Here you go for you, and for you.
 3              (Exhibit 2 was marked.)
 4    BY MS. CONLON:
 5         Q.   I am going to ask you to turn
 6    to page 5 of this document, please and to look
 7    at section C in the middle of the page where it
 8    says foreign policy.  When you've had a chance
 9    to review section C on page 5, please let me
10    know.
11         A.   I have had a chance to review.
12         Q.   Now, we talked a moment ago
13    about section 1182 of the U.S. Code subsection
14    A, subsection 3, subsection C.  Is that -- have
15    you seen this provision subsection C before?
16         A.   Not this.  I've seen it in the
17    INA.
18         Q.   You're aware that there are
19    parallel provisions of the U.S. Code in the --
20         A.   I am not.
21         Q.   You're not aware of that?
22         A.   I'm aware that counselor
23    offices tend to refer to the INA so I use that.
24         Q.   Okay.  But you understand that
25    there are identical parallel provisions
```

```
 1    codified in the U.S. Code?

 2              A.   Yes.  I misspoke.  I do

 3    understand that.

 4              Q.   And you actually cited to that

 5    in your declaration?

 6              A.   Yes, because they're the same.

 7              Q.   Right.  Exactly because they

 8    are the same.

 9              A.   And yes, C, I'm familiar with

10    that.

11              Q.   So when you talk about 3C

12    policies, do you mean policies developed

13    pursuant to C foreign policy on page 5 of this

14    exhibit?

15              A.   Yes.  There are many of them.

16              Q.   Approximately how many have

17    been finalized since 2025 began?

18              A.   I don't know.  20, 10, since

19    this year?

20              Q.   Correct.

21              A.   Since this administration,

22    since January 20.

23              Q.   That's exactly right.  That's

24    the question.

25              A.   10, 20.
```

```
 1              Q.   And you have so far mentioned
 2    only three.  You mentioned the 3C policy
 3    against foreign Government officials who
 4    support illegal migration.  A similar policy
 5    against private persons who support illegal
 6    migration and a policy relating to gross
 7    violators of human rights.  You agree with me
 8    that there are more?
 9              A.   It seems to me there are more
10    once a 3C policy is put in effect, it remains
11    in effect.  So there's all the ones from the
12    previous administrations.
13              Q.   Are you aware -- are you
14    familiar with any that have been put into
15    effect by this administration, the current
16    administration?
17              A.   The one that I noted on the
18    officials involved in facilitating illegal
19    migration.  There may be others.  That is the
20    one I am aware of.
21              Q.   Who in the State Department
22    develops the 3C policies under this
23    administration?
24              MS. SANTORA:  Objection.  Form.
25    Objection.  Foundation.
```

1    BY MS. CONLON:

2                Q.    You can answer.

3                A.    It depends on the subject they

4    deal with.

5                Q.    Who in the State Department

6    develops policy relating to the two executive

7    orders cited in your declaration?

8                MS. SANTORA:    Objection.    Foundation.

9    BY MS. CONLON:

10               Q.    You can answer?

11               A.    I need to refresh my memory of

12   the executive order.

13               Q.    Okay.    I can just save you the

14   time and tell you what they are?

15               A.    Okay.

16               Q.    Who, to your knowledge,

17   develops policy for the State Department

18   regarding Executive Order 14161 Protecting the

19   United States From Foreign Terrorist and Other

20   National Security and Public Safety Threats?

21               MS. SANTORA:    Objection.    Form.

22   Objection.    Foundation.

23   BY MS. CONLON:

24               Q.    You can answer?

25               A.    To my knowledge, which may be

```
 1    incomplete, Mr. Veprek works on that, Bureau of

 2    Consular Affairs works on that, the Counter

 3    Terrorism Bureau.

 4               Q.   Are you finished answering?

 5               A.   Also in the development of a

 6    policy, the very important part is the

 7    clearance process.

 8               Q.   What is the clearance process?

 9               A.    It is when the written policy

10    action memo goes around and all offices who

11    have any equities have to sign off on it.  So

12    an action memo could have 20 offices that need

13    to sign off on it.  So all those offices,

14    depending how we define development, could also

15    have a role, if they change something, for

16    example.

17               Q.   Are you aware of any other

18    offices with involvement in developing policy

19    in response to Executive Order 14161 Protecting

20    the United States From Foreign Terrorist and

21    Other National Security and Public Safety

22    Threats?

23               MS. SANTORA:  Objection.  Foundation.

24    Are you able to show him the document you're

25    referring to?
```

```
 1              MS. CONLON:  You want me to show him
 2    Executive Order 1416 --
 3              MS. SANTORA:  Executive order.
 4    BY MS. CONLON:
 5         Q.   Sure.  Although I don't think
 6    I'm asking him to interpret the text of it, so
 7    let's try this first.  You're familiar with
 8    Executive Order 14161 Protecting the United
 9    States From Foreign Terrorist and Other
10    National Security and Public Safety Threats?
11         A.   Yes.
12         Q.   Okay.  You have mentioned that
13    you understand that for the State Department,
14    Mr. Veprek and the Bureau of Consular
15    Affairs --
16         A.   He does not work for the Bureau
17    of Consular Affairs.
18         Q.   Oh, I'm sorry.  He works for
19    the counselor?
20         A.   The counselor, Mr. Needham.
21         Q.   Right.  So you have mentioned
22    that you're aware that he works on developing
23    policy in response to that E.O. and you've
24    mentioned that the counter terrorism bureau may
25    be involved.  Are there any other bureaus or
```

```
 1    offices of the State Department that you are

 2    aware of as being involved in that regard?

 3              A.   My understanding that anyone

 4    who development being defined as clearance

 5    there's the Office of the Deputy Secretary,

 6    there's the Office of the Under Secretary For

 7    Political Affairs, there is the office of my

 8    supervisor, the Under Secretary For Management,

 9    there is the -- it's called SP, I don't --

10    policy planning is another office.

11        Also it's my understanding that there can

12    be geographic offices, geographic bureaus could

13    play a role.

14              Q.   You've said understanding that

15    developing policy as clearance?

16              A.   Yes.

17              Q.   Who do you understand from the

18    State Department to be involved in creating the

19    State Department's policy response to this

20    executive order as opposed to it being in the

21    clearance process?

22              MS. SANTORA:   Objection.   Foundation.

23    I'm going to ask again that you show him the

24    document.   You're asking him to speculate on

25    it.   He said he's familiar with it, but I -- he
```

1    clearly doesn't have the document memorized and

2    it's not in front of him.

3              MS. CONLON:  I understand.  If I were

4    asking questions about what's in that document

5    I would definitely do that, but I don't want to

6    derail us because right now I just am curious

7    about who in the State Department is a part of

8    the response.

9         So if you could just respond to the

10   question to the extent you're able to from your

11   recollection.

12   BY MS. CONLON:

13             Q.   Who within the State Department

14   is part of responding to executive order issued

15   this year protecting the United States from

16   foreign terrorist and other national security

17   and public safety threats?

18             MS. SANTORA:  Objection.  Foundation.

19             UNIDENTIFIED PERSON:  She's going to

20   take forever.

21             THE WITNESS:  Am I required to

22   answer?

23             MS. SANTORA:  Yes.

24             A.   Are you asking about concrete

25   people or organizational bodies?

```
 1    BY MS. CONLON:
 2            Q.    Let's start with organizational
 3    bodies.
 4            A.    It will depend.  And the
 5    question is it about the creation of the
 6    policy, not the clearance.
 7            Q.    Exactly?
 8            A.    Although I will take issue, I
 9    believe that clearance is creation, but I will
10    try to answer.  Mr. Veprek and the counselor's
11    office, the secretary's office, the Office of
12    Deputy Secretary, Mr. Landau, Ambassador
13    Landau; Christopher, his name, the deputy
14    secretary, the Office of the Under Secretary
15    for Political Affairs, the Counter Terrorism
16    Bureau, Bureau of Consular Affairs and
17    depending on the exact part of terrorism or
18    issue being dealt with, one of the regional
19    bureaus could be involved in the actual
20    creation, drafting -- sorry.  I've been in the
21    State Department for 30 years -- drafting
22    authorship of the document that has later
23    cleared.
24            Q.    In terms of particular people,
25    who in the Bureau of Consular Affairs is part
```

1    of creating policy in response to this

2    executive order?

3              MS. SANTORA:  Objection.  Foundation

4    objection.  Calls for speculation.

5    BY MS. CONLON:

6              Q.   You can answer?

7              A.   To my knowledge --

8              Q.   Yes.

9              A.   -- which may be incomplete.

10   Various people mentioned previously.  Mr. DAS

11   Smith -- or sorry, DAS Wilson.  The - whoever

12   is in the role of the acting principal deputy

13   assistant secretary, the people who work in the

14   Visa office, Miss Norris, Managing Director

15   Norris and people who work for her.  I do not

16   know all their names.

17             Q.   Any other person or part of the

18   Bureau of Consular Affairs relevant to that

19   creation of this policy?

20             MS. SANTORA:  Objection.  Calls for

21   speculation.

22             THE WITNESS:  I must answer?

23             MS. SANTORA:  Yes.

24             A.   It seems to me based on my

25   recollection, which may be incomplete, the key

 1    players are off- organizational units or the

 2    front office and the Visa office.

 3                 MS. CONLON:  I think it makes sense

 4    for us to take a short break now for a few

 5    minutes, then we can figure out timing of a

 6    lunch break if anybody wants to do that.  So

 7    could we please go off the record?

 8                 THE VIDEOGRAPHER: Off the record,

 9    12:23 p.m.

10                    (A break was taken.)

11                 THE VIDEOGRAPHER: We're back on the

12    record at 12:48.

13    BY MS. CONLON:

14           Q.   Okay.  Focusing for a moment on

15    3C policies that have been developed under this

16    administration, were any of those policies the

17    result of a special project from the Bureau of

18    Consular Affairs?

19           A.    I do not know.

20           Q.    Were any of those policies the

21    result of work performed by Ms. Smith?

22           A.    To my knowledge, no.

23           Q.    Who, to your knowledge -- well,

24    withdrawn.  I just want to check the

25    transcript.  Hold on one second.

1          So just for clarity, do you know who

2      from the Bureau of Consular Affairs has

3      contributed to the development of 3C policies

4      under this administration?

5                MS. SANTORA:  Objection.  Form.

6          A.   I know with certainty that I

7      have reviewed some of them, but I do not

8      remember the policies.

9      BY MS. CONLON:

10         Q.   Did you review any 3C policies

11     under this administration apart from the three

12     you mentioned earlier?

13         A.   I do not know.

14         Q.   Sorry.  You --

15         A.   I do not recall.  I do not

16     recall.

17         Q.   The only three you recall

18     reviewing are -- withdrawn.  The only ones you

19     recall reviewing are the three you mentioned;

20     is that right?

21         A.   Two of them existed previous to

22     this administration.  I recall reviewing the

23     one about the officials.

24         Q.   Who else are you aware of in

25     the Bureau of Consular Affairs has worked on

```
 1    the development of 3C policies under this

 2    administration?

 3             MS. SANTORA:  Objection.  Calls for

 4    speculation.

 5             A.   Per my recollection in the

 6    clearance process that counsels work on the

 7    policy.

 8    BY MS. CONLON:

 9             Q.   Not for this question.  So but

10    I --

11             A.   I don't know.

12             Q.   -- appreciate your clarifying

13    answer.

14             A.   I don't know.

15             Q.   Okay.  Have you consulted any

16    finalized 3C policies in reviewing Visa

17    revocations under this administration?

18             A.   Could you repeat the question?

19             Q.   Sure.  Have you consulted any

20    finalized 3C policies in reviewing Visa

21    revocations under this administration?

22             A.   To my recollection, no.

23             Q.   Have you made any determination

24    that a person is removable under a 3C policy

25    under this administration?
```

```
 1              MS. SANTORA:  Objection.  Foundation.
 2    BY MS. CONLON:
 3              Q.   Go ahead.
 4              A.   DHS does removals.  They have
 5    the final say on that.  I have no power to
 6    deport anyone.
 7              Q.   Have you made any
 8    determinations that a person's Visa should be
 9    revoked under that 3C in this administration?
10              A.   I believe so, but I do not
11    remember details at this moment.
12              Q.   Have you reviewed any finalized
13    3C policies that are relevant to Visa
14    revocations that you have approved?
15              MS. SANTORA:  Objection.  Form.
16              A.   Could you repeat that?  I'm
17    sorry.  Seems convoluted.
18    BY MS. CONLON:
19              Q.   Have you reviewed any finalized
20    3C policies in making Visa revocations?
21              A.   Have I reviewed the policies in
22    order to make the revocation?
23              Q.   Yes.
24              A.   So an existing policy?
25              Q.   Yes.
```

```
 1                   A.    That I did not create?

 2                   Q.    Yes.

 3                   A.    I'm not sure.

 4                   Q.    Have you created any 3C

 5     policies under this administration?

 6                   A.    If clearance is creation, I

 7     contributed to one at least.

 8                   Q.    Which one?

 9                   A.    The one with the officials.

10                   Q.    I think with respect to 3C, we

11     can move on.  Have you reviewed any policies --

12     withdrawn.

13          Have you contributed to, through

14     clearance, any policies relating to Visa

15     revocation developed under this administration

16     regard -- setting aside 3C completely?

17                   MS. SANTORA:  I'm sorry, can you

18     repeat the question?

19     BY MS. CONLON:

20                   Q.    Sure.  Have you -- is "cleared"

21     the verb?

22                   A.    Cleared.  Yes, cleared.

23                   Q.    Have you cleared any policies

24     relating to Visa revocation developed under

25     this administration?
```

```
 1              A.   I'm not sure.  I clear a lot of
 2    stuff.
 3              Q.   Can you give me an estimate of
 4    how many policies relating to Visas you have
 5    cleared under this administration?
 6              A.   50, 100.
 7              Q.   A lot?
 8              A.   Yes, many.
 9              Q.   Have any of those policies
10    addressed specifically combatting
11    anti-Semitism?
12              A.   Yes.
13              Q.   Tell me about that policy.
14              MS. SANTORA:  Objection.  Form.  You
15    can answer.
16              THE WITNESS:  Am I obligated to
17    answer?
18              MS. SANTORA:  Yes.
19              A.   One sticks in my mind in
20    particular.  The catch and revoke policy.
21    BY MS. CONLON:
22              Q.   What is that?
23              A.   It means that when -- there was
24    a cable issued about this authored by -- sorry,
25    I don't remember fully.  There is a cable,
```

```
 1   catch and revoke, and it talked about the
 2   importance of when people that had several
 3   elements, and one of them, a reason for
 4   revoking a Visa was anti-Semitism but also
 5   criminal activity.
 6            Q.   Do you recall who this cable
 7   was sent to?
 8            A.   I believe -- well, yes, it was
 9   an ALDAC.
10            Q.   I may have a copy, let me just
11   take a look if I'm thinking of same document as
12   you.
13       Before I start putting documents in
14   front of you, I want to make sure I give you
15   the right thing.  Are you aware of more than
16   one cable issued under this administration
17   concerning anti-Semitism?
18            A.   I am aware of this cable with
19   certainty.
20            MS. CONLON:  Okay.  One second.  All
21   right.  I can pass you guys a document.
22            (Exhibit 3 was marked.)
23            MS. CONLON:  So I have just handed
24   you a multi-page document which I think has now
25   been marked as Exhibit 3.  Thank you,
```

1    Ms. Henderson, and it has an index on the

2    front.  And if you look at that index, the

3    third entry says, Department of State cable

4    26168 and the page numbers are at the bottom, a

5    very small text.  It says AAUPCAR followed by a

6    number.  If you could turn to page 12, please.

7                A.   No, this isn't catch and

8    revoke.

9                Q.   Okay.  So to be clear, the

10   document that begins at page 12 in this exhibit

11   is not catch and revoke; is that correct?

12               A.   Yes.

13               Q.   Thank you, that is helpful.  So

14   we can put this away for a moment or set it

15   aside.  So the cable?

16               A.   Sorry, one minute.  One minute.

17   Sorry.

18               Q.   Yeah.  Take your time.

19               A.   I apologize.

20               Q.   We may come back to this one,

21   but right now, I do want to ask you about the

22   cable that you were recollecting which it

23   sounds like it's not this one?

24               A.   Just one second.  I'm not

25   certain -- again, this was in March.  It's ages

 1   ago.

 2          No.   I don't believe this is it.   I

 3   believe there's another cable.

 4                 Q.   Okay.   The cable you're

 5   thinking of, do you recall approximately when

 6   it was issued?

 7                 A.   March.

 8                 Q.   And do you recall who issued

 9   it?

10                 A.   I don't understand the

11   question.

12                 Q.   When -- do you -- using that as

13   an example, hang on, do you recall who wrote

14   that cable, whose name appeared on the cable as

15   the from?

16                 A.   It's -- they're all from the

17   secretary.

18                 Q.   Do you recall the content of

19   the cable?

20                 MS. SANTORA:   Objection.   Foundation.

21   Objection.   Calls for speculation.

22   BY MS. CONLON:

23                 Q.   Do you recall the content of

24   the cable?

25                 A.   To my recollection, the cable

1    talked about the importance of using the

2    information that we have to revoke Visas.  In

3    other words, catching, for example, criminal

4    activity or pro-Hamas activity, and then going

5    after the person that -- going after --

6    revoking the Visa on that basis.

7              Q.    Did the catch and revoke cable

8    focus on particular types of Visa holders?

9              MS. SANTORA:  Objection.  Foundation.

10   Objection.  Calls for speculation.

11             A.    Nonimmigrant Visa holders.

12   BY MS. CONLON:

13             Q.    Did it mention specifically

14   student Visa holders?

15             A.    I do not recall.

16             Q.    You said the cable specifically

17   addressed the importance of catching pro-Hamas

18   Visa holders; is that correct?

19             A.    To my recollection, the support

20   for terrorist anti-Semitic organizations was

21   mentioned.

22             Q.    Do you recall whether that

23   cable set forth any sort of definition of

24   pro-Hamas?

25             A.    I do not recall.

1      Q.   Do you recall whether it set

2   forth any definition of support for pro-Hamas?

3      A.   I do not recall.

4      Q.   Do you recall whether that

5   cable discussed not only support for Hamas but

6   those who endorse or espouse its views?

7      A.   I'm not sure.

8      Q.   You mentioned that the cable

9   did address anti-Semitism as well, correct?

10      A.   That is my recollection.

11      Q.   Do you recall whether that

12   cable explained how the State Department

13   defines anti-Semitism?

14      A.   I do not recall.

15      Q.   Do you recall whether --

16   withdrawn.

17         Did the cable specifically discuss

18   anti-Semitism on college campuses in the U.S.?

19         MS. SANTORA:   Objection.   Calls for

20   speculation.

21      A.   I do not recall.

22   BY MS. CONLON:

23      Q.   Do you recall whether the cable

24   specifically discussed students at all in any

25   capacity?

 1              A.    I do not recall with certainty.

 2              Q.    What is the -- withdrawn.

 3         The cable you are talking about, it

 4    contained guidance to the diplomatic and

 5    consular posts that received it; is that

 6    correct?

 7              A.    Yes.

 8              Q.    What did that cable tell them

 9    to do?

10              A.    It is my recollection, as I

11    previously stated, that it instructed them when

12    derogatory information was found that was of

13    such a weight that a Visa should be revoked and

14    should be revoked including systems messages.

15              Q.    I'm sorry.  What are systems

16    messages?

17              A.    They're messages that come up

18    in the computer system about applicants who

19    have previously received Visas.

20              Q.    So for example, somebody who

21    works in a consulate speaking to an applicant

22    could enter their name into a system and see

23    information about them?

24              A.    No, the system message comes up

25    on its own.  It's sent on its own.

1        Q.   I see.  Okay.  And did the

2   cable direct the review of current Visa holders

3   or did it speak only of what you were

4   describing, an applicant?

5        MS. SANTORA:  Objection.  Calls for

6   speculation.

7        A.   Sorry.  It referred to current

8   Visa holders for clarity, Visa holders, former

9   applicants.

10  BY MS. CONLON:

11       Q.   Did the cable address lawful

12  permanent residents?

13       MS. SANTORA:  Objection.  Calls for

14  speculation.

15       A.   I do not believe so because it

16  dealt with nonimmigrant Visas and by

17  definition.

18       Q.   Is there an arm of the Bureau

19  of Consular Affairs that does deal with lawful

20  permanent residents or green cards?

21       A.   Could you refine what you mean

22  by "deal with"?

23       Q.   Well, you said the Bureau of

24  Consular Affairs has an office of Visas.  Is

25  there a counter part for lawful permanent

```
 1    residents or green cards?

 2              A.    No.

 3              Q.    What -- does the Bureau of

 4    Consular Affairs have any involvement in the

 5    issuance or revocation of green cards?

 6              MS. SANTORA:   Objection.  Form.

 7              A.    The Bureau of Consular Affairs

 8    and the Visa office both work on the issuance

 9    of immigrant Visas, the result of which can be

10    lawful permanent residents.

11    BY MS. CONLON:

12              Q.    Am I correct that the Bureau of

13    Consular Affairs does not make

14    determinations -- well, withdrawn.

15         Does the Bureau of Consular Affairs

16    play any part in making a determination that a

17    green card should be revoked?

18              A.    I don't know.

19              Q.    Fair to say you have not played

20    a role in that?

21              A.    I cannot state with certainty

22    because it's a legal question, and I'm not a

23    lawyer.

24              Q.    I'm not seeking to ask you a

25    legal question or seeking a legal opinion.
```

 1    Simply, have you worked on matters involving

 2    lawful permanent residents?

 3            A.    Yes.

 4            Q.    Have you worked on matters

 5    regarding the revocation of a green card from a

 6    lawful permanent resident?

 7            A.    I don't know.  I don't know.

 8            Q.    Okay.

 9            A.    It's complicated.

10            Q.    Is there -- what is your

11    understanding of the process for the revocation

12    of a green card?

13            A.    My understanding is that DHS

14    has to do it, but there may be parts of the INA

15    that I do not know that give other people power

16    to do that.

17            Q.    When the Secretary of State

18    makes a determination that a lawful permanent

19    resident is removable pursuant to the foreign

20    policy provision, does that involve the Bureau

21    of Consular Affairs?

22            A.    Yes.

23            Q.    Does that involve you

24    personally?

25            A.    It could.

 1              Q.   Is there a separate office

 2     within the Department of State dedicated to

 3     making those determinations about lawful

 4     permanent residents?

 5              A.   Dedicated only to that?

 6              Q.   Another office that addresses

 7     that.

 8              A.   My understanding is, we do not

 9     have the power to do an actual revocation even

10     under the form policy grounds.  My

11     understanding is, we can make a determination,

12     but we do not do the actual revocation.

13              Q.   Is there another office of the

14     Department of State involved in making the

15     determination that a lawful permanent

16     resident's green card should be revoked?

17              A.   What do you mean by "office"?

18              Q.   I'm using office here to be

19     inclusive of any component part division of the

20     Department of State that you are aware of.

21              A.   The legal advisors would have a

22     role in rendering such an opinion.  The legal

23     advisors' office.

24              Q.   Would the legal advisors'

25     office be involved in seeking the secretaries

 1    that determination that a lawful permanent

 2    resident is removal pursuant to the foreign

 3    policy provision?

 4              MS. SANTORA:   Objection.   Calls for

 5    speculation.

 6    BY MS. CONLON:

 7              Q.   If you know?

 8              A.   If we're making a determination

 9    under what part of the law?

10              Q.   Under the foreign policy

11    provision.

12              A.   To my knowledge.   The legal

13    advisor would clear on such determinations or

14    the legal advisors' staff.

15              Q.   Is there anyone at the State

16    Department other than you who you know

17    participates in clearing a determination that a

18    lawful permanent resident's green card should

19    be revoked?

20              A.   You mean the determination

21    under the foreign policy provision.

22              Q.   Yes.

23              A.   Again, my understanding is, we

24    do not revoke the green card.

25              Q.   Yes.   The determination under

 1    the foreign policy provision.  Anyone other

 2    than you.  Surely there are.

 3             A.   In the clearance process?

 4             Q.   Yes.

 5             A.   Oh, yeah.

 6             Q.   Okay.  What are the components

 7    that are part of that clearance process?  The

 8    entities, whatever word I need to use.

 9             A.   Offices.

10             Q.   That's the one I want, I guess.

11    Yes.

12             A.   The offices, to my

13    recollection, are Bureau of Consular Affairs,

14    Visa office is part of that.  It would go

15    through those in the front office who work on

16    Visas, Mr. Wilson, the -- or whoever is in the

17    role of DAS, Deputy Assistant Secretary for

18    Visa services, the Principle Deputy Assistant

19    Secretary, in my absence, that person would be

20    acting, Visa Office Managing Director, various

21    people at the Visa office, Counselor's Office

22    would likely review it, the Deputy Secretary's

23    Office would likely review it, the Policy and

24    Planning Office may review it, the staff of the

25    -- Under Secretary for Management would likely

```
 1    clear -- by review, I mean, clear, would clear.
 2    The office of the legal advisor would clear as
 3    previously noted.  Those are all that I
 4    remember.
 5              Q.   Which, if any, of those offices
 6    would be involved in seeking the secretary's
 7    determination as opposed to simply clearing it?
 8              MS. SANTORA:  Objection.  Calls for
 9    speculation.
10              A.   I'm not sure I can comprehend
11    the question.  In the --
12    BY MS. CONLON:
13              Q.   So, is an action memo written
14    when the State Department seeks a determination
15    from the secretary that a lawful permanent
16    resident should be -- should have their green
17    card revoked under the foreign policy
18    provision?
19              A.   I believe the determination is
20    just for the foreign policy provision.  Again,
21    as I repeated several times, DHS make as call
22    on revocation.  My understanding is, we can't
23    actually revoke a green card.
24              Q.   Okay.  I'm asking about the
25    determination that it ought to be revoked.
```

```
 1              A.    The determination that the

 2    person is under the foreign affairs, the 3C.

 3              Q.    I'm asking -- sure.  A

 4    determine in addition made by the State

 5    Department that a lawful permanent resident

 6    should have their green card taken from them

 7    under the foreign policy provision?

 8              A.    Do you have a particular

 9    document you would like me to look at?

10              Q.    I don't actually.  I'm asking

11    whether an action memo is written in that

12    circumstance.

13              A.    It's my recollection that in

14    such circumstances because it requires a

15    decision by a secretary on a person, there

16    would be an action memo written.

17              Q.    And in your experience, which

18    office is involved in writing the action memo?

19              A.    As opposed to clearing?

20              Q.    Exactly.

21              MS. SANTORA:  Objection.  Calls for

22    speculation.

23              A.    In my experience, someone in

24    the Visa office would be the author, the

25    drafter.
```

```
 1    BY MS. CONLON:

 2              Q.   Who in the Visa office?

 3              MS. SANTORA:  Objection.  Calls for

 4    speculation.

 5              A.   Could be any number of people.

 6    There's probably over a hundred people working

 7    in the Visa office.

 8    BY MS. CONLON:

 9              Q.   At what level of worker in the

10    Visa office is this kind of a memo written?

11              A.   A mid level, I believe.  Mid to

12    lower.

13              Q.   You're not writing the memo?

14              A.   I am not.

15              Q.   Is there a particular title

16    that a person who writes this memo would hold?

17    Is that an analyst?

18              MS. SANTORA:  Objection.  Foundation.

19    Objection.  Calls for speculation.

20              A.   I don't know.

21    BY MS. CONLON:

22              Q.   When you've received these

23    memos, is there anyone in particular that you

24    recall having written them?

25              A.   As opposed to clearing?
```

```
 1                 Q.    Exactly.

 2                 A.    No.

 3                 Q.    Do you recall the author of any

 4     memo -- action memo you have seen regarding the

 5     that proposed revocation of a lawful permanent

 6     resident's green card under the foreign policy

 7     provision this year?

 8                 A.    Could you -- I'm sorry.  Could

 9     repeat the question?

10                 Q.    I know, it's so long.  I'm

11     asking if you remember the name of anyone who

12     wrote any of the memos you have seen just this

13     year?

14                 A.    The drafter?

15                 Q.    Exactly.

16                 A.    No.

17                 Q.    Is there someone who is

18     subordinate to you who reviews those memos

19     before they are provided to you?

20                 A.    Generally, yes.

21                 Q.    Who is that person?

22                 A.    The person in the Principal

23     Deputy Assistant Secretary role, the person in

24     the Deputy Assistant Secretary for Visa

25     services role, the managing director for Visa
```

```
 1    services, those are the ones within the Bureau

 2    of Consular Affairs, and there maybe others,

 3    but those are the three that stick in my mind.

 4    That is my recollection.

 5            Q.   Okay.  Just a moment.  Okay.

 6    That was a detour, unexpected.  I would like to

 7    go back to the cable as you recall it for catch

 8    and revoke.

 9            Do you know who was involved in the

10    development of that cable?

11            MS. SANTORA:  Objection.  Calls for

12    speculation.  Objection.  Foundation.

13            THE WITNESS:  I'm required to answer?

14            MS. SANTORA:  Uh-huh.

15            A.   To my recollection, Mr. Olowski

16    was involved, Lew Olowski.

17    BY MS. CONLON:

18            Q.   Lew Olowski?

19            A.   Yes.

20            Q.   Does he work in the Bureau of

21    Consular Affairs?

22            A.   No, he does not.

23            Q.   Where does he work?

24            A.   Presently, he works in the

25    PERT, Personnel and Training.
```

```
 1              Q.   Is that within the State

 2    Department?

 3              A.   Yes.

 4              Q.   Do you know whether anybody

 5    other than Mr. Olowski was involved in the

 6    development of the cable?

 7              A.   I believe Mr. Veprek was

 8    involved.

 9              Q.   Do you know of anyone else who

10    was involved in the development of the cable?

11              A.   As opposed to clearance?

12              Q.   Yes.

13              A.   It's possible that Mr. Wilson

14    was involved.  I do not know.  I know I saw it

15    in the clearance process.

16              Q.   Did anyone discuss the cable

17    with you before you were asked to clear it?

18              A.   I'm not sure.

19              Q.   Did you contribute in any way

20    to the development of the catch and revoke

21    policy set out in the cable?

22              MS. SANTORA:   Objection.   Form.

23              A.   I cleared it.

24    BY MS. CONLON:

25              Q.   Other than by clearing it?
```

```
 1                    A.   I do not believe so.

 2                    Q.   Did the cable establish any new

 3    process that the recipients were expected to

 4    undertake?

 5                    MS. SANTORA:   Objection.   Form.

 6                    A.   What do you mean by

 7    "recipients"?

 8    BY MS. CONLON:

 9                    Q.   The people who the cable was

10    sent to?

11                    A.   I don't know.

12                    Q.   Apart from reviewing system

13    messages relevant to the topics of the catch

14    and revoke cable, did the cable direct the

15    recipients to do anything else?

16                    A.   I recall it directed greater

17    vigilance, it may have directed other things.

18                    Q.   Do you recall whether it

19    directed the review of social media?

20                    A.   I don't know.

21                    Q.   Did the cable address the

22    monitoring of nonimmigrant Visa holders' social

23    media accounts?

24                    A.   I do not believe so.

25                    Q.   Do you recall whether the cable
```

1    addressed social media in any respect?

2              A.    I do not recall.

3              Q.    Just a moment.  To your

4    knowledge, is the catch and revoke policy

5    currently being implemented?

6              A.    Yes.

7              Q.    To your knowledge, was the

8    catch and revoke policy developed in response

9    to an executive order?

10             MS. SANTORA:  Objection.  Foundation.

11   Calls for speculation.

12             A.    I believe so, yes.

13   BY MS. CONLON:

14             Q.    Which executive order?

15             A.    This one here (indicating).

16             Q.    You're looking at which

17   document?

18             A.    MRN 2618, 25 state 2618.  I

19   think it's the third.

20             Q.    Sorry.  What page number of

21   that exhibit are you looking at?

22             A.    1.

23             MS. SANTORA:  Which page, all the way

24   the bottom, center, bottom?  Yeah, they're very

25   small.

```
 1                   A.    AAUPCAR 012.

 2                   Q.    Thank you.

 3                   A.    You're welcome.

 4                   Q.    In other words, the catch and

 5      revoke policy was developed in response to

 6      Executive Orders 14161 and 14188; is that

 7      correct?

 8                   A.    14188, I believe.

 9                   Q.    The executive order about

10      additional measures to combat anti-Semitism?

11                   A.    And protect the United States

12      from foreign terrorist and other national

13      security.  Oh, wait no.  There's two executive

14      orders.

15                   Q.    Yes.

16                   A.    Yes.  I believe it was those

17      two.  I'm not 100 percent certain.

18                   Q.    Are you aware of -- withdrawn.

19              Has the State Department, to your

20      knowledge, announced the catch and revoke

21      policy to the public?

22                   A.    I don't know.

23                   Q.    To your knowledge, has the

24      secretary made any public statements about

25      catch and revoke?
```

1              A.    I do not know.

2              Q.    Are you aware of other policies

3    developed by the State Department in response

4    to either of the executive orders that we just

5    discussed?

6              A.    Define "policy," please.

7              Q.    Well, first, are you aware of

8    any other cables that have been sent in

9    response to Executive Orders 14161 or 14188?

10             A.    I do not recall any.

11             Q.    For clarity, the cable that

12   begins on CAR 012 of Exhibit 3, this is not a

13   cable you have seen before?

14             A.    This is not -- no, I have seen

15   this before.

16             Q.    Okay.  So apart from this cable

17   and the catch and revoke cable you have

18   described, those two cables, you are not aware

19   of any cables issued as a part of response of

20   the two executive orders?

21             A.    I do not recall any.

22             Q.    Are you aware -- so I was

23   asking about policies.  Are you aware of any

24   action memos seeking the secretary's approval

25   that set forth a policy issued in response to

1    either of the executive orders?

2              A.    With the exception of these two

3    cables which did not go to the secretary?

4              Q.    These cables did not go to the

5    secretary?

6              A.    They did not.

7              Q.    Whole did these cables go to?

8              A.    It's my recollection that I

9    approved both catch and revoke cable and this

10   one.

11             Q.    And the buck stopped with you

12   on both of them?

13             A.    Yes, I was the one who approved

14   them, and then were transmitted to all

15   diplomatic and consulate posts.

16             Q.    I see.  Well, while we're on

17   the topic, have you approved any other action

18   memos submitted to you as part of the

19   Department's response to the two executive

20   orders?

21             A.    I do not recall any.

22             Q.    Are you aware of other action

23   memos submitted to the secretary for approval

24   in response to either of the executive orders?

25             A.    I do not recall any.

```
 1              Q.   Are you aware off -- if you --
 2    to the extent you recall in the catch and
 3    revoke cable that you cleared, what reasons
 4    were set forth as the basis for revocation?
 5              A.   Generally, activity as -- as I
 6    recall, generally, activity contrary to the
 7    purpose of travel in the Visa -- that the Visa
 8    was issued for.
 9              Q.   Did the cable provide any more
10    detail than that?
11              A.   My recollection is, it
12    mentioned law enforcement issues and it also
13    mentioned anti-Semitic activity.
14              Q.   What kind of anti-Semitic
15    activity did it mention as best you recall?
16              A.   I do not recall specific
17    examples.  I'm sorry.
18              Q.   It's okay.  Do you need a
19    break?
20              A.   No, I'm good.  Keep going.
21              Q.   Do you recall whether the catch
22    and revoke cable the anti-Semitic activity had
23    to be criminal activity to be a basis for
24    action?
25              A.   I do not recall.
```

1          Q.    You said that -- you said that

2    the cable generally addressed as a basis for

3    action activity contrary to the purpose of

4    travel.   Did the cable specifically address

5    student Visas?

6              A.    It addressed nonimmigrant

7    Visas.

8              Q.    Did it expressly address

9    student Visas?

10             A.    I do not recall which

11   nonimmigrant Visas were expressly addressed.

12             Q.    Cables are one way that a

13   directive can be given to people in the field

14   where a new directive is set forth by the State

15   Department; is that right?

16             A.    What do you mean by

17   "directive"?

18             Q.    Well, how would you describe

19   the content that -- withdrawn.

20         The cable, the catch and revoke cable,

21   would you call that a directive?

22             A.    I would call it guidance or

23   instructions.

24             Q.    Are you aware of any other

25   guidance or instructions issued regarding

1    anti-Semitism since the beginning of this

2    administration?

3              A.    These two ex -- the one

4    executive order?

5              Q.    Whether or not it's an

6    executive order.

7              A.    No.  I'm aware of this

8    executive order.  That is a directive or

9    instruction against anti-Semitism.

10             Q.    Yes, sorry.  Are you aware of

11    any others?

12             A.    I do not recall any others.

13             Q.    Do you know whether the State

14    Department has issued any guidance or

15    instructions regarding anti-Semitism since the

16    beginning of this administration?

17             A.    It is possible, but I do not

18    recall concrete examples.

19             Q.    You mentioned that the catch

20    and revoke cable related to nonimmigrant Visa

21    holders.  Are you aware of any similar cables

22    relating to lawful permanent residents?

23             A.    No.

24             Q.    Do you -- is there a particular

25    part of State Department that would issue

1    guidance or instructions regarding

2    anti-Semitism?

3            MS. SANTORA:  Objection.  Form.

4        A.    Anti-Semitism in general or

5    anti-Semitism in relation to consular issues?

6    BY MS. CONLON:

7        Q.    Anti-Semitism in relation to

8    Visas.

9        A.    Part of the department --

10   outside consular affairs?

11       Q.    Yes?

12       A.    Regarding Visas, I believe it

13   would have to go through the Bureau of Consular

14   Affairs because we are responsible for Visa

15   issuance overseas and denials.

16       Q.    Is there a particular part of

17   the State Department that would issue guidance

18   or instructions regarding lawful permanent

19   residents with respect to anti-Semitism?

20           MS. SANTORA:  Objection.  Form.

21   Calls for speculation.

22       A.    Lawful permanent residents

23   other than the immigrant Visa process are in

24   the prerogative of the department of Homeland

25   Security is my understanding of the division of

1    labor between the two.

2    BY MS. CONLON:

3         Q.    I understand that you're saying

4    that the Department of Homeland Security is

5    principally responsible for lawful permanent

6    residents in this regard, but you testified

7    earlier to your own involvement and

8    determinations relating to certain lawful

9    permanent residents, correct?

10        A.    Could you refresh my memory?

11        Q.    Sure.  The Bureau of Consular

12   Affairs has been a part of seeking the

13   secretary's position on revoking the green card

14   of lawful permanent residents under the foreign

15   policy provision, correct?

16        A.    I wouldn't phrase it that way.

17   The -- our role is to determine whether they

18   are ineligible or not.  Yes, in regards to

19   lawful permanent residents, we have made

20   decisions under the foreign policy provision.

21   That is -- because it's a Secretary of State.

22        Q.    Right.

23        A.    For whom we work.

24        Q.    So, is there a part of the

25   State Department other than your bureau that

1    would issue guidance or instructions regarding

2    lawful permanent residents and anti-Semitism in

3    the exact context you just described, the

4    application of the foreign policy provision?

5            MS. SANTORA:  Objection.  Form.

6    Objection.  Calls for speculation.

7            A.   I don't even see how we would

8    issue such guidance because a decision is not

9    guidance.

10   BY MS. CONLON:

11           Q.   A decision is not guidance?

12           A.   A decision in an action memo is

13   not necessarily guidance, it's a decision.

14   It's an action.

15           Q.   So a decision on an action memo

16   is not necessarily guidance?

17           A.   No, it's a decision.

18           Q.   Okay.  But guidance must be

19   submitted in an action memo to the secretary

20   for approval; is that correct?

21           A.   No, it's not correct.

22           Q.   Okay.  So, how is guidance

23   issued?

24           MS. SANTORA:  Objection.  Form.

25           A.   A guidance is issued in two

1    forms usually; you mean for the Bureau of

2    Consular Affairs?

3    BY MS. CONLON:

4              Q.    Yes.

5              A.    In the form of a cable and in

6    the form of an update to the Foreign Affairs

7    Manual or sometimes yes, the Foreign Affairs

8    Manual.

9              Q.    Is the Foreign Affairs Manual a

10   public document?

11             A.    In parts.

12             Q.    There are parts of foreign

13   affairs manual that are not publically

14   available?

15             A.    To my knowledge and

16   understanding, yes, but I'm not an expert.  I

17   don't work in necessarily in that part.

18             Q.    We have discussed cables.  Are

19   you aware of any guidance having been issued

20   since this administration began in the foreign

21   affairs manual concerning anti-Semitism?

22             A.    I recall none.

23             Q.    Is there -- how are -- well, go

24   ahead.  Go ahead.

25             A.    Could you rephrase -- repeat

```
 1    the question?  Sorry.
 2              Q.    Sure.   I understand you to be
 3    saying guidance is issued by the Bureau of
 4    Consular Affairs as cables or updates to the
 5    Foreign Affairs Manual; is that correct?
 6              A.    Or both.
 7              Q.    We have discussed cables.   So
 8    my question is just, are you aware of any
 9    updates to the Foreign Affairs Manual under
10    this administration relating to anti-Semitism?
11              A.    Just the Foreign Affairs
12    Manual?
13              Q.    Yes.
14              A.    No.
15              Q.    Are you aware of updates to any
16    other official set of documents that the Bureau
17    of Consular Affairs updates?
18              MS. SANTORA:   Objection.   Form.
19              A.    About anti-Semitism?
20    BY MS. CONLON:
21              Q.    Yes.
22              A.    I'm not aware of such things.
23    I do not recall any such things.
24              Q.    Are you aware of any updates --
25    well, withdrawn.
```

```
 1              Are you aware of any other type of
 2    guidance issued by a Bureau of Consular Affairs
 3    regarding anti-Semitism under this
 4    administration?
 5              A.   I do not recall any at this
 6    time.
 7              Q.   Okay.  Are you aware of any
 8    guidance from a different -- from any part of
 9    the State Department issued under this
10    administration regarding anti-Semitism?
11              A.   Am I aware?
12              Q.   Yes.
13              A.   I do not recall any at this
14    time.
15              Q.   Are you aware of any -- well,
16    withdrawn.
17          Fair to say the State Department has
18    issued new guidance under this administration
19    about all kinds of things?
20              MS. SANTORA:  Objection.  Form.
21    Foundation.
22              THE WITNESS:  Am I required to
23    answer?
24              MS. SANTORA:  You can answer.
25              A.   Yes.  The State Department has
```

1   issued new guidance on many things.

2   BY MS. CONLON:

3          Q.    You are not involved in all

4   guidance issued by the State Department,

5   correct?

6          A.    That is correct.

7          Q.    Are you aware of any guidance

8   issued by the State Department under this

9   administration relating to pro-Hamas activity?

10         A.    I do not recall any at this

11  time.

12         Q.    Are you aware of any guidance

13  issued by the State Department under this

14  administration relating to Hamas at all?

15         A.    I know the department is

16  against Hamas and it's a recognized terrorist

17  organization.  However, I do not recall any

18  concrete examples I could give of guidance

19  about Hamas being issued under this

20  administration.  That is my recollection at

21  this moment.

22         Q.    Is guidance distinct from

23  instructions issued by the State Department?

24         A.    No.

25         Q.    When you say "guidance," that

1    covers instructions too?

2            A.   Yes, in my understanding.

3            Q.   Just so we're speaking the same

4    language, are directive distinct from guidance

5    or instructions?

6            A.   In my understanding, I would

7    say referring to the State Department guidance

8    or instructions as opposed to statements.

9            Q.   What about directives?

10           A.   I would not use the term,

11   generally use the term "directive".

12           Q.   Thank you.  Same question:  Are

13   you aware of any guidance or instructions

14   issued by the State Department relating to

15   pro-Palestinian or anti-Israel activity?

16           A.   I'm aware of the two cables

17   that we have mentioned.

18           Q.   Are you aware of anything other

19   than the two cables?

20           A.   I recall no concrete examples

21   at this point.

22           Q.   Are you aware of any guidance

23   or instructions issued by the State Department

24   under this administration relating to

25   pro-Palestinian or anti-Israel speech?

1            A.   I can not recall any concrete

2    examples at this point.

3            Q.   And without repeating the

4    entire question again, the same question I have

5    been asking you regarding pro-Palestinian or

6    anti-Israel movements as opposed to speech or

7    activity?

8            MS. SANTORA:  Objection.

9    BY MS. CONLON:

10           Q.   I want to cover all the basis

11   here.  So this question is, are you aware of

12   any guidance or instructions issued by the

13   State Department under this administration

14   relating to pro-Palestinian or anti-Israel

15   movements?

16           MS. SANTORA:  Objection.  Form.

17           A.   Movements meaning actions or

18   organizations as in, like, the labor movement?

19   BY MS. CONLON:

20           Q.   Both.

21           A.   I do not recall any concrete

22   examples -- I'm sorry.

23           MS. SANTORA:  I was going to object

24   to form again.

25           THE WITNESS:  Sorry.

```
 1   BY MS. CONLON:
 2          Q.   Are you aware of any guidance
 3   or instructions issued by the State Department
 4   under this administration regarding student
 5   demonstrations?
 6          A.   I cannot any of concrete
 7   examples at this point.  I do not recall any.
 8          Q.   Are you aware of any guidance
 9   or instructions currently being developed by
10   the State Department concerning
11   pro-Palestinian, anti-Israel or pro-Hamas
12   activity?
13          MS. SANTORA:  Objection.  You can
14   answer to the extent he's aware, but otherwise
15   implicates the deliberative process privilege,
16   I instruct the witness not the answer.
17          A.   Then, I can't answer.
18          MS. SANTORA:  You can say whether you
19   are aware or not.  Her question is, are you
20   aware?
21          THE WITNESS:  Of its existence?
22          MS. SANTORA:  Can you ask the
23   question again?
24   BY MS. CONLON:
25          Q.   Yes.  Are you aware of whether
```

1    the State Department is developing guidance or

2    instructions concerning pro-Palestinian,

3    anti-Israel or pro-Hamas activity?

4                A.    Am I aware of the fact?

5                Q.    Aware of whether, yes.

6                A.    Yes.

7                Q.    Aware of whether that's

8    occurring.

9                A.    Without saying whether it is or

10   not?

11               Q.    Yes.

12               A.    Yes.

13               Q.    And I assume your counsel will

14   object.  Is there guidance or instructions

15   being developed by the State Department

16   concerning pro-Palestinian anti-Israel or

17   pro-Hamas support activity by noncitizens?

18               MS. SANTORA:  Objection.  Calls for

19   information deliberative process privilege.  I

20   instruct the witness not to answer.

21   BY MS. CONLON:

22               Q.    Do you recall in the catch and

23   revoke cable whether it mentioned any specific

24   organizations or groups?

25               MS. SANTORA:  Objection.  Calls for

1    speculation.

2              A.    No, I do not recall.

3    BY MS. CONLON:

4              Q.    Setting aside -- and we're

5    almost done with this, I promise.  This part.

6    Setting aside guidance and instructions, are

7    you aware of any new steps being undertaken by

8    the State Department in response to Executive

9    Orders 14161 and 14188?

10             MS. SANTORA:  Objection.  Form.

11             A.    Can you repeat the question?

12   I'm sorry.

13   BY MS. CONLON:

14             Q.    Sure.  And I can ask one at a

15   time.  Okay.  Are you aware of any new steps

16   being undertaken by the State Department in

17   response to Executive Order 14161 protecting

18   the United States from foreign terrorists and

19   other national security and public safety

20   threats?

21             A.    Am I aware of any steps being

22   taken by a State Department?  Yes.

23             Q.    Has the State Department taken

24   any steps to respond to that executive order

25   apart from the issuance of guidance or

1    instructions that we have discussed?

2              A.   Yes.

3              Q.   What steps has the State

4    Department taken, to your knowledge?

5              MS. SANTORA:   Objection.   To the

6    extent that this would implicate information

7    that remains deliberative, I would instruct you

8    not to answer.

9              A.   Without talking about

10   deliberative information, there had been

11   organizations found to be foreign terrorists

12   organizations, and it's been announced

13   publically.

14   BY MS. CONLON:

15             Q.   In other words, certain

16   organizations were newly designated as foreign

17   terrorist organizations in response to that

18   executive order?

19             A.   In part of, yes.   Yes.

20             Q.   Are you aware of any other --

21   sorry, go ahead.

22             A.   The first executive order, the

23   14161?

24             Q.   Yes.

25             A.   Yes.

1          Q.    Sticking with that same

2     Executive Order 14161, are you aware of any new

3     programs developed by the State Department as

4     response to that executive order?

5          A.    I do not recall any programs.

6          Q.    Are you aware of any new

7     processes developed by the State Department in

8     response to that executive order?

9          MS. SANTORA:  Same objection.  To the

10    extent your answer would reveal deliberative

11    information, I instruct you not to answer.

12         A.    Not revealing deliberative

13    information, these two cables that we talked

14    about would be new processes -- was it

15    processes or programs?

16    BY MS. CONLON:

17         Q.    This time, I tried processes.

18         A.    Yes, I would point to these two

19    cables.

20         Q.    Apart from the cables, are

21    there any -- is the State Department doing

22    anything differently now as a response to

23    Executive Order 14161 than it did before?

24         A.    Yes, we are more vigilant.

25         Q.    What does that increased

1    vigilance manifest as?

2              A.    Social media review.

3              Q.    We can talk about that cable.

4    I guess before I do that, you mentioned a group

5    was designated newly as a foreign terrorist

6    organization under 14161.   Was that a domestic

7    group?

8              A.    No.   No.   There were a couple

9    of them actually.   The drug cartels, for

10   example.

11             Q.    Has there been any

12   determination regarding designating domestic

13   groups as terrorist -- sorry.   One second.

14   Okay.   So withdrawn, the question I was asking.

15        Has there been any determination made

16   in response to Executive Order 14161 that there

17   are domestic organizations with ties to a

18   foreign terrorist organization?

19             A.    Domestic only?

20             Q.    Yes.

21             A.    To my knowledge no, because the

22   State Department does not deal with domestic

23   issues.   We deal with foreign terrorist

24   organizations, so they have to be foreign.

25   That is my understanding.   Perhaps the FBI.

```
 1              Q.   Before we jump into the second
 2     cable, I'm not sure how long we have within
 3     going for, whether it's been an hour, but I
 4     don't want to hit anyone's limit.  How are we
 5     doing?
 6              MS. SANTORA:  Do you want to keep
 7     going or do you want a break?
 8              THE WITNESS:  Why don't we go to
 9     2:00, if that's enough time.
10     BY MS. CONLON:
11              Q.   Yeah, that's fine.  So turning
12     to the cable that begins on page 12 of the
13     administrative record which is Exhibit 3, you
14     cleared this cable; is that right?
15              A.   This cable?
16              Q.   Yes, sir.
17              A.   No, that is incorrect.
18              Q.   Oh dear, okay.  Who cleared
19     this cable?
20              A.   Other people did, I approved
21     it.
22              Q.   You approved it.  The lingo is
23     tough for those of us who don't work in the
24     department.
25              A.   I apologize.
```

```
 1              Q.    No, I'm learning.

 2              A.    Approval is the last thing

 3      before it goes.

 4              Q.    Got it.  Okay.  So you cleared?

 5              A.    No, I approved.

 6              Q.    I'm sorry.  Maybe we should

 7      take that break.  No, you approved the cable

 8      that begins of page 12 of that exhibit that's

 9      in front of you, correct?

10              A.    That is my recollection.

11              Q.    Did you -- were you part of the

12      development of this cable?  You look

13      inquisically (sic).

14              A.    Could you rephrase?

15              Q.    Did you help develop the

16      content of this cable?

17              A.    Yes.

18              Q.    I'd like to ask you about some

19      particular provisions in it.  One moment.  What

20      prompted you to -- well, withdrawn.

21           What prompted the creation of the

22      guidance in this cable?

23              A.    Per my recollection -- isn't

24      this deliberative process?

25      BY MS. CONLON:
```

```
 1              Q.   The question was, what prompted
 2    the creation of the guidance in this cable?
 3              MS. SANTORA:  Can we just talk for
 4    one second?
 5              MS. CONLON:  Yes.  Go ahead.  Can we
 6    go off the record?
 7              THE VIDEOGRAPHER:  Off the record,
 8    13:57.
 9         (A break was taken at 1:57 p.m.)
10              THE VIDEOGRAPHER:  Back on the record
11    14:04.
12    BY MS. CONLON:
13              Q.   The question was, to your
14    knowledge, what prompted the creation of the
15    guidance in this cable?
16              MS. SANTORA:  Objection.  Calls for
17    information covered by the deliberative process
18    privilege.  I instruct the witness not to
19    answer.
20              MS. CONLON:  Just for the record, I
21    object to the instruction in every instance,
22    but always want to make sure you have the
23    opportunity to assert it.  Okay.
24    BY MS. CONLON:
25              Q.   When was the decision made to
```

```
 1   issue this cable?
 2              A.    Some time after January 20th,
 3   but before March 25th.
 4              Q.    Who was involved in the
 5   decision to issue this cable apart from you?
 6              A.    I don't know.
 7              Q.    Do you know who wrote this
 8   cable?
 9              A.    My recollection -- this one --
10   this one?
11              Q.    Yeah.  So just for the record
12   so it's clear, we're speaking of the same
13   cable, it's a cable with reference 25 state
14   5914.  Is that a meaningful reference number or
15   is there a different number?  What is the best
16   way to refer to it?  You tell me.
17              A.    You see MRN at the top, MRN
18   message record number 25 state 26168.
19              Q.    Do you know who wrote this
20   cable?
21              A.    I do not recall.
22              Q.    Do you know what part of the
23   State Department the person who wrote this
24   cable works in?
25              A.    I believe in the Visa office.
```

```
 1            Q.   Looking at that time content of
 2    it, on page 3, could you please turn to page 3
 3    for me.  In paragraph 7, there is an
 4    abbreviation used, and I don't know what it
 5    means, what does FPU mean in paragraph 7?
 6            A.   FPU means Fraud Prevention
 7    Unit.
 8            Q.   And what does ECAS stand for?
 9            A.   ECAS, I do not know what the
10    letters stand for.
11            Q.   What does it refer to?
12            A.   It refers to the system that
13    the Fraud Prevention Unit uses to track fraud
14    cases.
15            Q.   Turning to page 4, paragraph 9.
16    In the beginning of that paragraph, it directs
17    consular officers to review content to
18    understand the grounds under -- withdrawn.
19            In paragraph 9, the cable quotes the
20    language [As read] "An applicant who endorses
21    or espouses terrorist activity or persuades
22    others to endorse or espouse terrorist activity
23    or support a terrorist organization."  Right?
24            A.   That is what is written on the
25    piece of paper that I have.
```

```
 1              Q.   And that language comes from
 2    the foreign policy provision that we discussed
 3    earlier, correct?
 4              A.   I don't have it in front of me,
 5    so I can't say.
 6              Q.   In any case, that language is a
 7    basis upon which the State Department could
 8    determine which a person is ineligible; is that
 9    right?
10              A.   Yes.
11              Q.   Has the State Department, to
12    your knowledge, issued any guidance on what it
13    means to endorse or espouse terrorist activity
14    under this administration?
15              A.   No, not to my knowledge.
16              Q.   Are you aware of any, whether
17    its guidance or some other formal document, but
18    any document issued under this administration
19    addressing the meaning of those terms?
20              A.   I am not aware of one.
21              Q.   Later on in the paragraph it
22    says [As read] "Evidence that an applicant
23    advocates for terrorist activity."
24          I'm going to pause there.  Are you
25    aware of any document issued by a State
```

1    Department concerning what it means for someone

2    to advocate for terrorist activity?

3            A.    I'm sorry, where is this?

4            Q.    Take your time.  It's middle --

5    more than halfway down the paragraph /the

6    sentence that begins with the word "evidence".

7            A.    Evidence that an applicant

8    advocates.  Evidence --

9            Q.    Okay.  Have you found the

10   sentence?  Sorry, you did.

11           A.    Yes.

12           Q.    So this sentence states [As

13   read] "Evidence that an applicant advocates for

14   a terrorist activity or otherwise demonstrate a

15   degree of public approval or public advocacy

16   for terrorist activity or terrorist activity or

17   terrorist organization may be indicative of

18   ineligibility under INA 212(a)(3)(b)."

19           So having drawn your attention to that

20   sentence, my question is whether you are aware

21   of any guidance from the State Department on

22   what it means to advocate for terrorist

23   activity.

24           A.    Yes.

25           Q.    What guidance addresses that

```
 1    language?
 2              A.    It said it here, 9 FAM 302.6.
 3              Q.    When to your knowledge was 9
 4    FAM 302.6 developed?
 5              MS. SANTORA:  Objection.  Form.
 6    Objection as to foundation.
 7              A.    To my knowledge, it was
 8    developed for this administration.
 9    BY MS. CONLON:
10              Q.    Do you know who developed it?
11              A.    I do not.
12              Q.    Do you know if that's in a
13    public part of the FAM?
14              A.    I do not, no.
15              Q.    Do you know what was updated
16    about it during this administration?
17              A.    I do not know.
18              Q.    Which part of State Department
19    is responsible for updating it?
20              A.    9 FAM?
21              Q.    Yes.
22              A.    That would be Consular Affairs.
23              Q.    Who at Consular Affairs is
24    responsible for updating it?
25              MS. SANTORA:  Objection.  Calls for
```

 1    speculation.

 2              A.    I do not know the concrete

 3    person.

 4    BY MS. CONLON:

 5              Q.    Is there a particular office,

 6    unit or division that is responsible for

 7    updating it within Consular Affairs?

 8              A.    I believe it would be the Visa

 9    office.

10              Q.    Do you know what 9 FAM 302.6

11    says?

12              MS. SANTORA:   Objection.   Calls for

13    speculation.

14              A.    I do not, but I would be happy

15    to read it over and familiarize myself with it.

16              MS. CONLON:   If I had it, I would

17    give it to you, but I don't.   Okay.

18    BY MS. CONLON:

19              Q.    Do you know what prompted the

20    update to 9 FAM 302.6?

21              A.    I do not.

22              Q.    Do you know whether 9 FAM 302.6

23    addresses the other provisions in that sentence

24    we read at the meaning of demonstrating public

25    approval or public advocacy for terrorist

```
 1    activity?
 2              A.    I do not know with certainty.
 3              Q.    Setting 9 FAM aside for a
 4    moment, what is your understanding of what it
 5    means for a person to demonstrate a quote
 6    degree of public approval or public advocacy or
 7    terrorist activity or a terrorist organization?
 8              MS. SANTORA:    I'm sorry.    Can you
 9    repeat the question?
10    BY MS. CONLON:
11              Q.    Sure.    Setting aside 9 FAM,
12    what is your understanding of what it means
13    when it states quote a degree of public
14    approval or public advocacy or terrorist
15    activity or a terrorist organization?
16              A.    Seems speculative.
17              Q.    I'm asking --
18              A.    My understanding?
19              Q.    Well, you are the person who
20    approved the cable, so what do you understand
21    that to mean?
22              A.    Well -- I'm sorry, could you
23    repeat the question?
24              Q.    Sure.    What do you understand
25    this statement in the cable to mean, quote a
```

1    degree of public approval or public advocacy or

2    terrorist activity or terrorist organization?

3              A.    I would understand that to

4    mean, for example, public statement, I support

5    Hamas.

6              Q.    Would you understand it to mean

7    something less explicit than that?

8              MS. SANTORA:  Objection.  Form.

9              MS. CONLON:  You can answer.

10             THE WITNESS:  Am I required to

11   answer?

12             MS. SANTORA:  Uh-huh.

13             A.    It could.  It would depend on

14   the situation where it was at.  Maybe there's

15   some hand sign that could be made in a crowd

16   that shows you're supporting Hamas.  Terrorist

17   and other groups use hand signs or symbols.

18   BY MS. CONLON:

19             Q.    The next part of the sentence

20   or the following sentence says [As read] "This

21   may be evident in conduct if there is a hostile

22   attitude towards U.S. citizens or U.S. culture

23   including Government, institutions or founding

24   principals."

25             What do you understand that to mean?

```
 1              A.    A rejection of our system, the

 2    U.S. system of Government based on our founding

 3    documents, in particular Declaration of

 4    Independence and the Constitution.

 5              Q.    What do you understand the

 6    provision here about hostility toward U.S.

 7    culture to mean?

 8              A.    An unjustified rejection of

 9    U.S. -- clear U.S. cultural things or icons.

10              Q.    Can you give me an example?

11              A.    Like burning the U.S. flag.

12              Q.    What do you understand the

13    phrase "a hostile attitude toward U.S.

14    citizens" to mean?

15              A.    Would be -- this is speculative

16    because you're asking my opinion.

17              Q.    I'm asking your opinion, yes.

18              A.    My opinion.  Not secretary

19    Rubio's?

20              Q.    Unless you're in a position to

21    give that?

22              A.    I am not.  I am definitely not.

23              Q.    Yes.

24              A.    It would be a blanket

25    condemnation:  All Americans are fat and evil.
```

```
 1   It would not be:  I hate hot dogs.
 2             Q.   Now, you mentioned earlier that
 3   9 FAM addresses the endorse or espouse
 4   language.  Is there any guidance from the State
 5   Department that addresses the language we have
 6   just discussed?
 7             A.   I do not know.
 8             Q.   It goes on to say, to refer to
 9   advocacy or sympathy for foreign terrorist
10   organizations.
11        What do you understand that to mean?
12             A.   Advocacy, public declarations
13   of support.
14             Q.   What about sympathy?
15             A.   Public declarations of a good
16   feeling toward a terrorist organization or a
17   positive statements about their activities or
18   advocacy could be encouraging people to donate
19   money to a terrorist organization.  Yes,
20   advocacy in my opinion can be an action, not
21   just a statement.  But that is only my opinion.
22             Q.   I'm going to give you some
23   examples of statements, and I would like to
24   understand whether in your understanding, they
25   meet the criteria set forth in this paragraph.
```

```
 1                A.    Can I just review the paragraph
 2      briefly before you give the statements?
 3                Q.    Please.   Absolutely, will you
 4      please read paragraph 9?
 5                A.    Thank you.
 6                MS. SANTORA:   While he's reviewing,
 7      do you know about how much longer you plan to
 8      go before breaking?
 9                MS. CONLON:   I'm very close to being
10      done with this document, and then I'm happy to
11      take a break for however long, if that is okay
12      with you all.
13                MS. SANTORA:   Okay.   That's fine.
14      Are you okay?
15                THE WITNESS:   Yes.   (Witness
16      reviewing document. ) Thank you.   I have
17      reviewed the cable.
18      BY MS. CONLON:
19                Q.    Would a statement calling for a
20      free Palestine be covered by the language in
21      paragraph 9 of this cable?
22                MS. SANTORA:   Objection.   Calls for
23      speculation.
24                A.    It could be.   What is it?   From
25      the mountains to the sea?
```

```
 1    BY MS. CONLON:

 2              Q.   A statement "from the river to

 3    the sea, Palestine will be free," is that a

 4    statement that could be covered by paragraph 9?

 5              A.   It could be.

 6              MS. SANTORA:  Objection.  Calls for

 7    speculation.

 8              A.   It could be in my opinion,

 9    because by definition, it means the elimination

10    of Israel and the Israeli people.

11    BY MS. CONLON:

12              Q.   Could a statement denouncing

13    Zionism be covered by paragraph 9?

14              MS. SANTORA:  Objection.  Calls for

15    speculation.

16              A.   In my opinion, yes, because

17    Zionism just is Jewish patriotism or Israeli

18    patriotism.

19    BY MS. CONLON:

20              Q.   Could a statement criticizing

21    Israel's actions in Gaza be covered by

22    paragraph 9?

23              MS. SANTORA:  Objection.  Calls for

24    speculation.

25              A.   I think it would depend on the
```

1    statement.

2    BY MS. CONLON:

3           Q.   What about a statement calling

4    for an institutional divestment from Israel?

5           MS. SANTORA:  Same objection.

6           A.   It could be.

7    BY MS. CONLON:

8           Q.   What about a statement calling

9    for an arms embargo on Israel?

10          MS. SANTORA:  Same objection.

11          A.   It could be, it would depend on

12   phrasing too, but more so than divestment.

13   BY MS. CONLON:

14          Q.   What about a statement calling

15   for limiting military aid to Israel?

16          MS. SANTORA:  Same objection.

17          A.   Yes.

18   BY MS. CONLON:

19          Q.   What about a statement calling

20   for humanitarian aid to Palestine or

21   Palestinians?

22          MS. SANTORA:  Same objection.

23          A.   It would depend, but probably

24   no.

25   BY MS. CONLON:

```
 1              Q.   A statement calling for a cease

 2    fire?

 3              MS. SANTORA:  Same objection.

 4              A.   No.

 5              MS. SANTORA:  Sorry.  Same objection,

 6    you can answer.

 7              A.   Our Government has called for a

 8    cease fire.  The President has called for a

 9    cease fire.  So no.

10    BY MS. CONLON:

11              Q.   What about a statement

12    criticizing Israel for being a religious state?

13              MS. SANTORA:  Same objection.

14              A.   It could be.  Possibly.  I

15    would need to know the details in a lot of

16    these.  In a vacuum, it's hard to make a

17    determination, and I think the language of

18    this, it also talks about gathering as much

19    evidence as possible, so...

20    BY MS. CONLON:

21              Q.   Is a statement calling Israel

22    an Apartheid state covered, in your opinion, by

23    the language in paragraph 9?

24              MS. SANTORA:  Same objection.

25              A.   Yes, probably.
```

```
 1    BY MS. CONLON:

 2            Q.   Is a statement that compares

 3    Israeli policy to that of the Nazis covered by

 4    the language in paragraph 9?

 5            MS. SANTORA:  Same objection.

 6            A.   I believe so, yes.  You mean

 7    Nazi Germany, yes?

 8    BY MS. CONLON:

 9            Q.   Yes.  Is a statement

10    criticizing the state of Israel as a racist

11    endeavor; would that be covered by paragraph 9?

12            A.   Yes.

13            MS. SANTORA:  Same objection.

14    BY MS. CONLON:

15            Q.   Paragraph 9 also as we

16    discussed speaks of bearing a hostility towards

17    U.S. citizens or U.S. culture.  Could a

18    criticism of the administration be covered by

19    paragraph 9?

20            MS. SANTORA:  Same objection.

21            A.   It could be.  It would depend

22    on what words were used.

23    BY MS. CONLON:

24            Q.   Could a criticism of

25    administration's policy or actions of Israel be
```

```
 1    covered by paragraph 9?

 2              A.   Possibly.

 3              MS. SANTORA:  Sorry, same objection.

 4              A.   Sorry.

 5              MS. CONLON:  I understand you have a

 6    standing objection.

 7              MS. SANTORA:  Standing objection to

 8    hypotheticals as speculative.  Calling for

 9    speculative.

10              A.   Possibly, it would depend on

11    the phrasing and what words were used.

12    BY MS. CONLON:

13              Q.   So you have said some of these

14    statements could be covered by this policy,

15    correct?

16              A.   In my opinion?

17              Q.   Yes.

18              A.   Speculatively, yes.

19              Q.   And I understand you say

20    "speculatively," but isn't the Bureau of

21    Consular Affairs involved in the application of

22    this policy?

23              A.   Yes.

24              Q.   In other words, the Bureau of

25    Consular Affairs is in the position of needing
```

 1    to determine whether particular statements fall

 2    under paragraph 9 or not, right?

 3              A.    Yes, the individual Visa

 4    officers and for the 3B, the terrorism, they

 5    would need an advisory opinion, I believe, from

 6    the Visa office.

 7              Q.    Is that referred to as a

 8    Security Advisory Opinion?

 9              A.    Yes, SAO.

10              Q.    And who in the Visa office

11    issues that?

12              A.    I don't know the exact person.

13              Q.    What part of the Visa office is

14    responsible for issuing Security Advisory

15    Opinions?

16              A.    I'm not sure.

17              Q.    Do you have to clear or approve

18    them?

19              A.    Rarely.

20              Q.    Have you had to make any

21    decisions relating to the application of the

22    catch and revoke policy?

23              MS. SANTORA:    Objection.    Form.

24              A.    I don't remember.

25    BY MS. CONLON:

```
 1              Q.   You said that you rarely have

 2     to clear or approve Security Advisory Opinions.

 3     In what circumstances have you done that?

 4              MS. SANTORA:  Objection.  To the

 5     extent that your answer will call for law

 6     enforcement privileged information, I direct

 7     you not to answer.  If you need to talk, we

 8     could take a break.

 9              MS. CONLON:  It could be a good

10     chance for a break, more generally, if anyone

11     wants to.

12              A.   In difficult cases.

13              MS. CONLON:  I have follow-up

14     questions.

15              MS. SANTORA:  Okay.  Are you ready

16     for a lunch break now or do you want to take a

17     short break?

18              A.   How many --

19              MS. CONLON:  Follow-up questions?

20              THE WITNESS:  Yes.

21              MS. CONLON:  On this topic or just

22     how much is left for today?

23              THE WITNESS:  No, how much on this

24     topic?

25              MS. CONLON:  A couple of questions.
```

```
 1              MS. SANTORA:  Do you want to do a
 2    couple, and then -- okay.
 3              THE WITNESS:  Are you okay?  All
 4    right.  Adam, are you all right down there?
 5              MS. CONLON:  Everyone, please feel
 6    free to tell me you need a break.  Do you need
 7    a break?
 8              MS. SANTORA:  Yes.  Okay.
 9              MS. CONLON:  Let's take it.
10              THE VIDEOGRAPHER:  Off the record
11    14:29.
12         (A break was taken at 2:29 p.m.)
13              THE VIDEOGRAPHER:  We're back on the
14    record 15:40.
15              MS. CONLON: Good afternoon.
16              THE WITNESS: Good afternoon.
17    BY MS. CONLON:
18              Q.   Just looking to see where we
19    left off.  Okay.  Earlier, you said that you
20    rarely have to clear or approve Security
21    Advisory Opinions.  In what circumstances have
22    you done that?
23              A.   When it's a difficult case.
24              Q.   Are there any particular types
25    of difficult cases that come your way for a
```

```
 1    Security Advisory Opinion?
 2              A.   It would be hard to generalize
 3    without getting into information that's either
 4    classified or not for public knowledge.
 5              Q.   Does not for public
 6    knowledge -- this is a question to your
 7    counsel.  Not for public knowledge, do you have
 8    an understanding of what that means, if that is
 9    different from, you know, classified or
10    confidential?
11              MS. SANTORA:  Can we just go off for
12    a minute?
13              MS. CONLON:  Yes.  Take a second.
14              MS. SANTORA:  So the confidentiality
15    issue would be related to the fact that
16    while -- and it is difficult to generalize,
17    because every opinion is different, but while
18    they may not necessarily be privileged, it is
19    law enforcement sensitive information.
20              MS. CONLON:  Is it your view that
21    that's not covered by the protective order in
22    this case?
23              MS. SANTORA:  Can you repeat the
24    question?
25              MS. CONLON:  Sure.  Are there
```

1   particular types of cases that come your way

2   for Security Advisory Opinions.  He said

3   difficult cases, then I asked for particular

4   types of difficult cases.

5              MS. SANTORA:  To the extent your

6   response would not reveal information that's

7   privileged or classified, you can speak

8   generally to Security Advisory Opinions.

9              A.   Noting that my response does

10  not include information that is classified or

11  privileged and deals with law enforcement, such

12  cases would be those that require review by a

13  senior official.

14  BY MS. CONLON:

15             Q.   What are the characteristics of

16  a Security Advisory Opinion that requires

17  review from a senior official?

18             A.   It depends on the situation and

19  the circumstances and the details.

20             Q.   Have you been asked to issue a

21  Security Advisory Opinion relating to a student

22  protester?

23             A.   To my recollection, no.

24             Q.   Do you know whether since the

25  beginning of this year Security Advisory

```
 1    Opinions have been issued by a State Department

 2    concerning student protesters?

 3            A.   I do not know.

 4            Q.   Are you the only person who

 5    writes Security Advisory Opinions for the

 6    Bureau of Consular Affairs?

 7            A.   I do not write them.  I would

 8    make a decision.

 9            Q.   Are you the only person who

10    makes decisions on them?

11            A.   No.

12            Q.   Who else for the Bureau of

13    Consular Affairs makes decisions on Security

14    Advisory Opinions?

15            A.   Generally, people who are

16    employed in the Visa office.

17            Q.   Do you know whether since the

18    beginning of this year Security Advisory

19    Opinions have been issued by someone in the

20    Bureau of Consular Affairs concerning

21    pro-Palestinian advocacy?

22            MS. SANTORA:  Objection.  Form.

23            A.   To my knowledge, no, but I have

24    only been working back at the Department of

25    State since February 13th.
```

```
 1    BY MS. CONLON:
 2             Q.   Okay.  I want to turn for a
 3    moment back to your declaration which should be
 4    Exhibit 1.  And paragraph 16, so that's page 4,
 5    no, no, no, I'm sorry.  It looks like that's
 6    the administrative record in your hand, so
 7    maybe I got to exhibit number wrong, but it's
 8    your declaration that I'm referring to.
 9             A.   Let me see if this is it.
10             Q.   That is it and that is
11    Exhibit 1.  Could you please turn to paragraph
12    16 of your declaration?  When you have reviewed
13    that paragraph, let me know.
14             A.   (The witness reviews document.)
15    I have completed my review.
16             Q.   Thank you.  Okay.  Paragraph 16
17    refers to new guidance to consular officers on
18    reviewing Visa applicants' social media,
19    correct?
20             A.   That is what is written.
21             Q.   Is paragraph 16 describing the
22    cable we have been reviewing MRN 25 state
23    26168?
24             A.   I do not know.
25             Q.   Is there anything that would
```

1    help you determine what you meant in that

2    paragraph when you said that the State

3    Department offered new -- is there anything

4    that would help you determine what you meant in

5    paragraph 16 where you said that the State

6    Department had offered new guidance to

7    counselor offers offering Visa applicants'

8    social media?

9             A.    My review of all the cables we

10   sent, it seems that this cable is part of that.

11            Q.    Do you -- are you aware of

12   other cables that are a part of the new

13   guidance referenced in paragraph 16?

14            A.    I do not recall any at this

15   moment, but there are many cables that have

16   been set.

17            Q.    Are there many cables -- well,

18   withdrawn.

19         Are there many cables that have been

20   sent concerning the social media review

21   noncitizens?

22            MS. SANTORA:   Objection.   Form.

23            A.    I can say with certainty that

24   this cable was sent regarding social media

25   vetting.

1    BY MS. CONLON:

2              Q.    Have there been others?

3              A.    There may have been.  I do not

4    recall concretely.

5              Q.    The sentence in paragraph 16,

6    [As read] "It is true that the State Department

7    has authored new guidance" -- I won't read the

8    whole rest of it, the one that we've been

9    discussing.  Does that refer to guidance

10   outside of cables?

11             A.    It could be discussion of the

12   cables, but I believe that that refers first

13   and foremost to cables.  That is my

14   understanding of the paragraph as written.

15             Q.    You said guidance could also

16   include discussion of the cables; is that

17   correct?

18             A.    Yes.

19             Q.    In other words --

20             A.    No.  I said it could also be

21   discussion of the guidance.

22             Q.    I'm sorry, I think I'm not

23   understanding.

24             A.    Please.

25             Q.    I'm going to try.  In paragraph

```
 1   16 where you refer to new guidance, what are

 2   you referring to apart from cables?

 3              A.   I believe first and foremost,

 4   this refers to cables, but there can be

 5   discussion of guidance, clarification of

 6   guidance in the form of webinars.

 7              Q.   Can clarification of guidance

 8   take any other form?

 9              A.   Theoretically, there could be

10   an e-mail.

11              Q.   Do you know if there have been

12   any webinars on this topic?

13              A.   I do not.  No.  I do not recall

14   precisely.

15              Q.   So, am I correct -- is this

16   statement correct that guidance can include

17   formal communications like cables and also

18   informal communications like e-mails?

19              MS. SANTORA:  Object to the

20   characterization.  So objection.  Form.

21              A.   In my opinion, the guidance is

22   the cable, the FAM.  The discussions are not

23   the guidance.  They can --

24   BY MS. CONLON:

25              Q.   Are you finished?
```

```
 1                    A.   Yes.
 2                    Q.   The discussions can clarify the
 3    guidance?
 4                    A.   It could.
 5                    Q.   Are there any e-mails that you
 6    have sent or received concerning the social
 7    media -- well, withdrawn.
 8         Are there any e-mails that you have
 9    sent or received that clarify the State
10    Department's guidance on reviewing Visa
11    applicants' social media?
12                    MS. SANTORA:  Objection.  Form.
13                    A.   To my recollection, I have not
14    sent such e-mails.
15    BY MS. CONLON:
16                    Q.   Have you received them?
17                    A.   I don't know.
18                    Q.   Have you -- are there any --
19    and I apologize, I don't want to retread ground
20    that we have been on, but are there any
21    clarifications of guidance including webinars
22    or e-mails that you have received regarding the
23    catch and revoke policy?
24                    A.   I recall none.
25                    Q.   I'll ask you the same thing,
```

```
 1    any clarifications of guidance you have

 2    received in any form to include discussions

 3    about the catch and revoke policy?

 4             A.   Not that I recall.

 5             Q.   Did you participate in the

 6    drafting of your declaration in this case?

 7             A.   I reviewed it.

 8             Q.   Who drafted it for you, if you

 9    recall?

10             A.   I do not recall.

11             Q.   When this was drafted, were any

12    documents compiled in the course of drafting

13    it?

14             A.   I do not know, I was not

15    involved in drafting it.

16             Q.   When you reviewed it for

17    accuracy before you signed it, did you consult

18    any documents?

19             A.   I believe I looked at some

20    documents, but I do not remember what they

21    were.

22             Q.   Were those documents provided

23    to you in an e-mail?

24             A.   I'm not sure.

25             Q.   Were those documents provided
```

 1    to you by someone else to review in tandem with

 2    your declaration?

 3            A.    Yeah.   The staffer would have

 4    brought in it.

 5            Q.    And in what form would you have

 6    received that?

 7            A.    In general, I receive things in

 8    hard copy because its quicker to review.

 9            Q.    Do you know where the documents

10    are that were put together for you to look at

11    in tandem with this declaration?

12            A.    Pardon.

13            Q.    Do you know where the documents

14    are that were put together for you to review in

15    tandem with this declaration?

16            A.    I do not, they could have been

17    shredded.

18            Q.    Just to make sure we have

19    covered all your bases, have you sent any

20    communications to anyone regarding the catch

21    and revoke policy?

22            A.    Not that I remember.

23            Q.    Okay.   Now, you had mentioned

24    earlier that the catch and revoke policy

25    addresses anti-Semitic activity, right?

```
 1                   A.    With a previous question?

 2                   Q.    Yes.

 3                   A.    I remember clearing on a report

 4       on the execution of the executive orders.

 5                   Q.    You remember clearing on a

 6       report on the execution --

 7                   A.    About the carrying out.

 8                   Q.    Yes.  Okay --

 9                   A.    And I remember that catch and

10       revoke was mentioned in one place in that

11       report when I saw it.  That is the one document

12       that I recall.  I apologize for not answering

13       straight up.

14                   Q.    It's a lot to take it all in,

15       and I appreciate you bringing it up.  What kind

16       of a report was it?

17                   A.    It was a report for the White

18       House.

19                   Q.    Is it a report of

20       investigation?

21                   A.    The report?

22                   MS. SANTORA:  Objection.  We are

23       going to invoke the presidential communications

24       privilege regarding reports to the White House.

25                   MS. CONLON:  I'm going to ask
```

```
 1    questions around it, and you tell me if this

 2    invokes privilege from your perspective or not.

 3    BY MS. CONLON:

 4             Q.   Do you know whether the report

 5    you reviewed in fact was sent to the White

 6    House?

 7             A.   I am not sure.

 8             Q.   Do you know whether you

 9    reviewed a draft of a report or a final report?

10             A.   My recollection is, I reviewed

11    a draft.

12             MS. CONLON:  I think my perspective,

13    and this is for your counsel, would be that

14    something that is not a communication that

15    actually went to the White House but is a draft

16    isn't covered by a communication made to the

17    White House, but I will admit that this is my

18    first encounter with this issue, surely not

19    yours, so why don't you tell me your position?

20             MS. SANTORA:  So our position would

21    be to the extent that it was a draft without

22    having to reach the presidential communications

23    privilege, it would be privilege under the

24    deliberative process privilege.

25             MS. CONLON:  But we don't know if
```

 1    it's a draft that contains deliberations.  We

 2    don't know anything about what it is or not.

 3              MS. SANTORA:  Well, it's a draft, so

 4    it's not final.  So to the extent it's a draft,

 5    it doesn't represent a final position of the

 6    agency.

 7              MS. CONLON:  Sure.  But I guess what

 8    I'm saying is, I don't think I have asked him

 9    to describe even the content of it.  I'm saying

10    I intent to keep asking questions about what it

11    is.

12              MS. SANTORA:  Okay.  That's fine.

13    Based on your questions, I may raise ether the

14    presidential communications privilege or the

15    deliberative process privilege.

16              MS. CONLON:  I understand.

17    BY MS. CONLON:

18         Q.   The draft report -- let me

19    withdraw that.

20         The report you recall receiving about

21    the implementation of these executive orders

22    that reference to catch and revoke policy, do

23    you recall who sent it to you?

24         A.   I believe it was Lew Olowski.

25         Q.   Do you recall who else it was

```
1   sent to?

2              A.   No.

3              Q.   About how long ago did you

4   receive it?

5              A.   Two months ago, perhaps.

6              Q.   Some time in April?

7              A.   Not in May.

8              Q.   Before May?

9              A.   Yes.

10             Q.   Did you make any revisions to

11  the report?

12             MS. SANTORA:  Objection.  Calls for

13  information covered by the deliberative process

14  privilege and I instruct the witness not to

15  answer.

16             MS. CONLON:  I have a standing

17  objection to the instruction for this line of

18  questioning, but I will obviously honor it.

19  BY MS. CONLON:

20             Q.   Did you contribute to the

21  drafting of this report in any way?

22             A.   No.

23             Q.   Were you asked to clear the

24  report?

25             A.   Yes.
```

1          Q.   Did you clear the report?

2          A.   Yes, I cleared the report.

3          Q.   Do you know who in the White

4    House the report but meant to be sent to?

5          A.   I do not remember exactly.

6          Q.   Was there a particular office

7    or person in the White House who receives

8    communications like this from the State

9    Department?

10          MS. SANTORA:  Objection.  Foundation.

11    Calls for speculation.

12          A.   I believe the executive

13    secretary of the NSC, but I'm not sure.

14          MS. CONLON:  Just a moment.

15    BY MS. CONLON:

16          Q.   Do you know whether the report

17    was sent to anyone other than the Executive

18    Secretary of NSC?

19          MS. SANTORA:  Objection.  Foundation.

20    Calls for speculation.

21          A.   I have no knowledge of any

22    persons other than my previous speculation.

23    BY MS. CONLON:

24          Q.   And have you -- do you know

25    whether the report was sent to the Secretary of

```
 1    State for his review?
 2              A.   I do not know.
 3              Q.   When you were finished
 4    reviewing the report, who did you send it back
 5    to?
 6              A.   Back to Mr. Olowski.
 7              Q.   Was anyone CC'd on your
 8    communications with Mr. Olowski about the
 9    report?
10              A.   I do not recall.
11              Q.   Is it your practice to?
12              THE COURT:   Any of your staffers on
13    your e-mails.
14              A.   It depends on the situation.  I
15    believe Mr. Olowski sent the report to me
16    directly without the staffers.
17              Q.   Have you heard anything about
18    the report since you sent it back to
19    Mr. Olowski?
20              MS. SANTORA:   Objection.  Calls for
21    material privileged under the deliberative
22    process privilege.  I instruct the witness not
23    to answer to the extent that your answer would
24    reveal deliberations.
25              A.   I cannot answer the question in
```

```
 1    that case.

 2    BY MS. CONLON:

 3            Q.   To be clear, the question is

 4    not what have you heard, but just whether you

 5    have heard of the report again since sending it

 6    to Mr. Olowski.

 7            A.   After sending it to Mr.

 8    Olowski?

 9            Q.   Correct.

10            A.   Whether I have heard anything

11    about the report?

12            Q.   Since then.

13            A.   Yes.

14            Q.   Do you know whether the report

15    has been implemented?

16            A.   No.

17            MS. SANTORA:   Objection.   Form.

18    BY MS. CONLON:

19            Q.   Did the report cause the State

20    Department to take any particular action?

21            A.   I don't know.

22            Q.   Did the report effect your work

23    in the Bureau of Consular Affairs in any way?

24            A.   I do not believe so.

25            Q.   Apart from the report, the
```

 1    substance of which I understand privilege is

 2    being asserted over, is there any other written

 3    document or communication that you have

 4    received concerning the catch and revoke

 5    policy?

 6              A.   I don't know with certainty.

 7              Q.   Apart from the report, is there

 8    any other written document or communication

 9    that you have sent concerning the catch and

10    revoke policy?

11              A.   I don't recall.

12              Q.   Okay.  So I think when you

13    mentioned the report, I was just asking you

14    back to the catch and revoke policy, the catch

15    and revoke policy addresses anti-Semitic

16    activity of non-Visa immigrants among other

17    things, correct?

18              MS. SANTORA:  Objection.  Calls for

19    speculation.  Are you able to show him the

20    document that you're referring to?

21              MS. CONLON:  Do you know what's

22    really funny about that?  I think our

23    colleagues just had a meet and confer with all

24    of you asking for that document that we have

25    asked for repeatedly and have not received it,

Deposition of John Armstrong                                    AAUP, et al. v. Rubio, et al.

```
 1    so I cannot.  But if you have it, I sure would
 2    like to see it.
 3            MS. SANTORA:  Well, to the extent he
 4    answers questions about it today, his answers
 5    will be speculative.
 6            MS. CONLON:  He has seen the
 7    document.  He has approved the document, and if
 8    he doesn't know to answer to the question, he
 9    can tell me, so I appreciate the standing
10    objection, but I am going to continue to ask
11    about it.  You asked --
12            A.   Could you repeat?
13            Q.   Yes.  Okay.  So the catch and
14    revoke policy, you mentioned earlier that it
15    addresses anti-Semitic activity -- hang on one
16    second.  That it addresses anti-Semitic
17    activity; is that correct?
18            A.   Not completely.
19            Q.   What part of that is incorrect?
20            A.    That it addresses various types
21    of activity including anti-Semitic activity,
22    including violation of law and other
23    information that could be the basis for
24    revocation.
25            Q.    With respect only to
```

```
 1    anti-Semitic activity -- well, withdrawn
 2    actually.
 3          Do you recall whether the catch and
 4    revoke policy additionally addressed pro-Hamas
 5    activity?
 6             A.   I do not recall concretely.
 7             Q.   With respect to anti-Semitic
 8    activity, do you recall whether the catch and
 9    revoke policy that described what that activity
10    might include?
11             A.   I do not recall.
12             Q.   The State Department has been
13    tasked with determining whether certain
14    activities by noncitizens are anti-Semitic
15    within the meaning of executive orders,
16    correct?
17             A.   I would have to look at the
18    executive orders to say.  I'm happy to review
19    them.
20          MS. CONLON:  Just a moment.
21    BY MS. CONLON:
22             Q.   I am going to pull out the
23    executive orders in just a second, but as to
24    the report, tell me what your position is on
25    this question.
```

1        Mr. Armstrong, I would like to know

2    whether the report that you mentioned that was

3    prepared for the White House contained

4    directives or policy guidance?

5            MS. SANTORA:  He has testified that

6    it was a draft report, so I will direct him not

7    to answer regarding because his answer will

8    involve material covered by the deliberative

9    process privilege.

10   BY MS. CONLON:

11           Q.   As we sit here, do you know

12   whether the version you saw is the same as the

13   final version?

14           A.   I do not --

15           MS. SANTORA:  Objection.  Foundation.

16   BY MS. CONLON:

17           Q.   Okay.

18           A.   I must answer?

19           MS. SANTORA:  Yeah, you can go ahead

20   and answer.

21           A.   Could you repeat the question,

22   please?

23           MS. CONLON:  Sorry.  I need just one

24   second.  I'm sorry.

25   BY MS. CONLON:

1          Q.   Did you have any meetings with

2    anyone concerning the preparation of that

3    report?

4          A.   None that I recall.

5          Q.   Did you have any conversations

6    with anyone concerning the report?

7          A.   Yes.

8          Q.   I appreciate your good spirits.

9    Who did you speak to?

10         A.   Someone in the Visa office.

11         Q.   Who was that?

12         A.   My recollection is it was

13   Managing Director Jessica Norris.

14         Q.   About when did you speak with

15   her?  When did you speak with her?

16         A.   When I was clearing the report.

17   It was probably in the afternoon.

18         Q.   That's okay.  Do you know who

19   was involved in the development of the report?

20         A.   Mr. Olowski.

21         Q.   Do you know whether anyone else

22   was involved in the development of the report?

23         A.   I do not know.

24         Q.   Did Ms. Norris also clear the

25   report?

```
 1              A.   No.
 2              MS. CONLON:  Yes.  I'm just trying to
 3   remember where I was.  I'm sorry.  I need one
 4   second.  The executive order.  I'm just
 5   grabbing a copy of the executive orders for
 6   you.  But overall question, whether from the
 7   E.O.s or anywhere else, the State Department
 8   Bureau of Consular Affairs has been asked to
 9   review activities for anti-Semitism, correct?
10              MS. SANTORA:  Objection.  Form.
11              MS. CONLON:  You can answer, if you
12   can.
13              THE WITNESS:  I need to answer this?
14              MS. SANTORA:  Uh-huh.
15              A.   Yes.
16   BY MS. CONLON:
17              Q.   Have you received any guidance
18   from anyone on what the State Department should
19   treat as being anti-Semitic?
20              A.   No.
21              Q.   What is your understanding of
22   what is anti-Semitic for the purposes of the
23   State Department's review of noncitizens
24   conduct based on?
25              MS. SANTORA:  Objection.  Form.
```

```
 1     Calls for speculation.

 2               THE WITNESS:  Is this deliberative?

 3               MS. SANTORA:  To the extent that your

 4     response would reveal deliberations, I direct

 5     you not to answer.

 6               THE WITNESS:  Thank you.

 7               MS. CONLON:  Can you respond?

 8               A.   What was the question?  I'm

 9     sorry.

10     BY MS. CONLON:

11               Q.   That's okay.  You said you

12     haven't received guidance from anyone on what

13     is anti-Semitic for the purposes of the State

14     Department's work, and so I'm asking what your

15     understanding of it is based upon if not

16     guidance from anyone.

17               A.   Hatred of Jews, things that are

18     Jewish and/or Israel including Jewish people,

19     and Israeli people.  Also prejudice against

20     those categories of people and things.

21               MS. CONLON:  Okay.  Just one moment.

22               A.   May I continue my answer?

23               Q.   I'm so sorry.  I didn't know

24     you weren't finished.

25               A.   Okay.
```

```
 1              Q.   Please go on.

 2              A.   Of course this may also depend

 3    on the circumstances and the situation in which

 4    such actions, views, efforts were taken.

 5              MS. SANTORA:  Before you ask your

 6    next question, can we take a brief break?

 7              MS. CONLON:  Sure.  Beforehand?

 8              MS. SANTORA:  Yes.

 9              MS. CONLON:  Sure.

10              THE VIDEOGRAPHER:  Off the record at

11    16:16.

12         (A break was taken at 4:17 p.m.)

13              THE VIDEOGRAPHER:  Back on the record

14    16:41.

15    BY MS. CONLON:

16              Q.   So before we went on the break

17    you were speaking about the meaning of

18    anti-Semitic activity for the purpose of State

19    Department work.

20         I spoke with you about some statements

21    earlier when we discussed the social media

22    guidance.  I want to return to that for a

23    moment.  I'm just trying to find it in the

24    transcript so bear with me, please.  All right.

25    Okay.
```

```
 1              Would a statement calling for a free
 2      Palestine be anti-Semitic for the purposes of
 3      the State Department's work
 4              MS. SANTORA:  Objection.  Calls for
 5      speculation.
 6              A.   That's a hard one to answer
 7      without knowing the complete context that the
 8      statement was made in because a lot of our work
 9      is actually quite complicated, and we work on a
10      lot of different issues in one day.
11          But without knowing the full context, it
12      would be quite difficult and quite a real
13      hypothetical to make a statement on that.
14              I'd have to know, you know, the
15      situation, what was going on, the details to
16      really see if the -- for the State Department
17      purposes as I believe you put it.
18      BY MS. CONLON:
19              Q.   Yes.  So, for example, if a
20      student protester chanted, "free Palestine" is
21      that anti-Semitic for the State Department Club
22      in its review of that activity?
23              MS. SANTORA:  Objection.  Calls for
24      speculation.
25              A.   It seems to be pretty
```

1    speculative to me because, again, it may be

2    more than just a protest, it maybe it's a

3    violent protest.  Maybe they're blocking a

4    synagogue and shouting that, maybe they're in

5    the synagogue, they've crossed into the

6    synagogue or in a Jewish cemetery knocking

7    overhead stones.  So you'd have to know the

8    full context, and without the full context it's

9    really difficult for me to say.

10         As I said, our work is complex and

11   requires judgment which is one of the reasons

12   they have such high standards to get into the

13   foreign service in my opinion.

14   BY MS. CONLON:

15         Q.   The statement, "from the river

16   to the sea Palestine will be free," is that

17   anti-Semitic?

18         MS. SANTORA:  Objection.  Calls for

19   speculation.

20         A.   In this case, too, it would

21   require to know more details, however, that

22   statement in itself carries the implication

23   that there is no river.  There is no -- sorry.

24   There's a river, but there's no Israel and no

25   Israeli's, in other words, no Jews.

```
 1        So that one, perhaps, some less context
 2   would be needed.  That's a clear -- and it's a
 3   clear message imbedded in there that if
 4   Palestine is there, there ain't no Israel or
 5   Israeli's.
 6   BY MS. CONLON:
 7           Q.   A statement -- what about a
 8   statement that calls for an arms embargo to
 9   Israel?
10           MS. SANTORA:   Objection.  Calls for
11   speculation.
12           A.   This one is -- again, is
13   complex, hard, requires background details, the
14   full picture and probably some careful thought,
15   actually.
16        You know, why did they say it, when did
17   they say it, who did they say it to, but
18   certainly it does have an implication buried in
19   there that you want to take away the weapons
20   that Israel needs to defend itself so
21   that perhaps.  I don't know.  I need to know
22   the whole situation, it's hard, it's
23   complicated like life.
24   BY MS. CONLON:
25           Q.   And you have to make these
```

```
 1    determinations in the course of your work

 2    without any set standard; is that correct?

 3              MS. SANTORA:  Objection.  Form.  Lack

 4    of foundation.

 5              A.   Well, I think the executive

 6    order gives some as I recall and of course I'd

 7    to look at it again, if you've got it.

 8              MS. CONLON:  I think I can help you

 9    with that.  Oh, we took it out.  We took it out

10    to give to you and then I didn't or maybe I

11    did.  One second.  Did I give you guys 14 --

12              MS. SANTORA:  No, I think we took a

13    break right as you were planning to.  I just

14    have Exhibits 1, 2, and 3.

15              MS. CONLON:  Okay.  Give me a second

16    while I look through my pile here.  Here we go.

17    Okay.

18              MS. SANTORA:  Thank you.

19              THE WITNESS:  Thank you.

20              MS. CONLON:  Ms. Henderson was that

21    No. 4?

22              THE COURT REPORTER:  4.

23              THE WITNESS:  I'm going to review the

24    document.

25              MS. CONLON:  Please do.
```

1            A.    I believe the question was

2      guidance and this does provide some guidance

3      but it also refers to other guidance in

4      previous Executive Order 13899 so there is some

5      guidance.

6      BY MS. CONLON:

7            Q.    And do you review that guidance

8      when you are making determinations about

9      whether a particular person's conduct is

10     anti-Semitic?

11           A.    In my duties I usually don't

12     make those determinations.

13           Q.    Who does?

14           A.    People in the Visa office.

15           Q.    Your subordinates?

16           A.    Yes.  Well -- yes.

17           Q.    What training have your

18     subordinates received on how to determine

19     whether a particular activity is anti-Semitic?

20           MS. SANTORA:  Objection.  Lack of

21     foundation.

22           A.    I don't know.

23     BY MS. CONLON:

24           Q.    Have you given them any

25     training?

1          A.    No.

2          Q.    Do you know what -- withdrawn.

3   Have you given them any written guidance to

4   determine whether particular activity or

5   statements is anti-Semitic?

6          A.    No, however not written but I

7   know everyone knows about these executive

8   orders because we always carry out executive

9   orders regardless of who the President is.

10         Q.    Okay.  Withdrawn.  Are you

11  aware of any materials that those in the Visa

12  office who have to make these determinations

13  refer to when they are determining whether

14  certain conduct is anti-Semitic?

15         MS. SANTORA:  Objection.  Calls for

16  speculation.

17         A.    There may be.  I don't know.

18  BY MS. CONLON:

19         Q.    Are you aware of any work

20  product that has been generated internally in

21  your bureau regarding how to determine if

22  certain conduct or speech is anti-Semitic?

23         A.    I do not recall any knowledge

24  of such a work product.

25         Q.    Have you exchanged any

```
 1    clarifying guidance -- withdrawn.  Have you

 2    shared any clarifying guidance with those who

 3    work for you in the Visa office on this issue?

 4            A.   I recall none.

 5            Q.   And it is your understanding --

 6    well withdrawn.  You mentioned that Executive

 7    Order 14188 incorporates a prior Executive

 8    Order 13899, correct?

 9            A.   That is actually what the paper

10    says.

11            Q.   And you are -- do you have any

12    familiarity with the previous order that it

13    incorporates?

14            A.   Some.  I would be happy to

15    familiarize myself with it, if you have it.

16            Q.   If I did, I would give it to

17    you.

18         Is it your understanding that that

19    previous executive order adopts the

20    International Holocaust Remembrance Alliance

21    definition of anti-Semitism?

22            MS. SANTORA:  Objection.  Calls for

23    speculation, and without seeing the document

24    his answers will be speculative.

25            MS. CONLON:  If you can answer the
```

```
 1    question you still have to.
 2              A.   Without seeing the document
 3    it's really difficult for me to answer that
 4    question.  I wouldn't want to hazard a guess
 5    because I would want to be as accurate and
 6    truthful as possible as counsel for the
 7    Government has reinforced with me that I need
 8    to be accurate and truthful in all statements.
 9    BY MS. CONLON:
10              Q.   Have you have made any
11    statements that you are concerned that are not
12    accurate and truthful thus far?
13              A.   No.
14              Q.   Are you familiar with the
15    International Holocaust Remembrance Alliance
16    definition for anti-Semitism whether in an
17    executive order or otherwise?
18              A.   Somewhat familiar.
19              Q.   Did you rely on that definition
20    in your work at the State Department?
21              A.   I haven't had to use it in my
22    work in my current position.
23              Q.   What about in past positions?
24              A.   I'd have to look at it,
25    actually, to refresh my memory because I have
```

 1    worked on Jewish and Holocaust issues in the

 2    past.

 3              Q.   Do you know whether the Visa

 4    office personnel who have to make these

 5    assessments use the definition from the

 6    International Holocaust Remembrance Alliance?

 7              A.   I do not know.

 8              Q.   Is there someone other than you

 9    responsible for training the Visa office

10    personnel who make these decisions on how to

11    determine whether conduct is anti-Semitic?

12              A.   I'm responsible for all the

13    operations of the Bureau of Consular Affairs.

14    13,000 people worldwide with a budget of five

15    billion, however -- over five billion all fees,

16    however, the Visa office is under Deputy

17    Assistant Secretary Wilson and also Managing

18    Director Norris.

19         And I believe they would also be

20    responsible for the operations of the Visa

21    office and I above them are responsible for

22    their operations and the operations of

23    everything that is underneath them.

24              Q.   I see.  In other words, you are

25    not in the position of yourself directly giving

1    trainings to employees in the Visa office,

2    correct?

3              A.   Yes.

4              Q.   It's -- that responsibility

5    would fall to one of your subordinates but not

6    sit with you, correct?

7              A.   I'm responsible for everything

8    they do.  The buck stops here with me.

9    However, there are other people who are also

10   responsibile.

11             Q.   When I say responsible -- well,

12   withdrawn.

13        Are there people who are your

14   subordinates who have as one of their

15   particular duties of their job to train people

16   in the Visa office on the implementation of

17   guidance from the Department of State?

18             A.   Guidance in general?

19             Q.   Sure.  Yes.

20             A.   Yes, that's done, for example,

21   in Webinars to clarify the meaning of the

22   guidance.

23             Q.   Right.  Are there people

24   subordinate to you whose particular duties

25   include training people in the Visa office on

1   the implementation of Executive Order 14188,

2   additional measures to combat anti-Semitism?

3           A.   I do not know.

4           Q.   Are there likewise people

5   subordinate to you whose particular duties

6   include training people in the Visa office on

7   the implementation of the other executive order

8   that we've discussed 14161?

9           MS. SANTORA:  Objection.  Calls for

10  speculation.

11          A.   I do not know.  I speculate

12  there probably are.

13  BY MS. CONLON:

14          Q.   Are there people subordinate to

15  you whose particular duties include training

16  people in the Visa office on the catch and

17  revoke policy?

18          MS. SANTORA:  Objection.  Calls for

19  speculation.

20          A.   I do not know.

21  BY MS. CONLON:

22          Q.   Who would know?

23          MS. SANTORA:  Objection.  Calls for

24  speculation.

25          A.   Other people responsible for

 1   the operations of the Visa office.

 2   BY MS. CONLON:

 3         Q.   And whose responsibilities

 4   within the Visa office at -- are relevant to

 5   training members of the Visa office on these

 6   executive orders?

 7         MS. SANTORA:  Objection.  Lack of

 8   foundation.  Calls for speculation.

 9         A.   Deputy Assistant Secretary

10   Stuart Wilson and Managing Director Jessica

11   Norris are responsible for the total operations

12   of the Visa office, as am I responsible for

13   their operations and the Visa office.  Yes,

14   it's my head that rolls.

15   BY MS. CONLON:

16         Q.   This executive order that we

17   have in front of us 14188, calls for in section

18   3 the creation of a report to the President as

19   per response from the State Department to this

20   order.

21         My question is whether the report that

22   you mentioned earlier is the report referenced

23   here in section 3?

24         A.   I'm going to familiarize myself

25   with section 3.

```
 1              Q.   Take your time.  And I'm

 2     referring to section 3A.

 3              A.   Yes, it is that report as I

 4     recall it.

 5              Q.   Do you recall whether that

 6     report was titled -- this is going to be

 7     long -- report on Department of State authority

 8     to counter anti-Semitism and recommendations

 9     for familiarizing institutions of higher

10     education with the security and related grounds

11     of Visa inadmissibility?

12              MS. SANTORA:  Objection.  Calls for

13     speculation.  And to the extent you have a

14     document, can you show it to him?

15              MS. CONLON:  I'm going surprise you

16     with more jokes again which is that this

17     document was withheld by the Government and

18     given only to the court in our case.

19                   We just received the privilege

20     log, and that is the title of one of the

21     documents on it, and I'm trying to ascertain if

22     that document is the one that we're talking

23     about, so I don't have it, otherwise, I would

24     definitely be using it.

25              MS. SANTORA:  Okay, well it was
```

1    withheld for privilege reasons, and the court

2    is currently reviewing it.

3            MS. CONLON:  Right.  So my question

4    is simply are we talking about that same report

5    or some other report, not what the content of

6    the report is?

7            MS. SANTORA:  Okay.  That's fine.

8    Just the objection would be that without seeing

9    it and I understand the circumstances of why he

10    can't see it, he would be speculating.

11            MS. CONLON:  If he knows the title of

12    the report he saw, can't he tell me that

13    that's --

14            MS. SANTORA:  He can say what he

15    remembers.  To the extent he's not looking at

16    the report, that would be speculative.

17    BY MS. CONLON:

18        Q.    Sure.  So understanding, Mr.

19    Armstrong, that I can't give you a copy of the

20    report right now, the very long title that I

21    read to you, do you recall whether that was the

22    title of the report that you reviewed?

23        A.    I do not recall.  I do not

24    know.

25        Q.    Fair enough.  Are you aware --

```
 1    withdrawn.  Okay.  We understand that in March
 2    the Department of Homeland Security developed a
 3    new process in response to these E.O.s that
 4    involves the State Department.
 5          Have you been a part of a new process
 6    developed in conjunction with the Department of
 7    Homeland Security beginning in March?
 8              MS. SANTORA:  Objection.  Foundation.
 9    BY MS. CONLON:
10          Q.   I can -- maybe I can give more
11    guidance.  We spoke with --
12          A.   Yes.
13          Q.   We spoke with Mr. Andre Watson
14    yesterday.
15          A.   Mm-hmm.
16          Q.   Have you had occasion since
17    March to coordinate with him on referrals or
18    Visa revocations of student Visa holders?
19          A.   Since March or since March 1st?
20          Q.   Since March 1st.
21          A.   I have been in communication
22    with Mr. Watson as has the Deputy Assistance
23    Secretary for Visa Services, Stuart Wilson and
24    then Acting Principle Deputy Assistant
25    Secretary Shane Myers as well as Managing
```

 1    Director Norris in receiving information and

 2    what's not a new process it seems to me because

 3    we've received information from DHS in the

 4    past, received information from all sorts of

 5    sources.

 6            Information about students who -- for

 7    consideration on Visa revocations.

 8            Q.    Information about students in

 9    consideration on Visa revocations on what

10    basis?

11            A.    On the basis that their

12    activity is not consistent with the type of

13    Visa they were issued.

14            Q.    Is there a particular statutory

15    provision for revocations of Visa holders based

16    on their engaging in activities that are not

17    consistent with the type of Visa they were

18    issued?

19            A.    As I stated in my -- what is

20    this called.

21            Q.    Declaration, I think.

22            A.    Declaration -- Exhibit 1.  As I

23    stated in Exhibit 1, paragraph 8, the State

24    Department has the authority to revoke Visa

25    under Section 221(i) of the Immigration

 1    Nationality Act.

 2         Also the U.S. code is cited here which

 3    states, [As read] "In pertinent part after

 4    issuance of a Visa the documentation to any

 5    alien in th Consular Office of the Secretary of

 6    State may at any time in his discretion revoke

 7    such a Visa or other documentation."  So to

 8    answer to the question 221(i) of the INA.

 9         Q.   Is there a policy that guides

10    the application of the statutory provision in

11    paragraph 8?

12         A.   Policies that exist for years,

13    yes.

14         Q.   Are there any new policies

15    under this administration regarding the

16    application of the provision in paragraph 8?

17         A.   In my recollection, no.

18         Q.   Is there any guidance or

19    instructions regarding the application of the

20    provision in paragraph 8?

21         A.   The cables.  The two cables

22    that we mentioned deal with 22NI if I'm not

23    mistaken, the catch and revoke and the vetting

24    cable which I believe the vetting cable is

25    Exhibit 3 MRN 25 State 26168.

```
 1              Q.    Is there any guidance apart
 2    from the vetting cable and the catch and revoke
 3    policy regarding when the provision in
 4    paragraph 8 should be applied?
 5              A.    There's been policy for years
 6    well established.
 7              Q.    Is there any new policy that
 8    developed under this administration?
 9              A.    To my knowledge, no, as far as
10    I recall no, other than the two cables, the
11    catch and revoke in Exhibit I believe 3.  Yes,
12    Exhibit 3.
13              Q.    Paragraph 8 the provision
14    that's cited here indicates that the Secretary
15    of State may in his discretion revoke a Visa,
16    correct?
17              A.    Only partially correct.  The
18    Consular Officer or the Secretary of State.
19              Q.    I did not mean to exclude
20    Consular Officers, that was an oversight.  In
21    pertinent part, though, it says, in his
22    discretion.
23          So my question is whether you have
24    received any clarification from anyone on when
25    it is appropriate for the State Department to
```

 1    recommend to the secretary that the secretary

 2    exercise their discretion here on this

 3    provision?

 4            A.    Only the Secretary, not

 5    Consular Officers.

 6            Q.    No, I keep forgetting them, the

 7    Secretary or Consular Officers.  Thank you for

 8    asking.

 9            A.    And what was it -- I'm sorry.

10    What was it that they received or did not?

11            Q.    Whether they have received any

12    clarification on when it is appropriate for the

13    Consular Officer or Secretary of State to use

14    the discretion forwarded to them under this

15    provision to revoke a Visa?

16            A.    I do not know of clarification

17    except in certain difficult cases.

18            Q.    When you say, "except in

19    certain difficult cases," are you thinking of

20    any particular cases?

21            A.    In certain different -- I'm

22    sorry.  I'm getting tired and slow.

23            Q.    Me too.

24            A.    In certain difficult cases

25    where the decision of a higher level manager is

```
 1    needed where the action officer is unable to

 2    make a determination, yes, no, then it goes up

 3    to a higher level.  In rare cases since I've

 4    been in my position, the current position of

 5    senior bureau official since February 27th

 6    there have been a handful that have been

 7    brought to me for discussion.

 8              Q.   Have all of the ones that were

 9    brought to you for discussion concerned the

10    application of this provision from paragraph 8?

11              A.   Of 221(i)?

12              Q.   Yes.

13              A.   There were some that also

14    involved 3C and 4C, I believe.

15              Q.   That's a new one for me.  Okay.

16    Now, you said the -- well, withdrawn.

17         Were you a part of any briefings in

18    March concerning a new effort to focus on

19    student protesters with respect to Visa

20    revocations?

21              MS. SANTORA:  Objection.  Form.

22              A.   I do not recall any such

23    briefings.

24    BY MS. CONLON:

25              Q.   Were you a part of any
```

1   briefings where there was a discussion even if

2   it's not the focus of the meeting, regarding a

3   new referral process from his overseen by

4   Mr. Watson to you at the Department of State?

5          A.   I would take issue with the

6   description of that as a new process.  I

7   believe my predecessor Julie Stufft and her

8   predecessors also engaged and contact with DHS,

9   but I cannot say that with full certainty.

10        The cast of characters may have changed,

11  but it is my understanding that the process has

12  been there for years.

13         Q.   When you say "process" you just

14  mean -- well, withdrawn.  When you say

15  "process", you mean a referral from Homeland

16  Security to the Department of State to take

17  action on a Visa, correct?

18         A.   A communication.  Yes.

19         Q.   But that's the process?

20         A.   A communication.

21         Q.   Okay.  Now have you been a part

22  of any recurring meetings regarding the

23  revocation of Visas of certain student

24  protesters?

25         A.   No, not recurring meetings.

1          Q.    What about any non-recurring

2    meetings?

3          A.    Yes.

4          Q.    Approximately, how many?

5          A.    Any meeting where it was

6    discussed?

7          Q.    Yes.

8          A.    I do not recall.  It was more

9    than four.

10         Q.    When did those meetings begin?

11         A.    Sometime after I assumed my

12   current position.

13         Q.    So March or thereafter.  The

14   beginning of March or thereafter?

15         A.    Sometime after.  I assumed the

16   position on February 27th.

17         Q.    Who was in the meetings that

18   you participated in where the revocation of

19   Visas for student protesters was discussed?

20              THE WITNESS:  Is this deliberation?

21              MS. SANTORA:  She's asking you who.

22              THE WITNESS:  Okay.

23         A.    The staff of consular affairs,

24   mostly Visa Office and the Consular Affairs

25   front office, different people different times.

 1          Sometimes it would come up in our
 2     leadership meetings or in our DAS meetings,
 3     deputy assistant secretaries.
 4     BY MS. CONLON:
 5          Q.    So it came up in meetings with
 6     personnel from the Visa office, meetings in
 7     personnel with front office folks, and meetings
 8     with others in leadership; is that correct --
 9     oh and, gosh, I'm sorry, and meetings with
10     deputy assistant secretaries?
11          A.    Yes, just leadership.
12          Q.    Did it come up in any meetings
13     with anyone from -- well, withdrawn.
14          The meetings you just described, was
15     anybody from the Department of Homeland
16     Security in any of these meetings?
17          A.    Not that I recall.
18          Q.    In the meetings that you
19     described, starting with meetings with
20     personnel from the Visa office, who from the
21     Visa office was in a meeting with you where
22     this was discussed?
23          A.    Actually, this may have also
24     been discussed in meetings with C staff, the
25     staff of the consular's office as well as

```
 1    Mr. Olowski when he was working in the
 2    consular's office.
 3              Q.   Sorry.  Thank you for that
 4    addition.  Do you have anything to add?
 5              A.   No.
 6              Q.   Who from the Visa office was in
 7    a meeting with you where this was discussed?
 8              A.   I don't recall exactly.
 9              Q.   Do you recall anyone from the
10    Visa office who was in a meeting with you where
11    this was discussed?
12              A.   DAS Wilson.
13              Q.   Anybody else?
14              A.   Managing Director Norris,
15    Senior Advisor Smith may have been, Mr. Myers
16    who I mentioned previously who had been the
17    acting deputy -- acting principal deputy
18    assistant secretary.
19              Q.   Who is retired?
20              A.   Who is in the process of
21    retiring.  The current Acting Principle Deputy
22    Assistant Secretary Matt Pierce, there may have
23    been others from the Visa office.
24              MS. CONLON:  Just one moment.  Sorry.
25    BY MS. CONLON:
```

1          Q.   In any of the meeting you were

2     in was a decision made?

3          A.   What do you mean by decision?

4          Q.   Yeah, that's fair.  In any of

5     the meetings you were in was a decision made

6     regarding the revocation of Visa -- of a Visa

7     from a student protester?

8          A.   Is a conversation a meeting?

9          Q.   For our purposes, yes.

10         MS. SANTORA:  Can you ask the

11    question again?

12    BY MS. CONLON:

13         Q.   I'll ask it maybe a different

14    or perhaps more straightforward question.

15         First, have you been a part of any

16    conversations about the revocation of Visas

17    from student protesters?

18         A.   I have been a party to

19    conversations about the revocation of Visas

20    including the revocation non-immigrant Visas,

21    including the revocation of student Visas.

22         Q.   Have the conversations that

23    you've been a part of about the revocation of

24    student Visas discussed student protesters?

25         MS. SANTORA:  Objection to the extent

```
 1    that you're discussing pre-decisional

 2    conversations that's privilege under the

 3    deliberative process privilege, and I would

 4    direct you not to answer except with respect to

 5    final decisions.

 6    BY MS. CONLON:

 7             Q.   So to make it a little

 8    easier -- I'm sorry.  I know this is very

 9    painful.

10             A.   My head is going to explode.

11    I'm sorry.

12             Q.   No, no, that's okay.  Without

13    asking you what was discussed, have you been a

14    party to discussions about the revocation of a

15    student Visa from a student protester?

16             A.   Conversation?

17             Q.   Yes.

18             A.   Yes.

19             Q.   Okay.  When?  Well, let me say

20    this --

21             A.   Sometime after taking on my

22    position on February 27th.

23             Q.   Have you been in more than one

24    conversation about that?

25             A.   I have participated in more
```

1    than one conversation about the revocation of

2    non-immigrant Visas which included student

3    Visas.

4            Q.   And to be clear I'm only

5    interested in -- well, withdrawn, actually.  I

6    don't want to overstate that.

7            MS. SANTORA:  Do you need a break?

8            A.   I'm good for now.  We can do it

9    at 5:30.

10           MS. CONLON:  Okay.  Do you want to

11   take a break at 5:30 or from now until 5:30?

12           MS. SANTORA:  Oh, no, at 5:30.

13   BY MS. CONLON:

14           Q.   You said you participated in

15   more than one conversation about the revocation

16   of non-immigrant Visas including student Visas,

17   my question is only going to be directed to

18   student Visas.

19           Approximately, how many conversations

20   have you been a part of since taking your new

21   position regarding a decision to revoke a

22   student Visa?

23           A.   Since taking my position,

24   current position on the 27th of February, I

25   have participated in a number of conversations

```
 1    about the revocation of non-immigrant Visas

 2    including the revocation of student Visas.

 3              Q.   How many were specifically

 4    about student Visas?

 5              A.   And not about any other topic?

 6              Q.   No.  How many touched on

 7    student Visas?  In other words, I'm not asking

 8    about other kinds of non-immigrant Visas, I'm

 9    only asking how many conversations you've been

10    in in your role?

11              A.   What is --

12              Q.   If you want clarification --

13              A.   I'm confused.

14              Q.   -- you should --

15              A.   I'm confused.  So a meeting

16    that any student Visas revocation was discussed

17    even if it was only 5 percent of the meeting

18    and the other 95 percent say, for example, were

19    other things, that wouldn't count?

20              Q.   Well, I think start -- we're

21    going to start big and get small.  So at the

22    outset, yes.

23              A.   Okay.  How many?

24              Q.   Can you give me a ballpark?

25    I'm clearly --
```

1          A.    Meaning several, several.

2          Q.    Many, many.

3          A.    Many might be going too far,

4    but a number of conversations.

5          Q.    How many have you --

6    conversations have you been in in your new

7    position where a revocation of student Visas

8    was more than 50 percent of the focus of

9    conversation?

10         I'm estimating here to try to make it a

11   little bit easier so you understand what I

12   mean?

13         MS. SANTORA:  Objection.  Lack --

14   form.

15         A.    A dozen.  More than a dozen.

16   BY MS. CONLON:

17         Q.    Have those conversations

18   exclusively been with other members of the

19   State Department?

20         A.    Conversations.  20.  Around 20.

21   No, they have not.

22         Q.    Okay.  What other departments

23   have you spoken to people in about the

24   revocation of the student Visas since taking

25   your role?

1          A.    Department of Homeland

2    Security.  The Homeland Security counsel.

3    Conversations?

4          Q.    Yes.

5          A.    Yes.  So a conversation could

6    have taken place on the telephone, obviously.

7          Q.    Yes.

8          A.    If it was a conference call.

9          Q.    Counts.

10          A.    But does every agency who was

11    on the call count?  Even if they weren't --

12    even if that wasn't their subject.

13          Q.    Let me -- let me try to make

14    this easier.  It's not a test.  I'm not looking

15    for a list.

16       Who are the agencies you speak to most

17    often about the revocation of student Visas?

18          A.    The Department of State.

19          Q.    Second most often?

20          A.    DHS.

21          Q.    Okay.  Do you ever speak with

22    anyone in -- well, ever is not going to help

23    you, is it.  Withdrawn.

24       Do you have occasion to speak with

25    anyone in the Department of Education about the

1     revocation of student Visas?

2              A.   I have not had such an

3     occasion.

4              Q.   Do you have the occasion to

5     speak with anyone in the White House about the

6     revocation of student Visas?

7              A.   I have had such occasion.

8              Q.   Approximately, how many times?

9              MS. SANTORA:  That's fine.  Sorry.

10             A.   Five, 10, 15 -- no, I have to

11    raise any number because it's -- and I

12    apologize because as I sit here I remember -- I

13    talk to dozens of people all throughout the

14    day.

15    BY MS. CONLON:

16             Q.   I understand.

17             A.   So the number of total

18    conversations was probably more.  More than --

19    over 20.  And I would say on at least a dozen

20    occasions I had spoken with someone in the

21    White House about the revocation of student

22    Visas and the revocation of the non-immigrant

23    Visas in general, student Visas being part of

24    that set.

25             Q.   Who in the White House have you

```
 1   spoken with about the revocation of student

 2   Visas?

 3           A.   Steven Miller.

 4           Q.   Anybody else?

 5           A.   Yeah, his deputy Tony.

 6           Q.   His deputy Tony?

 7           A.   I don't know the deputy's name.

 8   Adam, help me out guys.

 9           MR. BEAUMONT:   Lason.

10           A.   Adam Lason.   Thank you.

11   BY MS. CONLON:

12           Q.   Approximately, how many times

13   have you spoken with Steve Miller about the

14   revocation of student Visas?

15           A.   I would estimate over a dozen.

16           Q.   Did most of those conversations

17   take place in March, the beginning of your new

18   role?

19           A.   Yes.

20           Q.   Have you had any conversations

21   with the President concerning the revocation of

22   student Visas?

23           A.   No, I have never had a

24   conversation with the President at all ever.

25           Q.   Me, either.   Okay.   At the
```

```
 1    Department of Homeland Security, who have you
 2    spoken with most often about the revocation of
 3    student Visas?
 4              A.    Mr. Watson.
 5              Q.    Anybody else who you speak to
 6    frequently there?
 7              A.    Adam Lason from time to time.
 8    Again, about the revocation of non-immigrant
 9    Visas in general, of student Visas being a
10    subset of that.
11              Q.    When you -- in your
12    conversations with Steven Miller, did you
13    discuss the executive orders that we have been
14    looking at today?
15              MS. SANTORA:   Objection.   We're going
16    to invoke the presidential communications
17    privilege and I instruct the witness not to
18    answer.
19    BY MS. CONLON:
20              Q.    In your conversations with
21    others at the White House, not Steven Miller,
22    did you discuss the executive orders that we
23    have discussed today?
24              MS. SANTORA:   Objection.   We are
25    going to invoke the presidential communications
```

```
 1    privilege and instruct the witness not to
 2    answer.
 3              MS. CONLON:  Just one second.  Sorry.
 4    Lots of conferring.  Yes.  Can we go off the
 5    record for a moment?
 6              THE VIDEOGRAPHER:  Off the record,
 7    17:25.
 8         (A break was taken at 5:25 p.m.)
 9              THE VIDEOGRAPHER:  We are back on the
10    record 17:48.
11              MS. CONLON:  Just a moment.
12              THE WITNESS:  Thank you for your
13    break.  It was very nice.
14              MS. CONLON:  Yes, of course.  We
15    needed it too.
16    BY MS. CONLON:
17              Q.   Okay.  So on this question of
18    conversation with folks in the White House, I
19    understand your counsel may have some
20    objections.  I have a few questions left on
21    that before we move on.
22         Was anyone else in conversations that
23    you had with Steven Miller apart from the two
24    of you?
25              A.   There were conference calls,
```

1    so, yes.

2              Q.   Who else was on the conference

3    calls?

4              A.   People from across the

5    interagency.  From State Andrew Veprek, someone

6    from the WHA Bureau.

7              Q.   Sorry.  I missed the word you

8    said, people from across the --

9              A.   Interagency.

10             Q.   What is interagency in this

11   context?

12             A.   The interagency is a collective

13   noun used to refer -- to refer to all

14   Government departments and agencies when

15   they're working on an issue.

16             Q.   What are the Government

17   departments and agencies working on the issue

18   of the revocation of student Visas that were --

19   I'm sorry, that were part of the conversations

20   with Mr. Miller?

21             A.   As I recall, DHS, State

22   Department, DOD.  Those are the ones that I

23   recall with certainty and the White House.  The

24   Homeland Security council.

25             Q.   Do you know approximately how

1    many people were on the conference calls that

2    Mr. Miller was on with you?

3              A.    I do not know with certainty.

4              Q.    Do you know whether it was more

5    than five people?

6              A.    Yes, it was more than five

7    people because more than five people spoke.

8              Q.    Approximately, how many

9    different people spoke?

10             A.    Five to ten.

11             Q.    Do you know whether there were

12   more participants on the call who did not

13   speak?

14             A.    I know that there were more

15   participants on these calls who did not speak.

16             Q.    Do you know whether there were

17   more than 10 participants total on the call?

18             A.    Yes.

19             Q.    Do you know whether there were

20   more than 20 participants total in these calls

21   with Mr. Miller?

22             A.    No.

23             Q.    During these calls, were

24   specific students with student Visas ever

25   mentioned?

```
 1              MS. SANTORA:  Objection.  I'm

 2    instructing the witness not to answer pursuant

 3    to the deliberative process privilege and also

 4    the presidential communications privilege.

 5              MS. CONLON:  During these calls --

 6    well, withdrawn.  I would like to ask the

 7    witness for the record about whether the five

 8    non-citizens who are at issue in this case were

 9    specifically mentioned.

10              I assume you will object and

11    invoke privilege if I do that?

12              MS. SANTORA:  Yeah, there will be a

13    standing objection and the invocation of both

14    privileges --

15              THE COURT REPORTER:  I'm sorry.

16    There will be a standing objection and what?

17              MS. SANTORA:  Standing objection and

18    the invocation of the deliberative process

19    privilege and the Presidential communications

20    privileges and on those basis I'm instructing

21    the witness not to answer.

22              MS. CONLON:  I understand.

23    Ms. Santora, if I ask any questions not about

24    particular students but about discussion of

25    guidance, policies, methods relating to the
```

 1    handling of the revocations of student Visas,

 2    will you also object?

 3              MS. SANTORA:  Yes, on those grounds

 4    and invoke those privileges.

 5    BY MS. CONLON:

 6              Q.   How often were these conference

 7    calls with Mr. Miller?

 8              MS. SANTORA:  You can answer that.

 9              A.   The ones that dealt with the

10    topic that you're interested in?

11    BY MS. CONLON:

12              Q.   Yes.

13              A.   At one point at least weekly.

14              Q.   Have they -- has the weekly

15    calls stopped?

16              A.   Dealing with the topic you're

17    interested in?

18              Q.   Yes.

19              A.   Yes, and that topic was not

20    discussed.

21              Q.   When did the weekly call on

22    this topic stop?

23              A.   I don't know.

24              Q.   Approximately, how long were

25    these calls?

```
 1                A.   The total call is -- I don't
 2      know up to an hour, less, sometimes 15 minutes.
 3                Q.   Depends on the call?
 4                A.   It depends.
 5                Q.   Well, I'd like to turn now to a
 6      discussion about a particular student.  Are you
 7      familiar with Rumeysa Ozturk?
 8                A.   I have heard the name.
 9                Q.   Have you had any personal
10      involvement in Ms. Ozturk's case?
11                MS. SANTORA:  Objection.  Form.
12                A.   I did not know Ms. Ozturk,
13      personally.
14      BY MS. CONLON:
15                Q.   No, no, have you through your
16      work had any involvement with Ms. Ozturk's
17      case?
18                A.   It's my recollection, that I
19      did.
20                Q.   What did you recall about your
21      involvement in Ms. Ozturk's case?
22                A.   I remember that there was a
23      decision on whether to revoke her Visa.
24                Q.   Did you make that decision?
25                A.   It is my recollection that I
```

```
 1    did, but if you have a particular document I'd

 2    like to review it.

 3            Q.    Let's take a look at the

 4    administrative record exhibit.

 5            A.    Exhibit 3?

 6            Q.    Yes.  If you can turn to page

 7    34 in those tiny numbers at the bottom.  Let me

 8    know when you've had a chance to review the

 9    document?

10            A.    I have completed reading this

11    document.

12            Q.    Did you write this document?

13            A.    No.

14            Q.    Do you know who wrote it?

15            A.    Someone who worked in the

16    Bureau of Consular Affairs.

17            Q.    Did you sign this document?

18            A.    I don't believe so because I

19    see no signature on it.

20            Q.    I don't know if we're looking

21    at the same document then.

22            MS. SANTORA:  The second page.

23            A.    Yes, sorry.  I missed page 2.

24    BY MS. CONLON:

25            Q.    No, no it's okay.  Okay.  So
```

```
 1    this document begins --
 2                A.   Yes, I did sign this document.
 3                Q.   This document begins on March
 4    21, 2025 in response to a request from DHS ICE
 5    and -- well, I'm going to pause right there.
 6          What do you recall about the request
 7    from DHS ICE concerning Ms. Ozturk?
 8                MS. SANTORA:  Objection.  Instruct
 9    the witness not to answer based on the law
10    enforcement privilege.
11    BY MS. CONLON:
12                Q.   Do you -- without telling me
13    what you recall do you recall receiving a
14    request from DHS ICE regarding Ms. Ozturk?
15                A.   No.
16                Q.   Would seeing a copy of the
17    request from DHS ICE refresh your recollection?
18                A.   It might.
19                Q.   Unfortunately, I do not have
20    that document to give you.
21                A.   It will not refresh my
22    recollection.
23                Q.   Okay.  Do you recall the basis
24    for DHS's ICE's assessment as described here
25    that Ms. Ozturk has been involved in
```

1    associations that, [As read] "May undermine

2    U.S. foreign policy by creating a hostile

3    environment for Jewish students and indicating

4    support for a designated terrorist

5    organization."

6              MS. SANTORA:  Objection.  And I

7    instruct the witness not to answer based on the

8    law enforcement privilege.

9    BY MS. CONLON:

10             Q.   Well, the question is do you

11   recall the basis?  I'm not asking what it is.

12   So do you recall the basis?

13             A.   Am I compelled to answer?

14             MS. SANTORA:  You can answer as to

15   whether you recall.

16             A.   I do not recall the basis.

17   BY MS. CONLON:

18             Q.   Where it states here, [As read]

19   "That Ms. Ozturk has been involved in

20   associations that may undermine U.S. foreign

21   policy by creating a hostile environment for

22   Jewish students," can you please explain the

23   connection between the environment for Jewish

24   students and U.S. foreign policy?

25             MS. SANTORA:  Objection.  Form.  Lack

```
 1   of foundation.  Calls for speculation.
 2            MS. CONLON:  You can answer.
 3            A.   This is speculation because I
 4   don't have all the documents in front me
 5   including whatever may have possibly come in
 6   from ICE which I would love to see.
 7   BY MS. CONLON:
 8            Q.   Me too.  Do you know what it's
 9   quoting from here, this quotation that appears
10   in this memo?
11            A.   I do not know what it is
12   quoting from.  It appears -- no, I do not know.
13            Q.   Have you seen the language
14   anywhere before that's quoted here, [As read]
15   "Undermine U.S. foreign policy by creating a
16   hostile environment for Jewish students and
17   indicating a support for designated terrorist
18   organization anywhere?
19            A.   The language seems familiar.
20   It must be I saw it when I signed this on the
21   21st of March.
22            Q.   Just one sec.  Have you
23   received -- well, sorry.
24            Does the State Department have a
25   position on how creating a hostile environment
```

1    for Jewish students on campuses undermines U.S.

2    foreign policy?

3              MS. SANTORA:  Objection.  Lack of

4    foundation.  Calls for speculation.

5              A.   Secretary Rubio was quite

6    forcefully coming out against anti-Semitism in

7    general.

8    BY MS. CONLON:

9              Q.   This may sound like a silly

10   question, but are Secretary Rubio's positions

11   U.S. foreign policy for the purposes of State

12   Department decision making?

13             A.   I don't understand the

14   question.

15             Q.   Well, I asked you about -- let

16   me just see how I said it.  One second.

17        You said Secretary Rubio has forcefully

18   come out against anti-Semitism in general,

19   right?

20             A.   That is what I said according

21   to the record.

22             Q.   And you would agree with me

23   Secretary Rubio has made many public statements

24   about anti-Semitism since becoming secretary?

25             A.   Yes, and he's against it.

```
 1              Q.   Yes.  Understood.  And my
 2    question --
 3              A.   As am I, personally.
 4              Q.   And my question to you was:
 5    What is the connection between U.S. foreign
 6    policy and anti-Semitism on college campuses
 7    that seems to be eluded to here in this
 8    document?
 9              MS. SANTORA:  Objection.  Calls for
10    speculation.  Lack of foundation.
11              A.   I'm speculating it's -- if you
12    oppose it everywhere you oppose it on U.S.
13    campuses too because they're a part of
14    everywhere.  And it -- in this case you have a
15    foreign policy element because you have this
16    foreign alien who in this statement is
17    described as carrying out such acts.
18         So you have a foreign access right there,
19    and Secretary Rubio does foreign policy.
20    BY MS. CONLON:
21              Q.   Well, I think that last part is
22    the thing I'm trying to ask you.  Like in this
23    memo that you've signed --
24              A.   Yes, I did sign it.
25              Q.   It says that, [As read] "Ms.
```

1    Ozturk was involved in associations that may

2    undermine U.S. foreign policy by creating a

3    hostile environment for Jewish students and

4    indicating support for designated terrorist

5    organization."

6         Focusing on the first part, "a hostile

7    environment for Jewish students," my question

8    is really, what is the connection between that

9    environment and U.S. foreign policy; that's

10   what I'm trying to ask?

11         MS. SANTORA:  Same objection.

12         A.   Visa policy is a core foreign

13   policy function.  Ms. Ozturk is a foreign

14   alien.  Ms. Ozturk refused -- received a Visa.

15   She received a Visa to study, supporting

16   designated terrorist organizations and carrying

17   out anti-Semitic acts are behavior contrary to

18   the purposes of an F1 Visa.

19   BY MS. CONLON:

20         Q.   And U.S foreign policy --

21         A.   F1 Visa is a student Visa.

22         Q.   The U.S. foreign policy in this

23   case is United States' ICE policy of combatting

24   anti-Semitism?

25         A.   That's a possible

 1    interpretation.  I would think -- also point

 2    out the support for designated terrorist

 3    organization.

 4              Q.   I mean, to be clear, I know

 5    that -- withdrawn.

 6         I'm not asking you to speculate, I'm

 7    asking what you meant for this to mean when you

 8    signed the document because that's the language

 9    that's in it.

10         So where it says U.S. foreign policy

11    what did you understand that to mean?

12              MS. SANTORA:  Objection.  Lack

13    foundation.  Calls for speculation.

14              A.   I don't exactly remember.  This

15    was almost three months ago.

16    BY MS. CONLON:

17              Q.   What anti-Semitic acts did Ms.

18    Ozturk perform?

19              A.   I don't remember.

20              Q.   How did Ms. Ozturk demonstrate

21    support for a designated foreign terrorist

22    organization?

23              MS. SANTORA:  Objection.  I'm

24    instructing the witness not to answer based on

25    law enforcement privilege.

```
 1              MS. CONLON:  Did you say the
 2     objection is based on law enforcement
 3     privilege?
 4              MS. SANTORA:  Yeah, I'm sorry.  Can
 5     you repeat the question?
 6     BY MS. CONLON:
 7          Q.   The question was how did Ms.
 8     Ozturk demonstrate support for a designated
 9     foreign terrorist organization?
10              MS. SANTORA:  Yes, I will object to
11     the extent your answer will reveal privileged
12     information.
13          If there's non-privileged information
14     that answers the question, you can answer.
15          A.   I do not remember.  I do not
16     recall.
17     BY MS. CONLON:
18          Q.   In the next part of the
19     sentence that we've been looking at in the
20     memo, it says that [As read] "Ms. Ozturk
21     coauthored an Op ed that found common cause
22     with an organization that was later temporarily
23     banned from campus."  Did you review the Op ed
24     reference there?
25          A.   Did I review the reference or
```

```
 1    the Op ed?

 2              Q.    Did you review the underlying

 3    Op ed?

 4              A.    I do not recall.

 5              Q.    Have you ever seen it before?

 6              A.    I do not know.

 7              Q.    If I were to show you a copy of

 8    it, would that refresh your recollection about

 9    whether you had seen it before?

10              A.    It might.

11              MS. SANTORA:  I think I'm going to

12    object to this line of questioning.  It's

13    outside the scope.

14         This appears to be litigating her

15    individual habeas case in this form which the

16    Judge has said is off limits here.

17              MS. CONLON:  Okay.  Your objection is

18    noted.  It sounds like it's as to relevance.

19    We disagree so I'm going to pass the document

20    to each of you.

21              THE WITNESS:  Counsel, am I to review

22    the document or not?

23              MS. SANTORA:  He asked me can he

24    review the document?

25              MS. CONLON:  Oh, yes, I would like
```

```
 1    for you to review the document.

 2    BY MS. CONLON:

 3             Q.   Once you had a chance to read

 4    it, can you let me know?

 5             A.   I have skimmed through the

 6    document.

 7             Q.   Okay.  I have just one

 8    question.  The memo in front of us says that

 9    Ms. Ozturk coauthored an Op ed.

10        Is the document I handed you marked as

11    Exhibit 5 -- the Op ed referenced in this memo?

12             A.   I do not know.  I do not

13    recall.

14             Q.   Are you aware of any other Op

15    ed written my Ms. Ozturk?

16             A.   No, but that doesn't mean they

17    don't exist.

18             Q.   Sticking with the memo for a

19    moment, it says toward the bottom of that

20    paragraph, [As read] "Due to ongoing ICE

21    operational security, this revocation will be

22    silent."

23        Did you decide that the revocation

24    would be silent?

25             THE WITNESS:  (Inaudible response.)
```

1              MS. CONLON:  Can we go off the

2      record, if you're not sure.

3              THE VIDEOGRAPHER:  Off the record

4      18:13.

5          (A break was taken at 6:13 p.m.)

6              THE VIDEOGRAPHER:  Back on the

7      record, 18:15.

8      BY MS. CONLON:

9              Q.  So the question was, did you

10     decide that the revocation of Ms. Ozturk's Visa

11     would be silent?

12             A.  I do not recall.

13             Q.  If you -- withdrawn.  It says

14     here, [As read] "The Department of State will

15     not notify the subject of the revocation."

16     That's what a silent revocation means?

17             A.  Yes.

18             Q.  What are the circumstances

19     under which you approve silent revocations?

20             MS. SANTORA:  Objection.  Foundation.

21             A.  Is there some reason not to

22     inform the Visa holder of the revocation?

23     BY MS. CONLON:

24             Q.  What reasons have you granted

25     a -- granted is the wrong word, I guess --

```
 1   withdrawn.
 2            A.    I wasn't necessarily the one
 3   who made the decision.
 4            Q.    What are the circumstances
 5   under which you have seen the State Department
 6   grant silent revocations?
 7            A.    Cases where there was a reason
 8   not to inform the Visa holder.
 9            Q.    Can you give me an example of
10   reasons of not to inform the Visa holder?
11            A.    For example, if there would be
12   action to detain the Visa holder that we would
13   know about or the possibility of that.
14            Q.    What do you mean by action to
15   obtain the Visa holder?
16            A.    Well, action to -- I'm not a
17   lawyer.  Arrest, stop, pick up.
18            Q.    In the ordinary course in your
19   experience does the State Department notify
20   Visa holder's of the revocation of their Visas?
21            A.    Not in every case.
22            Q.    In most cases does the State
23   Department notify Visa holder's of the
24   revocation of their Visas?
25            MS. SANTORA:  Objection.  Form.
```

```
 1              A.    Based on my experience, which

 2   may be limited since I've only been in my

 3   current position since the 27th of February,

 4   usually the State Department informs the Visa

 5   holder of the revocation, but not in all cases.

 6   BY MS. CONLON:

 7              Q.    Sure.  In your experience what

 8   are the special circumstances under which the

 9   State Department does not inform the Visa

10   holder of their revocation?

11              A.    Situations in which there would

12   be a reason not to inform them.  For example,

13   plans by law enforcement or immigration

14   enforcement is part of law enforcement.

15              Q.    Does the State Department --

16   withdrawn.  What does the phrase ongoing ICE

17   operational security mean here?

18              A.    I think it's clear, it's on the

19   paper.

20              Q.    You're going to have to help

21   me.  What does -- what operational security was

22   imperilled by the notification of Ms. Ozturk's

23   Visa revocation?

24              MS. SANTORA:  Objection.  Form.

25              A.    Some operation that ICE was
```

1    undertaking that it would undermine if the Visa

2    holder knew of it.

3    BY MS. CONLON:

4             Q.   When ICE -- withdrawn.  I want

5    to talk about the process for one second.  You

6    received documentation from DHS or ICE

7    concerning Ms. Ozturk before issuing this memo,

8    correct?

9             A.   That is my recollection.  I'd

10   be happy to see it and refresh my memory, if

11   you could show it to me.

12            Q.   Just add it to the list of

13   things that I wish we both could see or had.

14        Now when ICE sends over a referral to

15   the State Department, that referral contains a

16   report of analysis and an accompanying letter;

17   is that correct?

18            MS. SANTORA:  Objection.  Lack of

19   foundation.

20            A.   It's my recollection that the

21   request referrals come in various forms.

22   BY MS. CONLON:

23            Q.   In your experience, do you

24   receive something called an his subject profile

25   and accompanying letter from DHS when you

```
 1    receive referrals from them?
 2              A.   If I could see an example of
 3    such document, I could refresh my memory.
 4              Q.   So right now you don't recall?
 5              A.   I don't recall.
 6              Q.   When you received a referral
 7    from ICE in the case of Ms. Ozturk, does ICE
 8    make a recommendation to you as to whether the
 9    revocation should be silent?
10              MS. SANTORA:  Objection.  Instructing
11    the witness not to answer based on the law
12    enforcement privilege.
13    BY MS. CONLON:
14              Q.   Well, here in this memo that
15    you signed it says, [As read] "Due to ongoing
16    ICE operational security the revocation will be
17    silent."
18         What does the State Department know
19    about ICE's operational security other than
20    what is shared in the referral?
21              MS. SANTORA:  Objection.
22    Speculation.  Calls for speculation.
23    BY MS. CONLON:
24              Q.   You can answer that because
25    it's only a speculation objection.
```

```
 1              A.   I'm sorry.  Could you repeat
 2    the question?
 3              Q.   No, it's okay.  I guess I'm
 4    trying to ask you here for Ms. Ozturk, you
 5    don't recall the specific reason that you
 6    approved a silent revocation; is that correct?
 7              MS. SANTORA:  Objection.  Misstates
 8    prior testimony.
 9    BY MS. CONLON:
10              Q.   Do you recall the reason
11    specifically that you approved a silent
12    revocation for Ms. Ozturk?
13              A.   It says so right here, due to
14    ongoing ICE operational security.
15              Q.   What ongoing ICE operational
16    security?
17              A.   And operation that ICE at the
18    time was undertaking that required that the
19    information not be revealed, that will it be
20    kept silent.
21              Q.   That operation was arresting
22    her?
23              A.   I do not know.  I'm not in law
24    enforcement.  We do not deport people.
25              Q.   When the State Department
```

1    chooses not to inform a Visa holder of a

2    revocation, is that on the basis of a

3    representation from ICE about how the

4    revocation would affect ICE's operational

5    security?

6            A.    And I can't comment in general

7    because it would depend on the circumstances of

8    the case.  In this case it's spelled out

9    clearly due to on -- in the document which you

10   presented and is right here dated March 21st,

11   2025, due to ongoing ICE operational security

12   this revocation will be silent.

13           Q.    Did you agree with this

14   decision?

15           A.    I signed the document.

16           Q.    I see that you signed it.  Did

17   you think this was the correct decision to

18   make?

19           MS. SANTORA:  Objection.  Calls for

20   speculation.

21           A.    Speculating what I may have

22   thought in one of many cases almost three

23   months ago?

24   BY MS. CONLON:

25           Q.    Well, sitting here now, do you

```
 1    think it was the right decision?
 2                 MS. SANTORA:  Objection.  Calls for
 3    speculation.
 4                 MS. CONLON:  Respectfully, I'm asking
 5    him for his own opinion on his own decision, so
 6    it's not speculation but even if it was, he can
 7    still answer.
 8                 MS. SANTORA:  I believe he did
 9    testify there were other documents before him
10    at the time he made the decision, so asking him
11    to answer that he agreed with the decision as
12    he said three months ago about those documents
13    before him he would be speculating.
14           A.   I would request the documents
15    including the one that Mr. Watson sent or it's
16    asserted that he sent.
17    BY MS. CONLON:
18           Q.   Just line up.  Me too.  Okay.
19    Are there ever instances that you sign a memo
20    approving a Visa revocation where you
21    personally disagree with the revocation
22    decision?
23           A.   That's a hypothetical.  I
24    mean --
25           Q.   Has that ever happened?
```

1           A.    Not that I recall.  I have no

2    recollection of such a case.

3           Q.    I understand that the State

4    Department has produced other memos about Ms.

5    Ozturk.  Have you seen any memo other than this

6    one about Ms. Ozturk?

7           A.    I do not recall.  If you would

8    have that document, I'd be happy to review it.

9           Q.    It's like torture hearing you

10   say that because I wish that I had it for both

11   of us.

12          There was a report in the Washington

13   Post that does not contain the memo that

14   describes it.  I'm going to tell you what it

15   says and see if that refreshes your

16   recollection.

17          It was, according to the Washington

18   Post, a March 2025 State Department memorandum

19   finding that, [As read] "Neither DHS nor ICE

20   nor Homeland Security investigations had

21   produced any evidence showing that Ms. Ozturk

22   engaged in anti-Semitic activity or made public

23   statements indicating support for a terrorist

24   organization."

25   Have you seen a memo to that effect?

```
 1              MS. SANTORA:  Objection.  Lack of
 2    foundation.  Calls for speculation.  Can you
 3    show him the document you're reading from?
 4              MS. CONLON:  Sure.  I can -- this is
 5    a Washington Post article, it's not the
 6    underlying memo, but I will happily pass it
 7    around.
 8              MS. SANTORA:  While he's reviewing
 9    this, I also want to raise the standing
10    objection that questions about this document
11    would be irrelevant and outside the scope of
12    these depositions.
13              MS. CONLON:  Obviously we disagree.
14    I don't want to waste time quarrelling about
15    it.
16    BY MS. CONLON:
17         Q.   So you know what I'm going to
18    ask you about with respect to this article, I'm
19    going to ask you about the top half of the
20    second page.  And when you've gotten through
21    the top half to the second page, please, let me
22    know.
23         A.   I'd prefer to review the whole
24    document.
25         Q.   You can.  I'm only going to ask
```

```
 1   you about one paragraph on that page.
 2              A.   I have finished reviewing this
 3   article from the Washington Post.
 4              Q.   So you asked to see the
 5   document that I was reading from or referring
 6   to.  As you can see here on page 2 of Exhibit 6
 7   I think it is, this Washington Post article,
 8   the article states [As read] "That after
 9   receiving the recommendation from DHS
10   concerning Ms. Ozturk the State Department
11   found that while Ozturk had protested past
12   relationship with Israel neither DHS nor ICE
13   nor Homeland Security investigations produced
14   any evidence showing that Ozturk had engaged in
15   anti-Semitic activity or made public statements
16   indicating support for a terrorist organization
17   according to U.S. Government employee --
18   according to U.S. Government employees, plural,
19   briefed on the State Department's memo."
20         Are you aware of the memo that is
21   referenced in that paragraph?
22              MS. SANTORA:  Objection.  I'm sorry.
23   Let me just say, objection lack of foundation.
24              A.   According to a U.S. Government
25   employee brief on the memo.  So someone who
```

 1    hadn't even seen the memo because they were

 2    briefed on it.  I do not recall such a

 3    document.  Please, produce it so I can refresh

 4    my memory.  I'd be happy to read it through.

 5            MS. CONLON:  I hope you're not under

 6    the impression that we have it and we have not

 7    given it to you.  We have not received it from

 8    anyone, to be clear, for the record.  Now is it

 9    the --

10            A.   I'm sorry.  I feel like I'm in

11    an unfair position to be asked to comment on a

12    document that I can't even see.  If it exists.

13    BY MS. CONLON:

14            Q.   I'm not asking you to comment

15    on it --

16            A.   If it exists.

17            Q.   -- I'm just asking you if you

18    happen to know if it exists --

19            A.   I do not.

20            Q.   And if you don't you can say

21    so.

22            A.   I do not know if a document

23    exists.  This is complete hearsay.

24            Q.   Is it the State Department's

25    practice to write the memo in response to a

```
 1    recommendation from Homeland Security setting
 2    Ms. Ozturk aside completely?
 3              A.   Here's the response right here.
 4    Apparently and please show me the incoming from
 5    Mr. Watson but this is the response or the
 6    document to Mr. Watson that refers to a request
 7    from DHS ICE.
 8              Q.   You are not aware of any other
 9    memos produced by the Department of State
10    concerning Ms. Ozturk, correct?
11              A.   I am not.  I recall no such
12    memos.
13              Q.   Do you recall whether the
14    referral from DHS in this case recommended
15    removing Ms. Ozturk under a 3C provision?
16              MS. SANTORA:  Objection.  I instruct
17    the witness not to answer based on the law
18    enforcement privilege.
19    BY MS. CONLON:
20              Q.   In your time in the role that
21    you're in now since February, have you received
22    referrals recommending removal of a student
23    under that 3C provision?
24              MS. SANTORA:  Objection.  I instruct
25    the witness not to answer based on the law
```

```
 1   enforcement privilege.
 2              MS. CONLON:  You're going to object
 3   to any questions we ask about the process by
 4   which student Visas are revoked in terms of the
 5   authority that they're based on?  The
 6   question -- just to be clear, the question is:
 7   Have you received referrals recommending
 8   removal of a student under the 3 -- under a 3C
 9   provision?
10              MS. SANTORA:  Yeah, let us --
11              MS. CONLON:  Do you want to take a
12   minute?
13          (Discussion between counsel.)
14              MS. SANTORA:  So to the extent that
15   you're talking about the substance of referrals
16   that would be law enforcement privileged.  Can
17   you repeat your question?
18   BY MS. CONLON:
19         Q.   Yes.  Have you received any
20   referrals recommending removal of a student
21   under a 3C provision?
22              MS. SANTORA:  Okay.  So the objection
23   is that the substance of referrals is law
24   enforcement privileged.  To the extent you can
25   answer the question, otherwise, which you asked
```

```
 1    about removals, correct?

 2              MS. CONLON:  Yes.

 3              MS. SANTORA:  Okay.  If you could

 4    repeat the question one more time.

 5              MS. CONLON:  I can't see how he can

 6    answer it given the objection, but I will ask

 7    it.

 8                   Have you received any referrals

 9    recommending removal of a student under a 3C

10    provision.

11              MS. SANTORA:  Also objection to form.

12    Lack of foundation.

13              A.   We can't remove anyone.  We can

14    only revoke Visas.  We have no one -- that's

15    not one of our authorities to remove.  So,

16    therefore, I would answer, no, because we --

17    you couldn't put a question to us to remove

18    someone.

19    BY MS. CONLON:

20              Q.   Have you received any referrals

21    recommending the revocation of a Visa of a

22    student under a 3C provision?

23              MS. SANTORA:  Objection.  The content

24    of referrals is law enforcement privileged.  I

25    instruct the witness not to answer.
```

```
 1    BY MS. CONLON:

 2              Q.    Here in this memo it states

 3    that Ms. Ozturk's Visa's being revoked pursuant

 4    to 1201 I, correct?

 5              A.    No, that is incorrect.  It's

 6    221(i).  Not 1201 -- oh, sorry 221(i) in INA.

 7    Yes, in the U.S.C.  I apologize.  I was looking

 8    at the INA.

 9              Q.    No, that's fine.  Does the fact

10    that this memo says she is going to have her

11    Visa revoked pursuant to 1201 I mean that the

12    referral you received only referenced 1201 I?

13              MS. SANTORA:  Objection.  Lack of

14    foundation.  Calls for speculation, and to the

15    extent it references the substance of referrals

16    law enforcement privileged.

17              A.    I can't answer due to law

18    enforcement privilege, and I don't remember

19    what was in the referral.

20    BY MS. CONLON:

21              Q.    Okay.

22              A.    If you could produce the

23    referral.

24              Q.    Just for the making sure that

25    you're clear since I'm questioning you and
```

```
 1    you're responding to me.  I do not have the
 2    referral.  I do not have any memos outside of
 3    this administrative record that is in front of
 4    you and the if I had them, I would give them to
 5    you because this isn't any sort of
 6    gamesmanship.  I generally do not have the
 7    documents.  I had requested them many times at
 8    this point.
 9         In this memo it notes that Ms. Ozturk
10    coauthored an Op ed that found common cause
11    with an organization that was later temporarily
12    banned from campus.
13         What is the relevance of the fact that
14    a student group was banned from campus to the
15    determination to revoke Ms. Ozturk's Visa?
16         MS. SANTORA:  Objection.  Calls for
17    speculation.
18         A.   It's hard to say.  I mean, the
19    implication would be that it was involved in
20    some sort of perhaps illegal activity that led
21    to it being banned or some other activity that
22    was if not illegal, unacceptable under whatever
23    rules at the university but that's just
24    speculation.
25         Nonetheless, I conclude based on looking
```

 1    at the document that temporarily banned meant

 2    that the organization was not one in good

 3    standing.

 4    BY MS. CONLON:

 5            Q.    You don't recall which

 6    organization it was, do you?

 7            A.    I do not.

 8            Q.    And you don't know the reason

 9    that it was apparently temporarily banned?

10            A.    I do not recall.

11            Q.    Are there particular student

12    groups that you have become familiar with

13    through your work on student Visas in the past

14    couple of months?

15            MS. SANTORA:    Objection.    Form.

16            A.    None that I recall.

17    BY MS. CONLON:

18            Q.    Have you ever heard of Students

19    for Justice in Palestine?

20            A.    I do not know.

21            Q.    Have you heard of Jewish Voice

22    for Peace?

23            A.    I do not recall hearing of

24    Jewish Voice for Peace in the past.

25            Q.    As in before this moment?

```
 1              A.    Yes.
 2              Q.    Have you heard faculty and
 3    staff for Justice in Palestine?
 4              A.    I do not recall having heard of
 5    faculty and staff for Justice in Palestine.
 6              Q.    Are you familiar with Columbia
 7    University Apartheid Divest?
 8              A.    I am not familiar with Columbia
 9    University Apartheid Divest.  I thought
10    apartheid was gone.
11              Q.    Since Ms. Ozturk was arrested,
12    have you had further involvement in her case?
13              A.    When was she arrested?
14              Q.    March 25, 2025.
15              A.    To my recollection, I have had
16    no involvement in Ms. Ozturk's case since she
17    was arrested in March 25th, 2025.
18              Q.    Prior to your approval of this
19    memo, have you ever approved a Visa revocation
20    on the basis of a person's anti-Semitic
21    conduct?
22              A.    I do not know.
23              Q.    Have you approved other Visa
24    revocations on the basis in whole or in part
25    that a person engaged in anti-Semitic conduct?
```

```
 1              A.   I am not certain.

 2              Q.   You would need to see the

 3   documents to recall?

 4              A.   Yes, that would help me.  I

 5   sign many memos.

 6              Q.   Is there a person in the Visa

 7   office who is junior to you which I appreciate

 8   is everyone but who is specifically in charge

 9   of reviewing these recommendations before they

10   come to you to sign?

11              A.   DAS Wilson.

12              Q.   Anyone else?

13              A.   And managing director Norris

14   and also outside the Visa office whose ever

15   serving as the principle deputy assistant

16   secretary.

17              Q.   Sticking within the Visa office

18   for a moment, who is the person who receives

19   the referral from DHS, reviews it, makes the

20   determination about whether or not revocation

21   is warranted before it gets to you?

22              MS. SANTORA:  Objection.  Calls for

23   speculation.

24              A.   I know that DAS Wilson has

25   received recommendations, information from DHS
```

 1    as regarding possible revocations as has

 2    managing director Norris.  There may be other

 3    people but those are the two that I can speak

 4    with authority on.

 5         There is a group within the Visa office

 6    and I don't remember the name of it that deals

 7    in particular with revocations.  Not just

 8    students, but all types of revocations for

 9    non-immigrant Visas.

10    BY MS. CONLON:

11         Q.   Just a second.  Is there anyone

12    in the Visa office who is principally in charge

13    of Visa revocations of student Visas relating

14    to anti-Semitism, pro Hamas support or anything

15    of that nature?

16         A.   It's my understanding the

17    people who deal with revocations in general

18    also deal with those issues.  And, of course,

19    managing director Norris being responsible for

20    everything that happens at the Visa office as

21    DAS Wilson being the next level up is also

22    responsible for everything that happens in the

23    Visa office.

24         Q.   To be transparent, I'm trying

25    to find out who is the person who is seeing

Deposition of John Armstrong                                    AAUP, et al. v. Rubio, et al.

```
 1    these reports and vetting them and going

 2    through them, and it sounds like when this go

 3    to you it's in the form already of a distilled

 4    memo; is that correct?

 5              A.    That's correct.

 6              Q.    In other words, you are not in

 7    a position to be familiar with the underlying

 8    documents that lead to the creation of this

 9    memo; is that right?

10              A.    I may have asked for them, I

11    may have not, I do not recall.  I could ask for

12    them, if I thought it was necessary.  Maybe I

13    would ask the person whoever the author was to

14    discuss it with me if I had a question.

15              Q.    The author of this memo you

16    mean?

17              A.    Yes, sorry.  Just like your

18    boss would ask you a question on some brief or

19    something.

20              Q.    Yes.  Have you had occasion to

21    confer with anyone in the Office of

22    Intelligence over at Homeland Security

23    concerning student Visa revocations?

24              A.    Not that I recall.

25              Q.    Do you know whether Ms. Norris
```

```
 1    or Mr. Wilson have coordinated with anyone in
 2    the Office of Intelligence at DHS on student
 3    revocations?
 4              A.   I do not know.
 5              MS. SANTORA:  Can we -- before we ask
 6    another question can we take a break whenever
 7    natural.
 8              MS. CONLON:  I have like two more
 9    questions on Ms. Ozturk and then I'm done so
10    maybe let's just finish, okay.
11              MS. SANTORA:  Sure.
12              MS. CONLON:  Is that okay with
13    everybody else?
14              THE WITNESS:  We should finish the
15    Ozturk matter in my opinion but I will turn to
16    counsel they know better than I.
17              MS. SANTORA:  Yeah, we'll finish
18    Ozturk and then we'll take a break.
19    BY MS. CONLON:
20              Q.   Are you aware of the
21    circumstances of Ms. Ozturk's arrest?
22              A.   I know she was arrested.  You
23    told me it was on the 25th of March.  Tufts is
24    in New York I believe so it was probably
25    winter, that's about all I know.
```

```
 1              Q.   Did anybody discuss with you

 2    the plans for her arrest before it was

 3    executed?

 4              A.   No.  Definitely not.

 5              Q.   Did anyone -- has anyone

 6    discussed it -- did anyone discuss her arrest

 7    with you afterwards?

 8              A.   Not that I recall.  Again, the

 9    State Department does not deal with

10    enforcement, that is law enforcement and DHS.

11    We do not arrest people, we do not deport

12    people, that is not part of our duties or

13    prerogative.

14              MS. CONLON:  I think it's a good

15    place for a break, and we're ready to leave

16    this topic.

17              MS. SANTORA:  Okay.

18              THE VIDEOGRAPHER:  Off the record

19    16 -- I'm sorry 18:46.

20         (A break was taken at 6:46 p.m.)

21        (Proceedings resumed at 7:16 p.m.)

22              THE VIDEOGRAPHER:  We're back on the

23    record 19:16.

24    BY MS. CONLON:

25              Q.   Okay.  So I know I said we
```

 1    believe Ms. Ozturk and we are almost going to

 2    leave her but just another question on that.

 3         What is the standard or threshold that

 4    has to be met for a revocation under the

 5    provision that was relied on in Ms. Ozturk's

 6    revocation which is 1201 I?

 7         MS. SANTORA:  Objection.  Lack of

 8    foundation.

 9         A.   Well, it depends on the

10    situation of course and there's many variables

11    depending on different situations and different

12    cases it'd really have to be taken into

13    consideration.

14      I would refer back to the 1201 I as you

15    call it or the 221(i) INA that refer back to

16    the original declaration that I made at

17    paragraph 8, Exhibit 1 where it quotes saying,

18    [As read] "After the issuance of Visa or other

19    documentation to any alien consular officer --

20         THE COURT REPORTER:  I'm sorry.

21    After the issuance --

22         A.   "Issuance of a Visa or other

23    documentation to any alien a council/consular

24    officer of the Secretary of State may at any

25    time at his discretion revoke such Visa or

```
 1   other documentation."
 2           It's at the discretion of the people
 3   mentioned so it's going to depend on the
 4   situation, and the -- I couldn't really hazard
 5   a guess in a vacuum, you know, hypothetical.
 6   BY MS. CONLON:
 7           Q.   What is the threshold that you
 8   use when deciding whether to send to the
 9   secretary for his determination a proposed
10   revocation under this provision?
11           A.   Since the consular office is
12   empowered to do it, I don't recall a case which
13   we've sent to the secretary for 22 -- for
14   221(i) since the counselor officer has it in
15   his power which counselor officers involved are
16   working in council affairs obviously at a
17   certain level.
18       So I will not generally see a need under
19   221(i) to send to the secretary.  Of course the
20   secretary could ask us to send it to him, any
21   secretary could, this is a very general long
22   established procedure, but most cases under
23   this stipulation, it's handled at a level lower
24   than the secretary that involves the consular
25   officer.
```

 1          Q.   Did Ms. Ozturk's case get
 2   resolved under your determination not the
 3   secretaries; is that correct?
 4          A.   I do not recall.  I would need
 5   to see the documentation, if they're making the
 6   decision.
 7          Q.   What documentation reflects who
 8   makes the decision?
 9          A.   If there was an action memo on
10   this, for example.
11          Q.   Sorry.  Go ahead.
12          A.   Or it could be in the
13   revocation system.  There's a system --
14   computer system for revocations.
15          Q.   There's a computer system for
16   revocations used by the Department of State?
17          A.   Under 221(i), yes.
18          Q.   Is an action memo generated for
19   every revocation under 221(i) as best you know?
20          A.   As best I know and I'm not
21   involved on a daily basis with revocations
22   because most of them don't require my
23   involvement considering I'm the top of the
24   pyramid in the Bureau of Consular Affairs.  I
25   cannot say what is done on an every day basis.

1          Q.    In the revocations that you

2    have personally been involved in under 221(i),

3    have there been action memos generated?

4          A.    In general, yes, but not in

5    every case.  Some might have been my

6    consultation or my advice has been sought and

7    I've provided it, and then it was taken care of

8    at a different level within the Bureau of

9    Consular Affairs.

10         Q.    Is there any guidance or

11   instruction about the factors that Bureau of

12   Consular Affairs should consider before sending

13   a referral under 1201(i)/221(i) to a consular

14   officer or the secretary?

15         A.    I would again look to what it

16   says in this declaration that I made that it's

17   at the discretion so that would -- I would look

18   to that.

19         Q.    Well, it's precisely because

20   it's indiscretion that I ask this question

21   whether there's any guiding principle or

22   standard or threshold that's used to decide

23   whether to take the action?

24         A.    On such things as with many

25   procedures the guidance is found in the FAM.

1          Q.    In the FAM.  Is there a

2     particular section of the FAM that provides

3     guidance for when to take action under 1201 I?

4          A.    I do not know if there exists a

5     particular section of the FAM on that topic.  I

6     have not memorized the contents of the FAM.

7          Q.    Nor have I.  This memo on Ms.

8     Ozturk states as the basis for the revocation

9     that she had been involved in associations that

10    may undermine U.S. foreign policy among other

11    things, but the revocation is under the

12    discretionary power in 221(i), 1201(i).  Why is

13    that?

14          MS. SANTORA:  Objection.  Form.

15    Calls for speculation.

16          A.    I don't know.  I do not recall

17    and I couldn't speak of them in any case of any

18    deliberations that took place.

19    BY MS. CONLON:

20          Q.    How do you decide whether the

21    revocation that could be made under either 1201

22    I/221(i) or a 3C provision gets made under 1201

23    I or the 3C provision?

24          I can see how that was confusing, I'll

25    withdraw it.

1          My question is:  There were certain

2     revocations for which the factual basis it

3     would seem could call for revocation under a 3C

4     provision or 1201 A which is just

5     discretionary.  How does the Department of

6     State beside which provision to rely on in that

7     circumstance?

8               A.   Actually, I appreciate the

9     question, it's a very good one, and it gets to

10    the heart of much of our work which requires

11    judgment which is why the selection and

12    training of the foreign service and the civil

13    service who works on such as things is so

14    intense.

15         It's complicated and it really depends on

16    the concrete -- concrete details and

17    circumstances of the case, and it's very

18    difficult for me to express a view that's a

19    supposition or a hypothetical without having

20    the concrete case or concrete facts in front of

21    me.

22               Q.   Okay.  And fair to say in Ms.

23    Ozturk's case you don't know why that memo

24    recommends revocation under 1201 I as opposed

25    to another provision?

 1          A.   I do not recall and do not know

 2     at the basis of any knowledge.  I would be

 3     happy to review any document that you might be

 4     able to present.

 5          MS. CONLON:  It almost feels like

 6     you're teasing me now.  I have nothing.  I

 7     think you know that.  I hope you know that.

 8               I'm not withholding anything from

 9     you and I've asked your counsel many times for

10     these documents.  So just please know that from

11     the bottom of my heart, if I have it, I'd give

12     it to you.  Okay.  Do we have anything else on

13     Ms. Ozturk?  We don't.

14               Okay.  We are hopeful for your

15     situational awareness there are four other

16     non-citizens we have questions about.  We have

17     understand that privilege will be invoked in

18     response to many of our questions about those

19     other people.

20               I'm just going to ask a few

21     specific questions to make a record about

22     revocations under different basis, but then I

23     think we can try to sort of efficiently deal

24     with everybody else.

25          MS. SANTORA:  Okay.

```
 1    BY MS. CONLON:

 2           Q.   So I'd like to turn your

 3    attention, Mr. Armstrong, to page 44 of the

 4    administrative record?

 5           A.   Which document is that?

 6           Q.   It's in -- I'm sorry it's the

 7    same exhibit that you're in, Exhibit 5.

 8           A.   Exhibit 5 or Exhibit 3?

 9           MS. SANTORA:  Exhibit 3.

10           MS. CONLON:  Exhibit 3?

11           MS. SANTORA:  3.

12           THE WITNESS:  Exhibit 3, not 5.  And

13    what was the page?

14           MR. BEAUMONT:  44.

15           MS. SANTORA:  44.

16           MS. CONLON:  44.

17    BY MS. CONLON:

18           Q.   When you've had a chance to

19    skim the document, let me know.

20           A.   This one, here?

21           Q.   Yes, exactly.  This one

22    concerning Badar Khan Suri S-U-R-I?

23           A.   (The witness reviews document.)

24           Q.   When you're finished let me

25    know.
```

```
 1              A.   Okay.
 2              Q.   I'm just asking that you read
 3    the memorandum.
 4              A.   I see.  Not the attachments?
 5              Q.   That's right.
 6              A.   I have completed reviewing the
 7    document.
 8              Q.   Okay.  Thank you.  So this is a
 9    memorandum concerning Badar Khan Suri, correct?
10              A.   Yes, that is the subject of the
11    memorandum.
12              Q.   Have you seen this memorandum
13    before?
14              A.   I do not recall.
15              Q.   This memorandum was signed off
16    on or issued by Secretary Rubio, right?
17              A.   Yes, from Marco Rubio.
18              Q.   And in this memorandum Mr. Suri
19    is found to be -- is found to be suitable for
20    revocation under the 4C provision of the INA;
21    is that right?
22              A.   Yes.
23              Q.   Under 4C a person is deportable
24    if their presence or activities in the United
25    States would have potentially serious, adverse,
```

1    foreign policy consequences for the United

2    States, correct?

3              A.    That is what it writes in the

4    memorandum or what is written in the

5    memorandum.

6              Q.    Is that consistent with your

7    understanding of 4C through your work?

8              A.    Yes.

9              Q.    Now, were you involved in any

10   capacity in Mr. -- in the determination about

11   Mr. Suri?

12             A.    I may have been, I do not

13   recall with certainty.

14             Q.    If you look at the top of the

15   second page, there is language that appears in

16   quotation marks.  I'll read it to you, [As

17   read] "Suri's direct connection to moss

18   leadership and involvement in anti-Semitic

19   activities creates a hostile environment for

20   Jewish students and indicates support for a

21   designated terrorist organization."

22             Do you know what this memorandum is

23   quoting from?

24             A.    I do not.

25             Q.    We looked moments ago at the

```
 1    memorandum you signed for Ms. Ozturk and in
 2    that memo there was quoted language, I can
 3    draw -- you're welcome to look back at it.
 4    That's on page 34.
 5           That quoted language is similar to what
 6    we see here in Mr. Suri's memo and Ms. Ozturk's
 7    memo the quotation is, [As read] "(inaudible)
 8    U.S. foreign policy by creating a hostile
 9    environment for Jewish students and indicating
10    support for a designated terrorist
11    organization."
12           Do you see that the similar language in
13    their memos?
14              A.    Yes.
15              Q.    Does that inform your
16    understanding of what these memos are quoting
17    in any way?
18              A.    No.
19              Q.    Do you know anything about the
20    basis for the claim that Mr. Suri had a direct
21    connection to Hamas leadership?
22              A.    No.
23              Q.    Do you know anything about the
24    basis for the claim that Mr. Suri was involved
25    in anti-Semitic activities?
```

```
 1                    A.   I recall --

 2                    MS. SANTORA:  Objection.  You can

 3       answer -- what was your question, do you --

 4             BY MS. CONLON:

 5                    Q.   Do you know anything about the

 6       basis for the claim that Mr. Suri was involved

 7       in anti-Semitic activities?

 8                    MS. SANTORA:  You can answer whether

 9       you know.  To the extent the question's asking

10       for the basis that is law enforcement privilege

11       then I direct you not to answer.

12                    A.   I do not recall if I was

13       familiar at the time with the basis of the

14       claim.

15       BY MS. CONLON:

16                    Q.   Are you familiar now?

17                    A.   To my knowledge, no.

18                    Q.   Do you know anything about the

19       basis for the claim that Mr. Suri created a

20       hostile environment for Jewish students?

21                    A.   I do not recall any information

22       on this basis.

23                    Q.   Instead of going line by line,

24       is it fair to say that you don't know about the

25       factual basis for the determination concerning
```

 1    Mr. Suri apart from what you're reading in this

 2    memo?

 3              A.    I do not recall this

 4    information.

 5              Q.    Now, further down in that -- on

 6    page 2 there's a sentence at the end of the

 7    main paragraph that states, [As read] "Moreover

 8    the type of intimidation and in segment

 9    attributable to Suri potentially undermines the

10    peace process under way in the Middle East by

11    reenforcing anti-Semitic sentiment in the

12    regional and thereby threatening the U.S.

13    foreign policy goal of peacefully resolving the

14    Gaza conflict."

15         Do you know anything about the factual

16    basis for that claim?

17              MS. SANTORA:   Objection.   Lack of

18    foundation.   Calls for speculation.

19              A.    Based on what's in front of me,

20    I know nothing more than what is in this

21    document.

22    BY MS. CONLON:

23              Q.    Is it the State Department's

24    position that campus protests that are

25    anti-Semitic threaten the U.S. foreign policy

1    goal of peacefully solving the conflict?

2              MS. SANTORA:   Objection.   Lack of

3    foundation.   Calls for speculation.

4              A.   The State Department has been

5    very clear on its position on anti-Semitism in

6    general.

7    BY MS. CONLON:

8              Q.   Is it the State -- well,

9    withdrawn.   You mentioned earlier the State

10   Department has forcefully come out against

11   anti-Semitism, but does the State Department

12   have a position on whether student protests on

13   college campuses in the U.S. threaten the U.S.

14   foreign policy goal of peacefully resolving the

15   Gaza conflict?

16             MS. SANTORA:   Objection.   Lack of

17   foundation.   Calls for speculation.

18             A.   Secretary Rubio has stated that

19   he's against foreign aliens organizing

20   anti-Semitic activity in the United States

21   foreign aliens, guests in our country.

22   BY MS. CONLON:

23             Q.   Fair to say to understand the

24   State Department's position on something like

25   this I should look at Mr. Rubio's statements

```
 1   about it; is that correct?
 2              A.   He is the Secretary of State.
 3              Q.   And he makes U.S. foreign
 4   policy?
 5              MS. SANTORA:  Objection.  Lack of
 6   foundation.  Calls for speculation.
 7              A.   Yes, he's also the national
 8   security advisor at the present time as well as
 9   the head of national archives and he has one
10   other position which I have forgotten.
11   BY MS. CONLON:
12              Q.   He's currently also the head of
13   the national archives?
14              A.   Yes.
15              Q.   Very busy man.  I'm just -- one
16   second.  Okay.  So you don't have any
17   information about why the determination in this
18   case was under 4C and not 1201 I, correct?
19              A.   I only have the information
20   that is in this memo that you have kindly shown
21   me.
22              MS. CONLON:  Okay.  I think -- am I
23   correct in understanding from the Government
24   that any questions I would ask about the basis
25   for the action as to all of the targeted
```

1    students in our case would lead you to invoke a

2    privilege?

3            MS. SANTORA:  Yes, the law

4    enforcement privilege.

5            MS. CONLON:  All right.

6            MS. SANTORA:  Also to the extent that

7    it's the recommendation of deliberative process

8    privilege.

9    BY MS. CONLON:

10           Q.   So I have one more non-citizen

11   I want to ask you about whose circumstances are

12   slightly different than that rest of the group

13   and then the rest of the group I can just make

14   a record about and we don't need to talk about

15   given the Government's implication privilege.

16           Just one moment.  I want to make sure I

17   have nothing else on Mr. Suri before we move

18   on.

19           So turning now to page 18 of the

20   administrative record that's in front of you.

21           A.   Exhibit 3, yes?

22           Q.   Yes.  Please take a moment to

23   review pages 18 and 19.  I'm just asking you to

24   look at 18 and 19 so when you have done that

25   let me know.

```
 1                A.    Okay.

 2                Q.    This is a notification of

 3    removability determination for Mahmoud Khalil,

 4    right?

 5                A.    It appears to be, yes.

 6                Q.    And this memorandum states that

 7    Mr. Khalil is a lawful permanent resident,

 8    correct?

 9                A.    And another person too.

10                Q.    Yes, I don't know who that is

11    because it is redacted.  But I'm only going to

12    ask you questions with respect to Mr. Khalil?

13                A.    It says both, so yes, he's one

14    of the two.

15                Q.    And the memorandum concludes

16    that Mr. Khalil is deportable under 4C,

17    correct?

18                A.    Yes, both Mr. Khalil and the

19    other unnamed alien.

20                Q.    The other memorandum memos that

21    we looked at concerned Visa holders not lawful

22    permanent residents.  Is there anything

23    different about the process for making a

24    removability determination of a lawful

25    permanent resident?
```

```
 1              MS. SANTORA:  Objection.  Lack of

 2      foundation.  Calls for speculation.

 3              A.   Again, I don't have the INA in

 4      front of me so I'm certainly going from memory,

 5      the difference being I do not believe the

 6      221(i) applies to lawful permanent residents

 7      because they're not Visa holders by definition.

 8      BY MS. CONLON:

 9              Q.   I'm sorry, I don't mean with

10      respect to the INA I mean, the process in the

11      Department of State.

12          Is there anything different about the

13      process for making a removability determination

14      for a lawful permanent resident under 4C than

15      for a Visa holder?

16              MS. SANTORA:  Objection.  Lack of

17      foundation.  Calls for speculation.

18              A.   I do not know.

19      BY MS. CONLON:

20              Q.   Now, is there -- I think we

21      talked about it in another context, but in the

22      context of making a removability determination

23      for a lawful permanent resident, is there a

24      person in the Bureau of Consular Affairs who

25      handles that?
```

```
 1              MS. SANTORA:  Objection.  Lack of
 2      foundation.  Calls for speculation.
 3              A.   It would be a person in the
 4      Visa office.  Again, DAS Wilson and MD,
 5      managing director, Norris of the Visa office.
 6      BY MS. CONLON:
 7              Q.   For your purposes when you are
 8      asked to review a memo making a removability
 9      determination for a lawful permanent resident
10      is there anything different that you do than
11      you would do for a memo on a Visa holder?
12              A.   In all cases I would determine
13      with certainty that the part of the law being
14      used can be used against that an alien in that
15      status.
16              Q.   There is no specific --
17      withdrawn.  In other words, the process on your
18      end is the same when reviewing a removability
19      recommendation or determination for a lawful
20      permanent resident or a Visa holder; is that
21      correct?
22              A.   Essentially, yes, it is my
23      recollection.  I haven't reviewed a case in a
24      bit.
25              Q.   Now, is the chain of people
```

1    starting at that time top with Secretary Rubio

2    down to the most junior person any different

3    for removability determinations of lawful

4    permanent residents from Visa holders?

5              MS. SANTORA:  Objection.  Lack of

6    foundation, calls for speculation.

7              A.    I would have to look at

8    concrete memoranda to make that determination,

9    although there could be a difference.

10        For example, if a 22 -- 222 I case does

11   not require it, it can be the Secretary of

12   State but it does not require to be the

13   Secretary of State but as is noted here the

14   Secretary of State must personally determine.

15        So for the use of the 237 A, small A4,

16   large C 2, it must be the Secretary of State.

17   Well, for the 222 I it is not required, it can

18   be, but is not required.

19        That is the significance difference which

20   means that 222 I can go to a person at a lower

21   level, for example, to me to a DAS or someone

22   even lower, managing director, for example.

23   BY MS. CONLON:

24             Q.   Okay.  I'm not sure if you can

25   answer this, but in the chain of people up to

1    you starting from the bottom, is that part of

2    the chain any different whether it's a

3    removal -- a removability determination under

4    4C or 3C or 1201 I, 221(i); does that change?

5              MS. SANTORA:  Objection.  Lack of

6    foundation.  Calls for speculation.

7              A.   To say with 100 percent

8    certainty I'd have to look at concrete examples

9    and see the list of the people.

10   BY MS. CONLON:

11             Q.   Is -- sorry.  Go ahead.

12             A.   No, I'm done with that answer.

13             Q.   Is there memorialized anywhere

14   the list of people from the bottom to the top

15   involved in any particular removability

16   determination?

17             A.   I do not know.

18             Q.   If you wanted to know every

19   person who had been a part of a removability

20   determination for a given individual, how would

21   you get that information?

22             A.   I'd ask for it.

23             Q.   And who would you ask?

24             A.   I'd ask the Visa office.

25             Q.   And who in the Visa office

 1    would you ask?

 2              A.   I'd ask the DAS, Stuart Wilson.

 3              Q.   And you expect Mr. Wilson to be

 4    able to tell you each person who was a part of

 5    the chain of making that decision; is that

 6    correct?

 7              A.   Yes.  Or to be able to get such

 8    information.  If not, he would receive a

 9    talking to.

10              Q.   Is there a particular computer

11    system or information system that you would

12    expect to have that information?

13         I believe earlier you mentioned a

14    information system for revocations, but I now

15    cannot remember what it is called.

16              A.   Yes, I did note that and I

17    think it's just on the -- one of our systems,

18    but I don't know which one because I do not

19    personally press the button to do the

20    revocations because every single one is

21    reviewed by a -- someone who knows how to do

22    this.

23         They just don't do them in mass without

24    reviewing every single case and the totality of

25    the circumstances.  It's actually quite time

```
 1    consuming is my understanding.
 2            What I would look to, I would look to
 3    turn to Stuart, DAS Wilson and in the document
 4    there should be a list somewhere of who wrote
 5    it.  Who was -- participated in it.
 6            Q.   And you said in the document
 7    there should be a list somewhere of who wrote
 8    it.  In what document?
 9            A.   I'm sorry.  It's called the
10    clearance sheet.
11            Q.   Is a clearance sheet a log of
12    every person who has cleared a particular
13    report or document?
14            A.   Yes.
15            Q.   And is a clearance sheet
16    generated for every -- as part of every
17    removability determination?
18            A.   Every?  I do not know 100
19    percent.
20            Q.   Well, I'm not seeking a promise
21    that it's 100 percent of the time, but is the
22    ordinary course that a clearance sheet is
23    generated for a removability determination?
24            A.   Yes.
25            Q.   What about for revocation
```

 1    determination?

 2            A.   It depends who the revocation

 3    determination is going to.

 4            Q.   There are certain types of

 5    revocation determinations for which there would

 6    not be a clearance log?

 7            A.   That is correct, and it's my

 8    understanding I think the best thing would be

 9    to ask the people in the Visa office.  I do not

10    know.  Simply, I do not know with certainty.

11            Q.   Okay.  We talked about from you

12    and down the chain of folks involved in a

13    determination.  Where -- I'd like to talk about

14    the top part of the chain, not sure how long is

15    it, but who else is in the chain potentially

16    besides you and then Secretary Rubio up at the

17    top.

18            MS. SANTORA:  Objection.  Lack of

19    foundation.  Calls for speculation.

20            A.   Action memos go from me as

21    filling the duties of an assistant secretary to

22    Secretary Rubio through his staff through the

23    staff.

24    BY MS. CONLON:

25            Q.   The staff of Secretary Rubio?

1              A.    Yes.   The executive secretary.

2              Q.    Secretary Rubio's executive

3    secretary?

4              A.    Yes.

5              Q.    And who is that, I'm sorry?

6              A.    It's a bunch of people that

7    have the exec, that exec sec just like at NSC

8    Ms. Stufft, here it's Ambassador Canuff (ph),

9    if I'm not mistaken, who runs that staff.

10             Q.    Do you know whether between

11   when you give the determination to Secretary

12   Rubio's executive secretary and that person

13   gives it to Secretary Rubio, is there anyone

14   else in the chain who reads it?

15             A.    I'm not privy to that, I do not

16   know who it goes to.

17             Q.    Is it your understanding when

18   you give it to Secretary Rubio's executive

19   secretary that the purpose of that is for

20   Secretary Rubio to review it?

21             A.    Yes.   Why else would I send it

22   to him?

23             Q.    Decoration.

24             A.    No, he doesn't have a lot of

25   time.   I'm sorry.   Forgive me, I digress.   I'm

```
 1    sorry.  I do not know.  I have no knowledge of
 2    that.
 3              Q.   Okay.  For Mr. Khalil's whose
 4    memo we have in front of us, do you know
 5    anything about the factual basis for the
 6    removability determination for Mr. Khalil?
 7              A.   I know what is contained in
 8    this document that you kindly presented to me.
 9              Q.   Do you know anything outside of
10    the four corners of this document?
11              A.   I recall no other information
12    regarding Mr. Khalil outside of this -- the
13    four corners of this document other than I
14    heard on the news he had been released.
15              MS. CONLON:  Sorry.  Just one moment.
16    So this is for your counsel now.  We would ask
17    questions about the factual basis and other
18    basis for actions against the other targeted
19    non-citizens we are focus on in this case and
20    that's Mohsen Madawi, M-A-D-A-W-I, as well as
21    Yunseo Chung.
22              We will not take the time to do
23    that understanding that the Government would
24    invoke various privileges in response to any
25    questions about that on the same grounds that
```

1    was we set forth in yesterday's deposition of

2    Mr. Watson.

3              MS. SANTORA:  Yeah, I just want to be

4    clear for the record that with respect to those

5    questions those questions or questions about

6    the basis for the determinations in the memos

7    regarding the five non-citizens, we are

8    invoking the law enforcement privilege.

9              And to the extent the basis

10   involves recommendations for deliberative

11   process privilege and we're directing the

12   witness not to answer those questions with

13   respect to the five non-citizens.

14             THE WITNESS:  Can we have a break?

15             MS. SANTORA:  Yes, we can have a

16   break.  I'm sorry.  Can we have a break?

17             MS. CONLON:  Yes.

18             THE VIDEOGRAPHER:  Off the record

19   19:55.

20         (A break was taken at 7:55 p.m.)

21       (Proceedings resumed at 8:11 p.m.)

22             THE VIDEOGRAPHER:  Back on the record

23   at 20:12.

24   BY MS. CONLON:

25             Q.   Okay.  We're really close.  The

```
 1   referrals that we looked at for Mr. Suri, Mr.
 2   Khalil and Ms. Ozturk came from the Department
 3   of Homeland Security.
 4        Have you received any referrals from
 5   anybody other than the Department of Homeland
 6   Security in connection with revocations of
 7   student Visas or determines of removability for
 8   lawful permanent residents?
 9        MS. SANTORA:  I'm sorry.  Objection.
10   Form.  Can you repeat that?
11        MS. CONLON:  Oh, it's very long.
12        MS. SANTORA:  I'm sorry.
13        MS. CONLON:  No, it's okay.  Do
14   referrals for the kinds of removability
15   determinations and revocation determinations
16   we've been discussing come to the State
17   Department from anywhere other than Homeland
18   Security?
19        MS. SANTORA:  Objection.  Form.  To
20   the extent you can answer, you can answer.
21        A.   I do not know with certainty.
22   BY MS. CONLON:
23        Q.   Have you ever seen a referral
24   from any place other than the Department of
25   Homeland Security?
```

1          A.   I'm not sure.

2          Q.   Do you have any reason to

3     believe they come from any other agency?

4          MS. SANTORA:   Objection.   Form.

5          A.   Yes, because we look for

6     information from various sources.   DHS is quite

7     prolific, but there could be others.

8     BY MS. CONLON:

9          Q.   Are there any other sources

10    that you routinely receive referrals from apart

11    from DHS?

12         A.   No, not referrals.

13         Q.   Is there something that is a

14    referral equivalent called by another name that

15    you are thinking of when you say that?

16         A.   There have been cases where the

17    parts of the State Department have been put

18    forth holders of non-immigrant Visas for

19    consideration for revocation.

20         Q.   Have any of those cases

21    occurred under this administration, to your

22    knowledge?

23         A.   Yes.

24         Q.   Have any of those cases

25    involved student Visas?

```
 1              A.   Yes.
 2              Q.   Have any of those cases
 3   involved student Visas holders accused of
 4   anti-Semitism or association with or support
 5   for foreign terrorists organizations?
 6              A.   I'm not sure.  I do not recall
 7   with certainty.
 8              Q.   When a referral comes from
 9   within the Department of State which part of
10   the Department of State generates that
11   referral?
12              A.   The leadership.
13              Q.   What are the circumstances
14   under which a particular Visa holder comes to
15   the attention of the leadership of the State
16   Department leading to the determination of
17   removability or revocation?
18              MS. SANTORA:  Objection.  Lacks
19   foundation.  Calls for speculation.
20              A.   The leadership is quite well
21   connected and has in its sources of information
22   from all over the place and it really depends
23   on the situation and where they -- and where it
24   comes from.
25   BY MS. CONLON:
```

```
 1              Q.   Does the leadership ever get

 2    information leading to a revocation or

 3    removability determination from parties outside

 4    the Government?

 5              A.   Yes.

 6              Q.   Which parties?

 7              A.   I don't recall.

 8              Q.   Do you know whether leadership

 9    has gotten information from any of the

10    following entities, Canary Mission, Heritage

11    Foundation, Betar U.S.

12              MS. SANTORA:   Objection.   Form.

13              A.   Could you repeat those?

14    BY MS. CONLON:

15              Q.   Do you know whether leadership

16    has gotten any information leading to a

17    removability or revocation determination from

18    any of the following entities:   Canary Mission,

19    Heritage Foundation, Betar U.S.?

20              A.   The first two I have not heard

21    of.  I have heard of Betar U.S. mentioned but I

22    don't remember the situation and what it was

23    mentioned.  I've heard of the other

24    organization the other two, Heritage Foundation

25    I've also heard of, but those two I've heard
```

1    of, but I don't remember the exact situation.

2           Q.   Have you ever heard of any

3    coordination between the State Department and

4    either Betar U.S. or the Heritage Foundation in

5    any context?

6           A.   I remember reading something

7    that cited since I've been in my position that

8    referred to some information from Betar U.S.  I

9    do not remember what this document was.  I do

10   not remember what it involved.  It could have

11   been a revocation.  It might not.  I do not

12   know with certainty.

13        The Heritage Foundation has put on

14   various events that I know people from the

15   State Department have attended and have for

16   years, it's a well known think tank.  That is

17   what I know to.

18          Q.   Okay.  Do you know any --

19   withdrawn.  Do you know whether the State

20   Department has investigated any referrals based

21   on any information received from Betar U.S.?

22          A.   I do not know with certainty.

23          Q.   Do you have any information

24   about whether you have certainty as to the

25   question?  What do you know about it?

1          A.   I remember reading in a

2    document I believe it was an unclassified

3    document, I do not know for sure.  I think it

4    was unclassified -- yes, it was definitely

5    unclassified, as a matter of fact.

6          Q.   Thank you.  The heart attack.

7          A.   The mention of Betar U.S. in

8    some situation, in this position that I am in

9    now, I do not remember the exact information

10   involved, but I do remember Betar U.S.

11         Q.   Are you aware of any specific

12   repeat providers of information to the

13   Department of State in connection with

14   referrals that are non-Government actors?

15         A.   Well, DHS, but they're a

16   Government actor.  No.  None come to mind.

17         Q.   In the time you've been in your

18   role starting in March actually, has there

19   been --

20         A.   February 27th.

21         Q.   I'm not trying to shortchange

22   you time.  My question is actually beginning of

23   March, recognize there's some pre-maritime

24   there.

25         Has there been any reallocation of the

```
 1    resources at the Bureau of Consular Affairs in

 2    connection with the two executive orders we've

 3    discussed today?

 4              A.   I'm not sure.  I don't think

 5    so.

 6              Q.   Has there been any reallocation

 7    of personnel to -- sorry withdrawn.

 8         Has there been any reallocation of

 9    personnel to various projects -- or no.

10    Withdrawn.  Sorry.

11         Do you know whether just before you

12    took on your role, February 27th, whether there

13    was any reallocation of resources within the

14    Bureau of Consular Affairs in connection with

15    the two executive orders?

16              A.   None that I'm aware of, but I

17    can't speak with authority about what happened

18    before I took on my role.

19              Q.   What about reallocation of

20    personnel?

21              A.   None that I know of.

22              Q.   So I'm not asking you questions

23    about them I just want to know if you had any

24    involvement with the students who we didn't

25    discuss that are part of our case.
```

```
 1              Were you involved in any way with the
 2     determination concerning Mohsen Madawi, if you
 3     recall?
 4              A.   I do not recall.
 5              Q.   Okay.  And were you involved in
 6     any way with the determination concerning
 7     Yunseo Chung?
 8              A.   I may have been.  I do not know
 9     with certainty.  The name is familiar to me.
10              Q.   Do you recall as you sit here
11     any details about her case?
12              MS. SANTORA:  Objection.  Form.  Lack
13     of foundation.  Calls for speculation.
14              A.   That she was from the People's
15     Republic of China.
16     BY MS. CONLON:
17              Q.   She's from the People's
18     Republic of -- is there anything else that you
19     recall about her or her case?
20              A.   She's female.
21              Q.   These are good deductions.
22     Anything --
23              A.   No, actually I recall -- I
24     actually recall reading the name and saying,
25     oh, this is a woman from the People's Republic
```

```
 1    of China.

 2              Q.   Is there anything about her

 3    name or country of origin that you recall about

 4    her or her case?

 5              A.   I recall hearing recently that

 6    she has not been detained, but that could have

 7    been from the media.  I do not know the source

 8    of that information.

 9              Q.   To the best of your

10    recollection, have you performed any particular

11    work on her case?

12              A.   I'm not sure.  I may have since

13    the name rang a bell, but I don't know with

14    certainty.  If you've got a document that you'd

15    like to show, I'm happy to review it.

16              MS. CONLON:  I have no document with

17    your name on it relating to her.  And hardly

18    any documents about her at all.

19              Okay.  I think the only thing left I

20    just want to clarify the record about what I

21    would have asked and then I'll stop shocking

22    all of us I'm sure.

23    You said earlier, Ms. Santora, that you would

24    object to questions concerning the content of

25    memorandum about the decisions that were made.
```

```
 1    I just wanted to be clear that I would ask

 2    questions about more than just the content of

 3    substance of the memoranda but actual questions

 4    about the basis for the decision whether

 5    reflected in the memoranda or not.

 6    So I would ask if you would let me -- questions

 7    about the basis for the decision that a person

 8    was removable or that their Visa should be

 9    revoked, the factual basis the process of

10    reaching that determination including all

11    deliberations from the most junior person to

12    the most senior person who participated in that

13    determination, if you would let me.

14              MS. SANTORA:  We would invoke both

15    the law enforcement provision and deliberative

16    process privilege to protect all --

17              THE COURT REPORTER:  I'm sorry.  We

18    invoke both the law enforcement privilege --

19              MS. SANTORA:  And deliberative

20    process privilege with respect to all five

21    non-citizens.

22              MS. CONLON:  And also for the record

23    I would ask about all communications concerning

24    those decisions as well.

25              MS. SANTORA:  Yes, we would invoke
```

 1    the deliberative process and the law

 2    enforcement privilege over those communications

 3    with respect to all five.

 4                MS. CONLON:  Okay.  And for the

 5    record we object to the invocation we will save

 6    everybody the time and not go through the whole

 7    process now.

 8                I think depending on what your

 9    direct is, I am done.  How much time remains?

10                THE VIDEOGRAPHER:  6 hours 27 minutes

11    on the record.

12                MS. SANTORA:  Do you want to talk

13    briefly?  Okay.  Just give us 2 minutes.

14                THE VIDEOGRAPHER:  Off the record.

15    8:26 p.m.

16          (A break was taken at 8:26 p.m.)

17        (Proceedings resumed at 8:31 p.m.)

18                THE VIDEOGRAPHER:  We're back on the

19    record 20:31.

20    BY MS. CONLON:

21                Q.   Okay.  In your declaration

22    which I think is Exhibit 1 on the second to

23    last page which is page 4 in paragraphs 15 and

24    17 speak of Secretary Rubio's public remarks.

25                My question is only did you speak with

Case 1:25-cv-10685-WGY    Document 186-1    Filed 07/07/25    Page 513 of 863
Deposition of John Armstrong
AAUP, et al. v. Rubio, et al.

```
 1    Secretary Rubio about his remarks?

 2              A.   Personally?

 3         Q.   Yes.

 4         A.   No.

 5         MS. CONLON:  Okay.  I don't think I

 6    have any other questions.  That's it literally.

 7              THE VIDEOGRAPHER:  This ends today's

 8    deposition.  We are going off the record 20:32.

 9              THE COURT REPORTER:  Just before I do

10    that could I get the transcript orders.

11         MS. SANTORA:  We would like expedited

12    is that --

13              THE COURT REPORTER:  Same time as

14    before?

15         MS. SANTORA:  Yeah, next day.

16              THE COURT REPORTER:  That would be

17    Monday -- you'll probably get it over the

18    weekend.

19         MS. SANTORA: Okay.  Yeah, the one

20    that's -- whatever's as quick as possible.  I

21    know it's late.

22              THE COURT REPORTER:  Did you want a

23    rough tonight?

24         MS.  SANTORA:  If you have a rough.

25              MS. CONLON:  And same for us.  Thanks.
```

1                                    - - -

2                          E R R A T A   S H E E T

3                                    - - -

4

5        PAGE        LINE        CHANGE

6        _____      _____      _____

7        _____      _____      _____

8        _____      _____      _____

9        _____      _____      _____

10       _____      _____      _____

11       _____      _____      _____

12       _____      _____      _____

13       _____      _____      _____

14       _____      _____      _____

15       _____      _____      _____

16       _____      _____      _____

17       _____      _____      _____

18       _____      _____      _____

19       _____      _____      _____

20       _____      _____      _____

21       _____      _____      _____

22       _____      _____      _____

23       _____      _____      _____

24       _____      _____      _____

25       _____      _____      _____

1              ACKNOWLEDGMENT OF DEPONENT

2

3        I,                        , do hereby

4    certify that I have read the foregoing pages and

5    that the same is a correct transcription of the

6    answers given by me to the questions therein

7    propounded, except for the corrections or

8    changes in form or substance, if any, noted in

9    the attached Errata Sheet.

10

11

12

13

14

15    _____      _____
      Date            Signature

16

17

18

19

20

21

22

23

24

25

1                         CERTIFICATE

2

3            I, Okeemah S. Henderson, RPR, the officer before

4    whom the foregoing deposition was taken, do hereby certify

5    that the foregoing transcript is a true and correct record

6    of the testimony given; that said testimony was taken by me

7    stenographically and thereafter reduced to typewriting

8    under my direction; that reading and signing was not

9    requested; and that I am neither counsel for, related to,

10   nor employed by any of the parties to this case and have no

11   interest, financial or otherwise, in its outcome.

12            IN WITNESS WHEREOF, I have hereunto set my hand

13   and affixed my notarial seal this 17th day of June, 2025.

14   My commission expires:

15   September 30, 2029

16

17

18

19

20

21   *Okeemah S. Henderson*
     Okeemah S. Henderson, RPR
22   Official Court Reporter

23

24

25

### WORD INDEX

**< 0 >**
**012**  105:*1*  106:*12*

**< 1 >**
**1**  4:*12*  5:*3*  15:*9*
16:*5, 20*  45:*23*  65:*9*
104:*22*  151:*4, 11*
176:*14*  188:*22, 23*
247:*17*  284:*22*
**1:25-cv-10685**  1:*6*
**1:25-CV-108**  5:*8*
**1:57**  128:*9*
**10**  70:*18, 25*  203:*10*
208:*17*
**10:18**  1:*12*  5:*10*
**10:47**  25:*15, 16*
**100**  37:*1*  84:*6*
105:*17*  267:*7*  269:*18, 21*
**10004**  2:*9*
**10115**  2:*21*
**10685**  5:*8*
**11:01**  25:*17, 19*
**11:10**  33:*7, 8*
**11:22**  33:*9, 12*
**1182**  4:*13*  69:*13*
**1182(a**  46:*9*
**1182(a)(3**  45:*19*
**1182(a)(3)(c**  68:*20*
**12**  1:*12*  5:*9*  8:*13*
46:*24*  47:*4, 9*  65:*16*
86:*6, 10*  126:*12*
127:*8*
**12:23**  79:*9*
**12:48**  79:*12*
**1201**  238:*4, 6, 11, 12*
247:*6, 14*  251:*3, 21,*
22  252:*4, 24*  261:*18*
267:*4*
**1201(i**  251:*12*
**1201(i)/221(i**  250:*13*
**13,000**  181:*14*
**13:57**  128:*8*
**13899**  177:*4*  179:*8*
**13th**  150:*25*
**14**  176:*11*
**14:04**  128:*11*

**14:29**  147:*11*
**1416**  74:*2*
**14161**  57:*15, 21*
58:*22*  63:*4*  72:*18*
73:*19*  74:*8*  105:*6*
106:*9*  122:*9, 17*
123:*23*  124:*2, 23*
125:*6, 16*  183:*8*
**14188**  57:*15*  58:*3*
59:*4*  63:*16*  105:*6, 8*
106:*9*  122:*9*  179:*7*
183:*1*  184:*17*
**15**  4:*12*  203:*10*
211:*2*  284:*23*
**15:40**  147:*14*
**16**  151:*4, 12, 16, 21*
152:*5, 13*  153:*5*
154:*1*  246:*19*
**16:16**  172:*11*
**16:41**  172:*14*
**1615**  1:*14*  5:*12*
**17**  284:*24*
**17:25**  206:*7*
**17:48**  206:*10*
**17th**  288:*13*
**18**  262:*19, 23, 24*
**18:13**  223:*4*
**18:15**  223:*7*
**18:46**  246:*19*
**19**  262:*23, 24*
**19:16**  246:*23*
**19:55**  273:*19*
**19th**  3:*19*
**1CA**  18:*25*
**1st**  27:*16, 19*  187:*19,*
20

**< 2 >**
**2**  4:*13*  45:*24*  66:*19,*
22  69:*3*  176:*14*
212:*23*  233:*6*  259:*6*
266:*16*  284:*13*
**2:00**  126:*9*
**2:29**  147:*12*
**20**  70:*18, 22, 25*
73:*12*  201:*20*  203:*19*
208:*20*
**20:12**  273:*23*
**20:31**  284:*19*

**20:32**  285:*8*
**2000**  35:*10*
**20006**  3:*20*
**20036**  1:*15*
**20044**  3:*9*
**202**  3:*11, 22*
**202-2600**  2:*11*
**2025**  1:*13*  5:*9*  70:*17*
213:*4*  229:*11*  231:*18*
241:*14, 17*  288:*13*
**2029**  288:*15*
**20th**  129:*2*
**21**  213:*4*
**212**  2:*11*
**212(a)(3)(b**  132:*18*
**21st**  215:*21*  229:*10*
**22**  248:*13*  266:*10*
**221(i**  67:*5*  188:*25*
189:*8*  192:*11*  238:*6*
247:*15*  248:*14, 19*
249:*17, 19*  250:*2*
251:*12*  264:*6*  267:*4*
**222**  266:*10, 17, 20*
**22NI**  189:*22*
**237**  266:*15*
**23rd**  2:*8*
**25**  104:*18*  129:*13, 18*
151:*22*  189:*25*
241:*14*
**25th**  129:*3*  241:*17*
245:*23*
**26168**  86:*4*  129:*18*
151:*23*  189:*25*
**2618**  104:*18*
**27**  41:*7*  284:*10*
**27th**  41:*4*  192:*5*
194:*16*  198:*22*
199:*24*  225:*3*  279:*20*
280:*12*

**< 3 >**
**3**  4:*13*  46:*10, 24*
69:*14*  85:*22, 25*
106:*12*  126:*13*  130:*2*
176:*14*  184:*18, 23, 25*
189:*25*  190:*11, 12*
212:*5*  236:*8*  254:*8, 9,*
10, 11, 12  262:*21*
**30**  77:*21*  288:*15*
**302**  2:*20*

**302.6**  133:*2, 4*
134:*10, 20, 22*
**34**  212:*7*  257:*4*
**3A**  185:*2*
**3B**  145:*4*
**3C**  35:*12, 14, 25*
36:*10, 12*  37:*6*  38:*10,*
15, 19  39:*4, 19, 25*
40:*6, 9, 23*  41:*16, 19*
42:*6, 8, 13, 16, 22, 24*
43:*6, 12, 14*  44:*3, 16,*
20, 23  45:*7, 10, 17*
47:*2, 8, 16, 20, 24*
48:*1, 5, 9, 11, 13, 16,*
20  50:*14*  51:*3, 13*
52:*2, 13*  53:*3, 8, 14,*
23  54:*2, 5, 7, 10, 15,*
18, 22  55:*4, 9, 19*
56:*7, 12, 17, 23*  57:*6*
58:*9, 13, 19*  59:*2*
60:*20*  63:*4, 8, 14*
67:*23*  68:*17, 19, 21*
70:*11*  71:*2, 10, 22*
79:*15*  80:*3, 10*  81:*1,*
16, 20, 24  82:*9, 13, 20*
83:*4, 10, 16*  98:*2*
192:*14*  235:*15, 23*
236:*8, 21*  237:*9, 22*
251:*22, 23*  252:*3*
267:*4*
**3-C**  34:*3*

**< 4 >**
**4**  130:*15*  151:*4*
176:*21, 22*  284:*23*
**4:17**  172:*12*
**400**  1:*15*
**41659**  1:*19*
**44**  254:*3, 14, 15, 16*
**45**  13:*24*
**4-6**  4:*13*
**475**  2:*19*
**4C**  192:*14*  255:*20,*
23  256:*7*  261:*18*
263:*16*  264:*14*  267:*4*

**< 5 >**
**5**  69:*6, 9*  70:*13*
200:*17*  222:*11*  254:*7,*

*8*, *12*
**5:25**   206:*8*
**5:30**   199:*9*, *11*, *12*
**50**   84:*6*   201:*8*
**5914**   129:*14*

**< 6 >**
**6**   4:*6*   45:*25*   46:*8*
   233:*6*   284:*10*
**6:13**   223:*5*
**6:46**   246:*20*
**600**   3:*19*
**616-8779**   3:*11*, *22*
**646**   2:*23*
**69**   4:*13*

**< 7 >**
**7**   130:*3*, *5*
**7:16**   246:*21*
**7:55**   273:*20*
**745-8500**   2:*23*

**< 8 >**
**8**   4:*13*   66:*19*, *24*
   67:*20*, *25*   188:*23*
   189:*11*, *16*, *20*   190:*4*,
   *13*   192:*10*   247:*17*
**8:11**   273:*21*
**8:26**   284:*15*, *16*
**8:31**   284:*17*
**85**   4:*13*
**878**   3:*8*
**8USC**   46:*9*

**< 9 >**
**9**   130:*15*, *19*   133:*2*, *3*,
   *20*   134:*10*, *20*, *22*
   135:*3*, *11*   138:*3*
   139:*4*, *21*   140:*4*, *13*,
   *22*   142:*23*   143:*4*, *11*,
   *15*, *19*   144:*1*   145:*2*
**90**   2:*7*
**95**   200:*18*

**< A >**
**a.m**   1:*12*   5:*10*
   25:*15*, *16*   33:*8*
**A4**   266:*15*
**AAUPCAR**   86:*5*

*105:1*
**abbreviation**   130:*4*
**ability**   7:*19*
**able**   38:*9*   73:*24*
   76:*10*   165:*19*   253:*4*
   268:*4*, *7*
**abroad**   17:*11*, *14*
   18:*2*, *7*   21:*13*   60:*22*
**absence**   96:*19*
**Absolutely**   139:*3*
**access**   217:*18*
**accompanying**
   226:*16*, *25*
**accounts**   103:*23*
**accuracy**   156:*17*
**accurate**   15:*25*   16:*3*
   180:*5*, *8*, *12*
**accused**   276:*3*
**ACKNOWLEDGMEN
T**   287:*1*
**Aconlon@shertremont
e.com**   2:*10*
**Act**   35:*15*   52:*9*
   189:*1*
**acting**   19:*7*, *9*   22:*22*
   26:*15*, *16*   36:*24*   52:*7*
   78:*12*   96:*20*   187:*24*
   196:*17*, *21*
**action**   49:*2*, *4*, *5*, *6*, *7*,
   *13*, *16*, *25*   50:*18*, *22*
   51:*4*, *12*   59:*8*, *17*
   64:*3*, *5*, *15*, *18*, *24*
   66:*12*   73:*10*, *12*
   97:*13*   98:*11*, *16*, *18*
   100:*4*   106:*24*   107:*17*,
   *22*   108:*24*   109:*3*
   113:*12*, *14*, *15*, *19*
   138:*20*   164:*20*   192:*1*
   193:*17*   224:*12*, *14*, *16*
   249:*9*, *18*   250:*3*, *23*
   251:*3*   261:*25*   270:*20*
**actions**   119:*17*
   140:*21*   143:*25*   172:*4*
   272:*18*
**activities**   138:*17*
   167:*14*   170:*9*   188:*16*
   255:*24*   256:*19*
   257:*25*   258:*7*
**activity**   85:*5*   88:*4*
   108:*5*, *6*, *13*, *15*, *22*, *23*

109:*3*   117:*9*   118:*15*
   119:*7*   120:*12*   121:*3*,
   *17*   130:*21*, *22*   131:*13*,
   *23*   132:*2*, *14*, *16*, *23*
   135:*1*, *7*, *15*   136:*2*
   157:*25*   165:*16*
   166:*15*, *17*, *21*   167:*1*,
   *5*, *8*, *9*   172:*18*   173:*22*
   177:*19*   178:*4*   188:*12*
   231:*22*   233:*15*
   239:*20*, *21*   260:*20*
**actor**   279:*16*
**actors**   279:*14*
**acts**   217:*17*   218:*17*
   219:*17*
**actual**   36:*8*   77:*19*
   94:*9*, *12*   283:*3*
**ADAM**   3:*25*   5:*14*
   147:*4*   204:*8*, *10*
   205:*7*
**add**   196:*4*   226:*12*
**added**   15:*22*
**addition**   98:*4*   196:*4*
**Additional**   58:*4*   59:*4*
   63:*17*   105:*10*   183:*2*
**additionally**   167:*4*
**address**   11:*17*   42:*14*,
   *22*   47:*8*   68:*12*   89:*9*
   91:*11*   103:*21*   109:*4*,
   *8*
**addressed**   84:*10*
   88:*17*   104:*1*   109:*2*, *6*,
   *11*   167:*4*
**addresses**   45:*18*
   47:*3*   94:*6*   132:*25*
   134:*23*   138:*3*, *5*
   157:*25*   165:*15*
   166:*15*, *16*, *20*
**addressing**   131:*19*
**administer**   6:*16*
**administration**   70:*21*
   71:*15*, *16*, *23*   79:*16*
   80:*4*, *11*, *22*   81:*2*, *17*,
   *21*, *25*   82:*9*   83:*5*, *15*,
   *25*   84:*5*   85:*16*   110:*2*,
   *16*   114:*20*   115:*10*
   116:*4*, *10*, *18*   117:*9*,
   *14*, *20*   118:*24*   119:*13*
   120:*4*   131:*14*, *18*

133:*8*, *16*   143:*18*
   189:*15*   190:*8*   275:*21*
**administrations**   71:*12*
**administration's**
   143:*25*
**Administrative**   4:*13*
   126:*13*   151:*6*   212:*4*
   239:*3*   254:*4*   262:*20*
**admit**   159:*17*
**adopt**   49:*17*
**adopts**   179:*19*
**adverse**   255:*25*
**advice**   12:*14*   13:*8*, *9*
   250:*6*
**advise**   8:*20*   32:*9*
**advised**   12:*12*
**ADVISER**   3:*17*
**advises**   23:*6*
**advisor**   19:*11*   22:*24*
   23:*3*, *4*, *5*, *8*   33:*24*
   38:*8*   95:*13*   97:*2*
   196:*15*   261:*8*
**advisors**   94:*21*, *23*, *24*
   95:*14*
**advisor's**   25:*23*
**advisory**   145:*5*, *8*, *14*
   146:*2*   147:*21*   148:*1*
   149:*2*, *8*, *16*, *21*, *25*
   150:*5*, *14*, *18*
**advocacy**   132:*15*
   134:*25*   135:*6*, *14*
   136:*1*   138:*9*, *12*, *18*,
   *20*   150:*21*
**advocate**   132:*2*, *22*
**advocates**   131:*23*
   132:*8*, *13*
**AFFAIRS**   3:*18*   10:*4*
   17:*3*, *5*, *9*   18:*1*, *6*, *11*,
   *17*, *21*   19:*25*   37:*23*
   52:*2*   61:*7*, *17*, *20*
   73:*2*   74:*15*, *17*   75:*7*
   77:*15*, *16*, *25*   78:*18*
   79:*18*   80:*2*, *25*   91:*19*,
   *24*   92:*4*, *7*, *13*, *15*
   93:*21*   96:*13*   98:*2*
   101:*2*, *21*   111:*10*, *14*
   112:*12*   114:*2*, *6*, *7*, *9*,
   *13*, *21*   115:*4*, *5*, *9*, *11*,
   *17*   116:*2*   133:*22*, *23*
   134:*7*   144:*21*, *25*

150:6, *13*, *20*   164:*23*
170:8   181:*13*   194:*23*,
*24*   212:*16*   248:*16*
249:*24*   250:9, *12*
264:*24*   280:*1*, *14*
**affect**   7:*18*   229:4
**affixed**   288:*13*
**afternoon**   147:*15*, *16*
169:*17*
**agencies**   202:*16*
207:*14*, *17*
**agency**   54:2   160:6
202:*10*   275:3
**ages**   86:*25*
**ago**   8:2, *13*   69:*12*
87:*1*   161:*3*, *5*   219:*15*
229:*23*   230:*12*
256:*25*
**agree**   71:7   216:*22*
229:*13*
**agreed**   230:*11*
**ahead**   19:*13*   48:*25*
82:*3*   114:*24*   123:*21*
128:*5*   168:*19*   249:*11*
267:*11*
**aid**   141:*15*, *20*
**aims**   44:*22*   45:7
**ain't**   175:*4*
**AL**   1:*3*, *6*   5:*5*, *6*
**ALDAC**   60:*22*, *25*
61:*5*, *21*, *22*, *23*, *24*
85:*9*
**ALEXANDRA**   2:*4*
5:*20*
**alien**   189:*5*   217:*16*
218:*14*   247:*19*, *23*
263:*19*   265:*14*
**aliens**   4:*13*   35:*18*
260:*19*, *21*
**Alliance**   179:*20*
180:*15*   181:6
**allow**   24:*22*
**Amanda**   19:*19*
**Ambassador**   77:*12*
271:8
**AMENDMENT**   2:*17*
5:*23*
**AMERICAN**   1:2   5:*4*
17:*13*   18:7

**Americans**   137:*25*
**analysis**   226:*16*
**analyst**   99:*17*
**and/or**   171:*18*
**Andre**   187:*13*
**Andrew**   36:*20*   52:*4*
207:*5*
**announced**   60:*17*
105:*20*   123:*12*
**answer**   7:*15*   8:*21*
12:*18*   13:2   23:*13*, *15*,
*16*, *19*   24:*14*, *18*, *22*
30:*10*, *20*, *21*, *24*   31:*3*,
*17*   32:*20*   38:9   39:*1*,
*10*, *23*   40:2, *5*, *21*
41:*22*   42:*20*   43:*3*, *10*,
*16*   45:*1*, *2*, *13*, *14*
46:*3*, *15*, *16*   47:*13*, *23*
51:*24*   53:*12*, *19*, *21*
55:*15*, *24*   56:*5*, *10*, *15*,
*21*   57:*4*, *9*, *18*   59:*13*
64:*10*   65:*12*, *13*, *20*
68:*8*   72:*2*, *10*, *24*
76:*22*   77:*10*   78:*6*, *22*
81:*13*   84:*15*, *17*
101:*13*   116:*23*, *24*
120:*14*, *16*, *17*   121:*20*
123:*8*   124:*10*, *11*
128:*19*   136:*9*, *11*
142:*6*   146:*5*, *7*
161:*15*   163:*23*, *25*
166:*8*   168:*7*, *18*, *20*
170:*11*, *13*   171:*5*, *22*
173:*6*   179:*25*   180:*3*
189:*8*   198:*4*   205:*18*
206:*2*   209:*2*, *21*
210:*8*   213:*9*   214:*7*,
*13*, *14*   215:*2*   219:*24*
220:*11*, *14*   227:*11*, *24*
230:*7*, *11*   235:*17*, *25*
236:*25*   237:*6*, *16*, *25*
238:*17*   258:*3*, *8*, *11*
266:*25*   267:*12*
273:*12*   274:*20*
**answering**   43:*20*
59:*20*   73:*4*   158:*12*
**answers**   43:*21*   166:*4*
179:*24*   220:*14*   287:*6*

**anti-Israel**   118:*15*, *25*
119:*6*, *14*   120:*11*
121:*3*, *16*
**anti-Semitic**   88:*20*
108:*13*, *14*, *22*   157:*25*
165:*15*   166:*15*, *16*, *21*
167:*1*, *7*, *14*   170:*19*,
*22*   171:*13*   172:*18*
173:*2*, *21*   174:*17*
177:*10*, *19*   178:*5*, *14*,
*22*   181:*11*   218:*17*
219:*17*   231:*22*
233:*15*   241:*20*, *25*
256:*18*   257:*25*   258:*7*
259:*11*, *25*   260:*20*
**anti-Semitism**   54:*8*
55:*20*   58:*5*   59:*5*
63:*17*   68:*13*   84:*11*
85:*4*, *17*   89:*9*, *13*, *18*
105:*10*   110:*1*, *9*, *15*
111:*2*, *4*, *5*, *7*, *19*
113:*2*   114:*21*   115:*10*,
*19*   116:*3*, *10*   170:*9*
179:*21*   180:*16*   183:*2*
185:*8*   216:*6*, *18*, *24*
217:*6*   218:*24*   243:*14*
260:*5*, *11*   276:*4*
**Anybody**   36:*22*   37:*3*
52:*6*   79:*6*   102:*4*
195:*15*   196:*13*   204:*4*
205:*5*   246:*1*   274:*5*
**anyone's**   126:*4*
**apart**   10:*9*   18:*17*
20:*19*   80:*11*   103:*12*
106:*16*   122:*25*
124:*20*   129:*5*   154:*2*
164:*25*   165:*7*   190:*1*
206:*23*   259:*1*   275:*10*
**Apartheid**   142:*22*
241:*7*, *9*, *10*
**apologize**   86:*19*
126:*25*   155:*19*
158:*12*   203:*12*   238:*7*
**Apparently**   235:*4*
240:*9*
**APPEARANCES**   2:*1*
3:*1*
**appeared**   87:*14*
**appears**   215:*9*, *12*
221:*14*   256:*15*   263:*5*

**applicant**   90:*21*   91:*4*
130:*20*   131:*22*   132:*7*,
*13*
**applicants**   90:*18*
91:*9*   151:*18*   152:*7*
155:*11*
**application**   43:*7*, *14*
44:*6*, *10*   45:*18*   113:*4*
144:*21*   145:*21*
189:*10*, *16*, *19*   192:*10*
**applied**   41:*20*   42:*1*
190:*4*
**applies**   264:*6*
**apply**   34:*17*
**appointee**   19:*22*
**Appreciate**   11:*10*
32:*24*   81:*12*   158:*15*
166:*9*   169:*8*   242:*7*
252:*8*
**appropriate**   190:*25*
191:*12*
**approval**   106:*24*
107:*23*   113:*20*   127:*2*
132:*15*   134:*25*   135:*6*,
*14*   136:*1*   241:*18*
**approve**   145:*17*
146:*2*   147:*20*   223:*19*
**approved**   48:*17*
49:*15*   82:*14*   107:*9*,
*13*, *17*   126:*20*, *22*
127:*5*, *7*   135:*20*
166:*7*   228:*6*, *11*
241:*19*, *23*
**approving**   230:*20*
**approximately**   8:*1*, *2*,
*13*   13:*23*   27:*15*
70:*16*   87:*5*   194:*4*
199:*19*   203:*8*   204:*12*
207:*25*   208:*8*   210:*24*
**April**   161:*6*
**archives**   261:*9*, *13*
**area**   37:*2*
**areas**   60:*3*
**arm**   91:*18*
**arms**   141:*9*   175:*8*
**ARMSTRONG**   1:*11*
4:*3*, *12*   5:*4*   6:*17*
7:*24*   24:*14*   33:*14*
168:*1*   186:*19*   254:*3*

Arrest 224:*17*
245:*21* 246:2, *6*, *11*
**arrested** 241:*11*, *13*,
*17* 245:22
**arresting** 228:2*1*
**article** 232:5, *18*
233:*3*, *7*, *8*
**ascertain** 185:2*1*
**aside** 83:*16* 86:*15*
122:*4*, *6* 135:*3*, *11*
235:2
**asked** 24:*15* 25:9
37:*10* 43:*18*, *23* 46:*4*,
*7* 55:*18* 60:*13* 67:*10*
102:*17* 149:*3*, *20*
160:8 161:*23* 165:25
166:*11* 170:8 216:*15*
221:*23* 233:*4* 234:*11*
236:*25* 244:*10* 253:9
265:8 282:*21*
**asking** 8:22 13:6
32:*25* 46:*20* 74:6
75:*24* 76:*4*, *24* 97:*24*
98:*3*, *10* 100:*11*
106:*23* 119:5 125:*14*
135:*17* 137:*16*, *17*
160:*10* 165:*13*, *24*
171:*14* 191:8 194:2*1*
198:*13* 200:7, *9*
214:*11* 219:6, *7*
230:*4*, *10* 234:*14*, *17*
255:2 258:9 262:*23*
280:22
**assert** 128:*23*
**asserted** 165:2
230:*16*
**assessment** 213:*24*
**assessments** 181:5
**assigned** 20:*10* 26:*6*,
*12* 27:6, *14* 28:9
**Assistance** 187:22
**ASSISTANT** 3:*17*
19:8, *9* 22:*21*, *23*
26:*15*, *16*, *18* 29:*3*
36:*24* 50:9, *10* 52:*4*,
*8* 78:*13* 96:*17*, *18*
100:*23*, *24* 181:*17*
184:9 187:*24* 195:*3*,
*10* 196:*18*, *22* 242:*15*
270:2*1*

**ASSOCIATION** 1:2
5:*4* 276:*4*
**associations** 214:*1*, *20*
218:*1* 251:9
**assume** 121:*13*
209:*10*
**assumed** 194:*11*, *15*
**Attached** 4:9 287:9
**attachments** 255:*4*
**attack** 279:6
**attended** 278:*15*
**attention** 132:*19*
254:*3* 276:*15*
**attitude** 136:22
137:*13*
**attorney-client** 12:2*1*
14:*10*
**attorneys** 5:*15* 8:*20*
9:2, *10* 12:*15* 13:7
**attributable** 259:9
**author** 98:*24* 100:*3*
244:*13*, *15*
**authored** 84:*24*
153:7
**authorities** 237:*15*
**authority** 35:*17*
42:*15* 185:7 188:*24*
236:5 243:*4* 280:*17*
**authorship** 77:22
**available** 114:*14*
**aware** 37:*12* 63:*3*, *14*
68:*12* 69:*18*, *21*, *22*
71:*13*, *20* 73:*17*
74:22 75:2 80:*24*
85:*15*, *18* 94:20
105:*18* 106:2, *7*, *18*,
*22*, *23* 107:22 108:*1*
109:*24* 110:7, *10*, *21*
114:*19* 115:8, *15*, *22*,
*24* 116:*1*, *7*, *11*, *15*
117:*7*, *12* 118:*13*, *16*,
*18*, *22* 119:*11* 120:2,
*8*, *14*, *19*, *20*, *25* 121:*4*,
*5*, *7* 122:*7*, *15*, *21*
123:*20* 124:2, *6*
131:*16*, *20*, *25* 132:*20*
152:*11* 178:*11*, *19*
186:*25* 222:*14*
233:*20* 235:8 245:*20*

279:*11* 280:*16*
**awareness** 253:*15*

**< B >**
**back** 25:*18* 33:*11*
62:2 79:*11* 86:*20*
101:7 128:*10* 147:*13*
150:*24* 151:*3* 163:*4*,
*6*, *18* 165:*14* 172:*13*
206:9 223:6 246:22
247:*14*, *15* 257:*3*
273:22 284:*18*
**background** 175:*13*
**Badar** 254:22 255:9
**Bahamas** 35:8
**ballpark** 200:*24*
**banned** 220:*23*
239:*12*, *14*, *21* 240:*1*,
*9*
**base** 21:*17*
**based** 21:*23* 29:*12*
34:*24* 35:*3*, *6*, *18*
78:*24* 137:2 160:*13*
170:*24* 171:*15*
188:*15* 213:9 214:7
219:*24* 220:2 225:*1*
227:*11* 235:*17*, *25*
236:5 239:*25* 259:*19*
278:*20*
**bases** 157:*19*
**basically** 24:*20*
**basics** 7:5
**basis** 88:6 108:*4*, *23*
109:2 119:*10* 131:7
166:*23* 188:*10*, *11*
209:*20* 213:*23*
214:*11*, *12*, *16* 229:2
241:*20*, *24* 249:*21*, *25*
251:*8* 252:2 253:*2*,
*22* 257:*20*, *24* 258:*6*,
*10*, *13*, *19*, *22*, *25*
259:*16* 261:*24* 272:*5*,
*17*, *18* 273:6, *9* 283:*4*,
*7*, *9*
**bear** 172:*24*
**bearing** 143:*16*
**BEAUMONT** 3:*14*
6:7 22:*25* 24:*15*
204:9 254:*14*

**Beaumonttw@state.go**
**v** 3:2*1*
**becoming** 216:*24*
**began** 27:*19* 70:*17*
114:*20*
**beginning** 1:*12* 5:*17*
30:*4* 110:*1*, *16*
130:*16* 149:25
150:*18* 187:7 194:*14*
204:*17* 279:22
**begins** 86:*10* 106:*12*
126:*12* 127:8 132:6
213:*1*, *3*
**behalf** 1:*11* 2:*3*, *14*
3:2, *13*
**behavior** 218:*17*
**believe** 13:*17*, *19*, *23*
16:2 34:2*1* 36:2*1*, *25*
37:9 38:7 41:*11*
77:9 82:*10* 85:8
87:2, *3* 91:*15* 97:*19*
99:*11* 102:7 103:*1*,
*24* 104:*12* 105:8, *16*
111:*12* 129:25 134:8
143:6 145:5 153:*12*
154:*3* 156:*19* 160:*24*
162:*12* 163:*15*
164:24 173:*17* 177:*1*
181:*19* 189:*24*
190:*11* 192:*14* 193:7
212:*18* 230:8 245:*24*
247:*1* 264:5 268:*13*
275:*3* 279:2
**bell** 282:*13*
**Benjamin** 3:7
**best** 7:*12* 9:*18*
33:*24* 37:5, *13* 41:*1*
108:*15* 129:*15*
249:*19*, *20* 270:8
282:9
**Betar** 277:*11*, *19*, *21*
278:*4*, *8*, *21* 279:7, *10*
**better** 245:*16*
**big** 200:*21*
**billion** 181:*15*
**birth** 21:*12*
**bit** 201:*11* 265:*24*
**blanket** 137:*24*
**blocking** 174:*3*

bodies 76:25 77:3
bond 34:4
boss 20:15 244:18
bottom 86:4 104:24
212:7 222:19 253:11
267:1, 14
BOX 3:8
break 7:13, 16 25:10,
12, 16 31:6 33:8, 16
79:4, 6, 10 108:19
126:7 127:7 128:9
139:11 146:8, 10, 16,
17 147:6, 7, 12 172:6,
12, 16 176:13 199:7,
11 206:8, 13 223:5
245:6, 18 246:15, 20
273:14, 16, 20 284:16
breaking 139:8
brief 10:18 11:3
172:6 233:25 244:18
briefed 233:19 234:2
briefings 192:17, 23
193:1
briefly 14:21 139:2
284:13
bringing 34:24
158:15
Broad 2:7
brought 48:1, 5
157:4 192:7, 9
buck 107:11 182:8
budget 181:14
bunch 271:6
Bureau 10:3 17:1, 2,
4, 9, 25 18:5, 11, 17
19:24 20:6, 9, 13
37:23 52:1 61:7, 17,
19 73:1, 3 74:14, 16,
24 77:16, 25 78:18
79:17 80:2, 25 91:18,
23 92:3, 7, 12, 15
93:20 96:13 101:1,
20 111:13 112:11, 25
114:1 115:3, 16
116:2 144:20, 24
150:6, 12, 20 164:23
170:8 178:21 181:13
192:5 207:6 212:16
249:24 250:8, 11
264:24 280:1, 14

bureaus 61:12, 13
74:25 75:12 77:19
buried 175:18
burning 137:11
business 48:6
busy 261:15
button 268:19

< C >
cable 60:21 84:24,
25 85:6, 16, 18 86:3,
15, 22 87:3, 4, 14, 19,
24, 25 88:7, 16, 23
89:5, 8, 12, 17, 23
90:3, 8 91:2, 11
101:7, 10 102:6, 10,
16, 21 103:2, 9, 14, 21,
25 106:11, 13, 16, 17
107:9 108:3, 9, 22
109:2, 4, 20 110:20
114:5 121:23 125:3
126:2, 12, 14, 15, 19
127:7, 12, 16, 22
128:2, 15 129:1, 5, 8,
13, 20, 24 130:19
135:20, 25 139:17, 21
151:22 152:10, 24
154:22 189:24 190:2
cables 106:8, 18, 19
107:3, 4, 7 109:12
110:21 114:18 115:4,
7 118:16, 19 124:13,
19, 20 152:9, 12, 15,
17, 19 153:10, 12, 13,
16 154:2, 4, 17
189:21 190:10
caffeine 12:13
call 31:16 32:17
42:24 97:21 109:21,
22 146:5 202:8, 11
208:12, 17 210:21
211:1, 3 247:15
252:3
called 6:18 18:24
28:10 34:22 35:11
75:9 142:7, 8 188:20
226:24 268:15 269:9
275:14

calling 139:19 141:3,
8, 14, 19 142:1, 21
144:8 173:1
Calls 12:20 14:8
31:2 38:22 39:6, 20
40:18 42:17 47:10
49:6 51:21 53:9, 16
55:21 56:2 68:5
78:4, 20 81:3 87:21
88:10 89:19 91:5, 13
95:4 97:8 98:21
99:3, 19 101:11
104:11 111:21 113:6
121:18, 25 128:16
133:25 134:12
139:22 140:6, 14, 23
161:12 162:11, 20
163:20 165:18 171:1
173:4, 23 174:18
175:8, 10 178:15
179:22 183:9, 18, 23
184:8, 17 185:12
206:25 207:3 208:1,
15, 20, 23 209:5
210:7, 15, 25 215:1
216:4 217:9 219:13
227:22 229:19 230:2
232:2 238:14 239:16
242:22 251:15
259:18 260:3, 17
261:6 264:2, 17
265:2 266:6 267:6
270:19 276:19
281:13
campus 220:23
239:12, 14 259:24
campuses 89:18
216:1 217:6, 13
260:13
Canary 277:10, 18
Canuff 271:8
capacity 89:25
256:10
CAR 106:12
card 92:17 93:5, 12
94:16 95:18, 24
97:17, 23 98:6 100:6
112:13
cards 91:20 92:1, 5

care 250:7
Career 18:24
careful 175:14
carries 174:22
carry 178:8
carrying 158:7
217:17 218:16
cartels 125:9
Case 1:3 5:7 8:6
14:25 15:24 16:20
20:22 28:3, 5 31:8
48:19 131:6 147:23
148:22 156:6 164:1
174:20 185:18 209:8
211:10, 17, 21 217:14
218:23 221:15
224:21 227:7 229:8
231:2 235:14 241:12,
16 248:12 249:1
250:5 251:17 252:17,
20, 23 261:18 262:1
265:23 266:10
268:24 272:19
280:25 281:11, 19
282:4, 11 288:10
cases 15:2 22:6
24:2, 4, 7 25:1 26:2,
6, 9 50:10 130:14
146:12 147:25 149:1,
3, 4, 12 191:17, 19, 20,
24 192:3 224:7, 22
225:5 229:22 247:12
248:22 265:12
275:16, 20, 24 276:2
CaseViewNet 1:16
cast 26:19 193:10
catch 84:20 85:1
86:7, 11 88:7 101:7
102:20 103:13 104:4,
8 105:4, 20, 25
106:17 107:9 108:2,
21 109:20 110:19
121:22 145:22
155:23 156:3 157:20,
24 158:9 160:22
165:4, 9, 14 166:13
167:3, 8 183:16
189:23 190:2, 11
catching 34:6 88:3,

*17*

**categories** 171:2*0*

**category** 29:16

**cause** 164:*19* 220:*21* 239:*10*

**CC'd** 163:7

**cease** 142:*1, 8, 9*

**cemetery** 174:6

**center** 104:*24*

**certain** 35:*17* 86:25 105:*17* 112:8 123:*15* 167:13 178:*14, 22* 191:*17, 19, 21, 24* 193:*23* 242:*1* 248:*17* 252:*1* 270:4

**certainly** 175:*18* 264:4

**certainty** 44:*12, 15* 68:*14* 80:6 85:*19* 90:*1* 92:2*1* 135:2 152:*23* 165:6 193:9 207:*23* 208:*3* 256:*13* 265:*13* 267:*8* 270:*10* 274:*21* 276:*7* 278:*12, 22, 24* 281:9 282:*14*

**CERTIFICATE** 288:*1*

**Certified** 4:*13*

**certify** 287:4 288:4

**chain** 265:25 266:25 267:2 268:5 270:*12, 14, 15* 271:*14*

**chair** 50:*13*

**chance** 15:*14* 46:*1* 55:*17* 69:*8, 11* 146:*10* 212:8 222:*3* 254:*18*

**change** 73:*15* 267:4 286:5

**changed** 193:*10*

**changes** 287:8

**chanted** 173:*20*

**characteristics** 149:*15*

**characterization** 154:2*0*

**characters** 26:2*0* 193:*10*

**charge** 242:8 243:*12*

**chart** 19:*3*

**check** 79:*24*

**chief** 19:*11, 12*

**China** 281:*15* 282:*1*

**chooses** 229:*1*

**Christopher** 77:*13*

**Chung** 272:2*1* 281:7

**circumstance** 98:*12* 252:7

**circumstances** 20:*22* 98:*14* 146:*3* 147:*21* 149:*19* 172:*3* 186:9 223:*18* 224:4 225:8 229:7 245:*21* 252:*17* 262:*11* 268:25 276:*13*

**cite** 65:*16*

**cited** 67:6, *20* 70:4 72:7 189:2 190:*14* 278:7

**Citizen** 17:*17* 18:8 20:*1*

**citizens** 17:*13* 18:7 136:22 137:*14* 143:*17*

**civil** 252:*12*

**claim** 257:*20, 24* 258:6, *14, 19* 259:*16*

**clarification** 154:5, 7 190:*24* 191:*12, 16* 200:*12*

**clarifications** 155:2*1* 156:*1*

**clarify** 13:6 49:*11* 155:2, 9 182:2*1* 282:2*0*

**clarifying** 16:2*1* 81:*12* 179:*1, 2*

**clarity** 80:*1* 91:8 106:*11*

**classes** 35:*18*

**classified** 30:*14* 31:2 32:*15* 33:22, *25* 148:*4, 9* 149:7, *10* **clear** 37:2 39:*10* 84:*1* 86:9 95:*13* 97:*1, 2* 102:*17* 129:*12* 137:9 145:*17* 146:2 147:*20* 161:*23* 162:*1* 164:*3* 169:*24* 175:2, *3* 199:4 219:4

**check** 225:*18* 234:*8* 236:6 238:25 260:*5* 273:*4* 283:*1*

**clearance** 73:7, *8* 75:*4, 15, 21* 77:6, 9 81:6 83:6, *14* 96:*3, 7* 102:*11, 15* 269:*10, 11, 15, 22* 270:6

**cleared** 77:*23* 83:*20, 22, 23* 84:5 102:*23* 108:*3* 126:*14, 18* 127:*4* 162:2 269:*12*

**clearer** 31:8

**clearing** 95:*17* 97:7 98:*19* 99:25 102:*25* 158:3, *5* 169:*16*

**clearly** 76:*1* 200:25 229:9

**client** 13:*1*

**close** 139:9 273:25

**Club** 173:2*1*

**coaching** 24:2*0*

**coauthored** 220:*21* 222:9 239:*10*

**Code** 69:*13, 19* 70:*1* 189:2

**codified** 70:*1*

**coffee** 24:9

**colleagues** 9:*4, 9* 10:8 38:8 165:*23*

**collective** 207:*12*

**college** 89:*18* 217:6 260:*13*

**colleges** 54:*19* 56:*13*

**Columbia** 1:*18* 2:*18* 241:6, *8*

**combat** 58:*4* 59:*5* 63:*17* 105:*10* 183:2

**combatting** 84:*10* 218:*23*

**come** 60:*1* 63:*11* 86:20 90:*17* 147:25 149:*1* 195:*1, 12* 215:*5* 216:*18* 226:2*1* 242:*10* 260:*10* 274:*16* 275:*3* 279:*16*

**comes** 36:2, *5* 90:*24* 131:*1* 276:8, *14, 24*

**coming** 8:*24* 13:*14* 67:*17* 216:6

**comment** 229:6 234:*11, 14*

**commission** 288:*14*

**common** 220:2*1* 239:*10*

**communication** 159:*14, 16* 165:3, *8* 187:2*1* 193:*18, 20*

**communications** 154:*17, 18* 157:2*0* 158:*23* 159:22 160:*14* 162:8 163:8 205:*16, 25* 209:*4, 19* 283:*23* 284:2

**compares** 143:2

**compelled** 214:*13*

**compiled** 156:*12*

**complete** 20:*13* 173:7 234:*23*

**completed** 30:*1, 3* 151:*15* 212:*10* 255:6

**completely** 24:*19* 83:*16* 166:*18* 235:2

**complex** 174:*10* 175:*13*

**complicated** 93:9 173:9 175:*23* 252:*15*

**component** 52:*12* 53:2, *6, 22* 94:*19*

**components** 96:6

**comprehend** 97:*10*

**comptroller's** 18:22

**computer** 90:*18* 249:*14, 15* 268:*10*

**concern** 68:*3*

**concerned** 180:*11* 192:9 263:2*1*

**concerning** 85:*17* 114:2*1* 120:*10* 121:*2, 16* 132:*1* 150:*2, 20* 152:2*0* 155:6 165:*4, 9* 169:*2, 6* 192:*18* 204:2*1* 213:7 226:7 233:*10* 235:*10* 244:*23* 254:22 255:9 258:25 281:*2, 6* 282:24 283:*23*

**concerns** 55:*10* 57:7 67:24 68:*12*

conclude 239:25
concludes 263:15
concrete 13:10 76:24
110:18 117:18
118:20 119:1, 21
120:6 134:2 252:16,
20 266:8 267:8
concretely 153:4
167:6
condemnation 137:25
conduct 136:21
170:24 177:9 178:14,
22 181:11 241:21, 25
confer 33:2, 4, 15
165:23 244:21
conference 62:6
202:8 206:25 207:2
208:1 210:6
conferring 206:4
confidential 148:10
confidentiality 148:14
conflict 259:14
260:1, 15
confused 200:13, 15
confusing 251:24
Congressional 18:21
conjunction 187:6
CONLON 2:4 4:6
5:19, 20 6:22 10:22
12:23 13:8, 11 14:11,
18 15:12, 13 17:22,
23 21:3 22:12 23:12,
23 24:24 25:5, 8, 13,
20 27:25 30:19
31:18, 24 32:23 33:5,
13 34:6 39:3, 9, 13,
24 40:8, 22 42:2, 21
43:4, 5, 11, 17 44:2,
25 45:5, 13, 16 46:15,
19 47:14, 22 49:3, 20,
22 51:25 53:13, 20
55:12, 13 56:6, 11, 16,
22 57:5, 10 59:19
63:2, 20 64:2, 9
65:19 68:9, 23 69:4
72:1, 9, 23 74:1, 4
76:3, 12 77:1 78:5
79:3, 13 80:9 81:8
82:2, 18 83:19 84:21
85:20, 23 87:22

88:12 89:22 91:10
92:11 95:6 97:12
99:1, 8, 21 101:17
102:24 103:8 104:13
111:6 112:2 113:10
114:3 115:20 117:2
119:9, 19 120:1, 24
121:21 122:3, 13
123:14 124:16
126:10 127:25 128:5,
12, 20, 24 133:9
134:4, 16, 18 135:10
136:9, 18 139:9, 18
140:1, 11, 19 141:2, 7,
13, 18, 25 142:10, 20
143:1, 8, 14, 23 144:5,
12 145:25 146:9, 13,
19, 21, 25 147:5, 9, 15,
17 148:13, 20, 25
149:14 151:1 153:1
154:24 155:15
158:25 159:3, 12, 25
160:7, 16, 17 161:16,
19 162:14, 15, 23
164:2, 18 165:21
166:6 167:20, 21
168:10, 16, 23, 25
170:2, 11, 16 171:7,
10, 21 172:7, 9, 15
173:18 174:14 175:6,
24 176:8, 15, 20, 25
177:6, 23 178:18
179:25 180:9 183:13,
21 184:2, 15 185:15
186:3, 11, 17 187:9
192:24 195:4 196:24,
25 197:12 198:6
199:10, 13 201:16
203:15 204:11
205:19 206:3, 11, 14,
16 209:5, 22 210:5,
11 211:14 212:24
213:11 214:9, 17
215:2, 7 216:8
217:20 218:19
219:16 220:1, 6, 17
221:17, 25 222:2
223:1, 8, 23 225:6
226:3, 22 227:13, 23
228:9 229:24 230:4,

17 232:4, 13, 16
234:5, 13 235:19
236:2, 11, 18 237:2, 5,
19 238:1, 20 240:4,
17 243:10 245:8, 12,
19 246:14, 24 248:6
251:19 253:5 254:1,
10, 16, 17 258:4, 15
259:22 260:7, 22
261:11, 22 262:5, 9
264:8, 19 265:6
266:23 267:10
270:24 272:15
273:17, 24 274:11, 13,
22 275:8 276:25
277:14 281:16
282:16 283:22 284:4,
20 285:5, 25
connected 276:21
connection 8:16
214:23 217:5 218:8
256:17 257:21 274:6
279:13 280:2, 14
consequences 256:1
consider 250:12
consideration 188:7,
9 247:13 275:19
considering 249:23
consistent 63:16, 23
188:12, 17 256:6
Constitution 137:4
CONSULAR 3:18
10:4 17:3, 5, 9, 25
18:6, 11, 17 19:25
21:12 37:23, 25 52:1
61:2, 6, 7, 17, 19 73:2
74:14, 17 77:16, 25
78:18 79:18 80:2, 25
90:5 91:19, 24 92:4,
7, 13, 15 93:21 96:13
101:2, 21 111:5, 10,
13 112:11 114:2
115:4, 17 116:2
130:17 133:22, 23
134:7 144:21, 25
150:6, 13, 20 151:17
164:23 170:8 181:13
189:5 190:18, 20
191:5, 7, 13 194:23,
24 212:16 247:19

248:11, 24 249:24
250:9, 12, 13 264:24
280:1, 14
consular's 195:25
196:2
consulate 90:21
107:15
consult 156:17
consultation 250:6
consulted 81:15, 19
consuming 269:1
contact 193:8
contain 231:13
contained 90:4
168:3 272:7
contains 160:1
226:15
content 87:18, 23
109:19 127:16 130:1,
17 160:9 186:5
237:23 282:24 283:2
contents 251:6
context 113:3 173:7,
11 174:8 175:1
207:11 264:21, 22
278:5
continue 166:10
171:22
Continued 3:1
contrary 108:6
109:3 218:17
contribute 102:19
161:20
contributed 80:3
83:7, 13
conversation 10:13
11:21 12:2 197:8
198:16, 24 199:1, 15
201:9 202:5 204:24
206:18
conversations 12:16
13:1, 6 14:1 169:5
197:16, 19, 22 198:2
199:19, 25 200:9
201:4, 6, 17, 20 202:3
203:18 204:16, 20
205:12, 20 206:22
207:19
conveyed 61:20

**convoluted** 82:*17*
**coordinate** 187:*17*
**coordinated** 245:*1*
**coordination** 278:*3*
**copies** 64:*5*
**copy** 15:*3*, *7*, *8*  16:*1*,
  *3*  85:*10*  157:*8*  170:*5*
  186:*19*  213:*16*  221:7
**core** 218:*12*
**corners** 272:*10*, *13*
**correct** 20:*2*, *3*  26:*3*
  51:*17*  59:*6*  62:*1*
  66:*1*, *5*, *9*  70:*20*
  86:*11*  88:*18*  89:*9*
  90:*6*  92:*12*  105:*7*
  112:*9*, *15*  113:*20*, *21*
  115:*5*  117:*5*, *6*  127:*9*
  131:*3*  144:*15*  151:*19*
  153:*17*  154:*15*, *16*
  164:*9*  165:*17*  166:*17*
  167:*16*  170:*9*  176:*2*
  179:*8*  182:*2*, *6*
  190:*16*, *17*  193:*17*
  195:*8*  226:*8*, *17*
  228:*6*  229:*17*  235:*10*
  237:*1*  238:*4*  244:*4*, *5*
  249:*3*  255:*9*  256:*2*
  261:*1*, *18*, *23*  263:*8*,
  *17*  265:*21*  268:*6*
  270:*7*  287:*5*  288:*5*
**corrections** 287:*7*
**correctly** 35:*13*
**council** 207:*24*
  248:*16*
**council/consular**
  247:*23*
**COUNSEL** 2:*1*  3:*1*
  6:*8*, *10*  23:*20*  24:*16*
  25:*3*, *4*  30:*22*  32:*22*
  33:*15*  37:*25*  38:*4*
  39:*16*  41:*13*  43:*19*
  44:*1*  55:*14*  121:*13*
  148:*7*  159:*13*  180:*6*
  202:*2*  206:*19*  221:*21*
  236:*13*  245:*16*  253:*9*
  272:*16*  288:*9*
**counselor** 37:*18*, *19*,
  *20*, *24*  69:*22*  74:*19*,
  *20*  152:*7*  248:*14*, *15*

**counselor's** 53:*1*
  77:*10*  96:*21*
**counsels** 81:6
**count** 200:*19*  202:*11*
**Counter** 73:2  74:*24*
  77:*15*  91:*25*  185:*8*
**countries** 34:*17*  35:*3*
**country** 35:*5*, *7*, *9*
  260:*21*  282:*3*
**Counts** 202:*9*
**couple** 36:*8*  125:*8*
  146:*25*  147:*2*  240:*14*
**course** 13:*25*  51:*11*
  156:*12*  172:*2*  176:*1*,
  *6*  206:*14*  224:*18*
  243:*18*  247:*10*
  248:*19*  269:*22*
**COURT** 1:*1*  5:6
  6:*14*  7:7  8:*10*  15:*23*
  17:*20*  55:*25*  163:*12*
  176:*22*  185:*18*  186:*1*
  209:*15*  247:*20*
  283:*17*  285:*9*, *13*, *16*,
  *22*  288:*21*
**COURTNEY** 2:5  6:*3*
**cover** 11:*24*  119:*10*
**covered** 12:*21*  29:*15*
  128:*17*  139:*20*  140:*4*,
  *13*, *21*  142:*22*  143:*3*,
  *11*, *18*  144:*1*, *14*
  148:*21*  157:*19*
  159:*16*  161:*13*  168:*8*
**covers** 118:*1*
**create** 83:*1*
**created** 28:*1*  51:*4*,
  *13*, *20*  57:*11*  83:*4*
  258:*19*
**creates** 256:*19*
**creating** 75:*18*  78:*1*
  214:*2*, *21*  215:*15*, *25*
  218:*2*  257:*8*
**creation** 27:*22*  28:*10*
  42:*25*  77:*5*, *9*, *20*
  78:*19*  83:*6*  127:*21*
  128:*2*, *14*  184:*18*
  244:*8*
**criminal** 85:*5*  88:*3*
  108:*23*
**criteria** 35:*19*  43:7

44:*5*, *10*  138:*25*
**criticism** 143:*18*, *24*
**criticizing** 140:*20*
  142:*12*  143:*10*
**crossed** 174:*5*
**crowd** 136:*15*
**cultural** 137:*9*
**culture** 136:*22*  137:*7*
  143:*17*
**curious** 76:*6*
**current** 71:*15*  91:*2*,
  *7*  180:*22*  192:*4*
  194:*12*  196:*21*
  199:*24*  225:*3*
**currently** 104:*5*
  120:*9*  186:*2*  261:*12*


**< D >**
**D.C** 1:*15*  5:*13*
**daily** 249:*21*
**DAS** 22:*20*  36:*19*
  78:*10*, *11*  96:*17*
  195:*2*  196:*12*  242:*11*,
  *24*  243:*21*  265:*4*
  266:*21*  268:*2*  269:*3*
**date** 5:*9*  287:*15*
**dated** 229:*10*
**day** 173:*10*  203:*14*
  249:*25*  285:*15*
  288:*13*
**DC** 3:*9*, *20*
**deal** 72:*4*  91:*19*, *22*
  125:*22*, *23*  189:*22*
  243:*17*, *18*  246:*9*
  253:*23*
**Dealing** 210:*16*
**deals** 149:*11*  243:*6*
**dealt** 23:*22*, *25*
  77:*18*  91:*16*  210:*9*
**dear** 126:*18*
**decades** 34:*23*
**decide** 32:*25*  222:*23*
  223:*10*  250:*22*
  251:*20*
**deciding** 248:*8*
**decision** 49:*6*  50:*1*
  51:*1*  59:*17*  98:*15*
  113:*8*, *11*, *12*, *13*, *15*,
  *17*  128:*25*  129:*5*
  150:*8*  191:*25*  197:*2*,

*3*, *5*  199:*21*  211:*23*,
  *24*  216:*12*  224:*3*
  229:*14*, *17*  230:*1*, *5*,
  *10*, *11*, *22*  249:*6*, *8*
  268:*5*  283:*4*, *7*
**decisions** 112:*20*
  145:*21*  150:*10*, *13*
  181:*10*  198:*5*  282:*25*
  283:*24*
**Declaration** 4:*12*
  14:*25*  15:*4*, *23*  16:*1*,
  *8*, *20*, *24*  21:*16*, *17*, *22*,
  *23*  22:*10*, *14*  45:*22*,
  *24*  46:*9*, *24*  47:*5*, *9*
  57:*13*  65:*9*  66:*18*
  67:*21*  68:*1*  70:*5*
  72:*7*  137:*3*  151:*3*, *8*,
  *12*  156:*6*  157:*2*, *11*,
  *15*  188:*21*, *22*  247:*16*
  250:*16*  284:*21*
**declarations** 15:*2*
  22:*5*  138:*12*, *15*
**Decoration** 271:*23*
**dedicated** 94:*2*, *5*
**deductions** 281:*21*
**defend** 175:*20*
**Defendants** 1:*6*  3:*2*,
  *13*  6:*6*, *8*, *11*, *13*
**define** 10:*20*  73:*14*
  106:*6*
**defined** 75:*4*
**defines** 89:*13*
**definitely** 76:*5*
  137:*22*  185:*24*  246:*4*
  279:*4*
**definition** 88:*23*
  89:*2*  91:*17*  140:*9*
  179:*21*  180:*16*, *19*
  181:*5*  264:*7*
**degree** 36:*21*  132:*15*
  135:*6*, *13*  136:*1*
**deliberation** 194:*20*
**deliberations** 160:*1*
  163:*24*  171:*4*  251:*18*
  283:*11*
**deliberative** 32:*19*
  34:*1*  38:*23*  39:*7*, *21*
  40:*19*  42:*12*, *18*
  47:*11*  51:*22*  53:*10*,
  *17*  55:*22*  56:*3*  68:6

Deposition of John Armstrong                                    AAUP, et al. v. Rubio, et al.

120:*15*  121:*19*  123:7,
*10*  124:*10*, *12*  127:*24*
128:*17*  159:*24*
160:*15*  161:*13*
163:*21*  168:*8*  171:*2*
198:*3*  209:*3*, *18*
262:*7*  273:*10*  283:*15*,
*19*  284:*1*
**demonstrate**  132:*14*
135:*5*  219:*20*  220:*8*
**demonstrating**  134:*24*
**demonstrations**  120:*5*
**denials**  111:*15*
**denote**  1:*23*
**denouncing**  140:*12*
**deny**  35:*17*
**DEPARTMENT**  3:6,
*16*  6:6, *8*, *10*  17:2, *6*
21:*18*, *19*, *24*  24:*16*
26:*21*, *24*  38:*1*, *5*, *8*
40:*1*  43:*1*  47:*16*, *20*
49:*9*, *24*  52:*13*  53:*3*,
*7*, *23*  60:*11*, *15*  61:*10*,
*14*  62:*3*, *5*, *10*, *14*, *18*,
*22*  63:*15*, *22*  64:*7*
65:*22*, *25*  68:*11*
71:*21*  72:*5*, *17*  74:*13*
75:*1*, *18*  76:*7*, *13*
77:*21*  86:*3*  89:*12*
94:2, *14*, *20*  95:*16*
97:*14*  98:*5*  102:*2*
105:*19*  106:*3*  109:*15*
110:*14*, *25*  111:*9*, *17*,
*24*  112:*4*, *25*  116:*9*,
*17*, *25*  117:*4*, *8*, *13*, *15*,
*23*  118:*7*, *14*, *23*
119:*13*  120:*3*, *10*
121:*1*, *15*  122:*8*, *16*,
*22*, *23*  123:*4*  124:*3*, *7*,
*21*  125:*22*  126:*24*
129:*23*  131:*7*, *11*
132:*1*, *21*  133:*18*
138:*5*  150:*1*, *24*
152:*3*, *6*  153:*6*  162:*9*
164:*20*  167:*12*  170:*7*,
*18*  172:*19*  173:*16*, *21*
180:*20*  182:*17*
184:*19*  185:*7*  187:*2*,
*4*, *6*  188:*24*  190:*25*
193:*4*, *16*  195:*15*

201:*19*  202:*1*, *18*, *25*
205:*1*  207:*22*  215:*24*
216:*12*  223:*14*  224:*5*,
*19*, *23*  225:*4*, *9*, *15*
226:*15*  227:*18*
228:*25*  231:*4*, *18*
233:*10*  235:*9*  246:*9*
249:*16*  252:*5*  260:*4*,
*10*, *11*  264:*11*  274:*2*,
*5*, *17*, *24*  275:*17*
276:*9*, *10*, *16*  278:*3*,
*15*, *20*  279:*13*
**departments**  201:*22*
207:*14*, *17*
**department's**  60:*7*
75:*19*  107:*19*  155:*10*
170:*23*  171:*14*  173:*3*
233:*19*  234:*24*
259:*23*  260:*24*
**depend**  40:*17*  77:*4*
136:*13*  140:*25*
141:*11*, *23*  143:*21*
144:*10*  172:*2*  229:*7*
248:*3*
**depending**  20:*21*
73:*14*  77:*17*  247:*11*
284:*8*
**depends**  72:*3*  149:*18*
163:*14*  211:*3*, *4*
247:*9*  252:*15*  270:*2*
276:*22*
**DEPONENT**  287:*1*
**deport**  82:*6*  228:*24*
246:*11*
**deportable**  255:*23*
263:*16*
**deposed**  6:*25*  7:*25*
10:*17*
**deposition**  1:*10*  5:*3*,
*11*  7:*5*  273:*1*  285:*8*
288:*4*
**depositions**  232:*12*
**deputized**  65:*23*
**deputy**  9:*18*, *23*
11:*25*  19:7, *8*, *9*
22:*20*, *22*  26:*15*, *16*,
*17*  29:*3*  36:*23*  50:*7*,
*10*  52:*4*, *8*  75:*5*
77:*12*, *13*  78:*12*
96:*17*, *18*, *22*  100:*23*,

*24*  181:*16*  184:*9*
187:*22*, *24*  195:*3*, *10*
196:*17*, *21*  204:*5*, *6*
242:*15*
**deputy's**  204:*7*
**derail**  76:*6*
**derogatory**  90:*12*
**describe**  10:*12*  11:*2*
47:*19*  109:*18*  160:*9*
**described**  17:*16*
50:*15*  65:*8*  106:*18*
113:*3*  167:*9*  195:*14*,
*19*  213:*24*  217:*17*
**describes**  35:*16*
231:*14*
**describing**  91:*4*
151:*21*
**description**  193:*6*
**designated**  123:*16*
125:*5*  214:*4*  215:*17*
218:*4*, *16*  219:*2*, *21*
220:*8*  256:*21*  257:*10*
**designating**  125:*12*
**detail**  108:*10*
**details**  28:*22*  82:*11*
142:*15*  149:*19*
173:*15*  174:*21*
175:*13*  252:*16*
281:*11*
**detain**  224:*12*
**detained**  282:*6*
**determination**  66:*4*, *7*
67:*18*  81:*23*  92:*16*
93:*18*  94:*11*, *15*  95:*1*,
*8*, *17*, *20*, *25*  97:*7*, *14*,
*19*, *25*  98:*1*  125:*12*,
*15*  142:*17*  192:*2*
239:*15*  242:*20*  248:*9*
249:*2*  256:*10*  258:*25*
261:*17*  263:*3*, *24*
264:*13*, *22*  265:*9*, *19*
266:*8*  267:*3*, *16*, *20*
269:*17*, *23*  270:*1*, *3*,
*13*  271:*11*  272:*6*
276:*16*  277:*3*, *17*
281:2, *6*  283:*10*, *13*
**determinations**  66:*1*,
*2*  82:*8*  92:*14*  94:*3*
95:*13*  112:*8*  176:*1*
177:*8*, *12*  178:*12*

266:*3*  270:*5*  273:*6*
274:*15*
**determine**  27:*12*
98:*4*  112:*17*  131:*8*
145:*1*  152:*1*, *4*
177:*18*  178:*4*, *21*
181:*11*  265:*12*
266:*14*
**determines**  274:*7*
**determining**  167:*13*
178:*13*
**detour**  101:*6*
**develop**  61:*20*  127:*15*
**developed**  40:*25*
63:*15*, *22*  70:*12*
79:*15*  83:*15*, *24*
104:*8*  105:*5*  106:*3*
120:*9*  121:*15*  124:*3*,
*7*  133:*4*, *8*, *10*  187:*2*,
*6*  190:*8*
**developing**  73:*18*
74:*22*  75:*15*  121:*1*
**Development**  18:*24*
73:*5*, *14*  75:*4*  80:*3*
81:*1*  101:*10*  102:*6*,
*10*, *20*  127:*12*  169:*19*,
*22*
**develops**  71:*22*  72:*6*,
*17*
**DHS**  65:*22*  82:*4*
93:*13*  97:*21*  188:*3*
193:*8*  202:*20*  207:*21*
213:*4*, *7*, *14*, *17*  226:*6*,
*25*  231:*19*  233:*9*, *12*
235:*7*, *14*  242:*19*, *25*
245:*2*  246:*10*  275:*6*,
*11*  279:*15*
**DHS's**  213:*24*
**Dias**  19:*11*
**difference**  38:*19*
264:*5*  266:*9*, *19*
**different**  34:*17*  37:*9*
116:*8*  129:*15*  148:*9*,
*17*  173:*10*  191:*21*
194:*25*  197:*13*  208:*9*
247:*11*  250:*8*  253:*22*
262:*12*  263:*23*
264:*12*  265:*10*  266:*2*
267:*2*
**differently**  124:*22*

**difficult** 31:*4* 33:*1*
146:*12* 147:*23, 25*
148:*16* 149:*3, 4*
173:*12* 174:*9* 180:*3*
191:*17, 19, 24* 252:*18*
**digress** 271:*25*
**Diplomatic** 61:*2*
90:*4* 107:*15*
**DIRECT** 4:*5* 28:*24*
91:*2* 103:*14* 146:*6*
168:*6* 171:*4* 198:*4*
256:*17* 257:*20*
258:*11* 284:*9*
**directed** 103:*16, 17,*
*19* 199:*17*
**directing** 273:*11*
**direction** 288:*8*
**directive** 109:*13, 14,*
*17, 21* 110:*8* 118:*4,*
*11*
**directives** 118:*9*
168:*4*
**directly** 163:*16*
181:*25*
**director** 9:*22* 78:*14*
96:*20* 100:*25* 169:*13*
181:*18* 184:*10* 188:*1*
196:*14* 242:*13* 243:*2,*
*19* 265:*5* 266:*22*
**director's** 18:*23*
**directs** 130:*16*
**disagree** 221:*19*
230:*21* 232:*13*
**discretion** 189:*6*
190:*15, 22* 191:*2, 14*
247:*25* 248:*2* 250:*17*
**discretionary** 251:*12*
252:*5*
**discuss** 9:*7* 12:*18*
89:*17* 102:*16* 205:*13,*
*22* 244:*14* 246:*1, 6*
280:*25*
**discussed** 11:*15* 47:*4*
89:*5, 24* 106:*5*
114:*18* 115:*7* 123:*1*
131:*2* 138:*6* 143:*16*
172:*21* 183:*8* 194:*6,*
*19* 195:*22, 24* 196:*7,*
*11* 197:*24* 198:*13*

200:*16* 205:*23*
210:*20* 246:*6* 280:*3*
**discussing** 25:*22*
60:*9* 153:*9* 198:*1*
274:*16*
**discussion** 10:*19*
16:*12* 21:*24* 153:*11,*
*16, 21* 154:*5* 192:*7, 9*
193:*1* 209:*24* 211:*6*
236:*13*
**discussions** 23:*6*
41:*14* 154:*22* 155:*2*
156:*2* 198:*14*
**distilled** 244:*3*
**distinct** 61:*16*
117:*22* 118:*4*
**DISTRICT** 1:*1, 18*
5:*6, 7*
**Diversity** 34:*10, 11,*
*13, 22, 25*
**Divest** 241:*7, 9*
**divestment** 141:*4, 12*
**DIVISION** 3:*6*
94:*19* 111:*25* 134:*6*
**document** 1:*23* 4:*13*
15:*11, 15* 68:*25* 69:*6*
73:*24* 75:*24* 76:*1, 4*
77:*22* 85:*11, 21, 24*
86:*10* 98:*9* 104:*17*
114:*10* 131:*17, 18, 25*
139:*10, 16* 151:*14*
158:*11* 165:*3, 8, 20,*
*24* 166:*7* 176:*24*
179:*23* 180:*2* 185:*14,*
*17, 22* 212:*1, 9, 11, 12,*
*17, 21* 213:*1, 2, 3, 20*
217:*8* 219:*8* 221:*19,*
*22, 24* 222:*1, 6, 10*
227:*3* 229:*9, 15*
231:*8* 232:*3, 10, 24*
233:*5* 234:*3, 12, 22*
235:*6* 240:*1* 253:*3*
254:*5, 19, 23* 255:*7*
259:*21* 269:*3, 6, 8, 13*
272:*8, 10, 13* 278:*9*
279:*2, 3* 282:*14, 16*
**documentation** 189:*4,*
*7* 226:*6* 247:*19, 23*
248:*1* 249:*5, 7*

**documents** 14:*2, 4, 6,*
*14, 19* 16:*9, 14, 16*
21:*11* 85:*13* 115:*16*
137:*3* 156:*12, 18, 20,*
*22, 25* 157:*9, 13*
185:*21* 215:*4* 230:*9,*
*12, 14* 239:*7* 242:*3*
244:*8* 253:*10* 282:*18*
**DOD** 207:*22*
**dog** 20:*14*
**dogs** 138:*1*
**doing** 24:*10* 44:*20*
124:*21* 126:*5*
**DOJ** 6:*13*
**domestic** 125:*6, 12,*
*17, 19, 22*
**domestically** 17:*12*
**donate** 138:*18*
**dozen** 201:*15* 203:*19*
204:*15*
**dozens** 203:*13*
**draft** 49:*24* 159:*9,*
*11, 15, 21* 160:*1, 3, 4,*
*18* 168:*6*
**drafted** 21:*16* 49:*14*
156:*8, 11*
**drafter** 98:*25* 100:*14*
**drafting** 77:*20, 21*
156:*6, 12, 15* 161:*21*
**draw** 257:*3*
**drawn** 34:*18* 132:*19*
**drink** 12:*12*
**Drive** 2:*19*
**drug** 125:*9*
**Due** 222:*20* 227:*15*
228:*13* 229:*9, 11*
238:*17*
**duly** 6:*19*
**duties** 11:*24, 25*
23:*22, 24* 177:*11*
182:*15, 24* 183:*5, 15*
246:*12* 270:*21*

**< E >**
**E.O** 74:*23*
**E.O.s** 170:*7* 187:*3*
**earlier** 38:*13* 41:*3*
48:*5* 80:*12* 112:*7*
131:*3* 138:*2* 147:*19*
157:*24* 166:*14*

172:*21* 184:*22* 260:*9*
268:*13* 282:*23*
**easier** 68:*24* 198:*8*
201:*11* 202:*14*
**East** 259:*10*
**ECAS** 130:*8, 9*
**ed** 220:*21, 23* 221:*1,*
*3* 222:*9, 11, 15*
239:*10*
**education** 185:*10*
202:*25*
**effect** 71:*10, 11, 15*
164:*22* 231:*25*
**efficiently** 253:*23*
**effort** 192:*18*
**efforts** 172:*4*
**either** 26:*14* 58:*10,*
*12* 63:*23* 106:*4*
107:*1, 24* 148:*3*
204:*25* 251:*21* 278:*4*
**element** 217:*15*
**elements** 85:*3*
**elimination** 140:*9*
**Elizabeth** 19:*7*
**eluded** 217:*7*
**E-mail** 3:*10, 21*
154:*10* 156:*23*
**e-mails** 154:*18* 155:*5,*
*8, 14, 22* 163:*13*
**embargo** 141:*9* 175:*8*
**employed** 150:*16*
288:*10*
**employee** 26:*25*
233:*17, 25*
**employees** 21:*25*
182:*1* 233:*18*
**empowered** 248:*12*
**encounter** 159:*18*
**encouraging** 138:*18*
**encumbering** 50:*11,*
*12*
**endeavor** 143:*11*
**endorse** 56:*25* 57:*1*
89:*6* 130:*22* 131:*13*
138:*3*
**endorses** 130:*20*
**ends** 285:*7*
**enforcement** 31:*23*
32:*19* 34:*1* 65:*24*
108:*12* 146:*6* 148:*19*

149:*11* 213:*10* 214:*8*
219:*25* 220:*2* 225:*13*,
*14* 227:*12* 228:*24*
235:*18* 236:*1*, *16*, *24*
237:*24* 238:*16*, *18*
246:*10* 258:*10* 262:*4*
273:*8* 283:*15*, *18*
284:*2*
**engaged** 193:*8*
231:*22* 233:*14*
241:*25*
**engaging** 188:*16*
**enter** 90:*22*
**entered** 41:*3*
**entire** 119:*4*
**entities** 96:*8* 277:*10*,
*18*
**entry** 86:*3*
**environment** 214:*3*,
*21*, *23* 215:*16*, *25*
218:*3*, *7*, *9* 256:*19*
257:*9* 258:*20*
**equities** 73:*11*
**equivalent** 275:*14*
**Errata** 287:*9*
**espouse** 56:*25* 89:*6*
130:*22* 131:*13* 138:*3*
**espouses** 130:*21*
**ESQUIRE** 2:*4*, *5*, *15*,
*16* 3:*3*, *4*, *5*, *14*, *15*
**Essentially** 265:*22*
**establish** 43:*6* 103:*2*
**established** 190:*6*
248:*22*
**establishes** 44:*5*, *9*
**estimate** 84:*3* 204:*15*
**estimating** 201:*10*
**ET** 1:*3*, *6* 5:*5*, *6*
**ether** 160:*13*
**events** 16:*10* 41:*4*
278:*14*
**Everest** 1:*19* 5:*14*
6:*15*
**everybody** 245:*13*
253:*24* 284:*6*
**Evidence** 131:*22*
132:*6*, *7*, *8*, *13* 142:*19*
231:*21* 233:*14*
**evident** 136:*21*

**evil** 137:*25*
**ex** 110:*3*
**exact** 1:*23* 77:*17*
113:*3* 145:*12* 278:*1*
279:*9*
**exactly** 16:*22* 22:*2*
24:*3* 70:*7*, *23* 77:*7*
98:*20* 100:*1*, *15*
162:*5* 196:*8* 219:*14*
254:*21*
**EXAMINATION** 4:*1*,
*5* 6:*21*
**examined** 6:*19*
**example** 35:*7* 48:*1*
73:*16* 87:*13* 88:*3*
90:*20* 125:*10* 136:*4*
137:*10* 173:*19*
182:*20* 200:*18* 224:*9*,
*11* 225:*12* 227:*2*
249:*10* 266:*10*, *21*, *22*
**examples** 108:*17*
110:*18* 117:*18*
118:*20* 119:*2*, *22*
120:*7* 138:*23* 267:*8*
**exception** 107:*2*
**exchanged** 178:*25*
**exclude** 12:*25* 190:*19*
**exclusively** 201:*18*
**Excuse** 31:*5*
**exec** 271:*7*
**executed** 246:*3*
**execution** 158:*4*, *6*
**executive** 18:*22*
41:*12* 57:*12*, *14*, *15*,
*17*, *21*, *25* 58:*3*, *6*, *11*,
*14*, *18*, *22* 59:*4* 63:*4*,
*11*, *16*, *23* 72:*6*, *12*, *18*
73:*19* 74:*2*, *3*, *8*
75:*20* 76:*14* 78:*2*
104:*9*, *14* 105:*6*, *9*, *13*
106:*4*, *9*, *20* 107:*1*, *19*,
*24* 110:*4*, *6*, *8* 122:*8*,
*17*, *24* 123:*18*, *22*
124:*2*, *4*, *8*, *23* 125:*16*
158:*4* 160:*21* 162:*12*,
*17* 167:*15*, *18*, *23*
170:*4*, *5* 176:*5* 177:*4*
178:*7*, *8* 179:*6*, *7*, *19*
180:*17* 183:*1*, *7*
184:*6*, *16* 205:*13*, *22*

271:*1*, *2*, *12*, *18* 280:*2*,
*15*
**exercise** 42:*15* 191:*2*
**Exhibit** 4:*12*, *13*
15:*9* 16:*5*, *20* 45:*23*
69:*3* 70:*14* 85:*22*, *25*
86:*10* 104:*21* 106:*12*
126:*13* 127:*8* 151:*4*,
*7*, *11* 188:*22*, *23*
189:*25* 190:*11*, *12*
212:*4*, *5* 222:*11*
233:*6* 247:*17* 254:*7*,
*8*, *9*, *10*, *12* 262:*21*
284:*22*
**exhibits** 1:*20* 4:*8*, *11*,
*13* 176:*14*
**exist** 189:*12* 222:*17*
**existed** 34:*22* 80:*21*
**existence** 40:*7* 42:*9*
120:*21*
**existing** 82:*24*
**exists** 234:*12*, *16*, *18*,
*23* 251:*4*
**expect** 55:*14* 268:*3*,
*12*
**expected** 9:*7* 10:*14*
103:*3*
**expedited** 285:*11*
**experience** 98:*17*, *23*
224:*19* 225:*1*, *7*
226:*23*
**expert** 60:*4* 114:*16*
**expires** 288:*14*
**explain** 214:*22*
**explained** 89:*12*
**explicit** 136:*7*
**explode** 198:*10*
**express** 252:*18*
**expressly** 109:*8*, *11*
**extent** 12:*17* 13:*2*
31:*1*, *15* 32:*14*, *17*
33:*21* 76:*10* 108:*2*
120:*14* 123:*6* 124:*10*
146:*5* 149:*5* 159:*21*
160:*4* 163:*23* 166:*3*
171:*3* 185:*13* 186:*15*
197:*25* 220:*11*
236:*14*, *24* 238:*15*
258:*9* 262:*6* 273:*9*

274:*20*

**< F >**
**F1** 218:*18*, *21*
**facilitate** 48:*3*, *6*
**facilitating** 71:*18*
**fact** 121:*4* 148:*15*
159:*5* 238:*9* 239:*13*
279:*5*
**factors** 250:*11*
**facts** 252:*20*
**factual** 252:*2* 258:*25*
259:*15* 272:*5*, *17*
283:*9*
**faculty** 241:*2*, *5*
**fair** 60:*11* 92:*19*
116:*17* 186:*25* 197:*4*
252:*22* 258:*24*
260:*23*
**fall** 61:*10*, *11* 145:*1*
182:*5*
**falls** 68:*20*
**FAM** 133:*2*, *4*, *13*, *20*
134:*10*, *20*, *22* 135:*3*,
*11* 138:*3* 154:*22*
250:*25* 251:*1*, *2*, *5*, *6*
**familiar** 34:*14* 44:*19*,
*22* 45:*6*, *9* 46:*12*, *20*
57:*25* 58:*6* 70:*9*
71:*14* 74:*7* 75:*25*
180:*14*, *18* 211:*7*
215:*19* 240:*12* 241:*6*,
*8* 244:*7* 258:*13*, *16*
281:*9*
**familiarity** 32:*2*, *4*
46:*22* 48:*9* 179:*12*
**familiarize** 134:*15*
179:*15* 184:*24*
**familiarizing** 185:*9*
**far** 71:*1* 180:*12*
190:*9* 201:*3*
**fast** 34:*5*, *8*
**fat** 137:*25*
**FBI** 125:*25*
**February** 41:*4*, *7*
150:*25* 192:*5* 194:*16*
198:*22* 199:*24* 225:*3*
235:*21* 279:*20*
280:*12*

feel 147:5 234:10
feeling 138:16
feels 253:5
fees 181:15
fellow 19:22
female 281:20
field 109:13
Figel 1:14
figure 79:5
filling 270:21
final 50:24 60:5
62:2, 5, 9 82:5 159:9
160:4, 5 168:13
198:5
finalization 40:16
finalized 40:1, 11, 14
41:25 42:5, 7, 9, 11
47:17, 19 48:15
50:21 62:13, 18 63:3
68:10 70:17 81:16,
20 82:12, 19
financial 288:11
find 172:23 243:25
finding 231:19
fine 25:10 49:20
126:11 139:13
160:12 186:7 203:9
238:9
finish 19:14 245:10,
14, 17
finished 59:20 73:4
154:25 163:3 171:24
233:2 254:24
fire 142:2, 8, 9
FIRST 2:17 5:23
6:18 15:22 16:25
50:15, 18 58:21 67:2,
3 74:7 106:7 123:22
153:12 154:3 159:18
197:15 218:6 277:20
five 181:14, 15
203:10 208:5, 6, 7, 10
209:7 273:7, 13
283:20 284:3
flag 137:11
flip 46:23
Floor 2:8
focus 88:8 192:16
193:2 201:8 272:19

focuses 45:11
Focusing 79:14 218:6
folks 195:7 206:18
270:12
followed 86:5
following 136:20
277:10, 18
follows 6:20
follow-up 146:13, 19
forcefully 216:6, 17
260:10
foregoing 287:4
288:4, 5
foreign 36:6, 9 43:8,
13 44:6, 11 45:19
48:2 50:16 54:25
55:6 56:19 57:1, 23
58:23 63:5 69:8
70:13 71:3 72:19
73:20 74:9 76:16
93:19 95:2, 10, 21
96:1 97:17, 20 98:2,
7 100:6 105:12
112:14, 20 113:4
114:6, 7, 9, 12, 20
115:5, 9, 11 122:18
123:11, 16 125:5, 18,
23, 24 131:2 138:9
174:13 214:2, 20, 24
215:15 216:2, 11
217:5, 15, 16, 18, 19
218:2, 9, 12, 13, 20, 22
219:10, 21 220:9
251:10 252:12 256:1
257:8 259:13, 25
260:14, 19, 21 261:3
276:5
foremost 153:13
154:3
forever 76:20
forgetting 191:6
Forgive 271:25
forgot 19:19
forgotten 261:10
Form 10:21 14:16
22:11 23:14 27:23
30:18 31:14 43:24
44:24 46:14 48:20,
24 49:19 59:13
60:19, 22, 23 63:1, 18,

25 64:8 71:24 72:21
80:5 82:15 84:14
92:6 94:10 102:22
103:5 111:3, 20
113:5, 24 114:5, 6
115:18 116:20
119:16, 24 122:10
133:5 136:8 145:23
150:22 152:22 154:6,
8, 20 155:12 156:2
157:5 164:17 170:10,
25 176:3 192:21
201:14 211:11
214:25 221:15
224:25 225:24
237:11 240:15 244:3
251:14 274:10, 19
275:4 277:12 281:12
287:8
formal 59:23 60:10
131:17 154:17
former 91:8
forms 114:1 226:21
formula 35:1
forth 43:12 88:23
89:2 106:25 108:4
109:14 138:25 273:1
275:18
forwarded 191:14
found 90:12 123:11
132:9 220:21 233:11
239:10 250:25
255:19
Foundation 14:17
23:11, 14 27:24
43:25 45:12 47:21
48:23 59:12 65:18
71:25 72:8, 22 73:23
75:22 76:18 78:3
82:1 87:20 88:9
99:18 101:12 104:10
116:21 133:6 162:10,
19 168:15 176:4
177:21 184:8 187:8
215:1 216:4 217:10
219:13 223:20
226:19 232:2 233:23
237:12 238:14 247:8
259:18 260:3, 17
261:6 264:2, 17

265:2 266:6 267:6
270:19 276:19
277:11, 19, 24 278:4,
13 281:13
founding 136:23
137:2
four 11:8, 9 19:16
194:9 253:15 272:10,
13
FPU 130:5, 6
Franklin 3:7
Fraud 18:20 20:23
21:1, 4, 7 130:6, 13
fraudulently 21:13
Frederick 1:14
free 139:20 140:3
147:6 173:1, 20
174:16
frequently 205:6
Friday 29:6
front 9:19 10:1, 2
18:25 19:3, 4 45:23
76:2 79:2 85:14
86:2 96:15 127:9
131:4 184:17 194:25
195:7 215:4 222:8
239:3 252:20 259:19
262:20 264:4 272:4
full 67:2 173:11
174:8 175:14 193:9
fully 37:2 52:24
61:8 84:25
function 218:13
functionally 19:12
functions 17:15
funny 165:22
further 241:12 259:5

< G >
gamesmanship 239:6
GANS 2:5 6:3
gathering 142:18
Gaza 140:21 259:14
260:15
general 111:4 157:7
182:18 203:23 205:9
216:7, 18 229:6
243:17 248:21 250:4
260:6
generalize 148:2, 16

generally 21:1 30:23
100:20 108:5, 6
109:2 118:11 146:10
149:8 150:15 239:6
248:18
generated 178:20
249:18 250:3 269:16,
23
generates 276:10
geographic 75:12
Germany 143:7
getting 148:3 191:22
give 7:8 10:14
11:12, 15 13:24 15:3
84:3 85:14 93:15
117:18 134:17
137:10, 21 138:22
139:2 176:10, 11, 15
179:16 186:19
187:10 200:24
213:20 224:9 239:4
253:11 271:11, 18
284:13
given 13:9 109:13
177:24 178:3 185:18
234:7 237:6 262:15
267:20 287:6 288:6
gives 35:16 176:6
271:13
giving 181:25
Go 19:13 25:11
48:25 50:7 55:17
64:12 69:2 79:7
82:3 96:14 101:7
107:3, 4, 7 111:13
114:23, 24 123:21
126:8 128:5, 6 139:8
148:11 168:19 172:1
176:16 206:4 223:1
244:2 249:11 266:20
267:11 270:20 284:6
goal 259:13 260:1, 14
goes 73:10 127:3
138:8 192:2 271:16
going 7:4 31:5
32:23 34:5 55:16, 17
68:25 69:5 75:23
76:19 88:4, 5 108:20
119:23 126:3, 7
131:24 138:22

153:25 158:23, 25
166:10 167:22
173:15 176:23
184:24 185:6, 15
198:10 199:17
200:21 201:3 202:22
205:15, 25 213:5
221:11, 19 225:20
231:14 232:17, 19, 25
236:2 238:10 244:1
247:1 248:3 253:20
258:23 263:11 264:4
270:3 285:8
Good 6:23, 24 12:14
108:20 138:15 146:9
147:15, 16 169:8
199:8 240:2 246:14
252:9 281:21
gosh 195:9
gotten 232:20 277:9,
16
Government 9:3
13:13 14:22 25:3
44:1 48:2, 3 50:16
71:3 136:23 137:2
142:7 180:7 185:17
207:14, 16 233:17, 18,
24 261:23 272:23
277:4 279:16
Government's 262:15
grabbing 170:5
Gracon 19:7
grant 224:6
granted 223:24, 25
Great 7:24
greater 103:16
green 91:20 92:1, 5,
17 93:5, 12 94:16
95:18, 24 97:16, 23
98:6 100:6 112:13
gross 48:10 71:6
ground 66:14 155:19
grounds 24:7 26:3
31:1, 15 45:10 47:3,
8 65:10 94:10
130:18 185:10 210:3
272:25
group 22:25 125:4, 7
239:14 243:5 262:12,
13

groups 121:24
125:13 136:17
240:12
guess 96:10 125:4
160:7 180:4 223:25
228:3 248:5
guests 260:21
guidance 90:4
109:22, 25 110:14
111:1, 17 113:1, 8, 9,
11, 13, 16, 18, 22, 25
114:19 115:3 116:2,
8, 18 117:1, 4, 7, 12,
18, 22, 25 118:4, 7, 13,
22 119:12 120:2, 8
121:1, 14 122:6, 25
127:22 128:2, 15
131:12, 17 132:21, 25
138:4 151:17 152:6,
13 153:7, 9, 15, 21
154:1, 5, 6, 7, 16, 21,
23 155:3, 10, 21
156:1 168:4 170:17
171:12, 16 172:22
177:2, 3, 5, 7 178:3
179:1, 2 182:17, 18,
22 187:11 189:18
190:1 209:25 250:10,
25 251:3
guides 189:9
guiding 250:21
guise 61:6
guys 85:21 176:11
204:8

< H >
habeas 221:15
half 232:19, 21
halfway 132:5
Hamas 55:10 57:7
89:5 117:14, 16, 19
136:5, 16 243:14
257:21
hand 136:15, 17
151:6 288:12
handed 85:23 222:10
handful 192:6
handle 60:2
handled 18:3, 7, 13

248:23
handles 23:7 264:25
handling 210:1
hang 87:13 166:15
Hansen 1:13 5:12
happen 234:18
happened 48:18
230:25 280:17
happens 243:20, 22
happily 232:6
happy 134:14
139:10 167:18
179:14 226:10 231:8
234:4 253:3 282:15
hard 142:16 148:2
157:8 173:6 175:13,
22 239:18
hate 138:1
Hatred 171:17
hazard 180:4 248:4
head 20:14 57:17
184:14 198:10 261:9,
12
heard 48:8 163:17
164:4, 5, 10 211:8
240:18, 21 241:2, 4
272:14 277:20, 21, 23,
25 278:2
hearing 13:4 231:9
240:23 282:5
hearsay 234:23
heart 252:10 253:11
279:6
help 16:10, 14
127:15 152:1, 4
176:8 202:22 204:8
225:20 242:4
helped 16:17
helpful 86:13
Henderson 1:16, 25
6:15 7:6 15:8 34:7,
8 86:1 176:20 288:3,
20
hereunto 288:12
Heritage 277:10, 19,
24 278:4, 13
high 174:12
higher 185:9 191:25
192:3

Deposition of John Armstrong

AAUP, et al. v. Rubio, et al.

**hit** 126:*4*
**Hold** 79:*25* 99:*16*
**holder** 223:22 224:*8,
10, 12, 15* 225:5, *10*
226:2 229:*1* 264:*15*
265:*11, 20* 276:*14*
**holders** 88:*8, 11, 14,
18* 91:2, *8* 103:22
110:*21* 187:*18*
188:*15* 263:*21* 264:7
266:*4* 275:*18* 276:*3*
**holder's** 224:*20, 23*
**Holocaust** 179:*20*
180:*15* 181:*1, 6*
**Homeland** 53:*7, 23*
111:*24* 112:*4* 187:2,
*7* 193:*15* 195:*15*
202:*1, 2* 205:*1*
207:*24* 231:*20*
233:*13* 235:*1* 244:22
274:*3, 5, 17, 25*
**honcho** 20:*14*
**honor** 161:*18*
**hope** 234:5 253:7
**hopeful** 253:*14*
**hostile** 136:*21*
137:*13* 214:2, *21*
215:*16, 25* 218:*3, 6*
256:*19* 257:8 258:*20*
**hostility** 137:6
143:*16*
**hot** 138:*1*
**hour** 126:*3* 211:2
**hours** 13:*24* 284:*10*
**House** 19:22 54:5
158:*18, 24* 159:6, *15,
17* 162:4, *7* 168:*3*
203:5, *21, 25* 205:*21*
206:*18* 207:*23*
**How's** 24:*9*
**human** 48:*10* 71:7
**humanitarian** 141:*20*
**hundred** 99:6
**hypothetical** 173:*13*
230:*23* 248:5 252:*19*
**hypotheticals** 144:*8*

**< I >**
**I&A** 66:*18*
**I/221(i** 251:22

**ICE** 213:*4, 7, 14, 17*
215:6 218:*23* 222:*20*
225:*16, 25* 226:4, *6,
14* 227:7, *16* 228:*14,
15, 17* 229:*3, 11*
231:*19* 233:*12* 235:7
**ICE's** 213:*24* 227:*19*
229:*4*
**icons** 137:*9*
**identical** 69:*1, 25*
**identify** 5:*16*
**illegal** 48:*4, 7* 50:*17*
71:4, *5, 18* 239:*20, 22*
**imbedded** 175:*3*
**immediate** 61:*3*
**immigrant** 34:*3* 92:9
111:*23*
**immigrants** 165:*16*
**immigrate** 34:*19*
**immigration** 35:*3, 15*
188:*25* 225:*13*
**imperilled** 225:22
**implementation**
160:*21* 182:*16* 183:*1,
7*
**implemented** 104:5
164:*15*
**implicate** 123:6
**implicates** 120:*15*
**implication** 174:22
175:*18* 239:*19*
262:*15*
**importance** 85:2
88:*1, 17*
**important** 73:6
**impression** 234:6
**improper** 24:*20*
**INA** 36:*3* 54:24
55:5 56:*18, 24* 65:2,
*6, 8, 16* 66:8, *15*
67:25 68:22 69:*17,
23* 93:*14* 132:*18*
189:8 238:6, *8*
247:*15* 255:*20* 264:*3,
10*
**Inadmissibility** 65:*10*
67:*19* 185:*11*
**Inadmissible** 4:*13*
**Inaudible** 222:*25*
257:7

**include** 29:*19*
149:*10* 153:16
154:*16* 156:2 167:*10*
182:*25* 183:6, *15*
**included** 199:2
**Including** 66:4, *7*
90:*14* 136:*23* 155:*21*
166:*21, 22* 171:*18*
197:*20, 21* 199:*16*
200:2 215:5 230:*15*
283:*10*
**inclusive** 94:*19*
**incoming** 235:*4*
**incomplete** 73:*1*
78:9, *25*
**incorporates** 179:7, *13*
**incorrect** 20:*4*
126:*17* 166:*19* 238:5
**increased** 124:25
**Independence** 137:*4*
**INDEX** 4:*1, 8* 86:*1, 2*
**indicates** 190:*14*
256:*20*
**indicating** 104:*15*
214:*3* 215:*17* 218:*4*
231:*23* 233:*16* 257:9
**indicative** 132:*17*
**indiscretion** 250:*20*
**individual** 145:*3*
221:*15* 267:*20*
**ineligibility** 132:*18*
**ineligible** 112:*18*
131:*8*
**inform** 223:22 224:*8,
10* 225:9, *12* 229:*1*
257:*15*
**informal** 154:*18*
**information** 12:*21*
14:*9* 20:*24* 31:2, *16,
19* 32:*18* 34:*2* 38:*23*
39:7, *21* 40:*19* 42:*18*
44:*13* 47:*11* 51:22
53:*10, 17* 55:22 56:*3*
68:6 88:*2* 90:*12, 23*
121:*19* 123:6, *10*
124:*11, 13* 128:*17*
146:6 148:*3, 19*
149:6, *10* 161:*13*
166:*23* 188:*1, 3, 4, 6,
8* 220:*12, 13* 228:*19*

242:25 258:*21* 259:*4*
261:*17, 19* 267:*21*
268:8, *11, 12, 14*
272:11 275:6 276:*21*
277:2, *9, 16* 278:*8, 21,
23* 279:*9, 12* 282:*8*
**informs** 225:*4*
**input** 11:*12*
**inquisically** 127:*13*
**instance** 128:*21*
**instances** 230:*19*
**INSTITUTE** 2:*17*
5:*23* 6:*1*
**institutional** 141:*4*
**institutions** 136:*23*
185:*9*
**instruct** 39:22 42:*19*
43:*3, 10, 16* 47:*12*
51:23 53:*11, 18*
55:*15, 23* 56:*4, 10, 15,
21* 57:*4, 9* 68:7
120:*16* 121:*20* 123:7
124:*11* 128:*18*
161:*14* 163:22
205:*17* 206:*1* 213:8
214:7 235:*16, 24*
237:*25*
**instructed** 90:*11*
**instructing** 39:9
40:20 209:2, *20*
219:*24* 227:*10*
**instruction** 110:9
128:*21* 161:*17*
250:*11*
**instructions** 11:*16*
109:*23, 25* 110:*15*
111:*1, 18* 113:*1*
117:*23* 118:*1, 5, 8, 13,
23* 119:*12* 120:*3, 9*
121:2, *14* 122:6
123:*1* 189:*19*
**Intelligence** 244:22
245:2
**intense** 252:*14*
**intent** 160:*10*
**interagency** 53:*15*
207:*5, 9, 10, 12*
**interest** 288:*11*
**interested** 13:*4*

199:5  210:10, 17
**interests**  43:13
**internally**  60:16
178:20
**International**  179:20
180:15  181:6
**interpret**  74:6
**interpretation**  219:1
**interrupt**  35:21
**intimidation**  259:8
**investigated**  278:20
**investigation**  158:20
**investigations**  231:20
233:13
**invocation**  209:13, 18
284:5
**invoke**  158:23
205:16, 25  209:11
210:4  262:1  272:24
283:14, 18, 25
**invoked**  253:17
**invokes**  30:22  159:2
**invoking**  273:8
**involve**  10:16  93:20,
23  168:8
**involved**  22:16  24:2,
5  26:2, 10  54:5
71:18  74:25  75:2, 18
77:19  94:14, 25  97:6
98:18  101:9, 16
102:5, 8, 10, 14  117:3
129:4  144:21  156:15
169:19, 22  192:14
213:25  214:19  218:1
239:19  248:15
249:21  250:2  251:9
256:9  257:24  258:6
267:15  270:12
275:25  276:3  278:10
279:10  281:1, 5
**involvement**  73:18
92:4  112:7  211:10,
16, 21  241:12, 16
249:23  256:18
280:24
**involves**  54:8  187:4
248:24  273:10
**involving**  15:23  34:2
93:1
**irrelevant**  232:11

**Israel**  140:10  141:4,
9, 15  142:12, 21
143:10, 25  171:18
174:24  175:4, 9, 20
233:12
**Israeli**  140:10, 17
143:3  171:19
**Israeli's**  174:25
175:5
**Israel's**  140:21
**issuance**  17:10, 11
18:2, 12  20:19  92:5,
8  111:15  122:25
189:4  247:18, 21, 22
**issue**  16:11  77:8, 18
110:25  111:17  113:1,
8  129:1, 5  148:15
149:20  159:18  179:3
193:5  207:15, 17
209:8
**issued**  21:12  76:14
84:24  85:16  87:6, 8
106:19, 25  108:8
109:25  110:14
113:23, 25  114:19
115:3  116:2, 9, 18
117:1, 4, 8, 13, 19, 23
118:14, 23  119:12
120:3  131:12, 18, 25
150:1, 19  188:13, 18
255:16
**issues**  108:12  111:5
125:23  145:11
173:10  181:1  243:18
**issuing**  145:14  226:7
**it'd**  247:12
**its**  40:16  89:6  90:25
120:21  131:17  157:8
173:22  260:5  276:21
288:11

**< J >**
**Jaffar**  19:11
**January**  70:22  129:2
**JESSICA**  3:5  6:12
9:21  169:13  184:10
**Jewish**  140:17
171:18  174:6  181:1
214:3, 22, 23  215:16
216:1  218:3, 7

240:21, 24  256:20
257:9  258:20
**Jews**  171:17  174:25
**Job**  1:19  41:3
182:15
**Joe**  19:20
**JOHN**  1:10  4:3, 12
5:3  6:17
**jokes**  185:16
**JP**  19:17
**Judge**  221:16
**judgment**  174:11
252:11
**Julie**  41:8  193:7
**jump**  126:1
**June**  1:12  5:9
288:13
**junior**  242:7  266:2
283:11
**Justice**  6:6  240:19
241:3, 5
**JUSTICE/CIVIL**  3:6

**< K >**
**KANELLIS**  3:4
**keep**  26:19  108:20
126:6  160:10  191:6
**Kellogg**  1:13  5:12
**kept**  228:20
**key**  78:25
**Khalil**  263:3, 7, 12,
16, 18  272:6, 12
274:2
**Khalil's**  272:3
**Khan**  254:22  255:9
**kind**  31:19, 20  99:10
108:14  158:15
**kindly**  261:20  272:8
**kinds**  116:19  200:8
274:14
**knew**  226:2
**KNIGHT**  2:17  5:23
6:1
**knocking**  174:6
**know**  7:11, 14  9:5, 6
12:25  27:2  28:8, 21
30:2, 8, 13, 17  31:11
35:1  38:6  41:17
43:21  44:3, 7, 8, 12
45:17  46:1, 3  47:2

51:2, 6, 7, 8, 12, 18
52:20, 22, 23, 25
53:22, 25  54:1, 3, 4, 6,
7, 9, 10, 14, 18, 22
55:3, 8  57:16, 20
60:5, 8  62:7, 11, 15,
20, 25  63:21  64:1
65:20  66:10  67:23
68:18  69:10  70:18
78:16  79:19  80:1, 6,
13  81:11, 14  92:18
93:7, 15  95:7, 16
99:20  100:10  101:9
102:4, 9, 14  103:11,
20  105:22  106:1
110:13  117:15  129:6,
7, 19, 22  130:4, 9
133:10, 12, 15, 17
134:2, 10, 19, 22
135:2  138:7  139:7
142:15  145:12  148:9
149:24  150:3, 17
151:13, 24  154:11
155:17  156:14  157:9,
13  159:4, 8, 25  160:2
162:3, 16, 24  163:2
164:14, 21  165:6, 21
166:8  168:1, 11
169:18, 21, 23  171:23
173:14  174:7, 21
175:16, 21  177:22
178:2, 7, 17  181:3, 7
183:3, 11, 20, 22
186:24  191:16  198:8
204:7  207:25  208:3,
4, 11, 14, 16, 19
210:23  211:2, 12
212:8, 14, 20  215:8,
11, 12  219:4  221:6
222:4, 12  224:13
227:18  228:23
232:17, 22  234:18, 22
240:8, 20  241:22
242:24  244:25  245:4,
16, 22, 25  246:25
248:5  249:19, 20
251:4, 16  252:23
253:1, 7, 10  254:19,
25  256:22  257:19, 23
258:5, 9, 18, 24

259:*15, 20*  262:*25*
263:*10*  264:*18*
267:*17, 18*  268:*18*
269:*18*  270:*10*
271:*10, 16*  272:*1, 4, 7,*
*9*  274:*21*  277:*8, 15*
278:*12, 14, 17, 18, 19,*
*22, 25*  279:*3*  280:*11,*
*21, 23*  281:*8*  282:*7,*
*13*  285:*21*
**knowing**  173:*7, 11*
**knowledge**  28:*20*
*29:13, 22*  37:*6, 13*
*41:4*  49:*1*  51:*16*
*52:10*  53:*5*  58:*9, 12,*
*15, 17*  59:*2, 14*  62:*4,*
*8, 12, 16*  72:*16, 25*
*78:7*  79:*22, 23*  95:*12*
*104:4, 7*  105:*20, 23*
*114:15*  123:*4*  125:*21*
*128:14*  131:*12, 15*
*133:3, 7*  148:*4, 6, 7*
*150:23*  162:*21*
*178:23*  190:*9*  253:*2*
*258:17*  272:*1*  275:*22*
**known**  29:*14*  34:*13*
*36:6*  278:*16*
**knows**  178:*7*  186:*11*
*268:21*
**KRISHNAN**  2:*16*
*5:25*

**< L >**
**labor**  112:*1*  119:*18*
*184:7*  201:*13*  214:*25*
*216:3*  217:*10*  219:*12*
*226:18*  232:*1*  233:*23*
*237:12*  238:*13*  247:*7*
*259:17*  260:*2, 16*
*261:5*  264:*1, 16*
*265:1*  266:*5*  267:*5*
*270:18*  281:*12*
**Lacks**  276:*18*
**Landau**  77:*12, 13*
**language**  118:*4*
*130:20*  131:*1, 6*
*133:1*  138:*4, 5*
*139:20*  142:*17, 23*
*143:4*  215:*13, 19*

**219:**8  256:*15*  257:*2,*
*5, 12*
**large**  35:*9*  266:*16*
**largely**  18:*4, 15*
**Lason**  204:*9, 10*
*205:7*
**lasted**  13:*23*
**late**  285:*21*
**law**  1:*13*  31:*22*
*32:19*  34:*1*  45:*21*
*65:23*  95:*9*  108:*12*
*146:5*  148:*19*  149:*11*
*166:22*  213:*9*  214:*8*
*219:25*  220:*2*  225:*13,*
*14*  227:*11*  228:*23*
*235:17, 25*  236:*16, 23*
*237:24*  238:*16, 17*
*246:10*  258:*10*  262:*3*
*265:13*  273:*8*  283:*15,*
*18*  284:*1*
**lawful**  91:*11, 19, 25*
*92:10*  93:*2, 6, 18*
*94:3, 15*  95:*1, 18*
*97:15*  98:*5*  100:*5*
*110:22*  111:*18, 22*
*112:5, 8, 14, 19*  113:*2*
*263:7, 21, 24*  264:*6,*
*14, 23*  265:*9, 19*
*266:3*  274:*8*
**lawyer**  9:*12*  12:*16*
*13:1*  66:*11*  92:*23*
*224:17*
**lawyers**  12:*18*  13:*13*
*14:1, 13, 22*
**lead**  38:*4*  244:*8*
*262:1*
**leadership**  10:*4*  23:*6*
*195:2, 8, 11*  256:*18*
*257:21*  276:*12, 15, 20*
*277:1, 8, 15*
**leading**  276:*16*
*277:2, 16*
**learning**  127:*1*
**leave**  246:*15*  247:*2*
**led**  239:*20*
**left**  146:*22*  147:*19*
*206:20*  282:*19*
**LEGAL**  3:*17*  13:*7*
*38:7, 8*  92:*22, 25*

**94:**21, 22, 24  95:*12,*
*14*  97:*2*
**lengthy**  10:*19*
**letter**  226:*16, 25*
**letters**  130:*10*
**level**  50:*6*  99:*9, 11*
*191:25*  192:*3*  243:*21*
*248:17, 23*  250:*8*
*266:21*
**levels**  35:*4*
**Lew**  101:*16, 18*
*160:24*
**life**  175:*23*
**likewise**  183:*4*
**limit**  126:*4*
**limited**  22:*19*  41:*5*
*225:2*
**limiting**  141:*15*
**limits**  221:*16*
**line**  161:*17*  221:*12*
*230:18*  258:*23*  286:*5*
**lingo**  126:*22*
**Lipschutz**  19:*8*
**list**  202:*15*  226:*12*
*267:9, 14*  269:*4, 7*
**literally**  285:*6*
**litigating**  221:*14*
**little**  34:*23*  198:*7*
*201:11*
**Lloyd**  52:*18, 19*
**Lloyd's**  52:*20*
**LLP**  2:*6*
**log**  185:*20*  269:*11*
*270:6*
**long**  10:*23*  11:*3*
*13:21*  100:*10*  126:*2*
*139:11*  161:*3*  185:*7*
*186:20*  210:*24*
*248:21*  270:*14*
*274:11*
**longer**  26:*25*  139:*7*
**long-standing**  59:*16*
**look**  24:*15, 16*  67:*2,*
*3*  69:*6*  85:*11*  86:*2*
*98:9*  127:*12*  157:*10*
*167:17*  176:*7, 16*
*180:24*  212:*3*  250:*15,*
*17*  256:*14*  257:*3*
*260:25*  262:*24*  266:*7*
*267:8*  269:*2*  275:*5*

**looked**  156:*19*
*256:25*  263:*21*  274:*1*
**looking**  17:*12*  34:*3*
*104:16, 21*  130:*1*
*147:18*  186:*15*
*202:14*  205:*14*
*212:20*  220:*19*  238:*7*
*239:25*
**looks**  18:*6*  151:*5*
**lot**  12:*13*  84:*1, 7*
*142:15*  158:*14*  173:*8,*
*10*  271:*24*
**Lots**  206:*4*
**lottery**  34:*14, 18*
**love**  215:*6*
**lower**  99:*12*  248:*23*
*266:20, 22*
**luck**  12:*4, 8*
**lunch**  79:*6*  146:*16*

**< M >**
**Madawi**  272:*20*
*281:2*
**M-A-D-A-W-I**  272:*20*
**Mahmoud**  263:*3*
**main**  259:*7*
**making**  82:*20*  92:*16*
*94:3, 14*  95:*8*  177:*8*
*216:12*  238:*24*  249:*5*
*263:23*  264:*13, 22*
*265:8*  268:*5*
**man**  261:*15*
**Management**  75:*8*
*96:25*
**manager**  191:*25*
**managing**  9:*21*
*78:14*  96:*20*  100:*25*
*169:13*  181:*17*
*184:10*  187:*25*
*196:14*  242:*13*  243:*2,*
*19*  265:*5*  266:*22*
**manifest**  125:*1*
**manner**  1:*21*
**Manual**  114:*7, 8, 9,*
*13, 21*  115:*5, 9, 12*
**March**  27:*16, 19*
*30:5*  38:*12*  41:*2*
*86:25*  87:*7*  129:*3*
*187:1, 7, 17, 19, 20*
*192:18*  194:*13, 14*

204:*17*  213:*3*  215:*21*
229:*10*  231:*18*
241:*14, 17*  245:*23*
279:*18, 23*
**Marci**  19:*17*
**MARCO**  1:*6*  5:*5*
255:*17*
**marked**  4:*13*  15:*9*
16:*4*  69:*3*  85:*22, 25*
222:*10*
**marks**  256:*16*
**mass**  268:*23*
**MASSACHUSETTS**
1:*1*  5:*7*
**material**  163:*21*
168:*8*
**materials**  178:*11*
**Matt**  196:*22*
**matter**  5:*4*  9:*15*
245:*15*  279:*5*
**matters**  93:*1, 4*
**Matthew**  9:*24*  29:*6*
**Maureen**  19:*10*
33:*24*
**MD**  265:*4*
**mean**  10:*2*  64:*22*
68:*21*  70:*12*  91:*21*
94:*17*  95:*20*  97:*1*
103:*6*  109:*16*  114:*1*
130:*5*  135:*21, 25*
136:*4, 6, 25*  137:*7, 14*
138:*11*  143:*6*  190:*19*
193:*14, 15*  197:*3*
201:*12*  219:*4, 7, 11*
222:*16*  224:*14*
225:*17*  230:*24*
238:*11*  239:*18*
244:*16*  264:*9, 10*
**meaning**  119:*17*
131:*19*  134:*24*
167:*15*  172:*17*
182:*21*  201:*1*
**meaningful**  129:*14*
**means**  63:*10*  84:*23*
130:*5, 6*  131:*13*
132:*1, 22*  135:*5, 12*
140:*9*  148:*8*  223:*16*
266:*20*
**meant**  152:*1, 4*
162:*4*  219:*7*  240:*1*

**measures**  58:*4*  59:*4*
63:*17*  105:*10*  183:*2*
**Media**  5:*2*  62:*10, 14,*
*19*  103:*19, 23*  104:*1*
125:*2*  151:*18*  152:*8,*
*20, 24*  155:*7, 11*
172:*21*  282:*7*
**medication**  7:*18*
**meet**  13:*12*  138:*25*
165:*23*
**meeting**  13:*21, 23, 25*
193:*2*  194:*5*  195:*21*
196:*7, 10*  197:*1, 8*
200:*15, 17*
**meetings**  169:*1*
193:*22, 25*  194:*2, 10,*
*17*  195:*2, 5, 6, 7, 9, 12,*
*14, 16, 18, 19, 24*
197:*5*
**members**  184:*5*
201:*18*
**memo**  49:*2, 4, 5, 13,*
*16, 25*  50:*19, 22*  51:*4,*
*12*  59:*8, 17*  64:*18*
73:*10, 12*  97:*13*
98:*11, 16, 18*  99:*10,*
*13, 16*  100:*4*  113:*12,*
*15, 19*  215:*10*  217:*23*
220:*20*  222:*8, 11, 18*
226:*7*  227:*14*  230:*19*
231:*5, 13, 25*  232:*6*
233:*19, 20, 25*  234:*1,*
*25*  238:*2, 10*  239:*9*
241:*19*  244:*4, 9, 15*
249:*9, 18*  251:*7*
252:*23*  257:*2, 6, 7*
259:*2*  261:*20*  265:*8,*
*11*  272:*4*
**memoranda**  266:*8*
283:*3, 5*
**memorandum**  231:*18*
255:*3, 9, 11, 12, 15, 18*
256:*4, 5, 22*  257:*1*
263:*6, 15, 20*  282:*25*
**memorialized**  267:*13*
**memorized**  46:*18*
47:*25*  76:*1*  251:*6*
**memory**  72:*11*
112:*10*  180:*25*

226:*10*  227:*3*  234:*4*
264:*4*
**memos**  49:*7*  64:*3, 5,*
*15, 24*  65:*4, 7, 14*
66:*12*  67:*18*  99:*23*
100:*12, 18*  106:*24*
107:*18, 23*  231:*4*
235:*9, 12*  239:*2*
242:*5*  250:*3*  257:*13,*
*16*  263:*20*  270:*20*
273:*6*
**mention**  35:*23*  66:*17*
88:*13*  108:*15*  279:*7*
**mentioned**  9:*4, 25*
18:*18*  20:*11, 17*
22:*20, 22, 24*  23:*3*
26:*1*  30:*7*  35:*11*
36:*20*  46:*9*  47:*15*
48:*21*  50:*16*  57:*13*
58:*21*  71:*1, 2*  74:*12,*
*21, 24*  78:*10*  80:*12,*
*19*  88:*21*  89:*8*
108:*12, 13*  110:*19*
118:*17*  121:*23*  125:*4*
138:*2*  157:*23*  158:*10*
165:*13*  166:*14*  168:*2*
179:*6*  184:*22*  189:*22*
196:*16*  208:*25*  209:*9*
248:*3*  260:*9*  268:*13*
277:*21, 23*
**message**  90:*24*
129:*18*  175:*3*
**messages**  90:*14, 16,*
*17*  103:*13*
**met**  247:*4*
**methods**  209:*25*
**Michael**  37:*18*
**mid**  99:*11*
**middle**  69:*7*  132:*4*
259:*10*
**migration**  48:*4, 7*
50:*17*  71:*4, 6, 19*
**military**  141:*15*
**Miller**  204:*3, 13*
205:*12, 21*  206:*23*
207:*20*  208:*2, 21*
210:*7*
**Milotvic**  19:*18*
**mind**  84:*19*  101:*3*
279:*16*

**minute**  86:*16*  148:*12*
236:*12*
**minutes**  11:*1, 8, 9*
13:*24*  79:*5*  211:*2*
284:*10, 13*
**missed**  207:*7*  212:*23*
**Mission**  277:*10, 18*
**missions**  60:*21*
**misspoke**  70:*2*
**Misstates**  228:*7*
**mistaken**  189:*23*
271:*9*
**misunderstood**  60:*12*
**Mm-hmm**  187:*15*
**Mohsen**  272:*20*
281:*2*
**moment**  7:*5*  25:*2*
26:*24*  46:*25*  48:*14*
67:*1*  69:*12*  79:*14*
82:*11*  86:*14*  101:*5*
104:*3*  117:*21*  127:*19*
135:*4*  151:*3*  152:*15*
162:*14*  167:*20*
171:*21*  172:*23*
196:*24*  206:*5, 11*
222:*19*  240:*25*
242:*18*  262:*16, 22*
272:*15*
**moments**  256:*25*
**Monday**  285:*17*
**money**  138:*19*
**monitoring**  62:*23*
103:*22*
**months**  161:*5*
219:*15*  229:*23*
230:*12*  240:*14*
**morning**  6:*23, 24*
**Morris**  22:*20*
**moss**  256:*17*
**mountains**  139:*25*
**move**  35:*20*  83:*11*
206:*21*  262:*17*
**movement**  119:*18*
**movements**  119:*6, 15,*
*17*
**MRN**  104:*18*  129:*17*
151:*22*  189:*25*
**multi-page**  85:*24*
**multiple**  28:*7*

Deposition of John Armstrong                                     AAUP, et al. v. Rubio, et al.

**Myers** 22:*23* 26:*17,*
*20* 27:6 29:4 36:*24*
37:8 52:5, *9* 187:*25*
196:*15*

**< N >**
**name** 19:*20, 21* 36:5
52:*21* 77:*13* 87:*14*
90:22 100:*11* 204:7
211:*8* 243:6 275:*14*
281:*9, 24* 282:*3, 13,*
*17*
**names** 78:*16*
**national** 41:*12* 57:*23*
58:*24* 63:6 72:20
73:*21* 74:*10* 76:*16*
105:*12* 122:*19* 261:7,
*9, 13*
**Nationality** 189:*1*
**natural** 245:7
**Naturalization** 35:*15*
**nature** 32:*19* 243:*15*
**Nazi** 143:7
**Nazis** 143:*3*
**necessarily** 1:*22*
113:*13, 16* 114:*17*
148:*18* 224:2
**necessary** 244:*12*
**need** 9:5 28:2, *4*
32:*21* 67:*3* 72:*11*
73:*12* 96:*8* 108:*18*
142:*15* 145:5 146:7
147:6 168:*23* 170:*3,*
*13* 175:*21* 180:7
199:7 242:2 248:*18*
249:*4* 262:*14*
**needed** 175:2 192:*1*
206:*15*
**Needham** 37:*18* 53:*1*
74:20
**needing** 144:*25*
**needs** 175:*20*
**Neither** 231:*19*
233:*12* 288:*9*
**never** 204:*23*
**New** 2:9, *21* 19:*20*
42:25 103:2 109:*14*
116:*18* 117:*1* 122:7,
*15* 124:2, *6, 14*
151:*17* 152:*3, 6, 12*

153:7 154:*1* 187:*3, 5*
188:2 189:*14* 190:7
192:*15, 18* 193:*3, 6*
199:*20* 201:6 204:*17*
245:*24*
**newly** 123:*16* 125:5
**news** 62:*14* 272:*14*
**nice** 206:*13*
**NIV** 29:*14* 34:*4*
**nod** 24:*17, 23*
**Noe** 19:*17*
**non-citizen** 262:*10*
**noncitizens** 121:*17*
152:*21* 167:*14*
170:*23*
**non-citizens** 209:*8*
253:*16* 272:*19* 273:7,
*13* 283:*21*
**nonclassified** 30:*15*
31:*9, 12* 32:*18*
**non-Government**
279:*14*
**nonimmigrant** 29:*14,*
*16* 88:*11* 91:*16*
103:22 109:6, *11*
110:*20*
**non-immigrant**
197:*20* 199:2, *16*
200:*1, 8* 203:22
205:*8* 243:9 275:*18*
**non-privileged** 220:*13*
**non-recurring** 194:*1*
**non-Visa** 165:*16*
**nope** 52:5
**Normally** 19:*19*
**Norris** 9:*21* 10:*10*
11:7 12:7, *8* 78:*14,*
*15* 169:*13, 24* 181:*18*
184:*11* 188:*1* 196:*14*
242:*13* 243:2, *19*
244:25 265:5
**Northwest** 5:*12*
**notarial** 288:*13*
**Notary** 1:*17*
**NOTE** 1:*20* 268:*16*
**noted** 71:*17* 97:*3*
221:*18* 266:*13* 287:*8*
**notes** 239:*9*
**noticing** 5:*17* 24:*13*

**notification** 225:22
263:2
**notify** 223:*15* 224:*19,*
*23*
**Noting** 149:*9*
**noun** 207:*13*
**NSC** 162:*13, 18*
271:7
**NUDELMAN** 3:*25*
5:*14*
**number** 8:*19* 15:2
35:6 69:*1* 86:6 99:5
104:20 129:*14, 15, 18*
151:7 199:*25* 201:*4*
203:*11, 17*
**numbers** 86:*4* 212:7
**NW** 1:*15* 3:*19*
**NY** 2:9, *21*

**< O >**
**oath** 6:*16*
**object** 12:*15* 30:25
31:*14* 32:*16* 39:*15,*
*16* 40:*18* 47:7
119:*23* 121:*14*
128:*21* 154:*19*
209:*10* 210:2 220:*10*
221:*12* 236:2 282:*24*
284:5
**objected** 23:*14* 43:*19*
**Objection** 10:*21*
12:*20* 14:8, *16, 17*
21:2 22:*11* 23:*11*
24:*17* 27:*23, 24*
30:*18* 31:*14, 21*
38:22 39:6, *20* 40:*4*
42:*17* 43:2, *9, 15, 24*
44:24 45:*12* 46:*14*
47:*10, 21* 48:*23, 24*
49:*19* 51:*21* 53:*9, 16*
55:*21* 56:2, *9, 14, 20*
57:*3, 8* 59:*12, 13*
60:*19* 63:*1, 18, 25*
64:*8* 65:*18* 68:5
71:*24, 25* 72:8, *21, 22*
73:*23* 75:22 76:*18*
78:*3, 4, 20* 80:5 81:*3*
82:*1, 15* 84:*14* 87:*20,*
*21* 88:*9, 10* 89:*19*
91:*5, 13* 92:6 95:*4*

97:8 98:*21* 99:*3, 18,*
*19* 101:*11, 12* 102:22
103:5 104:*10* 111:*3,*
*20* 113:*5, 6, 24*
115:*18* 116:*20* 119:*8,*
*16* 120:*13* 121:*18, 25*
122:*10* 123:5 124:9
128:*16* 133:5, *6, 25*
134:*12* 136:*8* 139:22
140:*6, 14, 23* 141:*5,*
*10, 16, 22* 142:*3, 5, 13,*
*24* 143:5, *13, 20*
144:*3, 6, 7* 145:*23*
146:*4* 150:22 152:22
154:*20* 155:*12*
158:22 161:*12, 17*
162:*10, 19* 163:*20*
164:*17* 165:*18*
166:*10* 168:*15*
170:*10, 25* 173:*4, 23*
174:*18* 175:*10* 176:*3*
177:*20* 178:*15*
179:22 183:*9, 18, 23*
184:7 185:*12* 186:*8*
187:8 192:*21* 197:*25*
201:*13* 205:*15, 24*
209:*1, 13, 16, 17*
211:*11* 213:*8* 214:*6,*
*25* 216:*3* 217:*9*
218:*11* 219:*12, 23*
220:2 221:*17* 223:*20*
224:25 225:*24*
226:*18* 227:*10, 21, 25*
228:7 229:*19* 230:2
232:*1, 10* 233:22, *23*
235:*16, 24* 236:22
237:6, *11, 23* 238:*13*
239:*16* 240:*15*
242:22 247:7 251:*14*
258:2 259:*17* 260:2,
*16* 261:5 264:*1, 16*
265:*1* 266:5 267:5
270:*18* 274:9, *19*
275:*4* 276:*18* 277:*12*
281:*12*
**objections** 206:*20*
**obligated** 84:*16*
**obtain** 224:*15*
**obviously** 161:*18*
202:6 232:*13* 248:*16*

occasion 187:*16*
202:*24* 203:*3, 4, 7*
244:*20*
occasions 203:*20*
occurred 275:*21*
occurring 121:*8*
offered 152:*3, 6*
offering 152:*7*
offers 152:*7*
OFFICE 3:*17* 9:*19*
10:*1, 2* 17:*16, 17, 18*
18:*3, 8, 13, 20, 21, 22,
23, 24, 25* 19:*5, 25*
20:*11, 20* 53:*1* 60:*2*
61:*9* 75:*5, 6, 7, 10*
77:*11, 14* 78:*14* 79:*2*
91:*24* 92:*8* 94:*1, 6,
13, 17, 18, 23, 25*
96:*14, 15, 20, 21, 23,
24* 97:*2* 98:*18, 24*
99:*2, 7, 10* 129:*25*
134:*5, 9* 145:*6, 10, 13*
150:*16* 162:*6* 169:*10*
177:*14* 178:*12* 179:*3*
181:*4, 9, 16, 21* 182:*1,
16, 25* 183:*6, 16*
184:*1, 4, 5, 12, 13*
189:*5* 194:*24, 25*
195:*6, 7, 20, 21, 25*
196:*2, 6, 10, 23* 242:*7,
14, 17* 243:*5, 12, 20,
23* 244:*21* 245:*2*
248:*11* 265:*4, 5*
267:*24, 25* 270:*9*
Officer 190:*18*
191:*13* 192:*1* 247:*19,
24* 248:*14, 25* 250:*14*
288:*3*
officers 130:*17*
145:*4* 151:*17* 190:*20*
191:*5, 7* 248:*15*
offices 1:*13* 5:*11*
18:*16* 19:*1* 20:*10, 17,
18* 69:*23* 73:*10, 12,
13, 18* 75:*1, 12* 96:*9,
12* 97:*5*
official 17:*1* 50:*6*
115:*16* 149:*13, 17*
192:*5* 288:*21*

officials 48:*3* 50:*16*
71:*3, 18* 80:*23* 83:*9*
Oh 19:*20* 25:*8* 46:*6,
8* 74:*18* 96:*5* 105:*13*
126:*18* 176:*9* 195:*9*
199:*12* 221:*25* 238:*6*
274:*11* 281:*25*
Okay 5:*19* 7:*24*
11:*2* 16:*4, 23* 19:*13*
21:*15* 25:*8, 13, 21*
27:*5* 31:*25* 33:*5*
36:*12* 37:*22* 38:*10*
39:*18* 46:*23* 51:*19*
55:*18* 57:*19* 61:*25*
67:*8* 69:*24* 72:*13, 15*
74:*12* 79:*14* 81:*15*
85:*20* 86:*9* 87:*4*
91:*1* 93:*8* 96:*6*
97:*24* 101:*5* 106:*16*
108:*18* 113:*18, 22*
116:*7* 122:*15* 125:*14*
126:*18* 127:*4* 128:*23*
132:*9* 134:*17* 139:*11,
13, 14* 146:*15* 147:*2,
3, 8, 19* 151:*2, 16*
157:*23* 158:*8* 160:*12*
165:*12* 166:*13*
168:*17* 169:*18*
171:*11, 21, 25* 172:*25*
176:*15, 17* 178:*10*
185:*25* 186:*7* 187:*1*
192:*15* 193:*21*
194:*22* 198:*12, 19*
199:*10* 200:*23*
201:*22* 202:*21*
204:*25* 206:*17*
212:*25* 213:*23*
221:*17* 222:*7* 228:*3*
230:*18* 236:*22* 237:*3*
238:*21* 245:*10, 12*
246:*17, 25* 252:*22*
253:*12, 14, 25* 255:*1,
8* 261:*16, 22* 263:*1*
266:*24* 270:*11* 272:*3*
273:*25* 274:*13*
278:*18* 281:*5* 282:*19*
284:*4, 13, 21* 285:*5,
19*
Okeemah 1:*16, 25*
6:*15* 288:*3, 20*

Olowski 101:*15, 16,
18* 102:*5* 160:*24*
163:*6, 8, 15, 19* 164:*6,
8* 169:*20* 196:*1*
once 13:*15* 60:*14*
71:*10* 222:*3*
ones 9:*17* 24:*3*
71:*11* 80:*18* 101:*1*
192:*8* 207:*22* 210:*9*
ongoing 29:*24* 30:*6*
222:*20* 225:*16*
227:*15* 228:*14, 15*
229:*11*
Op 220:*21, 23* 221:*1,
3* 222:*9, 11, 14*
239:*10*
open 59:*25*
operation 225:*25*
228:*17, 21*
operational 222:*21*
225:*17, 21* 227:*16, 19*
228:*14, 15* 229:*4, 11*
operations 20:*5, 8, 13*
21:*8, 9* 181:*13, 20, 22*
184:*1, 11, 13*
OPERATOR 3:*25*
opinion 92:*25* 94:*22*
137:*16, 17, 18* 138:*20,
21* 140:*8, 16* 142:*22*
144:*16* 145:*5, 8*
148:*1, 17* 149:*16, 21*
154:*21* 174:*13* 230:*5*
245:*15*
Opinions 145:*15*
146:*2* 147:*21* 149:*2,
8* 150:*1, 5, 14, 19*
opportunity 33:*15*
34:*19* 128:*23*
oppose 217:*12*
opposed 75:*20* 97:*7*
98:*19* 99:*25* 102:*11*
118:*8* 119:*6* 252:*24*
order 27:*13* 57:*15,
21* 58:*1, 3, 7, 22* 59:*4*
63:*4, 11, 16* 72:*12, 18*
73:*19* 74:*2, 3, 8*
75:*20* 76:*14* 78:*2*
82:*22* 104:*9, 14*
105:*9* 110:*4, 6, 8*
122:*17, 24* 123:*18, 22*

124:*2, 4, 8, 23* 125:*16*
148:*21* 170:*4* 176:*6*
177:*4* 179:*7, 8, 12, 19*
180:*17* 183:*1, 7*
184:*16, 20*
orders 57:*12, 17*
58:*11, 14, 18* 63:*24*
72:*7* 105:*6, 14* 106:*4,
9, 20* 107:*1, 20, 24*
122:*9* 158:*4* 160:*21*
167:*15, 18, 23* 170:*5*
178:*8, 9* 184:*6*
205:*13, 22* 280:*2, 15*
285:*10*
ordinarily 22:*9*
ordinary 224:*18*
269:*22*
organization 117:*17*
125:*6, 18* 130:*23*
132:*17* 135:*7, 15*
136:*2* 138:*16, 19*
214:*5* 215:*18* 218:*5*
219:*3, 22* 220:*9, 22*
231:*24* 233:*16*
239:*11* 240:*2, 6*
256:*21* 257:*11*
277:*24*
organizational 19:*3*
76:*25* 77:*2* 79:*1*
organizations 54:*25*
55:*6* 56:*19* 57:*2*
88:*20* 119:*18* 121:*24*
123:*11, 12, 16, 17*
125:*17, 24* 138:*10*
218:*16* 276:*5*
organizing 260:*19*
origin 282:*3*
original 247:*16*
ought 97:*25*
outcome 288:*11*
outset 200:*22*
outside 111:*10*
153:*10* 221:*13*
232:*11* 239:*2* 242:*14*
272:*9, 12* 277:*3*
overall 170:*6*
overhead 174:*7*
overlay 17:*16*
Oversea 19:*25*

**Overseas** 18:*8*
111:*15*
**Oversee** 17:*17* 19:*25*
20:*5, 8, 11*
**overseen** 193:*3*
**oversight** 190:*20*
**overstate** 199:*6*
**Ozturk** 211:7, *12*
213:7, *14, 25* 214:*19*
218:*1, 13, 14* 219:*18,
20* 220:8, *20* 222:9,
*15* 226:7 227:7
228:*4, 12* 231:5, 6, 21
233:*10, 11, 14* 235:2,
*10, 15* 239:9 241:*11*
245:9, *15, 18* 247:*1*
251:8 253:*13* 257:*1*
274:2
**Ozturk's** 211:*10, 16,
21* 223:10 225:22
238:*3* 239:*15* 241:*16*
245:*21* 247:5 249:*1*
252:23 257:6

**< P >**
**P.L.L.C** 1:*14*
**p.m** 25:*17* 33:9
79:9 128:9 147:*12*
172:*12* 206:8 223:5
246:20, *21* 273:20, *21*
284:*15, 16, 17*
**PAGE** 4:*3, 11* 7:6
15:22 45:24 46:24
66:*19, 20, 21, 22* 69:6,
*7, 9* 70:*13* 86:4, 6, *10*
104:20, *23* 126:*12*
127:8 130:2, *15*
151:*4* 212:6, 22, 23
232:20, *21* 233:*1, 6*
254:3, *13* 256:15
257:4 259:6 262:*19*
284:*23* 286:5
**pages** 69:2 262:23
287:*4*
**painful** 198:9
**Palestine** 139:*20*
140:*3* 141:*20* 173:2,
*20* 174:16 175:4
240:*19* 241:*3, 5*
**Palestinians** 141:*21*

**paper** 130:*25* 179:9
225:*19*
**paragraph** 16:*25*
45:25 46:8, *24* 47:*1,
4, 9* 65:9, *16* 66:*19,
23, 24* 67:20, *25*
130:3, *5, 15, 16, 19*
131:*21* 132:5 138:25
139:*1, 4, 21* 140:4, *13,
22* 142:23 143:4, *11,
15, 19* 144:*1* 145:2
151:4, *11, 13, 16, 21*
152:2, *5, 13* 153:5, *14,
25* 188:23 189:*11, 16,
20* 190:4, *13* 192:*10*
222:20 233:*1, 21*
247:*17* 259:7
**paragraphs** 284:*23*
**parallel** 69:*19, 25*
**Pardon** 157:*12*
**part** 10:*3* 15:*21*
20:*4* 23:5 26:9 35:6
40:*24* 41:*19, 24* 42:4,
*6* 65:2, *3, 8* 73:6
76:7, *14* 77:17, 25
78:*17* 91:25 92:*16*
94:*19* 95:9 96:7, *14*
106:*19* 107:*18*
110:25 111:9, *16*
112:*12, 24* 114:*17*
116:8 122:5 123:*19*
127:*11* 129:22
133:*13, 18* 136:*19*
145:*13* 152:*10, 12*
166:*19* 187:5 189:*3*
190:*21* 192:*17, 25*
193:*21* 197:*15, 23*
199:*20* 203:23
207:*19* 217:*13, 21*
218:6 220:*18* 225:*14*
241:*24* 246:*12*
265:*13* 267:*1, 19*
268:*4* 269:*16* 270:*14*
276:9 280:25
**partake** 35:*4*
**partially** 190:*17*
**participants** 208:*12,
15, 17, 20*
**participate** 156:5

**participated** 194:*18*
198:*25* 199:*14, 25*
269:5 283:*12*
**participates** 95:*17*
**particular** 20:22
23:*24* 26:5 29:9
45:*10* 49:8 68:*15*
77:*24* 84:*20* 88:8
98:*8* 99:*15, 23*
110:*24* 111:*16*
127:*19* 134:5 137:*3*
145:*1* 147:*24* 149:*1,
3* 162:6 164:*20*
177:*9, 19* 178:*4*
182:*15, 24* 183:5, *15*
188:*14* 191:*20*
209:*24* 211:6 212:*1*
240:*11* 243:7 251:2,
*5* 267:*15* 268:*10*
269:*12* 276:*14*
282:*10*
**parties** 277:*3, 6*
288:*10*
**Partly** 20:*3*
**parts** 65:5 93:*14*
114:*11, 12* 275:*17*
**party** 5:*17* 197:*18*
198:*14*
**pass** 68:*25* 85:*21*
221:*19* 232:6
**Passport** 17:*18*
18:*13* 20:*1* 21:*13*
**passports** 17:*11*
18:*12* 21:7
**patriotism** 140:*17, 18*
**pause** 55:*17* 131:*24*
213:5
**Peace** 240:22, *24*
259:*10*
**peacefully** 259:*13*
260:*1, 14*
**pending** 7:*14*
**people** 9:*19* 11:*11,
14* 22:16 28:*12*
32:*11* 34:16 36:15
37:6, *11, 14* 48:6
49:8 50:*10* 52:*10*
60:2 65:23 76:25
77:24 78:*10, 13, 15*
85:2 93:*15* 96:*21*

99:5, *6* 103:9 109:*13*
126:*20* 138:*18*
140:*10* 150:*15*
171:*18, 19, 20* 177:*14*
181:*14* 182:9, *13, 15,
23, 25* 183:4, *6, 14, 16,
25* 194:25 201:*23*
203:*13* 207:4, *8*
208:*1, 5, 7, 9* 228:24
243:*3, 17* 246:*11, 12*
248:2 253:*19* 265:25
266:25 267:9, *14*
270:9 271:6 278:*14*
**People's** 281:*14, 17,
25*
**percent** 37:*1* 105:*17*
200:*17, 18* 201:8
267:7 269:*19, 21*
**perform** 219:*18*
**performed** 79:*21*
282:*10*
**permanent** 91:*12, 20,
25* 92:*10* 93:2, 6, *18*
94:4, *15* 95:*1, 18*
97:*15* 98:5 100:5
110:22 111:*18, 22*
112:5, 9, *14, 19* 113:2
263:7, *22, 25* 264:6,
*14, 23* 265:9, *20*
266:4 274:8
**person** 9:*20* 19:*20*
22:25 34:9 49:*23*
52:*16* 62:*21* 66:8, *13*
76:*19* 78:*17* 81:24
88:5 96:*19* 98:2, *15*
99:*16* 100:*21, 22, 23*
129:*23* 131:8 134:*3*
135:5, *19* 145:*12*
150:4, *9* 162:7
241:25 242:6, *18*
243:25 244:*13*
255:23 263:9 264:24
265:3 266:2, *20*
267:*19* 268:4 269:*12*
271:*12* 283:7, *11, 12*
**personal** 211:9
**personally** 93:*24*
211:*13* 217:3 230:*21*
250:2 266:*14* 268:*19*
285:2

**personnel** 18:*23*
101:*25* 181:*4, 10*
195:*6, 7, 20* 280:*7, 9, 20*

**persons** 48:*10* 71:*5*
162:*22*

**person's** 66:*5* 82:*8*
177:*9* 241:*20*

**perspective** 159:*2, 12*

**persuades** 130:*21*

**PERT** 101:*25*

**pertinent** 189:*3*
190:*21*

**ph** 19:*18* 271:*8*

**phrase** 112:*16*
137:*13* 225:*16*

**phrasing** 141:*12*
144:*11*

**pick** 224:*17*

**picked** 34:*18*

**picture** 175:*14*

**Piece** 10:*9, 24* 130:*25*

**Pierce** 9:*24* 10:*13*
11:*6, 21* 19:*6* 29:*7*
52:*8* 196:*22*

**pile** 176:*16*

**place** 5:*11* 16:*13*
158:*10* 202:*6* 204:*17*
246:*15* 251:*18*
274:*24* 276:*22*

**Plaintiffs** 1:*3, 11* 2:*3,
14* 5:*21, 24* 6:*2, 4*

**plan** 139:*7*

**planning** 75:*10*
96:*24* 176:*13*

**plans** 225:*13* 246:*2*

**play** 20:*18* 75:*13*
92:*16*

**played** 92:*19*

**players** 79:*1*

**plea** 55:*2*

**please** 5:*15* 7:*8, 11*
10:*12* 17:*8, 21* 19:*15*
45:*4, 23* 46:*23, 25*
47:*19* 51:*9, 10* 66:*19*
67:*9* 69:*6, 9* 79:*7*
86:*6* 106:*6* 130:*2*
139:*3, 4* 147:*5*
151:*11* 153:*24*
168:*22* 172:*1, 24*

176:*25* 214:*22*
232:*21* 234:*3* 235:*4*
253:*10* 262:*22*

**plural** 233:*18*

**PO** 3:*8*

**point** 7:*13* 50:*25*
64:*11, 12* 118:*21*
119:*2* 120:*7* 124:*18*
210:*13* 219:*1* 239:*8*

**policies** 40:*6* 42:*8*
47:*16, 24* 48:*9, 11, 14,
16, 21* 50:*14* 61:*20*
62:*2* 63:*4, 8, 15, 22*
68:*11, 17* 70:*12*
71:*22* 79:*15, 16, 20*
80:*3, 8, 10* 81:*1, 16,
20* 82:*13, 20, 21* 83:*5,
11, 14, 23* 84:*4, 9*
106:*2, 23* 189:*12, 14*
209:*25*

**policy** 34:*4* 35:*12, 16*
36:*1, 7, 9, 13* 37:*6*
38:*11, 16, 20* 39:*5, 19,
25* 40:*9, 10, 23* 41:*16,
19* 42:*6, 10, 13, 22, 24*
43:*6, 8, 12, 13* 44:*4, 6,
11, 16, 20, 23* 45:*7, 11,
18, 19* 47:*3, 20* 48:*1,
5* 49:*18* 59:*9, 10, 17*
60:*6, 10, 14* 62:*5, 10,
14, 18* 64:*6, 16, 19, 23*
67:*24* 68:*19* 69:*8*
70:*13* 71:*2, 4, 6, 10*
72:*6, 17* 73:*6, 9, 18*
74:*23* 75:*10, 15, 19*
77:*6* 78:*1, 19* 81:*7,
24* 82:*24* 84:*13, 20*
93:*20* 94:*10* 95:*3, 10,
21* 96:*1, 23* 97:*17, 20*
98:*7* 100:*6* 102:*21*
104:*4, 8* 105:*5, 21*
106:*6, 25* 112:*15, 20*
113:*4* 131:*2* 143:*3,
25* 144:*14, 22* 145:*22*
155:*23* 156:*3* 157:*21,
24* 160:*22* 165:*5, 10,
14, 15* 166:*14* 167:*4,
9* 168:*4* 183:*17*
189:*9* 190:*3, 5, 7*
214:*2, 21, 24* 215:*15*

216:*2, 11* 217:*6, 15,
19* 218:*2, 9, 12, 13, 20,
22, 23* 219:*10* 251:*10*
256:*1* 257:*8* 259:*13,
25* 260:*14* 261:*4*

**policy-making** 60:*10*

**political** 19:*22* 75:*7*
77:*15*

**population** 34:*25*
35:*7*

**posed** 33:*16*

**position** 26:*25* 27:*2*
29:*2* 33:*2* 37:*21, 22*
112:*13* 137:*20*
144:*25* 159:*19, 20*
160:*5* 167:*24* 180:*22*
181:*25* 192:*4* 194:*12,
16* 198:*22* 199:*21, 23,
24* 201:*7* 215:*25*
225:*3* 234:*11* 244:*7*
259:*24* 260:*5, 12, 24*
261:*10* 278:*7* 279:*8*

**positions** 50:*11*
180:*23* 216:*10*

**positive** 59:*16* 138:*17*

**possibility** 34:*4*
224:*13*

**possible** 20:*21* 52:*16*
102:*13* 110:*17*
142:*19* 180:*6* 218:*25*
243:*1* 285:*20*

**possibly** 26:*17*
142:*14* 144:*2, 10*
215:*5*

**Post** 231:*13, 18*
232:*5* 233:*3, 7*

**posts** 61:*3, 6* 90:*5*
107:*15*

**potentially** 37:*8*
255:*25* 259:*9* 270:*15*

**power** 82:*5* 93:*15*
94:*9* 248:*15* 251:*12*

**practice** 163:*11*
234:*25*

**precedence** 61:*3*

**precisely** 154:*14*
250:*19*

**precision** 11:*10*

**predecessor** 193:*7*

**predecessors** 193:*8*

**pre-decisional** 198:*1*

**prefer** 232:*23*

**prejudice** 171:*19*

**pre-maritime** 279:*23*

**preparation** 169:*2*

**prepare** 14:*2, 14, 20*
22:*10*

**prepared** 22:*5* 168:*3*

**preparing** 22:*14*
26:*23*

**prerogative** 111:*24*
246:*13*

**presence** 255:*24*

**PRESENT** 3:*24*
5:*15* 52:*7* 253:*4*
261:*8*

**presented** 48:*21*
49:*2* 50:*18* 229:*10*
272:*8*

**Presently** 101:*24*

**President** 142:*8*
178:*9* 184:*18* 204:*21,
24*

**presidential** 158:*23*
159:*22* 160:*14*
205:*16, 25* 209:*4, 19*

**press** 59:*23* 62:*6*
268:*19*

**pretty** 173:*25*

**preventing** 21:*7*

**Prevention** 18:*20*
20:*23* 21:*1, 4* 130:*6,
13*

**previous** 22:*22* 35:*3*
36:*23* 71:*12* 80:*21*
158:*1* 162:*22* 177:*4*
179:*12, 19*

**previously** 22:*20, 21,
24* 35:*8* 36:*20* 78:*10*
90:*11, 19* 97:*3*
196:*16*

**principal** 22:*22*
26:*16* 29:*3* 36:*23*
50:*3* 52:*8* 78:*12*
100:*22* 196:*17*

**principally** 18:*9*
112:*5* 243:*12*

**principals** 50:*5*
136:*24*

**Principle** 96:*18*
187:*24* 196:*21*
242:*15* 250:*21*
**prior** 179:7 228:*8*
241:*18*
**private** 48:6 71:*5*
**privilege** 12:22
14:*10* 30:23 31:*20*,
*23* 38:24 39:*8, 22*
40:20 42:*19* 47:*12*
51:23 53:*11, 18*
55:23 56:4 68:7
120:*15* 121:*19*
128:*18* 158:24 159:2,
*23, 24* 160:*14, 15*
161:*14* 163:22 165:*1*
168:9 185:*19* 186:*1*
198:*2, 3* 205:*17*
206:*1* 209:*3, 4, 11, 19*
213:*10* 214:8 219:25
220:3 227:12 235:*18*
236:*1* 238:*18* 253:*17*
258:*10* 262:2, *4, 8, 15*
273:8, *11* 283:*16, 18,*
*20* 284:2
**privileged** 12:*17*
13:2 14:9 31:2, *16*
32:*18* 33:*1* 38:23
39:7, *21* 40:*19* 47:*11*
51:22 53:*10, 17*
55:22 56:3 68:6
146:6 148:*18* 149:7,
*11* 163:*21* 220:*11*
236:*16, 24* 237:24
238:*16*
**privileges** 209:*14, 20*
210:*4* 272:24
**privy** 271:*15*
**pro** 243:*14*
**probably** 99:6
141:*23* 142:25
169:*17* 175:*14*
183:*12* 203:*18*
245:24 285:*17*
**problem** 33:*3*
**procedure** 59:*16*
248:22
**procedures** 250:*25*
**proceed** 6:*16*
**proceeding** 5:*18*

**Proceedings** 25:*17*
33:9 246:*21* 273:*21*
284:*17*
**process** 38:24 39:*8,*
*22* 40:20 42:*18*
47:*12* 51:23 53:*11,*
*18* 55:23 56:4 60:*10*
68:7 73:7, *8* 75:*21*
81:6 93:*11* 96:3, *7*
102:*15* 103:*3* 111:*23*
120:*15* 121:*19*
127:24 128:*17*
159:24 160:*15*
161:*13* 163:22 168:9
187:*3, 5* 188:2 193:*3,*
*6, 11, 13, 15, 19*
196:20 198:*3* 209:*3,*
*18* 226:5 236:*3*
259:*10* 262:7 263:*23*
264:*10, 13* 265:*17*
273:*11* 283:9, *16, 20*
284:*1, 7*
**processes** 42:*25*
124:7, *14, 15, 17*
**produce** 234:*3*
238:22
**produced** 231:*4, 21*
233:*13* 235:9
**product** 178:*20, 24*
**PROFESSORS** 1:*3*
5:*5*
**profile** 226:*24*
**program** 20:*23* 21:*1,*
*5* 34:*13, 16*
**programs** 124:*3, 5, 15*
**pro-Hamas** 88:*4, 17,*
*24* 89:2 117:9
120:*11* 121:*3, 17*
167:*4*
**project** 26:*10, 13*
27:7, *11, 14, 19, 22*
28:*1, 9, 10, 22* 29:*23*
35:22 36:*13* 37:7
38:*11, 14, 16, 18, 20*
39:*5, 19* 40:*10, 24*
41:*16, 20* 42:6, *13*
44:4, *20, 23* 45:7, *11,*
*18* 47:*3, 8* 48:*19*
51:*3, 14* 52:*3, 14*
53:*4, 8, 14, 15, 24*

54:2, *5, 8, 11, 15, 19,*
*23* 55:*4, 9, 19* 56:7,
*12, 17, 23* 57:6, *11*
58:*10, 13, 19* 59:*3*
67:*24* 79:*17*
**projects** 23:7, *9* 26:2
28:*13, 15, 16, 18* 30:6,
*8, 9, 16* 31:9, *12* 32:2,
*5, 8, 10, 13, 14* 33:*20,*
*23* 280:*9*
**prolific** 275:7
**promise** 122:*5*
269:*20*
**prompted** 27:*21*
127:*20, 21* 128:*1, 14*
134:*19*
**pro-Palestinian**
118:*15, 25* 119:*5, 14*
120:*11* 121:2, *16*
150:*21*
**proposed** 64:6 100:*5*
248:*9*
**propounded** 287:7
**protect** 105:*11*
283:*16*
**Protecting** 57:22
58:*23* 63:5 72:*18*
73:*19* 74:8 76:*15*
122:*17*
**protective** 148:*21*
**protest** 174:*2, 3*
**protested** 233:*11*
**protester** 149:22
173:*20* 197:7 198:*15*
**protesters** 150:2
192:*19* 193:24
194:*19* 197:*17, 24*
**protestors** 26:*10*
**protests** 54:*12, 16*
56:8 259:*24* 260:*12*
**provide** 7:22 108:9
177:2
**provided** 100:*19*
156:22, *25* 250:7
**providers** 279:*12*
**provides** 251:2
**provision** 36:*3, 7*
43:8 44:6, *11* 45:*19*
65:*15* 66:*15, 18*
67:*20, 25* 68:4 69:*15*

93:20 95:*3, 11, 21*
96:*1* 97:*18, 20* 98:7
100:7 112:*15, 20*
113:*4* 131:2 137:6
188:*15* 189:*10, 16, 20*
190:*3, 13* 191:*3, 15*
192:*10* 235:*15, 23*
236:9, *21* 237:*10, 22*
247:*5* 248:*10* 251:*22,*
*23* 252:*4, 6, 25*
255:*20* 283:*15*
**provisions** 36:*9*
54:*24* 55:5 56:*18, 24*
69:*19, 25* 127:*19*
134:*23*
**Public** 1:*17* 18:*21*
57:*24* 58:*25* 59:*11,*
*18, 22* 60:*1, 13, 17*
62:*3, 5, 9, 13, 17, 23*
63:7 72:*20* 73:*21*
74:*10* 76:*17* 105:*21,*
*24* 114:*10* 122:*19*
132:*15* 133:*13*
134:*24, 25* 135:*6, 13,*
*14* 136:*1, 4* 138:*12,*
*15* 148:*4, 5, 7* 216:*23*
231:22 233:*15*
284:*24*
**publically** 114:*13*
123:*13*
**published** 59:*10*
60:7, *17*
**pull** 167:*22*
**purpose** 27:*10* 39:4
108:7 109:*3* 172:*18*
271:*19*
**purposes** 170:22
171:*13* 173:2, *17*
197:9 216:*11* 218:*18*
265:7
**pursuant** 70:*13*
93:*19* 95:2 209:2
238:*3, 11*
**put** 24:*12, 19* 35:2
71:*10, 14* 86:*14*
157:*10, 14* 173:*17*
237:*17* 275:*17*
278:*13*
**puts** 33:*1*

Case 1:25-cv-10685-WGY    Document 186-1    Filed 07/07/25    Page 539 of 863
Deposition of John Armstrong
AAUP, et al. v. Rubio, et al.

**putting** 85:*13*
**pyramid** 249:*24*

**< Q >**
**quarrelling** 232:*14*
**question** 7:*10, 14*
11:*19* 12:*15* 23:*13,*
*17, 19* 24:*14, 22* 25:7
30:*11* 31:*8* 32:*22*
33:*16* 37:*10* 40:*3*
45:*3* 46:*5* 49:*11*
51:*10, 12, 15* 54:*13*
55:*1* 57:*18* 60:*13*
61:*5* 67:*9, 15* 70:*24*
76:*10* 77:*5* 81:*9, 18*
83:*18* 87:*11* 92:*22,*
*25* 97:*11* 100:*9*
115:*1, 8* 118:*12*
119:*4, 11* 120:*19, 23*
122:*11* 125:*14* 128:*1,*
*13* 132:*20* 135:*9, 23*
148:*6, 24* 158:*1*
163:*25* 164:*3* 166:*8*
167:*25* 168:*21* 170:6
171:*8* 172:6 177:*1*
180:*1, 4* 184:*21*
186:*3* 189:*8* 190:*23*
197:*11, 14* 199:*17*
206:*17* 214:*10*
216:*10, 14* 217:2, *4*
218:7 220:*5, 7, 14*
222:*8* 223:9 228:2
236:6, *17, 25* 237:*4,*
*17* 244:*14, 18* 245:6
247:2 250:*20* 252:*1,*
*9* 258:*3* 278:*25*
279:22 284:25
**questioning** 161:*18*
221:*12* 238:25
**questions** 39:*14*
43:*18, 22* 55:*16* 76:*4*
146:*14, 19, 25* 159:*1*
160:*10, 13* 166:*4*
206:*20* 209:*23*
232:*10* 236:*3* 245:9
253:*16, 18, 21* 261:*24*
263:*12* 272:*17, 25*
273:5, *12* 280:22
282:24 283:2, *3, 6*

285:6 287:6
**question's** 258:*9*
**quick** 285:*20*
**quicker** 157:*8*
**quite** 173:*9, 12*
216:*5* 268:*25* 275:6
276:*20*
**quotation** 215:*9*
256:*16* 257:7
**quotations** 1:*20*
**quote** 1:*23* 135:*5, 13,*
*25*
**quoted** 215:*14* 257:2,
*5*
**quotes** 130:*19* 247:*17*
**quoting** 215:*9, 12*
256:*23* 257:*16*

**< R >**
**Rachel** 19:*17*
**racist** 143:*10*
**raise** 160:*13* 203:*11*
232:9
**RAMYA** 2:*16* 5:*25*
**randomly** 34:*18*
**rang** 282:*13*
**rare** 192:*3*
**Rarely** 145:*19* 146:*1*
147:*20*
**reach** 159:22
**reached** 60:*15*
**reaching** 283:*10*
**read** 1:*22* 17:*1*
21:*17, 23* 46:*25* 47:*1*
57:22 58:*4* 67:*4*
130:*20* 131:22
132:*13* 134:*15, 24*
136:*20* 139:*4* 153:6,
*7* 186:*21* 189:*3*
214:*1, 18* 215:*14*
217:*25* 220:*20* 222:*3,*
*20* 223:*14* 227:*15*
231:*19* 233:8 234:*4*
247:*18* 255:2 256:*16,*
*17* 257:7 259:7
287:*4*
**reading** 212:*10*
232:*3* 233:*5* 259:*1*
278:6 279:*1* 281:*24*

288:8
**reads** 271:*14*
**ready** 146:*15* 246:*15*
**real** 173:*12*
**reallocation** 279:*25*
280:6, *8, 13, 19*
**really** 165:22 173:*16*
174:9 180:*3* 218:8
247:*12* 248:*4* 252:*15*
273:*25* 276:22
**Realtime** 1:*17*
**reason** 7:*21* 85:*3*
223:*21* 224:7 225:*12*
228:5, *10* 240:8
275:2
**reasons** 108:*3*
174:*11* 186:*1* 223:*24*
224:*10*
**recall** 8:6 9:*5, 17*
14:*5, 6, 24* 15:*1*
16:*12, 16, 22* 21:*15,*
*19* 24:2 26:*7, 8, 11*
27:*10, 21* 29:*8, 11*
35:24 37:*4* 41:*18*
64:*18, 20* 66:*16*
80:*15, 16, 17, 19, 22*
85:6 87:*5, 8, 13, 18,*
*23* 88:*15, 22, 25* 89:*1,*
*3, 4, 11, 14, 15, 21, 23*
90:*1* 99:*24* 100:*3*
101:7 103:*16, 18, 25*
104:2 106:*10, 21*
107:*21, 25* 108:2, *6,*
*15, 16, 21, 25* 109:*10*
110:*12, 18* 114:22
115:*23* 116:*5, 13*
117:*10, 17* 118:*20*
119:*1, 21* 120:7
121:*22* 122:*2* 124:*5*
129:*21* 152:*14* 153:*4*
154:*13* 155:*24* 156:*4,*
*9, 10* 158:*12* 160:*20,*
*23, 25* 163:*10* 165:*11*
167:*3, 6, 8, 11* 169:*4*
176:6 178:*23* 179:*4*
185:*4, 5* 186:*21, 23*
190:*10* 192:22 194:*8*
195:*17* 196:*8, 9*
207:*21, 23* 211:*20*
213:6, *13, 23* 214:*11,*

*12, 15, 16* 220:*16*
221:*4* 222:*13* 223:*12*
227:*4, 5* 228:*5, 10*
231:*1, 7* 234:2
235:*11, 13* 240:*5, 10,*
*16, 23* 241:*4* 242:*3*
244:*11, 24* 246:8
248:*12* 249:*4* 251:*16*
253:*1* 255:*14* 256:*13*
258:*1, 12, 21* 259:*3*
272:*11* 276:6 277:7
281:*3, 4, 10, 19, 23, 24*
282:*3, 5*
**receipt** 68:*10*
**receive** 34:*19* 35:9,
*10* 64:*5, 15, 24* 65:*14*
157:7 161:*4* 226:*24*
227:*1* 268:*8* 275:*10*
**received** 65:*4, 7*
66:*12* 67:*17* 90:*5, 19*
99:22 155:6, *9, 16, 22*
156:*2* 157:6 165:*4,*
*25* 170:*17* 171:*12*
177:*18* 185:*19* 188:*3,*
*4* 190:*24* 191:*10, 11*
215:*23* 218:*14, 15*
226:6 227:6 234:7
235:*21* 236:7, *19*
237:*8, 20* 238:*12*
242:*25* 274:4 278:*21*
**receives** 35:*5* 162:7
242:*18*
**receiving** 64:*20*
160:*20* 188:*1* 213:*13*
233:9
**recipients** 103:*3, 7, 15*
**recognize** 15:*17, 19,*
*21* 279:*23*
**recognized** 117:*16*
**recollecting** 86:22
**recollection** 9:*18*
10:*25* 13:*15, 22* 15:*5*
16:*10, 15, 17* 18:*19*
22:*7, 15* 23:*21* 24:*1,*
*6* 26:*4* 27:*9, 20*
33:*25* 37:*1* 41:2
58:*20* 59:7 76:*11*
78:*25* 81:*5, 22* 87:*25*
88:*19* 89:*10* 90:*10*
96:*13* 98:*13* 101:*4,*

*15* 107:8 108:*11*
117:*20* 127:*10*, *23*
129:9 149:*23* 155:*13*
159:*10* 169:*12*
189:*17* 211:*18*, *25*
213:*17*, *22* 221:8
226:9, *20* 231:2, *16*
241:*15* 265:*23*
282:*10*
recommend 191:*1*
recommendation
227:8 233:9 235:*1*
262:7 265:*19*
recommendations
185:8 242:9, *25*
273:*10*
recommended 235:*14*
recommending
235:22 236:7, *20*
237:9, *21*
recommends 252:*24*
record 1:22 4:*13*
5:*10* 24:*12*, *19* 25:*14*,
*19*, *22* 31:*18* 33:6, *12*
39:*11* 43:20 57:*14*
79:7, 8, *12* 126:*13*
128:6, 7, *10*, *20*
129:*11*, *18* 147:*10*, *14*
151:6 172:*10*, *13*
206:5, 6, *10* 209:7
212:*4* 216:*21* 223:2,
*3*, *7* 234:*8* 239:*3*
246:*18*, *23* 253:*21*
254:*4* 262:*14*, *20*
273:*4*, *18*, *22* 282:*20*
283:22 284:5, *11*, *14*,
*19* 285:8 288:5
records 21:*18*, *20*
recurring 193:*22*, *25*
redacted 263:*11*
reduced 288:7
reenforcing 259:*11*
refer 67:*15* 69:*23*
129:*16* 130:*11* 138:8
153:9 154:*1* 178:*13*
207:*13* 247:*14*, *15*
reference 129:*13*, *14*
160:22 220:*24*, *25*
referenced 4:*13*
152:*13* 184:22

222:*11* 233:*21*
238:*12*
references 238:*15*
referral 193:*3*, *15*
226:*14*, *15* 227:6, *20*
235:*14* 238:*12*, *19*, *23*
239:2 242:*19* 250:*13*
274:*23* 275:*14* 276:8,
*11*
referrals 187:*17*
226:*21* 227:*1* 235:22
236:7, *15*, *20*, *23*
237:8, *20*, *24* 238:*15*
274:*1*, *4*, *14* 275:*10*,
*12* 278:20 279:*14*
referred 91:7 145:7
278:8
referring 35:*12*
38:*15* 50:5 73:*25*
118:7 151:8 154:2
165:*20* 185:2 233:5
refers 35:*14* 130:*12*
151:*17* 153:*12* 154:*4*
177:*3* 235:6
refine 91:*21*
reflected 1:*21* 7:9
283:5
reflects 249:7
refresh 15:*4* 16:*10*,
*14*, *17* 72:*11* 112:*10*
180:25 213:*17*, *21*
221:8 226:*10* 227:*3*
234:*3*
refreshes 231:*15*
refused 218:*14*
regard 60:*20* 75:2
83:*16* 112:6
regarding 33:*21*
54:*24* 55:5, *10* 56:*18*,
*24* 57:7 63:*4* 64:*16*,
*25* 66:*13* 72:*18* 93:5
100:*4* 109:*25* 110:*15*
111:*1*, *12*, *18* 113:*1*
116:*3*, *10* 119:5
120:*4* 125:*12* 152:*24*
155:22 157:*20*
158:*24* 168:7 178:*21*
189:*15*, *19* 190:*3*
193:*2*, *22* 197:6

199:*21* 213:*14* 243:*1*
272:*12* 273:7
Regardless 14:*12*
59:*15* 178:9
regards 112:*18*
regional 61:*12*, *13*
77:*18* 259:*12*
reinforced 180:7
rejection 137:*1*, 8
relate 23:9 28:*18*
55:*19* 56:8, *13*, *17*, *24*
57:7 58:*10*, *14*, *19*
59:*3*
related 26:*13* 38:*14*
65:*10*, *15*, *16* 66:*14*
110:*20* 148:*15*
185:*10* 288:9
relates 54:*11*, *15*, *19*,
*23* 55:*4*, 9 58:*21*
relating 27:7 28:*15*,
*17* 29:*23* 30:8 38:*20*
71:6 72:6 83:*14*, *24*
84:*4* 110:22 112:8
115:*10* 117:9, *14*
118:*14*, *24* 119:*14*
145:*21* 149:*21*
209:*25* 243:*13*
282:*17*
relation 111:5, 7
relationship 233:*12*
release 59:*24*
released 272:*14*
relevance 221:*18*
239:*13*
relevant 50:*4* 78:*18*
82:*13* 103:*13* 184:*4*
relied 247:5
religious 142:*12*
rely 180:*19* 252:6
remains 42:*12* 71:*10*
123:7 284:9
remarks 284:*24*
285:*1*
remember 10:*11*
19:*1*, *21* 22:2 23:2
35:*13* 43:22 48:*12*,
*14* 80:8 82:*11* 84:*25*
97:*4* 100:*11* 145:*24*
156:*20* 157:22 158:*3*,
*5*, 9 162:5 170:*3*

203:*12* 211:22
219:*14*, *19* 220:*15*
238:*18* 243:6 268:*15*
277:22 278:*1*, 6, 9, *10*
279:*1*, 9, *10*
remembers 186:*15*
Remembrance
179:*20* 180:*15* 181:6
remind 29:5
removability 47:*4*
65:*17* 66:*1* 67:*19*
263:*3*, *24* 264:*13*, *22*
265:8, *18* 266:*3*
267:*3*, *15*, *19* 269:*17*,
*23* 272:6 274:7, *14*
276:*17* 277:*3*, *17*
removable 66:8, *14*
81:*24* 93:*19* 283:8
removal 95:2 235:22
236:8, *20* 237:9
267:*3*
removals 82:*4* 237:*1*
remove 65:22, *23*
237:*13*, *15*, *17*
removing 235:*15*
rendering 94:22
repeat 31:7, *13*
43:*25* 45:*3* 54:*13*
55:*1* 67:8 81:*18*
82:*16* 83:*18* 100:9
114:*25* 122:*11* 135:9,
*23* 148:*23* 166:*12*
168:*21* 220:5 228:*1*
236:*17* 237:*4* 274:*10*
277:*13* 279:*12*
repeated 97:*21*
repeatedly 165:*25*
repeating 119:*3*
rephrase 7:*12* 51:*10*
114:*25* 127:*14*
replaced 52:9
report 52:*25* 158:*3*,
6, *11*, *16*, *17*, *19*, *21*
159:*4*, 9 160:*18*, *20*
161:*11*, *21*, *24* 162:*1*,
*2*, *4*, *16*, *25* 163:*4*, 9,
*15*, *18* 164:5, *11*, *14*,
*19*, *22*, *25* 165:7, *13*
167:*24* 168:2, 6
169:*3*, 6, *16*, *19*, 22, *25*

Case 1:25-cv-10685-WGY     Document 186-1     Filed 07/07/25     Page 541 of 863
Deposition of John Armstrong
AAUP, et al. v. Rubio, et al.

184:*18, 21, 22*  185:*3, 6, 7*  186:*4, 5, 6, 12, 16, 20, 22*  226:*16*  231:*12*  269:*13*

**Reported**  1:*25*

**Reporter**  1:*17*  6:*14*  7:*7*  17:*20*  55:*25*  176:*22*  209:*15*  247:*20*  283:*17*  285:*9, 13, 16, 22*  288:*21*

**REPORTER'S**  1:*20*

**reports**  21:*12*  158:*24*  244:*1*

**represent**  5:*16*  160:*5*

**representation**  229:*3*

**representing**  5:*21, 23*  6:*1, 4, 6, 13*

**Republic**  281:*15, 18, 25*

**request**  213:*4, 6, 14, 17*  226:*21*  230:*14*  235:*6*

**requested**  239:*7*  288:*9*

**require**  149:*12*  174:*21*  249:*22*  266:*11, 12*

**required**  23:*16, 18*  30:*10, 21, 23*  38:*25*  41:*21*  49:*17, 24*  76:*21*  101:*13*  116:*22*  136:*10*  228:*18*  266:*17, 18*

**requires**  98:*14*  149:*16*  174:*11*  175:*13*  252:*10*

**researching**  20:*24*

**resident**  93:*6, 19*  95:*2*  97:*16*  98:*5*  263:*7, 25*  264:*14, 23*  265:*9, 20*

**residents**  91:*12, 20*  92:*1, 10*  93:*2*  94:*4*  110:*22*  111:*19, 22*  112:*6, 9, 14, 19*  113:*2*  263:*22*  264:*6*  266:*4*  274:*8*

**resident's**  94:*16*  95:*18*  100:*6*

**resolved**  249:*2*

**resolving**  259:*13*  260:*14*

**resources**  280:*1, 13*

**respect**  35:*25*  38:*10*  43:*14*  51:*3*  83:*10*  104:*1*  111:*19*  166:*25*  167:*7*  192:*19*  198:*4*  232:*18*  263:*12*  264:*10*  273:*4, 13*  283:*20*  284:*3*

**Respectfully**  230:*4*

**respond**  33:*3*  76:*9*  122:*24*  171:*7*

**responding**  76:*14*  239:*1*

**response**  11:*20*  12:*1, 10*  31:*1, 15*  32:*17*  57:*12*  73:*19*  74:*23*  75:*19*  76:*8*  78:*1*  104:*8*  105:*5*  106:*3, 9, 19, 25*  107:*19, 24*  122:*8, 17*  123:*17*  124:*4, 8, 22*  125:*16*  149:*6, 9*  171:*4*  184:*19*  187:*3*  213:*4*  222:*25*  234:*25*  235:*3, 5*  253:*18*  272:*24*

**responses**  7:*8*

**responsibile**  182:*10*

**responsibilities**  184:*3*

**responsibility**  182:*4*

**responsible**  17:*5, 10*  18:*2, 12*  20:*6, 12*  21:*6*  62:*22*  111:*14*  112:*5*  133:*19, 24*  134:*6*  145:*14*  181:*9, 12, 20, 21*  182:*7, 11*  183:*25*  184:*11, 12*  243:*19, 22*

**rest**  153:*8*  262:*12, 13*

**result**  79:*17, 21*  92:*9*

**resumed**  25:*17*  33:*9*  246:*21*  273:*21*  284:*17*

**retired**  196:*19*

**retirement**  26:*23*

**retiring**  196:*21*

**retread**  155:*19*

**return**  25:*24*  172:*22*

**reveal**  124:*10*  149:*6*  163:*24*  171:*4*  220:*11*

**revealed**  228:*19*

**revealing**  34:*1*  124:*12*

**review**  7:*4*  14:*14, 19*  15:*10, 14*  21:*18*  24:*7*  26:*6*  28:*3, 4*  45:*25*  46:*2*  69:*9, 11*  80:*10*  91:*2*  96:*22, 23, 24*  97:*1*  103:*19*  125:*2*  130:*17*  139:*1*  149:*12, 17*  151:*15*  152:*9, 20*  157:*1, 8, 14*  163:*1*  167:*18*  170:*9, 23*  173:*22*  176:*23*  177:*7*  212:*2, 8*  220:*23, 25*  221:*2, 21, 24*  222:*1*  231:*8*  232:*23*  253:*3*  262:*23*  265:*8*  271:*20*  282:*15*

**reviewed**  14:*21*  16:*9*  21:*20*  25:*1*  26:*9*  80:*7*  82:*12, 19, 21*  83:*11*  139:*17*  151:*12*  156:*7, 16*  159:*5, 9, 10*  186:*22*  265:*23*  268:*21*

**reviewing**  14:*2*  26:*2*  29:*9*  80:*18, 19, 22*  81:*16, 20*  103:*12*  139:*6, 16*  151:*18, 22*  155:*10*  163:*4*  186:*2*  232:*8*  233:*2*  242:*9*  255:*6*  265:*18*  268:*24*

**reviews**  100:*18*  151:*14*  242:*19*  254:*23*

**revisions**  161:*10*

**revocation**  10:*17*  20:*19*  24:*8*  26:*3*  27:*13*  29:*10*  45:*10*  64:*16, 19, 23*  82:*22*  83:*15, 24*  92:*5*  93:*5, 11*  94:*9, 12*  97:*22*  100:*5*  108:*4*  166:*24*  193:*23*  194:*18*  197:*6, 16, 19, 20, 21, 23*  198:*14*  199:*1, 15*  200:*1, 2, 16*  201:*7, 24*

202:*17*  203:*1, 6, 21, 22*  204:*1, 14, 21*  205:*2, 8*  207:*18*  222:*21, 23*  223:*10, 15, 16, 22*  224:*20, 24*  225:*5, 10, 23*  227:*9, 16*  228:*6, 12*  229:*2, 4, 12*  230:*20, 21*  237:*21*  241:*19*  242:*20*  247:*4, 6*  248:*10*  249:*13, 19*  251:*8, 11, 21*  252:*3, 24*  255:*20*  269:*25*  270:*2, 5*  274:*15*  275:*19*  276:*17*  277:*2, 17*  278:*11*

**revocations**  12:*11*  22:*17*  23:*10, 22, 25*  25:*23*  26:*13*  27:*8*  28:*15, 19*  29:*24*  38:*15, 21*  64:*25*  81:*17, 21*  82:*14, 20*  187:*18*  188:*7, 9, 15*  192:*20*  210:*1*  223:*19*  224:*6*  241:*24*  243:*1, 7, 8, 13, 17*  244:*23*  245:*3*  249:*14, 16, 21*  250:*1*  252:*2*  253:*22*  268:*14, 20*  274:*6*

**revoke**  84:*20*  85:*1*  86:*8, 11*  88:*2, 7*  95:*24*  97:*23*  101:*8*  102:*20*  103:*14*  104:*4, 8*  105:*5, 20, 25*  106:*17*  107:*9*  108:*3, 22*  109:*20*  110:*20*  121:*23*  145:*22*  155:*23*  156:*3*  157:*21, 24*  158:*10*  160:*22*  165:*4, 10, 14, 15*  166:*14*  167:*4, 9*  183:*17*  188:*24*  189:*6, 23*  190:*2, 11, 15*  191:*15*  199:*21*  211:*23*  237:*14*  239:*15*  247:*25*

**revoked**  66:*5*  82:*9*  90:*13, 14*  92:*17*  94:*16*  95:*19*  97:*17, 25*  236:*4*  238:*3, 11*  283:*9*

**revoking** 85:4 88:6
112:13
**right** 27:8 36:3
46:10 60:18 70:7, 23
74:21 76:6 80:20
85:15, 21 86:21
109:15 112:22
126:14 130:23 131:9
145:2 147:4 157:25
172:24 176:13
182:23 186:3, 20
213:5 216:19 217:18
227:4 228:13 229:10
230:1 235:3 244:9
255:5, 16, 21 262:5
263:4
**rights** 48:10 71:7
**river** 140:2 174:15,
23, 24
**Riverside** 2:19
**role** 19:24 20:18, 23
24:4 37:16 41:6, 9,
15 52:22 73:15
75:13 78:12 92:20
94:22 96:17 100:23,
25 112:17 200:10
201:25 204:18
235:20 279:18
280:12, 18
**roles** 49:8
**rolls** 184:14
**room** 25:12
**rough** 285:23, 24
**routinely** 275:10
**RPR** 1:25 288:3, 20
**RRP** 1:16
**RUBIO** 1:6 5:6
59:9 216:5, 17, 23
217:19 255:16, 17
260:18 266:1 270:16,
22, 25 271:13, 20
285:1
**Rubio's** 137:19
216:10 260:25 271:2,
12, 18 284:24
**rules** 239:23
**Rumeysa** 211:7
**run** 36:13
**runs** 271:9

**< S >**
**safety** 57:24 58:25
63:7 72:20 73:21
74:10 76:17 122:19
**SANTORA** 3:3 6:5
10:21 12:20 13:5
14:8, 16 21:2 22:11
23:11, 15, 18 25:11
27:23 30:18, 25
31:13, 22 32:16
38:22 39:2, 6, 12, 20
40:4, 18 41:23 42:17
43:2, 9, 15, 24 44:24
45:2, 12, 14 46:14, 16
47:10, 21 48:23
49:19 51:21 53:9, 16
55:21 56:2, 9, 14, 20
57:3, 8 59:12 60:19
63:1, 18, 25 64:8
65:18 68:5 71:24
72:8, 21 73:23 74:3
75:22 76:18, 23 78:3,
20, 23 80:5 81:3
82:1, 15 83:17 84:14,
18 87:20 88:9 89:19
91:5, 13 92:6 95:4
97:8 98:21 99:3, 18
101:11, 14 102:22
103:5 104:10, 23
111:3, 20 113:5, 24
115:18 116:20, 24
119:8, 16, 23 120:13,
18, 22 121:18, 25
122:10 123:5 124:9
126:6 128:3, 16
133:5, 25 134:12
135:8 136:8, 12
139:6, 13, 22 140:6,
14, 23 141:5, 10, 16,
22 142:3, 5, 13, 24
143:5, 13, 20 144:3, 7
145:23 146:4, 15
147:1, 8 148:11, 14,
23 149:5 150:22
152:22 154:19
155:12 158:22
159:20 160:3, 12
161:12 162:10, 19
163:20 164:17

165:18 166:3 168:5,
15, 19 170:10, 14, 25
171:3 172:5, 8 173:4,
23 174:18 175:10
176:3, 12, 18 177:20
178:15 179:22 183:9,
18, 23 184:7 185:12,
25 186:7, 14 187:8
192:21 194:21
197:10, 25 199:7, 12
201:13 203:9 205:15,
24 209:1, 12, 17, 23
210:3, 8 211:11
212:22 213:8 214:6,
14, 25 216:3 217:9
218:11 219:12, 23
220:4, 10 221:11, 23
223:20 224:25
225:24 226:18
227:10, 21 228:7
229:19 230:2, 8
232:1, 8 233:22
235:16, 24 236:10, 14,
22 237:3, 11, 23
238:13 239:16
240:15 242:22 245:5,
11, 17 246:17 247:7
251:14 253:25 254:9,
11, 15 258:2, 8
259:17 260:2, 16
261:5 262:3, 6 264:1,
16 265:1 266:5
267:5 270:18 273:3,
15 274:9, 12, 19
275:4 276:18 277:12
281:12 282:23
283:14, 19, 25 284:12
285:11, 15, 19, 24
**SAO** 145:9
**SARAH** 3:15 6:9
**save** 72:13 284:5
**saw** 16:20 102:14
158:11 168:12
186:12 215:20
**saying** 27:18 32:1
112:3 115:3 121:9
160:8, 9 247:17
281:24
**says** 21:17 46:11
69:8 86:3, 5 131:22

134:11 136:20
179:10 190:21
217:25 219:10
220:20 222:8, 19
223:13 227:15
228:13 231:15
238:10 250:16
263:13
**say-so** 24:23
**scheduler** 19:18
**scope** 39:18 221:13
232:11
**SCOTT** 2:15 5:22
24:11
**Scott.wilkens@knightc
olumbia.org** 2:22
**sea** 139:25 140:3
174:16
**seal** 288:13
**sec** 215:22 271:7
**second** 43:4 55:12
68:23 79:25 85:20
86:24 125:13 126:1
128:4 148:13 166:16
167:23 168:24 170:4
176:11, 15 202:19
206:3 212:22 216:16
226:5 232:20, 21
243:11 256:15
261:16 284:22
**secretaries** 50:9, 10
94:25 195:3, 10
249:3
**secretary** 19:8, 10
22:21, 23 26:17, 18
29:3 35:16 36:24
41:12 42:15 48:18,
22 49:17 50:2, 7, 8,
18, 21, 25 52:4, 8
59:9, 15 60:6 62:4, 9,
13, 17, 23 64:6, 13, 17
65:1, 5, 8, 15 66:13
67:18 75:5, 6, 8
77:12, 14 78:13
87:17 93:17 96:17,
19, 25 97:15 98:15
100:23, 24 105:24
107:3, 5, 23 112:21
113:19 137:18
162:13, 18, 25 181:17

184:9  187:23, 25
189:5  190:14, 18
191:1, 4, 7, 13  196:18,
22  216:5, 10, 17, 23,
24  217:19  242:16
247:24  248:9, 13, 19,
20, 21, 24  250:14
255:16  260:18  261:2
266:1, 11, 13, 14, 16
270:16, 21, 22, 25
271:1, 2, 3, 11, 12, 13,
18, 19, 20  284:24
285:1
secretary's  77:11
96:22  97:6  106:24
112:13
section  35:14  45:20
46:7  67:5, 6  68:22
69:7, 9, 13  184:17, 23,
25  185:2  188:25
251:2, 5
security  41:12  53:7,
23  57:23  58:24  63:6
65:9  66:14  72:20
73:21  74:10  76:16
105:13  111:25  112:4
122:19  145:8, 14
146:2  147:20  148:1
149:2, 8, 16, 21, 25
150:5, 13, 18  185:10
187:2, 7  193:16
195:16  202:2  205:1
207:24  222:21
225:17, 21  227:16, 19
228:14, 16  229:5, 11
231:20  233:13  235:1
244:22  261:8  274:3,
6, 18, 25
see  24:17  45:20
46:7  90:22  91:1
107:16  113:7  129:17
147:18  151:9  166:2
173:16  181:24
186:10  212:19  215:6
216:16  226:10, 13
227:2  229:16  231:15
233:4, 6  234:12
237:5  242:2  248:18
249:5  251:24  255:4
257:6, 12  267:9

seeing  179:23  180:2
186:8  213:16  243:25
seeking  92:24, 25
94:25  97:6  106:24
112:12  269:20
seeks  97:14
seen  46:17  69:15, 16
100:4, 12  106:13, 14
166:6  215:13  221:5,
9  224:5  231:5, 25
234:1  255:12  274:23
segment  259:8
selection  252:11
send  163:4  248:8, 19,
20  271:21
sending  164:5, 7
250:12
sends  226:14
senior  17:1  19:10
22:23  23:3, 4, 5, 8
25:22  149:13, 17
192:5  196:15  283:12
sense  79:3
sensitive  148:19
sent  59:8  60:21
64:17, 25  85:7  90:25
103:10  106:8  152:10,
20, 24  155:6, 9, 14
157:19  159:5  160:23
161:1  162:4, 17, 25
163:15, 18  165:9
230:15, 16  248:13
sentence  67:2, 3
132:6, 10, 12, 20
134:23  136:19, 20
153:5  220:19  259:6
sentiment  259:11
separate  94:1
September  288:15
series  39:13  55:15
serious  255:25
service  174:13
252:12, 13
Services  17:17, 18, 19
18:3, 8, 14  20:1, 2, 20
96:18  100:25  101:1
187:23
serving  242:15
set  43:12  86:14
88:23  89:1  102:21

106:25  108:4  109:14
115:16  138:25
152:16  176:2  203:24
273:1  288:12
setting  83:16  122:4,
6  135:3, 11  235:1
Shane  22:23  26:17
187:25
shared  29:1  179:2
227:20
sheet  269:10, 11, 15,
22  287:9
SHER  2:6  5:20  6:3
shocking  282:21
short  79:4  146:17
shortchange  279:21
shouting  174:4
show  73:24  74:1
75:23  165:19  185:14
221:7  226:11  232:3
235:4  282:15
showed  14:22, 23
showing  231:21
233:14
shown  14:4, 7, 13
261:20
shows  136:16
shredded  157:17
sic  127:13
sign  73:11, 13
136:15  212:17  213:2
217:24  230:19  242:5,
10
signature  212:19
287:15
signed  15:23  16:1
21:16  50:22  60:6
156:17  215:20
217:23  219:8  227:15
229:15, 16  255:15
257:1
significance  266:19
signing  288:8
signs  59:9, 17  136:17
silent  222:22, 24
223:11, 16, 19  224:6
227:9, 17  228:6, 11,
20  229:12
silly  61:5  216:9

similar  71:4  110:21
257:5, 12
Simply  93:1  97:7
186:4  270:10
single  28:5, 6  47:25
268:20, 24
sir  63:9  126:16
sit  48:12  168:11
182:6  203:12  281:10
sitting  229:25
situation  136:14
149:18  163:14  172:3
173:15  175:22
247:10  248:4  276:23
277:22  278:1  279:8
situational  253:15
Situations  225:11
247:11
skim  254:19
skimmed  222:5
slightly  262:12
slow  191:22
small  35:7  86:5
104:25  200:21
266:15
Smith  19:10  22:24
23:4, 5  24:25  25:22
26:12  27:7  28:9, 12,
22, 24  30:16  32:3, 5
33:21, 24  36:14
37:11  38:14  40:10,
24  41:24  42:4, 10, 14
44:4, 20  51:3  52:3
78:11  79:21  196:15
Smith's  23:9  29:23
31:9, 11  41:20  51:13
social  62:10, 19
103:19, 22  104:1
125:2  151:18  152:8,
20, 24  155:6, 11
172:21
solving  260:1
somebody  90:20
Somewhat  180:18
Soon  40:15
sorry  5:8  16:5, 6
17:20  18:10  19:13
26:16  27:18  32:21
36:10  46:4, 6  51:9
55:25  60:14, 24

74:*18*  77:*20*  78:*11*
80:*14*  82:*17*  83:*17*
84:24  86:*16, 17*
90:*15*  91:7  100:8
104:*20*  108:*17*
110:*10*  115:*1*  119:22,
*25*  122:*12*  123:*21*
125:*13*  127:6  132:*3,*
*10*  135:*8, 22*  142:*5*
144:*3, 4*  151:*5*
153:*22*  168:*23, 24*
170:*3*  171:*9, 23*
174:23  191:*9, 22*
195:*9*  196:*3, 24*
198:*8, 11*  203:*9*
206:*3*  207:7, *19*
209:*15*  212:23
215:*23*  220:*4*  228:*1*
233:22  234:*10*  238:6
244:*17*  246:*19*
247:*20*  249:*11*  254:6
264:*9*  267:*11*  269:*9*
271:*5, 25*  272:*1, 15*
273:*16*  274:*9, 12*
280:*7, 10*  283:*17*
**sort**  88:*23*  239:*5, 20*
253:*23*
**sorts**  188:*4*
**sought**  250:6
**sound**  216:*9*
**sounds**  86:*23*  221:*18*
244:*2*
**source**  282:*7*
**sources**  188:*5*  275:*6,*
*9*  276:*21*
**SP**  75:*9*
**speak**  9:*1, 14*  10:*7,*
*23*  11:*3*  22:*1, 9, 16*
91:*3*  149:*7*  169:*9, 14,*
*15*  202:*16, 21, 24*
203:*5*  205:*5*  208:*13,*
*15*  243:*3*  251:*17*
280:*17*  284:*24, 25*
**speaking**  32:*12*
90:*21*  118:*3*  129:*12*
172:*17*
**speaks**  143:*16*
**special**  23:*7, 9*  26:*2,*
*13*  27:*7*  28:*12, 14, 16*
30:6  33:*20, 24*  36:*13*

38:*11, 14, 20*  40:*10,*
*24*  41:*20*  51:*13*  52:*3,*
*13*  53:*4, 8, 14, 24*
54:*2, 5, 8, 11, 15, 19,*
*23*  55:*4, 9, 19*  56:*7,*
*12, 23*  57:*6, 11*  58:*10,*
*13, 19*  59:*3*  67:*24*
79:*17*  225:*8*
**specific**  21:*10*  24:*2*
42:*10*  108:*16*  121:*23*
208:*24*  228:*5*  253:*21*
265:*16*  279:*11*
**specifically**  12:*24*
19:*24*  20:*9*  84:*10*
88:*13, 16*  89:*17, 24*
109:*4*  200:*3*  209:*9*
228:*11*  242:*8*
**speculate**  36:*11*
75:*24*  183:*11*  219:6
**speculating**  186:*10*
217:*11*  229:*21*
230:*13*
**speculation**  78:*4, 21*
81:*4*  87:*21*  88:*10*
89:*20*  91:6, *14*  95:*5*
97:*9*  98:*22*  99:*4, 19*
101:*12*  104:*11*
111:*21*  113:6  122:*1*
134:*1, 13*  139:*23*
140:*7, 15, 24*  162:*11,*
*20, 22*  165:*19*  171:*1*
173:*5, 24*  174:*19*
175:*11*  178:*16*
179:*23*  183:*10, 19, 24*
184:*8*  185:*13*  215:*1,*
*3*  216:*4*  217:*10*
219:*13*  227:*22, 25*
229:*20*  230:*3, 6*
232:*2*  238:*14*  239:*17,*
*24*  242:*23*  251:*15*
259:*18*  260:*3, 17*
261:6  264:*2, 17*
265:*2*  266:6  267:6
270:*19*  276:*19*
281:*13*
**speculative**  135:*16*
137:*15*  144:*8, 9*
166:*5*  174:*1*  179:*24*
186:*16*

**Speculatively**  144:*18,*
*20*
**speech**  118:*25*  119:6
178:*22*
**spelled**  229:*8*
**spirits**  169:*8*
**spoke**  8:*23*  9:*2, 3*
11:*11, 14*  22:*3*  23:*2*
172:*20*  187:*11, 13*
208:*7, 9*
**spoken**  22:*13*  201:*23*
203:*20*  204:*1, 13*
205:*2*
**spokesperson's**  60:*2*
**spots**  35:*6, 9, 10*
**staff**  19:*11, 12, 16*
23:*1*  95:*14*  96:*24*
194:*23*  195:*24, 25*
241:*3, 5*  270:*22, 23,*
*25*  271:*9*
**staffer**  157:*3*
**staffers**  19:*17*
163:*12, 16*
**stand**  130:*8, 10*
**standard**  43:7  44:*5,*
*10*  176:*2*  247:*3*
250:*22*
**standards**  174:*12*
**standing**  144:6, *7*
161:*16*  166:*9*  209:*13,*
*16, 17*  232:*9*  240:*3*
**start**  5:*19*  8:*22*  77:*2*
85:*13*  200:*20, 21*
**starting**  50:*15*
195:*19*  266:*1*  267:*1*
279:*18*
**STATE**  3:*16*  5:*16*
6:*8, 10*  17:*2, 6*  21:*18,*
*19, 24*  24:*16*  26:*21,*
*24*  31:*19*  35:*17*  38:*2,*
*5*  40:*1*  42:*15, 25*
47:*16, 20*  48:*18, 22*
49:*8, 17, 24*  50:*2*
52:*13*  53:*3*  59:*15*
60:*11, 15*  61:*9, 14*
62:*3, 4, 5, 9, 10, 13, 14,*
*17, 18, 21*  63:*15, 21*
64:*7*  65:*22, 25*  68:*11*
71:*21*  72:*5, 17*  74:*13*
75:*1, 18, 19*  76:*7, 13*

77:*21*  86:*3*  89:*12*
92:*21*  93:*17*  94:*2, 14,*
*20*  95:*15*  97:*14*  98:*4*
102:*1*  104:*18*  105:*19*
106:*3*  109:*14*  110:*13,*
*25*  111:*17*  112:*21, 25*
116:*9, 17, 25*  117:*4, 8,*
*13, 23*  118:*7, 14, 23*
119:*13*  120:*3, 10*
121:*1, 15*  122:*8, 16,*
*22, 23*  123:*3*  124:*3, 7,*
*21*  125:*22*  129:*13, 18,*
*23*  131:*7, 11, 25*
132:*21*  133:*18*  138:*4*
142:*12, 22*  143:*10*
150:*1, 25*  151:*22*
152:*2, 5*  153:6  155:*9*
162:*8*  163:*1*  164:*19*
167:*12*  170:*7, 18, 23*
171:*13*  172:*18*  173:*3,*
*16, 21*  180:*20*  182:*17*
184:*19*  185:*7*  187:*4*
188:*23*  189:*6, 25*
190:*15, 18, 25*  191:*13*
193:*4, 16*  201:*19*
202:*18*  207:*5, 21*
215:*24*  216:*11*
223:*14*  224:*5, 19, 22*
225:*4, 9, 15*  226:*15*
227:*18*  228:*25*  231:*3,*
*18*  233:*10, 19*  234:*24*
235:*9*  246:*9*  247:*24*
249:*16*  252:6  259:*23*
260:*4, 8, 9, 11, 24*
261:*2*  264:*11*  266:*12,*
*13, 14, 16*  274:*16*
275:*17*  276:*9, 10, 15*
278:*3, 15, 19*  279:*13*
**stated**  90:*11*  188:*19,*
*23*  260:*18*
**statement**  59:*18, 23,*
*25*  135:*25*  136:*4*
138:*21*  139:*19*  140:*2,*
*4, 12, 20*  141:*1, 3, 8,*
*14, 19*  142:*1, 11, 21*
143:*2, 9*  154:*16*
173:*1, 8, 13*  174:*15,*
*22*  175:*7, 8*  217:*16*
**statements**  62:*17, 24*
105:*24*  118:*8*  138:*17,*

23 139:2 144:*14*
145:*1* 172:*20* 178:5
180:8, *11* 216:*23*
231:*23* 233:*15*
260:*25*
**STATES** 1:*1* 16:*25*
21:22 29:*18* 34:*20*
43:*13* 48:4, 7 57:22
58:*23* 63:5 72:*19*
73:*20* 74:9 76:*15*
105:*11* 122:*18*
132:*12* 135:*13* 189:*3*
214:*18* 218:*23* 233:8
238:2 251:8 255:*25*
256:2 259:7 260:*20*
263:6
**State's** 62:*23*
**Station** 3:7
**status** 66:*3* 265:*15*
**statute** 46:*13*
**statutory** 36:2
188:*14* 189:*10*
**stays** 29:*17*
**stenographically**
288:7
**step** 60:*16*
**steps** 122:7, *15*, *21*, 24
123:*3*
**Steve** 204:*13*
**Steven** 204:*3* 205:*12*,
*21* 206:*23*
**stick** 101:*3*
**Sticking** 124:*1*
222:*18* 242:*17*
**sticks** 84:*19*
**stipulation** 248:*23*
**stones** 174:7
**stop** 24:*21* 210:22
224:*17* 282:*21*
**stopped** 107:*11*
210:*15*
**stops** 182:8
**straight** 26:*20* 158:*13*
**straightforward**
197:*14*
**Street** 1:*15* 2:7 3:*19*
5:*12*
**STROKUS** 3:5 6:*12*

**Stuart** 9:*20*, *21*
26:*18* 184:*10* 187:*23*
268:2 269:*3*
**student** 26:*10* 29:*19*
54:*11*, 16 56:8 88:*14*
109:5, 9 120:*4*
149:*21* 150:*2* 173:*20*
187:*18* 192:*19*
193:*23* 194:*19* 197:7,
*17*, *21*, *24* 198:*15*
199:*2*, *16*, *18*, *22*
200:2, *4*, 7, *16* 201:7,
*24* 202:*17* 203:*1*, 6,
*21*, *23* 204:*1*, *14*, *22*
205:*3*, 9 207:*18*
208:*24* 210:*1* 211:6
218:*21* 235:22 236:*4*,
8, *20* 237:9, *22*
239:*14* 240:*11*, *13*
243:*13* 244:*23* 245:2
260:*12* 274:7 275:*25*
276:*3*
**students** 89:*24* 188:6,
8 208:*24* 209:*24*
214:*3*, *22*, *24* 215:*16*
216:*1* 218:*3*, 7
240:*18* 243:8 256:*20*
257:9 258:*20* 262:*1*
280:*24*
**study** 218:*15*
**stuff** 84:2
**Stufft** 41:8, *15* 193:7
271:8
**subject** 9:*15* 10:8
57:*17* 72:3 202:*12*
223:*15* 226:*24*
255:*10*
**submitted** 64:6
107:*18*, *23* 113:*19*
**submitting** 14:*24*
15:*1*
**subordinate** 100:*18*
182:*24* 183:5, *14*
**subordinates** 177:*15*,
*18* 182:5, *14*
**subsection** 46:*10*
69:*13*, *14*, *15*
**subset** 205:*10*
**substance** 9:8 16:8
44:*19* 165:*1* 236:*15*,

23 238:*15* 283:*3*
287:8
**suitable** 255:*19*
**Suite** 1:*15* 2:20
**Supervision** 29:*1*
**supervisor** 28:*25*
75:8
**support** 48:*3* 50:*17*
54:*24* 55:5 56:*18*
57:*1* 71:4, 5 88:*19*
89:*2*, 5 121:*17*
130:*23* 136:4 138:*13*
214:*4* 215:*17* 218:*4*
219:*2*, *21* 220:8
231:*23* 233:*16*
243:*14* 256:*20*
257:*10* 276:*4*
**supporting** 136:*16*
218:*15*
**supposed** 67:*15*
**supposition** 252:*19*
**suppositions** 35:2
**sure** 8:*20* 10:*23*
11:*18*, *20* 17:22 28:6,
8, *11* 36:9 37:*1* 45:6
49:*12* 54:*14* 55:*3*, *16*
62:*15*, *20* 63:*13*, *19*
64:*1* 67:*12* 69:*1*
74:5 81:*19* 83:*3*, *20*
84:*1* 85:*14* 89:7
97:*10* 98:*3* 102:*18*
112:*11* 115:2 122:*14*
126:2 128:22 135:*11*,
*24* 145:*16* 148:*25*
156:*24* 157:*18* 159:7
160:7 162:*13* 166:*1*
172:7, 9 182:*19*
186:*18* 223:2 225:7
232:*4* 238:*24* 245:*11*
262:*16* 266:*24*
270:*14* 275:*1* 276:6
279:*3* 280:*4* 282:*12*,
22
**Surely** 96:2 159:*18*
**Suri** 254:22 255:*9*,
*18* 256:*11* 257:*20*, *24*
258:6, *19* 259:*1*, 9
262:*17* 274:*1*
**S-U-R-I** 254:22

**Suri's** 256:*17* 257:6
**surprise** 185:*15*
**sworn** 6:*19*
**symbols** 136:*17*
**sympathy** 138:*9*, *14*
**synagogue** 174:4, *5*, 6
**system** 90:*18*, 22, 24
103:*12* 130:*12* 137:*1*,
2 249:*13*, *14*, *15*
268:*11*, *14*
**systems** 90:*14*, *15*
268:*17*

**< T >**
**take** 13:*24* 15:*12*
17:*24* 25:5, 6, *10*
31:5 46:*25* 67:*1*
76:*20* 77:8 79:*4*
85:*11* 86:*18* 127:7
132:*4* 139:*11* 146:8,
*16* 147:9 148:*13*
154:8 158:*14* 164:*20*
172:6 175:*19* 185:*1*
193:5, *16* 199:*11*
204:*17* 212:*3* 236:*11*
245:6, *18* 250:*23*
251:*3* 262:22 272:22
**taken** 1:*11* 25:*16*
33:8 79:*10* 98:6
122:22, *23* 123:*4*
128:9 147:*12* 172:*4*,
*12* 202:6 206:8
223:5 246:*20* 247:*12*
250:7 273:*20* 284:*16*
288:*4*, 6
**takes** 23:5
**talk** 16:*24* 25:*3*
70:*11* 125:*3* 128:*3*
146:7 203:*13* 226:5
262:*14* 270:*13*
284:*12*
**talked** 69:*12* 85:*1*
88:*1* 124:*13* 264:*21*
270:*11*
**talking** 31:*20* 90:*3*
123:9 185:22 186:*4*
236:*15* 268:9
**TALKOVSKY** 3:*15*
6:9

Deposition of John Armstrong

AAUP, et al. v. Rubio, et al.

talks 142:*18*
tandem 157:*1*, *11*, *15*
tank 278:*16*
targeted 261:*25*
272:*18*
tasked 167:*13*
TAYLOR 3:*14* 6:7
22:*24*
teasing 253:6
telephone 202:6
tell 8:*1* 17:*4* 20:*25*
43:*21* 72:*14* 84:*13*
90:8 129:*16* 147:6
159:*1*, *19* 166:9
167:*24* 186:*12*
231:*14* 268:4
telling 12:*10* 44:*18*
53:*21* 213:*12*
temporarily 19:*18*
220:22 239:*11* 240:*1*,
*9*
temporary 29:*17*
ten 8:2 35:9 208:*10*
tend 69:*23*
term 118:*10*, *11*
terms 19:*23* 68:*10*
77:*24* 131:*19* 236:4
Terrorism 73:*3*
74:*24* 77:*15*, *17*
145:*4*
terrorist 54:*25* 55:6
56:*19* 57:*1* 72:*19*
73:*20* 74:9 76:*16*
88:*20* 105:*12* 117:*16*
123:*17* 125:5, *13*, *18*,
*23* 130:*21*, *22*, *23*
131:*13*, *23* 132:2, *14*,
*16*, *17*, *22* 134:*25*
135:7, *14*, *15* 136:2,
*16* 138:9, *16*, *19*
214:*4* 215:*17* 218:*4*,
*16* 219:2, *21* 220:9
231:*23* 233:*16*
256:*21* 257:*10*
terrorists 57:*23*
58:*24* 63:6 122:*18*
123:*11* 276:5
test 202:*14*

testified 6:*19* 8:9
13:*14* 14:*15*, *20*
112:6 168:5
testify 7:*19* 8:*24*
14:*3* 230:9
testifying 10:*16*
12:*11*, *19* 16:9
testimony 7:22 8:*23*
9:*8*, *15* 10:9, *14* 11:*4*,
*12*, *17*, *22* 12:*3*, *13*
228:8 288:6
text 74:6 86:5
th 189:5
Thank 16:5, *21*
19:*23* 23:*20* 33:*17*
66:*25* 85:*25* 86:*13*
105:2 118:*12* 139:5,
*16* 151:*16* 171:6
176:*18*, *19* 191:7
196:*3* 204:*10* 206:*12*
255:8 279:6
Thanks 285:*25*
Theoretically 154:9
thing 24:*12* 85:*15*
127:2 155:*25* 217:22
270:8 282:*19*
things 42:*10* 103:*17*
115:22, *23* 116:*19*
117:*1* 137:9 157:7
165:*17* 171:*17*, *20*
200:*19* 226:*13*
250:*24* 251:*11*
252:*13*
think 68:*24* 74:5
79:*3* 83:*10* 85:*24*
104:*19* 140:*25*
142:*17* 153:22
159:*12* 160:8 165:*12*,
*22* 176:5, *8*, *12*
188:*21* 200:*20*
217:*21* 219:*1* 221:*11*
225:*18* 229:*17* 230:*1*
233:7 246:*14* 253:7,
*23* 261:22 264:*20*
268:*17* 270:8 278:*16*
279:*3* 280:*4* 282:*19*
284:*8*, *22* 285:5
thinking 68:*16*
85:*11* 87:5 191:*19*

275:*15*
third 86:*3* 104:*19*
thought 46:6 67:*14*
175:*14* 229:22 241:9
244:*12*
threaten 259:*25*
260:*13*
threatening 259:*12*
threats 57:*24* 58:*25*
63:7 72:*20* 73:22
74:*10* 76:*17* 122:*20*
three 11:8, 9, *11*
17:*15* 18:*18* 20:*10*
28:*12* 34:22 71:2
80:*11*, *17*, *19* 101:*3*
219:*15* 229:22
230:*12*
threshold 247:*3*
248:7 250:22
Thursday 1:*12*
ties 125:*17*
Time 5:*10* 7:*16*, *17*
15:*12* 16:*19* 17:*24*
41:5 52:7 56:*1*
72:*14* 86:*18* 116:6,
*14* 117:*11* 122:*15*
124:*17* 126:9 129:2
130:*1* 132:*4* 161:6
185:*1* 189:6 205:7
228:*18* 230:*10*
232:*14* 235:*20* 237:*4*
247:*25* 258:*13* 261:8
266:*1* 268:*25* 269:*21*
271:*25* 272:22
279:*17*, *22* 284:6, *9*
285:*13*
times 13:*12* 24:*13*
97:*21* 194:*25* 203:8
204:*12* 239:7 253:9
timing 79:5
tiny 212:7
tired 191:22
title 99:*15* 185:*20*
186:*11*, *20*, *22*
titled 57:*21* 58:*3*
185:6
today 5:*13* 6:*15*
7:*19*, 22 8:*19*, *24*
10:*14* 11:*4*, *12* 12:*3*,
*11*, *19* 14:*15*, *20*

146:22 166:*4* 205:*14*,
*23* 280:*3*
Today's 5:9 285:7
Todd 1:*14* 5:*12*
told 245:*23*
tonight 285:*23*
Tony 204:5, *6*
top 20:*13* 57:*16*
129:*17* 232:*19*, *21*
249:*23* 256:*14* 266:*1*
267:*14* 270:*14*, *17*
topic 107:*17* 146:*21*,
*24* 154:*12* 200:5
210:*10*, *16*, *19*, *22*
246:*16* 251:5
topics 11:*16* 32:*14*
103:*13*
torture 231:9
total 184:*11* 203:*17*
208:*17*, *20* 211:*1*
totality 268:*24*
totally 25:9
touched 200:6
tough 126:*23*
track 130:*13*
train 182:*15*
Training 101:*25*
177:*17*, *25* 181:9
182:*25* 183:6, *15*
184:5 252:*12*
trainings 182:*1*
transcript 4:9 7:9
34:7 79:*25* 172:*24*
285:*10* 288:5
transcription 287:5
transmitted 107:*14*
transparent 243:*24*
travel 108:7 109:*4*
treat 170:*19*
TREMONTE 2:6
5:*20* 6:*4*
tried 124:*17*
true 15:*25* 16:2
153:6 288:5
truthful 7:22 180:6,
*8*, *12*
truthfully 7:*19*
try 31:*25* 74:7
77:*10* 153:*25* 201:*10*
202:*13* 253:*23*

trying 12:24 35:22
170:2 172:23 185:21
217:22 218:10 228:4
243:24 279:21
Tuesday 13:17 16:13
Tufts 245:23
turn 16:23 45:24
66:19 69:5 86:6
130:2 151:2, 11
211:5 212:6 245:15
254:2 269:3
turning 126:11
130:15 262:19
two 10:25 13:23
50:8 58:18 63:23
72:6 80:21 105:13,
17 106:18, 20 107:2,
19 110:3 112:1
113:25 118:16, 19
124:13, 18 161:5
189:21 190:10
206:23 243:3 245:8
263:14 277:20, 24, 25
280:2, 15
type 26:5 29:9, 11
35:21, 22 116:1
188:12, 17 259:8
types 29:15 35:18
88:8 147:24 149:1, 4
166:20 243:8 270:4
typewriting 288:7

< U >
U.S 3:6, 16 5:6 17:2
34:25 69:13, 19 70:1
89:18 136:22 137:2,
6, 9, 11, 13 143:17
189:2 214:2, 20, 24
215:15 216:1, 11
217:5, 12 218:2, 9, 20,
22 219:10 233:17, 18,
24 251:10 257:8
259:12, 25 260:13
261:3 277:11, 19, 21
278:4, 8, 21 279:7, 10
U.S.C 238:7
Uh-huh 101:14
136:12 170:14
Ukraine 35:10

unable 192:1
unacceptable 239:22
unclassified 279:2, 4,
5
underlying 221:2
232:6 244:7
undermine 214:1, 20
215:15 218:2 226:1
251:10
undermines 216:1
259:9
underneath 181:23
understand 7:10
11:18 34:21 49:10
69:24 70:3 74:13
75:17 76:3 87:10
112:3 115:2 130:18
135:20, 24 136:3, 6,
25 137:5, 12 138:11,
24 144:5, 19 160:16
165:1 186:9 187:1
201:11 203:16
206:19 209:22
216:13 219:11 231:3
253:17 260:23
understanding 26:22
34:12 36:4 39:15
40:13 50:20 65:21
75:3, 11, 14 93:11, 13
94:8, 11 95:23 97:22
111:25 114:16 118:2,
6 125:25 135:4, 12,
18 138:24 148:8
153:14, 23 170:21
171:15 179:5, 18
186:18 193:11
243:16 256:7 257:16
261:23 269:1 270:8
271:17 272:23
understood 11:23
217:1
undertake 103:4
undertaken 122:7, 16
undertaking 226:1
228:18
unexpected 101:6
unfair 234:11
Unfortunately 213:19
UNIDENTIFIED
76:19

Unit 5:2 130:7, 13
134:6
UNITED 1:1 29:18
34:20 43:13 48:4, 7
57:22 58:23 63:5
72:19 73:20 74:8
76:15 105:11 122:18
218:23 255:24 256:1
260:20
units 79:1
universities 54:20
56:13
UNIVERSITY 1:3
2:18 5:5 239:23
241:7, 9
unjustified 137:8
unnamed 263:19
unsure 68:16
update 114:6 134:20
updated 133:15
updates 115:4, 9, 15,
17, 24
updating 133:19, 24
134:7
USC 4:13 45:19
use 16:24 18:1 34:3
69:23 96:8 118:10,
11 136:17 180:21
181:5 191:13 248:8
266:15
uses 130:13
usually 60:21 61:3
114:1 177:11 225:4

< V >
vacuum 142:16
248:5
Vague 21:2
variables 247:10
various 35:18 42:9
65:5 78:10 96:20
166:20 226:21
272:24 275:6 278:14
280:9
Veprek 36:20 37:7
52:5, 21, 23 73:1
74:14 77:10 102:7
207:5
Veprek's 37:16

verb 83:21
verbal 7:8
version 168:12, 13
versus 5:5
vetting 152:25
189:23, 24 190:2
244:1
VICTORIA 3:3 6:5
Victoria.santora@usdo
j.gov 3:10
VIDEO 3:25
VIDEOGRAPHER
5:2, 13 6:14 25:14,
18 33:6, 11 79:8, 11
128:7, 10 147:10, 13
172:10, 13 206:6, 9
223:3, 6 246:18, 22
273:18, 22 284:10, 14,
18 285:7
Videotaped 1:10 5:3
view 148:20 252:18
views 89:6 172:4
vigilance 103:17
125:1
vigilant 124:24
violation 166:22
violators 48:10 71:7
violent 174:3
Visa 12:11 17:18
18:3 20:1, 20 21:14
22:16 23:9, 22, 25
25:23 26:13 27:7
28:15 29:9, 12, 14, 16,
23 30:15 31:9, 12
32:2, 5 34:4, 13, 14,
22 38:14, 21 64:16,
19, 22, 25 66:3, 5
78:14 79:2 81:16, 20
82:8, 13, 20 83:14, 24
85:4 88:6, 8, 11, 14,
18 90:13 91:2, 8
92:8 96:14, 18, 20, 21
98:24 99:2, 7, 10
100:24, 25 103:22
108:7 110:20 111:14,
23 129:25 134:8
145:3, 6, 10, 13
150:16 151:18 152:7
155:10 169:10
177:14 178:11 179:3

Deposition of John Armstrong                                      AAUP, et al. v. Rubio, et al.

181:*3*, *9*, *16*, *20*  182:*1*, *16*, *25*  183:*6*, *16*
184:*1*, *4*, *5*, *12*, *13*
185:*11*  187:*18*, *23*
188:*7*, *9*, *13*, *15*, *17*, *24*
189:*4*, *7*  190:*15*
191:*15*  192:*19*
193:*17*  194:*24*  195:6, *20*, *21*  196:6, *10*, *23*
197:6  198:*15*  199:*22*
211:*23*  218:*12*, *14*, *15*, *18*, *21*  223:*10*, *22*
224:8, *10*, *12*, *15*, *20*, *23*  225:*4*, *9*, *23*  226:*1*
229:*1*  230:*20*  237:*21*
238:*11*  239:*15*
241:*19*, *23*  242:6, *14*, *17*  243:5, *12*, *13*, *20*, *23*  244:*23*  247:*18*, *22*, *25*  263:*21*  264:*7*, *15*
265:*4*, *5*, *11*, *20*  266:*4*
267:*24*, *25*  270:*9*
276:*14*  283:*8*
**Visa-related**  30:*9*
**Visas**  10:*17*  17:*10*
18:*2*  20:*19*  21:*7*
28:*17*  29:*15*, *17*, *20*
30:8  33:*21*  34:2, *3*, *10*, *11*  35:*17*  84:*4*
88:2  90:*19*  91:*16*, *24*
92:*9*  96:*16*  109:5, *7*, *9*, *11*  111:*8*, *12*
193:*23*  194:*19*
197:*16*, *19*, *20*, *21*, *24*
199:*2*, *3*, *16*, *18*  200:*1*, *2*, *4*, *7*, *8*, *16*  201:7, *24*
202:*17*  203:*1*, *6*, *22*, *23*  204:2, *14*, *22*
205:*3*, *9*  207:*18*
208:*24*  210:*1*  224:*20*, *24*  236:*4*  237:*14*
240:*13*  243:*9*, *13*
274:*7*  275:*18*, *25*
276:*3*
**Visa's**  238:*3*
**Vlad**  19:*8*
**Voice**  240:*21*, *24*

**< W >**

**wait**  39:*16*, *17*  51:*9*
52:*15*  105:*13*
**want**  7:*13*  8:*22*
13:5  24:*12*, *18*  25:*5*, *23*  33:*2*  35:*2*  36:*10*
74:*1*  76:5  79:*24*
85:*14*  86:*21*  96:*10*
119:*10*  126:*4*, *6*, *7*
128:*22*  146:*16*  147:*1*
151:*2*  155:*19*  172:*22*
175:*19*  180:*4*, *5*
199:6, *10*  200:*12*
226:*4*  232:9, *14*
236:*11*  262:*11*, *16*
273:*3*  280:*23*  282:*20*
284:*12*  285:*22*
**wanted**  267:*18*  283:*1*
**wants**  79:6  146:*11*
**warranted**  242:*21*
**Washington**  1:*15*
3:9, *20*  5:*13*  231:*12*, *17*  232:5  233:*3*, *7*
**waste**  232:*14*
**Watson**  187:*13*, *22*
193:*4*  205:*4*  230:*15*
235:*5*, *6*  273:*2*
**way**  32:*1*  44:*17*
54:*11*, *15*, *19*, *23*  55:*4*, *10*, *20*  56:*8*, *13*, *18*, *24*
57:7  102:*19*  104:*23*
109:*12*  112:*16*
129:*16*  147:*25*  149:*1*
161:*21*  164:*23*
257:*17*  259:*10*  281:*1*, *6*
**weapons**  175:*19*
**webinars**  154:6, *12*
155:*21*  182:*21*
**website**  60:*7*
**week**  13:*18*, *20*
**weekend**  285:*18*
**weekly**  210:*13*, *14*, *21*
**weight**  90:*13*
**welcome**  105:*3*  257:*3*
**welfare**  17:*13*  18:6
**Well**  11:2  22:6  31:*7*, *10*  34:7  42:*23*  64:*4*
67:*14*  79:*23*  85:*8*
89:9  91:*23*  92:*14*
106:7  107:*16*  109:*18*

114:*23*  115:*25*
116:*15*  127:*20*
135:*19*, *22*  152:*17*
155:7  160:*3*  166:*3*
167:*1*  176:5  177:*16*
179:6  182:*11*  185:*25*
187:*25*  190:6  192:*16*
193:*14*  195:*13*, *25*
198:*19*  199:5  200:*20*
202:*22*  209:6  211:5
213:5  214:*10*  215:*23*
216:*15*  217:*21*
224:*16*  227:*14*
229:*25*  247:*9*  250:*19*
260:8  261:8  266:*17*
269:*20*  272:*20*
276:*20*  278:*16*
279:*15*  283:*24*
**went**  25:*21*  159:*15*
172:*16*
**We're**  33:*11*  55:*17*
60:9  79:*11*  95:8
107:*16*  118:*3*  122:*4*
129:*12*  147:*13*
185:*22*  200:*20*
205:*15*  212:*20*
246:*15*, *22*  273:*11*, *25*
284:*18*
**we've**  153:*8*  183:*8*
188:*3*  220:*19*  248:*13*
274:*16*  280:*2*
**WGY**  1:6
**WHA**  207:6
**whatever's**  285:*20*
**whereabouts**  17:*13*
**WHEREOF**  288:*12*
**White**  19:*21*  54:*4*
158:*17*, *24*  159:*5*, *15*, *17*  162:*3*, *7*  168:*3*
203:*5*, *21*, *25*  205:*21*
206:*18*  207:*23*
**wife**  9:*3*
**WILKENS**  2:*15*
5:*22*  24:*11*
**WILLIAM**  3:*4*
**Wilson**  9:*20*  10:*1*, *9*
11:*4*  19:6  22:*21*
26:*18*  27:6  36:*20*
37:7  52:*4*  78:*11*
96:*16*  102:*13*  181:*17*

184:*10*  187:*23*
196:*12*  242:*11*, *24*
243:*21*  245:*1*  265:*4*
268:*2*, *3*  269:*3*
**Wilson's**  12:*1*
**winter**  245:*25*
**wish**  226:*13*  231:*10*
**wished**  12:*4*, *8*
**withdraw**  49:*21*
160:*19*  251:*25*
**withdrawn**  11:*13*
22:*4*  31:*10*  36:*1*
38:*18*  42:*3*, *23*  64:*4*
79:*24*  80:*18*  83:*12*
89:*16*  90:*2*  92:*14*
105:*18*  109:*19*
115:*25*  116:*16*
125:*14*  127:*20*
130:*18*  152:*18*  155:7
167:*1*  178:*2*, *10*
179:*1*, *6*  182:*12*
187:*1*  192:*16*  193:*14*
195:*13*  199:5  202:*23*
209:6  219:5  223:*13*
224:*1*  225:*16*  226:*4*
260:9  265:*17*  278:*19*
280:*7*, *10*
**withheld**  185:*17*
186:*1*
**withholding**  253:8
**WITNESS**  4:*3*  6:*18*
15:*10*  23:*16*, *20*  24:9,
*20*, *22*  25:*2*, *6*  32:*25*
33:*1*, *4*  38:*25*  39:*10*,
*22*  40:*2*, *20*  41:*21*
42:*19*  43:*3*, *10*, *16*
47:*12*  51:*23*  53:*11*,
*18*  55:*23*  56:*4*, *10*, *15*,
*21*  57:*4*, *9*  68:7
76:*21*  78:*22*  84:*16*
101:*13*  116:*22*
119:*25*  120:*16*, *21*
121:*20*  126:*8*  128:*18*
136:*10*  139:*15*
146:*20*, *23*  147:*3*, *16*
151:*14*  161:*14*
163:*22*  170:*13*  171:*2*,
*6*  176:*19*, *23*  194:*20*,
*22*  205:*17*  206:*1*, *12*
209:*2*, *7*, *21*  213:9

214:*7*  219:*24*  221:*21*
222:*25*  227:*11*
235:*17, 25*  237:*25*
245:*14*  254:*12, 23*
273:*12, 14*  288:*12*
**woman**  281:*25*
**word**  96:*8*  132:6
207:7  223:*25*
**words**  18:*1*  88:*3*
105:*4*  123:*15*  143:22
144:*11, 24*  153:*19*
174:*25*  181:*24*  200:7
244:6  265:*17*
**work**  8:*4, 17*  9:*4, 9,*
*16*  10:5  16:*25*  18:*25*
25:*23*  32:7, *10, 13*
33:*20, 23*  36:*19*  37:6
44:*19*  60:*3*  74:*16*
78:*13, 15*  79:*21*  81:6
92:8  96:*15*  101:*20,*
*23*  112:*23*  114:*17*
126:*23*  164:22
171:*14*  172:*19*  173:*3,*
*8, 9*  174:*10*  176:*1*
178:*19, 24*  179:*3*
180:*20, 22*  211:*16*
240:*13*  252:*10*  256:7
282:*11*
**worked**  35:8  36:*25*
80:*25*  93:*1, 4*  181:*1*
212:*15*
**worker**  99:*9*
**working**  28:22  37:*11,*
*14*  41:*25*  42:5, *11, 14*
44:*4*  51:*3*  52:2, *11,*
*13, 24*  53:*3, 7*  99:6
150:*24*  196:*1*  207:*15,*
*17*  248:*16*
**works**  9:*19, 20*  10:*1,*
*4*  19:*4*  30:*16*  32:*3, 6*
36:*15, 17, 21*  37:*10,*
*17*  38:*1*  40:*10*  49:*18,*
*23*  52:*21, 23*  53:23
54:2  73:*1, 2*  74:*18,*
*22*  90:*21*  101:*24*
129:*24*  252:*13*
**worldwide**  181:*14*
**worry**  67:*13*
**write**  150:7  212:*12*
234:*25*

**writes**  99:*16*  150:5
256:*3*
**writing**  98:*18*  99:*13*
**written**  49:7, *12*  73:9
97:*13*  98:*11, 16*
99:*10, 24*  130:24
151:*20*  153:*14*  165:2,
*8*  178:*3, 6*  222:*15*
256:*4*
**wrong**  151:7  223:*25*
**wrote**  87:*13*  100:*12*
129:7, *19, 23*  212:*14*
269:*4, 7*

**< Y >**
**Yeah**  51:*11*  86:*18*
96:5  104:*24*  126:*11*
129:*11*  157:*3*  168:*19*
197:*4*  204:5  209:*12*
220:*4*  236:*10*  245:*17*
273:3  285:*15, 19*
**year**  70:*19*  76:*15*
100:*7, 13*  149:*25*
150:*18*
**years**  8:2, *13*  77:*21*
189:*12*  190:5  193:*12*
278:*16*
**yesterday**  187:*14*
**yesterday's**  273:*1*
**York**  2:*9, 21*  245:*24*
**Yunseo**  272:*21*  281:7

**< Z >**
**Zionism**  140:*13, 17*
**Zoran**  19:*18*

Deposition of John Armstrong

AAUP, et al. v. Rubio, et al.

## WORD LIST

**< 0 >**
**012** *(2)*

**< 1 >**
**1** *(15)*
**1:25-cv-10685** *(1)*
**1:25-CV-108** *(1)*
**1:57** *(1)*
**10** *(4)*
**10:18** *(2)*
**10:47** *(2)*
**100** *(6)*
**10004** *(1)*
**10115** *(1)*
**10685** *(1)*
**11:01** *(2)*
**11:10** *(2)*
**11:22** *(2)*
**1182** *(2)*
**1182(a** *(1)*
**1182(a)(3** *(1)*
**1182(a)(3)(c** *(1)*
**12** *(11)*
**12:23** *(1)*
**12:48** *(1)*
**1201** *(13)*
**1201(i** *(1)*
**1201(i)/221(i** *(1)*
**13,000** *(1)*
**13:57** *(1)*
**13899** *(2)*
**13th** *(1)*
**14** *(1)*
**14:04** *(1)*
**14:29** *(1)*
**1416** *(1)*
**14161** *(17)*
**14188** *(11)*
**15** *(4)*
**15:40** *(1)*
**16** *(9)*
**16:16** *(1)*
**16:41** *(1)*
**1615** *(2)*
**17** *(1)*
**17:25** *(1)*
**17:48** *(1)*

**17th** *(1)*
**18** *(3)*
**18:13** *(1)*
**18:15** *(1)*
**18:46** *(1)*
**19** *(2)*
**19:16** *(1)*
**19:55** *(1)*
**19th** *(1)*
**1CA** *(1)*
**1st** *(4)*

**< 2 >**
**2** *(11)*
**2:00** *(1)*
**2:29** *(1)*
**20** *(8)*
**20:12** *(1)*
**20:31** *(1)*
**20:32** *(1)*
**2000** *(1)*
**20006** *(1)*
**20036** *(1)*
**20044** *(1)*
**202** *(2)*
**202-2600** *(1)*
**2025** *(9)*
**2029** *(1)*
**20th** *(1)*
**21** *(1)*
**212** *(1)*
**212(a)(3)(b** *(1)*
**21st** *(2)*
**22** *(2)*
**221(i** *(15)*
**222** *(3)*
**22NI** *(1)*
**237** *(1)*
**23rd** *(1)*
**25** *(6)*
**25th** *(3)*
**26168** *(4)*
**2618** *(2)*
**27** *(2)*
**27th** *(8)*

**< 3 >**
**3** *(25)*
**30** *(2)*

**302** *(1)*
**302.6** *(5)*
**34** *(2)*
**3A** *(1)*
**3B** *(1)*
**3C** *(112)*
**3-C** *(1)*

**< 4 >**
**4** *(5)*
**4:17** *(1)*
**400** *(1)*
**41659** *(1)*
**44** *(4)*
**45** *(1)*
**4-6** *(1)*
**475** *(1)*
**4C** *(8)*

**< 5 >**
**5** *(8)*
**5:25** *(1)*
**5:30** *(4)*
**50** *(2)*
**5914** *(1)*

**< 6 >**
**6** *(5)*
**6:13** *(1)*
**6:46** *(1)*
**600** *(1)*
**616-8779** *(2)*
**646** *(1)*
**69** *(1)*

**< 7 >**
**7** *(2)*
**7:16** *(1)*
**7:55** *(1)*
**745-8500** *(1)*

**< 8 >**
**8** *(13)*
**8:11** *(1)*
**8:26** *(1)*
**8:31** *(1)*
**85** *(1)*
**878** *(1)*
**8USC** *(1)*

**< 9 >**
**9** *(23)*
**90** *(1)*
**95** *(1)*

**< A >**
**a.m** *(5)*
**A4** *(1)*
**AAUPCAR** *(2)*
**abbreviation** *(1)*
**ability** *(1)*
**able** *(7)*
**abroad** *(6)*
**absence** *(1)*
**Absolutely** *(1)*
**access** *(1)*
**accompanying** *(2)*
**accounts** *(1)*
**accuracy** *(1)*
**accurate** *(5)*
**accused** *(1)*
**ACKNOWLEDGMEN
T** *(1)*
**Aconlon@shertremont
e.com** *(1)*
**Act** *(3)*
**acting** *(13)*
**action** *(51)*
**actions** *(5)*
**activities** *(8)*
**activity** *(49)*
**actor** *(1)*
**actors** *(1)*
**acts** *(3)*
**actual** *(5)*
**ADAM** *(6)*
**add** *(2)*
**added** *(1)*
**addition** *(2)*
**Additional** *(5)*
**additionally** *(1)*
**address** *(10)*
**addressed** *(7)*
**addresses** *(12)*
**addressing** *(1)*
**administer** *(1)*
**administration** *(39)*
**administrations** *(1)*

administration's  *(1)*
Administrative  *(7)*
admit  *(1)*
adopt  *(1)*
adopts  *(1)*
adverse  *(1)*
advice  *(4)*
advise  *(2)*
advised  *(1)*
ADVISER  *(1)*
advises  *(1)*
advisor  *(12)*
advisors  *(4)*
advisor's  *(1)*
advisory  *(14)*
advocacy  *(10)*
advocate  *(2)*
advocates  *(3)*
AFFAIRS  *(74)*
affect  *(2)*
affixed  *(1)*
afternoon  *(3)*
agencies  *(3)*
agency  *(4)*
ages  *(1)*
ago  *(10)*
agree  *(3)*
agreed  *(1)*
ahead  *(10)*
aid  *(2)*
aims  *(2)*
ain't  *(1)*
AL  *(4)*
ALDAC  *(8)*
ALEXANDRA  *(2)*
alien  *(7)*
aliens  *(4)*
Alliance  *(3)*
allow  *(1)*
Amanda  *(1)*
Ambassador  *(2)*
AMENDMENT  *(2)*
AMERICAN  *(4)*
Americans  *(1)*
analysis  *(1)*
analyst  *(1)*
and/or  *(1)*
Andre  *(1)*
Andrew  *(3)*

announced  *(3)*
answer  *(134)*
answering  *(4)*
answers  *(6)*
anti-Israel  *(7)*
anti-Semitic  *(37)*
anti-Semitism  *(41)*
Anybody  *(11)*
anyone's  *(1)*
apart  *(16)*
Apartheid  *(4)*
apologize  *(6)*
Apparently  *(2)*
APPEARANCES  *(2)*
appeared  *(1)*
appears  *(5)*
applicant  *(6)*
applicants  *(5)*
application  *(12)*
applied  *(3)*
applies  *(1)*
apply  *(1)*
appointee  *(1)*
Appreciate  *(8)*
appropriate  *(2)*
approval  *(10)*
approve  *(4)*
approved  *(16)*
approving  *(1)*
approximately  *(14)*
April  *(1)*
archives  *(2)*
area  *(1)*
areas  *(1)*
arm  *(1)*
arms  *(2)*
ARMSTRONG  *(11)*
Arrest  *(5)*
arrested  *(4)*
arresting  *(1)*
article  *(5)*
ascertain  *(1)*
aside  *(7)*
asked  *(27)*
asking  *(38)*
assert  *(1)*
asserted  *(2)*
assessment  *(1)*
assessments  *(1)*

assigned  *(6)*
Assistance  *(1)*
ASSISTANT  *(28)*
ASSOCIATION  *(3)*
associations  *(4)*
assume  *(2)*
assumed  *(2)*
Attached  *(2)*
attachments  *(1)*
attack  *(1)*
attended  *(1)*
attention  *(3)*
attitude  *(2)*
attorney-client  *(2)*
attorneys  *(6)*
attributable  *(1)*
author  *(4)*
authored  *(2)*
authorities  *(1)*
authority  *(7)*
authorship  *(1)*
available  *(1)*
aware  *(73)*
awareness  *(1)*

< B >
back  *(23)*
background  *(1)*
Badar  *(2)*
Bahamas  *(1)*
ballpark  *(1)*
banned  *(6)*
base  *(1)*
based  *(24)*
bases  *(1)*
basically  *(1)*
basics  *(1)*
basis  *(41)*
bear  *(1)*
bearing  *(1)*
BEAUMONT  *(7)*
Beaumonttw@state.gov  *(1)*
becoming  *(1)*
began  *(3)*
beginning  *(12)*
begins  *(7)*
behalf  *(5)*
behavior  *(1)*

believe  *(52)*
bell  *(1)*
Benjamin  *(1)*
best  *(12)*
Betar  *(8)*
better  *(1)*
big  *(1)*
billion  *(2)*
birth  *(1)*
bit  *(2)*
blanket  *(1)*
blocking  *(1)*
bodies  *(2)*
bond  *(1)*
boss  *(2)*
bottom  *(8)*
BOX  *(1)*
break  *(41)*
breaking  *(1)*
brief  *(5)*
briefed  *(2)*
briefings  *(3)*
briefly  *(3)*
bringing  *(2)*
Broad  *(1)*
brought  *(5)*
buck  *(2)*
budget  *(1)*
bunch  *(1)*
Bureau  *(65)*
bureaus  *(5)*
buried  *(1)*
burning  *(1)*
business  *(1)*
busy  *(1)*
button  *(1)*

< C >
cable  *(86)*
cables  *(31)*
caffeine  *(1)*
call  *(16)*
called  *(13)*
calling  *(9)*
Calls  *(95)*
campus  *(4)*
campuses  *(5)*
Canary  *(2)*
Canuff  *(1)*

**capacity**  (2)
**CAR**  (1)
**card**  (11)
**cards**  (3)
**care**  (1)
**Career**  (1)
**careful**  (1)
**carries**  (1)
**carry**  (1)
**carrying**  (3)
**cartels**  (1)
**Case**  (52)
**cases**  (33)
**CaseViewNet**  (1)
**cast**  (2)
**catch**  (38)
**catching**  (3)
**categories**  (1)
**category**  (1)
**cause**  (3)
**CC'd**  (1)
**cease**  (3)
**cemetery**  (1)
**center**  (1)
**certain**  (17)
**certainly**  (2)
**certainty**  (24)
**CERTIFICATE**  (1)
**Certified**  (1)
**certify**  (2)
**chain**  (8)
**chair**  (1)
**chance**  (9)
**change**  (3)
**changed**  (1)
**changes**  (1)
**chanted**  (1)
**characteristics**  (1)
**characterization**  (1)
**characters**  (2)
**charge**  (2)
**chart**  (1)
**check**  (1)
**chief**  (2)
**China**  (2)
**chooses**  (1)
**Christopher**  (1)
**Chung**  (2)
**circumstance**  (2)

**circumstances**  (16)
**cite**  (1)
**cited**  (7)
**Citizen**  (3)
**citizens**  (5)
**civil**  (1)
**claim**  (6)
**clarification**  (6)
**clarifications**  (2)
**clarify**  (6)
**clarifying**  (4)
**clarity**  (3)
**classes**  (1)
**classified**  (9)
**clear**  (30)
**clearance**  (19)
**cleared**  (13)
**clearer**  (1)
**clearing**  (8)
**clearly**  (3)
**client**  (1)
**close**  (2)
**Club**  (1)
**coaching**  (1)
**coauthored**  (3)
**Code**  (4)
**codified**  (1)
**coffee**  (1)
**colleagues**  (5)
**collective**  (1)
**college**  (3)
**colleges**  (2)
**Columbia**  (4)
**combat**  (5)
**combatting**  (2)
**come**  (16)
**comes**  (7)
**coming**  (4)
**comment**  (3)
**commission**  (1)
**common**  (2)
**communication**  (7)
**communications**  (14)
**compares**  (1)
**compelled**  (1)
**compiled**  (1)
**complete**  (3)
**completed**  (5)
**completely**  (4)

**complex**  (2)
**complicated**  (4)
**component**  (5)
**components**  (1)
**comprehend**  (1)
**comptroller's**  (1)
**computer**  (4)
**concern**  (1)
**concerned**  (3)
**concerning**  (28)
**concerns**  (4)
**conclude**  (1)
**concludes**  (1)
**concrete**  (15)
**concretely**  (2)
**condemnation**  (1)
**conduct**  (8)
**confer**  (5)
**conference**  (6)
**conferring**  (1)
**confidential**  (1)
**confidentiality**  (1)
**conflict**  (3)
**confused**  (2)
**confusing**  (1)
**Congressional**  (1)
**conjunction**  (1)
**CONLON**  (335)
**connected**  (1)
**connection**  (10)
**consequences**  (1)
**consider**  (1)
**consideration**  (4)
**considering**  (1)
**consistent**  (5)
**Constitution**  (1)
**CONSULAR**  (79)
**consular's**  (2)
**consulate**  (2)
**consult**  (1)
**consultation**  (1)
**consulted**  (2)
**consuming**  (1)
**contact**  (1)
**contain**  (1)
**contained**  (3)
**contains**  (2)
**content**  (11)
**contents**  (1)

**context**  (10)
**continue**  (2)
**Continued**  (1)
**contrary**  (3)
**contribute**  (2)
**contributed**  (3)
**conversation**  (12)
**conversations**  (24)
**conveyed**  (1)
**convoluted**  (1)
**coordinate**  (1)
**coordinated**  (1)
**coordination**  (1)
**copies**  (1)
**copy**  (11)
**core**  (1)
**corners**  (2)
**correct**  (65)
**corrections**  (1)
**correctly**  (2)
**council**  (2)
**council/consular**  (1)
**COUNSEL**  (30)
**counselor**  (10)
**counselor's**  (3)
**counsels**  (1)
**count**  (2)
**Counter**  (5)
**countries**  (2)
**country**  (5)
**Counts**  (1)
**couple**  (5)
**course**  (12)
**COURT**  (20)
**COURTNEY**  (2)
**cover**  (2)
**covered**  (18)
**covers**  (1)
**create**  (1)
**created**  (7)
**creates**  (1)
**creating**  (8)
**creation**  (13)
**criminal**  (3)
**criteria**  (5)
**criticism**  (2)
**criticizing**  (3)
**crossed**  (1)
**crowd**  (1)

Deposition of John Armstrong

AAUP, et al. v. Rubio, et al.

cultural  *(1)*
culture  *(3)*
curious  *(1)*
current  *(9)*
currently  *(4)*

< D >
D.C  *(2)*
daily  *(1)*
DAS  *(14)*
date  *(2)*
dated  *(1)*
day  *(5)*
DC  *(2)*
deal  *(10)*
Dealing  *(1)*
deals  *(2)*
dealt  *(5)*
dear  *(1)*
decades  *(1)*
decide  *(5)*
deciding  *(1)*
decision  *(35)*
decisions  *(8)*
Declaration  *(40)*
declarations  *(4)*
Decoration  *(1)*
dedicated  *(2)*
deductions  *(1)*
defend  *(1)*
Defendants  *(7)*
define  *(3)*
defined  *(1)*
defines  *(1)*
definitely  *(5)*
definition  *(9)*
degree  *(5)*
deliberation  *(1)*
deliberations  *(5)*
deliberative  *(37)*
demonstrate  *(4)*
demonstrating  *(1)*
demonstrations  *(1)*
denials  *(1)*
denote  *(1)*
denouncing  *(1)*
deny  *(1)*
DEPARTMENT
  *(169)*

departments  *(3)*
department's  *(11)*
depend  *(11)*
depending  *(5)*
depends  *(9)*
DEPONENT  *(1)*
deport  *(3)*
deportable  *(2)*
deposed  *(3)*
deposition  *(7)*
depositions  *(1)*
deputized  *(1)*
deputy  *(38)*
deputy's  *(1)*
derail  *(1)*
derogatory  *(1)*
describe  *(5)*
described  *(10)*
describes  *(2)*
describing  *(2)*
description  *(1)*
designated  *(11)*
designating  *(1)*
detail  *(1)*
details  *(9)*
detain  *(1)*
detained  *(1)*
determination  *(53)*
determinations  *(16)*
determine  *(13)*
determines  *(1)*
determining  *(2)*
detour  *(1)*
develop  *(2)*
developed  *(20)*
developing  *(4)*
Development  *(13)*
develops  *(3)*
DHS  *(26)*
DHS's  *(1)*
Dias  *(1)*
difference  *(4)*
different  *(22)*
differently  *(1)*
difficult  *(15)*
digress  *(1)*
Diplomatic  *(3)*
DIRECT  *(12)*
directed  *(4)*

directing  *(1)*
direction  *(1)*
directive  *(7)*
directives  *(2)*
directly  *(2)*
director  *(14)*
director's  *(1)*
directs  *(1)*
disagree  *(3)*
discretion  *(8)*
discretionary  *(2)*
discuss  *(10)*
discussed  *(26)*
discussing  *(5)*
discussion  *(14)*
discussions  *(6)*
distilled  *(1)*
distinct  *(3)*
DISTRICT  *(5)*
Diversity  *(5)*
Divest  *(2)*
divestment  *(1)*
DIVISION  *(4)*
document  *(86)*
documentation  *(8)*
documents  *(29)*
DOD  *(1)*
dog  *(1)*
dogs  *(1)*
doing  *(4)*
DOJ  *(2)*
domestic  *(5)*
domestically  *(1)*
donate  *(1)*
dozen  *(4)*
dozens  *(1)*
draft  *(10)*
drafted  *(4)*
drafter  *(2)*
drafting  *(6)*
draw  *(1)*
drawn  *(2)*
drink  *(1)*
Drive  *(1)*
drug  *(1)*
Due  *(6)*
duly  *(1)*
duties  *(11)*

< E >
E.O  *(1)*
E.O.s  *(2)*
earlier  *(15)*
easier  *(4)*
East  *(1)*
ECAS  *(2)*
ed  *(8)*
education  *(2)*
effect  *(5)*
efficiently  *(1)*
effort  *(1)*
efforts  *(1)*
either  *(11)*
element  *(1)*
elements  *(1)*
elimination  *(1)*
Elizabeth  *(1)*
eluded  *(1)*
E-mail  *(4)*
e-mails  *(6)*
embargo  *(2)*
employed  *(2)*
employee  *(3)*
employees  *(3)*
empowered  *(1)*
encounter  *(1)*
encouraging  *(1)*
encumbering  *(2)*
endeavor  *(1)*
endorse  *(6)*
endorses  *(1)*
ends  *(1)*
enforcement  *(32)*
engaged  *(4)*
engaging  *(1)*
enter  *(1)*
entered  *(1)*
entire  *(1)*
entities  *(3)*
entry  *(1)*
environment  *(11)*
equities  *(1)*
equivalent  *(1)*
Errata  *(1)*
espouse  *(6)*
espouses  *(1)*
ESQUIRE  *(9)*
Essentially  *(1)*

**establish** *(2)*
**established** *(2)*
**establishes** *(2)*
**estimate** *(2)*
**estimating** *(1)*
**ET** *(4)*
**ether** *(1)*
**events** *(3)*
**Everest** *(3)*
**everybody** *(3)*
**Evidence** *(8)*
**evident** *(1)*
**evil** *(1)*
**ex** *(1)*
**exact** *(6)*
**exactly** *(13)*
**EXAMINATION** *(3)*
**examined** *(1)*
**example** *(20)*
**examples** *(9)*
**exception** *(1)*
**exchanged** *(1)*
**exclude** *(2)*
**exclusively** *(1)*
**Excuse** *(1)*
**exec** *(2)*
**executed** *(1)*
**execution** *(2)*
**executive** *(82)*
**exercise** *(2)*
**Exhibit** *(38)*
**exhibits** *(5)*
**exist** *(2)*
**existed** *(2)*
**existence** *(3)*
**existing** *(1)*
**exists** *(5)*
**expect** *(3)*
**expected** *(3)*
**expedited** *(1)*
**experience** *(6)*
**expert** *(2)*
**expires** *(1)*
**explain** *(1)*
**explained** *(1)*
**explicit** *(1)*
**explode** *(1)*
**express** *(1)*
**expressly** *(2)*

**extent** *(30)*

**< F >**
**F1** *(2)*
**facilitate** *(2)*
**facilitating** *(1)*
**fact** *(6)*
**factors** *(1)*
**facts** *(1)*
**factual** *(6)*
**faculty** *(2)*
**fair** *(8)*
**fall** *(4)*
**falls** *(1)*
**FAM** *(16)*
**familiar** *(24)*
**familiarity** *(5)*
**familiarize** *(3)*
**familiarizing** *(1)*
**far** *(4)*
**fast** *(2)*
**fat** *(1)*
**FBI** *(1)*
**February** *(11)*
**feel** *(2)*
**feeling** *(1)*
**feels** *(1)*
**fees** *(1)*
**fellow** *(1)*
**female** *(1)*
**field** *(1)*
**Figel** *(1)*
**figure** *(1)*
**filling** *(1)*
**final** *(11)*
**finalization** *(1)*
**finalized** *(21)*
**financial** *(1)*
**find** *(2)*
**finding** *(1)*
**fine** *(8)*
**finish** *(4)*
**finished** *(7)*
**fire** *(3)*
**FIRST** *(19)*
**five** *(12)*
**flag** *(1)*
**flip** *(1)*
**Floor** *(1)*

**focus** *(5)*
**focuses** *(1)*
**Focusing** *(2)*
**folks** *(3)*
**followed** *(1)*
**following** *(3)*
**follows** *(1)*
**follow-up** *(2)*
**forcefully** *(3)*
**foregoing** *(3)*
**foreign** *(86)*
**foremost** *(2)*
**forever** *(1)*
**forgetting** *(1)*
**Forgive** *(1)*
**forgot** *(1)*
**forgotten** *(1)*
**Form** *(73)*
**formal** *(4)*
**former** *(1)*
**forms** *(2)*
**formula** *(1)*
**forth** *(9)*
**forwarded** *(1)*
**found** *(9)*
**Foundation** *(60)*
**founding** *(2)*
**four** *(7)*
**FPU** *(2)*
**Franklin** *(1)*
**Fraud** *(8)*
**fraudulently** *(1)*
**Frederick** *(1)*
**free** *(6)*
**frequently** *(1)*
**Friday** *(1)*
**front** *(25)*
**full** *(6)*
**fully** *(4)*
**function** *(1)*
**functionally** *(1)*
**functions** *(1)*
**funny** *(1)*
**further** *(2)*

**< G >**
**gamesmanship** *(1)*
**GANS** *(3)*
**gathering** *(1)*

**Gaza** *(3)*
**general** *(12)*
**generalize** *(2)*
**generally** *(12)*
**generated** *(5)*
**generates** *(1)*
**geographic** *(2)*
**Germany** *(1)*
**getting** *(2)*
**give** *(29)*
**given** *(11)*
**gives** *(3)*
**giving** *(1)*
**Go** *(34)*
**goal** *(3)*
**goes** *(5)*
**going** *(54)*
**Good** *(14)*
**gosh** *(1)*
**gotten** *(3)*
**Government** *(23)*
**Government's** *(1)*
**grabbing** *(1)*
**Gracon** *(1)*
**grant** *(1)*
**granted** *(2)*
**Great** *(1)*
**greater** *(1)*
**green** *(14)*
**gross** *(2)*
**ground** *(2)*
**grounds** *(13)*
**group** *(7)*
**groups** *(4)*
**guess** *(7)*
**guests** *(1)*
**guidance** *(87)*
**guides** *(1)*
**guiding** *(1)*
**guise** *(1)*
**guys** *(3)*

**< H >**
**habeas** *(1)*
**half** *(2)*
**halfway** *(1)*
**Hamas** *(10)*
**hand** *(4)*
**handed** *(2)*

Deposition of John Armstrong                        AAUP, et al. v. Rubio, et al.

**handful** *(1)*
**handle** *(1)*
**handled** *(4)*
**handles** *(2)*
**handling** *(1)*
**hang** *(2)*
**Hansen** *(2)*
**happen** *(1)*
**happened** *(3)*
**happens** *(2)*
**happily** *(1)*
**happy** *(9)*
**hard** *(7)*
**hate** *(1)*
**Hatred** *(1)*
**hazard** *(2)*
**head** *(6)*
**heard** *(17)*
**hearing** *(4)*
**hearsay** *(1)*
**heart** *(3)*
**help** *(10)*
**helped** *(1)*
**helpful** *(1)*
**Henderson** *(11)*
**hereunto** *(1)*
**Heritage** *(5)*
**high** *(1)*
**higher** *(3)*
**hit** *(1)*
**Hold** *(2)*
**holder** *(13)*
**holders** *(16)*
**holder's** *(2)*
**Holocaust** *(4)*
**Homeland** *(20)*
**honcho** *(1)*
**honor** *(1)*
**hope** *(2)*
**hopeful** *(1)*
**hostile** *(11)*
**hostility** *(2)*
**hot** *(1)*
**hour** *(2)*
**hours** *(2)*
**House** *(16)*
**How's** *(1)*
**human** *(2)*
**humanitarian** *(1)*

**hundred** *(1)*
**hypothetical** *(4)*
**hypotheticals** *(1)*

**< I >**
**I&A** *(1)*
**I/221(i** *(1)*
**ICE** *(23)*
**ICE's** *(3)*
**icons** *(1)*
**identical** *(2)*
**identify** *(1)*
**illegal** *(8)*
**imbedded** *(1)*
**immediate** *(1)*
**immigrant** *(3)*
**immigrants** *(1)*
**immigrate** *(1)*
**immigration** *(4)*
**imperilled** *(1)*
**implementation** *(4)*
**implemented** *(2)*
**implicate** *(1)*
**implicates** *(1)*
**implication** *(4)*
**importance** *(3)*
**important** *(1)*
**impression** *(1)*
**improper** *(1)*
**INA** *(24)*
**Inadmissibility** *(3)*
**Inadmissible** *(1)*
**Inaudible** *(2)*
**include** *(9)*
**included** *(1)*
**Including** *(15)*
**inclusive** *(1)*
**incoming** *(1)*
**incomplete** *(3)*
**incorporates** *(2)*
**incorrect** *(4)*
**increased** *(1)*
**Independence** *(1)*
**INDEX** *(4)*
**indicates** *(2)*
**indicating** *(7)*
**indicative** *(1)*
**indiscretion** *(1)*
**individual** *(3)*

**ineligibility** *(1)*
**ineligible** *(2)*
**inform** *(7)*
**informal** *(1)*
**information** *(67)*
**informs** *(1)*
**input** *(1)*
**inquisically** *(1)*
**instance** *(1)*
**instances** *(1)*
**INSTITUTE** *(3)*
**institutional** *(1)*
**institutions** *(2)*
**instruct** *(32)*
**instructed** *(1)*
**instructing** *(6)*
**instruction** *(4)*
**instructions** *(21)*
**Intelligence** *(2)*
**intense** *(1)*
**intent** *(1)*
**interagency** *(5)*
**interest** *(1)*
**interested** *(4)*
**interests** *(1)*
**internally** *(2)*
**International** *(3)*
**interpret** *(1)*
**interpretation** *(1)*
**interrupt** *(1)*
**intimidation** *(1)*
**investigated** *(1)*
**investigation** *(1)*
**investigations** *(2)*
**invocation** *(3)*
**invoke** *(10)*
**invoked** *(1)*
**invokes** *(2)*
**invoking** *(1)*
**involve** *(4)*
**involved** *(47)*
**involvement** *(11)*
**involves** *(4)*
**involving** *(3)*
**irrelevant** *(1)*
**Israel** *(14)*
**Israeli** *(4)*
**Israeli's** *(2)*
**Israel's** *(1)*

**issuance** *(13)*
**issue** *(17)*
**issued** *(36)*
**issues** *(7)*
**issuing** *(2)*
**it'd** *(1)*
**its** *(11)*

**< J >**
**Jaffar** *(1)*
**January** *(2)*
**JESSICA** *(5)*
**Jewish** *(17)*
**Jews** *(2)*
**Job** *(3)*
**Joe** *(1)*
**JOHN** *(5)*
**jokes** *(1)*
**JP** *(1)*
**Judge** *(1)*
**judgment** *(2)*
**Julie** *(2)*
**jump** *(1)*
**June** *(3)*
**junior** *(3)*
**Justice** *(4)*
**JUSTICE/CIVIL** *(1)*

**< K >**
**KANELLIS** *(1)*
**keep** *(5)*
**Kellogg** *(2)*
**kept** *(1)*
**key** *(1)*
**Khalil** *(8)*
**Khalil's** *(1)*
**Khan** *(2)*
**kind** *(5)*
**kindly** *(2)*
**kinds** *(3)*
**knew** *(1)*
**KNIGHT** *(3)*
**knocking** *(1)*
**know** *(256)*
**knowing** *(2)*
**knowledge** *(49)*
**known** *(4)*
**knows** *(3)*
**KRISHNAN** *(3)*

Deposition of John Armstrong                                    AAUP, et al. v. Rubio, et al.

**< L >**
labor  *(2)*
Lack  *(25)*
Lacks  *(1)*
Landau  *(2)*
language  *(18)*
large  *(2)*
largely  *(2)*
Lason  *(3)*
lasted  *(1)*
late  *(1)*
law  *(35)*
lawful  *(32)*
lawyer  *(6)*
lawyers  *(6)*
lead  *(3)*
leadership  *(13)*
leading  *(3)*
learning  *(1)*
leave  *(2)*
led  *(1)*
left  *(4)*
LEGAL  *(13)*
lengthy  *(1)*
letter  *(2)*
letters  *(1)*
level  *(10)*
levels  *(1)*
Lew  *(3)*
life  *(1)*
likewise  *(1)*
limit  *(1)*
limited  *(3)*
limiting  *(1)*
limits  *(1)*
line  *(6)*
lingo  *(1)*
Lipschutz  *(1)*
list  *(6)*
literally  *(1)*
litigating  *(1)*
little  *(4)*
Lloyd  *(2)*
Lloyd's  *(1)*
LLP  *(1)*
log  *(3)*
long  *(13)*
longer  *(2)*

long-standing  *(1)*
look  *(26)*
looked  *(4)*
looking  *(13)*
looks  *(2)*
lot  *(8)*
Lots  *(1)*
lottery  *(2)*
love  *(1)*
lower  *(4)*
luck  *(2)*
lunch  *(2)*

**< M >**
Madawi  *(2)*
M-A-D-A-W-I  *(1)*
Mahmoud  *(1)*
main  *(1)*
making  *(14)*
man  *(1)*
Management  *(2)*
manager  *(1)*
managing  *(14)*
manifest  *(1)*
manner  *(1)*
Manual  *(8)*
March  *(27)*
Marci  *(1)*
MARCO  *(3)*
marked  *(7)*
marks  *(1)*
mass  *(1)*
MASSACHUSETTS
  *(2)*
material  *(2)*
materials  *(1)*
Matt  *(1)*
matter  *(4)*
matters  *(2)*
Matthew  *(2)*
Maureen  *(2)*
MD  *(1)*
mean  *(38)*
meaning  *(7)*
meaningful  *(1)*
means  *(13)*
meant  *(5)*
measures  *(5)*
Media  *(16)*

medication  *(1)*
meet  *(3)*
meeting  *(12)*
meetings  *(19)*
members  *(2)*
memo  *(65)*
memoranda  *(3)*
memorandum  *(15)*
memorialized  *(1)*
memorized  *(4)*
memory  *(7)*
memos  *(27)*
mention  *(5)*
mentioned  *(52)*
message  *(3)*
messages  *(4)*
met  *(1)*
methods  *(1)*
Michael  *(1)*
mid  *(2)*
middle  *(3)*
migration  *(6)*
military  *(1)*
Miller  *(9)*
Milotvic  *(1)*
mind  *(3)*
minute  *(4)*
minutes  *(8)*
missed  *(2)*
Mission  *(2)*
missions  *(1)*
misspoke  *(1)*
Misstates  *(1)*
mistaken  *(2)*
misunderstood  *(1)*
Mm-hmm  *(1)*
Mohsen  *(2)*
moment  *(30)*
moments  *(1)*
Monday  *(1)*
money  *(1)*
monitoring  *(2)*
months  *(5)*
morning  *(2)*
Morris  *(1)*
moss  *(1)*
mountains  *(1)*
move  *(4)*
movement  *(1)*

movements  *(3)*
MRN  *(5)*
multi-page  *(1)*
multiple  *(1)*
Myers  *(11)*

**< N >**
name  *(17)*
names  *(1)*
national  *(13)*
Nationality  *(1)*
natural  *(1)*
Naturalization  *(1)*
nature  *(2)*
Nazi  *(1)*
Nazis  *(1)*
necessarily  *(6)*
necessary  *(1)*
need  *(24)*
needed  *(3)*
Needham  *(4)*
needing  *(1)*
needs  *(1)*
Neither  *(3)*
never  *(1)*
New  *(32)*
newly  *(2)*
news  *(2)*
nice  *(1)*
NIV  *(2)*
nod  *(2)*
Noe  *(1)*
non-citizen  *(1)*
noncitizens  *(4)*
non-citizens  *(6)*
nonclassified  *(1)*
non-Government  *(1)*
nonimmigrant  *(8)*
non-immigrant  *(9)*
non-privileged  *(1)*
non-recurring  *(1)*
non-Visa  *(1)*
nope  *(1)*
Normally  *(1)*
Norris  *(18)*
Northwest  *(1)*
notarial  *(1)*
Notary  *(1)*
NOTE  *(2)*

Case 1:25-cv-10685-WGY   Document 186-1   Filed 07/07/25   Page 557 of 863
Deposition of John Armstrong
AAUP, et al. v. Rubio, et al.

noted (5)
notes (1)
noticing (2)
notification (2)
notify (3)
Noting (1)
noun (1)
NSC (3)
NUDELMAN (2)
number (15)
numbers (2)
NW (2)
NY (2)

< O >
oath (1)
object (19)
objected (2)
Objection (220)
objections (1)
obligated (1)
obtain (1)
obviously (4)
occasion (6)
occasions (1)
occurred (1)
occurring (1)
offered (2)
offering (1)
offers (1)
OFFICE (110)
Officer (9)
officers (7)
offices (17)
official (7)
officials (6)
Oh (15)
Okay (124)
Okeemah (5)
Olowski (13)
once (4)
ones (8)
ongoing (8)
Op (8)
open (1)
operation (3)
operational (9)
operations (12)
OPERATOR (1)

opinion (21)
Opinions (9)
opportunity (3)
oppose (2)
opposed (8)
order (50)
orders (30)
ordinarily (1)
ordinary (2)
organization (25)
organizational (4)
organizations (16)
organizing (1)
origin (1)
original (1)
ought (1)
outcome (1)
outset (1)
outside (9)
overall (1)
overhead (1)
overlay (1)
Oversea (1)
Overseas (2)
Oversee (5)
overseen (1)
oversight (1)
overstate (1)
Ozturk (38)
Ozturk's (13)

< P >
P.L.L.C (1)
p.m (15)
PAGE (41)
pages (3)
painful (1)
Palestine (10)
Palestinians (1)
paper (3)
paragraph (58)
paragraphs (1)
parallel (2)
Pardon (1)
part (72)
partake (1)
partially (1)
participants (4)
participate (1)

participated (6)
participates (1)
particular (45)
parties (3)
Partly (1)
parts (5)
party (3)
pass (4)
Passport (4)
passports (3)
patriotism (2)
pause (3)
Peace (3)
peacefully (3)
pending (1)
people (72)
People's (3)
percent (8)
perform (1)
performed (2)
permanent (32)
person (47)
personal (1)
personally (8)
personnel (10)
persons (3)
person's (4)
perspective (2)
persuades (1)
PERT (1)
pertinent (2)
ph (2)
phrase (3)
phrasing (2)
pick (1)
picked (1)
picture (1)
Piece (3)
Pierce (8)
pile (1)
place (9)
Plaintiffs (8)
plan (1)
planning (1)
plans (2)
play (3)
played (1)
players (1)
plea (1)

please (37)
plural (1)
PO (1)
point (11)
policies (44)
policy (151)
policy-making (1)
political (3)
population (2)
posed (1)
position (35)
positions (3)
positive (2)
possibility (2)
possible (9)
possibly (5)
Post (5)
posts (4)
potentially (4)
power (5)
practice (2)
precedence (1)
precisely (2)
precision (1)
predecessor (1)
predecessors (1)
pre-decisional (1)
prefer (1)
prejudice (1)
pre-maritime (1)
preparation (1)
prepare (4)
prepared (2)
preparing (2)
prerogative (2)
presence (1)
PRESENT (5)
presented (5)
Presently (1)
President (5)
presidential (7)
press (3)
pretty (1)
preventing (1)
Prevention (6)
previous (10)
previously (10)
principal (9)
principally (3)

principals  (2)
Principle  (5)
prior  (3)
private  (2)
privilege  (61)
privileged  (28)
privileges  (4)
privy  (1)
pro  (1)
probably  (9)
problem  (1)
procedure  (2)
procedures  (1)
proceed  (1)
proceeding  (1)
Proceedings  (5)
process  (60)
processes  (5)
produce  (2)
produced  (4)
product  (2)
PROFESSORS  (2)
profile  (1)
program  (5)
programs  (3)
pro-Hamas  (9)
project  (70)
projects  (23)
prolific  (1)
promise  (2)
prompted  (6)
pro-Palestinian  (8)
proposed  (3)
propounded  (1)
protect  (2)
Protecting  (8)
protective  (1)
protest  (2)
protested  (1)
protester  (4)
protesters  (6)
protestors  (1)
protests  (5)
provide  (3)
provided  (4)
providers  (1)
provides  (1)
provision  (51)
provisions  (9)

Public  (46)
publically  (2)
published  (3)
pull  (1)
purpose  (6)
purposes  (8)
pursuant  (6)
put  (12)
puts  (1)
putting  (1)
pyramid  (1)

< Q >
quarrelling  (1)
question  (106)
questioning  (3)
questions  (35)
question's  (1)
quick  (1)
quicker  (1)
quite  (7)
quotation  (3)
quotations  (1)
quote  (4)
quoted  (3)
quotes  (2)
quoting  (4)

< R >
Rachel  (1)
racist  (1)
raise  (3)
RAMYA  (2)
randomly  (1)
rang  (1)
rare  (1)
Rarely  (3)
reach  (1)
reached  (1)
reaching  (1)
read  (39)
reading  (8)
reads  (1)
ready  (2)
real  (1)
reallocation  (5)
really  (10)
Realtime  (1)
reason  (9)

reasons  (5)
recall  (168)
receipt  (1)
receive  (13)
received  (39)
receives  (3)
receiving  (5)
recipients  (3)
recognize  (4)
recognized  (1)
recollecting  (1)
recollection  (57)
recommend  (1)
recommendation  (5)
recommendations  (4)
recommended  (1)
recommending  (5)
recommends  (1)
record  (57)
records  (2)
recurring  (2)
redacted  (1)
reduced  (1)
reenforcing  (1)
refer  (12)
reference  (5)
referenced  (6)
references  (1)
referral  (17)
referrals  (19)
referred  (3)
referring  (10)
refers  (7)
refine  (1)
reflected  (3)
reflects  (1)
refresh  (13)
refreshes  (1)
refused  (1)
regard  (4)
regarding  (42)
Regardless  (3)
regards  (1)
regional  (1)
reinforced  (1)
rejection  (2)
relate  (12)
related  (10)
relates  (7)

relating  (24)
relation  (2)
relationship  (1)
release  (1)
released  (1)
relevance  (1)
relevant  (5)
relied  (1)
religious  (1)
rely  (2)
remains  (4)
remarks  (2)
remember  (38)
remembers  (1)
Remembrance  (3)
remind  (1)
removability  (22)
removable  (5)
removal  (6)
removals  (2)
remove  (5)
removing  (1)
rendering  (1)
repeat  (25)
repeated  (1)
repeatedly  (1)
repeating  (1)
rephrase  (4)
replaced  (1)
report  (58)
Reported  (1)
Reporter  (14)
REPORTER'S  (1)
reports  (3)
represent  (2)
representation  (1)
representing  (6)
Republic  (3)
request  (7)
requested  (2)
require  (5)
required  (16)
requires  (5)
researching  (1)
resident  (11)
residents  (18)
resident's  (3)
resolved  (1)
resolving  (2)

| | | | |
|---|---|---|---|
| resources (2) | runs (1) | set (15) | sought (1) |
| respect (18) | | setting (6) | sound (1) |
| Respectfully (1) | < S > | Shane (3) | sounds (3) |
| respond (4) | safety (8) | shared (3) | source (1) |
| responding (2) | SANTORA (292) | sheet (5) | sources (4) |
| response (39) | SAO (1) | SHER (3) | SP (1) |
| responses (1) | SARAH (2) | shocking (1) | speak (25) |
| responsibile (1) | save (2) | short (2) | speaking (5) |
| responsibilities (1) | saw (6) | shortchange (1) | speaks (1) |
| responsibility (1) | saying (9) | shouting (1) | special (48) |
| responsible (25) | says (22) | show (10) | specific (10) |
| rest (3) | say-so (1) | showed (2) | specifically (13) |
| result (3) | scheduler (1) | showing (2) | speculate (4) |
| resumed (5) | scope (3) | shown (4) | speculating (4) |
| retired (1) | SCOTT (3) | shows (1) | speculation (69) |
| retirement (1) | Scott.wilkens@knightc | shredded (1) | speculative (8) |
| retiring (1) | olumbia.org (1) | sic (1) | Speculatively (2) |
| retread (1) | sea (1) | sign (9) | speech (3) |
| return (2) | seal (1) | signature (2) | spelled (1) |
| reveal (5) | sec (2) | signed (14) | spirits (1) |
| revealed (1) | second (27) | significance (1) | spoke (12) |
| revealing (2) | secretaries (7) | signing (1) | spoken (6) |
| review (54) | secretary (117) | signs (3) | spokesperson's (1) |
| reviewed (20) | secretary's (5) | silent (12) | spots (3) |
| reviewing (22) | section (16) | silly (2) | staff (15) |
| reviews (4) | security (56) | similar (4) | staffer (1) |
| revisions (1) | see (34) | Simply (4) | staffers (3) |
| revocation (92) | seeing (5) | single (5) | stand (2) |
| revocations (43) | seeking (7) | sir (2) | standard (6) |
| revoke (50) | seeks (1) | sit (5) | standards (1) |
| revoked (13) | seen (17) | sitting (1) | standing (9) |
| revoking (3) | segment (1) | situation (12) | start (6) |
| right (40) | selection (1) | situational (1) | starting (5) |
| rights (2) | send (5) | Situations (2) | STATE (196) |
| river (4) | sending (3) | skim (1) | stated (4) |
| Riverside (1) | sends (1) | skimmed (1) | statement (30) |
| role (25) | senior (13) | slightly (1) | statements (17) |
| roles (1) | sense (1) | slow (1) | STATES (30) |
| rolls (1) | sensitive (1) | small (5) | State's (1) |
| room (1) | sent (27) | Smith (33) | Station (1) |
| rough (2) | sentence (12) | Smith's (6) | status (3) |
| routinely (1) | sentiment (1) | social (13) | statute (1) |
| RPR (3) | separate (1) | solving (1) | statutory (3) |
| RRP (1) | September (1) | somebody (1) | stays (1) |
| RUBIO (17) | series (2) | Somewhat (1) | stenographically (1) |
| Rubio's (7) | serious (1) | Soon (1) | step (1) |
| rules (1) | service (3) | sorry (90) | steps (5) |
| Rumeysa (1) | Services (14) | sort (4) | Steve (1) |
| run (1) | serving (1) | sorts (1) | Steven (4) |

Deposition of John Armstrong

AAUP, et al. v. Rubio, et al.

stick  *(1)*
Sticking  *(3)*
sticks  *(1)*
stipulation  *(1)*
stones  *(1)*
stop  *(4)*
stopped  *(2)*
stops  *(1)*
straight  *(2)*
straightforward  *(1)*
Street  *(4)*
STROKUS  *(3)*
Stuart  *(7)*
student  *(64)*
students  *(19)*
study  *(1)*
stuff  *(1)*
Stufft  *(4)*
subject  *(8)*
submitted  *(4)*
submitting  *(2)*
subordinate  *(4)*
subordinates  *(4)*
subsection  *(5)*
subset  *(1)*
substance  *(9)*
suitable  *(1)*
Suite  *(2)*
Supervision  *(1)*
supervisor  *(2)*
support  *(27)*
supporting  *(2)*
supposed  *(1)*
supposition  *(1)*
suppositions  *(1)*
sure  *(65)*
Surely  *(2)*
Suri  *(12)*
S-U-R-I  *(1)*
Suri's  *(2)*
surprise  *(1)*
sworn  *(1)*
symbols  *(1)*
sympathy  *(2)*
synagogue  *(3)*
system  *(14)*
systems  *(3)*

< T >

take  *(39)*
taken  *(22)*
takes  *(1)*
talk  *(11)*
talked  *(6)*
talking  *(7)*
TALKOVSKY  *(3)*
talks  *(1)*
tandem  *(3)*
tank  *(1)*
targeted  *(2)*
tasked  *(1)*
TAYLOR  *(3)*
teasing  *(1)*
telephone  *(1)*
tell  *(16)*
telling  *(4)*
temporarily  *(5)*
temporary  *(1)*
ten  *(3)*
tend  *(1)*
term  *(2)*
terms  *(5)*
Terrorism  *(5)*
terrorist  *(49)*
terrorists  *(6)*
test  *(1)*
testified  *(7)*
testify  *(4)*
testifying  *(4)*
testimony  *(15)*
text  *(1)*
th  *(1)*
Thank  *(22)*
Thanks  *(1)*
Theoretically  *(1)*
thing  *(7)*
things  *(16)*
think  *(39)*
thinking  *(5)*
third  *(2)*
thought  *(6)*
threaten  *(2)*
threatening  *(1)*
threats  *(8)*
three  *(16)*
threshold  *(3)*
Thursday  *(1)*
ties  *(1)*

Time  *(43)*
times  *(8)*
timing  *(1)*
tiny  *(1)*
tired  *(1)*
title  *(5)*
titled  *(3)*
today  *(19)*
Today's  *(2)*
Todd  *(2)*
told  *(1)*
tonight  *(1)*
Tony  *(2)*
top  *(11)*
topic  *(11)*
topics  *(3)*
torture  *(1)*
total  *(5)*
totality  *(1)*
totally  *(1)*
touched  *(1)*
tough  *(4)*
track  *(1)*
train  *(1)*
Training  *(9)*
trainings  *(1)*
transcript  *(7)*
transcription  *(1)*
transmitted  *(1)*
transparent  *(1)*
travel  *(2)*
treat  *(1)*
TREMONTE  *(3)*
tried  *(1)*
true  *(4)*
truthful  *(4)*
truthfully  *(1)*
try  *(7)*
trying  *(10)*
Tuesday  *(2)*
Tufts  *(1)*
turn  *(13)*
turning  *(3)*
two  *(32)*
type  *(9)*
types  *(9)*
typewriting  *(1)*

< U >

U.S  *(51)*
U.S.C  *(1)*
Uh-huh  *(3)*
Ukraine  *(1)*
unable  *(1)*
unacceptable  *(1)*
unclassified  *(3)*
underlying  *(3)*
undermine  *(6)*
undermines  *(2)*
underneath  *(1)*
understand  *(37)*
understanding  *(42)*
understood  *(2)*
undertake  *(1)*
undertaken  *(2)*
undertaking  *(2)*
unexpected  *(1)*
unfair  *(1)*
Unfortunately  *(1)*
UNIDENTIFIED  *(1)*
Unit  *(1)*
UNITED  *(19)*
units  *(1)*
universities  *(2)*
UNIVERSITY  *(6)*
unjustified  *(1)*
unnamed  *(1)*
unsure  *(1)*
update  *(2)*
updated  *(1)*
updates  *(5)*
updating  *(3)*
USC  *(2)*
use  *(13)*
uses  *(1)*
usually  *(5)*

< V >

vacuum  *(2)*
Vague  *(1)*
variables  *(1)*
various  *(11)*
Veprek  *(10)*
Veprek's  *(1)*
verb  *(1)*
verbal  *(1)*
version  *(2)*
versus  *(1)*

vetting  *(5)*
VICTORIA  *(2)*
Victoria.santora@usdo
j.gov  *(1)*
VIDEO  *(1)*
VIDEOGRAPHER
  *(27)*
Videotaped  *(2)*
view  *(2)*
views  *(2)*
vigilance  *(2)*
vigilant  *(1)*
violation  *(1)*
violators  *(2)*
violent  *(1)*
Visa  *(179)*
Visa-related  *(1)*
Visas  *(75)*
Visa's  *(1)*
Vlad  *(1)*
Voice  *(2)*

**< W >**
wait  *(5)*
want  *(43)*
wanted  *(2)*
wants  *(2)*
warranted  *(1)*
Washington  *(9)*
waste  *(1)*
Watson  *(8)*
way  *(27)*
weapons  *(1)*
webinars  *(4)*
website  *(1)*
week  *(2)*
weekend  *(1)*
weekly  *(3)*
weight  *(1)*
welcome  *(2)*
welfare  *(2)*
Well  *(63)*
went  *(3)*
We're  *(19)*
we've  *(7)*
WGY  *(1)*
WHA  *(1)*
whatever's  *(1)*
whereabouts  *(1)*

WHEREOF  *(1)*
White  *(16)*
wife  *(1)*
WILKENS  *(5)*
WILLIAM  *(1)*
Wilson  *(27)*
Wilson's  *(1)*
winter  *(1)*
wish  *(2)*
wished  *(2)*
withdraw  *(3)*
withdrawn  *(46)*
withheld  *(2)*
withholding  *(1)*
WITNESS  *(84)*
woman  *(1)*
word  *(4)*
words  *(13)*
work  *(48)*
worked  *(7)*
worker  *(1)*
working  *(21)*
works  *(29)*
worldwide  *(1)*
worry  *(1)*
write  *(3)*
writes  *(3)*
writing  *(2)*
written  *(17)*
wrong  *(2)*
wrote  *(8)*

**< Y >**
Yeah  *(17)*
year  *(6)*
years  *(7)*
yesterday  *(1)*
yesterday's  *(1)*
York  *(3)*
Yunseo  *(2)*

**< Z >**
Zionism  *(2)*
Zoran  *(1)*

# EXHIBIT 6

```
 1            UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
 2
                          Case No. 1:25-cv-10685 (WGY)
 3    AMERICAN ASSOCIATION OF                    :
      UNIVERSITY PROFESSORS, AMERICAN            :
 4    ASSOCIATION OF UNIVERSITY                  :
      PROFESSORS-HARVARD FACULTY CHAPTER,        :
 5    AMERICAN ASSOCIATION OF                    :
      UNIVERSITY PROFESSORS AT NEW               :
 6    YORK UNIVERSITY, RUTGERS AMERICAN          :
      ASSOCIATION OF UNIVERSITY                  :
 7    PROFESSORS-AMERICAN                        :
      FEDERATION OF TEACHERS, and                :
 8    MIDDLE EAST STUDIES ASSOCIATION,           :
                                                 :
 9            Plaintiffs,                        :
                   vs.                           :
10    MARCO RUBIO, in his official capacity as   :
      Secretary of State, and the DEPARTMENT     :
11    OF STATE, KRISTI NOEM, in her official     :
      capacity as Secretary of Homeland          :
12    Security, and the DEPARTMENT OF HOMELAND   :
      SECURITY, TODD LYONS, in his official      :
13    capacity as Acting Director of U.S.        :
      Immigration and Customs Enforcement,       :
14    DONALD J. TRUMP, in his official capacity  :
      As President of the United States, and     :
15    UNITED STATES OF AMERICA,                  :
                                                 :
16            Defendants.

17
              ------------------------------------
18                    REMOTE VIDEOTAPED
              DEPOSITION UNDER ORAL EXAMINATION OF:
19                      PETER HATCH

20                    June 25, 2025
                      -----------
21     REPORTED BY:  JENNIFER L. WIELAGE, CCR, RPR, CRR

22     REPORTED BY:  OKEEMAH S. HENDERSON, RPR

23

24
      EVEREST JOB #  42251
25
```

Deposition of Peter Hatch                                    AAUP, et al. v. Rubio, et al.

1                 TRANSCRIPT of the remote deposition of the

2      above-named witness, called for Oral Examination in

3      the above-entitled matter, said deposition being

4      taken pursuant to Federal Court Rules, by and before

5      JENNIFER WIELAGE, Certified Shorthand Reporter and

6      Notary Public, License No. XI01916, on Wednesday,

7      June 25, 2025, commencing at 7:00 in the evening.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
        A P P E A R A N C E S:
2

3     SHER TREMONTE, LLP
      90 Broad Street
      23rd Floor
4     New York, New York 10004
      (212) 202-2600
5     BY:  ALEXANDRA CONLON, ESQ.
      Aconlon@shertremonte.com
6     Attorneys for the Plaintiffs

7

8     KNIGHT FIRST AMENDMENT
      INSTITUTE AT COLUMBIA UNIVERSITY
      475 Riverside Drive
9     Suite 302
      New York, New York 10115
10    (646) 745-8500
      BY:  RAMYA KRISHNAN, ESQ.
11    Ramya.krishnan@knightcolumbia.org
      BY:  TALYA NEVINS, ESQ.
12    talya.nevins@knightcolumbia.org
      Attorneys for the Plaintiffs

13

14    U.S. DEPARTMENT OF JUSTICE/CIVIL DIVISION
      Benjamin Franklin Station
15    PO BOX 878
      Washington, DC 20044
16    (202) 616-8779
      BY:  JESSICA STROKUS, ESQUIRE
17    Jessica.strokus@usdoj.gov
      BY:  NANCY SAFAVI, ESQUIRE
18    Nancy.safavi@usdoj.gov
      Attorneys for the Defendants

19

20    ALSO PRESENT:  JON RASSON, Videographer

21

22

23

24

25

```
 1                  INDEX OF EXAMINATION

 2

 3   WITNESS: PETER HATCH                      PAGE

 4

 5   DIRECT EXAMINATION

 6      By Ms. Krishnan                          6

 7

 8                   INDEX OF EXHIBITS

 9

10   EXHIBITS                                 PAGE

11   Exhibit 1    Executive Order 14161        99

12   Exhibit 2    Executive Order 14188       134

13   Exhibit 3    DHS press release           136

14   Exhibit 4    Certified Administrative Record  219

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S

 2              THE VIDEOGRAPHER:  We are now on the

 3    record today's date is June 25th 2025, and the

 4    time is 10:21 a.m. Eastern daylight time.

 5         This is the recorded video deposition

 6    of Peter Hatch in the Matter of American

 7    Association of University Professors, et al

 8    versus Marco Rubio, et al.  United States

 9    District Court, District of Massachusetts.

10    Civil Action No. 125-CV-10685.

11         This deposition is being held at 1615 M

12    Street, Northwest, Washington, D.C.  My name is

13    Jon Rasson from Everest Court Reporting and I

14    am the video specialist.  The court reporter

15    today is Okeemah Henderson also from Everest

16    Court Reporting.

17         Will counsel, please, state their

18    appearances for the record.

19              MS. KRISHNAN:  My name is Ramya

20    Krishnan and I represent the Plaintiffs.

21              MS. CONLON:  My name is Alex Conlon,

22    and I also represent the plaintiffs.

23              MS. EVANS:  My name is Talya Nevins

24    and I also represent the Plaintiffs.

25              MS. SAFAVI:  My name is Nancy Safavi,
```

1    and I represent the Respondents in this case.

2            MS. STROKUS:   Jessica Strokus from

3    DOJ for the Defendants.

4            MR. ALEXANDER:   Darrell Alexander

5    with ICE representing the Defendants.

6            MS. CHARETTE:   Kaitlyn Charette, DHS

7    OGC representative for the Government.

8            THE VIDEOGRAPHER:   Will the court

9    reporter please swear in the witness.

10                    PETER HATCH,

11   was called as a witness, and having been first

12   duly sworn, was examined and testified as

13   follows:

14            THE WITNESS:   I do.

15                    EXAMINATION

16   BY MS. KRISHNAN:

17            Q.   Good morning, Mr. Hatch.

18   Before I get started with questions, I just

19   want to start with some ground rules.

20        Because the court reporter is taking

21   down everything we say, please, give visual

22   responses.  If you don't understand a question,

23   please let me know, and I'm happy to rephrase

24   it.  It's important that if you don't

25   understand a question that I've asked, that you

 1   ask the clarification.

 2          If you need a break, just let me know.

 3   We can break at any time except when a question

 4   is pending.  If a question is pending, I prefer

 5   that you answer it before we break.

 6          The next couple of questions I would

 7   ask at any deposition:  Are you taking any

 8   medication that could affect your ability to

 9   testify truthfully today?

10          A.   No.

11          Q.   Is there any reason why you

12   can't provide truthful testimony today?

13          A.   No.

14          Q.   State your name for the record?

15          A.   Peter Hatch.

16          Q.   As you know, your testimony is

17   under oath today.  Have you ever given

18   testimony -- sworn testimony before?

19          A.   Yes.

20          Q.   When?

21          A.   Mid 2000s over almost 20 years

22   ago.

23          Q.   Was that in a specific case?

24          A.   Yes.

25          Q.   And this testimony was in

1    court?

2              A.    Yes.

3              Q.    And what was the case about?

4              A.    It was a theft internal to

5    Coast Guard.

6              Q.    Is that the only case that you

7    have given sworn testimony in?

8              A.    One other that was EEO

9    complaint, again, almost 20 years ago.

10             Q.    EEO stands for what?

11             A.    It was a workplace incident,

12   Equal Employment Opportunity.

13             Q.    To your knowledge, has any

14   court ever found that your testimony is not

15   credible or was not credible?

16             A.    No.

17             Q.    Do any of the lawyers here

18   today represent you in your personal capacity

19   as opposed to your capacity as an employee of

20   DHS?

21             A.    No.

22             Q.    Did you speak with anyone about

23   the testimony that you're providing here today?

24             A.    No.

25             Q.    You didn't speak to your

1    lawyers?

2              A.    Yes, I -- about the deposition

3    process, things like that.

4              Q.    How many times did you meet

5    with Government attorneys to prepare for your

6    deposition today?

7              A.    Twice.

8              Q.    And how long was each of those

9    meetings?

10             A.    The first one was about a half

11   hour, the second was two hours.

12             Q.    Have you spoken with Andre

13   Watson about this case?

14             A.    No.

15             Q.    Have you spoken to Andre Watson

16   about the testimony that he has provided in

17   this case?

18             A.    No.

19             Q.    Have you spoken to John

20   Armstrong from the State Department about this

21   case?

22             A.    No.

23             Q.    Have you spoken to John

24   Armstrong about the testimony that he has

25   provided in this case?

```
 1              A.    No.
 2              Q.    Did you review any documents to
 3     prepare for your testimony today?
 4              A.    No.
 5              Q.    Have you been advised not to
 6     answer particular kinds of questions?
 7              A.    No.
 8              Q.    Okay.  I'm just going to ask a
 9     series of questions about your background.  And
10     what is your highest level of education?
11              A.    Bachelor of Science.
12              Q.    Where did you get that degree?
13              A.    Coast Guard Academy.
14              Q.    When did you get that degree?
15              A.    (Inaudible response.)
16              THE COURT REPORTER:  I'm sorry.  If
17     you could just keep your voice up because of
18     the blowers.  Repeat your answer.
19              A.    1989.
20     BY MS. KRISHNAN:
21              Q.    What is your current title?
22              A.    Assistant Director, Office of
23     Intelligence, Homeland Security Investigations.
24              Q.    And how long have you been in
25     that role?
```

1          A.    Six years.

2          Q.    What are your responsibilities

3    in that role?

4          A.    I manage Homeland Security

5    Investigations Intelligence Program.

6          Q.    What does managing HSI's

7    Intelligence Programs entail?

8          A.    Training, equipping, allocating

9    resources, obtaining resources and developing a

10   policy tactics, techniques and procedures for

11   doing analysis.

12         Q.    Analysis of what?

13         A.    Primarily criminals, criminal

14   conspiracies and criminal networks.

15         Q.    What do you train employees

16   inside the Office of Intelligence in?

17         A.    Criminal analysis.

18         Q.    Is it fair to say that you are

19   the senior most official in the Office of

20   Intelligence?

21         A.    Yes.

22         Q.    Who do you report to?

23         A.    The deputy executive associate

24   director of Homeland Security Investigations.

25         Q.    Who is -- what is their name?

1          A.    Derek Gordon.

2          Q.    Who do you oversee?

3          A.    Approximately, 1,000

4    investigative analysts.

5          Q.    What is the -- what are the

6    responsibilities of investigative analysts?

7          A.    Again, to analyze criminals,

8    criminal conspiracies and criminal networks.

9          Q.    You mentioned criminal

10   analysis, is there any other kind of analysis

11   that the offices -- Office of Intelligence

12   engages in?

13         A.    Yes.

14         Q.    What other kinds of analysis

15   does the Office of Intelligence engage in?

16         A.    Protective intelligence.

17         Q.    What does protective

18   intelligence mean?

19         MS. SAFAVI:  Objection.  I'm going to

20   instruct my client to answer to the extent that

21   it doesn't disclose law enforcement privilege.

22         A.    Threats to -- ICE personnel,

23   ICE leadership, ICE operations, Homeland

24   Security investigations and their information

25   and facilities.

```
 1    BY MS. KRISHNAN:
 2              Q.    Who in the Office of
 3    Intelligence directly reports to you?
 4              A.    I have a deputy.
 5              Q.    What's the deputy's name?
 6              A.    Brad Etter (ph).
 7              Q.    Is there anyone else who
 8    directly reports to you in the Office of
 9    Intelligence?
10              A.    No.
11              Q.    Are there any other senior
12    officials in the Office of Intelligence?
13              A.    Yes.
14              MS. SAFAVI:  Objection.  Form.
15    BY MS. KRISHNAN:
16              Q.    What are the names, to the
17    extent you can answer?
18              MS. SAFAVI:  Actually, I'm going to
19    ask that you define what senior official means,
20    if that's okay and define clarification in your
21    question.
22    BY MS. KRISHNAN:
23              Q.    Let's do this another way.  Who
24    directly reports to Brad Etter.
25              A.    Four division chiefs.
```

1      Q.    Who are those division -- what

2    are the four divisions?

3          A.    Analysis, collections,

4    emergency management, and admin.

5          Q.    Can you tell me who the chief

6    of each of those divisions is?

7          A.    Yes.

8          Q.    What are -- what are their

9    names?

10         A.    Analysis is Roy Stanley,

11   collections is Clem Avery, admin or enterprise

12   services is Samantha Daniels and emergency

13   management is Michael Vice.

14         Q.    His last name is Vice?

15         A.    Yes.

16         Q.    Please walk us through your

17   professional background prior to your current

18   role?

19         A.    I spent over 30 years as a

20   coast guard officer.

21         Q.    When did you join his?

22         A.    2019.

23         Q.    When you joined his, what was

24   your role?

25         A.    Same one I'm in now.

1      Q.   So just to confirm, you were a

2  coast -- you were in the coast guard until

3  2019?

4      A.   That's correct.

5      Q.   And before we get into your

6  work at the Office of Intelligence, I want to

7  understand where that office is situated in

8  Government.

9      Is the Office of Intelligence a

10  division within his?

11      A.   Yes.

12      Q.   And his is a component of ICE?

13      A.   A sub component.

14      Q.   A sub component.  And ICE is an

15  agency within DHS?

16      A.   ICE is a component within DHS.

17      Q.   I want to get this jargon

18  straight.  What is your understanding of HSI's

19  mission?

20      A.   To dismantle criminal --

21  transactional criminal organizations.

22      Q.   Does his have any other names?

23      A.   Yes.

24      Q.   Could you name the main ones?

25      A.   Manage the intellectual

1    property rights center, manage the center for

2    counter on human trafficking, manage the

3    student exchange visitor program, counter

4    terrorist organizations.

5            Q.    You mentioned the student and

6    exchange visitor program.  What does HSI's

7    management of that program entail?

8            A.    I don't know.  It's not

9    under (inaudible).

10           Q.    Which division does

11   responsibility for that program fall?

12           A.    National Security Division.

13           Q.    Does his conduct noncriminal

14   investigations?

15           MS. SAFAVI:  Objection.  Form.

16           MS. KRISHNAN:  You can answer.

17           MS. SAFAVI:  Actually, I'm going to

18   ask that you define what that means.

19           MS. KRISHNAN:  If the witness wants

20   clarification as I mentioned at the beginning,

21   you're more than welcome to seek clarification.

22   Let me know if you don't understand what a

23   question means.

24           And did you not understand my question?

25           A.    What's that, what do you mean

```
 1    by a noncriminal investigation?

 2    BY MS. KRISHNAN:

 3              Q.   Does his investigate

 4    individuals in relation to anything other than

 5    criminal offenses?

 6              A.   I don't know.  I don't know the

 7    answer.

 8              Q.   Does his -- withdrawn.

 9         Does his investigate individuals not

10    suspected of breaking criminal law?

11              A.   No.

12              Q.   You mentioned earlier that

13    his -- or the Office of Intelligence, rather,

14    engages in criminal analysis, but it also

15    engages in other kinds of analysis.

16         Does that analysis -- that other

17    analysis, does it relate to individuals not

18    suspected of breaking criminal law?

19              MS. SAFAVI:  Objection.  Form.

20              A.   Can you repeat the question?

21    BY MS. KRISHNAN:

22              Q.   You mentioned earlier that

23    there was criminal analysis and then there was

24    other analysis.

25              A.   Okay.
```

```
 1                    Q.   Does criminal analysis relate

 2        to investigating individuals suspected of

 3        breaking criminal law?

 4                    A.   Yes.

 5                    Q.   Does other analysis relate

 6        to -- relate only to individuals suspected of

 7        breaking criminal law?

 8                    A.   Yes.

 9                    Q.   Does his make arrests?

10                    A.   Yes.

11                    Q.   Is there any other division in

12        his that makes arrests?

13                    A.   I don't understand.  No.

14                    Q.   Going back one step.  Is it

15        your testimony that his does not investigate

16        noncriminal conduct?

17                    MS. SAFAVI:  Objection.  Form.

18                    A.   What do you mean by

19        "noncriminal conduct"?

20        BY MS. KRISHNAN:

21                    Q.   I mean conduct that isn't

22        breaking the law?

23                    MS. SAFAVI:  Objection.  Form.  Calls

24        for a legal conclusion.  Objection as well.

25        BY MS. KRISHNAN:
```

1          Q.    Well, do you not understand the

2     question?

3          A.    No.

4          Q.    Earlier you said the Office of

5     Intelligence engages in two kinds of analysis,

6     criminal analysis and other analysis.

7          And I just want to go back to the

8     testimony because I don't remember what was

9     said -- I'm going to move on, and I'll come

10    back to this.  Okay.

11         You mentioned that -- we talked about

12    HSI's mission, how does the Office of

13    Intelligence support HSI's mission?

14         A.    By analyzing criminals,

15    conspiracies, criminal networks in ways that

16    support investigations.

17         Q.    So all of the things you just

18    mentioned included criminal in it.  Does the

19    Office of Intelligence investigate individuals

20    when not suspected of violating criminal law?

21         A.    No.

22         Q.    You mentioned that criminal

23    analysis is one of the programs within the

24    Office of Intelligence.  What are the different

25    roles within that program?

1          A.   Typically, they're broken down

2    by mission area, so terrorism related, child

3    exploitation, human trafficking, human

4    smuggling, drug smuggling, weapons smuggling,

5    the crime series, and the crime programs that

6    we have in his.

7          Q.   You mentioned terrorism

8    related.   What does terrorism related mean?

9          MS. SAFAVI:  Objection.  Privileged.

10   I'm going to instruct my client to answer the

11   question, so long as it does not divulge

12   classified or law enforcement privilege

13   information.

14         THE COURT REPORTER:  Classified or --

15   if you could keep your voice up, please.

16         MS. SAFAVI:  Oh, yeah.  Sure.  Or law

17   enforcement privileged information.

18         THE COURT REPORTER:  Thank you.

19         MS. SAFAVI:  You're welcome.

20         A.   Can you repeat the question?

21   BY MS. KRISHNAN:

22         Q.   When I asked about the

23   different roles within criminal analysis, you

24   responded, typically their programmed out by

25   mission area, so terrorism related and you

1    mentioned some other areas.  What does

2    terrorism related mean?

3              A.   Threats to Homeland Security

4    and threats to national security.

5              Q.   Does advocating for terrorism a

6    threat to Homeland Security?

7              MS. SAFAVI:  Objection.  Form.

8              A.   I don't know.

9    BY MS. KRISHNAN:

10             Q.   Is expressing support for a

11   foreign terrorist organization a threat to

12   Homeland Security?

13             MS. SAFAVI:  Objection.  Form.

14             A.   What do you mean by

15   "advocating"?  How do you define "advocating"?

16   BY MS. KRISHNAN:

17             Q.   Endorsing.  Endorsing

18   terrorism.

19             A.   Maybe.  It would have to be in

20   the context of the individual situation.

21             Q.   Is expressing support for Hamas

22   a threat to Homeland Security?

23             A.   Again, in the context of the

24   individual case, it might be.

25             Q.   What counts as relevant to

 1    whether it is a threat to Homeland Security?

 2              MS. SAFAVI:  Objection.  I'm going

 3    to -- privilege.  I'm going to instruct my

 4    client to answer the question, so long as it

 5    does not divulge classified or law enforcement

 6    privileged information or deliberative process.

 7              A.    I think it would depend on if

 8    it was in the context of violence or some

 9    physical activity or depending on connections

10    they have with others.  Those would be types of

11    factors that I think would be considered.

12    BY MS. KRISHNAN:

13              Q.   So if support for Hamas didn't

14    entail violence or similar --

15              MS. SAFAVI:  Objection.  I couldn't

16    hear.  I'm sorry.

17    BY MS. KRISHNAN:

18              Q.   The question that I began was:

19    If support for Hamas didn't entail violence or

20    similar physical activity, would it constitute

21    a threat to Homeland Security?

22              MS. SAFAVI:  Objection.  Form.  And

23    it calls -- and privilege.  But I'll instruct

24    my client to answer the question, so long as it

25    does not divulge privileged information.

1          A.   I don't know.

2    BY MS. KRISHNAN:

3          Q.   Has the Office of Intelligence

4    investigated people who express support for

5    Hamas?

6          MS. SAFAVI:  Objection.  Form.

7          A.   Can you say that again?

8    BY MS. KRISHNAN:

9          Q.   Has the Office of Intelligence

10   investigated people who express support for

11   Hamas?

12         A.   What do you mean by

13   "investigate"?

14         Q.   I think you've used the term

15   investigate.

16         A.   The Office of Intelligence does

17   not conduct investigations.

18         Q.   It conducts only analysis.  And

19   how does --

20         A.   That's correct.

21         Q.   Sorry.  I should have let you

22   answer first.

23      How does analysis relate to

24   investigations conducted by his?

25         A.   Analysis is fact-finding

1    research that is provided to an investigator to

2    make a determination on whether something meets

3    the -- whether activities meet the evidence of

4    a crime.

5              Q.    You mentioned that "analysis is

6    fact-finding research that is provided to an

7    investigator."

8              Where would that investigator sit

9    within his?

10             A.    Could be anywhere.

11             Q.    Could you provide some examples

12   of other parts of his that conduct

13   investigations that the Office of Analysis

14   would provide its analysis and research to?

15             A.    Some examples would be National

16   Security Division all the way to a case agent

17   in a field office in one of our domestic

18   offices.

19             Q.    Does the destination of

20   research and analysis produced by the Office of

21   Intelligence depend on the basis for the

22   investigation?

23             MS. SAFAVI:  Objection.  Form.

24             A.    Can you clarify?

25   BY MS. KRISHNAN

1      Q.   Does the destination of

2   research and analysis produced by the Office of

3   Intelligence depend on the subject of that

4   research and analysis?

5           MS. SAFAVI:  Objection.  Form.

6           A.   What do you mean by "subject"?

7   BY MS. KRISHNAN:

8           Q.   How does the Office of

9   Intelligence decide where to refer its analysis

10  and research?

11          A.   It depends on location often or

12  program.

13          Q.   Let's start with location.

14  When you say, "location," do you mean the

15  location of the individual that is the subject

16  of the research and analysis?

17          A.   It could be the location of

18  the -- current location of the person.  Could

19  be where the criminal activity or suspected

20  criminal activity took place.

21          Q.   You also mentioned that it

22  could depend on program.  What -- what do you

23  mean by "program"?

24          A.   If it's a human trafficking

25  investigation and usually we will refer that to

1    the Center for Countering Human Trafficking as

2    the program lead for his human trafficking

3    investigations.

4           Q.   You mentioned that how the

5    Office of Intelligence decides where to refer

6    its research and analysis may depend on

7    location or program.

8        Are there any other things it could

9    depend on?

10          A.   Yes.

11          Q.   What are those things?

12          MS. SAFAVI:  Objection.  Privilege.

13   I'm going to instruct my client to answer the

14   question to the extent it doesn't divulge

15   privileged or classified information.

16          A.   Okay.  If there was an existing

17   open case we could refer it to that -- to those

18   investigators that can help the case.

19   BY MS. KRISHNAN:

20          Q.   Any other relevant factors?

21          A.   Not that I can think of.

22          Q.   What does collections do within

23   the Office of Intelligence?

24          A.   That's our office that liaisons

25   with the National Intelligence Community.

```
 1              Q.   When you say "National
 2    Intelligence Community," to what are you
 3    referring?
 4              MS. SAFAVI:  Objection.  I'm going to
 5    instruct my client to answer the question to
 6    the extent that it does not divulge law
 7    enforcement privilege or classified
 8    information.
 9              A.   The members -- the member
10    agencies that make up the Intelligence
11    Community.
12    BY MS. KRISHNAN:
13              Q.   Is the State Department part of
14    the National Intelligence Community?
15              A.   Part of the State Department is
16    part of the National Intelligence Community.
17              Q.   Which part of the State
18    Department?
19              MS. SAFAVI:  Objection.  I'm going to
20    instruct my client to answer the question to
21    the extent that it does not divulge law
22    enforcement privilege.
23    BY MS. KRISHNAN:
24              Q.   I hadn't finished my question,
25    but --
```

```
 1                    MS. SAFAVI:  Okay.  Sorry.
 2    BY MS. KRISHNAN:
 3          Q.   Which part -- I imagine you
 4    will object to this, but which part of the
 5    State Department is part of the National
 6    Intelligence Community.
 7                    MS. SAFAVI:  Objection.  I'm going to
 8    instruct my client to answer the question to
 9    the extent that it does not divulge classified
10    or law enforcement privilege.
11          A.   The intelligence unit.
12    BY MS. KRISHNAN:
13          Q.   What is the name of the State
14    Department's Intelligence unit?
15                    MS. SAFAVI:  Standing objection.
16          A.    I don't remember the exact
17    name.
18    BY MS. KRISHNAN:
19          Q.   So the liaison -- is the
20    liaison -- collections liaison with the
21    National Intelligence Community, Clement Avery.
22          A.   Yes.
23                    THE COURT REPORTER:  I'm sorry.  The
24    end of that was --
25                    MS. KRISHNAN:  Clement Avery.
```

```
 1              A.   Yes.
 2    BY MS. KRISHNAN:
 3              Q.   What does emergency management
 4    do?
 5              A.   That's the unit that responds
 6    to or coordinates ICE's response to manmade and
 7    natural, national disasters.
 8              Q.   Going back to the State
 9    Department's Intelligence unit, what are the
10    names of its leadership?
11              A.   I don't know.  I'm sorry.
12              MS. SAFAVI:  No, it's okay.  Standing
13    objection with the instruction of answer the
14    question to the extent that it doesn't divulge
15    classified or privileged information.
16    BY MS. KRISHNAN:
17              Q.   Is there a unit within the
18    Office of Intelligence called the Counter
19    Terrorism Intelligence unit?
20              A.   Yes.
21              Q.   Where inside the Office of
22    Intelligence does that unit sit?
23              A.   Analysis.
24              Q.   When was this unit created?
25              MS. SAFAVI:  Objection.  Objection to
```

```
 1   relevance.  You can answer the question.
 2           A.   Two years ago, approximately.
 3   Maybe.
 4   BY MS. KRISHNAN:
 5           Q.   What was the unit created in
 6   response to?
 7           A.   A --
 8           MS. SAFAVI:  Objection.  I'm sorry.
 9   I need a moment, if that's okay.  Objection.
10   Law enforcement privilege, and I'm going to
11   instruct my client to answer the question so
12   long as it does not divulge that privilege or
13   classified information.
14           A.   It was created in response to a
15   particular threat against the United States.
16   BY MS. KRISHNAN:
17           Q.   What was that threat?
18           MS. SAFAVI:  Objection.  Standing
19   objection and standard instruction.
20           A.   A terrorism related threat to
21   national security.
22   BY MS. KRISHNAN:
23           Q.   What is the unit's current
24   mission?
25           A.   Analyzing threats to national
```

 1    security and Homeland Security, that's it.

 2              Q.   What does the unit do to

 3    support that mission?

 4              MS. SAFAVI:  Standing objection.  I'm

 5    going to instruct my client to answer to the

 6    extent it does not divulge classified or law

 7    enforcement privilege and deliberative process

 8    privilege.

 9              A.   Analyzing any individuals who

10    threaten national security or Homeland Security

11    or suspected of threatening national security

12    or Homeland security.

13    BY MS. KRISHNAN:

14              Q.   Does it conduct research and

15    analysis on such individuals?

16              A.   Yes.

17              Q.   Does it do anything other than

18    research and analysis to support it's mission?

19              A.   Yes.

20              Q.   Does it conduct investigations?

21              A.   No.

22              Q.   What does it do besides

23    research analysis?

24              MS. SAFAVI:  Objection.  Asked and

25    answered.  You can answer the question.

1        A.    Attends meetings, works with

2    other agencies, does training, things like

3    that.

4    BY MS. KRISHNAN:

5        Q.    Which agencies does it most

6    regularly meet with?

7        MS. SAFAVI:  Objection.  Form.

8        A.    It could meet with anybody, but

9    DHS, Customs and Border Protection.

10   BY MS. KRISHNAN:

11       Q.    Does it typically meet with the

12   State Department?

13       A.    No.

14       Q.    To your knowledge, have

15   employees within the counter terrorism

16   intelligence unit met with employee of the

17   State Department this year?

18       A.    I don't know.

19       Q.    Prior to 2025, did the unit

20   prepare research and analysis on noncitizens?

21       MS. SAFAVI:  Objection.  Form.

22       A.    What do you mean by

23   "noncitizens"?

24   BY MS. KRISHNAN:

25       Q.    People who are not U.S.

1    citizens who live inside of the U.S.?

2              A.   Yes.

3              Q.   For what purpose did the unit

4    prepare research analysis on noncitizens?

5              MS. SAFAVI:  Standing objection with

6    standard instruction.

7              A.   Analyzing threats to national

8    security and Homeland Security.

9    BY MS. KRISHNAN:

10             Q.   Does it currently prepare

11   research and analysis on noncitizens for any

12   other reason?

13             MS. SAFAVI:  Objection.  Standing

14   objection and the standard instruction.

15             A.   What do you mean by "any other

16   reason"?

17   BY MS. KRISHNAN:

18             Q.   So earlier you said that, "The

19   unit prepared research and analysis on

20   noncitizens to analyze threats to national

21   security and Homeland Security."

22        And my question is:  Does the unit

23   prepare research and analysis on noncitizens

24   for any other reason?

25             MS. SAFAVI:  And objection.  The

1    standing objection about privilege.  The

2    standard instruction.

3              A.    Sometimes they're called on to

4    help other -- other analysts with other

5    threats, so maybe.

6    BY MS. KRISHNAN:

7              Q.    What other threats?

8              MS. SAFAVI:  Objection.  Standing

9    objection.

10             A.    So, for example, if there was a

11   human trafficking network and the workload was

12   getting too big for the analysts that are

13   assigned, I might use that unit to get help.

14   BY MS. KRISHNAN:

15             Q.    Who oversees the unit?

16             A.    The unit chief.

17             Q.    What is the name of the unit

18   chief?

19             A.    Roy Stanley.

20             Q.    So Mr. Stanley is the chief of

21   the counter intelligence unit but he is also

22   the chief of analysis?

23             MS. SAFAVI:  Objection.  Form.

24   BY MS. KRISHNAN:

25             Q.    Is it the same Roy Stanley?

1          A.    It's the same Roy Stanley.

2          Q.    And who reports to Mr. Stanley?

3          A.    He has section chiefs that

4    report to him and analysts within the unit.

5          Q.    How many section chiefs report

6    to him?

7          A.    I don't know.

8          Q.    What are the names of the

9    sections?

10         A.    I don't know.

11         Q.    What is the function of each of

12   those sections?

13         MS. SAFAVI:  Objection.  Standing

14   objection and standard instruction.

15         A.    Like I said, to analyze threats

16   to Homeland Security and national security.

17   The sections just divide up the workload.

18   BY MS. KRISHNAN:

19         Q.    You've mentioned threats to

20   national security and threats to Homeland

21   Security.

22         What is the difference between threats

23   to national security and threats to Homeland

24   Security?

25         A.    National security is --

1    includes things like counter terrorism,

2    espionage.  Homeland Security is really

3    everything else.

4            Q.   What does everything else mean

5    within the context of his?

6            A.   So a transnational criminal

7    organization like the Mexican cartel could be

8    a -- is a threat to Homeland Security in that

9    they conduct operations in the homeland and

10   national security in that they could impact the

11   United States as a whole versus (inaudible)

12   community.  They're almost interchangeable

13   terms.

14           Q.   What other threats to Homeland

15   Security exist?

16           A.   Weapons trafficking, human

17   smuggling, exploitation of children, drug

18   smuggling.  I'm sure there's others but, fraud,

19   money laundering.

20           Q.   So when does a foreign student

21   pose a threat to national security?

22           MS. SAFAVI:  Objection.  Form.

23           A.   I don't know.  In general

24   terms, I don't know.

25   BY MS. KRISHNAN:

1        Q.   If a foreign student expresses

2   support for a foreign terrorist organization

3   like Hamas, do they pose a threat to national

4   security?

5              MS. SAFAVI:  Objection.  Form.

6              A.   It depends on the context.

7   BY MS. KRISHNAN:

8              Q.   If that foreign student has not

9   been engaged in any violent or criminal

10  activity, but they have expressed support for

11  Hamas, does that foreign student pose a threat

12  to national security?

13             MS. SAFAVI:  Objection.  Form.

14             A.   I don't know.

15  BY MS. KRISHNAN:

16             Q.   When does a foreign student

17  pose a threat to Homeland Security?

18             A.   I don't know.

19             Q.   If a foreign student -- in what

20  circumstances -- sorry.  Withdrawn.

21        In what circumstances might a foreign

22  student who has not engaged in criminal or

23  violent activity pose a threat to Homeland

24  Security?

25             A.   I would be speculating.

```
 1            Q.   Does a foreign student who is
 2     engaged in what the Office of Intelligence --
 3     I'm sorry.  Withdrawn.
 4            Does a foreign student who is engaged
 5     in anti-Semitic activity pose a threat to
 6     Homeland Security?
 7                 MS. SAFAVI:  Objection.  Form.
 8            A.   What do you mean by
 9     "anti-Semitic".
10     BY MS. KRISHNAN:
11            Q.   What do you understand anti --
12     anti-Semitic activity?
13            A.   I don't define anti-Semitic
14     activity.
15            Q.   Is it your testimony that you
16     don't have any understanding of what
17     anti-Semitic activity means?
18                 MS. SAFAVI:  Objection.
19     Mischaracterization of his testimony.  Object
20     to form.
21                 MS. KRISHNAN:  I was asking him what
22     his testimony meant.
23     BY MS. KRISHNAN:
24            Q.   Do you have any understanding
25     of what anti-Semitism is?
```

```
 1              A.   Yes.

 2              Q.   What is your understanding of

 3   anti-Semitism?

 4              A.   I don't define it.

 5              MS. KRISHNAN:  I would like to take a

 6   brief break now.

 7              MS. CONLON:  Can we have 15 minutes?

 8              THE VIDEOGRAPHER:  The time is 11:12

 9   and we are off the record.

10         (A break was taken at 11:13 a.m.)

11          THE VIDEOGRAPHER:  The time is 11:48

12   and we're back on the record.

13   BY MS. KRISHNAN:

14              Q.   Prior to 2025, did his

15   investigate Visa holders?

16              A.   Yes.

17              Q.   What did his investigate --

18              THE COURT REPORTER:  I'm sorry what

19   did his --

20              MS. KRISHNAN:  Investigate them for.

21              MS. SAFAVI:  Objection.  Standing

22   objection and with the instruction that you can

23   answer so long as it does not disclose

24   privileged or (inaudible) information.

25              A.   Any criminal activity conducted
```

1    by a person who holds a Visa.

2    BY MS. KRISHNAN:

3           Q.   Did his, prior to 2025,

4    investigate Visa holders for any activity other

5    than criminal activity.

6           MS. SAFAVI:  Objection.  Same

7    objection.  But you can answer.

8           A.   Not that I know of.

9    BY MS. KRISHNAN:

10          Q.   Did it investigate whether Visa

11   holders are engaged in activity that is

12   inconsistent with their Visa?

13          MS. SAFAVI:  I'm sorry.  I didn't

14   hear.

15   BY MS. KRISHNAN:

16          Q.   Prior to 2025, did his

17   investigate whether Visa holders are engaged in

18   activity that is inconsistent with their Visa?

19          MS. SAFAVI:  Objection.  Form.

20          A.   What do you mean by

21   "inconsistent with their Visa"?

22   BY MS. KRISHNAN:

23          Q.   Did it investigate whether Visa

24   holders are in compliance with the terms of

25   their Visa?

```
 1                    A.    Yes.

 2                    Q.    Even when they were not

 3    suspected of engaging in criminal activity?

 4                    MS. SAFAVI:  Objection.  Form.

 5                    A.    Can you clarify?

 6    BY MS. KRISHNAN:

 7                    Q.    Did it investigate whether Visa

 8    holders are in compliance with the terms of

 9    their Visa when there was no reason to believe

10    that they were engaged in criminal activity?

11                    A.    I don't know.

12                    Q.    Did it investigate whether Visa

13    holders had overstayed their Visa?

14                    A.    Yes.

15                    Q.    Did it investigate Visa holders

16    for working unlawfully in the country?

17                    A.    Yes.

18                    Q.    Did it investigate student Visa

19    holders based on their advocacy?

20                    MS. SAFAVI:  Objection.  Form.

21                    A.    Can you clarify "advocacy"?

22    BY MS. KRISHNAN:

23                    Q.    Did it investigate student Visa

24    holders based on their participation in

25    political protests?
```

```
 1              MS. SAFAVI:  Objection.  Form.
 2              A.   What do you mean by "political
 3   protest"?
 4   BY MS. KRISHNAN:
 5              Q.   What do you understand
 6   political protest to mean?
 7              A.   Can you rephrase the first
 8   question?
 9              Q.   Mm-hmm.  I'm asking prior to
10   2025, did his investigate student Visa holders
11   because of their attendance at a political
12   protest?
13              A.   I don't know.
14              Q.   Prior to 2025, did his
15   investigate student Visa holders for leading a
16   political group?
17              A.   I don't know.
18              Q.   Have you ever been involved in
19   the investigation of a foreign student who is
20   engaged in political protests during your time
21   at his?
22              A.   No.
23              Q.   What is the Office of
24   Intelligence's role when his decides to
25   investigate the Visa holder?
```

1          MS. SAFAVI:  Objection.  Asked and

2     answered.

3     BY MS. KRISHNAN:

4          Q.   You can still answer.

5          A.   Research and analysis of the

6     individual in support of the investigation.

7     BY MS. KRISHNAN:

8          Q.   Does the Office of Intelligence

9     prepare a report of analysis only if requested

10    to in support of an existing investigation?

11         A.   No.

12         MS. SAFAVI:  Objection -- I'm sorry.

13    Objection.  Form, and the standing objection

14    about privilege.

15         A.   No.

16    BY MS. KRISHNAN:

17         Q.   So to confirm, the only

18    circumstance in which the Office of

19    Intelligence prepares a report of analysis is

20    when it is being asked to in support of an

21    investigation -- existing investigation.

22         A.   No.

23         Q.   So what are the other

24    circumstances in which the Office of

25    Intelligence prepares the report of analysis?

1              MS. SAFAVI:  Objection.  Standing --

2       the standing objection on privilege law

3       enforcement and deliberative and I'll instruct

4       my client to answer to the extent that he can

5       without divulging that information.

6       BY MS. KRISHNAN:

7              Q.   I'll repeat my question.

8              What are the other circumstances in

9       which the Office of Intelligence prepares the

10      report of analysis?

11             A.   Existing investigation,

12      suspicious activity.  When asked to by the

13      (inaudible) programs or someone -- and agent in

14      his.

15             Q.   So let's start with an existing

16      investigation.  What other parts of his might

17      ask the Office of Intelligence to prepare a

18      report of analysis in support of an existing

19      investigation?

20             MS. SAFAVI:  Objection.  Standing

21      objection and same instructions.

22             A.   In support of an existing

23      investigation in which most cases come from the

24      investigator or any of the investigators

25      involved in that investigation or any of the

1    supervisors involved in that investigation.

2    BY MS. KRISHNAN:

3             Q.    What are the other cases?

4             A.    If there wasn't an open

5    investigation, we could get asked to look into

6    an individual by any agent that suspected

7    criminal activity.

8             Q.    Where do investigators sit

9    within his?

10            MS. SAFAVI:  Objection.  Form.

11            A.    You got to be more specific.

12    Everywhere.

13    BY MS. KRISHNAN:

14            Q.    Which parts of his most

15    regularly ask the Office of Intelligence to

16    produce a report of analysis in support of an

17    existing investigation?

18            MS. SAFAVI:  Objection.  And standing

19    objection and standard instruction.

20            A.    The programs, the investigative

21    programs.

22    BY MS. KRISHNAN:

23            Q.    Where do the investigative

24    programs reside within his?

25            MS. SAFAVI:  Standing objection and

1    standard instruction.

2            A.    In D.C., National Capital

3    region, sorry.

4    BY MS. KRISHNAN:

5            Q.    Which part of his do these

6    investigative programs exist within?

7            MS. SAFAVI:  Same objection.

8            A.    The investigative programs are

9    how his divides itself.

10   BY MS. KRISHNAN:

11           Q.    So when you say "investigative

12   programs," you mean analysis, for example?

13           A.    No. Analysis is a division --

14   sorry, analysis is a division within the Office

15   of Intelligence.  Investigative programs are

16   divisions within his.

17           Q.    Such as the National Security

18   Division?

19           A.    Correct.

20           Q.    And what other divisions do

21   investigator programs seeks within?

22           MS. SAFAVI:  Same objection, standard

23   instruction.

24           A.    Domestic operations,

25   international operations, countering

 1    transnational organized crime, National

 2    Security Division and computer and operational

 3    technology division and global trade

 4    investigations division.

 5    BY MS. KRISHNAN:

 6              Q.   Does the Office of Intelligence

 7    prepare reports of analysis on what you called

 8    OES suspicious activity?

 9              A.   Yes.

10              Q.   What do you mean by the term

11    "suspicious activity"?

12              MS. SAFAVI:  Standing objection.  I'm

13    going to instruct my client that to the extent

14    this calls for privileged or classified

15    information, that you not disclose that.

16              A.   Suspicion of violating U.S.

17    laws.

18    BY MS. KRISHNAN:

19              Q.   U.S. criminal laws or other

20    laws as well?

21              MS. SAFAVI:  Objection.  Form.

22              A.   What do you mean by "other

23    laws"?

24    BY MS. KRISHNAN:

25              Q.   As an example, violations of

 1    immigration law that are not criminal in

 2    nature?

 3              MS. SAFAVI:  Objection.  Form.  Can

 4    you, please, repeat the entire question?

 5    BY MS. KRISHNAN:

 6              Q.   If he's unsure of what a

 7    question means he is briefed, he can feel free

 8    to clarify with me, but that's for him to do.

 9              MS. SAFAVI:  As counsel, I need to be

10    clear on what your question is.

11    BY MS. KRISHNAN:

12              Q.   You used the term suspicious

13    activity, and I'm just trying to understand

14    whether that term, as you used it, entails any

15    activity that is not criminal in nature?

16              A.   Can you give me an example of

17    an activity that's not criminal in nature?

18              Q.   I'm not -- I'm not asking you

19    to define suspicious activity in the abstract.

20         You mentioned that one circumstance in

21    which the Office of Intelligence prepares a

22    report of analysis is where there is suspicious

23    activity.  And I'm just trying to understand

24    what "suspicious activity" means in that

25    context?

```
 1              A.    The context is violations of
 2      law.
 3              Q.    Does that include violations of
 4      law that exist outside of Title 18 of the U.S.
 5      code?
 6              A.    Can you say the title again?
 7              Q.    Title 18 of the U.S. code.
 8              A.    Yes.
 9              Q.    What provisions do you have in
10      mind?
11              A.    Title 8.
12              Q.    Does that mean that the Office
13      of Intelligence prepares reports of analysis
14      where a Visa holder is suspected of being
15      inadmissible within the meaning of Title 8?
16              MS. SAFAVI:  Objection.  Form.
17              A.    Can you repeat that?
18      BY MS. KRISHNAN:
19              Q.    Does that mean that the Office
20      of Intelligence prepares reports of analysis
21      where a Visa holder is suspected of being
22      inadmissible within the meaning of Title 8?
23              A.    We would do reports of analysis
24      for the -- all of Title 8.
25              Q.    Does the office -- withdrawn.
```

```
 1    Does that mean that the Office of Intelligence
 2    also produces reports where a Visa holder is
 3    suspected of being removable within the meaning
 4    of Title 8?
 5              MS. SAFAVI:  Standard objection.
 6    Standard instruction.
 7              A.   Yes.
 8    BY MS. KRISHNAN:
 9              Q.   If the Office of Intelligence
10    decides the Visa should be revoked, what action
11    does it take?
12              MS. SAFAVI:  I'm sorry I couldn't
13    hear.  Can you repeat the question?
14    BY MS. KRISHNAN:
15              Q.   If the Office of Intelligence
16    decides the Visa should be revoked, what action
17    does it take.
18              MS. SAFAVI:  Objection.  Form and
19    mischaracterization of testimony and facts.
20              MS. KRISHNAN:  I'm not trying to
21    characterize testimony.
22              MS. SAFAVI:  Okay.  Objection.  Form.
23              A.   The -- say it one more time?
24    BY MS. KRISHNAN:
25              Q.   If the Office of Intelligence
```

1   decides a Visa should be revoked, what action

2   does it take?

3           A.    The Office of Intelligence does

4   not decide, it doesn't make that decision.

5           Q.    Who makes that decision?

6           A.    People other than the Office of

7   Intelligence.

8           Q.    Do you know who those people

9   are?

10          A.    Yes.

11          Q.    Who are those people?

12          A.    The State Department.  I don't

13  know the individuals.

14          Q.    Any other people outside of the

15  State Department?

16          A.    Not that I know of.

17          Q.    And I know you said that you

18  don't know the names of any people, but within

19  the State Department, is there a particular

20  office or program or bureau that you know to be

21  responsible for revoking Visas?

22          A.    No, I don't know.

23          Q.    Where do requests to research

24  and analyze Visa holders in relation to Title 8

25  come from?

```
 1              MS. SAFAVI:  Objection.  Form.
 2              A.   Say that one more time, please.
 3     BY MS. KRISHNAN:
 4              Q.   Where do requests for the
 5     Office of Intelligence to research and analyze
 6     Visa holders in relation to Title 8 come from?
 7              A.   Other -- the program lead, my
 8     supervisors.
 9              Q.   When you say, "your
10     supervisors" who are you referring to?
11              A.   The deputy executive associate
12     director of his, the executive associate
13     director of his, their staff.
14              Q.   I believe you told me the names
15     of one of those people before, but can you tell
16     me the names of both the deputy executive
17     associate director of his and the executive
18     associate director of his?
19              A.   The executive associate
20     director of his is Tony Salisbury.
21              Q.   Tony Salsburg?
22              A.   Salisbury.
23              Q.   Salisbury.  Okay.  And the
24     other individual?
25              A.   Derek Gordon.
```

```
 1              Q.    Derek Gordon.  You said that
 2      requests also come from program leads.  To whom
 3      are you referring there?
 4              A.    NSD, National Security
 5      Division.
 6              Q.    Is there any other part of his
 7      from which you would receive a request to
 8      research or analyze the Visa holder in relation
 9      to Title 8?
10              MS. SAFAVI:  Objection.  Form.
11              A.    You're asking me to say where
12      they could come from.
13      BY MS. KRISHNAN:
14              Q.    Where have they come from?
15              A.    Can you give me a time frame?
16              Q.    During your tenure at his.
17              A.    Just to look into a Visa
18      holder, it could come from any investigator.
19              Q.    Do requests to produce reports
20      of analysis, ever come from outside --
21      withdrawn.
22          Do requests to research and analyze
23      Visa holders in relation to Title 8 ever come
24      from outside of his?
25              MS. SAFAVI:  Objection.  Form.
```

```
 1              A.    Can you be more specific on

 2      "outside of"?

 3      BY MS. KRISHNAN:

 4              Q.    Let's start with within the

 5      Department of Homeland Security?

 6              A.    Yes.

 7              Q.    What other parts of depart- of

 8      DHS would such requests come from?

 9              A.    The Border Czar -- sorry -- the

10      question.  The Office of the Border Czar.

11              THE COURT REPORTER:  I'm sorry.  The

12      what?

13              A.    The Office of the Border Czar,

14      the Office of Secretary, the Office of

15      Intelligence and Analysis and potentially the

16      Office of the Counter Terrorism coordinator --

17      no, that's not -- let me correct that.  The

18      Office of Policy.

19      BY MS. KRISHNAN:

20              Q.    Is the Office of Intelligence

21      and Analysis different from the Office of

22      Intelligence that you --

23              A.    Yes.

24              Q.    -- lead?

25              A.    Yes.
```

1      Q.    Do requests to research and

2  analyze Visa holders in relation to Title 8

3  come from the State Department in any

4  circumstance?

5          MS. SAFAVI:  Objection.  Form.

6          A.    Can you be more specific?  Can

7  you clarify?

8  BY MS. KRISHNAN:

9          Q.    Do you not -- you don't

10  understand my question?

11          A.    It could be 20 years -- can you

12  narrow the time frame, so I can answer it.

13          Q.    Unless I specify -- withdrawn.

14  During the several years that you've been at

15  his, have any requests to research and analyze

16  Visa holders in relation to Title 8 come from

17  the State Department?

18          A.    I don't know.

19          Q.    What about this year?

20          A.    I don't think so.  Not that I

21  know of.

22          Q.    Who would know?

23          A.    National Security Division.

24          Q.    Are there circumstances in

25  which the National Security Division asked the

```
 1    Office of Intelligence to research and analyze

 2    Visa holders because it has been requested to

 3    investigate that Visa holder --

 4              MS. SAFAVI:  Objection --

 5              MS. KRISHNAN:  -- by somebody outside

 6    of his?

 7              MS. SAFAVI:  Objection.  Form.

 8              A.   I don't know.

 9    BY MS. KRISHNAN:

10              Q.   Would NSD tell you if another

11    agency had requested that his research and

12    analyze the Visa holder?

13              A.   Not necessarily.

14              Q.   Have they ever told you that

15    another agency has requested that his research

16    and analyze a Visa holder?

17              A.   Yes.

18              Q.   When has that happened?

19              A.   Two years ago.

20              Q.   Has it happened since?

21              A.   No.

22              Q.   In that case, what was the Visa

23    holder being researched and analyzed for?

24              MS. SAFAVI:  Objection.  Standing

25    objection.  I'll instruct my client to answer
```

```
 1    to the extent it doesn't disclose privileged or
 2    classified information.
 3              A.    Suspected of being linked to a
 4    terrorist organization.
 5    BY MS. KRISHNAN:
 6              Q.    Was that terrorist organization
 7    Hamas?
 8              MS. SAFAVI:  Objection.  Relevance.
 9    Objection.  Relevance, and standing objection.
10              A.    The identity of the group would
11    be at a minimum law enforcement sensitive and
12    probably classified.
13    BY MS. KRISHNAN:
14              Q.    Prior to 2025, did his ever
15    request the revocation of a noncitizen's Visa?
16              MS. SAFAVI:  Objection.  Form.
17              A.    I don't know if I can answer
18    that.  Not to my knowledge.
19              MS. SAFAVI:  Objection.
20    BY MS. KRISHNAN:
21              Q.    Prior to 2025, did his ever
22    recommend the revocation of a noncitizen's
23    Visa?
24              MS. SAFAVI:  Objection.  Form and
25    calls for speculation.
```

```
 1    BY MS. KRISHNAN:

 2              Q.   To your knowledge?

 3              A.   I don't know the answer.

 4              Q.   Who would know?

 5              A.   For Visas, National Security

 6    Division or any agent involved in that case.

 7              Q.   Prior to 2025, and I'm asking

 8    during your tenure, did his ever refer a case

 9    involving a Visa holder to the State

10    Department?

11              MS. SAFAVI:   Objection.   Calls for

12    speculation.

13    BY MS. KRISHNAN:

14              Q.   You still have to answer to the

15    extent you can.

16              A.   I don't know.

17    BY MS. KRISHNAN:

18              Q.   Who would know?

19              A.   The agents involved in that

20    specific case.

21              Q.   To your knowledge, has his ever

22    recommended the revocation of a noncitizen's

23    Visa?

24              MS. SAFAVI:   Objection.   Calls for

25    speculation.
```

1           A.   It's not my part of his.  I
2    don't know.
3    BY MS. KRISHNAN:
4           Q.   So when the Office of
5    Intelligence prepares a report of analysis,
6    what does it do with that report?
7           A.   Provides it to the agent.
8           Q.   And if the -- if that agent or
9    whoever -- which ever other part of his
10   requested that report takes some action, is the
11   Office of Intelligence notified of that action?
12          A.   Not necessarily.
13          Q.   Is it notified of that action
14   in any case?
15          A.   The -- not the -- the analyst
16   involved may be aware of it, the agent is not
17   required to tell the analyst what the
18   operational outcome is or what the operational
19   decision is.
20          Q.   If the agent decides to
21   recommend the revocation of a Visa based on a
22   report of analysis created by the Office of
23   Intelligence, would it notify the office in
24   some way of that recommendation?
25          MS. SAFAVI:  Objection.  Form.

```
 1    BY MS. KRISHNAN:

 2            Q.   I'm just trying to understand

 3    in the typical case where the Office of

 4    Intelligence prepares a report of analysis, is

 5    it the case that it sends that report to the

 6    agent or the National Security Division or

 7    whatever part of his it might be, and then it

 8    never hears back, or does it usually hear what

 9    the outcome of the investigation is?

10            A.   In most cases, we would not

11    hear of the outcome directly from the agent

12    involved.

13        For example, we might hear of the arrest

14    from its inclusion in a daily briefing or in

15    some sort of operational reporting.

16            Q.   Since the beginning -- since

17    the beginning of 2025, has the Office of

18    Intelligence been notified of arrests made

19    based on reports of intelligence it has

20    produced?

21            MS. SAFAVI:  Objection.  Form.

22            A.   Can you clarify "notified"?

23    BY MS. KRISHNAN:

24            Q.   Been informed of.

25            A.   Yes.
```

1          Q.   In what circumstances has it

2    been informed of arrests made based on reports

3    of analysis the office has produced?

4          A.   On several occasions when an

5    arrest was made in a Fentanyl case in a human

6    smuggling case.

7          Q.   Has it been informed of any

8    arrests made of foreign students this year?

9          A.   Yes, to the -- yes.

10         Q.   How has it been informed of

11   arrests made of foreign students this year that

12   have been based on reports of analysis?

13         A.   As in discussions with

14   operational leadership and senior leadership of

15   his.

16         Q.   Who are you referring to when

17   you say "senior leadership"?

18         A.   The division -- the

19   investigative division leaders that I mention

20   and senior leadership of his that I told you.

21         Q.   So this would include Tony

22   Salisbury and Derek Gordon?

23         A.   Derek Gordon.

24         Q.   Anyone else from senior

25   leadership?

```
 1              A.   The assistant director of

 2    operations.

 3              Q.   What is their name?

 4              A.   William Walker.

 5              Q.   Anyone else?

 6              A.   That's it.  National Security

 7    Division, Andre Watson.

 8              Q.   Who is operational leadership?

 9              A.   William Walker.

10              Q.   When did these discussions take

11    place?

12              A.   Daily.

13              Q.   When did they stop?

14              A.   We have operational

15    coordination meetings --

16              THE COURT REPORTER:  I'm sorry.  We

17    have operational coordination -- please keep

18    your voice up.

19              A.   We have operational

20    coordination and senior leadership meetings

21    ever since I got there.

22    BY MS. KRISHNAN:

23              Q.   When did mention of arrest of

24    foreign students start at these meetings?

25              A.   If there was an arrest of a
```

 1    foreign student it could be mentioned at any of
 2    the meetings at any time since I got there.
 3              Q.   Do you recall occasions where
 4    arrests of foreign students were made at these
 5    meetings last year?
 6              A.   Yes.
 7              Q.   In those cases, why was the
 8    foreign student arrested?
 9              MS. SAFAVI:  Objection.  Calls for
10    speculation and standing objection regarding
11    privileged information, and I'm going to
12    instruct my client to answer to the extent it
13    doesn't disclose privilege or classified
14    information.
15              A.   They were involved in criminal
16    activity.
17    BY MS. KRISHNAN:
18              Q.   Have any of these discussions
19    involved -- withdrawn.
20         Have any of these discussions addressed
21    the arrest of foreign students who were not
22    involved in criminal activity?
23              MS. SAFAVI:  Objection.  Form.
24              A.   What do you mean by arresting
25    someone who is not engaged in -- not suspected

1    of criminal activity.

2    BY MS. KRISHNAN:

3         Q.   Can a foreign student be

4    arrested by his -- withdrawn.

5         Can a foreign student be arrested by

6    ICE in circumstances where they have violated

7    no criminal law?

8         MS. SAFAVI:  Objection.  Form.

9         A.   You're asking me to speculate.

10   BY MS. KRISHNAN:

11        Q.   Are you aware of any

12   circumstance this year where a foreign student

13   has been arrested by ICE where that student has

14   not violated criminal law?

15        A.   Not to my knowledge.

16        Q.   Prior to 2025, did his

17   investigate lawful permanent residents?

18        A.   Yes.

19        Q.   Did his investigate them only

20   for suspected violations of criminal law?

21        MS. SAFAVI:  I'm sorry.  Can you

22   repeat that I couldn't hear it.

23   BY MS. KRISHNAN:

24        Q.   It might be my accent.  Did his

25   investigate lawful permanent residents only for

1    suspected violations of criminal law?

2          A.   Yes, to the best of my

3    knowledge.  Yes.

4          Q.   What was the Office of

5    Intelligence's role in these investigations?

6          A.   Providing research and

7    analysis.

8          Q.   Prior to 2025, did his ever

9    refer a case involving a lawful permanent

10   resident to the State Department?

11         MS. SAFAVI:  Objection.  Calls for

12   speculation.

13   BY MS. KRISHNAN:

14         Q.   Are you aware of any case prior

15   to 2025 where his referred a case involving a

16   lawful permanent resident to the State

17   Department?

18         A.   I'm not aware.

19         Q.   Are you aware of any case prior

20   to 2025 where his requested a determination by

21   the State Department that the activities or

22   presence of the lawful permanent resident had

23   potentially adverse policy consequences?

24         A.   I'm not aware.

25         Q.   Are you aware of any case prior

1   to 2025 where his shed information with the

2   State Department so that the department could

3   consider whether to make such a determination?

4           A.   I'm not aware.

5           Q.   Do reports of analysis ever

6   contain recommendations?

7           MS. SAFAVI:  Objection.  Standing

8   objection.  I'm going to instruct my client to

9   answer to the extent that it doesn't divulge

10  privilege.

11          A.   Can you clarify

12  "recommendations"?

13  BY MS. KRISHNAN:

14          Q.   Have you ever seen a report of

15  analysis that contains a recommendation that a

16  Visa holder had their Visa revoked?

17          A.   No.

18          Q.   Have you ever seen a report of

19  analysis that makes a recommendation that a

20  lawful permanent resident be removed?

21          A.   No.

22          Q.   Have you ever seen a report of

23  analysis that requests the State Department to

24  revoke the Visa of a Visa holder?

25          A.   No.

1        Q.    Have you ever seen a report of

2    analysis that contains a request that the State

3    Department determine that that person poses

4    foreign policy concerns?

5        A.    No.

6        Q.    Within the Office of

7    Intelligence, is there a different group of

8    people who work on Visa holders as opposed to

9    lawful permanent residents?

10        MS. SAFAVI:  Objection.  Form.

11        A.    Say it again, please?

12    BY MS. KRISHNAN:

13        Q.    Within the Office of

14    Intelligence, is there a different group of

15    people that work on Visa holders as opposed to

16    lawful permanent residents?

17        A.    No.

18        Q.    Who in the Office of

19    Intelligence generates a report of analysis?

20        A.    Any analyst.

21        THE WITNESS:  The horn was a good

22    effect.

23        MS. KRISHNAN:  Oh.  Ok.  I didn't

24    realize I'd made a joke, but I'm always happy

25    when people are laughing.

```
 1   BY MS. KRISHNAN:

 2           Q.   What is a report of analysis?

 3           A.   It's a document produced by

 4   analysts that records the research and analysis

 5   they make.

 6           Q.   For what purpose is the report

 7   of analysis created?

 8           A.   It documents and is the record

 9   of the research analysts.

10           Q.   What is your understanding of

11   how the report of analysis is used?

12           MS. SAFAVI:  Objection.  Form.

13           A.   Can you rephrase that?

14   BY MS. KRISHNAN:

15           Q.   What is your understanding of

16   how a report of analysis gets used?

17           A.   It's used to inform the agent

18   of a research analysis.

19           Q.   In what circumstances would --

20   withdrawn.

21       What is in a typical report of

22   analysis?

23           MS. SAFAVI:  Standing objection.

24   Standard instruction.

25           A.   There are several types of
```

```
 1    reports of analyses.  They include the report

 2    on a individual and then others report

 3    different characteristics of a network.

 4    BY MS. KRISHNAN:

 5          Q.   Would a report of analysis --

 6    withdrawn.

 7          In addition to individuals and

 8    characteristics of a network, would a report of

 9    analysis ever address a group?

10          MS. SAFAVI:  Objection.  Relevance.

11    Objection.  Form.

12          A.   What do you mean by "group"?

13    BY MS. KRISHNAN:

14          Q.   Just the ordinary meaning of

15    group.

16          A.   A report -- like I said before,

17    reports of analysis are written on criminals,

18    criminal conspiracies, network criminal

19    conspiracies would involve groups, criminal

20    networks would involve groups.

21          Q.   Would a report of analysis --

22    withdrawn.

23          Do reports of analysis ever address a

24    category or cause of activities?

25          MS. SAFAVI:  Objection.  Form.
```

1          A.    Can you be more specific?

2    BY MS. KRISHNAN:

3          Q.    Would a report of analysis ever

4    address support for Hamas outside of addressing

5    a specific individual.

6          A.    The report of analysis could be

7    written about any group of people involved or

8    suspected of being involved in criminal

9    activities.

10         Q.    What about activities that are

11   contrary to an executive order?

12         MS. SAFAVI:  Objection.  Form.

13         A.    I don't understand the

14   question.

15   BY MS. KRISHNAN:

16         Q.    For reports analysis on an

17   individual and noncitizen, would the report of

18   analysis include that subject's history inside

19   of the U.S.?

20         A.    Yes.

21         Q.    Would it include biographical

22   information?

23         A.    Yes.

24         Q.    Would it include that person's

25   immigration history?

1        A.    Yes.

2              Q.    Would it include other factual

3   information about the activities that they

4   engaged in in the U.S.?

5              MS. SAFAVI:   Standard -- I'm sorry.

6   Standing objection and standard instructions.

7              A.    Yes.

8   BY MS. KRISHNAN:

9              Q.    In addition to that factual

10  information, does the report of analysis

11  include any conclusions?

12             MS. SAFAVI:   Objection.  Asked and

13  answered and standing objection.  Standard

14  instruction.

15             A.    No.

16  BY MS. KRISHNAN:

17             Q.    Does the report of analysis

18  include the analyst's opinion?

19             A.    No.

20             Q.    In other words, a report of

21  analysis is just a summary of factual

22  information?

23             A.    Not a summary, it's factual

24  information.

25             Q.    A report of analysis doesn't

1    include anything other than factual

2    information?

3              A.    Correct.  Yes.

4              Q.    Does a report of analysis

5    include the underlying materials that the

6    analyst reviewed to produce that report?

7              MS. SAFAVI:  Standing objection.

8    Standard instruction.

9              A.    The report of analysis will

10   reference source materials.

11   BY MS. KRISHNAN:

12             Q.    Does it append those source

13   materials?

14             A.    Sometimes.

15             Q.    In most cases?

16             A.    In most cases they will -- the

17   analyst will either append testimony or they

18   will reference them and include them in their

19   analytical file.

20             Q.    Where are analytical files

21   stored?

22             A.    In HSI's knowledge management

23   system.

24             Q.    What is that knowledge

25   management system called?

```
1                 MS. SAFAVI:  Objection.  Standing
2        objection and standard instruction.
3                 A.   I don't remember what the
4        acronym stands for, but the acronym is RAVEN.
5        BY MS. KRISHNAN:
6                 Q.   Does the office -- withdrawn.
7        Do analysts apply any policies or guidance in
8        compiling a report of analysis?
9                 MS. SAFAVI:  Objection.  Form.
10                A.   Can you clarify "guidance", I
11       guess?
12       BY MS. KRISHNAN:
13                Q.   Are there any guidelines that
14       an analyst consults to produce a report of
15       analysis?
16                A.   Yes.
17                Q.   Where are those guidelines?
18                MS. SAFAVI:  Objection.  Form.
19                A.   Can you rephrase?
20       BY MS. KRISHNAN:
21                Q.   You said that there are
22       guidelines that an analyst consults to produce
23       the report of analysis, and my question is
24       where -- where are those guidelines located; is
25       it a manual, handbook, something else?
```

1          A.    We have a handbook and trade

2    craft guides for how to conduct a criminal

3    analysis which includes (inaudible).

4          Q.    What is that handbook called?

5          A.    The his handbook for criminal

6    analysis.

7          Q.    And what is the trade craft

8    guide called?

9          A.    The trade craft guides are --

10   there's multiple, how to conduct -- conduct

11   currency analysis, supply chain analysis, the

12   role of an analyst in a law enforcement

13   interview, and some others.

14         Q.    Do these guidelines address the

15   review of open source information?

16         MS. SAFAVI:  Objection.  Form.

17         A.    What do you mean by "discuss"?

18   BY MS. KRISHNAN:

19         Q.    Do they impose -- withdrawn.

20   Do they establish any procedures for engaging

21   in review of open source materials?

22         A.    Yes.

23         Q.    Do they establish any

24   procedures for engaging in review of social

25   media?

1          A.   Yes.

2          Q.   Have these guidelines been

3    updated this year?

4          A.   Those particular ones, no.

5          Q.   Have any portions of the

6    guidelines addressing reports of analysis been

7    updated this year?

8          A.   No.

9          Q.   When does the Office of

10   Intelligence compile a report of analysis on a

11   lawful permanent resident?

12         MS. SAFAVI:  Objection.  Asked and

13   answered.

14         MS. KRISHNAN:  I believe I asked

15   about a Visa holder last time.

16         A.   When there's suspicion of

17   criminal activity.

18   BY MS. KRISHNAN:

19         Q.   Does the Office of

20   Intelligence -- withdrawn.

21         Who has to sign off on a report of

22   analysis?

23         A.   An analyst supervisor.

24         Q.   Do you ever have to sign off on

25   a report of analysis?

```
 1                   A.   No.

 2                   Q.   Does Brad Etter ever have to

 3      sign off on a report of analysis?

 4                   A.   No.

 5                   Q.   Do you review reports of

 6      analysis before they are referred outside of

 7      the Office of Intelligence?

 8                   A.   Not as a -- no.

 9                   Q.   Never?

10                   A.   Define "review", please?

11                   Q.   Read.

12                   A.   Do I read reports of analysis;

13      yes.

14                   Q.   Have you ever read a report --

15      withdrawn.

16              Have you read a report of analysis this

17      year addressing a foreign student?

18                   A.   Yes.

19                   Q.   Have you read a report of

20      analysis this year addressing a student

21      protester?

22                   A.   Yes.

23                   Q.   How many reports did you read

24      this year addressing student protesters?

25                   A.   Dozens.
```

1    Q.   And where were those reports

2    referred?

3         A.   Where were they referred?

4         Q.   Mm-hmm.

5         A.   Some were referred to National

6    Security Division.

7         Q.   Where else would they --

8         A.   Others weren't referred at all.

9         Q.   So who makes the decision

10   whether to refer a report of analysis?

11        A.   The case agent or the agent

12   assigned to the -- to conduct a review, the

13   program review.

14        Q.   Is the case agent assigned to

15   conduct a review inside or outside of the

16   Office of Intelligence?

17        A.   Outside.

18        Q.   In what circumstances would a

19   case agent decide not to refer a report of

20   analysis?

21        MS. SAFAVI:  Standing objection and

22   standard instruction.

23        A.   If the information in the

24   report of analysis was not -- didn't show the

25   elements of crime.

```
 1   BY MS. KRISHNAN:
 2           Q.   So it's your testimony that a
 3   case agent would not refer a report of
 4   analysis, if it didn't show the elements of a
 5   crime?
 6           MS. SAFAVI:  Objection.  Form.
 7           A.   Can you rephrase -- can --
 8   yeah, can you rephrase it?
 9   BY MS. KRISHNAN:
10           Q.   I'm trying to understand when a
11   report of analysis would be referred and when
12   it would not.
13        And you said one circumstance in which
14   a case agent would decide not to refer report
15   of analysis is if the information in the report
16   of analysis didn't show the elements of a
17   crime.
18        I'm trying to -- are there any other
19   circumstances where a case agent would decide
20   not to refer a report of analysis?
21           MS. SAFAVI:  Standing objection and
22   standard -- standard instruction.
23           A.   So, for example, if the
24   agent -- if the analyst was asked to look into
25   a suspicion of child exploitation and for
```

```
 1    the -- for the division -- for the
 2    investigative division that handles child
 3    exploitation cases, and they found no
 4    indication of child exploitation, then the ROA
 5    cannot be referred.  That's an example.
 6    BY MS. KRISHNAN:
 7              Q.   When did you start seeing
 8    reports of analysis on student protesters?
 9              MS. SAFAVI:  Objection.  Form.
10              A.   One more time?
11    BY MS. KRISHNAN:
12              Q.   Did you start seeing reports of
13    analysis on student protesters this year?
14              MS. SAFAVI:  Objection.  Form.
15              A.   I may have seen ROA's on
16    student protestors.
17              THE COURT REPORTER:  You may have
18    seen --
19              A.   I may have seen ROAs or report
20    of analysis on student protesters years -- in
21    the past -- before.
22    BY MS. KRISHNAN:
23              Q.   Can you recall any specific
24    instance?
25              A.   I cannot.
```

1        Q.   But did you start seeing --

2   withdrawn.

3        You mentioned that you've seen dozens

4   of reports of analysis on student protesters

5   this year.

6        Did you see that influx in March?

7             MS. SAFAVI:  Objection.  Form.

8        A.   I don't know when I started

9   seeing them this year.

10  BY MS. KRISHNAN:

11       Q.   What's an approximation?

12       A.   2025.

13       Q.   Did the influx start before

14  January 20th of 2025?

15       A.   No.

16       Q.   Where did the request of

17  reports of analysis on student protesters come

18  from?

19       A.   His (inaudible).

20       Q.   Sorry to make you do this

21  again, but I am going to make you be specific.

22  Who specifically in his?

23       A.   The deputy, Derek Gordon.

24       Q.   In those conversations, were

25  you told the reason for the request?

1           MS. SAFAVI:  Objection.  Calls for

2   hearsay.

3           A.   Yes, I have to speculate.

4   BY MS. KRISHNAN:

5           Q.   Let me clarify.  Why were you

6   asked to produce reports of analysis on student

7   protesters?

8           A.   I have to speculate.

9           Q.   Did the reports -- withdrawn.

10      How many of the reports of analysis on

11  student protesters that you reviewed include

12  allegations that the student committed criminal

13  activity?

14          MS. SAFAVI:  Objection.  Standing

15  objection.  Standard instruction.

16          A.   None include allegations.

17          THE COURT REPORTER:  Many you said?

18          A.   None.

19          THE COURT REPORTER:  Keep your voice

20  up, please.

21  BY MS. KRISHNAN:

22          Q.   How many -- and this is -- I'm

23  just asking for an approximation, not a precise

24  number, but how many of these reports of

25  analysis on student protesters related to Title

1    8?

2              MS. SAFAVI:  Objection.  Calls for

3    speculation.

4              A.   I can't give the exact number.

5    I don't know the exact number.

6    BY MS. KRISHNAN:

7              Q.   Did any of them?

8              A.   Yes.

9              Q.   How many of these -- withdrawn.

10   Did any of these reports of analysis refer to

11   U.S. foreign policy or foreign policy concerns?

12             A.   No.

13             Q.   Did any of these reports of

14   analysis refer to anti-Semitism or anti-Semitic

15   activity?

16             MS. SAFAVI:  Objection.  Form.

17             A.   Can you define or clarify

18   "refer"?

19   BY MS. KRISHNAN:

20             Q.   Mention.

21             A.   Can you repeat the question?

22             Q.   Did any of these reports of

23   analysis mention anti-Semitism or anti-Semitic

24   activity?

25             A.   I don't know if they mentioned

1    anti-Semitism or anti-Semitic in any of them.

2    I don't recall reading those words.

3            Q.   Do you recall whether any of

4    these reports of analysis on student protesters

5    referred to support for Hamas?

6            MS. SAFAVI:  Standing objection and

7    standard instruction.

8            A.   Yes.

9    BY MS. KRISHNAN:

10           Q.   How many of them,

11   approximately, referred to support from Hamas?

12           A.   I don't know.

13           Q.   Do you recall whether any of

14   these reports of analysis on student protesters

15   mentioned the terms "Israel or Palestine"?

16           A.   Yes.

17           Q.   I'm going to ask you for an

18   approximation again.  How many of them,

19   approximately, mentioned Israel and Palestine?

20           A.   I don't know.

21           Q.   Five -- withdrawn.  More than

22   five?

23           A.   Yes.

24           THE COURT REPORTER:  You said, yes?

25           A.   (Witness nodded head.)

```
 1     BY MS. KRISHNAN:

 2             Q.   More than 10.

 3             A.   Yes.

 4             Q.   More than 20?

 5             A.   I would say greater than 50

 6     percent.

 7             Q.   So this would be greater than

 8     50 percent of dozens you said earlier?

 9             A.   Yes.

10             Q.   And when you say "dozens"

11     what's a ballpark figure?

12             A.   Approximately, 100.

13             Q.   Do you recall whether any of

14     these reports of analysis on student protesters

15     mentioned the term hostile environment?

16             A.   I don't recall.

17             Q.   Do you recall whether any of

18     these reports of analysis on student protesters

19     referred to Executive Order 14161 titled:

20     Protecting the U.S. From Foreign Terrorists and

21     Other National Security and Public Safety

22     Threats?

23             A.   No.

24             Q.   Do you recall whether any of

25     these reports of analysis on student protesters
```

1    mentioned the Executive Order 14188, Additional

2    Measures to Combat Anti-Semitism?

3              A.    No.

4              MS. SAFAVI:   Can I ask when did you

5    want to break for lunch?

6              MS. KRISHNAN:   Would now be a good

7    time for you?

8              MS. SAFAVI:   Now would be nice.

9    Would now be a good time for you?

10             THE WITNESS:   Sure.

11             THE VIDEOGRAPHER: Time is 13:07 and

12   we are off the record.

13        (A break was taken at 1:08 p.m.)

14             THE VIDEOGRAPHER:   The time is 14:15

15   and we're back on the record.

16   BY MS. KRISHNAN:

17             Q.   And so, Mr. Hatch, before the

18   break, we were talking about reports of

19   analysis on student protesters that you have

20   read this year.  And you said that more than 50

21   percent of those reports mentioned Israel or

22   Palestine.

23        And my question is:  Is it more than 60

24   percent?

25             A.   I don't know.  Best I can say

```
 1    is more than 50 percent.
 2            Q.   Did you know all of them
 3    mention Israel or Palestine?
 4            A.   I'm not sure.  You're saying --
 5    just to clarify, you're saying "Israel and
 6    Palestine."
 7            Q.   Israel or.
 8            A.   So Israel or Palestine,
 9    probably most.
10            Q.   Who asked for those reports to
11    be compiled?
12            A.   I take my direction from HSI
13    leadership, the folks that I mentioned.
14            Q.   Okay.  And did you receive a
15    request to compile these reports from anyone
16    other than Mr. Gordon in HSI leadership?
17            A.   I take my tasking from -- from
18    my boss.
19            Q.   And have you received -- just
20    trying to be comprehensive here.
21        Have you received a request to produce
22    a report of analysis on student protesters from
23    anyone outside of HSI leadership?
24            A.   I have not.
25            Q.   In your conversations with Mr.
```

```
 1    Gordon -- I withdraw that.
 2           When Mr. Gordon requested these reports
 3    of analysis on student protesters, what reason
 4    did he give to you?
 5           MS. SAFAVI:  Objection.  Calls for
 6    hearsay.
 7           THE WITNESS:  Yeah.
 8    BY MS. KRISHNAN:
 9           Q.   Maybe I can clarify.
10           A.   All right.
11           Q.   Unless -- unless if you want to
12    answer, answer.
13           A.   Go ahead, clarify, please.
14           Q.   What did he ask you to report
15    and analyze about these student protesters?
16           MS. SAFAVI:  Objection.  Standing
17    objection and standard instruction about law
18    enforcement privilege and other privileges.
19           A.   The general guidance was look
20    at the protesters and find out research and
21    analysis to -- about any suspicious criminal
22    activity.
23    BY MS. KRISHNAN:
24           Q.   Did he ask you to report and
25    analyze the student and protesters for any
```

```
 1   reason other than suspicious criminal activity?
 2            MS. SAFAVI:  Standing objection and
 3   standard instruction.
 4            A.   No, the context is always
 5   suspicious criminal activity.
 6   BY MS. KRISHNAN:
 7            Q.   What kinds of criminal
 8   activity?
 9            MS. SAFAVI:  Standing objection and
10   standard instruction.
11            A.   Violence, obstruction, any --
12   any kind of physical violence, any Title 8
13   activity, any fraud, any --
14   BY MS. KRISHNAN:
15            Q.   Were the requests that you
16   received from Mr. Gordon to report and analyze
17   student protesters reduced to writing?
18            A.   Can you say that again, please?
19            Q.   Were Mr. Gordon's requests to
20   compile reports of analysis on student
21   protesters, were these requests put in writing?
22            A.   No, it would be verbal.
23            Q.   Was anyone else present when he
24   requested these reports of analysis?
25            A.   Yes.
```

1          Q.   Who else was present?

2          A.   The assistant director of

3    operations, Wynn Walker; assistant director of

4    national security, Ben Watson; and my deputy

5    director --

6          Q.   Anyone else?

7          A.   Probably, but I don't remember.

8          Q.   Was there anyone present who

9    was not from HSI?

10         A.   No.

11         Q.   You mentioned Title 8 activity.

12      What do you mean by that term?

13         A.   So any activity in -- in

14   violation of the Immigration and Naturalization

15   Act.

16         THE COURT REPORTER:  Immigration?

17         THE WITNESS:  And Naturalization Act.

18   BY MS. KRISHNAN:

19         Q.   And when Mr. Gordon asked you

20   to report and analyze student protesters for

21   suspicious criminal activity, did it give you

22   any reason for the focus on student protesters?

23         MS. SAFAVI:  Standing objection and

24   standard instruction.

25         A.   No.  He wouldn't have to --

1    like, the only instruction he would need to say

2    is -- is you need reports of analysis on

3    these -- on individual protesters to see if

4    there's -- they're involved in suspicious

5    criminal activity.

6    BY MS. KRISHNAN:

7            Q.   Did he mention any specific

8    provisions of Title 8 in these conversations?

9            A.   No, not that I recall.

10           Q.   Did he mention support for

11   terrorism in these conversations?

12           MS. SAFAVI:  Objection, hearsay, and

13   standing objection on privileges and standard

14   instruction.

15           A.   Can you repeat the question?

16   BY MS. KRISHNAN:

17           Q.   Did he mention support for

18   terrorism in any of these conversations?

19           A.   I don't recall.

20           Q.   Did he mention Hamas in any of

21   these conversations?

22           A.   Yes.

23           Q.   Did he mention anti-Semitic

24   activity in these conversations?

25           MS. SAFAVI:  Objection.  Form.  Also

1    hearsay and standing objection and instruction.

2            A.   I don't recall him using the

3    words "anti-Semitic."

4    BY MS. KRISHNAN:

5            Q.   Did he mention the word

6    "Israel" or "Palestine" in these conversations?

7            A.   Yes.

8            Q.   Did he mention any executive

9    order in these conversations?

10           A.   I don't recall him mentioning

11   any executive order or a specific executive

12   order.

13           Q.   Did any of the reports of

14   analysis on these student protesters make any

15   determination whether they had engaged in Title

16   8 activity?

17           MS. SAFAVI:  Standing objection.

18   Standard instruction.

19           A.   No.

20   BY MS. KRISHNAN:

21           Q.   In these reports of analysis on

22   student protesters, were they assessed

23   against -- withdrawn.

24        Did these reports of analysis on

25   student protesters look at or address whether

1    there was any ground for removing them?

2            A.    No.

3            Q.    Did these reports of analysis

4    on student protesters address whether there was

5    any ground for revoking a Visa?

6            MS. SAFAVI:  Objection.  Form.

7            A.    Can you clarify "grounds"?

8    BY MS. KRISHNAN:

9            Q.    Any -- any basis?  Any basis

10   for revoking a Visa.

11           A.    "Basis" implies they made a

12   judgment.  So no.

13           Q.    I did not mean to imply that

14   there would have to be a judgment.

15       Did these reports of analysis compile

16   information that was relevant to whether there

17   was any ground for revoking a Visa?

18           A.    Yes.

19           Q.    Did these reports of analysis

20   specify any grounds for revoking a Visa?

21           MS. SAFAVI:  Objection.  Form.

22           A.    Can you rephrase that?

23   BY MS. KRISHNAN:

24           Q.    Did these reports of analysis

25   include information that is relevant to whether

1    there is any ground for revoking a Visa?

2              A.    Yes.

3              Q.    Did these reports of analysis

4    identify any potential grounds for revoking a

5    Visa?

6              A.    Yes.

7              Q.    What grounds were those?

8              MS. SAFAVI:    Standing objection.

9    Standard instruction.

10             A.    I recall one ROA describing a

11   protester assaulting someone.

12   BY MS. KRISHNAN:

13             Q.    What other grounds were

14   mentioned in other reports?

15             MS. SAFAVI:    Standing objection.

16   Standard instruction.

17             A.    The -- there's one, obstructing

18   or impeding students from getting to a job

19   fair.

20   BY MS. KRISHNAN:

21             Q.    Any others?

22             A.    I'd have to review the ROAs, I

23   don't recall the --

24             Q.    Did any --

25             A.    -- other circumstances.

```
 1              Q.   Did any of these reports of
 2    analysis identify a student's writing as a
 3    potential ground for revocation?
 4              MS. SAFAVI:  Objection.  Form.
 5              A.   Can you rephrase?
 6    BY MS. KRISHNAN:
 7              Q.   Did any of the reports of
 8    analysis on student protesters identify a
 9    student's writing as a possible ground for
10    revoking that person's Visa?
11              MS. SAFAVI:  Objection.  Form.
12              A.   The ROAs describe the facts of
13    what the analyst found.  The analyst doesn't
14    make a determination on whether or not that is
15    grounds for a Visa revocation.
16    BY MS. KRISHNAN:
17              Q.   That's helpful.
18         Do -- do any of the reports of analysis
19    on student protesters, that you recall, mention
20    a student's writing?
21              MS. SAFAVI:  Objection.  Form.
22              A.   So what do you mean by
23    "writing"?
24    BY MS. KRISHNAN:
25              Q.   A piece that is being published
```

1    to the internet.

2            A.   Yes.

3            Q.   Did any of these reports of

4    analysis mention a student protester's social

5    media?

6            A.   Yes.

7            Q.   Did any of these reports of

8    analysis mention a student protester's

9    association with a student group?

10           MS. SAFAVI:   Standing -- objection.

11   Form.  And standing objection and instruction.

12           A.   Could you be more specific, or

13   rephrase?

14   BY MS. KRISHNAN:

15           Q.   Did any of these reports of

16   analysis mention a student protester's

17   membership of a student group?

18           A.   Yes.

19           Q.   Did any of these reports of

20   analysis mention a student protester's public

21   statements?

22           A.   Yes.

23           Q.   Did any of these reports of

24   analysis on student protesters mention their

25   role as a negotiator or spokesperson for a

1    group?

2              MS. SAFAVI:  Objection.  Form.

3              A.   Can you repeat the question?

4    BY MS. KRISHNAN:

5              Q.   Did any of these reports of

6    analysis on student protesters mention the

7    protester's role as a negotiator or

8    spokesperson for the group?

9              MS. SAFAVI:  Objection.  Form.

10             A.   I don't recall.

11   BY MS. KRISHNAN:

12             Q.   Do you recall whether any of

13   these reports of analysis on student protesters

14   mentioned Students for Justice in Palestine?

15             THE COURT REPORTER:  Mention

16   Students?

17             MS. KRISHNAN:  For Justice in

18   Palestine.

19             THE WITNESS:  Yes.

20   BY MS. KRISHNAN:

21             Q.   Do you recall whether any of

22   these reports of analysis mentioned faculty and

23   staff for justice of Palestine?

24             A.   No, I don't recall.

25             Q.   I should go back.  So I asked

1    whether you recalled whether the reports of

2    analysis mentioned Students For Justice in

3    Palestine?

4         Did they mention Students For Justice

5    in Palestine?

6              A.   Yes.

7              Q.   Did any of the reports for

8    analysis mention Jewish Voice for Peace?

9              A.   I don't know.

10             Q.   Did any of the reports of

11   analysis mention Columbia University Apartheid

12   Divest?

13             A.   I don't know.

14             Q.   Did any of the reports of

15   analysis mention Columbia University?

16             A.   Yes.

17             Q.   Do you recall approximately how

18   many of the reports of analysis on student

19   protesters mentioned Columbia University?

20             A.   I don't know.

21             Q.   More than five?

22             A.   I would say yes.

23             Q.   More than a dozen?

24             A.   I don't know.

25             Q.   You mentioned there being

1    dozens of a reports of analysis on student

2    protesters, 20 percent?

3                A.   I don't know.

4                Q.   Did any of the reports of

5    analysis mention the student protesters'

6    support for Palestine?

7                A.   I don't know.

8                Q.   Did any of them mention the

9    term "pro-Palestinian"?

10               A.   I would have to review the

11   ROAs, but I don't remember pro-Palestinian

12   being a term.

13               Q.   Did any of the reports of

14   analysis mention criticism of Israel?

15               MS. SAFAVI:  Objection.  Form.

16               A.   Can you be more specific?

17   BY MS. KRISHNAN:

18               Q.   Did any of them mention the

19   term "anti-Israel"?

20               A.   I don't know.

21               Q.   Did any of them mention the war

22   in Gaza?

23               A.   Yes.

24               Q.   Did any of them mention calling

25   for a free Palestine?

```
 1                  A.   I don't know.
 2                  Q.   Did any of them mention support
 3      for Boycott, Divestment and Sanctions,
 4      otherwise known as BDS?
 5                  A.   I don't know.
 6                  Q.   Did any of them mention
 7      institutional divestment for Israel?
 8                  A.   I don't know.
 9                  Q.   Did any of them mention the
10      phrase "from the river to the sea Palestine
11      will be free"?
12                  A.   Yes.
13                  Q.   Did any of them mention the
14      phrase "Intifada Revolution"?
15                  THE COURT REPORTER:   Say it again.
16      Oh, okay.
17      BY MS. KRISHNAN:
18                  Q.   Did any of them mention the
19      phrase "Intifada Revolution"?
20                  A.   I don't know if they mentioned
21      those words.
22                  Q.   Did any of them mention
23      denouncing or posing Zionism?
24                  A.   I don't know.
25                  Q.   Did any of them mention "coin
```

```
 1    Israel in apartheid state"?
 2              A.   I don't know.
 3              Q.   Did any of them mention calling
 4    for a cease fire?
 5              A.   I don't know.
 6              Q.   Did any of them mention calling
 7    for institutional divestment from Israel?
 8              A.   I don't know.
 9              Q.   Did any of them mention
10    limiting military aid to Israel?
11              A.   I don't know.
12              Q.   What kinds of things about
13    Israel were noted in the reports of analysis?
14              MS. SAFAVI:  Standing objection and
15    standard instruction.
16              A.   I don't know.
17    BY MS. KRISHNAN:
18              Q.   Did any of the reports of
19    analysis mention a student protester's
20    perspective on Israel?
21              MS. SAFAVI:  Objection.  Form.
22              A.   Can you rephrase?
23    BY MS. KRISHNAN:
24              Q.   Did any of the reports of
25    analysis mention a student protester's
```

1    attitudes towards Israel?

2              A.   I don't recall.

3              Q.   The reports of analysis

4    generally concern students' negative remarks

5    about Israel, right?

6              MS. SAFAVI:  Objection.  Form.

7              A.   Can you rephrase?

8    BY MS. KRISHNAN:

9              Q.   Can you recall any report of

10   analysis you've read on student protesters that

11   addresses a student's pro-Israel sentiment?

12             A.   No.  We did not make

13   assessments on attitudes for a protester's

14   opinions towards Israel.

15             Q.   Did any of the reports of

16   analysis address a student protester's

17   criticism of the administration?

18             A.   No.

19             Q.   Did any of the reports of

20   analysis mention a student's anti-American

21   attitudes?

22             A.   No, not that I recall.

23             Q.   These conversations where Mr.

24   Gordon asked the Office of Intelligence to

25   research and analyze student protesters, did he

```
 1    provide any specific names?
 2             MS. SAFAVI:  Objection.  Hearsay and
 3    standing objection on privilege instruction to
 4    answer without divulging privileged
 5    information.
 6             A.   What do you mean by "names"?
 7    BY MS. KRISHNAN:
 8             Q.   Did he provide the names of
 9    student protesters that he wanted the Office of
10    Intelligence to research and analyze?
11             A.   Yes.
12             Q.   Do you know where those names
13    came from?
14             MS. SAFAVI:  Objection.  Calls for
15    speculation.
16             A.   I don't know the names of
17    anyone who provided him names.
18    BY MS. KRISHNAN:
19             Q.   Do you know if he received --
20    withdrawn.
21        I know you say that you don't know the
22    names of anyone who provided him names.  I'm
23    not asking for names, but do you know whether
24    he got those names from HSI?
25             MS. SAFAVI:  Objection.  Calls for
```

1    speculation.

2              A.   I'd have to speculate.

3    BY MS. KRISHNAN:

4              Q.   Was the State Department

5    mentioned in these conversations?

6              MS. SAFAVI:  Objection.  Calls for

7    speculation.

8              A.   Can you rephrase it?

9    BY MS. KRISHNAN:

10             Q.   At these meetings that you had

11   with Mr. Gordon, where you were asked to

12   research and analyze student protesters, did

13   the State Department come up?

14             A.   In the context of providing

15   names, I don't ever recall Mr. Gordon

16   mentioning State Department.

17             Q.   What about conversations where

18   specific names were provided?  So just in any

19   of these conversations that you had with Mr.

20   Gordon about the topic of student protesters,

21   did the State Department come up?

22             A.   Yes.

23             Q.   Did Mr. Gordon mention the

24   State Department?

25             MS. SAFAVI:  Objection.  Calls for

```
 1    hearsay.
 2              A.   Can you rephrase?
 3    BY MS. KRISHNAN:
 4              Q.   Who at these conversations
 5    mentioned the State Department?
 6              A.   At one time or other probably
 7    all of us because the State Department was
 8    going to make a determination on any
 9    revocation.
10              Q.   How did you know that the State
11    Department was going to make a determination
12    about Visa revocations about the student
13    protesters?
14              A.   I think that was described at
15    one point on what the process was in a
16    conversation with the -- the deputy chief of
17    HOBs, chief NSD.
18              Q.   Did this conversation take
19    place in March?
20              A.   I think so.  I'm not sure on
21    the date.
22              Q.   When you say "deputy chief of
23    HOBs," what does HOB stand for?
24              A.   Chief of -- the deputy of HSI.
25    The chief of operations or the assistant
```

```
 1    director operations and the assistant director

 2    of National Security Division, I think

 3    something got transposed there.

 4              Q.   And that was Mr. -- is

 5    Mr. Watson?

 6              A.   Correct.

 7              Q.   And you mentioned that a

 8    process was described in this conversation.

 9         What was that process?

10              A.   Intel does the fact-finding,

11    National Security Division would do the --

12    compile the information to do the letter to

13    State Department, and State Department would

14    make the decision on visas.

15              Q.   Who led this meeting?

16              A.   The deputy.

17              Q.   And this would be the deputy of

18    HSI?

19              A.   Yes.

20              Q.   Which --

21              A.   Mr. Gordon.

22              Q.   Thank you.

23         And how long was this meeting?

24              A.   I don't recall.

25              Q.   At this meeting, was any
```

1    executive order mentioned?

2              A.   I don't think so.  I don't

3    recall.

4              Q.   Did Mr. Gordon mention the

5    reason for this new process?

6              A.   I don't recall.

7              Q.   Now, as part of this process,

8    you said that Intel does the fact-finding and

9    then the National Security Division compiles

10   the information and does a letter to the State

11   Department.

12        Does the National Security Division

13   send a letter to the State Department in every

14   case where it receives report of analysis on a

15   student protester?

16             MS. SAFAVI:  Objection.  Form.

17             A.   Can you say that again?

18   BY MS. KRISHNAN:

19             Q.   As part of this process that

20   we've been talking about, does the National

21   Security Division send a letter to the State

22   Department in every case where it receives a

23   report of analysis?

24             MS. SAFAVI:  Objection.  Calls for

25   speculation.

```
 1              A.   No.
 2   BY MS. KRISHNAN:
 3              Q.   So how does the National
 4   Security Division decide whether to send a
 5   letter to the State Department in a given case?
 6              MS. SAFAVI:  Objection.  Calls for
 7   speculation.
 8              A.   I'd have to speculate.
 9   BY MS. KRISHNAN:
10              Q.   How many reports of analysis on
11   student protesters -- withdrawn.
12         Were all reports of analysis on student
13   protesters referred to the National Security
14   Division as part of this process?
15              MS. SAFAVI:  Objection.  Form.
16              A.   Can you -- yeah, can you repeat
17   or rephrase?
18   BY MS. KRISHNAN:
19              Q.   Were all reports of analysis on
20   student protesters referred to the National
21   Security Division as part of this process?
22              A.   No.
23              Q.   When did the Office of
24   Intelligence refer a report of analysis on a
25   student protester to the National Security
```

1    Division?

2              MS. SAFAVI:  Objection.  Form.

3              A.   What do you mean by -- time

4    frame or...

5    BY MS. KRISHNAN:

6              Q.   Let me clarify.

7         In what circumstances would the Office

8    of Intelligence refer report of analysis on a

9    student protester to the National Security

10   Division?

11             A.   When a -- when a report of

12   analysis contained information that may

13   indicate a violation of law.

14             Q.   We're talking about Title 8?

15             A.   Any -- any violation of law.

16             Q.   Okay.  So where else have

17   reports of analysis on student protesters been

18   sent other than the National Security Division?

19             MS. SAFAVI:  Objection.  Form.

20             A.   What do you mean by "sent"?

21   BY MS. KRISHNAN:

22             Q.   I don't mean it as a term of

23   art.  I just mean, in -- you know, when else --

24   oh, sorry.

25         Where else have reports of analysis on

1    student protesters been referred other than the

2    National Security Division?

3            A.    The National Security Division

4    is the customer.  It goes to them.

5            Q.    And what is your understanding

6    of when the National Security Division decides

7    to send a letter to the State Department after

8    a reviewing report of analysis?

9            A.    I'd have to speculate.

10            Q.    How many -- withdrawn.

11        Do you know if any of the reports of

12    analysis that were referred to the National

13    Security Division resulted in a Visa

14    revocation?

15            MS. SAFAVI:  Objection.  Speculation.

16            A.    I wasn't tracking that.

17    BY MS. KRISHNAN:

18            Q.    Was a report of analysis --

19    withdrawn.

20        Did any of the reports of analysis on

21    student protesters that the Office of

22    Intelligence referred to the National Security

23    Division result in a Visa revocation?

24            MS. SAFAVI:  Objection.  Calls for

25    speculation.

 1              A.   I wasn't tracking that.

 2      BY MS. KRISHNAN:

 3              Q.   Did any of the reports of

 4      analysis on student protesters of the Office of

 5      Intelligence referred to the National Security

 6      Division result in a determination by the State

 7      Department?

 8              MS. SAFAVI:  Objection.  Calls for

 9      speculation.

10              A.   Again, I wasn't tracking that.

11      BY MS. KRISHNAN:

12              Q.   To your knowledge, does the

13      National Security Division assess the report of

14      analysis that is sent to them in any way before

15      sending the letter to the State Department?

16              A.   Yes.

17              Q.   What did they assess the report

18      of analysis for?

19              MS. SAFAVI:  Objection.  Calls for

20      speculation and standing objection and standing

21      instruction about privilege.

22              A.   I'd have to speculate.

23      BY MS. KRISHNAN:

24              Q.   Did the National Security

25      Division update you on any student protester

1    that was a result -- I'm sorry -- that was the

2    subject of a report of analysis as part of this

3    process?

4                    A.    Not me.

5    BY MS. KRISHNAN:

6                    Q.    Do you know who was updated?

7                    A.    The -- the unit chief.

8                    THE COURT REPORTER:  The --

9                    THE WITNESS:  I'm sorry.  The unit

10   chief.

11   BY MS. KRISHNAN:

12                   Q.    Anyone else?

13                   A.    My deputy and -- and then

14   anything else is their role to work.

15                   Q.    Were any of these updates

16   reduced to writing, to your knowledge?

17                   A.    No.

18                   Q.    Did any of these updates occur

19   at meetings?

20                   A.    Yes.

21                   Q.    Did your deputy convey the

22   content of any of these updates to you?

23                   MS. SAFAVI:  Objection.  Calls for

24   hearsay.

25                   A.    Can you rephrase?

```
 1    BY MS. KRISHNAN:
 2            Q.   Did your deputy communicate the
 3    content of any of these updates to you?
 4            MS. SAFAVI:  Objection.  Calls for
 5    hearsay.
 6            A.   Can you rephrase?
 7    BY MS. KRISHNAN:
 8            Q.   You mentioned that your deputy
 9    received updates on student protesters that
10    were the subject of a report of analysis as
11    part of this process.  And my question is:  Did
12    your deputy communicate those updates to you?
13            A.   Yes.
14            Q.   And what did he say?
15            MS. SAFAVI:  Objection.  Calls for
16    hearsay.
17            A.   I don't recall.
18    BY MS. KRISHNAN:
19            Q.   Do you remember any update that
20    he communicated to you?
21            A.   Yes.
22            Q.   What was the content of the
23    updates that you can recall?
24            A.   My deputy updated me on the
25    process, how it was going, workflow, workload
```

 1    of the analysts, things like that.

 2              Q.   What did he tell you about how

 3    the new process was going?

 4              MS. SAFAVI:  Objection.  Calls for

 5    hearsay.

 6              A.   Can you rephrase?

 7    BY MS. KRISHNAN:

 8              Q.   You said that one of the

 9    updates that your deputy gave you was on how

10    the process was going.

11         What did your deputy tell you about how

12    the new process was going?

13              MS. SAFAVI:  Objection.  Calls for

14    hearsay.

15              A.   Can you rephrase?

16    BY MS. KRISHNAN:

17              Q.   What did he tell you about the

18    process?

19              A.   That it was working.  Our ways

20    were being -- reports of analysis were being

21    produced, the analysts were able to do the

22    work.  Again, that type of stuff.

23              Q.   Did he report any difficulties

24    with the new process?

25              A.   No.

1    Q.   Did he mention any goal for how

2    quickly the reports of analysis needed to be

3    turned around?

4         A.   No.

5         Q.   Did he mention any objectives

6    for the new process?

7         A.   No.

8         Q.   Did he provide any reports on

9    whether there was sufficient staffing on the

10   process?

11             MS. SAFAVI:  Objection.  Form.

12        A.   Can you rephrase?

13   BY MS. KRISHNAN:

14        Q.   Did he mention any personnel

15   being allocated to support the new process?

16        A.   Yes.

17        Q.   Allocated from where?

18        A.   From the counterterrorism

19   intelligence unit.

20        Q.   Anywhere else?

21        A.   From other parts of the

22   analysis division of Office of Intel.

23             THE COURT REPORTER:  Of?

24             THE WITNESS:  Office of Intel.

25   Office of Intelligence.

1    BY MS. KRISHNAN:

2            Q.   And how many personnel were

3    reallocated to work on this new process?

4            MS. SAFAVI:  Standing objection and

5    standard instruction regarding privileged

6    information.

7            A.   More than ten.

8    BY MS. KRISHNAN:

9            Q.   And what was the workflow

10   within the Office of Intelligence for this new

11   process?

12           MS. SAFAVI:  Objection.  Form.  And

13   standing objection as to privilege and standard

14   instruction.

15           A.   I believe that's deliberative.

16           MS. SAFAVI:  Yes.

17   BY MS. KRISHNAN:

18           Q.   To clarify, my question is

19   about who was involved in this new workflow

20   rather than the content of any particular case

21   that went through this process.

22           A.   Okay.

23           Q.   So --

24           MS. SAFAVI:  Can we have just a

25   moment, please.

```
 1              Yeah, okay.

 2              I'm sorry just because I want to make

 3      sure -- can you read or tell me if there's a

 4      question pending?

 5                    MS. KRISHNAN:  Yes, there is.

 6                    MS. SAFAVI:  Okay.  Can I have it

 7      repeated so I know what it is, please?

 8                    MS. KRISHNAN:  Sure.  And I started

 9      it, I didn't get to finish.

10                    MS. SAFAVI:  Okay.  Okay.

11                    MS. KRISHNAN:  So I'm still

12      formulating it.

13                    MS. SAFAVI:  Okay.  Well, let me give

14      you that moment and then I'll -- I'll tell you

15      what the objection is.

16                    MS. KRISHNAN:  Okay.

17      BY MS. KRISHNAN:

18              Q.   So I said, to clarify, my

19      question is about who was involved in the new

20      workflow rather than the content of any

21      particular case that went through this process.

22              So who within the Office of

23      Intelligence worked on this new process?

24                    MS. SAFAVI:  Okay.  So objection.

25      Call for classified information, and so I would
```

```
 1    instruct my client to answer the question to

 2    the extent that it would not reveal classified

 3    information.

 4            MS. KRISHNAN:  And just to clarify,

 5    the iden- -- my -- my question is about the

 6    identities of these people.

 7            MS. SAFAVI:  Yes, and our objection

 8    is it is classified.

 9            MS. KRISHNAN:  Okay.

10    BY MS. KRISHNAN:

11        Q.   Can you answer the question to

12    the extent it's not classified?

13        A.    Investigative analysts are

14    assigned to the process.

15        Q.   Who supervises the process

16    within the Office of Intelligence?

17            MS. SAFAVI:  Objection.  Classified.

18      So I would instruct you to answer the

19    question in a way that it does not divulge

20    classified information.

21        A.    Section chiefs supervise

22    analysts.  Unit chiefs -- a unit chief

23    supervises the section chiefs.  Division chief

24    supervises the unit chief.  The deputy

25    supervises the division chiefs.  I supervise
```

```
 1    the deputy.

 2

 3         (Off-the-record discussion was held at

 4                   3:15 p.m.)

 5

 6    BY MS. KRISHNAN:

 7              Q.   You mentioned that Mr. Gordon

 8    provided names of student protesters that

 9    should be researched and analyzed.

10         Were all of these names given at once

11    or were they given on a rolling basis?

12              A.   Rolling basis.

13              Q.   What is your understanding

14    about why the request to research and analyze

15    student protesters increased this year?

16              A.   Calls for speculation.  I'd

17    have to speculate.

18              Q.   Okay.  Even if it's

19    speculative, what is your understanding?

20              A.   I don't want to speculate.  I

21    don't want to speculate on why.

22              Q.   Do you have any information on

23    why the Office of Intelligence was being

24    asked -- withdrawn.

25         Do you have any information on why the
```

1    number of student protesters the Office of

2    Intelligence was being asked to research and

3    analyze increase this year?

4              A.   The number of protests

5    increased this year.

6              Q.   Protests about Israel and

7    Palestine?

8              A.   Correct.

9              Q.   To your knowledge, did the

10   Office of Intelligence receive request to

11   research and analyze students involved in

12   protests about Israel and Palestine before this

13   year?

14             MS. SAFAVI:  Objection.  Form.

15             A.   Can you rephrase?

16   BY MS. KRISHNAN:

17             Q.   To your knowledge, did the

18   Office of Intelligence receive requests to

19   research and analyze students involved in

20   protests about Israel and Palestine before this

21   year?

22             A.   No.

23             Q.   Did you receive any explanation

24   for why the Office of Intelligence --

25   withdrawn.

1           Did you receive any explanation for why

2     the Office of Intelligence was now being asked

3     to research and analyze students involved in

4     protests about Israel and Palestine this year?

5           A.   I did not receive any

6     information why.

7           Q.   Are you familiar with Executive

8     Order 14161 protecting the United States from

9     foreign terrorists and other national security

10    and public safety threats?

11          A.   Do you have a copy?

12          Q.   I'd be happy to provide you

13    with one, but before I do, are you familiar

14    with it?  If you don't know, you can say that.

15          A.   Can you define "familiar"?

16          Q.   Have you heard of it?

17          A.   Yes.

18          MS. KRISHNAN:  I'm going to mark this

19    as Exhibit 1.

20              (Exhibit 1 was marked.)

21          MS. SAFAVI:  I'm sorry.  Can you

22    clarify, since I'm legally blind, what Bates

23    stamp number does this have in terms

24    of discovery?

25          MS. KRISHNAN:  Oh, it -- it doesn't

Case 1:25-cv-10685-WGY    Document 186-1    Filed 07/07/25    Page 683 of 863
Deposition of Peter Hatch
AAUP, et al. v. Rubio, et al.

```
 1    have a Bates stamp number.
 2              MS. SAFAVI:  No Bates stamp.  Oh,
 3    okay.  Can I have just a moment, please, since
 4    I just -- since I can't see it?  I just want to
 5    make sure I -- I know what this document is.
 6              MS. CONLON:  Sure.
 7         Can we go off the record while you --
 8              MS. SAFAVI:  Yeah.
 9              THE VIDEOGRAPHER:  Time is 15:20 and
10    we are off the record.
11              (A break was taken at 3:20 p.m.)
12              THE VIDEOGRAPHER:  The time is 15:31.
13    We're back on the record.
14    BY MS. KRISHNAN:
15         Q.   Do you understand the document
16    marked Exhibit 1 to be Executive Order 14161?
17         A.   Yes.
18         Q.   And how did you become aware of
19    this order?
20              MS. SAFAVI:  Objection.  Foundation
21    needs to be laid for this document.
22              MS. KRISHNAN:  I don't think I have
23    to lay a foundation, so it's fine.
24              MS. SAFAVI:  Okay.
25    BY MS. KRISHNAN:
```

```
 1                  Q.   How did you become aware of the
 2     order?
 3                  A.   I think I read every executive
 4     order when they -- when it was published --
 5     when they were published.
 6                  Q.   Did you receive any
 7     notification of this order from within DHS?
 8                  A.   No.
 9                  Q.   Do you understand DHS to have
10     any role in implementing or enforcing this
11     order?
12                  THE COURT REPORTER:   Implementing or?
13                  MS. KRISHNAN:   Enforcing.
14                  THE WITNESS:   Can you clarify what
15     you mean by "DHS"?
16     BY MS. KRISHNAN:
17                  Q.   Do you understand ICE to have a
18     role in implementing this order?
19                  A.   Yes.
20                  Q.   What is that role?
21                  A.   It's my understanding that
22     everything in this order addresses issues
23     already in Title 8 and ICE has the function of
24     enforcing those laws.
25                  Q.   Can you look -- withdrawn.
```

```
 1           I'm going to read part of the order and

 2     you're free to read it after me to check I have

 3     quoted it accurately.  The Section 2(a)

 4     states --

 5              MS. SAFAVI:  Can you give us the

 6     quotation?

 7              MS. KRISHNAN:  It starts about

 8     halfway down the first page.

 9              MS. SAFAVI:  Okay.

10     BY MS. KRISHNAN:

11         Q.   2(a) states:  [As read] "The

12     Secretary of State in coordination with the

13     Attorney General, the Secretary of Homeland

14     Security, and the Director of National

15     Intelligence shall promptly" -- now I'm reading

16     from Subparagraph, [As read] "vet and screen to

17     the maximum degree possible all aliens who

18     intend to be admitted, enter, or are already

19     inside the United States."

20          Is HSI involved in vetting and

21     screening admitted noncitizens pursuant to this

22     directive?

23              MS. SAFAVI:  Objection.  Form.

24          A.   Can you rephrase?

25     BY MS. KRISHNAN:
```

1              Q.   Do you not understand my

2     question?

3              MS. SAFAVI:  Oh -- and, actually, I

4     have an objection.

5         Do you mind reading the complete

6     sentence and the last phrase that you are

7     reading?

8              MS. KRISHNAN:  You're more than

9     welcome to read the Section 2(a), Subparagraph

10    (iv).

11             A.   Okay.

12    BY MS. KRISHNAN:

13             Q.   So my question is:  Is HSI

14    involved in vetting and screening admitted

15    noncitizens pursuant to this directive?

16             MS. SAFAVI:  Objection.  Form.

17             A.   Can you rephrase?

18    BY MS. KRISHNAN:

19             Q.   Did you not understand my

20    question?

21             A.   The terms "vet" and "screen"

22    have different connotations.

23             Q.   What does "vet" mean?

24             A.   So can you repeat the question?

25             Q.   Uh-huh.  Yeah.  I mean, I think

 1    part of the problem is I'm -- I'm taking that

 2    term from the -- so I can't clarify because I'm

 3    trying to find out what they mean.

 4           But -- what does "vet" mean to you?

 5           A.   I'm trying to call -- recall

 6    the definition and I have a blank.  Vetting is

 7    typically determining whether an individual can

 8    enter the United States.

 9       You just asked me about vetting, right?

10           Q.   Yes.

11           A.   Okay.

12           Q.   And I bet you know what I'm

13    going to ask you next.  What does "screen"

14    mean?

15           A.   "Screen" is when you're looking

16    at an individual to see if there's any

17    derogatory information about that individual.

18           Q.   Okay.  So I can see now why my

19    question was confusing.

20       All right.  And is HSI involved in

21    screening admitted noncitizens pursuant to

22    Section 2(a) of this E.O.?

23           MS. SAFAVI:  Objection.  Calls for

24    speculation.

25           A.   I can't -- I can't speculate on

1    the intent of the executive order.

2    BY MS. KRISHNAN:

3            Q.   I -- I'm not -- to be clear,

4    I'm not asking you to speak to the intent of

5    the order.  My question is:  If HSI is

6    screening admitted noncitizens pursuant to this

7    instruction to vet and screen to the maximum

8    degree possible?

9            MS. SAFAVI:  Objection.  Calls for

10   speculation.

11           A.   HSI has been screening

12   individuals since its existence.

13   BY MS. KRISHNAN:

14           Q.   Paragraph 1(b) states -- and

15   I'm quoting -- and this is just above the

16   halfway mark of the page.  Quote, [As read]

17   "The United States" -- withdrawn.

18           I'm going to do multiple sentence.

19   Quote, [As read] "And the United States must

20   ensure that admitted aliens and aliens

21   otherwise already present in the United States

22   do not bear hostile attitudes towards citizens,

23   culture, Government, institutions, or founding

24   principles, and do not advocate for, aid, or

25   support designated foreign terrorists and other

```
 1    threats to our national security."
 2            Is HSI screening admitted noncitizens
 3    for advocacy for and support of foreign
 4    terrorist organizations?
 5            MS. SAFAVI:  Objection.  Speculation.
 6            A.   Can you rephrase?
 7    BY MS. KRISHNAN:
 8            Q.   Is HSI screening admitted
 9    noncitizens for advocacy for and support of
10    foreign terrorist organizations?
11            MS. SAFAVI:  Objection.  Speculation.
12            A.   Can you be more specific in the
13    question?
14    BY MS. KRISHNAN:
15            Q.   I -- I'm using -- and I'm sure
16    you can appreciate this, but I am taking terms
17    from the executive order.  So my question is
18    about HSI's involvement in the implementation
19    of this executive order.
20            This executive order says that, [As
21    read] "The United States must ensure that
22    admitted aliens do not advocate for, aid, or
23    support designated foreign terrorists."
24    So my question is:  Is HSI screening admitted
25    noncitizens for advocacy for and support of
```

```
 1    designated foreign terrorists?

 2              A.   Yes.

 3         Go ahead.  Do you have another question?

 4              MS. CONLON:  Oh, sorry.  I thought

 5    you weren't done.

 6              MS. KRISHNAN:  Were you done?  I

 7    didn't mean to cut you off.

 8              A.   I'm done.

 9    BY MS. KRISHNAN:

10              Q.   Does HSI screen admitted

11    noncitizens for advocacy for and support of

12    Hamas?

13              MS. SAFAVI:  Objection.  Form and

14    speculation.

15              A.   It's my understanding that

16    Hamas is a designated foreign terrorist

17    organization.

18    BY MS. KRISHNAN:

19              Q.   And to your knowledge, is HSI

20    screening admitted noncitizens for advocacy for

21    and support of designated foreign terrorist

22    organizations such as Hamas?

23              A.   Yes.

24              Q.   Is HSI screening admitted

25    noncitizens to ensure that admitted --
```

1    withdrawn.

2           Is HSI screening to ensure that

3    admitted noncitizens do not bear hostile

4    attitudes towards America's citizens, culture,

5    Government, institutions, or founding

6    principles?

7           MS. SAFAVI:  Objection.  Speculation.

8           A.   It's my understanding that all

9    of these are included in Title 8 and HSI has

10   been doing this since its existence.

11   BY MS. KRISHNAN:

12          Q.   Which part of Title 8 addresses

13   hostile attitudes towards American citizens,

14   culture, Government, institutions or founding

15   principles.

16          MS. SAFAVI:  Objection.  Calls for a

17   legal conclusion.

18   BY MS. KRISHNAN:

19          Q.   Well, you said that in your

20   understanding all of these are included in

21   Title 8, and so I just want to know which part

22   of Title 8.

23          A.   Well, it's my general

24   understanding that all of them are included in

25   Title 8.  I do not have Title 8 memorized and

```
 1    I'm not a lawyer.
 2              Q.   Have you been told that all of
 3    these things fall within Title 8?
 4              A.   No.
 5              Q.   Does HSI screen admitted
 6    noncitizens for anti-Semitic activity?
 7              MS. SAFAVI:  Objection.  Form.  Calls
 8    for speculation.
 9              A.   Not to my knowledge.
10    BY MS. KRISHNAN:
11              Q.   Has HSI coordinated with the
12    State Department to screen admitted
13    noncitizens?
14              A.   Not to my knowledge.  Sorry.
15              MS. SAFAVI:  That's okay.  Objection.
16    Speculation.
17    BY MS. KRISHNAN:
18              Q.   Are reports of analysis used as
19    part of ICE's screening process?
20              A.   Yes.
21              Q.   How are they used in ICE's
22    screening process?
23              MS. SAFAVI:  Standing objection as to
24    privileged or classified information.  So
25    standard instruction.
```

1          To the extent that you can, go ahead

2     and answer the question.

3               A.    In general, if derogatory

4     information is suspected or exists during a

5     screening process, the individual doing the

6     screening will write an ROA describing what

7     that information is.

8     BY MS. KRISHNAN:

9               Q.    When you say, "during a

10    screening process," what does "screening

11    process" refer to?

12              MS. SAFAVI:   Objection.   Standing

13    objection and the instruction that -- go ahead

14    and answer without, you know -- to the best

15    that you can without revealing classified or

16    privileged information.

17              A.    So, for example, if someone is

18    applying for a Visa overseas and is linked to a

19    terrorist organization, the analyst overseas

20    would do an ROA on that person describing what

21    that linkage was.

22    BY MS. KRISHNAN:

23              Q.    Okay.   And what does the

24    screening process entail for noncitizens who

25    have -- are already inside the U.S.?

 1            MS. SAFAVI:  Standing objection and

 2    standard instruction.

 3            A.   So if an individual in the

 4    United States was found to have, again,

 5    derogatory information such as a link to a

 6    terrorist group, that the information appeared

 7    or became available after they had already

 8    arrived in the United States, then the analyst

 9    would do an ROA, a report of analysis on that

10    individual describing what the derogatory

11    information was.

12    BY MS. KRISHNAN:

13            Q.   And how would that individual

14    come to the attention of the Office of

15    Intelligence?

16            A.   In a number of ways.

17            Q.   What are the ways?

18            MS. SAFAVI:  Objection -- standing

19    objection and standard instruction.

20            A.   We could have been notified of

21    the individual by the agency partner that new

22    information -- that they had obtained new

23    information.  We could have done it in the

24    course of normal analytical review or normal

25    review of different information sources.

```
 1    BY MS. KRISHNAN:
 2            Q.   Has the Office of Intelligence
 3    been asked to produce a report of analysis as
 4    part of the screening process by the State
 5    Department this year?
 6            MS. SAFAVI:  Objection.  Form.
 7            A.   Not to my knowledge.
 8    BY MS. KRISHNAN:
 9            Q.   Have there been any changes to
10    the screening process since the introduction of
11    Executive Order 14161?
12            A.   No.
13            Q.   Are you familiar with --
14    withdrawn.
15        Do you -- have you heard of Executive
16    Order 14188, "Additional Measures to Combat
17    Anti-Semitism"?
18            A.   Can I have a copy?
19            MS. SAFAVI:  Sorry.  Just for
20    clarification, we marked this as Exhibit 1?
21            MS. KRISHNAN:  Yes.
22        This was, likewise, attached as an
23    exhibit to my declaration.
24            MS. SAFAVI:  Okay.
25            MS. KRISHNAN:  Thank you.
```

```
 1              MS. SAFAVI:  And we're marking it
 2    Exhibit 2?
 3              MS. KRISHNAN:  Yes.
 4                 (Exhibit 2 was marked.)
 5    BY MS. KRISHNAN:
 6              Q.   Do you understand this document
 7    to be a copy of Executive Order 14188?
 8              A.   Yes.
 9              Q.   How did you become aware of
10    this order?
11              A.   I saw it when it came out.  I
12    don't think I've ever read it.
13              Q.   Do you understand ICE to have a
14    role in implementing or enforcing that order?
15              MS. SAFAVI:  Objection.  Form.
16              A.   I'd have to read it.
17              MS. SAFAVI:  Oh, do you need time to
18    read it?
19              THE WITNESS:  Yeah.
20              MS. SAFAVI:  Can he have time to read
21    it, please?
22              MS. KRISHNAN:  Yes.
23              MS. SAFAVI:  Thank you.
24         Do we want to go off the record?
25              MS. KRISHNAN:  Yeah, yeah, let's go
```

 1    off the record.

 2              THE VIDEOGRAPHER:  The time is 15:53

 3    and we're off the record.

 4

 5              (A break was taken at 4:01 p.m.)

 6              THE VIDEOGRAPHER:  The time is 16:01

 7    and we're back on the record.

 8    BY MS. KRISHNAN:

 9         Q.   Now that you've had an

10    opportunity to read the document, do you

11    understand ICE to have any role in implementing

12    or enforcing this order?

13         A.   Yes.

14         Q.   What is that role?

15         A.   Section 3, paragraph E, working

16    with institutions who have foreign students and

17    foreign personnel is my understanding that's

18    the role of the National Security Division on

19    the SEVP program.

20              THE COURT REPORTER:  On where?

21              THE WITNESS:  S-E-V-P.  SEVP program.

22    BY MS. KRISHNAN:

23         Q.   Section 3 requires the

24    preparation of a report.

25              Have you been involved with the

1   preparation of the report called by Section 3?

2           A.   No.

3           Q.   Do you know if anyone at HSI

4   was involved in the preparation of that report?

5           MS. SAFAVI:  Objection.  Speculation.

6           A.   I'd have to speculate.

7   BY MS. KRISHNAN:

8           Q.   To your knowledge, was anyone

9   in HSI involved in the preparation of the

10  report?

11          A.   I don't know.  No.  To my

12  knowledge, no.

13          MS. KRISHNAN:  I'm sorry to have to

14  hand you another document, but this one is much

15  shorter.  And this is another document that was

16  attached to my attorney declaration.

17          MS. SAFAVI:  Okay.  Could this be

18  marked Exhibit 3?

19              (Exhibit 3 was marked.)

20  BY MS. KRISHNAN:

21          Q.   What is this document?

22          A.   It appears to be a DHS press

23  release.

24          Q.   And it states --

25          MS. SAFAVI:  I'm sorry.  Can you give

```
 1   me a moment?

 2            MS. KRISHNAN:  Uh-huh.

 3            MS. SAFAVI:  Thank you.

 4         Okay.  Okay.

 5         And where are -- are you reading from

 6   the top or the second paragraph?

 7            MS. KRISHNAN:  I'm reading from --

 8   I'm going to read from the first sentence.

 9            MS. SAFAVI:  Okay.  Great.

10            MS. KRISHNAN:  Uh-huh.  Yeah.  But

11   I'm not going to read out the whole sentence

12   because he's had an opportunity to read it.

13            MS. SAFAVI:  Okay.

14   BY MS. KRISHNAN:

15            Q.   The first sentence states that,

16   [As read] "ICE arrested Mahmoud Khalil of

17   Columbia, a former Columbia University graduate

18   student," quote, "in support of President

19   Trump's executive orders prohibiting

20   anti-Semitism."

21         How did the arrest of Mr. Khalil

22   support President Trump's executive orders

23   prohibiting anti-Semitism?

24            MS. SAFAVI:  Objection.  Calls for

25   speculation.
```

```
 1              A.   Yeah.  I don't have any insight
 2    into DHS press releases.
 3    BY MS. KRISHNAN:
 4              Q.   Does this press release suggest
 5    to you that ICE has a broader role than the
 6    preparation of the report called for by Section
 7    3 of Executive Order 14188?
 8              MS. SAFAVI:  Objection.  Form.
 9              A.   I don't read anything into the
10    press releases.
11    BY MS. KRISHNAN:
12              Q.   So when the Department of
13    Homeland Security states in this press release
14    that, [As read] "ICE is committed to enforcing
15    President Trump's executive orders," what do
16    you understand them to mean?
17              A.   I'm not interpreting the
18    comments made by somebody else.
19              Q.   What is your understanding of
20    what the Department of Homeland Security means
21    when it refers to the "enforcement of Executive
22    Order 14188"?
23              A.   I'm not speculating on what the
24    Department means.  ICE and HSI's job is to
25    enforce the law.
```

1          Q.    Would it surprise you to hear

2     that in a declaration filed by Andre Watson in

3     this case he stated that, [As read] "ICE is

4     committed to enforcing Executive Order 14188"?

5               MS. SAFAVI:   Objection.   Hearsay.

6          A.    Yeah, I'd have to speculate.

7     BY MS. KRISHNAN:

8          Q.    What does the enforcement of

9     Executive Order 14188 mean to you?

10         A.    We enforce the law.   We follow

11    executive orders, but our job is to enforce the

12    law.

13         Q.    To your knowledge, is HSI

14    trying to identify individuals that fall within

15    the purview of 14188?

16         A.    Well, to the best of my

17    knowledge, we are trying to identify

18    individuals who are in violation of the law.

19         Q.    Earlier I mentioned that

20    Mr. Watson filed a declaration in this case.

21    I'm going to read from that declaration and

22    representing to you that he said this in his

23    declaration, quote, [As read] "In applying

24    existing authorities, HSI, Office of

25    Intelligence proactively reviews open-source

1    information to identify individuals within the

2    parameters of E.O. 14188."

3          Now I know you didn't write this

4    sentence, but what do you understand that

5    sentence to mean?

6          MS. SAFAVI:  Objection.  Hearsay.

7          A.   Yeah.  I'm not going to -- I'm

8    not going to speculate on what Mr. Watson

9    meant.

10   BY MS. KRISHNAN:

11         Q.   Is it a true statement?

12         A.   Can you read it again?

13         Q.   [As read] "In applying existing

14   authorities, HSI, Office of Intelligence

15   proactively reviews open-source information to

16   identify individuals within the parameters of

17   E.O. 14188."

18         A.   And your question is?

19         Q.   Is it a true statement?

20         MS. SAFAVI:  Objection.  Hearsay.

21   BY MS. KRISHNAN:

22         Q.   He's describing your work.  Is

23   he correct?

24         A.   Not exactly.

25         Q.   I am representing to you that

1    Roy Stanley submitted a declaration in a case

2    called "Taal versus Donald J. Trump."  This

3    declaration is dated the 22nd of March 2025,

4    and it states:  [As read] "To implement this

5    executive order, the HSI, Office of

6    Intelligence proactively reviews open-source

7    information to identify individuals subject to

8    the order" -- "executive order."

9         And I'm representing to you that

10   "executive order" in this sentence refers to

11   Executive Order 14188.  And my question is:  Is

12   this a correct statement?

13         MS. SAFAVI:  Objection.  Hearsay.

14   Also objection, Counsel testifying.  Also, I --

15   I need clarification.  What case are you

16   referring to?  Is this a named plaintiff in

17   this case?

18         MS. KRISHNAN:  No, it isn't.  And the

19   name of the case is Momodou Taal versus Donald

20   J. Trump.

21         MS. SAFAVI:  Okay.  I need just a

22   second, please.  Can we go on break?

23         MS. CONLON:  Well, the question is

24   pending.

25         MS. SAFAVI:  Oh, okay.  So no.

1           Go ahead and answer the question to the

2      extent that you can answer it.

3           A.   Can you repeat the question

4      again?

5           MS. SAFAVI:   Actually, now that the

6      question is no longer pending, can we go on a

7      break?

8           MS. KRISHNAN:   He's just asked me to

9      repeat the question.   The question --

10          MS. SAFAVI:   Okay.

11          MS. KRISHNAN:   Yeah.

12     BY MS. KRISHNAN:

13          Q.   And it states, quote, [As read]

14     "To implement this executive order, the HSI,

15     Office of Intelligence proactively reviews

16     open-source information to identify individuals

17     subject to the executive order."

18          Is that true?

19          A.   Yes.   To the extent that HSI,

20     Office of Intel does that all the time.   Has

21     been doing that.   Whether or not there was an

22     executive order, we analyze individuals for

23     violations of the law.   If the violations of

24     the law are within the parameters of the

25     executive order, then yes, that's a true

```
 1   statement.
 2            MS. KRISHNAN:  Did you want a break?
 3            MS. SAFAVI:  Yes, please.  Can we go
 4   on break?
 5            THE VIDEOGRAPHER:  The time is 16:16
 6   and we are off the record.
 7
 8            (A break was taken at 4:17 p.m.)
 9
10            THE VIDEOGRAPHER:  The time is 16:30
11   and we're back on the record.
12            MS. SAFAVI:  Yes.  And the
13   respondent -- Defendants would move to strike
14   the questions and the answers on the most
15   recent declaration that was quoted by Counsel
16   based on our objections that it is hearsay.  It
17   was Counsel testifying and it is also outside
18   of the scope of this case.
19            It is Defendant's understanding, and
20   this is also the purpose of the objection --
21   and the judge did allow for you guys -- for
22   Plaintiffs to cite to five individual cases.
23   This individual case is not one of them.
24            Also, we cannot see the declaration to
25   make sure that the quote is accurate and
```

1   consistent with what the declaration was filed

2   in that case.

3        So that is our objection and that is

4   our request to strike that question and answer

5   series based on that declaration.

6        MS. KRISHNAN:  This is just a

7   clarification question, but the motion to

8   strike an objection, is that only about the

9   declaration of Roy Stanley and also about the

10  declaration of Andre Watson that was filed in

11  this case.

12       MS. SAFAVI:  So the declaration of

13  Andre Watson was filed in this case.

14       MS. KRISHNAN:  Yes.

15       MS. SAFAVI:  Yes.  That's fine.  The

16  one of Stanley was not filed in this case and

17  it is not one of the named plaintiffs in this

18  case.  So it's outside of the scope of this

19  case.

20       MS. KRISHNAN:  I disagree, but I

21  don't --

22       MS. SAFAVI:  Okay.  Well, if you

23  disagree and you want to bring a hard copy in

24  for us to look at and present to our witness,

25  then that's one thing.  But as it stands right

 1    now, respond -- Defendants object and we move

 2    to strike that question-and-answer series.

 3              MS. KRISHNAN:  Ms. Safavi, you've

 4    made your record.

 5    BY MS. KRISHNAN:

 6              Q.   Earlier, you stated, "If the

 7    violations of the law are within the parameters

 8    of the executive order, then yes, that's a true

 9    statement."

10         My question is:  How does the Office of

11    Intelligence decide whether someone is in --

12    within -- within the parameters of E.O. 14188?

13              A.   You don't.

14              Q.   You don't?

15              A.   No.

16              Q.   Is your testimony that the

17    Office of Intelligence researches and analyzes

18    and individual only upon request from another

19    part of ICE?

20              A.   Yeah.

21              Q.   Does the Office of Intelligence

22    decide to research and analyze individuals of

23    its own initiative?

24              A.   Yes.

25              Q.   In what cases would the --

1    withdrawn.

2         In what circumstances would the Office

3    of Intelligence decide to research and analyze

4    an individual of his own initiative?

5         MS. SAFAVI:  Standing objection and

6    standard instruction regarding privilege.

7         A.   If in the course of the analyst

8    doing his or her job they came across

9    suspicious activity, they would produce an ROA,

10   report of analysis.

11   BY MS. KRISHNAN:

12        Q.   And when you say, "suspicious

13   activity," are you referring to suspicious

14   criminal activity?

15        A.   Yes.

16        Q.   Has DHS or ICE received any

17   guidance or instructions about how to implement

18   or enforce either of the executive orders we've

19   discussed?

20        A.   I don't know.

21        Q.   Has HSI received any guidance

22   or instructions about how to implement or

23   enforce the executive orders?

24        MS. SAFAVI:  Objection.  Form.

25        A.   I'd have to speculate.

```
 1   BY MS. KRISHNAN:

 2           Q.   I'm asking about your

 3   knowledge.

 4        Do you know if HSI has received any

 5   guidance or instructions about how they

 6   implement the executive orders?

 7           MS. SAFAVI:  Objection.  Form.

 8           A.   Can you rephrase?

 9   BY MS. KRISHNAN:

10           Q.   I'm asking whether, to your

11   knowledge, HSI has received any guidance or

12   instructions about these executive orders.

13           A.   That's a question for my -- for

14   other people at HSI.

15           Q.   So you haven't seen any

16   guidance or instructions about these executive

17   orders?

18           A.   No.

19           Q.   Has the Office of Intelligence

20   received any guidance or instructions about

21   preparing reports of analysis in response to

22   the executive orders?

23           A.   Can you say that again?

24           Q.   Has the Office of Intelligence

25   received any guidance or instructions about
```

1    preparing reports of analysis in response to

2    the executive orders?

3              A.    Yes.

4              Q.    From whom has the Office of

5    Intelligence received guidance or instructions?

6              MS. SAFAVI:  Objection.  Standing

7    objection and standard instruction about

8    privilege.

9              A.    Direct deputy, Derrick Gordon.

10   BY MS. KRISHNAN:

11             Q.    Anyone else?

12             A.    The assistant director for

13   operations.

14             Q.    Is that Mr. Wolcott (ph).

15             A.    Yes.

16             THE COURT REPORTER:  Is that Mr. Who?

17             MS. KRISHNAN:  Wolcott.

18   BY MS. KRISHNAN:

19             Q.    Anyone else?

20             A.    Yes, one more.  Robert Hammer.

21             Q.    And I believe I've heard of

22   Robert Hammer before, but remind me of what his

23   title is.

24             A.    He was the acting -- actually,

25   he was the deputy executive associate director

```
 1   of HSI prior to Mr. Gordon.

 2           Q.   Have you received any guidance

 3   or instructions about the executive orders from

 4   anyone in the White House?

 5           A.   No.

 6           Q.   What -- what guidance did you

 7   receive from Mr. Gordon?

 8           MS. SAFAVI:  Objection.  Form.

 9           A.   What do you mean by "guidance"?

10   BY MS. KRISHNAN:

11           Q.   Well, you -- you agreed -- you

12   answered in the affirmative to whether you have

13   received guidance or instructions about the

14   executive orders and you named as one person

15   who has provided that guidance, Mr. Gordon.

16       My question is:  What was that

17   guidance?

18           MS. SAFAVI:  Standing objection and

19   standard instruction.

20           A.   Produce reports of analysis on

21   individuals involved in protests as it relates

22   to Title 8.

23   BY MS. KRISHNAN:

24           Q.   Did he provide any other

25   guidance about these executive orders?
```

```
 1              A.   Do it quickly.
 2              Q.   And when did he give you this
 3   guidance?  Was it February, March?
 4              A.   February or March.
 5              Q.   Did he say why it needed to be
 6   done quickly?
 7              MS. SAFAVI:  Objection.  Hearsay.
 8              A.   Can you rephrase?
 9   BY MS. KRISHNAN:
10              Q.   He said "do it quickly," and my
11   question is:  Did he provide an explanation for
12   why it needed to be done quickly?
13              MS. SAFAVI:  Standing objection and
14   standard instruction.
15              A.   Yeah, we -- I was being
16   facetious, we -- we have to do everything
17   quickly.  His guidance was to produce the ROAs,
18   exactly as I said before, look for the -- based
19   on suspicious activity in Title 8 or any other
20   crimes.
21   BY MS. KRISHNAN:
22              Q.   And did he provide any guidance
23   as to what "suspicious activity within Title 8"
24   means?
25              A.   He did not provide specific
```

 1    guidance on the Title 8, what Title 8 offenses

 2    to look for.

 3              Q.    Is this the same conversation

 4    in which he provided names of student

 5    protesters to research and analyze?

 6              A.    No.

 7              Q.    Was anyone else present when

 8    Mr. Gordon instructed you to produce reports of

 9    analysis of those involved in protests?

10              A.    Yes, the folks I mentioned

11    before.

12              Q.    Okay.  Did anyone else at this

13    meeting provide you guidance or instructions

14    about the executive orders?

15              A.    About the executive orders, no.

16              Q.    Did anyone else at the meeting

17    provide guidance or instructions about the

18    reports of analysis that you had been asked to

19    produce?

20              A.    Yes.

21              Q.    Who provided that guidance?

22              A.    These were discussions amongst

23    the people named, as I mentioned before,

24    rolling discussions over days.  So we were

25    discussing what the -- what the analysts were

```
 1    finding, what the -- the research and analysis
 2    was, and how we might do it better.  Things
 3    like that.
 4              Q.   Was there any -- a name for
 5    this line of effort?
 6              A.   Yes.
 7              Q.   What was the name?
 8              A.   The -- we call it the tiger
 9    team.
10              Q.   Does the tiger team continue to
11    meet?
12              THE COURT REPORTER:  I'm sorry?
13    BY MS. KRISHNAN:
14              Q.   Does the tiger team continue to
15    meet?
16              A.   Yes.
17              Q.   How often does it meet?
18              MS. SAFAVI:  Standing objection and
19    standard instruction.
20              A.   It's constant.
21    BY MS. KRISHNAN:
22              Q.   And is this team still having
23    discussions about reports of analysis about
24    student protesters?
25              MS. SAFAVI:  Standing objection and
```

1    standard instruction.

2              A.    No.

3    BY MS. KRISHNAN:

4              Q.    Do you recall when the last

5    discussion among this group of people about --

6              MS. SAFAVI:  Standing --

7    BY MS. KRISHNAN:

8              Q.    -- student protesters occurred?

9              MS. SAFAVI:  Standing objection and

10   standard instruction.

11             A.    Maybe a month ago.

12   BY MS. KRISHNAN:

13             Q.    Did Mr. Walker provide any

14   guidance or instructions about the reports of

15   analysis on student protesters?

16             A.    He was part of the discussions.

17             Q.    What did he say?

18             MS. SAFAVI:  Objection.  Hearsay.

19   Also calls for privileged requested

20   information, and so I'm going to instruct my

21   client to answer to the extent that he can

22   without divulging privileged information.

23             A.    I don't recall except that it

24   was deliberative.

25   BY MS. KRISHNAN:

1          Q.   Did anyone -- did anyone

2    address the connection between these reports of

3    analysis and the executive orders?

4               MS. SAFAVI:  Objection.  Standing

5    objection and instruction regarding

6    deliberative or law enforcement privilege.

7          Go ahead an answer the question to the

8    best that you can.

9          A.   I don't know specifics, I don't

10   recall who said what, but I'm sure the

11   executive orders were mentioned.

12   BY MS. KRISHNAN:

13          Q.   And so apart from the fact that

14   reports of analysis on certain student

15   protesters were required to be produced, what

16   else was said about these executive orders?

17               MS. SAFAVI:  Standing objection and

18   instruction and also objection.  Hearsay.

19          A.   I don't recall.

20   BY MS. KRISHNAN:

21          Q.   Which part or parts of Title 8

22   did the Office of Intelligence focus on in

23   response to this request to produce reports of

24   analysis on student protesters?

25               MS. SAFAVI:  Standing objection and

1   standard instruction.

2              A.   Yeah, the -- the entirety of

3   it.

4   BY MS. KRISHNAN:

5              Q.   Was foreign policy mentioned in

6   any of these discussions?

7              A.   Yes.

8              Q.   What was said about foreign

9   policy?

10             MS. SAFAVI:  Objection.  Hearsay.

11  And standing objection and standard

12  instruction.

13             A.   I don't recall.  I don't recall

14  except that it was a State Department decision.

15  BY MS. KRISHNAN:

16             Q.   What was a State Department

17  decision?

18             MS. SAFAVI:  Objection.  Speculation.

19             A.   I'd have to speculate, but

20  State Department is in charge of foreign

21  policy.

22  BY MS. KRISHNAN:

23             Q.   Yes, but you refer to a State

24  Department decision, and I'm asking what

25  decision are you referring to.

```
 1              MS. SAFAVI:  Objection.  Form.
 2              A.   Can you rephrase the question?
 3    BY MS. KRISHNAN:
 4              Q.   When I asked what was said
 5    about foreign policy, you said it was a State
 6    Department decision, and I'm asking what is the
 7    State Department decision to which you were
 8    referring.
 9              A.   Anything to do with foreign
10    policy.  So all -- all foreign policies.
11    Those -- only decisions related to foreign
12    policies are made by State Department.
13              Q.   Do you recall anyone referring
14    to a State Department decision that certain
15    student protesters should be researched and
16    analyzed in order to determine whether they
17    pose foreign policy concerns?
18              MS. SAFAVI:  Objection.  Form.
19              A.   Can you rephrase?
20    BY MS. KRISHNAN:
21              Q.   So at these conversations that
22    we've been talking about, do you recall anyone
23    referring to a State Department decision that
24    these protesters should be researched and
25    analyzed in order for the State Department to
```

1    determine whether they pose foreign policy

2    concerns?

3                MS. SAFAVI:  Objection.  Form.

4                A.   No.

5    BY MS. KRISHNAN:

6                Q.   Was anti-Semitism mentioned at

7    any of these meetings addressing reports of

8    analysis on student protesters?

9                A.   Yes.

10               Q.   What was said -- withdrawn.

11          Did anyone address how anti-Semitism

12    related to these reports of analysis?

13               MS. SAFAVI:  Standing objection and

14    instruction to answer the question the best

15    that you can without revealing classified law

16    enforcement privilege or deliberative process

17    privilege.

18               A.   The analyst job was -- is to

19    provide research and analysis on suspicions of

20    violations of the law.  That's what the team

21    was focused on.

22    BY MS. KRISHNAN:

23               Q.   I understand that.  But you

24    said that anti-Semitism was mentioned in these

25    conversations, and I'm asking whether anyone

1    addressed how anti-Semitism related to these

2    reports of analysis.

3            A.    No.

4            Q.    Did anyone mention support for

5    Hamas?

6            A.    Yes.

7            Q.    Who mentioned it?

8            MS. SAFAVI:    Objection.    Standing

9    objection and the instruction to go ahead and

10   answer to the extent it doesn't expose

11   privileged information or classified

12   information.

13           A.    I think all of us at one point

14   or another mentioned -- discussed pro-Hamas.

15   BY MS. KRISHNAN:

16           Q.    Did anyone address what

17   anti-Semitism means at any of these meetings?

18           A.    No.

19           Q.    Did anyone address what

20   qualifies as pro-Hamas activity at any of these

21   meetings?

22           A.    Yes.

23           Q.    What was said about what

24   qualifies as pro-Hamas?

25           MS. SAFAVI:    Objection.    Hearsay.

1    And standing objection on privilege.

2          Go ahead and answer the question to the

3    best that you can without disclosing privileged

4    information.

5          A.   Activities that may be

6    construed as pro-Hamas.

7    BY MS. KRISHNAN:

8          Q.   And in your understanding, what

9    activities qualify as pro-Hamas?

10          A.   Statements in support of

11    October 7th.  Statements in support of Hamas

12    leaders.  Statements in support of increased

13    violence.

14          Q.   Anything else?

15          A.   That's it.

16          Q.   In your understanding, would

17    criticizing Israel for being a Jewish state

18    qualify as pro-Hamas?

19          MS. SAFAVI:  Objection.  Standing

20    objection with the instruction to go ahead and

21    answer without revealing deliberative or law

22    enforcement privileges.

23          A.   No.

24    BY MS. KRISHNAN:

25          Q.   What about the statement

```
 1    Intifada Revolution?
 2              A.   I don't know.
 3              Q.   Is pro-Hamas a term that you
 4    have seen in any of the reports of analysis you
 5    read on student protesters?
 6              A.   Yes.
 7              Q.   Have employees at the Office of
 8    Intelligence received any training or guidance
 9    about what qualifies as pro-Hamas?
10              A.   Yes.
11         You said guidance or training?
12              Q.   Yes.  Let's -- let's start with
13    training.
14         And who has provided training to
15    employees of the Office of Intelligence about
16    what is pro-Hamas?
17              MS. SAFAVI:  Standing objection and
18    instruction.
19              A.   So define "training."  Are we
20    talking formal instruction?  Informal
21    instruction to me would be guidance on
22    training.
23    BY MS. KRISHNAN:
24              Q.   Yeah.  Well, let's start with
25    formal instruction.
```

Deposition of Peter Hatch                                              AAUP, et al. v. Rubio, et al.

```
 1            Has there been any formal instruction
 2      to employees of the Office of Intelligence
 3      about what is pro-Hamas?
 4                  A.   No.
 5                  Q.   Okay.  And has there been
 6      informal instructions about what constitutes
 7      pro-Hamas?
 8                  A.   Yes, in the sense there's been
 9      guidance given on what could constitute
10      pro-Hamas activity in the context of the -- all
11      the information on an individual.
12                  Q.   In what -- in what form was
13      that guidance given?
14                  A.   Supervisors to employees,
15      discussions, guidance given from supervisors to
16      employees, supervisory analysts to the analyst.
17                  Q.   Was any of this guidance in
18      written form?
19                  A.   I don't know.
20                  Q.   Who would know?
21                  A.   The unit chief, Roy Stanley.
22                  Q.   And who provided instructions
23      to the supervisors?
24                  A.   For my deputy, Brad Etter.
25                  THE COURT REPORTER:  I'm sorry?
```

```
 1                    THE WITNESS:  Brad Etter.
 2      BY MS. KRISHNAN:
 3              Q.   And what instructions did you
 4      provide?
 5              MS. SAFAVI:  Standing objection and
 6      instruction.
 7              A.   Guidance was on what active --
 8      what activities could be construed as pro-Hamas
 9      in the right circumstance -- or in the
10      individual -- in the specific circumstances of
11      the information gathered about that individual.
12              Q.   And what guidance did you
13      provide on the question of what activities
14      could be construed as pro-Hamas?
15              A.   The ones I mentioned.
16              Q.   And when -- and when you
17      provided those instructions, did you mean to --
18      did you mean for the example statements that
19      you gave to be exhaustive?
20              A.   No.  I'm sure there were
21      others.
22              Q.   Do you remember any of the
23      others?
24              MS. SAFAVI:  Standing objection and
25      instruction.
```

```
 1                    A.    Not right now.

 2                    Q.    But whatever statements you

 3      provided when you gave these instructions, did

 4      you tell the recipient that that was the

 5      universe of statements --

 6                    A.    No. Sorry.

 7                    Q.    -- that could qualify as

 8      pro-Hamas?

 9                    MS. SAFAVI:  Yeah.  Objection.  Form.

10                    A.    Can you rephrase?

11      BY MS. KRISHNAN:

12                    Q.    And when you provided examples

13      of what could constitute pro-Hamas activity,

14      did you intend for those examples to be

15      exhaustive?

16                    A.    No.

17                    Q.    Have you provided similar

18      instructions to any employee of the Office of

19      Intelligence about what could constitute

20      anti-Semitic activity?

21                    A.    No.  Sorry.

22                    MS. SAFAVI:  That's okay.

23            Standing objection and instruction.

24      You can answer the question.

25                    What guidance did Bradley Etter provide
```

1    to members of the Office of Intelligence about

2    what constitutes pro-Hamas activity?

3              MS. SAFAVI:  Standing objection and

4    instruction.

5              A.   I don't know.

6    BY MS. KRISHNAN:

7              Q.   Do you or Mr. Etter weigh in on

8    when something is pro-Hamas in difficult cases?

9              A.   It is not the job of the Office

10   of Intelligence to make a determination on

11   whether something is pro-Hamas or not

12   pro-Hamas.

13             Q.   But do you make a determination

14   of what could be pro-Hamas?

15             MS. SAFAVI:  Objection.  Form.

16             A.   We include the facts in the

17   report of analysis.  We do not make the

18   determination in the report of analysis, nor do

19   I as the Chief of Intel make the determination.

20   BY MS. KRISHNAN:

21             Q.   But if someone has included the

22   term "pro-Hamas" in a report of analysis,

23   haven't they made an assessment that the

24   subject activity is pro-Hamas?

25             A.   Not necessarily.

1            Q.   But is it the case that an

2    analyst within the Office of Intelligence

3    include information in reports of analysis that

4    could be pro-Hamas?

5            MS. SAFAVI:  Objection.  Form.

6            MS. KRISHNAN:  I'm going to

7    restate -- oh, okay.

8            A.   Can you rephrase?

9    BY MS. KRISHNAN:

10           Q.   Yeah.

11       But is it the case that analysts within

12   the Office of Intelligence include information

13   in reports of analysis that could be construed

14   as pro-Hamas?

15           A.   Yes.

16           Q.   Who sets the agenda for the

17   meetings that you have been part of about

18   reports of analysis on student protesters that

19   you've been asked to compile in response to the

20   executive orders?

21           A.   Can you say that again?

22           Q.   Uh-huh.

23       Who sets the agenda for the meetings

24   that you have been part of about reports of

25   analysis on student protesters in response to

1    the executive orders?

2            A.    Would be a front office staff.

3    The deputy -- deputy staff.

4            Q.    This would be Mr. Gordon's

5    staff?

6            A.    Yes.

7            Q.    Has the Office of Intelligence

8    given other divisions of HSI any guidance or

9    instructions about the executive orders?

10           MS. SAFAVI:  Standing objection and

11   instruction.

12           A.    Define "the executive orders."

13           Q.    To clarify, unless I say

14   otherwise, the executive orders refers, in my

15   questions, to E.O. 14161 and E.O. 14188, the

16   two executive orders we've been talking about.

17           A.    No.

18           Q.    Okay.  Who is training or

19   instructing employees of NSD, that is the

20   National Security Division of HSI, on the

21   executive orders?

22           MS. SAFAVI:  Objection.  Speculation.

23   And standing objection and instruction on

24   privilege.

25           A.    It's not my division.

```
 1    BY MS. KRISHNAN:

 2             Q.   But do you know?

 3             A.   No.

 4             Q.   Has the Office of Intelligence

 5    provided any briefings about the two executive

 6    orders to any other employees of ICE?

 7             MS. SAFAVI:  Objection.  Form.

 8             A.   Can you rephrase?

 9    BY MS. KRISHNAN:

10             Q.   Has the Office of Intelligence

11    provided any briefings about either executive

12    order to other employees of ICE?

13             A.   No.

14             Q.   Do you know that Mr. Watson has

15    provided deposi- -- deposition testimony in

16    this case?

17             A.   Yes.

18             Q.   He said during his deposition

19    that he attended an executive briefing about a

20    program initiated in response to the two

21    executive orders we've been talking about and

22    that executive briefing was given by the Office

23    of Intelligence.

24        Does that refresh your recollection?

25             MS. SAFAVI:  Objection.  Hearsay.
```

```
 1              A.   Can you rephrase?

 2    BY MS. KRISHNAN:

 3              Q.   Well, I can give you some

 4    further details in case this refreshes your --

 5    your recollection.  He said that the briefing

 6    occurred in March of 2025 and he said that you

 7    were present together with Mr. Etter,

 8    Mr. Gordon, and Mr. Hammer.

 9              MS. SAFAVI:  Objection.  Hearsay.

10    And Counsel is testifying.

11              A.   So can I see the document?

12              Q.   Yeah.  I -- I'm representing to

13    you that this was his testimony.

14              A.   Can you repeat that?

15              Q.   Uh-huh.

16         He says that he believes in March of

17    2025 he attended an executive briefing at which

18    you were present where he learned of a program

19    initiated in response to the two executive

20    orders we've been describing and that this

21    executive briefing was given by the Office of

22    Intelligence.

23              A.   Okay.

24              MS. SAFAVI:  Objection.  Hearsay.

25              A.   There are just a couple of
```

```
1    points that are confusing.  So can you break
2    the question into parts to clarify?
3              MS. KRISHNAN:  Sure.
4    BY MS. KRISHNAN:
5              Q.   Do you remember attending an
6    executive briefing about executive orders in
7    March of 2025?
8              A.   To my recollection, that
9    meeting was about the protests.  The purpose of
10   the meeting was to discuss the protests.
11             Q.   This was a meeting in March?
12             A.   I believe so.
13             Q.   And was that meeting initiated
14   by the Office of Intelligence?
15             A.   No.
16             Q.   And you said the purpose of the
17   meeting was to discuss the protests.  What
18   about the protests?
19             MS. SAFAVI:  Standing objection and
20   instruction.
21             A.   Whether or not the protests
22   were -- involved violations of crime --
23   violation of the law.
24   BY MS. KRISHNAN:
25             Q.   And did anyone offer an
```

1    assessment on that question?

2              MS. SAFAVI:  Objection.  Form.

3              A.   I don't think so.

4    BY MS. KRISHNAN:

5              Q.   So no one offered an opinion at

6    that meeting about whether the protests

7    involved the violation of the law?

8              A.   I think the discussion was it

9    could be.

10             Q.   It could be?

11             A.   It could be violations of law.

12             Q.   What violations of the law were

13   mentioned at that meeting?

14             A.   Violations of Title 8,

15   violations related to violence.

16             Q.   Any others?

17             A.   Probably.  That's what I

18   remember, though.

19             Q.   Okay.  And what, if any,

20   specific violations of Title 8 were mentioned

21   at the meeting?

22             A.   I don't recall which specific

23   ones.

24             Q.   Was foreign policy mentioned at

25   this briefing?

1          A.   At this particular briefing, I

2     don't know.

3          Q.   What about support for Hamas?

4          MS. SAFAVI:  Objection.  Form.

5          A.   Can you rephrase?

6     BY MS. KRISHNAN:

7          Q.   Was support for Hamas mentioned

8     at this briefing?

9          A.   I think so.

10          Q.   And when you said that the

11     purpose of the meeting was to discuss the

12     protests, are you referring to the protests

13     that have been ongoing since October 7, 2023?

14          A.   Yes.

15          Q.   And these would be the protests

16     against Israel's military actions in Gaza?

17          A.   That would be speculation.  I

18     don't know what the -- I don't know the intent

19     of the protests.  I don't know the -- the

20     intent of the protesters.

21          Q.   To your knowledge, who convened

22     this briefing?

23          A.   HSI leadership.

24          Q.   HSI leadership.

25          Was the State Department mentioned at

1    this briefing?

2              A.    I don't know.

3              Q.    Is this where the tiger team --

4    is this briefing where the tiger team was

5    formed?

6              A.    Yes.

7              Q.    And were there any briefings

8    after this briefing that we've been talking

9    about that addressed the protests?

10             A.    Yes, the rolling discussions.

11             Q.    The rolling discussions.  Okay.

12        When was the last time you received the

13   names of student protesters for the Office of

14   Intelligence to research and analyze?

15             A.    I think more than a month ago.

16             Q.    Have you had any conversations

17   with State Department employees about the

18   reports of analysis your office has been

19   working on?

20             A.    No.

21             Q.    Has HSI leadership had any

22   conversations with State Department employees

23   about the protests?

24             A.    Yes.

25             Q.    Who in HSI leadership has had

1    conversations with State Department employees

2    about the protests?

3              MS. SAFAVI:  Objection.  Speculation.

4              A.   I think you already know.

5    Mr. Watson.

6    BY MS. KRISHNAN:

7              Q.   Mr. Watson.

8         Anyone else?

9              A.   Not that I know of.

10             Q.   Okay.  And who has Mr. Watson

11   spoken to at the State Department about the

12   protests?

13             MS. SAFAVI:  Objection.  Speculation.

14             A.   You have to ask him.  I don't

15   know.

16   BY MS. KRISHNAN:

17             Q.   And are you aware of a working

18   group called The Student Visa Working Group

19   that includes employees from the State

20   Department and DHS?

21             A.   What's it called?

22             Q.   It called The Student Visa

23   Working Group.

24             A.   No.

25             Q.   Are you aware of any effort by

```
 1    the State Department and DHS to share
 2    information about and coordinate actions on
 3    student Visa holders?
 4              A.   No.
 5              Q.   Are you aware that the State
 6    Department has represented to its employees
 7    that it is working with DHS to share
 8    information about and coordinate on student
 9    Visa holders?
10              A.   No.
11              Q.   Is there anyone else in ICE,
12    besides Mr. Watson and Mr. Gordon, that would
13    coordinate with the State Department on any
14    effort to share information about and
15    coordinate actions on student Visa holders?
16              MS. SAFAVI:  Objection.  Speculation.
17              A.   Yeah, I'd be speculating.
18    BY MS. KRISHNAN:
19              Q.   Are Mr. Watson and Mr. Gordon
20    the most likely officials from HSI to be
21    involved in any such effort.
22              A.   In the context of this
23    discussion, yes.
24              Q.   Did any of the reports of
25    analysis that the Office of Intelligence
```

1    compiled instituted protesters involve

2    permanent residents?

3            A.    Yes.

4            Q.    Have you had any contact or

5    communication with employees of the State

6    Department about either of the two executive

7    orders we've been discussing?

8            A.    No.

9            Q.    Has anyone else within your

10   office had any contact or communication with

11   State Department employees regarding either of

12   the two executive orders we've been discussing?

13           A.    Not that I know of.

14           Q.    To your knowledge, has DHS or

15   ICE issued any guidance or instructions to

16   universities concerning either of the two

17   executive orders?

18           MS. SAFAVI:  Objection.  Form.

19           A.    Can you rephrase?

20   BY MS. KRISHNAN:

21           Q.    To your knowledge, has DHS

22   issued any guidance or instructions to

23   universities concerning the executive orders?

24           MS. SAFAVI:  Objection.  Speculation.

25           A.    I have to speculate.  I don't

1    know.

2    BY MS. KRISHNAN:

3         Q.   To your knowledge, has ICE had

4    any -- any communication with universities

5    concerning the executive orders?

6         MS. STROKUS:  Objection.

7    Speculation.

8         A.   That's not my world of work.

9         THE COURT REPORTER:  I'm sorry?

10        THE WITNESS:  That's not my world of

11   work.

12   BY MS. KRISHNAN:

13        Q.   But do you know?

14        A.   I'd have to speculate.

15        Q.   Because you don't know?

16        A.   Because I don't know.

17        Q.   Okay.

18        MS. SAFAVI:  Can we have a break?

19        MS. CONLON:  Sure.

20        How long of a break do you need.

21        MS. SAFAVI:  I just need to get

22   candy.

23        THE VIDEOGRAPHER:  Time is 17:27 and

24   we are off the record.

25

```
 1              (A break was taken at 5:27 p.m.)

 2

 3              THE VIDEOGRAPHER:  The time is 17:45

 4    and we're back on the record.

 5    BY MS. KRISHNAN:

 6         Q.   When is the last time that you

 7    received names of student protesters?

 8         A.   I think over a month ago.

 9         Q.   And how does HSI leadership

10    identify the names that are given to you?

11              MS. SAFAVI:  Objection.  Speculation.

12         A.   Can you rephrase?

13    BY MS. KRISHNAN:

14         Q.   How has HSI leadership

15    identified the individuals they want the Office

16    of Intelligence to research an analyst?

17              MS. SAFAVI:  Objection.  Speculation.

18         A.   I think you asked that before.

19    BY MS. KRISHNAN:

20         Q.   I'm not sure I have.  I can't

21    say definitively, but if I have, could you

22    remind me?  How has HSI leadership identified

23    the protesters they want the Office of

24    Intelligence to research and analyze?

25         A.   I think I said we've -- we
```

```
 1   receive lists from -- in a number of ways.  The
 2   clarification would be those lists usually go
 3   through the front office, so the leadership of
 4   HSI, but they come from Office of Border Czar,
 5   Office of the Secretary.
 6             THE COURT REPORTER:  I'm sorry.  You
 7   said office of who?
 8             THE WITNESS:  The Border Czar.
 9             THE COURT REPORTER:  Border Czar.
10             THE WITNESS:  Office of Secretary,
11   interagency partners, and I'd have to speculate
12   about anybody else.
13   BY MS. KRISHNAN:
14        Q.   Are you able so say where the
15   majority of these names have come from, any of
16   the particular places you've mentioned?
17             MS. SAFAVI:  Objection.  Form and
18   speculation.
19        A.   Can you rephrase?
20   BY MS. KRISHNAN:
21        Q.   Where have most of the names
22   that you have received come from, and I'm
23   speaking here about the student protesters?
24        A.   Most of the names were on the
25   Canary Mission website.
```

```
 1              Q.   And who collated those names

 2    into a list?

 3              MS. SAFAVI:  Objection.  Speculation.

 4    And standing objection and instruction on

 5    privilege.

 6              A.   I don't know.

 7    BY MS. KRISHNAN:

 8              Q.   But when you mentioned the list

 9    of places that give HSI leadership the names

10    and you mentioned that; most of the names were

11    on a Canary Mission website.  Of the places you

12    named -- withdrawn.

13         Which of those places identified names

14    from Canary Mission's website?

15              A.   I don't know which one.

16              Q.   Do any of the names come from

17    Betar?

18              THE COURT REPORTER:  From where?

19              MS. KRISHNAN:  Betar, B-E-T-A-R.

20              MS. SAFAVI:  Objection.  Form.

21              THE WITNESS:  What do you mean by

22    Betar?  Are you referring to the website?

23    BY MS. KRISHNAN:

24              Q.   I -- I'm referring to the group

25    and it has a website.
```

1        A.    I believe some of the names

2   came from that website.  I believe a lot of the

3   names on that website are also in Canary

4   Mission.

5        Q.    Besides the Canary Mission and

6   Betar website, are there any other websites

7   that these names were pulled from?

8        A.    Not that I know of.

9        Q.    Did any of the names, to your

10  knowledge, come from The Heritage Foundation?

11       A.    I don't know.

12       Q.    To your knowledge, did any of

13  the names come from the White House?

14       A.    I would have to speculate.

15       Q.    Do you know?

16       A.    I don't know for sure where

17  they came from.

18       Q.    Do you suspect that some of

19  them come -- came from the White House?

20            MS. SAFAVI:  Objection, form.

21  Objection, speculation.

22            MS. KRISHNAN:  You can still answer.

23            MS. SAFAVI:  Also standing objection

24  instruction to the extent it calls for

25  privileged information.

1          A.    Can you clarify which parts --

2     I don't know where they came from.

3     BY MS. KRISHNAN:

4          Q.    Do you have any understanding

5     of whether anyone in the White House has input

6     into which student protesters should be

7     researched and analyzed?

8          MS. SAFAVI:  Objection.  Privileged,

9     presidential communication privilege.  So --

10    and deliberative and law enforcement.

11    So I'm going to instruct you to answer

12    the question to the best that you can without

13    disclosing privileged information.

14         MS. KRISHNAN:  And I just want to

15    clarify I'm only -- I'm not asking about the

16    content or any specific names, but just whether

17    anyone in the White House has provided input

18    into which student protesters should be

19    researched and analyzed.

20         MS. SAFAVI:  Okay.  So then

21    objection.  Form.

22         A.    Again, I'd be speculating.  So

23    can you rephrase?

24    BY MS. KRISHNAN:

25         Q.    Do you have any information

```
 1   about whether anyone at the White House has

 2   provided input into which student protesters

 3   HSI should investigate?

 4            A.   No.

 5            Q.   And do you have, just to cover

 6   all basis, any information on whether anyone at

 7   the White House has provided input into which

 8   student protesters should be researched and

 9   analyzed?

10            A.   I do not.

11            Q.   Have any of the student names,

12   and I'm talking here of the student protesters,

13   come from social media?

14            MS. SAFAVI:  Objection.  Asked and

15   answered.

16   BY MS. KRISHNAN:

17            Q.   Have any of the names come from

18   social media posts in which an individual or

19   organization tags ICE on a social media

20   platform?

21            A.   No.

22            Q.   Have any of these names come

23   through a tip submitted through ICE's public

24   Tip form?

25            A.   I don't know.
```

```
 1              Q.   What happens when a member of
 2    the public submits a tip through ICE's public
 3    tip form?
 4              A.   It gets reviewed by a panelist
 5    at the tip line and then sent to the relevant
 6    office that would handle that type of tip.
 7              Q.   And which part of ICE do staff
 8    who work the tip line work it?
 9              A.   The Office of Intelligence.
10              Q.   So many of these names have
11    come from his leadership.
12         Have any of the name -- have any of the
13    student protesters that the Office of
14    Intelligence -- withdrawn.
15         Has the Office of Intelligence
16    researched and analyzed any student protesters
17    who weren't identified to you by his
18    leadership?
19              MS. SAFAVI:  Objection.  Form.
20              A.   Can you rephrase?
21    BY MS. KRISHNAN:
22              Q.   Has the Office of Intelligence
23    researched any student protesters who were not
24    on a list of names provided to you?
25              A.   Yes.
```

1          Q.    And how did the Office of

2    Intelligence identify those student protesters?

3               MS. SAFAVI:    Standing objection and

4    standard instruction.

5               A.    If during the course of their

6    research and analysis the analyst was able to

7    identify the protester without being given the

8    name from someone else, then they

9    would (inaudible).

10              Q.    And in what circumstances would

11   an analyst decide that a student protesters who

12   comes up in their research is themselves worth

13   researching?

14              MS. SAFAVI:    Standing objection and

15   standard instruction.

16              A.    So an analyst can write an ROA

17   on a protester and find that the protester

18   engaged in no suspicious activity and the ROA

19   is still produced.

20   BY MS. KRISHNAN:

21              Q.    And in this case, the ROA is

22   produced to the National Security Division?

23              A.    In -- in this context, yes.

24              Q.    Okay.  So there have been cases

25   in which the Office of Intelligence has found

```
 1   that a protester has engaged in no suspicious

 2   activity?

 3            A.   (Inaudible)

 4            Q.   Other cases that an analyst has

 5   found that a protester has engaged in

 6   suspicious activity?

 7            A.   There are circumstances where

 8   the analyst has found indications of suspicious

 9   activity for the agent to make the

10   determining -- or for another decision-maker to

11   make a determination on whether or not it was

12   actually a violation.

13            Q.   In this context, when we're

14   talking about student protesters, is it the

15   National Security Division that would make that

16   determination?

17            A.   Yes.

18            Q.   Okay.  Has analysts in the

19   Office of Intelligence identified any student

20   protesters that are -- deserve research and

21   analysis based on their review of Canary

22   Mission's website?

23            MS. SAFAVI:  Objection.  Form.

24            A.   Can you rephrase that?

25   BY MS. KRISHNAN:
```

```
 1              Q.    Uh-huh.

 2         Have analysts in the Office of

 3    Intelligence identified in the course of their

 4    research any student protesters -- withdrawn.

 5         Have analysts in the Office of

 6    Intelligence researched and analyzed a student

 7    protester based on their own review of Canary

 8    Mission's website?

 9              MS. SAFAVI:  Objection.  Form.

10              A.    Can you rephrase?

11    BY MS. KRISHNAN:

12              Q.    So many of the names provided

13    to the Office of Intelligence came from the

14    Canary Mission's website.  And my question is:

15    Have analysts in the Office of Intelligence

16    identified additional student protesters from

17    their review of the Canary Mission's website?

18              A.    I don't know.

19              Q.    And have analysts in the Office

20    of Intelligence identified additional student

21    protesters from their review of Betar's

22    website?

23              A.    I don't know.

24              Q.    And do the names that have been

25    given to the Office of Intelligence from the
```

```
 1      Canary Mission's website come from this -- that

 2      the Canary -- withdrawn.

 3           Does the -- what is the Canary Mission?

 4           A.   It is a website produced by

 5      individuals who allege different types of

 6      activities, usually related to Israel and

 7      Palestine, that they have detected on their own

 8      and on behalf of themselves.

 9           Q.   And have any of the names on

10      the list of names of student protesters that

11      you've received come from the Canary Mission?

12           A.   From the website, yes.

13           Q.   Has the Canary Mission

14      submitted names from its website?

15           A.   No, not that I know of.  Not to

16      the Office of Intel.

17           Q.   Has Betar, to your knowledge,

18      submitted names from its website to ICE?

19           A.   To the Office of Intel, no.

20           Q.   What about to ICE?

21           A.   I don't know.

22           Q.   And has the Canary Mission

23      submitted names from its website to ICE?

24           A.   I don't know.

25           Q.   Did the Office of Intelligence
```

1    prepare a report of analysis on Mahmoud Khalil?

2            A.   Yes.

3            Q.   Did his name come from the

4    Canary Mission?

5            A.   I don't recall where his name

6    came from.

7            Q.   Did it come from his

8    leadership?

9            A.   I don't recall where his name

10   came from.

11           Q.   Has the -- or did the Office of

12   Intelligence prepare a report of analysis on

13   Mohsen Mahdawi?

14           A.   Yes.

15           Q.   Did his name come from the

16   Canary Mission's website?

17           A.   I don't recall where his name

18   came from.

19           Q.   At all?

20           A.   At all.

21           Q.   Did the Office of Intelligence

22   prepare a report of analysis on Rumeysa Ozturk?

23           A.   Yes.

24           Q.   And do you recall where her

25   name came from?

```
 1              A.    No.
 2              Q.    Do you recall whether it came
 3    from his leadership?
 4              A.    I don't recall where it came
 5    from.
 6              Q.    Did the Office of Intelligence
 7    prepare a report of analysis on Yunseo Chung?
 8              A.    Yes.
 9              Q.    Where did her name come from?
10              A.    I don't recall.
11              Q.    Did the Office of Intelligence
12    prepare a report of analysis on Badar Khan
13    Suri?
14              A.    Yes.
15              Q.    Do you know where his name came
16    from?
17              A.    No.
18              Q.    What percentage -- I'm just
19    asking for approximation, but what percentage
20    of names of student protesters that were
21    provided to you came from the Canary Mission's
22    website?
23              A.    Large percentage.
24              Q.    75 percent?
25              A.    More than 75 percent.
```

1              Q.    Close to 100?

2              A.    No.

3              Q.    What percentage of the names

4    came from Betar's website?

5              A.    That, I don't know.

6              Q.    So of the five individuals I

7    just mentioned, were you involved in compiling

8    the report of analysis?

9              A.    No.

10             Q.    Who in the Office of

11   Intelligence was?

12             MS. SAFAVI:  Objection.  Standing

13   objection on law enforcement privilege and also

14   objection on the classified information.

15        So I'm going to instruct you to answer

16   it accordingly.

17             A.    The unit chief manages -- the

18   unit chief and section chiefs manage the

19   analyst's workload and would assign -- would

20   make the assignments of what the analyst works

21   on, what project or what individual.

22   BY MS. KRISHNAN:

23             Q.    Were any senior officials

24   within the Office of Intelligence involved in

25   the compilation of the report of analysis in

```
 1    any of these cases?
 2            MS. SAFAVI:  Standing objection.
 3    Deliberative process privilege.
 4        I instruct you to answer the question
 5    to the best that you can without divulging
 6    privileged information.
 7            A.   Can you define "involved in" or
 8    clarify "involved in"?
 9            THE COURT REPORTER:  I'm sorry.  What
10    was the first part of that?
11            THE WITNESS:  Can you define
12    "involved in" or clarify "involved in"?
13    BY MS. KRISHNAN:
14            Q.   Did any senior official in the
15    Office of Intelligence have to sign off on any
16    of these reports?
17            A.   No --
18            Q.   Did any senior officials in the
19    Office of Intelligence review any of these
20    reports before they were referred to the
21    National Security Division?
22            MS. SAFAVI:  Objection.  Form.
23            A.   Can you rephrase?
24    BY MS. KRISHNAN:
25            Q.   Well, let me start with you.
```

```
 1    Did -- did you review the report of analysis on

 2    any of these five individuals before they went

 3    to the National Security Division?

 4              A.    No.

 5              Q.    Did Mr. Etter review any of

 6    these reports of analysis before they went to

 7    the National Security Division?

 8              A.    I don't believe so.

 9              Q.    Was there any senior official

10    who reviewed these reports of analysis in these

11    five cases before they went to the National

12    Security Division?

13              MS. SAFAVI:  Objection.  Form.

14              A.    Can you rephrase?

15    BY MS. KRISHNAN:

16              Q.    Did any senior official review

17    the reports of analysis in any of these five

18    cases before they went to the National Security

19    Division.

20              MS. SAFAVI:  Objection.  Form.

21              A.    Before they went to the

22    National Security -- before -- can you

23    rephrase?

24    BY MS. KRISHNAN:

25              Q.    So when I say "review," it's
```

1    not a term of art, it means read.

2            Did any senior official read any of the

3    reports of analysis of these five cases before

4    they went to the National Security Division?

5            MS. SAFAVI:  Objection.  Form.

6            A.    Can you clarify "went"?

7    BY MS. KRISHNAN:

8            Q.    Before they were provided to.

9            A.    Yes.  Before they were provided

10   to Mr. Watson.

11   BY MS. KRISHNAN:

12           Q.    Who are those officials?

13           A.    The ones I named.

14           Q.    And I'm just going to confirm,

15   Mr. Gordon, Mr. Walker?

16           A.    Yes.

17           Q.    Mr. Stanley?

18           A.    Yes.

19           Q.    Have I left anyone out?

20           A.    When he was there, Mr. Hammer.

21           Q.    Mr. Hammer.

22           And, to your knowledge, was there a

23   reason that these officials reviewed these

24   reports of analysis before they were provided

25   to Mr. Watson?

```
 1              A.    Yes.

 2              Q.    What was that reason?

 3              MS. SAFAVI:   Standing objection and

 4      instruction to answer to the extent it doesn't

 5      reveal deliberative process, law enforcement

 6      privilege, or classified information.

 7              A.    To -- to gain awareness on what

 8      the analysts were producing.  Awareness of what

 9      they were saying.

10      BY MS. KRISHNAN:

11              Q.    And did they want to gain

12      awareness because they had to report --

13      withdrawn.

14          Did they want to gain awareness because

15      they had to provide an update on the SEPV

16      program.

17              MS. SAFAVI:   Objection.  Form.  Calls

18      for speculation.

19              A.    You have to ask them why they

20      (ph).

21      BY MS. KRISHNAN:

22              Q.    Do you know if any of these

23      four individuals provided updates on this

24      project to anyone senior to them?

25              A.    I suspect, yes.  Yeah.
```

1    Speculation.  I'm speculating.

2              Q.   I understand.

3         And who would they have provided

4    updates on this project?

5              MS. SAFAVI:  Objection.  Calls for

6    speculation, and also standing objection on

7    privilege.

8         So I instruct you to answer to the best

9    that you can without divulging privileged

10   information.

11             A.   I speculate their supervisors

12   and seniors.

13   BY MS. KRISHNAN:

14             Q.   Now, you'll have to tell me who

15   those people are.

16             A.   The head of the -- EAD of his

17   works for the director of ICE.

18             Q.   And who is the EAD of his?

19             A.   That would be Tony Salisbury

20   and through the deputies that I mentioned,

21   which are Mr. Gordon and Mr. Hammer.

22             Q.   Do you -- Mr. Gordon,

23   Mr. Walker, Mr. Stanley, and Mr. Hammer

24   typically review reports of analysis before

25   they are referred by the Office of

 1    Intelligence?

 2                A.    Mr. Stanley is the unit chief,

 3    so he is -- he works for Mr. Etter, works for

 4    me.

 5                Q.    I see.  I see.

 6                A.    Can you repeat the question?

 7                Q.    Do Mr. Gordon, Mr. Walker, and

 8    Mr. Hammer typically review reports of analysis

 9    before they are referred by the Office of

10    Intelligence?

11                MS. SAFAVI:  Objection, speculation.

12    And objection, form.

13                A.    Can you clarify whether you're

14    referring to the context of this effort or just

15    HSIY?

16                THE COURT REPORTER:  Or just what?

17                THE WITNESS:  HSIY.  His.  All of

18    his.

19    BY MS. KRISHNAN:

20                Q.    I mean, outside of this effort.

21                A.    They read ROAs, not as a matter

22    of course anymore than they -- not as a matter

23    of course.

24                Q.    But within this effort they do?

25                A.    For this effort, they read --

```
 1    read some of the ROAs that were produced.  Ones
 2    that had been already reviewed by NSD, but not
 3    formally referred to NSD for consideration of
 4    the next step in the process which would be
 5    forwarding to State Department.
 6                Q.   So if I understand correctly,
 7    for a subset of the reports of analysis that
 8    the Office of Intelligence produced on student
 9    protesters, they were reviewed informally by
10    the National Security Division before they were
11    referred formally to that division?
12                MS. SAFAVI:  Objection.  Form.
13                A.   Can you rephrase it?
14    BY MS. KRISHNAN:
15                Q.   If I understand correctly, for
16    subset of the reports of analysis that your
17    office produced on student protesters, they
18    were reviewed informally by the National
19    Security Division before they were formally
20    referred to that division?
21                MS. SAFAVI:  Objection.  Form.
22                A.   Can you rephrase?
23    BY MS. KRISHNAN:
24                Q.   Do you not understand my
25    question?
```

```
 1            A.   The language you're using is
 2      confusing.
 3            Q.   Oh, I see.  I don't mean any of
 4      the words that I'm using as terms of art and I
 5      know that they are often terms of art within
 6      Government agencies, and I do not have your
 7      dictionary, unfortunately, so I am just using
 8      them within their plain meaning.
 9            So my -- my question is -- so I
10      understand that a subset of the reports of
11      analysis produced on student protesters were
12      read by the National Security Division before
13      they were formally sent in some way to that
14      division; is that correct?
15            A.   All of the ROAs were reviewed
16      by special agent from the National Security
17      Division before being formally referred to the
18      National Security Division.
19            Q.   Okay.  So what distinguished
20      these five cases from other cases involving
21      student protesters where Mr. Gordon, Mr.
22      Walker, and Mr. Hammer didn't review the report
23      before it was sent to the National Security
24      Division in the first instance?
25            MS. SAFAVI:  Standing objection and
```

1    standard instruction.

2            A.   As an example, if during the

3    course of using the RO -- the report of

4    analysis we found out that the individual is

5    actually a U.S. person and not actually a

6    foreign student, as alleged by one of the

7    sources who provided them, we -- we would not

8    obviously forward that for review, to read

9    to -- to the National Security Division.  It

10   would just be set aside.

11   BY MS. KRISHNAN:

12           Q.   I'm trying to understand why

13   Mr. Gordon, Mr. Walker, and Mr. Hammer reviewed

14   the reports of analysis in these five cases but

15   not every report of analysis that was produced

16   by the Office of Intelligence on student

17   protesters.

18           MS. SAFAVI:  Objection.  Form.  And

19   standing objection and instruction on

20   privilege.

21           MS. KRISHNAN:  I haven't asked a

22   question yet.

23           MS. SAFAVI:  Oh, yeah.  Sorry.

24   BY MS. KRISHNAN:

25           Q.   So my question is:  How are

```
 1   these five cases different?
 2             MS. SAFAVI:  Standing objection and
 3   standard instruction.
 4             A.   These were the ones that were
 5   going to be referred -- likely referred to
 6   State Department for their consideration.  And
 7   the senior officials read the ROAs, they did
 8   not review the ROAs.  The term "review"
 9   connotes approval and that's not what -- that's
10   not how the ROA process works.
11   BY MS. KRISHNAN:
12             Q.   Did any of Mr. Gordon,
13   Mr. Walker, and Mr. Hammer provide an opinion
14   on whether the National Security Division
15   should forward any of these names to the State
16   Department?
17             MS. SAFAVI:  Standing objection, and
18   I'll in -- I instruct you to answer the
19   question to the extent it doesn't disclose
20   deliberative or law enforcement privileges.
21             THE VIDEOGRAPHER:  Could you fix your
22   mic, so it's --
23             MS. SAFAVI:  Oh, sorry.  Yes.
24          Do I need to repeat the objection?
25   Could you hear it?
```

 1          So standing objection, and the

 2     instruction go ahead and answer the question to

 3     the best that you can without divulging

 4     deliberative or law enforcement privilege.

 5          A.    To the best of my knowledge,

 6     the conversations involved discussions -- is

 7     this a good individual -- just should we refer

 8     to this individual?  Is there a violation of

 9     law?  What is the violation?  Their -- and

10     discussions of the activity that was cited in

11     the report of analysis.

12     BY MS. KRISHNAN:

13          Q.    And did any of Mr. Gordon,

14     Mr. Walker, and Mr. Hammer identify evaluation

15     of law in Mr. Khalil's case?

16          MS. SAFAVI:  Objection.  Form.  And

17     standing objection and the instruction to go

18     ahead and answer the question without divulging

19     privileged information.

20          A.    So I don't recall the details

21     in the report of analysis or the discussions

22     for those particular individuals.

23     BY MS. KRISHNAN:

24          Q.    Why did you read the reports of

25     analysis on these five individuals before they

 1    were shared with the National Security Division

 2    in the first instance?

 3              MS. SAFAVI:  Objection.  Form.

 4              A.   The question is confusing

 5    because of the before or after language.

 6    BY MS. KRISHNAN:

 7              Q.   When I say "before" I mean,

 8    before the National Security Division forwards

 9    the name to the State Department.

10              A.   Now, can you repeat the

11    question?

12              Q.   Okay.  So my question is:  Why

13    did you read the reports of analysis on these

14    five individuals before the National Security

15    Division forwarded their names to the State

16    Department?

17              A.   I wanted to see what the

18    analysts were doing.  I wanted to hear the

19    conversation about violations of law.  I was

20    not part of the decision-making process on

21    whether or not to refer it.  I was interested

22    in what the analysts who worked for me were

23    doing and what information they were gathering.

24              Q.   And what violations before were

25    mentioned in Mr. Khalil's case?

```
 1            MS. SAFAVI:  Standing objection and

 2     instruction, but go ahead and answer the

 3     question to the extent that you can without

 4     disclosing deliberative process privilege.

 5            A.   So I am not familiar with the

 6     other ways to distinguish the details between

 7     any of them or to recall by individual what

 8     the -- what was in the ROA.

 9     BY MS. KRISHNAN:

10            Q.   And did you -- did you see any

11     reference to foreign policy in the ROAs of

12     these five individuals?

13            A.   Not that I recall.

14            Q.   Did you see any reference to

15     anti-Semitic activity in the ROAs of these five

16     individuals?

17            MS. SAFAVI:  Objection.  Form.

18            A.   Can you rephrase?

19            Q.   Did you see any mention of

20     anti-Semitic activity in the ROAs of these five

21     individuals?

22            A.   I don't recall ever seeing the

23     word "anti-Semitic."  It wouldn't be a -- it

24     wouldn't be the analyst's job to determine

25     whether activity was anti-Semitic.
```

```
 1              Q.   Did you see any mention of

 2    Hamas in the ROAs of these five individuals?

 3              A.   Can you repeat that?  Sorry.

 4              Q.   Uh-huh.

 5         Did you see any mention of Hamas in the

 6    ROAs of these five individuals?

 7              A.   I don't recall any of the

 8    information in the ROAs for those individuals

 9    who --

10              THE COURT REPORTER:  For those

11    individuals who?

12              THE WITNESS:  For those individuals

13    that you mentioned.

14    BY MS. KRISHNAN:

15              Q.   Were these five cases difficult

16    cases?

17              MS. SAFAVI:  Objection.  Form.

18              A.   Can you define "difficult"?

19    BY MS. KRISHNAN:

20              Q.   I just mean it in the plain

21    meaning of that term.

22              A.   So I can only make a judgment

23    on difficulty as it pertains to analysis.  The

24    production of these ROAs is not what I would

25    consider to be complex.
```

```
1              Q.   Do you re- -- did Mr. Gordon,

2     Mr. Walker, or Mr. Hammer find these to be

3     difficult cases?

4              MS. SAFAVI:  Objection.  Speculation.

5     BY MS. KRISHNAN:

6              Q.   If these weren't difficult

7     cases, why did they need to weigh in?

8              MS. SAFAVI:  Objection.  Form.

9     Mischaracterization of his testimony.

10    BY MS. KRISHNAN:

11             Q.   Yeah, you can answer.

12             A.   It was not complex analysis.

13    Term of art, analysis is not the same as a

14    case.

15             Q.   Mr. Gordon, Mr. Walker, and

16    Mr. Hammer don't review every report of

17    analysis produced on a student protester; is

18    that correct?

19             A.   Yes.

20             Q.   So why these five reports of

21    analysis?

22             A.   We --

23             MS. SAFAVI:  Objection.  Standing

24    objection to the extent it calls for

25    deliberative process privilege.
```

1              Go ahead and answer the question as

2     best that you can without divulging privileged

3     information.

4              A.    I'm speculating that they were

5     also interested in what the analysts were

6     finding and that -- and that these referrals

7     were going to State Department.

8     BY MS. KRISHNAN:

9              Q.    Fair to say that there was more

10    discussion than usual about these five student

11    protesters because this was still early on in

12    this new line of effort?

13              MS. SAFAVI:   Objection.   Form.

14              A.    Can you rephrase?

15    BY MS. KRISHNAN:

16              Q.    Is it fair to say that there

17    was more discussion than usual about these five

18    student protesters because this was still early

19    on in a new line of effort?

20              MS. SAFAVI:   Objection.   Form.

21              A.    We have been investigating

22    foreign students for violations of U.S. law for

23    a long time.

24    BY MS. KRISHNAN:

25              Q.    This process is new, correct?

```
 1              MS. SAFAVI:  Objection.  Form.

 2         A.   Can you clarify which

 3    "process"?

 4    BY MS. KRISHNAN:

 5         Q.   The process where the Office of

 6    Intelligence researches and analyzes student

 7    protesters and these reports are shared with

 8    the National Security Division, which, in turn,

 9    forwards some of these student protesters to

10    the State Department.

11         A.   Yes, it was -- it is rare for

12    us to have used that process in the past.

13    However, it's my understanding that we may have

14    used it in the past.  So you can't call it a

15    new line of effort.

16         Q.   Okay.  Well, during your tenure

17    as the senior most official at the Office of

18    Intelligence, is there any occasion you can

19    remember where the office used this process

20    before 2025?

21         A.   No.

22         Q.   Have you seen the Canary

23    Mission's website?

24         A.   Yes.

25         Q.   Okay.  And have you seen
```

```
 1   Betar's website?
 2              A.   No.
 3              Q.   Okay.  Any reports of analysis
 4   in these five cases include information about
 5   the individual's history inside the U.S.?
 6              A.   Yes.
 7              Q.   Did it contain biographical --
 8   did they contain biographical information?
 9              MS. SAFAVI:  Objection.  Asked and
10   answered.
11              MS. KRISHNAN:  I believe I asked
12   about reports of analysis generally before.
13   I'm asking about these five.
14              A.   All reports of analysis contain
15   biographical information on what they're
16   reporting on individuals.
17   BY MS. KRISHNAN:
18              Q.   Okay.  Did the reports of
19   analysis in these five cases contain any
20   reference to social media?
21              A.   I don't recall the specific
22   details of any of these.
23              Q.   Did any of the reports of
24   analysis in these five case -- any of these
25   five cases mention the possibility of Visa
```

1    revocation?

2              A.    No.

3              Q.    Did any of these reports of

4    analysis in these five cases mention the

5    possibility of a State Department determination

6    that they pose foreign policy concerns?

7              MS. SAFAVI:  Objection.  Form.

8              A.    Rephrase.

9    BY MS. KRISHNAN:

10             Q.    Did any of the reports of

11   analysis in these five cases mention the

12   possibility of a State Department determination

13   about foreign policy?

14             A.    No.

15             Q.    Were the reports of analysis in

16   these five cases prepared with the possibility

17   that the State Department would make a

18   determination about foreign policy?

19             MS. SAFAVI:  Objection.  Speculation.

20   And standing objection and instruction to

21   privileged information.

22        So go ahead and answer the question now

23   to the best that you can without disclosing

24   deliberative process privilege.

25             A.    The -- the analyst just present

```
 1    the facts.  They don't make determinations and
 2    they don't -- their objective is to consider
 3    the facts, not policy ramifications.
 4    BY MS. KRISHNAN:
 5              Q.   Has the Office of Intelligence
 6    received any information about what America's
 7    foreign policy interests are this year?
 8              MS. SAFAVI:  Objection.  Form.
 9              A.   Can you restate it?
10    BY MS. KRISHNAN:
11              Q.   Has the Office of Intelligence
12    received any information about what America's
13    foreign policy interests are this year?
14              THE COURT REPORTER:  This year?
15              MS. KRISHNAN:  Yeah.
16              MS. SAFAVI:  Objection.  Form.
17              THE WITNESS:  We have not received --
18    BY MS. KRISHNAN:
19              Q.   Has -- has the Office of
20    Intelligence been given any information about
21    what America's foreign policy interests are in
22    2025?
23              A.   No.  Sorry.
24              MS. SAFAVI:  That's okay.  Standing
25    objection and instruction.
```

1    BY MS. KRISHNAN:

2              Q.   Has the Office of Intelligence

3    been given any information about U.S. foreign

4    policy this year?

5              A.   No.

6              Q.   Does the process for sharing a

7    report of analysis to the National Security

8    Division in the case of a student protester

9    vary depending on whether the subject is a Visa

10   holder or a permanent resident?

11             THE COURT REPORTER:  Or a what?

12             MS. KRISHNAN:  Permanent resident.

13             MS. SAFAVI:  Standing objection and

14   instruction to the extent that it potentially

15   calls for a deliberative process privilege.

16             THE WITNESS:  No.

17   BY MS. KRISHNAN:

18             Q.   How do analysts within your

19   office know what to look for in their research

20   and analysis of a specific student protester?

21             MS. SAFAVI:  Standing objection and

22   instruction.

23             A.   In general terms, they would

24   include descriptions of activities that -- that

25   would relate to violations of law.

```
 1   BY MS. KRISHNAN:

 2          Q.   So how does an analyst in the

 3   Office of Intelligence determine whether

 4   information is relevant to a potential

 5   violation of law in a case of a student

 6   protester?

 7          MS. SAFAVI:   Standing objection and

 8   instruction.

 9       Go ahead and answer the question to the

10   best that you can without disclosing privileged

11   information.

12          A.   If an analyst is looking at an

13   individual who is at a protest, they would look

14   at their activities.   And any activity that

15   appeared to be a violation of law they would

16   include in the report.

17   BY MS. KRISHNAN:

18          Q.   Would they -- and would they

19   specify the violation for they believe the

20   information to be relevant to?

21          MS. SAFAVI:   Standing objection and

22   instruction.

23          A.   They -- they conclude that on

24   the report of analysis.

25   BY MS. KRISHNAN:
```

1      Q.   And do you recall seeing

2   information about the relevant violation in any

3   of these five reports of analysis?

4      A.   I don't recall.  Sorry.

5      MS. SAFAVI: That's okay.  Standing

6   objection and instruction.

7   BY MS. KRISHNAN:

8      Q.   Do analysts get anything more

9   than the name of the student protester when

10  they are assigned to look into that individual?

11     MS. SAFAVI:  Standing objection and

12  instruction.

13     A.   Can you rephrase or repeat?

14  Clarify.

15  BY MS. KRISHNAN:

16     Q.   Do analysts get anything more

17  than the name of a student protester when they

18  are asked to research that individual?

19     A.   Yes.

20     Q.   What information besides the

21  name do they get?

22     MS. SAFAVI:  Standing objection and

23  instruction.

24     A.   As I recall, they could get

25  what protests they were at.  They could get the

```
 1   suspected nationality.  Other than that, I

 2   don't recall.

 3   BY MS. KRISHNAN:

 4           Q.    And who compiles information

 5   about protests that a protester may

 6   have attended?

 7           MS. SAFAVI:  Standing objection and

 8   instruction.

 9           A.    I'd be speculating, but it

10   could be anybody.

11   BY MS. KRISHNAN:

12           Q.    Does that information come from

13   the Canary Mission in many of these cases?

14           A.    Yes.

15           Q.    Does it come from the Canary

16   Mission in most of these cases?

17           A.    Yes.

18           Q.    Does it come from Betar in any

19   of these cases?

20           A.    Yes.  Again, I don't know the

21   overlap between Betar and Canary Mission.

22           Q.    Understood.

23       So in the case of a student protester,

24   really any individual there are many, many

25   potential violations of law they could be
```

```
 1    looking for, what potential violations are
 2    analysts focused on in the case of student
 3    protesters?
 4              MS. SAFAVI:  Standing objection --
 5              THE COURT REPORTER:  I'm sorry.  I'm
 6    sorry.  Hold on.
 7         Could you keep your voice up at the
 8    end.  You're trailing off and I'm not
 9    understanding.
10         Could be looking for, what potential
11    violations are analysts focused?  In the case
12    of a student protester --
13              MS. KRISHNAN:  Focused on in the
14    cases of student protesters.
15              THE COURT REPORTER:  Okay.
16              MS. SAFAVI:  And then standing
17    objection and instruction.
18              THE WITNESS:  Title 8.
19              THE COURT REPORTER:  I'm sorry?
20              THE WITNESS:  Title 8.
21    BY MS. KRISHNAN:
22         Q.   Title 8 contains a lot of
23    potential violations.
24         Has that range of violations been
25    narrowed in any way in the case of student
```

 1   protesters and analysts being asked to analyze?

 2            MS. SAFAVI:   Standing objection and

 3   instruction.

 4            A.   Those relating to national

 5   security and public safety.

 6   BY MS. KRISHNAN:

 7            Q.   Does that include the

 8   provisions of Title 8 that give the State

 9   Department the ability to determine that

10   somebody poses adverse consequences to U.S.

11   foreign policy?

12            MS. SAFAVI:   Objection, form.

13   Objection, calls for a legal conclusion.   And

14   standing objection and instruction to the

15   witness.

16            A.   Yeah, can you rephrase?

17   BY MS. KRISHNAN:

18            Q.   You said, "those relating to

19   national security and public safety."   Which

20   provisions of Title 8 did you have in mind when

21   you said that?

22            A.   It was related to national

23   security and public safety.   I cannot give you

24   chapter and verse.

25            Q.   Can you tell me which

1    violations came up often in the case of student

2    protesters?

3              MS. SAFAVI:  Standing objection and

4    instruction to the witness.

5              A.   No.

6    BY MS. KRISHNAN:

7              Q.   Which violations are most

8    relevant to the two executive orders that we've

9    been talking about?

10             MS. SAFAVI:  Standing objection and

11   instruction to the witness.

12             A.   I can't -- I can't determine

13   that.

14   BY MS. KRISHNAN:

15             Q.   When an analyst -- withdrawn.

16       Let's talk about the category of

17   student protesters for whom there is no

18   information but they engaged in criminal

19   activity, which is to say a violation of

20   criminal law.  So we're putting them to one

21   side.

22       For other student protesters, what

23   potential violations of law are most relevant

24   to an analyst analysis?

25             MS. SAFAVI:  Objection, form.  And

```
 1    objection -- standing objection on privilege,
 2    law enforcement, deliberative and then
 3    instruction to the witness, and calls for
 4    speculation.
 5              A.   Your question confused me.
 6    BY MS. KRISHNAN:
 7              Q.   Okay.  If a student protester
 8    hasn't violated criminal law, what potential
 9    violations of Title 8 are relevant to an
10    analyst research on a student protester?
11              THE COURT REPORTER:  On what?
12              MS. KRISHNAN:  On a student
13    protester.
14              MS. SAFAVI:  Objection, form.
15    Objection, speculation.  And standing objection
16    on privileged and instruction to the witness.
17              THE WITNESS:  The analysts were
18    looking for violations of Title 8 which are
19    violations of criminal law.
20    BY MS. KRISHNAN:
21              Q.   In your understanding, does the
22    State Department --
23              MS. SAFAVI:  Can we get a time -- how
24    much time is left?
25              THE VIDEOGRAPHER:  We're at almost at
```

```
 1   six hours.

 2            MS. SAFAVI:  We're at almost six

 3   hours?

 4            THE VIDEOGRAPHER:  Just about.

 5            MS. SAFAVI:  Okay.

 6   BY MS. KRISHNAN:

 7        Q.   And who from the Office of

 8   Intelligence worked on Mr. Khalil's case?

 9            MS. SAFAVI:  Objection.  Asked and

10   answered.  And standing instruction -- standing

11   objection and instruction to the witness.

12        A.   I don't know which analyst and

13   which report of analysis.

14            MS. KRISHNAN:  I'm going to hand off

15   another document which is the certified

16   administrative record produced by the

17   Government in this case.

18            (Exhibit 4 was marked.)

19   BY MS. KRISHNAN:

20        Q.   Could you go to page 18 -- the

21   page numbers?

22            MS. SAFAVI:  Can my witness have a

23   chance, please, to actually review -- have you

24   had enough time to look this through?

25            MS. KRISHNAN:  I'm not asking him to
```

```
 1    review the whole thing.
 2          Can I specify the document I'm going to
 3    be asking about?
 4                MS. SAFAVI:  Okay.  But I still think
 5    he needs to know what it is that he got --
 6                MS. KRISHNAN:  It's a collection of
 7    document that's 50 pages.  It's the entire
 8    administrative record that the Government
 9    provided in this case.
10                MS. SAFAVI:  Okay.
11                MS. KRISHNAN:  I am only asking
12    questions for now about pages 18 and 19.
13                MS. SAFAVI:  Okay.
14          A.   My document does not have page
15    numbers.
16    BY MS. KRISHNAN:
17          Q.   And so they're at the very
18    bottom.  If you can see, there's a stamp on
19    every page that says AUPCAR and then a number,
20    and I would like you to turn to CAR 18?
21          A.   Okay.
22          Q.   Have you seen this document
23    before?
24          A.   No.
25          Q.   What do you recognize it as?
```

```
 1              MS. SAFAVI:  Objection.  Form.
 2    BY MS. KRISHNAN:
 3         Q.   Do you see the title
 4    "Notification of Removability Determinations"
 5    under Section 237(a)(4)(C)?
 6              THE COURT REPORTER:  (A)(4)(C).
 7              MS. KRISHNAN:  Of the Immigration and
 8    Nationality Act.
 9              THE WITNESS:  Yes.
10    BY MS. KRISHNAN:
11         Q.   And do you see above that it
12    says, "from," and then it says, "Marco Rubio"?
13         A.   Yes.
14         Q.   Okay.  The first sentence says,
15    [As read] "I'm writing to inform you that upon
16    notification from the Department of Homeland
17    Securities, Homeland Security Investigations on
18    March 7, 2025, I have determined that,"
19    redacted, "and Mahmoud Khalil," date of birth
20    redacted,
21    "POB Algeria, both U.S. lawful residents LPRs
22    are deportable aliens under INA Section
23    237(a)(4)(C)."
24         Do you see that?
25         A.   Yes.
```

1          Q.   Do you understand notification

2    from the Department of Homeland Securities,

3    his, to refer to the letter not the National

4    Security Division sent in his case?

5          MS. SAFAVI:   Standing objection.

6    Instruction and -- objection, speculation.

7          A.   Appears so.

8    BY MS. KRISHNAN:

9          Q.   At the top of the third

10   paragraph it states, [As read] "Pursuant to

11   these authorities, I have determined that the

12   activities of these aliens in the United

13   States, which would have potentially serious

14   adverse on policy consequences and would

15   compromise a compelling foreign policy

16   interest."

17        Do you know what these determinations

18   were based on?

19        MS. SAFAVI:   Objection.   Calls for a

20   legal conclusion.

21        A.   I don't know.

22   BY MS. KRISHNAN:

23        Q.   Okay.   The next sentence says,

24   [As read] "These determinations are based on

25   information provided DHS, ICE, HSI regarding

1    the participation and roles," of redacted --

2    "and Khalil and anti-Semitic protests."

3            THE COURT REPORTER:  I'm sorry.

4    You'll have to slow down when you're reading

5    and read a little clearer for me because I

6    don't have the document.

7    BY MS. KRISHNAN:

8            Q.   "These determinations are based

9    on information provided by DHS, ICE, HSI

10   regarding the participation and roles of,"

11   redacted, "and Khalil and anti-Semitic

12   protests."

13        What do you understand "information

14   provided by DHS, ICE, HSI to refer to"?

15           MS. SAFAVI:  Objection.  Speculation.

16           A.   Can you rephrase?

17   BY MS. KRISHNAN:

18           Q.   Do you understand -- withdrawn.

19        Is the report of analysis produced by

20   the Office of Intelligence included in the

21   information that Mr. Watson forwards to the

22   State Department in the context we've been

23   talking about?

24           A.   Yes.

25           Q.   If you look at the attachment

 1    section on page 19, it says, [As read] "Tab 2,

 2    HSI, subject" -- withdrawn.

 3          Go to tab 5.  It says there, [As read]

 4    "Tab 5, HSI is subject profile of Mahmoud

 5    Khalil."

 6          Do you understand that document to be

 7    the report of analysis produced in his case?

 8          A.   Yes.

 9          Q.   Okay.  In tab 3, DHS letter on

10    Mahmoud Khalil, do you understand that to be a

11    reference to the letter that Mr. Watson

12    forwards to the State Department in these

13    cases?

14          A.   Yes.

15          MS. KRISHNAN:  So the court reporter

16    has told us that they need to leave now.  Since

17    we have some time remaining, the court reporter

18    has, I think, identified someone who can

19    relieve her via Zoom.

20          Is that amenable to you?

21          MS. SAFAVI:  It works for me.  Great.

22    Yeah, let's do it.

23          MS. KRISHNAN:  Okay.  Thank you so

24    much.  We'll go off the record.

25          THE VIDEOGRAPHER:  Time is 19:04 and

1    we are off the record.

2          (Proceedings suspended at 7:04 p.m.)

```
 1    PETER HATCH,

 2   Previously sworn, continues examination as follows:

 3   EXAMINATION BY MS. KRISHNAN:

 4                 THE VIDEOGRAPHER:  The time is 19:25

 5    and we are back on the record.

 6         Q.    Okay.  Mr. Hatch, let's return to

 7    page 19 of the document marked Exhibit 4.

 8                 Do you see the third sentence on that

 9    page, it says the words "fosters a hostile

10    environment"?

11         A.    Yes.

12         Q.    Does the term "hostile environment"

13    appear in any report of analysis concerning a student

14    protestor that you have reviewed?

15                 MS. SAFAVI:  Standing objection and

16    instruction.

17         A.    I don't recall seeing the words

18    "hostile environment."

19   BY MS. KRISHNAN:

20         Q.    Have you heard the term "hostile

21    environment" in any discussions you have been a part

22    of about this line of effort?

23         A.    Not that I recall.

24         Q.    Okay.

25                 Can you turn to the next page?
```

```
 1                    MS. SAFAVI:  Let the record reflect,
 2       we're on page 20.
 3       BY MS. KRISHNAN:
 4               Q.      What is this document?
 5               A.      A Notice to Appear.
 6               Q.      And do you see that it is in the case
 7       of Mr. Khalil?
 8               A.      Yes.
 9               Q.      Which division or program or office
10       in ICE would have issued this Notice to Appear?
11               A.      Not mine.
12               Q.      Do you know which part of ICE --
13               A.      No.
14               Q.      -- would have issued this Notice to
15       Appear?
16                       Do you know which part of ICE,
17       typically, issues Notices to Appear?
18               A.      No.
19               Q.      Which part of ICE would have decided
20       whether to arrest Mr. Khalil?
21               A.      Again, not mine.
22               Q.      But do you know which part of ICE
23       decided whether to arrest Mr. Khalil?
24               A.      Office of Intelligence does not
25       arrest anybody.  I would speculate that this is
```

1    whatever relevant investigative office was handling

2    this particular case.

3            Q.      Do you know which investigative

4    office was handling Mr. Khalil's case?

5            A.      I don't know.

6            Q.      Which part of ICE is, typically,

7    responsible for deciding whether to arrest a visa

8    holder or permanent resident?

9                    MS. SAFAVI:  Objection; form.

10           A.      Can you -- can you rephrase?

11   BY MS. KRISHNAN:

12           Q.      Which part of ICE, in the ordinary

13   course, would decide whether to arrest a noncitizen?

14           A.      The relevant domestic office.

15           Q.      Of HSI?

16           A.      Of HSI.

17                   Can you put the whole sentence

18   together?

19           Q.      My question is:  Which part of ICE,

20   in the ordinary course, would decide whether to

21   arrest a noncitizen?

22                   MS. SAFAVI:  Objection; form.

23           A.      Could be anybody with arrest powers.

24   Can you clarify?

25           Q.      Well, which parts of ICE conduct

```
 1    arrests?

 2              A.        ERO and HSI.

 3              Q.        And when does HSI conduct arrests?

 4              A.        You're talking about the operational

 5    investigative side of HSI and ICE and I am on the

 6    intelligence side.

 7              Q.        Uh-huh.

 8              A.        That's not my expertise.

 9              Q.        I know that you're not responsible

10    for it.  But as somebody that's worked in HSI for

11    some time now, do you know which part of HSI conducts

12    arrests?

13                        MS. SAFAVI:  Objection; speculation

14    and also standing objection and instruction to the

15    witness regarding privileged information, law

16    enforcement sensitive information.

17              A.        In general, the domestic offices make

18    the majority of arrests by HSI.

19    BY MS. KRISHNAN:

20              Q.        And what distinguishes instances

21    where ERO would conduct the arrest versus HSI?

22              A.        I don't know.

23              Q.        In your understanding -- and I know

24    that you don't have responsibility for this area,

25    but -- in your understanding, in what circumstances
```

```
 1    would ICE usually arrest a noncitizen before serving

 2    them with a Notice to Appear?

 3         A.      I don't know.

 4                 MS. SAFAVI:  Objection; form; and

 5    calls for speculation.

 6    BY MS. KRISHNAN:

 7         Q.      To your knowledge, does ICE ever give

 8    a noncitizen the chance to surrender rather than

 9    being arrested?

10                 MS. SAFAVI:  Objection; form.

11         A.      Can you rephrase?

12    BY MS. KRISHNAN:

13         Q.      In cases where ICE intends to issue a

14    Notice of Appear, does it ever give a noncitizen the

15    chance to surrender to the agency, rather than being

16    arrested?

17                 MS. SAFAVI:  Yeah, objection; form.

18         A.      I am unfamiliar with arrest

19    procedures.

20    BY MS. KRISHNAN:

21         Q.      Can you turn to page 23 of the

22    document, of Exhibit 4?

23                 MS. SAFAVI:  Of the Certified

24    Administrative Record.

25                 THE DEPONENT:  Okay.
```

```
 1    BY MS. KRISHNAN:
 2         Q.      What is this document?
 3         A.      I don't know.
 4         Q.      Do you see the title:  "Additional
 5    Charges of Inadmissibility/Deportability"?
 6         A.      Yes.
 7         Q.      Do you see that this is a document
 8    relating to Mr. Khalil?
 9         A.      Yes.
10         Q.      Were you aware that additional
11    charges had been laid in Mr. Khalil's case?
12         A.      No.
13         Q.      Did the Office of Intelligence
14    prepare more than one report of analysis on
15    Mr. Khalil?
16         A.      I believe it was only one.
17         Q.      Was the Office of Intelligence asked
18    to look into Mr. Khalil at any point after he had
19    been arrested?
20         A.      I don't know.
21         Q.      Who would know?
22         A.      The unit chief.
23                 MS. SAFAVI:  A standing objection and
24    instruction to the witness.
25
```

```
 1    BY MS. KRISHNAN:

 2            Q.      Mr. Stanley?

 3            A.      Yes.

 4            Q.      Can you go to page 26 of the

 5    certified exhibit -- the Certified Administrative

 6    Record which is marked Exhibit 4?

 7            A.      Okay.

 8            Q.      Do you see the subject line

 9    "Determination of Deportability"?

10            A.      Yes.

11            Q.      And do you see above that, it says

12    "Marco Rubio"?

13            A.      Yes.

14            Q.      Okay.  And do you see, in the third

15    sentence, a reference to Mohsen Mahdawi?

16            A.      Yes.

17            Q.      Was a report of analysis forwarded to

18    the State Department in Mr. Mahdawi's case?

19            A.      Yes.

20            Q.      Please look at the sentence starting

21    at the bottom of page 26 and running on to the top of

22    page 27.

23                    Please tell me when you've read that

24    sentence.

25            A.      I've read it.
```

1    Q.    Do you recall seeing any report of

2  analysis that refers to pro-Palestinian protests?

3            MS. SAFAVI:  Objection; form.

4    A.    Can you rephrase?

5  BY MS. KRISHNAN:

6    Q.    Do you recall seeing any report of

7  analysis that mentions pro-Palestinian protests?

8    A.    Yes.

9    Q.    Approximately how many reports have

10  you seen mentioning pro-Palestinian protests?

11    A.    I don't know.

12    Q.    Are we more than 20?

13    A.    No.

14    Q.    More than ten?

15    A.    Maybe around 10.

16    Q.    And have you seen any Report of

17  Analysis mentioning calling for Israel's destruction?

18    A.    Yes.

19    Q.    Have you seen more than ten reports

20  mentioning calling for Israel's destruction?

21    A.    No.

22    Q.    Have you seen about five?

23    A.    Yes, about five.

24    Q.    In your understanding, does the

25  phrase "from the river to the sea, Palestine will be

```
 1    free" call for Israel's destruction?
 2                   MS. SAFAVI:  Objection.  Objection.
 3    Form and speculation.
 4    BY MS. KRISHNAN:
 5         Q.     I'm just asking about your own
 6    understanding.
 7         A.     Can you rephrase?  Repeat the
 8    question.
 9         Q.     In your understanding, does the
10    phrase "from the river to the sea, Palestine will be
11    free" call for Israel's destruction?
12         A.     I don't know.
13         Q.     How would an analyst researching a
14    student protestor know whether a given statement
15    calls for Israel's destruction?
16                   MS. SAFAVI:  Objection; form.
17         A.     Can you rephrase?
18    BY MS. KRISHNAN:
19         Q.     How would an analyst in the Office of
20    Intelligence who was researching a student protestor
21    know whether a given statement calls for Israel's
22    destruction?
23         A.     The analyst's job would be to
24    describe or include the statement in the Report of
25    Analysis.  It's not the analyst's job or the Office
```

1    of Intelligence's job to make a determination on what

2    was meant by that statement.

3              Q.       Has the Canary -- withdrawn.

4                       Does the Canary Mission website

5    mention calling for Israel's destruction insofar as

6    you have seen the website?

7              A.       It's a confusing question.

8              Q.       Uh-huh.

9              A.       The Canary Mission website doesn't

10   call for Israel's destruction.

11             Q.       No, I know.  Let me clarify.

12                      Canary Mission website contains

13   information about various individuals, correct?

14             A.       Yes.

15             Q.       And in those descriptions of

16   individuals, have you seen any mention of calling for

17   Israel's destruction?

18             A.       I have seen allegations of students

19   calling for -- allegations that someone made a

20   statement about -- that meant Israel's destruction.

21             Q.       And if an analyst came across such a

22   description in the course of compiling information on

23   the individual that they were researching, would they

24   include that allegation in their Report of Analysis?

25             A.       No.

```
 1         Q.        So if the Canary Mission described a
 2   person as calling for the destruction of Israel and
 3   an analyst was producing a Report of Analysis on that
 4   individual, would they note the Canary Mission's
 5   allegations?
 6              MS. SAFAVI:  Objection; form.
 7         A.        Rephrase, please.
 8   BY MS. KRISHNAN:
 9         Q.        If an analyst is producing a Report
10   of Analysis on a student protestor who is on the
11   Canary Mission's website, would they include the
12   Canary Mission's allegations in the information that
13   they compile as part of the Report of Analysis?
14         A.        No.
15         Q.        So how would an analyst use the
16   information they see on the Canary Mission's website
17   when compiling a Report of Analysis?
18              MS. SAFAVI:  Standing objection and
19   instruction to the witness.
20         A.        If Canary Mission alleged that
21   someone was anything, the analyst would go to the
22   source material, review the activities of the
23   person -- of the individual and describe in the
24   Report of Analysis what the facts were, not what
25   the -- someone alleged they were.
```

```
 1    BY MS. KRISHNAN:
 2         Q.     So they would have to make their own
 3    finding -- withdrawn.
 4                Why is the Canary Mission a source of
 5    investigative leads in this line of effort?
 6                MS. SAFAVI:  Objection; form.
 7         A.     Can you rephrase?
 8    BY MS. KRISHNAN:
 9         Q.     Why is the Canary Mission a source of
10    investigative leads in this line of effort?
11                MS. SAFAVI:  Objection; form.
12         A.     Can you clarify?
13    BY MS. KRISHNAN:
14         Q.     A large volume of the names that have
15    been given to the Office of Intelligence come from
16    the Canary Mission and my question is why the Canary
17    Mission is a source of these investigative leads in
18    this line of effort?
19                MS. SAFAVI:  Objection; form.
20         A.     You're asking me to speculate why
21    someone sent us the Canary Mission website?
22    BY MS. KRISHNAN:
23         Q.     Yes, in your understanding.
24         A.     I'd have to speculate that it
25    contained allegations of -- of violations of U.S.
```

```
 1   law.
 2          Q.      Does --
 3          A.      It contained allegations against
 4   students.
 5          Q.      Does the Canary Mission website
 6   mention any violations of U.S. law?
 7          A.      The -- to my knowledge, the Canary
 8   Mission website does not cite U.S. law.
 9          Q.      And how does an analyst know whether
10   to include information from the Canary Mission
11   website in their Report of Analysis on a student
12   protestor?
13                  MS. SAFAVI:  Standing objection and
14   instruction.
15          A.      The same process I described before,
16   when we get an individual to research, they go
17   through the same process I described before to
18   conduct that research and analysis.
19   BY MS. KRISHNAN:
20          Q.      Can you turn to page 34 of the
21   Certified Administrative Record that is marked as
22   Exhibit 4?
23                  Do you see the subject line:
24   Revocation of visa, Rumeysa Ozturk.
25          A.      Yes.
```

1     Q.     And do you see the "From" line above

2  that that says John L. Armstrong, Senior Bureau

3  Official?

4     A.     Yes.

5     Q.     The first sentence says -- withdrawn.

6            The first sentence mentions a, quote:

7  Request from DHS, ICE, closed quote.

8            Do you understand that to refer to a

9  request for visa revocation provided by the National

10  Security Division?

11     A.     I'm not aware of the details of the

12  communications between National Security Division and

13  State Department.

14     Q.     Based on your knowledge of the

15  process that we've been talking about, would this

16  request have come from the National Security

17  Division?

18     A.     I would assume, yes.

19     Q.     Do you see the -- please go to Line

20  5, which mentions coauthoring an op-ed.

21            Is that the kind of activity the

22  analyst, in Ms. Ozturk's case, would have included in

23  their Report of Analysis?

24            MS. SAFAVI:  Standing objection and

25  instruction.

```
 1           A.      Yes, it could be included in a Report

 2      of Analysis.

 3      BY MS. KRISHNAN:

 4           Q.      Have you seen the op-ed referred to

 5      in that sentence?

 6           A.      I have not read the op-ed.

 7           Q.      Have you read any description of that

 8      op-ed?

 9                   MS. SAFAVI:  Objection; form.

10           A.      Can you rephrase?

11      BY MS. KRISHNAN:

12           Q.      Have you read any description of

13      Ms. Ozturk?

14                   MS. SAFAVI:  Objection; form.

15           A.      I've read the ROA.

16      BY MS. KRISHNAN:

17           Q.      And that ROA included mention of an

18      op-ed?

19           A.      I assume, yes.

20           Q.      Do you know that it was an op-ed that

21      she published in her school newspaper?

22           A.      It probably said so in the ROA.

23           Q.      Do you recall what the op-ed was

24      about?

25           A.      I don't recall any of the details
```

```
 1    from this ROA.
 2           Q.      Do you recall the op-ed being
 3    described as anti-Israel?
 4                   MS. SAFAVI:  Objection; asked and
 5    answered.
 6                   THE REPORTER:  What was the answer?
 7                   MS. KRISHNAN:  He didn't respond.
 8    BY MS. KRISHNAN:
 9           Q.      Could you respond?
10           A.      Could you repeat the question?
11           Q.      Do you recall the op-ed being
12    described as anti-Israel?
13                   MS. SAFAVI:  Objection; asked and
14    answered.
15           A.      I don't recall any of the details of
16    the ROA.
17    BY MS. KRISHNAN:
18           Q.      Was the op-ed found from her Canary
19    Mission profile?
20           A.      I don't know how they found the
21    op-ed.
22           Q.      Can you go to the last sentence?
23                   It says:  "Due to ongoing ICE
24    operational security, this revocation will be
25    silent."
```

 1                    Do you understand what a "silent

 2       revocation" refers to?

 3              A.      No.

 4                    MS. SAFAVI:  Objection; form.

 5       BY MS. KRISHNAN:

 6              Q.      To your knowledge, has ICE requested

 7       that any visa revocations -- withdrawn.

 8                    To your knowledge, has ICE requested

 9       that the State Department not notify a visa holder of

10       their impending revocation in any case involving a

11       student protestor?

12                    MS. SAFAVI:  Objection; form.

13              A.      Can you rephrase?

14       BY MS. KRISHNAN:

15              Q.      To your knowledge, has ICE requested

16       that the State Department not notify a visa holder

17       that their visa will be revoked in any case involving

18       a student protestor?

19                    MS. SAFAVI:  Objection; calls for

20       speculation; also a standing objection and

21       instruction to the witness.

22              A.      I'm not part of the revocation

23       process after -- post-ROA development.

24       BY MS. KRISHNAN:

25              Q.      I understand that arrests are not

```
 1    your responsibility, revoking visas is not something
 2    that the Office of Intelligence does.
 3                 I'm asking for your understanding
 4    based -- as one of the senior officials in HSI.
 5         A.      I don't know the answer.
 6         Q.      If you go to -- go back to Lines 5
 7    and 6.  It notes that there is information
 8    indicating that she had coauthored an op-ed that
 9    found common cause with an organization that was
10    later temporarily banned from campus.
11                 Why is it significant if Ms. Ozturk
12    coauthored an op-ed?
13                 MS. SAFAVI:  Objection; speculation;
14    calls for a legal conclusion and standing objection
15    and instruction to the witness.
16                 MS. KRISHNAN:  I hadn't finished my
17    question.
18                 MS. SAFAVI:  Okay.
19                 MS. KRISHNAN:  Yes.
20    BY MS. KRISHNAN:
21         Q.      My question is:  Why is it
22    significant that her op-ed found common cause with an
23    organization that was subsequently banned from
24    campus?
25                 MS. SAFAVI:  Objection; speculation;
```

1    calls for a legal conclusion and standing objection

2    and instruction to the witness.

3         A.        Again, the job of the analyst is to

4    report what they find, report the facts they find,

5    not to make the determination.

6    BY MS. KRISHNAN:

7         Q.        But do analysts, typically, include

8    information that is irrelevant to a determination

9    whether someone is in violation of Title 8?

10             MS. SAFAVI:  Objection; form.

11        A.        Can you rephrase?

12   BY MS. KRISHNAN:

13        Q.        Do analysts, typically, include

14   information that is irrelevant to whether someone is

15   in violation of U.S. Law, including Title 8?

16        A.        No.  If they were making a statement

17   about the Yankees, it would not be in the Report of

18   Analysis, but anything related to suspicion of an

19   offense can be put in a Report of Analysis as long as

20   it's factual.

21        Q.        So in your understanding, how is

22   coauthoring an op-ed that found common cause with an

23   organization that was subsequently banned from campus

24   relevant to any violation of U.S. law?

25             MS. SAFAVI:  Objection; form.

```
 1              A.      Can you rephrase?

 2    BY MS. KRISHNAN:

 3              Q.      In your understanding, how is

 4    coauthoring an op-ed that found common cause with an

 5    organization that was subsequently banned from campus

 6    relevant to any violation of U.S. law?

 7                     MS. SAFAVI:  Objection; form;

 8    speculation; calls for a legal conclusion.

 9              A.      So you're asking me to speculate when

10    it's the job of the analyst to put in relevant

11    information and that relevant information might

12    not -- may or may not affect the determination.

13    BY MS. KRISHNAN:

14              Q.      In response to my question:  Do

15    analysts, typically, include information that is

16    irrelevant to whether someone is in violation of U.S.

17    law, including Title 8, you said no.

18                     So I'm trying to understand why

19    information about this op-ed was included in the

20    Report of Analysis on Ms. Ozturk.

21                     Is drafting an op-ed that is

22    published in a school newspaper relevant to any

23    violation of U.S. law that you can identify?

24                     MS. SAFAVI:  Objection; form;

25    speculation; calls for a legal conclusion; asked and
```

```
 1   answered.
 2          A.      Can you clarify?
 3   BY MS. KRISHNAN:
 4          Q.      In response to my question, do
 5   analysts, typically, include information that is
 6   irrelevant to whether someone is in violation of U.S.
 7   law, including Title 8, you said no.
 8          A.      I said no, not, typically.
 9          Q.      Uh-huh.  Okay.
10          A.      Just to clarify.
11          Q.      Thank you.  So I'm trying to
12   understand why information about this op-ed was
13   included in a Report of Analysis on Ms. Ozturk.  The
14   drafting an op-ed published in a school newspaper
15   relevant to any violation of U.S. law that you can
16   identify?
17          A.      Maybe.
18          Q.      What does it depend on?
19                  MS. SAFAVI:  Standing objection and
20   instruction to the witness.
21          A.      Again, the circumstances around it,
22   the facts being collected and whether or not the
23   analyst thought that there might be relevance to
24   National Security of Public Safety sections of Title
25   8.
```

```
 1    BY MS. KRISHNAN:

 2          Q.      How does an op-ed -- withdrawn.

 3                  When could an op-ed published in a

 4    school newspaper present a threat to national

 5    security?

 6                  MS. SAFAVI:  Objection; form;

 7    speculation; standing objection and instruction to

 8    the witness regarding law enforcement privilege.

 9          A.      Yeah, you're -- you're asking me to

10    speculate, but let me clarify:  If the analyst

11    included the comment about the Yankees in that

12    hypothetical, the analyst -- let me -- there are

13    occasions when analysts put information that is not

14    potentially relevant to a violation of the law, if

15    it's relevant to what they did in -- in an activity,

16    if it was their activity.

17    BY MS. KRISHNAN:

18          Q.      So analysts can include information

19    about anything a noncitizen has written inside the

20    country, including when it doesn't -- withdrawn.

21                  So analysts can include information

22    about anything a noncitizen has written inside the

23    country even if it's not relevant to a violation of

24    U.S. law?

25                  MS. SAFAVI:  Standing objection and
```

 1    instruction to the witness.

 2          A.       Can you restate the question?

 3    BY MS. KRISHNAN:

 4          Q.       So analysts can include information

 5    about anything a noncitizen has written inside the

 6    country even if it's not relevant to a violation of

 7    U.S. law?

 8                   MS. SAFAVI:   Standing objection and

 9    instruction.

10          A.       Yes.

11    BY MS. KRISHNAN:

12          Q.       Can you think of any offense to which

13    writing an op-ed in a school newspaper could even be

14    peripherally relevant?

15                   MS. SAFAVI:   Objection; calls for a

16    legal conclusion and standing objection and

17    instruction to the witness on privilege.

18          A.       I don't make those determinations.

19    BY MS. KRISHNAN:

20          Q.       I understand that your office does

21    not make a determination as to whether there has been

22    a violation of U.S. law, but I understand your

23    testimony to be that an analyst includes information,

24    at least in part, based on their assessment of

25    whether it's relevant to a violation of U.S. law; is

```
 1    that correct?
 2              A.       That is part of it.
 3              Q.       That is part of it, okay.
 4                       So then my question is:  Can you
 5    think of any violation of U.S. law to which writing
 6    an op-ed could be relevant?
 7              A.       That -- I'd be speculating.  I don't
 8    want to speculate.
 9              Q.       I'm just asking -- I'm not asking
10    about a specific case.  I'm asking a hypothetical,
11    and I'm asking you to answer to the extent you can
12    based on your understanding as the senior-most
13    official in the Office of Intelligence?
14                       MS. SAFAVI:  Objection; sidebar.
15                       MS. KRISHNAN:  I'm sorry.  What does
16    that mean?
17                       I'm just not sure what you're asking
18    for.
19                       MS. SAFAVI:  It's a statement, not a
20    question.  If you want to phrase it --
21                       MS. KRISHNAN:  Well, I had asked a
22    question.
23                       MS. SAFAVI:  Okay.
24                       MS. KRISHNAN:  Yeah, so my question
25    again is:
```

```
 1    BY MS. KRISHNAN:

 2          Q.      Can you think of any violation of law

 3    to which an op-ed could be relevant?  And your answer

 4    was:  "I'd be speculating," and I'm asking you to

 5    answer nevertheless to the extent you can as somebody

 6    who is the senior-most official in the Office of

 7    Intelligence.

 8          A.      Relevant, "I intend to do violence."

 9    You're asking me for an example in a hypothetical.

10          Q.      Right.

11          A.      Got it.

12          Q.      So it depends on the content of the

13    op-ed?

14          A.      Yes.

15          Q.      Would an op-ed -- withdrawn.

16                  Would the publication of an op-ed in

17    a school newspaper be relevant to any violation of

18    U.S. law if it did not include a call for violence?

19                  MS. SAFAVI:  Objection; form.

20          A.      Can you clarify?

21    BY MS. KRISHNAN:

22          Q.      If an op-ed in a school newspaper

23    didn't include a statement "I intend to do violence,"

24    is there any violation of U.S. law that such an op-ed

25    would be relevant here?
```

1      A.      You're asking me to speculate after

2   six and a half hours.

3              If the op-ed mentioned Hamas, it

4   would be relevant.  I'm sure there's other examples.

5      Q.      I'm going to take you to one last

6   document.

7              Can you turn to page 44 of the

8   Certified Administrative Record that is marked as

9   Exhibit 4?

10     A.      You said page 44?

11     Q.      Yes.

12     A.      Okay.

13     Q.      Okay.  Do you see the title

14  "Determination of Deportability"?

15     A.      Yes.

16     Q.      And do you see, above that, from

17  Marco Rubio?

18     A.      Yes.

19     Q.      Okay.  And do you see the reference

20  to Badar Kahn Suri in the third line?

21     A.      Yes.

22     Q.      Okay.  Could you turn to the line

23  running from the bottom of page 44 on to the top of

24  page 45.  It's -- I'll lead you read that sentence?

25              MS. SAFAVI:  I'm sorry, I can't hear

```
 1    right now, so if we could just have a moment.
 2                    MS. KRISHNAN:  Can we go off the
 3    record?  Oh, we're good.  Sorry.
 4         A.        Can you repeat the question?
 5    BY MS. KRISHNAN:
 6         Q.        I was just asking you to read that
 7    sentence.
 8         A.        Okay.
 9         Q.        Have you read it?  Okay.
10                    So that sentence quotes from an
11    assessment and conclusion provided by DHS, ICE and I
12    think there's a typo, I think it's meant to refer to
13    HSI and it includes a quote.
14                    Do you understand that to be a quote
15    from the Report of Analysis prepared in his case?
16         A.        No.
17         Q.        Do you understand that to be a quote
18    from the letter that Mr. Watson would have sent to
19    the State Department in Mr. Suri's case?
20         A.        It could be -- I presume so.
21         Q.        In the next sentence, it says:  "In
22    addition, DHS, ICE, HSI also assesses that Suri is,"
23    quote, 'actively supporting Hamas terrorism.'"
24                    Do you understand that quote to be
25    from the Report of Analysis produced in Mr. Suri's
```

```
 1   case?
 2          A.      No.
 3          Q.      It goes on to say, and, quote,
 4   actively spreads its propaganda and promotes
 5   anti-Semitism in social media.
 6                  Do you understand that to be a quote
 7   from the Report of Analysis produced in Mr. Suri's
 8   case?
 9          A.      No.
10          Q.      Do you understand that quote and the
11   quote mentioning actively supporting Hamas terrorism
12   to be from the letter that Mr. Watson sent to the
13   State Department in Mr. Suri's case?
14          A.      I assume so.
15          Q.      Is there any record of which
16   supervisor has reviewed a Report of Analysis?
17          A.      No.
18          Q.      Is there any record of which analyst
19   prepared a Report of Analysis?
20          A.      Yes.
21          Q.      Where is that record maintained?
22                  MS. SAFAVI:  Standing objection and
23   instruction to the witness.
24          A.      In the Knowledge Management System I
25   referenced earlier.
```

```
 1          Q.      What is the name of that system?
 2                  MS. SAFAVI:  Objection; asked and
 3    answered and also standing objection and instruction
 4    to the witness.
 5          A.      It's our Knowledge Management System
 6    for HSI.
 7          Q.      Have you ever seen a letter that
 8    Mr. Watson has sent to the State Department in any
 9    manner involving a student protestor?
10                  MS. SAFAVI:  Objection; form.
11          A.      Can you clarify?
12    BY MS. KRISHNAN:
13          Q.      Uh-huh.  Have you seen -- yeah, have
14    you seen any of the letters that Mr. Watson has
15    forwarded to the State Department in a matter
16    involving a student protestor?
17          A.      No.
18                  MS. KRISHNAN:  I'm going to let you
19    go, Mr. Hatch.
20                  THE DEPONENT:  Thank you.
21                  MS. KRISHNAN:  Thank you for being so
22    patient.
23                  THE DEPONENT:  You're welcome.
24                  MS. SAFAVI:  And Defendants have no
25    questions, so...
```

```
 1                    MS. KRISHNAN:  Wonderful, thank you.
 2                    THE VIDEOGRAPHER:  Here marks the end
 3     of the video deposition.  The time on the record is
 4     20:17 and we are off the record.
 5                    THE REPORTER:  May I have your orders
 6     please?
 7                    MS. CONLON:  For -- this is
 8     Ms. Conlon, it's a rush order for us.
 9                    THE REPORTER:  Like a daily you mean?
10                    MS. CONLON:  Yes and the rough as
11     soon as we can have it, please.
12                    MS. SAFAVI:  This is Nancy for
13     defendants, we'd also like an expedited order of the
14     transcript and we do not waive signing, so we want
15     our witness to -- or the witness to have a chance to
16     review the transcript and sign it.
17                    THE REPORTER:  Would you like a rough
18     as well?
19                    MS. SAFAVI:  Yes, thank you.
20                    THE REPORTER:  And Ms. Krishnan?
21                    MS. KRISHNAN:  I'm with Ms. Conlon.
22                    (Deposition concluded at 8:18 p.m.)
23
24
25
```

1                              CERTIFICATE

2

3           I, Okeemah S. Henderson, RPR, the officer

4    before whom the foregoing deposition was taken, do

5    hereby certify that the foregoing transcript is a true

6    and correct record of the testimony given; that said

7    testimony was taken by me stenographically and

8    thereafter reduced to typewriting under my direction;

9    that reading and signing was not requested; and that I

10   am neither counsel for, related to, nor employed by any

11   of the parties to this case and have no interest,

12   financial or otherwise, in its outcome.

13           IN WITNESS WHEREOF, I have hereunto set my

14   hand and affixed my notarial seal this 27th day of June,

15   2025.

16

17   My commission expires:

18   September 30, 2029

19

20

21

22

23              *Okeemah S. Henderson*
                Okeemah S. Henderson, RPR

24              Official Court Reporter

25

```
 1            UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
 2

 3        I, Jennifer L. Wielage, CCR No. 30X100191600,

 4   Certified Court Reporter, certify:

 5        That the foregoing proceedings were taken

 6   before me at the time and place therein set forth, at

 7   which time the witness was put under oath by me;

 8        That the testimony of the witness, the

 9   questions propounded, and all objections and

10   statements made at the time of the examination were

11   recorded stenographically by me and were thereafter

12   transcribed;

13        That a review of the transcript by the

14   deponent was requested;

15        That the foregoing is a true and correct

16   transcript of my shorthand notes so taken.

17        I further certify that I am not a relative or

18   employee of any attorney of the parties, nor

19   financially interested in the action.

20        I declare under penalty of perjury under the

21   law that the foregoing is true and correct.

22        Dated this 25th day of June 2025.

23        Jennifer L. Wielage

24   Jennifer L. Wielage, CCR, RPR, CRR

25
```

```
 1
     DEPOSITION ERRATA SHEET
 2

 3    Our Assignment No.  42251
      Case Caption:  AMERICAN VS. RUBIO
 4
      Page No._____Line No._____Change to:_____
 5
      _____
      Reason for change:_____
 6    Page No._____Line No._____Change to:_____

 7    _____
      Reason for change:_____
      Page No._____Line No._____Change to:_____
 8
      _____
      Reason for change:_____
 9    Page No._____Line No._____Change to:_____

10    _____
      Reason for change:_____
      Page No._____Line No._____Change to:_____
11
      _____
      Reason for change:_____
12    Page No._____Line No._____Change to:_____

13    _____
      Reason for change:_____
      Page No._____Line No._____Change to:_____
14
      _____
      Reason for change:_____
15
      Page No._____Line No._____Change to:_____
16
      _____
      Reason for change:_____
17    Page No._____Line No._____Change to:_____

18    _____
      Reason for change:_____
      Page No._____Line No._____Change to:_____
19
      _____
      Reason for change:_____
20    Page No._____Line No._____Change to:_____

21    _____
      Reason for change:_____
      Page No._____Line No._____Change to:_____
22
      _____
      Reason for change:_____
23    Page No._____Line No._____Change to:_____

24    _____
      Reason for change:_____
      Page No._____Line No._____Change to:_____
25
      _____
```

```
 1    Page No._____Line No._____Change to:_____
                                            _____
 2    Reason for change:_____
      Page No._____Line No._____Change to:_____
 3
      _____
      Reason for change:_____
 4    Page No._____Line No._____Change to:_____

 5    _____
      Reason for change:_____
      Page No._____Line No._____Change to:_____
 6
      _____
      Reason for change:_____
 7    Page No._____Line No._____Change to:_____

 8    _____
      Reason for change:_____
      Page No._____Line No._____Change to:_____
 9
      _____
      Reason for change:_____
10
      Page No._____Line No._____Change to:_____
11
      _____
      Reason for change:_____
12    Page No._____Line No._____Change to:_____

13    _____
      Reason for change:_____
      Page No._____Line No._____Change to:_____
14
      _____
      Reason for change:_____
15    Page No._____Line No._____Change to:_____

16    _____
      Reason for change:_____
      Page No._____Line No._____Change to:_____
17
      _____
      Reason for change:_____
18    Page No._____Line No._____Change to:_____

19    _____
      Reason for change:_____
20    Page No._____Line No._____Change to:_____

21    _____
      Reason for change:_____
      Page No._____Line No._____Change to:_____
22
      _____
      Reason for change:_____
23    Page No._____Line No._____Change to:_____

24    _____
      Reason for change:_____
      Page No._____Line No._____Change to:_____
25
      _____
```

1    Page No._____Line No._____Change to:_____

2    _____
     Reason for change:_____
     Page No._____Line No._____Change to:_____
3    _____
     Reason for change:_____
4
     Page No._____Line No._____Change to:_____
5    _____
     Reason for change:_____
6    Page No._____Line No._____Change to:_____

7    _____
     Reason for change:_____
     Page No._____Line No._____Change to:_____
8    _____
     Reason for change:_____
9    Page No._____Line No._____Change to:_____

10   _____
     Reason for change:_____
     Page No._____Line No._____Change to:_____
11   _____
     Reason for change:_____
12   Page No._____Line No._____Change to:_____

13   _____
     Reason for change:_____

14       DECLARATION UNDER PENALTY OF PERJURY
         I declare under penalty of perjury
15   that I have read the entire transcript of
     my Deposition taken in the captioned matter
16   or the same has been read to me, and
     the same is true and accurate, save and
17   except for changes and/or corrections, if
     any, as indicated by me on the DEPOSITION
18   ERRATA SHEET hereof, with the understanding
     that I offer these changes as if still under
19   oath.
         Signed on the _____ day of
20   _____, 20___.

21   _____
         PETER HATCH
22

23

24

25

## WORD INDEX

**< 1 >**
**1**  4:*11*  120:*19, 20*
121:*16*  133:*20*
**1(b**  126:*14*
**1,000**  12:*3*
**1:08**  85:*13*
**1:25-cv-10685**  1:*1*
**10**  84:2  233:*15*
**10:21**  5:*4*
**100**  84:*12*  190:*1*
**10004**  3:*4*
**10115**  3:*9*
**11:12**  39:*8*
**11:13**  39:*10*
**11:48**  39:*11*
**125-CV-10685**  5:*10*
**13:07**  85:*11*
**134**  4:*12*
**136**  4:*13*
**14:15**  85:*14*
**14161**  4:*11*  84:*19*
120:*8*  121:*16*  133:*11*
166:*15*
**14188**  4:*12*  85:*1*
133:*16*  134:*7*  138:*7,
22*  139:*4, 9, 15*  140:*2,
17*  141:*11*  145:*12*
166:*15*
**15**  39:*7*
**15:20**  121:*9*
**15:31**  121:*12*
**15:53**  135:*2*
**16:01**  135:*6*
**16:16**  143:*5*
**16:30**  143:*10*
**1615**  5:*11*
**17:27**  176:*23*
**17:45**  177:*3*
**18**  49:*4, 7*  219:*20*
220:*12, 20*
**19**  220:*12*  224:*1*
226:*7*
**19:04**  224:*25*
**19:25**  226:*4*
**1989**  10:*19*

**< 2 >**

**2**  4:*12*  134:2, *4*
224:*1*
**2(a**  123:*3, 11*  124:*9*
125:22
**20**  7:*21*  8:*9*  55:*11*
84:*4*  98:2  227:*2*
233:*12*  260:*20*
**20:17**  255:*4*
**2000s**  7:*21*
**20044**  3:*15*
**2019**  14:22  15:*3*
**202**  3:*16*
**202-2600**  3:*4*
**2023**  171:*13*
**2025**  1:*20*  2:7  5:*3*
32:*19*  39:*14*  40:*3, 16*
42:*10, 14*  57:*14, 21*
58:7  60:*17*  64:*16*
65:*8, 15, 20*  66:*1*
80:*12, 14*  141:*3*
168:*6, 17*  169:*7*
207:*20*  210:22
221:*18*  256:*15*
257:22
**2029**  256:*18*
**20th**  80:*14*
**212**  3:*4*
**219**  4:*14*
**22nd**  141:*3*
**23**  230:*21*
**237(a)(4)(C**  221:*5, 23*
**23rd**  3:*3*
**25**  1:*20*  2:7
**25th**  5:*3*  257:22
**26**  232:*4, 21*
**27**  232:22
**27th**  256:*14*

**< 3 >**

**3**  4:*13*  135:*15, 23*
136:*1, 18, 19*  138:*7*
224:*9*
**3:15**  118:*4*
**3:20**  121:*11*
**30**  14:*19*  256:*18*
**302**  3:*9*
**30X100191600**  257:*3*
**34**  238:*20*

**< 4 >**

**4**  4:*14*  219:*18*  226:*7*
230:22  232:6  238:22
251:*9*
**4:01**  135:*5*
**4:17**  143:*8*
**42251**  1:22  258:*3*
**44**  251:*7, 10, 23*
**45**  251:*24*
**475**  3:*8*

**< 5 >**

**5**  224:*3, 4*  239:*20*
243:*6*
**5:27**  177:*1*
**50**  84:*5, 8*  85:*20*
86:*1*  220:*7*

**< 6 >**

**6**  4:*6*  243:*7*
**60**  85:*23*
**616-8779**  3:*16*
**646**  3:*10*

**< 7 >**

**7**  171:*13*  221:*18*
**7:00**  2:*7*
**7:04**  225:*2*
**745-8500**  3:*10*
**75**  189:*24, 25*
**7th**  159:*11*

**< 8 >**

**8**  49:*11, 15, 22, 24*
50:*4*  51:*24*  52:*6*
53:*9, 23*  55:*24, 16*
82:*1*  88:*12*  89:*11*
90:*8*  91:*16*  108:*14*
122:*23*  129:*9, 12, 21,
22, 25*  130:*3*  149:22
150:*19, 23*  151:*1*
154:*21*  170:*14, 20*
215:*18, 20, 22*  216:*8,
20*  218:*9, 18*  244:*9,
15*  245:*17*  246:*7, 25*
**8:18**  255:22
**878**  3:*15*

**< 9 >**

**90**  3:*3*

**99**  4:*11*

**< A >**

**A)(4)(C**  221:*6*
**a.m**  5:*4*  39:*10*
**ability**  7:*8*  216:*9*
**able**  113:*21*  178:*14*
184:*6*
**above-entitled**  2:*3*
**above-named**  2:*2*
**abstract**  48:*19*
**Academy**  10:*13*
**accent**  64:*24*
**accurate**  143:*25*
260:*16*
**accurately**  123:*3*
**Aconlon@shertremont
e.com**  3:*5*
**acronym**  73:*4*
**Act**  89:*15, 17*  221:*8*
**Acting**  1:*13*  148:*24*
**Action**  5:*10*  50:*10,
16*  51:*1*  59:*10, 11, 13*
257:*19*
**actions**  171:*16*  174:*2,
15*
**active**  162:*7*
**actively**  252:*23*
253:*4, 11*
**activities**  24:*3*  65:*21*
69:*24*  70:*9, 10*  71:*3*
159:*5, 9*  162:*8, 13*
187:*6*  211:*24*  212:*14*
222:*12*  236:22
**activity**  22:*9, 20*
25:*19, 20*  37:*10, 23*
38:*5, 12, 14, 17*  39:*25*
40:*4, 5, 11, 18*  41:*3,
10*  44:*12*  45:*7*  47:*8,
11*  48:*13, 15, 17, 19,
23, 24*  63:*16, 22*  64:*1*
75:*17*  81:*13*  82:*15,
24*  87:22  88:*1, 5, 8,
13*  89:*11, 13, 21*  90:*5,
24*  91:*16*  130:*6*
146:*9, 13, 14*  150:*19,
23*  158:*20*  161:*10*
163:*13, 20*  164:*2, 24*
184:*18*  185:*2, 6, 9*
201:*10*  203:*15, 20, 25*

212:*14*  217:*19*
239:*21*  247:*15, 16*
**addition**  69:*7*  71:*9*
252:*22*
**Additional**  85:*1*
133:*16*  186:*16, 20*
231:*4, 10*
**address**  69:*9, 23*
70:*4*  74:*14*  91:*25*
92:*4*  101:*16*  154:*2*
157:*11*  158:*16, 19*
**addressed**  63:*20*
158:*1*  172:*9*
**addresses**  101:*11*
122:*22*  129:*12*
**addressing**  70:*4*
75:6  76:*17, 20, 24*
157:*7*
**admin**  14:*4, 11*
**administration**  101:*17*
**Administrative**  4:*14*
219:*16*  220:*8*  230:*24*
232:5  238:*21*  251:*8*
**admitted**  123:*18, 21*
124:*14*  125:*21*  126:6,
*20*  127:*2, 8, 22, 24*
128:*10, 20, 24, 25*
129:*3*  130:*5, 12*
**adverse**  65:*23*
216:*10*  222:*14*
**advised**  10:*5*
**advocacy**  41:*19, 21*
127:*3, 9, 25*  128:*11,
20*
**advocate**  126:*24*
127:*22*
**advocating**  21:*5, 15*
**affect**  7:8  245:*12*
**affirmative**  149:*12*
**affixed**  256:*14*
**agencies**  27:*10*  32:2,
*5*  198:6
**agency**  15:*15*  56:*11,
15*  132:*21*  230:*15*
**agenda**  165:*16, 23*
**agent**  24:*16*  44:*13*
45:6  58:6  59:*7, 8, 16,
20*  60:6, *11*  68:*17*
77:*11, 14, 19*  78:*3, 14,

19, 24*  185:*9*  198:*16*
**agents**  58:*19*
**ago**  7:*22*  8:*9*  30:2
56:*19*  153:*11*  172:*15*
177:*8*
**agreed**  149:*11*
**ahead**  87:*13*  128:*3*
131:*1, 13*  142:*1*
154:*7*  158:*9*  159:2,
*20*  201:*2, 18*  203:*2*
206:*1*  209:*22*  212:*9*
**aid**  100:*10*  126:*24*
127:*22*
**al**  5:*7, 8*
**Alex**  5:*21*
**ALEXANDER**  6:*4*
**ALEXANDRA**  3:*5*
**Algeria**  221:*21*
**aliens**  123:*17*  126:*20*
127:*22*  221:*22*
222:*12*
**allegation**  235:*24*
**allegations**  81:*12, 16*
235:*18, 19*  236:5, *12*
237:*25*  238:*3*
**allege**  187:*5*
**alleged**  199:6  236:*20,
25*
**allocated**  114:*15, 17*
**allocating**  11:*8*
**allow**  143:*21*
**amenable**  224:*20*
**AMENDMENT**  3:*6*
**AMERICA**  1:*15*
**AMERICAN**  1:*3, 5, 6*
5:6  129:*13*  258:*3*
**America's**  129:*4*
210:6, *12, 21*
**analyses**  69:*1*
**analysis**  11:*11, 12, 17*
12:*10, 14*  14:*3, 10*
17:*14, 15, 16, 17, 23,
24*  18:*1, 5*  19:*5, 6, 23*
20:*23*  23:*18, 23, 25*
24:*5, 13, 14, 20*  25:2,
*4, 9, 16*  26:6  29:*23*
31:*15, 18, 23*  32:*20*
33:*4, 11, 19, 23*  34:*22*
43:*5, 9, 19, 25*  44:*10,
18*  45:*16*  46:*12, 13,

14*  47:*7*  48:*22*  49:*13,
20, 23*  53:*20*  54:*15,
21*  59:*5, 22*  60:*4*
61:*3, 12*  65:*7*  66:*5,
15, 19, 23*  67:*2, 19*
68:*2, 4, 7, 11, 16, 18,
22*  69:*5, 9, 17, 21, 23*
70:*3, 6, 16, 18*  71:*10,
17, 21, 25*  72:*4, 9*
73:*8, 15, 23*  74:*3, 6,
11*  75:6, *10, 22, 25*
76:*3, 6, 12, 16, 20*
77:*10, 20, 24*  78:*4, 11,
15, 16, 20*  79:*8, 13, 20*
80:*4, 17*  81:6, *10, 25*
82:*10, 14, 23*  83:*4, 14*
84:*14, 18, 25*  85:*19*
86:*22*  87:*3, 21*  88:*20,
24*  90:2  91:*4, 21, 24*
92:*3, 15, 19, 24*  93:*3*
94:*2, 8, 18*  95:*4, 8, 16,
20, 24*  96:*6, 13, 22*
97:*2, 8, 11, 15, 18*
98:*1, 5, 14*  100:*13, 19,
25*  101:*3, 10, 16, 20*
106:*14, 23*  107:*10, 12,
19, 24*  108:*8, 12, 17,
25*  109:*8, 12, 18, 20*
110:*4, 14, 18*  111:2
112:*10*  113:*20*  114:2,
22  130:*18*  132:*9*
133:*3*  146:*10*  147:*21*
148:*1*  149:*20*  151:*9,
18*  152:*1, 23*  153:*15*
154:*3, 14, 24*  157:*8,
12, 19*  158:2  160:*4*
164:*17, 18, 22*  165:*3,
13, 18, 25*  172:*18*
174:*25*  184:6  185:*21*
188:*1, 12, 22*  189:*7,
12*  190:*8, 25*  192:*1, 6,
10, 17*  193:*3, 24*
195:*24*  196:*8*  197:*7,
16*  198:*11*  199:*4, 14,
15*  201:*11, 21, 25*
202:*13*  204:*23*
205:*12, 13, 17, 21*
208:*3, 12, 14, 19, 24*
209:*4, 11, 15*  211:*7,
20*  212:*24*  213:*3*

217:*24*  219:*13*
223:*19*  224:*7*  226:*13*
231:*14*  232:*17*  233:2,
*7, 17*  234:*25*  235:*24*
236:*3, 10, 13, 17, 24*
238:*11, 18*  239:*23*
240:2  244:*18, 19*
245:*20*  246:*13*
252:*15, 25*  253:*7, 16,
19*
**analyst**  59:*15, 17*
67:*20*  72:*6, 17*  73:*14,
22*  74:*12*  75:*23*
78:*24*  94:*13*  131:*19*
132:*8*  146:*7*  157:*18*
161:*16*  165:*2*  177:*16*
184:*6, 11, 16*  185:*4, 8*
190:*20*  209:*25*  212:2,
*12*  217:*15, 24*  218:*10*
219:*12*  234:*13, 19*
235:*21*  236:*3, 9, 15,
21*  238:*9*  239:*22*
244:*3*  245:*10*  246:*23*
247:*10, 12*  248:*23*
253:*18*
**analysts**  12:*4, 6*  34:*4,
12*  35:*4*  68:*4, 9*  73:*7*
113:*1, 21*  117:*13, 22*
151:*25*  161:*16*
165:*11*  185:*18*  186:2,
*5, 15, 19*  194:*8*
202:*18, 22*  206:*5*
211:*18*  213:*8, 16*
215:*2, 11*  216:*1*
218:*17*  244:*7, 13*
245:*15*  246:*5*  247:*13,
18, 21*  248:*4*
**analyst's**  71:*18*
190:*19*  203:*24*
234:*23, 25*
**analytical**  72:*19, 20*
132:*24*
**analyze**  12:*7*  33:*20*
35:*15*  51:*24*  52:*5*
53:*8, 22*  55:*2, 15*
56:*1, 12, 16*  87:*15, 25*
88:*16*  89:*20*  101:*25*
102:*10*  103:*12*
118:*14*  119:*3, 11, 19*
120:*3*  142:*22*  145:*22*

146:*3*  151:*5*  172:*14*
177:*24*  216:*1*
**analyzed**  56:*23*
118:*9*  156:*16, 25*
181:*7, 19*  182:*9*
183:*16*  186:*6*
**analyzes**  145:*17*
207:*6*
**analyzing**  19:*14*
30:*25*  31:*9*  33:*7*
**and/or**  260:*17*
**Andre**  9:*12, 15*  62:*7*
139:*2*  144:*10, 13*
**answer**  7:*5*  10:*6, 18*
12:*20*  13:*17*  16:*16*
17:*7*  20:*10*  22:*4, 24*
23:*22*  26:*13*  27:*5, 20*
28:*8*  29:*13*  30:*1, 11*
31:*5, 25*  39:*23*  40:*7*
43:*4*  44:*4*  55:*12*
56:*25*  57:*17*  58:*3, 14*
63:*12*  66:*9*  87:*12*
102:*4*  117:*1, 11, 18*
131:*2, 14*  142:*1, 2*
144:*4*  153:*21*  154:*7*
157:*14*  158:*10*  159:*2,
21*  163:*24*  180:*22*
181:*11*  190:*15*  191:*4*
194:*4*  195:*8*  200:*18*
201:*2, 18*  203:*2*
205:*11*  206:*1*  209:*22*
212:*9*  241:*6*  243:*5*
249:*11*  250:*3, 5*
**answered**  31:*25*  43:*2*
71:*13*  75:*13*  149:*12*
182:*15*  208:*10*
219:*10*  241:*5, 14*
246:*1*  254:*3*
**answers**  143:*14*
**anti**  38:*11*
**anti-American**  101:*20*
**anti-Israel**  98:*19*
241:*3, 12*
**anti-Semitic**  38:*5, 9,
12, 13, 17*  82:*14, 23*
83:*1*  90:*23*  91:*3*
130:*6*  163:*20*  203:*15,
20, 23, 25*  223:*2, 11*
**anti-Semitism**  38:*25*
39:*3*  82:*14, 23*  83:*1*

85:*2*  133:*17*  137:*20,
23*  157:*6, 11, 24*
158:*1, 17*  253:*5*
**anybody**  32:*8*
178:*12*  214:*10*
227:*25*  228:*23*
**anymore**  196:*22*
**apart**  154:*13*
**Apartheid**  97:*11*
100:*1*
**appear**  226:*13*  227:*5,
10, 15, 17*  230:*2, 14*
**appearances**  5:*18*
**appeared**  132:*6*
212:*15*
**appears**  136:*22*
222:*7*
**append**  72:*12, 17*
**apply**  73:*7*
**applying**  131:*18*
139:*23*  140:*13*
**appreciate**  127:*16*
**approval**  200:*9*
**Approximately**  12:*3*
30:*2*  83:*11, 19*  84:*12*
97:*17*  233:*9*
**approximation**  80:*11*
81:*23*  83:*18*  189:*19*
**area**  20:*2, 25*  229:*24*
**areas**  21:*1*
**Armstrong**  9:*20, 24*
239:*2*
**arrest**  60:*13*  61:*5*
62:*23, 25*  63:*21*
137:*21*  227:*20, 23, 25*
228:*7, 13, 21, 23*
229:*21*  230:*1, 18*
**arrested**  63:*8*  64:*4, 5,
13*  137:*16*  230:*9, 16*
231:*19*
**arresting**  63:*24*
**arrests**  18:*9, 12*
60:*18*  61:*2, 8, 11*
63:*4*  229:*1, 3, 12, 18*
242:*25*
**arrived**  132:*8*
**art**  108:*23*  193:*1*
198:*4, 5*  205:*13*
**aside**  199:*10*

**asked**  6:*25*  20:*22*
31:*24*  43:*1, 20*  44:*12*
45:*5*  55:*25*  71:*12*
75:*12, 14*  78:*24*  81:*6*
86:*10*  89:*19*  96:*25*
101:*24*  103:*11*
118:*24*  119:*2*  120:*2*
125:*9*  133:*3*  142:*8*
151:*18*  156:*4*  165:*19*
177:*18*  182:*14*
199:*21*  208:*9, 11*
213:*18*  216:*1*  219:*9*
231:*17*  241:*4, 13*
245:*25*  249:*21*  254:*2*
**asking**  38:*21*  42:*9*
48:*18*  53:*11*  58:*7*
64:*9*  81:*23*  102:*23*
126:*4*  147:*2, 10*
155:*24*  156:*6*  157:*25*
181:*15*  189:*19*
208:*13*  219:*25*  220:*3,
11*  234:*5*  237:*20*
243:*3*  245:*9*  247:*9*
249:*9, 10, 11, 17*
250:*4, 9*  251:*1*  252:*6*
**assaulting**  93:*11*
**assess**  110:*13, 17*
**assessed**  91:*22*
**assesses**  252:*22*
**assessment**  164:*23*
170:*1*  248:*24*  252:*11*
**assessments**  101:*13*
**assign**  190:*19*
**assigned**  34:*13*
77:*12, 14*  117:*14*
213:*10*
**Assignment**  258:*3*
**assignments**  190:*20*
**Assistant**  10:*22*  62:*1*
89:*2, 3*  104:*25*  105:*1*
148:*12*
**associate**  11:*23*
52:*11, 12, 17, 18, 19*
148:*25*
**ASSOCIATION**  1:*3,
4, 5, 6, 8*  5:*7*  95:*9*
**assume**  239:*18*
240:*19*  253:*14*
**attached**  133:*22*

136:*16*
**attachment**  223:*25*
**attendance**  42:*11*
**attended**  167:*19*
168:*17*  214:*6*
**attending**  169:*5*
**Attends**  32:*1*
**attention**  132:*14*
**attitudes**  101:*1, 13,
21*  126:*22*  129:*4, 13*
**Attorney**  123:*13*
136:*16*  257:*18*
**Attorneys**  3:*6, 12, 18*
9:*5*
**AUPCAR**  220:*19*
**authorities**  139:*24*
140:*14*  222:*11*
**available**  132:*7*
**Avery**  14:*11*  28:*21,
25*
**aware**  59:*16*  64:*11*
65:*14, 18, 19, 24, 25*
66:*4*  121:*18*  122:*1*
134:*9*  173:*17, 25*
174:*5*  231:*10*  239:*11*
**awareness**  194:*7, 8,
12, 14*

**< B >**
**Bachelor**  10:*11*
**back**  18:*14*  19:*7, 10*
29:*8*  39:*12*  60:*8*
85:*15*  96:*25*  121:*13*
135:*7*  143:*11*  177:*4*
226:*5*  243:*6*
**background**  10:*9*
14:*17*
**Badar**  189:*12*  251:*20*
**ballpark**  84:*11*
**banned**  243:*10, 23*
244:*23*  245:*5*
**based**  41:*19, 24*
59:*21*  60:*19*  61:*2, 12*
143:*16*  144:*5*  150:*18*
185:*21*  186:*7*  222:*18,
24*  223:*8*  239:*14*
243:*4*  248:*24*  249:*12*
**basis**  24:*21*  92:*9, 11*
118:*11, 12*  182:*6*

**Bates** 120:22  121:*1, 2*
**BDS** 99:*4*
**bear** 126:22  129:3
**began** 22:*18*
**beginning** 16:*20*
  60:*16, 17*
**behalf** 187:*8*
**believe** 41:9  52:*14*
  75:*14*  115:15  148:*21*
  169:*12*  180:*1, 2*
  192:8  208:*11*  212:*19*
  231:16
**believes** 168:16
**Ben** 89:*4*
**Benjamin** 3:*14*
**best** 65:2  85:25
  131:*14*  139:*16*  154:8
  157:*14*  159:3  181:*12*
  191:5  195:8  201:*3, 5*
  206:2  209:23  212:*10*
**bet** 125:*12*
**Betar** 179:*17, 19, 22*
  180:6  187:*17*  214:*18,
  21*
**B-E-T-A-R** 179:*19*
**Betar's** 186:*21*  190:*4*
  208:*1*
**better** 152:2
**big** 34:*12*
**biographical** 70:*21*
  208:*7, 8, 15*
**birth** 221:*19*
**blank** 125:6
**blind** 120:22
**blowers** 10:*18*
**Border** 32:9  54:9, *10,
  13*  178:*4, 8, 9*
**boss** 86:*18*
**bottom** 220:*18*
  232:*21*  251:23
**BOX** 3:*15*
**Boycott** 99:*3*
**Brad** 13:6, *24*  76:2
  161:*24*  162:*1*
**Bradley** 163:25
**break** 7:2, *3, 5*  39:6,
  *10*  85:5, *13, 18*
  121:*11*  135:5  141:22
  142:7  143:2, *4, 8*

169:*1*  176:*18, 20*
  177:*1*
**breaking** 17:*10, 18*
  18:*3, 7, 22*
**brief** 39:6
**briefed** 48:7
**briefing** 60:*14*
  167:*19, 22*  168:5, *17,
  21*  169:6  170:25
  171:*1, 8, 22*  172:*1, 4,
  8*
**briefings** 167:5, *11*
  172:7
**bring** 144:*23*
**Broad** 3:*3*
**broader** 138:5
**broken** 20:*1*
**bureau** 51:*20*  239:2

**< C >**
**Call** 116:25  125:5
  152:8  207:*14*  234:*1,
  11*  235:*10*  250:*18*
**called** 2:2  6:*11*
  29:*18*  34:*3*  47:7
  72:25  74:*4, 8*  136:*1*
  138:6  141:2  173:*18,
  21, 22*
**calling** 98:*24*  100:*3,
  6*  233:*17, 20*  235:5,
  *16, 19*  236:2
**Calls** 18:*23*  22:*23*
  47:*14*  57:25  58:*11,
  24*  63:9  65:*11*  81:*1*
  82:*2*  87:5  102:*14, 25*
  103:6, *25*  106:*24*
  107:6  109:*24*  110:*8,
  19*  111:*23*  112:*4, 15*
  113:*4, 13*  118:*16*
  125:*23*  126:*9*  129:*16*
  130:7  137:*24*  153:*19*
  180:*24*  194:*17*  195:5
  205:*24*  211:*15*
  216:*13*  218:*3*  222:*19*
  230:5  234:*15, 21*
  242:*19*  243:*14*  244:*1*
  245:8, *25*  248:*15*
**campus** 243:*10, 24*
  244:*23*  245:5

**Canary** 178:25
  179:*11, 14*  180:*3, 5*
  185:*21*  186:7, *14, 17*
  187:*1, 2, 3, 11, 13, 22*
  188:*4, 16*  189:*21*
  207:22  214:*13, 15, 21*
  235:3, *4, 9, 12*  236:*1,
  4, 11, 12, 16, 20*  237:*4,
  9, 16, 21*  238:5, *7, 10*
  241:*18*
**candy** 176:22
**capacity** 1:*10, 11, 13,
  14*  8:*18, 19*
**Capital** 46:2
**Caption** 258:*3*
**captioned** 260:*15*
**CAR** 220:*20*
**cartel** 36:7
**Case** 1:*1*  6:*1*  7:*23*
  8:*3, 6*  9:*13, 17, 21, 25*
  21:24  24:*16*  26:*17,
  18*  56:22  58:6, *8, 20*
  59:*14*  60:*3, 5*  61:5, *6*
  65:9, *14, 15, 19, 25*
  77:*11, 14, 19*  78:*3, 14,
  19*  106:*14, 22*  107:5
  115:*20*  116:*21*  139:*3,
  20*  141:*1, 15, 17, 19*
  143:*18, 23*  144:2, *11,
  13, 16, 18, 19*  165:*1,
  11*  167:*16*  168:*4*
  184:*21*  201:*15*
  202:25  205:*14*
  208:24  211:*8*  212:5
  214:23  215:2, *11, 25*
  217:*1*  219:8, *17*
  220:9  222:*4*  224:7
  227:6  228:2, *4*
  231:*11*  232:*18*
  239:22  242:*10, 17*
  249:*10*  252:*15, 19*
  253:*1, 8, 13*  256:*11*
  258:*3*
**cases** 44:*23*  45:*3*
  60:*10*  63:7  72:*15, 16*
  79:*3*  143:22  145:25
  164:8  184:*24*  185:*4*
  191:*1*  192:*11, 18*
  193:*3*  198:*20*  199:*14*
  200:*1*  204:*15, 16*

205:*3, 7*  208:*4, 19, 25*
  209:*4, 11, 16*  214:*13,
  16, 19*  215:*14*  224:*13*
  230:*13*
**category** 69:*24*
  217:*16*
**cause** 69:*24*  243:*9,
  22*  244:22  245:4
**CCR** 1:*21*  257:*3, 24*
**cease** 100:*4*
**center** 16:*1*  26:*1*
**certain** 154:*14*
  156:*14*
**CERTIFICATE**
  256:*1*
**Certified** 2:5  4:*14*
  219:*15*  230:23  232:5
  238:*21*  251:8  257:*4*
**certify** 256:5  257:*4,
  17*
**chain** 74:*11*
**chance** 219:23  230:8,
  *15*  255:*15*
**change** 258:5, *7, 8, 10,
  11, 13, 14, 16, 18, 19,
  21, 22, 24*  259:2, *3, 5,
  6, 8, 9, 11, 13, 14, 16,
  17, 19, 21, 22, 24*
  260:2, *3, 5, 7, 8, 10, 11,
  13*
**changes** 133:9
  260:*17, 18*
**CHAPTER** 1:*4*
  216:24
**characteristics** 69:*3, 8*
**characterize** 50:*21*
**CHARETTE** 6:6
**charge** 155:*20*
**Charges** 231:5, *11*
**check** 123:2
**chief** 14:5  34:*16, 18,
  20, 22*  104:*16, 17, 22,
  24, 25*  111:7, *10*
  117:*22, 23, 24*  161:*21*
  164:*19*  190:*17, 18*
  196:2  231:22
**chiefs** 13:25  35:*3, 5*
  117:*21, 22, 23, 25*
  190:*18*

**child** 20:2  78:25
79:2, 4
**children** 36:17
**Chung** 189:7
**circumstance** 43:18
48:20  55:4  64:12
78:13  162:9
**circumstances** 37:20,
21  43:24  44:8  55:24
61:1  64:6  68:19
77:18  78:19  93:25
108:7  146:2  162:10
184:10  185:7  229:25
246:21
**cite** 143:22  238:8
**cited** 201:10
**citizens** 33:1  126:22
129:4, 13
**Civil** 5:10
**clarification** 7:1
13:20  16:20, 21
133:20  141:15  144:7
178:2
**clarify** 24:24  41:5,
21  48:8  55:7  60:22
66:11  73:10  81:5
82:17  86:5  87:9, 13
92:7  108:6  115:18
116:18  117:4  120:22
122:14  125:2  166:13
169:2  181:1, 15
191:8, 12  193:6
196:13  207:2  213:14
228:24  235:11
237:12  246:2, 10
247:10  250:20
254:11
**classified** 20:12, 14
22:5  26:15  27:7
28:9  29:15  30:13
31:6  47:14  57:2, 12
63:13  116:25  117:2,
8, 12, 17, 20  130:24
131:15  157:15
158:11  190:14  194:6
**clear** 48:10  126:3
**clearer** 223:5
**Clem** 14:11
**Clement** 28:21, 25

**client** 12:20  20:10
22:4, 24  26:13  27:5,
20  28:8  30:11  31:5
44:4  47:13  56:25
63:12  66:8  117:1
153:21
**Close** 190:1
**closed** 239:7
**Coast** 8:5  10:13
14:20  15:2
**coauthored** 243:8, 12
**coauthoring** 239:20
244:22  245:4
**code** 49:5, 7
**coin** 99:25
**collated** 179:1
**collected** 246:22
**collection** 220:6
**collections** 14:3, 11
26:22  28:20
**COLUMBIA** 3:8
97:11, 15, 19  137:17
**Combat** 85:2  133:16
**come** 19:9  44:23
51:25  52:6  53:2, 12,
14, 18, 20, 23  54:8
55:3, 16  80:17
103:13, 21  132:14
178:4, 15, 22  179:16
180:10, 13, 19  182:13,
17, 22  183:17  187:1,
11  188:3, 7, 15  189:9
214:12, 15, 18  237:15
239:16
**comes** 184:12
**commencing** 2:7
**comment** 247:11
**comments** 138:18
**commission** 256:17
**committed** 81:12
138:14  139:4
**common** 243:9, 22
244:22  245:4
**communicate** 112:2,
12
**communicated** 112:20
**communication** 175:5,
10  176:4  181:9
**communications**
239:12

**Community** 26:25
27:2, 11, 14, 16  28:6,
21  36:12
**compelling** 222:15
**compilation** 190:25
**compile** 75:10  86:15
88:20  92:15  105:12
165:19  236:13
**compiled** 86:11
175:1
**compiles** 106:9  214:4
**compiling** 73:8
190:7  235:22  236:17
**complaint** 8:9
**complete** 124:5
**complex** 204:25
205:12
**compliance** 40:24
41:8
**component** 15:12, 13,
14, 16
**comprehensive** 86:20
**compromise** 222:15
**computer** 47:2
**concern** 101:4
**concerning** 175:16,
23  176:5  226:13
**concerns** 67:4  82:11
156:17  157:2  209:6
**conclude** 212:23
**concluded** 255:22
**conclusion** 18:24
129:17  216:13
222:20  243:14  244:1
245:8, 25  248:16
252:11
**conclusions** 71:11
**conduct** 16:13  18:16,
19, 21  23:17  24:12
31:14, 20  36:9  74:2,
10  77:12, 15  228:25
229:3, 21  238:18
**conducted** 23:24
39:25
**conducts** 23:18
229:11
**confirm** 15:1  43:17
193:14
**confused** 218:5

**confusing** 125:19
169:1  198:2  202:4
235:7
**CONLON** 3:5  5:21
39:7  121:6  128:4
141:23  176:19  255:7,
8, 10, 21
**connection** 154:2
**connections** 22:9
**connotations** 124:22
**connotes** 200:9
**consequences** 65:23
216:10  222:14
**consider** 66:3
204:25  210:2
**consideration** 197:3
200:6
**considered** 22:11
**consistent** 144:1
**conspiracies** 11:14
12:8  19:15  69:18, 19
**constant** 152:20
**constitute** 22:20
161:9  163:13, 19
**constitutes** 161:6
164:2
**construed** 159:6
162:8, 14  165:13
**consults** 73:14, 22
**contact** 175:4, 10
**contain** 66:6  208:7,
8, 14, 19
**contained** 108:12
237:25  238:3
**contains** 66:15  67:2
215:22  235:12
**content** 111:22
112:3, 22  115:20
116:20  181:16
250:12
**context** 21:20, 23
22:8  36:5  37:6
48:25  49:1  88:4
103:14  161:10
174:22  184:23
185:13  196:14
223:22
**continue** 152:10, 14
**continues** 226:2

contrary 70:*11*
convened 171:*21*
conversation 104:*16,*
*18* 105:8 151:*3*
202:*19*
conversations 80:*24*
86:25 90:8, *11, 18, 21,*
*24* 91:6, *9* 101:*23*
103:5, *17, 19* 104:*4*
156:*21* 157:25
172:*16, 22* 173:*1*
201:6
convey 111:*21*
coordinate 174:2, *8,*
*13, 15*
coordinated 130:*11*
coordinates 29:6
coordination 62:*15,*
*17, 20* 123:*12*
coordinator 54:*16*
copy 120:*11* 133:*18*
134:7 144:*23*
correct 15:*4* 23:*20*
46:*19* 54:*17* 72:3
105:6 119:8 140:*23*
141:*12* 198:*14*
205:*18* 206:25
235:*13* 249:*1* 256:6
257:*15, 21*
corrections 260:*17*
correctly 197:6, *15*
counsel 5:*17* 48:9
141:*14* 143:*15, 17*
168:*10* 256:*10*
counter 16:2, *3*
29:*18* 32:*15* 34:*21*
36:*1* 54:*16*
Countering 26:*1*
46:25
counterterrorism
114:*18*
country 41:*16*
247:*20, 23* 248:6
counts 21:25
couple 7:6 168:25
course 132:*24* 146:7
184:5 186:*3* 196:*22,*
*23* 199:*3* 228:*13, 20*
235:22

COURT 1:*1* 2:*4*
5:*9, 13, 14, 16* 6:8, *20*
8:*1, 14* 10:*16* 20:*14,*
*18* 28:*23* 39:*18*
54:*11* 62:*16* 79:*17*
81:*17, 19* 83:*24*
89:*16* 96:*15* 99:*15*
111:8 114:*23* 122:*12*
135:*20* 148:*16*
152:*12* 161:25 176:9
178:6, *9* 179:*18*
191:9 196:*16* 204:*10*
210:*14* 211:*11* 215:5,
*15, 19* 218:*11* 221:6
223:*3* 224:*15, 17*
256:25 257:*1, 4*
cover 182:5
craft 74:2, 7, *9*
created 29:*24* 30:*5,*
*14* 59:22 68:7
credible 8:*15*
crime 20:5 24:*4*
47:*1* 77:25 78:5, *17*
169:22
crimes 150:*20*
criminal 11:*13, 14, 17*
12:8, *9* 15:*20, 21*
17:5, *10, 14, 18, 23*
18:*1, 3, 7* 19:6, *15, 18,*
*20, 22* 20:*23* 25:*19,*
*20* 36:6 37:*9, 22*
39:*25* 40:5 41:*3, 10*
45:7 47:*19* 48:*1, 15,*
*17* 63:*15, 22* 64:*1, 7,*
*14, 20* 65:*1* 69:*19*
70:8 74:2, 5 75:*17*
81:*12* 87:*21* 88:*1, 5,*
7 89:*21* 90:5 146:*14*
217:*18, 20* 218:8, *19*
criminals 11:*13* 12:7
19:*14* 69:*17*
criticism 98:*14*
101:*17*
criticizing 159:*17*
CRR 1:*21* 257:*24*
culture 126:*23* 129:*4,*
*14*
currency 74:*11*
current 10:*21* 14:*17*

25:*18* 30:*23*
currently 33:*10*
customer 109:*4*
Customs 1:*13* 32:9
cut 128:7
Czar 54:*9, 10, 13*
178:*4, 8, 9*

< D >
D.C 5:*12* 46:2
daily 60:*14* 62:*12*
255:9
Daniels 14:*12*
Darrell 6:*4*
date 5:*3* 104:*21*
221:*19*
dated 141:*3* 257:22
day 256:*14* 257:22
260:*19*
daylight 5:*4*
days 151:*24*
DC 3:*15*
decide 25:9 51:*4*
77:*19* 78:*14, 19*
107:*4* 145:*11, 22*
146:*3* 184:*11* 228:*13,*
*20*
decided 227:*19, 23*
decides 26:5 42:*24*
50:*10, 16* 51:*1* 59:*20*
109:6
deciding 228:7
decision 51:*4, 5*
59:*19* 77:9 105:*14*
155:*14, 17, 24, 25*
156:6, *7, 14, 23*
decision-maker
185:*10*
decision-making
202:*20*
decisions 156:*11*
declaration 133:*23*
136:*16* 139:2, *20, 21,*
*23* 141:*1, 3* 143:*15,*
*24* 144:*1, 5, 9, 10, 12*
260:*14*
declare 257:*20*
260:*14*

Defendants 1:*16*
3:*18* 6:3, *5* 143:*13*
145:*1* 254:*24* 255:*13*
Defendant's 143:*19*
define 13:*19, 20*
16:*18* 21:*15* 38:*13*
39:*4* 48:*19* 76:*10*
82:*17* 120:*15* 160:*19*
166:*12* 191:*7, 11*
204:*18*
definition 125:6
definitively 177:*21*
degree 10:*12, 14*
123:*17* 126:8
deliberative 22:6
31:7 44:*3* 115:*15*
153:*24* 154:6 157:*16*
159:*21* 181:*10* 191:*3*
194:5 200:*20* 201:*4*
203:*4* 205:25 209:*24*
211:*15* 218:2
denouncing 99:*23*
depart 54:7
DEPARTMENT 1:*10,*
*12* 3:*14* 9:*20* 27:*13,*
*15, 18* 28:5 32:*12, 17*
51:*12, 15, 19* 54:5
55:*3, 17* 58:*10* 65:*10,*
*17, 21* 66:2, *23* 67:3
103:*4, 13, 16, 21, 24*
104:5, *7, 11* 105:*13*
106:*11, 13, 22* 107:5
109:7 110:7, *15*
130:*12* 133:5 138:*12,*
*20, 24* 155:*14, 16, 20,*
*24* 156:6, *7, 12, 14, 23,*
*25* 171:25 172:*17, 22*
173:*1, 11, 20* 174:*1, 6,*
*13* 175:6, *11* 197:5
200:6, *16* 202:9, *16*
206:7 207:*10* 209:5,
*12, 17* 216:9 218:22
221:*16* 222:2 223:22
224:*12* 232:*18*
239:*13* 242:9, *16*
252:*19* 253:*13* 254:8,
*15*
Department's 28:*14*
29:9

**depend** 22:7 24:*21*
25:*3, 22* 26:6, *9*
246:*18*

**depending** 22:*9*
211:*9*

**depends** 25:*11* 37:6
250:*12*

**DEPONENT** 230:*25*
254:20, *23* 257:*14*

**Deportability** 232:*9*
251:*14*

**deportable** 221:22

**deposi** 167:*15*

**DEPOSITION** 1:*18*
2:*1, 3* 5:5, *11* 7:7
9:2, *6* 167:*15, 18*
255:*3, 22* 256:*4*
258:*1* 260:*15, 17*

**deputies** 195:*20*

**deputy** 11:*23* 13:*4*
52:*11, 16* 80:*23* 89:*4*
104:*16, 22, 24* 105:*16,
17* 111:*13, 21* 112:*2,
8, 12, 24* 113:*9, 11*
117:*24* 118:*1* 148:*9,
25* 161:*24* 166:*3*

**deputy's** 13:*5*

**Derek** 12:*1* 52:*25*
53:*1* 61:22, *23* 80:*23*

**derogatory** 125:*17*
131:*3* 132:*5, 10*

**Derrick** 148:*9*

**describe** 94:*12*
234:*24* 236:*23*

**described** 104:*14*
105:*8* 236:*1* 238:*15,
17* 241:*3, 12*

**describing** 93:*10*
131:*6, 20* 132:*10*
140:*22* 168:*20*

**description** 235:22
240:*7, 12*

**descriptions** 211:*24*
235:*15*

**deserve** 185:*20*

**designated** 126:*25*
127:*23* 128:*1, 16, 21*

**destination** 24:*19*
25:*1*

**destruction** 233:*17,
20* 234:*1, 11, 15, 22*
235:5, *10, 17, 20*
236:*2*

**details** 168:*4* 201:*20*
203:*6* 208:*22* 239:*11*
240:*25* 241:*15*

**detected** 187:*7*

**determination** 24:*2*
65:*20* 66:*3* 91:*15*
94:*14* 104:8, *11*
110:*6* 164:*10, 13, 18,
19* 185:*11, 16* 209:*5,
12, 18* 232:*9* 235:*1*
244:*5, 8* 245:*12*
248:*21* 251:*14*

**determinations** 210:*1*
221:*4* 222:*17, 24*
223:*8* 248:*18*

**determine** 67:*3*
156:*16* 157:*1* 203:*24*
212:*3* 216:*9* 217:*12*

**determined** 221:*18*
222:*11*

**determining** 125:*7*
185:*10*

**developing** 11:*9*

**development** 242:*23*

**DHS** 4:*13* 6:6 8:*20*
15:*15, 16* 32:*9* 54:*8*
122:*7, 9, 15* 136:*22*
138:*2* 146:*16* 173:*20*
174:*1, 7* 175:*14, 21*
222:*25* 223:*9, 14*
224:*9* 239:*7* 252:*11,
22*

**dictionary** 198:*7*

**difference** 35:*22*

**different** 19:*24*
20:*23* 54:*21* 67:*7, 14*
69:*3* 124:*22* 132:*25*
187:*5* 200:*1*

**difficult** 164:*8*
204:*15, 18* 205:*3, 6*

**difficulties** 113:*23*

**difficulty** 204:*23*

**DIRECT** 4:*5* 148:*9*

**direction** 86:*12* 256:*8*

**directive** 123:*22*
124:*15*

**directly** 13:*3, 8, 24*
60:*11*

**Director** 1:*13* 10:22
11:*24* 52:*12, 13, 17,
18, 20* 62:*1* 89:*2, 3, 5*
105:*1* 123:*14* 148:*12,
25* 195:*17*

**disagree** 144:*20, 23*

**disasters** 29:*7*

**disclose** 12:*21* 39:*23*
47:*15* 57:*1* 63:*13*
200:*19*

**disclosing** 159:*3*
181:*13* 203:*4* 209:*23*
212:*10*

**discovery** 120:*24*

**discuss** 74:*17* 169:*10,
17* 171:*11*

**discussed** 146:*19*
158:*14*

**discussing** 151:*25*
175:*7, 12*

**discussion** 118:*3*
153:*5* 170:*8* 174:*23*
206:*10, 17*

**discussions** 61:*13*
62:*10* 63:*18, 20*
151:*22, 24* 152:*23*
153:*16* 155:*6* 161:*15*
172:*10, 11* 201:*6, 10,
21* 226:*21*

**dismantle** 15:*20*

**distinguish** 203:*6*

**distinguished** 198:*19*

**distinguishes** 229:*20*

**DISTRICT** 1:*1* 5:*9*
257:*1*

**Divest** 97:*12*

**Divestment** 99:*3, 7*
100:*7*

**divide** 35:*17*

**divides** 46:*9*

**DIVISION** 3:*14*
13:*25* 14:*1* 15:*10*
16:*10, 12* 18:*11*
24:*16* 46:*13, 14, 18*
47:*2, 3, 4* 53:*5* 55:*23,
25* 58:*6* 60:*6* 61:*18,
19* 62:*7* 77:*6* 79:*1, 2*
105:*2, 11* 106:*9, 12,*

*21* 107:*4, 14, 21*
108:*1, 10, 18* 109:*2, 3,
6, 13, 23* 110:*6, 13, 25*
114:*22* 117:*23, 25*
135:*18* 166:*20, 25*
184:*22* 185:*15*
191:*21* 192:*3, 7, 12,
19* 193:*4* 197:*10, 11,
19, 20* 198:*12, 14, 17,
18, 24* 199:*9* 200:*14*
202:*1, 8, 15* 207:*8*
211:*8* 222:*4* 227:*9*
239:*10, 12, 17*

**divisions** 14:*2, 6*
46:*16, 20* 166:*8*

**divulge** 20:*11* 22:*5,
25* 26:*14* 27:6, *21*
28:*9* 29:*14* 30:*12*
31:*6* 66:*9* 117:*19*

**divulging** 44:*5* 102:*4*
153:*22* 191:*5* 195:*9*
201:*3, 18* 206:*2*

**document** 68:*3*
121:*5, 15, 21* 134:*6*
135:*10* 136:*14, 15, 21*
168:*11* 219:*15* 220:*2,
7, 14, 22* 223:*6* 224:*6*
226:*7* 227:*4* 230:22
231:*2, 7* 251:*6*

**documents** 10:2 68:*8*

**doing** 11:*11* 129:*10*
131:*5* 142:*21* 146:*8*
202:*18, 23*

**DOJ** 6:*3*

**domestic** 24:*17*
46:*24* 228:*14* 229:*17*

**DONALD** 1:*14*
141:*2, 19*

**dozen** 97:*23*

**Dozens** 76:*25* 80:*3*
84:*8, 10* 98:*1*

**drafting** 245:*21*
246:*14*

**Drive** 3:*8*

**drug** 20:*4* 36:*17*

**Due** 241:*23*

**duly** 6:*12*

**< E >**

**E.O** 125:22  140:2,
17  145:12  166:15
**EAD** 195:16, 18
**earlier** 17:12, 22
19:4  33:18  84:8
139:19  145:6  253:25
**early** 206:11, 18
**EAST** 1:8
**Eastern** 5:4
**education** 10:10
**EEO** 8:8, 10
**effect** 67:22
**effort** 152:5  173:25
174:14, 21  196:14, 20,
24, 25  206:12, 19
207:15  226:22  237:5,
10, 18
**either** 72:17  146:18
167:11  175:6, 11, 16
**elements** 77:25  78:4,
16
**emergency** 14:4, 12
29:3
**employed** 256:10
**employee** 8:19  32:16
163:18  257:18
**employees** 11:15
32:15  160:7, 15
161:2, 14, 16  166:19
167:6, 12  172:17, 22
173:1, 19  174:6
175:5, 11
**Employment** 8:12
**Endorsing** 21:17
**enforce** 138:25
139:10, 11  146:18, 23
**Enforcement** 1:13
12:21  20:12, 17  22:5
27:7, 22  28:10  30:10
31:7  44:3  57:11
74:12  87:18  138:21
139:8  154:6  157:16
159:22  181:10
190:13  194:5  200:20
201:4  218:2  229:16
247:8
**enforcing** 122:10, 13,
24  134:14  135:12
138:14  139:4
**engage** 12:15

**engaged** 37:9, 22
38:2, 4  40:11, 17
41:10  42:20  63:25
71:4  91:15  184:18
185:1, 5  217:18
**engages** 12:12  17:14,
15  19:5
**engaging** 41:3  74:20,
24
**ensure** 126:20
127:21  128:25  129:2
**entail** 11:7  16:7
22:14, 19  131:24
**entails** 48:14
**enter** 123:18  125:8
**enterprise** 14:11
**entire** 48:4  220:7
260:15
**entirety** 155:2
**environment** 84:15
226:10, 12, 18, 21
**Equal** 8:12
**equipping** 11:8
**ERO** 229:2, 21
**ERRATA** 258:1
260:18
**espionage** 36:2
**ESQ** 3:5, 10, 11
**ESQUIRE** 3:16, 17
**establish** 74:20, 23
**et** 5:7, 8
**Etter** 13:6, 24  76:2
161:24  162:1  163:25
164:7  168:7  192:5
196:3
**evaluation** 201:14
**EVANS** 5:23
**evening** 2:7
**EVEREST** 1:22
5:13, 15
**evidence** 24:3
**exact** 28:16  82:4, 5
**exactly** 140:24
150:18
**EXAMINATION**
1:18  2:2  4:1, 5  6:15
226:2, 3  257:10
**examined** 6:12
**example** 34:10  46:12
47:25  48:16  60:13

78:23  79:5  131:17
162:18  199:2  250:9
**examples** 24:11, 15
163:12, 14  251:4
**exchange** 16:3, 6
**Executive** 4:11, 12
11:23  52:11, 12, 16,
17, 19  70:11  84:19
85:1  91:8, 11  106:1
120:7  121:16  122:3
126:1  127:17, 19, 20
133:11, 15  134:7
137:19, 22  138:7, 15,
21  139:4, 9, 11  141:5,
8, 10, 11  142:14, 17,
22, 25  145:8  146:18,
23  147:6, 12, 16, 22
148:2, 25  149:3, 14,
25  151:14, 15  154:3,
11, 16  165:20  166:1,
9, 12, 14, 16, 21  167:5,
11, 19, 21, 22  168:17,
19, 21  169:6  175:6,
12, 17, 23  176:5
217:8
**exhaustive** 162:19
163:15
**Exhibit** 4:11, 12, 13,
14  120:19, 20  121:16
133:20, 23  134:2, 4
136:18, 19  219:18
226:7  230:22  232:5,
6  238:22  251:9
**EXHIBITS** 4:8, 10
**exist** 36:15  46:6
49:4
**existence** 126:12
129:10
**existing** 26:16  43:10,
21  44:11, 15, 18, 22
45:17  139:24  140:13
**exists** 131:4
**expedited** 255:13
**expertise** 229:8
**expires** 256:17
**explanation** 119:23
120:1  150:11
**exploitation** 20:3
36:17  78:25  79:3, 4

**expose** 158:10
**express** 23:4, 10
**expressed** 37:10
**expresses** 37:1
**expressing** 21:10, 21
**extent** 12:20  13:17
26:14  27:6, 21  28:9
29:14  31:6  44:4
47:13  57:1  58:15
63:12  66:9  117:2, 12
131:1  142:2, 19
153:21  158:10
180:24  194:4  200:19
203:3  205:24  211:14
249:11  250:5

**< F >**
**facetious** 150:16
**facilities** 12:25
**fact** 154:13
**fact-finding** 23:25
24:6  105:10  106:8
**factors** 22:11  26:20
**facts** 50:19  94:12
164:16  210:1, 3
236:24  244:4  246:22
**factual** 71:2, 9, 21, 23
72:1  244:20
**FACULTY** 1:4  96:22
**fair** 11:18  93:19
206:9, 16
**fall** 16:11  130:3
139:14
**familiar** 120:7, 13, 15
133:13  203:5
**February** 150:3, 4
**Federal** 2:4
**FEDERATION** 1:7
**feel** 48:7
**Fentanyl** 61:5
**field** 24:17
**figure** 84:11
**file** 72:19
**filed** 139:2, 20  144:1,
10, 13, 16
**files** 72:20
**financial** 256:12
**financially** 257:19
**find** 87:20  125:3
184:17  205:2  244:4

finding 152:*1* 206:6
237:*3*
fine 121:*23* 144:*15*
finish 116:*9*
finished 27:*24*
243:*16*
fire 100:*4*
FIRST 3:6 6:*11*
9:*10* 23:22 42:7
123:*8* 137:*8*, *15*
191:*10* 198:*24* 202:2
221:*14* 239:5, *6*
Five 83:*21*, *22* 97:*21*
143:*22* 190:6 192:*2*,
*11*, *17* 193:*3* 198:*20*
199:*14* 200:*1* 201:*25*
202:*14* 203:*12*, *15*, *20*
204:*2*, *6*, *15* 205:*20*
206:*10*, *17* 208:*4*, *13*,
*19*, *24*, *25* 209:*4*, *11*,
*16* 213:*3* 233:22, *23*
fix 200:*21*
Floor 3:*3*
focus 89:*22* 154:*22*
focused 157:*21*
215:2, *11*, *13*
folks 86:*13* 151:*10*
follow 139:*10*
follows 6:*13* 226:2
foregoing 256:*4*, *5*
257:*5*, *15*, *21*
foreign 21:*11* 36:*20*
37:*1*, *2*, *8*, *11*, *16*, *19*,
*21* 38:*1*, *4* 42:*19*
61:*8*, *11* 62:*24* 63:*1*,
*4*, *8*, *21* 64:*3*, *5*, *12*
67:*4* 76:*17* 82:*11*
84:*20* 120:*9* 126:*25*
127:*3*, *10*, *23* 128:*1*,
*16*, *21* 135:*16*, *17*
155:*5*, *8*, *20* 156:*5*, *9*,
*10*, *11*, *17* 157:*1*
170:*24* 199:6 203:*11*
206:*22* 209:6, *13*, *18*
210:*7*, *13*, *21* 211:*3*
216:*11* 222:*15*
Form 13:*14* 16:*15*
17:*19* 18:*17*, *23* 21:*7*,
*13* 22:22 23:6 24:*23*
25:*5* 32:*7*, *21* 34:*23*

36:22 37:*5*, *13* 38:*7*,
*20* 40:*19* 41:*4*, *20*
42:*1* 43:*13* 45:*10*
47:*21* 48:*3* 49:*16*
50:*18*, *22* 52:*1* 53:*10*,
*25* 55:*5* 56:7 57:*16*,
*24* 59:25 60:*21*
63:*23* 64:8 67:*10*
68:*12* 69:*11*, *25*
70:*12* 73:*9*, *18* 74:*16*
78:*6* 79:*9*, *14* 80:*7*
82:*16* 90:*25* 92:6, *21*
94:*4*, *11*, *21* 95:*11*
96:*2*, *9* 98:*15* 100:*21*
101:*6* 106:*16* 107:*15*
108:*2*, *19* 114:*11*
115:*12* 119:*14*
123:*23* 124:*16*
128:*13* 130:*7* 133:6
134:*15* 138:*8* 146:*24*
147:*7* 149:*8* 156:*1*,
*18* 157:*3* 161:*12*, *18*
163:*9* 164:*15* 165:*5*
167:*7* 170:*2* 171:*4*
175:*18* 178:*17*
179:*20* 180:*20*
181:*21* 182:*24* 183:*3*,
*19* 185:*23* 186:*9*
191:*22* 192:*13*, *20*
193:*5* 194:*17* 196:*12*
197:*12*, *21* 199:*18*
201:*16* 202:*3* 203:*17*
204:*17* 205:*8* 206:*13*,
*20* 207:*1* 209:*7*
210:*8*, *16* 216:*12*
217:*25* 218:*14* 221:*1*
228:*9*, *22* 230:*4*, *10*,
*17* 233:*3* 234:*3*, *16*
236:6 237:6, *11*, *19*
240:*9*, *14* 242:*4*, *12*
244:*10*, *25* 245:*7*, *24*
247:6 250:*19* 254:*10*
formal 160:*20*, *25*
161:*1*
formally 197:*3*, *11*,
*19* 198:*13*, *17*
formed 172:*5*
former 137:*17*
formulating 116:*12*
forth 257:6

forward 199:*8*
200:*15*
forwarded 202:*15*
232:*17* 254:*15*
forwarding 197:*5*
forwards 202:*8*
207:*9* 223:*21* 224:*12*
fosters 226:*9*
found 8:*14* 79:*3*
94:*13* 132:*4* 184:*25*
185:*5*, *8* 199:*4*
241:*18*, *20* 243:*9*, *22*
244:*22* 245:*4*
Foundation 121:*20*,
*23* 180:*10*
founding 126:*23*
129:*5*, *14*
Four 13:*25* 14:*2*
194:*23*
frame 53:*15* 55:*12*
108:*4*
Franklin 3:*14*
fraud 36:*18* 88:*13*
free 48:*7* 98:*25*
99:*11* 123:*2* 234:*1*,
*11*
front 166:*2* 178:*3*
function 35:*11*
122:*23*
further 168:*4* 257:*17*

< G >
gain 194:*7*, *11*, *14*
gathered 162:*11*
gathering 202:*23*
Gaza 98:*22* 171:*16*
general 36:*23* 87:*19*
123:*13* 129:*23* 131:*3*
211:*23* 229:*17*
generally 101:*4*
208:*12*
generates 67:*19*
getting 34:*12* 93:*18*
give 6:*21* 48:*16*
53:*15* 82:*4* 87:*4*
89:*21* 116:*13* 123:*5*
136:*25* 150:*2* 168:*3*
179:*9* 216:*8*, *23*
230:*7*, *14*

given 7:*17* 8:*7*
107:*5* 118:*10*, *11*
161:*9*, *13*, *15* 166:*8*
167:*22* 168:*21*
177:*10* 184:*7* 186:*25*
210:*20* 211:*3* 234:*14*,
*21* 237:*15* 256:*6*
global 47:*3*
go 19:*7* 87:*13* 96:*25*
121:*7* 128:*3* 131:*1*,
*13* 134:*24*, *25* 141:*22*
142:*1*, *6* 143:*3* 154:*7*
158:*9* 159:*2*, *20*
178:*2* 201:*2*, *17*
203:*2* 206:*1* 209:*22*
212:*9* 219:*20* 224:*3*,
*24* 232:*4* 236:*21*
238:*16* 239:*19*
241:*22* 243:*6* 252:*2*
254:*19*
goal 114:*1*
goes 109:*4* 253:*3*
going 10:*8* 12:*19*
13:*18* 16:*17* 18:*14*
19:*9* 20:*10* 22:*2*, *3*
26:*13* 27:*4*, *19* 28:*7*
29:*8* 30:*10* 31:*5*
47:*13* 63:*11* 66:*8*
80:*21* 83:*17* 104:*8*,
*11* 112:*25* 113:*3*, *10*,
*12* 120:*18* 123:*1*
125:*13* 126:*18* 137:*8*,
*11* 139:*21* 140:*7*, *8*
153:*20* 165:*6* 181:*11*
190:*15* 193:*14* 200:*5*
206:*7* 219:*14* 220:*2*
251:*5* 254:*18*
Good 6:*17* 67:*21*
85:*6*, *9* 201:*7* 252:*3*
Gordon 12:*1* 52:*25*
53:*1* 61:22, *23* 80:*23*
86:*16* 87:*1*, *2* 88:*16*
89:*19* 101:*24* 103:*11*,
*15*, *20*, *23* 105:*21*
106:*4* 118:*7* 148:*9*
149:*1*, *7*, *15* 151:*8*
168:*8* 174:*12*, *19*
193:*15* 195:*21*, *22*
196:*7* 198:*21* 199:*13*

200:*12*  201:*13*  205:*1*, *15*

**Gordon's** 88:*19*  166:*4*

**Government** 6:*7*  9:*5*  15:*8*  126:*23*  129:*5*, *14*  198:*6*  219:*17*  220:*8*

**graduate** 137:*17*

**Great** 137:*9*  224:*21*

**greater** 84:*5*, *7*

**ground** 6:*19*  92:*1*, *5*, *17*  93:*1*  94:*3*, *9*

**grounds** 92:*7*, *20*  93:*4*, *7*, *13*  94:*15*

**group** 42:*16*  57:*10*  67:*7*, *14*  69:*9*, *12*, *15*  70:*7*  95:*9*, *17*  96:*1*, *8*  132:*6*  153:*5*  173:*18*, *23*  179:*24*

**groups** 69:*19*, *20*

**Guard** 8:*5*  10:*13*  14:*20*  15:*2*

**guess** 73:*11*

**guidance** 73:*7*, *10*  87:*19*  146:*17*, *21*  147:*5*, *11*, *16*, *20*, *25*  148:*5*  149:*2*, *6*, *9*, *13*, *15*, *17*, *25*  150:*3*, *17*, *22*  151:*1*, *13*, *17*, *21*  153:*14*  160:*8*, *11*, *21*  161:*9*, *13*, *15*, *17*  162:*7*, *12*  163:*25*  166:*8*  175:*15*, *22*

**guide** 74:*8*

**guidelines** 73:*13*, *17*, *22*, *24*  74:*14*  75:*2*, *6*

**guides** 74:*2*, *9*

**guys** 143:*21*


**< H >**

**half** 9:*10*  251:*2*

**halfway** 123:*8*  126:*16*

**Hamas** 21:*21*  22:*13*, *19*  23:*5*, *11*  37:*3*, *11*  57:*7*  70:*4*  83:*5*, *11*  90:*20*  128:*12*, *16*, *22*  158:*5*  159:*11*  171:*3*,

7  204:*2*, *5*  251:*3*  252:*23*  253:*11*

**Hammer** 148:*20*, *22*  168:*8*  193:*20*, *21*  195:*21*, *23*  196:*8*  198:*22*  199:*13*  200:*13*  201:*14*  205:*2*, *16*

**hand** 136:*14*  219:*14*  256:*14*

**handbook** 73:*25*  74:*1*, *4*, *5*

**handle** 183:*6*

**handles** 79:*2*

**handling** 228:*1*, *4*

**happened** 56:*18*, *20*

**happens** 183:*1*

**happy** 6:*23*  67:*24*  120:*12*

**hard** 144:*23*

**HATCH** 1:*19*  4:*3*  5:*6*  6:*10*, *17*  7:*15*  85:*17*  226:*1*, *6*  254:*19*  260:*21*

**head** 83:*25*  195:*16*

**hear** 22:*16*  40:*14*  50:*13*  60:*8*, *11*, *13*  64:*22*  139:*1*  200:*25*  202:*18*  251:*25*

**heard** 120:*16*  133:*15*  148:*21*  226:*20*

**hears** 60:*8*

**hearsay** 81:*2*  87:*6*  90:*12*  91:*1*  102:*2*  104:*1*  111:*24*  112:*5*, *16*  113:*5*, *14*  139:*5*  140:*6*, *20*  141:*13*  143:*16*  150:*7*  153:*18*  154:*18*  155:*10*  158:*25*  167:*25*  168:*9*, *24*

**held** 5:*11*  118:*3*

**help** 26:*18*  34:*4*, *13*

**helpful** 94:*17*

**HENDERSON** 1:*22*  5:*15*  256:*3*, *24*

**hereof** 260:*18*

**hereunto** 256:*13*

**Heritage** 180:*10*

**highest** 10:*10*

**history** 70:*18*, *25*  208:*5*

**HOB** 104:*23*

**HOBs** 104:*17*, *23*

**Hold** 215:*6*

**holder** 42:*25*  49:*14*, *21*  50:*2*  53:*8*, *18*  56:*3*, *12*, *16*, *23*  58:*9*  66:*16*, *24*  75:*15*  211:*10*  228:*8*  242:*9*, *16*

**holders** 39:*15*  40:*4*, *11*, *17*, *24*  41:*8*, *13*, *15*, *19*, *24*  42:*10*, *15*  51:*24*  52:*6*  53:*23*  55:*2*, *16*  56:*2*  67:*8*, *15*  174:*3*, *9*, *15*

**holds** 40:*1*

**Homeland** 1:*11*, *12*  10:*23*  11:*4*, *24*  12:*23*  21:*3*, *6*, *12*, *22*  22:*1*, *21*  31:*1*, *10*, *12*  33:*8*, *21*  35:*16*, *20*, *23*  36:*2*, *8*, *9*, *14*  37:*17*, *23*  38:*6*  54:*5*  123:*13*  138:*13*, *20*  221:*16*, *17*  222:*2*

**horn** 67:*21*

**hostile** 84:*15*  126:*22*  129:*3*, *13*  226:*9*, *12*, *18*, *20*

**hour** 9:*11*

**hours** 9:*11*  219:*1*, *3*  251:*2*

**House** 149:*4*  180:*13*, *19*  181:*5*, *17*  182:*1*, *7*

**HSI** 86:*12*, *16*, *23*  89:*9*  102:*24*  104:*24*  105:*18*  123:*20*  124:*13*  125:*20*  126:*5*, *11*  127:*2*, *8*, *24*  128:*10*, *19*, *24*  129:*2*, *9*  130:*5*, *11*  136:*3*, *9*  139:*13*, *24*  140:*14*  141:*5*  142:*14*, *19*  146:*21*  147:*4*, *11*, *14*  149:*1*  166:*8*, *20*  171:*23*, *24*  172:*21*, *25*  174:*20*  177:*9*, *14*, *22*  178:*4*  179:*9*  182:*3*

222:*25*  223:*9*, *14*  224:*2*, *4*  228:*15*, *16*  229:*2*, *3*, *5*, *10*, *11*, *18*, *21*  243:*4*  252:*13*, *22*  254:*6*

**HSI's** 11:*6*  15:*18*  16:*6*  19:*12*, *13*  72:*22*  127:*18*  138:*24*

**HSIY** 196:*15*, *17*

**human** 16:*2*  20:*3*  25:*24*  26:*1*, *2*  34:*11*  36:*16*  61:*5*

**hypothetical** 247:*12*  249:*10*  250:*9*


**< I >**

**ICE** 6:*5*  12:*22*, *23*  15:*12*, *14*, *16*  64:*6*, *13*  122:*17*, *23*  134:*13*  135:*11*  137:*16*  138:*5*, *14*, *24*  139:*3*  145:*19*  146:*16*  167:*6*, *12*  174:*11*  175:*15*  176:*3*  182:*19*  183:*7*  187:*18*, *20*, *23*  195:*17*  222:*25*  223:*9*, *14*  227:*10*, *12*, *16*, *19*, *22*  228:*6*, *12*, *19*, *25*  229:*5*  230:*1*, *7*, *13*  239:*7*  241:*23*  242:*6*, *8*, *15*  252:*11*, *22*

**ICE's** 29:*6*  130:*19*, *21*  182:*23*  183:*2*

**iden** 117:*5*

**identified** 177:*15*, *22*  179:*13*  183:*17*  185:*19*  186:*3*, *16*, *20*  224:*18*

**identify** 93:*4*  94:*2*, *8*  139:*14*, *17*  140:*1*, *16*  141:*7*  142:*16*  177:*10*  184:*2*, *7*  201:*14*  245:*23*  246:*16*

**identities** 117:*6*

**identity** 57:*10*

**imagine** 28:*3*

**Immigration** 1:*13*  48:*1*  70:*25*  89:*14*, *16*  221:*7*

impact 36:*10*
impeding 93:*18*
impending 242:*10*
implement 141:*4*
142:*14* 146:*17*, *22*
147:*6*
implementation
127:*18*
implementing 122:*10*,
*12*, *18* 134:*14* 135:*11*
implies 92:*11*
imply 92:*13*
important 6:*24*
impose 74:*19*
INA 221:*22*
Inadmissibility/Deport
ability 231:*5*
inadmissible 49:*15*, *22*
Inaudible 10:*15*
16:*9* 36:*11* 39:*24*
44:*13* 74:*3* 80:*19*
184:*9* 185:*3*
incident 8:*11*
include 49:*3* 61:*21*
69:*1* 70:*18*, *21*, *24*
71:2, *11*, *18* 72:*1*, *5*,
*18* 81:*11*, *16* 92:*25*
164:*16* 165:*3*, *12*
208:*4* 211:*24* 212:*16*
216:*7* 234:*24* 235:*24*
236:*11* 238:*10* 244:*7*,
*13* 245:*15* 246:*5*
247:*18*, *21* 248:*4*
250:*18*, *23*
included 19:*18*
129:9, *20*, *24* 164:*21*
223:*20* 239:*22* 240:*1*,
*17* 245:*19* 246:*13*
247:*11*
includes 36:*1* 74:*3*
173:*19* 248:*23*
252:*13*
including 244:*15*
245:*17* 246:*7* 247:*20*
inclusion 60:*14*
inconsistent 40:*12*, *18*,
*21*
increase 119:*3*
increased 118:*15*

119:5 159:*12*
INDEX 4:*1*, *8*
indicate 108:*13*
indicated 260:*17*
indicating 243:*8*
indication 79:*4*
indications 185:*8*
individual 21:*20*, *24*
25:*15* 43:6 45:6
52:*24* 69:2 70:*5*, *17*
90:*3* 125:*7*, *16*, *17*
131:*5* 132:*3*, *10*, *13*,
*21* 143:*22*, *23* 145:*18*
146:*4* 161:*11* 162:*10*,
*11* 182:*18* 190:*21*
199:*4* 201:*7*, *8* 203:*7*
212:*13* 213:*10*, *18*
214:*24* 235:*23* 236:*4*,
*23* 238:*16*
individuals 17:*4*, *9*,
*17* 18:2, 6 19:*19*
31:*9*, *15* 51:*13* 69:*7*
126:*12* 139:*14*, *18*
140:*1*, *16* 141:*7*
142:*16*, *22* 145:*22*
149:*21* 177:*15* 187:*5*
190:6 192:*2* 194:*23*
201:*22*, *25* 202:*14*
203:*12*, *16*, *21* 204:*2*,
*6*, *8*, *11*, *12* 208:*16*
235:*13*, *16*
individual's 208:*5*
influx 80:*6*, *13*
inform 68:*17* 221:*15*
Informal 160:*20*
161:*6*
informally 197:*9*, *18*
information 12:*24*
20:*13*, *17* 22:*6*, *25*
26:*15* 27:*8* 29:*15*
30:*13* 39:*24* 44:*5*
47:*15* 57:2 63:*11*, *14*
66:*1* 70:*22* 71:*3*, *10*,
*22*, *24* 72:*2* 74:*15*
77:*23* 78:*15* 92:*16*,
*25* 102:*5* 105:*12*
106:*10* 108:*12* 115:*6*
116:*25* 117:*3*, *20*
118:*22*, *25* 120:*6*
125:*17* 130:*24* 131:*4*,

7, *16* 132:*5*, *6*, *11*, *22*,
*23*, *25* 140:*1*, *15*
141:*7* 142:*16* 153:*20*,
*22* 158:*11*, *12* 159:*4*
161:*11* 162:*11* 165:*3*,
*12* 174:*2*, *8*, *14*
180:*25* 181:*13*, *25*
182:6 190:*14* 191:*6*
194:6 195:*10* 201:*19*
202:*23* 204:*8* 206:*3*
208:*4*, *8*, *15* 209:*21*
210:6, *12*, *20* 211:*3*
212:*4*, *11*, *20* 213:*2*,
*20* 214:*4*, *12* 217:*18*
222:*25* 223:*9*, *13*, *21*
229:*15*, *16* 235:*13*, *22*
236:*12*, *16* 238:*10*
243:*7* 244:*8*, *14*
245:*11*, *15*, *19* 246:*5*,
*12* 247:*13*, *18*, *21*
248:*4*, *23*
informed 60:*24* 61:*2*,
*7*, *10*
initiated 167:*20*
168:*19* 169:*13*
initiative 145:*23*
146:*4*
input 181:*5*, *17*
182:*2*, *7*
inside 11:*16* 29:*21*
33:*1* 70:*18* 77:*15*
123:*19* 131:*25* 208:*5*
247:*19*, *22* 248:*5*
insight 138:*1*
insofar 235:*5*
instance 79:*24*
198:*24* 202:*2*
instances 229:*20*
INSTITUTE 3:*8*
instituted 175:*1*
institutional 99:*7*
100:*7*
institutions 126:*23*
129:*5*, *14* 135:*16*
instruct 12:*20* 20:*10*
22:*3*, *23* 26:*13* 27:*5*,
*20* 28:*8* 30:*11* 31:*5*
44:*3* 47:*13* 56:*25*
63:*12* 66:*8* 117:*1*, *18*
153:*20* 181:*11*

190:*15* 191:*4* 195:*8*
200:*18*
instructed 151:*8*
instructing 166:*19*
instruction 29:*13*
30:*19* 33:*6*, *14* 34:*2*
35:*14* 39:*22* 45:*19*
46:*1*, *23* 50:6 68:*24*
71:*14* 72:*8* 73:*2*
77:*22* 78:*22* 81:*15*
83:*7* 87:*17* 88:*3*, *10*
89:*24* 90:*1*, *14* 91:*1*,
*18* 93:*9*, *16* 95:*11*
100:*15* 102:*3* 110:*21*
115:*5*, *14* 126:*7*
130:*25* 131:*13* 132:*2*,
*19* 146:6 148:*7*
149:*19* 150:*14*
152:*19* 153:*1*, *10*
154:*5*, *18* 155:*1*, *12*
157:*14* 158:*9* 159:*20*
160:*18*, *20*, *21*, *25*
161:*1* 162:*6*, *25*
163:*23* 164:*4* 166:*11*,
*23* 169:*20* 179:*4*
180:*24* 184:*4*, *15*
194:*4* 199:*1*, *19*
200:*3* 201:*2*, *17*
203:*2* 209:*20* 210:*25*
211:*14*, *22* 212:*8*, *22*
213:*6*, *12*, *23* 214:*8*
215:*17* 216:*3*, *14*
217:*4*, *11* 218:*3*, *16*
219:*10*, *11* 222:*6*
226:*16* 229:*14*
231:*24* 236:*19*
238:*14* 239:*25*
242:*21* 243:*15* 244:*2*
246:*20* 247:*7* 248:*1*,
*9*, *17* 253:*23* 254:*3*
instructions 44:*21*
71:6 146:*17*, *22*
147:*5*, *12*, *16*, *20*, *25*
148:*5* 149:*3*, *13*
151:*13*, *17* 153:*14*
161:6, *22* 162:*3*, *17*
163:*3*, *18* 166:*9*
175:*15*, *22*

**Intel** 105:*10* 106:*8*
114:*22, 24* 142:*20*
164:*19* 187:*16, 19*
**intellectual** 15:*25*
**Intelligence** 10:*23*
11:*5, 7, 16, 20* 12:*11,*
*15, 16, 18* 13:*3, 9, 12*
15:*6, 9* 17:*13* 19:*5,*
*13, 19, 24* 23:*3, 9, 16*
24:*21* 25:*3, 9* 26:*5,*
*23, 25* 27:*2, 10, 14, 16*
28:*6, 11, 14, 21* 29:*9,*
*18, 19, 22* 32:*16*
34:*21* 38:*2* 43:*8, 19,*
*25* 44:*9, 17* 45:*15*
46:*15* 47:*6* 48:*21*
49:*13, 20* 50:*1, 9, 15,*
*25* 51:*3, 7* 52:*5*
54:*15, 20, 22* 56:*1*
59:*5, 11, 23* 60:*4, 18,*
*19* 67:*7, 14, 19* 75:*10,*
*20* 76:*7* 77:*16*
101:*24* 102:*10*
107:*24* 108:*8* 109:*22*
110:*5* 114:*19, 25*
115:*10* 116:*23*
117:*16* 118:*23* 119:*2,*
*10, 18, 24* 120:*2*
123:*15* 132:*15* 133:*2*
139:*25* 140:*14* 141:*6*
142:*15* 145:*11, 17, 21*
146:*3* 147:*19, 24*
148:*5* 154:*22* 160:*8,*
*15* 161:*2* 163:*19*
164:*1, 10* 165:*2, 12*
166:*7* 167:*4, 10, 23*
168:*22* 169:*14*
172:*14* 174:*25*
177:*16, 24* 183:*9, 14,*
*15, 22* 184:*2, 25*
185:*19* 186:*3, 6, 13,*
*15, 20, 25* 187:*25*
188:*12, 21* 189:*6, 11*
190:*11, 24* 191:*15, 19*
196:*1, 10* 197:*8*
199:*16* 207:*6, 18*
210:*5, 11, 20* 211:*2*
212:*3* 219:*8* 223:*20*
227:*24* 229:*6* 231:*13,*

*17* 234:*20* 237:*15*
243:*2* 249:*13* 250:*7*
**Intelligence's** 42:*24*
65:*5* 235:*1*
**intend** 123:*18*
163:*14* 250:*8, 23*
**intends** 230:*13*
**intent** 126:*1, 4*
171:*18, 20*
**interagency** 178:*11*
**interchangeable** 36:*12*
**interest** 222:*16*
256:*11*
**interested** 202:*21*
206:*5* 257:*19*
**interests** 210:*7, 13, 21*
**internal** 8:*4*
**international** 46:*25*
**internet** 95:*1*
**interpreting** 138:*17*
**interview** 74:*13*
**Intifada** 99:*14, 19*
160:*1*
**introduction** 133:*10*
**investigate** 17:*3, 9*
18:*15* 19:*19* 23:*13,*
*15* 39:*15, 17, 20* 40:*4,*
*10, 17, 23* 41:*7, 12, 15,*
*18, 23* 42:*10, 15, 25*
56:*3* 64:*17, 19, 25*
182:*3*
**investigated** 23:*4, 10*
**investigating** 18:*2*
206:*21*
**investigation** 17:*1*
24:*22* 25:*25* 42:*19*
43:*6, 10, 21* 44:*11, 16,*
*19, 23, 25* 45:*1, 5, 17*
60:*9*
**Investigations** 10:*23*
11:*5, 24* 12:*24* 16:*14*
19:*16* 23:*17, 24*
24:*13* 26:*3* 31:*20*
47:*4* 65:*5* 221:*17*
**investigative** 12:*4, 6*
45:*20, 23* 46:*6, 8, 11,*
*15* 61:*19* 79:*2*
117:*13* 228:*1, 3*
229:*5* 237:*5, 10, 17*

**investigator** 24:*1, 7, 8*
44:*24* 46:*21* 53:*18*
**investigators** 26:*18*
44:*24* 45:*8*
**involve** 69:*19, 20*
175:*1*
**involved** 42:*18*
44:*25* 45:*1* 58:*6, 19*
59:*16* 60:*12* 63:*15,*
*19, 22* 70:*7, 8* 90:*4*
115:*19* 116:*19*
119:*11, 19* 120:*3*
123:*20* 124:*14*
125:*20* 135:*25* 136:*4,*
*9* 149:*21* 151:*9*
169:*22* 170:*7* 174:*21*
190:*7, 24* 191:*7, 8, 12*
201:*6*
**involvement** 127:*18*
**involving** 58:*9* 65:*9,*
*15* 198:*20* 242:*10, 17*
254:*9, 16*
**irrelevant** 244:*8, 14*
245:*16* 246:*6*
**Israel** 83:*15, 19*
85:*21* 86:*3, 5, 7, 8*
91:*6* 98:*14* 99:*7*
100:*1, 7, 10, 13, 20*
101:*1, 5, 14* 119:*6, 12,*
*20* 120:*4* 159:*17*
187:*6* 236:*2*
**Israel's** 171:*16*
233:*17, 20* 234:*1, 11,*
*15, 21* 235:*5, 10, 17,*
*20*
**issue** 230:*13*
**issued** 175:*15, 22*
227:*10, 14*
**issues** 122:*22* 227:*17*
**its** 24:*14* 25:*9* 26:*6*
29:*10* 60:*14* 126:*12*
129:*10* 145:*23* 174:*6*
187:*14, 18, 23* 253:*4*
256:*12*
**iv** 124:*10*

**< J >**
**January** 80:*14*
**jargon** 15:*17*

**JENNIFER** 1:*21* 2:*5*
257:*3, 24*
**JESSICA** 3:*16* 6:*2*
**Jessica.strokus@usdoj.**
**gov** 3:*17*
**Jewish** 97:*8* 159:*17*
**JOB** 1:*22* 93:*18*
138:*24* 139:*11* 146:*8*
157:*18* 164:*9* 203:*24*
234:*23, 25* 235:*1*
244:*3* 245:*10*
**John** 9:*19, 23* 239:*2*
**join** 14:*21*
**joined** 14:*23*
**joke** 67:*24*
**JON** 3:*20* 5:*13*
**judge** 143:*21*
**judgment** 92:*12, 14*
204:*22*
**June** 1:*20* 2:*7* 5:*3*
256:*14* 257:*22*
**Justice** 96:*14, 17, 23*
97:*2, 4*
**JUSTICE/CIVIL**
3:*14*

**< K >**
**Kahn** 251:*20*
**Kaitlyn** 6:*6*
**keep** 10:*17* 20:*15*
62:*17* 81:*19* 215:*7*
**Khalil** 137:*16, 21*
188:*1* 221:*19* 223:*2,*
*11* 224:*5, 10* 227:*7,*
*20, 23* 231:*8, 15, 18*
**Khalil's** 201:*15*
202:*25* 219:*8* 228:*4*
231:*11*
**Khan** 189:*12*
**kind** 12:*10* 88:*12*
239:*21*
**kinds** 10:*6* 12:*14*
17:*15* 19:*5* 88:*7*
100:*12*
**KNIGHT** 3:*6*
**know** 6:*23* 7:*2, 16*
16:*8, 22* 17:*6* 21:*8*
23:*1* 29:*11* 32:*18*
35:*7, 10* 36:*23, 24*
37:*14, 18* 40:*8* 41:*11*

42:13, 17  51:8, 13, 16,
17, 18, 20, 22  55:18,
21, 22  56:8  57:17
58:3, 4, 16, 18  59:2
80:8  82:5, 25  83:12,
20  85:25  86:2  97:9,
13, 20, 24  98:3, 7, 20
99:1, 5, 8, 20, 24
100:2, 5, 8, 11, 16
102:12, 16, 19, 21, 23
104:10  108:23
109:11  111:6  116:7
120:14  121:5  125:12
129:21  131:14  136:3,
11  140:3  146:20
147:4  154:9  160:2
161:19, 20  164:5
167:2, 14  171:2, 18,
19  172:2  173:4, 9, 15
175:13  176:1, 13, 15,
16  179:6, 15  180:8,
11, 15, 16  181:2
182:25  186:18, 23
187:15, 21, 24  189:15
190:5  194:22  198:5
211:19  214:20
219:12  220:5  222:17,
21  227:12, 16, 22
228:3, 5  229:9, 11, 22,
23  230:3  231:3, 20,
21  233:11  234:12, 14,
21  235:11  238:9
240:20  241:20  243:5
**knowledge**  8:13
32:14  57:18  58:2, 21
64:15  65:3  72:22, 24
110:12  111:16  119:9,
17  128:19  130:9, 14
133:7  136:8, 12
139:13, 17  147:3, 11
171:21  175:14, 21
176:3  180:10, 12
187:17  193:22  201:5
230:7  238:7  239:14
242:6, 8, 15  253:24
254:5
**known**  99:4
**KRISHNAN**  3:10
4:6  5:19, 20  6:16
10:20  13:1, 15, 22

16:16, 19  17:2, 21
18:20, 25  20:21  21:9,
16  22:12, 17  23:2, 8
24:25  25:7  26:19
27:12, 23  28:2, 12, 18,
25  29:2, 16  30:4, 16,
22  31:13  32:4, 10, 24
33:9, 17  34:6, 14, 24
35:18  36:25  37:7, 15
38:10, 21, 23  39:5, 13,
20  40:2, 9, 15, 22
41:6, 22  42:4  43:3, 7,
16  44:6  45:2, 13, 22
46:4, 10  47:5, 18, 24
48:5, 11  49:18  50:8,
14, 20, 24  52:3  53:13
54:3, 19  55:8  56:5, 9
57:5, 13, 20  58:1, 13,
17  59:3  60:1, 23
62:22  63:17  64:2, 10,
23  65:13  66:13
67:12, 23  68:1, 14
69:4, 13  70:2, 15
71:8, 16  72:11  73:5,
12, 20  74:18  75:14,
18  78:1, 9  79:6, 11,
22  80:10  81:4, 21
82:6, 19  83:9  84:1
85:6, 16  87:8, 23
88:6, 14  89:18  90:6,
16  91:4, 20  92:8, 23
93:12, 20  94:6, 16, 24
95:14  96:4, 11, 17, 20
98:17  99:17  100:17,
23  101:8  102:7, 18
103:3, 9  104:3
106:18  107:2, 9, 18
108:5, 21  109:17
110:2, 11, 23  111:5,
11  112:1, 7, 18  113:7,
16  114:13  115:1, 8,
17  116:5, 8, 11, 16, 17
117:4, 9, 10  118:6
119:16  120:18, 25
121:14, 22, 25  122:13,
16  123:7, 10, 25
124:8, 12, 18  126:2,
13  127:7, 14  128:6, 9,
18  129:11, 18  130:10,
17  131:8, 22  132:12

133:1, 8, 21, 25  134:3,
5, 22, 25  135:8, 22
136:7, 13, 20  137:2, 7,
10, 14  138:3, 11
139:7  140:10, 21
141:18  142:8, 11, 12
143:2  144:6, 14, 20
145:3, 5  146:11
147:1, 9  148:10, 17,
18  149:10, 23  150:9,
21  152:13, 21  153:3,
7, 12, 25  154:12, 20
155:4, 15, 22  156:3,
20  157:5, 22  158:15
159:7, 24  160:23
162:2  163:11  164:6,
20  165:6, 9  167:1, 9
168:2  169:3, 4, 24
170:4  171:6  173:6,
16  174:18  175:20
176:2, 12  177:5, 13,
19  178:13, 20  179:7,
19, 23  180:22  181:3,
14, 24  182:16  183:21
184:20  185:25
186:11  190:22
191:13, 24  192:15, 24
193:7, 11  194:10, 21
195:13  196:19
197:14, 23  199:11, 21,
24  200:11  201:12, 23
202:6  203:9  204:14,
19  205:5, 10  206:8,
15, 24  207:4  208:11,
17  209:9  210:4, 10,
15, 18  211:1, 12, 17
212:1, 17, 25  213:7,
15  214:3, 11  215:13,
21  216:6, 17  217:6,
14  218:6, 12, 20
219:6, 14, 19, 25
220:6, 11, 16  221:2, 7,
10  222:8, 22  223:7,
17  224:15, 23  226:3,
19  227:3  228:11
229:19  230:6, 12, 20
231:1  232:1  233:5
234:4, 18  236:8
237:1, 8, 13, 22
238:19  240:3, 11, 16

241:7, 8, 17  242:5, 14,
24  243:16, 19, 20
244:6, 12  245:2, 13
246:3  247:1, 17
248:3, 11, 19  249:15,
21, 24  250:1, 21
252:2, 5  254:12, 18,
21  255:1, 20, 21
**KRISTI**  1:11

**< L >**
**laid**  121:21  231:11
**language**  198:1  202:5
**Large**  189:23  237:14
**laughing**  67:25
**laundering**  36:19
**law**  12:21  17:10, 18
18:3, 7, 22  19:20
20:12, 16  22:5  27:6,
21  28:10  30:10  31:6
44:2  48:1  49:2, 4
57:11  64:7, 14, 20
65:1  74:12  87:17
108:13, 15  138:25
139:10, 12, 18  142:23,
24  145:7  154:6
157:15, 20  159:21
169:23  170:7, 11, 12
181:10  190:13  194:5
200:20  201:4, 9, 15
202:19  206:22
211:25  212:5, 15
214:25  217:20, 23
218:2, 8, 19  229:15
238:1, 6, 8  244:15, 24
245:6, 17, 23  246:7,
15  247:8, 14, 24
248:7, 22, 25  249:5
250:2, 18, 24  257:21
**lawful**  64:17, 25
65:9, 16, 22  66:20
67:9, 16  75:11
221:21
**laws**  47:17, 19, 20, 23
122:24
**lawyer**  130:1
**lawyers**  8:17  9:1
**lay**  121:23
**lead**  26:2  52:7

leaders 61:*19* 159:*12*
leadership 12:*23*
 29:*10* 61:*14*, *17*, *20*,
 *25* 62:*8*, *20* 86:*13*, *16*,
 *23* 171:*23*, *24* 172:*21*,
 *25* 177:*9*, *14*, *22*
 178:*3* 179:*9* 183:*11*,
 *18* 188:*8* 189:*3*
leading 42:*15*
leads 53:2 237:*5*, *10*,
 *17*
learned 168:*18*
leave 224:*16*
led 105:*15*
left 193:*19* 218:*24*
legal 18:*24* 129:*17*
 216:*13* 222:*20*
 243:*14* 244:*1* 245:*8*,
 *25* 248:*16*
legally 120:*22*
letter 105:*12* 106:*10*,
 *13*, *21* 107:5 109:7
 110:*15* 222:*3* 224:*9*,
 *11* 252:*18* 253:*12*
 254:7
letters 254:*14*
level 10:*10*
liaison 28:*19*, 20
liaisons 26:*24*
License 2:6
likewise 133:*22*
limiting 100:*10*
line 152:5 183:*5*, *8*
 206:*12*, *19* 207:*15*
 226:*22* 232:*8* 237:*5*,
 *10*, *18* 238:*23* 239:*1*,
 *19* 251:*20*, *22*
Lines 243:6
link 132:5
linkage 131:*21*
linked 57:*3* 131:*18*
list 179:2, 8 183:*24*
 187:*10*
lists 178:*1*, *2*
little 223:5
live 33:*1*
LLP 3:*1*
located 73:*24*

location 25:*11*, *13*, *14*,
 *15*, *17*, *18* 26:7
long 9:8 10:*24*
 20:*11* 22:4, *24* 30:*12*
 39:*23* 105:*23* 176:*20*
 206:*23* 244:*19*
longer 142:6
look 45:5 53:*17*
 78:*24* 87:*19* 91:*25*
 122:*25* 144:*24*
 150:*18* 151:2 211:*19*
 212:*13* 213:*10*
 219:*24* 223:*25*
 231:*18* 232:*20*
looking 125:*15*
 212:*12* 215:*1*, *10*
 218:*18*
lot 180:2 215:*22*
LPRs 221:*21*
lunch 85:5
LYONS 1:*12*

< M >
Mahdawi 188:*13*
 232:*15*
Mahdawi's 232:*18*
Mahmoud 137:*16*
 188:*1* 221:*19* 224:*4*,
 *10*
main 15:*24*
maintained 253:*21*
majority 178:*15*
 229:*18*
making 244:*16*
manage 11:4 15:*25*
 16:*1*, 2 190:*18*
management 14:4, *13*
 16:7 29:3 72:22, *25*
 253:*24* 254:5
manages 190:*17*
managing 11:6
manmade 29:6
manner 254:9
manual 73:*25*
March 80:6 104:*19*
 141:*3* 150:3, *4* 168:*6*,
 *16* 169:*7*, *11* 221:*18*
MARCO 1:*10* 5:8
 221:*12* 232:*12*

251:*17*
mark 120:*18* 126:*16*
marked 120:*20*
 121:*16* 133:*20* 134:*4*
 136:*18*, *19* 219:*18*
 226:7 232:6 238:*21*
 251:8
marking 134:*1*
marks 255:2
MASSACHUSETTS
 1:*1* 5:9 257:*1*
material 236:*22*
materials 72:5, *10*, *13*
 74:*21*
matter 2:*3* 5:6
 196:*21*, *22* 254:*15*
 260:*15*
maximum 123:*17*
 126:7
mean 12:*18* 16:*25*
 18:*18*, *21* 20:8 21:2,
 *14* 23:12 25:6, *14*, *23*
 32:22 33:*15* 36:4
 38:8 40:*20* 42:2, *6*
 46:*12* 47:*10*, 22
 49:*12*, *19* 50:*1* 63:*24*
 69:*12* 74:*17* 89:*12*
 92:*13* 94:22 102:6
 108:*3*, *20*, 22, *23*
 122:*15* 124:*23*, *25*
 125:*3*, *4*, *14* 128:7
 138:*16* 139:*9* 140:5
 149:9 162:*17*, *18*
 179:*21* 196:*20* 198:*3*
 202:7 204:*20* 249:*16*
 255:9
meaning 49:*15*, *22*
 50:*3* 69:*14* 198:8
 204:*21*
means 13:*19* 16:*18*,
 *23* 38:*17* 48:7, *24*
 138:*20*, *24* 150:*24*
 158:*17* 193:*1*
meant 38:22 140:9
 235:2, *20* 252:*12*
Measures 85:2
 133:*16*
media 74:*25* 95:5
 182:*13*, *18*, *19* 208:*20*

253:5
medication 7:8
meet 9:*4* 24:*3* 32:6,
 8, *11* 152:*11*, *15*, *17*
meeting 105:*15*, *23*,
 25 151:*13*, *16* 169:9,
 *10*, *11*, *13*, *17* 170:6,
 *13*, *21* 171:*11*
meetings 9:9 32:*1*
 62:*15*, *20*, *24* 63:2, 5
 103:*10* 111:*19* 157:7
 158:*17*, *21* 165:*17*, *23*
meets 24:2
member 27:9 183:*1*
members 27:9 164:*1*
membership 95:*17*
memorized 129:*25*
mention 61:*19* 62:*23*
 82:*20*, *23* 86:*3* 90:7,
 *10*, *17*, *20*, *23* 91:*5*, 8
 94:*19* 95:*4*, 8, *16*, *20*,
 *24* 96:*6*, *15* 97:*4*, 8,
 *11*, *15* 98:*5*, 8, *14*, *18*,
 *21*, *24* 99:2, 6, 9, *13*,
 *18*, 22, *25* 100:*3*, 6, 9,
 *19*, *25* 101:*20* 103:*23*
 106:*4* 114:*1*, 5, *14*
 158:*4* 203:*19* 204:*1*,
 5 208:*25* 209:*4*, *11*
 235:5, *16* 238:6
 240:*17*
mentioned 12:9 16:5,
 *20* 17:*12*, 22 19:*11*,
 *18*, 22 20:7 21:*1*
 24:5 25:*21* 26:4
 35:*19* 48:*20* 63:*1*
 80:*3* 82:*25* 83:*15*, *19*
 84:*15* 85:*1*, *21* 86:*13*
 89:*11* 93:*14* 96:*14*,
 22 97:2, *19*, *25* 99:*20*
 103:5 104:5 105:7
 106:*1* 112:8 118:7
 139:*19* 151:*10*, *23*
 154:*11* 155:5 157:6,
 *24* 158:7, *14* 162:*15*
 170:*13*, *20*, *24* 171:7,
 *25* 178:*16* 179:8, *10*
 190:7 195:*20* 202:*25*
 204:*13* 251:*3*

**mentioning** 91:*10*
103:*16* 233:*10*, *17*, *20*
253:*11*

**mentions** 233:7
239:*6*, *20*

**met** 32:*16*

**Mexican** 36:7

**mic** 200:22

**Michael** 14:*13*

**Mid** 7:*21*

**MIDDLE** 1:*8*

**military** 100:*10*
171:*16*

**mind** 49:*10* 124:*5*
216:*20*

**mine** 227:*11*, *21*

**minimum** 57:*11*

**minutes** 39:7

**Mischaracterization**
38:*19* 50:*19* 205:9

**mission** 15:*19* 19:*12*,
*13* 20:2, *25* 30:*24*
31:*3*, *18* 178:*25*
179:*11* 180:4, *5*
187:*3*, *11*, *13*, *22*
188:*4* 214:*13*, *16*, *21*
235:*4*, *9*, *12* 236:*1*, *20*
237:*4*, *9*, *16*, *17*, *21*
238:*5*, *8*, *10* 241:*19*

**Mission's** 179:*14*
185:22 186:*8*, *14*, *17*
187:*1* 188:*16* 189:*21*
207:*23* 236:*4*, *11*, *12*,
*16*

**Mm-hmm** 42:*9* 77:*4*

**Mohsen** 188:*13*
232:*15*

**moment** 30:*9* 115:*25*
116:*14* 121:*3* 137:*1*
252:*1*

**Momodou** 141:*19*

**money** 36:*19*

**month** 153:*11*
172:*15* 177:*8*

**morning** 6:*17*

**motion** 144:7

**move** 19:*9* 143:*13*
145:*1*

**multiple** 74:*10*

126:*18*

**< N >**

**name** 5:*12*, *19*, *21*, *23*,
*25* 7:*14* 11:25 13:5
14:*14* 15:*24* 28:*13*,
*17* 34:*17* 62:*3*
141:*19* 152:*4*, *7*
183:*12* 184:*8* 188:*3*,
*5*, *9*, *15*, *17*, *25* 189:*9*,
*15* 202:*9* 213:*9*, *17*,
*21* 254:*1*

**named** 141:*16*
144:*17* 149:*14*
151:*23* 179:*12*
193:*13*

**names** 13:*16* 14:*9*
15:22 29:*10* 35:*8*
51:*18* 52:*14*, *16*
102:*1*, *6*, *8*, *12*, *16*, *17*,
*22*, *23*, *24* 103:*15*, *18*
118:*8*, *10* 151:*4*
172:*13* 177:7, *10*
178:*15*, *21*, *24* 179:*1*,
*9*, *10*, *13*, *16* 180:*1*, *3*,
*7*, *9*, *13* 181:*16*
182:*11*, *17*, *22* 183:*10*,
*24* 186:*12*, *24* 187:*9*,
*10*, *14*, *18*, *23* 189:*20*
190:*3* 200:*15* 202:*15*
237:*14*

**NANCY** 3:*17* 5:25
255:*12*

**Nancy.safavi@usdoj.g
ov** 3:*18*

**narrow** 55:*12*

**narrowed** 215:25

**National** 16:*12* 21:*4*
24:*15* 26:25 27:*1*, *14*,
*16* 28:*5*, *21* 29:7
30:*21*, *25* 31:*10*, *11*
33:7, *20* 35:*16*, *20*, *23*,
*25* 36:*10*, *21* 37:*3*, *12*
46:*2*, *17* 47:*1* 53:*4*
55:*23*, *25* 58:*5* 60:*6*
62:*6* 77:*5* 84:*21*
89:*4* 105:*2*, *11* 106:*9*,
*12*, *20* 107:*3*, *13*, *20*,
*25* 108:*9*, *18* 109:*2*, *3*,
*6*, *12*, *22* 110:*5*, *13*, *24*

120:*9* 123:*14* 127:*1*
135:*18* 166:*20*
184:22 185:*15*
191:*21* 192:*3*, *7*, *11*,
*18*, *22* 193:*4* 197:*10*,
*18* 198:*12*, *16*, *18*, *23*
199:*9* 200:*14* 202:*1*,
*8*, *14* 207:8 211:7
216:*4*, *19*, *22* 222:*3*
239:*9*, *12*, *16* 246:*24*
247:*4*

**nationality** 214:*1*
221:8

**natural** 29:7

**Naturalization** 89:*14*,
*17*

**nature** 48:2, *15*, *17*

**necessarily** 56:*13*
59:*12* 164:*25*

**need** 7:2 30:*9* 48:*9*
90:*1*, *2* 134:*17*
141:*15*, *21* 176:*20*, *21*
200:*24* 205:7 224:*16*

**needed** 114:2 150:*5*,
*12*

**needs** 121:*21* 220:*5*

**negative** 101:*4*

**negotiator** 95:*25*
96:7

**neither** 256:*10*

**network** 34:*11* 69:*3*,
*8*, *18*

**networks** 11:*14* 12:8
19:*15* 69:*20*

**never** 60:*8* 76:*9*

**nevertheless** 250:*5*

**NEVINS** 3:*11* 5:*23*

**NEW** 1:*5* 3:*4*, *9*
106:*5* 113:*3*, *12*, *24*
114:*6*, *15* 115:*3*, *10*,
*19* 116:*19*, *23* 132:*21*,
*22* 206:*12*, *19*, *25*
207:*15*

**newspaper** 240:*21*
245:22 246:*14* 247:*4*
248:*13* 250:*17*, *22*

**nice** 85:*8*

**No._____Change**
258:*3*, *6*, *7*, *9*, *10*, *12*,
*13*, *14*, *17*, *18*, *20*, *21*,

*23*, *24* 259:*1*, *2*, *4*, *5*, *7*,
*8*, *9*, *12*, *13*, *15*, *16*, *18*,
*20*, *21*, *23*, *24* 260:*1*, *2*,
*3*, *6*, *7*, *9*, *10*, *12*

**No._____Line** 258:*3*,
*6*, *7*, *9*, *10*, *12*, *13*, *14*,
*17*, *18*, *20*, *21*, *23*, *24*
259:*1*, *2*, *4*, *5*, *7*, *8*, *9*,
*12*, *13*, *15*, *16*, *18*, *20*,
*21*, *23*, *24* 260:*1*, *2*, *3*,
*6*, *7*, *9*, *10*, *12*

**nodded** 83:*25*

**NOEM** 1:*11*

**noncitizen** 70:*17*
228:*13*, *21* 230:*1*, *8*,
*14* 247:*19*, *22* 248:*5*

**noncitizens** 32:*20*, *23*
33:*4*, *11*, *20*, *23*
123:*21* 124:*15*
125:*21* 126:*6* 127:*2*,
*9*, *25* 128:*11*, *20*, *25*
129:*3* 130:*6*, *13*
131:*24*

**noncitizen's** 57:*15*, *22*
58:22

**noncriminal** 16:*13*
17:*1* 18:*16*, *19*

**normal** 132:*24*

**Northwest** 5:*12*

**notarial** 256:*14*

**Notary** 2:6

**note** 236:*4*

**noted** 100:*13*

**notes** 243:7 257:*16*

**Notice** 227:*5*, *10*, *14*
230:*2*, *14*

**Notices** 227:*17*

**notification** 122:7
221:*4*, *16* 222:*1*

**notified** 59:*11*, *13*
60:*18*, *22* 132:*20*

**notify** 59:*23* 242:*9*,
*16*

**NSD** 53:*4* 56:*10*
104:*17* 166:*19* 197:*2*,
*3*

**number** 81:*24* 82:*4*,
*5* 119:*1*, *4* 120:*23*
121:*1* 132:*16* 178:*1*
220:*19*

**numbers** 219:*21*
220:*15*

**< O >**
**oath** 7:*17* 257:7
260:*19*
**object** 28:4 38:*19*
145:*1*
**Objection** 12:*19*
13:*14* 16:*15* 17:*19*
18:*17, 23, 24* 20:9
21:7, *13* 22:2, *15, 22*
23:6 24:23 25:5
26:*12* 27:4, *19* 28:7,
*15* 29:*13, 25* 30:8, *9,
18, 19* 31:4, *24* 32:7,
*21* 33:5, *13, 14, 25*
34:*1, 8, 9, 23* 35:*13,
14* 36:22 37:5, *13*
38:7, *18* 39:*21, 22*
40:6, 7, *19* 41:4, *20*
42:*1* 43:*1, 12, 13*
44:*1, 2, 20, 21* 45:*10,
18, 19, 25* 46:7, *22*
47:*12, 21* 48:3 49:*16*
50:5, *18, 22* 52:*1*
53:*10, 25* 55:5 56:4,
7, *24, 25* 57:8, *9, 16,
19, 24* 58:*11, 24*
59:25 60:*21* 63:9, *10,
23* 64:8 65:*11* 66:7,
8 67:*10* 68:*12, 23*
69:*10, 11, 25* 70:*12*
71:6, *12, 13* 72:7
73:*1, 2, 9, 18* 74:*16*
75:*12* 77:*21* 78:6, *21*
79:9, *14* 80:7 81:*1,
14, 15* 82:2, *16* 83:6
87:5, *16, 17* 88:2, *9*
89:*23* 90:*12, 13, 25*
91:*1, 17* 92:6, *21*
93:8, *15* 94:4, *11, 21*
95:*10, 11* 96:2, *9*
98:*15* 100:*14, 21*
101:6 102:2, *3, 14, 25*
103:6, *25* 106:*16, 24*
107:6, *15* 108:2, *19*
109:*15, 24* 110:8, *19,
20* 111:*23* 112:4, *15*
113:*4, 13* 114:*11*

115:*4, 12, 13* 116:*15,
24* 117:*7, 17* 119:*14*
121:*20* 123:*23* 124:*4,
16* 125:*23* 126:9
127:5, *11* 128:*13*
129:7, *16* 130:7, *15,
23* 131:*12, 13* 132:*1,
18, 19* 133:6 134:*15*
136:5 137:*24* 138:8
139:5 140:6, *20*
141:*13, 14* 143:*20*
144:3, *8* 146:5, *24*
147:7 148:6, 7 149:8,
*18* 150:7, *13* 152:*18,
25* 153:9, *18* 154:4, *5,
17, 18, 25* 155:*10, 11,
18* 156:*1, 18* 157:*3,
13* 158:8, 9, *25* 159:*1,
19, 20* 160:*17* 162:5,
*24* 163:9, *23* 164:*3,
15* 165:5 166:*10, 22,
23* 167:*7, 25* 168:*9,
24* 169:*19* 170:2
171:*4* 173:*3, 13*
174:16 175:*18, 24*
176:6 177:*11, 17*
178:*17* 179:*3, 4, 20*
180:*20, 21, 23* 181:8,
*21* 182:*14* 183:*19*
184:*3, 14* 185:*23*
186:9 190:*12, 13, 14*
191:2, *22* 192:*13, 20*
193:5 194:*3, 17*
195:5, *6* 196:*11, 12*
197:*12, 21* 198:*25*
199:*18, 19* 200:2, *17,
24* 201:*1, 16, 17*
202:*3* 203:*1, 17*
204:*17* 205:*4, 8, 23,
24* 206:*13, 20* 207:*1*
208:9 209:*7, 19, 20*
210:8, *16, 25* 211:*13,
21* 212:*7, 21* 213:*6,
11, 22* 214:7 215:*4,
17* 216:*2, 12, 13, 14*
217:*3, 10, 25* 218:*1,
14, 15* 219:9, *11*
221:*1* 222:5, *6, 19*
223:*15* 226:*15* 228:9,
*22* 229:*13, 14* 230:*4,

10, 17* 231:*23* 233:*3*
234:2, *16* 236:6, *18*
237:6, *11, 19* 238:*13*
239:*24* 240:9, *14*
241:*4, 13* 242:*4, 12,
19, 20* 243:*13, 14, 25*
244:*1, 10, 25* 245:7,
*24* 246:*19* 247:6, 7,
*25* 248:8, *15, 16*
249:*14* 250:*19*
253:*22* 254:2, *3, 10*
**objections** 143:*16*
257:9
**objective** 210:2
**objectives** 114:5
**obstructing** 93:*17*
**obstruction** 88:*11*
**obtained** 132:22
**obtaining** 11:9
**obviously** 199:8
**occasion** 207:*18*
**occasions** 61:4 63:*3*
247:*13*
**occur** 111:*18*
**occurred** 153:8 168:6
**October** 159:*11*
171:*13*
**OES** 47:8
**offense** 244:*19*
248:*12*
**offenses** 17:5 151:*1*
**offer** 169:25 260:*18*
**offered** 170:5
**Office** 10:22 11:*16,
19* 12:*11, 15* 13:2, 8,
12* 15:6, 7, 9 17:*13*
19:*4, 12, 19, 24* 23:*3,
9, 16* 24:*13, 17, 20*
25:2, 8 26:5, *23, 24*
29:*18, 21* 38:2 42:*23*
43:8, *18, 24* 44:9, *17*
45:*15* 46:*14* 47:6
48:*21* 49:*12, 19, 25*
50:*1, 9, 15, 25* 51:*3, 6,
20* 52:5 54:*10, 13, 14,
16, 18, 20, 21* 56:*1*
59:*4, 11, 22, 23* 60:*3,
17* 61:*3* 65:4 67:6,
*13, 18* 73:6 75:9, *19*
76:7 77:16 101:24

102:9 107:*23* 108:7
109:*21* 110:*4* 114:22,
*24, 25* 115:*10* 116:22
117:*16* 118:*23* 119:*1,
10, 18, 24* 120:2
132:*14* 133:2 139:*24*
140:*14* 141:5 142:*15,
20* 145:*10, 17, 21*
146:2 147:*19, 24*
148:*4* 154:22 160:7,
*15* 161:*22* 163:*18*
164:*1, 9* 165:2, *12*
166:2, 7 167:*4, 10, 22*
168:*21* 169:*14*
172:*13, 18* 174:25
175:*10* 177:*15, 23*
178:*3, 4, 5, 7, 10*
183:6, *9, 13, 15, 22*
184:*1, 25* 185:*19*
186:2, *5, 13, 15, 19, 25*
187:*16, 19, 25* 188:*11,
21* 189:6, *11* 190:*10,
24* 191:*15, 19* 195:25
196:9 197:8, *17*
199:*16* 207:5, *17, 19*
210:5, *11, 19* 211:2,
*19* 212:*3* 219:7
223:*20* 227:9, *24*
228:*1, 4, 14* 231:*13,
17* 234:*19, 25* 237:*15*
243:*2* 248:*20* 249:*13*
250:6
**officer** 14:*20* 256:*3*
**offices** 12:*11* 24:*18*
229:*17*
**official** 1:*10, 11, 12,
14* 11:*19* 13:*19*
191:*14* 192:9, *16*
193:2 207:*17* 239:*3*
249:*13* 250:6 256:*25*
**officials** 13:*12*
174:*20* 190:*23*
191:*18* 193:*12, 23*
200:7 243:*4*
**Off-the-record** 118:*3*
**OGC** 6:7
**Oh** 20:*16* 67:*23*
99:*16* 108:*24* 120:25
121:2 124:*3* 128:*4*
134:*17* 141:25 165:7

198:*3*　199:*23*　200:*23*
252:*3*
**Ok**　67:*23*
**Okay**　10:*8*　13:*20*
17:*25*　19:*10*　26:*16*
28:*1*　29:*12*　30:*9*
50:22　52:*23*　86:*14*
99:*16*　108:*16*　115:22
116:*1, 6, 10, 13, 16, 24*
117:*9*　118:*18*　121:*3,
24*　123:*9*　124:*11*
125:*11, 18*　130:*15*
131:*23*　133:*24*
136:*17*　137:*4, 9, 13*
141:*21, 25*　142:*10*
144:22　151:*12*　161:*5*
163:22　165:*7*　166:*18*
168:*23*　170:*19*
172:*11*　173:*10*
176:*17*　181:*20*
184:*24*　185:*18*
198:*19*　202:*12*
207:*16, 25*　208:*3, 18*
210:*24*　213:*5*　215:*15*
218:*7*　219:*5*　220:*4,
10, 13, 21*　221:*14*
222:*23*　224:*9, 23*
226:*6, 24*　230:*25*
232:*7, 14*　243:*18*
246:*9*　249:*3, 23*
251:*12, 13, 19, 22*
252:*8, 9*
**OKEEMAH**　1:*22*
5:*15*　256:*3, 24*
**once**　118:*10*
**ones**　15:*24*　75:*4*
162:*15*　170:*23*
193:*13*　197:*1*　200:*4*
**ongoing**　171:*13*
241:*23*
**op-ed**　239:*20*　240:*4,
6, 8, 18, 20, 23*　241:*2,
11, 18, 21*　243:*8, 12,
22*　244:22　245:*4, 19,
21*　246:*12, 14*　247:*2,
3*　248:*13*　249:*6*
250:*3, 13, 15, 16, 22,
24*　251:*3*
**open**　26:*17*　45:*4*
74:*15, 21*

**open-source**　139:*25*
140:*15*　141:*6*　142:*16*
**operational**　47:*2*
59:*18*　60:*15*　61:*14*
62:*8, 14, 17, 19*　229:*4*
241:*24*
**operations**　12:*23*
36:*9*　46:*24, 25*　62:*2*
89:*3*　104:*25*　105:*1*
148:*13*
**opinion**　71:*18*　170:*5*
200:*13*
**opinions**　101:*14*
**Opportunity**　8:*12*
135:*10*　137:*12*
**opposed**　8:*19*　67:*8,
15*
**ORAL**　1:*18*　2:*2*
**Order**　4:*11, 12*
70:*11*　84:*19*　85:*1*
91:*9, 11, 12*　106:*1*
120:*8*　121:*16, 19*
122:*2, 4, 7, 11, 18, 22*
123:*1*　126:*1, 5*
127:*17, 19, 20*　133:*11,
16*　134:*7, 10, 14*
135:*12*　138:*7, 22*
139:*4, 9*　141:*5, 8, 10,
11*　142:*14, 17, 22, 25*
145:*8*　156:*16, 25*
167:*12*　255:*8, 13*
**orders**　137:*19, 22*
138:*15*　139:*11*
146:*18, 23*　147:*6, 12,
17, 22*　148:*2*　149:*3,
14, 25*　151:*14, 15*
154:*3, 11, 16*　165:*20*
166:*1, 9, 12, 14, 16, 21*
167:*6, 21*　168:*20*
169:*6*　175:*7, 12, 17,
23*　176:*5*　217:*8*
255:*5*
**ordinary**　69:*14*
228:*12, 20*
**organization**　21:*11*
36:*7*　37:*2*　57:*4, 6*
128:*17*　131:*19*
182:*19*　243:*9, 23*
244:*23*　245:*5*

**organizations**　15:*21*
16:*4*　127:*4, 10*
128:22
**organized**　47:*1*
**outcome**　59:*18*　60:*9,
11*　256:*12*
**outside**　49:*4*　51:*14*
53:*20, 24*　54:*2*　56:*5*
70:*4*　76:*6*　77:*15, 17*
86:*23*　143:*17*　144:*18*
196:*20*
**overlap**　214:*21*
**overseas**　131:*18, 19*
**oversee**　12:*2*
**oversees**　34:*15*
**overstayed**　41:*13*
**Ozturk**　188:*22*
238:*24*　240:*13*
243:*11*　245:*20*
246:*13*
**Ozturk's**　239:*22*

**< P >**
**p.m**　85:*13*　118:*4*
121:*11*　135:*5*　143:*8*
177:*1*　225:*2*　255:22
**PAGE**　4:*3, 10*　123:*8*
126:*16*　219:*20, 21*
220:*14, 19*　224:*1*
226:*7, 9, 25*　227:*2*
230:*21*　232:*4, 21, 22*
238:*20*　251:*7, 10, 23,
24*　258:*3, 6, 7, 9, 10,
12, 13, 14, 17, 18, 20,
21, 23, 24*　259:*1, 2, 4,
5, 7, 8, 9, 12, 13, 15, 16,
18, 20, 21, 23, 24*
260:*1, 2, 3, 6, 7, 9, 10,
12*
**pages**　220:*7, 12*
**Palestine**　83:*15, 19*
85:22　86:*3, 6, 8*　91:*6*
96:*14, 18, 23*　97:*3, 5*
98:*6, 25*　99:*10*　119:*7,
12, 20*　120:*4*　187:*7*
233:25　234:*10*
**panelist**　183:*4*
**Paragraph**　126:*14*
135:*15*　137:*6*　222:*10*

**parameters**　140:*2, 16*
142:24　145:*7, 12*
**part**　27:*13, 15, 16, 17*
28:*3, 4, 5*　46:*5*　53:*6*
59:*1, 9*　60:*7*　106:*7,
19*　107:*14, 21*　111:*2*
112:*11*　123:*1*　125:*1*
129:*12, 21*　130:*19*
133:*4*　145:*19*　153:*16*
154:*21*　165:*17, 24*
183:*7*　191:*10*　202:*20*
226:*21*　227:*12, 16, 19,
22*　228:*6, 12, 19*
229:*11*　236:*13*
242:22　248:*24*　249:*2,
3*
**participation**　41:*24*
223:*1, 10*
**particular**　10:*6*
30:*15*　51:*19*　75:*4*
115:*20*　116:*21*　171:*1*
178:*16*　201:22　228:*2*
**parties**　256:*11*
257:*18*
**partner**　132:*21*
**partners**　178:*11*
**parts**　24:*12*　44:*16*
45:*14*　54:*7*　114:*21*
154:*21*　169:*2*　181:*1*
228:*25*
**patient**　254:22
**Peace**　97:*8*
**penalty**　257:*20*
260:*14*
**pending**　7:*4*　116:*4*
141:24　142:*6*
**people**　23:*4, 10*
32:*25*　51:*6, 8, 11, 14,
18*　52:*15*　67:*8, 15, 25*
70:*7*　117:*6*　147:*14*
151:*23*　153:*5*　195:*15*
**percent**　84:*6, 8*
85:*21, 24*　86:*1*　98:*2*
189:*24, 25*
**percentage**　189:*18,
19, 23*　190:*3*
**peripherally**　248:*14*
**perjury**　257:*20*
260:*14*

permanent 64:*17*, *25*
65:*9*, *16*, *22* 66:*20*
67:*9*, *16* 75:*11* 175:*2*
211:*10*, *12* 228:*8*
person 25:*18* 40:*1*
67:*3* 131:*20* 149:*14*
199:*5* 236:*2*, *23*
personal 8:*18*
personnel 12:*22*
114:*14* 115:*2* 135:*17*
person's 70:*24* 94:*10*
perspective 100:*20*
pertains 204:*23*
PETER 1:*19* 4:*3*
5:*6* 6:*10* 7:*15* 226:*1*
260:*21*
ph 13:*6* 148:*14*
194:*20*
phrase 99:*10*, *14*, *19*
124:*6* 233:*25* 234:*10*
249:*20*
physical 22:*9*, *20*
88:*12*
piece 94:*25*
place 25:*20* 62:*11*
104:*19* 257:*6*
places 178:*16* 179:*9*,
*11*, *13*
plain 198:*8* 204:*20*
plaintiff 141:*16*
Plaintiffs 1:*9* 3:*6*, *12*
5:*20*, *22*, *24* 143:*22*
144:*17*
platform 182:*20*
please 5:*17* 6:*9*, *21*,
*23* 14:*16* 20:*15* 48:*4*
52:*2* 62:*17* 67:*11*
76:*10* 81:*20* 87:*13*
88:*18* 115:*25* 116:*7*
121:*3* 134:*21* 141:*22*
143:*3* 219:*23* 232:*20*,
*23* 236:*7* 239:*19*
255:*6*, *11*
PO 3:*15*
POB 221:*21*
point 104:*15* 158:*13*
231:*18*
points 169:*1*
policies 73:*7* 156:*10*,
*12*

policy 11:*10* 54:*18*
65:*23* 67:*4* 82:*11*
155:*5*, *9*, *21* 156:*5*, *10*,
*17* 157:*1* 170:*24*
203:*11* 209:*6*, *13*, *18*
210:*3*, *7*, *13*, *21* 211:*4*
216:*11* 222:*14*, *15*
political 41:*25* 42:*2*,
*6*, *11*, *16*, *20*
portions 75:*5*
pose 36:*21* 37:*3*, *11*,
*17*, *23* 38:*5* 156:*17*
157:*1* 209:*6*
poses 67:*3* 216:*10*
posing 99:*23*
possibility 208:*25*
209:*5*, *12*, *16*
possible 94:*9* 123:*17*
126:*8*
post-ROA 242:*23*
posts 182:*18*
potential 93:*4* 94:*3*
212:*4* 214:*25* 215:*1*,
*10*, *23* 217:*23* 218:*8*
potentially 54:*15*
65:*23* 211:*14* 222:*13*
247:*14*
powers 228:*23*
precise 81:*23*
prefer 7:*4*
preparation 135:*24*
136:*1*, *4*, *9* 138:*6*
prepare 9:*5* 10:*3*
32:*20* 33:*4*, *10*, *23*
43:*9* 44:*17* 47:*7*
188:*1*, *12*, *22* 189:*7*,
*12* 231:*14*
prepared 33:*19*
209:*16* 252:*15*
253:*19*
prepares 43:*19*, *25*
44:*9* 48:*21* 49:*13*, *20*
59:*5* 60:*4*
preparing 147:*21*
148:*1*
presence 65:*22*
PRESENT 3:*20*
88:*23* 89:*1*, *8* 126:*21*
144:*24* 151:*7* 168:*7*,
*18* 209:*25* 247:*4*

President 1:*14*
137:*18*, *22* 138:*15*
presidential 181:*9*
press 4:*13* 136:*22*
138:*2*, *4*, *10*, *13*
presume 252:*20*
Previously 226:*2*
Primarily 11:*13*
principles 126:*24*
129:*6*, *15*
prior 14:*17* 32:*19*
39:*14* 40:*3*, *16* 42:*9*,
*14* 57:*14*, *21* 58:*7*
64:*16* 65:*8*, *14*, *19*, *25*
149:*1*
privilege 12:*21*
20:*12* 22:*3*, *23* 26:*12*
27:*7*, *22* 28:*10* 30:*10*,
*12* 31:*7*, *8* 34:*1*
43:*14* 44:*2* 63:*13*
66:*10* 87:*18* 102:*3*
110:*21* 115:*13* 146:*6*
148:*8* 154:*6* 157:*16*,
*17* 159:*1* 166:*24*
179:*5* 181:*9* 190:*13*
191:*3* 194:*6* 195:*7*
199:*20* 201:*4* 203:*4*
205:*25* 209:*24*
211:*15* 218:*1* 247:*8*
248:*17*
Privileged 20:*9*, *17*
22:*6*, *25* 26:*15* 29:*15*
39:*24* 47:*14* 57:*1*
63:*11* 102:*4* 115:*5*
130:*24* 131:*16*
153:*19*, *22* 158:*11*
159:*3* 180:*25* 181:*8*,
*13* 191:*6* 195:*9*
201:*19* 206:*2* 209:*21*
212:*10* 218:*16*
229:*15*
privileges 87:*18*
90:*13* 159:*22* 200:*20*
proactively 139:*25*
140:*15* 141:*6* 142:*15*
probably 57:*12* 86:*9*
89:*7* 104:*6* 170:*17*
240:*22*
problem 125:*1*

procedures 11:*10*
74:*20*, *24* 230:*19*
Proceedings 225:*2*
257:*5*
process 9:*3* 22:*6*
31:*7* 104:*15* 105:*8*, *9*
106:*5*, *7*, *19* 107:*14*,
*21* 111:*3* 112:*11*, *25*
113:*3*, *10*, *12*, *18*, *24*
114:*6*, *10*, *15* 115:*3*,
*11*, *21* 116:*21*, *23*
117:*14*, *15* 130:*19*, *22*
131:*5*, *10*, *11*, *24*
133:*4*, *10* 157:*16*
191:*3* 194:*5* 197:*4*
200:*10* 202:*20* 203:*4*
205:*25* 206:*25* 207:*3*,
*5*, *12*, *19* 209:*24*
211:*6*, *15* 238:*15*, *17*
239:*15* 242:*23*
produce 45:*16* 53:*19*
72:*6* 73:*14*, *22* 81:*6*
86:*21* 133:*3* 146:*9*
149:*20* 150:*17* 151:*8*,
*19* 154:*23*
produced 24:*20* 25:*2*
60:*20* 61:*3* 68:*3*
113:*21* 154:*15*
184:*19*, *22* 187:*4*
197:*1*, *8*, *17* 198:*11*
199:*15* 205:*17*
219:*16* 223:*19* 224:*7*
252:*25* 253:*7*
produces 50:*2*
producing 194:*8*
236:*3*, *9*
production 204:*24*
professional 14:*17*
PROFESSORS 1:*3*, *5*
5:*7*
PROFESSORS-
AMERICAN 1:*7*
PROFESSORS-
HARVARD 1:*4*
profile 224:*4* 241:*19*
Program 11:*5* 16:*3*,
*6*, *7*, *11* 19:*25* 25:*12*,
*22*, *23* 26:*2*, *7* 51:*20*
52:*7* 53:*2* 77:*13*

135:*19*, *21*  167:*20*
168:*18*  194:*16*  227:*9*
**programmed**  20:*24*
**Programs**  11:*7*
19:*23*  20:*5*  44:*13*
45:*20*, *21*, *24*  46:*6*, *8*,
*12*, *15*, *21*
**pro-Hamas**  158:*14*,
*20*, *24*  159:*6*, *9*, *18*
160:*3*, *9*, *16*  161:*3*, *7*,
*10*  162:*8*, *14*  163:*8*,
*13*  164:*2*, *8*, *11*, *12*, *14*,
*22*, *24*  165:*4*, *14*
**prohibiting**  137:*19*, *23*
**pro-Israel**  101:*11*
**project**  190:*21*
194:*24*  195:*4*
**promotes**  253:*4*
**promptly**  123:*15*
**propaganda**  253:*4*
**pro-Palestinian**  98:*9*,
*11*  233:*2*, *7*, *10*
**property**  16:*1*
**propounded**  257:*9*
**Protecting**  84:*20*
120:*8*
**Protection**  32:*9*
**Protective**  12:*16*, *17*
**protest**  42:*3*, *6*, *12*
212:*13*
**protester**  76:*21*
93:*11*  106:*15*  107:*25*
108:*9*  110:*25*  184:*7*,
*17*  185:*1*, *5*  186:*7*
205:*17*  211:*8*, *20*
212:*6*  213:*9*, *17*
214:*5*, *23*  215:*12*
218:*7*, *10*, *13*
**protesters**  76:*24*
79:*8*, *13*, *20*  80:*4*, *17*
81:*7*, *11*, *25*  83:*4*, *14*
84:*14*, *18*, *25*  85:*19*
86:*22*  87:*3*, *15*, *20*, *25*
88:*17*, *21*  89:*20*, *22*
90:*3*  91:*14*, *22*, *25*
92:*4*  94:*8*, *19*  95:*24*
96:*6*, *13*  97:*19*  98:*2*,
*5*  101:*10*, *25*  102:*9*
103:*12*, *20*  104:*13*
107:*11*, *13*, *20*  108:*17*

109:*1*, *21*  110:*4*
112:*9*  118:*8*, *15*
119:*1*  151:*5*  152:*24*
153:*8*, *15*  154:*15*, *24*
156:*15*, *24*  157:*8*
160:*5*  165:*18*, *25*
171:*20*  172:*13*  175:*1*
177:*7*, *23*  178:*23*
181:*6*, *18*  182:*2*, *8*, *12*
183:*13*, *16*, *23*  184:*2*,
*11*  185:*14*, *20*  186:*4*,
*16*, *21*  187:*10*  189:*20*
197:*9*, *17*  198:*11*, *21*
199:*17*  206:*11*, *18*
207:*7*, *9*  215:*3*, *14*
216:*1*  217:*2*, *17*, *22*
**protester's**  95:*4*, *8*, *16*,
*20*  96:*7*  100:*19*, *25*
101:*13*, *16*
**protestor**  226:*14*
234:*14*, *20*  236:*10*
238:*12*  242:*11*, *18*
254:*9*, *16*
**protestors**  79:*16*
**protests**  41:*25*  42:*20*
119:*4*, *6*, *12*, *20*  120:*4*
149:*21*  151:*9*  169:*9*,
*10*, *17*, *18*, *21*  170:*6*
171:*12*, *15*, *19*  172:*9*,
*23*  173:*2*, *12*  213:*25*
214:*5*  223:*2*, *12*
233:*2*, *7*, *10*
**provide**  7:*12*  24:*11*,
*14*  102:*1*, *8*  114:*8*
120:*12*  149:*24*
150:*11*, *22*, *25*  151:*13*,
*17*  153:*13*  157:*19*
162:*4*, *13*  163:*25*
194:*15*  200:*13*
**provided**  9:*16*, *25*
24:*1*, *6*  102:*17*, *22*
103:*18*  118:*8*  149:*15*
151:*4*, *21*  160:*14*
161:*22*  162:*17*  163:*3*,
*12*, *17*  167:*5*, *11*, *15*
181:*17*  182:*2*, *7*
183:*24*  186:*12*
189:*21*  193:*8*, *9*, *24*
194:*23*  195:*3*  199:*7*

220:*9*  222:*25*  223:*9*,
*14*  239:*9*  252:*11*
**Provides**  59:*7*
**providing**  8:*23*  65:*6*
103:*14*
**provisions**  49:*9*  90:*8*
216:*8*, *20*
**Public**  2:*6*  84:*21*
95:*20*  120:*10*  182:*23*
183:*2*  216:*5*, *19*, *23*
246:*24*
**publication**  250:*16*
**published**  94:*25*
122:*4*, *5*  240:*21*
245:*22*  246:*14*  247:*3*
**pulled**  180:*7*
**purpose**  33:*3*  68:*6*
143:*20*  169:*9*, *16*
171:*11*
**pursuant**  2:*4*  123:*21*
124:*15*  125:*21*  126:*6*
222:*10*
**purview**  139:*15*
**put**  88:*21*  228:*17*
244:*19*  245:*10*
247:*13*  257:*7*
**putting**  217:*20*

**< Q >**
**qualifies**  158:*20*, *24*
160:*9*
**qualify**  159:*9*, *18*
163:*7*
**question**  6:*22*, *25*
7:*3*, *4*  13:*21*  16:*23*,
*24*  17:*20*  19:*2*  20:*11*,
*20*  22:*4*, *18*, *24*  26:*14*
27:*5*, *20*, *24*  28:*8*
29:*14*  30:*1*, *11*  31:*25*
33:*22*  42:*8*  44:*7*
48:*4*, *7*, *10*  50:*13*
54:*10*  55:*10*  70:*14*
73:*23*  82:*21*  85:*23*
90:*15*  96:*3*  112:*11*
115:*18*  116:*4*, *19*
117:*1*, *5*, *11*, *19*  124:*2*,
*13*, *20*, *24*  125:*19*
126:*5*  127:*13*, *17*, *24*
128:*3*  131:*2*  140:*18*
141:*11*, *23*  142:*1*, *3*, *6*,

9  144:*4*, *7*  145:*10*
147:*13*  149:*16*
150:*11*  154:*7*  156:*2*
157:*14*  159:*2*  162:*13*
163:*24*  169:*2*  170:*1*
181:*12*  186:*14*  191:*4*
196:*6*  197:*25*  198:*9*
199:*22*, *25*  200:*19*
201:*2*, *18*  202:*4*, *11*,
*12*  203:*3*  206:*1*
209:*22*  212:*9*  218:*5*
228:*19*  234:*8*  235:*7*
237:*16*  241:*10*
243:*17*, *21*  245:*14*
246:*4*  248:*2*  249:*4*,
*20*, *22*, *24*  252:*4*
**question-and-answer**
145:*2*
**questions**  6:*18*  7:*6*
10:*6*, *9*  143:*14*
166:*15*  220:*12*
254:*25*  257:*9*
**quickly**  114:*2*  150:*1*,
*6*, *10*, *12*, *17*
**quotation**  123:*6*
**Quote**  126:*16*, *19*
137:*18*  139:*23*
142:*13*  143:*25*  239:*6*,
*7*  252:*13*, *14*, *17*, *23*,
*24*  253:*3*, *6*, *10*, *11*
**quoted**  123:*3*  143:*15*
**quotes**  252:*10*
**quoting**  126:*15*

**< R >**
**ramifications**  210:*3*
**RAMYA**  3:*10*  5:*19*
**Ramya.krishnan@kni**
**ghtcolumbia.org**  3:*11*
**range**  215:*24*
**rare**  207:*11*
**RASSON**  3:*20*  5:*13*
**RAVEN**  73:*4*
**Read**  76:*11*, *12*, *14*,
*16*, *19*, *23*  85:*20*
101:*10*  116:*3*  122:*3*
123:*1*, *2*, *11*, *16*  124:*9*
126:*16*, *19*  127:*21*
134:*12*, *16*, *18*, *20*
135:*10*  137:*8*, *11*, *12*,

Case 1:25-cv-10685-WGY    Document 186-1    Filed 07/07/25    Page 842 of 863
Deposition of Peter Hatch
AAUP, et al. v. Rubio, et al.

16 138:9, 14 139:3,
21, 23 140:12, 13
141:4 142:13 160:5
193:1, 2 196:21, 25
197:1 198:12 199:8
200:7 201:24 202:13
221:15 222:10, 24
223:5 224:1, 3
232:23, 25 240:6, 7,
12, 15 251:24 252:6,
9 260:15, 16
**reading** 83:2 123:15
124:5, 7 137:5, 7
223:4 256:9
**realize** 67:24
**reallocated** 115:3
**really** 36:2 214:24
**reason** 7:11 33:12,
16, 24 41:9 80:25
87:3 88:1 89:22
106:5 193:23 194:2
258:5, 7, 8, 10, 11, 13,
14, 16, 18, 19, 21, 22,
24 259:2, 3, 5, 6, 8, 9,
11, 13, 14, 16, 17, 19,
21, 22, 24 260:2, 3, 5,
7, 8, 10, 11, 13
**recall** 63:3 79:23
83:2, 3, 13 84:13, 16,
17, 24 90:9, 19 91:2,
10 93:10, 23 94:19
96:10, 12, 21, 24
97:17 101:2, 9, 22
103:15 105:24 106:3,
6 112:17, 23 125:5
153:4, 23 154:10, 19
155:13 156:13, 22
170:22 188:5, 9, 17,
24 189:2, 4, 10
201:20 203:7, 13, 22
204:7 208:21 213:1,
4, 24 214:2 226:17,
23 233:1, 6 240:23,
25 241:2, 11, 15
**recalled** 97:1
**receive** 53:7 86:14
119:10, 18, 23 120:1,
5 122:6 149:7 178:1
**received** 86:19, 21
88:16 102:19 112:9

146:16, 21 147:4, 11,
20, 25 148:5 149:2,
13 160:8 172:12
177:7 178:22 187:11
210:6, 12, 17
**receives** 106:14, 22
**recipient** 163:4
**recognize** 220:25
**recollection** 167:24
168:5 169:8
**recommend** 57:22
59:21
**recommendation**
59:24 66:15, 19
**recommendations**
66:6, 12
**recommended** 58:22
**Record** 4:14 5:3, 18
7:14 39:9, 12 68:8
85:12, 15 121:7, 10,
13 134:24 135:1, 3, 7
143:6, 11 145:4
176:24 177:4 219:16
220:8 224:24 225:1
226:5 227:1 230:24
232:6 238:21 251:8
252:3 253:15, 18, 21
255:3, 4 256:6
**recorded** 5:5 257:11
**records** 68:4
**redacted** 221:19, 20
223:1, 11
**reduced** 88:17
111:16 256:8
**refer** 25:9, 25 26:5,
17 58:8 65:9 77:10,
19 78:3, 14, 20 82:10,
14, 18 107:24 108:8
131:11 155:23 201:7
202:21 222:3 223:14
239:8 252:12
**reference** 72:10, 18
203:11, 14 208:20
224:11 232:15
251:19
**referenced** 253:25
**referrals** 206:6
**referred** 65:15 76:6
77:2, 3, 5, 8 78:11
79:5 83:5, 11 84:19

107:13, 20 109:1, 12,
22 110:5 191:20
195:25 196:9 197:3,
11, 20 198:17 200:5
240:4
**referring** 27:3 52:10
53:3 61:16 141:16
146:13 155:25 156:8,
13, 23 171:12 179:22,
24 196:14
**refers** 138:21 141:10
166:14 233:2 242:2
**reflect** 227:1
**refresh** 167:24
**refreshes** 168:4
**regarding** 63:10
115:5 146:6 154:5
175:11 222:25
223:10 229:15 247:8
**region** 46:3
**regularly** 32:6 45:15
**relate** 17:17 18:1, 5,
6 23:23 211:25
**related** 20:2, 8, 25
21:2 30:20 81:25
156:11 157:12 158:1
170:15 187:6 216:22
244:18 256:10
**relates** 149:21
**relating** 216:4, 18
231:8
**relation** 17:4 51:24
52:6 53:8, 23 55:2,
16
**relative** 257:17
**release** 4:13 136:23
138:4, 13
**releases** 138:2, 10
**relevance** 30:1 57:8,
9 69:10 246:23
**relevant** 21:25 26:20
92:16, 25 183:5
212:4, 20 213:2
217:8, 23 218:9
228:1, 14 244:24
245:6, 10, 11, 22
246:15 247:14, 15, 23
248:6, 14, 25 249:6
250:3, 8, 17, 25 251:4

**relieve** 224:19
**remaining** 224:17
**remarks** 101:4
**remember** 19:8
28:16 73:3 89:7
98:11 112:19 162:22
169:5 170:18 207:19
**remind** 148:22
177:22
**REMOTE** 1:18 2:1
**Removability** 221:4
**removable** 50:3
**removed** 66:20
**removing** 92:1
**Repeat** 10:18 17:20
20:20 44:7 48:4
49:17 50:13 64:22
82:21 90:15 96:3
107:16 124:24 142:3,
9 168:14 196:6
200:24 202:10 204:3
213:13 234:7 241:10
252:4
**repeated** 116:7
**rephrase** 6:23 42:7
68:13 73:19 78:7, 8
92:22 94:5 95:13
100:22 101:7 103:8
104:2 107:17 111:25
112:6 113:6, 15
114:12 119:15
123:24 124:17 127:6
147:8 150:8 156:2,
19 163:10 165:8
167:8 168:1 171:5
175:19 177:12
178:19 181:23
183:20 185:24
186:10 191:23
192:14, 23 197:13, 22
203:18 206:14 209:8
213:13 216:16
223:16 228:10
230:11 233:4 234:7,
17 236:7 237:7
240:10 242:13
244:11 245:1
**report** 11:22 35:4, 5
43:9, 19, 25 44:10, 18
45:16 48:22 59:5, 6,

10, 22   60:4, 5   66:14,
18, 22   67:1, 19   68:2,
6, 11, 16, 21   69:1, 2, 5,
8, 16, 21   70:3, 6, 17
71:10, 17, 20, 25   72:4,
6, 9   73:8, 14, 23
75:10, 21, 25   76:3, 14,
16, 19   77:10, 19, 24
78:3, 11, 14, 15, 20
79:19   86:22   87:14,
24   88:16   89:20
101:9   106:14, 23
107:24   108:8, 11
109:8, 18   110:13, 17
111:2   112:10   113:23
132:9   133:3   135:24
136:1, 4, 10   138:6
146:10   164:17, 18, 22
188:1, 12, 22   189:7,
12   190:8, 25   192:1
194:12   198:22   199:3,
15   201:11, 21   205:16
211:7   212:16, 24
219:13   223:19   224:7
226:13   231:14
232:17   233:1, 6, 16
234:24   235:24   236:3,
9, 13, 17, 24   238:11
239:23   240:1   244:4,
17, 19   245:20   246:13
252:15, 25   253:7, 16,
19

**REPORTED**   1:21, 22
**Reporter**   2:5   5:14
6:9, 20   10:16   20:14,
18   28:23   39:18
54:11   62:16   79:17
81:17, 19   83:24
89:16   96:15   99:15
111:8   114:23   122:12
135:20   148:16
152:12   161:25   176:9
178:6, 9   179:18
191:9   196:16   204:10
210:14   211:11   215:5,
15, 19   218:11   221:6
223:3   224:15, 17
241:6   255:5, 9, 17, 20
256:25   257:4

**Reporting**   5:13, 16
60:15   208:16
**reports**   13:3, 8, 24
35:2   47:7   49:13, 20,
23   50:2   53:19   60:19
61:2, 12   66:5   69:1,
17, 23   70:16   75:6
76:5, 12, 23   77:1
79:8, 12   80:4, 17
81:6, 9, 10, 24   82:10,
13, 22   83:4, 14   84:14,
18, 25   85:18, 21
86:10, 15   87:2   88:20,
24   90:2   91:13, 21, 24
92:3, 15, 19, 24   93:3,
14   94:1, 7, 18   95:3, 7,
15, 19, 23   96:5, 13, 22
97:1, 7, 10, 14, 18
98:1, 4, 13   100:13, 18,
24   101:3, 15, 19
107:10, 12, 19   108:17,
25   109:11, 20   110:3
113:20   114:2, 8
130:18   147:21   148:1
149:20   151:8, 18
152:23   153:14   154:2,
14, 23   157:7, 12
158:2   160:4   165:3,
13, 18, 24   172:18
174:24   191:16, 20
192:6, 10, 17   193:3,
24   195:24   196:8
197:7, 16   198:10
199:14   201:24
202:13   205:20   207:7
208:3, 12, 14, 18, 23
209:3, 10, 15   213:3
233:9, 19
**represent**   5:20, 22, 24
6:1   8:18
**representative**   6:7
**represented**   174:6
**representing**   6:5
139:22   140:25   141:9
168:12
**request**   53:7   57:15
67:2   80:16, 25   86:15,
21   118:14   119:10
144:4   145:18   154:23
239:7, 19

**requested**   43:9   56:2,
11, 15   59:10   65:20
87:2   88:24   153:19
242:6, 8, 15   256:9
257:14
**requests**   51:23   52:4
53:2, 19, 22   54:8
55:1, 15   66:23   88:15,
19, 21   119:18
**required**   59:17
154:15
**requires**   135:23
**research**   24:1, 6, 14,
20   25:2, 4, 10, 16
26:6   31:14, 18, 23
32:20   33:4, 11, 19, 23
43:5   51:23   52:5
53:8, 22   55:1, 15
56:1, 11, 15   65:6
68:4, 9, 18   87:20
101:25   102:10
103:12   118:14   119:2,
11, 19   120:3   145:22
146:3   151:5   152:1
157:19   172:14
177:16, 24   184:6, 12
185:20   186:4   211:19
213:18   218:10
238:16, 18
**researched**   56:23
118:9   156:15, 24
181:7, 19   182:8
183:16, 23   186:6
**researches**   145:17
207:6
**researching**   184:13
234:13, 20   235:23
**reside**   45:24
**resident**   65:10, 16, 22
66:20   75:11   211:10,
12   228:8
**residents**   64:17, 25
67:9, 16   175:2
221:21
**resources**   11:9
**respond**   145:1   241:7,
9
**responded**   20:24
**respondent**   143:13

**Respondents**   6:1
**responds**   29:5
**response**   10:15   29:6
30:6, 14   147:21
148:1   154:23   165:19,
25   167:20   168:19
245:14   246:4
**responses**   6:22
**responsibilities**   11:2
12:6
**responsibility**   16:11
229:24   243:1
**responsible**   51:21
228:7   229:9
**restate**   165:7   210:9
248:2
**result**   109:23   110:6
111:1
**resulted**   109:13
**return**   226:6
**reveal**   117:2   194:5
**revealing**   131:15
157:15   159:21
**review**   10:2   74:15,
21, 24   76:5, 10   77:12,
13, 15   93:22   98:10
132:24, 25   185:21
186:7, 17, 21   191:19
192:1, 5, 16, 25
195:24   196:8   198:22
199:8   200:8   205:16
219:23   220:1   236:22
255:16   257:13
**reviewed**   72:6   81:11
183:4   192:10   193:23
197:2, 9, 18   198:15
199:13   226:14
253:16
**reviewing**   109:8
**reviews**   139:25
140:15   141:6   142:15
**revocation**   57:15, 22
58:22   59:21   94:3, 15
104:9   109:14, 23
209:1   238:24   239:9
241:24   242:2, 10, 22
**revocations**   104:12
242:7
**revoke**   66:24

revoked 50:*10*, *16*
51:*1* 66:*16* 242:*17*
revoking 51:*21* 92:*5*,
*10*, *17*, *20* 93:*1*, *4*
94:*10* 243:*1*
Revolution 99:*14*, *19*
160:*1*
right 87:*10* 101:*5*
125:*9*, *20* 144:*25*
162:*9* 163:*1* 250:*10*
252:*1*
rights 16:*1*
river 99:*10* 233:*25*
234:*10*
Riverside 3:*8*
RO 199:*3*
ROA 79:*4* 93:*10*
131:*6*, *20* 132:*9*
146:*9* 184:*16*, *18*, *21*
200:*10* 203:*8* 240:*15*,
*17*, *22* 241:*1*, *16*
ROAs 79:*19* 93:*22*
94:*12* 98:*11* 150:*17*
196:*21* 197:*1* 198:*15*
200:*7*, *8* 203:*11*, *15*,
*20* 204:*2*, *6*, *8*, *24*
ROA's 79:*15*
Robert 148:*20*, *22*
role 10:*25* 11:*3*
14:*18*, *24* 42:*24* 65:*5*
74:*12* 95:*25* 96:*7*
111:*14* 122:*10*, *18*, *20*
134:*14* 135:*11*, *14*, *18*
138:*5*
roles 19:*25* 20:*23*
223:*1*, *10*
rolling 118:*11*, *12*
151:*24* 172:*10*, *11*
rough 255:*10*, *17*
Roy 14:*10* 34:*19*, *25*
35:*1* 141:*1* 144:*9*
161:*21*
RPR 1:*21*, *22* 256:*3*,
*24* 257:*24*
RUBIO 1:*10* 5:*8*
221:*12* 232:*12*
251:*17* 258:*3*
Rules 2:*4* 6:*19*
Rumeysa 188:*22*
238:*24*

running 232:*21*
251:*23*
rush 255:*8*
RUTGERS 1:*6*

< S >
SAFAVI 3:*17* 5:*25*
12:*19* 13:*14*, *18*
16:*15*, *17* 17:*19*
18:*17*, *23* 20:*9*, *16*, *19*
21:*7*, *13* 22:*2*, *15*, *22*
23:*6* 24:*23* 25:*5*
26:*12* 27:*4*, *19* 28:*1*,
*7*, *15* 29:*12*, *25* 30:*8*,
*18* 31:*4*, *24* 32:*7*, *21*
33:*5*, *13*, *25* 34:*8*, *23*
35:*13* 36:*22* 37:*5*, *13*
38:*7*, *18* 39:*21* 40:*6*,
*13*, *19* 41:*4*, *20* 42:*1*
43:*1*, *12* 44:*1*, *20*
45:*10*, *18*, *25* 46:*7*, *22*
47:*12*, *21* 48:*3*, *9*
49:*16* 50:*5*, *12*, *18*, *22*
52:*1* 53:*10*, *25* 55:*5*
56:*4*, *7*, *24* 57:*8*, *16*,
*19*, *24* 58:*11*, *24*
59:*25* 60:*21* 63:*9*, *23*
64:*8*, *21* 65:*11* 66:*7*
67:*10* 68:*12*, *23*
69:*10*, *25* 70:*12* 71:*5*,
*12* 72:*7* 73:*1*, *9*, *18*
74:*16* 75:*12* 77:*21*
78:*6*, *21* 79:*9*, *14*
80:*7* 81:*1*, *14* 82:*2*,
*16* 83:*6* 85:*4*, *8* 87:*5*,
*16* 88:*2*, *9* 89:*23*
90:*12*, *25* 91:*17* 92:*6*,
*21* 93:*8*, *15* 94:*4*, *11*,
*21* 95:*10* 96:*2*, *9*
98:*15* 100:*14*, *21*
101:*6* 102:*2*, *14*, *25*
103:*6*, *25* 106:*16*, *24*
107:*6*, *15* 108:*2*, *19*
109:*15*, *24* 110:*8*, *19*
111:*23* 112:*4*, *15*
113:*4*, *13* 114:*11*
115:*4*, *12*, *16*, *24*
116:*6*, *10*, *13*, *24*
117:*7*, *17* 119:*14*
120:*21* 121:*2*, *8*, *20*,

*24* 123:*5*, *9*, *23* 124:*3*,
*16* 125:*23* 126:*9*
127:*5*, *11* 128:*13*
129:*7*, *16* 130:*7*, *15*,
*23* 131:*12* 132:*1*, *18*
133:*6*, *19*, *24* 134:*1*,
*15*, *17*, *20*, *23* 136:*5*,
*17*, *25* 137:*3*, *9*, *13*, *24*
138:*8* 139:*5* 140:*6*,
*20* 141:*13*, *21*, *25*
142:*5*, *10* 143:*3*, *12*
144:*12*, *15*, *22* 145:*3*
146:*5*, *24* 147:*7*
148:*6* 149:*8*, *18*
150:*7*, *13* 152:*18*, *25*
153:*6*, *9*, *18* 154:*4*, *17*,
*25* 155:*10*, *18* 156:*1*,
*18* 157:*3*, *13* 158:*8*,
*25* 159:*19* 160:*17*
162:*5*, *24* 163:*9*, *22*
164:*3*, *15* 165:*5*
166:*10*, *22* 167:*7*, *25*
168:*9*, *24* 169:*19*
170:*2* 171:*4* 173:*3*,
*13* 174:*16* 175:*18*, *24*
176:*18*, *21* 177:*11*, *17*
178:*17* 179:*3*, *20*
180:*20*, *23* 181:*8*, *20*
182:*14* 183:*19* 184:*3*,
*14* 185:*23* 186:*9*
190:*12* 191:*2*, *22*
192:*13*, *20* 193:*5*
194:*3*, *17* 195:*5*
196:*11* 197:*12*, *21*
198:*25* 199:*18*, *23*
200:*2*, *17*, *23* 201:*16*
202:*3* 203:*1*, *17*
204:*17* 205:*4*, *8*, *23*
206:*13*, *20* 207:*1*
208:*9* 209:*7*, *19*
210:*8*, *16*, *24* 211:*13*,
*21* 212:*7*, *21* 213:*5*,
*11*, *22* 214:*7* 215:*4*,
*16* 216:*2*, *12* 217:*3*,
*10*, *25* 218:*14*, *23*
219:*2*, *5*, *9*, *22* 220:*4*,
*10*, *13* 221:*1* 222:*5*,
*19* 223:*15* 224:*21*
226:*15* 227:*1* 228:*9*,
*22* 229:*13* 230:*4*, *10*,

*17*, *23* 231:*23* 233:*3*
234:*2*, *16* 236:*6*, *18*
237:*6*, *11*, *19* 238:*13*
239:*24* 240:*9*, *14*
241:*4*, *13* 242:*4*, *12*,
*19* 243:*13*, *18*, *25*
244:*10*, *25* 245:*7*, *24*
246:*19* 247:*6*, *25*
248:*8*, *15* 249:*14*, *19*,
*23* 250:*19* 251:*25*
253:*22* 254:*2*, *10*, *24*
255:*12*, *19*
Safety 84:*21* 120:*10*
216:*5*, *19*, *23* 246:*24*
Salisbury 52:*20*, *22*,
*23* 61:*22* 195:*19*
Salsburg 52:*21*
Samantha 14:*12*
Sanctions 99:*3*
save 260:*16*
saw 134:*11*
saying 86:*4*, *5* 194:*9*
says 127:*20* 168:*16*
220:*19* 221:*12*, *14*
222:*23* 224:*1*, *3*
226:*9* 232:*11* 239:*2*,
*5* 241:*23* 252:*21*
school 240:*21*
245:*22* 246:*14* 247:*4*
248:*13* 250:*17*, *22*
Science 10:*11*
scope 143:*18* 144:*18*
screen 123:*16*
124:*21* 125:*13*, *15*
126:*7* 128:*10* 130:*5*,
*12*
screening 123:*21*
124:*14* 125:*21* 126:*6*,
*11* 127:*2*, *8*, *24*
128:*20*, *24* 129:*2*
130:*19*, *22* 131:*5*, *6*,
*10*, *24* 133:*4*, *10*
sea 99:*10* 233:*25*
234:*10*
seal 256:*14*
second 9:*11* 137:*6*
141:*22*
Secretary 1:*10*, *11*
54:*14* 123:*12*, *13*
178:*5*, *10*

**section** 35:*3*, *5*
117:*21*, *23* 123:*3*
124:*9* 125:*22* 135:*15*,
*23* 136:*1* 138:6
190:*18* 221:*5*, *22*
224:*1*

**sections** 35:*9*, *12*, *17*
246:*24*

**Securities** 221:*17*
222:*2*

**Security** 1:*12* 10:*23*
11:*4*, *24* 12:*24* 16:*12*
21:*3*, *4*, *6*, *12*, *22* 22:*1*,
*21* 24:*16* 30:*21* 31:*1*,
*10*, *11*, *12* 33:*8*, *21*
35:*16*, *20*, *21*, *23*, *24*,
*25* 36:*2*, *8*, *10*, *15*, *21*
37:*4*, *12*, *17*, *24* 38:6
46:*17* 47:*2* 53:*4*
54:*5* 55:*23*, *25* 58:*5*
60:6 62:6 77:6
84:*21* 89:*4* 105:*2*, *11*
106:*9*, *12*, *21* 107:*4*,
*13*, *21*, *25* 108:*9*, *18*
109:*2*, *3*, *6*, *13*, *22*
110:*5*, *13*, *24* 120:*9*
123:*14* 127:*1* 135:*18*
138:*13*, *20* 166:*20*
184:*22* 185:*15*
191:*21* 192:*3*, *7*, *12*,
*18*, *22* 193:*4* 197:*10*,
*19* 198:*12*, *16*, *18*, *23*
199:*9* 200:*14* 202:*1*,
*8*, *14* 207:*8* 211:*7*
216:*5*, *19*, *23* 221:*17*
222:*4* 239:*10*, *12*, *16*
241:*24* 246:*24* 247:*5*

**see** 80:6 90:*3* 121:*4*
125:*16*, *18* 143:*24*
168:*11* 196:*5* 198:*3*
202:*17* 203:*10*, *14*, *19*
204:*1*, *5* 220:*18*
221:*3*, *11*, *24* 226:*8*
227:*6* 231:*4*, *7* 232:*8*,
*11*, *14* 236:*16* 238:*23*
239:*1*, *19* 251:*13*, *16*,
*19*

**seeing** 79:*7*, *12* 80:*1*,
*9* 203:*22* 213:*1*

226:*17* 233:*1*, 6

**seek** 16:*21*

**seeks** 46:*21*

**seen** 66:*14*, *18*, *22*
67:*1* 79:*15*, *18*, *19*
80:*3* 147:*15* 160:*4*
207:*22*, *25* 220:*22*
233:*10*, *16*, *19*, *22*
235:*6*, *16*, *18* 240:*4*
254:*7*, *13*, *14*

**send** 106:*13*, *21*
107:*4* 109:*7*

**sending** 110:*15*

**sends** 60:*5*

**senior** 11:*19* 13:*11*,
*19* 61:*14*, *17*, *20*, *24*
62:*20* 190:*23* 191:*14*,
*18* 192:*9*, *16* 193:*2*
194:*24* 200:*7* 207:*17*
239:*2* 243:*4*

**senior-most** 249:*12*
250:6

**seniors** 195:*12*

**sense** 161:*8*

**sensitive** 57:*11*
229:*16*

**sent** 108:*18*, *20*
110:*14* 183:*5* 198:*13*,
*23* 222:*4* 237:*21*
252:*18* 253:*12* 254:*8*

**sentence** 124:6
126:*18* 137:*8*, *11*, *15*
140:*4*, *5* 141:*10*
221:*14* 222:*23* 226:*8*
228:*17* 232:*15*, *20*, *24*
239:*5*, *6* 240:*5*
241:*22* 251:*24* 252:*7*,
*10*, *21*

**sentiment** 101:*11*

**September** 256:*18*

**SEPV** 194:*15*

**series** 10:*9* 20:*5*
144:*5* 145:*2*

**serious** 222:*13*

**services** 14:*12*

**serving** 230:*1*

**set** 199:*10* 256:*13*
257:6

**sets** 165:*16*, *23*

**SEVP** 135:*19*, *21*

**S-E-V-P** 135:*21*

**share** 174:*1*, *7*, *14*

**shared** 202:*1* 207:*7*

**sharing** 211:6

**shed** 66:*1*

**SHEET** 258:*1* 260:*18*

**SHER** 3:*1*

**shorter** 136:*15*

**Shorthand** 2:*5*
257:*16*

**show** 77:*24* 78:*4*, *16*

**side** 217:*21* 229:*5*, *6*

**sidebar** 249:*14*

**sign** 75:*21*, *24* 76:*3*
191:*15* 255:*16*

**Signed** 260:*19*

**significant** 243:*11*, *22*

**signing** 255:*14* 256:*9*

**silent** 241:*25* 242:*1*

**similar** 22:*14*, *20*
163:*17*

**sit** 24:*8* 29:*22* 45:*8*

**situated** 15:*7*

**situation** 21:*20*

**Six** 11:*1* 219:*1*, *2*
251:*2*

**slow** 223:*4*

**smuggling** 20:*4*
36:*17*, *18* 61:6

**social** 74:*24* 95:*4*
182:*13*, *18*, *19* 208:*20*
253:*5*

**somebody** 56:*5*
138:*18* 216:*10*
229:*10* 250:*5*

**soon** 255:*11*

**sorry** 10:*16* 22:*16*
23:*21* 28:*1*, *23* 29:*11*
30:*8* 37:*20* 38:*3*
39:*18* 40:*13* 43:*12*
46:*3*, *14* 50:*12* 54:*9*,
*11* 62:*16* 64:*21* 71:*5*
80:*20* 108:*24* 111:*1*,
*9* 116:*2* 120:*21*
128:*4* 130:*14* 133:*19*
136:*13*, *25* 152:*12*
161:*25* 163:6, *21*
176:*9* 178:6 191:*9*
199:*23* 200:*23* 204:*3*

210:*23* 213:*4* 215:*5*,
*6*, *19* 223:*3* 249:*15*
251:*25* 252:*3*

**sort** 60:*15*

**source** 72:*10*, *12*
74:*15*, *21* 236:*22*
237:*4*, *9*, *17*

**sources** 132:*25* 199:*7*

**speak** 8:*22*, *25* 126:*4*

**speaking** 178:*23*

**special** 198:*16*

**specialist** 5:*14*

**specific** 7:*23* 45:*11*
54:*1* 55:6 58:*20*
70:*1*, *5* 79:*23* 80:*21*
90:*7* 91:*11* 95:*12*
98:*16* 102:*1* 103:*18*
127:*12* 150:*25*
162:*10* 170:*20*, *22*
181:*16* 208:*21*
211:*20* 249:*10*

**specifically** 80:*22*

**specifics** 154:*9*

**specify** 55:*13* 92:*20*
212:*19* 220:*2*

**speculate** 64:*9* 81:*3*,
*8* 103:*2* 107:*8* 109:*9*
110:*22* 118:*17*, *20*, *21*
125:*25* 136:*6* 139:6
140:*8* 146:*25* 155:*19*
175:*25* 176:*14*
178:*11* 180:*14*
195:*11* 227:*25*
237:*20*, *24* 245:*9*
247:*10* 249:*8* 251:*1*

**speculating** 37:*25*
138:*23* 174:*17*
181:*22* 195:*1* 206:*4*
214:*9* 249:*7* 250:*4*

**speculation** 57:*25*
58:*12*, *25* 63:*22*
65:*12* 82:*3* 102:*15*
103:*1*, *7* 106:*25*
107:*7* 109:*15*, *25*
110:*9*, *20* 118:*16*
125:*24* 126:*10* 127:*5*,
*11* 128:*14* 129:*7*
130:*8*, *16* 136:*5*
137:*25* 155:*18*
166:*22* 171:*17* 173:*3*,

13  174:16  175:24
176:7  177:11, 17
178:18  179:3  180:21
194:18  195:1, 6
196:11  205:4  209:19
218:4, 15  222:6
223:15  229:13  230:5
234:3  242:20  243:13,
25  245:8, 25  247:7
**speculative**  118:19
**spent**  14:19
**spoken**  9:12, 15, 19,
23  173:11
**spokesperson**  95:25
96:8
**spreads**  253:4
**staff**  52:13  96:23
166:2, 3, 5  183:7
**staffing**  114:9
**stamp**  120:23  121:1,
2  220:18
**stand**  104:23
**standard**  30:19  33:6,
14  34:2  35:14  45:19
46:1, 22  50:5, 6
68:24  71:5, 6, 13
72:8  73:2  77:22
78:22  81:15  83:7
87:17  88:3, 10  89:24
90:13  91:18  93:9, 16
100:15  115:5, 13
130:25  132:2, 19
146:6  148:7  149:19
150:14  152:19  153:1,
10  155:1, 11  184:4,
15  199:1  200:3
**Standing**  28:15
29:12  30:18  31:4
33:5, 13  34:1, 8
35:13  39:21  43:13
44:1, 2, 20  45:18, 25
47:12  56:24  57:9
63:10  66:7  68:23
71:6, 13  72:7  73:1
77:21  78:21  81:14
83:6  87:16  88:2, 9
89:23  90:13  91:1, 17
93:8, 15  95:10, 11
100:14  102:3  110:20
115:4, 13  130:23

131:12  132:1, 18
146:5  148:6  149:18
150:13  152:18, 25
153:6, 9  154:4, 17, 25
155:11  157:13  158:8
159:1, 19  160:17
162:5, 24  163:23
164:3  166:10, 23
169:19  179:4  180:23
184:3, 14  190:12
191:2  194:3  195:6
198:25  199:19  200:2,
17  201:1, 17  203:1
205:23  209:20
210:24  211:13, 21
212:7, 21  213:5, 11,
22  214:7  215:4, 16
216:2, 14  217:3, 10
218:1, 15  219:10
222:5  226:15  229:14
231:23  236:18
238:13  239:24
242:20  243:14  244:1
246:19  247:7, 25
248:8, 16  253:22
254:3
**stands**  8:10  73:4
144:25
**Stanley**  14:10  34:19,
20, 25  35:1, 2  141:1
144:9, 16  161:21
193:17  195:23  196:2
232:2
**start**  6:19  25:13
44:15  54:4  62:24
79:7, 12  80:1, 13
160:12, 24  191:25
**started**  6:18  80:8
116:8
**starting**  232:20
**starts**  123:7
**State**  1:10, 11  5:17
7:14  9:20  27:13, 15,
17  28:5, 13  29:8
32:12, 17  51:12, 15,
19  55:3, 17  58:9
65:10, 16, 21  66:2, 23
67:2  100:1  103:4, 13,
16, 21, 24  104:5, 7, 10
105:13  106:10, 13, 21

107:5  109:7  110:6,
15  123:12  130:12
133:4  155:14, 16, 20,
23  156:5, 7, 12, 14, 23,
25  159:17  171:25
172:17, 22  173:1, 11,
19  174:1, 5, 13  175:5,
11  197:5  200:6, 15
202:9, 15  206:7
207:10  209:5, 12, 17
216:8  218:22  223:22
224:12  232:18
239:13  242:9, 16
252:19  253:13  254:8,
15
**stated**  139:3  145:6
**statement**  140:11, 19
141:12  143:1  145:9
159:25  234:14, 21, 24
235:2, 20  244:16
249:19  250:23
**statements**  95:21
159:10, 11, 12  162:18
163:2, 5  257:10
**STATES**  1:1, 14, 15
5:8  30:15  36:11
120:8  123:4, 11, 19
125:8  126:14, 17, 19,
21  127:21  132:4, 8
136:24  137:15
138:13  141:4  142:13
222:10, 13  257:1
**Station**  3:14
**stenographically**
256:7  257:11
**step**  18:14  197:4
**stop**  62:13
**stored**  72:21
**straight**  15:18
**Street**  3:3  5:12
**strike**  143:13  144:4,
8  145:2
**STROKUS**  3:16  6:2
176:6
**student**  16:3, 5
36:20  37:1, 8, 11, 16,
19, 22  38:1, 4  41:18,
23  42:10, 15, 19  63:1,
8  64:3, 5, 12, 13
76:17, 20, 24  79:8, 13,

16, 20  80:4, 17  81:6,
11, 12, 25  83:4, 14
84:14, 18, 25  85:19
86:22  87:3, 15, 25
88:17, 20  89:20, 22
91:14, 22, 25  92:4
94:8, 19  95:4, 8, 9, 16,
17, 20, 24  96:6, 13
97:18  98:1, 5  100:19,
25  101:10, 16, 25
102:9  103:12, 20
104:12  106:15
107:11, 12, 20, 25
108:9, 17  109:1, 21
110:4, 25  112:9
118:8, 15  119:1
137:18  151:4  152:24
153:8, 15  154:14, 24
156:15  157:8  160:5
165:18, 25  172:13
173:18, 22  174:3, 8,
15  177:7  178:23
181:6, 18  182:2, 8, 11,
12  183:13, 16, 23
184:2, 11  185:14, 19
186:4, 6, 16, 20
187:10  189:20  197:8,
17  198:11, 21  199:6,
16  205:17  206:10, 18
207:6, 9  211:8, 20
212:5  213:9, 17
214:23  215:2, 12, 14,
25  217:1, 17, 22
218:7, 10, 12  226:13
234:14, 20  236:10
238:11  242:11, 18
254:9, 16
**students**  61:8, 11
62:24  63:4, 21  93:18
96:14, 16  97:2, 4
101:4  119:11, 19
120:3  135:16  206:22
235:18  238:4
**student's**  94:2, 9, 20
101:11, 20
**STUDIES**  1:8
**stuff**  113:22
**sub**  15:13, 14
**subject**  25:3, 6, 15
111:2  112:10  141:7

142:*17* 164:*24* 211:*9* 224:2, *4* 232:8 238:*23*
**subject's** 70:*18*
**submits** 183:*2*
**submitted** 141:*1* 182:*23* 187:*14*, *18*, *23*
**Subparagraph** 123:*16* 124:*9*
**subsequently** 243:*23* 244:*23* 245:*5*
**subset** 197:*7*, *16* 198:*10*
**sufficient** 114:*9*
**suggest** 138:*4*
**Suite** 3:*9*
**summary** 71:*21*, *23*
**supervise** 117:*21*, *25*
**supervises** 117:*15*, *23*, *24*, *25*
**supervisor** 75:*23* 253:*16*
**supervisors** 45:*1* 52:8, *10* 161:*14*, *15*, *23* 195:*11*
**supervisory** 161:*16*
**supply** 74:*11*
**support** 19:*13*, *16* 21:*10*, *21* 22:*13*, *19* 23:4, *10* 31:*3*, *18* 37:2, *10* 43:6, *10*, *20* 44:*18*, *22* 45:*16* 70:*4* 83:5, *11* 90:*10*, *17* 98:6 99:2 114:*15* 126:*25* 127:*3*, *9*, *23*, *25* 128:*11*, *21* 137:*18*, *22* 158:*4* 159:*10*, *11*, *12* 171:*3*, *7*
**supporting** 252:*23* 253:*11*
**Sure** 20:*16* 36:*18* 85:*10* 86:*4* 104:*20* 116:*3*, *8* 121:*5*, *6* 127:*15* 143:*25* 154:*10* 162:*20* 169:*3* 176:*19* 177:*20* 180:*16* 249:*17* 251:*4*
**Suri** 189:*13* 251:*20* 252:*22*

**Suri's** 252:*19*, *25* 253:*7*, *13*
**surprise** 139:*1*
**surrender** 230:8, *15*
**suspect** 180:*18* 194:*25*
**suspected** 17:*10*, *18* 18:2, *6* 19:*20* 25:*19* 31:*11* 41:*3* 45:6 49:*14*, *21* 50:*3* 57:*3* 63:*25* 64:*20* 65:*1* 70:8 131:*4* 214:*1*
**suspended** 225:2
**Suspicion** 47:*16* 75:*16* 78:*25* 244:*18*
**suspicions** 157:*19*
**suspicious** 44:*12* 47:8, *11* 48:*12*, *19*, *22*, *24* 87:*21* 88:*1*, *5* 89:*21* 90:*4* 146:*9*, *12*, *13* 150:*19*, *23* 184:*18* 185:*1*, *6*, *8*
**swear** 6:*9*
**sworn** 6:*12* 7:*18* 8:*7* 226:2
**system** 72:*23*, *25* 253:*24* 254:*1*, *5*

**< T >**
**Taal** 141:2, *19*
**Tab** 224:*1*, *3*, *4*, *9*
**tactics** 11:*10*
**tags** 182:*19*
**take** 39:5 50:*11*, *17* 51:2 62:*10* 86:*12*, *17* 104:*18* 251:*5*
**taken** 2:4 39:*10* 85:*13* 121:*11* 135:*5* 143:*8* 177:*1* 256:*4*, *7* 257:*5*, *16* 260:*15*
**takes** 59:*10*
**talk** 217:*16*
**talked** 19:*11*
**talking** 85:*18* 106:*20* 108:*14* 156:*22* 160:*20* 166:*16* 167:*21* 172:8 182:*12* 185:*14* 217:*9* 223:*23* 229:*4* 239:*15*
**TALYA** 3:*11* 5:*23*

talya.nevins@knightco lumbia.org 3:*12*
**tasking** 86:*17*
**TEACHERS** 1:*7*
**team** 152:*9*, *10*, *14*, *22* 157:*20* 172:*3*, *4*
**techniques** 11:*10*
**technology** 47:*3*
**tell** 14:5 52:*15* 56:*10* 59:*17* 113:2, *11*, *17* 116:*3*, *14* 163:*4* 195:*14* 216:*25* 232:*23*
**temporarily** 243:*10*
**ten** 115:7 233:*14*, *19*
**tenure** 53:*16* 58:8 207:*16*
**term** 23:*14* 47:*10* 48:*12*, *14* 84:*15* 89:*12* 98:*9*, *12*, *19* 108:*22* 125:2 160:*3* 164:*22* 193:*1* 200:8 204:*21* 205:*13* 226:*12*, *20*
**terms** 36:*13*, *24* 40:*24* 41:8 83:*15* 120:*23* 124:*21* 127:*16* 198:*4*, *5* 211:*23*
**terrorism** 20:2, *7*, *8*, *25* 21:2, *5*, *18* 29:*19* 30:*20* 32:*15* 36:*1* 54:*16* 90:*11*, *18* 252:*23* 253:*11*
**terrorist** 16:4 21:*11* 37:2 57:4, *6* 127:*4*, *10* 128:*16*, *21* 131:*19* 132:*6*
**Terrorists** 84:*20* 120:9 126:*25* 127:*23* 128:*1*
**testified** 6:*12*
**testify** 7:*9*
**testifying** 141:*14* 143:*17* 168:*10*
**testimony** 7:*12*, *16*, *18*, *25* 8:*7*, *14*, *23* 9:*16*, *24* 10:*3* 18:*15* 19:8 38:*15*, *19*, *22* 50:*19*, *21* 72:*17* 78:2

145:*16* 167:*15* 168:*13* 205:*9* 248:*23* 256:6, *7* 257:*8*
**Thank** 20:*18* 105:22 133:*25* 134:*23* 137:*3* 224:*23* 246:*11* 254:*20*, *21* 255:*1*, *19*
**theft** 8:*4*
**thing** 144:*25* 220:*1*
**things** 9:*3* 19:*17* 26:8, *11* 32:2 36:*1* 100:*12* 113:*1* 130:*3* 152:2
**think** 22:*7*, *11* 23:*14* 26:*21* 55:*20* 104:*14*, *20* 105:2 106:2 121:22 122:*3* 124:25 134:*12* 158:*13* 170:*3*, *8* 171:9 172:*15* 173:*4* 177:8, *18*, *25* 220:4 224:*18* 248:*12* 249:*5* 250:2 252:*12*
**third** 222:9 226:8 232:*14* 251:*20*
**thought** 128:*4* 246:*23*
**threat** 21:6, *11*, *22* 22:*1*, *21* 30:*15*, *17*, *20* 36:8, *21* 37:*3*, *11*, *17*, *23* 38:5 247:*4*
**threaten** 31:*10*
**threatening** 31:*11*
**Threats** 12:22 21:*3*, *4* 30:*25* 33:*7*, *20* 34:5, *7* 35:*15*, *19*, *20*, *22*, *23* 36:*14* 84:22 120:*10* 127:*1*
**tiger** 152:8, *10*, *14* 172:*3*, *4*
**time** 5:*4* 7:*3* 39:*8*, *11* 42:*20* 50:*23* 52:2 53:*15* 55:*12* 63:2 75:*15* 79:*10* 85:*7*, *9*, *11*, *14* 104:6 108:*3* 121:*9*, *12* 134:*17*, *20* 135:2, *6* 142:*20* 143:*5*, *10* 172:*12* 176:*23* 177:*3*, *6* 206:*23* 218:*23*, *24* 219:*24* 224:*17*, *25*

226:*4* 229:*11* 255:*3*
257:*6*, *7*, *10*
**times** 9:*4*
**tip** 182:*23*, *24* 183:*2*,
*3*, *5*, *6*, *8*
**title** 10:*21* 49:*4*, *6*, *7*,
*11*, *15*, *22*, *24* 50:*4*
51:*24* 52:*6* 53:*9*, *23*
55:*2*, *16* 81:*25* 88:*12*
89:*11* 90:*8* 91:*15*
108:*14* 122:*23* 129:*9*,
*12*, *21*, *22*, *25* 130:*3*
148:*23* 149:*22*
150:*19*, *23* 151:*1*
154:*21* 170:*14*, *20*
215:*18*, *20*, *22* 216:*8*,
*20* 218:*9*, *18* 221:*3*
231:*4* 244:*9*, *15*
245:*17* 246:*7*, *24*
251:*13*
**titled** 84:*19*
**today** 5:*15* 7:*9*, *12*,
*17* 8:*18*, *23* 9:*6* 10:*3*
**today's** 5:*3*
**TODD** 1:*12*
**told** 52:*14* 56:*14*
61:*20* 80:*25* 130:*2*
224:*16*
**Tony** 52:*20*, *21*
61:*21* 195:*19*
**top** 137:*6* 222:*9*
232:*21* 251:*23*
**topic** 103:*20*
**tracking** 109:*16*
110:*1*, *10*
**trade** 47:*3* 74:*1*, *7*, *9*
**trafficking** 16:*2* 20:*3*
25:*24* 26:*1*, *2* 34:*11*
36:*16*
**trailing** 215:*8*
**train** 11:*15*
**Training** 11:*8* 32:*2*
160:*8*, *11*, *13*, *14*, *19*,
*22* 166:*18*
**transactional** 15:*21*
**transcribed** 257:*12*
**TRANSCRIPT** 2:*1*
255:*14*, *16* 256:*5*
257:*13*, *16* 260:*15*

**transnational** 36:*6*
47:*1*
**transposed** 105:*3*
**TREMONTE** 3:*1*
**true** 140:*11*, *19*
142:*18*, *25* 145:*8*
256:*5* 257:*15*, *21*
260:*16*
**TRUMP** 1:*14* 141:*2*,
*20*
**Trump's** 137:*19*, *22*
138:*15*
**truthful** 7:*12*
**truthfully** 7:*9*
**trying** 48:*13*, *23*
50:*20* 60:*2* 78:*10*, *18*
86:*20* 125:*3*, *5*
139:*14*, *17* 199:*12*
245:*18* 246:*11*
**turn** 207:*8* 220:*20*
226:*25* 230:*21*
238:*20* 251:*7*, *22*
**turned** 114:*3*
**Twice** 9:*7*
**two** 9:*11* 19:*5* 30:*2*
56:*19* 166:*16* 167:*5*,
*20* 168:*19* 175:*6*, *12*,
*16* 217:*8*
**type** 113:*22* 183:*6*
**types** 22:*10* 68:*25*
187:*5*
**typewriting** 256:*8*
**typical** 60:*3* 68:*21*
**Typically** 20:*1*, *24*
32:*11* 125:*7* 195:*24*
196:*8* 227:*17* 228:*6*
244:*7*, *13* 245:*15*
246:*5*, *8*
**typo** 252:*12*

**< U >**
**U.S** 1:*13* 3:*14* 32:*25*
33:*1* 47:*16*, *19* 49:*4*,
*7* 70:*19* 71:*4* 82:*11*
84:*20* 131:*25* 199:*5*
206:*22* 208:*5* 211:*3*
216:*10* 221:*21*
237:*25* 238:*6*, *8*
244:*15*, *24* 245:*6*, *16*,
*23* 246:*6*, *15* 247:*24*

248:*7*, *22*, *25* 249:*5*
250:*18*, *24*
**Uh-huh** 124:*25*
137:*2*, *10* 165:*22*
168:*15* 186:*1* 204:*4*
229:*7* 235:*8* 246:*9*
254:*13*
**underlying** 72:*5*
**understand** 6:*22*, *25*
15:*7* 16:*22*, *24* 18:*13*
19:*1* 38:*11* 42:*5*
48:*13*, *23* 55:*10* 60:*2*
70:*13* 78:*10* 121:*15*
122:*9*, *17* 124:*1*, *19*
134:*6*, *13* 135:*11*
138:*16* 140:*4* 157:*23*
195:*2* 197:*6*, *15*, *24*
198:*10* 199:*12* 222:*1*
223:*13*, *18* 224:*6*, *10*
239:*8* 242:*1*, *25*
245:*18* 246:*12*
248:*20*, *22* 252:*14*, *17*,
*24* 253:*6*, *10*
**understanding** 15:*18*
38:*16*, *24* 39:*2* 68:*10*,
*15* 109:*5* 118:*13*, *19*
122:*21* 128:*15* 129:*8*,
*20*, *24* 135:*17* 138:*19*
143:*19* 159:*8*, *16*
181:*4* 207:*13* 215:*9*
218:*21* 229:*23*, *25*
233:*24* 234:*6*, *9*
237:*23* 243:*3* 244:*21*
245:*3* 249:*12* 260:*18*
**Understood** 214:*22*
**unfamiliar** 230:*18*
**unfortunately** 198:*7*
**unit** 28:*11*, *14* 29:*5*,
*9*, *17*, *19*, *22*, *24* 30:*5*
31:*2* 32:*16*, *19* 33:*3*,
*19*, *22* 34:*13*, *15*, *16*,
*17*, *21* 35:*4* 111:*7*, *9*
114:*19* 117:*22*, *24*
161:*21* 190:*17*, *18*
196:*2* 231:*22*
**UNITED** 1:*1*, *14*, *15*
5:*8* 30:*15* 36:*11*
120:*8* 123:*19* 125:*8*
126:*17*, *19*, *21* 127:*21*

132:*4*, *8* 222:*12*
257:*1*
**unit's** 30:*23*
**universe** 163:*5*
**universities** 175:*16*,
*23* 176:*4*
**UNIVERSITY** 1:*3*, *4*,
*5*, *6* 3:*8* 5:*7* 97:*11*,
*15*, *19* 137:*17*
**unlawfully** 41:*16*
**unsure** 48:*6*
**update** 110:*25*
112:*19* 194:*15*
**updated** 75:*3*, *7*
111:*6* 112:*24*
**updates** 111:*15*, *18*,
*22* 112:*3*, *9*, *12*, *23*
113:*9* 194:*23* 195:*4*
**use** 34:*13* 236:*15*
**usual** 206:*10*, *17*
**usually** 25:*25* 60:*8*
178:*2* 187:*6* 230:*1*

**< V >**
**various** 235:*13*
**vary** 211:*9*
**verbal** 88:*22*
**verse** 216:*24*
**versus** 5:*8* 36:*11*
141:*2*, *19* 229:*21*
**vet** 123:*16* 124:*21*,
*23* 125:*4* 126:*7*
**vetting** 123:*20*
124:*14* 125:*6*, *9*
**Vice** 14:*13*, *14*
**video** 5:*5*, *14* 255:*3*
**Videographer** 3:*20*
5:*2* 6:*8* 39:*8*, *11*
85:*11*, *14* 121:*9*, *12*
135:*2*, *6* 143:*5*, *10*
176:*23* 177:*3* 200:*21*
218:*25* 219:*4* 224:*25*
226:*4* 255:*2*
**VIDEOTAPED** 1:*18*
**violated** 64:*6*, *14*
218:*8*
**violating** 19:*20* 47:*16*
**violation** 89:*14*
108:*13*, *15* 139:*18*
169:*23* 170:*7* 185:*12*

201:*8*, *9*  212:*5*, *15*, *19*
213:2  217:*19*  244:*9*,
*15*, *24*  245:6, *16*, *23*
246:6, *15*  247:*14*, *23*
248:*6*, *22*, *25*  249:*5*
250:*2*, *17*, *24*

**violations**  47:*25*
49:*1*, *3*  64:*20*  65:*1*
142:*23*  145:*7*  157:*20*
169:*22*  170:*11*, *12*, *14*,
*15*, *20*  202:*19*, *24*
206:22  211:*25*
214:*25*  215:*1*, *11*, *23*,
*24*  217:*1*, *7*, *23*  218:*9*,
*18*, *19*  237:*25*  238:*6*

**violence**  22:*8*, *14*, *19*
88:*11*, *12*  159:*13*
170:*15*  250:*8*, *18*, *23*

**violent**  37:*9*, *23*

**Visa**  39:*15*  40:*1*, *4*,
*10*, *12*, *17*, *18*, *21*, *23*,
*25*  41:*7*, *9*, *12*, *13*, *15*,
*18*, *23*  42:*10*, *15*, *25*
49:*14*, *21*  50:*2*, *10*, *16*
51:*1*, *24*  52:6  53:*8*,
*17*, *23*  55:*2*, *16*  56:*2*,
*3*, *12*, *16*, *22*  57:*15*, *23*
58:*9*, *23*  59:*21*  66:*16*,
*24*  67:*8*, *15*  75:*15*
92:*5*, *10*, *17*, *20*  93:*1*,
*5*  94:*10*, *15*  104:*12*
109:*13*, *23*  131:*18*
173:*18*, *22*  174:*3*, *9*,
*15*  208:*25*  211:*9*
228:*7*  238:*24*  239:*9*
242:*7*, *9*, *16*, *17*

**Visas**  51:*21*  58:*5*
105:*14*  243:*1*

**visitor**  16:*3*, *6*

**visual**  6:*21*

**voice**  10:*17*  20:*15*
62:*18*  81:*19*  97:*8*
215:*7*

**volume**  237:*14*

**vs**  1:*9*  258:*3*


**< W >**
**waive**  255:*14*
**walk**  14:*16*

**Walker**  62:*4*, *9*  89:*3*
153:*13*  193:*15*
195:*23*  196:*7*  198:*22*
199:*13*  200:*13*
201:*14*  205:*2*, *15*

**want**  6:*19*  15:*6*, *17*
19:*7*  85:*5*  87:*11*
116:2  118:*20*, *21*
121:*4*  129:*21*  134:*24*
143:*2*  144:*23*  177:*15*,
*23*  181:*14*  194:*11*, *14*
249:*8*, *20*  255:*14*

**wanted**  102:*9*
202:*17*, *18*

**wants**  16:*19*

**war**  98:*21*

**Washington**  3:*15*
5:*12*

**Watson**  9:*13*, *15*
62:7  89:*4*  105:*5*
139:*2*, *20*  140:*8*
144:*10*, *13*  167:*14*
173:*5*, *7*, *10*  174:*12*,
*19*  193:*10*, *25*  223:*21*
224:*11*  252:*18*
253:*12*  254:*8*, *14*

**way**  13:*23*  24:*16*
59:*24*  110:*14*  117:*19*
198:*13*  215:*25*

**ways**  19:*15*  113:*19*
132:*16*, *17*  178:*1*
203:6

**weapons**  20:*4*  36:*16*

**website**  178:*25*
179:*11*, *14*, *22*, *25*
180:*2*, *3*, *6*  185:*22*
186:*8*, *14*, *17*, *22*
187:*1*, *4*, *12*, *14*, *18*, *23*
188:*16*  189:*22*  190:*4*
207:*23*  208:*1*  235:*4*,
*6*, *9*, *12*  236:*11*, *16*
237:*21*  238:*5*, *8*, *11*

**websites**  180:6

**Wednesday**  2:6

**weigh**  164:7  205:7

**welcome**  16:*21*
20:*19*  124:9  254:*23*

**well**  18:*24*  19:*1*
47:*20*  116:*13*  129:*19*,
*23*  139:*16*  141:*23*

144:22  149:*11*
160:*24*  168:*3*  191:*25*
207:*16*  228:*25*
249:*21*  255:*18*

**went**  115:*21*  116:*21*
192:*2*, *6*, *11*, *18*, *21*
193:*4*, *6*

**we're**  39:*12*  85:*15*
108:*14*  121:*13*  134:*1*
135:*3*, *7*  143:*11*
177:*4*  185:*13*  217:*20*
218:*25*  219:2  227:2
252:*3*

**we've**  106:*20*  146:*18*
156:*22*  166:*16*
167:*21*  168:*20*  172:*8*
175:*7*, *12*  177:*25*
217:*8*  223:*22*  239:*15*

**WGY**  1:*1*

**WHEREOF**  256:*13*

**White**  149:*4*  180:*13*,
*19*  181:*5*, *17*  182:*1*, *7*

**WIELAGE**  1:*21*  2:5
257:*3*, *24*

**William**  62:*4*, *9*

**withdraw**  87:*1*

**withdrawn**  17:*8*
37:*20*  38:*3*  49:*25*
53:*21*  55:*13*  63:*19*
64:*4*  68:*20*  69:*6*, *22*
73:*6*  74:*19*  75:*20*
76:*15*  80:2  81:*9*
82:*9*  83:*21*  91:*23*
102:*20*  107:*11*
109:*10*, *19*  118:*24*
119:*25*  122:*25*
126:*17*  129:*1*  133:*14*
146:*1*  157:*10*  179:*12*
183:*14*  186:*4*  187:*2*
194:*13*  217:*15*
223:*18*  224:*2*  235:*3*
237:*3*  239:*5*  242:*7*
247:*2*, *20*  250:*15*

**witness**  2:*2*  4:*3*  6:*9*,
*11*, *14*  16:*19*  67:*21*
83:*25*  85:*10*  87:*7*
89:*17*  96:*19*  111:*9*
114:*24*  122:*14*
134:*19*  135:*21*
144:*24*  162:*1*  176:*10*

178:*8*, *10*  179:*21*
191:*11*  196:*17*
204:*12*  210:*17*
211:*16*  215:*18*, *20*
216:*15*  217:*4*, *11*
218:*3*, *16*, *17*  219:*11*,
*22*  221:*9*  229:*15*
231:*24*  236:*19*
242:*21*  243:*15*  244:*2*
246:*20*  247:*8*  248:*1*,
*17*  253:*23*  254:*4*
255:*15*  256:*13*  257:*7*,
*8*

**Wolcott**  148:*14*, *17*

**Wonderful**  255:*1*

**word**  91:*5*  203:*23*

**words**  71:*20*  83:2
91:*3*  99:*21*  198:*4*
226:*9*, *17*

**work**  15:*6*  67:*8*, *15*
111:*14*  113:22  115:*3*
140:*22*  176:*8*, *11*
183:*8*

**worked**  116:*23*
202:*22*  219:*8*  229:*10*

**workflow**  112:*25*
115:*9*, *19*  116:*20*

**working**  41:*16*
113:*19*  135:*15*
172:*19*  173:*17*, *18*, *23*
174:*7*

**workload**  34:*11*
35:*17*  112:*25*  190:*19*

**workplace**  8:*11*

**works**  32:*1*  190:*20*
195:*17*  196:*3*  200:*10*
224:*21*

**world**  176:*8*, *10*

**worth**  184:*12*

**write**  131:6  140:*3*
184:*16*

**writing**  88:*17*, *21*
94:*2*, *9*, *20*, *23*  111:*16*
221:*15*  248:*13*  249:*5*

**written**  69:*17*  70:*7*
161:*18*  247:*19*, *22*
248:*5*

**Wynn**  89:*3*

**< X >**
**XI01916**  2:*6*

**< Y >**
**Yankees**  244:*17*
 247:*11*
**yeah**  20:*16*  78:*8*
 87:*7*  107:*16*  116:*1*
 121:*8*  124:*25*  134:*19,*
 *25*  137:*10*  138:*1*
 139:*6*  140:*7*  142:*11*
 145:*20*  150:*15*  155:*2*
 160:*24*  163:*9*  165:*10*
 168:*12*  174:*17*
 194:*25*  199:*23*
 205:*11*  210:*15*
 216:*16*  224:*22*
 230:*17*  247:*9*  249:*24*
 254:*13*
**year**  32:*17*  55:*19*
 61:*8, 11*  63:*5*  64:*12*
 75:*3, 7*  76:*17, 20, 24*
 79:*13*  80:*5, 9*  85:*20*
 118:*15*  119:*3, 5, 13,*
 *21*  120:*4*  133:*5*
 210:*7, 13, 14*  211:*4*
**years**  7:*21*  8:*9*  11:*1*
 14:*19*  30:*2*  55:*11, 14*
 56:*19*  79:*20*
**YORK**  1:*6*  3:*4, 9*
**Yunseo**  189:*7*

**< Z >**
**Zionism**  99:*23*
**Zoom**  224:*19*

## WORD LIST

**< 1 >**
**1** *(5)*
**1(b** *(1)*
**1,000** *(1)*
**1:08** *(1)*
**1:25-cv-10685** *(1)*
**10** *(2)*
**10:21** *(1)*
**100** *(2)*
**10004** *(1)*
**10115** *(1)*
**11:12** *(1)*
**11:13** *(1)*
**11:48** *(1)*
**125-CV-10685** *(1)*
**13:07** *(1)*
**134** *(1)*
**136** *(1)*
**14:15** *(1)*
**14161** *(6)*
**14188** *(14)*
**15** *(1)*
**15:20** *(1)*
**15:31** *(1)*
**15:53** *(1)*
**16:01** *(1)*
**16:16** *(1)*
**16:30** *(1)*
**1615** *(1)*
**17:27** *(1)*
**17:45** *(1)*
**18** *(5)*
**19** *(3)*
**19:04** *(1)*
**19:25** *(1)*
**1989** *(1)*

**< 2 >**
**2** *(4)*
**2(a** *(4)*
**20** *(8)*
**20:17** *(1)*
**2000s** *(1)*
**20044** *(1)*
**2019** *(2)*
**202** *(1)*
**202-2600** *(1)*

**2023** *(1)*
**2025** *(29)*
**2029** *(1)*
**20th** *(1)*
**212** *(1)*
**219** *(1)*
**22nd** *(1)*
**23** *(1)*
**237(a)(4)(C** *(2)*
**23rd** *(1)*
**25** *(2)*
**25th** *(2)*
**26** *(2)*
**27** *(1)*
**27th** *(1)*

**< 3 >**
**3** *(8)*
**3:15** *(1)*
**3:20** *(1)*
**30** *(2)*
**302** *(1)*
**30X100191600** *(1)*
**34** *(1)*

**< 4 >**
**4** *(7)*
**4:01** *(1)*
**4:17** *(1)*
**42251** *(2)*
**44** *(3)*
**45** *(1)*
**475** *(1)*

**< 5 >**
**5** *(4)*
**5:27** *(1)*
**50** *(5)*

**< 6 >**
**6** *(2)*
**60** *(1)*
**616-8779** *(1)*
**646** *(1)*

**< 7 >**
**7** *(2)*
**7:00** *(1)*
**7:04** *(1)*

**745-8500** *(1)*
**75** *(2)*
**7th** *(1)*

**< 8 >**
**8** *(45)*
**8:18** *(1)*
**878** *(1)*

**< 9 >**
**90** *(1)*
**99** *(1)*

**< A >**
**A)(4)(C** *(1)*
**a.m** *(2)*
**ability** *(2)*
**able** *(3)*
**above-entitled** *(1)*
**above-named** *(1)*
**abstract** *(1)*
**Academy** *(1)*
**accent** *(1)*
**accurate** *(2)*
**accurately** *(1)*
**Aconlon@shertremont**
**e.com** *(1)*
**acronym** *(2)*
**Act** *(3)*
**Acting** *(2)*
**Action** *(8)*
**actions** *(3)*
**active** *(1)*
**actively** *(3)*
**activities** *(15)*
**activity** *(70)*
**addition** *(3)*
**Additional** *(6)*
**address** *(11)*
**addressed** *(3)*
**addresses** *(3)*
**addressing** *(6)*
**admin** *(2)*
**administration** *(1)*
**Administrative** *(7)*
**admitted** *(17)*
**adverse** *(3)*
**advised** *(1)*
**advocacy** *(7)*

**advocate** *(2)*
**advocating** *(3)*
**affect** *(2)*
**affirmative** *(1)*
**affixed** *(1)*
**agencies** *(4)*
**agency** *(5)*
**agenda** *(2)*
**agent** *(21)*
**agents** *(1)*
**ago** *(7)*
**agreed** *(1)*
**ahead** *(15)*
**aid** *(3)*
**al** *(2)*
**Alex** *(1)*
**ALEXANDER** *(2)*
**ALEXANDRA** *(1)*
**Algeria** *(1)*
**aliens** *(6)*
**allegation** *(1)*
**allegations** *(8)*
**allege** *(1)*
**alleged** *(3)*
**allocated** *(2)*
**allocating** *(1)*
**allow** *(1)*
**amenable** *(1)*
**AMENDMENT** *(1)*
**AMERICA** *(1)*
**AMERICAN** *(7)*
**America's** *(4)*
**analyses** *(1)*
**analysis** *(301)*
**analyst** *(48)*
**analysts** *(39)*
**analyst's** *(5)*
**analytical** *(3)*
**analyze** *(31)*
**analyzed** *(9)*
**analyzes** *(2)*
**analyzing** *(4)*
**and/or** *(1)*
**Andre** *(6)*
**answer** *(68)*
**answered** *(12)*
**answers** *(1)*
**anti** *(1)*
**anti-American** *(1)*

anti-Israel *(3)*
anti-Semitic *(18)*
anti-Semitism *(15)*
anybody *(5)*
anymore *(1)*
apart *(1)*
Apartheid *(2)*
appear *(7)*
appearances *(1)*
appeared *(2)*
appears *(2)*
append *(2)*
apply *(1)*
applying *(3)*
appreciate *(1)*
approval *(1)*
Approximately *(7)*
approximation *(4)*
area *(3)*
areas *(1)*
Armstrong *(3)*
arrest *(16)*
arrested *(8)*
arresting *(1)*
arrests *(12)*
arrived *(1)*
art *(5)*
aside *(1)*
asked *(41)*
asking *(34)*
assaulting *(1)*
assess *(2)*
assessed *(1)*
assesses *(1)*
assessment *(4)*
assessments *(1)*
assign *(1)*
assigned *(5)*
Assignment *(1)*
assignments *(1)*
Assistant *(7)*
associate *(7)*
ASSOCIATION *(7)*
assume *(3)*
attached *(2)*
attachment *(1)*
attendance *(1)*
attended *(3)*
attending *(1)*

Attends *(1)*
attention *(1)*
attitudes *(6)*
Attorney *(3)*
Attorneys *(4)*
AUPCAR *(1)*
authorities *(3)*
available *(1)*
Avery *(3)*
aware *(16)*
awareness *(4)*

< B >
Bachelor *(1)*
back *(14)*
background *(2)*
Badar *(2)*
ballpark *(1)*
banned *(4)*
based *(18)*
basis *(7)*
Bates *(3)*
BDS *(1)*
bear *(2)*
began *(1)*
beginning *(3)*
behalf *(1)*
believe *(12)*
believes *(1)*
Ben *(1)*
Benjamin *(1)*
best *(15)*
bet *(1)*
Betar *(7)*
B-E-T-A-R *(1)*
Betar's *(3)*
better *(1)*
big *(1)*
biographical *(4)*
birth *(1)*
blank *(1)*
blind *(1)*
blowers *(1)*
Border *(7)*
boss *(1)*
bottom *(3)*
BOX *(1)*
Boycott *(1)*
Brad *(5)*

Bradley *(1)*
break *(19)*
breaking *(5)*
brief *(1)*
briefed *(1)*
briefing *(14)*
briefings *(3)*
bring *(1)*
Broad *(1)*
broader *(1)*
broken *(1)*
bureau *(2)*

< C >
Call *(8)*
called *(14)*
calling *(9)*
Calls *(49)*
campus *(4)*
Canary *(41)*
candy *(1)*
capacity *(6)*
Capital *(1)*
Caption *(1)*
captioned *(1)*
CAR *(1)*
cartel *(1)*
Case *(89)*
cases *(36)*
category *(2)*
cause *(5)*
CCR *(3)*
cease *(1)*
center *(3)*
certain *(2)*
CERTIFICATE *(1)*
Certified *(9)*
certify *(3)*
chain *(1)*
chance *(4)*
change *(36)*
changes *(3)*
CHAPTER *(2)*
characteristics *(1)*
characterize *(1)*
CHARETTE *(2)*
charge *(1)*
Charges *(2)*
check *(1)*

chief *(21)*
chiefs *(8)*
child *(4)*
children *(1)*
Chung *(1)*
circumstance *(6)*
circumstances *(18)*
cite *(2)*
cited *(1)*
citizens *(4)*
Civil *(1)*
clarification *(8)*
clarify *(39)*
classified *(25)*
clear *(1)*
clearer *(1)*
Clem *(1)*
Clement *(2)*
client *(17)*
Close *(1)*
closed *(1)*
Coast *(5)*
coauthored *(2)*
coauthoring *(3)*
code *(2)*
coin *(1)*
collated *(1)*
collected *(1)*
collection *(1)*
collections *(4)*
COLUMBIA *(6)*
Combat *(1)*
come *(39)*
comes *(1)*
commencing *(1)*
comment *(1)*
comments *(1)*
commission *(1)*
committed *(3)*
common *(1)*
communicate *(2)*
communicated *(1)*
communication *(4)*
communications *(1)*
Community *(8)*
compelling *(1)*
compilation *(1)*
compile *(7)*
compiled *(2)*

compiles  (2)
compiling  (4)
complaint  (1)
complete  (1)
complex  (2)
compliance  (2)
component  (4)
comprehensive  (1)
compromise  (1)
computer  (1)
concern  (1)
concerning  (4)
concerns  (5)
conclude  (1)
concluded  (1)
conclusion  (10)
conclusions  (1)
conduct  (18)
conducted  (2)
conducts  (2)
confirm  (3)
confused  (1)
confusing  (5)
CONLON  (12)
connection  (1)
connections  (1)
connotations  (1)
connotes  (1)
consequences  (3)
consider  (3)
consideration  (2)
considered  (1)
consistent  (1)
conspiracies  (5)
constant  (1)
constitute  (4)
constitutes  (2)
construed  (4)
consults  (2)
contact  (2)
contain  (5)
contained  (3)
contains  (4)
content  (7)
context  (15)
continue  (2)
continues  (1)
contrary  (1)
convened  (1)

conversation  (5)
conversations  (20)
convey  (1)
coordinate  (4)
coordinated  (1)
coordinates  (1)
coordination  (4)
coordinator  (1)
copy  (4)
correct  (17)
corrections  (1)
correctly  (2)
counsel  (7)
counter  (2)
Countering  (2)
counterterrorism  (1)
country  (4)
counts  (1)
couple  (1)
course  (10)
COURT  (51)
cover  (1)
craft  (3)
created  (5)
credible  (2)
crime  (8)
crimes  (1)
criminal  (62)
criminals  (4)
criticism  (2)
criticizing  (1)
CRR  (2)
culture  (3)
currency  (1)
current  (4)
currently  (1)
customer  (1)
Customs  (2)
cut  (1)
Czar  (6)

< D >
D.C  (2)
daily  (3)
Daniels  (1)
Darrell  (1)
date  (3)
dated  (2)
day  (3)

daylight  (1)
days  (1)
DC  (1)
decide  (12)
decided  (2)
decides  (7)
deciding  (1)
decision  (13)
decision-maker  (1)
decision-making  (1)
decisions  (1)
declaration  (16)
declare  (2)
Defendants  (8)
Defendant's  (1)
define  (15)
definition  (1)
definitively  (1)
degree  (1)
deliberative  (18)
denouncing  (1)
depart  (1)
DEPARTMENT  (91)
Department's  (2)
depend  (7)
depending  (2)
depends  (3)
DEPONENT  (4)
Deportability  (2)
deportable  (1)
deposi  (1)
DEPOSITION  (16)
deputies  (1)
deputy  (26)
deputy's  (1)
Derek  (6)
derogatory  (4)
Derrick  (1)
describe  (3)
described  (7)
describing  (6)
description  (3)
descriptions  (2)
deserve  (1)
designated  (5)
destination  (2)
destruction  (11)
details  (7)
detected  (1)

determination  (24)
determinations  (6)
determine  (7)
determined  (2)
determining  (2)
developing  (1)
development  (1)
DHS  (25)
dictionary  (1)
difference  (1)
different  (10)
difficult  (5)
difficulties  (1)
difficulty  (1)
DIRECT  (2)
direction  (2)
directive  (2)
directly  (4)
Director  (18)
disagree  (2)
disasters  (1)
disclose  (6)
disclosing  (5)
discovery  (1)
discuss  (4)
discussed  (2)
discussing  (3)
discussion  (6)
discussions  (16)
dismantle  (1)
distinguish  (1)
distinguished  (1)
distinguishes  (1)
DISTRICT  (6)
Divest  (1)
Divestment  (3)
divide  (1)
divides  (1)
DIVISION  (79)
divisions  (5)
divulge  (12)
divulging  (8)
document  (23)
documents  (2)
doing  (7)
DOJ  (1)
domestic  (4)
DONALD  (3)
dozen  (1)

Dozens  (5)
drafting  (2)
Drive  (1)
drug  (2)
Due  (1)
duly  (1)

< E >
E.O  (6)
EAD  (2)
earlier  (8)
early  (2)
EAST  (1)
Eastern  (1)
education  (1)
EEO  (2)
effect  (1)
effort  (15)
either  (6)
elements  (3)
emergency  (3)
employed  (1)
employee  (4)
employees  (17)
Employment  (1)
Endorsing  (2)
enforce  (5)
Enforcement  (27)
enforcing  (7)
engage  (1)
engaged  (15)
engages  (4)
engaging  (3)
ensure  (4)
entail  (5)
entails  (1)
enter  (2)
enterprise  (1)
entire  (3)
entirety  (1)
environment  (5)
Equal  (1)
equipping  (1)
ERO  (2)
ERRATA  (2)
espionage  (1)
ESQ  (3)
ESQUIRE  (2)
establish  (2)

et  (2)
Etter  (10)
evaluation  (1)
EVANS  (1)
evening  (1)
EVEREST  (3)
evidence  (1)
exact  (3)
exactly  (2)
EXAMINATION  (8)
examined  (1)
example  (11)
examples  (5)
exchange  (2)
Executive  (81)
exhaustive  (2)
Exhibit  (20)
EXHIBITS  (2)
exist  (3)
existence  (2)
existing  (10)
exists  (1)
expedited  (1)
expertise  (1)
expires  (1)
explanation  (3)
exploitation  (5)
expose  (1)
express  (2)
expressed  (1)
expresses  (1)
expressing  (2)
extent  (29)

< F >
facetious  (1)
facilities  (1)
fact  (10)
fact-finding  (4)
factors  (2)
facts  (8)
factual  (6)
FACULTY  (2)
fair  (4)
fall  (3)
familiar  (5)
February  (2)
Federal  (1)
FEDERATION  (1)

feel  (1)
Fentanyl  (1)
field  (1)
figure  (1)
file  (1)
filed  (6)
files  (1)
financial  (1)
financially  (1)
find  (6)
finding  (3)
fine  (2)
finish  (1)
finished  (2)
fire  (1)
FIRST  (14)
Five  (34)
fix  (1)
Floor  (1)
focus  (2)
focused  (4)
folks  (2)
follow  (1)
follows  (2)
foregoing  (5)
foreign  (59)
Form  (151)
formal  (3)
formally  (5)
formed  (1)
former  (1)
formulating  (1)
forth  (1)
forward  (2)
forwarded  (3)
forwarding  (1)
forwards  (4)
fosters  (1)
found  (14)
Foundation  (3)
founding  (3)
Four  (3)
frame  (3)
Franklin  (1)
fraud  (2)
free  (6)
front  (2)
function  (2)
further  (2)

< G >
gain  (3)
gathered  (1)
gathering  (1)
Gaza  (1)
general  (7)
generally  (2)
generates  (1)
getting  (2)
give  (16)
given  (20)
global  (1)
go  (36)
goal  (1)
goes  (2)
going  (47)
Good  (6)
Gordon  (37)
Gordon's  (2)
Government  (9)
graduate  (1)
Great  (2)
greater  (2)
ground  (7)
grounds  (6)
group  (18)
groups  (2)
Guard  (4)
guess  (1)
guidance  (39)
guide  (1)
guidelines  (7)
guides  (2)
guys  (1)

< H >
half  (2)
halfway  (1)
Hamas  (24)
Hammer  (14)
hand  (3)
handbook  (4)
handle  (1)
handles  (1)
handling  (2)
happened  (2)
happens  (1)
happy  (3)

Case 1:25-cv-10685-WGY    Document 186-1    Filed 07/07/25    Page 855 of 863
Deposition of Peter Hatch
AAUP, et al. v. Rubio, et al.

hard (1)
HATCH (11)
head (2)
hear (11)
heard (4)
hears (1)
hearsay (24)
held (2)
help (3)
helpful (1)
HENDERSON (4)
hereof (1)
hereunto (1)
Heritage (1)
highest (1)
history (3)
HOB (1)
HOBs (2)
Hold (1)
holder (18)
holders (23)
holds (1)
Homeland (34)
horn (1)
hostile (8)
hour (1)
hours (4)
House (7)
HSI (66)
HSI's (8)
HSIY (2)
human (9)
hypothetical (3)

< I >
ICE (54)
ICE's (5)
iden (1)
identified (9)
identify (15)
identities (1)
identity (1)
imagine (1)
Immigration (6)
impact (1)
impeding (1)
impending (1)
implement (5)
implementation (1)

implementing (5)
implies (1)
imply (1)
important (1)
impose (1)
INA (1)
Inadmissibility/Deport
ability (1)
inadmissible (2)
Inaudible (9)
incident (1)
include (35)
included (12)
includes (5)
including (4)
inclusion (1)
inconsistent (3)
increase (1)
increased (3)
INDEX (2)
indicate (1)
indicated (1)
indicating (1)
indication (1)
indications (1)
individual (39)
individuals (39)
individual's (1)
influx (2)
inform (2)
Informal (1)
informally (2)
information (118)
informed (4)
initiated (3)
initiative (2)
input (4)
inside (11)
insight (1)
insofar (1)
instance (3)
instances (1)
INSTITUTE (1)
instituted (1)
institutional (2)
institutions (4)
instruct (23)
instructed (1)
instructing (1)

instruction (113)
instructions (24)
Intel (8)
intellectual (1)
Intelligence (172)
Intelligence's (3)
intend (4)
intends (1)
intent (4)
interagency (1)
interchangeable (1)
interest (2)
interested (3)
interests (3)
internal (1)
international (1)
internet (1)
interpreting (1)
interview (1)
Intifada (3)
introduction (1)
investigate (26)
investigated (2)
investigating (2)
investigation (17)
Investigations (14)
investigative (17)
investigator (6)
investigators (3)
involve (3)
involved (36)
involvement (1)
involving (8)
irrelevant (4)
Israel (25)
Israel's (11)
issue (1)
issued (4)
issues (2)
its (14)
iv (1)

< J >
January (1)
jargon (1)
JENNIFER (4)
JESSICA (2)
Jessica.strokus@usdoj.
gov (1)

Jewish (2)
JOB (13)
John (3)
join (1)
joined (1)
joke (1)
JON (2)
judge (1)
judgment (3)
June (5)
Justice (5)
JUSTICE/CIVIL (1)

< K >
Kahn (1)
Kaitlyn (1)
keep (5)
Khalil (14)
Khalil's (5)
Khan (1)
kind (3)
kinds (6)
KNIGHT (1)
know (148)
knowledge (40)
known (1)
KRISHNAN (447)
KRISTI (1)

< L >
laid (2)
language (2)
Large (2)
laughing (1)
laundering (1)
law (83)
lawful (10)
laws (5)
lawyer (1)
lawyers (2)
lay (1)
lead (4)
leaders (2)
leadership (25)
leading (1)
leads (4)
learned (1)
leave (1)
led (1)

left  (2)
legal  (9)
legally  (1)
letter  (13)
letters  (1)
level  (1)
liaison  (3)
liaisons  (1)
License  (1)
likewise  (1)
limiting  (1)
line  (16)
Lines  (1)
link  (1)
linkage  (1)
linked  (2)
list  (4)
lists  (2)
little  (1)
live  (1)
LLP  (1)
located  (1)
location  (7)
long  (11)
longer  (1)
look  (16)
looking  (5)
lot  (2)
LPRs  (1)
lunch  (1)
LYONS  (1)

< M >
Mahdawi  (2)
Mahdawi's  (1)
Mahmoud  (5)
main  (1)
maintained  (1)
majority  (2)
making  (1)
manage  (5)
management  (8)
manages  (1)
managing  (1)
manmade  (1)
manner  (1)
manual  (1)
March  (10)
MARCO  (5)

mark  (2)
marked  (11)
marking  (1)
marks  (1)
MASSACHUSETTS
  (3)
material  (1)
materials  (4)
matter  (6)
maximum  (2)
mean  (55)
meaning  (6)
means  (11)
meant  (5)
Measures  (2)
media  (7)
medication  (1)
meet  (8)
meeting  (14)
meetings  (14)
meets  (1)
member  (2)
members  (2)
membership  (1)
memorized  (1)
mention  (59)
mentioned  (61)
mentioning  (6)
mentions  (3)
met  (1)
Mexican  (1)
mic  (1)
Michael  (1)
Mid  (1)
MIDDLE  (1)
military  (2)
mind  (3)
mine  (2)
minimum  (1)
minutes  (1)
Mischaracterization
  (3)
mission  (34)
Mission's  (13)
Mm-hmm  (1)
Mohsen  (2)
moment  (6)
Momodou  (1)
money  (1)

month  (3)
morning  (1)
motion  (1)
move  (3)
multiple  (2)

< N >
name  (32)
named  (6)
names  (57)
NANCY  (3)
Nancy.safavi@usdoj.g
ov  (1)
narrow  (1)
narrowed  (1)
National  (91)
nationality  (2)
natural  (1)
Naturalization  (2)
nature  (3)
necessarily  (3)
need  (13)
needed  (3)
needs  (2)
negative  (1)
negotiator  (2)
neither  (1)
network  (4)
networks  (4)
never  (2)
nevertheless  (1)
NEVINS  (2)
NEW  (22)
newspaper  (7)
nice  (1)
No._____Change  (38)
No._____Line  (38)
nodded  (1)
NOEM  (1)
noncitizen  (9)
noncitizens  (20)
noncitizen's  (3)
noncriminal  (4)
normal  (1)
Northwest  (1)
notarial  (1)
Notary  (1)
note  (1)
noted  (1)

notes  (2)
Notice  (5)
Notices  (1)
notification  (4)
notified  (5)
notify  (3)
NSD  (6)
number  (10)
numbers  (2)

< O >
oath  (3)
object  (3)
Objection  (412)
objections  (2)
objective  (1)
objectives  (1)
obstructing  (1)
obstruction  (1)
obtained  (1)
obtaining  (1)
obviously  (1)
occasion  (1)
occasions  (3)
occur  (1)
occurred  (2)
October  (2)
OES  (1)
offense  (2)
offenses  (2)
offer  (2)
offered  (1)
Office  (190)
officer  (2)
offices  (3)
official  (15)
officials  (8)
Off-the-record  (1)
OGC  (1)
Oh  (15)
Ok  (1)
Okay  (88)
OKEEMAH  (4)
once  (1)
ones  (7)
ongoing  (2)
op-ed  (31)
open  (4)
open-source  (4)

operational *(11)*
operations *(9)*
opinion *(3)*
opinions *(1)*
Opportunity *(3)*
opposed *(3)*
ORAL *(2)*
Order *(49)*
orders *(37)*
ordinary *(3)*
organization *(12)*
organizations *(5)*
organized *(1)*
outcome *(4)*
outside *(14)*
overlap *(1)*
overseas *(2)*
oversee *(1)*
oversees *(1)*
overstayed *(1)*
Ozturk *(6)*
Ozturk's *(1)*

**< P >**
p.m *(8)*
PAGE *(60)*
pages *(2)*
Palestine *(22)*
panelist *(1)*
Paragraph *(4)*
parameters *(5)*
part *(46)*
participation *(3)*
particular *(10)*
parties *(2)*
partner *(1)*
partners *(1)*
parts *(9)*
patient *(1)*
Peace *(1)*
penalty *(3)*
pending *(5)*
people *(18)*
percent *(8)*
percentage *(4)*
peripherally *(1)*
perjury *(3)*
permanent *(13)*
person *(8)*

personal *(1)*
personnel *(4)*
person's *(2)*
perspective *(1)*
pertains *(1)*
PETER *(7)*
ph *(3)*
phrase *(7)*
physical *(3)*
piece *(1)*
place *(4)*
places *(4)*
plain *(2)*
plaintiff *(1)*
Plaintiffs *(8)*
platform *(1)*
please *(27)*
PO *(1)*
POB *(1)*
point *(3)*
points *(1)*
policies *(3)*
policy *(26)*
political *(6)*
portions *(1)*
pose *(9)*
poses *(2)*
posing *(1)*
possibility *(4)*
possible *(3)*
post-ROA *(1)*
posts *(1)*
potential *(9)*
potentially *(5)*
powers *(1)*
precise *(1)*
prefer *(1)*
preparation *(5)*
prepare *(15)*
prepared *(4)*
prepares *(8)*
preparing *(2)*
presence *(1)*
PRESENT *(11)*
President *(4)*
presidential *(1)*
press *(6)*
presume *(1)*
Previously *(1)*

Primarily *(1)*
principles *(3)*
prior *(16)*
privilege *(43)*
Privileged *(29)*
privileges *(4)*
proactively *(4)*
probably *(6)*
problem *(1)*
procedures *(4)*
Proceedings *(2)*
process *(57)*
produce *(14)*
produced *(21)*
produces *(1)*
producing *(3)*
production *(1)*
professional *(1)*
PROFESSORS *(3)*
PROFESSORS-
AMERICAN *(1)*
PROFESSORS-
HARVARD *(1)*
profile *(2)*
Program *(21)*
programmed *(1)*
Programs *(12)*
pro-Hamas *(25)*
prohibiting *(2)*
pro-Israel *(1)*
project *(3)*
promotes *(1)*
promptly *(1)*
propaganda *(1)*
pro-Palestinian *(5)*
property *(1)*
propounded *(1)*
Protecting *(2)*
Protection *(1)*
Protective *(2)*
protest *(4)*
protester *(24)*
protesters *(104)*
protester's *(9)*
protestor *(9)*
protestors *(1)*
protests *(30)*
provide *(20)*
provided *(38)*

Provides *(1)*
providing *(3)*
provisions *(4)*
Public *(11)*
publication *(1)*
published *(7)*
pulled *(1)*
purpose *(6)*
pursuant *(6)*
purview *(1)*
put *(6)*
putting *(1)*

**< Q >**
qualifies *(3)*
qualify *(3)*
question *(113)*
question-and-answer
*(1)*
questions *(9)*
quickly *(6)*
quotation *(1)*
Quote *(17)*
quoted *(2)*
quotes *(1)*
quoting *(1)*

**< R >**
ramifications *(1)*
RAMYA *(2)*
Ramya.krishnan@kni
ghtcolumbia.org *(1)*
range *(1)*
rare *(1)*
RASSON *(2)*
RAVEN *(1)*
Read *(64)*
reading *(8)*
realize *(1)*
reallocated *(1)*
really *(2)*
reason *(48)*
recall *(66)*
recalled *(1)*
receive *(10)*
received *(22)*
receives *(2)*
recipient *(1)*
recognize *(1)*

Deposition of Peter Hatch

AAUP, et al. v. Rubio, et al.

recollection *(3)*
recommend *(2)*
recommendation *(3)*
recommendations *(2)*
recommended *(1)*
Record *(38)*
recorded *(2)*
records *(1)*
redacted *(4)*
reduced *(3)*
refer *(24)*
reference *(8)*
referenced *(1)*
referrals *(1)*
referred *(27)*
referring *(14)*
refers *(5)*
reflect *(1)*
refresh *(1)*
refreshes *(1)*
regarding *(9)*
region *(1)*
regularly *(2)*
relate *(6)*
related *(15)*
relates *(1)*
relating *(3)*
relation *(7)*
relative *(1)*
release *(4)*
releases *(2)*
relevance *(5)*
relevant *(31)*
relieve *(1)*
remaining *(1)*
remarks *(1)*
remember *(10)*
remind *(2)*
REMOTE *(2)*
Removability *(1)*
removable *(1)*
removed *(1)*
removing *(1)*
Repeat *(24)*
repeated *(1)*
rephrase *(61)*
report *(138)*
REPORTED *(2)*
Reporter *(49)*

Reporting *(4)*
reports *(141)*
represent *(5)*
representative *(1)*
represented *(1)*
representing *(5)*
request *(15)*
requested *(14)*
requests *(13)*
required *(2)*
requires *(1)*
research *(57)*
researched *(10)*
researches *(2)*
researching *(4)*
reside *(1)*
resident *(8)*
residents *(6)*
resources *(2)*
respond *(3)*
responded *(1)*
respondent *(1)*
Respondents *(1)*
responds *(1)*
response *(13)*
responses *(1)*
responsibilities *(2)*
responsibility *(3)*
responsible *(3)*
restate *(3)*
result *(1)*
resulted *(1)*
return *(1)*
reveal *(2)*
revealing *(3)*
review *(34)*
reviewed *(12)*
reviewing *(1)*
reviews *(4)*
revocation *(16)*
revocations *(2)*
revoke *(1)*
revoked *(5)*
revoking *(9)*
Revolution *(3)*
right *(9)*
rights *(1)*
river *(3)*
Riverside *(1)*

RO *(1)*
ROA *(16)*
ROAs *(17)*
ROA's *(1)*
Robert *(2)*
role *(18)*
roles *(4)*
rolling *(5)*
rough *(2)*
Roy *(7)*
RPR *(5)*
RUBIO *(6)*
Rules *(2)*
Rumeysa *(2)*
running *(2)*
rush *(1)*
RUTGERS *(1)*

< S >
SAFAVI *(405)*
Safety *(6)*
Salisbury *(5)*
Salsburg *(1)*
Samantha *(1)*
Sanctions *(1)*
save *(1)*
saw *(1)*
saying *(3)*
says *(15)*
school *(7)*
Science *(1)*
scope *(2)*
screen *(8)*
screening *(20)*
sea *(3)*
seal *(1)*
second *(3)*
Secretary *(7)*
section *(15)*
sections *(4)*
Securities *(2)*
Security *(114)*
see *(34)*
seeing *(9)*
seek *(1)*
seeks *(1)*
seen *(24)*
send *(4)*
sending *(1)*

sends *(1)*
senior *(19)*
senior-most *(2)*
seniors *(1)*
sense *(1)*
sensitive *(2)*
sent *(11)*
sentence *(23)*
sentiment *(1)*
September *(1)*
SEPV *(1)*
series *(4)*
serious *(1)*
services *(1)*
serving *(1)*
set *(3)*
sets *(2)*
SEVP *(2)*
S-E-V-P *(1)*
share *(3)*
shared *(2)*
sharing *(1)*
shed *(1)*
SHEET *(2)*
SHER *(1)*
shorter *(1)*
Shorthand *(2)*
show *(3)*
side *(3)*
sidebar *(1)*
sign *(5)*
Signed *(1)*
significant *(2)*
signing *(2)*
silent *(2)*
similar *(3)*
sit *(3)*
situated *(1)*
situation *(1)*
Six *(4)*
slow *(1)*
smuggling *(6)*
social *(7)*
somebody *(5)*
soon *(1)*
sorry *(50)*
sort *(1)*
source *(8)*
sources *(2)*

speak *(3)*
speaking *(1)*
special *(1)*
specialist *(1)*
specific *(24)*
specifically *(1)*
specifics *(1)*
specify *(4)*
speculate *(28)*
speculating *(9)*
speculation *(58)*
speculative *(1)*
spent *(1)*
spoken *(5)*
spokesperson *(2)*
spreads *(1)*
staff *(6)*
staffing *(1)*
stamp *(4)*
stand *(1)*
standard *(48)*
Standing *(128)*
stands *(3)*
Stanley *(14)*
start *(12)*
started *(3)*
starting *(1)*
starts *(1)*
State *(90)*
stated *(2)*
statement *(14)*
statements *(8)*
STATES *(26)*
Station *(1)*
stenographically *(2)*
step *(2)*
stop *(1)*
stored *(1)*
straight *(1)*
Street *(2)*
strike *(4)*
STROKUS *(4)*
student *(166)*
students *(18)*
student's *(5)*
STUDIES *(1)*
stuff *(1)*
sub *(2)*
subject *(13)*

subject's *(1)*
submits *(1)*
submitted *(5)*
Subparagraph *(2)*
subsequently *(3)*
subset *(3)*
sufficient *(1)*
suggest *(1)*
Suite *(1)*
summary *(2)*
supervise *(2)*
supervises *(4)*
supervisor *(2)*
supervisors *(7)*
supervisory *(3)*
supply *(1)*
support *(41)*
supporting *(2)*
Sure *(19)*
Suri *(3)*
Suri's *(4)*
surprise *(1)*
surrender *(2)*
suspect *(2)*
suspected *(19)*
suspended *(1)*
Suspicion *(4)*
suspicions *(1)*
suspicious *(21)*
swear *(1)*
sworn *(4)*
system *(5)*

< T >
Taal *(2)*
Tab *(4)*
tactics *(1)*
tags *(1)*
take *(9)*
taken *(12)*
takes *(1)*
talk *(1)*
talked *(1)*
talking *(14)*
TALYA *(2)*
talya.nevins@knightco
lumbia.org *(1)*
tasking *(1)*
TEACHERS *(1)*

team *(7)*
techniques *(1)*
technology *(1)*
tell *(13)*
temporarily *(1)*
ten *(3)*
tenure *(3)*
term *(19)*
terms *(11)*
terrorism *(16)*
terrorist *(11)*
Terrorists *(5)*
testified *(1)*
testify *(1)*
testifying *(3)*
testimony *(28)*
Thank *(11)*
theft *(1)*
thing *(2)*
things *(10)*
think *(29)*
third *(4)*
thought *(2)*
threat *(16)*
threaten *(1)*
threatening *(1)*
Threats *(17)*
tiger *(5)*
time *(44)*
times *(1)*
tip *(7)*
title *(53)*
titled *(1)*
today *(8)*
today's *(1)*
TODD *(1)*
told *(6)*
Tony *(4)*
top *(4)*
topic *(1)*
tracking *(3)*
trade *(4)*
trafficking *(7)*
trailing *(1)*
train *(1)*
Training *(9)*
transactional *(1)*
transcribed *(1)*
TRANSCRIPT *(7)*

transnational *(2)*
transposed *(1)*
TREMONTE *(1)*
true *(9)*
TRUMP *(3)*
Trump's *(3)*
truthful *(1)*
truthfully *(1)*
trying *(14)*
turn *(7)*
turned *(1)*
Twice *(1)*
two *(12)*
type *(2)*
types *(3)*
typewriting *(1)*
typical *(2)*
Typically *(13)*
typo *(1)*

< U >
U.S *(36)*
Uh-huh *(11)*
underlying *(1)*
understand *(49)*
understanding *(34)*
Understood *(1)*
unfamiliar *(1)*
unfortunately *(1)*
unit *(32)*
UNITED *(17)*
unit's *(1)*
universe *(1)*
universities *(3)*
UNIVERSITY *(11)*
unlawfully *(1)*
unsure *(1)*
update *(3)*
updated *(4)*
updates *(10)*
use *(2)*
usual *(2)*
usually *(5)*

< V >
various *(1)*
vary *(1)*
verbal *(1)*
verse *(1)*

Case 1:25-cv-10685-WGY    Document 186-1    Filed 07/07/25    Page 860 of 863
Deposition of Peter Hatch
AAUP, et al. v. Rubio, et al.

versus  (5)
vet  (5)
vetting  (4)
Vice  (2)
video  (3)
Videographer  (21)
VIDEOTAPED  (1)
violated  (3)
violating  (2)
violation  (31)
violations  (32)
violence  (10)
violent  (2)
Visa  (76)
Visas  (4)
visitor  (2)
visual  (1)
voice  (6)
volume  (1)
vs  (2)

< W >
waive  (1)
walk  (1)
Walker  (13)
want  (22)
wanted  (3)
wants  (1)
war  (1)
Washington  (2)
Watson  (24)
way  (7)
ways  (6)
weapons  (2)
website  (34)
websites  (1)
Wednesday  (1)
weigh  (2)
welcome  (4)
well  (17)
went  (9)
we're  (15)
we've  (13)
WGY  (1)
WHEREOF  (1)
White  (7)
WIELAGE  (4)
William  (2)
withdraw  (1)

withdrawn  (47)
witness  (56)
Wolcott  (2)
Wonderful  (1)
word  (2)
words  (7)
work  (11)
worked  (4)
workflow  (4)
working  (8)
workload  (4)
workplace  (1)
works  (7)
world  (2)
worth  (1)
write  (3)
writing  (10)
written  (6)
Wynn  (1)

< X >
XI01916  (1)

< Y >
Yankees  (2)
yeah  (33)
year  (26)
years  (9)
YORK  (5)
Yunseo  (1)

< Z >
Zionism  (1)
Zoom  (1)

# EXHIBIT 7

# OUR MISSION

Canary Mission documents individuals and organizations that promote hatred of the USA, Israel and Jews on North American college campuses and beyond. Canary Mission investigates hatred across the entire political spectrum, including the far right, far left and anti-Israel activists.

Canary Mission is motivated by a desire to combat the rise in anti-Semitism on college campuses. We pursue our mission by presenting the words and deeds of individuals and organizations that engage in anti-Semitism, racism and bigotry on the far right, far left and among the array of organizations that comprise the anti-Semitic Boycott, Divestment, Sanctions (BDS) movement.

Canary Mission gathers content from publicly available sources. Additionally, we collect and validate materials submitted privately through our website. We aggregate this information into a concise and easily searchable format, providing free access to the general public.

Before publication, all content is verified, meeting our high standards of accuracy and authenticity.

When published content is based on validated information submitted privately, a note indicating this is placed on the page.

The addition of individuals to our database is governed by our Ethics Policy .

Individuals who believe that they should be removed from the Canary Mission website are encouraged to be in touch with us and may become an Ex-Canary.

 

we all have the right to know if an individual has been affiliated with movements that routinely engage in anti-Semitic rhetoric and actions, promote hatred of Jews and seek the destruction of Israel.



**HOME**

**OUR MISSION**

**ETHICS POLICY**

**CONTACT US**

**STUDENTS**

**PROFESSORS**

**PROFESSIONALS**

**MEDICAL**

**ORGANIZATIONS**

**EX-CANARY**

**BLOG**

**CAMPAIGNS**

**CANADA**

Copyright © 2024 Canary Mission Inc.
All rights reserved.