# EXHIBIT 8

← Back to Glossary Terms

# Betar USA

Betar USA is a chapter of the worldwide Zionist youth organization Betar, founded by early Zionist thinker and philosopher Ze'ev Jabotinsky in 1923. The U.S. chapter of Betar, which was revived in June 2023, adopts the far-right Kahanist slogan calling for Jewish armament, "Every Jew, a .22." The group also openly embraces Islamophobia and harasses Muslims online and in person. The group has indicated that they would like to work with the Proud Boys, a far-right extremist group with a history of antisemitism and Islamophobia, to "counter Islamic jihadis."

Betar USA encourages Jewish people to "fight back" in the streets against antisemitism with "aggressive in-person protests." It has posted footage of these actions online alongside inciting images of baseball bats. In February 2025, it posted a video of an individual (who was not Betar-related) shouting Islamophobic slurs outside of a mosque with the caption, "We protest mosques." The post was later removed. Some of Betar USA's tactics include confronting Muslim and Arab protestors at rallies, often taking photographs of them to send to ICE and government officials with the intention of prompting their deportation. More escalatory tactics of Betar USA include vandalism (they call themselves vandals) as well as burning and tearing down Palestinian flags. Betar USA has also encouraged supporters and members to "mask up" when committing acts of vandalism or protesting.

GROUPS / MOVEMENTS

Betar | Glossary: Center on Extremism



This database provides an overview of many of the terms and individuals used by or associated with movements and groups that subscribe to and/or promote extremist or hateful ideologies.

# EXHIBIT 9

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

MOMODOU TAAL., *et al*.,

Plaintiffs,

v.

DONALD J. TRUMP, *et al.*,

Defendants.

No. 3:25-cv-335 (ECC/ML)

Declaration of Unit Chief Roy M. Stanley III

## DECLARATION OF UNIT CHIEF ROY M. STANLEY

I, Roy M. Stanley III pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.        I am Unit Chief of the Counterterrorism Intelligence Unit within U.S. Immigration and Customs Enforcement ("ICE") Homeland Security Investigations ("HSI") Office of Intelligence. I have held a supervisory position within ICE since September 2018. I also have over thirty-five years of intelligence and operations experience as a senior U.S. Air Force officer and Department of Defense ("DoD") civilian employee with multiple assignments to Iraq, Afghanistan, Pakistan, Qatar, and on the Joint Staff. I retired at the rank of O-6, and my last assignment in uniform was as a Director, Joint Intelligence and Operations Center, CENTCOM HQ. As a DoD civilian, I worked for the Joint Warfare and Analysis Center, Joint Improvised Explosive Device Defeat Organization in Afghanistan, served as a CENTCOM rep at DEA Special Operations Division and the CBP National Targeting Center.

2.      HSI is a component of ICE that conducts significant and complex criminal investigations into individuals and international criminal networks that violate U.S. laws. HSI focuses its efforts on combating the transnational criminal networks that pose the greatest threats to the security of the United States. HSI has more than 10,000 employees stationed in more than 235 U.S. cities and more than 50 countries worldwide. The HSI workforce is made up of special agents, criminal analysts, intelligence analysts, and support personnel who live and work in the communities they are sworn to protect and serve.

3.      I am aware of the above-captioned lawsuit. I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other Department of Homeland Security (DHS) employees, and information portals maintained and relied upon by DHS in the regular course of business.

4.      On January 29, 2025, President Trump issued Executive Order 14188, *Additional Measures to Combat Anti-Semitism* (Executive Order). ICE is steadfast in its commitment to enforcing the Executive Order prohibiting anti-Semitism and safeguarding national security. ICE conducts targeted analysis to substantiate aliens' alleged engagement of antisemitic activities.

5.      To implement this Executive Order, the HSI Office of Intelligence proactively reviews open-source information to identify individuals subject to the Executive Order. Open-source information is defined as unclassified information that has been published or broadcast in some manner to the general public, could be lawfully seen or observed by a casual observer, is made available at a meeting open to the public, or is obtained by visiting any place or attending any event that is open to the public.

6.      Mr. Taal was identified as a student at Cornell University and a prominent pro-Palestinian activist involved in protests and disruption of university events. In one incident that

led to the University suspending him, he failed to comply with University directives to remove an unauthorized encampment, cease unreasonably loud chants and behavior, and disperse.

7.     Mr. Taal faced suspension on more than one occasion due to his disorderly behavior and long-term pattern of disregarding the rights of other students and the general public and was in fact banned from campus for a period of time while one suspension was being reviewed. This was due to, per a Senior Associate Dean, his "demonstrated a pattern of escalating, egregious behavior and a disregard for the university policies that exist to protect and response the rights of all members of the community." Mr. Taal posted emails with these and other, similar sentiments to the online magazine *Inside Higher Ed*.

8.     In or about March of 2025, HSI Office of Intelligence identified open-source records that indicated the Cornell University campus police determined that Mr. Taal had engaged in "disruptive conduct" that violated the university's code of conduct in multiple ways, including, for instance, knowingly following individuals who had used force – pushing aside Cornell University Police Officers – to gain access to an off-campus University event at the Ithaca Statler Hotel on September 18, 2024, and failing to follow University directives and campus police orders. Noise from the resulting protest was so loud that bystanders reported medical complaints and possible hearing loss. The University's Interim President contemplated pursuing both administrative and criminal charges following this event.

9.     Mr. Taal's involvement in certain protests at Cornell University align with the Executive Order's focus on deporting individuals who perpetrate "unlawful anti-Semitic harassment." His involvement in these disruptive protests creates a hostile environment for Jewish students.

10. Because of Mr. Taal's conduct, HSI referred Mr. Taal's case to the U.S. Department of State, which has the authority to determine whether the alien's presence or activities within the United States compromise a compelling U.S. foreign policy interest and potentially have serious adverse foreign policy consequences, as outlined in Section 237(a)(4)(C) of the Immigration and Nationality Act (INA), codified at 8 U.S.C. § 1227(a)(4)(C).

11. I am aware of the Court's order of March 21, 2025, directing the Government to address "whether the portions of the Executive Orders challenged in the Complaint, Dkt. No. 1 , are a basis for Mr. Taal's anticipated 'surrender to [U.S. Immigration and Customs Enforcement] custody' as stated in the March 21, 2025 electronic mail message from the Government to Plaintiffs' counsel." Dkt. No. 27. HSI's March 14, 2025 referral of Mr. Taal's case to the Department of State referred to the Executive Order. The Department of State revoked Mr. Taal's visa the same day. That is the extent of HSI's provision of information related to the Executive Order in question.


I declare under penalty of perjury that the foregoing is true and correct.


Executed this 22nd day of March 2025.


_____
Roy M. Stanley III
Unit Chief
Homeland Security Investigations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

# EXHIBIT 10

1          UNITED STATES DISTRICT COURT
2            DISTRICT OF MASSACHUSETTS
   - - - - - - - - - - - - - - x
   AMERICAN ASSOCIATION OF      :
3  UNIVERSITY PROFESSORS, ET
   AL,                          :
4
           Plaintiffs,          :    Case No.
5
     v.                         :
6                                    1:25-cv-10685 (WGY)
   MARCO RUBIO, ET AL,          :
7
           Defendants.          :
8
   - - - - - - - - - - - - - - x
9

10          Videotaped deposition of ANDRE WATSON,

11   taken on behalf of the Plaintiffs, beginning at

12   10:10 a.m., on Wednesday, June 11, 2025, at the

13   law offices of Kellogg, Hansen, Todd, Figel &

14   Frederick, P.L.L.C., 1615 M Street, NW, Suite

15   400, Washington D.C. 20036, before Okeemah S.

16   Henderson, RRP, CaseViewNet Realtime Reporter,

17   and Notary Public for the District of Columbia.

18

19    (REPORTER'S NOTE: All quotations from exhibits

20   are reflected in the manner in which they were

21   read into the record and do not necessarily

22   denote an exact quote from the document.)

23   Everest Job No. 41658

24

25   Reported by: Okeemah S. Henderson, RPR

```
 1    APPEARANCES OF COUNSEL

 2


 3       ON BEHALF OF THE PLAINTIFFS:

 4            ALEXANDRA CONLON, ESQUIRE

 5            COURTNEY GANS, ESQUIRE

 6            SHER TREMONTE, LLP

 7            90 Broad Street

 8            23rd Floor

 9            New York, NY 10004

10            Aconlon@shertremonte.com

11            (212) 202-2600

12


13


14       ON BEHALF OF THE PLAINTIFFS:

15            SCOTT WILKENS, ESQUIRE

16            RAMYA KRISHNAN, ESQUIRE

17            KNIGHT FIRST AMENDMENT INSTITUTE AT

18            COLUMBIA UNIVERSITY

19            475 Riverside Drive

20            Suite 302

21            New York, NY 10115

22            Scott.wilkens@knightcolumbia.org

23            (646) 745-8500

24


25
```

```
 1    APPEARANCES OF COUNSEL (Continued)

 2

 3       ON BEHALF OF THE DEFENDANTS:

 4          WILLIAM KANELLIS, ESQUIRE

 5          VICTORIA SANTORA, ESQUIRE

 6          JESSICA STROKUS, ESQUIRE

 7          U.S. DEPARTMENT OF JUSTICE

 8          CIVIL DIVISION

 9          Benjamin Franklin Station

10          PO BOX 878

11          Washington, DC 20044

12          (202) 616-8779

13

14

15

16

17

18

19

20

21

22       ALSO PRESENT:

23           MACKLIN EVERLY, ESQUIRE

24           KAITLYN CHARETTE, ESQUIRE

25           JON RASSON, VIDEO OPERATOR
```

1

2                    INDEX OF EXAMINATION

3

4    WITNESS: ANDRE WATSON                    PAGE

5

6    DIRECT EXAMINATION

7       By Ms. Conlon                         5

8

9                    INDEX OF EXHIBITS

10          (Attached to the transcript)

11    EXHIBITS                                PAGE

12    Exhibit 1   Executive Order 14161       88

13    Exhibit 2   Declaration of Andre Watson  100

14    Exhibit 3   Executive Order 14188       111

15    Exhibit 4   Excerpt of section 1182     120

16    Exhibit 5   Certified administrative record
                  for Mahmoud Khalil          227
17
      Exhibit 6   Post on X by DHS's social media
18                account                     240

19    Exhibit 7   3/11/25 press briefing by
                  Karoline Leavitt            247
20

21

22

23

24

25

1                P R O C E E D I N G S

2              THE VIDEOGRAPHER:  We are now on the

3    record.  Today's date is June 11, 2025 and the

4    time is 10:10 a.m., Eastern daylight time.

5    This is the recorded video deposition of Andre

6    Watson in the matter of American Association of

7    University Professors, et al versus Marco

8    Rubio, et al in the United States District

9    Court, District of Massachusetts, case number

10   125-CV-10685.

11           This deposition is being held at 1615 M

12   Street, Northwest, Washington, D.C.  My name is

13   Jon Rasson from Everest Court Reporting, and

14   I'm the video specialist.  The Court Reporter

15   today is Okeemah Henderson, also from Everest

16   Court Reporting.

17           All counsel appearing today will be

18   noted on the stenographic record.  Will court

19   reporter please swear in the witness.

20                    ANDRE WATSON,

21   was called as a witness, and having been first

22   duly sworn, was examined and testified as

23   follows:

24                    EXAMINATION

25   BY MS. CONLON:

```
 1              Q.   Okay.  Good morning.

 2              A.   Good morning.

 3              Q.   So we didn't get to meet, which

 4    is surprising because we did a lot of

 5    introductions, so I'm sorry I missed you.  I'm

 6    Alex Conlon.  I work at Sher Tremonte LLP and

 7    we are the law firm that is partnering with the

 8    Knight Institute on this case.

 9         I'm going to be questioning you.  Have

10    you done a deposition before?

11              A.   It's been some time.

12              Q.   Okay.  I'm going to review the

13    plaintiff basic ground rules for both of us

14    before we start.  Because Ms. Henderson, our

15    court reporter, is taking down everything we

16    say, please make sure you give verbal

17    responses, so not just a nod or a shake of the

18    head.

19         If you don't understand a question, let

20    me know, I'll rephrase it.  Please don't answer

21    a question if you don't understand it before

22    getting clarification.  If you want to take a

23    break, just let me know.  If a question is

24    pending, I'm just going to ask you to answer it

25    before we break.  Um, I think that's it.
```

```
 1              Before we start, are you taking any
 2    medication that could affect your ability to
 3    testify truthfully or accurately today?
 4              A.    No.
 5              Q.    Any other reason that you
 6    wouldn't be able to provide truthful testimony
 7    today?
 8              A.    No other reason.
 9              Q.    Okay.  So please state your
10    name for the record.
11              A.    Andre Watson.
12              Q.    And Mr. Watson, have you given
13    sworn testimony before in court or in a
14    deposition, just so I'm clear.
15              A.    Yes.
16              Q.    When -- how many times?
17              A.    I can't give you an exact
18    number.
19              Q.    I'll take a ballpark estimate.
20              A.    More recently at least two over
21    the past three months.
22              Q.    Anything before 2025?
23              A.    I had testimony before the
24    Senate Judiciary Committee back in 2022.
25              Q.    Any other instances of
```

 1    testimony that you can recall?

 2              A.   Not at this time.

 3              Q.   The testimony that you

 4    referenced giving in 2025, where did you give

 5    that testimony?

 6              A.   The District of Columbia.

 7              Q.   And in what circumstance?

 8              A.   As a declarant.

 9              Q.   In what case?

10              A.   I don't remember the case.

11              Q.   Do you recall what judge you

12    were in front of?

13              A.   No.

14              Q.   Can you tell me what that case

15    was about?

16              A.   It was about a student studying

17    in the United States.

18              Q.   What was your role testifying

19    there as a declarant?

20              A.   It was testifying in

21    furtherance of my declarant statement.

22              Q.   Were you there -- withdrawn.

23    What was the substance of your declarant

24    statement?

25              A.   My knowledge and participation.

1          Q.    In what?

2          A.    An investigation.

3          Q.    What was the name of the

4    student?

5          A.    I don't recall.

6          Q.    What did that case have to do

7    with your current job in the Department of --

8    in the Homeland Security investigations?

9          MR. KANELLIS:   Objection.

10   Foundation.  You can answer if you can.

11   BY MS. CONLON:

12         Q.    Do you want me to repeat the

13   question?

14         A.    Please.

15         Q.    What did the case that you

16   testified in in the District Court in D.C. have

17   to do if anything with your current job in the

18   Department -- in Homeland Security

19   Investigations?

20         A.    I have oversight of the student

21   and exchange visitor program.

22         Q.    I take it that the student at

23   issue in that case was overseen by the student

24   and exchange visitor program?

25         A.    Yes.

1        Q.   To your knowledge, was there

2   any determination by the court in D.C. as to

3   the credibility of your testimony?

4        A.   Yes.

5        Q.   And what was that

6   determination?

7        A.   I was found to be credible.

8        Q.   Well, there's a lot of lawyers

9   here from the Government.  Are you represented

10  in your personal capacity by any of them?

11       A.   Help me -- can you rephrase

12  that question?

13       Q.   Sure.  Of course.  Do you

14  understand any of the lawyers who are here

15  today to represent you individually as opposed

16  to representing the agency that you work for?

17       A.   I don't understand that

18  question.

19       Q.   Did you personally retain any

20  of the counsel that's here today?

21       A.   No.

22       Q.   Do you understand any of the

23  counsel that's here today to represent the

24  agency that you work for?

25       A.   Agency counsel.

1        Q.    Who is that of this group?

2        A.    Right here (indicating).

3        Q.    Did you speak with anyone about

4    your testimony here today before coming to

5    testify?

6        A.    Anyone is broad.  Can you

7    restate the question?

8        Q.    Do you not understand the

9    question?

10        A.    Anyone is broad.  So I would

11    ask for a narrower scope.

12        Q.    Did you speak with anyone who

13    works for the Department of Homeland Security

14    about your testimony here today before coming

15    here?

16        A.    My leadership is aware of this

17    event.

18        Q.    And who is in your leadership?

19        A.    Acting Deputy Associate

20    Director William Walker.

21        Q.    Anybody else that you spoke

22    with in your leadership about testifying here

23    today?

24        A.    He's my chain of command and

25    for clarification, that is Acting Deputy

1    Executive Associate Director, William Walker.

2              Q.   Is he the person that you

3    report to directly?

4              A.   As of today, yes.

5              Q.   Did you speak with anybody else

6    at the Department of Homeland Security about

7    your testimony here today before coming to

8    testify?

9              A.   I've spoken with Agency

10   counsel.

11             Q.   And who was that that you spoke

12   to?

13             A.   Ann Daniels, who is deputy

14   chief counsel or deputy chief.

15             Q.   Anyone else from the Department

16   of Homeland Security?

17             A.   Agency counsel present and also

18   departmental counsel present.

19             Q.   Departmental counsel.  Okay.

20   So apart from the three lawyers that you

21   identify that you spoke with from the

22   Department of Homeland Security and Mr. Walker,

23   you did not speak with anyone else at the

24   Department of Homeland Security before coming

25   to testify about the testimony?

```
 1                A.   I didn't discuss the testimony,
 2     only that I have an upcoming event.
 3                Q.   Did you speak with anyone from
 4     the Department of State about your testimony
 5     before coming to testify today?
 6                A.   No.
 7                Q.   Did you speak with anyone at
 8     any other executive agency about your testimony
 9     before coming to testify today?
10                A.   Just my colleagues from the
11     Department of Justice present today.
12                Q.   Were you given any guidance by
13     anyone in the Department of Homeland Security
14     about the substance of your testimony for
15     today?
16                MR. KANELLIS:  Objection. Vague.
17                MS. CONLON:  If you understand the
18     question, you can answer.
19                A.   An explanation of what a
20     deposition is.
21     BY MS. CONLON:
22                Q.   What about the substance of
23     your testimony; the topics you are going to
24     testify about today?
25                A.   I don't know what the topics
```

1    are.

2              Q.   With all those lawyer

3    conversations they didn't give you much of a

4    preview sounds like.  Were you given any

5    guidance either from your colleagues at the

6    Department of Homeland Security or from anyone

7    in the Department of Justice about topics that

8    you cannot answer questions about today?

9              MR. KANELLIS:  Objection.  Vague.

10   BY MS. CONLON:

11             Q.   Do you understand the question?

12             MR. KANELLIS:  And I will note that

13   to the degree this calls for privileged

14   communications, lawyer advice, I'll instruct

15   the witness not to answer.

16   BY MS. CONLON:

17             Q.   Are there any topics that you

18   understand you are not supposed to address in

19   your testimony today?

20             A.   Can you restate that question?

21             Q.   Are there any topics that you

22   understand you should refuse to answer

23   questions about today?

24             A.   I don't know.

25             Q.   In your conversations --

 1    withdrawn.  Did you take any steps to prepare

 2    to testify today?

 3              A.   Yes.

 4              Q.   What steps did you take?

 5              A.   Rest.

 6              Q.   Well, that's a good step.  Any

 7    other steps?

 8              A.   No exercise.

 9              Q.   Did you take any steps to

10    prepare to testify today apart from resting and

11    not exercising?

12              A.   No.

13              Q.   Did you review any documents to

14    prepare to testify today?

15              A.   No.

16              Q.   Going back for one second to

17    things you will be testifying about today, were

18    you given any parameters by colleagues at the

19    Department of Homeland Security who are not

20    lawyers about topics that you should not

21    discuss in your testimony today?

22              A.    Not that I can recall.

23              Q.    Okay.  Mr. Watson, I'm going to

24    turn to some just personal background

25    information because I don't know much about

Deposition of Andre Watson                                      AAUP, et al. v. Rubio, et al.

1    you.   What is your highest level of education?

2              A.    Bachelors of Science degree.

3              Q.    What is your current title?

4              A.    Assistant Director.

5              Q.    Assistant Director of what?

6              A.    National Security Division.

7              Q.    In what department?

8              A.    Homeland Security.

9              Q.    How long have you been in that

10   role?

11             A.    Since July of 2020.

12             Q.    You mentioned that your title

13   is Assistant Director, does that cannote

14   anything about your rank in the department?

15             A.    No.

16             Q.    No need to have any humility

17   and response to this but I take it that's a

18   high-ranking position in the department?

19             A.    It can be.

20             Q.    In this instance, is it?

21             A.    Yes.

22             Q.    Fair to say you are a

23   high-ranking official within the National

24   Security Division?

25             A.    Fair.

1           Q.    Who is senior to you in rank in

2      the National Security Division?

3           A.    No one.

4           Q.    Do you oversee any employees at

5      the National Security Division in your role?

6           A.    Yes.

7           Q.    How many?

8           A.    Two direct -- three direct

9      reports.

10          Q.    And who are they?

11          A.    Akil Baldwin, Spiros Karabinas

12     and Chaz Davis.

13          Q.    What are their roles, starting

14     with Mr. Baldwin?

15          A.    Deputy Assistant Director.

16          Q.    And for Mr. Karabinas?

17          A.    Acting Deputy Assistant

18     Director.

19          Q.    Okay.  And for Mr. Davis?

20          A.    Chief of staff.

21          Q.    Mr. Davis is your chief of

22     staff?

23          A.    Yes, ma'am.

24          Q.    Did I understand you earlier

25     correctly that the person you report to is

1    Mr. Walker?

2              A.    Correct.

3              Q.    You don't report to anybody

4    else?

5              A.    He is my supervisor.

6              Q.    And who does Mr. Walker report

7    to?

8              A.    Derrick Gordan.

9              Q.    And what is Mr. Gordan's title

10   if you know it?

11             A.    Acting executive associate

12   director.

13             Q.    Mr. Gordan is the acting

14   executive associate director of the National

15   Security Division of Homeland Security?

16             A.    No, ma'am.

17             Q.    Okay.  Tell me which part of

18   that I got wrong.

19             A.    He is the acting executive

20   associate director of Homeland Security

21   Investigations.

22             Q.    We're going to talk about that

23   in a second because I want to make sure I

24   understand where Homeland Security

25   Investigation sits in the Agency, and I want to

 1    stick with you in your background for just one

 2    more moment.  Prior to -- prior to 2020 when

 3    you took on the role you're currently in, what

 4    did you do professionally?

 5            A.   I served on a detail assignment

 6    for the U.S. Department of Homeland Security.

 7            Q.   For how long?

 8            A.   Just under two-and-a-half

 9    years.

10            Q.   What was that detail

11    assignment?

12            A.   To serve as the principal

13    Deputy Assistant Security for the Countering

14    Weapons of Mass Destruction Office within the

15    Department of Homeland Security.

16            Q.   And before that -- before

17    that -- withdrawn actually.  Where were you

18    detailed from?

19            A.   Homeland Security

20    Investigations; ICE.

21            Q.   Before that detail, what was

22    your role?

23            A.   Special agent in charge.

24            Q.   Special agent in charge of

25    what?

1           A.    Baltimore, Maryland field

2    office.

3           Q.    And how long were you in that

4    role?

5           A.    Just under three years.

6           Q.    How long have you worked in the

7    Department of Homeland Security all together?

8           A.    Since the inception of the

9    department.

10          Q.    Which was when?

11          A.    March of 2003.

12          Q.    What did you do before that?

13          A.    I served as a special agent for

14   the Department of Treasury.

15          Q.    And how long were you in that

16   role?

17          A.    From September of 1994 to the

18   creation of the Department of Homeland

19   Security.

20          Q.    I won't make us go back any

21   farther than that.  Thank you for walking me

22   through it.  You are based here in D.C. in your

23   current role?

24          A.    Yes.

25          Q.    I am hopeful that we can avoid

 1    it but if we needed to speak to you again in

 2    the next two weeks, do you have any travel

 3    planned outside of D.C.?

 4              A.   Yes.

 5              Q.   What dates are you traveling?

 6              A.   June 14 through June 18.

 7              Q.   Any other travel in the next

 8    two weeks?

 9              A.   That is pending.

10              Q.   I'm sorry.  What's pending?

11              A.   Travel.

12              Q.   In other words, you may have

13    travel but you're not sure.

14              A.   Correct.

15              Q.   Any commitments that are

16    immovable for you in the next two weeks and

17    days that you know you could not be available

18    to speak with us in the next two weeks?

19              A.   That I would say is fluid as

20    well.

21              Q.   Understood.  No particular date

22    comes to mind right now as a day that we should

23    cross off the calendar for you?

24              A.   I don't have my schedule in

25    front of me.

```
 1              Q.   So you're not sure?

 2              A.   Correct.

 3              Q.   So I want to turn now to

 4   Homeland Security Investigations.  Homeland

 5   Security Investigations is a component of ICE;

 6   is that correct?

 7              A.   Program office.

 8              Q.   A program office of ICE.  What

 9   does it mean for something to be a program

10   office?

11              A.   It's a subordinate office

12   within an agency.

13              Q.   Subordinate office within --

14   okay.  And what are the other subordinate

15   offices within ICE?

16              A.   Enforcement and Removal

17   Operations, management and administration.

18              Q.   Uh-huh?

19              A.   The Office of Professional

20   Responsibility.

21              Q.   Uh-huh?

22              A.   And the principle legal

23   advisor.

24              Q.   Okay.  Are all of the --

25   withdrawn.  We've talked about the National
```

```
 1    Security Division.  Is that also a division of
 2    ICE.  Help me understand the relationship
 3    between the National Security Division and
 4    Homeland Security Investigations.
 5            A.   The National Security Division
 6    is within Homeland Security Investigations.
 7            Q.   Got it.  Sticking with that for
 8    a moment, what are the other divisions of
 9    Homeland Security Investigations?
10            A.   Cyber and operational
11    technology, countering transnational organized
12    crime, international operations, domestic
13    operations and the Office of Intelligence.
14            Q.   So the five components you just
15    named and the National Security -- and the
16    National Security Division together make up
17    Homeland Security Investigations; is that
18    right?
19            A.   Those are the major divisions.
20            Q.   And zooming out from that,
21    there's the National Security Division within
22    HSI, what other divisions are there?
23            A.   Those are the ones I just
24    referenced.
25            Q.   Oh, I'm sorry.  Let me -- I'm
```

1  sorry.  There's HSI as part of ICE and then you

2  mentioned, sorry, ERO, Enforcement and Removal

3  Operations, right?

4          A.   Correct.

5          Q.   What does, big picture, what

6  does Enforcement and Removal Operations do or

7  what are they tasked to do?

8          A.   Civil enforcement to include

9  detention and removal.

10          Q.   How is that different from what

11  HSI overall does?

12          A.   HSI conducts criminal

13  investigations.

14          Q.   Is that the only difference

15  between the work that they do?

16          A.   The most notable, yes.

17          Q.   When you say, "criminal

18  investigations," you mean violations of

19  criminal statutes?

20          A.   Correct.

21          Q.   As opposed to immigration

22  statutes?

23          A.   Immigration statutes can be

24  criminal as well.

25          Q.   Fair to say HSI -- so

 1    withdrawn.  So ERO does not work on criminal

 2    investigations of immigration statutes but HSI

 3    does; is that correct?

 4              A.    No.

 5              Q.    Tell me what's wrong.

 6              MR. KANELLIS:  Objection.  Vague.

 7    BY MS. CONLON:

 8              Q.    Help me understand the

 9    difference with regard to criminal

10    investigations between the work of HSI and the

11    work of ERO?

12              A.    The primary difference in that

13    construct comes down to the enforcement of

14    Title 18 United States Code and the legacy

15    authorities that were derived from the U.S.

16    Customs Service by customs law.

17              So for criminal investigators within

18    the Department of Homeland Security, ICE

19    Homeland Security Investigations, they are

20    certified pursuant to the criminal

21    investigative training program at the federal

22    law enforcement training center.  That is an

23    OPM requirement to be labeled a criminal

24    investigator.  ERO does not participate in that

25    training regiment at the federal law

1    enforcement training center and as such, they

2    do not have the OPM certification to conduct

3    criminal investigations in that space.

4              Q.    And what does OPM stand for?

5              A.    The Office of Personnel

6    Management.

7              Q.    Is there a difference in the

8    statutory violations that are investigated by

9    ERO and HSI?

10             A.    I don't know.

11             Q.    What role does HSI have in Visa

12   revocations?

13             MR. KANELLIS:    Objection.  Vague.

14             MS. CONLON:    You can answer the

15   question.

16             A.    I don't know.

17   BY MS. CONLON:

18             Q.    What responsibilities does HSI

19   have with respect to Visa revocations?

20             MR. KANELLIS:    Objection.  Vague.

21   BY MS. CONLON:

22             Q.    Going back for a moment to the

23   questions I was asking you about your criminal

24   investigative work, does HSI investigate only

25   criminal basis for revoking Visas?

1          A.    Can you restate that question?

2          Q.    Does HSI -- as an initial

3    matter, does HSI investigate criminal basis for

4    revoking Visas?

5          A.    What do you mean by criminal

6    basis.

7          Q.    Alleged violations of criminal

8    laws?

9          A.    HSI conducts investigations as

10   it relates to alleged violations of federal

11   law.

12         Q.    And my question is focused on

13   Visa revocations.  So does HSI conduct any

14   investigations in connection with potential

15   revocations of Visas for reasons other than

16   violations of criminal laws?

17         A.    Restate the question please.

18         Q.    Maybe it will be easier if I

19   just let you tell me what are the basis for

20   revocations of Visas that HSI investigates?

21         A.    HSI investigates violations of

22   criminal law as it relates to immigration and

23   customs law.

24         Q.    When you say, "customs law,"

25   what particular set of statutes are you

```
 1    referring to?

 2              A.   To start, it can be United

 3    States Federal Code as it relates to the

 4    importation of goods into the United States.

 5    And importations contrary to that are a

 6    violation of 18 USC 545, smuggling goods into

 7    the United States.  So in that sense, that is

 8    just one example of a customs law that HSI

 9    investigates.

10              Q.   What are the other examples

11    that you can think of?

12              A.   18 USC 2320 which relates to

13    intellectual property laws.

14              Q.   I don't want to make you sit

15    here and name every example you can think of.

16    I'm trying to ascertain from you whether there

17    is a particular section of the code that in

18    your mind falls under customs law so that I can

19    understand what you mean when you use that

20    term.  So do you think you can explain what

21    parts of the code you're referring to when you

22    say, "customs law"?

23              A.   Those two are examples.

24              Q.   I understand, but I'd like to

25    understand the full universe of laws that you
```

1    are referring to when you say, "customs law"

2    because that's not a term that I know.

3            MR. KANELLIS:  Objection.  Vague.

4            MS. CONLON:  I'm asking your witness

5    to explain what he means because I think it's

6    vague.  So I'll ask you again, Mr. Watson.

7    BY MS. CONLON:

8            Q.   When you say, "customs law,"

9    what body of law are you referring to?

10           A.   Title 18 United States code and

11   the two sections that I referenced, 545 and

12   2320.

13           Q.   There are no other particular

14   sections that you can think of that are a part

15   of customs law in your understanding?

16           A.   There's also 554 which is

17   smuggling goods outbound.

18           Q.   And those are the only three

19   sections 18 USC 545, 18 USC 554, 18 USC 2320

20   that are your particular -- those are the only

21   three sections that you understand make up

22   customs law; is that correct?

23           A.   There are more beyond Title 18.

24           Q.   What else --

25           A.   Title 19 United States Code

1    Section 507 states specifically what customs

2    authorities and -- what the customs authorities

3    are and designates customs officers.  So by

4    statute, that gives customs the ability to

5    cross designate.

6                Q.   To cross designate -- I'm

7    sorry.  Can you finish that thought; to cross

8    designate what?

9                A.   State and local officers.

10               Q.   To cross designate them to

11   serve in furtherance of customs goals; is that

12   what you mean?

13               A.   The enforcement of law.

14               Q.   Of customs laws.

15               A.   Yes.

16               Q.   HSI does not issue Visas,

17   right?

18               A.   No.

19               Q.   That's not part of HSI's work?

20               A.   No.

21               Q.   And HSI does not issue green

22   cards, right?

23               A.   Not to my knowledge.

24               Q.   What role -- what

25   responsibility or duty does HSI have in

1    connection with the investigation of people who

2    hold Visas?

3            A.    HSI has a compliance and

4    oversight function through the student and

5    exchange visitor program.

6            Q.    And does HSI have any

7    responsibilities for the investigation of Visa

8    holders outside of the Student Exchange and

9    Visitor Program?

10           A.    If there is a violation of law.

11           Q.    In other words, HSI may have

12   occasion to investigate a Visa holder if it

13   becomes aware of a alleged violation of a

14   criminal law but there is no specific duty that

15   HSI has to investigate Visa holders apart from

16   the Student and Exchange Visitor Program.

17       Do I understand you correctly?

18       MR. KANELLIS:  Objection.  Compound.

19   Mischaracterizes prior testimony.  A little bit

20   vague.  You can answer if you can.

21           A.    I can't.

22   BY MS. CONLON:

23           Q.    What types of Visas does HSI

24   have any -- any responsibility to investigate?

25   What types of Visa holders.  You've mentioned

1    students as part of the Student Exchange and

2    Visitor Program.  Are there any other

3    categories of Visa holders that HSI has an

4    obligation to investigate?

5              A.    There's no specific category.

6              Q.    Apart from this category of

7    folks with student Visas; is that correct?

8              A.    There's no specific category --

9              Q.    Okay.

10             A.    -- as relates to alleged

11   violations of federal law involving noncitizens

12   or aliens in the United States or elsewhere.

13             Q.    So fair to say HSI is

14   responsible for investigating alleged

15   violations of federal law by all noncitizens?

16             A.    As well as U.S. persons.

17             Q.    HSI also investigates U.S.

18   citizens?

19             A.    As it relates to violations of

20   criminal law.

21             Q.    Does HSI have any enforcement

22   power of violations of federal criminal law

23   against U.S. citizens?

24             MR. KANELLIS:  Objection. Vague.

25   BY MS. CONLON:

1        Q.    Do you understand the question?

2        A.    No, I don't.

3        Q.    Could an HSI officer arrest a

4   U.S. citizen?

5        A.    On what violation?

6        Q.    Any violation.

7        A.    Of United States code?

8        Q.    Yes.

9        A.    If there's probable cause.

10       Q.    And to be clear, when you're

11  talking about the universe of people who HSI

12  can investigate who are noncitizens, that

13  includes both the Visa holders and lawful

14  permanent residents, right?

15       A.    Yes.

16       Q.    So HSI investigates alleged

17  violations of federal law.  If HSI concludes

18  that someone has violated federal law, does HSI

19  have enforcement power with respect to that

20  alleged violation?

21            MR. KANELLIS:  Objection.  Vague.

22  And let me just be specific, enforcement power

23  is a loaded term.  So that's -- maybe if you

24  can rephrase --

25       Q.    Sure.

1          A.    -- that would help him answer

2     your question.

3          MS. CONLON:   Sure.

4     BY MS. CONLON:

5          Q.    Once HSI makes the

6     determination that someone has -- I'll be more

7     specific.  When HSI makes a determination that

8     a Visa holder has violated federal law, what is

9     the next step for HSI at that point?  What do

10    they do?

11         A.    In furtherance of a criminal

12    investigation it would be referred to the

13    United States Attorney's Office in the

14    applicable jurisdiction.

15         Q.    And if it was in furtherance of

16    a noncriminal investigation, what would HSI's

17    next step be?

18         A.    It depends.

19         Q.    Can you help me understand the

20    menu of options?

21         A.    The menu of options are

22    contingent upon coordination between the United

23    States Attorney's Office as well as Agency

24    counsel.

25         Q.    Sticking with alleged

1    violations of criminal laws, I understand you

2    to be saying HSI would coordinate with the U.S.

3    Attorney's Office with the Department of

4    Justice; is that correct?

5              A.    Yes.

6              Q.    In the case of an alleged

7    violation of a noncriminal law, what other

8    agencies does HSI coordinate with?

9              A.    We have coordinated with the

10   Department of State.

11             Q.    Any other agencies?

12             A.    The department of -- not

13   agencies but department.

14             Q.    Any other departments?

15             A.    Defense.

16             Q.    Going back to the Department of

17   State for a moment, is there a particular

18   division of the Department of State that HSI

19   coordinates with for investigations of

20   noncriminal laws?

21             A.    The Department of State Bureau

22   of Consular Affairs.

23             Q.    What does the Bureau of

24   Consular Affairs do?

25             A.    They have oversight of Visas.

1      Q.   Do they have oversight of green

2  cards or lawful permanent resident status?

3          A.   Not to my knowledge.

4          Q.   What division of the Department

5  of State does?

6          A.   Department -- for

7  clarification.  So for -- so for -- give me

8  that question one more time.

9          Q.   Sure.  What division of the

10  Department of State does HSI coordinate with

11  for investigations of lawful permanent

12  residents?

13          A.   That would be the Department of

14  State.

15          Q.   There is no counter part to the

16  Bureau of Consular Affairs for lawful permanent

17  residents?

18          A.   Yes, there is and that would be

19  the U.S. Office of Citizenship and Immigration

20  Services and we do coordinate with both

21  offices.

22          THE COURT REPORTER: We do coordinate

23  with...

24          A.   Department of State and U.S.

25  Citizenship and Immigration Services.

```
 1    BY MS. CONLON:

 2            Q.   In HSI's investigation of

 3    noncitizens, is there any other department or

 4    division within the Department of State that

 5    you work with?

 6            A.   Not for me.

 7            Q.   That HSI works with?

 8            A.   I'm not aware of any others for

 9    me personally.

10            Q.   Who in the -- can you tell me

11    who is in the leadership of the Bureau of

12    Consular Affairs in the Department of State?

13            A.   John Armstrong.

14            Q.   And what is his role?

15            A.   Senior bureau official.

16            Q.   As far as you know, is he the

17    senior-most official in the Bureau of Consular

18    Affairs?

19            A.   Yes.

20            Q.   Is there anyone else, any other

21    officials at the Bureau of Consular Affairs

22    that HSI coordinates with in the investigation

23    of noncitizens?

24            A.   Yes.

25            Q.   Who else?
```

1           A.    Andrea Whiting.

2           Q.    Anybody else?

3           A.    Stuart Wilson.

4           Q.    Is there anyone apart from John

5     Armstrong, Andrea Whiting and Stewart Wilson

6     who HSI coordinates with in the investigations

7     of noncitizens within the Bureau of Consular

8     Affairs?

9           A.    At my level, those are the

10    individuals that I'm aware of.

11          Q.    What is Ms. Whitings's role or

12    title, do you know?

13          A.    I don't know.

14          Q.    What do you understand to fall

15    within her purview?

16          A.    I don't know.

17          Q.    How do you understand her work

18    to be any different from Mr. Armstrong's?

19          A.    I don't know.

20          Q.    For all you know, they do the

21    same job.

22          A.    Fair.

23          Q.    For all you know, they have the

24    same title.

25          A.    I don't know that.

1          Q.    What about Mr. Stuart Wilson,

2    what is his title?

3          A.    Deputy Assistant Secretary.

4          Q.    Deputy Assistant Secretary of

5    Homeland Security -- I'm sorry, of the

6    Department of State?

7          A.    He is an employee within the

8    Department of State.

9          Q.    So he's the Deputy Assistant

10   Secretary of what?

11         A.    He is a subordinate to John

12   Armstrong.

13         Q.    So we've just been discussing

14   the senior leaders of the Bureau of Consular

15   Affairs.  Who are the senior leaders of the

16   United States Office of Citizenship Immigration

17   Services that HSI coordinates with?

18         A.    I don't know them.

19         Q.    Do you work less often with the

20   senior leaders at the U.S. Office of

21   Citizenship Immigration Services?

22         A.    Correct.

23         Q.    Why is that?

24         MR. KANELLIS:  Objection.

25   Foundation.  Objection.  Vague.

```
 1   BY MS. CONLON:
 2          Q.    Am I correct in understanding
 3   that HSI coordinates more frequently with the
 4   Bureau of Consular Affairs than the U.S. office
 5   of Citizenship Immigration Services?
 6          A.    No.  I can only speak to my
 7   level, not to that of my subordinate staff.
 8          Q.    Do you have any understanding
 9   of how often your subordinate staff coordinates
10   with the Bureau of Consular Affairs; how often
11   they coordinate with the U.S. Office of
12   Immigration -- of Citizen Immigration Services?
13          A.    No.
14          Q.    Who would know the answer to
15   that question?
16          A.    My Deputy Assistant Director
17   Akil Baldwin.
18          Q.    Is there any -- is there anyone
19   within HSI who's specifically assigned to
20   coordinate with the Bureau of Consular Affairs?
21          A.    HSI is a broad program office,
22   so I can't answer that question.
23          Q.    Is there anyone within the
24   National Security Division of HSI which you
25   oversee who is specifically tasked with
```

1    coordinating with the Bureau of Consular

2    Affairs?

3                A.    Not to my knowledge.

4                Q.    Who most frequently in the

5    National Security Division coordinates with the

6    Bureau of Consular Affairs?

7                MR. KANELLIS:    Objection. Foundation.

8    BY MS. CONLON:

9                Q.    Mr. Watson, you are the

10   senior-most official in the National Security

11   Division of the Homeland Security

12   Investigations -- of Homeland Security

13   Investigations; is that right?

14               A.    Yes.

15               Q.    You supervise -- you supervise

16   the Department of the National Security

17   Division; is that right?

18               A.    I supervise the National

19   Security Division, we're not a department.

20               Q.    Sorry.  It's hard to keep the

21   lingo distinct.  You supervise the National

22   Security Division, right?

23               A.    I oversee it.

24               Q.    So I'll ask you again, who, to

25   your knowledge, coordinates most often for the

1    National Security Division with the Bureau of

2    Consular Affairs?

3              A.    The human right violators and

4    war crime center as well as the human right

5    violator and war crimes unit has a relationship

6    with the Department of State Bureau of Consular

7    Affairs.

8              Q.    What is the human right

9    violators and war crimes center?

10             A.    That is an interagency

11   initiative between HSI, the federal bureau of

12   investigations, the Department of Justice,

13   human rights and special prosecution section.

14   In addition to the Department of Justice office

15   of immigration litigation and the Department of

16   State Bureau of Consular Affairs as well as

17   customs and boarder protection that focuses on

18   human right violators and war crimes.

19             Q.    And the war crimes unit that

20   you referenced, is that different from the

21   human rights violators and war crimes center?

22             A.    It's a subordinate unit within.

23             Q.    Got it.  So setting aside this

24   human right violators and war crimes center, is

25   there any other identifiable program within the

1    national security division that regularly

2    coordinates with the Bureau of Consular

3    Affairs?

4            A.    Yes.

5            Q.    What's that?

6            A.    The Counter Threat Lead

7    Development unit.

8            Q.    What is the Counter Threat Lead

9    Development unit?

10           A.    That unit focuses on overstays.

11           Q.    I can't tell if you're finished

12   answering.  Okay.  Overstays as in Visa

13   overstays?

14           A.    Yes.

15           Q.    Does the Counter Threat Lead

16   Development unit focus on lawful permanent

17   residents as well?

18           A.    No.

19           Q.    Does the Counter Threat Lead

20   Development unit investigate exclusively Visa

21   overstays?

22           A.    That is one area.

23           Q.    What are the other areas that

24   they investigate?

25           A.    Visa overstays as it relates to

1    noncitizens cover a wide spectrum of Visas.

2              Q.   What -- I think I don't

3    understand when you say, "Visa overstays" the

4    breadth what you're talking about.  So Visa

5    overstays covers a wide spectrum of Visas.

6    Tell me what's within that spectrum?

7              A.   Noncitizens or aliens that are

8    admitted under categories of Visas by the U.S.

9    State Department.

10             Q.   Are there particular categories

11   of Visas that the Counter Threat Lead

12   Development unit oversees or investigates?

13             A.   No.

14             Q.   When you say, "Visa overstays,"

15   what does that mean?

16             A.   A person that overstays the

17   time within the issuance of the Visa as

18   authorized by the U.S. Department of State.

19             Q.   Now, does that mean only a Visa

20   that as a particular expiration date and the

21   person has stayed beyond it or does that refer

22   to something more?

23             A.   I don't know, because each Visa

24   category and term of admission is different.

25             Q.   Can you give me a couple of

 1    examples of different types of Visa overstays

 2    so I better understand what you mean?

 3              A.    You can have a noncitizen alien

 4    that is admitted under that B1 or B2 for period

 5    of up to 6 months.  And if that person doesn't

 6    renew or depart, it may fall within the

 7    determination that they overstayed their Visa.

 8              Q.    Are there other ways a Visa

 9    holder overstays their Visa apart from failing

10    to renew at its expiration or to depart at its

11    expiration?

12              A.    I don't know.

13              Q.    So the Counter Threat Lead

14    Development unit is only investigating Visa

15    overstays of the kind that you have given me an

16    example of?

17              A.    That's a small framework.

18              Q.    What's the better framework for

19    understanding what you mean?

20              A.    B-1/B-2 but it can also include

21    F.

22              Q.    And what, just so I understand,

23    what are F Visas?

24              A.    Student.

25              Q.    Can you give me an example of

1    an overstay on an F Visa that the Counter

2    Threat Lead Development unit would investigate?

3              A.    An example could include a

4    student that is terminated by a school for

5    failure to complete the terms of their

6    admission and course of study.

7              Q.    So that's very helpful.  So

8    overstay -- when we're talking about the Visa

9    overstays that the Counter Threat Lead

10   Development unit investigates, that can include

11   violations of the terms and conditions of the

12   Visa holder's Visa; is that right?

13             A.    That's accurate.

14             Q.    In other words, a person can

15   overstay their Visa not just by staying past

16   the expiration date but also by falling out of

17   compliance with the conditions of the Visa?

18             A.    That's fair.

19             Q.    Are there particular kinds of

20   violations of the terms and conditions of Visas

21   that the Counter Threat Lead Development unit

22   focuses on?

23             A.    Yes.

24             Q.    What are they?

25             A.    National security and also

 1    public safety.

 2              Q.   Are there particular sections

 3    of immigration law that you're referring to

 4    when you talk about national security in this

 5    context?

 6              A.   Not necessarily in the I&A.

 7              Q.   I see.  Is there -- if I'm

 8    trying to understand what national security

 9    means for the Counter Threat Lead Development

10    unit, what is the source of law that I would

11    look to if there is one?

12              A.   Espionage, terrorism.

13              Q.   In other words, the Counter

14    Threat Lead Development unit focuses on Visa

15    overstays relating to espionage and terrorism

16    among other things?

17              A.   These are overstays or those

18    that have engaged in activities as captured

19    within the INA in areas to include counter

20    intelligence, espionage or terrorism.

21              Q.   So the Counter Threat Lead

22    Development unit in addition to investigating

23    Visa overstays also investigates Visa holders

24    whose activities may relate to -- withdrawn.

25              What you're saying about the Counter

1    Threat Lead Development unit investigating

2    national security and public safety is that

3    distinct from that unit's investigation of Visa

4    overstays?

5              A.    I'm sorry.  I don't understand

6    the question.

7              Q.    I think I don't either.  It's

8    okay.  You said that the Counter Threat Lead

9    Development unit focuses on potential national

10   security or public safety concerns in its

11   investigations, right?

12             A.    Yes.

13             Q.    Is that only with respect to

14   Visa overstays or does that cover a broader

15   category of noncitizens?

16             A.    I need you to restate that

17   question.

18             Q.    I'm just waiting for the

19   transcript to catch up so I can see it.

20        The Counter Threat Lead Development

21   unit focuses on potential national security or

22   public safety concerns separate and apart from

23   its investigation of Visa overstays; is that

24   correct?

25             A.    No.

1    Q.   The Counter Threat Lead

2    Development unit only investigates potential

3    national security or public safety concerns

4    with respect to Visa holders; is that correct?

5            A.   No.

6            Q.   What is the population of

7    noncitizens it that the Counter Threat Lead

8    Development unit can investigate for potential

9    national security for public safety concern?

10           MR. KANELLIS:   Objection.   Vague.

11   BY MS. CONLON:

12           Q.   If you can answer the question

13   please do.

14           A.   I can't.

15           Q.   Does the Counter Threat Lead

16   Development unit investigate lawful permanent

17   residents?

18           A.   Do we receive allegations

19   involving lawful permanent residents, yes.

20           Q.   Does the Counter Threat Lead

21   Development unit investigate those allegations?

22           A.   The unit can refer a matter for

23   further investigation.

24           Q.   So the Counter Threat Lead

25   Development unit refers alleged violations by

1    lawful permanent residents to a different unit;

2    is that correct?

3              A.    It can be a field office.

4              Q.    I'm trying to understand

5    whether the Counter Threat Lead Development

6    unit itself investigates lawful permanent

7    residents or only Visa holders.  Can you answer

8    that?

9              A.    The unit receives information

10   on national security and public safety concerns

11   that can relate to legal permanent residents,

12   aliens or U.S. persons and can refer leads to

13   applicable HSI field offices as deemed

14   appropriate.

15             Q.    For allegations involving U.S.

16   citizens, who does the Counter Threat Lead

17   Development unit refer those allegations to for

18   U.S. citizens?

19             A.    They can be referred to a field

20   office.

21             Q.    A field office of what?

22             A.    Homeland Security

23   Investigations.

24             Q.    Is the same true for an alleged

25   violations of law by aliens or lawful permanent

```
 1   residents?

 2              A.   Yes.

 3              Q.   You referenced the counter

 4   threat -- sorry.  Is there an acronym that you

 5   use for this --

 6              A.   CTLD.

 7              Q.   You referenced CTLD receiving

 8   information concerning alleged violations of

 9   law.  Where does CTLD receive that information

10   from?

11              A.   U.S. Customs and Border

12   Protection.

13              Q.   Where else?

14              A.   Department of Defense.

15              Q.   Any other departments?

16              A.   No for department and another

17   source can be Citizenship and Immigration

18   Services, USCIS.

19              Q.   Any sources apart from Customs

20   and Border Patrol, the Department of Defense

21   and USCIS?

22              A.   I can't speak to others right

23   now but those three are of substantial

24   interaction and coordination.

25              Q.   Who at USCIS, what senior
```

1    officials does CLTD (sic) coordinate with?

2                A.    I don't know.

3                Q.    Who runs CLTD (sic)?

4                A.    Right now that is acting unit

5    chief Kristin Falcone.

6                Q.    Would you expect Ms. Falcone to

7    know who CLTD (sic) coordinates with at USCIS?

8                A.    Her subordinate supervisors,

9    yes.

10                Q.    Who are Ms. Falcone's

11    subordinate supervisors?

12                A.    Richard Phillips.

13                Q.    Do you know his title?

14                A.    Section chief.

15                Q.    Does she have any other

16    subordinate supervisors?

17                A.    Not permanent beyond

18    (inaudible).

19                Q.    When you say, not permanent,

20    what does that mean?

21                A.    We have folks in acting roles.

22                Q.    Do you know who her current

23    acting supervising subordinates are?

24                A.    No.  We just had a departure.

25                Q.    And who was it that just left?

1          A.    Mason Nichols.

2          Q.    Does CLTD (sic) receive

3    investigative leads from nonGovernment actors?

4          A.    I don't know.

5          Q.    When -- I think I got that

6    acronym wrong last time.  When CTLD receives

7    investigative leads from a Government agency,

8    is there a particular information system that's

9    used for the lead to be conveyed to CTLD?

10         A.    Yes.

11         Q.    What is that?

12         A.    LEADTRACK.

13         Q.    Have you ever used LEADTRACK?

14         A.    No.

15         Q.    Do you know how long LEADTRACK

16   has been in place?

17         A.    Since I have been in my role.

18         Q.    At least since 2020?

19         A.    I believe so, yes.

20         Q.    Do you know which -- withdrawn.

21   Do you know whether the Department of State has

22   access to LEADTRACK?

23         A.    I don't know.

24         Q.    Do you know whether any agency

25   or department apart from CTLD, U.S. Customs

1    Border Patrol, Department of Defense and USCIS

2    has access to LEADTRACK?

3              A.   I don't know.

4              Q.   Who within CTLD is well versed

5    in LEADTRACK?

6              A.   Acting unit chief Falcone.

7              Q.   Do you have -- withdrawn.  When

8    investigative leads are shared with CTLD, what

9    kind of documentation is generated or created

10   about the lead?

11             MR. KANELLIS:  Objection.  Calls for

12   materials covered by the law enforcement

13   privilege.  Do not answer that question.

14   BY MS. CONLON:

15             Q.   Any documentation generated in

16   connection with an investigative lead for CTLD

17   is maintained in LEADTRACK?

18             A.   I don't know.

19             Q.   When an investigative lead is

20   shared with CTLD, is a file created about the

21   subject of that lead?

22             MR. KANELLIS:  Objection.  Calls for

23   materials covered by the law enforcement

24   privilege.  Do not answer that question.

25             MS. CONLON:  Just a moment.

AAUP, et al. v. Rubio, et al.

```
 1          We, Mr. Kanellis, have a disagreement

 2     with you about the scope of the privilege which

 3     of course you're welcome to invoke.  So I'm

 4     going to ask the questions that I think are

 5     appropriate.  I understand you'll object and we

 6     can deal with it on the back end.

 7     BY MS. CONLON:

 8          Q.   When a file -- assuming that a

 9     file is created -- well, withdrawn actually.

10     Who is responsible within CTLD for responding

11     to an investigative lead?

12               MR. KANELLIS:  Objection.  Vague.

13     Objection.  May call for materials covered by

14     the law enforcement privilege.  Do not answer

15     that question.

16     BY MS. CONLON:

17          Q.   How many people work in CTLD;

18     an approximation is fine.

19          A.   There are at least ten.

20          Q.   At least ten?

21          A.   Correct.

22          Q.   Who besides -- to your

23     knowledge, who besides Ms. Falcone and

24     Mr. Phillips works within CTLD?

25          A.   I can't give you their names at
```

```
 1    this time because I don't have that information

 2    in my mind right now.

 3              Q.    Is there a directory that

 4    exists that names all of the people who work in

 5    CTLD?

 6              A.    Directory, I don't understand

 7    that.

 8              Q.    Is there any sort of document

 9    that you're aware of that would name the people

10    who work in CTLD.  Like a roster of the people

11    in the unit?

12              A.    Document, no.

13              Q.    If you wanted to contact

14    someone in CTLD and you didn't know their

15    e-mail address, where would you look for it?

16              A.    So that's intranet where most

17    of that information is kept.

18              Q.    In other words, the intranet

19    that HSI has access to would have the contact

20    information for people who work in CTLD?

21              A.    Yes.  There is also an office

22    roster.

23              Q.    When I say directory, I think I

24    should have said roster.  There's a roster that

25    exists that identifies the various people that
```

1    work in CTLD and any other unit; is that right?

2              A.    Yes.

3              Q.    When CTLD investigates, at the

4    end of its investigation, does it make a

5    recommendation to the Department of State about

6    actions that should be taken?

7              A.    When you say, "investigation,"

8    what do you mean?

9              MS. CONLON:  And if you need water

10   let me know.

11   BY MS. CONLON:

12             Q.    Let's say CTLD receives an

13   investigative lead, investigates that lead and

14   reaches a conclusion about whether they think

15   there's been a violation of law.  Where does

16   CTLD report that information out to or who do

17   they report it out to?

18             A.    The applicable field office

19   where the person of interest may be located.

20             Q.    And can the field office act on

21   a determination of CTLD without involving the

22   Department of State?

23             A.    They can investigate further.

24             Q.    But can they take an action

25   like an arrest without involving the Department

```
 1    of State?
 2              A.    That depends.  In coordination
 3    with the Office of the Principal Legal Advisor
 4    within the judicial district where that field
 5    office is located.
 6              Q.    Okay.  I'll come back to that
 7    in a second.  Does referral to an HSI field
 8    office depend on the location of the subject
 9    person?
10              A.    It can.
11              Q.    Is there any other basis for
12    determining which HSI field office gets the
13    referral?
14              A.    Not to my knowledge.
15              Q.    Does CTLD ever refer to -- does
16    CTLD ever refer to something other than a HSI
17    field office?
18              A.    When you say, "refer," I'm
19    trying to understand --
20              Q.    Yeah, I understand your
21    question.
22              A.    -- what that means.
23              Q.    If CTLD investigates and
24    believes further investigation is warranted,
25    can CTLD refer to anywhere other than a HSI
```

1    field office?

2              A.    CTLDU can coordinate with

3    another entity as deemed appropriate.

4              Q.    Are there particular entities

5    that CTLD most frequently coordinates with?

6              A.    The Department of Defense, the

7    Department of State and USCIS.

8              Q.    Within the Department of State,

9    who does CTLD coordinate with?

10             A.    The person I can't name but the

11   office has been the Bureau of Consular Affairs.

12             Q.    Within USCIS do you know who

13   CTLD coordinates with?

14             A.    Name, no, but the FDNS office

15   within CIS, I believe that is the Fraud

16   Detection and National Security office.

17             Q.    Do you know who leads the Fraud

18   Detection and National Security Office?

19             A.    Not at this time.

20             Q.    Do you know who lead it most

21   recently?

22             A.    No.

23             Q.    Do you know the names of any

24   senior officials in FDNS?

25             A.    Not at this time.

1       Q.   The names of any less senior

2   officials within FDNS?

3       A.   Not at this time.

4       Q.   Are the names of the leadership

5   of FDNS publically available?

6       A.   I don't know.

7       Q.   And I apologize if you said

8   this already and I missed it, but for a CTLD

9   investigation of a lawful permanent resident,

10  that coordination would be with USCIS as

11  opposed to the Department of State?

12      A.   It can be both.

13      Q.   It could be both.  Within the

14  Department of State; what unit would that be

15  for a lawful permanent resident?

16      A.   I don't know.

17      Q.   Am I correct that it would not

18  be the Bureau of Consular Affairs if it was a

19  lawful permanent resident that was being

20  investigated by CTLD?

21      A.   I don't know.

22      MS. CONLON: So just give me one

23  moment.

24      MR. KANELLIS:  We've been going an

25  hour and a half, can we take a --

```
 1              MS. CONLON:  Sure.

 2              MR. KANELLIS: -- short break.  At a

 3    good juncture for you.

 4              MS. CONLON:  No, I think -- this

 5    feels like a fine juncture.  Let's take -- how

 6    long would you like?

 7              MR. KANELLIS:  Oh, whatever.  I

 8    just --

 9              MS. CONLON:  Let's take 10 minutes.

10              THE VIDEOGRAPHER:  The time is 11:29.

11    We are off the record.

12         (A break was taken at 11:30 a.m.)

13              THE VIDEOGRAPHER: The time is 11:52

14    and we are back on the record.

15    BY MS. CONLON:

16              Q.   Okay.  Is there any other

17    division or component of HSI responsible for

18    investigating national security and public

19    safety related concerns besides CLTD (sic) --

20    or did I get that wrong, besides CTLD?

21              A.   Yes.

22              Q.   What are the other divisions or

23    components of HSI responsible for investigating

24    national security and public safety concerns

25    apart from CTLD?
```

1           A.    Countering transact- -- pardon

2    me.  Countering Transnational Organized Crime

3    Division has public safety functions, and the

4    Office of Intelligence has support functions.

5           Q.    What are you referring to when

6    you say, "the Office of Intelligence has

7    support functions".  What does that mean?

8           A.    Research, analysis.

9           Q.    In other words, the Office of

10   Intelligence provides research and analysis on

11   national security and public safety related

12   concerns?

13          A.    Yes.

14          Q.    And the Countering

15   Transnational Organized Crime unit, what kind

16   of support does it provide for national

17   security and public safety?

18          A.    Well, that is a division and

19   they have programatic oversight.

20          Q.    Can you give me just a couple

21   -- a handful of examples of what kinds of

22   transnational organized crime that program

23   oversees?

24          A.    Gangs.

25          Q.    Do you have any sense of how

```
 1   many investigations CTLD conducts in a given
 2   year?
 3            A.   No.
 4            Q.   Is that something Ms. Falcone
 5   would be expected to know?
 6            A.   She may have a better
 7   understanding of how many.
 8            Q.   Is there a particular
 9   information system CTLD uses to document its
10   investigations?
11            A.   No.
12            Q.   How does CTLD document its
13   investigations?
14            MR. KANELLIS:   Objection.   Calls for
15   law enforcement privileged material.   Do not
16   answer that question.
17   BY MS. CONLON:
18            Q.   I'm going to finish my question
19   for the record.
20            MR. KANELLIS:   Okay.
21            MS. CONLON:   Just so it's clear.
22            MR. KANELLIS:   Sure.
23   BY MS. CONLON:
24            Q.   How does CTLD document its
25   investigations electronically?   So my question
```

1   is what system does it use to save documents

2   relating to investigations?

3           MR. KANELLIS:  Same objection.

4   BY MS. CONLON:

5           Q.   What system does HSI use to

6   document its investigation?

7           MR. KANELLIS:  Objection as to vague

8   and potentially law enforcement privilege.

9   System is what I have issue with.

10  BY MS. CONLON:

11          Q.   What information system, like

12  earlier you mentioned LEADTRACKER, what

13  information system does HSI use to document its

14  investigations?

15          MR. KANELLIS:  Okay.  That's fair.

16          A.   It's the investigative case

17  module.

18  BY MS. CONLON:

19          Q.   Will you please describe that

20  for us?

21          MR. KANELLIS:  I'm going to instruct

22  the witness to not answer that question to the

23  degree that this would reveal law enforcement

24  practices or procedures.

25          So if answering that question would

1    require you to divulge that, do not answer that

2    question.  Otherwise you may answer if you

3    know.

4         A.    I don't know.

5    BY MS. CONLON:

6         Q.    Have you ever used the

7    investigative case module system?

8         A.    Yes.

9         Q.    How long ago?  Looked like it

10   might have been a while ago from that pause.

11        A.    2015 to 2018 is when I had

12   oversight of personnel that executed that

13   function.

14        Q.    What personnel execute that

15   function?  Like which group of personnel are

16   you referring to?

17        A.    Special agents, criminal

18   analyst and supervisory personnel.

19        Q.    That was the -- the

20   investigative case module system was in place

21   as at least of 2015; is that correct?

22        A.    In or about that time.

23        Q.    Turning to CTLD's

24   investigations generally, do you have any

25   impression of whether CTLD is performing more

1    investigations since 2025 than it performed in

2    past years?

3              A.    No.

4              Q.    You have no impression or no

5    it's not performing more investigations?

6              A.    I have no impression.

7              Q.    Do you ever receive reports

8    from Ms. Falcone about the activities of CTLD?

9              A.    Yes.

10             Q.    On a regular basis?

11             A.    No.

12             Q.    What are the occasions where

13   you would receive a report from Ms. Falcone

14   about the activities of CTLD if not on a

15   regular basis?

16             A.    If she is present during

17   leadership discussions with her supervisors.

18             Q.    Do you ever receive a regular

19   report on the activities of CTLD from someone

20   other than Ms. Falcone?

21             A.    Yes.

22             Q.    Who is that?

23             A.    Deputy Assistant Director Akil

24   Baldwin.

25             Q.    And you receive reports from

```
 1    Mr. Baldwin about the activities of CTLD on a

 2    regular basis?

 3              A.   I receive updates on demand.

 4              Q.   Updates on demand.  Do you make

 5    inquiries about particular cases that CTLD is

 6    investigating?

 7              A.   As needed.

 8              Q.   So sometimes you do?

 9              A.   Yes.

10              Q.   What are the circumstances

11    where you need that information?  What would

12    prompt you to ask for it?

13              A.   A request from my leadership.

14              Q.   Can you give me an example of a

15    circumstance where you would ask for that

16    information?

17              A.   If there is an event that is

18    documented by way of open source media.

19              Q.   What is an open source media.

20    What do you mean when you say that?

21              A.   CNN, Fox News.

22              Q.   Does it only refer to news

23    media?

24              A.   I don't know.

25              Q.   When you use it, are you only
```

1    referring to news media.  I'm asking because

2    those are the examples you gave?

3              A.    Within the context of my

4    response, that's the only two instances that

5    I'm referring to.

6              Q.    And you say if there is an

7    event that is documented by open source media.

8    What kind of an event would prompt you to ask

9    CTLD for information about the particular case?

10             A.    A terrorist attack.

11             Q.    Anything short of that?

12             A.    I don't know.

13             Q.    Are there any circumstances in

14   which particular investigations come across

15   your desk and require your personal

16   involvement?

17             A.    Ask that one more time please.

18             Q.    Sure.  Are there any

19   circumstances in which particular

20   investigations require your involvement?

21             A.    It depends.

22             Q.    Depends on what?

23             A.    Investigation or inquiry.

24             Q.    Are you asking me?

25             A.    No.

1           Q.    Okay.   Investigation or

2    inquiry -- I'm sorry.  I can't tell if you're

3    finished answering or I don't understand your

4    answer.

5           What are the circumstances where you

6    are required to personally weigh in on an

7    investigation being conducted by HSI?

8                 A.    I can't identify a standard or

9    a requirement for me to do so.

10                Q.    Speaking of standards and

11   requirements, is there any written guidance

12   that delineates what CTLD can and cannot

13   investigate?

14                A.    Not to my knowledge.

15                Q.    Are there any particular

16   policies that govern what HIS can and cannot

17   investigate whether or not reduced to writing?

18                A.    Can you ask that again?

19                Q.    Sure.  Are there any particular

20   policies that govern the scope of what HSI --

21   withdrawn.  The scope of what CTLD can

22   investigate whether or not they are reduced to

23   writing?

24                A.    Not to my knowledge.

25                Q.    Are you aware of any changes in

```
 1    the nature of CTLD's investigations since 20 --
 2    from before 2025 to after that?
 3              MR. KANELLIS:  Can you read that
 4    question back for me.  I'm sorry.  I think I
 5    understood it but...
 6    BY MS. CONLON:
 7         Q.   Yeah.  Are you aware of any
 8    changes in the nature of CTLD investigations
 9    from before 2025 to after that?
10              MR. KANELLIS:  I'm going to object.
11    Vague.  You can answer if you can.
12         A.   No.
13    BY MS. CONLON:
14         Q.   You are not aware of an
15    increase in the number of investigations since
16    2025 by CTLD; is that correct?
17         A.   Not as of today.
18         Q.   And you're not aware of a shift
19    in the kinds of cases CTLD is investigating
20    since 2025, right?
21         A.   No.
22         Q.   You're not aware of CTLD
23    shifting its focus to a particular set of
24    noncitizens since 2025, different from what it
25    was focused on before; is that correct?
```

1          A.    Yes.

2          Q.    Do you know how many times HSI

3    recommended a Visa revocation before January of

4    2025 based on the foreign policy provision that

5    you describe in your declaration?

6          A.    No.

7          Q.    Do you have any impression as

8    to whether HSI has recommended more Visa

9    revocations on the basis of foreign policy

10   provision described in your declaration since

11   the beginning of 2025 than it did in prior

12   years?

13         A.    May I have that question again

14   please?

15         Q.    Sure.  Just gonna let her

16   finish.  Do you have any impression -- sorry.

17   Do you have any impression as to whether HSI

18   has recommended more Visa revocations on the

19   basis of the foreign policy provision described

20   in your declaration since the beginning of 2025

21   than it did in prior years?

22         A.    No.

23         Q.    When HSI is recommending a Visa

24   revocation on the basis of the foreign policy

25   provision described in your declaration, is

1    there a requirement that it coordinate with the

2    Department of State?

3              A.    Can you ask me that question

4    again?

5              Q.    When HSI is recommending a Visa

6    revocation on the basis of the foreign policy

7    provision described in your declaration, is

8    there a requirement that HSI coordinate with

9    the Department of State?

10             A.    HSI has coordinated with the

11   Department of State.

12             Q.    Is there a requirement that HSI

13   coordinate with the Department of State in

14   particular cases?

15             A.    Not that I'm aware of in

16   particular cases.

17             Q.    Asked in another way, when HSI

18   recommends a Visa revocation on the basis of

19   the foreign policy provision, does that require

20   the involvement of the Department of State?

21             A.    Coordination on Visa

22   revocations is done by HSI with the Department

23   of State.

24             Q.    Does HSI ever act on Visa

25   revocations would the involvement of the

```
 1   Department of State?

 2              A.   I don't understand that

 3   question.

 4              Q.   Can HSI move forward on the

 5   basis of its determination that a Visa should

 6   be revoked without involving the Department of

 7   State?

 8              A.   When you say, "move forward,"

 9   what do you mean?

10              Q.   Can HSI take any action against

11   an noncitizen whose Visa HSI thinks should be

12   invoked without involving the Department of

13   State?

14              A.   I don't understand the question

15   because you haven't identified what violation

16   exist.

17              Q.   Well, I think the question

18   presumes that HSI believes there is a

19   violation, right?  Like, HSI believes there's a

20   violation.  HSI thinks a Visa should be

21   revoked.  Can HSI act unilaterally and take

22   some action against that Visa holder or must it

23   coordinate with the Department of State.

24   That's what I want to understand.

25              MR. KANELLIS:  Okay.  I'm going to
```

1    object to that question as being vague.  If you

2    can answer it, answer.

3         A.   I'm just trying to understand

4    what action are we to take.

5    BY MS. CONLON:

6         Q.   If HSI wants to arrest a Visa

7    holder on the basis that HSI thinks its Visa

8    should be revoked.  Can HSI do that without

9    involving the Department of State?

10        A.   Again on what violation?

11        Q.   Why would the nature of the

12   violation make a difference?

13        A.   Because it has to be presented

14   to a judge and you need probable cause or some

15   burden of standard of proof for a judge to make

16   a ruling on the matter and on the advice of

17   counsel whether they agree that there is in

18   fact a violation.

19        Q.   Let me be very direct.  I would

20   like to understand when HSI must involve the

21   Department of State and when it's optional.  So

22   what are the circumstances where HSI must

23   involve the Department of State in an action it

24   wants to take in connection with a Visa holder.

25        Maybe the answer is there's no

 1    situation where it's a requirement.  I just

 2    would like to understand.

 3              A.   The requirement for

 4    coordination is relevant when the agency or

 5    department has jurisdiction.  And it is at

 6    their discretion whether they take action.

 7              Q.   When HSI is investigating a

 8    noncitizen for alleged anti-Semitic speech or

 9    activity, does HSI have to coordinate with the

10    Department of State?

11              MR. KANELLIS:  Objection.

12    Foundation.

13    BY MS. CONLON:

14              Q.   Okay.  You can answer because

15    I'm confident that you are aware of

16    investigations of anti-Semitic speech and

17    activity so please answer the question.

18              MR. KANELLIS:  And objection.  Vague.

19    BY MS. CONLON:

20              Q.   Please answer the question.

21              A.   When you say, "investigation,"

22    I am trying to understand what that means.

23              Q.   Can you tell me what you think

24    that possible interpretations of the word

25    investigation is in context so that I can

```
 1   understand your confusion and try to clear it?
 2          MR. KANELLIS:  Calls for speculation.
 3   You're asking him to opine upon what he thinks
 4   you mean in your question.
 5   BY MS. CONLON:
 6          Q.   No, no.  I'd like you to just
 7   tell me what you mean.  You've used the word
 8   "investigations" many times this morning.  When
 9   you say, "investigations" and you're talking
10   about HSI where you work, what do you mean?
11          A.   Criminal investigation.
12          Q.   You only mean criminal
13   investigation.  Okay.
14          A.   Yes.
15          Q.   So when HSI is conducting a
16   criminal -- well, withdrawn.  HSI only
17   conducts -- let me just back up.  I thought you
18   said earlier that HSI conducts investigations
19   of violations of federal laws beyond simply
20   criminal violations.  Am I mistaken?
21          A.   HSI conducts criminal
22   investigations into violations of U.S. code as
23   well as violations of the Immigration and
24   Nationality Act.  Okay.  There are functions in
25   support thereof.
```

1          Q.    Can you please describe the

2    functions you're referring to?

3               A.    Research and intelligence and

4    analysis.

5               Q.    In other words, HSI provides

6    research and intelligence analysis support in

7    furtherance of noncriminal investigations as

8    well; is that correct?

9               A.    That does happen.

10              Q.    Has HSI provided research and

11   intelligence analysis if furtherance of

12   investigations relating to the foreign policy

13   provision you describe in your declaration?

14              A.    Yes.

15              Q.    You agree with me that those

16   investigations do not implicate criminal

17   laws -- may not implicate criminal laws?

18              A.    Restate the question please.

19              Q.    When HSI provides the court for

20   investigations relating to the thought --

21   foreign policy provision, those investigations

22   do not necessarily implicate criminal laws; is

23   that correct?

24              MR. KANELLIS:   Objection to the

25   extent that calls for a legal conclusion.

1    BY MS. CONLON:

2              Q.   You have an understanding of

3    the laws that you perform -- HSI performs

4    investigations under; that's an essential part

5    of your job, right?

6              A.   Yes.

7              Q.   Is it your understanding that

8    when HSI provides support for investigations

9    relating to the foreign policy provision

10   described in your declaration, that those are

11   civil investigations, noncriminal

12   investigations; is that correct?

13             A.   As it relates to the

14   Immigration and Nationality Act?

15             Q.   Yes.

16             A.   Yes.

17             Q.   Does CTLD provide support for

18   investigations relating to the foreign policy

19   provision?

20             A.   They can.

21             Q.   Had they in the past six

22   months, to your knowledge?

23             A.   I don't know.

24             Q.   You mentioned the Office of

25   Intelligence within HSI.  Has the Office of

 1     Intelligence provided support for

 2     investigations relating to the foreign policy

 3     provision since January 2025?

 4              A.   Yes.

 5              Q.   What kind of support has the

 6     Office of Intelligence provided?

 7              A.   Reports of analysis.

 8              Q.   And just one moment.  You may

 9     have said this already, and I'm sorry if you

10     did.  Can you remind me who leads the Office of

11     Intelligence for HSI?

12              A.   Peter Hatch.

13              Q.   And do you know his title?

14              A.   Assistant Director.

15              Q.   Same title as you?

16              A.   Yes, ma'am.

17              Q.   And do you know who his

18     supervising subordinates are?  Is that the

19     right term?  The people just -- the people --

20     his most immediate subordinates?

21              A.   Deputy Assistant Director

22     Bradley Etter.

23              THE COURT REPORTER:  Bradley.

24              A.   Etter.  I'll spell it.  Echo,

25     Tango, Tango, Echo, Romeo.

```
 1   BY MS. CONLON:
 2            Q.    Anyone else?
 3            A.    That's all that I know of at
 4   this time.
 5            Q.    Do you know how many people
 6   work in the Office of Intelligence for HSI
 7   approximately?
 8            A.    No.
 9            Q.    Do you know whether it's more
10   than the number of people who are in CTLD?
11            A.    Can you ask me that one more
12   time?
13            Q.    Sure.  Do you know whether
14   there are more employees of HSI in the Office
15   of Intelligence that are in the CTLD?
16            A.    Yes.
17            Q.    You know the answer but what is
18   the answer.  Are there more in --
19            A.    The Office of Intelligence is a
20   division which is larger than a unit.
21            Q.    Okay.  Are there more than 50
22   people in that division?
23            A.    I don't know.
24            Q.    What is your best guess?
25            A.    More than 50 is my best guess.
```

 1          Q.   You said that the Office of

 2   Intelligence provides reports of analysis.

 3   What kind of information is typically contained

 4   in a report of analysis?

 5          A.   Open source media reporting.

 6          Q.   The only type of information

 7   typically contained in a report of analysis is

 8   open source media reporting?

 9          A.   It varies.

10          Q.   What else can it include?

11          MR. KANELLIS:  We're getting close to

12   practices and procedures, so I'm going to

13   instruct the witness not to answer on the basis

14   of law enforcement privileges.

15   BY MS. CONLON:

16          Q.   My question, which I understand

17   you have been directed not to answer and I'm

18   not telling you otherwise, but just to be clear

19   for the record, the questions I would like to

20   ask you are whether there are any other public

21   sources of information relied on in reports of

22   analysis apart from open source media

23   reporting?

24          A.   I don't know.

25          Q.   Who writes reports of analysis?

1  What is the job of the person who writes

2  reports of analysis?

3          A.    Criminal analyst writes the

4  report of analysis.

5          Q.    And just -- one second.  Sorry.

6  Are you aware whether the Office of

7  Intelligence has produced any reports of

8  analysis concerning alleged anti-Semitism?

9          A.    I don't know.

10          Q.    You're not familiar with the

11  subject matter covered by reports of analysis

12  produced by the Office of Intelligence?

13          A.    Not every one, no.

14          Q.    I appreciate that you don't

15  know each and every one but as a general

16  matter, are you familiar with the subject

17  matter that they cover most often?

18          A.    Investigative programs within

19  HSI's area of responsibility.

20          Q.    You're going to have to help

21  me.  What are -- when you say, "investigative

22  programs within HSI's area of responsibility,"

23  what were you referring to?

24          A.    Topics in areas and interest as

25  it relates to national security, public safety.

1          Q.    Would -- is Anti-Semitism in

2     HSI's view a topic within its -- looking for

3     your language -- within its investigative

4     programs?

5          A.    Topic?  What do you mean?

6          Q.    Okay.  You've said that HSI's

7     topics and areas of interest include national

8     security and public safety.  My question is

9     whether anti-Semitism falls under either

10    national security or public safety for HSI?

11         A.    I don't know.

12         Q.    What about pro-Palestinian

13    advocacy; does that fall under national

14    security or public safety for HSI?

15         A.    I don't know.

16         Q.    What about proHamas advocacy?

17         A.    Yes.

18         Q.    Are you aware of whether the

19    Office of Intelligence has produced reports of

20    analysis regarding particular noncitizens

21    alleged proHamas advocacy?

22         A.    Yes.

23         Q.    Are you aware of whether the

24    Office of Intelligence had ever produced

25    reports of analysis on that topic before

1    January of 2025?

2              THE COURT REPORTER: 2025?

3              MS. CONLON:  Yes, ma'am.

4              A.   I don't know.

5    BY MS. CONLON:

6              Q.   Do you know who the assistant

7    director of the Office of Intelligence was

8    prior to -- just prior to January 2025?

9              A.   Yes.

10             Q.   Who was that?

11             A.   Brad -- excuse me, Peter Hatch?

12             Q.   How long has Peter Hatch,

13   approximately is fine, been in his role?

14             A.   Since July of 2020.

15             Q.   About the same amount of time

16   you've been in your role?

17             A.   At least.

18             Q.   Is there any other manner in

19   which the Office of Intelligence provides

20   support for investigations of the foreign

21   policy provision apart from reports of

22   analysis?

23             A.   I don't know.

24             Q.   You mentioned another division

25   that Countering Transnational Organized Crime

Case 1:25-cv-10685-WGY    Document 186-2    Filed 07/07/25    Page 94 of 518
Deposition of Andre Watson
AAUP, et al. v. Rubio, et al.

```
 1   division of HSI earlier?

 2              A.   Yes, ma'am.

 3              Q.   Are you aware of whether that

 4   division has provided support in connection

 5   with investigations of the foreign policy

 6   provision?

 7              A.   I don't know.

 8              Q.   Who is the most senior official

 9   in that division?

10              A.   James Harris.

11              Q.   And he's the assistance

12   director?

13              A.   Yes, ma'am.

14              Q.   I'm beginning to catch on to

15   the titles.  Who are his most senior

16   subordinates?

17              A.   Deputy Assistant Director

18   Selwin Smith.

19              Q.   Do you know if that's

20   S-E-L-W-I-N?

21              A.   Yes, ma'am.

22              Q.   Does he have any other senior

23   subordinates?

24              A.   I don't recall their names.

25              Q.   All right.  This might be a
```

1    little painful, the next part, but we're going

2    to do our best to muddle through.

3              In your declaration, you wrote about

4    executive orders that were issued earlier this

5    year in January, 2025.  One of them is E.O.

6    14188.  Are you familiar with that executive

7    order?

8              A.    The number, yes, I am.

9              Q.    Okay.  Is there a phrase or

10   title that you most often used to describe it?

11   Like, we're going to be having some discussion

12   about it and I want to refer to it however you

13   ordinarily refer to it.

14             A.    No, ma'am.

15             Q.    Are you familiar with Executive

16   Order 14161?

17             A.    The number, yes, but for the

18   purposes of this discussion, the titles are

19   helpful.

20             Q.    Oh, okay.  I'm sorry. That's

21   what I was asking is how do you talk about

22   these when you talk about them by title.

23             A.    I need the titles, yes, ma'am.

24             Q.    We'll start with 14161.  The

25   title is Protecting the U.S. From Foreign

1  Terrorists and Other National Security and

2  Public Safety Threats.  Are you familiar with

3  that E.O.?

4          A.   Yes, ma'am.

5          Q.   And that E.O. was issued in

6  January of this past year, this year, 2025,

7  correct?

8          THE COURT REPORTER: You said -- I'm

9  sorry.  You said that e-mail was issued?

10 BY MR. CONLON:

11         Q.   No, no.  Sorry.  E-O. It's an

12 abbreviation for executive order but I will try

13 to spell it out?

14         THE COURT REPORTER: That's fine.

15 BY MS. CONLON:

16         Q.   Okay.  So Executive Order 1 --

17 strike that.  I'll use the title.  The

18 executive order protecting the U.S. from

19 foreign terrorists and other national security

20 and public safety threats was issued January

21 2025, correct?

22         A.   In or about.

23         Q.   Because it's such a mouthful,

24 that's why is I was asking if you have a

25 shorthand that you use for that one but it

```
1    sounds like you don't.
2              A.   (Witness shakes head.)
3              Q.   So this executive order
4    provides policy of the United States regarding
5    the protection of its citizens from certain
6    noncitizens, correct?
7              MR. KANELLIS:  Objection.  Can we
8    maybe show the -- to expedite things, show the
9    witness the document, so he's not -- he's under
10   oath.  I don't want him speculating about a
11   document that's easily --
12             MS. CONLON:  Sure.
13             MR. KANELLIS:  It will make it go
14   faster.
15             MS. CONLON:  This will take a moment.
16   I'm going to pass to the court reporter,
17   Ms. Henderson, or I guess what's going to now
18   be Plaintiff's Exhibit 1.
19                 (Exhibit 1 was marked.)
20   BY MS. CONLON:
21             Q.   I just handed you a document.
22   Have you seen this document before?
23             A.   Yes, ma'am.
24             Q.   What do you recognize it to be?
25             A.   An executive order.
```

1             Q.   Do you recognize it as

2     Executive Order 14161 is?

3             A.   Yes, ma'am.

4             MS. CONLON:   Moving this document

5     into evidence as Exhibit 1.  Is there any

6     objection from the Government?

7             MR. KANELLIS:   Moving it into

8     evidence?

9             MS. CONLON:   Moving it in as an

10    exhibit.  I'm going to talk about it as

11    Exhibit 1 --

12            MR. KANELLIS:   Oh, no, you've

13    identified it.

14    BY MS. CONLON:

15            Q.   So you've seen this executive

16    order before, Exhibit 1?

17            A.   Yes, ma'am.

18            Q.   So you would agree that

19    Exhibit 1 said among other things that it's a

20    policy to protect citizens from certain

21    noncitizens, right; that's what this E.O. does?

22            A.   Can you ask me that question

23    again?

24            Q.   Sure.  I think I can make it

25    simpler.  In the course of your work at HSI, do

1    you have occasion to interpret Executive Order

2    14161 for your work?

3              A.   Yes, ma'am.

4              Q.   You have to determine whether a

5    noncitizen's conduct falls under Executive

6    Order 14161 as part of your job, right?

7              A.   The executive order compliments

8    existing lines of effort by HSI as it relates

9    to violations of criminal law.

10             Q.   When you say, "it compliments

11   existing lines of effort by HSI," what do you

12   mean?

13             A.   HSI is already conducting

14   investigations as it relates to violations of

15   U.S. law to include violations of the

16   immigration and nationality act in areas to

17   include public safety and national security.

18             Q.   So what is the effect of this

19   executive order on HSI's work?

20             MR. KANELLIS:   Sorry.   I'm going to

21   object.   Little vague.   And overbroad and a

22   little bit of foundation but you can answer if

23   you can.

24   BY MS. CONLON:

25             Q.   Please answer.

```
 1              A.   Effect, I can't identify one.
 2              Q.   Does HSI follow the guidance
 3   set forth in this executive order in conducting
 4   its work?
 5              A.   In coordination with the Office
 6   of the Principal Legal Advisor, yes.
 7              Q.   Okay.  So I want to ask you
 8   about your understanding of certain parts of
 9   this E.O. starting with on the first page since
10   you have it in front of you, Section 1(a) it
11   states [As read] "It is the policy of the
12   United States to protect its citizens from
13   aliens who intend to commit terrorists attacks,
14   threaten our national security, espouse hateful
15   ideology or otherwise exploit the immigration
16   laws for malevolent purposes."
17         What do you understand espouse hateful
18   ideology to mean?
19              A.   I don't know.
20              Q.   How are you able to apply this
21   executive order to what HSI does without any
22   understanding of what that phrase means and
23   what do you understand it to mean?
24         MR. KANELLIS:  Objection.
25   Mischaracterizes prior testimony.  You can
```

```
 1    answer if you can.
 2             A.   HSI remains committed to
 3    conducting investigations to prevent terrorists
 4    acts that threaten our national security.
 5    BY MS. CONLON:
 6             Q.   This E.O. specifies that it's
 7    the policy of the U.S. to protect its citizens
 8    from those who espouse hateful ideology.  How
 9    does HSI interpret that phrase for its work?
10             MR. KANELLIS:  Objection.  No
11    foundation.
12             MS. CONLON:  Respectfully, he just
13    testified --
14             MR. KANELLIS:  You asked about HSI.
15    Before you had asked about what his personal
16    interpretation was.  Those are two different
17    questions.
18             MS. CONLON:  Well, let's do both.
19    BY MS. CONLON:
20             Q.   What is your personal
21    interpretation of the meaning of the phrase
22    espouse hateful ideology --
23             (Reporter interruption.)
24             Q.   What is your personal
25    understanding of the phrase "espouse hateful
```

```
 1    ideology" in this E.O.?
 2              A.   I don't have an understanding
 3    of espouse hateful ideology.
 4              Q.   Neither do I.  How does HSI
 5    interpret that provision?
 6              MR. KANELLIS:  Same objection as
 7    before.  No foundation.
 8    BY MS. CONLON:
 9              Q.   I'll ask again because I
10    disagree.  How does HSI interpret the provision
11    espouse hateful ideology?
12              MR. KANELLIS:  Also say vague.  Calls
13    for speculation as to how HSI as an
14    organization would interpret this particular
15    sentence.  You have to first establish the
16    predicate foundation that he knows how HSI
17    internal as an agency would interpret this and
18    you haven't done that.
19              MS. CONLON:  Mr. Kanellis, you stated
20    your objection --
21              MR. KANELLIS:  No, I'm trying to
22    help.  I'm trying to help to expedite it,
23    that's all.
24              MS. CONLON:  I, too, would like to
25    expedite things, believe me, because we would
```

 1    be here all day if we can't move along.

 2              MR. KANELLIS:  Great.

 3    BY MS. CONLON:

 4              Q.   What is your understanding of

 5    how HSI identifies -- withdrawn.  How does HSI

 6    determine that a person has espoused hateful

 7    ideology within the meaning of this E.O.?

 8              MR. KANELLIS:  Same objection as to

 9    foundation.  If you can answer, you can give it

10    a shot.

11              A.   Conduct analysis of open source

12    media.

13    BY MS. CONLON:

14              Q.   Well, I think that answers the

15    question on how you identify a person who has

16    allegedly done this.  But what I mean is, how

17    does HSI determine that a person's espousal of

18    an ideology is hateful?

19              A.   I don't know.

20              Q.   Okay.  Have you been given any

21    guidance from the White House, who issued this

22    executive order, about how HSI should

23    understand the meaning of that phrase, espouse

24    hateful ideology?

25              MR. KANELLIS:  I'm sorry.  Can you

```
 1    repeat that question please, Ms. Court

 2    Reporter.

 3            MS. CONLON: I have it in front of me.

 4    I can do it.

 5            MR. KANELLIS:  Sure.

 6    BY MS. CONLON:

 7            Q.   Have you been given any

 8    guidance from the White House, who issued this

 9    executive order, about how HSI should interpret

10    the meaning of phrase, "espouse hateful

11    ideology".

12            MR. KANELLIS:  Objection as to

13    foundation.  Objection as to deliberative

14    process.  Objection as to the extent it calls

15    for privileged communications.

16    BY MS. CONLON:

17            Q.   To be clear, the question I'm

18    asking is not what the guidance was or any

19    discussions about that guidance but literally

20    has HSI received guidance on how to interpret

21    this phrase?

22            MR. KANELLIS:  Okay.

23            MS. CONLON:  Does that sound fair?

24            MR. KANELLIS: That's fair.

25            MS. CONLON:  That's the question.
```

1    Has HSI received guidance on how to interpret

2    the phrase espouse hateful ideology on this

3    E.O.?

4              A.    I don't know.

5              Q.    Who at HSI would be the person

6    to receive guidance on the interpretation of an

7    E.O.?

8              A.    I don't know.

9              Q.    You are one of the most senior

10   officials at HIS and you aren't sure who it is

11   at HSI that receives that kind of guidance; is

12   that correct?

13             MR. KANELLIS:   Objection.   Compound

14   question.   You can answer if you can.

15             MS. CONLON:   I can ask it maybe -- go

16   ahead.

17             A.    The acting executive associate

18   director.

19   BY MS. CONLON:

20             Q.    You're identifying -- the

21   acting executive associate director as the

22   person at HSI most likely to receive guidance

23   on the interpretation of E.O. 14161; is that

24   correct?

25             A.    Notice of the executive order.

1              Q.    Notice just in -- what does

2     notice encompass?

3              A.    Notification.

4              Q.    Just notification hey, this

5     E.O. is coming or has come out?

6              A.    Has come out.

7              Q.    HSI does not receive any

8     guidance from the executive branch about how to

9     interpret the provisions in its executive

10    orders; is that correct?

11             A.    I don't recall seeing guidance

12    or receiving it.

13             Q.    Does HSI create its own

14    guidance for its interpretation of executive

15    orders?

16             A.    I haven't seen any.

17             Q.    Well, let me just ask you

18    candidly.  The phrase espouse hateful ideology

19    as I think we both agree is broad. So how does

20    HSI determine whether something falls under

21    that.  What source of guidance does HSI have to

22    understand whether someone's conduct falls

23    under that provision?

24             MR. KANELLIS:  Objection.  Assumes

25    facts not in evidence.  Foundation.

```
 1    BY MS. CONLON:
 2              Q.   Can you please answer the
 3    question?
 4              A.   Can you repeat it one more
 5    time?
 6              Q.   Oh, gosh.  Okay.  You agree
 7    that the phrase "espouse hateful ideology" is
 8    broad, right?
 9              A.   Yes.
10              Q.   That could be interpreted in a
11    variety of ways, correct?
12              A.   Yes.
13              Q.   HSI, to your knowledge, has not
14    received guidance from the executive branch
15    about how HSI should interpret that phrase, is
16    that correct?
17              A.   Correct.
18              Q.   HSI, to your knowledge, has not
19    received guidance from any branch of Government
20    about how it should interpret the phrase
21    "espouse hateful ideology," correct?
22              A.   Correct.
23              Q.   And as far as you know, HSI has
24    not itself created any guidance setting forth
25    how HSI will interpret the phrase "espouse
```

```
 1    hateful ideology," right?

 2               A.    Correct.

 3               Q.    And that's true for I assume

 4    every provision in this executive order?

 5               A.    I don't know.

 6               Q.    HSI is tasked with enforcing

 7    this executive order, correct?

 8               MR. KANELLIS:  I'm just going to

 9    object to the term enforce -- enforcing as

10    vague.

11    BY MS. CONLON:

12               Q.    I'm going to read to you from

13    your declaration, Mr. Watson.  You wrote, [as

14    read] "ICE remains steadfast in its commitment

15    to enforcing E.O. and in this instance you're

16    referring --

17               THE COURT REPORTER:  To enforcing

18    E.O. --

19    BY MS. CONLON:

20               Q.    Sorry.  14188 which is the next

21    E.O. we're going to talk about, but I

22    understand that HSI is steadfast in its

23    commitment to enforcing E.O. 14161 the one

24    we're looking at, right?

25               A.    We conduct activities in
```

```
 1    support thereof.
 2              Q.   How -- just a second.  I'm
 3    going to for fairness give you a copy of your
 4    declaration and to help us move forward.  Mr.
 5    Kanellis, and Mr. Watson and if we could mark
 6    this as Plaintiff's Exhibit 2.
 7              (Exhibit 2 was marked.)
 8    BY MS. CONLON:
 9              Q.   I just passed you a document
10    titled, Declaration of Andre Watson.  Do you
11    recognize it?
12              A.   Yes, ma'am.
13              Q.   And you have approved the
14    content of this declaration, right?
15              A.   Yes, ma'am.
16              Q.   And you've digitally signed it
17    under penalty of perjury, correct?
18              A.   Yes, ma'am.
19              Q.   So I want to turn to
20    paragraph 6 which talks about a different
21    executive order, Executive Order 14188,
22    additional members to combat anti-Semitism,
23    correct?
24              A.   Yes.
25              Q.   In paragraph 6 you state [As
```

1    read] "ICR remains steadfast in its commitment

2    to enforcing E.O. 14188 prohibiting

3    anti-Semitism."

4          I'm just going to pause there.  That's

5    what it says, right?

6              A.    It does say that, yes.

7              Q.    There you framed ICE's

8    obligations as enforcement of an E.O.,

9    correct?

10             A.    Yes.

11             Q.    Here, when I'm asking you about

12   Executive Order 14161, doesn't ICE equally have

13   an obligation to enforce it?

14             A.    It depends.

15             Q.    What does it depend on?

16             A.    Upon whether or not an agency

17   or department with authority takes an action

18   that connotates a potential violation of the

19   Immigration and Nationality Act.

20             Q.    So from your perspective, ICE's

21   role is different with respect to E.O. 14161

22   and E.O. 14188?

23             A.    I don't understand your

24   question.

25             Q.    Sure.  You said now several

1    times that ICE has a role of providing support

2    in connection with E.O. 14161?

3              A.   Which is?

4              Q.   The one that's right in front

5    you, sir?

6              A.   Okay.  I just want to make sure

7    because you're going through numbers pretty

8    quickly and --

9              Q.   No (simultaneously talking).

10             A.   Well, true.  But I want to be

11   clear to make sure I'm giving you a right

12   answer.

13             Q.   I appreciate that.  So if we

14   could use the exhibit number so we can skip all

15   the numbers.  For Exhibit 1, you maintain for

16   Exhibit 1 ICE provides support but in your

17   declaration you say for the other E.O. 14188

18   ICE enforces it and I'm just trying to

19   understand the difference?

20             A.   For Executive Order 14161,

21   Exhibit 1, you spoke specifically about hateful

22   ideology but you did not reference terrorist

23   acts and threatening national security and ICE

24   has lines of effort in support of Executive

25   Order 14161.  So by your statement, it's

```
 1    narrowly defined.

 2              Q.   Right.  I just meant to explore

 3    with you your meaning of what I found to be a

 4    vague phrase but my question is does ICE

 5    enforce Executive Order 14161, that's the

 6    question?

 7              A.   ICE enforces criminal law as

 8    well as the Immigration and Nationality Act,

 9    and in doing so, it is complimentary to this

10    executive order, similar to executive order

11    identified in Plaintiff's Exhibit Number 2.

12              Q.   So sticking with Exhibit 1 for

13    one moment, Executive Order 14161 that I will

14    find the paragraph.  It directs in section 3

15    the secretary of Homeland Security among others

16    to take certain actions.

17              Have you had any involvement on behalf

18    of Homeland Security with the requirements set

19    forth in section 3.  And take a moment.  I know

20    you need to review it.

21              A.   Yes.

22              Q.   Just a moment.  What about same

23    question, have you had any involvement on

24    behalf of Homeland Security with the

25    requirements set forth in section 2?
```

1              A.    Still for Exhibit 1?

2              Q.    Yes.

3              A.    Yes.

4              Q.    Subsection 4 of section 2

5    requires that Homeland Security, quote, met and

6    screened to the maximum degree possible.

7    All aliens -- I'll give you second to get

8    there.  We're in section 2, subsection 4,

9    that's on page 2.

10             A.    Thank you.

11             Q.    It requires the vetting and

12   screening to the maximum degree possible all

13   aliens who intend to be admitted, enter or are

14   already inside the United States, particularly

15   those aliens coming from regions or regions

16   with identified security risks.

17        My question is what role HSI has played

18   in satisfying the requirement?

19             MR. KANELLIS:  Objection to the

20   degree you've characterized it as a requirement

21   but you can answer the question.

22   BY MS. CONLON:

23             Q.    I'll ask it in a way that I

24   think Mr. Kanellis will accept.  What has HSI

25   done -- withdrawn.  What has the Department of

1    Homeland Security done in response to that

2    directive?

3              A.   I can only speak to what HSI

4    has done and that is to continue our lines of

5    effort as it relates to screening and vetting.

6    BY MS. CONLON:

7              Q.   Have there been any changes to

8    HSI's lines of effort for vetting and screening

9    since this executive order was issued?

10             A.   Yes.

11             Q.   What has changed?

12             A.   Personnel resource allocation.

13             Q.   In what way?

14             A.   Shift of resources.  People.

15             Q.   Right.  Sorry.  In what way

16   were people shifted or reallocated within HSI?

17             A.   In support of screening and

18   vetting.

19             Q.   I don't -- I don't think I'm

20   being hard to follow here.  Please describe the

21   manner in which people were reallocated in

22   response to this E.O.?

23             A.   Personnel were shift from

24   program divisions to --

25             MS. CONLON:  Does the Government need

```
 1   a moment?

 2              MR. KANELLIS:  No.  Sorry.  And we

 3   didn't mean to interfere with your answer.  If

 4   you can answer the question, please.

 5              A.   Yes, I can.  We just move

 6   personnel from one office to the other.

 7   BY MS. CONLON:

 8              Q.   How many people approximately

 9   were moved?

10              A.   I don't know.

11              Q.   Was it a large shift?

12              A.   No.

13              Q.   What was the focus of the

14   change?

15              A.   I don't understand the

16   question.

17              Q.   Okay.  Where were people taken

18   away from?

19              A.   That, I don't know.

20              Q.   Where were people added to?

21              A.   The Office of Intelligence.

22              Q.   Approximately how many people

23   were added to the Office of Intelligence?

24              A.   I don't know.

25              Q.   More than ten?
```

```
 1              A.    I don't know.
 2              Q.    You're not sure if it's more
 3    than ten?
 4              A.    Correct.
 5              Q.    Who oversaw -- withdrawn.  Who
 6    decided to reallocate people within HSI in
 7    response to this executive order?
 8              A.    I don't know.
 9              Q.    Who is in charge of the
10    allocation of people within HSI?
11              A.    I don't know.
12              Q.    Who would know?
13              A.    I don't know because it depends
14    and I can't answer that question.
15              Q.    Well, instead of asking
16    hypothetically I'm asking about this
17    reallocation of people.  Who at HSI would know
18    about this reallocation of people?
19              A.    I still don't know.
20              Q.    It's a mystery.  When did this
21    reallocation occur?
22              A.    March 2025.
23              Q.    Do you know what precipitated
24    that -- the decision to do this in March?
25              A.    No.
```

1          Q.    Was there any communication

2     between HSI and the White House regarding the

3     reallocation of people at HSI?

4          A.    I don't know.

5          Q.    Who communicates with the White

6     House for HSI.  Are you going to tell me you

7     don't know?

8          A.    I don't know.

9          Q.    No.  I get it.  I understand.

10    Okay.  Is there someone at HSI who is required

11    to know about staffing and the allocation of

12    people?

13         A.    Yes.

14         Q.    Who is that?

15         A.    That would be Acting Assistant

16    Director Eddy Wang.

17         Q.    And he's your subordinate?

18         A.    No.

19         Q.    No, he's -- up the chain?

20         A.    He is my equivalent.

21         Q.    He's your equivalent over what

22    part of HSI?

23         A.    Administrative operations.

24         Q.    That is helpful.  Okay.  Do you

25    know whether the people who were reassigned to

1    the Office of Intelligence were assigned to a

2    particular function?

3            A.    Yes.

4            Q.    What function were they

5    assigned to?

6            A.    Analysis.

7            Q.    What are the other functions

8    that a person could be assigned to in the

9    Office of Intelligence.  Sounds like analysis

10   is the main thing they do?

11           A.    Correct.

12           Q.    So are there other functions to

13   which they could have been assigned?

14           A.    I don't know.

15           Q.    Do you know whether they were

16   the people who were added in March to the

17   Office of Intelligence were added to work on

18   any particular investigations?

19           A.    No, I don't know.

20           Q.    Do you know whether they were

21   added to specifically investigate anything

22   relating to Hamas?

23           A.    No.

24           Q.    What do you know if anything

25   about the types of investigations or subjects

 1   that the people added to the Office of

 2   Intelligence have now been tasked with?

 3           A.   Investigations as it relates to

 4   alleged criminal violations.

 5           MS. CONLON:  Does everyone feel like

 6   we can make it through the next executive order

 7   and then take a lunch break or do people need a

 8   break now?  I'll ask you.  You're the most

 9   important person.  Do you need a break now or

10   do you want to power --

11           THE WITNESS:  Keep going.

12           MS. CONLON:  All right.  In the

13   spirit of getting there faster, let me give you

14   a copy of the next E.O. that we're going to

15   look at?

16           THE WITNESS:  Would you like these

17   back?

18           MS. CONLON:  Yes.

19           MR. KANELLIS:  You can give the to

20   the court reporter.

21           MS. CONLON:  And you may want to look

22   back at your declaration, Exhibit 2, so just

23   keep it near you.  So I'm going to -- this is

24   for you, Mr. Kanellis and this is for you, Mr.

25   Watson.  Pass this up.  Actually -- -

```
 1                THE WITNESS:  Oh, we have to mark it
 2     first.
 3                MR. KANELLIS:  All good let's mark it
 4     first.
 5                (Exhibit 3 was marked.)
 6     BY MS. CONLON:
 7           Q.   I have just handed you another
 8     document.  Do you recognize this document and
 9     take your time?
10           A.   I do recognize it.  Yes, ma'am.
11           Q.   Do you recognize it as
12     Executive Order 14188, Additional Measures to
13     Combat Anti-Semitism?
14           A.   Yes, ma'am.
15           Q.   And as far as you know, is this
16     a fair and accurate copy of the executive
17     order?
18           A.   Yes, ma'am.
19           Q.   And it's been marked as exhibit
20     -- can you tell me?  Is it 3?  Yes.
21     Ms. Henderson tells me 3.
22           A.   Yes, ma'am.
23           Q.   So as you indicated in your
24     declaration, ICE enforces this Executive Order
25     14188, correct?
```

 1              A.    Yes, ma'am.

 2              Q.    Have you received any guidance

 3     from anyone regarding how ICE is supposed to

 4     interpret this executive order?

 5              A.    No, ma'am.

 6              Q.    Has HSI created its own

 7     guidance regarding how it will interpret and

 8     apply this executive order?

 9              A.    Not to my knowledge.

10              Q.    Just a moment.  So looking at

11     section 2 of the policy, please, on page 1.  It

12     states [As read] "It shall be the policy of the

13     United States to combat anti-Semitism

14     vigorously using all available and appropriate

15     legal tools to prosecute, remove or otherwise

16     hold to account the perpetrators of unlawful

17     anti-Semitism harassment and violence." Right?

18              A.    Yes, ma'am.

19              Q.    HSI is responsible for the

20     enforcement of section 2 with respect to the

21     removal of noncitizens; is that correct?

22              A.    ICE is responsible.

23              Q.    ICE.  I'm sorry.  ICE is

24     responsible?

25              A.    Yes, ma'am.

```
 1                 Q.   And HSI supports ICE's efforts,
 2      correct?
 3                 A.   Yes, ma'am.
 4                 Q.   How do you, as a senior
 5      official in HSI, understand the meaning of
 6      anti-Semitism as used in section 2?
 7                 A.   Ask me that one more time
 8      please.
 9                 Q.   How do you, as a senior
10      official in HSI, understand the meaning of
11      anti-Semitism as used in section 2?
12                 A.   I don't know.
13                 Q.   That's fair.  Just a moment.
14      This executive order -- withdrawn.  I'll ask it
15      a different way.  Do you have an understanding
16      as a senior official at HSI about the
17      relationship between anti-Semitism and support
18      for Hamas as relates to section 2?
19                 A.   No.
20                 Q.   Do you have an understanding of
21      the relationship between criticism in Israel
22      and anti-Semitism as it relates to section 2?
23                 A.   No.
24                 Q.   Do you also -- one second.  I
25      want to find the right citation for you, sir.
```

1    So this executive order in section 3 discusses

2    certain requirements of agencies including the

3    Department of Homeland Security, correct?  I'm

4    looking at the first paragraph of section 3?

5              A.    Yes.

6              Q.    It calls for the head of each

7    executive department or agency to submit a

8    report to the president identifying means of

9    essentially -- identifying means of, and I'll

10   quote here, "that might be used to curb or

11   combat anti-Semitism." Correct?

12             A.    Identifying all civil and

13   criminal authorities or actions, yes.

14             Q.    Have you supported the

15   Department of Homeland Security's response to

16   this directive in section 3?

17             A.    When you say, "support," what

18   do you mean?

19             Q.    Have you personally --

20             THE COURT REPORTER:  I'm sorry.  Have

21   you...

22   BY MS. CONLON:

23             Q.    Have you personally aided a

24   response in any way?

25             A.    I'm sorry but aided is broad.

1          Q.    Yeah.  Have you contributed to

2     the report, for example, that is called for by

3     section 3?

4               A.    I have not contributed to the

5     report, no.

6               Q.    Do you know who has for the

7     Department of Homeland Security?

8               A.    No.

9               Q.    Do you have an expectation

10    about whose role -- who it would be within the

11    Department of Homeland Security that would be

12    tasked with responding to section 3(b) of this

13    executive order?

14              A.    No.

15              Q.    Are you aware of who at HSI has

16    been a part of putting together to report

17    called for by section 3 on behalf of -- I'm

18    sorry.  Withdrawn.

19         Are you aware of who at the Department

20    of Homeland Security has been a part of

21    preparing Homeland Security's response to

22    section 3?

23              A.    No, ma'am.

24              Q.    Are you aware of any civil and

25    criminal authorities or actions that the

1    Department of Homeland Security has identified

2    that it could take in response to section 3?

3                A.    Civil authorities that may be

4    relevant pursuant to the Immigration and

5    Nationality Act.

6                Q.    Are you aware of particular

7    civil authorities that have been identified as

8    potentially usable to, as this says, curve or

9    combat anti-Semitism?

10               A.    Not the particular ones, no.

11               Q.    Do you have any awareness of

12   Secretary Noems's involvement in responding to

13   this executive order?

14               A.    No.

15               Q.    I'm sorry.  What about her

16   executive office; are you aware of their

17   response to this executive order?

18               A.    No, ma'am.

19               Q.    You have not seen any such

20   report drafted by the Department of Homeland

21   Security?

22               A.    I don't recall.

23               Q.    Are you aware of any changes in

24   the enforcement efforts of the Department of

25   Homeland Security in response to the directive

1    in section 3?

2              A.    When you say, "changes," what

3    do you mean.

4              Q.    Anything that the Department of

5    Homeland Security is now doing that it didn't

6    do before this executive order was issued in

7    response to this executive order?

8              A.    No.

9              Q.    Are you aware of -- one second.

10   Withdrawn.  Is the Department of Homeland

11   Security spending more time and effort on

12   anything than it was before this executive

13   order was issued in response to this executive

14   order?

15             MR. KANELLIS:  Objection.  Vague.

16   BY MS. CONLON:

17             Q.    Please answer if you know the

18   answer.

19             A.    Not within my division.

20   BY MS. CONLON:

21             Q.    It's your testimony that HSI's

22   work has not been affected by Executive Order

23   14188; is that correct?

24             A.    I'm sorry.  Say that again?

25             Q.    It's your testimony that HSI's

 1    work has not been affected by Executive Order

 2    14188, Exhibit 3?

 3              MR. KANELLIS:  Objection.  Vague.

 4    BY MS. CONLON:

 5              Q.   Would you answer to the extent

 6    that you are able to?

 7              A.   Within my division, no.

 8              Q.   Your division meaning HSI --

 9              A.   National security.

10              Q.   -- or something smaller.

11    National Security Division.  Got it.  Are you

12    aware of any changes to the work of other

13    divisions within HSI as a result of this

14    executive order?

15              A.   No.

16              Q.   Are you aware of any changes to

17    the priorities of enforcement for any division

18    of HSI in response to this executive order?

19              A.   No.

20              Q.   Are you aware of any

21    reallocation of resources within HSI in

22    response to this executive order?

23              A.   No.

24              Q.   Would you know about

25    reallocation of resources in other divisions of

```
 1    the Department of Homeland Security?

 2              A.   No.

 3              Q.   Would you know about changes to

 4    the enforcement priorities of other divisions

 5    of the Department of Homeland Security?

 6              A.   No.

 7              Q.   Fair to say you can't speak to

 8    how this executive order may have affected the

 9    work of other parts of the Department of

10    Homeland Security; is that correct?

11              A.   Yes.

12              Q.   Now, turning to section 3,

13    subsection E, second page of Exhibit 3.  I'm

14    just going to give you a moment to look at it.

15         In section E and I don't want to pain

16    us all by reading the whole thing aloud but in

17    section E the order directs the secretary of

18    Homeland Security and others to include

19    recommendations for familiarizing institutions

20    of higher education with the grounds for

21    inadmissibility under 8 USC 1182(a)(3).  Before

22    I continue, Mr. Watson, are you familiar with

23    this statute listed there; 8 USC 11823(a)(3).

24              A.   I am familiar.

25              Q.   And this is not a test.  I'm
```

```
 1    asking to make sure that we're talking about

 2    the same thing.

 3              A.   Clearly.

 4              Q.   1182(a)(3) provides security

 5    and terrorism related grounds for

 6    inadmissibility and deportation, correct?

 7              MR. KANELLIS:  Can we share the

 8    witness's the statute.  That's very --

 9              MS. CONLON:  Sure.  It's very, very

10    long.  Very long.

11              MR. KANELLIS:  He's under oath and I

12    don't want him to --

13              MS. CONLON:  No, no, no.  Of course.

14    I understand, and it's not meant to trip anyone

15    up.  It's just meant to expedite.

16         So I'm going to give you, Mr. Kanellis,

17    a document that is an excerpt of 1182 but not

18    the 80 pages of the whole statute but has the

19    part I want to talk about.  And give Ms.

20    Henderson this one.

21              (Exhibit 4 was marked.)

22    BY MS. CONLON:

23              Q.   So this has been marked I think

24    as Exhibit 4, Mr. Watson.  Have you had

25    occasion to see the text of this document
```

1    before?

2              A.    Yes, ma'am.

3              Q.    Do you recognize this as an

4    excerpt of section 1182?

5              A.    Yes, ma'am.

6              Q.    And this is from title 8,

7    right?

8              A.    Yes, ma'am.

9              Q.    I want to draw your attention

10   to page 3.  And I guess I should ask you, does

11   this -- I mean, it's not fair to ask you this

12   but we'll just ask you about the excerpt.  Go

13   to page 3, please?

14             A.    Yes, ma'am.

15             Q.    Directing your attention to

16   subsection 3 where it says security and related

17   grounds?

18             A.    Yes, ma'am.

19             Q.    Just a moment.  You see under

20   subsection 3 a subsection B, terrorist

21   activities, correct?

22             A.    Yes, ma'am.

23             Q.    And are you familiar with this

24   particular provision of section 1182?

25             A.    Yes, ma'am.

1          Q.   Do you have occasion to enforce

2     or -- withdrawn.  Does HSI have a role in

3     enforcing this provision of the section 1182?

4          A.   This section deals more with

5     entry determinations by virtue of the word

6     inadmissible and as such, I would say that CBP

7     and the Department of State have more gravitas

8     in the area than HSI.

9          Q.   Just one moment.  Can we turn

10    to page 5 and look at subsection C, please,

11    where it says foreign policy?

12         A.   Yes, ma'am.

13         Q.   I'm looking at this subsection

14    C.  Do you have occasion to enforce or support

15    enforcement of 1182(a)(3)(c), this provision

16    here on page 5?

17         A.   Yes.

18         Q.   And I know you mentioned

19    earlier the first provision we looked at, the

20    terrorism-related provisions as speak directly

21    of inadmissibility.  Does HSI provide a support

22    function with respect to that statute?

23         A.   Yes.

24         Q.   You mentioned also that the

25    statute that I showed you, the first provision

1    relating to terrorism -- let me just get you

2    the cite for the record.  Well, withdrawn.  You

3    mentioned earlier that section 1182(a)(3)

4    speaks of inadmissibility, correct?

5             A.   Yes.

6             Q.   Are you aware of any other

7    statutes that also make it applicable to

8    removability --

9             MR. KANELLIS:  I'm sorry.  Can you

10   read that question back?

11   BY MS. CONLON:

12            Q.   Sure.  I think I can ask it in

13   a clearer way?

14        Mr. Watson, are you aware of another

15   statute, section 1227 and I don't have a copy

16   of it for you so that's why I'm not going to

17   get into the language of it, but are you aware

18   of another statute that makes the one that we

19   are together looking at, Exhibit 4, applicable

20   also to removability, not just admissibility.

21            MR. KANELLIS:  Okay.  I'm going to

22   object.  It calls for a legal conclusion.

23            MS. CONLON:  Well, let me ask -- I'm

24   sorry.  Go ahead.

25            MR. KANELLIS:  If you can answer,

```
 1   answer.
 2            A.    I believe it may be
 3   237(a)(4)(c).
 4   BY MS. CONLON:
 5            Q.    So you know better than I know.
 6   I knew you'd know.  There is another statute
 7   that makes the security and terrorism related
 8   provisions that we are talking about at Section
 9   1183 applicable also to removal of foreigners,
10   correct?
11            A.    In that instance, yes.
12            Q.    So you have occasion to deal
13   with these provisions in your work through HSI,
14   right?
15            A.    Yes.
16            Q.    In the case of 1182(a)(3)(c)
17   which is on page 5?
18            A.    Three.
19            Q.    Yes.  I know this is painful,
20   huh.  Okay.  It says [As read] "Subsection I
21   states that the Secretary of State -- an alien
22   whose entry or proposed activities in the
23   United States the Secretary of State has
24   reasonable ground to believe would have
25   potentially serious, adverse foreign policy
```

1    consequences for the United States is

2    inadmissible." Correct?

3              A.    Yes.

4              Q.    And as we discussed, the same

5    is true for someone who has already entered but

6    could become removable on that basis, right?

7              A.    Yes, that does exist.

8              Q.    What is your understanding of

9    how Executive Order 14188 which should be

10   Exhibit 3 over by you, regarding anti-Semitism.

11   What is your understanding of how that -- how

12   that is affected or works in coordination with

13   this provision here on the Secretary of State's

14   ability to make this determination?

15             MR. KANELLIS:   Objection.

16   Foundation.  Answer if you can.

17             A.    I don't know.

18   BY MS. CONLON:

19             Q.    Okay.  Have you received --

20   well, when we talk about the foreign policy

21   provision, which you talk about in your

22   declaration, you are referring to

23   1182(a)(3)(c); what you and I are looking at

24   together on page 5 of Exhibit 4, correct?

25             A.    Yes.  But it also applies in

```
 1    237, too, so to be clear.
 2            Q.    It could be -- you could be --
 3    in your declaration, when you just described it
 4    as a foreign policy provision, you could be
 5    referring to it in either of those --
 6            A.    Correct.
 7            Q.    And you're familiar with the
 8    foreign policy provision as we discussed
 9    through your work at HSI, correct?
10            A.    Yes.
11            Q.    Do you have any understanding
12    of how an alleged violation of Executive Order
13    14188 relates to the foreign policy provision
14    in your work at HSI?
15            MR. KANELLIS:   Counsel, when you say,
16    "an alleged violation of Executive Order
17    14188," are you referring to language in the
18    document?  I'm not seeing that.
19            MS. CONLON:   No.  I'm asking -- I can
20    ask it in a different way.  Just a moment.
21    BY MS. CONLON:
22            Q.    Have you received any guidance
23    about application of the foreign policy
24    provision from anyone?
25            A.    No.
```

1           Q.    Has HSI created any guidance

2     about it?

3           A.    No.

4           Q.    And when I say guidance here,

5     I'm using that broadly.  So I mean directive,

6     memo, anything at all in writing about the

7     application of the foreign policy provision?

8           A.    Not to my knowledge.

9           Q.    You see here in the foreign

10    policy provision in Exhibit 4(3) there's a

11    clause titled Exceptions For Other Aliens,

12    right?

13          A.    What page is that on?

14          Q.    Page 5.

15          A.    Yes.  Well, I see it -- yes, I

16    see it.

17          Q.    And this provision states [As

18    read] "That an alien shall not be excludable or

19    subject to restrictions or conditions on entry

20    into the United States under clause one because

21    of the alien's past, current, or expected

22    beliefs, statements or associations if such

23    beliefs, statements, or associations would be

24    lawful within the United States."

25          I'm just going to pause there.  Do you

1    see the same text I see?

2          A.    Yes.

3          Q.    Have you ever received any

4    guidance on how to determine whether a person's

5    beliefs, statements, or associations would be

6    lawful within the United States?

7          A.    No.

8          Q.    You see how in the next clause

9    it says [As read] "Unless the Secretary of

10   State personally determines that the alien's

11   admission would compromise a compelling United

12   States foreign policy interest."  Right?

13         A.    Yes.

14         Q.    What is the process within HSI

15   for seeking the Secretary of State's position

16   as to whether an alien's admission would

17   compromise a compelling United States foreign

18   policy interest?

19         A.    Your question was again?

20         Q.    Okay.  What is the process for

21   seeking the Secretary of State's position as to

22   whether an alien's admission would compromise a

23   compelling United States foreign policy

24   interest?

25         A.    Letter.

1          Q.   A letter from who?

2          A.   From HSI.

3          Q.   HSI would send a letter to

4    the Secretary of State?

5          A.   Department of State.

6          Q.   To the Department of State.

7    Who at the Department of State would receive

8    that letter?

9          A.   It would be a Bureau of

10   Consular Affairs official.

11         Q.   And what would HSI typically --

12   what kind of information would HSI typically

13   include in this letter?

14         A.   A narrative summary that refers

15   the matter to the Department of State.

16         Q.   Would HSI include any

17   underlying factual evidence with the letter to

18   the Department of State?

19         A.   Yes.

20         Q.   How would HSI send the letter

21   to the Department of State; just an e-mail?

22         A.   Yes.

23         Q.   And HSI would just send as

24   attachments whatever evidence it had in support

25   of its letter?

1          A.    Yes.

2          Q.    How would the Department of

3    State convey its determination in response to

4    HSI?

5          A.    Via e-mail.

6          Q.    Who from the Department of

7    State is responsible for responding?

8          A.    I don't know.

9          Q.    So there's a lot built into

10   these provisions.  One question I have for you.

11   How does HSI assess pursuant to the foreign

12   policy provision whether someone's presence or

13   activities would have a potentially serious

14   adverse foreign policy consequence?

15         A.    I don't know.

16         Q.    Who at HSI is responsible for

17   making that determination in a given case?

18         A.    I don't know.

19         Q.    Who do you think would know

20   whose job it is at HSI to make the

21   determination that a particular person's

22   presence or activities would have potentially

23   serious adverse foreign policy consequences?

24         A.    When you say "who," I can't say

25   the person because it changes.  But the senior

1    official in HSI is the executive associate

2    director.

3            Q.   So essentially the person up

4    the chain from you?

5            A.   Yes.

6            Q.   Are you aware of any standards

7    or guidelines that that person relies upon in

8    making this determination?

9            A.   No, ma'am.

10           Q.   The foreign policy provision

11   uses the phrase in various places, the foreign

12   policy of the United States or a United States

13   foreign policy interest.  How does HSI

14   determine the foreign policy of the United

15   States for the purposes of this provision?

16           A.   I'm not aware.

17           Q.   Would the person who you would

18   expect to be aware, that would be the person

19   one up the chain from you, whose name I'm now

20   forgetting.  I'm sorry.

21           A.   Noted.  I don't know.

22           Q.   Has HSI been given -- well, one

23   second.  It says in Executive Order 14188.  So

24   I think that's taking you back to Exhibit 3 if

25   I'm correct?

1          A.   Yes.

2          Q.   All right.  It says in

3    section 2 which we looked at earlier, [As read]

4    "It shall be the policy of the United States to

5    combat anti-Semitism vigorously."

6          I'm going to pause there recognizing

7    that's not the full section.

8          A.   Yes, ma'am.

9          Q.   Okay.  Does HSI treat that

10   language in Executive Order 14188 as indicating

11   that it is the foreign policy of the United

12   States to combat anti-Semitism?

13         A.   I don't know.

14         Q.   Has HSI been told that the U.S.

15   has a policy of combatting anti-Semitism in the

16   U.S. or around the world?

17         A.   I don't know.

18         MS. CONLON:  I think we're almost

19   done with this executive order and we can take

20   a break, but I want to finish, if that's okay

21   with everyone.  Okay.

22   BY MS. CONLON:

23         Q.   It says in your declaration

24   which I think is Exhibit 2; is that right?

25         A.   Yes, ma'am.

```
 1              Q.   Okay.  Great.  Back to
 2    paragraph 6 which appears on page 3, you state
 3    here [As read] "ICE remains steadfast in its
 4    commitment to enforcing E.O. 14188 prohibiting
 5    anti-Semitism and safeguarding national
 6    security by applying existing authorities
 7    consistent with the priorities set forth in the
 8    E.O. 14188."
 9          So I'd like you to tell us what you
10    mean when you say, "the priorities set forth in
11    the E.O."?
12              A.   National security.
13              Q.   Your testimony is that the --
14    your statement in your declaration refers only
15    to national security generally?
16              A.   Yes, ma'am.
17              Q.   It's your testimony that --
18    withdrawn.  Your declaration states that ICE's
19    applying existing authorities consistent with
20    the priority set forth in 14188.
21          Does that include with the priority of
22    combining anti-Semitism?
23              A.   In furtherance of national
24    security.
25              Q.   Is that a yes?
```

```
 1              A.   In furtherance of national
 2    security.
 3              Q.   Yes.
 4              A.   That's my answer.
 5              Q.   I understand.  I wasn't sure if
 6    it was a question or an answer.  Okay.  In the
 7    next paragraph you write [As read] "In applying
 8    existing authorities, HSI Office of
 9    Intelligence proactively reviews open source
10    information to identify individuals within the
11    parameters of E.O. 14188."
12         My question is what is HSI's
13    understanding of the parameters of E.O. 14188.
14              MR. KANELLIS:  I'm going to make an
15    objection.  Just a little bit vague.
16    BY MS. CONLON:
17              Q.   I'm trying to ask you about
18    your statement.  So can you just tell me what
19    you meant when you wrote that?
20              A.   The parameters would include
21    the activities captured within the executive
22    order.
23              Q.   How do you determine what
24    activities are captured within the executive
25    order?
```

 1              A.    I think it's stated in

 2      paragraph 7.  We review open source

 3      information.

 4              Q.    Sorry.  What I meant is how do

 5      you determine whether the particular activity

 6      is anti-Semitic?

 7              A.    I don't.

 8              Q.    How does someone else at HSI?

 9      How does HSI reach that conclusion?

10              A.    I don't know.

11              Q.    Earlier you said just a moment

12      ago that HSI applies authorities -- I'm sorry.

13      Withdrawn.  HSI acts consistent with the

14      priorities set forth in E.O. 14188 to the

15      extent that they further national security,

16      correct?

17              A.    Yes, ma'am.

18              Q.    What is your understanding of

19      how combatting anti-Semitism as outlined in

20      this E.O. furthers national security?

21              A.    In terms of the national

22      security cornerstone, there's considerable

23      interest and focus on foreign terrorists org --

24      foreign terrorists organizations and

25      synthesizers.

```
 1              Q.   This executive order speaks
 2    repeatedly of anti-Semitism separate and apart
 3    from terrorism, terrorist organizations.  So my
 4    question is how does combatting anti-Semitism
 5    further national security?
 6              MR. KANELLIS:  Objection to the
 7    characterization of the document.  Document
 8    speaks for itself.  So if you want to break
 9    that up and ask the witness if he agrees with
10    you on the first, that would be better.
11    BY MS. CONLON:
12              Q.   My question is how does
13    combatting anti-Semitism not pro-terrorists
14    behaviors or sympathies but anti-Semitism
15    advance national security?
16              A.   I don't know.
17              Q.   Since Mr. Kanellis suggested we
18    look at the E.O., section 1, page 1 provides
19    examples of particular manifestations of
20    anti-Semitism that this order combats.
21         Do you agree with that statement?
22              A.   The entire section or just the
23    statement, which one are you referring to.  I'm
24    sorry.
25              Q.   Sorry.  I'm asking if you agree
```

```
 1   with that characterization or understanding of

 2   this E.O.?

 3            A.    What's the characterization?

 4            Q.    That the E.O. including

 5   examples of the kind of anti-Semitism that the

 6   E.O. seeks to combat?

 7            A.    I believe so.

 8            Q.    For example, the E.O. in

 9   section 1 notes that Jewish students have faced

10   discrimination, correct?

11            A.    Yes.

12            Q.    That Jewish students have been

13   denied access to certain areas on campus -- on

14   college campuses, right?

15            A.    Yes.

16            Q.    So my question is what is HSI's

17   understanding of how combatting that

18   anti-Semitism behavior advances national

19   security?

20            A.    Is that behavior inspired by

21   foreign terrorists organization or sympathizers

22   and that is the cornerstone of what HSI has

23   done to include ICE since the creation of the

24   department which, by way, the cornerstone of

25   which was the terrorist attacks of 911.
```

1        Q.    So fair to say that the reason

2   HSI focuses on anti-Semitism is the potential

3   that the anti-Semitism is driven by -- I'm

4   looking for your words, sympathy with

5   terrorists organizations; is that correct?

6        A.    It's not sympathy.  It's those

7   who inspire or support.  Sympathetic is a term

8   of art that I will defer to Webster on.

9        Q.    I'm sorry.  That's what it

10  looked like you had said.  So what you're

11  saying is HSI it advances the national security

12  interest of this country to combat

13  anti-Semitism in so far as the anti-Semitism is

14  inspired by or in support of foreign terrorist

15  organization?

16       A.    Foreign terrorist organization.

17       Q.    Okay.  In your declaration you

18  wrote about HSI Office of Intelligence's

19  reviews of open source information, correct?

20       A.    Yes.

21       Q.    It says here it explains open

22  source information as information available to

23  the public, correct?

24       A.    Yes.

25       Q.    First, how does HSI find

 1    relevant information find this relevant open

 2    source information what is this process?

 3                A.   I don't know.

 4                MR. KANELLIS:   I'm going to object to

 5    the degree it exposes methods or procedures or

 6    practices of HSI in conducting law enforcement

 7    investigations.

 8    BY MS. CONLON:

 9                Q.   When HSI does find relevant

10    open source information, where does HSI record

11    that in the investigative module you mentioned

12    earlier?

13                A.   Where do we record it?

14                Q.   Yes.

15                A.   In a report of analysis.

16                Q.   Who does HSI share that

17    information with that it gets from open

18    sources?

19                A.   Those with a need to know.

20                Q.   Is there a name for this

21    particular effort by HSI?

22                A.   No.

23                Q.   Have you heard the phrase,

24    catch and revoke?

25                A.   I haven't.

1          Q.   Has HSI received any guidance

2     or directives about the parameters of looking

3     at open source information?

4          A.   Not to my knowledge.

5          Q.   Does open source information

6     include social media information?

7          A.   It can.

8          Q.   What about social media

9     accounts that are set to private?

10          A.   I don't know.

11          Q.   Who would know?

12          A.   I don't know.

13          Q.   Do you know who at the Office

14     of Intelligence within HSI oversees its open

15     source information project?

16          A.   No.

17          Q.   What is HSI looking for in open

18     source information to determine whether a

19     person falls within the parameters of this

20     E.O.?

21          MR. KANELLIS:  I'm going to instruct

22     the witness not to answer because that, as I

23     understand the question, calls for information

24     that would reveal practices, techniques,

25     methods of law enforcement investigation.

```
 1                    MS. CONLON:  Just a moment.
 2                    THE COURT REPORTER:  I'm sorry.
 3                    MS. CONLON:  Oh, I said just a
 4       moment.  I'm sorry.
 5       BY MS. CONLON:
 6                    Q.   My question and or the next
 7       question I'd like to ask, and Mr. Kanellis, you
 8       can tell me if this is objectionable to you.
 9                    MR. KANELLIS:  Sure.
10       BY MS. CONLON:
11                    Q.   Without speaking about the
12       methods that are used to identify speech that
13       falls into the parameters -- this is going to
14       get complicated, let me start again.
15       Withdrawn.
16            Without speaking about privileged law
17       enforcement methods of identifying relevant
18       open source information, can you tell us the
19       topics that HSI used as relevant to Executive
20       Order 14188?
21                    MR. KANELLIS:  Before I lodge my
22       objection, if I do, I need to talk to counsel.
23                    MS. CONLON:  Okay.
24                    MR. KANELLIS:  Because I don't want
25       to --
```

```
 1              MS. CONLON:  I understand.
 2              MR. KANELLIS:  I'm fine with some of
 3     your questions but others I'm not.  Can we just
 4     talk real quick.
 5              MS. CONLON:  You guys have a room if
 6     you want --
 7              THE VIDEOGRAPHER: Off the record.
 8              MS. CONLON:  We should be off the
 9     record then they can confer.
10              MR. KANELLIS:  No, no, no, we can do
11     it right here.
12              MS. CONLON:  We're still off the
13     record.
14     (Off record discussion was held at 1:54 p.m.)
15              MR. KANELLIS:  And I apologize.  Can
16     you read back the question?  We're ready to go
17     back on.
18     BY MS. CONLON:
19          Q.   Okay.  Without speaking about
20     privileged law enforcement methods of
21     identifying relevant open source information,
22     can you tell us the topics that HSI uses as
23     relevant -- I think I said views, not uses but
24     use as relevant to Executive Order 14188?
25          A.   I don't know.
```

```
 1              MR. KANELLIS:  All that for an I

 2     don't know.

 3              MS. CONLON:  I know.  I know.  You're

 4     making him work really hard.

 5     BY MS. CONLON:

 6              Q.   We talked a moment ago about

 7     sort of connection between anti-Semitism and

 8     the United States's national security interest

 9     as turning on inspiration by or support of

10     foreign terrorist organizations.  Is Hamas one

11     of the foreign terrorist organizations that

12     you're talking about when you say that?

13              A.   Yes.

14              Q.   How does HSI determine -- an

15     I'm not talking about law enforcement methods

16     but the decision.  How does HSI determine that

17     particular anti-Semitic speech or activities is

18     inspired by Hamas?

19              MR. KANELLIS:  I'm going to object on

20     the grounds that it's vague and that it

21     potentially calls for law enforcement

22     privileged information, but I'll allow the

23     witness to answer to the extent it does not

24     intrude upon methods, practices, techniques if

25     you have that answer to give.
```

```
 1              A.    I don't.

 2    BY MS. CONLON:

 3              Q.    Maybe a better way to ask, are

 4    there any examples that you can provide of

 5    instances where HSI has determined that

 6    particular anti-Semitic speech was inspired by

 7    a foreign terrorist organization?

 8              MR. KANELLIS:   Okay.   That's plainly

 9    a no-go, deliberative process privilege.

10              MS. CONLON:   No non -- there's no

11    public -- at this point public at least

12    determinations of that nature that he can speak

13    about?

14              MR. KANELLIS:   No.   I mean, you asked

15    for specific examples and I'm not going to

16    allow him to answer about deliberative

17    predecisional -- such predecisional

18    deliberations.

19              MS. CONLON:   Will you let him answer

20    by giving me an example not based in fact of

21    something he's worked on that's privileged but

22    so we can understand what this phrase means.

23              MR. KANELLIS:   If you want to ask him

24    a question about some hypothetical --

25              MS. CONLON:   Statement.
```

```
 1              MR. KANELLIS:  -- circumstance that

 2     doesn't actually discuss an existing case and

 3     if he can answer the question, I won't object

 4     to that.

 5              MS. CONLON:  Okay.  Let's do that,

 6     see if that helps us.  One second.  Okay.

 7     BY MS. CONLON:

 8          Q.   If a person calls for a free

 9     Palestine, if that's their statement, is that

10     an anti-Semitic statement inspired by a foreign

11     terrorist organization?

12          A.   I don't know.

13          Q.   Why don't you know.  What makes

14     you say that?

15          A.   Is there more information

16     there?

17          Q.   That standing alone isn't

18     enough for you to know the answer?

19          A.   Correct.

20          Q.   What about if somebody

21     challenges Israel's right to exist as a Jewish

22     state?

23          A.   Don't know, because there's not

24     enough there.

25          Q.   What about if somebody at a
```

```
 1    demonstration uses the phrase "from the river
 2    to the sea Palestine will be free"?
 3              A.   I don't know in and of itself
 4    by itself.
 5              Q.   What about if a person at a
 6    demonstration chants "Intefada revolution."
 7              THE COURT REPORTER:  I'm sorry?
 8              MS. CONLON:  Intefada --
 9              THE COURT REPORTER:  No, I need the
10    question.
11    BY MS. CONLON:
12              Q.   Oh, sorry.  What about if a
13    person at a demonstration chants "Intefada
14    revolution"?
15              A.   I don't know.
16              Q.   Are there any statements
17    standing alone that you can imagine would be
18    alone -- be enough on its own to demonstrate
19    anti-Semitism inspired by a foreign terrorist
20    organization?
21              MR. KANELLIS:  Objection.  Calls for
22    speculation.
23    BY MS. CONLON:
24              Q.   If you can think of one that's
25    been linked to one.
```

```
 1              A.    Specifically resinate --
 2    specifically identifying a designated foreign
 3    terrorist organization espousing a threat of
 4    serious body injury or harm to an innocent
 5    civilian to include one with Jewish heritage or
 6    background.
 7    BY MS. CONLON:
 8              Q.    That sounds like a relatively
 9    high bar; is that right?
10              A.    That's not the only --
11              MR. KANELLIS:  Objection.  Objection.
12    Vague.
13              MS. CONLON:  Let me put it this
14    way --
15              MR. KANELLIS:  Also vague given the
16    response to a hypothetical question in a
17    hypothetical answer.
18    BY MS. CONLON:
19              Q.    It sounds like there's a
20    spectrum of statements a person could make
21    about that are -- that could be characterized
22    as anti-Semitic that would be relevant to HSI's
23    determination but not dispositive of it; is
24    that correct?
25              A.    Yes.
```

```
 1                Q.   And it sounds like in the

 2      example you gave at the sort of most extreme

 3      end would be specifically invoking the foreign

 4      terrorist organization in a statement; is that

 5      correct?

 6                MR. KANELLIS:  Objection.

 7      Mischaracterizes his prior testimony, but you

 8      can answer, if you want.

 9                A.   Restate the question.

10      BY MS. CONLON:

11                Q.   I'll ask a slightly different

12      question.  A statement that specifically names

13      a foreign terrorist organization as an

14      anti-Semitic statement that is the kind of

15      statement that would fall under the provision

16      we've been discussing; is that right?

17                MR. KANELLIS:  Oh, objection because

18      now it's vague because we've been discussing a

19      lot of different provisions and he responded

20      with a hypothetical response to your

21      hypothetical question before.  I'm not trying

22      to be difficult --

23                MS. CONLON:  No. No, I know you're

24      not --

25                MR. KANELLIS:  -- but that's -- it's
```

```
 1    sort of loaded.
 2            MS. CONLON:  Talking about these
 3    things in the abstract is just difficult.  I
 4    don't think you are being difficult.  Okay.
 5    BY MS. CONLON:
 6            Q.   I'm trying to understand how --
 7    when anti-Semitic speech without more is in
 8    HSI's view inspired by a foreign terrorist
 9    organization, and my question is that statement
10    that invokes the foreign terrorist
11    organization, that would potentially be a
12    statement that HSI would say was inspired by a
13    foreign terrorist organization; is that fair?
14            A.   That could fall within.
15            Q.   But even an statement that
16    doesn't expressly invoke a foreign terrorist
17    organization could be deemed as inspired by
18    foreign terrorist organization by HSI; is that
19    correct?
20            MR. KANELLIS:  Again, calls for
21    speculation.  If you can answer the question in
22    the nature it's been phrased, go ahead.
23            A.   Yeah.
24    BY MS. CONLON:
25            Q.   And I gave you some example of
```

 1    statements, I'll give you some more.

 2            If a person calls for institutional

 3    divestment from Israel, is that the kind of

 4    statement that is anti-Semitic speech in HSI's

 5    understanding under Executive Order 14188?

 6            MR. KANELLIS:   Objection.

 7    Foundation, HSI's understanding.   Objection.

 8    Calls for speculation because it's -- just

 9    there's no context, but if you can answer the

10    question, please go ahead.

11            A.   I don't know.

12    BY MS. CONLON:

13            Q.   Okay.  Well, Mr. Kanellis wants

14    more foundation, so I'll just go back to the

15    fact that HSI has an open source review program

16    to look at information for any indication that

17    a person's anti-Semitic speech is inspired by a

18    foreign terrorist organization, right?

19            A.   Restate that again.

20            Q.   Yeah, maybe we need some food.

21    HSI's Office of Intelligence reviews open

22    source information for an indication that a

23    person's anti-Semitic speech is inspired by a

24    foreign terrorist organization, right?

25            A.   I don't know.

```
 1              Q.    It sounds like there's not a

 2    hard and fast rule of what kind of anti-Semitic

 3    speech is inspired by foreign terrorist

 4    organizations from HSI's perspective; is that

 5    fair to say?

 6              A.    I think consistently.

 7              Q.    You'd say that -- it's fact

 8    dependent?

 9              A.    Correct.

10              Q.    And am I correct in having

11    understood you to say that you would look at

12    more than a person's speech to make that

13    determination?

14              A.    Are you in the hypothetical

15    context?

16              Q.    I don't think I'm allowed to be

17    in any other context with you right now, Mr.

18    Watson.  Yes, in the hypothetical context, you

19    said you'd need to know more when I gave you

20    examples of speech.

21              A.     In a hypothetical context, but

22    I think to be clear, there's a criminal context

23    and then there's this.  And what I'm saying to

24    you is in terms of an investigation, which one?

25              Q.    I think we are in the land of
```

1    supporting efforts to comply with Executive

2    Order 14188 and not a criminal investigation.

3         Does that offer some clarity?

4              A.   A little bit.

5              Q.   Okay.  Just one moment.  Do you

6    have an understanding -- well, withdrawn.  One

7    second.

8              MR. KANELLIS:  Oh, I'm sorry.

9              MS. CONLON:  Sorry.  I'm just trying

10   to see if there's anything else that I want to

11   ask before we break, so it's imminent.  I

12   promise.

13        BY MS. CONLON:

14             Q.   Okay.  On the open source

15   information review that the Office of

16   Intelligence is doing, does HSI receive

17   information from other law enforcement agencies

18   as part of that work?

19             A.   I don't know.

20             Q.   Do you know whether they

21   receive information from NSA?

22             A.   No, I don't know.

23             Q.   CIA?

24             A.   I don't know.

25             Q.   And HSI -- just so I'm clear,

```
 1   HSI has not received to your knowledge any
 2   guidance or directives from the State
 3   Department about its open source information
 4   review, correct?
 5               A.   Correct.
 6               MS. CONLON:  Okay.  Okay.  I think we
 7   should break.  Let's break.  Let's take a
 8   break.
 9               MR. KANELLIS:  Okay.  Before we --
10   you can step out, I just one real quick thing.
11   We can go off the record.
12               THE VIDEOGRAPHER:  The time is 14:07
13   and we are off the record.
14          (A break was taken at 2:08 p.m.)
15               THE VIDEOGRAPHER:  The time is 15:31,
16   and we're back on the record.
17               MS. CONLON:  Hi.  Okay.  We're going
18   back to the E.O.'s a little briefly, and then
19   we're leaving them behind.
20               A.   Okay.
21               Q.   So we talked about efforts by
22   the Department of Homeland Security to identify
23   people that may fall under the parameters of
24   E.O. 14188 which should be hopefully in front
25   you as an exhibit still?
```

```
 1                A.    Yes.

 2                Q.    Okay.  Great.  And can you

 3    remind me the exhibit number?  I apologize.

 4                A.    Yes, ma'am, it's Number 3.

 5                Q.    Okay.  Is a person's

 6    association with or membership in a particular

 7    group relevant to that effort by DHS?

 8                A.    I don't know.

 9                Q.    You don't know, but somebody

10    else would know?

11                A.    I can't speculate on that.

12                Q.    Let me ask you about specific

13    groups to make it easier.  Is a person's

14    association with or membership of the group

15    Students for Justice in Palestine relevant to

16    DHS's determination of whether that person

17    falls under the E.O. in Exhibit 4?

18                MR. KANELLIS:  Objection.  Calls for

19    speculation.  Objection to the extent it calls

20    for deliberative process communications or law

21    enforcement privileged information, but to the

22    extent that your answer does not touch upon

23    those subjects, you may try to answer the

24    question.

25                A.    I don't know.
```

```
 1    BY MS. CONLON:
 2              Q.   Are you familiar with group
 3    Students for Justice in Palestine?
 4              A.   No.
 5              Q.   Have you ever heard that phrase
 6    before?
 7              A.   Not that I can recall -- recall
 8    at this time.
 9              Q.   Are you familiar with the group
10    Faculty and Staff for Justice in Palestine?
11              A.   No.
12              Q.   Never heard that phrase before
13    either?
14              A.   I can't recall that right now
15    at this time.
16              Q.   Are you aware of the group
17    Jewish Boys for Peace?
18              A.   I can't recall on that group
19    now either.
20              Q.   What about the group Columbia
21    University Apartheid Divest?
22              A.   I can't recall on that group
23    either.
24              Q.   Are you aware of any particular
25    campus groups that are thought to have any
```

```
 1   association with Hamas?
 2              MR. KANELLIS:  Objection.  Calls for
 3   speculation.  Objection to the degree it calls
 4   for materials protected by a law enforcement
 5   privilege or materials that would reflect the
 6   deliberative process of a -- any Government
 7   agency.  You can answer, if you can.
 8              A.   I can't.
 9   BY MS. CONLON:
10              Q.   Let me back up.  First,
11   Mr. Kanellis, the question is not what are the
12   groups, it's whether he knows.
13         And even if you want to assert the
14   privilege and say he can't tell me what the
15   groups are, because we're going to fight about
16   this with you and litigate it, I need to come
17   back and ask him about it.  If we prevail, it
18   would be helpful to know if he knows the answer
19   because if he doesn't, we can just not waste
20   our time?
21              MR. KANELLIS:  Well, that's why I
22   qualified my response by if -- you can answer
23   to the degree it doesn't permeate any
24   privilege.
25              MS. CONLON:  Okay.
```

1           MR. KANELLIS:  So hopefully that'll

2     save us time.

3           MS. CONLON:  I'm hopeful too.

4     BY MS. CONLON:

5           Q.   So I guess my question is:  Are

6     there any particular campus groups relating to

7     advocacy for Palestine that are on DHSs -- that

8     are in DHSs view associated with Hamas?

9           A.   I don't know.

10          Q.   Going back to the E.O.'s, E.O.

11    14188 Exhibit 4 that we looked at earlier

12    discusses anti-Semitism on campus and calls

13    for -- and I can -- let me just get my copy too

14    so we're all looking at the same thing.  Hold

15    on one second.

16         Calls for the provision of guidance to

17    higher education institutions about this E.O.

18    So I'm thinking it's Section E again.  Section

19    3E of 14188.  I'll give you a second to get

20    there.

21          Once you've had a chance to look at E

22    which is on the back of Exhibit 4, let me know.

23    I think, perhaps, you're looking at the wrong

24    document.  We're talking about -- maybe I'm

25    mentioning the wrong exhibit number Executive

 1    Order 14188, it's a one-page document in front

 2    of you.

 3              A.    Thank you.  I heard Exhibit 4

 4    sp.

 5              Q.    Yeah, yeah, that's my fault.  I

 6    think it's the one right there by your right

 7    hand.

 8              A.    Okay.  This one.

 9              Q.    That's correct?

10              A.    All right.  Yes.

11              Q.    So Section E?

12              A.    Yes.

13              Q.    So in Section E it directs

14    various Government agencies to provide

15    recommendations for institutions of higher

16    education familiarizing them with the grounds

17    for inadmissibility under 8USC 118283.

18         I'm asking, I guess, just whether you

19    are aware of any recommendations that have been

20    made by the Department of Homeland Security in

21    response to this E.O.?

22              A.    No.

23              Q.    Is there someone at the

24    Department of Homeland Security who you would

25    expect to know the answer to that question?

```
 1            A.    Not at this time.

 2            Q.    What does that mean?  Is there

 3     another time that would like -- withdrawn.

 4            Why would there be some other time that

 5     somebody would be more better positioned to

 6     respond to this question than right now?

 7            A.    There are three distinct

 8     process owners being the Secretary of State or

 9     the Department of State.  The Department of

10     Education and the Department of Homeland

11     Security.

12        With multiple departments there are lines

13     of efforts as well as guidelines that should be

14     considered in coordination with departmental

15     counsel.  I'm not aware of those efforts or

16     deliverables as of today.

17            Q.    The order itself was issued on

18     January 29, 2025, right?  If you look at the

19     first page?

20            A.    I see.

21            Q.    And Section 3 says, [As read]

22     "Within 60 days of the date of this order,"

23     right?

24            A.    When you say, "60 days," where

25     is that?
```

1          Q.    The first sentence at Section

2     3.

3          A.    Okay.

4          Q.    [As read] "Within 60 days of

5     the date of this order, the head of each

6     executive department or agency shall submit the

7     report to the President."  And then it goes on

8     to cover all of the parts of Section 3.  So I

9     guess I'm asking you if it's your testimony

10    that the Department of Homeland Security as far

11    as you know has not complied with Section 3s

12    timeline for providing this report?

13         A.    My testimony is I haven't seen

14    it, so I can't confirm it.

15         Q.    You said that there are

16    guidelines for -- that should be considered in

17    coordination with departmental counsel when

18    there are multiple departments involved in

19    responding to something just a moment ago,

20    right?

21         A.    Yes.

22         Q.    What guidelines are you

23    referring to?

24         A.    Authorities, roles and

25    responsibilities for each applicable department

1    pursuant to the code of federal regulation

2    and/or U.S. code.  And I would defer to those

3    departments to elaborate further as I am not a

4    subject matter expert nor legal counsel.

5              Q.   Separate and apart from the

6    executive orders, are you aware of whether the

7    Department of Homeland Security has received

8    any guidance that it should focus on student

9    protesters in its enforcement efforts?

10             A.   No.

11             Q.   Again, setting aside the

12   executive orders are you aware of whether the

13   Department of Homeland Security has received

14   any guidance that it should focus on particular

15   universities with respect to its enforcement

16   efforts?

17             A.   No.

18             Q.   You're not aware of any --

19   well, let me step back.  Guidance, perhaps,

20   seems to too specific.

21        Are you aware of any discussions within

22   the Department of Homeland Security calling for

23   a focus on student protestors as part of the

24   department's enforcement efforts?

25             A.   No.

```
 1              Q.    Who would be aware of such
 2   discussions if they occurred?  Who has the role
 3   for deciding what the enforcement priorities
 4   are for the Department of Homeland Security?
 5              MR. KANELLIS:  Objection.  Calls for
 6   speculation.  If you can answer, go ahead.
 7              A.    I don't know.
 8   BY MS. CONLON:
 9              Q.    Who decides the Department of
10   Homeland Security's priorities for enforcement?
11              A.    I don't know.
12              Q.    You've worked with the
13   Department of Homeland Security for like 20
14   years, right?
15              A.    I have.
16              Q.    And you don't know who sets the
17   agenda for the Department of Homeland Security?
18   Is it a more complicated question than I'm
19   imagining?
20              A.    It can be.
21              MR. KANELLIS:  Yeah, let me just tell
22   you -- sorry.  I object to "who sets the
23   agenda."  Very -- very loaded question or
24   phrase.
25   BY MS. CONLON:
```

```
 1              Q.   Who sets the enforcement
 2    priorities for the Department of Homeland
 3    Security?  I see I'm making you laugh, I wish
 4    that I too was laughing.
 5              A.   Well, because I'm going to
 6    simply say this.  These departments are members
 7    of what branch of Government.
 8              Q.   So that's the answer?
 9              A.   That's my answer.
10              Q.   And is there a particular
11    person within the executive branch who you
12    would say sets the enforcement priorities for
13    the Department of Homeland Security?
14              A.   No.
15              Q.   Okay.  So we can now forget the
16    E.O.s.  I want to talk about the way in which
17    the Department of Homeland Security typically
18    effectuates revocations.  So when a noncitizen
19    has their Visa revoked, sometimes it's the
20    practice of the Department of Homeland Security
21    to give that person notice ahead of time; is
22    that right?
23              A.   On a Visa revocation?
24              Q.   Yes, sir.
25              A.   That's the primacy of the
```

```
 1   Department of State.
 2             Q.   So am I correct in
 3   understanding, and tell me if I have this
 4   Division of Labor wrong, that the decision to
 5   revoke would be made by the Department of
 6   State?
 7             A.   That's correct.
 8             Q.   But the acting on or executing
 9   of a revocation, like, for example, the
10   detaining of a person, the arresting of that
11   person, that would be done by the Department of
12   Homeland Security; is that right?
13             A.   Upon the issuance of a notice
14   to appear.
15             Q.   And my question is about a
16   silent notice.  Notices to appear versus silent
17   revocations.
18        My understanding is that there are
19   times when a person is warned ahead of time
20   that their Visa is about to be revoked, there
21   are times that they're not told ahead of time;
22   is that correct?
23             A.   Not as stated, no.
24             Q.   What would be the correct way
25   to state that?
```

```
 1              MR. KANELLIS:  Objection.
 2   BY MS. CONLON:
 3              Q.   Please explain to me the notice
 4   process for Visa revocations?
 5              A.   It depends on the authority
 6   under which it is revoked.  I'm not the subject
 7   matter expert.  That would be the Department of
 8   State.
 9              Q.   And who at the Department of
10   State would you think is expert on that?
11              A.   I would start with the Bureau
12   of Consular Affairs.
13              Q.   Who at the Bureau of Consular
14   Affairs would you start with?
15              A.   I don't know.
16              Q.   If the authority under which
17   it' being revoked is the from criminal law.
18   How does notification after?
19              A.   I don't know.
20              Q.   If the authority on which it's
21   being revoked is the foreign policy provision,
22   how does notice of revocation work?
23              A.   I'm not sure.
24              Q.   What do you know about that
25   process?
```

```
 1              A.   I'm familiar with two ways that
 2    Visas are revoked.   There can be an immediate
 3    revocation or there can be a prudential
 4    revocation.
 5              Q.   What is a prudential
 6    revocation?
 7              A.   I can't give you the term of
 8    art there or the legal definition.   I would
 9    defer to the Department of State.
10              Q.   What do you mean when you say,
11    "it"?
12              A.   A prudential revocation is when
13    the State Department revokes the Visa with the
14    ability of the alien to depart.
15              Q.   In an immediate revocation, the
16    Visa holder is arrested.   Is that the
17    difference?
18              A.   It can be.   If a notice of --
19    notice to appear is issued.
20              Q.   And the notice to appear has to
21    be issued by a judge?
22              A.   I don't -- I'm not sure on
23    that.
24              Q.   Are you -- who can issue a
25    notice to appear?
```

```
 1              A.   Well, agencies.  So CIS.

 2              Q.   Okay.  What are the

 3    circumstances in your experience in which a

 4    Visa holder facing an immediate revocation is

 5    not given an opportunity to appear?

 6              A.   I'm sorry, can you give me that

 7    question again?

 8              Q.   Sure.  In your experience, what

 9    are the circumstances under which a person

10    whose Visa has been immediately revoked is not

11    given an opportunity to appear?

12              A.   Appear before who?

13              Q.   Well, you talked about a notice

14    to appear.  So I'm asking, what are the

15    circumstances under which a person's Visa is

16    immediately revoked and they are arrested

17    rather than having the opportunity to appear

18    somewhere?

19              A.   I'm not clear on that question

20    and the line of thought there.

21              Q.   I think, perhaps, this is like

22    a terms of art problem.  I don't mean any of

23    these to be terms of art.  I'm asking literally

24    what were the circumstances under which the

25    Department of Homeland Security arrests someone
```

 1    because their Visa has been immediately

 2    terminated instead of going through some other

 3    process with them; that's my question?

 4            A.   I don't know what other process

 5    there is other --

 6            Q.   A process by which a person --

 7    and I apologize for interrupting you, I'm just

 8    going to try to clarify.

 9         When a person gets a notice to appear,

10    are they then given a time and place that they

11    need to show up at to essentially surrender to

12    the Department of Homeland Security?

13            A.   It depends on the judicial

14    district and the docket before the court.

15            Q.   So the world of possibilities

16    for how to -- how to enact an immediate Visa

17    revocation includes arresting someone, giving

18    them a notice to appear which could require

19    them to be somewhere at a particular time and

20    place, is that correct; just two paths?

21            A.   I can't speak to the existence

22    of more than at this point, and at the end of

23    the day that is an operational decision that is

24    made based on the judicial district and

25    coordination with the principle legal advisor.

```
 1                 Q.   When you say, "the judicial
 2      district," you don't mean that's a decision
 3      that a judge has to make, right?
 4                 A.   I'm not clear on the question.
 5                 Q.   What do you mean when you say,
 6      "judicial district"?
 7                 A.   A venue aligned with the
 8      executive office of immigration review where
 9      they hear cases, and if a violation has
10      occurred in that district, they would have
11      venue to hear the case.  I can't speak to the
12      docket or the timing of it.
13                 Q.   Does ICE have any discretion as
14      to whether they arrest someone or give them an
15      opportunity to appear and turn themselves in?
16                 A.   That circumstance can exist.
17                 Q.   Okay.  In what circumstance can
18      that happen?
19                 A.   I can't give you every one.
20                 Q.   Could you give me one as a
21      starting point?
22                 A.   Yes, if there's the issuance of
23      a G56 --
24                 THE COURT REPORTER:  G --
25                 THE WITNESS:  G56 G as in golf 56
```

1    which is an interview opportunity.

2    BY MS. CONLON:

3            Q.   And what -- I'm sorry.  I'm not

4    familiar with a G56 or the phrase interview

5    opportunity, so can you explain what that is?

6            A.   It's an opportunity for the

7    alien to appear before an immigration officer

8    and answer questions as it relates to their

9    status.

10           Q.   And can a G56 be conducted in

11   connection with a Visa revocation?

12           A.   I don't know.

13           Q.   Are there circumstances under

14   which a Visa is revoked and ICE rather than

15   going and finding the person and arresting them

16   gives the person an opportunity to turn

17   themselves in?  Not for an interview, but to be

18   arrested?

19           A.   Can you ask that question

20   again?

21           Q.   Sure.  Are there circumstances

22   under which a Visa is revoked and ICE allows

23   the person to turn themselves in rather than

24   going out and arresting them?

25           A.   That is a possible scenario.

1          Q.    Is there any document that
2    explains when that is permitted?
3          A.    No.
4          Q.    Who decides whether that can
5    happen in a particular case?
6          A.    An authorized official in the
7    field.
8          Q.    And an authorized official in
9    the field is the final decision-maker on that
10   issue?
11         A.    I don't know in that space.
12         Q.    You worked as an agent for some
13   amount of time in the Department of Homeland
14   Security, correct?
15         A.    Yes.
16         Q.    Were there times that you
17   arranged for someone to turn themselves in
18   rather than arresting them when their Visa had
19   been revoked?
20         A.    No.
21         Q.    You always arrested someone
22   whose Visa had been revoked?
23         A.    I always deferred to the
24   special agent in charge in coordination with
25   the United States Attorney's Office.

1          Q.    And the United States

2    Attorney's Office is involved in the arrest of

3    a person whose Visa has been revoked even for

4    noncriminal violations of the law?

5          A.    No.

6          Q.    So in the circumstance where a

7    person's Visa is revoked for a noncriminal

8    violation of law, who did you in your

9    experience did make that decision with about

10   whether to arrest them or have them turn

11   themselves in.

12         A.    I don't make that decision as a

13   principle field official.  That decision is

14   delegated to supervisory personnel and it also

15   includes other parts of the ICE as I mentioned

16   before enforcement and removal operations.

17         Q.    And it's supervisory personnel

18   at the level of a field office or in some other

19   part of ICE?

20         A.    I'm aware of those decisions

21   being made at the field level.

22         Q.    Now, you mention enforcement

23   and removal operations.  Enforcement and

24   removal operations, are they tasked with

25   effectuating the arrest or detention of that

1    person whose Visa has been revoked?

2            A.    They have responsibility in

3    that requirement.

4            Q.    Does HSI National Security

5    Division also have any responsibility in that

6    requirement?

7            A.    We support the function of

8    identifying and referring leads for

9    investigation.

10           Q.    To your knowledge, and if you

11   don't know it's fine, can the State Department

12   decide not to notify a student that their Visa

13   has been revoked before the student is

14   arrested?

15           A.    I don't know.

16           Q.    Are you aware of any

17   circumstances in which that has occurred?

18           A.    Can you restate the question?

19           Q.    Are you aware of any instances

20   of the State Department deciding not to notify

21   a student that their Visa has been revoked?

22           A.    Yes.

23           Q.    Is that a common practice?

24           A.    It has occasions as it relates

25   to law enforcement safety and operational

 1    security.

 2              Q.    Do you have any information

 3    about whether the State Department has

 4    increased the number of times -- has increased

 5    the number of authorizations of silent

 6    revocations since the beginning of this year as

 7    compared to years past?

 8              A.    No.

 9              Q.    Will you expect the head of the

10    Bureau of Consular Affairs to be in a position

11    to answer that question?

12              MR. KANELLIS:    Objection.    Calls for

13    speculation.

14    BY MS. CONLON:

15              Q.    Yeah.    Okay.    Are you aware of

16    any particular instances where the State

17    Department has not notified a student that

18    their Visa has been revoked in the past six

19    months.

20              A.    I don't know on a student.

21              Q.    What about for nonstudents?

22              A.    I'm not sure.

23              Q.    Does ICE have the opportunity

24    to give input to the State Department about

25    whether or not to notify a Visa holder that

```
 1    their Visa has been revoked?
 2              MR. KANELLIS:  I'm sorry.  Can you
 3    repeat that question?
 4    BY MS. CONLON:
 5              Q.   Does ICE have the opportunity
 6    the give input to the State Department about
 7    whether or not to notify a Visa holder that
 8    their Visa has been revoked?
 9              A.   I'm not sure.
10              Q.   ICE recommends under certain
11    circumstances the revocation of a particular
12    Visa holder's Visa to the Department of State,
13    correct?
14              A.   ICE provides information in
15    support of their decision as it relates to the
16    revocation of a Visa.
17              Q.   When ICE provides information
18    in support of their decision to revoke a Visa,
19    does ICE provide information about whether it
20    should be a silent revocation?
21              A.   I would say, yes, we have.
22              Q.   Under what circumstances has
23    ICE done that?
24              A.   When the Department of State
25    has considered immediate revocation of a Visa.
```

1          Q.    When the Department of State

2    has considered immediate revocation of a Visa

3    ICE has provided input regarding whether that

4    should be a silent revocation; is that correct?

5          A.    In limited instances.

6          Q.    Approximately how many times

7    has ICE done that in the past six months?

8          A.    I'm not aware of more than 25

9    instances.

10         Q.    What did those instances have

11   in common that prompted ICE to make that

12   recommendation?

13         MR. KANELLIS:  Objection.

14   Foundation.

15   BY MS. CONLON:

16         Q.    Did those 25 --

17         MR. KANELLIS:  Calls for speculation.

18         MS. CONLON:  I'm sorry.  Anything

19   else?

20   BY MS. CONLON:

21         Q.    Did those 25 instances have

22   anything in common?

23         A.    I'm not sure.

24         Q.    Who from ICE made the

25   recommendation in those 25 instances?

1           A.    I can't say in every instance.

2           Q.    In any of the instances,

3   please, identify who made the decision?

4           A.    I'm sorry.  Decision to do

5   what?

6           Q.    Who from ICE recommended silent

7   revocation in the 25 instances that you

8   mentioned a moment ago?

9           A.    Again, I can't say for every

10  instance who made the recommendation.

11          Q.    I understand that.  I'm asking

12  you to identify as many people as you can

13  recall.

14          A.    In -- I would say one of my

15  letters I believe there was reference to that,

16  but I don't remember which one exactly.  So I

17  think I am within that scope but I can't say

18  for which one.

19          Q.    Who besides you for ICE has

20  made a recommendation for a silent revocation?

21          A.    I don't know.

22          Q.    You're not aware of a single

23  other person from ICE who has made the

24  recommendation for a silent revocation in the

25  past six months?

1          A.   I don't want to speculate.

2          Q.   When you said, "one of your

3    letters," are you referring to a letter from

4    DHS to the Department of State?

5          A.   One of the letters that I

6    digitally signed; that's what I'm referring to.

7          Q.   Approximately how many times in

8    2024 did ICE recommend the silent revocation?

9          A.   I don't know.

10         Q.   Was it more than 25 times?

11         A.   I don't know.

12         Q.   Sorry.  Okay.  And you

13   mentioned earlier that -- well, in your

14   experience, you have -- why have you

15   recommend -- in the instance where you

16   recommended silent revocation, what was the

17   reason for that?

18         MR. KANELLIS:  Objection.  Calls for

19   deliberative process information.  I'm

20   instructing the witness not to answer.

21   BY MS. CONLON:

22         Q.   You said that there are reasons

23   generally not about a particular instance for

24   recommending a silent revocation are law

25   enforcement, safety, and operational security;

1    is that right?

2                    A.    Yes.

3                    Q.    Law enforcement safety meaning

4    the safety of the officers effectuating the

5    person's arrest?

6                    A.    Correct.

7                    Q.    What does operational security

8    mean in that context?

9                    A.    Probability of success in

10   finding the person.

11                   Q.    Okay.  The letter that you

12   mentioned, one that you electronically signed,

13   why were you in a position of having to sign a

14   letter regarding this if you're not typically

15   involved in the day-to-day cases?

16                   A.    Because the process was ICE

17   headquarters to the Department of State.

18                   Q.    And that runs through you?

19                   A.    In this line of effort for this

20   specific program, it did.

21                   Q.    And what particular program are

22   we talking about?

23                   A.    The executive order and the

24   lines of effort as it relates to leads.

25                   Q.    When you say, "the executive

1    order," do you mean the executive order that we

2    were discussing 14188?

3            A.    That would be one.

4            Q.    Do you also mean the executive

5    order we discussed this morning 141 -- the

6    other one that's in front of you are, I

7    apologize, Exhibit 1?

8            A.    Yes.

9            Q.    And that's Executive Order

10   14161; did I get that right?

11           A.    Yes, as Exhibit Number 1.

12           Q.    What other -- you said -- let

13   me just scroll up to get it right.

14           You said in this line of effort for

15   this specific program it ran through you, and I

16   asked you what program are we talking about.

17   So what other than the two executive orders we

18   just identified are part of the program we're

19   talking about?

20           A.    I'm not aware of any other from

21   my division.

22           Q.    Are there any other guiding

23   documents or policies that are a part of this

24   program?

25           A.    Not to my knowledge.

```
 1                Q.   And this program meaning the

 2      effort -- HSI's effort to implement these two

 3      executive orders?

 4                A.   In furtherance thereof.

 5                Q.   Is there a name for this

 6      program?

 7                A.   Not to my knowledge.

 8                Q.   Is there a way in which this

 9      program was referred to in internal documents?

10                A.   Not to my knowledge.

11                Q.   You said the program is the

12      executive order and lines of effort as it

13      relates to leads.  Does that mean investigative

14      leads?

15                A.   Tips.

16                Q.   Tips.  And where did the tips

17      that are part of this program come from?

18                A.   I don't know.

19                Q.   Who -- who would you say runs

20      this program?

21                A.   Office of Intelligence.

22                Q.   Do you know who within the

23      Office of Intelligence runs it?

24                A.   The person, no.

25                Q.   Do you know the title of the
```

```
 1    person who runs it?

 2            A.    No.

 3            Q.    Do you know when this program

 4    began?

 5            A.    No.

 6            Q.    Do you know if it's ongoing?

 7            A.    I don't know.

 8            Q.    Was there any sort of

 9    announcement of the initiation of this program

10    at DHS or ICE?

11            A.    Not to my knowledge.

12            Q.    How did you become aware of the

13    program?

14            A.    Executive briefing.

15            Q.    Who did you receive an

16    executive briefing from about this program?

17            A.    The Office of Intelligence.

18            Q.    And when did that briefing take

19    place?

20            A.    I believe it was March of 2025.

21            Q.    Do you recall who gave you the

22    executive briefing?

23            A.    No.

24            Q.    Who normally gives you

25    executive briefings from the Office of
```

```
 1   Intelligence?
 2               A.   I can't say who because it's a
 3   team of employees, and I don't recall who the
 4   subject matter expert was that did.
 5               Q.   Who are the members of the
 6   briefing tam for the Office of Intelligence,
 7   understanding that you don't know the
 8   particular expertise?
 9               A.   I don't know.
10               Q.   How often do you receive
11   executive briefings from the Office of
12   Intelligence?
13               A.   It is infrequent.
14               Q.   Can you please estimate the
15   frequency on a monthly basis?
16               A.   Less than once.
17               Q.   So less than once a month.
18               A.   Correct.
19               Q.   It sounds like -- you said
20   earlier the program doesn't have a name.  If
21   you're speaking to a colleague about the
22   program, how would you refer to it?
23               A.   So when you say, "colleague,"
24   what do you mean?
25               Q.   Another employee at the
```

1    Department of Homeland Security.

2            A.   I don't use a name with other

3    Department of Homeland Security employees for

4    this program.

5            Q.   If you had -- if you were

6    speaking about this program with the Department

7    of State, what would you call it?

8            A.   I don't know.

9            Q.   Have you ever discussed this

10   program with anyone at the Department of State?

11           A.   I've discussed lines of effort

12   with my State Department counterpart.

13           Q.   And remind me who is your State

14   Department counterpart?

15           A.   John Armstrong.

16           Q.   What lines of effort have you

17   discussed with him?

18           A.   The referrals that originate

19   from ICE to the Department of State.

20           Q.   How was this program described

21   to you in the executive briefing?

22           A.   A team of analysts conducting

23   research and analysis of open source, compiling

24   a report of analysis for review and

25   consideration.

```
 1                   Q.    A report of analysis on what
 2      topic?
 3                   A.    Activity contrary to the
 4      executive order.
 5                   Q.    The program addresses activity
 6      contrary to Executive Order 14188; is that
 7      correct?
 8                   A.    That would be one, yes.
 9                   Q.    And the program also addresses
10      activity contrary to Executive Order 14161; is
11      that correct?
12                   A.    Yes.
13                   Q.    The program only address those
14      two executive orders no other executive orders,
15      correct?
16                   A.    I don't know.
17                   Q.    When you were at the executive
18      briefing who else was there?
19                   A.    Assistant Director Pete
20      Hatch -- Peter Hatch, Deputy Assistant Director
21      Bradley Etter, at the time Acting Deputy
22      Executive Associate Director Derrick Gordan and
23      then Acting Executive Associate Director Robert
24      Hammer.
25                   Q.    And those are officials within
```

1    the Office of Intelligence and also within

2    National Security Division; is that right?

3            A.   No.

4            Q.   Okay.  Correct me.  Which

5    divisions are they from within HSA?

6            A.   Office of Intelligence and the

7    principles -- the two principles that I

8    referenced are the office of Homeland -- HSI.

9            Q.   HSI.  So let's just -- so

10   clarify for the record, Pete Hatch remind me,

11   I'm sorry he's --

12           A.   Office of Intelligence, he's

13   the Assistant Director.

14           Q.   Bradley Etter is associated

15   with which?

16           A.   Intelligence.  He's the Deputy

17   Assistant Director.

18           Q.   Derrick Gordan?

19           A.   He is the Deputy Executive

20   Associate Director acting for HSI.

21           Q.   And then Robert Hammer is?

22           A.   The Acting Executive Associate

23   Director for HSI.

24           Q.   Were there any materials

25   provided to you as part of the briefing?

```
 1              A.    Not to my knowledge.

 2              Q.    Was there a presentation made

 3   with a slide deck?

 4              A.    Not to my knowledge.

 5              Q.    No visual aids?

 6              A.    No.

 7              Q.    How did the briefing describe

 8   activity contrary to the two executive orders?

 9              A.    I --

10              MR. KANELLIS:  Can you.  Hold on.

11   Sorry.  Caught me napping.  Can you read back

12   the question, please?

13   BY MS. CONLON:

14              Q.    How did the briefing describe

15   activity contrary to the two executive orders?

16              MR. KANELLIS:  I'm going to object to

17   the extent that that witness calls for

18   deliberative predecisional communications, and

19   instruct the witness not to answer to the

20   degree that his response would incorporate

21   predecisional deliberative communications

22   within the Agency.

23   BY MS. CONLON:

24              Q.    Are you aware of a time at

25   which the Agency decided what activity contrary
```

1    to the E.O.s would be?

2              A.   No.

3              Q.   Has the Agency now decided what

4    activity contrary to the E.O.s means for the

5    implementation of this program?

6              MR. KANELLIS:  Objection.

7    Foundation.

8    BY MS. CONLON:

9              Q.   You said that at the --

10              THE COURT REPORTER:  I'm sorry.  I

11    didn't get an answer.

12              MS. CONLON:  Oh, yeah, you didn't

13    get --

14              THE WITNESS:  To which question?

15              MR. KANELLIS:  The one to which I

16    lodged a foundation objection, if you can

17    respond you're welcome to respond.

18              THE WITNESS:  Can I hear the question

19    again?

20    BY MS. CONLON:

21              Q.   Has the Agency decided what

22    activity contrary to the E.O.'s means for the

23    implementation of this program?

24              A.   Not to my knowledge.

25              Q.   Have you had any subsequent

 1    meeting apart from the meeting in March

 2    regarding the program?

 3              A.   I'm sorry, that's a broad

 4    question.

 5              Q.   Has the program come up in any

 6    meetings since the first briefing about it in

 7    March?

 8              A.   Yes.

 9              Q.   Approximately, how many

10    meetings?

11              A.   I would say at least once a

12    week.

13              Q.   Have any of those meetings

14    included the people you've identified as being

15    present for the first briefing?

16              A.   Subject to availability, yes.

17              Q.   Is there a standing weekly

18    meeting about the program?

19              A.   No.

20              Q.   Are there minutes taken at the

21    meetings where the program has been discussed?

22              A.   No.

23              Q.   Have you seen any written --

24    any documentation generated relating to this

25    program?

```
 1              MR. KANELLIS:  Objection.  A little
 2   vague.  Over broad.
 3   BY MS. CONLON:
 4              Q.   I'll be more specific.  Have
 5   you seen any document that describes this
 6   program?
 7              A.   Not that I can recall at this
 8   time.
 9              Q.   Have you exchanged any written
10   communications with anyone about this program?
11              A.   That's a little broad, I'm
12   sorry.
13              Q.   Have you ever sent an e-mail or
14   received one about this program?
15              A.   Referral e-mails between myself
16   and Department of State colleagues.
17              Q.   Referral e-mails means
18   referrals ICE is making to the Department of
19   State of investigative leads generated by the
20   program; is that what that means?
21              A.   Referrals of reports of
22   analysis and the accompanying letter.
23              Q.   Is there a name for the
24   accompanying letter that gets sent?
25              A.   No.
```

1      Q.   What kind of information is

2   typically included in an accompanying letter?

3           A.   What's the question again?

4           Q.   What kind of information is

5   typically included in the accompanying letter?

6           A.   An advisory of the referral

7   with notification of an attachment.

8           Q.   Does the letter typically say

9   anything other than this is a referral, it's

10  attached?

11          MR. KANELLIS:  I'm going to object to

12  the degree that the letter contains

13  predecisional or deliberative information.  But

14  if you can answer the question, that, I guess,

15  hypothetical question, you may except to the

16  degree it reveals that deliberative taking.

17          A.   I can't.

18  BY MS. CONLON:

19          Q.   Mr. Kanellis, would you have an

20  objection if we just stopped determine whether

21  the letter contains predecisional or

22  deliberative information?  I can't tell if it's

23  a cover letter or a letter that are contains

24  opinion, analysis or recommendation?

25          MR. KANELLIS:  I wouldn't object to a

1    question where there was a foundation laid that

2    he had an understanding of the contents about

3    generally what topics were covered.

4              But he's indicated in his last

5    response that he did not -- as I recall, he did

6    not know that.

7              MS. CONLON:  He's said it before, but

8    let's just ask him.

9    BY MS. CONLON:

10             Q.   Mr. Watson, you've sent a

11   letter accompanying a referral to the

12   Department of State, correct?

13             A.   On at least one occasion, yes.

14             Q.   Have you ever seen any letter

15   accompanying a referral to the Department of

16   State other than the one that you've signed?

17             A.   I don't know.

18             Q.   Who typically receives these

19   letters at the Department of State?

20             A.   I don't know beyond the

21   intended recipient identified in the e-mail.

22             Q.   That's the question I'm meaning

23   to ask you.  Who is the intended recipient at

24   the Department of State for the referrals and

25   accompanying letters?

1          A.   At a minimum it was John

2     Armstrong.

3          Q.   In your accompanying letter,

4     did you -- what topics without saying the

5     substance of them, but what topics did you

6     address?

7          A.   I don't recall a specific topic

8     being addressed.

9          Q.   Did you provide your opinion or

10    recommendation in the accompanying letter?

11         A.   I don't recall.

12         Q.   Now, in the meetings that

13    you've had about -- well, withdrawn.  Is there

14    any other manner in which you have learned

15    about this program apart from the meetings that

16    you had since the March briefing?

17         A.   No.

18         Q.   Have you received any

19    information about how this program is being

20    implemented?

21         A.   From whom?

22         Q.   From the Office of

23    Intelligence?

24         A.   No.

25         Q.   From anybody else?

```
 1              A.   Not to my knowledge.

 2              Q.   Just for the avoidance of

 3    doubt, you have not seen any training materials

 4    on the implementation of this program, right?

 5              A.   No.

 6              Q.   Now, do all the cases

 7    identified as part of this program run through

 8    ICE headquarters?

 9              A.   I don't know.

10              Q.   This will seem like a silly

11    question, but are you in ICE headquarters?

12              A.   Yes.

13              Q.   Who else -- what other --

14    withdrawn.

15         How many people are in ICE

16    headquarters, approximately?

17              A.   I don't know.

18              Q.   What's your best guess?

19              A.   I don't have one, we just

20    reconstituted.

21              Q.   Is ICE headquarters located in

22    D.C.?

23              A.   Yes.

24              Q.   Are there more than 100 people

25    in your office building that you work in at ICE
```

```
 1    headquarters?

 2              A.    I don't work at ICE

 3    headquarters.

 4              Q.    Okay.  Help me understand when

 5    you say, "ICE headquarters," what do you mean?

 6              A.    The location inside the city

 7    limits of Washington, D.C.

 8              Q.    But that's not where you work?

 9              A.    Correct.

10              Q.    I'm sorry.  Where are you

11    located, if not that building?

12              A.    I'm located in Vienna,

13    Virginia.

14              Q.    Ahh, and is that where HSI is

15    based?

16              A.    Not in its entirety.

17              Q.    Okay.  The meetings that you

18    mentioned what was the purpose for those

19    meetings?  Why were they being convened?

20              A.    We provide weekly updates to

21    our leadership.

22              Q.    Who gave weekly -- who gave the

23    updates of the program at these weekly

24    meetings?

25              A.    The designated representative
```

 1    for the division.

 2              Q.   Do you recall on any occasion

 3    who that was?

 4              A.   For which division?

 5              Q.   Well, which division was

 6    responsible for providing an update on this

 7    program?

 8              A.   There was burden sharing across

 9    Intelligence and National Security.

10              Q.   Were you the senior most

11    official within national security sharing the

12    burden of this program?

13              A.   Yes.

14              Q.   Anybody else besides you and

15    national security working on this program?

16              A.   Working on this program or

17    briefing?  I don't understand your question.

18              Q.   Well, we'll start with

19    briefing.  Anybody besides you who is giving a

20    briefing on this program for the National

21    Security Division?

22              A.   I don't recall.

23              Q.   Is there anyone within the

24    National Security Division who has done work in

25    support of this program?

1          A.    Deputy Assistant Director Akil

2     Baldwin.

3          Q.    Anybody else?

4          A.    Acting Unit Chief Kristin

5     Falcone.

6          Q.    Does that mean that the Counter

7     Threat Lead Development unit has supported this

8     program?

9          A.    Yes.

10         Q.    In what ways has the national

11    security division support the program?

12         A.    Personnel.

13         Q.    Do you have an estimate of the

14    number of personnel that the national security

15    division has used to support the program?

16         A.    At least one.

17         Q.    Who is the one that you have in

18    mind?

19         A.    Mason Nichols.

20         Q.    And what has Mr. Nichols done

21    to support the program?

22         A.    He supported analysis functions

23    for the analyst assigned.

24         Q.    You mean for an analyst

25    assigned in the Office of Intelligence?

1        A.    Correct.

2        Q.    Is there a specific analyst

3    assigned to this program in the Office of

4    Intelligence?

5        A.    I don't know.

6        Q.    Who are you referring to when

7    you say, "analyst assigned," with respect to

8    Mr. Nichols?

9        A.    Within the Office of

10   Intelligence there are criminal analysts.  I

11   don't know which ones they had working on this

12   initiative.

13       Q.    I see, but Mr. Nichols is

14   supporting them?

15       A.    That's correct.

16       Q.    And what is the work as you

17   understand it that the Office of Intelligence

18   has specifically done to support the program?

19       A.    Open source analysis.

20       Q.    Is that it?

21       A.    To the best of my knowledge.

22       Q.    Do you know if the Office of

23   Intelligence has reached a definition of --

24   withdrawn, actually.

25            Do you know whether the Office of

1    Intelligence has developed of you of what

2    activities contrary to the E.O. means?

3              A.    No.

4              MR. KANELLIS:   You got to let me

5    object.

6              THE WITNESS:   I'm sorry.

7              MR. KANELLIS:   Objection.  Vague.  He

8    answered the question.

9    BY MS. CONLON:

10             Q.    Just a moment.  Do you know how

11   many referrals have been made to the Department

12   of State as a part of this program?

13             A.    I don't know.

14             Q.    Do you know whether there's a

15   recordkeeping system being used by this

16   program?

17             A.    What do you mean by

18   recordkeeping system?

19             Q.    Where are -- where is the

20   documentation of investigations done by this

21   program stored?

22             A.    Reports of analysis are in the

23   investigative case module.

24             Q.    Are you aware whether this

25   program generates any documents other than a

1    report for analysis?

2             A.    There would a report of

3    investigation for any action that were taken in

4    the field.

5             Q.    When is a report of

6    investigation -- what kind of actions prompt

7    the creation of a report of investigation?

8             A.    Interviews, efforts to locate,

9    results thereto.

10             Q.    If a person's social media is

11    reviewed, would that create -- lead to the

12    creation of a report of investigation?

13             MR. KANELLIS:    Objection.    Calls for

14    speculation and to the degree that your answer

15    implicates methods or practices or techniques,

16    I instruct you not to answer, but otherwise you

17    can answer.

18    BY MS. CONLON:

19             Q.    Are you able to answer the

20    question?

21             A.    Can you repeat it again?

22             Q.    Sure.    If an analyst reviews a

23    person's social media, does that generate a

24    report of investigation?

25             A.    I don't know.

1        Q.    Are there any guidelines for

2    when a report of investigation should be

3    created?

4        A.    I'm not sure.

5        Q.    Does HSI regularly create

6    reports of investigation for its work?

7        A.    Yes.

8        Q.    Have you ever received any

9    training on when to create a report of

10   investigation in the course of your career?

11       A.    Prior to the inception of ICM.

12       Q.    Have you ever given anyone

13   guidance who works in Homeland Security

14   investigations about when they need to create a

15   report of investigation?

16       A.    Not that I can recall.

17       Q.    Just one moment.  Is it fair to

18   say that the report of investigation is

19   ordinarily generated for any investigative step

20   that's taken?

21       A.    Not for any step that's taken,

22   but it can capture the steps that have been

23   taken to date.

24       Q.    Are there any documents that

25   the program has generated apart from reports of

1    investigation and reports of analysis?

2              A.    Documents is broad.

3              Q.    I mean, it in a broad sense.

4    Anything in writing put together by this

5    program other than reports of analysis and

6    reports of investigation?

7              A.    Documents, not to my knowledge.

8              Q.    You seem hesitant.  Is there

9    something else that you're thinking of that has

10   been generated as a function of this program?

11             A.    Documents is a broad term.

12             Q.    What term -- what is another

13   term that seems better suited to you to this

14   question?

15             MR. KANELLIS:  Objection.

16   BY MS. CONLON:

17             Q.    Other than the word document?

18             A.    You're asking him to give you a

19   word for your question that you're asking him.

20             Q.    Well, he just seems so hung up

21   on the word that I'm using which feels to me

22   very straightforward and I must be missing

23   something.

24        The question is literally about the

25   word document.

1          Have you received any instructions at

2     the executive briefing or any subsequent

3     meeting about steps you are to take in

4     connection with the program?

5               MR. KANELLIS:  Objection to the

6     degree that calls for deliberative process

7     communications including predecisional

8     information strategies and/or law enforcement

9     sensitive information or law enforcement

10    privileged information relating to practices,

11    techniques that sort of thing.

12          If there's anything that you have to

13    say that doesn't fall within the ambit of what

14    I've just described, you can try to answer the

15    question.

16               A.    No, sir.

17               MS. CONLON:  Mr. Kanellis, it's your

18    view, just so I'm clear, that if Mr. Watson has

19    received instructions the fact of his receipt

20    of them is not something he can disclose?

21               MR. KANELLIS:  No.  It's the

22    substance of any such communications.

23    BY MS. CONLON:

24               Q.    So to be very clear, Mr.

25    Watson, I'm not asking you what instructions

1    you've received if you received them, just

2    whether you've received instructions about this

3    program?

4              MR. KANELLIS:  Then you can answer

5    that question.

6              A.   Yes.

7    BY MS. CONLON:

8              Q.   Who did you receive

9    instructions from?

10             A.   Acting Deputy Associate

11   Director Derrick Gordon.

12             Q.   Have you received instructions

13   from anybody else?

14             A.   Acting Executive Associate

15   Director Robert Hammer.

16             Q.   Have you received instructions

17   on the program from anyone other than

18   Mr. Gordan and Mr. Hammer?

19             A.   Not that I can recall.

20             Q.   Have any of the instructions

21   you received been in writing?

22             A.   I don't think so.

23             Q.   What are the goals of the

24   program as you understand it?

25             A.   I'm not tracking on any

1    particular goal that was given to me.

2            Q.   You said you're not tracking on

3    any particular goal?

4            A.   I've not been told.

5            Q.   I don't mean a goal for you but

6    I mean, I'm saying -- I'm asking you, sorry,

7    whether it has been articulated to you what the

8    goal of this program is?

9            A.   No.

10            Q.   Without saying what the

11    instructions were that you received, do you

12    remember what they are?

13            A.   Update.

14            Q.   Are you familiar with White

15    House fact sheets?

16            A.   The term, yes.

17            Q.   Are you familiar with any White

18    House fact sheets that have been issued in

19    connection with the two executive orders we've

20    been discussing?

21            A.   No.

22            Q.   Do you recall whether a White

23    House fact sheet was mentioned in connection

24    with the program at any point?

25            A.   I don't recall.

1          Q.    Just a moment, I'm sorry.

2     Okay.  While I search for this document.  Okay.

3          Are you aware that the White House

4     issued a fact sheet the day after it issued

5     Executive Order 14188?

6          A.    No.

7          Q.    Do you ever review White House

8     fact sheets as part of your work?  Do you want

9     me to repeat the question?

10          A.    No, I'm waiting for whatever

11     sound I hear to dissipate.

12          Q.    Do you review White House fact

13     sheets as part of your work?

14          A.    I don't recall the last time I

15     have.

16          Q.    Okay.  I asked you before we

17     got into discussing this program, I was asking

18     you about ordinary practices around arrests by

19     ICE.

20          Is there any sort of -- any guidelines

21     regarding the tactics that ICE officers can use

22     when effectuating an arrest?

23          A.    What do you mean by tactics.

24          Q.    For example, recently it's been

25     reported that ICE agents have on occasion wore

```
 1   masks when effectuating an arrest.
 2        Is there any guideline that you're
 3   aware of that addresses whether an ICE officer
 4   can wear a mask when effectuating an arrest?
 5             A.   I'm not aware of any
 6   guidelines, but to be clear, the reason for
 7   that was to diminish the likelihood of the law
 8   enforcement officer in this case ICE agent
 9   being doxxed which translates to officer safety
10   and that of their family.
11             Q.   And the concern you articulated
12   in officer safety, that's not about a threat
13   posed by a person they're arresting; is that
14   correct?
15             A.   I don't know and you can't
16   appoint -- you can't assign that to every
17   instance.
18             Q.   The -- I understand that.  The
19   rationale that you laid out, though, of masking
20   to avoid being identified and doxxed is that a
21   concern driven -- is that a concern about the
22   arrestees conduct or other people's conduct?
23             A.   I don't know, it could be both.
24   It's a case by case determination.
25             Q.   How many times to your
```

```
 1   knowledge have ICE agents been doxxed in
 2   connection with an arrest that they've made?
 3              A.   I don't know.
 4              Q.   Are you aware of any occasions
 5   on which an ICE agent has been doxxed in
 6   connection with an arrest they made?
 7              A.   I'm aware of occasions where of
 8   ICE agents have been doxxed.  I don't know the
 9   reason why.
10              Q.   You're not aware of any
11   specific instances where an ICE agent was
12   doxxed because they were identified in the
13   course of an arrest; am I correct?
14              A.   Again, I don't know.
15              Q.   You don't.  Have you --
16   withdrawn.  When did ICE agents begin to wear
17   masks as part of making arrests?
18              A.   I don't know.
19              Q.   What is the earliest occasion
20   that you can recall where that happened?
21              A.   I don't know.
22              Q.   Do you recall any instance
23   before 2025 where you learned that an ICE agent
24   had wore a mask when making an arrest?
25              A.   No.
```

1          Q.    When an ICE agent wears a mask

2    making an arrest, is that a decision made by

3    the individual officer?

4               MR. KANELLIS:    Objection calls for

5    speculation.

6    BY MS. CONLON:

7          Q.    Is there any -- do ICE agents

8    get to decide -- withdrawn.  Do ICE agents have

9    discretion over their appearance at arrest?

10              MR. KANELLIS:    Objection.  Still

11   calls for speculation.

12   BY MS. CONLON:

13         Q.    You've been an agent, so I'll

14   just ask you based on your experience to the

15   best of your knowledge.  Do ICE agents have

16   discretion over there appearance at arrest?

17         A.    That depends.

18         Q.    What does it depend on?

19         A.    The decision of leadership in

20   addition to the instruction of the principle

21   field official.

22         Q.    And principle field official

23   means the special agent in charge of a

24   particular field office?

25         A.    Or a field office director.

1              Q.   Or a field office director.

2     Okay.

3          Is there -- to your knowledge, is there

4     currently -- is there currently any uniform

5     decision about whether it's permissible to wear

6     a mask at arrest at the level of field offices

7     for Homeland Security?

8              A.   Homeland Security is broad.

9              Q.   For ICE?

10             A.   I don't know.

11             Q.   Is there a particular person in

12    ICE who oversees these kinds of decisions made

13    by field offices?

14             MR. KANELLIS:   Objection.   Vague.

15    BY MS. CONLON:

16             Q.   Is there a particular person at

17    ICE who oversees the way in which field offices

18    conduct arrests?

19             A.   I don't know.

20             Q.   Are you aware of more than one

21    occasion in 2025 in which an ICE agent has worn

22    a mask when arresting someone?

23             A.   I don't know.

24             Q.   You mentioned a particular

25    instance earlier when someone wore a mask to

```
 1    avoid beings doxxed.  Is that the only instance
 2    you're aware of a single time?
 3            A.   I don't think that's the only
 4    instance know.
 5            Q.   Approximately how many
 6    instances are you aware of?
 7            A.   I don't know.
 8            Q.   I'm not asking you how many
 9    instances have occurred outside of your
10    knowledge.  I'm asking within your knowledge,
11    how many approximately are you aware of?
12            A.   I don't know.
13            Q.   In the one instance that you
14    are personally familiar with, do you know who
15    decided that the officers would wear masks at
16    arrest?
17            A.   I believe that was the agents.
18            Q.   What is the basis of your
19    belief that it was the agents who decided?
20            A.   Not sure on that one; I don't
21    know.
22            Q.   Do you recall who the person
23    was that was arrested in that occasion?
24            A.   No.
25            Q.   Do you recall where that arrest
```

1    took place?

2            A.   No.

3            Q.   Do you know whether it was

4    Rumeysa Ozturk who was arrested?

5            A.   No.

6            Q.   Is there any requirement that

7    ICE agents make their identification visible

8    during an arrest?

9            A.   Not to my knowledge.

10           Q.   Is there any -- I asked before

11   were there any guidelines about how ICE agents

12   are supposed to appear at arrest and you said,

13   no.

14        Are there any standards for how ICE

15   agents must behave during the course of an

16   arrest?

17           MR. KANELLIS:   I'm going to object.

18   Standards and behave are both similar

19   problematic because they're vague, that's where

20   I'm going.

21   BY MS. CONLON:

22           Q.   I understand they're vague, but

23   I don't have anything more specific to offer

24   you so I'm going to ask you to work with me,

25   Mr. Watson.

1              To the extent you know, are there any

2      restrictions on how an ICE officer can appear

3      during -- when they're making an arrest?

4              A.   I'm not aware of any

5      restrictions.

6              Q.   Are there any common practices

7      about how an ICE officer is supposed to appear

8      when they're making an arrest?

9              A.   You should have a badge or

10     means to identify yourself as a federal law

11     enforcement officer.  That begins with your

12     credentials.

13             Q.   That's helpful.  Anything other

14     than that an ICE agent should have, a badge to

15     identify themselves?

16             A.   That I would submit is the

17     minimum standard.

18             Q.   What other standards would

19     you -- can you're articulate?

20             MR. KANELLIS:  Objection.  Vague.

21     BY MS. CONLON:

22             Q.   Well, you said that having a

23     badge to identify yourself is the minimum

24     standard of how an ICE agent should appear

25     during an arrest.

```
 1          Is there anything else that an ICE
 2   agent should do about their appearance during
 3   an arrest?
 4              MR. KANELLIS:  I'm going to instruct
 5   the witness not to answer to the degree that
 6   responding to the question reveals techniques,
 7   methods, practices, or any other law
 8   enforcement sensitive or privileged
 9   information.  But if you can avoid giving --
10   responding with any of that, you're welcome to
11   try.
12          A.   I can't.
13   BY MS. CONLON:
14          Q.   Is there a gold standard for
15   how an ICE agent should appear when making an
16   arrest?
17              MR. KANELLIS:  Objection.
18   BY MS. CONLON:
19          Q.   Is there a normal practice
20   relating to their appearance?  I promise you I
21   hate this as much as you do but is there --
22   what can you tell me about how an ICE agent is
23   supposed to conduct an arrest?
24          A.   Safely.
25          Q.   And apart from having a badge
```

1    to identify himself or herself, are there any

2    other -- are there any other steps they should

3    take to safely conduct an arrest?

4                   A.   I would defer to the ICE

5    special agent, the ERO or HSI on the ground at

6    that time to make the decision on a

7    case-by-case basis.

8                   Q.   Isn't it a normal practice for

9    ICE agents to wear hoods when they arrest

10   someone?

11                  A.   I don't know.

12                  Q.   Is it a normal practice to for

13   ICE agents to wear plain clothes when they

14   arrest someone?

15                  A.   I don't know.

16                  Q.   Are there circumstances in

17   which an ICE agent can arrest someone without

18   showing them their badge or credentials?

19                  MR. KANELLIS:   I'm going to object to

20   the degree that that calls for a legal

21   conclusion, otherwise I'll allow the answer, if

22   you can.

23                  A.   I can't.

24   BY MS. CONLON:

25                  Q.   Are you aware of any particular

```
 1    circumstances in which an ICE agent has

 2    arrested someone without having their badge or

 3    credentials?

 4              A.    Not in recent memory, no.

 5              Q.    Let's talk about some specific

 6    people.  Are you familiar with Mahmoud Khalil?

 7              A.    Yes.

 8              Q.    Did you work on his case?

 9              A.    What do you mean work?

10              Q.    Have you had any involvement

11    whatsoever with his case?

12              A.    The referral to the Department

13    of State.

14              THE COURT REPORTER:  I'm sorry.

15              A.    The referral to the Department

16    of State.

17    BY MS. CONLON:

18              Q.    Did you decide to make the

19    referral to the Department of State?

20              A.    I sent the referral to the

21    Department of State.

22              Q.    Just one second.  Mr. Khalil

23    was arrested on March 8th, correct?

24              A.    I don't recall, but I'm happy

25    to stipulate.
```

```
 1                Q.   Why was Mr. Khalil arrested?

 2                MR. KANELLIS:  Objection.  Involves

 3      deliberative process communications, involves

 4      law enforcement determinations and decisions,

 5      so I'll instruct the witness not to answer.

 6      BY MS. CONLON:

 7                Q.   So in terms of how we're going

 8      to proceed because I'm guessing this is going

 9      to keep happening, I think that at least as we

10      go through one of the people it make sense for

11      us to throw questions on record you that you're

12      objecting to --

13                MR. KANELLIS:  Sure.

14                MS. CONLON:  -- and then you might be

15      able to do --

16                MR. KANELLIS:  We just can't --

17                THE COURT REPORTER:  I'm sorry.  I'm

18      sorry.  I can't get both of you at the same

19      time.

20                MR. KANELLIS:  Sorry.

21                MS. CONLON:  Sorry.  Ms. Henderson.

22      And then we can just, you know, have you have a

23      standing objection unless you want to state it

24      over and over and I can indicate that I would

25      have asked the same questions --
```

```
 1                    MR. KANELLIS:  Why don't we get

 2       through one --

 3                    MS. CONLON:  That's what I'm saying.

 4                    MR. KANELLIS:  And then instead of

 5       asking questions about all the others, I can

 6       tell you in advance that we're going to --

 7                    MS. CONLON:  Yes.

 8                    MR. KANELLIS:  Okay.  Sure.

 9       BY MS. CONLON:

10            Q.   Without saying why Mr. Khalil

11       was arrested, do you know why?

12                    MR. KANELLIS:  I'm going to object,

13       separate objection to that one, because the

14       "why" is a very loaded, open-ended question.

15                    MS. CONLON:  We can break the "why"

16       down into subparts.

17       BY MS. CONLON:

18            Q.   Do you know what brought Mr.

19       Khalil to ICE's attention?

20            A.   No.

21            Q.   Do you know, to whose attention

22       within ICE did -- withdrawn.

23            Was there a particular ICE -- I'm going

24       to withdraw that.  I'm just thinking about the

25       best way to ask you this that doesn't make it a
```

```
 1    tough question to answer.
 2            Do you know who decided, in the first
 3    instance, that Mr. Khalil should be arrested?
 4               A.   No.
 5               Q.   Mr. Khalil -- are you aware
 6    that Mr. Khalil was initially told that he was
 7    being arrested because his student Visa had
 8    been revoked?
 9               A.   No.
10               Q.   Do you know which component of
11    ICE investigated Mr. Khalil before he was
12    arrested?
13               A.   Component within ICE.
14               Q.   Yes.  If "component" is a term
15    of art, then consider "component" to be
16    program, division, department.
17            Who within ICE, what group of people,
18    was responsible for investigating Mr. Khalil
19    before he was arrested?
20               A.   The Office of Intelligence
21    conducted the report of analysis that was
22    referred to the Department of State.
23               Q.   And without saying the reason
24    for it, do you know what led the Office of
25    Intelligence to conduct the report of analysis
```

 1    about Mr. Khalil?

 2              A.   No.

 3              Q.   Do you know when the Office of

 4    Intelligence conducted -- began to conduct its

 5    investigation of Mr. Khalil?

 6              A.   No.

 7              Q.   Do you know who within the

 8    Office of Intelligence worked on the

 9    investigation of Mr. Khalil?

10              A.   No.

11              Q.   Do you know when the report of

12    analysis about Mr. Khalil was prepared?

13              A.   Not off the top of my head.

14              Q.   Do you know the names of anyone

15    in DHS who worked on Mr. Khalil's case?

16              A.   No.

17              Q.   You don't know the name of

18    anyone else who worked on his case?

19              A.   That's a broad term, when you

20    say "DHS."

21              Q.   Do you know anyone else within

22    ICE who worked on Mr. Khalil's case?

23              A.   No.

24              Q.   Do you know anyone else with --

25    well, strike.

```
 1              Do you know anyone else within the
 2    National Security Division who had any
 3    involvement in Mr. Khalil's case?
 4              A.    "Any involvement" is broad.
 5              Q.    I mean for it to be broad.
 6              THE COURT REPORTER:  I'm sorry?
 7    BY MS. CONLON:
 8              Q.    I mean for it to be broad.
 9         Can you identify anyone else in the
10    National Security Division, besides you, who
11    had any involvement in Mr. Khalil's case?
12              MR. KANELLIS:  Yeah, that --
13    objection.  That is really overbroad.
14    "Involvement" can mean a myriad of things, and
15    it could be everyone or no one.  So I'm going
16    to object on the basis that it's vague and
17    overbroad.
18    BY MS. CONLON:
19              Q.    Is it standard practice for
20    everyone in the National Security Division to
21    be involved in a given investigation of a
22    single person?
23              A.    What does "everyone" mean?
24              Q.    Well, Mr. Kanellis just
25    suggested that perhaps when I said identify all
```

```
 1   the people, that could be everyone.  So I

 2   suppose I mean it in the same way that he did.

 3           I mean, literally, are you aware of any

 4   time that every person who works in the

 5   National Security Division was involved in some

 6   capacity in a particular case?

 7           A.    That question is complicated

 8   and confusing.

 9           Q.    Is that a yes to the question?

10   Has that ever happened?

11           A.    I don't know.

12           Q.    Who else did you discuss

13   Mr. Khalil's case with in the National Security

14   Division?

15           A.    I don't recall.

16           Q.    Did you discuss this case with

17   more than one person in the National Security

18   Division?

19           A.    I don't recall.

20           Q.    Were you ever in any briefings

21   in which Mr. Khalil's case was discussed?

22           A.    Don't recall on that one.

23           Q.    Have you ever sent or received

24   any e-mails about Mr. Khalil's case?

25           A.    The referral.
```

```
 1                  Q.   Is that the only e-mail you've
 2      ever sent or received about Mr. Khalil's case?
 3                  A.   That I can recall right now.
 4                  Q.   Did you have any discussions
 5      about Mr. Khalil's case with anyone at the
 6      Department of State before sending the
 7      referral?
 8                  A.   I don't recall.
 9                  Q.   Is it normal practice for you
10      to speak with someone at the Department of
11      State before you send a referral?
12                  A.   This was a new process.  So
13      beyond that, I don't know.
14                  Q.   And when you say, "this was a
15      new process," you mean that the program under
16      which Mr. Khalil was arrested only started in
17      March of 2025; is that right?
18                  MR. KANELLIS:  Objection.  I think
19      that mischaracterizes his prior testimony.  And
20      it also -- "program" is also vague.
21                  MS. CONLON:  Well, "program" is the
22      way we've been talking about it for the last
23      hour, so I'm going to have to stick with
24      "program."
25      BY MS. CONLON:
```

```
 1            Q.   Was Mr. Khalil the first person
 2  arrested pursuant to this program?
 3            A.   I don't recall if he was the
 4  first.
 5            Q.   Mr. Khalil -- you've graciously
 6  accepted my representation that Mr. Khalil was
 7  arrested on March 8th of 2025.
 8            Do you recall whether the program --
 9  when the program was up and running in relation
10  to his arrest?
11            A.   No.
12            Q.   No.
13            Now, when you said -- when I asked you
14  if it's normal practice to speak with someone
15  at the Department of State before sending a
16  referral, you said this "was a new process."
17            What is the -- what are you referring
18  to when you say, "this was a new process"?
19            A.   The first time I spoke to
20  somebody before I referred something to them.
21  This is the first time.
22            Q.   Mr. Khalil's case was the first
23  time that you spoke to the Department of State
24  before making a referral?
25            A.   No.  This is -- so let me be
```

```
 1   clear.
 2              Q.   Okay.
 3              A.   I can't say exactly who the
 4   first person was.
 5              Q.   Mm-hmm.
 6              A.   But what I can say is, in or
 7   about March of 2025 is when I had conversations
 8   with the Department of State.
 9              Q.   About?
10              A.   Referrals.
11              Q.   About referrals.
12         That's the first time that you had
13   conversations with the Department of State
14   about referrals, was March of 2025; is that
15   correct?
16              A.   I believe so.
17              Q.   Now, in Mr. Khalil's case,
18   various paperwork was generated, which has been
19   provided to us -- hold on.
20         I'm sorry.  Before we get to the
21   administrative record, what you described as a
22   new process, making these referrals to the
23   Department of State, who asked you to start
24   that process in March?
25              A.   Acting Executive Associate
```

 1    Director Robert Hammer.

 2              Q.   Do you recall anything else he

 3    asked you to do?

 4              A.   No.

 5              Q.   Okay.  So I'm going to pull out

 6    a copy of the administrative record to give to

 7    you.

 8         Were you part of generating or pulling

 9    together the administrative record for this

10    case?

11              A.   I haven't seen the

12    administrative record in its entirety to know.

13              Q.   Okay.  So just one minute to

14    get you a copy of it -- to get everyone a copy.

15              MR. KANELLIS:  If we're going to go

16    on much longer, do you want to take a short

17    break now, or -- or do you think you can wrap

18    this up in 15 minutes?

19              MS. CONLON:  I'll do my very best.  I

20    think it could make sense for us to finish

21    discussing Mr. Khalil, to the extent that that

22    will kind of govern how we go forward.  But I'm

23    happy to take a break, if you want to take a

24    break now.  It's up to you.

25              MR. KANELLIS:  Well, it's not for me,

 1    but I just want to get a sense -- it's already

 2    past 5:00, so I just want to get a sense from

 3    you how long we're going to go.

 4            MS. CONLON:  I genuinely think it

 5    depends on how we're going to handle the

 6    answering of the questions I'm about to ask

 7    about noncitizens, so -- specific noncitizens.

 8            MR. KANELLIS:  Well, you speak up if

 9    you want to take a break.

10            MS. CONLON:  Yes, please do.

11            THE WITNESS:  No, it's -- I would

12    rather go through with this.  A break only

13    prolongs the process.

14            MS. CONLON:  I hear you.

15            Okay.  So here is -- here's one copy

16    of the certified administrative record for Mr.

17    Khalil.  And I'm going to hand you a copy, as

18    well, via Ms. Henderson.

19                (Exhibit 5 was marked.)

20    BY MS. CONLON:

21            Q.   Okay.  So I handed you a

22    document that's been marked for identification

23    as, I'm guessing, Exhibit 5.

24            MS. CONLON:  Thank you --

25            A.   Correct.

```
 1              MS. CONLON:  -- Ms. Henderson.

 2    BY MS. CONLON:

 3         Q.   Okay.  You haven't seen this

 4    full document before.  I'll represent that it's

 5    the certified administrative record that the

 6    Government provided to us.  And I'm going to

 7    draw your attention to some particular

 8    documents contained in this, including

 9    documents concerning Mr. Khalil.  It's a little

10    frustrating, because there's not Bates stamps

11    across -- oh, there is -- Bates stamps across

12    the bottom.  Great.

13         Okay.  Can you please turn to the page

14    marked at CAR 018 at the bottom, in the tiniest

15    possible font, to a document -- here, I'm going

16    to show you.  This is what you're looking for.

17    It looks like this (indicating).  And there are

18    page numbers on the bottom.

19         So the document you're looking for

20    states, at the top, "Memorandum for the

21    Secretary of Homeland Security."

22         A.   Okay.

23         Q.   Great.  Thank you.

24         Okay.  Have you seen this document,

25    which starts at CAR018 and ends at CAR019,
```

```
 1    before?  Just these two pages?

 2              A.   I think so, yes.

 3              Q.   This is a memorandum written by

 4    Marco Rubio, correct?

 5              A.   He signed it.

 6              Q.   Fair enough.  He signed it.

 7         And it mentions, in the second

 8    paragraph, Mahmoud Khalil?

 9              A.   In the second paragraph?

10              Q.   Yes, the first full paragraph

11    under the subject line on the first page.

12              A.   Okay.

13              Q.   Do you see that?

14              A.   I do.

15              Q.   Is there a name for this type

16    of document?

17              A.   I don't know.

18              Q.   You don't know.  Okay.

19         Did you receive a copy of this

20    document?

21              A.   It's familiar to me.

22              Q.   In what circumstance was it

23    shown to you?

24              A.   I don't recall if it was

25    e-mailed or otherwise.
```

1          Q.   Do you know who provided it to

2     you?

3          A.   No, ma'am.  I don't remember

4     that.

5          Q.   Okay.  In this document, Mr.

6     Rubio finds that Mr. Khalil's continuing

7     presence would compromise a compelling U.S.

8     foreign policy interest.  That's in the second

9     paragraph.

10         Do you see that?

11         A.   I do.

12         Q.   Do you know what the compelling

13    U.S. foreign policy interest is?

14         A.   No.

15         Q.   In the second paragraph, Mr.

16    Rubio says that his determination [as read] "is

17    based on information provided by the DHS, ICE,

18    HSI regarding the participation and roles of --

19    redacted -- and Khalil in anti-Semitic protests

20    and disruptive activities."

21         Do you see that as well?

22         A.   Yes.

23         Q.   Do you know what information

24    was provided by HSI regarding the participation

25    and role of Mr. Khalil in anti-Semitic protests

1   and disruptive activities?

2           MR. KANELLIS:  Okay.  I'm going to

3   instruct the witness -- she's asked the

4   question, do you know.  You may answer whether

5   or not you know.  You may not answer beyond

6   that, as to the substance, if you do know, of

7   whatever underlies that litigation.

8           A.   I don't recall the substance.

9   BY MS. CONLON:

10          Q.   Was that information, at some

11  point, made available to you?

12          A.   It was provided in the

13  referral.

14          Q.   And when you say, "it was

15  provided in the referral," do you mean that you

16  provided that information to the Department of

17  State in your referral?

18          A.   Yes.

19          Q.   Who collected that information

20  for you?

21          A.   The ICE Office of Intelligence.

22          Q.   Who at the ICE Office of

23  Intelligence?

24          A.   I don't know.

25          Q.   Did the ICE Office of

1      Intelligence provide you with anything other

2      than the referral and an accompanying letter?

3                A.    No.

4                Q.    Are you familiar with any of

5      the facts underlying the claim that Mr. Khalil

6      engaged in anti-Semitic protests?

7                A.    I don't recall.

8                Q.    But that information would be

9      contained within the referral?

10               A.    The report.

11               Q.    The report of analysis?

12               A.    Correct.

13               Q.    In the referral, did you

14     recommend that Mr. Rubio make the determination

15     that Mr. Khalil is deportable under the foreign

16     policy provision?

17               A.    I don't recall.

18               Q.    Do you recall whether you made

19     any recommendation in the referral?

20               A.    No, I don't.

21               Q.    Is it the practice of HSI to

22     make referrals without any recommendation?

23               MR. KANELLIS:  Objection.  Overbroad.

24     BY MS. CONLON:

25               Q.    Since this new process began in

```
 1   March of 2025, has HSI made any referrals to

 2   the Department of State without making a

 3   recommendation?

 4            MR. KANELLIS:  Objection.

 5   Foundation.

 6            But answer, to the extent you know.

 7            A.   Yes.

 8   BY MS. CONLON:

 9            Q.   It also says here that [as

10   read] "there was a determination made that

11   Mr. Khalil's presence in the United States

12   undermines U.S." --

13            THE COURT REPORTER:  I'm sorry.  Can

14   you say it again?

15            MS. CONLON:  Sure.

16            THE COURT REPORTER:  And just speak

17   up a little louder.

18            MS. CONLON:  Sure.  Sorry.

19   BY MS. CONLON:

20            Q.   It says here that [as read]

21   "Mr. Rubio has determined that Mr. Khalil's

22   presence in the United States undermines U.S.

23   policy to combat anti-Semitism around the world

24   and in the United States."

25            Are you familiar with which U.S. policy
```

```
 1   he is referring to?
 2               A.   No.
 3               Q.   Do you understand that to be a
 4   reference to the program through which you were
 5   making these referrals?
 6               A.   I don't know.
 7               Q.   In the attachments listed at
 8   the bottom of this document, tab 2 says
 9   "HSI" -- or "subject profile."
10         What is an HSI subject profile?
11               A.   I've never heard that term.
12   And I'm not familiar with that term.
13               Q.   Do you know who creates an HSI
14   subject profile?
15               MR. KANELLIS:   Objection.
16   Foundation.  He just said he's never heard the
17   term.
18   BY MS. CONLON:
19               Q.   So you've never seen the term
20   "subject profile" before; is that right?
21               A.   Correct.
22               Q.   And where you see tab 30 say
23   "DHS letter on Mahmoud Khalil," do you
24   understand that to be the accompanying letter
25   that you sent with your referral?
```

```
 1              A.   Yes.

 2              Q.   In the referral that you made

 3   here, did you cite U.S. foreign policy; do you

 4   recall?

 5              A.   I don't recall.

 6              Q.   Have you cited U.S. foreign

 7   policy in any referral that you have made under

 8   this program that began in March?

 9              A.   I don't recall.

10              Q.   And I apologize if you said

11   this already.

12         Do you know how many referrals have

13   been made under the program since it began in

14   March?

15              A.   No.

16              Q.   Do you know how many referrals

17   you have personally been a part of since the

18   program began in March?

19              A.   No.

20              Q.   Do you know whether you've been

21   a part of any referrals other than the referral

22   for Mr. Khalil?

23              A.   Yes.

24              Q.   But you can't ballpark how

25   many?
```

```
 1              A.   No.

 2              Q.   Is it -- it's okay.

 3              A.   Sorry.

 4              Q.   It's okay.

 5         Have you been a part of more than ten

 6    referrals?

 7              A.   Yes.

 8              Q.   Do you think you've been a part

 9    of more than 50 referrals?

10              A.   I don't think so.

11              Q.   I hate to do this, but do you

12    think it's been more than 25 referrals?

13              A.   I'm not sure.

14              Q.   So somewhere between 10 and 50

15    is a good approximation?

16              A.   I'm not sure.

17              Q.   Can we narrow that window at

18    all?

19              A.   Not under oath.

20              Q.   Okay.  Fair enough.  I

21    appreciate your precision.

22         I understand that you don't know the

23    number of referrals that have been made since

24    the program began in March, but do you know who

25    does track that information?
```

```
 1                MR. KANELLIS:  Objection.

 2   Foundation.

 3   BY MS. CONLON:

 4          Q.   Please answer --

 5                MR. KANELLIS:  And speculation.

 6

 7                MS. CONLON:  Well, the question is

 8   "do you know," so --

 9          A.   No.

10                MR. KANELLIS:  No, it's -- the

11   question -- well, also assumes facts not in

12   evidence.  You're assuming someone does track

13   that.

14   BY MS. CONLON:

15          Q.   Who, would you say, runs this

16   program?

17          A.   I don't know that I can say who

18   runs the program.

19          Q.   Who are the principals of this

20   program?

21          A.   Principals...

22          Q.   Who are the people you would

23   say are in charge of this program?

24          A.   I can't assign ownership to a

25   particular person.
```

```
 1                Q.    Okay.  Are there any agencies,

 2      other than DHS and the Department of State,

 3      that are a part of this program?

 4                A.    No.

 5                Q.    Have you had contact with

 6      anyone at an agency, other than DHS or DOS, as

 7      part of this program?

 8                A.    Not to my knowledge.

 9                Q.    In terms of who runs the

10      program, I understand that you can't assign it

11      to one particular person, but is it fair to say

12      that the people in charge are the people who

13      were in the original briefing about it with you

14      in March?

15                A.    No, because we've had

16      leadership changes.

17                Q.    Okay.  Then to the best of your

18      ability, currently the most senior person in

19      the Office of Intelligence who works on this

20      program, what is that person's name?

21                A.    Peter Hatch.

22                Q.    And the senior most person who

23      works on this program in the Department of

24      State, what's their name?

25                A.    John Armstrong.
```

1          Q.    Are there other components,

2    besides the National Security Division and the

3    Office of Intelligence for DHS, that are part

4    of this program?

5          A.    I don't know.

6          Q.    What about anybody in Secretary

7    Noem's executive office?  Do you have any

8    awareness whether anyone in Secretary Noem's

9    executive office works on this program?

10         A.    I don't know.

11         MS. CONLON:  So we won't be done in

12   15 minutes, unfortunately, or whatever time you

13   were asking about, but we could take a short

14   break now, or we can just keep going.

15         THE WITNESS:  Just keep going.

16         MS. CONLON:  Okay.

17         Does that work for you,

18   Ms. Henderson?

19         THE COURT REPORTER:  Yes.

20         MS. CONLON:  Okay.

21   BY MS. CONLON:

22         Q.    All right.  You're aware that

23   DHS -- well, are you aware that DHS has social

24   media accounts?

25         A.    Yes.

```
 1              Q.   And are you familiar with DHS's
 2    social media account on the platform X?
 3              A.   I am aware.
 4              MS. CONLON:  Okay.  I am going to
 5    pass out a document.
 6              There you go.
 7              (Exhibit 6 was marked.)
 8    BY MS. CONLON:
 9              Q.   Okay.  I've just shown you a
10    document, and I want you to just take a second
11    to take a look at it.  Do you recognize this to
12    be a post on X by DHS's social media account on
13    X?
14              A.   I don't know.
15              Q.   In other words, you haven't
16    seen this before?
17              A.   Correct.
18              Q.   Okay.  Accepting that you
19    haven't seen it before, I still have a question
20    for you.  If you take a look, this post -- you
21    can see that it's from the user name @DHSgov,
22    right?
23              A.   Vaguely, yes.
24              Q.   Yeah.  I know it's faint.
25         And you're familiar -- you know that
```

1    @DHSgov is DHS's username on X, the platform,

2    right?

3              A.   No.  I'm not on X, so I don't

4    stipulate or speculate on that.

5              Q.   That's probably for the best.

6         Taking for the purpose of my question

7    as true --

8              A.   Okay.

9              Q.   -- that that is really a post

10   by DHS, in it, it states [As read], "Khalil led

11   activities aligned to Hamas, a designated

12   terrorist organization."

13        My question is whether you have any

14   information regarding the accuracy of that

15   statement, without telling us what it is.

16             MR. KANELLIS:  You're asking him

17   about whether he has information -- has or does

18   not have information about that particular

19   statement?

20             MS. CONLON:  My question -- and I'll

21   ask it anew.

22   BY MS. CONLON:

23             Q.   Mr. Watson, do you know whether

24   Mr. Khalil led activities aligned to Hamas?

25             A.   Ask the question again, please.

1      Q.   Sure.  Do you know whether Mr.

2  Khalil led activities aligned to Hamas?

3      A.   Do I know that personally?

4      Q.   I don't mean like were you

5  there.  Let me ask you in a different way.

6      This is a statement by DHS saying

7  Mr. Khalil led activities aligned to Hamas.  Do

8  you have any information that Mr. Khalil led

9  activities aligned to Hamas?

10     A.   I would defer to the report of

11  analysis, but I don't have that.

12     Q.   In other words, sitting here,

13  you don't recall?

14     A.   Correct.

15     Q.   If you saw the report of

16  analysis, that would refresh your recollection?

17     MR. KANELLIS:  Objection.  Calls for

18  speculation.

19  BY MS. CONLON:

20     Q.   If you wanted to remember the

21  answer to my question, you would need to look

22  at the report of analysis; is that right?

23     A.   Yes.

24     Q.   So you don't know the basis for

25  the claim in this statement here, correct?

```
 1              A.    I didn't write it.

 2              Q.    And you don't know the basis

 3    for the claim in this statement, do you?

 4              A.    Not at this time.

 5              Q.    For Mr. Khalil's case, when you

 6    received the report of analysis, were there any

 7    steps you took between receiving the analysis

 8    and making the referral to the Department of

 9    State?

10              A.    I don't understand your

11    question.

12              Q.    Did you do any independent --

13    did you do -- withdrawn.

14         Did you make an assessment of whether

15    what was contained in the report of analysis

16    rose to the level, in your view, of whether the

17    Department of State should take action, or did

18    you just make the referral?

19              A.    I made the referral.

20              Q.    Did you make an assessment that

21    it was appropriate for there to be action taken

22    against Mr. Khalil on the basis of the report

23    of analysis?

24              A.    I made the assessment that it

25    was appropriate to refer the report of
```

1    investigate -- report of analysis to the

2    Department of State.

3            Q.   Do you ever receive a report of

4    analysis and choose not to refer it to the

5    Department of State?

6            A.   That has not occurred.

7            Q.   Do you know whether anyone else

8    in NSD has received a report of analysis and

9    not referred it to the Department of State?

10           A.   I'm not aware.

11           Q.   Was your assessment that it was

12   appropriate to make the referral based only on

13   the information contained in the report of

14   analysis for Mr. Khalil?

15           A.   Yes.

16           Q.   Do you recall whether there was

17   any -- do you recall the kinds -- well, this

18   will draw an objection, but do you recall

19   whether there was any evidence attached to the

20   report of analysis that you received?

21           A.   "Evidence attached"?

22           Q.   Were you provided any primary

23   source information regarding Mr. Khalil's

24   activities?

25           A.   What do you mean by "primary

 1    source"?

 2            Q.   Were you provided, for example,

 3    with any flyers from protests that Mr. Khalil

 4    allegedly led?

 5            MR. KANELLIS:   Okay.   That gets a

 6    little into -- too far into the substance of

 7    any analysis.   So I'm going to object.   I'm

 8    going to instruct the witness not to answer.

 9    Because you're asking about specifics

10    underlying the referral.   That's subject to law

11    enforcement privilege.

12    BY MS. CONLON:

13            Q.   Without asking you to describe

14    these things, were you given copies for you to

15    review and assess of whatever it was that the

16    people in the Office of Investigation (sic)

17    themselves looked at, or were you only given

18    their description and analysis of those

19    underlying materials?

20            A.   I was given a report of

21    analysis.

22            Q.   Well, unfortunately, not so

23    helpful for me, because I have never seen one.

24    So help me out.

25            Does a report of analysis that comes to

1    you contain the actual underlying evidence that

2    was reviewed by the Office of Investigation, or

3    does a report of analysis only contain their

4    impressions, opinions, analysis?

5              MR. KANELLIS:  Can you read that

6    question back, please.

7    BY MS. CONLON:

8              Q.   Does the report of analysis

9    that comes to you contain the actual underlying

10   evidence that was reviewed by the Office of

11   Investigation, or does a report of analysis

12   only contain their impressions, opinions, and

13   analysis?

14             A.   A report of analysis is a

15   report that captures findings from open sources

16   that is then written and referred.

17             Q.   Are you given copies of the

18   open sources that the Office of Investigation

19   looked at?

20             A.   Copies.

21             Q.   I will give you an example, to

22   make it easier.

23             If the Office of Investigation writes a

24   report of analysis based on open source

25   information, like a news article, do you

 1    receive, in the report of analysis, the actual

 2    news article that they looked at, or do you

 3    receive only their description of the news

 4    article?

 5              A.   The sourcing is either the

 6    hyperlink or a screenshot of the actual

 7    product.

 8              Q.   Okay.  So turning now to a

 9    different document.

10              MS. CONLON:  Okay.  If I could please

11    hand this to everybody.

12              (Exhibit 7 was marked.)

13    BY MS. CONLON:

14              Q.   Okay.  I have just handed you a

15    document that I think has been premarked as

16    Exhibit 7.  I will represent to you that this

17    is a press briefing by Karoline Leavitt from

18    March 11, 2025.

19         Are you familiar with Ms. Leavitt?

20              A.   I am familiar with the name,

21    yes.

22              Q.   Okay.  You know her to be the

23    press secretary?

24              A.   I believe I've seen her

25    conducting press briefings, yes.

```
 1              Q.   Okay.  So this document is from
 2    March 11, 2025.  It's a full transcript of the
 3    press briefing that Ms. Leavitt gave that day.
 4    I just want to draw your attention to it -- two
 5    parts of it.
 6              Can you please turn to page 5?
 7                   MR. KANELLIS:  To save time --
 8                   MS. CONLON:  Mm-hmm.
 9                   MR. KANELLIS:  -- can you just ask if
10    the witness has ever seen or reviewed this,
11    before we get into a long line of questions?
12                   MS. CONLON:  Sure.
13                   MR. KANELLIS:  Because he may not
14    have anything to say about this.
15                   MS. CONLON:  Yeah.  I think I have a
16    question for him, whether he's seen it or not,
17    but I appreciate -- I can skip a bunch, you're
18    right, if he has nothing to say about the
19    document itself.
20    BY MS. CONLON:
21              Q.   Have you ever -- have you seen
22    either a transcript of this press briefing, or
23    have you heard a recording or seen a video of
24    it?
25              A.   No.
```

```
 1              Q.   Okay.  And you're not familiar
 2     with what the press secretary has said about
 3     Mr. Khalil's case?
 4              A.   I'm not familiar with what is
 5     being said.
 6              Q.   Well, then, without needing to
 7     actually look at this document, I'll just ask
 8     you my questions.  Thank you.
 9          Okay.  If Ms. Leavitt -- Ms. Leavitt
10     has stated that Mr. Khalil sided with
11     terrorists.  Do you have any idea what the
12     basis for that statement is?
13              A.   I can't speak to why that
14     statement was made --
15              Q.   Do you have --
16              A.   -- nor is it appropriate for me
17     to.
18              Q.   Do you have any information
19     regarding the accuracy of that statement?
20              A.   Not off the top of my head
21     right now.
22              Q.   Just one second.
23          If, in your estimation, Mr. Khalil had
24     sided with terrorists, would the paperwork that
25     you sent to the Department of State have
```

```
 1    invoked a terrorism-related ground for his

 2    removal?

 3              MR. KANELLIS:  Okay.  Calls for --

 4    hold on.  It calls for speculation.  Calls for

 5    information that would be protected by

 6    deliberative process privilege.  Potentially

 7    calls for law enforcement privileged

 8    information itself.

 9              I'll instruct you not to answer.  And

10    if you can answer that very speculative

11    question, then I'll allow you, as long as you

12    don't exceed my instruction.

13              How about that?

14              MS. CONLON:  Well, I think I can just

15    make it easy.

16    BY MS. CONLON:

17         Q.   Do you have the administrative

18    record still in front of you?

19         A.   Which one?

20         Q.   That should be Exhibit 6.

21              MS. CONLON:  Is it 6?

22              *woman:  It's 5.

23              MS. CONLON:  5.  5.  I'm sorry.  I'm

24    being corrected by my smarter colleagues.

25    BY MS. CONLON:
```

```
 1              Q.    Exhibit 5.  If you go to
 2    CAR023, so like two pages past where we were
 3    before.
 4              A.    So which page, CAR --
 5              Q.    023, at the bottom.
 6              MR. KANELLIS:  Looks like this
 7    (indicating).
 8              MS. CONLON:  Thank you.
 9              THE WITNESS:  Thank you, sir.
10              A.    Okay.
11    BY MS. CONLON:
12              Q.    Okay.  Have you ever seen this
13    document?
14              A.    No.
15              Q.    Is this a document typically
16    created by the Department of Homeland Security?
17              A.    It has our agency and
18    department name at the top.
19              Q.    And this document, which I'll
20    represent to you is part of the administrative
21    record in our case provided to us by the
22    Government, discusses Mr. Khalil, right?
23              A.    It references his name.
24              Q.    Well, it says [as read], "In
25    the matter of Mahmoud Khalil," right?
```

```
 1            A.   That would be his name.
 2            Q.   And if you would look now at
 3   paragraphs 3 through 8, could you just take a
 4   moment and review those paragraphs?
 5            MR. KANELLIS:  Did the witness
 6   already say he hasn't seen this document
 7   before?
 8            MS. CONLON:  Let me go back up and
 9   see what he said.
10            THE WITNESS:  Yes.
11            MR. KANELLIS:  Well, if he hasn't
12   seen it before, you're going to ask him to make
13   commentary on a document he hasn't seen?
14            MS. CONLON:  Well, you know, this
15   witness did just tell us that this is a DHS
16   document.  And it is in connection with the
17   case that he worked on in the administrative
18   record you gave us, so I think I feel confident
19   that I can ask him the question I want to ask
20   him about this --
21            MR. KANELLIS:  Well, I mean, if
22   you're going to ask him to comment on a
23   document he hasn't seen before, then I'm going
24   to object to every question, because it calls
25   for speculation.  I'm trying to save you time
```

 1   by not asking the witness to comment on

 2   everything that might appear in the media.  So

 3   if you want me to do that, I'll do that.  But,

 4   honestly -- okay.  You conduct the deposition

 5   the way you want.  It's your time.  We got

 6   seven hours.  You take as much of it as you

 7   want.

 8   BY MS. CONLON:

 9            Q.   Okay.  Mr. Watson, can you

10   please take a look at this document?  And

11   before I ask you about the specifics of it, do

12   you see at the top where it says "Additional

13   Charges of Inadmissibility or Deportability"?

14            A.   No.

15            Q.   Can you look at the top of the

16   document?

17            A.   Yes.

18            Q.   Upper right corner.

19            A.   I see it now.

20            Q.   Yep.  Have you ever seen a

21   document titled "Additional Charges of

22   Inadmissibility or deportability" from the --

23            A.   I don't recall.

24            Q.   -- Department of -- I'll just

25   finish the question.

```
 1              -- from the Department of Homeland
 2       Security before?
 3              A.   I don't recall.
 4              Q.   Are you familiar with when this
 5       kind of document gets prepared by your
 6       department?
 7              A.   I don't recall.
 8              Q.   Do you know who in the
 9       Department of Homeland Security is responsible
10       for preparing documents like this?
11              A.   I don't want to speculate.
12              Q.   So you don't know?
13              A.   Correct.
14              Q.   And this document, as you can
15       see, was issued on March 17, 2025, at the
16       bottom; is that correct?
17              A.   That's what's written.
18              Q.   Okay.  Now, do you recall the
19       date of the referral that you sent to the
20       Department of State?
21              A.   No.
22              Q.   In your experience, how long
23       between when you send the referral and when the
24       Department of State issues a memorandum about
25       it?
```

```
 1              A.   My experience is limited, so I
 2     can't speculate on a time frame.
 3              Q.   Do you recall, for Mr. Khalil's
 4     case, how much time lag there was?
 5              A.   No.
 6              Q.   Okay.  Are you familiar --
 7     could you please take a quick look for me at
 8     paragraph 6 of this document?  And tell me when
 9     you've had a chance to look at it.
10              A.   I have.
11              Q.   It makes reference to something
12     called the United Nations Relief and Works
13     Agency for Palestine Refugees.  Is that an
14     organization --
15              THE COURT REPORTER:  I'm sorry.
16     Agency for?
17              MS. CONLON:  Palestine Refugees.
18     BY MS. CONLON:
19              Q.   Is that an agency you've ever
20     heard of before?
21              A.   I'm not familiar with it.
22              Q.   In paragraph 7, it says -- it
23     makes reference to Mr. Khalil's alleged
24     position as a program manager by the Syria
25     office in the British Embassy.
```

```
 1              Do you have any familiarity with the
 2     program manager Syria office British Embassy
 3     program referenced here?
 4              A.    No.
 5              Q.    And, lastly, paragraph 8 makes
 6     reference to Columbia University Apartheid
 7     Divest.  You've already stated, am I correct,
 8     that you are not familiar with that entity
 9     either?
10              A.    Correct.
11              Q.    Okay.  Fair to say that your
12     referral wouldn't have referenced these
13     organizations you've never heard of?
14              A.    I don't know.
15              Q.    You think it's possible that
16     you wrote in your referral about these entities
17     right here listed in these three paragraphs we
18     just looked at?
19              MR. KANELLIS:  Objection.  Calls for
20     speculation.
21     BY MS. CONLON:
22              Q.    So the answer to my question is
23     you don't know?
24              A.    Correct.
25              Q.    And you see up here, in
```

1    paragraph 5, that one of the bases listed is

2    the foreign policy provision; is that correct?

3    That's what that language comes from in

4    paragraph 5?

5             A.   That's the language that's

6    captured therein.

7             Q.   Mm-hmm.  Terrorism-related

8    grounds for inadmissibility or removability are

9    separate from the foreign policy provision

10   described in paragraph 5, right?

11            A.   I don't know.

12            Q.   Well, when you and I talked

13   about those provisions earlier, you would agree

14   with me that in the statute where they both

15   exist, Section 1182, they're in distinct parts

16   of that statute, right?

17            A.   Yes.

18            Q.   There are specific statutory

19   grounds that you or anyone could invoke to

20   remove someone for terrorism-related conduct,

21   right?

22            A.   When you say, "me or anyone,"

23   what do you mean?

24            Q.   Well, what I'm saying is,

25   there's the foreign policy provision, and then

 1    there's terrorism-related grounds for a

 2    person's removal, right?

 3          A.    Yes.

 4          Q.    And you've had a chance to look

 5    at this one-page document.  You don't see any

 6    references to terrorism on this document, do

 7    you?

 8          MR. KANELLIS:  Objection.  You

 9    pointed to paragraph 5.  You had him read

10    paragraph 5.  You represented to him that

11    paragraph 5, foreign policy interest, was the

12    same terminology that was used in the statute,

13    which it wasn't.  So, I mean, there's a lot of

14    predicate problems with your question.

15          And now you're asking him to

16    speculate about something not appearing in

17    here, when we don't have the record that he's

18    ever seen this document and has no basis to

19    testify about the meaning behind any of the

20    words in the document.

21          So that's -- I'm trying to pinpoint

22    the problems I have with him speculating about

23    words in this document that he's never seen

24    before.

25    BY MS. CONLON:

```
 1              Q.   Okay.  So hearing all of the

 2    objections from Mr. Kanellis, none of which

 3    involve a privilege, which means you can answer

 4    the question, my question was just:  Do you see

 5    anything about terrorism-related grounds in

 6    this document?

 7              A.   I don't see the word

 8    "terrorist."

 9              Q.   Okay.

10              MS. CONLON:  We'd like to just take a

11    three-minute break to see if we can just stop

12    here and make a record about what we would ask,

13    with respect to the other targeted noncitizens,

14    instead of asking.  Is -- we're --

15              MR. KANELLIS:  Mm-hmm.

16              MS. CONLON:  -- we'll just duck out

17    three minutes to just strategize about it.

18              MR. KANELLIS:  Sure.  And let me

19    offer, if you want to send us the written --

20    like, to save time, send us written

21    questions -- I mean --

22              MS. CONLON:  Yeah.

23              MR. KANELLIS:  -- just to save you

24    time in your -- so you're being specific.  It's

25    up to you.
```

```
 1              MS. CONLON:  No, I appreciate that.

 2    I certainly don't want to make us sit here and

 3    do the same thing for every person.

 4              So if we can just take -- I'd like to

 5    go off the record.

 6              THE VIDEOGRAPHER:  The time is 17:46,

 7    and we're off the record.

 8         (A break was taken at 5:47 p.m.)

 9              THE VIDEOGRAPHER:  The time is 18:02,

10    and we're back on the record.

11              MS. CONLON:  Okay.  So before I

12    continue questioning, I'm just going to make a

13    record of the topics that I would cover with

14    Mr. Watson with respect to the four other

15    targeted noncitizens that are --

16              THE COURT REPORTER:  I'm sorry.  With

17    the four other?  There's a lot of papers

18    ruffling, and I have my mic down.

19              MS. CONLON:  I'm sorry.  I'm just

20    getting quieter and quieter too.  Okay.

21              -- with respect to the four other

22    targeted noncitizens who are the focus of

23    Plaintiff's case.

24         These are the topics that we covered

25    with Mr. Khalil, where privilege was invoked,
```

1    where we understand privilege would be invoked

2    again.

3            First, the content of any referral

4    made under this new process to the Department

5    of State, including its basis; second, the

6    content of the accompanying letter; third, the

7    HSI profile of the targeted noncitizen; fourth,

8    the report of analysis concerning the targeted

9    noncitizen; fifth, communications with anyone

10   concerning the decision to take action against

11   the targeted noncitizen and the nature of the

12   actions that was discussed.

13            I've lost count of the number, but

14   next, communications concerning the manner in

15   which any subsequent action would be taken

16   against a targeted noncitizen, including with

17   respect to the manner of their arrest and

18   detention.

19         Did I leave anything out?

20            MR. KANELLIS:  And can I --

21            MS. CONLON:  And, sorry.  Lastly,

22   just --

23            MR. KANELLIS:  Sure.

24            MS. CONLON:  -- to complete it, and

25   more generally and most importantly, the basis

```
 1    of the referral determinations, the reason
 2    these noncitizens were referred.
 3             MR. KANELLIS:  Okay.  And can I offer
 4    this as something we would not necessarily
 5    object to?  And that is, you know, the court
 6    has been clear that, like, the practices,
 7    policies, and protocols generally in play at
 8    the time are fair game.  And we would allow him
 9    to talk -- as we have allowed him to talk about
10    policies, practices, and protocols.
11             It's the -- where we draw the line,
12    just for the record, is where it gets into the
13    individual desiderata underlying the decisions
14    that were made with respect to the four -- the
15    five.
16        So that's sort of our bright line,
17    following with the Court.
18             MS. CONLON:  But that's inclusive of
19    communications about the targeted -- the other
20    four targeted noncitizens.
21             MR. KANELLIS:  Yes.  Yes, because
22    then it gets into the specifics, the
23    rationales, the specific operations, and that
24    sort of thing.
25             MS. CONLON:  And to be clear, we
```

```
 1   would also be asking about the basis, not just
 2   of HSI or Department of Homeland Security's
 3   decision to refer, but the basis for
 4   Mr. Rubio's actions, to the extent it's known
 5   by this witness, and it may not be -- but,
 6   again, I understand the Government would object
 7   to that as covered by the deliberative process
 8   privilege.
 9            MR. KANELLIS:  Yes, because it
10   does -- as the Court said, he's not going to
11   interfere with individual district court
12   proceedings.
13            I would also say -- and I agree with
14   what you said, but I would also say that, you
15   know, the witness -- one basis for the
16   objection regarding Mr. Khalil is that the
17   witness said he did not -- didn't have the
18   information.  And so that's a separate
19   objection that goes beyond the privilege.
20            MS. CONLON:  And I think, for that
21   reason, we will inquire about whether Mr.
22   Watson has the information we are seeking as to
23   the others, but not any questions, if that
24   makes --
25            MR. KANELLIS:  Sure.  Yeah.
```

```
 1                    MS. CONLON:  -- if that makes sense?
 2                    MR. KANELLIS:  If you want to do
 3        that, we'd have -- right.  That's fine by us.
 4                    MS. CONLON:  Okay.
 5        BY MS. CONLON:
 6                    Q.   Okay.  So I'm just going to go
 7        through them name by name.
 8              Do you have -- this is tough -- any
 9        information concerning actions taken by the
10        Department of Homeland Security or the
11        Department of State against Badar Khan Suri,
12        S-U-R-I?
13                    A.   "Information" is broad.
14                    Q.   Okay.  Did you have any
15        involvement in Mr. Suri's case?
16                    A.   I referred the ROA --
17                    Q.   You did.
18                    A.   -- to the Department of State.
19                    MS. CONLON:  And I understand,
20        Mr. Kanellis, that the topics I outlined that I
21        would want to ask about with respect to
22        Mr. Suri would be covered by privilege,
23        notwithstanding that Mr. Watson has the
24        information in this instance about Mr. Suri, or
25        may have it.
```

```
 1              MR. KANELLIS:  Right.  The topics

 2    that you've identified would be -- except for

 3    any -- I mean, except for, again, protocols,

 4    procedures, general --

 5              MS. CONLON:  Mm-hmm.

 6              MR. KANELLIS:  -- general how they

 7    did business, not specific to any particular

 8    one of the aliens, five subject aliens, yes.

 9    BY MS. CONLON:

10         Q.   Because Mr. Kanellis didn't

11    object to this question with respect to

12    Mr. Khalil, I'll ask now.

13              MS. CONLON:  But if there's an

14    objection, let me know.

15              MR. KANELLIS:

16    BY MS. CONLON:

17         Q.   Do you recall who else you

18    worked on Mr. Suri's case with?

19         A.   Department of State, Bureau of

20    Consular Affairs.

21         Q.   Anyone apart from John

22    Armstrong?

23         A.   I don't recall if there was

24    someone else.

25         Q.   Okay.  Do you recall whether
```

1    you had communications -- well, withdrawn.

2          Okay.  And sitting here right now, do

3    you recall the basis for the referral for

4    Mr. Suri?

5          A.   A completed report of analysis.

6          Q.   Sorry.  Do you recall, without

7    saying what it is, the content of the completed

8    report of analysis?

9          A.   Not offhand, no.

10         Q.   Okay.  Do you recall the

11   content of any of the other documents for Mr.

12   Suri that we discussed for Mr. Khalil?

13         A.   No.

14         Q.   Okay.  Are you familiar with

15   the case of Mohsen Mahdawi, Mr. Mahdawi?

16         A.   I referred.

17         Q.   You did.

18         So you referred the ROA in his case as

19   well?

20         A.   I believe so.

21         Q.   And sitting here right now, do

22   you recall anything about the content of the

23   ROA for Mr. Mahdawi?

24         A.   No.

25         Q.   Sorry.  What was that?

```
 1              A.    No.

 2              Q.    No.

 3          Are you familiar with the case of

 4     Rumeysa Ozturk?

 5              A.    I'm sorry?

 6              Q.    Are you familiar with the case

 7     for Rumeysa Ozturk?

 8              A.    Yes.

 9              Q.    Did you make the referral in

10     this case as well?

11              A.    I believe so.

12              Q.    And sitting here now, do you

13     recall anything regarding the basis for the

14     referral for her?

15              A.    No.

16              Q.    Okay.  And last targeted

17     noncitizen -- I do have a few other questions,

18     just so you don't get too excited.

19          But the last targeted noncitizen,

20     Yunseo -- I'm sure I'm saying it wrong.  I'll

21     spell it. Y-U-N-S-E-O --

22              A.    Chung?

23              Q.    Yes, sir.

24          So you are familiar with Ms. Chung's

25     case?
```

```
 1                A.    I made the referral.

 2                Q.    Now, these referrals were all

 3    made as part of this new process that began in

 4    March for you, correct?

 5                A.    Yes.

 6                Q.    And we've just discussed five

 7    specific referrals.  And these referrals --

 8    we've just discussed five specific referrals,

 9    correct?  Five distinct individuals?

10                A.    I think so.

11                Q.    Okay.  Well, take my word for

12    it.  The Court assigned us five only, so it's

13    five.

14          These individuals were all referraled

15    [sic] within the first couple weeks of March,

16    correct?

17                A.    I think so.

18                Q.    Do you have any estimate of how

19    many people were referred through this program

20    in March?

21                A.    No.

22                Q.    Are you aware of any referrals

23    being made through this program from DHS to the

24    Department of State that went through someone

25    other than you?
```

```
 1                A.    Not to my knowledge.

 2                Q.    Okay.  So for the reasons

 3     stated on the record earlier, I will not ask

 4     questions -- more specific questions about the

 5     particular targeted noncitizens and the basis

 6     for the decisions in their cases, but I do have

 7     a few additional questions.

 8                With respect to Mr. Mahdawi, are you

 9     familiar with the circumstances of his arrest?

10                A.    No.

11                Q.    You're not aware that he was

12     arrested at a scheduled citizenship interview?

13                A.    I don't recall that.

14                Q.    Okay.  Fair to say, then,

15     you're not familiar with whatever the

16     decision-making process was to arrest him

17     there?

18                A.    That's correct.

19                Q.    With respect to Ms. Ozturk, are

20     you familiar with the manner in which she was

21     arrested?

22                A.    No.

23                Q.    And fair to say you had nothing

24     to do with the -- any decision made about the

25     manner in which she would be arrested?
```

```
 1              A.    Correct.

 2              Q.    Is that true for all of the

 3    five people we just talked about?

 4              A.    I believe so, yes.

 5              Q.    Do you know who had input into

 6    the manner in which the five people we've

 7    discussed would be arrested?

 8              A.    No.

 9              Q.    Are you aware -- with respect

10    to Ms. Chung, are you aware that Ms. Chung has

11    not been arrested?

12              A.    I don't know.

13              Q.    You didn't know.  Okay.

14         Fair to say you don't know why there's

15    been no notice to arrest issued for her?

16              A.    I don't know.

17              Q.    Just a second.

18         Do you recall whether you recommended

19    silent revocations for any of these five

20    people?

21              A.    I don't recall.

22              Q.    Fair to say you don't recall

23    the basis for it, if you did?

24              A.    The basis for it would be

25    officer safety and operational security.
```

```
 1              Q.   You don't recall the specific
 2    reason you might have ordered it or recommended
 3    it, rather, in any -- the case of these five
 4    noncitizens; is that correct?
 5              A.   I stated two reasons why.  I
 6    can't go beyond that.
 7              Q.   One second.
 8         Okay.  Without asking in which ones, do
 9    you recall whether the ROAs for any of these
10    five noncitizens mentioned their pro-Palestine
11    views?
12              A.   I don't recall.
13              Q.   Do you recall whether the ROAs
14    for any of these five noncitizens mentioned
15    anti-Israel views?
16              A.   I don't recall.
17              Q.   Since this new program began in
18    March, have you seen any ROAs that discuss
19    someone's pro-Palestinian views?
20              A.   Yes.
21              Q.   Since this process began in
22    March, have you seen any ROAs that talk about
23    someone's anti-Israel views?
24              A.   Yes.
25              Q.   Do you know whether any ROA
```

1    which discusses a person's pro-Palestine views

2    has been referred to the Department of State?

3           A.    I don't know.

4           Q.    Do you know whether any ROA

5    that discusses a person's anti-Israel views has

6    been referred to the Department of State?

7           A.    I'm not sure.

8           Q.    But I am correct in

9    remembering, earlier, you said that, to your

10   knowledge, all of the ROAs under this program

11   since March have been referred to the

12   Department of State?

13          A.    Yes.

14          Q.    Just a moment.

15       Speaking about ROAs generally and not

16   for particular people, what's the threshold you

17   use to determine whether an ROA rises to the

18   level of a referral?

19          A.    I don't use a threshold.

20          Q.    Well, how do you decide whether

21   to refer an ROA to the Department of State

22   under this particular program?

23          A.    When the ROA is provided to me,

24   that is when I review for content, and upon

25   receipt of the letter.

1          Q.    And you say you review for

2    content.

3          A.    Mm-hmm.

4          Q.    What is it that you are

5    assessing in the content?  Like, what are you

6    reviewing it for?

7          A.    Content.

8          Q.    What I meant is, could you

9    refer an ROA without having read it?

10         A.    I don't think so.

11         Q.    What criteria do you use to

12   decide whether to refer an ROA?

13         A.    Is the ROA complete.

14         Q.    And what makes it complete?

15         A.    That I can read it, that it has

16   information with a description of what it is.

17         Q.    So an ROA is complete if it is

18   readable and contains the information it says

19   that it will contain; is that correct?

20         A.    For my individual purpose, yes.

21         Q.    Is there anything else required

22   to make an ROA complete?

23         A.    The process for ROAs does not

24   fall under me.

25         Q.    Right.  I'm sorry.

1        Is there anything else that you look

2    at -- when you consider the ROA, is there

3    anything else you require of it to determine

4    that it is complete and ready to be referred?

5            A.    No.

6            Q.    If an ROA came to you and was

7    missing screenshots that it described, is that

8    something you would send back as incomplete?

9            A.    I have yet to witness that.

10           Q.    Can you give me an example of

11   what would make an ROA incomplete?

12           A.    So an ROA is approved by the

13   Office of Intelligence.  And, again, as I

14   stated, I have yet to see one that is

15   incomplete.

16           Q.    Okay.  So you're reviewing it

17   for completeness.  And as long as you agree

18   it's complete, then your next step is to refer

19   it; is that right?

20           A.    Yes.

21           Q.    And do you know who, in the

22   Office of Intelligence, is the final person to

23   sign off on an ROA as complete before it gets

24   to you?

25           A.    I don't use the term "complete"

1    for Office of Intelligence.

2              Q.   Do you know the last person to

3    handle an ROA before it comes to you from the

4    Office of Intelligence?

5              A.   No.

6              Q.   Do you know whether there's a

7    person who signs off on it for the Office of

8    Intelligence, just as you sign off on these

9    before you send it to the Department of State?

10             A.   My understanding is ROAs are

11   approved.  I don't know who does that.

12             Q.   Is there the name on an ROA of

13   anyone from the Office of Intelligence?

14             A.   Not to my knowledge.

15             Q.   Does an ROA indicate on its

16   face who wrote it?

17             A.   Not to my knowledge.

18             Q.   And you don't know who within

19   the Office of Intelligence approves ROAs before

20   they come to you?

21             A.   No, ma'am.

22             Q.   Okay.  I think we can leave

23   ROAs.  We're almost done.

24             Okay.  Going totally away from this now

25   for a second.  For this process that began in

 1    March, you mentioned that tips can be provided

 2    to generate leads; is that right?

 3            A.   Yes.

 4            Q.   Do you know whether any of

 5    those tips have come from organizations outside

 6    of the Government?

 7            A.   No.

 8            Q.   Are you familiar with Canary

 9    Mission?

10            A.   I've heard the name before.

11            Q.   Have you ever had any contact

12    with them?

13            A.   No.

14            Q.   Do you know whether anyone who

15    works for the -- well, withdrawn.

16        Do you know whether Canary Mission has

17    provided any tips that have led to ROAs under

18    this program?

19            A.   I don't know.

20            Q.   Do you know whether Canary

21    Mission has provided any tips that have led to

22    investigations?

23            A.   I don't know.

24            Q.   Are you familiar with Betar?

25            A.   No.

```
 1              Q.   B-E-T-A-R?  Do you know whether
 2    they have provided any tips that have led to
 3    investigations under this program?
 4              MR. KANELLIS:  Objection.  Calls for
 5    speculation.  He just said he didn't know.
 6    BY MS. CONLON:
 7              Q.   Oh, sorry.  I missed it.  You
 8    said you don't -- you've never heard of them,
 9    Betar?
10              A.   Correct.
11              Q.   I'm -- you've never heard of
12    them?
13              A.   Correct.
14              Q.   Okay.  Sorry.
15         So you've heard of Canary Mission, not
16    Betar?
17              A.   Yes.
18              Q.   Are there any other
19    organizations that you are aware of that have
20    submitted tips in connection with student
21    protestors?
22              A.   No.
23              Q.   Are there any other
24    organizations you're aware of that have
25    submitted tips in connection with faculty at
```

 1    universities, colleges?

 2              A.   Not to my knowledge.

 3              Q.   Do you know whether the Office

 4    of Intelligence receives tips from

 5    organizations outside the Government?

 6              A.   I don't know.

 7              Q.   Do you know whether --

 8    withdrawn.

 9         Okay.  To your knowledge, the sources

10    of investigative leads for the Office of

11    Intelligence, under this new program, include

12    CBP, USCIS.  Any other organizations or

13    entities?

14              A.   I don't identify CBP and those

15    agencies as the sources of leads.  So I think

16    we have a conflation there.

17              Q.   Help me understand.  Who would

18    you identify -- or what agencies would you

19    identify as the sources of leads for the Office

20    of Intelligence for this new program --

21              A.   I can't identify that for the

22    Office of Intelligence.  When we spoke before,

23    it was about overstays, and I --

24              Q.   Ah.

25              A.   -- identified those agencies as

1      being the sources of leads for overstays.

2              Q.    So you're not sure -- you are

3      unfamiliar with the sources of investigative

4      leads for the Office of Intelligence in

5      connection with this program that started in

6      March?

7              A.    Correct.

8              Q.    Okay.  Do the ROAs that you've

9      reviewed explain how the person discussed in

10     the ROA came to the Government's attention?

11             A.    Not to my knowledge.

12             Q.    Okay.  And I apologize in

13     advance if we're going in circles.  We are

14     almost done.

15         Mr. Kanellis laid out earlier that he

16     doesn't have objections to questions about

17     policies, protocols, and practices.  Are there

18     any written policies for the program that began

19     in March that you are aware of?

20             A.    Not to my knowledge.

21             Q.    Are there any written protocols

22     for the program that began in March?

23             A.    Not to my knowledge.

24             Q.    Are there any trainings that

25     have been administered on the program that

```
 1   began in March?
 2              A.   Not to my knowledge.
 3              Q.   Are you aware of how
 4   information has been conveyed to the people who
 5   have been detailed to work on that program
 6   about the program?
 7              A.   No.
 8              Q.   Okay.  Do you know whether any
 9   people who are not employees of the Government
10   work on the program that began in March?  Any
11   contractors?  Anybody outside the Government?
12              A.   I don't know.
13              Q.   We talked about a roster
14   earlier.  Is there any sort of a list or roster
15   of the people who participate in this program?
16              A.   Not to my knowledge.
17              Q.   Are you aware of whether anyone
18   who -- withdrawn.
19          In the implementation of this program,
20   has the Government conferred with any
21   universities or colleges?
22              A.   I don't know.
23              Q.   In the development of this
24   program, did the Government confer with any
25   universities or colleges?
```

```
 1              A.   I don't know.

 2              Q.   Do you know whether the

 3    Government has requested any information from a

 4    university or college in connection with this

 5    program?

 6              A.   I'm not sure.

 7              Q.   Do you know whether the

 8    Government has provided any information

 9    concerning students or faculty at any college

10    or university in connection with this program?

11              A.   I'm sorry.  I don't understand

12    the question.

13              Q.   Do you know whether the

14    Government has provided to any educational

15    institution information about that

16    institution's students or faculty in connection

17    with this program?

18              A.   I don't know.

19              Q.   Do you know whose idea this

20    program was?

21              A.   No.

22              Q.   Just a second here.

23         Do you know whether the people who have

24    been referred to the State Department under

25    this program have been referred for any reason
```

```
 1    other than the foreign policy provision?
 2              A.   I'm not sure.
 3              Q.   Speaking only about the
 4    particular referrals that you can remember as
 5    you sit here, were any of them made on the
 6    basis of anything other than the foreign policy
 7    provision?
 8              A.   Not to my knowledge.
 9              Q.   Do you recall whether -- oh,
10    I'm sorry.
11              A.   To your last question, just to
12    be clear, I can't think of any other reason.
13              Q.   Right.
14              A.   So to be clear, in that
15    response --
16              Q.   Yes.
17              A.   -- I can't think of any other
18    reason.  So just to be clear on that.
19              Q.   No, I understand they're not --
20              A.   Okay.
21              Q.   -- we don't have the documents
22    to put in front of you.
23              A.   Correct.
24              Q.   Sitting here -- I'm going to
25    suggest this to you and ask if you now recall
```

1    it -- were any of the ROAs referred on the

2    basis of the terrorism-related provisions that

3    we have discussed?

4              A.   I don't recall.

5              Q.   Do you recall whether --

6    withdrawn.

7         Have you had any involvement in --

8    well, withdrawn.

9         Once a person has been arrested on a

10   visa revocation and they are detained, does the

11   Department of Homeland Security have any power

12   over where that person is taken upon arrest for

13   detention?

14             A.   I don't know.

15             Q.   Does the Department of Homeland

16   Security, as far as you know, make plans before

17   a person is arrested for how their arrest and

18   detention will be executed?

19             A.   When you say, "make plans,"

20   what do you mean?

21             Q.   Is there any coordination that

22   is reduced to writing ahead of time regarding

23   how a particular person's arrest will be

24   effectuated?

25             A.   It can happen on a case-by-case

```
 1    basis.
 2                  Q.   Do you happen to know whether
 3    that -- where -- whether any plans regarding
 4    the arrests of the five noncitizens we've been
 5    talking about were reduced to writing before
 6    they were arrested?
 7                  A.   I don't know.
 8                  Q.   What are the circumstances
 9    under which the particular plan that would be
10    followed in arresting and detaining someone is
11    reduced to writing before it's executed?
12                  A.   Can you repeat that question?
13                  Q.   It's a long one.
14                  A.   It is.
15                  Q.   What are the circumstances
16    under which a plan -- sorry, there's a big lag
17    here.  And I was reading to you, but it's
18    lagging.  Just give me one second.
19             THE COURT REPORTER:  It's coming.
20             MS. CONLON:  I think it's just still
21    refreshing.  Ah.
22    BY MS. CONLON:
23                  Q.   What are the circumstances
24    under which a particular plan that would be
25    followed in arresting and detaining someone is
```

```
 1    reduced to writing before it's executed?
 2              A.   When you say, "reduced to
 3    writing," what do you mean?
 4              Q.   Let me back up even farther.
 5          When ICE is going to effectuate
 6    someone's arrest, is there normally a written
 7    plan made beforehand?
 8              A.   It depends on the circumstances
 9    involved in the arrest.
10              Q.   What are the circumstances that
11    lead ICE to make a written plan before
12    arresting someone?
13              A.   Aggravating factors, to include
14    high risk.
15              Q.   What makes a person's arrest
16    high risk?
17              A.   Felony convictions, history of
18    possession of firearms, narcotics-related
19    offenses.
20              Q.   And when you say -- you're
21    saying a history of a narcotics-related
22    offense, you don't mean that someone's being
23    arrested in that moment for a narcotics-related
24    offense; is that correct?
25              A.   Not necessarily, no.  They
```

```
 1    could have a conviction, and there could be a

 2    subsequent offense.

 3              Q.    So in either case, that could

 4    be a factor?

 5              A.    Yes.

 6              Q.    Okay.  What unit in ICE makes

 7    these plans?

 8              A.    There's no unit within ICE that

 9    makes the plan, because the arrests occur in

10    the field.

11              Q.    So the plans are made at the

12    field office level?

13              A.    That's correct.

14              Q.    Do you know which field offices

15    were involved in the arrests of the five

16    noncitizens we've talked about?

17              A.    Not all, no.

18              Q.    Do you know any of them?  I can

19    go back through the names, if that is at all

20    helpful.

21              A.    No, the names are not helpful.

22              Q.    Okay.  I wish there was another

23    way I could help.

24         For Mr. Khalil, in particular, do you

25    know which field office was involved?
```

1          A.    Not off the top of my head, no.

2          Q.    Is there any paperwork

3    generated in the course of a person's arrest

4    that reflects which field office was involved

5    in their arrest?

6          A.    A report of investigation.

7          Q.    Is an ROI created after a

8    person is arrested?

9          A.    Yes.  You can't have one

10   without the other.

11         Q.    Okay.  And the ROI indicates

12   who made the arrest?

13         A.    It can.

14         Q.    If you knew where the

15   noncitizens in our case were arrested, would

16   that help you determine which field office

17   arrested them?

18         A.    Potentially.

19         Q.    Mr. Khalil was arrested in New

20   York City.  What does that tell you, if

21   anything, about which field office was involved

22   in his arrest?

23         A.    It could have been the New York

24   field office.

25         Q.    Okay.  But you don't know for

```
 1    sure?  You're sort of doing your best to

 2    speculate, at my request?

 3              A.   Yes, but there are multiple

 4    program offices within ICE.

 5              Q.   Sorry.  I'm not sure I

 6    understood that one.

 7          There are multiple program offices

 8    within ICE that effect arrests?

 9              A.   Correct.

10              Q.   So what are those program

11    offices?

12              A.   HSI and ERO.

13              Q.   Ah.

14              A.   And from time to time, the

15    Office of Professional Responsibility.

16              Q.   What determines whether an

17    arrest is being effectuated by HSI as opposed

18    to ERO?

19              A.   The violation.

20              Q.   And does this come back to, if

21    it's a criminal violation, it goes to one

22    program office, and if it's a civil, it goes to

23    another; or what's the distinction?

24              A.   Criminal, typically, is HSI.

25    But civil can be both.
```

1          Q.    And what determines whether a
2     particular civil violation gets handled for
3     arrest by HSI or ERO?
4          A.    Availability of personnel.
5          Q.    And who makes that decision?
6          A.    I'm sorry?
7          Q.    Who makes that decision?  You
8     said "availability of personnel."  Who is
9     looking at the availability of personnel and
10    making the decision?
11         A.    The principal field official.
12         Q.    For the -- for the field
13    office?
14         A.    Correct.
15         Q.    Do you know, in the case of the
16    five noncitizens we're talking about, whether
17    it was HSI or ERO that effectuated their
18    arrests?
19         A.    I don't know in every instance.
20         Q.    Do you know in any instance?
21         A.    Not off the top of my head.
22         Q.    Fair enough.
23        Just one second.  Sorry.
24        Okay.  Oh.  There are -- there is a
25    particular set of two memos that has been

```
 1    described in the news with respect to

 2    Ms. Ozturk.  Do you have any familiarity with

 3    the memos that were created in Ms. Ozturk's

 4    case?

 5              A.   I'm not tracking on the issue,

 6    nor do I have familiarity on the topic.

 7              Q.   Are you privy to State

 8    Department memorandum created in response to a

 9    referral from HSI?

10              A.   I don't know.

11              Q.   From just a process

12    perspective, once you send the referral over to

13    the Department of State, what is the next time

14    that you hear anything back about that

15    referral?

16              A.   It depends.

17              Q.   Are there times where you don't

18    hear anything again after sending off the

19    referral?

20              A.   Yes.

21              Q.   When you do hear something

22    again, who do you typically interface with?

23              A.   It depends.

24              Q.   Okay.  Are there any sort of

25    repeat circumstances you face, where you get
```

 1    contacted again by the Department of State

 2    after sending the referral over?

 3              A.   When you say, "repeated"

 4    sentences [sic], help me out.  I don't

 5    understand.

 6              Q.   Well, without asking you to

 7    describe every time it's ever happened, are

 8    there common instances where that occurs?

 9              A.   I don't think so.

10              Q.   Do you know whether your -- do

11    you know whether referrals from HSI are

12    typically approved by the State Department?

13              A.   When you say, "typical," what

14    do you mean?

15              Q.   Are you aware of any instance

16    where the State Department, since the inception

17    of this March program, has not approved on a

18    referral that you sent?

19              A.   I don't say "approved."

20              Q.   What is the --

21              MS. CONLON:  I'm sorry?  Mm.

22    BY MS. CONLON:

23              Q.   Are you aware of any referral

24    that has been sent under this program that

25    started in March to the State Department where

1    the State Department did not act in accordance

2    with the recommendation?

3              A.    Yes.

4              Q.    About how many times has that

5    happened?

6              A.    Several, but I don't have the

7    exact number.

8              Q.    You would agree it's not the

9    majority of cases?

10             A.    If I can't say how many

11   referrals went over, I don't want to speculate

12   to what a majority is or isn't.

13             Q.    Well, we know there's more than

14   10, fewer than 50, right?  That's the best

15   estimate we got to.  Are you aware of more than

16   ten times that the State Department --

17             A.    I don't know.

18             Q.    Do you recall whether you were

19   contacted after making the referral with

20   respect to any of the five noncitizens in this

21   case?

22             A.    I don't recall.

23             Q.    If the referral is approved by

24   the Department of State, is there any reason

25   they have to come back to you after approving

```
 1    it?
 2              A.   When you "approved," what do
 3    you mean?
 4              Q.   Sorry.  Not approved.
 5         If the Department of State agrees with
 6    the recommendation in your referral, is there
 7    any further work they need to do with you on
 8    that case?
 9              A.   I'm not aware of any additional
10    requirements.
11              Q.   Do you have any further
12    occasions to coordinate with them on a
13    referral, once you've sent it to them?
14              A.   When you say, "further
15    coordination," what do you mean?
16              Q.   Any occasion to further discuss
17    the referral.
18              A.   I'm not aware of further
19    discussions, but that doesn't mean it can't
20    happen.
21              Q.   I understand.  Never say never.
22         But it's not in every case that you
23    expect to have follow-on conversations with
24    them after sending a referral, correct?
25              A.   Correct.
```

```
 1              Q.   In the several occasions where
 2    you said State did not act in accordance with
 3    the recommendation, is that because the State
 4    Department took no action, or did it take
 5    different action, if you recall?
 6              A.   I don't know.
 7              Q.   Oh.  I asked you about Betar
 8    and the Canary Mission, but I didn't ask you
 9    about The Heritage Foundation.  Are you
10    familiar with that?
11              A.   I'm familiar with the name.
12              Q.   Have you had any -- you're
13    familiar with the name.  Are you aware of
14    whether The Heritage Foundation has provided
15    any tips that have led to investigations under
16    this program that began in March?
17              A.   I don't know.
18              Q.   Okay.  Have you -- do you have
19    any familiarity with -- withdrawn, actually.
20              MS. CONLON:  I'm about to tell you
21    we're done, but I just want to be really sure
22    before I get everyone's hopes up.
23              Okay.  Shockingly, I think we have
24    nothing else.  Thank you very much for your
25    time.
```

```
 1              I guess -- I want to make a record
 2    regarding things that we don't need Mr. Watson
 3    for, but we can keep him here, if you want to.
 4              MR. KANELLIS:  No.  But if you're
 5    going to make a record, then why don't we do
 6    that.  We can --
 7              MS. CONLON:  Sure.
 8              MR. KANELLIS:  -- start to pack up.
 9              THE WITNESS:  Well, all I got --
10              MR. KANELLIS:  Off the record.  How
11    long is this going to take?
12              MS. CONLON:  Literally, 30 seconds.
13              MR. KANELLIS:  Okay.  Go ahead.
14              MS. CONLON:  So we had indicated this
15    by e-mail, but because we're still engaging in
16    discovery with the Government and understand
17    that there are documents that may have been
18    relevant to this deposition that we haven't yet
19    received, we are just reserving the right to
20    redepose Mr. Watson, if necessary.  And I think
21    the Government understood that going into
22    this --
23              MR. KANELLIS:  Right.  But we have a
24    seven-hour limit.  And what time are we at
25    right now?
```

```
 1              THE VIDEOGRAPHER:  6:37.
 2              MR. KANELLIS:  Okay.  So no problem
 3   if you want to try to depose him for 23 --
 4              MS. CONLON:  Well, respectfully, we
 5   would disagree that the seven-hour limit should
 6   tac us when we didn't have discovery and had to
 7   depose him, and you wouldn't agree to
 8   adjournment.
 9              MR. KANELLIS:  No.  Well, you could
10   have asked the questions you asked in three
11   hours.  And it took way too much time.  So I'll
12   let you have 23 minutes; otherwise, you can go
13   to the Court and show good cause for it.
14              MS. CONLON:  We'll get off the record
15   right now, not to eat into the 23 minutes any
16   further.
17              MR. KANELLIS:  Are we off record?
18              THE VIDEOGRAPHER:  The time is 18:50,
19   and we're off the record.
20              ^designation video stopped?
21              MR. KANELLIS:  Great.  Thanks.
22              You're going to get a copy of this.
23   We'll forward that to you.  You just review it
24   just to make sure -- typos and all that stuff.
25              THE COURT REPORTER:  I just wanted to
```

 1    get transcript orders on the record.

 2              MR. KANELLIS:  We'll just take

 3    next-day or soonest.

 4              MR. WILKENS:  We will too, please.

 5         (Deposition concluded at 6:51 p.m.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              ACKNOWLEDGEMENT OF DEPONENT (JURAT)

2

3           I, ANDRE WATSON, do hereby acknowledge

4      that I have read and examined the foregoing

5      testimony, and the same is a true, correct and

6      complete transcription of the testimony given

7      by me and any corrections appear on the

8      attached errata sheet signed by me.

9

10     _____    _____

11          (DATE)                    (SIGNATURE)

12

13     NOTARY:

14           IN WITNESS WHEREOF, I have hereunto set

15     my hand and affixed my notarial seal this _____

16     day of _____, 2025.

17     My commission expires:

18

19     _____    _____

20          (DATE)                    (SIGNATURE)

21

22

23

24

25

```
 1                DEPOSITION ERRATA SHEET

 2

 3     Page_____   Line No._____

 4     Change To:_____

 5     Reason for change:_____

 6

 7     Page_____   Line No._____

 8     Change To:_____

 9     Reason for change:_____

10

11     Page_____   Line No._____

12     Change To:_____

13     Reason for change:_____

14

15     Page_____   Line No._____

16     Change To:_____

17     Reason for change:_____

18

19     Page_____   Line No._____

20     Change To:_____

21     Reason for change:_____

22

23     Page_____   Line No._____

24     Change To:_____

25     Reason for change:_____
```

 1    Page_____  Line No._____

 2    Change To:_____

 3    Reason for change:_____

 4

 5    Page_____Line No._____

 6    Change To:_____

 7    Reason for change:_____

 8

 9    Page_____  Line No._____

10    Change To:_____

11    Reason for change:_____

12

13    Page_____Line No._____

14    Change To:_____

15    Reason for change:_____

16

17    Page_____  Line No._____

18    Change To:_____

19    Reason for change:_____

20

21    Page_____Line No._____

22    Change To:_____

23    Reason for change:_____

24

25

1    Page_____    Line No._____

2    Change To:_____

3    Reason for change:_____

4

5    Page_____Line No._____

6    Change To:_____

7    Reason for change:_____

8

9    Page_____    Line No._____

10   Change To:_____

11   Reason for change:_____

12

13   Page_____    Line No._____

14   Change To:_____

15   Reason for change:_____

16

17   Page_____Line No._____

18   Change To:_____

19   Reason for change:_____

20

21   Page_____    Line No._____

22   Change To:_____

23   Reason for change:_____

24

25

1                           CERTIFICATE

2

3            I, Okeemah S. Henderson, RPR, the officer before

4    whom the foregoing deposition was taken, do hereby certify

5    that the foregoing transcript is a true and correct record

6    of the testimony given; that said testimony was taken by me

7    stenographically and thereafter reduced to typewriting

8    under my direction; that reading and signing was requested;

9    and that I am neither counsel for, related to, nor employed

10   by any of the parties to this case and have no interest,

11   financial or otherwise, in its outcome.

12           IN WITNESS WHEREOF, I have hereunto set my hand

13   and affixed my notarial seal this 16th day of June, 2025.

14   My commission expires:

15   September 30, 2029

16

17

18

19

20

21                   _Okeemah S. Henderson_

22                   Okeemah S. Henderson, RPR
                     Official Court Reporter

23

24

25

## WORD INDEX

**< 0 >**
**018**  228:*14*
**023**  251:*5*

**< 1 >**
**1**  4:*12*  87:*16*  88:*18*,
*19*  89:*5*, *11*, *16*, *19*
102:*15*, *16*, *21*  103:*12*
104:*1*  112:*11*  136:*18*
137:*9*  180:*7*, *11*
**1(a**  91:*10*
**1:25-cv-10685**  1:*6*
**1:54**  142:*14*
**10**  61:*9*  236:*14*
292:*14*
**10:10**  1:*12*  5:*4*
**100**  4:*13*  194:*24*
**10004**  2:*9*
**10115**  2:*21*
**11**  1:*12*  5:*3*  247:*18*
248:*2*
**11:29**  61:*10*
**11:30**  61:*12*
**11:52**  61:*13*
**111**  4:*14*
**1182**  4:*15*  120:*17*
121:*4*, *24*  122:*3*
257:*15*
**1182(a)(3**  119:*21*
120:*4*  123:*3*
**1182(a)(3)(c**  122:*15*
124:*16*  125:*23*
**11823(a)(3**  119:*23*
**118283**  158:*17*
**1183**  124:*9*
**120**  4:*15*
**1227**  123:*15*
**125-CV-10685**  5:*10*
**14**  21:*6*
**14:07**  153:*12*
**141**  180:*5*
**14161**  4:*12*  86:*16*, *24*
89:*2*  90:*2*, *6*  96:*23*
99:*23*  101:*12*, *21*
102:*2*, *20*, *25*  103:*5*,
*13*  180:*10*  185:*10*
**14188**  4:*14*  86:*6*
99:*20*  100:*21*  101:*2*,

**22**  102:*17*  111:*12*, *25*
117:*23*  118:*2*  125:*9*
126:*13*, *17*  131:*23*
132:*10*  133:*4*, *8*, *20*
134:*11*, *13*  135:*14*
141:*20*  142:*24*  150:*5*
152:*2*  153:*24*  157:*11*,
*19*  158:*1*  180:*2*
185:*6*  206:*5*
**15**  226:*18*  239:*12*
**15:31**  153:*15*
**1615**  1:*14*  5:*11*
**16th**  302:*13*
**17**  254:*15*
**17:46**  260:*6*
**18**  21:*6*  25:*14*  28:*6*,
*12*  29:*10*, *19*, *23*
**18:02**  260:*9*
**18:50**  296:*18*
**19**  29:*25*
**1994**  20:*17*

**< 2 >**
**2**  4:*13*  100:*6*, *7*
103:*11*, *25*  104:*4*, *8*, *9*
110:*22*  112:*11*, *20*
113:*6*, *11*, *18*, *22*
132:*3*, *24*  234:*8*
**2:08**  153:*14*
**20**  70:*1*  162:*13*
**2003**  20:*11*
**20036**  1:*15*
**20044**  3:*11*
**2015**  65:*11*, *21*
**2018**  65:*11*
**202**  3:*12*
**2020**  16:*11*  19:*2*
53:*18*  84:*14*
**2022**  7:*24*
**202-2600**  2:*11*
**2024**  178:*8*
**2025**  1:*12*  5:*3*  7:*22*
8:*4*  66:*1*  70:*2*, *9*, *16*,
*20*, *24*  71:*4*, *11*, *20*
79:*3*  84:*1*, *2*, *8*  86:*5*
87:*6*, *21*  107:*22*
159:*18*  182:*20*
208:*23*  210:*21*
223:*17*  224:*7*  225:*7*,
*14*  233:*1*  247:*18*

**248:2**  254:*15*  298:*16*
302:*13*
**2029**  302:*15*
**212**  2:*11*
**227**  4:*16*
**23**  296:*3*, *12*, *15*
**2320**  28:*12*  29:*12*, *19*
**237**  126:*1*
**237(a)(4)(c**  124:*3*
**23rd**  2:*8*
**240**  4:*18*
**247**  4:*19*
**25**  176:*8*, *16*, *21*, *25*
177:*7*  178:*10*  236:*12*
**29**  159:*18*

**< 3 >**
**3**  4:*14*  103:*14*, *19*
111:*5*, *20*, *21*  114:*1*, *4*,
*16*  115:*3*, *17*, *22*
116:*2*  117:*1*  118:*2*
119:*12*, *13*  121:*10*, *13*,
*16*, *20*  125:*10*  131:*24*
133:*2*  154:*4*  159:*21*
160:*2*, *8*  252:*3*
**3(b**  115:*12*
**3/11/25**  4:*19*
**30**  234:*22*  295:*12*
302:*15*
**302**  2:*20*
**3E**  157:*19*
**3s**  160:*11*

**< 4 >**
**4**  4:*15*  104:*4*, *8*
120:*21*, *24*  123:*19*
125:*24*  154:*17*
157:*11*, *22*  158:*3*
**4(3**  127:*10*
**400**  1:*15*
**41658**  1:*23*
**475**  2:*19*

**< 5 >**
**5**  4:*7*, *16*  122:*10*, *16*
124:*17*  125:*24*
127:*14*  227:*19*, *23*
248:*6*  250:*22*, *23*
251:*1*  257:*1*, *4*, *10*

**258:9**, *10*, *11*
**5:00**  227:*2*
**5:47**  260:*8*
**50**  80:*21*, *25*  236:*9*,
*14*  292:*14*
**507**  30:*1*
**545**  28:*6*  29:*11*, *19*
**554**  29:*16*, *19*
**56**  169:*25*

**< 6 >**
**6**  4:*16*  45:*5*  100:*20*,
*25*  133:*2*  240:*7*
250:*20*, *21*  255:*8*
**6:37**  296:*1*
**6:51**  297:*5*
**60**  159:*22*, *24*  160:*4*
**616-8779**  3:*12*
**646**  2:*23*

**< 7 >**
**7**  4:*19*  135:*2*  247:*12*,
*16*  255:*22*
**745-8500**  2:*23*

**< 8 >**
**8**  119:*21*, *23*  121:*6*
252:*3*  256:*5*
**80**  120:*18*
**878**  3:*10*
**88**  4:*12*
**8th**  216:*23*  224:*7*
**8USC**  158:*17*

**< 9 >**
**90**  2:*7*
**911**  137:*25*

**< A >**
**a.m**  1:*12*  5:*4*  61:*12*
**abbreviation**  87:*12*
**ability**  7:*2*  30:*4*
125:*14*  166:*14*
238:*18*
**able**  7:*6*  91:*20*
118:*6*  200:*19*  217:*15*
**abstract**  149:*3*
**accept**  104:*24*
**accepted**  224:*6*
**Accepting**  240:*18*

access 53:22 54:2
56:19 137:13
accompanying
190:22, 24 191:2, 5
192:11, 15, 25 193:3,
10 232:2 234:24
261:6
account 4:18 112:16
240:2, 12
accounts 140:9
239:24
accuracy 241:14
249:19
accurate 46:13
111:16
accurately 7:3
acknowledge 298:3
ACKNOWLEDGEME
NT 298:1
Aconlon@shertremont
e.com 2:10
acronym 51:4 53:6
act 57:20 72:24
73:21 76:24 78:14
90:16 101:19 103:8
116:5 292:1 294:2
Acting 11:19, 25
17:17 18:11, 13, 19
52:4, 21, 23 54:6
96:17, 21 108:15
164:8 185:21, 23
186:20, 22 197:4
204:10, 14 225:25
action 57:24 73:10,
22 74:4, 23 75:6
101:17 200:3 243:17,
21 261:10, 15 294:4,
5
actions 57:6 103:16
114:13 115:25 200:6
261:12 263:4 264:9
activities 47:18, 24
66:8, 14, 19 67:1
99:25 121:21 124:22
130:13, 22 134:21, 24
143:17 199:2 230:20
231:1 241:11, 24
242:2, 7, 9 244:24
activity 75:9, 17
135:5 185:3, 5, 10

187:8, 15, 25 188:4,
22
actors 53:3
acts 92:4 102:23
135:13
actual 246:1, 9
247:1, 6
added 106:20, 23
109:16, 17, 21 110:1
addition 42:14 47:22
209:20
additional 100:22
111:12 253:12, 21
269:7 293:9
address 14:18 56:15
185:13 193:6
addressed 193:8
addresses 185:5, 9
207:3
adjournment 296:8
administered 279:25
administration 22:17
administrative 4:16
108:23 225:21 226:6,
9, 12 227:16 228:5
250:17 251:20
252:17
admissibility 123:20
admission 44:24
46:6 128:11, 16, 22
admitted 44:8 45:4
104:13
advance 136:15
218:6 279:13
advances 137:18
138:11
adverse 124:25
130:14, 23
advice 14:14 74:16
advisor 22:23 58:3
91:6 168:25
advisory 191:6
advocacy 83:13, 16,
21 157:7
Affairs 35:22, 24
36:16 37:12, 18, 21
38:8 39:15 40:4, 10,
20 41:2, 6 42:2, 7, 16
43:3 59:11 60:18

129:10 165:12, 14
174:10 265:20
affect 7:2
affixed 298:15
302:13
agencies 35:8, 11, 13
114:2 152:17 158:14
167:1 238:1 278:15,
18, 25
agency 10:16, 24, 25
12:9, 17 13:8 18:25
22:12 34:23 53:7, 24
75:4 93:17 101:16
114:7 156:7 160:6
187:22, 25 188:3, 21
238:6 251:17 255:13,
16, 19
agenda 162:17, 23
agent 19:23, 24
20:13 171:12, 24
207:8 208:5, 11, 23
209:1, 13, 23 210:21
213:14, 24 214:2, 15,
22 215:5, 17 216:1
agents 65:17 206:25
208:1, 8, 16 209:7, 8,
15 211:17, 19 212:7,
11, 15 215:9, 13
Aggravating 285:13
ago 65:9, 10 135:12
143:6 160:19 177:8
agree 74:17 77:15
89:18 97:19 98:6
136:21, 25 257:13
263:13 274:17 292:8
296:7
agrees 136:9 293:5
Ah 278:24 284:21
288:13
ahead 96:16 123:24
149:22 150:10 162:6
163:21 164:19, 21
283:22 295:13
Ahh 195:14
aided 114:23, 25
aids 187:5
Akil 17:11 40:17
66:23 197:1
AL 1:3, 6 5:7, 8

Alex 6:6
ALEXANDRA 2:4
alien 45:3 124:21
127:18 166:14 170:7
aliens 32:12 44:7
50:12, 25 91:13
104:7, 13, 15 127:11
265:8
alien's 127:21
128:10, 16, 22
aligned 169:7
241:11, 24 242:2, 7, 9
allegations 49:18, 21
50:15, 17
Alleged 27:7, 10
31:13 32:10, 14
33:16, 20 34:25 35:6
49:25 50:24 51:8
75:8 82:8 83:21
110:4 126:12, 16
255:23
allegedly 94:16 245:4
allocation 105:12
107:10 108:11
allow 143:22 144:16
215:21 250:11 262:8
allowed 151:16 262:9
allows 170:22
aloud 119:16
ambit 203:13
AMENDMENT 2:17
AMERICAN 1:2 5:6
amount 84:15 171:13
analysis 62:8, 10
77:4, 6, 11 79:7 81:2,
4, 7, 22, 25 82:2, 4, 8,
11 83:20, 25 84:22
94:11 109:6, 9
139:15 184:23, 24
185:1 190:22 191:24
197:22 198:19
199:22 200:1 202:1,
5 219:21, 25 220:12
232:11 242:11, 16, 22
243:6, 7, 15, 23 244:1,
4, 8, 14, 20 245:7, 18,
21, 25 246:3, 4, 8, 11,
13, 14, 24 247:1
261:8 266:5, 8

analyst 65:18 82:3
197:23, 24 198:2, 7
200:22
analysts 184:22
198:10
and/or 161:2 203:8
ANDRE 1:10 4:4, 13
5:5, 20 7:11 100:10
298:3
Andrea 38:1, 5
anew 241:21
Ann 12:13
announcement 182:9
answer 6:20, 24 9:10
13:18 14:8, 15, 22
26:14 31:20 34:1
40:14, 22 49:12 50:7
54:13, 24 55:14
63:16 64:22 65:1, 2
69:4 70:11 74:2, 25
75:14, 17, 20 80:17,
18 81:13, 17 90:22,
25 92:1 94:9 96:14
98:2 102:12 104:21
106:3, 4 107:14
117:17, 18 118:5
123:25 124:1 125:16
134:4, 6 140:22
143:23, 25 144:16, 19
145:3, 18 147:17
148:8 149:21 150:9
154:22, 23 156:7, 18,
22 158:25 162:6
163:8, 9 170:8
174:11 178:20
187:19 188:11
191:14 200:14, 16, 17,
19 203:14 204:4
214:5 215:21 217:5
219:1 231:4, 5 233:6
237:4 242:21 245:8
250:9, 10 256:22
259:3
answered 199:8
answering 43:12
64:25 69:3 227:6
answers 94:14
anti-Israel 271:15, 23
272:5

anti-Semitic 75:8, 16
135:6 143:17 144:6
145:10 147:22
148:14 149:7 150:4,
17, 23 151:2 230:19,
25 232:6
anti-Semitism 82:8
83:1, 9 100:22 101:3
111:13 112:13, 17
113:6, 11, 17, 22
114:11 116:9 125:10
132:5, 12, 15 133:5,
22 135:19 136:2, 4,
13, 14, 20 137:5, 18
138:2, 3, 13 143:7
146:19 157:12
233:23
Anybody 11:21 12:5
18:3 38:2 193:25
196:14, 19 197:3
204:13 239:6 280:11
apart 12:20 15:10
31:15 32:6 38:4
45:9 48:22 51:19
53:25 61:25 81:22
84:21 136:2 161:5
189:1 193:15 201:25
214:25 265:21
Apartheid 155:21
256:6
apologize 60:7
142:15 154:3 168:7
180:7 235:10 279:12
appear 164:14, 16
166:19, 20, 25 167:5,
11, 12, 14, 17 168:9,
18 169:15 170:7
212:12 213:2, 7, 24
214:15 253:2 298:7
appearance 209:9, 16
214:2, 20
APPEARANCES 2:1
3:1
appearing 5:17
258:16
appears 133:2
applicable 34:14
50:13 57:18 123:7,
19 124:9 160:25

application 126:23
127:7
applies 125:25
135:12
apply 91:20 112:8
applying 133:6, 19
134:7
appoint 207:16
appreciate 82:14
102:13 236:21
248:17 260:1
appropriate 50:14
55:5 59:3 112:14
243:21, 25 244:12
249:16
approved 100:13
274:12 275:11
291:12, 17, 19 292:23
293:2, 4
approves 275:19
approving 292:25
approximately 80:7
84:13 106:8, 22
176:6 178:7 189:9
194:16 211:5, 11
approximation 55:18
236:15
area 43:22 82:19, 22
122:8
areas 43:23 47:19
82:24 83:7 90:16
137:13
Armstrong 37:13
38:5 39:12 184:15
193:2 238:25 265:22
Armstrong's 38:18
arranged 171:17
arrest 33:3 57:25
74:6 169:14 172:2,
10, 25 179:5 206:22
207:1, 4 208:2, 6, 13,
24 209:2, 9, 16 210:6
211:16, 25 212:8, 12,
16 213:3, 8, 25 214:3,
16, 23 215:3, 9, 14, 17
224:10 261:17 269:9,
16 270:15 283:12, 17,
23 285:6, 9, 15 287:3,
5, 12, 22 288:17
289:3

arrested 166:16
167:16 170:18
171:21 173:14
211:23 212:4 216:2,
23 217:1 218:11
219:3, 7, 12, 19
223:16 224:2, 7
269:12, 21, 25 270:7,
11 283:9, 17 284:6
285:23 287:8, 15, 17,
19
arrestees 207:22
arresting 164:10
168:17 170:15, 24
171:18 207:13
210:22 284:10, 25
285:12
arrests 167:25
206:18 208:17
210:18 284:4 286:9,
15 288:8 289:18
art 138:8 166:8
167:22, 23 219:15
article 246:25 247:2,
4
articulate 213:19
articulated 205:7
207:11
ascertain 28:16
aside 42:23 161:11
Asked 72:17 92:14,
15 144:14 180:16
206:16 212:10
217:25 224:13
225:23 226:3 231:3
294:7 296:10
asking 26:23 29:4
68:1, 24 76:3 86:21
87:24 95:18 101:11
107:15, 16 120:1
126:19 136:25
158:18 160:9 167:14,
23 177:11 202:18, 19
203:25 205:6 206:17
211:8, 10 218:5
239:13 241:16 245:9,
13 253:1 258:15
259:14 263:1 271:8
291:6

**assert** 156:*13*
**assess** 130:*11* 245:*15*
**assessing** 273:*5*
**assessment** 243:*14*, 20, 24 244:*11*
**assign** 207:*16* 237:*24* 238:*10*
**assigned** 40:*19* 109:*1, 5, 8, 13* 197:*23, 25* 198:*3, 7* 268:*12*
**assignment** 19:*5, 11*
**assistance** 85:*11*
**Assistant** 16:*4, 5, 13* 17:*15, 17* 19:*13* 39:*3, 4, 9* 40:*16* 66:*23* 79:*14, 21* 84:*6* 85:*17* 108:*15* 185:*19, 20* 186:*13, 17* 197:*1*
**Associate** 11:*19* 12:*1* 18:*11, 14, 20* 96:*17, 21* 131:*1* 185:*22, 23* 186:*20, 22* 204:*10, 14* 225:*25*
**associated** 157:*8* 186:*14*
**ASSOCIATION** 1:*2* 5:*6* 154:*6, 14* 156:*1*
**associations** 127:*22, 23* 128:*5*
**assume** 99:*3*
**Assumes** 97:*24* 237:*11*
**assuming** 55:*8* 237:*12*
**Attached** 4:*10* 191:*10* 244:*19, 21* 298:*8*
**attachment** 191:*7*
**attachments** 129:*24* 234:*7*
**attack** 68:*10*
**attacks** 91:*13* 137:*25*
**attention** 121:*9, 15* 218:*19, 21* 228:*7* 248:*4* 279:*10*
**Attorney's** 34:*13, 23* 35:*3* 171:*25* 172:*2*
**authorities** 25:*15* 30:*2* 114:*13* 115:*25*

116:*3, 7* 133:*6, 19* 134:*8* 135:*12* 160:*24*
**authority** 101:*17* 165:*5, 16, 20*
**authorizations** 174:*5*
**authorized** 44:*18* 171:*6, 8*
**availability** 189:*16* 289:*4, 8, 9*
**available** 21:*17* 60:*5* 112:*14* 138:*22* 231:*11*
**avoid** 20:*25* 207:*20* 211:*1* 214:*9*
**avoidance** 194:*2*
**aware** 11:*16* 31:*13* 37:*8* 38:*10* 56:*9* 69:*25* 70:*7, 14, 18, 22* 72:*15* 75:*15* 82:*6* 83:*18, 23* 85:*3* 115:*15, 19, 24* 116:*6, 16, 23* 117:*9* 118:*12, 16, 20* 123:*6, 14, 17* 131:*6, 16, 18* 155:*16, 24* 158:*19* 159:*15* 161:*6, 12, 18, 21* 162:*1* 172:*20* 173:*16, 19* 174:*15* 176:*8* 177:*22* 180:*20* 182:*12* 187:*24* 199:*24* 206:*3* 207:*3, 5* 208:*4, 7, 10* 210:*20* 211:*2, 6, 11* 213:*4* 215:*25* 219:*5* 222:*3* 239:*22, 23* 240:*3* 244:*10* 268:*22* 269:*11* 270:*9, 10* 277:*19, 24* 279:*19* 280:*3, 17* 291:*15, 23* 292:*15* 293:*9, 18* 294:*13*
**awareness** 116:*11* 239:*8*

**< B >**
**B1** 45:*4*
**B-1/B-2** 45:*20*
**B2** 45:*4*
**Bachelors** 16:*2*

**back** 7:*24* 15:*16* 20:*20* 26:*22* 35:*16* 55:*6* 58:*6* 61:*14* 70:*4* 76:*17* 110:*17, 22* 123:*10* 131:*24* 133:*1* 142:*16, 17* 150:*14* 153:*16, 18* 156:*10, 17* 157:*10, 22* 161:*19* 187:*11* 246:*6* 252:*8* 260:*10* 274:*8* 285:*4* 286:*19* 288:*20* 290:*14* 292:*25*
**background** 15:*24* 19:*1* 147:*6*
**Badar** 264:*11*
**badge** 213:*9, 14, 23* 214:*25* 215:*18* 216:*2*
**Baldwin** 17:*11, 14* 40:*17* 66:*24* 67:*1* 197:*2*
**ballpark** 7:*19* 235:*24*
**Baltimore** 20:*1*
**bar** 147:*9*
**based** 20:*22* 71:*4* 144:*20* 168:*24* 195:*15* 209:*14* 230:*17* 244:*12* 246:*24*
**bases** 257:*1*
**basic** 6:*13*
**basis** 26:*25* 27:*3, 6, 19* 58:*11* 66:*10, 15* 67:*2* 71:*9, 19, 24* 72:*6, 18* 73:*5* 74:*7* 81:*13* 125:*6* 183:*15* 211:*18* 215:*7* 221:*16* 242:*24* 243:*2, 22* 249:*12* 258:*18* 261:*5, 25* 263:*1, 3, 15* 266:*3* 267:*13* 269:*5* 270:*23, 24* 282:*6* 283:*2* 284:*1*
**Bates** 228:*10, 11*
**began** 182:*4* 220:*4* 232:*25* 235:*8, 13, 18* 236:*24* 268:*3* 271:*17, 21* 275:*25* 279:*18, 22* 280:*1, 10* 294:*16*

**beginning** 1:*11* 71:*11, 20* 85:*14* 174:*6*
**begins** 213:*11*
**behalf** 1:*11* 2:*3, 14* 3:*3* 103:*17, 24* 115:*17*
**behave** 212:*15, 18*
**behavior** 137:*18, 20*
**behaviors** 136:*14*
**beings** 211:*1*
**belief** 211:*19*
**beliefs** 127:*22, 23* 128:*5*
**believe** 53:*19* 59:*15* 93:*25* 124:*2, 24* 137:*7* 177:*15* 182:*20* 211:*17* 225:*16* 247:*24* 266:*20* 267:*11* 270:*4*
**believes** 58:*24* 73:*18, 19*
**Benjamin** 3:*9*
**best** 80:*24, 25* 86:*2* 194:*18* 198:*21* 209:*15* 218:*25* 226:*19* 238:*17* 241:*5* 288:*1* 292:*14*
**Betar** 276:*24* 277:*9, 16* 294:*7*
**B-E-T-A-R** 277:*1*
**better** 45:*2, 18* 63:*6* 124:*5* 136:*10* 144:*3* 159:*5* 202:*13*
**beyond** 29:*23* 44:*21* 52:*17* 76:*19* 192:*20* 223:*13* 231:*5* 263:*19* 271:*6*
**big** 24:*5* 284:*16*
**bit** 31:*19* 90:*22* 134:*15* 152:*4*
**boarder** 42:*17*
**body** 29:*9* 147:*4*
**Border** 51:*11, 20* 54:*1*
**bottom** 228:*12, 14, 18* 234:*8* 251:*5* 254:*16*
**BOX** 3:*10*
**Boys** 155:*17*
**Brad** 84:*11*

**Bradley** 79:22, 23
185:21 186:14
**branch** 97:8 98:14,
19 163:7, 11
**breadth** 44:4
**break** 6:23, 25 61:2,
12 110:7, 8, 9 132:20
136:8 152:11 153:7,
8, 14 218:15 226:17,
23, 24 227:9, 12
239:14 259:11 260:8
**briefing** 4:19 182:14,
16, 18, 22 183:6
184:21 185:18
186:25 187:7, 14
189:6, 15 193:16
196:17, 19, 20 203:2
238:13 247:17 248:3,
22
**briefings** 182:25
183:11 222:20
247:25
**briefly** 153:18
**bright** 262:16
**British** 255:25 256:2
**Broad** 2:7 11:6, 10
40:21 97:19 98:8
114:25 189:3 190:2,
11 202:2, 3, 11 210:8
220:19 221:4, 5, 8
264:13
**broader** 48:14
**broadly** 127:5
**brought** 218:18
**building** 194:25
195:11
**built** 130:9
**bunch** 248:17
**burden** 74:15 196:8,
12
**Bureau** 35:21, 23
36:16 37:11, 15, 17,
21 38:7 39:14 40:4,
10, 20 41:1, 6 42:1, 6,
11, 16 43:2 59:11
60:18 129:9 165:11,
13 174:10 265:19
**business** 265:7

**< C >**
**calendar** 21:23
**call** 55:13 184:7
**called** 5:21 115:2, 17
255:12
**calling** 161:22
**calls** 14:13 54:11, 22
63:14 76:2 77:25
93:12 95:14 114:6
123:22 140:23
143:21 145:8 146:21
149:20 150:2, 8
154:18, 19 156:2, 3
157:12, 16 162:5
174:12 176:17
178:18 187:17
200:13 203:6 209:4,
11 215:20 242:17
250:3, 4, 7 252:24
256:19 277:4
**campus** 137:13
155:25 157:6, 12
**campuses** 137:14
**Canary** 276:8, 16, 20
277:15 294:8
**candidly** 97:18
**cannote** 16:13
**capacity** 10:10 222:6
**capture** 201:22
**captured** 47:18
134:21, 24 257:6
**captures** 246:15
**CAR** 228:14 251:4
**CAR018** 228:25
**CAR019** 228:25
**CAR023** 251:2
**cards** 30:22 36:2
**career** 201:10
**Case** 1:3 5:9 6:8
8:9, 10, 14 9:6, 15, 23
35:6 64:16 65:7, 20
68:9 124:16 130:17
145:2 169:11 171:5
199:23 207:8, 24
216:8, 11 220:15, 18,
22 221:3, 11 222:6,
13, 16, 21, 24 223:2, 5
224:22 225:17
226:10 243:5 249:3
251:21 252:17 255:4

260:23 264:15
265:18 266:15, 18
267:3, 6, 10, 25 271:3
286:3 287:15 289:15
290:4 292:21 293:8,
22 302:10
**case-by-case** 215:7
283:25
**cases** 67:5 70:19
72:14, 16 169:9
179:15 194:6 269:6
292:9
**CaseViewNet** 1:16
**catch** 48:19 85:14
139:24
**categories** 32:3 44:8,
10
**category** 32:5, 6, 8
44:24 48:15
**Caught** 187:11
**cause** 33:9 74:14
296:13
**CBP** 122:6 278:12,
14
**center** 25:22 26:1
42:4, 9, 21, 24
**certain** 88:5 89:20
91:8 103:16 114:2
137:13 175:10
**certainly** 260:2
**CERTIFICATE**
302:1
**certification** 26:2
**Certified** 4:16 25:20
227:16 228:5
**certify** 302:4
**chain** 11:24 108:19
131:4, 19
**challenges** 145:21
**chance** 157:21 255:9
258:4
**change** 106:14 299:4,
5, 8, 9, 12, 13, 16, 17,
20, 21, 24, 25 300:2, 3,
6, 7, 10, 11, 14, 15, 18,
19, 22, 23 301:2, 3, 6,
7, 10, 11, 14, 15, 18, 19,
22, 23
**changed** 105:11

**changes** 69:25 70:8
105:7 116:23 117:2
118:12, 16 119:3
130:25 238:16
**chants** 146:6, 13
**characterization**
136:7 137:1, 3
**characterized** 104:20
147:21
**CHARETTE** 3:24
**charge** 19:23, 24
107:9 171:24 209:23
237:23 238:12
**Charges** 253:13, 21
**Chaz** 17:12
**chief** 12:14 17:20, 21
52:5, 14 54:6 197:4
**choose** 244:4
**Chung** 267:22
270:10
**Chung's** 267:24
**CIA** 152:23
**circles** 279:13
**circumstance** 8:7
67:15 145:1 169:16,
17 172:6 229:22
**circumstances** 67:10
68:13, 19 69:5 74:22
167:3, 9, 15, 24
170:13, 21 173:17
175:11, 22 215:16
216:1 269:9 284:8,
15, 23 285:8, 10
290:25
**CIS** 59:15 167:1
**citation** 113:25
**cite** 123:2 235:3
**cited** 235:6
**citizen** 33:4 40:12
**citizens** 32:18, 23
50:16, 18 88:5 89:20
91:12 92:7
**Citizenship** 36:19, 25
39:16, 21 40:5 51:17
269:12
**city** 195:6 287:20
**CIVIL** 3:8 24:8
78:11 114:12 115:24
116:3, 7 288:22, 25

289:2

**civilian** 147:5

**claim** 232:5 242:25
243:3

**clarification** 6:22
11:25 36:7

**clarify** 168:8 186:10

**clarity** 152:3

**clause** 127:11, 20
128:8

**clear** 7:14 33:10
63:21 76:1 81:18
95:17 102:11 126:1
151:22 152:25
167:19 169:4 203:18,
24 207:6 225:1
262:6, 25 282:12, 14,
18

**clearer** 123:13

**Clearly** 120:3

**close** 81:11

**clothes** 215:13

**CLTD** 52:1, 3, 7
53:2 61:19

**CNN** 67:21

**Code** 25:14 28:3, 17,
21 29:10, 25 33:7
76:22 161:1, 2

**colleague** 183:21, 23

**colleagues** 13:10
14:5 15:18 190:16
250:24

**collected** 231:19

**college** 137:14 281:4,
9

**colleges** 278:1
280:21, 25

**Columbia** 1:17 2:18
8:6 155:20 256:6

**combat** 100:22
111:13 112:13
114:11 116:9 132:5,
12 137:6 138:12
233:23

**combats** 136:20

**combatting** 132:15
135:19 136:4, 13
137:17

**combining** 133:22

**come** 58:6 68:14
97:5, 6 156:16
181:17 189:5 275:20
276:5 288:20 292:25

**comes** 21:22 25:13
245:25 246:9 257:3
275:3

**coming** 11:4, 14
12:7, 24 13:5, 9 97:5
104:15 284:19

**command** 11:24

**comment** 252:22
253:1

**commentary** 252:13

**commission** 298:17
302:14

**commit** 91:13

**commitment** 99:14,
23 101:1 133:4

**commitments** 21:15

**committed** 92:2

**Committee** 7:24

**common** 173:23
176:11, 22 213:6
291:8

**communicates** 108:5

**communication** 108:1

**communications**
14:14 95:15 154:20
187:18, 21 190:10
203:7, 22 217:3
261:9, 14 262:19
266:1

**compared** 174:7

**compelling** 128:11,
17, 23 230:7, 12

**compiling** 184:23

**complete** 46:5
261:24 273:13, 14, 17,
22 274:4, 18, 23, 25
298:6

**completed** 266:5, 7

**completeness** 274:17

**compliance** 31:3
46:17

**complicated** 141:14
162:18 222:7

**complied** 160:11

**complimentary** 103:9

**compliments** 90:7, 10

**comply** 152:1

**component** 22:5
61:17 219:10, 13, 14,
15

**components** 23:14
61:23 239:1

**Compound** 31:18
96:13

**compromise** 128:11,
17, 22 230:7

**concern** 49:9 207:11,
21

**concerning** 51:8
82:8 228:9 261:8, 10,
14 264:9 281:9

**concerns** 48:10, 22
49:3 50:10 61:19, 24
62:12

**concluded** 297:5

**concludes** 33:17

**conclusion** 57:14
77:25 123:22 135:9
215:21

**conditions** 46:11, 17,
20 127:19

**conduct** 26:2 27:13
90:5 94:11 97:22
99:25 207:22 210:18
214:23 215:3 219:25
220:4 253:4 257:20

**conducted** 69:7
170:10 219:21 220:4

**conducting** 76:15
90:13 91:3 92:3
139:6 184:22 247:25

**conducts** 24:12 27:9
63:1 76:17, 18, 21

**confer** 142:9 280:24

**conferred** 280:20

**confident** 75:15
252:18

**confirm** 160:14

**conflation** 278:16

**confusing** 222:8

**confusion** 76:1

**CONLON** 2:4 4:7
5:25 6:6 9:11 13:17,
21 14:10, 16 25:7
26:14, 17, 21 29:4, 7

31:22 32:25 34:3, 4
37:1 40:1 41:8
49:11 54:14, 25 55:7,
16 57:9, 11 60:22
61:1, 4, 9, 15 63:17,
21, 23 64:4, 10, 18
65:5 70:6, 13 74:5
75:13, 19 76:5 78:1
80:1 81:15 84:3, 5
87:10, 15 88:12, 15,
20 89:4, 9, 14 90:24
92:5, 12, 18, 19 93:8,
19, 24 94:3, 13 95:3,
6, 16, 23, 25 96:15, 19
98:1 99:11, 19 100:8
104:22 105:6, 25
106:7 110:5, 12, 18,
21 111:6 114:22
117:16, 20 118:4
120:9, 13, 22 123:11,
23 124:4 125:18
126:19, 21 132:18, 22
134:16 136:11 139:8
141:1, 3, 5, 10, 23
142:1, 5, 8, 12, 18
143:3, 5 144:2, 10, 19,
25 145:5, 7 146:8, 11,
23 147:7, 13, 18
148:10, 23 149:2, 5,
24 150:12 152:9, 13
153:6, 17 155:1
156:9, 25 157:3, 4
162:8, 25 165:2
170:2 174:14 175:4
176:15, 18, 20 178:21
187:13, 23 188:8, 12,
20 190:3 191:18
192:7, 9 199:9
200:18 202:16
203:17, 23 204:7
209:6, 12 210:15
212:21 213:21
214:13, 18 215:24
216:17 217:6, 14, 21
218:3, 7, 9, 15, 17
221:7, 18 223:21, 25
226:19 227:4, 10, 14,
20, 24 228:1, 2 231:9
232:24 233:8, 15, 18,
19 234:18 237:3, 7,

*14* 239:*11*, *16*, *20*, *21*
240:*4*, *8*  241:*20*, *22*
242:*19*  245:*12*  246:*7*
247:*10*, *13*  248:*8*, *12*,
*15*, *20*  250:*14*, *16*, *21*,
*23*, *25*  251:*8*, *11*
252:*8*, *14*  253:*8*
255:*17*, *18*  256:*21*
258:*25*  259:*10*, *16*, *22*
260:*1*, *11*, *19*  261:*21*,
*24*  262:*18*, *25*  263:*20*
264:*1*, *4*, *5*, *19*  265:*5*,
*9*, *13*, *16*  277:*6*
284:*20*, *22*  291:*21*, *22*
294:*20*  295:*7*, *12*, *14*
296:*4*, *14*
**connection**  27:*14*
31:*1*  54:*16*  74:*24*
85:*4*  102:*2*  143:*7*
170:*11*  203:*4*  205:*19*,
*23*  208:*2*, *6*  252:*16*
277:*20*, *25*  279:*5*
281:*4*, *10*, *16*
**connotates**  101:*18*
**consequence**  130:*14*
**consequences**  125:*1*
130:*23*
**consider**  219:*15*
274:*2*
**considerable**  135:*22*
**consideration**  184:*25*
**considered**  159:*14*
160:*16*  175:*25*  176:*2*
*15*:*13*
**consistent**  133:*7*, *19*
135:*13*
**consistently**  151:*6*
**construct**  25:*13*
**Consular**  35:*22*, *24*
36:*16*  37:*12*, *17*, *21*
38:*7*  39:*14*  40:*4*, *10*,
*20*  41:*1*, *6*  42:*2*, *6*, *16*
43:*2*  59:*11*  60:*18*
129:*10*  165:*12*, *13*
174:*10*  265:*20*
**contact**  56:*13*, *19*
238:*5*  276:*11*
**contacted**  291:*1*
292:*19*
**contain**  246:*1*, *3*, *9*,
*12*  273:*19*

**contained**  81:*3*, *7*
228:*8*  232:*9*  243:*15*
244:*13*
**contains**  191:*12*, *21*,
*23*  273:*18*
**content**  100:*14*
261:*3*, *6*  266:*7*, *11*, *22*
272:*24*  273:*2*, *5*, *7*
**contents**  192:*2*
**context**  47:*5*  68:*3*
75:*25*  150:*9*  151:*15*,
*17*, *18*, *21*, *22*  179:*8*
**contingent**  34:*22*
**continue**  105:*4*
119:*22*  260:*12*
**Continued**  3:*1*
**continuing**  230:*6*
**contractors**  280:*11*
**contrary**  28:*5*  185:*3*,
*6*, *10*  187:*8*, *15*, *25*
188:*4*, *22*  199:*2*
**contributed**  115:*1*, *4*
**convened**  195:*19*
**conversations**  14:*3*,
*25*  225:*7*, *13*  293:*23*
**convey**  130:*3*
**conveyed**  53:*9*  280:*4*
**conviction**  286:*1*
**convictions**  285:*17*
**coordinate**  35:*2*, *8*
36:*10*, *20*, *22*  40:*11*,
*20*  52:*1*  59:*2*, *9*  72:*1*,
*8*, *13*  73:*23*  75:*9*
293:*12*
**coordinated**  35:*9*
72:*10*
**coordinates**  35:*19*
37:*22*  38:*6*  39:*17*
40:*3*, *9*  41:*5*, *25*  43:*2*
52:*7*  59:*5*, *13*
**coordinating**  41:*1*
**coordination**  34:*22*
51:*24*  58:*2*  60:*10*
72:*21*  75:*4*  91:*5*
125:*12*  159:*14*
160:*17*  168:*25*
171:*24*  283:*21*
293:*15*
**copies**  245:*14*
246:*17*, *20*

**copy**  100:*3*  110:*14*
111:*16*  123:*15*
157:*13*  226:*6*, *14*
227:*15*, *17*  229:*19*
296:*22*
**corner**  253:*18*
**cornerstone**  135:*22*
137:*22*, *24*
**Correct**  18:*2*  21:*14*
22:*2*, *6*  24:*4*, *20*  25:*3*
29:*22*  32:*7*  35:*4*
39:*22*  40:*2*  48:*24*
49:*4*  50:*2*  55:*21*
60:*17*  65:*21*  70:*16*,
*25*  77:*8*, *23*  78:*12*
87:*7*, *21*  88:*6*  96:*12*,
*24*  97:*10*  98:*11*, *16*,
*17*, *21*, *22*  99:*2*, *7*
100:*17*, *23*  101:*9*
107:*4*  109:*11*  111:*25*
112:*21*  113:*2*  114:*3*,
*11*  117:*23*  119:*10*
120:*6*  121:*21*  123:*4*
124:*10*  125:*2*, *24*
126:*6*, *9*  131:*25*
135:*16*  137:*10*  138:*5*,
*19*, *23*  145:*19*  147:*24*
148:*5*  149:*19*  151:*9*,
*10*  153:*4*, *5*  158:*9*
164:*2*, *7*, *22*, *24*
168:*20*  171:*14*
175:*13*  176:*4*  179:*6*
183:*18*  185:*7*, *11*, *15*
186:*4*  192:*12*  195:*9*
198:*1*, *15*  207:*14*
208:*13*  216:*23*
225:*15*  227:*25*  229:*4*
232:*12*  234:*21*
240:*17*  242:*14*, *25*
254:*13*, *16*  256:*7*, *10*,
*24*  257:*2*  268:*4*, *9*, *16*
269:*18*  270:*1*  271:*4*
272:*8*  273:*19*  277:*10*,
*13*  279:*7*  282:*23*
285:*24*  286:*13*  288:*9*
289:*14*  293:*24*, *25*
298:*5*  302:*5*
**corrected**  250:*24*
**corrections**  298:*7*
**correctly**  17:*25*  31:*17*

**COUNSEL**  2:*1*  3:*1*
5:*17*  10:*20*, *23*, *25*
12:*10*, *14*, *17*, *18*, *19*
34:*24*  74:*17*  126:*15*
141:*22*  159:*15*
160:*17*  161:*4*  302:*9*
**count**  261:*13*
**counter**  36:*15*  43:*6*,
*8*, *15*, *19*  44:*11*  45:*13*
46:*1*, *9*, *21*  47:*9*, *13*,
*19*, *21*, *25*  48:*8*, *20*
49:*1*, *7*, *15*, *20*, *24*
50:*5*, *16*  51:*3*  197:*6*
**Countering**  19:*13*
23:*11*  62:*1*, *2*, *14*
84:*25*
**counterpart**  184:*12*,
*14*
**country**  138:*12*
**couple**  44:*25*  62:*20*
268:*15*
**course**  10:*13*  46:*6*
55:*3*  89:*25*  120:*13*
201:*10*  208:*13*
212:*15*  287:*3*
**COURT**  1:*1*  5:*9*, *13*,
*14*, *16*, *18*  6:*15*  7:*13*
9:*16*  10:*2*  36:*22*
77:*19*  79:*23*  84:*2*
87:*8*, *14*  88:*16*  95:*1*
99:*17*  110:*20*  114:*20*
141:*2*  146:*7*, *9*
168:*14*  169:*24*
188:*10*  216:*14*
217:*17*  221:*6*  233:*13*,
*16*  239:*19*  255:*15*
260:*16*  262:*5*, *17*
263:*10*, *11*  268:*12*
284:*19*  296:*13*, *25*
302:*21*
**COURTNEY**  2:*5*
**cover**  44:*1*  48:*14*
82:*17*  160:*8*  191:*23*
260:*13*
**covered**  54:*12*, *23*
55:*13*  82:*11*  192:*3*
260:*24*  263:*7*  264:*22*
**covers**  44:*5*
**create**  97:*13*  200:*11*
201:*5*, *9*, *14*

created  54:9, 20
55:9  98:24  112:6
127:1  201:3  251:16
287:7  290:3, 8
creates  234:13
creation  20:18
137:23  200:7, 12
credentials  213:12
215:18  216:3
credibility  10:3
credible  10:7
crime  23:12  42:4
62:2, 15, 22  84:25
crimes  42:5, 9, 18, 19,
21, 24
criminal  24:12, 17, 19,
24  25:1, 9, 17, 20, 23
26:3, 23, 25  27:3, 5, 7,
16, 22  31:14  32:20,
22  34:11  35:1  65:17
76:11, 12, 16, 20, 21
77:16, 17, 22  82:3
90:9  103:7  110:4
114:13  115:25
151:22  152:2  165:17
198:10  288:21, 24
criteria  273:11
criticism  113:21
cross  21:23  30:5, 6,
7, 10
CTLD  51:6, 7, 9
53:6, 9, 25  54:4, 8, 16,
20  55:10, 17, 24  56:5,
10, 14, 20  57:1, 3, 12,
16, 21  58:15, 16, 23,
25  59:5, 9, 13  60:8,
20  61:20, 25  63:1, 9,
12, 24  65:25  66:8, 14,
19  67:1, 5  68:9
69:12, 21  70:8, 16, 19,
22  78:17  80:10, 15
CTLD's  65:23  70:1
CTLDU  59:2
curb  114:10
current  9:7, 17  16:3
20:23  52:22  127:21
currently  19:3  210:4
238:18
curve  116:8

Customs  25:16
27:23, 24  28:8, 18, 22
29:1, 8, 15, 22  30:1, 2,
3, 4, 11, 14  42:17
51:11, 19  53:25
Cyber  23:10

< D >
D.C  1:15  5:12  9:16
10:2  20:22  21:3
194:22  195:7
Daniels  12:13
date  5:3  21:21
44:20  46:16  159:22
160:5  201:23  254:19
298:11, 20
dates  21:5
Davis  17:12, 19, 21
day  21:22  94:1
168:23  206:4  248:3
298:16  302:13
daylight  5:4
days  21:17  159:22,
24  160:4
day-to-day  179:15
DC  3:11
deal  55:6  124:12
deals  122:4
decide  173:12  209:8
216:18  272:20
273:12
decided  107:6
187:25  188:3, 21
211:15, 19  219:2
decides  162:9  171:4
deciding  162:3
173:20
decision  107:24
143:16  164:4  168:23
169:2  172:9, 12, 13
175:15, 18  177:3, 4
209:2, 19  210:5
215:6  261:10  263:3
269:24  289:5, 7, 10
decision-maker  171:9
decision-making
269:16
decisions  172:20
210:12  217:4  262:13

269:6
deck  187:3
declarant  8:8, 19, 21,
23
Declaration  4:13
71:5, 10, 20, 25  72:7
77:13  78:10  86:3
99:13  100:4, 10, 14
102:17  110:22
111:24  125:22  126:3
132:23  133:14, 18
138:17
deemed  50:13  59:3
149:17
Defendants  1:6  3:3
Defense  35:15  51:14,
20  54:1  59:6
defer  138:8  161:2
166:9  215:4  242:10
deferred  171:23
defined  103:1
definition  166:8
198:23
degree  14:13  16:2
64:23  104:6, 12, 20
139:5  156:3, 23
187:20  191:12, 16
200:14  203:6  214:5
215:20
delegated  172:14
deliberations  144:18
deliberative  95:13
144:9, 16  154:20
156:6  178:19  187:18,
21  191:13, 16, 22
203:6  217:3  250:6
263:7
delineates  69:12
deliverables  159:16
demand  67:3, 4
demonstrate  146:18
demonstration  146:1,
6, 13
denied  137:13
denote  1:22
depart  45:6, 10
166:14
DEPARTMENT  3:7
9:7, 18  11:13  12:6,
15, 22, 24  13:4, 11, 13

269:6
14:6, 7  15:19  16:7,
14, 18  19:6, 15  20:7,
9, 14, 18  25:18  35:3,
10, 12, 13, 16, 18, 21
36:4, 6, 10, 13, 24
37:3, 4, 12  39:6, 8
41:16, 19  42:6, 12, 14,
15  44:9, 18  51:14, 16,
20  53:21, 25  54:1
57:5, 22, 25  59:6, 7, 8
60:11, 14  72:2, 9, 11,
13, 20, 22  73:1, 6, 12,
23  74:9, 21, 23  75:5,
10  101:17  104:25
114:3, 7, 15  115:7, 11,
19  116:1, 20, 24
117:4, 10  119:1, 5, 9
122:7  129:5, 6, 7, 15,
18, 21  130:2, 6
137:24  153:3, 22
158:20, 24  159:9, 10
160:6, 10, 25  161:7,
13, 22  162:4, 9, 13, 17
163:2, 13, 17, 20
164:1, 5, 11  165:7, 9
166:9, 13  167:25
168:12  171:13
173:11, 20  174:3, 17,
24  175:6, 12, 24
176:1  178:4  179:17
184:1, 3, 6, 10, 12, 14,
19  190:16, 18  192:12,
15, 19, 24  199:11
216:12, 15, 19, 21
219:16, 22  223:6, 10
224:15, 23  225:8, 13,
23  231:16  233:2
238:2, 23  243:8, 17
244:2, 5, 9  249:25
251:16, 18  253:24
254:1, 6, 9, 20, 24
261:4  263:2  264:10,
11, 18  265:19  268:24
272:2, 6, 12, 21  275:9
281:24  283:11, 15
290:8, 13  291:1, 12,
16, 25  292:1, 16, 24
293:5  294:4
departmental  12:18,
19  159:14  160:17

**departments** 35:*14*
51:*15* 159:*12* 160:*18*
161:*3* 163:*6*
**department's** 161:*24*
**departure** 52:*24*
**depend** 58:*8* 101:*15*
209:*18*
**dependent** 151:*8*
**depends** 34:*18* 58:*2*
68:*21*, *22* 101:*14*
107:*13* 165:*5* 168:*13*
209:*17* 227:*5* 285:*8*
290:*16*, *23*
**DEPONENT** 298:*1*
**Deportability** 253:*13*,
22
**deportable** 232:*15*
**deportation** 120:*6*
**depose** 296:*3*, *7*
**deposition** 1:*10* 5:*5*,
*11* 6:*10* 7:*14* 13:*20*
253:*4* 295:*18* 297:*5*
299:*1* 302:*4*
**Deputy** 11:*19*, *25*
12:*13*, *14* 17:*15*, *17*
19:*13* 39:*3*, *4*, *9*
40:*16* 66:*23* 79:*21*
85:*17* 185:*20*, *21*
186:*16*, *19* 197:*1*
204:*10*
**derived** 25:*15*
**Derrick** 18:*8* 185:*22*
186:*18* 204:*11*
**describe** 64:*19* 71:*5*
77:*1*, *13* 86:*10*
105:*20* 187:*7*, *14*
245:*13* 291:*7*
**described** 71:*10*, *19*,
*25* 72:*7* 78:*10* 126:*3*
184:*20* 203:*14*
225:*21* 257:*10* 274:*7*
290:*1*
**describes** 190:*5*
**description** 245:*18*
247:*3* 273:*16*
**desiderata** 262:*13*
**designate** 30:*5*, *6*, *8*,
*10*
**designated** 147:*2*

195:*25* 241:*11*
**designates** 30:*3*
**designation** 296:*20*
**desk** 68:*15*
**Destruction** 19:*14*
**detail** 19:*5*, *10*, *21*
**detailed** 19:*18* 280:*5*
**detained** 283:*10*
**detaining** 164:*10*
284:*10*, *25*
**Detection** 59:*16*, *18*
**detention** 24:*9*
172:*25* 261:*18*
283:*13*, *18*
**determination** 10:*2*, *6*
34:*6*, *7* 45:*7* 57:*21*
73:*5* 125:*14* 130:*3*,
*17*, *21* 131:*8* 147:*23*
151:*13* 154:*16*
207:*24* 230:*16*
232:*14* 233:*10*
**determinations** 122:*5*
144:*12* 217:*4* 262:*1*
**determine** 90:*4* 94:*6*,
*17* 97:*20* 128:*4*
131:*14* 134:*23* 135:*5*
140:*18* 143:*14*, *16*
191:*20* 272:*17* 274:*3*
287:*16*
**determined** 144:*5*
233:*21*
**determines** 128:*10*
288:*16* 289:*1*
**determining** 58:*12*
**developed** 199:*1*
**Development** 43:*7*, *9*,
*16*, *20* 44:*12* 45:*14*
46:*2*, *10*, *21* 47:*9*, *14*,
*22* 48:*1*, *9*, *20* 49:*2*, *8*,
*16*, *21*, *25* 50:*5*, *17*
197:*7* 280:*23*
**DHS** 154:*7* 178:*4*
182:*10* 220:*15*, *20*
230:*17* 234:*23* 238:*2*,
*6* 239:*3*, *23* 241:*10*
242:*6* 252:*15* 268:*23*
**DHSgov** 240:*21*
241:*1*
**DHSs** 157:*7*, *8*

**DHS's** 4:*16* 154:*16*
240:*1*, *12* 241:*1*
**difference** 24:*14*
25:*9*, *12* 26:*7* 74:*12*
102:*19* 166:*17*
**different** 24:*10*
38:*18* 42:*20* 44:*24*
45:*1* 50:*1* 70:*24*
92:*16* 100:*20* 101:*21*
113:*15* 126:*20*
148:*11*, *19* 242:*5*
247:*9* 294:*5*
**difficult** 148:*22*
149:*3*, *4*
**digitally** 100:*16*
178:*6*
**diminish** 207:*7*
**DIRECT** 4:*6* 17:*8*
74:*19*
**directed** 81:*17*
**Directing** 121:*15*
**direction** 302:*8*
**directive** 105:*2*
114:*16* 116:*25* 127:*5*
**directives** 140:*2*
153:*2*
**directly** 12:*3* 122:*20*
**Director** 11:*20* 12:*1*
16:*4*, *5*, *13* 17:*15*, *18*
18:*12*, *14*, *20* 40:*16*
66:*23* 79:*14*, *21* 84:*7*
85:*12*, *17* 96:*18*, *21*
108:*16* 131:*2* 185:*19*,
*20*, *22*, *23* 186:*13*, *17*,
*20*, *22*, *23* 197:*1* 204:*11*,
*15* 209:*25* 210:*1*
226:*1*
**directory** 56:*3*, *6*, *23*
**directs** 103:*14*
119:*17* 158:*13*
**disagree** 93:*10* 296:*5*
**disagreement** 55:*1*
**disclose** 203:*20*
**discovery** 295:*16*
296:*6*
**discretion** 75:*6*
169:*13* 209:*9*, *16*
**discrimination** 137:*10*

**discuss** 13:*1* 15:*21*
145:*2* 222:*12*, *16*
271:*18* 293:*16*
**discussed** 125:*4*
126:*8* 180:*5* 184:*9*,
*11*, *17* 189:*21* 222:*21*
261:*12* 266:*12* 268:*6*,
*8* 270:*7* 279:*9* 283:*3*
**discusses** 114:*1*
157:*12* 251:*22* 272:*1*,
*5*
**discussing** 39:*13*
148:*16*, *18* 180:*2*
205:*20* 206:*17*
226:*21*
**discussion** 86:*11*, *18*
142:*14*
**discussions** 66:*17*
95:*19* 161:*21* 162:*2*
223:*4* 293:*19*
**dispositive** 147:*23*
**disruptive** 230:*20*
231:*1*
**dissipate** 206:*11*
**distinct** 41:*21* 48:*3*
159:*7* 257:*15* 268:*9*
**distinction** 288:*23*
**DISTRICT** 1:*1*, *17*
5:*8*, *9* 8:*6* 9:*16* 58:*4*
168:*14*, *24* 169:*2*, *6*,
*10* 263:*11*
**Divest** 155:*21* 256:*7*
**divestment** 150:*3*
**DIVISION** 3:*8* 16:*6*,
*24* 17:*2*, *5* 18:*15*
23:*1*, *3*, *5*, *16*, *21*
35:*18* 36:*4*, *9* 37:*4*
40:*24* 41:*5*, *11*, *17*, *19*,
*22* 42:*1* 43:*1* 61:*17*
62:*3*, *18* 80:*20*, *22*
84:*24* 85:*1*, *4*, *9*
117:*19* 118:*7*, *8*, *11*,
*17* 164:*4* 173:*5*
180:*21* 186:*2* 196:*1*,
*4*, *5*, *21*, *24* 197:*11*, *15*
219:*16* 221:*2*, *10*, *20*
222:*5*, *14*, *18* 239:*2*
**divisions** 23:*8*, *19*, *22*
61:*22* 105:*24* 118:*13*,

*25* 119:*4* 186:5

**divulge** 65:*1*

**docket** 168:*14* 169:*12*

**document** 1:*22* 56:8,
*12* 63:*9*, *12*, *24* 64:6,
*13* 88:*9*, *11*, *21*, *22*
89:*4* 100:*9* 111:8
120:*17*, *25* 126:*18*
136:7 157:*24* 158:*1*
171:*1* 190:5 202:*17*,
*25* 206:2 227:*22*
228:*4*, *15*, *19*, *24*
229:*16*, *20* 230:5
234:*8* 240:5, *10*
247:*9*, *15* 248:*1*, *19*
249:7 251:*13*, *15*, *19*
252:6, *13*, *16*, *23*
253:*10*, *16*, *21* 254:5,
*14* 255:*8* 258:5, *6*, *18*,
*20*, *23* 259:6

**documentation** 54:*9*,
*15* 189:*24* 199:*20*

**documented** 67:*18*
68:7

**documents** 15:*13*
64:*1* 180:*23* 181:*9*
199:*25* 201:*24* 202:2,
*7*, *11* 228:8, *9* 254:*10*
266:*11* 282:*21*
295:*17*

**doing** 103:*9* 117:5
152:*16* 288:*1*

**domestic** 23:*12*

**DOS** 238:6

**doubt** 194:*3*

**doxxed** 207:*9*, *20*
208:*1*, *5*, *8*, *12* 211:*1*

**drafted** 116:*20*

**draw** 121:*9* 228:7
244:*18* 248:*4* 262:*11*

**Drive** 2:*19*

**driven** 138:*3* 207:*21*

**duck** 259:*16*

**duly** 5:*22*

**duty** 30:*25* 31:*14*

**< E >**

**E.O** 86:5 87:*3*, *5*
89:*21* 91:*9* 92:6
93:*1* 94:7 96:*3*, *7*, *23*

97:5 99:*15*, *18*, *21*, *23*
101:2, *8*, *21*, *22* 102:2,
*17* 105:22 110:*14*
133:*4*, *8*, *11* 134:*11*,
*13* 135:*14*, *20* 136:*18*
137:2, *4*, *6*, *8* 140:*20*
153:*24* 154:*17*
157:*10*, *17* 158:*21*
199:2

**E.O.s** 163:*16* 188:*1*, *4*

**E.O.'s** 153:*18*
157:*10* 188:22

**earlier** 17:*24* 64:*12*
76:*18* 85:*1* 86:*4*
122:*19* 123:*3* 132:*3*
135:*11* 139:*12*
157:*11* 178:*13*
183:*20* 210:25
257:*13* 269:*3* 272:*9*
279:*15* 280:*14*

**earliest** 208:*19*

**easier** 27:*18* 154:*13*
246:*22*

**easily** 88:*11*

**Eastern** 5:*4*

**easy** 250:*15*

**eat** 296:*15*

**Echo** 79:*24*, *25*

**Eddy** 108:*16*

**education** 16:*1*
119:*20* 157:*17*
158:*16* 159:*10*

**educational** 281:*14*

**effect** 90:*18* 91:*1*
288:*8*

**effectuate** 285:5

**effectuated** 283:*24*
288:*17* 289:*17*

**effectuates** 163:*18*

**effectuating** 172:*25*
179:*4* 206:22 207:*1*,
*4*

**effort** 90:8, *11*
102:*24* 105:5, *8*
117:*11* 139:*21* 154:7
179:*19*, *24* 180:*14*
181:2, *12* 184:*11*, *16*

**efforts** 113:*1* 116:*24*
152:*1* 153:*21* 159:*13*,

*15* 161:*9*, *16*, *24*
200:8

**either** 14:5 48:7
83:9 126:5 155:*13*,
*19*, *23* 247:5 248:22
256:9 286:*3*

**elaborate** 161:*3*

**electronically** 63:*25*
179:*12*

**e-mail** 56:*15* 87:*9*
129:*21* 130:5 190:*13*
192:*21* 223:*1* 295:*15*

**e-mailed** 229:25

**e-mails** 190:*15*, *17*
222:*24*

**Embassy** 255:25
256:2

**employed** 302:*9*

**employee** 39:7
183:*25*

**employees** 17:*4*
80:*14* 183:*3* 184:*3*
280:*9*

**enact** 168:*16*

**encompass** 97:2

**ends** 228:25

**enforce** 99:9 101:*13*
103:5 122:*1*, *14*

**Enforcement** 22:*16*
24:2, *6*, *8* 25:*13*, *22*
26:*1* 30:*13* 32:*21*
33:*19*, *22* 54:*12*, *23*
55:*14* 63:*15* 64:*8*, *23*
81:*14* 101:8 112:*20*
116:*24* 118:*17* 119:*4*
122:*15* 139:6 140:*25*
141:*17* 142:*20*
143:*15*, *21* 152:*17*
154:*21* 156:4 161:*9*,
*15*, *24* 162:*3*, *10*
163:*1*, *12* 172:*16*, *22*,
*23* 173:*25* 178:*25*
179:*3* 203:8, *9* 207:8
213:*11* 214:8 217:*4*
245:*11* 250:7

**enforces** 102:*18*
103:7 111:*24*

**enforcing** 99:6, *9*, *15*,
*17*, *23* 101:2 122:*3*

133:*4*

**engaged** 47:*18* 232:6

**engaging** 295:*15*

**enter** 104:*13*

**entered** 125:5

**entire** 136:22

**entirety** 195:*16*
226:*12*

**entities** 59:*4* 256:*16*
278:*13*

**entity** 59:*3* 256:8

**entry** 122:5 124:22
127:*19*

**E-O** 87:*11*

**equally** 101:*12*

**equivalent** 108:*20*, *21*

**ERO** 24:2 25:*1*, *11*,
*24* 26:9 215:5
288:*12*, *18* 289:*3*, *17*

**errata** 298:8 299:*1*

**Espionage** 47:*12*, *15*,
*20*

**espousal** 94:*17*

**espouse** 91:*14*, *17*
92:8, *22*, *25* 93:*3*, *11*
94:*23* 95:*10* 96:2
97:*18* 98:7, *21*, *25*

**espoused** 94:6

**espousing** 147:*3*

**ESQUIRE** 2:*4*, *5*, *15*,
*16* 3:*4*, *5*, *6*, *23*, *24*

**essential** 78:*4*

**essentially** 114:*9*
131:*3* 168:*11*

**establish** 93:*15*

**estimate** 7:*19* 183:*14*
197:*13* 268:*18*
292:*15*

**estimation** 249:*23*

**ET** 1:*3*, *6* 5:*7*, *8*

**Etter** 79:22, *24*
185:*21* 186:*14*

**event** 11:*17* 13:2
67:*17* 68:7, *8*

**Everest** 1:*23* 5:*13*, *15*

**EVERLY** 3:*23*

**everybody** 247:*11*

**everyone's** 294:22

**evidence** 89:5, *8*
97:25 129:*17*, *24*

237:*12*  244:*19*, *21*
246:*1*, *10*

**exact**  1:*22*  7:*17*
292:*7*

**exactly**  177:*16*  225:*3*

**EXAMINATION**  4:*2*,
*6*  5:*24*

**examined**  5:*22*  298:*4*

**example**  28:*8*, *15*
45:*16*, *25*  46:*3*  67:*14*
115:*2*  137:*8*  144:*20*
148:*2*  149:*25*  164:*9*
206:*24*  245:*2*  246:*21*
274:*10*

**examples**  28:*10*, *23*
45:*1*  62:*21*  68:*2*
136:*19*  137:*5*  144:*4*,
*15*  151:*20*

**exceed**  250:*12*

**Exceptions**  127:*11*

**Excerpt**  4:*15*  120:*17*
121:*4*, *12*

**exchange**  9:*21*, *24*
31:*5*, *8*, *16*  32:*1*

**exchanged**  190:*9*

**excited**  267:*18*

**excludable**  127:*18*

**exclusively**  43:*20*

**excuse**  84:*11*

**execute**  65:*14*

**executed**  65:*12*
283:*18*  284:*11*  285:*1*

**executing**  164:*8*

**Executive**  4:*12*, *14*
12:*1*  13:*8*  18:*11*, *14*,
*19*  86:*4*, *6*, *15*  87:*12*,
*16*, *18*  88:*3*, *25*  89:*2*,
*15*  90:*1*, *5*, *7*, *19*  91:*3*,
*21*  94:*22*  95:*9*  96:*17*,
*21*, *25*  97:*8*, *9*, *14*
98:*14*  99:*4*, *7*  100:*21*
101:*12*  102:*20*, *24*
103:*5*, *10*, *13*  105:*9*
107:*7*  110:*6*  111:*12*,
*16*, *24*  112:*4*, *8*
113:*14*  114:*1*, *7*
115:*13*  116:*13*, *16*, *17*
117:*6*, *7*, *12*, *13*, *22*
118:*1*, *14*, *18*, *22*
119:*8*  125:*9*  126:*12*,

*16*  131:*1*, *23*  132:*10*,
*19*  134:*21*, *24*  136:*1*
141:*19*  142:*24*  150:*5*
152:*1*  157:*25*  160:*6*
161:*6*, *12*  163:*11*
169:*8*  179:*23*, *25*
180:*1*, *4*, *9*, *17*  181:*3*,
*12*  182:*14*, *16*, *22*, *25*
183:*11*  184:*21*  185:*4*,
*6*, *10*, *14*, *17*, *22*, *23*
186:*19*, *22*  187:*8*, *15*
203:*2*  204:*14*  205:*19*
206:*5*  225:*25*  239:*7*,
*9*

**exercise**  15:*8*

**exercising**  15:*11*

**Exhibit**  4:*12*, *13*, *14*,
*15*, *16*, *19*  88:*18*, *19*
89:*5*, *10*, *11*, *16*, *19*
100:*6*, *7*  102:*14*, *15*,
*16*, *21*  103:*11*, *12*
104:*1*  110:*22*  111:*5*,
*19*  118:*2*  119:*13*
120:*21*, *24*  123:*19*
125:*10*, *24*  127:*10*
131:*24*  132:*24*
153:*25*  154:*3*, *17*
157:*11*, *22*, *25*  158:*3*
180:*7*, *11*  227:*19*, *23*
240:*7*  247:*12*, *16*
250:*20*  251:*1*

**exhibits**  1:*19*  4:*9*, *11*

**exist**  73:*16*  125:*7*
145:*21*  169:*16*
257:*15*

**existence**  168:*21*

**existing**  90:*8*, *11*
133:*6*, *19*  134:*8*
145:*2*

**exists**  56:*4*, *25*

**expect**  52:*6*  131:*18*
158:*25*  174:*9*  293:*23*

**expectation**  115:*9*

**expected**  63:*5*  127:*21*

**expedite**  88:*8*  93:*22*,
*25*  120:*15*

**experience**  167:*3*, *8*
172:*9*  178:*14*  209:*14*
254:*22*  255:*1*

**expert**  161:*4*  165:*7*,
*10*  183:*4*

**expertise**  183:*8*

**expiration**  44:*20*
45:*10*, *11*  46:*16*

**expires**  298:*17*
302:*14*

**explain**  28:*20*  29:*5*
165:*3*  170:*5*  279:*9*

**explains**  138:*21*
171:*2*

**explanation**  13:*19*

**exploit**  91:*15*

**explore**  103:*2*

**exposes**  139:*5*

**expressly**  149:*16*

**extent**  77:*25*  95:*14*
118:*5*  135:*15*  143:*23*
154:*19*, *22*  187:*17*
213:*1*  226:*21*  233:*6*
263:*4*

**extreme**  148:*2*


**< F >**

**face**  275:*16*  290:*25*

**faced**  137:*9*

**facing**  167:*4*

**fact**  74:*18*  144:*20*
150:*15*  151:*7*  203:*19*
205:*15*, *18*, *23*  206:*4*,
*8*, *12*

**factor**  286:*4*

**factors**  285:*13*

**facts**  97:*25*  232:*5*
237:*11*

**factual**  129:*17*

**Faculty**  155:*10*
277:*25*  281:*9*, *16*

**failing**  45:*9*

**failure**  46:*5*

**faint**  240:*24*

**Fair**  16:*22*, *25*  24:*25*
32:*13*  38:*22*  46:*18*
64:*15*  95:*23*, *24*
111:*16*  113:*13*  119:*7*
121:*11*  138:*1*  149:*13*
151:*5*  201:*17*  229:*6*
236:*20*  238:*11*
256:*11*  262:*8*  269:*14*,

*23*  270:*14*, *22*  289:*22*

**fairness**  100:*3*

**Falcone**  52:*5*, *6*  54:*6*
55:*23*  63:*4*  66:*8*, *13*,
*20*  197:*5*

**Falcone's**  52:*10*

**fall**  38:*14*  45:*6*
83:*13*  148:*15*  149:*14*
153:*23*  203:*13*
273:*24*

**falling**  46:*16*

**falls**  28:*18*  83:*9*
90:*5*  97:*20*, *22*
140:*19*  141:*13*
154:*17*

**familiar**  82:*10*, *16*
86:*6*, *15*  87:*2*  119:*22*,
*24*  121:*23*  126:*7*
155:*2*, *9*  166:*1*  170:*4*
205:*14*, *17*  211:*14*
216:*6*  229:*21*  232:*4*
233:*25*  234:*12*  240:*1*,
*25*  247:*19*, *20*  249:*1*,
*4*  254:*4*  255:*6*, *21*
256:*8*  266:*14*  267:*3*,
*6*, *24*  269:*9*, *15*, *20*
276:*8*, *24*  294:*10*, *11*,
*13*

**familiarity**  256:*1*
290:*2*, *6*  294:*19*

**familiarizing**  119:*19*
158:*16*

**family**  207:*10*

**far**  37:*16*  98:*23*
111:*15*  138:*13*
160:*10*  245:*6*  283:*16*

**farther**  20:*21*  285:*4*

**fast**  151:*2*

**faster**  88:*14*  110:*13*

**fault**  158:*5*

**FDNS**  59:*14*, *24*
60:*2*, *5*

**federal**  25:*21*, *25*
27:*10*  28:*3*  32:*11*, *15*,
*22*  33:*17*, *18*  34:*8*
42:*11*  76:*19*  161:*1*
213:*10*

**feel**  110:*5*  252:*18*

**feels**  61:*5*  202:*21*

**Felony** 285:*17*
**fewer** 292:*14*
**field** 20:*1* 50:*3*, *13*, *19*, *21* 57:*18*, *20* 58:*4*, *7*, *12*, *17* 59:*1* 171:*7*, *9* 172:*13*, *18*, *21* 200:*4* 209:*21*, *22*, *24*, *25* 210:*1*, *6*, *13*, *17* 286:*10*, *12*, *14*, *25* 287:*4*, *16*, *21*, *24* 289:*11*, *12*
**fifth** 261:*9*
**Figel** 1:*13*
**fight** 156:*15*
**file** 54:*20* 55:*8*, *9*
**final** 171:*9* 274:*22*
**financial** 302:*11*
**find** 103:*14* 113:*25* 138:*25* 139:*1*, *9*
**finding** 170:*15* 179:*10*
**findings** 246:*15*
**finds** 230:*6*
**fine** 55:*18* 61:*5* 84:*13* 87:*14* 142:*2* 173:*11* 264:*3*
**finish** 30:*7* 63:*18* 71:*16* 132:*20* 226:*20* 253:*25*
**finished** 43:*11* 69:*3*
**firearms** 285:*18*
**firm** 6:*7*
**FIRST** 2:*17* 5:*21* 91:*9* 93:*15* 111:*2*, *4* 114:*4* 122:*19*, *25* 136:*10* 138:*25* 156:*10* 159:*19* 160:*1* 189:*6*, *15* 219:*2* 224:*1*, *4*, *19*, *21*, *22* 225:*4*, *12* 229:*10*, *11* 261:*3* 268:*15*
**five** 23:*14* 262:*15* 265:*8* 268:*6*, *8*, *9*, *12*, *13* 270:*3*, *6*, *19* 271:*3*, *10*, *14* 284:*4* 286:*15* 289:*16* 292:*20*
**Floor** 2:*8*
**fluid** 21:*19*
**flyers** 245:*3*

**focus** 43:*16* 70:*23* 106:*13* 135:*23* 161:*8*, *14*, *23* 260:*22*
**focused** 27:*12* 70:*25*
**focuses** 42:*17* 43:*10* 46:*22* 47:*14* 48:*9*, *21* 138:*2*
**folks** 32:*7* 52:*21*
**follow** 91:*2* 105:*20*
**followed** 284:*10*, *25*
**following** 262:*17*
**follow-on** 293:*23*
**follows** 5:*23*
**font** 228:*15*
**food** 150:*20*
**foregoing** 298:*4* 302:*4*, *5*
**foreign** 71:*4*, *9*, *19*, *24* 72:*6*, *19* 77:*12*, *21* 78:*9*, *18* 79:*2* 84:*20* 85:*5* 86:*25* 87:*19* 122:*11* 124:*25* 125:*20* 126:*4*, *8*, *13*, *23* 127:*7*, *9* 128:*12*, *17*, *23* 130:*11*, *14*, *23* 131:*10*, *11*, *13*, *14* 132:*11* 135:*23*, *24* 137:*21* 138:*14*, *16* 143:*10*, *11* 144:*7* 145:*10* 146:*19* 147:*2* 148:*3*, *13* 149:*8*, *10*, *13*, *16*, *18* 150:*18*, *24* 151:*3* 165:*21* 230:*8*, *13* 232:*15* 235:*3*, *6* 257:*2*, *9*, *25* 258:*11* 282:*1*, *6*
**foreigners** 124:*9*
**forget** 163:*15*
**forgetting** 131:*20*
**forth** 91:*3* 98:*24* 103:*19*, *25* 133:*7*, *10*, *20* 135:*14*
**forward** 73:*4*, *8* 100:*4* 226:*22* 296:*23*
**found** 10:*7* 103:*3*
**Foundation** 9:*10* 39:*25* 41:*7* 75:*12* 90:*22* 92:*11* 93:*7*, *16* 94:*9* 95:*13* 97:*25* 125:*16* 150:*7*, *14*

**176:*14** 188:*7*, *16* 192:*1* 233:*5* 234:*16* 237:*2* 294:*9*, *14*
**four** 260:*14*, *17*, *21* 262:*14*, *20*
**fourth** 261:*7*
**Fox** 67:*21*
**frame** 255:*2*
**framed** 101:*7*
**framework** 45:*17*, *18*
**Franklin** 3:*9*
**Fraud** 59:*15*, *17*
**Frederick** 1:*14*
**free** 145:*8* 146:*2*
**frequency** 183:*15*
**frequently** 40:*3* 41:*4* 59:*5*
**front** 8:*12* 21:*25* 91:*10* 95:*3* 102:*4* 153:*24* 158:*1* 180:*6* 250:*18* 282:*22*
**frustrating** 228:*10*
**full** 28:*25* 132:*7* 228:*4* 229:*10* 248:*2*
**function** 31:*4* 65:*13*, *15* 109:*2*, *4* 122:*22* 173:*7* 202:*10*
**functions** 62:*3*, *4*, *7* 76:*24* 77:*2* 109:*7*, *12* 197:*22*
**further** 49:*23* 57:*23* 58:*24* 135:*15* 136:*5* 161:*3* 293:*7*, *11*, *14*, *16*, *18* 296:*16*
**furtherance** 8:*21* 30:*11* 34:*11*, *15* 77:*7*, *11* 133:*23* 134:*1* 181:*4*
**furthers** 135:*20*

**< G >**
**G56** 169:*23*, *25* 170:*4*, *10*
**game** 262:*8*
**Gangs** 62:*24*
**GANS** 2:*5*
**general** 82:*15* 265:*4*, *6*

**generally** 65:*24* 133:*15* 178:*23* 192:*3* 261:*25* 262:*7* 272:*15*
**generate** 200:*23* 276:*2*
**generated** 54:*9*, *15* 189:*24* 190:*19* 201:*19*, *25* 202:*10* 225:*18* 287:*3*
**generates** 199:*25*
**generating** 226:*8*
**genuinely** 227:*4*
**getting** 6:*22* 81:*11* 110:*13* 260:*20*
**give** 6:*16* 7:*17* 8:*4* 14:*3* 36:*7* 44:*25* 45:*25* 55:*25* 60:*22* 62:*20* 67:*14* 94:*9* 100:*3* 104:*7* 110:*13*, *19* 119:*14* 120:*16*, *19* 143:*25* 150:*1* 157:*19* 163:*21* 166:*7* 167:*6* 169:*14*, *19*, *20* 174:*24* 175:*6* 202:*18* 226:*6* 246:*21* 274:*10* 284:*18*
**given** 7:*12* 13:*12* 14:*4* 15:*18* 45:*15* 63:*1* 94:*20* 95:*7* 130:*17* 131:*22* 147:*15* 167:*5*, *11* 168:*10* 201:*12* 205:*1* 221:*21* 245:*14*, *17*, *20* 246:*17* 298:*6* 302:*6*
**gives** 30:*4* 170:*16* 182:*24*
**giving** 8:*4* 102:*11* 144:*20* 168:*17* 196:*19* 214:*9*
**go** 20:*20* 88:*13* 96:*15* 121:*12* 123:*24* 142:*16* 149:*22* 150:*10*, *14* 153:*11* 162:*6* 217:*10* 226:*15*, *22* 227:*3*, *12* 240:*6* 251:*1* 252:*8* 260:*5* 264:*6* 271:*6* 286:*19* 295:*13* 296:*12*
**goal** 205:*1*, *3*, *5*, *8*
**goals** 30:*11* 204:*23*

goes 160:7 263:19
288:21, 22

going 6:9, 12, 24
13:23 15:16, 23
18:22 26:22 35:16
55:4 60:24 63:18
64:21 70:10 73:25
81:12 82:20 86:1, 11
88:16, 17 89:10
90:20 99:8, 12, 21
100:3 101:4 102:7
108:6 110:11, 14, 23
119:14 120:16
123:16, 21 127:25
132:6 134:14 139:4
140:21 141:13
143:19 144:15
153:17 156:15
157:10 163:5 168:2,
8 170:15, 24 187:16
191:11 212:17, 20, 24
214:4 215:19 217:7,
8 218:6, 12, 23
221:15 223:23 226:5,
15 227:3, 5, 17 228:6,
15 231:2 239:14, 15
240:4 245:7, 8
252:12, 22, 23 260:12
263:10 264:6 275:24
279:13 282:24 285:5
295:5, 11, 21 296:22

gold 214:14

golf 169:25

gonna 71:15

Good 6:1, 2 15:6
61:3 111:3 236:15
296:13

goods 28:4, 6 29:17

Gordan 18:8, 13
185:22 186:18
204:18

Gordan's 18:9

Gordon 204:11

gosh 98:6

govern 69:16, 20
226:22

Government 10:9
53:7 89:6 98:19
105:25 156:6 158:14
163:7 228:6 251:22

263:6 276:6 278:5
280:9, 11, 20, 24
281:3, 8, 14 295:16,
21

Government's 279:10

graciously 224:5

gravitas 122:7

Great 94:2 133:1
154:2 228:12, 23
296:21

green 30:21 36:1

ground 6:13 124:24
215:5 250:1

grounds 119:20
120:5 121:17 143:20
158:16 257:8, 19
258:1 259:5

group 11:1 65:15
154:7, 14 155:2, 9, 16,
18, 20, 22 219:17

groups 154:13
155:25 156:12, 15
157:6

guess 80:24, 25
88:17 121:10 157:5
158:18 160:9 191:14
194:18 295:1

guessing 217:8
227:23

guidance 13:12 14:5
69:11 91:2 94:21
95:8, 18, 19, 20 96:1,
6, 11, 22 97:8, 11, 14,
21 98:14, 19, 24
112:2, 7 126:22
127:1, 4 128:4 140:1
153:2 157:16 161:8,
14, 19 201:13

guideline 207:2

guidelines 131:7
159:13 160:16, 22
201:1 206:20 207:6
212:11

guiding 180:22

guys 142:5

< H >

half 60:25

Hamas 109:22
113:18 143:10, 18

156:1 157:8 241:11,
24 242:2, 7, 9

Hammer 185:24
186:21 204:15, 18
226:1

hand 158:7 227:17
247:11 298:15
302:12

handed 88:21 111:7
227:21 247:14

handful 62:21

handle 227:5 275:3

handled 289:2

Hansen 1:13

happen 77:9 169:18
171:5 283:25 284:2
293:20

happened 208:20
222:10 291:7 292:5

happening 217:9

happy 216:24 226:23

harassment 112:17

hard 41:20 105:20
143:4 151:2

harm 147:4

Harris 85:10

Hatch 79:12 84:11,
12 185:20 186:10
238:21

hate 214:21 236:11

hateful 91:14, 17
92:8, 22, 25 93:3, 11
94:6, 18, 24 95:10
96:2 97:18 98:7, 21
99:1 102:21

head 6:18 88:2
114:6 160:5 174:9
220:13 249:20 287:1
289:21

headquarters 179:17
194:8, 11, 16, 21
195:1, 3, 5

hear 169:9, 11
188:18 206:11
227:14 290:14, 18, 21

heard 139:23 155:5,
12 158:3 234:11, 16
248:23 255:20
256:13 276:10 277:8,

11, 15

hearing 259:1

held 5:11 142:14

Help 10:11 23:2
25:8 34:1, 19 82:20
93:22 100:4 195:4
245:24 278:17
286:23 287:16 291:4

helpful 46:7 86:19
108:24 156:18
213:13 245:23
286:20, 21

helps 145:6

Henderson 1:16, 25
5:15 6:14 88:17
111:21 120:20
217:21 227:18 228:1
239:18 302:3, 20

hereunto 298:14
302:12

heritage 147:5 294:9,
14

hesitant 202:8

hey 97:4

Hi 153:17

high 147:9 285:14,
16

higher 119:20
157:17 158:15

highest 16:1

high-ranking 16:18,
23

history 285:17, 21

hold 31:2 112:16
157:14 187:10
225:19 250:4

holder 31:12 34:8
45:9 73:22 74:7, 24
166:16 167:4 174:25
175:7

holders 31:8, 15, 25
32:3 33:13 47:23
49:4 50:7

holder's 46:12
175:12

Homeland 9:8, 18
11:13 12:6, 16, 22, 24
13:13 14:6 15:19
16:8 18:15, 20, 24
19:6, 15, 19 20:7, 18

22:4  23:4, 6, 9, 17
25:18, 19  39:5  41:11,
12  50:22  103:15, 18,
24  104:5  105:1
114:3, 15  115:7, 11,
20, 21  116:1, 20, 25
117:5, 10  119:1, 5, 10,
18  153:22  158:20, 24
159:10  160:10  161:7,
13, 22  162:4, 10, 13,
17  163:2, 13, 17, 20
164:12  167:25
168:12  171:13  184:1,
3  186:8  201:13
210:7, 8  228:21
251:16  254:1, 9
263:2  264:10  283:11,
15
**honestly** 253:4
**hoods** 215:9
**hopeful** 20:25  157:3
**hopefully** 153:24
157:1
**hopes** 294:22
**hour** 60:25  223:23
**hours** 253:6  296:11
**House** 94:21  95:8
108:2, 6  205:15, 18,
23  206:3, 7, 12
**HSA** 186:5
**HSI** 23:22  24:1, 11,
12, 25  25:2, 10  26:9,
11, 18, 24  27:2, 3, 9,
13, 20, 21  28:8  30:16,
21, 25  31:3, 6, 11, 15,
23  32:3, 13, 17, 21
33:3, 11, 16, 17, 18
34:5, 7, 9  35:2, 8, 18
36:10  37:7, 22  38:6
39:17  40:3, 19, 21, 24
42:11  50:13  56:19
58:7, 12, 16, 25  61:17,
23  64:5, 13  69:7, 20
71:2, 8, 17, 23  72:5, 8,
10, 12, 17, 22, 24  73:4,
10, 11, 18, 19, 20, 21
74:6, 7, 8, 20, 22  75:7,
9  76:10, 15, 16, 18, 21
77:5, 10, 19  78:3, 8,
25  79:11  80:6, 14

83:10, 14  85:1  89:25
90:8, 11, 13  91:2, 21
92:2, 9, 14  93:4, 10,
13, 16  94:5, 17, 22
95:9, 20  96:1, 5, 11,
22  97:7, 13, 20, 21
98:13, 15, 18, 23, 25
99:6, 22  104:17, 24
105:3, 16  107:6, 10,
17  108:2, 3, 6, 10, 22
112:6, 19  113:1, 5, 10,
16  115:15  118:8, 13,
18, 21  122:2, 8, 21
124:13  126:9, 14
127:1  128:14  129:2,
3, 11, 12, 16, 20, 23
130:4, 11, 16, 20
131:1, 13, 22  132:9,
14  134:8  135:8, 9, 12,
13  137:22  138:2, 11,
18, 25  139:6, 9, 10, 16,
21  140:1, 14, 17
141:19  142:22
143:14, 16  144:5
149:12, 18  150:15
152:16, 25  153:1
173:4  186:8, 9, 20, 23
195:14  201:5  215:5
230:18, 24  232:21
233:1  234:9, 10, 13
261:7  263:2  288:12,
17, 24  289:3, 17
290:9  291:11
**HSI's** 30:19  34:16
37:2  82:19, 22  83:2,
6  90:19  105:8
117:21, 25  134:12
137:16  147:22  149:8
150:4, 7, 21  151:4
181:2
**huh** 124:20
**human** 42:3, 4, 8, 13,
18, 21, 24
**humility** 16:16
**hung** 202:20
**hyperlink** 247:6
**hypothetical** 144:24
147:16, 17  148:20, 21
151:14, 18, 21  191:15

**hypothetically** 107:16

**< I >**
**I&A** 47:6
**ICE** 19:20  22:5, 8,
15  23:2  24:1  25:18
99:14  101:12  102:1,
16, 18, 23  103:4, 7
111:24  112:3, 22, 23
133:3  137:23  169:13
170:14, 22  172:15, 19
174:23  175:5, 10, 14,
17, 19, 23  176:3, 7, 11,
24  177:6, 19, 23
178:8  179:16  182:10
184:19  190:18  194:8,
11, 15, 21, 25  195:2, 5
206:19, 21, 25  207:3,
8  208:1, 5, 8, 11, 16,
23  209:1, 7, 8, 15
210:9, 12, 17, 21
212:7, 11, 14  213:2, 7,
14, 24  214:1, 15, 22
215:4, 9, 13, 17  216:1
218:22, 23  219:11, 13,
17  220:22  230:17
231:21, 22, 25  285:5,
11  286:6, 8  288:4, 8
**ICE's** 101:7, 20
113:1  133:18  218:19
**ICM** 201:11
**ICR** 101:1
**idea** 249:11  281:19
**identifiable** 42:25
**identification** 212:7
227:22
**identified** 73:15
89:13  103:11  104:16
116:1, 7  180:18
189:14  192:21  194:7
207:20  208:12  265:2
278:25
**identifies** 56:25  94:5
**identify** 12:21  69:8
91:1  94:15  134:10
141:12  153:22  177:3,
12  213:10, 15, 23
215:1  221:9, 25
278:14, 18, 19, 21

**identifying** 96:20
114:8, 9, 12  141:17
142:21  147:2  173:8
**ideology** 91:15, 18
92:8, 22  93:1, 3, 11
94:7, 18, 24  95:11
96:2  97:18  98:7, 21
99:1  102:22
**imagine** 146:17
**imagining** 162:19
**immediate** 79:20
166:2, 15  167:4
168:16  175:25  176:2
**immediately** 167:10,
16  168:1
**immigration** 24:21,
23  25:2  27:22  36:19,
25  39:16, 21  40:5, 12
42:15  47:3  51:17
76:23  78:14  90:16
91:15  101:19  103:8
116:4  169:8  170:7
**imminent** 152:11
**immovable** 21:16
**implement** 181:2
**implementation**
188:5, 23  194:4
280:19
**implemented** 193:20
**implicate** 77:16, 17,
22
**implicates** 200:15
**important** 110:9
**importantly** 261:25
**importation** 28:4
**importations** 28:5
**impression** 65:25
66:4, 6  71:7, 16, 17
**impressions** 246:4, 12
**INA** 47:19
**inadmissibility**
119:21  120:6  122:21
123:4  158:17  253:13,
22  257:8
**inadmissible** 122:6
125:2
**inaudible** 52:18
**inception** 20:8
201:11  291:16

**include** 24:8 45:20
46:3, 10 47:19 81:10
83:7 90:15, 17
119:18 129:13, 16
133:21 134:20
137:23 140:6 147:5
278:11 285:13
**included** 189:14
191:2, 5
**includes** 33:13
168:17 172:15
**including** 114:2
137:4 203:7 228:8
261:5, 16
**inclusive** 262:18
**incomplete** 274:8, 11,
15
**incorporate** 187:20
**increase** 70:15
**increased** 174:4
**independent** 243:12
**INDEX** 4:2, 9
**indicate** 217:24
275:15
**indicated** 111:23
192:4 295:14
**indicates** 287:11
**indicating** 11:2
132:10 228:17 251:7
**indication** 150:16, 22
**individual** 209:3
262:13 263:11
273:20
**individually** 10:15
**individuals** 38:10
134:10 268:9, 14
**information** 15:25
50:9 51:8, 9 53:8
56:1, 17, 20 57:16
63:9 64:11, 13 67:11,
16 68:9 81:3, 6, 21
129:12 134:10 135:3
138:19, 22 139:1, 2,
10, 17 140:3, 5, 6, 15,
18, 23 141:18 142:21
143:22 145:15
150:16, 22 152:15, 17,
21 153:3 154:21
174:2 175:14, 17, 19
178:19 191:1, 4, 13,

22 193:19 203:8, 9,
10 214:9 230:17, 23
231:10, 16, 19 232:8
236:25 241:14, 17, 18
242:8 244:13, 23
246:25 249:18 250:5,
8 263:18, 22 264:9,
13, 24 273:16, 18
280:4 281:3, 8, 15
**infrequent** 183:13
**initial** 27:2
**initially** 219:6
**initiation** 182:9
**initiative** 42:11
198:12
**injury** 147:4
**innocent** 147:4
**input** 174:24 175:6
176:3 270:5
**inquire** 263:21
**inquiries** 67:5
**inquiry** 68:23 69:2
**inside** 104:14 195:6
**inspiration** 143:9
**inspire** 138:7
**inspired** 137:20
138:14 143:18 144:6
145:10 146:19 149:8,
12, 17 150:17, 23
151:3
**instance** 16:20 99:15
124:11 177:1, 10
178:15, 23 207:17
208:22 210:25 211:1,
4, 13 219:3 264:24
289:19, 20 291:15
**instances** 7:25 68:4
144:5 173:19 174:16
176:5, 9, 10, 21, 25
177:2, 7 208:11
211:6, 9 291:8
**INSTITUTE** 2:17
6:8
**institution** 281:15
**institutional** 150:2
**institutions** 119:19
157:17 158:15
**institution's** 281:16
**instruct** 14:14 64:21
81:13 140:21 187:19

200:16 214:4 217:5
231:3 245:8 250:9
**instructing** 178:20
**instruction** 209:20
250:12
**instructions** 203:1, 19,
25 204:2, 9, 12, 16, 20
205:11
**Intefada** 146:6, 8, 13
**intellectual** 28:13
**Intelligence** 23:13
47:20 62:4, 6, 10
77:3, 6, 11 78:25
79:1, 6, 11 80:6, 15,
19 81:2 82:7, 12
83:19, 24 84:7, 19
106:21, 23 109:1, 9,
17 110:2 134:9
140:14 150:21
152:16 181:21, 23
182:17 183:1, 6, 12
186:1, 6, 12, 16
193:23 196:9 197:25
198:4, 10, 17, 23
199:1 219:20, 25
220:4, 8 231:21, 23
232:1 238:19 239:3
274:13, 22 275:1, 4, 8,
13, 19 278:4, 11, 20,
22 279:4
**Intelligence's** 138:18
**intend** 91:13 104:13
**intended** 192:21, 23
**interaction** 51:24
**interagency** 42:10
**interest** 57:19 82:24
83:7 128:12, 18, 24
131:13 135:23
138:12 143:8 230:8,
13 258:11 302:10
**interface** 290:22
**interfere** 106:3
263:11
**internal** 93:17 181:9
**international** 23:12
**interpret** 90:1 92:9
93:5, 10, 14, 17 95:9,
20 96:1 97:9 98:15,
20, 25 112:4, 7

**interpretation** 92:16,
21 96:6, 23 97:14
**interpretations** 75:24
**interpreted** 98:10
**interrupting** 168:7
**interruption** 92:23
**interview** 170:1, 4, 17
269:12
**Interviews** 200:8
**intranet** 56:16, 18
**introductions** 6:5
**intrude** 143:24
**investigate** 26:24
27:3 31:12, 15, 24
32:4 33:12 43:20, 24
46:2 49:8, 16, 21
57:23 69:13, 17, 22
109:21 244:1
**investigated** 26:8
60:20 219:11
**investigates** 27:20, 21
28:9 32:17 33:16
44:12 46:10 47:23
49:2 50:6 57:3, 13
58:23
**investigating** 32:14
45:14 47:22 48:1
61:18, 23 67:6 70:19
75:7 219:18
**investigation** 9:2
18:25 31:1, 7 34:12,
16 37:2, 22 48:3, 23
49:23 57:4, 7 58:24
60:9 64:6 68:23
69:1, 7 75:21, 25
76:11, 13 140:25
151:24 152:2 173:9
200:3, 6, 7, 12, 24
201:2, 6, 10, 15, 18
202:1, 6 220:5, 9
221:21 245:16 246:2,
11, 18, 23 287:6
**investigations** 9:8, 19
18:21 19:20 22:4, 5
23:4, 6, 9, 17 24:13,
18 25:2, 10, 19 26:3
27:9, 14 35:19 36:11
38:6 41:12, 13 42:12
48:11 50:23 63:1, 10,
13, 25 64:2, 14 65:24

66:*1*, *5*  68:*14*, *20*
70:*1*, *8*, *15*  75:*16*
76:8, *9*, *18*, *22*  77:*7*,
*12*, *16*, *20*, *21*  78:*4*, *8*,
*11*, *12*, *18*  79:*2*  84:*20*
85:*5*  90:*14*  92:*3*
109:*18*, *25*  110:*3*
139:7  199:*20*  201:*14*
276:22  277:*3*  294:*15*
**investigative**  25:*21*
26:*24*  53:*3*, *7*  54:*8*,
*16*, *19*  55:*11*  57:*13*
64:*16*  65:*7*, *20*  82:*18*,
*21*  83:*3*  139:*11*
181:*13*  190:*19*
199:*23*  201:*19*
278:*10*  279:*3*
**investigator**  25:*24*
**investigators**  25:*17*
**invoke**  55:*3*  149:*16*
257:*19*
**invoked**  73:*12*  250:*1*
260:*25*  261:*1*
**invokes**  149:*10*
**invoking**  148:*3*
**involve**  74:*20*, *23*
259:*3*
**involved**  160:*18*
172:2  179:*15*  221:*21*
222:5  285:9  286:*15*,
*25*  287:*4*, *21*
**involvement**  68:*16*,
*20*  72:*20*, *25*  103:*17*,
*23*  116:*12*  216:*10*
221:*3*, *4*, *11*, *14*
264:*15*  283:7
**Involves**  217:*2*, *3*
**involving**  32:*11*
49:*19*  50:*15*  57:*21*,
*25*  73:6, *12*  74:9
**Israel**  113:*21*  150:*3*
**Israel's**  145:*21*
**issuance**  44:*17*
164:*13*  169:22
**issue**  9:*23*  30:*16*, *21*
64:*9*  166:*24*  171:*10*
290:*5*
**issued**  86:*4*  87:*5*, *9*,
*20*  94:*21*  95:8  105:*9*
117:*6*, *13*  159:*17*

166:*19*, *21*  205:*18*
206:*4*  254:*15*  270:*15*
**issues**  254:*24*
**its**  45:*10*  48:*10*, *23*
57:*4*  63:*9*, *12*, *24*
64:*6*, *13*  70:*23*  73:*5*
74:*7*  83:*2*, *3*  88:*5*
91:*4*, *12*  92:*7*, *9*  97:*9*,
*13*, *14*  99:*14*, *22*
101:*1*  112:*6*  129:*25*
130:*3*  133:*3*  140:*14*
146:*18*  153:*3*  161:*9*,
*15*  195:*16*  201:*6*
220:*4*  226:*12*  261:*5*
275:*15*  302:*11*


**< J >**
**James**  85:*10*
**January**  71:*3*  79:*3*
84:*1*, *8*  86:*5*  87:*6*, *20*
159:*18*
**JESSICA**  3:*6*
**Jewish**  137:*9*, *12*
145:*21*  147:*5*  155:*17*
**Job**  1:*23*  9:*7*, *17*
38:*21*  78:*5*  82:*1*
90:*6*  130:*20*
**John**  37:*13*  38:*4*
39:*11*  184:*15*  193:*1*
238:*25*  265:*21*
**JON**  3:*25*  5:*13*
**judge**  8:*11*  74:*14*, *15*
166:*21*  169:*3*
**judicial**  58:*4*  168:*13*,
*24*  169:*1*, *6*
**Judiciary**  7:*24*
**July**  16:*11*  84:*14*
**juncture**  61:*3*, *5*
**June**  1:*12*  5:*3*  21:6
302:*13*
**JURAT**  298:*1*
**jurisdiction**  34:*14*
75:*5*
**JUSTICE**  3:*7*  13:*11*
14:*7*  35:*4*  42:*12*, *14*
154:*15*  155:*3*, *10*


**< K >**
**KAITLYN**  3:*24*

**KANELLIS**  3:*4*  9:*9*
13:*16*  14:*9*, *12*  25:*6*
26:*13*, *20*  29:*3*  31:*18*
32:*24*  33:*21*  39:*24*
41:*7*  49:*10*  54:*11*, *22*
55:*1*, *12*  60:*24*  61:*2*,
*7*  63:*14*, *20*, *22*  64:*3*,
*7*, *15*, *21*  70:*3*, *10*
73:*25*  75:*11*, *18*  76:*2*
77:*24*  81:*11*  88:*7*, *13*
89:*7*, *12*  90:*20*  91:*24*
92:*10*, *14*  93:*6*, *12*, *19*,
*21*  94:*2*, *8*, *25*  95:*5*,
*12*, *22*, *24*  96:*13*
97:*24*  99:*8*  100:*5*
104:*19*, *24*  106:*2*
110:*19*, *24*  111:*3*
117:*15*  118:*3*  120:*7*,
*11*, *16*  123:*9*, *21*, *25*
125:*15*  126:*15*
134:*14*  136:*6*, *17*
139:*4*  140:*21*  141:*7*,
*9*, *21*, *24*  142:*2*, *10*, *15*
143:*1*, *19*  144:*8*, *14*,
*23*  145:*1*  146:*21*
147:*11*, *15*  148:*6*, *17*,
*25*  149:*20*  150:*6*, *13*
152:*8*  153:*9*  154:*18*
156:*2*, *11*, *21*  157:*1*
162:*5*, *21*  165:*1*
167:*12*  175:*2*  176:*13*,
*17*  178:*18*  187:*10*, *16*
188:*6*, *15*  190:*1*
191:*11*, *19*, *25*  199:*4*,
*7*  200:*13*  202:*15*
203:*5*, *17*, *21*  204:*4*
209:*4*, *10*  210:*14*
212:*17*  213:*20*  214:*4*,
*17*  215:*19*  217:*2*, *13*,
*16*, *20*  218:*1*, *4*, *8*, *12*
221:*12*, *24*  223:*18*
226:*15*, *25*  227:*8*
231:*2*  232:*23*  233:*4*
234:*15*  237:*1*, *5*, *10*
241:*16*  242:*17*  245:*5*
246:*5*  248:*7*, *9*, *13*
250:*3*  251:*6*  252:*5*,
*11*, *21*  256:*19*  258:*8*
259:*2*, *15*, *18*, *23*
261:*20*, *23*  262:*3*, *21*

263:*9*, *25*  264:*2*, *20*
265:*1*, *6*, *10*, *15*  277:*4*
279:*15*  295:*4*, *8*, *10*,
*13*, *23*  296:*2*, *9*, *17*, *21*
297:*2*
**Karabinas**  17:*11*, *16*
**Karoline**  4:*19*  247:*17*
**keep**  41:*20*  110:*11*,
*23*  217:*9*  239:*14*, *15*
295:*3*
**Kellogg**  1:*13*
**kept**  56:*17*
**Khalil**  4:*16*  216:*6*,
*22*  217:*1*  218:*10*, *19*
219:*3*, *5*, *6*, *11*, *18*
220:*1*, *5*, *9*, *12*  223:*16*
224:*1*, *5*, *6*  226:*21*
227:*17*  228:*9*  229:*8*
230:*19*, *25*  232:*5*, *15*
234:*23*  235:22
241:*10*, *24*  242:*2*, *7*, *8*
243:*22*  244:*14*  245:*3*
249:*10*, *23*  251:*22*, *25*
260:*25*  263:*16*
265:*12*  266:*12*
286:*24*  287:*19*
**Khalil's**  220:*15*, *22*
221:*3*, *11*  222:*13*, *21*,
*24*  223:*2*, *5*  224:*22*
225:*17*  230:*6*  233:*11*,
*21*  243:*5*  244:*23*
249:*3*  255:*3*, *23*
**Khan**  264:*11*
**kind**  45:*15*  54:*9*
62:*15*  68:*8*  79:*5*
81:*3*  96:*11*  129:*12*
137:*5*  148:*14*  150:*3*
151:*2*  191:*1*, *4*  200:*6*
226:22  254:*5*
**kinds**  46:*19*  62:*21*
70:*19*  210:*12*  244:*17*
**knew**  124:6  287:*14*
**KNIGHT**  2:*17*  6:*8*
**know**  6:*20*, *23*  13:*25*
14:*24*  15:*25*  18:*10*
21:*17*  26:*10*, *16*  29:*2*
37:*16*  38:*12*, *13*, *16*,
*19*, *20*, *23*, *25*  39:*18*
40:*14*  44:*23*  45:*12*
52:*2*, *7*, *13*, *22*  53:*4*,

15, 20, 21, 23, 24 54:3,
18 56:14 57:10
59:12, 17, 20, 23 60:6,
16, 21 63:5 65:3, 4
67:24 68:12 71:2
78:23 79:13, 17 80:3,
5, 9, 13, 17, 23 81:24
82:9, 15 83:11, 15
84:4, 6, 23 85:7, 19
91:19 94:19 96:4, 8
98:23 99:5 103:19
106:10, 19, 24 107:1,
8, 11, 12, 13, 17, 19, 23
108:4, 7, 8, 11, 25
109:14, 15, 19, 20, 24
111:15 113:12 115:6
117:17 118:24 119:3
122:18 124:5, 6, 19
125:17 130:8, 15, 18,
19 131:21 132:13, 17
135:10 136:16 139:3,
19 140:10, 11, 12, 13
142:25 143:2, 3
145:12, 13, 18, 23
146:3, 15 148:23
150:11, 25 151:19
152:19, 20, 22, 24
154:8, 9, 10, 25
156:18 157:9, 22
158:25 160:11 162:7,
11, 16 165:15, 19, 24
168:4 170:12 171:11
173:11, 15 174:20
177:21 178:9, 11
181:18, 22, 25 182:3,
6, 7 183:7, 9 184:8
185:16 192:6, 17, 20
194:9, 17 198:5, 11,
22, 25 199:10, 13, 14
200:25 207:15, 23
208:3, 8, 14, 18, 21
210:10, 19, 23 211:4,
7, 12, 14, 21 212:3
213:1 215:11, 15
217:22 218:11, 18, 21
219:2, 10, 24 220:3, 7,
11, 14, 17, 21, 24
221:1 222:11 223:13
226:12 229:17, 18
230:1, 12, 23 231:4, 5,

6, 24 233:6 234:6, 13
235:12, 16, 20 236:22,
24 237:8, 17 239:5,
10 240:14, 24, 25
241:23 242:1, 3, 24
243:2 244:7 247:22
252:14 254:8, 12
256:14, 23 257:11
262:5 263:15 265:14
270:5, 12, 13, 14, 16
271:25 272:3, 4
274:21 275:2, 6, 11,
18 276:4, 14, 16, 19,
20, 23 277:1, 5 278:3,
6, 7 280:8, 12, 22
281:1, 2, 7, 13, 18, 19,
23 283:14, 16 284:2,
7 286:14, 18, 25
287:25 289:15, 19, 20
290:10 291:10, 11
292:13, 17 294:6, 17
knowledge 8:25 10:1
30:23 36:3 41:3, 25
55:23 58:14 69:14,
24 78:22 98:13, 18
112:9 127:8 140:4
153:1 173:10 180:25
181:7, 10 182:11
187:1, 4 188:24
194:1 198:21 202:7
208:1 209:15 210:3
211:10 212:9 238:8
269:1 272:10 275:14,
17 278:2, 9 279:11,
20, 23 280:2, 16
282:8
known 263:4
knows 93:16 156:12,
18
KRISHNAN 2:16
Kristin 52:5 197:4

< L >
labeled 25:23
Labor 164:4
lag 255:4 284:16
lagging 284:18
laid 192:1 207:19
279:15
land 151:25

language 83:3
123:17 126:17
132:10 257:3, 5
large 106:11
larger 80:20
lastly 256:5 261:21
laugh 163:3
laughing 163:4
law 1:13 6:7 25:16,
22, 25 27:11, 22, 23,
24 28:8, 18, 22 29:1,
8, 9, 15, 22 30:13
31:10, 14 32:11, 15,
20, 22 33:17, 18 34:8
35:7 47:3, 10 50:25
51:9 54:12, 23 55:14
57:15 63:15 64:8, 23
81:14 90:9, 15 103:7
139:6 140:25 141:16
142:20 143:15, 21
152:17 154:20 156:4
165:17 172:4, 8
173:25 178:24 179:3
203:8, 9 207:7
213:10 214:7 217:4
245:10 250:7
lawful 33:13 36:2,
11, 16 43:16 49:16,
19 50:1, 6, 25 60:9,
15, 19 127:24 128:6
laws 27:8, 16 28:13,
25 30:14 35:1, 20
76:19 77:17, 22 78:3
91:16
lawyer 14:2, 14
lawyers 10:8, 14
12:20 15:20
Lead 43:6, 8, 15, 19
44:11 45:13 46:2, 9,
21 47:9, 14, 21 48:1,
8, 20 49:1, 7, 15, 20,
24 50:5, 16 53:9
54:10, 16, 19, 21
55:11 57:13 59:20
197:7 200:11 285:11
leaders 39:14, 15, 20
leadership 11:16, 18,
22 37:11 60:4 66:17
67:13 195:21 209:19
238:16

leads 50:12 53:3, 7
54:8 59:17 79:10
173:8 179:24 181:13,
14 190:19 276:2
278:10, 15, 19 279:1,
4
LEADTRACK 53:12,
13, 15, 22 54:2, 5, 17
LEADTRACKER
64:12
learned 193:14
208:23
leave 261:19 275:22
leaving 153:19
Leavitt 4:19 247:17,
19 248:3 249:9
led 219:24 241:10,
24 242:2, 7, 8 245:4
276:17, 21 277:2
294:15
left 52:25
legacy 25:14
legal 22:22 50:11
58:3 77:25 91:6
112:15 123:22 161:4
166:8 168:25 215:20
Letter 128:25 129:1,
3, 8, 13, 17, 20, 25
178:3 179:11, 14
190:22, 24 191:2, 5, 8,
12, 21, 23 192:11, 14
193:3, 10 232:2
234:23, 24 261:6
272:25
letters 177:15 178:3,
5 192:19, 25
level 16:1 38:9 40:7
172:18, 21 210:6
243:16 272:18
286:12
likelihood 207:7
limit 295:24 296:5
limited 176:5 255:1
limits 195:7
line 167:20 179:19
180:14 229:11
248:11 262:11, 16
299:3, 7, 11, 15, 19, 23
300:1, 9, 17 301:1, 9,
13, 21

**lines** 90:*8, 11* 102:*24*
105:*4, 8* 159:*12*
179:*24* 181:*12*
184:*11, 16*
**lingo** 41:*21*
**linked** 146:*25*
**list** 280:*14*
**listed** 119:*23* 234:7
256:*17* 257:*1*
**literally** 95:*19*
167:*23* 202:*24* 222:*3*
295:*12*
**litigate** 156:*16*
**litigation** 42:*15* 231:7
**little** 31:*19* 86:*1*
90:*21, 22* 134:*15*
152:*4* 153:*18* 190:*1,
11* 228:9 233:*17*
245:6
**LLP** 2:6 6:6
**loaded** 33:*23* 149:*1*
162:*23* 218:*14*
**local** 30:9
**locate** 200:8
**located** 57:*19* 58:5
194:*21* 195:*11, 12*
**location** 58:8 195:6
**lodge** 141:*21*
**lodged** 188:*16*
**long** 16:9 19:7 20:*3,
6, 15* 53:*15* 61:6
65:9 84:*12* 120:*10*
227:3 248:*11* 250:*11*
254:22 274:*17*
284:*13* 295:*11*
**longer** 226:*16*
**look** 47:*11* 56:*15*
110:*15, 21* 119:*14*
122:*10* 136:*18*
150:*16* 151:*11*
157:*21* 159:*18*
240:*11, 20* 242:*21*
249:7 252:2 253:*10,
15* 255:*7, 9* 258:*4*
274:*1*
**Looked** 65:9 122:*19*
132:*3* 138:*10* 157:*11*
245:*17* 246:*19* 247:2
256:*18*

**looking** 83:2 99:*24*
112:*10* 114:*4* 122:*13*
123:*19* 125:*23* 138:*4*
140:2, *17* 157:*14, 23*
228:*16, 19* 289:9
**looks** 228:*17* 251:6
**lost** 261:*13*
**lot** 6:*4* 10:8 130:9
148:*19* 258:*13*
260:*17*
**louder** 233:*17*
**lunch** 110:7

**< M >**
**ma'am** 17:*23* 18:*16*
79:*16* 84:*3* 85:2, *13,
21* 86:*14, 23* 87:4
88:*23* 89:*3, 17* 90:*3*
100:*12, 15, 18* 111:*10,
14, 18, 22* 112:*1, 5, 18,
25* 113:*3* 115:*23*
116:*18* 121:2, *5, 8, 14,
18, 22, 25* 122:*12*
131:9 132:8, *25*
133:*16* 135:*17* 154:*4*
230:*3* 275:*21*
**MACKLIN** 3:*23*
**Mahdawi** 266:*15, 23*
269:8
**Mahmoud** 4:*16*
216:6 229:8 234:*23*
251:*25*
**main** 109:*10*
**maintain** 102:*15*
**maintained** 54:*17*
**major** 23:*19*
**majority** 292:9, *12*
**making** 130:*17*
131:8 143:*4* 163:*3*
190:*18* 208:*17, 24*
209:2 213:*3, 8*
214:*15* 224:*24*
225:22 233:2 234:5
243:8 289:*10* 292:*19*
**malevolent** 91:*16*
**management** 22:*17*
26:6
**manager** 255:*24*
256:2
**manifestations** 136:*19*

**manner** 1:*20* 84:*18*
105:*21* 193:*14*
261:*14, 17* 269:*20, 25*
270:6
**March** 20:*11* 107:22,
*24* 109:*16* 182:*20*
189:*1, 7* 193:*16*
216:*23* 223:*17* 224:7
225:*7, 14, 24* 233:*1*
235:8, *14, 18* 236:*24*
238:*14* 247:*18* 248:2
254:*15* 268:*4, 15, 20*
271:*18, 22* 272:*11*
276:*1* 279:6, *19, 22*
280:*1, 10* 291:*17, 25*
294:*16*
**MARCO** 1:6 5:7
229:*4*
**mark** 100:5 111:*1, 3*
**marked** 88:*19* 100:7
111:*5, 19* 120:*21, 23*
227:*19, 22* 228:*14*
240:7 247:*12*
**Maryland** 20:*1*
**mask** 207:*4* 208:*24*
209:*1* 210:6, *22, 25*
**masking** 207:*19*
**masks** 207:*1* 208:*17*
211:*15*
**Mason** 53:*1* 197:*19*
**Mass** 19:*14*
**MASSACHUSETTS**
1:*1* 5:9
**material** 63:*15*
**materials** 54:*12, 23*
55:*13* 156:*4, 5*
186:*24* 194:*3* 245:*19*
**matter** 5:6 27:*3*
49:22 74:*16* 82:*11,
16, 17* 129:*15* 161:*4*
165:7 183:*4* 251:*25*
**maximum** 104:*6, 12*
**mean** 22:9 24:*18*
27:5 28:*19* 30:*12*
44:*15, 19* 45:2, *19*
52:20 57:8 62:7
67:20 73:9 76:*4, 7,
10, 12* 83:5 90:*12*
91:*18, 23* 94:*16*
106:*3* 114:*18* 117:*3*

121:*11* 127:5 133:*10*
144:*14* 159:2 166:*10*
167:22 169:2, *5*
179:8 180:*1, 4*
181:*13* 183:24 195:5
197:6, *24* 199:*17*
202:3 205:5, 6
206:*23* 216:9 221:5,
8, *14, 23* 222:2, *3*
223:*15* 231:*15* 242:*4*
244:25 252:*21*
257:*23* 258:*13*
259:*21* 265:*3* 283:*20*
285:*3, 22* 291:*14*
293:*3, 15, 19*
**meaning** 92:*21* 94:7,
*23* 95:*10* 103:*3*
113:*5, 10* 118:*8*
179:*3* 181:*1* 192:22
258:*19*
**means** 29:5 47:9
58:22 75:22 91:22
114:8, 9 144:22
188:*4, 22* 190:*17, 20*
199:2 209:*23* 213:*10*
259:*3*
**meant** 103:2 120:*14,
15* 134:*19* 135:*4*
273:8
**Measures** 111:*12*
**media** 4:*16* 67:*18,
19, 23* 68:*1, 7* 81:5, *8,
22* 94:*12* 140:6, *8*
200:*10, 23* 239:24
240:2, *12* 253:2
**medication** 7:2
**meet** 6:*3*
**meeting** 189:*1, 18*
203:*3*
**meetings** 189:6, *10,
13, 21* 193:*12, 15*
195:*17, 19, 24*
**members** 100:22
163:6 183:5
**membership** 154:6, *14*
**memo** 127:6
**Memorandum**
228:*20* 229:*3* 254:*24*
290:8

**memory** 216:*4*
**memos** 289:*25* 290:*3*
**mention** 172:*22*
**mentioned** 16:*12*
24:*2* 31:*25* 64:*12*
78:*24* 84:*24* 122:*18*,
*24* 123:*3* 139:*11*
172:*15* 177:*8* 178:*13*
179:*12* 195:*18*
205:*23* 210:*24*
271:*10*, *14* 276:*1*
**mentioning** 157:*25*
**mentions** 229:*7*
**menu** 34:*20*, *21*
**met** 104:*5*
**methods** 139:*5*
140:*25* 141:*12*, *17*
142:*20* 143:*15*, *24*
200:*15* 214:*7*
**mic** 260:*18*
**mind** 21:*22* 28:*18*
56:*2* 197:*18*
**minimum** 193:*1*
213:*17*, *23*
**minute** 226:*13*
**minutes** 61:*9* 189:*20*
226:*18* 239:*12*
259:*17* 296:*12*, *15*
**Mischaracterizes**
31:*19* 91:*25* 148:*7*
223:*19*
**missed** 6:*5* 60:*8*
277:*7*
**missing** 202:*22* 274:*7*
**Mission** 276:*9*, *16*, *21*
277:*15* 294:*8*
**mistaken** 76:*20*
**Mm** 291:*21*
**Mm-hmm** 225:*5*
248:*8* 257:*7* 259:*15*
265:*5* 273:*3*
**module** 64:*17* 65:*7*,
*20* 139:*11* 199:*23*
**Mohsen** 266:*15*
**moment** 19:2 23:*8*
26:22 35:*17* 54:*25*
60:*23* 79:8 88:*15*
103:*13*, *19*, *22* 106:*1*
112:*10* 113:*13*
119:*14* 121:*19* 122:*9*

126:*20* 135:*11* 141:*1*,
*4* 143:6 152:*5*
160:*19* 177:*8* 199:*10*
201:*17* 206:*1* 252:*4*
272:*14* 285:*23*
**month** 183:*17*
**monthly** 183:*15*
**months** 7:*21* 45:*5*
78:22 174:*19* 176:*7*
177:*25*
**morning** 6:*1*, *2* 76:*8*
180:*5*
**mouthful** 87:*23*
**move** 73:*4*, *8* 94:*1*
100:*4* 106:*5*
**moved** 106:*9*
**Moving** 89:*4*, *7*, *9*
**muddle** 86:*2*
**multiple** 159:*12*
160:*18* 288:*3*, *7*
**myriad** 221:*14*
**mystery** 107:*20*

**< N >**
**name** 5:*12* 7:*10* 9:*3*
28:*15* 56:9 59:*10*, *14*
131:*19* 139:*20* 181:*5*
183:*20* 184:*2* 190:*23*
220:*17* 229:*15*
238:*20*, *24* 240:*21*
247:*20* 251:*18*, *23*
252:*1* 264:*7* 275:*12*
276:*10* 294:*11*, *13*
**named** 23:*15*
**names** 55:*25* 56:*4*
59:*23* 60:*1*, *4* 85:*24*
148:*12* 220:*14*
286:*19*, *21*
**napping** 187:*11*
**narcotics-related**
285:*18*, *21*, *23*
**narrative** 129:*14*
**narrow** 236:*17*
**narrower** 11:*11*
**narrowly** 103:*1*
**National** 16:6, *23*
17:2, *5* 18:*14* 22:*25*
23:*3*, *5*, *15*, *16*, *21*
40:*24* 41:*5*, *10*, *16*, *18*,
*21* 42:*1* 43:*1* 46:*25*

47:*4*, *8* 48:*2*, *9*, *21*
49:*3*, *9* 50:*10* 59:*16*,
*18* 61:*18*, *24* 62:*11*,
*16* 82:*25* 83:*7*, *10*, *13*
87:*1*, *19* 90:*17* 91:*14*
92:*4* 102:*23* 118:*9*,
*11* 133:*5*, *12*, *15*, *23*
134:*1* 135:*15*, *20*, *21*
136:*5*, *15* 137:*18*
138:*11* 143:*8* 173:*4*
186:*2* 196:*9*, *11*, *15*,
*20*, *24* 197:*10*, *14*
221:*2*, *10*, *20* 222:*5*,
*13*, *17* 239:*2*
**Nationality** 76:*24*
78:*14* 90:*16* 101:*19*
103:*8* 116:*5*
**Nations** 255:*12*
**nature** 70:*1*, *8* 74:*11*
144:*12* 149:*22*
261:*11*
**near** 110:*23*
**necessarily** 1:*21*
47:6 77:*22* 262:*4*
285:*25*
**necessary** 295:*20*
**need** 16:*16* 48:*16*
57:*9* 67:*11* 74:*14*
86:*23* 103:*20* 105:*25*
110:*7*, *9* 139:*19*
141:*22* 146:*9* 150:*20*
151:*19* 156:*16*
168:*11* 201:*14*
242:*21* 293:*7* 295:*2*
**needed** 21:*1* 67:*7*
**needing** 249:*6*
**Neither** 93:*4* 302:*9*
**Never** 155:*12* 234:*11*,
*16*, *19* 245:*23* 256:*13*
258:*23* 277:*8*, *11*
293:*21*
**New** 2:*9*, *21* 223:*12*,
*15* 224:*16*, *18* 225:*22*
232:*25* 261:*4* 268:*3*
271:*17* 278:*11*, *20*
287:*19*, *23*
**News** 67:*21*, *22* 68:*1*
246:*25* 247:*2*, *3*
290:*1*
**next-day** 297:*3*

**Nichols** 53:*1* 197:*19*,
*20* 198:*8*, *13*
**nod** 6:*17*
**Noem's** 239:*7*, *8*
**Noems's** 116:*12*
**no-go** 144:*9*
**non** 144:*10*
**noncitizen** 45:*3*
73:*11* 75:*8* 163:*18*
261:*7*, *9*, *11*, *16*
267:*17*, *19*
**noncitizens** 32:*11*, *15*
33:*12* 37:*3*, *23* 38:*7*
44:*1*, *7* 48:*15* 49:*7*
70:*24* 83:*20* 88:6
89:*21* 112:*21* 227:*7*
259:*13* 260:*15*, *22*
262:*2*, *20* 269:*5*
271:*4*, *10*, *14* 284:*4*
286:*16* 287:*15*
289:*16* 292:*20*
**noncitizen's** 90:*5*
**noncriminal** 34:*16*
35:*7*, *20* 77:*7* 78:*11*
172:*4*, *7*
**nonGovernment** 53:*3*
**nonstudents** 174:*21*
**normal** 214:*19*
215:*8*, *12* 223:*9*
224:*14*
**normally** 182:*24*
285:*6*
**Northwest** 5:*12*
**notable** 24:*16*
**notarial** 298:*15*
302:*13*
**Notary** 1:*17* 298:*13*
**NOTE** 1:*19* 14:*12*
**noted** 5:*18* 131:*21*
**notes** 137:*9*
**Notice** 96:*25* 97:*1*, *2*
163:*21* 164:*13*, *16*
165:*3*, *22* 166:*18*, *19*,
*20*, *25* 167:*13* 168:*9*,
*18* 270:*15*
**Notices** 164:*16*
**Notification** 97:*3*, *4*
165:*18* 191:*7*
**notified** 174:*17*

**notify** 173:*12, 20*
174:*25* 175:*7*
**notwithstanding**
264:*23*
**NSA** 152:*21*
**NSD** 244:8
**number** 5:*9* 7:*18*
70:*15* 80:*10* 86:8, *17*
102:*14* 103:*11* 154:*3,*
*4* 157:*25* 174:*4, 5*
180:*11* 197:*14*
236:*23* 261:*13* 292:7
**numbers** 102:7, *15*
228:*18*
**NW** 1:*14*
**NY** 2:*9, 21*

**< O >**
**oath** 88:*10* 120:*11*
236:*19*
**object** 55:5 70:*10*
74:*1* 90:*21* 99:*9*
123:*22* 139:*4* 143:*19*
145:*3* 162:22 187:*16*
191:*11, 25* 199:5
212:*17* 215:*19*
218:*12* 221:*16* 245:7
252:*24* 262:5 263:6
265:*11*
**objecting** 217:*12*
**Objection** 9:*9* 13:*16*
14:*9* 25:6 26:*13, 20*
29:*3* 31:*18* 32:*24*
33:*21* 39:*24, 25* 41:7
49:*10* 54:*11, 22*
55:*12, 13* 63:*14* 64:*3,*
*7* 75:*11, 18* 77:*24*
88:7 89:6 91:*24*
92:*10* 93:6, *20* 94:8
95:*12, 13, 14* 96:*13*
97:*24* 104:*19* 117:*15*
118:*3* 125:*15* 134:*15*
136:6 141:22 146:*21*
147:*11* 148:6, *17*
150:6, 7 154:*18, 19*
156:2, *3* 162:5 165:*1*
174:*12* 176:*13*
178:*18* 188:6, *16*
190:*1* 191:*20* 199:7
200:*13* 202:*15* 203:5

209:*4, 10* 210:*14*
213:*20* 214:*17* 217:2,
*23* 218:*13* 221:*13*
223:*18* 232:23 233:*4*
234:*15* 237:*1* 242:*17*
244:*18* 256:*19* 258:8
263:*16, 19* 265:*14*
277:*4*
**objectionable** 141:8
**objections** 259:2
279:*16*
**obligation** 32:*4*
101:*13*
**obligations** 101:*8*
**occasion** 31:*12* 90:*1*
120:*25* 122:*1, 14*
124:*12* 192:*13* 196:2
206:*25* 208:*19*
210:*21* 211:*23*
293:*16*
**occasions** 66:*12*
173:*24* 208:*4, 7*
293:*12* 294:*1*
**occur** 107:*21* 286:*9*
**occurred** 162:2
169:*10* 173:*17* 211:9
244:6
**occurs** 291:8
**offense** 285:22, *24*
286:2
**offenses** 285:*19*
**offer** 152:*3* 212:*23*
259:*19* 262:*3*
**offhand** 266:*9*
**Office** 19:*14* 20:2
22:7, 8, *10, 11, 13, 19*
23:*13* 26:5 34:*13, 23*
35:*3* 36:*19* 39:*16, 20*
40:*4, 11, 21* 42:*14*
50:*3, 20, 21* 56:*21*
57:*18, 20* 58:*3, 5, 8,*
*12, 17* 59:*1, 11, 14, 16,*
*18* 62:*4, 6, 9* 78:*24,*
*25* 79:6, *10* 80:6, *14,*
*19* 81:*1* 82:6, *12*
83:*19, 24* 84:7, *19*
91:5 106:6, *21, 23*
109:*1, 9, 17* 110:*1*
116:*16* 134:8 138:*18*
140:*13* 150:*21*

152:*15* 169:8 171:*25*
172:2, *18* 181:*21, 23*
182:*17, 25* 183:6, *11*
186:*1, 6, 8, 12* 193:22
194:25 197:25 198:*3,*
*9, 17, 22, 25* 209:24,
*25* 210:*1* 219:*20, 24*
220:*3, 8* 231:*21, 22,*
*25* 238:*19* 239:*3, 7, 9*
245:*16* 246:2, *10, 18,*
*23* 255:25 256:2
274:*13, 22* 275:*1, 4, 7,*
*13, 19* 278:*3, 10, 19,*
*22* 279:*4* 286:*12, 25*
287:*4, 16, 21, 24*
288:*15, 22* 289:*13*
**officer** 33:*3* 170:7
207:*3, 8, 9, 12* 209:*3*
213:2, 7, *11* 270:25
302:*3*
**officers** 30:*3, 9*
179:*4* 206:*21* 211:*15*
**offices** 1:*13* 22:*15*
36:*21* 50:*13* 210:6,
*13, 17* 286:*14* 288:*4,*
*7, 11*
**official** 16:*23* 37:*15,*
*17* 41:*10* 85:8 113:*5,*
*10, 16* 129:*10* 131:*1*
171:6, *8* 172:*13*
196:*11* 209:*21, 22*
289:*11* 302:*21*
**officials** 37:*21* 52:*1*
59:*24* 60:2 96:*10*
185:25
**Oh** 23:25 61:7
86:*20* 89:*12* 98:6
111:*1* 141:*3* 146:*12*
148:*17* 152:8 188:*12*
228:*11* 277:7 282:9
289:*24* 294:7
**Okay** 6:*1, 12* 7:9
12:*19* 15:*23* 17:*19*
18:*17* 22:*14, 24* 32:9
43:*12* 48:8 58:6
61:*16* 63:*20* 64:*15*
69:*1* 73:25 75:*14*
76:*13, 24* 80:*21* 83:6
86:*9, 20* 87:*16* 91:7
94:*20* 95:22 98:6

102:6 106:*17* 108:*10,*
*24* 123:*21* 124:*20*
125:*19* 128:*20* 132:*9,*
*20, 21* 133:*1* 134:6
138:*17* 141:*23*
142:*19* 144:8 145:*5,*
*6* 149:*4* 150:*13*
152:*5, 14* 153:6, *9, 17,*
*20* 154:2, *5* 156:25
158:8 160:*3* 163:*15*
167:2 169:*17* 174:*15*
178:*12* 179:*11* 186:4
195:*4, 17* 206:2, *16*
210:2 218:8 225:2
226:*5, 13* 227:*15, 21*
228:*3, 13, 22, 24*
229:*12, 18* 230:5
231:2 236:2, *4, 20*
238:*1, 17* 239:*16, 20*
240:*4, 9, 18* 241:8
245:5 247:8, *10, 14,*
*22* 248:*1* 249:*1, 9*
250:*3* 251:*10, 12*
253:*4, 9* 254:*18*
255:6 256:*11* 259:*1,*
*9* 260:*11, 20* 262:*3*
264:*4, 6, 14* 265:25
266:2, *10, 14* 267:*16*
268:*11* 269:2, *14*
270:*13* 271:8 274:*16*
275:22, *24* 277:*14*
278:*9* 279:8, *12*
280:8 282:*20* 286:6,
*22* 287:*11, 25* 289:*24*
290:*24* 294:*18, 23*
295:*13* 296:2
**Okeemah** 1:*15, 25*
5:*15* 302:*3, 20*
**Once** 34:5 157:*21*
183:*16, 17* 189:*11*
283:*9* 290:*12* 293:*13*
**one-page** 158:*1* 258:5
**ones** 23:23 116:*10*
198:*11* 271:8
**ongoing** 182:6
**open** 67:*18, 19* 68:7
81:*5, 8, 22* 94:*11*
134:*9* 135:2 138:*19,*
*21* 139:*1, 10, 17*
140:*3, 5, 14, 17*

141:*18*  142:*21*
150:*15, 21*  152:*14*
153:*3*  184:*23*  198:*19*
246:*15, 18, 24*
open-ended  218:*14*
operational  23:*10*
168:*23*  173:*25*
178:*25*  179:*7*  270:*25*
Operations  22:*17*
23:*12, 13*  24:*3, 6*
108:*23*  172:*16, 23, 24*
262:*23*
OPERATOR  3:*25*
opine  76:*3*
opinion  191:*24*  193:*9*
opinions  246:*4, 12*
OPM  25:*23*  26:*2, 4*
opportunity  167:*5, 11,*
*17*  169:*15*  170:*1, 5, 6,*
*16*  174:*23*  175:*5*
opposed  10:*15*  24:*21*
60:*11*  288:*17*
optional  74:*21*
options  34:*20, 21*
Order  4:*12, 14*  86:*7,*
*16*  87:*12, 16, 18*  88:*3,*
*25*  89:*2, 16*  90:*1, 6, 7,*
*19*  91:*3, 21*  94:*22*
95:*9*  96:*25*  99:*4, 7*
100:*21*  101:*12*
102:*20, 25*  103:*5, 10,*
*13*  105:*9*  107:*7*
110:*6*  111:*12, 17, 24*
112:*4, 8*  113:*14*
114:*1*  115:*13*  116:*13,*
*17*  117:*6, 7, 13, 14, 22*
118:*1, 14, 18, 22*
119:*8, 17*  125:*9*
126:*12, 16*  131:*23*
132:*10, 19*  134:*22, 25*
136:*1, 20*  141:*20*
142:*24*  150:*5*  152:*2*
158:*1*  159:*17, 22*
160:*5*  179:*23*  180:*1,*
*5, 9*  181:*12*  185:*4, 6,*
*10*  206:*5*
ordered  271:*2*
orders  86:*4*  97:*10,*
*15*  161:*6, 12*  180:*17*

181:*3*  185:*14*  187:*8,*
*15*  205:*19*  297:*1*
ordinarily  86:*13*
201:*19*
ordinary  206:*18*
org  135:*23*
organization  93:*14*
137:*21*  138:*15, 16*
144:*7*  145:*11*  146:*20*
147:*3*  148:*4, 13*
149:*9, 11, 13, 17, 18*
150:*18, 24*  241:*12*
255:*14*
organizations  135:*24*
136:*3*  138:*5*  143:*10,*
*11*  151:*4*  256:*13*
276:*5*  277:*19, 24*
278:*5, 12*
organized  23:*11*
62:*2, 15, 22*  84:*25*
original  238:*13*
originate  184:*18*
outbound  29:*17*
outcome  302:*11*
outlined  135:*19*
264:*20*
outside  21:*3*  31:*8*
211:*9*  276:*5*  278:*5*
280:*11*
overall  24:*11*
overbroad  90:*21*
221:*13, 17*  232:*23*
oversaw  107:*5*
oversee  17:*4*  40:*25*
41:*23*
overseen  9:*23*
oversees  44:*12*  62:*23*
140:*14*  210:*12, 17*
oversight  9:*20*  31:*4*
35:*25*  36:*1*  62:*19*
65:*12*
overstay  46:*1, 8, 15*
overstayed  45:*7*
overstays  43:*10, 12,*
*13, 21, 25*  44:*3, 5, 14,*
*16*  45:*1, 9, 15*  46:*9*
47:*15, 17, 23*  48:*4, 14,*
*23*  278:*23*  279:*1*
owners  159:*8*
ownership  237:*24*

Ozturk  212:*4*  267:*4,*
*7*  269:*19*  290:*2*
Ozturk's  290:*3*

< P >
P.L.L.C  1:*14*
p.m  142:*14*  153:*14*
260:*8*  297:*5*
pack  295:*8*
PAGE  4:*4, 11*  91:*9*
104:*9*  112:*11*  119:*13*
121:*10, 13*  122:*10, 16*
124:*17*  125:*24*
127:*13, 14*  133:*2*
136:*18*  159:*19*
228:*13, 18*  229:*11*
248:*6*  251:*4*  299:*3, 7,*
*11, 15, 19, 23*  300:*1, 9,*
*17*  301:*1, 9, 13, 21*
Page_____Line
300:*5, 13, 21*  301:*5,*
*17*
pages  120:*18*  229:*1*
251:*2*
pain  119:*15*
painful  86:*1*  124:*19*
Palestine  145:*9*
146:*2*  154:*15*  155:*3,*
*10*  157:*7*  255:*13, 17*
papers  260:*17*
paperwork  225:*18*
249:*24*  287:*2*
paragraph  100:*20, 25*
103:*14*  114:*4*  133:*2*
134:*7*  135:*2*  229:*8, 9,*
*10*  230:*9, 15*  255:*8,*
*22*  256:*5*  257:*1, 4, 10*
258:*9, 10, 11*
paragraphs  252:*3, 4*
256:*17*
parameters  15:*18*
134:*11, 13, 20*  140:*2,*
*19*  141:*13*  153:*23*
pardon  62:*1*
part  18:*17*  24:*1*
29:*14*  30:*19*  32:*1*
36:*15*  78:*4*  86:*1*
90:*6*  108:*22*  115:*16,*
*20*  120:*19*  152:*18*
161:*23*  172:*19*

180:*18, 23*  181:*17*
186:*25*  194:*7*  199:*12*
206:*8, 13*  208:*17*
226:*8*  235:*17, 21*
236:*5, 8*  238:*3, 7*
239:*3*  251:*20*  268:*3*
participate  25:*24*
280:*15*
participation  8:*25*
230:*18, 24*
particular  21:*21*
27:*25*  28:*17*  29:*13,*
*20*  35:*17*  44:*10, 20*
46:*19*  47:*2*  53:*8*
59:*4*  63:*8*  67:*5*  68:*9,*
*14, 19*  69:*15, 19*
70:*23*  72:*14, 16*
83:*20*  93:*14*  109:*2,*
*18*  116:*6, 10*  121:*24*
130:*21*  135:*5*  136:*19*
139:*21*  143:*17*  144:*6*
154:*6*  155:*24*  157:*6*
161:*14*  163:*10*
168:*19*  171:*5*  174:*16*
175:*11*  178:*23*
179:*21*  183:*8*  205:*1,*
*3*  209:*24*  210:*11, 16,*
*24*  215:*25*  218:*23*
222:*6*  228:*7*  237:*25*
269:*5*  272:*16, 22*
282:*4*  283:*23*  284:*9,*
*24*  286:*24*  289:*2, 25*
particularly  104:*14*
parties  302:*10*
partnering  6:*7*
parts  28:*21*  91:*8*
119:*9*  160:*8*  172:*15*
248:*5*  257:*15*
pass  88:*16*  110:*25*
240:*5*
passed  100:*9*
paths  168:*20*
Patrol  51:*20*  54:*1*
pause  65:*10*  101:*4*
127:*25*  132:*6*
Peace  155:*17*
penalty  100:*17*
pending  6:*24*  21:*9,*
*10*

**people** 31:*1* 33:*11*
55:*17* 56:*4, 9, 10, 20,*
*25* 79:*19* 80:*5, 10, 22*
105:*14, 16, 21* 106:*8,*
*17, 20, 22* 107:*6, 10,*
*17, 18* 108:*3, 12, 25*
109:*16* 110:*1, 7*
153:*23* 177:*12*
189:*14* 194:*15, 24*
216:*6* 217:*10* 219:*17*
222:*1* 237:*22* 238:*12*
245:*16* 268:*19* 270:*3,*
*6, 20* 272:*16* 280:*4, 9,*
*15* 281:*23*
**people's** 207:*22*
**perform** 78:*3*
**performed** 66:*1*
**performing** 65:*25*
66:*5*
**performs** 78:*3*
**period** 45:*4*
**perjury** 100:*17*
**permanent** 33:*14*
36:*2, 11, 16* 43:*16*
49:*16, 19* 50:*1, 6, 11,*
*25* 52:*17, 19* 60:*9, 15,*
*19*
**permeate** 156:*23*
**permissible** 210:*5*
**permitted** 171:2
**perpetrators** 112:*16*
**person** 12:2 17:*25*
44:*16, 21* 45:*5* 46:*14*
57:*19* 58:*9* 59:*10*
82:*1* 94:*6, 15* 96:*5,*
*22* 109:*8* 110:*9*
130:*25* 131:*3, 7, 17,*
*18* 140:*19* 145:*8*
146:*5, 13* 147:*20*
150:2 154:*16* 163:*11,*
*21* 164:*10, 11, 19*
167:*9* 168:*6, 9*
170:*15, 16, 23* 172:*3*
173:*1* 177:*23* 179:*10*
181:*24* 182:*1* 207:*13*
210:*11, 16* 211:*22*
221:*22* 222:*4, 17*
224:*1* 225:*4* 237:*25*
238:*11, 18, 22* 260:*3*
274:*22* 275:*2, 7*

279:*9* 283:*9, 12, 17*
287:*8*
**personal** 10:*10*
15:*24* 68:*15* 92:*15,*
*20, 24*
**personally** 10:*19*
37:*9* 69:*6* 114:*19, 23*
128:*10* 211:*14*
235:*17* 242:*3*
**Personnel** 26:*5*
65:*12, 14, 15, 18*
105:*12, 23* 106:*6*
172:*14, 17* 197:*12, 14*
289:*4, 8, 9*
**persons** 32:*16* 50:*12*
**person's** 94:*17* 128:*4*
130:*21* 150:*17, 23*
151:*12* 154:*5, 13*
167:*15* 172:*7* 179:*5*
200:*10, 23* 238:*20*
258:2 272:*1, 5*
283:*23* 285:*15* 287:*3*
**perspective** 101:*20*
151:*4* 290:*12*
**Pete** 185:*19* 186:*10*
**Peter** 79:*12* 84:*11,*
*12* 185:*20* 238:*21*
**Phillips** 52:*12* 55:*24*
**phrase** 86:*9* 91:*22*
92:*9, 21, 25* 94:*23*
95:*10, 21* 96:2 97:*18*
98:*7, 15, 20, 25* 103:*4*
131:*11* 139:*23*
144:*22* 146:*1* 155:*5,*
*12* 162:*24* 170:*4*
**phrased** 149:*22*
**picture** 24:*5*
**pinpoint** 258:*21*
**place** 53:*16* 65:*20*
168:*10, 20* 182:*19*
212:*1*
**places** 131:*11*
**plain** 215:*13*
**plainly** 144:*8*
**plaintiff** 6:*13*
**Plaintiffs** 1:*3, 11* 2:*3,*
*14*
**Plaintiff's** 88:*18*
100:*6* 103:*11* 260:*23*

**plan** 284:*9, 16, 24*
285:*7, 11* 286:*9*
**planned** 21:*3*
**plans** 283:*16, 19*
284:*3* 286:*7, 11*
**platform** 240:2 241:*1*
**play** 262:*7*
**played** 104:*17*
**please** 5:*19* 6:*16, 20*
7:*9* 9:*14* 27:*17*
49:*13* 64:*19* 68:*17*
71:*14* 75:*17, 20* 77:*1,*
*18* 90:*25* 95:*1* 98:*2*
105:*20* 106:*4* 112:*11*
113:*8* 117:*17* 121:*13*
122:*10* 150:*10* 165:*3*
177:*3* 183:*14* 187:*12*
227:*10* 228:*13* 237:*4*
241:*25* 246:*6* 247:*10*
248:*6* 253:*10* 255:*7*
297:*4*
**PO** 3:*10*
**point** 34:*9* 144:*11*
168:*22* 169:*21*
205:*24* 231:*11*
**pointed** 258:*9*
**policies** 69:*16, 20*
180:*23* 262:*7, 10*
279:*17, 18*
**policy** 71:*4, 9, 19, 24*
72:*6, 19* 77:*12, 21*
78:*9, 18* 79:*2* 84:*21*
85:*5* 88:*4* 89:*20*
91:*11* 92:*7* 112:*11,*
*12* 122:*11* 124:*25*
125:*20* 126:*4, 8, 13,*
*23* 127:*7, 10* 128:*12,*
*18, 23* 130:*12, 14, 23*
131:*10, 12, 13, 14*
132:*4, 11, 15* 165:*21*
230:*8, 13* 232:*16*
233:*23, 25* 235:*3, 7*
257:*2, 9, 25* 258:*11*
282:*1, 6*
**population** 49:*6*
**posed** 207:*13*
**position** 16:*18*
128:*15, 21* 174:*10*
179:*13* 255:*24*

**positioned** 159:*5*
**possession** 285:*18*
**possibilities** 168:*15*
**possible** 75:*24* 104:*6,*
*12* 170:*25* 228:*15*
256:*15*
**Post** 4:*16* 240:*12, 20*
241:*9*
**potential** 27:*14* 48:*9,*
*21* 49:*2, 8* 101:*18*
138:*2*
**potentially** 64:*8*
116:*8* 124:*25* 130:*13,*
*22* 143:*21* 149:*11*
250:*6* 287:*18*
**power** 32:*22* 33:*19,*
*22* 110:*10* 283:*11*
**practice** 163:*20*
173:*23* 214:*19* 215:*8,*
*12* 221:*19* 223:*9*
224:*14* 232:*21*
**practices** 64:*24*
81:*12* 139:*6* 140:*24*
143:*24* 200:*15*
203:*10* 206:*18* 213:*6*
214:*7* 262:*6, 10*
279:*17*
**precipitated** 107:*23*
**precision** 236:*21*
**predecisional** 144:*17*
187:*18, 21* 191:*13, 21*
203:*7*
**predicate** 93:*16*
258:*14*
**premarked** 247:*15*
**prepare** 15:*1, 10, 14*
**prepared** 220:*12*
254:*5*
**preparing** 115:*21*
254:*10*
**presence** 130:*12, 22*
230:*7* 233:*11, 22*
**PRESENT** 3:*22*
12:*17, 18* 13:*11*
66:*16* 189:*15*
**presentation** 187:*2*
**presented** 74:*13*
**president** 114:*8*
160:*7*

**press** 4:*19* 247:*17, 23, 25* 248:*3, 22* 249:*2*
**presumes** 73:*18*
**pretty** 102:*7*
**prevail** 156:*17*
**prevent** 92:*3*
**preview** 14:*4*
**primacy** 163:*25*
**primary** 25:*12* 244:*22, 25*
**principal** 19:*12* 58:*3* 91:*6* 289:*11*
**principals** 237:*19, 21*
**principle** 22:*22* 168:*25* 172:*13* 209:*20, 22*
**principles** 186:*7*
**Prior** 19:*2* 31:*19* 71:*11, 21* 84:*8* 91:*25* 148:*7* 201:*11* 223:*19*
**priorities** 118:*17* 119:*4* 133:*7, 10* 135:*14* 162:*3, 10* 163:*2, 12*
**priority** 133:*20, 21*
**private** 140:*9*
**privilege** 54:*13, 24* 55:*2, 14* 64:*8* 144:*9* 156:*5, 14, 24* 245:*11* 250:*6* 259:*3* 260:*25* 261:*1* 263:*8, 19* 264:*22*
**privileged** 14:*13* 63:*15* 95:*15* 141:*16* 142:*20* 143:*22* 144:*21* 154:*21* 203:*10* 214:*8* 250:*7*
**privileges** 81:*14*
**privy** 290:*7*
**proactively** 134:*9*
**Probability** 179:*9*
**probable** 33:*9* 74:*14*
**probably** 241:*5*
**problem** 167:*22* 296:*2*
**problematic** 212:*19*
**problems** 258:*14, 22*
**procedures** 64:*24*

**press** 81:*12* 139:*5* 265:*4*
**proceed** 217:*8*
**proceedings** 263:*12*
**process** 95:*14* 128:*14, 20* 139:*2* 144:*9* 154:*20* 156:*6* 159:*8* 165:*4, 25* 168:*3, 4, 6* 178:*19* 179:*16* 203:*6* 217:*3* 223:*12, 15* 224:*16, 18* 225:*22, 24* 227:*13* 232:*25* 250:*6* 261:*4* 263:*7* 268:*3* 269:*16* 271:*21* 273:*23* 275:*25* 290:*11*
**produced** 82:*7, 12* 83:*19, 24*
**product** 247:*7*
**Professional** 22:*19* 288:*15*
**professionally** 19:*4*
**PROFESSORS** 1:*3* 5:*7*
**profile** 234:*9, 10, 14, 20* 261:*7*
**program** 9:*21, 24* 22:*7, 8, 9* 25:*21* 31:*5, 9, 16* 32:*2* 40:*21* 42:*25* 62:*22* 105:*24* 150:*15* 179:*20, 21* 180:*15, 16, 18, 24* 181:*1, 6, 9, 11, 17, 20* 182:*3, 9, 13, 16* 183:*20, 22* 184:*4, 6, 10, 20* 185:*5, 9, 13* 188:*5, 23* 189:*2, 5, 18, 21, 25* 190:*6, 10, 14, 20* 193:*15, 19* 194:*4, 7* 195:*23* 196:*7, 12, 15, 16, 20, 25* 197:*8, 11, 15, 21* 198:*3, 18* 199:*12, 16, 21, 25* 201:*25* 202:*5, 10* 203:*4* 204:*3, 17, 24* 205:*8, 24* 206:*17* 219:*16* 223:*15, 20, 21, 24* 224:*2, 8, 9* 234:*4* 235:*8, 13, 18* 236:*24* 237:*16, 18, 20, 23* 238:*3, 7, 10, 20, 23*

**program** 239:*4, 9* 255:*24* 256:*2, 3* 268:*19, 23* 271:*17* 272:*10, 22* 276:*18* 277:*3* 278:*11, 20* 279:*5, 18, 22, 25* 280:*5, 6, 10, 15, 19, 24* 281:*5, 10, 17, 20, 25* 288:*4, 7, 10, 22* 291:*17, 24* 294:*16*
**programatic** 62:*19*
**programs** 82:*18, 22* 83:*4*
**proHamas** 83:*16, 21*
**prohibiting** 101:*2* 133:*4*
**project** 140:*15*
**prolongs** 227:*13*
**promise** 152:*12* 214:*20*
**prompt** 67:*12* 68:*8* 200:*6*
**prompted** 176:*11*
**proof** 74:*15*
**pro-Palestine** 271:*10* 272:*1*
**pro-Palestinian** 83:*12* 271:*19*
**property** 28:*13*
**proposed** 124:*22*
**prosecute** 112:*15*
**prosecution** 42:*13*
**protect** 89:*20* 91:*12* 92:*7*
**protected** 156:*4* 250:*5*
**Protecting** 86:*25* 87:*18*
**protection** 42:*17* 51:*12* 88:*5*
**pro-terrorists** 136:*13*
**protesters** 161:*9*
**protestors** 161:*23* 277:*21*
**protests** 230:*19, 25* 232:*6* 245:*3*
**protocols** 262:*7, 10* 265:*3* 279:*17, 21*
**provide** 7:*6* 62:*16* 78:*17* 122:*21* 144:*4*

**provide** 158:*14* 175:*19* 193:*9* 195:*20* 232:*1*
**provided** 77:*10* 79:*1, 6* 85:*4* 176:*3* 186:*25* 225:*19* 228:*6* 230:*1, 17, 24* 231:*12, 15, 16* 244:*22* 245:*2* 251:*21* 272:*23* 276:*1, 17, 21* 277:*2* 281:*8, 14* 294:*14*
**provides** 62:*10* 77:*5, 19* 78:*8* 81:*2* 84:*19* 88:*4* 102:*16* 120:*4* 136:*18* 175:*14, 17*
**providing** 102:*1* 160:*12* 196:*6*
**provision** 71:*4, 10, 19, 25* 72:*7, 19* 77:*13, 21* 78:*9, 19* 79:*3* 84:*21* 85:*6* 93:*5, 10* 97:*23* 99:*4* 121:*24* 122:*3, 15, 19, 25* 125:*13, 21* 126:*4, 8, 13, 24* 127:*7, 10, 17* 130:*12* 131:*10, 15* 148:*15* 157:*16* 165:*21* 232:*16* 257:*2, 9, 25* 282:*1, 7*
**provisions** 97:*9* 122:*20* 124:*8, 13* 130:*10* 148:*19* 257:*13* 283:*2*
**prudential** 166:*3, 5, 12*
**Public** 1:*17* 47:*1* 48:*2, 10, 22* 49:*3, 9* 50:*10* 61:*18, 24* 62:*3, 11, 17* 81:*20* 82:*25* 83:*8, 10, 14* 87:*2, 20* 90:*17* 138:*23* 144:*11*
**publically** 60:*5*
**pull** 226:*5*
**pulling** 226:*8*
**purpose** 195:*18* 241:*6* 273:*20*
**purposes** 86:*18* 91:*16* 131:*15*
**pursuant** 25:*20* 116:*4* 130:*11* 161:*1* 224:*2*
**purview** 38:*15*

put 147:*13* 202:*4*
282:22
putting 115:*16*

**< Q >**
qualified 156:22
question 6:*19, 21, 23*
9:*13* 10:*12, 18* 11:7,
*9* 13:*18* 14:*11, 20*
26:*15* 27:*1, 12, 17*
33:*1* 34:2 36:8
40:*15, 22* 48:6, *17*
49:*12* 54:*13, 24*
55:*15* 58:*21* 63:*16,
18, 25* 64:22, *25* 65:2
70:*4* 71:*13* 72:*3*
73:*3, 14, 17* 74:*1*
75:*17, 20* 76:*4* 77:*18*
81:*16* 83:8 89:22
94:*15* 95:*1, 17, 25*
96:*14* 98:*3* 101:24
103:*4, 6, 23* 104:*17,
21* 106:*4, 16* 107:*14*
123:*10* 128:*19*
130:*10* 134:6, *12*
136:*4, 12* 137:*16*
140:*23* 141:6, *7*
142:*16* 144:24 145:*3*
146:*10* 147:*16* 148:*9,
12, 21* 149:9, *21*
150:*10* 154:*24*
156:*11* 157:5 158:*25*
159:6 162:*18, 23*
164:*15* 167:7, *19*
168:*3* 169:*4* 170:*19*
173:*18* 174:*11* 175:*3*
187:*12* 188:*14, 18*
189:*4* 191:*3, 14, 15*
192:*1, 22* 194:*11*
196:*17* 199:*8* 200:*20*
202:*14, 19, 24* 203:*15*
204:5 206:9 214:6
218:*14* 219:*1* 222:7,
*9* 231:*4* 237:7, *11*
240:*19* 241:6, *13, 20,
25* 242:*21* 243:*11*
246:6 248:*16* 250:*11*
252:*19, 24* 253:25
256:22 258:*14* 259:4

265:*11* 281:*12*
282:*11* 284:*12*
questioning 6:*9*
260:*12*
questions 14:*8, 23*
26:23 55:*4* 81:*19*
92:*17* 142:*3* 170:*8*
217:*11, 25* 218:5
227:6 248:*11* 249:*8*
259:*21* 263:*23*
267:*17* 269:*4, 7*
279:*16* 296:*10*
quick 142:*4* 153:*10*
255:7
quickly 102:*8*
quieter 260:*20*
quotations 1:*19*
quote 1:22 104:5
114:*10*

**< R >**
RAMYA 2:*16*
ran 180:*15*
rank 16:*14* 17:*1*
RASSON 3:25 5:*13*
rationale 207:*19*
rationales 262:*23*
reach 135:9
reached 198:*23*
reaches 57:*14*
read 1:*21* 70:*3*
91:*11* 99:*12, 14*
101:*1* 112:*12* 123:*10*
124:*20* 127:*18* 128:9
132:*3* 133:*3* 134:7
142:*16* 159:*21* 160:*4*
187:*11* 230:*16*
233:*10, 20* 241:*10*
246:5 251:24 258:9
273:9, *15* 298:*4*
readable 273:*18*
reading 119:*16*
284:*17* 302:8
ready 142:*16* 274:*4*
real 142:*4* 153:*10*
reallocate 107:6
reallocated 105:*16, 21*
reallocation 107:*17,
18, 21* 108:*3* 118:*21,
25*

really 143:*4* 221:*13*
241:9 294:*21*
Realtime 1:*16*
reason 7:5, *8* 138:*1*
178:*17* 207:6 208:9
219:*23* 262:*1* 263:*21*
271:2 281:*25* 282:*12,
18* 292:24 299:5, *9,
13, 17, 21, 25* 300:*3, 7,
11, 15, 19, 23* 301:*3, 7,
11, 15, 19, 23*
reasonable 124:*24*
reasons 27:*15*
178:22 269:2 271:5
reassigned 108:*25*
recall 8:*1, 11* 9:5
15:22 85:24 97:*11*
116:22 155:7, *14, 18,
22* 177:*13* 182:*21*
183:*3* 190:7 192:5
193:7, *11* 196:2, 22
201:*16* 204:*19*
205:22, 25 206:*14*
208:*20, 22* 211:22, 25
216:24 222:*15, 19, 22*
223:*3, 8* 224:*3, 8*
226:2 229:24 231:8
232:7, *17, 18* 235:*4, 5,
9* 242:*13* 244:*16, 17,
18* 253:23 254:*3, 7,
18* 255:*3* 265:*17, 23,
25* 266:*3, 6, 10, 22*
267:*13* 269:*13*
270:*18, 21, 22* 271:*1,
9, 12, 13, 16* 282:9, 25
283:*4, 5* 292:*18, 22*
294:5
receipt 203:*19*
272:25
receive 49:*18* 51:9
53:2 66:7, *13, 18, 25*
67:*3* 96:6, *22* 97:7
129:7 152:*16, 21*
182:*15* 183:*10* 204:8
229:*19* 244:*3* 247:*1,
3*
received 95:*20* 96:*1*
98:*14, 19* 112:2
125:*19* 126:22 128:*3*
140:*1* 153:*1* 161:7,

*13* 190:*14* 193:*18*
201:8 203:*1, 19*
204:*1, 2, 12, 16, 21*
205:*11* 222:23 223:2
243:6 244:8, *20*
295:*19*
receives 50:9 53:6
57:*12* 96:*11* 192:*18*
278:*4*
receiving 51:7 97:*12*
243:7
recipient 192:*21, 23*
recognize 88:*24* 89:*1*
100:*11* 111:8, *10, 11*
121:*3* 240:*11*
recognizing 132:6
recollection 242:*16*
recommend 178:8, *15*
232:*14*
recommendation
57:5 176:*12, 25*
177:*10, 20, 24* 191:24
193:*10* 232:*19, 22*
233:*3* 292:2 293:*6*
294:*3*
recommendations
119:*19* 158:*15, 19*
recommended 71:*3, 8,
18* 177:6 178:*16*
270:*18* 271:2
recommending 71:*23*
72:5 178:*24*
recommends 72:*18*
175:*10*
reconstituted 194:*20*
record 1:*21* 4:*16*
5:*3, 18* 7:*10* 61:*11,
14* 63:*19* 81:*19*
123:2 139:*10, 13*
142:7, *9, 13, 14*
153:*11, 13, 16* 186:*10*
217:*11* 225:*21* 226:6,
*9, 12* 227:*16* 228:5
250:*18* 251:*21*
252:*18* 258:*17*
259:*12* 260:5, *7, 10,
13* 262:*12* 269:*3*
295:*1, 5, 10* 296:*14,
17, 19* 297:*1* 302:5

recorded 5:5
recording 248:23
recordkeeping
  199:15, 18
redacted 230:19
redepose 295:20
reduced 69:17, 22
  283:22 284:5, 11
  285:1, 2 302:7
refer 44:21 49:22
  50:12, 17 58:15, 16,
  18, 25 67:22 86:12,
  13 183:22 243:25
  244:4 263:3 272:21
  273:9, 12 274:18
reference 102:22
  177:15 234:4 255:11,
  23 256:6
referenced 8:4 23:24
  29:11 42:20 51:3, 7
  186:8 256:3, 12
references 251:23
  258:6
referral 58:7, 13
  190:15, 17 191:6, 9
  192:11, 15 216:12, 15,
  19, 20 222:25 223:7,
  11 224:16, 24 231:13,
  15, 17 232:2, 9, 13, 19
  234:25 235:2, 7, 21
  243:8, 18, 19 244:12
  245:10 254:19, 23
  256:12, 16 261:3
  262:1 266:3 267:9,
  14 268:1 272:18
  290:9, 12, 15, 19
  291:2, 18, 23 292:19,
  23 293:6, 13, 17, 24
referraled 268:14
referrals 184:18
  190:18, 21 192:24
  199:11 225:10, 11, 14,
  22 232:22 233:1
  234:5 235:12, 16, 21
  236:6, 9, 12, 23 268:2,
  7, 8, 22 282:4 291:11
  292:11
referred 34:12 50:19
  181:9 219:22 224:20
  244:9 246:16 262:2

264:16 266:16, 18
  268:19 272:2, 6, 11
  274:4 281:24, 25
  283:1
referring 28:1, 21
  29:1, 9 47:3 62:5
  65:16 68:1, 5 77:2
  82:23 99:16 125:22
  126:5, 17 136:23
  160:23 173:8 178:3,
  6 198:6 224:17
  234:1
refers 49:25 129:14
  133:14
reflect 156:5
reflected 1:20
reflects 287:4
refresh 242:16
refreshing 284:21
Refugees 255:13, 17
refuse 14:22
regard 25:9
regarding 83:20
  88:4 108:2 112:3, 7
  125:10 176:3 179:14
  189:2 206:21 230:18,
  24 241:14 244:23
  249:19 263:16
  267:13 283:22 284:3
  295:2
regiment 25:25
regions 104:15
regular 66:10, 15, 18
  67:2
regularly 43:1 201:5
regulation 161:1
relate 47:24 50:11
related 61:19 62:11
  120:5 121:16 124:7
  302:9
relates 27:10, 22
  28:3, 12 32:10, 19
  43:25 78:13 82:25
  90:8, 14 105:5 110:3
  113:18, 22 126:13
  170:8 173:24 175:15
  179:24 181:13
relating 47:15 64:2
  77:12, 20 78:9, 18
  79:2 109:22 123:1

157:6 189:24 203:10
  214:20
relation 224:9
relationship 23:2
  42:5 113:17, 21
relatively 147:8
relevant 75:4 116:4
  139:1, 9 141:17, 19
  142:21, 23, 24 147:22
  154:7, 15 295:18
relied 81:21
Relief 255:12
relies 131:7
remains 92:2 99:14
  101:1 133:3
remember 8:10
  177:16 205:12 230:3
  242:20 282:4
remembering 272:9
remind 79:10 154:3
  184:13 186:10
removability 123:8,
  20 257:8
removable 125:6
Removal 22:16 24:2,
  6, 9 112:21 124:9
  172:16, 23, 24 250:2
  258:2
remove 112:15
  257:20
renew 45:6, 10
repeat 9:12 95:1
  98:4 175:3 200:21
  206:9 284:12 290:25
repeated 291:3
repeatedly 136:2
rephrase 6:20 10:11
  33:24
report 12:3 17:25
  18:3, 6 57:16, 17
  66:13, 19 81:4, 7
  82:4 114:8 115:2, 5,
  16 116:20 139:15
  160:7, 12 184:24
  185:1 200:1, 2, 5, 7,
  12, 24 201:2, 9, 15, 18
  219:21, 25 220:11
  232:10, 11 242:10, 15,
  22 243:6, 15, 22, 25
  244:1, 3, 8, 13, 20

245:20, 25 246:3, 8,
  11, 14, 15, 24 247:1
  261:8 266:5, 8 287:6
Reported 1:25
  206:25
Reporter 1:16 5:14,
  19 6:15 36:22 79:23
  84:2 87:8, 14 88:16
  92:23 95:2 99:17
  110:20 114:20 141:2
  146:7, 9 169:24
  188:10 216:14
  217:17 221:6 233:13,
  16 239:19 255:15
  260:16 284:19
  296:25 302:21
REPORTER'S 1:19
Reporting 5:13, 16
  81:5, 8, 23
reports 17:9 66:7, 25
  79:7 81:2, 21, 25
  82:2, 7, 11 83:19, 25
  84:21 190:21 199:22
  201:6, 25 202:1, 5, 6
represent 10:15, 23
  228:4 247:16 251:20
representation 224:6
representative 195:25
represented 10:9
  258:10
representing 10:16
request 67:13 288:2
requested 281:3
  302:8
require 65:1 68:15,
  20 72:19 168:18
  274:3
required 69:6
  108:10 273:21
requirement 25:23
  69:9 72:1, 8, 12 75:1,
  3 104:18, 20 173:3, 6
  212:6
requirements 69:11
  103:18, 25 114:2
  293:10
requires 104:5, 11
Research 62:8, 10
  77:3, 6, 10 184:23
reserving 295:19

**resident** 36:2  60:9, *15*, *19*

**residents** 33:*14* 36:*12*, *17*  43:*17* 49:*17*, *19*  50:*1*, *7*, *11* 51:*1*

**resinate** 147:*1*

**resource** 105:*12*

**resources** 105:*14* 118:*21*, *25*

**respect** 26:*19*  33:*19* 48:*13*  49:*4*  101:*21* 112:*20*  122:22 161:*15*  198:*7*  259:*13* 260:*14*, *21*  261:*17* 262:*14*  264:*21* 265:*11*  269:*8*, *19* 270:*9*  290:*1*  292:*20*

**Respectfully** 92:*12* 296:*4*

**respond** 159:6 188:*17*

**responded** 148:*19*

**responding** 55:*10* 115:*12*  116:*12*  130:7 160:*19*  214:6, *10*

**response** 16:*17*  68:4 105:*1*, *22*  107:7 114:*15*, *24*  115:*21* 116:2, *17*, *25*  117:7, *13*  118:*18*, 22  130:*3* 147:*16*  148:*20* 156:22  158:*21* 187:*20*  192:5  282:*15* 290:*8*

**responses** 6:*17*

**responsibilities** 26:*18* 31:7  160:*25*

**Responsibility** 22:*20* 30:*25*  31:*24*  82:*19*, *22*  173:*2*, *5*  288:*15*

**responsible** 32:*14* 55:*10*  61:*17*, *23* 112:*19*, *22*, *24*  130:*7*, *16*  196:6  219:*18* 254:*9*

**Rest** 15:*5*

**restate** 11:7  14:*20* 27:*1*, *17*  48:*16*  77:*18*

148:*9*  150:*19*  173:*18*

**resting** 15:*10*

**restrictions** 127:*19* 213:2, *5*

**result** 118:*13*

**results** 200:*9*

**retain** 10:*19*

**reveal** 64:*23*  140:*24*

**reveals** 191:*16*  214:6

**review** 6:*12*  15:*13* 103:*20*  135:2  150:*15* 152:*15*  153:*4*  169:*8* 184:*24*  206:*7*, *12* 245:*15*  252:*4*  272:*24* 273:*1*  296:*23*

**reviewed** 200:*11* 246:2, *10*  248:*10* 279:*9*

**reviewing** 273:6 274:*16*

**reviews** 134:*9* 138:*19*  150:*21* 200:22

**revocation** 71:*3*, *24* 72:6, *18*  163:*23* 164:*9*  165:*22*  166:*3*, *4*, *6*, *12*, *15*  167:*4* 168:*17*  170:*11* 175:*11*, *16*, *20*, *25* 176:2, *4*  177:*7*, *20*, *24* 178:*8*, *16*, *24*  283:*10*

**revocations** 26:*12*, *19* 27:*13*, *15*, *20*  71:*9*, *18* 72:22, *25*  163:*18* 164:*17*  165:*4*  174:6 270:*19*

**revoke** 139:*24*  164:*5* 175:*18*

**revoked** 73:6, *21* 74:8  163:*19*  164:*20* 165:6, *17*, *21*  166:2 167:*10*, *16*  170:*14*, *22* 171:*19*, *22*  172:*3*, *7* 173:*1*, *13*, *21*  174:*18* 175:*1*, *8*  219:8

**revokes** 166:*13*

**revoking** 26:*25*  27:4

**revolution** 146:6, *14*

**Richard** 52:*12*

**Right** 11:2  21:22 23:*18*  24:3  30:*17*, 22 33:*14*  41:*13*, *17*, 22 42:*3*, *4*, 8, *18*, 24 46:*12*  48:*11*  51:22 52:4  56:2  57:*1* 70:20  73:*19*  78:5 79:*19*  85:25  89:*21* 90:6  98:8  99:*1*, 24 100:*14*  101:5  102:*4*, *11*  103:2  105:*15* 110:*12*  112:*17* 113:25  121:7  124:*14* 125:6  127:*12*  128:*12* 132:2, *24*  137:*14* 142:*11*  145:*21*  147:9 148:*16*  150:*18*, *24* 151:*17*  155:*14*  158:6, *10*  159:6, *18*, *23* 160:20  162:*14* 163:22  164:*12*  169:*3* 179:*1*  180:*10*, *13* 186:2  194:*4*  223:*3*, *17*  234:20  239:22 240:22  241:2  242:22 248:*18*  249:*21* 251:22, 25  253:*18* 256:*17*  257:*10*, *16*, *21* 258:2  264:*3*  265:*1* 266:2, *21*  273:25 274:*19*  276:2  282:*13* 292:*14*  295:*19*, *23*, *25* 296:*15*

**rights** 42:*13*, *21*

**rises** 272:*17*

**risk** 285:*14*, *16*

**risks** 104:*16*

**river** 146:*1*

**Riverside** 2:*19*

**ROA** 264:*16*  266:*18*, *23*  271:25  272:*4*, *17*, *21*, *23*  273:*9*, *12*, *13*, *17*, *22*  274:2, *6*, *11*, *12*, *23*  275:*3*, *12*, *15* 279:*10*

**ROAs** 271:*9*, *13*, *18*, *22*  272:*10*, *15*  273:*23* 275:*10*, *19*, *23*  276:*17* 279:*8*  283:*1*

**Robert** 185:*23* 186:*21*  204:*15*  226:*1*

**ROI** 287:7, *11*

**role** 8:*18*  16:*10* 17:*5*  19:*3*, 22  20:*4*, *16*, *23*  26:*11*  30:24 37:*14*  38:*11*  53:*17* 84:*13*, *16*  101:*21* 102:*1*  104:*17*  115:*10* 122:2  162:*12*  230:25

**roles** 17:*13*  52:*21* 160:*24*  230:*18*

**Romeo** 79:*25*

**room** 142:*5*

**rose** 243:*16*

**roster** 56:*10*, *22*, *24* 280:*13*, *14*

**RPR** 1:*25*  302:*3*, *20*

**RRP** 1:*16*

**RUBIO** 1:6  5:*8* 229:*4*  230:6, *16* 232:*14*  233:*21*

**Rubio's** 263:*4*

**ruffling** 260:*18*

**rule** 151:*2*

**rules** 6:*13*

**ruling** 74:*16*

**Rumeysa** 212:*4* 267:*4*, *7*

**run** 194:7

**running** 224:*9*

**runs** 52:*3*  179:*18* 181:*19*, *23*  182:*1* 237:*15*, *18*  238:*9*

**< S >**

**safeguarding** 133:*5*

**Safely** 214:*24*  215:*3*

**safety** 47:*1*  48:2, *10*, 22  49:*3*, 9  50:*10* 61:*19*, *24*  62:*3*, *11*, *17* 82:25  83:8, *10*, *14* 87:2, *20*  90:*17* 173:25  178:25  179:*3*, *4*  207:9, *12*  270:*25*

**SANTORA** 3:*5*

**satisfying** 104:*18*

**save** 64:*1*  157:2 248:7  252:25  259:*20*,

*23*
saw 242:*15*
saying 35:2 47:*25*
138:*11* 151:*23* 193:*4*
205:*6, 10* 218:*3, 10*
219:*23* 242:*6* 257:*24*
266:*7* 267:*20* 285:*21*
says 101:*5* 116:*8*
121:*16* 122:*11*
124:*20* 128:*9* 131:*23*
132:*2, 23* 138:*21*
159:*21* 230:*16* 233:*9,
20* 234:*8* 251:*24*
253:*12* 255:*22*
273:*18*
scenario 170:*25*
schedule 21:*24*
scheduled 269:*12*
school 46:*4*
Science 16:*2*
scope 11:*11* 55:*2*
69:*20, 21* 177:*17*
SCOTT 2:*15*
Scott.wilkens@knightc
olumbia.org 2:*22*
screened 104:*6*
screening 104:*12*
105:*5, 8, 17*
screenshot 247:*6*
screenshots 274:*7*
scroll 180:*13*
sea 146:*2*
seal 298:*15* 302:*13*
search 206:*2*
second 15:*16* 18:*23*
58:*7* 82:*5* 100:*2*
104:*7* 113:*24* 117:*9*
119:*13* 131:*23* 145:*6*
152:*7* 157:*15, 19*
216:*22* 229:*7, 9*
230:*8, 15* 240:*10*
249:*22* 261:*5* 270:*17*
271:*7* 275:*25* 281:*22*
284:*18* 289:*23*
seconds 295:*12*
Secretary 39:*3, 4, 10*
103:*15* 116:*12*
119:*17* 124:*21, 23*
125:*13* 128:*9, 15, 21*
129:*4* 159:*8* 228:*21*

239:*6, 8* 247:*23*
249:*2*
section 4:*15* 28:*17*
30:*1* 42:*13* 52:*14*
91:*10* 103:*14, 19, 25*
104:*4, 8* 112:*11, 20*
113:*6, 11, 18, 22*
114:*1, 4, 16* 115:*3, 12,
17, 22* 116:*2* 117:*1*
119:*12, 15, 17* 121:*4,
24* 122:*3, 4* 123:*3, 15*
124:*8* 132:*3, 7*
136:*18, 22* 137:*9*
157:*18* 158:*11, 13*
159:*21* 160:*1, 8, 11*
257:*15*
sections 29:*11, 14, 19,
21* 47:*2*
Security 9:*8, 18*
11:*13* 12:*6, 16, 22, 24*
13:*13* 14:*6* 15:*19*
16:*6, 8, 24* 17:*2, 5*
18:*15, 20, 24* 19:*6, 13,
15, 19* 20:*7, 19* 22:*4,
5* 23:*1, 3, 4, 5, 6, 9, 15,
16, 17, 21* 25:*18, 19*
39:*5* 40:*24* 41:*5, 10,
11, 12, 16, 19, 22* 42:*1*
43:*1* 46:*25* 47:*4, 8*
48:*2, 10, 21* 49:*3, 9*
50:*10, 22* 59:*16, 18*
61:*18, 24* 62:*11, 17*
82:*25* 83:*8, 10, 14*
87:*1, 19* 90:*17* 91:*14*
92:*4* 102:*23* 103:*15,
18, 24* 104:*5, 16*
105:*1* 114:*3* 115:*7,
11, 20* 116:*1, 21, 25*
117:*5, 11* 118:*9, 11*
119:*1, 5, 10, 18* 120:*4*
121:*16* 124:*7* 133:*6,
12, 15, 24* 134:*2*
135:*15, 20, 22* 136:*5,
15* 137:*19* 138:*11*
143:*8* 153:*22* 158:*20,
24* 159:*11* 160:*10*
161:*7, 13, 22* 162:*4,
13, 17* 163:*3, 13, 17,
20* 164:*12* 167:*25*
168:*12* 171:*14* 173:*4*

174:*1* 178:*25* 179:*7*
184:*1, 3* 186:*2* 196:*9,
11, 15, 21, 24* 197:*11,
14* 201:*13* 210:*7, 8*
221:*2, 10, 20* 222:*5,
13, 17* 228:*21* 239:*2*
251:*16* 254:*2, 9*
264:*10* 270:*25*
283:*11, 16*
Security's 114:*15*
115:*21* 162:*10* 263:*2*
see 47:*7* 48:*19*
120:*25* 121:*19* 127:*9,
15, 16* 128:*1, 8* 145:*6*
152:*10* 159:*20* 163:*3*
198:*13* 229:*13*
230:*10, 21* 234:*22*
240:*21* 252:*9* 253:*12,
19* 254:*15* 256:*25*
258:*5* 259:*4, 7, 11*
274:*14*
seeing 97:*11* 126:*18*
seeking 128:*15, 21*
263:*22*
seeks 137:*6*
seen 88:*22* 89:*15*
97:*16* 116:*19* 160:*13*
189:*23* 190:*5* 192:*14*
194:*3* 226:*11* 228:*3,
24* 234:*19* 240:*16, 19*
245:*23* 247:*24*
248:*10, 16, 21, 23*
251:*12* 252:*6, 12, 13,
23* 253:*20* 258:*18, 23*
271:*18, 22*
Selwin 85:*18*
S-E-L-W-I-N 85:*20*
Senate 7:*24*
send 129:*3, 20, 23*
223:*11* 254:*23*
259:*19, 20* 274:*8*
275:*9* 290:*12*
sending 223:*6*
224:*15* 290:*18* 291:*2*
293:*24*
senior 17:*1* 37:*15*
39:*14, 15, 20* 51:*25*
59:*24* 60:*1* 85:*8, 15,
22* 96:*9* 113:*4, 9, 16*

130:*25* 196:*10*
238:*18, 22*
senior-most 37:*17*
41:*10*
sense 28:*7* 62:*25*
202:*3* 217:*10* 226:*20*
227:*1, 2* 264:*1*
sensitive 203:*9* 214:*8*
sent 190:*13, 24*
192:*10* 216:*20*
222:*23* 223:*2* 234:*25*
249:*25* 254:*19*
291:*18, 24* 293:*13*
sentence 93:*15* 160:*1*
sentences 291:*4*
separate 48:*22* 136:*2*
161:*5* 218:*13* 257:*9*
263:*18*
September 20:*17*
302:*15*
serious 124:*25*
130:*13, 23* 147:*4*
serve 19:*12* 30:*11*
served 19:*5* 20:*13*
Service 25:*16*
Services 36:*20, 25*
39:*17, 21* 40:*5, 12*
51:*18*
set 27:*25* 70:*23*
91:*3* 103:*18, 25*
133:*7, 10, 20* 135:*14*
140:*9* 289:*25* 298:*14*
302:*12*
sets 162:*16, 22* 163:*1,
12*
setting 42:*23* 98:*24*
161:*11*
seven 253:*6*
seven-hour 295:*24*
296:*5*
shake 6:*17*
shakes 88:*2*
share 120:*7* 139:*16*
shared 54:*8, 20*
sharing 196:*8, 11*
sheet 205:*23* 206:*4*
298:*8* 299:*1*
sheets 205:*15, 18*
206:*8, 13*
SHER 2:*6* 6:*6*

shift 70:*18* 105:*14*, *23* 106:*11*
shifted 105:*16*
shifting 70:*23*
Shockingly 294:*23*
short 61:2 68:*11* 226:*16* 239:*13*
shorthand 87:*25*
shot 94:*10*
show 88:8 168:*11* 228:*16* 296:*13*
showed 122:*25*
showing 215:*18*
shown 229:*23* 240:*9*
sic 52:*1*, *3*, *7* 53:2 61:*19* 245:*16* 268:*15* 291:*4*
sided 249:*10*, *24*
sign 179:*13* 274:*23* 275:8
SIGNATURE 298:*11*, *20*
signed 100:*16* 178:6 179:*12* 192:*16* 229:*5*, *6* 298:8
signing 302:8
signs 275:7
silent 164:*16* 174:5 175:*20* 176:4 177:6, *20*, *24* 178:8, *16*, *24* 270:*19*
silly 194:*10*
similar 103:*10* 212:*18*
simpler 89:*25*
simply 76:*19* 163:6
simultaneously 102:*9*
single 177:*22* 211:2 221:*22*
sir 102:5 113:*25* 163:*24* 203:*16* 251:*9* 267:*23*
sit 28:*14* 260:2 282:5
sits 18:*25*
sitting 242:*12* 266:2, *21* 267:*12* 282:*24*
situation 75:*1*
six 78:*21* 174:*18*

176:7 177:*25*
skip 102:*14* 248:*17*
slide 187:*3*
slightly 148:*11*
small 45:*17*
smaller 118:*10*
smarter 250:*24*
Smith 85:*18*
smuggling 28:6 29:*17*
social 4:*16* 140:6, 8 200:*10*, *23* 239:*23* 240:2, *12*
somebody 145:*20*, *25* 154:*9* 159:5 224:*20*
someone's 97:*22* 130:*12* 271:*19*, *23* 285:6, *22*
soonest 297:*3*
sorry 6:5 21:*10* 23:*25* 24:*1*, *2* 30:7 39:5 41:*20* 48:5 51:*4* 69:2 70:*4* 71:*16* 79:9 82:5 86:*20* 87:9, *11* 90:*20* 94:*25* 99:*20* 105:*15* 106:2 112:*23* 114:*20*, *25* 115:*18* 116:*15* 117:*24* 123:9, *24* 131:*20* 135:4, *12* 136:*24*, *25* 138:9 141:2, *4* 146:7, *12* 152:8, 9 162:*22* 167:6 170:*3* 175:2 176:*18* 177:4 178:*12* 186:*11* 187:*11* 188:*10* 189:*3* 190:*12* 195:*10* 199:6 205:6 206:*1* 216:*14* 217:*17*, *18*, *20*, *21* 221:6 225:*20* 233:*13*, *18* 236:3 250:*23* 255:*15* 260:*16*, *19* 261:*21* 266:6, *25* 267:5 273:*25* 277:7, *14* 281:*11* 282:*10* 284:*16* 288:5 289:6, *23* 291:*21* 293:*4*
sort 56:*8* 143:7 148:2 149:*1* 182:8

203:*11* 206:*20* 262:*16*, *24* 280:*14* 288:*1* 290:*24*
sound 95:*23* 206:*11*
sounds 14:4 88:*1* 109:*9* 147:8, *19* 148:*1* 151:*1* 183:*19*
source 47:*10* 51:*17* 67:*18*, *19* 68:7 81:5, *8*, *22* 94:*11* 97:*21* 134:*9* 135:2 138:*19*, *22* 139:2, *10* 140:*3*, *5*, *15*, *18* 141:*18* 142:*21* 150:*15*, *22* 152:*14* 153:*3* 184:*23* 198:*19* 244:*23* 245:*1* 246:*24*
sources 51:*19* 81:*21* 139:*18* 246:*15*, *18* 278:*9*, *15*, *19* 279:*1*, *3*
sourcing 247:5
sp 158:*4*
space 26:*3* 171:*11*
speak 11:*3*, *12* 12:5, *23* 13:*3*, *7* 21:*1*, *18* 40:6 51:*22* 105:*3* 119:7 122:*20* 144:*12* 168:*21* 169:*11* 223:*10* 224:*14* 227:8 233:*16* 249:*13*
Speaking 69:*10* 141:*11*, *16* 142:*19* 183:*21* 184:6 272:*15* 282:*3*
speaks 123:*4* 136:*1*, 8
Special 19:*23*, *24* 20:*13* 42:*13* 65:*17* 171:*24* 209:*23* 215:5
specialist 5:*14*
specific 31:*14* 32:5, *8* 33:*22* 34:7 144:*15* 154:*12* 161:*20* 179:*20* 180:*15* 190:*4* 193:7 198:2 208:*11* 212:*23* 216:5 227:7 257:*18* 259:*24* 262:*23* 265:7 268:7, *8* 269:*4* 271:*1*
specifically 30:*1* 40:*19*, *25* 102:*21*

109:*21* 147:*1*, 2 148:*3*, *12* 198:*18*
specifics 245:*9* 253:*11* 262:*22*
specifies 92:*6*
spectrum 44:*1*, 5, 6 147:*20*
speculate 154:*11* 178:*1* 241:*4* 254:*11* 255:2 258:*16* 288:2 292:*11*
speculating 88:*10* 258:*22*
speculation 76:2 93:*13* 146:*22* 149:*21* 150:8 154:*19* 156:*3* 162:6 174:*13* 176:*17* 200:*14* 209:5, *11* 237:5 242:*18* 250:*4* 252:*25* 256:*20* 277:5
speculative 250:*10*
speech 75:8, *16* 141:*12* 143:*17* 144:6 149:7 150:*4*, *17*, *23* 151:*3*, *12*, *20*
spell 79:*24* 87:*13* 267:*21*
spending 117:*11*
spirit 110:*13*
Spiros 17:*11*
spoke 11:*21* 12:*11*, *21* 102:*21* 224:*19*, *23* 278:*22*
spoken 12:*9*
staff 17:*20*, *22* 40:7, *9* 155:*10*
staffing 108:*11*
stamps 228:*10*, *11*
stand 26:*4*
standard 69:8 74:*15* 213:*17*, *24* 214:*14* 221:*19*
standards 69:*10* 131:6 212:*14*, *18* 213:*18*
standing 145:*17* 146:*17* 189:*17* 217:*23*
start 6:*14* 7:*1* 28:2 86:*24* 141:*14* 165:*11*,

*14* 196:*18* 225:*23*
295:*8*

**started** 223:*16* 279:*5*
291:*25*

**starting** 17:*13* 91:*9*
169:*21*

**starts** 228:*25*

**state** 7:*9* 13:*4* 30:*9*
35:*10, 17, 18, 21* 36:*5,*
*10, 14, 24* 37:*4, 12*
39:*6, 8* 42:*6, 16* 44:*9,*
*18* 53:*21* 57:*5, 22*
58:*1* 59:*7, 8* 60:*11,*
*14* 72:*2, 9, 11, 13, 20,*
*23* 73:*1, 7, 13, 23*
74:*9, 21, 23* 75:*10*
100:*25* 122:*7* 124:*21,*
*23* 128:*10* 129:*4, 5, 6,*
*7, 15, 18, 21* 130:*3, 7*
133:*2* 145:*22* 153:*2*
159:*8, 9* 164:*1, 6, 25*
165:*8, 10* 166:*9, 13*
173:*11, 20* 174:*3, 16,*
*24* 175:*6, 12, 24*
176:*1* 178:*4* 179:*17*
184:*7, 10, 12, 13, 19*
190:*16, 19* 192:*12, 16,*
*19, 24* 199:*12* 216:*13,*
*16, 19, 21* 217:*23*
219:*22* 223:*6, 11*
224:*15, 23* 225:*8, 13,*
*23* 231:*17* 233:*2*
238:*2, 24* 243:*9, 17*
244:*2, 5, 9* 249:*25*
254:*20, 24* 261:*5*
264:*11, 18* 265:*19*
268:*24* 272:*2, 6, 12,*
*21* 275:*9* 281:*24*
290:*7, 13* 291:*1, 12,*
*16, 25* 292:*1, 16, 24*
293:*5* 294:*2, 3*

**stated** 93:*19* 135:*1*
164:*23* 249:*10* 256:*7*
269:*3* 271:*5* 274:*14*

**statement** 8:*21, 24*
102:*25* 133:*14*
134:*18* 136:*21, 23*
144:*25* 145:*9, 10*
148:*4, 12, 14, 15*
149:*9, 12, 15* 150:*4*

241:*15, 19* 242:*6, 25*
243:*3* 249:*12, 14, 19*

**statements** 127:*22, 23*
128:*5* 146:*16* 147:*20*
150:*1*

**STATES** 1:*1* 5:*8*
8:*17* 25:*14* 28:*3, 4, 7*
29:*10, 25* 30:*1* 32:*12*
33:*7* 34:*13, 23* 39:*16*
88:*4* 91:*11, 12*
104:*14* 112:*12, 13*
124:*21, 23* 125:*1*
127:*17, 20, 24* 128:*6,*
*12, 17, 23* 131:*12, 15*
132:*4, 12* 133:*18*
171:*25* 172:*1* 228:*20*
233:*11, 22, 24* 241:*10*

**State's** 125:*13*
128:*15, 21*

**States's** 143:*8*

**Station** 3:*9*

**status** 36:*2* 170:*9*

**statute** 30:*4* 119:*23*
120:*8, 18* 122:*22, 25*
123:*15, 18* 124:*6*
257:*14, 16* 258:*12*

**statutes** 24:*19, 22, 23*
25:*2* 27:*25* 123:*7*

**statutory** 26:*8*
257:*18*

**stayed** 44:*21*

**staying** 46:*15*

**steadfast** 99:*14, 22*
101:*1* 133:*3*

**stenographic** 5:*18*

**stenographically**
302:*7*

**step** 15:*6* 34:*9, 17*
153:*10* 161:*19*
201:*19, 21* 274:*18*

**steps** 15:*1, 4, 7, 9*
201:*22* 203:*3* 215:*2*
243:*7*

**Stewart** 38:*5*

**stick** 19:*1* 223:*23*

**Sticking** 23:*7* 34:*25*
103:*12*

**stipulate** 216:*25*
241:*4*

**stop** 259:*11*

**stopped** 191:*20*
296:*20*

**stored** 199:*21*

**straightforward**
202:*22*

**strategies** 203:*8*

**strategize** 259:*17*

**Street** 1:*14* 2:*7* 5:*12*

**strike** 87:*17* 220:*25*

**STROKUS** 3:*6*

**Stuart** 38:*3* 39:*1*

**student** 8:*16* 9:*4, 20,*
*22, 23* 31:*4, 8, 16*
32:*1, 7* 45:*24* 46:*4*
161:*8, 23* 173:*12, 13,*
*21* 174:*17, 20* 219:*7*
277:*20*

**students** 32:*1* 137:*9,*
*12* 154:*15* 155:*3*
281:*9, 16*

**study** 46:*6*

**studying** 8:*16*

**stuff** 296:*24*

**subject** 54:*21* 58:*8*
82:*11, 16* 127:*19*
161:*4* 165:*6* 183:*4*
189:*16* 229:*11* 234:*9,*
*10, 14, 20* 245:*10*
265:*8*

**subjects** 109:*25*
154:*23*

**submit** 114:*7* 160:*6*
213:*16*

**submitted** 277:*20, 25*

**subordinate** 22:*11, 13,*
*14* 39:*11* 40:*7, 9*
42:*22* 52:*8, 11, 16*
108:*17*

**subordinates** 52:*23*
79:*18, 20* 85:*16, 23*

**subparts** 218:*16*

**Subsection** 104:*4, 8*
119:*13* 121:*16, 20*
122:*10, 13* 124:*20*

**subsequent** 188:*25*
203:*2* 261:*15* 286:*2*

**substance** 8:*23*
13:*14, 22* 193:*5*
203:*22* 231:*6, 8*

245:*6*

**substantial** 51:*23*

**success** 179:*9*

**suggest** 282:*25*

**suggested** 136:*17*
221:*25*

**Suite** 1:*14* 2:*20*

**suited** 202:*13*

**summary** 129:*14*

**supervise** 41:*15, 18,*
*21*

**supervising** 52:*23*
79:*18*

**supervisor** 18:*5*

**supervisors** 52:*8, 11,*
*16* 66:*17*

**supervisory** 65:*18*
172:*14, 17*

**support** 62:*4, 7, 16*
76:*25* 77:*6* 78:*8, 17*
79:*1, 5* 84:*20* 85:*4*
100:*1* 102:*1, 16, 24*
105:*17* 113:*17*
114:*17* 122:*14, 21*
129:*24* 138:*7, 14*
143:*9* 173:*7* 175:*15,*
*18* 196:*25* 197:*11, 15,*
*21* 198:*18*

**supported** 114:*14*
197:*7, 22*

**supporting** 152:*1*
198:*14*

**supports** 113:*1*

**suppose** 222:*2*

**supposed** 14:*18*
112:*3* 212:*12* 213:*7*
214:*23*

**sure** 6:*16* 10:*13*
18:*23* 21:*13* 22:*1*
33:*25* 34:*3* 36:*9*
61:*1* 63:*22* 68:*18*
69:*19* 71:*15* 80:*13*
88:*12* 89:*24* 95:*5*
96:*10* 101:*25* 102:*6,*
*11* 107:*2* 120:*1, 9*
123:*12* 134:*5* 141:*9*
165:*23* 166:*22* 167:*8*
170:*21* 174:*22* 175:*9*
176:*23* 200:*22* 201:*4*
211:*20* 217:*13* 218:*8*

233:*15*, *18*  236:*13*, *16*
242:*1*  248:*12*  259:*18*
261:*23*  263:*25*
267:*20*  272:7  279:2
281:*6*  282:2  288:*1*, *5*
294:*21*  295:7  296:*24*
**Suri**  264:*11*, *22*, *24*
266:*4*, *12*
**S-U-R-I**  264:*12*
**Suri's**  264:*15*  265:*18*
**surprising**  6:*4*
**surrender**  168:*11*
**swear**  5:*19*
**sworn**  5:22  7:*13*
**Sympathetic**  138:7
**sympathies**  136:*14*
**sympathizers**  137:*21*
**sympathy**  138:*4*, *6*
**synthesizers**  135:*25*
**Syria**  255:*24*  256:2
**system**  53:8  63:9
64:*1*, *5*, *9*, *11*, *13*  65:7,
*20*  199:*15*, *18*

**< T >**
**tab**  234:*8*, *22*
**tac**  296:*6*
**tactics**  206:*21*, *23*
**take**  6:22  7:*19*  9:22
15:*1*, *4*, *9*  16:*17*
57:*24*  60:25  61:*5*, *9*
73:*10*, *21*  74:*4*, *24*
75:6  88:*15*  103:*16*,
*19*  110:7  111:9
116:2  132:*19*  153:7
182:*18*  203:3  215:3
226:*16*, *23*  227:9
239:*13*  240:*10*, *11*, *20*
243:*17*  252:3  253:*6*,
*10*  255:7  259:*10*
260:*4*  261:*10*  268:*11*
294:*4*  295:*11*  297:2
**taken**  1:*11*  57:6
61:*12*  106:*17*  153:*14*
189:*20*  200:3  201:*20*,
*21*, *23*  243:*21*  260:*8*
261:*15*  264:9  283:*12*
302:*4*, *6*
**takes**  101:*17*

**talk**  18:22  47:*4*
86:*21*, *22*  89:*10*
99:*21*  120:*19*  125:*20*,
*21*  141:22  142:*4*
163:*16*  216:5  262:9
271:22
**talked**  22:25  143:6
153:*21*  167:*13*
257:*12*  270:3  280:*13*
286:*16*
**talking**  33:*11*  44:*4*
46:8  76:9  102:9
120:*1*  124:8  143:*12*,
*15*  149:2  157:*24*
179:22  180:*16*, *19*
223:22  284:5  289:*16*
**talks**  100:*20*
**tam**  183:6
**Tango**  79:*25*
**targeted**  259:*13*
260:*15*, *22*  261:7, *8*,
*11*, *16*  262:*19*, *20*
267:*16*, *19*  269:5
**tasked**  24:7  40:*25*
99:6  110:2  115:*12*
172:*24*
**team**  183:*3*  184:22
**techniques**  140:*24*
143:*24*  200:*15*
203:*11*  214:6
**technology**  23:*11*
**tell**  8:*14*  18:*17*  25:5
27:*19*  37:*10*  43:*11*
44:6  69:2  75:*23*
76:7  108:6  111:*20*
133:9  134:*18*  141:*8*,
*18*  142:22  156:*14*
162:*21*  164:*3*  191:22
214:22  218:6  252:*15*
255:8  287:*20*  294:*20*
**telling**  81:*18*  241:*15*
**tells**  111:*21*
**ten**  55:*19*, *20*  106:25
107:*3*  236:5  292:*16*
**term**  28:20  29:2
33:*23*  44:*24*  79:*19*
99:9  138:7  166:7
202:*11*, *12*, *13*  205:*16*
219:*14*  220:*19*

234:*11*, *12*, *17*, *19*
274:25
**terminated**  46:*4*
168:2
**terminology**  258:*12*
**terms**  46:*5*, *11*, *20*
135:*21*  151:*24*
167:*22*, *23*  217:7
238:9
**terrorism**  47:*12*, *15*,
*20*  120:5  123:*1*
124:7  136:*3*  258:6
**terrorism-related**
122:*20*  250:*1*  257:7,
*20*  258:*1*  259:*5*
283:2
**terrorist**  68:*10*
102:*22*  121:*20*  136:*3*
137:*25*  138:*14*, *16*
143:*10*, *11*  144:7
145:*11*  146:*19*  147:*3*
148:*4*, *13*  149:*8*, *10*,
*13*, *16*, *18*  150:*18*, *24*
151:*3*  241:*12*  259:8
**Terrorists**  87:*1*, *19*
91:*13*  92:*3*  135:*23*,
*24*  137:*21*  138:*5*
249:*11*, *24*
**test**  119:*25*
**testified**  5:22  9:*16*
92:*13*
**testify**  7:*3*  11:5
12:*8*, *25*  13:*5*, *9*, *24*
15:*2*, *10*, *14*  258:*19*
**testifying**  8:*18*, *20*
11:22  15:*17*
**testimony**  7:6, *13*, *23*
8:*1*, *3*, *5*  10:*3*  11:*4*,
*14*  12:7, *25*  13:*1*, *4*, *8*,
*14*, *23*  14:*19*  15:*21*
31:*19*  91:25  117:*21*,
*25*  133:*13*, *17*  148:7
160:9, *13*  223:*19*
298:5, *6*  302:6
**text**  120:*25*  128:*1*
**Thank**  20:*21*  104:*10*
158:*3*  227:*24*  228:*23*
249:8  251:*8*, *9*
294:*24*
**Thanks**  296:*21*

**thereof**  76:25  100:*1*
181:*4*
**thereto**  200:9
**thing**  109:*10*  119:*16*
120:2  153:*10*  157:*14*
203:*11*  260:*3*  262:*24*
**things**  15:*17*  47:*16*
88:8  89:*19*  93:*25*
149:*3*  221:*14*  245:*14*
295:2
**think**  6:*25*  28:*11*, *15*,
*20*  29:*5*, *14*  44:2
48:7  53:5  55:*4*
56:*23*  57:*14*  61:*4*
70:*4*  73:*17*  75:*23*
89:*24*  94:*14*  97:*19*
104:*24*  105:*19*
120:*23*  123:*12*
130:*19*  131:*24*
132:*18*, *24*  135:*1*
142:*23*  146:*24*  149:*4*
151:6, *16*, *22*, *25*
153:6  157:*23*  158:6
165:*10*  167:*21*
177:*17*  204:22  211:*3*
217:9  223:*18*  226:*17*,
*20*  227:*4*  229:2
236:8, *10*, *12*  247:*15*
248:*15*  250:*14*
252:*18*  256:*15*
263:*20*  268:*10*, *17*
273:*10*  275:22
278:*15*  282:*12*, *17*
284:*20*  291:9  294:*23*
295:*20*
**thinking**  157:*18*
202:9  218:*24*
**thinks**  73:*11*, *20*
74:7  76:*3*
**third**  261:6
**thought**  30:7  76:*17*
77:*20*  155:*25*  167:*20*
**Threat**  43:6, *8*, *15*, *19*
44:*11*  45:*13*  46:2, *9*,
*21*  47:9, *14*, *21*  48:*1*,
*8*, *20*  49:*1*, 7, *15*, *20*,
*24*  50:5, *16*  51:*4*
147:*3*  197:7  207:*12*
**threaten**  91:*14*  92:*4*

**threatening** 102:*23*
**Threats** 87:2, *20*
**three** 7:*21* 12:20
  17:8 20:5 29:*18*, *21*
  51:*23* 124:*18* 159:7
  256:*17* 259:*17*
  296:*10*
**three-minute** 259:*11*
**threshold** 272:*16*, *19*
**throw** 217:*11*
**time** 5:*4* 6:*11* 8:2
  36:8 44:*17* 53:6
  56:*1* 59:*19*, *25* 60:*3*
  61:*10*, *13* 65:22
  68:*17* 80:4, *12* 84:*15*
  98:5 111:9 113:7
  117:*11* 153:*12*, *15*
  155:8, *15* 156:*20*
  157:2 159:*1*, *3*, *4*
  163:*21* 164:*19*, *21*
  168:*10*, *19* 171:*13*
  185:*21* 187:*24* 190:*8*
  206:*14* 211:2 215:6
  217:*19* 222:4 224:*19*,
  *21*, *23* 225:*12* 239:*12*
  243:*4* 248:7 252:*25*
  253:5 255:2, *4*
  259:*20*, *24* 260:6, *9*
  262:8 283:22 288:*14*
  290:*13* 291:7 294:*25*
  295:*24* 296:*11*, *18*
**timeline** 160:*12*
**times** 7:*16* 71:2
  76:8 102:*1* 164:*19*,
  *21* 171:*16* 174:4
  176:6 178:7, *10*
  207:*25* 290:*17* 292:*4*,
  *16*
**timing** 169:*12*
**tiniest** 228:*14*
**Tips** 181:*15*, *16*
  276:*1*, *5*, *17*, *21* 277:2,
  *20*, *25* 278:4 294:*15*
**title** 16:*3*, *12* 18:9
  25:*14* 29:*10*, *23*, *25*
  38:*12*, *24* 39:2 52:*13*
  79:*13*, *15* 86:*10*, *22*,
  *25* 87:*17* 121:6
  181:*25*

**titled** 100:*10* 127:*11*
  253:*21*
**titles** 85:*15* 86:*18*, *23*
**today** 5:*15*, *17* 7:3, *7*
  10:*15*, *20*, *23* 11:*4*, *14*,
  *23* 12:4, *7* 13:5, *9*, *11*,
  *15*, *24* 14:8, *19*, *23*
  15:2, *10*, *14*, *17*, *21*
  70:*17* 159:*16*
**Today's** 5:*3*
**Todd** 1:*13*
**told** 132:*14* 164:*21*
  205:*4* 219:6
**tools** 112:*15*
**top** 220:*13* 228:*20*
  249:*20* 251:*18*
  253:*12*, *15* 287:*1*
  289:*21*
**topic** 83:2, *5*, *25*
  185:2 193:7 290:6
**topics** 13:*23*, *25* 14:7,
  *17*, *21* 15:20 82:24
  83:7 141:*19* 142:22
  192:3 193:*4*, *5*
  260:*13*, *24* 264:20
  265:*1*
**totally** 275:*24*
**touch** 154:22
**tough** 219:*1* 264:8
**track** 236:25 237:*12*
**tracking** 204:25
  205:2 290:5
**training** 25:*21*, 22, *25*
  26:*1* 194:*3* 201:9
**trainings** 279:*24*
**transact** 62:*1*
**transcript** 4:*10*
  48:*19* 248:2, 22
  297:*1* 302:5
**transcription** 298:6
**translates** 207:9
**transnational** 23:*11*
  62:2, *15*, 22 84:25
**travel** 21:2, *7*, *11*, *13*
**traveling** 21:5
**Treasury** 20:*14*
**treat** 132:9
**TREMONTE** 2:6 6:6
**trip** 120:*14*

**true** 50:*24* 99:*3*
  102:*10* 125:5 241:7
  270:2 298:5 302:5
**truthful** 7:6
**truthfully** 7:3
**try** 76:*1* 87:*12*
  154:*23* 168:8 203:*14*
  214:*11* 296:3
**trying** 28:*16* 47:8
  50:*4* 58:*19* 74:3
  75:22 93:*21*, 22
  102:*18* 134:*17*
  148:*21* 149:6 152:9
  252:25 258:*21*
**turn** 15:*24* 22:*3*
  100:*19* 122:9 169:*15*
  170:*16*, *23* 171:*17*
  172:*10* 228:*13* 248:6
**Turning** 65:*23*
  119:*12* 143:9 247:8
**two** 7:*20* 17:8 21:2,
  *8*, *16*, *18* 28:*23* 29:*11*
  68:*4* 92:*16* 166:*1*
  168:*20* 180:*17* 181:2
  185:*14* 186:7 187:*8*,
  *15* 205:*19* 229:*1*
  248:*4* 251:2 271:5
  289:*25*
**two-and-a-half** 19:*8*
**type** 81:6 229:*15*
**types** 31:*23*, *25* 45:*1*
  109:*25*
**typewriting** 302:7
**typical** 291:*13*
**typically** 81:*3*, *7*
  129:*11*, *12* 163:*17*
  179:*14* 191:2, *5*, *8*
  192:*18* 251:*15*
  288:*24* 290:22
  291:*12*
**typos** 296:*24*

**< U >**
**U.S.** 3:*7* 19:6 25:*15*
  32:*16*, *17*, *23* 33:*4*
  35:2 36:*19*, *24* 39:20
  40:*4*, *11* 44:8, *18*
  50:*12*, *15*, *18* 51:*11*
  53:25 76:22 86:25
  87:*18* 90:*15* 92:7

132:*14*, *16* 161:2
  230:*7*, *13* 233:*12*, 22,
  *25* 235:3, *6*
**Uh-huh** 22:*18*, *21*
**Um** 6:*25*
**underlies** 231:7
**underlying** 129:*17*
  232:5 245:*10*, *19*
  246:*1*, *9* 262:*13*
**undermines** 233:*12*,
  22
**understand** 6:*19*, *21*
  10:*14*, *17*, 22 11:8
  13:*17* 14:*11*, *18*, 22
  17:*24* 18:24 23:2
  25:8 28:*19*, *24*, *25*
  29:*21* 31:*17* 33:*1*
  34:*19* 35:*1* 38:*14*, *17*
  44:*3* 45:2, 22 47:8
  48:5 50:*4* 55:5 56:6
  58:*19*, *20* 69:*3* 73:2,
  *14*, 24 74:*3*, 20 75:2,
  22 76:*1* 81:*16* 91:*17*,
  23 94:*23* 97:22
  99:22 101:*23* 102:*19*
  106:*15* 108:9 113:5,
  *10* 120:*14* 134:5
  140:*23* 142:*1* 144:22
  149:6 177:*11* 195:*4*
  196:*17* 198:*17*
  204:*24* 207:*18*
  212:22 234:3, *24*
  236:22 238:*10*
  243:*10* 261:*1* 263:6
  264:*19* 278:*17*
  281:*11* 282:*19* 291:5
  293:*21* 295:*16*
**understanding** 29:*15*
  40:2, *8* 45:*19* 63:7
  78:2, *7* 91:*8*, 22
  92:*25* 93:2 94:*4*
  113:*15*, *20* 125:8, *11*
  126:*11* 134:*13*
  135:*18* 137:*1*, *17*
  150:5, *7* 152:6 164:*3*,
  *18* 183:7 192:2
  275:*10*
**Understood** 21:*21*
  70:5 151:*11* 288:6

295:2*1*

**unfamiliar** 279:*3*

**unfortunately** 239:*12*
245:22

**uniform** 210:*4*

**unilaterally** 73:2*1*

**unit** 42:5, *19, 22*
43:*7, 9, 10, 16, 20*
44:*12* 45:*14* 46:2, *10,
21* 47:*10, 14, 22* 48:*1,
9, 21* 49:2, *8, 16, 21,
22, 25* 50:*1, 6, 9, 17*
52:*4* 54:6 56:*11*
57:*1* 60:*14* 62:*15*
80:2*0* 197:*4, 7* 286:6,
8

**UNITED** 1:*1* 5:8
8:*17* 25:*14* 28:2, *4, 7*
29:*10, 25* 32:*12* 33:7
34:*13, 22* 39:*16* 88:*4*
91:*12* 104:*14* 112:*13*
124:*23* 125:*1* 127:*20,
24* 128:6, *11, 17, 23*
131:*12, 14* 132:4, *11*
143:8 171:*25* 172:*1*
233:*11, 22, 24* 255:*12*

**unit's** 48:*3*

**universe** 28:25 33:*11*

**universities** 161:*15*
278:*1* 280:2*1, 25*

**UNIVERSITY** 1:*3*
2:*18* 5:7 155:2*1*
256:6 281:*4, 10*

**unlawful** 112:*16*

**upcoming** 13:2

**update** 196:6 205:*13*

**updates** 67:*3, 4*
195:2*0, 23*

**Upper** 253:*18*

**usable** 116:8

**USC** 28:6, *12* 29:*19*
119:2*1, 23*

**USCIS** 51:*18, 21, 25*
52:7 54:*1* 59:7, *12*
60:*10* 278:*12*

**use** 28:*19* 51:5 64:*1,
5, 13* 67:25 87:*17, 25*
102:*14* 142:24 184:2
206:2*1* 272:*17, 19*

273:*11* 274:25

**user** 240:2*1*

**username** 241:*1*

**uses** 63:9 131:*11*
142:22, *23* 146:*1*

**< V >**

**Vague** 13:*16* 14:9
25:*6* 26:*13, 20* 29:*3,
6* 31:2*0* 32:24 33:2*1*
39:25 49:*10* 55:*12*
64:7 70:*11* 74:*1*
75:*18* 90:2*1* 93:*12*
99:*10* 103:*4* 117:*15*
118:*3* 134:*15* 143:2*0*
147:*12, 15* 148:*18*
190:2 199:7 210:*14*
212:*19, 22* 213:2*0*
221:*16* 223:2*0*

**Vaguely** 240:*23*

**varies** 81:9

**variety** 98:*11*

**various** 56:25
131:*11* 158:*14*
225:*18*

**venue** 169:7, *11*

**verbal** 6:*16*

**versed** 54:*4*

**versus** 5:7 164:*16*

**vetting** 104:*11* 105:*5,
8, 18*

**VICTORIA** 3:*5*

**VIDEO** 3:25 5:5, *14*
248:*23* 296:2*0*

**VIDEOGRAPHER**
5:2 61:*10, 13* 142:7
153:*12, 15* 260:6, *9*
296:*1, 18*

**Videotaped** 1:*10*

**Vienna** 195:*12*

**view** 83:2 149:*8*
157:8 203:*18* 243:*16*

**views** 142:*23* 271:*11,
15, 19, 23* 272:*1, 5*

**vigorously** 112:*14*
132:5

**violated** 33:*18* 34:8

**violation** 28:6 31:*10,
13* 33:5, *6, 20* 35:7
57:*15* 73:*15, 19, 20*

74:*10, 12, 18* 101:*18*
126:*12, 16* 169:9
172:8 288:*19, 21*
289:2

**violations** 24:*18*
26:8 27:7, *10, 16, 21*
32:*11, 15, 19, 22*
33:*17* 35:*1* 46:*11, 20*
49:25 50:25 51:8
76:*19, 20, 22, 23* 90:9,
*14, 15* 110:*4* 172:*4*

**violator** 42:5

**violators** 42:*3, 9, 18,
21, 24*

**violence** 112:*17*

**Virginia** 195:*13*

**virtue** 122:5

**Visa** 26:*11, 19* 27:*13*
31:7, *12, 15, 25* 32:3
33:*13* 34:8 43:*12, 20,
25* 44:3, *4, 14, 17, 19,
23* 45:*1, 7, 8, 9, 14*
46:*1, 8, 12, 15, 17*
47:*14, 23* 48:3, *14, 23*
49:*4* 50:7 71:3, *8, 18,
23* 72:5, *18, 21, 24*
73:5, *11, 20, 22* 74:6,
*7, 24* 163:*19, 23*
164:2*0* 165:*4* 166:*13,
16* 167:*4, 10, 15*
168:*1, 16* 170:*11, 14,
22* 171:*18, 22* 172:*3,
7* 173:*1, 12, 21*
174:*18, 25* 175:*1, 7, 8,
12, 16, 18, 25* 176:2
219:7 283:*10*

**Visas** 26:25 27:*4, 15,
20* 30:*16* 31:2, *23*
32:7 35:25 44:*1, 5, 8,
11* 45:23 46:2*0*
166:2

**visible** 212:7

**visitor** 9:2*1, 24* 31:5,
*9, 16* 32:2

**visual** 187:5

**< W >**

**waiting** 48:*18* 206:*10*

**Walker** 11:2*0* 12:*1,

22* 18:*1, 6*

**walking** 20:2*1*

**Wang** 108:*16*

**want** 6:22 9:*12*
18:*23, 25* 22:*3* 28:*14*
73:24 86:*12* 88:*10*
91:7 100:*19* 102:6,
*10* 110:*10, 21* 113:25
119:*15* 120:*12, 19*
121:9 132:2*0* 136:8
141:24 142:6 144:*23*
148:8 152:*10* 156:*13*
163:*16* 178:*1* 206:8
217:*23* 226:*16, 23*
227:*1, 2, 9* 240:*10*
248:*4* 252:*19* 253:*3,
5, 7* 254:*11* 259:*19*
260:2 264:2, *21*
292:*11* 294:2*1* 295:*1,
3* 296:*3*

**wanted** 56:*13*
242:2*0* 296:25

**wants** 74:6, 24
150:*13*

**war** 42:4, *5, 9, 18, 19,
21, 24*

**warned** 164:*19*

**warranted** 58:*24*

**Washington** 1:*15*
3:*11* 5:*12* 195:7

**waste** 156:*19*

**water** 57:9

**WATSON** 1:*10* 4:4,
*13* 5:6, *20* 7:*11, 12*
15:*23* 29:6 41:9
99:*13* 100:5, *10*
110:25 119:22
120:24 123:*14*
151:*18* 192:*10*
203:*18, 25* 212:25
241:*23* 253:9 260:*14*
263:22 264:*23* 295:2,
*20* 298:*3*

**way** 67:*18* 72:*17*
104:*23* 105:*13, 15*
113:*15* 114:*24*
123:*13* 126:2*0*
137:24 144:*3* 147:*14*
163:*16* 164:24 181:8
210:*17* 218:25 222:2

223:22 242:5 253:5
286:23 296:11
**ways** 45:8 98:11
166:1 197:10
**Weapons** 19:14
**wear** 207:4 208:16
210:5 211:15 215:9,
13
**wears** 209:1
**Webster** 138:8
**Wednesday** 1:12
**week** 189:12
**weekly** 189:17
195:20, 22, 23
**weeks** 21:2, 8, 16, 18
268:15
**weigh** 69:6
**welcome** 55:3
188:17 214:10
**Well** 10:8 15:6
21:20 24:24 32:16
34:23 42:4, 16 43:17
54:4 55:9 62:18
73:17 76:16, 23 77:8
92:18 94:14 97:17
102:10 103:8 107:15
123:2, 23 125:20
127:15 131:22
150:13 152:6 156:21
159:13 161:19 163:5
167:1, 13 178:13
193:13 196:5, 18
202:20 213:22
220:25 221:24
223:21 226:25 227:8,
18 230:21 237:7, 11
239:23 244:17
245:22 249:6 250:14
251:24 252:11, 14, 21
257:12, 24 266:1, 19
267:10 268:11
272:20 276:15 283:8
291:6 292:13 295:9
296:4, 9
**went** 268:24 292:11
**We're** 18:22 41:19
46:8 81:11 86:1, 11
99:21, 24 104:8
110:14 120:1 132:18
142:12, 16 153:16, 17,

19 156:15 157:14, 24
180:18 217:7 218:6
226:15 227:3, 5
259:14 260:7, 10
275:23 279:13
289:16 294:21
295:15 296:19
**We've** 22:25 39:13
60:24 148:16, 18
205:19 223:22
238:15 268:6, 8
270:6 284:4 286:16
**WGY** 1:6
**whatsoever** 216:11
**WHEREOF** 298:14
302:12
**White** 94:21 95:8
108:2, 5 205:14, 17,
22 206:3, 7, 12
**Whiting** 38:1, 5
**Whitings's** 38:11
**wide** 44:1, 5
**WILKENS** 2:15
297:4
**WILLIAM** 3:4
11:20 12:1
**Wilson** 38:3, 5 39:1
**window** 236:17
**wish** 163:3 286:22
**withdraw** 218:24
**withdrawn** 8:22
15:1 19:17 22:25
25:1 47:24 53:20
54:7 55:9 69:21
76:16 94:5 104:25
107:5 113:14 115:18
117:10 122:2 123:2
133:18 135:13
141:15 152:6 159:3
193:13 194:14
198:24 208:16 209:8
218:22 243:13 266:1
276:15 278:8 280:18
283:6, 8 294:19
**WITNESS** 4:4 5:19,
21 14:15 29:4 64:22
81:13 88:2, 9 110:11,
16 111:1 136:9
140:22 143:23
169:25 178:20

187:17, 19 188:14, 18
199:6 214:5 217:5
227:11 231:3 239:15
245:8 248:10 251:9
252:5, 10, 15 253:1
263:5, 15, 17 274:9
295:9 298:14 302:12
**witness's** 120:8
**woman** 250:22
**word** 75:24 76:7
122:5 202:17, 19, 21,
25 259:7 268:11
**words** 21:12 31:11
46:14 47:13 56:18
62:9 77:5 138:4
240:15 242:12
258:20, 23
**wore** 206:25 208:24
210:25
**work** 6:6 10:16, 24
24:15 25:1, 10, 11
26:24 30:19 37:5
38:17 39:19 55:17
56:4, 10, 20 57:1
76:10 80:6 89:25
90:2, 19 91:4 92:9
109:17 117:22 118:1,
12 119:9 124:13
126:9, 14 143:4
152:18 165:22
194:25 195:2, 8
196:24 198:16 201:6
206:8, 13 212:24
216:8, 9 239:17
280:5, 10 293:7
**worked** 20:6 144:21
162:12 171:12 220:8,
15, 18, 22 252:17
265:18
**working** 196:15, 16
198:11
**works** 11:13 37:7
55:24 125:12 201:13
222:4 238:19, 23
239:9 255:12 276:15
**world** 132:16 168:15
233:23
**worn** 210:21
**wrap** 226:17
**write** 134:7 243:1

**writes** 81:25 82:1, 3
246:23
**writing** 69:17, 23
127:6 202:4 204:21
283:22 284:5, 11
285:1, 3
**written** 69:11 189:23
190:9 229:3 246:16
254:17 259:19, 20
279:18, 21 285:6, 11
**wrong** 18:18 25:5
53:6 61:20 157:23,
25 164:4 267:20
**wrote** 86:3 99:13
134:19 138:18
256:16 275:16

< Y >
**Yeah** 58:20 70:7
115:1 149:23 150:20
158:5 162:21 174:15
188:12 221:12
240:24 248:15
259:22 263:25
**year** 63:2 86:5 87:6
174:6
**years** 19:9 20:5
66:2 71:12, 21
162:14 174:7
**Yep** 253:20
**York** 2:9, 21 287:20,
23
**Yunseo** 267:20
**Y-U-N-S-E-O** 267:21

< Z >
**zooming** 23:20

## WORD LIST

**< 0 >**
**018**  *(1)*
**023**  *(1)*

**< 1 >**
**1**  *(19)*
**1(a**  *(1)*
**1:25-cv-10685**  *(1)*
**1:54**  *(1)*
**10**  *(3)*
**10:10**  *(2)*
**100**  *(2)*
**10004**  *(1)*
**10115**  *(1)*
**11**  *(4)*
**11:29**  *(1)*
**11:30**  *(1)*
**11:52**  *(1)*
**111**  *(1)*
**1182**  *(6)*
**1182(a)(3**  *(3)*
**1182(a)(3)(c**  *(3)*
**11823(a)(3**  *(1)*
**118283**  *(1)*
**1183**  *(1)*
**120**  *(1)*
**1227**  *(1)*
**125-CV-10685**  *(1)*
**14**  *(1)*
**14:07**  *(1)*
**141**  *(1)*
**14161**  *(17)*
**14188**  *(33)*
**15**  *(2)*
**15:31**  *(1)*
**1615**  *(2)*
**16th**  *(1)*
**17**  *(1)*
**17:46**  *(1)*
**18**  *(9)*
**18:02**  *(1)*
**18:50**  *(1)*
**19**  *(1)*
**1994**  *(1)*

**< 2 >**
**2**  *(18)*

**2:08**  *(1)*
**20**  *(2)*
**2003**  *(1)*
**20036**  *(1)*
**20044**  *(1)*
**2015**  *(2)*
**2018**  *(1)*
**202**  *(1)*
**2020**  *(4)*
**2022**  *(1)*
**202-2600**  *(1)*
**2024**  *(1)*
**2025**  *(35)*
**2029**  *(1)*
**212**  *(1)*
**227**  *(1)*
**23**  *(3)*
**2320**  *(3)*
**237**  *(1)*
**237(a)(4)(c**  *(1)*
**23rd**  *(1)*
**240**  *(1)*
**247**  *(1)*
**25**  *(7)*
**29**  *(1)*

**< 3 >**
**3**  *(29)*
**3(b**  *(1)*
**3/11/25**  *(1)*
**30**  *(3)*
**302**  *(1)*
**3E**  *(1)*
**3s**  *(1)*

**< 4 >**
**4**  *(11)*
**4(3**  *(1)*
**400**  *(1)*
**41658**  *(1)*
**475**  *(1)*

**< 5 >**
**5**  *(20)*
**5:00**  *(1)*
**5:47**  *(1)*
**50**  *(5)*
**507**  *(1)*
**545**  *(3)*

**554**  *(2)*
**56**  *(1)*

**< 6 >**
**6**  *(9)*
**6:37**  *(1)*
**6:51**  *(1)*
**60**  *(3)*
**616-8779**  *(1)*
**646**  *(1)*

**< 7 >**
**7**  *(5)*
**745-8500**  *(1)*

**< 8 >**
**8**  *(5)*
**80**  *(1)*
**878**  *(1)*
**88**  *(1)*
**8th**  *(2)*
**8USC**  *(1)*

**< 9 >**
**90**  *(1)*
**911**  *(1)*

**< A >**
**a.m**  *(3)*
**abbreviation**  *(1)*
**ability**  *(5)*
**able**  *(5)*
**abstract**  *(1)*
**accept**  *(1)*
**accepted**  *(1)*
**Accepting**  *(1)*
**access**  *(4)*
**accompanying**  *(12)*
**account**  *(4)*
**accounts**  *(2)*
**accuracy**  *(2)*
**accurate**  *(2)*
**accurately**  *(1)*
**acknowledge**  *(1)*
**ACKNOWLEDGEME
NT**  *(1)*
**Aconlon@shertremont
e.com**  *(1)*
**acronym**  *(2)*

**act**  *(11)*
**Acting**  *(22)*
**action**  *(14)*
**actions**  *(8)*
**activities**  *(23)*
**activity**  *(11)*
**actors**  *(1)*
**acts**  *(3)*
**actual**  *(4)*
**added**  *(6)*
**addition**  *(3)*
**additional**  *(6)*
**address**  *(4)*
**addressed**  *(1)*
**addresses**  *(3)*
**adjournment**  *(1)*
**administered**  *(1)*
**administration**  *(1)*
**administrative**  *(11)*
**admissibility**  *(1)*
**admission**  *(5)*
**admitted**  *(3)*
**advance**  *(3)*
**advances**  *(2)*
**adverse**  *(3)*
**advice**  *(2)*
**advisor**  *(4)*
**advisory**  *(1)*
**advocacy**  *(4)*
**Affairs**  *(24)*
**affect**  *(1)*
**affixed**  *(2)*
**agencies**  *(11)*
**agency**  *(26)*
**agenda**  *(2)*
**agent**  *(21)*
**agents**  *(15)*
**Aggravating**  *(1)*
**ago**  *(6)*
**agree**  *(12)*
**agrees**  *(2)*
**Ah**  *(3)*
**ahead**  *(10)*
**Ahh**  *(1)*
**aided**  *(2)*
**aids**  *(1)*
**Akil**  *(4)*
**AL**  *(4)*
**Alex**  *(1)*

ALEXANDRA *(1)*
alien *(5)*
aliens *(11)*
alien's *(4)*
aligned *(6)*
allegations *(4)*
Alleged *(19)*
allegedly *(2)*
allocation *(3)*
allow *(5)*
allowed *(2)*
allows *(1)*
aloud *(1)*
ambit *(1)*
AMENDMENT *(1)*
AMERICAN *(2)*
amount *(2)*
analysis *(64)*
analyst *(7)*
analysts *(2)*
and/or *(2)*
ANDRE *(8)*
Andrea *(2)*
anew *(1)*
Ann *(1)*
announcement *(1)*
answer *(98)*
answered *(1)*
answering *(4)*
answers *(1)*
anti-Israel *(3)*
anti-Semitic *(16)*
anti-Semitism *(36)*
Anybody *(11)*
apart *(19)*
Apartheid *(2)*
apologize *(7)*
appear *(21)*
appearance *(4)*
APPEARANCES *(2)*
appearing *(2)*
appears *(1)*
applicable *(7)*
application *(2)*
applies *(2)*
apply *(2)*
applying *(3)*
appoint *(1)*
appreciate *(5)*

appropriate *(8)*
approved *(9)*
approves *(1)*
approving *(1)*
approximately *(10)*
approximation *(2)*
area *(4)*
areas *(6)*
Armstrong *(7)*
Armstrong's *(1)*
arranged *(1)*
arrest *(51)*
arrested *(31)*
arrestees *(1)*
arresting *(10)*
arrests *(9)*
art *(5)*
article *(3)*
articulate *(1)*
articulated *(2)*
ascertain *(1)*
aside *(2)*
Asked *(15)*
asking *(37)*
assert *(1)*
assess *(2)*
assessing *(1)*
assessment *(4)*
assign *(3)*
assigned *(10)*
assignment *(2)*
assistance *(1)*
Assistant *(21)*
Associate *(15)*
associated *(2)*
ASSOCIATION *(5)*
associations *(3)*
assume *(1)*
Assumes *(2)*
assuming *(2)*
Attached *(5)*
attachment *(1)*
attachments *(2)*
attack *(1)*
attacks *(2)*
attention *(7)*
Attorney's *(5)*
authorities *(12)*
authority *(4)*

authorizations *(1)*
authorized *(3)*
availability *(4)*
available *(5)*
avoid *(4)*
avoidance *(1)*
aware *(84)*
awareness *(2)*

< B >
B1 *(1)*
B-1/B-2 *(1)*
B2 *(1)*
Bachelors *(1)*
back *(35)*
background *(3)*
Badar *(1)*
badge *(6)*
Baldwin *(6)*
ballpark *(2)*
Baltimore *(1)*
bar *(1)*
based *(9)*
bases *(1)*
basic *(1)*
basis *(39)*
Bates *(2)*
began *(16)*
beginning *(5)*
begins *(1)*
behalf *(7)*
behave *(2)*
behavior *(2)*
behaviors *(1)*
beings *(1)*
belief *(1)*
beliefs *(3)*
believe *(14)*
believes *(3)*
Benjamin *(1)*
best *(12)*
Betar *(4)*
B-E-T-A-R *(1)*
better *(8)*
beyond *(9)*
big *(2)*
bit *(4)*
boarder *(1)*
body *(2)*

Border *(3)*
bottom *(6)*
BOX *(1)*
Boys *(1)*
Brad *(1)*
Bradley *(4)*
branch *(5)*
breadth *(1)*
break *(23)*
briefing *(22)*
briefings *(4)*
briefly *(1)*
bright *(1)*
British *(2)*
Broad *(19)*
broader *(1)*
broadly *(1)*
brought *(1)*
building *(2)*
built *(1)*
bunch *(1)*
burden *(3)*
Bureau *(26)*
business *(1)*

< C >
calendar *(1)*
call *(2)*
called *(4)*
calling *(1)*
calls *(41)*
campus *(4)*
campuses *(1)*
Canary *(5)*
candidly *(1)*
cannote *(2)*
capacity *(3)*
capture *(1)*
captured *(4)*
captures *(1)*
CAR *(2)*
CAR018 *(1)*
CAR019 *(1)*
CAR023 *(1)*
cards *(2)*
career *(1)*
Case *(63)*
case-by-case *(2)*
cases *(9)*

**CaseViewNet** *(1)*
**catch** *(3)*
**categories** *(3)*
**category** *(5)*
**Caught** *(1)*
**cause** *(3)*
**CBP** *(3)*
**center** *(6)*
**certain** *(7)*
**certainly** *(1)*
**CERTIFICATE** *(1)*
**certification** *(1)*
**Certified** *(4)*
**certify** *(1)*
**chain** *(4)*
**challenges** *(1)*
**chance** *(3)*
**change** *(37)*
**changed** *(1)*
**changes** *(10)*
**chants** *(2)*
**characterization** *(3)*
**characterized** *(2)*
**CHARETTE** *(1)*
**charge** *(7)*
**Charges** *(2)*
**Chaz** *(1)*
**chief** *(8)*
**choose** *(1)*
**Chung** *(3)*
**Chung's** *(1)*
**CIA** *(1)*
**circles** *(1)*
**circumstance** *(7)*
**circumstances** *(23)*
**CIS** *(2)*
**citation** *(1)*
**cite** *(2)*
**cited** *(1)*
**citizen** *(2)*
**citizens** *(8)*
**Citizenship** *(7)*
**city** *(2)*
**CIVIL** *(10)*
**civilian** *(1)*
**claim** *(3)*
**clarification** *(3)*
**clarify** *(2)*
**clarity** *(1)*

**clause** *(3)*
**clear** *(21)*
**clearer** *(1)*
**Clearly** *(1)*
**close** *(1)*
**clothes** *(1)*
**CLTD** *(5)*
**CNN** *(1)*
**Code** *(10)*
**colleague** *(2)*
**colleagues** *(5)*
**collected** *(1)*
**college** *(3)*
**colleges** *(3)*
**Columbia** *(5)*
**combat** *(10)*
**combats** *(1)*
**combatting** *(5)*
**combining** *(1)*
**come** *(11)*
**comes** *(6)*
**coming** *(9)*
**command** *(1)*
**comment** *(2)*
**commentary** *(1)*
**commission** *(2)*
**commit** *(1)*
**commitment** *(4)*
**commitments** *(1)*
**committed** *(1)*
**Committee** *(1)*
**common** *(5)*
**communicates** *(1)*
**communication** *(1)*
**communications** *(13)*
**compared** *(1)*
**compelling** *(5)*
**compiling** *(1)*
**complete** *(11)*
**completed** *(2)*
**completeness** *(1)*
**compliance** *(2)*
**complicated** *(3)*
**complied** *(1)*
**complimentary** *(1)*
**compliments** *(2)*
**comply** *(1)*
**component** *(6)*
**components** *(3)*

**Compound** *(2)*
**compromise** *(4)*
**concern** *(4)*
**concerning** *(8)*
**concerns** *(7)*
**concluded** *(1)*
**concludes** *(1)*
**conclusion** *(5)*
**conditions** *(4)*
**conduct** *(15)*
**conducted** *(4)*
**conducting** *(7)*
**conducts** *(6)*
**confer** *(1)*
**conferred** *(1)*
**confident** *(2)*
**confirm** *(1)*
**conflation** *(1)*
**confusing** *(1)*
**confusion** *(1)*
**CONLON** *(272)*
**connection** *(20)*
**connotates** *(1)*
**consequence** *(1)*
**consequences** *(2)*
**consider** *(2)*
**considerable** *(1)*
**consideration** *(1)*
**considered** *(4)*
**consistent** *(3)*
**consistently** *(1)*
**construct** *(1)*
**Consular** *(24)*
**contact** *(4)*
**contacted** *(2)*
**contain** *(5)*
**contained** *(6)*
**contains** *(4)*
**content** *(10)*
**contents** *(1)*
**context** *(10)*
**contingent** *(1)*
**continue** *(3)*
**Continued** *(1)*
**continuing** *(1)*
**contractors** *(1)*
**contrary** *(10)*
**contributed** *(2)*
**convened** *(1)*

**conversations** *(5)*
**convey** *(1)*
**conveyed** *(2)*
**conviction** *(1)*
**convictions** *(1)*
**coordinate** *(16)*
**coordinated** *(2)*
**coordinates** *(12)*
**coordinating** *(1)*
**coordination** *(14)*
**copies** *(3)*
**copy** *(12)*
**corner** *(1)*
**cornerstone** *(3)*
**Correct** *(126)*
**corrected** *(1)*
**corrections** *(1)*
**correctly** *(2)*
**COUNSEL** *(19)*
**count** *(1)*
**counter** *(26)*
**Countering** *(6)*
**counterpart** *(2)*
**country** *(1)*
**couple** *(3)*
**course** *(9)*
**COURT** *(44)*
**COURTNEY** *(1)*
**cover** *(6)*
**covered** *(8)*
**covers** *(1)*
**create** *(5)*
**created** *(11)*
**creates** *(1)*
**creation** *(4)*
**credentials** *(3)*
**credibility** *(1)*
**credible** *(1)*
**crime** *(6)*
**crimes** *(6)*
**criminal** *(43)*
**criteria** *(1)*
**criticism** *(1)*
**cross** *(5)*
**CTLD** *(53)*
**CTLD's** *(2)*
**CTLDU** *(1)*
**curb** *(1)*
**current** *(6)*

currently  (4)
curve  (1)
Customs  (21)
Cyber  (1)

< D >
D.C  (8)
Daniels  (1)
date  (10)
dates  (1)
Davis  (3)
day  (7)
daylight  (1)
days  (4)
day-to-day  (1)
DC  (1)
deal  (2)
deals  (1)
decide  (5)
decided  (7)
decides  (2)
deciding  (2)
decision  (22)
decision-maker  (1)
decision-making  (1)
decisions  (5)
deck  (1)
declarant  (4)
Declaration  (22)
deemed  (3)
Defendants  (2)
Defense  (5)
defer  (5)
deferred  (1)
defined  (1)
definition  (2)
degree  (16)
delegated  (1)
deliberations  (1)
deliberative  (15)
delineates  (1)
deliverables  (1)
demand  (2)
demonstrate  (1)
demonstration  (3)
denied  (1)
denote  (1)
depart  (3)
DEPARTMENT

(217)
departmental  (4)
departments  (6)
department's  (1)
departure  (1)
depend  (3)
dependent  (1)
depends  (13)
DEPONENT  (1)
Deportability  (2)
deportable  (1)
deportation  (1)
depose  (2)
deposition  (11)
Deputy  (20)
derived  (1)
Derrick  (4)
describe  (10)
described  (12)
describes  (1)
description  (3)
desiderata  (1)
designate  (4)
designated  (3)
designates  (1)
designation  (1)
desk  (1)
Destruction  (1)
detail  (3)
detailed  (2)
detained  (1)
detaining  (3)
Detection  (2)
detention  (5)
determination  (19)
determinations  (4)
determine  (15)
determined  (2)
determines  (3)
determining  (1)
developed  (1)
Development  (24)
DHS  (16)
DHSgov  (2)
DHSs  (1)
DHS's  (5)
difference  (7)
different  (17)
difficult  (3)

digitally  (2)
diminish  (1)
DIRECT  (4)
directed  (1)
Directing  (1)
direction  (1)
directive  (4)
directives  (2)
directly  (2)
Director  (35)
directory  (3)
directs  (3)
disagree  (2)
disagreement  (1)
disclose  (1)
discovery  (2)
discretion  (4)
discrimination  (1)
discuss  (7)
discussed  (15)
discusses  (5)
discussing  (7)
discussion  (3)
discussions  (6)
dispositive  (1)
disruptive  (2)
dissipate  (1)
distinct  (5)
distinction  (1)
DISTRICT  (14)
Divest  (2)
divestment  (1)
DIVISION  (57)
divisions  (9)
divulge  (1)
docket  (2)
document  (63)
documentation  (4)
documented  (2)
documents  (15)
doing  (4)
domestic  (1)
DOS  (1)
doubt  (1)
doxxed  (7)
drafted  (1)
draw  (5)
Drive  (1)
driven  (2)

duck  (1)
duly  (1)
duty  (2)

< E >
E.O  (43)
E.O.s  (3)
E.O.'s  (3)
earlier  (19)
earliest  (1)
easier  (3)
easily  (1)
Eastern  (1)
easy  (1)
eat  (1)
Echo  (2)
Eddy  (1)
education  (5)
educational  (1)
effect  (3)
effectuate  (1)
effectuated  (3)
effectuates  (1)
effectuating  (5)
effort  (16)
efforts  (10)
either  (11)
elaborate  (1)
electronically  (2)
e-mail  (8)
e-mailed  (1)
e-mails  (3)
Embassy  (2)
employed  (1)
employee  (2)
employees  (5)
enact  (1)
encompass  (1)
ends  (1)
enforce  (5)
Enforcement  (54)
enforces  (3)
enforcing  (8)
engaged  (2)
engaging  (1)
enter  (1)
entered  (1)
entire  (1)
entirety  (2)

entities *(3)*
entity *(2)*
entry *(3)*
E-O *(1)*
equally *(1)*
equivalent *(2)*
ERO *(10)*
errata *(2)*
Espionage *(3)*
espousal *(1)*
espouse *(14)*
espoused *(1)*
espousing *(1)*
ESQUIRE *(9)*
essential *(1)*
essentially *(3)*
establish *(1)*
estimate *(5)*
estimation *(1)*
ET *(4)*
Etter *(4)*
event *(5)*
Everest *(3)*
EVERLY *(1)*
everybody *(1)*
everyone's *(1)*
evidence *(10)*
exact *(3)*
exactly *(2)*
EXAMINATION *(3)*
examined *(2)*
example *(16)*
examples *(10)*
exceed *(1)*
Exceptions *(1)*
Excerpt *(4)*
exchange *(6)*
exchanged *(1)*
excited *(1)*
excludable *(1)*
exclusively *(1)*
excuse *(1)*
execute *(1)*
executed *(4)*
executing *(1)*
Executive *(121)*
exercise *(1)*
exercising *(1)*
Exhibit *(52)*

exhibits *(3)*
exist *(5)*
existence *(1)*
existing *(6)*
exists *(2)*
expect *(5)*
expectation *(1)*
expected *(2)*
expedite *(4)*
experience *(7)*
expert *(4)*
expertise *(1)*
expiration *(4)*
expires *(2)*
explain *(5)*
explains *(2)*
explanation *(1)*
exploit *(1)*
explore *(1)*
exposes *(1)*
expressly *(1)*
extent *(12)*
extreme *(1)*

< F >
face *(2)*
faced *(1)*
facing *(1)*
fact *(11)*
factor *(1)*
factors *(1)*
facts *(3)*
factual *(1)*
Faculty *(4)*
failing *(1)*
failure *(1)*
faint *(1)*
Fair *(27)*
fairness *(1)*
Falcone *(9)*
Falcone's *(1)*
fall *(8)*
falling *(1)*
falls *(8)*
familiar *(43)*
familiarity *(4)*
familiarizing *(2)*
family *(1)*
far *(7)*

farther *(2)*
fast *(1)*
faster *(2)*
fault *(1)*
FDNS *(4)*
federal *(14)*
feel *(2)*
feels *(2)*
Felony *(1)*
fewer *(1)*
field *(36)*
fifth *(1)*
Figel *(1)*
fight *(1)*
file *(3)*
final *(2)*
financial *(1)*
find *(5)*
finding *(2)*
findings *(1)*
finds *(1)*
fine *(7)*
finish *(6)*
finished *(2)*
firearms *(1)*
firm *(1)*
FIRST *(28)*
five *(18)*
Floor *(1)*
fluid *(1)*
flyers *(1)*
focus *(8)*
focused *(2)*
focuses *(7)*
folks *(2)*
follow *(2)*
followed *(2)*
following *(1)*
follow-on *(1)*
follows *(1)*
font *(1)*
food *(1)*
foregoing *(3)*
foreign *(68)*
foreigners *(1)*
forget *(1)*
forgetting *(1)*
forth *(8)*
forward *(5)*

found *(2)*
Foundation *(23)*
four *(5)*
fourth *(1)*
Fox *(1)*
frame *(1)*
framed *(1)*
framework *(2)*
Franklin *(1)*
Fraud *(2)*
Frederick *(1)*
free *(2)*
frequency *(1)*
frequently *(3)*
front *(10)*
frustrating *(1)*
full *(5)*
function *(8)*
functions *(8)*
further *(12)*
furtherance *(9)*
furthers *(1)*

< G >
G56 *(4)*
game *(1)*
Gangs *(1)*
GANS *(1)*
general *(3)*
generally *(7)*
generate *(2)*
generated *(9)*
generates *(1)*
generating *(1)*
genuinely *(1)*
getting *(4)*
give *(35)*
given *(23)*
gives *(3)*
giving *(6)*
go *(25)*
goal *(4)*
goals *(2)*
goes *(4)*
going *(94)*
gold *(1)*
golf *(1)*
gonna *(1)*
Good *(7)*

goods *(3)*
Gordan *(5)*
Gordan's *(1)*
Gordon *(1)*
gosh *(1)*
govern *(3)*
Government *(22)*
Government's *(1)*
graciously *(1)*
gravitas *(1)*
Great *(6)*
green *(2)*
ground *(4)*
grounds *(9)*
group *(11)*
groups *(5)*
guess *(10)*
guessing *(2)*
guidance *(33)*
guideline *(1)*
guidelines *(8)*
guiding *(1)*
guys *(1)*

< H >
half *(1)*
Hamas *(11)*
Hammer *(5)*
hand *(5)*
handed *(4)*
handful *(1)*
handle *(2)*
handled *(1)*
Hansen *(1)*
happen *(6)*
happened *(4)*
happening *(1)*
happy *(2)*
harassment *(1)*
hard *(4)*
harm *(1)*
Harris *(1)*
Hatch *(7)*
hate *(2)*
hateful *(17)*
head *(9)*
headquarters *(8)*
hear *(8)*
heard *(13)*

hearing *(1)*
held *(2)*
Help *(15)*
helpful *(8)*
helps *(1)*
Henderson *(13)*
hereunto *(2)*
heritage *(3)*
hesitant *(1)*
hey *(1)*
Hi *(1)*
high *(3)*
higher *(3)*
highest *(1)*
high-ranking *(2)*
history *(2)*
hold *(6)*
holder *(10)*
holders *(8)*
holder's *(2)*
Homeland *(85)*
honestly *(1)*
hoods *(1)*
hopeful *(2)*
hopefully *(2)*
hopes *(1)*
hour *(2)*
hours *(2)*
House *(10)*
HSA *(1)*
HSI *(239)*
HSI's *(20)*
huh *(1)*
human *(7)*
humility *(1)*
hung *(1)*
hyperlink *(1)*
hypothetical *(9)*
hypothetically *(1)*

< I >
I&A *(1)*
ICE *(103)*
ICE's *(5)*
ICM *(1)*
ICR *(1)*
idea *(2)*
identifiable *(1)*
identification *(2)*

identified *(14)*
identifies *(2)*
identify *(19)*
identifying *(8)*
ideology *(17)*
imagine *(1)*
imagining *(1)*
immediate *(7)*
immediately *(3)*
immigration *(23)*
imminent *(1)*
immovable *(1)*
implement *(1)*
implementation *(4)*
implemented *(1)*
implicate *(3)*
implicates *(1)*
important *(1)*
importantly *(1)*
importation *(1)*
importations *(1)*
impression *(6)*
impressions *(2)*
INA *(1)*
inadmissibility *(8)*
inadmissible *(2)*
inaudible *(1)*
inception *(3)*
include *(19)*
included *(3)*
includes *(3)*
including *(6)*
inclusive *(1)*
incomplete *(3)*
incorporate *(1)*
increase *(1)*
increased *(2)*
independent *(1)*
INDEX *(2)*
indicate *(2)*
indicated *(3)*
indicates *(1)*
indicating *(4)*
indication *(2)*
individual *(4)*
individually *(1)*
individuals *(4)*
information *(87)*
infrequent *(1)*

initial *(1)*
initially *(1)*
initiation *(1)*
initiative *(2)*
injury *(1)*
innocent *(1)*
input *(4)*
inquire *(1)*
inquiries *(1)*
inquiry *(2)*
inside *(2)*
inspiration *(1)*
inspire *(1)*
inspired *(12)*
instance *(18)*
instances *(16)*
INSTITUTE *(2)*
institution *(1)*
institutional *(1)*
institutions *(3)*
institution's *(1)*
instruct *(11)*
instructing *(1)*
instruction *(7)*
instructions *(9)*
Intefada *(3)*
intellectual *(1)*
Intelligence *(71)*
Intelligence's *(1)*
intend *(2)*
intended *(2)*
interaction *(1)*
interagency *(1)*
interest *(14)*
interface *(1)*
interfere *(2)*
internal *(2)*
international *(1)*
interpret *(15)*
interpretation *(5)*
interpretations *(1)*
interpreted *(1)*
interrupting *(1)*
interruption *(1)*
interview *(4)*
Interviews *(1)*
intranet *(2)*
introductions *(1)*
intrude *(1)*

Deposition of Andre Watson

AAUP, et al. v. Rubio, et al.

investigate  (19)
investigated  (3)
investigates  (13)
investigating  (10)
investigation  (48)
investigations  (69)
investigative  (22)
investigator  (1)
investigators  (1)
invoke  (3)
invoked  (4)
invokes  (1)
invoking  (1)
involve  (3)
involved  (10)
involvement  (14)
Involves  (2)
involving  (8)
Israel  (2)
Israel's  (1)
issuance  (3)
issue  (7)
issued  (17)
issues  (1)
its  (42)

< J >
James  (1)
January  (8)
JESSICA  (1)
Jewish  (5)
Job  (8)
John  (7)
JON  (2)
judge  (5)
judicial  (5)
Judiciary  (1)
July  (2)
juncture  (2)
June  (5)
JURAT  (1)
jurisdiction  (2)
JUSTICE  (9)

< K >
KAITLYN  (1)
KANELLIS  (205)
Karabinas  (2)
Karoline  (2)

keep  (7)
Kellogg  (1)
kept  (1)
Khalil  (47)
Khalil's  (19)
Khan  (1)
kind  (17)
kinds  (5)
knew  (2)
KNIGHT  (2)
know  (317)
knowledge  (47)
known  (1)
knows  (3)
KRISHNAN  (1)
Kristin  (2)

< L >
labeled  (1)
Labor  (1)
lag  (2)
lagging  (1)
laid  (3)
land  (1)
language  (6)
large  (1)
larger  (1)
lastly  (2)
laugh  (1)
laughing  (1)
law  (66)
lawful  (15)
laws  (13)
lawyer  (2)
lawyers  (4)
Lead  (34)
leaders  (3)
leadership  (10)
leads  (17)
LEADTRACK  (7)
LEADTRACKER  (1)
learned  (2)
leave  (2)
leaving  (1)
Leavitt  (6)
led  (11)
left  (1)
legacy  (1)
legal  (11)

Letter  (29)
letters  (5)
level  (9)
likelihood  (1)
limit  (2)
limited  (2)
limits  (1)
line  (20)
lines  (10)
lingo  (1)
linked  (1)
list  (1)
listed  (4)
literally  (5)
litigate  (1)
litigation  (2)
little  (12)
LLP  (2)
loaded  (4)
local  (1)
locate  (1)
located  (5)
location  (2)
lodge  (1)
lodged  (1)
long  (18)
longer  (1)
look  (22)
Looked  (9)
looking  (15)
looks  (2)
lost  (1)
lot  (6)
louder  (1)
lunch  (1)

< M >
ma'am  (44)
MACKLIN  (1)
Mahdawi  (4)
Mahmoud  (5)
main  (1)
maintain  (1)
maintained  (1)
major  (1)
majority  (2)
making  (18)
malevolent  (1)
management  (2)

manager  (2)
manifestations  (1)
manner  (9)
March  (38)
MARCO  (3)
mark  (3)
marked  (11)
Maryland  (1)
mask  (6)
masking  (1)
masks  (3)
Mason  (2)
Mass  (1)
MASSACHUSETTS  (2)
material  (1)
materials  (8)
matter  (12)
maximum  (2)
mean  (71)
meaning  (12)
means  (16)
meant  (6)
Measures  (1)
media  (18)
medication  (1)
meet  (1)
meeting  (4)
meetings  (9)
members  (3)
membership  (2)
memo  (1)
Memorandum  (4)
memory  (1)
memos  (2)
mention  (1)
mentioned  (20)
mentioning  (1)
mentions  (1)
menu  (2)
met  (1)
methods  (9)
mic  (1)
mind  (4)
minimum  (3)
minute  (1)
minutes  (7)
Mischaracterizes  (4)
missed  (3)

missing  (2)
Mission  (5)
mistaken  (1)
Mm  (1)
Mm-hmm  (6)
module  (5)
Mohsen  (1)
moment  (31)
month  (1)
monthly  (1)
months  (6)
morning  (4)
mouthful  (1)
move  (5)
moved  (1)
Moving  (3)
muddle  (1)
multiple  (4)
myriad  (1)
mystery  (1)

< N >
name  (28)
named  (1)
names  (10)
napping  (1)
narcotics-related  (3)
narrative  (1)
narrow  (1)
narrower  (1)
narrowly  (1)
National  (75)
Nationality  (6)
Nations  (1)
nature  (6)
near  (1)
necessarily  (5)
necessary  (1)
need  (21)
needed  (2)
needing  (1)
Neither  (2)
Never  (11)
New  (15)
News  (7)
next-day  (1)
Nichols  (5)
nod  (1)
Noem's  (2)

Noems's  (1)
no-go  (1)
non  (1)
noncitizen  (10)
noncitizens  (31)
noncitizen's  (1)
noncriminal  (7)
nonGovernment  (1)
nonstudents  (1)
normal  (5)
normally  (2)
Northwest  (1)
notable  (1)
notarial  (2)
Notary  (2)
NOTE  (2)
noted  (2)
notes  (1)
Notice  (16)
Notices  (1)
Notification  (4)
notified  (1)
notify  (4)
notwithstanding  (1)
NSA  (1)
NSD  (1)
number  (18)
numbers  (3)
NW  (1)
NY  (2)

< O >
oath  (3)
object  (23)
objecting  (1)
Objection  (89)
objectionable  (1)
objections  (2)
obligation  (2)
obligations  (1)
occasion  (13)
occasions  (6)
occur  (2)
occurred  (5)
occurs  (1)
offense  (3)
offenses  (1)
offer  (4)
offhand  (1)

Office  (131)
officer  (12)
officers  (5)
offices  (11)
official  (18)
officials  (6)
Oh  (16)
Okay  (154)
Okeemah  (5)
Once  (8)
one-page  (2)
ones  (4)
ongoing  (1)
open  (29)
open-ended  (1)
operational  (6)
Operations  (10)
OPERATOR  (1)
opine  (1)
opinion  (2)
opinions  (2)
OPM  (3)
opportunity  (10)
opposed  (4)
optional  (1)
options  (2)
Order  (83)
ordered  (1)
orders  (13)
ordinarily  (2)
ordinary  (1)
org  (1)
organization  (19)
organizations  (12)
organized  (5)
original  (1)
originate  (1)
outbound  (1)
outcome  (1)
outlined  (2)
outside  (6)
overall  (1)
overbroad  (4)
oversaw  (1)
oversee  (3)
overseen  (1)
oversees  (5)
oversight  (6)
overstay  (3)

overstayed  (1)
overstays  (21)
owners  (1)
ownership  (1)
Ozturk  (5)
Ozturk's  (1)

< P >
P.L.L.C  (1)
p.m  (2)
pack  (1)
PAGE  (35)
Page_____Line  (5)
pages  (3)
pain  (1)
painful  (2)
Palestine  (8)
papers  (1)
paperwork  (3)
paragraph  (21)
paragraphs  (3)
parameters  (8)
pardon  (1)
part  (35)
participate  (2)
participation  (3)
particular  (71)
particularly  (1)
parties  (1)
partnering  (1)
parts  (7)
pass  (3)
passed  (1)
paths  (1)
Patrol  (2)
pause  (3)
Peace  (1)
penalty  (1)
pending  (3)
people  (52)
people's  (1)
perform  (1)
performed  (1)
performing  (2)
performs  (1)
period  (1)
perjury  (1)
permanent  (16)
permeate  (1)

permissible *(1)*
permitted *(1)*
perpetrators *(1)*
person *(67)*
personal *(6)*
personally *(9)*
Personnel *(15)*
persons *(2)*
person's *(20)*
perspective *(3)*
Pete *(2)*
Peter *(5)*
Phillips *(2)*
phrase *(23)*
phrased *(1)*
picture *(1)*
pinpoint *(1)*
place *(6)*
places *(1)*
plain *(1)*
plainly *(1)*
plaintiff *(1)*
Plaintiffs *(4)*
Plaintiff's *(4)*
plan *(6)*
planned *(1)*
plans *(5)*
platform *(2)*
play *(1)*
played *(1)*
please *(39)*
PO *(1)*
point *(6)*
pointed *(1)*
policies *(7)*
policy *(55)*
population *(1)*
posed *(1)*
position *(6)*
positioned *(1)*
possession *(1)*
possibilities *(1)*
possible *(6)*
Post *(4)*
potential *(7)*
potentially *(9)*
power *(5)*
practice *(9)*
practices *(13)*

precipitated *(1)*
precision *(1)*
predecisional *(7)*
predicate *(2)*
premarked *(1)*
prepare *(3)*
prepared *(2)*
preparing *(2)*
presence *(5)*
PRESENT *(6)*
presentation *(1)*
presented *(1)*
president *(2)*
press *(7)*
presumes *(1)*
pretty *(1)*
prevail *(1)*
prevent *(1)*
preview *(1)*
primacy *(1)*
primary *(3)*
principal *(4)*
principals *(2)*
principle *(5)*
principles *(2)*
Prior *(11)*
priorities *(9)*
priority *(2)*
private *(1)*
privilege *(17)*
privileged *(11)*
privileges *(1)*
privy *(1)*
proactively *(1)*
Probability *(1)*
probable *(2)*
probably *(1)*
problem *(2)*
problematic *(1)*
problems *(1)*
procedures *(4)*
proceed *(1)*
proceedings *(1)*
process *(34)*
produced *(4)*
product *(1)*
Professional *(2)*
professionally *(1)*
PROFESSORS *(2)*

profile *(5)*
program *(140)*
programatic *(1)*
programs *(3)*
proHamas *(2)*
prohibiting *(1)*
project *(2)*
prolongs *(1)*
promise *(2)*
prompt *(3)*
prompted *(1)*
proof *(1)*
pro-Palestine *(2)*
pro-Palestinian *(2)*
property *(1)*
proposed *(1)*
prosecute *(1)*
prosecution *(1)*
protect *(1)*
protected *(2)*
Protecting *(2)*
protection *(3)*
pro-terrorists *(1)*
protesters *(1)*
protestors *(2)*
protests *(4)*
protocols *(5)*
provide *(10)*
provided *(25)*
provides *(12)*
providing *(3)*
provision *(43)*
provisions *(8)*
prudential *(3)*
Public *(24)*
publically *(1)*
pull *(1)*
pulling *(1)*
purpose *(3)*
purposes *(3)*
pursuant *(5)*
purview *(1)*
put *(3)*
putting *(1)*

< Q >
qualified *(1)*
question *(148)*
questioning *(2)*

questions *(22)*
quick *(3)*
quickly *(1)*
quieter *(2)*
quotations *(1)*
quote *(3)*

< R >
RAMYA *(1)*
ran *(1)*
rank *(2)*
RASSON *(2)*
rationale *(1)*
rationales *(1)*
reach *(2)*
reached *(1)*
reaches *(1)*
read *(28)*
readable *(1)*
reading *(3)*
ready *(2)*
real *(1)*
reallocate *(1)*
reallocated *(2)*
reallocation *(6)*
really *(4)*
Realtime *(1)*
reason *(32)*
reasonable *(1)*
reasons *(4)*
reassigned *(1)*
recall *(80)*
receipt *(2)*
receive *(21)*
received *(30)*
receives *(6)*
receiving *(3)*
recipient *(2)*
recognize *(8)*
recognizing *(1)*
recollection *(1)*
recommend *(3)*
recommendation *(14)*
recommendations *(3)*
recommended *(7)*
recommending *(3)*
recommends *(2)*
reconstituted *(1)*
record *(46)*

recorded (1)
recording (1)
recordkeeping (2)
redacted (1)
redepose (1)
reduced (8)
refer (19)
reference (6)
referenced (9)
references (2)
referral (57)
referralled (1)
referrals (27)
referred (19)
referring (23)
refers (3)
reflect (1)
reflected (1)
reflects (1)
refresh (1)
refreshing (1)
Refugees (2)
refuse (1)
regard (1)
regarding (20)
regiment (1)
regions (2)
regular (4)
regularly (2)
regulation (1)
relate (2)
related (6)
relates (21)
relating (13)
relation (1)
relationship (4)
relatively (1)
relevant (14)
relied (1)
Relief (1)
relies (1)
remains (4)
remember (6)
remembering (1)
remind (4)
removability (3)
removable (1)
Removal (11)
remove (2)

renew (2)
repeat (8)
repeated (1)
repeatedly (1)
rephrase (3)
report (61)
Reported (2)
Reporter (31)
REPORTER'S (1)
Reporting (5)
reports (20)
represent (5)
representation (1)
representative (1)
represented (2)
representing (1)
request (2)
requested (2)
require (6)
required (3)
requirement (12)
requirements (5)
requires (2)
Research (6)
reserving (1)
resident (4)
residents (10)
resinate (1)
resource (1)
resources (3)
respect (21)
Respectfully (2)
respond (3)
responded (1)
responding (7)
response (24)
responses (1)
responsibilities (3)
Responsibility (8)
responsible (12)
Rest (1)
restate (9)
resting (1)
restrictions (3)
result (1)
results (1)
retain (1)
reveal (2)
reveals (2)

review (16)
reviewed (5)
reviewing (2)
reviews (4)
revocation (28)
revocations (14)
revoke (3)
revoked (24)
revokes (1)
revoking (2)
revolution (2)
Richard (1)
Right (102)
rights (2)
rises (1)
risk (2)
risks (1)
river (1)
Riverside (1)
ROA (22)
ROAs (13)
Robert (4)
ROI (2)
role (22)
roles (4)
Romeo (1)
room (1)
rose (1)
roster (6)
RPR (3)
RRP (1)
RUBIO (7)
Rubio's (1)
ruffling (1)
rule (1)
rules (1)
ruling (1)
Rumeysa (3)
run (1)
running (1)
runs (8)

< S >
safeguarding (1)
Safely (2)
safety (26)
SANTORA (1)
satisfying (1)
save (6)

saw (1)
saying (15)
says (19)
scenario (1)
schedule (1)
scheduled (1)
school (1)
Science (1)
scope (5)
SCOTT (1)
Scott.wilkens@knightc
olumbia.org (1)
screened (1)
screening (4)
screenshot (1)
screenshots (1)
scroll (1)
sea (1)
seal (2)
search (1)
second (28)
seconds (1)
Secretary (19)
section (50)
sections (5)
Security (164)
Security's (4)
see (30)
seeing (2)
seeking (3)
seeks (1)
seen (31)
Selwin (1)
S-E-L-W-I-N (1)
Senate (1)
send (10)
sending (5)
senior (19)
senior-most (2)
sense (8)
sensitive (2)
sent (12)
sentence (2)
sentences (1)
separate (6)
September (2)
serious (4)
serve (2)
served (2)

Deposition of Andre Watson                                    AAUP, et al. v. Rubio, et al.

Service *(1)*
Services *(7)*
set *(13)*
sets *(4)*
setting *(3)*
seven *(1)*
seven-hour *(2)*
shake *(1)*
shakes *(1)*
share *(2)*
shared *(2)*
sharing *(2)*
sheet *(4)*
sheets *(4)*
SHER *(2)*
shift *(4)*
shifted *(1)*
shifting *(1)*
Shockingly *(1)*
short *(4)*
shorthand *(1)*
shot *(1)*
show *(5)*
showed *(1)*
showing *(1)*
shown *(2)*
sic *(8)*
sided *(2)*
sign *(3)*
SIGNATURE *(2)*
signed *(7)*
signing *(1)*
signs *(1)*
silent *(12)*
silly *(1)*
similar *(2)*
simpler *(1)*
simply *(2)*
simultaneously *(1)*
single *(3)*
sir *(6)*
sit *(3)*
sits *(1)*
sitting *(5)*
situation *(1)*
six *(4)*
skip *(2)*
slide *(1)*
slightly *(1)*

small *(1)*
smaller *(1)*
smarter *(1)*
Smith *(1)*
smuggling *(2)*
social *(8)*
somebody *(5)*
someone's *(6)*
soonest *(1)*
sorry *(88)*
sort *(12)*
sound *(2)*
sounds *(8)*
source *(31)*
sources *(10)*
sourcing *(1)*
sp *(1)*
space *(2)*
speak *(21)*
Speaking *(8)*
speaks *(3)*
Special *(8)*
specialist *(1)*
specific *(25)*
specifically *(10)*
specifics *(3)*
specifies *(1)*
spectrum *(4)*
speculate *(8)*
speculating *(2)*
speculation *(19)*
speculative *(1)*
speech *(12)*
spell *(3)*
spending *(1)*
spirit *(1)*
Spiros *(1)*
spoke *(7)*
spoken *(1)*
staff *(5)*
staffing *(1)*
stamps *(2)*
stand *(1)*
standard *(6)*
standards *(5)*
standing *(4)*
start *(10)*
started *(3)*
starting *(3)*

starts *(1)*
state *(138)*
stated *(8)*
statement *(26)*
statements *(6)*
STATES *(44)*
State's *(3)*
States's *(1)*
Station *(1)*
status *(2)*
statute *(12)*
statutes *(6)*
statutory *(2)*
stayed *(1)*
staying *(1)*
steadfast *(4)*
stenographic *(1)*
stenographically *(1)*
step *(8)*
steps *(8)*
Stewart *(1)*
stick *(2)*
Sticking *(3)*
stipulate *(2)*
stop *(1)*
stopped *(2)*
stored *(1)*
straightforward *(1)*
strategies *(1)*
strategize *(1)*
Street *(3)*
strike *(2)*
STROKUS *(1)*
Stuart *(2)*
student *(21)*
students *(7)*
study *(1)*
studying *(1)*
stuff *(1)*
subject *(16)*
subjects *(2)*
submit *(3)*
submitted *(2)*
subordinate *(11)*
subordinates *(5)*
subparts *(1)*
Subsection *(9)*
subsequent *(4)*
substance *(8)*

substantial *(1)*
success *(1)*
suggest *(1)*
suggested *(2)*
Suite *(2)*
suited *(1)*
summary *(1)*
supervise *(4)*
supervising *(2)*
supervisor *(1)*
supervisors *(4)*
supervisory *(3)*
support *(32)*
supported *(3)*
supporting *(2)*
supports *(1)*
suppose *(1)*
supposed *(5)*
sure *(58)*
Suri *(5)*
S-U-R-I *(1)*
Suri's *(2)*
surprising *(1)*
surrender *(1)*
swear *(1)*
sworn *(2)*
Sympathetic *(1)*
sympathies *(1)*
sympathizers *(1)*
sympathy *(2)*
synthesizers *(1)*
Syria *(2)*
system *(11)*

< T >
tab *(2)*
tac *(1)*
tactics *(2)*
take *(47)*
taken *(17)*
takes *(1)*
talk *(16)*
talked *(8)*
talking *(17)*
talks *(1)*
tam *(1)*
Tango *(2)*
targeted *(12)*
tasked *(6)*

team  (2)
techniques  (5)
technology  (1)
tell  (27)
telling  (2)
tells  (1)
ten  (6)
term  (19)
terminated  (2)
terminology  (1)
terms  (9)
terrorism  (8)
terrorism-related  (7)
terrorist  (25)
Terrorists  (10)
test  (1)
testified  (3)
testify  (11)
testifying  (4)
testimony  (32)
text  (2)
Thank  (9)
Thanks  (1)
thereof  (3)
thereto  (1)
thing  (8)
things  (9)
think  (69)
thinking  (3)
thinks  (4)
third  (1)
thought  (5)
Threat  (26)
threaten  (2)
threatening  (1)
Threats  (2)
three  (12)
three-minute  (1)
threshold  (2)
throw  (1)
time  (70)
timeline  (1)
times  (15)
timing  (1)
tiniest  (1)
Tips  (12)
title  (19)
titled  (3)
titles  (3)

today  (27)
Today's  (1)
Todd  (1)
told  (4)
tools  (1)
top  (8)
topic  (6)
topics  (17)
totally  (1)
touch  (1)
tough  (2)
track  (2)
tracking  (3)
training  (6)
trainings  (1)
transact  (1)
transcript  (6)
transcription  (1)
translates  (1)
transnational  (5)
travel  (4)
traveling  (1)
Treasury  (1)
treat  (1)
TREMONTE  (2)
trip  (1)
true  (8)
truthful  (1)
truthfully  (1)
try  (7)
trying  (15)
turn  (11)
Turning  (4)
two  (24)
two-and-a-half  (1)
type  (2)
types  (4)
typewriting  (1)
typical  (1)
typically  (14)
typos  (1)

< U >
U.S  (35)
Uh-huh  (2)
Um  (1)
underlies  (1)
underlying  (7)
undermines  (2)

understand  (82)
understanding  (29)
Understood  (5)
unfamiliar  (1)
unfortunately  (2)
uniform  (1)
unilaterally  (1)
unit  (40)
UNITED  (38)
unit's  (1)
universe  (2)
universities  (4)
UNIVERSITY  (7)
unlawful  (1)
upcoming  (1)
update  (2)
updates  (4)
Upper  (1)
usable  (1)
USC  (7)
USCIS  (9)
use  (16)
user  (1)
username  (1)
uses  (5)

< V >
Vague  (36)
Vaguely  (1)
varies  (1)
variety  (1)
various  (4)
venue  (2)
verbal  (1)
versed  (1)
versus  (2)
vetting  (4)
VICTORIA  (1)
VIDEO  (5)
VIDEOGRAPHER
  (10)
Videotaped  (1)
Vienna  (1)
view  (5)
views  (7)
vigorously  (2)
violated  (2)
violation  (22)
violations  (26)

violator  (1)
violators  (5)
violence  (1)
Virginia  (1)
virtue  (1)
Visa  (87)
Visas  (16)
visible  (1)
visitor  (6)
visual  (1)

< W >
waiting  (2)
Walker  (5)
walking  (2)
Wang  (1)
want  (53)
wanted  (3)
wants  (3)
war  (7)
warned  (1)
warranted  (1)
Washington  (4)
waste  (1)
water  (1)
WATSON  (30)
way  (23)
ways  (4)
Weapons  (1)
wear  (6)
wears  (1)
Webster  (1)
Wednesday  (1)
week  (1)
weekly  (4)
weeks  (5)
weigh  (1)
welcome  (3)
Well  (73)
went  (2)
We're  (35)
We've  (13)
WGY  (1)
whatsoever  (1)
WHEREOF  (2)
White  (10)
Whiting  (2)
Whitings's  (1)
wide  (2)

**WILKENS**  (2)
**WILLIAM**  (3)
**Wilson**  (3)
**window**  (1)
**wish**  (2)
**withdraw**  (1)
**withdrawn**  (38)
**WITNESS**  (41)
**witness's**  (1)
**woman**  (1)
**word**  (9)
**words**  (12)
**wore**  (3)
**work**  (50)
**worked**  (10)
**working**  (3)
**works**  (11)
**world**  (3)
**worn**  (1)
**wrap**  (1)
**write**  (2)
**writes**  (4)
**writing**  (10)
**written**  (12)
**wrong**  (8)
**wrote**  (6)

**< Y >**
**Yeah**  (15)
**year**  (5)
**years**  (7)
**Yep**  (1)
**York**  (4)
**Yunseo**  (1)
**Y-U-N-S-E-O**  (1)

**< Z >**
**zooming**  (1)

# EXHIBIT 11

UNCLASSIFIED
SBU



| MRN: | 25 STATE 17178 |
|---|---|
| Date/DTG: | Feb 28, 2025 / 280143Z FEB 25 |
| From: | SECSTATE WASHDC |
| Action: | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Routine* |
| E.O: | 13526 |
| TAGS: | CVIS, CMGT, KCSY |
| Captions: | SENSITIVE |
| Reference: | 25 STATE 5914 |
| Subject: | (U) Catch And Revoke:  National Security Through Timely Processing of Visa Systems Messages |

1. (U) This is an **Action Request**.  Please see paragraph 5.

2. (SBU) **SUMMARY**:  Among the best evidence of a person's eligibility for a visa is his or her actual behavior.  Therefore, recurrent vetting conducted throughout the entire validity period of a visa - based on actual travel to the United States and actual encounters with United States law enforcement authorities - is necessary to protect Americans and U.S. borders.   Under Executive Order (E.O.) 14161, "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," the Department is directed to ensure maximum screening and vetting throughout the visa process.  Therefore, consular officers must utilize whole-of-government law enforcement systems to vigilantly monitor the activities of aliens - whether they are inside the United States or not.  In particular, Posts LE ███████████████████ daily and revoke or request revocation of any visas for a visa holder you determine is no longer eligible under Section 214(b) or 212(a) of the Immigration and Nationality Act (INA), or has overstayed.  In other words, when a consular officer catches an alien misusing a visa, the officer should generally revoke it.  Catch and revoke.  **END SUMMARY.**

3. (SBU) Section 1(b) of E.O. 14161 states that, "[t]o protect Americans, the United States must be vigilant during the visa-issuance process to ensure that those aliens approved for admission into the United States do not intend to harm Americans or our national interests.  More importantly, the United States must identify them before their admission or entry into the United States."  Timely and stringent processing of ████████ after visa issuance, and revoking visas when appropriate, is necessary to this effort.  Visa holders who overstay their admission period in the United States even by one day, engage in conduct that poses a threat to U.S. national security, or otherwise misuse their visas should have their visas revoked under INA 221(i).  In accordance with 9 FAM 403.11-(A), Posts should also carefully review for revocation any visa holders who are arrested or convicted of crimes in the United States, including assessing whether the visa holder remains eligible for the visa classification under INA 214(b).

4. (SBU) LE



**ACTION REQUEST/IMPLEMENTATION GUIDANCE**

5. (SBU) **ACTION REQUEST:** LE





If a post anticipates a large quantity of cases will require prudential revocation, post must also include the VO/SAC revocations team.  Managers should monitor the queue size daily and take action if messages accumulate.

6. (SBU) 



8. (SBU) Applicants may not or visa holders may no longer overcome 214(b) if they engage in activities that are inconsistent with the claimed nonimmigrant status (Ref A).  Even if an alien has not yet been convicted of crime and his or her visa is not yet revocable under INA 212(a)(2)(A)(i)(1), consular officers must evaluate whether the visa should be revoked under INA 214(b). ██████████████████████████████████████████████████████████████████████████████, you must assess whether INA 214(b) applies as a basis for revocation.  Every overstay and/or arrest requires you to weigh whether the alien is ineligible under 212(a) or no longer overcomes INA 214(b).  Remember, applicants may not, or visa holders may no longer, overcome 214(b) if they engage in activities that are inconsistent with the claimed nonimmigrant status (Ref A).

9.  (SBU) If a consular officer already suspects at the interview window that an applicant has committed a crime in the United States, then the consular officer must carefully consider all potentially applicable grounds of ineligibility and enter these considerations through case notes.  A consular officer will usually refuse to issue a visa to such a suspected criminal applicant. ██████████████████████████



**LE**

If a consular officer knows at the window that an applicant will overstay a visa even beyond the admit-until date permitted by U.S. Customs and Border Protection authorities at ports of entry (let alone beyond the applicant's stated purpose of travel), then the consular officer will likely refuse to issue a visa to such an applicant. Yet this is exactly what a visa overstay means: a one-day overstay is still an overstay. Even if such a visa holder has not yet overstayed by more than 180 days and his or her visa is therefore not yet void under INA 222(g), nonetheless the alien likely no longer overcomes INA 214(b).

**Revocation If the Alien Has Departed the United States**

10. (SBU) **LE**

If the alien has departed from the United States, posts should initiate revocation procedures in accordance with 9 FAM 403.11-3(A)(2), including **LE**

. Consular officers do not have the authority to revoke a visa for individuals who are still in the United States based on a suspected ineligibility or based on derogatory information that is insufficient to support an ineligibility finding, other than a revocation based on driving under the influence (DUI).

**Revocation If the Alien is Still in the United States**

11. (SBU) Requests for revocation of visas where the individual is in the United States must be sent to the Revocation Team in VO/SAC/RC at **LE**



**Immigrant Visa (IV) Cases**

12. (SBU) LE ███████████████████████████████████

███████████████████████████████████████ For unused, valid

IVs, use the guidance in 9 FAM 303.7-6(C)(1) to determine whether the
information is sufficient to render the person ineligible for an IV.  If so,
initiate revocation procedures in accordance with the guidance in 9 FAM
504.12.

**TRAINING & GUIDANCE**

13. (SBU) LE ███████████████████████████████████

██████████████████████████████████

14. (U) Additional guidance and contacts:  Guidance related to Executive
Orders can be found on CAWeb.  State Department personnel can also join
the CA/VO Transition Coordination Team to review official guidance and
submit questions to VO subject matter experts regarding the E.O.

15. (U) Inquiries:  For any media or congressional inquiries on E.O.s, posts
must use pre-cleared language from public talking points located on CA Web
(linked here), and copy CA/P on any responses.  When responding to general
or press inquiries about the E.O., copy CAPressRequests@state.gov.  When
responding to any congressional inquiries, copy
ConsularOnTheHill@state.gov.

16. Minimize Considered.

**MINIMIZE CONSIDERED**

| Signature: | RUBIO |
|---|---|
| XMT: | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST |

PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL;
YEKATERINBURG, AMCONSUL

---

**UNCLASSIFIED**
SBU

EXHIBIT 12

**UNCLASSIFIED (U)**

# 5 FAM 1200
# STATE MESSAGING AND ARCHIVE RETRIEVAL TOOLSET (SMART)

## 5 FAM 1210
## PURPOSE AND SCOPE

*(CT:IM-323; 06-20-2024)*
*(Office of Origin: DT/ES/MCS/GMS)*

## 5 FAM 1211 PURPOSE AND SCOPE

*(CT:IM-272; 03-02-2020)*

a. This subchapter establishes policy for the State Messaging and Archive Retrieval Toolset (SMART) application. This policy applies to all Department personnel, contractors, and other U.S. Government agency personnel (referred to as "users") who are authorized access to Department facilities and networks (domestically and abroad).

b. All users of SMART must follow the policy in this subchapter and the associated Telecommunications Handbook ([5 FAH-2](#)) when using SMART.

## 5 FAM 1212 AUTHORITIES

*(CT:IM-127; 03-05-2012)*

The authorities for this policy are found in [1 FAM 271.5](#) and [5 FAM 113.](#)

## 5 FAM 1213 DEFINITIONS

*(CT:IM-300; 06-06-2023)*

**Allied Communications Publication (ACP)**: One of several publications that regulate the use of allied government transmission facilities. ACPs are identified by a numerical suffix, ACP-127, ACP-131, etc.

**Addressee**: The post, collective, individual, or distribution list to whom a message is directed by the originator. Addressees are indicated as either action or info (information).

**Approver**:  An individual who has the authority (or to whom the authority has been delegated) to authorize release of a message or document that carries the authority of the Department of State, including reporting, policy formulation, and management.

**Archive message**:  Department messages that have long-term record value and are stored in the SMART archive.  SMART has two archive message types: cables and record emails.

**Archive:**  The official Department database of all archive messages sent to and received by SMART.  Users can search the archive for messages, save searches, and opt to enable notifications for when messages that meet their interests are added to the archive.  Access to the archive is controlled by role-based access control (RBAC) restrictions.

**Captions:**  Acronyms or phrases used to provide handling or distribution instructions for a cable or record email.  A caption denotes the expected audience of a SMART message, thereby targeting distribution and limiting archive access.  Captions take precedence over all other handling instructions.  Refer to 5 FAH-2 H-440 for more information.

**Classified message**:  In SMART, an archive message that is marked as Confidential or Secret and can only be received and retrieved from the archive by individuals with an appropriate security clearance.

**Clearer**:  An individual who reviews and concurs with message text or substance. SMART messages can have more than one clearer.

**Collective**:  A distribution list of several posts, agencies, and/or organizations grouped for a specific purpose or type of cable traffic.  There are two types of collectives:

  (1) **Department-originated**: Only the domestic designated organizations or bureaus within the Department may originate cable traffic to these collectives (i.e., the originator post must be SECSTATE WASHDC); and

  (2) **Field-originated**: Only overseas designated posts may originate a cable to these collectives.  Agencies outside the Department are not authorized to use collectives.

**Critical Intelligence (CRITIC):**  A handling symbol and precedence for specially formatted cables, per the Defense Special Security Communications System Operating Instructions [DOI 103] conveying national security information that must be routed to the National Security Agency [NSA] and then delivered to the highest levels of the U.S. Government as fast as possible.  Overseas personnel may only send CRITIC messages via SMART from a classified workstation.

**Dissemination rules:**  Descriptive logic directives that determine message distribution based on logical expressions of the Department's business rules.  Dissemination rules direct SMART to perform actions based on the properties or metadata of a message, the keyword contents of the message, and job roles assigned to a user.  These rules allow messages to be distributed to

necessary recipients through derived addresses rather than only to direct addresses.

**Enclave**:  The Department's two enterprise networks:  ClassNet for processing up to SECRET level information, and OpenNet for processing up to Sensitive but Unclassified (SBU) information.  SMART processes and archives only unclassified and SBU messages on OpenNet.  Both unclassified and classified messages are processed and archived on ClassNet.  With the exception of the United States Department of Agriculture, cable traffic originating from outside agencies is processed on ClassNet.  Almost all unclassified traffic originating from other agencies passes through an electronic cross domain security guard for access on OpenNet.

**Main State Messaging Center (MSMC) administrator**:  An administrator at SMART's central site, the Department's Messaging Center.

**Metadata:**  Descriptive information about the content of a SMART message including, but not limited to, precedence, classification, TAGS, captions, special handling and passing instructions, drafters, clearers and approvers, and addressees.

**Microsoft Outlook:**  The software application on which the SMART Client runs.

**Originator:**  The post or organization that initiates a message.

**Personally identifiable information (PII):**  (as defined by OMB M-07-16) Information that can be used to distinguish or trace an individual's identity; such as their name, Social Security number, biometric records, etc., alone, or when combined with other personal or identifying information, which is linked or linkable to a specific individual, such as date and place of birth, mother's maiden name, etc.  Refer to 5 FAM 460 for more information.

**Plain language address (PLA):**  A unique readable name for use in the address component of a Command, Control, and Communications (C3) system message (i.e., cable).  A PLA is an organizational address that identifies an organization or a group of organizations (e.g., SECSTATE WASHDC, AMEMBASSY ABUJA, AMCONSUL DURBAN, ALL EUROPE COLLECTIVE).

**Precedence:**  A designation assigned to a cable by the drafter to indicate the relative urgency of the cable's subject matter to the addressee.  The selected precedence dictates the message processing path and alerts addressees to the level of action required.  Generally, there are two precedence categories:

(1)  Standard; and

(2)  High.

**Recipient:**  Someone that SMART delivers a message to based on derived or direct addressing.

**Releaser:**  A user who sends an archive message.  In SMART, a user must be provisioned with release authority to send a cable.  Any user with a SMART account can send a record email.

**Rolebased access control (RBAC):**  A method of restricting information access based on the roles of individual users within an organization.  Users have access rights only to the information they need to do their jobs.  In SMART, RBAC is enforced using captions, traffic analysis by geography and subject (TAGS), sensitivity, assigned post, employee type, and classification.  RBAC is enforced when messages are disseminated and when users search the SMART archive.

**Sensitive but unclassified (SBU) message:**  Information that is not classified for national security reasons, but that warrants a degree of protection and administrative control that meets the criteria for exemption from public disclosure set forth under Sections 552 and 552a of Title 5, United States Code: the Freedom of Information Act and the Privacy Act.  See 12 FAM 540 for details on SBU.

**SMART message:**  Electronically transmitted official and unofficial correspondence known as cables and record emails.

**SMART post administrator:**  The local system administrator at a post abroad or at some domestic offices in the Department who manages the SMART users, messages, and post within their purview.

**State Messaging and Archive Retrieval Toolset (SMART)**:  The Department's cable and record email application designed as a simple, secure, and user-driven system to support the conduct of diplomacy through modern messaging, dynamic archiving, and information sharing.  SMART enables users to send and receive organizational authority messages and other messages with long-term value on both OpenNet and ClassNet.  These messages are stored and searchable in the SMART Archive.

**Traffic analysis by geography and subject (TAGS):**  Abbreviations that aid in identifying subject content, world locations, and programs in communications disseminated throughout the Department and posts.  These markings are metadata that factor into message dissemination, message retrieval, and disposition in the archive.  TAGS types include: subject, geographical, program, organizational, and personal.  SMART requires at least one subject TAGS on archive messages.

# 5 FAM 1214  MESSAGE TYPES AND THEIR USAGE

## 5 FAM 1214.1  Archive Messages

*(CT:IM-300;   06-06-2023)*

a. There are two types of SMART archive messages: cables and record emails.  See 5 FAM 1214.2 and 5 FAM 1214.3 for definitions of these message types.

b. When drafting, approving, and/or releasing archive messages, a user must comply with 5 FAM 400, 5 FAM 1200, 5 FAH-1, 5 FAH-2, 12 FAM 500, 12 FAM

600, 12 FAH-6 H-540 and any other Department requirements concerning records management, correspondence, and information security.

c.  Other agencies must comply with Department standards and procedures when using the Department's communications systems.  At post, the messaging regulations for other agencies will be followed only when they do not conflict with or adversely impact the Department's systems and requirements.

d.  Include at least one subject TAGS (see 5 FAH-1 H-140) and an appropriate subject line on all Department archive messages.  SMART automatically applies Executive Order 13526 information to Department archive messages.

e.  All archive messages must be marked accordingly using the appropriate sensitivity marking category designator (see 12 FAM 540).

# 5 FAM 1214.2  CABLES

*(CT:IM-300;   06-06-2023)*

a.  Cables are official records of Department of State policies, program activities, post operations, and personnel management.  Cables are archive messages that are sent to organizational addressees (SECSTATE, AMEMBASSY, AMCONSUL, etc.) and are disseminated according to system rules and user profiles.  Cables are always cleared and approved, either directly or through delegation, and carry organizational authority.

b.  Cables contain official evidence of the Department's business.

c.   Cables require a PLA in the line.

d.  Cables may be addressed to individuals in the info line.

e.  Cables must have precedence, TAGS, and classification defined.

f.  Cables may contain captions to restrict dissemination and archive access.

g.  Cables may be marked 'Addressee Only' to limit search access to the releaser and message addressees, subject to RBAC permissions.

h.  Cables may carry the privacy/PII marking as a reminder to safeguard the content appropriately.  This marking must be used in conjunction with a restrictive caption or SMART's 'Addressee Only' option to limit dissemination and/or search access.

i.  Cables must display the signature of the designated principal in charge as the authority for release at the end of the cable.

j.  Cables must have message reference numbers as unique identifiers.

k.  Cables are saved to the archive.

l.  Cables can be searched and retrieved from the archive depending on user RBAC permissions. Unclassified ALDAC messages, without restrictions, are accessible to all authenticated cleared personnel regardless of a SMART account.

## 5 FAM 1214.3  Record Email

*(CT:IM-300;   06-06-2023)*

a. A record email is a message, or an email converted to an archive message, whose content adds to a proper understanding of the formulation and execution of basic policies, decisions, actions, or responsibilities of Department offices and posts abroad, and as such is stored in the SMART archive for its long-term record value.  Record emails may be analogous to memos, correspondence, important meeting notes, and other documents with long-term value.  There are two types of record email:

    (1)  Message directly addressed (MDA), and

    (2)  For the record (FTR).

b. MDA record emails are addressed to individuals or distribution lists and assigned a unique identifier as a MDA (e.g., 21 MDA 12345).

c.  FTR emails are addressed to the archive and assigned a unique identifier as a message "For the Record" (e.g., 21 FTR 4567).

d. Record emails must have a TAGS and classification defined.

e. Record emails may contain captions to restrict dissemination and archive access.

f.  Record emails may be marked 'Addressee Only' to limit search access to the releaser and message addressees, subject to RBAC permissions.

g. Record emails may carry the Privacy/PII marking as a reminder to safeguard the content appropriately.  This marking must be used in conjunction with a restrictive caption or SMART's 'Addressee Only' option to restrict dissemination and/or search access.

h. SMART does not require record emails to have a clearer or approver.

i.  Record emails will not display the signature of the designated principal in charge as the authority for release at the end of the email.

j.  Record emails can be searched and retrieved from the archive, depending on user RBAC permissions.


## 5 FAM 1215  REPORTING SMART PROBLEMS

*(CT:IM-272;   03-02-2020)*

Domestic users experiencing problems with SMART should contact the IT Service Center at ITServiceCenter@state.gov or 202-647-2000.  Users abroad experiencing problems with SMART should contact their local information management (IM) staff.

# 5 FAM 1216  SMART SYSTEM ADMINISTRATOR TRAINING

*(CT:IM-272;   03-02-2020)*

a. SMART post administrators are required to complete annual SMART system administrator training.  For current SMART system administrator course offerings and schedules, please see the FSI OpenNet site.

b. A "Post Administrator Training Report" in SMART's Full Reporting can assist post administrators with tracking their training due date.  SMART also sends reminder emails when training is due.

# 5 FAM 1217  THROUGH 1219  UNASSIGNED

**UNCLASSIFIED (U)**

EXHIBIT 13

**UNCLASSIFIED**
SBU



| | |
|---|---|
| **MRN:** | 25 STATE 45612 |
| **Date/DTG:** | May 15, 2025 / 151708Z MAY 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Routine* |
| **E.O.** | 13526 |
| **TAGS:** | CVIS, CMGT, KCSY |
| **Captions:** | SENSITIVE |
| **Reference:** | A) 25 STATE 17178 |
| | B) 25 STATE 5914 |
| **Subject:** | Caught and Revoked:  Updated Guidance on Systems Messages |

1. (SBU) **SUMMARY**:  E.O. 14161 states to "protect Americans the United States must be vigilant during the visa-issuance process to ensure that those aliens approved for admission into the United States do not intend to harm Americans or our national interests.  More importantly the United States must identify them before their admission or entry into the United States."  Thanks to consular sections' ██████ LE ██████████, visa revocation actions increased by 200 percent in the week following the action request (REF A).  To help posts continue to focus resources on priority cases and protect U.S. borders, ██████████ ████████████ LE ████████████████████████████████ This cable also serves to correct an error in the original request (REF A), which incorrectly stated that INA 222(g) does not apply to overstays of fewer than 180 days.  INA 222(g) renders void an NIV on which an alien entered if that alien remains beyond the period of authorized stay.  The alien does not have to have remained more than 180 days beyond the period of authorized stay for INA 222(g) to apply (see 9 FAM 302.1-9).  **END SUMMARY.**

**A LEG UP FROM WASHINGTON**

2. (SBU) 

3. (SBU)

*Contact your <u>VO/F analyst</u> and/or your RCO if you need specific data for your post.

4. (SBU) This initial sweep addressed the backlog of system messages.  New messages in these categories will continue to accumulate.

5. (SBU) Following the transmission of REF A on March 1, to protect U.S. borders and Americans in the weeks following REF

A.  This focused work resulted in an immediate doubling in visa revocations for aliens who no longer qualify for their visas, and a sustained 150 percent increase in visa revocations as compared to March 1-April 15, 2024.

**VISA REVOCATIONS PORTAL**

6. (SBU) With the migration of CAWeb, there is a new link to the Visa Revocations Portal containing the new template spreadsheet for bulk prudential revocation requests, links to 9 FAM revocation sections, and the email address of the VO/SAC revocations team where requests should be sent.  There is also helpful guidance on what to consider when submitting revocation requests and tips.

**ADDRESSING LE RECORDS**

7. (SBU)



**FURTHER GUIDANCE**

8. (U) Please contact your VO/F analyst with questions on this effort. Please contact LE with questions about prudential revocations.

DEF-086

| | |
|---|---|
| **Signature:** | RUBIO |

| | |
|---|---|
| **XMT:** | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL |

**UNCLASSIFIED**
SBU

# EXHIBIT 14



**From:** SMART Core
**Sent:** Wednesday, June 18, 2025 1:47 PM
**Cc:**

**Subject:** Action Request:  Expanding Screening and Vetting for FMJ Applicants

### UNCLASSIFIED

SBU



**Action Office:**

**Info Office:** ALDACS

| | |
|---|---|
| **MRN:** | 25 STATE 59756    Reply |
| **Date/DTG:** | Jun 18, 2025 / 181737Z JUN 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| **E.O:** | 13526 |
| **TAGS:** | CMGT, CVIS, KFRD |
| **Captions:** | SENSITIVE |
| **Reference:** | A) 25 STATE 5914 |
| | B) 25 STATE 26168 |
| | C) 25 STATE 50220 |
| **Subject:** | Action Request:  Expanding Screening and Vetting for FMJ Applicants |

1. (U) This is an action request.  See paras. 26-29.

## INTRODUCTION AND SUMMARY

1

2. (SBU) In ref A, the Department directed consular officers to maintain extra vigilance and to comprehensively review and screen every visa applicant for potential security and non-security related ineligibilities including to assess whether the applicant poses a threat to U.S. national security.  In ref B, consular officers were instructed to conduct expanded social media screening and vetting for certain F, M, and J nonimmigrant visa (FMJ) applicants.  In ref C, the Department directed consular sections to temporarily suspend scheduling FMJ cases pending further guidance on FMJ vetting.  This guidance supersedes ref B, which was limited to social media vetting for certain FMJ applicants.

3. (SBU) This updated guidance requires consular officers to conduct a comprehensive and thorough vetting of all FMJ applicants, including online presence, to identify applicants who bear hostile attitudes toward our citizens, culture, government, institutions, or founding principles; who advocate for, aid, or support designated foreign terrorists and other threats to U.S. national security; or who perpetrate unlawful antisemitic harassment or violence.  <u>Consular sections should resume scheduling FMJ appointments but should consider the effect of this guidance on workload and schedule accordingly.</u>  **Posts should prioritize expedited FMJ appointment requests as described in para 29.**  Posts should implement these vetting procedures within five business days.

**WHY ARE WE DOING THIS?**

4. (U) E.O. 14161, Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats, directs us to ensure that foreign nationals admitted to the United States do not bear hostile attitudes toward the citizens, culture, government, institutions, or founding principles of the United States, and that they do not advocate for, aid, or support designated foreign terrorists and other threats to U.S. national security.  E.O. 14188, Additional Measures to Combat Anti-Semitism, establishes U.S. policy to combat antisemitism vigorously, using all available legal tools to hold to account perpetrators of unlawful antisemitic harassment and violence, including on university campuses.

5. (U) Removing foreign nationals from the United States, even when they have clearly violated our laws, is a lengthy, expensive, and difficult process.  Therefore, we must be vigilant during the visa issuance process.  We must ensure that aliens seeking admission

to the United States are screened and vetted to the maximum extent possible and that they will respect the terms of their admission to the United States. As Secretary Rubio said, "a visa is a privilege, not a right."

6. (SBU) Such pre-admission vetting is particularly important for long-stay NIV holders, and acutely for FMJ cases. The FBI has long warned that foreign powers seek access to American higher education institutions to, among other things, steal technical information, exploit U.S. research and development, and spread false information for political or other reasons. In addition, a recent CA/FPP study suggested that almost half of international students seek to remain in the United States, whether legally or illegally.

**WHICH CASES ARE COVERED?**

7. (SBU) This guidance for consular officers covers **all FMJ applicants,** new or returning. This updated guidance supersedes that in ref B, which was limited to social media vetting for certain FMJ applicants.

**HOW DO I HANDLE THESE CASES?**

8. (SBU) Post should conduct intake and interviews in accordance with standard procedures. Once you determine an FMJ applicant is otherwise eligible for the requested nonimmigrant status, you must refuse the case under INA 221(g). Inform the applicant that his case is refused and requires additional administrative processing to establish his eligibility for the visa. Request that the applicant set all of his social media accounts to "public" and remind the applicant that limited access to, or visibility of, online presence could be construed as an effort to evade or hide certain activity.

**WHO DOES THE VETTING?**

9. (SBU) The <u>same</u> consular officer who interviews the applicant should perform the vetting described below. This "caseworker" approach is a best practice that allows a single decisionmaker to consider the whole applicant and the totality of facts surrounding the application. It also permits better detection of potentially derogatory information and inconsistencies. Other consular staff may perform discrete portions of the vetting that cannot be performed by the interviewing officer. For example, if only FPU staff have access to LexisNexis, FPU staff may conduct that check and return the results to the interviewing consular officer.

10. (SBU) **Vetting is not a fraud assessment.** Do not refer a case to post FPU for vetting or for any portion of the vetting. However, you might discover information during vetting that leads to an FPU referral. Posts should handle such cases according to their FPU referral SOPs and 7 FAH-1 H-940, Overseas FPU Responsibilities.

11. (SBU) To promote thorough vetting of visa applicants, and to promote quality decision-making generally, consular managers shall not maintain or establish any formal or informal production or processing quotas or targets for consular officers or those involved in administrative processing of visa cases. Rather consular officers shall take the time necessary to satisfy themselves that visa applicants qualify for the visas they seek, and personnel involved in back-office processing shall take the time necessary to perform their tasks thoroughly.

**WHERE DO I LOOK?**

12. (SBU) You must conduct a comprehensive and thorough vetting of each FMJ applicant who is otherwise issuable (i.e. overcomes 214(b)). Vetting means examining all aspects of the case, including the application, supporting evidence, and information you gather during the interview. You should review these in light of your personal knowledge, your expertise, and all sources of information available to you. It should include a review of the applicant's entire online presence -- not just social media activity -- using any appropriate search engines or other online resources. It also should include a check of any databases to which the consular section has access (e.g., LexisNexis or local equivalents).

13. (SBU) Consular sections may consult LE staff and Public Diplomacy sections to understand the social media environment at post and which search engines and techniques are best for comprehensively exploring an applicant's online presence. LE

staff can help provide context, including when assessing the credibility of applicants who apparently lack any online presence or who did not provide social media identifiers.

14. (SBU) If it is necessary to sign in to an account to view all of an applicant's activity on a particular social media platform (e.g., Instagram), you must do so using an official account that is publicly attributable to the Department.  <u>Consular sections may create such accounts in accordance with the platform's Terms of Service.</u>  Do not use accounts that are used for public communication.  Follow the guidance on social media use in 7 FAH-1 H-945.4, Social Media Rules of Conduct in Fraud Assessments, but recall that **vetting is not a fraud assessment,** so you should not track such vetting activities in ECAS.

15. (SBU) If you are unable to review any aspect of an applicant's online presence because social media accounts are set to "private" or otherwise limited, you should treat the case as any other where an applicant fails to provide certain information on request.  **You must consider whether such failure reflects evasiveness or otherwise calls into question the applicant's credibility.**

## WHAT AM I LOOKING FOR?

16. (U) During the vetting, you simply are looking for any potentially derogatory information about the applicant.  You must review any such information to ensure it does not indicate an ineligibility under INA 212(a) or 214(b).  For example, during an online presence search, you might discover in local media that an applicant had been arrested and charged with a serious crime, a possible 2A1 ineligibility, that he did not disclose on his application.  In such a case, you could request additional information from the applicant to help you determine whether he is ineligible.

17. (U) You should consider as potentially derogatory any indications of hostility toward the citizens, culture, government, institutions, or founding principles of the United States; of advocacy for, aid, or support for designated foreign terrorists and other threats to U.S. national security; or of support for unlawful antisemitic harassment or

violence.  You must review any such indicators to ensure they do not indicate an ineligibility under INA 212(a).  For example, during an online presence search, you might discover on social media that an applicant endorsed Hamas or its activities, a possible 3B ineligibility, that he did not disclose on this application.

18. (SBU) You also should be alert to any inconsistencies between what you discover during vetting and how the applicant presented himself in his application, in his supporting evidence, or during the interview.  You must explore all such inconsistencies to ensure they do not indicate visa ineligibilities.  **Even when such inconsistencies do not point to an INA 212(a) ineligibility, they can call into question the applicant's credibility.**

19. (U) You must document the results of your vetting in detailed case notes, including all potentially derogatory information and inconsistencies.  If you find any relevant information online, take screenshots to preserve the record against possible later alteration or loss of the information and upload those screenshots to the applicant's case record in the CCD.

**DOES THE APPLICANT STILL OVERCOME INA 214(B)?**

20. (U) INA 214(b) requires an applicant to show credibly that all activities in which he is expected to engage in while in the United States are consistent with the specific requirements of his visa classification.  That is, **if you are not completely satisfied (1) that the applicant is credible and (2) that, during his time in the United States, the applicant will engage only in activities consistent with his nonimmigrant visa status, you should refuse the visa under INA 214(b).**  That is true even in cases where the applicant has convinced you that he is not an intending immigrant, and even in cases where the applicant is also ineligible under another section of the law.

21. (SBU) Even if inconsistencies or potentially derogatory information you uncover during vetting do not rise to the level of an INA 212(a) ineligibility, you must consider whether they undermine the applicant's credibility or suggest that the applicant will not

respect the terms of his admission to the United States.  For example, while vetting applicants, many posts have discovered evidence online that those applicants had <u>worked illegally</u> while in the United States previously, thus seriously undermining their credibility in subsequent visa applications.

22. (SBU) In the same way, indications of hostility toward the citizens, culture, government, institutions, or founding principles of the United States; of advocacy for, aid, or support for designated foreign terrorists and other threats to U.S. national security; or of support for unlawful anti-Semitic harassment or violence might not lead to an INA 212(a) ineligibility.  However, you must consider whether applicants who express such strong animus are likely to respect the terms of their admission to the United States, including respecting all of its laws.

23. (SBU) Likewise, for applicants who demonstrate a history of political activism, especially when it is associated with violence or with the views and activities described above, you must consider the likelihood they would continue such activity in the United States and, if so, whether such activity is consistent with the nonimmigrant visa classification they seek.  As Secretary Rubio has said, we do not seek to import activists who will disrupt and undermine scholarly activity at U.S. universities.

## IS THE APPLICANT INELIGIBLE UNDER INA 212(a)(3)?

24. (SBU) If you uncover information that might lead to an INA 212(a)(3) ineligibility, you should follow the instructions in 9 FAM 304.2 to request an SAO.  This includes but is not limited to ineligibilities under:

- INA 212(a)(3)(A)(ii), where an applicant is traveling solely, principally, or incidentally to engage in any unlawful activity (9 FAM 302.5-4).
- INA 212(a)(3)(A)(iii), where an applicant seeks to engage solely, principally, or incidentally in any activity, a purpose of which is the opposition to, or the control or overthrow of, the U.S. government by force, violence, or other unlawful means (9 FAM 302.5-5).
- INA 212(a)(3)(B), where an applicant engages in certain terrorist activities, including espousing such activities, or has provided any form of material support to a terrorist organization (9 FAM 302.6).

25. (SBU) In any case where an applicant:

- expresses hostile attitudes toward the citizens, culture, government, institutions, or founding principles of the United States;
- **OR** advocates for, aids, or supports designated foreign terrorists and other threats to U.S. national security;
- **OR** expresses support for or perpetrates unlawful anti-Semitic harassment or violence;
- **AND** overcomes INA 214(b);
- **AND** is not ineligible under any other provision of INA 212(a)(3);
- **THEN** you should pursue a finding that the applicant is ineligible under INA 212(a)(3)(C), where an applicant's entry or proposed activities would have potentially serious foreign policy consequences or compromise a compelling U.S. foreign policy interest.  Only the Secretary can make such a finding, which requires an SAO.  See 9 FAM 302.14-2 for details.

## ACTION REQUESTS

26. (U) Posts should implement these vetting procedures within five business days.

27. (U) In addition, posts should work with their Public Diplomacy Sections on any public announcements for appropriate social media platforms and/or in local press.  Cleared social media content for posts to translate for this purpose will be available on the Consular Affairs Outreach Hub, and cleared press guidance will be available on CAWeb.  The GSS Program Team will instruct vendors to update GSS websites.

## RESUMING FMJ SCHEDULING

28. (U) Posts should resume regular scheduling of FMJ visa applications once these actions requests are implemented.  However, posts should consider overall scheduling volume and the resource demands of appropriate vetting; posts might need to schedule fewer FMJ cases than they did previously.

29. (SBU) Posts may resume processing of FMJ Referrals and Priority Appointment Requests (PARs), as well as FMJ expedited appointment requests.  However, among expedited appointment requests for FMJs, posts should prioritize the following groups:

- J-1 physicians
- F-1 students seeking to study at a U.S. university where international students constitute 15 percent or less of the total student population, according to the U.S. Department of Education.  CA will post a list of such schools on CAWeb.

**APPLICATION PROCESS CONSIDERATIONS**

30. (U) For FMJ cases currently in "open" status that have not yet been interviewed or, in the case of interview waiver cases, otherwise adjudicated, posts should request that applicants make their social media accounts "public," then conduct the vetting described in this cable.  If no potentially derogatory information is found, post can adjudicate the case to completion.  If potentially derogatory information is found, post should refuse the case under the appropriate refusal code; or, if needed, post should call the applicant back for a follow-up interview.

31. (U) For FMJ cases that were interviewed before the release of ref C and are otherwise approvable but currently in INA 221(g) status, posts should request that applicants make their social media accounts "public," then conduct the vetting described in this cable.  If no potentially derogatory information is found, post can adjudicate the case to completion.  If potentially derogatory information is found, post should refuse the case under the appropriate refusal code; or, if needed, post should call the applicant back for a follow-up interview.

EXHIBIT 15

The **Foreign Affairs Manual (FAM)** and associated **Handbooks (FAHs)** are a single, comprehensive, and authoritative source for the Department's organization structures, policies, and procedures that govern the operations of the State Department, the Foreign Service and, when applicable, other federal agencies. The FAM (generally policy) and the FAHs (generally procedures) together convey codified information to Department staff and contractors so they can carry out their responsibilities in accordance with statutory, executive and Department mandates.



Enter Search Text             **Search**

# FAM Volume Listing

## 1 FAM Organization and Functions
Policy Manual

View Table of Contents

View Changes

## 2 FAM General
Policy Manual

View Table of Contents

View Changes

## 3 FAM Personnel
Policy Manual

View Table of Contents

View Changes

## 4 FAM Financial Management
Policy Manual

View Table of Contents

View Changes

## 5 FAM Information Management

Policy Manual

View Table of Contents

View Changes

## 6 FAM General Services

Policy Manual

View Table of Contents

View Changes

## 7 FAM Consular Affairs

Policy Manual

View Table of Contents

View Changes

## 8 FAM FAM Passports and Consular Reports of Birth Abroad

Policy Manual

View Table of Contents

View Changes

## 9 FAM Visas

Policy Manual

View Table of Contents

View Changes

## 10 FAM Public, Educational, and Cultural Affairs

Policy Manual

View Table of Contents

View Changes

## 11 FAM Legal and Political Affairs

Policy Manual

[View Table of Contents](#)

[View Changes](#)

## 12 FAM Diplomatic Security

Policy Manual

[View Table of Contents](#)

[View Changes](#)

## 13 FAM Training and Professional Development

Policy Manual

[View Table of Contents](#)

[View Changes](#)

## 14 FAM Logistics Management

Policy Manual

[View Table of Contents](#)

[View Changes](#)

## 15 FAM Overseas Buildings Operations

Policy Manual

[View Table of Contents](#)

[View Changes](#)

## 16 FAM Medical

Policy Manual

[View Table of Contents](#)

View Changes

## 18 FAM Programs, Practices, and Planning

Policy Manual

View Table of Contents

View Changes

## 19 FAM Cybersecurity Guidance

Policy Manual

View Table of Contents

View Changes

## 20 FAM Data and Artificial Intelligence

Policy Manual

View Table of Contents

View Changes

---

© 2025 - Department of State: FAM Website    STATE.GOV    USA.GOV    Privacy and Disclaimers    Contact

EXHIBIT 16

**UNCLASSIFIED (U)**

# 9 FAM 402.5

# (U) STUDENTS AND EXCHANGE VISITORS – F, M, AND J VISAS

*(CT:VISA-2150;   04-29-2025)*
*(Office of Origin:  CA/VO)*

## 9 FAM 402.5-1  (U) STATUTORY AND REGULATORY AUTHORITY

### 9 FAM 402.5-1(A)  (U) Immigration and Nationality Act

*(CT:VISA-1;   11-18-2015)*

**(U)** INA 101(a)(15)(F) (8 U.S.C. 1101(a)(15)(F)); INA 101(a)(15)(J) (8 U.S.C. 1101(a)(15)(J)); INA 101(a)(15)(M) (8 U.S.C. 1101(a)(15)(M)); INA 212(a)(6)(C) (8 U.S.C. 1182(a)(6)(C)); INA 212(e) (8 U.S.C. 1182(e)); INA 212(j) (8 U.S.C. 1182(j)); INA 214(b) (8 U.S.C. 1184(b)); INA 214(l) (8 U.S.C. 1184(l)), INA 214(m) (8 U.S.C. 1184(m)).

### 9 FAM 402.5-1(B)  (U) Code of Federal Regulations

*(CT:VISA-1;   11-18-2015)*

**(U)** 22 CFR 41.61; 22 CFR 41.62; 22 CFR 41.63; 22 CFR Part 62.

## 9 FAM 402.5-2  (U) OVERVIEW

*(CT:VISA-1970;   04-22-2024)*

**(U)** Except for incidental, short-term courses permitted under a B visa (see 9 FAM 402.5-5(I)(3)-(4)), a noncitizen must have a student visa to study in the United States. The course of study and type of school they plan to attend determines whether they need an F-1 visa (academic) or an M-1 visa (nonacademic, vocational). Exchange visitor (J-1) visas are for individuals approved to participate in exchange visitor programs in the United States, which can range from student to research scholar to camp counselor to physician, among other programs.  Students and exchange visitors must be accepted by their schools or program sponsors before applying for visas.

# 9 FAM 402.5-3  (U) Categories of F, J, and M Visas

*(CT:VISA-1828;   09-12-2023)*

**(U)** 22 CFR 41.12 identities the following F, J, and M visas classifications for noncitizens engaged in study or participation in exchange programs:

| | |
|---|---|
| F1 | Student in an Academic or Language Training Program |
| F2 | Spouse or Child of F1 |
| F3 | Canadian or Mexican National Commuter Student in an Academic or Language Training Program |
| J1 | Exchange Visitor |
| J2 | Spouse or Child of J1 |
| M1 | Vocational Student or Other Nonacademic Student |
| M2 | Spouse or Child of M1 |
| M3 | Canadian or Mexican National Commuter Student (Vocational Student or Other Nonacademic Student) |

# 9 FAM 402.5-4  (U) STUDENT AND EXCHANGE VISITOR PROGRAM (SEVP)

## 9 FAM 402.5-4(A)  (U) Background on SEVP

*(CT:VISA-3012;   12-11-2024)*

a. **(U)** The Student and Exchange Visitor Information System (SEVIS) is designed to monitor the academic progress, movement, etc. of foreign students and exchange visitors from entry into the United States to departure. The Student and Exchange Visitor Program (SEVP) manages SEVIS.  SEVP is under the auspices of the National Security Investigations Division of ICE.

b. **(U)** SEVIS monitors schools and programs, students, exchange visitors, and their dependents throughout the duration of approved participation within the U.S. education system.  You can access the SEVIS record associated with the student through the CCD SEVIS report.

c.  **(U)** Contact the Education and Tourism Division CA/VO/F/ET with policy and procedural questions related to F, M, and J visas.

## 9 FAM 402.5-4(B)  (U) Student and Exchange Visitor Information System (SEVIS) Record is Definitive Record

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** While applicants must still present a paper Form I-20 (F or M visa) or Form DS-2019 (J visa) to qualify for a visa, the SEVIS record is the definitive

record of student or exchange visitor status and visa eligibility.  You must always check an applicant's SEVIS status before issuing an F, M, or J visa, for two reasons:  (1) You must verify that the SEVIS fee has been paid (see following paragraph); and (2) While presentation of a valid Form I-20 or Form DS-2019 generally indicates that an individual is eligible to apply for a visa, the electronic SEVIS record in the CCD, not the paper form, is the definitive record.

b.  **(U)** The electronic SEVIS record will indicate the applicant's current SEVIS status.  You should issue F, M, or J visas only to visa applicants whose SEVIS record indicates a SEVIS status of "initial" or "active."

c.  **(U)** On occasion, you may encounter an applicant who presents a hard copy Form I-20 or Form DS-2019 but you are unable to locate the SEVIS record in the CCD.  This may occur because records were not "swept" into the CCD from the SEVIS database as usual.  If the applicant is otherwise qualified, refuse the visa under INA 221(g) for administrative processing and alert the Visa Office F/M/J portfolio holder(s) listed in the CAWeb "Who's Who" in VO for assistance in verifying the record.

## 9 FAM 402.5-4(C)  (U) The Student and Exchange Visitor Information System (SEVIS) Fee

*(CT:VISA-2048;   08-15-2024)*

**(U)** All students and exchange visitors, except those exchange visitors who are sponsored by the U.S. government (programs with a serial number that begins with the prefix G-1, G-2, G-3, or G-7 on the Form DS-2019), must pay the I-901 SEVIS fee at FMJFee.com before the visa interview.  You must verify SEVIS fee payment through the SEVIS CCD report.  If the applicant's CCD SEVIS record does not show the fee was paid but the applicant states it was, you can easily and accurately verify the SEVIS payment by entering the SEVIS number, the last name of the applicant, and the applicant's date of birth into the FMJfee.com website.  Applicants who cannot demonstrate that they have paid the SEVIS fee should be refused under INA 221(g).  Questions about SEVIS fee payment should be directed to the Visa Office F/M/J portfolio holder(s) listed in the CAWeb "Who's Who".  Additional details and FAQs on the SEVIS fee can be found on the ICE website and on DHS's Study in the States website.

# 9 FAM 402.5-5  (U) STUDENTS: ACADEMIC AND NONACADEMIC – F AND M VISAS

# 9 FAM 402.5-5(A)  (U) Related Statutory and Regulatory Authorities

## 9 FAM 402.5-5(A)(1)  (U) Immigration and Nationality Act

*(CT:VISA-1;   11-18-2015)*

INA 101(a)(15)(F) (8 U.S.C. 1101(a)(15)(F)); INA 101(a)(15)(M) (8 U.S.C. 1101(a)(15)(M)); INA 212(a)(6)(C) (8 U.S.C. 1182(a)(6)(C)); INA 214(b) (8 U.S.C. 1184(b)); INA 214(l) (8 U.S.C. 1184(l)), INA 214(m) (8 U.S.C. 1184(m)).

## 9 FAM 402.5-5(A)(2)  (U) Code of Federal Regulations

*(CT:VISA-1;   11-18-2015)*

22 CFR 41.61.

# 9 FAM 402.5-5(B)  (U) Overview

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** An F or M visa is usually required for individuals to enter the United States to attend university or college, public or private secondary school, private elementary school, seminary, conservatory, other academic institution, including a language training program, or vocational or other recognized nonacademic institution.  Also see 9 FAM 402.5-6 below regarding the J visa for exchange visitors, some of whose programs include attendance at a U.S. school.

b. **(U)** Citizens of VWP participating countries who intend to study cannot travel on the VWP or on visitor (B) visas, except to undertake recreational study incidental to their visit.

c.  **(U)** Study leading to a degree or certificate conferred by either a U.S. or foreign educational institution is not permitted on a visitor (B) visa, even if it is for a short duration.  For example, distance learning which requires a period on the institution's U.S. campus requires a student visa.

d. **(U)** B-2 visa appropriate for certain students: See 9 FAM 402.5-5(R)(3) below for information on appropriate issuance of B-2 visas to prospective students, 9 FAM 402.5-5(I)(3) on students pursuing a short course of study, and 9 FAM 402.5-5(J)(2) below, 9 FAM 402.1-3 paragraph a, and 9 FAM 402.1-5(C) for derivative children applying for B-2 status.

# 9 FAM 402.5-5(C)  (U) Qualifying for a Student Visa (F-1/M-1)

*(CT:VISA-2150;   04-29-2025)*

a. **(U)** An applicant applying for a student visa under INA 101(a)(15)(F)(i) or INA 101(a)(15)(M)(i) must meet the following requirements to qualify for a

student visa:

(1) **(U)** Acceptance at a school as evidenced by a Form I-20 (see 9 FAM 402.5-4(B) above and 9 FAM 402.5-5(D) below);

(2) **(U)** Intent to enter the United States solely to pursue a full course of study at an approved institution *(see 9 FAM 402.5-5(C)(1) below)*;

(3) **(U)** Present intent to leave the United States at conclusion of approved activities (see 9 FAM 402.5-5(E) below);

(4) **(U)** Possession of sufficient funds to meet the individual's financial needs (see 9 FAM 402.5-5(G) below); and

(5) **(U)** Preparation for course of study (see 9 FAM 402.5-5(H) below).

b. **(U)** If an applicant fails to meet one or more of the above criteria, the appropriate ground of refusal is INA 214(b).

## *9 FAM 402.5-5(C)(1) (U) Intent to Solely Pursue a Full Course of Study*

*(CT:VISA-2150;   04-29-2025)*

*a. Unavailable*

*b. Unavailable*

  *(1) Unavailable*

  *(2) Unavailable*

  *(3) Unavailable*

*c. Unavailable*

  *(1) Unavailable*

  *(2) Unavailable*

  *(3) Unavailable*

# 9 FAM 402.5-5(D)  (U) Form I-20 Certificate of Eligibility for Nonimmigrant (F-1) Student Status - For Academic and Language Students

## 9 FAM 402.5-5(D)(1)  (U) Form I-20 Required

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** A prospective student must have a Form I-20, Certificate of Eligibility for Nonimmigrant Student Status, issued by an SEVP-certified school to be issued an F-1 or M-1 student visa.  Only an SEVP-certified school can issue a Form I-20 to students who have been accepted for enrollment.  The Form I-20 constitutes proof of acceptance at an SEVP-certified school and allows the holder to apply for a visa or change of status and admission into the United

States.  The Form I-20 has the student's unique SEVIS identification (ID) number on the upper left-hand side with the visa class printed on the top right-hand side.  New forms do not have a bar code.  SEVIS ID numbers are an N followed by 9 digits.  Old Forms I-20 with a bar code ceased to be issued as of June 26, 2015, and became invalid for visa issuance on July 1, 2016.

b. **(U)** An F-1 or M-1 visa may be issued only to an applicant who presents a properly completed and valid Form I-20 from the institution the student will attend and who is otherwise eligible for a visa.  These forms are issued only in the United States by approved institutions to students who will pursue a full course of study.

c.  **(U)** F and M visa applicants must present a signed Form I-20 and J Visa applicants a Form DS-2019 before visa issuance.  If there are minor errors on the form (e.g., a program start date that is off by one day) you can process the case using that form.  However, if the form indicates an unrealizable program start date, or has a typographic error in the biographic data, you must verify that the information is correct in SEVIS.  The SEVIS record is the definitive record of student status and visa eligibility.  In most cases, the electronic record can be corrected by the institution without requiring issuance of a new hard copy Form I-20 or Form DS 2019.  You must verify that the SEVIS status is either "initial" or "active".  Make a case note that the electronic record contains corrections, and that the traveler will present the Form I-20 at the POE.  CBP accesses the electronic record using the SEVIS number.

d. **(U)** A Form I-20 must bear the signature of the designated school official (DSO) certifying that:

   (1)  **(U)** The student's application for admission has been fully reviewed and is approved;

   (2)  **(U)** The student is financially able to pursue the proposed course of study;

   (3)  **(U)** Page 1 of the Form I-20 was completed and verified to be accurate before signature; and

   (4)  **(U)** If the student will be attending a public high school on an F-1 visa, the school indicates that the student has paid the unsubsidized cost of the education (see INA 214(m)) and the amount submitted by the student for that purpose.

e.  **(U)** On November 1, 2021, SEVP published policy guidance outlining the new procedure for the use of electronic signatures and transmission of the Form I-20, "Certificate of Eligibility for Nonimmigrant Student Status."  This guidance permits designated school officials (DSOs) to electronically sign and transmit the Form I-20 to initial and continuing international students and their dependents, using software programs or applications or by using electronically reproduced copies of a signature.  Additionally, school officials may scan and email or electronically transmit the Form I-20 via a secure platform, such as a school portal or other secure site, to F and M students

and their dependents. DSOs may also choose to still physically sign and mail the Form I-20 to students.

f. **(U)** A Form I-20 issued by a school system must indicate the specific school within the system that the student will attend.

g. **(U)** If the applicant submits a Form I-20 that does not contain all the required information, you must refuse the visa under INA 221(g) and require that the missing information be submitted.

## 9 FAM 402.5-5(D)(2)  (U) Student Must Present Form I-20 at Port of Entry (POE)

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** At the time of admission to the United States, a student must present the entire Form I-20, properly filled out and signed by the DSO and the student. Thus, after the visa interview or after an F-1 or M-1 visa has been issued, you must return the completed Form I-20, together with all supporting financial evidence, to the individual for presentation to the U.S. immigration officer at the POE.  Upon the student's arrival, the immigration officer will examine the documentation and return the financial evidence to the individual.

b. **(U)** The student must always retain the Form I-20 while in the United States.

## 9 FAM 402.5-5(D)(3)  (U) Suspension of Cases Involving Unrealizable Reporting Dates

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** Action on the application must be suspended if the program start date specified in the applicant's Form I-20 or Form DS-2019 is already past or you believe that the applicant will be unable to meet that date.  The officer must review the SEVIS record in the CCD to determine whether the DSO (for F and M visas) or responsible officer (J visas) has amended the SEVIS record to change the program start date.  If this has not already been done, the applicant must ask the official to enter a new program start date in SEVIS - one that the applicant can meet.  You may then issue the visa based on the electronic record.

b. **(U)** You may issue an F or M visa to an applicant who is otherwise qualified, was previously admitted in F or M status, and is seeking to renew the visa to continue participation in a student program, if the status of the individual's SEVIS record is "active."

c. **(U)** Do not renew F or M visas for individuals whose SEVIS status is in any status other than active, regardless of presentation of a hard copy Form I-20 that may appear to be valid on its face.

## 9 FAM 402.5-5(D)(4)  (U) Fraud Related to Form I-20

*(CT:VISA-2048;   08-15-2024)*

**(U)** Fraud, as it relates to F and M cases, often involves the submission of false records to institutions to secure a Form I-20.  You may also observe unusual patterns of Form I-20 issuance from a particular institution.  If any type of fraud is suspected, refuse the visa under INA 221g and refer the case to the Fraud Prevention Manager through ECAS and to CA/FPP.  In addition, notify CA/FPP/ATD student visa portfolio holder and the F/M/J portfolio manager(s) in CA/VO/F/ET.  If a fraud investigation confirms fraud or misrepresentation of a material fact on the part of the applicant, you must consider an ineligibility under INA 212(a)(6)(C).  Questions concerning an applicant's ineligibility under INA 212(a)(6)(C) must be addressed to L/CA.

## 9 FAM 402.5-5(D)(5)  (U) F-1 Form I-20 Sample

*(CT:VISA-432;   08-08-2017)*

**(U)** See Form I-20 Sample.

# 9 FAM 402.5-5(E)  (U) Residence Abroad

## 9 FAM 402.5-5(E)(1)  (U) Residence Abroad Required

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** INA 101(a)(15)(F)(i) and INA 101(a)(15)(M)(i) both require that an F-1 or M-1 applicant possess a residence in a foreign country they have no intention of abandoning.  You must be satisfied that the applicant intends to depart upon completion of the approved activity; specifically, they must:

   (1)  **(U)** Have a residence abroad;

   (2)  **(U)** Have no immediate intention of abandoning that residence; and

   (3)  **(U)** Intend to depart from the United States upon completion of approved activities.

b. **(U)** Adjudicating student visa applications differs from those of other short-term visitors in that the residence-abroad requirement should be looked at differently.  Typically, students lack the strong economic and social ties of more established visa applicants, and they plan longer stays in the United States.  The statute assumes that the natural circumstances of being a student do not disqualify the applicant from qualifying for a student visa. You should consider the applicant's present intent in determining visa eligibility, not what they might do after a lengthy stay in the United States.

c. **(U)** If a student visa applicant is residing with parents or guardians, they are maintaining a residence abroad if you are satisfied that the applicant has the present intent to depart the United States at the conclusion of their studies. The fact that this intention may change is not sufficient reason to deny a

visa. In addition, the present intent to depart does not imply the need to return to the country from which they hold a passport. It means only that they must intend to leave the United States upon completion of their studies. Given that most student visa applicants are young, they are not expected to have a long-range plan and may not be able to fully explain their plans at the conclusion of their studies. You must be satisfied when adjudicating the application that the applicant possesses the present intent to depart at the conclusion of their approved activities.

## 9 FAM 402.5-5(E)(2) (U) Relationship of Education or Training Sought to Existence of Ties Abroad

*(CT:VISA-1970; 04-22-2024)*

a. **(U)** The fact that a student's proposed education or training would not appear to be useful in their homeland is not a basis for refusing an F-1 or M-1 visa. This remains true even if the applicant's proposed course of study seems to be impractical. For example, if a student visa applicant from a developing country wishes to study nuclear engineering simply because they enjoy it, they may no more be denied a visa because there is no market for a nuclear engineer's skills in their homeland than they may be denied a visa for the study of philosophy or Greek simply because they do not lead to a specific vocation.

b. **(U)** The fact that education or training like that which the applicant plans to undertake is apparently available in their home country is not in itself a basis for refusing a student visa. An applicant may legitimately seek to study in the United States for various reasons, including a higher standard of education or training. Furthermore, the desired education or training in the applicant's homeland may be only theoretically available; openings in local schools and institutions may be already filled or reserved for others.

## 9 FAM 402.5-5(E)(3) (U) Returning Students

*(CT:VISA-2048; 08-15-2024)*

**(U)** Some students must apply for visa renewals if they go home or travel during their period of study. Where applicable, returning students may be eligible to apply under an interview waiver authority (see 9 FAM 403.5-4(A)(1)). You should usually issue visas to returning students who are qualified unless circumstances have changed significantly since the previous issuance. Students should be encouraged to travel home during their studies to maintain ties to their country of origin. If students feel they will encounter difficulties in seeking a new student visa or that they will not be issued a visa to continue their studies, they may be less inclined to leave the United States during their studies and hence may distance themselves from their family and homeland. Facilitate the reissuance of student visas so that these students can travel freely back and forth between their homeland and the United States and thereby maintain their ties.

# 9 FAM 402.5-5(F)  (U) Knowledge of English

## 9 FAM 402.5-5(F)(1)  (U) Notation on Form I-20

*(CT:VISA-1628;   09-13-2022)*

a. **(U)** If the individual's Form I-20 indicates that proficiency in English is required for pursuing the selected course of study and no arrangements have been made to overcome any English-language deficiency, you must determine whether the visa applicant has the necessary proficiency.  To this end, the officer must conduct the visa interview in English and may require the applicant to read aloud from an English-language book, periodical, or newspaper, and to restate in English in the applicant's own words what was read.  The applicant may also be asked to read aloud and explain several of the conditions set forth in the Form I-20.  A student must demonstrate English language proficiency only if an admitting institution has made English language ability a requirement for the intended course of study.

b. **(U)** If a school has admitted an applicant based on the applicant's TOEFL, IELTS, or other English language test scores, the officer must not reevaluate the school's admission decision, even if the applicant seems to know less English than the TOEFL or IELTS score indicates, unless the officer suspects the applicant obtained the results through fraud.  Many students do well on the TOEFL or IELTS but seem to falter in their English when confronted with a face-to-face interview.  Since 2018, hundreds of colleges and universities have started accepting the Duolingo English Test scores as part of their admissions process.

c.  **(U)** If the school is aware of a student's lack of English proficiency and has arranged for the student to study English before enrolling in regular courses, then the lack of English skills is not relevant.

## 9 FAM 402.5-5(F)(2)  (U) Courses for Students Taught in a Language Other than English in which the Student Is Proficient

*(CT:VISA-1;   11-18-2015)*

**(U)** Proficiency in English is not required of a student if the enrolling institution conducts the course in a language in which the visa applicant is proficient.

## 9 FAM 402.5-5(F)(3)  (U) English as a Second Language (ESL)

*(CT:VISA-2048;   08-15-2024)*

**(U)** The fact that an ESL or other education program is available locally is not in itself grounds for refusing an applicant.  Many students find language learning enhanced by living in the country where the language is spoken. Students who intend to study in ESL-only programs must present a valid Form I-20 and be found qualified for an F visa.  Postsecondary institutions that require English

proficiency for a student to matriculate use a variety of mechanisms, and such arrangements must be evident on the visa applicant's Form I-20.  Contact VO's F/M/J portfolio holder(s) listed in the CAWeb "Who's Who" in VO for additional guidance, as required.

# 9 FAM 402.5-5(G)  (U) Adequate Financial Resources

## 9 FAM 402.5-5(G)(1)  (U) Determining Financial Status of F-1 and M-1 Students

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** The sponsoring school is required to verify the availability of financial support before issuing the Form I-20.  Schools may not be as well-versed in local documentation or cultural practices as you may be; therefore, you must still ensure that the student has sufficient funds to successfully study in the United States without being forced to resort to unauthorized employment.

b. **(U) F-1 Student:**  The phrase "sufficient funds to cover expenses" referred to in 22 CFR 41.61(b)(1)(ii) means the applicant must have sufficient funds to successfully study in the United States without resorting to unauthorized U.S. employment for financial support.  An applicant must provide evidence that sufficient funds are, or will be, available to defray all expenses during the entire period of anticipated study.  In addition to personal funds, sources of funding may include scholarships, assistantships, fellowships, and approved on-campus employment.  This does not mean the applicant must have cash immediately available to cover the entire period of intended study, which may last several years.  You must, however, establish, usually through credible documentary evidence, that the applicant has enough readily available funds to meet all expenses for the first year of study.  A student could potentially satisfy this requirement by presenting evidence of an existing student loan, but the mere intention to obtain a loan would be insufficient.  Likewise, a student's plan to use curricular practical training (CPT) or optional practical training (OPT) to cover first-year expenses would be insufficient.  You also must be satisfied that, barring unforeseen circumstances, adequate funds will be available for each additional year of study from the same source or from one or more other specifically identified and reliable financial sources.  Funds derived from CPT or OPT may be considered for returning students, who are authorized to participate.  Mere eligibility and/or intent to engage in CPT or OPT is speculative, both in terms of the amount of money that might be earned and whether authorization to work will be granted and may not be sufficient to demonstrate the necessary funds.  See 9 FAM 402.5-5(N) below for more information on employment for F-1 and M-1 students.

c. **(U) M-1 Student:**  All applicants for M-1 visas must establish that they have immediately available to them funds or assurances of support necessary to pay all tuition and living costs for the entire period of intended stay.

## 9 FAM 402.5-5(G)(2)  (U) Adequate Medical Insurance

*(CT:VISA-1292;   05-27-2021)*

**(U)** F and M students and their dependents are not required to have U.S. medical or travel insurance to qualify for a visa.

## 9 FAM 402.5-5(G)(3)  (U) Funds from Source(s) Outside the United States

*(CT:VISA-2048;   08-15-2024)*

**(U)** When an applicant indicates financial support from a source outside the United States (for example, from parents living in the country of origin), determine whether there are restrictions on the transfer of funds from the country concerned.  If so, you must require acceptable evidence that these restrictions will not prevent the funds from being made available during the period of the applicant's projected stay in the United States.

## 9 FAM 402.5-5(G)(4)  (U) Affidavits of Support or Other Assurances by an Interested Party

*(CT:VISA-1;   11-18-2015)*

**(U)** Various factors are important in evaluating assurances of financial support by interested parties:

(1)  **(U)** Financial support to a student is not a mere formality to facilitate the applicant's entry into the United States, nor does it pertain only when the individual cannot otherwise provide adequate personal support.  Rather, the sponsor must ensure that the applicant will not become a public charge nor be compelled to take unauthorized employment while studying in the United States.  This obligation commences when the visa holder enters the United States and continues until the visa holder's completion of their program of study and departure.

(2)  **(U)** You must resolve any doubt that the financial status of the person giving the assurance is sufficient to substantiate the assertion that financial support is available to the applicant.

(3)  **(U)** You must also carefully evaluate the factors that would motivate a sponsor to honor a commitment of financial support.  If the sponsor is a close relative of the applicant, there may be a greater probability that the commitment will be honored than if the sponsor is not a relative.  Regardless of the relationship, you must be satisfied that the reasons prompting the offer of financial support make it likely the commitment will be fulfilled.

## 9 FAM 402.5-5(G)(5)  (U) Funds from Fellowships and Scholarships for F-1 Student

*(CT:VISA-1837;   09-26-2023)*

**(U)** A college or university may arrange for a nonimmigrant student to engage in research projects, give lectures, or perform other academic functions as part of a fellowship, scholarship, or assistantship grant, if the institution certifies that the student will also pursue a full course of study.

## 9 FAM 402.5-5(G)(6)  (U) Post-Doctoral Research Grants for F-1 Student

*(CT:VISA-1;   11-18-2015)*

**(U)** A visa applicant may be issued an F-1 visa for post-doctoral research even if the college or university provides compensation to the individual in the form of a grant.

# 9 FAM 402.5-5(H)  (U) Educational Qualifications for F-1 and M-1 Students

## 9 FAM 402.5-5(H)(1)  (U) Consular Role in Determining Educational Qualifications

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** The Form I-20 and SEVIS record are evidence that a school has accepted the applicant as a student.  You should normally not go behind the Form I-20 or SEVIS record to assess the applicant's qualifications as a student for that institution.  If you have reason to believe that the applicant engaged in fraud or misrepresentation to garner acceptance into the school, then that information is an important factor to consider in determining if the applicant has a bona fide intent to engage in study in the United States.

b. **(U)** You are not expected to assume the role of guidance or admissions counselor to determine whether an applicant for an F-1 or M-1 visa is qualified to pursue the desired course of study.  You must, however, be alert to three specific factors when determining whether the applicant qualifies for a student visa:

   (1) **(U)** The applicant has successfully completed a course of study equivalent to that normally required of a U.S. student seeking enrollment at the same level;

   (2) **(U)** Cases in which an applicant has submitted forged or altered transcripts of previous or related study or training which the institution has accepted as valid; and

   (3) **(U)** Cases in which an institution has accepted an applicant's alleged previous course of study or training as the equivalent of its normal

requirements when, in fact, such is not the case.

c.  **(U)** Through its school certification process, SEVP evaluates the qualifications of a school to issue Forms I-20.  This process includes a determination as to whether the school is a bona fide, established institution of learning which possesses the necessary facilities, personnel, and finances to conduct instruction in recognized courses of study.  Evaluation also involves an on-site visit.  If you have reason to question the authenticity of a school or exchange program, contact the (CA/VO/F/ET) F/M/J portfolio holder and the Office of Fraud Prevention Programs (CA/FPP) so inquiries to ECA or SEVP are appropriately coordinated through CA.

d.  **(U)** Many U.S. colleges and universities do not require foreign students to submit SAT, ACT, or other standardized admission test scores, and not all schools require specific grade point averages (GPAs) for admission.  Therefore, you may not require that applicants provide admission test scores, or that applicants have a certain grade point average.  SEVP does not have a role in dictating admissions practices to the schools they approve to issue Form I-20.

# 9 FAM 402.5-5(H)(2)  (U) Choice of Academic Institution

*(CT:VISA-1494;   02-28-2022)*

**(U)** Which school a student chooses is not nearly as important as why they choose it.  The United States has over 4,700 accredited colleges and universities of all types and sizes.  Accreditation is the process that ensures a program or institution meets a certain level of academic standard.  Schools may be public or private; non-profit or for-profit; large or small.  A plan that includes initial attendance at a community college or English language program, and then a transfer to a four-year college is common, for reasons such as affordability, to fulfill academic prerequisites, and due to the flexibility and wide array of options available in the U.S. higher education system.  Some students may seek only to study at community colleges or do short-term programs such as Intensive English Programs (IEP), or pursue studies at specialized institutions, such as medical, business, technology-related, or fine arts schools, which typically award most degrees in a single field.  Attendance at a lesser-known college or university is not a ground of ineligibility and applicants cannot be refused a visa for this reason.  Faced with growing international competition for international students, promoting U.S. colleges and universities is a priority for the Department to ensure that the United States continues to be the top receiver of international students globally.  The Department's EducationUSA network of educational advising centers actively promotes all accredited U.S. colleges and universities, maintaining over 430 advising centers in over 175 countries and territories.  EducationUSA advisers assist international students in identifying accredited U.S. colleges and universities where they may be best positioned for success. There is no legal difference between SEVP-certified community colleges, English language schools, and four-year institutions in terms of their

authorization to issue Form I-20.  Resources to identify which institutions are accredited can be found at Understanding U.S. Accreditation.

# 9 FAM 402.5-5(I)  (U) Full Course of Study

## 9 FAM 402.5-5(I)(1)  (U) F-1 Academic Student

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** DHS regulations (8 CFR 214.2(f)(6)(i)) specify that "Successful completion of the full course of study must lead to the attainment of a specific educational or professional objective."  Those regulations state that a "full course of study" as required by INA 101(a)(15)(F)(i) means:

(1) **(U)** Postgraduate study or postdoctoral study at a college or university, or undergraduate or postgraduate study at a conservatory or religious seminary, certified by a designated school official (DSO) as a full course of study;

(2) **(U)** Undergraduate study at a college or university, certified by a school official to consist of at least 12 semester or quarter hours of instruction per academic term in those institutions using standard semester, trimester, or quarter hour systems, where all undergraduate students who are enrolled for a minimum of twelve semester or quarter hours are charged full-time tuition or are considered full time for other administrative purposes, or its equivalent (as determined by the district director in the school approval process), except when the student needs a lesser course load to complete the course of study during the current term;

(3) **(U)** Study in a postsecondary language, liberal arts, fine arts, or other non-vocational program at a school which confers upon its graduates recognized associate or other degrees or has established that its credits have been and are accepted unconditionally by at least three institutions of higher learning which are either:

(a) **(U)** A school (or school system) owned and operated as a public educational institution by the United States or a State or political subdivision thereof; or

(b) **(U)** A school accredited by a nationally recognized accrediting body, and which has been certified by a DSO to consist of at least twelve clock hours of instruction a week, or its equivalent as determined by the district director in the school approval process;

(4) **(U)** Study in any other language, liberal arts, fine arts, or other non-vocational training program, certified by a DSO to consist of at least eighteen clock hours of attendance a week if the dominant part of the course of study consists of classroom instruction, or to consist of at least twenty-two clock hours a week if the dominant part of the course of study consists of laboratory work; or

(5)   **(U)** Study in a curriculum at an approved private elementary or middle school or public or private academic high school which is certified by a DSO to consist of class attendance for not less than the minimum number of hours a week prescribed by the school for normal progress towards graduation.

b. **(U)** Notwithstanding paragraphs 8 CFR 214.2(f)(6)(i)(A) and 8 CFR 214.2 (f)(6)(i)(B), a noncitizen who has been granted employment authorization pursuant to the terms of a document issued by USCIS under paragraphs 8 CFR 214.2(f)(9)(i) or 8 CFR 214.2(f)(9)(ii) and published in the Federal Register shall be deemed to be engaged in a "full course of study" if they remain registered for no less than the number of semester or quarter hours of instruction per academic term specified by the Commissioner in the notice for the validity period of such employment authorization.

c. **(U) Institution of Higher Learning:**   Under DHS regulations (8 CFR 214.2(f)(6)(ii)), "a college or university is an institution of higher learning which awards recognized associate, bachelor's, master's, doctorate, or professional degrees."   DHS holds that schools that devote themselves exclusively or primarily to vocational or business schools are not included in the category of colleges or universities but are categorized as M-1 schools.

d. **(U) Reduced Course Load:**   The DSO may advise an F-1 student to engage in less than a full course of study due to initial difficulties with the English language or reading requirements, unfamiliarity with U.S. teaching methods, or improper course level placement.   An F-1 student authorized to reduce course load by the DSO in accordance with the provisions of 8 CFR 214.2(f)(6)(iii) is maintaining status.   On-campus employment pursuant to the terms of a scholarship, fellowship, or assistantship is deemed to be part of the academic program of a student otherwise taking a full course of study.

# 9 FAM 402.5-5(I)(2)   (U) M-1 Nonacademic Student

*(CT:VISA-1090;   06-24-2020)*

**(U)** DHS regulations (8 CFR 214.2(m)(9)) specify that "successful completion of the course of study must lead to the attainment of a specific educational or vocational objective."   Those regulations state that a "full course of study" as required by INA 101(a)(15)(M)(i) means:

(1)   **(U)** Study at a community college or junior college, certified by a school official to consist of at least twelve semester or quarter hours of instruction per academic term in those institutions using standard semester, trimester, or quarter-hour systems, where all students enrolled for a minimum of twelve semester or quarter hours are charged full-time tuition or considered full time for other administrative purposes, or its equivalent (as determined by the district director) except when the student needs a lesser course load to complete the course of study during the current term;

(2) **(U)** Study at a postsecondary vocational or business school, other than in a language training program except as provided in 8 CFR 214.3(a)(2)(iv), which confers upon its graduates recognized associate or other degrees or has established that its credits have been and are accepted unconditionally by at least three institutions of higher learning which are either:

    (a) **(U)** A school (or school system) owned and operated as a public educational institution by the United States or a State or political subdivision thereof; or

    (b) **(U)** A school accredited by a nationally recognized accrediting body; and which has been certified by a designated school official (DSO) to consist of at least twelve hours of instruction a week, or its equivalent as determined by the district director;

(3) **(U)** Study in a vocational or other nonacademic curriculum, other than in a language training program except as provided in 8 CFR 214.3(a)(2)(iv), certified by a DSO to consist of at least eighteen clock hours of attendance a week if the dominant part of the course of study consists of classroom instruction, or at least twenty-two clock hours a week if the dominant part of the course of study consists of shop or laboratory work; or

(4) **(U)** Study in a vocational or other nonacademic high school curriculum, certified by a DSO to consist of class attendance for not less than the minimum number of hours a week prescribed by the school for normal progress towards graduation.

## 9 FAM 402.5-5(I)(3)  (U) B-2 Visa for Visitor Who Will Engage in a Short Course of Study

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** Individuals whose principal purpose of travel (see 9 FAM 402.1-3) is tourism, but who also engage in a "short course of study" while in the United States, are properly classified for B-2 visas.  If the student will earn academic credit toward completion of an academic program, then it is not a "short course of study", and B-2 is not the appropriate visa class.  This guidance applies regardless of whether it is a U.S. or foreign educational institution that will grant academic credit for completion of the short course of study.  You should not advise applicants to obtain an I-20 but should refuse the visa under INA 214(b) as not approvable for the planned activities.

b. **(U)** An individual whose principal purpose of travel is non-credit-bearing avocational/recreational study, which can itself be touristic in nature, may be properly classified B-2 visas.  See 9 FAM 402.2-4(B)(9).

c. **(U)** Individuals traveling to the United States to attend seminars or conferences that are required to earn a degree (i.e., the applicant cannot complete the requirements for the degree unless they complete the proposed

seminar or conference in the United States) are not eligible for B visa classification.  This  includes students engaged in an online course of study traveling to the United States for academic consultations or to take examinations.  In the case of a noncitizen traveling to the United States to attend seminars and conferences for credit toward a degree, the study is neither incidental to a tourist visit, avocational, nor recreational.

d. **(U)** Individuals traveling to attend professional education, seminars, or conferences that do not result in academic credit may qualify for a B-1 per 9 FAM 402.2-5(B).

e. **(U)** It is common for U.S. colleges, universities, and private organizations to offer summer programs tailored for high school or college-aged students. Though these programs are for academic enrichment and are marketed as "study" and the participants attend "classes" the activities do not meet the definition of "full" or "part-time" course of study and therefore do not qualify for issuance of an I-20.  You may not advise applicants to obtain an I-20 for these programs.  In most cases, the activity, which is more like a summer camp with an academic focus, can be undertaken in B-2 status.  Consult L/CA for an AO on the appropriate visa classification.

## 9 FAM 402.5-5(I)(4)  (U) F-1 or M-1 Visa for Visitor Who Will Engage in a Short-Term Program

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** Only applicants who present a valid Form I-20 should be adjudicated as F or M applicants.  Do not advise applicants who do not present a Form I-20 to obtain one and return for further adjudication.  Instead, applicants without a Form I-20 should be adjudicated in the most logical category that allows the proposed activities in the United States.  In most cases, this will be a B visa. Consult with L/CA if it is unclear whether the activities proposed are permissible on a B visa.

b. **(U)** An individual may be issued a Form I-20 by a school only if they will engage in a full course of study.

c. **(U)** If a student is receiving academic credit for the program of study or the program of study is required for their degree, the student must qualify for an F-1 or M-1 visa.  8 CFR 214.2(b)(7) prohibits an individual from enrolling in a course of study on a B-1 or B-2 visa.  See 9 FAM 402.5-5(J)(2) below, 9 FAM 402.1-3 paragraph a, and 9 FAM 402.1-5(C) for possible limited exceptions.

d. **(U)** Students may enroll in online degree programs that allow them to reside overseas but that may require them to travel to the United States for short programs required for their degree.  Such students should apply for F-1 or M-1 visas and should present a properly executed Form I-20 indicating appropriate program dates for this limited period of school attendance on their U.S. campus.

# 9 FAM 402.5-5(J)  (U) Special Types of Students

## 9 FAM 402.5-5(J)(1)  (U) Students Destined to Schools Which are Avocational or Recreational in Character

*(CT:VISA-2048;   08-15-2024)*

**(U)** DHS cannot approve schools which are avocational or recreational in character for issuance of Form I-20, Certificate of Eligibility for Nonimmigrant Student Status.  Students coming to study in such schools may be eligible for B-2 visas if the purpose of attendance is recreational or avocational.  When the nature of a school's program makes determining its character difficult, consult with L/CA on the appropriate visa classification.

## 9 FAM 402.5-5(J)(2)  (U) Elementary School Students

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** Only children qualified for a derivative nonimmigrant classification through a principal parent may attend a publicly funded elementary school.  No public elementary schools or school systems are approved by SEVP to issue Form I-20 for attendance in F-1 nonimmigrant status by children in kindergarten through grade eight.  However, any school age student (kindergarten through grade 12) who is otherwise qualified may receive an F-1 visa under INA 101(a)(15)(F)(i) to attend a private school.

b. **(U)** Occasionally, you may encounter situations in which an American citizen/LPR friend or relative, or an institution in the United States, may offer to accept guardianship of a child to provide an indeterminate period of free schooling at a public school.  You may determine that a parent appears to be seeking a B visa for a child or children to facilitate this arrangement.  Keep in mind that study is usually not allowed on a B visa and that even legal guardianship does not constitute a qualifying family relationship for residence in the United States.  See 9 FAM 402.5-5(K)(4) below.  Separately, see 9 FAM 402.1-3 paragraph a and 9 FAM 402.1-5(C) for situations in which a child applies for a B-2 visa to accompany a parent who is the principal applicant.

## 9 FAM 402.5-5(J)(3)  (U) Candidates for Religious Orders

*(CT:VISA-1;   11-18-2015)*

**(U)** Individuals desiring to enter a convent or other institution for religious training of a temporary nature are classifiable as F-1 students under INA 101(a)(15)(F) if the institution has been approved as a place of study and the applicant will return abroad after concluding the course of study or training.

## 9 FAM 402.5-5(J)(4)  (U) Student Destined to U.S. Military Training Facility

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** Military cadets accepted by any of the U.S. military service academies must be classified as A-2 if attendance is on behalf of a non-NATO foreign government or as NATO-2 if the attendance is on behalf of a NATO country. Military cadets whose attendance is not on behalf of a foreign government are classifiable as F-1 students are required to present Form I-20 and pay the SEVIS fee.

b. **(U)** Military personnel coming to the United States for education or training at any armed forces training facility are to be classified as foreign government officials and issued A-2 visas for non-NATO member military personnel, or NATO-2 for NATO member military personnel.

## 9 FAM 402.5-5(J)(5)  (U) Graduate of Foreign Medical School

*(CT:VISA-1628;   09-13-2022)*

a. **(U)** Foreign medical graduates seeking to enter temporarily in connection with their profession are not eligible for F-1 visas.  Such applicants must apply and qualify for IV*s* or for exchange visitor (J) or temporary worker (H) visas.  See 9 FAM 402.5-6(B) below and 9 FAM 402.10-4(B).

b. **(U)** At least one school has been approved to issue Forms I-20 to foreign medical graduates for a review-type continuing education course of study in preparation for taking tests in the field of medicine.  Foreign medical graduates seeking to enter the United States to take such a review-type course of study who present a Form I-20 from an approved school are classifiable as F-1 students.

## 9 FAM 402.5-5(J)(6)  (U) Entering the United States for Nursing Training

*(CT:VISA-1628;   09-13-2022)*

**(U)** DHS has approved several hospital-affiliated nurses' training schools for nonimmigrant students.  In cases where a school has been approved, the application may be considered under INA 101(a)(15)(F).

## 9 FAM 402.5-5(J)(7)  (U) Aviation Training

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** All flight training for initial training or subsequent training that will result in a certificate or rating must be undertaken on an F or M visa.  This includes FAA, EASA, and other equivalent certificates.

b. **(U)** Recurrent or refresher training (training related to an aircraft for which the applicant has already received certification) may be undertaken on a B-1.

Recurrent training is the training required for crewmembers to remain adequately trained and currently proficient for each aircraft crewmember position, and type of operation in which the crewmember serves.  It often consists of flight simulator training but may also entail classroom training to update pilots on such things as recent safety issues, trends in aviation, and modifications to aircraft configuration or operating procedures. This assumes that the applicant's employer is covering the recurrent training costs, incidental costs, and that the applicant does not receive a salary or perform labor in the United States.

# 9 FAM 402.5-5(K)  (U) Applying INA 214(m)

## 9 FAM 402.5-5(K)(1)  (U) Public Primary School or a Publicly Funded Adult Education Program

*(CT:VISA-1628;   09-13-2022)*

**(U)** Congress imposed limitations on noncitizen attendance in publicly funded institutions in the 1996 immigration legislation.  As of November 30, 1996, F-1 visas cannot be issued to persons seeking to enter the United States to attend a public primary school or a publicly funded adult education program. See INA 214(m).  This does not, however, bar a dependent of a nonimmigrant in any classification, including F-1, from attendance at a public primary school, an adult education program, or another public educational institution, as appropriate. Under INA 214(m), primary school means kindergarten through 8th grade.

## 9 FAM 402.5-5(K)(2)  (U) Secondary School

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** INA 214(m) restricts, but does not prohibit, the issuance of F-1 visas to students seeking to attend public high schools.  Secondary school is deemed to be grades 9-12.  As of November 30, 1996, two new additional criteria were imposed on intending F-1 students at public high schools:

   (1)  **(U)** They cannot attend such school for more than 12 months; and

   (2)  **(U)** They must repay the school system for the full, unsubsidized, per capita cost of providing the education to them.

b. **(U)** You may not issue an F-1 visa for attendance at a public high school if the length of study indicated on the Form I-20 exceeds the 12-month cumulative period permitted under INA 214(m).  F-1 visas issued to attend public secondary schools must be limited to 12 months and payment of the full, unsubsidized, per capita cost must be demonstrated before visa issuance.

c.  **(U)** It is important to remember that public secondary school attendance in a status other than F-1 (including unlawful status) does not count against the 12-month limit, nor does attendance in F-1 status before November 30, 1996.

## 9 FAM 402.5-5(K)(3)  (U) Reimbursement

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** A public school system issuing a Form I-20 for attendance at a secondary school must indicate on the Form I-20 that such payment has been made and the amount of such payment.  School districts may not waive or otherwise ignore this requirement.  If the Form I-20 does not include the requisite information, the student must have a notarized statement stating the payment has been made and the amount from the designated school official (DSO) who signed the Form I-20.  If not, the visa must be refused, under INA 221(g), until the applicant provides the necessary documentation.

b. **(U)** Although the per capita costs vary from one school district to another (and sometimes from one school to another within the same district), the averages across the country have ranged from about $8,000 to more than $20,000.  They run somewhat less than that in Puerto Rico and U.S. territories.  These figures are guidelines only and must not be taken as absolutes.  If, however, a Form I-20 indicates a repaid cost radically different (for example, something less than $7,000), contact the F/M/J portfolio holder(s) in CA/VO/F/ET to coordinate an inquiry through SEVP.

## 9 FAM 402.5-5(K)(4)  (U) Noncitizens Under Legal Guardianship of American Citizen Relatives

*(CT:VISA-1292;   05-27-2021)*

**(U)** Schools sometimes advise relatives to declare themselves as the noncitizen's legal guardian.  The school then admits the foreign student as a resident, wrongfully assuming this would exempt the student from the INA 214(m) requirements.  The student's status as a resident of the school district is irrelevant.  Likewise, the fact that the student's U.S. sponsor has paid local property/school taxes does not fulfill the reimbursement requirement of INA 214(m).

## 9 FAM 402.5-5(K)(5)  (U) Student Visa Abusers

*(CT:VISA-1628;   09-13-2022)*

**(U)** INA 212(a)(6)(G) provides sanctions against foreign students who fail to comply with the INA 214(m) requirements.  A noncitizen in F-1 status who violates INA 214(m) is excludable until they have been outside the United States for a continuous period of five years after the date of the violation (see 9 FAM 302.9-9).  Noncitizens who are not subject to INA 214(m) are not subject to INA 212(a)(6)(G).

# 9 FAM 402.5-5(L)  (U) Period of Stay

## 9 FAM 402.5-5(L)(1)  (U) For F-1 Applicants

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** An individual entering as an F-1 student or granted a change to that status is usually admitted or given an extension of stay for the duration of status.  Duration of status means the time during which the student is pursuing a full course of study and any additional periods of authorized practical training, plus 60 days following completion of the course or practical training within which to depart.  Since November 30, 1996, however, the duration of status of an F-1 student in a publicly funded secondary school cannot exceed an aggregate of 12 months schooling (see 9 FAM 402.5-5(K) (2) above).

b. **(U)** An academic student is in status during the summer between terms, if eligible and intending to register for the next term.  The student is expected to resume a full course of study at the commencement of the next term. A student compelled by illness or other medical condition to interrupt or reduce studies is in status until their recovery.  The student is expected to resume a full course of study upon recovery.

c. **(U)** DHS amended its regulations to permit the DHS Secretary to waive the usual limitations, including hours of coursework, on employment for students faced by unexpected severe economic circumstances.  Such circumstances could include substantial fluctuations in exchange rates, loss of on-campus employment, loss of other financial assistance through no fault of the student, etc.  Students granted such waivers are deemed to be in status until the economic emergency is over and the necessity for such reduced studies has passed.

## 9 FAM 402.5-5(L)(2)  (U) For M-1 Applicants

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** The period of stay for an M-1 student, whether from admission or through a change of nonimmigrant classification, is the time necessary to complete the course of study indicated on Form I-20 plus 30 days within which to depart, not to exceed one year.

b. **(U)** An M-1 student may be granted an extension of stay if it is established that the student:

  (1)  **(U)** Is a bona fide nonimmigrant currently maintaining student status;

  (2)  **(U)** Is able to, and in good faith intends to, continue to maintain that status for the period for which the extension is granted; and

  (3)  **(U)** Has compelling educational or medical reasons which resulted in a delay to the course of study.  Delays caused by academic probation or

suspension are not acceptable reasons for program extension. Cumulative extensions are limited to three years.

# 9 FAM 402.5-5(M)  (U) Spouse and Child of F-1 or M-1 Student

## 9 FAM 402.5-5(M)(1)  (U) Refusals of Spouse and Child of F-1 or M-1 Student

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** Before issuing an F-2 or M-2 visa to a spouse or child of a principal F-1 or M-1 student, you must be satisfied that the relationship between the principal applicant and the spouse or child exists, and that the spouse or child can be expected to depart from the United States upon completion of approved activities by the F-1 or M-1 principal applicant.  See 9 FAM 402.5-5(E) above. Keep in mind that coming to a different conclusion about family members entitled to a derivative nonimmigrant classification and the principal should be rare.  See 9 FAM 402.1-4(A).  If the derivative F-2 or M-2 is seeking to join an F-1 or M-1 principal applicant already in the United States, you must confirm that the derivative F-2 or M-2 applicants have the requisite nonimmigrant intent and that the family's circumstances have not changed in a way to alter the intent of the principal applicant, to conclude the applicants overcome INA 214(b).  See 9 FAM 402.1-4(C).

b. **(U)** If you doubt an F-1 or M-1 student's intent to return abroad, the student cannot satisfy your doubts by offering to leave a child, spouse, or other dependent abroad.  See 9 FAM 402.2-2(B) paragraph b.

## 9 FAM 402.5-5(M)(2)  (U) Separate Form I-20 and SEVIS Registration Required for Accompanying Spouse and/or Minor, Unmarried Child of F-1 or M-1 Student

*(CT:VISA-2048;   08-15-2024)*

**(U)** Each F-2 or M-2 dependent is required to have their own properly executed Form I-20 and their own unique SEVIS ID number.  It is not possible to issue dependent F-2 or M-2 visas based on the principal's Form I-20.  The F-2 or M-2 must present this evidence to both you and the immigration officer at the POE. F-2 or M-2 dependents are not required to pay a separate SEVIS fee.  Additional details on the SEVIS fee can be found on the SEVP page at the ICE website.

## 9 FAM 402.5-5(M)(3) (U) Classification of Spouse or Child Who Will Attend School in the United States

*(CT:VISA-1970; 04-22-2024)*

a. **(U)** A spouse qualified for an F-2, M-2, or any other derivative nonimmigrant classification may only study if those studies are incidental to the primary purpose of travel: to accompany their spouse to the United States. A spouse in F-2 status, therefore, may only participate in avocational or recreational programs. A spouse of an F-1 visa holder may only enroll in a full-time course of study if they independently qualify under INA 101(a)(15)(F)(i) as a nonimmigrant student.

b. **(U)** A child qualified for an F-2, M-2, or any other derivative nonimmigrant classification is not required to qualify under INA 101(a)(15)(F)(i) as a nonimmigrant student even though the child will attend school while accompanying the principal (see 9 FAM 402.1-5(C)). Moreover, a child in F-1 status could not qualify to attend a public primary school and would be limited to 12 months of attendance at a public high school. See 9 FAM 302.9-9(B)(1).

## 9 FAM 402.5-5(N) (U) Employment of F-1 and M-1 Student, Spouse, and Children

### 9 FAM 402.5-5(N)(1) (U) On-Campus Employment for F-1 Student

*(CT:VISA-1292; 05-27-2021)*

**(U)** An F-1 student may accept on-campus employment with the approval of the designated school official (DSO) in an enterprise operated by or on behalf of the school. The work must take place either at the school or at an educationally affiliated (associated with the school's established curriculum or part of a contractually funded research project at the postgraduate level) off-campus location. Work that takes place at the school location could be for an on-campus commercial business, such as a bookstore or cafeteria, if the work directly provides services for students. Employment located on-campus that does not directly involve services to students (such as construction work) does not qualify as on-campus employment. Work with an employer that is educationally affiliated with the school is on-campus employment even if the work site is not located on the campus (such as a research lab affiliated with the school). Such on-campus employment must not displace an American citizen or LPR. The employment may not exceed 20 hours a week while school is in session but may be full time when school is not in session. The student must be maintaining status. An F-1 student who finishes a program, such as a bachelor's degree, and starts another program of study at the same campus may continue on-campus employment if the student plans to enroll in the new program of study for the next term.

## 9 FAM 402.5-5(N)(2)  (U) Off-Campus Employment for F-1 Student

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** An F-1 student may not accept off-campus employment without first applying to U.S. Citizenship and Immigration Services (USCIS) for employment authorization.  An F-1 student may be eligible to apply for off-campus employment authorization after completing one full academic year in F-1 status.  A student who receives authorization from USCIS for off-campus employment may not work more than 20 hours a week when school is in session.  Such employment authorization is automatically terminated if the student fails to maintain status.  A designated school official (DSO) must request off-campus employment for an F-1 student in SEVIS in support of the Form I-765 which must be filed with USCIS, and the request will appear in the electronic SEVIS record.  To recommend off-campus employment, the DSO must certify that:

(1) **(U)** The student has been in F-1 status for one full academic year;

(2) **(U)** The student is in good standing and carrying a full course of study;

(3) **(U)** The student has established that acceptance of employment will not interfere with the full course of study; and

(4) **(U)** The prospective employer has submitted a labor and wage attestation, or the student has established a severe economic necessity for employment due to unforeseen circumstances beyond the student's control.

b. **(U)** A student who has received approval from USCIS for off-campus employment will have an employment authorization document (EAD) showing the duration of the employment authorization, which may be up to one year at a time.  The student's electronic SEVIS record will also show approval for off-campus employment.

c. **(U)** If a student who has been granted off-campus employment authorization temporarily leaves the country during the period when employment is authorized, such employment can be resumed upon return.  The student must, however, be returning to the same school.

## 9 FAM 402.5-5(N)(3)  (U) Employment as Part of Curricular or Alternate Work/Study Practical Training for F-1 Student

*(CT:VISA-1757;   04-17-2023)*

**(U)** A student enrolled in a college or other academic institution having alternate work/study courses as part of the curriculum within the student's program of study may participate in and be compensated for such practical training when authorized for curricular practical training (CPT) by the designated school official (DSO).  Students may not begin such training before endorsement of their electronic SEVIS record by the DSO with such authorization.  Periods of actual

off-campus employment in a work/study program are considered practical training.  Students who have engaged in a full year of full-time CPT will not receive authorization to engage in optional practical training (OPT) after completion of the course of study.

## 9 FAM 402.5-5(N)(4)  (U) Practical Training

*(CT:VISA-1757;   04-17-2023)*

a. **(U)** Students are eligible for practical training only after they have completed a full academic year in an approved college-level institution, except for graduate students whose program requires them to participate immediately in curricular practical training (CPT).  Students in English language training programs are ineligible for practical training.  Optional practical training (OPT) is training that is directly related to an F-1 student's major area of study.  It is intended to provide a student with practical experience in their field of study during or upon completion of a degree program and is authorized through the recommendation of the designated school official (DSO) and the filing of Form I-765 with USCIS and subsequent issuance of an Employment Authorization Document (EAD) by USCIS.  CPT is employment that is an integral part of a student's specified curriculum.  In most cases, CPT involves internships and similar work experience specifically required by the student's program of study.  The DSO must authorize CPT before the student begins work.  See the SEVP website for more information on practical training.

b. **(U)** Any authorization for employment for purposes of practical training is suspended in the event of a certified strike or other labor dispute involving a work stoppage at the place of employment.

## 9 FAM 402.5-5(N)(5)  (U) Optional Practical Training

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** An F-1 student may apply for OPT in a job related to their major area of study.  OPT may be authorized pre- and post-completion and on a full-time or part-time basis.  During school vacations, either part-time or full-time OPT is permissible. When school is in session, OPT may not exceed 20 hours per week.  An F-1 student may request post-completion OPT after completion of all course requirements not including thesis or equivalent, or after completion of all requirements for graduation.  Post-completion OPT must be full time.  Such training must be completed within 12 months, although certain F-1 students may be eligible for an extension of post-completion OPT based on their major field of study or a pending change of status to H-1B.  In addition to a DSO's request for OPT which will appear in the student's electronic SEVIS record, the student must apply to USCIS using Form I-765 for an Employment Authorization Document (EAD).  If the student makes a brief trip abroad during a period of post-completion OPT, a valid F-1 visa, the unexpired EAD, the endorsed Form I-20, and the electronic SEVIS record will be required for reentry to complete the training.  A letter of employment may

also be required.  F-1 students may also travel abroad during the period following the completion of their academic programs while they have a pending request for OPT, which will appear in their electronic SEVIS record, but such travel should be undertaken with caution. USCIS may send a request for evidence to the U.S. address on the OPT application while the applicant is away. Additionally, if USCIS approves the application, the applicant will be expected to have the EAD in hand to reenter the United States. Like a request for evidence, USCIS can only send the EAD to a U.S. address.

b. **(U)** OPT is different from curricular practical training (CPT), which is part of a student's degree curriculum and can only be authorized during a student's course of study.  OPT, by contrast, can be authorized during the student's degree program, as well as after graduation.

## 9 FAM 402.5-5(N)(6)  (U) Extension of OPT for Science, Technology, Engineering, or Mathematics (STEM) Students, and H-1B Beneficiaries ("Cap Gap")

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** Effective May 10, 2008, until May 9, 2016, USCIS could grant an OPT extension of 17 months, for a maximum of 29 months, to an eligible F-1 student on post-completion OPT with a degree in a DHS-approved science, technology, engineering, or mathematics (STEM) field.

b. **(U)** Effective May 10, 2016, an F-1 student with a bachelor's or higher degree in a DHS-approved STEM field who is already in a period of approved post-completion OPT may apply to USCIS to extend that period by 24 months, for a maximum of 36 months.  Eligibility for this extension is based upon the Classification of Instructional Programs (CIP) code *f*or the student's degree program as indicated on the Form I-20, on an official transcript, or as shown in SEVIS (including for eligibility based on a previously obtained degree) and whether the CIP code for the degree program is included on the DHS-approved list of qualifying degree program categories for the extension, which can be found on the SEVP website.  Students are also required to complete Form I-983, Training Plan for STEM OPT Students, with their employer and submit it to the DSO.  See the SEVP website for more information on Form I-983.  The DSO must verify the student's eligibility, including ensuring that Form I-983 has been properly completed and executed, recommend the extension through SEVIS, and provide the student with a Form I-20 annotated with the recommendation.  Once the DSO recommends the extension, the student must submit a Form I-765, Application for Employment Authorization, and all appropriate fees to USCIS.  Additional information can be found on the USCIS website.

c. **(U)** F-1 students on post-completion OPT must report all employment and periods of unemployment to their DSOs, who then report the information in SEVIS on the student's record.  F-1 students participating in post-completion OPT are initially allowed an aggregate period of unemployment of 90 days.

Students on a 24-month STEM OPT extension are allowed an additional 60 days of unemployment, for a total of 150 days. This measure allows time for job searches or a break when switching employers. See the SEVP OPT policy guidance on the SEVP website for more information on how unemployment is counted.

d. **(U)** If the F-1 student has filed a Form I-765 for a 24-month extension in a timely manner before their end of regular post-completion OPT, then the student's OPT employment authorization is automatically extended for 180 days. This extension ends once USCIS adjudicates the STEM OPT application. If USCIS approves the STEM OPT extension the student is provided with a new EAD reflecting the extension dates. If the petition is denied, the student's period of OPT ends.

e. **(U)** As the STEM OPT extension is automatic for the first 180 days following regular post-completion OPT (when the student has properly filed Form I-765), the student may not necessarily have a renewed EAD. Therefore, any students having automatically authorized employment through filing for the STEM OPT extension may not be able to present a valid EAD when they apply to renew their visa. However, F-1 students in this situation can request an updated Form I-20 from the DSO, annotated for the STEM OPT extension, as well as proof that the I-765 petition was filed in a timely manner. You must confirm that the student's electronic SEVIS record contains the same information as the updated hard copy Form I-20 before issuing a visa.

f. **(U)** The STEM Designated Degree Program List provides degree program categories approved for the 24-month STEM OPT extension and significant additional information.

g. **(U)** If an F-1 student is the intended beneficiary of a timely filed Form I-129 petition for a cap-subject H-1B visa to start on October 1, the F-1 status and any OPT authorization held on the eligibility date is automatically extended to dates determined by USCIS that allow for receipt or approval of the petition, up to September 30. The Cap Gap OPT Extension is automatic, and USCIS will not provide the student with a renewed EAD. However, F-1 students in this situation can request an updated Form I-20 from the DSO, annotated for the Cap Gap OPT Extension, as well as proof that the Form I-129 petition was timely filed. Verify that the electronic SEVIS record has also been updated before issuing a visa.

## 9 FAM 402.5-5(N)(7)  (U) Practical Training for M-1 Student

*(CT:VISA-2048;   08-15-2024)*

**(U)** Except for temporary employment for practical training as set forth herein, an M-1 student may not accept employment. Practical training may only be authorized at the completion of an M-1 course of study. An M-1 student who desires temporary employment for practical training must apply to USCIS by filing Form I-765. If approval is granted, DHS will endorse the student's Form I-20 with the dates the authorization for practical training begins and ends. Because M-1 students are admitted until a certain date, an M-1 student may

need to also file Form I-539, Application to Extend/Change Nonimmigrant Status, to apply for an extension of M-1 status in conjunction with the application for employment authorization. Verify that the electronic SEVIS record has been updated before issuing a new visa.

## 9 FAM 402.5-5(N)(8) (U) Temporary Absence of F-1 or M-1 Student with Pending or Granted Practical Training

*(CT:VISA-1757; 04-17-2023)*

a. **(U)** An F-1 or M-1 student authorized to accept employment for practical training who leaves the country temporarily may be readmitted for the remainder of the authorized period. The student must be returning solely to perform the authorized training. Additionally, a student may travel abroad and be readmitted while the request for practical training is pending with USCIS, but such travel should be undertaken with caution. USCIS may send a request for evidence to the U.S. address on the application while the applicant is away. Additionally, if USCIS approves the practical training application, the applicant will be expected to have the Employment Authorization Document (EAD) in hand to reenter the United States. Like a request for evidence, USCIS can only send the EAD to a U.S. address.

b. **(U)** A valid F-1 or M-1 visa, the Form I-20, EAD (if issued), and an accurate electronic SEVIS record are required to reenter the United States for practical training purposes. A letter of employment may also be required. For individuals attempting to travel abroad and be readmitted while an application for the STEM OPT extension is pending, the Form I-20 should be endorsed for reentry by the DSO within the last six months.

## 9 FAM 402.5-5(N)(9) (U) Employment of F-2 and M-2 Spouse and Children

*(CT:VISA-1; 11-18-2015)*

**(U)** The F-2 spouse and children of an F-1 student may not accept employment. The M-2 spouse and children of an M-1 student may not accept employment.

## 9 FAM 402.5-5(O) (U) F-3 and M-3 Nonimmigrant Visa Classifications

*(CT:VISA-1757; 04-17-2023)*

a. **(U)** The Border Commuter Student Act of 2002 (Public Law 107-274), which was signed into law on November 2, 2002, amended INA 101(a)(15)(F) and (J) to create the F-3 and M-3 NIV categories for Canadian and Mexican citizens and residents who commute to the United States for study at a DHS-approved school located within 75 miles of the U.S. border. These students are permitted to study on either a full-time or part-time basis. Until further notice, applicants applying to study in the United States who present a valid

Form I-20, have an electronic SEVIS record in INITIAL or ACTIVE status, and will commute to school; i.e., not reside in the United States while attending classes, are to be processed as F-1/M-1 students, and the annotation "border commuter" placed on the visa foil.

b. **(U)** The family members of border commuter students are not entitled to derivative F-2 or M-2 status, given that these students do not reside in the United States.

# 9 FAM 402.5-5(P)  (U) Temporary Absence

## 9 FAM 402.5-5(P)(1)  (U) Applicants Who Apply While Abroad for an F-1 or M-1 Visa

*(CT:VISA-1628;   09-13-2022)*

**(U)** Except as provided below, a student making a short trip abroad during an authorized period of study, who needs to obtain a new visa during such absence, must present their Form I-20, properly executed and endorsed.  You must verify that the SEVIS record of the applicant is in ACTIVE status.  If otherwise qualified, the applicant may be issued the appropriate visa.

## 9 FAM 402.5-5(P)(2)  (U) Temporary Absence of Applicants Applying Abroad for Attendance at School Other than Listed on the Visa

*(CT:VISA-2048;   08-15-2024)*

**(U)** A student temporarily abroad who intends to return to study at a United States institution other than the one for which the original visa was issued may seek admission with the original visa, if still valid, and the Form I-20 from the new school.  If the student wishes to apply for a new visa, however, they must present proof that the transfer has been completed and the student is in "initial" or "active" status at the new school.  Verify that the applicant has a valid SEVIS record showing the applicant is in INITIAL or ACTIVE status at the new institution and that the SEVIS fee has been paid on the new record before issuing a new student visa.

## 9 FAM 402.5-5(P)(3)  (U) Renewing F or M Visas for Returning Students

*(CT:VISA-2048;   08-15-2024)*

**(U)** Where applicable, returning students may be eligible to apply under interview waiver authority (see 9 FAM 403.5-4(A)(1)). You usually should renew F or M visas to returning students who have remained in status and have not had any significant changes in either their academic program or their personal circumstances.  When a foreign student engaged in study takes a short trip abroad and requires a visa to return to the United States, you are encouraged to

issue visas, if the student is otherwise qualified, to allow the student to complete their study.  Verify that the student's SEVIS record is in ACTIVE status before issuing a new visa.

# 9 FAM 402.5-5(Q)  (U) Processing F and M Visas

## 9 FAM 402.5-5(Q)(1)  (U) Issue Full Validity Student Visas

*(CT:VISA-2143;   03-26-2025)*

**Unavailable**

## 9 FAM 402.5-5(Q)(2)  (U) Maintenance of Status and Departure Bond

*(CT:VISA-432;   08-08-2017)*

**(U)** See 9 FAM 403.9-8.

## 9 FAM 402.5-5(Q)(3)  (U) Automatic Extension of Validity of Visa

*(CT:VISA-432;   08-08-2017)*

**(U)** See 9 FAM 403.9-4(E).

# 9 FAM 402.5-5(R)  (U) Visa Annotations

## 9 FAM 402.5-5(R)(1)  (U) Name of School and SEVIS ID

*(CT:VISA-2048;   08-15-2024)*

**(U)** An initial F-1 or M-1 visa must be annotated with the SEVIS ID and the name of the institution the student will initially attend.  Ensure that the SEVIS ID is correctly annotated on the visa foil.  Inform an applicant who has been accepted by more than one institution that the visa application will be considered only based on the Form I-20 issued by the school which the applicant will attend.  Also advise the applicant that the immigration inspector at the POE can refuse admission for a student seeking an initial entry with a Form I-20 from a school other than the one named on the visa or if the student indicates an intention to attend a different institution.

## 9 FAM 402.5-5(R)(2)  (U) Entry of Student Before Enrollment

*(CT:VISA-2048;   08-15-2024)*

a. **Unavailable**

b. **(U)** A student who wants to travel to the United States more than 30 days in advance of their program start date must obtain a visa in a different

classification and seek admission under that other visa.

c. **(U)** If a B-2 visa is issued, advise the applicant that, if admitted to the United States as a B-2 visitor, they are required to obtain a change of nonimmigrant status from USCIS to that of an F, M, or J student, as applicable, before their program start date.

## 9 FAM 402.5-5(R)(3)  (U) Entry When School Not Selected

*(CT:VISA-1090;   06-24-2020)*

**(U)** A prospective student applicant who has neither been issued a Form I-20 nor made a final selection of a school may wish to travel to the United States for the primary purpose of selecting a school.  If the applicant qualifies for a visitor visa, and would appear to qualify for a student visa, a B-2 visa may be issued for this purpose of travel.

## 9 FAM 402.5-5(R)(4)  (U) Admitted Student Traveling Without Form I-20

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** A signed hard copy Form I-20 must be presented at the POE for a student to be admitted in F or M status.

b. **(U)** When a student has documentary evidence that admission to a school has been granted, and when circumstances warrant visa issuance before the hard copy Form I-20 has been received, you may issue an F-1 visa based on the electronic SEVIS record.  The electronic SEVIS record must show that the visa applicant is in INITIAL or ACTIVE student status and that the SEVIS I-901 fee has been paid.  Enter a case note stating that you have reviewed the electronic SEVIS record and advised the student to carry the hard copy Form I-20 when travelling.

# 9 FAM 402.5-6  (U) EXCHANGE VISITORS – J VISAS

## 9 FAM 402.5-6(A)  (U) Statutory and  Regulatory Authorities

### 9 FAM 402.5-6(A)(1)  (U) Immigration and Nationality Act

*(CT:VISA-1;   11-18-2015)*

**(U)** INA 101(a)(15)(J) (8 U.S.C. 1101(a)(15)(J)); INA 212(e) (8 U.S.C. 1182(e)); INA 212(j) (8 U.S.C. 1182(j)); INA 214(b) (8 U.S.C. 1184(b)); INA 214(l) (8 U.S.C. 1184(l)).

## 9 FAM 402.5-6(A)(2)  Code of Federal Regulations

*(CT:VISA-1;   11-18-2015)*

**(U)** 22 CFR 41.62; 22 CFR 41.63; 22 CFR Part 62.

# 9 FAM 402.5-6(B)  (U) The Exchange Visitor Program

## 9 FAM 402.5-6(B)(1)  (U) Overview

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** The purpose of the Exchange Visitor Program (J visa program) is to further the foreign policy interests of the United States by increasing the mutual understanding between the people of the United States and the people of other countries by means of mutual educational and cultural exchanges.  The goal is to meet this purpose while protecting the health, safety, and welfare of the foreign nationals participating in the Program as exchange visitors.  Only organizations that have been designated by ECA, may participate.

b. **(U)** The Exchange Visitor Program is administered under the oversight of the Deputy Assistant Secretary for Private Sector Exchange.  The Office of Private Sector Exchange Designation, the Office of Exchange Coordination and Compliance, and the Office of Private Sector Exchange Administration are located at:

> Bureau of Educational and Cultural Affairs
> Department of State
> State Annex SA-4E
> 2430 E Street, NW
> Washington, DC  20522

c.  **(U)** Detailed guidance can be found on the Exchange Visitor Program at j1visa.state.gov.

## 9 FAM 402.5-6(B)(2)  (U) Mandatory Exchange Visitor Classification in Certain Cases

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** Participants in exchange visitor programs sponsored by USAID (program serial numbers G-1 and G-2, respectively) are supported by U.S. government funding.  These participants must be documented as exchange visitors (J visa) rather than in another visa category (such as F-1 student), even if they qualify for that visa category.  Participants in exchange visitor programs sponsored by other U.S. government agencies (program serial number G-3) or participants in a federally funded national research and development center program (program serial number G-7), must also be documented as exchange visitors if participation is directly financed in whole or in part by the sponsoring agency.  The only exception to these rules requiring J classification is for an applicant who would otherwise qualify for an A-1 or A-2 visa.  Such

applicants must always be issued A visas, rather than J visas, regardless of the funding of their travel.  See 9 FAM 402.3-4(A) regarding the rule that there is no alternative to A or G visa classification.  Contact CA/VO/F/ET for additional guidance, if required.

b. **(U)** You may receive visa applications from individuals seeking to participate in exchange program*s* or conferences that will be funded by a U.S. government agency, but the applicant does not present a Form DS-2019 as the program does not have ECA designation.  As such, these applications cannot qualify for J-1 classification.  You must determine whether the applicant qualifies for another visa classification appropriate for the purpose of travel, usually a B visa.  See 9 FAM 402.2-5(B).  Do not instruct applicants that they must apply for a J-1 visa, even if the planned travel is funded by the U.S. government, if the program does not have an ECA designation.  Contact L/CA with classification-specific questions.

# 9 FAM 402.5-6(C)  (U) Qualifying for an Exchange Visitor Visa (J-1)

*(CT:VISA-2048;   08-15-2024)*

**(U)** An applicant applying for a visa under INA 101(a)(15)(J) must meet the following requirements to qualify for an exchange visitor visa:

(1) **(U)** Acceptance to a designated exchange visitor program, as evidenced by presentation of Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status (see 9 FAM 402.5-6(D) below);

(2) **(U)** Sufficient funds, or adequate arrangements made by a host organization, to cover expenses;

(3) **(U)** Sufficient proficiency in the English language to participate in their program and compliance with the requirements of INA 212(j) (see 9 FAM 402.5-6(G) below);

(4) **(U)** Present intent to leave the United States at conclusion of program (see 9 FAM 402.5-6(F) below);

(5) **(U)** Possession of qualifications for the program offered (see 9 FAM 402.5-6(E) below); and

(6) **(U)** Compliance with INA 212(e) if applicable (see 9 FAM 302.13-2 and 22 CFR 41.63).  Annotate the Form DS-2019 (see 9 FAM 402.5-6(D)(2) paragraph b below and annotate the visa (see 9 FAM 402.5-6(I)(6) below) accordingly.

# 9 FAM 402.5-6(D)  (U) Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-Nonimmigrant) Status

## 9 FAM 402.5-6(D)(1)  (U) The Basic Form

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-Nonimmigrant) Status, is the document required to support an application for an exchange visitor visa (J-1).  It is a two-page document which can only be produced through SEVIS.  SEVIS is the DHS database developed to collect information on F, M, and J visa holders (see 9 FAM 402.5-4 above and 9 FAM 402.5-6(J) below).  The prospective exchange visitor's signature on page one of the Form DS-2019 is required.  Page two of Form DS-2019 consists of instructions and certification language relating to participation.  Form DS-2019 is generated with a unique identifier known as a "SEVIS ID number" in the top right-hand corner, which consists of an "alpha" character (N) and 10 numerical characters (e.g., N0002123457).

b. **(U)** ECA/EC/D designates U.S. organizations to conduct exchange visitor programs.  These organizations are known as program sponsors.  Designated sponsors have access to SEVIS and the capability of generating Form*s* DS-2019 from SEVIS.  Effective April 27, 2023, designated sponsors are permitted to use digital signatures and electronically transmit Form DS-2019 directly to exchange visitors. As of this date, consular sections should accept printed versions of the digitally signed copy of Form DS-2019 for all J applicants.  Sponsors also may print, physically sign paper forms in any color ink, and continue to mail the forms or scan the signed forms (e.g., into portable document format (PDF) files) and transmit them electronically. Sponsors may also digitally sign and electronically transmit Forms DS-2019 to eligible J-2 spouses or children of an exchange visitor.

c. **(U)** J visa applicants must continue to present a signed paper Form DS-2019 at their visa interview and at the POE when they travel to the United States. If there are minor errors on the form (e.g., a program begin date that is off by one day), you can process the case using that form.  You must verify the applicant's SEVIS record in the SEVIS report in CCD.  If corrections are needed, they may be made electronically; there is no need to request a new hard copy of the Form DS-2019.  Make a case note to alert CBP that the electronic record has been updated.  Once the visa is issued, however, the SEVIS record cannot be updated until the participant's program is validated ("Active" in SEVIS).  See 22 CFR 62.13(a).  The sponsor is required to update the SEVIS record upon the exchange visitor's entry and no corrections to the record can be made until that time.  In addition, in the event a visa is needed for a spouse or a minor child and the primary's J-1 visa has already been issued, the system will not permit new Forms DS-2019 to be created until after the sponsor validates the primary applicant's SEVIS record.

## 9 FAM 402.5-6(D)(2)  (U) Processing of Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status

*(CT:VISA-1741;   03-30-2023)*

a. **(U)** The Form DS-2019, also known as Certificate of Eligibility for Exchange Visitor (J-1) Status, indicates the visa applicant understands all conditions of the stay in the United States in J status and understands also that a consular or immigration officer will make a preliminary determination as to whether the applicant is subject to the two-year home country physical presence requirement.  Before the visa is issued, the applicant must sign the bottom of page one of the Form DS-2019 certifying they agree to comply with that requirement if it is determined to be applicable.

b. **(U)** A consular or immigration officer makes the preliminary determination regarding the applicability to the two-year home country physical presence requirement under INA 212(e) after a personal interview with the individual unless personal appearance has been waived under 9 FAM 403.5-4(A).  The consular or immigration officer signs page one of Form DS-2019 indicating the determination made by the officer.  The Department*'s* Waiver Review Division (CA/VO/DO/W) reserves the authority to make the final determination whether to issue a favorable recommendation to DHS to waive the two-year requirement under INA 212(e).

## 9 FAM 402.5-6(D)(3)  (U) Serial Numbers of Designated Exchange Visitor Programs

*(CT:VISA-2048;   08-15-2024)*

**(U)** When ECA/EC/D designates an organization or agency as a sponsor, it is enrolled in SEVIS and assigned a unique program serial number (referred to as the program number) that is used to identify the specific program.  The sponsor number is assigned based upon the following series:

(1) **(U)** G-1—Department of State;

(2) **(U)** G-2—U.S. Agency for International Development (USAID);

(3) **(U)** G-3—Other U.S. Federal agencies;

(4) **(U)** G-4—International agencies or organizations in which the U.S. government participates;

(5) **(U)** G-5—Other national, State, or local government agencies;

(6) **(U)** G-7—Federally funded national research and development center or a U.S. Federal laboratory;

(7) **(U)** P-1—Educational institutions, e.g., schools, colleges, universities, seminaries, libraries, museums, and institutions devoted to scientific and technological research;

(8) **(U)** P-2—Hospitals and related institutions;

(9) **(U)** P-3—Nonprofit organizations, associations, foundations, and institutions (academic institutions conducting training programs can be classified as a P-3 if they are nonprofit); and

(10) **(U)** P-4—For-profit organizations (business and industrial concerns).

## 9 FAM 402.5-6(D)(4)  (U) Requirement for Form DS-2019 in Case of Spouse and/or Minor, Unmarried Children

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** Each accompanying J-2 spouse or child of a principal J-1 is required to have a separate Form DS-2019 issued by the program sponsor and will have their own unique SEVIS ID number.  You may not issue dependent J-2 visas based on the principal's (J-1's) Form DS-2019.

b. **(U)** A minor, unmarried child qualified for J-2 status is not required to qualify under INA 101(a)(15)(F)(i) as a nonimmigrant student even though the child will attend school while accompanying the principal J-1.  See 9 FAM 402.1-5(C).

c. **(U)** The J-2 applicant must present their Form DS-2019 to you during the visa interview, and to the U.S. Customs and Border Protection (CBP) officer at the POE.

d. **(U)** Participants in the Summer Work Travel, camp counselor, au pair, and high school exchange programs are not expected to be accompanied by dependents.  If you receive a Form DS-2019 supporting a J-2 visa application from an individual claiming such status, contact CA/VO/F/ET for guidance.

## 9 FAM 402.5-6(D)(5)  (U) Processing of Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status, at Port of Entry (POE)

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** After a J-1 visa has been issued, return the completed Form DS-2019 to the exchange visitor.  Inform the exchange visitor that they must carry Form DS-2019 on their person for presentation to the CBP officer at the U.S. POE.  At each admission to the United States, an exchange visitor must present the Form DS-2019 along with the visa to the CBP officer.  Upon the exchange visitor's arrival in the United States, the CBP officer will examine the visa, the Form DS-2019, and any supporting documentation and return the documents to the exchange visitor.

b. **(U)** If the exchange visitor is admitted, DHS will return the Form DS-2019 to the individual.  The exchange visitor must always safeguard the form.  If the exchange visitor loses the Form DS-2019, they must obtain a replacement from the designated sponsor.

## 9 FAM 402.5-6(D)(6)  (U) Sample Form DS–2019

*(CT:VISA-1090;   06-24-2020)*

a. **(U) J-1 Principal Applicant Sample:**  For a sample of a properly completed DS-2019 for a J-1 Principal, click here, Sample DS-2019 for J-1.

b. **(U) J-2 Dependent Sample:**  For a sample of a properly completed DS-2019 for a J-2 dependent click here, Sample DS-2019 for J-2.

## 9 FAM 402.5-6(D)(7)  (U) Form DS-7002, Training/Internship Placement Plan

*(CT:VISA-1837;   09-26-2023)*

a. **(U)** The Form DS-7002, Training/Internship Placement Plan (T/IPP), is designed to standardize applications in the Trainee, Intern, and College and University Student Intern categories and to increase transparency and accountability and curb potential abuse by having all three concerned parties— the exchange visitor, the U.S. sponsor, and the entity providing the training or internship sign the Form DS-7002 acknowledging the program plan and their regulatory responsibilities.

b. **(U)** You may wish to use the Form DS-7002 to help in formulating interview questions, but you are not required to verify the contents of the form.

c. **(U)** Electronic signatures (including faxed signatures) are permissible on Form DS-7002, and you should accept these as they adjudicate applications.

d. **(U)** The form requires each participant to have U.S. contact information.  As some prospective exchange program participants may not have this information at the visa interview, you may accept the contact details for the participant's host organization in the United States instead.

## 9 FAM 402.5-6(D)(8)  (U) Sample Form DS-7002

*(CT:VISA-1741;   03-30-2023)*

**(U)** To see the Form DS-7002 see myData.

# 9 FAM 402.5-6(E)  (U) Categories of Exchange Visitors

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** At present, the Department has 15 exchange categories in which foreign nationals may participate.  Participants may only engage in activities authorized for their program.

b. **(U)** The following sections list these categories in alphabetical order with a brief description of key points.

c. **(U)** The presentation of a valid Form DS-2019 by the visa applicant constitutes evidence that the individual was determined by the designated U.S. program sponsor to be qualified to participate in the specific exchange

program.  Verify the Form DS-2019 in the electronic SEVIS report in the CCD and determine that the applicant's record is in either INITIAL or ACTIVE status and that the SEVIS I-901 fee has been paid.  Also note the program end date as it appears in the electronic record and ensure that the J visa is issued with a validity that corresponds to the program end or to the reciprocity schedule for the country of the applicant's nationality, whichever is shorter.  See 9 FAM 402.5-6(I)(6).

# 9 FAM 402.5-6(E)(1)  (U) Noncitizen Physician

*(CT:VISA-1628;   09-13-2022)*

a. **(U) Noncitizen Physician:**  This category is for foreign national medical graduates pursuing American medical board certification through graduate education and training at accredited U.S. schools of medicine or other U.S. institutions through a clinical exchange program.

b. **(U)** The Educational Commission for Foreign Medical Graduates (ECFMG) is the only program sponsor authorized to use this category.  Foreign medical graduates under this category must successfully complete examinations administered by ECFMG that measure their command of English and the medical sciences.

c. **(U)** All foreign medical graduates sponsored in the category of Alien Physician are subject to the 2-year home-country physical presence requirement.  See 9 FAM 402.5-6(L) below.

d. **(U) Exception to ECFMG sponsorship:**  A foreign physician may be sponsored by a designated sponsor other than ECFMG (e.g., a U.S. university, academic medical center, school of public health, or other public health institution) as a "research scholar" only if the dean of the accredited U.S. medical school or their designee certifies the following 5 points, and such certification is appended to the Form DS-2019 issued to the prospective exchange visitor Alien Physician:

(1)  **(U)** The program is predominantly involved with observation, consultation, teaching, or research;

(2)  **(U)** Any incidental patient contact will be under the direct supervision of a U.S. citizen or LPR physician who is licensed to practice medicine in the State in which the activity is taking place;

(3)  **(U)** The foreign national physician will not be given final responsibility for the diagnosis and treatment of patients;

(4)  **(U)** Any activities will conform fully with the State licensing requirements and regulations for medical and health care professionals in the State in which the program is being pursued; and

(5)  **(U)** Any experience gained will not be credited towards any clinical requirements for medical specialty board certification.  In such cases, the program sponsor's letter of designation will explicitly authorize the sponsor to issue Form DS-2019 using the Research Scholar category.

The duration of participation as a Research Scholar is limited to 5 years unless the Department approves a program extension for a G-7-sponsored exchange visitor.

e. **(U) Duration:**  The duration of participation is limited to seven years, unless specifically authorized by the Department (ECA/EC).  Such authorization will be indicated by an active SEVIS status with the same SEVIS number and an extended program end date.

f. **(U)** Exchange Visitor Program Regulation**:** See 22 CFR 62.27.

# 9 FAM 402.5-6(E)(2)  (U) Au Pair

*(CT:VISA-1837;   09-26-2023)*

a. **(U) Au Pair:**  This category is for a foreign national age 18-26 entering the United States for a period of one year to reside with an American host family, or the family of an LPR, while participating in their home life and providing limited childcare services.  Au Pair applicants who are 26 years of age at the time of the program start date are eligible to participate in the Au Pair program.  The Au Pair is also required to enroll and attend classes offered by an accredited U.S. postsecondary institution for not less than 6 semester hours of academic credit, or the equivalent.  As a condition of participation, host-families must agree to facilitate the enrollment and attendance of the Au Pair and to pay the cost of such academic course work in an amount not to exceed $500.  Au Pairs may enroll in appropriate course work after they arrive on the program and are not required to have a plan in place at the time of visa interview for the course work they intend to enroll in. Failure to adhere to the education component is grounds for termination of the Au Pair from the program by the sponsor.

b. **(U) EduCare:**  The regulations governing the Au Pair category were amended to create a subcategory called EduCare.  This component is specifically designed for families with school-aged children requiring limited childcare assistance.  Au Pairs participating in the EduCare component may not be placed with families having pre-school-aged children unless alternative arrangements are in place for these children.  EduCare participants may not work more than 10 hours a day/30 hours a week.  They must complete a minimum of 12 semester hours of academic credit, or its equivalent, during their program.  Host families provide the first $1,000 to the Au Pair toward the cost of the educational component.  EduCare Au Pairs may enroll in appropriate course work after they arrive on the program and are not required to have a plan in place at the time of visa interview for the course work, they intend to enroll in.

c.  **(U) No Family Placement:**  Au Pairs are not to be placed in the homes of family/relatives, irrespective of the distance in relations (e.g., third cousin, great aunt and/or uncle, etc.).

d. **(U) Duration:**  The duration of participation is limited to one year/one sponsor only, unless specifically authorized by the Department (ECA/EC).

Such authorization will be indicated by an active SEVIS status with the same SEVIS number as the applicant's initial Au Pair program, and an extended program end date.

e. **(U) Extension of program:**  Designated Au Pair sponsors may request that an Au Pair be granted an extension of program participation beyond the original twelve months.  Au Pair sponsors may request an Au Pair be granted an additional 6-, 9-, or 12-month extension of program participation.  The applicant's age is not a barrier to program extension if they were 18-26 years of age at the time of the initial program start date.

f. **(U) Repeat Participation:**  A foreign national who successfully completed an Au Pair program is eligible to participate again as an Au Pair, including a participant who was granted an extension of an initial program, if they had resided outside the United States for at least two years following completion (program end date) of their initial Au Pair program.  The repeat participant must qualify as an Au Pair under the same rules as an initial participant.

g. **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.31.

## 9 FAM 402.5-6(E)(3)  (U) Camp Counselor

*(CT:VISA-1628;   09-13-2022)*

a. **(U) Camp Counselor:**

   (1) **(U)** This category is for a foreign national selected to be a counselor in an accredited U.S. summer camp (during the U.S. summer months) who imparts skills to American campers and information about their country or culture.

   (2) **(U)** Foreign nationals who apply for this program must be bona fide youth workers, students, teachers, or individuals with specialized skills.

   (3) **(U)** While the minimum age of the foreign national is 18 years, there is no maximum age for this category.

   (4) **(U)** While it is recognized that some non-counseling chores are an essential part of camp life for all counselors, this program is not intended to assist American camps in bringing in foreign nationals to serve as administrative personnel, cooks, nurses, physicians, or menial laborers, such as dishwashers or janitors.

b. **(U) Duration:**  The duration of participation must not exceed 4 months.

c. **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.30.

## 9 FAM 402.5-6(E)(4)  (U) Government Visitor

*(CT:VISA-1;   11-18-2015)*

a. **(U) Government Visitor:**  This category is for a foreign national who is recognized as an influential or distinguished person in their own country, and who is selected by a Federal, State, or local government agency to participate

in observation tours, discussions, consultations, professional meetings, conferences, workshops, and travel.

b. **(U)** This category is for the "exclusive use" of United States Federal, State, and local government agencies.

c. **(U) Duration:** The duration of participation must not exceed 18 months.

d. **(U)** Exchange Visitor Program **Regulation:** See 22 CFR 62.29.

# 9 FAM 402.5-6(E)(5) (U) Intern

*(CT:VISA-2058; 08-29-2024)*

a. **(U) Intern:**

(1) **(U) The Intern category aims:** to strengthen U.S. public diplomacy by expanding opportunities for substantive programming for foreign students and professionals; to enhance the skills and expertise of exchange visitors in their academic or occupational fields; to improve participants' knowledge of American techniques, methodologies, and technologies; and to increase participants' understanding of American society and culture. The requirements in the Intern program regulations are designed to distinguish between a period of work-based learning in the intern's academic field, which is permitted, and casual and unskilled labor, which is not.

(2) **(U)** This category is for a foreign national who is either currently enrolled in and pursuing studies at a degree- or certificate-granting postsecondary academic institution outside the United States or who graduated from such an institution no more than 12 months before their exchange visitor program start date, and who enters the United States to participate in a structured and guided work-based internship in their specific academic field.

c. **(U) Duration:** The duration of participation must not exceed twelve months.

d. **(U) Program exclusions:** Sponsors must not:

(1) **(U)** Place Interns in unskilled or casual labor positions; in positions that require or involve childcare or elder care; or in clinical or any other kind of work that involves patient care or contact, including any work that would require them to provide therapy, medication, or other clinical or medical care (e.g., sports or physical therapy, psychological counseling, nursing, dentistry, veterinary medicine, social work, speech therapy, or early childhood education;

(2) **(U)** Place Interns in the field of aviation;

(3) **(U)** Place Interns in positions, occupations, or businesses that could bring the Exchange Visitor Program or the Department into notoriety or disrepute;

(4) **(U)** Engage or otherwise cooperate or contract with a domestic staffing/employment agency in the United States to recruit, screen,

orient, place, evaluate, or train Trainees or Interns, or in any other way involve such agencies in an Exchange Visitor Program training or internship program.

e. **(U) Program requirements:**  Sponsors must:

   (1) **(U)** Ensure that the duties of Trainees or Interns as outlined in a Trainee/Internship Placement Plans (T/IPP Form DS-7002) will not involve more than 20 percent clerical work, and that all tasks assigned to Trainees or Interns are necessary for the completion of training and internship program assignments; and

   (2) **(U)** Ensure that all "hospitality and tourism" training and internship programs of 6 months or longer contain at least 3 departmental or functional rotations.

f. **(U) Program Fees:**  Program regulations do not address the fee amount that a program sponsor may charge an exchange visitor to participate in Intern programs, and each program sponsor may set its fees based on its business model.

g. **(U) Training/Internship Placement Plan (T/IPP):**  Sponsors must complete and obtain requisite signatures for a Form DS-7002, Training/Internship Placement Plan, for each intern before issuing a Form DS-2019.  Upon request, visa applicants must present their fully executed Form DS-7002 to the adjudicator during the visa interview.  See 9 FAM 402.5-6(D)(7) above for information on the T/IPP.

h. **(U) Repeat Participation:**

   (1) **(U)** A foreign national can participate in additional internship programs to develop more advanced skills or in a different field of expertise if they maintain student status or begin a new internship program within 12 months of graduation from an academic institution outside the United States.

   (2) **(U)** Participants who have successfully completed an internship program and no longer meet the selection criteria for internship programs may participate in a training program after a two-year period of residency outside the United States following their internship program.  This two-year period should not be confused with the two-year home-country physical presence requirement under INA 212(e) (9 FAM 402.5-6(L) below).

i. **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.22.

j. **(U) Twelve Month Intern Work and Travel (IWT) Program:**

   (1) **(U)** The IWT program began on October 31, 2008, following signing of a Memorandum of Understanding (MOU) by the governments of the United States and Ireland.  IWT was a pilot program initially.  In December 2016, pilot status was lifted.  In January 2023, the MOU was amended to extend the program until January 30, 202*8*.

(2) **(U)** Citizens of Ireland, who have completed Level VI of the Irish Higher Education System, may participate in the IWT Program, which is governed by existing Intern category regulations in 22 CFR 62.22 and applicable program rules, except for participant placement.  A participant must be a bona fide postsecondary student (i.e., an Irish citizen who will commence their program in the United States within 12 months of the conferring date indicated on their scroll) and provide evidence from the appropriate postsecondary institution to this effect.

(3) **(U)** IWT Program participants are not required to have site of activity placement before entering the United States, and as such, applicants without placement will not have a Form DS-7002, Training/Internship Placement Plan, at the time of visa interview.  Program sponsors must ensure that participants have placement within 90 days of arrival.  Sponsors must enter "IWT Program" in the Subject Field Remarks box (box #4) of Form DS-2019.

(4) **(U)** Vocational students pursuing studies at a tertiary level accredited academic institution are not eligible for participation unless such vocational study is part of a structured program leading to a degree or other credential recognized as equivalent to Level VI of the Irish Higher Education System and unless at least 50 percent or their coursework is academic.

(5) **(U)** The maximum program length is 12 months.  No program extensions are permitted.

(6) **(U)** IWT Program participants are not permitted to be accompanied by a spouse or dependent children.

k. **(U) Twelve Month Intern Trainee Program - Austria**

(1) **(U)** The Professional Development and Cultural Exchange Program with the Republic of Austria began on January 31, 2024, following signing of a Memorandum of Understanding (MOU) by the governments of the United States and the Republic of Austria;

(2) **(U)** Austrian exchange visitors will be placed as Interns or Trainees for periods of between six (6) and twelve (12) months at up to two U.S. private companies or non-profit institutions;

(3) **(U)** Austrian exchange visitors must have at least two rotations in their program, evenly divided over the length of their program. The second rotation must build upon the exchange visitor's field of study, a closely related field, or previous rotation and must give the exchange visitor more responsibility than in the first rotation.  The second rotation may be at the same placement institution as the first rotation;

(4) **(U)** Program participants must be citizens of the Republic of Austria, be 18 to 30 years of age, and have a working knowledge of English. Austrian exchange visitors are permitted to be currently enrolled in or have recently completed (within 12 months of graduation) studies in an

    Austrian-accredited post-secondary or dual/vocational education program outside the United States;

(5) **(U)** Austrian exchange visitors are required to have a placement before entering the United States. Upon request, applicants must provide a fully executed copy of Form DS-7002, Training/Internship Placement Plan, at the time of visa interview;

(6) **(U)** The maximum length of program is 12 months.  No program extensions are permitted, nor may participants take part in an additional J-Visa training program unless in accordance with 22 CFR 62.22(n); and

(7) **(U)** Austrian participants are not permitted to be accompanied by a spouse or dependent children unless the dependents also are J-1 visa exchange visitors.

## 9 FAM 402.5-6(E)(6)  (U) International Visitor

*(CT:VISA-1628;   09-13-2022)*

a. **(U) International Visitor:**  This category is for the exclusive use of the U.S. Department of State.  It is for an individual who is a recognized or potential leader in their own country and is selected by the Department to participate in observation tours, discussions, consultation, professional meetings, conferences, workshops, and travel.

b. **(U) Duration:**  The duration of participation must not exceed one year.

c.  **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.28.

## 9 FAM 402.5-6(E)(7)  (U) Professor

*(CT:VISA-1741;   03-30-2023)*

a. **(U) Professor:**  This category is for an individual who is engaged primarily in teaching, lecturing, observing, or consulting at accredited post-secondary academic institutions, museums, libraries, or similar institutions.  The professor may also conduct research and participate in occasional lectures if authorized by the program sponsor.

b. **(U)** The professor's appointment to a position must be temporary, even if the position itself is permanent.  The individual must not be a candidate for a tenure-tracked position.

c.  **(U) Duration:**  The duration of participation must not exceed five years unless the participant is directly sponsored by a federally funded national research and development center or a U.S. federal laboratory (program serial number G-7).

d. **(U) Repeat Participation:**  Exchange visitors who have participated in Professor or Research Scholar exchange programs and who have completed their programs are not eligible to participate in another Professor or Research Scholar programs for a period of two years following the program end date, as governed by regulation set forth in 22 CFR 62.20(i)(2).  This regulation

differs from the two-year home-country physical presence requirement to which certain former exchange visitors are subject under INA 212(e). See 9 FAM 402.5-6(L) below.

e. **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.20.

## 9 FAM 402.5-6(E)(8)  (U) Research Scholar

*(CT:VISA-1837;   09-26-2023)*

a. **(U) Research Scholar:**  This category is for an individual whose primary purpose of travel is to conduct research, observe, or consult in connection with a research project at research institutions, corporate research facilities, museums, libraries, post-secondary accredited academic institutions, or similar institutions.  The Research Scholar may also teach or lecture, unless disallowed by the sponsor.  The Research Scholar's appointment to a position must be temporary, even if the position itself is permanent.  The individual must not be a candidate for a tenure-tracked position.

b. **(U)** Minimum qualifications for this category are a bachelor's degree with appropriate experience in the field in which research is to be conducted.

c.  **(U) Duration:**  The duration of participation must not exceed 5 years unless the participant is directly sponsored by a federally funded national research and development center or a U.S. federal laboratory (program serial number G-7).

d. **(U) Repeat Participation:**  Exchange visitors who have participated in Professor or Research Scholar programs and who have completed their programs are not eligible to participate in another Professor or Research Scholar program for a period of two years following the program end date, as governed by regulation set forth in 22 CFR 62.20(i)(2).  This regulation differs from the two-year home-country physical presence requirement to which certain former exchange visitors are subject under INA 212(e). See 9 FAM 402.5-6(L).

e. **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.20.

## 9 FAM 402.5-6(E)(9)  (U) Short-Term Scholar

*(CT:VISA-1837;   09-26-2023)*

a. **(U) Short-Term Scholar:**  This category is for a foreign national who is a professor, research scholar, or person with similar education or accomplishments coming to the United States on a short-term visit to lecture, observe, consult, train, or demonstrate special skills at research institutions, museums, libraries, post-secondary accredited academic institutions, or similar institution.

b. **(U)** Exchange visitors who have recently participated in an exchange program as a Professor or Research Scholar in the United States are not expected to attempt to reenter the United States as a Short-Term Scholar to rejoin their

original sponsor as this would be a continuation of their original program objective.

c. **(U) Duration:** The duration of participation must not exceed 6 months. No program extensions are permitted.

d. **(U)** Exchange Visitor Program **Regulation:** See 22 CFR 62.21.

# 9 FAM 402.5-6(E)(10)  (U) Specialist

*(CT:VISA-2069;   09-16-2024)*

a. **(U) Specialist:** This category is for a foreign national who is an expert in a field of specialized knowledge or skill coming to the United States to observe, consult, or demonstrate their special skills except as:

   (1) **(U)** Research Scholars and Professors, who are governed by regulations set forth in 22 CFR 62.20;

   (2) **(U)** Short-Term Scholars, who are governed by regulations set forth in 22 CFR 62.21; and

   (3) **(U)** Alien Physicians in graduate medical education or training, who are governed by regulations set forth in 22 CFR 62.27.

b. **(U) Duration:** Participation must not exceed one year. Within the Specialist category there are nine program numbers with approved exceptions to this one-year duration.

   (1) **(U)** The first eight excepted program numbers are for: Israeli Specialists under the Jewish Agency-American Section Inc. (P-3-37641) and the World Zionist Organization (P-3-04530); Japanese language Specialists under the Laurasian Institute (P-3-05588) and the Institute of International Education (P-3-14039); Specialists under the East-West Center (P-3-10434); Specialists under the Middle East Broadcasting Network (P-3-13019); Specialists under the U.S. Agency for Global Media (G-3-00366) and Specialists under the U.S. Department of Energy (G-3-00348). For these eight excepted program numbers, the duration of participation is three years, and the visa should usually be issued for the full three years. Note: the program dates listed on the Form DS-2019 in Box 3 will be one year in length. However, both the Form DS-2019 and the SEVIS record will include a notation that the program has a three-year duration. The visa should be set to expire two years after the program end date listed in Box 3 on the Form DS-2019.

   (2) **(U)** The ninth excepted program is the German American Partnership Program (GAPP) (P-3-43541). Participation in the GAPP must not exceed three years and the visa should usually be issued for three years as stated in Box 3 on the Form DS-2019.

   (3) **(U)** Specialists under the GAPP (P-3-43541), Middle East Broadcasting Network (P-3-13019), and U.S. Agency for Global Media(G-3-00366) are permitted one three-year repeat of program.

c.  **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.26.

# 9 FAM 402.5-6(E)(11)  (U) Students

*(CT:VISA-2048;   08-15-2024)*

a. **(U) Secondary School Student:**

(1)  **(U)** This category affords foreign secondary school students an opportunity to study for an academic semester or an academic year in a U.S. accredited public or private secondary school while living with an American host family or residing at an accredited U.S. boarding school. Participants in this category must meet the following requirements:

(a)  **(U)** Be a secondary school student in their home country who has not completed more than 11 years of primary and secondary study excluding kindergarten; or

(b)  **(U)** Be at least the age of 15 but not more than 18-1/2 years of age as of the program start date; and

(c)  **(U)** Has not previously participated in an academic year or semester Secondary School Student exchange program in the United States or attended school in the United States in either F-1 or J-1 visa status. Screening by the program sponsor of factors such as English language proficiency, maturity, character, and scholastic aptitude are critical.

(2)  **(U)** Sponsors are required to secure host family placement before the student's departure from their home country.  This does not need to happen before visa issuance because it may occur after the student's visa interview.  As a result, the student's Form DS-2019 may list the sponsor's contact information instead of the host family's contact information.

(3)  **(U) Duration:**  Participation is a minimum of one academic semester or a maximum of one academic year.  Sponsors are permitted to issue a Form DS-2019 for an academic semester or academic year.  When a student is from a country whose school calendar is opposite that of the United States, a sponsor can issue a Form DS-2019 for a calendar year cycle.

b. **(U) College and University/Students:**

(1) To participate, a foreign individual must intend to:

(a)  **(U)** Pursue a full course of study leading to or culminating in the award of a U.S. degree from a post-secondary accredited academic institution; or engage full-time in a prescribed course of study in a non-degree program of up to 24 months duration conducted by a post-secondary accredited academic institution; or

(b)  **(U)** Engage in English language training at a post-secondary accredited academic institution, or an institute approved by or

acceptable to the post-secondary accredited academic institution where the college or university student is to be enrolled upon completion of the language training. A Form DS-2019 for language training can only be issued if the student is fully funded by the student's home government.

(2) **(U)** Exchange visitors participating in the College and University Student category must be supported substantially by funding from any source other than personal or family funds.

(3) **(U) Duration:** Duration of participation is determined by whether the exchange visitor is a degree or non-degree student. An explanation of each is provided in paragraphs c and d below.

c. **(U) Degree Students:** College and University Students who are in degree programs ("Student Associate," "Student Bachelors," "Student Masters," or "Student Doctorate," as stated on the Form DS-2019 and in SEVIS) may be authorized to participate in the Exchange Visitor Program for an unlimited length of time, if they are either:

(1) **(U)** Studying at the post-secondary accredited academic institution listed on their Form DS-2019 and are:

   (a) **(U)** Pursuing a full course of study as set forth in 22 CFR 62.23(e); and

   (b) **(U)** Maintaining satisfactory advancement towards the completion of their academic program; or

(2) **(U)** Participating in an authorized academic training program as permitted in 22 CFR 62.23(f).

d. **(U) Nondegree Students:** College and University Students who are nondegree students may be authorized to participate in the Exchange Visitor Program for up to 24 months, if they are either:

(1) **(U)** Studying at the post-secondary accredited academic institution listed on their Form DS-2019 and are:

   (a) **(U)** Participating full time in a prescribed course of study; and

   (b) **(U)** Maintaining satisfactory advancement towards the completion of their academic program; or

(2) **(U)** Participating in an authorized academic training program as permitted in 22 CFR 62.23(f).

e. **(U) Student Intern Subcategory:**

(1) **(U)** Department-designated U.S. colleges and universities can administer internship programs substantially like those detailed herein under their J-1 College/University Student designation.

(2) **(U)** The Student Intern must be in good academic standing with the postsecondary academic institution outside the United States where they are enrolled and pursuing a degree.

(3) **(U)** The Student Intern will return to her/his academic program and fulfill and obtain a degree from such academic institution after completion of the student internship program.

(4) **(U)** The program sponsor must fully complete and obtain requisite signatures for a Form DS-7002 for each Student Intern before issuing a Form DS-2019.  The sponsor must provide to each signatory an executed copy of the Form DS-7002.  Upon request, a Student Intern must present her/his fully executed Form DS-7002 to the you during the visa interview.

(5) **(U)** Several colleges and universities currently hold J-1 training designations and can be expected to issue Form DS-2019 and Form DS-7002 to applicants as Trainees per the current rulemaking and the program guidelines described herein.

(6) **(U)** The category of Trainee will be reflected on the Form DS-2019 if the sponsor is authorized for this category.

f. **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.25 and 22 CFR 62.23.

## 9 FAM 402.5-6(E)(12)  (U) Summer Work Travel (SWT)

*(CT:VISA-2143;   03-26-2025)*

a. **(U) Qualifying for SWT:**  A participant is defined as a bona fide post-secondary student in the applicant's own or another foreign country if the applicant is currently enrolled and participating full time at an accredited post-secondary classroom-based academic institution at the time of the application, or as that status is defined by the educational system of the country.  Final year students are eligible to take part in this program during the school's major academic break immediately following their graduation if they apply to participate in the program before graduation.

(1) **(U)** An applicant must have completed at least one semester, or the quarter or trimester equivalent, of postsecondary education to be eligible to participate in this program.

(2) **(U)** Participants must demonstrate sufficient proficiency in English to enable them to not only carry out their job duties but also to interact effectively with law enforcement authorities and medical personnel, read rental agreements, carry on non-work-related conversations, etc.  It is appropriate to conduct SWT visa interviews in English to assess the applicant's proficiency.  U.S. sponsors may use video teleconferencing to conduct interviews with potential participants but assertions by the sponsor that an applicant meets the English language requirement are not alone sufficient to meet the burden of proof for this program requirement.

(3) **(U)** Unless they are final year students, participants must demonstrate that they are bona fide students who are maintaining student status and

are actively pursuing their degree per their local educational system.

(4) **(U)** Unless the participant is a final year student, they must demonstrate that they will resume activities as a student after participation in the SWT program.

(5) **(U)** It is not necessary for the student to be enrolled in the same institution both before and after participating in SWT. Students may participate if they are transferring from one school to another, if they have finished an academic program at one school and are going on to another full-time program, or if they are continuing to graduate school. Documentation, satisfactory to you, that applicants have been accepted for and will commence studies upon their return may be accepted to establish status as a continuing student.

(6) **(U)** Students attending vocational schools are usually not eligible for participation in the SWT program unless they can demonstrate that study in the vocational school will ultimately lead to a degree from a full-time post-secondary academic institution.

(7) **(U)** Students may participate in the program every year that they meet the definition of bona fide student but participation each year is limited to the shorter of four months or the length of the long break between academic years at the school they attend.

(8) **(U)** In no case should there be more than one SWT period per year identified in any country without the concurrence of both the Visa Office and ECA's Office of Private Programs.

b. **(U) SWT Sponsor Obligations:**

(1) **(U)** Designated U.S. sponsors of SWT exchange programs must not place program participants in jobs as described in 22 CFR 62.32(h).

(2) **(U)** U. S. sponsors must ensure that 100 percent of their non-Visa Waiver Program country participants have a confirmed, vetted job placement. Job placements may be secured directly by the U.S. sponsor or through self-placement by the participant. See Program Date Chart.

(3) **(U)** For SWT participants from Visa Waiver Program (VWP) countries for whom employment has not been pre-arranged, sponsors must:

(a) **(U)** Ensure that participants have sufficient financial resources to support themselves during their search for employment;

(b) **(U)** Provide participants with pre-departure information that explains how to seek employment and secure lodging in the United States;

(c) **(U)** Maintain and provide a roster of bona fide jobs that includes at least as many job listings as the number of participants entering the United States with pre-arranged and confirmed employment;

(d) **(U)** Undertake reasonable efforts to secure suitable employment for participants unable to find jobs on their own after 2 weeks of commencing the job search; and

(e) **(U)** Vet the job placement selected by the participant ***before*** the commencement of employment.

(4) **(U)** All SWT participants should be cautioned to comply with their responsibility to inform their U.S. sponsor of their arrival and commencement at work and keep the sponsor informed of their whereabouts, should they change locations.  SWT participants who wish to change jobs or to accept an additional job must inform their U.S. sponsor of the desired job placement and wait for the sponsor to perform the same vetting and approval process as for the initial employment **before** beginning work.

c.  **(U) Duration of SWT Program:**

(1) **(U)** The duration of participation in the SWT program must not exceed four months.  These four months must coincide with the exchange visitor's official academic school break between school years.  *W*hile the program may not be longer than four months, you are permitted to issue visas valid before the program start date.

(2) **(U)** SWT programs are only permitted once a year during the long break between academic years.

d. **(U) SWT Outreach and Fraud Prevention Measures:**

(1) **(U)** Designated U.S. sponsors are responsible for conducting the SWT program under the regulations at 22 CFR 62.32.  The U.S. sponsors play a vital outreach role by explaining to audiences of the receiving state the SWT program's purpose, how it is structured, its economic imperatives, and the checks in place to safeguard the welfare of foreign youth while in the United States.  You should seek to develop a good working relationship with U.S. sponsors, which will allow you to better reach local audiences and deal with any problems that come up later, after program participants have entered the United States; but ECA is responsible for managing the administrative relationship with the U.S. sponsors and will officially notify U.S. sponsors of their compliance responsibilities.

(2) **(U)** The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("Wilberforce Act") requires you to ensure that applicants applying for J visas are made aware of their legal rights under U.S. Federal immigration, labor, and employment laws.  This includes information on the illegality of slavery, peonage, trafficking in persons, sexual assault, extortion, blackmail, and worker exploitation in the United States.  This information is available in the form of a physical "Know Your Rights" information pamphlet or a Quick Response (QR) code, which permits applicants to access an online version of the information pamphlet by scanning the code with their smartphone camera.  During the NIV interview, you must ask applicants if they prefer the QR code, the physical pamphlet, or both, and confirm that the information prepared by the Department has been received, read, and understood by the applicant.  Enter a case note in the NIV system stating the QR code and/or pamphlet was provided, and the applicant has

acknowledged receipt and understanding of the pamphlet.  See 9 FAM 402.3-9(C)(1) for more information about Wilberforce Act enforcement.

(3)  **(U)** It is important to ensure your fraud prevention measures stay within the parameters established by regulations.  You must allow any applicant with a valid Form DS-2019 to apply for a visa.  Each local SWT third-party contractor (foreign agent, recruiter, or partner) operating overseas must have executed a written agreement with the designated U.S. sponsor that explains the relationship between the sponsor and the contractor and identifies their respective obligations.  These agreements must include annually updated price lists for the services provided to the U.S. sponsors and confirm that they will not outsource any core programmatic functions or pay or provide other incentives to U.S. host employers.  ECA has created a "Foreign Entity Report" SharePoint site listing, by country, the designated U.S. sponsors and their affiliated local SWT third-party contractors. Sponsors are required to maintain a current listing of all third-party contractors on the Foreign Entity Report.  The Report must contain the names, addresses, and contact information (i.e., telephone numbers and email addresses) of all third-party contractors that assist the sponsors in fulfilling the provision of core program services.  Share information about misconduct by local third-party contractors with the relevant portfolio holders in CA/FPP and CA/VO/F (see the Who's Who pages on the CAWeb).  In turn, they will work with ECA's Office of Coordination and Compliance so that ECA can review and take appropriate action.

(4)  **(U)** When you receive applications from previous SWT participants who failed to return in time for the start of their university classes, this fact may call into question their eligibility (whether they are in fact "bona fide students") for future J-1 visas.  That is the case even when the applicant departed the United States within 30 days of the completion of their exchange program and did not incur a U.S. immigration violation.  Each of these cases must be evaluated on its own merits.

e. **(U) Sample Handout for SWT Participants:**

Congratulations on your acceptance as an Exchange Visitor Program participant in a Summer Work Travel program.  This program is a cultural exchange, and your eligibility for program participation is based on your status as a foreign college/university student.  It is therefore very important that the program does not interfere with your studies and that you return to school in time for the first day of your classes.  Please take a moment to read the following information to ensure that you are familiar with certain requirements of the program.

What do the program BEGIN and END dates on my Form DS-2019 mean?

The program begin and end dates indicate when you may begin work and when you must stop working.  You may begin working at any point on or after the program start date, but you must end your work by the end date of the program.  Working beyond the program end date will impact your ability to participate in the program in future years.

How long before the program begin date may I enter the United States?

You may enter the United States up to 30 days in advance of your program begin date but may not begin working until the program begin date is reached. Please remember that participation in the program cannot prevent you from attending any scheduled classes or taking exams at your university. If you miss any classes due to participation in the program, you will greatly jeopardize your chances of participating in the program.

How long after the program end date may I stay in the United States?

You have 30 days following the end date of your program to travel and/or to arrange for your return home. You are not permitted to work during these 30 days, and if you leave the United States during this grace period, you will not be permitted to re-enter the United States on your J-1 visa because you will no longer be in J status. Please keep in mind that it is your responsibility to return home in time for the start of your scheduled classes, no matter what your program end date is.

Can I switch jobs once I am in the United States?

Please check with your U.S. sponsor before making any changes in your employment. If you change employment without the permission of your U.S. sponsor your status in the program may be terminated.

If your program is terminated, you must leave the United States immediately.

Can I work more than one job in the United States?

The Exchange Visitor Program regulations do not prohibit a participant from accepting a second job. However, you must check with your U.S. sponsor before accepting a second job. Your U.S. sponsor agency must approve and vet all jobs.

What if I have a complaint about the U.S. sponsor or my employer in the United States?

You may register complaints with the Department of State at jvisas@state.gov. However, your U.S. sponsor has primary responsibility for your program. If you have a complaint about your employer, you should first contact your U.S. sponsor for assistance. Contact information for your U.S. sponsor can be found in Box #7 of your Form DS-2019.

What if I have a difficult time finding a job placement once I arrive in the United States, or have concerns about the work conditions?

If you have questions or are experiencing difficulty in finding employment, or have concerns about the work conditions, you should first contact your U.S. sponsor for assistance. You also may contact the Department of State (jvisas@state.gov). You may also wish to contact your country's nearest Embassy or Consulate.

If you have other questions not answered here, please consult the following Web page:

J1visa.state.gov or write to the Department of State at jvisas@state.gov.

## f. **(U) SWT Pilot Programs for Citizens of Australia and New Zealand:**

(1) **(U)** In September 2007, the U.S. government signed memorandums of understanding (MOUs) with Australia and New Zealand launching 12-month SWT pilot programs. The MOU with New Zealand became effective on September 10, 2007; the MOU with Australia became effective on October 31, 2007. The MOUs allow certain Australian, New Zealand, or U.S. citizens who are bona fide postsecondary students or recent graduates (within 12 months of graduation) from postsecondary

schools to work and travel in Australia, New Zealand, or in the United States, respectively, for up to 12 months.

(2) **(U)** The guidance for the Australia and New Zealand pilot programs differs from other J-1 SWT guidance (see paragraph a above) in the following respects:  Participants are not required to return home in time for the school year to begin, and qualified postsecondary students can enter the United States at any time.

(3) **(U) Duration:**  The duration of participation in this category must not exceed 12 months.  No extensions of program are permitted.

## 9 FAM 402.5-6(E)(13)  (U) Teacher

*(CT:VISA-2020;   07-03-2024)*

a. **(U) Teacher:**  This category is for an individual teaching full time in a primary or secondary accredited academic institution.  A foreign national must satisfy all the following:

(1) **(U)**

(a) **(U)** Meet the qualifications for teaching at the primary (including pre-kindergarten) or secondary levels in schools in their home country; is working as a teacher in their home country at the time of initial application to the sponsor; and has at least two years of full-time teaching experience; or

(b) **(U)** If not working as a teacher in their home country at the time of application, but otherwise meets the qualifications for teaching at the primary (including pre-kindergarten) or secondary levels in schools in the home country has had at least two years of full-time teaching experience within the past eight years; and, within 12 months of their application submission date for the program, has or will have completed an advanced degree (beyond a degree equivalent to a U.S. bachelor's degree) in education or in an academic subject matter that they intend to teach or that is directly related to their teaching subject field;

(2) **(U)** Possess, at a minimum, a degree equivalent to a U.S. bachelor's degree in either education or the academic subject field in which they intend to teach;

(3) **(U)** Satisfy the teaching eligibility standards of the U.S. state in which they will teach (e.g., meets minimum educational requirements, has passed teacher training coursework at a sufficiently proficient level, has provided an evaluation of foreign teaching preparation coursework, has demonstrated the requisite prior teaching experience), to include any required criminal background or other checks;

(4) **(U)** Be of good reputation and character; and

(5) **(U)** Agree to come to the United States temporarily as a full-time teacher of record in an accredited primary or secondary school. Exchange visitor Teachers may teach a variety of subjects and levels at their host school or schools, if qualified, but at the pre-kindergarten level, may teach only in language immersion programs.

b. **(U) Extension of program:**  Designated Teacher program sponsors may request that an exchange Teacher be granted an extension of program participation beyond the original 3 years.  Teacher program sponsors may request an exchange Teacher be granted up to a 2-year extension. Extensions will not exceed June 30th of any given year to coincide with the U.S. teaching cycle and December 31st for the year-round cycle discussed above.  A Teacher from Germany may be extended an additional 3 years per an agreement between the Department and the government of Germany.

c. **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.24.

# 9 FAM 402.5-6(E)(14)  (U) Trainee

*(CT:VISA-1628;   09-13-2022)*

a. **(U) The Trainee category aims:**  to strengthen U.S. public diplomacy by expanding opportunities for substantive programming for foreign students and professionals; to enhance the skills and expertise of exchange visitors in their academic or occupational fields; to improve participants' knowledge of U.S. techniques, methodologies, and technologies; and to increase participants' understanding of U.S. society and culture.  The requirements in the Trainee regulations are designed to distinguish between bona fide training, which is permitted, and merely gaining additional work experience, which is not permitted.

b. **(U)** This category is for a foreign national who has either a degree or professional certificate from a postsecondary academic institution outside the United States and at least one year of prior related work experience in their occupational field acquired outside the United States; or five years of work experience outside the United States in their occupational field.

c. **(U) Program fees:**  Program regulations do not address the fee amount that program sponsors may charge exchange visitors to participate in Trainee programs, and each program sponsor may set its fees based on its business model.

d. **(U) Program exclusions:**  Sponsors must not:

(1) **(U)** Place Trainees in unskilled or casual labor positions, in positions that require or involve childcare or elder care, or in clinical or any other kind of work that involves patient care or contact, including any work that would require them to provide therapy, medication, or other clinical or medical care (e.g., sports or physical therapy, psychological counseling, nursing, dentistry, veterinary medicine, social work, speech therapy, or early childhood education;

(2) **(U)** Place Trainees in positions, occupations, or businesses that could bring the Exchange Visitor Program or the Department into notoriety or disrepute;

(3) **(U)** Engage or otherwise cooperate or contract with a domestic staffing/employment agency in the United States to recruit, screen, orient, place, evaluate, or train Trainees, or in any other way involve such agencies in an Exchange Visitor Program training program; nor

(4) **(U)** Place trainees in the field of aviation.

(5) **(U)** Designated sponsors must ensure that the duties of Trainee as outlined in the T/IPP will not involve more than 20 percent clerical work, and that all tasks assigned to Trainees are necessary for the completion of training program assignments.

(6) **(U)** Sponsor must also ensure that all "Hospitality and Tourism" training programs of six months or longer contain at least three departmental or functional rotations.

e. **(U) Form** DS-7002**, Training/Internship Placement Plan (T/IIP):** Sponsors must complete and obtain requisite signatures on this form for each trainee before issuing Form DS-2019.  Upon request, a J-1 Trainee visa applicant must present a fully executed Form DS-7002 to the adjudicator during the visa interview (see 9 FAM 402.5-6(D)(7) for more information on the T/IPP).

f. **(U) Repeat Participation:**  Trainees can participate in additional training programs that address the development of more advanced skills or a different field of expertise after a 2-year period of residency outside the United States following their training program.  This two-year period should not be confused with the two-year home-country physical presence requirement under INA 212(e) (see 9 FAM 402.5-6(L) below).

g. **(U) Exchange Visitor Program Regulation:**  See 22 CFR 62.22.


## 9 FAM 402.5-6(E)(15)  (U) Intern and Trainee Programs with a Management or Supervisory Focus

*(CT:VISA-1292;   05-27-2021)*

a. **(U)** The occupational category of Management, Business, Commerce, and Finance is up to 18 months for any type of management training, which may include hotel or restaurant management, turf management, office management, etc.  The duration of a trainee's or intern's participation in a training or internship program must be established before a sponsor issues a Form DS–2019.  Except as noted below, the maximum duration of a training program is 18 months, and the maximum duration of an internship program is 12 months.

b. **(U)** For training programs in the "Hospitality and Tourism" occupational category, the maximum duration is 12 months and must not have less than three departmental or functional rotations for "Hospitality and Tourism"

training and internship programs of six months or longer.  Training programs in the field of agriculture are permitted to last a total of 18 months, if in the development of the training plan, as documented in the T/IPP, the additional six months of the program consist of classroom participation and studies. Program extensions are permitted only within maximum durations if the need for an extended training and internship program is documented by the full completion and execution of a new Form DS–7002.

c.  **(U)** Typical rotational programs offered in hotels or restaurants in a variety of related functions leading to a final rotation in a single supervisory position, such as front desk supervisor or manager, floor supervisor, lead chief or room service manager, would fall under the "Hospitality and Tourism" occupational category and be limited to 12 months.

d.  **(U)** Non-management placements on farms or other production facilities fall under 'Agriculture' and are limited to 12 months, or 18 months providing that six months of the program consists of classroom participation and studies.

# 9 FAM 402.5-6(F)  (U) Residence Abroad

*(CT:VISA-2048;   08-15-2024)*

a.  **(U)** The INA requires that a J visa applicant possess a residence in a foreign country they have no intention of abandoning.  You must be satisfied that the applicant has present intent to depart the United States upon completion of their exchange visitor program.  Consequently, you must be satisfied when adjudicating the visa that the applicant:

(1)  **(U)** Has a residence abroad;

(2)  **(U)** Has no immediate intention of abandoning that residence; and

(3)  **(U)** Intends to depart from the United States upon completion of the program.

b.  **(U)** The context of the residence abroad requirement for exchange visitor visas inherently differs from the context for B visitor visas or other short-term visas.  The statute clearly presupposes that the natural circumstances and conditions of being an exchange visitor do not disqualify the applicant from obtaining a J visa.  It is natural that the exchange visitor proposes an extended absence from their home country (see 9 FAM 401.1-3(E)(2) paragraph a).  Nonetheless, you must be satisfied when adjudicating the visa application that an applicant possesses the present intent to depart the U.S. at the conclusion of their program.  That this intention is subject to change is not a sufficient reason to refuse a visa.  Although exchange visitors may apply to change or adjust status in the United States in the future, this is not a basis to refuse a visa application if the exchange visitor's present intent is to depart at the conclusion of their program.

# 9 FAM 402.5-6(G)  (U) Knowledge of English

*(CT:VISA-1628;   09-13-2022)*

**(U)** A prospective exchange visitor must have sufficient proficiency in the English language to undertake the anticipated program successfully.  Successful participation in exchange programs requires that participants interact with Americans both at the participants' sites of activity and in the broader context of daily life, to achieve the cultural goals of these programs.  Some exchange visitor programs provide for an interpreter, and this may be noted on the Form DS-2019.  Participants may not avoid the English language requirement by claiming that their site of activity offers a work environment in their native language.  If the applicant lacks the English skills described above, but the Form DS-2019 is not annotated to reflect the use of an interpreter, and you are unable to determine whether the program permits use of an interpreter, contact the CA/VO/F F/M/J portfolio holder.  Exchange visitors who are deaf or hard of hearing, and who rely on signing, must be proficient in American Sign Language (ASL) or another signing language widely used in the United States.

# 9 FAM 402.5-6(H)  (U) Employment

## 9 FAM 402.5-6(H)(1)  (U) Employment - In General

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** An exchange visitor may receive compensation for employment when such activities are part of the exchange visitor's program.

b. **(U)** DHS is responsible for authorizing the employment of the spouse and any minor unmarried children (J-2 visa holders) of the exchange visitor (J-1 visa holder).  The dependent must file Form I-765, Application for Employment Authorization, requesting permission to work from USCIS.

## 9 FAM 402.5-6(H)(2)  (U) College/University Student Employment

*(CT:VISA-1292;   05-27-2021)*

a. **(U) There are two types of employment authorizations available for College/University Students with J status:**

   (1)  **(U)** Student employment (see 22 CFR 62.23(g) for more information on student employment); or

   (2)  **(U)** Academic training (see 22 CFR 62.23(f) for more information on academic training).

b. **(U)** In both situations, the responsible officer (RO) must approve the exchange visitor's participation in the activity.

c.  **(U)** College/University Students (degree and non-degree) granted permission for student employment (22 CFR 62.23(g)) are limited to twenty (20) hours

per week, except during school breaks and annual vacation, unless authorized for economic necessity.

d. **(U) Some examples of student employment and academic training are:**

   (1) **(U) Scholarship, fellowship, or assistantship:**  If the employment is required because of a scholarship, fellowship, or an assistantship, such activity usually occurs on campus with the school as the employer.  In certain circumstances, however, the work can be done elsewhere for a different employer.  For example, an exchange visitor may work in a government or private research laboratory if the exchange visitor's major professor has a joint appointment at one of those locations and the employment is supervised and counts towards the exchange visitor's degree;

   (2) **(U) On campus:**  The Exchange Visitor Program regulations allow for jobs on-campus, whether the job is related to the course of study.

   (3) **(U) Off campus:**  Exchange visitors may be authorized off-campus employment by the program's responsible officer (RO) when "necessary due to serious, urgent and unforeseen economic circumstances" that have arisen since the exchange visitor's sponsorship on the J visa.

## 9 FAM 402.5-6(H)(3)  (U) Summer Employment for College/University Students Transferring to Another Program Sponsor

*(CT:VISA-1292;   05-27-2021)*

**(U)** If a College/University Student intends to transfer sponsors during the summer months but wants to remain at the current program to work during the summer, the current sponsor must delay the transfer procedure until after the period of employment.  To permit the student to stay in the current program, the period of employment must be included in the exchange visitor's program noted on the Form DS-2019.

# 9 FAM 402.5-6(I)  (U) Visa Application Procedures and Conditions

## 9 FAM 402.5-6(I)(1)  (U) Applicant Qualifications

*(CT:VISA-2150;   04-29-2025)*

a. **(U)** Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status, is the basic document required to support an application for an exchange visitor visa and for maintaining valid exchange visitor program participant status.  The electronic SEVIS record in the CCD will indicate the applicant's current SEVIS status.  Verify that the applicant's SEVIS record is in either INITIAL or ACTIVE status.

b. **(U)** On occasion, you will see applicants who claim they have followed the established procedure, but you cannot locate their SEVIS records in the CCD. When this occurs, contact the F/M/J portfolio holder(s) in CA/VO/F/ET for assistance.  It is important that CA/VO/F/ET and CA/VO/I be made aware of any failure of the records to replicate so that efforts to correct the problem are appropriately coordinated with DHS/ICE/SEVP.

c. **(U)** Ensure the applicant's information is correct in the electronic SEVIS record (see 9 FAM 402.5-6(J)), and that the SEVIS fee has been paid.  You can also verify SEVIS fee payment at FMJfee.com.

d. **(U)** If you are uncertain as to whether the applicant's qualifications or planned activities fit within the Exchange Visitor Program or have concerns that the sponsor is not in compliance with sponsor regulations, you should refuse the visa application under INA 221(g) and notify the F/M/J portfolio holder(s) in CA/VO/F/ET who will coordinate with ECA to provide guidance.

e. **(U)** When an applicant applies for a J-2 visa to follow-to-join a principal J-1 applicant already in the United States, or when a J-2 applicant applies to renew their visa when the principal J-1 applicant is already in the United States, you must be satisfied that the principal applicant is maintaining J-1 status before issuing the visa.  The J-1 principal applicant's SEVIS record is the official record of whether the J-1 principal applicant is maintaining their status.  In some cases, the J-1 applicant's visa may have expired but if the J-1 applicant was approved for an extension of their program, and the dates in SEVIS reflect this program extension, the J-1 applicant has maintained status for the sake of the J-2 visa applicant's eligibility for a visa.

f. *Unavailable*

g. *Unavailable*

   (1) *Unavailable*

   *(2) Unavailable*

   *(3) Unavailable*

h. *Unavailable*

   *(1) Unavailable*

   *(2) Unavailable*

i. *Unavailable*

# 9 FAM 402.5-6(I)(2)  (U) Cases Involving Unrealizable Reporting Dates

*(CT:VISA-1837;   09-26-2023)*

**(U)** If the program start date specified in the applicant's Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status, is already past or there is reason to believe the applicant will be unable to meet that date, you may assume the applicant may encounter difficulty at POE.  You should determine

whether the sponsor has amended the electronic SEVIS record to change the program start date, and make a case note to that effect to alert CBP. If this has not been done, you should direct the visa applicant to alert the designated U.S. program sponsor. You should not intervene directly with program sponsors on behalf of visa applicants.

## 9 FAM 402.5-6(I)(3)  (U) Entry of Exchange Visitor Program Participants Before Program Start Date

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** You may issue an exchange visitor visa to an applicant at any time before the program start date if the SEVIS record is in INITIAL or ACTIVE status. However, the exchange visitor may not enter the United States earlier than 30 days before the program start date. Applicants continuing an Exchange Visitor Program are not subject to this travel restriction.

b. **(U)** An exchange visitor who desires an earlier entry must obtain a B-2 visitor visa. If the applicant enters on a B visa, however, they must first obtain a change of status from USCIS, from B status to J status to participate in the exchange program. The applicant is not allowed to begin the exchange visitor program until USCIS has approved the change of status. The process to change status may be lengthy and may impact the ability of the applicant to participate in the program.

## 9 FAM 402.5-6(I)(4)  (U) Consecutive Exchange Programs

*(CT:VISA-2048;   08-15-2024)*

**(U)** An exchange visitor may participate in consecutive exchange programs unless otherwise limited or prohibited by the Exchange Visitor Regulations. Do not issue an individual two separate J-1 visas for two different programs that will run back-to-back (e.g., Au Pair then Trainee; or Summer Work Travel then College University Student). Following completion of the first program, the exchange visitor is usually expected to return home and may apply for another J-1 visa for the subsequent program. The exception to this is an exchange visitor who receives approval for a change of exchange visitor category (22 CFR 62.41) while in the United States, allowing him or her to begin the second program without returning to the home country. Exchange visitors with questions about a change of category should be directed to their program sponsors.

## 9 FAM 402.5-6(I)(5)  (U) 30-Day Post-Completion Period

*(CT:VISA-1628;   09-13-2022)*

a. **(U)** Exchange visitors are no longer issued a paper Form I-94, Arrival and Departure Record, marked "D/S" (Duration of Status) upon entry into the United States. CBP now gathers travelers' arrival/departure information automatically from their electronic travel records. However, CBP will still

issue a paper Form I-94 at land border ports of entry.  Visa holders may download a copy of their electronic I-94 at www.cbp.gov/I94.

b. **(U)** The initial period of admission of the exchange visitor will not exceed the period specified on the Form DS-2019 (the start and end dates), plus a period of 30 days "for the purpose of travel" (see 8 CFR 214.2(j)).  DHS established this 30-day period at the successful completion of the program to use for domestic travel and/or to prepare for and depart from the United States, and for no other purpose.  A program extension and/or transfer cannot be done if an exchange visitor's record in SEVIS is not in active status during this period.

c.  **(U)** Any validation study of return rates for J travelers must take this authorized grace period into account.

## 9 FAM 402.5-6(I)(6)  (U) Annotation and Visa Validity

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** A J-1 or J-2 visa must be annotated to show the program number, program dates, and sponsor name of the applicant's exchange program, as well as the SEVIS number of the individual.  The J visa must also state whether the applicant is subject to INA 212(e).  Keep in mind that you are making a preliminary determination of the applicability of INA 212(e).  An exchange visitor cannot use a J visa for a program other than that specified on the annotation, unless the exchange visitor transfers to another sponsor while on program in the United States.  In this case, the visa remains valid under the same SEVIS ID and the exchange visitor may exit and re-enter the United States on an unexpired J-visa with the current Form DS-2019.  The new Form DS-2019 will include a new program number and a travel validation signature, which may be electronic.

b. **(U)** A new visa is required following the transfer of program when:

(1) **(U)** the exchange visitor travels internationally; and

(2) **(U)** the J-visa has already expired or will expire before the date of U.S. re-entry.

**(U)** Exchange visitors approved for a change of category must obtain a new J-1 visa if/when they exit and want to re-enter the U.S. to continue their exchange program in the new program category.

c. **Unavailable**

d. **Unavailable**

e. **(U)** J-1 visas must be issued for the program dates listed on the Form DS-2019, except as described in para d below or in 9 FAM 402.5-6(E)(10) above or where visa reciprocity only allows for a shorter validity period.  J-2 derivatives are subject to the same visa validity as the J-1 principal applicant unless visa reciprocity only allows for a shorter validity period.

f. **Unavailable**

g. **(U)** For those exceptions noted in <u>9 FAM 402.5-6(E)(10)</u>, you are authorized to issue with a visa validity extending for three years.  The visa should be set to expire two years after the listed program end date found in Box 3 on the Form DS-2019.

## 9 FAM 402.5-6(I)(7)  (U) Renewing J Visas for Returning Exchange Visitors

*(CT:VISA-2048;   08-15-2024)*

**(U)** Where applicable, returning J applicants may be eligible for an interview waiver (see <u>9 FAM 403.5-4(A)(1)).</u>  You usually should renew J visas to returning exchange visitors who have remained in valid program status and have not had any significant changes in either their program or their personal circumstances.  When an exchange visitor engaged in a program takes a short trip abroad and requires a visa to return to the United States, you are encouraged to issue the visa, if the exchange visitor is otherwise qualified, to allow the individual to complete their program if the status of the electronic record in SEVIS is ACTIVE.

## 9 FAM 402.5-6(J)  (U) The Student and Exchange Visitor Information System (SEVIS)

## 9 FAM 402.5-6(J)(1)  (U) Student and Exchange Visitor Information System (SEVIS) - In General

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** For an overview of the Student and Exchange Visitor Program and SEVIS see <u>9 FAM 402.5-4</u> above.

b. **(U)** SEVIS is an internet-based database that tracks students and exchange visitors in F, M, and J visa status while in the United States.  Using SEVIS, designated Exchange Visitor Program sponsors enter information into the individual SEVIS record for a prospective exchange visitor, and that information can then be printed on the Form DS-2019.

c. **(U)** ECA) authorizes designated U.S. sponsor officials - referred to as responsible officers (ROs) and alternate responsible officers (AROs) - access to SEVIS so that they may create and update official records on exchange visitors and their dependents.  SEVIS enables exchange program sponsors to transmit electronic information and event notifications, via the Internet, to the Department and to DHS throughout an exchange visitor's stay in the United States.  The information in SEVIS is updated, as needed, and supersedes information on the printed Form DS-2019.  The SEVIS record is the definitive record of exchange visitor eligibility and you must check it for each applicant.

d. **(U)** Exchange Visitor Program sponsors designated by ECA must use SEVIS.  Only a Form DS-2019 that has been issued through SEVIS, and contains a

unique SEVIS identification number, may be accepted in support of a J visa application.  The Form DS-2019 must be signed in any color ink by the RO (or ARO).  Digital signatures are also acceptable.  However, the definitive record is the electronic SEVIS record in the CCD (or directly in SEVIS, usually accessible by your FPU).  CBP can also access the electronic record at POE.

## 9 FAM 402.5-6(J)(2)  (U) Responsible and/or Alternate Responsible Officers

*(CT:VISA-1090;   06-24-2020)*

a. **(U)** Exchange Visitor Program sponsors designate individuals to perform the duties attendant to designation.  The responsible officer (RO) is the primary person appointed as being responsible and thoroughly familiar with the Exchange Visitor Program regulations, policies, and SEVIS requirements.  An alternate responsible officer (ARO) is an individual appointed to assist the RO in administering the program.

b. **(U)** The RO (or ARO) is required to ensure that the exchange visitor obtains sufficient advice and assistance to facilitate the successful completion of their exchange program.  ROs and AROs are also responsible for the security of SEVIS.  Only ROs and AROs are authorized access to SEVIS to issue Form DS-2019.

# 9 FAM 402.5-6(K)  (U) J Visa Fees

## 9 FAM 402.5-6(K)(1)  (U) SEVIS I-901, Fee Remittance for Certain J Nonimmigrants, Fee

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** The SEVIS I-901 fee is a one-time fee for persons applying for J-1 visas.  The fee covers the costs of administering SEVIS and related enforcement efforts.  Only principal J-1s must pay the SEVIS I-901 fee.  Even though J-2 derivative applicants have a unique SEVIS ID number, they are not subject to this fee.

b. **(U)** Applicants must pay the SEVIS fee before their visa interviews.  Applicants may schedule interview appointments before paying the fee.  While consular sections must verify that the SEVIS fee has been paid, they are not responsible for collecting it.  Applicants should be referred to FMJFee.com to pay the SEVIS I-901 fee.

c.  **(U)** You can verify SEVIS I-901 fee payment through the CCD SEVIS report.  You can also verify SEVIS I-901 fee payment at FMJFee.com if the fee payment information has not yet replicated to the CCD.

d. **(U)** Most exchange visitors will pay the full fee; however, the fee is reduced for some, including those in Summer Work Travel, Camp Counselor, and Au Pair categories.

e. **(U)** Exchange visitors and their spouses and/or dependents sponsored by a government program (program serial numbers G-1, G-2, G-3, and G-7) are not required to pay the SEVIS fee.  Publicize and explain on post's website how an exchange visitor participating in one of these government-sponsored programs can reach the consular section to schedule a visa interview appointment without paying either the nonrefundable MRV fee or the SEVIS fee (see 9 FAM 402.5-6(K)(2) below).

## 9 FAM 402.5-6(K)(2)  (U) Fee Waivers for Certain Exchange Visitors

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** J-1 visa applicants are exempted from the machine readable visa (MRV) fee if they are participating in a USAID, or other federally funded educational and cultural exchange program.  Exchange programs eligible for the MRV exemption have a program serial number that begins with the prefix G-1, G-2, G-3, or G-7 on the Form DS-2019.  J-2 derivatives of these J-1 applicants are also exempted from the MRV fee.  All other applicants with U.S. Government funding must pay the MRV processing fee.  You must ensure that post's website provides clear guidance to these visa applicants on how to obtain a visa interview appointment without paying the MRV fee, because the fee, once paid, is usually not refundable (see 7 FAH-1 H-728*)*.

b. **(U)** Applicants participating in a U.S. government-sponsored exchange visitor program who are exempt from the MRV fee as described above in paragraph a, are also exempt from any applicable visa reciprocity fee.

# 9 FAM 402.5-6(L)  (U) INA 212(e)

*(CT:VISA-3009;   12-09-2024)*

**(U)** INA 212(e) and implementing regulations prohibits certain exchange visitors from applying for an IV or for adjustment of status to that of a*n* LPR or from changing status to or receiving a visa as a temporary worker (H),  fiancé (K), or intracompany transferee (L) until the applicant has established that they have resided and been physically present in the country of nationality or last legal permanent residence for an aggregate of at least two years following departure from the United States.

## 9 FAM 402.5-6(L)(1)  (U) Subject to INA 212(e)

*(CT:VISA-3009;   12-09-2024)*

a. **(U)** An individual admitted as an exchange visitor under INA 101(a)(15)(J) or who acquires such status after admission is subject to the two-year home-county physical presence requirement under INA 212(e) if:

(1)  **(U)** The program in which the individual is participating was financed in whole or in part, directly or indirectly, by:

(a) **(U)** A U.S. Government Agency, or

(b) **(U)** The government of the country of the noncitizen's nationality or last legal permanent residence;

(2) **(U)** The noncitizen is a national or legal permanent resident of a country that has been designated as clearly requiring the*ir* field of specialized knowledge or skill as shown in the 2024 Exchange Visitor Skills List; or

(3) **(U)** The individual entered the United States, or acquired such status, to receive graduate medical education or training.

b. **(U)** Individuals participating in the Au Pair and Summer Work Travel exchange visitor program categories are not subject to INA 212(e).

## 9 FAM 402.5-6(L)(2)  (U) Waiver of INA 212(e) Requirement

*(CT:VISA-3009;   12-09-2024)*

a. **(U)** A noncitizen may seek a waiver of the two-year home-country physical presence requirement if:

(1) **(U)** A U.S. government agency makes such a request for a noncitizen who is actively and substantially involved in a program sponsored by or of interest to that U.S. government agency; (see 9 FAM 302.13-2(D)(4))*;*

(2) **(U)** In the case of an individual who entered the United States, or acquired such status, to receive graduate medical education or training: A U.S. state's Department of Public Health makes such a request (see 9 FAM 302.13-2(D)(5))*.*

(3) **(U)** The noncitizen establishes exceptional hardship to a U.S. citizen or LPR spouse or child, or probable persecution on account of race, religion, or political opinion (see also 9 FAM 302.13-2(D)(3))*;* and

(4) **(U)** The noncitizen has received a statement of "no objection" from their country of nationality or last legal permanent residence (see 9 FAM 302.13-2(D)(1)).

b. **(U)** You should refer former exchange visitors who wish to learn more about applying for a waiver of INA 212(e) to Waiver of the Exchange Visitor Two-Year Home-Country Physical Presence Requirement.

## 9 FAM 402.5-6(L)(3)  (U) Department's Policy on Extension of Program Participation While a Waiver of the Two 2-Year Home-Country Physical Presence Requirement Is Pending

*(CT:VISA-3009;   12-09-2024)*

**(U)** Once WRD has recommended a waiver and forwarded to DHS, an exchange visitor is no longer eligible for an extension of program beyond the end date shown on the current Form DS-2019 even though they may not have completed the maximum duration of participation permitted for the category.  If a waiver request was denied, however, and the exchange visitor is still within the

maximum duration of participation established by the regulations, an extension may be issued by the sponsor up to the maximum duration of time permitted for that category.

# 9 FAM 402.5-6(M)  (U) Exchange Visitor Skills Lists

## 9 FAM 402.5-6(M)(1)  (U) Exchange Visitor Skill List, 2024

*(CT:VISA-3009;   12-09-2024)*

**(U)** See: 2024 Exchange Visitor Skills List.

## 9 FAM 402.5-6(M)(2)  (U) Exchange Visitor Skill List, 2009

*(CT:VISA-3009;   12-09-2024)*

**(U)** See:  2009 Exchange Visitor Skills List.

## 9 FAM 402.5-6(M)(3)  (U) Exchange Visitor Skill List, 1997

*(CT:VISA-3009;   12-09-2024)*

**(U)** See:  1997 Exchange Visitor Skills List.

## 9 FAM 402.5-6(M)(4)  (U) Exchange Visitor Skill List, 1984

*(CT:VISA-3009;   12-09-2024)*

**(U)** See:  1984 Exchange Visitor Skills List.

## 9 FAM 402.5-6(M)(5)  (U) Exchange Visitor Skills List, 1972

*(CT:VISA-3009;   12-09-2024)*

**(U)** See:  1972 Exchange Visitor Skills List.

**UNCLASSIFIED (U)**

EXHIBIT 17

6/30/25, 3:18 PM    9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1...

Case 1:25-cv-10685-WGY    Document 186-2    Filed 07/07/25    Page 466 of 518

**UNCLASSIFIED (U)**

# 9 FAM 302.6

# (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B), INA 212(A)(3)(F) AND 8 U.S.C. 1735

*(CT:VISA-2150;   04-29-2025)*
*(Office of Origin:  CA/VO)*

# 9 FAM 302.6-1  (U) STATUTORY AND REGULATORY AUTHORITY

## 9 FAM 302.6-1(A)  (U) Immigration and Nationality Act

*(CT:VISA-1;   11-18-2015)*

**(U)** INA 101(b)(1) (8 U.S.C. 1101(b)(1)); INA 212(a)(3)(B)(8 U.S.C. 1182(a)(3)(B)); INA 212(a)(3)(F) (8 U.S.C. 1182(a)(3)(f)); INA 212(d)(3)(A) (8 U.S.C. 1182(d)(3)(A)); INA 212(d)(3)(B) (8 U.S.C. 1182(d)(3)(B)); INA 219 (8 U.S.C. 1189).

## 9 FAM 302.6-1(B)  (U) United States Code

*(CT:VISA-55;   02-23-2016)*

**(U)** 18 U.S.C. 2339D(c)(1); 22 U.S.C. 2723.

## 9 FAM 302.6-1(C)  (U) Public Laws

*(CT:VISA-1;   11-18-2015)*

**(U)** Foreign Relations Authorization Act, Fiscal Years 1992 and 1993, Public Law 102-138, section 128; Homeland Security Act of 2002, Public Law 107-296; Consolidated Appropriations Act, 2008, Public Law 110-161, at section 691 of Title VI of Division J (the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2008); An Act to Remove the African National Congress from Treatment as a Terrorist Organization for Certain Acts or Events, Provide Relief for Certain Members of the African National Congress Regarding Admissibility, and for Other Purposes, Public Law 110-257.

# 9 FAM 302.6-2  (U) TERRORIST ACTIVITIES - INA 212(A)(3)(B)

## 9 FAM 302.6-2(A)  (U) Grounds

*(CT:VISA-2014;   06-20-2024)*

**(U)** INA 212(a)(3)(B)(i) renders ineligible any applicant who**:**

   (1)  **(U)** has engaged in a terrorist activity;

   (2)  **(U)** you know, or have reason to believe, is engaged in or is likely to engage after entry in any terrorist activity;

   (3)  **(U)** has, under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity;

   (4)  **(U)** is a representative of:

     (a)  **(U)** a terrorist organization; or

     (b)  **(U)** a political, social, or other group that endorses or espouses terrorist activity;

   (5)  **(U)** is a member of a designated terrorist organization;

   (6)  **(U)** is a member of an undesignated terrorist organization, unless the applicant can demonstrate by clear and convincing evidence that the applicant did not know, and should not reasonably have known, that the organization was a terrorist organization;

   (7)  **(U)** endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization;

   (8)  **(U)** has received military-type training from or on behalf of any organization that, when the training was received, was a terrorist organization; or

   (9)  **(U)** is the spouse or child of an applicant who is ineligible, if the activity causing the applicant to be found ineligible occurred within the last 5 years.

## 9 FAM 302.6-2(B)  (U) Application

### 9 FAM 302.6-2(B)(1)  (U) Summary

*(CT:VISA-2150;   04-29-2025)*

a.  **(U)** INA 212(a)(3)(B) describes visa ineligibilities related to terrorism.  The ineligibilities hinge on terrorism-related definitions that were significantly expanded by post-9/11 legislation, most significantly, the USA PATRIOT Act (2001) and the REAL ID Act (2005).  Due to these expansions, the scope of activities covered by the phrase "engage in terrorist activity" is broad.  As defined in INA 212(a)(3)(B)(vi), the term "terrorist organization"

6/30/25, 3:18 PM  9 FAM 302.6-2 (U) CRIMES, BAD MORAL CHARACTER AND RELATED INA 212(A)(3)(A), 212(A)(3)(B), INA 212(A)(3)(D), AND 8 U.S.C. 1...

Case 1:25-cv-10685-WGY   Document 186-2   Filed 07/07/25   Page 468 of 518

encompasses both organizations that have been designated previously by the Department as terrorist organizations and organizations that have never been so designated by the Department or any other U.S. Government agency, but that have engaged in any of the activities listed in INA 212(a)(3)(B)(iv)(I)-(IV).  Because terms in INA 212(a)(3)(B) are defined broadly, elicit as much pertinent information from visa applicants as possible, including the names of all groups potentially covered by these provisions with which the applicant may be linked, for example, by current membership or past financial contributions or other support.  Inquire into the nature and activities of those organizations, bearing in mind the definition of "terrorist organization" in INA 212(a)(3)(B)(vi), described in 9 FAM 302.6-2(B)(3) paragraph i below and other FAM provisions referenced therein.

b. **Unavailable**

c. ***Unavailable***

# 9 FAM 302.6-2(B)(2)  (U) Background

*(CT:VISA-2014;   06-20-2024)*

a. **(U)** The Immigration Act of 1990 (Public Law 101-649) amended INA 212(a) by replacing the previous 43 classes of excludable applicants with nine broad classes, each with subclasses.  New INA 212(a)(3)(B), "Terrorist Activities," incorporated aspects of former 212(a)(27) and 212(a)(29).

b. **(U)** The Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104-132) expanded the scope of INA 212(a)(3)(B) to make ineligible representatives and members of organizations designated by the Secretary under INA 219 as Foreign Terrorist Organizations (FTOs).

c. **(U)** The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (Public Law 104-208) amended INA 212(a)(3)(B)(i) again to make ineligible any applicant who, "under circumstances indicating an intention to cause death or serious bodily harm," incited terrorist activity.  The new provision applied retroactively to all such incitement activities, regardless of when they occurred.

d. **(U)** The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act") (Public Law 107-56), enacted after the terrorist attacks on September 11, 2001, expanded the scope of INA 212(a)(3) in several important respects:

(1) **(U)** It gave the Secretary of State new authority to designate organizations as terrorist organizations for purposes of INA 212(a)(3)(B) if certain criteria are met.  Organizations so designated are listed on the "Terrorist Exclusion List" or "TEL";

(2) **(U)** It defined "terrorist organization" for the first time, creating three categories.  The first category is FTOs designated under INA 219 (see INA 212(a)(3)(B)(vi)(I)) (Tier I); the second is entities designated under

the Terrorism Exclusion List (TEL) authority included in the USA PATRIOT Act (Tier II) (see INA 212(a)(3)(B)(vi)(II)).  The third category, referred to as "undesignated terrorist organizations," includes entities that engage in specified "terrorist activities" listed in the INA, but that have not been designated under FTO or TEL authorities (Tier III) (see INA 212(a)(3)(B) (vi)(III)); and

(3) **(U)** It created INA 212(a)(3)(F), "Association with Terrorist Organizations," which made applicants who have been associated with a terrorist organization, and who are engaged or likely to engage in certain activities that endanger the United States, ineligible under certain circumstances.

e. **(U)** The Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief of 2005 ("REAL ID Act") (Public Law 109-13) at sections 103 and 104 of Division B further expanded the scope of INA 212(a)(3)(B) by:

(1) **(U)** Broadening "terrorist organization" to capture undesignated groups with subgroups that "engage in terrorist activity";

(2) **(U)** Making it harder for an applicant suspected of "engaging in terrorist activities" to escape ineligibility based on an alleged lack of knowledge concerning an undesignated terrorist organization or how any contribution of material support might be used by a terrorist organization (see (5), (6), and (8) below);

(3) **(U)** Making ineligible "representatives" of all three types of terrorist organizations, regardless of applicant's knowledge or intent.  Previously, only representatives of groups designated under INA 219 (Tier I) were specified;

(4) **(U)** Making ineligible all representatives of "a political, social, or other group that endorses or espouses terrorist activity."  Previously the Secretary of State had to find that the group's public endorsement of acts of terrorist activity undermines U.S. efforts to reduce or eliminate terrorist activities;

(5) **(U)** Eliminating the knowledge defense to ineligibility for members of entities designated for the TEL (Tier II) and raising the standard to "clear and convincing evidence" for an applicant to avoid ineligibility for being a member of an undesignated terrorist organization on the grounds that they did not know, and should not reasonably have known, that the organization was a terrorist organization;

(6) **(U)** Raising the standard to "clear and convincing evidence" for an applicant to avoid ineligibility for soliciting funds or members for an undesignated terrorist organization on the grounds that they did not know, and should not reasonably have known, that the organization was a terrorist organization;

(7) **(U)** Expanding the "material support" bar to admissibility for knowingly providing support to any terrorist organization or its members, except,

with respect to undesignated terrorist organizations, where an applicant presents "clear and convincing evidence" that the applicant lacked knowledge of any terrorist activity.  The amendment eliminated the requirement that the applicant intended to support terrorist activity;

(8)  **(U)** Making ineligible any applicant who commits an act the applicant knows or reasonably should know provides material support to an undesignated terrorist organization or a member of an undesignated terrorist organization, unless the applicant can demonstrate "by clear and convincing evidence" that they did not know, and should not reasonably have known, that the organization was a terrorist organization.  Before amendment, the provision did not include material support afforded to a member of an undesignated terrorist organization.  The REAL ID Act added the "clear and convincing evidence" standard for an applicant attempting to prove lack of knowledge of an undesignated group's terrorist activity;

(9)  **(U)** Making ineligible any applicant who "endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization."  Before amendment, the provision covered only persons who used their position of prominence to endorse or espouse terrorist activity or to persuade others to support terrorist activity or a terrorist organization in a way the Secretary of State determined undermines U.S. efforts to reduce or eliminate terrorist activities;

(10)  **(U)** Making ineligible any applicant who has "received military-type training" from or on behalf of a terrorist organization; and

(11)  **(U)** Applying the terrorism provisions of the REAL ID Act amendments to actions taken by an applicant before, on, or after the date of enactment, May 11, 2005.

f.  **(U)** The Consolidated Appropriations Act, 2008, Public Law 110-161, 121 Stat. 1844, at section 691 of Title VI of Division J (the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2008) amended the discretionary authority of the Secretary of Homeland Security and the Secretary of State, under INA 212(d)(3)(B)(i), to exempt an applicant from most of the terrorism-related bars to admissibility under INA 212(a)(3)(B) and to exempt a group from treatment as an undesignated terrorist organization under INA 212(a)(3)(B)(vi)(III).  The amendment also provided that certain groups should not be considered terrorist organizations based on any act or event occurring before the amendment's enactment on December 26, 2007, and that the Taliban must be considered to be a designated foreign terrorist organization, under INA 212(a)(3)(B)(vi)(I), for immigration purposes.  See 9 FAM 302.6-2(B)(3) paragraph i below.  The amendments were effective upon enactment and apply to acts before or after enactment.

## 9 FAM 302.6-2(B)(3)  (U) Definitions

*(CT:VISA-2014;   06-20-2024)*

a. **(U)** This section explains terms used in INA 212(a)(3)(B) in alphabetical order.  Where listed terms are specifically defined in the statute, the statutory reference follows immediately after the term.

b. **(U) CLEAR AND CONVINCING EVIDENCE:**

   (1) **(U)** The phrase "clear and convincing evidence" appears several times in INA 212(a)(3)(B) with reference to undesignated terrorist organizations. The INA places the burden of proof on the applicant to establish that they did not know, or should not have reasonably known, that the undesignated terrorist organization was, in fact, a terrorist organization. (Applicants are deemed to know that designated terrorist organizations are terrorist organizations, regardless of their actual knowledge or belief).

   (2) **(U)** Consider the following in determining whether a visa applicant can demonstrate by "clear and convincing evidence" that they did not know, and should not reasonably have known, that an undesignated organization was a terrorist organization:

      (a) **(U)** Facts specific to the individual, such as residence, profession, education, and people with whom and groups with which the applicant has associated;

      (b) **(U)** The public availability of information about the organization and more specifically, about the activities that make it a terrorist organization under the INA's broad definition; and

      (c) **(U)** The extent to which the organization is actively and overtly engaged in the activities that make it a terrorist organization under the INA.

   (3) **Unavailable**

c. **(U) ENDORSING OR ESPOUSING TERRORISM:**

   (1) **(U)** An applicant is ineligible under INA 212(a)(3)(B)(i)(VII) if the applicant endorses or espouses terrorist activity or persuades others to endorse or support terrorist activity or a terrorist organization.

   (2) **Unavailable**

d. **Unavailable**

   (1) **(U)** A safe house;

   (2) **(U)** Transportation;

   (3) **(U)** Communications;

   (4) **(U)** Funds;

   (5) **(U)** Transfer of funds or other material financial benefit;

6/30/25, 3:18 PM    9 FAM 302.6 INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS - INA 212(A)(3)(B) AND 8 U.S.C. 1...

Case 1:25-cv-10685-WGY    Document 186-2    Filed 07/07/25    Page 472 of 518

(6) **(U)** False documentation or identification;

(7) **(U)** Weapons including chemical, biological, or radiological weapons;

(8) **(U)** Explosives; or

(9) **(U)** Training.

e. **(U) MEMBER OF A TERRORIST ORGANIZATION:**

(1) **(U)** Applicants who are members of designated FTOs or entities on the Terrorism Exclusion List are ineligible. The INA does not require the applicant to know that the organization has been designated. Members of undesignated terrorist organizations are ineligible, but there is a narrow exception based on lack of knowledge (see 9 FAM 302.6-2(B)(3) paragraph i below).

(2) **(U)** Evidence of membership in a terrorist organization might include the individual's taking of an oath or performance of some act that is a prerequisite of membership. A formal induction is not necessary for a finding of membership.

(3) **(U)** Membership is determined by considering all relevant facts, including, but not limited to, the following:

(a) **(U)** Acknowledgment of membership;

(b) **(U)** Frequent association with other members;

(c) **(U)** Participation in the organization's activities, even if lawful;

(d) **(U)** Actively working to further the organization's aims and methods in a way suggesting close affiliation constituting membership;

(e) **(U)** Occupying a position of trust in the organization, past or present;

(f) **(U)** Receiving financial support from the organization, e.g., scholarships, pensions, salary;

(g) **(U)** Contributing money to the organization;

(h) **(U)** Determination of membership by a competent court;

(i) **(U)** Voluntarily displaying symbols of the organization; or

(j) **(U)** Receiving honors and awards given by the organization.

(4) **(U)** No single factor necessarily determines that an applicant was a member of an organization.

(5) **Unavailable**

(6) **Unavailable**

(7) **(U)** Former members will still be ineligible if they have previously provided material support (such as membership fees), raised money, or solicited members for the organization.

f. **(U) INCITEMENT OF TERRORISM:**

(1) **(U)** "Incitement with intent to cause death or serious bodily harm" renders an applicant ineligible under INA 212(a)(3)(B)(i)(III) if they have incited terrorist activity under circumstances indicating an intention to cause death or serious bodily harm.

(2) **(U)** "Incited" in the context of INA 212(a)(3)(B) is speech that induces or otherwise moves another person to undertake terrorist activity. Normally speech will not rise to the level of "inciting" unless there is a clear link between the speech and an actual effort to undertake the terrorist activity. It connotes speech that is not merely an expression of views but that directs or induces action, typically in a volatile situation.

(3) **(U)** The applicant may have incited terrorist activity even if a terrorist attack does not actually occur (e.g., because an attempt to commit such activity was thwarted).

(4) **(U)** An applicant who has "incited" terrorist activity must also have acted in circumstances indicating an intention to cause death or serious bodily harm to be ineligible under INA 212(a)(3)(B). In other words, the applicant's speech must not only have induced others to undertake terrorist activity but was also made with the specific intent that such activity would result in death or serious bodily injury.

(5) **(U)** Incitement and the requisite intent to cause bodily harm could be inferred in the following situations:

    (a) **(U)** Widespread opposition to Country A's policies and actions lead to a series of protests, some violent, outside Country A's embassy in Country B. The applicant goes to the embassy, stands on a box, and shouts to the crowd to join them in standing up to Country A and humiliating it. Shortly afterwards, when they see an embassy vehicle approaching, they yell: "Don't let them in! Make them pay for what they have done!" The crowd blocks the car and removes occupants (including a diplomat working at Country A's embassy), from the car, beating them severely and taking them hostage.

    (b) **(U) Analysis:** Diplomatic hostage-taking and violent attacks on diplomats are terrorist activities. Given the applicant's urging the crowd to stop the embassy vehicle and "make them pay," you would have reasonable ground to believe that the applicant's speech incited terrorist activity. The applicant's "make them pay" statement, when viewed against the backdrop of previous violent protests and their general comments about standing up to Country A and humiliating it, would provide you with reasonable ground to believe that the applicant intended to cause death or serious bodily harm.

    (c) **(U)** The applicant is an ardent nationalist whose opinions voiced to an audience regularly blame "foreigners" for their country's problems and who argues that the only solution to these problems is that "foreigners" should be driven out of the country. Press reports say that some of those in the targeted audience have been purchasing weapons and seeking to obtain and manufacture explosives. Police

notify the applicant or those associated with the applicant that they are investigating several of those in the targeted audience for weapons-related offenses.  At the end of a week of strong anti-foreign sentiment, the applicant gives a special speech entitled "A Call to Action."  With the knowledge that those under investigation are in the audience, the applicant begins their speech with: "The time has come for action!"  They then reiterate throughout their speech that "The only solution to the country's problems is to purge our great land of these foreigners once and for all through whatever means necessary."  Shortly thereafter, some of those in the target audience detonate a truck bomb outside a restaurant frequented by foreign nationals, killing several foreign nationals and injuring many restaurant employees.

(d) **(U) Analysis:** The use of any explosive with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property is a terrorist activity.  In the example, the applicant helps foster anti-foreign sentiments and then, during an especially tense period, urges students to act to drive "foreigners" from the country "through whatever means necessary."  Under these circumstances, you would have reason to believe that the applicant's speech incited terrorist activity.  The fact that the applicant knew that several students likely had access to weapons and/or explosives and that those students attended their special lecture would provide you with reason to believe that the applicant intended to cause death or serious bodily harm.

(e) **(U)** The USA PATRIOT Act amended INA 212(a)(3)(B)'s definition of "engaging in terrorist activity" also to include incitement (see INA 212(a)(3)(B)(iv)(I)).  As a result, a person who is ineligible under INA 212(a)(3)(B)(i)(III) for inciting terrorist activity will also now be ineligible under INA 212(a)(3)(B)(i)(I) for engaging in a terrorist activity.

g. **(U) REPRESENTATIVE:** A "representative" is defined in INA 212(a)(3)(B)(v) as "an officer, official, or spokesman of an organization, and any person who directs, counsels, commands, or induces an organization or its members to engage in terrorist activity."

h. **(U) SUBGROUP:** A group (Group X), even if not organized, can be a "subgroup" of another organization (Group Y) if there are reasonable grounds to believe that either (1) Group X as a whole or (2) the members of Group X are affiliated with Group Y.   If a subgroup engages in terrorist activities, then both groups are terrorist organizations.  See 9 FAM 302.6-2(B)(3) paragraph i(1)(c) below.  A subgroup relationship may be found where there are reasonable grounds to believe that Group X is subordinate to, or affiliated with, Group Y and Group X is dependent on, or otherwise relies upon, Group Y in whole or in part to support or maintain its operations.  As an example, Group X would be a subgroup of Group Y if the latter establishes rules or

guidelines that Group X generally follows and Group X relies on Group Y as a source of funds for Group X operations.

### i. (U) TERRORIST ORGANIZATION:

(1) **(U)** "Terrorist organization," as defined in INA 212(a)(3)(B)(vi), includes both designated terrorist organizations (paragraphs (a) and (b), below) and undesignated terrorist organizations (paragraph (c), below):

(a) **(U)** An organization designated by the Secretary of State as a "foreign terrorist organization" (FTO) under INA 219. This designation has implications beyond the INA, including penalties under U.S. criminal law. Applicants who engage in certain activities in connection with these organizations can be rendered ineligible under the INA. Organizations currently designated as FTOs and information about the designation process can be found on the J/CT website.

(b) **(U)** An organization designated by the Secretary of State for inclusion in the Terrorist Exclusion List (TEL), pursuant to INA 212(a)(3)(B)(vi)(II). The TEL designation is for immigration purposes only. Information about the designation process can be found on the J/CT website.

(c) **(U)** An organization that has not been designated but is a group of two or more individuals, whether organized or not, which engages in, or has a subgroup (see 9 FAM 302.6-2(B)(3) paragraph h above) which engages in, terrorist activities described in the INA 212(a)(3)(B)(iv)(I) – (VI). With respect to undesignated terrorist organizations:

(i) **Unavailable**

(ii) **Unavailable**

(iii) **(U)** Where a finding of ineligibility would involve an undesignated terrorist organization, the applicant may overcome the finding by demonstrating, by clear and convincing evidence (see 9 FAM 302.6-2(B)(3) paragraph b above), that the applicant did not know, and should not reasonably have known, that the organization was a terrorist organization (except with respect to representatives of undesignated terrorist organizations, those who persuade others to support an undesignated terrorist organization, and those who receive military-type training on behalf of an undesignated terrorist organization, for whom there is no such defense); and,

(2) **(U)** Pursuant to section 691(b) of the Consolidated Appropriations Act, 2008, the following groups are not terrorist organizations under INA 212(a)(3)(B)(vi) for acts or events that occurred before December 26, 2007:

- **(U)** Karen National Union/Karen Liberation Army (KNU/KNLA)
- **(U)** Chin National Front/Chin National Army (CNF/CNA)
- **(U)** Chin National League for Democracy (CNLD)
- **(U)** Kayan New Land Party (KNLP)
- **(U)** Arakan Liberation Party (ALP)
- **(U)** Tibetan Mustangs
- **(U)** Cuban Alzados
- **(U)** Karenni National Progressive Party
- **(U)** "Appropriate groups affiliated with" the Hmong
- **(U)** "Appropriate groups affiliated with" the Montagnards

(3) **(U)** As a result of this legislation, an applicant who did any of the following before December 26, 2007, is no longer ineligible on account of the following terrorism-related grounds of ineligibility:

- **(U)** Solicited funds or other things of value on behalf of one of these named groups (INA 212(a)(3)(B)(iv)(IV)(cc))
- **(U)** Solicited an individual for membership in one of these named groups (INA 212(a)(3)(B)(iv)(V)(cc))
- **(U)** Committed an act that provided material support, including transfer of funds, false documentation, weapons, or training to one of these named terrorist groups (INA 212(a)(3)(B)(iv)(VI)(dd))
- **(U)** Is a representative of one of these named groups (INA 212(a)(3)(B)(i)(IV)(aa))
- **(U)** Is a member of one of these named terrorist groups (INA 212(a)(3)(B)(i)(VI))
- **(U)** Persuaded others to endorse or support one of these named terrorist groups (INA 212(a)(3)(B)(i)(VII))
- **(U)** Received military-type training from one these named terrorist groups (INA 212(a)(3)(B)(i)(VIII))
- **Unavailable**

(4) **(U)** Pursuant to 691(d) of Division J of the Consolidated Appropriations Act, 2008 as of December 26, 2007, the Taliban is a designated terrorist organization described in INA 212(a)(3)(B)(vi)(I) for purposes of immigration law.

(5) **(U)** Public Law No. 110-257, codified at 8 U.S.C. 1182 note, added the African National Congress to the list of groups in subparagraph b, above, that are not terrorist organizations.

(6)  **(U)** In determining whether an organization may be an undesignated terrorist organization; i.e., that it "engaged in terrorist activities" as described in INA 212(a)(3)(B)(iv)(I) – (VI).  Evaluate information obtained in the visa interview, take advantage of available local resources, as appropriate, and check relevant databases, including:

   (a)  **(U)** The United Nations 1267 Committee's list of individuals and entities belonging or related to the Taliban, Osama Bin Laden, and the Al-Qaida organization.

   (b)  **(U)** Terrorists and groups identified under E.O. 13224.

   (c)  **Unavailable**

## 9 FAM 302.6-2(B)(4)  (U) Ineligibility Under INA 212(a)(3)(B)

*(CT:VISA-2014;   06-20-2024)*

a. **(U) OVERVIEW:**

   (1)  **(U)** INA 212(a)(3)(B) generally identifies as grounds for ineligibility "engaging in terrorist activities" and having certain links to "terrorist organizations."  The standards apply even if the relevant acts or associations preceded enactment of the law and regardless of any link to an actual terrorist attack.  The section defines "terrorist activities" to include a broad range of violent acts (see INA 212(a)(3)(B)(iii)), while also making ineligible representatives and members of groups engaging in listed activities; those endorsing, espousing, or promoting terrorism; those who have received military-type training from terrorist organizations; and immediate family members of any covered persons – with certain exceptions.

   (2)  **(U)** It also explicitly makes PLO officers, officials, representatives, and spokesmen ineligible.  INA 212(a)(3)(B) next defines "engaging in terrorist activities," which covers a broad range of activities that support or promote the commission of terrorist activities or groups that engage in them (see INA 212(a)(3)(B)(iv)).  See 9 FAM 302.6-2(B)(4) paragraph b below for more detail.

b. **Unavailable**

   (1)  **Unavailable**

   (2)  **Unavailable**

   (3)  **Unavailable**

   (4)  **Unavailable**

   (5)  **Unavailable**

   (6)  **Unavailable**

c.  **(U) ENGAGED IN TERRORIST ACTIVITY:**

(1) **(U)** After defining the violent acts that constitute terrorist activity (see INA 212(a)(3)(B)(iii)), the INA identifies the acts that render applicant's ineligible because of their connections to those violent acts or to those who commit them.  See definition of "engage in terrorist activity" INA 212(a)(3)(B)(iv).

(2) **(U)** An applicant is ineligible on any of the grounds identified below if either the applicant has engaged in terrorist activity in the past or you or the Secretary of Homeland Security or the Attorney General knows or has reason to believe that the applicant currently is engaged in, or likely after entry to engage in, a terrorist activity.  See INA 212(a)(3)(B)(i)(I)-(II).

(3) **(U)** An applicant is ineligible for "engaging in terrorist activity" if the applicant acts, as an individual or as a member of a group, to:

  (a) **(U)** Commit or incite to commit a terrorist activity, under circumstances that indicate an intention to cause death or serious bodily injury;

  (b) **(U)** Prepare or plan a terrorist activity;

  (c) **(U)** Gather information on potential targets for terrorist activity;

  (d) **(U)** Solicit funds or other things of value for a terrorist activity or terrorist organization.  If the terrorist organization is undesignated when the solicitation for membership occurred, see 9 FAM 302.6-2(B)(3) paragraph i(3);

  (e) **(U)** Solicit any individual to engage in terrorist activity, or for membership in a terrorist organization.  If the terrorist organization is undesignated when the solicitation for membership occurred, see 9 FAM 302.6-2(B)(3) paragraph i(3) above;

  (f) **(U)** Commit an act that the actor knows, or reasonably should know, affords material support for the commission of a terrorist activity;

  (g) **(U)** Commit an act that the actor knows, or reasonably should know, affords material support to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity; or

  (h) **(U)** Commit an act that the actor knows, or reasonably should know, affords material support to an entity that was a terrorist organization (i.e., engaged in terrorist activity) when the material support was provided or to a member of a terrorist organization, without regard to how the contribution was to be used.  If the terrorist organization was undesignated when material support was provided, (see 9 FAM 302.6-2(B)(3) paragraph i(3) above).

(4) **Unavailable**

(5) **(U)** Current representatives of the following are ineligible:

(a) **(U)** A terrorist organization (designated or undesignated; there is no defense based on lack of knowledge concerning the organization's activities); or

(b) **(U)** A political, social, or other similar group that endorses or espouses terrorist activity, regardless of whether the group's endorsement or espousing undermines U.S. efforts.

(6) **(U)** Current members of a terrorist organization are ineligible.  See 9 FAM 302.6-2(B)(3) paragraph e above.  If the terrorist organization is undesignated, the applicant is not inadmissible if the applicant can demonstrate "by clear and convincing evidence" that they did not know, and should not reasonably have known, that the organization was a terrorist organization. See 9 FAM 302.6-2(B)(3) paragraph b above.

(7) **(U)** Endorsing or espousing terrorist activity or persuading others to endorse or espouse terrorist activity or support a terrorist organization, whether designated or undesignated renders an applicant is ineligible.  See 9 FAM 302.6-2(B)(3) paragraph c above.

(8) **(U)** Military-type training, received from or on behalf of any organization that, when the training was received, was a terrorist organization, makes an applicant ineligible.  "Military-type training," as defined in 18 U.S.C. 2339D(c)(1), includes training in means or methods that can cause death or serious bodily injury, destroy or damage property, or disrupt services to critical infrastructure, or training on the use, storage, production, or assembly of any explosive, firearm or other weapon, including any weapon of mass destruction.

d. **(U) PALESTINE LIBERATION ORGANIZATION (PLO) AND OTHER PALESTINIAN ENTITIES:**

(1) **(U)** Any applicant who is an officer, official, representative, or spokesperson of the PLO is engaged in terrorist activity and therefore ineligible.  See INA 212(a)(3)(B)(i).  This provision applies only to those individuals who are currently PLO officers, officials, representatives, or spokespersons.  Although not covered by the PLO-specific provisions, past officers, officials, representatives, or spokespersons likely would be ineligible under the other provisions of INA 212(a)(3)(B).  "PLO Officials" would be individuals with substantive or policy-making responsibility in the PLO.  Members of the PLO Executive Committee, PLO Representatives at Missions around the world, and PLO Representatives to the United Nations and other International Organizations clearly would be ineligible under this provision.

(2) **(U)** Applicants who no longer occupy official positions with the PLO and persons who may be viewed as current or former members or employees, but are not officers, officials, representatives, or spokespersons, are not ineligible under the PLO-specific provision.  Be alert to the possibility that applicants with present or past associations with the PLO may be ineligible under INA 212(a)(3)(B) for other reasons.

(3) **Unavailable**

(4) **(U) Composition of the Palestine Liberation Organization (PLO):**

    (a) **Unavailable**

    (b) **Unavailable**

    (c) **Unavailable**

        (i) **Unavailable**

        (ii) **Unavailable**

        (iii) **Unavailable**

        (iv) **Unavailable**

        (v) **Unavailable**

        (vi) **Unavailable**

        (vii) **Unavailable**

        (viii) **Unavailable**

        (ix) **Unavailable**

        (x) **Unavailable**

        (xi) **Unavailable**

        (xii) **Unavailable**

(5) **(U) Implications for Other Palestinian Entities:**

    (a) **Unavailable**

    (b) **Unavailable**

    (c) **Unavailable**

e. **(U) SPOUSE AND CHILDREN OF AN INELIGIBLE APPLICANT:**

(1) **(U)** Spouses and children of applicants found ineligible under INA 212(a)(3)(B) are also ineligible if the activity causing the applicant to be ineligible occurred within the last five years.  However, there are exceptions to this ineligibility.  See statutory exceptions for spouses and children at INA 212(a)(3)(B)(ii) and paragraph (6) below.

(2) **Unavailable**

(3) **(U)** This ground only applies to spouses who are currently married to applicants found ineligible under INA 212(a)(3)(B).  It does not include those whose marriage has ended due to divorce or the death of the ineligible applicant.

(4) **(U)** This ineligibility only applies to an applicant who is a child at the time of visa issuance.  INA 101(b)(1) defines "child" as an unmarried person under twenty-one years of age.  A child remains the child of an applicant found ineligible under INA 212(a)(3)(B) even after the death of the

ineligible applicant parent, assuming they continue to meet the definition of a child.

(5) **Unavailable**

(6) **(U)** This ineligibility does not apply to a spouse or child who did not know or should not reasonably have known of the applicant's activity that caused the applicant to be found ineligible.  It also does not apply if you or the Secretary of Homeland Security finds that there are reasonable grounds to believe the spouse or child has renounced the activity causing the applicant to be found ineligible.  The statutory exception to spouse and child ineligibility applicable in cases where the spouse or child didn't know of the terrorist activity or renounced the activity is found in INA 212(a)(3)(B)(ii).

(7) **Unavailable**

## 9 FAM 302.6-2(B)(5)  (U) Exemptions

*(CT:VISA-2014;   06-20-2024)*

a. **(U) EXEMPTION VERSUS WAIVER:** Both discretionary authorities allow an applicant to receive an immigration benefit, even though the applicant would not otherwise qualify for the benefit.  One significant difference is that when using a waiver authority, the Department first determines that the applicant is not qualified to receive a benefit (e.g., a visa) and then follows the applicable procedures for obtaining a waiver of the disqualification from DHS.  The waiver authority, found in INA 212(d)(3)(A), is available only for NIVs.  In contrast, when exemption authority is exercised, the Secretary, following interagency consultations, determines that the disqualification (which must arise under the INA's terrorism-related grounds for ineligibility) "shall not apply" in that case.  Exemptions are available for both NIV and IV cases, as well as other immigration-related benefits.  These authorities are discussed below.

b. **(U) EXEMPTION AUTHORITY FOR INDIVIDUALS UNDER** INA 212(d)(3) (B)(i)**:**

(1) **(U)** Under INA 212(d)(3)(B)(i), the Secretaries of Homeland Security and State, in consultation with each other and the Attorney General, each are authorized to conclude that almost any of the terrorism-related provisions under INA 212(a)(3)(B) should not apply to an applicant.  If the applicant is in the United States, however, and removal proceedings have commenced, only the Secretary of Homeland Security has the authority to apply the exemption.

(2) **(U)** INA 212(d)(3)(B)(i) exemptions cannot be granted to:

(a) **(U)** Applicants for whom there are reasonable grounds to believe are engaged in (present activities) or likely to engage after entry in (future activities) terrorist activity (INA 212(a)(3)(B)(i)(II));

(b) **(U)** Members of Tier I and Tier II terrorist organizations (designated by the Department) (INA 212(a)(3)(B)(i)(V));

(c) **(U)** Representatives of Tier I and Tier II terrorist organizations (designated by the Department) (INA 212(a)(3)(B)(i)(IV)(aa));

(d) **(U)** Applicants who voluntarily and knowingly engaged in terrorist activity on behalf of a Tier I or Tier II group (INA 212(a)(3)(B)(i)(I), as defined by INA 212(a)(3)(B)(iv));

(e) **(U)** Applicants who voluntarily and knowingly endorsed or espoused terrorist activity or persuaded others to do so on behalf of a Tier I or Tier II group (INA 212(a)(3)(B)(i)(VII));

(f) **(U)** Applicants who voluntarily and knowingly received military-type training from a Tier I or II terrorist organization (INA 212(a)(3)(B)(i) (VIII)).

(3) **(U)** Regarding past activities, the limitations on the exemption authority relate only to applicants with ties to designated (Tier I and Tier II) terrorist organizations. The exemption potentially may overcome ineligibility for any past terrorist activity associated with an undesignated (Tier III) terrorist organization.

(4) **(U)** By including "voluntarily or knowingly" in the statute, Congress made clear that exemptions may be used to overcome ineligibility for past terrorist activity associated with a designated (Tier I or II) terrorist organization if the applicant acted under duress or without the relevant knowledge.

(5) **(U)** Although exercises of the exemption authority require action by the Secretary following interagency consultations and, therefore, will not be commonplace, you may recommend that the Department pursue an exemption from provisions of INA 212(a)(3)(B) for an NIV applicant, if politically justified, or an IV applicant. Submit such requests to the Department with a detailed assessment explaining why an exemption is appropriate and any balancing considerations.

(6) **Unavailable**

c. **(U) EXEMPTION AUTHORITY FOR INDIVIDUALS ASSOCIATED WITH THE AFRICAN NATIONAL CONGRESS:**

(1) **(U) In General:**

(a) **(U)** Under Public Law No. 110-257, codified at 8 U.S.C. 1182 note, the Secretaries of State and Homeland Security, in consultation with each other and the Attorney General, each are authorized to determine, in their sole and unreviewable discretion, that (2)(A)(i) (I), (2)(B), and (3)(B) (other than clause (i)(II)) of INA 212(a), does not apply to an applicant with respect to activities undertaken in association with the African National Congress in opposition to apartheid rule in South Africa. This authority operates the same as the general individual exemption authority described in 9 FAM 302.6-

[2(B)(5)](#) paragraph b, above but for activities that may fall within the scope of this law, only this exemption should be considered. An exemption under the Public Law may cover both terrorism-related and some of the criminal-related grounds of ineligibility. The same law also establishes that the ANC must not be treated as a terrorist organization, for purposes of INA 212(a)(3)(B), based on past actions. See [9 FAM 302.6-2(B)(3)](#) paragraph i above.

(b) **(U)** Effective March 30, 2011, the Secretary of State, following consultations with the Secretary of Homeland Security and the Attorney General, exercised their discretionary authority under Public Law 110-257 to determine that INA 212(a)(2)(A)(i)(I), INA 212(a)(2)(B), and INA 212(a)(3)(B) (other than clause (i)(II)) "shall not apply" to individuals for activities undertaken in association with the African National Congress (ANC) in opposition to apartheid rule in South Africa (the "ANC categorical exemption"). The ANC categorical exemption sets out conditions for eligibility, described below, that must be applied by consular officers and other relevant U.S. Government officials in accordance with the procedures below.

(2) **Unavailable**

    (a) **Unavailable**

    (b) **Unavailable**

    (c) **Unavailable**

    (d) **Unavailable**

(3) **(U) Requirements for ANC Exemptions:**

    (a) **Unavailable**

        (i) **Unavailable**

        (ii) **Unavailable**

    (b) **Unavailable**

    (c) **Unavailable**

    (d) **Unavailable**

        (i) **Unavailable**

        (ii) **Unavailable**

(4) **Unavailable**

    (a) **Unavailable**

    (b) **Unavailable**

    (c) **Unavailable**

    (d) **Unavailable**

        (i) **Unavailable**

(ii)    **Unavailable**

(iii)    **Unavailable**

(iv)    **Unavailable**

(e) **Unavailable**

**Unavailable**

(f)    **Unavailable**

(i)    **Unavailable**

(ii)    **Unavailable**

(A)    **Unavailable**

(B)    **Unavailable**

(C)    **Unavailable**

(1) **Unavailable**

(2) **Unavailable**

·   **Unavailable**

·   **Unavailable**

·   **Unavailable**

·   **Unavailable**

(3) **Unavailable**

(iii)    **Unavailable**

(iv)    **Unavailable**

d. **(U) EXEMPTION AUTHORITY FOR INDIVIDUALS WHO HAVE PROVIDED MATERIAL SUPPORT UNDER DURESS TO A TERRORIST ORGANIZATION:**

(1) **(U) In General:**

(a) **(U)** On October 26, 2015, the Secretary of State exercised his authority under INA 212(d)(3)(B)(i) to determine that INA 212(a)(3)(B)(iv)(VI) shall not apply with respect to material support provided under duress to a terrorist organization.  This Material Support Under Duress exemption sets out conditions for eligibility, described below, that may be applied by consular officers in accordance with the procedures below.

(b) **(U)** As an example, USCIS guidance indicates that material support under duress could include providing money or a service (such as transporting fighters and supplies) to a rebel group when threatened at gunpoint to comply with such a demand.

(2) **Unavailable**

(a) **Unavailable**

6/30/25, 3:18 PM                9 FAM 302.6 (U) GUIDELINES BASED ON DOCUMENTS RELATED TO INA 212(A)(3)(B) AND 8 U.S.C. 1...

Case 1:25-cv-10685-WGY    Document 186-2    Filed 07/07/25    Page 485 of 518

(b) **Unavailable**

    (i)    **Unavailable**

    (ii)    **Unavailable**

    (iii)    **Unavailable**

    (iv)    **Unavailable**

(c) **Unavailable**

    (i)    **Unavailable**

    (ii)    **Unavailable**

    (iii)    **Unavailable**

    (iv)    **Unavailable**

(d) **Unavailable**

    (i)    **Unavailable**

    (ii)    **Unavailable**

    (iii)    **Unavailable**

    (iv)    **Unavailable**

    (v)    **Unavailable**

    (vi)    **Unavailable**

(e) **Unavailable**

(3) **Unavailable**

(a) **Unavailable**

(b) **Unavailable**

(c) **Unavailable**

(d) **Unavailable**

(e) **Unavailable**

(4) **Unavailable**

(a) **Unavailable**

(b) **Unavailable**

(5) **Unavailable**

e. **(U) EXEMPTION AUTHORITY FOR KURDISTAN DEMOCRATIC PARTY, IRAQI NATIONAL CONGRESS, AND PATRIOTIC UNION OF KURDISTAN:**

(1) **(U) Background:**

(a) **Unavailable**

(b) **Unavailable**

6/30/25, 3:18 PM    9 FAM 302.6 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS — INA 212(A)(3)(B) AND 8 U.S.C. 1...

Case 1:25-cv-10685-WGY    Document 186-2    Filed 07/07/25    Page 486 of 518

  (c) **Unavailable**

   **Unavailable**

  (d) **Unavailable**

  (e) **Unavailable**

(2) **(U) In General:** In September 2009, the Secretary of Homeland Security and Secretary of State granted an exemption under INA212(d)(3)(B)(i) covering the category of individuals who meet certain conditions, as determined by consular or DHS officials, as appropriate, from certain ineligibility grounds in INA 212(a)(3)(B) of the INA with respect to any activities or associations related to the Kurdistan Democratic Party (KDP), the Patriotic Union of Kurdistan (PUK) or the Iraqi National Congress (INC) (hereinafter the "categorical exemption").

(3) **(U) Procedures:**

  (a) **Unavailable**

  (b) **Unavailable**

  (c) **Unavailable**

  (d) **Unavailable**

  (e) **Unavailable**

  (f)  **Unavailable**

  (g) **Unavailable**

(4) **Unavailable**

  (a) **Unavailable**

   (i)  **Unavailable**

   (ii)  **Unavailable**

   (iii)  **Unavailable**

   (iv)  **Unavailable**

   (v)  **Unavailable**

   (vi)  **Unavailable**

   (vii)  **Unavailable**

   (viii) **Unavailable**

   (ix)  **Unavailable**

   (x)  **Unavailable**

  (b) **Unavailable**

f. **(U) APPLICATION OF EXEMPTION FOR INDIVIDUALS ASSOCIATED WITH KOSOVO LIBERATION ARMY (KLA):**

(1) **Unavailable**

6/30/25, 3:18 PM    9 FAM 302.6 - INELIGIBILITIES BASED ON SECURITY-RELATED GROUNDS - INA 212(A)(3)(A), INA 212(A)(3)(B), AND 8 U.S.C. 1…

Case 1:25-cv-10685-WGY    Document 186-2    Filed 07/09/25    Page 487 of 518

(a) **Unavailable**

(b) **Unavailable**

(c) **Unavailable**

(d) **Unavailable**

(e) **Unavailable**

(2) **Unavailable**

    (a) **Unavailable**

    (b) **(U)** The applicant is seeking a benefit or protection under the INA, which may include an NIV, and is otherwise eligible for the benefit or protection.

    (c) **Unavailable**

    (d) **(U)** The applicant has fully disclosed, to the best of their knowledge, in all relevant applications and interviews with U.S. government representatives and agents, the nature and circumstances of activities or associations falling within the scope of INA 212(a)(3)(B).

    (e) **Unavailable**

    (f) **(U)** The applicant has not participated in, or knowingly provided material support to, terrorist activities that targeted noncombatant persons or United States interests.  For further information on material support, see 9 FAM 302.6-2(B)(3) above.

    (g) **(U)** The applicant has established to your satisfaction that they pose no danger to the safety and security of the United States.

    (h) **(U)** The applicant warrants an exemption from the relevant ineligibility provisions in the totality of the circumstances.  The exemption gives you broad latitude to consider any relevant factors and determine that an applicant who might otherwise appear eligible for the exemption should not benefit based on the totality of circumstances.

    (i) **Unavailable**

    (j) **Unavailable**

(3) **Unavailable**

    (a) **Unavailable**

        (i) **Unavailable**

        (ii) **Unavailable**

        (iii) **Unavailable**

        (iv) **Unavailable**

    (b) **Unavailable**

(4) **Unavailable**

(a) **Unavailable**

(b) **Unavailable**

(c) **Unavailable**

(d) **Unavailable**

(e) **Unavailable**

(f)  **Unavailable**

(g) **Unavailable**

(5) **Unavailable**

(6) **Unavailable**

g. **Unavailable**

(1) **(U)** In addition to those listed in paragraphs d through f above, exemptions have been created for certain individuals associated with or activities related to the following groups:

(a)  **(U)** The All-Burma Student's Democratic Front (ABSDF);

(b)  **(U)** The All-India Sikh Student's Federation - Bittu (AISSF-Bittu);

(c)  **(U)** the Democratic Movement for the Liberation of Eritrean Kunam (DMLEK);

(d)  **(U)** The Eritrean Liberation Front (ELF);

(e)  **(U)** The Ethiopian People's Revolutionary Party (EPRP);

(f)   **(U)** The Farabundo Marti para la Liberation National (FMLN) and Nationalist Republican Alliance (ARENA);

(g)  **(U**)The Oromo Liberation Front (OLF);

(h)  **(U)** The Tigray People's Liberation Front (TPLF);

(i)   **(U)** Certain Burmese Groups; and/or

(j)   **(U)** 10 groups named in the Consolidated Appropriations Act, 2008 (see 9 FAM 302.6-2(B)(3) paragraph i(2) above.

(2) **Unavailable**

(a) **(U)** Solicitation or Military-Type Training Under Duress (see 9 FAM 302.6-2(B)(5) paragraph d above);

(b) **(U)** Voluntary Medical Care;

(c) **(U)** Participation in the Iraqi Uprisings;

(d) **(U)** Certain Limited or Insignificant Material Support;

(e) **Unavailable**

(f)  **Unavailable**

(g)  **Unavailable**

6/30/25, 3:18 PM     9 FAM 302.6-2 (U) INELIGIBILITIES BASED ON TERRORISM-RELATED GROUNDS – INA 212(A)(3)(B) AND 8 U.S.C. 1…

Case 1:25-cv-10685-WGY    Document 186-2    Filed 07/07/25    Page 489 of 518

## 9 FAM 302.6-2(B)(6)  (U) Reports to Congress

*(CT:VISA-1798;   07-12-2023)*

a. **(U) Report on 3B Denials:**  Section 128 of Public Law 102-138 of October 28, 1991, added to the law a permanent requirement that the Secretary of State report, on a timely basis, to the Judiciary Committees of the House and Senate, the House Foreign Affairs Committee, and the Senate Foreign Relations Committee every denial of a visa "on grounds of terrorist activity," along with a brief description of the factual basis for the denial.

b. **(U) Report on 3B Waivers:**  The Secretary of State also must report on all applicants found ineligible under INA 212(a)(3)(B) to whom the Department issued a visa or failed to object to the issuance of a visa.  This report, required by section 51 of the State Department Basic Authorities Act, as amended by Section 231 of the Foreign Relations Authorization Act, Fiscal Year 2003, must be submitted to appropriate committees on a semi-annual basis. The requirement for these reports may be found at 22 U.S.C. 2723.

c. **(U) Report on Exemptions under** INA 212(d)(3)(B)**:**  Not later than 90 days after the end of each fiscal year, the Secretaries of State and Homeland Security must submit a report to specified congressional committees on all individuals exempted under INA 212(d)(3)(B)(i).  Exemptions for groups must be reported within one week (INA 212(d)(3)(B)(ii)).

## 9 FAM 302.6-2(C)  Unavailable

## 9 FAM 302.6-2(C)(1)  Unavailable

*(CT:VISA-2014;   06-20-2024)*

a. **Unavailable**

b. **Unavailable**

c.  **Unavailable**

d. **Unavailable**

e. **Unavailable**

f.  **Unavailable**

g. **Unavailable**

   (1)  **Unavailable**

   (2)  **Unavailable**

   (3)  **Unavailable**

h. **Unavailable**

i.  **Unavailable**

j.  **Unavailable**

## 9 FAM 302.6-2(C)(2)  Unavailable

*(CT:VISA-2014;   06-20-2024)*

a. **Unavailable**

    (1) **Unavailable**

    (2) **Unavailable**

    (3) **Unavailable**

    (4) **Unavailable**

    (5) **Unavailable**

b. **Unavailable**

    (1) **Unavailable**

        (a) **Unavailable**

        (b) **Unavailable**

        (c) **Unavailable**

    (2) **Unavailable**

        (a) **Unavailable**

        (b) **Unavailable**

        (c) **Unavailable**

        (d) **Unavailable**

        (e) **Unavailable**

        (f) **Unavailable**

## 9 FAM 302.6-2(C)(3)  Unavailable

*(CT:VISA-1798;   07-12-2023)*

a. **Unavailable**

b. **Unavailable**

c. **Unavailable**

d. **Unavailable**

e. **Unavailable**

f. **Unavailable**

g. **Unavailable**

h. **Unavailable**

i. **Unavailable**

## 9 FAM 302.6-2(C)(4)  (U) Exemption Authority for Individuals or Activities Associated with the Kosovo Liberation Army (KLA)

*(CT:VISA-2014;   06-20-2024)*

a. **(U)** On June 4, 2012, DHS Secretary Napolitano, following consultations with the Secretary of State and the Attorney General, exercised her authority under INA 212(d)(3)(B)(i), not to apply certain ineligibility grounds under INA 212(a)(3)(B) for certain activities or associations relating to the Kosovo Liberation Army (KLA).  There are several issues that must be considered before applying this "exemption" to a visa applicant.  These are described below and differ for NIV and IV applicants.

b. **(U)** The exemption cannot be applied to any NIV or IV applicant you know or have reasonable grounds to believe is engaged in or is likely to engage after entry into the United States in any terrorist activity, as defined in INA 212(a)(3)(B)(iv).

# 9 FAM 302.6-2(D)  (U) Waivers

## 9 FAM 302.6-2(D)(1)  (U) Waivers for Immigrants

*(CT:VISA-1798;   07-12-2023)*

**(U)** No waiver is available for an IV applicant found ineligible under INA 212(a)(3)(B).

## 9 FAM 302.6-2(D)(2)  (U) Waivers for Nonimmigrants

*(CT:VISA-2014;   06-20-2024)*

**a. (U)** You may request a finding of INA 212(a)(3)(B) ineligibility be waived for a nonimmigrant found ineligible under INA 212(a)(3)(B).  The waiver request must be submitted to the Department with a detailed assessment explaining why a waiver is appropriate and any balancing considerations.  Where appropriate, the Department will forward the request with a recommendation to DHS to grant the waiver.  Do not request waivers from DHS attachés at post.

**b. (U)** The Department may request a waiver from DHS on its own initiative if it believes a waiver is appropriate under the circumstances in a case.  The Department will advise you whenever a waiver has been approved, and you must annotate the visa in accordance with 9 FAM 403.9-5.

## 9 FAM 302.6-2(E)  Unavailable

### 9 FAM 302.6-2(E)(1)  Unavailable

*(CT:VISA-2014;   06-20-2024)*

**Unavailable**

### 9 FAM 302.6-2(E)(2)  Unavailable

*(CT:VISA-218;   10-20-2016)*

**Unavailable**

# 9 FAM 302.6-3  (U) ASSOCIATION WITH TERRORIST ORGANIZATIONS - INA 212(A)(3)(F)

## 9 FAM 302.6-3(A)  (U) Grounds

*(CT:VISA-1351;   08-27-2021)*

**(U)** INA 212(a)(3)(F) renders ineligible any applicant who the Secretary of State, after consultation with the Secretary of Homeland Security, determines has been associated with a terrorist organization and intends while in the United States to engage solely, principally, or incidentally in activities that could endanger the welfare, safety, or security of the United States.

## 9 FAM 302.6-3(B)  (U) Application

### 9 FAM 302.6-3(B)(1)  (U) Background and Summary

*(CT:VISA-1351;   08-27-2021)*

a. **(U)** INA 212(a)(3)(F) was added by Section 411(a)(2) of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of October 26, 2001 (Public Law 107-56) (USA PATRIOT ACT).  Enacted after the terrorist attacks on September 11, 2001, it was proposed by the Executive Branch and modeled in part on former INA 212(a)(27) and (28) to expand the scope and provide a flexible legal basis for denying entry to applicants who have been associated with terrorist organizations and whose travel to the United States would be inconsistent with the welfare, safety, or security of the United States.

b. **(U)** INA 212(a)(3)(F) applies only if the Secretary of State, after consultation with the Secretary of Homeland Security, or Secretary of Homeland Security after consultation with the Secretary of State, determines that the applicant has been associated with a terrorist organization and intends while in the

United States to engage solely, principally, or incidentally in activities that could endanger the welfare, safety, or security of the United States.  The Secretary of State's authority to make such a determination has not been delegated to consular officers.  Therefore, this provision can be used to deny visas only when such use is approved by the Department after a determination is made by the Secretary or an official to whom the Secretary's authority has been delegated.

## 9 FAM 302.6-3(B)(2)  (U) Recommending a Finding

*(CT:VISA-2014;   06-20-2024)*

a. **(U)** The authority to determine whether an applicant is ineligible under INA 212(a)(3)(F) rests with the Secretary of State and the Secretary of Homeland Security, each in consultation with the other.  Accordingly, if you believe that an individual may be ineligible under this provision, you must refer the matter back to the Department for a decision.

b. **(U) Address the following in any request for a determination of ineligibility under this provision:**

(1) **(U) Terrorist organization(s) involved:**

(a) **(U)** If the organization involved has been designated as a foreign terrorist organization under INA 219 as a Terrorist Exclusion List (TEL) organization under INA 212(a)(3)(B)(vi)(II), under Executive Order 13224, or has been defined by INA 212(a)(3)(B)(vi)(III) as a Tier III terrorist organization, provide the name of the organization and note the relevant designation(s).  If an organization has not been designated under any of these authorities, you must explain why the organization is a terrorist organization and provide as much information as possible regarding the nature and structure of the organization and its activities.  Include information on the nature, timing, and relevant circumstances surrounding the organization's terrorist activities;

(b) **(U)** "Terrorist Organization" is defined in INA 212(a)(3)(B)(vi) and references the definition of "engaged in terrorist activity" under INA 212(a)(3)(B)(iv);

(2) **(U) Nature of the applicant's association:**  The association must be meaningful for an applicant to be ineligible under INA 212(a)(3)(F), so information concerning the following should be provided:

(a) **(U)** The frequency, duration, and level of the applicant's contacts with the organization;

(b) **(U)** The nature and purpose of the applicant's contacts with the organization; and

(c) **(U)** The applicant's awareness of association.  Because terrorist organizations often operate in secret, you must provide your assessment of:

    (i)    **(U)** Whether the applicant knew or should have known that the organization was a terrorist organization (see <u>9 FAM 302.6-2(B)(3)</u> paragraph e above for relevant factors to consider);

    (ii)    **(U)** Whether the applicant knew or should have known that the person(s) with whom the applicant had contact was a member, representative, or affiliate of a terrorist organization; and

    (iii)    **(U)** Whether the applicant knew or should have known that the person(s) with whom the applicant had contact was engaged in terrorist activity;

(3)  **(U) Timeframe:** INA 212(a)(3)(F) applies to an applicant who "has been" associated with a terrorist organization, regardless of when that association occurred.  Therefore, an applicant whose association with a terrorist group occurred before enactment of INA 212(a)(3)(F) could be found ineligible.  On the other hand, the ineligibility can be triggered only if the applicant intends while in the United States to engage in activities that could endanger the welfare, safety, or security of the United States.

(4)  **(U) Applicant's activities in the United States:**  Provide as much information as possible regarding the applicant's proposed activities in the United States and explain why these activities are cause for concern – i.e., why the determination required under subsection F should be made; and

(5)  **Unavailable**

## 9 FAM 302.6-3(B)(3)  (U) Findings

*(CT:VISA-2014;   06-20-2024)*

a. **(U)** To find an applicant ineligible under INA 212(a)(3)(F)*,* the Secretary of State or Secretary of Homeland Security, each in consultation with the other (or their delegates), must find:

(1)  **(U)** That the applicant has been associated with a terrorist organization; and

(2)  **(U)** That the applicant intends while in the United States to engage solely, principally, or incidentally in activities that could endanger the welfare, safety, or security of the United States.

b. **(U)** Within the Department, CA will normally take the lead in coordinating the necessary interagency consultations and ensuring that a determination, if made, is made by an appropriate Department official with delegated authority.  Generally, a determination will be made only if INA 212(a)(3)(B) is not applicable.

c.  **(U)** The Department believes that "associated with" requires a meaningful association.  Generally, to be found ineligible, an applicant must have had contact over time with individuals who the applicant knew or should have

known were members or representatives of a terrorist organization.  A single meeting with a terrorist operative could be sufficient for finding that an applicant has been "associated with" a terrorist organization, however.  However, the Department would most likely find an applicant was associated with a terrorist organization if the applicant had made a commitment at a single meeting with a known recruiter for a terrorist organization to act on the organization's behalf.

d. **(U)** A finding that an applicant "intends while in the United States to engage in activities that could endanger the welfare, safety, or security of the United States" can be made in appropriate cases by inferring the necessary intent from the relevant facts and circumstances.  For example, an applicant who has extensive knowledge of explosives who has been meeting regularly with well-known members of a terrorist organization and seeks to travel to the United States could be found ineligible under INA 212(a)(3)(F).  Similarly, an applicant who has received flight training or has received counter-surveillance training from a terrorist organization (as defined in INA 212(a)(3)(B)(vi)) could be found to have such an intent based on these and other relevant facts, and therefore be found ineligible under INA 212(a)(3)(F).

e. **(U)** It is not necessary that the applicant intend to engage in activities that would be illegal or otherwise prohibited under the laws and regulations in the United States for the Department to find the applicant ineligible under INA 212(a)(3)(F).  For example, an applicant who intends to attend flight school in the United States – a lawful activity – could be found ineligible under INA 212(a)(3)(F) if the facts are sufficient to permit the Secretary or their delegate to determine that the applicant has been associated with a terrorist organization and that the applicant's attendance at the flight school could endanger the security of the United States.

## 9 FAM 302.6-3(B)(4)  (U) Not a Permanent Bar

*(CT:VISA-1351;   08-27-2021)*

**Unavailable**

# 9 FAM 302.6-3(C)  Unavailable

*(CT:VISA-2014;   06-20-2024)*

**Unavailable**

# 9 FAM 302.6-3(D)  (U) Waivers

## 9 FAM 302.6-3(D)(1)  (U) Waivers for Immigrants

*(CT:VISA-1798;   07-12-2023)*

**(U)** No waiver is available for an IV applicant found ineligible under INA 212(a)(3)(F).

## 9 FAM 302.6-3(D)(2)  (U) Waivers for Nonimmigrants

*(CT:VISA-1798;   07-12-2023)*

**(U)** An INA 212(d)(3)(A) waiver is available for an NIV applicant found ineligible under INA 212(a)(3)(F).

## 9 FAM 302.6-3(E)  Unavailable

## 9 FAM 302.6-3(E)(1)  Unavailable

*(CT:VISA-1351;   08-27-2021)*

**Unavailable**

## 9 FAM 302.6-3(E)(2)  Unavailable

*(CT:VISA-218;   10-20-2016)*

**Unavailable**

# 9 FAM 302.6-4  (U) SECTION 306 OF THE ENHANCED BORDER SECURITY AND VISA ENTRY REFORM ACT OF 2002 - 8 U.S.C. 1735 APPLICANTS FROM A STATE SPONSOR OF TERRORISM

## 9 FAM 302.6-4(A)  (U) Grounds

*(CT:VISA-1586;   07-26-2022)*

**(U)** Section 306 of the Enhanced Border Security and Visa Entry Reform Act of 2002 ("section 306"), 8 U.S.C. 1735, prohibits issuance of visas to NIV applicants from a state sponsor of terrorism unless the Secretary of State determines the applicant does not pose a threat to the safety and security of the United States.

## 9 FAM 302.6-4(B)  (U) Application

*(CT:VISA-2014;   06-20-2024)*

a. **Unavailable**

b. **Unavailable**

c. **Unavailable**

   (1)  **Unavailable**

(2) **Unavailable**
(3) **Unavailable**
    (a) **Unavailable**
    (b) **Unavailable**
(4) **Unavailable**
    (a) **Unavailable**
    (b) **Unavailable**
    (c) **Unavailable**
    (d) **Unavailable**

# 9 FAM 302.6-4(C)  Unavailable

*(CT:VISA-1586;   07-26-2022)*

a. **Unavailable**
b. **Unavailable**
    (1) **Unavailable**
    (2) **Unavailable**
c. **Unavailable**

# 9 FAM 302.6-4(D)  (U) Waivers

## 9 FAM 302.6-4(D)(1)  (U) Waivers for Immigrants

*(CT:VISA-1586;   07-26-2022)*

**(U)** IV applicants are not subject to Section 306.

## 9 FAM 302.6-4(D)(2)  (U) Waivers for Nonimmigrants

*(CT:VISA-1798;   07-12-2023)*

**(U)** No waiver is available for an NIV applicant ineligible under Section 306.

# 9 FAM 302.6-4(E)  Unavailable

## 9 FAM 302.6-4(E)(1)  Unavailable

*(CT:VISA-2014;   06-20-2024)*

**Unavailable**

# 9 FAM 302.6-4(E)(2)  Unavailable

*(CT:VISA-664;   08-22-2018)*

**Unavailable**

UNCLASSIFIED (U)

EXHIBIT 18

**UNCLASSIFIED (U)**

# 9 FAM 403.11
# (U) NIV REVOCATION

*(CT:VISA-2150;   04-29-2025)*
*(Office of Origin:  CA/VO)*

# 9 FAM 403.11-1  (U) STATUTORY AND REGULATORY AUTHORITIES

## 9 FAM 403.11-1(A)  (U) Immigration and Nationality Act

*(CT:VISA-1;   11-18-2015)*

**(U)** INA 221(i) (8 U.S.C. 1201(i)).

## 9 FAM 403.11-1(B)  (U) Code of Federal Regulations

*(CT:VISA-1;   11-18-2015)*

**(U)** 22 CFR 41.122.

# 9 FAM 403.11-2  (U) NIV REVOCATION

*(CT:VISA-1;   11-18-2015)*

**(U)** Regulations no longer distinguish between invalidation and revocation in cases when it is determined that the bearer of a visa is ineligible.  The visa should be revoked in accordance with INA 221(i), 22 CFR 41.122 and this subchapter.

# 9 FAM 403.11-3  (U) WHEN TO REVOKE A VISA

## 9 FAM 403.11-3(A)  (U) When You May Revoke Visas

*(CT:VISA-1948;   03-07-2024)*

**(U) There are four circumstances under which you may revoke a visa:**

(1) **Unavailable**

(2) **(U)** The individual is not eligible for the visa classification (this includes ineligibility under INA 214(b));

(3) **(U)** The visa has been physically removed from the passport in which it was issued; or

(4) **(U)** The individual is subject to an IDENT Watchlist record in System Messages for an arrest or conviction of driving under the influence, driving while intoxicated, or similar arrests/convictions (DUI) that occurred within the previous five years, pursuant to 9 FAM 403.11-5(B) paragraph c, below.

# 9 FAM 403.11-3(B)  (U) When You May Not Revoke A Visa

*(CT:VISA-1463;   02-01-2022)*

a. **(U)** You do not have the authority to revoke a visa based on a suspected ineligibility or based on derogatory information that is insufficient to support an ineligibility finding, other than a revocation based on driving under the influence (DUI).  A consular revocation must be based on an actual finding that the individual is ineligible for the visa.

b. **(U)** Under no circumstances should you revoke a visa when the individual is in the United States, or after the individual has commenced an uninterrupted journey to the United States, other than a revocation based on driving under the influence (DUI).  Outside of the DUI exception, revocations of individuals in, or en route to, the United States may only be done by the Department's Visa Office of Screening, Analysis, and Coordination (CA/VO/SAC).

# 9 FAM 403.11-4  (U) REVOCATION PROCEDURES

# 9 FAM 403.11-4(A)  (U) Visa Revocations by Consular Officers

*(CT:VISA-2088;   10-02-2024)*

**(U)** Although the decision to revoke a visa is a discretionary one, you should not use this authority arbitrarily.  When practicable:

(1) **(U)** Notify the individual of the intention to revoke the visa;

(2) **(U)** Allow the individual the opportunity to show why the visa should not be revoked; and

(3) **(U)** Request the individual to present the travel document in which the visa was issued.

# 9 FAM 403.11-4(A)(1)  (U) Required Procedures

*(CT:VISA-2088;   10-02-2024)*

a. **(U) Informing Individual of Intent to Revoke Visa:**

(1) **(U)** Notify the individual of the intent to revoke a visa if such notification is practicable.  The notice of intent to revoke a visa affords the individual the opportunity to demonstrate why the visa should not be revoked.  An after-the-fact notice that the visa has already been revoked is not sufficient unless prior notice of intent to revoke was not practicable.

(2) **(U)** A prior notification of intent to revoke a visa would not be practicable if, for instance, you do not know the whereabouts of the individual, or if the individual's departure is believed to be imminent.  In cases where the individual can be contacted and travel is not imminent, prior notice of intent to revoke the visa is normally required, unless you have reason to believe that a notice of this type would prompt the individual to attempt immediate travel to the United States.

b. **(U) Physical Cancellation of Visa:**  If a decision to revoke the visa is reached after the case has been reviewed, print or stamp the word "REVOKED" in large block letters across the face of the visa.  Also date and sign this action.  If you are at a post other than the one where the visa was issued, the title and location of your post should be written below the signature.

c.  **(U) If the Individual Possesses Another Valid U.S. Visa:**  When you have taken action to revoke a visa, you should determine whether the individual holds another current U.S. visa in the same or another passport. You should revoke that visa as well, if the grounds for revoking the first visa apply to any other visa the individual may hold, or if independent grounds for revocation apply.  In the latter case, if practicable, give the individual an opportunity to rebut or overcome that ground(s) of ineligibility.

d. **Unavailable**

e. **Unavailable**

# 9 FAM 403.11-4(A)(2)  (U) When to Notify Department Regarding Revocation

*(CT:VISA-1948;   03-07-2024)*

a. **(U)** If a visa is physically cancelled before the individual's departure to the United States, then there is no need to report the revocation to the Department, except in cases involving A, G, C-2, C-3, or NATO visas.

b. **(U)** L/CA, the Diplomatic Liaison Division (CA/VO/DO/DL), the Chief of Protocol (S/CPR), and the appropriate country desk should be promptly notified whenever any diplomatic or official visa, or any visa in the A, G, C-2, C-3, or NATO classification is revoked.

c.  **(U)** See 9 FAM 403.11-4(C)(1) below for more information about notifying the Department of visa revocations that may have political, public relations, or law enforcement consequences.

# 9 FAM 403.11-4(B)  Unavailable

*(CT:VISA-2088;   10-02-2024)*

a. **Unavailable**

b. **Unavailable**

c.  **(U)** See [9 FAM 402.8-8](#), Procedures to be Followed When Derogatory Information Received.

# 9 FAM 403.11-4(C)  (U) Revoking Visas in Sensitive Cases

## 9 FAM 403.11-4(C)(1)  (U) Keeping Department Informed in High Profile Cases

*(CT:VISA-1948;   03-07-2024)*

a. **(U)** You should be alert to the political, public relations, and law enforcement consequences that can follow a visa revocation and should work with the Department to ensure that all legally available options are fully and properly assessed.  The revocation of the visa of a public official or prominent local or international person can have immediate and long-term repercussions on our political relationships with foreign powers and on our public diplomacy goals in a foreign state.  The visa laws must be applied to such persons like any others, recognizing that certain visa categories, particularly A's and G's, are not subject to the same standards of ineligibility as others. Hasty action, however, must be avoided in such high-profile visa cases and you should seek the Department's guidance before any visa revocation unless unusual and exigent circumstances prevent such a consultation.  Consultation both within the mission and with the Department may result in a decision that the Department, rather than the consular officer, should undertake the revocation, since Department revocations pursuant to the Secretary's revocation authority provide more flexibility in managing the relevant issues.

b. **(U) When to Consult with the Department:**

(1)  **(U)** You are responsible for keeping the Department (CA/VO/SAC, CA/VO/F, L/CA, and the appropriate country desk) informed of visa actions that may affect our relations with foreign states or our public diplomacy, or that may affect or impede ongoing or potential investigations and prosecutions by U.S. and other cooperating foreign law enforcement agencies.

(2)  **(U)** This is particularly true when you use the power granted under INA 221(i) as implemented in 22 CFR 41.122 and this section, to revoke the visas of officials of foreign governments, prominent public figures, and subjects or potential subjects of U.S. and foreign criminal investigations.

(3) **(U)** In such cases, you should seek the Department's guidance before any visa revocation unless unusual and exigent circumstances prevent such a consultation.  In the rare cases in which advance consultation is not possible, you should inform the Department immediately after the revocation.

c. **Unavailable**

## 9 FAM 403.11-4(C)(2)  (U) Diplomatic and Official Visas

*(CT:VISA-1650;   11-21-2022)*

**(U)** You must keep in mind that most A, G, C-2, C-3, and North Atlantic Treaty Organization (NATO) visa categories are exempt from most INA 212(a) ineligibility provisions per 22 CFR 41.21(d).  Precipitant action must be avoided in cases involving foreign government officials and other prominent public figures.  Consultations at post and with the Department might result in the decision that the Department, rather than the consular officer, should undertake the revocation.  The Department's revocation authority provides more flexibility in managing relevant issues.  For example, Department revocations may be undertaken prudentially, rather than based on a specific finding of ineligibility and are not subject to the 22 CFR 41.122 requirement with respect to notification to the individual.

## 9 FAM 403.11-4(C)(3)  (U) When Revocation Subject is Subject of Criminal Investigation

*(CT:VISA-2088;   10-02-2024)*

a. **(U)** In cases in which the individual whose visa is revocable is also the subject of a criminal investigation involving U.S. law enforcement agencies, action without prior Department consultation and coordination could:

(1) **(U)** Jeopardize an ongoing investigation;

(2) **(U)** Prejudice an intended prosecution;

(3) **(U)** Preclude apprehension of the subject in the United States;

(4) **(U)** Put informants at risk; or

(5) **(U)** Damage cooperative law enforcement relationships with foreign police agencies.

b. **Unavailable**

c. **(U)** In deciding what cases to report in advance to the Department, err on the side of prudence.  It is always better to report cases requiring no Department action rather than having to inform the Department after the fact in a case that has adverse consequences for U.S. law enforcement or diplomatic interests.  Contact CA/VO/SAC and other functional bureaus, as appropriate.

# 9 FAM 403.11-5  (U) REVOCATION OF VISAS BY THE DEPARTMENT

*(CT:VISA-1948;   03-07-2024)*

a. **(U)** When the Department revokes a visa, when possible, a revocation notice will be sent to the consular section by email furnishing a point of contact in the Visa Office.  You must follow the instructions in the revocation notice.

b. **(U)** Although the Department is not required to notify an individual of a revocation done pursuant to the Secretary's discretionary authority, you should do so unless instructed otherwise, especially in cases where the revoked visa was issued to a government official.

## 9 FAM 403.11-5(A)  (U) Notice to Department of Presence in United States

*(CT:VISA-2150;   04-29-2025)*

a. **Unavailable**

b. **(U)** Upon receipt of your report, the Department will decide whether the visa should be revoked.  Alternatively, the Department may inform DHS of the data submitted and give DHS an opportunity to initiate proceedings under the pertinent provisions of INA 237.  If the latter course is followed, the Department will request that DHS advise the Department of the individual's date of departure and destination, so the individual's *visa may be physically canceled after their* departure from the United States.

## 9 FAM 403.11-5(B)  (U) Prudential Revocations

*(CT:VISA-2150;   04-29-2025)*

a. **(U)** Although you usually may revoke a visa only if the individual is ineligible under INA 212(a), or INA 214(b), or is no longer entitled to the visa classification, the Department may revoke a visa if an ineligibility or lack of entitlement is suspected, when an individual would not meet requirements for admission, or in other situations where warranted.  This is known as a "prudential revocation."  In addition to the conditions described in 9 FAM 403.11-5(A) above, the Department may revoke a visa when it receives derogatory information directly from another U.S. Government agency, including a member of the intelligence or law enforcement community.  These requests are reviewed by CA/VO/SAC/RC, which forwards an electronic memo requesting revocation to a duly authorized official in the Visa Office, along with a summary of the available intelligence and/or background information and any other relevant documentation.  When prudential revocation is approved, the subject's name is entered into CLASS, the visa case status is updated to "Revoke", and the revocation is communicated within the Department and to other agencies by the following means:

(1) **Unavailable**

(2) **Unavailable**

(3) **Unavailable**

b. **Unavailable**

c. **(U) Prudential Revocation for Driving Under the Influence:**  Either the consular section or the Department has the authority to prudentially revoke a visa based on a potential INA 212(a)(1)(A) ineligibility when an IDENT Watchlist Record appears in System Messages for a CJIS Search of US-VISIT or a CJIS Search of OBIM record.  Before doing so, re-send the fingerprints to NGI to obtain a RAP sheet for an arrest or conviction of driving under the influence, driving while intoxicated, or similar arrests/convictions (DUI) that occurred within the previous five years.  This does not apply when the arrest has already been addressed within the context of a visa application; i.e., the individual has been through the panel physician's assessment due to the arrest.  This does not apply to other alcohol related arrests such as public intoxication that do not involve the operation of a vehicle.  Unlike other prudential revocations, you do not need to refer the case to the Department but can prudentially revoke on your own authority.  Process the revocation from the Spoil tab NIV and add P1A3 and VRVK lookouts from the Refusal window.

## 9 FAM 403.11-5(C)  Unavailable

*(CT:VISA-2150;   04-29-2025)*

a. **Unavailable**

b. **Unavailable**

c. **Unavailable**

(1) **Unavailable**

(2) **Unavailable**

(3) **Unavailable**

d. **Unavailable**

e. **Unavailable**

# 9 FAM 403.11-6  (U) RECONSIDERATION OF REVOCATIONS

## 9 FAM 403.11-6(A)  (U) Reinstatement Following Revocation

*(CT:VISA-2088;   10-02-2024)*

Unavailable

    (1)  **Unavailable**

    (2)  **(U) If Visa Has Been Revoked and Physically Canceled:** If a visa has been revoked and the revoked visa physically canceled, the individual may apply for a new visa; however, they may not travel on the physically cancelled visa.

    (3)  **Unavailable**

    (4)  **Unavailable**

# 9 FAM 403.11-7  (U) ACTIONS BY DHS

## 9 FAM 403.11-7(A)  (U) Cancellation of Visas by Immigration Officers Under 22 CFR 41.122(e)

*(CT:VISA-2088;   10-02-2024)*

a.  **(U) When a visa is canceled by a DHS officer, one of the following notations will normally be entered in the individual's passport:**

    (1)  **(U)** Canceled.  Adjusted;

    (2)  **(U)** Canceled.  Excluded. DHS (Office) (Date);

    (3)  **(U)** Canceled.  Application withdrawn. DHS (Office) (Date);

    (4)  **(U)** Canceled.  Final order of deportation/voluntary departure entered DHS (Office) (Date) Canceled.  Departure required.  DHS (Office) (Date);

    (5)  **(U)** Canceled.  Waiver revoked. DHS (Office) (Date); and

    (6)  **(U)** Canceled.  Presented by impostor.  DHS (Office) (Date).

b.  **(U)** Except when a visa is canceled after the individual's status has been adjusted to that of a permanent resident, DHS will inform the consular section that issued the visa of the cancellation action.  The I-275, Withdrawal of Application/Consular Notification form, will be used to inform consular officers at the issuing office of the cancellation action.  The I-275 form and any other attached forms should not be released to individuals or their representatives.

## 9 FAM 403.11-7(B)  (U) Voidance of Counterfeit Visas

*(CT:VISA-1275;   05-10-2021)*

**(U)** When DHS has determined through examination that a visa has been altered or is counterfeit, it will void the visa by entering one of the following notations on the visa page, together with the action officer's signature, title, and office location:

(1)  **(U)** Counterfeit visa per testimony of individual (file number); or

(2)  **(U)** Counterfeit visa per telecon, letter, e-mail from U.S. Embassy (U.S. Consul).

UNCLASSIFIED (U)

# EXHIBIT 19

Secretary
**U.S. Department of Homeland Security**
Washington, DC 20528



April 16, 2025

Maureen Martin
School Code: BOS214F00162000
Harvard University
c/o Harvard International Office
1350 Massachusetts Ave., Rm. 864
Cambridge, MA  02138
Maureen_Martin@Harvard.edu

### Student and Exchange Visitor Program
### Student Records Request

It is a privilege to have foreign students attend Harvard University, not a guarantee. The United States Government understands that Harvard University relies heavily on foreign student funding from over 10,000 foreign students to build and maintain their substantial endowment. At the same time, your institution has created a hostile learning environment for Jewish students due to Harvard's failure to condemn antisemitism. As a reminder, President Donald J. Trump issued Executive Order 14188, which specifies that "[i]t shall be the policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." EO 14188 (Jan 29, 2025).

The Student and Exchange Visitor Program (SEVP) regularly monitors SEVP-approved schools to determine their compliance with governing regulations, and to ensure the accuracy of information in the Student and Exchange Visitor Information System (SEVIS) for such institutions, and for the nonimmigrant students and exchange visitors attending school.  Your continued SEVP certification is contingent upon meeting the requirements of the U.S. Department of Homeland Security (DHS), set out in *Title 8 Code of Federal Regulations* (*8 CFR*).  SEVP may request information regarding nonimmigrant students from certified schools under *8 CFR § 214.3(g)(1)*. Your school must submit the following information to our office on or before April 30, 2025:

1. Provide relevant information regarding each student visa holder's known illegal activity, and whether the activity occurred on campus.
2. Provide relevant information regarding each student visa holder's known dangerous or violent activity, and whether the activity occurred on campus.
3. Provide relevant information regarding each student visa holder's known threats to other students or university personnel, and whether the activity occurred on campus.
4. Provide relevant information regarding each student visa holder's known deprivation of rights of other classmates or university personnel, and whether the activity occurred on campus.

Page 2 of 3
Harvard University- BOS214F00162000

5. Provide relevant information on whether any student visa holders have left Harvard University due to dangerous or violent activity or deprivation of rights, and whether the activity occurred on campus.
6. Provide relevant information on whether any student visa holders have had disciplinary actions taken as a result of making threats to other students or populations or participating in protests, which impacted their nonimmigrant student status.
7. Provide relevant information regarding each student visa holder's obstruction of the school's learning environment.
8. Provide relevant information regarding each student visa holder's maintenance of at least the minimum required coursework to maintain nonimmigrant student status.

Providing materially false, fictitious, or fraudulent information may subject you to criminal prosecution under *18 USC § 1001*. Other possible criminal and civil violations may be applicable.

SEVP uses the school's Principal Designated School Official (PDSO) as the main point of contact on any issues that relate to the school's compliance with the regulations, per *8 CFR § 214.3(l)(1)(ii)*. Therefore, any requests from SEVP with relation to compliance with the recordkeeping, retention, reporting and other requirements of paragraphs *(f)*, *(g)*, *(j)*, *(k)*, and *(l)* of *8 CFR § 214.3* must be submitted by the PDSO who must also sign the attached attestation statement. The attestation statement will certify the evidence was submitted by the PDSO.

Failure to comply with this Student Records Request will be treated as a voluntary withdrawal, per *8 CFR § 214.3(h)(3)(vii)*. Therefore, in the event the school fails to respond to this request within the timeframe provided above, SEVP will automatically withdraw the school's certification. The withdrawal will not be subject to appeal.

**Harvard University must confirm receipt of this request immediately via email at** SupportSEVP@ice.dhs.gov**.**

Any questions regarding this request may be sent to SEVP Support at SupportSEVP@ice.dhs.gov, subject line: **Question: Harvard University - BOS214F00162000 – Student Records Request.**

All requested evidence must be submitted at one time via e-mail to SupportSEVP@ice.dhs.gov, subject line: **Attention: Harvard University - BOS214F00162000 – Student Records Request**. SEVP cannot accept any documentation from a third-party server such as Dropbox or Google Drive. All documents submitted to SEVP should be in a Portable Document Format (PDF). Please visit this website for guidelines to submitting PDF documents.

Sincerely,

Kristi Noem
Secretary of Homeland Security

Page 3 of 3
Harvard University- BOS214F00162000

### Evidence Attestation Statement

I, _____ , Primary Designated School Official (PDSO) of
_____ , an institution certified by the Student and Exchange
Visitor Program (SEVP), attest the following is true:

As PDSO, I am the point of contact for any issues that relate to the school's compliance with the regulations relating to nonimmigrant students and SEVP-certified schools per 8 CFR § 214.3(l)(1)(ii). I understand SEVP may review my institution's certification at any time and may request documentation to establish my institution's eligibility for certification as well as review evidence and records for compliance with the regulations. I am responsible for any requests for documentation or evidence in connection with an out-of-cycle review on behalf of my institution.

Additionally, I attest:

- I have read, understood, and will comply with all federal regulations relating to nonimmigrant students;
- I am a citizen / lawful permanent resident of the United States and maintain copies of a passport, birth certificate and/or green card for myself and all DSOs employed by my institution. Additionally, copies of these documents are readily accessible and are available to the SEVP upon request;
- I understand that willful misstatements may constitute perjury (18 USC § 1621);
- I understand that providing materially false, fictitious, or fraudulent information may subject me to criminal prosecution under 18 USC § 1001. Other possible criminal and civil violations may also be applicable; and
- I prepared the evidence sent to SEVP in response to its Request for Student Records dated April 16, 2025.


_____        _____
Printed name of PDSO                              Signature of PDSO


_____
Date

EXHIBIT 20



U.S. Department of Homeland Security

# 100 Days of Fighting Fake News

**Release Date:** April 30, 2025

*From Stories on Criminals to Statistics, DHS has been Holding the Media Accountable for Spreading Disinformation to the American people*

WASHINGTON— During President Trump's 100 days in office, the Department of Homeland Security published a non-exhaustive list of facts, to help set the record straight on numerous false and misleading stories that have spread around news coverage and social media.

The list can be found below:

## The Facts on Noteworthy Individuals Deported or Prevented from Entering the U.S.

- **The Deportation Of American Citizens**
  - The media has FALSELY claimed that ICE is deporting US citizen children of illegal aliens. This is false.
  - In both cases the mother made the determination to take her children with her back to Honduras.
  - DHS takes our responsibility to protect children seriously and will continue to work with federal law enforcement to ensure that children are safe and protected.
  - The Trump Administration is giving parents in this country illegally the opportunity to self-deport and take control of their departure process with the potential ability to return the legal, right way and come back to live the American dream. The CBP Home app is a free and easy way to self deport.
- **Kilmar Abrego Garcia - The "Maryland Man"**
  - Garcia is NOT an American citizen. He is a citizen of El Salvador who had been living in the country illegally.
  - In 2019, two courts – an immigration court and an appellate immigration court – ruled that he was not only a member of MS-13, but that he was in our country illegally. There was a deportation order for him dating back to 2019.
  - Further details about Garcia's history prove that he is far from innocent.
    - In 2020, his wife filed a petition for protection citing three separate instances of violence
    - In 2021, his wife filed for a restraining order against him due to domestic violence.
    - In 2022, Garcia was pulled over by Tennessee Highway Patrol with 8 people crammed into one car. Despite telling the officers that they were going on a trip from Houston, Texas to Temple Hills, Maryland, there was no sign of luggage in the car.
    - It was later revealed that the vehicle Garcia was driving during this stop was registered to another illegal alien who had been convicted of human trafficking, Jose Ramon Hernandez Reyes.
  - The media further claimed that the Supreme Court ordered the Trump Administration to return Garcia to the United States. This is another falsehood.
  - The Supreme Court unanimously overturned that judge's ruling but instead said that the United States should "facilitate" Garcia's return. This would only be possible if the government of El Salvador decided to return him, in which case the United States would have to provide transportation.
  - It's up to Salvadoran President Nayib Bukele and the government of El Salvador if they want to return him. But as President Bukele said during his Oval Office visit with President Trump, he has no intention of releasing a terrorist and sending him back to the United States.
  - When President Trump declared MS-13 a foreign terrorist organization, Abrego Garcia became no longer eligible for any form of immigration relief in the United States. He had a valid deportation order.
  - Furthermore, the Supreme Court also held that EVEN IF El Salvador returned this MS-13 member to the United States, we could deport him a second time. NO version of this legally ends with him ever living in the U.S., because he is a citizen of El Salvador.
  - The foreign policy of the United States is conducted by the President – not by a court – and no court in the United States has the power to conduct the foreign policy of the United States.
- **Dr. Rasha Alawieh - "The Brown University Assistant Professor"**
  - Dr. Rasha Alawieh was an assistant professor at Brown University. She was in the United States with an H-1B visa.
  - She was deported back to her home country of Lebanon after she admitted to attending the funeral of Hassan Nasrallah, a brutal terrorist who led Hezbollah and was responsible for killing hundreds of Americans.

- The media tried to portray Alawieh's case as an example of a "lawful immigrant" being deported. But they completely ignored her direct and alarming ties to radical Islamic terrorism, including her veneration of a dead terrorist leader.

- **Alfredo "Alex" Orellana - "The Caregiver"**
  - Alfredo "Alex" Orellana has multiple charges on his record from 2012 to 2019, including: distributing drugs, drug possession, assault and battery, failure to appear to court (twice), theft at the second degree, and larceny.
  - He has since been arrested and faces deportation.
  - The New York Times wrote a lengthy article on Orellana's case. Their article painted a picture of a loving 31-year-old caregiver who was the "best friend" of a 28-year-old autistic man. They also pointed to the fact that Orellana had a green card. The press tried to paint him as a victim who was a caretaker, despite violent charges on his record.

- **Jerce Reyes Barrios - "The Venezuelan Soccer Player"**
  - Jerce Reyes Barrios was in the United States illegally. He was a member of the vicious Tren de Aragua gang, and he was deported to El Salvador.
  - He has tattoos that are consistent with those indicating membership in the vicious Tren de Aragua gang.
  - His own social media indicates that he is a Tren de Aragua member.
  - That hasn't stopped the media, however. They tried to whip up a frenzy over this deported criminal gang member, publishing wild claims that he was deported because of a tattoo of a soccer team on his arm.
  - The facts are the facts. Our intelligence assessments go beyond just social media and tattoos. We are confident in our findings.

- **Nascimento Blair - "The Ex-Con"**
  - Blair was an illegal alien living in the United States who was tried and convicted for kidnapping and sentenced to 15 years in prison.
  - The New York Times published a fawning profile about this criminal illegal alien.
  - In 2008, he was ordered removed out of the country. However, because of the Biden administration's open border policies, this criminal illegal alien was released onto the streets of New York.
  - The Trump administration is putting the American people first by getting this criminal illegal alien off the streets and out of our country.

- **"The French Scientist Denied Entry Over His Political Views"**
  - In March, a French scientist was denied entry into the United States.
  - The researcher in question was in possession of confidential information on his electronic device from Los Alamos National Laboratory.
  - This was in clear violation of a non-disclosure agreement - something he admitted to taking without permission and attempted to conceal to authorities.
  - The mainstream media ran with the baseless narrative that this individual was blocked from entering the U.S. because of social media posts that were critical of President Trump.
  - This lie was even echoed by France's Minister for Higher Education, Philippe Baptiste.
  - His political beliefs were not considered at all in his removal.

- **Marie Lepère and Charlotte Pohl – "German Tourists Turned Away on Vacation"**
  - Two German tourists were denied entry after attempting to enter the U.S. under false pretenses.
  - Both claimed they were touring California but later admitted that they intended to work.
  - One used a Visitor visa, while the other used the Visa Waiver Program. Under U.S. immigration laws, work is prohibited for these visas.
  - The media version of events depicted two young women who tried to go on a five-week backpacking trip through the United States. The media claimed that the two – aged 18 and 19 – were "deported" because they simply wanted to go on a fun, loosely-planned trip.
  - These travelers weren't deported—they were denied entry. And the reason for their removal was visa fraud, not because of the planning nature of their so-called "vacation."

- **Jose Hermosillo – "The American Citizen Detained by Border Patrol"**
  - Hermosillo turned himself in to immigration authorities on April 8. He approached Border Patrol in Tucson, Arizona and declared that he had entered the U.S. illegally.
  - He completed a sworn statement identifying as a Mexican citizen who had entered unlawfully. He was processed and appeared in court on April 11. Afterwards, he was held by the U.S. Marshals in Florence, Arizona.
  - A few days later, his family presented documents showing U.S. citizenship. The charges were dismissed, and he was released to his family.
  - The media, instead of reporting the facts, created a false and baseless story that an American citizen was illegally detained.
  - Hermosillio's arrest was the direct action of his own actions and statements. When his citizenship was confirmed, he was promptly released back to his family.

- **Kseniia Petrova - "The Russian Scientist Trying to Cure Cancer"**
  - Kseniia Petrova, a Russian researcher working for Harvard University, was lawfully detained after lying to federal officers about carrying substances into the country. A subsequent K9 inspection uncovered undeclared petri dishes, containers of unknown substances, and loose vials of embryonic frog cells, all without proper permits.
  - Messages found on her phone revealed she planned to smuggle the materials through customs without declaring them.
  - She knowingly broke the law and took deliberate steps to evade it.
  - But upon her detainment, the media rushed to defend her by claiming that her research could help to cure cancer.

- The facts of the matter are simple: Petrova broke the law and actively planned to do so. Her research does not make her exempt from the laws of our country.
- **Renato Subotic – "The MMA Coach"**
  - Subotic is an MMA coach who entered the United States under a visa waiver program that prohibits compensation – only travel reimbursements are allowed.
  - When Subotic was detained under American law, the media claimed that he was thrown in prison and deported for no real reason. Here are the facts: Subotic couldn't meet the requirement to prove he wasn't being compensated for participating at a high-dollar, multi-day event.
  - The law is clear: the burden of proof is on the traveler. Since he couldn't provide detailed answers or the necessary documentation for compensation related to the work event, he was held until the next available flight out the following day.
- **Ricardo Jesus Prada Vasquez – The "Disappearing" Delivery Driver**
  - Yet again, the media has manufactured a fake controversy on behalf of a terrorist gang member and criminal illegal alien.
  - Ricardo Jesus Prada Vasquez is a Venezuelan national and confirmed member of Tren De Aragua. He entered the United States illegally on November 29, 2024 at the Brownsville, Texas Port of Entry via the CBP One App.
  - The Biden administration, like it did with so many other dangerous criminals, released Prada Vasquez back into the United States.
  - On January 15th, Prada was encountered trying to enter the U.S. from Canada. He was detained, investigated, and confirmed as a member of TDA and a public safety threat. On February 27, a judge ordered him removed from the U.S. He was then removed to El Salvador.
  - The media, however, has falsely claimed that Prada Vasquez was an innocent delivery driver who was "disappeared" by the government.
  - Prada Vasquez was living and working in the U.S. illegally, he was a member of a criminal gang designated as a terrorist organization, and was deported with full compliance with American law.
- **Jeanette Vizguerra – "The Activist Who Needed Sanctuary"**
  - Jeanette Vizguerra is a convicted criminal alien from Mexico who has a final order of deportation issued by a federal immigration judge. She illegally entered the United States near El Paso, Texas, on Dec. 24, 1997, and has received legal due process in U.S. immigration court.
  - The media, however, has tried to turn her into a martyr. They claim she was an "activist" who needed "sanctuary." In reality, she getting famous and making money for breaking the law.
  - Under President Trump, this is a nation of laws. We will find, arrest, and deport illegal aliens, no matter how famous the media thinks they are.
  - Vizguerra was in the United States illegally. She was convicted of breaking the law. She was deported.
  - If you come to our country illegally, we will deport you, and you will never return. The safest option for illegal aliens is to self-deport, so they still have the opportunity to return and live the American dream.

## The Facts on Those Who Have Abused The Privilege of a Student Visa

- **Yunseo Chung – "The Columbia Student"**
  - Yunseo Chung, who was born in South Korea, is a Columbia University student who engaged in concerning conduct on-campus. This includes her being arrested by NYPD during a pro-Hamas protest at Barnard College.
- **Mahmoud Khalil - "The Activist Leader at Columbia"**
  - Mahmoud Khalil, a former Columbia University graduate student from Syria, is one of the ringleaders of the vicious, anti-American, anti-Semitic protests at Columbia University. His activities are aligned with Hamas, a designated terrorist organization.
  - On March 9, 2025, in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State, U.S. Immigration and Customs Enforcement arrested Khalil.
  - But upon his arrest, radical student protesters at Columbia and across the country have attempted to turn him into a martyr, waving signs and banners bearing his likeness.
  - Taking over private buildings, inciting violence, harassing Jewish students, defacing buildings, and passing out terrorist propaganda do not constitute free speech.
  - A judge ruled that Khalil's deportation can move forward. He will be removed from our country.
- **Mohsen Mahdawi – "The Palestinian at Columbia University"**
  - Mahdawi is a Palestinian who has been living in the United States on a visa while he was studying at Columbia University.
  - Like many other anti-Israel student protesters, supporters in the media tried to claim that Mahdawi was a victim of political persecution. But his rhetoric on the war in Israel proves his terrorist sympathies.
  - In the wake of October 7, Mahdawi said he could empathize with Hamas's attack on Israel.
  - He appeared on "60 Minutes" justifying the massacre.
  - He organized and led pro-Hamas protests on Columbia University's campus, harassed Jewish students, and openly displayed his support for a terrorist organization.
- **Leqaa Kordia – "The Palestinian at Columbia University"**

- Leqaa Kordia was another Columbia Student who actively participated in anti-American, pro-terrorist activities on campus.
- However, her arrest had nothing to do with her radical activities.
- Kordia was arrested for immigration violations due to having overstayed her F-1 student visa, which had been terminated on January 26, 2022 for lack of attendance
- **Dogukan Gunaydin - "The University of Minnesota Student"**
  - Dogukan Gunaydin, a graduate student at the University of Minnesota, was arrested after a visa revocation by the State Dept. related to a prior criminal history for a DUI.
  - Contrary to the mainstream media's quick speculation that he was arrested due to his involvement in student protests, his protest activity had nothing to do with his detainment.
- **Badar Khan Suri – "The Georgetown Foreign Exchange Student"**
  - Suri was a foreign exchange student at Georgetown University actively spreading Hamas propaganda and promoting antisemitism on social media.
  - The media calls him a "scholar" who was innocent of any wrongdoing, even though he was married to the daughter of a senior advisor for to Hamas terrorist group.
- **Momodou Taal – "The Cornell University Student"**
  - Taal was unapologetic in his pro-terrorist views.
  - Taal, a foreign student studying at Cornell University, participated in pro-Hamas protests on campus.
  - He has a pinned post on his X profile that talks about a so-called "Zionist genocide," and also states "Long live the student intifada!"

## Other Fake News Narratives Corrected

- **The Biden Administration's inflated deportation numbers**
  - DHS uncovered what should be a massive scandal: the Biden administration was cooking the books on ICE arrest data. They were purposefully misleading the American public by categorizing individuals processed and released into the interior of the United States as ICE arrests.
  - Of course, the media ignored this fact. Instead, they falsely claimed that the Biden administration had carried out more arrests than the Trump administration.
  - Tens of thousands of cases recorded as "arrests" were, in fact, instances where illegal aliens were simply processed and released into American communities.
  - Many of these were violent criminals and gang members.
  - The previous administration counted these as arrests even though no immigration enforcement action was taken.
  - During fiscal year 2024, ICE made 113,431 arrests but the vast majority of those were what we call "pass-through" arrests.
  - They are called pass-through arrests because ICE didn't take enforcement actions against these aliens. They just passed through ICE before they were released in the U.S. interior and told to report to an ICE office.
  - None of the arrests made by ICE since January 20th are pass-through arrests.
  - The difference between recent arrests and those from Biden's last year is that, now we're taking enforcement actions against each and every illegal alien arrested.
- **ICE Boston Militia rumors:**
  - The media eagerly fed and spread a false social media rumor that an ICE agent who conducted arrests of criminal illegal aliens in New England was a "militia leader" from Arizona.
  - The reality? He is a federal law enforcement office who has worked with ICE to help keep New England communities safe for years.
  - This claim was not only false, but also inflammatory and places the safety of federal officers in jeopardy.
  - Our ICE officers are facing 300% increase in assaults while carrying out enforcement operations.
- **Due process and treatment rumors in CECOT:**
  - These aliens HAVE had due process – we have a stringent law enforcement assessment in place that abides by due process under the U.S. Constitution.
  - The reality is that prison isn't supposed to be fun. It's a necessary measure to protect society and punish bad guys. It is not meant to be comfortable.
  - What's more: prison can be avoided by self-deportation. CBP Home makes it simple and easy.
  - If you are a criminal alien and we have to deport you, you could end up in Guantanamo Bay or CECOT. Leave now.
- **DOGE and ICE allegedly collecting sensitive data from the Centers for Medicare and Medicaid Services**
  - The Biden administration flooded the U.S. with tens of millions of illegal immigrants, many of which are exploiting the American taxpayer by illegally getting Medicare and other benefits meant for law-abiding Americans.
  - President Trump consistently promised to protect Medicare for eligible beneficiaries.
  - To keep that promise, DOGE, CMS, and DHS are exploring an initiative to ensure that illegal aliens are not receiving these benefits not meant for them.

- The media claimed that ICE is working with the Department of Government Efficiency (DOGE) to access sensitive personal information in order to identify illegal aliens. These claims are meant to frighten the American people, when in reality this process is working to keep them and their benefits safe from exploitation by illegal aliens.
- **ICE HSI presence at schools**
  - ICE's Homeland Security Investigations (HSI) works relentlessly to protect Americans, especially children, who are put in danger by illegal alien activity. This includes investigations into potential child sex trafficking.
  - But the media has tried to spin their investigative work into the idea that they are going to elementary schools to arrest children.
  - **HD Cooke Elementary School, Washington D.C.**
    - At the HD Cooke Elementary School in Washington D.C., ICE did not conduct any enforcement action at the school. HSI agents were present at the school unrelated to any kind of enforcement action.
  - **Russel Elementary and Lillian Elementary in Los Angeles:**
    - At two different elementary schools in Los Angeles, California, HSI officers were conducting wellness checks on children who arrived unaccompanied at the border. It had nothing to do with immigration enforcement.
  - DHS is leading efforts to conduct welfare checks on these children to ensure that they are safe and not being exploited, abused, and sex trafficked.
  - Unlike the previous administration, President Trump and Secretary Noem take the responsibility to protect children seriously and will continue to work with federal law enforcement to reunite children with their families.
  - In less than 70 days, Secretary Noem and Secretary Kennedy have already reunited nearly 5,000 unaccompanied children with a relative or safe guardian.
- **Immigrant children detained at Old McDonald Farm in New York**
  - In early April, a raid was carried out on a dairy farm in New York after the execution of a federal criminal warrant for an illegal alien in possession of + distributing child sexual abuse materials.
  - Upon the execution of the search warrant at Old McDonalds Farm in Sackets Harbor, New York, authorities encountered seven additional illegal aliens on the premises, including a mother and her three children. We immediately began conducting an investigation to ensure these children are not being sexually exploited.
  - But rather than address the very real evidence of child sexual abuse, the media chose to focus on the fact that a woman and her three children were taken into custody.
  - DHS takes its responsibility to protect children seriously and our ICE officers are working every day to remove pedophiles from American communities.
- **TDA members being identified via tattoos**
  - Some have claimed that DHS' assessments of TDA and other gang memberships are based solely on the tattoos that certain illegal aliens have.
  - DHS intelligence assessments go well beyond just gang affiliate tattoos and social media.
  - Tren De Aragua is one of the most violent and ruthless terrorist gangs on planet earth. They rape, maim, and murder for sport. President Trump and Secretary Noem will not allow criminal gangs to terrorize American citizens.
  - We are confident in our law enforcement's intelligence, and we aren't going to share intelligence reports and undermine national security every time a gang member denies he is one. That would be insane.

## Topics

BORDER SECURITY (/TOPICS/BORDER-SECURITY)     HOMELAND SECURITY ENTERPRISE (/TOPICS/HOMELAND-SECURITY-ENTERPRISE)
HUMAN TRAFFICKING (/TOPICS/HUMAN-TRAFFICKING)     IMMIGRATION AND CUSTOMS ENFORCEMENT (/TOPICS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT)

## Keywords

BORDER SECURITY (/KEYWORDS/BORDER-SECURITY)     BORDER WALL (/KEYWORDS/BORDER-WALL)
CUSTOMS AND BORDER PROTECTION (CBP) (/KEYWORDS/CUSTOMS-AND-BORDER-PROTECTION-CBP)
DEPARTMENT OF GOVERNMENT EFFICIENCY (DOGE) (/KEYWORDS/DEPARTMENT-GOVERNMENT-EFFICIENCY-DOGE)
DEPARTMENT OF HOMELAND SECURITY (DHS) (/KEYWORDS/DEPARTMENT-HOMELAND-SECURITY-DHS)     DEPORTATION (/KEYWORDS/DEPORTATION)
HOMELAND SECURITY INVESTIGATIONS (HSI) (/KEYWORDS/HOMELAND-SECURITY-INVESTIGATIONS-HSI)
IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) (/KEYWORDS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT-ICE)

Last Updated: 05/27/2025