## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN ASSOCIATIONS OF UNIVERSTIY PROFESSORS, ET AL., <br><br> *Plaintiffs*, <br><br> v. <br><br> MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, ET AL., <br><br> *Defendants.* | No. 1:25-cv-10685-WGY <br><br> NOTICE OF PRIVILEGE LOG FILING IN RESPONSE TO JULY 7, 2025 BENCH ORDER |

In accordance with the Court's July 7, 2025 bench ruling, Defendants hereby submit detailed privilege logs and supporting agency declarations for the privilege invocations over documents contained in Defendants' June 11, 2025 and July 2, 2025 in camera, ex parte submissions.  *See* Dkt. ## 131, 181. Separately, Defendants will provide in camera, and ex parte, proposed privilege redactions to the documents in those submissions for the Court's review and consideration. The following documents are attached:

Exhibit 1:  Privilege Log for June 11, 2025 In Camera, Ex Parte Submission

Exhibit 2: Privilege Log for July 2, 2025 In Camera, Ex Parte Submission

Exhibit 3: Declaration of Gary M. Lawkowski

Exhibit 4: Declaration of John Armstrong

Exhibit 5: Declaration of William S. Walker

Exhibit 6: Declaration of Luis Mejia

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General

WILLIAM KANELLIS

DREW C. ENSIGN
*Deputy Assistant Attorney General*

*Ethan B. Kanter*
ETHAN B. KANTER
*Chief, National Security Unit*
*Office of Immigration Litigation*
*Civil Division, U.S. Department of Justice*
*P.O. Box 878, Ben Franklin Station*
*Washington, D.C. 20001*

PAUL F. STONE
*Deputy Chief, National Security Unit*
*Office of Immigration Litigation*

Dated: July 11, 2025

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*Date: July 11, 2025*                                  By: *Ethan B. Kanter*
                                                       ETHAN B. KANTER
                                                       *Chief, National Security Unit*
                                                       *Office of Immigration Litigation*
                                                       *P.O. Box 878, Ben Franklin Station*
                                                       *Washington, D.C. 20001*

# Exhibit 1

AAUP et al. v. Rubio et al., 25-cv-10685 -- Privilege Log for June 11, 2025 In Camera Document Submission

| Exhibit | Agency of Origin | Document Name | Date | Privilege | Privilege Description |
|---|---|---|---|---|---|
| Ex A | U.S. Department of State | Report on Department of State Authorities to Counter Anti-Semitism and Recommendations for Familiarizing Institutions of Higher Education with the Security and Related Grounds for Visa Inadmissibility | 20-Mar-25 | WH - White House Communications Privilege; DP - Deliberative Process Privilege | **WH** - This document was prepared to assist the President in making a decision regarding countering Anti-Semitism at institutions of higher education. The document was solicited and received by immediate presidential advisors or their staff who have broad and significant responsibility for investigating and formulating advice to be given to the President with respect to decision-making on the subject of immigration policy. Without the protection of the presidential communications privilege over the document, presidential advisors and their staffs would be chilled from having candid conversations with senior officials in cabinet agencies, gathering relevant information, exploring alternatives, and providing fully informed recommendations regarding the performance of the President's duties. **DP** - This document was prepared to support internal agency deliberations within the Department of State (DOS), across interagency partners, and with the President and his advisors. This document is both pre-decisional and deliberative in nature. It reflects internal agency assessments, legal and policy interpretations, and potential courses of action that have not been finalized or adopted. Sensitive foreign policy and national security matters are contained within this report. The DOS depends on candid internal deliberations and the ability of its personnel to provide frank assessments without the fear of premature and improper disclosure. The release of this document would compromise the Department's ability to perform its mission. |
| Ex. G | U.S. Department of Homeland Security | "Subject Profile" of Specific Individual | 12-Mar-25 | LE - Law Enforcement Privilege | Law Enforcement Privilege Assertion Upheld by the Court on July 10, 2025 |

| Ex L | U.S. Department of State | Action Memo for the Secretary -- Removal of [Specific Individuals] under INA 237(a)(4)(C) | 8-Mar-25 | DP - Deliberative Process Privilege | **DP** - This document is a memorandum from a Senior Bureau Official within the Department of State to the Secretary of State and provides recommendations and analysis of policy and legal considerations regarding proposed use of INA 237(a)(4)(C) with respect to two individuals.  This document was prepared to assist the Secretary in making a decision regarding the use of INA 237(a)(4)(C). If Department employees are aware that their opinions, deliberations, and recommendations may be subject to public disclosure – and the scrutiny, potential misinterpretation and criticisms that may follow, the candor of their views could be chilled. It is thus critical that pre-decisional and deliberative communications and procedures be protected from disclosure. |

AAUP et al. v. Rubio et al., 25-cv-10685 -- Privilege Log for June 11, 2025 In Camera Document Submission

| Ex M | U.S. Department of State | Action Memo for the Secretary -- Determination of Deportability of [Specific Individual] under INA 237(a)(4)(C) | 15-Mar-25 | DP - Deliberative Process Privilege; LEP - Law Enforcement Privilege | **DP** - This document is a memorandum from a Senior Bureau Official within the Department of State to the Secretary of State and provides recommendations and analysis of policy and legal considerations regarding proposed use of INA 237(a)(4)(C) with respect to two individuals.  This document was prepared to assist the Secretary in making a decision regarding the use of INA 237(a)(4)(C). If Department employees are aware that their opinions, deliberations, and recommendations may be subject to public disclosure – and the scrutiny, potential misinterpretation and criticisms that may follow, the candor of their views could be chilled. It is thus critical that pre-decisional and deliberative communications and procedures be protected from disclosure. **LEP** - This document further contains law enforcement privileged material from CBP. The document contains information which would reveal the nature, scope or focus of certain law enforcement processes, techniques, or methods used by CBP in carrying out its national security and law enforcement missions.  This includes information available to CBP and subject specific analysis relating to CBP's national security and immigration enforcement missions which if disclosed to the public could reveal the nature and extent of information specific to a law enforcement investigation. |

AAUP et al. v. Rubio et al., 25-cv-10685 -- Privilege Log for June 11, 2025 In Camera Document Submission

| Ex N | U.S. Department of State | Action Memo for the Secretary -- Determination of Deportability of [Specific Individual] under INA 237(a)(4)(C) | 15-Mar-25 | DP - Deliberative Process Privilege | **DP** - This document is a memorandum from a Senior Bureau Official within the Department of State to the Secretary of State and provides recommendations and analysis of policy and legal considerations regarding proposed use of INA 237(a)(4)(C) with respect to two individuals.  This document was prepared to assist the Secretary in making a decision regarding the use of INA 237(a)(4)(C). If Department employees are aware that their opinions, deliberations, and recommendations may be subject to public disclosure – and the scrutiny, potential misinterpretation and criticisms that may follow, the candor of their views could be chilled. It is thus critical that pre-decisional and deliberative communications and procedures be protected from disclosure. |
|---|---|---|---|---|---|
| Ex O | U.S. Department of State | Action Memo for Senior Bureau Official John Armstrong -- [Specific Individual's] Visa Revocation | 21-Mar-25 | DP - Deliberative Process Privilege | **DP** - This document is a memorandum from a Deputy Assistant Secretary within the Department of State to a Senior Bureau Official and provides recommendations and analysis of policy and legal considerations regarding proposed use of INA 221(i) with respect to an individual.  This document was prepared to assist the Senior Bureau Official in making a decision regarding the use of INA 221(i). If Department employees are aware that their opinions, deliberations, and recommendations may be subject to public disclosure – and the scrutiny, potential misinterpretation and criticisms that may follow, the candor of their views could be chilled. It is thus critical that pre-decisional and deliberative communications and procedures be protected from disclosure. |

# Exhibit 2

| Page/Doc ID | Email Sent Date | Custodian Name | Email From | Email To | Email CC | Email Subject/Document Name | Privilege Description | Basis for Privilege |
|---|---|---|---|---|---|---|---|---|
| Page 11 - 12 (REV0000103213) | 03/08/2025 11:44:19 PM | | | | | Fw: For Administrative Arrest | LEP: Arrest plan for Specific Individual, who was not arrested by ICE and is subject to ongoing and future investigation; number of agents assigned to arrest operations and roles in such operation; | **LEP: Operational Integrity:** The effectiveness of ongoing and future law enforcement operations could be severely compromised if criminals, suspects, or the public learns of sensitive techniques and procedures utilized in ongoing and future investigations, surveillance, and arrests.If disclosed, such sensitives techniques and procedures could be rendered ineffective in future operations. Criminals and suspects may use this information to evade detection, alter their behavior, or take countermeasures against law enforcement efforts. For instance, knowing such information could allow suspects to identify patterns in law enforcement activities, making it easier for them to avoid capture or disrupt investigations. Additionally, the disclosure of such information could undermine the ability of law enforcement agencies to conduct covert operations, gather intelligence, and execute strategic plans effectively. It safeguards ongoing investigations by preventing suspects from being alerted and taking steps to evade capture or destroy evidence. The specific individual addressed in this document was not arrested and therefore the arrest plan discussed in this email could be used in future investigations against other persons of interests. The disclosure of this information could jeopardize future law enforcement plans. Redacting this information  preserves the integrity of broader strategic approaches used by ICE while ensuring our investigations continued effectiveness. Therefore, maintaining the confidentiality of the arrest plan is essential to carrying out ICE's duties and for public safety. |
| Page 13-14 REV0000110071 | 03/09/2025 09:33:58 PM | | | | | FW: For Administrative Arrest | LEP: Arrest plan for Specific Individual, who was not arrested by ICE and is subject to ongoing and future investigation; number of agents assigned to arrest operations and roles in such operation; | **LEP: Operational Integrity:** The effectiveness of ongoing and future law enforcement operations could be severely compromised if criminals, suspects, or the public learns of sensitive techniques and procedures utilized in ongoing and future investigations, surveillance, and arrests.If disclosed, such sensitives techniques and procedures could be rendered ineffective in future operations. Criminals and suspects may use this information to evade detection, alter their behavior, or take countermeasures against law enforcement efforts. For instance, knowing such information could allow suspects to identify patterns in law enforcement activities, making it easier for them to avoid capture or disrupt investigations. Additionally, the disclosure of such information could undermine the ability of law enforcement agencies to conduct covert operations, gather intelligence, and execute strategic plans effectively. It safeguards ongoing investigations by preventing suspects from being alerted and taking steps to evade capture or destroy evidence. The specific individual addressed in this document was not arrested and therefore the arrest plan discussed in this email could be used in future investigations against other persons of interests. The disclosure of this information could jeopardize future law enforcement plans. Redacting this information  preserves the integrity of broader strategic approaches used by ICE while ensuring our investigations continued effectiveness. Therefore, maintaining the confidentiality of the arrest plan is essential to carrying out ICE's duties and for public safety. |
| Page 18 - 19 (REV0000123891) | 03/08/2025 11:59:40 PM | | | | | Fw For Administrative Arrest | LEP: Arrest plan for Specific Individual, who was not arrested by ICE and is subject to ongoing and future investigation; number of agents assigned to arrest operations and roles in such operation; | **LEP: Operational Integrity:** The effectiveness of ongoing and future law enforcement operations could be severely compromised if criminals, suspects, or the public learns of sensitive techniques and procedures utilized in ongoing and future investigations, surveillance, and arrests.If disclosed, such sensitives techniques and procedures could be rendered ineffective in future operations. Criminals and suspects may use this information to evade detection, alter their behavior, or take countermeasures against law enforcement efforts. For instance, knowing such information could allow suspects to identify patterns in law enforcement activities, making it easier for them to avoid capture or disrupt investigations. Additionally, the disclosure of such information could undermine the ability of law enforcement agencies to conduct covert operations, gather intelligence, and execute strategic plans effectively. It safeguards ongoing investigations by preventing suspects from being alerted and taking steps to evade capture or destroy evidence. The specific individual addressed in this document was not arrested and therefore the arrest plan discussed in this email could be used in future investigations against other persons of interests. The disclosure of this information could jeopardize future law enforcement plans. Redacting this information  preserves the integrity of broader strategic approaches used by ICE while ensuring our investigations continued effectiveness. Therefore, maintaining the confidentiality of the arrest plan is essential to carrying out ICE's duties and for public safety. |
| Page 22 - 25 (REV0000126721_0001) | | | | | | Record of Deportable/Inadmissible Alien | LEP: Law enforcement case code | **LEP:** Aside from the purposes of indexing, storing, locating, retrieving, and distributing information, codes also indicate various aspects of investigative cases, such as: the type and location of a case; whether or not a subject should undergo closer scrutiny; and the distribution of information relating to a case, which could indicate the scope and relative size of the investigation in terms of agency resources, types of activity being investigated and location of investigative efforts. Release of codes, along with computer function commands, could assist third parties in deciphering the meanings of codes, which could potentially impede ongoing investigations as well as pose a danger to ICE personnel. This type of information must be redacted to reduce the possibility that someone would improperly gain access to any of these databases (i.e., a "hacker") and would be able to navigate the systems that house ICE investigative records, among the records of other law enforcement agencies. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Page 36 - 37 (REV0000131591) | 03/08/2025 08:45:26 PM | | | | FW: ROA1s- D3 target | LEP: Arrest plan for Specific Individual, who was not arrested by ICE and is subject to ongoing and future investigation; number of agents assigned to arrest operations and roles in such operation; | **LEP: Operational Integrity:** The effectiveness of ongoing and future law enforcement operations could be severely compromised if criminals, suspects, or the public learns of sensitive techniques and procedures utilized in ongoing and future investigations, surveillance, and arrests.If disclosed, such sensitives techniques and procedures could be rendered ineffective in future operations. Criminals and suspects may use this information to evade detection, alter their behavior, or take countermeasures against law enforcement efforts. For instance, knowing such information could allow suspects to identify patterns in law enforcement activities, making it easier for them to avoid capture or disrupt investigations. Additionally, the disclosure of such information could undermine the ability of law enforcement agencies to conduct covert operations, gather intelligence, and execute strategic plans effectively. It safeguards ongoing investigations by preventing suspects from being alerted and taking steps to evade capture or destroy evidence. The specific individual addressed in this document was not arrested and therefore the arrest plan discussed in this email could be used in future investigations against other persons of interests. The disclosure of this information could jeopardize future law enforcement plans. Redacting this information  preserves the integrity of broader strategic approaches used by ICE while ensuring our investigations continued effectiveness. Therefore, maintaining the confidentiality of the arrest plan is essential to carrying out ICE's duties and for public safety. |
| Page 38 - 39 (REV0000132226) | 03/08/2025 08:57:00 PM | | | | RE: ROA1s- D3 target | LEP: Arrest plan for Specific Individual, who was not arrested by ICE and is subject to ongoing and future investigation; number of agents assigned to arrest operations and roles in such operation; | **LEP: Operational Integrity:** The effectiveness of ongoing and future law enforcement operations could be severely compromised if criminals, suspects, or the public learns of sensitive techniques and procedures utilized in ongoing and future investigations, surveillance, and arrests.If disclosed, such sensitives techniques and procedures could be rendered ineffective in future operations. Criminals and suspects may use this information to evade detection, alter their behavior, or take countermeasures against law enforcement efforts. For instance, knowing such information could allow suspects to identify patterns in law enforcement activities, making it easier for them to avoid capture or disrupt investigations. Additionally, the disclosure of such information could undermine the ability of law enforcement agencies to conduct covert operations, gather intelligence, and execute strategic plans effectively. It safeguards ongoing investigations by preventing suspects from being alerted and taking steps to evade capture or destroy evidence. The specific individual addressed in this document was not arrested and therefore the arrest plan discussed in this email could be used in future investigations against other persons of interests. The disclosure of this information could jeopardize future law enforcement plans. Redacting this information  preserves the integrity of broader strategic approaches used by ICE while ensuring our investigations continued effectiveness. Therefore, maintaining the confidentiality of the arrest plan is essential to carrying out ICE's duties and for public safety. |
| Page 41 - 42 (REV0000134419 ) | 03/23/2025 07:35:37 PM | | | | FW: Signed memo | ACP: conversations between ICE-OPLA attorneys with ICE law enforcement personnel. | **Attorney Client Privilege:** This document contains correspondences between ICE's Office of the Principal Legal Advisor (OPLA) and employees of Homeland Security Investigations (HSI) regarding updates surrounding an arrest of a person of interest and the circumstantial difficulties of carrying out such arrest. Asserting attorney-client privilege is essential to protect the confidentiality of communications between a client and their attorney, ensuring that clients can speak freely and openly without fear of disclosure. The privilege applies to communications intended to be confidential and made for the purpose of seeking, obtaining, or providing legal advice within an established attorney-client relationship. It safeguards discussions about legal strategies, case theories, and potential actions, allowing attorneys to develop effective legal strategies without risk of exposure. This protection encourages clients to fully disclose all relevant information, enabling attorneys to provide accurate and effective legal counsel. |
| Page 43 - 48 (REV0000134454) | 03/25/2025 09:28:28 PM | | | | FW: Signed memo | ACP: conversations between ICE-OPLA attorneys with ICE law enforcement personnel. | **Attorney Client Privilege:** This document contains correspondences between ICE's Office of the Principal Legal Advisor (OPLA) and employees of Homeland Security Investigations (HSI) regarding updates surrounding an arrest of a person of interest and the circumstantial difficulties of carrying out such arrest. Asserting attorney-client privilege is essential to protect the confidentiality of communications between a client and their attorney, ensuring that clients can speak freely and openly without fear of disclosure. The privilege applies to communications intended to be confidential and made for the purpose of seeking, obtaining, or providing legal advice within an established attorney-client relationship. It safeguards discussions about legal strategies, case theories, and potential actions, allowing attorneys to develop effective legal strategies without risk of exposure. This protection encourages clients to fully disclose all relevant information, enabling attorneys to provide accurate and effective legal counsel. |
| Page 50 - 51 (REV0000141523) | 03/13/2025 04:12:04 PM | | | | RE: Columbia University Subject | LEP: Arrest plan for Specific Individual who was not arrested by ICE and is subject to ongoing and future investigation | **LEP: Operational Integrity:** The effectiveness of ongoing and future law enforcement operations could be severely compromised if criminals, suspects, or the public learns of sensitive techniques and procedures utilized in ongoing and future investigations, surveillance, and arrests.If disclosed, such sensitives techniques and procedures could be rendered ineffective in future operations. Criminals and suspects may use this information to evade detection, alter their behavior, or take countermeasures against law enforcement efforts. For instance, knowing such information could allow suspects to identify patterns in law enforcement activities, making it easier for them to avoid capture or disrupt investigations. Additionally, the disclosure of such information could undermine the ability of law enforcement agencies to conduct covert operations, gather intelligence, and execute strategic plans effectively. It safeguards ongoing investigations by preventing suspects from being alerted and taking steps to evade capture or destroy evidence. The specific individual addressed in this document was not arrested and therefore the arrest plan discussed in this email could be used in future investigations against other persons of interests. The disclosure of this information could jeopardize future law enforcement plans. Redacting this information  preserves the integrity of broader strategic approaches used by ICE while ensuring our investigations continued effectiveness. Therefore, maintaining the confidentiality of the arrest plan is essential to carrying out ICE's duties and for public safety. |

AAUP et al. v. Rubio et al., 25-cv-10685 -- Privilege Log For July 2, 2025 In Camera Document Submission

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Page 58 (REV0000142133) | 03/19/2025 10:07:49 PM | ███ | ███ ███ | ███ ███ ███ ███ | ███ ███ | Surveillance Manhattan 0900hrs | LEP: Arrest plan for Specific Individual who was not arrested by ICE and is subject to ongoing and future investigation | **LEP: Operational Integrity**: The effectiveness of ongoing and future law enforcement operations could be severely compromised if criminals, suspects, or the public learns of sensitive techniques and procedures utilized in ongoing and future investigations, surveillance, and arrests.If disclosed, such sensitives techniques and procedures could be rendered ineffective in future operations. Criminals and suspects may use this information to evade detection, alter their behavior, or take countermeasures against law enforcement efforts. For instance, knowing such information could allow suspects to identify patterns in law enforcement activities, making it easier for them to avoid capture or disrupt investigations. Additionally, the disclosure of such information could undermine the ability of law enforcement agencies to conduct covert operations, gather intelligence, and execute strategic plans effectively. It safeguards ongoing investigations by preventing suspects from being alerted and taking steps to evade capture or destroy evidence. The specific individual addressed in this document was not arrested and therefore the arrest plan discussed in this email could be used in future investigations against other persons of interests. The disclosure of this information could jeopardize future law enforcement plans. Redacting this information  preserves the integrity of broader strategic approaches used by ICE while ensuring our investigations continued effectiveness. Therefore, maintaining the confidentiality of the arrest plan is essential to carrying out ICE's duties and for public safety. |
| Page 59 - 60 (REV0000143672_0004) | 4/8/2025 6:21 PM | ███ | | | | Report of Investigation (ROI) | LEP: information and explanation regarding law enforcement technologies and what information such technology has found regarding a person of interest in an ongoing and future investigation. | **LEP**: Report of Investigation (ROI) detailing specific law enforcement technologies and surveillance methods used to obtain information about a person of interest, and how that specific technology works. Asserting law enforcement privilege to protect technologies and methods of surveillance is crucial to maintaining the effectiveness and integrity of law enforcement operations. Disclosure of these sensitive techniques could compromise future investigations by allowing criminals to anticipate and counteract surveillance methods, thereby evading detection and apprehension. Protecting this information ensures that law enforcement agencies can continue to use advanced technologies and methods effectively without the risk of them becoming public knowledge and losing their operational value. This privilege also safeguards the safety of law enforcement personnel and the success of ongoing and future investigations, ultimately contributing to public safety and the enforcement of the law. |
| Page 62 - 268 (REV0000330578_0001) | 3/8/2025 2:31 AM | ███ | | | | Intelligence Report | LEP: Intelligence report pulled from law enforcement database illustrating system functionalities and results surrounding a person of interest. | **LEP**: Document is an intelligence report illustrating law enforcement's databases and capabilities of such database reporting on sensitive information surrounding persons of interest. Document details in full what information can be found by ICE when conducting an investigation on an individual. Asserting law enforcement privilege to protect databases and intelligence reports is essential to safeguarding sensitive information that is critical to ICE's law enforcement operations. Disclosure of these resources could compromise ongoing investigations, reveal confidential sources, and expose methods used to gather and analyze intelligence, thereby undermining the effectiveness of law enforcement efforts. Protecting this information ensures that ICE can securely store and utilize data to track criminal activities, identify threats, and develop strategies without the risk of it being accessed by unauthorized individuals or criminal entities. This privilege is vital for maintaining the confidentiality and integrity of law enforcement operations, ensuring the safety of personnel and informants, and supporting the overall mission of public safety and security. |
| Page 269 - 272 (REV0000332022_0003) | 3/9/2025 5:22 PM | ███ | | | | Social Media Profile Results . | LEP: Intelligence report pulled from law enforcement database illustrating system functionalities and results surrounding a person of interest; Law enforcement case code. | **LEP**: Document is an intelligence report illustrating law enforcement's databases and capabilities of such database reporting on sensitive information surrounding persons of interest. Document details in full what information can be found by ICE when conducting an investigation on an individual. Asserting law enforcement privilege to protect databases and intelligence reports is essential to safeguarding sensitive information that is critical to ICE's law enforcement operations. Disclosure of these resources could compromise ongoing investigations, reveal confidential sources, and expose methods used to gather and analyze intelligence, thereby undermining the effectiveness of law enforcement efforts. Protecting this information ensures that ICE can securely store and utilize data to track criminal activities, identify threats, and develop strategies without the risk of it being accessed by unauthorized individuals or criminal entities. This privilege is vital for maintaining the confidentiality and integrity of law enforcement operations, ensuring the safety of personnel and informants, and supporting the overall mission of public safety and security. Additionally, aside from the purposes of indexing, storing, locating, retrieving, and distributing information, codes also indicate various aspects of investigative cases, such as: the type and location of a case; whether or not a subject should undergo closer scrutiny; and the distribution of information relating to a case, which could indicate the scope and relative size of the investigation in terms of agency resources, types of activity being investigated and location of investigative efforts. Release of codes, along with computer function commands, could assist third parties in deciphering the meanings of codes, which could potentially impede ongoing investigations as well as pose a danger to ICE personnel. This type of information must be redacted to reduce the possibility that someone would improperly gain access to any of these databases (i.e., a "hacker") and would be able to navigate the systems that house ICE investigative records, among the records of other law enforcement agencies. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Page 273 - 279 (REV0000332022_0004) | 3/9/2025 5:21 PM | ███ | | | | Social Media Profile Results | LEP: Intelligence report pulled from law enforcement database illustrating system functionalities and results surrounding a person of interest; Law enforcement case code. | **LEP:** Document is an intelligence report illustrating law enforcement's databases and capabilities of such database reporting on sensitive information surrounding persons of interest. Document details in full what information can be found by ICE when conducting an investigation on an individual. Asserting law enforcement privilege to protect databases and intelligence reports is essential to safeguarding sensitive information that is critical to ICE's law enforcement operations. Disclosure of these resources could compromise ongoing investigations, reveal confidential sources, and expose methods used to gather and analyze intelligence, thereby undermining the effectiveness of law enforcement efforts. Protecting this information ensures that ICE can securely store and utilize data to track criminal activities, identify threats, and develop strategies without the risk of it being accessed by unauthorized individuals or criminal entities. This privilege is vital for maintaining the confidentiality and integrity of law enforcement operations, ensuring the safety of personnel and informants, and supporting the overall mission of public safety and security. Additionally, aside from the purposes of indexing, storing, locating, retrieving, and distributing information, codes also indicate various aspects of investigative cases, such as: the type and location of a case; whether or not a subject should undergo closer scrutiny; and the distribution of information relating to a case, which could indicate the scope and relative size of the investigation in terms of agency resources, types of activity being investigated and location of investigative efforts. Release of codes, along with computer function commands, could assist third parties in deciphering the meanings of codes, which could potentially impede ongoing investigations as well as pose a danger to ICE personnel. This type of information must be redacted to reduce the possibility that someone would improperly gain access to any of these databases (i.e., a "hacker") and would be able to navigate the systems that house ICE investigative records, among the records of other law enforcement agencies. |
| Page 280 - 284 (REV0000333640_0012) | 3/17/2025 5:28 PM | ███ | | | | Customs and Border Patrol Incident Log Report | LEP: CBP Incident Log Report pulled from law enforcement database detailing an encounter between CBP and Specific Individual on January 12, 2019. | **LEP:** Document is an Incident Log Report pulled from a CBP law enforcement database, TECS, that documents a secondary inspection of a specific individual at the Derby Line, VT port of entry on January 12, 2019. The document contains information which would reveal the nature, scope or focus of certain law enforcement processes, techniques, or methods used by CBP in carrying out its national security and law enforcement missions. TECS is an overarching law enforcement information collection, risk assessment, and information sharing system and is a repository for law enforcement and investigative information, including inspection records. Disclosure of the redacted portions of this report would disclose system codes, procedures and techniques, and subject specific analysis which if disclosed could jeopardize ongoing investigations and border security operations as well as law enforcement priorities that could be exploited if disclosed. This document also contains redactions to personally identifiable information of the involved law enforcement officers, which, if disclosed, could reveal the nature and extent of CBP's law enforcement interest in the individual encountered. None of this PII pertains to ICE officers and instead relates to CBP officers and a Vermont State Police Officer. |
| Page 285 - 286 (REV0000352240) | 03/16/2025 10:22:22 PM | ███ | ███ | ███ | ███ | Re: 17MAR2025 Surveillance 1 | LEP: Document contains HSI radio channel; Law enforcement case code | **LEP:** Document is an intelligence report illustrating law enforcement's databases and capabilities of such database reporting on sensitive information surrounding persons of interest. Document details in full what information can be found by ICE when conducting an investigation on an individual. Asserting law enforcement privilege to protect databases and intelligence reports is essential to safeguarding sensitive information that is critical to ICE's law enforcement operations. Disclosure of these resources could compromise ongoing investigations, reveal confidential sources, and expose methods used to gather and analyze intelligence, thereby undermining the effectiveness of law enforcement efforts. Protecting this information ensures that ICE can securely store and utilize data to track criminal activities, identify threats, and develop strategies without the risk of it being accessed by unauthorized individuals or criminal entities. This privilege is vital for maintaining the confidentiality and integrity of law enforcement operations, ensuring the safety of personnel and informants, and supporting the overall mission of public safety and security. Additionally, aside from the purposes of indexing, storing, locating, retrieving, and distributing information, codes also indicate various aspects of investigative cases, such as: the type and location of a case; whether or not a subject should undergo closer scrutiny; and the distribution of information relating to a case, which could indicate the scope and relative size of the investigation in terms of agency resources, types of activity being investigated and location of investigative efforts. Release of codes, along with computer function commands, could assist third parties in deciphering the meanings of codes, which could potentially impede ongoing investigations as well as pose a danger to ICE personnel. This type of information must be redacted to reduce the possibility that someone would improperly gain access to any of these databases (i.e., a "hacker") and would be able to navigate the systems that house ICE investigative records, among the records of other law enforcement agencies. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Page 289 - 290 (REV0000365998) | 03/08/2025 09:39:21 PM | ███ | ███ | ███ | ██ ███ | Fw: For Administrative Arrest | LEP: Arrest plan for Specific Individual, who was not arrested by ICE and is subject to ongoing and future investigation; number of agents assigned to arrest operations and roles in such operation | **LEP: Operational Integrity:** The effectiveness of ongoing and future law enforcement operations could be severely compromised if criminals, suspects, or the public learns of sensitive techniques and procedures utilized in ongoing and future investigations, surveillance, and arrets.If disclosed, such sensitives techniques and procedures could be rendered ineffective in future operations. Criminals and suspects may use this information to evade detection, alter their behavior, or take countermeasures against law enforcement efforts. For instance, knowing such information could allow suspects to identify patterns in law enforcement activities, making it easier for them to avoid capture or disrupt investigations. Additionally, the disclosure of such information could undermine the ability of law enforcement agencies to conduct covert operations, gather intelligence, and execute strategic plans effectively. It safeguards ongoing investigations by preventing suspects from being alerted and taking steps to evade capture or destroy evidence. The specific individual addressed in this document was not arrested and therefore the arrest plan discussed in this email could be used in future investigations against other persons of interests. The disclosure of this information could jeopardize future law enforcement plans. Redacting this information preserves the integrity of broader strategic approaches used by ICE while ensuring our investigations continued effectiveness. Therefore, maintaining the confidentiality of the arrest plan is essential to carrying out ICE's duties and for public safety. |
| Page 291 - 292 (REV0000423445) | 03/08/2025 08:45:23 PM | ██ | ███ | ██ ███ | ███ ██ | FW: ROA1s- D3 target | LEP: Arrest plan for Specific Individual, who was not arrested by ICE and is subject to ongoing and future investigation; number of agents assigned to arrest operations and roles in such operation | **LEP: Operational Integrity:** The effectiveness of ongoing and future law enforcement operations could be severely compromised if criminals, suspects, or the public learns of sensitive techniques and procedures utilized in ongoing and future investigations, surveillance, and arrets.If disclosed, such sensitives techniques and procedures could be rendered ineffective in future operations. Criminals and suspects may use this information to evade detection, alter their behavior, or take countermeasures against law enforcement efforts. For instance, knowing such information could allow suspects to identify patterns in law enforcement activities, making it easier for them to avoid capture or disrupt investigations. Additionally, the disclosure of such information could undermine the ability of law enforcement agencies to conduct covert operations, gather intelligence, and execute strategic plans effectively. It safeguards ongoing investigations by preventing suspects from being alerted and taking steps to evade capture or destroy evidence. The specific individual was not arrested and therefore the arrest plan discussed in this email could be used in future investigations against other persons of interests. The disclosure of this information could jeopardize future law enforcement plans. Redacting this information preserves the integrity of broader strategic approaches used by ICE while ensuring our investigations continued effectiveness. Therefore, maintaining the confidentiality of the arrest plan is essential to carrying out ICE's duties and for public safety. |
| Page 300 - 316 (REV0000495393_0001) | | | | | | Homeland Security Investigations, RAC Burlington | LEP:  Document contains HSI signal codes and call names, arresting tactics and protocols for a person of interest used in ongoing and future investigations to include number of agents assigned to arrest operations and roles in such operation and agent positioning in arrest operations. | **LEP: Operational Integrity:** The effectiveness of ongoing and future law enforcement operations could be severely compromised if criminals, suspects, or the public learns of sensitive techniques and procedures utilized in ongoing and future investigations, surveillance, and arrets.If disclosed, such sensitives techniques and procedures could be rendered ineffective in future operations. Criminals and suspects may use this information to evade detection, alter their behavior, or take countermeasures against law enforcement efforts. For instance, knowing such information could allow suspects to identify patterns in law enforcement activities, making it easier for them to avoid capture or disrupt investigations. Additionally, the disclosure of such information could undermine the ability of law enforcement agencies to conduct covert operations, gather intelligence, and execute strategic plans effectively. It safeguards ongoing investigations by preventing suspects from being alerted and taking steps to evade capture or destroy evidence. The specific individual addressed in this document was not arrested and therefore the arrest plan discussed in this email could be used in future investigations against other persons of interests. The disclosure of this information could jeopardize future law enforcement plans. Redacting this information preserves the integrity of broader strategic approaches used by ICE while ensuring our investigations continued effectiveness. Therefore, maintaining the confidentiality of the arrest plan is essential to carrying out ICE's duties and for public safety. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Page 317 - 322 (REV0000495393_0002) | | | | | | HSI Enforcement Operation Plan | LEP: Document contains arresting tactics and protocols for a person of interest used in ongoing and future investigations to include number of agents assigned to arrest operations and roles in such operation; Law enforcement case codes and HSI signal codes. | **LEP: Operational Integrity**: The effectiveness of ongoing and future law enforcement operations could be severely compromised if criminals, suspects, or the public learns of sensitive techniques and procedures utilized in ongoing and future investigations, surveillance, and arrets.If disclosed, such sensitives techniques and procedures could be rendered ineffective in future operations. Criminals and suspects may use this information to evade detection, alter their behavior, or take countermeasures against law enforcement efforts. For instance, knowing such information could allow suspects to identify patterns in law enforcement activities, making it easier for them to avoid capture or disrupt investigations. Additionally, the disclosure of such information could undermine the ability of law enforcement agencies to conduct covert operations, gather intelligence, and execute strategic plans effectively. It safeguards ongoing investigations by preventing suspects from being alerted and taking steps to evade capture or destroy evidence. The specific individual addressed in this document was not arrested and therefore the arrest plan discussed in this email could be used in future investigations against other persons of interests. The disclosure of this information could jepardize future law enforcement plans. Redacting this information  preserves the integrity of broader strategic approaches used by ICE while ensuring our investigations continued effectiveness. Therefore, maintaining the confidentiality of the arrest plan is essential to carrying out ICE's duties and for public safety. Additionally, aside from the purposes of indexing, storing, locating, retrieving, and distributing information, codes also indicate various aspects of investigative cases, such as: the type and location of a case; whether or not a subject should undergo closer scrutiny; and the distribution of information relating to a case, which could indicate the scope and relative size of the investigation in terms of agency resources, types of activity being investigated and location of investigative efforts. Release of codes, along with computer function commands, could assist third parties in deciphering the meanings of codes, which could potentially impede ongoing investigations as well as pose a danger to ICE personnel. This type of information must be redacted to reduce the possibility that someone would improperly gain access to any of these databases (i.e., a "hacker") and would be able to navigate the systems that house ICE investigative records, among the records of other law enforcement agencies. |
| Page 326 - 335 (REV0000579250_0002) | | | | | | Overview of Admin Arrest Plan | LEP: Document contains arresting tactics and protocols for a person of interest used in ongoing and future investigations to include number of agents assigned to arrest operations and roles in such operation; Law enforcement case codes and HSI signal codes. | **LEP: Operational Integrity**: The effectiveness of ongoing and future law enforcement operations could be severely compromised if criminals, suspects, or the public learns of sensitive techniques and procedures utilized in ongoing and future investigations, surveillance, and arrets.If disclosed, such sensitives techniques and procedures could be rendered ineffective in future operations. Criminals and suspects may use this information to evade detection, alter their behavior, or take countermeasures against law enforcement efforts. For instance, knowing such information could allow suspects to identify patterns in law enforcement activities, making it easier for them to avoid capture or disrupt investigations. Additionally, the disclosure of such information could undermine the ability of law enforcement agencies to conduct covert operations, gather intelligence, and execute strategic plans effectively. It safeguards ongoing investigations by preventing suspects from being alerted and taking steps to evade capture or destroy evidence.  Redacting this information  preserves the integrity of broader strategic approaches used by ICE while ensuring our investigations continued effectiveness. Therefore, maintaining the confidentiality of the arrest plan is essential to carrying out ICE's duties and for public safety. Additionally, aside from the purposes of indexing, storing, locating, retrieving, and distributing information, codes also indicate various aspects of investigative cases, such as: the type and location of a case; whether or not a subject should undergo closer scrutiny; and the distribution of information relating to a case, which could indicate the scope and relative size of the investigation in terms of agency resources, types of activity being investigated and location of investigative efforts. |

# Exhibit 3

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, ET AL., | ) ) ) | Civil Action No. 1:25-cv-10685-WGY |
| Plaintiffs, | ) ) ) |  |
| v. | ) ) |  |
| MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, ET AL., | ) ) ) ) |  |
| Defendants. | ) ) ) |  |

## DECLARATION OF GARY M. LAWKOWSKI

I, Gary Lawkowski, declare:

1.      I currently hold the position of Deputy Assistant to the President and Deputy Counsel to the President. I joined the White House Counsel's Office as a deputy on January 20, 2025. In this capacity, I am responsible for, among other things, providing legal advice to White House staff, including advice on matters involving the invocation of the presidential communications privilege.

2.      I submit this declaration formally invoking the presidential communications privilege with respect to several documents and communications requested in discovery by Plaintiffs, including a document submitted for *in camera* review. I base this declaration on my personal knowledge, information made available to me in the performance of my duties, and my knowledge of the issues being litigated in the above-captioned case.

3.      I am aware that, upon consultation with the Office of the Counsel to the President, the United States has withheld certain documents and communications on the basis of the presidential communications privilege.

4.      On behalf of the Office of the President, I hereby assert the presidential communications privilege with respect to all portions of one document identified in the Government's Index as Exhibit A.  The assertion of privilege is based on my personal review of this document.  In making this declaration, I have also relied on the description of the document provided by my staff and on the description of the document contained in the Government's Index.

5.      I understand that the Department of State is also asserting the deliberative process privilege with respect to this document.  The fact that my assertion is limited to the presidential communications privilege is in no way intended to suggest that this document or portions of this document is not protected in whole or in part by other privileges.

6.      The document as to which the presidential communications privilege is being asserted consists of a report from the Department of State that was solicited by the President of the United States in Section 3 of Executive Order 14,188, *Additional Measures to Combat Anti-Semitism.*  It was transmitted to a Deputy Assistant to the President for circulation and consideration by White House advisers with broad and significant responsibility for investigating and formulating confidential advice to the President. In particular, the withheld document is a March 2025 report entitled "Report on Department of State Authorities to Counter Anti-Semitism and Recommendations for Familiarizing Institutions of Higher Education with the Security and Related Grounds for Visa Inadmissibility," to Julie M. Stufft, Deputy Assistant to the President and Executive Secretary, National Security Council, from Lisa D. Kenna,

Executive Secretary, Department of State.  The report includes a "recommendations" section, as requested by the President, regarding actions and authorities withn the jurisdiction of the Department of State to combat anti-semitism as well as for familiarizing institutions of higher education with the security and related grounds for visa inadmissibility to inform confidential deliberations.  The document addresses potential policies and guidance for the Government to pursue regarding combatting anti-semitism and familiarizing insitutitons of higher education with the security and related grounds for visa inadmissibility.

7.      Additionally, I hereby assert the presidential communications privilege with respect to all portions of communications from the White House, including Assistant to the President and Deputy Chief of Staff for Policy and Homeland Security Advisor Stephen Miller and counsel from the Office of White House Counsel, alluded to and discussed in part in the deposition of Senior Bureau Official John Armstrong.  The assertion of privilege is based on my personal review of the transcript for SBO Armstrong's deposition.  In making this declaration, I have also relied on the description of the communications provided by my staff.

8.      I understand that the Department of State is also asserting the deliberative process privilege with respect to these communications.  The fact that my assertion is limited to the presidential communications privilege is in no way intended to suggest that these communications or portions of these communications are not protected in whole or in part by other privileges.

9.      These communications as to which the presidential communications privilege is being asserted consists of interagency telephonic meetings regarding immigration policy.  In particular, the withheld communications occurred primarily in and around March 2025 and included senior White House and cabinet-level officials, such as Assistant to the President and

3

Deputy Chief of Staff for Policy and Homeland Security Advisor Stephen Miller and counsel from the Office of the White House Counsel. The communications addressed ongoing efforts and potential policies and guidance for the Government to pursue regarding immigration policy, including the specific discussion of one or more executive order issued by the President.

10.    These communications were solicited and received by senior presidential advisors or their staff, including Assistant to the President and Deputy Chief of Staff for Policy and Homeland Security Advisor Stephen Miller and counsel from the Office of the White House Counsel. Mr. Miller is a high-ranking White House staff member who provides support and advice to the President and his senior adivsors. The Office of White House Counsel advises the President, the Executive Office of the President, and the White House staff on legal issues pertaining to the President and the White House.

11.    The document and communications as to which the presidential communications privilege is being asserted were solicited and received by immediate presidential advisors or their staff who have broad and significant responsibility for investigating and formulating advice to be given to the President with respect to decision-making on the subject of immigration policy. I believe that, without the protection of the presidential communications privilege over the communications described above, presidential advisors and their staffs would be chilled from having candid conversations with senior officials in cabinet agencies, gathering relevant information, exploring alternatives, and providing fully informed recommendations regarding the performance of the President's duties.

4

12.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 27 day of June 2025.

Deputy Counsel to the President

# Exhibit 4

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS, ET AL.,

                 Plaintiff,

      -v-

MARCO RUBIO, in his official capacity as
Secretary of State, and the DEPARTMENT OF
STATE, ET AL.,

                 Defendant.

Civil Action No. 1:25-cv-10685-WGY

Declaration of John Armstrong

## DECLARATION OF JOHN ARMSTRONG
## ASSERTING DELIBERATIVE PROCESS PRIVILEGE

I, John Armstrong, hereby declare under penalty of perjury:

1. I am the Senior Bureau Official within the U.S. Department of State's Bureau of Consular Affairs. I am a career member of the Senior Foreign Service with the rank of Counselor. Prior to becoming the Senior Bureau Official, I briefly served as the Deputy Assistant Secretary for Overseas Citizen Services. I served overseas as the Consul General in Lima, Peru; as Economic Counselor in Warsaw, Poland; as Consular Section Chief and Acting Deputy Chief of Mission in Nassau, Bahamas; Deputy Consul General in Kyiv, Ukraine; and Nonimmigrant Visa Chief in Bucharest, Romania. I have also previously served domestic assignments in Washington, D.C., as Director of the Office of Eastern European Affairs, Director of the Washington Passport Agency, Senior Political Officer on the Russian Desk, and Belarus Desk Officer.

2. As the Senior Bureau Official, I play a central role in formulating and implementing

policies related to the protection of U.S. citizens abroad, visa and passport issuance, and consular operations globally. In this capacity, I routinely participate in internal deliberations with Department officials and interagency partners concerning complex policy issues, operational planning, and diplomatic strategy.

3. This declaration is based on my personal knowledge and vast professional experience. In my official capacity as Senior Bureau Officer, I have exercised oversight over matters involving United States citizen services abroad. These matters all encompass the sensitive deliberative process of the Department.

4. I am aware of the instant lawsuit that has been filed in the U.S. District Court for the District of Massachusetts. I understand that Marco Rubio in his official capacity as Secretary of State, in addition to the Department of State are named defendants.

5. I submit this declaration to explain the assertion of the deliberative process privilege (DPP) with respect to highly sensitive information that Plaintiffs seek the court to compel be publicly released.

6. The authority to assert the deliberative process privilege in judicial and administrative proceedings for the Department of State has been delegated to me in Department Delegations of Authority No. 479 and No. 577, as published in the Federal Register.

7. Based upon my personal review and knowledge of the information solicited by Plaintiffs, I am formally asserting DPP over the documents and information identified below, which the government withheld as privileged:

**Material Subject to the DPP:**

i. Report on Department of State Authorities to Counter Anti-Semitism and Recommendations for Familiarizing Institutions of Higher Education with

the Security and Related Grounds for Visa Inadmissibility

    ii. Portions of the deposition of Senior Bureau Official John Armstrong, related to interagency and Presidential communications, based upon the rough transcript of that deposition that is currently available (Defendants have not yet had an opportunity to identify/request any necessary corrections to the transcript)

   iii. Portions of the deposition of Senior Bureau Official John Armstrong related to the draft report, prepared for the White House concerning a "catch and revoke" policy implementing Executive Orders No. 14161 and No. 14188, based upon the rough transcript of that deposition that is currently available

   iv. Portions of the deposition of Senior Bureau Official John Armstrong related to Department of State decisions involving the Five Targeted Noncitizens, based upon the rough transcript of that deposition that is currently available

    v. Department of State action memoranda to the Secretary of State concerning Removal or Determinations of Deportability (three) and to Senior Bureau Official John Armstrong concerning a visa revocation (one)

   vi. Interrogatory responses related to the above

8. As the lead federal agency for United States foreign affairs, the Department of State is responsible for advancing American interests abroad, promoting peace and security, and implementing the President's foreign policy. The Department engages with foreign governments, global organizations, and domestic agencies on a broad range matters pertaining to human rights, counterterrorism, immigration, and U.S. citizen protection abroad. Mission fulfilment is reliant upon candid internal deliberations and robust

interagency coordination to develop effective strategies, perform adequate risk assessment, and respond to complex global issues.

9. With regard to the report named in this declaration and identified in the Government's Index as Exhibit A, it was prepared to support internal agency deliberations within the Department, across interagency partners, and with the President and his advisors. This document is both pre-decisional and deliberative in nature. It reflects internal agency assessments, legal and policy interpretations, and potential courses of action that have not been finalized or adopted. Sensitive foreign policy and national security matters are contained within this report.

10. The release of the information that Plaintiffs seek would reveal sensitive information subject to DPP.  This includes information pertaining to diplomatic engagement strategies, policy proposals, and interagency coordination. The revelation of such information could undermine the efforts of the Department to carry out its mission of promoting peace and security through robust and candid internal deliberations.

11. In carrying out its mission, the Department of State depends on candid internal deliberations and the ability of its personnel to provide frank assessments without the fear of premature and improper disclosure. Put simply, the release of the information Plaintiffs seek would compromise the Department's ability to perform its mission and is properly designated DPP. Disclosure of deliberative process privileged information could provide those who wish to harm the United States with valuable information in the form of a roadmap to the government's internal decision-making processes. This roadmap would reveal strategic priorities, vulnerabilities, or areas of uncertainty that our adversaries could exploit.

12. If disclosed, the release of information the Department has withheld here as DPP could chill an exchange of information between federal agencies, thus impeding their decision-making process. This is especially true where, as here, the opinions, proposals, and recommendations of Department employees may concern controversial approaches to the government's foreign affairs priorities. If Department employees are aware that their opinions, deliberations, and recommendations may be subject to public disclosure –and the scrutiny, potential misinterpretation and critics that may follow, the candor of their views could be chilled. It is thus critical that pre-decisional and deliberative communications and procedures be protected from disclosure based on DPP.

13. Given the sensitive and privileged nature of the information, there are no precautions that would allow the Department of State to safely release this information to Plaintiffs or the public at large.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 27th Day of June 2025.

John Armstrong
Senior Bureau Official
Bureau of Consular Affairs
U.S. Department of State

# Exhibit 5

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS, ET AL.,

                  Plaintiff,

      -v-

MARCO RUBIO, in his official capacity as
Secretary of State, and the DEPARTMENT OF
STATE, ET AL.,

                  Defendant.

Civil Action No. 1:25-cv-10685-WGY

Declaration of William S. Walker

## DECLARATION OF WILLIAM S. WALKER

I, William S. Walker, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

      1.      I am the Acting Deputy Executive Associate Director for Homeland Security Investigations (HSI) at U.S. Immigration and Customs Enforcement (ICE) within the U.S. Department of Homeland Security (DHS). This is a career position, not political, and is the second-highest ranking position at HSI. In this role, I oversee a workforce of more than 10,000 employees, including special agents, criminal analysts, mission support personnel and contract staff assigned to more than 237 offices throughout the United States and more than 56 countries around the world.

      2.      I previously served as the Acting Assistant Director ((A) AD) for Domestic Operations at HSI. As the (A) AD, I was responsible for oversight of 30 HSI Special Agents in Charge, 237 domestic field offices, and more than 7,100 special agents, ensuring all field operations are working to efficiently execute the agency mission. I began my career with the U.S. Government as an Inspector with the former U.S. Customs Service at the Port of Philadelphia.

Over a career that spans 26 years, I have served as a Deputy Special Agent in Charge, an Assistant Special Agent in Charge, and a Supervisory Special Agent with HSI. Prior to my time as (A) AD for Domestic Operations, I served as the Special Agent in Charge of HSI's New York Field Office, where I oversaw more than 700 investigators whose mission was investigating, disrupting, and dismantling transnational criminal organizations and two terrorist networks.

3.    HSI, the largest investigative arm of DHS and component of ICE, holds broad criminal and administrative investigative authorities, which it employs to disrupt national security and transnational criminal threats to the United States. HSI is authorized to conduct, and does conduct, both criminal and administrative investigations into national security and public safety threats related to immigration and transnational crime. This requires using a variety of law enforcement sensitive techniques and methods, as well as differing styles of investigations, including use of confidential informants and undercover operations. It also entails the arrest and detention of persons and the exercise of search and seizure authority. In many cases, the final disposition of an investigation depends on the evidence gathered, and it can be impossible to know in the early stages whether the ultimate result will be criminal prosecution, administrative proceedings, both, or neither.

4.    This declaration is based on my personal knowledge and experience as a law enforcement officer and information provided to me in my official capacity.

5.    In the exercise of my official duties, I am aware of the above-captioned civil action. I understand that ICE is a named defendant in this civil action.

6.    I submit this declaration to explain the assertion of the law enforcement privilege (LEP) with respect to certain information contained in HSI electronic messages (e-mails) and documents extracted during an ICE data pull for this civil action. I understand that these e-mails

and documents will be provided to Plaintiffs in a redacted manner and were already submitted to

the court in an unredacted *ex parte in camera* filing. The redacted information addresses internal

procedures for HSI Special Agents when they exercise their authority to investigate, arrest, detain,

and/or transport. Based upon my personal review of the e-mails and documents, I am formally

asserting LEP over certain information contained in the following documents:

    a.  REV0000579250_0002 (DEF 326-35) – HSI PowerPoint - Information related to investigative and arrest objectives, tactical arrest plan, arrest procedures, and communication method and codes that are used in HSI investigations and arrests;

    b.  REV0000495393_0001 (DEF 300-316) - HSI PowerPoint - Information related to investigative and arrest objectives, tactical arrest plan, arrest procedures, officer positioning in arrests, communication method and codes, operational mission codes, contingency planning for emergency situations such as officer safety, hostages, counter surveillance that are used in HSI investigations and arrests;

    c.  REV0000495393_0002 (DEF 317-22) – HSI Enforcement Operation Plan - Information related to investigative and arrest objectives, tactical arrest plan, officer positioning in arrests, officer call signs, codes and signals that are used in HSI investigations and arrests;

    d.  REV0000352240 (DEF 285-86) - Email Correspondence Between HSI New York City Special Agents – Law enforcement communication method and code used in HSI investigations and arrests;

    e.  REV0000143672_0004 (DEF 59-60) – HSI Report of Investigation - Information related to an ongoing investigation and HSI law enforcement techniques and methods.

    f.  REV0000330578_0001 (DEF 62-268); REV0000332022_003 (DEF 269-71); REV0000332022_0004 (DEF 272-79) – HSI Investigative Document – Information related to HSI law enforcement techniques and software used to conduct ongoing and future law enforcement investigations;

    g.  REV0000126721_0001 (DEF 22-25) – Khalil I-213 – Information related to HSI law enforcement code used to access case in HSI database; and

    h.  REV0000103213 (DEF 11-12); REV0000110071 (DEF 13-14); REV0000123891 (DEF 18-19); REV0000131591 (DEF 36-37); REV00013226 (DEF 38-39); REV0000141523 (DEF 50-51); REV0000142133 (DEF-58); REV0000365998 (DEF 289-90); REV0000423445 (DEF 291-92) - Email Correspondence Between HSI New York City Special Agents – Information related to an ongoing investigation and tactical arrest plans for an ongoing investigation.

7.      As discussed in greater detail below, the redacted information should remain redacted because the revelation of law enforcement privileged information could undermine the efforts of HSI and thereby ICE to carry out its mission of identifying criminal activities, eliminating vulnerabilities that pose a threat to our nation's borders, as well as ensuring economic, transportation, infrastructure, and national security, and to protect members of the public from public safety threats.

8.      In carrying out its mission, ICE depends on the use of law enforcement and investigative techniques, methods, and procedures not widely known to the public; this information is LEP. Put simply, the release of the redacted information would compromise ICE's ability to perform its mission and is properly designated LEP. Disclosure of LEP information could provide those who wish to harm the United States with valuable information about how the U.S. Government detects, investigates, and thwarts activity that impacts public safety and national security and violates U.S. laws. Disclosure of any such existing information related to such processes, coordination with law enforcement partners, or insight into arrest procedures could significantly undermine future law enforcement efforts. For example, if subjects of investigations were to obtain information related to HSI tactical arrest plans, agent positioning during arrest operations, communication methods/codes/signals, number of agents assigned to arrest operations and roles in such operation, bad actors could either change their behavior in order to evade law enforcement or place HSI Special Agents at heightened safety risk because the bad actors would know where the agents are positioned and how they are communicating during operations. Disclosure of such types of information increases the likelihood that subjects and potential subjects of investigations will develop methods to obscure or alter and behavior and thereby circumvent the agency's efforts to arrest, detain, and transport individuals and/or collect information and

evidence to thwart serious violations that may affect public safety. Moreover disclosure of information on ongoing and future investigations, particularly in cases where a suspect has not yet been arrested, could cause the suspect or target of investigation to evade law enforcement detection and subsequent arrest. Redacting this information preserves the integrity of broader strategic approaches used by ICE while ensuring our investigations' continued effectiveness. Therefore, maintaining the confidentiality of ongoing and future arrest plans that have not yet been executed is essential to carrying out ICE's law enforcement duties and for public safety.

9.      Additionally, aside from the purposes of indexing, storing, locating, retrieving, and distributing information, law enforcement codes indicate various aspects of investigative cases, such as: the type and location of a case; whether or not a subject should undergo closer scrutiny; and the distribution of information relating to a case, which could indicate the scope and relative size of the investigation in terms of agency resources, types of activity being investigated and location of investigative efforts. Release of codes, along with computer function commands, could assist third parties in deciphering the meanings of codes, which could potentially impede ongoing investigations as well as pose a danger to ICE personnel. This type of information must be redacted to reduce the possibility that someone would improperly gain access to any of these databases (i.e., a "hacker") and would be able to navigate the systems that house ICE investigative records, among the records of other law enforcement agencies.

10.      Given the privileged nature of the information, there are no precautions that would allow ICE to safely release this information to Plaintiffs or the public at large. For the foregoing reasons, this information should remain redacted.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 11th Day of July 2025.



WILLIAM S WALKER
Digitally signed by WILLIAM S WALKER
Date: 2025.07.11 08:39:02 -04'00'

William S. Walker
Acting Deputy Executive Associate Director
Homeland Security Investigations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

# Exhibit 6

# Exhibit 6

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETS

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS, *et al.*,

    *Plaintiffs*,

v.

MARCO RUBIO, in his official
capacity as Secretary of State, *et al.*,

    *Defendants*.

CASE NO. 25-CV-10685

**DECLARATION OF
LUIS A. MEJIA**

I, Luis A. Mejia, pursuant to 28 U.S.C. § 1746 and based upon my personal knowledge, and documents and information made known or available to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

1.      I am the Deputy Executive Director of Admisibility and Passenger Programs (APP), Office of Field Operations (OFO), U.S. Customs and Border Protection (CBP) and have been in this role since September 2021. In that capacity, I have oversight of OFO policy related to United States Code, Title 8 for all 328 Ports of Entry (POEs) and am responsible for preparing field guidance surrounding the application of relevant laws, regulations, court decisions, executive orders, and other statutory interpretations. Additionally, I oversee strategy, policy development, and implementation of national policies related to the processing of travelers at all POEs. Further, I direct approximately 75 national programs encompassing OFO primary and secondary inspections and actions developed in the course of those activities.

2.      Prior to this role, I served as the Director of the Enforcement Programs Division from January 2018 to September 2021. During this time, from April 2021 through September 2021, I was Acting Port Director for the Port of Charleston, South Carolina. Previously, I also served as Branch Chief, Enforcement Operations, Port of New York/Newark, where I was responsible for a staff of 165 CBP officers. I began my career as a CBP officer at the Port of New York/Newark, New Jersey in 2003.

3.      The effectiveness of CBP's mission is dependent to a large extent on the use of sensitive investigative techniques and methods that are not known to the general public. The disclosure of these techniques and methods would seriously compromise CBP's ability to perform its national security and law enforcement missions.

1

4.    I am making this declaration for the purpose of asserting the law enforcement privilege (LEP) over information contained in, and have been redacted from, a CBP document identified by ICE in the course of discovery. (See DEF 280-84). I am further asserting LEP over information contained in, and redacted from, a Department of State document on the deportability of Mohsen Mahdawi.  (See Exh. M to June 11, 2025 ex parte in camera submission).

5.    DEF 280-84 is an "Incident Log Report" (IOIL), a type of TECS record that documents secondary inspections.  An IOIL contains identifying information for the traveler, the identity of the relevant officers involved, and a narrative of the secondary inspection.  In this case, DEF 280-84 is an IOIL from an encounter CBP had with Mohsen Mahdawi at the Derby Line, VT port of entry on Saturday, January 12, 2019.

6.    TECS is an overarching law enforcement information collection, risk assessment, and information sharing system and is a repository for law enforcement and investigative information, including inspection records.  U.S. Customs and Border Protection – 011 TECS System of Records Notice, Federal Register, Volume 77 Issue 99 (May 22, 2012); *see also* DHS/CBP/PIA-021: TECS System: Platform (Aug. 12, 2016), https://www.dhs.gov/sites/default/files/2022-05/privacy-pia-cbp-tecs%20platform-april2022.pdf.  TECS is comprised of several modules that collect, maintain and evaluate data, conduct targeting analysis, and makes information available to appropriate law enforcement officers of the U.S. Government. Information within TECS includes border crossing information for all individuals who enter, are admitted or paroled into, and (when available) exit from the United States, regardless of method or conveyance.  *See* Privacy Act of 1974; Department of Homeland Security/U.S. Customs and Border Protection-007 Border Crossing Information ("BCI") System of Records, 81 Fed. Reg. 89957 (Jan. 12, 2017).

2

7. DEF 280-84 contains redactions for law enforcement privilege as well as to protect the Personally Identifiable Information (PII) of the involved law enforcement officers. None of this PII pertains to ICE officers and instead relates to CBP officers and a Vermont State Police Officer. Neither the Vermont State Police nor CBP are parties to this action. Additionally, at least one CBP officer has already been identified as having a role that, if disclosed, would reveal the nature and extent of CBP's law enforcement interest in the individual encountered. Given the short time frame for creating this declaration, a full assessment of all officers involved could not be completed. The risk of disclosure, however, would outweigh the risk of withholding this PII, especially when none of these officers were involved in the actions challenged in this case.

8. IOIL TECS records have listed the CBP officers involved in the secondary inspections. Generally, the line officers would have a greater role in the secondary inspection compared to any supervisory officers.

9. This particular IOIL contains law enforcement privileged material. Due to the sensitive law enforcement information contained within TECS records, access to TECS records is tightly constrained, even within CBP. The harm which could be caused by the release of this sensitive information outside of the carefully controlled context in which it is created, interpreted, and maintained is significant and far-reaching. The threat to the safe and effective enforcement of law and border security is most apparent with respect to the disclosure of: (a) system codes; (b) procedures and techniques; and (c) subject-specific analysis included in the "Comments" section.

10. The system codes at issue facilitate access to, and navigation through, TECS. Individuals who know the meaning of the codes would have sufficient law enforcement information regarding how CBP conducts its law enforcement operations, which would permit individuals to alter their patterns of conduct, adopt

3

new methods of operation, relocate, change associations, and effectuate other countermeasures, thus corrupting the integrity of ongoing investigations. Public dissemination of these access codes would reveal the technical capabilities of the system and could permit unauthorized users to manipulate records to avoid recognition, detection and apprehension. It would also arm unauthorized users with the ability to corrupt the integrity of the data contained therein through the alteration and/or manipulation of such data. In addition, if the system were to be hacked, it would permit the intruder to potentially manipulate the way certain records are created and maintained, which could jeopardize ongoing investigations and border security operations.

11. IOIL records include record identification numbers and other information that reveals the procedures and techniques used by law enforcement personnel. This information may be included in the Comments section as well as in the Incident Details section. While some of this data may appear innocuous in isolation, such information can place investigative activities in a precise context, pinpoint key players and events, identify critical tools and resources, and reveal the extent and shortfalls of law enforcement's knowledge of criminal or terrorist endeavors and/or immigration violations. Moreover, such information creates a basis for comparison of the handling of different inspections, which could reveal the nature and extent of the government's law enforcement interest in particular situations. Because this information can be used to clarify or predict a CBP officer's behavior in specific circumstances, the risk of circumventing enforcement efforts or harming officers or informants is significant. In addition, the TECS records include information that would reveal the capabilities of TECS, the release of which would impede CBP's law enforcement mission by alerting individuals to how CBP conducts searches of its systems and any limitations.

12.     Although a few factors used by CBP officers to conduct border inspections are in the public domain in court opinions or other contexts, the TECS format itself reveals more about the techniques that CBP officers use to conduct border inspections and assess risk than the information that can be gleaned from publicly available information.  Thus, disclosure of the remarks in TECS would reveal not only information unique to those particular inspections, but also information about inspectional activities generally.  This would include the kind of information considered important to the exercise of officer discretion, and the relative weight given different factors.  Information about such "red flags" for inspection, if unprotected, could enable individuals to thwart efforts to secure the border and enforce immigration and customs laws.

13.     TECS records also contain information that CBP considered when inspecting travelers at a port of entry including reasons why a traveler may be referred to secondary, which may be included in the Comments section.  While some of this information may seem harmless to an untrained eye, disclosure would reveal CBP's sensitive law enforcement techniques and procedures that it uses daily to conduct immigration and customs inspections at the border, and to identify threats to national security.  This information describes in detail actions taken by CBP personnel under specific circumstances in furtherance of investigation and enforcement efforts and includes information in a format that reveals law enforcement priorities, including what an officer considers when determining whether to refer a traveler to secondary inspection.

14.     Disclosure of the reasons as to why a traveler may be referred to secondary or processed on primary would reveal law enforcement techniques and procedures.  This disclosure would enable individuals to alter their patterns of conduct, adopt new methods of operation, and effectuate other countermeasures to circumvent the inspection process and undermine law enforcement techniques,

and, consequently, the law.  Such information, if unprotected, could enable individuals to thwart CBP's efforts to secure the border and enforce legal requirements at the border.  It could identify certain law enforcement priorities and, conversely, areas where investigative resources may not be focused.  If revealed, that information could be exploited and used to develop and employ more enhanced countermeasures to diminish the effectiveness of inspection efforts.

15.    As part of the inspection process, CBP performs law enforcement queries on the traveling public prior to and/or at the time of performing an inspection, including for the purpose of making admissibility determinations that may permit entry into the United States.  Disclosure of the particular types of queries performed may enable nefarious actors to take steps to avoid scrutiny and thwart efforts to identify violators or threats to border security.

16.    The second document for which I am asserting LEP, Exh. M to June 11, 2025 ex parte in camera submission, contains information which has been redacted and if released would reveal the nature, scope or focus of certain law enforcement processes, techniques, or methods used by CBP in carrying out its national security and law enforcement missions.  This includes information available to CBP relating to Mohsen Mahdawi and law enforcement analysis relating to CBP's national security and immigration enforcement missions, which if disclosed could reveal the nature and extent of information specific to a law enforcement investigation.  Additionally, disclosure of this information would disclose particular types of queries performed by CBP during vetting.  The process of how CBP identifies threat actors involves leveraging various data sources, including open-source information, law enforcement databases, as well as classified repositories.  Disclosure of these queries and their results may enable individuals encountered by CBP to alter their behavior to avoid scrutiny and thwart CBP's law enforcement mission.

17.     Under penalty of perjury, pursuant to 28 U.S.C. § 1746, I declare the foregoing is true and correct to the best of my knowledge and belief.


Dated July 11th, 2025

Respectfully submitted,

LUIS A MEJIA  Digitally signed by LUIS A MEJIA
Date: 2025.07.11 11:46:57 -04'00'

_____

Luis A. Mejia
Deputy Executive Director
Admissibility and Passenger Programs
Office of Field Operations
U.S. Customs and Border Protection