1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS (Boston)

3                        No. 1:25-cv-10685-WGY

4

5    AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
              Plaintiffs

6

7    vs.

8

9    MARCO RUBIO, in his official capacity as
     Secretary of State, et al,

10              Defendants

11                        * * * * * * * * *

12

13

                    For Bench Trial Before:
14                  Judge William G. Young

15

16

                    United States District Court
17                  District of Massachusetts (Boston.)
                    One Courthouse Way
18                  Boston, Massachusetts 02210
                    Monday, July 14, 2025

19

20                        * * * * * * * *

21

22          REPORTER: RICHARD H. ROMANOW, RPR
                    Official Court Reporter
23               United States District Court
          One Courthouse Way, Room 5510, Boston, MA 02210
24                    rhr3tubas@aol.com

25

```
 1                   A P P E A R A N C E S

 2

 3   RAMYA KRISHNAN, ESQ.
     CAROLINE DeCELL, ESQ.
 4   ALEXANDER ABDO, ESQ.
     SCOTT B. WILKENS, ESQ.
 5   ALEXANDRA CONLON, ESQ.
         Knight First Amendment Institute at Columbia
 6       University
         475 Riverside Drive, Suite 302
 7       New York, NY 10115
         (646) 745-8500
 8       E-mail: Ramya.krishnan@knightcolumbia.org
     and
 9   COURTNEY GANS, ESQ.
     NOAM BIALE, ESQ.
10       Sher Tremonte LLP
         90 Broad Street, 23rd Floor
11       New York, NY 10004
         (212) 540-0675
12       Email: Cgans@shertremonte.com
         For Plaintiffs
13

14   ETHAN B. KANTER, ESQ.
     WILLIAM KANELLIS, ESQ.
15   VICTORIA M. SANTORA, ESQ.
     JESSICA STROKUS, ESQ.
16       DOJ-Civ
         P.O. 878
17       Ben Franklin Station
         Washington, DC 20044
18       (202) 616-9123
         Email: Ethan.kanter@usdoj.gov
19   and
     SHAWNA YEN, ESQ.
20       United States Attorney's Office
         1 Courthouse Way, Suite 9200
21       Boston, MA 02210
         Email: Shawna.yen@usdoj.gov
22       For Defendants

23

24

25
```

```
1           P R O C E E D I N G S
2           (Begins, 9:05 a.m.)
3           THE COURT:  Good morning.
4               As I've authorized internet access to these
5       proceedings, let me say, as I've said each morning, if
6       you are observing these proceedings via the internet,
7       the rules of court remain in full force and effect, that
8       is to say there is no taping, streaming, rebroadcast,
9       screen shots, or other transcription of these
10      proceedings.
11              It's very important also that you keep your
12      microphone muted.  If you do not, you'll be cut off.
13              With that said, we have one witness this morning,
14      which is the only trial time, and then we have matters
15      to discuss.  But let's start with the witness and call
16      the witness.
17              MS. CONLON:  Your Honor, um, as we previewed in
18      our e-mail to the Court, we would be and now have filed
19      a motion for additional time, because of course we
20      didn't expect a ruling by today, we made a very
21      difficult decision to not call -- and understanding that
22      we won't have the opportunity at a later time to call
23      Mr. Reger, whose testimony we frankly think is
24      important, but we need to be able to cross-examine the
25      government's witnesses with these documents with the
```

```
 1    time that it takes.  So we have -- we have withdrawn our

 2    request to present testimony out of order and call

 3    Mr. Reger.

 4         THE COURT:  I follow that.  So the witness, Reger,

 5    is not going to be called?

 6         MS. CONLON:  That's right.

 7         THE COURT:  Then we'll start then with the

 8    discussion without -- trial time is not being recorded

 9    now and I need your help really, and I have some

10    observations to make about further proceedings in light

11    of the stay, but before we do that, um, two --

12         Yes, Ms. Strokus, I simply want to offer an

13    apology for not getting your name right.

14         MS. STROKUS:  No problem, your Honor.

15         THE COURT:  No, in my mind it's a problem.  By now

16    in the trial I should recognize your name and I have

17    mispronounced it and I apologize.

18         Thank you.

19         MS. STROKUS:  Thank you, your Honor.

20         THE COURT:  And, Mr. Kanellis, I was brusk at 1:00

21    only to -- it had nothing to do with the trial or the

22    mandamus proceedings, I had someplace to go.  And as you

23    have said, and now I say, I'm apologizing for being

24    brusk.

25         But let's start with whatever it was you wanted to
```

1    say at 1:00 on Friday, and we'll go from there.

2          MR. KANELLIS:  Thank you, your Honor.

3          I note that the Court has scheduled the post-trial

4    briefs to be due this Friday.  Is my understanding

5    shared with your Honor?

6          THE COURT:  I think that's correct.

7          MR. KANELLIS:  Your Honor, I believe, and I

8    don't -- we've talked about it with the plaintiffs and

9    I'm not sure what their position is, I believe that all

10   parties would be benefitted if we were given a few extra

11   days to capture the final testimony that's going to be

12   presented on --

13         THE COURT:  Actually I've had a chance to reflect

14   on these things as well.  I'm not disposed to give --

15   let's start there.  I'm not disposed to give the

16   plaintiffs any extra trial time.  Of course I'm going to

17   devote all the time that we agreed to concluding the

18   trial, which until the stay, and this is not whining,

19   was going swimmingly.

20         So let's be clear.  This is a case that involves,

21   among other things, motive and intent, and, um, since

22   I've had another of these cases that involve the

23   administration, um, and I thought it appropriate -- and

24   I absolutely thought it appropriate, that right after

25   final arguments I had various important things to say,

1     um, and then following it up with a written opinion.

2     The **Kennedy** case involving the National Institutes of

3     Health.  But this case is not like that.  Here's what I

4     expect to happen in this case.

5          In one part it's a, um, what I hope will happen

6     with respect to the trial.  I hope that, with respect to

7     the trial, the stay will be lifted, and either I'll --

8     either lifted and I'll be allowed to muddle through to

9     the end of the trial or will be lifted with

10    instructions, which of course I will scrupulously

11    follow.  But action will be taken promptly by the Court

12    of Appeals and I will get through the trial this month.

13         Now, um, this is a case in which I'm going to need

14    requests for findings and rulings and I've appreciated

15    the fact that you've ordered daily copy so that I have a

16    full transcript.  So, um, there's going to be a period

17    of time, um, once the matter has been taken under

18    advisement and these post-trial filings have been

19    submitted to the Court before the Court -- and we

20    understand we're only in the first phase.  The first

21    phase may be the last phase, the case may come to an end

22    after the Court's findings and rulings on the first

23    phase.  And, um, contrary-wise the opposite result is

24    possible, that that may result in what we might call a

25    "finding of liability," and then the Court would have to

1    wrestle with the second phase, which is the issue of

2    redressability, the issue of a correction, if any is

3    possible.

4        So, um, what Mr. Kanellis -- if we start there, I

5    am, um, perfectly amenable to extending the time for

6    such filings because I have a lot of under-advisement

7    work to do.  And, Mr. Kanellis, thank you.

8        So here I guess is -- what would be helpful to me,

9    now that I have the detailed privilege log -- I will say

10   in a font so small that I need a magnifying glass to

11   read it.

12        (Laughs.)

13        I want to talk with you, um -- well let's start

14   the talk like this, because it's a matter of interest to

15   me.

16        What, um -- on the plaintiffs' -- the plaintiffs

17   have rested but for certain witnesses, and that makes

18   perfect sense, and these witnesses include the cross-

19   examination of Armstrong, Watson, and who else?

20        MS. CONLON:  As far as we know, that's it.

21        THE COURT:  Well --

22        MS. CONLON:  Oh, I'm sorry, I thought you were

23   asking me about whose cross-examinations were affected,

24   in our view, by the documents.  Is that not the

25   question?

1      THE COURT:  I agree that those two are affected by

2  the documents which have been disclosed to the

3  plaintiffs, those two.

4      MS. CONLON:  Yes.

5      THE COURT:  So if any event, the stay, however

6  construed, applies until the Court of Appeals permits me

7  to go forward, and that's perfectly fine.  But now I'll

8  ask the broader question.

9      What else did you observe?

10     MS. CONLON:  Yeah, I see.  We reserved testimony

11  from our two witnesses who are traveling into the U.S.

12  to testify in this case who will both testify, time-

13  permitting on the 18th.  And that's Veena Dubal, who is

14  the General Counsel to the AAUP, and Cinzia Arruzza, who

15  is a noncitizen member of the AAUP.  And the person we

16  are not able to present, take testimony for, is Jeffrey

17  Reger, who is the Executive Director of MESA.

18     THE COURT:  Yeah, understood.

19     MS. CONLON:  Oh, I'm sorry, your Honor, my

20  colleague corrected me.  We also anticipate -- we had

21  told your Honor that we -- rather than asking the

22  law-enforcement witnesses who are set to come tomorrow,

23  these four, um, ICE agents who are of a supervisory

24  level who the government intends to present, we also

25  want the chance to question them potentially more

 1    broadly than the soap of their directs, which the

 2    government I think has agreed to rather than asking that

 3    we bring them back a second time.  And so to the extent

 4    that we need to go outside of their direct, I suppose

 5    that's off the part of our case that remains.

 6         THE COURT:  Thank you, that's a helpful answer.

 7    And again, just to move things along, as to those

 8    witnesses, my custom is to allow you to go beyond the

 9    direct.  Of course the rule requires you to take them as

10    though -- on direct as though it is cross.  But I've

11    allowed you to treat those witnesses as adverse because

12    they are employees of, um, one of the agencies where the

13    defendant public official is the top of that agency.  So

14    there's the answer of what the plaintiffs are going to

15    do with the remainder of their time.

16         What else are we going to hear -- what witnesses,

17    beyond what has been mentioned, do the defendant public

18    officials want to present?

19         MS. CONLON:  Your Honor, if I may correct myself

20    one more time, my smarter colleagues reminded me of

21    another point, which is that at least -- there's sort of

22    two components to this.

23         As I understand, we have now questioned one of the

24    agents who will be testifying tomorrow in a deposition

25    and there were many fights about privilege yet again,

1    um, relating to the scope of the law enforcement

2    privilege, as well as, I think, the deliberative process

3    privilege.  So to the extent that the Court's guidance

4    to the parts on how those privileges apply or don't,

5    with the documents in front of the Court, I think that

6    will potentially affect -- in other words I anticipate

7    --

8            THE COURT:  To make use of that.

9            MS. CONLON:  Yes, exactly.

10           Unlike Mr.(s) Armstrong and Watson, these agents

11   are not, um, senders or receivers of the documents, the

12   affected documents, but we very well may have questions

13   for them based on those documents in terms of the

14   content.  And so I don't -- I'm correcting my having

15   misspoken and saying, "Oh, the documents are totally

16   separate and apart from these agents," I should not have

17   made that representation.  Just to complicate things a

18   little further to the Court.

19           THE COURT:  No, no, that's very helpful.  Very

20   helpful, and I thank you.

21           Mr. Kanellis, what are the defendants' public

22   officials going to present?

23           MR. KANELLIS:  Your Honor, as indicated, tomorrow

24   we will present the four agents, as your Honor has

25   requested, who were at the sites of the arrest.  On

1    Thursday, we have put aside time for, um, AD Armstrong

2    -- sorry, AD Watson with HSI to describe the HSI's role

3    in these, um -- in these, um, facts at issue.

4            THE COURT:  Thank you.

5            MR. KANELLIS:  We have -- we intend to present a

6    summary witness.  It's not extensive, but some summary

7    exhibits through a summary witness.  And then there's a

8    witness, you Honor, that falls outside the purview of

9    the Court's jurisdiction, that we will have briefly.

10   That witness is Brian Shuvea's deposition testimony

11   entered pursuant to 804(a) and (b) as an unavailable

12   witness.  That is the extent of what we anticipate our

13   case to be.

14           THE COURT:  The deposition testimony -- in other

15   words, he's not going to be a live witness, but you're

16   going to present his deposition?

17           MR. KANELLIS:  Yes, your Honor, it will be very

18   brief, I just think it's significant, so it's important.

19           THE COURT:  I'm sure you do.

20           So, um, that shouldn't take any time, because the,

21   um, plaintiffs, if you have portions that you think are

22   inadmissible, they can be indicated on the deposition

23   and I will read the transcript and make rulings, and my

24   rulings will decide what's part of the record or not.

25           All right, let's -- and I appreciate what you've

1    said, all of this makes sense.  Let's talk then about,

2    um, what I call the core documents that the Court -- and

3    I don't -- well that's an appropriate phraseology.

4        I see the issues about the submission of documents

5    by the government to fall into three parts.  The core

6    documents, by which I mean the documents which evidence

7    the procedures of the Department of Homeland Security

8    transmitting ROAs to the Department of State and the,

9    um, procedures that the Department of State followed in

10   acting on those documents.  They started out as B

11   through K, which have been subject now to cross-

12   examination.  And, um, they involve, um, without

13   characterizing them in -- or I think it's permissible at

14   least to identify them in light of the stay, Watson

15   letters and, um, also these decision procedures, the

16   "agree," "disagree," um, "discuss," forms that were used

17   to present matters to the Secretary of State, those have

18   been mentioned.  And, um, in reviewing them -- and I

19   want to talk about them as a group.  I consider them

20   core documents here.  I note that certain of them have

21   attorney-written, um, data on the documents.

22       So not having reviewed the privilege log in

23   detail, um, but I think it's a good place to start, and

24   I think it will be helpful to the Court of Appeals to --

25   for the Court -- I can address this issue of waiver, and

```
 1    I intend to, but -- which the Court specifically --
 2    which the Court of Appeals specifically invited me to
 3    speak, but I think it would be helpful for us to discuss
 4    now where I have agreed to entertain the privilege log
 5    and the claims of privilege with respect to the core
 6    documents, and that's what I'd like to discuss.  And
 7    hopefully rule on.  I'm familiar with these documents.
 8    The ones that have been disclosed to the plaintiffs, the
 9    plaintiffs are surely familiar with them.  And defense
10    counsel is familiar with them.
11         So let me, um, identify first, as a place --
12    because it affects various aspects of what the Court's
13    duties are here, let's identify in the core documents
14    those written statements by attorneys.
15         Now as to those, I understand that the defense
16    raises the attorney-client privilege.
17         Is that correct?
18         MR. KANTER:  Your Honor, I understand you to be
19    referring to the action memo with the -- you refer to
20    "agree," "disagree," "discuss."  So I think we're
21    talking about the same sort of thing, there are some
22    handwritten notations --
23         THE COURT:  Right.
24         MR. KANTER:  -- which presumably Mr. Armstrong,
25    who -- this is his action memo.
```

1          THE COURT:  No, I understand that.

2          MR. KANTER:  They'll be able to clear that up, or

3     the meaning or significance of it.  And what I

4     understand you to be asking is what is the nature of the

5     privilege --

6          THE COURT:  But not as to Armstrong, he's not an

7     attorney.  There is an attorney --

8          MR. KANTER:  Yeah, there was attorney-client

9     privilege with regard to other e-mails in that core

10    subset.

11         THE COURT:  That's what I'm talking about.

12         MR. KANTER:  Yes, discussions of ICE officials

13    with their counsel.

14         THE COURT:  Right.

15         MR. KANTER:  And as your Honor knows, redactions

16    -- proposed redactions have been made with respect to

17    that attorney-client privilege.  Obviously, um, CK

18    counsel is to be encouraged in the government.  And, um,

19    this is a matter of some importance, um, I would say --

20    I would put it this way, on principle.  Because as your

21    Honor also knows, the content -- I remember when you

22    were telling me, "Why" -- "This shows the government in

23    a good light, why would you not want to, in effect, just

24    voluntarily?"  And our response was "That's of

25    course" --

1           THE COURT:  So you were listening, and it does

2    show that.

3           MR. KANTER:  That's for the client and the

4    attorney-client relationship to, you know, at a minimum

5    say, "I want to keep it privileged," right?  And as a

6    result, we, um -- we are pursuing that privilege on

7    their behalf.  And --

8           THE COURT:  That's fair.  That's fair.  And I

9    understand it.  I overrule it.

10          Now what other privilege applies?  And I'll work

11   out from this with the implication.  And I overrule it

12   on the ground that, um, you cannot give such data to

13   the -- the factfinder and then say, "Here it is, but

14   it's privileged, and therefore you can't consider it."

15   That -- and the basis is that is a knowing and

16   intelligent waiver of the privilege as to that data.

17   That's the ground that the Court's ruling.

18          Now are there other grounds to seek, um, a

19   privilege?

20          MR. KANTER:  Over those e-mails?

21          THE COURT:  Yes.

22          MR. KANTER:  The proposed redactions reflect the

23   identities of the participants to those exchanges.  Your

24   Honor's initial ruling was only e-mails and phone

25   numbers --

```
 1          (Interruption.)

 2          THE COURT:  Okay.

 3          MR. KANTER:  Not identities, um, where the

 4   government had proposed to redact, including the

 5   identities, as law enforcement privileged.  But

 6   otherwise putting --

 7          THE COURT:  I guess I don't -- no, no, I hear you.

 8   Why should the names of the people be redacted, they're

 9   public officers of the United States?

10          MR. KANTER:  The, um -- your Honor, it has to do

11   with the, um, the individuals and their responsibilities

12   and the nature of their responsibilities.  There are

13   sometimes law enforcement interests that pertain to

14   identity that the government, um, seeks to maintain the

15   integrity -- for example, an analogy would be

16   maintaining the integrity of an investigation.

17          THE COURT:  Well, of course.  You see that I

18   understand.  But, um, these are in-house people doing

19   their in-house work, um, I don't understand why their

20   names -- we ought not know who they are?

21          MR. KANTER:  The contents of the communication,

22   um, absent an attorney-client privilege, reflect the

23   nature of the discussion.  The agency, um -- and there

24   are limitations to what I would say in open court.  Your

25   Honor has --
```

```
1           THE COURT:  Well that's fine.
2           MR. KANTER:  Okay.
3           THE COURT:  And I -- I hear you, Mr. Kanter.
4           So again, I'm not disposed to redact the names,
5      absent some showing, um, which may -- an affidavit,
6      which may show the ongoing, um, concern that the
7      identity of a particular person, um, his or her name be
8      redacted.  That may be filed under seal and I will
9      consider it.
10          Is there anything else?
11          MR. KANTER:  Yes, there is one other matter that
12     your Honor enumerated, um, related to the action memos,
13     which, um -- the issue here is --
14          MR. ABDO:  Your Honor, before you move on from
15     this --
16          MR. KANTER:  May I finish my remark?
17          THE COURT:  Yes, I will hear Mr. Kanter.
18          Mr. Abdo, I'll hear you in time.
19          Go ahead, Mr. Kanter.
20          MR. KANTER:  I'll get right to the point.
21          THE COURT:  Please.
22          MR. KANTER:  The lead contention of my friend is
23     if you find that the action memos are not privileged
24     under the deliberative process privilege, then the
25     cross-examination of Mr. Armstrong and Mr. Watson may go
```

1    forward, that's their contention, and I would like to

2    address it.

3        THE COURT:  Yes, and I agree.  I agree that that

4    is a central issue here.  And, um, let's -- but I want

5    to start out with the attorney's, the attorney advice

6    that's here in the e-mail.

7        I've overruled the -- I've overruled the assertion

8    of the attorney-client privilege because these were

9    voluntarily submitted to the adjudicator, on the basis

10   that that is a knowing and intelligent waiver.  Now the

11   deliberative process privilege, in this Court's mind, is

12   something else again.  And the analogy -- I think in

13   analogies too, and I was talking with the law clerk,

14   that if -- it isn't the same thing as the deliberative

15   process privilege, but courts hold certain things

16   absolutely privileged, and it's roughly the same, how

17   the Court comes to a decision.

18       So if, for instance, a civil case, like this is a

19   civil case, a motion for summary judgment, before it are

20   briefs and affidavits.  None of those are in a

21   deliberative process privilege, though they are what the

22   parties have served up that will form the basis of the

23   Court's decision.

24       Then an attorney on the Court's staff takes an

25   affidavit, this happened more often in the covid days

1    when we were working remotely, and underlines, writes in

2    the margin, advice.  We're not deliberating, we're not

3    in a meeting.  There was that meeting, for instance,

4    that Hatch attended and I have sustained the

5    deliberative process privilege and allowed him to be

6    asked only what came out of the meeting, which was the

7    classic situation in my mind and easy to follow.

8         Here when an attorney does that, I think these

9    things fall within the deliberative process privilege.

10   I'm talking about the attorney.  And indeed you've --

11   you've, um, anticipated it.

12        So it's conceptually, it's easy for me to think

13   about it with these attorney interlineations on e-mail.

14   That's my concern.

15        So let's say I sustain that because I think that

16   that is within the deliberative process privilege, that

17   is, that's the attorney advising, albeit remotely, the

18   decision-maker to make the decision, the actual policy,

19   what the Secretary of State decided, that's public, and

20   no one -- there's no objection as to that.  So it falls

21   within the deliberative process privilege, it seems to

22   me.

23        We're in the middle of trial.  And then we get to

24   the next problem.  If I say, "No, that's within the

25   deliberative process privilege," candidly I've dealt --

1    in jury-waived cases, criminal cases, the stakes are

2    higher where matters were suppressed and I felt

3    perfectly comfortable in putting aside matters which

4    legally had to be suppressed.  Perhaps not in every

5    case, but certainly in most cases.  And making my

6    rulings on matters properly before me.  But this is

7    different because we're in the middle of trial and these

8    have been disclosed to the plaintiffs.

9         So the truth is, as I always try to speak the

10   truth and be transparent, that as to the lawyer

11   interlineations, I could put those aside.  I could

12   characterize them -- well I don't know that I have, and

13   I'll say no more.  I can put those aside.  But I'll say

14   this, well certainly some of the things that they said

15   are things that occurred to me before I read these

16   documents, that is, "Is this unprecedented?"  "Are we

17   concerned about blow-back?"  I need not go on.  But

18   things which, um, you could readily argue are informed

19   by reading what lawyers, in their lawyer-like way were

20   saying, that both occur to the Court and I'm sure have

21   occurred to, um, plaintiffs.

22        So suppose, because I'm -- I think I'm prepared to

23   say, we can put those to one side, what the lawyers had

24   to say.

25        Now when -- because attorneys can fashion

1    questions that don't depend on it, you can't cross-

2    examine -- "Oh, but do you see here your own lawyer said

3    this and that?"  We can exclude that.  But are you

4    saying that I should curb their cross-examination to

5    questions that don't depend directly on, um, what the

6    lawyers had to say?

7           MR. KANTER:  I --

8           THE COURT:  You're following my --

9           MR. KANTER:  I am following it, and I have -- I've

10   seen your Honor make these distinctions throughout this

11   trial frankly about many matters, admitting evidence,

12   for example, as limited, not for the content but for the

13   reaction, distinctions are made.  This is a bench trial.

14   Your Honor is the judge and the jury, as it were.  And,

15   um, those decisions and distinctions are yours to make.

16          I think the key, um -- the key aspect of this

17   process for the government, um, was the -- in handing

18   over the core documents to the plaintiffs, your Honor,

19   um, made a very important stipulation, the stipulation

20   was they were attorneys' eyes only, which I understood,

21   and your Honor can correct me if I am mistaken.

22          (Pause.)

23          THE COURT:  Go ahead.

24          MR. KANTER:  However I think your Honor was trying

25   to strike a balance, which is acknowledging either the

1    asserted privileges of the government or if the matter

2    of waiver is, um, pending before the First Circuit, or

3    there were other considerations related to attorney-

4    client or deliberative or law enforcement, your Honor

5    was striking a balance to enable the trial to proceed

6    and the examinations to proceed, attorneys'-eyes only.

7    And I think in asking me, "Can there be a robust cross-

8    examination based on these core documents?"  I think the

9    government's answer is "Yes."

10          There may be matters which, for example, I had to

11   talk around in open court and matters for which a

12   sidebar was required, um, but what I'd like to

13   underscore is the plaintiffs have the documents, they

14   have all the documents.  In fact, they have them

15   unredacted.

16          With respect to the, um, "agree," "disagree,"

17   "discuss" memos that your Honor, um, they not only have

18   those unredacted, they have the Secretary of State's

19   decisional memos unredacted.  Why?  Because we gave it

20   to them when we agreed to file it under seal with the

21   Court.  The decision memos are, um, not, um, under seal

22   in full, there's a companion set that is public.

23          The plaintiffs have the information.  They have

24   the ability to fashion questions.  And if any of those

25   questions were to touch on areas of sensitivity, whether

1      the Court has ruled directly with respect to the

2      privilege or the government maintains their -- for

3      example, the other day when there was an exhibit, most

4      of which we had no objection to the questions based on

5      that exhibit, we never stood up and objected, but there

6      was one part of that one exhibit, and we brought it to

7      the Court's attention, and you acted immediately, and my

8      friends complied immediately.  I think we were all on

9      the same page there.  But the --

10          THE COURT:  All right, that's very helpful,

11     Mr. Kantor, and I'm listening to you.

12          One last question before I hear Mr. Abdo, because

13     I -- you've -- I hear no suggestion in our discussion

14     that, um, while I said I could set aside the attorney

15     interlineations as, um, part of the deliberative

16     privilege, and I want to hear him on that, um -- and if

17     I decide to do that, I can do that, it does not affect

18     the integrity of my factfinding.  No one suggests, when

19     I come to decide this case, because, as you have

20     characterized and I think accurately, these documents

21     cut both ways.  I can't be more transparent.  They do

22     cut both ways.

23          No one says -- on the government's side, no one

24     says I can't look at the documents, even if I excluded

25     the attorney data, the core documents, isn't that

1   correct?

2        MR. KANTER:  Yes, that's absolutely correct.

3        THE COURT:  Thank you.

4        MR. KANTER:  And if I may?  One last point or not.

5   I can sit down.

6        THE COURT:  No, no, go ahead.

7        MR. KANTER:  If the issue is -- what I'm saying is

8   the issue of whether it's deliberative or not is a

9   nonissue in terms of being able to question the witness

10  about it, work around it --

11       THE COURT:  That's what I heard you say.

12       MR. KANTER:  That's my main point.

13       As to whether it's deliberative?  I do have an

14  argument that it is deliberative, even putting aside the

15  delineation, because this action memo is a proposed

16  decision.

17       THE COURT:  Oh, you're talking about the

18  interlineations of Mr. Armstrong?

19       MR. KANTER:  Mr. Armstrong's memo -- the whole

20  memo is a proposal to the Secretary of State.  It's not

21  a decision, it's an offer recommending approval.

22       So "approve," right, can, like your Honor said,

23  things can be -- have two meanings at once.

24       THE COURT:  Well that intrigues me.  So we're

25  talking about these action memos now.

1          MR. KANTER:  Yes.

2          THE COURT:  In which there are interlineations by

3    Mr. Armstrong, the witness here at trial.  We've all

4    seen them in their unredacted form.  But you now make an

5    argument that the memo, because it has the

6    interlineations, is, um, part of the deliberative

7    privilege.

8          MR. KANTER:  Yes, I do.

9          THE COURT:  Yes, I understand.

10          MR. KANTER:  And I think my friend helped me with

11    my argument for the following reason.

12          THE COURT:  Well we'll let them make their own

13    arguments.

14          MR. KANTER:  Okay, then I won't say that.

15          THE COURT:  All right.

16          MR. KANTER:  They made an argument that it's not

17    deliberative when it becomes final.  Those are two

18    different things actually, but they make the critical

19    point that they're virtually identical in content,

20    right?

21          THE COURT:  Yeah, let me.  Let me hear their

22    argument from them.

23          MR. KANTER:  Thank you, your Honor.

24          THE COURT:  Mr. Abdo, we've talked about the

25    attorney -- the attorney statements and e-mails, we've

1    talked about these memos of -- we're pretty clear what

2    they are, that Mr. Armstrong gives to the Secretary of

3    State.  Please address both.

4         MR. ABDO:  Thank you, your Honor.  And before I

5    address those, if I could just say one thing.

6         Last night, as you may know, we e-mailed

7    Ms. Belmont with a filing that we had hoped to file

8    under seal later today.  We provided a copy to opposing

9    counsel.  And if your Honor would like to have a copy of

10   it, I'd be happy to approach and provide it.

11        THE COURT:  I have it, don't I?

12        MR. ABDO:  Well I don't know if you have the

13   printout.  But if you don't, I'm happy to provide you

14   one.

15        THE COURT:  Oh, I have a printout.

16        MR. ABDO:  Oh, okay.  So let me just -- a few

17   points your Honor.

18        First, with respect to the attorney-client

19   privilege, we understand your Honor's ruling.  We would

20   just encourage you to overrule the assertion of

21   privilege for the additional reason that, with the

22   exception of maybe one or two sentences in the e-mail

23   thread that we're talking about, nothing in that e-mail

24   thread is plausibly protected by that privilege.  Most

25   of it concerns, um, decisions already made, not sought

1    -- you know not offered in the context of seeking legal

2    advice or received in that context.

3         The fact that attorneys happened to have been

4    copied on the e-mail is relevant, but it certainly isn't

5    dispositive to the assertions of privilege, and we'd ask

6    you to base your ruling on that additional basis, which

7    we think would, you know, clear up the record.

8         A second point with respect to, um, the

9    interlineations.  I think I now understand where things,

10   um, have landed, but just to be clear.  The

11   interlineations we're talking about, and I believe

12   Mr. Kanter was talking about, were ones made apparently

13   by Mr. Armstrong on the action memo, not by a lawyer.

14        THE COURT:  I -- I never was under a

15   misapprehension as to that.  The problem is we're being

16   cautious about documents, and he started off talking

17   about interlineations by Mr. Armstrong, I said, no, no,

18   no, and he moved to e-mails.  We talked about e-mails, I

19   allowed him to expand now to interlineations, undisputed

20   apparently by Mr. Armstrong on this decision memo.  And,

21   um, I've heard his argument.  I'll hear yours.

22        MR. ABDO:  Thank you.

23        And then a third point, your Honor, has to do with

24   the deliberative process privilege and connects to the

25   action memo that we were just talking about.  As you'll

```
 1    have seen from our filing, we don't think the
 2    deliberative process privilege covers any of the
 3    documents that have been turned over to plaintiffs for a
 4    variety of reasons.  We explained four in the memo.  I
 5    won't repeat them here.  But let me just highlight two
 6    of them.
 7         One is that all of the documents we're talking
 8    about have been adopted, including especially the action
 9    memo that we were just talking about.  Mr. Armstrong --
10    well I don't want to go into any details, but I think a
11    review of the document on its face makes clear that it
12    was adopted, and once a document is adopted as a
13    decision of the government, whatever predecisional and
14    deliberative character it had before that might have
15    justified invocation of the privilege falls away.
16         So, you know, we think it would be proper to
17    overrule all the government invocations for that reason.
18         THE COURT:  There have been opinions of this Court
19    which, if you looked at the draft, which otherwise was
20    privileged, I -- I don't know as I'll use the word
21    "confess," the only changes I made were to avoid split
22    infinitives, which is an issue of mine, and to move a
23    few, um, commas.  So that reveals that the draft, by the
24    law clerk, was 95 percent acceptable to the responsible
25    judicial officer when I signed my, um, my -- put my
```

1  signature on it.

2      I do not conceal from the bar that in the main,

3  um, I delegate to clerks and interns initial drafts.

4  Frequently I do rewrite or add sections and subtract,

5  and all of that business.  But, um, it does add a little

6  more information if you were to know the last draft

7  before the judge put, in my case, his signature on it.

8  And I always thought that was privileged.

9      I think that's correct, your Honor, but two points

10  about that.  One is that once you put your signature on

11  the document, then it is expressly adopted.

12      THE COURT:  Exactly.

13      MR. ABDO:  I don't think there's any debate in the

14  doctrine about that proposition.

15      And the second point is that, even with respect to

16  documents that were once predecisional and deliberative,

17  if they were incorporated by reference into the

18  decision, or relied upon, as many of these documents

19  were expressly in the decisional document, that

20  incorporation waives whatever deliberative process

21  privilege there would be.

22      So just to be very concrete.  In the decisional

23  memos we have, in the certified administrative record,

24  you know the ones from the Secretary, those memos

25  expressly base their decision on underlying memoranda

setting out the factual understanding of the Department

of State or the Department of Homeland Security.  They

quote them.  They site them.  They list them as

attachments.  That incorporation also waives whatever

predecisional and deliberative character the underlying

memos might otherwise have had prior to the final

decision.

And we think that applies to the bulk of -- and

between those two arguments, we think it covers all of

the documents over which the government has asserted the

privilege.

THE COURT:  And I'm saying it back to you now.  At

some stage I will write an opinion here, and in legal

writing they'll be citations, and the citations will be

to the record, or to opinions and the like, all of which

-- and your point is, "If you do that, Judge, all of

those necessarily are public, because, in legal writing,

that is explication of what you relied on, it shows your

reasoning."

MR. ABDO:  Precisely, that is the basis for your

decision.  And the bases cannot be withheld under the

deliberative process privilege.

THE COURT:  Okay.

MR. ABDO:  One final point, your Honor, has to do

with our ability to cross-examine on the basis of these

1    documents.  And to that I'd like to turn it over to

2    Ms. Conlon.  If that's okay?

3          THE COURT:  Of course it is.

4          MS. CONLON:  I have a very extra-vested interest

5    because I am, as you know, have begun the cross-

6    examination of Mr. Armstrong.

7          So our friends on the other side make the point

8    that even if the documents couldn't be used by us in

9    terms of entered into evidence or shown to a witness,

10   that we wouldn't be hampered because we could ask

11   important, you know well-crafted questions.

12         THE COURT:  He didn't say you wouldn't be

13   hampered, he says you can think of ways around it.

14         MS. CONLON:  And I want to let the Court know some

15   important context that there's no reason the Court would

16   have known, which is this.

17         I sat in a room with Mr. Armstrong for a whole

18   day.  He did not recall and could not answer a single

19   question about the basis for any of these decisions,

20   even the manner of these decisions, and he repeatedly

21   said, "Please show me the documents."  I cannot tell you

22   how many times he asked me to show him the action memo

23   and the Watson letter, and of course I didn't have them

24   because, until the Court shared them with us, we had

25   never seen them.  We could not effectively get at the

1    truth without them.

2        THE COURT:  Wait.  Now, um -- I'm going to cut you

3    off, Ms. Conlon, but only for this witness.  My ask to

4    the Court of Appeals is that they lift their stay, um,

5    not really that they, um, dismiss -- and I don't know

6    that it properly is before me, that they dismiss the

7    petition, that's up to counsel arguing the several

8    positions.

9        But at their invitation, I am going to ask that

10   they lift the stay, and as I put it, "allow me to muddle

11   through to the end of the evidentiary process."

12   Mr. Kanter referred to it, and respectful to plaintiffs'

13   counsel, deservedly so.  And I -- the counsel I have

14   here in the courtroom before me, I have genuine respect

15   for you all.  We have worked cooperatively and I have

16   been able to make rulings that I have thought

17   prudential.

18       I'm talking to the -- I can't decide -- I'm having

19   this discussion.  We have daily copy.  You can transmit

20   it all to the Court of Appeals.  But I can't -- I put on

21   the record that I'm ruling that the assertions of

22   attorney-client privilege are, um, overruled on the

23   basis of waiver, because they were put before the

24   factfinder.

25       I am ruling that the, um, claim of deliberative

1    privilege as to -- I want to reflect on what Mr. Abdo

2    said, but as to so much of the e-mails that actually

3    reflect attorney advice is sustained, so long as we are

4    clear, as Mr. Kanter has made it clear, that the Court

5    may look at those things, draw inferences and the like.

6    But I'm going to treat those as having sustained, um,

7    that on the deliberative process privilege.

8         Beyond that, I'm not making any rulings as to the

9    reach of the deliberative process privilege because the

10   process Mr. Kanter has described is, um, both acceptable

11   to the Court and workable.  And if the Court of Appeals

12   will allow me to proceed with Mr. Armstrong and

13   Mr. Watson, um, I don't think there's any more I can

14   say.  I've tried to be transparent to counsel and to the

15   Court of Appeals.

16        Yes?

17        MS. STROKUS:  Your Honor, I just wanted to put on

18   the record before you that Ms. Conlon has

19   mischaracterized what occurred at Mr. Armstrong's

20   deposition.  I was also there the entire day.  And

21   plaintiffs repeatedly asked him to speculate on

22   documents that they could not produce to him.  So he's

23   under oath --

24        THE COURT:  Well because they --

25        MS. STROKUS:  So he's under oath.  It's important

 1    that he tell them, "I'm not going to speculate on the

 2    contents of these documents."

 3         THE COURT:  I'm not drawing any conclusions.  If

 4    the Court of Appeals will allow him to resume the stand,

 5    I can handle the examination.

 6         Now that --

 7         Yes?

 8         MS. CONLON:  Your Honor, may I ask you a question?

 9         THE COURT:  Oh, of course you may.  We're talking

10    now.  And I'm fine with talking, but I can't -- I've

11    made the rulings I've made to try to be helpful, because

12    I have enough of a basis to make those rulings.  Beyond

13    that, I'm asking that they let the trial go on, and a

14    trial is a trial.

15         MS. CONLON:  And when your Honor said, "If the

16    trial is permitted to continue with examinations of

17    Mr. Armstrong and Mr. Watson, that we can use the

18    process we have used so far," which I understand --

19    that's the part I wanted to get clarification on.  I

20    take that to mean to deal with things as they come up.

21         THE COURT:  Yes.

22         MS. CONLON:  Okay.  We have discussed the action

23    memos today and we've discussed the e-mails, but we have

24    not discussed, unless I missed it, the letters from

25    Mr. Watson to the State Department.  I wanted to make

1     sure that that's also something we're addressing today

2     to the extent that the Court is willing.

3          THE COURT:  I am willing, because I consider them

4     core documents.  And, um, maybe I should go back to

5     Mr. Kanter to be -- to see if, um, there's any ruling I

6     can make.

7          Mr. Kanter, as to the Watson letters?

8          MR. KANTER:  Yes.

9          The Watson letters are referrals from one agency

10    to another, and, um, the government stands on the, um,

11    log entries as to those documents we submitted to the

12    Court.

13         THE COURT:  Yeah, but they really are very fine

14    points.

15         MR. KANTER:  (Laughs.)  Fine?

16         THE COURT:  What are your objections?

17         MR. KANTER:  You're right, and I apologize for

18    that.

19         THE COURT:  No, no, that's all right.

20         MR. KANTER:  I strained to read them myself.

21         THE COURT:  I have a magnifying glass.

22         MR. KANTER:  Um -- okay.

23         In my recollection, the referral letters are

24    law-enforcement sensitive, they were the subject of a

25    motion to compel by the plaintiffs, which your Honor

1    denied.  They were among the documents that your Honor

2    held the privilege had been waived.

3         We have not changed the assertions as to those

4    documents.  They remain law-enforcement sensitive.  Your

5    Honor handed them to plaintiffs with the AEO

6    stipulation.  We, um, believe that is a compromise that

7    enables the trial to proceed.

8         THE COURT:  Thank you.  Yeah, I think that's

9    well-said.

10        MR. ABDO:  Your Honor, if I may just add one note

11   with respect to those?

12        THE COURT:  Yes, please.

13        MR. ABDO:  You know those documents appear on the

14   chart that we provided to the Court last night.  Among

15   the first, I think 9 or 10, all withheld only under the

16   law-enforcement privilege.  And we understand your court

17   to have overruled that assertion of privilege with

18   respect to these documents based on your Court's

19   conclusion, which we fully agree with, that the

20   government had interpreted that privilege far too

21   broadly to cover not just information that was disclosed

22   with compromise and investigation, but the sort of

23   information we've seen from these memos, which is

24   largely factual information.  And using techniques that

25   have already been disclosed to the public and described

1    in open court, mainly the collection of social media

2    information and the like.

3         So we think the Court has already ruled with

4    respect to those documents on the merits, not on the

5    basis of waiver, such that the First Circuit's order

6    doesn't even implicate our use of these documents at

7    trial.

8         THE COURT:  Actually you've stated it better than

9    I.  But the use of the word "waiver" there, by the

10   Court, was infelicitous, because while I went on to

11   explain my focus on the law-enforcement privilege and

12   explain what I believed was the scope of the

13   law-enforcement privilege and functionally overrule that

14   privilege as to these documents, as you have properly

15   said and more effectively described, the use of the word

16   "waiver" was infelicitous.  And now that I've gone back

17   and looked at the transcript, I said, "You may submit

18   law-enforcement privileged data and I used words much

19   like "and I will honor it."  And that's their basis for

20   saying, in effect, that they were snookered.  They were

21   not snookered.  That didn't estop the Court from making

22   a ruling on the privilege.  I made the ruling on the

23   privilege.  But they did not waive it by asserting it

24   and giving me the documents.

25        What they did was give me the documents, allow me

1   to rule on the privilege, I overruled it, and as a

2   matter of trial management, have decided, and persist in

3   that decision, that they may be used to get in the

4   trial.  Everyone agrees I may look at them.  But I think

5   that, um, I may look at them more effectively if I

6   permit cross-examination, which has been the Court's

7   reason and process for turning things over under the

8   stipulation of attorneys'-eyes only.  Thank you.

9         MS. CONLON:  Your Honor, I'm so sorry, may I ask

10  you a question?

11        THE COURT:  Don't apologize.  You know we're

12  talking.

13        Go ahead, Ms. Conlon.

14        MS. CONLON:  Okay.

15        So understanding the Court's point that if we can

16  continue, we will use the process that we have used,

17  which is collaborative with the Court and the

18  government, the concern that I hope was clear in our

19  application for time is that that process takes time,

20  meaningful time, and I am deeply concerned that with

21  only several hours we will not be able to even finish

22  this process.

23        THE COURT:  I'm sure you're concerned, but that

24  was clearly to be anticipated in a trial of this sort.

25  No additional time.

1          Now, um, there's one other document and we haven't

2     talked about it and I actually talked about it in trial,

3     but we haven't talked about it here.  And I think my, um

4     -- I think, one, the document, as I understand it, is

5     not implicated in this application for a writ of

6     mandamus, and that is the single document marked A as to

7     which the government has asserted the Executive

8     Privilege.  They call it the "Presidential Privilege,"

9     which has thrown me a little bit, but it's the same

10    thing as the "Executive Privilege," which I am somewhat

11    familiar.

12         As to that document, I have characterized it in

13    open court saying, "It appears to be peripherally

14    relevant."  Here's how I'm going to handle that

15    document, if it hasn't been clear.  And again all of

16    this I fact expect you to transmit to the Court of

17    Appeals should you take a position with respect to it or

18    have issue with it.

19         The Executive Privilege has not in any way been

20    waived, and has been asserted, and timely asserted.  The

21    matter was and is under advisement by the Court without

22    respect to the, um -- without respect to the mandamus

23    proceedings.

24         It seems to me there are three possible outcomes.

25    The Court determines that the privilege applies.  If

1   that happens, the document itself will be returned to

2   the government forthwith.  But notification will be put

3   either by my saying so during the trial or if it's in

4   the under-advisement period, um, by notification on the

5   docket.

6        Second, that, um, the ruling, whether it applies,

7   um, is deferred by the Court until the, um, time I am

8   writing up the opinion and I decide that while relevant,

9   it's so peripheral that no mention of the document need

10  be made in the opinion, nor reference to it.  If that

11  happens, the document at that point will be returned to

12  the government forthwith, physically, no copies retained

13  in the file of the Court at all.  It's treated in our

14  procedures as a highly-sensitive document.  I have

15  custody of it.

16       The third possibility is that the Court finds that

17  the privilege -- rules that the privilege does not

18  apply, and further, um, wants to cite.  The second

19  option, I don't have to decide whether the privilege

20  applies, if I'm not going to cite it, I'll give it back,

21  because I'm not relying on it in any way.  If I find

22  that the rule -- that the privilege does not apply, and

23  the -- and I'm going to cite it or use it, in that case

24  I will give notice, and then I would think that would be

25  ripe, um, and indeed -- why don't I say it right now, I

1    will not do anything for -- I will automatically, I'm

2    putting it on the record now, stay any further action as

3    to the document for 7 days so that the government may,

4    um, seek to protect the document.

5          I have said one thing that, on reflection, I want

6    to retract, and I'm looking for you, Mr. Kanter, who's

7    arguing these privileges.  I suggested the possibility

8    that assertion of the privilege could be a basis, even

9    if it wasn't national security, for an adverse

10   inference.  That's error.  And I would not do that.  And

11   the reason, on the record, is there is an institutional,

12   um, reason, wholly apart from this case, for the Office

13   of the President of the United States to assert the

14   Executive Privilege and vigorously to patrol its

15   parameters to preserve the Office of the President of

16   the United States, both as to Congress and the courts

17   and the public.  That's established in the case law.  I

18   fully respect it.  And, um, the privilege asserted here,

19   I can readily conceive of reasons why the government, as

20   an institutional matter, would assert it, utterly

21   regardless of any issue laid before the Court.

22         So any adverse inference from asserting it is --

23   will be improper, and I assure you I would draw no such

24   inference.  That's how I'm going to handle that.  So

25   we're clear on that.

1          Now with that I think I -- let me tell you what I

2    plan to do.  I plan to go back and talk to the law

3    clerk, um, we'll say a 20-minute recess.  Then I'm going

4    to come back and I propose, really briefly, to --

5    subject to Mr. Abdo being heard here, to briefly, um,

6    accept the Court of Appeals invitation and to explain

7    myself on the record.  Again, this is not a brief.  I

8    will just explain how I -- if permitted, I will ask to

9    have the stay lifted, but the writ I take no position

10   on, the proceedings for the writ could depend, um, and

11   that will constitute my response.  And I will, because

12   we've got daily copy, I will transmit a copy of my

13   remarks, soon to be made, to the Court of Appeals.

14         I do want to add, with thanks, the Chalk HN, it

15   really sort of walks through the -- what I've described

16   as the "Core" documents.  And, um, I should append it to

17   my remarks and I'll see that that's done.  So I'll ask

18   you to wait for that because I think it will be helpful

19   for you to, um -- my whole reason for doing it this way

20   is for you to hear it.

21         And, Mr. Abdo.

22         MR. ABDO:  Thank you, your Honor, just one brief

23   point.

24         We obviously don't have Exhibit A, the document

25   for which the government has asserted the Executive

 1    Privilege or the Presidential Communications Privilege.

 2    Just one note about that document, if the Court

 3    determines it is relevant and is weighing the question

 4    of whether it is properly privileged.

 5         One of the key elements of the Presidential

 6    Communications Privilege is that the information in the

 7    document at issue not have been distributed beyond the

 8    President's close advisors involved in the

 9    decision-making at issue.  Mr. Lapowski's declaration

10    which asserted the privilege does not address the

11    distribution of this document.  And so it is our

12    position that the government has not yet met its burden

13    of invoking that privilege.  We obviously have no basis

14    to know the distribution of the document, but it's our

15    position that they have yet to satisfy that element of

16    the burden.  And so we'd ask them, at the very least, to

17    supplement their filing in that regard.

18         THE COURT:  Thank you.

19         I thank you all.  We'll take a recess for 20

20    minutes and, um, the Clerk will advise you as to what

21    will next happen.  But I'm hopeful to come back and

22    briefly accept the invitation of the Court of Appeals

23    and, um, so that you may all support or take issue with

24    it and the like.

25         And with that done, I think that would, um,

1    conclude the proceedings for today.  Because when I'm

2    done, I'm going to recess.  So let me go around.

3         Is there anything else that you think we ought be

4    discussing today?  I've told you what I'm going to ask

5    for.

6         (Silence.)

7         MS. CONLON:  Um, to make sure we understand we're

8    proceeding tomorrow.  If there is no ruling from the

9    First Circuit with respect to the, um --

10        THE COURT:  If there is no ruling, then, um, I

11   understand the boundaries of the stay and I will

12   scrupulously adhere to them.

13        MS. CONLON:  And to make sure that I understand

14   that same understanding, when we are questioning the ICE

15   agent tomorrow, so that we don't run afoul of anything

16   here, um, if there is no ruling from the Court of

17   Appeals, are we permitted to ask questions that rely

18   upon information that we know from those documents?

19        THE COURT:  It depends upon how you ask them.

20        MS. CONLON:  Okay.

21        THE COURT:  I don't, in any way, mean to be coy.

22   We can't unring the bell.  For good and sufficient

23   reason, I have turned the documents over to you because

24   candidly I wanted them, um, to subject them to cross-

25   examination so that I could better understand the full

1    context.  That's where we are in this case.

2         MS. CONLON:  A related question, your Honor.

3         These documents, in particular the Watson letters

4    and the action memos, does the Court understand and

5    review them as part of the record that's in evidence

6    that the Court may consider in reaching its findings or

7    are these from the Court's perspective outside of the --

8         THE COURT:  No, the Court -- that I think I made

9    clear, and I don't think the government has an objection

10   to that.

11        I take these documents, with the exception of

12   attorney, um, volunteering of, um, or giving -- I

13   shouldn't say "volunteering," giving legal advice, as to

14   which I am prepared to exclude as part of the

15   deliberative process, I'm not saying the whole e-mails,

16   um, and I'm going to put that to one side.

17        MS. CONLON:  Okay.

18        THE COURT:  Having said that, everything else --

19   and I don't hear defense counsel objecting to it,

20   unredacted, is part of the record on which -- except

21   perhaps for this Executive document as to which

22   Executive Privileges -- well let me start again.

23        As to the core documents -- I'm speaking to the

24   core documents.  As to the core documents, I can look

25   and rely upon them all, with the one exception that I've

1    just now stated in open court.  As to the document as to

2    which Executive Privilege is asserted, I've told you how

3    I'll handle that.

4         As to the other documents, if there are more, um,

5    I take the position -- we haven't discussed it here

6    today, but I take the position that the privileges that

7    I have allowed now to be asserted are asserted with

8    respect to those documents, and I will rule upon them.

9    Rather broadly I have, um, overruled the assertion of

10   the attorney-client privilege.  I intend to sort through

11   them, in the deliberative process, post-trial and, um --

12   it's a benal phrase, "Let the chips fall where they

13   may."  If I accept the privilege, I won't rely on it.

14   If I don't, I will.  And it should be clear.

15        Has that answered your question?  That is a good

16   question.  And that's what I intend to do.

17        MS. CONLON:  Nearly.  Nearly.  I think I nearly

18   have an understanding.

19        A concern, your Honor, or a related question, is,

20   um, if we spend time of our remaining time questioning

21   witnesses about the content of certain documents -- and

22   I'll call them the "core documents," forgetting the

23   e-mails, putting aside the e-mails, the "core

24   documents," being the Watson letters and the action

25   memos.  If we spend time questioning witnesses on them

1    and the Court later concludes those materials are under

2    some sort of a privilege and therefore the Court can't

3    rely on them or use them, you can see how it puts us --

4    all of us, I think, in a difficult position if we've

5    elicited all of this testimony --

6         THE COURT:  We're all in a difficult position.

7         MS. CONLON:  You too, of course.  And in

8    particular, because the Court knows I'm quite focused on

9    this time issue, it puts us in the hard position of

10   potentially having used all our time on stuff that I

11   think the Court can't even consider.  And so --

12        THE COURT:  No, what I've heard from them, I can

13   consider them.  I'm going to consider them, the core

14   documents.  I'm going to consider them all.  Whatever

15   your cross-examination, I'm going to consider them.

16   With the exception of what attorneys may have advised --

17   may have advised, but as we've said in open court, those

18   were logical questions which I was asking before I'd

19   even looked at the documents.  But I am permitted, they

20   are part of the record on which the Court will make its

21   decision.  Part of the record.  If I cite them, implicit

22   in that is I've overruled any privilege of any sort.

23        MS. CONLON:  And the Court will likewise consider

24   testimony from witnesses about those documents?

25        THE COURT:  Of course.

1          MS. CONLON:  Okay.

2          THE COURT:  Well I don't understand -- well the

3    Court of Appeals can instruct me as it wishes.  I would

4    be -- look, I'd be very surprised.  The Court of

5    Appeals, because I've made clear to the government I'm

6    going to -- with one exception, I am going to look at

7    the core documents.  If the Court of Appeals were to

8    instruct me otherwise, I would have seriously to -- to

9    strike some or most or, um, but a significant part of

10   the core documents, if I have made such a mistake, I

11   would seriously have to consider recusal.  Because if

12   this -- then if this case comes out and plaintiffs lose,

13   the integrity of the Court's factfinding will always be

14   suspect, truly suspect, that if only I had considered

15   those things, you would win.

16          Contrary-wise, if I were to find these high,

17   significant, the President of the United States, among

18   others, liable for infringing core constitutional rights

19   on such a truncated record, it will always be believed

20   that this Court didn't put it aside, as I've asserted,

21   all the attorney stuff I could put aside.  I was asking

22   those questions.  And I'm not going to be put in that

23   position.  I should recuse and we'll start over in

24   accordance with the, um, decisions of the Court of

25   Appeals, which of course I will follow scrupulously.

1       So if I've made that mistake, um, I'd seriously

2   considering recusal.  But I don't hear anyone saying

3   that.  Now maybe I'm mistaken.

4       MS. CONLON:  No, your Honor.

5       THE COURT:  Yes?  Mr. Kanellis, before I take the

6   recess.

7       MR. KANELLIS:  Just briefly, your Honor.  That

8   instruction we will plan on presenting four witnesses

9   tomorrow, one of them testifying from London.

10      THE COURT:  Oh, he was the one from London.  And

11  that's fine, that's worked well.

12      MR. KANELLIS:  Thank you, sir.

13      THE COURT:  All right.  20 minutes, we'll recess.

14  Thank you.

15      THE CLERK:  All rise.

16      (Recess, 10:25 a.m.)

17      (Resumed, 10:55 a.m.)

18      THE COURT:  The Court takes this opportunity, on

19  the record, in the presence -- in open court, in the

20  presence of counsel, to accept gratefully the invitation

21  of the Court of Appeals to address the, um, mandamus

22  petition both generally and expressly to address the

23  issue of waiver with respect to that petition.

24      I'm going to start by, um, making a request to the

25  Court of Appeals.  I'm not going to argue in any way the

1    substance of the petition.  That's for the parties.  The

2    Court's conduct is all a matter of record.  And the

3    transcript governs and is more, um, important than

4    anything I say now.  But I'm going to start with the

5    request, simply as a matter of case management, that I

6    would make of the Court of Appeals.  And it is this.

7        I request the Court of Appeals to lift the stay,

8    though I express no opinion on the disposition of the

9    petition for mandamus, and it might well, um -- it's

10   entirely up to the Court of Appeals, it might well make

11   sense to let the petition survive so that it may have

12   the benefit of further proceedings in this court.

13       But I would ask the Court of Appeals to lift the

14   stay so that the evidentiary portion of this first phase

15   of this jury-waived trial might complete.

16       We are in the, um, second week of a two-week --

17   9-day trial, and once that trial is over, or the

18   evidentiary portion is over, it's appropriate for this

19   Court to sketch what I anticipate will be the necessary

20   further proceedings.

21       This is a case -- and I know the Court of Appeals

22   appreciates this, but this is a case where intent and

23   motive play a significant role, and once the evidence is

24   fully before the Court, it's the Court's intention to

25   take the matter under advisement.  This is not a case

1    where even as to a portion of the case the Court expects

2    that, because of the evidence, to be in a position to

3    make any ruling from the bench, rather the Court expects

4    to take the case under advisement, seek, um, requested

5    findings and rulings from all parties, carefully review

6    the record, and then issue a full written opinion.

7         The actual likelihood of that opinion emerging

8    before September is unlikely.  So the urgency to fully

9    decide the, um, petition is, um, not grave.  Given the

10   fact that what's done is done, the plaintiffs have

11   access to the material which the Court deemed

12   appropriate to subject to cross-examination during the

13   trial, and I adhere to that decision and expect to

14   adhere to it, subject to a proper, um, a claim of

15   privilege during the course of the remaining

16   proceedings.  And I'll speak to that in a moment.

17        And one can anticipate, of course, that as this is

18   only the first phase of this case, if the case were to

19   resolve in favor of the defendant public officials, then

20   of course the plaintiffs would have the right to a

21   plenary appeal.  Contrary-wise, if the case were, at

22   least on what I'll call the "liability phase," resolved

23   against one or more, and I treat them separately, of the

24   defendant public officials, um, that would afford an

25   opinion -- that would afford a place for an

1      interlocutory appeal, should the Court of Appeals wish

2      to evaluate the propriety of that decision while this

3      Court wrestled with the very real problem, even if

4      that's how it were to play out, of redressability,

5      something this Court has not addressed in the -- its

6      hearings thus far.  So that's the Court's approach to

7      the management of this case.

8           Let me then, without arguing the point, um,

9      explain the Court's position with respect to matters to

10     be considered on the petition for mandamus.  And I think

11     it's important to understand that the Court, and I

12     believe the parties, place the documents in question,

13     because at bottom, this is an issue over evidentiary

14     rulings mid trial as to certain documents produced.

15          I separate the documents into three buckets.  What

16     I've called the "core documents," these documents are

17     documents that evidence the transmission of materials

18     about certain target subjects, which I've required the

19     plaintiffs to designate, which they are arguing are

20     exemplars of their so-called "ideological deportation

21     policy."  The Court of Appeals will understand that the

22     defense asserts there is no such policy and that the

23     proceedings of the government agencies were lawful in

24     every relevant part.

25          So the core documents are the "ROAs," so-called,

1    and transmittal letters, um, e-mails commenting thereon,

2    that were transmitted from the Department of Homeland

3    Security to the Department of State, specifically to the

4    Bureau of Consular Affairs, and certain of those, the

5    transmittal letters that so transmitted them, and, um,

6    thereafter the "decision memos," so-called by this

7    Court, that the Director of the Bureau of Consular

8    Affairs transmitted most, but not all, of the packet to

9    the Secretary of State for decision, as required under

10    the law.

11        The actual interplay is -- and the standard

12    procedure is best illustrated in a chalk that the Court

13    has marked HN, and will attach to the cover letter sent

14    to the Court of Appeals, which, um, so far as this Court

15    can see, accurately describes the standing procedure of

16    both executive departments in handling matters.  It of

17    course does not answer the key question which concerns

18    the content of the materials so transmitted.  So those

19    core materials are the materials that I understand the

20    petition to center upon, and I'll come back to them.

21        There are two other packets of materials that I

22    transmitted in bulk to the Court all together, but I've

23    broken them out for this discussion.  As to one

24    document, which I'll call Exhibit A, the government has

25    properly, and the Court recognizes the proper --

1  "proper" in the sense that I recognize that it's been

2  properly asserted and not waived, the government has

3  asserted an Executive Privilege.  That's a, in this

4  Court's eyes, a difficult issue and one the Court has

5  not resolved and which the Court understands it is free

6  to resolve as the case goes on.  So it's appropriate to

7  indicate to the Court of Appeals what I've told the

8  parties about how it will be resolved.

9       It seems to this Court that there are three

10  possible resolutions.  First, that the Court resolves

11  that the specific document in question is subject to an

12  Executive Privilege.  If it is, whenever the Court makes

13  that determination, it physically forthwith will return

14  the document to defense counsel and make a notation on

15  the record.

16       The second possibility is that, without deciding

17  whether the document is, um, subject to an Executive

18  Privilege, the Court, as it comes to analyze the case --

19  I've read the document and I largely understand it, um,

20  it makes no difference to the decision and the Court

21  needs not cite it.  If that is, um, decided, the Court

22  will immediately return it to the defense counsel and

23  again make a notation on the record.

24       The third possibility is that the Court, um,

25  rejects, overrules the assertion of an Executive

```
 1    Privilege and also decides that the document, which the
 2    Court has thus far characterized as "peripherally
 3    relevant," is in fact relevant to some conclusion the
 4    Court determines to make.  In that case, if the -- if
 5    this present petition were, um, still pending, a dispute
 6    over this document might be beholden to that petition.
 7    And I've told counsel, if I make that decision, I will
 8    stay it for 7 days so that they may take action with
 9    respect to that document.
10        The third packet of documents are documents as to
11    which I have now allowed privileges to be asserted, and
12    they have been, but which will not figure in the, um,
13    oral testimony as no further documents are going to be
14    produced to the plaintiff -- the plaintiffs by the
15    Court, but which all parties agree the Court may look
16    at, determine privileges, as it goes forward, and I
17    shall do so.
18        Again, if I decide to rely upon and cite a
19    document, implicitly or explicitly, it will be clear
20    that I have overruled the privilege.  If I don't cite
21    the document, it, um -- no ruling is necessary and those
22    documents no longer figure in the case.
23        The written -- were a decision on the petition of
24    mandamus -- for mandamus to await either appeal or allow
25    an interlocutory appeal, again that could all be
```

```
 1    reviewed in the ordinary course, and evidentiary error
 2    will be reviewed, and of course it is, as to whether it
 3    makes a substantial difference in the outcome.  And I
 4    would have the liberty of, on a full record, to make the
 5    findings and rulings that, um, I believe either have or
 6    have not been proved by a fair preponderance of the
 7    evidence.
 8         So let me conclude simply by focusing on the core
 9    documents and reiterate -- which do seem central to the
10    issues raised by the petition for mandamus, and, um,
11    respond directly to the Court's use of the word
12    "waiver," which the invitation expressly sought the
13    Court's further explanation.
14         The use of the word "waiver," upon reflection, was
15    infelicitous, so, um, it caused no prejudice to anyone,
16    because the Court followed it up with an explanation.
17    Here is the Court's view of what has happened.
18         The -- during a discussion on the plaintiffs'
19    motion to compel certain documents for, um, which the
20    plaintiffs claim were part of the record of decision of
21    its so-called "ideological deportation policy," the
22    Court declined to, um -- the Court denied the
23    plaintiffs' motion.  But did say -- and again the
24    transcript of what I actually said at the time governs,
25    but I'll characterize it, said, "But I would receive
```

1    documents as to which the law-enforcement privilege was

2    asserted and I would honor it."

3         Now again the transcript governs.  What happened

4    happened, was that ultimately over 300 documents were

5    submitted to the Court where the defense asserted not

6    only the law-enforcement privilege, but various

7    privileges, and, um, took, with respect to -- when you

8    look at these documents, a very aggressive, um,

9    position.  The Court's -- the Court's review of the

10   documents became more, um, thorough as trial approached

11   and as the acting trial became to the front burner and

12   trial commenced, and the Court, as to these core

13   documents, um, came to the conclusion that the

14   law-enforcement privilege was inapplicable and was

15   asserted extraordinarily overbroadly.  The Court

16   therefore was in a quandary.

17        Should, having overruled the -- that privilege,

18   should the documents be disclosed to the defense?  And

19   the Court determined, to have the fairest possible

20   trial, that such disclosure was in the interests of

21   justice, and I did disclose it.  Disclose them.

22        Various minor issues with respect to the -- I

23   shouldn't call them "minor," but with respect to

24   those -- to that disclosure have been worked out, I

25   believe, to the satisfaction of the parties.  The

 1    documents in their raw form I anticipated and expected

 2    redaction of e-mails and telephone numbers.  The defense

 3    wants more.  The, um -- there was indeed one reference

 4    to something that, in all fairness, in fact bore on the

 5    law-enforcement privilege, despite the Court's ruling.

 6    That was corrected by full cooperation between all

 7    parties, and the proper redaction made.

 8         I say the use of the word "waiver" was

 9    infelicitous because the Court did ask the defense to

10    submit the documents with respect to which it claimed a

11    law-enforcement privilege.  The government now says that

12    they were -- they don't say this expressly, but their

13    position is they were snookered, and I got the documents

14    just to disclose them.  Well that's not so.  I certainly

15    never conceived that anything I said could be thought to

16    estop the Court from making proper rulings with respect

17    to the documents.  And again, the transcript will

18    govern.  But it's the Court's position that proper

19    rulings have been made.

20         One last point which, um, I state again simply to

21    be of assistance to the Court of Appeals.  Today the

22    parties and the Court have had a very productive

23    discussion, the full transcript is of course available

24    to the Court of Appeals, and I recite only

25    determinations that I believe I am still authorized to

1    make with respect to these core documents.  And I have

2    made the following.

3         Actually I've made the following with respect to

4    the assertion of the attorney-client privilege.  Having

5    reviewed the documents and the arguments, I do rule that

6    the attorney-client privilege has been waived.  It

7    simply is inapplicable in a situation where counsel has

8    provided documents to the factfinder, um, on the theory

9    that these documents are relative -- are relevant to the

10   decision, as certainly the core documents are.  That

11   constitutes a waiver of the attorney-client privilege,

12   and the Court, less there be any doubt about it, so

13   rules.

14        In one respect the Court sustains the, um, claim

15   of deliberative process privilege and I have sustained

16   it as to, um, certain provision of legal advice by

17   attorneys in certain e-mails that form a portion of the

18   core documents.  Beyond that sustaining, after

19   discussion with counsel, I make no further rulings as to

20   the deliberative process privilege, or any other

21   privilege, as to the core documents.  And, um, I won't

22   say it's by agreement, but we've worked out that if

23   permitted to continue the trial, I will make what the

24   Court considers appropriate rulings on a

25   question-by-question basis.

1          Essentially the issues relate to the Director of

2     the Bureau of Consular Affairs, Mr. Armstrong, whose

3     testimony had just commenced cross-examination when the

4     stay, um, was transmitted, and a Mr. Watson, who wrote,

5     um, the transmittal letters from the Department of

6     Homeland Security to the State Department.

7          One other thing is significant and I will state

8     it.  I understand that whatever ruling the Court makes

9     as to cross-examination in the course of the trial, the

10    Court is empowered, without objection by the government,

11    to review all the records in its possession, make proper

12    privilege rulings, and rely upon those which it rules

13    the privilege or qualified privilege does not apply.

14          With those explanations, which I truly hope are

15    helpful, the Court will respectfully submit this

16    transcript, just as soon as I get my hands on it, to the

17    Court of Appeals, respectfully and with appreciation for

18    being given the opportunity to comment on these

19    proceedings.

20          All right.  So much for reporting to the Court of

21    Appeals.

22          Is there anything else we should discuss before

23    tomorrow at 9:00?

24          MR. ABDO:  No, your Honor.

25          THE COURT:  The defense?

1          MR. KANELLIS:  No, your Honor.

2          THE COURT:  Thank you.

3          All right, 9:00 tomorrow morning.  It's good to

4    see you all.

5          We'll recess.

6          (Adjourned, 11:20 a.m.)

```
1                      C E R T I F I C A T E

2

3

4         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

5    hereby certify that the forgoing transcript of the

6    record is a true and accurate transcription of my

7    stenographic notes, before Judge William G. Young, on

8    Monday, July 14, 2025, to the best of my skill and

9    ability.

10

11

12

13

    /s/ Richard H. Romanow 07-14-25
14   _____
    RICHARD H. ROMANOW  Date
15

16

17

18

19

20

21

22

23

24

25
```