UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AMERICAN ASSOCIATION OF UNIVERSITY
PROFESSORS, ET AL.,

                Plaintiffs,

    v.

MARCO RUBIO, ET AL.,

                Defendants.

Case No. 1:25-cv-10685 (WGY)

**PLAINTIFFS' SUPPLEMENTAL TRIAL BRIEF**

The Court has invited the parties to more fully address (1) whether noncitizens' First Amendment rights are co-extensive with those of citizens; and (2) whether Plaintiffs' challenge to the ideological deportation policy is properly characterized as a challenge to the foreign policy provision of the Immigration and Nationality Act. *See* July 7 Trial Tr. 15:8–11; July 9 Trial Tr. 19:6–24. Plaintiffs respectfully submit this brief in response to the Court's invitation.

**I.    Noncitizens lawfully present in the country have the same First Amendment rights as citizens.**

Noncitizens lawfully present in the United States are entitled to the full protection of the First Amendment. This has been settled law since *Bridges v. California* (*Bridges I*), 314 U.S. 252 (1941), and *Bridges v. Wixon* (*Bridges II*), 326 U.S. 135 (1945). Both cases involved Harry Bridges, an Australian citizen and labor organizer. The first involved California's attempt to jail Bridges for contempt of court after he refused to stop publishing editorials criticizing judges in cases pending against his union. The Supreme Court struck down the contempt sanctions applying

1

then-prevailing First Amendment doctrine, even though Bridges was a noncitizen. *Bridges I*, 314 U.S. at 268–78.[1]

The second case involved the government's effort to deport Bridges under statutory provisions that rendered noncitizens deportable if they were affiliated with, or members of, a political party that advocated the overthrow of the U.S. government by force or violence. *Bridges II*, 326 U.S. at 141. The government targeted Bridges for his alleged association with the Communist Party, pointing principally to his role in publishing a militant journal that the government contended was controlled by a Communist Party–linked union. *Id*. at 145–46. The Court found the government's allegations insufficient to satisfy the requirements of the statute, but only after construing the statutory provisions narrowly against the background of the First Amendment. *Id*. at 148. In reaching its conclusion, the Court stated in no uncertain terms: "Freedom of speech and the press is accorded aliens residing in this country." *Id*. (citing *Bridges I*). "That Bridges' aims are energetically radical may be admitted," it continued, "but the proof fails to establish that the methods he seeks to employ to realize them are other than those that the framework of democratic and constitutional government permits." *Id*. at 149.

The Court reached this conclusion in *Bridges II* even though it had yet to hold unequivocally that the First Amendment embraces the freedom of association, *cf. NAACP v. Alabama*, 357 U.S. 449, 460 (1958); even though Bridges himself was avowedly sympathetic to the Communist Party, *Bridges II*, 326 U.S. at 149; and even though it was widely believed at the time that the threat that communism posed to "democratic and constitutional government" was not just real but existential, *id.*; *see Dennis v. United States*, 341 U.S. 494, 497–98, 501 (1951). *See*

---

[1] The majority made no mention of Bridges' alienage, but Justice Frankfurter's dissent made clear that the Court was aware of it. *Bridges I*, 314 U.S. at 280 ("one of the petitioners here is an alien").

*generally* Ellen Schrecker, *Many are the Crimes: McCarthyism in America* (1998). Importantly, the Court expressly rejected the suggestion that its analysis should be different because Bridges was threatened with deportation rather than criminal prosecution. *Bridges II*, 326 U.S. at 148. The Court wrote: "Although deportation technically is not criminal punishment, it may nevertheless visit as great a hardship as the deprivation of the right to pursue a vocation or a calling." *Id*. at 147. Quoting Justice Brandeis, the Court continued: "Deportation may result in the loss 'of all that makes life worth living.'" *Id*. (quoting *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922)).

In concurrence, Justice Murphy agreed that the proceeding against Bridges was unconstitutional but explained that he would find the underlying statute unconstitutional as well. *Id.* at 160 (Murphy, J., concurring). The government's defense of the statute, he noted, relied on the proposition that "the deportation power of Congress is unaffected by considerations which in other contexts might justify the striking down of legislation as an abridgement of the constitutionally guaranteed rights of free speech and association." *Id.* To accept this proposition would mean that Congress could deport aliens "for whatever reasons it may choose"—including for merely criticizing the government, or for subscribing to an unpopular political belief. *Id.* at 160. Justice Murphy emphatically rejected this idea, observing that the First Amendment protects "persons," not just citizens, and that it "make[s] no exception in favor of deportation laws or laws enacted pursuant to a 'plenary power' [over immigration]." *Id*. at 161.

Justice Murphy also observed that accepting the government's argument would "make our constitutional safeguards transitory and discriminatory in nature," because "the government would be precluded from enjoining or imprisoning an alien for exercising his freedom of speech . . . while at the same time the government would be free, from a constitutional standpoint, to deport him for exercising that same freedom." *Id.* at 162. Justice Murphy concluded by highlighting the

3

implications of Bridges' case for the millions of other noncitizens in the United States—many of whom, he noted, had been driven from their original homelands "by bigoted authorities who denied the existence of freedom and tolerance." *Id*. at 166. Of those noncitizens, he wrote, "The Bill of Rights belongs to them, as well as to all citizens. It protects them as long as they reside within the boundaries of our land." *Id*.

Since *Bridges II*, the proposition that "[f]reedom of speech and of press is accorded aliens residing in this country" has been regarded as "well settled," including in the context of immigration enforcement. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 497 (1999) (Ginsburg, J., concurring in part). The Supreme Court has cited *Bridges II* with approval in observing that the First Amendment does not "acknowledge[] any distinction between citizens and resident aliens." *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953); *cf. Citizens United v. FEC*, 558 U.S. 310, 392–93 (2010) (Scalia, J., concurring) (noting that "the Amendment is written in terms of 'speech,' not speakers" and that "[i]ts text offers no foothold for excluding any category of speaker"). And multiple courts have affirmed that noncitizens lawfully admitted to the United States are entitled to "the full panoply of First Amendment rights." *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1063–66 (9th Cir. 1995); *Parcham v. INS*, 769 F.2d 1001, 1004 (4th Cir. 1985) ("It has long been held that aliens residing in this country enjoy the protection of the First Amendment."); *Ragbir v. Homan*, 923 F.3d 53, 69 (2d Cir. 2019) (holding that the First Amendment protects noncitizens who are threatened with deportation for their protected speech), *cert. granted, judgment vacated on other grounds sub nom. Pham v. Ragbir*, 141 S. Ct. 227 (2020).[2]

---

[2] In *Bluman v. FEC*, a three-judge panel of the U.S. District Court for the District of Columbia upheld a law that prohibited noncitizens on work visas from donating to federal and state political

Over the past five months, multiple lower courts have had occasion to consider challenges brought by foreign students to their detentions under the ideological deportation policy. Without exception, every court to have addressed the question has come to the same conclusion: The First Amendment protects noncitizens against viewpoint-based deportation—in the same way it protects citizens and noncitizens alike against viewpoint-based sanctions imposed in other contexts. *See, e.g.*, *Mohammed H. v. Trump*, No. 25-CV-1576, 2025 WL 1692739, at *3 (D. Minn. June 17, 2025) (citing *Bridges II* for the proposition that the First Amendment "applies equally to citizens and noncitizens"); *Aditya W.H. v. Trump*, No. 25-CV-1976, 2025 WL 1420131, at *10 (D. Minn. May 14, 2025) ("the First Amendment right to free speech protects citizens and noncitizens alike, and applies broadly to those in the United States"); *Ercelik v. Hyde*, No. 25-CV-11007, 2025 WL 1361543, at *10 (D. Mass. May 8, 2025) (stating that the First Amendment's protections have "long extended to noncitizens residing within the country"); *Mahdawi v. Trump*, No. 2:25-CV-389, 2025 WL 1243135, at *9 (D. Vt. Apr. 30, 2025) ("noncitizen aliens enjoy First Amendment rights in this country to the same extent as United States citizens"); *Öztürk v. Trump*, No. 2:25-CV-374, 2025 WL 1145250, at *18 (D. Vt. Apr. 18, 2025) (citing *Bridges II* for the proposition that "First Amendment protections have long extended to noncitizens residing within the country").

---

candidates and political parties, reasoning that the First Amendment did not preclude Congress from barring noncitizens from participating in activities "intimately related to the process of democratic self-government." 800 F. Supp. 2d 281, 287 (D.D.C. 2011) (Kavanaugh, J.), *aff'd*, 565 U.S. 1104 (2012). The Court assumed that strict scrutiny applied but concluded that the statute was constitutional nonetheless. The Court emphasized, however, that the constitutional analysis would be different if the law applied to legal permanent residents, or if it restricted noncitizens from "issue advocacy and speaking out on issues of public policy," *id.* at 292, and it expressly cited *Bridges II* for the proposition that "resident aliens [are] protected by the First Amendment in the context of deportation," *id.* at 286.

Against this background, Defendants' contention that noncitizens are not fully protected by the First Amendment is indefensible. Revealingly, the only First Amendment cases that Defendants have cited in defense of the ideological deportation policy—*United States ex rel. Turner v. Williams*, 194 U.S. 279 (1904) and *Harisiades v. Shaughnessy*, 342 U.S. 580 (1952)—predate the emergence of the modern First Amendment. *Turner* was based on the "distinction between rights and privileges," Adam B. Cox, *The Invention of Immigration Exceptionalism*, 134 Yale L.J. 329, 363 n.122 (2024), but that distinction simply has no purchase in contemporary First Amendment jurisprudence, *id*. (*citing, e.g.*, *Wieman v. Updegraff*, 344 U.S. 183, 192 (1952)).[3] Similarly, when the Court upheld the deportation of Communist Party members in *Harisiades*, it applied then-prevailing free speech principles under which even U.S. citizens could be punished for association with the Party. 342 U.S. at 592 (citing *Dennis v. United States*, 341 U.S. 494 (1951)); *see also Reno*, 70 F.3d at 1064 (endorsing this interpretation of *Harisiades*); *Am. Ass'n of Univ. Professors v. Rubio*, No. CV 25-10685-WGY, 2025 WL 1235084, at *19 (D. Mass. Apr. 29, 2025) ("The Public Officials' reliance on case law from the height of the second Red Scare era, such as *Harisiades* . . . , is misplaced[.]").

The *Bridges* cases and their progeny make clear that noncitizens do not lose their First Amendment rights in the deportation context. Any other rule would render noncitizens' First Amendment rights "transitory" (to use Justice Murphy's word) because the threat of deportation would hover ever-present over a noncitizen's every utterance. It would also render First Amendment doctrine incoherent, because the government would be barred from (say) censoring a

---

[3] *Turner* also involved the exclusion of a noncitizen not granted admission, rather than the deportation of someone previously allowed to enter. That distinction matters because "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

noncitizen's op-ed on the basis of viewpoint but not from expelling her from the country on the same basis. And it would chill and deter noncitizens from engaging in activities that are of manifest value to our society, including from sharing insights and information that immigrants can uniquely contribute to our public discourse. *Cf. Lane v. Franks*, 573 U.S. 228, 240 (2014) (observing that public employees' speech has "special value" because of public employees' distinctive knowledge and experience). Indeed, restricting noncitizens' First Amendment rights would have the effect of depriving citizens of insights and information that they have a right to receive. *See, e.g.*, *Kleindienst v. Mandel,* 408 U.S. 753, 762–63 (1972) (stating, in addressing U.S. citizens' challenge to denial of visa to a foreign scholar, that "[i]t is now well established that the Constitution protects the right to receive information and ideas"); *Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965) (invalidating statute that burdened U.S. citizens' right to receive expressive material from abroad).

At the opening of trial, the Court asked counsel for the government whether "a noncitizen lawfully in the United States has the same constitutional rights under the First Amendment as a citizen." July 7 Trial Tr. 15:8–11. Before backtracking, counsel for the government responded, "people in the United States share the same rights under the First Amendment." *Id.* at 15:24–16:2. That response was correct.

II.  **The Court need not address the constitutionality of the INA provisions relied upon by Defendants.**

At several points throughout these proceedings, the Court has asked whether it must address the constitutionality of the INA provisions on which Defendants have relied in carrying out the ideological deportation policy. The answer is no. Plaintiffs' primary argument is that the policy itself violates the First Amendment, and that it does so irrespective of its statutory bases. If the Court agrees, then a conclusion of law to that effect would fully resolve Plaintiffs' constitutional claims, and it would provide a complete basis for the relief Plaintiffs seek. As

explained further below, however, if the Court addresses the INA, then it should hold that the provisions relied upon by Defendants are unconstitutional as applied "[t]o the extent Defendants rely on [them] as the basis for carrying out the policy." Compl. ¶ 135.

A hypothetical may help illustrate the point. Imagine that Boston adopted a policy of prosecuting "pro-life" protesters, and that it carried out the policy under the commonwealth's laws on disorderly conduct and public nuisance. That policy would be unconstitutionally viewpoint discriminatory, and a court could hold as much (and provide an adequate remedy) without needing to address the constitutionality of the underlying criminal laws. Individuals prosecuted under the policy could, of course, argue that the criminal laws relied on in their individual cases are unconstitutional as applied; they might also be able to make out a claim of First Amendment retaliation. But those challenging the policy itself—in a civil case, outside of an individual enforcement action—would not need to challenge the underlying criminal laws to get redress.

This fact pattern, in broad strokes, is not uncommon. For example, in *Hoye v. City of Oakland*, 653 F.3d 835 (9th Cir. 2011), the Ninth Circuit addressed the constitutionality of Oakland's policy of enforcing its abortion-clinic protest ordinance in a content-discriminatory manner. The court discussed at some length whether the challenge was properly characterized as an as-applied challenge to the ordinance, a challenge to the ordinance's selective enforcement, or a challenge to the city's policy of enforcing the ordinance in a content-discriminatory way. *Id.* at 854–56. While the court observed that Oakland's "policy is unconstitutional, no matter the analytical approach taken," *id.* at 856, it ultimately held only "that Oakland's enforcement policy is . . . constitutionally invalid," *id.* at 859, without explicitly addressing whether the ordinance was unconstitutional as applied, *id.*

8

To be sure, a ruling in Plaintiffs' favor might *imply* that the statutory authorities underlying the ideological deportation policy are unconstitutional as applied—but that is no basis for rejecting Plaintiffs' challenge to the policy itself. Anytime a policy is challenged on constitutional grounds, a ruling against the policy may imply that the authority underlying the policy is unconstitutional as applied.

For these reasons, the Court needn't address the constitutionality of the INA provisions that underly the ideological deportation policy. And there is good reason for the Court to focus on the policy rather than the INA provisions. To date, Defendants have relied upon at least two provisions in carrying out the policy: the foreign policy provision, 8 U.S.C. § 1227(a)(4)(C), and the visa-revocation authority, *id.* § 1201(i). But they have considered using at least two others: the endorse-or-espouse provisions, *id.* § 1227(a)(4)(B), and 8 U.S.C. § 1184(b), which Defendants have interpreted to permit the revocation of visas of students who "engage in activities that are inconsistent with the claimed nonimmigrant status," *see* DEF-091. If the Court limited its ruling to the statutory provisions that Defendants happen to have used thus far, Defendants could circumvent the Court's ruling—and force Plaintiffs into a game of whack-a-mole—by relying upon other provisions to implement the same unconstitutional policy.

If the Court nonetheless *does* address the constitutionality of the statutes underlying the policy, it can and should hold that they are unconstitutional as applied. Plaintiffs' complaint pleaded this claim in the causes of action, *see* Compl. ¶ 135 (quoted in the opening paragraph of this section), and in the request for relief, *see id.* at 47–48 (Request for Relief D).

At several points during this litigation, the Court has asked whether it is relevant to the constitutional question here that Congress has passed a law authorizing the Secretary of State to revoke the visas of individuals based on their lawful speech. *See* 8 U.S.C. § 1227(a)(4)(C);

9

(incorporating the exception described in clause (iii) of § 1182(a)(3)(C), which provides that an individual may be excluded from the United States on the basis of their political beliefs if "the Secretary of State personally determines that the alien's admission would compromise a compelling United States foreign policy interest"). There are good reasons to believe that Congress intended this authority to be an exceptionally narrow one that doesn't authorize viewpoint discrimination. *See, e.g.*, H.R. Rep. No. 101-955 (1990) (Conf. Rep.), *as reprinted in* 1990 U.S.C.C.A.N. 6784, 6794 ("It is the intent of the conference committee that this authority would be used sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies."); *Khalil v. Trump*, No. 25-cv-01963 (MEF) (MAH), 2025 WL 1514713, at *36 (D.N.J. May 28, 2025) (legislative history and enforcement history demonstrate that the provision was intended to be used only in response to conduct "that entirely or all but entirely took place outside the United States"). But even interpreting the provision broadly, it is ultimately no defense to Plaintiffs' constitutional claims because (to state the obvious) Congress cannot authorize violations of the Constitution. *See, e.g.*, *Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it; or, that the legislature may alter the constitution by an ordinary act."). If the First Amendment forbids the government from deporting students and faculty based on their pro-Palestinian expression, then any statute that purports to authorize that violation of the Constitution is necessarily unconstitutional, at least as applied.

To the extent the Court's concern is that Congress's power over foreign policy and immigration trumps the First Amendment in this context, that concern has already been resolved in favor of the First Amendment. As the cases discussed in Part I demonstrate, citizens and noncitizens lawfully present have the same First Amendment rights. The government could not

10

constitutionally punish citizens for the speech at issue in this case, and so it cannot punish noncitizens, either. Indeed, even in the context of excluding foreign citizens not yet admitted into the country—where Congress's power over immigration and foreign policy is greater than in this case—multiple courts have made clear that the First Amendment limits the government's power to engage in viewpoint discrimination. *See, e.g.*, *Abourezk v. Reagan*, 592 F. Supp. 880, 888 & n.23 (D.D.C. 1984) ("[A]lthough the government may deny entry to aliens altogether, or for any number of specific reasons, it may not, consistent with the First Amendment, deny entry solely on account of the content of speech."), *vacated and remanded on other grounds*, 785 F.2d 1043 (D.C. Cir. 1986); *Allende v. Shultz*, 605 F. Supp. 1220, 1225 (D. Mass. 1985) (quoting relevant language from *Abourezk*, 592 F. Supp. at 887, approvingly), *aff'd*, 845 F.2d 1111 (1st Cir. 1988); *Harvard L. Sch. F. v. Shultz*, 633 F. Supp. 525, 531 (D. Mass. 1986) ("[T]he Secretary's reason . . . is not facially legitimate [because it] is directly related to the suppression of a political debate with American citizens."), *vacated without opinion*, 852 F.2d 563 (1st Cir. 1986); *see also Am. Acad. of Religion v. Chertoff*, 463 F. Supp. 2d 400, 415–16, 419 (S.D.N.Y. 2006), *aff'd sub. nom. Am. Acad. of Religion v. Napolitano*, 573 F.3d 115 (2d Cir. 2009).

      Finally, to the extent the Court is concerned that holding that the foreign policy provision is unconstitutional as applied would be tantamount to invaliding the statute in its entirety, the Court needn't be concerned. An as-applied ruling here wouldn't invalidate all applications of the foreign policy provision. For instance, a ruling in Plaintiffs' favor would not resolve the distinct question of whether it would be constitutional to deport a foreign *official* who had engaged in speech that undermines U.S. foreign policy interests. Nor would it prevent the government from attempting to demonstrate in other cases that it can satisfy strict scrutiny (with respect to viewpoint-based invocations of the foreign policy provision) or intermediate scrutiny (with respect to content-

neutral invocations of the foreign policy provision). All the Court must resolve is whether it is constitutional for Defendants to deport noncitizen students and faculty based on their pro-Palestinian expression. It is not.

June 15, 2025

Edwina Clarke (BBO 699702)
David Zimmer (BBO 692715)
Zimmer, Citron & Clarke, LLP
130 Bishop Allen Drive
Cambridge, MA 02139
(617) 676-9423
edwina@zimmercitronclarke.com

Noam Biale
Michael Tremonte
Alexandra Conlon
Courtney Gans
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2603
mtremonte@shertremonte.com
nbiale@shertremonte.com

Respectfully submitted,

/s/ Ramya Krishnan
Ramya Krishnan
Carrie DeCell
Xiangnong Wang
Talya Nevins
Jackson Busch
Scott Wilkens
Alex Abdo
Jameel Jaffer
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
alex.abdo@knightcolumbia.org

Ahilan T. Arulanantham (SBN 237841)
Professor from Practice
UCLA School of Law
385 Charles E. Young Dr. East
Los Angeles, CA 90095
(310) 825-1029
arulanantham@law.ucla.edu

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

      I, the undersigned counsel, certify that on July 18, 2025, I electronically filed the foregoing motion in the United States District Court for the District of Massachusetts using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Date: July 18, 2025                               /s/ Ramya Krishnan
                                                             Ramya Krishnan