UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No. 1:25-cv-10685-WGY
Volume 1, Pages 1 - 76

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
Defendants

********

BENCH TRIAL DAY 3

BEFORE THE HONORABLE WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
July 9, 2025

********

Court Reporter: Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter
United States District Court
One Courthouse Way
Boston, Massachusetts 02210
mortellite@gmail.com

A P P E A R A N C E S

RAMYA KRISHNAN
XIANGNONG WANG
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
Carrie.decell@knightcolumbia.org
and
COURTNEY GANS
NOAM BIALE
ALEXANDRA CONLON
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 540-0675
Cgans@shertremonte.com
For Plaintiffs

ETHAN B. KANTER
WILLIAM KANELLIS
VICTORIA M. SANTORA
JESSICA A. STROKUS
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9123
Ethan.kanter@usdoj.gov
and
SHAWNA YEN
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Shawna.yen@usdoj.gov
(617) 748-3100
For Defendants

## INDEX


| WITNESS | PAGE |
|---|---|
| ABU EL-HAJ | |
| Direct Examination By Mr. Wang (continued) | 5 |
| Cross-Examination By Mr. Kanellis | 36 |
| PETER HATCH | |
| Direct Examination By Ms. Conlon | 42 |


## E X H I B I T S


| Exhibit No. | Received |
|---|---|
| 228 | 16 |
| 229 | 32 |
| 230 | 33 |
| 231 | 34 |

P R O C E E D I N G S

(Begins, 9:04 a.m.)

THE COURT: Have we got the witness on the video? But before we do, forgive me, I should say that I've allowed internet access to these proceedings. It's appropriate therefore to say that if you are accessing these proceedings on the internet, the rules of court remain in full force and effect, which means there's no taping, streaming, rebroadcasts, screenshots or other transcription of these proceedings, and it is important that you keep your microphone muted. If you do not and interrupt the proceedings, we will turn you off.

Now, with that stated, counsel, are we ready to continue?

MR. WANG: Your Honor, one brief preliminary matter before we recall Ms. Abu El-Haj. Due to witness scheduling, we reached out to the government yesterday to see if they would be okay with me continuing the questioning of the witness in lieu of my colleague, Ms. Conlon. They consented on the understanding that we would extend them the same courtesy, and if you are amenable to it --

THE COURT: I am.

MR. WANG: Great. Thank you.

THE COURT: But state your name again.

MR. WANG: Yes. That's Xiangnong Wang for the plaintiffs, Your Honor.

THE COURT: Yes, Mr. Wang. Forgive me, but there's a large number of you all.

MR. WANG: Absolutely, understood.

THE COURT: I see the witness, and if the clerk could remind the witness that she remains under oath.

COURTROOM CLERK: I remind you that you remain under oath. Do you understand?

THE WITNESS: Yes, I do.

THE COURT: Thank you, Professor. Mr. Wang, you may continue.

09:05

DIRECT EXAMINATION BY MR. WANG:

Q. Good morning, or perhaps afternoon, Professor Abu El-Haj. Thank you again for joining us today.

So yesterday you began to talk about Mahmoud Khalil, and you mentioned that you heard Mr. Khalil speak on a number of occasions; is that correct?

A. Yes, that's correct.

Q. To the best of your recollection, where have you heard him speak?

09:06

A. I've heard him speak, he gave -- I've heard him speak to the press, press conferences, some at the encampment and one, definitely one after the raid of Hamilton Hall when the encampment was shut down.

Q. And the encampment you're speaking of, just to be clear, is the encampment at Columbia University between 2023 and 2024;

is that correct?
A. Correct, in April 2024.
Q. Have you heard Mr. Khalil speak publicly about Israel and Palestine?
A. Yes.
Q. What do you believe is Mr. Khalil's general message in his speech about Israel and Palestine?
MR. KANELLIS: Objection. Calls for speculation.
THE COURT: Why, even if not offered for the truth, why is it relevant?
MR. WANG: Well, I'm asking the witness to, from her personal knowledge of speaking with Mr. Khalil --
THE COURT: No, no. I'm following.
MR. WANG: Right. Just about --
THE COURT: If the speech itself is relevant, I understand. But she's already said about his maturity and about his negotiating skills, and based upon the record, as I understand it, he has made statements that are -- I must choose my words with care -- pro-Palestinian.
I don't know that anyone -- I don't know how we're going to get at relevant evidence here. That's my problem with the question. Because if they say he's speaking to recruit recruits for Hamas, a terrorist organization, but I have no evidence that he ever did that. And so her hearing him talk on some other occasion about something else, it doesn't help me.

MR. WANG: Understood, Your Honor.
THE COURT: Very well. Then ask another question.
MR. WANG: Understood, understood.
THE COURT: Sustained.
Q. Have you ever heard Mr. Khalil espouse violence?
A. No.
Q. Have you ever seen Mr. Khalil engage in violence?
A. No, I have not.
Q. Have you heard him threaten another student?
09:09 A. No.
Q. Have you heard him threaten anyone else?
A. I have not, no.
Q. Have you ever seen Mr. Khalil harass another student?
A. No.
Q. Have you seen Mr. Khalil engage in antisemitic behavior?
A. I have not.
Q. All right. I want to take you back to the day of Mr. Khalil's arrest.
THE COURT: Excuse me. And let me ask, Professor, 09:09 because definitions are important here, when you answered that you've never seen him engaged in antisemitic behavior, can you define, how do you use the term "antisemitic behavior," if you can tell me.
THE WITNESS: Yes. So I understand antisemitic behavior and speech to be speech and behavior that targets

individuals on the basis of their Jewish identity. Mahmoud Khalil's speech was always speech about the Israeli state, the critical speech about the Israeli state, about its conduct in Gaza, which you referred to -- the genocide in Gaza and sometimes he refers to it as the atrocities and about the inequality that the Zionist Project as a political ideology and as the governing institutions of the Israeli state, the inequality that that produces, both the disenfranchisement that has produced for Palestinians who were forced out or in the 09:10 occupied territories and the inequality that it produces for citizens of the state who are Palestinian. So it never was reference to a non-state project.

THE COURT: One other term you use that it will be helpful if you define it for me, you said he spoke about the Zionist Project. What does that mean, in your mind?

THE WITNESS: Well, the Zionist Project was, is, the project to have -- is the project of a Jewish state. In other words in the structure of law -- sorry?

THE COURT: I shouldn't interrupt, having asked the 09:11 question and you're right ready to answer it. I want to let the lawyers ask the questions, and I think you've answered mine. I understood what you mean by Zionist Project. They can inquire if they wish. Go ahead, Mr. Wang.

MR. WANG: Thank you very much, Your Honor.

BY MR. WANG:

Q. So I want to take you back to the day of Mr. Khalil's arrest. When did you first learn of his arrest?
A. I don't remember precisely, but I either learned late at night the Saturday night, if I recall correctly, that he was arrested or first thing in the morning.
Q. And you how did you hear of his arrest?
A. Various students and faculty members reached out. Yeah, that's how I heard.
Q. And what do you remember about how Columbia University's
09:12 campus felt to you in the days immediately following Mr. Khalil's arrest?
A. Well, I wasn't -- well, actually I was on campus that Sunday. But there was -- it was, I would say the feeling was both shock -- people were quite shocked that he was detained, especially when it became clear on top of everything else that he's a green card holder, and a sort of anxiety and panic about what might happen next.
Q. So Professor Abu El-Haj, you testified yesterday that things changed after Mr. Khalil's arrest. Do you believe that
09:13 Mr. Khalil's arrest had an impact on the campus speech environment at Columbia?
A. Absolutely.
Q. And what impact do you believe it had?
A. A lot of students who reached out to me were panicked that they -- students who had been publicly critical of the Israeli

state and the genocide in Gaza reached out to me, people who participated in the demonstrations feeling like they could be very vulnerable to ICE detention.

I do want to say that included students, Palestinian students who are U.S. citizens but not natural born citizens because that was a rhetoric also coming out of Washington. I also definitely have faculty friends who felt like they needed to withdraw a bit from -- withdraw from public speech out of fear of the possibility of their deportation.

Q. And did you observe a change in the student protests at Columbia following Mr. Khalil's arrest?

A. I definitely know that many of the Palestinian and Muslim students withdrew while they were trying to catch their breath and figure out what might happened next. There was a demonstration that was -- actually, it wasn't a demonstration. There was a sit-in, I don't know, a week maybe, I don't remember exactly when, after Mahmoud's detention. And it was organized by JVP, Jewish Voice for Peace and attended really I actually think exclusively by Jewish members of the community because they, as someone articulated it to me, they felt like they were the least likely to be --

MR. KANELLIS: Objection, Your Honor. This is hearsay.

THE COURT: I'll stop it there, but what she's testified to may stand.

MR. WANG: Thank you, Your Honor.
Q. I want to ask you about another individual now. Are you familiar with Mohsen Mahdawi?
A. Yes, I am.
Q. And how do you know Mr. Mahdawi?
A. I got to know him in the previous academic year, '23-'24, as part of the Palestinian student groups and political movement.
Q. And to your knowledge did Mr. Mahdawi have a role in the 09:15 student protests at Columbia from 2023 to 2024 that you mentioned yesterday?
A. He did. He was definitely one of the more vocal public voices about the student movements, particularly in the first five or six months. He was another person who spoke out publicly without ever masking up.
I personally did not see him at the encampment, so I'm not sure he was there, but he was definitely at many of the activities before that.
Q. And what was his role in these campus protests?
09:16 A. He often -- well, first of all, he was a head of the Palestinian -- there's a Palestinian student group called, I think Dawb -- I can't even remember. And he was the president of that, if I recall correctly. And basically he was often a person who spoke at the demonstrations and rallies.
Q. Have you heard Mr. Mahdawi speak publicly about Israel and

Palestine?
A. Yes, I have.
Q. And do you, in your mind is there something distinctive about the viewpoints that Mr. Mahdawi presented when speaking about Israel and Palestine?
MR. KANELLIS: Objection, Your Honor.
THE COURT: Well, I'm going to receive the answer since it's jury-waived, subject to your objection and a motion to strike. You may answer, Professor.
09:17 A. Yeah. In some ways there is something distinctive about him. He really speaks in the language of restorative justice. And he speaks in the language of sort of liberty, a very American language of liberty and democracy. He really sees himself as influenced by Martin Luther King and the nature of a nonviolent resistance and restorative justice. That's his language.
MR. KANELLIS: Your Honor, move to strike.
THE COURT: Move to strike? The motion to strike is denied. I'm asking accepting that that's what she heard of
09:17 him, heard or what she got from what he said. Go ahead.
MR. WANG: Thank you, Your Honor.
Q. Did you ever recall seeing Mr. Mahdawi speak on Columbia's campus?
A. Yes, I did, I do.
Q. How many times do you remember him speaking on Columbia's

campus?
A. I don't know. I mean, probably four or five times maybe.
Q. Are there any events at Columbia in which he spoke that you remember specifically?
A. I remember him speaking at what was organized as a vigil, I would say it was November sometime, 2023.
Q. So I'm going to show you a video that's been pre-marked as Exhibit DJ for identification purposes. Sorry, DJ1, I'm sorry.
MR. WANG: Mr. Kumar, would you please pull up that
09:18 video.
A. Okay. I am really sorry, but I seem to be -- oh, I found it. Never mind. Okay. Sorry. I found it.
Q. Professor Abu El-Haj, do you see the --
A. I see a document, yeah.
Q. -- the screen?
A. Okay, yes.
MR. WANG: Do we have that up here in court?
THE WITNESS: Yes, I see it.
MR. WANG: Your Honor, would you be amenable to us
09:19 playing just a few seconds of this video clip?
THE COURT: Well, I haven't heard any objection, so go ahead.
MR. KANELLIS: Well, I'm just going to object, Your Honor, to relevancy, unless she's going to lay -- if she's going to authenticate this. If she took the video, that's one

thing. Otherwise, relevancy.

THE COURT: Well, it's not necessary that she have taken it, so we can all stand a few seconds. The time counts against them. Go ahead.

MR. WANG: Thank you, Your Honor.

(Video played.)

THE COURT: You move to strike it.

MR. KANELLIS: Yes, Your Honor. It's not relevant.

THE COURT: No, I don't think it's relevant. You're right to say it, but I'll let it stand.

09:20

MR. WANG: Thank you, and can we have -- thank you very much, Ms. Belmont.

Q. Do you recognize what the video clip you just watched depicts?

A. It is a video of the -- sorry, I've lost you -- of the vigil that I mentioned before.

THE COURT: And who is speaking, ma'am, if you know of your own knowledge?

THE WITNESS: That is Mohsen Mahdawi.

09:20

THE COURT: Thank you.

Q. Just for the record, you were in attendance at the event that was depicted; is that correct?

A. I was sitting in the background with some faculty members, watching the event.

Q. And to the best of your knowledge, is the video an

accurate representation of the event where Mr. Mahdawi spoke?
A. Yes.
MR. WANG: Your Honor, we offer Exhibit DJ1.
THE COURT: Why is this relevant?
MR. WANG: Your Honor, it's relevant to show Mr. Mahdawi's protected speech.
THE COURT: Well, I think that actually I have some question about whether it's protected speech in the sense that in one connotation of the cry "From the river to the sea" is in 09:21 fact a call for genocide. I don't adopt that or reject it, but there's that possibility. Your point is that you've now authenticated that this is speech anyway --
MR. WANG: That's correct.
THE COURT: -- by what has been characterized as a target subject. Why is that relevant here? That's one snippet of speech. How long is the whole video?
MR. WANG: The whole video I think goes on for another maybe couple of minutes. One minute 20 seconds. Thank you.
THE COURT: So what's the relevance?
09:22 MR. WANG: So the relevance, Your Honor, is that it is an example of speech that Mr. Mahdawi, one of the targeted individuals, has engaged in, and part of plaintiffs' argument is that the policy -- that the government has engaged in a retaliatory policy that may involve showing that our targeted individuals engaged in protected speech, again, understanding

that the protected part of that is a legal inquiry, but we believe that --

THE COURT: I'm not saying that it's not entirely protected speech because he was using the subjunctive phrase and was asserting that so-called "they" ignore as he went on atrocities I take it in Gaza.

MR. WANG: Mm-hmm.

THE COURT: So that would seem to be just an example of political speech.

09:23 MR. WANG: You're correct, Your Honor, except that the government has cited Mr. Mahdawi's participation in protests as part of Secretary Rubio's determination.

THE COURT: Yes. Well, I don't -- actually, I think it would be best to have a full record here, so I'm going to overrule it. DJ for identification?

MR. WANG: Yes, DJ1. I believe the next exhibit number is Exhibit 228.

THE COURT: I think it is. DJ1 is admitted.

(Exhibit 228 admitted into evidence.)

09:24 THE COURT: Now, understand, you're touching on something that is going to recur in this case, and I've said throughout there's a statute here passed by the Congress of the United States. You people don't challenge that statute, and indeed I have doubts whether you have standing to challenge that statute. But you don't challenge it.

So long as the Secretary of State is following the law as the Congress has passed it, I don't see what I have to say about that, but a complete record is essential.

MR. KANELLIS: Your Honor, may I, for clarification?

THE COURT: You may.

MR. KANELLIS: So I just want to preserve our objections. This is hearsay.

THE COURT: It is. I acknowledge it.

MR. KANELLIS: And it's not relevant.

09:25 THE COURT: Well, they're not offering it for the truth. They're offering it for the fact that he spoke, and a competent witness has testified that it is his speech. So, no, I don't think it's hearsay.

MR. KANELLIS: For that purpose, Your Honor, then we -- if it's just -- if it's not for his statements but actually for the fact he spoke, we don't with a problem.

THE COURT: Well, he spoke and it's for, it's an example of his speech.

MR. KANELLIS: Sure. That's not a problem. Just not 09:26 for the substance.

THE COURT: But I don't -- that's the line I don't understand. It is for the substance.

MR. KANELLIS: No, it's not --

THE COURT: Suppose in the course of presiding I utter a racial slur. I'm not quoting from something, but I utter a

racial slur. Well, that fact of that speech, which is utterly inappropriate from a judicial officer, would be relevant, one imagines, in certain circumstances.

Here is one of the alleged target individuals speaking. He's speaking on a subject of both political interest and arguably a call for antisemitic violence, arguably. I take no position. It seems to me that's relevant.

MR. KANELLIS: No. That's fine, Your Honor. By "substance," I meant the statements that were made therein for

09:27 the truth. That's what I was referring to.

THE COURT: Oh, that somehow -- I understand.

MR. KANELLIS: Thank you, Your Honor.

THE COURT: We're arguing over how many angels dance on the head of a pin. I do not accept this as evidence of atrocities by anyone in Gaza. Go ahead.

MR. WANG: Your Honor, just two brief clarifications on the colloquy we just had.

THE COURT: I try my best and now we have qualifications or clarifications on the clarifications. Go

09:27 ahead.

MR. WANG: I'm sorry, Your Honor.

THE COURT: Don't apologize.

MR. WANG: I just wanted to briefly mention that, to be clear, we do challenge the statute that you were just referring to --

THE COURT: Oh, you do?

MR. WANG: -- in the complaint as a technical matter and, you know, as applied --

THE COURT: On constitutional grounds?

MR. WANG: That's right, Your Honor.

THE COURT: Do you think, since you're clarifying things, let me clarify, because I think you have a very high hurdle here, and it's this: When I read the complaint -- and I've read it recognizing this was an issue to begin with, I
09:28 don't see how your clients who are the people chilled here but who have not come within the ambit of that, you haven't challenged -- you haven't -- I don't know that you have standing to challenge the constitutionality of that statute. And if you think you do, that's something that I really need briefing on.

I've solicited it from the government, and I pause to clarify that I solicit it from you. If you challenge it, fine. I don't know that your clients have standing to challenge it, as the statute has never been used against any of them.
09:29 Mahdawi does, Khalil does, Ozturk does. But this court, and I'll be very clear, is not going to express any opinion. I don't instruct other judges or advise other judges. I handle the case before me. I respect other judges, but you've got to brief that.

MR. WANG: Of course, Your Honor.

THE COURT: I seem to remember Ms. Krishnan in her opening saying you didn't challenge the statute. But if you do, you've got to convince me you have standing to do that. And the fact that you got past a motion to dismiss doesn't establish it.

Go ahead, Mr. Wang. You don't need any clarification on that, Mr. Kanellis. Go ahead.

MR. WANG: Understood, Your Honor, and we'd be happy to address that in the brief.

09:30 THE COURT: I'm eager for it.

MR. WANG: And one final point on the video that was just played, you know, as I mentioned before, it does extend longer, and so now that it is in evidence, I would invite Your Honor to view the whole thing. Thank you.

THE COURT: That's my duty now that it's in evidence.

MR. WANG: Absolutely.

THE COURT: You can be sure that I will, but on my own time, not yours. Go ahead.

MR. WANG: Of course. Thank you, Your Honor.

09:30 BY MR. WANG:

Q. So returning to the event that we were just speaking about that you authenticated in the video, can you describe this event?

A. So it was organized primarily as a vigil with an art installation. It started out, in my memory -- this was a long

time ago and there have been many events -- it probably lasted about an hour and a half. I think a lot of the first half hour or 40 minutes was either silent or people were singing, and then there were some speeches, included Mohsen's, I don't really remember who else spoke, but I didn't know a lot of the students. I wouldn't necessarily know.

Q. And is there any reason why this event stuck in your mind?

A. I mean, it stuck in my mind for one thing because towards the very end of the event, I think it was towards the end, 09:31 somebody who approached from behind where the security, Columbia security was standing and started yelling some antisemitic thing, I don't remember what. And the students immediately shut this person down and Mohsen himself actually walked over to him and asked him to leave, et cetera, and then made a statement about antisemitism.

Q. Thank you. So I am going to show you now what's been pre-marked as Exhibit D1. And Your Honor, if I may approach, I can provide you a paper copy.

THE COURT: Of course you may.

09:32 MR. WANG: Sorry, DI.

THE COURT: This is DI?

MR. WANG: Yes. Do you need a paper copy, Your Honor?

THE COURT: Do I need a paper copy? Apparently I do not. So go ahead.

MR. WANG: Thank you.

BY MR. WANG:
Q. Do you recognize what -- sorry. Professor Abu El-Haj, do you see the document I'm referring to that's been pre-marked as DI?
A. Yeah, I do.
Q. Do you recognize what this is?
A. I mean, it's an article in The Columbia Spectator, which is Columbia's daily newspaper.
Q. And can --
09:33 A. And it -- go ahead.
Q. Can you please take a moment to review the article.
A. Yeah. Okay.
Q. Is the event this article describes the same event that you just discussed?
A. Yes.
Q. And how do you know it's referring to the same event?
A. Both because I remember aspects of the description, but also that panel that's at the top of artwork or whatever was only at that event.
09:34 MR. WANG: Thank you. Your Honor, we offer Exhibit DI.
MR. KANELLIS: Hearsay, not relevant.
THE COURT: It is, it is.
MR. WANG: Your Honor, we're offering it just to corroborate Professor Abu El-Haj's account.

THE COURT: Of course you are. That means substantively. It's hearsay. Sustained.

MR. WANG: Thank you, Your Honor.

MR. WANG:

Q. So moving on, have you ever seen Mr. Mahdawi engage in violence?

A. No.

Q. Have you heard him threaten another student?

A. No.

09:34 Q. Have you heard him threaten anyone else?

A. No, I've never heard him threaten anyone.

Q. Have you ever seen Mr. Mahdawi harass another student?

A. I have not.

Q. And based on the articulation of antisemitic behavior that you gave before, have you seen Mr. Mahdawi engage in antisemitic behavior?

A. No. And like Mahmoud Khalil, he often speaks out against antisemitism.

Q. Did you speak with Mr. Mahdawi in the days after Mahmoud

09:35 Khalil was arrested?

A. I did, yes.

Q. And did Mr. Mahdawi tell you how he was feeling at the time?

A. Yes. He was very --

MR. KANELLIS: Objection. Calls for hearsay.

THE COURT: No. Well, it does, but I'll limit it to what's admissible under 803. What did he say?

THE WITNESS: He said that he was worried that he was going to be the next target, and he asked me to convince the Columbia University president to move him from his Columbia housing that was off campus to inside the gates because at that point the university was requiring a judicial warrant for ICE agents to enter the gates of Columbia, and the properties outside were less secure.

09:36 MR. KANELLIS: Objection to the first, not to the second.

THE COURT: Just a moment, just a moment.

MR. KANELLIS: Sorry. Objection to the second, not the first.

THE COURT: So much of the answer as follows "because," I strike. The rest of it may stand. That's his then present state of mind and an expression of intentions as to the future. Go ahead.

MR. WANG: Thank you, Your Honor.

09:36 BY MR. WANG:

Q. Did you see, did you observe Mr. Mahdawi change his behavior in any way after Mr. Khalil was arrested?

A. Yes. He stayed in his apartment. He did not leave the apartment. People brought him food, et cetera.

Q. And how do you know that?

A. He told me.
Q. And --
MR. KANELLIS: Objection. Move to strike, hearsay.
THE COURT: Yeah, it is. Sustained. I'll strike that out -- well, I will not include it in the record. All right.
MR. WANG: Thank you, Your Honor.
Q. During the period that you just described, did he tell you how he was feeling at the time?
THE COURT: Haven't you just asked that? Now it's during the period?
09:37
MR. WANG: That's correct.
THE COURT: All right.
A. Well, he was very anxious.
THE COURT: Did you talk --
A. Yes.
THE COURT: I'm sorry, I spoke over you.
THE WITNESS: Sorry.
THE COURT: It was my fault. I heard you say he was anxious.
09:37
THE WITNESS: Yes.
THE COURT: Thank you.
THE WITNESS: And I did speak with him further.
THE COURT: And thank you for that.
BY MR. WANG:
Q. Did you perceive Mr. Mahdawi's arrest as having an effect

on the speech environment at Columbia?

A. I think it really just kept, it just escalated a sense of anxiety and panic at Columbia, including I think the feeling that Columbia was really kind of ground zero of the attacks on universities at that point.

Q. And did you continue to hear from noncitizens after Mr. Mahdawi's arrest?

A. I did, yes.

Q. Sorry. Just for the record, was Mr. Mahdawi arrested?

09:38 A. Yes, he was arrested when he went to his citizenship interview in Vermont three weeks I think after Mahmoud's arrest or about therein.

Q. Thank you. So I just want to move on to another topic now.

Yesterday you mentioned that some students were terrified about being doxed, and you described what you believe "doxed" means.

Why do you think students were so afraid of being doxed at that time?

09:38 MR. KANELLIS: Objection, foundation.

THE COURT: Sustained. She can't testify to what's in someone else's mind.

Q. Based on your -- yesterday you mentioned that you had conversations with noncitizen students who expressed concerns about being doxed. What were some of the concerns that they

expressed to you?

MR. KANELLIS: Same objection. Calls for hearsay.

THE COURT: We'll see. You may tell us. What did such students say to you about the doxing?

THE WITNESS: Well, so let me start with Mohsen. He specifically said that his name, like Mahmoud's name, had been tweeted at Secretary Rubio with a photo of his presence at a sit-in at Barnard College a few days before he was arrested with the tag, "he should be deported," or something like that.

09:39 Mohsen was, then subsequently his name was also tweeted -- this is what he told me -- at Rubio and maybe the White House, I don't recall, with the same, him being added to the list that a couple -- well, one organization in particular was creating.

And I think there was -- so that was -- that's the most specific I can tell you, but that was generally what students were saying to me. They were worried that their photo and names would be tweeted at the administration, and in their understanding, that was a key or that is what helped get Mahmoud arrested.

09:40

MR. KANELLIS: Okay. Your Honor, move to strike.

THE COURT: I will strike it all but for when she says "They were worried that they would be tweeted," et cetera. The rest of it is stricken as hearsay. Go ahead, Mr. Wang.

MR. WANG: Thank you, Your Honor.

BY MR. WANG:
Q. Are you familiar with the organization Betar U.S.?
A. Yes, I am.
Q. And what to your understanding is Betar U.S.'s purpose?
A. So Betar U.S. sees itself, or defines itself -- not sees itself -- as in the tradition of the Betar youth movement, which started in the pre-state period in Palestine and was led by Jabotinsky, who was the leader of the more right wing faction of Zionism that was at the very beginning committed to expelling Arabs, I mean explicitly committed.
09:41
I don't know what their -- I mean, I'll reword it a bit. I know what they say that they are doing. They see themselves as defenders of the Israeli state and in particular even its right wing iteration, the Netanyahu government.
They have been very explicit that they are creating lists of noncitizens in the U.S. or who they think are noncitizens, I don't know, they often -- I don't know how they know -- and calling for their deportation.
They have also, if I'm recalling correctly and I think I am, sent a list of American anti-Zionist Jews to the Israeli government and asked, these are the list of people you should not let in. They have also shown up at events and passed out or given a speaker a plastic pager, which is an explicit threat because it refers to the pagers that were exploded by Israeli intelligence in Lebanon that killed, I don't remember, but a
09:42

lot of people, over a thousand people and wounded more than that in my memory.

MR. KANELLIS: Objection. Move to strike --

A. That's what they do.

MR. KANELLIS: Objection. Move to strike the entirety of that prior statement as hearsay.

THE COURT: Well, there was no objection until she got to the interesting point about pagers. That, I will strike.

MR. KANELLIS: No, Your Honor. I was letting her

09:43 finish her answer, but she said "they say."

THE COURT: Indeed.

MR. KANELLIS: I was being polite and letting her finish before I interjected.

THE COURT: That's my ruling. Go ahead, Mr. Wang.

BY MR. WANG:

Q. Professor, you mentioned earlier that it is your belief that Betar has provided names to the current administration. What is the basis of that belief?

A. Their Twitter account or X account. They state that in

09:43 their account.

MR. KANELLIS: Objection. Move to strike.

THE COURT: Well, I mean, that's stating her basis for making the statement. I'm going to let that stand, but it confirms your objection, Mr. Gonzalez, that the basis of her knowledge is third-party declarations, not admissions,

certainly not admissions by the government, then I can't see any other basis for attributing it to the government. So I'll let the answer stand, but I don't really see what this adds, unless somehow the government is making use of this information.

MR. WANG: Sorry, Your Honor. Was that directed at me or --

THE COURT: No. I was just talking. I'm looking at you, but just talking.

09:44 MR. WANG: Thank you, Your Honor.

BY MR. WANG:

Q. Okay. Just a few more questions, Professor Abu El-Haj.

Are you familiar with a website called Canary Mission?

A. I am, yes.

Q. And when did you first learn about Canary Mission?

A. I don't really recall because it's been around for a long time. I would say maybe 15 years ago, maybe a little longer, but it's not an accurate estimate.

Q. And what do you understand --

09:45 A. It's not --

Q. Excuse me. Have you seen the Canary Mission website?

A. I have.

Q. Is there a profile page on Canary Mission about you?

A. Yes.

Q. Have you visited it?

A. Yes.
Q. And what generally does it say about you?
MR. KANELLIS: Objection.
THE COURT: At this point he objects. I sustain it. If there's such a website, if it has data that's relevant, that's the data, not the hearsay.
MR. WANG: Understood, Your Honor.
Q. Are there profiles of other people on Canary Mission who you personally know?
09:46 A. Many, many.
Q. Do you know if Mahmoud Khalil has a Canary Mission profile?
A. Yes.
Q. And have you visited this profile?
A. I have.
Q. When did you visit it?
A. I think around the time when he was arrested -- detained by ICE.
Q. And do you know if Mohsen Mahdawi has a Canary Mission profile?
09:46
A. Yeah.
Q. And have you visited his profile?
A. Yeah, I think around the same time.
Q. When did you visit it?
A. Around the time of the detentions. I don't remember

precisely.
Q. Okay. Just a couple more questions, Professor.
Professor, I'm going to show you -- sorry, let me find my exhibit list. Thank you. I'm going to show you what has been premarked as Exhibit CC.
Professor, do you have that in front of you?
A. Yeah.
Q. What do you recognize this to be? Sorry. Do you recognize it?
09:47 A. I do.
Q. And what do you recognize it to be?
A. I mean, it's on the Canary -- I don't know if it's their home page or whatever, but it's the Canary Mission's explication of their own mission, as it says.
Q. And have you visited this website before?
A. Yes, I have.
MR. WANG: We offer Exhibit CC.
MR. KANELLIS: Objection, hearsay.
MR. WANG: Not for the truth, Your Honor.
09:48 MR. KANELLIS: And relevancy.
THE COURT: Since it's not for the truth, it is relevant. CC will be admitted as limited, 229 in evidence.
(Exhibit 229 admitted into evidence.)
Q. Next I will show you Exhibit CY, what has been marked as Exhibit CY. Do you recognize what this is?

A. Yes. It's a photo of Mohsen Mahdawi on the Canary Mission website.
Q. And have you visited that web page before?
A. Yes, but briefly, not in a sustained manner.
MR. WANG: Your Honor, we offer Exhibit CY.
MR. KANELLIS: Objection. It's hearsay and it's not relevant. She's already testified she visited the website. It adds no value.
THE COURT: Not for the truth but for the fact of it being there. I need to be sure, Professor, you saw this entry on this website, you?
THE WITNESS: Yeah. I occasionally check out their website, who is on and what they're saying.
THE COURT: Well, but I'm looking at a specific here. It starts with a photo, and it's got a red arrow towards someone speaking. You've looked at this entry?
THE WITNESS: Yeah.
THE COURT: Is that your testimony?
THE WITNESS: Yes, I have, yes.
09:50 THE COURT: Overruled. CY is admitted. Exhibit 230 in evidence.
(Exhibit 230 admitted into evidence.)
MR. KANELLIS: Pardon me, Your Honor.
THE COURT: Limited.
MR. KANELLIS: Limited, thank you.

BY MR. WANG:

Q. And one more. I'm going to show you what has been pre-marked as Exhibit DA.

A. Yeah.

Q. Do you recognize this exhibit?

A. Yes, I do.

Q. And what is it?

A. It's the Canary Mission entry on Mahmoud Khalil.

Q. And have you seen this web page?

09:50 A. Yes, I have.

MR. WANG: Your Honor, we offer Exhibit DA.

THE COURT: Same.

MR. WANG: For the same reason.

THE COURT: Same limitation, DA, with the same limitation, is admitted, Exhibit 231.

(Exhibit 231 admitted into evidence.)

MR. WANG: All right. Thank you, Your Honor.

Q. Just a couple last questions.

Are you familiar with the term "ideological deportation

09:51 policy"?

A. I am familiar with it through the framing of this case.

Q. And what do you understand that term to mean in your mind?

A. So in my mind it refers to -- it refers to the fact that the government is committed to deporting noncitizens who hold beliefs that they do not agree with.

Q. And do you believe that Mahmoud Khalil's arrest, detention and attempted deportation are part of this ideological deportation policy?
A. Yes, I do.
Q. And why do you hold that belief?
A. Well, Senator Rubio said that the grounds of his arrest is some obscure, I think, law, that allows the Secretary of State presumably to deport someone who poses a risk or undermines U.S. foreign policy. And Rubio said that Mahmoud Khalil is 09:52 promoting antisemitism and that contradicts the U.S. foreign policy goal of fighting antisemitism worldwide.
Q. Do you believe that Mahmoud Mahdawi's arrest, detention and attempted deportation are part of this ideological deportation policy?
A. Yes, I do.
Q. And why do you hold that belief?
A. Because he was arrested under the same statute and for the same reasons on the allegation that he is promoting antisemitism which undermines an important foreign policy goal 09:53 of the U.S., which is fighting antisemitism globally.
Q. And final question, Professor. What do you perceive has been the effect of this policy, including the actions taken against the two individuals you just mentioned, on the community of Palestinian students at Columbia?
A. It has been terrifying for Palestinian students at

Columbia, especially those who do not hold U.S. citizenship. But as I said earlier, even students who are naturalized citizens are nervous.

MR. WANG: No further questions, Your Honor.

THE COURT: Mr. Kanellis, do you wish to examine this witness?

MR. KANELLIS: Yes, Your Honor. May I remain seated while I question?

THE COURT: You may, absolutely.

09:53 MR. KANELLIS: Thank you.

CROSS-EXAMINATION BY MR. KANELLIS:

Q. Professor, you are a U.S. citizen, correct?

A. I am.

Q. You've always been a U.S. citizen?

A. Yes. I was born in New York.

Q. Born in New York. And so this ideological deportation policy you've described does not relate to your fear of deportation, correct?

A. Correct.

09:54 Q. You indicated that after the arrest of Mr. Khalil, I believe you said there was a change in student protests, didn't you?

A. Yes.

Q. And those student protests are the ones that you're familiar with on the campus of Columbia University, correct?

A. Correct.
Q. And those protests, your involvement in those protests relates to your role with the Center for Palestine Studies at Columbia, correct?
A. No. I was not involved in the protests, and the Center for Palestine Studies does not work with student groups.
Q. Okay. Thank you for the clarification. You said the effects of the policy were terrifying, this ideological deportation policy?
09:55 A. Yes --
Q. But in fact --
A. -- for many people.
Q. But in fact, protests continued at Columbia after the arrest of Mr. Khalil, didn't they?
A. Yes. However, the students, many -- I don't -- the Palestinian students I know, certainly the ones without U.S. citizenship but including a few that have U.S. citizenship, stopped participating. And at least one person I know who does not hold U.S. citizenship went out and tried to -- what do you
09:55 call it -- erase her social media presence.
Q. Okay. And that's based upon what the student told you, correct?
A. Yes.
Q. And that's not based upon anything you personally observed; you didn't watch that student delete her social media

account, did you?
A. No, I did not.
Q. And the protests, after the arrest of Mr. Khalil, continued at Columbia University and were very well attended, weren't they?
A. I -- as far as I know, there were three protests. Two of them were organized by JVP and quite small. The third one was larger.
Q. The third one was huge in --
09:56 A. And the students I know about which I am speaking did not attend those protests.
Q. Okay. But --
A. The third protest -- any of them.
Q. One of the protests was huge in your opinion, wasn't it?
A. Yes, but I don't know who took part. Were they all U.S. citizens?
Q. Okay. Do you know who took part in the protests that were smaller in size?
A. I know -- sorry.
09:56 Q. Did you interview the students who were there to determine their nationality?
A. I did not.
Q. Okay. And in fact, you don't know who did or who did not attend the protests as far as their nationality or citizenship, do you?

A. No, but I do know that there are international students who explicitly said to me that they were not going to attend the protests or be public going forward.

MR. KANELLIS: Okay. I'll move to strike, Your Honor, on the basis of hearsay.

THE COURT: I will strike her last answer on that ground.

Q. Not only were there huge protests, but there were press conferences protesting the arrest of Mr. Khalil after his arrest, isn't that right?

09:57

A. I participated in press conferences, but I don't recall any by students.

Q. And in the press conference you participated in, you made a speech criticizing the U.S. Government for the arrest of Mr. Khalil, didn't you?

A. I did. I'm a U.S. citizen.

Q. And you said, in that press conference, you said, "Mahmoud's story is in short the Palestinian story, par excellence." You said that, didn't you?

09:58

A. I did.

Q. And you said, "But let us be clear, Mahmoud has been detained for his political speech." You said that, too, didn't you?

A. Yes.

Q. You said, "It is the political speech that some of our

colleagues and students and many agitators outside the university do not like." You also said that in your speech at this public protest, didn't you?
A. Yes.
Q. "It is political speech that they have tried to shut down by slandering Palestinians and pro-Palestinian protesters as antisemites and even as providing material support for terrorists with absolutely no evidence to back it up."
You also said that, didn't you?
09:59 A. I did.
Q. And when you said that, you were standing before a series of microphones from many news organizations, weren't you?
A. Yes, but I'm a U.S. citizen.
Q. Fox News was there, right?
A. Yes.
Q. AP was there?
A. Yes, but again, I'm a U.S. citizen. I'm not scared of deportation.
Q. ABC was there, correct?
09:59 A. I honestly do not remember everyone who was there. I remember there was a lot of press there.
Q. A lot of press there. And this press conference was given in the middle of New York City, right?
A. Correct.
Q. On Columbia's campus?

A. No, it was not on Columbia's campus. It was -- well, I don't know if that's Columbia's campus. It was up at 125th Street on a plaza in front of, I think it was a Columbia arts building, but I honestly do not know if that is considered legally Columbia's campus.

Q. The press conference was given at the Lenfest Center For Arts at Columbia University --

A. But we were not inside, we were not inside the building.

Q. Ah, I see. You were outside. So in that respect you question whether or not it was at Columbia University?

10:00

A. Look, I generally just don't know whether legally that public space is owned by Columbia University. That's all I'm saying.

Q. New York has over eight million residents, doesn't it?

MR. WANG: Objection.

THE COURT: I don't know that she is a demographer.

MR. KANELLIS: She can tell me if she knows.

THE COURT: I'll allow it.

A. That sounds right.

10:00

THE COURT: All right. We'll let that stand.

Q. Okay. And you knew that by giving this press conference, in making these statements critical of the United States and the policy regarding Palestine and the arrest of Mr. Khalil, that this could be heard by a great number of people; isn't that right?

A. Yes.

MR. KANELLIS: No more questions.

A. And I repeat, I'm a U.S. citizen.

THE COURT: Nothing further for this witness, Mr. Wang?

MR. WANG: Nothing further from us.

THE COURT: We thank you, Professor. All right. Call your next witness.

MR. BIALE: Your Honor, this is Noam Biale for the plaintiffs. Plaintiffs call Peter Hatch.

10:01

THE COURT: He may be called.

PETER HATCH, Sworn

COURTROOM CLERK: Can you please state your full name and spell your last name for the record.

THE WITNESS: Peter John Hatch, H-a-t-c-h.

COURTROOM CLERK: Thank you. You may be seated.

DIRECT EXAMINATION BY MS. CONLON:

Q. Good morning. Is there a way for me to adjust the volume on this? Okay. Good morning, Mr. Hatch.

10:03

A. Good morning.

Q. My name is Alex Conlon. Thank you for being here.

So just to situate us all, Mr. Hatch, you work for the United States Government?

A. Yes, I do.

Q. Okay. You work in the Department of Homeland Security?

A. Yes, for the component called Immigration and Customs Enforcement.
Q. ICE?
A. Yes.
Q. And specifically, within ICE, you work for the Office of Intelligence; is that right?
A. I work for a subcomponent of ICE called Homeland Security Investigations, and within Homeland Security Investigations, I'm the assistant director for the Office of Intelligence.
10:03 Q. Okay. Now, you and I of course didn't get to prepare together because you are here with the defendants, so I want to give you a sense of what we're going to cover today for you and the court.
In early March you were given the names of student protesters for the Office of Intelligence to produce analysis -- reports of analysis on; is that correct?
A. Yes.
MS. STROKUS: Objection, Your Honor, leading and foundation.
10:04 MS. CONLON: Your Honor, this is an adverse witness and under Rule 611 --
THE COURT: Please, I'm familiar with the rules of evidence. What's your response to that?
MS. STROKUS: Your Honor, Mr. Hatch is a federal government employee.

THE COURT: He is.

MS. STROKUS: And he is prepared to testify honestly and truthfully here today.

THE COURT: Well, that's the presumption, and I certainly respect him, as I do all witnesses. She may lead him. I'm familiar with leading, and of course it bears on the weight to be given to the answers, but she may proceed in that fashion.

MS. CONLON: Okay.

10:04 BY MS. CONLON:

Q. Many of the names of the student protesters provided to you for the Office of Intelligence to produce reports of analysis on came from the website Canary Mission, correct?

A. It's true many of the names, even most of the names came from that website, but we were getting names and leads from many different sources.

Q. The reports of analysis on the student protesters, you had the chance to review, or read, rather, many of them, right?

A. I have read several but not all of the reports of analysis

10:05 coming out of that effort.

Q. And the reports of analysis on the student protesters that you've read, you have seen ones that mention Israel, correct?

A. Yes. They've mentioned several of the nations involved in the Middle East conflict.

Q. You've seen reports of analysis that mention Palestine,

correct?
A. Yes.
Q. You've seen reports of analysis that mention pro-Palestinian protests, correct?
A. I've seen reports of analysis that mention Palestine and issues related to Palestine.
Q. You've specifically seen reports of analysis that mention pro-Palestinian protests, correct?
THE COURT: Well, I guess now she's framing it, so I guess the way I hear her, she wants to have you say, when you read reports, did the phrase "pro-Palestinian" -- what was her third word -- "pro-Palestinian activities" or the like, did you receive reports that had those phrases in it?
THE WITNESS: I don't think the reports of analysis mentioned that phrase as you've described it. I think the reports of analysis mentioned students involved in protests or personnel involved in protests. I don't know if a report of analysis specifically said, mentioned pro-Palestine protests, you know, those words. I just don't remember.
THE COURT: All right. How about pro-Hamas?
THE WITNESS: I do remember reports of analysis that mentioned Hamas, but it isn't the analyst's job to make the determination whether something is pro or con. They would just make the determination that a Hamas leader was, for example, mentioned in the protest or there was some sort of activity or

statement made in support of Hamas or related to Hamas. But the analyst would not make the decision of or classify it as this is pro-Hamas activity, this is pro-Palestine activity. They just don't make those determinations.

Q. So I want to make sure we get off on sort of the right foot here, and if I'm misunderstanding something that you've said in your deposition, you can tell me.

But we spoke to you in a deposition maybe a week ago; is that right?

10:08 A. That's correct.

Q. In that deposition -- and for the government's benefit, I'm looking at page 233, lines six to eight.

You were asked this question and you gave this answer.

Question: Do you recall seeing any reports of analysis that mention pro-Palestinian protests?

Answer: Yes.

MS. STROKUS: Objection, Your Honor, improper impeachment. Can she please show the witness the testimony to which she's referring?

10:08 THE COURT: Under Queen Charlotte's case, that's appropriate.

MS. CONLON: I'm happy to show the witness.

THE COURT: Yes, let's do it.

MS. CONLON: We're queueing it up. While we queue it up --

THE COURT: Government counsel, I just want to call people by names, and again, your name, I'm sorry?

MS. STROKUS: Yes, Your Honor. I'm Jessica Strokus on behalf of defendants.

THE COURT: Thank you, Ms. Strokus.

BY MS. CONLON:

Q. So Mr. Hatch, this deposition took place June 25, right?

A. Yes.

Q. And you had government counsel there with you?

10:09 A. Yes.

Q. And of course you were under oath in the deposition?

A. Yes.

Q. And at the outset of that deposition you were instructed that if a question was unclear, you could ask for clarification, right?

A. Yes.

Q. And in fact, many times you did ask for clarification, right?

A. Yes.

10:09 Q. Okay. So turning your attention now to the section that you see here on the screen, and this again is page 233, starting at line six, you see where it says, Question: "Do you recall seeing any report of analysis that mentions pro-Palestinian protests?"

Answer: "Yes."

Do you see that there?
A. I do, but that's not what it says.
Q. I'm sorry, that's not what it says?
A. I'm looking at line -- the question above that was, "Do you recall seeing any report of analysis that refers to pro-Palestinian protests."
Q. You then asked that the question be rephrased, right? Do you see that on line four?
A. Yes.
10:10 Q. And then the question was asked -- and I hate to repeat it, but it says, "Do you recall seeing any report of analysis that mentions pro-Palestinian protests?"
That is the question that was put to you, and the response you gave was, "Yes." Isn't that right?
A. "Do you recall seeing any report of" -- yes.
MS. CONLON: Okay. You can take it down.
Q. Now, the reports of analysis about the student protesters, you said that you only reviewed several of them, correct?
A. That's correct.
10:11 Q. When you say "several," can you give us a sense of how many that means?
A. For this particular effort, I probably reviewed a couple of dozen, maybe a dozen, maybe 20.
THE COURT: When you say "this particular effort," to what do you refer?

THE WITNESS: I review probably almost a thousand, maybe up to a thousand ROAs in total during a year, and we do, the Office of Intelligence does approximately 25,000 to 30,000 ROAs a year.

THE COURT: But my question was, you're able to say this particular effort, you reviewed about 20. What do you mean by "this particular effort"? What was the mission or the effort that we're talking about?

THE WITNESS: When we were looking at the protests.

10:12 So personnel from -- individuals from the lists of people who were involved in protests.

THE COURT: Protests at Columbia or other places as well?

THE WITNESS: Other places as well.

THE COURT: Thank you. Just so I understand, college protests or --

THE WITNESS: Student, student protests and personnel who was participating in those protests.

THE COURT: Thank you.

10:12 BY MS. CONLON:

Q. When you say "personnel participating in the student protests," does that extend to faculty?

A. It extends to everyone other than -- yes, and all others who are involved who may not have been associated with the university at all.

Q. You said a moment ago that the Office of Analysis -- or Intelligence, rather, produces upwards of 25,000 reports of analysis on all kinds of subjects in a given year, right?
A. That's correct.
Q. And you said that you review a small slice of that in a given year, maybe a thousand. Did I understand you right?
A. That's about right.
Q. And you said that in this line of effort, which was compiling reports of analysis on student protesters, that you recall reviewing several dozen; is that correct?
10:13
MS. STROKUS: Objection, Your Honor. It misstates his testimony.
THE COURT: That's not exactly what he said.
MS. CONLON: I'm seeking -- I'm sorry.
THE COURT: But I understand, and let me try.
MS. CONLON: Okay.
THE COURT: So with respect to student protests, you recall reviewing about 20?
THE WITNESS: That's correct.
10:13
THE COURT: All right. Now go from there.
MS. CONLON: Okay.
BY MS. CONLON:
Q. So again, I just want to make sure I'm understanding you and we're on the same page.
When you say "dozens," a couple dozen, you mean

approximately 100, isn't that right?
A. No. We said about -- I've reviewed about 20 of those.
Q. Okay.
A. I don't recall the exact number. Like I said, I review a lot of ROAs, so I'm estimating here.
Q. Okay. I'm going to ask -- I'm going to ask that we put the transcript back up. And can we please go first to page 83. So first -- and we're going to have to do this in a few parts, but Mr. Hatch, I want to direct your attention to lines 13 to 16 so that you're clear on the context for what I'm going to show you next here.

In line 13 you're asked, "Do you recall whether any of these reports of analysis on student protesters mentioned the terms 'Israel' or 'Palestine,'" to which you said yes, which you've also said today. And now moving ahead to page 84, lines 10 to 12, when you were asked about those reports, the question was, "And when you say dozens, what's a ballpark figure?" And in line 12 the answer you gave was, "Approximately, 100."

So you testified that you know that approximately 100 of the reports of analysis on student protesters mentioned the terms "Israel" or "Palestine," isn't that right?

MS. STROKUS: Objection, Your Honor. It's unclear from the what's on the screen right now what the original question was.

THE COURT: If it's clear to the witness -- if it's

clear to the witness, it's sufficiently clear. Do you understand the question?

THE WITNESS: Can you show me page 83?

MS. CONLON: Of course. And for ease -- sorry, the lines --

MS. STROKUS: You honor, we ask that the witness be provided a paper copy so we don't have to keep flipping back and forth.

THE COURT: Do you have one? Do you have one?

10:16 MS. STROKUS: No, Your Honor.

THE COURT: I was thinking that it might be helpful if I had one, but we live in the real world.

MS. CONLON: We may have extra copies. Can I take a moment to look?

THE COURT: Well, of course you may.

In the hierarchy of getting at the truth, among us, if you have a copy, let's give it to the witness.

MS. CONLON: If the court happens to have the pretrial brief exhibits here, the court then does have a full copy, and

10:17 we have a copy we could give the witness as well.

THE COURT: Give that to the witness.

MS. CONLON: It's Exhibit 2 to the pretrial brief.

THE COURT: Thank you, and I do.

MS. CONLON: May I approach to give the witness the binder?

THE COURT: You may.
Q. So Mr. Hatch, when you have a chance to look at pages 83 and 84, that's where I've been directing your attention, just let me know.
A. Yes.
Q. Okay.
THE COURT: It isn't Exhibit 2 in mine, but don't slow down.
MS. CONLON: Okay. I apologize. We're going to get clarification on that, Your Honor, but I won't stop, as you say.
Q. So Mr. Hatch, in the deposition you testified that approximately 100 of the reports of analysis on student protesters mentioned the terms "Israel" or "Palestine," correct?
A. Yes, I did.
Q. Okay. When you testified earlier a moment ago that you reviewed only maybe 20 or more of these reports of analysis, you were talking about the same reports that you mentioned in the deposition, right?
A. Yes, I was.
Q. Okay.
THE COURT: It's Exhibit 6, but go right ahead.
MS. CONLON: Okay.
Q. And just to be clear, the 100 or so reports of analysis

that mentioned the terms "Israel" or "Palestine" was a subset of the total reports of analysis on student protesters generated in this line of effort, correct?
A. Yes, I believe it was a subset.
Q. In other words, there were more than 100 reports of analysis generated about student protesters, right?
A. Slightly more, yes.
Q. How many more?
A. There were less than 200.
10:19 Q. More than 100, less than 200?
A. Yes.
Q. Okay. So I want to back up for a moment to -- so at a high level, so you understand, those are the topics I want to get into, but I want to get back for a moment to your work.
So you told us that you work in HSI, which is part of ICE, and ICE works to, among other things, dismantle transnational criminal organizations, right?
A. Yes, HSI's mission is to dismantle transnational criminal organizations.
10:20 Q. As in, ICE's mission is broader, but HSI's work is focused on dismantling transnational criminal organizations; is that correct?
A. That is correct.
Q. HSI, where you work, identifies and investigates people suspected of breaking criminal laws, right?

A. We don't investigate. We only analyze.
Q. You analyze, okay. You research and analyze?
A. Yes. We're talking about the Office of Intelligence.
Q. Yes. And let's talk about that. So you are the assistant director of the Office of Intelligence, right?
A. Yes, I am.
Q. And you have worked in law enforcement overall for more than 35 years, correct?
A. Yes, I have.
10:21 Q. You joined the Department of Homeland Security in 2019?
A. I became an HSI employee in 2019. Before that I was an officer in the Coast Guard.
Q. And when you joined in 2019, you moved into the senior role that you are in now, right?
A. I did.
Q. It may be obvious to others from your title, but so that I'm clear, you are senior-most office -- official in the Office of Intelligence; is that right?
A. I am.
10:21 Q. And you report directly to senior leadership of the umbrella that is also Homeland Security Investigations?
A. Yes, I report to the deputy.
Q. The deputy is Derek Gordon?
A. That is correct.
Q. You oversee more than a thousand investigative analysts?

A. Approximately a thousand.
Q. Now, the Office of Intelligence focuses on criminal networks, criminal conspiracies, those engaged in criminal conduct, right?
A. That is correct.
Q. Its work is divided into different types of crimes or program areas like child exploitation or human trafficking?
A. Yes.
Q. Okay. So you said earlier that the Office of Intelligence doesn't do investigation. It does research and analysis.
10:22
A. Yes. We are, investigative analysts are not law enforcement officers. They do not have arrest powers. They don't have investigative powers.
Q. Okay. And the Office of Intelligence supports investigations, though it does not do them itself, through factfinding, right?
A. Yes, we -- yes, we do.
Q. And those facts get memorialized in a report called a report of analysis?
10:23
A. Yes, the report of analysis is the way the investigative analyst documents their work.
Q. So I want to talk about what reports of analysis ordinarily contain, and I will be direct with you and tell you I have never seen one. They have been withheld as privileged in this case. So if I ask you a question and it doesn't make

sense or it's off-base, please tell me.
A report of analysis can focus on a particular person?
A. Yes, they can focus on individuals, yes.
Q. For our purposes, I'll call an individual that's the subject of a report "the subject," just so I don't have to keep repeating it.
The report can have a great deal of factual information about the subject, right?
A. The report should have a lot of factual information about the subject and only factual information.
10:24
Q. And the factual information they should have are facts that could be relevant to a suspected violation of a criminal law; is that right?
A. Violations of primarily criminal law but violations of law, and for HSI's mission, violations of immigration and customs law, which is our specialty.
Q. And when you say "immigration and customs law," are you referring to the Immigration and Nationality Act?
A. Title 8 for immigration.
10:24
Q. Okay. The reports of analysis on a subject include, among other things, the person's immigration history?
A. Yes, that would be part of it.
Q. The history of their activity in the United States?
MS. STROKUS: Objection, Your Honor. This line of questioning is teetering on the law enforcement privilege.

What goes into the report of analysis --

THE COURT: I haven't heard it yet.

MS. STROKUS: Your Honor, what goes into a report of analysis has been withheld as privilege.

THE COURT: It may have, but ultimately that's the court's decision. She may have the question.

BY MS. CONLON:

Q. A report of analysis may contain history of the subject's activity in the United States, right?

10:25 A. It would contain things like their criminal activity, perhaps employment, travel. But without getting into -- I want to keep it in general terms because people know -- if criminals learn what we write in a report of analysis, then they can make adjustments.

THE COURT: Actually, you've touched on the line I'm trying to draw. As I view the law enforcement privilege, and you're a person who works in this area, so I want you to tell me if you think a question trenches on it.

Nothing here should mess up or impair your office's or 10:26 any knowledge you have of government operations' ability to enforce the laws and protect the nation generally.

Having said that, we're engaged in a search for truth here about certain things that have happened or haven't happened and are in factual dispute. So it's not wrong for her to start this way because documents have been withheld. But if

you think -- I'll be satisfied with the 30,000-foot view if I can understand what you were doing, and then we may drill down on things that have happened which may bear on what I've got to sort out here. Do you understand my instructions?

THE WITNESS: Yes, Your Honor.

THE COURT: And so feel free to use them. I'm not at all disrespectful of counsel. You should listen to your counsel, but that's the line I'm following. Go ahead.

MS. CONLON: Your Honor.

10:27 MS. STROKUS: Your Honor, may I be heard?

THE COURT: Yes.

MS. STROKUS: These questions and the line of questioning that already began and we are anticipating go straight to methods, indicators, techniques that are privileged under the law enforcement privilege and that will have wide-ranging impacts on criminal and immigration investigation.

THE COURT: I'm not clear why you've withheld, if such documents exist, why you've withheld them with respect to the specific targets because that's in the past.

10:28 MS. STROKUS: Yes, Your Honor, it is in the past. What I'm saying here is we're talking about reports of analysis generally and what goes into them.

THE COURT: So we are. So I'd be interested to see the reports of analysis about any of the people that were denominated targets here. She says you withheld that. I'd be

interested in seeing that. Maybe we can save a lot of time.

MS. STROKUS: Yes, Your Honor, I believe those were submitted to you in camera and withheld from plaintiffs' counsel as law enforcement privilege.

THE COURT: I understand.

MS. CONLON: If I may assist. The court redirected yesterday the government to submit a log indicating the basis for its withholding of a certain packet of materials you provided to them --

10:29 THE COURT: I read the materials.

MS. CONLON: They submitted a log that I think makes reference, the one that was just filed last night I think refers to, from what I can tell, at least two reports of analysis on targeted noncitizens, so I know at least the court has those, but of course not what else.

MS. STROKUS: Yes, Your Honor. You were provided the individual for the five allegedly targeted individuals in this case in camera.

THE COURT: Okay. We'll address that in 15 minutes,

10:29 or maybe we should address it now, have him step down, and we'll see where we go. Would you prefer to do it that way?

MS. CONLON: I understand the witness has limited time, and I want to be to respectful of it.

THE COURT: Yes, I do, too. So let's go ahead and get him on his way.

BY MS. CONLON:
Q. Okay. So Mr. Hatch, without revealing any techniques of law enforcement, a report of analysis includes only factual information; is that right?
A. That is correct.
Q. It does not include, for example, a summary of anyone's opinion about the facts, correct?
A. No, it should not include any opinions at all.
Q. And a report of analysis in describing factual material
10:30 may append the underlying source materials to it for someone else to review, correct?
A. Yes, as part of our procedure, is to make sure that it's repeatable and you can find out why certain things were included or what the source material was for something being included.
Q. I want to talk about how ordinarily the Office of Intelligence gets tasked in the ordinary course as opposed to in this line of effort with creating these reports of analysis. And a report of analysis can be generated by the Office of
10:31 Intelligence in response to a request from a law enforcement partner, correct?
A. Yes. In fact, most of the time it's a special agent who is asking the investigative analyst for help in finding more information out about an individual.
Q. A special agent who, for example, is already investigating

someone and seeking help from the Office of Intelligence to gather information?
A. That's one of the ways, yes.
Q. And that is most often the way, correct?
A. That is most often the way. But it's not the only way.
Q. The agents who make such requests of the Office of Intelligence can be situated outside of the Office of Intelligence and in other parts of HSI, right?
A. Yes, the domestic offices, the programs, even leadership.
10:31 Q. Requests for reports of analysis can also come from outside of HSI and outside of the Department of Homeland Security, correct?
A. As long as it goes through HSI leadership and I get my tasking from HSI leadership, we can be asked to look into any individual.
Q. Now, I want to talk about what ordinarily happens when the Office of Intelligence receives such a request. The office gets the request from an agent, and when the report of analysis is created, it goes back to the agent who asked for it,
10:32 correct?
A. In most cases, yes, but not in every case. It could be provided to a related program. And again, we're only talking right now about what we receive from a special agent, but we do get tips and leads before an investigation that needs some background information or needs some information to be gathered

before it's given to the investigator to determine whether or not to continue an investigation or to start an investigation.
Q. And when you say the Office of Intelligence gets tips or leads, so something outside of an agent in HSI asking for help, do you mean tips and leads like outside of the government, like civilians?
A. It includes civilians. We have a tip line that civilians can call and provide information.
Q. Can civilians also provide information through the 10:33 agency's social media channels, for example, by tweeting at the Department of Homeland Security?
A. I suppose they could. I have never seen an instance of that.
Q. So you're aware only of tips through a tip line and not any other means; is that right?
A. Tips through the tip line or some other connection point with HSI. Sometimes tips are left in emails or sent to emails or sometimes to other public-facing phone numbers or email boxes, not to an individual but to a box.
10:34 Q. Now, ordinarily, after a report of analysis is generated, and for clarity, that's done at the level of an analyst in the Office of Intelligence; is that right?
A. What's your question? Can you repeat that?
THE COURT: She hasn't asked it yet.
Q. Reports of analysis are created not by you but by

investigative analysts in the Office of Intelligence, right?
A. Yes, the analysts write the ROAs. I have not written ROAs.
Q. Not ever probably?
A. Right.
Q. Okay. Once the ROA is drafted by an investigative -- or by an analyst, the ROA -- and I apologize for the record. That's what I'm abbreviating, report of analysis.
THE COURT: I am following.
10:35 Q. The ROA does not have to go through any formal sign-off procedure within the Office of Intelligence before it can leave the office and be given to whoever requested it, correct?
A. Yes. They do not go through me, if that's what you're asking. I do not have approval process where I sign off on every ROA.
Q. Right, because there's like 25,000 of them in a year?
A. Correct.
Q. Okay. And you have a deputy, correct?
A. I have one deputy.
10:35 Q. Mr. Etter, Bradley Etter?
A. That's correct.
Q. He also doesn't have to sign off on ROAs before they go outside of the Office of Intelligence, right?
A. No. The relationship is the analyst works with the agent, and that's a partnership that we try to encourage.

Q. In other words, we're talking about direct collaboration between the analyst in the Office of Intelligence and the agent who asked for the office's help?
A. That's correct.
THE COURT: This may all be relevant, but how much more do you think you have for this witness?
MS. CONLON: In general or on this topic?
THE COURT: No, in general.
MS. CONLON: I have a great deal more.
10:36 THE COURT: And you want to get him out of here today?
MS. CONLON: I do. I understand that he has a lot on his plate.
THE COURT: He may very well. They may have questions for him. All right. You go ahead. I guess I'm thinking, though he's being perfectly responsive to your questions as far as I can see, it might be helpful to get to this case.
MS. CONLON: I'm almost there, I promise.
BY MS. CONLON:
Q. So in the ordinary course, sticking with your regular
10:36 process, not the student protester process for a moment, after the Office of Intelligence gives the report of analysis to the party who requested it, that is often the end of the Office of Intelligence's involvement in that case, correct?
A. Yes. Oftentimes we don't hear back from the agent on any results of the investigation.

Q. Now, you've been in your role for six years, approximately?
A. Since 2019.
Q. For your first five and a half years in your role, you were never involved in the investigation of a foreign student engaged in political protest, correct?
A. I was never asked -- again, I don't do investigations.
Q. Sorry.
A. So I was never -- I don't recall any instance where I was asked to review protest activity.
Q. Now, prior to 2025, to the best of your knowledge, you also weren't involved in cases involving lawful permanent residence for potential action by the State Department, correct?
A. No. We -- I don't recall any actions where we provided information to the State Department, but we were -- that is, that referral to the State Department is one of the statutes in Title 8, and we've been investigating or we've been analyzing Title 8 offenses since I've been there.
Q. So just to bring you back to the question, you had seen reports of analysis on visa holders that went to the State Department prior to 2025 but not reports of analysis on green card holders, lawful permanent residents that went to the State Department before 2025, correct?
A. That I don't recall because I thought your question was

related to the protesters. So if you're asking me, I don't recall any instances of LPRs being referred to the State Department because of protest activity. I don't know the answer if we referred to any LPRs -- "we" being HSI referred any LPRs for other types of activity, I just don't -- I'm not sure I would remember those.
Q. You don't think you'd recall whether you reviewed reports that went to the State Department about lawful permanent residents before?
10:39 A. Yes. It's not something I would, as the assistant director, that I would be involved in in the normal course of business. It wouldn't really rise to my level as an issue.
Q. Do you recall ever seeing see a referral of a student protester for a visa revocation before 2025?
A. I don't recall that.
Q. Now, President Trump was inaugurated in January, right, of this year?
A. Yes.
Q. January 20. Is that a yes, if you know?
10:40 A. Yes.
Q. And shortly after he took office, he issued several executive orders that relate to the work of the Department of Homeland Security, correct?
A. Yes.
Q. You read, for your work, executive orders that relate to

the work of HSI, correct?
A. Yes, the ones that I can find and interpret, yes.
Q. Okay. And one of the orders that has affected the work of HSI this year is Executive Order 14161, which is titled Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats. Is that right?
A. Yes, but if you're going to ask me questions about it, can I have it, can I read it?
Q. Of course.
10:40 MS. CONLON: Your Honor, you look like you were going to say something. Should I continue?
THE COURT: No. I didn't understand your question. But go ahead and ask your question. He understood it, and I think I do. He's familiar with that executive order, but if you're going to question him --
MS. CONLON: He wants to see it.
THE COURT: -- we better look at it.
Q. Okay. So we have put a document that has been marked as Exhibit 70, which is in evidence, in front of you. Do you see
10:41 it on the screen there?
A. Yes, I do.
Q. Do you recognize that as Executive Order 14161?
A. Yes.
Q. And you can see it was issued January 20, 2025?
A. I can see that.

Q. Okay. You've seen this before, right?
A. I have seen it.
Q. Now, part of this executive order relates to HSI's work, correct?
A. It does.
Q. The part that most directly relates to HSI's work I think appears in Section 2, little (a), little number (4), so if you would direct your attention there. We may be able to make it bigger, maybe.
10:42 A. I can read it.
Q. Great. That part of the executive order calls for the vetting and screening to the maximum degree possible all aliens who intend to be admitted, enter or are already inside of the United States, particularly those aliens coming from regions or nations with identified security risks; is that right?
A. Screening and vetting is part of HSI's mission.
Q. That is exactly what I wanted to ask you.
Screening includes looking, from HSI's perspective, at an individual to see if there is any derogatory information about
10:42 that person, right?
A. Yes, that's also almost quoted directly from my deposition.
Q. I'm glad that you also remember it.
OI, Office of Intelligence screens a particular person and then writes a report of analysis with any derogatory

information if they find it, right?
A. Yes. And we are one of the agencies that does screening and vetting. There are an umbrella of agencies or cluster of agencies that do this in coordination.
Q. Including and pursuant to this executive order, right?
A. That's correct.
Q. President Trump has issued other executive orders that also affect your work this year, right?
A. Yes.
10:43 Q. Are you familiar with Executive Order 14188, which regards combatting antisemitism?
A. I am, but as you recall from the deposition, that was the first time I had read that executive order.
Q. So that's not one you had read closely?
A. No.
Q. Okay. Then I will not ask you to read it now.
So turning to early March of this year, after this executive order that we just looked at, Exhibit 70 --
THE COURT: Now we're turning? Just a matter of case management here.
10:44 MS. CONLON: Sure.
THE COURT: I said we'd take a brief recess, at which time I would hear the government, who is asking me to reconsider on a subset of documents which I'm familiar with which don't include but now they point out these ROAs at least

as to what we've denominated target individuals here.

I appreciate what you're doing. I'm prepared to go on or stop and have argument. You're not part of it. It doesn't count against anyone's time. How do you wish to proceed, Ms. Conlon?

MS. CONLON: I'd like to keep going if that's okay?

THE COURT: It is okay, as long as I can pay full attention. We will take a recess out of necessity. Go ahead.

MS. CONLON: Okay. Did Your Honor want to recess now?

10:45 THE COURT: No. Do you want to keep going?

MS. CONLON: I do, if that's okay.

THE COURT: We will.

MS. CONLON: Okay, great.

BY MS. CONLON:

Q. So in early March of this year you attended a briefing on student protests, correct?

A. I did.

Q. This briefing on student protests in March included your boss, Derek Gordon?

10:45 A. Yes, my boss, Derek Gordon, the chief of operations, William Walker, a number of other people, but the senior -- many of the senior leadership of HSI.

Q. So you mentioned that the briefing on student protests in March included William Walker, we've said Derek Gordon. Do you recall whether Robert Hammer was there?

A. I think so.
Q. And Mr. Hammer is the deputy executive associate director of Homeland Security Investigations or rather he was just before Mr. Gordon took over; is that right?
A. He was at the time, yes.
Q. Okay. I see. So the meeting occurred when Mr. Hammer was still incumbent in that seat and then Mr. Gordon took over?
A. That's correct.
Q. The meeting also included Roy Stanley, the chief of the
10:46 analysis division for the Office of Intelligence; is that right?
A. I believe he was there and he is the unit chief for the analysis division within Office of Intelligence.
Q. Do you recall who else from senior leadership was there, or is that the group?
A. I don't -- I don't remember who else was there.
Q. Okay. Now, in this meeting, the meeting was convened by HSI's leadership, correct?
A. Yes.
10:47 Q. And the meeting was held as part of HSI's effort to implement Executive Order 14161, correct?
A. I do not characterize it that way because, as I recall from the discussions, I don't think that was the topic of the meeting. The meeting was to talk about protest activity or student protesters who may be in violation of U.S. law.

Q. So it's your understanding that the meeting was about an effort to gather information on student protesters, but you don't understand it to have been --

THE COURT: Let's not beat around the bush. I'm interested in this meeting. You're the witness. Not how she characterizes things. What were the instructions or the like from the briefing?

MS. STROKUS: Objection, Your Honor.

THE COURT: Overruled.

10:48 MS. STROKUS: Objection, Your Honor, deliberative process privilege.

THE COURT: They weren't deliberating. They were being briefed. When you're briefed, you're told what's going to happen. Were you deliberating?

THE WITNESS: We weren't briefing. We were discussing.

THE COURT: I stand corrected. It was referred to as a briefing.

So you were discussing and you have characterized the

10:48 discussion as student protesters who may have broken the law?

THE WITNESS: Yes, sir.

THE COURT: Okay. And having been corrected and I appreciate your persistence, I sustain the objection.

And now I'll ask this. So as a result of that meeting, what instructions, if any, were adopted? And again,

I'm going to explain the line I'm drawing because I have some trust that you're following the line.

When you're kicking stuff around, the rest of us aren't entitled to know that, just as I kick stuff around with my law clerks. Once I've decided what we're going to do, well, then in the judicial end I have to write it all out and that's all above it. In your executive end, whatever is decided that bears on this case and student protesters, we're entitled to know that, and I need to know it.

10:49 Do you have that in mind?

THE WITNESS: Yes, Your Honor.

THE COURT: So recognizing that's the line, what came out of it?

THE WITNESS: To look at the protesters, to develop reports of analysis on the protesters, specifically looking for violations of U.S. laws, including and specific to immigration and customs laws.

THE COURT: Can you be any more specific as to the immigrations and customs laws that you were looking for were?

10:50 THE WITNESS: Thinking in general terms, it was anything that may relate to national security or public safety issues, things like were any of the protesters violent or inciting violence? I think that's a clear obvious one. Were any of them supporting terrorist organizations? Were any of them involved in obstruction or unlawful activity in the

protest?

THE COURT: What do you mean by "obstruction"?

THE WITNESS: Like blocking normal citizens from going about their business.

THE COURT: Okay. Thank you.

THE WITNESS: And that we would use the normal report of analysis process and our normal trade craft for this.

THE COURT: Proceed, Ms. Conlon.

MS. CONLON: Okay. Thanks.

10:51 BY MS. CONLON:

Q. So you characterized it as a meeting, not a briefing; is that right?

A. I characterized it as a discussion.

Q. You would call it a discussion?

A. Yes.

Q. The discussion was led by HSI leadership?

A. I think only HSI was in the room.

Q. So by default.

THE COURT: We're going to --

10:51 MS. CONLON: Sorry.

THE COURT: I'm not the only one who needs a break here. The court reporters need to switch. So what we're going to do is we're going to take a break until 11:00. That's the break. If you want to leave some time to have argument about issues that are to be discussed, fine. Otherwise you can run

until 12:00, and I'm stopping and we will take this matter up tomorrow without any further argument. And hopefully we can get him on his way.

MS. STROKUS: Your Honor, we were told by plaintiffs that Mr. Hatch would be going first today. He made his travel arrangements to testify today. I understand that we are going into tomorrow. May I request that we do, after the break, arguments on the issues that are percolating so that Mr. Hatch is able to rearrange his travel schedule?

10:52 THE COURT: In other words, you'd like to cause him to rearrange his travel schedule so that we get that taken care of, argument about -- you call it the issues percolating -- the issues about the documents I said could be turned over but I wanted to give you a chance to argue. That's how you'd like to do it?

MS. STROKUS: Your Honor, just based on the outline that Ms. Conlon started in the beginning, it does not sound like direct will be completed today.

THE COURT: So long as he's going to be here tomorrow, 10:53 I'm fine with that. She's nodding her head. But for now, five-minute break for all of us. I will hear you at 11:00, no more than ten minutes of argument. That's not an invitation to take ten minutes. And when that's resolved, you may resume the stand, and we'll have the pleasure of your company tomorrow probably. We'll recess. (Recess, 10:53 a.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this 9th day of July, 2025.

/s/ Kelly Mortellite

________________________________

Kelly Mortellite, RPR, RMR, CRR

Official Court Reporter