UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY
Volume 2, Page 78 to 121

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
Plaintiffs

vs.

MARCO RUBIO, in his official capacity as Secretary of State, et al,
Defendants

*********

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Wednesday, July 9, 2025

********

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A P P E A R A N C E S

RAMYA KRISHNAN, ESQ.
CAROLINE DeCELL, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
ALEXANDRA CONLON, ESQ.
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 540-0675
Email: Cgans@shertremonte.com
For Plaintiffs

ETHAN B. KANTER, ESQ.
WILLIAM KANELLIS, ESQ.
VICTORIA M. SANTORA, ESQ.
JESSICA STROKUS, ESQ.
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9123
Email: Ethan.kanter@usdoj.gov
and
SHAWNA YEN, ESQ.
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Email: Shawna.yen@usdoj.gov
For Defendants

# I N D E X


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PETER HATCH (Continued.) | | | | |
| By Ms. Conlon | 12 | | | |
| By Ms. Strokus | | | | |


# E X H I B I T S

(None marked.)

P R O C E E D I N G S

(Resumed, 11:00 a.m.)

THE COURT: All right. We'll start with this issue which Ms. Strokus characterizes as a "percolating issue."

But, Mr. Kanellis --

MR. KANTER: Mr. Kanter, your Honor.

THE COURT: Mr. Kanter. I'm sorry. And I have read your briefs, and I am appreciative about them, and in at least one respect I do reconsider my order. And let me say I appreciate the careful way you have, um, suggested redactions in the subset of materials. And you're absolutely right in at least two respects. There's no reason to disclose e-mails or cell phones, you can redact those.

I guess I do want to say one other thing. I don't understand why you're objecting so vigorously to this subset? And I'll tell you why.

What I get from this -- the whole exercise is trying to persuade me, is this shows officers of the government -- some are attorneys, actually seeking to follow the law, to bring the conduct of enforcement agents and the like, in accordance with the law. And it reveals the process that they went through to follow the law. That's what I get about it. And that's really

what drew my interest. There's a larger group of material, but that's what drew my interest to this subset. I'll say no more.

Why shouldn't I, um, subject to the protective order that it's used, "Just for the purposes of this litigation. It's not to be spread around. We'll see if any of it gets in evidence." I'll hear you.

MR. KANTER: Thank you, your Honor.

I will start with one clarification in light of the examination that is, um, we're in the middle of, and that was the reference to the so-called "ROAs," "Reports Of Analysis," and Ms. Conlon can correct me, I thought I heard, um, her to say that some of the ROAs are in the subset. They are not.

MS. CONLON: And I stood up to say exactly that. I wanted to indicate to the Court that I think I made a mistake.

THE COURT: Okay, so we're not talking about that.

MR. KANTER: I just want to --

THE COURT: Go ahead, as to the materials I have here.

MR. KANTER: To begin with and that I think as the -- and that three of the documents in the subset -- this is the thing. There were two in-camera submissions. The third, we explained the confusion

there, which had to do with merely, you know -- the first in-camera submission was redacted and we provided it to the plaintiffs, it's been the subject of the plaintiffs' motion to compel, which your Honor decided in the government's favor, denying the plaintiffs' motion to compel.

So the point regarding the subset that I wanted to make was that the first document in the subset and the last two were part of what was litigated in that motion to compel. That's the only sort of point of clarification. Because, um, the documents in the subset straddled the two submissions.

THE COURT: Understood. All right. I don't want to take up your time.

MR. KANTER: Yes.

THE COURT: But let me say this. On this issue, and indeed throughout the litigation I've made it clear, that I'm not impugning in any way the good faith of counsel for the defense, or of the plaintiffs. All right? Trials are living things. Now -- it's one thing in the run-up to a trial, you're ruling on discovery motions, but now it's put to me. I am the factfinder here. I take that with extraordinary seriousness.

And so now -- though in a jury-waived case I'm perfectly able to look at something and say -- for

instance, I've adhered to the enhanced Visa scrutiny. I think "Well that's national security, put that out," we're dealing with people who at one time we invited in and we gave them Visas, green cards, and the like, and that's what I'm looking at. And that's the class, if I think of it as a class, the class of people who these lawyers represent.

So putting that to one side, I look at the rest of it, some of it's interesting to me. And I'm not judging anything, I'm simply telling you why it's interesting to me.

MR. KANTER: Your Honor, I take your point --

THE COURT: So you tell me why I should put it aside and not have it part of the record.

MR. KANTER: Exactly. I will offer this up. That it is a difficult calculus that often the law enforcement, um, officers and investigators, and so forth, are confronted with.

THE COURT: Except where's the government if I reveal any of it?

MR. KANTER: We represent the defendant agencies.

THE COURT: Correct.

MR. KANTER: And those agencies reviewed these documents carefully, at multiple levels, and it's -- it's a question. As your Honor pointed out, there are

instances in which the government may choose to -- not with waiving a privilege, but nevertheless turn something over. And in the case we have decided that certain materials will only be shown attorneys' eyes only. That is an ongoing discussion and consideration.

But I take the point your Honor is making, which is we're saying this goes to the matters at issue in the factfinding of the Court. And you're asking why is it that the government would stand on its privileges with respect to some of that information? I take that point. I will take it back to the agencies. And -- but, you know, we, um, we want to represent the agencies, extend the privileges that are theirs to assert. And, um --

THE COURT: All right, here's what we're going to do. Now -- you go ahead and do that, but -- and I'll take responsibility.

By 5:00 this afternoon, redact -- if I've missed any, all cell phone numbers, all e-mail addresses, and otherwise turn it over. Subject to a complete call-back if the agency -- because the question is am I going to have it as part of the record or not? It's attorneys' eyes only, it's used for the purposes of this litigation. That's the order. Let's call the witness back and we'll run till 12:00.

MR. KANTER: I take the order, I'm not challenging

it --

THE COURT: Feel free in the appropriate way.

MR. KANTER: A point of information, which is we have redacted and we've shown the Court our redactions with respect to what you just referenced. Already it is before your Honor. And secondly, to the extent that your Honor is proposing to turn over material that is outside those redactions, we would request a stay of the ruling so the Solicitor General can decide whether or not to seek mandates. But I don't understand your Honor to be turning over material that we have redacted.

THE COURT: Wait a minute. Wait a minute. I just -- I just -- yes, and I've made --

MR. KANTER: We provided redactions.

THE COURT: I know you have, and I've sustained so much of them as, um -- excuse me. I've sustained so much of them as excised cell phone and e-mail addresses. You're going to have to do it again, because as to the rest of it, I overrule it. Now you make a motion to stay --

MR. KANTER: I make a motion to stay.

THE COURT: Of course, which is your right. I allow the motion until 9:00 tomorrow morning. You will then turn it over unless there is a stay from some court of competent jurisdiction. I have the obligation to try

this case and there's exigencies in moving through the case. That's the order of the Court.

All right.

MR. WILKENS: Your Honor, may I be briefly heard for the plaintiffs? Scott Wilkens.

THE COURT: Well I don't think you'll be part of it, but, Mr. Wilkens, we've got a witness coming in, but it's always a pleasure for you to fill the time.

(Pause.)

MR. WILKENS: I will sit down, your Honor. Thank you.

THE COURT: Well there's no need, I spoke seriously.

Yes, Mr. Biale?

MR. BIALE: Your Honor, briefly there's another issue.

We have a lawyer who went down to New York for the deposition that was --

THE COURT: Oh, I know. That's right.

You know I'm troubled by this nonproduction of witnesses. I sense some gamesmanship here. Having said that, I'm not going to compel his attendance. It bears on the Court's assessment of these witnesses when he's called upon to testify. Believe me, it bears on it that he was not produced against this background.

I have urged cooperation in significant respects, though I don't challenge anyone's good faith, there has not been cooperation. I need to get through the trial. The parties are benefitted if I get through the trial. Now let's get the witness in here.

(Pause.)

THE COURT: Where'd he go?

MS. SANTORA: Your Honor, Victoria Santora for the defendants. If I may? We were not able to respond to the motion to compel, but I do just want to note that as plaintiffs --

THE COURT: You just won it?

MS. SANTORA: So I did -- just to the extent that you said that you will consider the witness's conduct in not appearing at trial, I do want to note that it was a logistical issue more on the part of the attorneys than on the witness.

THE COURT: Then it could be worked out rather than having to make motions. You know we have days. We have a weekend here.

MS. SANTORA: I agree, your Honor. And we are willing to cooperate with opposing counsel.

THE COURT: I expect it. And that's helpful. Thank you, Ms. Santora.

What happened to -- usually when we have a jury

and we have sequestered witnesses and they don't come when you call them, I tell stories about the courtroom to the jury.

MS. CONLON: We'll hear your stories, your Honor.

THE COURT: No, here he is.

(Mr. Hatch, the witness, enters courtroom.)

THE COURT: And, Ms. Conlon, you may continue.

MS. CONLON: Thank you, your Honor.

DIRECT EXAMINATION BY MS. CONLON: (Continued.)

Q. Okay, Mr. Hatch, before the break you were describing for the Court, um, the instructions that you received at the March meeting with HSA leadership concerning student protestors. One of the things you said was that you were directed, um, to review and analyze whether any of the student protestors had, for example, supported terrorist organizations.

Did anybody specify Hamas in particular in the meeting?

A. I don't --

MS. STROKUS: Objection, your Honor, to the extent it calls for the deliberative process in the discussions in the meeting.

THE COURT: Oh, actually, Ms. Strokus, you're right, you must ask were any of the directions relative

to Hamas?

MS. CONLON: Yes, I will rephrase it.

THE COURT: (To the witness.) Do you see the line? Not the discussions, but the directions about what you were going to do.

Did anyone mention that you were, among other things, going to take a look at Hamas or pro-Hamas activity?

THE WITNESS: Um, yes, we -- the -- supporting Hamas would be, um, relative to a violation of law. So it would be standard practice for an analyst to that anyway. However, um, my direction to the team, um, was to look for, um -- as an example, to look for Hamas, any statements in support of Hamas, or any activities.

THE COURT: And a question for me.

Hamas was a designated terrorist organization well before January 20th of this year, correct?

THE WITNESS: Yes, your Honor, that's correct.

THE COURT: All right.

Go ahead, Ms. Conlon.

MS. CONLON: Thank you.

Q. You were just talking about the directions that you gave to others, but I want to bring it back to the directions you received from HSI leadership before we discuss what you may have directed others to do. So

sticking with what you were directed to do as a result of this meeting.

Were you specifically directed to look at whether student protesters supported Hamas as opposed to just all foreign terrorist organizations, was there any specific direction concerning Hamas?

A. I don't recall receiving any specific direction to me to look at Hamas.

Q. You don't recall anything in the meeting about student protestors resulting in a direction to review whether the student protestors expressed support for Hamas?

MS. STROKUS: Objection, your Honor, deliberative process privilege. He's asking about --

THE COURT: Please. Please. I'm not a fan of speaking objections. It's sufficient, and I think it is your right, to say "Objection, deliberative process privilege." That calls into mind what we're talking about. If I need argument, I'll ask for it.

This is directions. It's limited to directions.

And do you understand the question?

THE WITNESS: Yes, but I think, um, counsel rephrased the question from one to the other.

THE COURT: Go ahead.

A. So I do not recall receiving any specific direction

from my supervisors to, um, focus directly and solely on Hamas.
Q. Do you recall receiving any direction to focus on any particular foreign terrorist organization?
A. I recall receiving direction to focus on violations of the U.S. law. I don't -- I don't recall any instruction to me specifically to Hamas.
Q. Well earlier when you were answering the Court's questions about the instructions you received, you give certain examples of the kind of things that the Office of Intelligence was supposed to be on the lookout for. And your examples, as I recall, included inciting violence, supporting terrorist organizations, etc.
But it's true that the direction was actually broader, it was to look for any potential violations of Title VIII, correct?
A. Yes, any violations of U.S. law.
Q. Including Title VIII?
A. Our organization specializes in immigration and customs law.
Q. And the examples you were giving were examples that might be particularly relevant to the review of a student protester's conduct, is that correct?
A. Yes. You're asking me to speculate and those are the ones that would be -- those are the ones that I can

think of that would be relevant right now.

Q. Well you are an authority here, so I'm happy to have your understanding of it.

Now when you say "supporting terrorist organizations," in this context, were you given any direction about what "supporting" means here for the work of the Office of Intelligence?

A. I was not.

THE COURT: From something you said earlier, I got the sense, but let's see if I heard it right. And thereafter you carried out that mission, but you carried it out in your usual way?

THE WITNESS: Yes, sir.

Q. What kind of evidence does the Office of Intelligence look for as indicative potentially that a noncitizen supports a foreign terrorist organization? Can you -- I'm trying to understand what you mean when you say "supporting a terrorist organization"?

MS. STROKUS: Objection, your Honor.

THE COURT: Yeah, sustained.

Q. What does "supporting a terrorist organization" mean when you say it?

A. (Pause.) Again the analyst looks for indicators, does not make the judgment on whether the activity actually supports or doesn't support terrorism. So we

look for activities, um, such as, um, support for a terrorist -- statements in support of a terrorist leader, um, everything from that to material support, which would be providing money to a terrorist organization or making, um, donations to an organization that's affiliated with a terrorist organization. But I really don't want to say any more detail than that.

THE COURT: And that's perfectly acceptable to the Court. Let me give you this example.

If you find out that a person was saying, um, statements like this, "Hamas is right, what Hamas is doing is right for the situation, or for the Middle East, or just right." And I'll stop there.

How does that fit or doesn't it?

THE WITNESS: Yes. In that example, the analyst would be, um, within policy to include that statement, because again the analyst is just collecting the facts.

THE COURT: Right.

THE WITNESS: If the person actually didn't say that or someone alleged they say that and the analyst found out that they didn't say that, then they would write the facts and not the allegations. So it's just factfinding.

If they, um, made a statement in support of the Yankees, the analyst wouldn't put it in there because

it's not related to a national security or public safety issue. Although in the case of the Yankees, it might be.

Q. Are you a Nationals' fan?

A. I'm a Red Sox fan.

Q. Oh, then you're in the right place.

So the Court gave you an example of a statement that say, for example, "Hamas is right," that could be relevant to, um, an analyst's compiling of a report of analysis about a student protester.

Could a statement like "Free Palestinian" be similarly relevant?

A. Again all of these are on a case-by-case basis. But it could be, depending on the circumstances of that individual. But as long as that statement was factual and we could corroborate that it was made by the individual under the circumstances described.

Q. And just to understand the flip side of it. Could a statement condemning the actions or the existence of Israel still be relevant to a report of an analyst in the same way?

A. Again, it depends on the circumstances of the individual. It depends on the individual circumstances. But the analyst would -- as long as that statement is factual, the analyst would not be against policy in

including that in the Report Of Analysis. And it isn't the, um, the presence or existence of a Report of Analysis does not presume guilt or innocence, it's just factfinding.

Q. Okay. So it's fair to say the analyst's job is to include whatever facts could be relevant to a determination that a person, um, act contrary to U.S. law and that could include the person's speech, correct?

A. That's correct. It includes all kinds of activities.

Q. Now, um, this -- back to the March meeting -- we'll move on from it momentarily, but back to this March meeting where you received this guidance to produce these reports.

A team was formed to carry out that line of effort, correct?

A. I don't believe the team was formed during that meeting, I think the team was formed after that meeting, maybe a week after, several days after. I don't know the exact timeframe.

Q. And for our ease of reference here, that team's nickname was the Tiger Team?

A. It was called the "Tiger Team," yes.

Q. And the Tiger Team included senior officials carrying out this line of effort?

A. The Tiger Team consisted of not senior officials, it consisted of analysts, an agent, um, and led by the unit chief you mentioned earlier, Roy Stanley. He was not the unit chief at the time -- he was not the division chief at the time, he was the unit chief.
Q. Were you part of the Tiger Team?
A. No, I was not part of the Tiger Team.
Q. Who, um, briefed you on the progress of the Tiger Team?
A. Um, the unit chief, often through my deputy Brad Edder, was the one briefing me on the activities, or the progress of the Tiger Team.
Q. Now the Tiger Team, which was formed shortly after this March, um, meeting had rolling discussions over the following days about its work, right?
A. I believe they had daily discussions.
Q. "Daily," you said?
A. Within the team, you're asking me about discussions within the team?
Q. Actually, um, now understanding you're not a part of the team, I'm interested in your contact with the team.
So how often did you speak with the team?
A. I did not speak with the team as a group, I spoke with the team leader maybe once a day on all issues, not just, um, the team's issues, and specifically with the

team, um, I mean over the last -- over -- maybe initially once a day. But after weeks, when the team was home, maybe every other day, um, three times a week maybe.
Q. And the team itself, so far as you knew, did its work on a daily basis, right?
A. Yes.
Q. When you had discussions with senior leadership about the work of the Tiger Team, those discussions included the people you mentioned earlier, Derrick Gordon, Robert Handler, William Walker, Roy Stanley, is that right?
A. Yes.
Q. Okay. So I want to talk about the Tiger Team's process for this line of effort.
The Tiger Team was -- well, withdrawn.
At the March meeting, I understand that a procedure to expedite this work was set up, and I'm thinking of what you said in your deposition, in particular that the Office of Intelligence would do the factfinding, the National Security Division of Homeland Security Investigations would compile the information in a letter to the State Department, and the State Department would make the decision on what action to take.

Is that a fair summary of the process that emerged as a result of this meeting?
A. Yes, that's a fair summary of the three steps.
Q. Okay. Now you have said, a couple of times, that Reports Of Analysis that the Office of Intelligence created did not have a recommendation of actions to take, right?
A. That's correct.
Q. The recommendations for any actions to take it overlaid when the Report Of Analysis goes from the Office of Intelligence to the National Security Division, correct?
A. The National Security Division is the first step in the decision-making process on making judgments or assessments of the facts collected in the ROA.
Q. And it's your understanding that the National Security Division conveys its views of the next appropriate step in a letter that the National Security Division sends to the State Department, correct?
MS. STROKUS: Objection, your Honor, this calls for speculation. He does not work in the National Security --
THE COURT: Well we'll see if he knows, whether he worked there or not.
Is that correct?

THE WITNESS: That is the description of the process. How the mechanics worked and how it was conveyed to the State Department? I don't know the details of that.
Q. Well we talked in your deposition, right, about how the National Security Division would send a letter to the Department of State called a "DHS referral." Do you remember that?
A. Yes, only because you showed me -- I did not know it was even called a "DHS referral." I just knew it as the National Security Division's letter.
Q. Okay. So from your perspective, the way it works is, you, your Office of Intelligence gives the report to the National Security Division, and that division, which is led by Andre Watson, gives a letter, we'll call it the "DHS letter," to, um, the State Department?
A. That's how I understand it.
Q. Okay. Now the first instance of a recommendation being made by anyone in the chain of decision-makers occurs in that step that the National Security Division takes, correct?
A. Yes, that's not made in the Office of Intelligence.
Q. And I mention this, but just for clarity.
The head of the National Security Division is Andre Watson, is that right?

A. That's correct.
Q. And he is the person who sends the letters that come from the Office of Intelligence -- or I'm sorry, withdrawn, and strike that.
He's the person who sends the letter from the Department of Homeland Security to the Department of State conveying both the ROA produced by the Office of Intelligence and the letter from the Department of Homeland Security, correct?
A. He's the one who signs the letter? I do not know how it gets sent.
Q. Yes, a good distinction. He's the signer. We don't know who the sender is.
Okay. So you understood and understand that this three-step process is intended for the State Department to be able to make a determination, one way or the other, about whether a person's Visa, in the case of a Visa holder, should be revoked, correct?
A. No.
Q. Okay, tell me what's wrong with that?
A. I think that's -- that may -- the State Department can use the ROA and the information we collect in whatever way they need to to make decisions related to the State Department. I think Visa revocations is one way they may use it. But it may not be the only way.

Q. Okay. Are you talking right now about how it generally works or how it worked in this 3-step process on student protesters?
A. It's my understanding that this way would include -- what I just said would include both of your scenarios.
Q. All right. And to be clear, what you're saying is that it would be up to the State Department to determine what the appropriate action was to take?
A. That's correct.
Q. And that could include you understood and understand a Visa revocation, right?
A. It could include a Visa revocation.
Q. And it could include a determination that a lawful permanent resident is removable, correct?
A. It could anything under their authorities and I believe in that case -- the example you just mentioned is one of their authorities.
Q. Now this process was -- the 3-step process was developed in conjunction with, um, Mr. Watson, who again is the head of the National Security Division, right?
A. Yes, but I don't -- this process could have existed. It's not a complicated process of factfinding, a letter to the authoritative decision-maker. So, um, this could have been used -- like I said, Title VIII's been around since the 1950s. This process would have been possible,

um, would have been acceptable at any time since Title VIII.
Q. It may have been. But you've been in your job for 6 years, and until the Tiger Team was formed and this meeting occurred, you had never seen the process work this way, is that right?
A. That's right, since 2019, I had never seen it used.
Q. And it is, as you say, a simple and sort of expedient process, just three steps, but to you it was new, correct?
A. Yes, for me it was new.
Q. Now when the State Department did act on these referrals, that information traveled back to DHS, correct?
MS. STROKUS: Objection, your Honor, calls for speculation?
THE COURT: Well I don't know that he knows, but we'll see.
If you know the answer, you may give it.
A. I don't know the process for how it got back to, um -- I don't know the steps it took or the pathway it took to get back to HSI.
THE COURT: That's his answer.
Q. In this case, you were in Tiger Team discussions, consistent with this process, where you understood that

the Tiger Team received updates on whether the State Department had acted on its referrals, correct?
A. Yes, I believe that through National Security Division representatives, um, I believe the team knew if there was an action taken.
Q. An action like an arrest?
A. Yes.
Q. An action like detention?
A. Yes.
Q. Now you said earlier --
A. It did not go through me.
Q. Right.
A. So I'm making a, um, a speculation just from what I saw. But I did not dictate the process or have usability of how the mechanics worked.
Q. When you say it's speculation, but it's also from what you saw, referring to what you saw, you mean the meetings that you heard, whether or not you led them, correct?
A. Well I would hear back potentially from the unit chief or Brad Edder, my deputy, that there had been an action taken.
Q. Well it is not required that the State Department let the Department of Homeland Security know that it's taking an action on a referral, right?

MS. STROKUS: Objection, calls for speculation.
THE COURT: Sustained. Sustained.
Q. In your experience, you often do not learn whether or not the State Department has acted on a referral that HSI has sent, correct?
A. Me personally? No.
Q. And it's your understanding that HSI often is not informed of what happens to a referral that it sends to the State Department, right?
A. You ask me? I'm only speaking for the Office of Intell. HSI? You'd have to ask -- that's the operational part, the investigative part, the law enforcement part of the agency, not the intelligence part. So I don't have visibility in how or when or under what circumstances they would or would not be notified.
Q. And when you say "HSI," the operations part is separate from the Office of Intelligence, are you referring to Mr. Watson of the National Security Division?
A. The National Security Division. The other divisions I mentioned in my deposition, all, um, none of them report to me, um, they all report to the same deputy that I do. So, no, I don't have any authority over them. I don't have, um -- I'm not required to have

visibility of their actions.
Q. Just a moment. (Pause.)
It is your understanding that HSI leadership has had ongoing conversations with State Department employees about the student protesters, correct?
A. It is my understanding that, um, HSI -- members of HSI have had conversations with the Sate Department. I don't know if I'm qualified to make the determination if they're ongoing or at what frequency.
Q. Okay. So this three-step simple process, um, required HSI to reallocate some of its personnel, right?
A. It required me to reallocate some of my analysts, um, because of the workload.
Q. People were moved from the Counterterrorism Intelligence Unit to work on this effort, correct?
A. From the Counterintelligence Unit, the Counterterrorism Intelligence Unit, from the Cyber Intelligence Unit, from the Global Trade Intelligence Unit, from all different parts of HSI intelligence.
Q. And that was, as you say, because of the workload?
A. That's correct.
Q. Now, um, I want to talk about that workload and what it resulted in.
Here hours of labor were generated in response to lists of names of student protesters, right?

A. Yes, but we were working off a number of sources, including lists.
Q. Now you saw a number of sources, but the lists were communicated to you through Derrick Gordon, correct?
A. They were communicated to the leadership, including through the people we mentioned before.
Q. None of the student protester names came to you from any source other than HSI leadership, correct?
A. They always came through, um, HSI, um, yes, leadership positions. We did not get -- I did not get any lists sent to me directly from anyone outside the agency.
Q. These names were given to you. Were they given to you in a written form or verbally?
A. Again, um -- I think most of them were -- I don't know how they were --
Q. If you don't recall --
A. I don't recall how.
Q. Okay.
A. And again, they usually did not go through me either, they went to my deputy or to the team leader.
Q. The names went from Mr. Gordon either to you or to your deputy or the leader of the Tiger Team, is that right?
A. That's correct.

Q. And actually, I understand just now, and I can understand why, you don't recall how the names were transmitted to you. I'd like to see if we can refresh your recollection. So just give me one moment to see if I can find something that might be useful. (Pause.)

Okay, I'd like to show you -- or actually we don't even need to use the screen, because you have a binder. Could you just look for me at Page 88 of the transcript, and would you review just Lines 15 to 22. And when you've had a moment to do that, just let me know that you've done that, and then I'd like to ask you a question.

MS. STROKUS: Your Honor, can I request that we do actually use the screen as well here for the government's counsels' purpose?

THE COURT: You don't have it? Yes, that may be done if it can be done. But you may press on, Ms. Conlon.

MS. CONLON: I can press on. Okay, we'll start putting it up.

(On screen.)

Q. Okay. Does looking at Page 88 refresh your recollection at all as to whether you received any names and requests to generate reports from Mr. Gordon in writing or orally?

A. Yes, in my deposition I said verbal, but when you asked me about it now, I was thinking about the Canary list, which was over 5,000 names, and I don't think we got them verbally.

Q. I will turn to that in a moment.

THE COURT: Wait, I'm now not understanding. The what list, um, over 5000 names?

THE WITNESS: The Canary Mission list.

THE COURT: Oh, the Canary Mission list had over 5,000 names. So it didn't make any sense when you said you got that verbally. You mean someone said, "Here is a list that the Canary Mission has put together?

THE WITNESS: Yes.

THE COURT: I just want to understand.

THE WITNESS: Yes, sir. And actually, um, I need to correct myself, because, um, when I was answering the question I was thinking of the Canary Mission list, which is thousands of names, and I was thinking we would not have gotten that verbally. But actually we, um, the direction was to look at the website and that was a verbal direction, so. I'm trying to recall a conversation from a long time ago.

THE COURT: And I'm equally trying to understand. So here's what I understand.

Because the Canary Mission had a website, you were

directed to take a look at this website for leads?

THE WITNESS: That's correct, yes, sir.

THE COURT: All right.

Q. Okay. The direction to look at the Canary Mission website for its list was given to you in the March meeting that was discussed or was it given to you at another time?

A. I don't recall when it was given to us.

Q. And do you recall who gave you the direction?

A. I don't remember who mentioned it.

Q. Do you recall in what setting you received the direction, like a briefing, a meeting?

A. I don't know.

Q. Okay. But your understanding is that the Office of Intelligence should generate Reports Of Analysis on the names of persons on the Canary Mission's website lists, is that correct?

A. That we should look at the individuals named in the Canary Mission website and, um, in that process, when we look at an individual and do research on an individual, it is our process to do an ROA when we have relevant information and activities.

THE COURT: So that's over 5,000 people, is that right?

THE WITNESS: Yes, sir.

THE COURT: Yeah. Okay.

THE WITNESS: Which shows why we needed a Tiger Team. A normal division, a normal unit or section or group of analysts, um, operating in our normal organizational construct couldn't handle that workload.

THE COURT: Yes. Thank you.

Q. And was there a particular timeframe in which the Tiger Team needed to try to get through this very long list?

A. We are an organization or an agency that, um, in a world where, um, taking months to do things is not acceptable. So, yeah, it -- we were not -- I was not going to be allowed to say we've got 5 -- well you know a small number of analysts on this, it's going to take them 6 months to get through 5,000 names. I was not given a deadline. But I knew from how we were organized and how we worked that we needed to work through this expeditiously.

Q. What is your understanding of why the Canary Missions list was the list to use for this project?

A. It was one -- it was a list that made accusations or, um, asserted a lot of information like, um, these protesters are involved in violent activities, are condoning or supporting violence, possibly even terrorist organizations, and that list was, I think,

visible to -- or known to a lot of people. And because we're one of the agencies that is responsible for investigating this type of activity, as it relates to immigration and customs offenses, it seemed natural that we would get the list and have to review it.
Q. And when you say "get the list," um, is it your understanding Canary Mission provided the list to someone in the government?
A. I don't -- I don't know how we, um, got the notification. I don't know who notified us that this website exists. But I can say that Canary Mission is not part of the U.S. government. It is not information that we would take as an authoritative source or -- and we did not work with the individuals who created the website. I don't know who creates the website. We don't have a relationship with the creators of the website.
Q. You had never, prior to 2025, been asked to specifically review people identified on the Canary Mission website, right?
A. I did not know the Canary Mission website existed until I think after March, March or later of this year.
Q. But you have since then seen the Canary website?
A. I have looked at the Canary Mission website once.
Q. What was the occasion that led you to look at it?

A. I was curious, because I had heard of it.
Q. Do you recall approximately how long ago that was?
A. Maybe March, April.
Q. Do you have an understanding of what Canary Mission does, like, as an organization, what it is?
A. No, I don't have any details on what, um -- only in what type of information was presented on the website.
Q. And in broad strokes, do you understand that Canary Mission identifies people who allegedly promote hatred of the United States, Israel, and the Jewish people?
MS. STROKUS: Objection.
THE COURT: Well on this foundation, I'm going to sustain that. He's told us what he knows about it.
Q. So it's fair to say that what you know about it comes from what's on this website?
A. Yes, that's correct.
Q. Okay. Do you have an understanding of how Canary Mission identifies the people on its website?
MS. STROKUS: Objection, your Honor.
THE COURT: Well I'm going to let him answer that yes or no.
Do you have an understanding?
THE WITNESS: No.
THE COURT: That may stand.
Q. Do you have any understanding of what process they

use or don't to verify the information they put on the website?

MS. STROKUS: Objection, your Honor.

THE COURT: Well you know she's objecting vigorously and there's no foundation for this. He answered no to the last question. He looked at the website once. An understanding? I suppose he might have an understanding if there was some statement from some other person or a source. But this isn't discovery.

MS. CONLON: No, your Honor, I don't want to touch on anything that could be deliberative, but I want to better understand this witness's understanding of the work that he was doing.

THE COURT: I have it.

MS. CONLON: Okay.

THE COURT: Again, this isn't a game, you're trying to persuade the factfinder here. And here's what I'm getting from this witness.

That, um, they got the -- I shouldn't even say "got the list," somebody had access to this website. Somebody, a superior, said, "Look here, check these people out." Well that's not precisely what he said, but the transcript will govern. And he got on it. And that because there's a reference to Canary Mission, he

went and looked at it once and saw whatever he saw. And he's careful to point out, "They're not us." His looking at it told him that they make accusations. And I will tell you, it's significant to me that he said, "We approached it with an independent view," not simply accepting accusations that they got. Now it's not a discovery deposition. I think we've gotten his knowledge. But I'll ask this question.

Have I accurately characterized your testimony? Because I didn't use your words exactly and I was just saying this is what I'm hearing.

Have I accurately characterized it?

THE WITNESS: Yes, your Honor.

THE COURT: All right. I think that's what he knows.

MS. CONLON: And, your Honor, if that's all he knows, that's all he knows. But we heard about a list of 5,000 people on the website. And I appreciate this isn't discovery, but it's news to us that that is how it worked.

THE COURT: Well it's news to me, and I find it very interesting. But I'm telling you what I got from it. And now we've gotten it, so let's move on.

Q. So, Mr. Hatch, um, understanding that you have not spent time looking at the website, have you seen Reports

of Analysis that were generated in response to the directive to look at the Canary Mission website?
A. We, um -- the analysts wrote ROAs on personnel or individuals who are named in the website.
Q. To your knowledge, did the analysts include, in their ROAs, the allegations from the Canary Mission website as relevant -- as information that could be relevant to a potential violation of Title VIII?
MS. STROKUS: Objection, your Honor.
THE COURT: Sustained. The best evidence are the ROAs.
MS. CONLON: And, your Honor, it's ironic because I don't have them and I wish I did.
THE COURT: I understand.
MS. CONLON: But I can't offer them to you.
THE COURT: And we will see about that. Because they would seem, at least with respect to the target individuals, to be relevant. Perhaps they should have been prepared. I've made a ruling now with respect to a subset of documents. It's clarified that I don't have them. I'm wondering about that.
Go ahead.
MS. CONLON: Okay. I'm sorry, I'm getting a correction from somebody. (Talks to co-counsel.) Yes. Okay.

It is our understanding that the Court did receive all 5 of the Reports of Analysis on the targeted individuals in a production -- a document production to the Court on June 11th, that is, um --

(To co-counsel.) I think that's correct?

THE COURT: Well I'll look at what I have, physically.

MS. CONLON: Okay. And for the Court's ease of reference, we understand that to be Docket 131, that docket entry.

THE COURT: Thank you.

MS. CONLON: Okay.

Q. Now, um, you said that the project was to look at this list from Canary Mission. Did the list of student protesters -- it included information of student protesters identified through other means apart from simply Canary Mission?

MS. STROKUS: Objection, your Honor, a mischaracterization of testimony.

THE COURT: Well let me ask this question.

She started out saying how much -- how many ROAs did you look at, and you used the word the "student protester effort," and as you started, I didn't know what you were talking about.

Do we now understand that's the Tiger Team's work

after you got this list? Well I shouldn't even say "got this list," after the list was provided on the website?

THE WITNESS: Yes, your Honor. But the Canary Mission wasn't the only, um, group of students. It was most of it.

THE COURT: Yes.

THE WITNESS: But it wasn't the only way that we received, um, information on protesters. And also there were duplicates, we received information about the same protester from multiple sources. But Canary Mission was the most inclusive of that.

THE COURT: Do you recall other sources? Without revealing investigatory matters.

THE WITNESS: There was another website that does the same thing. I don't remember the name of it. Um, and --

THE COURT: If I suggested "Betar"?

THE WITNESS: That sounds right, sir.

THE COURT: Okay. Go ahead.

THE WITNESS: And then we would get individual names or we could even get a list from a police department if any protesters were arrested. We could get that.

So the list, um, came in from all different directions. The team -- the source of the information

was not necessarily relevant to the analyst, because the analysts were doing factfinding, and the analysts were not reporting, um, that, um -- where the name came from, because They're independent from that. Nor would they -- it's not our standard practice, it's not within policy for us to report other people's uncorroborated allegations or assertions. Everything, like I said before, needs to be collaborated.

THE COURT: So these sources though that you've now identified, as far as my notes, they came down from Mr. Jordan, is that right?

THE WITNESS: Mr. Gordon.

THE COURT: Mr. Gordon. They all come down from him. But of course you're looking at them. And you can see if a police department -- for instance, if it arrested someone at a protest, whether it fit within the scope of what the Tiger Team was doing?

THE WITNESS: Yes, sir.

THE COURT: All right. I think that it's noon. I am -- and I apologize for this, the time is not counted against you, but we'll start promptly at 9:00 a.m. tomorrow morning.

The total elapsed time for the plaintiffs is 2 days, 15 minutes. For the defense, 2 hours, 30 minutes.

We'll recess till 9:00 a.m. tomorrow morning.

We'll recess.

THE CLERK: All rise.

(Adjourned, 12:00 p.m.)

C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Wednesday, July 9, 2025, to the best of my skill and ability.

/s/ Richard H. Romanow 07-9-25
________________________
RICHARD H. ROMANOW Date