UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY
Volume 1, Page 1 to 71

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
Plaintiffs

vs.

MARCO RUBIO, in his official capacity as Secretary of State, et al,
Defendants

*********

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Thursday, July 10, 2025

********

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A P P E A R A N C E S

RAMYA KRISHNAN, ESQ.
CAROLINE DeCELL, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
ALEXANDRA CONLON, ESQ.
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 540-0675
Email: Cgans@shertremonte.com
For Plaintiffs

ETHAN B. KANTER, ESQ.
WILLIAM KANELLIS, ESQ.
VICTORIA M. SANTORA, ESQ.
JESSICA STROKUS, ESQ.
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9123
Email: Ethan.kanter@usdoj.gov
and
SHAWNA YEN, ESQ.
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Email: Shawna.yen@usdoj.gov
For Defendants

# I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PETER HATCH (Continued.) | | | | |
| By Ms. Conlon | 10 | | | |
| By Ms. Santora | | | | |

# E X H I B I T S


EXHIBIT 232................................ 29

EXHIBIT 233................................ 47

EXHIBIT 234................................ 53

EXHIBIT 235................................ 60

EXHIBIT 236................................ 66

P R O C E E D I N G S

(Begins, 9:00 a.m.)

THE COURT: Let me simply repeat, as I have allowed internet access in these proceedings, that if you are accessing these proceedings by the internet, the rules of court remain in full force and effect, that means there is no taping, streaming, rebroadcast, screen shots, or other transcription of these proceedings.

It is very important that you keep your microphone muted, and if you do not keep it muted, I will have to cut you off from access.

Now there's before the Court, and I've reviewed it, the defendants' motion to clarify the July 9 bench ruling. There's no reason to clarify. This is an attempt to cabin in the Court's ruling. The transcript makes clear it applies to all the documents that were furnished, and I stand on that ruling.

Now, again the question, Mr. Kanter, you've complied with the Court's order?

MR. KANTER: Yes, your Honor.

THE COURT: Thank you.

MR. KANTER: All the documents that have been furnished to the government in the subset have been turned over to the plaintiffs before the deadline.

THE COURT: And that was the Court's order. I'm

satisfied with that.

I have also, because it was a matter of issue yesterday, reviewed the documents that I have and I have ROAs for certain of the so-called "targets" here, and the Watson letters, as soon as I can make copies, they'll be turned over to you.

All right.

MR. BIALE: Your Honor, I just wanted to confirm what Mr. Kanter said, and we received a traunch of 18 pages of document. I don't know -- just putting that on the record so that --

THE COURT: Well you may have. You know I really have no reason to, um, impugn anyone's good faith and I'm not starting to.

MR. BIALE: Neither do I.

THE COURT: Please recall the witness.

MS. CONLON: Your Honor, I'm sorry, but before we begin, is there any possibility we could have -- the ROAs are the documents this witness is familiar with, helps oversee the preparation of, and knows about. If there's any chance I can have them before I question him? I don't need a break, if I could have them so I can --

THE COURT: I'm doing the best I can.

MS. CONLON: Thank you.

THE COURT: As soon as we copy them, you will have them.

MS. CONLON: I'm trying to suggest that even if it's in the course of the examination, I would take them if I could, so I can discuss them with him.

THE COURT: And you understand the Court's procedure.

MS. CONLON: Yes.

THE COURT: When I have them, and I have looked at what I intend to give you, I have a good --

Yes, Mr. Hatch, come on up.

MS. CONLON: Thank you.

MR. KANTER: Your Honor, I have one question for the Court.

THE COURT: Yes, while the witness is returning.

MR. KANTER: And this is for the purpose of, um, the consideration by the government to file a mandamus petition.

THE COURT: Yes.

MR. KANTER: And I want to be accurate in the scope of that petition. Because your Honor indicated that it's an order related to the subset that I have turned over and complied with. The most -- what I would like to clarify --

THE COURT: The order did, yes, and I'm satisfied

with your compliance with the order.

MR. KANTER: What my question pertains to is an in-camera submission on June 11th that has documents that are not included in that subset.

THE COURT: Yes.

MR. KANTER: And which, if your Honor has ordered that the privileges covering those other documents have been waived, the government will likely be seeking mandamus to overturn that order.

THE COURT: I have made myself clear on the record, and I think I am only reiterating because the record will govern.

I have said that as to the mass of documents that the government has voluntarily submitted to it, evidently to further its case, I have determined that those documents relating to any changes in Visa applications, because they implicate national security, are privileged. I am treating them as in-camera, which I mean the only eyes on those documents are my eyes. And as to the remaining documents, I have overruled the assertions of privilege. I have ordered the production of certain of them. It seems to me the government has complied.

MR. KANTER: We have, your Honor.

THE COURT: I'm now, um, going to -- and they come

out of what's Exhibits B through K. But you'll have to give me a moment to look it over. They are the ROAs and the Watson letters and such attachments to particular ROAs that existed.

MR. KANTER: Has your Honor --

THE COURT: That does not exhaust the total documents that I have. And as to those I've said -- I think I can reiterate --

MR. KANTER: You said Friday noon was to assert LEP on those documents.

THE COURT: That's correct.

MR. KANTER: Thank you, your Honor.

THE COURT: I said I was in a quandary, and I'm trying properly to manage the case. And that is what I'm trying to do.

MR. KANTER: As to the document over which --

THE COURT: Wait.

MR. KANTER: -- over which --

THE COURT: Wait a minute. Wait a minute.

MR. KANTER: Yes.

THE COURT: I want to start taking testimony, because time counts. All right? We can talk about it this afternoon.

Where is Mr. Hatch?

MS. CONLON: Mr. Hatch was in the hallway. He is

being retrieved.

THE COURT: Well -- but I want to use the time, Mr. Kanter.

MR. KANTER: Yes, I was asking specifically about the indication of the Presidential communications privilege with respect to a report sent by the Agencies to President Trump, as requested in his executive order. The government invoked the Presidential communications privilege. Your Honor held that --

THE COURT: I ordered the documents turned over to me. And as to that -- as to that, I, um, I think I am premature to say I overrule that. You've now identified that. As to that, it's under advisement.

Does that answer your question?

MR. KANTER: Yes.

THE COURT: And as to that, um -- actually I appreciate your correcting me because I accurately restated what earlier I had done. I am again reading these materials, working with them, and reflecting. And as to the document that you just made reference, it's under advisement. I have not overruled the privilege. Nor have I sustained it.

MR. KANTER: At the risk of --

THE COURT: No, the witness is here.

MR. KANTER: Okay, thank you, your Honor.

(Mr. Hatch takes the stand.)

THE COURT: And would you remind the witness.

THE CLERK: Sir, you remain under oath. Do you understand?

THE WITNESS: I do.

MR. BIALE: And, Ms. Conlon, you may continue.

DIRECT EXAMINATION BY MS. CONLON: (Continued.)

Q. Good morning, Mr. Hatch, how are you?

A. Good morning.

Q. Now, um, we talked a bit yesterday about a list of names that you understand came from Canary Mission. I have some further questions about that.

Canary mission doesn't limit the names on its website to immigrants. The list you received, was that only for noncitizens?

A. The list had, um, U.S. citizens on it, um, as well as noncitizens.

Q. And that list of 5,000 names, which included any number of citizens and noncitizens, that wasn't limited to people who, um, were students, correct?

A. Correct, I believe it had faculty, um, and others.

Q. And when you talk about others --

THE COURT: At the end of your -- and "others"?

THE WITNESS: Yes, people that weren't faculty,

weren't students.

Q. For example, the list also included medical professionals, which is another category of people that the Canary Mission catalogs information about, correct?

A. I don't recall any -- any information about medical personnel.

Q. Do you recall information about other kinds of professionals who are neither faculty nor students?

A. No details on it, just that they were present.

Q. The list, um, itself, includes, as does the Canary Mission website, people who are thought to have a variety of attitudes, right?

A. I don't understand the question?

Q. For example, Canary Mission's website is not limited to and does not purport to reflect people who have only pro-Hamas views?

A. I don't know -- I only looked at the website once. So you're asking me to comment on what the website does, and I don't have those answers.

Q. Well I'm less interested in the website, I'm interested in the list.

So the list, which came from the Canary Mission website, as you understand it, it's fair to say it was not, um, culled, before it came to you, to remove people who might not be relevant to your work, is that right?

A. As I understand it, the list was just names of people, um, who are in protests.
Q. When you received the list, if you recall, it was a list someone had created of names as opposed to just a direction to go check out this website?
A. As I understand it, it was a direction to check out the website, and the team went through the website and generated the list.
Q. I see. So when you say a list of over 5,000 names, you're just doing your best to estimate the total number of people who are cataloged on the website, is that right?
A. That were listed on the website, that's correct.
Q. I see. It may be more than 5,000 names, for example?
A. It may be.
Q. Now you said -- you testified that the list -- I asked you why -- why start with this Canary Mission website population of people as opposed to something else for this project? And you said that the list made accusations, included protesters who were accused of having been involved in violent activities or condoning or supporting violence. But I understand you now to have just said, in fact, the effort was just to look at everyone on the list. And you would agree that not

everyone on the Canary Mission website, who was looked at, had been accused of engaging in violence, terrorism, or stuff like that?

A. Yes, I didn't say the website made accusations against every single person on the list. I don't know that. But in general the website was making some accusations. However the list that we looked at was to, um, look at the protesters, again, as I said before, not based on the allegations, but based on what we could find for information relative to violations of U.S. law.

Q. Now just so I'm clear, it was not your understanding that the list included only people alleged to have violated U.S. laws, just that the list was a starting point for the Office of Intelligence to discern whether there was information to support that?

A. Yes, that's what I just said.

Q. Okay. And I guess sitting here you've said that you looked at the website only once, so you're not in a position to speak about the kind of information that the Canary Mission website contained about these people, is that right?

A. Not in any kind of detail.

Q. Okay. The people who actually worked at the Canary Mission website to do this work, those were the investigative analysts?

A. Yes.
Q. Do you recall any direction or limitation given to those analysts about who to focus on among this large pool of people?
A. Um, the direction was to go through everyone we got a lead on, which would have contained the entire list.
Q. Now the list is a living thing, their website is frequently updated. Is that a direction that you received, was it only to look at who was there at a given point in time, or was it time-limited?
A. I don't know. I would suspect -- as they were going through the list, I would suspect that -- I would guess that the analyst would -- or I would say that the analyst would go through everyone on the list, and if there were additions, they would look at additions as well.
Q. A moment ago you used the --
THE COURT: Just let me interrupt, because she's focusing on this Canary Mission, and properly so to her point of view.
But as I recall your testimony, you were clear yesterday that that was not the only source of leads to which this Tiger Team devoted its time, is that correct?
THE WITNESS: Yes, your Honor.
THE COURT: Now I have notes and I have that in

mind. And I wouldn't -- I didn't mean that as criticism, I just want to be clear in my own mind.

But at least 5,000, give or take, you understood, came through this Canary Mission?

THE WITNESS: Yes, your Honor.

THE COURT: Thank you.

(Pause.)

Q. Now I appreciate the Court's clarification and I do want to move, in a moment, to the other sources of leads. But before we do, um, I understand that at least 75 percent of the leads that the Tiger Team looked at came from the Canary Mission website, is that correct?

A. Yes, most of the names came from Canary Mission.

Q. And whether or not you've spent time reviewing the website, you understand that the Canary Mission only purports or sets out to identify people with hatred at or negative views of Israel, correct?

A. I don't know the intention of --

MS. SANTORA: Objection.

THE COURT: Yeah, it's sustained.

MS. CONLON: Sorry.

THE COURT: I don't -- I don't think he knows that.

MS. CONLON: May I inquire as to his knowledge?

THE COURT: You may inquire.

Q. Okay. So understanding you haven't spent time studying the website, you have an understanding of what the Canary Mission organization purports to do, right?
A. No, I don't.
Q. You have no idea whether the Canary Mission purports to identify people with negative views towards countries other than Israel and the United States?
A. I have -- that's not the question you asked me. I have seen that they have done that. I do not know the intentions. I don't know the purpose, the stated intent of the website. I don't know any of the people behind the website. As I said before, the website is not associated with us or the U.S. government. So you're asking me to comment on their intentions and their purpose. I don't know their -- I don't know their intentions or their goals.
Q. Now I understand you can't speak to the people who organize it or what their personal intentions are, but you're given a list as a starting point for research and analysis. You have some understanding of what that list purported to contain of the population of people it's supposed to include. And you have an understanding that it was including people other than those who hold negative views of the United States, Israel, or Jewish people?

A. I don't -- I saw indications of that, but to -- they may have had other intentions that I don't know about, so I can't say truthfully that I know that that's the purpose.

THE COURT: No, no, as I understood her question, her question was, you have some familiarity with the list as it was generated, and I understood her to be asking, um, as you looked at that list, to the extent you did, were there -- not asking about the credibility of accusations or anything, but accusations of conduct other than hostility to the United States, to the State of Israel, or to Jewish people, other people on the list who have other hostilities or concerns?

THE WITNESS: I don't -- I don't know if there were others. I do know, um, what I recall is, um, that there were allegations of, um, anti-U.S., anti-Israel, um, pro-Palestine, pro-Hamas. There may have been other things on there.

THE COURT: Thank you.

Q. And as far as you -- sorry. Strike that.

All you recall about the general views of this group is what you've just described, is that correct?

A. That's correct.

THE COURT: By "this group," you mean the list?

MS. CONLON: Yes. Thank you for the

clarification. Yes, the list.
THE COURT: All right.
Q. Now the list, in terms of the bases proffered that the Office of Intelligence researched, the bases for the claim that any of these people held the views that you described, many of those bases were the people's public speech, correct?
A. Um, more to the bases was from social media or -- yeah, social media.
Q. In other words, something a person might post on their social media website indicating, for example, their support of Palestine, right?
A. That could be one example.
Q. Others on the list were characterized as anti-Israel for supporting boycott, divestment, and sanctions, against the State of Israel, correct?
A. By, um --
Q. Canary Mission.
A. I believe Canary Mission, those are among the allegations that the Canary Mission made.
Q. The allegations included those academics who supported boycotts of Israeli academics, correct?
A. I believe so, but I'm not 100 percent sure about, um, what those comments were. Again, I didn't have the details.

Q. The allegations included people who had spoken critically about Israel's actions in Gaza, correct?
A. Yes, I believe those were, um -- were some of the allegations, or allegations of that general type.
MS. CONLON: Just a moment.
(Pause.)
Q. Okay. Now, um, the Court clarified that Canary Mission was not the only source of names, another source of names that came up briefly yesterday was "Betar U.S.", correct?
A. That's correct.
Q. So "Betar U.S." you described as similar to Canary Mission, right?
A. I had heard it was similar to Canary Mission. I did not look and have not ever seen that website. I don't know any details about that website.
Q. Um, without speaking about its website, you understand that Betar U.S., like Canary Mission, purports to identify people who hold anti-Israel views, correct?
A. No, I don't know anything about that website. I didn't even know it was called "Betar U.S." I just heard "Betar."
Q. Okay. So how are you aware that any of the names came from Betar?

A. One of the, um, I believe the supervisor of the, um, of the team, um, mentioned that list and said that, um, the names looked to be the same as Canary Mission.
Q. In other words, a supervisor identified that certain of the people were -- had been, um, cataloged on each website, both Betar U.S. and Canary Mission, is that correct?
A. Could you repeat the question. I couldn't really hear you.
Q. Yes. And I'll just wait one second until -- okay, we're good.
A supervisor indicated to you that some of the names on the Canary Mission website also appeared on Betar's U.S.'s website, is that correct?
A. On Betar's website, yes.
Q. And are you familiar with Betar's deport list?
A. As I said, I don't have -- I didn't see any list from Betar myself. I had not checked that website. I do not know any details about Betar.
Q. Now back for a moment to Canary Mission.
You said that Canary Mission is itself just a source of names for the research and analysis that the Office of Intelligence was going to do, right?
A. It was a list of names of people -- of protesters.
Q. Right. And you testified that the Office of

Intelligence vetted and corroborated claims in the Canary Mission website profiles of these students, right?
A. The Office of Intelligence did Reports of Analysis and looked at, um, the people on the list. We did not corroborate all the information that was in it. I wouldn't use that term to generalize what we did.
Q. When you say that you looked at the allegations -- and you testified very clearly to the Court yesterday that the Office's research and analysis is independent of, not reliant upon what Canary Mission claims, right?
A. That's correct.
Q. So, for example, if Canary Mission included a description of an academic's research, the Office of Intelligence would endeavor to determine whether the person had in fact done the research as described by Canary Mission, right?
A. Yes, we would not take any leads, information, as fact.
Q. If a person was described on Canary Mission as having written a news article, the Office of Intelligence would endeavor to confirm whether or not the person had in fact written the article, right?
A. As I said, we check all the information. We don't take any leads, information, as fact.

Q. Are you finished?
A. Yes.
Q. Okay. Now in the case of a person alleged by Canary Mission to have written an article that was antisemitic, if that's the allegation, the Office of Intelligence wouldn't make its own determination that the article is antisemitic, because that's a conclusion, the Office of Intelligence would just look at the facts, did they write this article? Is that correct?
A. That's correct. We don't do deliberations. We don't present opinions. We don't make assessments.
Q. So the Office of Intelligence --
THE COURT: Ms. Conlon, I'm talking notes and we'll have the complete transcript, but much of this examination is hypothetical when here we're interested in particular people. I mean I have no problem with the sweep, what types of people, we can look at all of them, or the procedures generally, he's talked about that. But now you're getting into matters that I would think maybe we could talk about this case?
MS. CONLON: Yes, your Honor, and my team is looking at the actual ROAs and --
THE COURT: I understand, and if that's why you're doing it --
MS. CONLON: I'm hoping to return to that, but I

myself have not seen them.

THE COURT: Understood. Understood.

MS. CONLON: Okay. We'll go back in a moment once I've gotten to look at it.

THE COURT: Understand that at some stage my duty is going to be to make findings of fact and generalized statements about procedure unless their relevance isn't going to help me much.

MS. CONLON: I appreciate that, your Honor.

THE COURT: All right.

Go ahead.

MS. CONLON: And I am going to, on the fly, attempt to do my very best to get into the actual facts of these ROAs.

THE COURT: Yes. Go ahead.

Q. Okay. So -- and in sum, what we learn from this, the Office of Intelligence, as you've said, is not a decision-maker about whether a person actually violated a law, but in the role of gathering information that could be relevant to someone else's determination that a person violated U.S. law, is that a fair summary?

A. Can you say that again, please?

Q. Yeah. The Office of Intelligence is not in a position of deciding whether a person's speech or conduct violated any U.S. law, but instead it's just,

um, tasked with gathering information that could help a later decision-maker make that determination, is that fair to say?

A. The Office of Intelligence is not the decision-maker, it doesn't make the decisions, um, and as I just said, collects the facts.

Q. And lastly, on Reports of Analysis.

Reports of Analysis include everything that the Office of Intelligence identified that could be relevant to a determination that a person violated a United States law, correct?

A. That's what was strived to put into the -- that's the purpose of the ROA.

Q. Okay.

MS. CONLON: Let's please put Exhibit B -- well hold on, just a moment, your Honor. I apologize. I just need one second.

(Pause.)

Q. Okay.

MS. CONLON: Your Honor, if we could please put the exhibit that your Honor just gave us, which I believe is identified as Court Exhibit B --

THE COURT: Well, no, that's how it's on the materials I have, but if you have an exhibit, you might as well identify it by, um --

MS. CONLON: Something. Okay.

THE COURT: -- by the date or something.

MS. CONLON: Okay.

MR. KANTER: Your Honor?

THE COURT: Yes.

MR. KANTER: There is a matter about the exhibits that counsel has, um, just referred to. Those exhibits contain law-enforcement privileged information that the government is --

THE COURT: Well I've overruled that.

MR. KANTER: -- that the government is going to log, by Friday at noon, as the Court gave us the opportunity to do and, um --

THE COURT: Well that's not a ground for delay. I'm sorry. I did give you that time.

MR. KANTER: We waived it on June 11th, your Honor, and we brought it to the Court's attention --

THE COURT: I've made my ruling. She may use the document.

MS. CONLON: I am holding here an exhibit that was provided to the Court, which I will mark for identification -- and I need a letter. What letter again? EK. Marked for identification as EK.

THE COURT: Fine.

MS. CONLON: And I have only one copy, so I will

have to provide my one copy to the witness, I think, unless the government has an electronic copy that we could have the Court and the witness --

THE COURT: No, we'll work off papers, and I have a copy, so I'll look over his shoulder, and I'll know what he's looking at, and we can go from there.

(Pause.)

(Puts document on screen.)

MR. KANELLIS: Whoa, whoa, whoa, take it down.

MS. CONLON: I need a way of showing it. Okay, we can take it off the public one, but I need to show the witness and I have one copy to work with.

THE COURT: Just a moment. Have in mind that I'm presiding here.

MR. KANELLIS: Yes, your Honor, I just --

THE COURT: All right? And no one just shouts out orders to anybody in this court. I try not to. And you won't.

MR. KANELLIS: Understood, your Honor.

THE COURT: Very well.

The document is for identification. It is not admitted and therefore it is not for the public. The Clerk can take care of that. And the document may be shown to the witness.

MS. CONLON: Is there a way for me to put this so

only he sees it?

THE COURT: Yes, the Clerk can do that. But for identification.

MS. CONLON: Yeah.

(On witness screen only.)

Q. Okay. Here, I'm showing you, the witness, a document, and I'm endeavoring to have it be that you can see the whole thing. Yes, there you go.

(On witness screen.)

THE COURT: May I help you?

THE WITNESS: Sir, may I have moment to review the entire thing?

THE COURT: Yes. There's no magic to it being clipped together, so feel free to unclip it.

THE WITNESS: Yes. Sure.

(Pause.)

MS. CONLON: When you've had a moment to review it, just let me know. I'm not going to show anyone, I just want to ask you a question about it next.

A. (Looks.)

MS. SANTORA: Your Honor, we were under the impression that these documents were provided to plaintiffs' counsel, attorneys'-eyes only, in which case I don't think it's appropriate for the witness to be looking at it.

THE COURT: I'm going to allow her to use it with the witness.
A. (Looks.)
THE COURT: Mr. Hatch, I'm simply -- feel free to look at anything, but the way I have them clipped together, they may pertain to individuals other than Ms. Ozturk, because I clipped the documents all together. But I think she wants to ask you about Ms. Ozturk and a report -- yeah, why don't you stop there.
MS. CONLON: Yes. Okay.
Q. Mr. Hatch, having reviewed this document, do you recognize what it is?
A. It is a subject profile of, um, Ms. Ozturk.
Q. And when you say "subject profile," that means the HSI subject profile?
A. It's the Report of Analysis.
Q. They are the same thing, the HSI profile and a Report of Analysis?
A. A subject profile is a Report of Analysis.
Q. I see. Is this a fair and accurate copy of the subject profile that the Office of Intelligence created concerning Rumeysa Ozturk?
A. It appears to be.
Q. Okay.

MS. CONLON: I am offering what was EK for evidence as Exhibit 232.

THE COURT: And I just want to be clear, the documents you looked at -- we've both been looking at together, down to Exhibit I, the page that says "Exhibit I," are those pages, is that how they appeared in the, um, report? Does the question make sense? Is that -- there's attachments, for instance. And were those attachments part of that report?

THE WITNESS: I don't -- I don't remember, um, this report specifically, but it would be within policy to include these other attachments.

THE COURT: And, um, as you look at the document, that's the type of material that would, in the ordinary course, be attached to such a report?

THE WITNESS: Yes, that's correct, sir.

THE COURT: All right.

EK is -- with the pages he's identified, may be admitted as Exhibit 232. The defendants' rights are saved.

(Exhibit 232, marked.)

MS. CONLON: And if the Court would permit me to publish it, while we speak about it, so the government and everybody has it. As well as I'm covering, to be clear, personal identifying information that is on it in

terms of Social Security number or anything else.

MS. SANTORA: Your Honor, we object to the showing of the document publicly.

THE COURT: Overruled. It's a public trial. I've admitted it in evidence.

MS. SANTORA: This document, I believe, is confidential pursuant to the terms of the protective order and --

THE COURT: Well, but the protective order is between you and them. I preside. Now they may use it as evidence. The public is entitled to know what I'm going to base my findings on. And it may be used. And if I were to base them on anything else, um -- let me give you an example here, because this troubles me.

I agreed with Mr. Kanter that I may have spoken too quickly in overruling a Presidential privilege. But if that's so, why was the document given to me, the judge who must make the findings of fact? One can only infer from the submission of the document to me that it, one, was relevant, two, it was authentic, and three, somehow it was intended to persuade me of something.

Now if the privilege is upheld as to that document, then I'll be clear as to what I'm going to do, I'm going to set it aside, it won't have any bearing on this case at all.

Now you say that's so here. I disagree. I've made my rulings. I express no opinion on any of this, but I'm going to look at it. As other documents as to which I have overruled the privilege.

MS. SANTORA: Your Honor, if I may? We did submit this document, um, in-camera at your invitation to us to submit it.

THE COURT: Yes, and I've ruled for the law-enforcement privilege, which you have significantly interpreted overbroadly, and I have rejected that.

MS. SANTORA: I just want to reiterate what Mr. Kanter said, that it is our position that this document is law-enforcement privileged and we do intend to submit a privilege log for it on Monday.

THE COURT: I understand that. I understand that and we're going forward. I've said your rights are saved.

Go ahead.

Q. Now, Mr. Hatch, this is Exhibit 232 on the screen. I have put Post Its over things like Social Security numbers that I'm not planning to ask you about. I'd like to turn your attention to the top left corner where it says "Analysis Findings."

Here the first sentence indicates that Ms. Ozturk, who is a Visa holder, is, quote, "A co-author of an

Op-Ed calling for divestment from Israel and associates with Tufts Students for Justice in Palestinian, which was suspended for cause for student intifada," end quote.

What is the reason that her Op-Ed, which calls for divestment from Israel, is mentioned in the analysis findings?

A. Again it's a fact that she wrote the Op-Ed, and the lead was for Ms. Ozturk, so the analyst, um, was presenting information on her. Again I did not write this ROA. I only read it one time. So I didn't -- I did not approve -- I'm not an approver of ROAs. So, um, all I can comment on is policies and procedures --

Q. Are you --

A. -- in general terms.

Q. I'm sorry, I didn't mean to interrupt you. Are you finished?

A. I finished.

Q. You say you're not an approver for ROAs, but you did read this one. And is it true that this one, as part of a sort of development of the three-step process we discussed yesterday, wherein certain ROAs were reviewed by senior HSI leadership before they were actually referred to the State Department for action, isn't that right?

A. That process, as I described it yesterday, was already in place, and we read the ROAs -- the review is a connotation that, um, that -- it connotates to me an approval.

THE COURT: Um, I just need to follow up here.

Do you recall that in the -- in the ordinary course of doing your business, this particular ROA, you've read that, before we gathered in the midst of this lawsuit, is that true?

THE WITNESS: I have read this.

THE COURT: You read it back in the ordinary course?

THE WITNESS: Yes.

THE COURT: So why did this one come to your attention?

THE WITNESS: Because of this process, um, I would see the ROAs in the, um -- within the process at times. I didn't see all of them. What I saw was a few of them, um, especially at first. And, um, and it looks like this one was written in March.

So, um, at that time I wanted to -- I actually wanted to make sure that the process was working, that the analysts were providing information, and that the analysts were doing what was, um -- what we wanted them to do.

Q. Now -- I'm sorry. The Court.

THE COURT: And so you read it, and in accordance with your view of the processes of your office, you thought that this followed the processes of your office?

THE WITNESS: Yes, I thought this was within policy for us.

THE COURT: Yeah. And so you sent it on to Mr. Watson?

THE WITNESS: No, I did not send it on to anybody. Again, I was not, um --

THE COURT: Well somebody sent it on?

THE WITNESS: Somebody sent it on, yes.

THE COURT: So I don't want to put any words in your mouth.

So after you reviewed it, what did you do, if anything?

THE WITNESS: Um, allowed it to go through the process. I didn't stop the process because of this ROA, I think that's a better way to characterize it.

THE COURT: All right. So if we analogized it to the papers that pass across my desk, there are many thing that I look at and put in an out-box which signifies to the appropriate person that this is okay, take the next step, whatever that may be. Is that a proper characterization of what you did?

THE WITNESS: Um, it's closer but, um, that implies that you made a decision that there was, um -- there was an in-box and an out-box. The only situation I would be in would be to say, "No." "Stop." "Hold." If I don't say anything, then it goes through the process.

THE COURT: I follow.

THE WITNESS: So only a negative action from me maybe is the best way to describe it.

THE COURT: And so it would be fair, in this case, to say you took no negative action?

THE WITNESS: I took no negative action, sir.

THE COURT: Thank you.

Ms. Colon, go ahead.

Q. Thank you, um, and that clarification is helpful, but I'm still stuck on one thing, which maybe you can help me with.

In the ordinary process -- not the special three-step process, but the ordinary process, ROAs were not normally reviewed by you and other senior HSI leaders before they were released into the State Department, correct?

A. That is correct. But we do read -- it is not correct to say that, um, we don't read ROAs, or, um, that, um, we don't discuss ROAs in other processes. But

in none of those processes are we, um, approving ROAs. I just would not characterize it as an "approval process" like they're trying to -- like you seem to be connoting.

Q. I understand that there are circumstances under which you, or other senior HSI leaders, have at one time or the other read an ROA before it went outside, but it's correct, that as a matter of course, that is not something you do?

A. We don't, um -- we don't typically, um, review or read all ROAs done by personnel, so.

Q. Mr. Hatch, not all ROAs. Isn't it true that as a matter of course you do not read ROAs before they go outside the Office of Intelligence?

A. Yes, that is true, that I don't read ROAs normally before they're sent to an agent or sent to, um, a program.

Q. But for this review, the three-step process that the Tiger Team was engaged in, you and other senior officials in HSI reviewed some of the ROAs, including this one, right?

A. We read some of the ROAs, yes.

Q. And it wasn't just you that read them, it was Derrick Gordon, correct?

A. Um, yes.

Q. William Walker?
A. Yes.
Q. Robert Hammer?
A. Yes.
Q. Roy Stanley?
A. He was the team lead.
Q. And I understand there was an additional layer of review, and tell me if this is part of the normal process or not, wherein the ROAs were informally sent to a Special Agent in the National Security Division, then back to the Office of Intelligence, reviewed by you and senior leadership, and then formally referred back to the National Security Division, and only in this process, isn't that correct?
A. The Special Agent was part of the team, so it wasn't sent -- the Special Agent was working with the analyst.
Q. So the office that was to receive the report, in this instance, also participated in developing the report, is that correct?
A. They helped supervise the team.
Q. Apart from -- moving away for a moment from this sort of extra layers of review, the process, when you participated in discussions about these particular ROAs in this new process with other HSI senior leaders, the kinds of considerations you made, or were supposed to

make, were has there been a violation of the law or was there information relevant to a violation of the law, correct?
A. That is the instruction given to the analyst.
Q. But that wasn't just the instruction for the analyst, that's what you, and the senior HSI leaders, sought to do when you sat together and looked at certain of these ROAs before referring them to the National Security Division, correct?
A. That was our intent to, um, to focus on violations of law.
Q. And you had specific discussions with other HSI senior leaders about ROAs on the student protesters produced in this effort before they were sent to the National Security Division for a formal referral, correct?
A. Yes, we did.
Q. Discussions of the activities that were cited in the Reports of Analysis that you all reviewed, correct?
A. Yes, we were discussing the ROAs.
Q. And to be clear, it's not ordinarily the case that the National Security Division, which receives a Report of Analysis from the Office of Intelligence, is involved in the developing of that report, overseeing of that report, it ordinarily just relies on the report and

sends it to NSD, correct?
A. It is common for analysts and agents to work together, but the analyst does write the ROA.
Q. Now here you specifically recall reviewing Ms. Ozturk's ROA, right?
A. I have read this ROA twice, once today and once back in March.
Q. And when you read it back in March, that was in a meeting with other senior HSI leaders, right?
A. Yes, it was.
Q. Now turning to the actual ROA.
I asked you, and I'll ask again, because I don't think I understood the answer, what possible violation of U.S. law is the fact that Ms. Ozturk co-authored an Op-Ed about divestment from Israel relevant to?
A. Again, the analyst who wrote this, um, was given the task of, um, of producing information or finding information, um, relative, um, to the protest. And so getting -- again, getting the facts on this person and whether they may be related to the law is the emphasis. But getting the facts on the person and what this person did builds the -- builds the understanding of the individual.
Q. So the analyst would include the facts I'm seeing here as part of their effort to gather information

relevant to the student's participation in protests, is that correct?
A. The -- the student's participation in protests, his contacts of what the individual did or did not do, and whether or not they were in any position to, um, conduct some activity.
Q. So to -- one second. (Pause.)
So you looked at this ROA. You saw that in the analysis findings the only activities cited about Ms. Ozturk's involvement in protests are, one, that she co-authored an Op-Ed calling for a divestment from Israel, and, two, that she associates with Tufts Students for Justice in Palestine. What made you think that here there was any indication that Ms. Ozturk had potentially violated a United States law?
A. I did not make that determination. That was not my job as the Assistant Director of the Office of Intelligence, was to supervise the analyst. I was not making the decision on determinations.
Q. I appreciate that you're not deciding that she did in fact violate the law or deciding that her Visa should be revoked, but the Office of Intelligence collects the facts that are relied upon by all the leader decision-makers to determine whether a violation of law has occurred. And so I'm asking you, as a person who

runs that office, when you look at the ROA in front of you, what do you see here that is, um, to you, potentially indicative of a violation of U.S. law?

A. I don't make those determinations. I'm not a Special Agent. I'm not an attorney. I don't work for the State Department.

THE COURT: That's his answer. Move on.

MS. CONLON: Yes.

Q. Now this ROA itself has a few additional pages. I'm going to, um, not -- I'm not going to remove the Post Its because I want to protect Ms. Ozturk's personal identifying information, but it's fair to say, because you can see the version in front of you that doesn't have any Post Its on it, that nothing in the part that I've covered is relevant to the law-office findings of an allegation of violating U.S. law, right? The parts that are covered have her Social Security number --

MS. SANTORA: Objection, lack of foundation.

THE COURT: No, he's looking at it. The document speaks for itself. So he can see it. And without characterizing what's there, counsel.

The parts that she covered in examining you, and you see the whole document, none of that has any relevance to the investigation beyond identifying a particular person, so we're clear who we're talking

about, is that right?

THE WITNESS: Yes, sir, there is information in the ROA that is for context, for understanding the individual, um, it includes details that, um, have biographical, and don't point to a violation of the law, but provide context for understanding that individual.

Q. And the same is true for the next page, which I'm putting here, which has Ms. Ozturk's travel history, right, that's part of the effort that LI makes to document biographical information about a person that might be relevant, right?

A. That's correct.

Q. Now I'd like to turn to the next page. This page here. (On screen.) It says "Social media and open sources." And the only social media listed here is a Canary Mission profile of Ms. Ozturk stating her participation in anti-Israel activism in March of 2024, is that correct?

A. It does.

Q. And the entire Canary Mission profile for Ms. Ozturk was included as an attachment to the Report of Analysis, correct?

A. It appears so.

Q. The other thing that was included as an attachment was an article that Ms. Ozturk wrote for the "Tufts

Daily," correct?
A. (Looks.) It does.
Q. That is, as I understand it, the Op-Ed referenced by the Canary Mission profile. So I'm going to put this here. (Moves on screen.) Sorry. Here we go.
Do you see where it says -- hang on. Sorry. I'm missing a page.
(Pause.)
MS. CONLON: Hold on.
Q. I'm going to go back actually to the actual Canary Mission profile. (On screen.) Okay, got it. Okay, I'm being told that you can't see it on this printout here, but the Op-Ed is linked in a drop-down on the Canary Mission website. And then I actually have the Op-Ed here. So I'm going to turn your attention to that.
This Op-Ed is the Op-Ed that was written by Ms. Ozturk, correct, cited by Canary Mission?
A. It appears to be.
Q. No, that's the wrong one. Dear Lord, I'm sorry. Doing this on the fly is proving to be a little tough. Okay, here we go.
THE COURT: I'm not sure what this adds?
MS. CONLON: I'm sorry?
THE COURT: I'm satisfied -- the government provided this. I'm satisfied that this is authentic.

And I asked him a question about what pages went along with the facing page, and he said that it appears that the other pages go along with that facing page.

What are we adding?

MS. CONLON: Well, your Honor, in candor the government wouldn't even stipulate that Ms. Ozturk wrote this Op-Ed, so I just want the record to be clear.

THE COURT: The case is being tried to me.

MS. CONLON: Okay. If the Court accepts that, then we can move on.

THE COURT: No one accepts it, I accept that it exists, and that this appears to be the authentic and complete -- I -- the complete ROA.

So far as you know, it's the complete ROA, is that right?

THE WITNESS: That's right.

MS. CONLON: Thank you.

THE COURT: It's always a question whether as factfinder I believe him, and I'm not permitted to say yet. We'll see the whole sweep of the exhibits. But I understand the testimony.

MS. CONLON: Okay.

Q. So it's fair to say that this ROA on Ms. Ozturk includes no allegations about her protest activity apart from what's on the face of it, in other words you're not

aware of anything missing, any other basis for the HSI to think that she had additional involvement, is that correct?

A. I believe this is what the analyst could find related to Ms. Ozturk.

Q. Okay. All right.

MS. CONLON: Thanks. And you can take that down.

(Pause.)

THE COURT: Are we done with the questions as to Ms. Ozturk?

MS. CONLON: As to Ms. Ozturk, yes.

THE COURT: Then maybe he can give me back those pages.

MS. CONLON: Yes. Sorry.

Q. Now I'd like to turn your attention to another document, and the Court, I believe, has a copy. And I'm sorry to deprive the Court of what may be its only copy, but I would ask that the witness be given the pages concerning Mahmoud Khalil.

THE COURT: Let me do that.

(Pause.)

MS. SANTORA: Your Honor, for the record we would like to preserve our objection with respect to the --

THE COURT: Oh, I think that's fair, you have a continuing objection as to each of the documents I have

provided this morning, on all the grounds you've articulated both in writing and, um, orally, not only today, but in the course of this proceeding.

MS. SANTORA: Thank you, your Honor.

Q. Have you had a chance to skim the document that is -- oh, he doesn't have it yet. Sorry.

(Judge gives documents to witness.)

THE COURT: Now that's the government's, um, not you, but start on the next page. No, no, keep going.

May I have the page before that?

(Hands to judge.)

THE COURT: Okay. For ease of the government following, I'm giving him the pages that were denominated of what was submitted as Exhibit E. They were proceeded by Exhibit D, which appears to be the Andre Watson letter.

Go ahead.

MS. CONLON: Thank you, your Honor.

Q. Okay. Mr. Hatch, do you recognize what I'm going to, for the record, premark as EO, the document in front of you?

A. It is the subject profile from Mr. Khalil.

Q. Does it appear to you to be a true and accurate copy of the subject profile that the Office of Intelligence prepared on Mr. Khalil?

A. It appears to be.
Q. Does it appear to you to be a complete profile of Mr. Khalil?
A. Again I only in read this one once. It appears to be, but I'm not -- I'd have to see our document.
MS. CONLON: At this time I would ask to move into evidence what's been premarked as EO, as Exhibit 233.
THE COURT: I understand the government to object. I think the foundation is sufficient. Overruled. It's Exhibit 233 in evidence.
(Exhibit 233, marked.)
Q. Now I'm going to show you the first page, and again here I've put Post Its over the personal identifying information that I don't intend to ask you about. The top of the report says "Analysis Findings."
Is that meant to capture everything that follows or does that refer only to the two bullets that appears right underneath the header?
A. The two bullets underneath the header.
Q. Okay so the findings for Mr. Khalil relay that he became a lawful permanent resident, correct?
A. Can you -- can you ask your -- the previous question again?
Q. The findings for Mr. Khalil indicate that he is a lawful permanent resident, correct?

A. No, I'm --

THE WITNESS: Sorry, your Honor, I'm confused. Can you start over? Please ask the question one more time, I wasn't -- you didn't have my full attention. I was looking at the document.

THE COURT: Her more general question was, the portion above the picture is the total findings of the examiner including in the report as to Mr. Khalil, the factual findings as to Mr. Khalil, that's how I took her question, is that right?

THE WITNESS: Not exactly. That paragraph, the analysis findings paragraph, is kind of what, um, those two bullets are, um, kind of a way for a person to read and get key details quickly. The entire document is the research and analysis, the totality of the research and analysis. It provides a partial summary so that the reader can get an understanding very quickly of what we're talking about and what the situation is.

Q. It's like the "headlines" basically?

A. Basically, yes.

Q. Okay. Now the categories that are covered are under the headline of "Biographical Information" and other such categories. I want to move to what is the third page of Exhibit 233, the category here is "News Articles." Now you don't have the benefit of having the

actual articles in front of you, and neither do I, so I'm not going to ask you what they say. However you are an expert in the Report of Analysis process.

Can you explain why these articles would be relevant to a Report of Analysis about Mr. Khalil?
A. Again, providing context for the -- for the individual who was in the lead -- who was the subject of the lead, um, it appears the analyst was, um, trying to get an understanding of his activities.
Q. Now you said it helps to provide context. The third bullet here actually is Mr. Khalil's Canary Mission profile, is that right? Do you see where it says "canarymission.org/individual/mamoud_khalil"?
A. It does appear that that's from Canary Mission, a source of Canary Mission, or --
Q. The italicized language that appears in this page, these are excerpts from articles that the analyst has highlighted as particularly relevant, is that correct?
A. It appears to be that the analyst highlighted where "Khalil" was mentioned.
Q. In other words, your understanding about -- at least how it ordinarily works, is that an analyst pulls out the relevant portions of sources that it is including as those sources relate to the person that the report is about?

A. Yes.
Q. I'm going to turn to -- and just so we're clear on this, the sources here, so we have an article from the "Wall Street Journal," the "Guardian," Canary Mission, and at the bottom we see "The New York Post"?
A. I see "The New York Post."
Q. Okay. And I'm going to put the next page in front of you and give you a second to -- oh, you have it in front of you already, to just take a look. This last bullet at the top of the next page I think is a continuation -- but tell me if I'm looking at it incorrectly, of what was from "The New York Post" article. Is that a fair understanding of it?
A. It appears to be. (On screen.)
Q. And here you see where it says that Mr. Khalil told the "Columbia Daily Spectrum," reading from the top, that he didn't participate in protests because he was worried about losing his Student Visa status that lets him be in the U.S.
What is the relevance of that to the context here?
A. Again, it's just a news article on him.
Q. You agree that the only articles we're seeing about Ms. Ozturk or Mr. Khalil are ones that relate to protests of Israel and Palestine and not any other topic, right?

A. That's correct.

Q. Um, okay. Just a moment. (Pause.) Okay. I'm going to -- and I guess lastly, you can see here the last category appears to be social media. There is an Instagram posting of a news clip -- that is an ordinary thing, I take it, to include in a Report of Analysis, an Instagram post, for example?

A. It could be.

Q. It could be. Okay. I'm going to move to another profile because I think the profile --

THE COURT: Well since we're working off paper copies, if he could give me that back. (Hands to judge.)

And the next one is who?

(Pause.)

Q. Okay.

MS. CONLON: If the Court could please give -- and thank you for your help, Mr. Hatch the document -- the pages concerning Badar Khan Suri.

THE COURT: All right.

(Hands to witness.)

(Pause.)

Q. And when you've had a chance to -- oh, you don't have it yet. Sorry.

(Pause.)

THE COURT: These are the documents, um, tabbed Exhibit K in the government's submission to the Court, so we're clear. The first page is not the file itself.
Q. I'm just going to give you a moment to look at that.
A. (Reads.)
Q. So you're reviewing right now what I'd like to have marked as -- EN for identification.
THE COURT: It may be so marked.
Q. Do you recognize this document?
A. It appears to be the ROA for Mr. Suri.
Q. Does this appear to be a true and accurate copy of the ROA for Mr. Suri, so far as you can tell?
A. It appears to be, so far as I can tell, not being familiar with this ROA, only having read it once.
Q. But you recall reading it, um, at some point before today, correct?
A. Yes.
Q. And you read it in the same context in which you read Ms. Ozturk's and Mr. Khalil's, which is to say in a meeting with senior HSI leadership, correct?
A. I do not recall where I read this one.
Q. Okay. And it appears to you, as you page through, to be the complete Report of Analysis from Mr. Suri, is that correct?
A. It looks like it.

MS. CONLON: We offer what has been premarked as Exhibit EN for identification as Exhibit 234 into evidence.

THE COURT: The government objects and its rights are saved, but the objection is overruled. It may be admitted, EN is admitted, Exhibit 234 in this proceeding.

(Exhibit 234, marked.)

MS. CONLON: Now I'm going to put this up in a second, I'm just covering any biographical, sensitive information, so I apologize. Just a moment.

(Pause.)

Q. Okay. So this page here, Page 1, for Mr. Suri --

MS. SANTORA: Your Honor, I'm so sorry to interrupt, but I don't think the government has that document, um, in the packet that was handed to us. He said it was Exhibit K, our packet stops at Exhibit I.

THE COURT: The law clerks may -- confer with her, um, with Ms. Conlon.

(Pause.)

THE COURT: Ms. Santora, also confer with Ms. Belmont, the Clerk, because you should have everything that she has, in the exactly the same form.

(Confers.)

Q. So just to confirm for the record, the government

does have it?

THE COURT: Well now they do.

MS. CONLON: Thank you.

Q. So this ROA for Mr. Suri has more information in the analysis binder than the others we've looked at, right?

A. It does.

Q. It cites here that Mr. Suri is married to a person who is the daughter of a person who is or was a senior Hamas figure in Gaza, is that right?

A. It appears to say that.

Q. And it says that Mr. Suri, according to open source reporting, spreads Hamas propaganda and promotes antisemitism on social media, right?

THE COURT: Well it's in evidence now, it speaks for itself. I can speak and read.

MS. CONLON: I want to ask him about that.

THE COURT: Then why don't you ask him about that.

Q. Where it says "open source reporting," that means there has been reporting in sources online that the government identified?

A. Yes, that's usually what "open source" means.

Q. I'm wondering if it's a term of art or if I'm misunderstanding something. So just to confirm, "open source reporting" means sources online have reported these claims about Mr. Suri, correct?

A. "Open source" usually means press reporting.
Q. Press reporting. Okay.
So turning to the press reporting here, which I think starts on Page 4.
A. (Looks.)
Q. There is -- just making sure you can see it. Okay.
Page 4, there's a Twitter posting included here, by someone else, not Mr. Suri, another person, Anna Stanley, with claims about Mr. Suri. Is that an example of "open source reporting"?
A. (Looks.) It could be.
Q. In other words, social media, in Reports of Analysis, doesn't have to be limited to the subject's social media, it can include things about the subject on social media, correct?
A. It can, yes.
Q. And in this instance the open source reporting about Mr. Suri from social media includes something by someone who isn't him, correct?
A. That's correct.
Q. Now -- just a moment.
A. One correction. One addition to that.
Q. Yes.
A. I'll note that the analyst properly included where the post came from, who posted it, um, and it looks like

it factually represented what was posted and the details.
Q. Yes. In other words, the analyst didn't suggest this is what the analyst thinks, the analyst made clear this is what somebody else has said?
A. That's correct. And the analyst did not say that that's what the government thinks or did not recommend anything from that, just put the fact that there was an article or a post and this is what it said and this is who it is said by.
Q. Yes, and that is the only sort of job as the ROA, that is what it's supposed to do?
A. That's correct.
Q. Now in the next page of this, at the top, um, here, it says "Khan Suri appears to post pro-Palestinian content." That is not an excerpt from social media, that is a characterization by the analyst about the nature of Mr. Suri's online postings, correct?
A. Again, you'd have to ask the analyst. I don't know -- again it says "It appears to post pro-Palestinian content." So, yes -- and it looks to be that that was written by the analyst, from the context of this report.
Q. That's all I wanted to confirm. I appreciate that you don't know what the content is. But just to be

clear, like if it were an excerpt, it would be in italics with a quotation mark. This text here, below the Instagram link, is actually something written coming from the analyst, not an excerpt or quotation from someone else?
A. It looks like it.
Q. And the -- what's listed as social media includes things other than, um -- you know includes things other than posts on like social media websites. So it includes things here, for example, about his work profile in the Georgetown website.
Is that, in the ordinary course, something that gets included?
A. Yes. We're collecting information about -- or reporting information about the individual, to understand the, um -- the, um, details about the individual.
Q. And on the next page, in addition to exploring -- the page before, that we just looked at, had descriptions about his research, and here on the next page there's a description of the course he's teaching from some website "Corsical."
So in a Report of Analysis, it's relevant, on a faculty member, what course they teach?
A. Again, we also put what car he drives or where he

lives. It provides information to understand the individual and what that individual does.

Q. Well just a moment, and I don't want to quivel, but there's nothing in here about, for example, what car he drives, right? I mean you don't know, from looking at this, if this man has a driver's license or drives a car, right?

A. As an example, I put car information and residence and other types of information in the ROA.

Q. But there's nothing in here about his hobbies, right?

A. I don't see anything like that.

Q. There's nothing in here about how he spends his time on the weekends, right?

A. There doesn't appear to be.

Q. Because this is only collect information pertinent potentially to a violation of law, right?

A. That's correct.

Q. And in this instance, for a professor, what was potentially pertinent were articles about his scholarship, his course posting at his university, and things that other people wrote about him on the internet, right?

A. This is what the analyst could find.

Q. And this is all they could find?

A. I would assume so.
Q. Okay.
MS. CONLON: I would ask that the Court please provide Mr. Hatch with the pages concerning Mohsen Kadar Mahdawi, and we're done speaking about Mr. Suri.
THE COURT: And then what?
MS. CONLON: I'm done with Mr. Suri's pages, so I was suggesting maybe they be returned to the Court.
THE COURT: Yes, and Mr. Hatch will do that while I'm finding Mr. Mahdawi.
MS. CONLON: Yes, Mr. Mahdawi.
(Pause.)
THE COURT: And so we're clear, I'm giving the witness the pages that the government has denominated Exhibit G in the submission to the Court.
And if you'll return what you've got. Yes, thank you. (Witness returns pages.)
Q. Okay. When you've had a moment to take a look, just let me know.
A. (Looks.) Okay.
Q. Now I'm showing you what I'd like premarked as EN for the record.
Do you recognize this document?
A. It appears to be the Report of Analysis on Mr. Mahdawi.

Q. Does it appear to be a true, accurate, and complete copy of that document as far as you can tell?
A. As far as I can tell, it appears to be.
Q. Okay.
MS. CONLON: I would like to offer this into evidence as Exhibit 235.
THE COURT: The government objects. It's rights are saved. The objection is overruled. The document may be admitted, Exhibit 235 in evidence.
(Exhibit 235, marked.)
Q. Okay. I'm showing you this first page. Here, again, we have the highlights and the analysis findings, which in this instance seem only biographical.
And a question for you. Is that typically the case?
A. That the analysis findings only include biographical information?
Q. We've seen kind of a mix as we look through these, and in some instances there's some indication of why the person is being examined and in some it's just here's when they came, here's their status, and I'm wondering if there's any sort of rhyme or reason into what goes into that section of the report?
A. It's just a summarization of the information they found. I don't know the answer to that.

Q. Okay. Fair enough.

Turning to -- and, Mr. Mahdawi, sorry, before we go on, he's a lawful permanent resident, as you see at the top.

I take it there's no difference in the type of Report of Analysis prepared whether the person is a Visa holder or a lawful permanent resident, is that correct?

A. We don't have Reports of Analysis categories based on those types of considerations.

Q. Okay. The process is the same?

A. Yes.

Q. Okay. Now I'm going to direct your attention to the third page, and I'm going to skip Page 2, which has lots of identifying information, but the third page does not, it has -- this is the section on social and open sources.

And my first question is this. Drawing your attention to the bullet on the left where it says, "has the Twitter X post." It includes the post claiming that Mr. Mahdawi is pro-Hamas based on an appearance he had on "60 Minutes."

You'd agree with me that there's nothing in the report indicating the analyst reviewed his appearance on "60 Minutes" to determine whether the Twitter post characterized his appearance accurately, right?

A. I --

THE COURT: I didn't understand the question.

MS. CONLON: Sorry, I'm going to break it into multiple parts just so we can all be on the same page.

Q. So first what we have here on the left is a Twitter post by someone else accusing Mr. Mahdawi of being pro-Hamas based on remarks he's alleged to have made on "60 Minutes," correct?

A. Yes, it appears to be.

Q. There is nothing in the Report of Analysis indicating that the analyst reviewed his appearance on "60 minutes" to determine whether what this person on Twitter said about him was correct, do you agree with that?

A. I don't see anything about the -- I don't know if the analyst reviewed "60 Minutes" or not.

Q. And is it, in the ordinary course, is that -- I'm trying to understand sort of the extent or the depth of the look that's given by the analyst.

Is it enough for the report if the analyst just indicates "Here is what someone else has accused this person of?" Is that --

THE COURT: Enough for what?

MS. CONLON: For the purpose of following the policies and guidance about making an ROA. Like is that

all that's expected?
A. Just on the circumstances you've given me, and in that scenario, I would have expected the analyst to have reviewed the "60 Minutes" report. However, as long as the analyst properly cites this was what it was, it was a statement made by a person about a video they had seen related to the individual, it's not a judgment call from the analyst, it's what they found.
Q. I understand that, that the analyst is not superimposing their characterization of it, they're just reporting what someone else says. But I'm concerned that the only information that's used later by decision-makers is what's in the Report of Analysis --
THE COURT: With all respect, Ms. Conlon, your concerns are not dispositive.
MS. CONLON: Sure. I'm sorry. I'm just trying to explain my question. But I can just be more direct.
Q. At least in this instance for Mr. Mahdawi, there's no indication on the face of this report that anybody reviewed any of the underlying materials that are being characterized by other people on social media, isn't that correct?
A. I don't know if you can make that characterization. I can't look at this and say the analyst -- that they may have looked at the "60 Minutes" report and, um,

found something or found nothing. They -- I can't make the judgment that you assert.
Q. If a person had looked, an analyst had looked at the "60 Minutes" report, wouldn't you expect them to include, in the report, whether or not that is what happened, whether or not the allegation was true?
A. I would have expected that. But again, if I'm looking at this, um, the ROA, and like you said assessing the -- whether or not the analyst followed policy, I see here that the analyst properly, um, wrote "sourced the material," and showed whoever reads it that this is just a claim somebody made about reading the report. So you could take this report and say, "Okay, the next step is to read the -- to actually look at the '60 Minutes' report," or again that's the other side of this on how the ROA is used. I'm assessing the ROA as to whether or not it's within policy, did the analyst do their job.
Q. So from your perspective -- or withdrawn.
It's not the Office of Intelligence's responsibility to take what you have identified as a potential useful next step, that's not the Office of Intelligence's responsibility, is that correct?
A. In a scenario like this, I or one of the supervisors could have asked the analyst, "Did you look at the '60

Minutes' report?" And I don't know if that happened. I don't recall if that happened. But that's the -- yeah.

Q. You don't recall -- you did review this one, but just to be clear, you don't recall whether you received any information not contained within this report about Mr. Mahdawi, correct?

A. I don't remember -- I don't -- I know that I read the report. I don't recall any actions taken from this report.

Q. Okay.

MS. CONLON: One second.

(Pause.)

MS. CONLON: Okay. And I think we can hand back to the Court the paperwork on Mr. Mahdawi, and I have one more Report of Analysis that I'd like to show you. If the Court would please provide Mr. Hatch with the Report of Analysis on Yunseo Chung.

(Pause.)

THE COURT: And I've given Mr. Hatch the documents that appear, and the government's designation, when submitted to the Court, as Exhibit C.

MS. CONLON: And I'm going to ask that the document be premarked as Exhibit EO for identification.

THE COURT: It may be so marked.

(Pause.)

Q. Do you recognize this document?
A. It appears to be the Report of Analysis for Ms. Chung.
Q. And does it appear to you to be a true, accurate, and complete copy of the Report of Analysis on Ms. Chung?
A. It appears to be. Again, the same comments as before. I think I read this one once.
MS. CONLON: Your Honor, I'd like to offer what was premarked as Exhibit EN -- EO rather, into evidence as Exhibit 237.
THE COURT: The government objects under its continuing objection to these, and its rights are saved, but overruled. The document may be admitted and marked Exhibit 236 in evidence.
(Exhibit 236, marked.)
Q. Now I'm going to show that you this exhibit, so you know what we're looking at.
A. (Looks.)
Q. This is a Report of Analysis on Ms. Chung, who is a legal permanent resident, and that is all that's in the headline of her report, right?
A. The report says she's a legal permanent resident.
Q. Okay. Now I want to turn to the substance of it in terms of the information about her activity. (On

screen.)

Here there are two news articles on this page and there are some notes from the analyst about the news articles above the excerpts about the article -- from the article. So turning your attention to the first one from the New York post.

Am I correct that the text that appears below the link where it says -- it describes her as being part of the protest, that is text that was put there by the analyst, and what appears below it is a quote from the article, is that right?

A. That's what it appears to be.

Q. And then again, on the next bullet, the same thing, right? This text here, the nonitalicized text under the link, that's the analyst's input, correct?

A. It appears to be from the analyst.

Q. Okay. And I don't want to put the first page -- I don't want to take the Post Its off this first page, so I'm just -- but I do need to look at it, so I need to direct your attention back to the first page.

There's a section on the first page that says "Criminal History," right?

A. Yes.

Q. And it lists three charges that were apparently related, it would seem, to the protest, is that correct?

A. I don't -- I don't know if I can make that judgment. I see the charges.
Q. The charges have the date -- there's a parenthetical after them that says "March 2025," that would be something that the analyst inputted, is that right?
A. Yes, that would be.
Q. And there's a description of the charges, but no indication of their status, is that correct?
A. That's correct.
Q. In other words, we can tell from this report that she was accused of disorderly conduct, trespass, and obstructing governmental administration, in the second degree, and that those charges were made in the New York County Criminal Court, is that correct?
A. That's what it says.
Q. But you couldn't discern, from looking at this, whether those charges were dismissed, is that right?
A. I cannot.
Q. If the charges had been dismissed or were later dismissed, does the ROA get updated to reflect that or once the ROA's made and goes out the door, that's the end of it?
A. It is our policy for ROAs to be updated.
Q. Okay. And this ROA, the published date at the bottom, that is the date that it was created, March 6th.

If it had been updated, would there be a second date on it?
A. There usually would be.
Q. It would appear -- would you see only one date, the most recent, or do you see ordinarily the original publication date and then a date of the revision or amendment?
A. It could be both.
Q. Okay.
MS. CONLON: One second.
(Pause.)
Q. Now, um, the five -- and you can put that aside, I don't expect to ask you more that requires you to look at the documents. I hope not to.
The five reports -- oh, sorry, your Honor, I think he's --
THE COURT: Yes. I'm sorry.
Q. The five reports that we've looked at, um, they are -- are they representative of the reports that you saw produced by the Tiger Team on the protestors as part of this effort that began in March?
A. Representative in what way?
Q. Um, is there anything special about --
THE COURT: I understand that question, and it occurred to me.

Are these typical reports?

THE WITNESS: They're typical subject profiles.

THE COURT: Okay.

Q. And is there anything different about these five subject profiles that you recall from the other subject profiles that you saw produced by the Tiger Team?

A. No, not substantially.

THE COURT: Much more for this witness, Ms. Conlon?

MS. CONLON: A bit more, your Honor, but not much. But more than 5 minutes.

THE COURT: Would you like to take the recess?

MS. CONLON: Yes, if your Honor wouldn't mind. Yes, please.

THE COURT: We'll take the recess for one half hour until 11:15.

We'll stand in recess.

THE CLERK: All rise.

(Recess, 10:45 a.m.)

C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Thursday, July 10, 2025, to the best of my skill and ability.

/s/ Richard H. Romanow 07-10-25
________________________
RICHARD H. ROMANOW Date