UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No. 1:25-cv-10685-WGY
Volume 2, Pages 72 - 132

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
Defendants

********

BENCH TRIAL DAY 4

BEFORE THE HONORABLE WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
July 10, 2025

********

Court Reporter: Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter
United States District Court
One Courthouse Way
Boston, Massachusetts 02210
mortellite@gmail.com

A P P E A R A N C E S

RAMYA KRISHNAN
XIANGNONG WANG
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
Carrie.decell@knightcolumbia.org
and
COURTNEY GANS
NOAM BIALE
ALEXANDRA CONLON
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 540-0675
Cgans@shertremonte.com
For Plaintiffs

ETHAN B. KANTER
WILLIAM KANELLIS
VICTORIA M. SANTORA
JESSICA A. STROKUS
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9123
Ethan.kanter@usdoj.gov
and
SHAWNA YEN
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Shawna.yen@usdoj.gov
(617) 748-3100
For Defendants

# INDEX


| WITNESS | PAGE |
| --- | --- |
| PETER HATCH | |
| Direct Examination By Ms. Conlon (continued) | 75 |
| Cross-Examination By Ms. Santora | 90 |
| Redirect Examination By Ms. Conlon | 107 |
| AMY GREER | |
| Direct Examination By Mr. Biale | 113 |
| Cross-Examination By Mr. Kanellis | 125 |


## E X H I B I T S


| Exhibit No. | Received |
| --- | --- |
| 237 | 124 |

P R O C E E D I N G S

(Resumed, 11:19 a.m.)

THE COURT: The witness may resume the stand.

MS. CONLON: Ms. Conlon, you may continue.

BY MS. CONLON:

Q. So we've spoken quite a bit about Canary Mission, that source of names, and the court alluded earlier with you to the fact that names came from elsewhere. I just want to turn to the "elsewhere" part of that for a moment.

11:19 You had previously testified that the names came through Derek Gordon, correct?

A. Yes, they came through ICE leadership, HSI leadership.

Q. And they came on multiple occasions, right? It wasn't one delivery?

A. Right, there were multiple.

Q. And certain -- well, you'll tell me if it's for all or some, but in certain instances you received more than just the name of a person to look at, right?

A. We would get the name, occasionally we would get what 11:19 protest they were alleged to have attended, maybe where they were a student, some basic information. The lead usually contained some basic information.

Q. When you say "the lead," you mean like the verbal information Mr. Gordon gave you about the person?

A. Yes.

Q. And when you say that in certain instances Mr. Gordon gave you the name of a student and which protest they had attended, you mean like the date and place and time of a particular protest, correct?
A. I believe so.
Q. And he didn't just give you their name and the protest they went to and the school they went to but also their suspected nationality, correct?
A. No. I don't -- again, these are -- as I said before in my deposition, the leads didn't go through me. Most of the leads went to the team lead or through my deputy.
But as I recall, when hearing the information, I don't know if I could say that they -- I don't know the details of each lead other than they usually had a name, they definitely had a name, that they were a protester and then it may have included what school they were from. I don't recall hearing anything about nationality.
Q. Mr. Hatch, I'm going to be referring to the transcript of your deposition. For the benefit of the court and the government, I'm thinking about pages 213 to 214 of Mr. Hatch's deposition, and I want to make sure you have a copy.
Actually, can we put it up on the screen because it's just one page. 213. We just need a moment. I just want you to be able to see it.
I'm going to draw your attention to the bottom half of the

page, and you can let me know if it refreshes your recollection because I'm assuming that you simply forgot.

Line 16, you were asked: "Do analysts get anything more than the name of a student protester when they're asked to research that individual?"

Answer: "Yes."

"What information besides the name do they get?"

We're going to start -- Ms. Safavi objected. Starting at line 24, Answer: "As I recall, they could get what protest they were at," and then continuing on to the next page, which may take us technically a moment.

11:22

A. Is it possible I can see the whole page? That's better. I can read this.

Q. Okay. "They could get the suspected nationality." Do you see that there?

A. Yes, they could get it. I don't recall but it's possible the nationality could have been part of the lead. I just don't recall it.

Q. So to the best of your recollection -- you can take that down.

11:23

To the best of your recollection having reviewed your deposition testimony, they could get the student name, where they were a student, the protests they attended and their suspected nationality, among other things; is that right?

A. They could get it, yes.

Q. Now, Mr. Gordon would convey that information to them separate from the directive to look at the Canary Mission website. That was a separate source of information; is that correct?
A. Yes, we had multiple sources of information. Canary Mission was not the only one.
Q. And about the quarter of the people identified came through alternate sources other than Canary Mission, right?
A. I guess up to.
11:23 Q. I'm sorry?
A. Up to a quarter.
Q. Up to a quarter?
A. I don't know the exact numbers of the leads we got. Sorry.
Q. Sorry, no.
You testified a bit in your deposition about the process, to the extent to which the process involves the front office, which I assume is the front office of HSI, in terms of identifying leads. And I want to ask you about that.
11:24 The leads, the list of leads usually goes through the front office, the leadership of HSI, isn't that correct?
A. Could you show the deposition?
Q. Sure. Do you not recall? Because we don't ordinarily just show people their depositions unless they don't remember. If you don't remember, we can if you want to.

THE COURT: He's asked and that's your answer, you're not going to show it to him.

MS. CONLON: I mean, I just -- you're right, not unless you don't recall.

THE COURT: It's not whether I'm right. This is your case to try, but that strikes me that when a witness asks -- well, it's your case to try. Show it to him or not.

A. You referenced the deposition, so I'd like to see the deposition.

11:25 Q. Sure. Can we please turn to page 177 of the deposition transcript. Actually, I guess it's page 178. I apologize. Page 178, please.

If you look at lines one through five, you indicated that -- you made a clarification about the list you received. You testified that, "They usually go through the front office, so the leadership of HSI, but they come from Office of Border Czar, Office of the Secretary."

Do you see that there?

A. I see that.

11:25 Q. So we can take that down.

So when you say, "They go through the front office," that means who exactly?

A. So the front office are the people we mentioned before. It could go through Mr. Gordon, Mr. Hammer. Again, that's the HSI top leadership.

Q. And when you say, "They go through the leadership of HSI, but they come from the Office of the Border Czar," you're speaking of the Office of the Border Czar, which is housed, as I understand it, outside of the Department of Homeland Security, right?

A. So when I said that, I was giving you possible examples of where the leads came from. I don't -- as I had said earlier, I don't know exactly, because I'm not familiar with that process and I was not privy to that, I don't know how they got the -- I 11:26 don't know how HSI got the leads. I don't know how it was sent to them, and I don't know who sent it to them. And at that point I was speculating who it came from.

I think I mentioned they came from possibly the Border Czar, possibly DHS, possibly other partners, even the public. So those leads can come from all directions.

Q. So I hear you saying you don't know for certain where the particular student protester names given to the tiger team came from but that the regular process -- and I'm literally reading your words here, "The clarification would be those lists 11:27 usually go through the front office so the leadership of HSI but they come from Office of Border Czar, Office of the Secretary." That is the ordinary process, correct?

A. No, it is not. The ordinary process for leads or the ordinary process for the protesters?

Q. The ordinary process for lists. You said, "Lists usually

go through the front office, so the leadership of HSI, but they come from Office of Border Czar, Office of the Secretary."
A. The leads go through -- in this case, the leads went through the front office and could have come from those locations.
As I said before, for example, with the Canary Mission list, I don't know how that was presented to us. I don't know who sent that, notified us of the website. I don't know of any leads, any particular leads coming from any place outside of HSI. I can't tell you where each lead came from.
11:28
Q. So I am clear here, when you made a reference in your deposition in response to a question about the leads to the Office of the Border Czar, you were referring to the Border Czar who is appointed by the President outside of the Department of Homeland Security; is that correct?
A. When I said "Border Czar," I was referring to the Border Czar.
Q. The Border Czar being Tom Homan. We can talk about him by name, right?
11:28
A. That's correct.
Q. Tom Homan was -- withdrawn. Tom Homan does not work for DHS, right?
A. I think -- I don't know who the Border Czar works for, if he works for DHS --
Q. He's not part of HSI's leadership; is that fair to say?

A. He's not part of HSI leadership.
Q. When you said that ordinarily -- or I'm not sure what you're saying about it now, but when you said in your deposition that, "Lists go through the front office but come from the Office of Border Czar or Office of the Secretary," "Office of the Secretary" was a reference to the Secretary of Homeland Security, correct?
A. Yes. And what I meant was their offices. So obviously the Secretary of Homeland Security is not sending us leads personally.
Q. The executive office?
A. Yes, her office, her staff, as well as Border Czar. And for clarification, as I said before in the deposition and now, I don't know where each particular lead came from. I don't know where each particular list came from. So I can't say for certain, but I was giving you general where they may have come from. I could not cite, for example, a specific lead that came from any particular source if you were to ask me.
Q. Yeah, I understand that you don't know the specific origin of these leads. I'm asking you how it normally works since you don't know the specifics of this source of leads. So that's what I wanted to clarify.
A. To answer your question on how it normally works is I get the lead from the chain of command. That's the normal process. How the chain of command gets it is something beyond my

visibility.
Q. Okay. Well, just to be very clear, the question you were asked was about how leadership gets it, and the answer you gave was that the lists go through the front office. Was that untrue? Is that incorrect?
A. The list goes through the front office -- in this case, the lists and leads were coming from the front office, the HSI front office.
Q. And literally in your deposition you said, quote, "But they come from Office of Border Czar, Office of the Secretary." Was that incorrect?
A. They could come from --
Q. That isn't what you said. Do you want to see it?
MS. SANTORA: Objection.
THE COURT: The objection is sustained. I've looked at the deposition. He said what he said. You've read it. It's part of the record. He's given his testimony here today. Let's move on.
Q. Okay. We can move on to -- I only have a few questions remaining.
So we spoke about the ROAs for five particular people, and you looked at them with me. You've mentioned that there were approximately 200, as best you know, ROAs generated by the tiger team, right?
A. Approximately, yes. I don't recall the numbers. I was

not keeping stats of what I read.
Q. I understand. Now, most of the ROAs, so far as you know, mentioned Israel or Palestine, correct?
A. Yes, as you saw the way they were mentioned in the five we reviewed earlier.
Q. In other words, whether a person -- references to what the person had said concerning Israel or Palestine?
A. Could be.
Q. Many of them mentioned specifically the war in Gaza, right?
11:32
A. I don't know.
Q. Do you recall seeing any that mentioned the war in Gaza?
A. I recall, yes.
Q. Is that a yes?
A. Yes. Some mentioned Gaza, I believe.
Q. Some mentioned pro-Palestinian protests, right?
A. I think so.
Q. More than just the one we saw today, correct?
A. Yes, I think so.
11:32
Q. Some used the term "pro-Hamas," correct?
A. I believe so.
Q. Some, like the ones we saw today, mentioned a student protester's public writing, correct?
A. If you mean a post as public writing, then yes.
Q. I don't only mean a post. Articles in newspapers, for

example?
A. That's possible as well.
Q. To be clear, I'm not asking you to just summarize what you and I looked at in those five, but I'm asking the broader body of ones --
A. I understand.
Q. Okay. Some mentioned a student protester's social media, right?
A. That's correct.
11:33 Q. Some of the ROAs mentioned public statements by protesters, not from social media, not from, say, an article, right?
A. Yes, some mentioned public statements.
Q. Some mentioned a student protester's chants at a student protest, right?
A. I believe some did.
THE COURT: Some of them mentioned criminal activity.
THE WITNESS: Yes, sir.
Q. Well, the question is about the ones we haven't seen, so I
11:33 guess the question for you, to build on what Your Honor has asked, Mr. Hatch, approximately how many of them mentioned criminal activity?
A. I don't recall those numbers.
Q. Today we looked at five, only one of which made a reference to a person having been arrested. Is that a

representative sample?
A. I think there were two with.
Q. I'm sorry?
A. I think that I read two today -- two of those five had criminal activity. One had the ones you mentioned about the New York cases, but another had an LSD possession charge.
Q. I am talking about recent criminal activity at a protest. You're talking about something else. I understand the distinction, so let me be clear.
11:34 Of the population of reports of analysis that you reviewed, approximately how many included allegations of recent criminal conduct in connection with a protest?
A. I don't know.
Q. Did any of the reports of analysis you reviewed mention that a person had been convicted of a crime?
A. I don't remember.
Q. Hmm. Some of the ROAs that you reviewed, not just the ones in this courtroom, specifically mentioned a protester's membership in a student group, right?
11:35 A. That's possible.
Q. That's possible or that is what you recall?
A. I believe there were some.
Q. Some specifically mentioned a student's membership in the group Students For Justice in Palestine, right?
A. I think that was one.

Q. Some specifically mentioned a student protester's statements or views on Israel, correct?
A. I believe so.
Q. Fair to say that the vast majority of the ROAs you reviewed said nothing about criminal activity whatsoever?
A. I don't know.
Q. You don't know whether the vast majority --
A. I don't recall the details of those ROAs.
Q. Now, this whole effort, tiger team effort, began sometime
11:36 in March, right?
A. I believe so, yes.
Q. And it was responsive to two executive orders issued by the President, one of which we've spent some time discussing, and those would be Executive Order 14161 and 14188, correct?
A. As I said before, the tiger team was formed because of the large number of individuals in the lists. The tiger team was formed to look at protesters.
Q. Okay. And the reason that you were looking at protesters was because of the executive orders, correct?
11:37 A. The reason I was looking at protesters is because I was directed to from HSI leadership. Whether or not they did it in response to the executive orders was not something I was privy to.

Do the protesters' activities relate to an executive order? Possibly. I guess it could be characterized that way.

But you're asking me if I characterized it that way, and I did not.

Q. Well, Mr. Hatch, I really don't want to have to go back to your deposition transcript, but I will if you don't recall saying this.

You've previously testified that Mr. Gordon gave you guidance or instructions about the executive orders to produce reports of analysis on student protesters. You linked those things, isn't that correct?

11:37 A. I think it's fair to say that yes, but that's not my -- I did link those things, but my direction to the team was not execute the executive order. My direction to the team was look at protesters.

Q. I don't want to argue with you. I'm not asking about your direction to your team. I'm asking about what you received, the directions you got. And the directions you got were to create these reports of analysis on student protesters as part of HSI's response to Executive Orders 14161 and 14188, isn't that right?

11:38 A. I don't know if -- I'm just trying to answer the question as best I can, Your Honor. I don't characterize it that way. I know that the executive orders, I know one of those executive orders existed. As I said in my deposition, that was the first time I had read one of them. So the context of everything we were doing is obviously from the executive orders, but in this

particular effort, my direction to the team and as I received it, my characterization of it is we were looking at protesters.
Q. Can we please put page 149 of the deposition transcript on the screen. Please take a look.
Line 11, Question: "Well, you -- you agreed -- you answered in the affirmative to whether you have received guidance or instructions about the executive orders and you named as one person who has provided that guidance, Mr. Gordon. My question is what was that guidance?"
11:39 Ms. Safavi objects. You answered, "Produce reports of analysis on individuals involved in protests as it relates to Title 8."
That's what you said, right?
A. Yes, I think that's what I just said a minute ago. The job was to produce reports of analysis on individuals involved in protests as it relates to Title 8 and violations of law.
Q. I'm not sure why you're so resistant to answer this here.
THE COURT: Don't characterize the witness's answers. I'm listening.
11:40 MS. CONLON: Okay. We can take down the transcript.
Q. Now, these protests that we're talking about, the student protests, they began in October of 2023, right?
A. Yes, I believe so.
Q. Okay. This urgent effort by HSI to identify these student protesters didn't start in 2023 when the protests began. It

started after these executive orders in the spring of 2025, right?
A. It started in the spring of 2025.
MS. CONLON: Okay. Nothing further.
THE COURT: Ms. Santora, do you wish to examine this witness?
MS. SANTORA: Yes, I do, Your Honor.
CROSS-EXAMINATION BY MS. SANTORA:
Q. Good morning. I want to ask you a few questions.
11:41 During your direct testimony yesterday you testified about your role with the Office of Intelligence, correct?
A. Yes, I did.
Q. And you are the highest-ranking official in the Office of Intelligence?
A. I am.
Q. And are you responsible as leadership in the Office of Intelligence for providing guidance to your analysts?
A. Yes, I do.
Q. Are you responsible for providing training to your
11:41 analysts?
A. Yes, training, policy, procedures, equipment and allocation of analysts.
Q. So would it be fair to say that if there were changes to policies and procedures in your office, you would know about those?

A. Yes, if they related to the analysts, yes.
Q. And you would provide training to your analysts on those?
A. That's correct.
Q. Would it be possible for a new policy or procedure to exist in your office without you knowing about it?
A. In my office, no.
Q. And since the beginning of 2025, have there been any changes to the policies and procedures in your office?
A. No. We've been doing our analysis the same way since I started in 2019, 2020, and developed the way we do analysis. We haven't changed the way we do subject profiles at any time in say -- during that time we've always done subject profiles this way. We conduct our analysis the same way. And for that matter, we've been looking at the same violations of law during that time as well.
Q. So you haven't changed the content of your reports of analysis?
A. We have not.
Q. So it's always included biographical information?
A. It has.
Q. Information about criminal activity?
A. Yes.
Q. Information about potential violations of law, including Title 8?
A. Yes.

Q. And I just mentioned reports of analysis. Can you, for the benefit of everyone, define what is a report of analysis?
A. It's the way the analyst documents their work product, and it is specifically designed for analyzing criminals, criminal networks, criminal conspiracies, and subject profile is just one ROA type that we use.
Q. You mentioned that your office receives leads or tips that can generate the creation of a report of analysis, correct?
A. That's correct.
11:43 Q. And from where does the Office of Intelligence receive tips or leads?
A. In general terms, beyond the scope of a protest, we receive them from all different kinds of directions. They can come from an agent's contacts. They can come from interagency partners. They can even come from the tip line, which is a public-facing mechanism for the public to provide tips. They even can be mailed to the office, hard copies.
Q. And with respect to the protesters, did your office receive leads in a different way?
11:44 A. I think we were getting the leads from all directions. I don't know in particular where we were getting the leads from.
Q. Okay. When your office receives a lead, generally speaking, what does it do with it?
A. Usually it's provided to an analyst to do exactly what you saw with these ROAs, to look for information, as I said before,

that's a violation, potential violation of law, with our specialty being immigration and customs laws. But it's also, as we're building that, it's also to get the context of the individual, which is why the biographical information and the car information like I mentioned is in there.
Q. And is a lead ever insufficient for your office to do anything with it?
A. Yes. There are times when a lead just has incomplete information, a nonspecific name, no identifying information to
11:45 help us identify or narrow down who it was.
Q. And in that case what does your office do?
A. We would just file the lead. We'd move on.
THE COURT: Well, that question interests me. I've had cases where someone's identified as LNU or FNU LNU, first name unknown, last name unknown, and I wondered what we're talking about in my case. And your answer jogged that memory.
When you don't have enough to do anything, do you report that in any way, or you just don't do anything because you haven't got enough to work on?
11:46 THE WITNESS: It's mostly the latter, sir.
THE COURT: The latter, all right. Ms. Santora, go ahead.
Q. Assuming that there's sufficient information in the lead, what does -- I guess I'll ask this. Does your office do -- you said you would create a report of analysis; is that correct?

A. That's correct.
Q. And in creating that report of analysis, you testified earlier that you do independent research?
A. Yes.
Q. So you look into the information in the lead and independently confirm?
A. Try to, yes.
Q. And that's the information that goes into the report of analysis?
11:46 A. Yes.
Q. So to be clear, the report of analysis is a fact-based document?
A. Yes, we try, as you saw with those, we try to just report the facts or what the analyst finds and properly source it so anyone reading it knows where this that came from.
Q. Does a report of analysis make any recommendations?
A. It does not.
Q. Does it include any opinions?
A. Does not.
11:47 Q. Does it make any referrals?
A. No.
Q. Or any judgments?
A. No.
Q. How do you know that reports of analysis don't include those things I just referred to, recommendations, opinions,

referrals and judgments?
A. It's in our policy.
Q. You spoke during your direct examination about a tiger team, correct?
A. That's correct.
Q. Generally speaking, what is a tiger team?
A. A tiger team is a term of art we use for an ad hoc, temporary standup of analysts or a combination of analysts that get assigned to a project, usually when it's a large workload, 11:47 and we use it when we have to bring analysts in from other parts so a specific group or section doesn't have the capacity to handle, so we'll bring in others to help.
And it's a way of differentiating between whether someone's doing their normal job or whether they're doing this additional duty or whether they have been reassigned to this duty.
THE COURT: So tiger team, you've had Tiger Teams more than once on different subjects?
THE WITNESS: Yes, Your Honor. We've used a tiger 11:48 team maybe half a dozen times since I've been at HSI for all different types of things. It's just a term of art.
THE COURT: Thank you.
BY MS. SANTORA:
Q. So why is the term tiger team used, if you know?
A. I think, I mean we got it from business, military I think

uses the term as a way to focus analysts. I didn't make up the term tiger team. If I go back to my Coast Guard days, we would set up a tiger team to fix an engine problem when you needed an electrician or mechanic. It's kind of always been in existence.

Q. So you've heard the term back to your Coast Guard days?

A. I have, yes.

Q. So it's a term that's used in government jargon?

A. Yes, and I believe in business, too.

11:49 Q. And it sounds a bit intimidating. Is it meant to intimidate?

MS. CONLON: Objection.

THE COURT: Sustained. He said it's a term of art.

Q. Is it meant to intimidate?

MS. CONLON: Objection.

THE COURT: Why don't you ask him whether he means it to intimidate.

Q. Do you mean it to intimidate?

A. No, not at all. It's an internal term.

11:49 THE COURT: The sense I get, so we're clear on what I'm hearing, is you mobilize a Tiger Team because you need to do the work assigned, correct?

THE WITNESS: Yes, Your Honor.

THE COURT: And calling it a tiger team conveys to me some sense of urgency and importance in that work.

THE WITNESS: Yes, sir.

THE COURT: Is that right?

THE WITNESS: That's correct. And we're analysts, so we're nerds. We're the nerds. We're a law enforcement and we're analysts. We're nerds. We're not ferocious.

THE COURT: It's not like painting decals on fighter planes.

THE WITNESS: No, sir.

THE COURT: Go ahead.

11:50 BY MS. SANTORA:

Q. I want to talk to you about the tiger team that was created in March of 2025. What topic was that Tiger Team created to address?

A. That was protesters and we had gotten a lot of leads.

Q. Were you asked specifically or was that tiger team asked specifically to look into student protesters?

A. All protesters.

Q. All protesters, okay.

And ultimately how many people did the tiger team look 11:51 into?

A. Over 5,000, more than 5,000. I don't know the exact number.

Q. And in looking into those people, did the Office of Intelligence analyze any differently than it normally does?

A. A little bit. Normally we do an ROA on everybody, no

matter what. And that's why you'll see the variation as we saw from the five today where one was two pages and one was longer.

But in this instance, because we had so many names, I told the analysts if you don't find anything beyond the biographic information -- we were looking at violations of law and as it relates to protests. So some of the names, for example, were said to be at a protest, but we never found that they were at a protest. We never found anything. We didn't find any conduct. We didn't find anything related to the individual. So it would 11:52 have been a one-page ROA. And so I told the team for the sake of expediency to get through this long list to just not do the ROAs on those individuals.

Q. Okay. You talked about the fact that you received information from Canary Mission with respect to these lists, correct?

A. Yes.

Q. To be clear, does your office work with Canary Mission?

A. No. Like I said before, we have no association with Canary Mission. Canary Mission is not associated with HSI at 11:52 all. I don't know who posts on that website. I don't know who runs that website. I don't know anybody in that organization. I don't have any connection with anybody in that organization.

Q. Does the office treat Canary Mission information differently than it treats other information?

A. We treat it just like any other lead.

Q. Was the office asked to look at Canary Mission information differently than other information?
A. No, we were not asked to look at it differently. We were not asked to change the ROA process or our process of criminal analysis.
Q. Would it be relevant to a report of analysis that someone had been charged with a crime but not convicted?
A. As long as the charge was factual, it could be included in the ROA, so yes.
11:53 THE COURT: I don't understand a charge that wasn't factual.
THE WITNESS: I guess you're right. A charge would be included in that section you saw, the criminal history.
BY MS. SANTORA:
Q. And how would that be relevant to the analysis, a charge that was not a conviction?
THE COURT: That's pretty hypothetical. I don't know what to do with that. This is a law enforcement operation or part of a law enforcement operation. Of course you include
11:54 charges because you might want to -- or someone, some enforcer might want to follow up on that. I just don't understand.
MS. SANTORA: Okay. We'll move on. Thank you, Your Honor.
THE COURT: All right.
MS. SANTORA: Preserving the government's objection to

these documents being entered into evidence based on privilege, in case our objection is ultimately overruled -- the overruling objection is upheld, I do want to ask questions about the documents that opposing counsel --

THE COURT: You don't waive the objection properly preserved by exercising your opportunity during the trial to ask about such documents.

MS. SANTORA: Thank you, Your Honor.

I want to ask you about a document you looked at earlier. I believe it was, it was in the packet we received. It was Exhibit K related to Mr. Mahdawi. I don't know what letter it's been marked.

MS. CONLON: It was marked as a number, and it's 235.

MS. SANTORA: 235, okay. Are you able to show the witness?

THE COURT: I'm an equal opportunity helper.

MS. SANTORA: Thank you, Your Honor.

THE COURT: Here's the documents that have now been marked, and thank you, Ms. Conlon, Exhibit 235 in evidence.

BY MS. SANTORA:

Q. Do you see subject profile for Mohsen Mahdawi?

THE COURT:

A. I'm looking at the one for Suri.

THE COURT: You said K.

MS. SANTORA: Sorry. That was K. I don't know what

letter this was.

THE COURT: You want Mahdawi?

MS. SANTORA: Mahdawi, yes.

THE COURT: All right. In the packet as it was delivered to the court, it's Exhibit E. And so our record is complete, someone will help me, Exhibit E has become --

MS. CONLON: 235.

THE WITNESS: Are you going to ask me about --

THE COURT: Since I have now become a document custodian. Go ahead.

11:56

BY MS. SANTORA:

Q. I believe when you were being questioned earlier --

THE WITNESS: Sir, this is Khalil.

THE COURT: It is, and that's my mistake. I'm not much of a document custodian. Yes.

MS. SANTORA: I can give the witness my copy --

THE COURT: No. I have it right here. Now I've got the right one. Having nothing to do with this exhibit, but it reminds me, the government has made an ex-parte submission, properly. The court has reviewed it, and pertaining to one of these exhibits, and that's something potentially should be redacted or withdrawn. I want to know precisely what it is with the brackets as you've done it in time for our conference at 3:00. You can hand it up to the clerk so I know what we're talking about. Go ahead.

11:57

BY MS. SANTORA:
Q. Mr. Hatch, you are looking at the subject profile now of Mohsen Mahdawi, correct?
A. Yes, I am.
Q. And do you remember when opposing counsel was questioning you and they said that in this report of analysis it included only biographical information, correct?
A. Yes.
Q. And do you see the last bullet under Analysis and 11:58 Findings?
A. Yes, I do.
Q. That relates to possession of various drugs, correct?
A. It does.
Q. Would you describe that as biographical information?
MS. CONLON: Objection, Your Honor.
THE COURT: No. She may have that question in that form.
A. I don't know.
Q. Would you describe the drug charges as biographical 11:59 information?
MS. CONLON: Objection. It doesn't even say "charges."
Q. Would you describe that bullet relating to this individual being in possession of drugs as biographical information?
A. I'd more likely say it was criminal history.

Q. Thank you.

And that bullet appears in the analysis and findings section, correct?

A. It did, it also appears in criminal history.

Q. Okay. Thank you. I want to ask you about another one of the documents opposing counsel asked you about. These are the documents related to Rumeysa Ozturk.

THE COURT: In the packet of documents given to the court, these appear as Exhibit C. And they are now in evidence as what? Ms. Conlon.

12:00

MS. CONLON: Sorry. Ms. Ozturk, 232.

THE COURT: 232.

THE WITNESS: Do you want this one back, sir?

THE COURT: Yes.

THE WITNESS: Okay.

BY MS. SANTORA:

Q. Opposing counsel asked you earlier about the first bullet under analysis and findings, and they mentioned the coauthoring of an op-ed. Do you remember that exchange?

12:01

A. Yes.

Q. And if you look at the rest of that bullet, it says that she wrote the op-ed with Tufts Students for Justice in Palestine, which was suspended for calls for Student Intifada.

Would that part of the bullet factor into the office's analysis?

A. Yes, I mean it is part of it.
Q. Moving on, I would like to ask you, I want to ask you some questions about the executive orders that you referenced in your testimony.
A. Okay.
Q. How did your office respond to Executive Order 14161 and Executive Order 14188, if at all?
A. Can you give me the titles? I don't know them by the numbers.
12:02 Q. Executive Order 14161 is protecting -- I'm sorry, I don't have the title in front of me. 14188 has to do with antisemitism. You mentioned that you had not seen that executive order until your deposition, correct?
A. That's correct.
Q. So we can put that to one aside. With respect to the other executive order that you --
A. Okay. I'm familiar with that.
Q. -- yesterday and today, how did your office respond to that executive order?
12:03 A. I recall when I read that executive order, I saw that just about everything related to that executive order and us were things we were already doing. They all related to existing Title 8 issues. So it did not task my office with doing anything different.
Q. And so your office didn't change the way it analyzed

information in response to the executive orders?
A. No. And especially in that executive order, it didn't change anything. It all related to Title 8. It emphasized things in Title 8, but nothing was new to us.
Q. So the executive order essentially directed your office to follow Title 8?
A. That's how I interpreted it for the most part.
Q. And your office does follow Title 8?
A. We have been since I've been there and, I mean, since HSI
12:04 has existed.
Q. And how long has HSI existed?
A. HSI, and in its previous form, Customs' Office of Investigations, has been around since the 1950s, and I believe Title 8 has been since the 1950s.
Q. I want to go back for a second to the ROAs about the protesters. You said that your office looked into 5,000 leads related to that, correct?
A. Over 5,000, yes.
Q. And because of the bulk of work in that particular
12:04 situation, ROAs were not created in every circumstance, correct?
A. That's correct.
Q. Do you know in what percentage of cases ROAs were created?
A. I don't know the exact numbers, but I would estimate, I think I said 200, so less than -- I'm not good at public math.

Less than 5 percent.
Q. Less than 5 percent. And so 95 percent did not result in the creation of an ROA?
A. That would seem to be true.
Q. What happened with those 95 percent of the 5,000 cases?
A. If we didn't do an ROA, we just moved on to the next person on the list or the next lead. We didn't do anything with them.
Q. Okay. So in 95 percent of those 5,000 cases regarding
12:05 protesters, your office did nothing?
A. We moved on to the next lead, yes.
MS. SANTORA: Thank you.
THE COURT: Ms. Conlon, anything further?
MS. CONLON: Yes, Your Honor.
THE COURT: You may.
MS. CONLON: Is it okay with Your Honor if I examine from here?
THE COURT: Of course it is. So you all understand, I understand that by passing the bar, you have the right to be
12:06 within the bar enclosure denominated by the rug in deeper blue. It's not an instruction that you have to stay on that rug, but I learned you could move around in the bar enclosure as a lawyer. Go ahead, Ms. Conlon.

MS. CONLON: Okay.

REDIRECT EXAMINATION BY MS. CONLON:

Q. So you were just asked about the percentage of ROAs that were generated as a result of this line of effort, and you have estimated -- and don't worry, this won't be an equation. But you've estimated about 5 percent; is that right?

A. Yes.

Q. And your estimate is based on the notion knowing that there were over 5,000 names at least on Canary Mission, and you saw maybe 200 reports; is that right?

12:06

A. As I recall, yes, I think that's what I said.

Q. Now, you have said before you didn't look at all the reports generated by the tiger team, right?

A. That's correct.

Q. You happened to have seen about 200, correct?

A. Somewhere in there. I don't know the exact numbers.

Q. Right?

A. I'm giving you an estimate. That's all I'm doing.

Q. No, no. I appreciate that you have seen 5 percent of -- if we're sticking with percentages, I appreciate that what you can tell us is that you've seen 200 and you know that at least more than 5,000 people were looked at. But I understood you to be saying earlier you can't tell us how many ROAs were actually created. Am I mistaken?

12:07

A. I'm estimating that somewhere under 200 or around 200 ROAs

were produced. In my testimony I believe I said, as you mentioned earlier, dozens, I had read -- you asked me how many I had read. I said dozens. And then you brought up my deposition and said, "You said here 100," and I had said earlier 20.

So I would estimate I've read between 20 and 100, but I know the team produced more, and I'm estimating they produced less than 200 in total.

Q. And what is that based on? What is your estimate of what the team produced, I mean, based on?

12:08

A. Just my recollection of the effort described to me by the team lead. I'm giving you my best estimate.

Q. I appreciate that. Fair to say you don't actually recall the total number that were created by the tiger team?

A. I do not recall the total number.

Q. Fair to say you are in a position to speak about the total number as an estimate only that you personally reviewed?

A. That's correct.

Q. Now, that 5,000-person list which resulted in -- for many folks resulted in no ROAs, one of the reasons it resulted in no ROAs for so many people is because that list included a lot of U.S. citizens, right?

12:08

A. That's correct.

Q. And it's not within the purview of the Office of Intelligence to write reports of analysis about U.S. citizens,

correct?

A. We absolutely are.

Q. Oh, you wrote them about U.S. citizens?

A. HSI intelligence is authorized to write ROAs about U.S. persons. That's the question you asked me, right?

Q. Yes, that is the question I'm asking.

A. Now, are you asking me if any of the protesters that were U.S. citizens had ROAs written on them?

Q. Well, I guess that's a good question.

12:09 A. I don't know. I don't recall, I don't recall reading an ROA on a U.S. person.

Q. Now, the circumstance in which you could write an ROA about a U.S. person, that would not be for a violation of Title 8 immigration offense, right, for example, being out of status or any number of things?

A. We are authorized to write ROAs on U.S. persons for any violation of U.S. law, potential violation of U.S. law, suspicion of violating U.S. law, information related to violations of U.S. law, as I've said before.

12:10 Q. Sorry. So going back to the question I think you tried to ask if I was asking just a moment ago, the tiger team did not, to your knowledge, create ROAs on U.S. citizen protesters; is that correct?

A. I don't recall reading any ROAs on U.S. citizen protesters.

Q. And you did not understand the project at hand to be one that included looking at U.S. citizen student protesters, correct?
A. I didn't interpret the focus to be U.S. persons.
Q. Now, you've said that ROAs were only generated for some small number out of the overall group. And one reason that could happen is if you couldn't sufficiently identify a person; is that correct?
A. That's correct. That's one reason.
12:11 Q. Another reason that could happen was if you couldn't confirm that a student had actually attended a protest; is that right?
A. That's correct, that's one reason. It's a possible reason, yes.
Q. In other words, the student protester initiative of the tiger team was meant really to capture people who protested, is that correct, who had attended protests?
A. I would not use the word "capture."
Q. Well, we can pick a different word.
12:11 THE COURT: Focus on is the sense of her question. Do you accept that?
A. That was the focus, yes.
Q. So if no protest, no ROA; is that right?
A. Yeah. If we found no activity, we would move on to the next one.

Q. I'm a little confused because "activity" -- I'm asking specifically about protest activity. If you did not find evidence of protest activity, the person did not receive an ROA; is that correct?
A. That is correct.
Q. Now, the ROAs were not limited to persons who attended protests who had potentially committed a criminal offense, correct?
A. When we start out with the leads, we don't know what we have to begin with, so we look, as you saw in the ROAs, we focus on the individual.
Q. And ROAs were generated for students who attended protests who were not suspected of having committed a crime, isn't that right?
A. That is correct, yes.
MS. CONLON: Just a moment.
Q. You said that you weren't directed to look at the Canary Mission list any differently from how you look at other information. Did I hear that correctly?
A. The Canary Mission list, it was one source of leads we get. We were not directed to look at Canary Mission any differently than we would another lead on a protester.
Q. You didn't receive a directive to look at any other collection of people from any other single source in the way that you did for the Canary Mission website, correct?

A. I think it's fair to say that Canary Mission was unique.

Q. It was unique because it was the focal point of this effort, wasn't it?

A. It was unique because it was a large amount of leads, large amount of information on protesters.

MS. CONLON: Just a moment.

Q. I think you testified earlier, but tell me if I'm wrong, that you as the director of the office are familiar with training given to analysts about how to do these reports of analysis, right?

THE COURT: This is redirect. That's beyond the scope.

MS. CONLON: Your Honor, I'm sorry, I thought that just came up in the government's questioning.

THE COURT: I didn't.

MS. CONLON: You didn't hear that?

THE COURT: That may not be the same.

MS. CONLON: Can I have just one second to see? I'm sorry.

I think that's it. Thank you so much. Thank you for your time.

THE COURT: Nothing more, Ms. Santora?

You may step down. Thank you. This witness is excused. Call your next witness.

MR. BIALE: Thank you, Your Honor. Noam Biale for the

plaintiffs. Plaintiffs call Amy Grier.

THE COURT: She may be called.

AMY GREER, Sworn

COURTROOM CLERK: Can you please state your name and spell your last name for the record.

THE WITNESS: Sure. My name is Amy Greer, G-r-e-e-r.

MR. BIALE: May I proceed, Your Honor?

THE COURT: You may.

DIRECT EXAMINATION BY MR. BIALE:

12:16 Q. Good afternoon, Ms. Greer.
A. Good afternoon.
Q. Where do you work?
A. At Dratel & Lewis as an associate attorney.
Q. And what is Dratel & Louis?
A. It is a small criminal defense firm.
Q. Where is it based?
A. In Manhattan.
Q. And how long have you been a licensed attorney?
A. Since September 18, 2020.
12:16 Q. Okay. Good memory for the date.
A. It was the day RGB died.
Q. I see.
A. It was not a celebratory day.
Q. I see. And you're admitted to the New York bar?
A. Yes.

Q. Any other states?
A. Actually that 2020 date I was admitted to the State Bar of Alaska. And since then I've been admitted to the District of New Jersey, the District of New York, and the District of the District of Columbia.
Q. Do you know an individual by the name of Mahmoud Khalil?
A. Yes.
Q. How do you know him?
A. He is my client.
12:17 Q. When did you begin representing Mr. Khalil?
A. In or around November of 2024.
Q. And since you began representing him in November of 2024, have you met with Mr. Khalil in person?
A. I have.
Q. Approximately how many times?
A. Approximately two to three times.
Q. In addition to the two to three times you met with Mr. Khalil in person, have you ever met with him in a videoconference or on FaceTime or something like that?
12:18 A. Yes. I have met with him numerous times by videoconference, Signal, et cetera.
Q. You said "numerous times." Can you estimate for us how many times you met with Mr. Khalil by videoconference?
A. Sure. Between November and March, probably weekly, so however that adds up to. And then after his detention, I met

with him nearly daily by videoconference.
Q. Okay. So fair to say you've met with Mr. Khalil, at least by videoconference, dozens, maybe even over 100 times?
A. Yes.
Q. Are you familiar with Mr. Khalil's wife?
A. Yes.
Q. What is her name?
A. Dr. Noor Abdalla.
Q. And have you met Dr. Abdalla in person?
12:18 A. Yes.
Q. Approximately how many times?
A. Probably five or six times.
Q. Have you also met with Dr. Abdalla on videoconference?
A. Yes, numerous times.
Q. Numerous. Can you give us a ballpark estimate?
A. I was one of the primary contacts for Dr. Abdalla throughout the course of this case. So it's hard to estimate, but probably a few times a week, so at least dozens, if not more.
12:19 Q. And just so we're clear, when you say "this case," you're referring --
A. Sorry. The habeas and immigration case post-detention.
THE COURT: Case in which you represent him as his attorney?
THE WITNESS: One of them, yes, sir.

MR. BIALE: Thank you.
Q. Are you familiar with Dr. Abdalla's voice?
A. Yes.
Q. Okay. Have you ever been to the building where Mr. Khalil and Dr. Abdalla live?
A. Yes.
Q. Approximately how many times have you been there?
A. Approximately twice.
Q. Are you familiar with the lobby of that building?
12:19 A. Yes.
Q. Okay. I'd like to direct your attention to March 8, 2025. What do you recall happened that day?
A. In the evening of March 8, 2025, I received a phone call from Mahmoud.
Q. Okay. Do you remember approximately what time?
A. I remember exactly what time. It was 8:26 p.m.
Q. And without telling me what -- when you say "Mahmoud," we're talking about Mr. Khalil?
A. Sorry. Mr. Khalil, yes.
12:20 Q. Without telling me what Mr. Khalil told you in that phone call, can you tell us about anything that he did in that phone call?
A. I am not sure if he handed the phone to the agent from immigration or if the agent took the phone, but the phone was given to one of the agents.

Q. And when you say, "one of the agents," can you clarify what you mean?
A. Sure. Mr. Khalil called me because agents had entered, and I know this because I spoke with the agent on the telephone, and so that agent introduced himself to me over the telephone.
Q. Okay. And did the agent identify what agency he was from?
A. He said he was from Department of Homeland Security, HSI.
Q. Okay. And you understood based on the way the phone call 12:21 went that this agent was physically present with Mr. Khalil at the time?
A. Yes.
Q. Now, were you physically present with Mr. Khalil and with this agent at the time?
A. No.
Q. Okay. Could you hear anything in the background of the phone call?
A. With Mr. Khalil?
Q. Yes.
12:21 A. I could hear him speaking, Mr. Khalil speaking, and I was obviously hearing the agent speaking to me. And then I heard other voices, ambient voices in the background.
Q. Okay. And then what happened next after you received this phone call?
A. Well, I spoke to the agent and he hung up on me.

Q. Okay. And what happened after that?
A. Well, I freaked out a little, to be completely candid, and I called the partners at my law firm. And then while I was on the phone with one of them, I received another phone call.
Q. And who was the second phone call -- who did the second phone call come from?
A. The second phone call came from Dr. Noor Abdalla.
Q. And Dr. Abdalla call you from her phone or from somebody else's phone?
12:22 A. She called me from Mr. Khalil's phone.
Q. Okay. And approximately when did Dr. Abdalla call you from Mr. Khalil's phone?
A. It was at 8:34, so eight minutes later.
Q. And when Dr. Abdalla called you, were you able to hear her voice over the phone?
A. Yes.
Q. Did you hear any other sounds over the phone?
A. Yes. I could hear Mahmoud, or Mr. Khalil, speaking in the background, and I heard other ambient male voices.
12:23 Q. Okay. I'd like to show you what's been marked for identification as Exhibit A1.
Mr. Kumar, if you can pull that up and just pause on the first frame.
Do you see that in front of you, Ms. Greer?
A. Yes.

Q. Just looking at the image in the middle, do you see the location?
A. On the bottom left there, or do you mean the actual --
THE COURT: No. Do you recognize the location?
A. Yes, I do.
MR. BIALE: Thank you, Your Honor.
Q. Where do you recognize that -- what do you recognize that location to be?
A. That is the lobby of Mr. Khalil and Dr. Abdalla's
12:24 apartment building.
Q. And how do you recognize that location to be the lobby of their apartment building?
A. Because I've been there and because I actually noticed the tiling on the floor when I visited, it's kind of an odd linoleum tile.
MR. BIALE: Okay. Mr. Kumar, I'd like you to play -- and I'm hoping that we have sound -- play the video to 7 seconds.
THE COURT: Well, you're calling her to authenticate
12:24 this video?
MR. BIALE: Yes, Your Honor.
THE COURT: And what do you -- let me ask this preliminary question. What do you understand this to be? Yes, what do you think this is, this video?
THE WITNESS: From what I know of this video, this is

the video of when Mahmoud, Mr. Khalil, was arrested.

THE COURT: And how did you come to know that?

THE WITNESS: I know that because I received it from Dr. Abdalla on the evening that Mr. Khalil was arrested.

THE COURT: All right. And who do you think took it?

THE WITNESS: Dr. Abdalla.

THE COURT: Thank you. All right. Mr. Kanellis.

MR. KANELLIS: I'll reserve my objection, Your Honor.

THE COURT: Reserved, okay. You may proceed.

12:25 MR. BIALE: Could you play it to seven seconds, Mr. Kumar, and with sound.

(Video played.)

BY MR. BIALE:

Q. Okay. You just heard some voices on that video, and you heard at the end it sounded like a woman's voice say, "He's not resisting."

A. Mm-hmm.

Q. Do you recognize that person's voice?

A. Yes.

12:25 Q. Who is that?

A. Dr. Abdalla.

MR. BIALE: Now, Mr. Kumar, if you can play a few more seconds to ten seconds.

(Video played.)

MR. BIALE: Stop.

Q. Now I'm going to ask you, who do you recognize in the video?
A. The person facing the camera is Mr. Khalil.
MR. BIALE: Okay. And now, with the court's indulgence, I'll ask to play another 20 seconds of the video, if we can do that.
THE COURT: Proceed.
(Video played.)
Q. Okay. You just heard some additional parts of the video,
12:26 and you heard Dr. Abdalla say "Hi Amy."
A. Mm-hmm.
Q. Do you know who she is referring to?
A. Yes.
Q. Who is she referring to?
A. Me.
Q. And how do you know that?
A. Because I was on the phone with her. I answered the telephone when she called.
Q. Okay. Can you just tell us about what you remember about
12:27 that conversation.
A. Sure. I was on the phone with Dr. Abdalla and one of the partners at my law firm, and together we were advising Dr. Abdalla, I was saying to her --
MR. KANELLIS: Objection, Your Honor. Two bases.
THE COURT: I'll hear you.

MR. KANELLIS: First is, if she's going to discuss these communications, she may be waiving her privilege. Second, calls for hearsay.

THE COURT: Well, the first is, I suppose she knows that, and she may make her own determinations.

The second is, what she says is hardly -- well, I'm not so sure it's even hearsay. If she was advising her, it's not for the truth. That's the advice, act in this way. Any response from Mr. Khalil's wife I would think under the circumstances is an excited utterance.

12:28

So subject to your motion to strike, you may answer the question. What did you say and -- did the partner speak, before we go any further?

THE WITNESS: We were both speaking, but I was primarily the one speaking.

THE COURT: And what's the name of the partner?

THE WITNESS: Lindsay Lewis.

THE COURT: All right. And tell us what each person said as best you can recall.

12:28

THE WITNESS: Okay. When we first got on the phone, we were attempting to calm Dr. Abdalla down. "It's going to be okay. Can you stay with us? Let's talk through this." And that was both Lindsay and myself, Ms. Lewis and myself. I was asking Dr. Abdalla, "How many people do you see? What's happening now? Can you ask them where they're taking him? Can

you ask them if they will show you a warrant? Will one of them identify themselves to you? Can you get a name? Again, where are they taking him?"

And I honestly do not recall, because this was obviously a rapidly unfolding situation, whether it was myself or Lindsay who asked if we could speak with one of the agents again and to see if Dr. Abdalla could hand one of them the phone.

MR. BIALE: Okay. So Your Honor, at this time I would play the rest of the video, given what you've heard about Ms. Greer's memory of what was said on that phone call, but I don't want to take up the time if the court would be prepared to receive the video in evidence now.

THE COURT: Well, I have this problem, but perhaps Mr. Kanellis wouldn't object on this ground. That's not the original video because the visages of the agents are obscured. Someone has done that. If he has no problem with that, I am prepared to receive the video as a video of whatever it records. So we'll ask him.

MR. KANELLIS: Your Honor, obscuring the faces is not the issue. The issue is it hasn't been properly authenticated. If Ms. Abdalla wants to come and lay the foundation, no issue with that.

THE COURT: I think it's been adequately identified, and that objection is overruled, and A1 is admitted as an

exhibit, now it will be Exhibit 237. 237. But I'll review it, so we need not play it.

(Exhibit 237 admitted into evidence.)

MR. BIALE: That's fine, Your Honor.

BY MR. BIALE:

Q. Let me just ask so the court understands because it's a good point. The court pointed out that the faces are obscured in the video. And I think you testified before that you received the video from Dr. Abdalla shortly after it was taken; is that right?

12:31

A. Yes, approximately two hours later.

Q. In the version that you received from Dr. Abdalla, were the agents' faces obscured?

A. No.

Q. Okay. How did, if you know, how did the faces of the agents come to be obscured in the video?

A. We, as a legal team, knew that there has been a respectful protocol when videos are shown publicly to blur out the faces of other people besides, you know, the person agreeing to make the video public. So as a team, we decided to blur out the

12:32

video -- excuse me, blur out the faces. And I was privy to part of those conversations, and then one of the legal team members undertook that, the blurring.

Q. Just to be clear, that was to protect the identities of the agents who were involved in the arrest, right?

A. Right, to protect the identities of any person who appeared in the video who was not Mahmoud.
Q. Okay. Now, you've seen this version of the video before? And by "this version," I mean the exhibit that was just admitted into court.
A. The Associated Press version, yes, I have seen it.
Q. And you have also seen the version that Dr. Abdalla sent you two hours after this incident?
A. Correct.
12:32 Q. Other than the obscured faces of agents, is there any difference between those two videos, or are they identical?
A. They appear identical to me, yes.
MR. BIALE: No further questions.
THE COURT: Mr. Kanellis.
MR. KANELLIS: Very short, Your Honor.
CROSS-EXAMINATION BY MR. KANELLIS:
Q. Ms. Greer, is it?
A. Yes.
Q. Let's keep that video up. Have you had -- you are a
12:33 criminal defense attorney?
A. Yes, sir.
Q. And you represent criminal clients who have been accused of breaking the law. Fair statement?
A. I represent people who have been accused of breaking the law.

Q. And have a few of your clients ever been arrested?
A. Sure.
Q. And when they were arrested, have a few of your clients ever been handcuffed?
A. Yes.
MR. BIALE: Objection. Your Honor.
THE COURT: No. Overruled, overruled. This is certainly something that is appropriate. I don't know how far we'll go, but he may proceed with it.
12:33 MR. KANELLIS: I've made that point, Your Honor. I'm going to move on to another one.
THE COURT: All right.
MR. KANELLIS:
Q. Do you remember in the video that hanging from the chests of the two -- and we can play it back if you need your memory refreshed, but hanging from the chests of the two agents were identification badges, correct?
A. I recall seeing at least one.
Q. At least one?
12:34 A. Yeah, I mean, just from memory.
Q. From memory. Do you want, we can play the video back.
THE COURT: It's in evidence. I'm going to have to look at it.
Q. All right. So there was no -- no one was concealing the fact that these were law enforcement officers, right?

A. No.

MR. KANELLIS: Okay. No more questions, Your Honor.

THE COURT: Nothing further for this witness, Mr. Biale?

MR. BIALE: No, Your Honor.

THE COURT: You may step down. So call your next witness.

MR. BIALE: Your Honor, at this time plaintiffs have called all our witnesses who we have not previously identified as being called out of order, and so, except with respect to those witnesses, plaintiffs rest.

THE COURT: All right. And who is left, just so we know?

MR. BIALE: Sure. Sorry. One second.

So here is what it includes. So we have Jeff Reger, who is scheduled to testify on Monday. He's the executive director of MESA.

On Tuesday, the government is going to be calling the agents who were involved in four of the relevant arrests, and we have agreed with the government that, because both sides wanted to call those witnesses, we have agreed that the cross-examinations could go beyond the scope of the direct so that we don't have to call them separately.

And then on Friday, we will have Veena Dubal, who is the head of --

THE COURT: Friday of this week?

MR. BIALE: No. Friday of next week. I'm sorry, would you like to know the whole schedule? I was just telling you plaintiffs' witnesses.

THE COURT: No, no. Keep going.

MR. BIALE: So Friday of next week we will have plaintiffs' additional witnesses. These are the ones who are out of the country this week. Veena Dubal, who is the general counsel of AAUP, and Cinzia Arruzza, who is a professor at 12:36 Boston University.

THE COURT: All that's fine.

MR. BIALE: And we may -- sorry, just to be complete, we may call one very brief summary witness to talk about evidence that's already been admitted or will be admitted, but that's still to be determined.

THE COURT: All right. So the government may call a witness.

MR. KANELLIS: Your Honor, we have operated under the understanding it was going to last -- our first witness would 12:36 be available tomorrow.

THE COURT: Fine. We'll charge you with the time, but that's fine. Well, actually, we'll charge you with the time, but we'll stop the clock now. There were matters that I was going to see you on at 3:00, once I've handled the proceeding I have on for 3:00. I'm happy to handle it now.

Where I'd like to start, if anyone could help me, and I'm looking to the government, is the ex-parte submission in the red folder, I want to see what document, to what document does that relate. And in that document -- you don't have to reveal it to them, but in that document to what words or sentence, if you can point it out. It doesn't have to be done -- oh, Ms. Santora is ready to do it.

MS. SANTORA: I was going to confer with our agent.

THE COURT: You go right ahead.

12:37 MR. BIALE: Your Honor, sorry. Before we get there, I of course forgot about one witness. We have also indicated to the government that we wished to call Stuart Wilson, who is a government official. We have served a trial subpoena for him on the government. The government so far has not accepted service of that subpoena but has told me that he will be available to come to testify either next Monday or next Friday.

MR. KANELLIS: That's not accurate.

MR. BIALE: Which part of it is not accurate?

MS. SANTORA: I can explain. I think I know what

12:38 you're talking about. So we had indicated based on -- or I had indicated, and I'm sorry if this was confusing, that based on the trial schedule as the parties had currently set, it seemed like the only days where there would be available trial time is Monday and Friday. And I had tried to indicate that we were inquiring with our witness as to his availability on those

days, not that he was available.

MR. BIALE: That's fine.

MR. KANELLIS: I apologize for multiple people speaking, Your Honor. One point of clarification, we have I think cooperated very well with respect to sharing time and figuring out how to fill out these two weeks. Mr. Wilson was not identified on their witness list. We had no idea --

THE COURT: Well, I deal with cases in controversy. So far I don't have controversy. Assuming we can get him and fit him in, that's fine.

12:39

All right. Have we got the document we're concerned about or the portion of it?

MS. SANTORA: Yes. Let us just confer for one minute. I want to make sure we have the accurate information, Your Honor.

THE COURT: Well, we've got a whole team here. What was the matter, the housekeeping or other matter that we were going to have to talk about at 3:00? Let's talk about it.

MR. KANELLIS: Your Honor, I would ask that we do that at sidebar. It contains sensitive information.

12:39

THE COURT: Sidebar on the record I will do it.

MR. KANELLIS: Yes, sir.

THE COURT: Very well.

(Sealed sidebar excised from transcript.)

THE COURT: One minute while I total up the time.

MR. BIALE: Your Honor, can I ask one clarifying question?

THE COURT: Of course.

MR. BIALE: This relates to what we were just discussing, but the question can be asked on the public record.

THE COURT: Yes.

MR. BIALE: With respect to the ROAs that were admitted into evidence today, other than the particular one that we just handed back --

12:46 THE COURT: That we're dealing with.

MR. BIALE: I just want to get clarification. Are those part of the public record?

THE COURT: They are not.

MR. BIALE: Those are sealed?

THE COURT: They're sealed. But all -- for instance, though I take it the last video has been on TV and the like, all the exhibits in this case are for the court. This court's protocol is not to share those during the trial or until the court is done with its decision.

12:47 The court in its decision will make reference to those things upon which the court has relied. I've always taken the position that those things, unless classified, and I've dealt with cases that had classified data, are then public so the decision may be thoroughly reviewed by obviously higher courts but anyone who wants to analyze the court's reasoning.

Now, there are various protective orders into which the attorneys have voluntarily entered, and those continue, and you are all subject to those.

MR. BIALE: Thank you for that helpful clarification, Your Honor.

THE COURT: Total elapsed time for the plaintiffs is two days, two hours, 45 minutes. Defense, three hours, 15 minutes. We'll resume tomorrow promptly at 9:00 a.m. Thank you.

(Recess, 12:47 p.m.)

* * * * *

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this 10th day of July, 2025.

/s/ Kelly Mortellite

________________________________

Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter