UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No. 1:25-cv-10685-WGY
Volume 2, Pages 83 - 127

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
Defendants

********

BENCH TRIAL DAY 7

BEFORE THE HONORABLE WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
July 15, 2025

********

Court Reporter: Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter
United States District Court
One Courthouse Way
Boston, Massachusetts 02210
mortellite@gmail.com

A P P E A R A N C E S

RAMYA KRISHNAN
ALEXANDER ABDO
SCOTT B. WILKENS
XIANGNONG WANG
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
Carrie.decell@knightcolumbia.org
and
COURTNEY GANS
NOAM BIALE
ALEXANDRA CONLON
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 540-0675
Cgans@shertremonte.com
For Plaintiffs

ETHAN B. KANTER
WILLIAM KANELLIS
VICTORIA M. SANTORA
JESSICA A. STROKUS
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9123
Ethan.kanter@usdoj.gov
and
SHAWNA YEN
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Shawna.yen@usdoj.gov
(617) 748-3100
For Defendants

## INDEX


| WITNESS | PAGE |
|---|---|
| DARREN MCCORMACK | |
| Direct Examination By Ms. Santora | 86 |
| Cross-Examination By Ms. Conlon | 101 |
| CHRISTOPHER HECK | |
| Direct Examination By Ms. Strokus | 110 |

E X H I B I T S

None

(Resumed, 11:18 a.m.)

THE COURT: Call your next witness.

MS. SANTORA: Your Honor, defendants call Special Agent Darren McCormack.

THE COURT: He may be called.

<u>DARREN MCCORMACK, Sworn</u>

COURTROOM CLERK: Can you please state your full name and spell your last name for the record.

THE WITNESS: Darren McCormack, M-c-C-o-r-m-a-c-k.

THE COURT: Ms. Santora, you may proceed.

DIRECT EXAMINATION BY MS. SANTORA:

Q. Good morning, Detective McCormack. Thank you for being here today. Where do you currently work?

A. HSI New York.

Q. What is your job title?

A. Deputy special agent in charge.

Q. How long have you held that role?

A. Approximately three years.

Q. What are your responsibilities in that role?

A. Operational and administrative oversight of Division 1, which was comprised of criminal investigators, special agents, administrative staff and intel.

Q. When did you begin working for United States Government?

A. 2005.

Q. In what capacity?

A. As a special agent with HSI.
Q. Where were you located?
A. My first duty assignment was Newark, New Jersey.
Q. Did you receive training before you started that duty assignment?
A. I did.
Q. Where did you receive training?
A. The Federal Law Enforcement Training Center in Glynco, Georgia.
Q. Can we refer to that as FLETC?
A. Yes.
Q. What training did you he receive at FLETC?
A. I received three months of criminal investigative training and three months of ICE-specific special agent training.
Q. And you said that following that you worked as a special agent in Newark, New Jersey?
A. Yes.
Q. How long were you there?
A. Approximately seven years.
Q. And what was your job after that?
A. From there I went to HSI headquarters in Washington, D.C. and worked on a technical development project as a special agent.
Q. How long were you there?
A. Approximately three years.

Q. And what was your job after that?
A. Following that I was the assistant attache in the U.S. embassy in Vienna, Austria.
Q. How long were you in Vienna?
A. Four years.
Q. And after Vienna?
A. After Vienna, back to Newark, New Jersey, as a supervisory special agent for approximately a year and a half to two years.
Q. And following that?
A. Following that to New York, HSI New York as an assistant special agent in charge for approximately two years.
Q. And following that?
A. My current role.
Q. Your current role. Does your office's work involve enforcing criminal laws?
A. Yes.
THE COURT: Let me interrupt. I'm one question behind here. So you were assistant to special agent in charge, and now you're an assistant special agent in charge, but they're different. Can you explain that to me.
THE WITNESS: I was an assistant special agent in charge, and now I'm a deputy special agent in charge.
THE COURT: Which is higher.
THE WITNESS: One rank higher. And then one above that is the special agent in charge, which is essentially the

CEO of the office. That's the number one of the office.

THE COURT: Thank you.

THE WITNESS: Yes.

BY MS. SANTORA:

Q. Does your office's work also involve enforcing Title 8?

A. Yes.

Q. What is Title 8?

A. Criminal immigration law.

Q. In the time that you have worked at HSI, has HSI always had authority under Title 8?

A. Yes.

Q. How many people do you supervise as a deputy special agent in charge?

A. Approximately 120 to 130 special agents, plus task force officers, plus mission support, plus intelligence officers.

Q. Do the agents that you supervise make arrests?

A. Yes.

Q. And in your career working at HSI, have you made arrests?

A. Yes.

Q. Do the agents who work for you who make arrests receive the same training that you received at FLETC?

A. Yes.

Q. And does that include training on making arrests?

A. Yes.

Q. Is making arrests important to HSI's work?

A. Making arrests is a fundamental function of a criminal investigator. So special agents are charged with running criminal investigations, which ultimately should yield arrests and seizures.
Q. Are you familiar with HSI's protocols and procedures for making arrests?
A. For the most part.
Q. Where are those procedures found?
A. In the special agent handbook.
Q. And are the agents who you supervise familiar with those processes and procedures?
A. Yes.
Q. And how are they familiar with them?
A. Through training.
Q. Have protocols and procedures changed in any material way since you received training at FLETC in 2005?
A. Not that I'm a aware of.
Q. I want to talk to you about a particular arrest. Were you involved in the arrest of Mahmoud Khalil?
A. Not personally involved but had some operational oversight of it.
Q. What was your role in that arrest?
A. My role was disseminating information that I received from headquarters to field agents.
MS. CONLON: Your Honor, I apologize for interrupting.

If we could ask the witness to put the microphone closer to him so we can hear him more easily.

THE WITNESS: Sure.

THE COURT: It moves. You be comfortable.

THE WITNESS: Thank you. Is that better?

THE COURT: It is.

MS. CONLON: That's much better. Thank you.

BY MS. SANTORA:

Q. What information did you receive about Mr. Khalil?

A. I received an intelligence packet that had some biographical information on Mr. Khalil, along with some social media posts and some pertinent intelligence information, which is typical for any sort of law enforcement subject of investigation or person of interest.

I received that from my headquarters with instructions. And with the instructions at the appropriate time, I disseminated that intel packet to the appropriate people.

Q. Did you determine that Mr. Khalil was amenable to arrest?

A. At some point I confirmed that Mr. Khalil was amenable to arrest.

Q. And why was he amenable to arrest?

A. Because his immigration status had changed pursuant to the Department of State.

Q. I want to ask you about some specific issues related to his arrest.

What date was he arrested?
A. March 8, 2025.
Q. And do you know if he was handcuffed when he was arrested?
A. He was handcuffed. Eventually he was handcuffed, yes.
Q. Was he not initially handcuffed?
A. He was not initially handcuffed. When he was encountered by special agents, he was free to move freely in the vestibule of his apartment building for a period of time until ultimately the time came that he had to be handcuffed and taken for processing.
Q. And does HSI have a policy on handcuffing people who are arrested?
A. Yes.
Q. What is that policy?
A. Two people, two are present when an individual is placed in custody in handcuffs. Based on the fact and circumstances, safety or otherwise, handcuffed for the safety of the individual and but also for the safety of officers. Hands will be handcuffed either in the front or in the person's back.
Q. And all individuals who are arrested by HSI are handcuffed?
A. Yes, absent some exigent circumstance like a potentially pregnant woman or some other outstanding health issue.
Q. And why is that HSI's policy?
A. For the safety of officers and the people we arrest.

Q. And I think you just said that HSI has a policy that two officers must participate in an arrest?
A. Correct.
Q. Can more officers participate in an arrest?
A. Yes.
Q. What determines how many officers participate in an arrest?
A. It's situational. Every case is different. Because generally we are making criminal arrests, criminals tend to have violent tendencies or violent criminal histories, so more is always better for safety of the agents and for the people present, and there may also be bystanders who are present, depending on where the arrest takes place.
Q. In the event that a person does not have a violent or criminal history, would precautions still be taken with regard to the arrest?
A. Yes, always.
Q. And why is it that you always take precautions with respect to an arrest?
A. Because you're placing somebody under arrest, so reasonably speaking, people who get arrested may not want to be arrested. So for the safety of agents, officers, individuals present and the person being arrested, we have more than -- more is better than less, but by policy at least two.
Q. Do you know how many officers participated in Mr. Khalil's

arrest?
A. Four were present.
Q. Did the officers who arrested Mr. Khalil identify themselves as HSI agents?
A. Yes.
Q. Is it HSI's policy that agents should identify themselves when arresting someone?
A. Yes.
Q. Why is that HSI's policy?
A. Because, again, for the safety and as a sworn law enforcement officer, if you are going to effect an arrest or act in the capacity of a sworn law enforcement officer, you have to identify yourself as such. And during the course of this arrest, all four agents had neck badges visible. Upon encountering Mr. Khalil and his wife they identified themselves but also had visible badges the whole time.

MS. CONLON: Your Honor, I'm going to object to the questions about the specifics of the arrest that this witness wasn't there for as speculation.

THE COURT: I've been listening. You didn't object.

MS. CONLON: I'm sorry. I am objecting now.

THE COURT: You can't object after the question has been answered. If it went beyond the question, you could move to strike. It didn't go beyond the question. It stands. If you have objections, you've put her on notice. Go ahead. She

may go ahead and ask the next question.
BY MS. SANTORA:
Q. You said you did not participate personally in Mr. Khalil's arrest?
A. I did not.
Q. How do you know the circumstances surrounding his arrest?
A. I'm sorry, say that again.
Q. How do you know the circumstances surrounding his arrest?
A. I read the report of investigation about the arrest itself, and I also watched videos of the arrest.
Q. And was that pursuant to your duties as a deputy special agent in charge?
A. Yes.
Q. Did the agents who arrested Mr. Khalil wear uniforms?
A. No.
Q. Why not?
A. HSI's special agents are criminal investigators who are special agents. They run transnational criminal investigations, and we do not have uniforms. We don't identify -- we always work in plainclothes, have unmarked government issued vehicles, all in furtherance of being undetected, appearing not to be law enforcement.
Q. Did the agents who were involved in Mr. Khalil's arrest wear masks?
A. No.

Q. Does HSI have a policy on whether agents can wear masks?
A. No policy, no.
Q. Does your office allow agents to wear masks?
A. We do.
Q. Why?
A. Well, during COVID, masks were sometimes mandatory, but also often for health and safety reasons. Currently in the world of social media and doxing and for safety of agents and their families, agents will wear masks to protect their identities.
Q. Do undercover agents typically wear masks?
A. We have undercover agents who specifically do undercover work. And if they are assigned to do some sort of fieldwork, they very often will wear masks to conceal their identity as their true identity but also their undercover identity.
Q. Following Mr. Khalil's arrest, did HSI transport him anywhere?
A. Agents transported Mr. Khalil to 26 Federal Plaza, which is a federal processing facility for HSI and ERO. At the completion of processing, Mr. Khalil was turned over to ERO custody.
Q. So at that point HSI no longer had custody of Mr. Khalil?
A. Correct.
Q. Were you told that Mr. Khalil was being arrested because of his support of Palestine?

MS. CONLON: Objection.
THE COURT: Overruled.
A. No.
Q. Were you told that Mr. Khalil was being arrested because of his criticism of Israel?
A. No.
Q. Why were you told that Mr. Khalil was being arrested?
A. Because of the change in his immigration status, the change in his immigration status which now left him illegally present in the United States and amenable to arrest.
MR. SANTORA: Thank you. No further questions.
THE COURT: Ms. Conlon.
MS. CONLON: Before I begin, Your Honor, I'd like to make a record that we have not received any reports of investigation about Mr. Khalil's arrest, and we would want them. And if the court has them and they're disclosable to us, we would love to receive them before we question this witness.
THE COURT: That's appropriate, an appropriate request. I have various data that has not been disclosed. I understand that the ROA has been disclosed.
MS. CONLON: That's right.
THE COURT: You know, in all honesty, there's nothing here that I recall -- yes, there's a report here of his arrest. It's on the documents that I have, it's numbered 23 and 24 and 25 of the 337 pages that have been given to me. I'd call that

a report of arrest.

And does the government object to turning this over to the plaintiffs?

MS. SANTORA: Your Honor, we do based on privilege grounds.

THE COURT: Well, what privilege, though, applies to this?

MS. SANTORA: Your Honor, I'd have to see the document that you're looking at.

THE COURT: Here, take a look at it. Report of the arrest is what she asked for. I mean, you called this witness.

MS. CONLON: My understanding is the privilege that we think was asserted with respect to this document, though it's a little hard to know --

THE COURT: She hasn't identified any privilege yet that I heard.

MS. CONLON: Okay. Your Honor.

MS. SANTORA: Your Honor, we would assert law enforcement privilege over this document.

THE COURT: Law enforcement privilege for something that's happened?

MS. SANTORA: Well, this talks about the officers' actions leading up to the arrest.

THE COURT: Well, yes, so it does, but these are the common -- it doesn't reveal any special technique. It doesn't

reveal anything that is uncommon. I don't mean it critically, but this is what law enforcement officers do.

MS. SANTORA: To the extent it reveals their methods and techniques leading up to the arrest.

THE COURT: But that's true. If the privilege were that broad, no police report could ever be produced if the government decided not to produce it. That's not the law enforcement privilege. You give me some case that sweeps that broadly.

That's what has baffled me from the outset here. This has no forward-looking aspect. It has no revelation as to planned law enforcement operations, and at least in my limited experience this all looks like just sound police work carrying out their directions.

MS. SANTORA: Your Honor, to the extent that it reveals the methods that the officers used in surveilling an individual, that could be extrapolated to other cases and allow other individuals to potentially --

THE COURT: Let me see. Since you don't seem to be able to put your finger on it and we have to work from the -- now, this you say can be extrapolated from -- actually, we have another copy. But so if you need one, Mr. Hohler will give you one.

You did surveillance and had his picture. I don't see anything -- and I mean no disrespect -- anything specifically

secret about going about criminal investigations that way. No. It's overruled.

And I really scrupulously want to honor the stay of the Court of Appeals, but this does not seem to fall within that order, and it may be given to the plaintiffs, and Mr. Hohler will give a copy to the plaintiffs, pages 23, 24 and 25 of 337.

MS. SANTORA: Your Honor, unfortunately, we only have a copy that is double-sided, which will reveal an additional page.

THE COURT: We'll give you our copy. It happens I have two copies, and I have a wonderful law clerk who can find it. You may have it.

MS. CONLON: May I receive a copy?

THE COURT: Oh, yes. I said we have all these copies. Now I'll give you the one that I have.

MS. CONLON: Thank you.

THE COURT: There's two sets. And what we'll do is we'll let her cross-examine. We'll xerox the copy, or when she's done her cross-examination, she can give you the copy she's been operating from and you can use it for redirect if you wish. Go ahead, Ms. Conlon.

MS. CONLON: Yes, Your Honor.

THE COURT: Once again, after all this work, it's hardly a smoking gun.

MS. CONLON: I take the court's word for it, and one of my colleagues will surely let me know.

THE COURT: We lawyers have to act like lawyers.

THE WITNESS: I understand. You're doing a good job, Judge.

MS. CONLON: For better or worse.

THE COURT: Go ahead.

CROSS-EXAMINATION BY MS. CONLON:

Q. Okay. Agent McCormack, is that -- what's the right title to use?

A. That's fine.

Q. On March 6, thereabouts, you received initial instructions concerning Mahmoud Khalil, right?

A. No.

Q. Okay. On what date?

A. I became with aware of Mr. Khalil on or around the 7th, March 7th.

Q. And on the date that you became aware of him you received some initial instructions about him, right?

A. Yes.

Q. Those instructions included conducting pattern of life surveillance; is that right?

A. The instructions were to locate him and, yes, establish a pattern of life with surveillance.

Q. And those instructions came from HSI senior leadership,

right?
A. Through other channels, but yes, ultimately through HSI leadership at headquarters.
Q. And through other channels, meaning it filtered to you through the special agent in charge?
A. Correct.
Q. Now, at that time when you first were made aware of Mr. Khalil, you did not understand him to be the subject of a criminal or civil enforcement action; is that correct?
A. Can you repeat the question?
THE COURT: When you first heard of him, you didn't understand that he was the subject of a criminal or civil investigation, when first you heard of him?
THE WITNESS: No, I did not understand him to be either.
BY MS. CONLON:
Q. You understood at that time that somebody at a higher level than you had some interest in him; is that right?
A. I was informed that somebody at a higher level than the people I was speaking to had an interest in him for whatever reason.
Q. Someone at a higher level even than the special agent in charge, in other words?
A. Correct, but this conversation was not with the special agent in charge.

Q. Who was this one with?
A. The acting assistant director.
Q. The acting assistant director --
A. For domestic operations, for HSI's domestic operations.
Q. William Walker?
A. Yes.
Q. And William Walker conveyed to you that the State Department had an interest in him, right?
A. I believe at some point the State Department's interest came up in conversation, yes.
Q. Just a moment.
He conveyed to you, specifically, that Secretary Rubio was interested in Mr. Khalil, correct?
A. At some point I was made aware that the Secretary of State and/or the White House had an interest in Mr. Khalil.
Q. And you were made aware of that through Mr. William Walker?
A. Correct.
Q. Now, approximately the day after you began or HSI began surveilling Mr. Khalil, you received a memo from the State Department about him, right?
A. Can you repeat the first part of the question, for the timing.
Q. Sure. The day after you became aware of Mr. Khalil and were surveilling him, you then received a memo about him from

the State Department, right?
A. Correct.
Q. The memo indicated that the State Department had determined that he was removable, correct?
A. The memo indicated that his status, his immigration status in the United States had changed. It did not say anything about -- if we're talking about the same document --
Q. I'm not sure if we are.
A. I don't recall it saying anything about his removability.
Q. That his status had changed in a manner that made him no longer a lawful permanent resident or something to that effect?
A. Something to that effect.
Q. Now, you had never seen a memo like this?
A. When you say "like this" --
Q. A memo from the State Department in this manner.
MS. SANTORA: Objection. If we're discussing a document, can we show the witness?
MS. CONLON: My time is short and I think we all know the document I'm talking about so I'd prefer not to.
THE COURT: I'm not sure that he knows it. They talk about these A4(c) memos. Is that what you --
THE WITNESS: I'm understanding the memo written by Secretary of State signed at the top.
THE COURT: Right.
THE WITNESS: Yes, yes, if that's what we're referring

to.

THE COURT: She may question.

MS. SANTORA: Your Honor, we would ask that to the extent they continue to question on the document the witness be shown the document.

THE COURT: Show him the document. She may continue.

Q. In your current position, you had never seen a memo like this before signed by the Secretary, correct?

A. When you say "like this," can you be more specific?

Q. A memo from the Secretary indicating that a person's status had changed, correct?

A. I've seen memos from the Secretary of State before when I worked overseas.

Q. I'll ask you again. In your current position you had never seen a memo from the Secretary of State indicating that a person's status had changed, correct?

A. I have not, correct.

Q. Now, you got this memo, and after you received it, you checked in with somebody named William Joyce who works in ERO, right?

A. Yes.

Q. And you did that because civil Title 8 enforcement is usually in the purview of ERO, correct?

A. I did that because while Title 8 or any sort of civil, criminal or administrative enforcement is in the statutory

authority of HSI agents, we historically, in the recent time, had not enforced those laws. So in an effort to comply with what my headquarters was asking, I wanted to confirm there was a legal basis for arrest with Mr. Joyce.

Q. Right. So headquarters HSI told you to make the arrest, but you checked in about it with William Joyce at ERO, correct?

A. HSI headquarters said, "Do your best to find him. If you find him, arrest him."

Q. And then you checked in about it with ERO, right?

A. Correct.

Q. And you checked in with ERO because they're the steward, historically at least, of all things immigration that are civil in Title 8, right?

A. It's more of their priority mission set, yes.

Q. And after checking in with ERO, that was when you determined that Mr. Khalil could be arrested; is that right?

A. I had confirmation from ERO that he was arrestable, given the change in status referenced in the Secretary of State's memo, at which point I informed -- I delegated the same instructions of locate and arrest to people in my chain of command.

Q. You weren't there for the arrest, correct?

A. I was not there for the arrest.

Q. What you know about it is what the people who effected it told you and whatever you saw in videos; is that right?

A. And what I read in multiple records reports.
Q. There were multiple reports about his arrest?
A. There was a synopsis that was provided to me that night. There was a synopsis emailed to me. There was a traditional report of investigation. There was what I believe the judge was just looking at, the report, I think it's an I-213. I think that's it.
MS. CONLON: Okay. I'm going to make the court aware that that, to us, sounds like there are several more documents relating to this arrest that we have not received, and I'll just turn to finish this examination.
Q. You don't know why HSI had to do this civil arrest of Mr. Khalil rather than ERO, do you?
A. Repeat the question.
Q. You're not sure why it was that this got assigned to HSI when it was a civil enforcement action as opposed to ERO, correct?
A. No, I'm not sure why.
Q. You wondered about it at the time, and you still don't know, correct?
MS. SANTORA: Objection.
THE COURT: Well, it's compound, so I'll sustain it.
Q. You wondered at the time why it was coming to you, correct?
MS. SANTORA: Objection.

THE COURT: Overruled.

THE WITNESS: Am I answering that?

THE COURT: Yeah, you answer.

A. I wondered why HSI was effectuating this arrest, not ERO, yes.

Q. And you still don't know?

A. I don't know.

MS. CONLON: Nothing further.

THE COURT: Nothing further, Ms. Santora?

MS. SANTORA: Nothing further.

THE COURT: You may step down. And may I have the document back? Simply because -- what we'll do is, the record is clear I showed it to you. Today we'll cause copies to be made both to the government and for plaintiffs so you know exactly what it is that I asked --

MS. CONLON: Your Honor, with respect to those additional documents, does the court know whether the court is in receipt of these additional reports that the witness mentioned?

THE COURT: No. I'm not going to be put in a position of culling through everything. I'm doing the best I can. You're going to give me a list, and in addition to the list I suppose you're going to give me a request, and I will take my time promptly and address it.

MS. CONLON: With respect to the next witness --

sorry.

THE COURT: Let's call the next witness while we're talking.

MS. CONLON: Okay. Well, it's an application to preclude the next witness, so I don't know if you want him in the room for it or not.

THE COURT: It's what?

MS. CONLON: An application to preclude the next witness, simply on this ground. Your Honor indicated Friday of last week very clearly that we weren't going to be putting on witnesses who had not been deposed. This is a witness who we did not get to depose. We had asked the government to let us. We brought that to the court's attention. The court said, "Work it out between the parties." It didn't work out. We didn't depose him. We move to preclude him.

MS. STROKUS: Your Honor, may I be heard?

THE COURT: Yes.

MS. STROKUS: Your Honor, since last Friday we have made Agent Heck available to plaintiffs. They simply have not asked to depose him yet.

THE COURT: He may testify. I'll give rather broad cross-examination. He may be called.

MS. SANTORA: Your honor, defendants call acting special agent in charge Christopher Heck.

THE COURT: He may be called.

CHRISTOPHER HECK, Sworn

COURTROOM CLERK: Can you please state your full name, and spell your last name for the record.

THE WITNESS: Sure. It's Christopher Reid Heck, H-e-c-k.

THE COURT: Thank you. You may be seated.

Ms. Strokus, you may continue -- or you may commence.

DIRECT EXAMINATION BY MS. STROKUS:

Q. Good morning, Mr. -- excuse me, Special Agent Heck.
A. Good morning.
Q. Where do you currently work?
A. I currently work in the Immigration and Customs Enforcement, Homeland Security Investigations, Washington, D.C. field office.
Q. And what is your current job title?
A. My current job title is acting special agent in charge.
Q. How long have you held that role?
A. Approximately five months.
Q. And what does a special agent in charge do?
A. Sure. In my current capacity, I'm responsible right now for administrative and operational oversight of our office's operations in the District of Columbia, the Commonwealth of Virginia and West Virginia.
Q. When did you begin working for the United States Government?

A. Approximately June 2003.
Q. And what were you doing?
A. When I first became employed by the U.S. Government, I started out as a U.S. Customs inspector in Tampa, Florida.
Q. What did you do after that?
A. So U.S. Customs transitioned into U.S. Customs and Border Protection after the merger after 9/11. Then I became hired by Immigration and Customs Enforcement, Homeland Security Investigations around November of 2008.
Q. Can you briefly walk us through the different roles you've had at HSI?
A. Sure. Upon graduation of the Federal Law Enforcement Training Center in Glynco, Georgia, I was initially assigned to the New York field office for approximately eight or nine years.
Within that stint, I was assigned an 18-month TDY or temporary duty assignment to our headquarters in Washington, D.C. And then upon arriving back at the New York field office, I was promoted to a program manager in the front office where the special agent in charge worked at the executive leadership and was supporting executive leadership at the time.
Then I was promoted again in the New York field office to a group supervisor or supervisory special agent over our trade enforcement group in New York.
Q. And after that you became the acting special agent in

charge in Washington?
A. No. So after New York, I took a promotion as the resident agent in charge in Jackson, Mississippi, and that was in roughly February 2019.
And then I became an assistant special agent in charge in our St. Louis office, overseeing operations in most of Missouri outside of the suburban Kansas City area as well as the eastern part of Iowa.
After a short stint there, I took a temporary detail, temporary duty assignment to our headquarters again where I became the acting deputy assistant director for our public safety and border security division in headquarters.
From there, in 2003, I was the HSI chief of staff for approximately two years prior to this current role.
Q. And you mentioned that you had received training all the way back when you first started with HSI, correct?
A. Yes, ma'am.
Q. And that was at what is commonly referred to at HSI as FLETC, the FLETC training center?
A. That is correct.
Q. And what type of training did you receive there?
A. Sure. You receive basic law enforcement training, such as firearms training, arrest techniques, handcuffing, defensive tactics, physical fitness and also, because we are investigators, we also receive criminal investigator training

program, criminal investigator training where we receive customs law, a little bit of immigration law as well as other activities.
Q. And after that training was complete, did you receive any other training?
A. Sure. Throughout the course of my career and every special agent's career, we get annual training, legal training, firearms training, defensive tactics training. Depending on what type of investigative discipline you're assigned, whether it is criminal investigations or Title 8 work, you receive on-the-job training and sometimes advanced training as well.
Q. So would it be fair to say that you've received continuous training on law enforcement techniques?
A. Yes, ma'am.
Q. As the acting special agent in charge for the Washington, D.C. area, how many people do you supervise?
A. Between administrative and government law enforcement officers as well as state and local task force officers, it's roughly 400.
Q. And of the agents that you supervise, do they also receive the same training that you receive?
A. The special agents do, yes.
Q. And that includes continuous training on law enforcement techniques as well?
A. Yes, quarterly defensive tactics training as well as

firearms training.
Q. What type of work do the agents that you supervise perform?
A. Agents under my purview, with any HSI special agent, we conduct criminal investigations pursuant to Title 18 of the U.S. Code, Title 19 of the U.S. Code, as well as Title 8 enforcement operations.
Q. In your rather long career at HSI, have you personally performed arrests?
A. I have.
Q. And are you familiar with the protocol surrounding arrest operations?
A. I am.
Q. Are your agents that you currently supervise similarly familiar with arrest protocols and practices?
A. Yes, they are.
Q. I would like to ask you a few questions about the arrest of Mr. Badar Khan Suri. Were you involved in that arrest in any capacity?
A. In charge of the field office, I oversaw the arrest, but I was not physically present at the time of arrest.
Q. So what was your role in the arrest?
A. To oversee the administrative arrest of Badar Khan Suri.
Q. Were normal HSI procedures followed with respect to Mr. Suri's arrest?

A. Again, I was not out there present on the street with the arrest. However, there would be no -- yes, the proper protocols would have been followed if I would have been --

MS. CONLON: Objection, Your Honor. I'm moving to strike this as speculative based on his response.

THE COURT: Well, I'll let what he responded to stand and I'll stop him at that point. He doesn't know of any deviation from procedure is what I get from him.

Q. Would you have been informed if there were any deviations from regular HSI procedures that occurred at Mr. Suri's arrest?

MS. CONLON: Objection. Calls for speculation.

THE COURT: Sustained. It does.

Q. With respect to Mr. Suri, when did you first become aware of Mr. Suri?

A. Sometime in mid March. I don't recall the specific date.

Q. And how did you become aware of Mr. Suri?

A. I received a phone call from our headquarters stating that the Department of State may deem Mr. Suri removable and that he may be amenable to administrative arrest at some point should that removability happen.

Q. And did you receive any instructions from headquarters on what to do with respect to Mr. Suri at that time?

A. Yes, sure. Headquarters just stated to get out and start beginning surveillance to try and locate Mr. Suri in the event that the State Department deemed him removable.

Q. Did HSI engage in this surveillance of Mr. Suri?
A. We did, yes.
Q. And at what point did HSI arrest Mr. Suri?
A. A few days later. Again, I don't remember the specific dates. I want to say I was notified on the weekend, and I believe he was arrested on a Monday night, from my recollection.
Q. Are you familiar with how Mr. Suri was arrested?
A. I'm aware that he was arrested in the Rosslyn, Virginia area and taken into custody there administratively, yes.
Q. Are you aware of any specifics with respect to Mr. Suri's arrest?
A. The specific arrest, he was apprehended in Rosslyn and taken into custody as normal protocol policies would dictate.
MS. CONLON: Objection, Your Honor. Moving to strike that last portion as speculative.
THE COURT: He doesn't know any evidence that they were not. I'll let it stand for that. Go ahead.
Q. At any point were you told or was it ever suggested to you that Mr. Suri was going to be arrested because of his support for Palestine?
MS. CONLON: Objection, form.
THE COURT: Overruled. I've allowed questions in this form. It goes to the heart of the case. They may get his answers.

A. Can you repeat the question, please?
Q. Sure.
THE COURT: Were you ever told or was it suggested to you that the reason for his arrest was his support for Palestine?
A. No.
Q. Were you ever told or was it ever suggested to you that Mr. Suri would be arrested because of his criticism of Israel?
A. No, never told that.
Q. Did you ever receive any communication of any kind at any time indicating that Mr. Suri was being arrested because of his political views?
A. No.
MS. STROKUS: I tender the witness, Your Honor.
THE COURT: Thank you.
Any questions for this witness?
MS. CONLON: No, I don't think we do.
THE COURT: You may step down. Thank you.
All right. That concludes the testimony for today. I'm not charging this last hour to anyone because witnesses that are available and could be called clearly fall within the stay of the Court of Appeals, and to honor that stay, it would be unfair to charge the time. Let me tote up the time that we have used and we'll recess.
Total elapsed time, plaintiff three days, one hour, 35

minutes. Defense, one day, three hours, five minutes.

One thing, anticipating that we may get Mr. Armstrong back and I think we've discussed it sufficiently that I'm able to rule. I do rule that the assertion of the deliberative privilege applies to those statements apparently of Mr. Armstrong on the discussion letters, so I'm not going to consider those statements. However, given Mr. Armstrong's central role here, he may be examined as to his views about the matters where he has written something on those statements.

Should he not remember, the discussion letters may be used to refresh his memory without them being in evidence, and I think that's sufficient under the circumstances.

MS. CONLON: Your Honor, may I -- sorry.

THE COURT: Actually, I saw Ms. Santora first. We'll go with their side first, but I could use the recess.

Ms. Santora, anything before we recess?

MS. SANTORA: Yes, Your Honor. We do have documents that the plaintiffs requested earlier today.

THE COURT: Then they may of course be disclosed.

Mr. Kanellis.

MR. KANELLIS: Your Honor, yesterday we raised the question of the timing of the posttrial --

THE COURT: You did and I didn't answer it. I don't know that I can answer it, but I'm thinking about it.

Here is what I'm thinking. Suppose my hopes are

realized and at least the stay is lifted. My primary goal, as I reported to the Court of Appeals, is to get through the evidentiary portion, and I'm going to do that. And then I'm going to entertain final arguments. I'm open to 45 minutes a side final arguments, but don't take this as an expansion of the time limits. If they go that long, probably that will be on another day. But final arguments, as I conceive of it, should be immediate or the next day because everything is out here, I will be more imbued with the case than at any time.

MR. KANELLIS: Your Honor, just a point of clarification. Sorry to interrupt.

THE COURT: I'm over-speaking, I know. Go ahead.

MR. KANELLIS: No. I'm interrupting. When you say final, are you talking about the written briefs?

THE COURT: No, no. I'm talking about the oral arguments.

MR. KANELLIS: And we'll be prepared to do the oral argument on Friday, but my question is about the written posttrial brief.

THE COURT: I was getting there.

MR. KANELLIS: I apologize.

THE COURT: Right. At that time, because I expect this to be interactive as I have been throughout, especially when you're making the arguments, both sides, I will say, as I have at other times, "But what about the statute," for example.

I can imagine my saying in anticipation of some expected argument, "But don't you think that," whatever, and we'll go back and forth.

Now, how you take my initial reactions is going to inform the briefs. So when we're done with that, as I reported to the Court of Appeals and it remains my intention, that's the time we will say, "When can you get me, I want requested findings of fact and rulings of law addressed to phase one." And of course I will accept posttrial briefs which have the appropriate citations to what's going on here at trial.

Does that answer your question?

MR. KANELLIS: Yes, Your Honor. I just want to make sure that you're not expecting from us a written posttrial brief on Friday.

THE COURT: Why did I just speak?

MR. KANELLIS: Yes.

THE COURT: Okay.

MS. CONLON: Your Honor, we have some questions and requests. Regarding closing arguments and posttrial briefing, we'd I guess ask the court and the government to consider this. We think that the court and the parties could benefit from having briefed the legal argument before it is argued so that the court may ask questions as to the arguments that are actually being put forward by the parties. In other words, we would suggest strongly that we be able to submit the posttrial

brief and then have the legal argument on the brief.

It seems difficult to do that on Friday before the court has actually received an articulation of what these arguments are, and we want to make sure we are responsive to the court's questions. And we have been working on our brief throughout diligently because we understood it was due Friday.

So if the court -- I understand the government wants more time for their brief. If the briefs were submitted Monday, we could appear truly as soon as the court wanted to do argument about it, but we want to make sure that we are as efficient as we can be with the court's time and that we are responsive to the court's questions. So that's my first request.

THE COURT: I've got to think about it. My initial reaction is, I think I'm a pretty transparent person, and I've got in mind the questions I have about the issues that are before the court. I don't know that I need some separate argument. In other words, do it in two stages.

And my hesitancy is this. Some of it depends on the finding. And to me the finding, it is very -- findings, plural, are first and foremost. What do I think of all this? And as to that, I hope I've been, as judges should be, appropriately cagey, but that's because I very much want to hear it all before, in a written opinion, I commit myself in a sound written opinion.

I'm not embarrassed by the objections. The guts of it are before the court, and I really think counsel on both sides have done a fine job. I just don't know what --

MS. CONLON: Would the court consider --

THE COURT: I mean, arguing the law, the law doesn't make much difference until we know what the facts are.

MS. CONLON: With that, I think we're on the same page. And what I would like to propose is we argue on the facts on Friday. We all have heard the testimony. The court sat through it too, we're all in a position to discuss it, but that you allow us to appear to respond to Your Honor's questions on the law after we have submitted to you how we think the law applies to these facts. In other words, two parts. So what we would propose is that on Friday we do the findings of fact.

THE COURT: If I need it, I'll call you back.

MS. CONLON: Okay.

THE COURT: Go ahead. What else?

MS. CONLON: Yes, next, okay. In terms of the sort of the thing you said at the very beginning about Mr. Armstrong, since I will be, if we're allowed to, resuming that cross and I want to make sure I heard it. I missed part of what you said. You said the deliberative process privilege applies. Is it only to his annotations?

THE COURT: Yes.

MS. CONLON: Okay. I just wanted make sure I got that. Then with respect to certain documents, obviously, we understand that this is in front of the circuit right now, but we wanted to make the court aware that in what we have received from the court we have not seen the action memos, the Armstrong action memos for Mr. Suri or for Mr. Mahdawi.

We can tell from various filings the government has made that the court received those as exhibits to docket 131, Exhibit M and Exhibit N. We received L and O, not M and N as in Nancy. And we are making the request for those in advance of -- depending on what happens, but in advance of Mr. Armstrong's cross-examination. We think they are part of the core documents in the case.

THE COURT: When you say "depending on what happens," you mean depending what the Court of Appeals does?

MS. CONLON: Well, I think we've made our position to this court and the circuit clear that we think that these particular documents should be squarely permitted to be part of this examination, but I'm saying -- yes, so yes.

THE COURT: That's right. Because reading their order, and it's an order, fairly, I'm not disclosing anything that trenches on that order. Depending upon what I am told, to the extent that I have discretion, I will wisely exercise that discretion. Beyond that, there's nothing I can say.

MS. CONLON: And one more thing to ask the court to

consider, if the court will allow me. Obviously, the court knows that we are very focused on time, and we appreciate that the court is, too. The court indicated that closing arguments could occur Friday, up to 45 minutes. We just want to make sure we understand whether that comes out of --

THE COURT: That comes out of your trial time.

MS. CONLON: Okay. And then we understand the court to have calculated our trial time as three days, one hour and 35 minutes and wanted to clarify whether that is inclusive of the ten-minute-or-so colloquy I had with the court and the government about whether they would give us this report before I began my cross-examination. I'm scraping for -- I'll take, even if I can get my ten minutes back, I'll take them. That's the level of desperation.

THE COURT: That's the ruling of the court. I've done it fairly since I came on the bench at 9:00.

All right. I do thank you all.

I don't know as you're going to be done by Friday. I mean, I think we might well shoot for Monday here, so -- well, I don't know. We have Armstrong's cross, redirect, et cetera, and we have -- those are the only two witnesses that are left, right?

MS. CONLON: Armstrong, Watson, the government's summary witness, and Veena Dubal for the plaintiffs.

THE COURT: Okay. I don't know if we're going to be

done. You know, let me say, and I probably shouldn't do this. I don't have much trouble with their summaries. It seems to me that the summaries are, broadly speaking, relevant. I do have trouble with one witness trying to put in all these summaries, unless that witness had something to do with preparing the summaries. That does seem to be the First Circuit law. But I'd just as soon not waste time on the witness and accept the summaries. They're peripheral, but assuming they're accurate, that's what people were posting or not posting, and it might be helpful to see it.

MS. CONLON: Your Honor, I would defer to my colleague.

THE COURT: Wait a minute. The gentleman I haven't heard from, just simply --

MR. WILKENS: Yes, Your Honor. Mr. Wilkens, Scott Wilkens.

THE COURT: Mr. Wilkens again, yes, sir.

MR. WILKENS: Yes. One quick question, which is, did you receive the motion in limine that we filed yesterday on these exhibits?

THE COURT: I did.

MR. WILKENS: Okay.

THE COURT: That's what caused me to speak.

MR. WILKENS: Okay. Thank you, Your Honor.

THE COURT: It's not a ruling. I'm just talking.

See, if I sit here and talk with you, the time goes by.

Ms. Conlon.

MS. CONLON: I hear the court, and unfortunately I think that our view would be that we -- we have concerns about the reliability of the summary exhibits and whether they show what they purport to show, in other words. We of course don't know -- we don't know who prepared them, obviously, so I can't address that.

THE COURT: Well, a summary exhibit, if it was a jury, let's say they pass 1006, I would always say to the jury, "Now, I'm letting you see this because this, they say, purports to summarize voluminous exhibits." Then I trash it in front of the jury. I say, "Now, understand, they made this up for this trial."

Now, I give myself the same instruction. But I'd just as soon have a more complete record rather than a less.

Mr. Kanellis.

MR. KANELLIS: I'll just note for the record this summary witness will comply with the *Milavetz* decision, which is the controlling First Circuit decision on 1006 summaries, and you'll be relieved to know he's going to be ten minutes on the stand. That's it.

THE COURT: Now it's time for me to recess. We'll recess. I don't sit tomorrow, as I said. 9:00 on Thursday, assuming we have something to do, but we have at least the

witnesses not covered by the First Circuit's order, and I would like to hear those witnesses. Thank you. We'll recess.

(Adjourned, 12:17 p.m.)

* * * * *

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this 15th day of July, 2025.

/s/ Kelly Mortellite

_______________________________

Kelly Mortellite, RPR, RMR, CRR

Official Court Reporter