UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
Defendants

*********

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Thursday, July 17, 2025

********

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A P P E A R A N C E S

RAMYA KRISHNAN, ESQ.
CAROLINE DeCELL, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
ALEXANDRA CONLON, ESQ.
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 540-0675
Email: Cgans@shertremonte.com
For Plaintiffs

ETHAN B. KANTER, ESQ.
WILLIAM KANELLIS, ESQ.
VICTORIA M. SANTORA, ESQ.
JESSICA STROKUS, ESQ.
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9123
Email: Ethan.kanter@usdoj.gov
and
SHAWNA YEN, ESQ.
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Email: Shawna.yen@usdoj.gov
For Defendants

# I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MOHAMED MAKLAD | | | | |
| By Mr. Kanellis | 5 | | | |
| By Mr. Biale | | 18 | | |
| ANDRE WATSON | | | | |
| By Mr. Kanellis | 26 | | | |
| By Ms. Krishnan | | 60 | | |

## E X H I B I T S

| | |
|---|---|
| EXHIBIT 240 | 22 |
| EXHIBIT 241 | 22 |
| EXHIBIT 242 | 80 |
| EXHIBIT 243 | 97 |
| EXHIBIT 244 | 98 |
| EXHIBIT 245 | 99 |
| EXHIBIT 246 | 99 |

P R O C E E D I N G S

(Begins, 9:00 a.m.)

THE COURT: Because I have authorized internet access to these proceedings, it's appropriate to say that if you are attending these proceeding via internet, you must remember that the rules of court remain in full and effect, and that means there is no taping, streaming, rebroadcast, screen shots, or other transcription of these proceedings.

Also, you must keep your microphone muted. That's very important. And if you do not, I shall have to cut you off.

Very well. The plaintiffs are calling two witnesses. You may call your first witness.

MR. KANELLIS: Your Honor, today the government will be calling two witnesses.

THE COURT: I misspoke. And, Mr. Kanellis, you may call the first of the two.

MR. KANELLIS: Your Honor, the U.S. government calls Mohamed Maklad.

THE COURT: He may be called.

(MOHAMED MAKLAD, sworn.)

THE CLERK: Can you please state your full name and spell your last name for the record.

THE WITNESS: My name is Mohamed Maklad, and my

last name is M-A-K-L-A-D.

THE COURT: Mr. Kanellis, you may proceed.

**************

MOHAMED MAKLAD

**************

DIRECT EXAMINATION BY MR. KANELLIS:

Q. Mr. Maklad, where do you work?
A. I work at Homeland security Investigations.
Q. And that's a part of the Department of Homeland Security?
A. That is correct.
Q. And what is your job at Homeland Security Investigations?
A. I'm a Supervisory Analyst.
Q. And what do you do as a Supervisory Analyst?
A. I conduct research and analysis in support of our agency's needs.
Q. As a Supervisory Analyst, have you had any experience retrieving data and information from public sources?
A. I have.
Q. And in that role have you had any experience analyzing and summarizing data from public sources?

A. I have.
Q. Why are you here to testify today?
A. I'm here to provide summary exhibits on public events and publications by AAUP and MESA.
Q. You said by AAUP and MESA?
A. Yes, correct.
Q. And those are two of the plaintiffs in this case, correct?
A. Yes, sir.
Q. And then you said, um -- did you say "public events"?
A. Yes, I did.
Q. What do you mean by "public events"?
A. Events that we're able to access through publicly-available information that occurred of some kind of gathering.
Q. You also mentioned, I think, "publications," is that right?
A. I did, sir.
Q. What do you mean by "publications"?
A. Anything that would be associated with the plaintiffs.
Q. Okay. Can you describe for the Court the volume of public events and publications you've retrieved when searching for the information that underline these

charts?

A. For all of --

MR. BIALE: Objection.

THE COURT: Well the chart's not yet before the Court, but this is where he's going. Overruled. He may have it.

A. Thousands, sir. Over a thousand of volumes that we got to make these exhibits.

Q. And have you compiled these thousands of references to the summary charts?

A. I have.

Q. Did you compile the sources for the work underlying these summary charts?

A. I have.

Q. And how did you do so?

A. I did so on an EXCEL spreadsheet, sir.

Q. Did you say an EXCEL spreadsheet?

A. EXCEL spreadsheets.

Q. Can you move the microphone a little bit closer to you?

A. (Moves mic.)

Q. Yes, thank you.

Was the spreadsheet with the sources for the data you compiled provided to plaintiffs in this case?

A. It was.

MR. BIALE: Objection.

THE COURT: Well do you know that?

THE WITNESS: I provided it to the defense.

THE COURT: Well my question is to you, do you know that it was provided? And you started to answer. You provided them?

THE WITNESS: I provided it to the defense team.

THE COURT: Okay. And when did you do that?

THE WITNESS: I did that on July 3rd, sir.

THE COURT: Thank you.

Go ahead.

MR. KANELLIS: Your Honor, may I approach?

THE COURT: You may.

MR. KANELLIS: Let the record reflect I'm handing you, the witness, three exhibits marked for identification.

THE COURT: And which are they?

MR. KANELLIS: Sir, they are HJ, HL, and HH.

THE COURT: All right.

(Hands to witness and judge.)

THE COURT: Proceed.

Q. Are these exhibits that you prepared for this litigation, sir?

A. They are.

MR. KANELLIS: Let's pull up Exhibit HJ, labeled

"Comparison AAUP Public Events 2022 through 2025."

(On screen.)

Q. Can you explain to the Court what information you're attempting to summarize with this exhibit?

A. This is a summary of the total number of events listed on AAUP's websites, between 2022 and 2025.

Q. And does it include the entire year of 2025?

A. It includes just the first 6 months of 2025.

Q. And what do you mean by "public events"?

A. These were events listed on the AAUP websites, um, various webinars, gatherings, and things that would bring people together over a certain cause.

Q. And how were you able to determine that these public events were sponsored or promoted by the plaintiff, AAUP?

A. I determined that by pulling it from their website directly.

Q. And how do you know you were looking at AAUP's website?

A. Based on the AOR, sir, the AAUP network.

Q. Now with respect to looking at AAUP's website, is it possible, in your mind, that AAUP sponsored more events than are listed on this website?

MR. BIALE: Objection.

THE COURT: Well I'm going to sustain that, "Is it

possible?" Let's get to the guts of it.

What's the difference between blue and red here?

THE WITNESS: Your Honor, blue represents the overall events and red is events that have been identified as being related to Palestine and Israel.

Q. And how many events total did you see promoted on AAUP's website?

THE COURT: Well the document speaks for itself. What's the relevance of this?

MR. KANELLIS: Your Honor, this shows AAUP's political activity after 2025. After the ideological deportation policy was in place, it increased, it did not decrease. It was unaffected by AAUP's --

THE COURT: Yes, I understand your point.

Yes?

MR. BIALE: Your Honor, if I may?

THE COURT: Yes.

MR. BIALE: No one is claiming, in this case, that the organization's speech has been chilled. The organization's --

THE COURT: That's understood. I've limited it.

MR. BIALE: Yes.

THE COURT: But it's peripherally relevant, and so I'll admit it.

HJ is admitted.

MR. BIALE: Your Honor, I'm sorry, I have a further objection to this document.

THE COURT: Yes?

MR. BIALE: We don't know anything about the methodology that this witness used to determine what is a Palestine/Israel-associated event.

THE COURT: He's here for cross-examination. I'll reconsider it.

MS. CONLON: He stated --

THE COURT: I said it's "peripherally relevant." It's a line in their closing argument, I suppose.

MR. BIALE: And, your Honor, the data about these events is also not in evidence. He's saying he pulled it from the website.

THE COURT: But it's available to you?

MR. BIALE: But we don't know what he looked at, your Honor.

THE COURT: Oh, wait a minute. Wait a minute. Well that slows me down.

And so Mr. Kanellis can address that?

MR. KANELLIS: Your Honor, we made the witness available, then we produced --

THE COURT: No. No.

MR. KANELLIS: They elected not to question him.

THE COURT: No, the data has got to be produced.

MR. KANELLIS: We produced it.

THE COURT: Is this all you gave them is this?

THE WITNESS: And the source data, your Honor.

THE COURT: And the source data?

THE WITNESS: Yes, your Honor.

THE COURT: And what does the source data look like?

THE WITNESS: It's an EXCEL spreadsheet, your Honor, that contains all of the --

THE COURT: Okay.

Is that one here?

MR. KANELLIS: Um, yes, your Honor.

THE COURT: Can I see it?

MR. KANELLIS: We can pull that. It's on --

Your Honor, we -- we don't have the --

(Discussion.)

MR. KANELLIS: We don't have a physical copy, your Honor, with us.

(Pause.)

MR. KANELLIS: The source data, your Honor, was sent to plaintiffs.

THE COURT: No one's impugning that, he so testified.

MR. BIALE: Well, your Honor --

THE COURT: I mean can I see what it looked like?

MR. KANELLIS: Yes, your Honor, we will -- but we're going to have to print that out.

THE COURT: All right, then we'll reserve on admitting it.

MR. BIALE: For clearing the record, your Honor, I believe he testified that he sent the source data to defendants. Now we received spreadsheets, but I don't know what this data relates to.

THE COURT: Well all right. I need help on this, so I'll vacate the admission of this, but he can go on.

Let's find out about these other ones, quickly.

MR. KANELLIS: Um --

THE COURT: You said 10 minutes, Mr. Kanellis.

MR. KANELLIS: Yes, I did.

THE COURT: Go ahead.

Q. How many events are listed by AAUP in Exhibit --

THE COURT: Well the document speaks for itself. If you get it in evidence, the numbers will be there. Let's look at the evidence.

(Pause.)

MR. KANELLIS: Let's go to "Hotel Lima," Exhibit HL.

(On screen.)

Q. And what's the purpose of this chart?

A. The purpose of this chart is to show, um, what the

witness has identified, to testify in this case, um, their searches or their associations related to Palestine or Israel in Google Overtime in 2024 and '25.

THE COURT: Forgive me for interrupting.

THE WITNESS: Yes, sir?

THE COURT: I don't know what that means, "associations relative to Palestine"?

THE WITNESS: Yes, your Honor.

THE COURT: Tell us what you mean by that?

THE WITNESS: So basically, sir, what we've done is we've taken all the names on the bottom on the, um -- in random, in Google, and identified whether their name, and "Israel" and "Palestine," has come with a result in Google in 2024 and 2025, showing an association between that name and some kind of publication on Israel and Palestine.

THE COURT: I see. I see. And blue is 24 and red is 25?

THE WITNESS: Yes, your Honor.

MR. BIALE: Your Honor --

THE COURT: Wait a minute. Wait a minute.

How is this relevant?

MR. KANELLIS: Your Honor, the plaintiffs have claimed that -- the individual witnesses have claimed that they were active and associated with issues with

Palestine and Israel prior to the implementation of the ideological deportation policy in 2025. This shows that if there was any public association with those witnesses and the issue of Palestine and Israel, it increased after -- for most of these witnesses, after the implementation of the ideological deportation --

THE COURT: If I understand though, this is some Google search where -- and we'll take Professor Nickel as an example, where his name and "Palestine" is in the same reference.

Is that correct?

THE WITNESS: That's correct, your Honor.

THE COURT: Yeah, that's too remote. It's excluded. Let's look at the, um --

MR. KANELLIS: Let's go to the final exhibit.

THE COURT: Yes.

MR. KANELLIS: "Hotel Hotel."

(On screen.)

Q. And, Mr. Maklad, what does Exhibit "Hotel Hotel" depict?

A. Exhibit "Hotel Hotel" depicts a single -- the number of events in a single day in 2024 and 2025 sponsored by AAUP under the Day of action for Higher Education.

Q. What is your understanding of the Day of Action

For Higher Education?

MR. BIALE: Objection, foundation.

MR. KANELLIS: I'm laying a foundation.

THE COURT: And you may.

A. My understanding of the Day of Action for Higher Education is it is sponsored by AAUP and others to engage in free speech activities across college campuses.

Q. And how do you know this was sponsored by AAUP, this National Day of Action for Higher Education?

A. AAUP was quoted saying that they spearheaded this action in 2024, and in 2025, their logo and on their website, "A Day of Action," indicates that they've sponsored these events.

MR. BIALE: Objection, move to strike. Quoted from where? We have no idea where he's getting this information, your Honor.

THE COURT: Well you can inquire.

All right.

Q. And what does this chart show about, um, the, um, political activity of AAUP and MESA from April 17th, 2024 compared to the same day, April 17th, 2025?

MR. BIALE: Objection. There was no testimony that this is activity of MESA. He stated that this was activity of MESA.

THE COURT: Correct.

MR. BIALE: Although the exhibit says "MESA," and I'm not sure where that comes, your Honor.

MR. KANELLIS: Oh, I can give you that foundation, your Honor, I can explain.

Q. Why do you include "MESA" on the title page of this exhibit?

A. MESA was also included as a sponsor on their website, "Day of Action."

Q. And how do you know that?

A. I saw the emblem on the website where I pulled the information from.

MR. BIALE: Objection.

Q. And then what did the exhibit show about the political activity of MESA and AAUP comparing 2024 and 2025?

A. In 2024, there were approximately 9 events that occurred, um, according to the website where I pulled this information. And in 2025, there were approximately 191 events that occurred, according to this --

Q. What is the increase percentage-wise in events sponsored by AAUP and MESA from 2024 to 2025?

A. Approximately 2000 percent.

Q. 2000 percent?

A. Yes, sir.

MR. KANELLIS: Your Honor, we tender the witness.

Oh, your Honor, actually -- my apologies. We move into evidence the Exhibits HH and, um, the first exhibit?

THE COURT: HJ.

MR. KANELLIS: Yes, sir.

MR. BIALE: Your Honor --

THE COURT: I'll reserve until I've heard cross-examination.

Mr. Biale, go ahead.

MR. BIALE: Okay. And very briefly.

CROSS-EXAMINATION BY MR. BIALE:

Q. You said that these are related to the National Day of Action, right?

A. Yes, sir.

Q. And the National Day of Action is an event that, um, has, um, relates to topics -- a variety of topics that AAUP and MESA have an interest in, right?

A. Correct.

Q. And in fact, in the source data you provided, the very first event description is "Indiana Graduate Workers Coalition went on Strike at Indiana University," right?

A. That's correct, that's what I provided.

Q. Okay. You don't know -- you have no idea whether that strike had anything to do with Israel or Palestine, right?
A. On the website it claims that these were, um, looking for opportunities to combat, um -- to provide opportunities for free speech to include Palestine and divestment issues, according to the Day of Action website.
Q. What website are you talking about? You keep mentioning a website.
A. The Day of Action website where I obtained this information from.
Q. Okay. And what is the URL for the Day of Action website?
A. I can retrieve it. It's a "Coalition for Higher Ed.org."
Q. Okay. And a "Coalition for Higher Ed," that's a different organization from AAUP, right?
A. It's sponsored by AAUP on the website.
Q. "Yes" or "No." Is the Coalition for Higher Education the same as AAUP?
A. It is not.
Q. Is the Coalition for Higher Education the same as MESA?
A. It is not.

Q. Okay. Now looking at these charts that you show. Assuming, just for the sake of argument, that these are in fact political activities engaged in by these organizations between 2024 and 2025, what this shows, right, is that the organizations have engaged in much more political activity in 2025, correct?

A. That is what is shown, correct.

Q. Okay. So whatever resources that they were deploying to other things in 2024, in 2025, they've deployed those resources much more to political activity, right?

MR. KANELLIS: Objection, your Honor, vague.

THE COURT: No, overruled.

A. Can you repeat the question, please?

Q. I said whatever resources they had to direct to other activities in 2024, they have directed more of those resources to political activities to 2025, "Yes" or "No"?

A. I'm not sure I -- I cannot answer that. I don't know what the resources were in 2024 versus 2025.

Q. Well presumably it took some resources of the organization to plan these events, right?

MR. KANELLIS: Objection, calls for speculation.

THE COURT: Well, on this foundation, I have to sustain it.

MR. BIALE: All right. If I could have one moment?

(Pause.)

Q. Now with respect to HJ, sir, you testified that these were public events, right?

A. That is correct, from the AAUP website under the events tab.

Q. Okay. And when you said "public," you meant that there was public information available about them on the website, correct?

A. That is correct.

Q. You don't know whether these events were attended by members of the public, right?

A. I am not aware of that. I just know what I was able to pull from the website.

Q. Okay. And that website, again, doesn't have any information about whether these were public events in the sense that everyone from the public was invited, right?

A. All this is showing is the number of events over time and what was displayed on the AAUP website. Whether they were public or private? I don't know.

Q. You don't know. Okay.

(Pause.)

Q. And all you know is they were advertised, you

don't actually know if these events occurred, right?

A. I do not know if they occurred, but I know they're advertised by AAUP.

MR. BIALE: Nothing further.

THE COURT: I will admit both Exhibits HH as Exhibit 240 and HJ as Exhibit 241.

(Exhibits 240 and 241, marked.)

THE COURT: You have nothing else for this witness, do you, Mr. Kanellis?

MR. KANELLIS: No, sir.

THE COURT: All right, you may step down.

Call your next witness.

MR. KANELLIS: Your Honor, the United States -- the government defendants call Assistant Director Andre Watson.

MS. CONLON: Your Honor --

THE COURT: Now wait a minute.

MS. CONLON: I just want an exhibit number.

THE COURT: Ms. Conlon, I have no direction from the Court of Appeals. Now my understanding is that Mr. Watson is familiar with documents that to which the stay undoubtedly applies, so I don't know what we're doing.

I -- in other words, I am not going to -- I recognize that when the stay went into effect, we, um,

had heard the direct examination of Mr. Armstrong, and we had one question or two on the cross-examination, and then the stay went into effect.

Now I suppose I could take his direct examination, um, but we're not going to get anywhere on cross-examination in light of the stay. Though I'm not going to consider the direct of either Armstrong or Watson if somehow I am precluded from considering the documents as to which the stay presently applies.

So with that said, I'm not clear what we're doing. And I'll start with you.

MR. KANELLIS: Well, your Honor, it was our understanding, and perhaps it was an misimpression, that certainly we are delaying Mr. Armstrong's cross, or the remainder of it, until we hear from the First Circuit. But it was our understanding we could proceed with Mr. Watson today with direct and cross on the --

THE COURT: But they can't cross on the documents that are, um -- I mean I'm not going to permit it, because I have to obey the stay. Even if you told me, "Well we'll waive it," I must obey it. And so of course I will.

So, I'm sorry, this is part of the problem of a stay in the midst of trial proceeding. But, um, I just don't think it will be as coherent as if we did it all

at once.

So --

MS. KRISHNAN: Your Honor, may I be heard on the issue of documents?

THE COURT: Yes. Why don't you, once again, introduce yourself.

MS. KRISHNAN: Yes. Good morning, your Honor, my name is Ms. Krishnan.

THE COURT: Yes.

MS. KRISHNAN: So I'll start by saying that the only documents that are part of the core documents that we plan to cross-examination Mr. Watson on are the letters that he authored that went to the State Department, and our understanding is that the First Circuit stay doesn't reach those documents because those documents are ones over which the government only claims the law enforcement privilege, and we had understood your Honor to have overruled the assertion of that privilege.

THE COURT: And your understanding is correct. Your understanding of what I've done is correct. But I read the order of the Court of Appeals -- and I'm not at all clear that their understanding is the same as mine.

So unless the government agrees with you and has no problem with -- I certainly accept your

representation that there's no problem allowing cross-examination as to those transmittal letters, then I'd be fine.

But Mr. Kanellis?

MR. KANELLIS: That's fine with us, your Honor.

THE COURT: Oh, it is?

MR. KANELLIS: Yes.

THE COURT: All right.

MR. KANELLIS: That is the --

THE COURT: No, no, I'll hold her to it. I mean she's an officer of the court.

He made be called.

(Pause.)

THE COURT: And while he's coming, are we clear then that the only thing that remains for the evidentiary presentation is the cross-examination of Mr. Armstrong, if you press to have Armstrong as a witness, is that right?

MS. KRISHNAN: Yes, in addition to, um, one of plaintiffs' witnesses, Professor Veena Dubal, who is the General Counsel of AAUP.

THE COURT: Yeah, when are we going to hear her?

MS. KRISHNAN: Friday.

THE COURT: Okay, thank you.

(ANDRE WATSON, sworn.)

THE CLERK: And please state your full name and spell your last name for the record.

THE WITNESS: Yes, ma'am. Andre Watson. My last name is spelled W-A-T-S-O-N.

THE CLERK: Thank you.

************

ANDRE WATSON

************

DIRECT EXAMINATION BY MR. KANELLIS:

Q. Good morning, Mr. Watson. I'm going to call you "AD Watson," because your title is "Assistant Director." Is that all right with you?

A. Yes, sir.

Q. AD Watson, who do you work for?

A. U.S. Immigrations and Customs Enforcement.

Q. And what is your current position?

A. The Assistant Director of the National Security Division.

Q. And for how long have you held the position of the Assistant Director for the National Security Division?

A. Since July of 2020.

Q. Let's talk briefly about your background. Where did you grow up?

A. I grew up in the Tidewater Region of Virginia, sir.
Q. And did you go to college?
A. Yes, sir.
Q. Where did you go to college?
A. Ultimately the Old Dominion University in Norfolk Virginia.
Q. After you graduated from college, um, what year was that actually?
A. In 1993, sir.
Q. And what did you do after you graduated from Old Dominion University in 1993?
A. I accepted an appointment to the position of Special Agent with the United States Customs Service.
Q. Briefly describe for the Court your responsibilities as a Special Agent for the Customs Service?
A. Conducting criminal investigations as to violations of customs and federal law, in addition to revenue collection investigations in furtherance of customs duties.
Q. Was that your first employment with the federal government?
A. Yes, sir, it was.
Q. May I ask you why did you want to work for the

federal government?
A. I grew up in a house that had military backgrounds with my father and I always saw a career either in the military or in law enforcement.
Q. How long did you remain as a Special Agent for the U.S. Customs Service?
A. Until the creation of the Department of Homeland Security.
Q. And when was that?
A. March of 2003, sir.
Q. Do you have an understanding, based upon your experience, of why the Department of Homeland Security was formed in 2003?
A. Yes, sir, I do.
MS. KRISHNAN: Objection.
Q. What is your understanding?
A. It was created in response to the terrorist attacks that occurred on 9/11.
Q. And what -- can you describe generally the changes that occurred with respect to the U.S. Customs Service in 2003?
MS. KRISHNAN: Objection, relevance.
THE COURT: No, no, he may do it. Generally.
How did things change?
A. For Special Agents assigned to the U.S. Customs

Service, we were merged with Special Agents from the Immigration and Naturalization Service, and for uniformed personnel with U.S. Customs Service, they were merged with uniformed personnel from the Immigration and Naturalization Service, and two agencies were created therein, being one, um, Immigration and Customs Enforcement, and the other being U.S. Customs and Border Protection.

THE COURT: Just so I'm clear, prior to this merger, the first agency was in what Cabinet Secretary?

THE WITNESS: For U.S. Customs Service, that was within the Department of Treasury, your Honor.

THE COURT: And --

THE WITNESS: And the Immigration and Naturalization Service was within the Department of Justice.

THE COURT: Understood. Thank you.

THE WITNESS: Yes, sir.

Q. So since 2003, you said the Department of Homeland Security was created. Was the Department of Homeland Security Investigations also created at that time?

A. Um, ICE was.

Q. Uh-huh. And what about -- can you explain to the Court the difference between ICE and HSI, if there is one?

A. Yes, sir. Homeland Security Investigations is a program office within U.S. Immigrations and Customs Enforcement.
Q. Okay. Now since 2003, you've worked for HSI, correct?
A. Yes, sir.
Q. And has HSI's mission changed or stayed the same since 2003?
A. It has stayed the same.
Q. Have priorities changed with different administrations since your -- since its inauguration in 2003?
A. Yes, sir.
Q. Can you give some examples of priorities changing with different Presidential administrations?
A. Yes, sir. I can begin with during the Obama administration that our priorities realigned to organized crime and firearms trafficking, to include firearms smuggling from the United States into the Republic of Mexico.
Q. Okay. And were there any other changes after the Obama administration left office?
A. Yes, sir, with the first Trump administration.
Q. Okay. Now you're aware that this case centers around HSI's enforcement of its Title VIII mission,

right?
A. Yes, sir.
Q. Can you explain to the Court briefly what your understanding of the Title VIII mission is?
A. The Title VIII mission for HSI focuses on opportunities to conduct criminal investigations as it relates to violations of United States Code. That sometimes goes into the space of Title VIII in areas such as Alien smuggling and so forth.
Q. Does Title VIII also include civil law violations?
A. It can.
Q. And in 2003, was HSI's mission, did it include the ability to enforce civil immigration laws?
A. Yes, sir.
Q. And just to be clear, were HSI's authorities, in 2003, different than they are now?
A. No, sir.
Q. You've talked about, um -- strike that.
Has the emphasis on Title VIII enforcement changed over time?
A. Yes, sir, it has.
Q. Well can you describe how it's changed?
A. It has changed in areas like investigations -- criminal investigations, in furtherance of worksite enforcement, labor trafficking. So there have been

times where HSI Special Agents have leveraged opportunities to conduct criminal investigations into those activities and allegations.

Q. And has the emphasis on Title VIII enforcement changed with different administrations?

A. Yes, sir.

Q. Does the -- do these changes impact the way HSI does business, in your experience?

A. No, sir.

Q. Can you explain to the Court why, if the priorities regarding Title VIII are different, your responsibilities remain the same?

A. Pursuant to our statutory authority, by way of the Homeland Security Act of 2003, as well as DHS delegation Order 7030.2, we've always had that authority to conduct criminal investigations to include enforcement of the Immigration and Nationality Act. So if we encounter a scenario where we're conducting a criminal investigation and we in turn identify an undocumented alien or a foreign student that is present without inspection or out of status or here otherwise contrary to law, we can, in coordination with the principal legal advisor and/or Enforcement and Removal Operations, take action.

Q. Let's take a step back to your background for a moment after you began working at HSI in 2003.

Can you briefly describe for the Court your professional background and promotions?

A. Um, yes. So again, beginning with my employment as a Special Agent with the U.S. Customs Service, I began in Atlanta, Georgia and served there for just under 8 years. And prior to that I took a reassignment to the U.S. Customs Service post in Vancouver or British Columbia as a Customs representative. And from that location I promoted out and became a Supervisory Special Agent in the Wayne Washington field office. At the time we merged and became DHS and then ICE. And then I took reassignment to ICE headquarters serving as a Section Chief and Unit Chief within the National Security Division.

And then on to an Assistant Special Agent in Charge in our Houston, Texas field office. Then back to headquarters to serve at the Department of Justice International Organized Crime Intelligence Operations Center. And then a reassignment to the Office of the Director to serve as the Chief of Staff to the Deputy Director. And then as a Deputy Special Agent In Charge in the Washington, D.C. field office. Then Special Agent in Charge in the Baltimore, Maryland field office. Before a detail assignment to DHS headquarters to serve as the Principal Deputy Assistant Secretary for the

Countering of Weapons of Mass Destruction field office.
Q. And what do you do now, again?
A. The Assistant Director for the National Security Division.
Q. How many people work for the National Security Division approximately?
A. Up to 400 employees, sir.
Q. What is the mission of the National Security Division?
A. Our mission is to leverage Customs and Immigration Authorities through programmatic support for HSI Special Agents that are assigned to the FBI's Joint Terrorism Task Force, as well as the Counterintelligence Task Force, to HSI Special Agents that are assigned to our Human Rights Violators and War Crimes Center -- as well as Unit, and also to our Special Agents that are working in the Counterintelligence Development Unit. And finally, with regards to the Student and Exchange Visitor Program compliance and oversight functions for just over 7,000 certified schools and universities in a student population of just under 1.3 million.
Q. The Student and Exchange Visitors Program, I think I mixed up that. Can you describe that a little bit?
A. Yes, sir. So that has primacy for oversight and compliance functions as it relates to colleges and

universities that are SEVP certified. So you're looking at a population of just under 7,000 schools. But you also have designated school officials, just under 40,000, that are certified by SEVP, to coordinate the functions of schools and universities in compliance with the code of federal regulations. And again, the student population is just under 1.3 million currently in the United States.

Q. How does the enforcement of immigration laws under Title VIII touch on issues of national security?

A. With regards to Title VIII, um, we are talking about non-immigration Visa holders and overstays, alien overstays, but also foreign students that are studying in the United States. So by way of the movement of people comes the opportunity for the United States government to screen and vet those persons that are coming into the United States.

So through our lines of effort and through partnerships across the agencies, we work hand and glove with the Department of Justice and the Department of State to identify risk and innate vulnerabilities as it relates to individuals that are presenting themselves for inspection or entry into the United States. But also while they're here in the United States, to ensure that they are in compliance with the laws thereto. If

there are threats or concerns that are raised, we coordinate with the inner agency to take action as appropriate.

Q. Why do these threats or concerns cause -- or how does that cause you, in the NSD, to take action?

A. With threats and concerns, we look to activities, associations, and/or conduct, and if there is linkage to foreign terrorist organizations or there are other national security or public safety concerns, those are indicators of opportunities whereby further analysis and review is required to determine if that person's presence is contrary to law.

Q. Since your work in 2003 with HSI, are you aware of historical events where immigration concerns have overlapped with the National Security Division's mandate?

A. Yes, sir.

Q. And can you provide examples of those?

A. Most recently, um, we've had instances of foreign students that have made threats at colleges and universities, and based on reports that came to the attention of law enforcement either by way of local law-enforcement representatives assigned to the Joint Terrorism Task Forces or to the school officials. HSI was brought in to conduct criminal investigations in

coordination with the JTTF in the case of one school, and in the case of another, after the fact, successfully taking action by one, issuing NTAs, in the case of one school, for individuals that were arrested on state charges, and in the instance of the other, issuing an NTA pursuant to a threat made by a student against a university Professor.

THE COURT: What's an "NTA"?

THE WITNESS: A "Notice to Appear," your Honor.

THE COURT: Thank you.

Q. And are there other historical events where the National Security Division has investigated matters relating to immigration?

A. Yes, sir, there is a continuous requirement in that space where the National Security Division has supported our Special Agents that are assigned to the Joint Terrorism Task Forces, and I have the privilege of seeing that information by way of reporting from my personnel at FBI headquarters, sir.

Q. Okay. Was the Boston Marathon Bombing, was that an example of such an immigration-related national security concern?

A. Yes, sir.

Q. And how about the San Bernadino attack?

A. Yes, sir.

Q. Okay, let's be clear about something. Does HSI make evaluations about whether someone may or may not receive a Visa?
A. Yes, sir.
Q. You make the evaluations or -- or how do you make those evaluations?
A. We contribute to that process.
Q. I see. And has that always been the case since HSI was formed in 2003?
A. To the best of my knowledge.
Q. Does HSI make decisions to revoke a visitor's Visa?
A. No, sir.
Q. What agency do you understand makes that decision?
A. The Department of State, sir.
Q. You were aware of the charges in the complaint, um, filed by the American Association of University Professors and other organizations, right?
A. Yes, sir.
Q. I'm going to refer to that organization as AAUP.
Are you familiar with the allegations that the government is targeting certain foreign Visa and green card holders for protesting?
A. Yes, sir.
Q. So that we can address them, describe your

understanding of what those allegations are?
A. That we are looking to, um, foreign students and/or potential faculty members and targeting them based on their speech alone.
Q. Does the U.S. government target individuals for removal from the U.S. based solely on participating in public protests?
A. No, sir.
MS. KRISHNAN: Objection.
THE COURT: The objection's overruled. The answer may stand.
Q. In the last couple of years, have you been aware of incidents relating to public safety at public protests?
A. Yes, sir.
Q. And, um, how are you aware of that?
A. Through reporting, um, to my division by way of personnel assigned to the Joint Terrorism Task Forces.
Q. Okay. And I believe earlier you discussed threats at school offices, right, is that what you're referring to here?
A. Yes, sir.
Q. Has HSI turned its attention to what is happening at certain on-campus protests?
A. HSI is aware of those activities based on

referrals that come to our agency, sir.
Q. AD Watson, people have the right to protest in this country, don't they?
A. Yes, sir.
MS. KRISHNAN: Objection.
Q. And people have the right to --
THE COURT: Overruled in that form and the answer may stand.
Q. People have the right to peaceably assemble in this country, correct?
A. Yes, sir.
Q. Then why is HSI aware or -- of what's happening at protests around the country?
A. Upon receipt of referrals and/or information to our Office of Intelligence, sir.
Q. And how does that trigger HSI's statutory authority?
A. The first opportunity comes from the allegation, and then it is to, one, identify either associations or activity, or conduct by persons that are identified in the referral.
Q. Why doesn't HSI just wait until an action or a violence has happened to act?
MS. KRISHNAN: Objection.
THE COURT: Well I think that's too general.

Let's come to this case.
Q. How many different Presidential administrations have you worked under?
A. At least 4 to 5, sir.
Q. With the 4 to 5 administrations you've worked under, have HSI's statutory authorities changed in any material respect?
A. No, sir.
Q. A different question.
With any of these 4 to 5 administrations, has HIS's priorities executing its statutory mission changed?
A. Yes, sir.
Q. When the Trump administration was voted in in November, did that alter in any respect HSI's statutory mission?
A. No, sir.
Q. Since the beginning of President Trump's second term, have the protocols or standards for HSI's enforcement of its statutory mission changed in any respect?
MS. KRISHNAN: Objection, lack of foundation.
THE COURT: Well to the extent of his authority and knowledge, I'm going to let him answer.
Has it within your purview?

THE WITNESS: No, sir.
THE COURT: All right, that may stand.
Q. Are you familiar with what an "Executive Order" is?
A. Yes, sir.
Q. Can you describe for the Court your understanding of what is an Executive Order?
A. An Executive Order is what I will frame as the Commander's intent, by way of the President of the United States, and direction for the Executive Office, and the agencies and department therein, to action accordingly pursuant to the laws that they have available.
Q. In your career, have you had occasion to be part of HSI's response when implementing the objectives of an Executive Order?
A. Yes, sir.
Q. And based on that experience, describe for the Court how HSI responds to Presidential executive orders?
A. Upon more recently notification of an Executive Order from the Trump administration, we look to identify existing lines of effort in program divisions that can complement the requirements or the desired in-state. So we're already looking at our lines of effort to include tactics and procedures that could prove helpful in

fulfilling the requirements therein.

THE COURT: Let me tell you what I heard you say.

In the current administration, upon receipt of Executive Orders, you align your resources and priorities, within the statutory framework or regulatory framework, best to accomplish those goals, is that fair?

THE WITNESS: Yes, your Honor.

THE COURT: All right.

Q. AD Watson, this year you referenced an Executive Order, um, issued by the Trump administration. Was this Executive Order relating to national security?

A. Yes, sir.

MR. KANELLIS: Your Honor, may I approach?

THE COURT: You may.

MR. KANELLIS: Let the record reflect I am presenting the witness what has been marked and admitted into evidence as Exhibit 70.

Your Honor, I have a copy for you, if you would like.

(Hands up.)

MR. KANELLIS: 70.

(On screen.)

Q. Mr. Watson, have you had an opportunity to -- AD Watson, have you had an opportunity to look over this document?

A. Yes, sir.
Q. Are you familiar with this document?
A. Yes, sir.
Q. Briefly describe for the Court what is this document?
A. "Protecting the United States Against Foreign Terrorists and other National Security and Public Safety Threats."
Q. And when did you, um, see this document for the first time?
A. The latter part of January 2025, sir.
Q. And this came from President Trump's office, correct?
A. Yes, sir.
Q. And what was your understanding of what this order related to?
A. Screening and vetting of, um, foreign nationals and aliens.
Q. When you received this Executive Order, did HSI already conduct screening and vetting of foreign aliens?
A. Yes, sir.
Q. What did you do with respect to your responsibilities in your office in response to this, um, upon receipt of this Executive Order?
A. Ensured that my subordinate staff, one, was aware,

and to executing operations accordingly.
Q. What do you mean by "executing operations accordingly"?
A. Existing screening and vetting operations, sir.
Q. And can you elaborate a little bit about what that means in terms of what the National Security Division actually did?
A. Yes, sir. So through process on an annual basis, the National Security Division receives just under 1.3 million records from the U.S. Customs and Border Protection arrival and departure information system. In addition to that, we also receive records from the Student Exchange Visitor Information System, and we also receive records from the Department of State Bureau of Consular Affairs as it relates to potential overstays that are believed to be within the Continental United States.
Q. Did you understand this Executive Order, when you reviewed it and received it, to change HSI's authorities in any way?
A. No, sir.
Q. Did you understand this Executive Order to change HSI's protocols for arrest or investigation?
A. No, sir.
Q. Did it change or alter the tools HSI already had

available with respect to conducting investigations?

A. No, sir.

Q. Did you -- did HSI, in response to this Executive Order, and your office in particular, develop a plan of action to implement the objectives of this Executive Order?

A. Yes.

Q. And can you describe, um, generally to the Court what did that plan entail?

A. That plan entailed a unit within the Office of Intelligence to process referrals, um, from a variety of sources, um, to complement the Executive Order and our existing lines of effort.

Q. Did that, um, initiative that you've just described involve coordination with the Department of State?

A. Yes, sir.

Q. And can you describe for the Court, um -- well, strike that.

Had -- prior to this Executive Order, had HSI in the past coordinated with the Department of State to implement national security interests?

A. Yes, sir.

Q. And describe how you've done so, you, HSI and NSD, have done so in the past?

A. So in the past, with regards to coordination from the Department of State, we've had that through our Human Rights Violators and War Crimes Center, we've had the pleasure of a virtual and/or part-time representative from the Department of State supporting that initiative in the space of human rights violators and war criminals.

Conversely, we've also leveraged that Department of State asset through our Counterthreat Lead Development Unit, as it relates to international military students that are in the United States, that sometimes go absent without leave. And upon receiving notifications from the Department of Defense of that declaration, we then in turn coordinate with the Department of State to make sure that they are aware of that status issue, and then take appropriate action as deemed necessary.

Q. With respect to the Executive Order that is contained in Exhibit 7, you indicated you coordinated with State. Well how did you -- what steps did you take to coordinate with State?

THE COURT: Actually I'm going to interrupt.

Your testimony is that following the Executive Order, you developed a plan of action concerning these matters.

Is that written down anywhere?

THE WITNESS: Not to my knowledge, sir.

THE COURT: All right. Describe it, as best you can, what's the plan now?

THE WITNESS: The plan was -- a team, based within the Office of Intelligence, that would conduct analysis on referrals from a variety of sources and prepare Reports Of Analysis for review and consideration and potential referral to the Department of State.

THE COURT: And these Reports of Analysis, I've heard them referred to as "ROAs," is that correct?

THE WITNESS: Yes, your Honor.

THE COURT: And that's -- in essence, that's the plan?

THE WITNESS: Yes, your Honor.

THE COURT: Go ahead, Mr. Kanellis.

MR. KANELLIS: Your Honor, you anticipated my next line of questions.

THE COURT: Well go ahead.

Q. Which is, um, AD Watson, for purposes of this trial, have you reviewed a visual depiction of the collaborative process between DHS and State?

A. Yes, sir.

Q. And would this chart help you to explain to the Court in understanding how that process worked?

A. Yes, sir.

(Interruption.)

THE COURT: He hasn't shown it to you yet. You're assuming it will help you. I assume he's going to show you what we have marked as HN.

Is that right?

MR. KANELLIS: HO?

THE COURT: Well maybe this is something else. All right.

MR. KANELLIS: I'm not sure about HO. I have the exhibit here, your Honor, and we will --

(On screen.)

MR. KANELLIS: Your Honor, may I approach?

THE COURT: You may.

(Hands to witness and judge.)

Q. AD Watson, we have on the screen here a visual PowerPoint presentation to assist in your testimony to the Court.

Can you describe to the Court, in a little more detail, how this initiative between State and DHS works with respect to DHS's response to the Executive Order?

A. Yeah. So as I understand it, the HSI Office of Intelligence was the "process owner," if you will, by way of their employees being criminal analysts to conduct analyses of referrals of information from a

variety of sources. Those analysts in turn, um, upon receipt of those referrals, would conduct open-source analysis and various checks to, one, validate the availability of information and/or the referral, and they would put together what's called a Report of Analysis. That Report of Analysis was prepared and reviewed and ultimately submitted for approval within the Office of Intelligence leadership framework, and then from there, um, with a letterhead memorandum prepared, in coordination with the Office of the Principal Legal Advisor as well as HSI's Special Agents assigned to the Office of Intelligence on detail, a package for referral to me as the Assistant Director.

Q. Okay. And so here we have, on the screen, depicting the HSI Director for National Security -- the Assistant Director for National Security Division, and that's you?

A. Yes, sir.

Q. Now what did you do when you received this packet?

A. Upon receipt of the approved packet, um, I then reviewed the letterhead, um, memorandum -- the letterhead memorandum letter, as well as the ROA, and with approval signed it, meaning I'm approving the submission package together, and providing a digital signature, and then referred it to the Department of

State.

THE COURT: I just want to -- your testimony was you reviewed it, and with approval, signed it, those were the words that you used. But I understand that to mean you reviewed it, and if you approved it, you signed it?

THE WITNESS: Yes, your Honor.

THE COURT: All right. I understand.

Q. And with respect to the State Department, did you participate in the internal processes of the State Department regarding this referral you sent to them?

A. No, sir.

Q. Did you hear back from the State Department at any point in time?

A. Sometimes.

Q. Sometimes. Not all the time?

A. Correct.

Q. Okay. Well let's pick up again from when you heard back from the State Department.

What happened then?

A. Thank you. We, on occasion, would receive notification from the Department of State that an action letter is forthcoming by way of transmission from the Department of State's Executive Secretary to the ICE Executive Secretary.

Q. And what happened next?
A. Upon receipt of that correspondence, we would then transfer it to the HSI Office of Domestic Operations and then from there to the appropriate HSI field office for action as deemed appropriate.
THE COURT: Just so as I understand this chart. Back it comes with the notation, "Action Letter," but it's parallel, it runs through you and through the ICE Executive Secretary, have I got that correct?
THE WITNESS: Yes, your Honor.
THE COURT: So who, um -- but once that action letter comes out, I don't see any place where action stops, it -- in any event you're notified, the Secretary is notified, and the action letter moves on, because this is a letter for action, to the HSI Domestic Operations Division.
Have I got that right?
THE WITNESS: Yes, your Honor.
THE COURT: So you're notified, but you're not asked to do anything else. Now comes the action from the Department of State?
THE WITNESS: Yes, your Honor.
THE COURT: Okay.
THE WITNESS: And I would further add to that, that in the beginning, some went to me directly, and the

others flowed through the Executive Secretary. So that's the reason why you have two arrows. There were, um, variations in who it went to. But those were the two recipients, either myself or the ICE Executive Secretary.

THE COURT: Or both?

THE WITNESS: Yes, sir.

Q. So then it went to the HSI SAC office, right?

A. Yes, sir.

Q. And in the SAC office, these are regional offices that would be in the place where the individual and his targeting is supposedly located, is that a fair statement?

A. Yes, sir.

Q. Okay. And then were arrests, um, made at that point?

A. Yes, sir.

Q. And what if somebody had left the country, were arrests made?

A. No, sir.

Q. Okay.

THE COURT: Well he's given an example that would justify these red boxes that say "No action." But other than having left the country already, where there other grounds at that stage for no action? Does my question

make sense?

THE WITNESS: It does, your Honor.

For the purpose of this, um, matter, um, no. But in other contexts the answer can be no action. Because if someone does leave by way of a voluntary departure, then there's no action, they left on their own accord.

THE COURT: All right.

THE WITNESS: So that's the reason why you would have that box there.

THE COURT: Thank you.

MR. KANELLIS: Your Honor, we, pursuant to Rule 107, we move into evidence, as a pedagogical exhibit, um, the exhibit, um, you have in your hand.

MS. KRISHNAN: Objection, this is a chalk, it doesn't need to be in evidence.

MR. KANELLIS: Your Honor, you --

THE COURT: Wait a minute. I'm a little unclear here, I guess. I'm perfectly willing to take this as a chalk as I took HN. Isn't that satisfactory?

MR. KANELLIS: Yes, your Honor, it's just a device to aid the Court.

THE COURT: It is, and it is as I understand it.

Q. AD Watson, as HSI's Assistant Director for National Security, do you have some familiarity with the volume of protests that have occurred in the United

States after the attacks of October 7th, 2023?
A. Yes, sir.
Q. And, um, how would you describe the number of protests based on your personal knowledge?
A. It increased.
Q. Have these protests occurred around the country?
A. Yes, sir.
Q. And to your knowledge have any of these protests included speech against the State of Israel or in support of Palestine?
A. Yes, sir.
Q. With respect to the volume of leads that the National Security Division has reviewed, through this process you've just described, has the volume of leads increased by HSI -- received by HSI increased over the last 6 months?
A. Yes, sir.
Q. How much would you say?
A. Um, I'd give it a modest increase, sir.
Q. And have you received leads regarding individuals who have been associated with protests?
A. Yes, sir.
Q. And with respect to the leads you received regarding individuals associated with these protests, about how many total have you reviewed?

A. At least 20. But I don't believe more than 30, sir.
Q. So between the thousands of protests, you've reviewed 20 or 30 referrals, is that a fair statement?
A. Yes, sir.
MS. KRISHNAN: Objection, misstates testimony.
THE COURT: No, he just adopted it. I'm going to let that stand.
Q. I'm going to ask you about five individuals who passed through this referral process you've just described?
Are you familiar with the name "Rumeysa Ozturk"?
A. Yes, sir.
Q. Is Ms. Ozturk one of the individuals referred in the vetting process between DHS and State that you just described?
A. Yes, sir.
Q. Was Ms. Ozturk's referral processed through the vetting procedures you've outlined above?
A. Yes, sir.
Q. And was Ms. Ozturk arrested?
A. Yes, sir.
Q. Was Ms. Ozturk arrested because she engaged in political speech?
MS. KRISHNAN: Objection.

THE COURT: Well I'm going to sustain that. You are leading this witness. You called him.

MR. KANELLIS: All right, that's fine.

Q. Are you familiar with the name "Badar Khan Suri"?

A. Yes, sir.

Q. Is Mr. Suri one of the individuals referred in the vetting process between DHS and State described above?

A. Yes, sir.

Q. And was Mr. Suri's referral given the same multilevel vetting review you've described before?

A. Yes, sir.

Q. Was Mr. Suri arrested?

A. Yes, sir.

Q. Was Mr. Suri arrested because of his political speech?

MS. KRISHNAN: Objection, your Honor.

THE COURT: Sustained.

MR. KANELLIS: Your Honor, what is the basis for the --

THE COURT: You're leading the witness.

Q. Do you know why Mr. Suri was arrested?

A. Yes, sir.

Q. Why was he arrested?

A. Because the State Department took action on his immigration status, sir.

Q. Are you familiar with the name "Mohsen Mahdawi"?
A. Yes, sir.
Q. Is Mr. Mahdawi one of the individuals referred in the vetting process between DHS and State that you described to the Court?
A. Yes, sir.
Q. Did Mr. Mahdawi receive a full vetting for the multiple levels of review you described?
A. Yes, sir.
Q. And was Mr. Mahdawi arrested?
A. Yes, sir.
Q. And why was Mr. Mahdawi arrested?
A. A change by the Department of State in his immigration status.
Q. Are you familiar with the name, um, "Mahmoud Khalil"?
A. Yes, sir.
Q. Is Mr. Khalil one of the individuals referred to in the -- that's referred in the vetting process between the Department of Homeland Security and State that you've described to the Court?
A. Yes, sir.
Q. Did Mr. Khalil's case receive a full vetting through the process you've described to the Court?
A. Yes, sir.

Q. Was Mr. Khalil arrested?
A. Yes, sir.
Q. And why was Mr. Khalil arrested?
A. Action by the Department of State against his immigration status.
Q. Are you familiar with the name "Yunseo Chung"?
A. Yes, sir.
Q. Is Ms. Chung one of the individuals referred in the process you've described regarding the State and DHS collaboration you've described to the Court?
A. Yes, sir.
Q. And did Ms. Chung's case receive a full multilevel review, the same multilevel review you've described to the Court?
A. Yes, sir.
Q. In your career, AD Watson, going back more than 20 years to 2003, have you ever heard of a policy instituted by the U.S. government to target people for deportation based upon engaging in political speech?
MS. KRISHNAN: Objection.
THE COURT: Overruled.
A. No, sir.
Q. In the last year, have you heard about any Visa revocation decisions or removal decisions made by anyone in the U.S. government that remains solely because

someone engaged in political speech?

MS. KRISHNAN: Objection.

THE COURT: Sustained.

Q. Are you aware, in the last year, of any decisions made by anyone in the U.S. government regarding removing a person from the United States for political speech?

MS. KRISHNAN: Objection.

THE COURT: Overruled.

A. No, sir.

MR. KANELLIS: We tender the witness.

THE COURT: Ms. Krishnan.

CROSS-EXAMINATION BY MS. KRISHNAN:

Q. Good morning, Mr. Watson.

A. Good morning.

Q. You were the Assistant Director at the National Security Division, correct?

A. I am.

Q. In HSI?

A. Correct.

Q. That makes you the senior-most official in the National Security Division?

A. Correct.

Q. You report to Acting Deputy Executive Associate Director William Russo?

A. Today, yes.
Q. And you've been in your current role since July 2020?
A. Correct.
Q. And you've worked at DHS since its inception?
A. Correct.
Q. In 2003?
A. Correct.
Q. The President has issued several Executive Orders that relate to HIS's work, right?
A. There are overlaps in the Executive Orders and HSI's investigative authorities, yes.
Q. You need to be familiar with these Executive Orders to do your job?
A. I'm sorry, I'm not following the question, Madam.
Q. Well the Executive Orders that you say overlap with HSI's work, you have to be familiar with those Executive Orders to do your job, correct?
A. We have to be familiar with our authority by way of statute and that training comes from the Federal Law Enforcement Training Center in Brunswick, Georgia. So those are the authorities that give us the ability to conduct investigations. So I would reference the Homeland Security Act of 2003 as well as DHS Delegation Order 7030.2, it is those authorities that give HSI the

ability to conduct criminal investigations.
Q. So your testimony is that you don't need to be familiar with Executive Orders that touch on HSI's work?
MR. KANELLIS: Objection, mischaracterizes --
THE COURT: Sustained, that wasn't his testimony.
Q. Do you need to be familiar with Executive Orders to do your job?
A. (Pause.) Do I need to have situational awareness of Executive Orders? It's helpful.
Q. Did you tell Mr. Kanellis that you were familiar with Executive Order 14161?
A. May I see it again to make sure I'm speaking to the correct one.
THE WITNESS: (From Judge.) Thank you, sir.
A. (Looks.) Yes.
Q. This Executive Order is titled "Protecting the United States from Foreign Terrorists and other National Security and Public Safety Threats"?
A. Yes, ma'am.
Q. Okay. And you are also familiar with Executive Order 14188?
A. By way of this matter, yes.
Q. And it's titled, "Additional Measures" --
THE COURT: Your answer then, that, um -- here's what I hear.

Once this case came up and you were preparing to testify and the like, you became more familiar with that Executive Order, is that accurate what you were saying to me?

THE WITNESS: Yes, your Honor.

THE COURT: And before that you may have known that it existed, but at least in terms of touching on what you say "situational awareness," doing your job, you didn't have any particular, um, awareness of that?

THE WITNESS: Yes, your Honor.

THE COURT: Are my statements fair? I don't want to put anything in your mouth.

THE WITNESS: Your statements are fair. Yes, your Honor.

THE COURT: All right.

Go ahead.

Q. ICE is enforcing Executive Order 14188, is that correct?

A. I'm sorry, state that again. Someone was coughing.

Q. ICE is enforcing Executive Order 14188, isn't it?

A. "Enforcing" the Executive Order?

Q. Yes.

A. May I see it, please?

Q. You'd like to see the Executive Order?

A. Yes, ma'am. I don't have it in front of me.
Q. It's being pulled up on the screen.
A. Okay. (Looks.)
Q. All right. I'm going to ask you again.
Is ICE enforcing the Executive Order 14188?
A. So, Counselor, I only see Page 1 in front of me, and this Executive Order speaks to specific lines of effort and gives primacy to various departments. So I'll reference in Section 3, um, Section C, that the attorney in general is encouraged to employ appropriate civil rights enforcement authorities. ICE is a component within the Department of Homeland Security and not within that framework. So since I can only see the first page, I don't think it's wise to speak beyond that under oath.
Q. And, Mr. Watson, you were deposed in this case, correct?
A. Yes.
Q. You were deposed just over a month ago on June 11th?
A. The month of June, yes. The date I don't remember.
Q. And you understood that you were then under oath?
A. Yes.
Q. And you had an attorney present with you at that

deposition?

A. Yes.

Q. You were asked this question and gave this answer at that deposition.

Question: "So as you indicated in your declaration, ICE enforces the Executive Order 14188, correct?" And your answer was "Yes, ma'am"?

MR. KANELLIS: Objection, your Honor. Can the witness and can I see the transcript so we can --

THE COURT: Well she's read it, and in these circumstances, she's entitled to read it. If she wants to question him, then she should show it to him. But that's what he said on his deposition and I'm allowed to pair it with his testimony at trial, and I do.

Go ahead. Go ahead, Ms. Krishnan.

MS. KRISHNAN: Thank you.

Q. HSI is implementing the two Executive Orders we've discussed?

MR. KANELLIS: I'm going to object again, your Honor, what she said mischaracterizes --

THE COURT: Wait a minute. When I need your argument, I'll ask for it. The objection is sustained.

See he hasn't said it.

MS. KRISHNAN: I was reading from the data, but I believe we've now got the deposition transcript up on

the screen. And this starts at the bottom of Page 11, um, 111, my apologies, and it runs on to the top of 112.

(On screen.)

Q. So it says: "So as you indicated in your declaration, ICE enforces this Executive Order 14188, correct?" And the answer states, "Yes, ma'am."

You said that, right?

A. It's captured in the transcript, Counselor.

Q. Okay, thank you.

And HSI is implementing --

A. I'm sorry, the screen just went dark. I apologize. I can't see it anymore.

Q. Understood. I'm not asking -- this question isn't about your deposition transcript.

HSI is implementing EO 14161 and EO 14188, is that right?

A. (Looks.) HSI has participated in support of Enforcement and Removal Operations as it relates to Title VIII initiatives. So by virtue of that support that HSI, as a program office, has provided to ERO, that that can apply on a large macro scale. But I can't speak to individual instances as I do not have oversight of every operation or investigation that is being conducted in the United States.

Q. HSI has implemented the Executive Orders we've

discussed by initiating a new program, right?
A. That's fair.
Q. Uh-huh. And you learned of this program through an executive briefing in March?
A. That's correct.
Q. Attended by senior HSI leaders?
A. That's correct.
Q. Including Acting Deputy Executive Associate Director Derrick Gordon?
A. Gordon, yes.
Q. And then Acting Executive Associate Director Robert Hammer?
A. That's correct.
Q. Assistant Director of the Office of Intelligence Peter Hatch was also present?
A. That's correct.
Q. As was your deputy, Bradley Etter?
A. That's correct. Well not my deputy, Mr. Etter is the deputy of Assistant Director Peter Hatch. Mr. Etter works within the Office of Intelligence. He's not my deputy.
Q. Understood. And the purpose of this program, what you called the Plan of Action letter, it was to identify protesters whose actions violated the Executive Orders?
A. (Pause.) The plan of action was to address the

referrals of information, um, as it relates to it. So I can't say, as you stated, that is the plan of action, that's not what I recall specifically.

Q. But you became aware of activities at student protests from the Reports of Analysis, that was your testimony?

A. Me personally, yes.

Q. Okay. And the program we'd been discussing, it led to a new process, right?

A. I don't know that it's a new process, because I can't speak to the lines of effort that the Office of Intelligence already has in place.

Q. Well I'm going to return to the deposition transcript. (Pause.) All right, well before I get to the transcript.

This process was new in your time at HSI, is that right?

A. It's new in my role as the Assistant Director where we, by way of the National Security Division, are providing a resource in support thereof.

Q. Were you aware of this process before you assumed your current role as Assistant Director in the National Security Division?

A. Not to my knowledge, no.

Q. Okay. And the process we're discussing, that

involved collaboration between the Office of Intelligence, the National Security Division, and the State Department, right?

A. If you're referencing the meeting between Mr. Hammer, Mr. Gordon, Mr. Hatch, Mr. Etter, and myself? Yes.

Q. And pursuant to this process, the Office of Intelligence creates Reports of Analysis?

A. The Office of Intelligence creates Reports of Analysis by way of a mission-essential function, that's what they do regardless.

Q. "Yes" or "No," the Office of Intelligence creates Reports of Analysis?

MR. KANELLIS: Objection, asked and answered.

THE COURT: It was. But just so I'm clear.

You've always been providing Reports of Analysis, is that correct?

THE WITNESS: Yes, your Honor.

THE COURT: All right. But then you have this meeting -- here's what I'm getting from this.

So you have this meeting, and so your focus in doing what you've always done, that does change about the emphasis on a certain aspect of things.

Isn't that right?

THE WITNESS: Yes, your Honor.

THE COURT: All right.
Q. And at this briefing, you discussed Reports of Analysis on activities contrary to the Executive Orders, those were the specific Reports of Analysis you discussed at this meeting?
MR. KANELLIS: Objection, your Honor.
THE COURT: Sustained, on the deliberative process privileged, what they discussed.
MS. KRISHNAN: This concerns an instruction that was provided at the briefing.
THE COURT: Well you're cross-examining, you may frame it that way, you were instructed thus and so.
MS. KRISHNAN: Okay.
Q. Was the Office of Intelligence instructed to create Reports of Analysis on activities contrary to the Executive Orders?
A. I don't recall that instruction being given or hearing it. I don't recall.
Q. Well as part of the process that we're describing, the Office of Intelligence producing Reports of Analysis on activities contrary to the Executive Orders?
THE COURT: I guess I'm not following. In other words, among the duties that he was expected to see implemented, was Reports of Analysis of activity that ran contrary to the Executive Orders?

MS. KRISHNAN: That's correct.

THE COURT: All right. I follow that.

Is that what you were told? Is that what you were expected to emphasize or focus on, Reports of Analysis of conduct that, among other things, ran contrary to the President's Executive Orders?

THE WITNESS: That was a deliverable that would be produced upon completion of analysis. So it's an output, your Honor, that could result from their efforts to review information received from various sources.

THE COURT: Right, I follow that. So let me put it to you another way.

One of the things you were directed to do was look at your leads and see if, having done your professional work, there's conduct contrary to the Executive Orders?

THE WITNESS: Yes, sir, your Honor.

THE COURT: All right.

Go ahead, Ms. Krishnan.

MS. KRISHNAN: Thank you.

Q. And these reports were then sent to the National Security Division?

A. If they were approved.

Q. Approved by the Office of Intelligence?

A. That's correct.

Q. Uh-huh. And upon receipt of these reports, the

National Security Division reviews them?
A. That's correct.
Q. And if the National Security Division determines that an ROA should be referred to the State Department for potential action, it refers that Report of Analysis to the State Department?
A. In coordination with the Office of the Principal Legal Advisor.
Q. Senior leaders at HSI have been continually updated about the new program, correct?
A. I don't understand the question in terms of "continually updated"?
Q. Well have senior leaders received updates about the new program?
A. They have received briefings and updates on the work and progress thereto.
Q. This program has been discussed in numerous meetings since the executive briefing, right?
A. (Pause.) It has come up on several occasions from its inception, but I can't say when those briefings ceased.
Q. Well it has been discussed on at least a weekly basis, right?
A. At its inception, yes.
Q. And in these meetings, senior HSI leaders were

present?
A. Yes.
Q. I want to talk more about your role in the process we've been discussing.
You received instructions in connection with the process, right?
A. Yes.
Q. From senior HSI leaders?
A. Yes.
Q. Including Derrick Gordon?
A. Yes.
Q. And Robert Hammer?
A. Yes.
Q. You were instructed to make referrals to the State Department?
A. Yes, when deemed appropriate.
Q. Uh-huh. These referrals included the Report of Analysis?
A. Yes.
Q. And an accompanying letter?
A. Yes.
Q. That was signed by you?
A. Yes.
THE COURT: I just want to get the names right. From Derrick Gordon and Robert --

THE WITNESS: Hammer.

THE COURT: Hammer. Yes. Thank you.

Q. And when deemed appropriate, you sent these referrals directly to John Armstrong?

A. He was one recipient, yes.

Q. He's the head of the State Department's Bureau of Consular Affairs?

A. That is my last understanding.

Q. HSI couldn't act on these referrals alone?

A. Correct.

Q. HSI needed Secretary of State Marco Rubio or Senior Bureau Official John Armstrong to decide whether it was appropriate for HSI to act or not?

A. (Pause.) Their decision is pursuant to their authorities, not ours.

THE COURT: Well I think what she's asking is you understood that, um, when she says you "needed them" under the law to take it any further, it was a decision that resided by law in the Secretary of State or in some instances Mr. Armstrong, is that what you thought?

THE WITNESS: Yes, your Honor.

THE COURT: All right.

Q. And some of these referrals sought the Secretary of State's assessment whether a noncitizen's activities in the U.S. would compromise a compelling U.S. foreign

policy interest, right?
A. Correct.
Q. In some of these referrals, it was the State Department's assessment whether to revoke a Visa, correct?
A. Correct.
Q. You had conversations with the State Department about these referrals?
A. Only to inform that they are coming.
Q. Okay. The first time you had one of these conversations was in March?
A. That seems accurate.
Q. You made the referral in Mahmoud Khalil's case?
A. I signed the letter, yes.
Q. And in Yunseo Chung's case?
A. I signed that letter too.
Q. In Rumeysa Ozturk's case?
A. I signed that letter.
Q. In Mohsen Mahdawi's case?
A. I signed that letter.
Q. In Badar Khan Suri's case?
A. I signed that letter.
Q. And these referrals I just mentioned, they were part of any process we've been discussing?
A. Yes.

Q. All of these referrals went through you?
A. Yes.
Q. And you've made other referrals through this process?
A. Yes.
Q. And as part of this new process, you've seen Reports of Analysis that discuss a person's pro-Palestinian views?
A. (Pause.) Some could have contained that information, but I can't speak to every one without the benefit of the document in front of me.
Q. Some did in fact contain that information, correct?
THE COURT: Well he just answered that.
MS. KRISHNAN: He said "could have."
THE COURT: Okay, I stand corrected. You are right.
Are you able to testify that some did?
THE WITNESS: I would respectfully ask your Honor, since I'm under oath, to have the benefit of a review.
THE COURT: All right.
Q. At your deposition you were asked, "Since this new program began in March, have you seen any ROAs that discussed someone's pro-Palestinian views?" And your answer was "Yes."

Do you recall saying that?
A. I do.
Q. And you have seen ROAs that discuss a person's anti-Israel view?
A. I have seen those, yes.
Q. You've also seen ROAs that discuss a person's alleged pro-Hamas advocacy?
A. Yes.
Q. You've seen ROAs that discuss a person's alleged antisemitic activities?
A. Yes.
Q. And your best recollection is that the number of referrals that you have made since March is between 10 and 50?
A. I do recall giving that answer, yes.
Q. Uh-huh. This was as of June, when we had the deposition?
A. Yes.
Q. In deciding to make referrals as part of this process, you have relied only on information contained in the Reports of Analysis that you received, right?
A. Yes.
Q. In other words, the basis for referral in each case was the Report of Analysis?
A. Yes.

Q. You read the ROAs you received before deciding whether to refer them to the State Department?

A. I review them, yes.

Q. And you review them to determine whether they are complete?

A. Yes.

Q. In other words, you review them to make sure that they're readable?

A. That's fair.

Q. And to make sure the ROA contains what it says it contains?

A. That's fair.

Q. And if they are complete, you send them to the State Department?

A. Yes.

Q. In fact in every case you have received a Report of Analysis as part of the new program we've been discussing, you've referred it to the State Department?

A. (Pause.) Yes.

Q. Because the question whether a Visa should be revoked or whether a removability determination should be made, that's a determination for the State Department to make?

A. Yes.

Q. I'd like for us to look at one of the letters that

you wrote. I will show you a document that has been premarked as D by the government.

MS. KRISHNAN: Your Honor, may I approach?

THE COURT: This is not yet in evidence?

MS. KRISHNAN: It's not in evidence, your Honor.

THE COURT: You may.

(Hands.)

MR. KANELLIS: Your Honor, I'm going to object to the extent that this document is attorneys-eyes only.

THE COURT: For that reason we're not going to put it on the public screen, but we may use it.

MR. KANELLIS: Thank you, your Honor.

A. (Reads.)

Q. This is a true and accurate copy of the referral letter that you sent in Mr. Khalil's case?

A. It appears to be the case. But for clarification, you said earlier a letter I "wrote," and there's a difference between you writing a letter and signing a letter. So I want to be clear that in the questions you've asked me up to this point, signing is applicable.

Q. Okay, so this is a true and accurate copy of the referral letter that you sent in Mr. Khalil's case?

A. That I signed and that I sent.

Q. Thank you.

MS. KRISHNAN: I'd like to offer this as an

exhibit, um, Number 242.

MR. KANELLIS: Objection, your Honor, no foundation for a hearsay exception.

THE COURT: Overruled. It's admitted as Exhibit 242 in evidence.

(Exhibit 242, marked.)

Q. Now you testified at your deposition -- you testified at your deposition that you don't --

THE COURT: Well I think I should simply say for everyone's guidance that my receiving it in evidence means only that it is part of the record in this case and, um, it does not lose its attorneys-eyes only designation. I think I've made that clear with respect to documents given to plaintiffs and the like. Where it's agreed they're attorneys-eyes only, that restriction remains until further order of the Court.

But go ahead, it is in evidence, and it's part of the record upon which I will review and base my decision.

Go ahead.

MS. KRISHNAN: Thank you, your Honor.

May I just clarify that, um, what you just said means that I can't, um, quote anything from the document?

THE COURT: No, you can.

MS. KRISHNAN: Oh, I can quote. Thank you.
Q. Now you testified at your deposition that you don't determine whether an activity is antisemitic in your work, correct?
A. Ma'am, I don't have my testimony in front of me to confirm that, so it would be helpful, if that's available, to see it.
MS. KRISHNAN: Let me show it to you.
(On screen.)
Q. Could you read lines -- this is on Page 135, Lines 4 to 10.
A. (Reads.)
Q. And please tell me when you're done reading.
A. Yes, I see that. Yes, ma'am.
Q. Thank you.
So you testified at your deposition that you don't determine whether an activity is antisemitic, correct?
A. Yes.
Q. And you testified that you don't know how someone else at HSI determines whether an activity is antisemitic?
A. Correct.
Q. Now if you look at, um, 242, in the first sentence here you state: "I am writing to provide a summary of the actions by Mahmoud Khalil that violate President

Trump's Executive Orders on antisemitic"?
A. Uh-huh.
Q. So you don't know how HSI determines activities are antisemitic?
A. I don't because I didn't.
Q. Okay. And so you don't know -- but you say here, um, that Mr. Khalil's actions violate President Trump's Executive Orders on antisemitism?
A. I signed the letter, yes.
THE COURT: Who -- these letters, they may differ in detail of course, but who would prepare such a letter for your signature?
THE WITNESS: The letters that --
THE COURT: And I don't mean that disparagingly, people prepare letters for my signature.
Go ahead.
THE WITNESS: Thank you, your Honor.
So the letters accompany the ROA. I don't know who prepared it within the Office of Intelligence --
THE COURT: But within the team that put the packet together -- you get a packet?
THE WITNESS: Yes, sir.
THE COURT: And you testified -- and I don't mean to delay it, but you've testified to your review of the packet, and having reviewed it and read the letter, you

have signed it.

Is that a proper characterization of your involvement in these letters?

THE WITNESS: Yes, your Honor.

THE COURT: Go ahead.

Q. When you signed this letter, did you adopt its contents?

THE COURT: Well I think that's what "signing" means and that's the inference I'm going to draw.

MS. KRISHNAN: Thank you, your Honor.

Q. And just to be clear, the Executive Orders referred to in this first sentence, they are EO 14161 and EO 14188, correct?

A. That's fair.

Q. Now during your deposition you testified that you don't know how HSI assesses whether a person's presence or activities in the U.S. could have adverse foreign policy consequences?

MR. KANELLIS: Objection, your Honor, what he testified to in his deposition is irrelevant, she can just ask him the question.

THE COURT: Well I'll make that determination. But he's present and so I think your use of the deposition should be confined to impeaching him. And I'll sustain the objection on that ground.

Q. You don't know how HSI assesses whether a person's presence or activities in the U.S. could have adverse foreign policy consequences?

A. Can you repeat that question again, please?

THE COURT: You don't know whether a person's presence or activities in the United States could have adverse foreign policy consequences?

THE WITNESS: Correct.

Q. And you don't know who at HSI makes that determination?

A. Correct.

Q. So turning to -- back to the first sentence of the first paragraph of Exhibit 242.

It states that Mr. Khalil's actions, quote, "may be sufficient for the Secretary of State to determine there are compelling adverse foreign policy consequences to the U.S. from Mr. Khalil's presence here," right?

A. (Looks.) I'm sorry, when you're reading that sentence, did you say the first sentence in the first paragraph?

Q. Yes.

A. (Reads.) Okay. "May be sufficient for the Secretary of State to determine" -- yes.

Q. So you don't know how HSI made that assessment?

A. (Pause.) I don't, but I would defer to the Report

of Analysis that was completed by the Office of Intelligence and the intelligence professionals that were responsible for it.

Q. Is your testimony that the Report of Analysis created by the Office of Intelligence included that assessment?

A. When you say "included that assessment," what do you mean?

Q. Well the assessment we've been talking about is the Secretary -- that it may be sufficient for the Secretary of State to determine that there are compelling adverse foreign policy consequences to the U.S. from Mr. Khalil's presence in the United States?

A. The Report of Analysis that's done by the Office of Intelligence professionals is materials that they have found through their research, those materials are what is provided in that determination for the benefit thereof.

Q. "Yes" or "No." The Report of Analysis created by the Office of Intelligence included the assessment that I just described, that it may be sufficient for the Secretary of State to determine that there are compelling adverse foreign policy consequences for the U.S.?

MR. KANELLIS: Objection.

THE COURT: No, she may have the question in that form. Overruled.

You may answer.

A. By including the Report of Analysis as part of the package? I think that's fair.

Q. And I'm asking about the contents of the Report of Analysis?

A. I understand, but I don't have that in front of me.

THE COURT: He answered your question that he thought it was fair.

MS. KRISHNAN: Okay, well the ROA will speak for itself.

Q. And the agency has not decided what activities contrary to the EO means?

A. I'm sorry, which agency?

Q. ICE. ICE has not decided what activities are contrary to EO 14161 and EO 14188, correct?

A. This letter is coming from HSI, so I can't speak for ICE. I can only speak to the program office on the letter.

Q. All right. Let me ask about HSI then.

Has HSI -- withdrawn.

HSI has not decided what activity is contrary to the Executive Order means?

A. I'm sorry, is that a question for me?
Q. That is a question for you.
A. By way of the Report of Analysis being submitted with the letterhead referral, it's for that consideration. Hence the word "may."
Q. "Yes" or "No," Mr. Watson. Has HSI decided what activities are contrary to the Executive Orders?
THE COURT: I guess really I don't understand the question. He's got before him a Report of Analysis. He signs the letter which was intended to move the thing along to the Secretary of State, or to Mr. Armstrong anyway, and I infer that he adopts what he signed after reviewing the Report of Analysis. So the logical inference from that, given the language here, is that the appropriate individuals who did the investigation came to that conclusion. But if you're asking whether there was a separate, um, standard, "This conduct fits," "This conduct does not," that's a different question. That's my confusion.
MS. KRISHNAN: Your Honor, that's precisely why I want to ask this question, because in his deposition testimony he stated that HSI had not decided what activities are contrary to --
THE COURT: Well I haven't heard any evidence to suggest that HSI has, as a general matter, decided it,

and -- but again, I say that to help.

About how much more have you got for this witness? Or phrased another way, do you want to take the morning recess?

MS. KRISHNAN: Yes, thank you.

THE COURT: All right. We'll take the morning recess for one half hour till 11:15. We'll stand in recess.

(Recess, 10:45 a.m.)

(Resumed, 11:15 a.m.)

THE COURT: Ms. Krishnan, you may continue.

Q. Mr. Watson, just to finish the topic we were on before the break.

HSI has not adopted standards for deciding what activities violate the two EOs we have been discussing, correct?

A. Not to my knowledge.

Q. And just returning to the letter, Exhibit 242. The first sentence of the third paragraph states that: "Mr. Khalil's involvement in the March 6th, 2025 protest at Barnhard College aligns with the Executive Orders focused on deporting Hamas sympathizers."

Do you see that?

MR. KANELLIS: Objection, she misreads it.

THE COURT: Well it's not exactly what it says,

but, um --

Do you see that sentence, sir?

THE WITNESS: Yes, your Honor.

THE COURT: That was her question. So focus on that sentence.

Now your question?

(Pause.)

Q. So your testimony is that HSI has not adopted, um, a standard for deciding what activities --

THE COURT: He just testified to that. Let's move on.

MS. KRISHNAN: All right.

Q. You don't know whether EO 14188 indicates that it is the foreign policy of the U.S. to combat antisemitism, correct?

A. I'm sorry, ask that question again, please?

Q. You don't know whether EO 14188 indicates that it is the foreign policy of the U.S. to combat antisemitism, correct?

A. I don't have that EO in front of me. So maybe that could be helpful, considering that I'm under oath.

Q. I don't -- the question is whether you know or you don't know?

A. I don't know.

Q. Okay. And you haven't been told whether the U.S.

has a policy of combating antisemitism domestically or abroad?

A. I'm sorry, I haven't been told. I'm trying to understand the question. There's an Executive Order.

Q. The question is, you haven't been told that the U.S. has a policy of combating antisemitism in America and abroad?

A. I don't recall being told, no.

Q. In your letter, um, at the second line of the last paragraph on the first page, you state that: "HSI is concerned that Mahmoud Khalil's protest activities, quote, 'may undermine U.S. foreign policy.'" Correct?

A. Correct.

Q. "May undermine U.S. foreign policy by creating a hostile environment to Jewish students," right?

A. That is one part of the sentence, yes.

Q. You testified earlier, during your direct examination, that your job at HSI is to protect national security and public safety, right?

A. Yes.

Q. That is HSI's mandate?

A. One of them, yes.

Q. And you don't know whether antisemitic activity falls within HSI's national security and public safety mandate?

THE COURT: Ask it again? I didn't understand the question.

Q. You don't know whether antisemitic activity falls within HSI's national security and public safety mandate?

MR. KANELLIS: Objection, foundation.

THE COURT: Well to me it's too vague, because it could. It's so vague.

MS. KRISHNAN: Okay.

Q. Does antisemitic activity fall within HSI's national security mandate?

THE COURT: Again, I don't know what you mean by "antisemitic activity." Two of the witnesses you have called have defined "antisemitism." When we -- if we have any time this morning, it's sort of sensitive, I think -- we're not going to have a bifurcated trial argument, but now that we're pretty much done with evidence, I was going to make some observations sort of to tee up what I'm thinking going into final arguments and to define certain things. One of the things I'm going to define is "antisemitism." And now that I started talking -- and I'm going to define it in the way plaintiffs' witnesses defined it, that is "hostility based upon one's faith or ethnicity to the group." That's what "antisemitism" is.

Now antisemitic activity can range from pure speech to -- and we've seen it, horrific violence. So I don't know what that means.

The objection is sustained.

MS. KRISHNAN: Understood, your Honor. My question is about antisemitic activity as that term is used in Mr. Watson's letter.

THE COURT: Well then can we ask him, to what did you think that phrase meant? What did you think that phrase meant, "antisemitic activity," when you saw you letter?

THE WITNESS: Well there's more to that phrase, and what's left out in the sentence you read was the part about indicating support for a designated terrorist organization, that is where HSI would be concerned pursuant to, as you referenced, our posture and mission as it relates to national security and public safety, and by way of our participation on the Joint Terrorism Task Forces.

Q. So HSI is concerned about antisemitic activity only insofar as it is tied to support for a designated foreign terrorist organization?

A. In this instance it's captured in the letter, each is a case-by-case determination.

Q. Well I'm asking generally, in the context of the

program that we've been talking about, is HSI concerned about antisemitic activities only so far as it demonstrates support for a designated foreign terrorist organization?

A. That could be a trigger in reference thereto, yes.

Q. So is HSI -- so HSI is concerned about antisemitic activity outside of that circumstance?

A. I don't understand the question?

THE COURT: No, no, that question makes sense because your answer was "It could be a trigger."

THE WITNESS: Yes.

THE COURT: And as I listen to that, that suggests that there's other forms of antisemitic activity that also could be a trigger.

Is that what you meant to say?

THE WITNESS: Yes.

THE COURT: Tell me what they are?

THE WITNESS: Other triggers could relate to associations, activities, or conduct that violates the Immigration and Nationality Act or U.S. law.

THE COURT: Well do associations violate the Act? You used the word "associations" and then you went to conduct.

THE WITNESS: Not necessarily, it's a case-by-case determination. Associations would warrant a further

investigation.

THE COURT: For instance, as to one of these individuals, it turned out that the wife of one of these individuals, her father, was an alleged Hamas leader. Now a law-enforcement agency, one imagines, would be interested in that fact. The fact itself might not be useful, but that's certainly an interesting fact. Whatever she's trying to get at, that's what I'm --

What else is there?

THE WITNESS: So --

THE COURT: Something like that? That's an association.

THE WITNESS: The association could be relevant as to a determination of admissibility. So if that factor is known by --

THE COURT: Well my duty here is people we've already admitted they're lawfully in here and the issue the plaintiffs claim is that the way they were -- their Visas were taken away or their status was taken away, they challenge that, that's the issue. So they're lawfully here.

And we'll let you ask the next question.

(Pause.)

Q. And so to be clear, HSI is concerned about associations that demonstrate antisemitic activity

whether or not it's linked with terrorist activity?
A. Foreign terrorist activity can be a cornerstone and it can expand. I would defer to the investigation and the analysis to determine if this is something that should be referred for consideration in coordination with the Office of the Principal Legal Advisor.
Q. Does antisemitic activity, as that term is used in your letter, fall within either the national security or public safety mandates of HSI?
A. It can based upon conduct.
Q. Okay. At your deposition you were asked, quote, you said that "HSI's topics in areas of interest include national security and public safety." My question is "Whether antisemitism falls within either national security or public safety for HSI?" And your answer was "I don't know."
A. I recall that, yes.
Q. And you don't know whether pro-Palestinian advocacy falls within HSI's national security and public safety mandates?
A. I don't know. But if an allegation is received or information is referred, an investigation or inquiry can be conducted to determine if the activity or conduct is contrary to law.
Q. Contrary to law?

A. Uh-huh.
Q. Not contrary to the Executive Orders?
A. Contrary to law, as I stated.
Q. Well does "contrary to law" include the two Executive Orders we've been discussing?
A. It could if the conduct aligns within that framework.
THE COURT: No, no, she's trying to get at whether, in your view, the Executive Orders, standing alone, are another source of action?
THE WITNESS: No, sir, not alone.
THE COURT: Okay.
Q. You have written other letters like the ones we've been discussing relating to Mahmoud Khalil, correct?
A. Yes.
Q. I'd like to show you a document that has been premarked as B by the government.
THE WITNESS: And, your Honor, if I may?
A. Once again, you're saying the word that I've "written" other letters. I've clarified it earlier in my testimony that I've signed them.
Q. My apologies. You've signed other letters like this one?
A. Yes.
MS. KRISHNAN: May I approach, your Honor?

THE COURT: Of course.
(Hands to witness.)
Q. This is a true and accurate copy of the referral letter that you sent in Ms. Chung's case?
A. (Looks.) Yes.
MS. KRISHNAN: I offer this as Exhibit 243.
THE COURT: Any objection?
MR. KANELLIS: Um, no, your Honor. But it is attorney-eyes only. I'll just make that --
THE COURT: And I've spoken to that. It's admitted in evidence, Exhibit 243. We understand it's attorneys-eyes only.
(Exhibit 243, marked.)
Q. I'd now like to show you a document that's been premarked as Exhibit F by the government.
A. (Looks.)
Q. Is this a true and accurate copy of the referral letter that you sent in Mr. Mahdawi's case?
A. (Looks.) It appears to be.
MS. KRISHNAN: I offer this as Exhibit 244.
MR. KANELLIS: No objection subject to the attorneys-eyes only designation, your Honor.
THE COURT: And I understand that it is. It's Exhibit 244 in evidence.
(Exhibit 244, marked.)

Q. I'd now like to show you a document which has been premarked as Exhibit H by the government.
A. (Looks.)
Q. Is this a true and accurate copy of the referral letter that you sent in Ms. Ozturk's case?
A. It is one that I digitally signed, but the reproduction uses off-key terminology in the header on Page 2.
THE COURT: I guess I -- I appreciate your patience, Mr. Watson, but looking back at Exhibit 244 and its second page, it reads, um, on the second page, "Homeland Security Investigations RE," and then the individuals, and in that case it was Mahdawi, um, and Page 2. Here what's left off, as I compare them, is "Homeland Security," and the second line is hard to make out, but it appears to be "Rumeysa Ozturk, Page 2."
Have I compared them correctly?
THE WITNESS: Affirmative, your Honor.
THE COURT: Very well.
Go ahead.
MS. KRISHNAN: I'd like to offer it as Exhibit 245.
MR. KANELLIS: No objection subject to the --
THE COURT: No objection, it's Exhibit 245 in evidence.

(Exhibit 245, marked.)

Q. I have one more letter that I would like to show you. This document has been premarked as Exhibit I by the government.

A. (Reads.)

Q. Is this a true and accurate copy of the referral letter that you sent in Mr. Suri's case?

A. Yes, ma'am.

MS. KRISHNAN: I'm offering this as Exhibit 246.

MR. KANELLIS: No objection, subject to the attorneys-eyes only restriction, your Honor.

THE COURT: Noted, and it is, but it's admitted as Exhibit 246 -- not but it's admitted, and it's admitted.

(Exhibit 246, marked.)

Q. Just so we're clear. Before an official determination is made by the State Department after receiving a referral letter, a notice goes from the State Department to HSI about the State Department's forthcoming action?

A. I'm not following on that question, ma'am?

THE COURT: Nor am I, Ms. Krishnan.

(Pause.)

MS. KRISHNAN: I'll clarify.

Q. Before an official determination is made by the State Department, there are sometimes informal

communications between the State Department and HSI, correct?

MR. KANELLIS: Objection, foundation.

THE COURT: Well that's pretty general. But in letters of this sort where the basis is the concern about a Title VIII violation, um, limited to that, and limited to, um, subsequent to January 20th in the Trump administration, is that correct?

THE WITNESS: It can happen.

THE COURT: Well do you -- and I've been given this chalk and the next arrow on the chalk is the arrow that says "Action Letter."

Now she properly asks, between your transmittal letter in and an action letter out, with the limitations that I've just posed, do you recall interaction with State Department officials? Do you recall? You don't have to be the one interacting, but do you recall such interactions?

THE WITNESS: I don't recall them.

THE COURT: You don't. All right.

THE WITNESS: With the referral going over in between?

THE COURT: Right.

THE WITNESS: I don't recall it.

THE COURT: Once they got it.

THE WITNESS: Right. I don't recall that.

THE COURT: All right, that's his answer.

Q. A change in a person's immigration status doesn't have to result in arrest, correct?

THE COURT: Well there's been this whole -- it's not a matter of this case, but I can take judicial notice of proceedings in other cases.

There was this whole business where apparently tapping into the FBI's database, a whole raft of student Visas were cancelled. I had 9 in one case, 2 in another. And about 50 temporary restraining orders resulted. The reason being that the FBI's database, for perfectly logical reasons, has arrests in it. It isn't just limited to convictions. So action allegedly was being taken that these people had committed crimes. It is still the fact in the United States that a person is innocent until convicted. And, um, my understanding, as far as I've spoken, I think I'm on sound ground.

My understanding is that they -- but I'm not clear who "they" is, has revised that policy and now is scrutinizing things in a different way. I don't see what that has to do with this case?

But go ahead, Ms. Krishnan.

MS. KRISHNAN: Thank you.

Q. You said, in your direct examination, that people

were arrested because of a change in their immigration legal status, correct?

A. Correct.

Q. A change that was affected by a determination by the State Department?

A. Correct.

Q. And that change in a person's immigration status, that doesn't have to result in arrest, correct?

A. (Silence.)

THE COURT: Well, again if we're talking about this case --

MS. KRISHNAN: We are.

THE COURT: All right.

My belief is that, um, for instance, taking away someone's student Visa does not automatically unleash the enforcement and removal officers of Homeland Security. I'm talking about something else.

So is the question you're asking, um, once an action letter is received, an action letter from the Department of State is, um -- I'll ask this question.

An action letter from the Department of State, that does trigger an arrest, it triggers action. That's the action that it triggers, isn't it?

THE WITNESS: It can, yes.

THE COURT: It can. But it need not, is that

right?

THE WITNESS: When you receive the action letter from the Department of State saying that the Visa has been revoked or the status has changed, it, one, can trigger a redetermination. So with that notice, that goes to Domestic Operations and it goes to the HSI field office. That HSI field office works in coordination with the Principal Legal Advisor in, one, crafting and preparing a notice to a peer for the person in question before an immigration judge, pursuant to the action from the Department of State.

THE COURT: I see. I see. And you've already gone over the -- which we needn't go over again. If you can't find the person, it turns out they've left the United States, then that action letter, no further action is necessary?

THE WITNESS: Yes, your Honor.

THE COURT: But your answer to me is back comes the action letter, out goes -- in the usual course, a notice to appear --

THE WITNESS: Yes, sir.

THE COURT: -- and proceedings follow?

THE WITNESS: Yes, sir.

THE COURT: Thank you.

Go ahead, Ms. Krishnan.

Q. You don't know what inquiry the State Department does once it receives a referral letter from you, correct?
A. Correct.
Q. Mr. Khalil was arrested on March 8th of this year. Do you know the date of his letter from his case?
A. (Looks.) March 7th is the date stamp.
Q. Thank you.

MS. KRISHNAN: No further questions.

THE COURT: Nothing further for this witness?

MR. KANELLIS: No, sir.

THE COURT: Very well. You may step down. Thank you.

(Steps down.)

THE COURT: Is that all the -- as I hear it, that's all the witnesses we have for today?

(Silence.)

THE COURT: All right. Let me stop the clock then.

(Pause.)

THE COURT: The total elapsed time is the plaintiffs, 3 days, 2 hours, 45 minutes. The defense, 2 days, 40 minutes.

There are motions for the Court that I should act upon and I am going to at this time.

There is a motion to seal the, um -- a certain motion, a discovery motion. That motion is -- the motion to seal is allowed. The motion to compel is denied as wholly untimely.

The matter of an adverse inference is premature. We're not going to -- I'm not going to consider adverse inferences until I come to consider the whole case.

So that takes care of ECF documents. I just ruled on Document 214. The motion to seal was Document 215.

I also have Document 211, a motion to compel additional documents. This appears to be the list to which reference has been made in the course of the trial.

The -- I think these documents are within the scope of the stay. The request asks for documents within the scope of the stay. So I'm not going to rule on it. But because it might be helpful, um, if I were permitted to rule on it, I can give an indicative ruling. My indicative ruling is that I would deny it as to the first bullet point on the first page as overbroad, and the last bullet point on the second page, because it's imprecise.

As to all the other documents, I would allow the motion, and if those documents are in the possession of the Court, and I believe certain action memos are, I

would, um -- and having reflected on it, I would deny -- excuse me, I would overrule the, um, asserted privileges and, um, turn them over to the defense, at least to subject them to cross-examination. They'll be before the Court in any event, but I will turn them over to the defense, um, and they might be used during the cross-examination of Mr. Armstrong, if ever I'm permitted to cross-examine Mr. Armstrong.

Now let's talk about what we're going to do here.

MR. KANTER: Your Honor, may I pose a question?

THE COURT: Yes.

MR. KANTER: Your reference, if I am permitted to allow the cross-examination of Mr. Armstrong. The question pertains to your Honor's deliberative process ruling privilege on Monday regarding the Armstrong action memos in which you denied the deliberative process privilege claimed on the merits except as to certain interlineations which you found were.

THE COURT: Right.

MR. KANTER: It is our understanding that the mandamus petition concerns privilege rulings that either have not yet been made or were made solely based on waiver. Therefore it is our understanding that your ruling regarding the action memos on the merits permits those action memos to be, um, the subject of cross-

examination of Mr. Armstrong, which, um, there's no objection from the government on, um, allowing that, they are subject to attorneys-eyes only, which occurred today regarding Mr. Watson.

Therefore, as it relates to action memos, um, that is not, in our understanding, as an impediment to the cross-examination of Mr. Armstrong, which we'd like to put on tomorrow morning.

THE COURT: And you've answered me.

What do you say to that?

MR. BIALE: I'd say that we agree, your Honor.

THE COURT: Wonderful.

MR. BIALE: Except insofar as the other action memos have not been disclosed, I think those should follow within the same rubric.

THE COURT: But we're going to.

MR. BIALE: I'm sorry, I should let Ms. Conlon address this.

THE COURT: I said what I would do. The other action memos in the possession of the Court will be disclosed forthwith, subject to attorneys-eyes only, and we will make copies just as soon as I get off the bench. And the copies, the government will have copies of what we may copy, so they know exactly what it is. Now I find that very helpful.

And that being so, and I think it will be clear that we will finish the evidence tomorrow, now let's talk about what will happen.

MR. KANTER: And one -- I'm sorry to interrupt.

THE COURT: But please don't be. The one time I didn't want to be interrupted, I was quick to say so. But other than that --

Go ahead.

MR. KANTER: Okay.

Mr. Armstrong, although he appeared in person for direct is unable to appear in person for cross-examination tomorrow. If he can appear by --

THE COURT: So long as you can arrange it, that will be fine with the Court, I'm eager to get it concluded.

MS. CONLON: Your Honor, I understand the Court is willing, but I want the record to be clear that we object, because he testified here in person and the Court had the benefit of seeing his demeanor and everything else, and we don't think it's fair that we don't get the benefit of having him back here. So I appreciate the ruling is moot, but I just want to lodge our objection.

THE COURT: And you have, but I adhere to my ruling. I've tried entire civil cases remotely. I can

see his demeanor sufficiently.

All right, now let's talk about what's going to happen.

45 minutes for argument. The plaintiffs will argue last. The defense will argue first. When shall we do it? Shall we do it on Monday or do you want to put it off further?

MR. KANTER: Um --

THE COURT: What's the government's position?

(Pause.)

MR. KANELLIS: Your Honor --

THE COURT: You were ready Friday.

MR. KANELLIS: We can do it tomorrow or -- I would defer to the Court. I think you are in a better position to guide us as to what you want.

THE COURT: Well I'm going to make the determination.

MS. KRISHNAN: Your Honor, if the Court would be amenable, Monday would be preferable to the plaintiffs.

THE COURT: Monday. We'll do it Monday -- well I work for Ms. Belmont, but I believe we are able to do it.

45 minutes a side is an hour and a half. I know I'll have questions. And, um, shall we start at 10:00, will that be more convenient? You're all here ready to

start at 9:00. I'll be ready to start at 9:00. I'm asking if it would be more convenient to start at 10:00?

MS. KRISHNAN: 10:00 is fine.

THE COURT: Very well.

MS. CONLON: Your Honor, we have another question concerning closing arguments, if that's okay?

THE COURT: Of course it's okay.

MS. CONLON: If plaintiffs wish to split the closing argument between two attorneys is that permissible?

THE COURT: That's fine for this case.

MS. CONLON: Okay.

And with respect to time, if plaintiffs have less than 45 minutes remaining of trial time, we presume plaintiffs just have less than 45 minutes for argument. But we just want to confirm our understanding.

THE COURT: Your understanding is correct.

MS. CONLON: Okay.

THE COURT: Now before I move off that, but recognizing that, um, we're going to have final arguments on Monday, um, I think it's appropriate to say a few words about -- I think they're words in a definitional sense, and I'm going to mention words as I did with antisemitism. And all I'm stating, and I just state it to be helpful, is how I think these words

figure in this first amendment case.

I do it with some diffidence because, um, I recognize that, um, a quick definition that I give here necessarily may lead or apply in a somewhat different guise in the totality of the circumstances as presented by the facts. But I really do think that it would be helpful if my operating definitions were known to the parties. That does not make them right. And it's open to the parties to simply say that they are wrong and support it with both factual support in the case and, um, legal support, if I'm wrong.

So let me just start, because these words are used in the documents before the Court, and this is the meaning to which, as I approach final argument, I ascribe to them. I've already spoken to antisemitism.

"Antisemitism" is that feeling of hostility to a person or a group on account of faith or certain ethnicity. I consider that it is a fit subject of the United States government to discourage antisemitism and, um, just as it would and should discourage Islamophobia, any sort of anticlericalism, and indeed hostility to atheists, sectarian hostility, it's not part of the America cannon. And it is a fit object of government to discourage it and encourage inclusiveness and, um, our ability to live together as citizens and lawful

visitors.

Antisemitism or antisemitic speech, standing alone, is not illegal. It may be repulsive, but it's not illegal. It is protected under the First Amendment.

Now let me jump to a word, a very broad-brush word on foreign policy, because it is not within the purview of this Court's authority to comment on the foreign policy of the United States, that, quite clearly, perhaps more than anything else in our separation of powers, is committed to the Executive. But because events that figure in this case are significant, um, and truly trying to stay away from any commentary, I think I go into final argument thinking this.

That Hamas, in October 2023, initiated a horrific, I'll use that normative word, against the State of Israel and its people. Israel responded with its full military force and the struggle between the two continues to this day. The foreign policy of the Biden administration was strongly to allie itself and support the State of Israel. That foreign policy has been followed by the Trump administration and if anything made more supportive.

And I mean nothing normative by this, but it appears that at least with respect to the conduct of the State of Israel in its war -- and I will call it "war,"

against Hamas, the foreign policy of the United States is to allie virtually, 100 percent with the foreign policy of the State of Israel.

Now to get back to definitions. Criticisms of the State of Israel are not antisemitism, they're political speech, protected speech. Even strong, violent criticism speech -- well violence is not acceptable, and that use of the word was probably wrong. But I meant vile criticisms of the State of Israel and its policies are protected speech. I think I can be this specific saying that, um, the conduct of the State of Israel is -- involves war crimes, it involves genocide, um, those matters are protected speech. Anyone is allowed -- well put aside the "anyone," but it's protected speech under the First Amendment to our Constitution.

What else? (Pause.) I think that's probably sufficient. Well a couple of legal questions.

The, um -- I take it we're agreed that Executive Orders do not have the force of law. But feel free to challenge the Court on this.

I have asked the question at the beginning, um, and I'm not sure of the answer, but I asked whether a person not a citizen of the United States, but lawfully here in the United States, has the same First Amendment rights as a citizen? As I have worked on this case

during the course of the case, and my own research, leads me to think that probably they do. The answer is in the affirmative. Again we're talking about pure speech, we're not talking about conduct that puts someone in fear or even more than that is, um, a threat of violence against a person.

Oh, there is one other definition. Criticism of the State of Israel, the use of the words that I mentioned, does not -- it's political speech, it does not constitute pro-Hamas, um, support. Pro-Hamas support has to be something more than, um, that.

And I think that's the -- I think that's where I'll stop. I'm not going to entertain questions on this. When you get to arguing, I will pull hypotheticals and we can go back and forth. Please feel free to challenge anything the Court has said, I've said it just to help.

The Court is authorized to take judicial notice at any time in a proceeding so long as I give notice that I am taking judicial notice. I think -- and I don't know how this plays at all, honestly, and everything I say to you is honest, but I am prepared to take judicial notice that Steven Miller is the President's prime advisor on immigration matters. That's all. I mean nothing normative by that.

Now one other matter we should raise, and I think it's ripe now, but we can raise it on Monday. How long do you want after final argument, where you will heard my hypotheticals and where I push back and where I don't, how long would you like for the filing of requested findings and rulings?

MR. KANELLIS: Your Honor, we ask for two weeks, if that's not too long.

MR. BIALE: And, your Honor, we would ask to submit it next Friday.

THE COURT: No, I'm going to give the two weeks. I'm not insensitive to how this case started, but the matter is complex.

So two weeks from, um, next Monday will be -- well Monday is the 21st, so that is Monday the 4th of August.

Now the matter, as I indicated when I spoke the other day, the matter then will be under advisement. I'll move with all speed to address the matter.

The only other loose end is, um, these orders are how we will proceed and conclude unless the Court of Appeals enters some affirmative order that requires action by this Court, and if it does, I will obey.

Are there any questions? Though I'm not going to get into any discussion, definitions, or legal issues.

Any questions on the part of the plaintiffs?

MS. KRISHNAN: No, your Honor.

THE COURT: The defense?

MR. KANELLIS: No, your Honor.

THE COURT: Again, thank you all. 9:00 tomorrow morning.

We'll recess.

(Ends, 12:10 p.m.)

C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Thursday, July 17, 2025, to the best of my skill and ability.

/s/ Richard H. Romanow 07-17-25
________________________
RICHARD H. ROMANOW Date