UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY
Vol 1, Pages 1 to 84

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
Plaintiffs

vs.

MARCO RUBIO, in his official capacity as Secretary of State, et al,
Defendants

*********

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Friday, July 18, 2025

********

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A P P E A R A N C E S

RAMYA KRISHNAN, ESQ.
CAROLINE DeCELL, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
ALEXANDRA CONLON, ESQ.
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 540-0675
Email: Cgans@shertremonte.com
For Plaintiffs

ETHAN B. KANTER, ESQ.
WILLIAM KANELLIS, ESQ.
VICTORIA M. SANTORA, ESQ.
JESSICA STROKUS, ESQ.
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9123
Email: Ethan.kanter@usdoj.gov
and
SHAWNA YEN, ESQ.
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Email: Shawna.yen@usdoj.gov
For Defendants

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JOHN ARMSTRONG (Continued, via zoom.) | | | | |
| By Ms. Santora (via Zoom) | | | | |
| By Ms. Conlon | | 5 | | |
| VEENA DUBAL | | | | |
| By Mr. Wang | 67 | | | |
| By Mr. Kanellis | | | | |

E X H I B I T S

(None marked.)

P R O C E E D I N G S

(Begins, 9:00 a.m.)

THE COURT: Good morning. Because I have made these proceedings available on the internet, it's appropriate to say that if you are accessing these proceedings on the internet, be aware that the rules of court remain in full force and effect, and that means there is no taping, streaming, rebroadcast, screen shots, or other transcription of these proceedings.

You must also keep your microphone muted at all times. If you do not, we will have to cut you off immediately.

Very well. The Clerk informs me we're ready to go. I see Mr. Armstrong on the screen.

And, yes, I'll ask the Clerk to remind you, sir, that you remain under oath.

THE CLERK: Sir, you remain under oath, do you understand?

THE DEFENDANT: Yes, I understand that I remain under oath.

THE COURT: And thank you.

And Ms. Conlon.

MS. CONLON: Thank you, your Honor.

THE COURT: You may examine.

CROSS-EXAMINATION BY MS. CONLON: (Continued.)
Q. Good morning, Mr. Armstrong. Can you hear me?
A. Good morning. I can hear you.
Q. Okay. You're in D.C. right now?
A. That is correct, I am in my office at 619th Street, Northwest.
Q. And can you just tell us who is in the room with you other than Ms. Santora?
A. We have two lawyers from the State Department, Sarah Tulkowski and, um, Taylor Beaumont.
Q. All right. Okay. Thank you.
Now, um, you testified that you would be very surprised if a policy related to Visas exists that you don't know about, is that correct?
A. I can't see how that could be the case. That the head -- at least for the time being, the Head of the Bureau of Consular Affairs, which at the State Department is the, um, part of the State Department that is responsible for Visas and issuing Visas abroad. So, yes, I would be extremely surprised. I do not see how this could happen.
Q. Now I want to talk about what "policy" means in the context of your work.
State has a policy-making process, right?
A. Yes, they're a policy-making process in the U.S.

government and the State Department also does that.
Q. Before a policy is finalized, a few things have to happen, right?
A. Yes, usually -- yes, that is correct.
Q. An action memo, with a proposed policy, must be cleared by all offices who have any equities in it, correct?
A. Yes, I think that is correct.
Q. A policy could require clearance from as many as 20 different offices, right?
A. Um, even more actually. I have seen some memos, although they weren't necessarily a policy memo, that had over 60 clearances.
Q. In once an action memo with a policy has been cleared by all relevant offices, it then has to go to Secretary Rubio, right?
A. It depends.
Q. If it's a policy that the Secretary needs to sign off on, he has to sign off on it before it's final, right?
A. That is true. But there are also -- I have the ability to sign off on policies too, to approve policies for the Bureau of Consular Affairs, after the necessary clearance process.
Q. Once a policy has been cleared, signed off on by

whoever the senior-most official is that has to sign off on it, then it can be publicly announced, correct?
A. Well not all policies are publicly announced, sometimes they're classified or they're sensitive but unclassified. But they would certainly be announced to those people who need to deal with them. In the case of Consular Affairs, most of our things are, um, but not all are unclassified.
Q. In other words, whoever needs to know could then be told about it?
A. Yes, that is correct, on a need-to-know basis, it's a good rule for OF-SAC.
Q. Now once a policy had been finalized and those who need to be made aware of it are made aware of it, guidance about that policy can be conveyed to folks who work in the State Department who have to implement it, right?
A. That's correct. And usually guidance in that form is especially for policies that affect these operations abroad, and it would go out then in the form of a, um, cable or telegram, and I believe we discussed these previously. And usually in the form of an All-Back, to all diplomatic and Consular posts.
Q. A cable --
A. And oftentimes at --

Q. Sorry. I didn't mean to interrupt you, sir.
A. No, I interrupted you. Please go ahead. Unless you'd like me to finish.
Q. I'll move on.
Other than a cable, sent "All-Back" as you say, another way that guidance can be conveyed to State employees is by making additions or revisions to the Foreign Affairs Manual, correct?
A. Yes, that is absolutely true, and the cables often -- or the All-Backs often announce this guidance and refer to the changes in the Foreign Affairs Manual. That makes sure that everybody knows that this has happened. Because otherwise you could change the Foreign Affairs Manual and there could be a new or a modified policy and no one would know about it.
Q. Now in your view, a decision by the Secretary on an action memo is not, in and of itself, guidance, correct?
A. No -- well it depends what's part of the action memo. Sometimes you have the FAM revisions, the Foreign Affairs Manual revisions, are also included and are part of the action memo. There can be more than one decision made in the action memo, or --
Q. I'm sorry. In an action memo --
A. -- or it's just --

Q. It's so hard to do this where you can't see me.
A. No, I apologize.
Q. No, it's okay, we'll figure this out together.
In an action memo on a decision, something other than an update to the FAM, a decision, that is an action, that's, in your view, is only an action, that is not a policy, correct?
MS. SANTORA: Objection.
THE COURT: Well I'm not really clear as to the relevance of this.
MS. CONLON: I can, your Honor --
THE COURT: In these charts I've been given, Mr. Armstrong, there's relevant -- well not relevant, there's mention of something that is called an "action letter." So, um, I'll ask this question and I'll make reference to our case specifically.
In our case you've testified, and I assume she's going to cross-examine you at some stage, on, um, communications you had with the Secretary, and then, um, the Secretary of State, um, came up, in the relevant individuals in our case, with something in it on those chalks, these guidances I have, called an "action letter."
Now when you get an "action letter," I understand that to be a -- a direction for action. It's not the

policy, it's the implementation of procedures, um, within the Department.

Am I correct?

THE WITNESS: Sir, no disrespect intended, your Honor, but could I see the chalk?

THE COURT: Sure.

THE WITNESS: Do we have a copy?

THE COURT: Ms. Santora may have one.

MS. SANTORA: Yes, your Honor, I can find one, if you give me one second.

THE COURT: Yes.

MS. CONLON: We're talking about H -- well it was HN. I thinks it's still HN.

THE COURT: Yes.

MS. CONLON: But we can backtrack in particular.

THE COURT: Correct. Yes.

(Silence.)

THE WITNESS: I apologize for needing to refresh my memory.

THE COURT: No, I understand. But it's those that I'll ask Ms. Conlon, so you can hear --

MS. CONLON: Yes.

THE COURT: -- It's those action letters that you're talking about?

MS. CONLON: That's correct, your Honor.

THE COURT: All right, then we're clear. That's what she wants to ask about.

MS. SANTORA: Okay. I can share a copy of the document that I had on the screen. Just give me one second.

THE COURT: That's fine.

MS. CONLON: And, Ms. Santora, we have copies here, so I think it's just Mr. Armstrong who needs to be able to see it.

MS. SANTORA: Okay, then I'll just share a copy with him on my screen, um, to save time.

THE COURT: Exactly.

THE WITNESS: Could you just make it larger? My eyesight has gotten worse with time.

MS. SANTORA: Sure.

(Enlarged.)

THE WITNESS: Yes, thank you.

All right. Consular Affairs. "Action memo goes to Secretary of State." (Looks.) "There will no action of foreign policy." (Looks.)

Oh, I understand the CALC -- the action letter is what goes back to the Department of Homeland Security informing them of the action taken and letting them know that the --

THE COURT: So -- and I'm interrupting, so do I.

So that's what we're talking about, that's what her next question is going to deal with, I take it.

Go ahead, Ms. Conlon.

Q. Well now I think just to make sure we're all clear in using words in the same way, there are action memos that are sent to you, or to Secretary Rubio, and from those there may be action letters that are sent from State to Homeland Security, is that correct?

A. That's my understanding, reviewing this, and based on my knowledge of my job, and that informs the, um, whatever person at the Department of Homeland Security who gets it. Of course if it's Secretary Rubio, it goes to Secretary Noem. If it's someone else like me writing back, then it would go to the person who sent it. And that is closing the loop then because the referral on this CALC is what started the whole process.

Q. So my question is about -- is twofold, I suppose, action memos that go to you, or the Secretary, decisions that are made on those. You've said before, and I just want to make sure I understood it, that that's just a decision, an action, that is not the creation of policy, in your view, correct?

A. I think that is accurate. A single decision does not a policy make in most cases. Of course it can depend on the situation. I'm sure we could find a

hypothetical where it might. But I get action memos all the time, to send this cable, do that, um, agree to this meeting or conference, and that is not a policy.

Q. And an action letter sent by State to the Department of Homeland Security, that is an example of implementation of a policy, but that in and of itself is not the creation of policy, right?

MS. SANTORA: Objection.

THE COURT: No, he may be asked the question. Overruled.

THE WITNESS: Thank you, your Honor.

A. The action letter informs of the decision. For example, on the CALC, the Secretary would make a decision on the action memo in the case of an alien. For example, a 4(c) finding, I'm referring to INA 237(a)(4)(c). And then that action letter informs the Department of Homeland Security. So to be informing of a decision, not necessarily a policy.

Q. Got it. Now we can move on from this. I think I understand what you mean when you say "policy." I want to turn to guidance you've received, um, relating to revocations of Visas.

So you've discussed revocations of Visas from student protesters with senior officials inside and outside of State, right?

A. Yes, I've discussed revocation of student Visas with senior officials both inside the State Department and outside the State Department.
Q. That's inclusive of senior officials at Homeland Security, right?
A. Yes.
Q. Senior officials at the White House, correct?
A. Yes.
Q. In the first few months of your job, you spoke with folks in the White House about the revocation of student Visas at least 20 times, right?
MS. SANTORA: Objection. This calls for information that's privileged.
THE COURT: What privilege?
MS. SANTORA: It would be Presidential communications, your Honor.
THE COURT: All right, I, um --
MS. CONLON: No, no, the question only asked, Judge, did he speak with anyone in the White House? There's no indication that it was something that went to the President. And also he testified about it in his deposition. So if they want to do a search-out privilege, then it's waived.
THE COURT: Well then go through the deposition.
MS. CONLON: Sure.

Q. Turning your attention to the deposition transcript from June 12th, 2025, Page 203 to 204, starting at Line 4. You were asked this question.

"Do you have the occasion to speak with anyone in the White House about the revocation of student Visas?" Line 7, you gave the answer, "I have had such an occasion." And continuing on down the page, "You were clarifying the occasions you had to do that," starting at Line 17, and you said, "So the number of total conversations wee probably more, more than over 20. I would say at least a dozen occasions."

I could keep going, but that was your testimony, right?

A. Um, that -- excuse me, Counselor, but I'm still looking it up here.

Q. Sure.

A. What was the page? 220 was the page number?

Q. No, sir, Page 203.

A. Thank you.

Q. And I first read to you from Lines 4 through 7.

A. (Looks.)

MS. CONLON: Your Honor, this might be more efficient if we could just put it on the screen for Mr. Armstrong so we can draw his attention to the portion we're using.

THE COURT: Fine. As you seek to --
(Pause.)
MS. CONLON: No, never mind, your Honor, I'm told it's not more efficient.
Q. Okay. So, Mr. Armstrong, you've had a chance to look at Page 203. You gave that testimony in your deposition, I read that correctly, right?
A. I believe you read it correctly, um, based on -- I didn't compare it word for word, but I -- and I think it is accurate, but somewhere between a dozen and over 20.
Q. And those conversations included Steven Miller, correct?
A. Yes.
Q. Those conversations also included his Deputy, Adam Leason, right?
A. Yes.
Q. Now most --
A. But not as many with Mr. Leason.
Q. More with Mr. Miller.
Now most of the conversations about the revocation of student Visas that you had with Mr. Miller took place in March of this year, correct?
A. It seems to be, yes, but I didn't keep an exact tally at the time. But it seems in March.
Q. And some of those conversations with Mr. Miller

were interagency, that is between you and folks of other relevant agencies were part of those discussions, right?
A. Yes.
Q. Interagency --
A. They were telephonic. I have never met Mr. Miller in person to this day.
Q. Interagency, in the context of these discussions about student Visa revocations, included folks from Homeland Security, the State Department, the Department of Defense, and the White House, correct?

MS. SANTORA: Objection. Your Honor, this is bearing into Presidential communications, I believe, he --

THE COURT: Here, um, here's the line I'm walking, Ms. Santora.

If it's in the deposition, it's waived. If she's gone beyond the deposition, and I don't have the deposition before me, but I'm following carefully, then I think your assertion must be sustained.

So I take it your position is that the question she just asked goes beyond what was set forth in the deposition. Is that your representation? And I'm being handed a copy of the deposition here.

MS. CONLON: And, your Honor, I'm looking at Page 207 of the deposition.

THE COURT: Fine.

But, Ms. Santora, talking to you, is it your position it goes beyond what's set forth in the deposition?

MS. SANTORA: Yes, I believe that question did go beyond what was set forth in the deposition.

THE COURT: Well then she'll be more specific in the deposition. I'm looking at Page 207.

MS. CONLON: And I'm looking at, um, Lines 12 through 24, in particular the question that begins at Line 16. Which I can read if it's helpful to anybody.

THE COURT: Well you know to save time, um, let me propose this, to save time, Ms. Santora, and Ms. Conlon.

I'm going to honor her, um, claim of Executive Privilege in the course of your oral cross-examination of Mr. Armstrong. At the same time what's revealed in the deposition, um, in absence of his oral testimony, which I'm sustaining, is waived and is before the Court and I can read. So all you need to do, again to save time, is to say, "We want in Pages X, Lines whatever," and we don't need to question him about it.

MS. CONLON: Okay.

THE COURT: If you're on this vein of talking to people, even by telephone, at the White House.

So with that guidance, um --

MS. CONLON: Yes, that makes sense.
THE COURT: -- proceed, Ms. Conlon.
MS. CONLON: Okay. So, your Honor, we will submit a designation after this cross-examination.
THE COURT: That's fine. Proceed then.
MS. CONLON: Okay.
(Pause.)
Q. Now, um, I'd like to turn to -- we're going to move away -- well one other question.
You attended meetings of the Homeland Security Council, correct?
A. No, I did not attend meetings of the Homeland Security Council in person, I took part in telephonic discussions with people who were on the Homeland Security Council.
Q. Okay.
A. I'm not of that rank to go to the Homeland Security Council.
Q. Well they invited you to speak. We can leave it there.
A. In telephone conversations with members of the Homeland Security Council, yes.
Q. And those conversations concerned student Visa revocations, is that fair?
A. They concerned many issues, but student Visa

revocations were also discussed, as were general Visa revocations.

MS. CONLON: Okay, so I will rely on the deposition for the remainder of what I'm questioning him on.

Q. Okay. So some of the determinations that we are going to talk about today involve U.S. foreign policy, so I want to understand what you mean when you're talking about U.S. foreign policy in these decisions that you wrote.

It's your understanding that it is the foreign policy of the U.S. to combat antisemitism at home and abroad, is that right?

A. Yes, it is my understanding that is the policy of the United States, and actually President Trump's Executive Order in a way codified long-term policy. The United States, at least in my tenure of over 30 years, has always been opposed to antisemitism both in the wider world and in our great country.

Q. And when you say the "Executive order," that is 14188, right?

A. I don't know the number offhand. I believe there was only one that dealt with antisemitism. I can try and look it up, if you'd like, ma'am.

Q. No, I think that we can assume it's what you mean

here for our purposes.

Now your understanding about the long-time U.S. policy combating antisemitism is also drawn from public statements made by Secretary Rubio, right?

A. Yes, Secretary Rubio has gone on record, it is my recollection, to be strongly against antisemitism, both domestically and, um, even more importantly, in the world.

Q. Now --

A. I personally am also against antisemitism, just for the record, and I have no embarrassment in stating that.

Q. Nor should you.

Now Secretary Rubio has made many public statements about antisemitism, correct?

A. It's my --

MS. SANTORA: Objection.

THE COURT: Well that's pretty vague and it's a matter of record. Sustained.

Go ahead.

Q. With respect to Secretary Rubio's position on pro-Palestinian student protests, your understanding is he's against foreign aliens organizing antisemitic activity in the U.S., is that right?

A. It's my understanding that he's against anyone

organizing antisemitic activity in the United States. He -- and again, my understanding is he has no power against you, American citizens, doing such things. He does have power, under the law, as has every Secretary of State, against aliens who could do such things.

Q. Aliens organizing antisemitic protests in his view, is that right?

MS. SANTORA: Objection, lack of foundation.

THE COURT: Sustained. It's sustained. This witness can't state his view.

MS. CONLON: Well, your Honor, I'm actually interested in this witness's understanding of his boss's --

THE COURT: Well you didn't in that question.

MS. CONLON: Yes, I'll clarify.

Q. So, Mr. Armstrong, to be clear, I'm not asking you to read Mr. Rubio's mind, but I want to focus on your understanding of the State Department's position based on Secretary Rubio's public statements.

Now it's your understanding that Secretary Rubio has expressed that the State Department has a policy of opposing antisemitic protests on U.S. college campuses, correct?

A. It's my understanding that Secretary Rubio has stated he opposes antisemitism both at home and abroad,

so that would include public campuses, that would include everywhere in the United States, and in the whole world.

Q. You have reviewed some of Secretary Rubio's public statements in the course of your work, correct?

A. Yes.

Q. You have cleared written guidance for State Department employees that actually quotes from Secretary Rubio's public statements, right?

A. It's my recollection that I cleared some cables that quoted from the Secretary. And there may have been other documents, but there were a couple of cables in particular that had stuck in my mind.

Q. Okay. And some of those --

A. And why? I do not know.

Q. Some of those cables in particular related to Visas and Visa revocations, right?

A. I believe so, yes, that is my recollection.

Q. You said, when we started this line of questioning, that EO 14188 codifies a longstanding U.S. policy against antisemitism. And do I understand you correctly to be saying, in other words this policy existed, but it was first written or memorialized or codified in that Executive Order. Is that what you meant?

A. What I meant was that I used -- I said "In a manner, I believe, codified it," because of course it's not a legal code, it's an Executive Order. It's not the same as if Congress had passed it. But, um, in my career, in the over 30 years that I've served the American people as a Foreign Service Officer at the State Department, both at home and abroad, we have come out repeatedly, various Secretaries of States, various State Department officials, against antisemitism. The U.S. government has done that too. And this is the first Executive Order that I recall, um, where it was said that "We are against antisemitism." So in that sense it memorialized, formalized, whatever way we want to describe this, took this policy to the next concrete level. It was always there, um, since Day 1 of my Foreign Service career.

Q. Now you've talked about antisemitism just now in that order, but I want to talk about your understanding of it.

You have had to review referrals from HSI concerning alleged antisemitic activity in the past few months, right?

A. Um, from DHS, but I don't remember what office in DHS.

Q. Those referrals were part of the implementation of

Executive Order 14188, right?
A. That's an interesting question. Yes, I think they could be seen as an implementation. Certainly we reviewed a number of cases, actually several thousands of students, um, for various things.
Q. So just to bring you up to my question. The referrals you got from the Department of Homeland Security concerning alleged antisemitic expression and activity, that was pursuant to or the implementation of EO 14188, correct?
A. I think it was also the implementation of our longstanding policy of being against antisemitism. It is not a new policy. Again, it was brought to a higher level. But we've always been against antisemitism.
Q. Isn't it true that people in the State Department were asked to review activities of students for antisemitism pursuant to the Executive Order 14188?
A. We were asked to review their activities. I don't remember whether the Executive Order was cited in the request. But we were asked to review their activities on antisemitism, and on other things too, on criminal activity, like the 800 students who, um, had assault charges.
Q. To your knowledge the State Department has not issued any guidance about what should be treated as

antisemitic, correct?

MS. SANTORA: Objection.

THE COURT: Overruled.

A. I cannot remember a concrete piece of guidance. It, um, seems to me there may have been -- been some. But I do not remember a concrete cable where I can say "This cable defines antisemitism."

Q. I'll ask you again.

You haven't received any guidance from anyone on what the State Department should treat as being antisemitic, yes or no?

MS. SANTORA: Objection.

THE COURT: Yeah, sustained. I think he's answered that.

MS. CONLON: Your Honor, I believe he just said he can't recall, and maybe not in a cable, and then --

THE COURT: I understand. I understand. The transcript will speak for itself. But the effort is to persuade me. And here's what I hear. Anyone can -- and he can correct it.

I hear him say there's been no guidance, formal or informal, as to what should be treated as antisemitism. I think that's the point.

MS. CONLON: It is.

Q. And fair to say you don't know whether your

subordinates in the Visa office, who write the action memos that you review, have received training on how to determine what activity is antisemitic?

MS. SANTORA: Objection.

THE COURT: No, overruled.

A. I do not -- I do not know all what training they have. To my knowledge I do not know of any of them having received formalized training on what is antisemitism.

Q. When employees in the Visa office are making these assessments that come to you in writing, you don't know where there's any written materials they review or refer to, correct?

A. Could you clarify, what kind of materials? You mean instruction materials? Or are they looking at the evidence that a person has engaged in antisemitic activity or has supported a terrorist organization?

Q. Materials about how to make that assessment.

A. The assessment of antisemitism or not?

Q. Yes.

A. I do not know of any such materials.

Q. You don't know what definition or standard the Visa office uses to determine whether speech or conduct is antisemitic, right?

MS. SANTORA: Objection.

THE COURT: Overruled.
A. I do not know of any materials. I do know that there's a common understanding in our culture in our society of what antisemitism is. It's just --
THE COURT: And -- thank you. I'd like to now ask, would you state that, so I understand it? What do you think is the common understanding of what "antisemitism" is?
THE WITNESS: In my opinion, antisemitism is unjustified views, biases, or prejudices, or actions against Jewish people, or Israel, that are the result of hatred towards them.
THE COURT: Thank you.
Q. In other words, in your understanding antisemitism includes hatred or prejudice against Israel and the Israeli people, right?
A. Yes. In my understanding antisemites will sometimes try to hide their views and say they're not against Jews, they're just against Israel, which is a farcical argument in my mind. It's just a dodge.
Q. It's a dodge. It's a way of obscuring a person's antisemitic views?
A. In my opinion, yes, Counselor.
Q. Now there are some cables that you cleared this past few months concerning, um, the espousal or

endorsement or support of terrorism and antisemitism, right?

A. There may have been. I believe so. I don't remember all the cables I cleared. But I believe that I did clear some, yes. And actually probably approved them.

Q. Not only cleared, but also approved, as in the final approver, right?

A. Yes, that is correct.

Q. Okay. Now once such cable, which I will draw everybody's attention to, it's Exhibit 64 in evidence. It's a cable from March of this year. And I just want to ask about your understanding of a part of that as it relates to endorsing, espousing, supporting terrorism, and antisemitism.

MS. CONLON: And tell me if you need a second to pull it up, Ms. Santora.

A. I am pulling it up. Wait. Wait. Now, sorry, I have to use my mouse. (Pause.) This is, um, an "Action Request Enhanced Screen and Social Media Vetting for Visa Applicants," yes?

Q. Yes.

A. Exhibit 64.

Q. Exactly. And so if you go to Paragraph 9 of this document.

A. (Turns.) I'm at Paragraph 9.
Q. Excellent. I'd like to draw your attention to the bottom few sentences, because I'll be asking you about them.
A. Okay.
Q. So this paragraph of this March cable that, um, for clarity, did you approve or just clear this one, can you tell?
A. I have to look at the bottom. (Looks.)
Q. Can you go ahead and do that, please.
A. (Looks.) I believe I approved this one.
Q. Okay. So turning to --
A. Also I can tell by looking at the tags, it's see "See this," and "See management," "Counselor viewed this," "Counselor management."
Q. So looking at Paragraph 9, the bottom few sentences, this portion of the cable concerns the understanding of 3(b), which is one of the grounds for potential ineligibility, on the basis of supporting terrorism, correct?
A. Yes, 3(b) is support for terrorism, a terrorist activity, or a terrorist organization.
Q. Now this cable provides guidance on how to determine whether a person, um, endorses or espouses or supports terrorism, right?

A. This part talks about that, yes. I'd have to flip back up to see what the title is.
Q. And some indicators, according to the cable, said a person may endorse, espouse, or support a terrorist organization, include evidence that an applicant added a case for terrorist activity, correct?
A. Can I read the lines, Counselor?
Q. Oh, sure, and I'm actually not quoting, but go ahead.
A. Okay.
Q. The last few sentences.
A. Okay. (Reads.)
Q. Okay. So I'm going to ask you.
It's fair to say this cable here has, um, understandings of how a person may reflect that they endorsed or espoused or support a terrorist organization, um, which could include bearing a hostility towards U.S. citizens or U.S. culture, among other things, right?
A. Yes, it does note that as a possible indicator.
Q. Potential sympathy for a foreign terrorist organization, right?
A. (Looks.) Yes, as a possible indicator. This requires judgment and it's not an easy task.
Q. Okay. Now if we can set this cable aside for a

moment, but I want to stick with the discussion of 3(b), um, so you can put that aside.

The State Department has, as I understood you to say on direct, a policy of revoking Visas based on a person's support for a terrorist organization, if that is their viewpoint, correct?

A. Support --

MS. SANTORA: Objection.

THE COURT: No, she may ask the question. Overruled. He may answer.

A. Support for a terrorist organization, or terrorist activity, is a reason to have a Visa revoked, yes.

Q. And on direct you were asked the question, does State have a policy to revoke Visas based on political viewpoints? And in responding to a question about political viewpoints, you said, "If you're supporting a terrorist organization, yes." That's correct, right, that's what you said?

A. Yeah, support for Hamas will get your Visa revoked.

Q. Now I want to --

A. No, I'd like to finish my answer, because it doesn't seem that the full complexity of what we deal with is being carried out.

THE COURT: You may -- you may, sir. Go ahead.

THE WITNESS: Thank you, your Honor.

A. This is not a mundane thing. If we get this wrong, we get the Molotov cocktail attack in Colorado. If we get these sort of things wrong, you get the Boston Bomber. If we get this stuff wrong, you get 9/11.

MS. CONLON: Your Honor, I'm going to ask that you --

A. This is very serious stuff, Counselor, and I don't think you realize --

THE COURT: Wait. Wait a minute. Wait. Wait. I've said you could amplify your answer. You've gone on to characterize the question.

THE WITNESS: I apologize.

THE COURT: We're not doing that. I fully accept, sir, that you take this very seriously. She's trying to flesh out what's meant by the phrase "Support Hamas." That is important to this Court, an understanding of that. And I'm going to allow her to ask questions along that line. That's what I need to get out of this. What does it mean to support Hamas?

As far as I can see, in this case, there is no dispute, and I don't see how there could be, that Hamas a terrorist organization. That said, she's trying to pin down what that means.

Go ahead, Ms. Conlon.

MS. CONLON: Thank you, your Honor.

Q. Now in your view, the phrase, "From the river to the sea, Palestine will be free," could be covered by the endorsing, espousing, supporting, a terrorist organization provision, correct?

A. It's basically calling for genocide of all Israelis, because there's no space for Israelis in that "river to the sea."

Q. In your view, a statement denouncing Zionism could be covered because Zionism is Jewish patriotism or Israeli patriotism, correct?

A. It could be, yes.

Q. In your view, a statement criticizing Israel's actions in Gaza could be covered, depending on the statement, right?

A. Yes, depending on the statement. It could definitely. If you say that "They're worse than Hitler in what they're doing in Gaza," that would be a statement that I think would be leading in that direction that you seem to go going, Counselor.

Q. In other words, a statement comparing the policy of Israel to that of the Nazis?

A. I'm saying it's worst than the Nazis.

Q. A statement calling for an arms embargo on Israel could be covered, correct?

A. It could be.

MS. SANTORA: Objection.

THE COURT: Wait. Wait. The objection is noted, but overruled. She may follow this line of questioning.

Q. A statement calling for limiting military aid to Israel could be covered, correct?

A. In my opinion, yes.

Q. A statement --

A. You'd have to look at the totality of the situation and the whole thing that's being said. Just one statement by itself is probably not going to make the decision.

Q. A statement calling Israel an "apartheid state" could probably be covered?

A. It might be. We'd have to look at the totality of the case. Which is what we do in the Visa revocations.

Q. Now you said a second ago, "Well that's just your opinion." But, Mr. Armstrong, you are the senior bureau official in Consular Affairs, right?

A. I am the senior --

THE COURT: Wait a minute. You may answer.

A. I am the senior bureau official at the present time in the Bureau of Consular Affairs at the State Department. I've been in the position since February 27th of this year and continue to be in it.

Q. And when you receive action memos about particular persons alleging that they have expressed support for terrorism, what we're talking about here, these understandings inform your decision-making, right?

A. Yes, my understanding does inform my decision-making, as does any other guidance that I have. And I actually discuss my decisions, if I have questions, with the people who sent the memos to me to make them.

Q. In the cable we looked at a moment ago, there was a reference to a person's hostile attitude toward U.S. citizens, government, and culture, as potential indicators that they support or sympathize with terrorist organizations. And I want to understand your view of that as well.

In your view, criticism of this administration's policies or actions toward Israel could be covered by this provision, right?

MS. SANTORA: Objection.

THE COURT: Well this deals with Visa applications and so I'm going to sustain that.

(Pause.)

MS. CONLON: Just a moment, your Honor.

(Pause.)

Q. The Court made the point that I'm asking you about

3(b), to endorse or espouse or support a terrorist organization, but you're familiar with 4(b) as well, correct?
A. Could you refresh my memory, please.
Q. Sure. You're familiar with the provision of the INA, which you in your deposition referred to as 4(b), which has these exact same grounds that are in 3(b), but as a ground for the revocation or the determination of removability, as opposed to something relating to the ineligibility to come into this country, correct?
MS. SANTORA: Objection.
THE COURT: No, she may ask him to characterize it, and the answer may stand.
MS. SANTORA: Well if she's asking him about a statute or a document, he's asked if she could show him the statute or document.
THE WITNESS: Well I would like to see it, ma'am, if you have it there.
THE COURT: Yes.
MS. CONLON: I'm just trying to be very efficient with our time, but I understand you want to see it. So maybe the easier way to do this is actually the cable you just looked at, 64.
A. Okay.
Q. This cable is not only about Visa applicants, but

it is also about Visa revocations, correct?
A. I'm going to have to answer -- honestly I'm going to have to look at the cable.
Q. No, all we want are your honest answers, so please pull up the cable.
A. For March.
Q. So please pull up the cable, and I'm going to draw your attention first to Paragraph 2, on the first page, and next to Paragraph 11, titled "Revocation of Valid Visas." And once you've had a chance to read both of those paragraphs, please let me know.
A. 2 and 11, yes?
Q. Okay. So having reviewed that --
A. No, I'm sorry, Paragraphs 2 and 11?
Q. Yes, please.
A. Thank you. (Reads.)
Q. Okay, so having looked at this cable, you agree with me that this cable --
A. I apologize, I'm still reading Paragraph 11. Could I please be allowed to finish?
Q. Of course.
A. Thank you. (Reads.) I have completed it.
Q. Okay. So you have looked at Exhibit 64, the cable we've been discussing, about the grounds for the endorsing, espousing, the support for a terrorist

organization, and you can see that this cable addresses not only applicants, but those who are here in our country, correct?

A. They may be here in the country, because actually, um, looking at Paragraph 11, um, you could have a -- someone could have a valid Visa and not be in the country and have the Visa revoked. Your previous question, if I understand it and remember it correctly, was "Was there a discussion of revocation in this cable?" "Yes, there is." And specifically in Paragraph 11. That's a good example. Reading through it quickly, I didn't see it, but it's definitely there in 11.

But the holder of the Visa can be -- for example, if someone from Peru applies for a Visa, they get it, additional information later comes to light, that Visa can be revoked whether they're in Peru or whether they're in the United States.

Q. Okay. So to answer my question, yes, this cable applies to people who are Visa holders inside the United States as well, correct?

THE COURT: He just said it --

A. It could, yes.

Q. Okay. Now you asked me to refresh your recollection about the INA provision that, in your deposition we described as 4(b). I'm going to try to do

that very quickly here so we are all on the same page.

MS. CONLON: Can we please show Mr. Armstrong Page 7 of what was identified as Exhibit 222.

(On screen.)

Q. I'm going to show you, Mr. Armstrong, a copy of --

MS. CONLON: Oh, and we can't scroll? (Scrolls.) Yes. Okay.

Q. So, Mr. Armstrong, I'm showing you a copy of a statute. And this is just to refresh your recollection.

A. Yes, I appreciate that.

Q. This is codified in the U.S. Code as 8 U.S.C. 1227, Deportable Aliens. And you have control of the mouse here, so I'm going to ask you to scroll to Page 7 of this, Section 4, titled "Security and Related Grounds."

A. (Scrolls.) Yes, I see it, and I see "terrorist activities."

Q. Now you can see here, under 4(a), that this statute applies to people who engage in the same grounds we're talking about in 3(b), another part of the INA, but here, instead of it being that they're ineligible, as in Number 3, under 4 they are deportable, correct?

A. I haven't compared the exact wording in 3(b), but it does say that, yes, if they engage in, it's 1, 2, 3, that they are deportable.

Q. Just like --
A. And I believe the finding in that would be done by the Secretary of State.
Q. And under (C), 4(c) here, which says "Foreign Policy," so that rolls on to the top of Page 8, here we can see a person who's present in the United States, as determined by the Secretary, to have adverse consequences for foreign policy, that person is deportable, correct?
A. Yes, the Secretary of State makes that determination.
Q. Right. So my point is that you said, well, 3(b), 3(c), that's both -- Oh, our screens just did something strange. You said that those refer to applicants. And you would agree with me that 4(b) and 4(c) are applicable to people who already have a valid Visa or a green card, right?
A. Based on a quick review here, yes, that makes sense, they would, um --
Q. Okay, well you say a "quick review." But am I recalling correctly that you testified on direct examination that you have to be familiar with statutes, about revocations, removability, to do your job, isn't that what you said?
A. I don't remember my testimony. And I'm clearly

familiar with it, because I'm able to discuss it. So, yes, I am familiar with this. And again the 4 -- the 4 authorities, those are determined by the Secretary. Like the 4 -- excuse me, the 4(c).

Q. So earlier I tried to ask you about the language in that cable, about whether a person's alleged hostile attitude towards U.S. Citizens, government, and culture, may be indications that that person supports or sympathizes with terrorist organizations. I'm asking that question with respect to 3(b) and 4(b). And the question is this.

In your view, criticism of the Trump administration's policies or actions toward Israel could be relevant to a 3(b) or 4(b) determination, correct?

MS. SANTORA: Objection.

THE COURT: No, overruled.

A. It could be. I would look at the totality of the situation. For example, if the person said that Hamas should kill all of the Trump administration because of the policy, yes, I would say that a statement like that, which would be a criticism of the Trump administration, would be indicative of support for a terrorist organization. So, yes, it could be.

Q. (Pause.) Hang on just a moment.

So you've given a pretty outrageous example of

what could be covered. But you've been asked this question and given this answer.

"Could a criticism of the administration's policy or actions of Israel be covered by Paragraph 9?" And your answer is simply "Possibly," correct?

A. Yes, it could be. But again you have to look at the totality of it. Perhaps my example seems extreme, but we deal with a lot of extremist people trying to get into the United States and we've got to get it right, Counselor, otherwise it results in terrorist attacks or threats to our own citizens.

Q. Well let's talk about some particular people whose cases you dealt with.

You testified, on direct examination, that the State Department uses only existing authorities and policies to implement EO 14188 and 14161, correct?

A. That's my recollection, yes, it is. We have --

Q. No, go ahead.

A. We have, with revocations, long established the, um, 3(c), um, 3(b), or 4(b), and 4(c) are long established in the INA, I believe since the beginning when it was initially -- when it became law in the '50s, so it's over 70 years. Yes, long-established policies and methods, tools.

Q. Long-established. Your point has been that the

EOs did not create new legal authorities, right?
A. Yes, that is -- they did not create a new revocation.
Q. Now just after you started in your current role, which was February 27th, you were confronted with the cases of Mahmoud Khalil and Yunseo Chung. Are you familiar with those names?
A. I remember Mr. Khalil's name. Um, Chung, Mr. Chung is ringing a bell, but I don't remember that one quite as well. But there could have been someone by that name.
MS. CONLON: Your Honor, I'd like to show, um, Mr. Armstrong what has been premarked as Exhibit EX, it's an attorney's-eyes only document that we received from the Court, the action memo concerning Mr. Khalil and Ms. Chung. I won't -- we want to be cognizant of not putting it on the screen, because it's AEO.
THE COURT: I'm assuming Ms. Santora has it.
MS. SANTORA: Um, I -- can they share it with the witness not on the public screen?
THE COURT: Well you're saying it, and everyone is cognizant, it's attorney's-eyes only. I assumed you had it?
MS. SANTORA: I can get it, your Honor, um, if --
THE COURT: Well so long as it's on your screen

only, that would be sufficient. We can do that.

MS. SANTORA: Okay. If opposing counsel would share it just to the witness's screen?

MS. CONLON: We're trying to ensure that we do that and do not show the public, so.

MS. SANTORA: Yes, thank you.

Q. So while we're getting you the document, Mr. Armstrong, you mentioned that there are certain determinations under 4(c), for example, that only the Secretary of State can make. One such determination is that a person's presence or activities in the U.S. posed a potential adverse foreign policy consequence to the United States, right?

A. Yes. I cannot make that determination, only the Secretary of State, whoever that person may be.

Q. Okay, we're still working on getting you the documents.

(Pause.)

MS. SANTORA: Your Honor, I think I may have them now.

THE COURT: Thank you.

MS. CONLON: That would be really helpful. We just don't want to mess up and put it publicly when we're not supposed to.

MS. SANTORA: Which one are you referring to?

MS. CONLON: For Mr. Khalil and Ms. Chung, it's an action memo.

(Pause.)

MS. CONLON: Are you able to find it?

MS. SANTORA: Yes. Hold on one second. I want to be sure we have the right one.

MS. CONLON: It's on DEF 121 is the Bates.

(Pause.)

MS. CONLON: And is the Court able to see the Court's copy?

THE COURT: I have access to it.

You have about 45 minutes total in the examination, if you want to reserve 45 minutes for closing. So go ahead.

MS. CONLON: I'm sorry, your Honor, could you say that again? I didn't understand.

THE COURT: You have 45 minutes for examination and 45 minutes for closing, as we stand now at 10:00.

MS. CONLON: Oh, I see. I understand. Okay.

MS. SANTORA: I'm sorry, I don't think our copy has numbers on them.

THE COURT: Well it's before the Court.

MS. CONLON: Okay, I'll just ask my questions and we'll do our best.

THE COURT: Yes, thank you.

Q. So, Mr. Armstrong, you passed along, after approving, action memos concerning Mahmoud Khalil and Yunseo Chung to Secretary Rubio, correct?
A. I believe there was an action memo. If it went up to the Secretary and I was working, I would have been the last person to look at it before it went. And my name should be on it.
Q. That's right. I'm trying to show it to you, because I'd like it to be in evidence and have a number.
A. Counselor, if it has my name on it, I believe you.
Q. I appreciate that.
THE COURT: Well, look, these materials are before the Court in their tortured history and I have made it clear they are part of the record on which I am going to make a decision.
MS. CONLON: Okay.
THE COURT: Now if you want to separate this out and give it a number, I'm fine with that, we can do that without the time running.
MS. CONLON: Okay, thank you.
THE COURT: Because it may help you, in both sides, with the requests for findings and rulings.
MS. CONLON: Exactly.
THE COURT: So go ahead with your questions to the witness.

MS. CONLON: Okay.
Q. So my question is that prior to issuing this action memo to Secretary Rubio on March 8th, you were not aware of any prior exercises of the Secretary's removal authority under 4(c), correct?
MS. SANTORA: Objection.
THE COURT: Overruled.
A. I do not recall any. That doesn't mean there weren't any. I can only --
Q. Mr. Armstrong, please look at the end of your action memo. Sorry, I should have drawn your attention to it to just make this faster. Would you please look at the last line of your action memo.
MS. SANTORA: There's a copy here, but it has redactions applied to it, so I --
MS. CONLON: All right, we'll just move on.
Q. So you don't recall, as you sit here today, whether before you, in almost the first week of your job, authorized this action, whether it was something the State Department had ever done before?
A. I believe it was done before, just not under Secretary Rubio, it was the beginning of March, I believe that this took place. Yes, the first week in March?
Q. This was March 8th, that's correct.

A. Yeah, so Secretary Rubio would have been in the saddle for 6 weeks. But that doesn't mean it was never used by other Secretaries of State. As noted, the INA has been in effect for over 70 years. So I believe it was used at other times. But I would not be surprised if Secretary Rubio had not used it within those 6 weeks of his tenure.

Q. So, Mr. Armstrong, you're saying that it was just about Secretary Rubio being new to his role, but isn't it true that what you wrote in the action memo was that Mr. Khalil and Ms. Chung were likely to challenge their removal under this authority, that the courts might scrutinize its basis, and that's because there was no prior exercise of this authority before, not just under Secretary Rubio, under anyone, isn't that correct?

A. No, my recollection is it was used at sometime earlier as a matter of fact in this century.

Q. In this century?

A. But I don't remember a date.

Q. Okay. Let's move on to Mr. Mahdawi.

This is the action memo, which is also attorneys-eyes only, and I believe it's something we can share with the witness if Ms. Santora doesn't have an unredacted copy of it.

You also prepared, or passed along, the action

memo concerning Mr. Mahdawi to Secretary Rubio, right?
A. This is, um, 5. Okay. Sorry. I'm getting the right document.
Q. I appreciate that.
A. On March 15th, "Action Memo for the Secretary." Yes, from CA John Armstrong. That is me.
Q. Now these -- this action memo concerns a number of people, but in particular Mohsen Mahdawi, right?
A. I see three people. Momodou Taal. Badar Khan Suri. And Mohsen Mahdawi.
Q. The action memo concludes, for those mentioned, that they are removable under 4(c), correct?
A. Just a second. (Looks.) Yeah, and it asks the Secretary to make that decision. I can't make that decision. It's recommending that he make that decision. But I didn't make that decision. I made the case and those who drafted it did and I approved that argument, but it's the Secretary's decision. Which he did find those three people to be removable under 4(c). You can see at the top, um, ma'am, it says the recommendations, "Recommendation 1 approved," "Recommendation 2 approved." So, yes, the Secretary agreed with the recommendation.
Q. Now for Mr. Suri and Mr. Mahdawi, for whom these actions were approved about a week after Mr. Khalil's

removability determination was issued, you specifically anticipated that there could be concerns around the fact that the determination was inextricably tied to their speech, correct?

MS. SANTORA: Objection.

THE COURT: Overruled.

A. Okay, can I review the memo so I can see what it is I signed? I mean this was 3 months ago.

Q. You don't recall, is that correct, without having to look?

A. Ma'am -- I mean, ma'am, I have -- in a week I can have 50 action memos go across my desk.

Q. I understand that you have a very important job with a lot to do. I'm focused on these particular people whose determinations led to determinations of their removability. So if you need to turn to the last paragraph to remember what you said about it, that is just fine, it's the last page of the memo.

A. Thank you. I appreciate that. (Looks.) Now the question is Mr. Mahdawi, yes?

Q. Yes, the question is Mr. Mahdawi and Mr. Suri. But if you have Mr. Mahdawi in front of you, we can just use that.

A. Yeah, actually in the memo it's clear that it was activities. "Antisemitic conduct." "Disruptive

protests" and "antisemitic conduct."

Q. Mr. Armstrong, do you see where it says "Given the potential that a court may consider his actions inextricably tied to speech protected under the First Amendment, it is likely that courts will closely scrutinize the basis for this determination."

Do you see that?

A. Which page is this on, on Page 4?

Q. Yes, sir, the last page.

A. (Looks.) Yes, I see that.

Q. Now this memo, that you noted the action and it was approved, um, the date on the top, on the first page, is March 15th. I now understand from you that what I see in the upper left, "Rec 1 approved," "Rec 2 approved," means the date -- means that the Secretary approved the recommendation.

Is the date next to those two provisions on the top left, by "Rec 1," "Rec 2," the date that the Secretary approved the recommendation?

A. Yes, that's --

MS. SANTORA: Objection.

THE COURT: No, overruled.

A. That's my understanding, those are the dates of the approval.

Q. And do you see on the first page where it says,

right under "Background," "On March 14th, the Assistant Director of NSD referred this information to CA"?
A. Yes.
Q. So this referral came on the 14th, the action memo was produced on the 15th, and it was approved on the 15th. Am I understanding all of that correctly?
A. Yes.
Q. And in that 24-hour period in which the action memo was generated, 13 people in departments cleared it, does that sound right? If you look at the last page for me. Just making sure I'm understanding that chart correctly.
A. Yeah, it could actually be more than 24 hours, depending on when it came in and when the memo went up. But let's say, for the sake of argument, it was approximately 24 hours.
Q. So you do see that, am I right?
A. Yes, I see the list of clearers.
Q. Okay.
MS. CONLON: Just a moment.
(Pause.)
A. And you'll note, on a couple of them, it's "Info."
Q. I'm so sorry, I missed that last thing you said. What did you say?
A. On a couple of them it's "Info."

Q. And "info" just means someone's letting them know, is that right?
A. That's correct. So those people actually did not bring any changes or express any opinion about the document.
Q. So it would be more accurate to say that 10 offices or persons cleared this memo and three people reviewed it, is that fair?
A. I count, um, 9. But, yeah, approximately 10.
Q. Okay. Now I have one more action memo I want to discuss quickly. And I would like you to, um --
MS. CONLON: Ms. Santora, if you have Ms. Ozturk's action number, that's what I'll be asking him about.
Q. Now you decided to revoke Rumeysa Ozturk's Visa, right?
A. I believe that was under, um -- yes. Yes, I believe that was under authority that I did exercise in my current position.
Q. Meaning, um -- meaning as Senior Bureau Official, you were empowered to make that choice, without needing approval from the Secretary, is that what you mean?
A. That's correct.
Q. Now --
A. In other words, it wasn't a 4(c).
Q. In reaching that decision, you did -- I assume

what you always do, you reviewed the action memo in its entirety, right?

A. Yes, actually it was proposed to me -- I believe if it would have come to me, it would have been from the, um, Deputy Assistant Secretary for Visa Services, um, Stuart Wilson.

Q. That's right, Stuart Wilson is the person who issued this action memo to you, correct?

A. Yes, the, um -- I believe so. I mean I'm -- yes, that would make sense.

Q. Do you have access to the action memo, sir?

MS. SANTORA: Um, I am looking for it.

MS. CONLON: I understand that it's on your screen, Ms. Santora, we've shared it with you. So perhaps you can --

MS. SANTORA: Oh, it is, okay. It's on the witness's screen, yes.

A. Thank you. Exhibit EY, yes?

Q. Yes.

Now this memo reflects, on Page 1, that HSI initially identified Ms. Ozturk as deportable potentially under 4(c), the foreign policy provision, right?

A. Wait a minute. Yes, in the background.

Q. Yes, exactly. Do you see that?

A. Yes, and I see I underlined that. Those are my notes.
Q. Yes, I understand, but I also understand that the Court has determined that your notes are protected by a privilege, so I am not going to ask you about any of them, um -- I'll leave that there.
Q. Now on the second page of the memo, it gets into the factual basis for the proposed action, um, in that big middle paragraph. Do you see that paragraph, it's the middle, the paragraph on the middle of 2?
A. (Looks.) Yes, the one that begins "Ozturk was issued an F-1 Visa on December 14th, 2020, valid until December 9th, 2025." Yes?
Q. Yes. Now there are various factual allegations in this paragraph compiled by HSI, correct?
A. There's information from HSI, yes.
Q. Now I'm not going to get into the specifics, but it's fair to say, because you have this in front of you, that this memo considered whether or not she had engaged in antisemitic activity, right, is that a fair characterization?
A. Just a moment.
Q. Sure.
A. (Looks.) Antisemitic activity was part of it. I'm reading it. I see that "S. Wilson noted the

totality of the circumstances."

So as I believe I stated in my deposition, and have said before, we have to look at the totality of the cases, something that we do with a fair amount of effort. And I think my notes, whether they're protected or admissible or not, the copious amount of them indicates that I looked at this with a fair amount of effort and actually thought about the decision before making it.

As a matter of fact, exceptionally, for all the paper I go through in a week or a month or a day sometimes, I actually remember taking some of these notes. I thought long and hard about Ms. Ozturk's case.

MS. CONLON: Your Honor --

THE COURT: Wait a minute.

MS. CONLON: Okay.

THE COURT: It's appropriate to say that, um, I think I have erred. I don't think any deliberative privilege applies to ones notes to themself, and they reflect precisely what the witness has testified, and I now vacate the order as to these, Mr. Armstrong's notes, on the memo to him, as to which he made the decision.

Go ahead.

Q. Now these notes indicate, in that bottom paragraph, the first line, you wrote the words "actions

not words," concerning Ms. Ozturk, correct?
A. Yes, that is my handwriting. And the emphasis on that was that it wasn't just her statements, it was things that she did.
Q. Yes, now that is exactly what I want to talk to you about. That whole sentence states, "While Ozturk has been involved with actions, protesting Tufts' relationship with Israel, DHS, ICE, HSI, has not however provided any evidence showing that Ozturk has engaged in any antisemitic activity or made any public statements indicating support for a terrorist organization or antisemitism generally."
What this sentence describes are things she did not do, correct, actions she did not take?
THE COURT: Well it says what it says. But go ahead with your question.
A. I would read it with the whole paragraph, things taken out of context do not reflect the totality of complicated cases, which this was a complicated case, as the amount of my notes indicate.
Q. Now the whole --
A. The next thing her --
Q. I'm sorry, I'm going to walk you through the whole paragraph, so don't worry, we're not going to ignore the rest of it.

The rest of the paragraph --
A. I would -- yeah, I would point out that she had a connection with this banned student organization.
Q. Now you say she had a connection, but what the report to you actually says is that the report from HSI implies a connection between her and a now-banned student group. And if you look at the paragraph above that, that implied connection is that she co-wrote an Op-Ed where she agreed with the proposal that had also been agreed to by that student group, isn't that correct, that that's the activity with the connection?
A. No, that is not the connection. They said clearly there's a connection, and the connection is not just the Op-Ed in my understanding.
Q. But your understanding was only based on this action memo, right, you don't have independent knowledge about Ms. Ozturk's activities apart from what was presented to you here?
A. My decision was based on the action memo, that is correct.
Q. And it goes on to say that the report presents no evidence other than her membership in a group, which notably is not the group that was banned, but a group that supported a proposal by a banned group, it said it had no evidence other than that, of her connection,

right? That's all there was?

MS. SANTORA: Objection.

THE COURT: No overruled. The question is leading, um, strongly leading, but it's appropriate.

A. (Pause.) Is the question that you are asserting that the only evidence was that she belonged to an organization that was a satellite or an ally of another organization, yes?

Q. A "satellite"?

A. Or associated with another organization.

Q. Yes, I guess that is my question. The activity that was the basis for your reaction here, I just want to make sure I understand, because I agree your notes are important.

There seem to me to be two actions here described. One, is her writing of an Op-Ed, that is a supposed action. Two, what's treated here, it seems as an action, is that she was part of a group that in the Op-Ed supported a proposal of another group. So some sort of attenuated affiliation with this other group.

Am I understanding that correctly?

MS. SANTORA: Objection.

THE COURT: No, the objection is made, but overruled.

A. I'm sorry, there's too many talking at me at once.

I'm trying to focus on this. I'm really trying to answer the question.

THE COURT: I don't doubt it, sir. Let me try it.

As you looked at this paragraph and evaluated it and the totality of the circumstances, is it correct that you, um, considered or were considering at least two actions, and I'll name them. One, is the writing of the Op-Ed. And the second is the, um, affiliation with the group that sponsored the Op-Ed, which, um, had, you're inferring from this, a connection with the now-banned student group.

Have I got that right?

THE WITNESS: Okay. In reviewing it, the key thing is looking -- and as I recall it, and based on my notes, the key thing that made -- was key in my decision, were her actions. The, one, actions of protesting Tufts' relationship with Israel. Secondly, her activities and associations, which are not speech. Activity and associations with these groups may undermine foreign policy by creating a hostile environment for Jewish students in indicating support for a designated terrorist organization. Those were the key things. Her activities and associations creating a hostile environment for Jewish students and indicating support for a designated terrorist organization. And

then the actions of protesting against Israel.

THE COURT: Go from there, Ms. Conlon.

Q. It's fair to say that the Op-Ed that she wrote is also being construed as an action here?

MS. SANTORA: Objection.

THE COURT: Overruled.

A. If it's in a -- it wasn't the key factor.

Q. Can you please answer the question.

A. Sure, it wasn't a key factor. If writing -- I suppose one could consider that an action. I think it was more indicative of her motivation in her activities, in her associations and in her activities to create a hostile environment for Jewish students. And I also noted that the Tufts -- and its underlined, "images of weapons." Tufts Students for Justice in Palestine was placed in suspension, the organization she was associated with.

Q. Right, associated in your view, because she supported a proposal of another organization that this organization also agreed with. You agree with me this doesn't say she was a part of the group that you've just described?

THE COURT: Too long. Start another question.

Q. Mr. Armstrong, this memo found that there were not grounds under the foreign policy provision, correct,

that that was not presented here?
A. Just one moment. I believe so, yes, because we didn't use that provision, which would have required the -- also the approval of the Secretary of State.
Q. And just so the record is --
A. Yes, I think that's -- yes, a short answer is, yes, the foreign policy grounds did not apply. Of course if the Secretary of State were to determine that, then a different story. But we didn't believe -- Deputy Assistant Secretary Wilson did not believe that they applied.
Q. And just so the record is clear, whatever you've said about her alleged affiliation with that group, this action memo says that there was no evidence that she was involved in any of the activities of the suspended group. It says that very clearly. Do you see that? It's the bottom of the second page, the top of the third.
A. It says "any antisemitic activity or public statements indicating a support for a terrorist organization, or antisemitism generally." That's what it says.
Q. Sir --
A. She was clearly involved with the Palestine -- I'm sorry, the Tufts Students for Justice in Palestine.

Q. Okay, just so we're really clear here, because I really don't think she deserves to be besmirched further, it says --

THE COURT: Just a moment. That's inappropriate. All you do is ask questions.

Are we very clear on that, Ms. Conlon?

MS. CONLON: Yes, your Honor.

THE COURT: All right. It's the witnesses who are testifying here. And though I play a bit role, I'm the one who is going to draw the inferences. Not you.

Go ahead.

Q. It states, quote, "Nowhere has DHS, ICE, HSI, shown any evidence that Ozturk was involved in any of the activities which resulted in TJSP's being suspended from Tufts," correct?

A. Which paragraph are we in, please?

Q. We're in the sentence at the bottom of the page that rolls onto the top of the next one, that's right in front of you.

A. (Looks.) Yes, I see that.

Q. So you said --

A. "Nonetheless she was associated with the organization, the Tufts Student for Justice in Palestine. She was against Tufts' relationship with Israel. An association is an activity. She was

involved in the Tufts Students for Justice for Palestine activity including when they had the interim suspension for the use of images of weapons to promote a protest rally. You know if you know join the student intifada --

Q. Okay, Mr. Armstrong, we're short on time and I think this memo is in evidence --

A. It's sort of like saying -- I mean I don't want to waste your time, ma'am, but it's sort of like saying --

Q. I'm going to stop it right here, but I have one question, just so I'm clear.

This was done under 221(i), not 4(c), correct?

A. Just one moment. I believe it was 221(i), but let me look at the top of the memo. Yes, 221(i). Not 4(c). Not 3(c).

Q. And that's a provision that let's you revoke not for foreign policy reasons, but for any reason?

A. That is correct.

Q. Or for none at all?

A. There is a reason. It's a discretion. I treat that power, as I believe all Consular Officers, and I try to instill this in them, should treat it seriously. A revocation is a serious decision.

Q. Okay, thank you very much.

MS. CONLON: Nothing further.

THE COURT: And, Ms. Santora, do you have any questions for this witness?

MS. SANTORA: No, we don't, your Honor.

THE COURT: Mr. Armstrong, thank you. And you're excused.

THE WITNESS: Thank you, your Honor.

(Zoom ends.)

THE COURT: And call the last witness.

MR. WANG: Good morning, your Honor, Xiangnong Wang for the plaintiffs, and the plaintiffs call Veena Dubal.

(Interruption by Court Reporter.)

THE COURT: And you did just right, but the first thing you did was state your name and it seemed to come from nowhere.

MR. WANG: You know after two weeks, I've learned.

THE COURT: So have we, sir.

The witness may take the stand.

(Take stand.)

(VEENA DUBAL, sworn.)

THE CLERK: And can you please state your full name and spell your last name for the record.

THE WITNESS: Veena Dubal. My last name is D-U-B-A-L.

***********

VEENA DUBAL

***********

DIRECT EXAMINATION BY MR. WANG:

Q. Good morning, Professor Dubal. And the first question for you, Professor, is where do you work?

A. I work at the University of California, Irvine, the School of Law.

Q. And what do you do there?

A. I'm a Professor of Law.

Q. Do you have a role with the American Association of University Professors?

A. Yes, I am the General Counsel of the AAUP.

Q. Right. So I'm going to call that organization the "AAUP," going forward, is that all right?

A. Great.

Q. When did you begin your role as General Counsel with the AAUP?

A. Um, late October, 2024.

Q. And turning to the organization itself. What is the AAUP?

A. So the AAUP is one of the nation's oldest professional organizations, um, representing faculty, um, and graduate student workers at Universities and

colleges in the U.S., and the goal of the organization is to, um, define and protect academic freedom and shared-governance principles.
Q. Does the AAUP's mission encompass protecting its members right to engage in speech outside of their scholarly work?
A. Yes, we call that "extramural speech," um, and from our inception it has been central to the mission of the organization.
Q. And so what do you mean by "extramural speech"?
A. So "extramural speech" is generally defined as speech in which a speech was made as a citizen, a person who makes it as a citizen, as opposed to in the context of being a, um -- in the context of their expertise as a researcher and a scholar.
Q. And when you say as a citizen there, do you mean in their personal capacity?
A. In their personal capacity, yes.
Q. Does that include engaging in political protests?
A. Yes.
Q. What about signing public protests?
A. Yes.
Q. Why is protecting extramural speech part of the AAUP's mission?
A. That's a great question. So it was first

articulated in our principles from 1915, our first set of principles on academic freedom and tenure, and the reason that extramural speech has long been integrated into how we define academic freedom is because so often our extramural speech is really hard to define outside of the context of our professorial speech.

It is often that we speak about public issues, um, in areas that we may be getting new research in, in areas which we may be considered public intellectuals on, um, it is broadly a part of our, um, identity as thinkers, as intellectuals, as people whose job it is to do, um, research, writing, um, debate, be part of -- be part of discourse.

And so because, you know, it is so easy to often say, "Well this is extramural speech and therefore not protected and therefore, you know, terminate or discipline someone," it has been critical, over 110 years, that extramural speech is protected as academic freedom.

THE COURT: Who is eligible to be a member of AAUP?

THE WITNESS: So, um, professors, both adjunct and tenure, tenure-track, and graduate students.

THE COURT: And how do you become a member?

THE WITNESS: That's a great question. You, um --

it depends on where you are. If you're at a University or college where we have a chapter, you sign up with your local chapter. Alternatively you can sign up directly with the national. You pay dues. And, um, you're a member.

THE COURT: So, um, if there's a chapter, you become a member of the AAUP, um, the name of the college or university, um, chapter?

THE WITNESS: Correct. And there are different types of chapters. We have advocacy chapters and then we have collective bargaining chapters. And so our collective bargaining chapters function as local unions for faculty, and the advocacy chapters function more as professional associations on campus.

THE COURT: What role does one citizenship play, if any?

THE WITNESS: Well ideally it shouldn't play any role, um, noncitizens and citizens should benefit from the same principles of academic freedom, be engaged in shared governance in the same way that, um -- that citizens are.

THE COURT: Thank you.

Go ahead, Mr. Wang.

Q. How many members does the AAUP have?

A. We have, excuse me, approximately 50,000.

Q. And is, um, membership in your local chapter, does that also mean you have membership in the national AAUP?
A. That's correct. If you're a member of the local, you're automatically a member of the national.
Q. And you mentioned the citizenship status of the AAUP's members earlier. How did the AAUP's noncitizen members contribute to its mission?
A. In the same way that the citizen members contribute. And maybe in more critical ways. You know often it is, with rights and freedoms, that the most marginal people are first affected by the -- by the withering of those rights and freedoms. And so the fact that our noncitizens are engaged in protecting academic freedom and upholding freedoms of shared governance is sort of central to how we, um, how we define ourselves as an organization.
Q. So I want to turn to this case now. Why is the AAUP a plaintiff in this lawsuit?
A. We are --
MR. KANELLIS: Objection, your Honor.
THE COURT: They're not a plaintiff. Various chapters are plaintiffs.
MR. WANG: Your Honor, the National AAUP is also a plaintiff in this lawsuit.
THE COURT: All right, I stand corrected, and I

appreciate it.

Why is that relevant?

MR. WANG: Your Honor, um, Professor Dubal is the General Counsel of the plaintiffs and --

THE COURT: I know. I know. But tell me what it adds?

MR. WANG: It speaks to the AAUP's interest in challenging the policy that --

THE COURT: And I've already ruled on that. Let's move on. Sustained.

MR. WANG: All right.

Q. Are you aware of, um, the ideological deportation policy that is at issue in this lawsuit?

A. I am.

Q. And when did you become aware of that policy?

A. Um, late February, early March, um, I would say specifically when Mahmoud Khalil was first arrested and detained.

Q. And do you believe that this policy is ongoing?

A. Absolutely. In fact, um, we are closely watching the, um, situation unfolding at Harvard in which the University just received, a few days ago, subpoenas from the federal government asking specifically for the, um, records of international students with respect to any disciplinary proceedings and activities and protests

since 2020.

Q. After the arrest of Mahmoud Khalil, anything about your role as General Counsel change?

A. My role changed dramatically. I went from doing what the General Counsel has traditionally done, which is write amicus briefs primarily, to essentially being a legal aid attorney. I talked every day to, um, noncitizens, members who were extremely afraid, who expressed fear about how the ideological deportation policy was going to affect their economic livelihoods and personal lives, and, um, all of my attention, most of my attention became -- became, um, focused in on, um, the academic freedom and shared governance rights of our noncitizens.

Q. And besides your personal duties changing, did the AAUP, as an organization, change after -- do anything differently after Mr. Khalil's arrest?

A. Yes. So we redirected, um, a lot of resources to, um, help support our noncitizen members. We put together two town halls for our noncitizen members. We spent a lot of time, our Executive Director, organizers, in addition to my own time, our staff time was redirected and devoted to these issues. And, um, so, yeah, organizationally not only were noncitizen members affected, but we, um, we had to sort of redirect time

and resources.
Q. So you mentioned these two town halls. I want to ask you about those. And starting with the first one. When did that occur?
A. So soon after Mahmoud Khalil was detained and, you know, soon after that, Rumeysa Ozturk, and Badar Khan Suri, and we were getting such a deluge of fear from questions from our noncitizen members, that given that I have a full-time job as a law professor, I thought it was in the best interests of efficiency to put together a town hall in which those questions could maybe get answered in a larger context. And so we reached out to various immigration attorneys, and together with the Middle East Studies Association, we put together our first town hall, um, where we talked about what was happening, answered people's questions, and, um, shared resources and information, information about immigration attorneys and information about certain basic rights and principles.
Q. And in your answer you mentioned the Middle East Studies Association. That's also known as "MESA," is that right?
A. That's right.
Q. Were you personally involved in organizing this event?

A. I organized it.
Q. And why did you organize this event?
A. Because we got so many questions from noncitizens. Every day there was such a clear concern among our membership that I felt that a town hall would not only sort of help to answer those questions and help people make decisions about their lives, but that I also thought it would be a good opportunity for people to come together and, um, have sort of a shared, um, a shared time where they could understand that they were not alone, that the AAUP was, um, standing up for its noncitizen members, and that we were behind them.
Q. Had the AAUP ever organized an event like that one before?
A. Not to my knowledge.
MR. KANELLIS: Objection, foundation, your Honor.
THE COURT: Well I don't know that it's relevant. Sustained.
Q. Okay. So turning to the second event that you mentioned earlier. When did that one occur?
A. That one occurred after the detentions and attempted deportations continued, a number of high-profile ones, so we got feedback that our noncitizen members would appreciate another town hall, especially before summer travel began. And so it was

late May, um, as people were wrapping up their semesters and, um, thinking about research projects that they were doing abroad, particularly noncitizen members, whether they had to change their research projects altogether, and whether it was safe for them to travel. And so we did another one.

Q. And, um, were the topics discussed at the second event similar to the ones discussed at the first event?

A. They were the same.

Q. Did MESA also co-host this event?

A. Yes.

Q. And so why did you organize another event, similar to that first town hall, only a few months later?

A. Because we got so much feedback that the town hall was so greatly appreciated and there were again a series of continuing, um, high-profile detentions of scholars and students that our noncitizen members were watching and were very very afraid that this continuing policy was going to impact them.

MR. KANELLIS: Objection, your Honor, the foundation.

THE COURT: No, the objection comes too late. That may stand.

Q. Are you planning any other events similar to the ones that you just described?

A. Yes, we have another one that we plan to have later this month or early August, before people, um, are coming back into the U.S to teach in the fall, to address ongoing fears about what may happen at the U.S. border.
Q. And the content of these events, are they different from what the AAUP has typically put on in its events?
A. To my knowledge the AAUP has never had to focus on immigration law.
Q. And other than content, did the events that you just described differ from the AAUP's other events in any other ways?
A. Yes. Um, we have -- so I myself am not an expert on immigration law, so we have had to reach out specifically to, um, to, um, experts in this area. We have, um, had to sort of think about, um, how to make our noncitizen members feel less vulnerable even in attending the events. And so I think a great deal of thought and time has gone into shaping, um, shaping not only the content, but also the structure of the events.
Q. And were these events public events?
A. They were private events made specifically so that people might feel safe attending them.
Q. So you testified earlier about how your personal

duties as General Counsel changed after the arrest of Mr. Khalil. How did they change?

A. So, um, I was hired or appointed specifically for my expertise in, um, in work law, so I do research and writing on contingency, and there is a rising adjuntification, um, that is the rising use of contract faculty to do the work of professors teaching in universities. And so one of the AAUP's goals, um, under this leadership has been to address adjunctification which we see as a threat to academic freedom. And so that was why I was appointed.

THE COURT: "Adjunctification" is where someone teaches a course as an Adjunct Professor, an employee for that course, but otherwise typically they're in practice or, um, their profession embodies that topic?

THE WITNESS: So that is true in law schools, but in other disciplines, in physics, in anthropology, in history, often those adjuncts have no other jobs, they are just PhDs who do not have security of employment.

THE COURT: Thank you.

A. And so because I study precarious work, um, this was something that I was going to focus on. And instead, um, I have spent a lot of time reading about areas outside of my expertise. I'm not a First Amendment scholar. I'm not an immigration law scholar.

I have devoted many number of hours to reading cases, Hornbooks, talking to experts in the field, to meet the needs of our noncitizen members in this moment. And again that was not what I accepted when I accepted this appointment in late October. It's not what I had envisioned myself doing. But doing more of what I felt I was equipped to do.

THE COURT: You have just a few more minutes, Mr. Wang.

MR. WANG: Yeah, just a few more minutes for me.

Q. So, um, did this also include having conversations with individual members?

A. Yes, I had many conversations with our individual members in an attorney-client context.

THE COURT: Wait. Wait a minute.

MR. KANELLIS: I just --

(Laughter.)

THE COURT: I understand. So we'll let that stand.

Go ahead, Mr. Wang.

A. Yes, I had many -- I was contacted by many noncitizen members, individually had attorney-client conversations with them, in which I would refer them to immigration attorneys, sometimes also private security, because people were so afraid of even walking to class.

MR. KANELLIS: Objection, your Honor, now she's waived privilege and I can ask her questions about privileged communications.

THE COURT: We'll see what you can ask her. But I don't take that as an objection, you're just trying to tell me that he's opened the door.

Go ahead, Mr. Wang.

Q. Without telling me what you discussed specifically with those members, how many of these conversations have you had since Mr. Khalil's arrest?

A. It's hard to know. This has been really -- it feels like an emergency, like a nightmare over many months. But I would say, um, somewhere between 80 and 100.

THE COURT: I mean it's your case to try, but now if you reserving 45 minutes for closing, you're into that time. But go ahead.

MR. WANG: Thank you, your Honor. I'll be very brief.

Q. So, um, without discussing the specifics again, can you tell me generally about what the number of conversations that you just described something about?

MR. KANELLIS: Objection, your Honor, it calls for hearsay.

THE COURT: It does.

MR. WANG: Your Honor, um, I think without hearing what Professor Dubal has to say, it's, um -- (Speaks with co-counsel.)

Okay, it's withdrawn.

Q. After you had these conversations, what did you do in response?

A. I, um, created lists of immigration attorneys that I could send to our noncitizen members. I created new rights information and resources that we could circulate for people who were not -- who stated that they were too fearful to take in the town halls. And I organized these two town halls.

Q. And how --

MR. KANELLIS: Objection, your Honor, move to strike about fearful of attending town halls.

THE COURT: Well she's already so testified. In the exercise of discretion, I'll let that stand.

Q. How often, after these member conversations, did you refer members to immigration attorneys?

A. Almost always.

Q. And before Mr. Khalil's arrest, was it part of your role, as GC, to speak with individual members?

A. No.

Q. And, um -- okay. So I'll just move to a couple final questions.

Okay. So in addition to what you've already described, are there other ways that the policy challenged here, that you mentioned earlier, impacted the AAUP?

A. The AAUP's central mission is to protect academic freedom and shared governance. I don't believe that there has been a time, since the McCarthy era, where those things have been so deeply and troublingly challenged. The idea that noncitizen members could not express, um, their --

MR. KANELLIS: Objection, your Honor, as nonresponsive.

THE COURT: Yeah, I think it is nonresponsive. Sustained. Sustained.

Q. So, um, you testified earlier that, um, you referred some members to immigration attorneys. Did you observe that these members, um, changed the way that they engaged with the AAUP?

A. I observed that noncitizen members, who were previously very active in our membership meetings, didn't attend them, or attended them with their video off.

Q. And how has, um, what you've just described impacted the AAUP's mission?

A. We haven't heard the voices of our noncitizen

members, we haven't had their advocacy and insight in our organization, and, um, given that the core of the organization is to protect academic freedom and shared governance, we feel that this is an existential threat to the organization more broadly.

MR. WANG: No further questions, your Honor.

THE COURT: Do you wish to examine this witness?

MR. KANELLIS: I certainly do, your Honor.

THE COURT: About how long do you think you're going to take?

MR. KANELLIS: Oh, maybe 30 minutes.

THE COURT: Okay, we'll take a recess for 15 minutes, until 5 minutes after 11:00.

During the recess, um, because when we're done here, I expect the -- I expect everyone finally to rest, you might -- if you want to encapsulate certain documents that are now in the record, and give them exhibit numbers, you might prepare a list, it can be an informal list, with the next numbers. And if I'm satisfied with it, I'll simply recite it as part of the record before you rest.

We'll stand in recess for 15 minutes. We'll recess.

(Recess, 10:50 a.m.)

C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Friday, July 18, 2025, to the best of my skill and ability.

/s/ Richard H. Romanow 07-18-25
________________________
RICHARD H. ROMANOW Date