**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, ET AL.,

Plaintiffs,

v.

MARCO RUBIO, ET AL.,

Defendants.

Case No. 1:25-cv-10685 (WGY)

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND REQUESTED RULINGS OF LAW**

# Table of Contents

Table of Authorities ..... vi

Preliminary Statement ..... 1

Plaintiffs' Proposed Findings of Fact ..... 3

I. President Trump issues executive orders calling for the deportation of pro-Palestinian protesters. ..... 3

II. Defendants implement the executive orders by adopting the ideological deportation policy. ..... 5

A. Defendants announce a policy of revoking the visas and green cards of pro-Palestinian protesters, and of arresting, detaining, and deporting them. ..... 6

1. Defendants announce their intent to deport noncitizen students and faculty based on speech they deem to be pro-Hamas or antisemitic. ..... 6

2. Defendants conflate pro-Palestinian advocacy with speech that is pro-Hamas and antisemitic. ..... 9

B. Defendants implement the ideological deportation policy. ..... 10

1. DHS and the State Department receive guidance from the White House concerning the implementation of the executive orders. ..... 11

2. DHS launches an operation to identify pro-Palestinian protesters on college campuses. ..... 12

a. Senior HSI leaders instruct the Office of Intelligence to prepare reports of analysis on pro-Palestinian protesters. ..... 13

b. The Office of Intelligence is directed to identify protesters on Canary Mission's website. ..... 15

c. The Office of Intelligence forms a "Tiger Team" to work through the Canary Mission list quickly. ..... 16

d. Senior HSI leaders provide the Tiger Team with other lists of protesters. ..... 18

e. The Tiger Team's reports of analysis document individuals' lawful political protest and academic speech. ..... 19

f. The Tiger Team's reports of analysis include unverified allegations that individuals' protest activity is antisemitic, pro-Hamas, or anti-Israel. ..... 21

g. The Office of Intelligence sends the reports of analysis to HSI's National Security Division for further action. ..... 22

3. DHS and the State Department establish a new referral process to fast track the arrest and deportation of protesters based on their lawful pro-Palestinian speech. ..... 23

a. Step One: HSI's National Security Division reviews the report of analysis and decides whether to make a referral to the State Department. ..... 24

b. The National Security Division's decision at step one is based solely on a cursory review of the report of analysis. ..... 26

c. The National Security Division's letters to the State Department purport to summarize the reports of analysis but make claims that are wholly unsupported by the reports. ..... 28

d. Step Two: The State Department reviews the referral from the National Security Division and decides whether to revoke a protester's visa or to find them removable. ..... 30

e. In carrying out step two, senior officials in the State Department conflate pro-Palestinian advocacy with antisemitism and support for terrorism, and constitutionally protected speech and association with unprotected conduct. ..... 33

f. The State Department's decisions to revoke visas or find protesters removable are based on lawful political speech. ..... 40

4. The State Department lays the groundwork for expanding its enforcement of the policy. ..... 42

a. The State Department issues new guidance governing visa revocations. ..... 43

b. The new guidance confirms that the State Department will revoke protesters' visas based on speech that it deems pro-Hamas or antisemitic. 44

i. Catch and Revoke Cable 44

ii. Enhanced Screening Cable 46

iii. Expanded Screening Cable 48

iv. The FAM 50

C. Defendants enforce the ideological deportation policy, including against the five targeted noncitizens. 51

1. Defendants target noncitizen students and faculty for deportation based on their lawful pro-Palestinian advocacy. 51

a. Mahmoud Khalil 52

b. Rümeysa Öztürk 60

c. Mohsen Mahdawi 67

d. Badar Khan Suri 73

e. Yunseo Chung 77

2. Defendants arrest and detain four of the five targeted noncitizens. 81

a. The decision to prioritize arrests of the targeted noncitizens was unusual. 81

b. HSI's involvement in the arrests was unusual. 84

c. The arrests were designed to intimidate. 85

d. The arrests did intimidate. 88

III. Defendants' intent in adopting the policy was to silence noncitizen scholars engaged in pro-Palestinian expression. 90

IV. Plaintiffs and their noncitizen members have been harmed by the policy. 92

A. Plaintiffs are nationwide associations of faculty and students dedicated to advancing academic freedom and scholarship. 92

1. The AAUP 92

2. MESA 94

B. The AAUP's and MESA's noncitizen members have been harmed by the policy. 95

1. Nadje Al-Ali 95

2. Megan Hyska 104

3. Bernhard Nickel 110

C. The AAUP has been harmed by the policy. 115

1. The AAUP has had to divert resources from mission-critical activities to support noncitizen members impacted by the policy 115

2. The AAUP has been deprived of their noncitizen members' insights and engagement. 119

D. MESA has been harmed by the policy. 120

1. MESA has had to divert resources from mission-critical activities to support noncitizen members impacted by the policy 120

2. MESA has been deprived of the insights and engagement of their noncitizen members. 122

Plaintiffs' Requested Rulings of Law 125

V. Plaintiffs the AAUP and MESA have standing. 125

A. The AAUP and MESA have associational standing to assert the rights of their noncitizen members 126

B. The AAUP and MESA have organizational standing 130

VI. The ideological deportation policy violates the First Amendment. 133

A. Defendants have a policy of revoking the visas and green cards of pro-Palestinian protesters, and of arresting, detaining, and deporting them. 133

B. Noncitizens lawfully present in the country have the same First Amendment rights as citizens. 139

C. The ideological deportation policy is unconstitutional because it discriminates on the basis of viewpoint. 145

1. The policy is subject to strict scrutiny because it discriminates on the basis of viewpoint. 145

2. The policy fails strict scrutiny because it is not narrowly tailored to serve a compelling governmental interest. ...................... 147

3. Plaintiffs need not prove censorial intent to succeed on their viewpoint-discrimination claim. .................................................... 149

D. The policy is unconstitutional for the independent reason that it is retaliatory. ......................................................................................... 150

E. The Court need not address the constitutionality of the INA provisions relied upon by Defendants, but if it does, it should hold that they are unconstitutional as applied. ............................................................... 155

VII. Defendants' coercive threats independently violate the First Amendment. ..............159

VIII. The ideological deportation policy violates the APA. ..............................................163

A. The policy is subject to review under the APA. .......................................... 164

B. The ideological deportation policy is contrary to constitutional right and arbitrary and capricious. ......................................................................... 167

## Table of Authorities

### Cases

*Abourezk v. Reagan*, 592 F. Supp. 880 (D.D.C. 1984) .......... 158

*Abourezk v. Reagan*, 785 F.2d 1043 (D.C. Cir. 1986) .......... 148, 167

*Aditya W.H. v. Trump*, No. 25-CV-1976, 2025 WL 1420131 (D. Minn. May 14, 2025) .......... 143, 152

*Al Otro Lado, Inc. v. Nielsen*, 327 F. Supp. 3d 1284 (S.D. Cal. 2018) .......... 167

*Allende v. Shultz*, 605 F. Supp. 1220 (D. Mass. 1985) .......... 159

*Am. Acad. of Religion v. Chertoff*, 463 F. Supp. 2d 400 (S.D.N.Y. 2006) .......... 159

*Am. Ass'n of Univ. Professors v. Rubio*, No. CV 25-10685-WGY, 2025 WL 1235084 (D. Mass. Apr. 29, 2025) .......... passim

*Am. Pub. Health Ass'n v. Nat'l Inst. of Health*, No. 25-10787, 2025 WL 1822487 (D. Mass. July 2, 2025) .......... 168

*Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045 (9th Cir. 1995) .......... 142, 144, 149

*Amadei v. Nielsen*, 348 F. Supp. 3d 145 (E.D.N.Y. 2018) .......... 136, 165

*Aracely v. Nielsen*, 319 F. Supp. 3d 110 (D.D.C. 2018) .......... 136

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) .......... 160, 161

*Bennett v. Spear*, 520 U.S. 154 (1997) .......... 164

*Berner v. Delahanty*, 129 F.3d 20 (1st Cir. 1997) .......... 128

*Biden v. Texas*, 597 U.S. 785 (2022) .......... 168

*Bluman v. FEC*, 800 F. Supp. 2d 281 (D.D.C. 2011) .......... 143

*Bridges v. California*, 314 U.S. 252 (1941) .......... 139, 140

*Bridges v. Wixon*, 326 U.S. 135 (1945) .......... 139, 140, 141, 142

*Citizens United v. FEC*, 558 U.S. 310 (2010) .......... 142

*CSL Plasma Inc. v. CBP*, 33 F.4th 584 (D.C. Cir. 2022) .......... 167

*Dennis v. United States*, 341 U.S. 494 (1951) .......... 140

*Diamond Alt. Energy LLC v. E.P.A.*, 145 S.Ct. 2121 (June 20, 2025) ........................................ 132

*Doe v. U.S. Immigr. & Customs Enf't*, 490 F. Supp. 3d 672 (S.D.N.Y. 2020).......................... 167

*Dream Defs. v. Governor of the State of Fla.*, 57 F.4th 879 (11th Cir. 2023)........................... 129

*Elec. Priv. Info. Ctr. v. DHS*, 653 F.3d 1 (D.C. Cir. 2011)....................................................... 136

*Ercelik v. Hyde*, No. 25-CV-11007, 2025 WL 1361543 (D. Mass. May 8, 2025) ............ 143, 152

*FCC v. Fox*, 556 U.S. 502 (2009) ........................................................................... 138, 168

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021)........................................................ 169

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) ............................................. 129, 162

*Gattineri v. Town of Lynnfield, Mass.*, 58 F.4th 512 (1st Cir. 2023)......................................... 150

*Gentile v. State Bar of Nev.*, 501 U.S. 1030 (1991)................................................................ 147

*Greater Bos. Legal Servs. v. DHS*, No. 21-cv-10083, 2022 WL 138629 (D. Mass. Jan. 14, 2022).............................................................................................. 136, 164, 166

*Harisiades v. Shaughnessy*, 342 U.S. 580 (1952)................................................................... 144

*Hartman v. Moore*, 547 U.S. 250 (2006)........................................................................ 152, 153

*Harvard L. Sch. F. v. Shultz*, 633 F. Supp. 525 (D. Mass. 1986) ............................................. 159

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) .......................................................... 131

*Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010) ........................................................... 148

*Housatonic River Initiative v. U.S. Env't Prot. Agency, New Eng. Region*, 75 F.4th 248 (1st Cir. 2023) ............................................................................................................. 164

*Hoye v. City of Oakland*, 653 F.3d 835 (9th Cir. 2011)............................................. 136, 138, 156

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) .......................................... 126

*In re Fin. Oversight & Mgmt. Bd. for P.R.*, 60 F.4th 9 (1st Cir. 2023) ......................................... 6

*In re Fin. Oversight and Mgmt. Bd. for P.R.*, 110 F.4th 295 (1st Cir. 2024) ............................ 126

*Khalil v. Trump*, No. 25-cv-01963, 2025 WL 1514713 (D.N.J. May 28, 2025) ........................ 157

*Khedkar v. U.S. Citizenship & Immigr. Servs.*, 552 F. Supp. 3d 1 (D.D.C. 2021) .................... 167

*Kleindienst v. Mandel,* 408 U.S. 753 (1972)........................................................................... 145

*Kwong Hai Chew v. Colding*, 344 U.S. 590 (1953) ............ 142

*Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965) ............ 145

*Lane v. Franks*, 573 U.S. 228 (2014) ............ 145

*Larson v. Valente*, 456 U.S. 228 (1982) ............ 129

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ............ 166

*Louis v. Saferent Sols., LLC*, 685 F. Supp. 3d 19 (D. Mass. 2023) ............ 131

*Lozman v. City of Riviera Beach, Fla.*, 585 U.S. 87 (2018) ............ 151, 153, 154

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ............ 127

*Lussier v. Runyon*, 50 F.3d 1103 (1st Cir. 1995) ............ 6

*Mahdawi v. Trump*, No. 2:25-CV-389, 2025 WL 1243135 (D. Vt. Apr. 30, 2025) ............ 143, 152

*Mangual v. Rotger-Sabat*, 317 F.3d 45 (1st Cir. 2003) ............ 128

*Marbury v. Madison*, 5 U.S. 137 (1803) ............ 158

*Massachusetts v. E.P.A.*, 549 U.S. 497 (2007) ............ 129

*Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 923 F.3d 209 (1st Cir. 2019) ............ 131

*Melone v. Coit*, 100 F.4th 21 (1st Cir. 2024) ............ 168

*Mohammed H. v. Trump*, No. 25-CV-1576, 2025 WL 1692739 (D. Minn. June 17, 2025) ............ 143, 152

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ............ 168

*N.H. Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8 (1st Cir. 1996) ............ 127

*N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) ............ 148

*NAACP v. Alabama*, 357 U.S. 449 (1958); ............ 140

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243 (D. Md. 2025) ............ 130

*Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, No. 25-CV-091-LM, 2025 WL 1188160 (D.N.H. Apr. 24, 2025) ............ 130, 163

*NRA v. Vullo*, 602 U.S. 175 (2024) ............ 160, 161, 162

*Öztürk v. Trump*, No. 2:25-CV-374, 2025 WL 1145250 (D. Vt. Apr. 18, 2025) ......... 66, 143, 152

*Parcham v. INS*, 769 F.2d 1001 (4th Cir. 1985) ..................... 142

*Perkins Coie LLP v. U.S. Dep't of Just.*, No. 25-716, 2025 WL 1276857 (D.D.C. May 2, 2025) ..................... 161

*Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009) ..................... 160

*President & Fellows of Harvard Coll. v. DHS.*, No. 25-cv-11472, 2025 WL 1737493 (D. Mass. June 23, 2025) ..................... 162

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ..................... 148

*R.F.M. v. Nielsen*, 365 F. Supp. 3d 350 (S.D.N.Y. 2019) ..................... 138, 139

*R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) ..................... 138, 164, 165

*Ragbir v. Homan*, 923 F.3d 53 (2d Cir. 2019) ..................... 142, 147, 149

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015) ..................... 146, 150

*Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999) ..................... 142

*Roe v. Mayorkas*, No. 22-cv-10808-ADB, 2024 WL 5198705 (D. Mass. Oct. 2, 2024) ..................... 163

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ..................... 146, 147

*Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, 123 F.4th 1 (1st Cir. 2024) .......... 164, 166

*Sierra Club v. Trump*, 929 F.3d 670 (9th Cir. 2019) ..................... 166

*Suri v. Trump*, No. 1:25-cv-00480, 2025 WL 1392143 (E.D. Va. May 14, 2025) ..................... 152

*Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025) ..................... 139

*United States ex rel. Turner v. Williams*, 194 U.S. 279 (1904) ..................... 144

*Velesaca v. Decker*, 458 F. Supp. 3d 224 (S.D.N.Y 2020) ..................... 138, 164, 166

*Velesaca v. Decker*, 458 F. Supp. 3d 224 (S.D.N.Y. 2020) ..................... 138

*Venetian Casino Resort LLC v. EEOC,* 530 F.3d 925 (D.C. Cir. 2008) ..................... 165

*Virginia v. Black*, 538 U.S. 343 (2003) ..................... 147

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015) ..................... 160

*Zadvydas v. Davis*, 533 U.S. 678 (2001) .................................................................... 144

**Statutes**

5 U.S.C. § 704 .............................................................................................................. 164

5 U.S.C. § 706 .............................................................................................................. 167

8 U.S.C. § 1101 ............................................................................................................ 167

8 U.S.C. § 1182 ........................................................................................................ passim

8 U.S.C. § 1201 ............................................................................................... 44, 52, 156

8 U.S.C. § 1227 ........................................................................................................ passim

**Other Authorities**

Adam B. Cox, *The Invention of Immigration Exceptionalism*, 134 Yale L.J. 329 (2024) ........................................................................................................ 144

Ellen Schrecker, *Many are the Crimes: McCarthyism in America* (1998) ............................... 141

H.R. Rep. No. 101-955 (1990) ..................................................................................... 157

Memorandum from Secretary of Homeland Security Mayorkas to Tae Johnson, Acting Director of U.S. Immigration and Customs Enforcement, *Guidelines for the Enforcement of Civil Immigration Law* (Sept. 30, 2021), *available at* https://perma.cc/Z7CL-NV5D ...................................................................... 6, 137

The White House, Organization of the National Security Council and Subcommittees (Jan. 20, 2025), https://perma.cc/W58Q-EWKK ......................................... 11

## Preliminary Statement

The evidence at trial has confirmed what Defendants' public statements made clear all along: Defendants have adopted a policy of revoking the visas and green cards of noncitizens who engage in pro-Palestinian advocacy, and of arresting, detaining, and deporting them (the "ideological deportation policy"). Defendants adopted this policy in response to two executive orders issued by President Trump shortly after taking office: Executive Orders 14,161 and 14,188. The president made no secret of the intent behind those orders. In a fact sheet released in connection with them, he stated: "To all the resident aliens who joined in the pro-jihadist protests, we put you on notice: come 2025, we will find you, and we will deport you."

The defendant agencies heard that message loud and clear. In March 2025, DHS's Homeland Security Investigations launched an operation to identify pro-Palestinian protesters on college campuses—an operation that involves scouring lists of suspected protesters, and producing reports that repeat unvetted allegations by third parties that the protesters are antisemitic or pro-Hamas. By far the largest source of names for this effort has been Canary Mission, a shadowy pro-Israel group that creates public blacklists of individuals who have expressed support for Palestinians or criticized the actions of the Israeli government. As part of a new fast-tracked process, DHS forwards these reports, without any further vetting, to the State Department, which in turn revokes protesters' visas or finds them removable without conducting any meaningful vetting itself. The defendant agencies have targeted an untold number—but potentially hundreds—of noncitizens as part of this process. These include the five targeted noncitizens as to which the Court allowed discovery in this case: Mahmoud Khalil, Rümeysa Öztürk, Mohsen Mahdawi, Badar Khan Suri, and Yunseo Chung. The State Department has also issued new guidance formalizing the many legal pathways it believes it can take to deport pro-Palestinian protesters.

The intent and effect of the ideological deportation policy has been to terrify noncitizens into silence. Defendants made an example of the five targeted noncitizens. Mr. Khalil and Dr. Khan Suri spent months in a detention facility in Louisiana, after being rapidly transferred there following their arrests in New York and Virginia. Ms. Öztürk was seized by masked agents from a public street in Somerville, Massachusetts. Mr. Mahdawi was arrested at his naturalization interview in a USCIS office in Vermont. Ms. Chung was forced into hiding. All of these individuals were targeted based on their pro-Palestinian advocacy, and Defendants, through their public statements, made sure the public knew it. They also made clear that more arrests were to come. The result has been that many of Plaintiffs' noncitizen members have self-censored: they have withdrawn from political advocacy, declined to publish scholarly and popular writing, and forgone research opportunities that would have required international travel.

The ideological deportation policy is unconstitutional. The policy violates the First Amendment because it is impermissibly viewpoint discriminatory and, separately, because it was adopted to retaliate against protected speech. It violates the Administrative Procedure Act because it is contrary to constitutional right and arbitrary and capricious. Defendants' campaign of threats against noncitizen students and faculty who engage in pro-Palestinian advocacy independently violates the First Amendment because it crosses the line from legitimate government speech into impermissible coercion.

Not since the McCarthy era has the federal government so flagrantly abused its power to silence noncitizen speakers and suppress their lawful speech. The Court should declare the ideological deportation policy unconstitutional and proceed to the remedy stage.

## Plaintiffs' Proposed Findings of Fact

### I. President Trump issues executive orders calling for the deportation of pro-Palestinian protesters.

1. The Department of Homeland Security ("DHS") and the Department of State adopted the ideological deportation policy in response to two executive orders that President Trump issued shortly after taking office: Executive Order 14,161, titled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," Ex. 70, and Executive Order 14,188, titled "Additional Measures to Combat Anti-Semitism," Ex. 71 (together, the "Executive Orders").

2. Executive Order 14,161 states that "it is the policy of the United States" to protect its citizens from noncitizens who "espouse hateful ideology," and to ensure that noncitizens who are already present in the United States "do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles" and "do not advocate for, aid, or support designated foreign terrorists and other threats to [America's] national security." Ex. 70 at 1.

3. Executive Order 14,161 directs the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to promptly "vet and screen" all noncitizens who are already inside the United States "to the maximum degree possible." *Id.*

4. Executive Order 14,188 states that it is the policy of the United States "to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." Ex. 71 at 1.

5. Executive Order 14,188 directs the head of each executive department or agency, within sixty days, to submit a report to the President "identifying all civil and criminal authorities

or actions within the jurisdiction of that agency" that might be used "to curb or combat anti-Semitism." Ex. 71 at 1.

6. Executive Order 14,188 also directs the Secretary of State, the Secretary of Education, and the Secretary of Homeland Security to collaborate and to include in their reports "recommendations for familiarizing institutions of higher education with the grounds for inadmissibility under 8 U.S.C. § 1182(a)(3) so that such institutions may monitor for and report activities by alien students and staff relevant to those grounds and for ensuring that such reports about aliens lead, as appropriate and consistent with applicable law, to investigations and, if warranted, actions to remove such aliens." *Id.* at 2.

7. The "grounds for inadmissibility under 8 U.S.C. § 1182(a)(3)" are the security and related grounds for inadmissibility. These grounds include various provisions related to terrorism and foreign policy, 8 U.S.C. § 1182(a)(3)(B), (a)(3)(C), which also serve as grounds for deportation, *id.* §§ 1227(a)(4)(B), (a)(4)(C).

8. Under the terrorism-related provisions, a noncitizen is inadmissible to the country, and therefore also deportable, if they engage in or incite terrorist activity. *Id.* § 1182(a)(3)(B)(i)(I), (III); *id.* § 1227(a)(4)(B). The same is true of noncitizens who "endorse[] or espouse[] terrorist activity or persuade[] others to endorse or espouse terrorist activity or support a terrorist organization," *id.* §§ 1182 (a)(3)(B)(i)(VII), 1227(a)(4)(B) , or who are representatives of "a political, social, or other group that endorses or espouses terrorist activity," *id.* §§ 1182 (a)(3)(B)(i)(IV)(bb), 1227(a)(4)(B) (together, the "endorse or espouse" provisions).

9. Under the foreign policy provision, a noncitizen is inadmissible, and therefore also deportable, if "the Secretary of State has reasonable ground to believe that [the noncitizen's presence or activities in the United States] would have serious adverse foreign policy

consequences. *Id*. §§ 1182(a)(3)(C)(i), 1227(a)(4)(C)(i). The provision also states, however, that individuals may not be excluded based on "past, current, or expected *beliefs, statements, or associations [that] would be lawful in the United States* unless the Secretary of State personally determines that the [noncitizen]'s admission would compromise a compelling United States foreign policy interest," *id.* §§ 1182 (a)(3)(C)(iii), 1227 (a)(4)(C)(ii) (emphasis added), and the Secretary provides timely notice of that determination to Congress, *id.* § 1182 (a)(3)(C)(iv).

10. After President Trump signed Executive Order 14,188, the White House released a fact sheet about the order, promising to "Deport Hamas Sympathizers and Revoke Student Visas." Ex. 45 at 2.

11. The fact sheet included this warning from the President: "To all the resident aliens who joined in the pro-jihadist protests, we put you on notice: come 2025, we will find you, and we will deport you. I will also quickly cancel the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before." *Id.*

## II. Defendants implement the executive orders by adopting the ideological deportation policy.

12. In response to the Executive Orders, the defendant agencies adopted the ideological deportation policy, as evidenced by their public statements, their explicit focus on identifying student and faculty protesters for investigation, their establishment of new processes to fast-track the investigation and attempted deportation of those protesters, and their actual enforcement of the policy against the five targeted noncitizens and others.

13. The ideological deportation policy represents a sharp break with the executive branch's prior immigration enforcement policy, which explicitly stated: "A noncitizen's exercise of their First Amendment rights . . . should never be a factor in deciding to take enforcement action." Memorandum from Secretary of Homeland Security Mayorkas to Tae Johnson, Acting

Director of U.S. Immigration and Customs Enforcement, *Guidelines for the Enforcement of Civil Immigration Law* (Sept. 30, 2021), *available at* https://perma.cc/Z7CL-NV5D.[1]

**A. Defendants announce a policy of revoking the visas and green cards of pro-Palestinian protesters, and of arresting, detaining, and deporting them.**

14. Starting in March 2025, Defendants have made a series of official statements touting the ideological deportation policy and their commitment to enforcing it. In these statements, Defendants made clear their intent to target noncitizen students and faculty engaged in speech that they deem to be pro-Hamas or antisemitic—to target them by revoking their visas and green cards and by arresting, detaining, and deporting them. Defendants also made clear that they view a broad spectrum of lawful pro-Palestinian speech to be pro-Hamas and antisemitic.

**1. Defendants announce their intent to deport noncitizen students and faculty based on speech they deem to be pro-Hamas or antisemitic.**

15. Beginning in early March 2025, Defendants have repeatedly proclaimed their intent to revoke the visas and green cards of, and to arrest, detain, and deport, noncitizen students and faculty based on speech they deem to be pro-Hamas or antisemitic.

16. On March 6, 2025, two days before Mahmoud Khalil's arrest, Secretary of State Marco Rubio posted to X from his official Secretary of State account: "Those who support designated terrorist organizations, including Hamas, threaten our national security. The United States has zero tolerance for foreign visitors who support terrorists. Violators of U.S. law—including international students—face visa denial or revocation, and deportation." Ex. 24.

[1] The Court may take judicial notice of this memorandum because it is published on the official website of U.S. Immigration and Customs Enforcement. *See, e.g.*, *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 60 F.4th 9, 13 n.3 (1st Cir. 2023). Judicial notice is proper even though the record is closed. *See Lussier v. Runyon*, 50 F.3d 1103, 1105–06, 1113–14 (1st Cir. 1995).

17. On March 9, 2025, the day after Mr. Khalil's arrest, Secretary Rubio again posted to X from his official Secretary of State account. The post linked to a news story about Mr. Khalil's arrest, with the comment: "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported." Ex. 26.

18. On March 10, 2025, President Trump posted to Truth Social: "This is the first arrest of many to come. We know there are more students at Columbia and other Universities across the Country who have engaged in pro-terrorist, anti-Semitic, anti-American activity, and the Trump Administration will not tolerate it. . . . We will find, apprehend, and deport these terrorist sympathizers from our country—never to return again." Ex. 27.

19. On March 14, 2025, Secretary of Homeland Security Kristi Noem stated in a press release published to DHS's website: "It is a privilege to be granted a visa to live and study in the United States of America. When you advocate for violence and terrorism that privilege should be revoked, and you should not be in this country." Ex. 32.

20. On March 16, 2025, Secretary Rubio appeared on CBS's *Face the Nation*. When asked about Khalil's arrest, he said: "[W]e're going to do more. In fact, every day now we're approving visa revocations, and, if that visa led to a green card, the green card process as well." Ex. 33 at 7. The "bottom line," he said, was this: "If you are in this country to promote Hamas, to promote terrorist organizations, to participate in vandalism, to participate . . . in acts of rebellion and riots on campus, we never would have let you in if we had known that, and now that we know it, you're going to leave." *Id.* at 8.

21. On April 9, 2025, DHS Assistant Secretary for Public Affairs Tricia McLaughlin stated in an agency press release: "There is no room in the United States for the rest of the world's terrorist sympathizers, and we are under no obligation to admit them or let them stay here . . .

Sec[retary] Noem has made it clear that anyone who thinks they can come to America and hide behind the First Amendment to advocate for anti-Semitic violence and terrorism—think again. You are not welcome here." Ex. 38.

22. In an April 17, 2025 interview on The Ben Shapiro Show, Secretary Rubio said: "[L]et's say . . . you get into the U.S. on a student visa, and all of a sudden it becomes obvious you think Hamas is a good group. Well, then we should revoke your visa. In essence, if we would have denied—if we had learned things about you once you're here that would have caused us to deny you a visa when you were overseas, that's grounds for revocation. It is not in the national interest of the United States, it's not in our foreign policy interest, it's not in our national security interest, to invite people onto our university campuses who are not just going to go there to study physics or engineering but who are also going to go there to foment movements that support and excuse foreign terrorist organizations[.] . . . So we have a right to deny visas before you get here, and we have a right to revoke them if we believe that your presence in our country undermines our national interest, our national security, and our foreign policy. And that's what we intend to do." Ex. 40 at 4. Underlining this point, he stated: "[W]hen someone is presented to me and it's clear that this person is a supporter of a foreign terrorist organization, we're going to remove them from the country." *Id.* at 5.

23. On April 30, 2025, Secretary Rubio published an article on the State Department's official Substack page called "100 Days of an America First State Department." The article observed that "the State Department has now made clear that a visa is a privilege, not a right," and that the department now has "a one-strike policy: Catch-And-Revoke." Ex. 57. The article stated that, under this policy, the State Department would revoke the visas of those deemed to be pro-Hamas: "Under the Immigration and Nationality Act, any alien who 'endorses or espouses terrorist

activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization' is inadmissible to the United States, and henceforth that law will be enforced to the letter. The State Department now reviews law-enforcement information about student visa holders and when we find those who have supported terrorists or otherwise abused our hospitality, their visas are instantly revoked." *Id.* at 4–5.

24. On May 8, 2025, DHS Assistant Secretary McLaughlin reposted a post about "anti-Israel students" at Columbia University on the agency's official account on X, and added: "If you are in this country on a visa, green card or otherwise, you are a guest. Act like it. If you are pushing Hamas propaganda, glorifying terrorists that relish the killing of Americans, harassing Jews, taking over buildings, or other anti-American actions that we have seen lately on these campuses, you can book yourself a ticket home. You can expect your visa will be revoked." Ex. 44.

**2. Defendants conflate pro-Palestinian advocacy with speech that is pro-Hamas and antisemitic.**

25. Although Defendants have announced a policy to deport noncitizens who are pro-Hamas and antisemitic, their statements make clear that they have interpreted these terms to sweep in a broad spectrum of lawful pro-Palestinian advocacy. They also reveal a conflation of those who engage in peaceful political protest with those who engage in violence or property damage.

26. For example, when Deputy Secretary of Homeland Security Troy Edgar was asked during a March 13, 2025 interview on NPR how Mr. Khalil had supported Hamas, he responded: "Well, I think you can see it on TV, right? This is somebody that we've invited and allowed the student to come into the country, and he's put himself in the middle of the process of basically pro-Palestinian activity." Ex. 29 at 3. When asked whether any criticism of the Israeli government or U.S. government was "a deportable offense," he doubled down, stating: "Let me put it this way, . . . imagine if he came in and filled out the form and said, 'I want a student visa.' They asked

him, 'What are you going to do here?' And he says, 'I'm going to go and protest.' We would have never let him into the country." *Id.* at 6–7.

27. On March 28, 2025, Secretary Rubio was asked whether all of the administration's first three hundred visa revocations were "related to pro-Palestinian protests." Ex. 36 at 2. He responded that most were. *Id.* ("I think there might be a few that are not.") Asked about these revocations, he explained: "[W]hat we have seen on campuses across the country where students literally cannot go to school, you cannot—buildings are being taken over, activities going on—this is clearly an organized movement. And if you are in this country on a student visa and are a participant in those movements, we have a right to deny your visa." *Id.* at 6. He added: "We are not going to be importing activists into the United States. They're here to study. They're here to go to class. They're not here to lead activist movements that are disruptive and undermine the—our universities. I think it's lunacy to continue to allow that." *Id.*

**B. Defendants implement the ideological deportation policy.**

28. After adopting the ideological deportation policy, the defendant agencies immediately began to implement it. With input from the White House, the agencies investigated student and faculty protesters, whose names came almost entirely from groups dedicated to blacklisting individuals they deemed to be anti-Israel. The agencies developed a fast-track process for conducting sham investigations of these protesters and then arresting and attempting to deport them based on unvetted claims that their pro-Palestinian advocacy was pro-Hamas or antisemitic. They also issued new guidance that laid the groundwork for expanding the enforcement of the policy.

1. **DHS and the State Department receive guidance from the White House concerning the implementation of the executive orders.**

29. Following the issuance of Executive Order 14,161 and Executive Order 14,188, the Homeland Security Council convened a series of interagency meetings to discuss "student protesters." July 11, Tr., Vol. 1, 42:3–6 (Smith) [REDACTED]

30. The Homeland Security Council is a formal council that is part of the Executive Office of the President. July 11, Tr., Vol. 1, 44:1–3 (Smith). White House Deputy Chief of Staff Stephen Miller, the President's primary adviser on immigration matters, is the Homeland Security Advisor to the Homeland Security Council. *Id.* 47:5–6 (Smith); *see also* July 17, Tr., Vol. 2, 115:18–25 (Court); The White House, Organization of the National Security Council and Subcommittees (Jan. 20, 2025), https://perma.cc/W58Q-EWKK; July 11, Tr., Vol. 1, 57:24–58:03 (the Court stating with respect to this document from whitehouse.gov that "it seems to me that it's the type of thing as to which I can take judicial notice").

31. The interagency meetings included representatives from DHS, the State Department, the Homeland Security Council, and the White House. Armstrong Tr. 207:16–24. Attendees included Stephen Miller, Miller's deputy Adam Lason, Deputy Secretary of State Chris Landau, Senior Bureau Official John Armstrong, [REDACTED] and Senior Advisor in the department's Bureau of Consular Affairs Maureen Smith. July 18, Tr., Vol. 1, 16:11–16 (Armstrong); [REDACTED] July 11, Tr., Vol. 1, 42:17–19 (Smith).

32. Most of the meetings took place in March 2025. July 18, Tr., Vol. 1, 16:23–24 (Armstrong); Armstrong Tr. 204:16–19.

33. Defendants invoked the presidential communications privilege to block government witnesses and other officials from answering Plaintiffs' questions concerning the content of the Homeland Security Council's meetings. July 11, Tr., Vol. 1, 42:21–47:12; July 18, Tr., Vol. 1, 16:20–17:12. The few details officials shared, however, indicate that participants discussed the revocation of student protesters' visas, and that the White House provided guidance on this topic. *See, e.g.*, July 18, Tr., Vol. 1, 15–18, 19:19– 20:2 (Armstrong); Armstrong Tr. 203:4–204:19, 206:22–207:24 [redacted]

34. [redacted]

35. [redacted]

**2. DHS launches an operation to identify pro-Palestinian protesters on college campuses.**

36. As documented through the evidence in more granular detail below, in March 2025 DHS's Homeland Security Investigations ("HSI")—a subagency of Immigration and Customs Enforcement ("ICE")—launched an operation to identify pro-Palestinian protesters on U.S. college campuses. In support of that operation, HSI directed its Office of Intelligence to prepare reports of analysis on noncitizen student protesters. The effort was not limited to students

suspected of having committed some criminal offense or of having engaged in non-speech-related activity that would render them inadmissible; the focus was on students who had protested. Senior HSI leadership provided the Office of Intelligence lists of individuals to investigate in attempting to identify noncitizen protesters, including over 5,000 people listed on the Canary Mission website, which publishes blacklists of people it deems to be anti-American, anti-Israel, or antisemitic. To manage the volume of names, the Office of Intelligence formed a specialized "Tiger Team," which produced reports on at least 200 protesters, including the five targeted noncitizens. These reports documented protest activity and included unverified allegations that the protesters' activity was antisemitic, pro-Hamas, or anti-Israel.

37. This operation deviated from past practice in multiple ways. Prior to March 2025, for example, HSI's Office of Intelligence had never been asked to prepare reports of analysis on student protesters based on their protest activity. Prior to March 2025, the Office of Intelligence had never been directed to prepare reports of analysis on people listed on the Canary Mission's website. And prior to March 2025, the head of the Office of Intelligence, Peter Hatch, did not normally review reports of analysis or discuss them with other senior HSI leadership before they were sent to HSI's National Security Division for potential referral to the State Department. All of that changed, however, with the implementation of the ideological deportation policy.

**a. Senior HSI leaders instruct the Office of Intelligence to prepare reports of analysis on pro-Palestinian protesters.**

38. HSI is a subcomponent of ICE, which sits within DHS. July 9, Tr., Vol. 1, 43:7–8, 42:25–43:4 (Hatch). HSI's mission, and its traditional focus, has been "to dismantle transnational criminal organizations." *Id.* 54:18–23 (Hatch).

39. In early March 2025, HSI's senior leadership convened a meeting to discuss a new line of effort that involved identifying student protesters for potential referral to the State Department. July 9, Tr., Vol. 1, 71:15–17, 72:17–19 (Hatch).

40. HSI Deputy Executive Associate Director Derek Gordon was at this meeting, as was then-Deputy Executive Associate Director Robert Hammer, Chief of Operations William Walker, Assistant Director of the Office of Intelligence Peter Hatch, and Unit Chief for the Analysis Division within the Office of Intelligence Roy Stanley. July 9, Tr., Vol. 1, 71:18–72:13, 55:4–6 (Hatch).

41. The Office of Intelligence is a program office within HSI that supports investigations by producing research and analysis, traditionally on "criminal networks, criminal conspiracies, [and] those engaged in criminal conduct." July 9, Tr., Vol. 1, 56:2–5 (Hatch); *see also id.* 56:9–17 (Hatch). As assistant director of the Office of Intelligence, Hatch is the senior-most official in that office. *Id.* 55:16–19 (Hatch). He oversees approximately 1,000 investigative analysts. *Id.* 55:25–56:1. He reports directly to senior HSI leader Derek Gordon. *Id.* 55:20–24.

42. Analysts in the Office of Intelligence memorialize their research and analysis in reports of analysis. July 9, Tr., Vol. 1, 56:18–21 (Hatch). Reports of analysis contain "factual information" relevant to suspected violations of U.S. law—"primarily criminal law" but also immigration and customs laws located in Title 8 of the U.S. Code. *Id.* 57:9–19 (Hatch); July 10, Tr., Vol. 2, 92:3–5 (Hatch) (noting that a report of analysis is "the way the analyst documents their work product, and it is specifically designed for analyzing criminals, criminal networks, and criminal conspiracies"). Reports of analysis do not make recommendations or referrals. July 10, Tr., Vol. 2, 94:16–95:2. They do not contain opinions or make judgments. *Id.* 94:18–23.

Ordinarily, analysts in the Office of Intelligence produce reports of analysis when a special agent requests their assistance with a pending investigation. July 9, Tr., Vol. 1, 61:22–62:5 (Hatch).

43. At the meeting senior HSI leaders convened in early March, Hatch was instructed "to develop reports of analysis on the protesters." July 9, Tr., Vol. 1, 74:12–17 (Hatch). This effort was not limited to students who were suspected of having committed criminal offenses or who had engaged in non-speech-related activity that might render them deportable. The focus of the operation was, instead, on students who had protested. July 10, Tr., Vol. 2, 110:15–22 (Hatch). This included looking for protesters who had "support[ed] terrorist organizations" such as Hamas. July 9, Tr., Vol. 2, 74:23–24 (Hatch); *see also id.* 90:6–10. Hatch did not receive any direction about what "support[ing] terrorist organizations" meant for the work of the Office of Intelligence. *Id.* 93:4–8 (Hatch).

44. Hatch has been in his role as assistant director of the Office of Intelligence since 2019. July 9, Tr., Vol. 1, 55:11–15, 66:1–3 (Hatch). He doesn't recall any instance prior to 2025 "where [he] was asked to review protest activity." *Id.* 66:9–10 (Hatch).

**b. The Office of Intelligence is directed to identify protesters on Canary Mission's website.**

45. At or following the early March meeting, the Office of Intelligence was directed to review a list of over 5,000 people on Canary Mission's website to identify noncitizen student protesters on which to write reports of analysis. July 9, Tr., Vol. 2, 110:14–25 (Hatch). Hatch does not recall who gave him this direction. *Id.* 110:9–10 (Hatch).

46. Canary Mission publishes a website that blacklists people it deems to be anti-American, anti-Israel, or antisemitic. Its website states that the organization "documents individuals and organizations that promote hatred of the USA, Israel, and Jews on North American college campuses and beyond." Ex. 229. The website contains profiles on individual students and

faculty and allows users to search these profiles by name. *Id.* Mr. Khalil, Mr. Mahdawi, and Ms. Öztürk all have profiles on Canary Mission's website. Exs. 231, 230, 227; *see also* July 9, Tr., Vol. 1, 30:23–24, 31:8–10 (Prof. Abu El-Haj) (noting that the website contains a profile on her and many people she knows).

47. Canary Mission includes people on its website because they have criticized Israel's actions in Gaza, expressed support of Palestine, and/or participated in the boycotts, divestment, and sanctions ("BDS") movement. July 10, Vol. 1, 18:10–19:4 (Hatch); *id.* 17:15–17 (Hatch) ("[W]hat I recall is, um, that there were allegations of, um, anti–U.S., anti-Israel, um, pro-Palestine, pro-Hamas [activity].")

48. The Office of Intelligence was asked to look at Canary Mission's website because it contained a "large amount of information on protesters." July 10, Tr., Vol. 2, 111:23–112:5 (Hatch).

49. Hatch does not know who notified HSI of the list of people on Canary Mission's website. July 9, Tr., Vol. 2, 112:10–15 ("I don't know who notified us that this website exists."); *id.* 112:21 ("I did not know the Canary Mission website existed until I think after March [2025]."); July 10, Vol. 1, 16:10–12 ("I don't know the purpose, the stated intent of the website. I don't know any of the people behind the website."). He does not know how Canary Mission identifies the people on its website. July 9, Tr., Vol. 2, 113:17–23.

**c. The Office of Intelligence forms a "Tiger Team" to work through the Canary Mission list quickly.**

50. Because of the very large number of people on the Canary Mission list, HSI formed a "Tiger Team" to work through the list. July 10, Tr., Vol. 2, 87:15–17 (Hatch) ("The [T]iger [T]eam was formed to look at protesters."); July 9, Tr., Vol. 2, 96:21–97:7, 111:3–5 (Hatch) ("A normal division, a normal unit or section or group of analysts, um, operating in our normal

organizational construct couldn't handle that workload."); *id.* 111:16–18 (Hatch) ("I knew from how we were organized and how we worked that we needed to work through this expeditiously.")

51. The Tiger Team consisted of investigative analysts and a special agent from HSI's National Security Division, led by the Analysis Division's Unit Chief Roy Stanley. July 10, Tr., Vol. 1, 37:5–20. To handle the workload, Hatch reallocated analysts from different parts of the Office of Intelligence to work on this project, including members of the Counterintelligence Unit and the Cyberintelligence Unit. July 9, Tr., Vol. 2, 106:10–21.

52. Hatch's "direction to the team was [to] look at protesters." July 10, Tr., Vol. 2, 88:12–13; *see also* July 9, Tr., Vol. 2, 90:6–14 (Hatch) (noting that he also directed analysts to look for "any statements in support of Hamas" or its activities).

53. The list of people on Canary Mission's website includes many U.S. citizens. July 10, Tr. Vol. 1, 10:17–18 (Hatch); July 10, Tr., Vol. 2, 108:19–23 (Hatch). It also includes people who were neither students nor faculty, such as "professional[s]." July 10, Tr. Vol. 1, 10:19–11:1 (Hatch); Ex. 229. The Tiger Team did not create reports of analysis on any of these individuals. July 10, Tr., Vol. 2, 109:24–110:4 (Hatch). The team also didn't create reports of analysis on individuals whom the team couldn't sufficiently identify, *id.* 110:5–9, or on individuals who had not actually attended a protest, *id.* 110:10–111:5 (Hatch); *see also id.* 98:6–12 (Hatch) ("I told the team for the sake of expediency to get through this long list to just not do the ROAs on those individuals.").

54. Instead, the team created reports only on noncitizen student and faculty who had engaged in protest—a deviation from ordinary practice. July 10, Tr., Vol. 2, 97:25–98:1 (Hatch) ("Normally we do any ROA on everybody, no matter what.").

55. Hatch was briefed on the Tiger Team's progress by the team's leader, Roy Stanley, and by Hatch's deputy Bradley Etter. July 9, Tr., Vol 2, 97:8–12 (Hatch). He received updates "initially once a day," but after several weeks, "every other day" and then "three times a week." *Id.* 97:20–98:4 (Hatch).

56. Hatch discussed the Tiger Team's progress with senior HSI leaders Derek Gordon, Robert Hammer, and William Walker. July 9, Tr., Vol. 2, 98:8–13 (Hatch).

**d. Senior HSI leaders provide the Tiger Team with other lists of protesters.**

57. At least 75% of the leads the Tiger Team received came from Canary Mission. July 10, Vol. 1, 15:10–13 (Hatch). The team did not receive a directive to look for protesters from any other single source in the way it did for Canary Mission's website. July 10, Tr., Vol. 2, 111:23–112:5 (Hatch) ("I think it's fair to say that Canary Mission was unique.")

58. Hatch testified, however, that HSI's "top leadership" also provided the team with other lists of names of protesters on a rolling basis. July 10, Tr., Vol. 2, 79:13–25, 80:25–81:5 (Hatch).

59. HSI leader Derek Gordon gave Hatch some of these lists of names verbally. July 10, Tr., Vol. 2, 75:10–15 (Hatch). When Gordon did this, he would often provide Hatch with some basic information in addition to the name of the protester, including the protester's university, the protests they had attended, and their suspected nationality. *Id.* 77:21–25 (Hatch). Gordon provided this information separate from the directive to look at the list of people on Canary Mission's website. *Id.* 78:1–6 (Hatch).

60. Some of the names HSI leadership provided the Tiger Team came from Betar. July 9, Tr., Vol. 2, 118:12–18 (Hatch).

61. At trial, Hatch testified that he doesn't know how HSI leadership got these names of protesters. July 10, Tr., Vol. 2, 80:1–15 ("I don't know how HSI got the leads. I don't know how it was sent to them, and I don't know who sent it to them.") But during his deposition, he testified that they came from the Office of the Secretary and the Office of the Border Czar, Tom Homan. *Id.* 79:10–19, 81:18–20.

**e. The Tiger Team's reports of analysis document individuals' lawful political protest and academic speech.**

62. Hatch personally reviewed approximately 200 reports of analysis on student protesters. July 10, Tr., Vol. 2, 83:22–84:1 (Hatch). He does not know the total number of reports on protesters produced. *Id.* 108:6–18.

63. Reports on student protesters included any information the Tiger Team identified as potentially relevant to a State Department decision to revoke the subject's visa, or to determine the subject removable under Title 8 of the U.S. Code. July 10, Tr., Vol. 1, 24:8–13 (Hatch).

64. This included information about a person's participation in protests. July 10, Tr., Vol. 1, 39:16–18 (Analysts were "given the task of, um, of producing information or finding information, um, relative, um, to the protest.").

65. Most of the reports Hatch reviewed mentioned Israel or Palestine. July 10, Tr., Vol. 2, 84:2–5. Some mentioned the war in Gaza. *Id.* 84:12–15. Some mentioned "pro-Palestinian protests." *Id.* 84:16–19; July 9, Tr., Vol. 1, 48:10–15. Some mentioned the term "pro-Hamas." July 10, Tr., Vol. 2, 84:20–21. Some mentioned a protester's public writing and statements, including on social media. *Id.* 84:22–85:13. Some mentioned a protester's chants at a protest. *Id.* 85:14–16. Some mentioned a student's membership of a student group such as Students for Justice in Palestine. *Id.* 86:17–25. Some mentioned a protester's statements and views on Israel. *Id.* 87:1–3.

66. Andre Watson, the Assistant Director of the National Security Division, who received the reports from Hatch, also recalled that the reports discussed protesters' viewpoints. He testified that some reports discussed a person's pro-Palestinian views, July 17, Tr. 76:3–77:2; some discussed a person's anti-Israel views, *id.* 77:3–5; some discussed a person's alleged pro-Hamas advocacy, *id.* 77:6–8; and some discussed a person's alleged antisemitic activities, *id.* 77:9–11.

67. Hatch testified that some reports included allegations of a protester's criminal conduct in connection with a protest, July 10, Tr., Vol. 2, 86:10–13, 85:17–18, but he could not recall approximately how many did so, *id.* 86:10–13. Nor could he recall whether any of the reports he reviewed mentioned that a protester had been convicted of a crime. *Id.* 86:14–16. Hatch acknowledged that many of the reports of analysis produced concerned students who attended protests and were not suspected of having committed a crime. *Id.* 111:12–15.

68. The Office of Intelligence produced reports of analysis on the five targeted noncitizens. Ex. 232 (Öztürk); Ex. 233 (Khalil); Ex. 234 (Khan Suri); Ex. 235 (Mahdawi); Ex. 236 (Chung). These reports were "typical" of the reports produced by the Office of Intelligence on student protesters. July 10, Tr., Vol. 1, 69:18–70:7 (Hatch).

69. Only one of these reports mentions allegations of criminal conduct in connection with the noncitizen's protest. That report, Yunseo Chung's, mentions charges for disorderly conduct, trespass, and obstructing government administration, in the second degree. Ex. 236. The remaining reports document only lawful political protest and academic speech. [redacted] The report that mentions criminal charges, moreover, does not indicate the status of those charges. July 10, Tr., Vol. 1, 68:16–18 (Hatch). Even if the charges led

to conviction, the conviction could not serve as the basis for a State Department determination that Chung—who is a lawful permanent resident—was removable. *See* 8 U.S.C. 1227(a)(2).[2]

**f. The Tiger Team's reports of analysis include unverified allegations that individuals' protest activity is antisemitic, pro-Hamas, or anti-Israel.**

70. In addition to documenting a student's or faculty member's protest activity, the reports of analysis also included allegations by Canary Mission and other nongovernment actors that a person's protest activity was antisemitic, pro-Hamas, or anti-Israel. In some cases the student's entire Canary Mission profile was simply attached to the report of analysis. Ex. 232 (Öztürk ROA); *see also* Ex. 233 (Khalil ROA linking to Khalil's Canary Mission profile).

71. Hatch testified that analysts would engage in "independent" review of Canary Mission's and other groups' claims. July 10, Tr., Vol. 1, 21:8–12. But when pressed on what this meant, he clarified that the scope of this review was extremely limited. For example, if Canary Mission alleged that a student had written a news article, the Office of Intelligence would confirm that the student had in fact written the article. *Id.* 21:20–25. But if Canary Mission alleged that the article was antisemitic, the office wouldn't make its own determination of whether the article was antisemitic or not. *Id.* 22:3–11 (Hatch) ("We don't do deliberations. We don't present opinions. We don't make assessments."); *id.* 24:4 ("The Office of Intelligence is not the decision-maker, it doesn't make the decisions . . . [it just] collects the facts."); *see also id.*, 56:3–13 (Hatch).

---

2 [redacted]

**g. The Office of Intelligence sends the reports of analysis to HSI's National Security Division for further action.**

72. The Office of Intelligence would send the reports of analysis produced as part of this effort to HSI's National Security Division, which would compile the information in a letter to the State Department, which in turn would decide what action to take. July 9, Tr., Vol. 2, 98:17–99:3.

73. The reports of analysis did not themselves include any recommendation of what action to take. July 9, Tr., Vol. 2, 99:4–8; *id.* 99:13–15 ("The National Security Division is the first step in the decision-making process on making judgments and assessments of the facts collected in the ROA.").

74. Typically, Hatch does not read reports of analysis before they leave the Office of Intelligence. July 10, Tr., Vol. 1, 35:18–23, 36:15–17 ("I don't read ROAs normally before they're sent to an agent or sent to, um a program."). But he did read reports of analysis on several of the student protesters, including the five targeted noncitizens. July 10, Tr., Vol. 1, 39:4–10 (Öztürk); *id.* 47:2–5 (Khalil); *id.* 52:15–17 (Khan Suri); *id.* 65:7–8 (Mahdawi); *id.* 66:8 (Chung).

75. In fact, in a departure from the Office of Intelligence's typical practice, Hatch discussed many of these reports of analysis with senior HSI leaders Derek Gordon, William Walker, Robert Hammer, and Roy Stanley before they were sent to the National Security Division for a formal referral. July 10, Tr., Vol. 1, 36:12–37:6.

76. Hatch doesn't recall any instance prior to 2025 where HSI provided information to the State Department about a student protester. July 9, Tr., Vol. 1, 66:11–67:1. He also doesn't recall any instance prior to 2025 of a lawful permanent resident or visa holder "being referred to the State Department because of protest activity." July 9, Tr., Vol. 1, 67:1–3, 67:13–15.

### 3. DHS and the State Department establish a new referral process to fast track the arrest and deportation of protesters based on their lawful pro-Palestinian speech.

77. HSI developed a new referral process to implement Executive Orders 14,161 and 14,188 in March 2025. July 17, Tr., Vol. 1, 67:3–5 (Watson).

78. At an executive briefing attended by Acting Deputy Executive Associate Director Derek Gordon, Active Executive Associate Director Robert Hammer, Assistant Director of the National Security Division Andre Watson, Assistant Director of the Office of Intelligence Peter Hatch, and others, the new referral process was explained to HSI senior leaders. July 17, Tr., Vol. 1, 67:3–16 (Watson).

79. At a high-level, the new process called for the reports of analysis developed by the Office of Intelligence to be sent to the National Security Division of HSI for review before being sent to the State Department for possible action, i.e., a visa revocation decision or determination of removability under Title 8 of the U.S. Code. July 17, Tr., Vol. 1, 26:16–20; 30:1–3; 46:3–7; 48:5–15; 66:25–67:2 (Watson).

80. The purpose of the new referral process was to "expedite" the Office of Intelligence's new line of effort. July 9, Tr., Vol. 2, 98:17–99:3 (Hatch).

81. Watson, who has worked for DHS for more than 20 years, and who has been the seniormost official in the National Security Division for five years, had no previous familiarity with or awareness of this referral process. July 17, Tr. Vol. 1, 68:16–24.

82. Hatch, who has been the seniormost official in the Office of Intelligence for six years, had never seen the referral process used before. July 9, Tr., Vol. 2, 103:3–7. For Hatch, the process was "new." *Id.* 103:8–11.

83. As a result of the executive briefing in March, the Office of Intelligence was directed to create reports of analysis on "conduct contrary to the Executive Orders." July 17, Tr., Vol. 1, 71:3–16 (Watson).

84. Senior HSI leaders, including Derek Gordon and Robert Hammer, instructed Watson to make referrals from the National Security Division to the State Department based on those reports of analysis. July 17, Tr., Vol. 1, 73:14–74:8 (Watson).

85. Before the new referral process was created, HSI had directly coordinated with the State Department only on discrete projects relating to human rights violators, suspected war criminals, and "international military students." July 17, Tr., Vol. 1, 46:24–47:17 (Watson).

86. The new referral process includes two primary steps.

**a. <u>Step One</u>: HSI's National Security Division reviews the report of analysis and decides whether to make a referral to the State Department.**

87. In the **<u>first step</u>** of the new referral process, Watson, the Assistant Director of HSI's National Security Division, receives and reviews a package including a report of analysis and referral letter prepared in coordination with ICE's Office of the Principal Legal Advisor and HSI special agents assigned to the Office of Intelligence on detail. July 17, Tr., Vol. 1, 50: 6–13 (Watson). If Watson approves the package for submission to the State Department, Watson signs the referral letter and sends the package along to John Armstrong, *id.* 50:19–51:7 (Watson), the seniormost official in the State Department's Bureau of Consular Affairs, for potential action. *Id.* 51:2–17; 74:3–8 (Watson). Watson sends Armstrong the referral by e-mail, which serves as a cover

letter, and includes the report of analysis and referral letter as attachments.[3] July 11, Tr., Vol. 2, 89:1–13 (Armstrong).

88. The referral letters sent by Watson purport to provide a summary of actions by the subject "that violate President Trump's executive orders on anti-Semitism" (namely, Executive Orders 14,161 and 14,188). *See, e.g.*, Ex. 242 (Khalil letter) July 17, Tr., Vol. 1, 83:11–14 (Watson). They also seek a decision from the State Department to revoke the subject's visa, and/or to determine that the subject is removable. July 17, Tr., Vol. 1, 74:11–75:6.



89. In some cases, the letters specifically seek the Secretary of State's assessment whether a noncitizen's activities in the U.S. would compromise a compelling U.S. foreign policy interest. July 17, Tr., Vol. 1, 74:23–75:2 (Watson)

[3] Plaintiffs requested but never received the emails from Watson to Armstrong transmitting the referral packages. Plaintiffs' Request for Production No. 2 Directed to Defendants (May 19, 2025) ("Documents and communications requesting or recommending the taking of, and memorializing, explaining, or justifying the decision to take any adverse action against a Targeted Noncitizen Student or Faculty Member[.]")

90. The State Department's decision to revoke the visa of Ms. Öztürk, and to make a removability determination in the cases of Mr. Khalil, Ms. Chung, Mr. Mahdawi, and Dr. Khan Suri all resulted from referrals made through the new referral process. July 17, Tr., Vol. 1, 75:7–25 (Watson).

91. As of June 2025, Watson recalled making more than 10 but less than 50 referrals to the State Department through the new referral process. July 17, Tr., Vol. 1, 77:12–15.

**b. The National Security Division's decision at step one is based solely on a cursory review of the report of analysis.**

92. Watson relies only on the information contained in the Office of Intelligence's report of analysis when deciding whether to refer the report's subject to the State Department in the new referral process. *Id.* 77:19–25 (Watson).

93. Before making a referral to the State Department, Watson reviews the report of analysis only to determine that it is "complete"—that is, to make sure that the report contains what it purports to contain and that it is readable. *Id.* 78:1–15 (Watson).

94. Watson does not review the report of analysis or referral letter prepared in connection with it to determine whether the activities they describe in fact violate Executive Orders. To the best of Watson's knowledge, HSI has not adopted standards for deciding whether a person's activities violate those orders. *Id.* 88:14–17 (Watson).

95. Watson has approved *every* referral he has received through the new process for submission to the State Department. *Id.* 78:16–19 (Watson).

96. In making these referrals, Watson reviewed and signed the referral letters drafted for his approval. *Id.* 82:10–83:10. The referral letters make assessments about a subject's activities that Watson repeatedly testified he is not personally capable of making. In other words, Watson

signed referral letters, adopting their content, without being positioned to assess whether the characterizations in the letters were accurate.

97. For example, Watson does not personally determine whether a person's activities are antisemitic and does not know how HSI determines that a person's activities are antisemitic. *Id.* 82:3–5; Watson Tr. 135:4–10. But Watson signed referral letters, including the letter concerning Khalil, accusing protesters of engaging in antisemitic activities. July 17, Tr., Vol. 1, 81:23–82:9; Ex. 242 (Khalil letter). In Watson's words, though he signed the letter accusing Khalil of antisemitic conduct, he "didn't" and "do[es]n't" make that determination. July 17, Tr., Vol. 1, 82:3–5.

98. Watson also signed referral letters asking the State Department to determine whether the subject's presence or activities in the U.S. may have adverse foreign policy consequences. *Id.* 84: 12–23. [REDACTED] In some instances, the letters stated that the summary provided "*may be sufficient* for the Secretary of State to determine that there are compelling adverse foreign policy consequences for the [U.S.] from the alien's presence or activities." Ex. 242 (Khalil letter) (emphasis added); [REDACTED]. But Watson testified that he does not determine whether a person's presence or activities could have adverse foreign policy consequences for the U.S., he does not know how HSI makes that determination, and he does not know who at HSI is responsible for making that determination in a given case. July 17, Tr., Vol. 1, 84: 5–11; 84:24–85:3; Watson Tr. 130:11–18.

99. In fact, Watson testified that he does not know whether Executive Order 14,188 indicates that it is the foreign policy of the United States to combat antisemitism; that he has not been told that the United States has a policy of combatting antisemitism in America and abroad; and that he does not know whether antisemitism or pro-Palestinian advocacy falls within HSI's national security or public safety mandates. July 17, Tr., Vol. 1, 89:17–90:8; 95:7–24.

100. Watson speculated that where a referral letter includes an assessment that the summary provided may be sufficient for a foreign policy determination, the underlying report of analysis includes that assessment. July 17, Tr., Vol. 1, 84:24–86:11 ("I would defer to the Report of Analysis that was completed by the Office of Intelligence and the intelligence professionals that were responsible for it.").



**c. The National Security Division's letters to the State Department purport to summarize the reports of analysis but make claims that are wholly unsupported by the reports.**

101. The referral letters Watson sends in a package to the State Department make baseless claims about the subjects of the reports of analysis. As described above, those reports include unvetted allegations that a person's protest activity is antisemitic, anti-Israel, or pro-Hamas. *See supra* Part II.B.2.f. But for the most part, they do not make any determination whether a protester's alleged activities are in fact pro-Palestinian, pro-Hamas, anti-Israel, or antisemitic.[4]

[4] There are some exceptions. *See, e.g.*, Ex. 234 at 5 (Khan Suri ROA) ("KHAN SURI appears to post pro-Palestine content.").

They do not make any assessment whether a protester's activities could provide a basis to revoke their visa or to find them removable. And they do not include any recommendation or conclusion concerning what, if anything, the State Department should do next. *See* Exs. 232 (Öztürk ROA), 233 (Khalil ROA), 234 (Khan Suri ROA), 235 (Mahdawi ROA), 236 (Chung ROA).

102. Watson's referral letters, on the other hand, expressly determine that a protester's alleged activities violate or may violate the Executive Orders, identify potential bases for revoking the protester's visa or finding them removable, [redacted] While the reports of analysis include screenshots of the documents they are based on or hyperlinks to the articles they are referring to and, importantly, make clear that they are merely repeating an allegation made by another party, the referral letters adopt unverified claims from unknown third parties as true and present them as the factual findings of HSI.

103. [redacted]





**d. Step Two: The State Department reviews the referral from the National Security Division and decides whether to revoke a protester's visa or to find them removable.**

104. In the **second step** of the new referral process, Armstrong and others in the Bureau of Consular Affairs review protesters' activities for antisemitism and/or "support" for terrorism as part of the agency's implementation of the Executive Orders. July 18, Tr., Vol. 1, 24:20–24; 25:6–23 (Armstrong). Those reviews are based on the package sent from Watson to Armstrong. July 17, Tr., Vol. 1, 49:16–51:1 (Watson); July 11, Tr., Vol. 2, 88:14–89:13 (Armstrong).

105. Generally, when Armstrong receives a referral from the National Security Division concerning a nonimmigrant visa holder, Armstrong sends the referral to the Visa Office for processing and review. When Armstrong receives a referral from that office concerning a legal permanent resident, the referral takes "a different track" and is sent to the Secretary of State if the Bureau of Consular Affairs determines that "the evidence is sufficient to take action." July 11, Tr., Vol. 2, 89:17–90:1 (Armstrong).

106. For referrals involving nonimmigrant visa holders, the Visa Office reviews the referral to determine whether "it's serious enough to enact a revocation." *Id.* 90:6–11. If the Visa Office concludes that a referral warrants action, the Visa Office "discuss[es] it with whoever received the referral from DHS"—in the case of the new referral process, Armstrong—"and if that person agrees, then it will go into the revocation process and the visa will be revoked." *Id.* 90:12–

20. The State Department then notifies DHS of its decision on the referral. When DHS refers a visa holder for potential visa revocation, State's decisions could be (1) to revoke the visa, (2) to take no action, or (3) to request more information from DHS. *Id.* 90:12–25.

107. In cases where Armstrong is the decision-maker on a proposed visa revocation, he is presented with an action memo from his deputy, Deputy Assistant Secretary Stuart Wilson. [redacted] This memo attaches the referral letter from HSI's National Security Division, the report of analysis prepared by HSI's Office of Intelligence, and a proposed letter to DHS notifying it of the State Department's decision. [redacted]

108. For referrals involving legal permanent residents, the Bureau of Consular Affairs prepares an action memo for the Secretary of State proposing that he make a determination of removability. The action memo includes three options: (1) agree the person is removable, (2) disagree and find the person is not removable, or (3) discuss the case. [redacted] If the Secretary of State determines that a legal permanent resident is removable, the State Department then sends two notifications to DHS. First, the State Department sends an informal notification to the person who made the referral—in the case of the new referral process, Andre Watson.[5] Second, the State Department sends an official notification of its decision from the Executive Secretary of the Secretary of State to the Executive Secretary of the Secretary of Homeland Security. July 11, Tr., Vol. 2, 91:23–92:4.

109. Action memos presented to Secretary Rubio attach the referral letter from HSI's National Security Division, the report of analysis prepared by HSI's Office of Intelligence, a

[5] Plaintiffs requested but never received informal communications from Armstrong to Watson regarding State's forthcoming action.

proposed letter to DHS notifying it of the State Department's decision, and in cases involving a (4)(C) determination, a copy of that provision. [redacted]

110. Armstrong personally reviewed the referrals from Watson for Mr. Khalil, Ms. Chung, Ms. Öztürk, Mr. Mahdawi, and Dr. Khan Suri. He also personally approved the action memo recommending the revocation of Ms. Öztürk's visa and was the final reviewer of the action memos recommending that Secretary Rubio find Khalil, Chung, Mahdawi and Khan Suri removable. July 11, Tr., Vol. 2, 127:4–22 (Armstrong).

111. Armstrong testified that he sent approximately 15 to 20 action memos concerning "student protests, protesters, and concerns about antisemitism" to the Secretary of State for potential action. *Id.* 119:4–12. Armstrong recalls that "almost all," or all but one, were ultimately agreed to by the Secretary. *Id.* 119:13–19.

112. Armstrong and staff members from the Visa Office may have personally approved many more action memos proposing the revocation of protesters' visas. Armstrong testified that action memos proposing visa revocation like the one from Ms. Öztürk's case were not sent to Secretary Rubio. *Id.* 90:12–20. At least 200 reports of analysis were prepared on student and faculty protesters. *See supra* ¶ 62. And Watson recalls referring as many as 50 to the State Department. July 17, Tr., Vol. 1, 77:12–15.

113. Some of the referrals made to the Secretary under the new referral process recommended that a person be removed under the 4(C) foreign policy provision. *See* 8 U.S.C. § 1227(a)(4)(C). Armstrong is not aware of any prior exercises by Secretary Rubio of that removal authority. July 18, Tr., Vol. 1, 48:2–9 (Armstrong). [redacted]



Though Armstrong insisted at trial that the Secretary's exercise of his 4(C) authority is not notable because 4(C) has long been a part of the INA, Armstrong could recall only one instance in which the 4(C) authority had been used by any Secretary of State "in this century." July 18, Tr., Vol. 1, 49:8–19.

114. The referrals from Watson were acted on swiftly by the State Department. For example, on March 14, 2025, the State Department received a referral from Watson recommending that Mohsen Mahdawi be found removable under the 4(C) foreign policy provision. Upon receipt, the Bureau of Consular Affairs reviewed the referral, compiled an action memo memorializing its recommendation that Mahdawi be found removable, collected approvals from nine offices or individuals, submitted the cleared action memo to the Secretary, and obtained the Secretary's sign-off in approximately 24 hours. July 18, Tr., Vol. 1, 53:4–54:9. The timelines for Mr. Khalil, Ms. Öztürk, Dr. Khan Suri, and Ms. Chung were similar. *See infra* ¶¶ 192–198 (Khalil), 225–236 (Öztürk), 275–283 (Khan Suri), 297–300 (Chung).

**e. In carrying out step two, senior officials in the State Department conflate pro-Palestinian advocacy with antisemitism and support for terrorism, and constitutionally protected speech and association with unprotected conduct.**

115. Armstrong testified that the Bureau of Consular Affairs was asked to review the activities of students for antisemitism. July 18, Tr., Vol. 1, 25:15–18.

116. But despite being the seniormost official in the Bureau of Consular Affairs—the office charged with overseeing the State Department's role in the new process—as well as the final decision-maker in cases involving visa revocations, Armstrong has not received formal or informal guidance on what constitutes antisemitism. *Id.* 25:15–26:24 (Armstrong). To Armstrong's

knowledge, the employees in the Visa Office who write action memos in response to the referrals from HSI's National Security Division also have not received any formalized training on what constitutes antisemitism. *Id.* 26:25–27:9.

117. Armstrong applies his own understanding of Executive Orders 14,161 and 14,188, United States foreign policy, what it means to express support for a terrorist organization, and antisemitism in performing his duties. July 18, Tr., Vol. 1, 35:17–36:9 ("[M]y understanding does inform my decision-making, as does any other guidance that I have.").

118. According to Armstrong, antisemitism is "unjustified views, biases, or prejudices, or actions against Jewish people, or Israel, that are the result of hatred towards them." *Id.* 28:9–12. In Armstrong's interpretation, "views" against Israel and/or Israeli people are necessarily antisemitic. It is not possible for a person to be "just against Israel" and "not against Jews"—that is "a farcical argument" and "just a dodge." *Id.* 28:14–23. Armstrong relies on his view, which he describes as the "common understanding in our culture in our society of what antisemitism is" in his decision-making concerning referrals. *Id.* 28:2–4, 36:1–9. This view is also consistent with the statements made by senior officials at DHS and the State Department describing the ideological deportation policy. *See, e.g.*, *supra* Part II.A.

119. Armstrong also reviewed referrals requesting that Secretary Rubio make a determination that a protester's presence or activities would have adverse foreign policy consequences for the U.S. and that their presence would compromise a compelling U.S. foreign policy interest. When deciding whether to submit an action memo to the Secretary that recommended making a determination under the foreign policy provision, Armstrong applied his understanding of U.S. foreign policy. *See* PFOF ¶ 117.

120. It is Armstrong's understanding, based in part on his reading of Executive Order 14,188, that "the official policy of the United States is to combat antisemitism both at home and abroad." July 11, Tr., Vol. 2, 108:10–12.

121. Armstrong and his subordinates view Secretary Rubio's public statements about U.S. foreign policy interests and goals, about antisemitism, and about the Executive Orders as guidance that the Bureau of Consular Affairs should follow in completing its work. [REDACTED][6]

122. Based on Secretary Rubio's public statements, Armstrong understands that it is the foreign policy of the U.S. to "be strongly against antisemitism." July 18, Tr., Vol. 1, 21:2–8. Armstrong understands that it is Secretary Rubio's position, and thus the position of the State Department, to oppose antisemitism on "college campuses," as well as the rest of the United States. *Id.* 22:20–23:3. Armstrong views U.S. foreign policy, based on Secretary Rubio's public statements, as diametrically opposed to "anyone organizing antisemitic activity in the United States," including student protesters. *Id.* 21:21–22:5.

[6] Indeed, diplomatic cables disseminating policy guidance to State Department officials sometimes quote directly from Secretary Rubio's public statements, including his remarks to the press, confirming that the State Department views his statements as articulations of official agency policy. *See infra* PFOF ¶¶ 155155, 166166.

123. Armstrong understands that the State Department has a policy of revoking visas based on political viewpoints insofar as a person's viewpoint is "supporting a terrorist organization." He stated: "If you support terrorism, you can have your visa revoked." July 11, Tr., Vol. 2, 121:22–122:3. Armstrong understands that 8 U.S.C. § 1182(a)(3)(B)—the terrorism-related grounds of inadmissibility which include the endorse or espouse provisions—and (a)(3)(C)—the foreign policy-related ground of inadmissibility—to be legal pathways to revoking a visa based on perceived support of terrorism. *Id.* 122:4–12; July 18, Tr., Vol. 1, 32:11–12 ("Support for a terrorist, or terrorist activity, is a reason to have a visa revoked, yes."); *Id.* 32:19–20 ("Yeah, support for Hamas will get your visa revoked").

124. In Armstrong's view, memorialized in a cable he signed that was distributed to the field, a noncitizen's "rejection of our system, the U.S. system of government based on our founding documents, in particular (sic) Declaration of Independence and the Constitution," a noncitizen's "unjustified rejection of clear U.S. cultural things or icons," "like burning the U.S. flag," or a noncitizen's "public declarations of a good feeling toward a terrorist organization" could potentially make a noncitizen ineligible or removable under the endorse or espouse provisions in 8 U.S.C. § 1182(a)(3)(B) and 8 U.S.C. § 1227(a)(4)(B). Armstrong Tr. 136:19–138:21; *see also* Ex. 64 (the Enhanced Screening Cable); PFOF Part II.B.4.b.ii. (discussing cable).

125. Armstrong also views statements expressing criticism of Israel or support for Palestinians as a potential ground for deportation under the endorse and espouse provisions of 3(B) and 4(B), the foreign policy provisions in 3(C) and 4(C), and other provisions of the INA. Though he cautioned that "[j]ust one statement by itself is probably not going to make the decision," July 18, Tr., Vol. 1, 35:9–12, he identified the following statements as expressions that could make a noncitizen deportable because they are, in his view, antisemitic statements, statements that endorse

or espouse terrorism or support a terrorist organization, or statements that otherwise implicate the foreign policy provisions of the INA.

a. In Armstrong's view, the phrase "from the river to the sea, Palestine will be free," could lead to deportation because it "call[s] for genocide of all Israelis, because there's no space for Israelis in that 'river to the sea.'" July 18, Tr., Vol. 1, 34:2–8; Armstrong Tr. 140:2–10 ("[I]n my opinion, . . . it means the elimination of Israel and the Israeli people.").

b. In Armstrong's view, a statement denouncing Zionism is antisemitic and a potential ground for deportation because Zionism is, in Armstrong's view, "Jewish patriotism or Israeli patriotism." July 18 Tr., Vol. 1, 34:9–12; Armstrong Tr., 140:12–18.

c. According to Armstrong, a statement criticizing Israel's actions in Gaza could be covered, depending on the statement. For example, a statement describing Israel's actions as "worse than the Nazis" could be a potential ground for deportation. July 18, Tr., Vol. 1 34:13–23; Armstrong Tr., 143:2–12 (Q: "Is a statement that compares Israeli policy to that of the Nazis covered by the language in paragraph 9 [of the cable discussing 3(b)]?" A: "I believe, so, yes. You mean Nazi Germany, yes?").

d. In Armstrong's view, a statement calling for limiting military aid to Israel or for an arms embargo on Israel could be a potential ground for deportation. July 18, Tr., Vol. 1, 34:24–35:7; Armstrong Tr. 141:8–17.

e. Armstrong views a statement calling Israel an "apartheid state" as a potential ground for deportation. July 18, Vol. 1, Tr. 35:13–16; Armstrong Tr., 142:21–25.

f. Armstrong views a statement criticizing the state of Israel as a "racist endeavor" as a potential ground for deportation. *Id.* 143:9–12.

g. Armstrong views a statement calling for an institutional divestment from Israel as a potential ground for deportation. *Id.* 141:3–6.

h. Armstrong views criticism of the Trump administration's policies or actions toward Israel as potentially relevant to a determination that a noncitizen endorses or espouses terrorism or supports a terrorist organization under 3(B) and 4(B). July 18, Tr., Vol. 1, 42:12–43:11; Armstrong Tr., 143:24–144:2.

126. Armstrong's view that a protester's "association is an activity" also guides his assessment of whether a person's activities establish a basis for their removal. July 18, Tr., Vol. 1, 64:22–65:4. For example, Armstrong testified that he personally determined that Rumeysa Öztürk's visa should be revoked because of her "actions." *Id.* 61:13–16. In his testimony and in the action memo, Armstrong described Öztürk's relevant actions as including (1) "protesting Tufts['] relationship with Israel" and being "against Tufts' relationship with Israel" and (2) her "association" with a pro-Palestinian Tufts campus group that was temporarily suspended from campus. *Id.* 61:13–62:1, 64:22–65:4. Armstrong distinguished protesting from speech, characterizing protesting as an "activity." *Id.* With respect to her alleged "association," the action memo, which Armstrong signed and was reviewing at the time of his testimony, makes clear that



[redacted] Armstrong's perspective, however, based on the action memo, is that Ms. Öztürk was "clearly involved" with the suspended student group, that her involvement was an association, and that an association is an activity that can form the basis of a decision to revoke a person's visa. July 18, Tr., Vol. 1, 63:24–25, 64:12–65:4.

127. Armstrong's testimony demonstrates that in carrying out his role in the new referral process—i.e., deciding whether to revoke a protester's visa or to recommend that Secretary Rubio find them removable—he conflates legitimate pro-Palestinian and anti-war speech with antisemitism and support for terrorism. It also establishes that he conflates constitutionally protected expression and association with unprotected conduct. *See also infra* PFOF Part II.C.1. (discussing the actions memos on the five targeted noncitizens).

128. This is borne out in the action memos themselves. The actions memos concerning the five targeted noncitizens as to which the court allowed discovery are illustrative. The action memos variously describe the targeted noncitizens as a [redacted] Then, often without further explanation,

the action memos describe the targeted noncitizens' speech as pro-Hamas and antisemitic.



129. Furthermore, whether the speech is characterized as pro-Hamas, antisemitic, anti-Israel or pro-Palestine, the action memos, for the most part, describe nothing more than speech.



**f. The State Department's decisions to revoke visas or find protesters removable are based on lawful political speech.**

130. The State Department decisions communicated back to DHS further prove that, in carrying out step two of the new process, the State Department conflates legitimate pro-Palestinian speech with antisemitism and support for terrorism, and constitutionally protected speech with unprotected conduct.

131. As Armstrong testified, the decision letters accurately reflect the basis for Secretary Rubio's determinations. *See, e.g.*, July 11, Tr., Vol. 2, 115:1–7 (Chung decision letter), 116:3–9 (Suri decision letter).

132. The State Department decision letter on Khalil and Chung attributes Secretary Rubio's removability determination to their "participation and roles" in "antisemitic protests and disruptive activities, which foster[] a hostile environment for Jewish students in the United States." Ex. 8 at 2. The State Department decision letter for Chung adds that her removability determination is based on her "citations for unlawful activity during these protests" but omits that the charges for

which she was cited could not independently support a removability determination under the crime-related grounds of deportability. *See* 8 U.S.C. § 1227(a)(2).

133. The State Department decision letter on Mahdawi attributes Secretary Rubio's removability determination to Mahdawi's alleged "leadership and involvement in disruptive protests" and his alleged "engage[ment] in anti-Semitic conduct *through* leading pro-Palestinian protests and calling for Israel's destruction"—in other words, the decision letter reflects that Mahdawi's alleged leadership in pro-Palestinian protests is, in the State Department's view, "anti-Semitic conduct." Ex. 12 at 2 (emphasis added). The decision letter also alleges that Mahdawi engaged in "threatening rhetoric and intimidation of pro-Israeli bystanders" at the protests but does not substantiate this allegation or indicate what this rhetoric or supposed intimidation entailed.

134. The State Department decision letter for Khan Suri expressly states that it defers to HIS's assessment and conclusion. Ex. 21 at 1–2. It then cites his alleged "direct connection to Hamas leadership" through his father-in-law, "involvement in antisemitic activities" that allegedly creates "a hostile environment for Jewish students and [indicates] support for a designated terrorist organization," and his alleged active support for "Hamas terrorism" and promotion of "antisemitism."

135. Armstrong's decision letter concerning Öztürk repeats HSI's generic claim that she has associations that "may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating a support for a designated terrorist organization" and points specifically to the op-ed she wrote, which Armstrong claims "found common cause" with a student group suspended from campus. Ex. 16. [redacted]

[REDACTED] Nonetheless, the decision to revoke her visa, as explained by Armstrong, turned on those allegations.

136. The boilerplate decision letters lay bare that the State Department's visa revocations and removability decisions in step two implement the ideological deportation policy exactly as Plaintiffs allege. The decisions are based on targeted noncitizens' speech and association and not, as Armstrong contended, on noncitizens' "actions." And, more specifically, the decisions are based on the targeted noncitizens' alleged antisemitic speech or support for terrorism, as those things are understood by senior State Department officials—in other words speech that is pro-Palestinian, anti-war, and critical of Israel. Finally, the decision letters make clear that the State Department's work in step two is not a check on DHS's work in step one. Indeed, the decision letters frequently quote from and defer to claims made in HSI's referral letters.

**4. The State Department lays the groundwork for expanding its enforcement of the policy.**

137. The State Department has laid the groundwork for expanding its enforcement of the ideological deportation policy by issuing new guidance governing visa revocations.

138. At a high level, this guidance formalizes multiple pathways for revoking the visas of students who engage in pro-Palestinian advocacy: (1) the agency may revoke the visas of students who engage in activities inconsistent with holding a student visa; (2) the agency may revoke the visas of students who endorse or espouse terrorist activity or terrorist organizations; and (3) the agency may revoke the visas of students whose presence or activities in the United States have serious foreign policy consequences. Under any of these pathways, the State Department considers support for foreign terrorists or for antisemitic conduct to be a ground for visa revocation, and as public statements by Secretary Rubio and trial testimony by Mr. Armstrong make clear, the agency deems a broad spectrum of pro-Palestinian and anti-war statements to be

pro-Hamas and antisemitic. *See* Parts II.A & II.B.3.e–f. The State Department's new guidance also confirms that the agency treats Rubio's public statements about ideological visa revocations and deportations as official policy.

**a. The State Department issues new guidance governing visa revocations.**

139. The State Department's new guidance is reflected in diplomatic cables from Secretary Rubio and in updates to the Foreign Affairs Manual ("FAM").

140. Diplomatic cables and the FAM are sources of official State Department policy and guidance. July 18, Tr., Vol. 1, 7:13–8:15 (Armstrong). Cables are "official records of Department of State policies, program activities, post operations, and personnel management" that are "cleared and approved, either directly or through delegation, and carry organizational authority." Ex. 211 at 5. The FAM is an "authoritative source" for the Department of State's policies, and it "govern[s] the operations of the State Department, the Foreign Service and, when applicable, other federal agencies." Ex. 212 at 1.

141. Some of the new cables and FAM provisions expressly govern visa revocations. Ex. 51 (25 STATE 17178); Ex. 64 (25 STATE 26168); Ex. 215 (9 FAM 403.11).

142. Others purport to govern only visa denials, but the guidance they set forth is also relevant to visa revocations. As Maureen Smith, a senior advisor at the State Department, testified at trial, the State Department can revoke a visa if it believes that the visa holder is no longer eligible for their visa. July 11, Tr., Vol. 2, 74:5–11, 75:3–19. In other words, a ground for *denying* a visa is also, according to Defendants, a ground for *revoking* a visa already granted.

143. This testimony is consistent with State Department policy as memorialized in the FAM as well as public statements made by Secretary Rubio. 9 FAM 403.11 provides that the State Department may "prudentially" revoke a nonimmigrant visa "if an ineligibility or lack of

entitlement is suspected when an individual would not meet requirements for admission or in other situations where warranted[,]" such as "when it receives derogatory information directly from another U.S. Government agency, including a member of the intelligence or law enforcement community." Ex. 215 at 6. Secretary Rubio's statements about the revocation of protesters' visas also reflects this policy. *See, e.g.,* PFOF ¶¶ 16–17, 20, 22–23, 27; *see also, e.g.*, Ex. 33 at 7 (asserting that the State Department may revoke the visas of individuals who "never should have [been] allowed [] in in [] the first place").

144. Although diplomatic cables are generally addressed to all diplomatic and consular posts, cables that address visa denials and revocations are also sent to and relied upon by officers in the Visa Office, which is located in Washington, D.C. July 11, Tr., Vol. 1, 29:24–32:11 (Smith).

**b. The new guidance confirms that the State Department will revoke protesters' visas based on speech that it deems pro-Hamas or antisemitic.**

**i. Catch and Revoke Cable**

145. On February 28, 2025, Secretary Rubio issued diplomatic cable 25 STATE 17178, titled "Catch and Revoke: National Security Through Timely Processing of Visa Systems Messages." Ex. 51 (the "Catch and Revoke Cable").

146. The cable notes that, under E.O. 14,161, "the Department is directed to ensure maximum screening and vetting *throughout* the visa process." Ex. 51 at 1 (emphasis added). It therefore directs consular officers to "vigilantly monitor the activities of aliens—whether they are inside the United States or not," and instructs: "when a consular officer catches an alien misusing a visa, the officer should generally revoke it [under the State Department's visa-revocation authority, in 8 U.S.C. § 1201(i)]. Catch and revoke." *Id.* at 1–2.

147. Under the policy conveyed in the Catch and Revoke Cable, the State Department considers students who engage in speech it deems to be pro-Hamas to be misusing their visas. *See* Ex. 57 at 4–5 (Secretary Rubio stating in article published to the State Department's Substack page that under the agency's new "one-strike" "Catch-And-Revoke" policy, the State Department "now reviews law-enforcement information about student visa holders and when [it] find[s] those who have supported terrorists or otherwise abused our hospitality, their visas are instantly revoked").

148. The cable states that "[e]ven if an alien has not yet been convicted of a crime," consular officers must evaluate whether the visa should be revoked because of "INA 214(b) [8 U.S.C. § 1184(b)]," Ex. 51 at 4, which presumes that a nonimmigrant visa applicant is an intending immigrant (i.e., a person who seeks to move to the U.S. *permanently*, which is not allowed using a nonimmigrant visa) unless they establish to the satisfaction of the consular officer that they meet the requirements of the nonimmigrant visa category they applied for. 8 U.S.C. § 1184(b). The cable further states that visas holders "may no longer [] overcome [the presumption in] 214(b) if they engage in activities that are inconsistent with the claimed nonimmigrant status." Ex. 51 at 4.

149. The cable also provides that "[r]equests for revocation of visas *where the individual is in the United States* must be sent to the Revocation Team in [the Visa Office]." *Id.* at 5 (emphasis added).

150. A May 15, 2025 cable titled "Caught and Revoked: Updated Guidance on Systems Messages" stated that the State Department's "focused work" on implementing the Catch and Revoke Cable resulted in "an immediate doubling in visa revocations for aliens who no longer qualify for their visas, and a sustained 150 percent increase in visa revocations as compared to March 1–April 15, 2024." Ex. 50 at 3.

**ii. Enhanced Screening Cable**

151. On March 25, 2025, Secretary Rubio issued diplomatic cable 25 STATE 26168, titled "Enhanced Screening and Social Media Vetting for Visa Applicants," which referenced the Executive Orders and required enhanced vetting of student visa applicants *and holders*. Ex. 64 (the "Enhanced Screening Cable").

152. The cable provides that consular officers must refer certain new or returning F-1, M-1, or J-1 visa applicants (i.e., student visa applicants) to the Fraud Prevention Unit (FPU) for a mandatory social media review for any "potentially derogatory information indicating that the applicant may not be eligible for a visa[.]" Ex. 64 at 3; *see also* Ex. 49 at 5, 12.

153. The cable provides that, as part of screening applicants for potential ineligibilities, consular officers must consider any information that suggests the applicant intends to engage in activities that are inconsistent with the visa status. Ex. 64 at 2; *see also* Ex. 49.

154. The cable also provides that "consular officers MUST ADDRESS any derogatory information indicating that a visa applicant may be subject to the terrorism-related ineligibility grounds of the [INA]," including the endorse or espouse provisions. Ex. 64 at 2–3. The cable states that derogatory information includes "[e]vidence that an applicant advocates for terrorist activity, or otherwise demonstrates a degree of public approval or public advocacy for terrorist activity or a terrorist organization." Ex. 64 at 4. It also explains that this information "may be evident in conduct that bears a hostile attitude towards U.S. citizens or U.S. culture (including government, institutions, or founding principles)," or in "advocacy or sympathy for foreign terrorist organizations." *Id.*[7]

[7] The endorse and espouse provisions are grounds of inadmissibility *and deportability*. 8 U.S.C. § 1227(a)(4)(B).

155. The cable states that its guidance "was reflected well by the Secretary's statement on March 16 [on CBS's *Face the Nation*], that 'when you apply to enter the United States and you get a visa, you are a guest . . . if you tell us when you apply for a visa, 'I'm coming to the U.S. to participate in pro-Hamas events,' that runs counter to the foreign policy interest of the United States . . . if you had told us you were going to do that, we never would have given you the visa.'" Ex. 64, at 2; *see also* Ex. 33 at 7.

156. The Enhanced Screening Cable's guidance about visa ineligibilities is directly applicable to visa revocations because, as explained above, the State Department can revoke a visa if it suspects that the holder no longer meets the requirements of admission. *See supra* ¶¶ 142–143. The cable itself recognizes this. *See* Ex. 64, at 5 ("If, subsequent to visa issuance, information becomes available to post that an individual may no longer be eligible for a visa due to particularized information indicating an ineligibility under specific INA provisions, including 214(b) [8 U.S.C. § 1184(b)], post should follow the procedures to revoke or request prudential revocation as described in 9 FAM 403.11 for nonimmigrant visas or 9 FAM 504.12 for immigrant visas."); *see also* July 18, Tr., Vol. 1, 39:18–22 (Armstrong).

157. During his deposition, Senior Bureau Official John Armstrong testified that the following pro-Palestinian and anti-war statements could be covered by the cable's guidance about what constitutes support for terrorism.

a. A statement that "from the river to the sea, Palestine will be free." Armstrong Tr. 140:2–5.

b. A statement denouncing Zionism. *Id.* 140:12–18.

c. A statement criticizing Israel's actions in Gaza. *Id.* 140:20–141:1.

d. A statement calling for an institution to divest from Israel. *Id.* 141:3–6.

e. A statement calling for an arms embargo on Israel. *Id.* 141:8–12.

f. A statement calling for limiting military aid to Israel. *Id.* 141:14–17.

g. A statement calling Israel an apartheid state. *Id.* 142:21–25.

h. A statement comparing the Israeli government's policies to those of Nazi Germany. *Id.* 143:2–9.

i. A statement criticizing the state of Israel as a racist endeavor. *Id.* 143:9–12.

j. Criticism of the administration's policy or actions of Israel. *Id.* 143:24–144:2.

158. Armstrong also testified that "[a] rejection of our systems, the U.S. system of Government based on our founding documents, in particular [the] Declaration of Independence and the Constitution" would be covered. Armstrong Tr. 136:19–137:4.

159. On April 3 and 4, 2025, the State Department's Visa Office conducted a training webinar on the new social media vetting processes introduced through the Enhanced Screening Cable. *See* Ex. 64 at 1; Ex. 49. That webinar described Secretary's Rubio's statement on CBS's *Face the Nation* as "guidance [that] is part of our implementation of Executive Orders 14161 and 14188." Ex. 49 at 4. The webinar also announced the creation of a new interagency "Student Visa Working Group to facilitate information flow and coordinate actions on individuals with derogatory information" between the State Department and DHS, including with respect to "the removal process." Ex. 49 at 14.

**iii. Expanded Screening Cable**

160. On June 18, 2025, Secretary Rubio issued diplomatic cable 25 STATE 59756, titled "Expanding Screening and Vetting for FMJ Applicants," which purported to supersede the Enhanced Screening Cable and required consular officers to "conduct a comprehensive and

thorough vetting of each [new or returning] FMJ applicant who is otherwise issuable," including by reviewing "the applicant's entire online presence — not just social media activity[.]" Ex. 239 at 4 (the "Expanded Screening Cable").

161. The cable states that the purpose of this vetting is to "look[] for any potentially derogatory information about the applicant" and "to ensure it does not indicate an ineligibility under INA 212(a) [8 U.S.C. § 1182(a)] or 214(b) [8 U.S.C. § 1184(b)]." Ex. 239 at 5.

162. The cable states that if an officer is "unable to review any aspect of an applicant's online presence because social media accounts are set to 'private' or otherwise limited," they should treat the applicant as having "fail[ed] to provide certain information on request," and "consider whether such failure reflects evasiveness or otherwise calls into question the applicant's credibility." Ex. 239 at 5.

163. The cable instructs officers to "consider as potentially derogatory *any indications of hostility* towards the citizens, culture, government, institutions, or founding principles of the United States; *of advocacy for, aid, or support for* designated foreign terrorists and other threats to U.S. national security; *or of support for* unlawful antisemitic harassment or violence." Ex. 239 at 5–6 (emphasis added).

164. In relation to potential ineligibility under 8 U.S.C. § 1184(b), the cable states that "for applicants who demonstrate a history of political activism, especially when it is associated with violence *or* with the views and activities [just] described," officers "must consider the likelihood they would continue such activity in the United States and, if so, whether such activity is consistent with the nonimmigrant visa classification they seek." Ex. 239 at 7 (emphasis added).

165. The cable provides that where an applicant who has engaged in support for foreign terrorists or antisemitic conduct overcomes 8 U.S.C. § 1184(b), *and* the information uncovered

does not rise to the level of an ineligibility under any other provision of 8 U.S.C. § 1182(a)(3) (i.e., the security and related grounds), Ex. 239 at 6, officers "should pursue a finding that the applicant is ineligible under [the foreign policy provision]," Ex. 239 at 8. In other words, the cable lays out various statutory pathways that all reach the same goal: revoke the visa of individuals who have engaged in disfavored speech or activity.

166. The cable confirms that engaging in pro-Palestinian protest is disfavored by referencing the following statement made by Secretary Rubio during remarks to the press on March 28, 2025 regarding Mr. Khalil's arrest: "[W]e do not seek to import activists who will disrupt and undermine scholarly activity at U.S. universities." Ex. 36; *see also* Ex. 239 at 7.

167. As with the other cables, the guidance described in the Expanded Screening Cable is equally applicable in the State Department's visa revocation decisions. July 11, Tr., Vol. 2, 75:3–19 (Smith).

**iv. The FAM**

168. [redacted]

169. The FAM sub-provision dealing with "prudential" visa revocations, 9 FAM 403.11-5(B), was updated on April 29, 2025. Ex. 215 at 6–7. That sub-provision is immediately followed by a second sub-provision that was updated or introduced on April 29, 2025, 9 FAM 403.11-5(C), yet that provision's contents are entirely redacted from the public version the FAM. Ex. 215 at 7.

170. Plaintiffs specifically requested that Defendants produce the contents of 9 FAM 403.11-5(C) in discovery. ECF No. 155, Ex. B. Defendants ignored this request. Given the provision's clear relevance to the subject matter of this litigation, Defendants' failure to produce

the text of 9 FAM 403.11-5(C) supports an adverse inference that the provision recorded a new policy or process for revoking nonimmigrant visas subject to the ideological deportation policy.

171. Additionally, the FAM sub-provision that sets forth the criteria for student visa eligibility, 9 FAM 402.5-5(C), was updated on April 29, 2025. Ex. 213 at 4–5. That provision is immediately followed by a second provision, titled "Intent to Solely Pursue a Full Course of Study," 9 FAM 402.5-5(C)(1), that was updated or introduced on April 29, 2025, yet that provision's contents are entirely redacted from the public version of the FAM. Ex. 213 at 5.

172. In response to Plaintiffs' request that Defendants produce the contents of 9 FAM 402.5-5(C)(1), ECF No. 155, Ex. B, Defendants produced a heavily redacted version of the provision that was heavily redacted on law enforcement privilege grounds. Ex. 55. This version makes clear that the provision sets forth criteria that trigger mandatory social media review to determine whether a student visa applicant intends "to pursue activities that are not consistent with a full course of study." Ex. 55 at 1. Read against the background of the cables just described, this provision very likely provides further evidence that the State Department views engaging in pro-Palestinian protest as inconsistent with holding a student visa under 8 U.S.C. § 1184(b), and therefore a ground for revoking a noncitizen student's visa.

**C. Defendants enforce the ideological deportation policy, including against the five targeted noncitizens.**

173. Defendants have enforced the ideological deportation policy by targeting noncitizens for arrest, detention, and deportation based on their pro-Palestinian advocacy.

**1. Defendants target noncitizen students and faculty for deportation based on their lawful pro-Palestinian advocacy.**

174. The defendant agencies have targeted numerous—potentially hundreds—of noncitizen students and faculty based on their lawful pro-Palestinian advocacy. They have

admitted this in statements to the public. For example, on March 28, Secretary Rubio was asked whether the administration's first 300 visa revocations "related to pro-Palestinian protests"; he responded that there were "a few that are not," signaling that most of the revocations to that point were in fact based on pro-Palestinian advocacy. *See supra* ¶ 27. Since then, senior administration officials have continued to say publicly that they intend to continue deportations under the policy. *See, e.g.*, ¶ 24.

175. The cases of the five "Targeted Noncitizens" as to which the Court permitted discovery confirm the public accounts of how Defendants' have enforced the ideological deportation policy.

176. The evidence adduced at trial shows that the Targeted Noncitizens were targeted by Defendants for their pro-Palestinian expression; that the "investigation" of them by HSI consisted of assembling unvetted allegations made by third parties who claimed that they are antisemitic or pro-Hamas; that DHS forwarded this collection of allegations, without any further vetting, to the State Department; that the State Department relied on the allegations without conducting any further vetting itself; and that in four of the five cases the Secretary of State then issued a determination that the individuals are deportable on the basis of "beliefs, statements, or associations that are otherwise lawful." In the fifth case, Ms. Öztürk's, Senior Bureau Official John Armstrong revoked her visa under the State Department's visa-revocation authority. *See* 8 U.S.C. § 1201(i). The evidence also shows that Defendants made it a priority to single out the Targeted Noncitizens for immediate arrest.

**a. Mahmoud Khalil**

177. Mahmoud Khalil is a legal permanent resident who recently graduated from Columbia University. [redacted]

178. Prior to his arrest, detention, and attempted deportation, Mr. Khalil engaged in pro-Palestinian expression and association. He was a leader in the pro-Palestinian protests that took place at Columbia University during the 2023–2024 academic year. July 8 Tr., Vol. 2, 142:18–143:8 (Prof. Abu El-Haj). And he was present at the student encampment on Columbia's campus during those protests. July 9 Tr., Vol. 1, 5:20–6:2 (Prof. Abu El-Haj).

179. Mr. Khalil was one of the few student protesters at Columbia willing to speak publicly and make statements to the press without wearing a mask to hide his identity. July 8 Tr., Vol. 2, 143:9–21 (Prof. Abu El-Haj). He spoke multiple times at press conferences, at the student encampment, and after the encampment was shut down. July 9 Tr., Vol. 1, 5:20–23 (Prof. Abu El-Haj).

180. Mr. Khalil's speech was critical of the Israeli government and its conduct in Gaza. July 9, Tr., Vol. 1, 8:1–12 (Prof. Abu El-Haj). He expressed the view that Israel's military campaign in Gaza constitutes a genocide, and he criticized the political ideology of Zionism for having produced inequality for Palestinians. *Id.* He levied his criticism at Israel for its conduct as a state, *id.*, and he often spoke out against antisemitism, July 9, Tr., Vol. 1, 23:17–18 (Prof. Abu El-Haj). Mr. Khalil did not espouse violence, did not engage in violence, did not threaten others, and did not engage in antisemitic behavior. July 9, Tr., Vol. 1, 7:5–8:12 (Prof. Abu El-Haj).

181. Mr. Khalil was a thoughtful and calm presence at the student demonstrations on campus. July 8 Tr., Vol. 2, 144:10–18 (Prof. Abu El-Haj). He was not an agitator, and he was never arrested or accused of any crimes. *Id.*

182. Mr. Khalil was also a key negotiator between the Columbia administration and the student demonstrators during the student encampment. July 8 Tr., Vol. 2, 143:11–13 (Prof. Abu El-Haj). In his capacity as negotiator, Mr. Khalil attempted to broker a peaceful end to the

encampment by reaching an agreement between the student demonstrators and the Columbia administration, so that the students could voluntarily leave the encampment before the university called the police in for a second time. July 8 Tr., Vol. 2, 143:24–144:3 (Prof. Abu El-Haj).

183. Mr. Khalil's expressive and associational activities related to Israel and Palestine drew the attention of Canary Mission.

184. Canary Mission's website has a profile on Mahmoud Khalil. Ex. 231. The profile asserts that Mr. Khalil led "anti-Israel protests at Columbia," including "a rally where activists chanted 'From the river to the sea'"; that Khalil "justified Hamas terrorism"; that the New York *Post* reported that a group he associates with "seeks the 'total eradication of Western civilization'"; and that he participated in the "[t]he Pro-Hamas Encampment at Columbia[.]" Ex. 231 at 1–3.

185. DHS targeted Mr. Khalil pursuant to the ideological deportation policy based on his expressive and associational activities and Canary Mission's unsubstantiated claims about those activities.

186. On March 6, HSI's Office of Intelligence created a report of analysis about Mr. Khalil. July 10 Tr., Vol. 1, 46:19–47:5 (Hatch); Ex. 233. The report included a link to Canary Mission's profile of Khalil and a Canary Mission Instagram post about Khalil, both under a subsection titled "News Articles." Ex. 233; July 10 Tr. 48:23–50:14 (Hatch). It also included articles from other sources, including the *New York Post*. Ex. 233; July 10 Tr., Vol. 1, 50:2–6 (Hatch). [redacted] Ex. 233 at 2; [redacted] Ex. 233 at 2.

187. Other than biographical and travel information, the information about Mr. Khalil contained in the report of analysis consists entirely of accounts of Mr. Khalil's expressive and associational activities, as well as unsubstantiated third-party allegations. Ex. 233.

188. Mr. Hatch testified that the only articles included in the report of analysis on Mr. Khalil are those "that relate to protests of Israel and Palestine, and not any other topic." July 10 Tr., Vol. 1, 50:22–51:1.

189. Senior HSI leaders discussed the report of analysis on Mr. Khalil before HSI's Office of Intelligence sent it to HSI's National Security Division for possible referral to the State Department. *See supra* ¶¶ 74–75.

190. On March 7, 2025, Assistant Director of the National Security Division Andre Watson sent a letter referring Mr. Khalil to the State Department. Ex. 242. The letter attached the report of analysis, *see* July 17, Tr., Vol. 1, 82:18 (Watson) ("the letters accompany the ROA"), and its first sentence stated: "I am writing to provide a summary of the actions by Mahmoud Khalil that violate President Trump's executive orders on anti-Semitism." Ex. 242; July 17 Tr., Vol. 1, 81:23–82:2 (Watson). [REDACTED] Ex. 242. [REDACTED] Ex. 242; July 17 Tr., Vol. 1, 88:18–89:5 (Watson), [REDACTED] Ex. 242 at 1, [REDACTED] *id.* [REDACTED] Ex. 242 at 1. It also suggested that Khalil's actions "may be sufficient for the Secretary of State to determine there are compelling adverse foreign policy consequences for the United States from [Khalil's] presence or activities," Ex. 242; July 17

Tr., Vol. 1, 84:12–23 (Watson), and stated that, [redacted] Ex. 242 at 2.

191. In making the referral to the State Department, Watson relied only on the report of analysis. PFOF ¶ 92.

192. On the same day as Watson's referral, Deputy Special Agent in Charge ("DSAC") Darren McCormack of HSI New York became "aware of" Mr. Khalil, when he received initial instructions to locate Khalil and "establish a pattern of life with surveillance." July 15 Tr., Vol. 2, 101:16–24; 86:12–14 (McCormack). These instructions came from HSI leadership at headquarters. July 15 Tr., Vol. 2., 101:25–102:6; 106:7–8 (McCormack). DSAC McCormack was told by the acting assistant director for domestic operations at HSI, William Walker, that the "Secretary of State and/or the White House had an interest in Mr. Khalil." July 15 Tr. 102:17–103:18.

193. Once the State Department received the referral letter from DHS, Secretary Rubio acted quickly to issue a determination that Mr. Khalil was removable.

194. On March 8, one day after Watson issued the referral letter regarding Mr. Khalil to the State Department (and after DSAC McCormack had already received instructions to target Khalil), Senior Bureau Official John Armstrong sent an action memo to Secretary Rubio, [redacted] Ex. 247; July 18 Tr., Vol. 1, 47:1–7 (Armstrong). The action memo [redacted] Ex. 247. The action memo stated that [redacted]



Ex. 247.

195. Explaining the basis for a potential Rubio determination, the action memo stated: Ex. 247 at 2. Armstrong continued on to state that Ex. 247.

196. Ex. 247.

197. Secretary Rubio approved Armstrong's recommendation and sent a memo to Secretary Noem, notifying her of his determination that Mr. Khalil is removable under the foreign policy provision. Ex. 8. The memo specifically invoked the exception within the foreign policy provision for "beliefs, statements, or associations that are otherwise lawful." *Id.* In the memo, Rubio said his determination is based on information provided by HSI regarding Mr. Khalil's participation in "antisemitic protests and disruptive activities, . . . [that] undermine U.S. policy to combat anti-Semitism around the world and in the United States." *Id.* The memo attached the report of analysis and HSI referral letter pertaining to Mr. Khalil. *Id.*

198. DHS immediately acted on Secretary Rubio's determination by arresting and detaining Mr. Khalil. That same day, ICE arrested Mr. Khalil around 8:30 PM. July 10 Tr., Vol.

2, 116:13–117:12, 119:4–121:18 (Greer); Ex. 237. Four agents in plain clothes cornered Mr. Khalil and his wife, Dr. Noor Abdalla, in the lobby of their apartment building, handcuffed Mr. Khalil, put him in an unmarked vehicle, and refused to give their names to Khalil's wife or to his lawyer, Amy Greer, who was on the phone with Dr. Abdalla during the arrest. *Id.*

199. After arresting Mr. Khalil, agents transported him to 26 Federal Plaza, "a federal processing facility for HSI and [Enforcement and Removal Operations ("ERO")]," and once processed, he "was turned over to ERO custody." July 15 Tr., Vol. 2, 96:18–21 (McCormack).

200. Defendants subsequently publicized Mr. Khalil's arrest, characterizing his expressive and associational activities as pro-Hamas, and tacitly confirming that he was targeted for lawful political expression.

201. On March 9, Secretary Rubio posted to X a news article about Mr. Khalil's arrest and commented: "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported." Ex. 26.

202. The same day, DHS posted on its official X account that Mr. Khalil had led activities "aligned to" Hamas, and that ICE had arrested him "in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State." Ex. 25.

203. On March 10, President Trump posted to Truth Social, announcing Mr. Khalil's arrest, and said: "This is the first arrest of many to come. We know there are more students at Columbia and other Universities across the Country who have engaged in pro-terrorist, anti-Semitic, anti-American activity, and the Trump Administration will not tolerate it. Many are not students, they are paid agitators. We will find, apprehend, and deport these terrorist sympathizers from our country — never to return again." Ex. 27.

204. On March 13, Deputy Secretary of Homeland Security Troy Edgar gave an interview on NPR, in which he was asked repeatedly how Mr. Khalil supported Hamas. His answer: "Well, I think you can see it on TV, right? This is somebody that we've invited and allowed the student to come into the country, and he's put himself in the middle of the process of basically pro-Palestinian activity." Ex. 29.

205. In the same interview, Mr. Edgar said: "Let me put it this way, . . . imagine if he came in and filled out the form and said, 'I want a student visa.' They asked him, 'What are you going to do here?' And he says, 'I'm going to go and protest.' We would have never let him into the country." Ex. 29.

206. On March 16, Secretary Rubio described Mr. Khalil's arrest in an interview on CBS. When asked about the "specific justification for the revocation of [Khalil's] visa," Secretary Rubio said: "Well, [Khalil] was the spokesperson, was the negotiator—negotiating on behalf of people that took over a campus, that vandalized buildings. Negotiating over what? That's a crime in and of itself that they're involved in being the negotiator or the spokesperson, this, that, the other. We don't want—we don't need these people in our country. We never should have allowed them in in in the first place. If he had told us, I'm going over there and I'm going over there to become the spokesperson and one of the leaders of a movement that's going to turn one of your allegedly elite colleges upside down, people can't even go to school, the library—buildings being vandalized, we never would have let him in. We never would have let him in to begin with. And now that he's doing it and he's here, he's going to leave and so are others, and we're going to keep doing it." Ex. 33.

**b. Rümeysa Öztürk**

207. Rümeysa Öztürk is a doctoral student in Child Study and Human Development at Tufts University. July 8 Tr., Vol. 2, 121:15–122:7 (Johnson). She came to the United States on an F-1 student visa. [redacted]

208. Prior to her arrest, detention, and attempted deportation, Ms. Öztürk engaged in pro-Palestinian expression and association.

209. On March 26, 2024, Ms. Öztürk co-authored an op-ed in the Tufts Daily, titled "Try Again, President Kumar: Renewing Calls for Tufts to Adopt March 4 TCU Senate Resolutions." Ex. 226; July 8 Tr., Vol. 2, 124:16–125:18 (Johnson).

210. In that op-ed, Ms. Öztürk and her co-authors criticized Tufts University President Kumar's "automatic rejection, dismissive nature and condescending tone" with respect to three resolutions passed by the Tufts Community Union ("TCU") Senate on March 4, which "demand[ed] that the University acknowledge the Palestinian genocide, apologize for University President Sunil Kumar's statements, [and] disclose its investments and divest from companies with direct or indirect ties to Israel." Ex. 226 at 1. The op-ed stated: "Graduate Students for Palestine joins Tufts Students for Justice in Palestine, the Tufts Faculty and Staff Coalition for Ceasefire and Fletcher Students for Palestine to reject the University's response" to the resolutions. Ex. 226 at 1.

211. Ms. Öztürk and her co-authors argued that "[t]he open and free debate demonstrated by the Senate process . . . , together with the serious organizing efforts of students, warrant credible self-reflection by the Office of the President and the University." Ex. 226 at 1. They "affirm[ed] the equal dignity and humanity of all people[,]" and "urge[d] President Kumar and the Tufts administration to meaningfully engage with and actualize the resolutions passed by the Senate." Ex. 226 at 1–2.

212. Ms. Öztürk's expressive activities drew the attention of Canary Mission.

213. Canary Mission's website has a profile on Ms. Öztürk. Ex. 227; July 8, Tr., Vol. 2, 127:25–129:11. In the profile, Canary Mission alleges that Ms. Öztürk "engaged in anti-Israel activism in March 2024," and that she "is a supporter of the Boycott, Divestment, Sanctions (BDS) movement" Ex. 227 at 1. The only evidence in the profile of Ms. Öztürk's alleged anti-Israel activities or political beliefs is the March 26, 2024 Tufts Daily op-ed. Ex. 227 at 2.

214. Canary Mission's profile on Ms. Öztürk also lists two courses that Ms. Öztürk teaches at Tufts University. Ex. 227 at 1.

215. DHS targeted Ms. Öztürk pursuant to the ideological deportation policy based on her expressive activities and Canary Mission's unsubstantiated claims about those activities.

216. On March 17, 2025, HSI's Office of Intelligence created a report of analysis on Ms. Öztürk. Ex. 232; July 10 Tr., Vol. 1, 28:15–24 (Hatch). The report included in its "Analysis Findings" section the allegation that Ms. Öztürk co-authored "an Op-Ed calling for divestment from Israel" and that she "associates with Tufts Students for Justice in Palestine, which was suspended for calls for student intifada." Ex. 227 at 1; July 10 Tr. 31:24–32:4 (Hatch).

217. The report appends the Canary Mission profile on Ms. Öztürk in its entirety. Ex. 232 at 3. [REDACTED] *Id.*

218. The report also appends Ms. Öztürk's March 26, 2024 Tufts Daily op-ed in its entirety, Ex. 232 at 9–12, [REDACTED] Ex. 232 at 6–8.

219. Finally, [REDACTED], Ex. 232 at 5, [REDACTED]



[redacted] Ex. 232 at 4.

220. When asked about the report of analysis on Ms. Öztürk, Assistant Director of HSI's Office of Intelligence Peter Hatch conceded that the only articles included in the report are those "that relate to protests of Israel and Palestine, and not any other topic." July 10, Tr., Vol. 1, 50:22–51:1.

221. Senior HSI leaders discussed the report of analysis on Ms. Öztürk before Hatch's office sent it to HSI's National Security Division for possible referral to the State Department. PFOF ¶¶ 74–75.

222. On March 21, Assistant Director of the National Security Division Andre Watson sent a letter referring Ms. Öztürk to the State Department. Ex. 245; July 17, Tr., Vol. 1, 75:13–25; 76:1–2 (Watson). The letter attached the report of analysis, *see* July 17, Tr., Vol .1, 82:18 (Watson), and [redacted] Ex. 245 at 1. The letter stated: [redacted] Ex. 245 at 1. The letter then summarized material in the report of analysis and suggested that [redacted] Ex. 245 at 2. The letter stated that [redacted]


[redacted] *Id.* The letter stated: [redacted] Ex. 245 at 2.

223. In making the referral to the State Department, Watson relied only on the report of analysis. PFOF ¶ 92.

224. Once the State Department received the referral letter from Watson, it moved quickly to revoke Ms. Öztürk's visa.

225. On March 21, the same day that Watson transmitted his referral letter regarding Ms. Öztürk to the State Department, Stuart Wilson of the State Department's Visa Office wrote an action memo for John Armstrong [redacted] Ex. 250. [redacted] Ex. 250 at 3. Armstrong reviewed the action memo, marked it in handwritten annotations, and approved both recommendations on the same day, March 21. Ex. 250 at 1; July 11, Tr., Vol. 2, 116:22–117:15.

226. The action memo [redacted] Ex. 250 at 2. [redacted] Ex. 250 at 2.



227. The action memo stated that Öztürk [redacted] Ex. 250 at 2. The action memo noted that HSI's referral [redacted] but clarified that it [redacted] Ex. 250 at 2. The action memo also noted that the HSI referral did not include [redacted] *Id.* at 2–3. Armstrong annotated the paragraph [redacted] "actions, not words." Ex. 250 at 2; *see also* PFOF ¶ 126 (describing Armstrong's testimony on this point).

228. The action memo concluded: [redacted] Ex. 250 at 3.

229. According to Armstrong, the basis for his decision to revoke Ms. Öztürk's visa was her "antisemitic activities in the U.S., as detailed [in the action memo]. It talks about creating a hostile environment for Jewish students, and indicating support for a designated terrorist organization. I believe it was Hamas, but it might have been Hezbollah." July 11 Tr., Vol. 2, 117:23–118:2. Armstrong also testified that his decision was based in part on the op-ed and also on Ms. Öztürk's "association[s]" with Tufts student groups. July 18, Tr., 64:22–65:4.

230. Also on March 21, Armstrong notified Andre Watson at HSI's National Security Division that the Bureau of Consular Affairs had revoked Ms. Öztürk's visa under 8 U.S.C. § 1201 (i), "effective immediately," based on her "associations . . . including co-authoring an op-ed that found common cause with an organization that was later temporarily banned from campus[.]" Ex. 16. His memo stated: "Due to ongoing ICE operational security, this revocation will be silent; the Department of State will not notify the subject of the revocation." *Id.*

231. In short order, DHS followed up on the State Department's visa revocation by arresting and detaining Ms. Öztürk.

232. 

233.

[8] On July 9, this Court ordered a subset of documents the defendants submitted for *in camera* review to be turned over to Plaintiffs as a part of the record. July 9, Tr., Vol. 2, 85:17–24. In doing so, the Court explained that these documents "reveal[] the process that [law enforcement agents] went through to follow the law[,]" and are therefore relevant to this case. *Id*. 81:19–82:3. Pursuant to this Order, on July 10, the defendants produced documents marked Exhibits ET, EU, EV, EW, EX, and EY as part of the record. July 10, Tr., Vol. 1, 4:22–24.

234. [REDACTED] supports the inference that Defendants' goal was simply to deport Ms. Öztürk by any means necessary.

235. [REDACTED]

236. On March 25, special agents from HSI Boston arrested Ms. Öztürk. July 15, Tr., Vol. 1, 48:21–24 (Cunningham); Ex. 225. Five agents in plain clothes cornered Öztürk on the sidewalk, told her they were "the police," handcuffed her, and drove her away in an unmarked vehicle. Ex. 225. Some of the agents who arrested her were wearing masks, others were wearing hoods, caps, and sunglasses that obscured their faces. Ex. 225; July 15, Tr., Vol. 1. 49:18–20 (Cunningham).

237. After HSI arrested Ms. Öztürk, HSI immediately transferred her to Vermont, where she was processed. July 15, Tr., Vol. 1, 53:16–21 (Cunningham).

238. HSI relinquished custody of Ms. Öztürk after she was processed in Vermont. *Id.* 55:13–16. ICE later transferred Ms. Öztürk to a detention facility in Louisiana. *Öztürk v. Trump*, No. 2:25-CV-374, 2025 WL 1145250, at *3 (D. Vt. Apr. 18, 2025).

239. Defendants widely publicized Ms. Öztürk's arrest, characterizing her speech as incompatible with her student visa.

240. On March 27, Secretary Rubio commented on Öztürk's visa revocation: "We revoked it, and here's why—and I'll say it again; I've said it everywhere. Let me be abundantly clear, okay. If you go apply for a visa right now anywhere in the world—let me just send this

message out—if you apply for a visa to enter the United States and be a student and you tell us that the reason why you're coming to the United States is not just because you want to write op-eds, but because you want to participate in movements that are involved in doing things like vandalizing universities, harassing students, taking over buildings, creating a ruckus, we're not going to give you a visa. If you lie to us and get a visa and then enter the United States and with that visa participate in that sort of activity, we're going to take away your visa." Ex. 35.

241. On March 28, when asked to explain Öztürk's visa revocation, Secretary Rubio stated: "The activities presented to me meet the standard of what I've just described to you: people that are supportive of movements that run counter to the foreign policy of the United States. . . . The overwhelming majority of student visas in this country will not be revoked, because the overwhelming majority of people that are coming to this country to study are not involved and associated or aligned with organizations that seek to do damage in this country, and that [are], frankly, organizations that hate the United States Government and hate our way of life. So I just think it's crazy to continue to provide visas so people can come here and advocate for policies that are in direct contradiction of our national interest." Ex. 36 at 8-9.

242. On May 7, DHS Assistant Secretary Tricia McLaughlin reacted to a district court's order that the government transfer Öztürk from Louisiana back to Vermont, saying: "is a privilege not a right[,]" and "[t]oday's ruling does not prevent the continued detention of Ms. Ozturk [*sic*], and we will continue to fight for the arrest, detention, and removal of aliens who have no right to be in this country." Ex. 42.

**c. Mohsen Mahdawi**

243. Mohsen Mahdawi is a legal permanent resident and was an undergraduate student at Columbia University. [redacted]

244. Prior to his arrest, detention, and attempted deportation, Mr. Mahdawi engaged in pro-Palestinian expression and association.

245. Mr. Mahdawi participated in the student protests at Columbia University in 2023 and 2024, and was a leader of a Palestinian student group. July 9, Tr., Vol. 1, 11:5–8, 19–24 (Prof. Abu El-Haj). He spoke publicly about Israel and Palestine. July 9, Tr., Vol. 1, 11:25–12:2, 12:22–13:6 (Prof. Abu El-Haj); Ex. 228. He was often a speaker at demonstrations and rallies. July 9, Tr., Vol. 1, 11:17–18. He was one of the more vocal voices in the pro-Palestinian student movement at Columbia, speaking publicly without ever wearing a mask to hide his identity. July 9, Tr., Vol. 1, 11:9–15.

246. For instance, during a vigil on Columbia's campus attended by Prof. Nadia Abu-El Haj in November 2023, Mr. Mahdawi gave a public address to a group of students, faculty, and other spectators. July 9, Tr., Vol. 1, 13:3–6, 14:13–16:19, 20:21–21:6; Ex. 228. During that address, Mr. Mahdawi said to the crowd that "from the river to the sea, Palestine will be free" is a call for "a Palestine [that] will be free for everybody. Free for Jews, for Christians, for Muslims. No more apartheid, no more genocide." Ex. 228. He then led the crowd in a chant of "from the river to the sea, Palestine will be free." *Id.*

247. Mr. Mahdawi did not engage in violence, did not threaten other students or anyone else, did not harass other students, and did not engage in antisemitic behavior. July 9, Tr., Vol. 1, 23:5–18 (Prof. Abu El-Haj).

248. To the contrary, Mr. Mahdawi often spoke out against antisemitism. July 9, Tr., Vol. 1, 23:17–18 (Prof. Abu El-Haj). Towards the end of the November 2023 vigil, someone in the crowd shouted an antisemitic message, and Mr. Mahdawi and others immediately shut this

individual down and rejected his message. *Id.* 21:8–13. Mr. Mahdawi then asked this individual to leave and made a statement about antisemitism. *Id.* 21:13–15.

249. Prof. Abu El-Haj understood Mr. Mahdawi to have a distinctive message when speaking about issues related to Israel and Palestine on campus. *Id.* 12:10–16. Specifically, she understood his message to reflect the principles of restorative justice, liberty, and democracy. *Id.* She understood Mr. Mahdawi to be influenced by Dr. Martin Luther King, Jr., and committed to nonviolent resistance. *Id.*

250. Mr. Mahdawi's expressive and associational activities drew the attention of Canary Mission.

251. Canary Mission's website has a profile on Mr. Mahdawi. July 9, Tr. 33:1–4; Ex. 230. In the profile, Canary Mission alleges that Mahdawi has "called for Israel's destruction and justified Hamas terrorism[.]" Ex. 230. As evidence, Canary Mission cites to the same November 2023 event at Columbia described above, *see supra* ¶¶ 246, 248, where Mahdawi led the crowd in chanting "from the river to the sea, Palestine will be free." Ex. 230 at 3. The profile also alleges that Mahdawi "showed support for the pro-Hamas encampment at Columbia[.]" Ex. 230 at 2. The profile notes that Mahdawi is a supporter of the Boycott, Divestment, Sanctions (BDS) movement. *Id.* at 2. It also states that in December 2023 he served as the co-president of Columbia's Palestinian student union DAR Palestine, that he was affiliated with "the pro-terror activist group Within our Lifetime (WOL) in 2023," and that he was "reportedly a member of Student for Justice in Palestine (SJP) that same year." *Id.*

252. DHS targeted Mr. Mahdawi pursuant to the ideological deportation policy based on his expressive and associational activities and Canary Mission's unsubstantiated claims about those activities.

253. On March 12, 2025, HSI's Office of Intelligence created a report of analysis about Mr. Mahdawi. July 10, Tr., Vol. 1, 59:21–60:3 (Hatch); Ex. 235. The report included [redacted] Ex. 235 at 4–6.

254. Senior HSI leaders discussed the report of analysis on Mr. Mahdawi before the Office of Intelligence sent it to HSI's National Security Division for possible referral to the State Department. *See supra* ¶¶ 74–75.

255. On March 14, Andre Watson of HSI's National Security Division sent a letter referring Mr. Mahdawi to the State Department. Ex. 244; July 17, Tr., Vol. 1, 75:13–25; 76:1–2 (Watson). The letter attached the report of analysis, *see id.* 82:18 (Watson), and it sought a [redacted] Ex. 244 at 1. The letter identified [redacted] Ex. 244 at 1. The letter [redacted] Ex. 244 at 2. [redacted] *Id.*

256. In making the referral to the State Department, Watson relied only on the report of analysis. PFOF ¶ 9392.

257. Once the State Department received the referral letter from DHS, Secretary Rubio acted quickly to issue a determination that Mr. Mahdawi was removable. The day after Mr. Watson transmitted the referral letter regarding Mr. Mahdawi to the State Department, John Armstrong sent an action memo to Secretary Rubio, [REDACTED], and recommending that Rubio determine Mr. Mahdawi to be removable under the (4)(C) foreign policy provision. Ex. 248; July 18, Tr., Vol. 1, 49:20–50:23 (Armstrong). The action memo also recommended that [REDACTED] Ex. 248 at 1. The action memo stated [REDACTED] Ex. 248 at 2.

258. Explaining the basis for a potential Rubio determination, the action memo stated: [REDACTED] Ex. 248 at 2; July 11, Tr., Vol. 2, 113:15–19. The action memo noted that the report of analysis [REDACTED] Ex. 248 at 2.

259. The action memo appeared [REDACTED]



[redacted] Ex. 248 at 2.

260. The action memo stated that [redacted] Ex. 248 at 3, and predicted: [redacted] Ex. 248 at 4.

261. Secretary Rubio then sent a memo to Secretary Noem, notifying her of his determination that Mr. Mahdawi is deportable under the foreign policy provision. Ex. 12. The memo specifically invoked the exception within the foreign policy provision for "beliefs, statements, or associations that are otherwise lawful." *Id.* at 1. In the memo, Rubio said his determination is based on information provided by HSI "that Mahdawi, through his leadership and involvement in disruptive protests at Columbia University, has engaged in anti-Semitic conduct through leading pro-Palestinian protests and calling for Israel's destruction." Ex. 12. Rubio added that "protests of the type led by Mahdawi potentially undermine the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the regional [sic] and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict." Ex. 12 at 2. The determination memo attached the report of analysis and Watson's referral letter pertaining to Mr. Mahdawi. *Id.*

262. DHS acted on Secretary Rubio's determination by arresting and detaining Mr. Mahdawi.

263. On April 14, special agents from HSI arrested Mr. Mahdawi at the conclusion of his naturalization interview at the CIS office in Colchester, Vermont. July 15, Tr., Vol. 1, 23:11–

17; 27:14–18, 37:20–24 (Crogan). The interview was conducted in a secure government building. *Id.* 36:25–37:19. Between ten and fifteen agents were present for Mr. Mahdawi's arrest, *id.* 16:17–18, including Assistant Special Agent in Charge William Crogan, *id.* 15:7–10. Some of the agents wore masks. *Id.* 29:7–14. Mr. Mahdawi was handcuffed, put into an HSI vehicle, and transported to the HSI office in South Burlington, Vermont, *id.* 29:7–21, and then transferred by ERO to the airport in Burlington, where ERO attempted to fly Mr. Mahdawi from Vermont to Louisiana, *id.* 30:15–31:1, 33:14–34:3.

**d. Badar Khan Suri**

264. Badar Khan Suri is postdoctoral fellow sponsored by Georgetown University.

265. Dr. Khan Suri is a citizen of India and is in the United States on a nonimmigrant exchange (J1) visa.

266. Dr. Khan Suri is married to a U.S. citizen.

267. DHS targeted Dr. Khan Suri pursuant to the ideological deportation policy based on his expressive activities and associations.

268. On March 10, 2025, HSI's Office of Intelligence prepared a report of analysis on Dr. Khan Suri. Ex. 234; July 10, Tr., Vol. 1, 52:9–25 (Hatch).

269. Ex. 234 at 1; *see also* July 10, Tr., Vol. 1, 54:7–10 (Hatch).

270. Ex. 234 at



3–4. [redacted] *Id.* at 4.

271. In the same section, the report includes a "Twitter posting . . . by someone else, not Mr. Suri, another person, Anna Stanley, with claims about Mr. Suri." July 10 Tr., Vol. 1, 55:7–10 (Hatch); Ex. 234 at 4. The report indicates that [redacted] Ex. 234 at 4.

272. The report also states that "KHAN SURI appears to post pro-Palestinian content." Ex. 234 at 5; July 10, Tr., Vol. 1, 56:14–23. [redacted] Ex. 234 at 5.

273. The report includes [redacted] Ex. 234 at 5. It also incorporates [redacted] *Id.* at 6.

274. Assistant Director of HSI's Office of Intelligence Peter Hatch reviewed Dr. Khan Suri's report of analysis at least once before it was sent to HSI's National Security Division. July 10, Tr., Vol. 1, 52:15–21.

275. On March 14, Assistant Director of HSI's National Security Division Andre Watson sent a letter referring Dr. Khan Suri to the State Department. Ex. 246; July 17, Tr., Vol. 1, 75:13–25, 76:1–2. The letter, which attached the report of analysis, *see* Ex. 246 at 2; July 17, Tr., 82:18, summarized [redacted]. Ex. 246 at 1. The letter stated: [redacted]



*Id.* The letter asserted that

*Id.* The letter also stated that

*Id.*

276. In making the referral to the State Department, Watson relied only on the report of analysis. PFOF ¶ 92.

277. Once the State Department received the referral letter from DHS, it moved quickly to revoke Dr. Khan Suri's visa.

278. On March 15, John Armstrong sent an action memo to Secretary Rubio, attaching the report of analysis and referral letter. Ex. 249; July 18 Tr., Vol. 1, 50:5–23 (Armstrong). The action memo recommended that Secretary Rubio determine that Dr. Khan Suri is removable under the (4)(C) foreign policy provision, and that Secretary Rubio authorize

Ex. 249 at 1. In support of its recommendations, the action memo observed that Dr. Khan Suri

It also stated:

Ex. 249 at 2. It noted that



[redacted] *Id.*

279. The memo stated that the State Department [redacted] *Id.*

280. The memo also observed that [redacted] *Id.* at 4.

281. Secretary Rubio then sent a memo to Secretary Noem, notifying her of his determination that Dr. Khan Suri is deportable under the foreign policy provision. Ex. 21. The memo specifically invoked the exception within the foreign policy provision for "beliefs, statements, or associations that are otherwise lawful." *Id.* at 1. In the memo, Secretary Rubio stated that his determination was based on HSI's assessment that "Suri's direct connection to Hamas leadership and involvement in antisemitic activities . . . [creates] a hostile environment for Jewish students and [indicates] support for a designated terrorist organization." Ex. 21 (alterations in original). The memo cited HSI's assessment that "Suri is 'actively supporting Hamas terrorism' and 'actively spreads its propaganda and promotes antisemitism on social media.'" *Id.* It also stated: "[T]he type of intimidation and incitement attributable to [him] potentially undermines the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the regional [sic] and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict." *Id.* at 2.

282. The determination memo attached HSI's report of analysis and referral letter. *Id.*

283. DHS acted quickly on Secretary Rubio's determination by arresting and detaining Dr. Khan Suri on March 17, 2025. Ex. 22 (Notice to Appear); *see also Suri v. Trump*, No. 1:25-CV-480, 2025 WL 1310745, at *1 (E.D. Va. May 6, 2025).

284. Acting Special Agent in Charge ("ASAC") Christopher Heck oversaw Dr. Khan Suri's arrest but was not present at the time of arrest. July 15, Tr., Vol. 2, 114:20–21 (Heck).

285. ASAC Heck learned of Dr. Khan Suri "[s]ometime in mid March," July 15, Tr., Vol. 2, 115:15 (Heck), when he "received a phone call from our headquarters stating that the Department of State may deem Mr. Suri removable and that he may be amenable to administrative arrest at some point should that removability happen." *Id.* 115:17–20.

286. HSI headquarters also instructed Heck to "get out and start beginning surveillance to try and locate Mr. Suri in the event that the State Department deemed him removable." *Id.* 115:23–25. HSI surveilled Khan Suri. *Id.* 116:1–2.

287. Defendants' public statements about Dr. Khan Suri's arrest confirm that he was targeted based on his speech. For instance, on March 19, 2025, DHS Assistant Secretary for Public Affairs Tricia McLaughlin said: "Suri was a foreign exchange student at Georgetown University actively spreading Hamas propaganda and promoting antisemitism on social media." Ex. 34.

**e. Yunseo Chung**

288. Yunseo Chung is an undergraduate student at Columbia University.

289. Ms. Chung is a citizen of South Korea. She entered the United States at age seven and became a U.S. legal permanent resident in 2021.

290. DHS targeted Ms. Chung pursuant to the ideological deportation policy based on her expressive and associational activities.

291. On March 6, 2025, HSI's Office of Intelligence prepared a report of analysis on Ms. Chung. July 10 Tr., Vol. 1, 66:1–8 (Hatch); Ex. 236.

292. [redacted] Ex. 236 at 2. According to the report, both articles "describe her as being part of the protests." Ex. 236 at 2; July 10 Tr., Vol. 1, 67:7–12 (Hatch).

293. The report of analysis included [redacted] Ex. 236 at 2.

294. Under a section titled "Criminal History," the report also included a list of three charges—disorderly conduct, trespass, and obstructing governmental administration in the second degree—all made in the New York County Criminal Court. Ex. 236 at 1; July 10 Tr., Vol. 1, 67:21–68:15 (Hatch).

295. The report does not include the disposition of those charges. *Id.* 68:7–9.

296. Assistant Director of HSI's Office of Intelligence Peter Hatch reviewed Ms. Chung's report of analysis before it was sent to HSI's National Security Division. *Id.* 66:7–8.

297. On March 7, Assistant Director of HSI's National Security Division Andre Watson sent a letter referring Ms. Chung to the State Department. Ex. 243; July 17, Tr., Vol. 1, 75:13–25; 76:1–2. The letter attached the report of analysis, *Id.* 82:18, and its first sentence stated: [redacted] Ex. 243 at 1. The letter alleged [redacted] *Id.* As evidence, [redacted] *Id.* The letter expressed concern that Chung's [redacted]



[redacted] *Id.* It also suggested that her actions [redacted] and stated that, [redacted] *Id.*

298. In making the referral to the State Department, Watson relied only on the report of analysis. PFOF ¶ 92.

299. Once the State Department received the referral letter from DHS, it moved quickly to issue a determination that Ms. Chung was removable.

300. The day after Watson transmitted the referral letter regarding Ms. Chung to the State Department, Mr. Armstrong sent an action memo to Secretary Rubio recommending that Secretary Rubio determine Ms. Chung to be removable under the (4)(C) foreign policy provision of the INA. Ex. 247 at 1; July 18, Tr., Vol. 1, 47:1–7 (Armstrong). ([redacted]) The action memo also recommended that [redacted] Ex. 247 at 1. The action memo [redacted] *Id.* at 4.

301. As justification for the recommendations, the action memo noted that [redacted] Ex. 247 at 2. Citing to the [redacted] the action memo also stated

that Ms. Chung  The memo concluded that *Id*. at 3.

302. Secretary Rubio approved Armstrong's recommendation and then sent a memo to Secretary Noem, notifying her of his determination that Ms. Chung is deportable under the foreign policy provision. Ex. 19. The memo specifically invoked the exception within the foreign policy provision for "beliefs, statements, or associations that are otherwise lawful." *Id.* In the memo, Rubio said that his determination was based on "information provided by the DHS/ICE/HSI regarding the participation and role[] of Chung . . . in antisemitic protests and disruptive activities," and Ms. Chung's "citations for unlawful activity during these protests." *Id.* at 2.

303. Before HSI arrested Ms. Chung, her lawyers obtained a temporary restraining order enjoining the government from detaining her or transferring her from the jurisdiction of the district pending further order of the court. *Chung v. Trump*, 1:25-cv-02412 (S.D.N.Y. June 4, 2025), ECF No. 19.

304. At a hearing on May 29, 2025, Judge Buchwald asked whether ICE would agree to serve a Notice to Appear on Ms. Chung's counsel rather than through personal service effectuated after an arrest. ICE refused. Letter from Assistant U.S. Attorney Brandon Waterman to Hon. Naomi Reice Buchwald, *Chung v. Trump*, 1:25-cv-02412 (S.D.N.Y. June 4, 2025), ECF No. 56.

**2. Defendants arrest and detain four of the five targeted noncitizens.**

305. Defendants arrested Mr. Khalil, Ms. Öztürk, Mr. Mahdawi, and Dr. Khan Suri, and attempted to arrest Ms. Chung, as a warning to other noncitizen protesters. As explained below, the decision to prioritize their arrests was unusual. HSI's involvement in the arrests was unusual. The circumstances of the noncitizens' arrests and detentions were also frightening to other noncitizen students and faculty.

**a. The decision to prioritize arrests of the targeted noncitizens was unusual.**

306. ICE does not arrest every person who has experienced some change in immigration legal status. Assistant Director of HSI's National Security Division Andre Watson testified that, in the usual course, a noncitizen whose visa has been revoked or whose status has changed receives a notice to appear before an immigration judge. July 17, Tr., Vol. 1, 102:14–103:23. An action letter from the Department of State concerning a change in a person's immigration status can, but does not need to, result in an arrest. *Id.*

307. The HSI Special Agents who supervised the Targeted Noncitizens' arrests testified that they had not been involved in similar arrests before. They understood that the reason for arrest in each case was a State Department decision effectuating a change in legal status, not any suspected criminal violations. *See, e.g.,* July 15, Tr., Vol. 1, 21:11–22:1, 37:22–38:5 (Crogan). They prioritized the arrests because they understood senior officials at DHS and the State Department to have taken an unusual interest in the cases, and because HSI headquarters had instructed them to do so.

308. Deputy Special Assistant Agent in Charge Darren McCormack testified that on March 7, 2025, he received instructions from HSI leadership at headquarters to locate and

"establish a pattern of life with surveillance" on Mr. Khalil. July 15, Tr., Vol. 2, 101:16–102:3. At this time, he did not understand Mr. Khalil to be the subject to a criminal or civil enforcement action. *Id.* 102:11–15.

309. The next day, McCormack received a memo from the Secretary of State indicating that Mr. Khalil's status as a lawful permanent resident had changed. *Id.* at 103:24–104:12. McCormack had never received a memo like this before. *Id.* 105:14–17.

310. McCormack received the instruction to arrest Mr. Khalil from HSI headquarters. *Id.* 106:7–8 ("HSI headquarters said, 'Do your best to find him. If you find him, arrest him.'"). "At some point [he] was made aware that the Secretary of State and/or White House had an interest in Mr. Khalil." *Id.* at 103:14–15. Because HSI agents have not historically enforced Title 8 of the U.S. Code, he contacted William Joyce, Acting Field Office Director, New York for ERO, "to confirm there was a legal basis for [the] arrest." *Id.* 106:2–14.

311. ASAC Patrick Cunningham testified that he received instructions to locate and arrest Ms. Öztürk by email from HSI headquarters. July 15, Tr., Vol. 1, 68:5–8, 68:15–20, 69:4–8. That email attached a memo from the State Department communicating the agency's decision to revoke Ms. Öztürk's visa, as well as the op-ed Ms. Öztürk had written. *Id.* 69:9–15. Cunningham read Ms. Öztürk's op-ed. *Id.* 69:9–21. He said that he "didn't see anything in the op-ed that suggested she committed a crime." *Id.* 78:6–7. He also said that he cannot recall receiving a communication of the kind he received from headquarters before. *Id.* 70:5–11.

312. Cunningham was asked to prioritize the surveillance and arrest of Ms. Öztürk because of the oversight of ICE headquarters. *Id.* 73:2–6, 79:7–19 ("I can't recall a time that it's come top-down like this with a Visa revocation, um, under my purview anyway. And so with the superiors that were you know, inquiring about this, it made it a priority"). To ensure that the

direction to arrest Ms. Öztürk was legally sound, he consulted with a lawyer from ICE's Office of the Principal Legal Advisor. *Id.* 73:7–10, 75:2–5, 74:6–15 ("I . . . contact[ed] our legal counsel to ensure that we were on solid legal ground.").

313. ASAC William Crogan testified that he first became aware of Mr. Mahdawi in mid-March, when his supervisor, the Special Agent in Charge of [the field office], told him "that the State Department may be providing a finding against [the student]." *Id.* 25:18–22. ASAC Crogan was then sent Secretary Rubio's foreign policy determination regarding Mr. Mahdawi; in his 20 years of federal law enforcement, Crogan had never seen a memo like it. *Id.* 38:6–18. Crogan was told by the Special Agent in Charge to prioritize the arrest of Mr. Mahdawi. July 15, Tr., Vol. 1, 34:6–15. But he understood the order to prioritize Mr. Mahdawi's to come from above his supervisor. *Id.* 34:20–23.

314. ASAC Christopher Heck testified that he first became aware of Dr. Khan Suri around mid-March when he received a phone call from headquarters stating that the State Department "may deem Mr. Suri removable and that he may be amenable to administrative arrest at some point should that removability happen." July 15, Tr., Vol. 2, 115:13–20. Heck received instructions from headquarters "to get out and start beginning surveillance to try and locate Mr. Suri in the event that the State Department deemed him removable." *Id.* 115:21–25. He received these instructions over the weekend and supervised Dr. Khan Suri's arrest on the following Monday. *Id.* 116:3–7.[9]

---

[9] On July 15, Plaintiffs provided the Court with a list of documents requested arising out of the depositions of Crogan, Cunningham, and McCormack. July 15, Tr., Vol. 1, 32:18–33:6. That day, the defendants produced 11-pages of documents that appear to reflect instructions to effectuate the arrest of Mr. Khalil and Ms. Chung. The following documents remain outstanding: "any e-mails, notes, or documents from January 2025 onwards related to the need for HSI to prioritize immigration enforcement (referenced by Agent Cunningham); the administrative warrant for Rumeysa Öztürk signed by Agent Cunningham; the e-mails and related attachments to Agent

**b. HSI's involvement in the arrests was unusual.**

315. The use of HSI, rather than ERO, to conduct these arrests deviated from typical civil immigration enforcement practices. ERO, not HSI, is the component of DHS that ordinarily effectuates civil immigration arrests under Title 8. July 15, Tr., Vol. 1, 63:15–19 (Cunningham); July 15, Tr., Vol. 2, 105:18–106:14 (McCormack) (Title 8 is "more of [ERO's] priority mission set"). HSI's primary enforcement responsibility involves criminal investigations, not civil immigration enforcement. *Id.* 95:17–19, 105:18–106:14.

316. The decision to deploy HSI agents typically tasked with criminal investigations was a departure from standard immigration enforcement practice and suggests an atypical approach to these arrests. In fact, DSAC McCormack wondered why the civil enforcement action against Mr. Khalil had been assigned to HSI rather than ERO. *Id.* 107:12–108:7; *see also* July 15, Tr., Vol. 1, 66:10–68:11 (Cunningham) (testifying that the instructions he received in relation to Ms. Öztürk were "separate from" HSI's more general prioritization of Title 8 enforcement following President Trump's inauguration).

317. The testifying ASACs lacked relevant experience with civil Title 8 immigration enforcement and could not offer any insight into standard practices for Title 8 enforcement. *Id.* 75:14–18 (Cunningham) ("[A]n administrative civil arrest based on a Visa revocation" "was not something I had, um, much experience with . . . if any"); *see also id.* 8:6–23 (Crogan) (explaining that the "goal" of his training was "to train future Special Agents to work in the capacity as *criminal investigators*) (emphasis added); July 15, Tr., Vol. 2, 95:17–22 (McCormack) ( "HSI's special agents are criminal investigators who are special agents. They run transnational criminal

---

Cunningham regarding Rumeysa Öztürk, including any e-mail sent by or copying Eulia Garolini; [and] any e-mail and notes regarding instructions to surveil . . . Mahmoud Khalil received by Darren McCormack." ECF No. 211.

investigations . . . ."); *id.* 87:12–14 (McCormack) (stating that he received criminal investigative training).

**c. The arrests were designed to intimidate.**

318. The manner in which HSI conducted the arrests was designed to intimidate in a number of respects.

319. First, HSI did not notify Ms. Öztürk that her visa had been revoked in advance of the arrest. July 15, Tr., Vol. 1, 76:24–77:5 (Cunningham). Nor did it notify the other Targeted Noncitizens of the Secretary of State's determinations of removability against them until after their arrest. *See* Ex. 9 (Notice to Appear for Mr. Khalil served in person on March 9); Ex. 13 (Notice to Appear for Mr. Mahdawi served in person on April 14); Ex. 22 (Notice to Appear for Dr. Khan Suri served in person on March 17).

320. Second, some of the arrests involved several agents. For example, there were ten to fifteen agents involved in Mr. Mahdawi's arrest. July 15, Tr., Vol. 1, 16:15–18 (Crogan).

321. ASAC Crogan testified that the number of agents involved in the arrest was due to the location of the arrest—a USCIS office where Mr. Madhawi was scheduled for a citizenship interview—and the need for surveillance of that area. *Id.* 16:19–17:7.

322. But Mr. Mahdawi appeared for his interview voluntarily, entered the USCIS building through metal detectors, and was processed like any person would be in that building to make sure that he had no weapons on his person. *Id*. 36:15–37:3. After Mr. Mahdawi had gone through security, he and his lawyer were alone in a room with a USCIS officer conducting the interview, and there were no special security precautions taken to protect that officer. *Id*. 37:10–19.

323. Four officers were involved in the arrest of Mr. Khalil. July 15, Tr., Vol. 2, 94:2 (McCormack). And the CCTV footage of Ms. Öztürk's arrest shows six officers in plain clothes. Ex. 225.

324. Third, the use of masks during the arrests of the Targeted Noncitizens suggests that the arresting officers expected the arrests to be recorded and publicized. *See* July 21, Tr., Vol. 1, 41:16–21 (Court) ("You know I don't know of a single law enforcement agency in the United States that permits their members, apparently at their option, to wear masks when carrying out their duty. Not one. And, um, it would seem that . . . the common sense inference is that that is to spread fear.").

325. According to ASAC Crogan, two agents involved in the arrest of Mr. Mahdawi wore masks while a third agent wore a baseball cap to obscure his face, because they were concerned about doxxing or public harassment in connection with the arrest. July 15, Tr., Vol. 1, 18:7–20. Yet, in the five years Crogan served as ASAC for the New England HSI Field Office, he oversaw no criminal enforcement operations in which agents wore masks, except for agents involved in undercover work. *Id.* 19:24–20:6. By contrast, ASAC Crogan recalled that agents had begun wearing masks in recent civil immigration enforcement operations under Title 8. *Id.* 19:13–20:6.

326. ASAC Cunningham, ASAC McCormack and ASAC Heck were not present during the arrests of Mr. Khalil, Ms. Öztürk, and Dr. Khan Suri and do not have firsthand knowledge of why the agents involved in those arrests wore masks. July 15, Tr., Vol. 2, 95:3–10 (McCormack); 114:17–115:5 (Heck).

327. Fourth, Mr. Mahdawi was arrested at his naturalization interview, July 15 Tr., Vol. 1, 23:11–13, 34:24–35:7, 37:20–22 (Crogan), a step every lawful permanent resident must take in

order to become a U.S. citizen. *See* July 9, Tr., Vol. 1, 25:25–26:5 (Prof. Abu El-Haj) (describing Mahdawi's arrest as "escalat[ing] a sense of anxiety and panic at Columbia"); Shuve Tr. 202:10–15 (recently naturalized citizen stating: "I heard media reports that he was detained at his naturalization interview and that there were attempts, I believe, to deport him.")

328. Fifth, following their arrests, Mr. Khalil, Ms. Öztürk, and Mr. Mahdawi were transferred by HSI to ERO custody and arrangements were made to quickly move them to a detention center in Louisiana. *See supra* ¶¶ 198–199 (describing Khalil's transfer), 237–238 (describing Öztürk's transfer), 263 (describing Mahdawi's transfer).

329. Defendants' failure to identify anyone from ERO in their discovery responses who could testify concerning this issue warrants an adverse inference.

330. ASAC Crogan testified that after Mr. Mahdawi was arrested, he was transferred to ERO custody and that ERO took Mr. Mahdawi to the airport in Burlington, Vermont "to fly [Mr. Mahdawi] out of the district." *Id.* 30:23–31:1. Crogan stated that he understood that ERO had attempted to transfer Mr. Mahdawi to Louisiana. *Id.* 33:17–34:3.

331. ASAC Cunningham testified that ERO made the decision to transport Ms. Öztürk Massachusetts to Vermont. July 15, Tr., Vol. 1, 55:9–12 (Cunningham) ("the decision was impressed upon us [HSI] by them [ERO] to transport her to Vermont").

332. And on July 10, Defendants produced an email [redacted]

333. Because Defendants failed to identify anyone in ERO (including [REDACTED]) with knowledge about Ms. Öztürk's arrest and detention in their discovery responses, and because Plaintiffs did not receive [REDACTED] communications until July 10 when the Court ordered that this correspondence and other documents relevant to the arrest of Ms. Öztürk be disclosed to Plaintiffs, the Court was unable to hear from any ERO personnel as witnesses to verify the reason why Ms. Öztürk (or any of the other Targeted Noncitizens) were rapidly moved out of their respective jurisdictions.

334. Given this lack of disclosure, it is appropriate to draw an adverse inference that ERO personnel would have testified that rapid transfers of the targeted noncitizens to Louisiana were done not out of operational necessity, but rather were intended to be punitive and fear-inducing. *United States v. Díaz-Nieves*, Crim. No. 24-00087 (GMM), 2025 WL 1235492, at *2 (D.P.R. Apr. 29, 2025) ("if . . . the Government 'controls or has peculiar access to a witness and in the circumstances, it may be reasonable to suppose that the [Government] would produce the witness unless the testimony was unfavorable'") (quoting *United States v. Pagán-Santini*, 451 F.3d 258, 267 (1st Cir. 2006)).

**d. The arrests did intimidate.**

335. The arrests of the Targeted Noncitizens had a powerful chilling effect on other students and faculty on college campuses.

336. In the wake of Mr. Khalil's arrest, for example, students at Columbia University became terrified. July 8, Tr., Vol. 2, 144:23–145:6; July 9, Tr., Vol. 1, 9:18–10:21 (Prof. Abu El-Haj). Noncitizen students in particular became afraid of being detained by ICE. July 8, Tr., Vol. 2, 146:9–21.

337. Students who were publicly critical of Israel and what they viewed to be the genocide in Gaza, as well as people who participated in pro-Palestinian protests on campus, were afraid that they would be especially vulnerable to ICE detention. July 9, Tr., Vol. 1, 9:24–10:3 (Prof. Abu El-Haj). Even faculty members felt a need to withdraw from public discussion of these issues out of fear of possible deportation. *Id.* 10:6–9.

338. After Mr. Khalil's arrest, many Palestinian and Muslim students withdrew from the student protests at Columbia University. *Id.* 10:10–14, 37:15–18 (Prof. Abu El-Haj). Although there was a protest shortly after Mr. Khalil's arrest, it was organized by Jewish Voice for Peace and was largely—if not exclusively—attended by Jewish members of the community. *Id.* 10:14–21.

339. After Mr. Khalil's arrest, Mr. Mahdawi became concerned that he could be the next target. July 9, Tr., Vol. 1, 23:19–24:4 (Prof. Abu El-Haj). He even asked Prof. Abu El-Haj for help convincing the president of Columbia University to move him from his off-campus university housing into a residence inside the gates of the university. *Id.* 24:4–9.

340. A few weeks later, Mr. Mahdawi was arrested at his citizenship interview in Vermont, increasing the sense of anxiety and panic at Columbia University. *Id.* 25:25–26:5 (Prof. Abu El-Haj). In particular, students began to fear that their photographs and names would be tweeted at the Trump administration. *Id.* 27:17–20.

341. The effect of the arrests of Mr. Khalil and Mr. Mahdawi, and other noncitizens, was to terrify students at Columbia University, especially those who do not hold U.S. citizenship. *Id.* 35:25–36:2 (Prof. Abu El-Haj).

## III. Defendants' intent in adopting the policy was to silence noncitizen scholars engaged in pro-Palestinian expression.

342. Defendants' intent in adopting the ideological deportation policy was to silence noncitizen students and faculty engaged in pro-Palestinian protest.

343. Defendants expressed their intent in many public statements. Through these statements, Defendants have touted the policy. *See supra* Part II.A. They have boasted about enforcing it against an untold number of students and faculty. Ex. 36 at 2 (Secretary Rubio acknowledging that most of the Trump Administration's first 300 visa revocations "related to pro-Palestinian protest"). And they have made clear that they intend to target many more. Ex. 27 (President Trump describing Mr. Khalil's arrest as "the first . . . of many to come"); Ex. 33 (Secretary Rubio stating: "[W]e're going to do more. In fact, every day now we're approving visa revocations, and, if that visa led to a green card, the green card process as well.").

344. Defendants often describe the targets of their policy as "pro-Hamas" or "antisemitic." But their statements routinely conflate pro-Palestinian speech with support for Hamas or antisemitic activity. *See supra* Part II.II.A.2; *see, e.g.*, Ex. 29 (Deputy Secretary of Homeland Security explaining that Khalil was arrested for "put[ting] himself in the middle of the process of basically pro-Palestinian activity").

345. The message of Defendants' public statements is therefore clear: if you are a noncitizen who engages in pro-Palestinian protest, we will deport you.

346. Defendants' implementation and enforcement of the policy confirms their intent. As described above, DHS set out to identify pro-Palestinian protesters against which the defendant agencies could enforce the policy. *See supra generally* Part II.II.B.2. By far the largest source of names for this operation came from the website of Canary Mission, a group whose express aim is to document "hatred" against America, Israel, and Jews—not violence or other criminal activity.

*See supra* ¶¶ 46, 57. DHS referred protesters to the State Department with unvetted allegations that they had engaged in activity that was pro-Hamas, anti-Israel, or antisemitic. *See supra* Part II.B.3.c. And the State Department revoked visas or made removability determinations based on these allegations. *See supra* Parts II.B.3.e–II.B.3.f. The cases of the Targeted Noncitizens illustrate that the defendant agencies have been targeting protesters based on their *lawful* political expression. *See supra generally* Part II.C.1.

347. Defendants' decision to arrest the pro-Palestinian protesters further establishes their intent to chill protected speech. Usually, when the State Department revokes a person's visa, or determines them to be removable, ICE will issue a notice to appear before an immigration judge. But they need not arrest the person. July 17, Tr., Vol. 1, 102:14–103:23 (Watson). In other words, an action letter from the State Department communicating its decision to revoke a visa or issue a removability determination can, but need not, lead to arrest. *Id.* Defendants' new referral process, however, called for those whose activities were deemed contrary to the Executive Orders to be arrested, unless the target had already left the United States. *Id.,* 53:10–54:6 (Watson).

348. The circumstances of targeted noncitizens' arrest, moreover, were objectively frightening. As described above, Defendants did not inform these individuals of the State Department's decision to revoke their visa, or to find them removable, before their arrests. *See supra* ¶ 319. Although they were not suspected of having committed criminal activity, Defendants met them with a show of force. *See supra* ¶¶ 320–323. Many of the agents who effectuated the arrests were masked. *See supra* ¶¶ 324–326. One of the noncitizens, Mr. Mahdawi, was arrested at his naturalization interview. *See supra* ¶ 327. And Defendants sought to quickly transfer several noncitizens—including Mr. Khalil, Ms. Öztürk, and Mr. Mahdawi—from their communities in the Northeast to a distant detention facility in Louisiana. *See supra* ¶¶ 328–334.

349. The only reasonable inference from Defendants' decisions to arrest and detain protesters for the reasons publicly provided and in the manner conducted is that they intended to deter other students and faculty from engaging in pro-Palestinian advocacy.

## IV. Plaintiffs and their noncitizen members have been harmed by the policy.

### A. Plaintiffs are nationwide associations of faculty and students dedicated to advancing academic freedom and scholarship.

#### 1. The AAUP

350. The American Association of University Professors ("AAUP") was founded in 1915 and remains the nation's leading organization primarily dedicated to the goal of protecting academic freedom and shared governance in higher education. Ex. 95; *see also* July 18, Tr., Vol. 1, 67:23–68:3. It represents both faculty (including adjunct professors) and graduate student instructors at universities and colleges around the country. July 18, Tr., Vol. 1, 67:24–68:1, 69:20–23.

351. As part of the AAUP's mission to protect academic freedom, the AAUP also protects its members' rights to engage in extramural speech. July 18, Tr., Vol. 1, 68:4–9. Extramural speech encompasses speech outside of a scholar's disciplinary expertise and includes speech that a scholar engages in in his or her personal capacity. *Id.* 68:10–18. Examples of extramural speech include participating in political protests and signing public statements. *Id.* 68:19–22.

352. The AAUP has been committed to protecting its members' rights to engage in extramural speech–i.e., to speak and write as citizens–since the organization first articulated its principles on academic freedom and tenure in 1915. July 18, Tr., Vol. 1., 68:10–22, 68:25–69:2. This is because a scholar's extramural speech is integral to their role as public intellectuals, thinkers, and participants in public discourse. *Id.* 69:2–19.

353. The AAUP has hundreds of local chapters spread across 47 states, the District of Columbia, and the U.S. Virgin Islands. Exs. 93, 94; *see also* July 18, Tr., Vol. 2, 89:24–90:4. It also has an international chapter. Ex. 94.

354. There are two kinds of AAUP local chapters: advocacy chapters and collective bargaining chapters. July 18, Tr., Vol. 1., 70:10–11. Advocacy chapters function like professional associations, while collective bargaining chapters function as local unions for faculty. *Id.* 70:11–14.

355. The AAUP is a membership organization with approximately 50,000 members. July 18, Tr., Vol. 1., 701:24–25. To become a member of the AAUP, an individual can either sign up with a local chapter of the AAUP at their university or college or with the national AAUP directly. July 18, Tr., Vol. 1., 69:24–70:4. When an individual becomes a member of a local chapter, they automatically become a member of the national AAUP. July 18, Tr., Vol. 1., 71:1–4.

356. Members pay dues to the AAUP. July 18, Tr., Vol. 1., 70:4.

357. The AAUP has both U.S. citizen and noncitizen members. *See, e.g.*, July 7, Tr., Vol. 1, 36:18–37:1 (Prof. Hyska); July 7, Tr., Vol. 2, 129:15, 131:6–10 (Prof. Al-Ali); July 8, Tr., Vol. 1, 61:18–23 (Prof. Nickel); July 8, Tr., Vol. 2, 135:9–17 (Prof. Abu El-Haj).

358. The participation of the AAUP's noncitizen members in the organization's work of advancing academic freedom and shared governance is central to the AAUP's mission, because noncitizen members, like AAUP's citizen members, are engaged in protecting academic freedom and upholding freedoms of shared governance. July 18, Tr., Vol. 1, 71:5–16, 82:23–83:5.

### 2. MESA

359. The Middle East Studies Association of North America ("MESA") is a 501(c)(3) non-profit association whose mission is to foster the study of the Middle East, promote high standards of scholarship and teaching, and encourage public understanding of the region and its peoples. Exs. 134 at 1, 136 at 1. It is the largest and most important international organization focused on Middle East studies. July 7, Tr., Vol. 2, 129:24–130:1; July 8, Tr., Vol. 2, 136:17–19.

360. MESA accomplishes its mission "through programs, publications, and services that enhance education, further intellectual exchange, recognize professional distinction, and defend academic freedom." Ex. 134 at 1; *see also* Ex. 136 at 1.

361. MESA is managed by a board of directors with nine voting members. Ex. 134 at 5. The president of MESA serves as the chair of the board and has general supervision of the affairs and property of MESA and over its officers. *Id.* at 7–8.

362. MESA is a membership organization with individual members and institutional members. Ex. 134 at 1–2.

363. MESA has over 2,000 individual members. Ex. 191 at 1.

364. MESA delineates three categories of full individual members: honorary fellows, who are "outstanding internationally recognized scholars who have made major contributions to Middle East studies"; fellows, who are individuals who have received a doctorate related to Middle East studies or who have taught in or made a scholarly contribution to Middle East studies; and student members, who are registered graduate or undergraduate students interested in Middle East studies. Ex. 134 at 2. Honorary fellows, fellows, and student members have voting privileges and must pay annual dues to retain membership. *Id.* MESA also has a category of associate members,

who are persons interested in the study of the Middle East. *Id.* Associate members do not have voting privileges and must pay annual dues to retain membership. *Id*.

365. MESA has both U.S. citizen and noncitizen members. *See, e.g.*, July 7, Tr., Vol. 2, 129:13–14 (Prof. Al-Ali); July 8, Tr., Vol. 2, 136:10–11 (Prof. Abu El-Haj). This includes members from U.S. as well as international universities. *Id.*138:18–22.

366. Members join MESA to attend conferences, hear from their colleagues, and network. July 7, Tr., Vol. 2, 130:1–4. Its annual meeting is an especially important gathering of scholars. *Id.* 143:20–144:3 (Prof. Al-Ali); July 8, Tr., Vol. 2, 136:19–137:2, 137:8–14 (Prof. Abu El-Haj). MESA also provides its graduate student members an opportunity to start meeting potential publishers and to get advice about how to find jobs. *Id.* 130:4–6.

367. MESA edits and arranges for publishing several publications, including the International Journal of Middle East Studies, the premiere journal on the region, and the Review of Middle East Studies. Ex. 136 at 2; *see also* Exs. 142, 143.

**B. The AAUP's and MESA's noncitizen members have been harmed by the policy.**

368. Plaintiffs have noncitizen members who have been compelled to curtail their expression and association because of the policy. These members include Prof. Nadje Al-Ali, a member of the AAUP and MESA; Prof. Megan Hyska, a member of the AAUP; and Prof. Bernhard Nickel, a member of the AAUP and Harvard's local AAUP chapter.

**1. Nadje Al-Ali**

369. Nadje Al-Ali is the Robert Family Professor of International Studies and a Professor of Anthropology and Middle East Studies at Brown University whose research interests include gender studies and Middle East studies. July 7, Tr., Vol. 2, 123:21–24, 124:22–125:4, 125:10–13, 126:12–12-19; July 8, Tr., Vol. 1, 8:19–21.

370. Prof. Al-Ali was born in Germany and is a German citizen. July 7, Tr., Vol. 2, 124:6–7. Growing up in Germany, Prof. Al-Ali was acutely aware of the Holocaust, which has informed her thinking and morals, especially her conviction that "being silent could mean complicity in certain situations." *Id.* 124:13–19.

371. Prof. Al-Ali spent three years in Tucson, Arizona for her undergraduate studies, then lived in London for 25 years. *Id.* 124:7–10.

372. In January 2019, Prof. Al-Ali moved to the United States, to teach at Brown University. July 7, Tr., Vol. 2, 124:3, 126:20–21.

373. In 2021, Prof. Al-Ali became a lawful permanent resident. July 7, Tr., Vol. 2, 127:5–6.

374. Prof. Al-Ali is a member of MESA and the AAUP. *Id.* 129:13–16.

375. Prof. Al-Ali has been a member of MESA since she was a graduate student and was an elected board member from around 2012 to 2014. *Id.* 129:13–14, 130:14–16.

376. Prof. Al-Ali has attended most of MESA's annual meetings, even when she was based outside of the United States. *Id.* 130:11–12.

377. Prof. Al-Ali joined the AAUP a few years after she arrived in the United States. *Id.* 129:15–16.

378. Before Defendants adopted the ideological deportation policy, Prof. Al-Ali regularly engaged in speech and association related to Palestine.

379. First, Prof. Al-Ali has published numerous books, academic articles, and book chapters, including scholarly work that touches on Palestine. *Id.* 125:18–20; *see also* Ex. 85 at 2–6.

380. For example, Prof. Al-Ali's work includes an edited volume examining the experience of women in wars in the Middle East drawing especially from Iraq and Palestine. July 7, Tr., Vol. 2, 125:18–20; Ex. 85 at 2.

381. Prof. Al-Ali has also published an article based on a roundtable discussion about feminist approaches to the Boycott, Divestment, and Sanctions ("BDS") movement. July 7, Tr., Vol. 2, 125:21–23.

382. Believing in non-violent activist strategies, Prof. Al-Ali supports the BDS movement and sees it as a non-violent form to resist the systematic oppression and marginalization of Palestinians. *Id.* 126:6–8.

383. As recently as January through March of 2025, Prof. Al-Ali had started researching a new academic article that would make a feminist critique of Hamas. *Id.* 132:17–134:7. Prof. Al-Ali anticipated that the article would present a nuanced critique of the gender ideology and militarism linked to Hamas as well as the structural and systemic oppression and inequalities produced by the Israeli government's policies in Gaza. *Id.* 132:24–133:12, 142:5–7.

384. Second, Prof. Al-Ali was the director of the Center for Middle East Studies ("CMES") at Brown University from July 2020 to 2024. *Id.* 127:9–15; July 8, Tr., Vol. 1, 13:1–7.

385. Following October 7, 2023, CMES shifted more of its focus toward issues related to Palestine and Israel, including providing support for Brown University students of Middle East background who felt concerned, worried, and stressed about the war in Gaza. July 7, Tr., Vol. 2, 128:8–14; July 8, Tr., Vol. 1, 13:8-15.

386. For example, Prof. Al-Ali and her colleagues at CMES provided pastoral care for students, which entailed organizing lunch events, gatherings, and other social events for students at which the students could express their concerns. July 7, Tr., Vol. 2, 128:15–23.

387. In her capacity as director of CMES, Prof. Al-Ali organized and led workshops, teach-ins, and meetings on topics related to the Middle East, including Israel and Palestine. *Id.* 128:2–7, 129:4–10.

388. Third, Prof. Al-Ali taught courses on gender and sexuality in the Middle East and transnational feminism. *Id.* 126:9–19; Ex. 85 at 8.

389. Fourth, Prof. Al-Ali had been actively involved in political speech on Brown University's campus prior to March 2025.

390. For example, in 2019, after joining Brown University, Prof. Al-Ali signed onto an open letter addressed to the president of Brown University, concerning a student-organized referendum on the question of whether the university should divest from all companies that are involved in the Israeli military occupation of Palestine. July 8, Tr., Vol. 1, 9:2–9:4, 9:14–17, 9:19–25. The open letter asked the president of Brown University to not treat student activism around Palestine differently from other student protests. *Id.* 10:17–24.

391. At the time she signed the open letter, Prof. Al-Ali had no concerns that signing the letter could cause problems with her employer or affect her immigration status in the United States. *Id.* 12:10–14.

392. As another example, Prof. Al-Ali drafted and signed an open letter, protesting the involvement of the Providence Police Department in a November 2023 student protest and asking the university president to insist that all legal charges against the student protesters be immediately dropped. Ex. 92; July 8, Tr., Vol. 1, 15:18–16:4. Prof. Al-Ali personally handed the open letter to the university president on November 9, 2023, and facilitated a faculty meeting with the president. July 8, Tr., Vol. 1, 15:24–25, 16:4–6, 16:11–13.

393. Prof. Al-Ali also signed onto a November 7, 2023 open letter from Brown University faculty to the university president asking the university president to issue a public statement in support of a ceasefire in Gaza. Ex. 224; July 8, Tr., Vol. 1, 17:7–11, 16–17.

394. In addition to the faculty meeting discussed earlier, Prof. Al-Ali facilitated and attended another meeting between the university president and a group of students in relation to the pro-Palestinian protests. July 8, Tr., Vol. 1, 18:8–19, 18:25–19:1. The meeting took place around the end of October or November of 2023. *Id.* at 18:20–22.

395. Since the initiation of the ideological deportation policy and particularly the arrest and detention of Mr. Khalil, Prof. Al-Ali has felt compelled to abandon many of her prior expressive and associational activities due to fear that those activities could lead to her deportation. July 7, Tr., Vol. 2, 135:3–8, 136:1–3.

396. Prof. Al-Ali learned of Mr. Khalil's arrest while traveling abroad in Germany on March 9, 2025. July 7, Tr., Vol. 2, 135:3–6. She had left the U.S. for Germany on March 8, 2025 to see her mother, who was in poor health. *Id.* 135:3–137:2.

397. Prof. Al-Ali was scared about her return to the the U.S. based on Mr. Khalil's arrest. July 7, Tr., Vol. 2, 137:16–20. She ultimately canceled a portion of her trip and returned home early because of her concerns. *Id.* 137:21–138:7.

398. During her return travel, she contacted an immigration lawyer to track her as she was flying back to the U.S., which she had never done before. *Id.* 138:5–7. She did so because she was afraid that she would be interrogated about CMES and that her pro-Palestinian speech would be construed as antisemitic or pro-Hamas. July 7, Tr. 138:10–15; *see id.* 138:22–139:2 (testifying she was worried about reports written by "extreme organizations," most prominently Committee for Accuracy in Middle East Reporting and Analysis ("CAMERA") about her role in CMES).

399. Prof. Al-Ali also read about and saw the video of the arrest of Rumeysa Öztürk later in March 2025. July 7, Tr., Vol. 2, 135:11–19.

400. The arrests of Mr. Khalil and Ms. Öztürk caused Prof. Al-Ali to feel vulnerable and targeted. July 7, Tr., Vol. 2, 136:6–11, 136:25–137:2. This was the first time in her academic career that she could not focus on her work. *Id.* 147:10–16.

401. President Trump's public statements about immigration, both as a candidate and as President, also made Prof. Al-Ali fearful that his administration would target noncitizens who engage in pro-Palestinian speech. July 8, Tr., Vol. 1, 29:18–30:21, 31:2–13.

402. For example, Prof. Al-Ali recalled reading a quote by President Trump that Mr. Khalil's arrest would be "one of many." July 7, Tr., Vol. 2, 140:6–10.

403. This fear was amplified by Prof. Al-Ali's public connection to CMES and false allegations made against her and CMES faculty. July 8, Tr., Vol. 1, 31:16–32:3.

404. Prof. Al-Ali feels that she has been silenced as an academic and as a person and that she cannot speak her mind, do her research, or engage with her students freely. *Id.* 32:16–24.

405. For example, following Mr. Khalil's arrest, Prof. Al-Ali began considering not attending the MESA annual meeting this year because she is concerned that the immigration authorities may target her and other Middle East scholars. July 7, Tr., Vol. 2, 143:7–14, 144:8–12. She has never before declined to attend a MESA meeting out of fear of such targeting. *Id.* 144:8–10.

406. In or around February 2025, Prof. Al-Ali was also approached by the Women's Association of Middle East Studies to chair its human rights committee. *Id.* 144:20–145:22. Prof. Al-Ali would have ordinarily been very interested in taking on that role, but she declined the position because she believed it would require her to work on issues related to pro-Palestinian

speech and allegations of antisemitism, which would expose her to targeting under the ideological deportation policy. *Id*.

407. Prof. Al-Ali also worries that the public letters she signs onto could be used against her by the federal government and lead to negative consequences for her immigration status. July 8, Tr., Vol. 1, 12:19–22. Prof. Al-Ali has therefore not signed onto any letters related to Israel or Palestine since the arrest of Mr. Khalil and Ms. Öztürk. *Id.* 19:2–8.

408. Prof. Al-Ali also has not signed onto any such letters because she is scared that organizations such as CAMERA, which has published two reports focused on Brown and CMES, would mischaracterize her and her speech as antisemitic or pro-Hamas, and that this could lead to negative immigration consequences under the policy. *Id.* 19:9–15; *see also* July 7, Tr., Vol. 2, 139:7–16 (describing CAMERA as "an extreme pro-Israel organization that has a long history of targeting" academics "in terms of their pro-Palestinian positions").

409. CAMERA publishes names of faculty with links to their open letters and articles. July 8, Tr., Vol. 1, 19:18–20. CAMERA has also published two reports that specifically focus on Brown University and CMES, and mention Prof. Al-Ali. *Id*. 19:20–25.

410. In addition, Prof. Al-Ali has decided to forgo research projects that she fears could subject her to immigration consequences under the ideological deportation policy and has declined academic opportunities that would have required her to travel to the Middle East.

411. For example, Prof. Al-Ali stopped working on her planned academic article making a feminist critique of Hamas, *see supra* ¶ 383, even though it would have been critical of Hamas, because the article also would have involved a critique of the Israeli government's policies in Gaza. July 7, Tr., Vol. 2, 132:17–133:12 (describing the planned article as a feminist critique of Hamas).

412. Prof. Al-Ali abandoned the research project because she believes that expressing any views critical of Israel, even nuanced ones, could result in her being targeted under the policy. *Id.* 142:11–25.

413. Prof. Al-Ali has also stopped going to and engaging with protests or demonstrations. For example, while Prof. Al-Ali has in the past taken an active role in negotiating between the Brown University administration and students, she has not facilitated any such meetings concerning the war in Gaza since the arrest of Mr. Khalil and Ms. Öztürk, because she is afraid that the government will target her for associating with pro-Palestinian views. July 8, Tr., Vol. 1, 20:2–15.

414. Similarly, since the implementation of the ideological deportation policy, Prof. Al-Ali has tried to stay away from public engagements that are linked to Palestine and Israel. *Id.* 20:24–25.

415. Prof. Al-Ali has also declined to attend other kinds of protests and demonstrations due to fears that her participation might draw the government's attention. She would have liked to attend a protest concerning the "DOGE Elon Musk cuts," but decided against it because she was worried that it would increase the chance that the government might scrutinize her past expressive activities. July 7, Tr., Vol. 2, 145:12–16; July 8, Tr., Vol. 1, 36:13–22. She also decided against attending the nationwide "No Kings" protest out of fear that she could be exposed in a similar way, especially if law enforcement became involved in the protest. July 7, Tr., Vol. 2, 145:16–24; July 8, Tr., Vol. 1, 34:14–35:14.

416. Prof. Al-Ali has also abstained from participating in protests in Providence, Rhode Island, where Brown University is located, because she is worried that her identity will be captured

and that such visibility will increase her vulnerability to being targeted under the policy. July 7, Tr., Vol. 1, 145:17–24.

417. Prof. Al-Ali has also stepped back from the role she played in facilitating meetings between the Brown University administration and students concerning the war in Gaza out of fears that her pro-Palestinian views will be used against her by the government. July 8, Tr., Vol. 1, 20:2–15.

418. Prof. Al-Ali's fear of being interrogated and denied reentry under the policy, July 7, Vol. 2, 138:8–15, has impacted and continues to impact her ability to pursue her scholarship, which often requires traveling abroad to the Middle East. For example, Prof. Al-Ali received funding through the Watson Institute for International and Public Affairs at Brown University to conduct research in Baghdad, Iraq, and Beirut, Lebanon, but declined to go due to her fear of being detained and deported under the ideological deportation policy. July 7, Tr., Vol. 2, 134:13–23; *see id.* 140:11–12 (testifying that she decided to forgo travel to the Middle East).

419. Before returning to the U.S. from Germany in March 2025, Prof. Al-Ali changed her Facebook profile photo from a black square to a photo of her mother and daughter out of fear of the policy. *Id.* 146:14–22. Prof. Al-Ali also decided to un-follow social media accounts that sometimes post pro-Palestinian content so that her own social media feed would include fewer posts about Israel and Palestine. *Id*. 146:23–147:4.

420. If the ideological deportation policy were no longer in effect, Prof. Al-Ali would resume pursuing her research, traveling to the Middle East, and attending meetings and conferences, including MESA's annual meeting this year. July 8, Tr., Vol. 1, 21:5–20. Prof. Al-Ali would also speak out publicly on the current affairs in Israel and Palestine. *Id.* 22:3–5.

**2. Megan Hyska**

421. Megan Hyska is an assistant professor of philosophy at Northwestern University with research interests in political communication and organizing, and how they contribute to social movements. July 7, Tr., Vol. 1, 29:10–25.

422. Prof. Hyska teaches courses in the philosophy of language and social philosophy, some of which touch on political issues. July 7, Tr., Vol. 1, 33:2–5; 33:14–16.

423. In her introductory course on the philosophy of language, for example, Prof. Hyska teaches, among other things, how linguistics as a discipline intersects with colonialism and "colonial ideas about language and the differences between languages." July 7, Tr., Vol. 1, 33:18–25. In her graduate seminars, Prof. Hyska teaches about how socialists and socialism has influenced the philosophy of language. *Id.* 34:1–6.

424. Prof. Hyska grew up in in Canada and moved to the United States to pursue a Ph.D. at University of Texas in Austin. *Id.* 35:11–16. Prof. Hyska has been a legal permanent resident since 2021. *Id.* 36:1–5.

425. Prof. Hyska has been a member of the AAUP since 2020. *Id.* 36:18–19. She decided to join the AAUP because she "believe[s] it [is] important for workers to . . . organize collectively to protect their working conditions in a private university" and "advocate for . . . the research and education machine of our institution." *Id.* 37:3–6, 37:10–13. Prof. Hyska pays membership dues to the AAUP, has participated in early discussions concerning increasing AAUP membership, and has attended several AAUP meetings in 2025. July 7, Tr., Vol. 2, 98:12–19, 99:6–12.

426. In addition to her scholarly work, Prof. Hyska has published popular writing about topics related to authoritarianism and political propaganda. July 7, Tr., Vol. 1, 32:14–24. For example, in 2018, Prof. Hyska published an article in the *Yale Review* on the Trump

administration's use of the "authoritarian tool box[.]" *Id.* 31:10–32:4. In 2022, Prof. Hyska published an article in the *Los Angeles Times* examining Russia's propaganda strategy in the context of its invasion of Ukraine. *Id.* 32:7–32:13.

427. Before Defendants adopted the ideological deportation policy, Prof. Hyska engaged in political expression and association, including relating to Israel and Palestine. July 7, Tr., Vol. 2, 101:17–20 (testifying she published a paper discussing "media around the conflict in Israel-Palestine"); July 7, Tr., Vol. 1, 34:16–35:1 (testifying she believes it is important for her, as a philosopher, to be politically active).

428. For example, Prof. Hyska is a member of the Democratic Socialists of America ("DSA"), which has publicly expressed pro-Palestinian viewpoints. *Id.* 39:25–40:3 (testifying that the DSA has endorsed the BDS Movement); *id.* 42:7–11; 54:9–25 (testifying her DSA membership relates to criticisms of Israel's state policy with respect to Palestinians). She is also a member of the Chicago Alliance Against Racism and Political Repression ("CAARPR"). *Id.* 36:20–23.

429. As a DSA member, Prof. Hyska has engaged in various campaigns with the group. July 7, Tr., Vol. 1, 34:12–15. She was active in the steering committee of her local chapter of the DSA, through which she mobilized other members to participate in political campaigns organized by the DSA. *Id.* 41:6–24. Prof. Hyska has also attended protests organized by the DSA, including protests concerning the Israel-Palestine conflict. *Id.* 42:2–11, 43:5–7, 57:4–13.

430. Prof. Hyska also personally supports the BDS movement because of her commitment to using nonviolent means to express her dissent to Israel's violation of Palestinians' human rights. *Id.* 40:7–16, 41:1–3.

431. Prof. Hyska has a history of participating in protests and has attended protests that included advocacy related to Israel and Palestine, including the pro-Palestinian student

encampments at Northwestern University in the spring of 2024. *Id.* 54:25–56:3. At the time, she did not believe that participating in such protests could affect her immigration status, *id.* 56:4–9, but did contemplate such participation could affect her relationship with the university and therefore affect her job, *id.* 56:10–24.

432. Prior to March 2025, Prof. Hyska also signed an open letter in support of students engaged in pro-Palestinian protests. July 7, Tr., Vol. 1, 68:21–69:2; Ex. 67.

433. Although Prof. Hyska initially intended to become more active in political organizing after President Trump's inauguration in January 2025, the arrest and detention particularly of Mr. Khalil and Ms. Öztürk for their speech made Prof. Hyska concerned about engaging in public activism, especially because she is, like Mr. Khalil, a green card holder. July 7, Tr., Vol. 1, 43:16–44:2.

434. Prof. Hyska learned of Mr. Khalil's arrest on or around March 9, 2025, from reading news sources and social media, and watching a video recording his detention. *Id.* 44:6–12, 46:3–10, 47:2–7. In particular, she recalls that President Trump posted on Truth Social (which was then reposted on X by the White House) that Mr. Khalil had been detained and would be deported because he was allegedly pro-Hamas, and that Mr. Khalils' arrest would be the first of many such arrests. *Id.* 48:3–10. These statements suggested to Prof. Hyska that Mr. Khalil had been targeted based on his political speech. *Id.* 46:3–10.

435. Prof. Hyska was shocked and distressed by Khalil's arrest. "It was shocking [to Prof. Hyska] that Mr. Khalil's status as a green card holder didn't protect him from this treatment," *Id.* 46:3–10. The day after Mr. Khalil's arrest, Prof. Hyska texted a colleague and expressed that she felt "extremely stressed out, scared, maybe even trapped" by Mr. Khalil's arrest. *Id.* 51:3–4; Ex. 65.

436. Likewise, Prof. Hyska learned of Rümeysa Özturk's arrest through news sources, including by watching a video of Ms. Özturk's arrest. July 7, Tr., Vol. 1, 51:9–11. Prof. Hyska was "extremely disturbed by [the] video," because Ms. Özturk looked like someone who could be her student and because, as far as Prof. Hyska understood, Ms. Özturk was arrested solely on the basis of an op-ed that Ms. Özturk authored. *Id.* 52:19, 53:20–54:3.

437. In addition to the arrests themselves, Prof. Hyska saw social media posts made by government officials about such arrests, including: posts by President Trump on Truth Social, July 7, Tr., Vol. 2, 89:6–12; posts by the White House on X, *id.* 89:9–10; and a post by the Department of Homeland Security on X, *id.* 89:10–12. Prof. Hyska also read reporting that the State Department was implementing additional screening mechanisms to vet international students and scholars applying for visas based on their political views. *Id.* 89:17–90:3. These social media posts and the public reporting have led Prof. Hyska to believe that the Trump administration is "interested in using a wide range of tools at its disposal to prevent noncitizens from engaging in political dissent on a pretty wide range of topics." *Id.* 90:4–7.

438. Since Defendants adopted the ideological deportation policy, Prof. Hyska has curtailed her political speech out of fear that she may be targeted under the policy.

439. For example, Prof. Hyska attended only one protest in early April 2025 since Mr. Khalil's arrest out of fear of the policy. July 7, Tr., Vol. 1, 63:9–21. Despite having attended many protests prior to the second Trump administration, she felt an "unusual degree of anxiety about attending a protest" due to the arrests of Mr. Khalil and Ms. Öztürk. *Id.* 63:21–25. As a result, Prof. Hyska, for the first time, wore a mask at this protest to hide her identity. *Id.* 63:25–64:23.

440. Prof. Hyska has declined to attend additional protests since that time even though she has wanted to do so, because she felt the protests were "now unusually risky for [her] to attend" as a noncitizen. *Id.* 65:13–15, 65:21–22.

441. In addition, Prof. Hyska has also curtailed her leadership involvement in the DSA after learning of the ideological deportation policy. At the beginning of the second Trump administration, Prof. Hyska took "some initial steps towards getting . . . deeply involved in the Chicago chapter of the DSA," including by attending a quarterly chapter meeting in March 2025. *Id.* 66:4–15. Prof. Hyska also considered putting her name forward to sit on a steering committee of the local chapter, *id.* 66:15–19, and to become a delegate at the national DSA convention, *id.* 68:1–3.

442. Prof. Hyska, however, decided not to pursue these leadership positions after learning of Mr. Khalil's and others' arrests, *id.* 43:14–23, because such arrests made her afraid that "engaging in . . . public dissent would . . . potentially endanger [her] immigration status," and "that [she] risked . . . detention and deportation for being publicly and politically critical of the Trump administration." *Id.* 43:23–44:2. While attending DSA meetings appeared to her to be less risky because they are "low profile," these leadership positions "struck [her] as potentially more high profile" and therefore "riskier to engage in with respect to [her] immigration status." *Id.* 68:3–7.

443. Since she learned of the ideological deportation policy, Prof. Hyska has also refrained from signing public letters under her legal name.[10] For example, she pseudonymously

[10] After March 2025, Prof. Hyska signed onto a "couple of open letters," one of which was in support of a professor whose tenure likely was denied because of his participation in the campus encampments, which "could be construed as connected to Israel-Palestine[.]" July 7, Tr., Vol. 1, 69:22–70:6; July 7, Tr., Vol. 2, 105:2–20, 112:14–113:20. The "primary intention" of this letter, however, was to address the higher administration of Northwestern University, and Prof. Hyska is not aware "whether this letter was ever made public with the signatures attached[.]" *Id.* 106:25–107:2. In April 2025, Prof. Hyska also signed onto a letter asking Northwestern University to avoid

signed an online petition shortly after Mr. Khalil's arrest, using her mother's maiden name, out of fear of "being associated with Mr. Khalil, [or] with pro-Palestinian politics publicly in any way." *Id.* 71:4–5, 71:16–18.

444. Prof. Hyska has also refrained from publishing an op-ed she had drafted for fear that she may be arrested like Ms. Öztürk for expressing a viewpoint contrary to that of the Trump Administration. Around the time Prof. Hyska learned of Ms. Öztürk's arrest, Prof. Hyska had drafted an op-ed criticizing the rising authoritarianism of the Trump administration and addressing what effective political resistance might look like. *See* Ex. 66 (draft op-ed). She sent the draft op-ed to several colleagues for their feedback. July 7, Tr., Vol. 1, 55:1–5, 57:17–58:4, 62:19–21.

445. But Prof. Hyska ultimately decided not to publish the op-ed because she feared that it would raise her profile and put her at risk of arrest, detention, and deportation pursuant to the policy. July 7, Tr., Vol. 1, 62:22–63:4. A significant factor in her decision was her understanding that Ms. Öztürk had been targeted for co-authoring an op-ed. *Id.* The draft is saved on Prof. Hyska's computer and has never been published. *Id.* 59:17–19, 63:5–8.

446. The policy has also chilled Prof. Hyska's speech as an educator. Although she has been on a research leave from teaching, she plans to revisit her syllabi before she resumes teaching to consider whether to modify her curriculum to avoid discussion of on political topics including the Israeli-Palestinian conflict. *Id.* 71:24–72:14.

447. The policy has also caused Prof. Hyska to refrain from traveling outside the United States. *Id.* 72:20–22. Prof. Hyska now fears that she will be denied reentry, detained, or deported when crossing the U.S. border. *Id.* 73:8–14. This has resulted in her forgoing international

---

voluntarily cooperating with ICE, but this letter too was not designed to become public. *Id*. 119:11–12; Ex. 69.

opportunities to present her work as well as visits with family members in Canada, including missing her mother's retirement party. *Id.* 73:3–7.

448. Prior to 2025, Prof. Hyska had planned to remain in the United States and be considered for tenure at the end of spring of 2026. *Id.* 36:6–12. Following the policy's enforcement, however, she began looking for employment outside of the United States due to her "stress and fear about the prospect of engaging in political speech in [the United States]." *Id.* 74:1–8.

449. If the government ended its ideological deportation policy, Prof. Hyska would feel comfortable exercising her political speech, including "going back to engaging more thoroughly in DSA work, potentially in leadership positions, and in writing and submitting for publication[s]" like the op-ed she wrote in March 2025. *Id.* 75:11–21. She would also plan to remain in her current job in the United States. *Id.* 75:11–13.

**3. Bernhard Nickel**

450. Bernhard Nickel is a professor of philosophy at Harvard University. July 8, Tr., Vol. 1, 53:20–25. Prof. Nickel was the chair of the philosophy department at Harvard for the last three years. *Id*. 54:1–4.

451. Prof. Nickel's research and teaching focus on the structures of language and how those structures inform the understanding of broader issues, including issues of history and politics. *Id.*, 58:17–60:4.

452. Prof. Nickel is a German citizen. *Id.* 54:5–8. He has lived in the United States for thirty years and has been a legal permanent resident for about twenty years. *Id*. 54:9–14.

453. Prof. Nickel came to the U.S. to attend college at Cornell University. July 8, Tr., Vol. 1, 55:14–16. After graduating from Cornell, Prof. Nickel spent a year volunteering for Habitat for Humanity in San Diego, California. *Id.* 57:7–14.

454. Prof. Nickel then pursued and completed his Ph.D. in philosophy at the Massachusetts Institute of Technology. *Id.* 57:15–23.

455. Prof. Nickel obtained a tenure-track position at Harvard University in 2006 and has been working at Harvard ever since. *Id.* 57:24–58:14.

456. Prof. Nickel is a member of the AAUP and Harvard-AAUP. July 8, Tr., Vol. 1, 61:14–18. He joined AAUP around the time when the Harvard chapter was founded, about a year ago. *Id*. 61:21–62:4.

457. Prof. Nickel joined the AAUP because faculty governance has been a very important issue at Harvard over the past two years, and the organization offers a way for faculty members to organize and make their voices heard. *Id*. 62:5–13.

458. Prof. Nickel has attended AAUP chapter meetings in the last year, July 8 Tr., Vol. 2, 94:10–17, and has also promoted Harvard-AAUP among his colleagues, *id*. 94:21–24.

459. Prior to the government's ideological deportation policy, Pro. Nickel was engaged in expression and association related to Israel and Palestine.

460. He had signed public letters and statements in support of Palestinian human rights and students' rights to engage in pro-Palestinian protests. *Id.* 61:6–13.

461. For example, in 2019, Prof. Nickel signed onto an open letter urging the director of the U.S. Holocaust Memorial Museum to retract its policy of condemning analogies between the holocaust and other events. Ex. 83; July 8, Tr., Vol. 1, 62:14–66:7. When Prof. Nickel signed onto

this open letter, he had no concerns about how it could affect his employment at Harvard or his immigration status. *Id.* 66:8–11.

462. In 2021, Prof. Nickel also signed onto a Harvard faculty statement in support of Palestinian human rights and self-determination. *Id.* 66:16–67:5; Ex. 84. This statement demanded an end to U.S.'s support for Israel's occupation and condemned the Israeli government's actions in Gaza. July 8, Tr., Vol. 1, 67:6–13.

463. Prof. Nickel signed onto this statement to express his support for people who are living under what he considers to be horrifying conditions in Gaza. *Id.* 67:14–20. When signing, he knew the letter would be publicly released and that the signatories would be publicly identified. *Id.* 67:21–25. When he signed onto this statement, Prof. Nickel had no concerns about how it could affect his employment at Harvard or his immigration status. *Id.* 68:1–5; July 8, Tr., Vol. 2, 100:22–101:7.

464. Prof. Nickel had also attended protests on issues related to Israel and Palestine.

465. For example, in the Spring of 2024, Prof. Nickel visited the pro-Palestinian encampment at Harvard approximately ten times. July 8, Tr., Vol. 1, 70:4–8. The purpose of such encampments was to demand Harvard's divestment from Israel and condemn Israel's military campaign. *Id*. 69:25–70:3. Prof. Nickel attended these encampments to support the students and their efforts to draw attention to the Isarael-Palestine conflict. *Id.* 70:23–71:24.

466. When Prof. Nickel attended the encampments, he had no concerns that his presence would cause him problems with Harvard or with his immigration status in the U.S. July 8, Tr., Vol. 1, 72:13–20.

467. Because of the ideological deportation policy, Prof. Nickel has curtailed his political speech, as described below.

468. Prof. Nickel understands the ideological deportation policy challenged in this lawsuit to be the Trump administration's policy of removing noncitizens who have spoken up about or are politically engaged in pro-Palestinian causes. July 8, Tr., Vol. 1, 54:15–55:4, July 8, Tr., Vol. 2, 81:21–25. This belief is informed by the arrests and attempted deportations of Mr. Khalil and Ms. Öztürk, as well as broader statements by the Trump administration conveying that pro-Palestinian protesters are not welcome in this country. *Id.* 82:1–7.

469. Prof. Nickel learned about Mr. Khalil's arrest from the news. *Id.* 82:13–15. He learned that Mr. Khalil was arrested at or close to his home in the presence of his then pregnant wife. *Id.* at 82:16–20. He also learned that Mr. Khalil was one of the leaders of some of the campus protests at Columbia University, and that he held a green card. *Id.* 82:25–83:13.

470. Prof. Nickel was scared after learning about Mr. Khalil's arrest because Prof. Nickel is a green card holder like Mr. Khalil and because Prof. Nickel believed based on news coverage of Mr. Khalil's proceedings that Mr. Khalil had been targeted based on his political speech. *Id.* 83:14–21, 82:21–25. Prof. Nickel never thought this kind of arrest would happen in America. *Id.* 83:14–21.

471. Prof. Nickel's own personal fear of reprisal came "much more sharply into focus" when Ms. Öztürk was arrested. *Id.* 83:22–24. Prof. Nickel learned about Ms. Öztürk's arrest through the media. *Id.* 84:18–21. He read accounts in newspapers saying that she was picked up in broad daylight off the street. *Id.* 84:22–24. He also remembers learning that "the only thing that [Ms. Öztürk] had done which could have anything to do with the arrest was publishing a piece in the Tufts student newspaper." *Id.* 84:25–85:2.

472. Prof. Nickel recalls seeing a video of Ms. Öztürk's being arrested on the street roughly two or three days after the incident. July 8, Tr., Vol. 2, 85:3–23. He found the video to be "really disturbing." *Id.* 85:9.

473. After Prof. Nickel learned about these arrests, he withdrew from public engagement on issues related to Israel and Palestine. *Id.* 86:2–13.

474. For example, Prof. Nickel now does not sign public letters or statements about Palestine, because he believes such letters may cause the Trump administration to target and deport him for his pro-Palestinian views. *Id.* 98:12–99:2, 100:22–101:7, 110:11–14.

475. Prof. Nickel has also curtailed his participation in protests. Following Mr. Khalil's arrest, he attended a demonstration in support of Mr. Khalil held in Harvard Yard, but he stayed away from the front row of the protest and was relieved to see that he was not in the picture published by the *Harvard Crimson*. *Id.* 86:14–24. Prof. Nickel believed if he drew attention to himself, he might potentially jeopardize his future international travel and be detained at the border for his pro-Palestinian views. *Id.* 86:25–87:13.

476. After learning of Ms. Öztürk's arrest, Prof. Nickel decided to keep his head down completely and refrain from going to protests, writing or signing onto public letters, or participating in any other potential forms of public advocacy. July 8, Tr., Vol. 1, 55:5–9; July 8, Tr., Vol. 2, 86:8–13.

477. Prof. Nickel has also cancelled his international travel due to his fear of being targeted under the policy. *Id.* 120:11–15.

478. For example, Prof. Nickel had planned to travel to Europe in May 2025 with his U.S. citizen daughter to visit his brother, who is terminally ill. July 8, Tr., Vol. 2, 87:17–88:22. He cancelled the trip, however, for fear of being detained at the border and denied reentry based on

his past statements in support of Palestinian human rights and his support of pro-Palestinian student protesters. *Id*. Prof. Nickel also fears that his role as the chair of the philosophy department at Harvard could draw additional scrutiny. *Id.* 120:11–20.

479. Prof. Nickel has also cancelled his trip to the United Kingdom for an academic conference for fear of potentially being detained at the border upon reentry. *Id.* 89:10–19, 90:4–10. Prior to March 2025, Prof. Nickel had frequently attended academic conferences outside of the United States. *Id.* 89:20–90:3.[11]

**C. The AAUP has been harmed by the policy.**

480. The AAUP has itself been harmed by the ideological deportation policy, because it has had to divert substantial time and resources to support its noncitizen members impacted by the policy, and because it has been deprived of its noncitizen members' insights and engagement, both of which are critical to the organization's mission.

**1. The AAUP has had to divert resources from mission-critical activities to support noncitizen members impacted by the policy.**

481. After the AAUP became aware of the ideological deportation policy, the AAUP redirected significant staff attention and resources to supporting noncitizen members affected by the policy. July 18, Tr., Vol. 1, 73:2–74:1 (Prof. Dubal).

482. Soon after the arrests of Mr. Khalil, Ms. Öztürk, and Dr. Khan Suri, the AAUP began receiving a deluge of questions from its noncitizen members. July 18, Tr., Vol. 1, 74:5–8

[11] Prof. Nickel has also engaged in speech critical of the Trump administration and advocating pro-Palestinian viewpoints in private emails sent to the philosophy department in his capacity as chair. July 8, Tr., Vol. 2, 78:15–23, 79:4–81:19, 108:4–10, 108:23–109:17. Although he has sent at least one such email after Mr. Khalil's arrest, *see id.* 108:4–10, 108:23–109:17, 117:22–118:13, Prof. Nickel believes these statements comes with less risk because they are not public but are aimed at a specific, close-knit community. *Id.* 90:21–91:16.

(Prof. Dubal). Noncitizen members expressed fear and concern to the AAUP, including through the AAUP's general counsel, Prof. Veena Dubal, about how the ideological deportation policy would affect their personal lives and economic livelihoods. *Id.* 73:2–74:7.

483. In response to these concerns, the AAUP has redirected substantial time and effort to provide resources to its noncitizen members, including through multiple townhalls, individual conversations, and legal counseling, as outlined below.

484. The AAUP has organized immigration townhall events in collaboration with immigration attorneys to address members' questions and concerns about the policy, and to share immigration-related information and resources. *Id.* 74:5–19, 75:2–12 (Prof. Dubal).

485. The first townhall the AAUP organized took place on March 27 and involved deportation law specialist Marc Van Der Hout. Ex. 184 at 13. It covered, among other things, information on the rights of visa holding students and faculty and best practices while traveling. *Id.* at 1, 13.

486. The townhall was co-organized with MESA. July 18, Tr., Vol. 1, 74:12–14 (Prof. Dubal).

487. It was held virtually over Zoom and was attended by members from all over the country. July 18, Tr., Vol. 2, 94:11–18 (Prof. Dubal).

488. The second immigration townhall took place in late May 2025, July 18, Tr., Vol. 1, 75:19–76:6 (Prof. Dubal), following Defendants' high-profile arrests and attempted deportations of additional students and scholars, *id.* 75:21–23 (Prof. Dubal), 76:12–19 (Prof. Dubal), including Mr. Mahdawi, *see supra* ¶ 263 (noting Mahdawi was arrested on April 14).

489. The AAUP organized the second immigration townhall because its noncitizen members continued to be concerned about the ideological deportation policy. July 18, Tr., Vol. 1, 76:15–19 (Prof. Dubal).

490. The AAUP had also received feedback from noncitizen members, who reported that they would welcome another immigration-focused event as they were finishing their semesters and arranging their summer travel and research plans. July 18, Tr., Vol. 1, 75:19–76:6 (Prof. Dubal).

491. The second immigration townhall covered similar topics as the first townhall and was also co-hosted by MESA. *Id.* 76:7–11 (Prof. Dubal).

492. The AAUP is planning a third immigration townhall for late July or early August before members come back to the U.S. to teach in the fall to address members' ongoing fears about what may happen when they cross the U.S. border, July 18, Tr., Vol. 1, 77:1–5 (Prof. Dubal), including fears about being denied reentry, detained, or deported, *see* July 7, Tr., Vol. 1, 72:15–73:14 (Prof. Hyska); July 7, Tr., Vol. 2, 138:8–15 (Prof. Al-Ali); July 8, Tr., Vol. 2, 89:10–19, 90:4–10 (Prof. Nickel).

493. The content of the immigration townhalls is different from the events the AAUP typically organizes. July 18, Tr., Vol. 1, 77:6–10 (Prof. Dubal).

494. The structure and planning of the immigration townhalls also differed from the events the AAUP typically organizes. July 18, Tr., Vol. 1, 77:11–24 (Prof. Dubal). In particular, the events were kept private to the membership rather than made public to allow noncitizen members to feel safer attending them and without the fear of their identity and participation in the meetings being leaked to ICE. *Id.*; July 18, Tr., Vol 2, 96:12–19 (Prof. Dubal).

495. The AAUP's staff, including Prof. Dubal, have invested substantial time and effort into organizing the immigration townhalls. July 18, Tr., Vol. 1, 73:19–23, 77:11–21 (Prof. Dubal). The AAUP has never had to focus on immigration law prior to the ideological deportation policy. *Id.* 77:6–10 (Prof. Dubal).

496. Separate from the AAUP's work in organizing the immigration townhalls, Prof. Dubal has also spent considerable time and resources fielding noncitizen members' fears concerning the ideological deportation policy. July 18, Tr., Vol. 1, 73:2–14. Prof. Dubal described her experience of the period since Mr. Khalil's arrest as "an emergency, like a nightmare over many months." *Id.* 80:12–13.

497. Since Mr. Khalil's arrest, Prof. Dubal has had as many as 80–100 conversations with individual AAUP members in her capacity as general counsel. July 18, Tr., Vol. 1, 79:11–14, 80:8–14.

498. In response to the individual member conversations, Prof. Dubal created lists of immigration attorneys that she could refer noncitizen members to, as well as new resources and information on members' rights for individuals who were too fearful to attend the immigration townhalls the AAUP had organized. July 18, Tr., Vol. 1, 81:5–12.

499. After individual member conversations, Prof. Dubal almost always referred the member she spoke with to immigration attorneys. July 18, Tr., Vol. 1, 81:18–20.

500. Prior to Mr. Khalil's arrest, it was not part of Prof. Dubal's role as general counsel to speak with members on an individual basis, let alone refer them to attorneys. July 18, Tr., Vol. 1, 81:21–23.

501. To meet noncitizen members' needs, Prof. Dubal was required to devote many hours to reading about and talking to experts in First Amendment and immigration law, which are not her areas of expertise. July 18, Tr., Vol. 1, 78:22–79:3.

502. Prof. Dubal's focus on immigration-related counseling marked a dramatic change in her work as general counsel. July 18, Tr., Vol. 1, 73:2–14, 78:22–79:7.

503. Prof. Dubal was hired and appointed as general counsel for the AAUP due to her expertise in labor law—in particular, her research and writing on precarious work and contingency. July 18, Tr., Vol. 1, 78:3–6, 21–22. One of the AAUP's goals when Prof. Dubal was hired was to address "adjunctification" as a threat to academic freedom.[12] *Id.* 78:8–11; *see also id.* 78:12–19.

504. Prof. Dubal has not been able to focus on the work that she was hired to do, because she has instead had to devote her time assisting the noncitizen members of the AAUP. July 18, Tr., Vol. 1, 78:22–79:7.

**2. The AAUP has been deprived of their noncitizen members' insights and engagement.**

505. Prof. Dubal observed that members she had individual conversations with about their immigration concerns changed the way they engaged with the AAUP. July 18, Tr., Vol. 1, 82:15–22. She saw that noncitizen members who were previously very active in the AAUP's membership meetings stopped attending the meetings or attended them with their videos off. *Id.*

506. In Prof. Dubal's experience, in other AAUP meetings that are open to the membership, it was common for members to keep their videos on and do nothing to hide their identity. July 18, Tr., Vol. 2, 99:15–20.

[12] "Adjunctification" refers to universities' increasing reliance on part-time, non-tenure track faculty. July 18, Tr. Vol. 1, 78:12–19 (Prof. Dubal). Non-law school adjunct professors typically don't enjoy full-time employment outside the university. *Id.*

507. The change in how noncitizen members have engaged with the AAUP has undermined the AAUP's mission. July 18, Tr., Vol. 1, 82:23–83:5 (Prof. Dubal). Specifically, the AAUP has been deprived of the voices, advocacy, and insights of their noncitizen members, *id.* 82:25–83:1 (Prof. Dubal), making it more difficult for the AAUP to effectively represent its full membership, and to promote academic freedom and shared governance. *Id.* Prof. Dubal described it as "an existential threat to the organization." *Id.* 83:4–5.

**D. MESA has been harmed by the policy.**

508. MESA has itself been harmed by the ideological deportation policy, because the policy has undermined MESA's advocacy activities supporting the civil and human rights of scholars and students in the field of Middle East studies, caused MESA to divert substantial time and resources to aid its noncitizen members, and decreased the membership participation in MESA's annual meetings.

**1. MESA has had to divert resources from mission-critical activities to support noncitizen members impacted by the policy.**

509. After MESA became aware of the ideological deportation policy, MESA has had to divert and expend significant staff time and resources on supporting noncitizen members impacted by the policy, as the following examples illustrate.

510. First, due to the policy, MESA has been forced to reactivate its previously dormant Task Force on Civil and Human Rights to advocate on issues related to the policy.

511. MESA has a Task Force on Civil and Human Rights, which focuses on, among other things, the ways in which immigration laws that target certain communities pose challenges to students and researchers working on topics related to the Middle East. Ex. 139 at 1. It serves as a vehicle to monitor legal and political developments and "devises ways for MESA to respond

effectively to the federal administration and its policies." *Id.* MESA's Task Force on Civil and Human Rights issues statements and provides resources to MESA's members. Ex. 139.

512. On March 10, 2025, the Task Force on Civil and Human Rights issued an advisory to MESA members in response to recent Trump administration policies, "condemn[ing] any actions taken against individual valid visa holders based on their expressive or associational activity" and noting "[r]ecent news reports indicat[ing] that the Trump Administration has begun revoking visas and/or detaining individuals in the United States who are on nonimmigrant visas or are permanent residents (green card holders) on the basis of their protected speech and associational activities." Exs. 97 at 1–2, 139 at 1.

513. On April 11, 2025, the MESA board of directors and its Task Force on Civil and Human Rights issued a joint statement "condemn[ing] in the strongest terms the Trump administration's targeting of noncitizen students and researchers for their constitutionally protected speech and advocacy." Ex. 103 at 1; *see also* Exs. 152, 153. The statement was a response to the ideological deportation policy challenged in this lawsuit and cited the arrests of Mr. Khalil, Dr. Khan Suri, and Ms. Öztürk, among others. *Id.* at 2–3. MESA's board and its Task Force on Civil and Human Rights stated that it would continue to act as a resource in the MESA membership's defense "in this climate of escalating fear." *Id.* at 5.

514. On May 13, 2025, MESA's Task Force on Civil and Human Rights announced its Academic Freedom Initiative. Ex. 105; *see also* Ex. 150. The initiative seeks to "identify and track trends regarding academic freedom and repression on campuses across North America," including by "document[ing] recent mass immigration enforcement." Ex. 105 at 1.

515. Prior to February 7, 2025, the most recent statement or resource the Task Force on Civil and Human Rights issued was on September 29, 2020. Ex. 139 at 1–2.

516. Second, MESA has been required to put on new events focused on informing members about the ideological deportation policy; their rights as citizens, legal permanent residents, or visa holders; and ways they can protect themselves from immigration enforcement.

517. For instance, on March 27, 2025, MESA co-sponsored an event with the AAUP called "Trump's Immigration Actions: What to Know." Ex. 100. The event included immigration and deportation law specialist Marc Van Der Hout as a speaker, and it sought to address the Trump administration's immigration actions and the rights of legal permanent residents, visa holders, and U.S. citizens. *Id.*

518. Similarly, on April 1, 2025, MESA hosted an event called "MESA Members: Know Your Rights Webinar." Ex. 101. The event was available only to current MESA members and was not recorded. *Id.*

519. On May 27, 2025, MESA co-hosted an event called "Know Your Rights Town Hall" with the AAUP. Ex. 106. The event was a pre-summer webinar "focused on immigration law, ideological detentions, and travel safety" and featured immigration attorneys Mr. Van Der Hout and Johnny Sinodis as speakers. *Id.* at 1. The webinar was aimed at discussing "updates in the detentions and attempted deportations of noncitizen students and scholars, best practices with respect to travel, and answers to the questions and concerns of international faculty." *Id.*

**2. MESA has been deprived of the insights and engagement of their noncitizen members.**

520. The ideological deportation policy has caused noncitizen members to withdraw from MESA events, including MESA's annual meeting, which is the organizations' most important event. Based on prior years' statistics, MESA anticipates that this will lead to an overall decrease in total membership in 2025.

521. The annual meeting is "a leading international forum for scholarship, intellectual exchange, and pedagogical innovation." Ex. 136 at 2. MESA hosts this meeting as part of its goal "to advance learning, facilitate communication and promote cooperation." *Id.* The annual meeting is provided for in MESA's bylaws. Ex. 134 at 3.

522. MESA's annual meeting is "an intellectual hub for people who work on the Middle East," including people who work on scholarship related to Israel and Palestine. July 8, Tr., Vol. 2, 137:8–14 (Prof. Abu El-Haj). The meeting includes pre-organized panels, roundtables, workshops, and meetings of the association. *See, e.g.,* Exs. 195 at 7–46, 194 at 10–86, 193 at 10–60; *see also* July 7 Tr., Vol. 2, 143:20–24 (Prof. Al-Ali). It also includes smaller group meetings, receptions, and occasions to network with colleagues. *See, e.g.,* Exs. 194 at 8–9, 193 at 8–9; *see also* July 7 Tr., Vol. 2, 143:24–144:3 (Prof. Al-Ali).

523. The annual meeting is MESA's biggest event. July 8, Tr., Vol. 2, 136:19–20 (Prof. Abu El-Haj). It provides an important forum for faculty to get to know one other and to participate in intellectual discourse. *Id.* 136:19–22. It also provides graduate students who are just entering the field with vital opportunities to present their work and to meet with other students and faculty working in Middle East studies. *Id.* 136:23–137:2.

524. MESA's 59th annual meeting will occur on November 22–25, 2025 in Washington, D.C. Ex. 137.

525. MESA set the initial deadline for paper and panel proposals for its 2025 annual meeting for noon on February 13, 2025. Ex. 128; *see also* Exs. 121–126. At the original deadline, MESA had received 1,050 abstracts submissions along with 157 pre-organized panels. Ex. 196. This marked "a significant drop" from what MESA's executive director expected. *Id.* As a result, MESA extended the submission deadline to noon on February 20, 2025. Exs. 118–19.

526. The only other time MESA changed its call for proposals submissions deadline for the MESA annual meeting was in 2023. Ex. 196 at 1. That year, the deadline was extended by one week to accommodate those affected by the earthquakes in Turkey and Syria. *Id.*; see also Ex. 189 at 1.

527. After the one-week extension in 2025, MESA reached a total of 1,422 abstract submissions and 160 pre-organized panel submissions. Ex. 196. This was still "lower than the average of a large meeting in a popular location." *Id.*

528. In 2023—the last time MESA held an in-person annual meeting in a major city—MESA received 1,557 abstracts with 214 pre-organized panels. *Id.* In 2020—the last time MESA was scheduled to host an annual meeting in Washington, D.C. (before it was moved online due to the COVID-19 pandemic)—MESA received 1,543 abstracts with 235 pre-organized panels. *Id.*

529. This is likely to affect MESA's overall membership numbers for the year. On April 3, 2025, MESA had 2,208 members. Ex. 191 at 1. On April 21, 2023, prior to MESA's annual meeting in Montreal, the organization had 2,433 members. *Id.* On March 18, 2020, prior to the annual meeting that was originally planned for Washington, D.C., the organization had 2,462 members. *Id.* On April 28, 2017, prior to MESA's last in-person meeting in Washington, D.C., the organization had 2,466 members. *Id.* MESA's staff has estimated that MESA's expected year-end membership for 2025 is approximately ten percent below expectations for a year where the annual meeting is held in Washington, D.C. *Id.*; *see also* Ex. 192.

530. Noncitizen members of MESA have shared concerns with MESA's president that attending the MESA annual meeting this year could subject green card holders to ideological targeting and retaliation by the U.S. government. July 7, Tr., Vol. 2, 143:7–19, 144:8–12 (Prof. Al-Ali).

**Plaintiffs' Requested Rulings of Law**

Based on the record adduced at trial, this Court should hold that Plaintiffs AAUP and MESA have standing. The Court should hold that the ideological deportation policy violates the First Amendment for two independent reasons: (1) because it is impermissibly viewpoint discriminatory, and (2) because it is impermissibly retaliatory. In so doing, the Court need not address the constitutionality of the statutory provisions underlying the policy, but if the Court does so, it should hold that those provisions are all unconstitutional as applied. The Court should also hold that Defendants' coercive threats to arrest, detain, and deport noncitizens independently violate the First Amendment. Finally, it should hold that the ideological deportation policy violates the Administrative Procedure Act ("APA") because it constitutes "final agency action," and it is contrary to constitutional right and arbitrary and capricious.

## V. Plaintiffs the AAUP and MESA have standing.

The evidence adduced at trial establishes that the AAUP and MESA have standing for two distinct reasons. First, they have associational standing to sue on behalf of their noncitizen members who have been chilled by the ideological deportation policy.[13] Second, they have organizational standing to sue on their own behalf because the policy has impeded their abilities to carry out their missions.

[13] As Plaintiffs have previously argued, the AAUP and MESA also have associational standing to sue on behalf of their U.S. citizen members who would have standing to sue in their own right, because the policy burdens their right to hear from and associate with specific noncitizens and directly injures their own expressive interests; and because their injuries are fairly traceable to the policy and would likely be redressed by Plaintiffs' requested relief. *See* Pls.' Pretrial Br., ECF No. 186, at 30–32. Plaintiffs do not address this argument further here, because the Court has ruled that Plaintiffs lack associational standing to sue on behalf of their citizen members and did not allow Plaintiffs to proffer testimony on this issue. *See* July 8, Tr., Vol. 2, 141:2–142:6.

**A. The AAUP and MESA have associational standing to assert the rights of their noncitizen members.**

The AAUP and MESA have associational standing to sue on behalf of their noncitizen members because the interests they seek to protect are germane to their scholarly and academic missions; neither the claims asserted, nor the relief requested, requires the participation of Plaintiffs' individual members in the lawsuit; and Plaintiffs' members "would otherwise have standing to sue in their own right." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see In re Fin. Oversight and Mgmt. Bd. for P.R.*, 110 F.4th 295, 309 (1st Cir. 2024) (applying *Hunt*).

As an initial matter, the expressive and associational interests of the AAUP's and MESA's members are germane to the organizations' missions. MESA's mission is to foster the study of the Middle East, including by encouraging public understanding of the region and its peoples. *See* PFOF ¶ 359. The ability of MESA's members to engage in expression and association on issues related to Israel and Palestine connects directly with that mission. That is true when MESA's members engage in scholarly expression and association related to Israel and Palestine, and it is also true when they engage in "extramural" speech by, for instance, posting on social media, signing public statements, or otherwise contributing to public discourse about Israel and Palestine. All of those expressive and associational activities further MESA's mission to promote public understanding of the Middle East.

Protecting the ability of AAUP members to engage in speech and association related to Israel and Palestine is similarly germane to the AAUP's mission of advancing academic freedom and shared governance. *See* PFOF ¶ 350. This includes scholarly expression on matters within AAUP members' disciplinary expertise. For instance, Prof. Al-Ali, a member of both the AAUP and MESA, testified that prior to the introduction of the ideological deportation policy she

published numerous books, academic articles, and book chapters that touch on Israel and Palestine. *See id.* ¶¶ 379–383. It also includes AAUP members' extramural speech and association. As Prof. Dubal testified, the AAUP has had a longstanding interest in protecting the ability of faculty and academic professionals to engage in extramural speech, including their rights to speak and advocate on issues outside of their areas of disciplinary expertise, because this speech is integral to their roles as public intellectuals, thinkers, and participants in broader public discourse. *See id.* ¶¶ 351–352. This includes their members' rights to participate in political protests and to sign public statements. *Id.*[14]

The AAUP's and MESA's noncitizen members would have standing to sue in their own right because the ideological deportation policy chills their speech and expressive activities and because their injuries are fairly traceable to the policy and would likely be redressed by Plaintiffs' requested relief. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). In the First Amendment context, "an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences." *N.H. Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 13 (1st Cir. 1996). In those circumstances, the "vice" of the government action "is its pull toward self-censorship." *Id.* at 14.

As described above, Plaintiffs' noncitizen witnesses have each been pulled to various forms of self-censorship due to fear that they may be arrested, detained, or deported pursuant to the policy. *See, e.g.*, PFOF ¶¶ 395–419 (describing MESA and AAUP member Prof. Al-Ali), 433–448 (describing AAUP member Prof. Hyska), 467–479 (describing AAUP member Prof. Nickel). For instance, Prof. Al-Ali testified that she felt compelled to abandon a research project making a

[14] There is no dispute that the claims asserted and the relief requested do not require the participation of the AAUP's or MESA's individual members.

feminist critique of Hamas because she believed it could lead to her targeting under the ideological deportation policy. *See id.* ¶¶ 410–412. She also decided to forgo leadership opportunities in the Association for Middle East Women's Studies—a scholarly organization affiliated with MESA that is directly connected to her academic work—and turned down research opportunities that would require travel to the Middle East due to fears that she may be arrested, detained, or deported under the policy. *See id.* ¶¶ 406, 418. Likewise, due to the policy, Prof. Hyska has withdrawn from public-facing leadership opportunities in the DSA, an organization that is publicly associated with pro-Palestinian viewpoints. *See id.* ¶¶ 441–442. Prof. Hyska also declined to publish a fully-drafted op-ed criticizing the rising authoritarianism of the Trump administration after she learned of Ms. Öztürk's detention and attempted deportation. *See id.* ¶¶ 444–445.

These harms are not the result of subjective or irrational fear. Rather, the AAUP's and MESA's noncitizen members are being deterred from participating in pro-Palestinian protests and related expression and association because they face "a credible threat that the [policy] will be enforced" against them if they do. *Mangual v. Rotger-Sabat*, 317 F.3d 45, 57 (1st Cir. 2003) (quoting *N.H. Right to Life PAC*, 99 F.3d at 14). The First Circuit has instructed that courts should "assume" a threat of enforcement is credible "in the absence of compelling contrary evidence." *Id.* (quoting *N.H. Right to Life PAC*, 99 F.3d at 15); *see also id*. (stating that "the evidentiary bar" for establishing a credible threat of enforcement in First Amendment cases "is extremely low"); *Berner v. Delahanty*, 129 F.3d 20, 24 (1st Cir. 1997) ("[A] realistic risk of future exposure to [a] challenged policy . . . is sufficient to satisfy" constitutional and prudential standing requirements.). Here, the threat is credible because Defendants have publicly stated—over and over again—that they intend to arrest, detain, and deport noncitizens who have engaged in pro-Palestinian expression; they have targeted an untold number of those noncitizens already (Secretary Rubio's

public remarks indicated that they had targeted close to 300 for visa revocation by the end of March, *see* PFOF ¶ 174, Ex. 36); and they have declared that they will target many more. *See* PFOF ¶ 343.

The injury to these noncitizen members is also fairly traceable to the policy and would be redressed by Plaintiffs' requested relief. As Plaintiffs' noncitizen witnesses testified, they each engaged in a range of expressive and associational activities prior to the ideological deportation policy but made the decision to reduce or stop those activities altogether once they learned of the policy and the actions Defendants have taken pursuant to it. Profs. Al-Ali, Nickel, and Hyska testified that the arrest, detention, and attempted deportation of Mr. Khalil and Ms. Öztürk specifically motivated their decisions to self-censor. *See* PFOF ¶¶ 395–402 (Prof. Al-Ali), 433–437 (Prof. Hyska), 468–473 (Prof. Nickel). Finally, Plaintiffs' requested relief would provide redress because these injuries flow directly from the policy. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("If a defendant's action causes an injury, enjoining the action . . . will typically redress that injury."). As Plaintiffs' noncitizen witnesses testified, they would be willing to pursue the expressive and associational activities they once did if Defendants were to abandon the ideological deportation policy. *See* PFOF ¶¶ 420 (Prof. Al-Ali), 449 (Prof. Hyska). In any event, all Plaintiffs need show is that the "risk would be reduced to some extent if [Plaintiffs] received the relief they seek." *Massachusetts v. E.P.A.*, 549 U.S. 497, 526 (2007); *see also Larson v. Valente*, 456 U.S. 228, 244, n.15 (1982) (stating that a plaintiff "need not show that a favorable decision will relieve his *every* injury"). Plaintiffs easily clear that bar.

Courts regularly conclude that plaintiffs have established associational standing based on members' self-censorship. *See, e.g.*, *Dream Defs. v. Governor of the State of Fla.*, 57 F.4th 879, 888 (11th Cir. 2023) (holding that organizations that lead protests had associational standing to

challenge a riot law which caused their members to abstain from protests for fear of being arrested and charged with rioting); *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, No. 25-CV-091-LM, 2025 WL 1188160, at *12–14 (D.N.H. Apr. 24, 2025) (finding that an education union had associational standing to raise First Amendment claims based on its members' reasonable decisions to self-censor following the issuance of a Department of Education letter addressing diversity, equity, and inclusion); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 269 (D. Md. 2025) (reasoning that the AAUP, among other plaintiffs, had associational standing to challenge executive orders aimed at ending diversity, equity, and inclusion programs because it had members who reasonably feared that their academic activities could subject them to punishment under the executive orders). This Court should do the same here.

**B. The AAUP and MESA have organizational standing.**

The AAUP and MESA also have standing to sue on their own behalf because the policy has seriously harmed their abilities to carry out their missions.[15]

First, the policy has deterred noncitizen faculty and students from participating in the AAUP's and MESA's events. As described above, Prof. Dubal testified that noncitizen members who she otherwise would have expected to be active participants in the AAUP's events have instead withdrawn from them, including virtual events, out of fear that they might be identified at the events. *See* PFOF Part IV.C.2. The policy has also caused MESA members to withdraw from MESA's annual meeting, its largest and more important event. *See id.* Part IV.D.2. The annual meeting, an academic conference that depends on the participation of MESA's members, has had

[15] In its motion to dismiss opinion, the Court ruled that "at least MESA has organizational standing to sue based on its own injuries." *Am. Ass'n of Univ. Professors v. Rubio*, No. CV 25-10685-WGY, 2025 WL 1235084, at *18 (D. Mass. Apr. 29, 2025). It declined to rule whether the AAUP had organizational standing at that stage, but acknowledged that at least some of its reasoning as to MESA applied to the AAUP as well. *Id.*

a lower submissions rate than expected, and MESA's staff expect that this will result in a notable drop in overall memberships for 2025. *See id.* ¶¶ 522–529. That economic injury alone suffices to establish standing. As the First Circuit has made clear, "[i]t is a bedrock proposition that a relatively small economic loss—even an identifiable trifle—is enough to confer standing." *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 923 F.3d 209, 222 (1st Cir. 2019). But even apart from this economic loss, the drop in attendance by noncitizen scholars at the annual meeting will harm MESA's mission of fostering scholarship and intellectual exchange on topics related to the Middle East. *See* PFOF ¶¶ 405, 521–523, 530.

Second, the policy has forced the AAUP and MESA to divert resources from other projects to address their noncitizen members' reasonable fears that they will be targeted under the policy. One way in which an organization can demonstrate standing is by pointing to a "concrete and demonstrable injury to the organization's activities," with a "consequent drain on the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also Louis v. Saferent Sols., LLC*, 685 F. Supp. 3d 19, 32 (D. Mass. 2023) ("[O]nly a perceptible impairment of an organization's activities is necessary." (citation omitted)). The evidence at trial demonstrated a significant diversion and drain to both the AAUP's and MESA's resources. Prof. Dubal testified that, following the arrest of Mr. Khalil, the AAUP organized two immigration townhalls (and has planned a third one) to address member concerns related to the policy. *See* PFOF ¶¶ 484–492. These events were different in kind from the types of events the AAUP has previously organized. *See id.* ¶¶ 493–495. Additionally, Prof. Dubal testified that she, a member of the AAUP's leadership team, has spent considerable time and resources on addressing members' concerns related to the policy, including in her role as general counsel advising members of their rights and connecting them with immigration attorneys. *See id.* ¶¶ 496–501. This has

diverted Prof. Dubal's attention away from the duties that the AAUP expected her to perform when she first took on the role of general counsel. *See id.* ¶¶ 502–504. MESA likewise has been forced to expend significant resources as a result of the policy. MESA's Task Force on Civil and Human Rights, which had largely been dormant since late 2020, has issued several statements in response to the ideological deportation policy and related issues. *See id.* ¶¶ 510–515. Additionally, MESA's leadership has also been compelled to develop new and different programming for members—including know your rights workshops and immigration trainings with deportation law specialists—that would not typically fall under the purview of a scholarly association. *See* PFOF ¶¶ 516–519; *see also id.* ¶¶ 486, 491 (describing the immigration townhalls co-hosted with the AAUP).

These injuries are fairly traceable to the ideological deportation policy and would be redressed by the relief Plaintiffs seek. The evidence shows that noncitizen members have withdrawn from the AAUP's and MESA's events after the high-profile arrests of Mr. Khalil and others, *see* PFOF Parts IV.C.2 (AAUP), IV.D.2 (MESA), and that the AAUP and MESA were forced to react to the policy and its anticipated impact on their members by diverting resources away from existing priorities to address concerns related to the policy, *see id.* Parts IV.C.1 (AAUP), IV.D.1 (MESA). Were Defendants to abandon the ideological deportation policy, the AAUP and MESA would no longer be forced to devote significant resources to protecting their members from the policy, and their noncitizen members would be willing to attend their events that address Israel and Palestine. *See Diamond Alt. Energy LLC v. E.P.A.*, 145 S.Ct. 2121, 2139 (June 20, 2025) (holding that to demonstrate causation and redressability, "the plaintiff must simply 'show a predictable chain of events' that would likely result from judicial relief and redress the plaintiff's injury" (citation omitted)).

## VI. The ideological deportation policy violates the First Amendment.

### A. Defendants have a policy of revoking the visas and green cards of pro-Palestinian protesters, and of arresting, detaining, and deporting them.

The evidence at trial established that Defendants have a policy of revoking the visas and green cards of students and faculty engaged in pro-Palestinian advocacy, and of arresting, detaining, and deporting them. The existence of the policy is evidenced by: (1) Defendants' statements, (2) Defendants' efforts to implement the policy, and (3) Defendants' enforcement of the policy against the Targeted Noncitizens, among others.

As explained at greater length above, *see generally* PFOF Part II.A, Defendants' official public statements are concrete admissions of the existence of the policy. Defendants have said explicitly that they will deport students and faculty who engage in speech they deem to be pro-Hamas or antisemitic, *see, e.g.*, PFOF ¶ 17 (Secretary Rubio: "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported."); they have acknowledged that they have already done so, *see, e.g.*, *id.* ¶ 202 (DHS stating on its official account that Khalil was arrested for being "aligned" with Hamas); *id.* ¶ 27 (Secretary Rubio acknowledging that most of the administration's visa revocations to date "related to pro-Palestinian protests"); and they have said that they will continue to do so, *see, e.g.*, *id.* ¶ 20–22. Defendants have conflated pro-Palestinian advocacy with speech that is pro-Hamas or antisemitic. *See, e.g.*, *id.* ¶ 26 (Deputy Secretary Edar: "[Khalil] is somebody that we've invited and allowed . . . to come into the country, and he's put himself in the middle of the process of basically pro-Palestinian activity."). *See generally* Part II.A.2. They have also made clear that the policy is about *speech*—not about antisemitic violence or conduct. For instance, when DHS's Deputy Secretary was asked whether any criticism of Israel or the U.S. could lead to deportation, he said: "Let me put it this way, . . . imagine if he came in and filled out the form and said, 'I want a student visa.' They asked

him, 'What are you going to do here?' And he says, 'I'm going to go and protest.' We would have never let him into the country." *Id.* ¶ 26.

These public statements are not simply a use of the bully pulpit. Officers at the defendant agencies have treated the official public statements described above as policy, and they have incorporated the statements into their own internal policy guidance. *See, e.g.*, PFOF ¶¶ 121–122, 155, 159. If there were any doubt about whether Defendants' public statements reflect agency policy, this fact resolves it.

The defendant agencies have also implemented the policy. *See generally* PFOF Part II.B. DHS has launched an operation to identify students and faculty engaged in pro-Palestinian advocacy—an operation that involves receiving lists of suspected protesters, and converting these lists into reports of analysis that repeat unvetted allegations that the protesters espoused antisemitism or terrorism. *See id.* Part II.B.2. The agencies have established a new referral process for quickly arresting and detaining those identified based on their lawful political protest. *See id.* Part II.B.3. The State Department has also issued new, formal guidance memorializing the multiple legal pathways it believes it may take to deport pro-Palestinian protesters. *See generally id.* Part II.B.4. That guidance makes clear that the State Department may revoke the visas of students who engage in pro-Palestinian protest, on the theory that protesting is inconsistent with student-visa status. *See id.* ¶¶ 146–148, 161–66. It also makes clear that the State Department may revoke the visas of, or determine to be deportable, those who engage in speech perceived to be antisemitic or supportive of terrorism or terrorist groups. *See id.* ¶¶ 146–50, 152, 154–155, 163–165. The seniormost official who testified at trial—Mr. Armstrong, who has the authority to revoke visas with the stroke of his pen, and whose action memos recommending the deportation of green-card holders were signed by Secretary Rubio—confirmed that these legal pathways may be used to

target noncitizens who denounce Zionism, *id.* ¶ 157.b, criticize Israel's actions in Gaza, *id.* ¶ 157.c, call for an arms embargo on Israel, *id.* ¶ 157.e, call Israel an apartheid state, *id.* ¶ 157.g, call for divestment from Israel, *id.* ¶ 157.d, compare Israel to Nazi Germany, *id.* ¶ 157.h, or criticize the state of Israel as a racist endeavor, *id.* ¶ 157.i; *see also id.* ¶ 125.

And finally, Defendants have enforced the policy against an untold number of students, including the five Targeted Noncitizens who have been the focus of discovery and trial. *See* PFOF Part II.C. Defendants targeted these individuals because of a decision made by senior officials (never identified by Defendants in this case) to focus the immigration enforcement authorities of the government on people whose names appear on websites dedicated to blacklisting pro-Palestinian protesters. In each case, DHS then produced a report of analysis that relied almost entirely, if not exclusively, on unvetted allegations that the political speech in which the individual engaged was antisemitic or pro-Hamas. In each case, the report of analysis was relied upon without meaningful fact-finding or vetting as the basis for either revoking the individual's visa or determining them to be deportable. And in four of the five cases, Defendants decided to prioritize the arrest of these individuals—none of whom posed any threat to public safety—based on instructions that came from senior officials (again, not identified by Defendants).

Outside of this Court, Defendants take credit for all of the above. But in this Court, Defendants deny the policy's existence, arguing that there is "not any formal directive, or codified program." Gov't PI Opp'n 18, ECF No. 65. That argument should be rejected for two reasons.

First, the policy is in fact codified in writing. Many of the official statements announcing the policy are written statements. For example, Secretary Rubio's statement that he will deport "Hamas supporters" was posted on X from his official Secretary of State account, *see* PFOF ¶ 17, and the record makes clear that his subordinates treat his public statements, including statements

on X, as official "guidance," *see id.* ¶¶ 121–122, 155, 159; *see also id.* ¶¶ 16, 19, 21, 23–24 (multiple other written statements describing the policy). Many of the components of the policy have also been memorialized in writing—including through State Department cables and updates to the Foreign Affairs Manual. *See, e.g.*, *id.* Part II.B.4. And each of the decisional memos in the cases of the Targeted Noncitizens distills into writing the operation and logic of the policy, including its conflation of antisemitism and support for Hamas, on the one hand, with speech critical of Israel, on the other. *See, e.g.*, Ex. 8 (Mr. Khalil); Ex. 12 (Mr. Mahdawi); Ex. 19 (Ms. Chung); Ex. 21 (Dr. Khan Suri); Ex. 250 (Ms. Öztürk).

Second, even if the policy were entirely unwritten, this Court was correct in observing that "First Amendment challenges may be brought against unwritten policies." *AAUP*, 2025 WL 1235084, at *19; *see also Aracely v. Nielsen*, 319 F. Supp. 3d 110, 138–39, 145–49 (D.D.C. 2018) (collecting cases); *Greater Bos. Legal Servs. v. DHS*, No. 21-cv-10083, 2022 WL 138629, at *7 (D. Mass. Jan. 14, 2022). A contrary rule would insulate a broad array of official conduct from review, which is why courts have not adopted it. *Aracely*, 319 F. Supp. 3d at 139. The relevant question, then, is not whether Defendants have set down in writing the ideological deportation policy, but whether the evidence establishes that Defendants are in fact pursuing a policy of targeting students and faculty for immigration enforcement based on their pro-Palestinian expression. The evidence clearly establishes that fact.[16]

[16] When addressing challenges to unwritten policies, courts routinely treat the public statements of government officials as evidence of a policy's existence. *See, e.g.*, *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 165 (E.D.N.Y. 2018) ("Defendants have repeatedly stated that there is a policy and even pointed to regulations that purportedly authorize such a policy."); *Hoye v. City of Oakland*, 653 F.3d 835, 856 (9th Cir. 2011) (noting that public officials' statements that "acknowledge" or "definitively articulate a content-discriminatory enforcement policy" can be evidence of that policy's existence); *Elec. Priv. Info. Ctr. v. DHS*, 653 F.3d 1, 7 (D.C. Cir. 2011) (explaining that, in the APA context, it is "clear that an agency pronouncement will be considered binding as a

Defendants have also argued that there is no ideological deportation policy because their immigration enforcement actions have relied entirely on existing legal authorities. *See, e.g.*, July 21, Tr., Vol. 1, 54:1–18. This argument is also mistaken for two reasons.

First, the ideological deportation policy does in fact rely on new legal authorities. In 2021, DHS issued formal guidelines making clear that "[a] noncitizen's exercise of their First Amendment rights . . . should never be a factor in deciding to take enforcement action." Memorandum from Secretary of Homeland Security Mayorkas to Tae Johnson, Acting Director of U.S. Immigration and Customs Enforcement, *Guidelines for the Enforcement of Civil Immigration Law* (Sept. 30, 2021), *available at* https://perma.cc/Z7CL-NV5D. The ideological deportation policy relies on a tacit reversal of this guidance. *See* PFOF ¶ 13. The policy also relies on interpretations of Defendants' legal authorities that are novel. Most notably, the foreign policy provision of the INA appears never before to have been interpreted to authorize the Secretary of State to determine that a noncitizen is removable for having expressed constitutionally protected viewpoints. *See, e.g.*, [redacted]. Defendants' position is presumably that this authority had lain dormant but never once been exercised in the decades since the provision's enactment. The more plausible account is that Defendants reinterpreted the statute to provide new power that Defendants then put to service in carrying out their new policy of ideological deportation. *See infra* VI.E (explaining that Congress intended the provision to apply exceptionally narrowly).

practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding" (quoting *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002))).

Second, even if the policy relied exclusively on existing legal authorities, that would be irrelevant to the question of whether the policy exists. In *Hoye v. City of Oakland*, for example, the Ninth Circuit had no trouble concluding that the City of Oakland had adopted "a content-discriminatory enforcement policy," 653 F.3d at 856, even though the policy relied on an existing legal authority. In arriving at this conclusion, the Ninth Circuit rejected Oakland's claim "that it has no enforcement policy distinct from the [underlying ordinance]," holding that the city was "enforcing a different, unwritten, rule" of targeting pro-life protesters. *Id.* The same is true here. None of the statutory provisions relied upon by Defendants compel them to target pro-Palestinian protesters for enforcement. It is only the ideological deportation policy that explains why Defendants have nonetheless been doing so.

In fact, courts have frequently found that agencies have adopted new policies—even in the face of agency denials—based on changes in agency practice. *See, e.g.*, *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 174–76, 185 (D.D.C. 2015) (concluding that ICE adopted policy of taking deterrence of mass migration into account in making custody determinations based on "the recent increased detention of Central American mothers and children"); *Velesaca v. Decker*, 458 F. Supp. 3d 224, 241 (S.D.N.Y. 2020) (finding that ICE adopted no-release policy based on substantial decrease in number of arrestees released on bond); *R.F.M. v. Nielsen*, 365 F. Supp. 3d 350, 374–75 (S.D.N.Y. 2019) (concluding that USCIS adopted new policy of deeming Family Court not to be a juvenile court under the INA with respect to certain young immigrants based on "sudden departure from its past practice"); *see also FCC v. Fox*, 556 U.S. 502, 517 (2009) (treating single enforcement decision as evidence of a "new enforcement policy," where the agency decision "broke[] new ground"). As the district court in *R.F.M. v. Neilsen* observed, "[an] agency's description of its practice is not conclusive as to whether there [has been] a policy change, 'for it

is the substance of what the [agency] has purported to do and has done which is decisive.'" 365 F. Supp. 3d at 375 (quoting *Columbia Broad. Sys. v. United States*, 316 U.S. 407, 416 (1942)).

Here, even if one leaves aside the 2021 DHS guidelines, it is clear that there has been a sea change in agency practice that only the existence of a new policy can explain. *See, e.g.*, PFOF ¶ 44 (DHS did not produce reports of analysis on student protesters before 2025); *id.* ¶¶ 76, 81–82 (DHS did not refer students to the State Department based on their protest activity before 2025); [REDACTED]; *see also* July 21, Tr., Vol. 1, 47:7 (Court) (observing that Defendants have used their authorities "[i]n ways never before seen").[17]

**B. Noncitizens lawfully present in the country have the same First Amendment rights as citizens.**

Noncitizens lawfully present in the United States are entitled to the full protection of the First Amendment. This has been settled law since *Bridges v. California* (*Bridges I*), 314 U.S. 252 (1941), and *Bridges v. Wixon* (*Bridges II*), 326 U.S. 135 (1945). Both cases involved Harry Bridges, an Australian citizen and labor organizer. The first involved California's attempt to jail Bridges for contempt of court after he refused to stop publishing editorials criticizing judges in cases pending against his union. The Supreme Court struck down the contempt sanctions applying

[17] Whether the Court calls this change a new policy or a new practice is not relevant to Plaintiffs' First Amendment challenge; either is unconstitutional and would be remediable by Plaintiffs' requested relief, as Plaintiffs explained in their preliminary-injunction briefing (and as they'll explain at greater length in briefing the question of remedy, should the Court rule in their favor on liability). With respect to Plaintiffs' APA claims, what matters is whether the policy or practice constitutes "final agency action" that is reviewable under the APA. Set-aside relief under the APA, also known as vacatur, is not barred by 8 U.S.C. § 1252(f)(1). *See AAUP*, 2025 WL 1235084, at *7; PI Reply, ECF No. 69, at 9–10. Nor is it limited by the Supreme Court's decision in *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2554 n.10 (2025) ("Nothing we say today resolves the distinct question of whether the [APA] authorizes federal courts to vacate federal agency action.").

then-prevailing First Amendment doctrine, even though Bridges was a noncitizen. *Bridges I*, 314 U.S. at 268–78.[18]

The second case involved the government's effort to deport Bridges under statutory provisions that rendered noncitizens deportable if they were affiliated with, or members of, a political party that advocated the overthrow of the U.S. government by force or violence. *Bridges II*, 326 U.S. at 141. The government targeted Bridges for his alleged association with the Communist Party, pointing principally to his role in publishing a militant journal that the government contended was controlled by a Communist Party–linked union. *Id*. at 145–46. The Court found the government's allegations insufficient to satisfy the requirements of the statute, but only after construing the statutory provisions narrowly against the background of the First Amendment. *Id*. at 148. In reaching its conclusion, the Court stated in no uncertain terms: "Freedom of speech and the press is accorded aliens residing in this country." *Id*. (citing *Bridges I*). "That Bridges' aims are energetically radical may be admitted," it continued, "but the proof fails to establish that the methods he seeks to employ to realize them are other than those that the framework of democratic and constitutional government permits." *Id*. at 149.

The Court reached this conclusion in *Bridges II* even though it had yet to hold unequivocally that the First Amendment embraces the freedom of association, *cf. NAACP v. Alabama*, 357 U.S. 449, 460 (1958); even though Bridges himself was avowedly sympathetic to the Communist Party, *Bridges II*, 326 U.S. at 149; and even though it was widely believed at the time that the threat that communism posed to "democratic and constitutional government" was not just real but existential, *id.*; *see Dennis v. United States*, 341 U.S. 494, 497–98, 501 (1951). *See*

[18] The majority made no mention of Bridges' alienage, but Justice Frankfurter's dissent made clear that the Court was aware of it. *Bridges I*, 314 U.S. at 280 (Frankfurter, J., dissenting) ("[O]ne of the petitioners here is an alien[.]").

*generally* Ellen Schrecker, *Many are the Crimes: McCarthyism in America* (1998). Importantly, the Court expressly rejected the suggestion that its analysis should be different because Bridges was threatened with deportation rather than criminal prosecution. *Bridges II*, 326 U.S. at 148. The Court wrote: "Although deportation technically is not criminal punishment, it may nevertheless visit as great a hardship as the deprivation of the right to pursue a vocation or a calling." *Id*. at 147. Quoting Justice Brandeis, the Court continued: "Deportation may result in the loss 'of all that makes life worth living.'" *Id*. (quoting *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922)).

In concurrence, Justice Murphy agreed that the proceeding against Bridges was unconstitutional but explained that he would find the underlying statute unconstitutional as well. *Id.* at 160 (Murphy, J., concurring) . The government's defense of the statute, he noted, relied on the proposition that "the deportation power of Congress is unaffected by considerations which in other contexts might justify the striking down of legislation as an abridgement of the constitutionally guaranteed rights of free speech and association." *Id.* To accept this proposition would mean that Congress could deport aliens "for whatever reasons it may choose"—including for merely criticizing the government, or for subscribing to an unpopular political belief. *Id.* at 160. Justice Murphy emphatically rejected this idea, observing that the First Amendment protects "persons," not just citizens, and that it "make[s] no exception in favor of deportation laws or laws enacted pursuant to a 'plenary power' [over immigration]." *Id*. at 161.

Justice Murphy also observed that accepting the government's argument would "make our constitutional safeguards transitory and discriminatory in nature," because "the government would be precluded from enjoining or imprisoning an alien for exercising his freedom of speech . . . while at the same time the government would be free, from a constitutional standpoint, to deport him for exercising that same freedom." *Id.* at 162. Justice Murphy concluded by highlighting the

implications of Bridges' case for the millions of other noncitizens in the United States—many of whom, he noted, had been driven from their original homelands "by bigoted authorities who denied the existence of freedom and tolerance." *Id*. at 166. Of those noncitizens, he wrote, "The Bill of Rights belongs to them, as well as to all citizens. It protects them as long as they reside within the boundaries of our land." *Id*.

Since *Bridges II*, the proposition that "[f]reedom of speech and of press is accorded aliens residing in this country" has been regarded as "well settled," including in the context of immigration enforcement. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 497 (1999) (Ginsburg, J., concurring in part). The Supreme Court has cited *Bridges II* with approval in observing that the First Amendment does not "acknowledge[] any distinction between citizens and resident aliens." *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953); *cf. Citizens United v. FEC*, 558 U.S. 310, 392–93 (2010) (Scalia, J., concurring) (noting that "the Amendment is written in terms of 'speech,' not speakers" and that "[i]ts text offers no foothold for excluding any category of speaker"). And multiple courts have affirmed that noncitizens lawfully admitted to the United States are entitled to "the full panoply of First Amendment rights." *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1063–66 (9th Cir. 1995); *Parcham v. INS*, 769 F.2d 1001, 1004 (4th Cir. 1985) ("It has long been held that aliens residing in this country enjoy the protection of the First Amendment."); *Ragbir v. Homan*, 923 F.3d 53, 69 (2d Cir. 2019) (holding that the First Amendment protects noncitizens who are threatened with deportation for their protected speech), *cert. granted, judgment vacated on other grounds sub nom. Pham v. Ragbir*, 141 S. Ct. 227 (2020).[19]

[19] In *Bluman v. FEC*, a three-judge panel of the U.S. District Court for the District of Columbia upheld a law that prohibited noncitizens on work visas from donating to federal and state political candidates and political parties, reasoning that the First Amendment did not preclude Congress

Over the past five months, multiple courts have had occasion to consider challenges brought by foreign students to their detentions under the ideological deportation policy. Without exception, every court to have addressed the question has come to the same conclusion: The First Amendment protects noncitizens against viewpoint-based deportation—in the same way it protects citizens and noncitizens alike against viewpoint-based sanctions imposed in other contexts. *See, e.g.*, *Mohammed H. v. Trump*, No. 25-CV-1576, 2025 WL 1692739, at *3 (D. Minn. June 17, 2025) (citing *Bridges II* for the proposition that the First Amendment "applies equally to citizens and noncitizens"); *Aditya W.H. v. Trump*, No. 25-CV-1976, 2025 WL 1420131, at *10 (D. Minn. May 14, 2025) ("[T]he First Amendment right to free speech protects citizens and noncitizens alike, and applies broadly to those in the United States."); *Ercelik v. Hyde*, No. 25-CV-11007, 2025 WL 1361543, at *10 (D. Mass. May 8, 2025) (stating that the First Amendment's protections have "long extended to noncitizens residing within the country"); *Mahdawi v. Trump*, No. 2:25-CV-389, 2025 WL 1243135, at *9 (D. Vt. Apr. 30, 2025) ("Noncitizen residents . . . enjoy First Amendment rights in this country to the same extent as United States citizens."); *Öztürk v. Trump*, No. 2:25-CV-374, 2025 WL 1145250, at *18 (D. Vt. Apr. 18, 2025) (citing *Bridges II* for the proposition that "First Amendment protections have long extended to noncitizens residing within the country").

---

from barring noncitizens from participating in activities "intimately related to the process of democratic self-government." 800 F. Supp. 2d 281, 287 (D.D.C. 2011) (Kavanaugh, J.), *aff'd*, 565 U.S. 1104 (2012). The court assumed that strict scrutiny applied but concluded that the statute was constitutional nonetheless. The court emphasized, however, that the constitutional analysis would be different if the law applied to legal permanent residents, or if it restricted noncitizens from "issue advocacy and speaking out on issues of public policy," *id.* at 292, and it expressly cited *Bridges II* for the proposition that "resident aliens [are] protected by the First Amendment in the context of deportation," *id. at* 286.

Against this background, Defendants' contention that noncitizens are not fully protected by the First Amendment is indefensible. Revealingly, the only First Amendment cases that Defendants have cited in defense of the ideological deportation policy—*United States ex rel. Turner v. Williams*, 194 U.S. 279 (1904), and *Harisiades v. Shaughnessy*, 342 U.S. 580 (1952)—predate the emergence of the modern First Amendment. *Turner* was based on the "distinction between rights and privileges," Adam B. Cox, *The Invention of Immigration Exceptionalism*, 134 Yale L.J. 329, 363 n.122 (2024), but that distinction simply has no purchase in contemporary First Amendment jurisprudence, *id*. (*citing, e.g.*, *Wieman v. Updegraff*, 344 U.S. 183, 192 (1952)).[20] Similarly, when the Court upheld the deportation of Communist Party members in *Harisiades*, it applied then-prevailing free speech principles under which even U.S. citizens could be punished for association with the Party. 342 U.S. at 592 (citing *Dennis v. United States*, 341 U.S. 494 (1951)); *see also Reno*, 70 F.3d at 1064 (endorsing this interpretation of *Harisiades*); *AAUP*, 2025 WL 1235084, at *19 ("The Public Officials' reliance on case law from the height of the second Red Scare era, such as *Harisiades* . . . , is misplaced[.]").

The *Bridges* cases and their progeny make clear that noncitizens do not lose their First Amendment rights in the deportation context. Any other rule would render noncitizens' First Amendment rights "transitory" (to use Justice Murphy's word) because the threat of deportation would hover ever-present over a noncitizen's every utterance. It would also render First Amendment doctrine incoherent, because the government would be barred from (say) censoring a noncitizen's op-ed on the basis of viewpoint but not from expelling her from the country on the

[20] *Turner* also involved the exclusion of a noncitizen not granted admission, rather than the deportation of someone previously allowed to enter. That distinction matters because "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

same basis. And it would chill and deter noncitizens from engaging in activities that are of manifest value to our society, including from sharing insights and information that immigrants can uniquely contribute to our public discourse. *Cf. Lane v. Franks*, 573 U.S. 228, 240 (2014) (observing that public employees' speech has "special value" because of public employees' distinctive knowledge and experience). Indeed, restricting noncitizens' First Amendment rights would have the effect of depriving citizens of insights and information that they have a right to receive. *See, e.g.*, *Kleindienst v. Mandel,* 408 U.S. 753, 762–63 (1972) (stating, in addressing U.S. citizens' challenge to denial of visa to a foreign scholar, that "[i]t is now well established that the Constitution protects the right to receive information and ideas"); *Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965) (invalidating statute that burdened U.S. citizens' right to receive expressive material from abroad).

At the opening of trial, the Court asked counsel for the government whether "a noncitizen lawfully in the United States has the same constitutional rights under the First Amendment as a citizen." July 7, Tr., Vol., 15:8–11. Before backtracking, counsel for the government responded, "people in the United States share the same rights under the First Amendment." *Id.* at 15:24–16:2. That response was correct.

**C. The ideological deportation policy is unconstitutional because it discriminates on the basis of viewpoint.**

The evidence at trial established that the ideological deportation policy discriminates against noncitizen students and faculty based on their pro-Palestinian expression and association. This violates the First Amendment's prohibition on viewpoint discrimination.

**1. The policy is subject to strict scrutiny because it discriminates on the basis of viewpoint.**

If a regulation of speech discriminates based on content or viewpoint, then the regulation is "presumptively unconstitutional" unless the government demonstrates that it is "narrowly

tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015); *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (characterizing viewpoint discrimination as an "egregious form of content discrimination"); *id.* at 828 ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."). A regulation of speech is content- or viewpoint-based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163.

It is beyond serious question that the ideological deportation policy is viewpoint based. As explained above, Defendants have openly proclaimed their policy of targeting individuals based on expression that Defendants deem to be "antisemitic," "pro-Hamas," "pro-terrorist," or "pro-Palestinian." *See* PFOF Part II.A. They have launched an operation to identify students and faculty who engage in this expression. *See* PFOF Part II.B.2. They have established a new referral process for quickly arresting and detaining those individuals. *See* PFOF Part II.B.3. They have issued new guidance formalizing the multiple legal pathways that exist for revoking the visas of pro-Palestinian protesters. *See* PFOF Part II.B.4. They acknowledge having enforced the policy against potentially hundreds of student protesters, including the five Targeted Noncitizens, and have said they will enforce it against others. *See* PFOF Part II.C.

Tellingly, with respect to the five Targeted Noncitizens, Defendants have cited—in support of their legal authority to act—the fact that each individual expressed constitutionally protected viewpoints. *See* PFOF ¶¶ 185–195 (Mr. Khalil), 215–230 (Ms. Öztürk), 252–261 (Mr. Mahdawi), 267–281 (Dr. Khan Suri), 290–302 (Ms. Chung). Defendants' explanations to the public confirm that this was the basis for their actions. *See id.* ¶¶ 200–206 (Defendants' public statements

regarding Mr. Khalil), 239–242 (regarding Ms. Öztürk), 287 (regarding Dr. Khan Suri). This is textbook viewpoint discrimination.

**2. The policy fails strict scrutiny because it is not narrowly tailored to serve a compelling governmental interest.**

Because the ideological deportation policy is viewpoint-discriminatory, it must be invalidated unless it survives strict scrutiny—but it cannot. To begin with, the policy challenged here is especially offensive to First Amendment values for at least two reasons.

First, the speech targeted by the policy—criticism of Israel's policies, criticism of our own government's policies relating to the Middle East, and advocacy for Palestinian rights—is "at the core of what the First Amendment is designed to protect." *Virginia v. Black*, 538 U.S. 343, 365 (2003). As the Court noted at the final pretrial conference, "statements concerning the policies of the State of Israel are political expression and are among the most protected statements under the First Amendment." June 26, Tr., 24:14–16, ECF No. 165. Accordingly, the ideological deportation policy "trenches upon an area in which the importance of First Amendment protections *is at its zenith*," *Ragbir*, 923 F.3d at 70 (2d Cir. 2019) (quoting *Meyer v. Grant*, 486 U.S. 414, 421–22, 425 (1988)), *cert. granted, judgment vacated on other grounds sub nom. Pham v. Ragbir*, 141 S. Ct. 227 (2020); *see also Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991).

Second, the policy challenged here regulates speech in the university setting, a setting in which the First Amendment's protections are especially important. As the Supreme Court has recognized, regulations of speech on campus pose the acute danger of "chilling [the] individual thought and expression . . . that is at the center of our intellectual and philosophic tradition." *Rosenberger*, 515 U.S. at 835. And as this Court has already explained, "the First Amendment is 'nowhere more vital than in our schools and universities.'" *AAUP*, 2025 WL 1235084, at *16 (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 763 (1972)); *see also Rosenberger*, 515 U.S. at 836

("For the [state] University, by regulation, to cast disapproval on particular viewpoints of its students risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses.").

Defendants have sought to defend the ideological deportation policy by pointing to national security and foreign policy concerns, but the mere incantation of these interests cannot satisfy the First Amendment's requirements. *See, e.g.*, *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010) ("[C]oncerns of national security and foreign relations do not warrant abdication of the judicial role. We do not defer to the Government's reading of the First Amendment, even when such interests are at stake."); *N.Y. Times Co. v. United States*, 403 U.S. 713, 719 (1971) (Black, J., concurring) ("The word 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment."); *Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986) ("The Executive has broad discretion over the admission and exclusion of aliens, but that discretion is not boundless. . . . It is the duty of the courts, in cases properly before them, to say where [the] statutory and constitutional boundaries lie.").

While the government does of course have a legitimate interest in addressing antisemitism and other forms of invidious discrimination, the policy challenged here conflates antisemitism with criticism of the Israeli government's policies and general expressions of support for Palestinian human rights and self-determination, and by doing so implicates a broad swath of political speech that falls within the core of the First Amendment's protection. Even a policy that focused more narrowly on the suppression of antisemitic or racist speech would still run afoul of the First Amendment. *See, e.g.*, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395–96 (1992) (viewpoint-discriminatory ordinance is not "narrowly tailored to serve compelling state interests" when the

ordinance is meant to "display[] the [government's] special hostility" toward that viewpoint). The policy challenged here, which sweeps far more broadly, plainly cannot be reconciled with settled First Amendment doctrine.

That the speakers targeted by the policy are noncitizens does not change the analysis. As explained above, noncitizens in the United States have "full" First Amendment rights. *See, e.g.*, *Reno*, 70 F.3d at 1063–66. But even if they did not, the First Amendment would still foreclose the government from arresting and deporting them based on political viewpoint. *Id.* at 1056 (foreign policy concerns do not deprive the courts of their "essential function in ensuring that aliens are not targeted by the INS in retaliation for exercising their acknowledged constitutional rights"); *Ragbir*, 923 F.3d at 73 (holding that the First Amendment protects noncitizens who are threatened with deportation as a result of their protected speech). In fact, multiple courts have made clear that the First Amendment limits the government's power to act on the basis of viewpoint even when it seeks to *exclude* a foreign citizen who has *not yet been admitted* to the country—a context in which Congress's power is "plenary," the only First Amendment rights at issue are the listener interests of U.S. citizens, and the courts' role is narrowly circumscribed. *See infra* Part VI.E (discussing cases).

**3. Plaintiffs need not prove censorial intent to succeed on their viewpoint-discrimination claim.**

During closing arguments, the Court stated that "If there was no intent to chill the speech of [Plaintiffs'] clients, they lose." July 21, Tr., Vol. 1, 49:11–12. Respectfully, this observation was incorrect as to Plaintiffs' viewpoint-discrimination claim. It is settled law that the intent behind a viewpoint-discriminatory regulation of speech is irrelevant to its constitutionality. If a regulation of speech is viewpoint-based, it "is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the

regulated speech." *Reed*, 576 U.S. at 165 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)). In other words, if a policy regulates speech on the basis of its content or viewpoint, strict scrutiny applies no matter the government's intent, and the "party opposing the government need adduce no evidence of an improper censorial motive." *Id.* (quoting *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 117 (1991) (internal quotation marks omitted)).

For this reason, Plaintiffs need not demonstrate that Defendants intended to chill speech to prevail on their viewpoint discrimination claim (though, as detailed above, the evidence establishes that this was Defendants' intent). *See* PFOF Part III. It is enough that, through the ideological deportation policy, Defendants are acting based on viewpoint.

**D. The policy is unconstitutional for the independent reason that it is retaliatory.**

The ideological deportation policy is unconstitutional for the additional reason that it is impermissibly retaliatory—that is, it reflects a decision to take adverse action against individuals based in substantial part on their constitutionally protected speech.

Ordinarily, when an individual plaintiff alleges First Amendment retaliation, the plaintiff must show that (1) they "engaged in constitutionally protected conduct"; (2) that they were "subjected to an adverse action" by the defendant; and (3) that "the protected conduct was a substantial or motivating factor in the adverse action." *Gattineri v. Town of Lynnfield, Mass.*, 58 F.4th 512, 514 (1st Cir. 2023) (quoting *Falmouth Sch. Dep't v. Doe on behalf of Doe*, 44 F.4th 23, 47 (1st Cir. 2022) (internal quotation marks omitted)). Here, Plaintiffs challenge a policy, rather than any individual instance of retaliation. The Supreme Court has explained that "[a]n official retaliatory policy is a particularly troubling and potent form of retaliation, for a policy can be long term and pervasive, unlike an ad hoc, on-the-spot decision by an individual [government official]."

*Lozman v. City of Riviera Beach, Fla.*, 585 U.S. 87, 100 (2018). To prove that the ideological deportation policy is retaliatory, Plaintiffs have shown that (1) the policy targets a category of individuals engaged in constitutionally protected expression and association, (2) the policy entails the taking of adverse actions against that category of individuals, and (3) Defendants' motivation for the policy was to punish individuals for their constitutionally protected expression and association.

First, the evidence has shown that Defendants established and implemented a policy of targeting noncitizen students and faculty engaged in constitutionally protected pro-Palestinian expression. *See* PFOF Part II.A–II.B. Second, the evidence has shown that, pursuant to the policy, Defendants have targeted (and continue to target) such individuals for immigration enforcement, including visa and green card revocation, arrest, detention, and deportation. *See* PFOF Part II.C. Finally, the evidence has shown that Defendants are targeting these individuals *because of* their constitutionally protected speech. This evidence included, among other things: Defendants' public statements describing the policy, which acknowledge their intent to retaliate against pro-Palestinian protestors, *see* PFOF Part II.A; Defendants' systematic effort to identify protesters, *see* PFOF Part II.B.2; Defendants' establishment of a new referral process to quickly arrest and deport those identified, *see* PFOF Part II.B.3; Defendants' issuance of new guidance codifying a framework for revoking the visas of protesters based on their disfavored viewpoints, *see* PFOF Part II.B.4; and the actual enforcement of the policy against the five Targeted Noncitizens, in which the government has cited each individual's pro-Palestinian speech or protest activity as a justification for taking adverse action, *see* PFOF Part II.C.

Many other courts, relying on narrow slices of the evidence described above, have concluded that Defendants likely retaliated against specific students for their pro-Palestinian

expression and advocacy. *See, e.g.*, *Mahdawi*, 2025 WL 1243135 at *10 (relying on same public statements as here in concluding that "this evidence is sufficient for Mr. Mahdawi's present purpose of raising a 'substantial claim' of First Amendment retaliation"); *Öztürk*, 2025 WL 1145250 at *19 (in allowing Ms. Öztürk's retaliation claim to proceed, observing that "[a]dministration officials have identified her speech as the reason her visa was revoked"); *Suri v. Trump*, No. 1:25-cv-00480, 2025 WL 1392143, at *1 (E.D. Va. May 14, 2025), *aff'd*, No. 25-1560, 2025 WL 1806692, at *4 (4th Cir. July 1, 2025) ("The government doesn't contest the district court's finding that it detained Suri in retaliation for his First Amendment activity."); *Ercelik*, 2025 WL 1361543 at *11 (concluding that "every fact points to Petitioner's [pro-Palestinian expression] as the substantial or motivating factor for Respondents' pursuit of detention"); *Aditya W.H*, 2025 WL 1420131 at *11 (concluding that the evidence "evince[s] an Executive policy to target noncitizen students located in the United States based on the expression of viewpoints about matters of public concern disfavored by the government," including pro-Palestinian expression); *Mohammed H*, 2025 WL 1692739 at *4 ("The more plausible inference, supported by timing, context, and the Government's own public statements, is that Petitioner was arrested and detained because he expressed pro-Palestinian views and criticized violence in Gaza.").

The much broader array of evidence in this case shows that the cases of individual students were instances of a broader policy. That broader policy entails retaliation against noncitizen students and faculty for expression and association protected by the First Amendment.

During closing arguments, Defendants asserted that the Supreme Court's decision in *Hartman v. Moore*, 547 U.S. 250 (2006), allows them to retaliate against protected speech so long as they have an independent "rational basis" for doing so. *See* July 21, Tr., Vol. 1, 51:7. This argument is wrong and reflects a basic misunderstanding of *Hartman*.

In *Hartman*, the Supreme Court required individuals who allege retaliatory prosecution to demonstrate a lack of probable cause before they may recover damages. *See* 547 U.S. at 252, 265–66. The Court's reasoning relied on considerations unique to the context of criminal prosecutions. Specifically, the Court observed that, in cases alleging retaliatory prosecution, the causal link between animus and harm is unusually complicated because the motivations of the police officers who instigated the prosecution may be independent of the motivations of the prosecutors who pursued the prosecution. *Id.* at 263 ("Herein lies the distinct problem of causation in cases like this one. Evidence of an inspector's animus does not necessarily show that the inspector induced the action of a prosecutor who would not have pressed charges otherwise."). Even as it imposed a special pleading obligation for claims of retaliatory prosecution, the Court reaffirmed the rule that "as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Id.* at 256.

Since *Hartman*, moreover, the Supreme Court has made clear that the no-probable-cause rule does not apply to claims challenging a retaliatory policy. In *Lozman*, 585 U.S. at 87, the Supreme Court considered a plaintiff's claim that "the City itself retaliated against him pursuant to an 'official municipal policy' of intimidation." *Id.* at 99. The City of Riviera Beach responded by invoking *Hartman* and arguing that Lozman had to demonstrate that the City lacked probable cause to arrest him (in ejecting him from the public portion of a city council meeting). *Id.* at 97–99. The Court emphatically rejected the City's reliance on *Hartman*, holding that the case's rationale does not apply when a plaintiff challenges a retaliatory *policy*:

> The fact that Lozman must prove the existence and enforcement of an official policy motivated by retaliation separates Lozman's claim from the typical retaliatory arrest claim. An official retaliatory policy is a particularly troubling and potent form of retaliation, for a policy can be long term and pervasive, unlike an ad hoc, on-the-spot decision by an individual officer. An official policy also can be difficult to dislodge. A citizen who suffers retaliation by an individual officer can

> seek to have the officer disciplined or removed from service, but there may be little practical recourse when the government itself orchestrates the retaliation. For these reasons, when retaliation against protected speech is elevated to the level of official policy, there is a compelling need for adequate avenues of redress.

*Id.* at 100.

*Hartman* thus has no relevance to Plaintiffs' case, which does not involve retaliatory prosecution, and which challenges an official policy rather than any individual instance of retaliation.

Even if *Hartman* applied, however, it is clear from the circumstances of the Targeted Noncitizens that Defendants pursued their retaliatory efforts even when they lacked any basis for their actions other than protected speech and association. In Ms. Öztürk's case, for example, the Report of Analysis provides [REDACTED]. *See* Ex. 232 (claiming that Ms. Öztürk "is a co-author of an Op-Ed calling for divestment from Israel and associates with Tufts Students for Justice in Palestine, which was suspended for calls for student intifada"). [REDACTED]. On the stand, Armstrong characterized these justifications as focused on conduct, *see* July 18, Tr., Vol. 1, 58:2–4 ("And the emphasis on that was that it wasn't just her statements, it was things that she did."), but publishing

an op-ed and associating with the political demands of another student group are speech and association protected by the First Amendment.

**E. The Court need not address the constitutionality of the INA provisions relied upon by Defendants, but if it does, it should hold that they are unconstitutional as applied.**

At several points throughout these proceedings, the Court has asked whether it must address the constitutionality of the INA provisions on which Defendants have relied in carrying out the ideological deportation policy. The answer is no. Plaintiffs' primary argument is that the policy itself violates the First Amendment, and that it does so irrespective of its statutory bases. If the Court agrees, then a conclusion of law to that effect would fully resolve Plaintiffs' constitutional claims, and it would provide a complete basis for the relief Plaintiffs seek. As explained further below, however, if the Court addresses the INA, then it should hold that the provisions relied upon by Defendants are unconstitutional as applied "[t]o the extent Defendants rely on [them] as the basis for carrying out the policy." Compl. ¶ 135.

A hypothetical may help illustrate the point. Imagine that Boston adopted a policy of prosecuting "pro-life" protesters, and that it carried out the policy under the commonwealth's laws on disorderly conduct and public nuisance. That policy would be unconstitutionally viewpoint discriminatory, and a court could hold as much (and provide an adequate remedy) without needing to address the constitutionality of the underlying criminal laws. Individuals prosecuted under the policy could, of course, argue that the criminal laws relied on in their individual cases are unconstitutional as applied; they might also be able to make out a claim of First Amendment retaliation. But those challenging the policy itself—in a civil case, outside of an individual enforcement action—would not need to challenge the underlying criminal laws to get redress.

This fact pattern, in broad strokes, is not uncommon. For example, in, 653 F.3d at 835, the Ninth Circuit addressed the constitutionality of Oakland's policy of enforcing its abortion-clinic protest ordinance in a content-discriminatory manner. The court discussed at some length whether the challenge was properly characterized as an as-applied challenge to the ordinance, a challenge to the ordinance's selective enforcement, or a challenge to the city's policy of enforcing the ordinance in a content-discriminatory way. *Id.* at 854–56. While the court observed that Oakland's "policy is unconstitutional, no matter the analytical approach taken," *id.* at 856, it ultimately held only "that Oakland's enforcement policy is . . . constitutionally invalid," *id.* at 859, without explicitly addressing whether the ordinance was unconstitutional as applied, *id.*

To be sure, a ruling in Plaintiffs' favor might *imply* that the statutory authorities underlying the ideological deportation policy are unconstitutional as applied—but that is no basis for rejecting Plaintiffs' challenge to the policy itself. Anytime a policy is challenged on constitutional grounds, a ruling against the policy may imply that the authority underlying the policy is unconstitutional as applied.

For these reasons, the Court needn't address the constitutionality of the INA provisions that underly the ideological deportation policy. And there is good reason for the Court to focus on the policy rather than the INA provisions. Defendants have been relying on a suite of provisions to carry out the policy: the foreign policy provision, 8 U.S.C. § 1227(a)(4)(C), the endorse-or-espouse provisions, *id.* § 1227(a)(4)(B), the State Department's visa-revocation authority, *id.* § 1201(i), and a statutory presumption, *id.* § 1184(b), which the State Department has interpreted to permit the revocation of visas of students who engage in activities that are inconsistent with student-visa status. *See* PFOF II.B.3–II.B.4 & Part II.C.1. In the cases of the five Targeted Noncitizens, Defendants happened to rely on only two of these provisions: the foreign policy

provision and the State Department's visa-revocation authority. But if the Court limited its ruling to these provisions, Defendants could circumvent the Court's ruling—and force Plaintiffs into a game of whack-a-mole—by relying upon other provisions to implement the same unconstitutional policy.

If the Court nonetheless *does* address the constitutionality of the statutes underlying the policy, it can and should hold that they are unconstitutional as applied. Plaintiffs' complaint pleaded this claim in the causes of action, *see* Compl. ¶ 135 (quoted in the opening paragraph of this section), and in the request for relief, *see id.* at 47–48 (Request for Relief D).

At several points during this litigation, the Court has asked whether it is relevant to the constitutional question here that Congress has passed a law authorizing the Secretary of State to revoke the visas of individuals based on their lawful speech. *See* 8 U.S.C. § 1227(a)(4)(C); (incorporating the exception described in clause (iii) of § 1182(a)(3)(C), which provides that an individual may be excluded from the United States on the basis of their political beliefs if "the Secretary of State personally determines that the alien's admission would compromise a compelling United States foreign policy interest"). There are good reasons to believe that Congress intended this authority to be an exceptionally narrow one that doesn't authorize viewpoint discrimination. *See, e.g.*, H.R. Rep. No. 101-955 (1990) (Conf. Rep.), *as reprinted in* 1990 U.S.C.C.A.N. 6784, 6794 ("It is the intent of the conference committee that this authority would be used sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies."); *Khalil v. Trump*, No. 25-cv-01963 (MEF) (MAH), 2025 WL 1514713, at *36 (D.N.J. May 28, 2025) (legislative history and enforcement history demonstrate that the provision was intended to be used only in response to conduct "that

entirely or all but entirely took place outside the United States").[21] But even interpreting the provision broadly, it is ultimately no defense to Plaintiffs' constitutional claims because (to state the obvious) Congress cannot authorize violations of the Constitution. *See, e.g.*, *Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it; or, that the legislature may alter the constitution by an ordinary act.").

If the First Amendment forbids the government from deporting students and faculty based on their pro-Palestinian expression, then any statute that purports to authorize that violation of the Constitution is necessarily unconstitutional, at least as applied.

To the extent the Court's concern is that Congress's power over foreign policy and immigration trumps the First Amendment in this context, that concern has already been resolved in favor of the First Amendment. As the cases discussed above demonstrate, citizens and noncitizens lawfully present have the same First Amendment rights. *See* PCOL Part VI.B. The government could not constitutionally punish citizens for the speech at issue in this case, and so it cannot punish noncitizens, either. Indeed, even in the context of excluding foreign citizens not yet admitted into the country—where Congress's power over immigration and foreign policy is greater than in this case—multiple courts have made clear that the First Amendment limits the government's power to engage in viewpoint discrimination. *See, e.g.*, *Abourezk v. Reagan*, 592 F. Supp. 880, 887 & n.23 (D.D.C. 1984) ("[A]lthough the government may deny entry to aliens altogether, or for any number of specific reasons, it may not, consistent with the First Amendment,

[21] The provision's text is further evidence that it is meant to apply only to non-domestic speech and association. Its specification that the Secretary of State may take action based on speech that "would be lawful *within the United States*," *see* 8 U.S.C. § 1182(a)(3)(C)(iii), suggests that the speech in question must be speech abroad. This limitation coheres with the Court's recognition that noncitizens inside the U.S. have long been understood to enjoy full First Amendment rights.

deny entry solely on account of the content of speech."), *vacated and remanded on other grounds*, 785 F.2d 1043 (D.C. Cir. 1986); *Allende v. Shultz*, 605 F. Supp. 1220, 1225 (D. Mass. 1985) (quoting relevant language from *Abourezk*, 592 F. Supp. at 887, approvingly), *aff'd*, 845 F.2d 1111 (1st Cir. 1988); *Harvard L. Sch. F. v. Shultz*, 633 F. Supp. 525, 531 (D. Mass. 1986) ("[T]he Secretary's reason . . . is not facially legitimate [because it] is directly related to the suppression of a political debate with American citizens."), *vacated without opinion*, 852 F.2d 563 (1st Cir. 1986); *see also Am. Acad. of Religion v. Chertoff*, 463 F. Supp. 2d 400, 415–16, 419 (S.D.N.Y. 2006), *aff'd sub. nom. Am. Acad. of Religion v. Napolitano*, 573 F.3d 115 (2d Cir. 2009).

Finally, to the extent the Court is concerned that holding that the foreign policy provision is unconstitutional as applied would be tantamount to invaliding the statute in its entirety, the Court needn't be concerned. An as-applied ruling here wouldn't invalidate all applications of the foreign policy provision. For instance, a ruling in Plaintiffs' favor would not resolve the distinct question of whether it would be constitutional to deport a foreign *official* who had engaged in speech that undermines U.S. foreign policy interests. Nor would it prevent the government from attempting to demonstrate in other cases that it can satisfy strict scrutiny (with respect to viewpoint-based invocations of the foreign policy provision) or intermediate scrutiny (with respect to content-neutral invocations of the foreign policy provision). All the Court must resolve is whether it is constitutional for Defendants to deport noncitizen students and faculty based on their pro-Palestinian expression. It is not.

## VII. Defendants' coercive threats independently violate the First Amendment.

Defendants' public statements help establish the existence and scope of the ideological deportation policy—a policy that is unconstitutional for the reasons explained above. But these statements also violate the First Amendment in themselves, because they are part of a campaign

of threats aimed at suppressing pro-Palestinian speech and advocacy. Of course, the government is entitled to speak on matters of public concern, including in ways that might deter disfavored political views, as this Court observed at earlier hearings in this case. *See, e.g.*, May 6, 2025, Tr., ECF No. 87, 8:6–13. But the government's threats to arrest, detain, and deport noncitizen students and faculty for their protected expression and associations—and their subsequent actions making good on those threats—go far beyond legitimate government speech. They are unconstitutional attempts to intimidate noncitizens into silence. The evidence at trial showed that Defendants' high-profile roundup of student protesters and their public statements accompanying that conduct are unconstitutionally "coercive threats aimed at punishing or suppressing disfavored speech." *NRA v. Vullo*, 602 U.S. 175, 197 (2024) (cleaned up).

The Supreme Court has made clear that government speech has its limits. Of course, government officials must be able to speak—sometimes forcefully—to do their jobs. "Indeed, it is not easy to imagine how government could function if it lacked this freedom." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 468 (2009); *see also Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015) ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."); *Goldstein v. Galvin*, 719 F.3d 16, 30 (1st Cir. 2013) ("Not only do public officials have free speech rights, but they also have an obligation to speak out about matters of public concern."). But "[t]his does not mean that there are no restraints on government speech." *Pleasant Grove*, 555 U.S. at 468.

Most importantly here, the Supreme Court held in *Bantam Books, Inc. v. Sullivan* that the First Amendment forbids government officials from using the "threat of invoking legal sanctions and other means of coercion" to "achieve the suppression" of protected speech. 372 U.S. 58, 67 (1963). As the Court explained just last Term in reaffirming *Bantam Books*, this rule ensures "that

a government official cannot do indirectly what she is barred from doing directly." *Vullo*, 602 U.S. at 190; *see also Perkins Coie LLP v. U.S. Dep't of Just.*, No. 25-716, 2025 WL 1276857, at *26 (D.D.C. May 2, 2025) ("[T]hreats of retaliation to effectuate viewpoint discrimination [are] uniquely harmful to a free and democratic society." (cleaned up)).

The constitutional line that *Bantam Books* and *Vullo* draw is between permissible efforts to persuade and impermissible efforts to coerce. In *Bantam Books*, a state commission with authority to investigate violations of the state's obscenity laws sent letters to a book distributor explaining that "certain designated books or magazines" were, in the commission's view, "objectionable," and "reminding" the distributor of the commission's "duty to recommend to the Attorney General prosecution of purveyors of obscenity." 372 U.S. at 60–62. When the publishers of the books sued, the Supreme Court held that the commission had impermissibly used the threat of legal sanctions to suppress disfavored publications. *Id.* at 67. Similarly, in *Vullo*, a financial regulator "brought a variety of insurance-law violations to [an insurer's] . . . attention during a private meeting," but suggested that "she would be less interested in pursuing these infractions so long as [the insurer] ceased providing insurance to gun groups, especially the NRA." 602 U.S. at 192 (cleaned up). The Court held that the official was free to criticize the NRA, but that she had impermissibly used the power of the state to coerce suppression of the organization's gun-promotion advocacy. *Id.* at 194. The line drawn by these cases seeks to give appropriate breathing space to the government's authority and obligation to speak on issues of public significance, while foreclosing speech that is intended to scare individuals into silence. *See id.* at 188.

To prevail on a coercion claim under *Bantam Books* and *Vullo*, the Supreme Court has said that a plaintiff must show that government officials engaged in "conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish

or suppress the plaintiff's speech." *Id*. at 191. Courts must consider the totality of the circumstances in applying this test, including factors like "'(1) word choice and tone; (2) the existence of regulatory authority; (3) whether the speech was perceived as a threat; and, perhaps most importantly, (4) whether the speech refers to adverse consequences." *Id.* at 189 (quoting *NRA v. Vullo*, 49 F.4th 700, 715 (2d Cir. 2022)), *vacated and remanded*, 602 U.S. 175 (2024)) ; *see also President & Fellows of Harvard Coll. v. DHS.*, No. 25-cv-11472, 2025 WL 1737493, at *21 (D. Mass. June 23, 2025) (citing a threatening statement by a government spokesperson as evidence that the government was "us[ing] the power of the State to punish or suppress disfavored expression").

The evidence at trial demonstrated that Defendants' campaign of threats is coercive. *See generally* PFOF Part III (summarizing evidence of Defendants' intent to chill speech). Defendants have repeatedly threatened to revoke the visas and green cards of, and to arrest, detain, and deport noncitizens based on their political speech. *See* PFOF II.A. These statements called out a particular group that had engaged in protected political speech, *see, e.g.*, PFOF ¶ 27 ("[I]f you are in this country on a student visa and are a participant in those movements, we have a right to deny your visa."); *id.* ¶ 26 ("This is somebody that we've invited and allowed the student to come into the country, and he's put himself in the middle of the process of basically pro-Palestinian activity."); they threatened specific adverse consequences, *see, e.g.*, *id.* ¶ 17 ("We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported."); they came from officials with the regulatory authority to carry out the threat, *see, e.g.*, *id.* (Secretary Rubio); and they were understood by Plaintiffs' noncitizen members as the clear threats that they were, *see, e.g.*, *id.* ¶¶ 400–402 (Prof. Al-Ali), 434–437 (Prof. Hyska), 468–473 (Prof. Nickel). *Cf. Vullo*, 602 U.S. at 193 (evaluating the effect of the allegedly coercive threats on the recipient); *Nat'l Educ.*

*Ass'n*, 2025 WL 1188160, at *26 (same). The evidence also showed that Defendants have effectuated this campaign of coercive threats through conduct. Specifically, Defendants launched new processes to identify individuals engaging in the pro-Palestinian expression targeted by Defendants' threats, *see* PFOF Part II.B.2; they developed new processes and guidance to fast-track the attempted deportation of these individuals, *id.* Part II.B.3–4; they enforced the policy against potentially hundreds of individuals, including the five Targeted Noncitizens, *see id.* Part II.C.1; and they carried out the arrest of several of these individuals in a manner seemingly calculated to terrify others, *id.* Part II.C.2. Plaintiffs' noncitizen witnesses testified that they understood these actions as threats and were intimidated as a result. *See, e.g.*, *id.* ¶¶ 400–402 (Prof. Al-Ali), 434–437 (Prof. Hyska), 468–473 (Prof. Nickel).

While there is no question that the President and members of his administration enjoy the bully pulpit, Defendants statements and actions went well beyond that prerogative and entered the impermissible terrain of coercive threats. As this Court observed in its opinion denying Defendants' motion to dismiss, "[i]t is hard to imagine a policy more focused on intimidating its targets from practicing protected political speech." *AAUP*, 2025 WL 1235084, at *19.

## VIII. The ideological deportation policy violates the APA.

Finally, the evidence at trial demonstrated that the ideological deportation policy violates the APA.[22]

[22] The Court has already held that its adjudication of Plaintiffs' claims—its APA claims as well as its First Amendment claims—should be based on a full record, and it allowed Plaintiffs to proceed to discovery on this basis. June 2, 2025, Tr. 27:21–28:6 (holding that the Court had "the authority to supplement the record" and that "the case [should] proceed to trial allowing the discovery" the Court had previously authorized). To avoid any ambiguity in the record on appeal, Plaintiffs respectfully ask the Court, now that the trial is complete, to reiterate that it has ordered the completion or supplementation of the administrative record and that its consideration of Plaintiffs' APA claims is based on the full trial record. See *Roe v. Mayorkas*, No. 22-cv-10808-ADB, 2024 WL 5198705, at *2 (D. Mass. Oct. 2, 2024) (completing record in APA case is

**A. The policy is subject to review under the APA.**

Plaintiffs are entitled to APA review of the ideological deportation policy because it is a "final agency action" for which there is "no other adequate remedy," 5 U.S.C. § 704, and because their claims fall within the relevant zone of interests, *see Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, 123 F.4th 1, 20 (1st Cir. 2024).

In its opinion denying in part Defendants' motion to dismiss, this Court correctly held that, based on the allegations in the complaint, the ideological deportation policy constituted final agency action. To reach this conclusion, the Court acknowledged two key legal principles. First, the standard for finality is broad. To be final, an agency action must be "one by which rights and obligations have been determined" or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). Second, and relatedly, a policy need not be written down to be final. *See, e.g. Greater Bos. Legal Servs.*, 2022 WL 138629, at *7 ("Failure to allege a written policy is not fatal to Plaintiffs' [APA] claim."); *Velesaca v. Decker*, 458 F. Supp. 3d 224, 243 (S.D.N.Y 2020) (explaining that "finality can be gleaned from agency action and the effects thereof and does not require any written evidence"); *R.I.L.-R*, 80 F. Supp. 3d at 184 (similar). And while final agency action must be more than "a constellation of independent decisions or a general drift in agency priorities," *AAUP*, 2025 WL 1235084, at *21, finality is "interpreted pragmatically" and not susceptible to bright-line requirements, *R.I.L-R*, 80 F. Supp.

---

appropriate where there is "clear evidence . . . that the record is incomplete"); *Housatonic River Initiative v. U.S. Env't Prot. Agency, New Eng. Region*, 75 F.4th 248, 278 (1st Cir. 2023) (supplementing record in APA case is appropriate "where there is a strong showing of bad faith or improper behavior by the agency," "to facilitate [the court's] comprehension of the record or the agency's decision, particularly when highly technical matters are at issue or when the agency has failed to explain administrative action as to frustrate effective judicial review," and perhaps "when necessary to determine whether the agency considered all relevant factors in making its decision" or "when the agency has relied on extra-record materials.").

3d at 184 (cleaned up); *see Venetian Casino Resort LLC v. EEOC,* 530 F.3d 925, 929 (D.C. Cir. 2008) (permitting review of an unwritten policy where "the record" as a whole "leaves no doubt" that a policy exists, even though "the details . . . are still unclear"). Applying these principles to the allegations in the complaint, this Court held that Plaintiffs had plausibly alleged final agency action: a policy of "targeting noncitizens who engage in pro-Palestinian advocacy for visa revocation and deportation." *AAUP*, 2025 WL 1235084, at *21.

The evidence at trial confirmed this conclusion. Senior government officials and the agencies themselves proclaimed Defendants' policy of revoking the visas and green cards of pro-Palestinian protesters, and of arresting, detaining, and deporting them. *See* PFOF Part II.A; *see also Amadei*, 348 F. Supp. 3d at 165 ("Defendants have repeatedly stated that there is a policy and . . . cannot, now, have their cake and eat it too."). And documentary evidence and witness testimony showed that the policy evidenced by these statements was implemented through new processes and guidance, and ultimately enforced with concrete legal consequences for the five Targeted Noncitizens and others. *See* PFOF Part II.B–C.

The evidence likewise supports the Court's conclusion that there is no adequate alternative remedy. *AAUP*, 2025 WL 1235084, at *21. The evidence presented at trial substantiated the harms Plaintiffs alleged in the complaint: "the chill on noncitizen members' speech, the harm to citizen members' ability to hear from and associate with noncitizen colleagues and students, and the direct harm to the organizations' core missions of supporting academic freedom and to their core activities and spending." *Id.* And, as this Court has already concluded, these harms cannot be redressed through individual removal proceedings. *Id.* Many of the AAUP and MESA members harmed by the policy will never (and in many cases could never) be placed in removal proceedings, and in any event the harms caused by these First Amendment violations will come to pass well

before many removal proceedings are resolved. *See Velesaca*, 458 F. Supp. 3d at 243 (explaining that a challenge to a broader policy "rather than [Plaintiffs'] individual custody findings" made it "improbable that Plaintiffs can receive an adequate remedy by appealing to an IJ or the BIA"); *Greater Bos. Legal Servs.*, 2022 WL 138629, at *5 (finding no adequate alternative remedy where plaintiffs were "not parties to the individual challenges between a noncitizen facing removal and the [a]gencies," and individual review could "not address the broader injury alleged by" plaintiffs).

Finally, to the extent the "zone of interests" requirement applies to Plaintiffs' claims, it is satisfied here. As an initial matter, the zone-of-interests requirement does not apply to Plaintiffs' claim that the policy is contrary to constitutional right. That requirement focuses "on *Congress's intent* in creating statutory causes of action, casting doubt on [the] argument that [it] has any role to play . . . where Plaintiffs' theory derives from the Constitution." *Sierra Club v. Trump*, 929 F.3d 670, 702 (9th Cir. 2019) (emphasis in original). Even if the test applied to Plaintiffs' constitutional claims, however, Plaintiffs' interests clearly fall within the zone of interests of the First Amendment. *See id.* at 702–03 (noting that the zone-of-interests test focuses on the underlying cause of action, "not any zone of interests of the APA itself").

Plaintiffs' arbitrary-and-capricious claim also plainly falls—though it need only "arguably fall[]"—within "the zone of interests to be protected or regulated by the underlying statute," in this case, the Immigration and Nationality Act ("INA"). *Seafreeze*, 123 F.4th at 20. The zone of interests test is "lenient," with all doubts resolved in the plaintiff's favor. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014). It "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized the plaintiff to sue." *Id.* (cleaned up).

The interests of Plaintiffs and their members "bear[] a plausible relationship to the policies underlying" the INA. *CSL Plasma Inc. v. CBP*, 33 F.4th 584, 593 (D.C. Cir. 2022) (cleaned up). Plaintiffs' noncitizen members, of course, have a direct interest in the lawful enforcement of the INA, because their immigration status is determined by that statute. *See Al Otro Lado, Inc. v. Nielsen*, 327 F. Supp. 3d 1284, 1301 & n.7 (S.D. Cal. 2018) ("Other district courts have found that organizational plaintiffs like Al Otro Lado can fall within the INA's zone of interests when it has members or clients targeted by the government action."); *Doe v. U.S. Immigr. & Customs Enf't*, 490 F. Supp. 3d 672, 685 (S.D.N.Y. 2020) ("Defendants do not contest that [the noncitizen plaintiff] falls within the INA's zone of interests."); *Khedkar v. U.S. Citizenship & Immigr. Servs.*, 552 F. Supp. 3d 1, 11 (D.D.C. 2021) (concluding that a visa holder fell within the INA's zone of interests and rejecting the argument that "Congress was completely indifferent to the interests of the 'qualified immigrants' themselves"). Plaintiffs also fall within the INA's zone of interests, because the INA includes visa classifications that enable foreign students, scholars, and others to study and work at U.S. universities, *see, e.g.*, 8 U.S.C. § 1101 (a)(15)(F), (J), and Congress "presumably" intended those visa holders to "benefit the people" and organizations that work with them. *CSL Plasma Inc.*, 33 F.4th at 590; *see Abourezk*, 785 F.2d at 1047, 1050–51 (holding that organizations that invited foreign nationals to attend meetings or address audiences in the United States were within the INA's zone of interests). Accordingly, the ideological deportation policy is subject to review under the APA.

### B. The ideological deportation policy is contrary to constitutional right and arbitrary and capricious.

The ideological deportation policy violates the APA in two ways. First, and most straightforwardly, it is contrary to constitutional right, *see* 5 U.S.C. § 706(2)(B), because, for the reasons explained above, it contravenes the First Amendment, *see supra* Part VI.

Second, the policy is arbitrary and capricious and an abuse of discretion. *See* 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Melone v. Coit*, 100 F.4th 21, 29 (1st Cir. 2024) (cleaned up). Ultimately, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Am. Pub. Health Ass'n v. Nat'l Inst. of Health*, No. 25-10787, 2025 WL 1822487, at *18 (D. Mass. July 2, 2025) (noting that when a new policy is at issue, the agency "must show . . . . that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better" (quoting *F.C.C. v. Fox Television Studios*, 556 U.S. 502, 515 (2009))). This is so even though agencies enjoy significant discretion in immigration enforcement. *See Biden v. Texas*, 597 U.S. 785, 806–07 (2022) ("[U]nder the APA, DHS's exercise of discretion within [the INA's] statutory framework must be reasonable and reasonably explained.").

Here, the Defendants have offered *no* explanation in support of the policy. "[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position." *Fox Television Studios*, 556 U.S. at 515 (emphasis in original). In this litigation, Defendants have expressly denied any such awareness, even though Defendants' statements and actions make the change in policy clear.[23] Defendants also have not articulated any legitimate interest in suppressing the broad category of pro-

[23] Notably, Defendants have not explained their implicit reversal of DHS's 2021 policy guidelines making clear that "[a] noncitizen's exercise of their First Amendment rights . . . should never be a factor in deciding to take enforcement action." PFOF ¶ 13.

Palestinian expression targeted by the policy, and there is none. The ideological deportation policy is therefore neither "reasonable" nor "reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Accordingly, it violates the APA.

August 4, 2025

Respectfully submitted,

/s/ Ramya Krishnan

Ramya Krishnan
Alex Abdo
Carrie DeCell
Xiangnong Wang
Talya Nevins
Jackson Busch
Stephany Kim
Scott Wilkens
Jameel Jaffer
Knight First Amendment Institute
at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
ramya.krishnan@knightcolumbia.org

Ahilan T. Arulanantham (SBN 237841)
Professor from Practice
UCLA School of Law
385 Charles E. Young Dr. East
Los Angeles, CA 90095
(310) 825-1029
arulanantham@law.ucla.edu

Edwina Clarke (BBO 699702)
David Zimmer (BBO 692715)
Zimmer, Citron & Clarke, LLP
130 Bishop Allen Drive
Cambridge, MA 02139
(617) 676-9423
edwina@zimmercitronclarke.com

Noam Biale
Michael Tremonte
Alexandra Conlon
Courtney Gans
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2603
mtremonte@shertremonte.com
nbiale@shertremonte.com

*Counsel for Plaintiffs*