# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| AMERICAN ASSOCIATIONS OF UNIVERSITY PROFESSORS, ET AL., | |
| *Plaintiffs,* | |
| v. | No. 1:25-cv-10685-WGY |
| MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, ET AL., | |
| *Defendants.* | |

# DEFENDANTS' POST-TRIAL PROPOSED
# FINDINGS OF FACT AND CONCLUSIONS OF LAW

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................. 1

I.    BACKGROUND ............................................................................ 3

       A.    Increase in Antisemitic Violence and Creation of
             Hostile Environments Since October 7 Attack ............................... 3

       B.    President Trump Issues Executive Orders 14161 and 14188 ......... 3

       C.    Implementation of the Executive Orders Concerning National
             Security Vetting and Antisemitic Conduct ..................................... 7

       D.    LPR Status and F-1 Student Visa Status and Legal
             Authorities Permitting Termination or Revocation and Detention
             Authorities ................................................................................... 12

             1.    Nonimmigrant Student Visa Holders ........................................ 13

             2.    Immigrant Aliens Lawfully Admitted
                   for Permanent Residence ........................................................... 15

       E.    Process and Procedures to Revoke Visas, Make
             Removability Determinations Under 8 U.S.C.
             § 1227(a)(4)(C), and Place Aliens Into Removal
             Proceedings and Detention ............................................................ 16

II.   PLAINTIFFS FAILED TO SHOW THAT THEY HAVE
      STANDING AND FAILED TO DEMONSTRATE THAT
      THEY HAVE BEEN HARMED ...................................................... 22

       A.    "Associational" Standing Violates
             Article III of the Constitution ........................................................ 23

             1.    Background to Associational Standing ....................................... 23

             2.    Plaintiffs' Theory of Associational Standing
                   Cannot be Squared with Facts Adduced at Trial ...................... 24

       B.    Plaintiffs Provided no Student Visa-Holding
             Witnesses and so Lack Associational Standing
             to Challenge any Policy or Action Relating to Nonimmigrant
             Student Visa Holders ..................................................................... 26

i

C.    Plaintiffs Fail to Establish Associational Standing
Based on Their LPR Members ........................................ 27

1.    Plaintiffs Cannot Establish Concrete Injury by
Their Members' Subjective Fears and Unreasonably
Self-Censoring Their Speech ........................................ 29

a)    The harms Plaintiffs' LPR members fear are not concrete . 29

b)    The harms Plaintiffs' alien members fear are not
impending ................................................................ 36

c)    Plaintiffs have not established a substantial, credible
threat of enforcement ............................................... 42

2.    Plaintiffs Fail to Establish That Their Self-Imposed
Harms are Caused by Unlawful Actions or Policy .................... 55

3.    Plaintiffs' Claims Are Not Redressable ..................... 59

D.    Plaintiffs Failed To Establish Organizational Standing ............. 61

1.    The Plaintiff Organizations Were Either Unaffected
or Aided by the Alleged Ideological Deportation Policy ............ 62

2.    The Plaintiff Organizations Were Not Harmed by the
Alleged Ideological Deportation Policy ........................ 65

III. PROPOSED LEGAL RULINGS AND FINDINGS
OF FACT ON FIRST AMENDMENT CLAIM (COUNT 1) ................ 69

A.    Plaintiffs Have Failed to Prove There is no
Legitimate Objective in the Implementation of
the Executive Orders ..................................................... 69

B.    Burdens on Noncitizen's First Amendment Rights
are Reviewed Under the Facially Legitimate and Bona Fide
Standard .................................................................... 77

C.    Scope of Noncitizens' First Amendment Rights ............................ 82

D.    Plaintiffs Failed to Prove the Existence of
an Unwritten Deportation Policy Targeting
Protected Speech ......................................................... 89

ii

1.  Public Officials' Media Statements do not Reflect
    an Unwritten Policy Targeting Protected Speech ..................... 91

2.  The Executive Orders Are Neutral on Their Faces and DoNot
    Show the Existence of an Ideological Deportation Policy .......... 93

3.  The Tiger Team's Investigations do not Show the
    Existence of an Ideological Deportation Policy Because
    They do not Target Protected Speech for Enforcement ............. 94

4.  The Immigration Enforcement Actions Taken
    Against the Five Noncitizens Identified by Plaintiffs
    do not Show the Existence of
    an Ideological Deportation Policy .............................................. 101

5.  The Use of Masks, Handcuffs, Officers' Wearing
    Plain Clothes, and Transporting Detainees to
    Other States Does Not Show the Existence of an
    Unwritten Ideological Deportation Policy ................................ 105

F.  Plaintiffs did not Plead or Prove at Trial
    a Retaliation Claim ....................................................................... 117

G.  The Facts Show no Retaliation ...................................................... 120

IV.  PLAINTIFFS HAVE NOT CARRIED THEIR BURDEN
     TO SHOW THREATS TARGETING THEIR PROTECTED
     SPEECH IN THE ABSENCE OF AN UNWRITTEN POLICY
     TO CARRY THEM OUT (COUNT 2) .................................................... 121

A.  Legal Standards for First Amendment Threats ......................... 121

B.  Proposed Findings of Fact on Threats......................................... 125

V.  PLAINTIFFS FAILED TO SHOW AN APA VIOLATION (COUNT 4) .......... 127

CONCLUSION ........................................................................................ 138

CERTIFICATE OF SERVICE ................................................................... 140

iii

# TABLE OF AUTHORITIES

## CASES

**Page(s)**

*AAUP v. Rubio,*
__ F. Supp. 3d __, 2025 WL 1235084 (D.Mass. Apr. 29, 2025) .................. 5 ,passim

*Aguilar v. ICE.,*
510 F.3d 1 (1st Cir. 2007) .................................................................... 132, 133

*American-Arab Anti-Discrimination Comm.* v. Reno ("AADC I"),
70 F.3d 1045 (9th Cir. 1995) .................................................................. 87

*Atieh v. Riordan,*
727 F.3d 73 (1st Cir. 2013) .................................................................... 136

*Babbitt v. Farm Workers,*
442 U.S. 289 (1979) .............................................................................. 42

*Bantam Books, Inc. v. Sullivan,*
372 U.S. 58 (1963) ................................................................................ 122

*Bennett v. Spear,*
520 U.S. 154 (1997) .......................................................... 129, 131, 132

*Biden v. Texas,*
597 U.S. 785 (2022) .............................................................................. 76

*Blassingame v. Trump,*
87 F.4th 1 (D.C. Cir. 2023) ............................................................ 93, 124

*Blum v. Holder,*
744 F.3d 790 (1st Cir. 2014) ........................................................... 36, 45

*Bluman v. Fed. Election Comm'n,*
800 F. Supp. 2d 281, 287 (D.D.C. 2011) ..................................... 79, 83, 85

*Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.,*
419 U.S. 281 (1974) .............................................................................. 135

*Bridges v. Wixon,*
  326 U.S. 135 (1945) ............................................................................ 71, 83

*California v. Texas,*
  593 U.S. 659 (2021) ................................................................................ 58

*Camp v. Pitts,*
  411 U.S. 138 (1973) .............................................................................. 136

*Carlson v. Landon,*
  342 U.S. 524 (1952) ................................................................................ 79

*Charlton Mem'l Hosp. v. Sullivan,*
  816 F. Supp. 50 (D. Mass. 1993) ......................................................... 136

*Citizens United v. Fed. Election Comm'n,*
  558 U.S. 310 (2010) ................................................................................ 85

*City of New York v. United States Department of Defense,*
  913 F.3d 423 (4th Cir. 2019) ............................................................... 129

*City of Taunton, Massachusetts v. United States Env't Prot. Agency,*
  895 F.3d 120 (1st Cir. 2018) ................................................................ 137

*Clapper v. Amnesty Intern. USA,*
  568 U.S. 398, 415 (2013). ................................................................ passim

*Commonwealth of Puerto Rico v. United States,*
  490 F.3d 50 (1st Cir. 2007) .................................................................. 132

*Culinary Workers Union, Loc. 226 v. Del Papa,*
  200 F.3d 614, 618 (9th Cir. 1999) .................................................... 45, 55

*Curley v. Village of Suffern,*
  268 F.3d 65 (2d Cir. 2001) .................................................................... 64

*DaimlerChrysler Corp. v. Cuno,*
  547 U.S. 332 (2006) ................................................................................ 58

*Demore v. Kim,*
  538 U.S. 510, 522 (2003) ........................................... 58, 82, 83, 89, 91

*Department of State v. Muñoz,*
    602 U.S. 899 (2024) ................................................................................ 79, 81

*Dep't of Commerce v. New York,*
    588 U.S. 752 (2019) ...................................................................... 76, 136, 137

*Doc Soc'y v. Rubio,*
    141 F.4th 1273 (D.C. Cir. 2025)..................................................................... 59

*Falmouth Sch. Dep't v. Doe on behalf of Doe,*
    44 F.4th 23 (1st Cir. 2022) ....................................................................... 119

*Donahue v. City of Boston,*
    304 F.3d 110 (1st Cir. 2002)......................................................................... 56

*Draper v. Healey,*
    827 F.3d 1 (1st Cir. 2016)............................................................................. 27

*El Rio Santa Cruz Neighborhood Health Ctr. v.*
    *U.S. Dep't of Health and Human Servs.*, 396 F.3d 1265 (D.C. Cir. 2005)............ 131

*Elend v. Basham,*
    471 F.3d 1199 (11th Cir. 2006) ............................................................... 60, 61

*FDA v. Alliance for Hippocratic Medicine,*
    602 U.S. 367 (2024) ................................................................................ 23, 61

*Fed. Commc'ns Comm'n v. Prometheus Radio Project,*
    592 U.S. 414 (2021) ................................................................................... 135

*Florida Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985) ................................................................................... 136

*Galvan v. Press,*
    347 U.S. 522 (1954) ..................................................................................... 80

*Garcia v. Vilsack,*
    563 F.3d 519 (D.C. Cir. 2009) ..................................................................... 131

*Gattineri v. Town of Lynnfield, Mass.,*
    58 F.4th 512 (1st Cir. 2023) ................................................................. 70, 119

*Goldstein v. Galvin,*
    719 F.3d 16 (1st Cir. 2013) ................................................................ 92, 124

*Graham v. Richardson,*
    403 U.S. 365 (1971) ..................................................................................... 86

*Haig v. Agee,*
    453 U.S. 280 (1981) ..................................................................................... 89

*Harisiades v. Shaughnessy,*
    342 U.S. 580 (1952). ........................................................................... passim

*Hartman v. Moore,*
    547 U.S. 250 (2006) ............................................................................. passim

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363, 366, 368, 378-79 (1982) ................................................... 65

*Hearst Radio v. FCC,*
    167 F.2d 225 (D.C. Cir. 1948) ................................................................ 129

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ............................................................................... 76, 77

*Hernandez-Lara v. Lyons,*
    10 F.4th 19 (1st Cir. 2021) ........................................................................ 16

*Holder v. Humanitarian Law Project,*
    ("HLP"), 561 U.S. 1 (2010) ......................................................... 86, 87, 88

*Hoye v. City of Oakland,*
    653 F.3d 835 (9th Cir. 2011) ..................................................................... 90

*Hunt v. Washington State Apple Advert. Comm'n*
    432 U.S. 333 (1977) ..................................................................................... 24

*Indep. Meat Packers Ass'n v. Butz,*
    526 F.2d 228 (8th Cir. 1975) ....................................................................... 5

*Initiative & Referendum Inst. v. Walker,*
    450 F.3d 1082 (10th Cir. 2006) ................................................................ 29

viii

*Jennings v. Rodriguez,*
    583 U.S. 281 (2018) ............................................................................ 16

*Johnson v. Eisentrager,*
    339 U.S. 763 (1950) ............................................................................ 84

*Kandamar v. Gonzales,*
    464 F.3d 65 (1st Cir. 2006)................................................................. 78

*Khalil v. Joyce,*
    __ F. Supp. 3d __, 2025 WL 1232369, *1-2 (D.N.J. Apr. 29, 2025)...................... 102

*Kwong Hai Chew v. Colding,*
    344 U.S. 590 (1953) ............................................................................ 84

*Lewis v. Casey,*
    518 U.S. 343 (1996) ............................................................................ 58

*Lopez v. Candaele,*
    630 F.3d 775 (9th Cir. 2010) ............................................................. 45

*Louis v. Saferent Sols., LLC,*
    685 F. Supp. 3d 19 (D. Mass. 2023) ................................................. 65

*Lozman v. City of Riviera Beach, Fla.,*
    585 U.S. 87 (2018) ..................................................................... 70, 119

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ......................................... 23, 29, 67, 69, 129, 131

*Kleindienst v. Mandel,*
    408 U.S. 753 (1972) ............................................................. 77, 80, 81

*Marbury v. Madison,*
    1 Cranch 137, 5 U.S. 137 (1803) ...................................................... 24

*Mathews v. Diaz,*
    426 U.S. 67 (1976) ...................................................................... passim

*McGuire v. Reilly,*
    386 F.3d 45 (1st Cir. 2004)........................................................... 90, 91

ix

*Moose Lodge No. 107 v. Irvis*,
    407 U.S. 163 (1972) ................................................................. 59

*Morris v. Powell*,
    449 F.3d 682 (5th Cir. 2006) ................................................. 119

*Morrison v. Bd. of Educ. of Boyd Cnty.*,
    521 F.3d 602 (6th Cir. 2008) .................................................. 29

*Motor Vehicle Mfrs. Assn. of United States, Inc. v.*
    *State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29 (1983) .............. 76, 77

*Murthy v. Missouri*,
    603 U.S. 43 (2024) ................................................ 27, 93, 124

*Muskrat v. United States*,
    219 U.S. 346 (1911) .............................................................. 24

*Nat'l Org. for Marriage v. McKee*,
    649 F.3d 34 (1st Cir. 2011).................................................. 28, 31

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024) .......................................................... 122, 123

*Negusie v. Holder*,
    555 U.S. 511 (2009) .............................................................. 82

*Nieves v. Bartlett*,
    587 U.S. 391 (2019) ................................................ 77, 120, 121

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ........................................................... 129, 131

*O'Neil v. Canton Police Dept.*,
    761 F. Supp. 3d 299 (D. Ma. Dec. 20, 2024) .......................... 120

*OPAWL - Bldg. AAPI Feminist Leadership v. Yost ("OPAWL")*,
    118 F.4th 770 (6th Cir. 2024)............................................. 83, 85

*Perkins Coie LLP v. U.S. Dep't of Just.*,
    __ F. Supp. 3d __, 2025 WL 1276857 (D.D.C. May 2, 2025).................... 123

*Pleasant Grove City, Utah v. Summum,*
    555 U.S. 460, 467-68 (2009) ................................................................. 124

*Poe v. Ullman,*
    367 U.S. 497 (1961) ............................................................................... 125

*Pope v. Bernard,*
    No. 10-1443, 2011 WL 478055 (1st Cir. Feb. 10, 2011) ....................... 119

*President & Fellows of Harvard College v. DHS,*
    __ F. Supp. 3d __, 2025 WL 1737493 (D. Mass. 2025). ........................ 123

*Qatanani v. Bondi,*
    __ F.4th __, 2025 WL 1934523 (3d Cir. July 15, 2025) .................... 84, 86

*R.I.L-R v. Johnson,*
    80 F.Supp 3d 164 (D. D.C. 2015) .......................................................... 130

*Raines v. Byrd,*
    521 U.S. 811 (1997) ................................................................................. 23

*Rajah v. Mukasey,*
    544 F.3d 427 (2d Cir. 2008) .................................................................... 78

*Reno v. Am-Arab Anti-Discrimination Comm.,*
    ("AADC II"), 525 U.S. 471 (1999) ................................................. passim

*River Street Donuts, LLC v. Napolitano,*
    558 F.3d 111 (1st Cir. 2009) .................................................................. 134

*Seafreeze Shoreside, Inc. v. United States Department of the Interior,*
    123 F.4th 1 (1st Cir. 2023) ............................................................ 132, 133

*Simon v. E. Ky. Welfare Rights Org.,*
    426 U.S. 26 (1976) ..................................................................... 67, 69, 70

*Singer v. Fulton County,*
    63 F.3d 110 (2d Cir. 1995) ...................................................................... 65

*Smith v. Bayer Corp.,*
    564 U.S. 229 (2011) ................................................................................. 24

*Spear v. Town of West,*
    *Hempstead*, 954 F.2d 63 (2d Cir. 1992) ................................................. 64

*Speech First, Inc. v. Fenves,*
    979 F.3d 319 (5th Cir. 2020) ...................................................... 42

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) .............................................................. 29

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ............................................................. 24, 59

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
    600 U.S. 181 (2023) ................................................................ 79

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ................................................ 26, 29, 42, 55

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ........................................................... 42, 44

*Taylor v. Strugell,*
    553 U.S. 880 (2008) ................................................................ 24

*Trafalger Capital Assocs. V. Cuomo,*
    159 F.3d 21 (1st Cir. 1998) ..................................................... 134

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ................................................................ 58

*Trump v. Hawaii,*
    585 U.S. 667 (2018) ..................................................... 5, *passim*

*Turner v. Williams,*
    194 U.S. 279 (1904) ................................................................ 86

*U.S. Dep't of Health & Hum. Servs. v. Fed. Lab. Rels. Auth.,*
    844 F.2d 1087 (4th Cir. 1988) .................................................... 5

*United Pub. Workers of Am. v. Mitchell,*
    330 U.S. 75 (1947) ................................................................ 45

*United States v. Sanchez-Gomez,*
    584 U.S. 381 (2018) ................................................... 24

*United States v. Texas,*
    599 U.S. 670 (2023) ............................................... 28, 57

*United States v. Verdugo-Urquidez,*
    494 U.S. 259 (1990) ................................................... 84

*Uzuegbunam v. Preczewski,*
    592 U.S. 279 (2021) ................................................... 25

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
    454 U.S. 464 (1982) ................................................... 26

*Venetian Casino Resort, LLC v. Cortez,*
    9 F. Supp. 2d 1102 (D. Nv. May 1, 2000) ........................... 125

*Virginia v. Black,*
    538 U.S. 343 (2003) ................................................... 83

*Walker v. Holder,*
    589 F.3d 12 (1st Cir. 2009) ........................................... 15

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.,*
    576 U.S. 200 (2015) ............................................... 92, 124

*Warth v. Seldin,*
    422 U.S. 490 (1975) ................................................... 67

*Younger v. Harris,*
    401 U.S. 7 (1971) ..................................................... 45

## STATUTES

### Immigration and Nationality Act of 1952, as amended:

5 U.S.C. § 704 ......................................................... 129

5 U.S.C. § 706(2)(A) .................................................. 134

8 U.S.C. § 1101(a)(15) ................................................. 12

xiii

8 U.S.C. § 1101(a)(15)(F) ................................................................................. 13

8 U.S.C. § 1101(a)(15)(F)(i) ....................................................................... 13, 84

8 U.S.C. § 1101(a)(15)(J) ....................................................................... 13, 15, 84

8 U.S.C. § 1101(a)(15)(M) ......................................................................... 13, 15

8 U.S.C. § 1101(a)(15)(M)(i) ............................................................................ 84

8 U.S.C. § 1101(a)(20) ...................................................................................... 15

8 U.S.C. § 1182(a)(3)(B) ........................................................................... 91, 126

8 U.S.C. § 1182(a)(3)(B)(v) .............................................................................. 88

8 U.S.C. § 1182(a)(3)(B)(VII) ..................................................................... 88, 91

8 U.S.C. § 1182(a)(3)(C) .................................................................................. 82

8 U.S.C. § 1182(f) ....................................................................................... 5, 123

8 U.S.C. § 1182(a)(3)(C)(iii) ..................................................... 16, 57, 88, 91

8 U.S.C. § 1184(b) ...................................................................................... 9, 12

8 U.S.C. § 1881a ............................................................................................... 58

8 U.S.C. § 1189 ....................................................................................... 126, 127

8 U.S.C. § 1201(i) ............................................................................... 15, *passim*

8 U.S.C. § 1226(a) ...................................................................................... 16, 21

8 U.S.C. § 1226(c) ...................................................................................... 16, 21

8 U.S.C. § 1227(a) ............................................................................................ 15

8 U.S.C. § 1227(a)(1)(A) .................................................................................. 36

8 U.S.C. § 1227(a)(1)(B) .............................................................................. 14, 18

8 U.S.C. § 1227(a)(4)(B) .................................................................. 57, 59, 88, 91

xiv

8 U.S.C. § 1227(a)(4)(C) ............................................................................ 15, *passim*

8 U.S.C. § 1227(a)(4)(C)(i) ............................................................... 15, 57, 80

8 U.S.C. § 1227(a)(4)(C)(ii) ............................................................. 16, 57, 91

8 U.S.C. § 1229 ..................................................................................... 14, 21

8 U.S.C. § 1229a ........................................................................................... 21

8 U.S.C. § 1252(a)(2)(D) ........................................................................ 15, 16

8 U.S.C. § 1252(a)(5) ..................................................................... 15, 21, 131, 133

8 U.S.C. § 1252(b)(9) ................................................................................ 133

8 U.S.C. § 1252(g) ............................................................................ 103, 133

8 U.S.C. § 1252(a)(5) .................................................................................. 21

## REGULATIONS

8 C.F.R. § 239.1 ........................................................................................ 14

22 C.F.R. § 41.122(a) ............................................................................... 14

## FEDERAL RULES OF APPELLATE PROCEDURE

Federal Rule of Civil Procedure 23 ........................................................ 24

## OTHER AUTHORITIES

*Foreign Terrorists and Other National Security and Public Safety Threats.*,
   90 Fed. Reg. 9451 ................................................................................. 3

## INTRODUCTION

In January 2025, the President issued several executive orders, setting a new policy direction for the Executive Branch. Among them are two, the implementation of which are the focus of this lawsuit. One seeks to bolster the nation's protections against terrorism, tightening and improving standards for vetting and screening of aliens who enter the country as well as remain here. Executive Order 14161.  The other calls for additional measures to combat the wave of antisemitism that followed the unprecedented and brutal terrorist attack by Hamas on October 7, 2023, against the United States' ally, Israel. Executive Order 14188. The order calls upon agencies to stem the tide of Jewish students who "have faced an unrelenting barrage of discrimination; denial of access to campus common areas and facilities, including libraries and classrooms; and intimidation, harassment, and physical threats and assault." *Id*. The Departments of Homeland Security ("DHS") and State are implementing these executive orders through existing statutory and regulatory authorities and are attempting to identify and remove aliens who are involved in activities supporting terrorist organizations as well as engaged in antisemitic conduct: harassment and violence.

 Plaintiffs attack the Administration's attempt to address these challenges by claiming that the Government is not targeting those who are supporting terrorist groups, or participating in the antisemitic discrimination, vandalism, and violence, but rather targeting aliens' protected political speech through what they have

termed an "ideological deportation policy." The evidence at trial shows Plaintiffs are wrong and that no such policy exists. But the Court should not reach that issue because Plaintiffs lack standing to bring this case.

Plaintiffs attempt to bring this case based on their lawful permanent resident alien ("LPR") members' fears they will be targeted by their imagined ideological deportation policy. However, none of their members have been targeted for immigration enforcement of any kind. In fact, one of their deponent witnesses, who did not testify at trial, became a naturalized citizen during discovery. This lack of harm and inchoate fear does not equate with the type of concrete or impending injury, or a substantial, credible threat of injury that Article III of the Constitution requires to confer "associational standing" on the Plaintiff organizations. Likewise, the organizations lack standing on their own behalf because they were either unaffected by, or aided by, the organizations' response to the Government's enforcement efforts.

Even if Plaintiffs had standing, they have not shown the existence of the alleged ideological deportation policy. The Government has strong immigration-related, national security, and foreign affairs interests in the implementation of the executive orders, enforcement of the immigration laws, and in managing foreign relations with its allies as it sees fit. In the context of a First Amendment claim, this means Plaintiffs must first show that the Government does not have a legitimate basis for the policy. Only then, do they move on to attempting to prove the existence of any impermissible ideological deportation policy and that

Government officials adopted it *because of* its discriminatory effect. They have done neither. Instead, numerous public servants have testified that they implemented the EOs through existing lawful authorities and are identifying aliens engaged in constitutionally unprotected conduct not protected speech.

Owing to Plaintiffs' failure of proof, the Court should find for the Defendants.

## I.    BACKGROUND

### A.    Increase in Antisemitic Violence and Creation of Hostile Environments Since October 7 Attack

At the close of trial, the Court took notice of the October 7, 2023, "horrific" Hamas attack against Israel and its people. *See* July 17 Tr. at 112:14-16; Executive Order 14188. Israel responded with its full military force and the struggle between the two continues to this day. *See* July 17 Tr. at 112:16-18. The President explained that these events gave rise to "an unprecedented wave of vile anti-Semitic discrimination, vandalism, and violence . . . especially in" schools. EO 14188.  And "Jewish students have faced an unrelenting barrage of discrimination; denial of access to campus common areas and facilities, including libraries and classrooms; and intimidation, harassment, and physical threats and assault." *Id.*

### B.    President Trump Issues Executive Orders 14161 and 14188

On January 20, 2025, the President signed Executive Order 14161: *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats*. 90 Fed. Reg. 9451. The EO declares the United States' policy to "protect its citizens from aliens who intend to commit terrorist attacks, threaten our

national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes." EO 14161, Sec. 1(a). In that vein, the EO further declares the need to ensure that aliens "do not advocate for, aid or support designated foreign terrorists and other threats to our national security." EO 14161, Sec. 1(b). EO 14161 calls for executive departments and agencies to "identify resources" (Sec. 2(a)(i)), "determine information needed" (Sec. 2(a)(ii)), "submit . . . report[s]" (Sec. 2(b)(i)), "evaluate" existing policies, programs, and guidance (Sec. 3(a), (c), (f))), and "recommend" actions (Sec. 3(g)). To the extent that EO 14161 requires departments or agencies to act in furtherance of its policy goals (*see, e.g.,* Sec. 2(b)(iii), 2(b)(iv), 3(a), 3(b), 3(e)), Section 4 makes express that any such action must be done consistent with all applicable law. EO 14161, Sec. 4(a)(i)-(ii).

As for the second, on January 29, 2025, the President signed Executive Order 14188, *Additional Measures to Combat Anti-Semitism*. 90 Fed. Reg. 8847. EO 14188 calls for stepped up federal enforcement in the wake of an "unprecedented wave" of antisemitic "discrimination, vandalism, and violence" against citizens and "especially in our schools and on our campuses." EO 14188, Sec. 1. EO 14188 directs executive agencies to use "all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." *Id.*, Sec. 2. As above, however, EO 14188 makes express that any such action must be taken "consistent with applicable law," and affirms that "agencies shall not diminish or infringe upon any right protected under Federal law or under the First Amendment." *Id.*, Sec. 4(b); Executive Order 13899, Sec. 2(b),

84 Fed. Reg. 68779 (affirmed in EO 14188, Sec. 1). The Court recognized that

Plaintiffs do not challenge the EOs themselves, but rather their implementation.

*See AAUP v. Rubio*, __ F. Supp. 3d __, 2025 WL 1235084, *19 n.10 (D.Mass. Apr. 29,

2025).

The EOs do not carry the force of law because they were not issued pursuant

to a statutory mandate or delegation of authority from Congress to the President.

*See Indep. Meat Packers Ass'n v. Butz*, 526 F.2d 228, 234-36 (8th Cir. 1975); *see also*

*U.S. Dep't of Health & Hum. Servs. v. Fed. Lab. Rels. Auth.*, 844 F.2d 1087, 1096

(4th Cir. 1988). This contrasts with the Proclamation at issue in *Trump v. Hawaii*,

which was issued pursuant to the President's authority under 8 U.S.C. § 1182(f).

*See Trump v. Hawaii*, 585 U.S. 667, 674 (2018). In his testimony, John Armstong

was clear that neither the executive orders, nor State Department guidance issued

in response to them, created or changed the Department's authorities under the

law. Specifically, when asked if EO 14161, "Protecting the United States from

Foreign Terrorists and Other National Security and Public Safety Threats," created

"new legal authorities related to the State Department's work," Mr. Armstong

responded that it did not. July 11 Tr. at 97:21-98:1, 98:25-99:2. He explained that

the EO "instructs" State Department employees "to use existing measures to

maximize the security of the American people." July 11 Tr. at 98:15-17. He further

described the EO as aimed at "increasing [the State Department's] vigilance," and

ensuring that the State Department uses "all *existing* mechanisms, procedures, and

policies that [it] ha[s] to ensure the security of the American people." July 11 Tr. at 98:21-24 (emphasis added).

When discussing guidance issued in response to EO 14161 and related to visa revocations, Mr. Armstrong clarified that the guidance did not provide new legal authority for revoking visas. *See* July 11 Tr. at 101:1-13. Rather, he said, the guidance provided for the revocation of visas under Section 221(i) of the Immigration and Nationality Act ("INA"), a statute that has been in place for roughly 70 years. *See* July 11 Tr. at 101:11-18. He similarly testified that guidance issued in response to EO 14161 and related to the presumption of immigrant intent in Section 214(b) of the INA emphasized "existing policies and authorities." July 11 Tr. at 101:19-102:2. He stressed, "it's nothing new in that regard." July 11 Tr. at 102:2. Finally, Mr. Armstrong testified that guidance issued in response to EO 14161 and related to social media vetting did not create new legal authority. *See* July 11 Tr. at 103:1-10, 104:8-19. Instead, he said, the guidance referenced Sections 214(b) and 212(a)(3)(b) of the INA, related to the presumption of immigrant intent and support for terrorist organizations, respectively. *See* July 11 Tr. at 104:16-19. He explained that these sections of the INA informed nonimmigrant visa vetting, including social media vetting, because both an individual's intent in traveling to the United States and whether they have supported a terrorist organization "most definitely" bear on that individual's eligibility for a visa. *See* July 11 Tr. at 104:20-105:6.

Turning to EO 14188, when asked if the State Department relied on that Executive Order, "Additional Measures to Combat Antisemitism," to revoke visas, John Armstrong testified that the State Department instead relies on the INA to revoke visas. *See* July 11 Tr. at 108:1-5, 13-16. He explained that the Executive Order "instructs," "emphasizes," and "informs" the work of the State Department, but "not as a part of the law." July 11 Tr. at 108:16-19; see also July 18 Tr. 24:2-4 (John Armstrong's testimony that EO 14188 is "not a legal code, it's an Executive Order. It's not the same as if Congress had passed it."). Mr. Armstrong stated that EO 14188 did not grant the State Department any legal authority to revoke visas, it did not change such authority, and it did not alter the State Department's process and protocols for revoking visas. *See* July 11 Tr. at 108:16, 20-25. Likewise, Mr. Armstrong testified, EO 14188 did not change the Secretary of State's authority to make removability determinations, nor did it change the process and protocols for doing so. *See* July 11 Tr. at 109:1-7.

### C. Implementation of the Executive Orders Concerning National Security Vetting and Antisemitic Conduct

Following this issuance of EO 14161 and EO 14188, the Departments of Homeland Security and State undertook measures to implement the priorities and emphases the EOs established. Maureen Smith testified that the State Department conveyed guidance on the implementation of executive orders through cables, updates to the Foreign Affairs Manual ("FAM"), sometimes emails prior to a cable's

release, and occasionally webinars. *See* July 11 Tr. 21-22, 31-33. John Armstrong also testified about multiple efforts of the State Department in this regard.

With respect to EO 14161, Mr. Armstrong testified that the State Department issued guidance in the form of a cable to its diplomatic posts abroad to review the nonimmigrant visa system, and when derogatory information related to an individual appeared in the system, to revoke the individual's visa, if warranted. *See generally* July 11 Tr. at 99:12-101:4 (John Armstrong's testimony about Exhibit 51, 25 STATE 17178, "Catch and Revoke: National Security Through Timely Processing of Visa Systems Messages").[1] Ms. Smith also testified regarding this cable, explaining that it "directs visa hosts abroad to catch up on their backlog of what are called system messages," which "are derogatory information that appears in [the State Department's] systems abroad when there's a visa holder." July 11 Tr. at 50:21-51:12 (discussing Exhibit 21). Mr. Armstrong explained that this guidance implements EO's 14161's priorities by placing an "emphasis on vigilance in reviewing systems messages which . . . can carry significant negative information about visa holders," including information justifying the revocation of visas. July 11 Tr. at 101:5-10.

---

[1]  This document is referred to as "Exhibit 21" in the transcript of the July 11 trial proceedings.  It is clear from Mr. Armstrong's testimony that at trial he was reviewing and speaking about Exhibit 51, a cable issued by the State Department, and not Exhibit 21, an arrest warrant. The government apologizes for any error on its part in identifying the exhibit at trial.

8

Ms. Smith also testified that the State Department issued follow-up guidance July 11 Tr. at 59:7-60:11 (discussing relationship between Ex. 51 and Ex. 50, 25 STATE 45612, Caught and Revoked: Updated Guidance on Systems Messages ("This cable also serves to correct an error in the original request (FRE A), which incorrectly stated that INA 222(g) does not apply to overstays of fewer than 180 days. INA 222(g) renders void a nonimmigrant visa ("NIV") on which an alien entered if that alien remains beyond the period of authorized stay. The alien does not have to remained more than 180 days beyond the period of authorized stay for INA 222(g) to apply.").

Mr. Armstong additionally noted guidance issued in response to EO 14161 that emphasized the importance of the presumption of immigrant intent found in Section 214(b) of the INA. *See* July 11 Tr. at 101:19-102:2; 8 U.S.C. § 1184(b) ("[e]very alien . . . shall be presumed to be an immigrant until he establishes to the satisfaction of the consular officer, at the time of application for a visa, and the immigration officers, at the time of application for admission, that he is entitled to a nonimmigrant status").

According to Mr. Armstrong, another piece of guidance issued by the State Department in response to EO 14161 was cable 25 STATE 26168, "Action Request: Enhanced Screening and Social Media Vetting for Visa Applicants." *See generally* July 11 Tr. at 102:9-104:7 (John Armstrong's testimony about Exhibit 64). This guidance provides for "social media and online screening of student and exchange

visitor[] visa applicants."[2] July 11 Tr. at 103:4-13. Mr. Armstrong stated that this

increased vetting "improves the security of the United States," the goal of EO

14161. July 11 Tr. at 11-16. He characterized social media as a "gold mine of

information" potentially relevant to visa eligibility. July 11 Tr. at 104:2.

Specifically, he noted that the social media vetting guidance refers to Sections

214(b) and 212(a)(3)(b) of the INA, which respectively relate to the presumption of

immigrant intent and support for terrorist organizations. *See* July 11 Tr. at 104:16-

19, 105:406. Mr. Armstrong explained,

> In vetting, one could find information that would lead to a 214(b)
> refusal under an intending immigrant, for example, if someone talks
> [on their social media] about their previous unauthorized work in the
> United States. Or [vetting] could lead to a finding on support for a
> terrorist organization [if] someone brags about how they've given
> money to Hamas.

July 11 Tr. at 104:22-105:3. Such findings, according to Mr. Armstrong, would "most

definitely" bear on an individual's eligibility for a nonimmigrant visa. July 11 Tr. at

105:4-6.

Homeland Security Investigations ("HSI") National Security Division

Assistant Director Andre Watson testified that based on the EOs, DHS aligned

their resources and priorities, within the statutory framework or regulatory

framework, to best accomplish those goals. *See* July 17 Tr. at 43:2-7. Through its

---

[2] Of note, social media vetting by the State Department for visa applicants is not
new. *See* July 11 Tr. at 18-20.  Rather, Ms. Smith testified that the State
Department began requiring visa applicants to provide their social media handles
for vetting purposes in 2019 or 2020, in response to the 2015 San Bernadino mass
shooting.  *Id.*

process and on an annual basis, the National Security Division receives just under

1.3 million records from the U.S. Customs and Border Protection arrival and

departure information system. In addition to that, it also receives records from the

Department of State Bureau of Consular Affairs as it relates to potential overstays

that are believed to be within the continental United States. *See* July 17 Tr. at 45:8-

17. The EO on Foreign Terrorists did not change HSI's authorities and protocols for

arrests and investigations. *See* July 17 Tr. at 45:18-24. In response to the EOs, HSI

developed a plan to process referrals from a variety of sources to complement the

EOs and use HSI's existing lines of effort. *See* July 17 at Tr. at 46:3-13. The plan

created a team, based within the Office of Intelligence, that conducted analysis on

referrals from a variety of sources and prepare Reports of Analysis ("ROAs") for

review and consideration and potential referral to the Department of State. *See* July

17 at Tr. 48:3-15. Mr. Watson used a flow chart to explain DHS' response to the EO

and the initiative between State and DHS. *See* Demonstrative HO (Attached). The

HSI Office of Intelligence is the "process owner," by way of their employees being

criminal analysts to conduct analyses of referrals of information from a variety of

sources. Those analysts in turn, on receipt of those referrals, conduct open-source

analysis and various checks to validate the availability of information and/or the

referral, and they would put together a ROA. ^^^ That ROA was prepared and

reviewed and ultimately submitted for approval within the Office of Intelligence

leadership framework, and then from there, with a letterhead memorandum

prepared, in coordination with the Office of the Principal Legal Advisor ("OPLA") as

11

well as HSI's Special Agents assigned to the Office of Intelligence on detail, a package for referral to Mr. Watson as the Assistant Director. *See* July 17 Tr. at 49:22-25; Tr. at 50:1-13.

On receiving the approved packet, Mr. Watson would review the letterhead memorandum letter, as well as the ROA, and if he approved, it, meaning that Mr. Watson was approving the submission package together, and providing a digital signature, and then referred it to the Department of State. *See* July 17 Tr. at 50:20-25, 51:1-7.

### D. LPR Status and F-1 Student Visa Status and Legal Authorities Permitting Termination or Revocation and Detention Authorities

Aliens legally present in the United States fall into several categories. This case concerns two such categories: nonimmigrant student visa holders and lawful permanent residents ("LPRs"). *See* Complaint ¶¶ 51, 54, 58, 62, 66, 67, 71, 74; Plaintiffs' Pretrial Br., Dkt. #179, at 17-22 (describing alleged harms to LPR members of AAUP and MESA); July 8, 2025 Trial Tr. at 141:13 (ruling that Plaintiffs' U.S. citizen members lack standing in this lawsuit). The Immigration and Nationality Act ("INA") lists classes of "nonimmigrant aliens." 8 U.S.C. § 1101(a)(15) (defining "immigrant" as "every alien except an alien who falls within one of [certain specified] classes of nonimmigrant aliens"). Importantly, with limited exceptions not applicable here, every applicant for a nonimmigrant visa is presumed to be an intending immigrant to the United States "until he establishes to the satisfaction of the consular officer, at the time of application for a visa, and the

12

immigration officers, at the time of application for admission, that he is entitled to a nonimmigration status under [INA S]ection 1101(a)(15).".  8 U.S.C. § 1184(b); *see also* July 11 Tr. at 84:12-20 (John Armstrong's testimony that nonimmigrant visa applicants bear the burden of proving "they do not intend to remain in the United States"). To obtain a nonimmigrant visa and to be admitted to the United States on that basis, an alien must demonstrate that they fall within one of the INA's classes of nonimmigrant aliens. *See id.*

### 1.    Nonimmigrant Student Visa Holders

While Plaintiffs provided testimony from no student visa holders, Defendants discuss the legal structure of those visa statuses here for completeness. Student visa holders are nonimmigrants under the INA. *See* 8 U.S.C. 1101(a)(15)(F), (J), (M). With respect to students, the INA allows for the entry of an alien who is "a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study. . . at an established college, university, seminary, conservatory, academic high school, elementary school, or other academic institution or in an accredited language training program in the United States." 8 U.S.C. § 1101(a)(15)(F)(i) ( "F-1 status"); July 11 Tr. at 84:10-11 (John Armstrong's testimony that a student visa applicant needs to submit a "form from an accredited university"). A student visa permits only temporary presence in the United States and the student must maintain "a residence in a foreign country which he [or she] has no intention of abandoning." *Id.* So, aliens present in the United States on nonimmigrant student

visas are neither *residents* nor *immigrants*. The same foreign residence requirement applies for J-1 researcher and exchange scholar visas and M-1 vocational student visas. *See* 1101(a)(15)(J) & (15)(M).

Nonimmigrant visas, including student visas, may be revoked at any time at the discretion of a consular officer or the Secretary of State. *See* 8 U.S.C. § 1201(i); 22 C.F.R. § 41.122(a); July 11 Tr. at 85:1-8 (John Armstrong's testimony that 8 U.S.C. § 1201(i) is the "key legal authority for [visa] revocation," and that the section "gives the Secretary of State and any consular officer the ability to revoke a visa at any time for any reason"). Notwithstanding the wide discretion consular officers and the Secretary of State have over nonimmigrant visa revocations, John Armstrong, the Senior Official at the Bureau of Consular Affairs, testified that "some sort of evidence" must support a visa revocation. July 11 Tr. at 85:9-10. According to Mr. Armstrong, visa revocations are premised upon "a reason"; visas are not revoked for "[no reason] at all." July 18 Tr. at 65:19-20. Mr. Armstrong added that "Consular Officers . . . treat [revocations] seriously," July 18 Tr. at 65:21-22; *see also* July 11 Tr. at 85:8-9, and that the State Department "review[s] each [visa revocation] case individually and carefully." July 11 Tr. at 85:10-11; *see also* July 11 Tr. at 31-32, 52-55 (Ms. Smith's testimony that each case is considered individually considering the totality of the circumstances).

An alien whose nonimmigrant visa has been revoked may be placed into removal proceedings on that basis. *See* 8 U.S.C. § 1227(a)(1)(B). Removal proceedings are commenced when DHS files a Notice to Appear ("NTA") with the

14

Immigration Court. 8 U.S.C. § 1229; 8 C.F.R. § 239.1. Aliens placed in removal proceedings are afforded procedural protections under Section 1229a of the INA. If an alien whose nonimmigrant visa has been revoked is placed into removal proceedings on the basis of the nonimmigrant visa revocation, and there is no other valid basis for removal, an immigration judge, and later a federal court of appeals may review the revocation. *See* 8 U.S.C. § 1201(i); *see also* 8 U.S.C. § 1252(a)(5) (providing that the federal courts of appeals have exclusive jurisdiction over final orders of removal rendered in removal proceedings). Irrespective of any jurisdictional bars in Chapter 12 of Title 8, the courts of appeals retain jurisdiction to review "constitutional claims or questions of law." 8 U.S.C. § 1252(a)(2)(D).

## 2.  Immigrant Aliens Lawfully Admitted for Permanent Residence

Unlike a nonimmigrant visa holder, a lawful permanent resident ("LPR") is an individual "lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws." *Walker v. Holder*, 589 F.3d 12, 19 (1st Cir. 2009) (citing the definition of "lawfully admitted for permanent residence" in 8 U.S.C. § 1101(a)(20)). The INA dictates that aliens "in and admitted to the United States," including LPRs, are removable from the United States if they fall within certain specified classes. *See* 8 U.S.C. § 1227(a). Section 237(a)(4)(C)(i) of the INA, the foreign policy removal provision, defines one such class of removable aliens as those "whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States."  8 U.S.C. §

1227(a)(4)(C)(i); *see* July 11 Tr. at 85:18-86:1 (John Armstrong's testimony that the Secretary of State may make removability determinations under 8 U.S.C. § 1227(a)(4)(C)). The foreign policy removal provision specifies that an alien cannot be removable "because of the alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States unless the Secretary of State personally determines that the alien's [presence] would compromise a compelling United States foreign policy interest." 8 U.S.C. § 1227(a)(4)(C)(ii) (referring to the inadmissibility provision at 8 U.S.C. § 1182(a)(3)(C)(iii)).

The Secretary of State's determination that aliens are removable under 8 U.S.C. § 1227(a)(4)(C) does not mean they will be removed. Rather, they may be removed only after they are afforded the procedural protections of removal proceedings under Section 1229a of the INA. And those proceedings can be reviewed in the courts of appeals, which retain jurisdiction to review "constitutional claims or questions of law." 8 U.S.C. § 1252(a)(2)(D). Aliens may be detained during the pendency of removal proceedings and on receiving a final order of removal. *See* 8 U.S.C. §§ 1226(a) (governing the discretionary detention of certain aliens in removal proceedings), 1226(c) (governing the mandatory detention of criminal aliens), 1226a (governing the detention of suspected terrorists), 1231(a) (governing detention of aliens ordered removed); *see also Jennings v. Rodriguez*, 583 U.S. 281, 303-305 (2018); *Hernandez-Lara v. Lyons*, 10 F.4th 19, 26 (1st Cir. 2021).

16

### E.    Process and Procedures to Revoke Visas, Make Removability Determinations Under 8 U.S.C. § 1227(a)(4)(C), and Place Aliens Into Removal Proceedings and Detention

To determine whether a visa should be revoked under 8 U.S.C. § 1201(i) and whether an alien is removable under 8 U.S.C. § 1227(a)(4)(C), the State Department relies on "various sources," including the Department of Homeland Security. July 11 Tr. at 23:14-25 (John Armstrong's testimony). Mr. Watson testified that HSI has always provided information to the State Department in determining whether someone should receive a visa. *See* July 17 Tr. at 38:1-10. And that information is not limited to students. HSI does not make the decision to revoke visas. *See id.* at 38:11-13. And the INA provides that the Secretary of State, not HSI, has the authority to make Section 1227(a)(4)(C) deportability determinations.

During his testimony, John Armstrong, using the aid of a demonstrative exhibit, explained the process for visa revocations and removability determinations in the case of DHS referrals to the State Department, as is at issue in this case. *See generally* July 11 Tr. at 88:7-95:24 (discussing the Government's chalk demonstrative HN (State Department Process and Protocol for Visa Revocations and (4)(C)) (attached).

Mr. Armstrong stated that when the State Department receives a referral from DHS, the State Department first determines whether the information received from DHS related to a nonimmigrant visa holder or LPR. *See* July 11 Tr. at 89:19-22; *see* Demonstrative HN. In the case of a nonimmigrant visa holder, the information is sent to the Visa Office within the Bureau of Consular Affairs. July 11

17

Tr. at 89:22-23; *see* Demonstrative HN. The Visa Office "examines the information" to determine whether it warrants "enact[ing] a revocation" of the nonimmigrant visa. July 11 Tr. at 90:6-7, 92:17-19 (emphasizing that the State Department "most definitely" independently analyzes DHS referrals in determining whether a visa should be revoked); *see* Demonstrative HN. In doing so, personnel in the Visa Office consult with State Department legal counsel. July 11 Tr. at 90:8-9. If the Visa Office determines that a revocation is warranted, that will be presented to the individual in the Bureau of Consular Affairs who received the referral from DHS. July 11 Tr. at 90:12-14; *see* Demonstrative HN. If that individual agrees the nonimmigrant visa should be revoked, "the visa will be revoked" under 8 U.S.C. 1201(i). July 11 Tr. at 90:14-16; *see* HN. DHS will then be informed whether the visa was revoked or not, or, prior to a revocation decision, DHS may be asked to provide additional information. July 11 Tr. at 90:16-25; *see* Demonstrative HN.[3] In Mr. Armstrong's estimation, 25% to 30% of DHS referrals involving nonimmigrant visa holders do not result in revocations, either because they are sent back to DHS to ask for more information or because the State Department finds the information not significant to warrant revocation. July 11 Tr. at 93:25-94:6.

Typically, a nonimmigrant visa holder is also informed when their visa is revoked. *See* July 11 Tr. at 118:9-12. However, in certain circumstances, such as

---

[3] When a nonimmigrant visa is revoked based on information that was not referred from DHS, the State Department does not inform DHS of the revocation. July 11 Tr. at 96:2-5 (John Armstong's testimony that "DHS is not involved in this.").

when DHS seeks to pursue an immigration enforcement action against an individual whose nonimmigrant visa is revoked, operational security concerns will dictate that the individual not be informed of the revocation. *See* July 11 Tr. at 118:9-17; *see also* Exhibit 16 (█████████████████████████████████ ██████████████████████████████), 8 U.S.C. 1227(a)(1)(B) (providing that an alien whose nonimmigrant visa has been revoked is deportable). Operational security includes the safety of the agents, the arrestee, and the public. *See* July 15 Tr. at 51:12-23, 93:10-23, 17-24 (ASAC Cunningham and DSAC McCormack's testimony that precautions must be taken during every arrest to protect the agents, the arrestee, and the public). It is of particular concern currently, given the prevalence of camera phones and the trend of doxxing federal agents. *See* July 15 Tr. at 18:7-20, 51:6-10, 96:6-10 (ASAC Crogan, ASAC Cunningham, and DSAC McCormack's testimony about doxxing concerns).

In the case of an LPR who DHS referred to the State Department, the State Department cannot "revoke [the individual's] status." July 11 Tr. at 91:7-8. Instead, "the Secretary of State can [make] a finding that th[e] person is removable" under 8 U.S.C. 1227(a)(4)(C).[4] July 11 Tr. at 91:8-9; *see* Demonstrative HN. So, when the

---

[4] LPRs do not hold a valid visa, and DHS is responsible for administering LPR status. In certain circumstances, nonimmigrants may retain lawful status in the United States despite not having a valid visa. For example, F or J visa holder are regularly admitted to the United States for the duration of their status, which can continue beyond the visa's period of validity, in which case the individual remains in valid nonimmigrant status as long as, after the expiry, the individual remains enrolled in the program for which they were granted the visa. Such an individual would be amenable to removal under any of the deportability provisions in Section

Bureau of Consular Affairs receives a DHS referral involving a LPR, the Bureau analyzes the referral, then, upon an assessment that the individual may be removable under 8 U.S.C. § 1227(a)(4)(C), sends an "action memo" to the Secretary of State. July 11 Tr. at 91:11-14; *see* Demonstrative HN. On receipt of an action memo, the Secretary has three choices: "agree and find the person removable" under 8 U.S.C. § 1227(a)(4)(C), "disagree and find the person not removable," or "discuss, in other words ask for more information." July 11 Tr. at 91:16-20. If the Secretary agrees and finds an individual removable under 8 U.S.C § 1227(a)(4)(C), DHS is informed of the revocation, both by a formal notification from the Secretary of State to the Secretary of Homeland Security and by an informal notification from the individual in the Bureau of Consular Affairs who received the referral to the individual at DHS who sent the referral. *See* July 11 Tr. at 91:21-92:4; *see* Demonstrative HN. In the event the Secretary disagrees that an individual is removable under 8 U.S.C. 1227(a)(4)(C), the Bureau of Consular Affairs would inform the person at DHS who made the referral of that determination. *See* July 11 Tr. at 92:5-11. Mr. Armstrong estimated that since late February 2025, when he became the senior official at the Bureau of Consular Affairs, "15 to 20" action memos have involved, as the court limited it, "student protests, protestors, and

---

1227 of the INA, assuming such grounds applied. *See* Exhibit 249 (███████████████); Exhibit 21 (█████████████████████████); ███████████ ).

concerns about antisemitism." July 11 Tr. at 119:6-12. He stated that the Secretary agreed to removability in "almost all" cases; he noted the Secretary may have disagreed in one case, and in another, there may have been further discussion before the Secretary ultimately agreed to removability. *See* July 11 Tr. at 119:13-19.

Mr. Armstrong testified that the above-described process, which he detailed at trial, has been the process in place for revoking nonimmigrant visas and making removability determinations based on DHS referrals even before he became the senior official at the Bureau of Consular Affairs in February 2025. *See* July 11 Tr. at 94:10-13. He noted, "We [did] not create any policy or procedure here." July 11 Tr. at 94:13-14. Mr. Armstrong further affirmed that the process he outlined is the process the State Department uses for all DHS referrals, including DHS referrals involving, as is at issue in this case, student protestors. *See* July 11 Tr. at 94:18-24.

Mr. Watson testified that when they receive notice from the State Department that a visa has been revoked or status has been changed (*i.e.*, a (4)(C) finding of deportability), it goes to Domestic Operations and then to the HSI field office. *See* July 17 Tr. at 103:2-11. The field office then works in coordination with OPLA to prepare a notice to appear for the alien to appear in removal proceedings. *See id*. The decision is also made as to whether the alien should be detained during the removal proceedings. *See* 8 U.S.C. §§ 1226(a) (governing the discretionary detention of certain aliens in removal proceedings), 1226(c) (governing the mandatory detention of criminal aliens), 1226a (governing the detention of suspected terrorists).

21

Removal proceedings take place with the procedural protections of 8 U.S.C. § 1229a. Aliens may be represented by counsel and they may appeal the immigration judge's decision to the Board of Immigration Appeals. The alien may then file a petition for review in the U.S. Court of Appeals under 8 U.S.C. § 1252(a)(5). Subparagraph (a)(2)(D) of that section preserves the reviewing court's jurisdiction over all constitutional and legal issues irrespective of other jurisdictional bars.

## II.   PLAINTIFFS FAILED TO SHOW THAT THEY HAVE STANDING AND FAILED TO DEMONSTRATE THAT THEY HAVE BEEN HARMED

This trial has illustrated, as Defendants argued in a motion to dismiss, that Plaintiffs lack both associational and organizational standing. Even if the Court were to accept the concept of associational standing, the validity of which is in doubt, trial evidence showed that the speculative and attenuated harms asserted by Plaintiffs' noncitizen members do not amount to a concrete injury, an impending injury, or a substantial, credible threat of injury. Further, Plaintiffs have not traced their members' supposed harms to unlawful conduct by the Government. Accordingly, with respect to associational standing, Plaintiffs should not be permitted to use hand-selected members' unreasonable decisions to self-censor their speech as a conduit for the organizations' First Amendment challenge to the Government's lawful enforcement of the immigration laws. The Plaintiff organizations should also not be permitted to raise such a claim on their own behalf. The evidence shows, indisputably, that Plaintiffs' organizations were

either unaffected by, or actually aided by, the Government action they challenge. At most, the testifying members spoke to the impact of the alleged policy on *other* organizations unrelated to AAUP. Plaintiffs' failure to establish standing ends the Court's inquiry; judgment should be entered for the Defendants. Even if they had standing, they have not produced evidence at trial showing the existence of the alleged discriminatory policy or demonstrating that they were harmed by the alleged policy, and for that reason too, judgment should be entered for Defendants.

## A.    "Associational" Standing Violates Article III of the Constitution

### 1.    Background to Associational Standing

The doctrine of associational standing violates Article III and distorts the traditional understanding of judicial power. The concept of standing is rooted in the traditional understanding of a case or controversy and, at a constitutional minimum, requires that a plaintiff (1) have suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Raines v. Byrd*, 521 U.S. 811, 818-20 (1997); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The Supreme Court has never explained or justified the expansion of Article III standing to include the modern concept of associational standing. In fact, associational standing is a comparatively new judicial development. And there are doubts as to its continued viability. *See, e.g., FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 398 (2024). (quotation omitted) (Thomas, J., concurring)

23

("Our third-party standing doctrine is mistaken. . . . [A] plaintiff cannot establish an Article III case or controversy by asserting another person's rights. . . . Associational standing . . . is simply another form of third-party standing.").

Article III empowers judges to hear "cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process." U.S. Const. Art. III, § 2; *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998); *Muskrat v. United States*, 219 U.S. 346, 356-58 (1911); *Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 170 (1803). Associational standing flouts this conveyance of judicial power by permitting an organization to assert its members' injuries— indeed, injury to a *single* member, whether or not tied to or representative of the organization, will suffice—instead of its own. *See Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333 (1977)

Associational standing is also in tension with and subverts the class-action mechanism by effectively allowing organizations to craft their own classes without judicial approval or satisfying the requirements of Federal Rule of Civil Procedure 23. Despite the Supreme Court's admonitions that "courts may not 'recognize…a common-law kind of class action' or 'create *de facto* class actions at will," that is precisely what associational standing permits. *United States v. Sanchez-Gomez*, 584 U.S. 381, 389-90 (2018) (quoting *Taylor v. Strugell*, 553 U.S. 880, 901 (2008); *see Smith v. Bayer Corp.*, 564 U.S. 229, 315-16 (2011) (same).

24

### 2. Plaintiffs' Theory of Associational Standing Cannot be Squared with Facts Adduced at Trial

The plaintiff organizations attempt to use the doctrine of associational standing to mask the absence of evidence that they, as organizations, were harmed by the alleged deportation policy. But the facts adduced at trial illustrate how far the doctrine in this case strays from the traditional judicial process and the constitutionally rooted concept of standing. For a plaintiff to have standing, the court must be able to "provid[e] a remedy that can redress *the plaintiff's* injury." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) (emphasis added). But, on the theory of associational standing, these organizational plaintiffs need have no injury to redress.

In this case, Plaintiffs' theory of associational standing and harm are incongruous: Plaintiffs allege that an "ideological deportation policy" chilled the First Amendment rights of select non-citizen members of their organizations. Plaintiffs then leap to the assumption that because select members were allegedly harmed, they, as organizations, were harmed as well. But trial evidence exposed this theory as incompatible with the facts of this case: (1) The member witnesses who were purportedly harmed had only a glancing relationship with organizational plaintiffs; (2) the member witnesses themselves were not targeted and suffered no material injury; (3) the claimed injury was predicated on the fourth-party harm of individuals who were not members of the plaintiff organizations; (4) the purported harm was not immediate or

identifiable, but rather, was based upon unfounded and/or unreasonable conjecture of a vague, downstream injury; and (5) the plaintiff organizations, *qua* organizations, experienced no demonstrable abrogation of First Amendment rights – to the contrary, they *increased* their First Amendment expression. As is discussed below, for these reasons, the Court should conclude that Plaintiffs lack standing and proved no injury, and enter judgment for the Government.

> **B.** **Plaintiffs Provided no Student Visa-Holding Witnesses and so Lack Associational Standing to Challenge any Policy or Action Relating to Nonimmigrant Student Visa Holders**

Should the Court entertain an associational standing theory in this case, the doctrine demands that the organization identify a particular affected member, not merely a "statistical probability that some of [its] members are threatened with concrete injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009). A general reference to unidentified members is insufficient to confer standing on an organization. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 487 n.23 (1982).

Here, the Plaintiff organizations have not identified a single member who is a nonimmigrant student visa holder or any other members who have been "threatened with concrete injury" from the alleged ideological deportation policy ("IDP"). *See Summers*, 555 U.S. at 497. None of Plaintiffs' witnesses were students or nonimmigrant student visa holders. All of Plaintiffs' witnesses belonging to either AAUP or MESA, or both, are either citizens, whom the Court found to lack standing, July 8 Tr. at 137:19-138:10, 140:2-16; *AAUP*, 2025 WL

26

1235084 at *16 (noting that "Plaintiffs' 'right to hear' argument . . . asks this Court to take an apparently unprecedented creative leap"), or lawful permanent residents. *See* July 7 Tr. at 36:1-5, 127:2-4; July 8 Tr. at 54:11-12; 134:24-135:1; July 18 Tr. at 86:24-87:1; Shuve Depo. Tr. at 132:25-133:4.

Thus, even assuming the existence of an ideological deportation policy, Plaintiffs lack standing to challenge any such policy or attendant threats directed at nonimmigrant student visa holders. *See Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (finding "advocacy group" lacked standing where it "did not identify any member of the group whom the regulation" at issue affected).

## C. Plaintiffs Fail to Establish Associational Standing Based on Their LPR Members

It is settled law that a First Amendment claim cannot rely on a plaintiff's "speculat[ion] about the decisions of third parties." *Murthy v. Missouri*, 603 U.S. 43, 57 & 72 (2024) ("it is no more than conjecture to assume that [plaintiff] will be subject to" future Government proscriptive action). In this case, Plaintiffs' associational standing theory rests not upon a direct "injury that is concrete, particularized, and actual or imminent[.]" *Id.* Rather, it is premised on Plaintiffs' members having (1) learned of a handful of arrests of others through first- or second-hand hearsay, (2) interpreted these arrests to mean that the Federal Government had a policy to deport pro-Palestine protestors and protestors otherwise critical of the Trump Administration, and (3) self-censored their political speech based on speculation that at some point, downstream in the

future, the Government might deport them as well for publicly criticizing the Administration or espousing an opinion supportive of Palestine.

In short, the fears expressed by these LPR witnesses, even if sincerely held, amount to harms too speculative and attenuated to establish cognizable injury for purposes of standing. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (explaining that, to establish Article III standing, "[t]he line of causation between the illegal conduct and injury – the "links in the chain of causation," must not be too speculative or too attenuated"). The fact that this is a First Amendment case does not change the analysis or the outcome. *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 46 (1st Cir. 2011) (explaining that "the constitutional [standing] requirements apply with equal force in every case" including First Amendment cases).

The Supreme Court's decision in *United States v. Texas*, 599 U.S. 670 (2023) confirms this. Plaintiffs ask this Court to second guess the Executive Branch's discretionary decision regarding where and how vigorously to direct its immigration enforcement resources. *Id.* at 679. The Supreme Court has made clear, however, that parties challenging immigration enforcement priorities lack an Article III injury because such lawsuits "run up against the Executive's Article II authority to enforce federal law," *id.* at 678, and "courts generally lack meaningful standards for assessing the propriety of enforcement choices" with respect to arrest and detention, given the needs of the Executive Branch to

weigh "resource constraints and regularly changing public-safety and public-welfare needs" when devising policy, *id.* at 679-80. Consequently, "federal courts lack Article III jurisdiction over suits that challenge the Executive's enforcement decisions." *Id.* at 685.

1.  **Plaintiffs Cannot Establish Concrete Injury by Their Members' Subjective Fears and Unreasonably Self-Censoring Their Speech**

  a)  **The harms Plaintiffs' LPR members fear are not concrete**

The standing requirement of "injury in fact" requires a plaintiff to establish that he or she "'has sustained or is immediately in danger of sustaining a direct injury'" because of the challenged action. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1552 (2016) (citations omitted). The injury must be "concrete and particularized," *Lujan*, 504 U.S. at 560 (citations omitted), and not "merely 'conjectural' or 'hypothetical' or otherwise speculative." *Summers,* 555 U.S. at 505 (quoting *Lujan*, 504 U.S. at 560). Absent proof of a concrete harm, where a First Amendment plaintiff only alleges inhibition of speech, the federal courts routinely hold that no standing exists." *Morrison v. Bd. of Educ. of Boyd Cnty.*, 521 F.3d 602, 609 (6th Cir. 2008); *see Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088 (10th Cir. 2006) (explaining that "in speech cases as in others, courts must not intervene in the processes of Government in the absence of a sufficiently 'concrete and particularized' injury") (quoting *Lujan*, 504 U.S. at 560); *see also Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 415 (2013)

29

("respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending").

Plaintiffs' LPR members who testified—Megan Hyska, Nadje Al-Ali, Bernhard Nickel, and Brian Shuve (at his deposition)—all claimed injury via self-censorship based on their perceptions of the reasons for the immigration arrests of other noncitizens, fearing the same might happen to them.  This does not establish any concrete harm to Plaintiffs LPR members; rather, the prospective harms that select testifying members identified were hypothetical, downstream, unreasonable, and speculative.

Megan Hyska testified that she feared arrest and deportation for engaging in political activity, and therefore chose to self-censor, based on arrests of Mr. Khalil and Ms. Öztürk. *See* July 7 Tr. at 43:19-44:2.54:14-17, 59:10-16. Ms. Hyska testified that she changed her mind about wanting to become more active with the Democratic Socialists of America ("DSA"), an organization aligned with pro-Palestinian causes, in 2025 after she became aware of "a couple high-profile detentions," including that of Mr. Khalil. She stated that she did so based on a fear that she would risk "detention and deportation for being publicly and politically critical of the Trump Administration." July 7 Tr. at 43:16-44:2. Ms. Hyska also chose not to attempt to publish an Op-Ed she wrote critical of the Trump Administration because of her belief that a nonimmigrant student visa

holder, "Rümeysa Öztürk [,] was detained for having co-authored an Op-Ed."
July 7 Tr. at 59:10-16.

Although Ms. Hyska claimed that in response to the alleged policy, she
withdrew from seeking a leadership role, this leadership role was with the
DSA—not AAUP.  *See id.* at 97:23-98:12. Ms. Hyska could not identify with
specificity the policy or immediate threat—rather, her fears were based upon her
review of internet reports. *See id.* at 84:25 ("I just know what I see in reporting"),
89:6-12 (referencing "clusters of social media posts around the detention of Mr.
Khalil").

Ms. Hyska's claimed self-censorship was unreasonable considering her
personal circumstance.  She was not outspoken on issues of Palestine or Isreal:
her scholarship in philosophy did not address these issues, and to the extent she
had publicly spoken out, it was within the aegis of DSA, or as one of scores or
thousands of signatories on a letter. *See id.* at 71, 122:5-22. She had never
personally been contacted by the U.S. Government regarding her speech or
political activity. She did not "receive[] anything, a personal message from the
government to tell [her] to withdraw or refrain from engaging in political speech
of any kind." *Id.* at 90:8-13.

Moreover, Ms. Hyska undermined her own testimony on the purported
effect of the alleged policy. She claimed that she has "felt such acute . . . stress
and fear about the prospect of engaging in political speech in this country that

I've concluded that I want to go on the job market this coming fall to hopefully find employment outside of the United States." *Id.* at 73:22-74. Yet, when asked about her many professional engagements in 2025, she volunteered that she intends to seek tenure at Northwestern University.

> Q. Okay. But with respect to your professional publications, you've been quite active in 2025, haven't you?
>
> A. I hope so.
>
> Q. Things are going well for you, aren't they?
>
> A. We'll see what the tenure committee thinks.

*Id.* at 91:3-7. This statement makes evident that Ms. Hyska has no intention of leaving Northwestern or abandoning her plans to seek tenure there.

<u>Nadie Al-Ali.</u> Ms. Al-Ali testified that she altered international travel plans following the arrest of Mr. Khalil, feeling that her pro-Palestinian speech put her at risk of being "flagged" upon return to the United States. *See* July 7 Tr. at 134:8-23; 135:3-8. She also halted plans to travel to Beirut and Baghdad to engage in research, conferences, and a fellowship opportunity. *See* July 7 Tr. at 131:25-132:15, 140:19-21. Relatedly, after Mr. Khalil's arrest, Ms. Al-Ali said she abandoned plans to write an article, which she was considering writing in January 2025 that would have provided a "feminist critique of Hamas." July 7 Tr. at 132:17-21. Ms. Al-Ali said she did not pursue the article because she would have included in it "a feminist critique of the Israeli government policies, especially in relation to what's happening in Gaza," which she had "started to

32

think about it and started to do some reading" and had "informally talk[ed] to people." July 7 Tr.at 132:17-21; 133:16-22; 142:207. She stated that, following the arrests of Mr. Khalil and Ms. Öztürk, "that was too risky." July 7 Tr. at 142:2-7. Ms. Al-Ali also explained at trial that, following the arrest of Mr. Khalil, she has not signed onto any letters, nor facilitated any meetings, regarding the situation in Israel and Palestine, despite having done both of these things prior to Mr. Khalil's arrest. July 8 Tr. at 19:5-15, 20:2-15. She additionally noted that she did not attend MESA's annual meeting, which she usually attends, July 7 Tr. at 143:6-17, 144:4-12, and she said she declined chairing the human rights committee of the Women's Association of Middle East Studies because she felt it would be "too risky to chair a human rights committee that would definitely deal with cases linked to academic freedom, pro-Palestinian speech, and allegation of antisemitism." July 7 Tr. at 144:13-145:2. . She also claimed to have refrained from protesting after March 2025 because she "didn't know whether these were going to be peaceful protests," she "didn't know what was going to happen," and she "was worried that if something was going to happen," she, as a noncitizen, "would be in a particularly vulnerable situation." July 8 Tr. at 36:16-22.

Like Ms. Hyska, Ms. Al-Ali's professed anxiety about the potential threat of deportation was unreasonable and wholly speculative. She had attended 30 to 40 protests in her life, and had never once been arrested or detained. *See* July 8 Tr. at Tr.37, 35:1-14, 36:23-37:8 ("I didn't think that I would be, out of 10,000 people, singled out."). Her ample scholarship includes only two works that

33

potentially touched upon Palestine. *See* July 7 Tr. at 125:16-23. She had no

social media postings on the subject. *Id.* at 146:23-147:1.  She was one of many

signatories on only three letters to Brown's president relating to (1) supporting

students who passed a divestment referendum, July 8, 2025 Tr.12:10-14; (2)

protesting the involvement of the Providence police, *Id.* at 15:22-16:6, and (3)

requesting the president of Brown University to call for a cease fire between

Isreal and Gaza. *Id.* at 17:7-14. Her suggestion that she believed she could be

deported for writing an article *critical of Hamas* strains credulity.

<u>Bernhard Nickel.</u> Bernhard Nickel testified that Mr. Khalil's arrest, which

he read about in the newspaper, "scared [him]," specifically of "political reprisal."

July 8 Tr. at 83:14-19, 84:15. Mr. Nickel also testified that the arrest of Ms.

Öztürk caused him to refrain from traveling internationally for personal and

professional purposes based on apprehension about "potentially being detained

at the border when [trying] to re-enter" the United States. July 8 Tr. at 88:12-

90:10. Mr. Nickel affirmed, following these arrests, he began to fear his past

political speech, such as his signature on a 2019 open letter to the Director of the

United States Holocaust Museum and his signature on a 2021 Harvard faculty

statement in support of Palestinian liberation, created a "heightened risk" that

the Trump Administration would target him for deportation. *See* July 8 Tr. at

97:6-19, 98:24-99:2, 99:15-19, 100:22-101:4 (discussing Exhibits 83 and 84). Mr.

Nickel qualified, "[Do I believe] that it would definitely happen? No." July 8 Tr.

at 101:4-5. Mr. Nickel stated that following Mr. Khalil's arrest he attempted not to "draw attention to [himself]," fearing that he "might potentially be the target of something." July 8 Tr. at 87:2-5. He claimed that the "ideological deportation policy" caused him to "stop[] going to protests," "stop[] signing on to public letters," and "cancel[] international travel." *Id.* at 55:7-9.

Mr. Nickel's personal history shows he had no plausible reason to believe that he would be targeted for deportation by the Government. He has lived in the United States for nearly 30 years. In that time, he has never been contacted by the Government about his political views or been given any indication that it has been monitoring his political speech. *Id.* at 115:3-10. His professional work is unrelated to the issue of Palestine. And prior to the election of President Trump, the only public acts he was associated with were his signatures on two letters where he was one of hundreds of signers. *Id.* at 98:24-99:14, 100:18-101:3. His involvement in protests was not publicized in any respect. *Id.* at 86:17-24, 109:9-110:14. Put succinctly, his history of public protest—or lack thereof—renders unreasonable Mr. Nickel's subjective "anxiety" about the possibility of a future deportation.

The fears of Plaintiffs' LPR members boil down to "a subjective chill based on speculation about potential governmental action." *Clapper*, 568 U.S. at 420 (citation omitted). But to establish harm, they must do more than "simply . . . claim[] that they experienced a 'chilling effect that resulted from a governmental

35

policy that does not regulate, constrain, or compel any action on their part." *Id.*
at 419. Plaintiffs are required to present "concrete evidence to substantiate their
fears," but instead they rely on "mere conjecture" which is insufficient to meet
their burden." *Id.* at 420.

### b) The harms Plaintiffs' alien members fear are not impending

Nor have Plaintiffs shown that the harms their LPR members fear are in
any way impending. A concrete injury in a pre-enforcement, or chill, case must
be "certainly impending." *Clapper*, 568 U.S. at 410. It cannot be "fanciful,
paranoid, or otherwise unreasonable." *Id.* at 416 (2013) (cleaned up); *cf. Blum v.
Holder*, 744 F.3d 790, 797-798 (1st Cir. 2014) (holding that the prior "objectively
reasonable likelihood" of harm standard in pre-enforcement First Amendment
cases is inconsistent with [*Clapper's*] requirement that injury be certainly
impending).

First, Plaintiffs' LPR members merely speculate that their co-noncitizen
members might come within the universe of people the Government has an
interest in investigating. Second, even if a member is investigated in the future,
Plaintiffs provide no evidence that this investigation would result in information
that could support any type of immigration enforcement activity. Third,
assuming a future immigration enforcement action against one of their
members, Plaintiffs offer nothing other than speculation to show that such
action would be based on protected speech rather than general noncompliance

36

with visa terms or some other unrelated basis for removal. *See* Exhibit 8 (█████

███████████████████████████████████████████████

███████████████████████████████████████████

████████████████████). Finally, even if Plaintiffs showed that certain

Government actors might seek enforcement action based on their alleged policy

and that it involved protected speech, Plaintiffs offer no concrete evidence

bearing on whether such action would be approved. *See Clapper*, 568 U.S. at 413

(expressing reluctance to find standing where it "require[s] guesswork as to how

independent decisionmakers will exercise their judgment").

It is also worth noting that all of Plaintiffs' noncitizen witnesses have

continued to engage in behaviors they themselves characterized as "risky" in

light of the Trump Administration's alleged ideological deportation policy, and

they have done so without suffering any of the consequences they claim to fear—

arrest, detention, and deportation.

For example, Megan Hyska gave multiple professional presentations since

January 2025, including one "about deep fakes and political mobilization." July 7

Tr. at 91:9-92:20. Following the arrests of Mr. Khalil and Ms. Öztürk, Ms.

Hyska— notwithstanding her claim that these arrests caused her to withdraw

from a number of political activities—continued to be politically active.  She

attended the "Hands-Off" protest in Chicago in April 2025, which she described

as "protesting . . . a wide range of Trump [A]dministration conduct." July 7 Tr. at

95:18-25; *see* July 7 Tr. at 63:9-20 (discussing the Hands-Off protest). She also

attended a meeting for the DSA's Unite and Fight campaign in late March or early April 2025, which she described as a "campaign that was designed to basically resist the Trump [A]dministration's policy on a number of fronts, including immigration." July 7 Tr. at 96:1-13; *see* July 7 Tr. at 66:4-15 (describing the Unite and Fight campaign). She affirmed that the meeting "generally concerned ICE raids and deportation of immigrants that people were concerned with and concerned with planning to protest." July 7 Tr. at 97:7-12.

Additionally, Ms. Hyska signed a March 18, 2025, letter to the Chair of Northwestern University's Board of Trustees raising concerns that the "Trump Administration is breaking laws and trampling government norms." July 7 Tr. at 108:6-18 (discussing Exhibit 72). She additionally signed a March 20, 2025, open letter expressing support for a Northwestern University professor denied tenure allegedly because of his support of students protesting related to the conflict in Israel and Palestine. *See* July 7 Tr. at 112:14-113:13 (discussing Exhibit 68). Ms. Hyska also signed an April 17, 2025, letter to Northwestern University's President and Provost, in which Northwestern University was urged to avoid voluntarily cooperating with ICE. *See* July 7 Tr. at 115:14-15, 115:24-116:6, 118:6-21 (discussing Exhibit 69).

Yet, despite engaging in these activities, all in 2025 and most following the arrests of Mr. Khalil and others, Ms. Hyska suffered no adverse immigration consequences. *See* July 7 Tr. at 101:25-102:15 (Ms. Hyska's testimony that she has never been detained or arrested, and in 2025, she has never been questioned

by an official of the United States Government other than when she underwent routine inspection when reentering the country in January 2025); see *Clapper*, 568 U.S. at 410. Harm against Ms. Hyska is not "certainly impending."

Likewise, Ms. Al-Ali testified that despite being "quite nervous" on hearing about the March 2025 arrest of Mr. Khalil while she was abroad, she chose to follow through with plans to give talks in Switzerland before returning to the United States. *See* July 7 Tr. at 13-23; *see* July 8 Tr. at 41:22-42:1. She was not detained, questioned about her scholarship related to Palestine, or subjected to any inspection other than normal inspection upon her return to the United States. *See* July 8 Tr. at 43:23-44:21.

Mr. Nickel testified that — despite allegedly not wanting to draw attention to himself for fear of being targeted for deportation, July 8 Tr. at 87:2-5—he sent several emails in 2025 critical of the Trump Administration. First, in February 2025, he sent an email to all graduate students in Harvard's philosophy department discussing the Trump Administration's "attacks on our institutions." July 8 Tr. at 103:21-104:23 (discussing Exhibit 78). Next, in March 2025, he emailed the faculty members in Harvard's philosophy department informing them of information made available by the Harvard International Office. *See* July 8 Tr. at 104:12-105:4 (discussing Exhibit 171). After that, in April 2025, Mr. Nickel emailed current and prospective graduate students inviting them to attend a discussion covering, in part, "attacks and threats" posed by the Trump Administration. *See* July 8 Tr. at 105:23-106:15, 107:6-10

(discussing Exhibit 172). Mr. Nickel also confirmed sending one additional email to approximately 200 recipients "critical of the Trump Administration" in 2025. July 8 Tr. at 108:2, 108:24-109:1, 18-22 (discussing Exhibit 79). Mr. Nickel acknowledged the possibility that any of his emails could be shared publicly. July 8 Tr. at 106:22-107:5. He also said that he attended an AAUP protest in 2025 following the inception of the Trump Administration. July 8 Tr. at 113:1-10. Notwithstanding his public criticisms of the Trump Administration in 2025, Mr. Nickel affirmed that he has never received any communication from anyone in the federal Government relating to political speech in which he engaged. *See* July 8 Tr. at 115:16-19.

But it is Brian Shuve's experience that best illustrates why these witnesses' purported fears about deportation are unreasonable.  Prior to trial, Mr. Shuve was identified by Plaintiffs as a prospective witness whom they expected to testify about the alleged policy. Based upon that representation, the Government deposed him. After he was deposed, Plaintiffs withdrew him from their list of witnesses. Mr. Shuve's deposition testimony revealed why Plaintiffs did not want him to testify at trial.

Of all Plaintiffs' witnesses, Mr. Shuve's public statements would have made him the most likely target of an "ideological deportation policy." He was a Canadian citizen (Shuve Depo. Tr.at 47:23-48:7) who spoke out publicly on issues of Palestine and Israel. He was a member of Claremont Colleges' Faculty for Justice in Palestine (FJP), Tr. at 64:5-8, an organization which publicly

40

speaks out in support of Palestine and criticizes Israel. *See* Shuve Depo. Tr. at
97:22-98:4. For two years Mr. Shuve has been the member representative for
Harvey Mudd College's AAUP chapter's 200 members. *See* Shuve Depo. Tr.
68:16-69:8. Through that chapter, he published a public statement about "the
ability of scholars to speak on contentious issues specifically with respect to
Israel and Palestine," Shuve Depo. Tr. 73:7-11, and at the National Day of
Action, his Harvey Mudd AAUP chapter hosted a meeting and participated in a
webinar which discussed issues including the topic of Palestine. *See* Shuve Depo.
Tr. 84:15-85:11, 89:13-15. He was involved in drafting multiple statements for
FJP on its website relating to Palestine and Gaza, Tr. 103:12-104:10, 111:1-
114:15, and participated in an FJP public demonstration in the Spring of 2025.
Tr.116:7-121:21.

By his account, Mr. Shuve's history of public, pro-Palestinian speech
between late-2023 and mid-2025, Depo. Tr. 72:5-78:1, 101:14-115:6, 117:20-
118:24, 128:18-132:21, left him fearful of being arrested and detained when he
attended his April 23, 2025, naturalization interview.  Shuve Depo. Tr. 171:3-7
(claiming fear leading up to his naturalization interview predicated upon the
arrest of Mohsen Mahdawi at his naturalization interview).[5]  Indeed, the
volume of his public speech in support of Palestine, his membership in FJP, and
his leadership role at Harvey-Mudd-AAUP, far exceeded the public political

---

[5] Reference to "Khalil" corrected in deposition errata to "Mahdawi."

profile of the other testifying witnesses. However, not only was he not detained at his interview, but rather, following a 20-minute interview, he became a U.S. citizen on the very same day. Shuve Depo. Tr. at 133:3-4, 135:6-21. Just as Mr. Shuve's purported anxiety was proven unreasonable, so was that of other AAUP non-citizen witnesses whose public profile on issues relating to Palestine was far less than his.

### c)    Plaintiffs have not established a substantial, credible threat of enforcement

In a case alleging chill, a plaintiff can also meet "the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (citing and quoting *Babbitt v. Farm Workers,* 442 U.S. 289, 298 (1979)); *see Speech First, Inc. v. Fenves*, 979 F.3d 319, 330-38 (5th Cir. 2020), as revised (Oct. 30, 2020) (explaining that chilled speech may establish an injury for standing purposes and applying the *SBA List* test to determine whether that chilled speech established injury). A "credible threat" requires that the threat of future prosecution be "substantial." *Susan B. Anthony List*, 573 U.S. at 164-67. A "realistic threat" is not enough. *See Summers*, 555 U.S. at 500.

Here too, Plaintiffs fail to establish standing because they cannot establish a substantial, credible threat that they will be arrested, detained, and

deported based on their "arguably proscribed" speech. *Susan B. Anthony List*, 573 U.S. at 162. At the most basic level, Plaintiffs cannot even show that their chilled speech is "arguably proscribed" because the alleged policy underlying their fears—the IDP—does not exist. John Armstrong testified that there is no IDP. *See* July 11 Tr. at 121:5-15. He also affirmed that the State Department does not have a policy to revoke visas based on protected speech, nor does the State Department have a policy to find people removable based on protected speech. *See* July 11 Tr. at 121:16-21. Andre Watson testified similarly, indicating that in his career of more than twenty years, he has never "heard of a policy instituted by the U.S. Government to target people for deportation for engaging in political speech." July 17 Tr. at 59:16-59:22. Nor is he "aware, in the last year, of any decisions made by anyone in the U.S. Government regarding removing a person from the United States for political speech." July 17 Tr. at 60:4-60:9. Without a policy that arguably proscribes Plaintiffs' First Amendment speech, they necessarily lack standing when no enforcement action has occurred.

Even if the policy exists, Plaintiffs have not produced evidence that the policy itself arguably proscribes any protected speech. *See* July 11 Tr. at 121:22-25 (John Armstrong's testimony, when asked if the State Department has a policy to revoke visas based on political viewpoints, that supporting a terrorist organization can result in the revocation of a visa); July 17 Tr. at 39:5-39:8 (Andre Watson's testimony denying that the U.S. Government targets individuals for removal based solely on participating in public protests); *id.* at

43

59:16-59:22 (Andre Watson's testimony denying that the U.S. Government targets individuals for removal based on their political speech). Instead, any authority to arrest, detain, or charge a alien with a removal ground will come from the INA, which is not being challenged in this case. At best, Plaintiffs' alleged policy tells agencies to enforce preexisting immigration laws. *See Susan B. Anthony List*, 573 U.S. at 162 (pre-enforcement review only available where Plaintiffs' "future conduct" is "'arguably proscribed'" by the challenged government action).

Plaintiffs point to little more than general statements issued in the media about immigration enforcement priorities to establish a credible threat of injury. Plaintiffs' noncitizen witnesses professed a general fear or anxiety triggered by such statements and their own estimation that such statements amount to an IDP that *could* be enforced against them. July 7, 2025 Tr. at 63:16-64:4 (Ms. Hyska's testimony that she "felt an unusual degree of anxiety about attending a protest"); July 8, 2025 Tr. at 113:9-114:18 (Mr. Nickel's testimony on his anxiety), 30:3-31:13 (Ms. Al-Ali's testimony about "anxiety" and "general anxiety"); July 9, 2025 Tr. at 9:9-17, 25:25-26:5 (Ms. Abu El Haj's testimony that Mr. Khalil's arrest created "a sort of anxiety and panic about what might happen next" and Mr. Mahdawi's arrest "escalated a sense of anxiety and panic at Columbia"); Shuve Depo. Tr. at 171:3-7 describing "fear and anxiety" after Mr.

Mahdawi's arrest).[6] That too falls far short of establishing a credible, substantial threat of prosecution required to establish standing. *See Younger v. Harris*, 401 U.S. 7, 42 (1971) ("[F]ears of prosecution cannot be merely 'imaginative or speculative.'"). It is plainly not enough. *See Lopez v. Candaele*, 630 F.3d 775, 787 (9th Cir. 2010) ("'[G]eneral threats by officials to enforce those laws which they are charged to administer' do not create the necessary injury in fact.") (citing *United Pub. Workers of Am. v. Mitchell*, 330 U.S. 75 (1947)).

Instead, to establish associational standing based on a substantial, credible threat of enforcement. Plaintiffs must establish a specific indication from Defendants that prosecution is imminent if they engage in the speech they have chilled. *See Culinary Workers Union, Loc. 226 v. Del Papa*, 200 F.3d 614, 618 (9th Cir. 1999) (letter from Attorney General to plaintiff stating that "she will cause the statute to be enforced unless the union ceases distribution of the handbill" was sufficient to show injury)." Plaintiffs fail here because the evidence shows that enforcement actions relating to this alleged policy are "rare" and focused on actions appreciably different from the speech that Plaintiffs' members have self-censored. *See Blum*, 744 F.3d at 799 (upholding no standing in a First Amendment chill case where enforcement under the challenged statute "has been rare and has addressed actions taken that are different from those plaintiffs propose to undertake").

---

[6] Corrected from "Khalil" in errata sheet.

In his testimony, John Armstrong emphasized that the enforcement actions against Mr. Khalil, Mr. Mahdawi, Mr. Suri, Ms. Öztürk, and the prospective enforcement action against Ms. Chung, were based on these individuals' actions. Specifically, with respect to Mr. Khalil, he noted ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████















The actions of the individual nonparty noncitizen students that Plaintiffs identified, contrast sharply with the protected speech, whether past or prospective, of Plaintiffs' members, three of whom are aliens and one recently naturalized citizen, who offered testimony in this case. For example, ███████ ████████████████████████████████████████████ Ms. Hyska testified that she "ha[s] a great problem with antisemitism" herself. July 7 Tr. at 86:7-8. Mr. Nickel similarly testified that he did not approve of the use of an antisemitic trope he witnessed at a student protest. July 8 Tr. at 72:5-12.

Where ████████████████████████████████████████████████, *see* July 11 Tr. at 111:23-112:1, 113:2-19, 114:2-18-115:7, Ms. Al-Ali testified that she has "never rioted" at a protest, is a "peaceful person who believes in nonviolence," and is "not frontline" with respect to protests related to the conflict in Palestine and Israel. *See* July 8 Tr. at 35:16-20, 44:21-22. Ms. Hyska and Mr. Nickel also referenced attending protests, but there is no indication that such

51

protests were disruptive. *See* July 7 Tr. at 63:9-20 (Ms. Hyska's testimony about the Hands-Off protest in Chicago in April 2025); July 8 Tr. at 113:1-10 (Mr. Nickel's testimony about an AAUP protest he attended in 2025).

Where ██████████████████████████████████████ *see* Exhibit 249, Mr. Shuve re-posted to his Facebook statements he co-authored, some of which concerned the conflict in Palestine and Israel, *see* Shuve Depo. Tr. at 154:11-14, 155:14-24. Likewise, Mr. Nickel's political speech via email and Ms. Hyska's political speech via statements she signed onto were critical of the Trump Administration and their universities' administrations, not supportive of a foreign terrorist organization. *See* July 8 Tr. at 103:21-104:23, 104:12-105:4, 105:23-106:15, 107:6-10, 108:2, 108:24-109:1 (Mr. Nickel's testimony discussing his emails critical of the Trump Administration, including Exhibits 78, 79, 171, and 172); July 7 Tr. at 108:6-18, 112:14-113:13, 115:14-15, 115:24-116:6, 118:6-21 (Ms. Hyska's testimony concerning statements she signed onto, including Exhibits 68, 69, and 72).

Finally, ████████████████████████████

████████████████████████████████████████████████████

██████████████, *see* Exhibit 250 (thus reflecting her association with the disciplined group), there is no indication that the Op-Ed Ms. Hyska authored, but elected not to publish, which was critical of the Trump Administration, would reflect any similar connection. *See* July 7 Tr. at 57:17-58:1, 59:10-16 (discussing Exhibit 66).  Ultimately, Plaintiffs' attempt to draw

52

parallels between the actions of the five individual noncitizen students against whom enforcement actions were pursued, and the speech, past or prospective, of Plaintiffs' noncitizen witnesses, is entirely unsuccessful in establishing a credible, substantial threat of enforcement against Plaintiffs' noncitizen members.

The infrequency of immigration enforcement against noncitizen protestors such as the Plaintiffs' LPR witnesses, underscore that Plaintiffs have not established a credible, substantial threat of enforcement required to establish standing. Mr. Hatch, Assistant Director of the HSI Office of Intelligence, testified that a "tiger team"[9] was created to handle the large volume of work— "[t]o look at the protesters, to develop Reports of Analysis [("ROA")][10] on the protesters, specifically looking for violations of U.S. laws," using "the normal [ROA] process and . . . normal trade craft." July 9 Tr. at 74:12-75: 7. The team

---

[9] Mr. Hatch explained that "tiger team" is a term of art used not only at HSI but also in the military and in business to describe "an ad hoc, temporary standup" of employees "assigned to a project, usually when it's a large workload." July 10 Tr. at 95:7-96:9. The term is used to "differentiat[e] between whether someone's doing their normal job or whether they're doing this additional duty or whether they have been reassigned to this duty." July 10 Tr. at 95:13-16. It is an internal term and not meant to intimidate. July 10 Tr. at 96:18-19. The Office of Intelligence has used tiger teams "maybe a half dozen times" since 2019. July 10 Tr. at at 95:19-21.

[10] Mr. Hatch repeatedly emphasized that ROAs are only fact-finding documents and present no opinions, judgments, or decisions and do "not presume guilt or innocence." July 9 Tr. at 45-46, 57, 61, 95-96, 99-100, 118-19; July 10 Tr. at 21-22, 24, 94-95. Put another way, ROAs are simply the work product of investigative analysts. July 9 Tr. at 56. The Office of Intelligence generates approximately 25,000 to 30,000 ROAs per year. July 9 Tr. at 49.

performed research and analysis on over 5,000 leads and generated ROAs for between 100 and 200 of these leads, representing no more than, at maximum, less than 5% of the total leads. *See* July 10 Tr. at 83:21-84:1, 97:19-22.. These ROAs were sent to the National Security Division. *See* July 9 Tr. at 98:17-99:15 (affirming that ROAs are sent to the National Security Division). For the remaining greater than 95% of leads, the Office of Intelligence "didn't do anything with them." July 10 Tr. at 106:5-8. Assistant Director Watson testified that he reviewed between 20 and 30 ROA-based referrals to the State Department regarding specific individuals associated with these protests. *See* July 17 Tr. at 55:23-56:5, 56:3-5.

In John Armstrong's estimation, 25% to 30% of DHS referrals involving nonimmigrant visa holders do not result in revocations, either because they are sent back to DHS to ask for more information or because the State Department finds the information not significant enough to warrant revocation. *See* July 11 Tr. at 93:25-94:6. Mr. Armstrong also estimated that since he assumed the role of senior official in the Bureau of Consular Affairs in late-February 2025, "about 15 to 20" action memos involving student protesters have been sent to the Secretary of State. July 11 Tr. at 119:6-12. He further testified that in "almost all" of those 15 to 20 cases, the Secretary of State made a removability determination. July 11 Tr. at 119:13-17. He offered, "There may have been one that was not [agreed to by the Secretary] . . . And there may have been another

54

one that was discussed and later agreed to [by the Secretary]." July 11 Tr. at 119:17-19.

This infrequency of enforcement of the immigration laws against alien protestors is further borne out by the fact that not one of Plaintiffs' more than 50,000 members has been the subject of an immigration enforcement action. *See* July 18 Tr. at 70 (Ms. Dubal's testimony that AAUP has approximately 50,000 members); *see also Summers*, 555 U.S. at 499 ("the Court has required plaintiffs claiming an organizational standing to identify members who have suffered the requisite harm—surely not a difficult task here, when so many thousands are alleged to have been harmed"). Nor have any of Plaintiffs' noncitizen witnesses directly received a threat of enforcement of any kind, whether it be an arrest warrant, a Notice to Appear in removal proceedings, or any other correspondence from the government. *See, e.g.,* July 7 Tr. at 101:25-102:15 July 8 Tr. at 19:10-15, 37:4-8, 43:23-44:21, 115:3-116:5 (testimony of the noncitizen witnesses affirming that they have not suffered any adverse actions); *see also Culinary Workers Union*, 200 F.3d at 618 (finding a "specific threat of prosecution" where the attorney general issued a "precise and exact" letter to the union indicating "she will cause the statute to be enforced unless the union ceases distribution of the handbill").

Ultimately, this rarity of enforcement of the immigration laws against alien protestors, coupled with the fact that, when enforcement actions have occurred, they were not based on protected speech, prevents Plaintiffs from

proving the substantial, credible threat of enforcement required to confer standing.

## 2. Plaintiffs Fail to Establish That Their Self-Imposed Harms are Caused by Unlawful Actions or Policy

Plaintiffs' claimed injuries arise from the fear and chilling behavior of certain of their members (third-parties) who are confronted with the hypothetical potential of immigration enforcement. *See*, *e.g.*, July 7 Tr. at 54:14-17, 134:8-23; July 8 Tr. at 88:12-90:10; Shuve Depo. Tr. at 171:3-7 (noncitizen witness testimony discussing self-censorship). But there is no concrete evidence directly linking the challenged policy and any harm or even a substantial threat of harm to Plaintiffs' third-party members. Rather, the crux of Plaintiffs' case is that other non-similarly-situated people who are not implicated in this litigation at all (e.g., Khalil and the other four so-called "targeted" individuals) suffered injuries (immigration enforcement actions), which caused Plaintiffs' members to restrict their speech out of fear that a similar (though not-yet-threatened) action may befall them. *See*, *e.g.*, July 7 Tr. at 59:10-16 143:6-17, 144:4-12, July 8 Tr. at 19:5-15, 20:2-15 88:12-90:10 (noncitizen witness testimony concerning self-censorship). This sequence of events illustrates the "overly attenuated" connections that the causation requirement seeks to bar. *Donahue v. City of Boston*, 304 F.3d 110, 115 (1st Cir. 2002); *see Alliance*, 602 U.S. at 383 ("[t]he causation requirement also rules out attenuated links—that is, where the

government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing").

Plaintiffs also fail to show a causal link between any hypothetical immigration enforcement actions that they fear and their alleged unlawful ideological deportation policy. If any adverse action befell Plaintiffs' members at some unknown point in the future, it would be the result of the lawful enforcement of valid immigration enforcement statutes that have been in force for decades. *See Texas*, 599 U.S. at 679-80 ("courts generally lack meaningful standards for assessing the propriety of enforcement choices" with respect to arrest and detention, given the needs of the Executive Branch to weigh "resource constraints and regularly changing public-safety and public-welfare needs" when devising policy). Indeed, well before 2025, Congress provided for deportation, where the Secretary of State has reasonable ground to believe an alien's "presence or activities" in the United States "would have potentially serious adverse foreign policy consequences. 8 U.S.C. § 1227(a)(4)(C)(i). Congress was clear that such consequences could attach to otherwise lawful "past, current, or expected beliefs, statements, or associations" if the Secretary of State determines that the alien's presence in the United States "would compromise a compelling United States foreign policy interest." 8 U.S.C. § 1227(a)(4)(C)(ii) (referencing, *inter alia*, 8 U.S.C. § 1182(a)(3)(C)(iii)); *see also* July 7 Tr. at 10:11-16 (the Court's recognition that 8 U.S.C. § 1227(a)(4)(C), in which "Congress has

57

empowered the Secretary of State" to impose immigration consequences in certain circumstances, has "been on the books for quite some time.").

Likewise, Congress proscribed deportation for aliens who "endorse[] or espouse[] terrorist activity or persuade[] others to endorse or espouse terrorist activity or support a terrorist organization." 8 U.S.C. § 1227(a)(4)(B) (referencing, *inter alia*, 8 U.S.C. § 1182(a)(3)(B)). Thus, even prior to the inception of the alleged IDP, Plaintiffs' noncitizen members had reason to restrict their speech, which defeats a causal link between their self-censoring and the IDP. *See Clapper*, 568 U.S. at 417 ("Another reason that respondents' present injuries are not fairly traceable to § 1881a is that even before § 1881a was enacted, they had a similar incentive to engage in many of the countermeasures that they are now taking.").

Finally, Plaintiffs cannot use their challenge to the IDP as a back-door mechanism for challenging the enforcement of INA provisions that exist independent of the policy they allege in this case. *See AAUP*, 2025 WL 1235084 at *20 (noting that Plaintiffs do not challenge the foreign policy removal provision); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (standing must be established separately for "each claim" and "each form of relief"). A plaintiff who is injured by one government policy does not automatically obtain standing to challenge a separate statute. *See California v. Texas*, 593 U.S. 659, 678 (2021) (holding that plaintiffs could not trace their asserted injury "to enforcement of [an] 'allegedly unlawful' provision of [an Act]"

58

where "other provisions of [the] Act, impose[d]" the requirements about which plaintiffs complained); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 350-53 n.5 (2006) (explaining that a litigant cannot, "by virtue of his standing to challenge one government action, challenge other government actions that did not injure him"); *Lewis v. Casey*, 518 U.S. 343, 357-60 (1996) (holding that a prisoner injured by one alleged flaw in a prisons law-library system lacked standing to challenge other alleged defects in that system, and explaining that "harm from one particular inadequacy in government administration" does not create standing to challenge "all inadequacies in that administration"); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 165-71 (1972) (holding that a guest excluded from a private club lacked standing to challenge the club's membership policies because the guest's injuries "stemmed, not from the [club's] membership requirements, but from its policies with respect to the serving of guests").  That principle precludes Plaintiffs from establishing standing to challenge the alleged misapplication of 8 U.S.C. § 1227(a)(4)(C), the foreign policy removal provision of the INA.

### 3.    Plaintiffs' Claims Are Not Redressable

A plaintiff must show that the requested relief will redress his or her injury. *See Steel Co.*, 523 U.S. at 103. Even if Plaintiffs' members' self-inflicted injuries brought on by their fear of the alleged IDP could establish an injury for standing purposes, they have failed to show a nonspeculative likelihood that enjoining the IDP would relieve their injury. While these third-party members

59

maintain that that they would resume the First Amendment activity they stopped if the alleged IDP were not in force, they fail to explain why that would be the case. *See Doc Soc'y v. Rubio*, 141 F.4th 1273, 1279 (D.C. Cir. 2025) (no redressability where Plaintiffs members failed to explain why they would feel comfortable returning to the actions they ceased "if the social media policy were vacated"), in light of the fact that the statutory provisions discussed above, 8 U.S.C. § 1227(a)(4)(B) & 1227(a)(4)(C), would remain valid law. For example, Megan Hyska seemed to identify the alleged IDP as the sole cause of her fear of "losing [her] immigration status" based on political speech and advocacy. July 7 Tr. at 75:7-21. Nadje Al-Ali said that if an IDP were ruled unlawful, it would allow her to pursue scholarship and professional opportunities from which she has refrained in 2025. July 8 Tr. at 21:9-16.  She noted that before doing so, however, she "would first want to see what is actually happening in practice." July 8 Tr. at 21:16-17. Enjoining the alleged IDP would leave in place all immigration enforcement statutes, which is what provides the Government with the authority to take immigration enforcement actions—not a general policy.

The lack of any concrete injury in this case creates a serious obstacle to this Court's ability to redress Plaintiffs' alleged harms "beyond abstractly commanding the [defendants] to obey the First Amendment." *Elend v. Basham*, 471 F.3d 1199, 1209 (11th Cir. 2006) (finding no redressability for standing). Here, Plaintiffs ask this Court to conduct strict scrutiny review of an unwritten policy, alleged by Plaintiffs for purposes of this litigation, and under which no

party, or even a witness, has suffered any concrete harm. *See, e.g.*, July 7 Tr. at

54:14-17; 134:8-23; July 8 Tr. at 88:12-90:10; Shuve Depo. Tr. at 171:3-7

(noncitizen witness testimony that they could be subject to arrest, detention, and

deportation); *but see, infra*, § III.C (describing correct standard of review as more

deferential).

Yet strict scrutiny review—not the correct standard of review—would

require the Court to look at precisely what speech the government has acted to

restrict, where and when that speech occurred, as well as other relevant

circumstances. *See* July 11 Tr. at 75:16-19 (John Armstrong's testimony that "a

consular officer always looks at the totality of the circumstances . . . and all the

facts for every case . . . before making . . . a decision to revoke a visa"); July 18

Tr. at 34:3-5, 35:5-12 (John Armstrong's testimony that "one statement by itself

is probably not going to make the decision" as to whether someone is endorsing,

espousing, or supporting a terrorist organization; rather, "you'd have to look at

the totality of the situation and the whole thing that's being said"); 57:17-58:9

(John Armstrong testimony that the ██████████████████████████████

██████████████████ considered "the totality of the circumstances" and that he

looked at the memo "with a fair amount of effort and actually thought about the

decision before making it"). The Court should not take on itself performin this

analysis in place of the agencys. S*ee Elend*, 471 F.3d at 1210 ("It seems to us

self-evident that a court would be unable to conduct the First Amendment

analysis required without knowing anything more than vague generalities about

61

future protests."). Given the attenuated, speculative, and prospective nature of any alleged harm in this case, the Court lacks the details that are necessary to resolve the hypothetical constitutional infirmity that Plaintiffs subjectively fear. "Such a claim is not fit for adjudication." *Id*. at 1212.

### D.    Plaintiffs Failed To Establish Organizational Standing

In general, organizations may "sue on their own behalf for injuries they have sustained." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 393 (2024). (quotation omitted). Like all litigants, however, organizations must establish standing to sue by "satisfy[ing] the usual standards for injury in fact, causation, and redressability." *Id*. at 393-94. At trial, Plaintiffs produced no evidence at all regarding alleged injuries suffered by plaintiffs AAUP–New York University, AAUP–Rutgers, and MESA. Accordingly, their claims must be dismissed.

With respect to AAUP and AAUP–Harvard, evidence adduced at trial showed that these two remaining organizational Plaintiffs were either unaffected or aided by the alleged IDP. Contrary to Plaintiffs claims, they were certainly not sufficiently harmed by the alleged policy to establish organizational standing.

### 1.    The Plaintiff Organizations Were Either Unaffected or Aided by the Alleged Ideological Deportation Policy

Plaintiffs' witnesses claimed that the policy impaired their political participation in *other* organizations–not at AAUP. *See, e.g.,* July 7 Tr.43:16-

44:2m 98:2-8 (Ms. Hyska's testimony that she feared her political participation

with the DSA "would potentially endanger my immigration status"); 127:7-

128:14 (Ms. Al-Ali's testimony that her speech on the subject of Palestine had

been through her role as director for Brown University's Center for Middle

Eastern Studies (CMES)); July 8 Tr. at 132:22-133:10, July 9 Tr. at 37:5-38:22

(the testimony of Ms. Abu El-Haj, who ran Columbia's Center for Palestine

Studies ("CPS"), that the alleged IDP affected political participation at Columbia

University). But these witnesses did not explain how the claimed abridgement of

speech at these other organizations related to, or could have impeded, the

political speech of AAUP or AAUP–Harvard.

To the contrary, evidence adduced at trial showed that even if Plaintiffs'

witnesses' accounts of personal harm were imputed to AAUP and AAUP–

Harvard, this foregoing speech would be dwarfed by incontrovertible evidence

that the political speech of these organizations *increased substantially* in 2025,

*after* the alleged policy was supposedly implemented. Indeed, evidence at trial

showed that AAUP and AAUP–Harvard exercised greater First Amendment

participation *after* the Trump Administration took office and the alleged policy

was put into place. In part, this was realized through their increased

membership. Professor Dubal testified that AAUP was trying to increase its

membership and did so after the election of President Trump. *See* July18 Tr. at

89:18-91:12. She acknowledged that AAUP had expanded the number of

chapters, which "increased the ability" of the organization and inured to its

63

benefit.  July 18 Tr. at 91:9-12. Professor Hyska agreed that AAUP was trying to increase its membership, explaining that, "[w]e're more powerful when we have more members." July 7 Tr. at 99.

No better evidence exists of AAUP's amplified First Amendment political activity after the alleged policy was implemented than a national protest it organized on April 17, 2025.  AAUP member Brian Shuve testified that on that date, "[t]he national AAUP organization organized an event that was called the National Day of Action and Higher Education, with the title, Free Higher Ed Now." Shuve Depo. Tr. at 84:12-85:1. This followed the National Day of Action "spearheaded" by AAUP on that same date in 2025. *See* July 17 Tr. at 16:9-17:12. Summary witness Mohamed Maklad testified that the number of events at AAUP's National Day of Action in 2025 was a *2000 percent increase* over the number of events in 2024 – from 9 events in 2024 to 191 events in 2025.  *See* July 17 Tr. at 17:21-25; Exhibits 240 & 241. Mr. Maklad further showed that AAUP's website promoted a significantly greater number of political events in the *first six months of 2025* than in *all* of 2024. *See* Exhibits 240 & 241.

Indeed, this summary undermines AAUP's allegation that its speech was chilled by an alleged Government policy targeting Palestine protestors:  it shows that in 2025, with the policy supposedly in place, AAUP itself *increased* the number of political events it dedicated to this very subject.

This same circumstance undermines AAUP–Harvard's claim that the alleged "policy" chilled its speech:  Professor Nickel admitted that he attended a

64

public protest sponsored by AAUP–Harvard after the March arrest of Mr.

Khalil—a public event *dedicated to protesting Mr. Khalil's arrest. See* July 8,

2025 Tr. at 86:14-24. In other words, AAUP–Harvard sponsored a public protest

of the very act that Plaintiffs claim chilled its right to protest. *Cf. Spear v. Town*

*of West Hempstead*, 954 F.2d 63, 68 (2d Cir. 1992) (no First Amendment

violation where plaintiff continued to speak out after government's alleged

suppressing conduct); *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)

("Where a party can show no change in his behavior, he has quite plainly shown

no chilling of his First Amendment right to free speech." (citing *Singer v. Fulton*

*County*, 63 F.3d 110, 120 (2d Cir. 1995)).

## 2.    The Plaintiff Organizations Were Not Harmed by the Alleged Ideological Deportation Policy

While AAUP provided some evidence that it diverted resources because of the

alleged IDP, that is not enough to establish organizational harm. *See Alliance*, 602

U.S. at 394 (holding that organizations "cannot spend [their] way into standing

simply by expending money to gather information and advocate against the

defendant's actions"). Generic setback to an organization's missions without any

actual "impediment to [their] advocacy business" also does not support Article III

standing. *Id.*

To establish organizational standing, a defendant's actions must directly

affect[] and interfere[] with [a plaintiff's] core business activities." *Id.* at 395. In

*Alliance*, the Supreme Court identified *Havens* as "an unusual case" and remarked

that it "has been careful not to extend the *Havens* holding beyond its context."

*Alliance*, 602 U.S. at 396. In *Havens*, the Plaintiff organization (HOME) established

standing not because it diverted resources, but because it suffered direct harm to

one of its primary business purposes (housing counseling) when Havens provided its

black employees with false information about apartment availability. *Alliance*, 602

U.S. at 395 (*citing Havens Realty Corp. v. Coleman*, 455 U.S. 363, 366, 368, 378-79

(1982)). So too in *Louis v. Saferent Sols.*, LLC, 685 F. Supp. 3d 19, 32 (D. Mass.

2023), which pre-dates *Alliance*. But even so, *Louis* is distinguishable from this case

because it involved a direct services organization that showed Saferent's credit

scoring practices directly impeded their ability to fulfill their core mission of finding

housing for low-income renters.

    In this case, Plaintiffs' organizational standing theory is exactly like the one

that the Supreme Court rejected in *Alliance*. Plaintiffs here, unlike in *Havens* or

*Louis*, are not the object of the Government action they challenge. The alleged IDP

does not require the organizational Plaintiffs to do—or refrain from doing—

anything. Nor have the organizational Plaintiffs pointed to any threats directed at

their organizations. Instead, the organizational Plaintiffs' assertion is that the IDP

may lead immigration officials to take unlawful enforcement action against certain

third parties (their members). Compl. ¶¶ 48-50. Because of this, according to Veena

Dubal, Plaintiff AAUP has expended resources to try to help its noncitizen members

avoid such action. *See* July 18 Tr. at 73:2-74:19, 78:21-81:23, 86:17-88:22. But

neither the IDP nor the immigration enforcement statutes Plaintiffs contend

underlie the alleged policy directly regulate or imposes any impediments on AAUP's core mission. And AAUP does not assert that the constitution provides *it* — rather than *aliens* — with any underlying legal right that the policy allegedly violates.

But even if the Court were to look solely at whether the challenged policy directly impeded AAUP's core mission—to protect academic freedom and promote shared governance—Plaintiffs fail to meet their burden. *See* July 18 Tr. at 68:4-22. Ms. Dubal testified that she had intended to perform work for AAUP on problems associated with increased adjunct faculty use but instead shifted to new and different activities—immigration counseling and seminars—based on conversations she had with unnamed individuals. *See* July 18 Tr. at 73:4-74:19, 78:3-80:25. But, there is no evidence that this shift directly impeded the organization's ability to fulfill its core functions or that these new initiatives impaired AAUP's advocacy on the adjunct faculty topic. No evidence shows that AAUP as an organization had to reduce its focus on this issue. Ms. Dubal testified only that *she* pivoted away from this focus. *See* July 18 Tr. at 73:4-74:19, 78:3-80:25. This is not evidence that the alleged policy directly impeded AAUP's ability to fulfill its core functions. *See Alliance*, 602 U.S. at 394 (rejecting standing where Plaintiffs claimed that they were forced to expend resources "to the detriment of other spending priorities"). This standing argument must fail.

Furthermore, to the extent Plaintiffs speculate that third parties will let their memberships lapse and not attend MESA's annual meeting, which will reduce MESA's revenue, Plaintiffs' Pretrial Br., Dkt. #179, at 32-33 (using what Dr. Reger

"anticipates" to support this argument), the Supreme Court repeatedly has "decline[d] to abandon [its] usual reluctance to endorse standing theories that rest on speculation about the decision of independent actors." *Clapper*, 568 U.S. at 414; *see also Lujan*, 504 U.S. at 561-62. "[A] federal court [must] act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury from independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976); *see also Warth v. Seldin*, 422 U.S. 490, 506 (1975) (finding standing lacking where alleged injury resulted from outside forces, "rather than . . . respondents' assertedly illegal acts").

Here, Plaintiffs provided no evidence explaining how they can "sufficiently predict[] how third parties would react to government action or cause downstream injury to plaintiffs." *Alliance*, 602 U.S. at 383. Indeed, none of the evidence in this case can "sufficiently predict" that current MESA members would let their membership lapse, especially when no member has been harmed under the alleged IDP. *Id*. Notably, Plaintiffs provided no evidence of reduced membership or revenue in the several months since this alleged policy came into effect.

Finally, to the extent Plaintiffs speculate that fear of immigration enforcement under an alleged IDP will cause AAUP and MESA to cancel events or have reduced attendance at events, such supposed organizational harms are too attenuated to show traceability or causation. Ms. Abu El-Haj's testimony that events were cancelled over fear of potential ICE raids is inapposite; Plaintiffs have never claimed the alleged IDP is carried out through ICE raids.

68

As explained above, the alleged IDP does not regulate any organization, as an organization cannot be deported. Nor have there been threats against Plaintiff organizations' First Amendment activity. Instead, Plaintiffs' organizational standing hook relies on the same speculative fears that are insufficient to establish associational standing. The only difference is that in this context, the harms—cancelled events and/or reduced attendance—are one additional step removed from the alleged policy. If no member can establish standing due to a speculative fear of harm, AAUP/MESA may not manufacture standing by pointing to an injury that may materialize solely due to members' speculative fears of unlawful Government action. A plaintiff who "is not himself the object of the governmental action or inaction he challenges" should find it "'substantially *more* difficult' to establish" standing, not less. *Lujan,* 504 U.S. at 562 (emphasis added; citations omitted); *Eastern Ky. Welfare Rights Org.,* 426 U.S. at 44-45 ("indirectness of injury" generally "'make[s] it substantially more difficult'" to establish standing) (citation omitted).

## III.    PROPOSED LEGAL RULINGS AND FINDINGS OF FACT ON FIRST AMENDMENT CLAIM (COUNT 1)

Plaintiffs bring this case claiming their LPR noncitizen members fear immigration enforcement proceedings being brought against them in retaliation for their protected speech. They are dismissive of the government's legitimate enforcement, national security and foreign affairs interests. Nevertheless, those interests are significant and guide this Court's review. In the context of a First

69

Amendment retaliation claim, before reaching the question of whether an unwritten policy exists that violates the First Amendment, Plaintiffs must first rule out any possible legitimate basis for the policy. Second, they must prove the existence of an unwritten policy targeting First Amendment protected speech and that the government officials adopted the policy because of the discriminatory effect. Finally, any such policy would be reviewed under the facially legitimate and bona fide standard of review.  As demonstrated below, Plaintiffs fail all such measures.

## A.    Plaintiffs Have Failed to Prove There is no Legitimate Objective in the Implementation of the Executive Orders

Plaintiffs have not carried their burden to show that the Presidents' Executive Orders were implemented through an allegedly retaliatory policy targeting protected speech.  But first, Plaintiffs' burden is different, and more demanding, than the one they contend is "ordinarily" applicable, and that they ask the Court to adopt. Plaintiffs' Pretrial Br. at 41; *see also id.* at 41-42 (arguing that the applicable retaliation framework and burdens are controlled by *Gattineri v. Town of Lynnfield, Mass.*, 58 F.4th 512, 514 (1st Cir. 2023) and *Lozman v. City of Riviera Beach, Fla.*, 585 U.S. 87, 100 (2018)).[11] The "ordinarily" applicable First Amendment framework does not apply to a case such as this. Neither does

_____

[11] These cases apply the familiar retaliation framework involving a prima facie burden on three elements of proof: (i) protected speech; (ii) adverse government action, and (iii) "but-for" causation (*i.e.*, that government officials intended to retaliate against the plaintiff *because of* the protected speech), the sufficiency of which shift the burden to show the same enforcement action would have been taken absent the protected speech.

*Gattineri*, a case about an alleged retaliatory campaign by Lynnfield town officials to restrict plaintiffs' spring water distribution business, or *Lozman*, concerning a criminal arrest the plaintiff claimed was attributable to the city of Riveria Beach's official policy to retaliate against him for his frequent criticism of the city's corruption and development projects, provide the most appropriate analysis here. After all, neither pertains to immigration law.  But even if there were no tension in the present case between asserted First Amendment interests and immigration law and policy, the analysis that Plaintiffs urge upon the Court remains inapt, because this matter involves national security and foreign policy. As such, the alleged unlawful targeting of expression through immigration enforcement at the very least points to the Supreme Court's retaliation analysis in *Hartman v. Moore*, 547 U.S. 250, 263 (2006).[12]

First, *Hartman* is called to mind by Plaintiffs' assertions of fear of retaliatory law enforcement, as well as their contention that high-level public officials such as the President and the Secretary of State (as allegedly reflected in their statements) hold a retaliatory animus against noncitizen student and faculty protesters (and others critical of Israel or supportive of Palestinians). In *Hartman*, the Court

---

[12] This Court determined in denying the motion to dismiss, noncitizens have at least some First Amendment rights. *See AAUP*, 2025 WL 1235084 at *19 (citing *Bridges v. Wixon*, 326 U.S. 135, 148 (1945)). The Court need not, however, wrestle with the differences between the application of the First Amendment to citizens and noncitizens because Plaintiffs' claims fail at the outset for lack of proof. *See, infra*, § III.C (discussing contours of noncitizens' First Amendment rights and associated standard of review).

explained that where there is a *non*-prosecuting public official the plaintiff believes retaliated against him or her by inducing a prosecutor to issue charges, the critical inquiry is whether the prosecutor brought charges because of the non-prosecuting public official's animus or another neutral reason. *See Hartman*, 547 U.S. at 263. The Court reasoned that the separation between the non-prosecuting official and the prosecutor breaks the "chain of causation" sufficient to preserve the "longstanding presumption of regularity accorded to prosecutorial decisionmaking." *Id.* (citing, *inter alia*, *Reno v. Am-Arab Anti-Discrimination Comm. ("AADC II")*, 525 U.S. 471, 489-490 (1999)). That break in causation was a key focus in *Hartman*, given the "distinct problem of causation" that arises when a public official's "animus does not necessarily show" that the public official "induced the action of a prosecutor who would not have pressed charges otherwise." *Hartman*, 525 U.S. at 389-490. To address the "factual difficulty of divining the influence" of the official upon the "prosecutor's mind," the Court reasoned that a factual showing by the plaintiff was "needed both to bridge the gap between the non-prosecuting government [official]'s motive and the prosecutor's action, and to address the presumption of prosecutorial regularity." *Id.* It held that the showing required is "the absence of probable cause." *Id.*

At closing argument, this Court grappled with the same problem confronted in *Hartman*. Referencing the historical anecdote involving Henry II's statement, "Who will rid me of this troublesome priest?" July 21 Tr. at 48:18-20, the Court

inquired about the proper "framework" in which motive and intent should be

analyzed and proven, directing its next question to the Government:

> You see it's not like the people who testified here are lawless, that they are
> just going to go ahead and ignore the law. If anyone thinks that's what I've
> gotten from this evidence it's not. But the law is used in a—it appears to me,
> in new and somewhat different ways. And that's why I've pressed the
> plaintiffs on intent. If there was no intent to chill the speech of their clients,
> they lose. Have they proved it? They would like to say, "Well given the way it
> was used, it affects speech and therefore **the burden is on you to show
> that it was completely neutral**." But **the framework** is, that **I'm
> grappling with**, and that's . . . my only reason for speaking, **is closer to my
> Henry II example. So what's wrong with that**?

July 21 Tr. at 49:5-19 (emphasis added). The Court's Henry II example draws upon

the Plaintiffs' contention that the statements of high-level officials may matter *more*

*than* the text of the Executive Orders directing a new emphasis on combatting

terrorism and antisemitism through existing enforcement authorities, tools, and

measures; and it echoes their argument that what the agencies are doing in practice

is more consistent with the intentions reflected in public officials' statements than

following the law. *See* July 21 Tr. at 12:21-13:2 (arguing that the goal of "stifling

dissent" is "quite clear from . . . what you heard from the witnesses, the documents

in evidence, and the statements of public officials").

Accordingly, *Hartman* provides the framework sought by this Court. It

honors the applicable presumption of regularity and addresses the difficulties of

proof regarding the separation between high-level officials and those in the agency

with enforcement discretion. And it imposes a threshold burden on Plaintiffs.

73

For example, where Plaintiffs point to the cases of the five allegedly targeted individuals as manifestations of an illegal policy, *Hartman* requires Plaintiffs to establish there was no probable cause to direct immigration enforcement action against any of the five individuals. *See, infra*, III.D.4 (discussing probable cause). And where Plaintiffs point to the statements of high-level public officials as evidence of the alleged unlawful policy, *Hartman* requires Plaintiffs to prove there is no basis or legitimate cause for those statements. In other words, when the Court, at closing, suggested the burden was on the Government to show that its enforcement actions are "completely neutral," then asked the Government "what's wrong with that?" *Hartman* answers that question: what is wrong is that *Plaintiffs have the burden*, not the Government, and their burden is to show there is no "neutral" cause or causes for such enforcement.[13]

Finally, when the Supreme Court cited and relied upon *AADC II* in *Hartman,* it signaled that the *Hartman* rule applies in the immigration context and is fully consistent with the high thresholds of proof imposed in that area. *See Hartman*, 547

---

[13] *Hartman* cannot be distinguished as an individualized enforcement case, rather than a case about an allegedly unconstitutional and more broadly applicable policy, any more than *Gattineri,* which also applies to an individual claim of retaliation. And to the extent Plaintiffs would point to *Lozman* as dispensing with the *Hartman* burden in the case of an alleged "official policy," *Lozman* is no different. It involved one claimant, and the alleged "policy" was a policy about him, and only him. The goal is to find relevant analogs to address the problem the Court is grappling with, and a reasonably applicable framework for doing so. *Hartman* fits the Court's paradigm and should control.

U.S. at 263 (citing, *inter alia*, *AADC II*, 525 U.S. at 489-490).[14] Indeed, *Hartman* emphasized that concerns about prosecutorial discretion are "greatly magnified" in the immigration context. *See AADC II*, 525 U.S. at 489-490. Thus, through *Hartman*, we come full circle. The justification for burdening plaintiffs to show that the enforcement decisions of the Defendant agencies have no neutral cause or legitimate objective is "magnified" and thus even more warranted in this case. *Hartman*, 547 U.S. at 263.

In sum, Plaintiffs must make a threshold showing of no probable cause. *See Hartman*, 547 U.S. at 265-266. Here, Plaintiffs challenge a program they allege threatens retaliation against them and contend that the retaliatory intent is evinced by comments from government officials such as Secretary of State Rubio and other government spokespersons. But it is not those officials and spokespersons

---

[14] *AADC II,* in turn, explained the broad deference afforded to immigration enforcement discretion by reference to the non-justiciability of enforcement decision-making generally:

> This broad discretion [afforded the Executive] rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake. Judicial supervision in this area, moreover, entails systemic costs of particular concern. Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy.

*AADC II*, 525 U.S. at 489-490.

who make enforcement or prosecutorial decisions. So, under *Hartman*, Plaintiffs must show a lack of probable cause in an individual retaliation case (such as in the cases of the five allegedly targeted individuals); and to the extent they challenge an entire alleged program, they must show at least that there is no legitimate objective in implementing the Executive Orders.

They cannot do so. The Government has national security interests in countering support for terrorist groups and addressing antisemitism. As Mr. Watson testified, DHS was created in response to the 9/11 terrorist attacks, July 17 Tr. at 28:17-28:18, and the Department's national security work often overlaps with immigration enforcement. *See* July 17 Tr. at 35:18-36:3 (addressing DHS's role in identifying national security risks and vulnerabilities relating to individuals who present themselves for admission to the United States); July 17 Tr. at 37:20-37:25 (referencing Boston Marathon Bombing and San Bernardino terrorist attack); *see also* July 18 Tr. at 43:8-43:11 (John Armstrong testifying "[W]e deal with a lot of extremist people trying to get into the United States and we've got to get it right, Counselor, otherwise it results in terrorist attacks or threats to our own citizens."); *id.* at 20:16-20:19 (John Armstrong testifying "The United States, at least in my tenure of over 30 years, has always been opposed to antisemitism both in the wider world and in our great country.").

Instead, the guidance implementing the Executive Orders reprioritizes enforcement using existing valid legal authorities and does not create new ones. It is beyond question that an administration is entitled to "evaluate priorities in light

of" its "philosophy." *Biden v. Texas*, 597 U.S. 785, 812 (2022) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 58 (1983) (Rehnquist, J. concurring in part and dissenting in part)); *Dep't of Commerce v. New York*, 588 U.S. 752, 783 (2019) ("[i]t is hardly improper for an agency head to come into office with policy preferences and ideas . . . and work with staff attorneys to substantiate the legal basis for a preferred policy"). This includes setting new enforcement priorities because, among other reasons, administrations cannot act against each violation of the statute. *See Heckler v. Chaney*, 470 U.S. 821, 831-832 (1985) (holding agencies are "far better equipped than the courts to deal with the many variables involved in the proper ordering of" priorities). Additionally, it is wholly permissible to consider speech when performing an investigation or arrest. *See Nieves v. Bartlett*, 587 U.S. 391, 402 (2019) (noting "the fact that protected speech is often a legitimate consideration when deciding whether to make an arrest").[15] The evidence here shows that the administration changed priorities and directed them toward enforcing immigration laws against noncitizens

---

[15] Plaintiffs' continue to assert that regulating speech on the basis of its content warrants "strict scrutiny . . . no matter the government's intent." Plaintiffs' Pretrial Brief at 36; *see id.* at 36-41. But given the evidence adduced at trial regarding the agencies' implementation of the executive orders, Plaintiffs articulate an impossibly broad claim; one that would subject to scrutiny any investigative or enforcement process simply because it includes the consideration of "content," or "speech." Investigations, by their very nature, entail the non-public exploration of facts, leads, and possible violations of law, a process fundamentally at odds with the pre-enforcement scrutiny that Plaintiffs urge the Court to authorize, as well as the caselaw protecting the agency processes from premature judicial examination. *See Hartman*, 547 U.S. at 263, 265-266; *AADC II*, 525 U.S. at 489-490; *Kleindienst v. Mandel*, 408 U.S. 753, 754, 769-770 (1972); *Heckler*, 470 U.S. at 831-832.

engaging in unprotected speech that supports terrorist organizations like Hamas, contributes to harassment and violence against Jewish students, or undermines United States foreign policy regarding the foregoing objectives. *See Hawaii*, 585 U.S. at 702 (quoting *Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976) (immigration priorities are bound up with "contemporaneous policies . . . defined in the light of changing political . . . circumstances" and best left to the "Legislature or the Executive"). In short, consistent with *Hartman* and *AADC II* (as well as the additional caselaw discussed below), the Plaintiffs fail to meet their burden to show that the Defendants' implementation of the President's Executive Orders was without cause or any legitimate purpose.

**B.     Burdens on Noncitizen's First Amendment Rights are Reviewed Under the Facially Legitimate and Bona Fide Standard**

The way noncitizens' constitutional rights typically differ from citizens' in practical terms is when courts apply a more permissive standard of review to Government conduct that may burden those rights. *See, infra*, § III.D (discussing scope of aliens' First Amendment rights). *See Mathews*, 426 U.S. at 78 (holding that although aliens "are protected by the Due Process Clause does not mean they are entitled to enjoy all the advantages of citizenship or . . . to the conclusion that all aliens [are] a homogeneous legal classification).

Although Plaintiffs have claimed the *Mandel* standard does not apply to noncitizens present in the United States, *Trump v. Hawaii* shows otherwise. That decision cited *Rajah v. Mukasey's* reliance on the *Mandel* facially legitimate and

bona fide standard when it applied it to noncitizens inside the United States. *See Hawaii*, 585 U.S. at 704 (citing *Rajah v. Mukasey*, 544 F.3d 427 (2d Cir. 2008)). *Rajah* recognized that while noncitizens present in the United States have a constitutional right to equal protection, a claim that an executive-created registration and removal program violates equal protection based on religion, ethnicity, gender, or race, is reviewed no more stringently than under a facially legitimate and bona fide standard, or for rational basis. *See Rajah*, 544 F.3d at 432, 438 (reviewing equal protection claim challenging executive-created NSEERS program under facially legitimate and bona fide standard); *Kandamar v. Gonzales*, 464 F.3d 65, 73 (1st Cir. 2006) (applying rational basis review to NSEERS program). By contrast, strict scrutiny is typically applied to discrimination on those grounds against a United States citizen. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 204, 206 (2023) (holding right of public education must be applied equally to citizens and any exception is reviewed for strict scrutiny).

As with equal protection, courts review burdens on noncitizens' speech rights under the permissive facially legitimate and bona fide standard. That standard looks to the legal justification proffered by the agency and, if facially valid, "the inquiry is at an end." *Department of State v. Muñoz*, 602 U.S. 899, 908 (2024) (reviewing a United States citizen's constitutional challenge to a noncitizen's visa denial for whether the agency provided a "facially legitimate and bona fide reason"); *but see  Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281, 285 (D.D.C. 2011)

(three judge panel) (Kavanaugh, J.) (declining the determine whether to apply a

more permissive or stringent standard of review). This is so because Congress has

plenary authority over immigration matters, which are "so exclusively entrusted to

the political branches of government as to be largely immune from judicial inquiry

or interference." *Mathews*, 426 U.S. at 81 n.17 (citations and quotations omitted);

*see also Carlson v. Landon*, 342 U.S. 524, 534 (1952) (as long as a noncitizen "fail[s]

to obtain and maintain citizenship by naturalization, they remain subject to the

plenary power of Congress to expel them under the sovereign right to determine

what noncitizens shall be permitted to remain within our borders").

This deferential review is appropriate given that immigration enforcement

involves the intersection of the executive and Congress's plenary power over

immigration and the executive's broad discretion over enforcement leading to

rightful deference to the political branches of Government's plenary power over

immigration. First, the Court has recognized "Congress' plenary power to make

rules for the admission of aliens and to exclude those who possess those

characteristics which Congress has forbidden." *Kleindienst*, 408 U.S. at 765-66. This

is what Congress did in enacting 8 U.S.C. § 1227(a)(4)(C)(i). Second, the Court has

made clear the executive and legislature's broad authority over enforcement

decisions on whom to admit or remove. *See Kleindienst v. Mandel*, 408 U.S. 753, 766

(1972) ("[o]ver no conceivable subject is the legislative power of Congress more

complete than it is over the admission of aliens"); *see also AADC II.*, 525 U.S. at

490-91 (finding no jurisdiction to enjoin deportation proceeding based on

noncitizens' claims that they were selectively targeted for deportation proceedings, which they asserted had a "chilling effect" on their exercise of First Amendment rights); *Galvan v. Press*, 347 U.S. 522, 530-32 (1954) (upholding constitutionality of deportation ground over dissent's First Amendment concerns). Given these factors, the facially legitimate standard is appropriate where First Amendment interests are asserted to block the Executive Branch's actions in immigration matters. An unbroken line of Supreme Court cases, since *Kleindienst* in 1972, establishes that the deferential facially legitimate and bona fide standard of review applies. *See Mandel*, 408 U.S. at 754, 769-70 (considering whether the Attorney General's refusal to admit an alien scholar to enter the country to attend academic meetings violated the First Amendment rights of the United States citizens who had invited him); *Muñoz*, 602 U.S. at 908 (reviewing a United States citizen's constitutional challenge to denial of visa to noncitizen).[16] Specifically, courts must defer to the agency's facially legitimate and bona fide reasons for decisions and actions on whether to enforce the immigration laws pertaining to the admission, exclusion, and deportation of aliens, while emphasizing that courts should neither "look behind" those reasons, nor "test" them against countervailing First Amendment concerns. *See Mandel*, 480 U.S. at 770.

---

[16] The Court nonetheless also applied rational basis review, given the government had suggested it may be appropriate, and held that the Proclamation was not inexplicable but for discriminatory animus and was instead legitimately premised on national security. 585 U.S. at 706.

While Plaintiffs failed to prove the existence of an unwritten policy targeting protected pro-terrorist and antisemitic speech, such a policy, in the immigration context, would survive any level of scrutiny. *See* Complaint ¶¶ 25-27. First, under the facially legitimate and bona fide standard, even Plaintiffs' witnesses disapprove of antisemitic hate speech. *See*, *e.g.*, July 7 Tr. at 86:7-8 (Ms. Hyska's testimony that she "ha[s] a great problem with antisemitism" herself); July 8 Tr. at 72:5-12 (Mr. Nickel' testimony that he did not approve of the use of an antisemitic trope he witnessed at a student protest). Targeting speech supporting terrorism is also a facially legitimate and bona fide aim. *See* July 17 Tr. at 28:17-28:18 (Mr. Watson testifying that DHS's national security work often overlaps with immigration enforcement).

But even applying intermediate or strict scrutiny, any such unwritten policy would survive. This is because regulating who comes to and lives or resides in the United States is, itself, a compelling Government interest. *See  Harisiades v. Shaughnessy*, 342 U.S. 580, 588-589 (1952) (immigration policies are "intricately interwoven" with foreign affairs and "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"); *see also Negusie v. Holder*, 555 U.S. 511, 526-527 (2009) ("in the context of immigration law, 'culpability' as a relevant factor in determining admissibility is only one facet of a more general consideration: desirability").

Congress has granted the Secretary of State broad authority in sections 1182(a)(3)(C) and 1227(a)(4)(C) of Title 8, to find noncitizens inadmissible and

deportable, even when it may burden their speech. Indeed, the Government's authority over noncitizens has no comparator to citizens as "[t]he exclusion of aliens and the reservation of the power to deport have no permissible counterpart in the Federal Government's power to regulate the conduct of its own citizenry." *Mathews*, 426 U.S. at 80. As a result, "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Kim*, 538 U.S. at 521 (citation and quotation omitted).

Here Plaintiffs challenge the executive branch and congressional conduct where its authority is at its zenith and entitled to the most deference from the courts: decisions concerning the presence of noncitizens, national security and foreign affairs. *See Kim*, 538 U.S. at 522 ("any policy toward aliens is . . . interwoven with . . . policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government"). For example, even LPRs can be held under a no-bail provision of the INA during the pendency of civil immigration proceedings. *See id.* at 521-523. And, under state law, LPRs can be prohibited from participating in political campaigns through donations. *See OPAWL*, 118 F.4th at 777. So here, any governmental policy targeting pro-terrorist and antisemitic speech would be a policy implemented with both congressional and executive authority over foreign affairs, and, hence, would satisfy even strict scrutiny.

## C.    Scope of Noncitizens' First Amendment Rights

Even if Plaintiffs were successful in showing the existence of an unwritten viewpoint discriminatory policy, noncitizens' First Amendment rights are not coextensive with citizens' rights. This Court determined while denying the motion to dismiss, noncitizens have at least some First Amendment rights. *See AAUP*, 2025 WL 1235084 at *18 (citing *Bridges v. Wixon*, 326 U.S. 135, 148 (1945)). And political speech is "at the core of what the First Amendment is designed to protect." *Virginia v. Black*, 538 U.S. 343, 365 (2003). However, as with other constitutional rights, noncitizens' speech rights are "less robust than those of citizens in certain discrete areas," *Bluman*, 800 F. Supp. 2d at 287 (citing *Harisiades*, 342 U.S. at 591-592), *aff'd*, 565 U.S. 1104 (2012)). *Bridges v. Wixon* does not hold to the contrary. That case involved a *resident* alien so, at most, the case stands for the proposition that LPRs have some First Amendment rights. *Kwong Hai Chew* likewise involved a *resident* alien when it described an ascending scale of rights that become more secure and "expand to those of full citizenship upon naturalization." *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (noting the petitioner was a LPR); *see also Qatanani v. Bondi*, __ F.4th __, 2025 WL 1934523, *23 (3d Cir. July 15, 2025) (Matey, J., dissenting) (explaining limitations of *Bridges* and the like and noting that the full scope of the First Amendment as to "aliens within our Nation's borders is [a] less explored" area of case law). The term "resident" in the context of legal status does not include temporary visitors like students. *See* U.S.C.

84

§§ 1101(a)(15)(F)(i), (J), (M)(i) (requiring student visa holders to maintain "a residence in a foreign country which he [or she] has no intention of abandoning").

Additionally, Constitutional rights among classes of noncitizens differ, *e.g.*, LPR, (student) visa holders, and undocumented noncitizens. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990) (holding that only as a noncitizen "increases his identity with our society" do the "generous and ascending scale of rights" spring into action) (quoting *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950)); *cf. AADC II*, 525 U.S. at 488 ("an alien *unlawfully* in this country has no constitutional right to assert selective enforcement [based on the First Amendment] as a defense against his deportation") (emphasis added). Plaintiffs failed to provide as witnesses any student visa holders (or other visa holders), instead identifying only LPRs. So, the organizational Plaintiffs have standing only to challenge the application of the putative unwritten policy to LPRs. Ultimately, LPRs' First Amendment rights are the only ones relevant here, but even LPRs' rights have limitations.

For example, the Supreme Court has held that the "First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office" in overturning certain limits on political campaign expenditures. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010) (quotations and citations omitted). Notwithstanding the *fullest and most urgent* application of the First Amendment, the rights of *non*citizens to engage in political speech through campaign contributions can be limited or eliminated entirely. *See Bluman*, 800 F.

85

Supp. 2d at 287-289 (upholding limit on noncitizens' right to make political contributions); *accord OPAWL - Bldg. AAPI Feminist Leadership v. Yost ("OPAWL")*, 118 F.4th 770, 777 (6th Cir. 2024) (holding limitations on LPRs' campaign contributions to be permissible under First Amendment and noting, without deciding, that a lower standard of review may be appropriate). *Harisiades* is also instructive. There, the Supreme Court reviewed a First Amendment challenge to removal. The petitioners were ordered deported because they associated with or were members of the Communist Party. *See Harisiades*, 342 U.S. at 582-83. The petitioners all raised in part the claim that their deportations abridged their freedom of speech and assembly protected by the First Amendment. *Id*. at 584. The Supreme Court ruled that the First Amendment did not "prevent the deportation of these aliens" even based on membership alone. *Id*. at 582-583, 592.[17] The Supreme Court continues to cite *Harisiades* and Defendants have not found the Court questioning *Harisiades* in a majority opinion, so it remains a binding precedent. Similarly, in *Turner v. Williams*, the Court held that there was no First Amendment impediment to the Government deporting an alien because of his anarchist beliefs and advocacy. *See Turner v. Williams*, 194 U.S. 279, 293 (1904); *see*

---

[17] Defendants recognize that this Court declined to rely on *Harisiades* in its denial of the motion to dismiss. *See* 2025 WL 1235084 at *19. However, *Harisiades* has not been overturned, is consistent with limits on noncitizens' other constitutional rights discussed here (e.g., *OPAWL*), and is still cited by the Supreme Court. *See, e.g.*, *Hawaii*, 585 U.S. at 702; *see also Qatanani*, 2025 WL 1934523 at *23-*28 (providing detailed historical analysis of limits of noncitizens', including LPRs', First Amendment rights).

*also Graham v. Richardson*, 403 U.S. 365, 377 (1971) ("[t]he national government has broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization").

The decision in *Holder v. Humanitarian Law Project ("HLP")*, 561 U.S. 1 (2010) underscores these principles. First, HLP involved the criminal material support for terrorism bar, which applies criminal liability—as opposed to civil immigration liability—to citizens and noncitizens alike, so a carveout to preserve protected speech was unquestionably constitutionally required. *See id.* at 25-26. Second, the criminal material support provision did, in fact, outlaw some speech including training, advice, and assistance directed to peaceful activities. *See id.* at 10. The Court affirmed the constitutionality of the restrictions on speech where the only exception was for "independent advocacy that might be viewed as promoting the [terrorist] group's legitimacy." *Id.* at 31-32. Meaning, only speech that was not in coordination with the group was not covered. Again, these restrictions on speech applied even to United States citizens.

Plaintiffs throughout these proceedings have relied heavily on the Ninth Circuit's decision in *American-Arab Anti-Discrimination Comm. v. Reno* ("AADC I"), 70 F.3d 1045, 1064 (9th Cir. 1995). And Plaintiffs believe the Ninth Circuit determined there that all noncitizens living in the United States have full First Amendment rights equivalent to citizens. That interpretation, however, does not correctly state the law. First, it is incorrect as demonstrated by the above cases,

*Blumen*, *OPAWL*, *Harisiades*, and *Verdugo-Urquidez*. Second, *AADC I* relies on Supreme Court cases involving LPRs (termed "resident aliens" in those cases). It also does not cite authority for the proposition that LPRs' First Amendment rights are the same as citizens'. Finally, the Supreme Court, in deciding *AADC II*, did not endorse the Ninth Circuit's view. Indeed, it determined there was no cause to delay of vindication of whatever First Amendment rights noncitizens have until their removal proceedings had been completed and the courts of appeals could review them. *See AADC II*, 525 U.S. at 487–489 (holding that noncitizens could not bring a selective enforcement claim outside of removal proceedings owing to 8 U.S.C. § 1252(g)). Essentially, by holding that noncitizens' First Amendment rights could be chilled pending review in the courts of appeals, the Supreme Court effectively rejected the lower courts' view that noncitizens' First Amendment rights were the same as citizens'.

The principle that certain First-Amendment interests can be overcome by national security and foreign policy concerns is what authorized Congress to enact the national security deportability provision. That provision permits the Secretary of State to find a noncitizen deportable based on past, current, or expected beliefs, statements, or associations that would be lawful within the United States, if the noncitizen's presence or activities would have a potentially serious adverse foreign policy consequence for the United States. *See* 8 U.S.C. § 1227(a)(4)(C) (referring to exception in 8 U.S.C. § 1182(a)(3)(C)(iii) (inadmissibility provision)). The limit being that in such a case the Secretary of State must personally determine that the

88

noncitizens' presence or activities "would compromise a compelling United States foreign policy interest." 8 U.S.C. § 1227(a)(4)(C) (referring to exception in 8 U.S.C. § 1182(a)(3)(C)(iii)). This provision shows clearly Congress's recognition that United States foreign policy and national security concerns can overcome noncitizens' First Amendment rights. Along those same lines, Congress also made deportable noncitizens who are members of terrorist organizations or those who "endorse[] or espouse[] terrorist activity or persuade[] others to endorse or spouse terrorist activity or support a terrorist organization," without providing a First Amendment carveout as it did with the criminal material support provision. *See* 8 U.S.C. § 1227(a)(4)(B) (incorporating 8 U.S.C. § 1182(a)(3)(B)(v) & (VII)); *Holder*, 561 U.S. at 25-26, 31-32 (affirming constitutionality of speech restrictions that could include citizens where the only exemption was for "independent advocacy that might be viewed as promoting the [terrorist] group's legitimacy").

These limits on noncitizens' constitutional rights are consistent with the Supreme Court's statement that "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *See Kim*, 538 U.S. at 521 (affirming holding is not dictum) (quoting *Mathews*, 426 U.S. at 79-80); *accord Hawaii*, 585 U.S. at 702. This is grounded on the principle that "'any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Kim*, at 522 (quoting *Harisiades*, 342 U.S. at 588-589). Additionally,

in the foreign relations context, the Government can burden even citizens' First Amendment rights. *See Haig v. Agee*, 453 U.S. 280, 287 (1981) (upholding executive's authority to revoke passport on national security and foreign policy grounds after concluding revocation was authorized by Congress). In *Haig*, the Court found sufficient the Secretary of State's determination that a citizen's passport should be revoked based on the citizen's speeches abroad that "were causing or were likely to cause serious damage to the national security or foreign policy of the United States." *Id.*

### D.    Plaintiffs Failed to Prove the Existence of an Unwritten Deportation Policy Targeting Protected Speech

Plaintiffs' failure to prove there is no legitimate objective in implementing the Executive Orders ends their case. *See, supra*, § III.A. But even if they made that threshold showing, they did not prove the existence of an unwritten enforcement policy targeting protected speech. Here, Plaintiffs do not facially challenge the provisions of the INA and regulations related to immigration enforcement but rather assert the existence of an unwritten viewpoint discriminatory policy that allegedly misuses those neutral authorities. Accordingly, this Court took guidance from *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004), which permits an as-applied challenge to a neutral law being enforced selectively in a viewpoint discriminatory way." *See AAUP*, 2025 WL 1235084 at *19 n.10 (citing *Hoye v. City of Oakland*, 653 F.3d 835, 855 (9th Cir. 2011) (discussing differences between the Ninth Circuit's approach and the First Circuit's approach in *McGuire*)).

90

Under this Circuit's precedent, to make this claim, Plaintiffs "need to show 'a pattern of *unlawful*'" enforcement actions. *McGuire*, 386 F.3d at 64 (emphasis added) (citation omitted). In doing so, a "showing of intent on the part of government officials probably is necessary to make out an as-applied First Amendment viewpoint discrimination claim." *Id.* at 62. Intent "means more than mere knowledge by the government actor that a policy has a discriminatory effect; the government agent must have adopted the policy because of, and not despite, its discriminatory impact." *Id.* at 63.[18] So, plaintiffs must prove government officials adopted the putative unwritten policy *because of* its discriminatory effect. This is a high burden in this case because it involves prosecutorial discretion in conjunction with immigration policy which "is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Demore v. Kim*, 538 U.S. 510, 522 (2003) (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-589 (1952)); *see AADC II*, 525 U.S. at 490 (noting the concerns about prosecutorial discretion are magnified in the immigration context).

As discussed above. the facts adduced at trial show that the actual implementation of the Executive Orders targets those noncitizens who, among other things, create or contribute to a hostile environment for Jews, which is not protected

---

[18] But as shown under the standard of review for immigration decisions, Courts are instructed to not look behind the action and determine only whether it is facially legitimate and bona fide. *See, supra*, § III.A.

speech. Additionally, the immigration laws *expressly contemplate* that an alien's "beliefs, statements, or associations" can give rise to removal, so long as the Secretary of State personally determines the alien's presence would compromise compelling American foreign policy interests. 8 U.S.C. § 1227(a)(4)(C)(ii) (referring to, *inter alia*, 8 U.S.C. § 1182(a)(3)(C)(iii)). And the immigration laws *specifically* state that espousing or endorsing a foreign terrorist organization (like Hamas) is grounds for removal too. 8 U.S.C. § 1227(a)(4)(B) (referencing, *inter alia*, 8 U.S.C. § 1182(a)(3)(B)); 8 U.S.C. § 1182(a)(3)(B)(VII); Designation of Foreign Terrorist Organizations, 62 Fed. Reg. 52,650 (Oct. 8, 1997).

Plaintiffs rely on circumstantial evidence to try and show the existence of what they describe as an ideological deportation policy. This evidence shows no such policy, and they have not carried their burden of proof.

## 1.    Public Officials' Media Statements do not Reflect an Unwritten Policy Targeting Protected Speech

While public officials have made many comments about antisemitism and national security, their comments do not have the weight of policy. Those who implement the Executive Orders addressing such topics have testified that they did so according to their legal and regulatory authorities. None purported to see public statements as binding on them.

Plaintiffs' interpretations of the statements of public officials do not show otherwise. *See,* infra, § IV (discussing First Amendment threats). As the Court recognized, the President, the Secretary of State, and other government officials

have their own right to free speech. *See AAUP*, 2025 WL 1235084 at *20 n.11 (citing *Goldstein v. Galvin*, 719 F.3d 16, 30 (1st Cir. 2013) ("Not only do public officials have free speech rights, but they also have an obligation to speak out about matters of public concern")). To be sure, "[w]hen the government speaks, it is not barred by the Free Speech Clause from determining the content of what it says. . . . That freedom in part reflects the fact that it is the democratic electoral process that first and foremost provides a check on government speech." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015) (citations and quotations omitted). In the case of the President, his right to speak to "his fellow citizens and on their behalf" is famously called the "bully pulpit." *Blassingame v. Trump*, 87 F.4th 1, 14-15 (D.C. Cir. 2023) (quoting *Hawaii*, 585 U.S. at 701). The use of this bully pulpit or other government speech can include addressing protected speech. *See Murthy*, 603 U.S. at 71-75) (communicating with social media platforms about speech the government regarded as misinformation); *see, infra*, § IV (discussing First Amendment threats).

Importantly, government officials' public pronouncements do not define the actual policies implemented through the bureaucracy and, by connection, cannot establish intent to target First Amendment speech. In *Trump v. Hawaii*, the plaintiffs challenged an Executive Order (turned Proclamation) that they claimed "was motivated not by concerns pertaining to national security but by animus toward Islam," in violation of the First Amendment. *Hawaii*, 585 U.S. at 681. The Supreme Court examined a series of media "statements by the President and his

advisors casting doubt on the official objective of the Proclamation," which the plaintiffs submitted to claim "the primary purpose of the Proclamation was religious animus." *Id.* at 699-700. The Court then explained that, because the Proclamation was "neutral on its face" and concerned "a matter within the core of executive responsibility," *i.e.*, national security and regulating the entry of aliens, it would not "probe the sincerity of the [Executive Branch's] stated justification for the policy by reference to extrinsic statements," and instead "ask[ed] only whether the policy is facially legitimate and bona fide." *Id.* at 702-04.

The communications Plaintiffs cite as threats are not threats against protected speech. *See, infra*, § IV.B (proposed findings of fact on threats). More importantly, even if the threats did target protected speech, they have no bearing on the legitimacy of a policy where the policy is otherwise neutral. *See Hawaii*, 585 U.S. at 699-700 (declining to rely on government officials' statements indicating the motive for policy may have violated First Amendment where policy was otherwise neutral).

At bottom, the decisionmakers explained how they implemented the policies consistent with legal authorities. They never claimed to have given weight to the public statements of government officials, but rather implemented the policies consistent with existing legal authorities.

94

## 2.    The Executive Orders Are Neutral on Their Faces and Do Not Show the Existence of an Ideological Deportation Policy

The Executive Orders do not show the existence of an alleged ideological deportation policy. At most, they show realignment of vetting, investigative, and criminal and immigration enforcement priorities. Mr. Armstrong explained that, among other things, the Executive Orders instruct, emphasize, and inform the work of the State Department, but "not as part of the law." July 11 Tr. at 108:18-19. As he testified, the Executive Orders do not "give us any authority here, it instructs us and emphasizes. It's a document that informs what we're doing, yes, but not as a part of the law that we would use to revoke a Visa." *Id.* at 108:16-19. Mr. Watson explained that, "An Executive Order is . . . the Commander's intent . . . and direction . . . [to] agencies and departments . . . to action accordingly pursuant to the laws that they have available." July 17 Tr. at 42:8-13. In response to the Court's query of whether the Executive Orders at issue in this case provide independent legal authority, Mr. Watson answered definitively, "No, sir, not alone." July 17 Tr. at 96:8-11.  The testimony of Mr. Armstrong and Mr. Watson is consistent with the legal status of the Executive Orders, which is that they do not have the force of law. *See, supra*, at I.B (background discussion of Executive Orders' lacking force of law). So, the Executive Orders are neutral on their face, are required to be implemented consistent with the law, and those implementing them understand the limits of the Executive Orders' authority. Plaintiffs have failed to show the Executive Orders evince an alleged ideological deportation policy.

### 3. The Tiger Team's Investigations do not Show the Existence of an Ideological Deportation Policy Because They do not Target Protected Speech for Enforcement

Assistant Director Hatch's[19] testimony was clear: the HSI Office of Intelligence's work, specifically the tiger team's work, did not target students or any other protesters based on their protected speech. July 9 Tr. at 49:9-25 (the Office's effort was to review anyone involved in protests). Mr. Hatch testified that a "tiger team" was formed in March 2025 in response to a directive to investigate protest activity for violations of United States law. July 9 Tr. at 71:15-17, 74:14-17, 75:6-7 (Mr. Hatch's testimony the result of a March 2025 meeting was "to look at the protesters, to develop [ROAs] on the protesters, specifically looking for violations of U.S. laws" and that the Office "use[d] the normal [ROA] process and [its] normal trade craft for this"), 92:5-6 (Mr. Hatch's testimony that he received direction "to focus [this effort] on violations of the U.S. law"), 96:15-23 (Mr. Hatch's testimony that after the March 2025 meeting a team was formed to carry out the line of effort discussed at the meeting, and the team was called the "Tiger Team").. The Office of Intelligence was responsible for the first step—the fact-finding step—of the plan, and decision-making fell outside of the Office's role. July 9 Tr. at 98:17-98:3 (Mr. Hatch's affirmation that "the Office of Intelligence would do the factfinding"),99:13-

---

[19] Mr. Hatch additionally testified that he was responsible for "training, policy, procedures, equipment and allocation of analysts," and that he would know about, and provide training to his analysts, changes in policies and procedures. July 10 Tr. at 90:19-91:1. Indeed, it would be impossible for a new policy or procedure to exist in his office without his knowledge. July 10 Tr. at 91.

15, 100:18-22 (Mr. Hatch's testimony that the "National Security Division is the first step in the decision-making process" and recommendations "are not made in the Office of Intelligence"). Mr. Hatch emphasized that this process was consistent with the Office's and HSI's authorities and responsibilities: "[T]his process could have existed. It's not a complicated process of fact-finding, a letter to the authoritative decision-maker . . . this could have been used—like I said, Title 8's been around since the 1950s. This process would have been possible, . . . would have been acceptable at any time since Title [8]."[20] July 9 Tr. at 102:21-03:2.

This specific tiger team was formed because of the large volume of leads the Office of Intelligence received in its direction to review all protesters. July 9 Tr. at 109:1-10, 110:18-111:5 (indicating that the Office of Intelligence received a list containing "over 5,000" names); July 10 Tr. at 87:15-17, 89:14-16 ("As I said before, the tiger team was formed because of the large number of individuals in the lists. The tiger team was formed to look at protesters…The job was to produce reports of analysis on individuals involved in protests as it relates to Title 8 and violations of law."). Indeed, Mr. Hatch testified that part of the tiger team's work was to look into each of the more than 5,000 individuals on the Canary Mission website—which Mr.

---

[20] When recalling Executive Order 14161, as he had not seen Executive Order 14188 prior to his deposition in this case, Mr. Hatch testified that, "just about everything related to [Executive Order 14161] and [the Office of Intelligence] were things [they] were already doing. They all related to existing Title 8 issues. So it did not task [the Office of Intelligence] with doing anything different…it didn't change anything. It all related to Title 8. It emphasized things in Title 8, but nothing was new to us." July 10 Tr. at 104:20-105:4.

Hatch emphasized was not part of the United States Government and that the team treated it as it would any other lead and independently corroborated any allegations, July 9 Tr. at 109:1-10, 110:18-111:5, 112:9-17; July 10 Tr. at 98:17-99:5—Mr. Hatch emphasized that the creation of a tiger team to handle this work was necessary because, based on his experience at the Office of Intelligence, Mr. Hatch knew that the Office could not take several months or longer to complete its research and analysis: "We are an organization or an agency that…in a world where…taking months to do things is not acceptable…I was not given a deadline. But I knew from how we were organized and how we worked that we needed to work through this expeditiously." July 9 Tr. at 111:10-18.

While the individuals on the Canary Mission website were included in the tiger team's work, Canary Mission "wasn't the only way that [team] received…information on protesters." July 9 Tr. at 118:3-8; *see* July 10 Tr. at 75:6-15 ("there were multiple" deliveries of leads), 78:5-6 ("[W]e had multiple sources of information. Canary mission was not the only one."). In fact, the team looked at a second website, possibly "Betar," that was similar to Canary Mission, as well as received "individual names or [they] could even get lists from a police department if any protesters were arrested." July 9 Tr. at 118:12-18, 119:14-17

Additionally, Mr. Hatch was clear that "the source of the information was not necessarily relevant to the analyst, because the analysts were doing fact-finding, and the analysts were not reporting…where the name came from because they're independent from that." July 9 Tr. at 118:24-119:4. Nor would the analysts do so

98

because "it's not our standard practice, it's not within policy for us to report other people's uncorroborated allegations or assertions. Everything, like I said before, needs to be [corroborated]." July 9 Tr. at 119:4-8. Indeed, the direction was not to look at the protesters based on the Canary Mission website's allegations, but rather to research and analyze, among others, the names on the website "based on what we could find for information relative to violations of U.S. law." July 10 Tr. at 12:7-10. Further, the mission was not to "corroborate all the information that was" on the Canary Mission website; instead, it was to look at the individuals on the overall list, which included the individuals on the website, and generate ROAs.[21] July 10 Tr. at 21:4-6. Mr. Hatch emphasized: "[W]e would not take any leads, information, as fact…we check all the information. We don't take any leads, information, as fact." July 10 Tr. at 21:18-19, 24-25. Further, as noted, it was not the role of the tiger team or the Office of Intelligence to make judgments, assessments, or decisions on the information which they found. *See* July 10 Tr. at 40:16-19 ("I did not make that determination. That was not my job as the Assistant Director of the Office of Intelligence, was to supervise the analysts. I was not making the decision on determinations); 41:4-6 (I don't make those determinations. I'm not a Special Agent. I'm not an attorney. I don't work for the State Department.").

---

[21] Mr. Hatch noted that the Office of Intelligence has been doing "analysis the same way since [he] started in 2019 . . . [The Office of Intelligence] conduct[s] [its] analysis the same way.  And for that matter, [the Office has] been looking at the same violations of law during that time as well." July 10 Tr. at 91:7-15.

Mr. Hatch testified that the leads were delivered to the tiger team in a manner consistent with how leads are generally disseminated at the Office of Intelligence. July 10 Tr. at 92:10-21 (Mr. Hatch's testimony that "[i]n general terms . . . [the Office of Intelligence] receives [leads] from all different kinds of directions," and "with respect to the protestors," the Office was also "getting leads from all directions"). Specifically, leads come to the agency and are then communicated to teams of analysts. July 10 Tr. at 82:23-24, 92:22-25. In the case of the tiger team, the leads came to HSI and were then distributed to the team. *See* July 10 Tr. at 82:19-83, 92:12-25. Generally, when the Office of Intelligence receives a lead, it is provided to analysts to research and analyze and generate a ROA—the same that occurred with respect to the tiger team. July 10 Tr. at 92:12-25. The tiger team generated between 100 and 200 ROAs on the more than 5,000 leads they received. July 9 Tr. at 54:5-11.

The comparatively small number of ROAs generated by the tiger team represents the single difference in the tiger team's work compared to the normal practices of the Office of Intelligence and demonstrates that the tiger team was not targeting protected speech. As noted, in the normal course, a ROA is generated for every lead unless it is missing critical information required to generate it. July 10 Tr. at 93:6-12 ("There are times when a lead just has incomplete information, a nonspecific name, no identifying information to help us identify or narrow down who it was" and in those cases "[w]e would just file the lead. We'd move on."); 93:23-94:1 (confirming that if there is sufficient information in the lead a ROA is

100

generated). However, in the case of the tiger team, Mr. Hatch explained that, under the exigent circumstances created by the massive volume of leads and a lack of time and resources, he eventually made the decision to have the team only generate ROAs if and when there was substantive information related to a violation of U.S. law. July 10 Tr. at 98:3-12 ("But in this instance, because we had so many names, I told the analysts if you don't find anything beyond the biographic information—we were looking at violations of law and as it relates to protests . . . [For some individuals] [w]e never found anything. We didn't find any conduct . . . . And so I told the team for the sake of expediency to get through this long list to just not do the ROAs on those individuals."), 105:15-22 (confirming that because the volume of work was over 5,000 leads, ROAs were not created for every lead); 110:24-25 ("If we found no activity, we would move on to the next one."). Notably, assuming the ROAs generated were on the high end of Mr. Hatch's estimate, at 200, and the total leads were below his lowest estimate, at 5,000, the tiger team generated ROAs for less than 5% of the leads they received. July 10 Tr. at 105:23-106:4. With respect to the other greater than 95% of leads, the tiger team "didn't do anything with them . . . . We moved on to the next lead." July 10 Tr. at 106:5-11.

After the tiger team was formed and began working, Mr. Hatch reviewed several of the ROAs produced by the team in the beginning "to make sure that the process was working, that the analysts were providing information, and that the analysts were doing what . . . we wanted them to do." July 10 Tr. at 33:16-25. For example, ███████████████████████████████████████████████████

███████████████. July 10 Tr. at 31:19-25, 34:2-6 (discussing Exhibit 232). Mr. Hatch highlighted that the ROAs have a purpose of "getting the facts on [a] person and whether they may be related to" a violation of U.S. law, which "builds the understanding of the individual." July 10 Tr. at 39:16-23; *see* July 10 Tr. at 60:21-25 (a ROA is "just a summarization of the information [the analyst] found"). It is the Office of Intelligence's policy to update ROAs as additional information becomes available. July 10 Tr. at 68:23. Mr. Hatch explained that the process of all individuals, regardless of their immigration status, was the same. July 10 Tr. at 61:5-11; *see* July 10 Tr. at 108:24-109:19: (noting that HSI intelligence is authorized to write ROAs about U.S. citizens "for any violation of U.S. law, suspicion of violating U.S. law, information related to violations of U.S. law"). Regarding the ROAs for the five allegedly "targeted noncitizens" identified as examples by Plaintiffs, Mr. Hatch testified that the ROAs for those individuals were "typical subject profiles" and there was nothing substantially different about those subject profiles from others he has seen. July 10 Tr. at 69:18-70:7.

### 4. The Immigration Enforcement Actions Taken Against the Five Noncitizens Identified by Plaintiffs do not Show the Existence of an Ideological Deportation Policy

The arrests of the four identified noncitizens that Plaintiffs have referred to do not show the existence of an ideological deportation policy (Yunseo Chung has not been detained). But, first, the Court warned Plaintiffs early on that it "in no way is going to retry immigration proceedings or judicial proceedings in another district, I just want to know what happened." Tr. Case Mgmt. Conf., Dkt. #87, 21:3-

21:5. This is critical because, irrespective of preliminary mandamus rulings on the legality of detention, the deportability of those noncitizens is still the subject of litigation in removal proceedings. *See, e.g., Khalil v. Joyce*, __ F. Supp. 3d __, 2025 WL 1232369, *1-2 (D.N.J. Apr. 29, 2025) (describing ongoing removal hearings). The Court should reject Plaintiffs' invitation to declare unconstitutional the initiation of those removal proceedings. The wisdom of the Court's earlier statement is borne out by the principles set out in *AADC II*, where the Supreme Court explained the INA review scheme, including 8 U.S.C. § 1252(g), bars the "deconstruction, fragmentation, and [] prolongation of removal proceedings." *AADC II*, 525 U.S. at 487. And it provides the forum in which constitutional claims will be heard in due course. *See id.* at 487-488 (holding the doctrine of constitutional doubt does not require pre-enforcement review). It would be paradoxical to require aliens to go through removal proceedings to have their constitutional rights vindicated in a petition for review but then permit the Plaintiffs here (a non-party to individual aliens' proceedings) to have those removal proceedings declared unconstitutional.

Even if the Court were to inquire into the merits of those proceedings, it should, at most, review the retaliation claims under *Hartman* and its progeny to determine whether the immigration proceedings were initiated in retaliation for protected speech. Under *Hartman*, before a court inquires into whether a prosecution was retaliatory, the plaintiff must first allege, then prove, that there was no other probable cause for the prosecution. *See Hartman*, 547 U.S. at 263 265-266; see also, *supra*, § III.A & *infra*, § III.F).

Plaintiffs have made no showing of a lack of probable cause for the arrests of the allegedly targeted noncitizens, instead they assert only that the reason for the arrests was protected speech. However, in each of the four cases where the noncitizens were detained and placed in removal proceedings, there was probable cause. *See, supra*, § II.C.1.c (more fulsome discussion of the bases for the revocation or deportability determinations for the five noncitizens). While discussed more fully above, in brief, John Armstrong testified ███████████████████

████████████████████████████████████

███████████████████████████ ██ ███████████

████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████ █ ██████████

██████████████████████████████

█████████████████████████████

████████████████████████

  ███████████████████████████

████████████████████████████████

███████████████████ █ ███████████████

██████████████████████████



" Exhibit 250. As Mr. Armstrong testified,

"

While there was probable cause for the enforcement decisions in the four noncitizens' cases, even if there were not, those cases do not evince an unwritten policy targeting protected speech. The numbers tell a different story. As Mr. Hatch testified, the "tiger team" looking at protesters, reviewed more than 5,000 leads. *See* July 10 Tr. at 97:19-22. Of those, they created reports of analysis ("ROAs"), which were sent to Mr. Watson's office, for around 200. *See* July 10 Tr. at 83:21-84:1; *see*

---

22 

July 9 Tr. at 100:12-17. For the remaining approximately 95% of leads the team "didn't do anything with them." July 10 Tr. at 105:15-106:8. Of those 200 ROAs, Assistant Director Watson forwarded between 20 and 30 to the Department of State. *See* July 17 Tr. at 55:23-56:5. Mr. Armstrong testified, since late February 2025, about 15 to 20 action memos involving LPR student protesters were sent to the Secretary of State. *See* July 11 Tr. at 119:6-12. *See, supra*, II.C.1.c (detailing testimony in standing section). So, the Office of Intelligence found it necessary to create ROAs for only about 4% of the protestor cases the office considered. If there were a policy targeting protestors' protected speech, it would be a poor one. Accordingly, the arrests of the five identified noncitizens do not show the existence of an unwritten ideological deportation policy.

### 5. The Use of Masks, Handcuffs, Officers' Wearing Plain Clothes, and Transporting Detainees to Other States Does Not Show the Existence of an Unwritten Ideological Deportation Policy

The use of masks, handcuffs, officers' wearing plain clothes, and transporting arrestees to other states do not show the existence of an unwritten ideological deportation policy. Rather, in the case of masks, handcuffs, and plain clothes, their use is permissible under long-standing HSI arrest policy and protocols, and not unusual under the circumstances described in testimony. Transporting immigration detainees to different locations is also permissible under long-existing policy and is typically necessary to reduce overcrowding. And detention during removal proceedings is authorized by law.

106

Assistant Special Agent in Charge ("ASAC") William Crogan, ASAC Patrick Cunningham, Deputy Special Agent in Charge ("DSAC") Darren McCormack, and Acting Special Agent in Charge ("SAC") Christopher Heck all testified that HSI law enforcement agents receive initial and continuous training on arrest procedures and that arrests are conducted consistent with these procedures. July 15 Tr. at 8:4-9:9, 40:15-41:6, 43:17-44:1, 87:3-14, 89:20-24, 90:5-14, 111:12-13, 112:15-113:14. The agents testified that HSI has always had authority to enforce the INA, also commonly referred to by HSI agents as Title 8. July 15 Tr. at 43:6-8, 64:4-7, 89:9-11, 114:2-7; *see* July 15 Tr. at 65:4-10: (ASAC Cunningham's testimony that HSI has always had the authority to enforce Title 8 and "the prioritization of that work has certainly increased").

ASAC Crogan explained that arrest procedures "have stayed relatively stable" in his over twenty-year career at HSI, noting that the "fundamentals" were "to maintain safety and accountability." July 15 Tr. at 10:2-6; *see* July 15 Tr. at 44:2-11 (ASAC Cunningham's testimony that HSI arrest protocols and procedures have not changed in his time as an agent, but some techniques have evolved over time, and giving an example about handcuffing a subject)*,* 90:15-17 (DSAC McCormack's testimony that protocols and procedures have not changed in any material way since he joined HSI in 2005). Specifically, ASAC Crogan discussed the importance of operational security—"essentially the priority to protect the…presence of an operation or an initiative from the opponents, or a bad actor"— July 15 Tr. at 12:23-13:3, and the variability of operations depending on the "many

variables" that may be present, in prioritizing safety and accountability in

operations and arrests. July 15 Tr. at 14:4-16. ASAC Cunningham and DSAC

McCormack added that HSI arrest protocols and procedures could be found in HSI's

manual. July 15 Tr. at 43:17-23, 90:5-9.

ASAC Crogan was aware of the ████████████████████, involved in

planning for his arrest, and present at his arrest. July 15 Tr. at 15:5-10. In the

context of Mr. Mahdawi's arrest, ASAC Crogan explained the purpose of the use of

handcuffs when conducting an arrest. Specifically:

> The factors that contributed to the use of handcuffs were our
> training and experience as agents, the policy and practice of HSI to
> retrain individuals who were being arrested for violations of law, and
> the transportation, the movement of the subject from one location to
> another.
> When we arrest somebody, we…put them under restraints,
> typically it's a set of handcuffs, and that subject is patted down. We
> check a subject to make sure they don't have any dangerous items on
> their person, that they could use to hurt themselves, or the officers, or
> a member of the public. And it's also our policy, when a subject who is
> under arrest is transported, they are restrained, during that
> transportation, to again protect subjects and the officers.

July 15 Tr. at 15:23-16:12. ASAC Cunningham confirmed that handcuffs are used

"to protect the safety of the officers and effectuate the restraint" during an arrest.

July 15 Tr. at 44:12-45:4. He explained that "in training [agents are] taught that an

individual's hands are dangerous," so subjects are restrained "to ensure the safety

of those involved." July 15 Tr. at 49:11-17; *see* July 15 Tr. at 80:1-6 (ASAC

Cunningham's testimony that HSI agents are "trained that an individual's hands,

that makes them—whatever item can be accessible is accessible. You want to

control the hands."). Because of the safety concerns, "[i]t's HSI's policy to handcuff those that [HSI] arrest[s]," "whether it be a criminal violation or an administrative violation." July 15 Tr. at 49:4-7. DSAC McCormack also confirmed HSI's policy to handcuff all individuals who are arrested "for the safety of the individual but also for the safety of officers." July 15 Tr. at 92:11-18.

ASAC Cunningham spoke to HSI's policy regarding the number of agents involved in any arrest, which requires a minimum of two agents to be present to conduct an arrest, but the number "will fluctuate on a case-by-case basis." July 15 Tr. at 50:24-51:3; *see* July 15 Tr. at 93:1-3: (DSAC McCormack's testimony that at least two officers must be present for an arrest). The reason behind the number of officers present "all goes back to officer safety." July 15 Tr. at 51:4-8; *see* July 15 Tr. at 93:6-8 (DSAC McCormack's testimony that the number who participate is "situational" because "[e]very case is different"). In considering the number of agents planned for an arrest, HSI policy considers "the location of the arrest…the environment that the arrest is anticipated to take place in" as "a major factor." July 15 Tr. at 16:19-24; *see generally* July 15 Tr. at 16:15-17:12 (explaining the anticipated environment ███████████████████████████ ██████████████████████████████████████████ ████████████████ and that the number of agents present was consistent with ASAC Crogan's experience for a "physical location of that type"). Additionally, HSI policy considers, as a factor, whether the subject has a criminal history. July 15 Tr. at 51:9-11. However, whether a subject has a criminal history is not dispositive—

"you always take precautions with respect to an arrest" because "[y]ou just don't know what type of situation you're going to encounter, you don't know who might be in the area, you don't know who else might be involved," and it is HSI's responsibility "to ensure the safety of everyone, including the general public, including the people [who are being] arrest[ed]." July 15 Tr. at 51:12-23; *see id.* at 93:10-23, 17-24 (DSAC McCormack's testimony that "more is always better for safety of the agents and for the people present, an there may also be bystanders who are present, depending on where the arrest takes place" and that precautions are "always" taken with respect to an arrest "for the safety of agents, officers, individuals present and the person being arrested").

ASACs Crogan and Cunningham, and DSAC McCormack, further testified regarding the use of masks by HSI agents during an arrest. July 15 Tr. at 17:13-18:4, 49:21-50:17, 96:1-15. ASAC Crogan explained that using a mask "is a decision that's made by the Special Agent or the officer at—you know at the time of the planning of the arrest." July 15 Tr. at 17:16-18, 18:2-4 (it is up to "the individual employee" to determine whether to wear a mask); *see* July 15 Tr.at 49:21-24 (ASAC Cunningham's testimony that were was no official HSI policy on masking and that agents are permitted to wear masks); *id.* at 96:1-4 (DSAC McCormack's testimony that there is no HSI policy regarding wearing masks). ASAC Crogan observed that wearing masks "is a more common practice, in [his] experience it's occurred in the past, that it's not necessarily a new thing in [his] experience." July 15 Tr. at 17:18-21, 19:2-17 (recalling "multiple occasions" that agents had worn masks during the

110

five years he served as an ASAC in both immigration and criminal investigations).

He explained that HSI has "traditionally" had agents wear masks during arrests

"for undercover agents who may be acting or are acting in an undercover capacity

and [HSI does not] want to betray their true employment as law-enforcement

officers, but they also have to go out and help out and perform an arrest." July 15

Tr. at 17:21-25. ASAC Cunningham confirmed that agents working in an

undercover capacity in another case may choose to wear a mask "to protect their

identity for that reason," and added that agents who are "simply…working that

area" may wear a mask to prevent their identity from being revealed to the general

public as a HSI agent. July 15 Tr. at 50:11-17; *see* July 15 Tr. at 96:11-15 (DSAC

McCormack's testimony that undercover agents, "if they are assigned to do some

sort of fieldwork, they very often will wear masks to conceal their identity as their

true identity but also their undercover identity"). Additionally, ASACs Crogan and

Cunningham, and DSAC McCormack, expressed that many agents were concerned

that they would become "victims potentially of doxxing or harassment," which, as

Defendants have previously informed the Court, has become so common as to have

caught the attention of Congress. July 15 Tr. at 18:7-20 (also noting that two or

three agents at Mr. Mahdawi's arrest expressed this concern and that two agents

ultimately decided to wear masks); *id.* at 50:6-10 (ASAC Cunningham explaining

that some agents wear masks because "[i]n the age of camera phones and the ability

of people to identify…those agents, that people would want to protect themselves if

they're members of this community, or they live here, have families here…."); *id.* at

111

96:6-10 (DSAC McCormick's testimony that, "during COVID, masks were sometimes mandatory, but also often [worn] for health and safety reasons," as well as "[c]urrently in the world of social media and doxing and for safety of agents and their families"); *see* Dkt. Entry 137, Assented to Motion for Protective Order.

ASACs Crogan and Cunningham, as well as DSAC McCormack, further testified about HSI policy regarding uniforms and plain clothes. Specifically, ASAC Cunningham explained that HSI does not "have a uniform." July 15 Tr. at 52:3; *see* July 15 Tr. at 95:17-22 (DSAC McCormack's testimony that "we do not have uniforms…we always work in plain clothes"); *accord* July 15 Tr. at 20:10-15(ASAC Crogan's testimony that, at Mr. Mahdawi's arrest, "the Special Agents wore plain clothes, which is a common and frequent practice for an operation where the individual was going to be observed before the arrest was initiated"); 52:4-11 (ASAC Cunningham's testimony that the Special Agents involved in Ms. Öztürk's arrest were wearing plain clothes, but it is "common practice for agents to identify themselves" before making an arrest);  94:6-16 (DSAC McCormack's testimony that it is HSI's policy for agents to identify themselves when conducting an arrest because "for the safety and as a sworn law enforcement officer, if you are going to effect an arrest or act in the capacity of a sworn law enforcement officer, you have to identify yourself as such," and that "[u]pon encountering Mr. Khalil and his wife, [the agents] identified themselves but also had visible badges the whole time"). In fact, ASAC Crogan explained that it was in more limited circumstances, such as when executing an arrest warrant, where agents may not be in plain clothes, and it

was more frequent "and in many different forms of investigations," that agents

"don't have the luxury of identifying the target or the subject positively right away,

and [they] have to…surreptitiously or discreetly observe from a distance or in plain

clothes." July 15 Tr. at 20:16-25.

Similarly to the use of plain clothes, ASAC Crogan explained that "HSI does

not typically have or use marked vehicles, and again akin to the same principle of

plain-clothes operations, because criminal investigators are not uniformed police

service…[but rather] investigators, and by that nature much of what [they] do

starts out in a discrete and again surreptitious manner." July 15 Tr. at 22:11-20; *see*

July 11 Tr. at 95:17-22 (DSAC McCormack's testimony that HSI uses "unmarked

government issued vehicles, all in furtherance of being undetected, appearing not to

be law enforcement"). Nonetheless, vehicles are equipped "with lights and sirens

that comply with local codes of law" and are "used in enforcement situations when

[HSI] need[s] to…basically identify…in the vehicle as law-enforcement officers."

July 15 Tr. at 22:21-25. ASAC Cunningham added that the only marked vehicle of

which he was aware that HSI had was a large, armored "Special Response Team

vehicle." July 15 Tr. at 53:1-4. "Otherwise agents are assigned vehicles that do not

have markings" because agents are "investigators" and "over the course of an

investigation you're not trying to give up your…you know your cause or your reason

for being out on the street, you don't want to necessarily identify yourself as police

until it's time." July 15 Tr. at 53:5-11. ASAC Cunningham emphasized that this was

important both for "officer safety" and "protecting the integrity of investigations." July 15 Tr. at 53:13-15.

Regarding Mr. Mahdawi's arrest, ASAC Crogan testified that he received a communication from his supervisor "████████████████████████████ ████████████████████████████████████████████ and was involved in supervising and planning for Mr. Mahdawi's investigation and "eventually the arrest, when that was authorized." July 15 Tr. at 25:11-25; see July 15 Tr. at 35:15-18 (████████████████████████████████████ ████████████████████████████████). ASAC Crogan affirmed that Mr. Mahdawi's arrest was "consistent with HSI's procedures and policies." July 15 Tr. at 27:19-22. As with other immigration detentions, Mr. Mahdawi was arrested pursuant to a Form I-200, Warrant for Arrest of Alien, that "was produced after a body of facts were reviewed by the ICE, the Office of Principal Legal Advisor." July 15 Tr. at 21:8-17. Following the interview for which Mr. Mahdawi appeared—which allowed the HSI team to positively identify Mr. Mahdawi—the arrest team, consisting of ASAC Crogan and three other Special Agents, encountered him and performed the arrest. July 15 Tr. at 23:11-17, 37:22-38:1. ASAC Crogan identified himself as a HSI Special Agent and presented his credentials, his "agency-issued ID card and badge that corresponds to [his] HSI identification number," the other three agents presented their credentials, and it "was clear that the other three agents were with [ASAC Crogan]." July 15 Tr. at 23:13-16, 24:1-6. None of the agents were wearing masks when they first encountered Mr. Mahdawi, and ASAC Crogan

114

believed that two of the agents donned masks "between the time when they left the office and when they were outside in a public area where the HSI transport vehicle was waiting." July 15 Tr. at 24:10-21. Mr. Mahdawi was then placed in an HSI vehicle and driven to the local HSI office in South Burlington, Vermont. July 15 Tr. at 29:7-21. There, Mr. Mahdawi was "processed" and transferred to the custody of Enforcement and Removal Operations ("ERO"). July 15 Tr. at 30:2-6. It was ASAC Crogan's understanding that ERO intended to transfer Mr. Mahdawi to another location, but he did not "have any involvement with custody location of determination." July 15 Tr. at 30:19-31:4. Indeed, he testified that, after a subject is transferred out of HSI's custody, "HSI relies on other elements of ICE and Homeland Security to maintain custody or detention of someone who's arrested for a civil immigration violation." July 15 Tr. at 29:3-6.

ASAC Cunningham testified that he was involved in Ms. Öztürk's arrest. July 15 Tr. at 45:8-9. He "received the information from headquarters…passed down to the chain of command…that ███████████████████████ ███████ and his role was "mainly to apply resources and…delegate agents on the street…to locate Ms. Öztürk and effectuate her arrest." July 15 Tr. at 45:11-17. He believed, based on standard HSI policy, that Ms. Öztürk was handcuffed upon her arrest. July 15 Tr. at 48:25-49:12. He further believed that agents present at Ms. Ozturk's arrest were wearing masks, the arresting agents were wearing plain clothes, and the arresting agents identified themselves before making the arrest. July 15 Tr. at 49:18-20, 51:24-52:15. HSI transported Ms. Öztürk to Vermont, where

she was "processed." July 15 Tr. at 52:19-20, 53:16-21. ASAC Cunningham explained that he was informed by ERO, which "determine[s]…where…detainees are housed," that Ms. Öztürk was transferred because "there was no bed space for her in Massachusetts." July 15 Tr. at 53:24-54:3. After Ms. Öztürk was processed in Vermont, she was transferred out of HSI custody. July 15 Tr. at 55:13-16.

DSAC McCormack testified that he had "operational oversight" of Mr. Khalil's arrest and that his "role was disseminating information that [he] received from headquarters to field agents." July 15 Tr. at 90:18-21. Specifically, DSAC McCormack "received an ███████████████████████████████████ ████████████████████████████████████ ████████████████ instructions" to disseminate ████████ to the appropriate people at the appropriate time. July 15 Tr. at 91:9-17. DSAC McCormack confirmed that Mr. Khalil was amenable to arrest "[b]ecause his immigration status had changed ██████████████████████████████." July 15 Tr. at 91:18-23. DSAC McCormack was aware of the circumstances of Mr. Khalil's arrest because he, pursuant to his official duties, "read the report of investigation about the arrest itself, and [he] also watched videos of the arrest." July 15 Tr. at 95:8-13. At his arrest, Mr. Khalil was not initially handcuffed and, after he was encountered by the arresting agents, "was free to move freely in the vestibule of his apartment building for a period of time until ultimately the time came that he had to be handcuffed and taken for processing," consistent with HSI policy. July 15 Tr. at 92:3-22. Four officers were present at Mr. Khalil's arrest and, consistent with HSI policy, they identified

themselves as HSI agents and had their neck badges visible "the whole time." July 15 Tr. at 93:25-94:16. They were in plain clothes—again, consistent with HSI policy—and did not wear masks. July 15 Tr. at 95:14-25. Following Mr. Khalil's arrest, HSI transferred him to a HSI facility in New York City for processing, after which he was "turned over to ERO custody." July 15 Tr. at 96:16-21.

Acting SAC Heck testified that, as he was in charge of the field office, he "oversaw the arrest" of Mr. Suri, but was "not physically present at the time of the arrest." July 15 Tr. at 114:17-21. He received a phone call from HSI headquarters "███████████████████████████████████████████████████████ ████████████████████████████████████████" July 15 Tr. at 115:16-20. HSI began conducting ██████████████████████ and Mr. Suri was later arrested "as normal protocol policies would dictate." July 15 Tr. at 116:1-18. He confirmed that "the proper protocols" for arrest were followed at Mr. Suri's arrest. July 15 Tr. at 114:24-115:3.

ASAC Crogan specifically testified that no one ever communicated or suggested to him that Mr. Mahdawi was being arrested because of his pro-Palestinian views, his criticisms of Israel, or because of his political views. July 15 Tr. at 28:8-13. Similarly, ASAC Cunningham testified that he was never told that Ms. Öztürk as being arrested because of her support of Palestine or her criticism of Israel, and his understanding was that the basis for her arrest was the State Department's revocation of her visa. July 15 Tr. at 55:17-56:7. DSAC McCormick testified that he was also never told that Mr. Khalil was being arrested because of

117

his sport of Palestine or criticism of Israel, and he instead was told that Mr. Khalil was subject to arrest "[b]ecause of the change in his immigration status…which now left him illegally present in the United States and amenable to arrest." July 15 Tr. at 96:24-97:10. Finally, likewise, Acting SAC Heck testified that he was never told that Mr. Suri was arrested because of his support for Palestine, his criticism of Israel, or because of his political views. July 15 Tr. at 116:19-117:13.

Thus, as the four Special Agents involved in the arrests of the allegedly "targeted noncitizens" testified, the use of masks, handcuffs, and plain clothes, and the transportation of subjects following arrest, was consistent with HSI policy and protocols. HSI has good reason for these policies and protocols as an investigative and law enforcement agent. That individuals were arrested consistent with longstanding HSI policy, protocols, and procedures simply does not show the existence of an unwritten ideological deportation policy.

Because Plaintiffs failed to prove the existence of an ideological deportation policy, the Court should enter judgment for the Government on Count 1.

### F.    Plaintiffs did not Plead or Prove at Trial a Retaliation Claim

Despite framing one of their claims as based on Government retaliation in their pretrial brief, *see* Plaintiffs' Pretrial Br. at 41-43, the facts they alleged and those shown at trial do not establish retaliation because Plaintiffs have not alleged that any of their members have been retaliated against. Rather, they claimed that threats are chilling their speech. *See* Compl. at ¶ 136 (Count 2). This is a different First Amendment claim. *See, infra*, § IV (discussing threats).

To succeed on a retaliation claim, the Government would have to retaliate against Plaintiffs. But Plaintiffs allege Government retaliation only against individuals who are not parties to the case. *See, e.g.*, Plaintiff's Pretrial Br. at 1, 42-43. Thus, they have not alleged, let alone proven, retaliation. In fact, in denying the motion to dismiss, the Court did not understand Plaintiffs to make a retaliation claim at all. *See* AAUP, 2025 WL 1235084 at *18-20. Plaintiffs cite several district court decisions concerning the aliens they claim suffered retaliation for their protected speech. But those cases do not establish Plaintiffs have established a retaliation claim; rather they confirm that retaliation claims should be litigated in the cases brought by the actual people who believe they suffered retaliation.

Even assuming the Plaintiffs could overcome the threshold burden in *Hartman*, individuals alleging a First Amendment retaliation claim must establish that: 1) they "engaged in constitutionally protected conduct;" 2) they were "subjected to an adverse action" by the defendant; and 3) that "the protected conduct was a substantial or motivating factor in the adverse action." *Gattineri*, 58 F.4th at 514 (*quoting Falmouth Sch. Dep't v. Doe on behalf of Doe*, 44 F.4th 23, 47 (1st Cir. 2022) (internal quotation marks omitted)). Plaintiffs do not allege an adverse action against any of their members. Rather they claim the adverse actions were taken against the five identified aliens, so their claim does not sound in First Amendment retaliation.

In their memorandum in support of their motion for a preliminary injunction, Plaintiffs suggest that they did not need to show an adverse action, and that

119

showing the existence of a discriminatory policy is sufficient. *See* Pretrial Br. at 41. They cite no support for this. *See Pope v. Bernard*, No. 10-1443, 2011 WL 478055, *2 (1st Cir. Feb. 10, 2011) (holding in First Amendment case that harm must be more than de minimis) (citing *Morris v. Powell*, 449 F.3d 682, 684 (5th Cir. 2006). Plaintiffs cite *Lozman*, but that case did not involve a retaliatory policy alone, it involved a policy that led to the plaintiff's arrest—the actual act of retaliation. *See Lozman*, 585 U.S. at 95-96. Separately, this Court has held that a person could prevail on a claim that government retaliation is based on an underlying policy, but they must establish "both the existence of a policy and a causal link between that policy and the constitutional harm." *O'Neil v. Canton Police Dept.*, 761 F. Supp. 3d 299, 310 (D. Ma. Dec. 20, 2024) (cleaned up). In *O'Neil*, the plaintiffs suffered retaliation—arrests under the Massachusetts witness-intimidation statutes. *See id.* at 305, 310. Again, there has been no retaliation here; Plaintiffs claim threats are chilling their speech. *See, infra*, § IV.

A retaliation claim also requires additional evidence. To succeed on the third prong, Plaintiffs must establish a causal connection between Defendants' "retaliatory animus" and Plaintiffs' injury. *See Nieves*, 587 U.S. at 398. In other words, Plaintiffs must establish that but for the retaliatory motive, the injury would not have occurred. *Id.* at 399. In *Hartman*, the Supreme Court held that a plaintiff in a retaliatory prosecution case must establish the lack of probable cause for pressing the underlying criminal charges. *See Hartman*, 547 U.S. at 261-263. The Supreme Court observed that establishing such causation could be difficult, as even

120

proving retaliatory motive by an arresting officer is insufficient to establish that the prosecutor acted with animus in pursuing the charges, noting the presumption of regularity for executive decisions to pursue prosecutions. *Id.* at 263. The Supreme Court concluded that, due to the high probative force of showing the absence of probable cause, plaintiffs in such retaliatory prosecution actions are required to plead and prove the fact of this absence. *See id.* at 265-66. The Supreme Court revisited this issue in *Nieves*, holding that retaliatory arrest claims face many of the same challenges as retaliatory prosecution claims, and that plaintiffs in such cases must also establish the absence of probable cause to conduct an arrest. *See id.* 399-402, 404. There are stronger concerns about court interference into matters of prosecutorial discretion in the immigration context. *See AADC II*, 525 U.S. at 489-90. As the Supreme Court said, such concerns are "greatly magnified" in the immigration context. *Id.* at 490.  Thus, as in the context of a retaliatory arrest or prosecution case, Plaintiffs bear the burden to establish that a retaliatory motive was the "but-for" cause of their injury.

### G.    The Facts Show no Retaliation

Plaintiffs' LPR witnesses, despite continuing to speak on Israel-Palestinian issues, were not retaliated against. Meghan Hyska admitted that she has never been detained or arrested, and in 2025, she has not been questioned by an official of the U.S. Government other than when going through routine inspection when reentering the country. *See* July 7 Tr. at 101:25-102:15. Nadje Al-Ali testified to being nervous on hearing about the arrest of Khalil while she was in Germany.

121

Nevertheless, she followed through with a planned talk in Switzerland before returning to the United States where she was not detained, questioned about her scholarship related to Palestine, or subjected to any inspection beyond that typical with return to the United States. *See* July 8 Tr. at 43:23-44:21. Bernhard Nickel affirmed that he has never received a communication from anyone in the federal Government relating to his political speech. *See* July 8 Tr. at 115:16-19. And Brian Shuve, who feared that because of his political speech, he would be arrested and detained at his naturalization interview, was granted naturalization the very same day of his interview, which lasted only 20 minutes. *See* Shuve Depo. Tr. at 133:3-4, 135:6-21.

Given that none of Plaintiffs LPR witnesses suffered retaliation, and Plaintiffs failed to carry their burden to prove the existence of an alleged ideological deportation policy, they have failed to allege or prove retaliation. Accordingly, their retaliation argument should be rejected. There is no corresponding claim in their complaint that needs to be dismissed on this ground.

## IV. PLAINTIFFS HAVE NOT CARRIED THEIR BURDEN TO SHOW THREATS TARGETING THEIR PROTECTED SPEECH IN THE ABSENCE OF AN UNWRITTEN POLICY TO CARRY THEM OUT (COUNT 2)

### A. Legal Standards for First Amendment Threats

In Count 2, of their complaint, Plaintiffs alleged that Defendants' threats to punish constitutionally protect speech violate the First Amendment. *See* Compl. ¶ 136. They have since urged the Court to apply the framework in *Vullo* and *Bantam*

122

*Books* in evaluating their allegations. *See* Plaintiff's Pretrial Br. at 44-45 (citing *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66-67 (1963). The Court found it unnecessary to treat Plaintiffs' two constitutional claims separately in denying the motion to dismiss and left until later their resolution. *See AAUP*, 2025 WL 1235084 at *20. Now it is clear that not only do Plaintiffs' claims as pleaded not satisfy the standards of threats described in *Vullo* and *Bantam Books*, but the evidence produced at trial likewise does not satisfy them.

Plaintiffs hope to use the *Vullo* and *Bantam Books* to overcome the need to prove the existence of their putatively alleged ideological deportation policy. *See* Plaintiffs' Reply in Supp. of Mot. for Prelim. Injunction, Dkt. #69, at 2 n.1, 7. But such a leap is inappropriate where Plaintiffs' claims and the facts adduced at trial do not fit within the *Vullo* framework. First, a *Vullo* and *Bantam Books* claim is premised on the point that the Government cannot accomplish indirectly what it cannot do directly: It cannot suppress one party's speech by coercing a third party to censor it. *See Vullo*, 602 U.S. at 191. Neither Plaintiffs' allegations nor the facts adduced at trial show the use of such a third party.

Plaintiffs cite *Harvard v. DHS*, where the court did not require the use of a third party for bringing a *Vullo* threat claim. *See President & Fellows of Harvard College v. DHS*, __ F. Supp. 3d __, 2025 WL 1737493, *20 (D. Mass. 2025). But what that case shows is that when there is no third party, there must be a closer relation between the threat and adverse action. The defendant, there, carried out the alleged

threat—issuing a proclamation exercising authority under 8 U.S.C. § 1182(f) to prohibit the entry of aliens to pursue a course of study at Harvard. *See id.* at *1; *see also Perkins Coie LLP v. U.S. Dep't of Just.*, __ F. Supp. 3d __, 2025 WL 1276857, *26 (D.D.C. May 2, 2025) (issuing Executive Order specifically targeting Perkins Coie). Finally, the government officials in those cases either threatened the Plaintiffs directly or threatened a third party to target them specifically. Here, Plaintiffs do not claim and have not shown the Defendants threatened any of their members directly or took any steps against them.

Given the gap between *Vullo*, and its ilk, and the facts of this case—there are no threats to a third party to act against Plaintiffs' members, no direct threats against Plaintiffs' members, and no steps toward actions against Platintiffs' members—Plaintiffs must at least prove the existence of the alleged ideological deportation policy. This is especially so given government officials' own First Amendment rights.

As the Court recognized, the President, the Secretary of State and other officials have their own rights to free speech. *See AAUP*, 2025 WL 1235084 at *20 n.11 (citing *Goldstein*, 719 F.3d at 30 ("Not only do public officials have free speech rights, but they also have an obligation to speak out about matters of public concern")); *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467-68 (2009) (the government has the right to speak for itself). To be sure, "[w]hen the government speaks, it is not barred by the Free Speech Clause from determining the content of what it says. . . .  That freedom in part reflects the fact that it is the democratic

electoral process that first and foremost provides a check on government speech." *Walker*, 576 U.S. at 207 (citations and quotations omitted). In the case of the President, his right to speak to "his fellow citizens and on their behalf" is famously labeled the "bully pulpit." *Blassingame*, 87 F.4th at 14-15 (quoting *Hawaii*, 585 U.S. at 701). The use of this bully pulpit or other government speech can include addressing protected speech. *See Murthy*, 603 U.S. at 71-75 (communicating with social media platforms about speech the government regarded as misinformation).

As part of their own right to free speech, general statements by government officials to prosecute unlawful actions are insufficient to support a claim of First Amendment retaliation or chilling of speech. *See Venetian Casino Resort, LLC v. Cortez*, 9 F. Supp. 2d 1102, 1107 (D. Nv. May 1, 2000); *see also Poe v. Ullman*, 367 U.S. 497, 501 (1961) (holding that allegations that official intends to prosecute offenses, and that giving advice concerning contraceptives constitutes offenses, did not provide immediate "threat . . . rais[ing] serious questions of non-justiciability of appellants' claims"). Likewise, public statements implying an unconstitutional basis for an action do not mean the action was unconstitutional if it was otherwise permissible. In *Trump v. Hawaii*, Plaintiffs challenged an Executive Order (turned Proclamation) that they claimed "was motivated not by concerns pertaining to national security but by animus toward Islam," in violation of the First Amendment. *See Hawaii*, 585 U.S. at 681. The Supreme Court examined a series of media "statements by the President and his advisors casting doubt on the official objective of the Proclamation," which Plaintiffs submitted to claim "the primary

125

purpose of the Proclamation was religious animus." 585 U.S. at 699-700. It then

explained that, because the Proclamation was "neutral on its face" and concerned "a

matter within the core of executive responsibility," i.e., national security and

regulating the entry of aliens, it would not "probe the sincerity of the [Executive

Branch's] stated justification for the policy by reference to extrinsic statements." *Id.*

at 702-04.

## B.    Proposed Findings of Fact on Threats

To begin, Plaintiffs are wrong that the public statements they identify

constitute threats targeting their protected speech. Rather they are exercises of the

federal officials' own free speech rights as they target for criticism violations of

immigration law. Additionally, the purported "threats" are mostly directed toward

visa holders (i.e., temporary visitors) so they are of no relevance. This is because

Plaintiffs did not offer a student visa holder as a witness, only LPRs, so even if most

of the government officials' speech constituted a threat sufficient to chill First

Amendment rights, it would be irrelevant to Plaintiffs claims which are directed to

LPRs.

For example, the Tweet from Secretary Rubio that Plaintiffs offered into

evidence as proof of a coercive threat says "[t]hose who support designated terrorist

organizations, including Hamas, threaten our national security. . . . Violators of

U.S. law—including international students—face visa denial or revocation, and

deportation." Exhibit 24. So, Secretary Rubio's tweet addressed those who support

terrorist organizations, which is unquestionably a ground of inadmissibility or

deportability. *See* 8 U.S.C. § 1182(a)(3)(B); 1227(a)(4)(B). It was also directed to visa holders. A DHS tweet stated that Khalil was detained for his activities aligned to Hamas. *See* Exhibit 25. So even though the tweet cited the Executive Order targeting antisemitism, it showed DHS regarded support for Hamas, a terrorist organization designated under 8 U.S.C. § 1189, as falling within antisemitism. *See also* Exhibits 26 (similar tweet from Secretary Rubio), 34 (tweet from Assistant Secretary for Public Affairs DHS stating Suri was targeted for spreading Hamas propaganda among other things), 44 (tweet from same, in response to report of masked anti-Israel students breaking into the library, saying those students or LPRs pushing Hamas propaganda, glorifying terrorists that relish the killing of Americans, harassing Jews, taking over buildings, or other anti-American activities will have their visas revoked), 43 (tweet from Secretary Rubio stating they are reviewing visa status of trespassers and vandals who took over the library). The President tweeted, about Khalil's detention, that it was because of his pro-Hamas activities. *See* Exhibit 27. Other public statements of government officials similarly targeted support for terrorism or other unprotected speech. *See* Exhibit 29 at 4-5 (stating Khalil was detained for supporting the Hamas terrorist organization).

Plaintiffs provided a statement by the White House Communications Director that laid out a clear non-protected justification for Khalil's arrest. She began by correctly describing the foreign policy removal provision at (a)(4)(C). *See* Exhibit 28 at 5. Then explained that Khalil had his green card revoked because of his support for Hamas, organizing group protests that disrupted college classes, and harassed

127

Jewish students and made them feel unsafe on their own college campus. *See id.* He also distributed pro-Hamas propaganda with a Hamas logo. *See id.* Plaintiffs' other exhibits showing so-called threats are more of the same. *See* Exhibits 24-44. At bottom, none of these "threats" targeted Plaintiffs LPR witnesses. At best they targeted Hamas supporters and those who commit unprotected acts, such as disrupting college classes, and invading college buildings.

Perhaps in recognition that the "threats" on their face did not target Plaintiffs members' protected speech but rather target unprotected conduct, Plaintiffs acknowledge that they need to prove that the Defendants "implemented the process to identify individuals who engage in the pro-Palestinian expression targeted by Defendants' threats." Plaintiffs' Pretrial Br. at 46. By pairing the two together, they could show the threats were targeted at protected speech. But as shown above at III.D, Plaintiffs have failed to prove the existence of this process, which they have falsely termed as an ideological deportation policy.

Plaintiffs' LPR witnesses testifying that they understood the public officials' speech to be threatening them and causing their speech to be chilled cannot establish a constitutional violation. Their subjective fears cannot substitute for objective proof and their fear is unreasonable. So, Plaintiffs have not established that their protected speech was threatened, that those threats were implemented in a policy, or that their fears of retaliation were objectively reasonable. The Court should enter judgment for the Defendants on Count 2 of the complaint.

## V.    PLAINTIFFS FAILED TO SHOW AN APA VIOLATION (COUNT 4)

At the outset of this case, Plaintiffs asserted that the alleged "ideological-deportation policy violates the APA because it is arbitrary, capricious, an abuse of discretion, and contrary to constitutional right, and because it exceeds Defendants' statutory authority." Complaint, Dkt. 1 at ¶ 139. But the evidence adduced at trial utterly fails to establish any APA violation by way of an alleged "ideological deportation policy." Plaintiffs were required to make certain threshold showings to warrant moving forward on their APA claim. They fell short at every turn.

<u>First</u>, Plaintiffs needed to show they were seeking review of a "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704; *see also Lujan*, 497 U.S. at 882; *Bennett v. Spear*, 520 U.S. 154, 157 (1997). An action is "final" when it is "one by which rights and obligations have been determined" or from which "legal consequences will flow." *Bennett*, 520 U.S. at 177-78.  But the concept stops well short of covering all agency conduct. *See Lujan*, 497 U.S. at 890-91; *see also Hearst Radio v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948) ("The difficulty with the appellant company's position is that the [APA] does not provide review for everything done by an agency."). The conduct in question must be "circumscribed" and "discrete" to qualify as an APA-reviewable action. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). Broad programmatic challenges generally are precluded, as courts would be hard-pressed to adjudicate them without intruding on powers reserved for the other branches of Government. *Id.* at 64; *Lujan*, 497 U.S. at 891.

129

Courts are well-suited to reviewing specific agency decisions, such as rulemakings, orders, or denials. They are woefully ill-suited, however, to adjudicate generalized grievances asking to improve an agency's performance or operations. In such a case, courts would be forced either to enter a disfavored "obey the law" injunction, or to engage in day-to-day oversight of the executive's administrative practices. Both alternatives are foreclosed by the APA, and rightly so. *See City of New York v. United States Department of Defense*, 913 F.3d 423, 431 (4th Cir. 2019) (internal citation omitted); *see generally Mathews*, 426 U.S. at 81 (1976) ("For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government.").

As discussed above, in Section III.E., Plaintiffs have not established the existence of an ideological deportation policy. The government officials called to testify all consistently denied the existence of any policy. *See, e.g.*, July 11 Tr. at 121:5-15 (John Armstrong's testimony that there is not an ideological deportation policy, and that it is "silly to suggest that there's such a policy" about which he — the senior official in the Bureau of Consular Affairs—is not aware), 121:16-21 (John Armstrong's testimony that the State Department does not have a policy to revoke visas based on protected speech, nor does the State Department have a policy to find people removable based on protected speech). And Plaintiffs point to no evidence of enforcement actions against any of their members. *Cf. R.I.L-R v. Johnson*, 80 F.Supp 3d 164, 174-76 (D. D.C. 2015) (finding that an alleged

130

Government policy of considering deterrence of mass migration as a factor in custody determinations existed where the evidence established that "ICE has been largely denying release to Central American mothers accompanied by minor children" and where the Government "essentially conceded" that a recent surge in detentions "reflect[ed] a design to deter such migration").

In quoting Administration officials' statements about immigration enforcement priorities, *see* Compl. ¶¶ 31, 33, 34, 39, 42-46; Plaintiffs' Pretrial Brief (Dkt 179) at 68, Plaintiffs attack broad policy aims, which are definitionally not subject to APA review. *See Bennett*, 520 U.S. at 177-78l; *see also Hawaii*, 585 U.S. at 702-04 (foreclosing First Amendment liability based solely on the allegedly bellicose statements of senior officials). None of those public statements carries the force of law. It is precisely the type of "broad programmatic attack" for which APA review is not available. *See Norton*, 542 U.S. at 64; *see also Lujan*, 497 U.S. at 890 (finding that the "continuing (and thus constantly changing) operations" of the [Bureau of Land Management] was "no more an identifiable 'agency action'—much less a 'final agency action'—than a 'weapons procurement program' of the Department of Defense or a 'drug interdiction program' of the Drug Enforcement Administration").

Second, Plaintiffs needed to establish there is no other adequate remedy to address their claims. The alternative remedy "need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.'" *Garcia v. Vilsack*, 563 F.3d 519 (D.C. Cir. 2009) (*quoting El Rio Santa Cruz Neighborhood*

*Health Ctr. v. U.S. Dept' of Health and Human Servs.*, 396 F.3d 1265, 1272 (D.C.

Cir. 2005)). The claim-channeling provisions of the INA provide that challenges to

the decision to initiate removal proceedings, and regarding the validity of removal

charges, must be raised in removal proceedings, and then, as appropriate, in a court

of appeals. *See* 8 U.S.C. §§ 1252(a)(5), (b)(9), (g); *see also* 8 U.S.C. § 1201(i). The

First Circuit has noted that these provisions are "breathtaking" in scope and were

"designed to consolidate and channel review of all legal and factual questions that

arise from the removal of an alien into the administrative process, with judicial

review of those decisions vested exclusively in the courts of appeals." *Aguilar v.*

*ICE.*, 510 F.3d 1, 9 (1st Cir. 2007). Because there is an alternative forum in which

Plaintiffs' claims against the implementation of an alleged "ideological deportation

policy" may be raised, their claims—including constitutional objections—are not

cognizable under the APA. *See Bennett*, 520 U.S. 175-77; *AADC II*, 525 U.S. at 487-

490; *see also Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 58 (1st

Cir. 2007) (nonstatutory review of constitutional claims outside the APA is a

narrow, exceptional pathway, justified only where there is no other means to obtain

review). Plaintiffs' counterargument that many "AAUP and MESA members

harmed by the policy will never (and in many cases could never) be placed in

removal proceedings." Plaintiffs' Pretrial Br. at 49, undermines the very basis for

their claim: if their members are not subject to removal proceedings and thus would

not have an opportunity to raise their First Amendment claims before an

immigration judge, then they have not been subject to the alleged ideological deportation policy.

Relatedly, to the extent that the Court deems the "zone-of-interests test" to apply here, Plaintiffs' claim also falls outside the "zone of interests" protected by the INA, further defeating their eligibility for APA review. *See Seafreeze Shoreside, Inc. v. United States Department of the Interior*, 123 F.4th 1, 20 (1st Cir. 2023); *cf.* ECF No. 14 at 17-18. The zone-of-interests test "forecloses suit" here because Plaintiffs' interests—challenging the initiation and validity of removal proceedings in district court—are plainly "inconsistent with the purposes implicit" in the INA's claim-channeling provisions. *See Seafreeze Shoreside*, 123 F.4th at 20.  Through the claim-channeling provisions, "Congress plainly intended to put an end to the scattershot and piecemeal nature of the review process that previously had held sway in regard to removal proceedings." *Aguilar*, 510 F.3d at 9.  Furthermore, the INA's claim-channeling provisions are clearly intended to apply to aliens who have been subject to a final removal order. *See* 8 U.S.C. §§ 1252(a)(5), (b)(9), (g). Plaintiffs do not allege that any of their members have been subject to removal (or any other adverse actions, for that matter) based on the alleged ideological deportation policy. To the contrary, their members who claim their speech has been chilled have been able to speak freely and publicly criticize the Trump Administration, *see* July 7 Tr. at 63:9-20, 66:4-15, 95:18-25, 96:1-13, 97:7-12 (Megan Hyska's testimony concerning protests and meetings she attended in March 2025); *see also* July 7 Tr. at 108:6-18, 115:14-15, 115:24-116:6, 118:6-21 (Ms. Hyska's testimony discussing Exhibits 69

133

and 72, letters she signed onto criticizing the Trump Administration in 2025), July

8 Tr. at 103:21-104:23, 105:23-106:15, 107:6-10, 108:2, 108:24-109:1 (Bernhard

Nickel's testimony discussing Exhibit 78, 79, and 172, emails he sent in 2025 that

were critical of the Trump Administration), July 8 Tr. at 113:1-10 (Mr. Nickel's

testimony that he attended an AAUP protest in 2025 following the inception of the

Trump Administration), and on matters concerning Israel and Palestine. *See* July 7

Tr. at 112:14-113:13 (Ms. Hyska's testimony discussing Exhibit 68, a letter she

signed onto expressing support for a professor allegedly denied tenure based on his

support of student protests related to the conflict in Palestine and Israel). They

have also traveled abroad and gained admittance back into the U.S. without

incident. *See* July 7 Tr. at 137:13-23, July 8 Tr. at 41:22-42:1, 43:23-44:21 (Nadje Al-

Ali's testimony that, following Mr. Khalil's arrest, she traveled to Switzerland to

give lectures, and was not subject to questioning beyond routine re-etnry

questioning when she returned to the United States in March 2025). One individual

even naturalized in late-April 2025 following much public advocacy between late

2023 and April 2025 related to the conflict in Palestine and Israel. *See generally*

Deposition of Brian Shuve at 72:5-78:1, 101:14-115:6, 117:20-118:24, 128:18-132:21

(discussing advocacy); Deposition of Brian Shuve at 133:3-4, 135:6-21 (Mr. Shuve's

testimony that he naturalized on the same day of his naturalization interview,

which he estimated to last approximately 20 minutes).

    <u>Third</u>, even assuming Plaintiffs met the threshold requirements for APA

review, their claim still fails on the merits. Plaintiffs needed to establish that the

policy they challenge is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This highly deferential standard obligates the Court to start from the assumption that the agency's actions are valid. *River Street Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009). A reviewing court "may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions." *Id.* (citing *Trafalger Capital Assocs. V. Cuomo*, 159 F.3d 21, 26 (1st Cir. 1998)); *see also Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) ("a court may not substitute its own policy judgment for that of the agency"). Rather, the Court must defer to the agency if there is any discernible rational basis for the action. *See Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285-86, 290 (1974). Here, Plaintiffs have made no showing that Defendants have acted in an arbitrary and capricious manner. Their accusation that Defendants "have offered no cogent explanation" in support of the enforcement policy is based on the false premise that Defendants' enforcement policy targets individuals' protected expressive activity. Dkt. 14 at 18-19. But, the Executive Orders underlying the enforcement policy Plaintiffs challenge are directed at conduct: "It is the policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes," EO 14161 § 1; and "[i]t shall be the policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the

perpetrators of unlawful anti-Semitic harassment and violence." EO 14188 § 2. Furthermore, the administrative record shows that the Government's implementation of Executive Orders 14,161 and 14,188 was lawful. It documents the State Department's adoption of screening and vetting guidance for visa applicants that is fully consistent with the INA. *See* Exhibit 7. It also shows that immigration enforcement actions taken against specific non-parties complied with the law. *See* Exhibits 8-22. Indeed, Plaintiffs point to nothing in the administrative record that supports their claim that an alleged ideological deportation policy exists or that the Government's implementation of the Executive Orders violates the APA. Notably, the Executive Orders additionally specify that they "shall be implemented consistent with applicable law." EO 14161 § 4(b); EO 14188 § 4(b). Implementing the stated aims of Executive Orders within the confines of applicable law is not arbitrary, capricious, an abuse of discretion, or in excess of Defendants' statutory authority.

Given that this is an APA case, the Court's review—including of Plaintiffs' constitutional claims—should be confined to the administrative record, as only narrow exceptions permit courts to look beyond the record in rare and clearly defined circumstances. *See Camp v. Pitts*, 411 U.S. 138, 141-42 (1973); *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 742-745 (1985); *Atieh v. Riordan*, 727 F.3d 73, 75 (1st Cir. 2013); *see, e.g.*, *Charlton Mem'l Hosp. v. Sullivan*, 816 F. Supp. 50, 51 (D. Mass. 1993) (plaintiff's equal protection claim "cannot so transform the case that it ceases to be primarily a case involving judicial review of agency action").

136

This principle of limited review "reflects the recognition that further judicial inquiry into 'executive motivation' represents 'a substantial intrusion' into the workings of another branch of Government and should normally be avoided." *Department of Commerce*, 588 U.S. at 780-81 (citations omitted). Limited extra-record discovery may be permitted "to facilitate our comprehension of the record or the agency's decision" or there has been a "strong showing of bad faith or improper behavior." *City of Taunton, Massachusetts v. United States Env't Prot. Agency*, 895 F.3d 120, 127 (1st Cir. 2018). But before a court may order extra-record discovery, it must first find that the record is incomplete and grant the agency an opportunity to cure the deficiency. *Department of Commerce*, 588 U.S. at 776.

Plaintiffs have not established that the administrative record in this case was incomplete and required supplementation through discovery. While they argue they should not be constrained by an administrative record where the Government denies the very existence of the policy in question, *see* Dkt. 115 at 18-19, their reasoning is circular. Plaintiffs should not benefit from yet further intrusion into Government practices simply because they cannot prove the existence of a policy or show they have been harmed by it. Rather, more is required—such as a showing of bad faith—before the Court may look to supplement the record or order limited discovery. *City of Taunton*, 895 F.3d at 127. But Plaintiffs have made no effort to make such a showing, nor could they. Not only did the evidence adduced at trial conclusively establish the lack of an ideological deportation policy, but it also showed, time and again, that government officials obeyed the law in carrying out

137

their duties. From the agents supervising the arrests of the individual noncitizens, to the senior-ranking State Department and DHS officials who evaluated whether the actions of the individual noncitizens rendered them removable, all acted within the confines of the law. *See generally* July 11 Tr. at 111:1-116:9 (John Armstrong's testimony concerning ███████████████████████████████ ███████████████████████████████████████████████████ ████████████, as discussed in Exhibits 8, 12, 19, and 21, ████████████ ██████████████████████████████████); *see also* July 11 Tr. at 116:19-24 (John Armstrong's testimony discussing Exhibit 16, █████████████ ███████████████████████████████████████████.

And further, none of the government officials testified that they took any enforcement action against the Plaintiff organizations or any of their members. *Compare* July 7 Tr. at 59:10-16 (Megan Hyska's testimony that, following the arrest of Rümeysa Öztürk, she chose not to attempt to publish an Op-Ed she wrote critical of the Trump Administration) *with* July 7 Tr. at 101:25-102:15 (Ms. Hyska's testimony that she has never been detained or arrested, and in 2025, she has never been questioned by an official of the United States Government other than when she underwent routine inspection when reentering the country in January 2025); *compare* 131:25-132:15, 140:19-21, 132:17-21, 134:8-23, 143:6-17, 144:4-12 (Nadje Al-Ali's testimony that, following Mr. Khalil's arrest, she altered her international travel plans, declined research, conference, and fellowship opportunities, elected not to pursue writing an article she was considering authoring, did not attend MESA's

annual meeting, and declined chairing the human rights committee of the Women's Association of Middle East Studies ) *and* July 8 Tr. at 19:5-15, 20:2-15 (Nadje Al-Ali's testimony that following Mr. Khalil's arrest, she did not sign onto letters or facilitate meetings concerning the conflict in Israel and Palestine) *with* July 8 Tr. at 19:10-15, 37:4-8, 43:23-44:21 (Ms. Al-Ali's testimony that she has never been arrested, detained, or questioned at a protest, nor was she detained, questioned about her scholarship related to Palestine, or subjected to any inspection other than routine re-entry inspection when she re-entered the United States in March 2025, despite being accused by a private organization, Camera, of associating with pro-Hamas causes); *compare* July 8 Tr. at 88:12-90:10 (Bernhard Nickel's testimony that, following the arrest of Rümeysa Öztürk, he refrained from traveling internationally for personal and professional purposes) *with* July 8 Tr. at 115:16-19 (Mr. Nickel's affirmation that he has never received any communication from anyone in the U.S. Government relating to political speech in which he has engaged).

Thus, even with the extraordinary opportunity to examine and scrutinize the inner workings of Defendants' immigration enforcement actions, Plaintiffs still have not demonstrated their entitlement to relief under the APA.

## **CONCLUSION**

Given that plaintiffs have failed to show standing, the existence of an alleged ideological deportation policy, as well as carrying any of the burdens of proof and

139

standards of review applicable to their claims, the Court should enter judgment for

the Defendants on all counts.


Respectfully Submitted,

BRETT A. SHUMATE                          WILLIAM KANELLIS
Assistant Attorney General

DREW C. ENSIGN                            *Ethan B. Kanter*
*Deputy Assistant Attorney General*       ETHAN B. KANTER
                                          *Chief, National Security Unit*
                                          *Office of Immigration Litigation*
                                          *Civil Division, U.S. Department of Justice*
                                          *P.O. Box 878, Ben Franklin Station*
                                          *Washington, D.C. 20001*

                                          PAUL F. STONE
                                          *Deputy Chief, National Security Unit*
                                          *Office of Immigration Litigation*

                                          *Counsel for Defendants*

Dated: August 4, 2025

140

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.


Date: August 4, 2025

By: *Ethan B. Kanter*
ETHAN B. KANTER
*Chief, National Security Unit*
*Office of Immigration Litigation*
*P.O. Box 878, Ben Franklin Station*
*Washington, D.C. 20001*