Post card dated June 19, 2025
(On file in Chambers)

19 JUNE 2025

TRUMP HAS PARDONS
AND TANKS...
WHAT DO YOU
HAVE ?

Dear Mr. or Ms. Anonymous,
    Alone, I have nothing but my
sense of duty.
    Together, We the People of the
United States -- you and me --
have our magnificent Constitution.
    Here's how that works out in a
specific case --

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                   )
AMERICAN ASSOCIATION OF            )
UNIVERSITY PROFESSORS,             )
AMERICAN ASSOCIATION OF            )
UNIVERSITY PROFESSORS -- HARVARD   )
FACULTY CHAPTER,                   )
AMERICAN ASSOCIATION OF            )
UNIVERSITY PROFESSORS AT NEW       )
YORK UNIVERSITY,                   )
RUTGERS AMERICAN ASSOCIATION OF    )
UNIVERSITY PROFESSORS-AMERICAN     )
FEDERATION OF TEACHERS, and        )        CIVIL ACTION NO.
MIDDLE EAST STUDIES ASSOCIATION,   )        25-10685-WGY
                                   )
                 Plaintiffs,       )
         v.                        )
                                   )
MARCO RUBIO, in his official       )
capacity as Secretary of State,    )
and the DEPARTMENT OF STATE,       )
KRISTI NOEM, in her official       )

[1]

```
capacity as Secretary of Homeland  )
Security, and the                  )
DEPARTMENT OF HOMELAND SECURITY,   )
TODD LYONS, in his official        )
capacity as Acting Director of     )
U.S. Immigration and               )
Customs Enforcement,               )
DONALD J. TRUMP, in his official   )
Capacity as President of           )
the United States, and             )
UNITED STATES OF AMERICA,          )
                                   )
                 Defendants.       )
_____)
```

YOUNG, D.J.                                    September 30, 2025

**FINDINGS OF FACT AND RULINGS OF LAW,**
**PURSUANT TO FED. R. CIV. P. 52(A)**

Proposed by Congress in 1789, and ratified in 1791, the
First Amendment to the Constitution of the United States -- its
words carved in New Hampshire granite on the exterior of the
very courthouse in which this Court sits -- provides:

**Congress shall make no law respecting an establishment of
religion, or prohibiting the free exercise thereof; or
abridging the freedom of speech, or of the press; or the
right of the people peaceably to assemble, and to petition
the Government for a redress of grievances.**

U.S. Const. amend. I.

**I.    INTRODUCTION**

On January 20, 2025, the first day of President Donald
Trump's second term in office, he promulgated 26 Executive
Orders. Executive Order 14149, entitled "Restoring Freedom of

Speech and Ending Federal Censorship",[1] ostensibly issued to reverse conduct of his predecessor, barred federal officials from "any conduct that would unconstitutionally abridge the free speech of any American citizen." Id. at § 2(b). President Trump here makes clear that, in his view, the First Amendment's protection of freedom of speech applies to American citizens alone, and to an unconstitutionally narrow view of citizenship at that.

This case -- perhaps the most important ever to fall within the jurisdiction of this district court -- squarely presents the issue whether non-citizens lawfully present here in United States actually have the same free speech rights as the rest of us. The Court answers this Constitutional question unequivocally "yes, they do." "No law" means "no law." The First Amendment does not draw President Trump's invidious distinction and it is not to be found in our history or

_____

[1] See Executive Order 14160, entitled "Protecting the Meaning and Value of American Citizenship", Exec. Order No. 14160, 90 Fed. Reg. 8449 (Jan. 20, 2025), unconstitutionally attempting -- by executive fiat -- to extinguish birthright citizenship. Doe v. Trump, 766 F. Supp. 3d 266, 289 (D. Mass. 2025), aff'd sub nom. New Jersey v. Trump, No. 25-1200, 2025 WL 2495232 (1st Cir. Apr. 23, 2025) ("[T]he Constitution confers birthright citizenship broadly, including to persons within the categories described in the EO. Under the plain language of the Citizenship Clause and the INA provision that later borrowed its wording, and pursuant to binding Supreme Court precedent, the Court concludes that the plaintiffs' constitutional and statutory challenges to [Executive Order 14160] are likely to prevail.") (Sorokin, J.).

jurisprudence. <u>See</u> Section III.A <u>infra</u>.  No one's freedom of speech is unlimited, of course, but these limits are the same for both citizens and non-citizens alike.

With this constitution ruling firmly undergirding its approach, the Court here held a full hearing and a nine-day bench trial on the issue of whether the rights of these plaintiffs to constitutional freedom of speech have been unconstitutionally chilled by the deliberate conduct of any or all of these Public Official defendants.  The Court heard 15 witnesses and admitted 250 exhibits consisting of documents, photographs, and video clips.[2]

Having carefully considered the entirety of the record, this Court finds by clear and convincing evidence[3] that the Secretary of Homeland Security Kristi Noem and the Secretary of State Marco Rubio, together with the subordinate officials and

---

[2] All of the agreed-to Exhibits 1 – 231 were admitted as matter of course.  As for the balance of the numbered exhibits, those were admitted during the trial.

[3] As applicable here, "[t]he usual standard of proof in civil litigation is preponderance of the evidence." <u>E.M.D. Sales, Inc.</u> v. <u>Carrera</u>, 604 U.S. 45, 47 (2025).  "A more demanding standard, such as clear and convincing evidence, applies only when a statute or the Constitution requires a heightened standard or in certain other rare cases, such as 'when the government seeks to take unusual coercive action— action more dramatic than entering an award of money damages or other conventional relief—against an individual.'"  <u>Id.</u>(quoting <u>Price Waterhouse</u> v. <u>Hopkins</u>, 490 U.S. 228, 253 (1989) (plurality opinion)).  Nevertheless, the Court considers the facts here so compelling as to meet and exceed the higher standard.

agents of each of them, deliberately and with purposeful aforethought, did so concert their actions and those of their two departments intentionally to chill the rights to freedom of speech and peacefully to assemble of the non-citizen plaintiff members of the plaintiff associations.  What remains after issuing this opinion is to consider what, if anything, may be done to remedy these constitutional violations.

## II.  FINDINGS OF FACT[4]

Actually, there is but little dispute over the facts. Here they are:

### A. The Plaintiff Associations –– AAUP and MESA.

AAUP is a nonprofit membership association and labor union of faculty, graduate students, and other academic professionals with chapters at universities across the country.  As AAUP's general counsel, Veena Dubal ("Professor Dubal"), testified, "AAUP is one of the nation's oldest professional organizations" that represents faculty and graduate student workers at universities and colleges in the United States, Trial Tr. vol. I, 67:23-25-68:1 Jul. 18, 2025.  AAUP's goal is to "define and

---

[4] As this Court has reiterated during trial, we live in the real world.  There are facts that exist outside those presented at trial of which the Court can take judicial notice and other facts of general knowledge which while not dispositive of any issue here, provide context.  Those facts are presented mostly in the footnotes to these Findings of Fact and have citation references outside of the record.

protect academic freedom and shared-governance principles." Id. 68:1-3.  Central to its mission, since 1915, is to protect its members' right to engage extramural speech.  Id. 68:4-9; 69:1-5. That is, speech made purely as a citizen, not as a researcher or scholar.  Id. 68:11-15.

AAUP is a national organization, and also has chapters at various universities and colleges, which include both advocacy and collective bargaining functions.  Trial Tr. vol. I, 70:1-11, Jul. 18, 2025.  AAUP--Harvard Faculty Chapter is the AAUP chapter for Harvard faculty, AAUP at New York University is the AAUP chapter for NYU faculty, and Rutgers AAUP--American Federation of Teachers is the Rutgers AAUP chapter for Rutgers University.

The Middle East Studies Association ("MESA") is "the largest international organization that focuses on Middle East studies."  Trial Tr. vol. II 129:24-130:1, Jul. 7, 2025. According to its website, its mission is  "to foster[] the study of the Middle East; to promote high standards of scholarship and teaching; and encourage public understanding of the region and its peoples through programs, publications, and services."  MESA Strategic Plan, 2021-2025, MESA Mission Statement, Ex. 133.

**B.  The Relevant Immigration and Nationality Act Statutes –
INA 212 and INA 237 Foreign Policy Non-Citizen
Exclusions, and INA 221(i) Visa Revocations**

Congress passed the Immigration and Nationality Act, 8
U.S.C. § 1101 et seq., ("INA") in 1952.  As set forth below,
Congress delegated to the Secretary of State significant
authority to exclude or classify as deportable non-citizens from
the United States, and to revoke visas.

**1.  Foreign Policy Reasons Making a Non-Citizen
Excludable (INA 212(a)(3)(C))**

For non-citizens attempting to gain entry to the United
States, pursuant to 8 U.S.C. § 1182(a)(3)(C)(i) ("INA
212(a)(3)(C)" or "Section 3C"), a non-citizen "whose entry or
proposed activities in the United States the Secretary of State
has reasonable ground to believe would have potentially serious
adverse foreign policy consequences for the United States is
inadmissible."  Id.  Congress has clarified that a non-citizen
is generally not "excludable or subject to restrictions or
conditions on entry into the United States" on account of the
non-citizen's "past, current, or expected beliefs, statements,
or associations, if such beliefs, statements, or associations
would be lawful within the United States, unless the Secretary
of State personally determines that the [non-citizen's]
admission would compromise a compelling United States foreign
policy interest."  Id. § 1182(a)(3)(C)(iii).

[7]

## 2.    Foreign Policy Reasons Making a Non-Citizen Deportable (INA 237(a)(4)(C))

For non-citizens already present in the United States, pursuant to 8 U.S.C. § 1227(a)(4)(C)(i) ("INA 237(a)(4)(C)" or "Section 4C"), a non-citizen "whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable."  Id.

INA 237(a)(4)(C) incorporates the same exception from Section 3C.  That is, while a non-citizen present in the United States is generally not deportable on account of the non-citizen's "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States" that non-citizen may be removed if "the Secretary of State personally determines that the [non-citizen's] admission would compromise a compelling United States foreign policy interest."  8 U.S.C. § 1182(a)(3)(C)(iii), as incorporated by 8 U.S.C. § 1227(a)(4)(C)(ii).  Essentially, INA 212(a)(3)(C) and INA 237(a)(4)(C)'s exceptions place profound -- but narrow -- exclusion and deportability classification power solely with the Secretary of State.[5]

_____

[5] Since the implementation of INA 237(a)(4)(C), it has only been applied in a handful of instances prior to 2025, and there

[8]

### 3.    Visa Revocations under INA 221(i)

With respect to a non-citizen visa holder, pursuant to 8
U.S.C. § 1201(i) ("INA 221(i)"), "[a]fter the issuance of a visa
or other documentation to any alien, the consular officer or the
Secretary of State may at any time, in his discretion, revoke
such visa or other documentation."  Discretion is guided by
Chapter 9 of the Foreign Affairs Manual ("FAM"), consular
guidance through cables, emails and webinars distributed by the
State Department.  Trial Tr. vol. I, 21:1-23, Jul. 11, 2025.
INA 221(i) does not contain a provision with respect to
revocations of visas based upon past, current, or expected
beliefs, statements, or associations, if such beliefs,
statements, or associations would be lawful within the United
States, such as appears in INA 237(a)(3)(C) and INA
237(a)(4)(C)'s exceptions.

### C. The United States Government's Relevant Organizational Structure Concerning Immigration and Removal

#### 1. The Department of State

The Department of State is charged with, among other
things, determining whether and on what conditions non-citizens
are admitted to, and permitted to retain status to remain in,
the United States.  See 8 U.S.C. § 1104.  The Department of

---

is no evidence of it ever having been employed in the context of
domestic speech.  See note 19, infra.

State is headed by the Defendant Secretary Marco Rubio ("Secretary Rubio"), a Presidential-appointed and Senate-confirmed Cabinet member.  As pertinent to this action, Senior Bureau Official of the Bureau of Consular Affairs John Armstrong ("SBO Armstrong") is the highest ranking consular official at the Department of State's Bureau of Consular Affairs, holding that position since February 27, 2025.  Trial Tr. vol. II, 78:7-14, 81:2-4, Jul. 11, 2025.

### 2. The Department of Homeland Security

The Department of Homeland Security ("DHS") is responsible for, among other things, the protection of the United States from internal threats just as the Department of Defense protects the nation from external threats.  The Department of Homeland Security is headed by the Defendant Secretary Kristi Noem ("Secretary Noem"), a Presidential-appointed and Senate-confirmed Cabinet member.  DHS oversees Immigration and Customs Enforcement ("ICE") (and its Enforcement and Removal Operations branch ("ICE-ERO" or "ERO")), which oversees the Department of Homeland Security Investigations ("HSI").  Trial Tr. vol. I, 43:7-8; 42:25-43:4, Jul. 9, 2025.  "HSI's mission is to dismantle transnational criminal organizations." Id. 54:18-19.

Assistant Director of the National Security Division of ICE, Andre Watson ("AD Watson"), is the "senior-most" ranking

official at the National Security Division.  Trial Tr., vol. I,
60:16-23, Jul. 17, 2025.

Assistant Director Peter Hatch ("AD Hatch") is the most
senior official at the Office of Intelligence, which operates
under the umbrella of HSI.  Trial Tr. vol. I, 42:25-43:12, 55:
16-21, Jul. 9, 2025.  The Office of Intelligence supports
investigations by producing research and analysis, traditionally
on "criminal networks, criminal conspiracies, [and] those
engaged in criminal conduct." Id. 56:2-5.  AD Hatch oversees the
compilation of intelligence reports known as Reports of Analysis
("ROAs").  Id. 56:18-21.  ROAs are compiled by approximately
1,000 analysts who conduct investigations and review a variety
of non-public and publicly available sources, otherwise known as
"open source,"  Trial Tr. vol. I, 54:18-55:19, Jul. 10 2025, to
inform, among other things, on possible violations of the INA
and criminal laws to DHS and other agencies.  Trial Tr. vol. I,
55:25-56:1, Jul. 9. 2025.  Hatch reviews approximately 1,000
ROAs per year, and his office produces about 25,000 - 30,000
ROAs in total in any given year.  Id. 49:1-4, 50:1-4.  With
respect to the student protests, Hatch reviewed approximately
100 ROAs.  Id. 53: 12-16.  There were approximately 100-200 ROAs
total generated with respect to student protests.  Id. 54:5-11.

While there is an internal review process, AD Hatch does not
"sign off" on ROAs.  Id. 64:10-25.[6]

### 3.  The Process of Initiation of Removal of Non-citizens under INA 237(a)(4)(C) or the Revocation of Visas under INA 221(i).

Since March 2025, the process for initiating the removal of
a non-citizen under INA 237(a)(4)(C) is straight-forward.  Under
the process at issue in this action, HSI issues an ROA which is
then presented to the National Security Division.  Trial Tr.
vol. II, 100:12-17, Jul. 9, 2025.  Upon review, if AD Watson and
his team determines that it is appropriate, he sends a letter to
the Department of State, id. 100:9-11, sometimes referred to as
a "DHS Referral Letter."  That DHS Referral Letter is reviewed,
and a recommendation is made directly to SBO Armstrong if it
concerns revocation of a visa under INA 221(i), Trial Tr. vol.
I, 54:14-55:9,  65:10-23, Jul. 18, 2025, or, if it concerns a
lawful permanent resident or a foreign policy reason, a
recommendation is made by SBO Armstrong to Secretary Rubio, so
he may then make the statutorily required personal determination

---

[6] These agencies' public servants' contributions and
sacrifices made in protecting the Nation are not lost on this
Court.  SBO Armstrong summed it up on the last day of trial:
"This is not a mundane thing.  If we get this wrong, we get the
Molotov cocktail attack in Colorado.  If we get these sort of
things wrong, you get the Boston Bomber.  If we get this stuff
wrong, you get 9/11."  Trial Tr. vol. I, 33: 1-5, Jul. 18, 2025.
While their efforts are oft times necessarily carried out in
secret, the enormous responsibilities and pressures these public
servants bear is acknowledged and appreciated.

as to whether the non-citizen ought be removed, under INA

237(a)(4)(C).  <u>Id.</u>  45:7-14, 50:11-23, Jul. 18, 2025.  If the

recommendation is approved, SBO Armstrong or Secretary Rubio

informs Secretary Noem, ICE, and HSI of the change in status of

the non-citizen.  Trial Tr. vol. II 91:23-92:4, Jul. 11, 2025.

If detention is sought, an administrative Form I-200 (HHS calls

it a "warrant") is then issued.[7]

### D. Timeline of Relevant Events

      **1.  Former President Biden's Secretary of Homeland Security Mayorkas Implements Written Policy Banning Consideration of Exercise of First Amendment Rights in Enforcement of INA.**

On September 30, 2021, Secretary of Homeland Security

Alejandro Mayorkas issued a memorandum stating, in pertinent

part:

> We must exercise our discretionary authority in a way that protects civil rights and civil liberties. The integrity of our work and our Department depend on it.  A noncitizen's race, religion, gender, sexual orientation or gender identity, national origin, or political associations shall never be factors in deciding to take enforcement action.  A noncitizen's exercise of their First Amendment rights also should never be a factor in deciding to take enforcement action.  We must ensure that enforcement actions are not discriminatory and do not lead to inequitable outcomes.

---

[7] <u>See</u> note 20, <u>infra</u>.

[13]

Memorandum from Alejandro N. Mayorkas, Sec'y, U.S. Dept. of
Homeland Sec., to Tae D. Johnson, Acting Director, U.S. Immigr.
& Customs Enf't 5 (Sept. 30, 2021).

### 2. October 7, 2023 Terror Attack in Israel

According to a 2023 State Department Report, "[o]n October
7, [2023] Hamas, Palestinian Islamic Jihad, and other
Palestinian terrorists launched a large-scale attack on Israel
from the Gaza Strip, killing an estimated 1,200 individuals,
injuring more than 5,400, and abducting 253 hostages. Israel
responded with a sustained, wide-scale military operation in
Gaza, which had killed more than 21,000 Palestinians and injured
more than 56,000 by the end of the year, displaced the vast
majority of Palestinians in Gaza, and resulted in a severe
humanitarian crisis." 2023 Country Reports on Human Rights
Practices: Israel, West Bank and Gaza,
https://www.state.gov/reports/2023-country-reports-on-human-
rights-practices/israel-west-bank-and-gaza/.[8]

Demonstrations on college campuses across the United States
ensued, many of which were pro-Palestine/anti-Israel. Many
protesters were non-citizens, many here on non-immigrant visas,
see 8 U.S.C. §1101, 1184, or lawful permanent resident status

---

[8] At trial, the Court in effect took judicial notice of this
event. Trial Tr. vol. II, 112:14-16, Jul. 17, 2025, and the
parties do not dispute the occurrence of the October 7 attack.

[14]

("Lawful Permanent Resident"), see 8 U.S.C. § 1151(a), so-called Green Card holders, of the United States.

In the wake of the October 2023 Hamas terror attack, the foreign policy of the United States under the Biden Administration was staunchly pro-Israel. This foreign policy has continued under the Trump administration. If anything, it has become even more strongly pro-Israel, following in virtual lock-step the foreign policy of the State of Israel.

### 3.    January 2025 – Executive Orders Issued that Blend Legally Protected Speech and Unprotected Speech

#### a.    Executive Order 14161

On January 20, 2025, upon President Trump's inauguration for his second term, he issued Executive Order 14161, entitled "Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats." Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 30, 2025), Ex. 70. The President declared that "[i]t is the policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, **espouse hateful ideology**, or otherwise exploit the immigration laws for malevolent purposes." Id. at § 1(a) (emphasis added). That Executive Order further states that "the United States must ensure that admitted aliens and aliens otherwise already present in the United States **do not bear hostile attitudes toward its**

[15]

**citizens, culture, government, institutions, or founding principles,** and do not advocate for, aid, or support designated foreign terrorists and other threats to our national security." Id. at § 1(b) (emphasis added).[9]

### b. Executive Order 14188

On January 29, 2025, the President issued Executive Order No. 14188, entitled "Additional Measures To Combat Anti-Semitism." Exec. Order No. 14188, 90 Fed. Reg. 8847 (Jan. 29, 2025). The President declared in that Executive Order that **"[i]t shall be the policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence."** Id. at § 2. That Executive Order reaffirmed an earlier Executive Order,[10] "and directs additional measures to advance

---

[9] Another court has questioned the undefined "hostile attitudes" language. Aditya W. H. v. Trump, No. 25-CV-1976 (KMM/JFD), 2025 WL 1420131, at *11 (D. Minn. May 14, 2025)(Menendez, J.) ("Executive Order 14161 demonstrates the government's intent to focus on the vaguely defined category of noncitizens within the United States who purportedly bear "hostile attitudes" toward Americans or U.S. culture and institutions.").

[10] Executive Order 13899, "Combating Anti-Semitism," was issued during the President's first term. Exec. Order No. 13899, 84 Fed. Reg. 68779 (2019). In that Executive Order, the President directed that in considering evidence of discrimination under Title VI of the Civil Rights Act of 1964 (Title VI), 42 U.S.C. 2000d et seq., as relating to anti-Semitism, "agencies shall not diminish or infringe upon any

the policy thereof in the wake of the Hamas terrorist attacks of October 7, 2023, against the people of Israel." Id. at § 1. According to the President, the "attacks unleashed an unprecedented wave of vile anti-Semitic discrimination, vandalism, and violence against our citizens, especially in our schools and on our campuses," and as a result "Jewish students have faced an unrelenting barrage of discrimination; denial of access to campus common areas and facilities, including libraries and classrooms; and intimidation, harassment, and physical threats and assault." Id.

The President ordered that within 60 days "the head of each executive department or agency [was to] submit a report to the President, . . . identifying all civil and criminal authorities or actions within the jurisdiction of that agency, beyond those already implemented under Executive Order 13899, that might be used to curb or combat anti-Semitism, and containing an inventory and analysis of all pending administrative complaints, as of the date of the report, against or involving institutions of higher education alleging civil-rights violations related to or arising from post-October 7, 2023, campus anti-Semitism." Id. at § 3.

---

right protected under Federal law or under the First Amendment." Id. at § 2(b).

Additionally, the President ordered that "the Secretary of State, . . . and the Secretary of Homeland Security, in consultation with each other, shall include in their reports recommendations for familiarizing institutions of higher education with the grounds for inadmissibility under 8 U.S.C. 1182(a)(3)[11] so that such institutions may monitor for and report activities by alien students and staff relevant to those grounds and for ensuring that such reports about aliens lead, as appropriate and consistent with applicable law, to investigations and, if warranted, actions to remove such aliens." Id. at § 3(e).

The President issued a fact sheet along with Executive Order 14188, explaining that the Department of Justice would take "immediate action" to, among other things, "investigate **and punish** anti-Jewish racism in leftist, anti-American colleges and universities." Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism (emphasis added), Ex. 45; Stipulation and Order ("Stipulation No. __"), Stipulation No. 22, ECF No. 130; see also Ex. 23. He also made the following statement in that fact sheet:

> **To all the resident aliens who joined in the pro-jihadist protests,** we put you on notice: **come 2025, we will find you, and we will deport you.  I will also**

---

[11] Section 1182(a)(3) of Title 8 of the United Sates Code enumerates security and related grounds that make aliens inadmissible to the United States, including INA 212(a)(3)(C).

> **quickly cancel the student visas of all Hamas
> sympathizers on college campuses,** which have been
> infested with radicalism like never before.

Id. at 2 (emphasis added).

### 4.     February 2025

#### a.    The Department of Justice Forms the Federal Government Task Force To Combat Anti-Semitism

On **February 3, 2025,** the Department of Justice announced
the creation of the Task Force to Combat Anti-Semitism ("Task
Force"), coordinated through its Civil Rights Division.[12]  "The
Task Force's first priority will be to root out anti-Semitic
harassment in schools and on college campuses."  Id.

#### b.    Diplomatic Cables Issued To Ensure Maximum Vetting of Visas

On **February 28, 2025,** Secretary Rubio issued a diplomatic
cable entitled "Catch and Revoke: National Security Through
Timely Processing of Visa Systems Messages" ("Catch and Revoke
Cable").  25 STATE 17178, Ex. 51; see Trial Tr. vol II, 99:12 –
100:2, Jul. 11, 2025.  That cable implements Executive Order
14161, explaining in its summary that because "the Department is
directed to ensure **maximum screening and vetting** throughout the
visa process," consular officers must "use the whole-of-
government law enforcement systems to vigilantly monitor the
activities of aliens -- whether they are inside the United

---

[12] See https://www.justice.gov/opa/pr/justice-department-
announces-formation-task-force-combat-anti-semitism.

States or not." Catch and Revoke Cable 1. Furthermore, if a consular officer "catches an alien misusing a visa, the officer should generally revoke it" under INA 221(i). Catch and Revoke Cable at 1 The cable anticipates domestic consumption, providing that "[r]equests for revocation of visas where the individual is in the United States must be sent to the Revocation Team[.]" Id. at 5.

SBO Armstrong testified that the Catch and Revoke Cable, known as an "all back," and sent to over 200 diplomatic posts abroad. Trial Tr. Vol. II, 100:18-25, Jul. 11, 2025. According to SBO Armstrong, the Catch and Revoke Cable did not provide new legal authority for revoking visas, but rather relied on existing legal authority under INA 221(i). Id. 101:14-18. Indeed, according to SBO Armstrong, the Catch and Revoke Cable increased vigilance of using this authority. Id. 101:6-10. According to SBO Armstrong, the Department of State also performed a partial review of its Section 3(C) policies for visa denials. Id. 105:7-15.

The Catch and Revoke guidance was apparently successful, as a cable was later updated in May 2025, with guidance that relayed the doubling of visa revocations, and a 150% increase in visa revocations over the same time period of March 1 through April 15, 2024. "Caught and Revoked: Update Guidance on Systems Messages", 25 STATE 45612, Ex. 50.

5.    March 2025

a.    The Homeland Security Council Held Multiple
       Meetings with Agencies to Align with the
       Executive Orders on Anti-Semitism

The Homeland Security Council is an executive branch

council under the Executive Office of the President.  Although

the Council is not "secret," the Public Officials claimed

privilege as to its membership, Trial Tr. vol. I, 45:6-16, and

of course much of what it does is necessarily concealed from the

public.  At least with respect to certain members, membership is

a matter of public record based upon their positions in the

government.[13]  Notably, White House Deputy Chief of Staff Stephen

Miller ("Deputy Chief of Staff Miller"), is also the Homeland

Security Advisor to the Homeland Security Council.  Trial Tr.

vol. I 47:5-6, Jul. 11, 2025; Trial Tr. vol. II, 114:22-24, July

17, 2025.

Throughout March 2025, the Homeland Security Council held

interagency meetings to discuss, among other things, student

visa revocations.  Trial Tr., vol. I, 42:3-6, Jul. 11, 2025;

---

[13] The Administration has set out the contours of the
Homeland Security Council and its membership on the public
record, and therefore any privilege asserted by Public Officials
as to the Council's composition -- at least as to those
officials that fill the titles described in the January 20, 2025
National Security Presidential Memorandum -- is inapplicable or
is waived.  See https://www.whitehouse.gov/presidential-
actions/2025/01/organization-of-the-national-security-council-
and-subcommittees/

[21]

Trial Tr. vol. I, 13:23-14:8, 19:12-20:2, Jul. 18, 2025. These meetings included "DHS, [the] State Department, [the Department of Defense] . . . the White House . . . [and] the Homeland Security [C]ouncil." Armstrong Dep. Tr. 207:21-24. Deputy Chief of Staff Miller, at times his deputy Adam Leason, SBO Armstrong, State Department's Office of Counsel Senior Advisor Andrew Veprek, and Senior Advisor Maureen Smith ("SA Smith") were attendees. Trial Tr. vol. I, 16:11-16, Jul. 18, 2025; Trial Tr. vol. I, 42:17-19, July 11, 2025. Approximately 12-20 meetings took place, mostly during March 2025. Trial Tr. vol. 1, 16:23-24, Jul. 18, 2025; Armstrong Depo. Tr. 201:1-21, 204:15-19.

As for the content of the communications, particularly from Deputy Chief of Staff Miller, the Public Officials assert the presidential communications privilege. For purposes of this action, the limited content of the communications disclosed from Deputy Chief of Staff Miller is unnecessary, and therefore the Court need not rule on the assertions of privilege with respect to those communications. The Court nevertheless infers from the timing and number of these meetings, that these weekly meetings logically were intended to implement the Administration's policies with respect to the executive orders, that the White House did not provide any guidance that contradicted the Public Officials' interpretations of the Executive Orders, and their

actions related thereto as set forth below.  To be sure, there is no evidence in the record that the President had any participation other than the Executive Orders and public statements attributed to him.

### b.  DHS Investigates Campus Protestors

In early March, AD Hatch attended a meeting with HSI senior leadership.  Trial Tr. vol. I, 71:15-20, Jul. 9, 2025.  The Office of Intelligence focused on non-citizens, being charged "[t]o look at the protesters, to develop reports of analysis on the protesters, specifically looking for violations of U.S. laws, including and specific to **immigration and customs laws.**"  Trial Tr. vol. I, 74:14-17, Jul. 9, 2025 (emphasis added).  As Hatch related:

> Thinking in general terms, it was anything that may relate to national security or public safety issues, things like were any of the protesters violent or inciting violence? I think that's a clear obvious one.  Were any of them supporting terrorist organizations?  Were any of them involved in obstruction or unlawful activity in the protest . . . .  Like blocking normal citizens from going about their business . . . .  And that we would use the normal report of analysis process and our normal trade craft for this.

Id. 74:20-75:7-7.  Notably, no direction or definition as to what "supporting terrorist organizations" was provided.  Trial Tr. vol. II 93:4-8, Jul. 9, 2025.  AD Hatch stated, however, that his office performed their analysis in the usual manner.  Id. 93: 9-13.  As Hatch testified:

[23]

Q.  What does "supporting a terrorist organization"
mean when you say it?

A.  (Pause.) Again the analyst looks for indicators,
does not make the judgment on whether the activity
actually supports or doesn't support terrorism.  So we
look for activities, um, such as, um, support for a
terrorist -- statements in support of a terrorist
leader, um, everything from that to material support,
which would be providing money to a terrorist
organization or making, um, donations to an
organization that's affiliated with a terrorist
organization.  But I really don't want to say any more
detail than that.

Id. 93:21-25, 94:1-7.

AD Hatch was told by DHS leadership (Hatch could not recall who) to review the names of student protestors on the Canary Mission website, which contains a database of over 5,000 individuals.  Id., 109-111.  Canary Mission's website purports to "document[] individuals and organizations that promote hatred of the USA, Israel and Jews on North American college campuses and beyond."  See "Our Mission", Canary Mission, Ex. 229.[14] Prior to March 2025, AD Hatch was unaware of the Canary Mission website.  Id. 112:18-22.

Within about a week of the early March meeting, a so-called "Tiger Team" was assembled to expedite the preparation of ROAs.

---

[14] The Public Officials are correct that Court did not admit the exhibit with respect to the Canary Mission website, Ex. 229, for its truth.  It makes no findings as to the truth of Canary Mission, its website, its contents, or its portrayal those individuals listed therein.  It is admitted as evidence of what the Public Officials viewed as Canary Mission's website as a primary source to investigate non-citizen student protesters.

Id. 98:8-25-99:3.  Hatch confirmed that the Tiger Team's process

was that: (1) the Office of Intelligence would fact find; (2)

the National Security Division of Homeland Security

Investigations would compile the information and provide it to

the State Department; and (3) the State Department would decide

on what action to take, if any.  Id. 98:20-99:3.  The use of the

term "Tiger Team" is not pejorative.  It is a common internal

practice referring to the speed and intensity of the work to be

completed.  The phrase was not intended to intimidate or,

indeed, to be publicly known.  Trial Tr. vol. II, 95:17-97:8,

Jul. 10, 2025.

Due to the workload, the requirement to review all 5,000

individuals on the Canary Mission Website, the assembly of the

Tiger Team required analysts be taken off of the

"Counterintelligence Unit, the Counterterrorism Intelligence

Unit, from the Cyber Intelligence Unit, from the Global Trade

Intelligence Unit, from all different parts of HSI

intelligence."  Trial Tr. vol. II, 106:16-21, Jul. 9, 2025.[15]

_____

[15] According to AD Hatch, the Tiger Team was needed because
"the normal unit or section or group of analysts . . . operating
in [the] normal organizational construct couldn't handle that
workload."  Id. 111:3-5.  When asked about deadlines, AD Hatch
responded, "We are an organization or an agency that, um, in a
world where . . . taking months to do things is not acceptable.
So, yeah, it -- we were not -- I was not  going to be allowed to
say we've got 5 -- well you know a small number of analysts on
this, it's going to take them 6 months to get through 5,000
names. I was not given a deadline.  But I knew from how we were

Canary Mission's list made up the bulk of the sources for HSI's investigations. Trial Tr. vol. I, 15:10-13, Jul. 10, 2025. There were others. For example, Hatch also related that the team relied on Betar U.S.'s website for additional names. Trial Tr. vol. I, 19: 7-16, Jul. 10, 2025. He was also provided lists of names from HSI "top leadership". Trial Tr. vol. II, 79:13-25, 80:25-81:5, July 10, 2025. Some of these leads apparently came the Office of the Border Czar, Tom Homan. Id. 79:10-19, 81:18-20.

Review of protest activity was new for AD Hatch, who had been in his position since 2019, and had not been requested to undertake such activity prior to 2025. Trial Tr. vol. I, 66:9-10, Jul. 9, 2025. AD Hatch understood that his department's ROAs were to focus only those engaged in protests because of the volume of names on the lists, which was a deviation from their normal practice of doing an ROA on all of those reviewed. Trial Tr. vol. II, 97:25-98:12, 109:24-110:4, Jul. 10, 2025. Thus, of the approximately 5,000 individuals investigated by the Office of Investigations, ROAs were prepared for less than 5%. Id. 105:15-106:11.

---

organized and how we worked that we needed to work through this expeditiously." Id. 111:10-18. The Court takes no position as to the Public Officials' prioritization of HSI's resources in this manner.

> **c.    The Public Officials Pursue Student Protestors Using an Elastic Definition of Anti-Semitism**

On **March 3, 2025,** the Joint Task Force, including the Department of Health and Human Services, Department of Education, and General Services Administration announced a comprehensive review of higher education contracts and grants "for dereliction of duties to curb or combat Ant-Semitism violence and harassment."[16]  HHS Secretary Robert F. Kennedy, Jr. is quoted as stating, "Anti-Semitism -- like racism -- is a spiritual and moral malady that sickens societies and kills people with lethalities comparable to history's most deadly plagues."  Id.  Further, he stated, "[i]n recent years, the censorship and false narratives of woke cancel culture have transformed our great universities into greenhouses for this deadly and virulent pestilence."  Id.

On **March 4, 2025,** the President posted on social media:

> All Federal Funding will STOP for any College, School, or University that allows illegal protests. **Agitators will be imprisoned/or permanently sent back to the country from which they came.**  American students will be permanently expelled or, depending on the crime, arrested.  NO MASKS!  Thank you for your attention to this matter.

https://truthsocial.com/@realDonaldTrump/posts/114104167452161158 (emphasis added).

---

[16] See https://www.ed.gov/about/news/press-release/ed-hhs-and-gsa-announce-additional-measures-end-anti-semitic-harassment-college-campuses.

On **March 6, 2025,** Secretary Rubio posted the following on social media:

> Those who support designated terrorist organizations, including Hamas, threaten our national security.  The United States has zero tolerance for foreign visitors who support terrorists.  Violators of U.S. law —- including international students —- face visa denial or revocation, and deportation.

March 6, 2025, Secretary Rubio post on X; Stipulation No. 1.

### d.    HSI Investigates and Issues DHS Referral Letters as to Chung and Khalil

On **March 6, 2025,** HSI issued an ROA for Yunseo Chung ("Chung"), a Legal Permanent Resident.  Chung ROA, Ex. 236. According to the report, Chung's criminal history included charges for obstruction of governmental administration, disorderly conduct, and trespass relating to a demonstration at Barnard College that occurred on the previous day.  Id.

That evening, AD Watson signed, but did not compose, a referral letter to Andrea Toll Whiting, Director of Field Operations ("DFO Whiting") at the State Department.  Chung DHS Referral Letter, Ex. 243; Trial Tr. vol. I, 79:16-23, Jul 17, 2025.  The purpose of the letter was "to provide a summary of the actions by Yunseo Chung that violate President Trump's executive orders on anti-Semitism and may be sufficient for the Secretary of State to determine there are compelling adverse

[28]

foreign policy consequences for the United States from" her "presence or activities consistent with" INA 237(a)(4)(C).  Id.

AD Watson stated Chung's Lawful Permanent Resident status, and related that "Chung's involvement in the March 5, 2025, protest at Barnard College, where Hamas fliers were distributed, aligns with the executive order's focus on deporting 'Hamas sympathizers.'"  Id.  He further stated social media posts, "indicate she was a figure in the Barnard College library occupation, where protesters distributed Hamas-authored flyers." Id.

Though there was neither an allegation nor evidence of Chung distributing flyers herself, Watson asserted that "HSI is concerned that the distribution of Hamas-authored flyers, leadership in disruptive protests, [and] involvement in antisemitic activities may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization." Id.  AD Watson concluded by requesting that "the Secretary of State determine whether there are compelling adverse foreign policy consequences for the United States from" Chung's "presence or activities consistent with" INA 237(a)(4)(C) and stated that if it did make that determination, "HSI would initiate removal charges against" Chung.  Id.  The letter

apparently attached a copy of the ROA.  Id.; Trial Tr. vol. I, 78:16-20, July 17, 2025.

On **March 6, 2025,** HSI issued an ROA for Mahmoud Khalil ("Khalil"), a Legal Permanent Resident and spouse of a United States citizen.  Khalil ROA, Ex. 233.  No criminal history was noted in the report.  According to the report, attached news articles and social media posts indicated that Khalil had been critical of Israel and participated in demonstrations at Columbia University, including an article from Canary Mission characterizing him as having "participated in the pro-Hamas encampment at Columbia in April 2024 as a lead negotiator on behalf of Columbia University Apartheid Divest (CUAD), an anti-Israel student coalition."  Id.

On **March 7, 2025,** AD Watson signed, but did not compose, a referral letter to DFO Whiting.  Trial Tr. vol. I, 79: 21-30, Jul. 17, 2025; Khalil DHS Referral Letter, Ex. 242.  That letter -- similar to the Chung DHS Referral letter -- was intended "to provide a summary of the actions by Mahmoud Khalil that violate President Trump's executive orders on anti-Semitism and may be sufficient for the Secretary of State to determine there are compelling adverse foreign policy consequences for the United States from" Khalil's "presence or activities consistent with" INA 237(a)(4)(C).  Id.

AD Watson confirmed Khalil's Lawful Permanent Resident status, and related that "Khalil's involvement in the March 6, 2025, protest at Barnard College, where Hamas fliers were distributed, aligns with the executive order's focus on deporting 'Hamas sympathizers.'"  Id.  He further stated that "[h]is leadership in these disruptive protests **creates a hostile environment for Jewish students**" and that "Khalil is identified as a . . . **prominent pro-Palestinian activist involved in antisemitic activities**."  Id. (emphasis added).  AD Watson continued, stating that the social media posts and news articles attached to the ROA "document his leadership roles, including the occupation of Columbia University's Hamilton Hall in April 2024."  Id.  Further, then-"recent social media posts from March 6, 2025, indicate [Khalil] was a key figure in the Barnard College library occupation, where protestors distributed Hamas-authored flyers."  Id.

Again, though there is neither an allegation nor evidence of Khalil actually distributing flyers (though, as set forth below, the Public Officials allege this anyway), AD Watson asserted that "HSI is concerned that **the** distribution of Hamas-authored flyers, **leadership roles** in antisemitic activities, and **leadership in disruptive protests** may undermine U.S. foreign policy **by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization**."

Id. (emphasis added).  AD Watson concluded by requesting that "the Secretary of State determine whether there are compelling adverse foreign policy consequences for the United States from [Khalil's] presence or activities consistent with" INA 237(a)(4)(C), and that if it did make that determination, "HSI would initiate removal charges against" Khalil.  Id. at 1-2. The letter attached a copy of the ROA.

On **March 8, 2025,** SBO Armstrong authored an "Action Memo for the Secretary" as to both Chung and Khalil.  Mar. 8, 2025 Action Memo for the Secretary ("Chung/Khalil Action Memo"), Ex. 247.  As to Recommendations Nos. 1 and 2, Armstrong recommended that Secretary Rubio "determine the presence and activities of" Chung and Khalil "have potentially serious adverse foreign policy consequences for the United States and would compromise a compelling U.S. foreign policy interest, rendering" them "deportable under" INA 237(a)(4)(C).  Id.  Armstrong relied solely on the DHS Referral Letter from HSI and the ROAs in making his recommendation to Secretary Rubio.  Id.

Notably, Armtrong has never received guidance on what constitutes antisemitism.  Trial Tr. vol. I 25:15-25-28:4, Jul. 18, 2025.  Rather, he believes that "there's a common understanding in our culture in our society of what antisemitism is."  Id. 28:3-4.  Armstrong elaborated as to what he viewed anti-Semitism as definitionally in the absence of guidance:

THE COURT: I'd like to now ask, would you state that,
so I understand it?  What do you think is the common
understanding of what  "antisemitism" is?

THE WITNESS: In my opinion, **antisemitism is
unjustified views, biases, or prejudices, or actions
against Jewish people, or Israel**, that are the result
of hatred towards them.

THE COURT: Thank you.

Q  [(by counsel)].  In other words, in your
understanding **antisemitism includes hatred or
prejudice against Israel and the Israeli people,
right?**

A.  Yes.  In my understanding **antisemites will
sometimes try to hide their views and say they're not
against Jews, they're just against Israel, which is a
farcical argument in my mind.  It's just a dodge.**

Q. It's a dodge.  It's a way of obscuring a person's
antisemitic views?

A.  In my opinion, yes, Counselor.

Id. 28:5-23 (emphasis added).  Armstrong is informed by the

public statements by Secretary Rubio that the United States has

a strong policy against anti-Semitism, particularly on college

campuses.  Id. 21:2-8.  According to Armstrong, this includes

"anyone organizing antisemitic activity in the United States."

Id. 21:21-22:5.

Guidance exists within the Department of State, however,

which has an entire web page dedicated to the definition of

anti-Semitism, in which it acknowledges, among other things,

that "[m]anifestations [of Anti-Semitism] might include the

targeting of the state of Israel, conceived as a Jewish

[33]

collectivity.  However, **criticism of Israel similar to that leveled against any other country cannot be regarded as antisemitic."**  Ex. 210; https://www.state.gov/defining-antisemitism/ (emphasis added).[17]

As for Chung and Khalil, SBO Armstrong forwarded the information provide by AD Watson to Secretary Rubio.  He concluded:

> The activities of Chung and Khalil in the United States have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest, because their participation and roles in antisemitic protests and disruptive activities fosters a hostile environment for Jewish students in the United States, and the public actions undermine U.S. policy to combat anti-Semitism around the world.  Under E.O. 14188, *Additional Measures to Combat Anti-Semitism*, it is the policy of the United States to combat anti-Semitism, using all available and appropriate legal tools to hold to account the perpetrators of unlawful anti-Semitic harassment and

---

[17] As the Court indicated during trial, and discusses further in its rulings of law, infra, "[c]riticisms of the State of Israel are not anti-Semitism, they're political speech, protected speech.  Even strong, . . . vile criticisms of the State of Israel and its policies are protected speech . . . . [T]he [hypothetical or alleged] conduct of the State of Israel [as] –- involve[ing] war crimes, as involve[ing] genocide,. . . those matters are protected speech. . . . under the First Amendment to our Constitution."  Trial Tr. vol. I, 113:4-15, Jul. 17, 2025.  Additionally, "[c]riticism of the State of Israel, the use of the words that I mentioned, does not -- it's political speech, it does not constitute pro-Hamas, um, support.  Pro-Hamas support has to be something more than, um, that."  Id. 114:7-10. See e.g. Mohammed H. v. Trump, 781 F. Supp. 3d 886, 894 (D. Minn. 2025) (Blackwell, J.) ("[Speech] opposing violence in Palestine[] falls within the core of protected expression, which extends to noncitizens.").  To be clear, while that type of speech is protected, the Court itself expresses no opinion as to the conduct of the State of Israel.

> violence.  Allowing Chung and Khalil to remain in the
> United States undermines the U.S. policy to combat
> anti-Semitism and efforts to protect Jewish students
> from harassment and violence in the United States.
> Consistent with E.O. 14150, *America First Policy*
> *Directive to the Secretary of State*, the foreign
> policy of the United States champions core American
> interests and U.S. citizens, and condoning anti-
> Semitic conduct and disruptive protests in the United
> States would severely undermine that significant
> foreign policy objective.

Chung/Khalil Action Memo 3.  Nevertheless, Armstrong alerted

Secretary Rubio about the lack of alternative grounds for

removing Chung or Khalil, the unprecedented nature of the

reliance on INA 237(a)(4)(C), and probable legal challenge:

> DHS has not identified any alternative grounds of
> removability that would be applicable to Chung and
> Khlail, including the ground of removability for aliens
> who have provided material support to a foreign
> terrorist organization  or terrorist activity.  We are
> not aware of any prior exercises of the Secretary's
> removal authority under . . . [INA 237(a)(4)(C)], and
> given their LPR status, Chung and Khalil are likely to
> challenge their removal under this authority, and
> courts may scrutinize the basis for these
> determinations.

Id. (emphasis added).[18]  When questioned about prior usage of INA

237(a)(4)(C), Armstrong clarified that he believed INA

---

[18]  Indeed, Chung challenged her INA 237(a)(4)(C)
determination, and a federal district judge issued a preliminary
injunction ruling that the Public Officials were "enjoined from
detaining and/or arresting" her and "[s]hould defendants-
respondents seek to detain [Chung] on any asserted basis other
than pursuing her removal under 8 U.S. C. § 1227 (a)(4)(C) are
ordered to provide seventy-two hours' advance notice to the
Court and counsel, in order to enable plaintiff-petitioner an
opportunity to be heard regarding whether any such asserted
basis for detention constitutes a pretext for First Amendment

237(a)(4)(C) "was used at other times" and "was used at some time earlier as a matter of fact in this century," but could not recall when.[19]  Trial Tr. vol. I, 49: 4-5, 16-19, Jul 18, 2025.

### e.    Khalil is Arrested in New York, New York.

On **March 8, 2025,** Secretary Rubio adopted SBO Armstrong's recommendations.  March 8, 2025, Memorandum from Secretary Rubio to Secretary Noem, Khalil, Exs. 8 and 19. In that memorandum, Secretary Rubio explains that he has exercised his authority to classify Khalil and Chung as deportable under the foreign policy

---

retaliation." Chung v. Trump, Civ. No. 1:25-02412-NRB, Order, ECF No. 57 (Buchwald, J.).  That case remains pending, and this Court takes no position as to that court's findings or rulings.

Khalil challenged his INA 237(a)(4)(C) determination, and a federal district judge entered a preliminary injunction against the Public Officials here, first ruling that Khalil "is likely to succeed on the merits of his claim that [INA 237(a)(4)(C)], as applied to him here through the Secretary of State's determination, is vague in violation of the Due Process Clause of the Constitution." Khalil v. Trump, 784 F. Supp. 3d 705, 767 (D.N.J. 2025) (Farbiarz, J.), and thereafter a preliminary injunction was issued. Khalil v. Trump, No. 25-CV-01963 (MEF)(MAH), 2025 WL 1649197, at *6 (D.N.J. June 11, 2025), opinion clarified, No. 25-CV-01963 (MEF)(MAH), 2025 WL 1981392 (D.N.J. July 16, 2025), and opinion clarified, No. 25-CV-01963 (MEF)(MAH), 2025 WL 1983755 (D.N.J. July 17, 2025).  That case, too, remains pending, and this Court takes no position as to that court's findings or rulings.

[19]  SBO Armstrong's recollection appears to be accurate. INA 237(a)(4)(C)'s language was incorporated into the statute 35 years ago, in 1990. See Immigration Act of 1990, Pub. L. 101-649, 104 Stat. 4978 (1990).  In Khalil, that court requested INA 237(a)(4)(C) enforcement information from, among others, the same defendants here, and was provided only **four** instances of the Secretary of State's exercising this extraordinary authority before 2025: twice in 1995, once in 1997, and once in 1999 -- none of which concerned domestic speech.  2025 WL 1514713, at *33-37.

exception, INA 237(a)(4)(C).  <u>Id.</u>  He explained the reasoning, incorporating much of SBO Armstrong's recommendation:

> These determinations are based on information
> DHS/ICE/HSI regarding the participation and roles of
> Chung and Khalil in antisemitic protests and
> disruptive activities, which fosters a hostile
> environment for Jewish students in the United States.
> My determination for Yunseo [Chung] is also based on
> her citations for unlawful activity during these
> protests.  The public actions and continued presence
> of Chung and Khalil in the United States undermines
> U.S. policy to combat anti-Semitism around the world
> and in the United States, in addition to efforts to
> protect Jewish students from harassment and violence
> in the United States.  Consistent with E.O. 14150,
> America First Policy Directive to the Secretary of
> State, the foreign policy of the United States
> champions core American interests and American
> citizens and condoning anti-Semitic conduct and
> disruptive protests in the United States would
> severely undermine that significant foreign policy
> objective.

<u>Id.</u>

Administrative Form I-200 arrest warrants for Chung and Khalil were issued.  Form I-200 Arrest Warrant, Khalil, Ex. 11; Form I- 200 Warrant, Chung Ex. 20; March 9, 2025 Homeland Security Social Media Post, Ex. 25 (indicating Khalil arrested).[20]

---

[20]  The warrants referenced here are all Form I-200 administrative arrest warrants issued by the Executive Branch. <u>See</u> Exs. 11, 14, 18, and 20.  The Form I-200 administrative warrants here are reviewed by "ICE, [and] the office of principal Legal Advisor." Trial Tr. vol 1, 21:1–22:6, July 15, 2025.  "The I-200 [administrative] warrant is a fascinating tool that is all but self-executing, issued to ICE agents by ICE agents without a neutral third-party to review its integrity." <u>Rodrigues De Oliveira</u> v. <u>Joyce</u>, No. 2:25-CV-00291-LEW, 2025 WL

Khalil was arrested in the lobby of his apartment building in New York City in the early evening of March 8, 2025. Trial Tr. vol. II, 119:9-10, Jul. 10, 2025; Tr. vol. II, 91:24-92:2, Jul. 15, 2025. Four HSI officers participated; they identified themselves, with neck badges visible. Id. 94:2-16; see also Khalil Arrest Video 00:24, Ex. 237. The agents did not wear masks, though again, there was no mask policy. Trial Tr. vol. I, 96:1-2, Jul. 15, 2025.

The HSI Special Agent in Charge of Khalil's arrest was informed that the "the Secretary of State and/or White House had an interest in Mr. Khalil." Trial Tr. vol. 2, 103:14-15, July 15, 2025. Because HSI agents have not in recent history enforced the INA, he contacted ERO "to confirm there was a legal basis for [the] arrest." Id. 106:2-14.

As for Chung, she obtained a temporary restraining order prior to any arrest. See Chung v. Trump, Civ. No. 1:25-cv-02412 (S.D.N.Y. March 25, 2025) Temporary Restraining Order, ECF No. 19. There is currently a preliminary injunction in place. See n. 18, supra.

---

1826118, at *4 (D. Me. July 2, 2025)(Walker,J.). It is "different from a judicial arrest warrant." Aditya W. H. v. Trump, 782 F. Supp. 3d 691, 699 n. 3 (D. Minn. 2025) (Menendez, J.).

**f.    The Public Officials Publicize the Arrest of Khalil and Speech of the Plaintiffs and their Members are Chilled**

On **March 9, 2025,** Secretary Rubio posted on social media that "[w]e will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported."  Ex. 26; Stipulation No. 3.  Attached to the post, is a photograph of Khalil attached to a news story.  Id.  Three hours later, DHS posted on social media:

> On March 9, **in support of President Trump's executive orders prohibiting anti-Semitism,** and in coordination with the Department of State, U.S. Immigration and Customs Enforcement arrested Mahmoud Khahlil, a former Columbia University graduate student.  **Khalil led activities aligned to Hamas,** a designated terrorist organization.

March 9, 2025 post on X (emphasis added), Ex. 25, Stipulation No. 2.

Professor of International Studies at Brown University Nadje Al-Ali ("Professor Al-Ali") is a member of MESA and AAUP, and an Lawful Permanent Resident.  Trial Tr. vol. II, 127:3-4; 129:13-15, Jul. 7, 2025.  When she learned of Khalil's arrest on March 9, 2025, she became afraid of being harassed upon reentry to the United States or possibly deported.  Id. 134:13-20; 135:3-8; 140:2-21; 142:14-17.  She has canceled overseas trips, shied away from writing on certain topics critical of Israeli policies, including ceasing development of a specific article that was to discuss Hamas and Israel, stopped engaging in

[39]

protests as she previously did, and generally kept a low
profile.  Id. 140-46.  If the alleged ideological deportation
policy were ended, Professor Ali testified, she would resume
activities such as research, travel to the Middle East,
attending meetings (including MESA's annual meeting), and
speaking out and writing on Israel and Palestine.  Trial Tr.
vol. I, 21:5-20; 22:3-5, Jul. 8, 2025.

Harvard University Professor of Philosophy Bernhard Nickel
("Professor Nickel"), is a member of AAUP, a German citizen, and
an Lawful Permanent Resident.  Trial Tr. vol. I, 53: 18-25,
54:7-14, July 8, 2025.  He believes the arrest of Khalil was a
manifestation of an ideological deportation policy because
"[n]othing in the [media] coverage of this case indicated that
he had done anything other than exercising his political
speech."  Id. 82:24-25.  This arrest scared Professor Nickel
because he "didn't think that those kinds of . . . arrests would
happen in America, but they did."  Trial Tr. vol. II, 83: 17-19,
Jul. 8, 2025.

On **March 10, 2025,** the President posted on social media:

Following my previously signed Executive Orders, ICE
proudly apprehended and **detained Mahmoud Khalil, a
Radical Foreign Pro-Hamas Student on the campus of
Columbia University.  This is the first arrest of many
to come.  We know there are more students at Columbia
and other Universities across the County who have
engaged in pro-terrorist anti-Semitic, anti-American
activity, and the Trump Administration will not
tolerate it . . . We will find, apprehend, and deport**

**these terrorist sympathizers from our country -- never
to return again.**  If you support terrorism, including
the slaughtering of innocent men, women, and children,
your presence is contrary to our national and foreign
policy interests, and you are not welcome here.  We
expect every one of America's Colleges and
Universities to comply.  Thank you!

Social Media Post (emphasis added), Ex. 27; Stipulation No. 4.

AAUP member and Northwestern University Professor Megan
Hyska ("Professor Hyska"), a Canadian citizen and Legal
Permanent Resident, testified that around this time she saw the
video of Khalil's arrest and that she was "shocked and
distressed" because his "status as a green card holder" did not
protect him from what she understood as retaliation for
political speech.  Trial Tr. vol. I, 35:7-8, 36:1-3, 44:6-13,
44:23-45:10, Jul. 7, 2025.  Seeing the President's social media
post in particular caused her to feel "extremely stressed out,
scared, maybe even trapped."  Id. 48: 1-25; 51:2-4.

AAUP General Counsel Veena Dubal ("Professor Dubal")
testified that it was about this time that AAUP became aware of
what it considers to be the ideological deportation policy,
which it believes is ongoing.  Trial Tr. vol. 1, 72:12-25, Jul.
18, 2025.  She testified about her conversations with
"noncitizens, members who were extremely afraid, who expressed
fear about how the ideological deportation policy was going to
affect their economic livelihood and personal lives, and, . . .
most of [her] attention became . . . focused in on  . . . the

[41]

academic freedom and shared governance rights of our

noncitizens." Id. 73:8-14.

Barnard College and Columbia University Professor of

Anthropology Nadia Abu El-Haj ("Professor El-Haj"), a MESA and

AAUP member, testified that everything changed after Khalil's

arrest. Trial Tr. vol. II, 131:14-132: 6, 135:12-14, 139:4-18;

146:9-21, Jul. 8, 2025.

> **g. The Public Officials' Investigations of Non-Citizens Continue and the Public Officials Concomitant Statements Publicizing Khalil's Arrest**

On **March 10, 2025**, HSI issued an ROA for Badar Khan Suri

("Khan Suri"). Khan Suri ROA, Ex. 234. No criminal history or

associated HSI investigations were noted in the ROA. Id. at 1.

According to the ROA, Khan Suri is married to the U.S.-citizen

daughter of Ahmed Yousef, a senior Hamas figure. Id. at 1. HSI

wrote that "according to open source reporting, Khan Suri

actively spreads Hamas propaganda and promotes anti-Semitism on

social media." Id. Those open sources were meforum.org, an

Instagram posting by a person who claimed to be affiliated with

meforum.org, articles posted by Khan Suri to Middle East

Monitor, and postings to Instagram by Khan Suri that "appear" to

be "Pro-Palestinian content." Id.

On **March 11, 2025**, White House Press Secretary Karoline

Leavitt ("Leavitt") claimed that Khalil "sid[ed] with

terrorists… who organized group protests that . . . distributed pro Hamas propaganda." Leavitt Press Conference, Mar. 11, 2025, Ex. 28; Stipulation 5, Ex 28; see also https://www.whitehouse.gov/videos/press-secretary-karoline-leavitt-briefs-members-of-the-media-mar-11-2025/10:45 – 11:32. Even though HSI reported that there was no evidence of Khalil distributing pro-Hamas materials, Leavitt nonetheless claimed that Khalil "distributed" pro-Hamas fliers on the campus of Columbia University. Id. at 11:38-11:44.

Leavitt further echoed the President's comments when asked about how many arrests were expected. She responded that she did not have an estimate, but that "anti-American, anti-Semitic, pro-Hamas protests will not be tolerated." Id. at 30:43-31:14.

On **March 12, 2025**, Secretary Rubio discussed revocation of visas:

> QUESTION: . . . President Trump appealed to a lot of Americans during his campaign on free speech arguments and not suppressing speech, especially from the government, but your revocation of the green card to many is seen as one of the most anti-speech actions a secretary can take with his powers. How do you respond?
>
> * * *
>
> Secretary Rubio: . . . . On your first point, when you enter the -- this is an important point, and I'm glad you asked this question. When you come to the United States as a visitor -- which is what a visa is, which is how this individual entered this country, on a visitor's visa, **okay -- you are here as a visitor. We can deny you that visa. We can deny you**

[43]

that -- if you tell us when you apply, "Hi, I'm trying
to get into the United States on a student visa, I am
a big supporter of Hamas, a murderous, barbaric group
that kidnaps children, that rapes teenage girls, that
takes hostages, that allows them to die in captivity,
that returns more bodies than live hostages" -- if you
tell us that you are in favor of a group like this,
and if you tell us when you apply for your visa, "And
by the way, I intend to come to your country as a
student and rile up all kinds of anti-Jewish student,
anti-Semitic activities, I intend to shut down your
universities" -- if you told us all these things when
you applied for a visa, we would deny your visa.  I
hope we would.  If you actually end up doing that once
you're in this country on such a visa, we will revoke
it.  And if you end up having a green card -- not
citizenship but a green card -- as a result of that
visa while you're here and those activities, we're
going to kick you out.  It's as simple as that.

        This is not about free speech.  This is about
people that don't have a right to be in the United
States to begin with.  No one has a right to a student
visa.  No one has a right to a green card, by the way.
So when you apply for a student visa or any visa to
enter the United States, we have a right to deny you
for virtually any reason, but I think being a
supporter of Hamas and coming into our universities
and turning them upside down and being complicit in
what are clearly crimes of vandalization, complicit in
shutting down learning institutions -- there are kids
at these schools that can't go to class.  You pay all
this money to these high-priced schools that are
supposed to be of great esteem and you can't even go
to class, you're afraid to go to class because these
lunatics are running around with covers on their face,
screaming terrifying things.  If you told us that's
what you intended to do when you came to America, we
would have never let you in.  And if you do it once
you get in, we're going to revoke it and kick you out.

Sec. of State Marco Rubio Remarks to Press, March 12, 2025 at 7

(emphasis added), Ex. 30, Stipulation No. 6.

On **March 12, 2025,** HSI issued an ROA for Mohsen Mahdawi ("Mahdawi"), a Lawful Permanent Resident.  Mahdawi ROA 1, Ex. 235.  Mahdawi had one incident concerning a drug seizure at the United States/Canada border in Derby, Vermont in 2019.[21]  Id. According to the report, news articles and social media posts attached thereto indicated, among other things, that Mahdawi was a co-President of the Palestinian Student Union and "organizer of pro-Hamas rallies."  Id.  Other posts relate to his appearance on 60-Minutes and his support of the death of his cousin.  Id.

On **March 13, 2025,** Deputy Secretary of Homeland Security Troy Edgar spoke about the Khalil arrest in an interview with National Public Radio's Michel Martin.  During that interview, Deputy Secretary Edgar would not provide a direct answer concerning the contours of deportation:

> Michel Martin:  Mahmoud Khalil says he acted as a spokesperson for pro-Palestinian demonstrators and as a mediator with Columbia University, where he was a graduate student.  **As you know, Mr. Edgar, any conduct that can be legally sanctioned must be described.  So, what is the specific conduct the government alleges that Mr. Khalil engaged in that merits removal from the United States.**
>
> Troy Edgar:  I think what you saw there is you've got somebody that has come into the country on a visa. And as he's going through the visa process, he is

---

[21] This incident is now a matter of public record, Mahdawi v. Trump, 781 F. Supp. 3d 214, 221 (D. Vt. 2025), and was not a basis asserted by Secretary Rubio as a basis for applying Section 4C to him.

coming in to basically be a student that is not going
to be supporting terrorism. **So, the issue is he was
let into the country on this visa.  He has been
promoting this antisemitism activity at the
university.  And at this point, the State Department
has revoked his visa for supporting a terrorist type
organization.  And we're the enforcing agencies, so
we've come in to basically arrest him.**

Martin:  A White House official told the Free
Press that there's no allegation that he broke any
laws.  So, again, I have to ask, **what specifically
constitutes terrorist activity that he was supporting?
What exactly do you say he did?**

Edgar: **Well, like I said, when you apply for a
visa, you go through the process to be able to say
that you're here on a student visa, that doesn't
afford you all the rights of coming in and basically
going through this process, agitating and supporting
Hamas.  So, at this point, yeah, the Secretary of
State and the State Department maintains the right to
revoke the visa, and that's what they've done.**

Martin: **How did he support Hamas?  Exactly what
did he do?**

Edgar: Well, I think you can see it on TV, right?
**This is somebody that we've invited and allowed the
student to come into the country, and he's put himself
in the middle of the process of basically pro-
Palestinian activity.**  And at this point, like I said,
the Secretary of State can review his visa process at
any point and revoke it.

Martin: **He's a permanent resident.  He's not a
visa holder. He's a legal permanent resident.  He has
the green card, at least he did, until it's alleged
that it was revoked.**

**If the allegation is that Mr. Khalil organized
protests and made speeches after which other people
engaged in prohibited activity, or, say, violent
activity.**  Well, Mr. Trump gave a political speech on
January 6, 2021, after which some individuals engaged
in violent and illegal acts.  How is this any
different?

[46]

Edgar: President Trump's a citizen and the president of the United States. **This is a person that came in under a visa. And again, the secretary of state at any point can take a look and evaluate that visa and decide if they want to revoke it.**

Martin: **He's a legal permanent resident. I have to keep insisting on that. He is a legal permanent resident. So what is the standard? Is any criticism of the Israeli government a deportable offense?**

Edgar: Like I said, **I think that at this point when he entered into the country on a student visa, at any point we can go through and evaluate what his status is.**

Martin: **Is any criticism of the United States government a deportable offense**?

Edgar: **Like I said, if you go through the process and you're a student and you're here on a visa and you go through it, at any point . . . .**

Martin: **Is any criticism of the government a deportable offense?**

Edgar: Let me put it this way, Michel, imagine if he came in and filled out the form and said, "I want a student visa." They asked him, "What are you going to do here?" And he says, "I'm going to go and protest." We would have never let him into the country.

Martin: **Is protesting a deportable offense?**

Edgar: **You're focused on protests. I'm focused on the visa process. He went through a legal process . . . .**

Martin: Are you saying he lied on his application? He's a lawful permanent resident, married to an American citizen.

Edgar: I think if he would have declared he's a terrorist, we would have never let him in.

Martin: **And what did he engage in that constitutes terrorist activity?**

Edgar: **I mean, Michel, have you watched it on TV? It's pretty clear.**

Michel: **No, it isn't. Well, explain it to those of us who have not or perhaps others have not. What exactly did you do?**

Edgar: Well, **I think it's clear or we wouldn't be talking about it. I mean, the reality is that if you watch and see what he's done on the university . . . .**

Martin: Do you not know? Are you telling us that you're not aware?

Edgar: I find it interesting that you're not aware.

Martin: **I think you could explain it to us. I think others would like to know exactly what the offenses are, what the propaganda was that you allege, what the activity was that you allege. Well, perhaps we can talk again and you can give us more details about this.** We really appreciate your coming to join us, and we do hope we'll talk again.

Edgar: Thank you.

March 12, 2025 Interview, NPR, (emphasis added), Ex. 29,

Stipulation No. 7.

On **March 13, 2025,** Vice President J.D. Vance appeared on

Fox News:

Vice President Vance: Laura, a green card holder, even if I might like that green card holder doesn't have an indefinite right to be in the United States of America. Right? **American citizens have different rights from people who have green cards, from people who have student visas. And so my attitude on this is: this is not fundamentally about free speech. And to me, yes, it's about national security, but it's**

[48]

**also, more importantly, about who do we as an American public decide gets to join our national community? And if the Secretary of State and the President decide this person shouldn't be in America, and they have no legal right to stay here, it's as simple as that.**

Laura Ingraham: Do you see more such deportations happening?

JD Vance: **I think we'll certainly see some people who get deported on student visas if we determine that it's not in the best interest of the United States to have them in our country.  So yeah, I don't know how high that number is going to be, but you're going to see more people.**

Fox News, "JD Vance Reveals Whether More Deportations of Green Card Holders Are Coming" (Mar. 13, 2025), https://www.foxnews.com/video/6369982152112 (emphasis added), Ex. 31, Stipulation No. 8.

More arrests were coming.

### h.   AD Watson issues DHS Referral Letters as to Mahdawi and Khan Suri

On **March 14, 2025**, AD Watson signed, but did not compose, two DHS Referral Letters to SBO Armstrong.

First, AD Watson signed a DHS Referral letter concerning Mahdawi.  Trial Tr. vol. I 97:17-19, Jul. 17, 2025; Mahdawi DHS Referral Letter, Ex. 244.  In that letter -- similar to the other referral letters -- Watson wrote "to provide a summary of the actions by Mohsen Mahdawi in violation of President Trump's executive orders on anti-Semitism and for the Secretary of State to assess whether" Mahdawi's "presence or activities in the U.S.

[49]

compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences consistent with" INA 237(a)(4)(C).  Id.

AD Watson confirmed Mahdawi's Lawful Permanent Residence status, and related that his "involvement in disruptive protests at Columbia University align with the executive orders' focus on deporting 'Hamas sympathizers.'"  Id.  The letter recites "[h]is leadership and involvement in these disruptive protests."  Id. AD Watson cites to news media articles referring to Mahdawi's calling for Israel's destruction, and justifying Hamas terrorism **in late 2023**.  Id.  AD Watson also cites to Mahdawi's using the slogan, "From the river to the sea, Palestine will be free." Id.  There is also reference to a poem attributed to him glorifying terrorism.  Id.  The poem purportedly "praises Dalal Mughrabi, who perpetrated the 1978 Coastal Road massacre."  Id. Mahdawi was also allegedly co-president of DAR Palestinian at Columbia University, and **in 2023** was affiliated with "the pro-terror activist group Within Our Lifetime" and "reportedly a member of Students for Justice in Palestine."  Id.

AD Watson concluded by stating that "HSI is concerned that Mahdawi's participation in the above activities may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization."  Id. at 2.  Accordingly, AD Watson requested that

"the Secretary of State [to] determine whether . . . [Mahdawi's] . . . presence and activities compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences for the United States consistent with" INA 237(a)(4)(C), and stated that if it did make that determination, "HSI would initiate removal charges against" Mahdawi. Id. The letter attached a copy of the ROA. Id.

That same afternoon, AD Watson sent a DHS Referral Letter concerning Khan Suri. Trial Tr. vol. I, 99:6-14, Jul. 17, 2025; Khan Suri DHS Referral Letter, Ex. 246. In that letter, Watson wrote "to provide a summary of the actions by Badar Khan Suri in violation of President Trump's executive orders on anti-Semitism and for the Secretary of State to assess whether the alien's presence or activities in the U.S. compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences consistent with" INA 237(a)(4)(C). Id.

AD Watson stated Khan Suri's nonimmigration exchange student (J-1) visa status, and, relying on the ROA, related that he was "identified as a research exchange student at Georgetown University actively supporting Hamas terrorism, who actively spreads it's [(sic)] propaganda and promotes antisemitism on social media." Id. The letter also identifies that Suri Khan's

wife, a U.S. citizen, is a daughter of a "known or suspected terrorist, who is a senior advisor to Hamas." Id. Watson claimed that "HSI is concerned that Suri's direct connection to Hamas leadership and involvement in antisemitic activities may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization." Id.

AD Watson concluded by requesting that "the Secretary of State . . . determine whether . . . [Khan Suri's] . . . presence and activities compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences for the United States consistent with" INA 237(a)(4)(C)] and that if he did make that determination, "HSI would initiate removal charges against" Suri Khan. Id. The letter attached a copy of the ROA. Id.

### i. SBO Armstrong Issues Separate Action Memoranda to Secretary Rubio on Mahdawi and Suri Khan

On **March 15, 2025**, SBO Armstrong authored an "Action Memo for the Secretary" of State Marco Rubio concerning Mahdawi. Mar. 15, 2025 Action Memo for the Secretary, Ex. 244. In Recommendations No. 1, Armstrong recommended "that [Secretary Rubio] determine the presence and activities of" Mahdawi "have potentially serious adverse foreign policy consequences for the United States and would compromise a compelling U.S. foreign

policy interest, rendering him deportable under" INA
237(a)(4)(C).  Id.  SBO Armstrong relied solely on the referrals
from HSI and the ROAs in making his recommendation to the
Secretary.  Armstrong relayed information concerning Mahdawi's
activities at a protest at Columbia in which Mahdawi was accused
of "instructing protestors to physically push a small group of
pro-Israel students, events that university officials later
acknowledged as threatening rhetoric and intimidation."  Id. at
2.  Armstrong relayed that "[o]pen-source reporting also
identifies Mahdawi as behind anti-Semitic rhetoric in the fall
2024 protests, referring to Israeli Defense Force soldiers as
terrorists and shouting through a megaphone at Jewish bystanders
and Israel supporters."  Id.

SBO Armstrong concluded that "[t]he activities and presence
of Mahdawi in the United States have potentially serious adverse
foreign policy consequences and would compromise a compelling
U.S. foreign policy interest" because of his "participation and
roles in anti-semitic protests and reported intimidating and
harassment of Jewish students during fall 2024 protests at
Columbia University undermine U.S. policy to combat anti-
Semitism around the world and in the United States."  Id. 2-3.
Armstrong cites Executive Order 14188, and also Executive Order
14150, "America First Policy Directive to the Secretary of
State."  Id. at 3.  Armstrong also asserted his belief that

[53]

"protests of the type led by Mahdawi potentially undermine the
peace process underway in the Middle East by reinforcing anti-
Semitic sentiment in the regionals [sic] and thereby threatening
the U.S. foreign policy goal of peacefully resolving the Gaza
conflict."  Id.

As with SBO Armstrong's earlier Action Memos, there were
caveats.  First, SBO Armstrong highlighted that "DHS/ICE/HSI has
not identified any alternative grounds of removability
applicable to Mahdawi, including any indication that Mahdawi has
provided material support to a foreign terrorist organization or
terrorist activity."  Id.  While there had been a prior visa
revocation, that occurred after his Legal Permanent Resident
status, and there was no information assessing Mahdawi as having
a current link to terrorism.  Id.

Second, Armstrong, although apparently not a lawyer,
properly raised Constitutional concerns with the proposed
actions:

> Like the legal challenge brought by Mahmoud
> Khalil with respect to your March 8, 2025, [INA
> 237(a)(4)(C)] determination regarding him, as an Legal
> Permanent Resident, Mahdawi is likely to challenge his
> removal under [INA 237(a)(4)(C)] authority, including
> whether the Department [of State] in fact has a
> compelling basis for determination.  Given the
> potential that a court may consider his actions
> inextricably tied to speech protected under the First
> Amendment, it is likely that courts will closely
> scrutinize the basis for this determination.  We
> understand that Khalil intends to seek an injunction

of the determination in his case, and we could
anticipate Mahdawi to do the same.

Id. (emphasis added).[22]

That same day, **March 15, 2025**, SBO Armstrong issued an
Action Memo for the Secretary, recommending to Secretary Rubio
that he make an INA 237(a)(4)(C) determination and provide
notification to Secretary Noem as to Khan Suri.  Mar. 15, 2025
Action Memo for the Secretary, Ex. 249.  SBO Armstrong related
that Khan Suri was married to the daughter of a "a senior Hamas
figure in Gaza and a senior advisor to Hamas leadership."  Id.
at 2.  SBO Armstrong also related DHS/ICE's assessment that Khan
Suri was "'actively supporting Hamas terrorism' and 'actively
spreads its propaganda and promotes antisemitism on social
media.'"  Id. SBO Armstrong summarized the ROA information, but
pointed out that "we have not uncovered additional open source
information regarding  Suri's involvement in antisemitic conduct
or intimidation of Jewish students.  Id.

---

[22]  Director Armstrong's warning to Secretary Rubio was, once
again, warranted.  After his arrest, Mahdawi challenged his INA
237(a)(4)(C) determination, and a federal district judge in
Vermont ordered bail pending the resolution of his habeas corpus
proceeding.  Mahdawi v. Trump, No. 2:25-CV-389, 2025 WL 1243135,
at *14 (D. Vt. Apr. 30, 2025)(Crawford,J.).  The Second Circuit
Court of Appeals denied the government's motion to stay.
Mahdawi v. Trump, 136 F.4th 443, 456 (2d Cir. 2025).  That case
remains pending, and this Court takes no position on the merits
of that action.

SBO Armstrong also noted that Consular Affairs was unable
to locate any independent information, and "DHS/ICE/HSI has not
provided [Consular Affairs] with an assessment of any
alternative grounds of removability that would be applicable to
Suri, including whether Suri may be removable under the
terrorism-related grounds based on his relationship with Ahmed
Yousef." Id. at 3.  Interestingly, the recommendation under INA
237(a)(4)(C) was "based upon the assessment of DHS/ICE/HSI, **to
which we defer as ICE is the principal investigative unit of
DHS,** that "'Suri's direct connection to Hamas leadership and
involvement in antisemitic activities . . . [creates] a hostile
environment for Jewish students and [indicates] support for a
designated terrorist organization.'" Id. (ellipses and brackets
in original, emphasis added).  Similar to Mahdawi, Armstrong
relied upon Executive Order Nos. 14188 and 14150 as to
antisemitism and "America First" policies. Id.  He further
stated, "the type of intimidation and incitement attributable
[to] Suri potentially undermines the peace process underway in
the Middle East by reinforcing anti-Semitic sentiment in the
regional[] and thereby threatening the U.S. foreign policy goal
of peacefully resolving the Gaza conflict." Id.

As in his other Action Memos, SBO Armstrong cautioned
Secretary Rubio in light of Khalil's response to his arrest:

Like the legal challenge brought by Mahmoud
Khalil with respect to your March 8 determination
regarding him, Suri is likely to challenge his removal
under [INA 237(a)(4)(C)] authority.  Such a challenge
would likely question whether the Department in fact
has a compelling basis for determination.  **Given the
reliance on Suri's public statements as an academic,
and the potential that a court may consider his
actions inextricably tied to speech protected under
the First Amendment, it is likely that courts will
closely scrutinize the basis for this determination**.
We understand that Khalil intends to seek an
injunction of the determination in his case, and we
could anticipate Suri to do the same.

Id. 3 (emphasis added).[23]  SBO Armstrong also requested "the

opportunity to consult with the DHS on any public statements

regarding this determination."  Id.

> **j.    Secretary Rubio Issues Memoranda Determining
>        Deportability For Foreign Policy Reasons under
>        INA 237(a)(4)(C) for Mahdawi and Khan Suri**

On **March 15, 2025**, Secretary Rubio issued a Memorandum for

the Secretary of Homeland Security concerning Mahdawi.  Mem.

Sec. Homeland Security (undated), Ex. 12.  In that memorandum,

---

[23]  SBO Armstrong's caution to Secretary Rubio, again, was
well-taken.  Khan Suri immediately challenged Secretary Rubio's
INA 237(a)(4)(C) determination.  Khan Suri was granted bail
pending determination of his habeas corpus petition. Suri v.
Trump, No. 1:25-CV-480 (PTG/WBP), 2025 WL 1392143, at *1 (E.D.
Va. May 14, 2025) (Giles, J.).  In denying the Public Officials
motion for a stay pending appeal, the Fourth Circuit ruled that
"[t]he government doesn't contest the district court's finding
that it detained Suri in retaliation for his First Amendment
activity. . . . 'The loss of First Amendment freedoms, for even
minimal periods of time, unquestionably constitutes irreparable
injury.'" Suri v. Trump, No. 25-1560, 2025 WL 1806692, at *9
(4th Cir. July 1, 2025) (quoting Elrod v. Burns, 427 U.S. 347,
373 (1976)).  That case remains pending, and this Court takes no
position on the merits of that action.

Secretary Rubio explains that he has exercised his authority to classify Mahdawi as deportable under the foreign policy exception, INA 237(a)(4)(C). Id. He explained the reasoning, incorporating much of SBO Armstrong's recommendation:

> These determinations are based on information provided by DHS/ICE/HSI that Mahdawi, through his leadership and involvement in disruptive protests at Columbia University, has engaged in anti-Semitic conduct through leading pro-Palestinian protests and calling for Israel's destruction. Mahdawi has been identified at those protests as having engaged in threatening rhetoric and intimidation of pro-Israeli bystanders. The activities and presence of Mahdawi in the United States undermines U.S. policy to combat antisemitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and intimidation in the United States. Under E.O. 14188, Additional Measures to Combat Anti-Semitism, it is the policy of the United States to combat antisemitism, using all available and appropriate legal tools to hold to account the perpetrators of unlawful anti-Semitic harassment and violence. Consistent with E.O. 14150, America First Policy Directive to the Secretary of State, the foreign policy of the United States champions core American interests and American citizens and condoning antisemitic conduct and disruptive protests in the United States would severely undermine that significant foreign policy objective. Moreover, protests of the type led by Mahdawi potentially undermines the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the regional [(sic)] and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict.

Id.

On **March 15, 2025,** Secretary Rubio issued a Memorandum for the Secretary of Homeland Security concerning Khan Suri. Mem. Sec. Homeland Security (undated), Ex. 21. In that memorandum,

[58]

Secretary Rubio explained that he has exercised his authority to classify Khan Suri as deportable under the foreign policy exception, INA 237(a)(4)(C). _Id._ He explained the reasoning, incorporating much of SBO Armstrong's recommendation:

> These determinations are based on the assessment and conclusion provided by DHS/ICE/his [(sic)], to which we defer as DHS/ICE is the principal investigative unit of DHS, that . . . "Suri's direct connection to Hamas leadership and involvement in antisemitic activities . . . [creates] a hostile environment for Jewish students and [indicates] support for a designated terrorist organization. In addition, DHS/ICE/HIS also assess that Suri is "actively supporting Hamas terrorism" and "actively spreads its propaganda and promotes antisemitism on social media." The activities and presence of Suri in the United States undermines U.S. policy to combat antisemitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and intimidation in the United States. Under E.O. 14188, Additional Measures to Combat Anti-Semitism, it is the policy of the United States to combat antisemitism, using all available and appropriate legal tools to hold to account the perpetrators of unlawful anti-Semitic harassment and violence. Consistent with E.O. 14150, America First Policy Directive to the Secretary of State, the foreign policy of the United States champions core American interests and American citizens and condoning antisemitic conduct and disruptive protests in the United States would severely undermine that significant foreign policy objective. Moreover, the type of intimidation and incitement attributable to Suri potentially undermines the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the regional[] and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict.

_Id._ (brackets with "(sic)" added).

  **k.** **Secretary Rubio Appears on CBS's Face the Nation**
    **News Program and Discusses Revocations**

On **March 16, 2025,** Secretary Rubio appeared on CBS's Face

the Nation:

  QUESTION: I want to ask you about a decision you
made to revoke a student visa from someone at Columbia
University this past week. **The Wall Street Journal
editorial board writes: "The… Administration needs to
be careful . . . [it's] targeting real promoters of
terrorism . . . not breaking the great promise of a
green card by deporting anyone with controversial
political views." Can you substantiate any form of
material support for terrorism, specifically to Hamas
—**

  SECRETARY RUBIO: Yes.

  QUESTION: **— from this Columbia student, or was it
simply that he was espousing a controversial political
point of view?**

  SECRETARY RUBIO: Well, not just the student **-- we're
going to do more. In fact, every day now we're
approving visa revocations, and, if that visa led to a
green card, the green card process as well.** And
here's why -- it's very simple. When you apply to
enter the United States and you get a visa, you are a
guest, and you're coming as a student, you're coming
as a tourist, or what have you. And in it, you have
to make certain assertations. **And if you tell us when
you apply for a visa, I'm coming to the U.S. to
participate in pro-Hamas events, that runs counter to
the foreign policy interests of the United States of
America. It's that simple. So you lied. You came --
if you had told us that you were going to do that, we
never would have given you the visa. Now you're here,
now you do it, so you lied to us. You're out. It's
that simple; it's that straightforward.**

  QUESTION: But is there any -- but **is there any
evidence of a link to terrorism, or is it just his
point of view?**

SECRETARY RUBIO:  Sure -- yeah, they take over --
I mean, do you not -- **I mean, you should watch the
news.  These guys take over entire buildings.  They
vandalize colleges; they shut down colleges.**

QUESTION:  We covered it intensely.

SECRETARY RUBIO:  Well, then you should know that
this is –

QUESTION:  **I'm asking about the specific
justification for the revocation of his visa.  Was
there any evidence of material support for terrorism?**

SECRETARY RUBIO:  Well, **this specific individual
was the spokesperson, was the negotiator --
negotiating on behalf of people that took over a
campus, that vandalized buildings.  Negotiating over
what?  That's a crime in and of itself that they're
involved in being the negotiator or the spokesperson,
this, that, the other.  We don't want -- we don't need
these people in our country.  We never should have
allowed them in . . . the first place.  If he had told
us, I'm going over there and I'm going over there to
become the spokesperson and one of the leaders of a
movement that's going to turn one of your allegedly
elite colleges upside down, people can't even go to
school, the library -- buildings being vandalized, we
never would have let him in.**  We never would have let
him in to begin with.  **And now that he's doing it and
he's here, he's going to leave and so are others, and
we're going to keep doing it.**

We are -- and by the way, I find it ironic that a
lot of these people out there defending the First
Amendment speech -- alleged free speech rights of
these Hamas sympathizers --

QUESTION:  Yes.

SECRETARY RUBIO:  -- they had no problem, okay,
pressuring social media to censor American political
speech.  So I think it's ironic and hypocritical.  But
the bottom line is this:  **If you are in this country to
promote Hamas, to promote terrorist organizations, to
participate in vandalism, to participate --**

QUESTION:  Yeah.

SECRETARY RUBIO:  **-- in acts of rebellion and riots on campus, we never would have let you in if we had known that, and now that we know it, you're going to leave.**

QUESTION:  **Is it only pro-Palestinian people who are going to have their visas revoked, or other points of view as well?**

SECRETARY RUBIO:  No, I think anybody who's here in favor -- look, we want to get rid of Tren de Aragua gang members.  They're terrorists too.  We -- the President designated them, asked me to designate, and I did, as a terrorist organization.  We want to get rid of them as well.  You are -- we don't want terrorists in America.  **I don't know how hard that is to understand.  We want people -- we don't want people in our country that are going to be committing crimes and undermining our national security or the public safety.**

QUESTION:  Yeah.  Okay.

SECRETARY RUBIO:  **It's that simple.  Especially people that are here as guests -- that is what a visa is.**

QUESTION:  Yes.

SECRETARY RUBIO:  **I don't know when we've gotten it in our head that a visa is some sort of birthright. It is not.  It is a visitor into our country, and if you violate the terms of your visitation, you are going to leave.**

QUESTION:  Yeah.  Okay.  Secretary Rubio, we'd like to have you back, talk to you about a lot more on your plate another time, but we have to leave it there.

SECRETARY RUBIO:  Thank you.

CBS Face the Nation, Mar. 16, 2025 (emphasis added), Ex. 33,

Stipulation No. 10.

### l.   Khan Suri is Arrested in Rosslyn, Virginia

On **March 17, 2025**, Khan Suri was arrested in Rosslyn, Virginia.  See Ex. 22, Notice to Appear; see also Suri v. Trump, No. 1:25-CV-480, 2025 WL 1310745, at *2 (E.D. Va. May 6, 2025) (Giles, J.).  Two days later, on **March 19, 2025**, DHS Assistant Secretary for Public Affairs Tricia McLaughlin ("McLaughlin") posted: "Suri was a foreign exchange student at Georgetown University actively spreading Hamas propaganda and promoting antisemitism on social media."  Ex. 34; Stipulation No. 11.

### m.   HSI Investigates Öztürk

On **March 17, 2025**, HSI issued an ROA on Rümeysa Öztürk ("Öztürk"), a Tufts University graduate student on a student visa. Öztürk ROA 1, Ex. 232.  According to the report, HSI located no criminal history or HSI investigations associated with Öztürk.  Id.  HSI attached a February 6, 2025 Canary Mission posting describing Öztürk as having "engaged in anti-Israel activism in March 2024" and as "a supporter of the Boycott, Divestment, Sanctions (BDS) movement."  Id. at 3.  The ROA attached articles, including an article co-authored by Öztürk entitled "Op-ed: Try again, President Kumar: Renewing calls for Tufts to adopt March 4 TCU Senate resolutions" ("the Op-Ed").  Id.; see also Ex. 226.  The Op-Ed took the position that Tufts University should "disclose its investments and divest from companies with direct or indirect ties to Israel"

[63]

because of "[c]redible accusations against Israel include[ing]
accounts of deliberate starvation and indiscriminate slaughter
of Palestinian civilians and plausible genocide." Id.

Attached to the ROA was a news article from Boston.com
showing the suspension of the group "Tufts Students for Justice
in Palestine[("Tufts SJP")]." Id. The analyst wrote: "This
article ties into the Op-Ed and demonstrates that the Tufts SJP
was suspended by the university for violations of having signs
demonstrating weapons and calls for student intifada," but that
"[a]nalysts were unable to locate images matching the exact
reference to signs." Id. Nothing in that article is attributed
to Öztürk.

### n.   ICE Issues Öztürk DHS Referral Letter to the Secretary of State

On **March 21, 2025**, AD Watson signed, but did not compose, a
referral letter to SBO Armstrong concerning Öztürk. Trial Tr.
vol. I, 98:1-25, Jul. 17, 2025; Öztürk DHS Referral Letter, Ex.
245. Similar to other DHS Referral letters, Watson indicated
that his letter was "to provide a summary of the actions by
Rumeysa Ozturk for consideration of actions that may constitute
violations of President Trump's executive orders on anti-
Semitism, and for the  Secretary of State to assess whether . .
.[her] . . . presence or activities in the U.S. compromise a
compelling U.S. foreign policy interest and would have

potentially serious adverse foreign policy consequences
consistent with" INA 237(a)(4)(C).  Id.

AD Watson described Öztürk's student F-1 visa status.  Id.
He then identified Öztürk as a co-author of the Op-Ed.  Id.
Watson then connected this to the Graduate Students for
Palestine's joining Tufts SJP's call to reject Tufts' response
to proposed resolutions by the Coalition for Palestinian
Liberation at Tufts ("the CPLT").  Id.

Although there is no direct connection alleged between
Öztürk and the Tufts SJP, Watson relates that that organization
was suspended.  Id.

Although the logic is somewhat hard to follow, AD Watson
concluded that Öztürk's co-authoring of an Op-Ed, that the
authors joined in voicing opposition to Tufts' investment in
Israel with a different group that later was suspended for
alleged violent imagery and a call for intifada, somehow was
itself an "association" that "**may** undermine U.S. foreign policy
by creating a hostile environment for Jewish students and
**indicating** support for a designated terrorist organization."
Id. at 2 (emphasis added).  AD Watson, accordingly, provided
that information for the Secretary of State to assess whether
Öztürk's Op-Ed "compromise[ed] a compelling U.S. foreign policy
interest and would have potentially serious adverse foreign
policy consequences for the United States consistent with" INA

[65]

237(a)(4)(C), which would require the Secretary of State's
personal determination.  Id.  In addition, AD Watson also
provided the information to determine whether Öztürk's visa
ought be revoked pursuant to INA 221(i), which would only
require a consular officer officer's sign off, in which case
Öztürk would, in turn be removable under 8 U.S.C. §
1227(a)(1)(B).  Id.

> o.  **Secretary of State Personnel Recommended SBO
> Armstrong Revoke Öztürk's Visa**

Later that day, Deputy Assistant Secretary Stuart Wilson
("DAS Wilson") determined that the latter course of action was
the appropriate way to proceed, and prepared an "Action Memo for
Senior Bureau Official John Armstrong" recommending a "silent"
revocation of Öztürk's F-1 student visa, and a notification to
the Department of Homeland Security of the revocation of her
visa.  Öztürk Action Memo, March 21, 2025, Ex. 250.

DAS Wilson's memorandum recounts that Öztürk co-authored
the Op-Ed and that the co-authors wrote "Graduate Students for
Palestine joins Tufts Students for Justice in Palestine (TSJP),
the Tufts Faculty and Staff Coalition for Ceasefire, and
Fletcher Students for Palestine to reject the University's
response . . . ."  Id.

DAS Wilson relied on the ROA's language that Öztürk's
"involvement in these activities and associations with these

groups may undermine U.S. foreign policy by creating a hostile
environment for Jewish students and indicating support for a
designated terrorist organization." Id. (quoting Öztürk ROA at
2).

DAS Wilson continued:

> While Öztürk has been **involved with actions
> protesting Tufts' relationship with Israel,
> DHS/ICE/HSI has not, however, provided any evidence
> showing that Öztürk has engaged in any antisemitic
> activity or made any public statements indicating
> support for a terrorist organization or antisemitism
> generally.** While the [Öztürk ROA] **implies** a
> connection between Öztürk and the now-banned Tufts
> Student[s] for Justice in Palestine (TJSP), **the report
> presents no evidence other than Öztürk's membership in
> Graduate Students for Palestine which supported
> proposals to Tufts which were also supported by TJSP.
> Nor has DHS/ICE/HSI shown any evidence that Öztürk was
> involved in any of the activities which resulted in
> TJSP being suspended from Tufts.**

Id. at 2-3 (emphasis added).  The Öztürk Action Memo recounted
no other information linking Öztürk to terrorist activities.
Id. at 3.  In summary, Wilson concluded that "[a]lthough
information provided by DHS/HSI/ICE **does not establish any
potential ineligibility for Öztürk,** you may in your discretion
and in accordance with Department policy in 9 FAM 403.11-5(B),
approve revocation of her F-1 visa effective immediately based
on the totality of the circumstances." Id. at 3 (emphasis
added).[24]

---

[24] As set forth earlier, the "FAM" is the State Department's
Foreign Affairs Manual.  9 FAM concerns visas , and guidance is

When presented with the question by the Court of whether "engaging in a student protest, nonviolent and standing alone, is inconsistent with a student's visa status -- I'll state it differently -- is grounds for revoking his visa status?", SA Smith  answered:

> I think it's a difficult question to answer.  If it's a nonviolent protest and it's not a protest that is supporting terrorism, then I'm not sure that that would be a problem.  I think that we would probably see it in a negative light if the person were **protesting in a way that supports terrorism, even if it's a nonviolent protest.**

Trial Tr. vol. I 55: 11–20., Jul 11, 2025 (emphasis added).

### p.    SBO Armstrong Revokes Öztürk's Visa

SBO Armstrong approved the recommendation that same day.

Action Memo for John Armstrong

SBO Armstrong was responsible for the decision to revoke Öztürk's visa.  He testified, and this Court credits, that he "thought long and hard about Öztürk's case."  Trial Tr. vol. I 57:13, Jul. 18, 2025.  SBO Armstrong wrote, among other things, "actions, not words" in his notes, testifying that he viewed it as a "totality of the circumstances" case, in particular her purported "connection with [a] banned student organization." Id. 59:2-3.  The Court inquired further:

> The Court: As you looked at this paragraph and evaluated it and the totality of the circumstances, is

---

also provided by cables, among other things.  Trial Tr. vol. I, 21-23, Jul. 11, 2025.

it correct that you, um, considered or were
considering at least two actions, and I'll name them.
One, is the writing of the Op-Ed. And the second is
the, um, affiliation with the group that sponsored the
Op-Ed, which, um, had, you're inferring from this, a
connection with the now-banned student group.  Have I
got that right?

SBO Armstrong: Okay. In reviewing it, the key thing is
looking -- and as I recall it, and based on my notes,
the key thing that made -- was key in my decision,
were her actions.  The, one, actions of protesting
Tufts' relationship with Israel.  Secondly,
her activities and associations, which are not speech.
Activity and associations with these groups may
undermine foreign policy by creating a hostile
environment for Jewish students in indicating support
for a designated terrorist organization. Those were
the key things. Her activities and associations
creating a hostile environment for Jewish students and
indicating support for a designated terrorist
organization. And then the actions of protesting
against Israel.

Id. 61:4-62;1.

The Court credits SBO Armstrong's testimony as to his

reasons, but what his testimony reveals is a misunderstanding of

the contours of speech in the Constitutional sense, which the

Supreme Court has determined incorporates expressive actions,

not only words.[25]  To be sure, a consular officer is, indeed,

---

[25] The First Amendment protects to a large extent, even
reprehensible expressive conduct.  For example, the burning of
the American flag, an action this Court views as utterly
abhorrent, is nonetheless quite properly protected speech under
the First Amendment.  See Texas v. Johnson, 491 U.S. 397, 404
(1989) (holding burning of the American flag protected speech).
As the Supreme Court held in that case:

The way to preserve the flag's special role is not to
punish those who feel differently about these matters.

[69]

looking at the totality of the circumstances.  Nevertheless,
there is no evidence that Öztürk did anything but co-author an
op-ed that criticized the University's position on investments
with Israel, that she criticized Israel, and that the
organization of which she was member joined in **that** criticism
with an organization that was banned on Tufts campus, with which
she was not affiliated.[26]  Id.

_____

It is to persuade them that they are wrong.  "To
courageous, self-reliant men, with confidence in the
power of free and fearless reasoning applied through
the processes of popular government, no danger flowing
from speech can be deemed clear and present, unless
the incidence of the evil apprehended is so imminent
that it may befall before there is opportunity for
full discussion.  If there be time to expose through
discussion the falsehood and fallacies, to avert the
evil by the processes of education, the remedy to be
applied is more speech, not enforced silence."
Whitney v. California, 274 U.S. 357, 377, 47 S.Ct.
641, 649, 71 L.Ed. 1095 (1927) (Brandeis, J.,
concurring).  And, precisely because it is our flag
that is involved, one's response to the flag burner
may exploit the uniquely persuasive power of the flag
itself.  We can imagine no more appropriate response
to burning a flag than waving one's own, no better way
to counter a flag burner's message than by saluting
the flag that burns, no surer means of preserving the
dignity even of the flag that burned than by -- as one
witness here did --according its remains a respectful
burial.  We do not consecrate the flag by punishing
its desecration, for in doing so we dilute the freedom
that this cherished emblem represents.

Id. at 419-20.

[26] Öztürk has pressed her direct claim in a habeas petition
challenging her detention.  In that case, the court ruled that
"The only specific act cited by the government so far as
justification for any of their adverse actions towards Ms. Öztürk

[70]

Based upon that notification, DHS issued an administrative I-200 warrant. Öztürk Warrant, Ex. 18. An HSI Assistant Special Agent was notified by headquarters that Öztürk's visa had been revoked. Trial Tr. vol. I, 45:11-17, Jul. 15, 2025.

### q.   Öztürk is Arrested In Somerville, Massachusetts

On **March 25, 2025**, Öztürk was arrested by HSI agents in Somerville, Massachusetts, a city adjacent to Boston. Id. 48: 21-23. Öztürk's arrest was captured on a security camera. Trial Tr. vol. I, 52:8-9; Öztürk Arrest Video, Ex. 225 ("Öztürk Arrest Video").[27]

At 1:51 of the Öztürk Arrest Video, three plain-clothes[28] officers exit a grey SUV, none initially wearing masks, and appear to wait. Id. At 2:21 of the Öztürk Arrest Video, two plain-clothes federal officers appear to identify and approach Öztürk. Id. Again, neither are masked, but the closest is

---

is her co-authored op-ed" and that "that Ms. Öztürk's op-ed does not readily fall into one of the established exemptions to the First Amendment's protection from government speech regulation." Ozturk v. Trump, 779 F. Supp. 3d 462, 490 (D. Vt.) (Sessions, J.), amended sub nom. Ozturk v. Hyde, 136 F.4th 382 (2d Cir. 2025). The action remains pending, and this Court takes no position as to the merits of that action.

[27] Earlier that day, this action was filed. Compl. ECF No. 1.

[28] HSI agents do not have uniforms and are plainclothes officers. Trial Tr. Vol. I, 51:24-52: 5, Jul. 15, 2025. With the exception of an armored vehicle, not applicable to the arrests at issue here, HSI vehicles are unmarked because of the nature of their investigatory work. Id. 53: 1-12.

wearing a baseball cap with a hooded jacket.  Id.  As that agent
approaches and converses with her, he grasps her hands:



Öztürk Arrest Video 2:34.  All three agents were unmasked.  Id.

    Öztürk appeared confused, pulled away, and screamed.
Öztürk Arrest Video 2:36–2:37.  The closest of the unmasked
agents appeared to pull out his badge on a lanyard and show it
to Öztürk.  Other agents appeared almost immediately on scene,
and identified themselves.  Id. 2:37-2:50.  To all of the

federal agents' credit, as menacing as their approach initially may have appeared to Öztürk, they acted promptly to assuage and deescalate Öztürk's apparent shock and fear.

The agents then all masked up, with the exception of one agent who already had a hood covering his head.  Öztürk did not resist.  Her wrists were cuffed behind her back and, taking her arms, the agents led her to a car which then sped away out of Massachusetts.

At 3:30 in the video, a voice can be heard asking, "Why are you hiding your faces?"  Öztürk Arrest Video 3:30.

A fair question.

HSI personnel testified with respect to the use of masked agents in Öztürk's arrest that it had no policy on masks; rather, HSI agents are permitted to wear masks.  Trial Tr. vol. I: 49: 18 - 24, Jul 15 2025.  It is a personal choice, likely to protect their identity from threats and to facilitate their involvement in other undercover work where secrecy is required.[29] Id. 49:25 - 50:1-17.

_____

[29]  Even crediting this concern, whether intentional or not, images of plain-clothed, masked federal agents -- faceless agents of the federal government -- snatching a non-violent person off the streets of Boston has caused fear in citizens and non-citizens alike.  While there are of course occasions when obscuring identities of agents is necessary, law enforcement in the United States has usually been performed in the open.  Days after the trial, Defendant Todd Lyons stated in an interview that he is "not a proponent of the masks," but permits mask wearing because he is concerned about agents' safety.  See

Öztürk was transported to Vermont where she was processed and detained by HSI and, at that point, turned over to ICE-ERO. Trial Tr. vol. I, 55:13-16, Jul. 15, 2025.[30]

Again, there was concern about the novelty of the arrest. ICE Assistant Special Agent in Charge had never seen that type of direction from the State Department and HSI headquarters, and while he assumed the direction to be sufficient because it was coming from the top, that agent consulted with a lawyer from ICE's Office of the Principal Legal Advisor. Id. 73:7-10, 75:2-5, 74:13-15 ("I . . . did contact our legal counsel to ensure that we were on solid legal ground.").

---

https://www.cbsnews.com/news/todd-lyons-ice-director-face-the-nation-transcript-07-20-2025. Crediting the Public Officials' assertions that the masks are not worn deliberately to instill fear, they nevertheless appear to be a byproduct of using special agents whose work was previously focused on criminal, high-risk operations in a new way, that is, to arrest noncitizens who have not been accused of violent crimes or direct association with a terrorist or other potentially violent organization; and, of course, after the first such use of masks, the Public Officials were on notice of how it might appear and of the fear it might cause, but have not disavowed their use going forward.

[30] As the Second Circuit Court of Appeals recently recounted, upon Ozturk's arrest, the agents "drove her away in an unmarked vehicle, crossing state lines and transporting her first to New Hampshire, then to Vermont, and the next day, flying her to a correctional facility in Basile, Louisiana . . . ." Ozturk v. Hyde, 136 F.4th 382, 389 (2d Cir. 2025). "Ozturk was not afforded an opportunity to speak with counsel or to tell anyone where she was until after her arrival in Louisiana, almost twenty-four hours after her arrest in Massachusetts." Id.

      **r.    The State Department Issues Cable for Enhanced Screening and Social Media Vetting for Visa Applicants.**

On March 25, 2025, Secretary Rubio issued a diplomatic Cable entitled "Enhanced Screening and Social Media Vetting for Media Applicants.  25 STATE 26168, Ex. 64.  That Cable, referencing Executive Orders 14161 and 14188, and Secretary Rubio's March 16, 2025 statements, required consular officers to screen social media of visa applicants and also those who already had been issued visas for both immigrant and non-immigrant visas.  Id. at 4-5.

      **s.    The Plaintiffs' and their Members' Speech Is Chilled, and the Government Publicizes Öztürk's Arrest**

The Court denied the Plaintiffs' motion to permit witnesses to testify anonymously, and this Court issued an order forbidding retribution against **any** witness testifying in this action by **anyone**.  Order ¶ 2, ECF No. 174 ("This Court is a safe place.  The plaintiffs and their witnesses may fully participate in the trial process without fear of retribution knowing they are protected by this Court's order. . . . Likewise, law enforcement officers testifying about enforcement of the laws passed by the Congress of the United States will receive the same courtesy and respect that has long been a hallmark of this Court.  Any retribution from any quarter by anyone will be met

[75]

with the full rigor of the Court's resources."). The

Plaintiffs' witnesses testified anyway.

Professor Hyska, an AAUP member, testified as to her reaction

to the arrest:

> Q. I'm not going to show you the video, Ms. Hyska, but
> can you tell us how you felt when you saw it?
>
> Professor Hyska:  Yeah, I was extremely disturbed by
> this video.  I don't believe that the video, at least
> the version that I saw had any audio, but you can see
> this young woman, Ms. Öztürk, walking along and sort
> of like it's startling, she's grabbed by the wrist by
> some individuals who are not discernible in the video,
> who I deemed law enforcement, although they weren't
> clearly wearing uniforms.  She looked very deeply
> frightened.  And I felt frightened and disturbed upon
> seeing it.
>
> * * *
>
> Q.  Okay, you said that when you saw the video you
> felt frightened and disturbed.  Why did you feel
> frightened and disturbed?
>
> Professor Hyska:  So in the first place, because I
> looked at Rumeysa Öztürk as somebody who could be, um,
> you know potentially one of my students, someone for
> whom I feel like -- like a kind of presumptive feeling
> of caring and concern, and also because she was
> somebody that I could identify with myself.  And this
> feeling grew more acute for me as I learned she was
> apparently being detained mostly, as far as I could
> read, entirely on the basis of this Op-Ed,
> particularly because I myself had recently drafted an
> Op-Ed that was critical of the Trump administration.

Trial Tr. vol. I, 52:17 - 53: 2, 53:17-25, July 7, 2025.

Professor Hyska further testified that she refrained from

publishing an Op-Ed that she had already drafted as a result of

the Öztürk arrest, because she believed "it would not be safe

for [her] to try to publish it, even though [she] had in the

past published things that are critical of the Trump

administration." Id. 59:11-16; Professor Hyska Unpublished Op-

Ed, Ex. 66.

Professor Al-Ali also testified that seeing the arrest

video was "very scary." Trial Tr. vol. II, 135:14, Jul. 7,

2025.

Professor Nickel recalled that his level of concern "came

much more sharply into focus . . . when Ms. Öztürk was arrested

in the way that she was." Trial Tr. vol. II, 83:22-24, July 8,

2025. He further recalled how it affected him:

> I actually love this country. And it's the kind of
> love that other immigrants who have been in the
> situation where they could just affirmatively choose
> to move here had. And throughout all the ups and
> downs and all the different parts of my life and
> certainly all of the different ways that America came
> to wrestle with itself and think about the ways it
> could try to create a more perfect union, that love
> never changed. And as my fear of political reprisal
> grew, I just don't feel that way about the country in
> quite the same way. That's depressing and it's
> destabilizing.

Id. 84:6-17. After the Öztürk arrest, that was "the turning

point" for Professor Nickel, after which he "decided on a

blanket policy that [he] would keep his head down completely,"

that he "would not go to protests . . . not write, . . . not

sign on to public letters, and any other potential forms of

publicity." Id. 86:8-13. He also canceled international travel

to see his terminally ill older brother, for whom he is his only family.  Id. 87:19-25.

AAUP's General Counsel Professor Dubal testified that after the arrests of Khalil, Khan Suri and Öztürk it "redirected . . . a lot of resources to . . . help support our noncitizen members," including two town hall meetings.  Trial Tr. vol. I 73:18-20, Jul. 18, 2025.  The first meeting occurred shortly after the arrest of Khalil.  Id. 74:3-5.  AAUP co-hosted the events with MESA, and addressed many issues concerning whether it was safe for non-citizens to travel, and whether they needed to change their research projects.  Id. 75:1-76:11.  The second town hall was organized because "there were again a series of continuing . . . high-profile detentions of scholars and students that our non-citizen members were watching and were very very afraid that this continuing policy was going to impact them."  Id. 76:15-19.  AAUP has run a number of meetings to address its non-citizen members' fears and concerns.  Id. AAUP's general counsel also related that in response to non-citizen members' concerns directed to her she "created lists of immigration attorneys that [she] could send to our noncitizen members[,] . . . . created new rights information and resources that we could circulate  for people who were not -- who stated that they were too fearful to take in the town hall[.] And I organized [the] two town halls."  Id. 81:7-12.  After almost

every conversation, she referred non-citizen members to immigration attorneys.  Id. 81:18-20.  Professor Dubal also testified that "non-citizen members who were previously very active in our membership meetings, didn't attend them, or attended them with their video off."  Id. 82:19-22.  She explained the effect on AAUP:

> We haven't heard the voices of our noncitizen members, we haven't had their advocacy and insight in our organization, and, um, given that the core of the organization is to protect academic freedom and shared governance, we feel that this is an existential threat to the organization more broadly.

Id. 82:25 – 83:1-5.

MESA also submitted evidence that in response to the alleged ideological deportation policy, it has had to shift resources, had meaningfully fewer submissions with respect to its upcoming flagship annual meeting, and likely lost membership as a result.  See, e.g., Exs. 189, 191.

On **March 27, 2025**, Secretary Rubio in a Press conference equated writing an op-ed with vandalizing universities and harassing students:

> QUESTION: Mr. Secretary, a Turkish student in Boston was detained and handcuffed on the street by plainclothes agents.  A year ago she wrote an opinion piece about the Gaza war.  Could you help us understand what the specific action she took led to her visa being revoked?  And what was your State Department's role in that process?
>
> SECRETARY RUBIO: We revoked her visa.  It's an F1 visa, I believe.  **We revoked it, and here's why –– and**

**I'll say it again; I've said it everywhere.** Let me be abundantly clear, okay. If you go apply for a visa right now anywhere in the world -- **let me just send this message out -- if you apply for a visa to enter the United States and be a student and you tell us that the reason why you're coming to the United States is not just because you want to write op-eds, but because you want to participate in movements that are involved in doing things like vandalizing universities, harassing students, taking over buildings, creating a ruckus, we're not going to give you a visa. If you lie to us and get a visa and then enter the United States and with that visa participate in that sort of activity, we're going to take away your visa.**

Now, once you've lost your visa, you're no longer legally in the United States, and we have a right, like every country in the world has a right, to remove you from our country. So it's just that simple.

I think it's crazy -- I think it's stupid for any country in the world to welcome people into their country that are going to go to their universities as visitors -- they're visitors -- and say I'm going to your universities to start a riot, I'm going to your universities to take over a library and harass people. I don't care what movement you're involved in. **Why would any country in the world allow people to come and disrupt? We gave you a visa to come and study and get a degree, not to become a social activist that tears up our university campuses. And if we've given you a visa and then you decide to do that, we're going to take it away.**

I encourage every country to do that, **by the way, because I think it's crazy to invite students into your country that are coming onto your campus and destabilizing it. We're just not going to have it. So we'll revoke your visa; and once your visa is revoked, you're illegally in the country and you have to leave. Every country in the world has a right to decide who comes in as a visitor and who doesn't.**

**If you invite me into your home because you say, "I want to come to your house for dinner," and I go to your house and I start putting mud on your couch and**

**spray-painting your kitchen, I bet you you're going to
kick me out.  Well, we're going to do the same thing
if you come into the United States as a visitor and
create a ruckus for us.  We don't want it.  We don't
want it in our country.  Go back and do it in your
country, but you're not going to do it in our country.**

        * * *

QUESTION: Could you confirm – there's new reporting
that 300 visas -- State Department has revoked 300
(inaudible).

SECRETARY RUBIO:  Maybe more. **It might be more than
300 at this point.  We do it every day.  Every time I
find one of these lunatics, I take away their visa.**

Press Remarks, Marco Rubio (emphasis added) at 7-8, Ex. 35;

Stipulation No. 12.[31]  The next day, Secretary Rubio again

addressed the press:

QUESTION: **And what does it mean when you say against
the foreign policy of the United States**?

SECRETARY RUBIO:  It runs counter to our foreign --
that's how we issue visas coming in.  **I think about it
this way.  If we knew this information –- my standard:
If we knew this information about them before we gave
them a visa, would we have allowed them in?  And if
the answer is no, then we revoke the visa.**

        * * *

QUESTION:  Can we go back to visa issue just for a
second?  I mean, a lot of people feel freedom of
speech concerns about it.  Are you saying that if you
come and if you apply for a visa and get a student
visa and you don't lie, and you tell the truth and
you're not coming to protest or anything, but during
the course of your studies, wherever it is in the
U.S., you develop views or opinions that are at odds
with the administration's foreign policy -- say you
learn something [sic] in your course of study that

_____

[31] <u>See also</u> https://www.youtube.com/watch?v=5c1idp7Qzd4.

makes you think that what the policy is wrong -- and then you protest it or write something about it, don't do anything violent, is that grounds enough to revoke a visa?

SECRETARY RUBIO:  Well, I think there's a little bit of common sense here.  You come to the States and then you decide you don't like those paper straws that some of the stores are selling and you start protesting or complaining about paper straws -- I mean, we're obviously not going to yank a visa over that.  I think it crosses a line -- think about it this way.  No one has a right to a visa.  These are things that we decide.  We deny visas every day for all kinds of reasons all over the world.  We deny visas because we think people might overstay.  We deny visas because the country they come from are people that historically overstay.  We deny visas every day, and we can revoke visas.  If you have the power to deny, you have the power to revoke.

I would argue that the -- what I would add to it is what we have seen on campuses across the country where students literally cannot go to school, you cannot -- buildings are being taken over, activities going on -- this is clearly an organized movement.  And if you are in this country on a student visa and are a participant in those movements, we have a right to deny your visa.  I think it would make sense to deny your visa.  We're going to err on the side of caution. We are not going to be importing activists into the United States.  They're here to study.  They're here to go to class.  They're not here to lead activist movements that are disruptive and undermine the -- our universities.  I think it's lunacy to continue to allow that.

QUESTION:  So expressing any kind of view --

SECRETARY RUBIO:  **And by the way, I've been saying that since I was in the Senate.  Now I'm just in a position to do something about it.**

QUESTION:  Mr. Secretary --

SECRETARY RUBIO:  Now that's a broad thing to say -- any kind of views.  **But when you're aligning yourself**

**with groups that are behind these activities, openly
aligning yourself with these groups that are behind
these disruptive criminal activities in the United
States, your visa is going to get yanked.**

QUESTION:  Mr. Secretary, I don't --

QUESTION:  Hamas?

SECRETARY RUBIO:  Yeah, there may be others.  I mean,
if you come here and join Tren de Aragua, we're going
to yank your visa too.  If --

QUESTION:  Mr. Secretary?

SECRETARY RUBIO:  And so there may be other movements,
but that's partly the movement we've seen on college
campuses.  **Let's be clear:  It is a movement that is
supportive of the group that just slaughtered babies,
like deliberately targeted and slaughtered babies and
civilians and took hostages and killed hostages.
That's the group they're aligning with.**

But beyond that, they are spray-painting buildings.
They are taking over buildings.  You must have seen
these reports in campus after campus where students
can't go to class and can't function and the
universities don't know what to do about it.  When you
look at it and you realize that some of the people
involved in this are here on student visas, it's
crazy.  We're not going to keep doing that.  We're
not.  Don't come here.  If you're going to do that, go
somewhere else.  Don't come here.

*  *  *

QUESTION:  I guess some of the examples have come up
like a student at Tufts University, like all they did
was write an op-ed for the student newspaper
advocating for a certain point of view.  They're not -
- as far as we can tell, they haven't openly advocated
for Hamas.

SECRETARY RUBIO:  Well, we will -- those -- as they
go, or if they seek to self-deport they can do that,
because that's what we've done.  We're basically
asking them to leave the country.  That's why they've

been detained.  They can do so tomorrow.  Buy an
airplane ticket and leave.  No problem.

QUESTION:  Mr. Secretary?

SECRETARY RUBIO:  **But I would add to this that I would
caution you against solely going off of what the media
has been able to identify, and those presentations, if
necessary, will be made in court.**

QUESTION:  But for example, in that -- the Turkish
students, the Tufts student's case, I asked you today
did she have -- has she committed, like, or has she
carried out any of those things that you just listed?

SECRETARY RUBIO:  **The activities presented to me meet
the standard of what I've just described to you:
people that are supportive of movements that run
counter to the foreign policy of the United States.
If necessary and a court compels us, we'll provide
that information.  But ultimately it's a visa.  Judges
don't issue student visas.  There is no right to a
student visa.  We can cancel a student visa under the
law just the same way that we can deny a student visa
under the law.  And we will do so in cases we find
appropriate.**

**The overwhelming majority of student visas in this
country will not be revoked, because the overwhelming
majority of people that are coming to this country to
study are not involved and associated or aligned with
organizations that seek to do damage in this country,
and that, frankly, organizations that hate the United
States Government and hate our way of life.  So I just
think it's crazy to continue to provide visas so
people can come here and advocate for policies that
are in direct contradiction of our national interest.**

Sec. of State Marco Rubio Remarks to the Press, Mar. 28. 2025,

at 3, 5-7, 8-9, Ex. 36; Stipulation No. 13.

6.    April 2025

a.    Early April -- The Public Officials' Statements

On **April 8, 2025,** Secretary Rubio appeared on Triggered

with Don, Jr.[32]  Secretary Rubio's April 8, 2025 interview on

Triggered with Don Jr., Ex. 37, Stipulation No. 14.  Secretary

Rubio answered questions concerning revocation of visas:

> QUESTION:  Can you lay out perhaps your mission
> and priorities as it relates to foreign national [sic]
> here on visas who are acting against America's
> interests?

> SECRETARY RUBIO:  Yeah.  So if you go right now
> to a window somewhere in an embassy and apply for a
> United States visa, there's all kinds of reasons why
> we won't allow you to come in: because we think you
> might overstay your visa, **because we don't like or
> have questions about some of your political activities
> and your views.  We just won't give you a visa
> proactively, on the front end.  My argument is if we
> identify people like that who we would not have given
> a visa to, had we known information, but now they've
> got a visa and now they're here and we know the
> information, shouldn't we ask them to leave as a
> result of it?  In essence, if we wouldn't -- if there
> are things about you that had we known we would not
> have given you a visa, we should be taking away your
> visa.  It's as simple as that.**

> There's no – no one's entitled to a visa.  I
> mean, there are all kinds of reasons why people get
> denied.  There are people that can't tell you why
> their visa was denied; they just don't know.  It's
> just we -- we're not taking more people from that
> country, or we just -- whatever it may be.  **So I
> think, at the end of the day, that's what we're trying
> to do right now, is we're trying to go and identify
> people who we have information about who, had we known
> that information, we never would have given them a**

---

[32] "Triggered with Don. Jr." is a video podcast hosted by
Donald Trump Jr., the President's eldest son.

visa. **And we're revoking those visas, and they have to leave.**

**Now, I think everyone would tell you this -- if you told me I'm applying for a student visa so I can attend a university, and while I'm at your university I'm going to become a member in support of or even participate in groups that are going to take over libraries, spray paint monuments, start riots, bang drums all day and night, harass Jewish students -- if you told me you were going to be linked to any of that stuff, we never should have given you the visa. Now that you're doing it, we should take away your visa. And that's what we're trying to do and that's what we are doing.**

Id.

On **April 9, 2025,** DHS issued a press release proclaiming:

Today U.S. Citizenship and Immigration Services (USCIS) will begin considering aliens' antisemitic activity on social media and the physical harassment of Jewish individuals as grounds for denying immigration benefit requests. This will immediately affect aliens applying for lawful permanent resident status, foreign students and aliens affiliated with educational institutions linked to antisemitic activity.

Apr. 9, 2025, DHS Press Release, Ex. 38; Stipulation No. 15.

> **b.    Mahdawi is Arrested at USCIS Facility in Colchester, Vermont After Completing (and Passing) his Citizenship Examination.**

On **April 14, 2025,** HSI issued an administrative Form I-200 arrest warrant for Mahdawi. Form I-200 Arrest Warrant, Mahdawi, Ex. 14. According to the Acting Special Agent in Charge, he was present for Mahdawi's arrest at the CIS facility where Mahdawi had been summoned to take his citizenship test

(which he completed and apparently passed).  Trial Tr. 15:7-10,
37:20-22, Jul. 15, 2025.  At the conclusion of the test, four
agents entered the room, identified themselves, and presented
credentials.  Id. 23:9-15, 24: 1-21, 25.  Some of the agents
masked up when they entered a public area.  Id. 24:15-21.  As
their reason for masking up, similar to the Öztürk arrest, some
of the agents had expressed "a concern of their faces being put
in the public eye and being victims potentially of doxxing or
harassment."  Id. 18:7-20.  After Mahdawi was arrested, he was
transported to HSI's South Burlington Vermont office and turned
over to ICE Enforcement and Removal Operations.  Id. at 29: 17-
25 and 30:1-18.  From there, Mahdawi was driven to the airport
where ICE-ERO attempted "to fly out of the district" of Vermont
to Louisiana.  Id.  30:19-31:1; 33:18-34:3.

### c.  Deputy Chief of Staff Miller and Secretary Rubio Continue Their Publicity of the Arrests

On **April 14, 2025,** Deputy Chief of Staff Miller predicted
on Fox News that Khalil would be deported:

> INTERVIEWER:  Will Mahmoud Khalil be deported from the
> United States?
>
> MILLER: Yes, he will, **as will anyone who preaches hate
> for America.**  His organization said they wanted to
> eradicate Western Civilization.  **Look, under this
> country, under this administration, under President
> Trump, people who hate America, who threaten our
> citizens, who rape, who murder, and support those who
> rape and murder are going to be ejected from this
> country . . . .**

[87]

White House Deputy Chief of Staff Stephen Miller's April 14,

2025 interview with Fox News (emphasis added), Ex. 39-1;

Stipulation No. 16.

On **April 17, 2025**, Secretary Rubio appeared on the Ben

Shapiro show:

> QUESTION:  What are the standards that are being used to determine whether somebody should stay in the United States or should go?  Because obviously opponents of the administration are arguing it's violations of free speech, people have the ability to say what they want.  That's not an argument that the administration is actually arguing with.  The administration is not trying to crack down on free speech.  You're trying to actually stop something else.

> SECRETARY RUBIO:  Yeah.  Well, let's start with a baseline, okay?  **No one is entitled to a student visa to the enter the United States.  No one.  It's not a constitutional right.  It's not a law.  Every day, consular officers on the ground in face-to-face interviews are denying people visas for all kinds of reasons -- because we think you're going to overstay, because we think your family member is a member of a drug ring, whatever it may be.  We deny visas every day all over the world.  No one is entitled to a visa. Let's start with that, because I hear some of this reporting out there like if somehow we -- you're allowed to have a visa unless we can come up with a reason why you shouldn't have one.  That's not true.** The burden of proof is the other way.

> Now, let's say you go to a window somewhere in the world and say, "I want to go to the United States to study at a university," and as part of that interview it comes out you think Hamas is actually a good group.  We probably would not let you in.  I would hope we wouldn't let you in.  Okay?

> **But let's say we don't ask you that question and you get into the U.S. on a student visa, and all of a sudden it becomes obvious you think Hamas is a good**

**group.  Well, then we should revoke your visa.**  In
essence, if we would have denied -- if we had learned
things about you once you're here that would have
caused us to deny you a visa when you were overseas,
that's grounds for revocation.  **It is not in the
national interest of the United States, it's not in
our foreign policy interest, it's not in our national
security interest, to invite people onto our
university campuses who are not just going to go there
to study physics or engineering but who are also going
to go there to foment movements that support and
excuse foreign terrorist organizations who are
committed to the destruction of the United States and
the killing and the raping and the kidnapping of
innocent civilians, not just in Israel but anywhere
they can get their hands on them.  That's not in our
national interest.**

So we have a right to deny visas before you get
here, **and we have a right to revoke them if we believe
that your presence in our country undermines our
national interest, our national security, and our
foreign policy.  And that's what we intend to do.**

Now listen, there are other student visas that
are being canceled that have nothing to do with us, by
the way.  And that has to do with someone, for
example, who is here on a student visa and has a DUI.
And I don't know – that's not us.  That's DHS.  But I
don't know if people realize if you commit a crime
while you're in the U.S., that's an automatic grounds
for revoking your visa.  And no one was ever doing it.
They weren't doing it.  They weren't cross-referencing
the system.  Now they're starting to do that.

So that's the majority of these, **but we have
identified -- I can't tell you the exact number
because it's static and it's constantly moving, but
when someone is presented to me and it's clear that
this person is a supporter of a foreign terrorist
organization, we're going to remove them from the
country.  You're not going to be here; it's just that
simple.  What a stupid thing, what a ridiculous thing,
to invite people in your country so they can be part
of these movements that are terrorizing fellow
students, tearing up campuses, shutting down campuses.
We have campuses in America that couldn't even operate**

[89]

**for weeks.**  People couldn't go to class.  Are we – are we crazy?  What other country in the world would allow this?  We shouldn't allow it.

Apr. 17, 2025 Interview of Secretary Rubio, The Ben Shapiro Show (emphasis added) at 4-5, Ex. 40; Stipulation No. 17.

On **April 30, 2025,** DHS Assistant Secretary for Public Affairs posted to social media:

> When you advocate for violence, **glorify and support terrorists** that relish the killing of Americans and harass Jews, that privilege should be revoked and you should not be in this country.
>
> **We have the law, facts and commonsense on our side.**
>
> **No judge, not this one or another, is going to stop the Trump Administration from restoring the rule of law to our immigration system.**

Department of Homeland Security Assistant Secretary for Public Affairs Tricia McLaughlin's April 30, 2025 post on X (emphasis added), Ex. 41; Stipulation No. 18.

### 7.    May 2025 - Present

On **May 7, 2025,** in the context of Öztürk's court-ordered detention in Vermont, "DHS Assistant Secretary Tricia McLaughlin said having a visa to live and study in the U.S. 'is a privilege not a right' and that the ruling did 'not prevent the continued detention of Ms. Ozturk, and we will continue to fight for the arrest, detention, and removal of aliens who have no right to be in this country.'"  Sergio Martínez-Beltrán, <u>Federal Court Rules</u>

<u>Rümeysa Öztürk Must be Transferred to Detention in Vermont</u>, May 7, 2025 at 3, Ex. 42; Stipulation No. 19.

Later that evening, Secretary Rubio posted to social media: "We are reviewing the visa status of the trespassers and vandals who took over Columbia University's library.  Pro-Hamas thugs are no longer welcome in our great nation."  May 7, 2025Secretary Rubio post on X, Ex. 43; Stipulation No. 20.

On **May 8, 2025,** in response to a report of unrest at Columbia, McLaughlin wrote on X:

> **If you are in this country on a visa, green card or otherwise, you are a guest.  Act like it.**  If you are **pushing Hamas propaganda, glorifying terrorists** that relish the killing of Americans, **harassing** Jews, taking over buildings, or **other anti-American actions** that we have seen lately on these campuses, you can book yourself a ticket home.  You can expect your visa will be revoked.

May 8, 2025 10:26 a.m. McLaughlin Post on X; Ex. 44; Stipulation No. 21.

On **May 20, 2025,** Secretary Rubio testified before the Senate Foreign relations Committee.  At that hearing, Senator Van Hollen and Secretary Rubio had the following exchange:

> Secretary Rubio:  About the student visas let say this: I don't deport anybody.  And I don't snatch anybody.  The State Department does not have officers in the streets snatching everybody.  What I do is revoke visas.  And it's very simple: a visa is not a right, it is a privilege.  People apply for student visas to come into the United States and study.  And if you tell me that you are coming to the United States to lead campus crusades, to take over libraries, and burn down -- try to burn down buildings

[91]

and acts of violence we're not going to give you a visa.

Sen. Van Hollen:  Is that what Ms. Öztürk did.  Is that what she did?  Come on Mr. Secretary, you're just blowing smoke.

Secretary Rubio: **In every single one of these cases the factors are different.  The bottom line is if you are coming her to stir up trouble on our campuses we will deny you a visa.  And if you have a visa and we find you . . . we'll revoke it.  And we're going to do more.  There are more coming.  We're going to continue to revoke the visas of people who are here as guests and are disrupting our higher education facilities. People are paying money, these kids pay money to go to school and they have to walk through a bunch of lunatics who are here on student visas.  It's as simple  as that.  I want to do more. I hope we can find more of these people.**

Ex. CU-1 9:34 – 10:32 (emphasis added) .

On **May 22, 2025,** Secretary Rubio testified before the House Foreign Affairs Committee.  He was specifically asked questions about the revocation of Öztürk's visa.

Representative Jayapal:  Do you think the INA trumps the Constitution of the United States, Mr. Secretary?

Secretary Rubio:  **Well, Congress can always change the law if you want, but I'm telling you that while I have the authority, I will continue to revoke the visas of these people that come . . . .  [T]hey are on student visas, they're guests.**

* * *

Representative Jayapal: You revoked [Öztürk's] student visa  --

Secretary Rubio:  -- **Yes, probably, and** -- .

[92]

Representative Jayapal: -- because [Öztürk] wrote an
Op-Ed

Secretary Rubio:  -- **And we'll do more, we're going to
do more.**

https://www.youtube.com/watch?v=EAGqh7jvyus (U.S. Dept. of State

Youtube Channel) 3:26:50 – 3:30:00.

On **August 7, 2025,** Secretary Rubio was interviewed by

Eternal World Television Network.

QUESTION:  They say it's a First Amendment violation.

SECRETARY RUBIO:  **Well, it has nothing to do with what
their opinion is.  It has to do what the impact of it
has on the United States.  Let's remember again --
student visas, okay, are not a right.  There is no
constitutional right to a student visa.  A student
visa is something we decide to give you.  And by the
way, visas of every kind are denied every day all over
the world.  As I speak to you now, someone's visa
application to the U.S. is being denied.  So, if I
would have denied you a visa had I known something
about you, and I find out afterwards that I gave you a
visa and I found this out about you, why wouldn't I be
able to revoke your visa?  If I wouldn't have let you
in had I known this – like if this guy, Khalil --
whatever his last name is.**

QUESTION:  Yeah.

SECRETARY RUBIO:  **If that guy had been saying and
doing abroad what he's now doing in the United States,
we never would have given him a visa.**  He was on TV, I
think it was yesterday or the day before —

QUESTION:  Yeah.

SECRETARY RUBIO:  — arguing that October 7th had to
happen – that it had happen -- that it was a necessary
evil that -- he didn't call it an evil.

QUESTION:  Yeah.

[93]

SECRETARY RUBIO:  He said it's a necessary thing; it had to happen.  **Why is a guy like that allowed into the United States on a visa?  He's not entitled to a visa.  So, it has nothing to do with what they're saying.  It has to do with what they're doing and its implications on the U.S. Student visas are a privilege.  They are not a right.**

See https://www.youtube.com/watch?v=8wI45pjCzs4; https://www.state.gov/releases/office-of-the-spokesperson/2025/08/secretary-of-state-marco-rubio-with-raymond-arroyo-of-ewtns-the-world-over.

### E.  The Public Officials' Witnesses All Deny the Existence of an Ideological Deportation Policy

The Plaintiffs' witnesses all testified as to their belief that an ideological deportation policy exists based upon their observations and public statements made by our government officials.  The Public Officials' witnesses consistently testified that an ideological deportation policy does not exist.  See e.g., Trial Tr. vol. II, 121:6-21, Jul. 11, 2025; Trial Tr. vol. I, 59:16-25; 60:1-9, Jul. 17, 2025.  The Public Officials' theory of the case is that the ideological deportation policy is merely a theory, conjured up.  The Public Officials' counsel summed it up when cross-examining Professor Nickel by quoting Danish philosopher Søren Kierkegaard, for the proposition that "anxiety is the dizziness of freedom," see Trial Tr. vol. II, 114:2-115:1, Jul 8, 2025, dismissing the plaintiffs' claims of collective chill as somehow wholly self-imposed.

### F.    Inferences From the Factual Record

The great paradox of this case is that the government witnesses -- to a person -- are decent, credible, dedicated non-partisan professionals.  True patriots who, in order to do their duty, have been weaponized by their highest superiors to reach foregone conclusions for most ignoble ends.

There was no ideological deportation policy.  It was never the Secretaries' immediate intention to deport all pro-Palestinian non-citizens for that obvious First Amendment violation, that could have raised a major outcry.  Rather, the intent of the Secretaries was more invidious -- to target a few for speaking out and then use the full rigor of the Immigration and Nationality Act (in ways it had never been used before) to have them publicly deported with the goal of tamping down pro-Palestinian student protests and terrorizing similarly situated non-citizen (and other) pro-Palestinians into silence because their views were unwelcome.

The Secretaries have succeeded, apparently well beyond their immediate intentions.[33]  One may speculate that they acted under instructions from the White House, but speculation is not

---

[33] One reason for this, of course, is that this gambit has been accompanied by the Trump administration's full-throated assault on the First Amendment across the board under the cover of an unconstitutionally broad definition of Anti-Semitism.  As it should, this Court confines itself to the facts proven herein and makes no further comment.

evidence and this Court does not so find.  What is clear, however, is that the President may not have authorized this operation (or even known about it), but once it was in play the President wholeheartedly supported it, making many individual case specific comments (some quite cruel) that demonstrate he has been fully briefed.  Such conduct, of course, violates his sacred oath to "faithfully execute the Office of President of the United States, and . . . to the best of [his] Ability, preserve, protect and defend the Constitution of the United States," U.S. Const. art. II, § 1, cl. 8, by ignoring the Constitution's command that the President "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3. The fact that the President is, for all practical purposes, totally immune from any consequences for this conduct, <u>Trump</u> v. <u>United States</u>, 603 U.S. 593 (2024), does not relieve this Court of its duty to find the facts.  Fed. R. Civ. P. 52(a).

In the golden age of our democracy, this opinion might end here.  After all, the facts prove that the President himself approves truly scandalous and unconstitutional suppression of free speech on the part of two of his senior cabinet secretaries.  One would imagine that the corrective would follow as a matter of course from the appropriate authorities.  Yet nothing will happen.  The Department of Justice represents the

the President, and Congress is occupied with other weighty
matters.

Nor will there be any meaningful public outcry.  There is
an amalgam of reasons.  The President in recent months has
strikingly unapologetically increased his attack on First
Amendment values, balked here and there by District Court
orders.  The issues presented here commenced last March.

ICE has successfully persuaded the public that it is our
principal criminal law enforcement agency.  Americans have an
abiding faith in our criminal justice system.  After all,
ultimately they run it as jurors. "The Trial of all Crimes,
except in Cases of Impeachment, shall be by Jury[.]" U.S. Const.
art. III, § 2, cl. 3.  Despite the meaningless but effective
"worst of the worst" rhetoric, however, ICE has nothing whatever
to do with criminal law enforcement and seeks to avoid the
actual criminal courts at all costs.  It is carrying a **civil** law
mandate passed by our Congress and pressed to its furthest reach
by the President.  Even so, it drapes itself in the public's
understanding of the **criminal** law though its "warrants" are but
unreviewed orders from an ICE superior and its "immigration
courts" are not true courts at all but hearings before officers
who cannot challenge the legal interpretations they are given.
Under the unitary President theory they must speak with his
voice.  The People's presence as jurors is unthinkable.

[97]

And there's the issue of **masks**.  This Court has listened
carefully to the reasons given by Öztürk's captors for masking-
up and has heard the same reasons advanced by the defendant Todd
Lyons, Acting Director of ICE.  It rejects this testimony as
disingenuous, squalid and dishonorable.  ICE goes masked for a
single reason -- to terrorize Americans into quiescence.  Small
wonder ICE often seems to need our respected military to guard
them as they go about implementing our immigration laws.  It
should be noted that our troops do not ordinarily wear masks.
Can you imagine a masked marine?  It is a matter of honor -- and
honor still matters.  To us, masks are associated with cowardly
desperados and the despised Ku Klux Klan.  In all our history we
have never tolerated an armed masked secret police.  Carrying on
in this fashion, ICE brings indelible obloquy to this
administration and everyone who works in it.  "We can not escape
history," Lincoln righty said.  "[It] will light us down in
honor or dishonor, to the latest generation."  Abraham Lincoln,
Second Annual Message to Congress (Dec. 1, 1862).

Perhaps we're now afraid to stick our necks out.  If the
distinguished Homeland Security intelligence agency can be
weaponized to squelch the free speech rights of a small, hapless
group of non-citizens in our midst, so too can the Federal Home
Loan Mortgage Corporation, and the audit divisions of the I.R.S.
and the Social Security Administration be unconstitutionally

weaponized against the President's ever growing list of "enemies" or opponents he "hates" notwithstanding that political persecution is anathema to our Constitution and everything for which America stands.

Finally, perhaps we don't much care. After all, these Plaintiffs, a group of non-citizen pro-Palestinians are relatively small compared to the much larger interest groups who have every right vigorously to espouse the cause of the State of Israel. Palestine is far away and its people are caught up in the horrors of a modern war with heavy ordinance wreaking massive indiscriminate destruction, a war that is not one of our making. Why should we care about the free speech rights of their compatriots here among us?

Here's why:

The United states is a great nation, not because any of us say so. It is great because we still practice our frontier tradition of selflessness for the good of us all. Strangers go out of their way to help strangers when they see a need. In times of fire, flood, and national disaster, everyone pitches in to help people we've never met and first responders selflessly risk their lives for others. Hundreds of firefighters rushed into the Twin Towers on 9/11 without hesitation desperate to find and save survivors. That's who we are. And on distant battlefields our military "fought and died for the men [they]

marched among."  Frank Loesser, "The Ballad of Roger Young",
LIFE, 5 March 1945, at 117.

Each day, I recognize (to paraphrase Lincoln again) that
the brave men and women, living and dead, who have struggled in
our Nation's service have hallowed our Constitutional freedom
far above my (or anyone's) poor power to add or detract.  The
only Constitutional rights upon which we can depend are those we
extend to the weakest and most reviled among us.

Expecting no self correction -- or even outcry -- for the
amalgam of reasons above this Court proceeds to lay the legal
groundwork supporting an effective order (Sections III and IV)
and then sketches the special issues extant today (Section V).

## III. RULINGS OF LAW

The Plaintiffs here press three counts against the Public
Officials: 1) a First Amendment challenge to the alleged
ideological-deportation policy as viewpoint-discriminatory, and,
to the extent that the Public Officials rely on "security and
related grounds of inadmissibility" such as the "foreign policy
provisions" of Section 4C, an as-applied challenge to those
provisions for the same reason, Compl. ¶¶ 134-35; 2) a First
Amendment challenge to the Public Officials' alleged campaign of
coercive threats to punish protected speech, id. ¶ 136; and 3)
an Administrative Procedure Act ("APA") challenge, 5 U.S.C. §
706(2)(A)-(C), to the alleged ideological-deportation policy as

arbitrary, capricious, an abuse of statutory discretion, contrary to constitutional right, and exceeding the Public Officials' statutory authority, Compl. ¶ 139.

This Court rules that the Plaintiffs have shown by clear and convincing evidence that Secretaries Noem and Rubio have intentionally and in concert implemented Executive Orders in 14161 and 14188 a viewpoint-discriminatory way to chill protected speech. This conduct violated the First Amendment. The coercion line of case law bolsters this conclusion, and the Public Officials' threats to continue detaining, deporting, and revoking visas based on political speech serves as circumstantial evidence that such enforcement exists, is viewpoint discriminatory, and has objectively chilled the Plaintiffs' speech, but the campaign of threats itself, because not directed specifically at the Plaintiffs, does not separately violate the Constitution under this precise line of case law.

This mode of enforcement policy also violates the APA because, for the same reasons, it is contrary to constitutional right. It is also arbitrary or capricious because it reverses prior policy without reasoned explanation or consideration of reliance interests, and is based on statutes that have never been used in this way.

## A. Standing

This Court ruled on the facts alleged in the complaint that both AAUP and MESA had associational standing to sue, and that at least MESA had organizational standing.  AAUP v. Rubio, 780 F. Supp. 3d 350, 374-81 (D. Mass. 2025).  The Public Officials renew their challenge to standing at the trial's end, arguing that associational standing violates the Constitution, that because AAUP and MESA provided no student visa-holding standing witnesses they may not challenge the mode of enforcement here as it relates to nonimmigrant student visa holders, that the Plaintiffs' Legal Permanent Resident witnesses testified only to subjective fear and self-censorship and so have no concrete or impending injury traceable to the alleged policy or redressable by a decision of this Court, and that AAUP and MESA do not have organizational standing because they have shown merely a diversion of resources and no restriction of their own political speech.  Defs.' Post-Trial Proposed Findings of Fact & Rulings of Law 22-69.

### 1. Associational Standing

This Court is of course bound by vertical precedent establishing and adhering to the associational standing framework.  See, e.g., Parent/Pro. Advoc. League v. City of Springfield, Mass., 934 F.3d 13, 33-34 (1st Cir. 2019).  It

explained its understanding of that governing precedent in its prior opinion.  AAUP, 780 F. Supp. 3d at 374-79.

Chill-based First Amendment challenges require more than subjective fear, but rather "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the] statute, and . . . a credible threat of prosecution," or a showing that one is "chilled from exercising [one's] right to free expression or foregoes expression in order to avoid enforcement consequences."  Blum v. Holder, 744 F.3d 790, 796 (1st Cir. 2014) (cert. denied) (quoting Mangual v. Rotger-Sabat, 317 F.3d 45, 56-57 (1st Cir. 2003)).  The Public Officials argue, and the First Circuit has noted in dicta that, in Clapper v. Amnesty Int'l USA, 568 U.S. 398 (2013), the Supreme Court "may have adopted a more stringent injury standard for standing than th[e] [First Circuit] has previously adopted in pre-enforcement challenges on First Amendment grounds." Blum, 744 F.3d at 798.

At the same time, courts in this circuit have continued to entertain chill-based and similar challenges after Clapper, see, e.g., Doe v. Hopkinton Pub. Schs., 19 F.4th 493, 510-11 (1st Cir. 2021) (evaluating chill-based overbreadth challenge); Martin v. Evans, 241 F. Supp. 3d 276, 281-83 (D. Mass. 2017) (Saris, J.) (ruling that complaint "sufficiently alleges an intention to engage in a particular course of conduct if not for

[the challenged law]," id. at 282, and observing that "the Court can assume that the plaintiffs will face a credible threat of prosecution should they engage in their intended actions," an "assumption [which] remains good law", id. at 283), as have several courts of appeals in recent years, see Speech First, Inc. v. Cartwright, 32 F.4th 1110, 1120 (11th Cir. 2022) (stating rule that First Amendment standing requires only that a "reasonable would-be speaker" would self-censor in response to the challenged policy); Speech First, Inc. v. Killeen, 968 F.3d 628, 638 (7th Cir. 2020) (stating that "a plaintiff may show a chilling effect on his speech that is objectively reasonable, and that he self-censors as a result"); Speech First, Inc. v. Fenves, 979 F.3d 319, 335-37 (5th Cir. 2020) (restating rule that "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations," id. at 335 (quoting Laird v. Tatum, 408 U.S. 1, 11 (1972)) and thus "[w]here the [challenged] policy remains non-moribund, the claim is that the policy causes self-censorship among those who are subject to it, and the [plaintiffs'] speech is arguably regulated by the policy, there is standing," id. at 336-37). Many of the reasons these other courts have found to distinguish Clapper from true objective chill-based cases apply here: this is a challenge to a mode of enforcement that directly threatens adverse action against the member plaintiffs' own speech, so

"the injury here does not depend on the government enforcing a law against another person with whom the plaintiffs might potentially interact." Martin, 241 F. Supp. 3d at 283; see also Hopkinton Pub. Schs., 19 F.4th at 511 ("'[A] chill on speech sometimes may be a cognizable injury,' but 'in order to have standing, the plaintiff must be within the class of persons potentially chilled.'" (alteration in original) (quoting Osediacz v. City of Cranston, 414 F.3d 136, 142 (1st Cir. 2005)). No one asserts "that the plaintiffs [are] in a class that, under the challenged [policy], could not be targeted" as in Clapper, Fenves, 979 F.3d at 336; rather, the Plaintiffs' noncitizen members are squarely within the class that is subject to the alleged mode of enforcement.[34] As the Supreme Court

---

[34] The Court acknowledges the complexity introduced by the fact that the Plaintiffs challenge an enforcement policy implementing Executive Orders, and so cannot point to a written version of the de facto speech regulation that allegedly chills their speech outside of the Executive Orders themselves, scattered public statements and social media posts, and the operation of the two government departments (Homeland Security and State) themselves. This is factually similar, however, to the recent campus speech code cases, where plaintiffs challenge harassment policies that they assert violate the First Amendment because they are in fact overbroad or viewpoint-discriminatory. see, e.g., Cartwright, 32 F. 4th at 1114-18. Here, the Executive Orders articulate a kind of harassment policy, singling out particular kinds of speech. The facts are also similar to First Circuit precedent allowing challenges to enforcement policies implementing facially neutral statutes based on a First Amendment chill, McGuire v. Reilly, 386 F.3d 45, 55, 59-64 (1st Cir. 2004). Specifically, the Executive Orders target antisemitic harassment, hateful ideology, hostile attitudes, and support for terrorists, and have allegedly been

observed in <u>Holder</u> v. <u>Humanitarian L. Proj.</u>, in the course of
explaining why plaintiffs, who had previously engaged in conduct
that was subsequently criminalized and said they wished to do so
again, had standing to challenge the criminalizing statute,
"[t]he Government has not argued to this Court that plaintiffs
will not be prosecuted if they do what they say they wish to
do," 561 U.S. 1, 16 (2010).  On the contrary, the Public

---

implemented to target particular viewpoints and protected
speech.  This challenge seems to this Court entirely
appropriate: it would be an odd kind of First Amendment chill
law, after all, that allowed government officials to regulate
speech so long as they did not write the details of their speech
regulations down.  <u>See</u> <u>Speech First, Inc.</u> v. <u>Whitten</u>, 145 S. Ct.
701, 703 (2024) (Thomas, J., dissenting from the denial of
certiorari) (discussing potential chill from campus bias
response program defining bias in a way that "appears limitless
in scope," with "weighty consequenc[es] . . . lurk[ing] in the
background" (citation omitted)); <u>Keyishian</u> v. <u>Board of Regents</u>,
385 U.S. 589, 601 (1967) ("The very intricacy of the plan and
the uncertainty as to the scope of its proscriptions make it a
highly efficient in terrorem mechanism.").  For clarity's sake,
this Court believes that the contours of the alleged speech
regulation may be briefly stated: Lawful Permanent Residents'
green cards and student visa-holders' visas may be revoked, and
these persons may be detained and deported, based on any public
anti-Israel or pro-Palestine speech or association.
Particularly given that a key agency official tasked with
implementing the policy refers consistently to potential
"violat[ions]" of the Executive Orders and to activity that
"aligns with the executive order's focus on deporting 'Hamas
sympathizers,'" and that the statutory authorities invoked here
are themselves sweepingly vague, this approach seems more
aligned with the facts at issue than the more typical approach -
- also invoked by the Plaintiffs, as a back-up position -- that
would focus on the potentially discriminatory application of
specific statutes.  The bulk of the Court's reasoning, however,
would also apply to that kind of challenge, under the same
chill-based precedents.

Officials have forcefully asserted their right to detain, deport, and revoke visas in response to the very speech-based activities in which the standing witnesses here previously engaged and credibly testify that they would engage in again were it not for the challenged policy. See Blum, 744 F.3d at 798 n.11 ("Clapper does not call into question the assumption that the [government] will enforce its own non-moribund criminal laws.").

In sum, the law of objective chill-based First Amendment standing remains intact after Clapper, and applies here.[35]  As Justice Thomas wrote recently and as this Court cited in its previous opinion (AAUP, 780 F. Supp. 3d at 376), "[i]t is well settled that plaintiffs may establish standing based on 'the

---

[35] This ought be no surprise, as Clapper addressed a mere paragraph to the chill issue, which it deemed largely irrelevant as no prior case "even suggest[ed] that plaintiffs can establish standing simply by claiming that they experienced a 'chilling effect' that resulted from a governmental policy that does not regulate, constrain, or compel any action on their part." Id. at 419. Clapper contrasted this with cases where "the plaintiff . . . [is] unquestionably regulated by the relevant statute" and wishes to engage in regulated conduct, showing more than a subjective chill. Id. at 420. The Court expressly acknowledged that standing may in some circumstances be based on a showing "that the defendant's actual action has caused a **substantial risk** of harm," id. at 414 n.5 (emphasis added), citing the First Amendment chill case Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979) as one of several examples. Babbitt, in turn, states simply: "A plaintiff who challenges a [law] must demonstrate a **realistic danger** of sustaining a direct injury as a result of the [law]'s operation or enforcement." 442 U.S. at 298 (emphasis added) (citing O'Shea v. Littleton, 414 U.S. 488, 494 (1974)).

deterrent, or "chilling," effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights,'" and, "in assessing whether an 'objective chill' exists in a particular case, courts must 'look through the forms to the substance' of the government's 'informal sanctions.'"  Whitten, 145 S. Ct. at 703 (Thomas, J., dissenting from the denial of certiorari) (first quoting Laird, 408 U.S. at 11; then citing Clapper, 568 U.S. at 418; and then quoting Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 67 (1963)).

On the merits, the Court disagrees that the Plaintiffs' standing witnesses have shown only subjective fear and unreasonable self-censorship.  In particular, standing witness Professor Al-Ali, who is a lawful permanent resident and a member of both AAUP and MESA, testified to a long history of scholarly work and advocacy on issues related to Palestine, including signing and in one case drafting open letters calling for, among other things, Brown University's divestment from companies involved in Israel's military occupation of Palestine, the dropping of legal charges against student protestors in aftermath of the October 7 attacks, and a ceasefire in Gaza. Trial Tr. vol. II, 125:16-126:8, 129:13-19, Jul. 7, 2025; Trial Tr. vol. I, 8:22-11:23, 15:21-17:15; see also Exs. 92, 223, & 224.  Professor Al-Ali credibly testified that news of Khalil and Öztürk's arrests, in addition to the comment from President

[108]

Trump that Khalil's arrest would be one of "many," led her to alter international travel plans and to contact an immigration lawyer to track her travel abroad, to decline a public-facing leadership opportunity that might have more firmly associated her with pro-Palestine human rights advocacy, to cease her previous practice of signing open letters related to these issues, to forego specific research projects related to Palestine and funded research opportunities requiring travel, and to stop attending protests and assisting in negotiations between Brown University and its students as she had previously done, all out of fear of being targeted for her pro-Palestinian speech and association with such views.  Trial Tr. vol. II, 138:5-15, 140:2-21, 141:9-10, 141:21-142:20, 144:13-145:5, 145:19-146:7, Jul. 7, 2025; Trial Tr. vol. I, 19:2-15, 20:5-14 Jul. 8, 2025.  Professor Al-Ali, moreover, bears many of the traits that appear to make one ripe for targeting under the mode of enforcement proved here: she has voiced public support for the BDS movement, which is a particular focus of the Canary Mission website from which many of the policy's targets so far have been drawn, she is already discussed on a similar website that targets such advocacy, and she has served as Director of a campus organization, the Center for Middle East Studies, that has been investigated and subject to public scrutiny based on allegations related to pro-Palestine advocacy.  Trial Tr. vol.

I, 19:16-20:1, Jul. 8, 2025; see Fenves, 979 F.3d at 336
(describing Clapper's emphasis on "a history of enforcement or
specific facts about the government's targeting practices that
might yet give rise to a substantial threat of enforcement").

Other standing witnesses for AAUP and Harvard-AAUP also
testified to the chilling effect of the arrests and alleged
policy on speech and expressive activity, such as their public-
facing writing, public letter signing, and protest attendance.
Professor Megan Hysaka, an AAUP member and lawful permanent
resident, has previously published a paper discussing media
treatment of the Israel-Palestine conflict, regularly attended
pro-Palestine protests including student encampments, and signed
an open letter in support of pro-Palestine student protests.
Trial Tr. vol. I, 36:1-5, 36:18-19, 55:9-16, Jul. 7, 2025. Now,
in response to the arrests and several social media posts by the
Public Officials, she has cut back on these activities and,
among other things, refrained from publishing a specific op-ed
that she drafted in response to Öztürk's arrest, out of fear
that the enforcement policy would be applied to her in the same
way that it was to Öztürk. Id. 43:2-44:12, 57:17-66:22; see
also Ex. 66. Professor Bernhard Nickel, a member of AAUP and
Harvard-AAUP, previously signed public letters and statements in
support of Palestinian human rights and student protestors and
attended pro-Palestine protests, including student encampments,

but, in response to the arrests and various threatening
statements by the Public Officials, he has ceased signing public
letters and attending protests, and canceled travel plans to
visit his terminally ill brother abroad and to attend an
international academic conference.  Trial Tr. vol. I, 18:17-18,
66:23-67:23, 70:4-8, Jul. 8, 2025; Trial Tr. vol. II, 86:2-13,
87:19-90:10, Jul. 8, 2025.

The Public Officials argued at trial that the fears
motivating these episodes of self-censorship were largely self-
inflicted, at trial quoting Kierkegaard that "anxiety is the
dizziness of freedom."  Trial Tr. vol. II, 114:2-115:1.  It is
an odd kind of freedom that compels one to leave writing
unpublished, leadership positions unpursued, and terminally ill
relatives unvisited.  This Court credits the testimony of AAUP
and MESA members that the enforcement policy they challenge
objectively chills their speech, and so rules that both AAUP and
MESA have associational standing to pursue their claim that the
Public Officials are engaged in a policy of targeting
noncitizens based on their viewpoints in order to chill speech.[36]

---

[36]  The Public Officials argue that because Plaintiffs did
not present nor name nonimmigrant student visa holders among
their membership, that those members lack associational
standing. This argument, however, overextends the rule.  First
Circuit and Supreme Court precedent do not require the naming of
every possible sub-group within an association in order to
establish standing for each sub-group within the association.
Rather, the rule requires only that the association "identify

The issue whether AAUP and MESA also have associational standing to pursue their challenge to the alleged campaign of coercive threats to silence their speech is intertwined with the merits, and so collapses with the liability discussion below. See infra Section III.C.  "Governmental activity constitutes an injury-in-fact when 'the challenged exercise of governmental power [is] regulatory, proscriptive, or compulsory in nature, and the complainant [is] either presently or prospectively subject to the regulations, proscriptions, or compulsions that he [is] challenging.'"  Speech First, Inc. v. Schlissel, 939 F.3d 756, 764-65 (quoting Laird, 408 U.S. at 11).  All standing witnesses testified to having been exposed to some combination of the public threats by the Public Officials and the publicized arrests of Khalil and Öztürk on which the plaintiffs base this claim, to have self-censored in response to this exposure, and all are potentially subject to the threatened consequences. Whether the threats were directed at the Plaintiffs with

_____

[a] member[ ] who ha[s] suffered the requisite harm.'  Housatonic River Initiative v. United States Env't Prot. Agency, New England Region, 75 F.4th 248, 265 (1st Cir. 2023) (citing Summers v. Earth Island Inst., 555 U.S. 488, 499 (2009)). Thus, defendant's delineation between legal permanent residents and nonimmigrant student visa holders in the context of associational standing is a distinction without a meaningful legal difference. Plaintiffs identified and solicited testimony from several noncitizen members who have suffered the requisite harm, thus satisfying the identification prong of the associational standing test.

sufficient particularity to support a claim under this line of case law is factually and legally complex, and so better left to the discussion of how First Amendment law applies to the facts proved at trial.

As to organizational standing -- which is ruled on separately here, because it may affect the scope of the relief this Court can offer -- this Court rules that MESA has organizational standing to pursue these claims for substantially the same reasons stated in this Court's previous opinion denying in part the Public Officials' motion to dismiss. AAUP, 780 F. Supp. 3d at 379-382. MESA alleged, and has now substantiated, that the challenged mode of enforcement and campaign of coercive threats has significantly harmed its core activity of facilitating academic discourse and scholarship about issues impacting the Middle East, including by reducing projected membership numbers and so membership dues, a reduced anticipated participation in its flagship annual meeting in November based on current submission numbers, and, as testified by Professor Al-Ali, by pressuring members to self-censor and so not to contribute scholarship and perspectives that they would otherwise contribute, which scholarship and discourse are the lifeblood of the organization. MESA has thus shown harm to its "core [] activities," rather than a mere voluntary diversion of resources "in response to a defendant's actions" still

essentially within that mission.  Food & Drug Admin. v. Alliance for Hippocratic Med., 144 S.Ct. 1540, 1564 (2024).

While acknowledging that the lines in this field are uncertainly drawn, this Court rules that AAUP's demonstrated harms -- deterred and diminished noncitizen participation in AAUP events and diverted resources from more typical core advocacy issues such as "adjunctification" to dealing with immigration law -- fall within the Supreme Court's warning against permitting an organization to "spend its way into standing simply by expending money to gather information and advocate against the defendant's action." Id. at 1563.  This formulation ought not give the impression that this Court does not acknowledge or credit the real hardships that the proven mode of enforcement and coercion campaign may have caused AAUP.  Rather, it is a judgment that organizational standing doctrine, which stems from what the Supreme Court has called an "unusual case" that it "has been careful not to extend . . . beyond its context," forbids a kind of coming-to-the nuisance, such that organizations that respond to their members' injuries within their core mission, without suffering "direct[] . . . interfere[nce] with" their own "core . . . activities," may not

benefit from this relatively unusual form of standing, id. at 1564.[37]

In sum, the challenged "government policy would cause a reasonable would-be speaker to 'self-censor,'" such that "the challenged policy 'objectively chills' protected expression." Cartwright, 32 F. 4th at 1120.  As noted above, the Public Officials do not disavow an intention to detain, deport, or revoke student visas in response to what would inarguably be constitutionally protected speech if engaged in by a citizen. In this Court's view, then, the Public Officials have

---

[37] The Court acknowledges, conversely, that MESA's organizational standing is premised on the arguably novel theory that, because its members are chilled, the organization itself is harmed, which could be viewed as insufficiently direct.  See Texas State LULAC v. Elfant, 52 F.4th 248, 256-57 (5th Cir. 2022) (finding no chill-based organizational standing where organization itself faced no substantial risk of penalty under the challenged statute).  This Court understands this, however, to be a unique case, like Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982), where the alleged enforcement policy cuts straight to the core of the organization's mission: without candid speech about the most pressing issues facing the Middle East, after all, what is MESA for?  In other words, the challenged policy has, as alleged, made it a potentially deportable offense to do what the organization exists to facilitate.  Havens Realty itself involved a challenge to a defendant's illegal racial steering practices that allegedly harmed the organization's **clients** by misleading them, which in turn made the organization's own core work of correctly counseling its clients more difficult; that is, it involved another form of arguably third-party, indirect harm.  See 455 U.S. at 378-79.  The focus of Havens Realty as interpreted by Hippocratic Med. is, again, on whether the defendant's "actions directly affected and interfered with [the plaintiff's] core business activities."  602 U.S. at 395.

essentially conceded that it is objectively reasonable for the Plaintiffs' noncitizen members to believe that, if they choose to engage in pro-Palestine or anti-Israel advocacy of any meaningfully public kind, they will expose themselves to the consequences they fear.[38]

Having ruled that both MESA and AAUP have associational standing, and that MESA has organizational standing as well, the Court proceeds to the merits.[39]

## B. First Amendment Viewpoint Discrimination (Count I)

Two preliminary questions must be settled before the Plaintiffs' First Amendment viewpoint discrimination claim can be analyzed: (1) what First Amendment rights the noncitizens at issue here possess; and (2) what standard of review applies to the Plaintiffs' challenge to an "ideological deportation policy" implementing the President's Executive Orders.  The first

---

[38] It is, of course, somewhat speculative whether these particular plaintiffs would end up on the particular anonymously-sourced lists from which the Public Officials have so far drawn the names of the noncitizens they have targeted, were they to attend a pro-Palestine protest or write an anti-Israel article.  But it seems objectively reasonable to this Court to fear that any published writing, or any attendance at a protest, might render them so.

[39] With the exception of the testimony of Professor Nickel, who is a member of Harvard-AAUP, the Plaintiffs did not provide evidence of the challenged policy's effects on the individual AAUP chapters that initially sued, and they do not press the issue in their briefing.  This Court therefore rules that, in addition to MESA, only AAUP itself, and not these individual chapters, has standing.

question is dealt with more easily, in part because the Court
has already addressed it and ruled that noncitizens have at
least the core First Amendment right to political speech without
reprisal.  AAUP, 780 F. Supp. 3d at  382 (D. Mass. 2025).
Despite that ruling, the Court pauses to acknowledge the
complexity of this issue, and to explain its reasoning.

**1. The First Amendment Rights of Noncitizens**

This Court appreciates, as the Plaintiffs have urged, that
several courts to have addressed the issue of noncitizen speech
in recent months have stated in no uncertain terms that
noncitizens' speech rights are identical to those of citizens.
See, e.g., Mahdawi, 781 F. Supp. 3d 214, 229 (D. Vt.
2025)(Crawford, Ch. J.).  Although the Court broadly agrees with
these analyses, the Public Officials are not wrong to suggest
that the matter is complex.  Unlike with citizens, the question
involves a collision between two doctrines that do not admit of
easy compromise: plenary power doctrine in the immigration
context and this nation's steadfast and foundational commitment
to freedom of speech.  See Bustamante v. Mukasey, 531 F.3d 1059,
1061-62 (9th Cir. 2008) (discussing Kleindienst v. Mandel, 408
U.S. 753 (1972), where the Supreme Court "acknowledged that
First Amendment rights were implicated, but emphasized the
longstanding principle that **Congress** has plenary power to make
policies and rules for the exclusion of aliens") (emphasis

added); but see Bridges v. Wixon, 326 U.S. 135, 162 (1945)
(Murphy, J., concurring) ("[T]he First Amendment and other
portions of the Bill of Rights make no exception in favor of
deportation laws or laws enacted pursuant to a 'plenary' power
of the Government."). Judicial review of Executive Branch
decision-making with respect to noncitizens is importantly
limited in certain contexts, even where recognized rights may be
implicated. See, e.g., Trump v. Hawaii, 138 S.Ct. 2392, 2419-20
(2018) (applying rational basis review, and citing Mandel's more
deferential "facially legitimate and bona fide" reason standard,
408 U.S. at 762, when evaluating Establishment Clause challenge
to allegedly discriminatory admission policy affecting aliens
abroad, which policy involved "matters of entry and national
security"); Reno v. American-Arab Anti-Discrim. Comm., 525 U.S.
471, 491-92 (1999) (holding that "[w]hen an alien's continuing
presence in this country is in violation of the immigration
laws, the Government does not offend the Constitution by
deporting him for the additional reason that it believes him to
be a member of an organization that supports terrorist
activity," but not "ruling out the possibility of a rare case in
which the alleged basis of discrimination is so outrageous" that
this rule might be overcome); Kandamar v. Gonzalez, 464 F.3d 65,
72 (1st Cir. 2006) ("The Supreme Court has long held that

judicial review of line-drawing in the immigration context is
deferential.").

Broadly speaking, however, "the Supreme Court [has] applied
to aliens the same First Amendment test then applicable to
citizens," American Arab Anti-Discrim. Comm. v. Meese, 714 F.
Supp. 1060, 1081 (C.D. Cal. 1989), vacated, 970 F.2d 501 (9th
Cir. 1992), with the significant exception that citizens
generally cannot be deported.  This makes sense of the cases
from the early Cold War era relied on by the Public Officials,
where Anarchist and Communist speech and association were
sometimes penalized as to citizens and noncitizens alike,
although the penalties differed.  See, e.g., Harisiades v.
Shaughnessy, 342 U.S. 580, 587-92 (1952) (upholding statute
allowing deportation of former Communist Party members based on
"[c]ongressional apprehension of foreign or internal dangers
short of war," id. at 587, including Congress' receiving
"evidence that the Communist movement here has been heavily
laden with aliens and that Soviet control of the American
Communist Party has been largely through alien Communists," id.
at 590, based on distinction between lawful advocacy and
"advocating overthrow of government by force and violence," id.
at 591-92); Dennis v. United States, 341 U.S. 494, 502-11 (1951)
(upholding criminal conviction of citizens based on conspiracy
to teach Communism against First Amendment challenge, applying

same test later used in Harisiades, again citing potential
"attempt to overthrow the Government by force and violence" id.
at 517).  Furthermore, some of the most notorious Red Scare
First Amendment Supreme Court cases were significantly cabined
by the infamous "Red Monday" cases of 1957.  See e.g., Yates v.
United States, 354 U.S. 298, 318 (1957) (distinguishing between
"effort to instigate action to th[e] end" of "forcible
overthrow", id. at 318, of the government, which was illegal
under the Smith Act's advocacy or organizing provisions, and
"advocacy and teaching . . . divorced from any [such] effort,"
which, even when done with "evil intent," was not, id.).  The
Court therefore continues to assume that the best reading of the
relevant First Amendment case law entitles noncitizens to the
protection of the Court's post-Cold War development of an
"incitement test" requiring "a likelihood of imminent harm" in
order to render otherwise lawful political speech subject to
adverse government action.  See Brandenburg v. Ohio, 395 U.S.
444 (1969).

The Public Officials urge, and this Court acknowledges,
that Harisiades has not been expressly overruled by the Supreme
Court.  Even assuming that the First Amendment law of the second
Red Scare era still applies to noncitizens in its entirety, the
Public Officials' reliance on these Red Scare era cases only
accentuates two important distinctions between this case and the

[120]

cases on which the Public Officials most rely. First, Harisiades carefully examined a specific congressional determination that the organization of which the plaintiffs were former members advocated the "methodical but prudent incitement to violence," and ultimately "incitement to violent overthrow" of the United States government. Harisiades, 342 U.S. at 592. Here, there is no alleged membership of any organization and no congressional determination specific to it or to the targeted noncitizens, much less a determination that the targeted noncitizens are involved in advocating for the government's violent overthrow, 342 U.S. at 592. Second, Mandel and Hawaii, which the Public Officials cite for the proposition that all burdens on noncitizens' First Amendment rights are subject to only a "facially legitimate and bona fide" reason standard of review, are exclusion cases, and "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law," Zadvydas v. Davis, 533 U.S. 678, 693 (2001); Gastelum-Quinones v. Kennedy, 374 U.S. 469, 479 (1963) ("[D]eportation is a drastic sanction, one which can destroy lives and disrupt families, and . . . a holding of deportability must therefore be premised upon [meaningful evidence of the relevant violation].").  In any case, political speech is not, on its own, a facially legitimate reason for expelling persons from this country, see Abourezk v.

[121]

Reagan, 592 F. Supp. 880, 887 & n.23 (D.D.C. 1984) (Greene, J.)
("[A]lthough the government may deny entry to aliens altogether,
for any number of specific reasons, it may not, consistent with
the First Amendment, deny entry solely on account of the content
of speech."), vacated and remanded on other grounds, 785 F.2d
1043 (D.C. Cir. 1986); American Acad. of Relig. v. Chertoff, 463
F. Supp. 2d 400, 415 (S.D.N.Y. 2006) (Crotty,J.) ("[W]hile the
Executive may exclude an alien for almost any reason, it cannot
do so solely because the Executive disagrees with the content of
the alien's speech and therefore wants to prevent the alien from
sharing this speech with a willing American audience.").
Indeed, even at the height of the second Red Scare, and even
when examining loyalty oaths required to obtain union leadership
rather than the far more serious consequence of deportation, the
Supreme Court stressed the need for some connection to intended,
concrete violent action in order to attach **any** negative
consequences to political speech and association: "The
congressional purpose is therefore served if we construe the
[challenged statutory language requiring an anti-Communist
loyalty oath] to apply to persons and organizations who believe
in violent overthrow of the Government as it presently exists
under the Constitution **as an objective, not merely a prophecy. .
. . Of course we agree that one may not be imprisoned . . .
because he holds particular beliefs**." American Commc'ns Ass'n,

[122]

C.I.O. v. Douds, 339 U.S. 382, 407-08 (1950) (emphasis added). And again, in the deportation case Harisiades, the Supreme Court specifically rejected the proposition "that the First Amendment allows Congress to make no distinction between advocating change in the existing order by lawful elective processes and **advocating change by force and violence**," and observed that "Communist Governments avoid the inquiry by suppressing everything distasteful." 342 U.S. at 592 (emphasis added). The Supreme Court "apprehend[ed] that the Constitution enjoins upon [courts] the duty, however difficult, of distinguishing between" pure political speech and incitement to violence. Id.

For these reasons, this Court rules that here the Plaintiffs have shown that Secretaries Noem and Rubio are engaged in a mode of enforcement leading to detaining, deporting, and revoking noncitizens' visas solely on the basis of political speech, and with the intent of chilling such speech and that of others similarly situated. Such conduct is not only unconstitutional, but a thing virtually unknown to our constitutional tradition.

Lastly, as is relevant to its analysis below, this Court observes that, on its face, the First Amendment does not distinguish between citizens and noncitizens; rather, it states simply, "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. Const. amend. I. As the Supreme Court's now

frequently cited statement in <u>Bridges</u> v. <u>Wixon</u> confirmed, this
text at least arguably implies that "[f]reedom of speech . . .
is accorded aliens residing in this country."  326 U.S. 135, 148
(1945).  It also suggests something a little less obvious, but
still worth saying, which is that its chief concern is with the
character and quality of the "speech" that occurs on American
soil, in what Justice Holmes called "free trade in ideas," which
is "the best test of truth," <u>Abrams</u> v. <u>United States</u>, 250 U.S.
616, 630 (1919), and ensuring that Congress may not twist that
speech in the federal government's preferred direction.  In
other words, as Professor Zechariah Chafee Jr. put it, the First
Amendment declares a "national policy in favor of the public
discussion of all public questions." <u>Freedom of Speech in War
Time</u>, 32 Harv. L. Rev. 932, 934, 956 (1919); <u>see also</u> <u>Mandel</u>,
408 U.S. at 775 (Marshall, J., dissenting) ("The freedom to
speak and the freedom to hear are inseparable; they are two
sides of the same coin.  But the coin itself is the process of
thought and discussion.  The activity of speakers becoming
listeners and listeners becoming speakers in the vital
interchange of thought is the 'means indispensable to the
discovery and spread of political truth.'  Its protection is 'a
fundamental principle of the American government.'  The First
Amendment means that Government has no power to thwart the
process of free discussion[.]" (citations omitted)).  Although

[124]

this Court rejected the Plaintiffs' arguments that their citizen members had standing to sue on the basis of chilled listening and association as such, it nevertheless takes seriously their concern that their own speech rights and rights to hear and to associate are implicated in this case.

## 2. The Standard of Review

As for the second question, that is, what standard of review ought apply to the Plaintiffs' First Amendment viewpoint discrimination challenge to the alleged procedures, this Court rules that it need not decide, because even under the "facially legitimate and bona fide" standard proposed by the Public Officials under Department of State v. Munoz, 602 U.S. 899, 908 (2024), or Hartman v. Moore, 547 U.S. 250 (2006), on this record, the Plaintiffs prevail.[40]

---

[40] The Court acknowledges that this sidesteps the tiers-of-scrutiny question raised by both parties, which seems somewhat beside the point: without a direct challenge to the Executive Orders or the statutes, there is no text to scrutinize; the question, then is what the policy mode of enforcement is, and whether it is, as the Plaintiffs allege, viewpoint-discriminatory. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys," and "[d]iscrimination against speech because of its message is presumed to be unconstitutional." Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, at 828 (1995). Likewise, "[t]he adoption of a facially neutral policy for the purpose of suppressing the expression of a particular viewpoint is viewpoint discrimination." Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of Law v. Martinez, 561 U.S. 661, 736 (2010) (Alito, J., dissenting). The intent element addresses the difficulty of definition in defining the policy: a policy of intentionally targeting pro-Palestine and anti-Israel

The Court credited at the motion to dismiss stage that the
Plaintiffs might plausibly be able to show that the
implementation of the specific Executive Orders cited amounted
to a discrete policy or practice, and that that discrete policy
or practice targeted protected political speech.  AAUP, 780 F.
Supp. 3d at 383-84.  There is nothing unusual, after all, in
objecting to the implementation of Executive Orders, which may
serve as a focal point for review even when they are not
directly challenged.  See Woonasquatucket River Watershed
Council v. U. S.  Dep't of Agric., 778 F. Supp. 3d 440, 462
(D.R.I. 2025) ("[T]he [plaintiffs] can challenge the

---

speech in order to chill it is of course viewpoint
discriminatory, and, to the extent that it applies, would also
fail strict scrutiny for want of being narrowly tailored to the
invoked end of combating antisemitism, as would a more
generously interpreted version of the policy as something like
"Hamas-sympathizers may be deported," without defining who such
sympathizers are.  See Reed v. Town of Gilbert, Ariz., 576 U.S.
155, 168, 171 (2015) (stating rule that content-based
restrictions, of which viewpoint-based restrictions are an
especially "egregious" kind, "can stand only if they survive
strict scrutiny," requiring the government to show that the law
furthers a compelling interest and is narrowly tailored to
achieve it).  The relevant Executive Orders do not purport to be
content-neutral, but they do purport to target antisemitic
harassment and violence; and, in lieu of a facially
discriminatory statute or regulation, a policy of combating
harassment that only incidentally burdens speech would raise
different questions.  See Test Masters Educ. Servs., Inc. v.
Singh, 428 F.3d 559, 580 ("Courts have made a distinction
between communication and harassment.  The difference is one
between free speech and conduct that may be proscribed.
Although restrictions based upon conduct may incidentally
restrict speech, the courts have found that such a restriction
poses only a minimal burden on speech." (citations omitted)).

implementation of an [Executive] order without challenging the
order itself[.]"); Franklin v. Massachusetts, 505 U.S. 788, 828
(1992) (Scalia, J., concurring in part and concurring in the
judgment) ("Review of the legality of Presidential action can
ordinarily be obtained in a suit seeking to enjoin the officers
who attempt to enforce the President's directive[.]").

    At the same time, this Court also expressed a related
concern that it was not clear that the plaintiffs could mount a
typical "facial" First Amendment challenge to an unwritten
policy, or, alternatively, an "as applied" challenge to statutes
applied in implementing the challenged policy, when those
statutes have not been applied to the Plaintiffs who are before
the Court. AAUP, 780 F. Supp. 3d at 383 n. 10. The Court cited
McGuire v. Reilly as the best controlling analogue to what the
First Circuit in that case described as an "enforcement policy,"
against which the plaintiffs mounted "a different sort" of as-
applied challenge, which "must be based on the idea that the law
itself is neutral and constitutional . . . , but that it has
been enforced selectively in a viewpoint discriminatory way."
386 F.3d 45, 61 (1st Cir. 2004). The Plaintiffs here argue that
the enforcement actions are viewpoint discriminatory and so
unconstitutional all the way down, and thus they need not show
intent, see Iancu v. Brunetti, 588 U.S. 388, 393 (2019)
(describing as "a core postulate of free speech law" that "[t]he

government may not discriminate against speech based on the
ideas or opinions it conveys." Iancu described viewpoint-
discriminatory laws "presumptively unconstitutional" (quoting
Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819,
829-30 (1995)).

On the other hand, the Public Officials invoke a framework
requiring a showing not just of retaliatory intent but of no
probable cause for any adverse actions, see Hartman, 547 U.S. at
263, 265-66 -- but it seems to the Court to capture the essence
of what the Plaintiffs allege: a pair of Executive Orders that,
although couched in a concern for hateful ideologies,
antisemitism, and antisemitic harassment, and accompanied by
appropriate disclaimers as to the lawfulness of any actions
taken pursuant to them, in fact incorporated a definition of
antisemitism that encompassed protected political speech, and,
by means of intentionally discriminatory enforcement procedures
implementing them, led to the singling out of pro-Palestine and
anti-Israel speech for a campaign of speech-chilling
retribution.[41]

---

[41] This framework also addresses the Public Officials'
reasonable concern that the Executive's prosecutorial discretion
not be micromanaged by the Judiciary, a concern which the
Supreme Court has described -- albeit in the context of concern
over delay in specific deportation proceedings, which has not
been threatened here -- as "greatly magnified in the deportation
context." Reno, 525 U.S. at 489-90. Under a McGuire-type
standard, the Plaintiffs take on the heavy burden of showing

[128]

This Court continues to find McGuire, and similar cases relied on by the Plaintiffs, helpful in guiding its review here. See Hoye v. City of Oakland, 653 F.3d 835, 856 (9th Cir. 2011) (ruling that, alongside a written Ordinance, the defendant was "instead enforcing **a different, unwritten, rule** . . . i.e., **the Ordinance as erroneously understood by [the defendant]**" which was itself "impermissibly content-discriminatory"); Lozman v. Riviera Beach, 585 U.S. 87, 100 (2018) (noting that "[a]n official retaliatory policy is a particularly troubling and potent form of retaliation, for a policy can be long term and pervasive" and "difficult to dislodge." The Court in Lozman declined, in view of the "compelling need for adequate avenues of redress," to apply a no-probable-cause standard to such a claim).

The Plaintiffs have alleged, and here have proved, a discrete practice of targeting pro-Palestine and anti-Israel speech, which arose from a kind of intentional ratcheting-up of

---

that the Public Officials have not just systematically selectively prosecuted, but intentionally have done so to chill speech.  A more demanding rule, like the one from Hartman suggested by the Public Officials, would risk doing serious violence to the First Amendment: the government could intentionally selectively deport for the express purpose of chilling speech, so long as at least sometimes it turned out that there were other, perhaps trivial, reasons justifying the removals, which occasional instances of "correct" selective prosecution would break the showing of an intentional pattern.

the Executive Orders' instruction to target antisemitic harassment and violence, while referencing a definition of antisemitism that includes protected speech such as comparing Israel's policies to those of the Nazis.  See Iancu, 588 U.S. at 395 ("The facial viewpoint bias in the law results in viewpoint-discriminatory application.").

On this Court's understanding of the law, however, this is not enough: because "some showing of intent on the part of government officials probably is necessary to make out an as-applied First Amendment viewpoint discrimination claim in this case." McGuire, 386 F.3d at 63.  The Plaintiffs must show that the Public Officials' implementation of the Executive Orders through the challenged enforcement steps was targeted intentionally at specific viewpoints in order to chill speech.

This Court finds that the Plaintiffs have made this showing.  The evidence presented at trial included the Public Officials' many public statements suggesting that they wished to staunch public protest related to Israel's treatment of Palestinians, including the President's campaign promise that he would put an end to the student protests on this issue by kicking out protestors and subsequent promise that the Public Officials would deport and cancel the visas of those "who joined in the pro-jihadist protests" and Secretary Rubio's plainspoken guarantee to deport "Hamas-supporters" and those who

"participat[e] in pro-Hamas events."  Evidence introduced at trial also showed that the Public Officials consistently referred to campus protests related to Palestine as per se "pro-Hamas," key inter-agency meetings included discussion of whether protesting alone could be grounds for visa revocation, and the tasking of HSI with investigating protestors for violations of laws based on anonymous website lists targeted at protesters. The Plaintiffs have proved that, as the fruits of this investigation percolated up the chain of command, decisionmakers at every step of the challenged implementation interpreted the "support" for terrorists (a key term from Executive Order 14161) that they construed as potentially subject to the penalty of detention, deportation, and visa revocation to encompass, and indeed to be centered on, core First Amendment speech and expressive conduct, such as attending public protests, leading such protests, or even publishing op-eds.

This review process, such as it was, was essentially frictionless.  Despite the apparent good intentions and professionalism of the Public Officials' subordinates, the Court saw virtually no evidence that anyone along the way seriously questioned whether pure political speech in support of Palestine or against Israel could be construed as support for terrorism, whether support for terrorism as such could be grounds for the adverse actions that were contemplated, or whether any targeted

individual had met any circumscribed, ascertainable standard of speech or conduct that might be grounds for these actions. Trial produced no evidence that the challenged procedures contemplated the speech to have been as incitement to imminent violence or, per the terms of an older test, clear and present danger. Rather, the subordinates spoke the language of "violat[ing]" the Executive Orders, as if they were the law, and of "align[ing] with the executive order's focus on deporting 'Hamas sympathizers,'" as if "Hamas sympathizers" were a self-interpreting term. They appear to have treated "antisemitism," which, however heinous, is, without more, protected speech, as something that, in essence, one simply knows when one sees it. In short, if it looked like the Executive Orders might have disapproved of it, that was potential grounds for deportation.

This might seem a matter of recklessness or even indifference as to how the Executive Orders ought be interpreted or what the Constitution requires. But just as a general matter ignorance of the law is no excuse, the Secretary of State's and other high officials' apparent indifference as to whether support or sympathy for terrorism, as opposed to material support, could be grounds for adverse action by law, or whether such support could be construed to include the voicing of support for Palestine or objection to the policies of the State of Israel, is no defense to the charge that they have done what

they have repeatedly said they were doing: intentionally

targeted political speech in order to stop campus protests.[42]

The Public Officials' selection of anonymously sourced lists of

campus protestors to supply the thousands of names initially

subject to investigation, moreover -- despite their

representations, which the Court credits, that HSI may at other

---

[42] An important component of this ruling has to do with what
was not shown at trial.  The Public Officials might conceivably
have demonstrated that the Homeland Security Council that
directed this initiative via weekly inter-agency meetings
appropriately channeled their inferiors' review, and thus that
any targeting of protected speech was an accidental byproduct of
a good faith attack on penalizable conduct such as the violence
and antisemitic harassment referred to in the Executive Orders;
but, in view of their sweeping assertion of privileges as to
these meetings and otherwise, including the assertion that the
names of the council members were themselves privileged as
presidential communications -- assertions with at best unsteady
support in the law of the privilege, see In re Sealed Case, 121
F.3d 729, 752 (D.C. Cir. 1997) ("[T]he presidential
communications privilege should be construed as narrowly as is
consistent with ensuring that the confidentiality of the
President's decisionmaking process is adequately protected. . .
. [T]he privilege only applies to communications that [White
House-level] advisers and their staff author or solicit and
receive in the course of performing their function of advising
the President on official government matters.  This restriction
is particularly important in regard to those officials who
exercise substantial independent authority or perform other
functions in addition to advising the President . . . .  The
presidential communications privilege should never serve as a
means of shielding information regarding governmental operations
that do not call ultimately for direct decisionmaking by the
President.") -- they have forfeited that opportunity to explain
what they intended in detail.  To be clear, this Court draws no
inferences from the assertion of any privileges as such; at the
same time, "[s]ilence is often evidence of the most persuasive
character." United States ex rel. Bilokumsky v. Tod, 263 U.S.
149, 153-54, (1923) (Brandeis, J.).

times act on totally anonymous tips -- belies any suggestion
that whatever unnamed person who supplied the lists to HSI for
review did not intend the policy to operate as it did.  Due to
the frictionless quality described above, once one was on the
lists, one was potentially subject to adverse action so long as,
it seems, there was any online mention of one's pro-Palestine
activities.[43]  The Public Officials' argument that few of the
originally investigated names were targeted is little comfort.
Those names that were passed up the chain of command by the
investigating subordinates were almost universally approved for
adverse action, and, again, the reasons for being passed up the
chain of command included any form of online suggestion that one
was "pro-Hamas," including Canary Mission's own anonymous
articles.  Watching the process at work, and not wishing to
credit the Public Officials with incompetence, it would require
a remarkable naivete not to conclude that this process worked as
intended.[44]

_____

[43] For instance, in at least one case, a significant source
of corroboration of allegations from the Canary Mission list
appears to have been the Canary Mission article itself.  In
other cases, news articles describing the target's pro-Palestine
protesting, or social media posts making anonymous accusations,
were also passed on as relevant.

[44] In Trump v. Hawaii, where the Supreme Court found
scattered campaign trail and other statements by the President
and his advisors too little to support an inference of
discriminatory intent regarding "a Presidential directive,
neutral on its face, addressing a matter within the core of

[134]

For these reasons, in addition to the reasons discussed below with respect to Count II -- which this Court considers collapsed ultimately into Count I -- the enforcement policy adopted by the Public Officials to implement the President's Executive Orders are intentionally viewpoint-discriminatory, and thus violate the First Amendment.

## C. First Amendment Coercion Campaign (Count II)

This Court denied the motion to dismiss as to the Plaintiffs' claim of an unlawful coercion campaign in part because it judged that the essence of this claim overlapped somewhat with their claim on Count I.  Given the substantiated allegations of generalized threats to noncitizen speech, the Plaintiffs had plausibly alleged a targeted campaign under the line of cases associated with Bantam Books, Inc. v. Sullivan, 372 U.S. 58 (1963); see AAUP, 780 F. Supp. 3d at 383-84. Ultimately, because the Plaintiffs have not produced evidence of

executive responsibility," and implemented pursuant to "a statute that grants the President sweeping authority to decide whether to suspend entry, whose entry to suspend, and for how long." Here, the Plaintiffs have shown that the ultimate decisionmakers, that is, Secretary Rubio and SBO Armstrong, have taken Executive Orders targeted at antisemitism, which already incorporated a definition of antisemitism encompassing protected speech, and implemented them in a way that systematically centered that latent focus on protected speech, under the aegis of statutes that, while sweeping on their face, have never historically been used in this way.  585 U.S. at 693, 702 . This determination further guides the Court's ruling that Hawaii does not govern here.

threats targeted specifically at their members, but rather of threats targeted at noncitizens in a general way, the Court rules that the Plaintiffs have not proved a campaign of coercion as defined by this line of case law.

The Court notes, however, that the general principles underlying Bantam Books, and, more recently, National Rifle Ass'n of America v. Vullo, 144 S.Ct. 1316 (2024), have significantly informed its analysis of Count I. The Court considers evidence relevant to Plaintiffs' campaign of threats claim as further circumstantial evidence that the chilling of speech at issue here was intentional. Because "a government official cannot do indirectly what she is barred from doing directly," Vullo, 144 S.Ct. at 1328, the Public Officials may not in effect regulate speech by means of an unwritten enforcement procedure implementing a facially lawful Executive Order, as if speech codes were permissible so long as they were not written down. Again, an unwritten speech code seems, if anything, potentially **more** threatening to core constitutional values than a written one, and the ambiguity recognized and criticized by several courts of appeals in the recent run of campus speech code cases discussed above, see supra Section III.A.1. The Plaintiffs' noncitizen members here have all been made to understand that there are certain things that it may be gravely dangerous for them to say or do, but have not been told

precisely what those things are (or are not); the diffuseness
and ambition of this coercion campaign do not render it less
constitutionally suspect.

This understanding of danger has been conveyed, moreover,
not just by means of the threatening statements and speech-
targeted arrests, detentions, and visa revocations already
discussed, but also by the manner in which these arrests,
detentions, and revocations have been conducted: by often-masked
agents, without prior notice of visa revocation or altered
status, sometimes on the street or at immigration appointments,
followed by conveyance quickly out of district and across the
country. This Court credits the testimony of the agents
involved that at least some of these practices were not per se
abnormal for HSI arrests and detentions; but this only begs the
question, however, why special agents previously deployed for
sensitive intelligence matters have been deployed to enforce
this particular policy of, in essence, rounding up campus
protestors and op-ed writers? Or why, having observed the first
arrests that were made under this policy and seen that these
arrests by these agents involved an obvious, highly publicized
atmosphere of secrecy and fright, the Public Officials
responsible for it did not adjust the policy to make the arrests
less obviously chilling? Or why the members of the inter-agency
advisory council whom the Public Officials will not name, did

[137]

not adjust the policy to make the arrests less obviously
chilling?  Again, deprived of any real attempted explanation as
to what the members of this council intended by the selected
means of these arrests, this Court must draw the most reasonable
inference: that the manner and method of their execution was
adopted, or at least approved of once the first such arrest had
been made, in part intentionally to chill the speech of other
would be pro-Palestine and anti-Israel speakers, including
Plaintiffs' noncitizen members.

The intended effect of the policy proved by a preponderance
of the evidence on Count I is essentially the same as the aim
that was held unconstitutional in the Bantam Books line of
cases.  The lessons of Bantam Books are incorporated into the
governing case law's appropriately keen focus on First Amendment
chills, which this Court has deemed best captured here by the
First Circuit's framework in McGuire.  See Whitten, 145 S. Ct.
at 703 (Thomas, J., dissenting from denial of certiorari).  The
Plaintiffs' case on Count I is therefore strengthened by this
line of case law with its emphasis on indicia of coercion and
thus of intended chill, but this Court does not extend that
particular doctrine here.

### D. APA Claims (Count IV)

The policy described above is final agency action, and as
such is unlawful as contrary to constitutional right for the

reasons described above.[45]  The policy is also arbitrary or
capricious because it represents an unexplained reversal of the
agencies' position without accounting for reliance interests.
It is also, in significant respects, without clear statutory
authorization.  The Public Officials have simply denied the
practice and offered no reasonable explanation.

The same actions challenged on Counts I and II ground the
Plaintiffs' APA claims, and this Court rules that the
requirements of the "zone of interests" test for these claims,
to the extent that it applies, are easily satisfied.  See
Seafreeze Shareside, Inc. v. United States Dep't Interior, 123
F.4th 1, 20 (1st Cir. 2023).  The plaintiff organizations and
their noncitizen members are beneficiaries of the immigration
laws on which this action depends and thus fall within the INA's

---

[45] The Court ordered extra-record discovery because the
Plaintiffs' two surviving constitutional claims did not totally
overlap with their APA claim.  It now rules that the
Administrative Record submitted, ECF No. 106, which provided no
more than the most bare-bones information about the statutes
invoked and the procedural steps taken toward arrest and
detention in the five examined cases, is incomplete, and thus
supplements the record with all extra-record materials produced
at trial, which the Court deems necessary to evaluate the
agencies' actions.  See Roe v. Mayorkas, No. 22-cv-10808, 2024
WL 5198705, at *2 (D. Mass. Oct. 2, 2024).  The Court's focus in
this section remains, properly, on the administrative record
itself.  Given the thinness of that record, however, it is
unable to analyze the agency's action and the grounds for it
without these extra-record materials.  See Housatonic River
Initiative v. United States Env't Prot. Agency, New Eng. Region,
75 F.4th 248, 278-79 (1st Cir. 2023).

zone of interests.  See e.g., Doe v. United States Immigr. & Customs Enf't, 490 F. Supp. 3d 672, 685 (S.D.N.Y. 2020) (finding that organizational plaintiffs fall within the INA's zone of interests."); Al Otro Lado, Inc. v. Nielsen, 327 F. Supp. 3d 1284, 1301 & n.7 (S.D. Cal. 2018) ("Other district courts have found that organizational plaintiffs . . . can fall within the INA's zone of interests when it has members or clients targeted by the government action.")(collecting cases).  As the Plaintiffs point out, moreover, it is not clear that their contrary-to-constitutional-right claim under the APA faces the zone-of-interests hurdle at all.  See Sierra Club v. Trump, 929 F.3d 670, 702 (9th Cir. 2019) (expressing "doubt" that zone of interests test applies "where Plaintiffs' theory derives from the Constitution," in view of recent Supreme Court precedent). To the extent that the Public Officials argue the INA's claim-channeling provisions render all actions related to deportation unreviewable outside of those provisions because such review conflicts with the statute's purpose, this Court disagrees.  See Patel v. United States Citizenship & Immig. Servs., 732 F.3d 633, 636 (6th Cir. 2013) (observing that "it is folly to talk about 'the purpose' of the statute when the statute reflects a compromise between multiple purposes," and, with reference to a different provision of the INA, that "there is no basis in the text of the statute -- none -- to conclude that Congress was

completely indifferent to the interests of the 'qualified immigrants' themselves").

Having determined that there is a procedure of roughly the kind alleged by the Plaintiffs, the Court is compelled to rule, as the final agency action test requires, that the agency Public Officials reached the consummation of their decision-making on a matter that determines rights and obligations or from which legal consequences flow. Bennett v. Spear, 520 U.S. 154, 177-78 (1997). Evidence at trial of this decision-making included the "tiger team" compiling ROAs to AD Watson and SBO Armstrong's subsequent review and referral of those reports pursuant to the guidance of the Executive Orders and their own sense of what antisemitic conduct entailed at every step of the process reviewed here. The persons involved have testified to a discrete enforcement initiative that targeted speech in an unprecedented way, making new use of the invoked statutes to dramatic legal effect. See Norton v. Southern Utah Wilderness All., 542 U.S. 55, 62 (2004) (stating that final agency actions must be "circumscribed" and "discrete"). It would be an odd interpretation of the "flexible" and "pragmatic" final agency test that did not capture such a discrete and novel agency initiative and attempted-alignment. Abbott Labs. v. Gardner, 387 U.S. 136, 149-51 (1967). Given this discreteness and novelty, the Public Officials' insistence that this was a mere

matter of shifting enforcement priorities, not a final agency
action, is unavailing.  See Heckler v. Chaney, 470 U.S. 821, 832
(1985) (contrasting decisions not to enforce with "when an
agency *does* act to enforce," which "provides a focus for
judicial review, inasmuch as the agency must have exercised its
power in some manner").

Proceeding to the merits, this agency action is
unconstitutional for the reasons described as to Counts I and II
above: nothing in the text, history, or tradition of the First
Amendment suggests that persons lawfully present here may be
subject to adverse action based on their political speech, where
that speech is primarily concerned with the actions of foreign
nations with whom the United States is not at war and Congress
has not made a specific determination that a specific
organization threatens the violent overthrow of the government.
This is a new invention that in important ways goes beyond its
closest analogues in the Red Scare.

This action is also arbitrary or capricious.  As the
Plaintiffs point out, 2021 DHS Guidelines for the Enforcement of
Civil Immigration Law, which the agency had given no sign of
altering at the time when the initially targeted protests
occurred, specified that "[a] noncitizen's exercise of their
First Amendment rights . . . should never be a factor in
deciding to take enforcement action."  Memorandum from Secretary

of Homeland Security Mayorkas to Tae Johnson, Acting Director of
U.S. Immigration and Customs Enforcement, Guidelines for the
Enforcement of Civil Immigration Law (Sept. 30, 2021),
www.ice.gov/doclib/news/guidelines-civilimmigrationlaw.pdf.
Although "[a]n agency policy statement" in general "merely
represents an agency position with respect to how it will treat
-- typically enforce -- the governing legal norm," and thus
"[t]he agency retains the discretion and authority to change its
position -- even abruptly -- in any specific case because a
change in its policy does not affect the legal norm," Syncor
Intern. Corp. v. Shalala, 127 F.3d 90, 94 (D.C. Cir. 1997), here
it is the legal norm itself that has been changed -- pure
political speech has never before been grounds for adverse
immigration action -- and, "when 'bizarre' interpretations are
made out of 'regulatory zeal,' deference is not appropriate,"
Matter of Seidman, 37 F.3d 911, 924 (3d Cir. 1994); see also
Texas v. United States, 86 F. Supp. 3d 591, 649 (S.D. Tex. 2015)
(finding final agency action test satisfied by Deferred Action
for Parents of Americans and Lawful Permanent Residents program
("DAPA") where, in the obverse of what has occurred here, it
"makes the illegal presence of . . . individuals legal").  The
policy identified above not only reverses course on the 2021
guidance, and on the way the relevant statutes had been enforced
in the past, without explanation -- the Executive Orders

themselves are not the agencies' explanation, and do not explain
the policy of targeting speech rather than harassment -- but
also does so in part by means of a statute which does not on its
face clearly apply to speech done only in this country.  The
Public Officials not only do not explain this policy; they deny
that it exists.  Thus, the agencies have engaged in
quintessential arbitrary action: an abrupt reversal of course,
using statutes in new and constitutionally suspect ways, with no
explanation.  See F.C.C. v. Fox Television Stations, Inc., 556
U.S. 502 (2009) (explaining that, although an agency need not
always provide a more detailed explanation for a changed policy
than a new one, it must "ordinarily . . . display awareness that
it *is* changing position," such that it "may not . . . depart
from a prior policy *sub silentio* or simply disregard rules that
are still on the books," and must provide a "more detailed
justification" when the "prior policy has engendered serious
reliance interests") (id. at 515).

To conclude, and to be clear, this Court has no sympathy
for terrorism, or for those who genuinely support it.  It has
proudly sentenced terrorists, see United States v. Reid, 206 F.
Supp. 2d 132 (2002), and understands its own role as one small
part of a federal scheme that exists significantly to protect
this Nation's national security.  Nor does the Court take a
position on any foreign conflict or express special sympathy for

[144]

any side of any political debate, foreign or domestic.  Rather, the judicial role is limited to safeguarding the rights of all persons lawfully present in this country.  This includes the freedom of speech that allows those persons to understand each other and to debate.  If "terrorist" is interpreted to mean "pro-Palestine" or "anti-Israel," and "support" encompasses pure political speech, then core free speech rights have been imperiled.

Throughout these proceedings, the Public Officials have emphasized that the noncitizens at issue are present at our grace.  They describe their presence here as a privilege, which can be revoked for almost any reason, or at least when we begin to feel we would not have invited them here had we known what they were going to say to us.  This Court in part must agree: non-citizens are, indeed, in a sense our guests.  How we treat our guests is a question of constitutional scope, because who we are as a people and as a nation is an important part of how we must interpret the fundamental laws that constrain us.  We are not, and we must not become, a nation that imprisons and deports people because we are afraid of what they have to tell us.  See Dennis v. United States, 341 U.S. 494 554-55 (1951) (Frankfurter, J., concurring in the judgment) (describing, in the context of the second Red Scare, "a danger that something may occur in our own minds and souls which will make us no

longer like the persons by whose efforts this republic was
founded and held together, but rather like the representatives
of that very power we are trying to combat: intolerant,
secretive, suspicious, cruel, and terrified of internal
dissension because we have lost our own belief in ourselves and
in the power of our ideals")(quoting George F. Kennan, Where do
You Stand on Communism?, New York Times Magazine, May 27, 1951,
at 53)); Whitney v. California, 274 U.S. 357, 377 (1927)
(Brandeis, J., concurring) ("Those who won our independence by
revolution were not cowards.  They did not fear political
change.  They did not exalt order at the cost of liberty.  To
courageous, self-reliant men, with confidence in the power of
free and fearless reasoning applied through the processes of
popular government, no danger flowing from speech can be deemed
clear and present, unless the incidence of the evil apprehended
is so imminent that it may befall before there is opportunity
for full discussion.  If there be time to expose through
discussion the falsehood and fallacies, . . . the remedy to be
applied is more speech, not enforced silence.  Only an emergency
can justify repression."); Carlson v. Landon, 342 U.S. 524, 554
(1952) (Black, J., dissenting) ("To put people [law-abiding
people] in jail for fear of their talk seems to me to be an
abridgment of speech in flat violation of the First Amendment. .
. .  My belief is that we must have freedom of speech, press and

religion for all or we may eventually have it for none.  I
further believe that the First Amendment grants an absolute
right to believe in any governmental system, discuss all
governmental affairs, and argue for desired changes in the
existing order.  This freedom is too dangerous for bad,
tyrannical governments to permit.  But those who wrote and
adopted our First Amendment weighed those dangers against the
dangers of censorship and deliberately chose the First
Amendment's unequivocal command that freedom of assembly,
petition, speech and press shall not be abridged.").

## IV.  CONCLUSION

For all these reasons, this Court finds as fact and
concludes as matter of law that Secretaries Noem and Rubio and
their several agents and subordinates acted in concert to misuse
the sweeping powers of their respective offices to target non-
citizen pro-Palestinians for deportation primarily on account of
their First Amendment protected political speech.  They did so
in order to strike fear into similarly situated non-citizen pro-
Palestinian individuals, pro-actively (and effectively) curbing
lawful pro-Palestinian speech and intentionally denying such
individuals (including the plaintiffs here) the freedom of
speech that is their right.  Moreover, the effect of these
targeted deportation proceedings continues unconstitutionally to
chill freedom of speech to this day.

V.    **JUSTICE IN THE TRUMP ERA**

The Court's finding and ruling above resolves phase one of these proceedings.  The wrong suffered by these plaintiffs is amply established.  **What now?**

It is not enough for the Court simply to determine that the plaintiffs' First Amendment constitutional rights have been violated.  The Constitution is not self-effectuating.  There must be some prospect of an effective remedy (we call it "redressability") in order to proceed. Diamond Alternative Energy, LLC v. Env't Prot. Agency, 145 S. Ct. 2121, 2133 (2025) ("The . . . redressability requirement generally serves to ensure that there is a sufficient relationship between the judicial relief requested and the injury suffered.")(citations and quotations omitted).  Otherwise, this Court ought terminate these proceedings at this point lest it become no more than a divisive scold.  When this Court denied the motion to dismiss herein, AAUP, 780 F. Supp. 3d at 379, it thought an effective remedy might be obtainable; today it is not so sure.

The reason is the rapidly changing nature of the Executive Branch under Article II of our Constitution and, while he is properly not now a defendant in these proceedings, the nature of our President himself.  It is appropriate, therefore, briefly to address each of these concerns and then limn the constraints that properly must govern the remedy phase of these proceedings.

[148]

**A. The unitary presidency**

In other proceedings involving the Trump administration, this Court has already set forth its understanding of what may be called "the unitary presidency" and I repeat it here:

> THE COURT: We've never had a President like President Trump. He espouses, [and] he's the first President in our history to espouse, a concept of the unified Presidency.  The idea is that the President of the United States -- and certainly he's duly-elected -- after a full and fair election, the President of the United States -- he is the single, superior, executive, motive force for all federal employees employed under Article II.  [T]here's issues about whether that actually works out with the Federal Reserve and the like, but none of it's before this Court, and I make no comment on it. Nor do I make any comment on the wisdom of this approach, it's not for me, but it's fair to say that that's his view, or it appears to me to be his view. Now, though he's not been in office all that long, a couple of things are evident here.
>
> One is that the approach to innovation is entirely different. We're not looking to the various Cabinet Secretaries, agencies, divisions, departments, to innovate and create new ways to serve the public. I'm not saying there's no innovation, but it's all got to go through or appear to go through or emanate from the President himself. [46]  That's one thing.
>
> The second thing is that the President, this President, expresses his view -- and he's certainly transparent -- he expresses his view through orders, through directives, through requirements. So the idea of "reasoned discourse,"  in the sense of Lincoln's "Team of Rivals"[47] or FDR combating the Depression or mobilizing for World War II and creating these

---

[46] As Marquis de Louvois, Minister of War to Louis XIV told a subordinate, "His Majesty must not be served any better than he wants to be!" THE READER'S COMPANION TO MILITARY HISTORY, Robert Cowley & Geoffrey Parker eds. (1996) at 278.

[47] Doris Kearns Goodwin, TEAM OF RIVALS: THE POLITICAL GENIUS OF ABRAHAM LINCOLN (2005).

bureaucratic empires that sparred with one another under
his final decision, that's absent from our discourse
today. I mean I ask you, we're not seeing wonky white
papers out of this Administration.

New York v. Trump, 25-11221-WGY (D. Mass. Sept. 4, 2025), Case
Stated Hearing, 6:19-8:3, ECF No. 215 (cleaned up).

**B. President Donald J. Trump**

**"He seems to be winning. He ignores everything and keeps
bullying ahead."**

Half admiring, half quizzical, a very wise woman -- my wife
-- made this comment about our 47th President in an entirely
different context.[48]  I quote it here because it so perfectly
captures the public persona of President Trump, especially as it
pertains to the issues presented in this case.  A brief
explanation will suffice.

**1.  He seems to be winning.**

Triumphalism is the very essence of the Trump brand.  Often
this is naught but hollow bragging: "my perfect administration,"
wearing a red baseball cap in the presidential oval office
emblazoned "Trump Was Right About Everything," or most recently
depicting himself as an officer in the First Cavalry Division.[49]
Unfortunately, this tends to obscure the very real and sweeping
changes President Trump has wrought in his first year in office.

---

[48] I do not discuss pending cases with anyone outside
chambers.
[49] I do not deride any of this in the least. Evidently, this
is markedly effective with a broad swath of our people.

[150]

If change is a mark of success, President Trump is the most successful president in history.

## 2. He ignores everything . . .

This is indubitably true.  The Constitution, our civil laws, regulations, mores, customs, practices, courtesies -- all of it; the President simply ignores it all when he takes it into his head to act.  A broad swath of our people find this refreshing in what they may feel is an over regulated society.  After all, lawyers seem to have a penchant for telling you what you can't do.  President Trump simply ignores them.[50]

This is not to suggest that he is entirely lawless.  He is not.  As an experienced litigator he has learned that -- at least on the civil side of our courts -- neither our Constitution nor laws enforce themselves, and he can do most anything until an aggrieved person or entity will stand up and say him "Nay," i.e. take him to court.  Now that he is our duly elected President after a full and fair election, he not only enjoys broad immunity from any personal liability, Trump v. United States, 144 S.Ct. 2312 (2024), he is prepared to deploy

---

[50] Let's be honest.  In our secret heart of hearts, many of us are tiny Trump wannabes.  After all, who does not feel the urge to stride about, "sticking it to The Man," wrecking institutions and careers simply because we find them irksome? Most of us, however, ascribe to Shakespeare's famous adage: "O, it is excellent To have a giant's strength; but it is tyrannous To use it like a giant." MEASURE FOR MEASURE, act 2, scene 2.66.

all the resources of the nation against obstruction. Daunting

prospect, isn't it?[51]

Small wonder then that our bastions of independent unbiased

free speech -- those entities we once thought unassailable --

have proven all too often to have only Quaker guns.[52]  Behold

President Trump's successes in limiting free speech -- law firms

cower,[53] institutional leaders in higher education meekly appease

the President,[54] media outlets from huge conglomerates to small

niche magazines mind the bottom line rather than the ethics of

journalism.[55]

---

[51] The federal courts themselves are complicit in chilling
would-be litigants.  It is not that we are less than
scrupulously impartial.  We demonstrate our judicial
independence and utter impartiality every day whatever the
personal cost.  It is, rather that in our effort to be entirely
fair, thorough, and transparent, we are **slow**, ponderously slow.
This in turn means we are **expensive**, crushingly so for an
individual litigant.  Frequently, the threat of federal civil
litigation, however frivolous, is enough severely to harass an
individual and cause his submission.
  The flurry of activity on the Supreme Court's emergency
docket is itself a tacit admission that, when dealing with an
administration that is admittedly seeking to "flood the zone,"
it needs to intervene to correct rulings that, if not
immediately remedied, will remain in effect far too long.
[52] A term from our Civil War – logs painted black to look
like cannons.
[53] But not all of them. See infra.
[54] But not all of them. See infra.
[55] But not all of them. See infra.

### 3.    . . . **and he keeps bullying on**.

Whether it's social media,[56] print, or television, President Trump is the master communicator of our time.  His speech dominates today's American idiom.  Indeed, it may be said to define it.  It is triumphal, transactional, imperative, bellicose, and coarse.  It seeks to persuade -- not through marshaling data driven evidence, science, or moral suasion, but through power.

While the President naturally seeks warm cheering and gladsome, welcoming acceptance of his views, in the real world he'll settle for sullen silence and obedience.  What he will not countenance is dissent or disagreement.  He recognizes, of course, that there are legislative and judicial branches to our government, co-equal even **to** a unitary Presidency.[57]  He meets dissent from his orders in those other two branches by demonizing and disparaging the speakers, sometimes descending to personal vitriol.[58]

---

[56] Recent perusal of the White House social media posts displays a meme of the President that, at a quick glance, depicts him as a comic book superhero.  People apparently go for this.

[57] I keep a copy of the Boy Scout pamphlet for the Citizenship in the Nation Merit Badge ready to hand. It well explains our nation's system of checks and balances among the three branches of our government.

[58] He's really quite inventive and, in this respect, he joins a rich tradition of American political invective.  Lincoln was called "a gorilla", Michael Burlingame, ABRAHAM LINCOLN, A LIFE VOL. ONE (2008) at 63, and John Randolph said of Edward Livingston

Dissent elsewhere among our people is likewise disfavored, often in colorful scurrilous terms. All this the First Amendment capaciously and emphatically allows.

When he drifts off into calling people "traitors" and condemning them for "treason," however, he reveals an ignorance of the crime and the special burden of proof it requires. More important, such speech is not protected by the First Amendment; it is defamatory. In his official capacity as President, however, President Trump enjoys broad immunity from any civil liability. Nixon v. Fitzgerald, 457 U.S. 731 (1982).

### 4. Retribution

Everything above in this section is necessary background to frame the problem this President has with the First Amendment. Where things run off the rails for him is his fixation with "retribution." "I am your retribution," he thundered famously while on the campaign trail.[59] Yet government retribution for speech (precisely what has happened here) is directly forbidden by the First Amendment. The President's palpable

---

"He shines and stinks like rotten mackerel by moonlight." W. Cabell Bruce, John Randolph of Roanoke (1923), vol. II, at 197. As Mr. Dooley said "Politics ain't beanbag." Finley Peter Dunne, MR. DOOLEY IN PEACE AND WAR (1898) (quoted in William Safire, SAFIRE'S POLITICAL DICTIONARY (2008) at 45-46). No president before President Trump, however, has so consistently and personally, attacked America's independent judiciary.

[59] See, e.g., Speech at CPAC, (March 4,2023), https://www.c-span.org/clip/campaign-2024/former-pres-trump-i-am-your-justicei-am-your-retribution/5060238 at 00:32-:00:34.

misunderstanding that the government simply cannot seek
retribution for speech he disdains poses a great threat to
Americans' freedom of speech.  It is at this juncture that the
judiciary has robustly rebuffed the President and his
administration.

> **a.** **Law Firms** – <u>Susman Godfrey LLP</u> v. <u>Exec. Off. of</u>
> <u>President</u>, No. 25-1107, 2025 WL 1779830, at *25
> (D.D.C. June 27, 2025) ("In April 2025, President
> Donald J. Trump issued an Executive Order
> targeting the law firm Susman Godfrey LLP
> ('Susman') based on the clients it represents and
> the causes it supports.  The order was one in a
> series attacking firms that had taken positions
> with which President Trump disagreed. In the
> ensuing months, every court to have considered a
> challenge to one of these orders has found grave
> constitutional violations and permanently
> enjoined enforcement of the order in full. Today,
> this court follows suit, concluding that the
> order targeting Susman violates the U.S.
> Constitution and must be permanently enjoined.")
> (citations omitted) (AliKhan, J.); <u>Wilmer Cutler</u>
> <u>Pickering Hale & Dorr LLP</u> v. <u>Exec. Off. of</u>
> <u>President</u>, No. 25-917, 2025 WL 1502329, at *33
> (D.D.C. May 27, 2025), <u>amended sub nom.</u> <u>Wilmer</u>
> <u>Cutler Pickering Hale & Dorr LLP</u> v. <u>Exec. Off. of</u>
> <u>the President</u>, No. 25-917, 2025 WL 2105262
> (D.D.C. June 26, 2025) ("The Order is
> unconstitutional, and thus defendants do not have
> a legitimate interest in enforcing the Order. In
> fact, it is 'obvious' that the 'enforcement of an
> unconstitutional law is always contrary to the
> public interest.' . . . Enjoining the Order
> serves the public interest by, for example,
> eliminating an obstacle to free speech and
> preserving the independent and adversarial nature
> of our judicial system.") (citation
> omitted)(Leon, J.); <u>Jenner & Block LLP</u> v. <u>U.S.</u>
> <u>Dep't of Just.</u>, No. 25-916, 2025 WL 1482021, at
> *9 (D.D.C. May 23, 2025) ("[T]he order targets
> Jenner not merely for the fact of its speech but
> for the specific views it expresses thereby. . .

. The order thus engages in the 'egregious form
of content discrimination' known as 'viewpoint
discrimination,' making its inconsistency with
the First Amendment 'all the more blatant.'.")
(Bates, J.)(citations omitted); <u>Perkins Coie LLP</u>
v. <u>U.S. Dep't of Just.</u>, 783 F. Supp. 3d 105, 180
(D.D.C. 2025)("The U.S. Constitution affords
critical protections against Executive action . .
. Government officials, including the President,
may not 'subject[ ] individuals to "retaliatory
actions" after the fact for having engaged in
protected speech.' They may neither 'use the
power of the State to punish or suppress
disfavored expression,' nor engage in the use of
'purely personal and arbitrary power.' In this
case, these and other foundational protections
were violated by EO 14230. On that basis, this
Court has found that EO 14230 violates the
Constitution and is thus null and void.")
(citations omitted).

b.   **Higher Education -** <u>President & Fellows of</u>
<u>Harvard Coll.</u> v. <u>United States Dep't of Health &</u>
<u>Hum. Servs.</u>, No. 25-CV-10910, 2025 WL 2528380,
at *37 (D. Mass. Sept. 3, 2025) ("The First
Amendment is important and the right to free
speech must be zealously guarded. . . . Now it
is the job of the courts to similarly step up,
to act to safeguard academic freedom and freedom
of speech as required by the Constitution, and
to ensure that important research is not
improperly subjected to arbitrary and
procedurally infirm grant terminations, even if
doing so risks the wrath of a government
committed to its agenda no matter the cost.")
(Burroughs, J.);

     **c.**    **Media –** <u>Associated Press</u> v. <u>Budowich</u>, 780 F. Supp. 3d 32, 39 (D.D.C. 2025) (McFadden, J.) (granting motion for preliminary injunction against public officials' First Amendment viewpoint discrimination and retaliation of barring Associated Press from press room after it continued to refer to the Gulf of Mexico as the Gulf of Mexico in its style book, ruling: "under the First Amendment, if the Government opens its doors to some journalists -- be it to the Oval Office, the East Room, or elsewhere -- it cannot then shut those doors to other journalists because of their viewpoints. The Constitution requires no less.") (McFadden, J.) [60]

It is these soundly reasoned decisions which today constitute the major bulwark of our right to free speech.

It is upon these decisions this Court relies in framing the remedy herein.  For there must be a remedy (not a monetary remedy).  In light of all the considerations just discussed, it will not do simply to order the Public Officials to cease and desist in the future.  The harm here and the deprivation suffered runs far deeper.  The following constraints will, however, govern the Court's remedy hearing.

---

[60] The public officials sought and received a stay at the D.C. Circuit, except as to access to the East Room.  <u>Associated Press</u> v. <u>Budowich</u>, No. 25-5109, 2025 WL 1649265, at *13 (D.C. Cir. June 6, 2025), reconsideration en banc denied, No. 25-5109, 2025 WL 2047025 (D.C. Cir. July 22, 2025).

1.  Though there is scholarship that urges otherwise,[61] there can be no constraint of any sort on the speech of the President of the United States, be that speech statesmanlike, magnanimous, and unifying or "foolish" and "knavish."[62] As President he has the absolute and undoubted right to speak. Indeed, no injunction of any sort may touch upon or constrain his executive powers under the law.  Such purported order would violate the Separation of Powers.  <u>Mississippi</u> v. <u>Johnson</u>, 71 U.S. (4 Wall.) 475 (1866) ("[T]his court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.")

2.  While the remaining defendant Public Officials here are subject to an injunctive order, any such order must necessarily be limited.  Pre-speech injunctive restraints can easily violate those Public Officials broad free speech rights that are largely unencumbered by the First Amendment.  See <u>Walker</u> v. <u>Texas Div., Sons of Confederate Veterans, Inc.</u>, 576 U.S. 200, 207 (2015) ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says.  That

---

[61] <u>See</u> Michael Kang & Jacob Eisler, <u>Rethinking the Government Speech Doctrine, Post-Trump</u>, 2022 U. Ill. L. Rev. 1943 (2022).

[62] <u>See</u> James Iredell, <u>Charge to Grand Jury</u>, 9 Fed. Cas. 826, no. 5,126 C.C.D.Pa. 1799.

freedom in part reflects the fact that it is the democratic electoral process that first and foremost provides a check on government speech.  Thus, government statements (and government actions and programs that take the form of speech) do not normally trigger the First Amendment rules designed to protect the marketplace of ideas.") (citations omitted).  Any such overbroad injunction would be improper.

3.  No order entered by this Court shall materially interfere with the defendant Public Officials and their agents abilities properly[63] to enforce the laws passed by Congress.

To this delicate task the Court will turn in the remedy phase.

> **Freedom is a fragile thing and it's never more than one generation away from extinction.  It is not ours by way of inheritance; it must be fought for and defended constantly by each generation, for it comes only once to a people.**

---

[63] Certain aspects of these laws presently face constitutional challenges. See Khalil v. Trump, 784 F. Supp. 3d 705, 757, 767 (D.N.J. 2025) ("When the First Amendment is implicated, as here, vagueness doctrine becomes especially unforgiving." Id. at 757.  "The Court holds: the Petitioner is likely to succeed on the merits of his claim that Section 1227, as applied to him here through the Secretary of State's determination, is vague in violation of the Due Process Clause of the Constitution." Id.) (footnote omitted).  Should any of them be held unconstitutional as applied -- a point this Court necessarily does not address -- such holding would naturally affect the scope of the work "properly."

President Ronald Reagan, Inaugural Address as Governor of the State of California (January 5, 1967).[64]

    I first heard these words of President Reagan's back in 2007 when my son quoted them in the Law Day celebration speech at the Norfolk Superior Court.  I was deeply moved and hold these words before me as a I discharge judicial duties.  As I've read and re-read the record in this case, listened widely, and reflected extensively, I've come to believe that President Trump truly understands and appreciates the full import of President Reagan's inspiring message -- yet I fear he has drawn from it a darker, more cynical message.  I fear President Trump believes the American people are so divided that today they will **not** stand up, fight for, and defend our most precious constitutional values so long as they are lulled into thinking their own personal interests are not affected.

    Is he correct?

---

[64] https://www.reaganlibrary.gov/archives/speech/january-5-1967-inaugural-address-public-ceremony.

A hearing on remedy will promptly be scheduled.

BY THE COURT,

/s/ William G. Young

WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[65]

**I hope you found this
helpful. Thanks for writing.
It shows you care. You
should.**

    **Sincerely & respectfully,
   Bill Young**


**P.S. The next time you're in
Boston** [the postmark on the card
is from the Philadelphia area]
**stop in at the Courthouse and
watch your fellow citizens, sitting
as jurors, reach out for justice.
It is here, and in courthouses
just like this one, both state and
federal, spread throughout our land
that our Constitution is most vibrantly
alive, for it is well said that "Where a
jury sits, there burns the lamp of
liberty."**

---

[65] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 47 years.