IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Civil Action No. 25-10685-WGY

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS, et al.,

        Plaintiffs,

v.

MARCO RUBIO, et al.,

        Defendants.

---

## MOTION TO INTERVENE (INCORPORATING AUTHORITY)

---

Proposed Intervenor respectfully submits this Motion to Intervene pursuant to Rule 24(b), Fed. R. Civ. P. in the above-captioned action, stating as follows:

### ARGUMENT

At essence, Intervenor seeks to address one of the sweet mysteries of life: Why is it that not a single Article III judge can solve a basic grade-school logic puzzle? The pertinent Section of the Fourteenth Amendment provides:

> No person shall be a Senator or Representative in Congress, or elector of President and Vice-President, or hold any office, civil or military, under the United States, or under any State **[then, D]** who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States **[Condition A]**, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof **[Condition B]**. But Congress may by a vote of two-thirds of each House, remove such disability **[not Condition C]**.

U.S. Const. amend. XIV, § 3 (interpretive commentary supplied).

**If A and B but NOT C, then D.** The judge of a competent court found after a trial on the merits in which Defendant Trump fully participated by clear and convincing evidence that Trump

1

had engaged in insurrection, *Anderson v. Griswold*, No. 23CV32577, ¶¶241, 298 (Dist. Ct., City & Cnty. of Denver, Nov. 17, 2023) **[Condition B]**, and stipulated that he had sworn out a qualifying oath. Id. at ¶ 56. **[Condition A]**. As *Trump v. Anderson*, 601 U.S. 100 (2024), did not disturb the trial court's factual findings, both conditions are set in stone. This Court can also take judicial notice of the fact that Congress did not, by the required vote of two-thirds of each House, remove such disability **[not Condition C]**. Therefore, Trump may not serve as President **[then, D]**. And Supreme Court precedent has established that every act a usurper purports to take in that capacity is void *ab initio*. *Norton v. Shelby County*, 118 U.S. 425, 443 (1886).[1]

1. **Standing On the Constitution's Throat**

Under the Framers' Constitution, the citizen was not an idle spectator. As Harvard's legendary Raoul Berger proved, every citizen enjoys standing in public interest cases.[2] In England, "[e]very

---

[1] In pertinent part, the Supreme Court observed that

> ...when the constitution or form of government remains unaltered and supreme, there can be no de facto department, or de facto office. The acts of the incumbents of such departments or office cannot be enforced conformably to the constitution, and can be regarded as valid only when the government is overturned.

This conclusion is consistent with our concept of popular sovereignty, foreign to our British forebears. The Framers' views were consonant with that of Locke, who maintained that a usurper could never attain legitimate power. John Locke, *Second Treatise of Government* ch. XVIII (1689). E.g., John Adams, *Novanglus* No. 5, Feb. 20, 1775; Thomas Jefferson, *Kentucky Resolution* (1798) (acts in excess of jurisdiction are void *ab initio*); George Washington, *Farewell Address* (Sept. 19, 1796) (the Constitution is the outer boundary of popular consent); Federalist No. 84 (Hamilton) (same). The stirring prose of Thomas Paine distills the thought. "[I]n America **THE LAW IS KING**. For as in absolute governments the King is law, so in free countries the law ought to be King; and there ought to be no other." Thomas Paine, *Common Sense* (Philadelphia, R. Bell, 1776) (emphasis in original), reprinted in pt. III, ¶ 103 (Project Gutenberg, 1994). As long as we remain governed by the Constitution, either an occupant of an office has a legal right to discharge the duties of an office, or s/he does not. There is no third option.

This is in direct contrast to the experience in medieval England during the Wars of the Roses (1455-1487), where factions vied over the kingship. As it wasn't entirely clear who the actual King was, Parliament enacted *The Treason Act*, 11 Hen. VII [1495], c. 1 ("noe person going wth the Kinge to the Warres shalbe attaynt of treason"), creating the de facto officer doctrine. Translated from the Middle English, it forbade legal punishment of subjects who followed the orders of the de facto king, irrespective of whether he was legitimate or a usurper. **Importantly, it is NOT a common-law doctrine.**

[2] Raoul Berger, *Standing to Sue in Public Actions: Is it a Constitutional Requirement?*, 78 Yale L.J. 816, 819 (1969) ("No English court, so far as I can discover, has ever rejected the authority of *Articulo Cleri* or denied that a writ of prohibition may be granted at the suit of a stranger."). In particular, quo warranto was available to a stranger in *Rex v. Smith* [1790] 100 Eng. Rep. 740, wherein it was observed that "the ground on which this application is made is to

subject,' said Justice Lush, "has an interest in securing that public duties shall be exercised only by those competent to exercise them...."[3] The law was identical on both sides of the Pond until the Taft Court invented 'standing' as part of their crusade to turn "Supreme Court Justice" into a part-time job in *Frothingham v. Mellon*, 262 U.S. 447 (1923). Moreover, Professor Berger adds that "[n]o hint that judicial restraint of legislative usurpation was to hinge on the suitor's 'interest' is to be found in the records of the Constitutional Convention." Berger, *Standing to Sue* at 829.

---

enforce a general Act of Parliament, which interests all the corporations in the kingdom; and therefore it is no objection that the party applying is not a member of the corporation." *Berger*, 78 Yale L.J. at 823 & n. 38.

[3] *Berger, Id.* at 823 & n. 39 ("In 1915, Lord Reading observed that "a stranger to a suit can obtain prohibition. ... and I see no reason why he should not in a proper case obtain an information of quo warranto." ... "Every subject,' said Justice Lush, "has an interest in securing that public duties shall be exercised only by those competent to exercise them .... ").

At common law, a subject who had suffered no individualized injury could challenge unlawful government action in a variety of ways, most commonly through prerogative writ procedure. As Professor Pushaw explains,

> In public law cases, a controversy was not required. A citizen who had suffered no individualized injury could challenge unlawful government action in a variety of ways, most commonly through prerogative writ procedure. Similarly, criminal and regulatory statutes often permitted an informer with no special interest in the case to sue.' Likewise, "relator" actions authorized citizens with no personal stake in a matter of public interest to prosecute as private attorneys general. In Hardwicke's words, "any persons, though the most remote in the contemplation of the [defendant], may be relators in these cases."

Robert J. Pushaw Jr., *Article III's Case/Controversy Distinction and the Dual Functions of Federal Courts*, 69-3 Notre Dame L. Rev. 447, 480-81 (1999).

This system translated well to our young nation, which was only a fraction of the size of Mother England. Informers' statutes were used extensively in the American colonies and in early state and federal practice. Steven L. Winter, *The Metaphor of Standing and the Problem of Self-Governance*, 40 Stan. L. Rev. 1371, 1406-08 (1988). "Relator" actions authorized citizens with no personal stake in a matter of public interest to prosecute as private attorneys general. *See id.* at 1398-99. Similarly, criminal and regulatory statutes often permitted an informer with no special interest in the case to sue (qui tam actions). *See id.* at 1406-09.

The approach was syllogistic. A legal question had to "assume such a form that the judicial power is capable of acting on it," *Osborn v. Bank of the United States*, 22 U.S. 738, 819 (1824). "In matter of mere public right ... the people are the real party, as in the other case they are the nominal. Yet it is well known that they cannot act except through individual information, by their attorney general or some private person." *People ex rel. Case v. Collins*, 19 Wend. 56, 65 (N.Y. Sup. Ct. 1837) (mandamus). "In a matter of public right, any citizen may prosecute a mandamus; but here the proceeding is for the benefit of a particular class, and the legislature has thought fit to direct that they shall be represented upon this question by a particular public officer." *People ex rel Blacksmith v. Tracy*, 1 Denio. 617, 618-1 (N.Y. Sup. Ct. 1845). *Accord, e.g., Cox v. Segee*, 206 Mass. 380, 381, 92 N.E. 620 (1910) ("But if in the performance of their official duties the respondents were subject to the by-law, the petitioners, as inhabitants and taxpayers of the town, may compel its enforcement by mandamus.").

The only open question was whether a court sitting in equity had the power to provide a remedy. The Supreme Court observed that "a decided preponderance of American authority in favor of the doctrine, that private persons may move for a mandamus to enforce a public duty, not due to the government as such, without the intervention of the government law-officer." *Union Pacific R.R. v. Hall*, 91 U.S. 343, 355 (1876).

Professor Jaffe concurs, arguing that "the public action—an action brought by a private person primarily to vindicate the public interest in the enforcement of public obligations—has long been a feature of our English and American law." Louis L. Jaffe, *Standing to Secure Judicial Review: Private Actions*, 75 Harv. L. Rev. 255, 302 (1961).

Justice Barrett recently cast grave aspersions on the modern doctrine of standing by chastising Justice Jackson last week in a frameworthy rant:

> We will not dwell on JUSTICE JACKSON's argument, which is at odds with more than two centuries' worth of precedent, not to mention **the Constitution itself**. ... JUSTICE JACKSON would do well to heed her own admonition: "[E]veryone, from the President on down, is bound by law." Ibid. **That goes for judges too.**

*Trump v. CASA, Inc.,* No. 24A884, 606 U.S. ___ (2025) (Application for Stay granted Jun. 27, 2025), *slip. op.* at 23, 24 (capitalization in original) (emphasis added). If the nationwide injunction is void on account of its lack of constitutional foundation, the same line of reasoning would apply to the Taft Court's sua sponte invention of 'standing'.

The right to have public duties exercised by "those competent to exercise them" is a common law right, for which there was a remedy enforceable in chancery court. "The common law ... ought not to be deemed to be repealed, unless the language of a statute be clear and explicit for this purpose," *Fairfax's Devisee v. Hunter's Lessee*, 11 U.S. 603, 623 (1813); *accord, United States v. Texas*, 507 U.S. 529, 534 (1993) (quotations and citations omitted). All the common law writs were available. Judiciary Act of 1789, ch. 20, § 14, 1 Stat. 73, 81-82 (1789). The practice is consistent with the Framers' design, the common law, and the concept of popular sovereignty.

This self-evident axiom is proven by the obverse: Our servants in government work for us, but we principals have no way of ensuring that they act within the bounds of their agency? To even state the case is to refute it.

4

## 2. The Only Remedy That Will Suffice Is to Enforce the Fourteenth Amendment.

You say that alone, you have nothing but your sense of duty. I also owe a duty of fealty to that pesky Constitution. Three thousand years of the collective wisdom of mankind distills to a theory of revolution, which Jefferson ably distilled into a single paragraph. Governments are instituted among men, deriving their just powers from the consent of the governed, who never consent to the absolute and capricious rule by another. "Tyranny" is the exercise of power exceeding the scope of that consent. When a tyrant exercises that power, and the rule of law fails, we owe a collective duty to our fellow citizens to depose that tyrant by "any means necessary."[4] To defend "the

---

[4] Locke defines terms: "As usurpation is the exercise of power which another has a right to, so tyranny is the exercise of power beyond right, which nobody can have a right to." John Locke, *Second Treatise of Civil Government* § 199 (1690). He goes on to observe that:

> Where-ever law ends, tyranny begins, if the law be transgressed to another's harm; and **whosoever in authority exceeds the power given him by the law, and makes use of the force he has under his command**, to compass that upon the subject, which the law allows not, **ceases in that to be a magistrate**; and, acting without authority, may be opposed, as any other man, who by force invades the right of another.

Id. at § 202 (emphasis added).

*Sic semper tyrannis.* Thus always to tyrants. Even a casual glance at Virginia's official state seal illustrates the problem. On the one hand, the right to kill a tyrant in defense of one's life and liberties is absolute and predates Magna Carta. Bishop John of Salisbury asserted that "[t]o kill a tyrant is not merely lawful, but right and just ... the law rightly takes arms against him who disarms the laws, and the public power rages in fury against him who strives to bring to nought the public force." John of Salisbury, Policraticus, Bk. iii, ch. 15, reprinted in, The Statesman's Book of John of Salisbury lxxiii (John Dickenson trans., Russell & Russell, 1963) (1159). Aquinas concurred, noting that a violent response to tyranny is not just permissible, but predictable: "[M]en remove themselves from a tyrant as from cruel beasts, and to be subject to a tyrant seems the same as to be mauled by a cruel animal." Thomas Aquinas, *De Regimine Principum, in St. Thomas Aquinas: Political Writings* 15 (R.W. Dyson trans., Cambridge Univ. Press 2002) (1267).

To a man, our Founding Fathers maintained that the right to kill a tyrant was absolute. Thomas Jefferson and Benjamin Franklin both recommended that the Great Seal of the United States be encircled by the phrase, "Rebellion against Tyrants Is Obedience to God." David Hall, *Genevan Reform and the American Founding* 8 (Lexington Books 2003). Concurrences resemble a Brandeis brief. Judge Roger Sherman—the only man to sign all four of our nation's founding documents—observed in the halls of Congress that it is "the privilege of every citizen, and one of his most essential rights, to bear arms, and to resist every attack upon his liberty or property, by whomsoever made." Don B. Kates, *The Right to Arms: The Criminology of Guns*, 2010 Cardozo L. Rev. 86, 98 & n. 41 (internal citation omitted); see also, e.g., Thomas Jefferson, *Letter* (to Isaac Tiffany), Apr. 4, 1819, at 1, 3 Elliot, *Debates* at 45 (Speech of Patrick Henry, Virginia Convention, Jun. 5, 1788). This view was perhaps best conveyed by Thomas Paine:

> Not all the treasures of the world, so far as I believe, could have induced me to support an offensive war, for I think it murder; but if a thief breaks into my house, burns and destroys my property, and kills or threatens to kill me, or those that are in it, and to "bind me in all cases whatsoever" to his absolute will, am I to suffer it? What signifies it to me, whether he who does it is a king or a common man?

Thomas Paine, *The American Crisis*, No. 1 (Dec. 19, 1776), as reprinted in *Paine: Collected Writings* 97 (E. Foner, ed.) (Putnam, 1984). Pope John Paul II judged that any violent result of struggle against an oppressive government is

Constitution and laws of the United States of America against all enemies." 8 C.F.R. § 337.1. As the late Rep. Barbara Jordan said, that duty dictates that we cannot sit by and "be an idle spectator to the diminution, the subversion, the destruction of the Constitution." *Barbara Jordan: Speaking the Truth with Eloquent Thunder* 24 (ed. Max Sherman) (U. Tex. Press 2007). And that solemn duty compels me to come before you today.

The Constitution exists to limit the power of government; the Bill of Rights exists "to prevent misconstruction or abuse of" those powers. Preamble, Bill of Rights (U.S. 1798). To not put too fine a spin on it, we pay you a handsome salary to wield the hammer of the law to protect us from the predations of lawless public servants, so that more drastic remedies never become necessary.

In this matter, this Court has already found that a redressable injury has occurred, and must now search for an effective remedy. Intervenor respectfully submits that the only effective remedy is to declare that Mr. Trump is not our President de jure and as such, based on hidebound Supreme Court precedent on point, any agents acting at his ostensible direction have no lawful authority to act as public officials. Pardons of violent criminals will be voided, an array of ruinous tariffs will be rescinded, a budget-busting billionaire bailout will be interred, and a certain child sex predator will be returned to maximum security. *Fiat iustitia, ruat cœlum!* Restoring the rule of law to this tortured land will be challenging, but it will be worth it.

---

morally "attributable to the aggressor whose action brought it about." Pope John Paul II, *Evangelium Vitae*, Sec. 55, Encyclical Letter on the Value and Inviolability of Human Life, Mar. 25, 1995. *See also,* Paul Butler, *By Any Means Necessary: Using Violence and Subversion to Change Unjust Law,* 50 U.C.L.A. L. Rev. 721 (2003) (invoking international law principle of "just war" to justify targeted assassination of public officials—including *judges,* I might add). **There is no contrary authority.**

"Violence," wrote Isaac Asimov, "is the last refuge of the incompetent." Isaac Asimov, *Foundation* 58 (1951). But one would not dare to call George Washington and Thomas Jefferson that. As Jefferson explained, the purpose of a written constitution is to "bind up the several branches of government ... to render unnecessary an appeal to the people, or in other words a rebellion, on every infraction of their rights." Thomas Jefferson, *Notes on the State of Virginia* 255 (Query 13) (1783). The Bill of Rights is, at essence, a bill of remedies, empowering the citizenry to bind their agents on an as-needed basis. For that reason, the better rule is that one only resort to violence at great need and then, only after all alternatives are exhausted. *See e.g., Declaration of the Causes and Necessity of Taking Up Arms* (U.S. 1775).

### 3. This IS War, and the Enemy Is Inside the Gates.



While there may be some resistance from "upstairs," this is a time for courage. Donald Trump does not have pardons or tanks—he only has our acquiescence. We have your judgment, and an army of the bravest men on the planet, **who swore an oath to the Constitution**—not to a usurper. All we need is for you to find the courage to exercise it.

Silencing the Oracles of One First Street should be as simple as reminding them of their own bulletproof jurisprudence.[5] Moreover, given the criminal prosecution of Judge Hannah Duggan

---

[5] Judges judge. It's what they do. And since the passing of Antonin Scalia, no one on any court has expressed his judicial philosophy with the force and clarity of Defendant Thomas. His concurrence in *Gamble v. United States,* 587 U.S. 678, 139 S.Ct. 1960, 1980-89 (2019), (Thomas, J., concurring), is a masterclass in jurisprudence—a ruthlessly rational exposition of originalism, as it now stands. Thomas is in rarefied company: the Framers were all originalists. As James Madison observes, there is one and only one proper way to interpret the Constitution:

> I entirely concur in the propriety of resorting to the sense in which the Constitution was accepted and ratified by the nation. In that sense alone is it the legitimate Constitution. And if that not be the guide in expounding it, there can be no security for a consistent and stable, more than for a faithful exercise of its powers.

James Madison, *Writings of James Madison: 1819-1836* 191 (G. Hunt ed. 1910). His mentor Thomas Jefferson concurred:

> Our peculiar security is in possession of a written constitution. Let us not make it a blank paper by construction. If [our public officials' powers are boundless] then we have no constitution. If it has bounds, they can be no other than the definition of the powers which that instrument gives.

Thomas Jefferson, Letter (to Wilson Nicholas), Sept. 7, 1803 at 2. To put it simply, **either the Constitution is dead, or our Republic is.** As Justice Scalia so adroitly put it, "the Constitution that I interpret and apply is not living but dead — or, as I prefer to put it, enduring. It means today not what current society (much less the Court) thinks it ought to mean, but what it meant when it was adopted." Antonin Scalia, God's Justice and Ours, *First Things* (May, 2002) at 17. As the Supreme Court put it,

> The object of construction, applied to a constitution, is to give effect to the intent of its framers, and of the people in adopting it. This intent is to be found in the instrument itself; and, when the text of a constitutional

> provision is not ambiguous, the courts, in giving construction thereto, are not at liberty to search for its meaning beyond the instrument.

*Lake County v. Rollins*, 130 U.S. 662, 670 (1889) (interpreting the Colorado Constitution).

His line of reasoning—from the Declaration to the Constitution to the law as it now stands (or, should stand) is all but bulletproof. The only mystery is why he doesn't apply it on the bench.

### a. The Originalist Jurisprudence of Clarence Thomas

Thomas offers us what is tantamount to a confession: "There are right and wrong answers to legal questions," Clarence Thomas, *Judging*, 45 U. Kan. L. Rev. 1, 5 (1996), and clear rules of the road. "We should restore our stare *decisis* jurisprudence to ensure that we exercise 'mer[e] judgment,' [as opposed to will], which can be achieved through adherence to the correct, original meaning of the laws we are charged with applying. In my view, anything less invites arbitrariness into judging." *Gamble v. United States*, 587 U.S. 678, 139 S.Ct. 1960, 1981 (2019) (Thomas, J., concurring) (citation omitted). He further avers that "the Court's typical formulation of the *stare decisis* standard does not comport with our judicial duty under Article III **because it elevates demonstrably erroneous decisions—** meaning decisions outside the realm of permissible interpretation—**over the text of the Constitution** and other duly enacted federal law." *Id.* (emphasis added).

"[W]e are not entitled to interpret the Constitution to align it with our personal sensibilities." *Id.* at 1980. "By applying demonstrably erroneous precedent instead of the relevant law's text…the Court exercises "force" and "will," two attributes the People did not give it." *Id.* at 1981 (citing Federalist #78). "It is always "tempting for judges to confuse our own preferences with the requirements of the law.'" *Id.* (citation omitted). He continues:

> A proper understanding of stare decisis in our constitutional structure requires a proper understanding of the nature of the "judicial Power" vested in the federal courts. That "Power" is—as Chief Justice Marshall put it— the power "to say what the law is" in the context of a particular "case" or "controversy" before the court. Phrased differently, the "judicial Power" "is fundamentally the power to decide cases in accordance with law." It refers to the duty to exercise "judicial discretion" as distinct from "arbitrary discretion."

Id. at 1982 (citations omitted).

"Judicial discretion is not the power to 'alter' the law; it is the duty to correctly 'expound' it." *Id.* (citation omitted). As he observed, "there are right and wrong answers to legal questions," *Id.* at 1984 (citation omitted), and it is the task of the judge to ascertain and apply the right ones, because judicial opinions are not the supreme Law of the Land. *U.S. Const. art. VI, cl. 2.*

Thomas provides the rule a judge should follow without fail: "When faced with a demonstrably erroneous precedent, my rule is simple: We should not follow it." *Gamble*, 587 U.S. 678, 139 S.Ct. at 1984. "This view of *stare decisis* follows directly from the Constitution's supremacy over other sources of law—including our own precedents … [as it] necessarily limits 'the power of a court to give legal effect to prior judicial decisions' that articulate demonstrably erroneous interpretations of the Constitution because those prior decisions cannot take precedence over the Constitution itself." *Id.* at 1984-85 (citations omitted). The only difference between a tyrant and a judge is that the latter is tethered to the rule of law.

### b. …and His Chorus

The other Team Roberts Justices posit themselves as originalists, even if they are of the faint-hearted variety. Antonin Scalia, Originalism: *The Lesser Evil*, 57 U. Cin. L. Rev. 849, 864 (1989) ("I hasten to confess that in a crunch I may prove a faint-hearted originalist."). Justice Barrett "tend[s] to agree with those who say that a [judge's] duty is to the Constitution and that it is thus more legitimate for her to enforce her best understanding of the Constitution rather than a precedent she thinks clearly in conflict with it," *Barrett, Precedent and Jurisprudential Disagreement*, 91 Tex. L. Rev. 1711, 1728 (2012-2013)—a notion foundational to originalist thought. *See also, e.g.,* Amy Coney Barrett, *"Originalism and Stare Decisis,"* 92 Notre Dame L. Rev. 1921 (2017).

On the bench, Justice Alito dutifully follows Scalia: "What I look for in the Constitution is precisely what I look for in a statute: the original meaning of the text." *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 141 S.Ct. 1868, 1894 (2021) (Alito, J. concurring; citation omitted). In his confirmation hearing, Justice Alito warranted that "[I]t is the job of a judge, the job of a Supreme Court Justice, to interpret the Constitution, not distort the Constitution, not add to the Constitution or subtract from the Constitution." *Confirmation Hearing on the Nomination*

8

for hindering the apprehension of a suspect, it would not be impolitic to mention that anyone who "assists [a criminal offender] in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact." 18 U.S.C. § 3. Supreme Court Justices are not above the law,[6] and judicial lawmaking is a violation of their Article III good behavior tenure.

---

*of Samuel A. Alito, Jr. To Be an Associate Justice of the Supreme Court of the United States*: Hearing Before the S. Comm. on the Judiciary, 109th Cong. 465 (2006) (statement of Samuel A. Alito, Jr.). Perhaps more importantly, he observed that "The Constitution does not always mean what we would like it to mean." Samuel A. Alito, Jr., Let Judges Be Judges (lecture) (Oct. 13, 2010) (transcript at https://perma.cc/L4MC-5STU). And when someone comes for his gunny-gun-guns, Defendant Alito declares that when "the statutory text is clear … we must follow it." *Garland v. Cargill*, 602 U. S. 406, 429 (2024) (Alito, J., concurring).

   In a Tenth Circuit concurrence, Justice Gorsuch observed that "judges are charged with applying [the text] according to its original public meaning." *Cordova v. City of Albuquerque*, 816 F.3d 645, 661 (10th Cir. 2016) (Gorsuch, J, concurring) (emphasis added). In speeches, Justice Kavanaugh embraces the originalist banner, speaking of **"those of us** who believe that the judges are confined to interpreting and applying the Constitution and laws as they are written and not as we might wish they were written." Brett M. Kavanaugh, From the Bench: The Constitutional Statesmanship of Chief Justice William Rehnquist, *American Enterprise Institute*, Dec. 12, 2017 (emphasis added). He adds: "As I see it, the Constitution is primarily a document of majestic specificity, and those specific words have meaning. Absent constitutional amendment, those words continue to bind us as judges, legislators, and executive officials." Id.  Finally, in an infamous dissent, Chief Justice Roberts declared that

> this Court is not a legislature … Under the Constitution, judges have power to say what the law is, not what it should be. The people who ratified the Constitution authorized courts to exercise "neither force nor will but merely judgment." The Federalist No. 78, p. 465 (C. Rossiter ed. 1961) (A. Hamilton) (capitalization altered). …
>
> The majority's decision is an act of will, not legal judgment. **The right it announces has no basis in the Constitution or this Court's precedent**. The majority expressly disclaims judicial "caution" and omits even a pretense of humility, openly relying on its desire to remake society according to its own "new insight" into the "nature of injustice." …
>
> Understand well what this dissent is about: … whether, in our democratic republic, that decision should rest with the people acting through their elected representatives, or with five lawyers who happen to hold commissions authorizing them to resolve legal disputes according to law. The Constitution leaves no doubt about the answer.

*Obergefell v. Hodges*, 576 U.S. 644, 135 S.Ct. 2584, 2811-12 (2015) (Roberts. C.J., dissenting) (emphasis added).

[6] Let's do the math.

### 1. The Roberts Six Knew

   In most cases involving accessory liability, the heaviest lift is in proving that a suspect knows that a federal offense has been committed. But in this case, not so much. Frankly, if your wife is being investigated as a co-conspirator, *e.g.*, Ewan Palmer, Ginni Thomas Subpoena Calls Grow Over John Eastman Jan. 6 Emails, *Newsweek*, Jul. 24, 2022, you are flying flags in support of an insurrection, (Judge) Michael Posnor (D.Mass), A Federal Judge Wonders: How Could Alito Have Been So Foolish?, *N.Y. Times*, May 24, 2024, or the beneficiary of your assistance in keeping him out of jail thanks you profusely for no objectively discernible reason, e.g., Paul Blumenthal, Donald Trump Rips The Mask Off Of John Roberts' Court In One Sentence, *Huffington Post*, Mar. 5, 2025, you have probably met that threshold, and that assumes that you don't read the morning paper or own a television.

   For purposes of 18 U.S.C. § 3, "knowledge" means awareness of the conduct constituting the essential elements of the principal's offense. *United States v. Graves*, 143 F.3d 1185 (9th Cir. 1998). An appellate judge reviewing a case

record would have detailed knowledge of the facts proving the offense (e.g., what the defendant did, how it violated federal law). Three cases made it to certiorari review, and Lord knows how many desperate supplicants sought review. A reasonsble person would conclude that these facts satisfy the knowledge element, with gracious plenty to spare.

### 2. Assisting the Offender by Rewriting the Constitution and Hindering a Prosecution

The legendary Judge Posner asserted that appellate judges often take indecent liberties with both facts and precedent, in an often-transparent effort to conceal the fact that they are not so much interpreting the law as they are writing it to suit their personal preferences, "constantly digging for quotations from and citations to previous cases to create a sense of inevitability about positions that they are in fact adopting on grounds other than deference to precedent"—a process colorfully characterized as "fig-leafing." Richard A. Posner, *How Judges Think* 144, 350 (Harv. U. Press 2008). What makes *Trump v. United States* so problematic is that there is no path from the Roberts Six's advertised originalism, the Constitution they are paid to interpret, and the warranties they offered to a conclusion that is so flagrantly irrational and outcome-driven. It is as if they were all screaming in unison, "We want Barabbas!" *Matt. 27:15–26.*

#### a. What the Constitution Doesn't Say

When he was applying for the job, Defendant Kavanaugh had much to say about the judging process. The judge "must interpret the Constitution as written, informed by history and precedent," and "interpret the law, not make the law." Brett Kavanaugh's Opening Statement to Senate Judiciary Committee, *CNN*, Sept. 4, 2018. Importantly, citing Federalist 83, he adds that "rules of legal interpretation are rules of common sense." Id. Taking Judge Kavanaugh's advice, Defendant Kavanaugh should have started by reading the Constitution. Version 1.1—where you would find Presidential immunity, if the Framers granted it—is only about 5,000 words. Article II is a soul-crushing 1,025 words. He could have read it over a beer.

And what would he have found? Presidential immunity cannot be found in the plain text of the Constitution, its penumbrae, or its emanations. Antonin G. Scalia, Historical Anomalies in Administrative Law, Y.B. Sup. Ct. Hist. Soc'y. 103 (1985). It has no "grounding in constitutional text, history, or precedent," *Dobbs*, 597 U.S. at 280 (2022), or the canons of common sense: The Framers designed their Constitution to prevent unchecked executive power—a principle rooted in their experience under King George III, as outlined with clarity in the *Declaration of Causes and Necessity for Taking Up Arms*, First Continental Congress (U.S. Jul. 6, 1775). He might have learned that the Framers thought about and knew how to grant immunity, U.S. Const. art. I, § 6, cl. 1 (Speech and Debate Clause). Their silence should have been dispositive.

#### b. What the Legislative History Doesn't Say

To a man, the Framers were adamant in their opposition to a grant of criminal immunity to the President. James Wilson told the Pennsylvania ratifying convention that the president was "far from being above the laws," and "not a single privilege [was] annexed to his character." 2 *Elliot's Debates* 480. Contrasting the President to the King, Alexander Hamilton assured the public that the president, unlike a monarch, "would be liable to prosecution and punishment in the ordinary course of law." *The Federalist* No. 69, 396-97 (Hamilton). Some years later, Charles Pinckney confirmed that "[n]o privilege of this kind was intended for your Executive, nor any except that which I have mentioned for your Legislature." Sen. Charles Pinckney (D/R-SC), Speech (in the United States Senate), Mar. 5, 1800, 3 *Farrand* 384-85. Noting "no subject had been more abused than privilege," he added that the Framers "set the example in merely limiting privilege to what was necessary, and no more." Id. **There is no contrary authority.**'

Influential commentators of the day agreed that the Constitution did not grant any form of immunity to the President, *e.g.*, 2 St. George Tucker, *Blackstone's Commentaries* 219 n.1. (1803); 3 *Debates in the Several State Conventions on the Adoption of the Federal Constitution* (2d Elliot ed. 1836) 59-60 (Patrick Henry), and their reason was self-evident: "Representative democracy ceases to exist the moment that the public functionaries are by any means absolved from their responsibility to their constituents." 1 *Tucker's Blackstone* 297 (editor's app'x.).

Whereas the Framers' public views carry the most probative value, it was generally understood that the president's accountability to prosecution would distinguish American leaders from European monarchs. In a September 1787 essay, Tench Coxe emphasized that the president could be "proceeded against like any other man in the ordinary course of law." An American Citizen I, *Indep. Gazetteer* (Philadelphia, Pa.) (Sept. 26, 1787), reprinted in 2 *Documentary History of Ratification* ("DHR") 138, 141. As "Americanus," a supporter of the Constitution from New Jersey, observed, the British king was "above the reach of all Courts of law," but this "prerogative[]" was not "vested

10

in the President." Americanus II, *N.Y. Daily Advertiser* (Nov. 23, 1787), reprinted in 19 *DHR* 287, 288-89. Patrick Henry asserted that "we may prescribe the rules by which he shall rule his people, and interpose such checks as shall prevent him from infringing them, but the President, in the field, at the head of his army, can prescribe the terms on which he shall reign," 3 *Elliot's Debates* 59-60 (Patrick Henry) (noting in opposition to the president's control over the army in the draft Constitution that a president who committed a crime might try to use the army to avoid "being ignominiously tried and punished"), presaging the concern Justice Sotomayor voiced in her *Trump* dissent.

Senator William Maclay (Anti-Administration-PA) asked what would happen in the case of a murderous president: "Suppose the President committed murder in the street. Impeach him? . . . But [suppose] . . . he runs away. But I will put up another case. Suppose he continues his murders daily, and neither House is sitting to impeach him." William Maclay, *The journal of William Maclay, United States Senator from Pennsylvania, 1789-1791,* 163 (Chas. A. Beard ed., 1927) (1965). "Senator William Grayson of Virginia was adamant that the 'President was not above the law,' arguing that presidents likely would be sued and that they might be prosecuted for murder." Saikrishna Prakash, *Prosecuting and Punishing Our Presidents*, 100 Tex. L. Rev.55, 74-5 (2021). Others underscored that the president could be "tried for his crimes," see Publicola: An Address to the Freemen of North Carolina, State Gazette of N.C. (Mar. 27, 1788), reprinted in 30 DHR Digital Edition 113, 116 (Kaminski et al. eds., 2009) and was "liable . . . to be indicted if the case should require it," see A Freeholder, *Va. Indep. Chron.* (Apr. 9, 1788), reprinted in 9 DHR 719, 723. The Federal Farmer was more concerned that the President would use his office to get re-elected, "Federal Farmer," The Character of the Executive Office, *Antifederalist No. 69*, reprinted https://www.history1700s.com/index.php/the-united-states-constitution-reference/the-anti-federalist-papers/1178-antifederalist-no-69.html. On the privileges of king and lords, Tucker states: "The fundamental principle of the American Constitutions and governments, being the perfect equality of rights, there was no room to admit any thing therein, that should bear the most distant resemblance to the subject of this chapter." 2 St. George Tucker, *Blackstone's Commentaries* 219 n.1. (1803). As Chief Justice Marshall put it, "the president is elevated from the mass of the people and, on the expiration of the time for which he is elected, returns to the mass of the people again." *United States v. Burr*, 25 F. Cas. 30, 34 (C.C.D. Va. 1807) (Marshall, C.J., riding circuit) (emphasis added). Therefore, "the first magistrate of the Union may more properly be likened to the first magistrate of a state," rather than to a "monarch." *Id.* Again, **there is no contrary authority**.

Unlike the question of criminal immunity, the efficacy of impeachment was discussed by the Framers. The danger being guarded against, in the words of Madison, was that "the chief Magistrate ... might pervert his administration into a scheme of peculation or oppression [or] betray his trust to foreign powers." Notes on the Constitutional Convention (July 20, 1787), 2 *Farrand* 65-66. Colonel Mason all but predicted a crime Mr. Trump was indicted for: "Shall the man who has practised corruption [through bribing Electors] & by that means procured his appointment in the first instance, be suffered to escape punishment, by repeating his guilt?" Id. at 65. Ben Franklin, in reasoning against any monarchical-like system which would place the chief executive beyond the reach of the law, argued it would be "best ... to provide in the Constitution for the regular punishment of the Executive when his misconduct should deserve it." *Id.* **When Ben Franklin disagrees with you, you probably need to double-check your work.**

### c. What the Roberts Six Don't Say



While it is bad enough that Justice Kavanaugh disagrees with Ben Franklin, **it is utterly scandalous that he disagrees with Judge Kavanaugh**. What makes this covert judicial flight to El Salvador so outrageous is that none

### 4. Where Was That Shadow Docket When We Needed It???

Delay is a weapon in the dishonest judge's arsenal, *e.g., Smith v. U.S. Court of Appeals for the Tenth Circuit*, 484 F.3d 1281 (10th Cir. 2007) (decided more than two years after briefing was complete), and the Supreme Court can move with alacrity when it needs to. *E.g., United States v. Nixon,* 418 U.S. 683 (1974). But they chose not only to entertain an appeal they had no business hearing, but to slow-walk it to its conclusion. This, in context, is compelling evidence of criminal intent.

---

of the Justices were not writing from a blank slate. Everything they said on the record beforehand would have led the reasonable citizen to believe that they had all concluded that the notion that our President enjoyed almost limitless immunity from criminal prosecution was fifty shades of absurd. Prior to issuing the ruling in *Trump v. United States*, Justice Kavanaugh admitted that the President did not enjoy criminal immunity. As he was an adjunct professor at Harvard who worked for independent counsel Kenneth Starr and wrote a scholarly articule on the subject, Brett M. Kavanaugh, *The President and the Independent Counsel*, 86 Geo. L.J. 2133 (1998), his was a fulsome answer:

> "No one has ever said, I do not think, that the president is immune from civil or criminal process," Kavanaugh said. "So immunity is the wrong term to even think about in this process." He added, "But immunity is not — not the correct word, and I do not think anyone thinks of immunity. And why not? No one is above the law. And that is just such a foundational principle of the Constitution and equal justice under law."

Aaron Blake, What conservative justices said about immunity—before giving it to Trump, *Wash. Post,* Jul. 2, 2024.

And in a response to Senator Grassley (R-IA) regarding suspicion that he would rule that the President enjoys broad immunity from criminal liability, Kavanaugh explained why:

> No one is above the law in our constitutional system. Federalist 69, Hamilton makes clear all the ways that the executive branch, as designed by the Framers of the Constitution, was different from the monarchy. Under our system of Government, the executive branch is subject to the law, subject to the court system, and that is an important part of Federalist 69. It is an important part of the constitutional structure.

S. Hrg. 115-545, Pt. 1, Confirmation Hearing on the Nomination of Hon. Brett Kavanaugh to be an Associate Justice of the United States 119 (Sept. 4-7, 2018) (stmt. of Judge Kavanaugh). Similar statements from the hearing are compiled via video. Conover Kennard, Brett Kavanaugh in 2018 Disagrees with Brett Kavanaugh of 2024, Crooks&Liars.com, Jul. 2, 2024, https://crooksandliars.com/cltv/2024/07/brett-kavanaugh-2018-disagrees-brett (video only).

Although examined less directly, when asked whether a President had criminal immunity, all the other Roberts Justices agreed under oath that he did not. When they were applying for the job of Justice, the Justices averred that "no man was above the law." ("I believe that no one is above the law under our system, and that includes the President. The President is fully bound by the law, the Constitution and statutes." S. Hrg. 109–158, *Confirmation Hearing on the Nomination of John G. Roberts, Jr. to be Chief Justice of the United States* 152 (2005) (stmt. of Judge Roberts); "No man is above the law. ... No man." S. Hrg. 115–208, *Confirmation Hearing on the Nomination of Hon. Neil Gorsuch to be an Associate Justice of the United States* 113 (2017) (stmt. of Judge Gorsuch); "Barrett said three times that nobody was 'above the law' while responding to questions about the president" and Alito stated that "no person in this country is above the law, and that includes the president and it includes the Supreme Court." Aaron Blake, What conservative justices said about immunity — before giving it to Trump, *Wash. Post,* Jul. 2, 2024). But without any colorable support in or reference to the law—and in inexplicable disregard of their own public positions—the Justices decided *sua sponte* that Presidents ought to be above the law. **Never mind that they all admitted that making policy decisions was above their pay grade.**

The last time we were prosecuting a corrupt President, our courts moved at breakneck speed. The case concerning the Nixon tapes was styled *United States v. Mitchell,* 377 F. Supp. 1326 (D.D.C. 1974); Judge John Sirica issued a subpoena on April 18, 1974. Nixon appealed; the Supreme Court granted certiorari before judgment on May 31, and the Court's opinion was issued on July 24, 1974. *Nixon, supra.* By stark contrast, in *Trump v. United States,* No. 23-939 (U.S. 2024), Special Counsel Smith petitioned the Supreme Court to bypass the D.C. Circuit and directly decide on Trump's immunity claim, citing the case's imperative public importance. The Justices declined the motion, and the D.C. Circuit issued its opinion on February 6, 2024, less than two months after the appeal. *United States v. Trump,* 88 F.4th 990 (D.C. Cir. 2024). The entire process took over 200 days, rendering it impossible for Trump to be tried in a timely manner in any federal court.[7]

**Where *was* that shadow docket when we needed it???**

*Finally, nobody crimes for free.* While "motive" is rarely an element of a crime, juries tend to insist that prosecutors provide one. And here, it distills to filthy lucre.



---

[7] On or about August 22, 2022, Judge Aileen Cannon intervened in a federal investigation into alleged criminal activity by Defendant Trump and co-conspirators, pursuant to a Motion styled "In the Matter of the Search of Mar-a-Lago." *Trump v. United States,* 9:22-cv-81294, (S.D. Fla.). On or about December 1, 2022, the Eleventh Circuit ordered the case to be dismissed because Cannon improperly exercised equitable jurisdiction over it, writing: "This appeal requires us to consider whether the district court had jurisdiction to block the United States from using lawfully seized records in a criminal investigation. The answer is no." *Trump v. United States,* No. 22-13005 (11th Cir. Dec. 1, 2022) (slip op. at 2). Any second-year law student would know that Trump's motion was frivolous; as her Orders had no possible chance of surviving appellate review, by process of elimination, her intent appeared to be to assist Plaintiff Trump to "hinder or prevent his apprehension, trial or punishment." 18 U.S.C. § 3. Coordination.

## CONCLUSION



*In free Governments the rulers are the servants, and the people their superiors and sovereigns.*
~Benjamin Franklin, July 26, 1787

Read *in pari materia*, the Framers' Constitution and the common law bedrock upon which it was erected was as bulletproof as any charter of individual liberty ever devised. But those learned men appreciated its limitations. They understood that the Constitution is a "parchment barrier," 5 *Writings of James Madison* 269, 272 (G. Hunt ed. 1901), flimsier than a porn star's nightgown. Doctor Franklin left us with "a Republic … if you can keep it." James McHenry, *The Papers of Dr. James McHenry on the Federal Convention of 1787*, 11 Am. Hist. Rev. 595, 618 (1906). And in every generation, as Ronald Reagan reminded us, the defense of freedom is literally up to us.

To a man, every Framer understood that faction was the gravest peril our Republic faced. Madison observed that a "well constructed union [would have a] tendency to break and control the violence of faction."[8] To address this peril, he later wrote: "It is of great importance in a republic not only to guard the society against the oppression of its rulers, but to guard one part of the society

---

[8] Madison's remarks, in proper context:

> Among the numerous advantages promised by a well constructed union, none deserves to be more accurately developed than its tendency to break and control the violence of faction.1 The friend of popular governments, never finds himself so much alarmed for their character and fate, as when he contemplates their propensity to this dangerous vice. He will not fail therefore to set a due value on any plan which, without violating the principles to which he is attached, provides a proper cure for it. The instability, injustice and confusion introduced into the public councils, have in truth been the mortal diseases under which popular governments have every where perished;

The Federalist No. 10 (James Madison), Founders Online, *National Archives*.

against the injustice of the other part. ... If a majority be united by a common interest, the rights of the minority will be insecure." *The Federalist* No. 51 (Madison). They feared that it would tear the country apart, as it did in Britain ... and ten years on, it damn near did. Sarah Pruitt, The Founding Fathers Feared Political Factions Would Tear the Nation Apart, *History.com*, Feb. 18, 2025. The Framers' Constitution had an array of firebreaks, including the diffusion of power between the suzerain and the vassal States **and the citizen's untrammeled right to engage in public interest litigation**. But today, all power converges in Washington.

We had a good run. Alexander Hamilton predicted our demise with chilling precision from 230 years away.[9] But as an old Goldwater Republican who actually believes that moderation in the pursuit of justice is no virtue, Intervenor could not remain silent. For together, Sir, we have this "magnificent Constitution." Even on its dying bed, it is most certainly that.

I beseech you to not let your words go to waste. Treat me as an intervenor. Treat me as an amicus. I could care less, as I have discharged my duty. Give those words the power they deserve and my words, the same consideration you did that postcard. You can either have our Constitution or President Donald Trump, but you cannot have both.

Respectfully submitted this 1st day of October,

K.L. Smith
3649 Evergreen Pkwy. #504
Evergreen, CO. 80437-0504
Manncoulter.fox@gmail.com
(720) 404-5383

---

[9] Alexander Hamilton, Objections and Answers Respecting the Administration, Aug. 18, 1792, *Founders Online*, Nat'l. Archives (last visited Apr. 3, 2025). Gibbon was equally prescient, observing that "the discretion of the judge is the first engine of tyranny." 4 C. Gibbon, The History of the Decline and Fall of the Roman Empire 385 (1776-89) (Philips Samson, and Co. 1856).

15

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2025, I caused a copy of this MOTION TO INTERVENE (INCORPORATING AUTHORITY) to be mailed to counsel at:


David Rassoul Rangaviz
Massachusetts Attorney General's Office
1 Ashburton Place
Boston, MA 02108


Joshua M. Daniels
The Law Office of Joshua M. Daniels
P.O. Box 300765
Jamaica Plain, MA 02130


Ahilan Arulanantham
ACLU of Southern California
1313 West 8th St.
Los Angeles, CA 90017


Michael Tremonte
Sher Tremonte LLP
90 Broad St.
23rd Floor
New York, NY 10004


RAYFORD A. FARQUHAR
Assistant United States Attorney
United States Attorney's Office
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210

/s/ K.L. Smith          .