**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
**Civil Action No. 25-10685-WGY**

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS, et al.,

      Plaintiffs,

v.

MARCO RUBIO, et al.,

      Defendants.

# EXHIBIT A

RECEIVED IN CLERK'S OFFICE
DATE __10/23/2025__

Oct. 21, 2025

Hon. William G. Young
1 Courthouse Way
Boston, MA  02210

Re: Your *AAUP v. Rubio* opinion

Dear Judge Young:

> *The Constitution has failed, and we no longer know which institution will rescue it.*
> --Prof. Jack Rakove[i]

With all respect, I believe you missed the point: While we WERE blessed with "a magnificent Constitution,"[ii] we are cursed with a judiciary that would embarrass Zimbabwe.  Donald Trump does not have pardons or tanks[iii]; **all he has is your supine acquiescence**.

Whereas Thomas Paine once proclaimed "that in America THE LAW IS KING,"[iv] Judge Posner admits that the law's once-vast kingdom "has shrunk and greyed to the point where today it is largely limited to routine cases."[v]  We WERE blessed with a magnificent Constitution, but as Justice Thomas laments, centuries of judicial infidelity has corroded its intended limitations on the judicial power[vi] to the point that Robert Bork called it a *coup d'état*.[vii]

## WHERE A JURY ONCE SAT....

While the list of calumnies is stunning, the judiciary's most grievous sin was in reducing the once-mighty citizen to mere serfdom.  Under the Framers' Constitution, the citizen was not an idle spectator.  As Harvard's legendary Raoul Berger proved, every citizen enjoyed standing in any public interest case.[viii]  Within the broad scope of their authority, a jury decided both law and fact.[ix]  A citizen could enforce Article III good behavior tenure,[x] and even prosecute crimes.[xi] The First Amendment right to petition,[xii] the right to equal justice under law via mandatory certiorari review,[xiii] to sue States for damages in a neutral forum,[xiv] to hold public officials and their principals accountable in tort,[xv] to meaningful appellate review,[xvi] to cast a meaningful vote,[xvii] *Rucho v. Common Cause*, 588 U.S. 684 (2019), are all extinct.  Without any semblance of constitutional authority, judges have assumed roles intended for citizens by devices such as summary judgment,[xviii] and heightened pleading rules,[xix] all but eradicating the jury's democratic function as a check on government and elites. But **whenever the Constitution gets in the way of the judiciary's quest for power, the Constitution ALWAYS loses.**

Our Framers were prescient. In his Farewell Address, Washington counseled to "let there be no change [in the Constitution] by usurpation ... [as] it is the customary weapon by which free governments are destroyed."[xx] In the clear eyes of Thomas Jefferson, the judiciary was the most dangerous branch—a "subtle corps of sappers and miners constantly working under ground to undermine the foundations of our confederated fabric,"[xxi] and "the germ of dissolution of our Federal Government."[xxii]  And the gavel was lethal to our Republic.

1

As St. George Tucker observed, "representative democracy ceases to exist the moment that the public functionaries are by any means absolved from their responsibility to their constituents."[xxiii] Judges handed out immunity like penny candy with no colorable warrant in law,[xxiv] preventing the injured from securing redress and thereby, turned rights into privileges.

The core of the Constitution fared no better. The Fourth and Fifth Amendments died the death of a thousand cuts. *Egbert v. Boule*, 142 S. Ct. 1793 (2022) (finally swallowing *Bivens* whole). The Ninth Amendment bled out on the operating table at the hands of judicial abortionist Samuel Alito. *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 348 (2022). The Supremacy Clause met an equally ignominious fate with respect to treaties. *See United States v. Schooner Peggy*, 5 U.S. 103, 109–10 (1801) (treaties used to be the law of the land). And this is by no means a seriatim list.

It is bad enough that the Supremacy Clause, Petition Clause, Free Speech Clause, Due Process and Equal Protection Clauses, and the Fourth, Fifth, Seventh, Eleventh, and Fourteenth Amendments are all gone, but now, even the rules we were taught to rely on for "how to read law" are left in tatters. A self-executing Constitution. The Rule of *Charming Betsey*. The Plain Meaning Rule. Reliance on legislative history. "Every word has meaning." "Dead. Dead. Dead."[xxv] Now, all I have to do is ask Grok who appointed the judges. Works every time.[xxvi]

America lies comatose—bruised, battered, and disheveled—on the floor of One First Street, the victim of relentless judicial betrayal. The Roberts Court, engorged by a torrent of bribes that we can no longer call bribes, *Snyder v. United States*, 603 U.S. 1 (2024), have inflicted a thousand deep cuts to her rule-of-law vein, and her life is ebbing away. Some of the sins are obvious, like *Alden v. Maine* and *Trump v. Anderson*. Others are more subtle, like *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). Birthright citizenship is next on the chopping block, with the self-evident purpose of disenfranchising millions to ensure another Republican victory. "Day by day, case by case, [our courts are] busy designing a Constitution for a country I do not recognize." *Bd. of Comm'rs, Wabaunsee Cnty. v. Umbehr*, 518 U.S. 668, 711 (1996) (Scalia, J., dissenting).

*And we are now a government of men, not laws.* Scalia distills the concept to essentials: "This practice of constitutional revision by an unelected committee of nine robs the People of the most important liberty they asserted in the Declaration of Independence and won in the Revolution of 1776: the freedom to govern themselves." *Obergefell v. Hodges*, 576 U.S. 644, ___, 135 S.Ct. 2584, 2627 (Scalia, J., dissenting).

I would come to the courts of Boston, but I know what I would find: corruption on a Brobdingnagian scale. Your colleague Nancy Gertner admitted it[xxvii]; Alan Dershowitz seconded the motion.[xxviii] And that comes as little surprise: From Chicago[xxix] to Denver[xxx] to Vegas,[xxxi] the local courts—and even federal courts (involving Judge Mahan)[xxxii]—have always been cash-and-carry. But one of the most grotesque examples is the coverup of the scandal involving District Judge Samuel B. Kent, as it required that the Fifth Circuit participate in a criminal conspiracy.[xxxiii] Based on the way the Kent and Nottingham scandals were kept from the public, one is forced to conclude that that is only the tip of the iceberg.

The Mahan and Kent cases expose one of the more pernicious aspects of corruption in federal district courts: failure to disclose disqualifying conflicts. 18 U.S.C. § 455 places the onus on the

judge to ascertain whether he can sit, and we litigants have a right to expect judges to disclose any conflicts *sua sponte*. *American Textile Mfrs. Institute v. The Limited*, 190 F. 3d 729, 742 (6th Cir. 1999).[xxxiv] In the infamous duck-hunting case, Justice Scalia observed that "friendship is a ground for recusal of a Justice where the personal fortune or the personal freedom of the friend is at issue," *Cheney v. United States District Court for the District of Columbia*, 541 U.S. 913, 916 (2004) (mem.) (Scalia, J.), and Section 455(a) provides that a federal judge "**shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned**." (emphasis added). Suffice it to say that it is disheartening to learn of a disqualifying conflict in the goddamned *New York Times*.[xxxv]

As Judge Gertner openly admits, the biggest loser in your sewer—you presumably trained her—is the pro se litigant, whose only sin is that he is a man of modest means. As Senior Judge John Kane of the District of Colorado confessed, "all pro se cases, not just civil rights cases, are treated shabbily and superficially by our courts, both bench and bar.[xxxvi] Other judges have told me the same thing,[xxxvii] and there is no shortage of scholarly concurrence.[xxxviii]

While the empirical evidence is overwhelming, the most egregious case I can think of is that of Yale and Georgetown Law grad John Cogswell, who had been at bar for forty years. Cogswell raised the obvious issue presaged in *Marbury v. Madison*: If "every right, when withheld, must have a remedy," (5 U.S. 137, 163 (1803)), it follows that the government has a concomitant duty to provide sufficient judicial resources to provide it. This was precipitated by a judge's untimely demise, the forced resignation of the Chief Judge (who was taking bribes on a galactic scale[xxxix]), and two transitions to senior status, leaving only three out of seven seats filled.[xl] The judges who were left performed triage, thereby depriving Cogswell of his right of access to the courts.

Unfortunately, Cogswell drew the execrable Robert Blackburn, who has demonstrated a pattern of administratively dismissing meritorious pro se cases.[xli] And Blackburn was able to get away with such chicanery because the average federal appellate judge spends more time on the shitter than he does in deciding an appeal.[xlii] The judicial output is so uniformly abysmal that Judge Kozinski called it "inedible sausage," unfit for human consumption.[xliii] Many of the summary decisions are not just wrong, but comically so.[xliv] But the Fourth Circuit Court of Appeals is more of a national disgrace than an appellate court, as its reversal rate was a stunning 4.0%.[xlv] By stark contrast, back in 1945, when judges still read briefs, held hearings, and wrote their own opinions, the national reversal rate was a respectable 27.9%.[xlvi]

Bottom line, the United States Circuit Courts of Appeal are no longer deserving of that lofty name, having devolved into barely more than playpens for petulant lawyers who once knew a President with galaxy-class egos, who have become sufficiently arrogant to declare that they are simply too important to do their jobs. William M. Richman, *Much Ado About the Tip of an Iceberg*, 62 Wash. & Lee L. Rev. 1723 (2005). They "deliver" opinions because they have never actually read them—to say nothing of writing them.

Though the blows the judiciary has struck are both cruel and relentless, few are as grievous as their emasculation of the jury. From the theory laid down by Sir John Hawles to the trial of John Peter Zenger,[xlvii] the principle that the jury is the ultimate master of law and fact was cemented in the common law.[xlviii] Today, an attorney could be held in contempt[xlix] for telling a jury what the

colonial jury didn't have to be told, and any defendant's attempt to read Chief Justice Jay's jury instructions to the Supreme Court's jury—it is a trial court, U.S. Const. art. III, § 2, cl. 2 —would be stricken.[l] Whereas, in Holmes' words, "the jury has the power to bring in a verdict in the teeth of both law and facts," *Horning v. District of Columbia*, 254 U.S. 135, 138 (1920), advocates and parties may not even speak this unspoken truth, under pain of imprisonment.[li]

A close second was the interment of the First Amendment right to petition. The Petition Clause was a central feature of the relationship between government and the governed, acting as an essential firebreak when the system failed, thereby ensuring a "remedy for the violation of a vested legal right." *Marbury v. Madison*, 5 U.S. at 163. By way of example, James Stanley, a master sergeant in the Army stationed at Fort Knox, was secretly administered doses of LSD, pursuant to an Army scheme to study its effects on human subjects. *United States v. Stanley*, 483 U.S. 669, 671 (1987). Inexplicably,[lii] our courts would not protect him. The ultimate irony here is that Stanley was a soldier: a man who took a solemn oath to uphold and defend the Constitution—a document so feeble, it was unable to protect him from a crime so heinous, it could only have come from the mind of Mengele.[liii] The Petition Clause has suffered a judicial evisceration so complete, Professor Tribe fails to even mention it in his treatise.[liv]

> *Take all the robes of all the good judges that have ever lived on the face of the earth and they would not be large enough to cover **the iniquity of one corrupt judge**. ... Nothing can atone for, nothing can palliate his wickedness. No words can be too fiery, no edge too sharp, no thunder too mighty, and no lightning too hot, to scorch such a man.*
>
> ~Rev. Henry Ward Beecher[lv]

## WE LOST FAITH BECAUSE YOU BROKE FAITH

> *The major cause of the loss of public confidence in the American judiciary, however, is the failure of judges to comply with established professional norms, including rules of conduct specifically prescribed. In brief, **it is the unethical conduct of judges, both on and off the bench, that most concerns the citizenry**.*
>
> ~Hon. Roger J. Miner (CA-2)[lvi]

Back in the day, the Supreme Court pontificated that "[t]here can be no equal justice where the kind of trial a man gets depends on the amount of money he has." *Griffin v. Illinois*, 351 U.S. 12, 19 (1965), and [t]he law is no respecter of persons," *Trist v. Child*, 88 U.S. 441, 453 (1875). That we have the right to "equal and impartial justice under the law," *Leeper v. Texas*, 139 U.S. 462, 468 (1891)," to procedural due process, *Carey v. Piphus*, 435 U.S. 247 (1978), to have our grievances heard by a fair and independent tribunal, *Tumey v. Ohio*, 273 U.S. 510, 523 (1927), and to rely on pronouncements of our courts as authoritative expositions of what "the law" is, *Moragne v. States Marine Lines*, 398 U.S. 375, 403 (1970), which are "conferred, not by legislative grace, but by constitutional guarantee." *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 541 (1985) (internal quotation omitted). **But in today's America, you only have as many rights as you can afford.**

Back when the Supreme Court still pretended to be a court of law, they declared that courts "are bound to proceed to judgment, and to afford redress to suitors before them, in every case to which their jurisdiction extends," *Hyde v. Stone*, 61 U.S. 170, 176 (1857), the existence of jurisdiction "creates an implication of duty to exercise it, and that its exercise may be onerous does not militate against that implication." *Mondou v. New York, N.H. & H.R. Co.*, 223 U.S. 1, 58 (1912), and that [w]e have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be **treason to the constitution**." *Cohens v. Virginia*, 19 U.S. 264, 387 (1821) (emphasis added).

*Everything I learned in law school was a lie.*

No judge "can war against the Constitution without violating his undertaking to support it," *Cooper v. Aaron*, 358 U.S. 1, 18 (1958), and your collective insurrection makes January 6 look like a tourist romp. By the force of your collective will, you have transformed federal court into the last Woolworth's lunch counter, where the Franklin McCains of the world are refused service, while the John McCain-class plutocrats receive limousine service.[lvii] The Roberts faction of the Supreme Court has been taking "not-bribes" on an industrial scale[lviii] because billionaires don't waste money, and access to the courts has value. And as your colleague Michael Ponsor recently learned to his chagrin, the only ethical rule your Order observes is "Thou shalt never criticize a colleague."[lix] *Quis custodiet ipsos custodes?[lx]*

A fish rots from the head first.

I don't plead for the courts and judiciary that experience has taught me to despise—they can be fixed—but for the Republic itself. Alexander Hamilton saw Donald Trump, and the existential threat he poses, from 230 years away.[lxi] I see extraordinary renditions. A weaponized Department of Justice. Troops in the goddamned street. And above all, fear. Freedom is a fragile thing that must be defended, lest we are forced to fight for it again. Judge Luttig submitted our own Declaration of Independence, J. Michael Luttig, America's Grievances Against Its "King" on Constitution Day 2025, *Telos*, Sep. 14, 2025, and Barbara Jordan has stated our creed. While I have been disabused of faith in God and have even less faith in men, our faith in the Constitution must "be whole; it is complete; it is total." 120 Cong. Rec. 25, 276 (1974) (statement of Rep. Barbara Jordan).

It is hard to love a country that doesn't love you back, but it is the only one I have. Thus, with Martin Luther, I post my theses on the door of your castle. "Here I stand, I can do no other."[lxii]

Respectfully,

K.L. Smith
3649 Evergreen Pkwy. #504
Evergreen, CO. 80437-0504
Manncoulter.fox@gmail.com
(720) 404-5383

5

---

[i] Jack N. Rakove, It's Not Just a Constitutional Crisis in the Trump Era. It's Constitutional Failure, *Washington Monthly*, Jun. 27, 2025 (Rakove is a historian and professor emeritus at Stanford University).

[ii] *American Assoc. of University Professors v. Rubio*, No. 1:25-cv-10685-WGY, ECF #261 at 1 (D.Mass. Oct. 1, 2025) (per Young, J.)

[iii] Rather by definition, an oathbreaking adjudged insurrectionist not absolved by Congress cannot be our President, U.S. Const. amend. XIV, § 3, and his purported actions are void on their face. *Norton v. Shelby County*, 118 U.S. 425, 443 (1886).

[iv] Thomas Paine, *Common Sense* 36 (P. Eckler Co. 1918) (1776) (emphasis in original).

[v] Richard Posner, *How Judges Think* 1 (Harv. U. Press 2008).

[vi] A Conversation with Justice Clarence Thomas, 36-10 *Imprimis* 6 (Oct. 2007).

[vii] Robert H. Bork, *Coercing Virtue: The Worldwide Rule of Judges* 13 (AEI Press, 2003).

[viii] Raoul Berger, *Standing to Sue in Public Actions: Is it a Constitutional Requirement?*, 78 Yale L.J. 816, 819 (1969) ("No English court, so far as I can discover, has ever rejected the authority of *Articulo Cleri* or denied that a writ of prohibition may be granted at the suit of a stranger."). In particular, quo warranto was available to a stranger in *Rex v. Smith* [1790] 100 Eng. Rep. 740, wherein it was observed that "the ground on which this application is made is to enforce a general Act of Parliament, which interests all the corporations in the kingdom; and therefore it is no objection that the party applying is not a member of the corporation." *Berger*, 78 Yale L.J. at 823 & n. 38. In England, "[e]very subject,' said Justice Lush, "has an interest in securing that public duties shall be exercised only by those competent to exercise them...." *Berger, Id.* at 823 & n. 39 ("In 1915, Lord Reading observed that "a stranger to a suit can obtain prohibition. ... and I see no reason why he should not in a proper case obtain an information of quo warranto." ... "Every subject,' said Justice Lush, "has an interest in securing that public duties shall be exercised only by those competent to exercise them .... "). Moreover, Professor Berger adds that "[n]o hint that judicial restraint of legislative usurpation was to hinge on the suitor's 'interest' is to be found in the records of the Constitutional Convention." Berger, *Standing to Sue* at 829. Professor Jaffe concurs, arguing that "the public action—an action brought by a private person primarily to vindicate the public interest in the enforcement of public obligations—has long been a feature of our English and American law." Louis L. Jaffe, *Standing to Secure Judicial Review: Private Actions*, 75 Harv. L. Rev. 255, 302 (1961).

At common law, a subject who had suffered no individualized injury could challenge unlawful government action in a variety of ways, most commonly through prerogative writ procedure. As Professor Pushaw explains,

> In public law cases, a controversy was not required. A citizen who had suffered no individualized injury could challenge unlawful government action in a variety of ways, most commonly through prerogative writ procedure. Similarly, criminal and regulatory statutes often permitted an informer with no special interest in the case to sue.' Likewise, "relator" actions authorized citizens with no personal stake in a matter of public interest to prosecute as private attorneys general. In Hardwicke's words, "any persons, though the most remote in the contemplation of the [defendant], may be relators in these cases."

Robert J. Pushaw Jr., *Article III's Case/Controversy Distinction and the Dual Functions of Federal Courts*, 69-3 Notre Dame L. Rev. 447, 480-81 (1999).

This system translated well to our young nation, which was only a fraction of the size of Mother England. Informers' statutes were used extensively in the American colonies and in early state and federal practice. Steven L. Winter, *The Metaphor of Standing and the Problem of Self-Governance*, 40 Stan. L. Rev. 1371, 1406-08 (1988). "Relator" actions authorized citizens with no personal stake in a matter of public interest to prosecute as private attorneys

general. *See id.* at 1398-99. Similarly, criminal and regulatory statutes often permitted an informer with no special interest in the case to sue (qui tam actions). *See id.* at 1406-09.

The approach was syllogistic. A legal question had to "assume such a form that the judicial power is capable of acting on it," *Osborn v. Bank of the United States*, 22 U.S. 738, 819 (1824). "In matter of mere public right ... the people are the real party, as in the other case they are the nominal. Yet it is well known that they cannot act except through individual information, by their attorney general or some private person." *People ex rel. Case v. Collins*, 19 Wend. 56, 65 (N.Y. Sup. Ct. 1837) (mandamus). "In a matter of public right, any citizen may prosecute a mandamus; but here the proceeding is for the benefit of a particular class, and the legislature has thought fit to direct that they shall be represented upon this question by a particular public officer." *People ex rel Blacksmith v. Tracy*, 1 Denio. 617, 618-1 (N.Y. Sup. Ct. 1845); *accord, e.g., Cox v. Segee*, 206 Mass. 380, 381, 92 N.E. 620 (1910) ("But if in the performance of their official duties the respondents were subject to the by-law, the petitioners, as inhabitants and taxpayers of the town, may compel its enforcement by mandamus."). The only open question was whether a court sitting in equity had the power to provide a remedy. The Supreme Court observed that "a decided preponderance of American authority in favor of the doctrine, that private persons may move for a mandamus to enforce a public duty, not due to the government as such, without the intervention of the government law-officer." *Union Pacific R.R. v. Hall*, 91 U.S. 343, 355 (1876)

The right to have public duties exercised by "those competent to exercise them" is a common law right, for which there was a remedy enforceable in chancery court. "The common law ... ought not to be deemed to be repealed, unless the language of a statute be clear and explicit for this purpose," *Fairfax's Devisee v. Hunter's Lessee*, 11 U.S. 603, 623 (1813); *accord, United States v. Texas*, 507 U.S. 529, 534 (1993) (quotations and citations omitted). All the common law writs were available. Judiciary Act of 1789, ch. 20, § 14, 1 Stat. 73, 81-82 (1789). The practice is consistent with the Framers' design, the common law, and the concept of popular sovereignty.

**Standing: Judges, Writing Laws**

Justice Barrett recently cast grave aspersions on the modern doctrine of standing by chastising Justice Jackson last week in a frameworthy rant:

> We will not dwell on JUSTICE JACKSON's argument, which is at odds with more than two centuries' worth of precedent, not to mention **the Constitution itself**. … JUSTICE JACKSON would do well to heed her own admonition: "[E]veryone, from the President on down, is bound by law." Ibid. **That goes for judges too.**

*Trump v. CASA, Inc.,* No. 24A884, 606 U.S. ___ (2025) (Application for Stay granted Jun. 27, 2025), *slip. op.* at 23, 24 (capitalization in original) (emphasis added). If the nationwide injunction is void on account of its lack of constitutional foundation, the same line of reasoning would apply to the Taft Court's invention of 'standing'. But in the face of over a century of settled American law, and centuries of British law before that, the Taft Court declared, *sua sponte*:

> The party who invokes the power must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally.

*Massachusetts v. Mellon,* 262 U.S. 447, 488 (1923).

The classic justification given for standing doctrine—separation of powers—is self-stultifying, as the Framers spent months separating the powers, and the courts are neither competent nor authorized to improve on their genius. Moreover, "standing" is a constitutional form of Calvinball. As Harvard's Laurence Tribe writes, "It is clear… that the Court has selectively employed standing and justiciability doctrines generally," Tribe, *American Constitutional Law* 110 (2d ed. 1988), to the point where it essentially translates to "if your judge wants to hear the case, you have standing." *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 66 (1976). In short, like Charlie Brown, the hapless citizen must run toward the football (vindication of your rights under law), never knowing whether Judge Lucy will let you kick it.

[ix] The crown jewel of the English legal system was the right to have a trial by jury under which, the judge was reduced to little more than father-confessor. It "is the most transcendent privilege which any subject can enjoy, or wish for, that he cannot be affected either in his property, his liberty, or his person, but by the unanimous consent of twelve of his neighbours and equals." 4 Blackstone, *Commentaries* at 379.

Concurrences read like a Brandeis brief. It "is a fundamental law, made sacred by the Constitution, and cannot be legislated away." *Vanhorne's Lessee v. Dorrance*, 2 U.S. 304 (D.Pa. 1795) (Paterson, J., riding circuit). According to Framer (and signatory to the Declaration of Independence) Elbridge Gerry, its purpose was to "guard agst. corrupt Judges." 2 Farrand, *The Records of the Federal Convention of 1787* 587 (1909). Quoting Blackstone and Matthew Hale, Elbridge Gerry observed "that property, liberty and life, depend on maintaining in its legal force the constitutional trial by jury," and that it "is adapted to the investigation of truth beyond any other the world can produce." Elbridge Gerry, *Observations on the New Constitution, and on the Federal and State Conventions* (1788) as reprinted in, *Pamphlets on the Constitution of the United States, Published During its Discussion by the People*, 1787-1788 10 (P. Ford ed. 1888). John Dickenson viewed it as a "Heaven-taught institution," Fabius, Letter (to the editor), *Delaware Gazette* (1788), as reprinted in, John Dickinson, *The Letters of Fabius, in 1788, on the Federal Constitution; and in 1797 on the Present Situation of Public Affairs* 32 (1797), and one of "the corner stones of liberty." Id. at 34.

Juries were the ultimate deciders of questions of law, *Georgia v. Brailsford*, 3 U.S. 1, 4 (1793) (jury instructions of Jay, C.J.), before judges dismantled the Seventh Amendment. **Juries look down on you; juries look at you.**

ˣ Article III judges "shall hold their Offices during good Behaviour." U.S. Const. art. III, § 1. English law sourced in Coke and Blackstone defines this facially abstruse term of legal art with remarkable precision. By making a public official subject to removal for violating it, the condition of "good behavior" defined the powers of any given office. Coke listed three grounds for forfeiture of good behavior tenure: abuse of office, nonuse of office, and willful refusal to exercise an office. *R. v. Bailiffs* of Ipswich [1706] 91 Eng. Rep. 378 (K.B.) (corporate recorder forfeited office for failure to attend corporate meetings); *Henry v. Barkley* [1596] 79 Eng. Rep. 1223, 1224 (K.B.); *see generally*, Raoul Berger, *Impeachment of Judges and "Good Behavior" Tenure*, 79 Yale L.J. 1475 (1970); *Saikrishna Prakash & Steven D. Smith, How to Remove a Federal Judge*, 116 Yale L.J. 72, 88-128 (2006). Blackstone adds "oppression and tyrannical partiality of judges, justices, and other magistrates, in the administration and under the colour of their office." 4 Blackstone, *Commentaries* *140.

American judges are fairly noticed on what conduct might get them fired. When an Article III judge is elevated to the federal bench, s/he swears an oath to "administer justice without respect to persons, and do equal right to the poor and to the rich, and ... faithfully and impartially discharge and perform all the duties incumbent upon" him or her, 28 U.S.C. § 453, thereby defining the scope of his duties and obligations. In short, a violation of good behavior tenure is a violation of the oath of office, which has not changed since the Judiciary Act of 1789, 1 Stat. 73, § 8 (1789).

**Owing to separation of powers concerns,** the Framers entrusted the citizen with exclusive authority to remove judges for violations of their good behavior tenure. This is consonant with the Framers' intent: In advocacy of the proposed Constitution to the people of New York, Framer Alexander Hamilton opined that "the standard of good behavior for the continuance in office of the judicial magistracy, ... [and] the best expedient which can be devised in any government, to secure a steady, upright, and impartial administration of the laws." *The Federalist* No. 87, 437 (Hamilton). Several States granted judicial sinecures subject to good behavior, e.g., Mass. Const. ch. III, art. 1 (1780); N.H. Const. pt. 2, art. 73-1 (1787), as did the Northwest Ordinance of 1787, § 4 1 Stat. 50, 52 (1787). Importantly, Prakash and Smith observe that the Continental Congress had no mechanism for impeaching federal officers. Saikrishna Prakash & Steven D. Smith, *Removing Federal Judges Without Impeachment*, 116 Yale L.J. Pocket Part 95 (2006), http://yalelawjournal.org/forum/removing-federal-judges-without-impeachment. Finally, the penalties are different: whereas an impeached judge can never hold another public office, U.S. Const. art. I, § 3, cl. 7, the only penalty for violating good behavior tenure is the loss of the office.

Whereas the 'conventional wisdom' is that Article III allows good behavior to be judged only through the procedure of impeachment by Congress, Congress respectfully disagrees. During debate over the Chase impeachment, Congress acknowledged its inability to enforce good behavior tenure. Senator Hemphill recounted the Framers' intent that "the words in the Constitution rendered the judges independent of both the other branches of government." 5 *Elliot's Debates* 444 (remarks of Sen. Hemphill (F-PA). As the right to decide what is or is not "good behavior" *sua sponte* is a de facto power of address, it does not appear to have been the intent of the Framers to entrust that power to Congress. This view was reinforced and established a century ago in the investigation of Judge Emory Speer of the District of Georgia, who was charged with "despotism, tyranny, oppression, and maladministration" in the course of his judicial decision-making. Charles Geyh, *When Courts and Congress Collide: The Struggle for Control of America's Courts* 160 (U. Mich. Press 2008). Specifically, the congressional committee concluded that "a series of legal oppressions [constituting] an abuse of judicial discretion" did not constitute an impeachable offense, *id.* at 160-61 (quotations omitted), despite their being self-evident serial violations of Speer's good behavior tenure.

While judges have consistently denied this remedy, it is out of obvious self-interest. When judges judge fellow judges, they show a pronounced and well-documented propensity for indulging in undue 'guild favoritism.'" Breyer, *Report to the Chief Justice* at 1. As Senior Judge Kane of the District of Colorado related to the *Washington Post*, the reason is obvious, as one of his colleagues told him: "'John, think about it. The next time it could be you or me. We've got to stick together.' " Ronald Rotunda, The Courts Need This Watchdog, *Wash. Post*, Dec. 21, 2006, A-29; *see Cleavinger v. Saxner*, 474 U.S. 193, 204 (1985) (re: guild favoritism). In ruling in favor of fellow judges, the judge makes a deposit into what Harvard's famed Alan Dershowitz calls "the favor bank," Alan Dershowitz, *Supreme Injustice: How the High Court Hijacked Election 2000* 116 (2001), which ends up costing nothing under the *status quo ante*. In Judge Posner's brutally candid parlance, it is Bayesian decision theory in action. See Richard A. Posner, *How Judges Think* (Harv. U. Press 2008).

[xi] "[O]ne of the ultimate sanctions [of the common law] is the right of private persons to lay informations and bring prosecutions," *Lund v Thompson* [1958] 3 All E.R. 356, 358, which serves as "a valuable constitutional safeguard against inertia or partiality on the part of authority." *Gouriet v. Union of Post Ofc. Workers*, [1978] A.C. 435, 477 (H.L.). While this right has never been repealed, judges have relegated it to the rubbish bin sua sponte.

This is mentioned here mostly for completeness, but constitutionally speaking, this really is a thing. The authority to keep the King's peace by prosecuting crimes is ubiquitous throughout the Commonwealth. the right (and duty) to initiate a private criminal prosecution is "a valuable constitutional safeguard against inertia or partiality on the part of authority," *Gouriet v. Union of Post Ofc. Workers* [1978] A.C. 435, 477 (H.L.)—flourishing a pedigree as old as the common law itself. Canada Dept. of Justice, *The Federal Prosecution Service Deskbook*, Part IV, ch. 26 (undated; copy on file). As a Note in the Yale Law Journal put it,

> no stronger or more effectual guarantee can be provided for the due observance of the law of the land, by all persons under all circumstances, than is given by the power, conceded to everyone by the English system, of testing the legality of any conduct of which he disapproves, either on private or on public grounds, by a criminal prosecution.

Note, *Private Prosecution: A Remedy for District Attorneys' Unwarranted Inaction*, 65 Yale L. J. 209, 209 (1955) (quoting 1 Stephen, *History of the Criminal Law* 496 (1883)).

[xii] See e.g., John E. Wolfgram, *How the Judiciary Stole the Right to Petition*, 31 U. W. L.A. L. Rev. (Summer 2000), http://www.constitution.org/abus/wolfgram/ptnright.htm; Julie M. Spanbauer, *The First Amendment Right to Petition Government for a Redress of Grievances: Cut from a Different Cloth*, 21 Hastings Const. L.Q. 15 (1993); Gregory A. Mark, *The Vestigial Constitution: The History and Significance of the Right to Petition.*, 66 Fordham L. Rev. 2153 (1998).

[xiii] At common law, certiorari is a supervisory writ, apprising a superior court of "jurisdictional error, failure to observe some applicable requirement of procedural fairness, fraud and 'error of law on the face of the record.'" *Craig v South Australia* (1995) 184 CLR 163, 175 (H.C. Austl.) (citations omitted). "The underlying policy is that all inferior courts and authorities have only limited jurisdiction or powers and must be kept within their legal bounds. This is the concern of the Crown, for the sake of orderly administration of justice, but it is a private complaint which sets the Crown in motion." *Surya Dev Rai v. Ram Chander Rai,* (2003) 6 SCC 675 (India). American courts no longer correct even egregious errors, Sup. Ct. R. 10, forever interring the concept of equal justice under law. **Needless to say, the Framers did not intend this.** *United States v. Peters*, 9 U.S. 121, 126 (1795); 2 *The Works of James Wilson* 149-50 (James D. Andrews ed., 1896).

[xiv] *Alden v. Maine*, 527 U.S. 706 (1999) (effectively adopting the version the Amendment's framers explicitly rejected). *See* John Paul Stevens, "*Two Questions About Justice*," 2003 Ill. L. Rev. 821 (proving this point).

[xv] Judges gave their guild an absolute immunity against civil suits, *Bradley v. Fisher*, 80 U.S. 335 (1871) (a judge must possess jurisdiction over a dispute to claim immunity); *Stump v. Sparkman*, 435 U.S. 349 (1978) (immunity is virtually unlimited); *see also, e.g., Pierson v. Ray*, 386 U.S. 547 (1967), (holding that "any person" means "any person but us judges"). extending it to prosecutors, *Imbler v. Pachtman*, 424 U.S. 409 (1976). States, *e.g., Alden v. Maine, supra.*, the federal government, *United States v. Bormes*, 568 U.S. 6, 9-10 (2012), and now, even the President. *Trump v. United States*, 603 U.S. 593 (2024).

[xvi] Allowing so-called "unpublished" opinions, granting judges the raw power to write *ad hoc, ex post facto* designer 'law', applicable to one and only one set of litigants. *E.g., Smith v. United States Ct. of App. for the Tenth Circuit*, No.

07-736 (*cert. den.* Feb. 19, 2008); *cf., Anastasoff v. United States*, 223 F.3d 898 (8th Cir. 2000), *vacated as moot on other grounds*, 235 F.3d 1054 (8th Cir. 2000); *Hart v. Massanari*, 266 F.3d 1155 (9ᵗʰ Cir. 2001).

At the federal appellate level, the average judge spends more time on the toilet than he does in considering an appeal. Panels in the Ninth Circuit might issue **150 rulings in a three-day session**, Alex Kozinski, *Letter* (to Judge Samuel A. Alito, Jr.), Jan. 16, 2004 at 5, and the late Richard Arnold admitted that his panel had issued **fifty rulings in two hours.** Perfunctory Justice: Overloaded Federal Judges Increasingly Are Resorting to One-Word Rulings, *Des Moines Register*, Mar. 26, 1999, at 12. As Professors Reynolds and Richman lament, our appellate courts are certiorari courts. William M. Reynolds & William L. Richman, *Elitism, Expediency, and the New Certiorari: Requiem for the Learned Hand Tradition*, 81 Cornell L. Rev. 273, 275 (1995-96).

ˣᵛⁱⁱ *Rucho v. Common Cause*, 588 U.S. 684 (2019).

ˣᵛⁱⁱⁱ The "Celotex Trilogy"—*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)—further erodes juror prerogatives by empowering judges to weigh evidence, assess credibility, and resolve cases without a jury. See generally, Suja A. Thomas, *Why Summary Judgment Is Unconstitutional*, 93 Va. L. Rev. 139 (2007).

ˣⁱˣ *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) abolished the traditional notice pleading standard of *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957), effectively requiring plaintiffs to plead evidence before discovery.

ˣˣ George Washington, *Farewell Address*, Sept. 19, 1796.

ˣˣⁱ Thomas Jefferson, Letter (to Judge Roane), Sept. 6, 1819 at 2.

ˣˣⁱⁱ Jefferson, Letter (to Charles Hammond), Aug 18, 1821 at 1.

ˣˣⁱⁱⁱ 1 *Tucker's Blackstone* 297 (editor's app'x.).

ˣˣⁱᵛ The judge-made law of sovereign immunity exists nowhere in the plain text of the Constitution, the spaces between the text, or even penumbrae from its emanations. Rather by definition, it defeats any opportunity for challenging government action as contrary to law or securing a fair remedy for wrongful injury, thereby eviscerating the Bill of Rights.

As the redoubtable Antonin Scalia noted, "[a]t the time of *Marbury v. Madison* there *was* no doctrine of domestic sovereign immunity, *as there never had been in English law*." Antonin Scalia, *Historical Anomalies in Administrative Law*, Y.B. Supreme Court Hist. Soc'y. 103, 104 (1985) (emphasis in original). Professor Chemerinsky elaborates: "Sovereign immunity is inconsistent with a central maxim of American government: no one, not even the government, is above the law. The effect of sovereign immunity is to place the government above the law," Ermin Chemerinsky, *Against Sovereign Immunity*, 53 Stan. L. Rev. 1201, 1202 (2001), undermining the basic principle that the individual has a right "to claim the protection of the laws whenever he receives an injury." *Marbury v. Madison, 5* U.S. at 163.

Once you gave your guild an absolute immunity against civil suits, *Bradley v. Fisher*, 80 U.S. 335 (1871) (a judge must possess jurisdiction over a dispute to claim immunity); *Stump v. Sparkman*, 435 U.S. 349 (1978) (immunity is virtually unlimited); *see also, e.g., Pierson v. Ray*, 386 U.S. 547 (1967), (holding that "any person" means "any person but us judges"), you extended it to prosecutors, *Imbler v. Pachtman*, 424 U.S. 409 (1976), States, *e.g., Alden v. Maine*, 527 U.S. 706 (1999), and even the federal government. *United States v. Bormes*, 568 U.S. 6, 9-10 (2012).

The only justification for judicial immunity is that judges wrote it into the law sua sponte, *Floyd & Barker*, 12 Co. Rep. 23, 25, 77 Eng. Rep. 1305, 1307 (Star Chamber 1607), despite its Lewis Carroll-level facial absurdity. Professor Olowofoyeku of London's Brunel University writes: "You have been injured by the misconduct of a judge. We have to deny you redress. This is necessary because we have to protect your interests by protecting the judges, so that they in turn can protect your interests without fear of apprehension." Abimbola A. Olowofoyeku, *Suing Judges: A Study of Judicial Immunity* 197 (Oxford Pr. 1993).

*Floyd and Barker* probably isn't good law. "In earliest English law not only was immunity of judges not recognized, but review of judicial decisions was in the form of a personal action against the judge." Jay M. Feinman and Roy S. Cohen, *Suing Judges: History and Theory*, 31 S.Car. L. Rev. 201, 205 (1980). But Ketanji Brown Jackson would rather sodomize her daughter's corpse than yield one scintilla of the raw power our judiciary has usurped. *Smith v. Scalia*, 44 F. Supp. 3d 28 (D.C. Dist. 2014)

[xxv] This is how Scalia described his Constitution in various speeches. Sadly, "Ninoville" (the Internet repository for all things Scalia) is defunct.

[xxvi] Tragically, I am not exaggerating. If Donald Trump or his designates are parties and Trump judges are on the case, you know how the case will turn out. For instance, when I heard about the case involving troops in Portland, I asked Grok: "Susan P. Graber, Ryan D. Nelson, and Bridget S. Bade. Circuit Judges. Who appointed them?" Grok told me that two were appointed by Trump, and one by Clinton. That told me that Trump was going to get his way, and there would be a dissent. And knock me over with a spoon! *Oregon v. Trump*, No. No. 25-6268 (9th Cir. Oct. 20, 2025).

"Trump sought three things in his judicial appointees, or as he sometimes called them, "**my judges**." First, he wanted justices who would overturn *Roe v. Wade*. Second, he wanted "jurists in the mold of Justices Antonin Scalia, Clarence Thomas and Samuel Alito." **Third, he wanted judges who would be loyal to him**." David Lat and Zachary B. Shemtob, Trump's Supreme Court Picks Are Not Quite What You Think, *N.Y. Times*, Feb. 12, 2023 (emphasis added). As a group, that is *exactly* what the public—and scholars across the political spectrum—thinks. E.g., Andrew Seger and Phil Mattingly, Trump transformed the federal judiciary. He could push the courts further right in a second term, *CNN*, July 13, 2024: ("'Some of Trump's judicial appointees really push the envelope in an ideological way,' Donald B. Ayer, a former deputy attorney general under President George H.W. Bush, told CNN."); Liz Mineo, Do justices really set aside personal beliefs? Nope, legal scholar says, *Harvard Gazette*, Oct. 30, 2020 (interview of Harvard's Michael Klayman); Keith Thirion, Vet Trump's Judicial Picks for Their Views on Presidential Power, *Democracy Docket*, Mar. 26, 2025. **And they are not wrong.**

If there is any discernible structural difference between the President's power and the *Führerprinzip* of Reichchancellor Hitler under the Roberts Court's ukases, it is not obvious. As Justice Sotomayor observes:

> The President of the United States is the most powerful person in the country, and possibly the world. When he uses his official powers in any way, under the majority's reasoning, he now will be insulated from criminal prosecution. Orders the Navy's Seal Team 6 to assassinate a political rival? Immune. Organizes a military coup to hold onto power? Immune. Takes a bribe in exchange for a pardon? Immune. Immune, immune, immune.
>
> In every use of official power, the President is now a king above the law.

*Trump v. United States*, No. 23-939, 603 U.S. __ (2024) (Sotomayor, J., dissenting), slip op. at 29-30.

I am the Plaintiff in two cases seeking to remove Donald Trump from office via a quo warranto. See Endnote iii. In the first case, I drew a Republican judge, and the case is being presided over by a Trump judge. Recognizing the obvious, I filed a petition in DC Superior Court pursuant to statute, buttressed by precedent. But the Trump Department of Justice filed a motion for removal, ensuring an interminable delay. *Smith v. Trump*, Case No. 25-cv-03602 (CRC) (D.D.C. 2025). As an interested party, I have automatic standing, see *N.M. ex rel. White v. Griffin*, No. D-101-CV-2022-00473 (N.M. Dist. Ct. Santa Fe Cnty. 2022) (barring insurrectionist Coay Griffin from holding state office; the statutes and processes are substantially identical), and all relevant facts are judicially noticeable or established by collateral estoppel. An order could be issued tomorrow, but delay is a weapon in the dishonest judge's arsenal, *e.g.*, *Smith v. U.S. Court of Appeals for the Tenth Circuit*, 484 F.3d 1281 (10th Cir. 2007) (decided more than two years after briefing was complete). Relief could be issued tomorrow, and you are in a position to issue it today, as you are in the remedies phase of this case. That is why I am here.

[xxvii] District Judge Nancy Gertner wrote in the Yale Law Review that federal judges are quite literally trained on how you get rid of [pro se civil rights] cases. "At the start of my judicial career in 1994, the trainer teaching discrimination law to new judges announced, 'Here's how to get rid of civil rights cases,'" Nancy Gertner, *Losers' Rules*, 122 Yale L.J. Online 109 (2012), http://yalelawjournal.org/forum/losers-rules.

[xxviii] Alan Dershowitz, *Letters to a Young Lawyer* 7-13 (Basic Books 2001). Truth be told, Dershowitz—who used to teach legal ethics at Harvard, *an apparent contradiction in terms*—has feet of clay. He counsels young lawyers to "blow the whistle to the Judicial Conference" and to Congress, Id., but admits to having **witnessed judicial corruption "with my own eyes in the courts of Boston**, New York, and elsewhere," Alan Dershowitz, *Supreme Injustice: How the High Court Hijacked Election 2000* 116 (Oxford U. Press, 2001), and evidently, failed to report it, **despite a duty to do so**: Any lawyer "having knowledge that a judge has committed a violation of applicable rules of judicial conduct that raises a substantial question as to the judge's fitness for office shall inform the Commission on Judicial Conduct." Mass. RPC 8.3(b). *You can't make this stuff up....*

xxix Forty years ago, the entire Cook County Circuit Court was described as "a criminal enterprise": To win his case, a lawyer had to put cash in an envelope for the judge … and pay the bailiff to give the envelope to the judge. *United States v. Murphy*, 768 F.2d 1518, 1531, 1535 (7th Cir. 1985) ("Operation Greylord").

xxx At least in Chicago, you had good old-fashioned, equal-opportunity graft: anyone could pay to play. In Denver, the evidence suggests that their disciplinary agency enforces three sets of ethics rules for Colorado attorneys: an exceedingly lenient one for the powerful and politically well-connected, an equable one for run-of-the-mill attorneys, and a brutally harsh one for malcontents. Former Rep. Scott McInnis **bilked $300,000 from a client, and the agency found absolutely nothing wrong with it,** Alan Prendergast, Scott McInnis: The Waterlogged Years (Pt. 3), *Westword Latest Word* (blog), Jun 23, 2010 (Felony theft by deception is still felony theft. Colo. Rev. Stat. § 18-4-401), while reaming a storefront lawyer for similar conduct. Howard Pankratz, Lawyer Gets 7 Years for Client Theft, *Denver Post*, Apr. 16, 2005, at C-2; *People v. Guttenberg*, No. [Docket Number Not Publicly Available], slip op. at 1 (Colo. Dist. Ct. Denver Cnty. Apr. 15, 2005) (sentencing Arnold P. Guttenberg to seven years for felony theft). **Arnold Guttenberg's problem wasn't so much that he was a thief (he was), but that he wasn't Scott McInnis.**

Other instances of disparate treatment include that of Democratic "fixer" Willie Shepherd. In a scenario straight out of a John Grisham novel, Shepherd is alleged to have engaged in fraudulent billing reminiscent of Grisham's Bandini, Lambert, and Locke; real-life Mitch McDeeres Lukas Stack and Rebecca Almon turned over stacks of bills that they believed to be fraudulent to this agency. Maximillian Potter, Power Broken, 5280 Magazine (Jun. 2010), But prosecutions for mail fraud only happen in the movies, or at least, don't happen to prominent lawyers in Colorado. Of course, if you're a storefront lawyer, your mileage will vary. *E.g., In re Green*, 11 P.3d 1078 (Colo. 2000) (prosecuted under Colo. RPC 1.5(a), unlike McInnis and Shepherd)

Contrast that with officials' brutal treatment of Stanford Law alum Mark Brennan. His client, Denver fireman Bill Cadorna, "had been fired in 2003 for allegedly stealing a $20 cookbook from a Safeway. The bizarre case against him later fell apart, after one of the key witnesses admitted to lying on the stand. But the city refused to rehire Cadorna, telling him that he was too old to be reinstated." Judge Robert Blackburn (more about him later) cited Brennan for contempt for his failure to properly genuflect, but the jury awarded his client a $1.5 million judgment, one of the largest ever awarded against the City of Denver. Alan Prendergast, Blackburned, *Westword*, Dec. 13, 2007.

**Mark Brennan had done his time.** Even if you ignore the spectacular due process violations the Office of Attorney Regulation Counsel (OARC) routinely indulges in, Brennan had served his one-year suspension. But he has not returned to the practice of law and apparently, never will. In both the Brennan and other cases, the OARC has imposed a condition for readmission that is both dark, Hearings on "Abuse of Psychiatry in the Soviet Union" before the Subcommittee on Human Rights and International Organizations of the House Committee on Foreign Affairs, 98th Cong., 1st Sess., 106 (1983) (Remarks by Max Kampelman, Chair of the U.S. Delegation, to the Plenary Session of the Commission on Security and Cooperation in Europe), as quoted in, *Washington v. Harper*, 494 U.S. 210, 239 & n. 2 (1990) (Stevens, J., concurring and dissenting in part), and spectacularly irrational: They must subject themselves to a psychiatric examination, conducted by a psychiatrist hand-picked by the OARC, at their own expense. Alan Prendergast, Defiant Attorney Awaits Cold Day in Hell for Psych Exam, *Westword's Latest Word* (blog), Dec. 2, 2009. In effect, for the malcontent attorney, it is the real-life version of the plot of *Kangaroo Jack*: **He must pay for his own professional execution.** And this is not a one-off. *See e.g., People v. Maynard*, No. 09PDJ028 (Colo. filed Mar. 31, 2010)

Casting aspersions on one's mental fitness to practice law is especially pernicious, as even an accusation by a government agency is debilitating to one's personal and professional reputation. Florida-based anti-pornography activist attorney Jack Thompson was forced to submit to one, on the grounds that he had a "disabling obsession with pornography"—not consuming it like Chief Judge "Naughty" Nottingham of the District of Colorado (more on him later), but *fighting it* á la Dr. James Dobson. Kenneth R. Timmerman, Reno Redux in Florida. *Insight*, Oct. 5, 2001. He addressed the controversy with good humor, stating he is "the only officially certified sane lawyer in the entire state of Florida," but his reputation has been permanently traduced.

xxxi In Vegas, "judges routinely rule in cases involving friends, former clients and business associates—and in favor of lawyers who fill their campaign coffers." Michael J. Goodman and William C. Rempel, In Las Vegas, They're Playing With a Stacked Judicial Deck, *L.A. Times*, June 8, 2006,

xxxii Michael J. Goodman and William C. Rempel, For This Judge and His Friends, One Good Turn Led to Another, *L.A. Times*, Jun. 9, 2006 (U.S. District Judge James C. Mahan).

[xxxiii] Heber Taylor, Judicial Discipline Needs a Full Probe, *Galveston County Daily News (TX)*, May 15, 2009. Eighty-five litigants were denied their constitutional right to have their cases heard by a fair and independent tribunal. Eighty-five separate acts of honest services mail fraud. E.g., *United States v. Welch*, 327 F.3d 1081 (10th Cir. 2003) (elements of honest services mail fraud). And one felony, committed by judges charged with ensuring that incidents like these do not happen.

Misprision of felony has four elements: (1) commission of the felony alleged; (2) the accused had full knowledge of that fact; (3) the accused failed to notify authorities; and (4) the accused took an affirmative step to conceal the crime. United States v. Baez, 732 F.2d 780 (10th Cir. 1984). But being a federal judge means never having to obey the law; that's how we got Edward Nottingham, Manuel Real, and Thomas Porteous, among others. "Heavy case-load?" No. The judges on the Fifth Circuit obviously knew what they were doing, and that what they were doing was a crime. And of course, Judge Kent was not prosecuted for criminal malfeasance on the bench but rather, for criminal sexual abuse. Stewart M. Powell, Judge Kent reports to prison hospital in Massachusetts, *Houston Chronicle*, Jun. 15, 2009.

[xxxiv] "The very purpose of § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible." *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 865 (1988) (citation to Committee Reports elided).

[xxxv] Mattathias Schwartz and Alan Feuer, Trump's Least Favorite Judge Has Friends in High Places, *N.Y. Times*, Apr. 7, 2025; *see* Katelyn Polantz and Tierney Sneed, There's a new chief judge in DC who could help determine the fate of Donald Trump, *CNN*, Mar. 17, 2023 ("As a student at Yale Law School, Boasberg lived in a house with now-Justice Kavanaugh and six other law students. The group of former roommates still remain close and organize annual trips together."). Never even acknowledging the obvious conflict (his bestie Kavanaugh was a proper party defendant in the case), he gave the case to Judge Carl J. Nichols, who was one of Clarence Thomas' law clerks. So now, I have the probably impossible task of persuading Clarence Thomas' law clerk that Clarence Thomas has committed a felony, based on the bulletproof jurisprudence of ... Clarence Thomas.

Franz Kafka couldn't have made this up. Hell, *Lewis Carroll* couldn't have made this up.

*Nemo iudex in causa sua.* This isn't just old law—it's as old as law itself. *Dr. Bonham's Case* [1610] 8 Co. Rep. 107a, 77 Eng. Rep. 646 (C.P. 1610*).* **When a judge has a dog in the hunt, he will never fail to scratch it.** A "fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). The Due Process Clause incorporated the common-law rule requiring recusal when a judge has "a direct, personal, substantial, pecuniary interest" in a case, *Tumey v. Ohio*, 273 U.S. 510, 523 (1927), and the Supreme Court has also identified additional instances which, as an objective matter, require recusal where "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Caperton v. AT Massey Coal Co., Inc.*, 556 U.S. 868, 872 (2009*)* (citation omitted) (collecting cases). And as Jefferson put it, "it is better to leave a cause to the decision of cross and pile, than to that of a judge biassed to one side." Thomas Jefferson, Letter (to L'Abbe Arnoux), Jul. 19, 1789 at 2.

[xxxvi] John L. Kane, e-mail (to Sean Harrington), Feb. 3, 2007, quoted in Sean Harrington, Disparate Treatment of Pro Se Civil Litigants in Federal Court: A Justification for Resort to Inappropriate Self-Help? (2007), at http://www.knowyourcourts.com/Archives/Pro_Se_Illusion-/Pro_Se_Illusion.htm (copy on file).

[xxxvii] Judge Mark Bennett of the Northern District of Iowa earned the nickname "The Terminator" for summarily dismissing pro se employment law cases. Mark W. Bennett, *Essay: From the "No Spittin', No Cussin' and No Summary Judgment" Days of Employment Discrimination Litigation to the "Defendant's Summary Judgment Affirmed Without Comment" Days: One Judge's Four-Decade Perspective*, 57 N.Y.L. Sch. L. Rev. 685, 688 & n. 11 (2012–2013). Plaintiff conversed with him on the late Judge Kopf's old blog, Hercules and the Umpire. Kopf basically admitted the same, as will any judge when you get him a bit tipsy. "[A]s one anonymous judge wrote of dealing with lawyerless litigants, 'It's like going to the dentist for a root canal. Not really fun.'" Ed Cohen, Judges think they know how to deal with self-represented litigants, *Nat'l Judicial College*, Aug. 15, 2023.

[xxxviii] See e.g., Drew A. Swank, *The Pro Se Phenomenon*, 19 B.Y.U. J. Pub. L. 373 (2005); Deborah L. Rhode, *Equal Justice Under Law: Connecting Principle to Practice*, 12 Wash. U. J.L. & Pol'y 47 (2003). Jona Goldschmidt of Loyola of Chicago has written as extensively about the topic as anyone in America; his view is in concurrence: As a rule, pro se litigants don't get a fair shake.

[xxxix] *Mister* Ed Nottingham was forced to quietly resign from the bench two years before his lavish retirement annuity would have vested, owing to evidence that he was taking bribes on an industrial scale. Molly McDonough, Qwest CEO Judge Nottingham Resigns Amid Misconduct Probe, *ABA J.*, Oct. 21, 2008. The driver told 9NEWS he took prostitutes to meet Judge Nottingham at two locations in the Denver area about 10 times during the summer of 2007 …The driver says the women returned from their meeting with the judge with $300 or $400 in cash [the tip] per visit." Jeffrey Wolf, et al., Chief federal judge investigated for alleged involvement with prostitutes, *9News.com*, Mar. 7, 2008. Given the reportedly high volume of his patronage, the cost was well above what a federal judge could plausibly afford on his salary alone, and his EIGA forms claimed no other significant source of income. See, Edward W. Nottingham, 2003-07 Financial Disclosure Reports. Disclosure reports for the years 2003-07 (acquired from http://www.judicialwatch.org/judge/nottingham-edward-w; as he is no longer a judge, they were removed from the Judicial Watch site; copies were retained).

Nottingham's official sins seemed survivable. He lived large, blowing $3,000 (excluding cash tips for the dancers) in a night of drunken debauchery at the Diamond Cabaret gentlemen's club that he claims that he didn't even remember—**lending a new meaning to the phrase, "sober as a judge."** Felisa Cardona, Feds Grill Nacchio Judge's Ex-Wife, *Denver Post*, Aug. 11, 2007; Judge issues statement on strip club visits, *Summit Daily News* (AP), Aug. 11, 2007. He parked in a handicapped spot, then threatened to sic the U.S. Marshals on the wheelchair-bound woman who calls him out on it. Debra Cassens Weiss, Chief Judge Accused in Handicapped Parking Spat, *ABA J.*, Oct. 24, 2007. (The worst publicly-disclosed allegation against him—that he allegedly tampered with a material witness, Deborah Sherman, Counsel investigating chief judge's past, *9News.com*, Oct 27, 2008, see 18 U.S.C. § 1512—was based purely on "he said, she said" evidence.) And he hired a lot of prostitutes—while married. Not exemplary behavior, but not a high crime or misdemeanor. With two years to go before vesting of his $3,000,000 retirement annuity, he would be a fool not to fight removal, unless there was more. **On the facts, the only possible explanation was the obvious one: bribery.**

To make matters even worse, it has been suggested that Nottingham probably wasn't the only Colorado or Tenth Circuit judge accepting gratuities to pay for the courtesans' favors. As local TV station KUSA reported, the escort service "catered to prominent clients **including judges,** lawyers, businessmen, athletes and politicians." Jeffrey Wolf and Jace Larson, New Warrant Served in Connection to Prostitution Ring, *9News.com*, Mar. 20, 2008, see also, Nicole Vap and Deborah Sherman, Sex for Sale: Escorts Talk To 9News After Police Raid, *9News.com*, (Mar. 2008; no exact publication date given).

The most infuriating part of the entire saga was that he wasn't prosecuted or even "flipped": Had he been, he might have taken down a sizable portion of the Denver legal establishment with him. If the judge was taking bribes, somebody was making them. And you would presume that this is something that federal authorities would want to find out. Threaten him with hard time in Club Fed for taking bribes and honest services fraud, and he would have sung like Whitney Houston. But as was the case with Clarence Thomas, the Feds looked the other way. And despite this, he wasn't even disciplined by the Colorado bar. https://www.licensedlawyer.org/Find-a-Lawyer/Profile/u/2000363/Edward-Nottingham (Bar #4498) (screenshot saved)—though his profile conveniently elides the time he spent on the bench. https://www.licensedlawyer.org/Find-a-Lawyer/Profile/u/2000363/Edward-Nottingham (screenshot saved).

[xl] Felisa Cardona, Vacant judge slots put plea into motion, *Denver Post*, May 16, 2008.

[xli] The undisputed champion of judicial hostility toward unrepresented litigants is Judge Robert Blackburn of the District of Colorado, who routinely shunts pro se cases to magistrates with apparent directions to get rid of them and then failing to review them, issuing boilerplate opinions bearing zero objective evidence that he had performed his statutory duty. *E.g.*, *Cogswell v. United States Senate*, No. 08-cv-01929-REB-MEH (D.Colo. Mar. 2, 2009), *Shell v. Devries*, No. 06-cv-00318-REB-BNB (D.Colo. Jan. 30, 2007), *Signer v. Pimkova*, No. 05-cv-02039-REB-MJW (D.Colo. Nov. 30, 2006).

The words "pro se" were the kiss of death in Blackburn's court—even if you were a graduate of Yale and Georgetown School of Law with over forty years' experience at bar who presented a completely novel argument never raised in any American court. Cogswell's argument cuts at the heart of representative government, alleging that the Senate's delay in filling judicial vacancies in the District of Colorado denied him reasonable access to the courts, arguing that Congress further acknowledged that an adequate number of judges are required to ensure

> "reasonably prompt consideration of all cases filed," to "efficiently and expeditiously handle the business brought before them," to promote "just, speedy, and inexpensive resolution of civil disputes" and to resolve "intolerable strains" on the bulwark of a limited constitution, namely the federal judiciary. The reasons offered

to justify increasing the number of judgeships do, by Congress' own words and admission, become the rea-
sons why meaningful access to the judiciary is denied when the appointed judges do not equal the number of
judgeships found to be necessary.

Pl.'s Obj. to Proposed Findings & Recommendations of Magistrate at 4, Cogswell v. United States Senate, No. 08-cv-
01929-REB-MEH (D. Colo. Mar. 2, 2009), ECF No. 25.

John Cogswell was not a stupid man. And he had a point: **Where rights begin, discretion ends**. The District of
Colorado was less than half-staffed, and the judges were triaging their dockets, with pro se cases always getting the
short straw. The only "rights" you have are the ones you can enforce at need, and if the courtroom doors can be
slammed in your face at the judge's discretion, you don't have rights. You have privileges, which can be taken away.

[xlii] At the federal appellate level, the average judge spends more time on the toilet than he does in considering an
appeal. Panels in the Ninth Circuit might issue **150 rulings in a three-day session**, Alex Kozinski, *Letter* (to Judge
Samuel A. Alito, Jr.), Jan. 16, 2004 at 5, and the late Richard Arnold admitted that his panel had issued **fifty rulings
in two hours**. Perfunctory Justice: Overloaded Federal Judges Increasingly Are Resorting to One-Word Rulings, *Des
Moines Register*, Mar. 26, 1999, at 12. Stephen Breyer, *Administering Justice in the First Circuit*, 24 Suffolk U. L.
Rev. 29, 32-33 (1990) (a typical appeal "takes only a little of their time"). As Professors Reynolds and Richman
lament, our appellate courts are certiorari courts. William M. Reynolds & William L. Richman, *Elitism, Expediency,
and the New Certiorari: Requiem for the Learned Hand Tradition*, 81 Cornell L. Rev. 273, 275 (1995-96).

It is not that federal appellate judges are overworked. Judge Kavanaugh had plenty of time to write law review
articles, E.g., Brett M. Kavanaugh, *Separation of Powers During the Fourty-Fourth Presidency and Beyond*, 93 Minn.
L. R. 1454 (2009), deliver speeches (Kavanaugh gave over 50 speeches to the Federalist Society alone, Senator Shel-
don Whitehouse, Kavanaugh Confirmation Hearing Opening Statement, Sept. 4, 2018 (as prepared for delivery),
available at https://www.whitehouse.senate.gov/news/release/whitehouse-reveals-kavanaughs-pro-corporate-right-
wing-record-in-scotus-hearing-opener), moonlight as a professor at a school four hundred miles away, Brett M. Ka-
vanaugh: Professional Biography, U.S. Court of Appeals for the D.C. Circuit (website) (accessed Sep. 7, 2018; copy
on file), at https://www.cadc.uscourts.gov/internet/home.nsf/Content/VL+-+Judges+-+BMK, and watch a lot of base-
ball. David A. Graham, The Mystery of Brett Kavanaugh's Baseball-Ticket Debt, *The Atlantic*, Jul. 12, 2018.

[xliii] Tony Mauro, Difference of Opinion, *Legal Times*, Apr. 12, 2004; see Alex J. Kozinski and Stephen R. Reinhardt,
Please Don't Cite This! Why We Don't Allow Citations to Unpublished Dispositions, *California Lawyer*, June 2000,
at 43 As Judge Murnaghan of the Fourth Circuit openly admitted, "it is well known that judges may put considerably
less effort into opinions that they do not intend to publish. Because these opinions will not be binding precedent in
any court, a judge may be less careful about his legal analysis, especially when dealing with a novel issue of law.
*Wilson v. Layne*, 141 F.3d 111, 124 n. 6 (4th Cir. 1998) (Murnaghan, J., dissenting). That is putting it politely.

[xliv] One of the most comical examples of appellate sloth involved Stanford-based constitutional law scholar Michael
McConnell, a Federalist Society darling whose primary career goal was to be the fifth vote to overturn *Roe v. Wade*;
he resigned in 2009, after Barack Obama was elected and his window to ascend to the High Court closed. He essen-
tially moonlighted on the Tenth Circuit, teaching law at both Harvard and Stanford while sitting on that Court. Mirela
Turc, Judge Michael McConnell Speaks About the Ninth Amendment, *The Observer* (Case West. U.), Oct. 31, 2008
(bio). But despite his bloated resume, he actually dismissed a matter on jurisdictional grounds WITH PREJUDICE.
*Harrington v. Wilson*, No. 06-1418 (10th Cir. Jun. 7. 2007) (withdrawn), *cf.*, *Ex parte McCardle*, 74 U.S. 506, 514
(1869). That is not the kind of mistake a first year Civil Procedure student is likely to make.

It is not that modern trial judges are any better, so much as appellate judges are committing criminal misconduct
(See 18 U.S.C. §§ 241-42 (denial of civil rights). Meaningful access to the courts is not a privilege, but a right.) on
an industrial scale. Speaking for a unanimous Court, Justice Ginsburg declared that a pure "question of law" must be
reviewed de novo—not "abuse of discretion," but de novo review. *Elder v. Holloway*, 510 U.S. 510, 516 (1994).
Fourth Circuit judge Harvie Wilkinson, also a constitutional scholar of national repute, has acknowledged that it "is
the solemn duty of judges on the inferior federal courts to follow, both in letter and in spirit, rules and decisions with
which we may not agree." J. Harvie Wilkinson III, *Of Guns, Abortions, and the Unraveling Rule of Law*, 95 Va. L.
Rev. 253, 255 (2009). But when confronted with an appeal raising a pure and virgin question of law—whether the
current regime of "discretionary certiorari" is constitutional—he signed off on an opinion which stated, without any
citation whatsoever to support it, that "[w]e have reviewed the record and conclude that the district court did not abuse
its discretion in finding [Appellant's] complaint frivolous and in dismissing the action on that basis." *Smith v. Kagan*,
No. 15-1347 (4th Cir. Sept. 21, 2015) (slip op. at 3).

[xlv] U.S. Courts of Appeals—Decisions in Cases Terminated on the Merits, by Nature of Proceeding—During the 12-Month Period Ending September 30, 2013 tbl. B-5 (2013).

[xlvi] Dir. of the Admin. Off. of U.S. Cts., Ann. Report 70 tbl.B1 (1945).

[xlvii] *The Tryal of John Peter Zenger*, J. Wilford (1738), at https://history.nycourts.gov/wp-content/uploads/2018/11/History_Tryal-John-Peter-Zenger.pdf; see also, *The People's {Ancient and Just} Liberties Assrted in the Tryal of William Penn and William Mead* (Sept. 1670). The judge imprisoned the jury for acquitting Penn and Mead, leading to the filing of a habeas. *Bushell's Case* [1670] Vaughan 135, 124 Eng. Rep. 1006 (C.P.) (juror cannot be punished for his verdict).

[xlviii] As long as there have been judges, there have been corrupt ones, and a need to restrain them. The solutions of antiquity were often brutal: the Persian vassal lord Cambyses had a particularly corrupt judge literally turned into upholstery, Herodotus, *Histories*, Bk. V, § 26 (~430 BCE), and King Alfred of Saxony reportedly hung forty-four judges in one year. Peter Hughes, *Georgicum* 6. England's solution was the jury trial. The brilliance of this system is in its redundancies: By having the judge as a 'check' on the jury and the jury as a 'check' on the judge, a jury trial affords what Alexander Hamilton called a "double security" against the corruption of either. The Federalist No. 83 at 464-65 (Hamilton). John Adams added, "[a]s the Constitution requires that the popular branch of the legislature should have an absolute check, so as to put a peremptory negative upon every act of the government, it requires that the common people, should have as complete a control, as decisive a negative, in every judgment of a court of judicature." 2 *The Works of John Adams, Second President of the United States* 253 (Charles F. Adams ed., Little Brown, 1850). Our rights are more likely to be secure with a civil jury that was ultimate master of both law and fact, *Georgia v. Brailsford*, 3 U.S. 1, 4 (1794) (jury instructions of Jay, C.J.), as Sir John Hawles, Solicitor-General to King William III, observes:

> Tho' judges are more likely to be able than jurymen, yet **jurymen are more likely to be more honest than judges**; especially in all cases where the power of the prerogative, or the rights of the people, are in dispute. Our rights, therefore, both as individuals, and as a people, are more likely to be secure while juries follow the result of their own opinion; for **less danger will arise from the mistakes of jurymen, than from the corruption of judges.**

John Hawles, *The Englishman's Right: A Dialogue Between a Barrister at Law and a Juryman* 71-2 & fn. (1680) (reprinted 1844) (emphasis added). And on an almost daily basis, we are assaulted by vindications of the Framers' wisdom.

[xlix] E.g., United States v. Renfroe, 634 F. Supp. 1536 (W.D. Pa. 1986); People v. Scott, No. 18CA0332 (Colo. Ct. App. May 27, 2021), ¶ 1 (party to the case). Read in pari materia, these cases are schizophrenic: Juries have this right, but no one can inform the jury of this right.

[l] *United States v. Dougherty*, 473 F. 2d 1113, 1130-1138 (D.C. Cir. 1972). To wit, Chief Justice Jay observed:

> It may not be amiss, here, Gentlemen, to remind you of the good old rule, that on questions of fact, it is the province of the jury, on questions of law, it is the province of the court to decide. But it must be observed that by the same law, which recognizes this reasonable distribution of jurisdiction, you have nevertheless a right to take upon yourselves to judge of both, and to determine the law as well as the fact in controversy. On this, and on every other occasion, however, we have no doubt, you will pay that respect, which is due to the opinion of the court: For, as on the one hand, it is presumed, that juries are the best judges of facts; it is, on the other hand, presumable, that the court are the best judges of law. But still both objects are lawfully, within your power of decision.

*Georgia v. Brailsford*, 3 U.S. at 4 (jury instructions of Jay, C.J.).

[li] "Members of this Court are vested with the authority to interpret the law; we possess neither the expertise nor the prerogative to make policy judgments. Those decisions are entrusted to our Nation's elected leaders, who can be thrown out of office if the people disagree with them." *Nat. Fedn. of Indep. Business v. Sebelius*, 567 U.S. 519, 132 S.Ct. 2566, 2579 (2012). But when has the rule of law ever deterred the "band of outlaws," Robert H. Bork, *Our Judicial Oligarchy*, 67 First Things 21, 24 (Nov. 1996), we call federal judges? Basically, never. *E.g., Dobbs, supra*.; *Trump v. United States, supra*.

Again, we turn to Holmes, who famously quipped, "a page of history was worth a volume of logic." *New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921). The jury's prerogative of nullification can be traced to Coke and Bacon and

even John Milton, with an unbroken throughline to the Fugitive Slave Laws. *Sparf v. United States*, 156 U.S. 51, 110-73 (1895) (Gray, J, dissenting). The Daugherty Court did not attempt to explain why Jefferson's observations or Jay's instructions were wrong; instead, they trotted out a parade of horribles argument from the Fourth Circuit:

> To encourage individuals to make their own determinations as to which laws they will obey and which they will permit themselves as a matter of conscience to disobey is to invite chaos. No legal system could long survive if it gave every individual the option of disregarding with impunity any law which by his personal standard was judged morally untenable.

*Dougherty*, 473 F.2d at 133-34 (citation omitted).

The Fourth Circuit might or might not be right in the abstract—jury nullification might not be optimal—but We the People write our laws, and for good or ill, the right to jury nullification was an integral part of our law at the dawn of our Republic. It is emphatically not the place of the courts to substitute their considered judgments for those of the Framers, no matter how well-intentioned their actions might be. *See generally*, Lawson Wright, *Originalism and Jury Nullification in America: A Legal Basis for the Restoration of a Lost Right*, 3 Prin. L. J. ___ (2024), available at https://legaljournal.princeton.edu/originalism-and-jury-nullification-in-america-a-legal-basis-for-the-restoration-of-a-lost-right/.

[lii] *Id.* To have a clear and undeniable right without a remedy is "a monstrous absurdity in a well organized government," *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 67 (1990) (quoting *Kendall v. United States*, 37 U.S. 524, 623 (1838)), and if there be an admitted wrong, the courts will look far to supply a remedy." *DeLima v. Bidwell*, 182 U.S. 1, 176-77 (1901). Yes, I do mean "inexplicably."

[liii] Stanley never received a dime in compensation for his injury, which destroyed his entire life. Ruling Reopens Wound for Bitter Ex-soldier, *N.Y. Times*, Jun. 30, 1987. And unlike the German doctors we so sanctimoniously prosecuted, *United States v. Karl Brandt et al.* (Medical Case No. 1), 2 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10, at 171 (1947), no one in our military ever faced justice for this unspeakable war crime.

[liv] See L. Tribe, *American Constitutional Law* (2d ed. 1988).

[lv]Rev. Henry Ward Beecher, "Works Meet for Repentance" (sermon) Dec. 20, 1868, reprinted in *Plymouth Pulpit*, Vol. 1, Iss. 15 (Ford & Co. 1869) at 241.

[lvi] Roger J. Miner, *Judicial Ethics in the Twenty-First Century: Tracing the Trends*, 32 Hofstra L. Rev. 1107, 1108 (2004) (emphasis added).

[lvii] *United States v. Nacchio*, 519 F.3d 1140 (10th Cir. 2008), *Marshall v. Marshall*, 547 U.S. 293 (2006), *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009).

[lviii] Vsevolod Kniaziev, the Chief Justice of Ukraine's Supreme Court, was reportedly caught red-handed taking a bribe. Dan Peleschuk, Ukraine Supreme Court chief dismissed after being detained in bribery case, *Reuters*, May 16, 2023. "According to investigators, Kniaziev, in collusion with notary Kyrylo Horburov and lawyer Oleh Horetskyi, orchestrated a scheme to receive bribes in exchange for favorable court decisions." HACC – Decided (database), The case of former Chairman of the Supreme Court Vsevolod Kniaziev, *Transparency International* (undated) (tracking cases handled by Ukraine's High Anti-Corruption Court (HACC)). He was suspended from the bench that week.

But in America, we call that "Tuesday."

*"Let the judge be a mere machine."* Thomas Jefferson, Letter (to Edmund Pendleton), Aug. 26, 1776, National Archives, Founders Online (web page). As Jefferson summarized in that elegant phrase, the Framers envisioned judges as their version of ChatGPT. The judge was expected to be little more than an administrator, playing what Professor Llewellyn called "the game of matching cases." Karl Llewellyn, *The Bramble Bush* 49 (1960). And while it is customary to tip the *maître d'* to get a better table, one wonders why you should have to tip your pocket calculator, which brings us to the topic of Clarence Thomas.

Accepting an "Improper Advantage." Criminal Code of Ukraine, art. 368. "Anything of value." 18 U.S.C. § 201. Defendant Clarence Thomas doesn't just take cash and equivalents. Jo Becker and Julie Tate, Clarence Thomas's $267,230 R.V. and the Friend Who Financed It, *N.Y. Times*, Aug. 5, 2023; see Justice Thomas Did Not Repay Substantial Portion of $267,230 Loan, Finance Committee Investigation Reveals; Failed to Report Forgiven Debt on

Ethics Filings, Raising Questions About Tax Compliance, *Senate Cmte. on Finance*, Oct. 25, 2023. He takes the kind of [not-] bribes money can't buy.



While our Justices are for sale, they certainly don't come cheap. The steady stream of thinly-disguised (alleged) bribes—*developer Harlan Crow is that generous with all of his friends, right*?—aimed at Justice Thomas includes a $500,000 cash payment to Thomas' wife, an undisclosed number of trips on Crow's yacht and private jet, a $175,000 library wing named in his honor, several million to turn the cannery his mother once worked for into a museum— *a project reportedly initiated by Thomas himself*—and the Bible of firebrand Black abolitionist Frederick Douglass, valued at $19,000. Mike McIntire, Friendship of Justice and Magnate Puts Focus on Ethics, *N.Y. Times*, June 18, 2011.

BribeFest has been underway in earnest for twenty-five years. Clarence Thomas' Private Complaints About Money Sparked Fears He Would Resign, ProPublica Dec. 18, 2023. Clarence and Ginni Thomas just couldn't make it on a measly $500,000/year in today's dollars, and needed some folding cash ("The month before, the justice had borrowed $267,000 from a friend to buy a high-end RV."). Desperate to retain their ideological majority on the Court, conservative oligarchs devised schemes designed to fatten Justices' bank accounts. *E.g.,* Frank Rich, Nobody Knows the Lynchings He's Seen, *N.Y. Times*, Oct. 7, 2007 ($1.5M advance for Justice Thomas' autobiography, "My Grandfather's Son"); Antonin Scalia, Form AO-10 (for Calendar Year 2004) at 4 (Auckland, NZ from Oct. 19- 27, 2004).

Whether it involves attending secretive junkets offered by the Federalist Society, taking frankincense and myrrh from a potential litigant, or duck hunting with a litigant during the pendency of a case, *Cheney v. United States Court of App. for the District of Columbia*, 541 U.S. 913 (2004) (Scalia, J., memo), the Roberts Court is more compromised than the average Congressman.[lviii] And it is no longer even subtle. Through a relentless campaign of (none dare call it) bribery, our Supreme Court "Justices" have allowed their once-august body to become an unelected and unaccountable wholly owned subsidiary of the Republican Party. Sheldon Whitehouse, *The Scheme: How the Right Wing Used Dark Money to Capture the Supreme Court* (2022); Lisa Graves, *Without Precedent: How Chief Justice Roberts and His Accomplices Rewrote the Constitution and Dismantled Our Rights* (2025).

## THE ROBERTS COURT "FIXED" IT

Permeated with a sense of common sense, the outside world is at liberty to call this what it appears to be on its face. In court filings, we have to equivocate. Let us just say that baksheesh is a universal language.

Thomas advertised himself as a tax lawyer, Clarence Thomas, *My Grandfather's Son* 75 (HarperCollins, 2007) (hereinafter, "MGS"); "Clarence Thomas," U.S. Equal Employment Opportunity Commission (*biography*, undated), at https://www.eeoc.gov/history/clarence-thomas (practiced as a tax lawyer). charged with the knowledge that on the face of it, that this steady stream of princely gratuities was not bestowed out of a "detached and disinterested generosity." *Commissioner v. Duberstein*, 363 U.S. 278, 285 (1960). To suggest otherwise "taxes the credulity of the credulous," *Maryland v. King*, 569 U.S. 435, 466 (2013) (Scalia, J., dissenting), as it is an objective test. *Bogardus v. Commissioner*, 302 U.S. 34, 40 (1937). 18 U.S.C. § 1001(a) criminalizes the false statements Clarence Thomas has been making on his Ethics in Government Act forms for the past quarter century, and properly interpreted, 18 U.S.C. § 201 and § 1346 criminalizes the [not-] bribes he has been taking on a galactic scale, and Title 26 taxes them as income.

"Most people would assume that giving $175,000 in loans, gifts, and other benefits to a sitting governor while trying to secure his state's help in launching your business would be unequivocally illegal." Note, *McDonnell v. United States*, 130 Harv. L. Rev. 467 (2016). **And 'gifts' to judges, doubly so.** We have a right to expect judges to be as above reproach as Caesar's wife. "I wished my wife to be not so much as suspected." Plutarch, *The Lives of the*

*Noble Grecians and Romans* 674 (Arthur Hugh Clough ed., Project Gutenberg 2024) (1996), https://www.gutenberg.org/cache/epub/674/pg674-images.html#chap48. Umpires, who dutifully call balls and strikes. *Confirmation Hearing on the Nomination of John G. Roberts, Jr. to Be Chief Justice of the United States: Hearing Before the S. Comm. on the Judiciary*, 109th Cong. 55-56 (2005) (statement of John G. Roberts, Jr., Nominee to Be Chief Justice of the United States).

The high-water mark for public accountability was in the late 1980s when, in reaction to *McNally v. United States*, 483 U.S. 350 (1987), Congress passed 18 U.S.C. § 1346, criminalizing schemes "to deprive another of the intangible right of honest services." The statute was simple and straightforward, and grounded on the bedrock of agency: If you work for the people, you owe the people a fiduciary duty, creating an enforceable intangible right. It was targeted at situations like the "Kids for Cash" scandal, wherein then-judges Michael Conahan and Mark Ciavarella "shut down a county-run juvenile detention center and accepted $2.8 million in payments from a friend of Conahan's who built and co-owned two for-profit lockups." Michael Rubinkam, Biden's commutation in 'kids for cash' scandal angers some Pennsylvania families, *Assoc. Press*, Dec. 13, 2024.

But The Roberts Court "fixed it," conducting a jihad to make America safe for graft, disemboweling the law criminalizing both honest service fraud, *Skilling v. United States*, 561 U.S. 358 (2010), and bribery. *McDonnell v. United States*, 579 U.S. 550 (2016); *Snyder v. United States*, 603 U.S. 1 (2024).

**THE CONGA LINE**
When it comes to judicial grift, "Clarence Sale" Thomas is the undisputed G.O.A.T., but it seems that everybody who is anybody in conservative judicial circles is on the gravy train. And they don't even have the decency to tell us about conflicts, much less recuse. *E.g.*, Kate Aronoff, Billionaire Poised to See Return on Investment in Neil Gorsuch, *The New Republic*, Jan. 16, 2024. In open defiance of 28 U.S.C. § 455, Gorsuch did not recuse. Robert El-Jaouhari, Highlights from Oral Argument in Loper Bright Enterprises v. Raimondo, Cranfill Sumner LLP, Jan. 18, 2024, at https://www.cshlaw.com/resources/highlights-from-oral-argument-in-loper-bright-enterprises-v-raimondo/. See also, the serendipitous purchase of Gorsuch's hunting lodge by the law firm of famed legal felon Jack Abramoff: "The Supreme Court justice did not report the identity of the purchaser, whose firm has had numerous cases before the court." Heidi Przybyla, Law firm head bought Gorsuch-owned property, *Politico*, Apr. 25, 2023.

One of the most common conduits for grift is the tender of book advances of staggering size. Who on Earth would pay the newest Supreme Court justice $2,000,000 to tell us "how judges compartmentalize their personal feelings" in rulings? Jake Lahut, Supreme Court Justice Amy Coney Barrett gets $2 million advance for a book deal, according to new report, *Business Insider*, Apr 19, 2021 (paywall). No matter where you go, the money trail has a consistent odor. Brett Kavanaugh (mysterious debt payments). Who made the down payment on his house? How did he come up with $92,000 in country club fees?" Stephanie Mencimer, The Many Mysteries of Brett Kavanaugh's Finances, *Mother Jones*, Sept. 13, 2018. Amy Coney Barrett (record book advance). Samuel Alito (hedge fund manager Paul Singer, with frequent business before the Court). "In the years after the undisclosed trip to Alaska, Republican mega-donor Paul Singer's hedge fund has repeatedly had business before the Supreme Court. Alito has never recused himself." Justin Elliot, Justice Samuel Alito Took Luxury Fishing Vacation with GOP Billionaire Who Later Had Cases Before the Court, *ProPublica*, Jun. 20, 2023. (And remember, "gratuities aren't bribes!"). John Roberts (via BigLaw headhunter wife Jane). Mattathias Schwartz, Jane Roberts, who is married to Chief Justice John Roberts, made $10.3 million in commissions from elite law firms, whistleblower documents show, *Business Insider*, Apr 28, 2023 (paywall); Press Release, Chief Justice Roberts' Wife Made Millions From Elite Law Firms, *Accountable.us*, Apr 28, 2023, at https://accountable.us/chief-justice-roberts-wife-made-millions-from-elite-law-firms/

So, why does this matter? For the average man, the United States Supreme Court does not exist. Us mere mortals will never eat at New York's Le Bernardin, the VIP Room at DC's Bourbon Steak, or Restaurant Guy Savoy at Caesar's in Vegas. And the same is true at One First Street: Whereas the well-heeled can often buy consideration of constitutional issues because they can afford the "right" law firm, *cf., e.g., Caperton v. A.T. Massey Coal Co.*, No. 08-22 (U.S. Jun. 9, 2009) (Caperton was represented by none other than Ted Olson of Gibson, Dunn, and Crutcher); *Smith v. Bender*, No. 09-931 (U.S. Sept. 11, 2009) (facts were objectively worse for the Government, but the petitioner filed *in propria persona*), for the unwashed masses, review by the United States Supreme Court really means a cursory review by a fresh-faced 25-year-old kid out of Harvard, unqualified to discharge a Justice's duties—and who has been trained to dismiss pro se appeals as a matter of course. Quite literally, if you even want to get your foot in the door of One First Street, YOU HAVE TO *PAY THE LADY*! *Really, Jane?* "They came to me," my left foot!!!

Even in war-torn Ukraine, there is no tolerance for judges taking [not-]bribes. But not here. I tried personally to have Thomas prosecuted for his fraudulent EIGA filings fifteen years ago, to no avail. Faith is like fine china: Once broken, it is never truly repaired.

[lix] In a May 24, 2024, *New York Times* op-ed ("A Federal Judge Wonders: How Could Alito Have Been So Foolish?,") Judge Ponsor publicly questioned Justice Alito's ethical judgment in displaying an upside-down American flag (associated with the "Stop the Steal" movement) at his Virginia home in 2021 and an "Appeal to Heaven" flag (linked to far-right symbolism) at his New Jersey vacation home in 2023. Ponsor argued that such actions undermined public confidence in the judiciary, especially amid calls for Alito's recusal from January 6-related cases. *In the Matter of a Judicial Complaint*, Case No. 04-24-90094. Appropriately disgusted, I filed a motion for reconsideration as a John Doe that was never docketed.

[lx] Juvenal, *Satire VI*, lines 347-348. "'I know this is a controversial view, but I'm willing to say it. No provision in the Constitution gives them the authority to regulate the Supreme Court—period.'" Reported in, Robert Barnes, Alito says Congress has no authority to police Supreme Court ethics, *Wash. Post*, Jul. 28, 2023, citing David B. Rivkin Jr. and James Taranto, Samuel Alito, the Supreme Court's Plain-Spoken Defender, *Wall. St. J.*, Jul. 28, 2023 (paywall). The Framers would never have agreed to that and didn't; the notion is comical on its face. See e.g., Lara A. Bazelon, *Putting the Mice in Charge of the Cheese: Why Federal Judges Cannot Always Be Trusted to Police Themselves and What Congress Can Do About It*, 97 Ky. L.J. 439 (2008-09) (first article of its kind to mention "Judge Naughty"); Anthony D'Amato, *Self-Regulation of Judicial Misconduct Could be Mis-Regulation*, 89 Mich. L.R. 609, 621 (1990). But if Congress can't do it, and his colleagues can't keep him in line, who can?

[lxi] To a man, every Framer understood that faction was the gravest peril our Republic faced. Madison observed that a "well-constructed union [would have a] tendency to break and control the violence of faction." The Federalist No. 10, 122 (Madison). To address this peril, he later wrote: "It is of great importance in a republic not only to guard the society against the oppression of its rulers, but to guard one part of the society against the injustice of the other part. ... If a majority be united by a common interest, the rights of the minority will be insecure." *The Federalist* No. 51 (Madison). They feared that it would tear the country apart, as it did in Britain ... and ten years on, it damn near did. Sarah Pruitt, The Founding Fathers Feared Political Factions Would Tear the Nation Apart, *History.com*, Feb. 18, 2025. The Framers' Constitution had an array of firebreaks, including the diffusion of power between the suzerain and the vassal States and the citizen's untrammeled right to engage in public interest litigation. Today, all power converges in Washington, and our out-of-control Imperial Judiciary has reduced what were once citizens to serfs.

But that was not the only internal danger the Framers identified. Alexander Hamilton saw Defendant Trump coming from 230 years away:

> **The truth unquestionably is**, that the only path to a subversion of the republican system of the Country is, by flattering the prejudices of the people, and exciting their jealousies and apprehensions, to throw affairs into confusion, and bring on civil commotion. Tired at length of anarchy, or want of government, they may take shelter in the arms of monarchy for repose and security. …

> When a man unprincipled in private life desperate in his fortune, bold in his temper, possessed of considerable talents, having the advantage of military habits—despotic in his ordinary demeanour—known to have scoffed in private at the principles of liberty—when such a man is seen to mount the hobby horse of popularity—to join in the cry of danger to liberty—to take every opportunity of embarrassing the General Government & bringing it under suspicion—to flatter and fall in with all the non sense of the zealots of the day—It may justly be suspected that his object is to throw things into confusion that he may "ride the storm and direct the whirlwind.

Alexander Hamilton, Objections and Answers Respecting the Administration, Aug. 18, 1792, *Founders Online*, Nat'l. Archives (last visited Apr. 3, 2025).

[lxii] On October 31, 1517, Martin Luther, a German monk, theologian, and professor at the University of Wittenberg, is traditionally said to have posted his Ninety-Five Theses (or Disputation on the Power and Efficacy of Indulgences) on the door of the Castle Church in Wittenberg (a then-common practice for initiating scholarly debate). And the parallels are not forced. I argue for sola scriptura (what scholars call originalism), and object to the sale of indulgences (judges writing laws ex cathedra). Luther was called to account for his then-heretical views before the Diet of Worms, where he is recorded as saying "*Hic sto, ego non possum aliter. Deus me adiuvet. Amen.*" ("Here I stand, I can do no other, so help me God. Amen.").