UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY


AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
        Plaintiffs


vs.


MARCO RUBIO, in his official capacity as
Secretary of State, et al,
        Defendants


\*\*\*\*\*\*\*\*


For Hearing Before:
Judge William G. Young


Remedies Hearing


United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Thursday, January 15, 2026


\*\*\*\*\*\*\*


REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A  P  P  E  A  R  A  N  C  E  S

RAMYA KRISHNAN, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
    Knight First Amendment Institute at Columbia
    University
    475 Riverside Drive, Suite 302
    New York, NY 10115
    (646) 745-8500
    E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
    Sher Tremonte LLP
    90 Broad Street, 23rd Floor
    New York, NY 10004
    (212) 540-0675
    Email: Cgans@shertremonte.com
    For Plaintiffs


PAUL F. STONE, ESQ.
LINDSAY M. MURPHY, ESQ.
ETHAN B. KANTER, ESQ.
VICTORIA M. SANTORA, ESQ.
    DOJ-Civ
    P.O. 878
    Ben Franklin Station
    Washington, DC 20044
    (202) 616-9123
    Email: Ethan.kanter@usdoj.gov
    For Defendants


SAMUEL D. THOMAS, ESQ.
    Morgan Lewis
    One Federal Street, Floor 14, Suite 1419
    Boston, MA 02110
    (774)263-0309
    Email: Tsamueldavid@gmail.com
    For Intervenors Boston Globe and New York Times


RENE GRIFFIN, ESQ.
    For Intervenors Intercept and The Center for
    Investigative Reporting

P R O C E E D I N G S

(Begins, 2:30 p.m.)

THE CLERK:  Civil Action 25-10685, American Association of University Professors, et al versus Rubio, et al.

THE COURT:  Good afternoon counsel.

Before we begin let me say that I've authorized internet access for this proceeding, and so let me say to you folks, who may be watching on the internet, that the rules of court remain in full force and effect, and that means there's no taping, streaming, rebroadcast, screen shots, or other transcription of these proceedings.  And you must keep your microphone muted. If you fail to do that, I have no choice but to cut off your access.

Then let me also say that to save time here I'll ask counsel, including counsel for the proposed intervenors, if you have an occasion to speak, to introduce yourself at that time and the record will be complete.

Now with that said, can I invite counsel to come to the sidebar, and I'll include counsel for the proposed intervenors.

AT THE SIDEBAR

(First part of sidebar off the record.)

THE COURT:  All right, now this, I think appropriately, should be at the sidebar and on the record.  And I'm not sealing it, there's nothing here that it's appropriate to seal.  But I have a couple of comments about documents here, and that the intervenors should hear.

First of all, there's one document as to which the government claimed is privileged, and the Clerk has it, and I am returning it to the government, with the representation on the record that, as best I can determine -- and I have a detailed clerks and law clerks for this, that there are no other copies of that document that exist in the hands of the Court.

Having said that, I want to say further that I never read the document, I never consulted the document, I never ruled on whether that document in fact deserved executive privilege.  But the better part of valor is to give it back to the government, and the government now has it.

What may come up in this case, when we get to the intervenors' arguments, at the end of it, the end of our discussion as to remedy, is that certain of these documents, which were exhibits in the case, have indicia on them that are meaningful to other agencies within

Homeland Security that have nothing to do with immigration. I assume the government knows what I'm talking about. I won't say anything further.

If I were to order that a document -- and I'm not making a ruling now, but if I were to do that, the government has a chance to redact that, but the window of going over such documents is going to be short in my mind, and you redact whatever such indicia may be, but only such indicia. And I'm not going to have oral argument as to that.

Okay, thank you.

(In open court.)

THE COURT: Now let me take a moment to attempt to organize the theory. You'll understand that I have read thoroughly your briefs and really reflected on the record here. And I think the -- I figure the remedy hearing, as we discuss the remedy, should take about an hour, and I'm going to try to hold myself to that. Without ruling, um, I think that plaintiffs' proposals are overbroad and I'll have questions about that.

One of the problems -- and I tried to indicate in the opinion in strength, under which we all operate here, is that I have not yet, though I plan to do it today, indicated how, um, I think we ought appeal -- um,

proceed, rather.  So the way I look at it is, we'll let the plaintiffs go first, I have questions, and I will indeed articulate what I think in response to my questions and your proposals.  That will get me pretty much on the record of where I think perhaps we ought go.  And I will certainly hear you as to why that's not satisfactory.

I need the oral argument.  Again, reading the record, the government's not going to be happy about that.  But, um -- and I want to hear the government -- and I say the "government," but the defendants here in this case.  And when that's done, we will see whether I can make any orders.

Being, as I always try to be, fully transparent, the matter is sufficiently complex that, um, if I think I can enter an order, it will be in the nature of looking to the plaintiffs and saying, "Do you think you can prepare a form of judgment in accordance with whatever ultimately is decided?"  And I'll want to know how long that is, how long it would take you to do that.  And so you want to take careful notes, because I'm looking to you with the idea that then I could tweak that, enter the order, and that would be the judgment.  And any further proceedings can take off from that point.

So with that said, I'll turn to the plaintiffs.  I don't mean to constrain your argument, but I think it's appropriate to ask a general question at the outset, and that is, "What are you trying to do here, what's your goal in the proposal that you make?"

MS. KRISHNAN:  The goal is to --

THE COURT:  Please introduce yourself.

MS. KRISHNAN:  My apologies, your Honor.  Good afternoon, Ramya Krishnan for the plaintiff.

THE COURT:  Good afternoon.

MS. KRISHNAN:  The goal is to effectively remedy the injuries to plaintiffs and their noncitizen members, and what I mean by that is to effectively remediate the chill that your Honor recognized that these noncitizen members labor under.  And also to ensure the defendants' compliance, ongoing compliance with any order that this Court ultimately issues.

THE COURT:  Well all right.  At least -- and this is drafting, as I've already telegraphed, it seems overbroad, but when I speak to you orally you say relief is sought for the plaintiffs and their noncitizen members.  My concern, and it will come as no surprise, is *Trump vs. CASA*, and, um, I think you're right, the relief, as I conceive it, is the noncitizen members of the American Association of University Professors and

MESA, the Middle Eastern Students Association, as of September 30, 2025.  And my analogy is to class actions.  And you can't -- having won the liability, you can't now join the class and expect to get relief.  So that's what I'm thinking about.  But I'll stop.

Isn't that right, isn't that what we're going to frame here?

MS. KRISHNAN:  Okay.  Well as I hear your Honor, there are a couple of issues that I want to address.  The first one maybe arises from a concern that the injunctive relief we seek goes beyond, um -- by its terms goes beyond plaintiff in relief, and there's a reason for that.  Our argument is that, consistent with the Supreme Court's decision in *Trump vs. CASA*, injunctive relief that applies to noncitizens lawfully present in the country is required to give a plaintiff noncitizen in this complete relief.

THE COURT:  Why is that?  If I can fashion relief that, um, removes the chill that I have found, which I think is my obligation -- and we'll reach out for that, we'll grope for that, if I do that for your members who were members, had the courage to be part of this associational group that brought this -- and I do think it's a very important action, against cabinet secretaries, and I know there are others, but the

cabinet secretaries are key, isn't that -- and it does accomplish that end, why should I make it any broader?

MS. KRISHNAN: So there are, um, two main reasons, both of which arise from the fact that limiting injunctive relief to members only would effectively impose a requirement to identify plaintiff noncitizen members to the government, and include the --

THE COURT: Well I'm concerned about that and I, um, have an answer to that, it seems to me. Actually what I'm thinking about is some sort of relief that would be self-executing, self-executing in the sense that so long as the government did not, in the future -- and I'll say "government" now, not just these defendant cabinet secretaries and the head of ICE here, not just those folks, but so long as if they transgressed, someone in the class could come into court to secure the relief, we don't have to -- because it would be I think an onerous burden on your clients to have them identify themselves, have a list of people that the government must refrain from. Rather, if I declare it now and leave on your clients the burden of proving that they were a member in good standing of the associations, which are the plaintiffs in this class, they put themselves out there, those associations, prior to the finding of liability, and then, at least the way I can

see it, that's all they have to do to obtain the relief, whatever relief we come up with.

Doesn't that work?

MS. KRISHNAN:  So I want to make sure I am understanding, um, your Honor's proposal.  Is it that relief be limited to noncitizen members at the time of the Court's judgment, but then those members --

THE COURT:  Before, right.

MS. KRISHNAN:  Right.  -- but then those members must identify themselves in order to --

THE COURT:  Must identify themselves if the government takes action against them, because, um -- you see I'm hoping that I can work it out so it's self-executing.  If they don't take action against those people -- and the government has no -- at least I want to hear from defense counsel, but I don't see any overriding policy that the government needs to know now who these people are, but so long as they don't muck around with those people's immigration status, why -- yes, that's fine.  If they do, having identified the class analogy here, having identified who that consists of, putting it on plaintiffs to prove just that they're a member in good standing and not are, but were, prior to September 30th.  Isn't that enough?

MS. KRISHNAN:  Well I think -- I think there are

-- I have two concerns.  One is that the government wouldn't know in advance whether somebody is a member of the AUP or MESA, and so it could take enforcement action that is effectively foreclosed.

THE COURT:  It could, but that's not before me.  One hopes -- you know until this case my, I guess, jurisprudential approach, and I used it in the National Institutes of Health, was not to enter injunctions, to declare the rights of the parties, and the government entities didn't always win, and when they didn't always win, I took the position that in a properly-functioning system an appropriate declaration of rights would cause any public servant, by a court of competent jurisdiction, to either (1) comply, without anything more, or (2) appeal.  That's what I'd like to do.

It's obvious, from my opinion, I was struck by the intentionality of the constitutional violation here.  I mean I see this as a conspiracy to deprive your clients of First Amendment constitutional rights.  Whatever we come up with ought remove that chill as to your clients.  And I don't think it's too much of a burden to require them, if the government were to take action against them -- and by the declaration that in effect is the sanction, that's the remedy, they can appeal it.  But one hopes, if it's a sound remedy, they won't

inappropriately tamper with anyone's rights, First Amendment rights.  I grant you that's aspirational, but I'm not hearing why that won't work.

MS. KRISHNAN:  I think I understand, your Honor, and I think it might be workable, although before agreeing to this relief I would want to --

THE COURT:  I understand, you're not agreeing to anything.

MS. KRISHNAN:  Yes.

THE COURT:  I'm not going to be hesitant in spelling out what I'm thinking about, I'm just trying to get from you where it, but for your presentation, butts up against what I'm thinking, and I'm pushing back.

MS. KRISHNAN:  There is one thing that I would like to mention in response to this proposal.

THE COURT:  Please.

MS. KRISHNAN:  Is that we don't think relief needs to be limited to individuals who were members at the time of judgment.  Courts often, when they limit relief, injunctive relief to plaintiff organization members, often extend relief to current and future members on the understanding that not doing so would give rise to continuing litigation, a waste of the Court's resources.

THE COURT:  But you see I see the other side of the coin.  This proposed injunction that you've laid

before the Court will -- it seems inevitable, would involve this Court, this session in continuing policing as so long as it's my good fortune to remain on the bench.  I'm candidly hesitant about that.  I'm groping towards some relief that would not only be in this court, though this is a court of competent jurisdiction, but would be in any United States District Court.  And if I confine it to the class analogy, which I think the Supreme Court suggests here, you don't become a class member once you see that the class has won, you've got to put yourself, as your clients have done -- and I praised the lawyers, I hope later in the hour to say some appropriate things about all the attorneys in this case, but I know there are such cases, I'm not persuaded as to that.

Let me ask you another question.  You -- in the injunction, you're making a nod toward Administrative Procedure Act cases and you're saying "Vacate this unconstitutional policy."  I expressly found there wasn't a policy.  There was no policy here.  I mean that's a finding of the Court.  I'm not persuaded there was any policy.  What happened here is an unconstitutional conspiracy to pick off certain people, to twist the laws, apply them for an inappropriate purpose, with the intentional idea -- and this is what

I've written, this is what I found after careful reflection, and that's the breathtaking part of this case.

Two cabinet secretaries conspired -- this is a constitutional court, I don't need the Administrative Procedure Act. They intentionally, knowing what they were doing, counseled by professionals who cautioned them, nevertheless went ahead to pick off these people with the intention that your clients would be chilled, and did so rather effectively, I might say. All right? We're trying to remedy that.

Now I don't propose to vacate a nonexistent policy. There's -- well I didn't find a policy. I'm not going to vacate a policy I didn't find.

MS. KRISHNAN: If I may, your Honor?

We of course acknowledge that the Court rejected the existence of a policy that entailed revoking the visas and the arrest detention and deportation of every noncitizen that engaged in pro-Palestinian and anti-Israel advocacy, but what we did read your Honor to find is that there was a policy of enforcing President Trump's executive orders in an intentionally-viewpoint-discriminatory manner, which was the basis for this Court's conclusion that there was a violation of the APA, both in terms of a final agency action that was

contrary to constitutional rights as well as being arbitrary and capricious, and it is that violation that we seek to remedy and vacatur.

THE COURT:  But let me explain what I have in mind and then -- take this down, and then I do want to hear -- because I think this is the best remedy in this case. I've given a fair amount of thought to this as time has passed since the trial.

I propose to declare that in view of the intentional abridgment of the constitutional rights of your clients, as we together have just defined it, that is all members in good standing of the American Association of University Professors and the Middle Eastern Students Association, as of, up to anyway, September 30th -- excuse me, 2025, shall, um, be granted a, um, presumption, a conclusive presumption that any alteration in their immigration status shall be conclusively presumed to be -- excuse me, to be in retribution for their participation in this lawsuit and, um, therefore void and of no effect, unless -- and I say a "conclusive presumption," but I can see three, um, reasons why such action can be taken.

Unless the government were to prove, on clear and convincing evidence that (1) the immigration status of the individual, as that immigration status stood as of

January 20th, 2025, or any expansion in their immigration status, has come to an end, or has terminated by its own terms.  And a good example is student visas are not without limit of time and, um, if the government proves that an individual's visa has run out, then what I've just said doesn't apply.  But certainly a person doesn't, by virtue of participation in this lawsuit, have a greater claim on immigration status than they had at the time they went into the lawsuit.

(2) that the person, um -- the government shall prove, by clear and convincing evidence, that the person has been convicted -- not arrested, but convicted of a crime which -- as to which trial by jury, um, was their right.

And then (3), any appropriate reason, that the government shall prove by clear and convincing evidence, that they -- that any other appropriate reason, under the governing immigration laws, for taking the administrative -- the alteration in the immigration status.

Now let me explain how I think this ought work. It's not an injunction, it puts the burden of proof first on the individual who says "Now they've done something to my immigration status."  It shall be

conclusively presumed that, if they're a member of the class, which they have to prove by a fair preponderance of the evidence, that once that happens, it's conclusively presumed that that immigration action is on account of, constitutes unlawful unconstitutional retribution for participation in this lawsuit, unless the government -- and the government bears the burden of proof by clear and convincing evidence, that one of these three exceptions applies.

And the reason I use the word "appropriate" -- I have two hypotheticals here.  And you'll understand now these are hypotheticals.  I am going to make reference to real-life events, but they are not of record in this case, and I personally don't know and I'm expressing no opinion on any of that.

Let's say that, um -- and I don't know whether this is true, but let's say people resident in the United States, noncitizens from Venezuela, have temporary protected status.  And I don't know that.  But let's say the President were to revoke that temporary protected status.  And that one of these Venezuelans is a member of -- because they're a teaching assistant or a graduate student, they're a member of the American Association of University Professors, within the appropriate time period, and she says, "Wait a minute,

I'm in this class, you can't revoke it."  And then the government -- and neither of the other two apply, her visa is perfectly valid, she hasn't been convicted of any crime, and -- but the government says, "No, come on, that's ridiculous."

Now Venezuela has nothing to do with the events that gave rise to this lawsuit.  Oh, no, so the government's got to prove it.  And I would say the likelihood of such proof is, um -- well I shouldn't opine.  But the government's got to prove it.  And that's part of the sanction.

Let me give you another situation closer to our case or I think harder for the government to prove.

I read somewhere that, um, in the wake of the tragic and horrific assassination of Charlie Kirk, that because certain noncitizens said something about that event, the Department of State had something to say about their visas.  And I remembered, when I saw that, I said, "Well that's our case."

So what are they doing?  If it's just speech -- it may be repulsive speech or disgusting speech, but if it's just speech.  Well the Department of State can't do that.  And again this is a hypothetical.  So -- but let's say that happened, we'll assume that happened. And then the person comes in and says, "I'm a member of

this class, you can't do that to me."

Well again, the government's going to have to prove that their reason was not in fact in retribution but -- and in addition, my second, that it's an appropriate exercise of governmental power.  And that gives -- because I don't expect that if these cases come up, they'll necessarily come before me, they can be brought in any jurisdiction, which is appropriate.  The American Association of University Professors have people who live in many different jurisdictions.  One of the subchapters, for instance, um -- well I thought we were limited to the subchapters when we started, but it could be brought in the District Court, wherever a person is a resident, and then it would be up to that judge.  And the government is going to have to prove that, um, whatever they did was appropriate, appropriate in light of the declaration that has been made in this case.

I would add one other -- and to be complete, I recognize that this litigation, and litigation such as this, and litigation such as I posit, would not have, as of right, an American jury.  I would put a footnote in the judgment because I don't expect that I will preside over such litigation necessarily, but I would recommend that an advisory jury be impaneled and that the, um, we

get the advice of an American jury as to whether the government can in fact prove, by clear and convincing evidence, that the immigration action sought to be taken against a class member was in fact free of any retribution and was appropriate under the governing law.

And one other recommendation.  Since I don't propose to handle such cases, if any there be -- in fact I would hope there never would be such a case, but it's certainly possible, that the government has every right appropriately to enforce the laws, but in such litigation I would advise that, um, claims of attorney-client privilege on the part of government agencies and claims of the deliberative process privilege be held in abeyance.  Both of those privileges are qualified privileges.  And while those privileges of course would kick in in their entirety once the litigation arose, litigation which one of your clients would start, um, everything prior, I would at least advise, recommend, that especially as to the deliberative process privilege, I honored that in this case, and I think on reflection on how far that qualified privilege goes, that I was too capacious in honoring that privilege by the government.

Now I think that's everything I have to say and that's what I'm thinking.

MS. KRISHNAN:  And just for clarification.  Is this order that your Honor just outlined, is that meant to supplant an injunction?

THE COURT:  It is.  No injunction, just an order.  And there it is, it's the sanction.  I'm sanctioning these government agencies and I'm sanctioning the United States.  They're not going to have to jump through these hoops in order to get the result -- if they seek such a result, and it will be clear and it will be transparent that they are not -- well let's get something straight here.

The big problem in this case is that, um, the cabinet secretaries, and ostensibly the President of the United States, are not honoring the First Amendment.  The First Amendment -- all this talk about retribution, and that goes beyond the record here, and I'm limited to the record here, I'm concentrating on the record here, but you know as Mr. Dooley said about the justices, "The justices read the newspapers and I do too."  It doesn't seem that there's an understanding of what the First Amendment is, in our government, by this unitary executive or, um -- and we pass around the word "authoritarian."  And I don't, um, in this context, treat that in a pejorative sense, and I use it carefully, but it's fairly clear that this President

believes, as an authoritarian, that when he speaks, everyone -- everyone in Article II is going to tow the line absolutely.

Now I didn't find that he was in on any such conspiracy, at the time it appears to have started with Secretary Noem, and then we've got the Secretary of State -- the Secretary of State, the senior cabinet officer in our history, involved in this, intentionally taking away a group's freedom of speech. I grant you it doesn't appear that the people I have mentioned honor the First Amendment. So I'm trying to tailor relief so that they have an incentive to honor the First Amendment with respect to your clients individually. That's why I propose this.

MS. KRISHNAN: I understand. I mean we would make -- we do think declaratory and APA relief complement the relief that your Honor has just outlined. Declaratory relief because, um --

THE COURT: Isn't that -- didn't I just declare it?

MS. KRISHNAN: Well the declaratory relief we seek, in Paragraph 1 of our proposal, seeks to make it emphatically clear not only to the cabinet secretaries, but also to line employees who have been charged with administering this conspiracy, or enforcement policy,

um, to make clear to them where the First Amendment lies now, because as your Honor's ample findings of fact recognize, there's considerable confusion that reins in these agencies as to --

THE COURT:  Am I not making myself clear?

MS. KRISHNAN:  I think your Honor made yourself abundantly clear.  But since your Honor's rulings, um, we have seen officials at these agencies continue to make statements about their --

THE COURT:  Of course you have.  Of course you have.  And what I just said, um, is I acknowledge that.  They don't -- I'll say the present sense.  They don't seem to understand, or willfully ignore, the provisions of the First Amendment.

Joseph Ellis, really one of our great historians, came out with a new book, and in it he has one sentence that really, I think, informs our discussions this afternoon.  He says, "The Constitution is not designed to settle arguments, the Constitution makes arguments the answer."  That's the genius of the First Amendment.  Think about it.  We've got a bicameral legislature, we've got three co-equal branches of government, and it's intended that they check and balance each other and argue amongst themselves and with each other, and all of us, including the President of the United States, are

subordinate to the people, who, under the First Amendment we are protecting, in speech, in petition, in the right to worship or not worship.  There's a reason why it's the First Amendment, it makes our government work.

I grant you that certain statements by government agents appear simply to be oblivious to those basic principles.  So I've made an order, or I propose to make an order -- which they can of course appeal, but it will be crystal clear that as to your clients, your individual clients, who have the courage to take on these cabinet secretaries -- and I dismiss the President because no relief can be -- injunction or relief can be granted against the President, but it doesn't mean he isn't a part of our constitutional system and subordinate to the will of the people, he is.  I -- I think I've -- I'm making myself clear.

Maybe -- anything else?  Because I want to get to the government and have them tell me how I overstep here.

MS. KRISHNAN:  I'll make just two very quick points, um, starting off of course with the fact that I couldn't agree more with everything your Honor has just said.  But this Court, having found substantive violations of the APA, the default remedy generally is

--

THE COURT:  And when you say "substantive violations of the APA," I have found that senior government officials have intentionally engaged in a conspiracy against the constitutional rights of American -- I was going to say "American citizens," of -- against people who have every right to speak as to citizens under the First Amendment.  That's what I found.

MS. KRISHNAN:  That is what your Honor found.  I mean I can find the reference in the opinion, but your Honor refers to an "enforcement policy," and that is a policy -- their policy of enforcing President Trump's executive orders in an intentionally --

THE COURT:  Look, what they did here -- I limited the record.  What they did here is pick off certain people, in a significantly public way, intentionally, to chill the speech of your clients, largely successfully.  Now while one can argue that there are other instances of similar conduct, they're not before me.

But let's go to the government, because I'd be informed by what the government has to say.  And then I'll give you a brief moment for rebuttal.

So now I'm transparent, I'm out there, that's what I'm thinking of, and I genuinely would like to hear your

concerns with it.  I -- I largely accepted your arguments against a broad subpoena -- um, not subpoena, an injunction.

So would you introduce yourself.

MR. STONE:  Yes, your Honor, my name is Paul Stone, representing the government.  I'd also like to introduce Lindsay Murphy, who's here at counsel table.  She'll be talking about any issues with unsealing the record.

THE COURT:  Understood.

MR. STONE:  So, your Honor, to be begin with, um, the problem the government has with this process, is that the jurisdictional limitations contained in now 1252(f)(1)(g) and (b)(9), um, just today the Third Circuit issued a decision in *Khalil* that illustrates these concerns.  And what the Third Circuit said in *Khalil* echoes *American Arab* in saying that "All issues relating to the initiation of removal proceedings, and are the subject of removal proceedings themselves, must be a channel into immigration court."  So Congress has specifically prohibited setting up a parallel proceeding where, um, you know the questions of law and fact are decided elsewhere and then applied in removal proceedings.

THE COURT:  I don't think I have.  Here your

clients have been found, on an ample record, to have intentionally violated the free speech rights of -- and I'm particularizing a group of people.  All I'm saying is if you -- not you, but if they, or their agents or any agents of government, were to do that again, that individual has the right, in the United States District Court, to set up this case, this decision, as a bar.

I haven't said one word about the proceedings -- well that's not true, I've said that you would then have to prove, not just in what you call an "immigration court" -- and I know that's the name that they're given, but they are hearing officers within the executive and subject, in a unitary executive, to the executive's will, as is capaciously demonstrated here. All of that can go on, they just cannot be removed.  And that's a sanction for the misuse of government power.

Constitutional courts are recognized.  Sanctions against the United States are recognized.  I'm not changing anything or taking any jurisdiction away from the so-called "immigration court" in any way.  It's just that before any action can be taken, we've got to be sure that such action is not in retribution for their participation in this case.  That's all I'm saying.

MR. STONE:  I understand that, your Honor.  But our position is that the channeling provisions prevent

any sort of outside adjudication of these issues.  The Third Circuit does point out that it doesn't end with the immigration court, it ends with the Courts of Appeals or the Supreme Court.  And if there's a constitutional statutory issue that gets decided in those courts, the Third Circuit also pointed out that, if there's an inadequate record to prove it, there are other ways, perhaps through the Hobbs Act, to create a record adequate to raise the sorts of challenges that your Honor has wrestled with.

THE COURT:  Well what would you have me do?

MR. STONE:  Your Honor, the government's position is that, because of these jurisdictional bars, there isn't a remedy that the Court can offer.

THE COURT:  I see, that's your --

So no remedy?

MR. STONE:  That's correct.

THE COURT:  No remedy when I have found, by clear and convincing evidence, that the Secretary of Homeland Security, in concert with the Secretary of State of the United States, all of which has been fully approved by the President of the United States, to violate the constitutional rights of these people, and you're telling me there is no remedy?

MR. STONE:  Your Honor, that's what the statutes

require.  The Congress sets out the jurisdictional limitations on the courts as well as the immigration proceedings.

THE COURT:  I respectfully disagree.

MR. STONE:  I understand that, your Honor.

THE COURT:  All right.  Thank you.

MR. STONE:  And I do have a question about your proposed order.

One of the government's concerns would be is if we don't know the identity of the members before an action is brought, we don't want that to be triggering a contempt proceeding, since we don't necessarily know --

THE COURT:  Who said anything about contempt?  The burden of proving -- of any individual proving that he or she in fact gets the benefit of this order rests upon the individual.  They've got to -- on the basis of the judgment in this case, assuming that the judgment stands and is affirmed, based upon the judgment in this case, what will happen -- what I hope will happen is nothing, that we won't get into these circumstances again, but if someone, properly represented by the plaintiffs here, and properly a member of an agency, has some problem with their immigration status, they -- the burden's on them to come into an appropriate United States District Court and say, "They're moving to deport me.  I was a

plaintiff in *AAUP vs. Rubio*.  They can't do it."  And then, um, you, the government, can't, unless they prove, by clear and convincing evidence, one of the three things.  The last being an appropriate use of the statutes.  I have found that the use here, intentionally to aggregate First Amendment rights, was inappropriate.  But that's all.  And you see here I'm staying away from contempt, I'm just putting a burden.

But I am putting a burden on government that it didn't have before, I'm putting a burden on the government, because these cabinet secretaries have failed in their sworn duty to uphold the Constitution, and I'm trying for a creative solution that doesn't just enjoin them and say, "Oh, don't do it," but say, "If you do it, you're going to have to jump through these hoops," and you're going to have to jump through these hoops transparently.  And I'd like it heard before an American jury.  But that can only be my advice, an advisory jury.  And if I'm not going to be the presiding officer, I don't tell other judges what to do.

All right, I think I understand your argument.  Thank you.

MR. STONE:  I do have another question, your Honor.

THE COURT:  Please.

MR. STONE:  What do you envision by way of notice requirements?  The current request from plaintiffs is extremely detailed, invasive, and vets confidential information.

THE COURT:  I don't expect anything beyond what I've just said.  I'll declare it -- I'll declare clearly that it will be an order as part of the judgment, fully subject to appeal, and assuming it stands, the order is out there.  Nothing more need be done.  The case stands or falls on its own merits, on the findings of fact I've made, the rulings of law I've made.  And I'm now crafting a judgment that goes no further than these plaintiffs specifically, which in fact they have to invoke, and I think one that's both fair and doesn't infringe.

You see, um, let me extemporize just one moment. And I put this in the opinion, but I'll say it again.

In the main, in these days of trial, I listened to professional patriotic employees of our United States government trying hard to do the job that they were trained and skilled in doing.  I am trying very hard not to make their job harder.  But let's talk the truth here.  The truth is that -- look at the intelligence portion of the Department of Homeland Security.  If ever you want chapter and verse about how the government can

be weaponized against a disfavored group, that's the record of it.

This, um -- "This is this list of people that this private agency thinks, um, may be hostile to the, um, foreign policies of the State of Israel, and so look them all up"?  The record points it out.  These people were taken -- these professionals were taken off antiterrorist investigations, they were taken off human trafficking investigations, all to look up what could be found, what dirt they could find on this group.  That some private agency, at the very highest level of the Department of Homeland Security, decided that's the best use of those people?  It's appalling.  Nevertheless, I'm not trying to make the job of any of our professionals more difficult, what the Court will order is intended to have both transparency and, um, an appropriate use of government power.  That's all.

All right, let me turn to the plaintiffs.  How long to draft such a form of judgment?

MS. KRISHNAN:  Your Honor, um, sorry, could I make two brief points?

THE COURT:  You may.

MS. KRISHNAN:  Thank you.

The reason we think injunctive relief is required here is to achieve effective deterrence.  I'm concerned

that under the proposal your Honor has outlined, the government could arrest, detain, transfer to Texas, as they had with some of the targeted five involved in this case, all before that person is able to bring a case in District Court, and at which point the government will argue that the Court lacks subject matter jurisdiction to --

THE COURT:  It's not me.  It's not me.  Courts sit in Texas.  The United States District Court sits in Texas.  It's just as good as I am.  I can imagine that it will honor the judgment of this court.  And the Constitution speaks to that, you know they're required to honor the judgment of this court, if it survives on appeal.

MS. KRISHNAN:  But even if that is the conclusion that the Court ultimately reaches, we could have plaintiff members languish in --

THE COURT:  We could and we do.  You see I live in the real world.  But this case, this case does not lend itself -- this is a free speech case.  I cannot -- in other cases, I have railed, ineffectively, against what appears to me -- and this is on the record, appears to me to be abuses by ICE.  This is not the place for that. I made mention of certain of them in the opinion.  They have not gone away.  If anything, they are exacerbated.

But that is not before me.  What's before me is trying to remedy the chill on free speech.

The chill on free speech is remedied by -- it seems to me, by the sanction that these cabinet secretaries visited on the group that you represent.  It appears that noncitizens and citizens alike are subject to -- well I'm not going to go there.

You suggest that, um, citizens and noncitizens alike are subjected to various abuses by ICE.  Perhaps.  But that's not before me.  What's before me is free speech.  I'm going to deal with that.  That goes way beyond this case, free speech of all persons in the United States and how it butts up against ICE.

ICE has a -- ICE has a difficult job.  This is the modern Fugitive Slave Act, it's not like we've never been there before.  Do you know that a marshal in this district was murdered by a mob trying to -- trying to protect or free a fugitive slave by the name of Anthony Burns not a quarter of a mile from this courthouse? That was the law in those days.

My duty, under the Constitution, is where it's been unconstitutional, I've spoken out, but under the Constitution my duty is simply to declare the law.

MS. KRISHNAN:  When I speak -- just to clarify my own remarks.

When I'm speaking of the deterring effects, I was concerning myself only with the noncitizen members of our plaintiff organizations and addressing the chill on them, and my concern is that they will continue to be reasonably chilled so long as the only relief available to them, should the government act against them, is that they have to file in District Court, while potentially languishing in --

THE COURT:  You can't have it both ways.  Unless we get into a situation where the class gets all identified, so we know who they're to stay away from, and we adjudicate that, this is the only solution I can come up with.

MS. KRISHNAN:  Injunctive relief would have the additional -- would have additional deterrence, I think.

THE COURT:  You think so, with these defendants, injunctive relief as you have crafted?  I don't.  So, um, try my approach and we'll see where we go.

How long to draft it?

(Pause.)

MS. KRISHNAN:  Um, 2 days?

THE COURT:  Fine.

So let's see, um, today is -- well let's make it Monday -- no, let's make it Tuesday.  So the day after President's Day you'll file.  All right.

Now you file -- I want it filed by noon on Tuesday the 20th.  The government will file any objection -- and I mean I know they object, and you're not waiving anything, but if any specific objection, I want it filed by Wednesday the, um, the 21st, and by noon.  And I propose to tweak it, if I want to tweak it, and enter the judgment in this case by Thursday the 22nd.

And we talked at the sidebar about certain redactions, and I'm now turning to the other lawyer here.  Yes, certain redactions, I'll expect those to have been made by that time.  I won't act any faster than that.  But assuming they comply with the Court's order, I will act on that date.

Now I'm turning to the issue -- and we have the proposed intervenors here, and I'm going to take the cart before the horse and start with the government.

Other than the statements I made at the sidebar, I propose then, on Thursday the 22nd, coincident with the, um, filing of the judgment on that day, to direct the Clerk to make available, make public every document marked as an exhibit in this case.

Why shouldn't I do that?

MS. MURPHY:  Well to begin, your Honor, it's stated in our response to the intervenors' motion, which was limited to about a dozen or so documents.  We don't

believe that the full list of trial exhibits warrants disclosure and nobody has asked for that here.

THE COURT:  Why not?

MS. MURPHY:  Nobody has asked for that here.

THE COURT:  No, but that's my practice, because that's -- you see the timing makes a difference.

I have kept some things sealed, I've been wrestling with -- and you've all aided me, but I've been wrestling with the idea of what remedy, and we'll see if I go through with the remedies that I have espoused. But if I do, then that's the judgment.  There's no reason then that anything that I did have available to me to consider the record, unless there's a viable privilege that would stand against the need for the public to know, my practice is just is to make it -- and I'm not going to publish them, I'm simply directing the Clerk that nothing's sealed, that's all, that's my general practice.

MS. MURPHY:  Well in this case, your Honor, there are a number of documents over which the government did assert privilege and --

THE COURT:  I understand, and I ruled on them.

MS. MURPHY:  And some of those rulings, um, upheld the privileges, and there are other rulings, your Honor, that --

THE COURT:  I guess I'm not following.  I didn't mark anything that was privileged.

MS. MURPHY:  Your Honor, I didn't understand that --

THE COURT:  These are exhibits.

MS. MURPHY:  Yes.

THE COURT:  These are exhibits.

MS. MURPHY:  So with some of the documents -- for example, your Honor, there's State Department action memos over which the government asserted a deliberative process privilege.

THE COURT:  Right.

MS. MURPHY:  My understanding is that the Court withheld judgment during trial over those privilege assertions and --

THE COURT:  Thank you.  Thank you.  I denied the privilege.  My intention is to disclose those.

MS. MURPHY:  Okay.  And then in that instance, your Honor, the government respectfully asks -- you know because these rulings are subject to appeal, that any disclosure of the documents or unsealing of the documents be delayed until such time as the government has had an opportunity to seek appeal.

And there's the additional question, your Honor, of the confidential nature, that even if they're not

privileged, of many of these documents, that they're law-enforcement-sensitive documents.

THE COURT:  Oh, no, no, no.  Listen. "Law-enforcement sensitive"?  We dealt with that during the trial.  And I say this respectfully, ma'am, "law-enforcement sensitive" are things like the location of pole cameras or some new, um, detection mechanisms. But your interpretation -- well not "yours," but your predecessors, which I rejected at the trial, was that a "law-enforcement sensitive document" was any government document, any government document that played any role in the operations of ICE here.  And that's not right.  I reject that.  That's simply wrong.  I'm not staying as to that.

Now as to the deliberative process privilege, I'm not inclined to stay anything.  So have that in mind. My intention is to make all the documents that were available to me of record.

I mean it's possible that when you look at these documents, when the public looks at these documents, they will think that the government has the better of it and that I didn't evaluate them correctly.  Or contrary-wise, they may think or be reinforced that in fact, if anything, I was too tender.  But that's my responsibility as the judicial officer.

All right, you're now aware of what I intend to do and let me talk to the intervenors' counsel now.

MS. MURPHY:  Your Honor, if I may make one additional point?

THE COURT:  Please.

MS. MURPHY:  There's a number of documents here that relate to individuals who are not parties to this litigation.  A number of the documents include personal identifiable information that may not have been redacted in the versions provided to the Court.

THE COURT:  Well that may be done.  You're absolutely right.  You can redact -- names will remain, but any other identifying information, they will be redacted by Thursday, at noon, the 22nd.

All right.  Now let me, um -- and now, um --

Ma'am, did I ask you to state your name?

MS. MURPHY:  Oh, I'm sorry, I'm Lindsay Murphy for the government.

THE COURT:  And you were introduced by your colleague and I got ahead of myself.

Now if any of the intervenors want to speak -- but before you do, yes, just come right up.  But here's what I want to do, and you then tell me why this won't work.

I don't think any of this stuff is privileged beyond what I've already ruled on, and as to that I'll

hear you.  And likewise it is my practice, in any case, and I propose to follow it here, to let them redact what I said they could redact, but at the moment the judgment enters, Ms. Belmont will be instructed that the record in this case is public.  And what I hope is, um, I can talk you out of intervening, having made this representation, which I will carry out.  It's only a few days and I would like to have my order, which is properly subject to appeal, accompany the full record.

So rather than act on your motion to intervene today, by the time that -- well my understanding of the law is largely as the intervenors have described it.  I understand that.  But in all my practice, I've always had the power to -- for instance, with respect to juror names, you're entitled to get juror names after a case, but there is an appropriate cooling-off period, and that's how it works.  I will give the juror names after a big controversial case, but only a week after the new cycle has passed, everyone's gotten home, they can calm down, and then you can go and try and get your interviews for jurors.  That's been upheld.

I have much the same, um -- well again trying to be transparent, I don't want a side show about the documents when the issue is the remedy.  We'll put the remedy out there and anyone can say what they want about

that and the documents would be right there with it. It's really the opinion is the most significant. So that's what I would like. But you don't have to do what I would like, I'm just telling you what I'd like.

Counsel? And who wants to speak?

MR. THOMAS: Thank you, your Honor, Sam Thomas for the Boston Globe and New York Times.

THE COURT: Yes.

MR. THOMAS: Yeah, I have a question. Because if all of the exhibits will be -- essentially the release of them will be held in abeyance until -- unless and until it's appealed --

THE COURT: I didn't say that.

MR. THOMAS: Okay.

THE COURT: What I said was whenever -- I'm not holding myself till noon, once I enter the -- in essence, though she's asking for a stay -- and she may formally ask for a stay, and if she wants to write it up, that's fine. But I've indicated today that I'm not persuaded, I'm certainly not persuaded by any "law-enforcement-sensitive document" that we dealt with at the trial. And so when that judgment enters, Ms. Belmont will simply say nothing's sealed.

MR. THOMAS: Respectfully, on behalf of the Globe and the Times, and I won't speak for my colleague on

behalf of the Intercept, um, I think it affects our appellate rights, because today, as of today, a compelling interest has not been demonstrated such that the exhibits should remain sealed.  And I understand your Honor is inclined to release them with the judgment.

THE COURT:  Well I can do it another way, Mr. Thomas, I can allow your motion to intervene.  But I'm not going to give out any documents until that, um, judgment enters, now scheduled to enter on Thursday the 22nd of January.

MR. THOMAS:  With respect, your Honor, that's the course that would -- we would still like to intervene and would not like to withdraw.

THE COURT:  And you join in that?

MS. GRIFFIN:  Yes, your Honor.

THE COURT:  The motion to intervene is allowed.

(Interruption by Court Reporter.)

THE COURT:  Please introduce yourself.

MS. GRIFFIN:  Thank you, your Honor, Rene Griffin on behalf of the proposed intervenor, Intercept, and The Center for Investigative Reporting.

THE COURT:  The motion to intervene is allowed. The Court's order is that the present sealings will remain in effect for the good and sufficient reasons,

one, there are added redactions which the government properly has raised about personal identifiers which properly may take place, as well as the matter raised at the sidebar, which an orderly, um, approach would allow the government -- and I do allow it, and it is the Court's continued intention to overrule other objections made by the government, and at the time the judgment enters, to, um, release all -- the entire record with those redactions.  All right, that's the order.

Mr. Thomas?

MR. THOMAS:  I have one question, your Honor.

The administrative record was cited.  I'm not familiar with the exhibit cite for what the administrative record would have been, recited within the opinion in a footnote around Page 140.  That's another record that, um, subject to the Globe and Times motion, we sought other provisionally-sealed documents that were sealed at 106.  And to the extent that that also will be released, then obviously there's nothing to do.

THE COURT:  I stated "All the documents."

MR. THOMAS:  Thank you, Judge.

THE COURT:  I'll go and reflect on it, but all the documents is what we're saying.

All right.

MS. MURPHY:  Your Honor, excuse me, one request for clarification?

You mentioned at the outset that there were certain documents, um, that had handwritten notations.

THE COURT:  I didn't say "handwritten."

MS. MURPHY:  Oh, I'm sorry, I must have misunderstood.  That maybe had notations on them that the government was permitted to redact.

THE COURT:  Right.

MS. MURPHY:  Would it be possible, um, for the Court to direct the government to which documents those are so that we understand?

THE COURT:  I expect you know which they are.  You have, um, among the faces I recognize here is counsel who was here during the trial.

Am I not correct?

(Pause.)

THE COURT:  Yes, actually the two of you.  Please introduce yourself.

MS. SANTORA:  Victoria Santora and Ethan Kanter, your Honor.

THE COURT:  And good afternoon to both of you, and welcome back.

You know what I'm talking about, don't you?

MR. KANTER:  Yes.

THE COURT:  Fine.

Your own side knows.

MS. MURPHY:  Thank you, your Honor.

THE COURT:  All right.

Now if this works the way I propose it to work, this will be the last time that we meet here in open court, and it's appropriate for me to say a few words about this.

This has been a well-tried case.  I have done, as all judges do, my best, fairly and impartially, to adjudicate this case.  I think it is appropriate to commend the lawyers, all the lawyers, on their professionalism, their civility, their vigorous advocacy, and their respect -- not just the plaintiffs, but counsel for the government defendants and the United States Attorney General, their respect for the rule of law.

Mr. Kanter, you're here, but you have a motion to withdraw?  Is it you?

MR. KANTER:  No, that was William Kanellis.

THE COURT:  Oh, I'm sorry.  I'm sorry.  No one suggests that it's you.  But Mr. Kanellis's motion, it's time now to allow that motion.  That was one loose end here.  And so -- and I mean that most sincerely, it's been a privilege to adjudicate the case.

I would say, because people are saying that, um, certain government lawyers have been investigated for lack of candor with the Court, but not in this case, and that's why I speak.  The government has been forthright, candid, vigorous, its attorneys, and, um, as have plaintiffs' counsel.  No one has played games with this court.

And you will recall that early on I entered an order that no witnesses or participants in this case were to have retribution taken against them in any way on account of their participation in the case.  Now that applies to lawyers.  And while, as I've structured this, I think my involvement comes to an end, and it comes to an end because as I can conceive of the different things that may happen, and I really think I'm at an end.

So I'll enter judgment.  If I'm appealed, and I'm affirmed, I propose a system that does not necessarily have any further involvement of me, and if it does, it would be involvement as to a specific individual making a -- or individuals making a very specific complaint.

Contrary-wise, if, um, either side takes an appeal and that appeal is successful, in whole or in part, under our rules of court -- and this is not a preliminary injunction -- maybe it was starting out, but this was a trial, and under our rules of court, if the

trial findings or legal conclusions are vacated, having tried the case, it will be retried before another judge. And that's fully appropriate.  I join in that rule. Either way I'm done.

(Laughter.)

THE COURT:  So, um, it's important to me to commend the lawyers, but I have some other things to say here, and I can say them briefly.

The opinion says that I consider this one of the most important cases ever to come before the jurisdiction of this Court, and I continue to think that.

I find it breathtaking that I have been compelled, on the evidence, to find the conduct of such high-level officers of our government, cabinet secretaries, conspiring to infringe the First Amendment rights of people with such rights here in the United States.  I have never had a case that approached that level of consequence before this case.  And I've made the findings that the evidence requires.  And the case will come to an end largely, if not entirely, on the remedy that I have explained here.  And either side may appeal if it doesn't go far enough or if it goes too far.

But I've asked myself why?  How did this happen? How could our own government, the highest officials in

our government seek to, um, so infringe the rights of people lawfully here in the United States? And I -- I've come to believe that -- well there's a concept of freedom here that I don't understand.

I do not in any way -- and I'm speaking just on the record in this case, I'm not speaking about newspaper articles or other media reports, but the record in this case convinces me that these high officials -- and I assume the President of the United States, have a fearful view of freedom, a view that defines the freedom here in the United States by who's excluded. And, um, it seems obvious from this record that these high officials, for one thing, are seeking to exclude everyone from those, they say, and it's erroneous, and I've so held, and it's clear on this record, that noncitizens -- that the First Amendment protects noncitizens equal to citizens. But that's not the view of these officials. Noncitizens, in their view, have less freedom, less freedom to speak. Well that's wrong. But that's their view. As though they feared the First Amendment expression.

The argument that Professor Ellis so eloquently describes, at the very heart of how our government works, is to argue. And so it's a fearful approach, it's like they would exclude from full participation

everyone who doesn't agree with them.  That's a lot of people.  (Laughter.)  And one can understand perhaps that fearful approach.

And I don't say -- and I'm not going to argue that that's wrong, but I've learned a different approach.  And, you know, you can talk rhetorically, but if I'm right, that this is a fearful approach to freedom, then the contrary is a fearless approach to freedom.

I've been privileged to serve as a judicial officer now for 47 years, and I've always been a trial judge, a trial judge in courts that try cases before American juries, and I've learned an extraordinary amount from those jurors, from the Americans who have served, of all walks of life, all backgrounds, all views.  And based upon that, I believe that the conception that most Americans hold -- well certainly the conception that jurors hold when they come into court, is not a fearless view of freedom, but rather a hopeful view of freedom.  And it's hopeful because they bring to the court common sense.

They uniformly, over all these years, bring to the court a quiet dignity.  And they bring to the court a true, what I think is a true understanding of freedom.  It's not so much the technicalities of the law, whether it's tort law, contract law, constitutional law, but

jurors get it, and what they get are the fundamentals. And I can say that, because I've been privileged -- because it's appropriate in some cases to remind jurors and then turn it over to them to reach out for justice.

I'm not going to play-act here, but when I talk to jurors, I was taught to always stand up -- now I'm a short person and so that's helpful, and you look at them, and I will say this, that all wisdom is not in the judiciary, that I always impanel 12 jurors. The rules in a civil case -- and this case doesn't allow for a jury, but in a civil case, you could have now only 6 jurors, so says the judicial conference. That's a big mistake. I impanel 12. And I'll tell you why, for diversity, more different ideas, more different backgrounds. And every sociologist who speaks to this issue, every one, bar none, says that the best small-group decision-making is the larger group, 10 to 14. The traditional 12 is in fact a magnificent way to reach out for justice.

And when I stand up, in an appropriate case, because the case raises the issue, I've used three things from our history and the jurors get it. They truly get it. And it will take only a minute.

"We hold these truths to be self-evident that all persons are created equal. They are endowed by their

creator with certain inalienable rights.  That among these rights are life, liberty, and the pursuit of happiness.  That to secure these rights, governments are instituted among us deriving their just powers from the consent of the government.  For this, in a constitutional case, we, the People of the United States, in order to form a more perfect union, provide for the common defense, promote the general welfare, and secure the blessings of liberty to ourselves and our posterity, do ordain and establish this Constitution" -- and then you go to the portion of the Constitution which was invoked in a particular case.

Or this, from Lincoln at Gettysburg, "Let us here highly resolve that this honored dead shall not have died in vain, but that this nation shall have a new birth of freedom, and that government of the people, by the people, for the people, shall not perish from the earth."

If you do -- I haven't done all three, no cases require that, but I've done each of those three, and when you do that, every single person in the courtroom knows that something majestic is going on.  Americans get that.  It's a hopeful view of freedom.

Now look at that flag here, that's the flag of the United States of America.  That flag has flown here for

28 years, this particular flag, as long as this courthouse has been open.  It will fly there long after I'm gone and this case is all forgotten, important though it may be.  What concept of freedom does that flag stand for?  You all, each one of you, knows the answer.

Thank you for your participation in this case. We'll stand in recess.

(Ends, 4:00 p.m.)

54

C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Thursday, January 15, 2026, to the best of my skill and ability.

/s/ Richard H. Romanow 01-21-26
_____
RICHARD H. ROMANOW   Date