UNCLASSIFIED

Confidential - Subject to Protective Order



EXHIBIT

**53**

UNCLASSIFIED
SBU



| | |
|---|---|
| **MRN:** | 25 STATE 50220 |
| **Date/DTG:** | May 27, 2025 / 271422Z MAY 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| **E.O:** | 13526 |
| **TAGS:** | CVIS, CMGT, PTER, KFRD |
| **Captions:** | SENSITIVE |
| **Reference:** | A) 25 STATE 5914 |
| | B) 25 STATE 26168 |
| **Subject:** | (U) Action Request:  Expanding Screening and Social Media Vetting for Visa Applicants - Part 1 |

1. (U) This is an action request.  **See paragraph 3.**

2. (SBU) In Ref A, the Department directed consular officers to maintain extra vigilance and to comprehensively review and screen every visa applicant for potential security and non-security related ineligibilities including to assess whether the applicant poses a threat to U.S. national security.  In Ref B, consular officers were instructed to refer certain student and exchange visitor (F, M, and J) visa applicants to ▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ for a mandatory social media check, pursuant to the implementation of Executive Order (E.O.) 14161 and E.O. 14188, known respectively as *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats* and *Additional Measures to Combat Anti-Semitism*.  The next step is for posts to evaluate operations and processes in preparation for this expanded social media vetting of all student and exchange visitor (F, M, J) visa applicants.

3. (SBU) **ACTION REQUEST:** Effective immediately, in preparation for an expansion of required social media screening and vetting, consular sections should <u>**not add any additional student or exchange visitor (F, M, and J) visa appointment capacity until further guidance is issued septel, which we**</u>

UNCLASSIFIED

UNCLASSIFIED

Confidential - Subject to Protective Order

**anticipate in the coming days**.  Appointments already scheduled can proceed under current guidelines.  However, appointments that are available, but not taken as of the release of this cable, should be immediately removed from availability.  Consular sections must consult with VO if they seek to schedule any new student or exchange visitor (F, M, or J) visa appointments in light of this guidance.

4. (SBU) The Department is conducting a review of existing operations and processes for screening and vetting of student and exchange visitor (F, M, J) visa applicants, and based on that review, plans to issue guidance on expanded social media vetting for all such applicants.  Expanded social media screening and vetting of all F, M, and J visa applicants will require consular sections to modify current operations, processes, and allocation of resources.  In light of the potentially significant implications for consular section operations, processes, and resource allocations, consular sections will need to take into consideration the workload and resource requirements of each case prior to scheduling them going forward.  This immediate action ensures that consular sections can make fully informed calibrations of capacity and appointment scheduling going forward.  Consular sections should remain focused on consular priorities including services for U.S. citizens, immigrant visas, and fraud prevention.

5. (SBU) Consular sections will be given guidance on expanded social media screening and vetting requirements septel.

| | |
|---|---|
| **Signature:** | RUBIO |
| **XMT:** | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL |

UNCLASSIFIED
SBU

DEF-100

UNCLASSIFIED

Confidential - Subject to Protective Order



EXHIBIT
**54**

UNCLASSIFIED
SBU



| | |
|---|---|
| **MRN:** | 25 STATE 52014 |
| **Date/DTG:** | May 30, 2025 / 300208Z MAY 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| **E.O:** | 13526 |
| **TAGS:** | CMGT, CVIS, KFRD, KPAO |
| **Captions:** | SENSITIVE |
| **Reference:** | A) 25 STATE 5914 |
| | B) 25 STATE 50220 |
| | C) 25 STATE 49972 |
| | D) 25 STATE 48928 |
| | E) 25 STATE 26168 |
| **Subject:** | ACTION REQUEST - Enhanced vetting for All Nonimmigrant Visa Applicants Traveling to Harvard University |

1. (U) This is an action request. **See paragraph 3.**

2. (SBU) **SUMMARY:** In Ref A, the Department directed consular officers to maintain extra vigilance and to comprehensively review and screen every visa applicant for potential security and non-security related ineligibilities including to assess whether the applicant poses a threat to U.S. national security. In Ref B, consular officers were instructed to prepare for expanded social media screening and vetting, pursuant to the implementation of Executive Orders (E.O.) 14161 and E.O. 14188, known respectively as *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats* and *Additional Measures to Combat Anti-Semitism*. To address acute concerns of violence and anti-Semitism at Harvard University, this cable instructs posts to immediately begin additional vetting of **any** nonimmigrant visa applicant seeking to travel to Harvard University for **any** purpose. Such applicants include, but are not limited to prospective students, students, faculty, employees, contractors, guest speakersk, and tourists. Implementation of this ALDAC will also serve

UNCLASSIFIED

Confidential - Subject to Protective Order

as a pilot for expanded screening and vetting of visa applicants. This pilot will be expanded over time. **END SUMMARY.**

3. (SBU) **ACTION REQUEST:** Effective immediately, consular sections must conduct a complete screening of the online presence of **any** nonimmigrant visa applicant seeking to travel to Harvard University for **any** purpose. Such applicants include, but are not limited to prospective students, students, faculty, employees, contractors, guest speakers, and other visitors. To determine whether an applicant seeks to travel to Harvard University, consular sections should use information provided by applicants in the DS-160 application, during pre-screening, or during the interview.



4. (SBU)

Consistent with 9 FAM 302.1-2(B)(6), if you are not satisfied that the applicant credibly, and to your personal satisfaction, meets the standards required by the visa classification for which he is applying, refuse the applicant under INA 214(b). This is true even in cases where the applicant has convinced you that he is not an intending immigrant, and even in cases where the applicant is also ineligible under another section of the law.

5. (SBU) Once a consular officer has determined the applicant is otherwise eligible for the requested nonimmigrant status, the consular officer must refuse the case under INA 221(g), inform the applicant that his case is subject to review of his online presence, request that the applicant set all of his social media accounts to "public," and remind him that limited access to or visibility of social media activity could be construed as an effort to evade or hide certain activity.

UNCLASSIFIED

Confidential - Subject to Protective Order

LE

All visa cases referred for online presence review **must** be referred LE

6. (SBU) LE

must not limit their review of these cases to the applicant's social media activity alone. Rather, LE conduct a comprehensive and thorough vetting of each such applicant, including social media activity based on identifiers provided in the DS-160, and more generally any online presence, to identify possible inadmissibilities, information suggesting the applicant intends to engage in activities inconsistent with the visa classification sought, or other information that might call into question the applicant's credibility.

7. (SBU) LE

INA 214(b) requires the applicant to show credibly that all activities in which he is expected to engage in while in the United States are consistent with the specific requirements of his visa classification. LE

8. (SBU) Per Ref E, when an online presence review uncovers potentially derogatory information that might lead to an INA 212(a)(3) ineligibility, the consular officer should follow the instructions in 9 FAM 304.2 LE . Consular officers are reminded to apply inadmissibility grounds under INA 212(a) only in accordance with applicable procedures, LE

Consular officers are also reminded of guidance in 9 FAM 302.5-4 regarding the applicability of INA 212(a)(3)(A)(ii) under which a visa

UNCLASSIFIED

Confidential - Subject to Protective Order

applicant is ineligible if the consular officer knows or has reason to believe that the applicant is traveling to the United States solely, principally, or incidentally to engage in any other unlawful activity. LE

9. (SBU) LE

arvard University failed to maintain a campus environment free from violence and anti-Semitism, the enhanced vetting measures described in this guidance aim at ensuring that consular officers can appropriately identify such visa applicants with histories of anti-Semitic harassment and violence, and to duly consider their visa eligibility under U.S. immigration law. This guidance is consistent with E.O. 14188, Additional Measures to Combat Anti-Semitism, which states that it is the "policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools...or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." Implementation of this vetting measure for applicants traveling to Harvard will also serve as a pilot for expanded screening and vetting of visa applicants, and as the Department continues to develop and expand any enhanced vetting requirements for student visas generally, it may announce similar measures for other groups of visa applicants as appropriate, and in accordance with U.S. law.

| Signature: | RUBIO |
|---|---|
| XMT: | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL |

UNCLASSIFIED
SBU

UNCLASSIFIED

Confidential - Subject to Protective Order
**SENSITIVE BUT UNCLASSIFIED (SBU)**
U.S. Department of State Foreign Affairs Manual Volume 9
Visas



EXHIBIT

**55**



## 9 FAM 402.5-5(C)(1)  (U) Intent to Solely Pursue a Full Course of Study

(CT:VISA-2150;   04-29-2025)

a. **(SBU)** Evidence suggesting students intend to travel, or have traveled, to the United States to engage in unlawful activities or to pursue activities that are not consistent with a full course of study calls into question whether they possess intent to solely pursue a full course of study.  Evidence suggesting that an

**SENSITIVE BUT UNCLASSIFIED (SBU)**

DEF-105

Confidential - Subject to Protective Order

**SENSITIVE BUT UNCLASSIFIED (SBU)**
U.S. Department of State Foreign Affairs Manual Volume 9
Visas

*applicant has endorsed or espoused terrorist activity, or persuaded others to support a terrorist organization should be submitted* ▮LE▮▮▮▮▮▮▮ *(See 9 FAM 304.2).  In addition, you should consider whether there is reason to believe that the applicant intends to engage in any form of unlawful activity or any activity that poses a threat to U.S. national security, as part of the totality of the applicant's circumstances in applying 214(b) and other applicable grounds of inadmissibility.  See 9 FAM 302.1-2(B)(6).*

b. **(SBU) Mandatory social media reviews:**  *You must refer all new F-1 or M-1 visa applicant cases as well as returning F-1 or M-1 visa applicant cases meeting one or more of the criteria below, and are otherwise eligible,* ▮LE▮▮▮▮▮▮ *for a social media review as described in 7 FAH-1 H-945.4:*

(1) ▮LE▮

(2) ▮LE▮ *; or*

(3) ▮LE▮

c. **(SBU) Documenting the results of the social media review:**

(1) ▮LE▮

(2) ▮LE▮

**SENSITIVE BUT UNCLASSIFIED (SBU)**

DEF-106

Confidential - Subject to Protective Order
## SENSITIVE BUT UNCLASSIFIED (SBU)
U.S. Department of State Foreign Affairs Manual Volume 9
Visas



(3)  *(SBU) When to submit* LE

## SENSITIVE BUT UNCLASSIFIED (SBU)

DEF-107

Confidential - Subject to Protective Order

EXHIBIT
**56**



# 7 FAH-1 H-945.4  (U) Social Media Rules of Conduct in Fraud Assessments

*(CT:CMH-139;   05-15-2024)*

a. (SBU) The following guidance on social media use only applies to consular staff engaging in fraud assessments on pending consular casework. **LE** **LE** **LE** (for guidance on other social media use by Department personnel, please see 5 FAM 790, Using Social Media):

   (1) (SBU) Setting Up Social Media Accounts for Fraud Assessments: Consular personnel engaging in fraud prevention activities at posts abroad should be aware of the following when creating accounts for fraud prevention purposes:

Confidential - Subject to Protective Order

(a) 

(b) (U) Employees who use social media accounts for the purpose of fraud assessments are responsible for maintaining appropriate passwords and should set all available privacy settings at the highest level possible; and

(c) (U) As noted in 5 FAM 790, employees who set up an account on a social media website for the purpose of fraud assessments must abide by the contractual rules of that service or platform provider;

(2) (SBU) Conduct While Reviewing Social Media in Fraud Assessments: Employees reviewing social media for fraud assessments must also adhere to the following guidelines:

(a) 

(b) (SBU) Adjudicators should not apply a 212(a) visa ineligibility or make a non-citizenship determination based solely on information from a social media site without consulting with L/CA;

(c) 

(d)

(3) (SBU) Creating and Keeping Social Media Records:  Because social media accounts can be disabled or deleted, it is important that fraud prevention

Confidential - Subject to Protective Order

staff clearly document relevant findings ▮



Secretary Rubio: 100 Days of an America First State Department    about:reader?url=https%3A%2F%2Fstatedept.substack.com%2Fp%2F...



statedept.substack.com

# Secretary Rubio: 100 Days of an America First State Department

*StateDept*

8–10 minutes

---

Author: **U.S. Secretary of State Marco Rubio**

One hundred days ago, America's borders were open, while China could close the Panama Canal at a time of Xi Jinping's choosing. Our leaders seemed content to allow violence to become the permanent norm, from Ukraine to Gaza, to our own college campuses and southern border. From every post abroad, and office in Washington, memos poured in describing what we must do, what we couldn't do, but not what it was possible to do.

Only one hundred days later, change has come. From reorganizing the Department to meet the challenges of the 21st Century, to bringing transparency to foreign assistance, to ensuring Panama's exit from the Belt and Road Initiative, and working hand in hand with regional partners to deport illegal immigrants and designate vicious cartels as Foreign Terrorist Organizations, our team has proven it is possible not merely to admire problems, but to solve them.



AAUP-01534

Secretary Rubio: 100 Days of an America First State Department    about:reader?url=https%3A%2F%2Fstatedept.substack.com%2Fp%2F...



Secretary Rubio (second from left) at President Trump's February 26 Cabinet meeting (White House/Molly Riley)

In the process, the State Department is becoming a leaner machine, eager to deliver for the taxpayers. Gone are offices like the former Global Engagement Center, which sought to censor the American people. Gone are tens of billions of dollars in contracts to NGOs at home and abroad that often undermined the interests and foreign policy of the United States. And gone are the days when merit took a back seat to radical, anti-American ideologies. By consolidating offices, eliminating bureaucracy, and ensuring a culture where the State Department's many talented voices can be heard, our impending reorganization will leave the United States with a foreign policy that is less expensive and more effective.

The State Department has begun, once more, to speak for our citizens' interests abroad. Our hemisphere is our neighborhood, and we cannot allow it to be conquered by an adversary. In my first hundred days, I undertook three trips to our hemisphere, including central America and the Caribbean where I stressed that Chinese efforts to gain control of critical infrastructure threaten the United States, and secured an agreement to terminate Beijing's management of the Panama Canal.

AAUP-01535

I brought a similar message to our friends in Europe, making clear that our extensive shared interests, especially in resisting Chinese aggression and Islamic extremism, are precisely why the United States cannot afford to shoulder the burden of every conflict imaginable in Europe. At the recent NATO summit I attended, our allies recognized the need to increase defense spending not to 2 percent as requested in 2017, but to 5 percent, following the lead of nations like Poland. There was a shared understanding that ending the war in Ukraine is in the interests of both the combatants, and the entire Transatlantic alliance.

While in Europe, I also made clear that while we are bound by a common history, faith, culture, and economic interests, friendship is not a one-way street. It requires honesty when reciprocity is lacking, and not just in the realm of defense spending. Efforts to regulate, exclude or censor US companies directly concern the United States, and raise questions about just how common our values may be. Europe's energy policies also directly affect the United States as they left the continent dependent on Russian gas, and exposed "green" supply chains to Communist China control.

In Africa, America needs a policy of trade, not aid, and over the past hundred days the State Department has replaced handouts with firm diplomatic engagement aimed at ending conflicts and expanding opportunities for American companies. Last week, the Foreign Ministers of Rwanda and the Democratic Republic of Congo joined me here at the State Department to sign a Declaration of Principles to end a war that has dragged on in one form or another for over twenty-five years. In Africa, and around the world, our message is that while USAID may be closed, America is open for business.

There is no more immediate American interest than the protection of our nation's borders. Both during my trips to the region, and across dozens

AAUP-03536

of bilateral engagements, I have made clear that the arrival of millions of foreign nationals at our border is unacceptable. Foreign nations have a responsibility to prevent their citizens from illegally entering the United States and possess a duty to assist us in removing those already here. We are working with regional allies in Latin America to secure agreements to take back both their own illegal aliens, but also those from third nations. And we have made it clear to less friendly nations such as Venezuela that a refusal to take back their nationals constitutes a hostile act. Partnership is valued, but hostility will be punished.

Critically, the State Department has now made clear that a visa is a privilege, not a right. Under the Biden Administration's "Catch and Release" policy, illegal aliens were often provided with a get-out-of-jail-free card after arrests for criminal activity including domestic violence, and assault. There is now a one-strike policy: Catch-And-Revoke. Whenever the government catches non-U.S. citizens breaking our laws, we will take action to revoke their status. The time of contemptuously taking advantage of our nation's generosity ends.

This extends to the thousands of foreign students studying in the United States who abuse our hospitality. When Hamas, one of the world's most notorious terrorist organizations, launched its barbaric October 7, 2023, attack on Israel, brutally murdering more than 1,200 innocents, and parading the dead bodies of murdered babies through the streets of Gaza, the Biden Administration did very little to protect our Jewish citizens and the American people at large from foreign terrorist sympathizers in their midst. They allowed campus buildings to be overrun by violent thugs, and Jewish students to be excluded from classrooms.

No more. Under the Immigration and Nationality Act, any alien who "endorses or espouses terrorist activity or persuades others to endorse

AAUP-01537

or espouse terrorist activity or support a terrorist organization" is inadmissible to the United States, and henceforth that law will be enforced to the letter. The State Department now reviews law-enforcement information about student visa holders and when we find those who have supported terrorists or otherwise abused our hospitality, their visas are instantly revoked.

Terrorists are on the run not just in America but around the world. With the unyielding support of the United States Department of State, Israel has crippled Hezbollah in Lebanon, and shattered Hamas in Gaza, leaving the terrorist group facing destruction if they do not release their hostages and lay down their arms. We have re-designated the Houthis as what they are – a foreign terrorist organization and made clear that those who disrupt the freedom of navigation and trade in the Red Sea will meet the fate of pirates throughout history. Iran, having seen the consequences its proxies have faced after challenging the new Administration, is now pursuing an agreement that will allow them to save face while surrendering their nuclear capabilities.

I am honored by the trust President Trump placed in me and I am proud of the work the Department of State has done over the past hundred days to implement his agenda and put the American people first. With an impending reorganization that will unleash the Department's talent from the ground-up, the State Department is set to continue to play a pivotal role in ensuring the safety, security and prosperity of the American people over the next four years.

*Marco Rubio was sworn in as the 72nd secretary of state on January 21, 2025. The secretary is creating a Department of State that puts America First.*

AAUP-01538

**EXHIBIT**

**58**

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

)
AMERICAN ASSOCIATION OF )
UNIVERSITY PROFESSORS, ET AL., )        Civil Action No. 1:25-cv-10685-WGY
)
      Plaintiffs, )
)
      v. )        **CERTIFIED**
)        **ADMINISTRATIVE RECORD**
)
MARCO RUBIO, in his official capacity )
as Secretary of State, and the )
DEPARTMENT OF STATE, ET AL., )
)
)
      Defendants. )
)

## **INDEX**

Declaration of John Armstrong .......................................................................................................... 1

Declaration of Andre Watson .......................................................................................................... 7

Department of State Cable 26168 ................................................................................................. 12

Notification of Removability Determination under INA 237(a)(4)(C) ............................. 18

Notice to Appear ........................................................................................................................... 20

Form I-261 ...................................................................................................................................... 23

Warrant for Arrest of Alien .......................................................................................................... 25

Notification of Deportability Determination under INA 237(a)(4)(C) ......................... 26

Notice to Appear ........................................................................................................................... 28

Warrant for Arrest of Alien .......................................................................................................... 32

Notice of Custody Determination ............................................................................................. 33

Visa Revocation – Memo for ICE .............................................................................................. 34

Notice to Appear ........................................................................................................................... 36

Warrant for Arrest of Alien .......................................................................................................... 40

Notification of Removability Determination under INA 237(a)(4)(C) ............................. 41

Unserved Warrant for Arrest of Alien ...................................................................................... 43

Notification of Deportability Determination under INA 237(a)(4)(C) ................................ 44

Notice to Appear ........................................................................................................................... 46

**EXHIBIT**

**59**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, ET AL., | ) ) ) | Civil Action No. 1:25-cv-10685-WGY |
| Plaintiffs, | ) ) |  |
| v. | ) ) | **CERTIFICATION OF ADMINISTRATIVE RECORD** |
| MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, ET AL., | ) ) ) ) | |
| Defendants. | ) ) | |

I, Larry W. Talbott, hereby declare under penalty of perjury:

1.  I am employed by the United States Department of State, Bureau of Consular Affairs, Visa Office, Office of Information Management and Liaison. The facts attested to herein are based upon my personal knowledge and upon information provided to me in my official capacity.

2.  Noting that this is not a traditional Administrative Record, because it is addressing the *absence* of a policy alleged to exist in litigation, and is further compiled for purposes of non-traditional review in a Rule 65(a) expedited proceeding, I certify that the following documents annexed hereto constitute the Department of State's administrative record in this matter, which consists of the declaration of John Armstrong, dated April 11, 2025, previously submitted to this Court (Dkt.# 65-1), describing the Department of State's requirements and polies relating to visa revocation and affirming that it is not true that the

1

Department is approving visa revocations for "ideological deportation" reasons, a true

and correct version of the Department of State Cable 26168, redacted for Law

Enforcement Privilege, and the following documents related to five individuals, filed in

separate litigation:

a.  ███   Notification of Removability Determination under INA 237(a)(4)(C)

b.  ███   Notification of Removability Determination under INA 237(a)(4)(C)

c.  ███   Visa Revocation – Memo for ICE

d.  ███   Notification of Removability Determination under INA 237(a)(4)(C)

e.  ███ Notification of Removability Determination under INA 237(a)(4)(C)

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1476, that the foregoing is true and

correct to the best of my knowledge.

*Larry W. Talbott*

Larry W. Talbott
Deputy Director
Office of Information Management and Liaison
Visa Office, Bureau of Consular Affairs
U.S. Department of State

2



**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, ET AL., | ) ) ) | Civil Action No. 1:25-cv-10685-WGY |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | **CERTIFICATION OF ADMINISTRATIVE RECORD** |
| MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, ET AL., | ) ) ) ) | |
| Defendants. | ) ) ) | |

I, Akil Baldwin, hereby declare under penalty of perjury:

1.  I am the Deputy Assistant Director for the National Security Division of Homeland

    Security Investigations (HSI). Prior to becoming the Deputy Assistant Director, I served

    as the Division Chief for the HSI Office of International Operations. I have additionally

    served as the HSI Attache in Hong Kong; Assistant Special Agent in Charge in New

    York, N.Y., and Assistant Attache in Brussels, Belgium. The facts attested to herein are

    based upon my personal knowledge and upon information provided to me in my official

    capacity.

2.  Noting that this is not a traditional Administrative Record, because it is addressing the

    *absence* of a policy alleged to exist in litigation, and is further compiled for purposes of

    non-traditional review in a Rule 65(a) expedited proceeding, I certify that the declaration

    of HSI National Security Division Assistant Director Andre Watson, dated April 11,

2025, previously submitted to this Court (Dkt.# 65-2), describing the Department of

Homeland Security's processes for identifying, disrupting and dismantling transnational

criminal enterprises and terrorist organizations that threaten the security, and confirming

that the Department has no official or unofficial "ideological deportation policy," is part

of the U.S. Immigration and Customs Enforcement's administrative record in this matter.

3.  In good faith, I certify the document that was put before me.  There's a separate

certification pertaining to other U.S. Immigration and Customs Enforcement documents

and a separate certification pertaining to U.S. Department of State's documents reflected

in the index and record.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1476, that the foregoing is true and

correct to the best of my knowledge.

**AKIL R BALDWIN**
Digitally signed by AKIL R BALDWIN
Date: 2025.05.29 12:11:47 -04'00'

Akil Baldwin
Deputy Assistant Director
National Security Division
Homeland Security Investigations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

2

EXHIBIT

**61**

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

|                                              |     |                                    |
| -------------------------------------------- | --- | ---------------------------------- |
| AMERICAN ASSOCIATION OF                      | )   |                                    |
| UNIVERSITY PROFESSORS, ET AL.,               | )   | Civil Action No. 1:25-cv-10685-WGY |
|                                              | )   |                                    |
| Plaintiffs,                                  | )   |                                    |
|                                              | )   |                                    |
| v.                                           | )   | **CERTIFICATION OF**               |
|                                              | )   | **ADMINISTRATIVE RECORD**          |
|                                              | )   |                                    |
| MARCO RUBIO, in his official capacity        | )   |                                    |
| as Secretary of State, and the              | )   |                                    |
| DEPARTMENT OF STATE, ET AL.,                 | )   |                                    |
|                                              | )   |                                    |
|                                              | )   |                                    |
| Defendants.                                  | )   |                                    |
|                                              | )   |                                    |

I, William S. Walker, hereby declare under penalty of perjury:

1. I am the Acting Assistant Director for Domestic Operations at Homeland Security
   Investigations ("HSI") at U.S. Immigration and Customs Enforcement ("ICE") within the
   U.S. Department of Homeland Security ("DHS"). As the Acting Assistant Director, I am
   responsible for oversight of 30 HSI Special Agents in Charge, ensuring all field
   operations are working to efficiently execute the agency mission.

2. I began my career with the U.S. Government as an Inspector with the former U.S.
   Customs Service at the Port of Philadelphia. Over 26 years, I have served as Deputy
   Special Agent in Charge, Assistant Special Agent in Charge, and Supervisory Special
   Agent with HSI. Most recently, I served as the Special Agent in Charge of HSI's New
   York Field Office where I oversaw over 700 investigators whose mission was
   investigating, disrupting, and dismantling transnational criminal organizations and

terrorist networks. In my capacity as Acting Assistant Director, I now oversee 237

Domestic Field Offices and more than 7,100 Special Agents.

3.  In good faith, I certify the documents that were put before me. There's a separate

    certification pertaining to the U.S. Department of State's documents reflected in the index

    and record.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1476, that the foregoing is true and

correct to the best of my knowledge.   **WILLIAM S.** Digitally signed by
WILLIAM S WALKER
**WALKER** Date: 2025.05.29
12:24:12 -04'00'

William S. Walker
HSI Acting Assistant Director for Domestic Operations
U.S. Immigration and Customs Enforcement

**EXHIBIT**

**62**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

AMERICAN ASSOCIATION OF            )
UNIVERSITY PROFESSORS, ET AL.,     )      Civil Action No. 1:25-cv-10685-WGY
                                   )
　　　　Plaintiffs,                  )
                                   )
v.                                 )
                                   )
MARCO RUBIO, in his official capacity  )
as Secretary of State, and the     )
DEPARTMENT OF STATE, ET AL.,       )
                                   )
                                   )
　　　　Defendants.                  )
                                   )

## DECLARATION OF JOHN ARMSTRONG IN SUPPORT OF DEFENDANTS'
## OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

AAUP C.A.R.001

I, John Armstrong, hereby declare under penalty of perjury:

1.    I am the Senior Bureau Official within the U.S. Department of State's Bureau of Consular Affairs. I am a career member of the Senior Foreign Service with the rank of Counselor. Prior to becoming the Senior Bureau Official, I briefly served as the Deputy Assistant Secretary for Overseas Citizen Services. I served overseas as the Consul General in Lima, Peru, as Economic Counselor in Warsaw, Poland, as Consular Section Chief and Acting Deputy Chief of Mission in Nassau, Bahamas, Deputy Consul General in Kyiv, Ukraine, and Nonimmigrant Visa Chief in Bucharest, Romania. I have also previously served domestic assignments in Washington, D.C., as Director of the Office of Eastern European Affairs, Director of the Washington Passport Agency, Senior Political Officer on the Russia Desk, and Belarus Desk Officer.

2.    As the Senior Bureau Official, I oversee the functions and responsibilities of the Bureau of Consular Affairs, including the Office of Overseas Citizen Services, the Office of Passport Services, and the Office of Visa Services ("Visa Office"), which encompasses all aspects of visa policy, procedures, and information related to U.S. visa issuance to foreign citizens who apply at more than 230 visa-issuing U.S. embassies and consulates.

3.    I am familiar with the Department's requirements and policies relating to visa revocation. I base this declaration on my review of Department of State records and discussion with other Department of State employees.

4.    The Visa Office's functions and responsibilities encompass all aspects of visa policy, procedures and information related to U.S. visa issuance to foreign citizens, who are applying at U.S. Embassies and Consulates worldwide, seeking to come to the United States. The responsibilities of the Visa Office include coordinating with other agencies to perform national security screening of foreign travelers, and providing guidance and recommendations on visa policy related to national security exclusions. Among its many functions, the Visa Office also revokes thousands of visas annually and provides guidance to the field on visa issuance, revocation and denial.

1

5.     On January 20, 2025, President Trump issued Executive Order 14161, Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats ("E.O. 14161"). Consistent with E.O. 14161, the Visa Office has undertaken numerous efforts to "identify all resources that may be used to ensure that all aliens seeking admission to the United States, or who are already in the United States, are vetted and screened to the maximum degree possible."

6.     On January 29, 2025, President Trump issued Executive Order 14188, Additional Measures to Combat Anti-Semitism ("E.O. 14188"). Pursuant to E.O. 14188, the Visa Office and other relevant offices at State are working with the Department of Education and the Department of Homeland Security ("DHS") on appropriate ways to "familiariz[e] institutions of higher education with the grounds for inadmissibility under 8 U.S.C. 1182(a)(3) so that such institutions may monitor for and report activities by alien students and staff relevant to those grounds and for ensuring that such reports about aliens lead, as appropriate and consistent with applicable law, to investigations and, if warranted, actions to remove such aliens."

7.     One of the tools in place to ensure maximum vetting of visa applicants and visa-holders, including students, is the Department's long-standing continuous vetting program. All visa-holders are continuously vetted by law enforcement and intelligence agencies for information that surfaces after visa issuance. Processes for coordinated security-related continuous vetting have been used by the State Department and partner agencies for over 10 years.

8.     The Department of State has the authority to revoke visas under Section 221(i) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1201(i), which states, in pertinent part: "After the issuance of a visa or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa or other documentation." For example, the Department may revoke a visa if information arises that indicates an alien is potentially ineligible for that visa or that revocation is otherwise warranted, including, for example, if the alien poses a threat to U.S. public safety. The Visa

2

AAUP C.A.R.003

Office provides notice to DHS when a visa is revoked.

9.      A visa is revoked only after the Department of State reviews available information
to ascertain whether the visa revocation is supported by the facts and law.

10.     Given the Department's commitment to, and responsibility for, national security,
the Visa Office uses all available resources in its visa screening and vetting both when
making the initial visa adjudication and during recurrent vetting.

11.     Information on visa-holders can come directly from interagency partners, from
offices within the Department of State, or from public sources. The Visa Office has long-
standing relationships with U.S. law enforcement agencies who regularly send the Visa
Office information when they believe derogatory information merits a revocation. This
includes information from DHS and the Federal Bureau of Investigation.

12.     A visa can be revoked for any potential ineligibility under U.S. law, including but
not limited to potential ineligibility for a visa under one of the "Security and related grounds"
of inadmissibility at section 212(a)(3) of the INA. The "Security and related grounds"
include terrorism related inadmissibility grounds, such as endorsing or espousing terrorist
activity or persuading others to endorse or espouse terrorist activity or support a terrorist
organization, as well as engaging in terrorist activity by providing material support to a
designated or undesignated terrorist organization. That section also includes an
inadmissibility ground for foreign policy reasons, when the Secretary of State has reasonable
ground to believe an alien's entry or proposed activities in the United States would have
potentially serious adverse foreign policy consequences for the United States.

13.     The Bureau of Consular Affairs, including the Office of Visa Services, does not
carry out deportations. DHS's Immigration and Customs Enforcement ("ICE") is responsible
for immigration enforcement in the United States, including initiating proceedings against
aliens charged as removable.

14.     As deportations are carried out by DHS, deportation policy is outside the purview
of the Bureau of Consular Affairs. No ideological deportation policy has been developed or

3

implemented by the Bureau of Consular Affairs or the Visa Office.

15.    I am aware of Secretary Rubio's public remarks indicating the U.S. government will revoke visas of and deport Hamas supporters. These statements are consistent with the State Department's long-standing implementation of visa and immigration laws, across administrations. Hamas has been a designated foreign terrorist organization under section 219 of the INA since it was designated by former Secretary Madeleine Albright in 1997. Support for a designated terrorist organization by statute is a basis for visa refusal and other immigration consequences; the INA provides that an alien who persuades others to support a terrorist organization, or who has afforded material support to a designated terrorist organization, is inadmissible and deportable. INA §§ 212(a)(3)(B), 237(a)(4)(B).

16.    I am aware of plaintiffs' contention that the State Department and ICE have launched new social media surveillance programs aimed at identifying noncitizen students and faculty with alleged terrorist sympathies. It is true that the State Department has authored new guidance to consular officers on reviewing visa applicants' social media. However, it is misleading and false to refer to the Department's review of publicly available social media as a form of "surveillance" to root out "terrorist sympathies" among students and faculty. Rather, review of publicly available social media is a component of the extensive information-collection and vetting process foreign visitors undergo when they apply for and use U.S. visas.

17.    I am aware of plaintiffs' contentions regarding Secretary Rubio's March 16, 2025, interview on the television news show *Face the Nation*. I understand Secretary Rubio's comments to refer to the ongoing work of the Visa Office to revoke visas, revocations which occur for a wide variety of reasons. Secretary Rubio did not state, and it is not true, that the Visa Office is approving visa revocations every day for "ideological deportation" reasons. This assertion is simply false.

4

I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed on this 11th day of April, 2025.

John Armstrong
Senior Bureau Official
Bureau of Consular Affairs
U.S. Department of State

5

EXHIBIT

**63**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS., *et al.*,

Plaintiffs,

v.

MARCO RUBIO, *et al.*,

Defendants.

No. 1:25-CV-10685

### DECLARATION OF ANDRE WATSON

I, Andre Watson pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.    I am the Senior Official within the National Security Division (NSD) for Homeland Security Investigations (HSI). I am a career member of the Senior Executive Service with the rank of Assistant Director. Prior to becoming the Assistant Director of NSD, I served on a detail assignment to the U.S. Department of Homeland Security in the capacity of Principal Deputy Assistant Secretary for the Countering Weapons of Mass Destruction Office. I served as the HSI Special Agent in Charge in Baltimore, M.D., Deputy Special Agent in Charge in Washington, D.C., Assistant Special Agent in Charge in Houston, T.X., and Supervisory Special Agent in Blaine, W.A. I have also previously served in Headquarters assignments as Chief of Staff to the Deputy Director of U.S. Immigration and Customs Enforcement (ICE), Chief of Intelligence for the U.S. Department of Justice, International Organized Crime and Intelligence Operations Center, and various supervisory positions within NSD.

2.      As the Senior Official within NSD, I oversee the National Security as well as

Student and Exchange Visitor Programs functions in support of ICE efforts to identify, disrupt and

dismantle transnational criminal enterprises and terrorist organizations that threaten the security

of the United States. These efforts encompass all investigations and aspects of terrorism, special

interests involving state and non-state actors, human rights violators and war criminals as well as

compliance and oversight functions for over 6,900 academic institutions, 45,000 designated school

officials, and over 1.2 million foreign students studying in the United States.

3.      HSI is a component of ICE that conducts significant and complex criminal

investigations into individuals and international criminal networks that violate U.S. laws. HSI

focuses its efforts on combating the transnational criminal networks that pose the greatest threats

to the security of the United States. HSI has more than 10,000 employees stationed in more than

235 U.S. cities and more than 50 countries worldwide. The HSI workforce is made up of special

agents, criminal analysts, intelligence analysts, and support personnel who live and work in the

communities they are sworn to protect and serve.

4.      The Student and Exchange Visitor Program (SEVP), a component of HSI's

National Security Division, was created in the wake of 9/11 to provide integrity to the immigration

system by collecting, maintaining and analyzing information so only legitimate nonimmigrant

students or exchange visitors can gain entry in the U.S. Through a database housing information

pertaining to schools and students, the Student and Exchange Visitor Information System (SEVIS),

SEVP manages and tracks nonimmigrants in the F, M, and J categories. To eliminate vulnerabilities

related to the nonimmigrant visa program, Congress first introduced statutory language mandating

the development of a program to collect data and improve tracking of foreign students in the Illegal

Immigration Reform and Immigrant Responsibility Act of (IIRIRA) of 1996. In 2001, Congress

expanded the foreign student tracking system when it enacted PATRIOT ACT, and in 2002 Congress strengthened the tracking system yet again, through the Enhanced Border Security and Visa Entry Reform Act, noting concerns with national security and emphasizing the need to carefully track student status and information. Accordingly, these laws and regulations demonstrate a clear congressional directive that ICE closely monitor foreign students and the schools in which they enroll by vigorously enforcing statutory and regulatory requirements.

5.    I am aware of the above-captioned lawsuit. I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other Department of Homeland Security (DHS) employees, and information portals maintained and relied upon by DHS in the regular course of business.

6.    On January 29, 2025, President Trump issued Executive Order 14188, *Additional Measures to Combat Anti-Semitism* (E.O. 14188). ICE remains steadfast in its commitment to enforcing E.O. 14188 prohibiting anti-Semitism and safeguarding national security by applying existing authorities consistent with the priorities set forth in the E.O. 14188.

7.    In applying existing authorities,, HSI Office of Intelligence proactively reviews open-source information to identify individuals within the parameters of E.O. 14188. Open-source information is defined as unclassified information that has been published or broadcast in some manner to the general public, could be lawfully seen or observed by a casual observer, is made available at a meeting open to the public, or is obtained by visiting any place or attending any event that is open to the public.

8.    The U.S. Department of State (DOS) has broad discretion under 8 U.S.C. § 1201(i) to revoke visas and make determinations of whether an alien's present or activities in the United States would have potentially serious adverse foreign policy consequences. ICE does not make

those determinations. Upon notification of DOS determination, ICE may take subsequent enforcement actions such as placing the alien in removal proceedings under the Immigration and Nationality Act (INA). HSI's Counter Threat Lead Development Unit (CTLD) is specifically responsible for analyzing alien nonimmigrant status violators, lawfully admitted to the United States, who violate the terms of their admission and pose a threat to national security, public safety and/or are involved in criminal activity for field referral and further investigation. Since 2003, the National Security Division has overseen this mission. Currently, CTLD receives over one million alien violator records each year, primarily from U.S. Customs and Border Protection (CBP) Arrival and Departure Information System (ADIS); as well as from SEVIS. CTLD generates viable, investigative leads on nonimmigrant overstays with national security and public safety concerns and/or criminal activity to HSI field offices for further action. CTLD may also provide information to DOS for possible visa revocation if appropriate. .

9.      Procedurally, once DOS notifies ICE of its decisions concerning whether to revoke a visa or make certain determinations that would render a alien removable, the determination is then disseminated to the local field office for additional enforcement actions against the student (e.g., issuing a Notice to Appear in removal proceedings) if appropriate.

10.     Enforcement actions carried out against aliens within the purview of E.O.14188 occur pursuant to ICE's existing civil immigration authorities under the INA. There is no official or unofficial "ideological deportation policy." Aliens may be charged with any deportation ground under the INA supported by fact and law.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of April 2025.

**ANDRE R WATSON**
Digitally signed by
ANDRE R WATSON
Date: 2025.04.11
18:22:22 -04'00'

Andre Watson, Assistant Director
National Security Division
Homeland Security Investigations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

**EXHIBIT**

**64**

UNCLASSIFIED
SBU



| MRN: | 25 STATE 26168 |
|---|---|
| Date/DTG: | Mar 25, 2025 / 251914Z MAR 25 |
| From: | SECSTATE WASHDC |
| Action: | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| E.O: | 13526 |
| TAGS: | CVIS, CMGT, PTER, KFRD |
| Captions: | SENSITIVE |
| Reference: | 25 STATE 5914 |
| Subject: | (U) Action Request:  Enhanced Screening and Social Media Vetting for Visa Applicants |

1. (U) This is an action request.  **See paragraph 7**.

2. **(SBU) SUMMARY:**  The protection of our nation and its citizens is a consular officer's first consideration.  Pursuant to the implementation of Executive Order (E.O.) 14161 and E.O. 14188, known respectively as *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats* and *Additional Measures to Combat Anti-Semitism*, effective immediately, consular officers must refer certain student and exchange visitor (F, M, and J) visa applicants to the Fraud Prevention Unit (FPU) for a mandatory social media check as described below.  As the Secretary stated on March 16, "We don't want people in our country that are going to be committing crimes and undermining our national security or the public safety.  It's that simple.  Especially people that are here as guests.  That is what a visa is...It is a visitor into our country.  And if you violate the terms of your visitation, you are going to leave."  The Visa Office will host webinars for consular officers to discuss this guidance on April 3 and April 4, 2025.  **END SUMMARY.**

3. **(SBU) Consular Officers Play a Critical Role in Protecting National Security:**  As part of screening every case for potential ineligibilities, consular officers MUST ADDRESS any derogatory information indicating that a visa

applicant may be subject to the terrorism-related ineligibility grounds of the Immigration and Nationality Act (INA). This includes advocating for, sympathizing with, or persuading others to endorse or espouse terrorist activities or support a DESIGNATED FOREIGN TERRORIST ORGANIZATION (FTO).

4. **(SBU) Every Visa Decision is a National Security Decision:** In Ref A, the Visa Office directed consular officers to maintain extra vigilance and to comprehensively review and screen every visa applicant for potential security and non-security related ineligibilities including to assess whether the applicant poses a threat to U.S. national security. Any nonimmigrant visa applicant who has not established to a consular officer's satisfaction that the applicant meets all standards required in that visa classification should be refused under 214(b), as appropriate. This includes establishing that the applicant does not intend to engage in activities inconsistent with the requested visa status. If 214(b) does not apply to the visa classification, consular officers should refuse any nonimmigrant or immigrant visa case presenting such concerns under section 221(g) of the INA for further review of additional ineligibility grounds, **LE** as appropriate. **LE**

5. (U) This was reflected well by the Secretary's statement on March 16, that "when you apply to enter the United States and you get a visa, you are a guest...if you tell us when you apply for a visa, 'I'm coming to the U.S. to participate in pro-Hamas events,' that runs counter to the foreign policy interest of the United States...if you had told us you were going to do that, we never would have given you the visa."

6. **(SBU) Situations that Cast Doubt on Students' Intent or Credibility:** As described in 9 FAM 402.5-5(C), an applicant applying for an F-1 or M-1 student visa must demonstrate intent to enter the United States solely to pursue a full course of study at an approved institution. In addition, J-1 visa applicants who are college, university, and other post-secondary students are required to pursue a full course of study as described in 9 FAM 402.5-6(E)(11). Evidence suggesting a student visa applicant intends to travel to

the United States to engage in unlawful activities clearly calls into question whether the applicant possesses intent and/or the ability to solely pursue a full course of study. While many activities may not fall under the INA's definitions of "terrorist activity," you should otherwise consider that information in assessing the credibility of a visa applicant's claimed purpose of travel. INA section 214(b) requires the applicant to show credibly that all activities in which he or she is expected to engage in while in the United States are consistent with the specific requirements of their visa classification.

7. **(SBU) ACTION REQUEST: Mandatory Social Media Reviews for Students and Student Exchange Visitors.** Effective immediately, consular officers must refer all new or returning F-1, M-1, or student J-1 visa applications meeting one or more of the following criteria, that the consular officer has determined is otherwise eligible for the requested nonimmigrant status, to the FPU via ECAS as described in 7 FAH-1 H-945.4, using the SOCIAL MEDIA REVIEW category. **LE**

**LE**

**LE**

**LE**

8. **(SBU) Documenting the Results of the Social Media Review:** If the social media review uncovers potentially derogatory information indicating that the applicant may not be eligible for a visa, Fraud Prevention Units are required to take screenshots of social media findings to the extent it is relevant to a visa ineligibility, to preserve the record against the applicant's later alteration of the information. Limit screenshots to information relevant to connecting the applicant, the applicant's actions, and a visa ineligibility. **LE**

AAUP C.A.R.014

**LE**

9. **(SBU) Support for Terrorist Organizations - Grounds and Definitions for INA 212(a)(3)(B):**  All consular officers should carefully review 9 FAM 302.6 to understand the grounds under which an applicant may be ineligible under 3B, including that an applicant who "endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization" is ineligible.  Consular officers should consider these grounds and definitions when conducting interviews and pursuing lines of inquiry.  Because terms in INA 212(a)(3)(B) are broadly defined, consular officers should elicit as much pertinent information as possible from visa applicants with suspected ties to terrorist organizations or terrorist activity.  This includes the names of all relevant organizations potentially involved in terrorist activity and the applicant's relationship with them (for example, by current membership or past financial contributions or other support).  Evidence that an applicant advocates for terrorist activity, or otherwise demonstrates a degree of public approval or public advocacy for terrorist activity or a terrorist organization, may be indicative of ineligibility under INA 212(a)(3)(B).  This may be evident in conduct that bears a hostile attitude toward U.S. citizens or U.S. culture (including government, institutions, or founding principles).  Or it may be evident in advocacy or sympathy for foreign terrorist organizations.  All of these matters may open lines of inquiry regarding the applicant's credibility and purpose of travel.  Consular officers should inquire into the nature and activities of those organizations.                **LE**

AAUP C.A.R.015

# LE

10. **(SBU) Intention to Engage in Unlawful Activity:** Consular officers are also reminded of guidance in 9 FAM 302.5-4 regarding the applicability of INA 212(a)(3)(A)(ii) under which a visa applicant is ineligible if the consular officer knows or has reason to believe that the applicant is traveling to the United States solely, principally, or incidentally to engage in any other unlawful activity. Consular officers should take care to enter detailed case notes regarding the specific activities expected in the United States and request an advisory opinion per 9 FAM 302.5-4(C).

11. **(SBU) Revocations of Valid Visas:** If, subsequent to visa issuance, information becomes available to post that an individual may no longer be eligible for a visa due to particularized information indicating an ineligibility under specific INA provisions, including 214(b), post should follow the procedures to revoke or request prudential revocation as described in 9 FAM 403.11 for nonimmigrant visas or 9 FAM 504.12 for immigrant visas. The Visa Office reminds posts that consular officers do not have the authority to revoke a visa based on a suspected ineligibility or based on derogatory information that is insufficient to support an ineligibility finding - other than a revocation based on driving under the influence (DUI) - and that such cases should be referred **LE** in accordance with 9 FAM 403.11-5(B) for further review. A consular officer's revocation must be based on an actual finding that the individual is ineligible for the visa.

12. **(U) Additional Guidance:** The Visa Office will host webinars for consular officers to discuss this guidance on Thursday, April 3 and Friday, April 4, 2025. Invitations with links to these webinars will be sent separately. The FAM will be updated to reflect this guidance.

13. **(U) Inquiries:** Post must refer any U.S. media inquiries regarding E.O.s to CA-Press@state.gov and congressional inquiries regarding E.O.s to ConsularOnTheHill@state.gov. Posts may respond to requests from

international media regarding E.O.s using CA's <u>cleared press guidance</u> <u>located on CA Web</u>, **copying** <u>CA-PRESS@STATE.GOV</u>.

14. (U) Minimize considered.

**MINIMIZE CONSIDERED**
Signature:        RUBIO

| XMT: | BASRAH; AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL |
|------|------|

UNCLASSIFIED
SBU
