(A) For States with populations of less than 9,000,000, based upon the 1990 decennial census of population, 25 visas.

(B) For States with populations of 9,000,000 or more, based upon the 1990 decennial census of population, 50 visas.

(C) If the total number of visas available under this paragraph for a fiscal year quarter exceeds the number of qualified nonimmigrants who may be issued such visas during those quarters, the visas made available under this paragraph shall be issued without regard to the numerical limitation under subparagraph (A) or (B) of this paragraph during the last fiscal year quarter.

(5) A facility that has filed a petition under section 1101(a)(15)(H)(i)(c) of this title to employ a nonimmigrant to perform nursing services for the facility--

(A) shall provide the nonimmigrant a wage rate and working conditions commensurate with those of nurses similarly employed by the facility;

(B) shall require the nonimmigrant to work hours commensurate with those of nurses similarly employed by the facility; and

(C) shall not interfere with the right of the nonimmigrant to join or organize a union.

(6) For purposes of this subsection and section 1101(a)(15)(H)(i)(c) of this title, the term "facility" means a subsection (d) hospital (as defined in section 1886(d)(1)(B) of the Social Security Act (42 U.S.C. 1395ww(d)(1)(B))) that meets the following requirements:

(A) As of March 31, 1997, the hospital was located in a health professional shortage area (as defined in section 254e of Title 42).

(B) Based on its settled cost report filed under title XVIII of the Social Security Act for its cost reporting period beginning during fiscal year 1994--

(i) the hospital has not less than 190 licensed acute care beds;

(ii) the number of the hospital's inpatient days for such period which were made up of patients who (for such days) were entitled to benefits under part A of such title is not less than 35 percent of the total number of such hospital's acute care inpatient days for such period; and

(iii) the number of the hospital's inpatient days for such period which were made up of patients who (for such days) were eligible for medical assistance under a State plan approved under title XIX of the Social Security Act, is not less than 28 percent of the total number of such hospital's acute care inpatient days for such period.

(7) For purposes of paragraph (2)(A)(v), the term "lay off", with respect to a worker--

(A) means to cause the worker's loss of employment, other than through a discharge for inadequate performance, violation of workplace rules, cause, voluntary departure, voluntary retirement, or the expiration of a grant or contract; but

(B) does not include any situation in which the worker is offered, as an alternative to such loss of employment, a similar employment opportunity with the same employer at equivalent or higher compensation and benefits than the position from which the employee was discharged, regardless of whether or not the employee accepts the offer.

Nothing in this paragraph is intended to limit an employee's or an employer's rights under a collective bargaining agreement or other employment contract.

**(n) Labor condition application**

(1) No alien may be admitted or provided status as an H-1B nonimmigrant in an occupational classification unless the employer has filed with the Secretary of Labor an application stating the following:

(A) The employer--

(i) is offering and will offer during the period of authorized employment to aliens admitted or provided status as an H-1B nonimmigrant wages that are at least--

(I) the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question, or

(II) the prevailing wage level for the occupational classification in the area of employment,

whichever is greater, based on the best information available as of the time of filing the application, and

(ii) will provide working conditions for such a nonimmigrant that will not adversely affect the working conditions of workers similarly employed.

(B) There is not a strike or lockout in the course of a labor dispute in the occupational classification at the place of employment.

(C) The employer, at the time of filing the application--

(i) has provided notice of the filing under this paragraph to the bargaining representative (if any) of the employer's employees in the occupational classification and area for which aliens are sought, or

(ii) if there is no such bargaining representative, has provided notice of filing in the occupational classification through such methods as physical posting in conspicuous locations at the place of employment or electronic notification to employees in the occupational classification for which H-1B nonimmigrants are sought.

(D) The application shall contain a specification of the number of workers sought, the occupational classification in which the workers will be employed, and wage rate and conditions under which they will be employed.

(E)(i) In the case of an application described in clause (ii), the employer did not displace and will not displace a United States worker (as defined in paragraph (4)) employed by the employer within the period beginning 90 days before and ending 90 days after the date of filing of any visa petition supported by the application.

(ii) An application described in this clause is an application filed on or after the date final regulations are first promulgated to carry out this subparagraph, and before [7] by an H-1B-dependent employer (as defined in paragraph (3)) or by an employer that has been found, on or after October 21, 1998, under paragraph (2)(C) or (5) to have committed a willful failure or misrepresentation during the 5-year period preceding the filing of the application. An application is not described in this clause if the only H-1B nonimmigrants sought in the application are exempt H-1B nonimmigrants.

(F) In the case of an application described in subparagraph (E)(ii), the employer will not place the nonimmigrant with another employer (regardless of whether or not such other employer is an H-1B-dependent employer) where--

(i) the nonimmigrant performs duties in whole or in part at one or more worksites owned, operated, or controlled by such other employer; and

(ii) there are indicia of an employment relationship between the nonimmigrant and such other employer;

unless the employer has inquired of the other employer as to whether, and has no knowledge that, within the period beginning 90 days before and ending 90 days after the date of the placement of the nonimmigrant with the other employer, the other employer has displaced or intends to displace a United States worker employed by the other employer.

(G)(i) In the case of an application described in subparagraph (E)(ii), subject to clause (ii), the employer, prior to filing the application--

(I) has taken good faith steps to recruit, in the United States using procedures that meet industry-wide standards and offering compensation that is at least as great as that required to be offered to H-1B nonimmigrants under subparagraph (A), United States workers for the job for which the nonimmigrant or nonimmigrants is or are sought; and

(II) has offered the job to any United States worker who applies and is equally or better qualified for the job for which the nonimmigrant or nonimmigrants is or are sought.

(ii) The conditions described in clause (i) shall not apply to an application filed with respect to the employment of an H-1B nonimmigrant who is described in subparagraph (A), (B), or (C) of section 1153(b)(1) of this title.

The employer shall make available for public examination, within one working day after the date on which an application under this paragraph is filed, at the employer's principal place of business or worksite, a copy of each such application (and such accompanying documents as are necessary). The Secretary shall compile, on a current basis, a list (by employer and by occupational classification) of the applications filed under this subsection. Such list shall include the wage rate, number of aliens sought, period of intended employment, and date of need. The Secretary shall make such list available for public examination in Washington, D.C. The Secretary of Labor shall review such an application only for completeness and obvious inaccuracies. Unless the Secretary finds that the application is incomplete or obviously inaccurate, the Secretary shall provide the certification described in section 1101(a)(15)(H)(i)(b) of this title within 7 days of the date of the filing of the application. The application form shall include a clear statement explaining the liability under subparagraph (F) of a placing employer if the other employer described in such subparagraph displaces a United States worker as described in such subparagraph. Nothing in subparagraph (G) shall be construed to prohibit an employer from using legitimate selection criteria relevant to the job that are normal or customary to the type of job involved, so long as such criteria are not applied in a discriminatory manner.

(2)(A) Subject to paragraph (5)(A), the Secretary shall establish a process for the receipt, investigation, and disposition of complaints respecting a petitioner's failure to meet a condition specified in an application submitted under paragraph (1) or a petitioner's misrepresentation of material facts in such an application. Complaints may be filed by any aggrieved person or organization (including bargaining representatives). No investigation or hearing shall be conducted on a complaint concerning such a failure or misrepresentation unless the complaint was filed not later than 12 months after the date of the failure or misrepresentation, respectively. The Secretary shall conduct an investigation under this paragraph if there is reasonable cause to believe that such a failure or misrepresentation has occurred.

(B) Under such process, the Secretary shall provide, within 30 days after the date such a complaint is filed, for a determination as to whether or not a reasonable basis exists to make a finding described in subparagraph (C). If the Secretary determines that such a reasonable basis exists, the Secretary shall provide for notice of such determination to the interested parties and an opportunity for a hearing on the complaint, in accordance with section 556 of Title 5, within 60 days after the date of the determination. If such a hearing is requested, the Secretary shall make a finding concerning the matter by not later than 60 days after the date of the hearing. In the case of similar complaints respecting the same applicant, the Secretary may consolidate the hearings under this subparagraph on such complaints.

(C)(i) If the Secretary finds, after notice and opportunity for a hearing, a failure to meet a condition of paragraph (1)(B), (1)(E), or (1)(F), a substantial failure to meet a condition of paragraph (1)(C), (1)(D), or (1)(G)(i)(I), or a misrepresentation of material fact in an application--

(I) the Secretary shall notify the Attorney General of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $1,000 per violation) as the Secretary determines to be appropriate; and

(II) the Attorney General shall not approve petitions filed with respect to that employer under section 1154 or 1184(c) of this title during a period of at least 1 year for aliens to be employed by the employer.

(ii) If the Secretary finds, after notice and opportunity for a hearing, a willful failure to meet a condition of paragraph (1), a willful misrepresentation of material fact in an application, or a violation of clause (iv)--

**(I)** the Secretary shall notify the Attorney General of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $5,000 per violation) as the Secretary determines to be appropriate; and

**(II)** the Attorney General shall not approve petitions filed with respect to that employer under section 1154 or 1184(c) of this title during a period of at least 2 years for aliens to be employed by the employer.

**(iii)** If the Secretary finds, after notice and opportunity for a hearing, a willful failure to meet a condition of paragraph (1) or a willful misrepresentation of material fact in an application, in the course of which failure or misrepresentation the employer displaced a United States worker employed by the employer within the period beginning 90 days before and ending 90 days after the date of filing of any visa petition supported by the application--

**(I)** the Secretary shall notify the Attorney General of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $35,000 per violation) as the Secretary determines to be appropriate; and

**(II)** the Attorney General shall not approve petitions filed with respect to that employer under section 1154 or 1184(c) of this title during a period of at least 3 years for aliens to be employed by the employer.

**(iv)** It is a violation of this clause for an employer who has filed an application under this subsection to intimidate, threaten, restrain, coerce, blacklist, discharge, or in any other manner discriminate against an employee (which term, for purposes of this clause, includes a former employee and an applicant for employment) because the employee has disclosed information to the employer, or to any other person, that the employee reasonably believes evidences a violation of this subsection, or any rule or regulation pertaining to this subsection, or because the employee cooperates or seeks to cooperate in an investigation or other proceeding concerning the employer's compliance with the requirements of this subsection or any rule or regulation pertaining to this subsection.

**(v)** The Secretary of Labor and the Attorney General shall devise a process under which an H-1B nonimmigrant who files a complaint regarding a violation of clause (iv) and is otherwise eligible to remain and work in the United States may be allowed to seek other appropriate employment in the United States for a period not to exceed the maximum period of stay authorized for such nonimmigrant classification.

**(vi)(I)** It is a violation of this clause for an employer who has filed an application under this subsection to require an H-1B nonimmigrant to pay a penalty for ceasing employment with the employer prior to a date agreed to by the nonimmigrant and the employer. The Secretary shall determine whether a required payment is a penalty (and not liquidated damages) pursuant to relevant State law.

**(II)** It is a violation of this clause for an employer who has filed an application under this subsection to require an alien who is the subject of a petition filed under section 1184(c)(1) of this title, for which a fee is imposed under section 1184(c)(9) of this title, to reimburse, or otherwise compensate, the employer for part or all of the cost of such fee. It is a violation of this clause for such an employer otherwise to accept such reimbursement or compensation from such an alien.

**(III)** If the Secretary finds, after notice and opportunity for a hearing, that an employer has committed a violation of this clause, the Secretary may impose a civil monetary penalty of $1,000 for each such violation and issue an administrative order requiring the return to the nonimmigrant of any amount paid in violation of this clause, or, if the nonimmigrant cannot be located, requiring payment of any such amount to the general fund of the Treasury.

**(vii)(I)** It is a failure to meet a condition of paragraph (1)(A) for an employer, who has filed an application under this subsection and who places an H-1B nonimmigrant designated as a full-time employee on the petition filed under section 1184(c)(1) of this title by the employer with respect to the nonimmigrant, after the nonimmigrant has entered into employment with the employer, in nonproductive status due to a decision by the employer (based on factors such as lack of work), or due to the nonimmigrant's lack of a permit or license, to fail to pay the nonimmigrant full-time wages in accordance with paragraph (1)(A) for all such nonproductive time.

**(II)** It is a failure to meet a condition of paragraph (1)(A) for an employer, who has filed an application under this subsection and who places an H-1B nonimmigrant designated as a part-time employee on the petition filed under section 1184(c)(1) of this title by the employer with respect to the nonimmigrant, after the nonimmigrant has entered into employment with the employer, in nonproductive status under circumstances described in subclause (I), to fail to pay such a nonimmigrant for such hours as are designated on such petition consistent with the rate of pay identified on such petition.

**(III)** In the case of an H-1B nonimmigrant who has not yet entered into employment with an employer who has had approved an application under this subsection, and a petition under section 1184(c)(1) of this title, with respect to the nonimmigrant, the provisions of subclauses (I) and (II) shall apply to the employer beginning 30 days after the date the nonimmigrant first is admitted into the United States pursuant to the petition, or 60 days after the date the nonimmigrant becomes eligible to work for the employer (in the case of a nonimmigrant who is present in the United States on the date of the approval of the petition).

**(IV)** This clause does not apply to a failure to pay wages to an H-1B nonimmigrant for nonproductive time due to non-work-related factors, such as the voluntary request of the nonimmigrant for an absence or circumstances rendering the nonimmigrant unable to work.

**(V)** This clause shall not be construed as prohibiting an employer that is a school or other educational institution from applying to an H-1B nonimmigrant an established salary practice of the employer, under which the employer pays to H-1B nonimmigrants and United States workers in the same occupational classification an annual salary in disbursements over fewer than 12 months, if--

**(aa)** the nonimmigrant agrees to the compressed annual salary payments prior to the commencement of the employment; and

**(bb)** the application of the salary practice to the nonimmigrant does not otherwise cause the nonimmigrant to violate any condition of the nonimmigrant's authorization under this chapter to remain in the United States.

**(VI)** This clause shall not be construed as superseding clause (viii).

**(viii)** It is a failure to meet a condition of paragraph (1)(A) for an employer who has filed an application under this subsection to fail to offer to an H-1B nonimmigrant, during the nonimmigrant's period of authorized employment, benefits and eligibility

for benefits (including the opportunity to participate in health, life, disability, and other insurance plans; the opportunity to participate in retirement and savings plans; and cash bonuses and noncash compensation, such as stock options (whether or not based on performance)) on the same basis, and in accordance with the same criteria, as the employer offers to United States workers.

**(D)** If the Secretary finds, after notice and opportunity for a hearing, that an employer has not paid wages at the wage level specified under the application and required under paragraph (1), the Secretary shall order the employer to provide for payment of such amounts of back pay as may be required to comply with the requirements of paragraph (1), whether or not a penalty under subparagraph (C) has been imposed.

**(E)** If an H-1B-dependent employer places a nonexempt H-1B nonimmigrant with another employer as provided under paragraph (1)(F) and the other employer has displaced or displaces a United States worker employed by such other employer during the period described in such paragraph, such displacement shall be considered for purposes of this paragraph a failure, by the placing employer, to meet a condition specified in an application submitted under paragraph (1); except that the Attorney General may impose a sanction described in subclause (II) of subparagraph (C)(i), (C)(ii), or (C)(iii) only if the Secretary of Labor found that such placing employer--

(i) knew or had reason to know of such displacement at the time of the placement of the nonimmigrant with the other employer; or

(ii) has been subject to a sanction under this subparagraph based upon a previous placement of an H-1B nonimmigrant with the same other employer.

**(F)** The Secretary may, on a case-by-case basis, subject an employer to random investigations for a period of up to 5 years, beginning on the date (on or after October 21, 1998) on which the employer is found by the Secretary to have committed a willful failure to meet a condition of paragraph (1) (or has been found under paragraph (5) to have committed a willful failure to meet the condition of paragraph (1)(G)(i)(II)) or to have made a willful misrepresentation of material fact in an application. The preceding sentence shall apply to an employer regardless of whether or not the employer is an H-1B-dependent employer. The authority of the Secretary under this subparagraph shall not be construed to be subject to, or limited by, the requirements of subparagraph (A).

(G)(i) The Secretary of Labor may initiate an investigation of any employer that employs nonimmigrants described in section 1101(a)(15)(H)(i)(b) of this title if the Secretary of Labor has reasonable cause to believe that the employer is not in compliance with this subsection. In the case of an investigation under this clause, the Secretary of Labor (or the acting Secretary in the case of the absence of[8] disability of the Secretary of Labor) shall personally certify that reasonable cause exists and shall approve commencement of the investigation. The investigation may be initiated for reasons other than completeness and obvious inaccuracies by the employer in complying with this subsection.

(ii) If the Secretary of Labor receives specific credible information from a source who is likely to have knowledge of an employer's practices or employment conditions, or an employer's compliance with the employer's labor condition application under paragraph (1), and whose identity is known to the Secretary of Labor, and such information provides reasonable cause to believe that the employer has committed a willful failure to meet a condition of paragraph (1)(A), (1)(B), (1)(C), (1)(E), (1)(F), or (1)(G)(i)(I), has engaged in a pattern or practice of failures to meet such a condition, or has committed a substantial failure to meet such a condition that affects multiple employees, the Secretary of Labor may conduct an investigation into the alleged

failure or failures. The Secretary of Labor may withhold the identity of the source from the employer, and the source's identity shall not be subject to disclosure under section 552 of Title 5.

**(iii)** The Secretary of Labor shall establish a procedure for any person desiring to provide to the Secretary of Labor information described in clause (ii) that may be used, in whole or in part, as the basis for the commencement of an investigation described in such clause, to provide the information in writing on a form developed and provided by the Secretary of Labor and completed by or on behalf of the person. The person may not be an officer or employee of the Department of Labor, unless the information satisfies the requirement of clause (iv)(II) (although an officer or employee of the Department of Labor may complete the form on behalf of the person).

**(iv)** Any investigation initiated or approved by the Secretary of Labor under clause (ii) shall be based on information that satisfies the requirements of such clause and that--

**(I)** originates from a source other than an officer or employee of the Department of Labor; or

**(II)** was lawfully obtained by the Secretary of Labor in the course of lawfully conducting another Department of Labor investigation under this chapter of [8] any other Act.

**(v)** The receipt by the Secretary of Labor of information submitted by an employer to the Attorney General or the Secretary of Labor for purposes of securing the employment of a nonimmigrant described in section 1101(a)(15)(H)(i)(b) of this title shall not be considered a receipt of information for purposes of clause (ii).

**(vi)** No investigation described in clause (ii) (or hearing described in clause (viii) based on such investigation) may be conducted with respect to information about a failure to meet a condition described in clause (ii), unless the Secretary of Labor receives the information not later than 12 months after the date of the alleged failure.

**(vii)** The Secretary of Labor shall provide notice to an employer with respect to whom there is reasonable cause to initiate an investigation described in clauses [9] (i) or (ii), prior to the commencement of an investigation under such clauses, of the intent to conduct an investigation. The notice shall be provided in such a manner, and shall contain sufficient detail, to permit the employer to respond to the allegations before an investigation is commenced. The Secretary of Labor is not required to comply with this clause if the Secretary of Labor determines that to do so would interfere with an effort by the Secretary of Labor to secure compliance by the employer with the requirements of this subsection. There shall be no judicial review of a determination by the Secretary of Labor under this clause.

**(viii)** An investigation under clauses [9] (i) or (ii) may be conducted for a period of up to 60 days. If the Secretary of Labor determines after such an investigation that a reasonable basis exists to make a finding that the employer has committed a willful failure to meet a condition of paragraph (1)(A), (1)(B), (1)(C), (1)(E), (1)(F), or (1)(G)(i)(I), has engaged in a pattern or practice of failures to meet such a condition, or has committed a substantial failure to meet such a condition that affects multiple employees, the Secretary of Labor shall provide for notice of such determination to the interested parties and an opportunity for a hearing in accordance with section 556 of Title 5 within 120 days after the date of the determination. If such a hearing is requested, the Secretary of Labor shall make a finding concerning the matter by not later than 120 days after the date of the hearing.

**(H)(i)** Except as provided in clauses (ii) and (iii), a person or entity is considered to have complied with the requirements of this subsection, notwithstanding a technical or procedural failure to meet such requirements, if there was a good faith attempt to comply with the requirements.

**(ii)** Clause (i) shall not apply if--

    **(I)** the Department of Labor (or another enforcement agency) has explained to the person or entity the basis for the failure;

    **(II)** the person or entity has been provided a period of not less than 10 business days (beginning after the date of the explanation) within which to correct the failure; and

    **(III)** the person or entity has not corrected the failure voluntarily within such period.

**(iii)** A person or entity that, in the course of an investigation, is found to have violated the prevailing wage requirements set forth in paragraph (1)(A), shall not be assessed fines or other penalties for such violation if the person or entity can establish that the manner in which the prevailing wage was calculated was consistent with recognized industry standards and practices.

**(iv)** Clauses (i) and (iii) shall not apply to a person or entity that has engaged in or is engaging in a pattern or practice of willful violations of this subsection.

**(I)** Nothing in this subsection shall be construed as superseding or preempting any other enforcement-related authority under this chapter (such as the authorities under section 1324b of this title), or any other Act.

**(3)(A)** For purposes of this subsection, the term "H-1B-dependent employer" means an employer that--

    **(i)(I)** has 25 or fewer full-time equivalent employees who are employed in the United States; and (II) employs more than 7 H-1B nonimmigrants;

    **(ii)(I)** has at least 26 but not more than 50 full-time equivalent employees who are employed in the United States; and (II) employs more than 12 H-1B nonimmigrants; or

    **(iii)(I)** has at least 51 full-time equivalent employees who are employed in the United States; and (II) employs H-1B nonimmigrants in a number that is equal to at least 15 percent of the number of such full-time equivalent employees.

**(B)** For purposes of this subsection--

    **(i)** the term "exempt H-1B nonimmigrant" means an H-1B nonimmigrant who--

(I) receives wages (including cash bonuses and similar compensation) at an annual rate equal to at least $60,000; or

(II) has attained a master's or higher degree (or its equivalent) in a specialty related to the intended employment; and

(ii) the term "nonexempt H-1B nonimmigrant" means an H-1B nonimmigrant who is not an exempt H-1B nonimmigrant.

(C) For purposes of subparagraph (A)--

(i) in computing the number of full-time equivalent employees and the number of H-1B nonimmigrants, exempt H-1B nonimmigrants shall not be taken into account during the longer of--

(I) the 6-month period beginning on October 21, 1998; or

(II) the period beginning on October 21, 1998, and ending on the date final regulations are issued to carry out this paragraph; and

(ii) any group treated as a single employer under subsection (b), (c), (m), or (o) of section 414 of Title 26 shall be treated as a single employer.

(4) For purposes of this subsection:

(A) The term "area of employment" means the area within normal commuting distance of the worksite or physical location where the work of the H-1B nonimmigrant is or will be performed. If such worksite or location is within a Metropolitan Statistical Area, any place within such area is deemed to be within the area of employment.

(B) In the case of an application with respect to one or more H-1B nonimmigrants by an employer, the employer is considered to "displace" a United States worker from a job if the employer lays off the worker from a job that is essentially the equivalent of the job for which the nonimmigrant or nonimmigrants is or are sought. A job shall not be considered to be essentially equivalent of another job unless it involves essentially the same responsibilities, was held by a United States worker with substantially equivalent qualifications and experience, and is located in the same area of employment as the other job.

(C) The term "H-1B nonimmigrant" means an alien admitted or provided status as a nonimmigrant described in section 1101(a)(15)(H)(i)(b) of this title.

(D)(i) The term "lays off", with respect to a worker--

(I) means to cause the worker's loss of employment, other than through a discharge for inadequate performance, violation of workplace rules, cause, voluntary departure, voluntary retirement, or the expiration of a grant or contract (other than a

temporary employment contract entered into in order to evade a condition described in subparagraph (E) or (F) of paragraph (1)); but

**(II)** does not include any situation in which the worker is offered, as an alternative to such loss of employment, a similar employment opportunity with the same employer (or, in the case of a placement of a worker with another employer under paragraph (1)(F), with either employer described in such paragraph) at equivalent or higher compensation and benefits than the position from which the employee was discharged, regardless of whether or not the employee accepts the offer.

**(ii)** Nothing in this subparagraph is intended to limit an employee's rights under a collective bargaining agreement or other employment contract.

**(E)** The term "United States worker" means an employee who—

**(i)** is a citizen or national of the United States; or

**(ii)** is an alien who is lawfully admitted for permanent residence, is admitted as a refugee under section 1157 of this title, is granted asylum under section 1158 of this title, or is an immigrant otherwise authorized, by this chapter or by the Attorney General, to be employed.

**(5)(A)** This paragraph shall apply instead of subparagraphs (A) through (E) of paragraph (2) in the case of a violation described in subparagraph (B), but shall not be construed to limit or affect the authority of the Secretary or the Attorney General with respect to any other violation.

**(B)** The Attorney General shall establish a process for the receipt, initial review, and disposition in accordance with this paragraph of complaints respecting an employer's failure to meet the condition of paragraph (1)(G)(i)(II) or a petitioner's misrepresentation of material facts with respect to such condition. Complaints may be filed by an aggrieved individual who has submitted a resume or otherwise applied in a reasonable manner for the job that is the subject of the condition. No proceeding shall be conducted under this paragraph on a complaint concerning such a failure or misrepresentation unless the Attorney General determines that the complaint was filed not later than 12 months after the date of the failure or misrepresentation, respectively.

**(C)** If the Attorney General finds that a complaint has been filed in accordance with subparagraph (B) and there is reasonable cause to believe that such a failure or misrepresentation described in such complaint has occurred, the Attorney General shall initiate binding arbitration proceedings by requesting the Federal Mediation and Conciliation Service to appoint an arbitrator from the roster of arbitrators maintained by such Service. The procedure and rules of such Service shall be applicable to the selection of such arbitrator and to such arbitration proceedings. The Attorney General shall pay the fee and expenses of the arbitrator.

**(D)(i)** The arbitrator shall make findings respecting whether a failure or misrepresentation described in subparagraph (B) occurred. If the arbitrator concludes that failure or misrepresentation was willful, the arbitrator shall make a finding to that effect. The arbitrator may not find such a failure or misrepresentation (or that such a failure or misrepresentation was willful) unless the complainant demonstrates such a failure or misrepresentation (or its willful character) by clear and convincing evidence. The arbitrator shall transmit the findings in the form of a written opinion to the parties to the arbitration and the Attorney General.

Such findings shall be final and conclusive, and, except as provided in this subparagraph, no official or court of the United States shall have power or jurisdiction to review any such findings.

(ii) The Attorney General may review and reverse or modify the findings of an arbitrator only on the same bases as an award of an arbitrator may be vacated or modified under section 10 or 11 of Title 9.

(iii) With respect to the findings of an arbitrator, a court may review only the actions of the Attorney General under clause (ii) and may set aside such actions only on the grounds described in subparagraph (A), (B), or (C) of section 706(a)(2) of Title 5. Notwithstanding any other provision of law, such judicial review may only be brought in an appropriate United States court of appeals.

(E) If the Attorney General receives a finding of an arbitrator under this paragraph that an employer has failed to meet the condition of paragraph (1)(G)(i)(II) or has misrepresented a material fact with respect to such condition, unless the Attorney General reverses or modifies the finding under subparagraph (D)(ii)--

(i) the Attorney General may impose administrative remedies (including civil monetary penalties in an amount not to exceed $1,000 per violation or $5,000 per violation in the case of a willful failure or misrepresentation) as the Attorney General determines to be appropriate; and

(ii) the Attorney General is authorized to not approve petitions filed, with respect to that employer and for aliens to be employed by the employer, under section 1154 or 1184(c) of this title--

(I) during a period of not more than 1 year; or

(II) in the case of a willful failure or willful misrepresentation, during a period of not more than 2 years.

(F) The Attorney General shall not delegate, to any other employee or official of the Department of Justice, any function of the Attorney General under this paragraph, until 60 days after the Attorney General has submitted a plan for such delegation to the Committees on the Judiciary of the United States House of Representatives and the Senate.

**(o) Omitted**

**(p) Computation of prevailing wage level**

(1) In computing the prevailing wage level for an occupational classification in an area of employment for purposes of subsections (a)(5)(A), (n)(1)(A)(i)(II), and (t)(1)(A)(i)(II) in the case of an employee of--

(A) an institution of higher education (as defined in section 1001(a) of Title 20), or a related or affiliated nonprofit entity; or

(B) a nonprofit research organization or a Governmental research organization,

the prevailing wage level shall only take into account employees at such institutions and organizations in the area of employment.

(2) With respect to a professional athlete (as defined in subsection (a)(5)(A)(iii)(II)) when the job opportunity is covered by professional sports league rules or regulations, the wage set forth in those rules or regulations shall be considered as not adversely affecting the wages of United States workers similarly employed and be considered the prevailing wage.

(3) The prevailing wage required to be paid pursuant to subsections (a)(5)(A), (n)(1)(A)(i)(II), and (t)(1)(A)(i)(II) shall be 100 percent of the wage determined pursuant to those sections.

(4) Where the Secretary of Labor uses, or makes available to employers, a governmental survey to determine the prevailing wage, such survey shall provide at least 4 levels of wages commensurate with experience, education, and the level of supervision. Where an existing government survey has only 2 levels, 2 intermediate levels may be created by dividing by 3, the difference between the 2 levels offered, adding the quotient thus obtained to the first level and subtracting that quotient from the second level.

**(q) Academic honoraria**

Any alien admitted under section 1101(a)(15)(B) of this title may accept an honorarium payment and associated incidental expenses for a usual academic activity or activities (lasting not longer than 9 days at any single institution), as defined by the Attorney General in consultation with the Secretary of Education, if such payment is offered by an institution or organization described in subsection (p)(1) and is made for services conducted for the benefit of that institution or entity and if the alien has not accepted such payment or expenses from more than 5 institutions or organizations in the previous 6-month period.

**(r) Exception for certain alien nurses**

Subsection (a)(5)(C) shall not apply to an alien who seeks to enter the United States for the purpose of performing labor as a nurse who presents to the consular officer (or in the case of an adjustment of status, the Attorney General) a certified statement from the Commission on Graduates of Foreign Nursing Schools (or an equivalent independent credentialing organization approved for the certification of nurses under subsection (a)(5)(C) by the Attorney General in consultation with the Secretary of Health and Human Services) that--

(1) the alien has a valid and unrestricted license as a nurse in a State where the alien intends to be employed and such State verifies that the foreign licenses of alien nurses are authentic and unencumbered;

(2) the alien has passed the National Council Licensure Examination (NCLEX);

(3) the alien is a graduate of a nursing program--

(A) in which the language of instruction was English;

**(B)** located in a country--

(i) designated by such commission not later than 30 days after November 12, 1999, based on such commission's assessment that the quality of nursing education in that country, and the English language proficiency of those who complete such programs in that country, justify the country's designation; or

(ii) designated on the basis of such an assessment by unanimous agreement of such commission and any equivalent credentialing organizations which have been approved under subsection (a)(5)(C) for the certification of nurses under this subsection; and

**(C)(i)** which was in operation on or before November 12, 1999; or

(ii) has been approved by unanimous agreement of such commission and any equivalent credentialing organizations which have been approved under subsection (a)(5)(C) for the certification of nurses under this subsection.

**(s) Consideration of benefits received as battered alien in determination of inadmissibility as likely to become public charge**

In determining whether an alien described in subsection (a)(4)(C)(i) is inadmissible under subsection (a)(4) or ineligible to receive an immigrant visa or otherwise to adjust to the status of permanent resident by reason of subsection (a)(4), the consular officer or the Attorney General shall not consider any benefits the alien may have received that were authorized under section 1641(c) of this title.

**(t)** [10] **Nonimmigrant professionals; labor attestations**

**(1)** No alien may be admitted or provided status as a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title in an occupational classification unless the employer has filed with the Secretary of Labor an attestation stating the following:

**(A)** The employer--

(i) is offering and will offer during the period of authorized employment to aliens admitted or provided status under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title wages that are at least--

**(I)** the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question; or

**(II)** the prevailing wage level for the occupational classification in the area of employment,

whichever is greater, based on the best information available as of the time of filing the attestation; and

(ii) will provide working conditions for such a nonimmigrant that will not adversely affect the working conditions of workers similarly employed.

(B) There is not a strike or lockout in the course of a labor dispute in the occupational classification at the place of employment.

(C) The employer, at the time of filing the attestation--

(i) has provided notice of the filing under this paragraph to the bargaining representative (if any) of the employer's employees in the occupational classification and area for which aliens are sought; or

(ii) if there is no such bargaining representative, has provided notice of filing in the occupational classification through such methods as physical posting in conspicuous locations at the place of employment or electronic notification to employees in the occupational classification for which nonimmigrants under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title are sought.

(D) A specification of the number of workers sought, the occupational classification in which the workers will be employed, and wage rate and conditions under which they will be employed.

(2)(A) The employer shall make available for public examination, within one working day after the date on which an attestation under this subsection is filed, at the employer's principal place of business or worksite, a copy of each such attestation (and such accompanying documents as are necessary).

(B)(i) The Secretary of Labor shall compile, on a current basis, a list (by employer and by occupational classification) of the attestations filed under this subsection. Such list shall include, with respect to each attestation, the wage rate, number of aliens sought, period of intended employment, and date of need.

(ii) The Secretary of Labor shall make such list available for public examination in Washington, D.C.

(C) The Secretary of Labor shall review an attestation filed under this subsection only for completeness and obvious inaccuracies. Unless the Secretary of Labor finds that an attestation is incomplete or obviously inaccurate, the Secretary of Labor shall provide the certification described in section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title within 7 days of the date of the filing of the attestation.

(3)(A) The Secretary of Labor shall establish a process for the receipt, investigation, and disposition of complaints respecting the failure of an employer to meet a condition specified in an attestation submitted under this subsection or misrepresentation by the employer of material facts in such an attestation. Complaints may be filed by any aggrieved person or organization (including bargaining representatives). No investigation or hearing shall be conducted on a complaint concerning such a failure or misrepresentation unless the complaint was filed not later than 12 months after the date of the failure or misrepresentation, respectively. The Secretary of Labor shall conduct an investigation under this paragraph if there is reasonable cause to believe that such a failure or misrepresentation has occurred.

**(B)** Under the process described in subparagraph (A), the Secretary of Labor shall provide, within 30 days after the date a complaint is filed, for a determination as to whether or not a reasonable basis exists to make a finding described in subparagraph (C). If the Secretary of Labor determines that such a reasonable basis exists, the Secretary of Labor shall provide for notice of such determination to the interested parties and an opportunity for a hearing on the complaint, in accordance with section 556 of Title 5, within 60 days after the date of the determination. If such a hearing is requested, the Secretary of Labor shall make a finding concerning the matter by not later than 60 days after the date of the hearing. In the case of similar complaints respecting the same applicant, the Secretary of Labor may consolidate the hearings under this subparagraph on such complaints.

**(C)(i)** If the Secretary of Labor finds, after notice and opportunity for a hearing, a failure to meet a condition of paragraph (1)(B), a substantial failure to meet a condition of paragraph (1)(C) or (1)(D), or a misrepresentation of material fact in an attestation--

**(I)** the Secretary of Labor shall notify the Secretary of State and the Secretary of Homeland Security of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $1,000 per violation) as the Secretary of Labor determines to be appropriate; and

**(II)** the Secretary of State or the Secretary of Homeland Security, as appropriate, shall not approve petitions or applications filed with respect to that employer under section 1154, 1184(c), 1101(a)(15)(H)(i)(b1), or 1101(a)(15)(E)(iii) of this title during a period of at least 1 year for aliens to be employed by the employer.

**(ii)** If the Secretary of Labor finds, after notice and opportunity for a hearing, a willful failure to meet a condition of paragraph (1), a willful misrepresentation of material fact in an attestation, or a violation of clause (iv)--

**(I)** the Secretary of Labor shall notify the Secretary of State and the Secretary of Homeland Security of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $5,000 per violation) as the Secretary of Labor determines to be appropriate; and

**(II)** the Secretary of State or the Secretary of Homeland Security, as appropriate, shall not approve petitions or applications filed with respect to that employer under section 1154, 1184(c), 1101(a)(15)(H)(i)(b1), or 1101(a)(15)(E)(iii) of this title during a period of at least 2 years for aliens to be employed by the employer.

**(iii)** If the Secretary of Labor finds, after notice and opportunity for a hearing, a willful failure to meet a condition of paragraph (1) or a willful misrepresentation of material fact in an attestation, in the course of which failure or misrepresentation the employer displaced a United States worker employed by the employer within the period beginning 90 days before and ending 90 days after the date of filing of any visa petition or application supported by the attestation--

**(I)** the Secretary of Labor shall notify the Secretary of State and the Secretary of Homeland Security of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $35,000 per violation) as the Secretary of Labor determines to be appropriate; and

**(II)** the Secretary of State or the Secretary of Homeland Security, as appropriate, shall not approve petitions or applications filed with respect to that employer under section 1154, 1184(c), 1101(a)(15)(H)(i)(b1), or 1101(a)(15)(E)(iii) of this title during a period of at least 3 years for aliens to be employed by the employer.

**(iv)** It is a violation of this clause for an employer who has filed an attestation under this subsection to intimidate, threaten, restrain, coerce, blacklist, discharge, or in any other manner discriminate against an employee (which term, for purposes of this clause, includes a former employee and an applicant for employment) because the employee has disclosed information to the employer, or to any other person, that the employee reasonably believes evidences a violation of this subsection, or any rule or regulation pertaining to this subsection, or because the employee cooperates or seeks to cooperate in an investigation or other proceeding concerning the employer's compliance with the requirements of this subsection or any rule or regulation pertaining to this subsection.

**(v)** The Secretary of Labor and the Secretary of Homeland Security shall devise a process under which a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title who files a complaint regarding a violation of clause (iv) and is otherwise eligible to remain and work in the United States may be allowed to seek other appropriate employment in the United States for a period not to exceed the maximum period of stay authorized for such nonimmigrant classification.

**(vi)(I)** It is a violation of this clause for an employer who has filed an attestation under this subsection to require a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title to pay a penalty for ceasing employment with the employer prior to a date agreed to by the nonimmigrant and the employer. The Secretary of Labor shall determine whether a required payment is a penalty (and not liquidated damages) pursuant to relevant State law.

**(II)** If the Secretary of Labor finds, after notice and opportunity for a hearing, that an employer has committed a violation of this clause, the Secretary of Labor may impose a civil monetary penalty of $1,000 for each such violation and issue an administrative order requiring the return to the nonimmigrant of any amount paid in violation of this clause, or, if the nonimmigrant cannot be located, requiring payment of any such amount to the general fund of the Treasury.

**(vii)(I)** It is a failure to meet a condition of paragraph (1)(A) for an employer who has filed an attestation under this subsection and who places a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title designated as a full-time employee in the attestation, after the nonimmigrant has entered into employment with the employer, in nonproductive status due to a decision by the employer (based on factors such as lack of work), or due to the nonimmigrant's lack of a permit or license, to fail to pay the nonimmigrant full-time wages in accordance with paragraph (1)(A) for all such nonproductive time.

**(II)** It is a failure to meet a condition of paragraph (1)(A) for an employer who has filed an attestation under this subsection and who places a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title designated as a part-time employee in the attestation, after the nonimmigrant has entered into employment with the employer, in nonproductive status under circumstances described in subclause (I), to fail to pay such a nonimmigrant for such hours as are designated on the attestation consistent with the rate of pay identified on the attestation.

**(III)** In the case of a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title who has not yet entered into employment with an employer who has had approved an attestation under this subsection with

respect to the nonimmigrant, the provisions of subclauses (I) and (II) shall apply to the employer beginning 30 days after the date the nonimmigrant first is admitted into the United States, or 60 days after the date the nonimmigrant becomes eligible to work for the employer in the case of a nonimmigrant who is present in the United States on the date of the approval of the attestation filed with the Secretary of Labor.

**(IV)** This clause does not apply to a failure to pay wages to a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title for nonproductive time due to non-work-related factors, such as the voluntary request of the nonimmigrant for an absence or circumstances rendering the nonimmigrant unable to work.

**(V)** This clause shall not be construed as prohibiting an employer that is a school or other educational institution from applying to a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title an established salary practice of the employer, under which the employer pays to nonimmigrants under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title and United States workers in the same occupational classification an annual salary in disbursements over fewer than 12 months, if--

(aa) the nonimmigrant agrees to the compressed annual salary payments prior to the commencement of the employment; and

(bb) the application of the salary practice to the nonimmigrant does not otherwise cause the nonimmigrant to violate any condition of the nonimmigrant's authorization under this chapter to remain in the United States.

**(VI)** This clause shall not be construed as superseding clause (viii).

**(viii)** It is a failure to meet a condition of paragraph (1)(A) for an employer who has filed an attestation under this subsection to fail to offer to a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title, during the nonimmigrant's period of authorized employment, benefits and eligibility for benefits (including the opportunity to participate in health, life, disability, and other insurance plans; the opportunity to participate in retirement and savings plans; and cash bonuses and non-cash compensation, such as stock options (whether or not based on performance)) on the same basis, and in accordance with the same criteria, as the employer offers to United States workers.

**(D)** If the Secretary of Labor finds, after notice and opportunity for a hearing, that an employer has not paid wages at the wage level specified in the attestation and required under paragraph (1), the Secretary of Labor shall order the employer to provide for payment of such amounts of back pay as may be required to comply with the requirements of paragraph (1), whether or not a penalty under subparagraph (C) has been imposed.

**(E)** The Secretary of Labor may, on a case-by-case basis, subject an employer to random investigations for a period of up to 5 years, beginning on the date on which the employer is found by the Secretary of Labor to have committed a willful failure to meet a condition of paragraph (1) or to have made a willful misrepresentation of material fact in an attestation. The authority of the Secretary of Labor under this subparagraph shall not be construed to be subject to, or limited by, the requirements of subparagraph (A).

**(F)** Nothing in this subsection shall be construed as superseding or preempting any other enforcement-related authority under this chapter (such as the authorities under section 1324b of this title), or any other Act.

(4) For purposes of this subsection:

(A) The term "area of employment" means the area within normal commuting distance of the worksite or physical location where the work of the nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title is or will be performed. If such worksite or location is within a Metropolitan Statistical Area, any place within such area is deemed to be within the area of employment.

(B) In the case of an attestation with respect to one or more nonimmigrants under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title by an employer, the employer is considered to "displace" a United States worker from a job if the employer lays off the worker from a job that is essentially the equivalent of the job for which the nonimmigrant or nonimmigrants is or are sought. A job shall not be considered to be essentially equivalent of another job unless it involves essentially the same responsibilities, was held by a United States worker with substantially equivalent qualifications and experience, and is located in the same area of employment as the other job.

(C)(i) The term "lays off", with respect to a worker--

(I) means to cause the worker's loss of employment, other than through a discharge for inadequate performance, violation of workplace rules, cause, voluntary departure, voluntary retirement, or the expiration of a grant or contract; but

(II) does not include any situation in which the worker is offered, as an alternative to such loss of employment, a similar employment opportunity with the same employer at equivalent or higher compensation and benefits than the position from which the employee was discharged, regardless of whether or not the employee accepts the offer.

(ii) Nothing in this subparagraph is intended to limit an employee's rights under a collective bargaining agreement or other employment contract.

(D) The term "United States worker" means an employee who--

(i) is a citizen or national of the United States; or

(ii) is an alien who is lawfully admitted for permanent residence, is admitted as a refugee under section 1157 of this title, is granted asylum under section 1158 of this title, or is an immigrant otherwise authorized, by this chapter or by the Secretary of Homeland Security, to be employed.

**(t)** [10] **Foreign residence requirement**

(1) Except as provided in paragraph (2), no person admitted under section 1101(a)(15)(Q)(ii)(I) of this title, or acquiring such status after admission, shall be eligible to apply for nonimmigrant status, an immigrant visa, or permanent residence under this chapter until it is established that such person has resided and been physically present in the person's country of nationality or last residence for an aggregate of at least 2 years following departure from the United States.

**(2)** The Secretary of Homeland Security may waive the requirement of such 2-year foreign residence abroad if the Secretary determines that--

**(A)** departure from the United States would impose exceptional hardship upon the alien's spouse or child (if such spouse or child is a citizen of the United States or an alien lawfully admitted for permanent residence); or

**(B)** the admission of the alien is in the public interest or the national interest of the United States.

**CREDIT(S)**

(June 27, 1952, c. 477, Title II, c. 2, § 212, 66 Stat. 182; July 18, 1956, c. 629, Title III, § 301(a), 70 Stat. 575; Pub.L. 85-508, § 23, July 7, 1958, 72 Stat. 351; Pub.L. 86-3, § 20(b), Mar. 18, 1959, 73 Stat. 13; Pub.L. 86-648, § 8, July 14, 1960, 74 Stat. 505; Pub.L. 87-256, § 109(c), Sept. 21, 1961, 75 Stat. 535; Pub.L. 87-301, §§ 11-15, Sept. 26, 1961, 75 Stat. 654, 655; Pub.L. 89-236, §§ 10, 15, Oct. 3, 1965, 79 Stat. 917, 919; Pub.L. 91-225, § 2, Apr. 7, 1970, 84 Stat. 116; Pub.L. 94-484, Title VI, § 601(a), (c), (d), Oct. 12, 1976, 90 Stat. 2300, 2301; Pub.L. 94-571, §§ 5, 7(d), Oct. 20, 1976, 90 Stat. 2705, 2706; Pub.L. 95-83, Title III, § 307(q)(1), (2), Aug. 1, 1977, 91 Stat. 394; Pub.L. 95-549, Title I, §§ 101, 102, Oct. 30, 1978, 92 Stat. 2065; Pub.L. 96-70, Title III, § 3201(b), Sept. 27, 1979, 93 Stat. 497; Pub.L. 96-212, Title II, § 203(d), (f), Mar. 17, 1980, 94 Stat. 107; Pub.L. 96-538, Title IV, § 404, Dec. 17, 1980, 94 Stat. 3192; Pub.L. 97-116, §§ 4, 5(a)(1), (2), (b), 18(e), Dec. 29, 1981, 95 Stat. 1611, 1612, 1620; Pub.L. 98-454, Title VI, § 602[(a)], Oct. 5, 1984, 98 Stat. 1737; Pub.L. 98-473, Title II, § 220(a), Oct. 12, 1984, 98 Stat. 2028; Pub.L. 99-396, § 14(a), Aug. 27, 1986, 100 Stat. 842; Pub.L. 99-570, Title I, § 1751(a), Oct. 27, 1986, 100 Stat. 3207-47; Pub.L. 99-639, § 6(a), Nov. 10, 1986, 100 Stat. 3543; Pub.L. 99-653, § 7(a), Nov. 14, 1986, 100 Stat. 3657; Pub.L. 100-204, Title VIII, § 806(c), Dec. 22, 1987, 101 Stat. 1399; Pub.L. 100-525, §§ 3(1)(A), 7(c)(1), (3), 8(f), 9(i), Oct. 24, 1988, 102 Stat. 2614, 2616, 2617, 2620; Pub.L. 100-690, Title VII, § 7349(a), Nov. 18, 1988, 102 Stat. 4473; Pub.L. 101-238, § 3(b), Dec. 18, 1989, 103 Stat. 2100; Pub.L. 101-246, Title I, § 131(a), (c), Feb. 16, 1990, 104 Stat. 31; Pub.L. 101-649, Title I, § 162(e)(1), (f)(2)(B), Title II, §§ 202(b), 205(c)(3), Title V, §§ 511(a), 514(a), Title VI, § 601(a), (b), (d), Nov. 29, 1990, 104 Stat. 5011, 5012, 5014, 5020, 5052, 5053, 5067, 5075 to 5077; Pub.L. 102-232, Title III, §§ 302(e)(6), (9), 303(a)(5)(B), (6), (7) (B), 306(a)(10), (12), 307(a) to (g), 309(b)(7), Dec. 12, 1991, 105 Stat. 1746, 1747, 1751, 1753 to 1755, 1759; Pub.L. 103-43, Title XX, § 2007(a), June 10, 1993, 107 Stat. 210; Pub.L. 103-317, Title V, § 506(a), Aug. 26, 1994, 108 Stat. 1765; Pub.L. 103-322, Title XIII, § 130003(b)(1), Sept. 13, 1994, 108 Stat. 2024; Pub.L. 103-416, Title II, §§ 203(a), 219(e), (z)(1), (5), 220(a), Oct. 25, 1994, 108 Stat. 4311, 4316, 4318, 4319; Pub.L. 104-132, Title IV, §§ 411, 412, 440(d), Apr. 24, 1996, 110 Stat. 1268, 1269, 1277; Pub.L. 104-208, Div. C, Title I, § 124(b)(1), Title III, §§ 301(b)(1), (c)(1), 304(b), 305(c), 306(d), 308(c)(2) (B), (d)(1), (e)(1)(B), (C), (2)(A), (6), (f)(1)(C) to (F), (3)(A), (g)(1), (4)(B), (10)(A), (H), 322(a)(2)(B), 341(a), (b), 342(a), 343, 344(a), 345(a), 346(a), 347(a), 348(a), 349, 351(a), 352(a), 355, Title V, § 531(a), Title VI, §§ 602(a), 622(b), 624(a), 671(e)(3), Sept. 30, 1996, 110 Stat. 3009-562, 3009-576, 3009-578, 3009-597, 3009-607, 3009-612, 3009-616, 3009-619 to 3009-622, 3009-625, 3009-629, 3009-635 to 3009-641, 3009-644, 3009-674, 3009-689, 3009-695, 3009-698, 3009-723; Pub.L. 105-73, § 1, Nov. 12, 1997, 111 Stat. 1459; Pub.L. 105-277, Div. C, Title IV, §§ 412(a) to (c), 413(a) to (e)(1), (f), 415(a), 431(a), Div. G, Title XXII, § 2226(a), Oct. 21, 1998, 112 Stat. 2681-642 to 2681-651, 2681-654, 2681-658, 2681-820; Pub.L. 105-292, Title VI, § 604(a), Oct. 27, 1998, 112 Stat. 2814; Pub.L. 106-95, §§ 2(b), 4(a), Nov. 12, 1999, 113 Stat. 1312, 1317; Pub.L. 106-120, Title VIII, § 809, Dec. 3, 1999, 113 Stat. 1632; Pub.L. 106-313, Title I, §§ 106(c)(2), 107(a), Oct. 17, 2000, 114 Stat. 1254, 1255; Pub.L. 106-386, Div. A, §§ 107(e)(3), 111(d), Div. B, Title V, § 1505(a), (c)(1), (d) to (f), 1513(e), Oct. 28, 2000, 114 Stat. 1478, 1485, 1525, 1526, 1536; Pub.L. 106-395, Title II, § 201(b)(1), (2), Oct. 30, 2000, 114 Stat. 1633, 1634; Pub.L. 106-396, Title I, § 101(b)(1), Oct. 30, 2000, 114 Stat. 1638; Pub.L. 107-56, Title IV, § 411(a), Title X, § 1006(a), Oct. 26, 2001, 115 Stat. 345, 394; Pub.L. 107-150, § 2(a)(2), Mar. 13, 2002, 116 Stat. 74; Pub.L. 107-273, Div. C, Title I, § 11018(c), Nov. 2, 2002, 116 Stat. 1825; Pub.L. 108-77, Title IV, § 402(b), (c), Sept. 3, 2003, 117 Stat. 940, 946; Pub.L. 108-193, §§ 4(b)(4), 8(a) (2), Dec. 19, 2003, 117 Stat. 2879, 2886; Pub.L. 108-447, Div. J, Title IV, §§ 422(a), 423, 424(a)(1), (b), Dec. 8, 2004, 118 Stat. 3353 to 3355; Pub.L. 108-449, § 1(b)(2), Dec. 10, 2004, 118 Stat. 3470; Pub.L. 108-458, Title V, §§ 5501(a), 5502(a), 5503,

Dec. 17, 2004, 118 Stat. 3740, 3741; Pub.L. 109-13, Div. B, Title I, §§ 103(a) to (c), 104, Title V, § 501(d), May 11, 2005, 119 Stat. 306 to 309, 322; Pub.L. 109-162, Title VIII, § 802, Jan. 5, 2006, 119 Stat. 3054; Pub.L. 109-271, § 6(b), Aug. 12, 2006, 120 Stat. 762; Pub.L. 110-161, Div. J, Title VI, § 691(a), (c), Dec. 26, 2007, 121 Stat. 2364, 2365; Pub.L. 110-229, Title VII, § 702(b)(2), (3), (d), May 8, 2008, 122 Stat. 860, 862; Pub.L. 110-293, Title III, § 305, July 30, 2008, 122 Stat. 2963; Pub.L. 110-340, § 2(b), Oct. 3, 2008, 122 Stat. 3736; Pub.L. 110-457, Title II, §§ 222(f)(1), 234, Dec. 23, 2008, 122 Stat. 5071, 5074; Pub.L. 111-122, § 3(b), Dec. 22, 2009, 123 Stat. 3481; Pub.L. 111-287, § 2, Nov. 30, 2010, 124 Stat. 3058; Pub.L. 113-4, Title VIII, § 804, Mar. 7, 2013, 127 Stat. 111; Pub.L. 119-1, § 3(d), Jan. 29, 2025, 139 Stat. 4.)

### TERMINATION OF AMENDMENT

<For termination of amendment by Pub.L. 108-77, § 107(c), see Effective and Applicability Provisions note set out under this section.>

### EXECUTIVE ORDERS

### EXECUTIVE ORDER NO. 12324

Ex. Ord. No. 12324, Sept. 29, 1981, 46 F.R. 48109, relating to high seas interdiction of illegal aliens, was revoked by Ex. Ord. No. 12807, May 24, 1992, 57 F.R. 23133, set out as a note under this section.

### EXECUTIVE ORDER NO. 12807

<May 24, 1992, 57 F.R. 23133, as amended Ex. Ord. No. 13286, Sec. 30, Feb. 28, 2003, 68 F.R. 10625>

#### Interdiction of Illegal Aliens

By the authority vested in me as President by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a)(1) of the Immigration and Nationality Act, as amended (8 U.S.C. 1182(f) and 1185(a)(1)) [subsec. (f) of this section and section 1185(a)(1) of this title] and whereas:

(1) The President has authority to suspend the entry of aliens coming by sea to the United States without necessary documentation, to establish reasonable rules and regulations regarding, and other limitations on, the entry or attempted entry of aliens into the United States, and to repatriate aliens interdicted beyond the territorial sea of the United States;

(2) The international legal obligations of the United States under the United Nations Protocol Relating to the Status of Refugees (U.S. T.I.A.S. 6577; 19 U.S.T. 6223) to apply Article 33 of the United Nations Convention Relating to the Status of Refugees do not extend to persons located outside the territory of the United States;

(3) Proclamation No. 4865 [set out as a note under this section] suspends the entry of all undocumented aliens into the United States by the high seas; and

(4) There continues to be a serious problem of persons attempting to come to the United States by sea without necessary documentation and otherwise illegally;

I, GEORGE BUSH, President of the United States of America, hereby order as follows:

**Section 1.** The Secretary of State shall undertake to enter into, on behalf of the United States, cooperative arrangements with appropriate foreign governments for the purpose of preventing illegal migration to the United States by sea.

**Sec. 2. (a)** The Secretary of the Department in which the Coast Guard is operating, in consultation, where appropriate, with the Secretary of Defense, the Attorney General, and the Secretary of State, shall issue appropriate instructions to the Coast Guard in order to enforce the suspension of the entry of undocumented aliens by sea and the interdiction of any defined vessel carrying such aliens.

**(b)** Those instructions shall apply to any of the following defined vessels:

**(1)** Vessels of the United States, meaning any vessel documented or numbered pursuant to the laws of the United States, or owned in whole or in part by the United States, a citizen of the United States, or a corporation incorporated under the laws of the United States or any State, Territory, District, Commonwealth, or possession thereof, unless the vessel has been granted nationality by a foreign nation in accord with Article 5 of the Convention on the High Seas of 1958 (U.S. T.I.A.S. 5200; 13 U.S.T. 2312).

**(2)** Vessels without nationality or vessels assimilated to vessels without nationality in accordance with paragraph (2) of Article 6 of the Convention on the High Seas of 1958 (U.S. T.I.A.S. 5200; 13 U.S.T. 2312).

**(3)** Vessels of foreign nations with whom we have arrangements authorizing the United States to stop and board such vessels.

**(c)** Those instructions to the Coast Guard shall include appropriate directives providing for the Coast Guard:

**(1)** To stop and board defined vessels, when there is reason to believe that such vessels are engaged in the irregular transportation of persons or violations of United States law or the law of a country with which the United States has an arrangement authorizing such action.

**(2)** To make inquiries of those on board, examine documents and take such actions as are necessary to carry out this order.

**(3)** To return the vessel and its passengers to the country from which it came, or to another country, when there is reason to believe that an offense is being committed against the United States immigration laws, or appropriate laws of a foreign country with which we have an arrangement to assist; provided, however, that the Secretary of Homeland Security, in his unreviewable discretion, may decide that a person who is a refugee will not be returned without his consent.

**(d)** These actions, pursuant to this section, are authorized to be undertaken only beyond the territorial sea of the United States.

**Sec. 3.** This order is intended only to improve the internal management of the Executive Branch. Neither this order nor any agency guidelines, procedures, instructions, directives, rules or regulations implementing this order shall create, or shall be construed to create, any right or benefit, substantive or procedural (including without limitation any right or benefit under the Administrative Procedure Act [section 551 et seq. of Title 5, Government Organization and Employees]), legally enforceable by any party against the United States, its agencies or instrumentalities, officers, employees, or any other person. Nor shall this order be construed to require any procedures to determine whether a person is a refugee.

**Sec. 4.** Executive Order No. 12324 [formerly set out as a note under this section] is hereby revoked and replaced by this order.

**Sec. 5.** This order shall be effective immediately.

GEORGE BUSH

**EXECUTIVE ORDER NO. 13276**

§ 1182. Inadmissible aliens, 8 USCA § 1182

<Nov. 15, 2002, 67 F.R. 69985, as amended Ex. Ord. No. 13286, Sec. 1, Feb. 28, 2003, 68 F.R. 10619>

**Delegation of Responsibilities Concerning Undocumented Aliens Interdicted or Intercepted in the Caribbean Region**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a)(1) of the Immigration and Nationality Act, as amended (8 U.S.C. 1182(f) and 1185(a)(1)) [subsecs. (f) and (a)(1) of this section], and section 301 of title 3, United States Code, and in order to delegate appropriate responsibilities to Federal agencies for responding to migration of undocumented aliens in the Caribbean region, it is hereby ordered:

**Section 1.** Duties and Authorities of Agency Heads. Consistent with applicable law,

(a)(i) The Secretary of Homeland Security may maintain custody, at any location he deems appropriate, of any undocumented aliens he has reason to believe are seeking to enter the United States and who are interdicted or intercepted in the Caribbean region. In this regard, the Secretary of Homeland Security shall provide and operate a facility, or facilities, to house and provide for the needs of any such aliens. Such a facility may be located at Guantanamo Bay Naval Base or any other appropriate location.

(ii) The Secretary of Homeland Security may conduct any screening of such aliens that he deems appropriate, including screening to determine whether such aliens should be returned to their country of origin or transit, or whether they are persons in need of protection who should not be returned without their consent. If the Secretary of Homeland Security institutes such screening, then until a determination is made, the Secretary of Homeland Security shall provide for the custody, care, safety, transportation, and other needs of the aliens. The Secretary of Homeland Security shall continue to provide for the custody, care, safety, transportation, and other needs of aliens who are determined not to be persons in need of protection until such time as they are returned to their country of origin or transit.

(b) The Secretary of State shall provide for the custody, care, safety, transportation, and other needs of undocumented aliens interdicted or intercepted in the Caribbean region whom the Secretary of Homeland Security has identified as persons in need of protection. The Secretary of State shall provide for and execute a process for resettling such persons in need of protection, as appropriate, in countries other than their country of origin, and shall also undertake such diplomatic efforts as may be necessary to address the problem of illegal migration of aliens in the Caribbean region and to facilitate the return of those aliens who are determined not to be persons in need of protection.

(c)(i) The Secretary of Defense shall make available to the Secretary of Homeland Security and the Secretary of State, for the housing and care of any undocumented aliens interdicted or intercepted in the Caribbean region and taken into their custody, any facilities at Guantanamo Bay Naval Base that are excess to current military needs and the provision of which does not interfere with the operation and security of the base. The Secretary of Defense shall be responsible for providing access to such facilities and perimeter security. The Secretary of Homeland Security and the Secretary of State, respectively, shall be responsible for reimbursement for necessary supporting utilities.

(ii) In the event of a mass migration in the Caribbean region, the Secretary of Defense shall provide support to the Secretary of Homeland Security and the Secretary of State in carrying out the duties described in paragraphs (a) and (b) of this section regarding the custody, care, safety, transportation, and other needs of the aliens, and shall assume primary responsibility for these duties on a nonreimbursable basis as necessary to contain the threat to national security posed by the migration. The Secretary of Defense shall also provide support to the Coast Guard in carrying out the duties described in Executive Order 12807 of May 24, 1992 [set out under this section], regarding interdiction of migrants.

**Sec. 2.** Definitions. For purposes of this order, the term "mass migration" means a migration of undocumented aliens that is of such magnitude and duration that it poses a threat to the national security of the United States, as determined by the President.

**Sec. 3.** Scope.

(a) Nothing in this order shall be construed to impair or otherwise affect the authorities and responsibilities set forth in Executive Order 12807 of May 24, 1992.

(b) Nothing in this order shall be construed to make reviewable in any judicial or administrative proceeding, or otherwise, any action, omission, or matter that otherwise would not be reviewable.

(c) This order is intended only to improve the management of the executive branch. This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity or otherwise against the United States, its departments, agencies, entities, instrumentalities, officers, employees, or any other person.

(d) Any agency assigned any duties by this order may use the provisions of the Economy Act, 31 U.S.C. 1535 and 1536, to carry out such duties, to the extent permitted by such Act.

(e) This order shall not be construed to require any procedure to determine whether a person is a refugee or otherwise in need of protection.

GEORGE W. BUSH

### EXECUTIVE ORDER NO. 13769

Ex. Ord. No. 13769, January 27, 2017, 82 F.R. 8977, relating to protecting the Nation from foreign terrorist entry into the United States, was revoked by Ex. Ord. No. 13780, § 13, March 9, 2017, 82 F.R. 13209.

### EXECUTIVE ORDER NO. 13780

Ex. Ord. No. 13780, Mar. 6, 2017, 82 F.R. 13209, which prevented nationals from certain countries from entering the United States, was revoked by Proc. No. 10141, Jan. 20, 2021, 86 F.R. 7005.

### EXECUTIVE ORDER NO. 13815

Ex. Ord. No. 13815, Oct. 24, 2017, 82 F.R. 50055, which related to resuming the Unites States Refugee Admissions Program with enhanced vetting capabilities, was revoked by Ex. Ord. No. 14013, § 2(a), Feb. 4, 2021, 86 F.R. 8840.

### EXECUTIVE ORDER NO. 13940

<August 3, 2020, 85 F.R. 47879>

#### Aligning Federal Contracting and Hiring Practices With the Interests of American Workers

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1. Policy.** It is the policy of the executive branch to create opportunities for United States workers to compete for jobs, including jobs created through Federal contracts. These opportunities, particularly in regions where the Federal Government remains the largest employer, are especially critical during the economic dislocation caused by the 2019 novel coronavirus (COVID-19) pandemic. When employers trade American jobs for temporary foreign labor, for example, it reduces opportunities

for United States workers in a manner inconsistent with the role guest-worker programs are meant to play in the Nation's economy.

**Sec. 2. Review of Contracting and Hiring Practices.** (a) The head of each executive department and agency (agency) that enters into contracts shall review, to the extent practicable, performance of contracts (including subcontracts) awarded by the agency in fiscal years 2018 and 2019 to assess:

(i) whether contractors (including subcontractors) used temporary foreign labor for contracts performed in the United States, and, if so, the nature of the work performed by temporary foreign labor on such contracts; whether opportunities for United States workers were affected by such hiring; and any potential effects on the national security caused by such hiring; and

(ii) whether contractors (including subcontractors) performed in foreign countries services previously performed in the United States, and, if so, whether opportunities for United States workers were affected by such offshoring; whether affected United States workers were eligible for assistance under the Trade Adjustment Assistance program authorized by the Trade Act of 1974; and any potential effects on the national security caused by such offshoring.

(b) The head of each agency that enters into contracts shall assess any negative impact of contractors' and subcontractors' temporary foreign labor hiring practices or offshoring practices on the economy and efficiency of Federal procurement and on the national security, and propose action, if necessary and as appropriate and consistent with applicable law, to improve the economy and efficiency of Federal procurement and protect the national security.

(c) The head of each agency shall, in coordination with the Director of the Office of Personnel Management, review the employment policies of the agency to assess the agency's compliance with Executive Order 11935 of September 2, 1976 (Citizenship Requirements for Federal Employment), and section 704 of the Consolidated Appropriations Act, 2020, Public Law 116-93.

(d) Within 120 days of the date of this order, the head of each agency shall submit a report to the Director of the Office of Management and Budget summarizing the results of the reviews required by subsections (a) through (c) of this section; recommending, if necessary, corrective actions that may be taken by the agency and timeframes to implement such actions; and proposing any Presidential actions that may be appropriate.y47880

**Sec. 3. Measures to Prevent Adverse Effects on United States Workers.** Within 45 days of the date of this order, the Secretaries of Labor and Homeland Security shall take action, as appropriate and consistent with applicable law, to protect United States workers from any adverse effects on wages and working conditions caused by the employment of H-1B visa holders at job sites (including third-party job sites), including measures to ensure that all employers of H-1B visa holders, including secondary employers, adhere to the requirements of section 212(n)(1) of the Immigration and Nationality Act (8 U.S.C. 1182(n)(1)).

**Sec. 4. General Provisions.** (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

## PROCLAMATIONS

### Suspending Entry of Certain Aliens

Suspension of entry of certain aliens into the United States were contained in the following Presidential proclamations:

Proc. No. 10685, Dec. 11, 2023, 88 F.R. 86541, relating to immigrants and nonimmigrants enabling corruption.

Proc. No. 10309, Nov. 16, 2021, 86 F.R. 64797, relating to immigrants and nonimmigrants responsible for policies or actions that threaten democracy in Nicaragua.

Proc. No. 10052, June 22, 2020, 85 F.R. 38263, as amended by Proc. No. 10054, June 29, 2020, 85 F.R. 40085; Proc. No. 10131, § 2, Dec. 31, 2020, 86 F.R. 418; Proc. No. 10149, § 1, Feb. 24, 2021, 86 F.R. 11847, relating to immigrants and nonimmigrants who present a risk to the United States labor market following the COVID-19 pandemic, expired Mar. 31, 2021.

Proc. No. 10043, May 29, 2020, 85 F.R. 34353, relating to certain students and researchers from the People's Republic of China.

Proc. No. 10014, Apr. 22, 2020, 85 F.R. 23441, as amended by Proc. No. 10052, § 1, June 22, 2020, 85 F.R. 38264; Proc. No. 10131, § 1, Dec. 31, 2020, 86 F.R. 418, relating to immigrants who present a risk to the United States labor market following the COVID-19 pandemic, was revoked by Proc. No. 10149, § 1, Feb. 24, 2021, 86 F.R. 11847.

Proc. No. 9945, Oct. 4, 2019, 84 F.R. 53991, relating to immigrants who will financially burden the United States healthcare system, was revoked by Proc. No. 10209, May 14, 2021, 86 F.R. 27015.

Proc. No. 9932, Sept. 25, 2019, 84 F.R. 51935, relating to senior officials of the government of Iran.

Proc. No. 9931, Sept. 25, 2019, 84 F.R. 51931, relating to persons responsible for policies or actions that threaten Venezuela's democratic institutions.

Proc. No. 8697, Aug. 4, 2011, 76 F.R. 49277, relating to persons who participate in serious human rights and humanitarian law violations and other abuses.

Proc. No. 8693, July 24, 2011, 76 F.R. 44751, relating to aliens subject to United Nations Security Council travel bans and International Emergency Economic Powers Act Sanctions.

Proc. No. 8342, Jan. 16, 2009, 74 F.R. 4093, relating to foreign government officials responsible for failing to combat trafficking in persons.

Proc. No. 7750, Jan. 12, 2004, 69 F.R. 2287, relating to persons engaged in or benefiting from corruption.

### Suspending Entry as Immigrants and Nonimmigrants of Persons Who Pose a Risk of Transmitting 2019 Novel Coronavirus:

§ 1182. Inadmissible aliens, 8 USCA § 1182

Proc. No. 10315, Nov. 26, 2021, 86 F.R. 68385, relating to noncitizens who were physically present within the Republic of Botswana, the Kingdom of Eswatini, the Kingdom of Lesotho, the Republic of Malawi, the Republic of Mozambique, the Republic of Namibia, the Republic of South Africa, and the Republic of Zimbabwe, was revoked by Proc. No. 10329, Dec. 28, 2021, 87 F.R. 149.

Proc. No. 10294, Oct. 25, 2021, 86 F.R. 59603, relating to certain noncitizens who are nonimmigrants and who are not fully vaccinated against COVID-19 arriving by air, was revoked in part, effective May 12, 2023, by Proc. No. 10575, May 9, 2023, 88 F.R. 30889.

Proc. No. 10199, Apr. 30, 2021, 86 F.R. 24297, relating to noncitizens entering as nonimmigrants who were physically present within the Republic of India, was revoked by Proc. No. 10294, § 1, Oct. 25, 2021, 86 F.R. 59604.

Proc. No. 10143, Jan. 25, 2021, 86 F.R. 7467, relating to noncitizens who were physically present within the Schengen Area, the United Kingdom (excluding overseas territories outside of Europe), the Republic of Ireland, and the Federative Republic of Brazil, was revoked by Proc. No. 10294, § 1, Oct. 25, 2021, 86 F.R. 59604.

Proc. No. 10041, May 24, 2020, 85. F.R. 31933, as amended by Proc. No. 10042, May 25, 2020 85 F.R. 32291, relating to aliens present in the Federative Republic of Brazil, was revoked by Proc. No. 10138, Jan. 18, 2021, 86 F.R. 6799.

Proc. No. 9996, Mar. 14, 2020, 85 F.R. 15341, relating to aliens present in the United Kingdom and Republic of Ireland, was revoked by Proc. No. 10138, Jan. 18, 2021, 86 F.R. 6799.

Proc. No. 9993, Mar. 11, 2020, 85 F.R. 15045, relating to aliens present in the Schengen Area, was revoked by Proc. No. 10138, Jan. 18, 2021, 86 F.R. 6799.

Proc. No. 9992, Feb. 29, 2020, 85 F.R. 12855, as amended by Proc. No. 10143, § 5, Jan. 25, 2021, 86 F.R. 7469, relating to aliens present in the Islamic Republic of Iran, was revoked by Proc. No. 10294, § 1, Oct. 25, 2021, 86 F.R. 59604.

Proc. No. 9984, Jan. 31, 2020, 85 F.R. 6709, as amended by Proc. No. 9992, § 4, Feb. 29, 2020, 85 F.R. 12857; Proc. No. 10143, § 5, Jan. 25, 2021, 86 F.R. 7469, relating to aliens present in the People's Republic of China, was revoked by Proc. No. 10294, § 1, Oct. 25, 2021, 86 F.R. 59604.

### PROCLAMATION NO. 4865

<Sept. 29, 1981, 46 F.R. 48107>

### High Seas Interdiction of Illegal Aliens

The ongoing migration of persons to the United States in violation of our laws is a serious national problem detrimental to the interests of the United States. A particularly difficult aspect of the problem is the continuing illegal migration by sea of large numbers of undocumented aliens into the southeastern United States. These arrivals have severely strained the law enforcement resources of the Immigration and Naturalization Service and have threatened the welfare and safety of communities in that region.

As a result of our discussions with the Governments of affected foreign countries and with agencies of the Executive Branch of our Government, I have determined that new and effective measures to curtail these unlawful arrivals are necessary. In this regard, I have determined that international cooperation to intercept vessels trafficking in illegal migrants is a necessary and proper means of insuring the effective enforcement of our laws.

NOW, THEREFORE, I, RONALD REAGAN, President of the United States of America, by the authority vested in me by the Constitution and the statutes of the United States, including Sections 212(f) and 215(a)(1) of the Immigration and Nationality Act, as amended (8 U.S.C. 1182(f) and 1185(a)(1)) [subsec. (f) of this section and section 1185(a)(1) of this title], in order to protect the sovereignty of the United States, and in accordance with cooperative arrangements with certain foreign governments, and having found that the entry of undocumented aliens, arriving at the borders of the United States from the high seas, is detrimental to the interests of the United States, do proclaim that:

The entry of undocumented aliens from the high seas is hereby suspended and shall be prevented by the interdiction of certain vessels carrying such aliens.

IN WITNESS WHEREOF, I have hereunto set my hand this twenty-ninth day of September, in the year of our Lord nineteen hundred and eighty-one, and of the Independence of the United States of America the two hundred and sixth.

RONALD REAGAN

### PROCLAMATION NO. 7359

Proc. No. 7359, Oct. 10, 2000, 65 F.R. 60831, related to the suspension of entry as immigrants and nonimmigrants of persons impeding the peace process in Sierra Leone.

### PROCLAMATION NO. 7750

<Jan. 12, 2004, 69 F.R. 2287>

**To Suspend Entry as Immigrants or Nonimmigrants of Persons Engaged in or Benefitting from Corruption**

**By the President of the United States of America**

**A Proclamation**

In light of the importance of legitimate and transparent public institutions to world stability, peace, and development, and the serious negative effects that corruption of public institutions has on the United States efforts to promote security and to strengthen democratic institutions and free market systems, and in light of the importance to the United States and the international community of fighting corruption, as evidenced by the Third Global Forum on Fighting Corruption and Safeguarding Integrity and other intergovernmental efforts, I have determined that it is in the interests of the United States to take action to restrict the international travel and to suspend the entry into the United States, as immigrants or nonimmigrants, of certain persons who have committed, participated in, or are beneficiaries of corruption in the performance of public functions where that corruption has serious adverse effects on international activity of U.S. businesses, U.S. foreign assistance goals, the security of the United States against transnational crime and terrorism, or the stability of democratic institutions and nations.

NOW, THEREFORE, I, GEORGE W. BUSH, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States, including section 212(f) of the Immigration and Nationality Act of 1952, 8 U.S.C. 1182(f) [subsec. (f) of this section], and section 301 of title 3, United States Code, hereby find that the unrestricted immigrant and nonimmigrant entry into the United States of persons described in section 1 of this proclamation would, except as provided in sections 2 and 3 of this proclamation, be detrimental to the interests of the United States.

I therefore hereby proclaim that:

**Section 1.** The entry into the United States, as immigrants or nonimmigrants, of the following persons is hereby suspended:

**(a)** Public officials or former public officials whose solicitation or acceptance of any article of monetary value, or other benefit, in exchange for any act or omission in the performance of their public functions has or had serious adverse effects on the national interests of the United States.

**(b)** Persons whose provision of or offer to provide any article of monetary value or other benefit to any public official in exchange for any act or omission in the performance of such official's public functions has or had serious adverse effects on the national interests of the United States.

**(c)** Public officials or former public officials whose misappropriation of public funds or interference with the judicial, electoral, or other public processes has or had serious adverse effects on the national interests of the United States.

**(d)** The spouses, children, and dependent household members of persons described in paragraphs (a), (b), and (c) above, who are beneficiaries of any articles of monetary value or other benefits obtained by such persons.

**Sec. 2.** Section 1 of this proclamation shall not apply with respect to any person otherwise covered by section 1 where entry of the person into the United States would not be contrary to the interests of the United States.

**Sec. 3.** Persons covered by sections 1 and 2 of this proclamation shall be identified by the Secretary of State or the Secretary's designee, in his or her sole discretion, pursuant to such standards and procedures as the Secretary may establish.

**Sec. 4.** For purposes of this proclamation, "serious adverse effects on the national interests of the United States" means serious adverse effects on the international economic activity of U.S. businesses, U.S. foreign assistance goals, the security of the United States against transnational crime and terrorism, or the stability of democratic institutions and nations.

**Sec. 5.** Nothing in this proclamation shall be construed to derogate from United States Government obligations under applicable international agreements.

**Sec. 6.** The Secretary of State shall have responsibility for implementing this proclamation pursuant to such procedures as the Secretary may, in the Secretary's discretion, establish.

**Sec. 7.** This proclamation is effective immediately.

**Sec. 8.** This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party, against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this twelfth day of January, in the year of our Lord two thousand four, and of the Independence of the United States of America the two hundred and twenty-eighth.

GEORGE W. BUSH

## PROCLAMATION NO. 9645

Proc. No. 9645, Sept. 24, 2017, 82 F.R. 45161, as amended by Proc. No. 9723, § 1, Apr. 10, 2018, 83 F.R. 15939; Proc. No. 9983, § 3, Jan. 31, 2020, 85 F.R. 6706, which prohibited entry into the United States by nationals of certain countries unless they are approved for a waiver, was revoked by Proc. No. 10141, Jan. 20, 2021, 86 F.R. 7005.

## PROCLAMATION NO. 9723

Proc. No. 9723, Apr. 10, 2018, 83 F.R. 15937, which maintained enhanced vetting capabilities and processes for detecting attempted entry into the United States by terrorists or other public-safety threats, was revoked by Proc. No. 10141, Jan. 20, 2021, 86 F.R. 7005.

## PROCLAMATION NO. 9983

Proc. No. 9983, Jan. 31, 2020 85 F.R. 6699, which prohibited entry into the United States by nationals of certain countries, was revoked by Proc. No. 10141, Jan. 20, 2021, 86 F.R. 7005.

## PROCLAMATION NO. 10773

<June 3, 2024, 89 F.R. 48487, as amended Sept. 27, 2024, 89 F.R. 80351>

### Securing the Border

**By the President of the United States of America**

**A Proclamation**

There are more people around the world who are displaced from their homes today than at any point in time since World War II. Many factors have contributed to this problem. Failing regimes and dire economic conditions afflict many countries, including several in the Western Hemisphere. Violence linked to transnational criminal organizations has displaced substantial numbers of people in Latin America. The global COVID-19 pandemic upended societies around the globe. Natural disasters have forced people from their homes.

As a result of these global conditions, we have been experiencing substantial levels of migration throughout the Western Hemisphere, including at our southwest land border. In 2019, encounters nearly doubled from their 2018 level to almost 1 million. In 2020, the global COVID-19 pandemic led countries throughout the world to shut their borders and suspend international travel; however, once the pandemic began to recede, international travel resumed, and we again experienced elevated levels of migration throughout the Western Hemisphere, including at our southwest land border.

On May 11, 2023, as part of my Administration's work to prepare for the end of the Centers for Disease Control and Prevention's public health order under title 42, United States Code, and to return to processing all noncitizens under immigration authorities under title 8, United States Code (title 8), the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a final rule, entitled Circumvention of Lawful Pathways (Lawful Pathways rule), encouraging the use of lawful pathways and imposing a rebuttable presumption of asylum ineligibility on those who do not use them.

The Lawful Pathways rule was designed to address the high levels of migration throughout the Western Hemisphere and further discourage irregular migration by encouraging migrants to use lawful, safe, and orderly processes for entering the United States or to seek protection in other partner nations; imposing a presumptive condition on asylum eligibility for those who fail to do so; and supporting the swift return of those who do not have valid protection claims.

As a complement to the Lawful Pathways rule and associated enforcement efforts, the Department of State and DHS have taken significant steps to expand safe and orderly pathways for migrants to enter the United States lawfully. Those steps include

establishing Safe Mobility Offices in Colombia, Costa Rica, Ecuador, and Guatemala to facilitate access to lawful pathways; expanding country-specific and other available processes to seek parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit; expanding access to visa programs for seasonal employment; establishing a mechanism for noncitizens to schedule a time and place to present at ports of entry in a safe, orderly, and lawful manner through the CBP One mobile application; and expanding refugee admissions from the Western Hemisphere from 5,000 in Fiscal Year 2021 to up to 50,000 in Fiscal Year 2024.

The Lawful Pathways rule and these complementary measures have made a substantial impact. On May 12, 2023, DHS returned to processing all noncitizens under title 8 immigration authorities and is processing noncitizens at record scale and efficiency. Since then, my Administration has maximized the use of expedited removal to the greatest extent possible given limited resources, placing more than 970 individuals encountered at and between ports of entry at the southwest land border into the process each day on average and conducting more than 152,000 credible fear interviews, both of which are record highs. As a result, from May 12, 2023, to May 1, 2024, my Administration removed or returned more than 720,000 noncitizens who did not have a lawful basis to remain in the United States, the vast majority of whom crossed the southwest land border. Total removals and returns in the 12 months following May 12, 2023, exceeded removals and returns in every full Fiscal Year since 2010. The majority of all individuals encountered at the southwest land border from Fiscal Year 2021 to Fiscal Year 2023 were removed, returned, or expelled.

Despite these efforts, and after months of reduced encounter levels following the changes put in place after May 12, 2023, encounter levels increased toward the end of 2023. and December 2023 saw the highest level of encounters between ports of entry in history, as increasing numbers of people migrated through the Western Hemisphere. The challenges presented by this surge in migration, which would have been even worse had the Lawful Pathways rule and other measures not been in place, were compounded by the fact that the surge was focused increasingly on western areas of the border in California and Arizona that are geographically remote, challenging to address. and without sufficient pre-existing infrastructure or resources to respond to the surge. From January to March 2024, encounters decreased from and have remained below levels experienced in November and December 2023, including as a result of increased enforcement by the United States and partner countries. However, the factors that are driving the unprecedented movement of people in our hemisphere remain, and there is still a substantial and elevated level of migration that continues to pose significant operational challenges.

The current situation is also the direct result of the Congress's failure to update an immigration and asylum system that is simply broken--and not equipped to meet current needs. While my Administration has vigorously enforced the law within the constraints imposed by the existing system, the statutory framework put in place by the Congress is outdated. For the vast majority of people in immigration proceedings, the current laws make it impossible to quickly grant protection to those who require it and to quickly remove those who do not establish a legal basis to remain in the United States. This reality is compounded by the fact that the Congress has chronically underfunded our border security and immigration system and has failed to provide the resources or reforms it needs to be able to deliver timely consequences to most individuals who cross unlawfully and cannot establish a legal basis to remain in the United States.

Despite the strengthened consequences in place at our border through the Lawful Pathways rule and the related measures that have led to record returns and removals, encounter levels are exceeding our capacity to deliver those consequences in a timely manner due to the outdated laws and limited resources we have available.

My Administration has repeatedly asked the Congress to update the outdated and inadequate immigration statutes, to create a legal framework that is functional and addresses current realities, and to provide additional resources so that we can more effectively deliver consequences at the border. In August 2023, I requested more than $4 billion in additional funding for border security and related migration issues, including more than $2 billion for urgent DHS border management requirements. The Congress failed to act. In October 2023, I requested $13.6 billion for border enforcement and migration management. This request included more than $5 billion for DHS to manage conditions on the southern border, as well as funding for

§ 1182. Inadmissible aliens, 8 USCA § 1182

critical capacity enhancements to keep the southern border secure. The Congress once again failed to provide our border and immigration system with the resources it needs to deliver timely consequences to those who cross unlawfully.

In early February 2024, a bipartisan group of Senators introduced legislation (bipartisan legislative proposal) containing the toughest and fairest reforms of our asylum laws in decades that would have provided new authorities to significantly streamline and speed up immigration enforcement proceedings for individuals encountered at the border, including those who are seeking protection. Critically, the bipartisan legislative proposal included nearly $20 billion in additional resources for DHS and other departments to implement those new authorities, such as:

(a) over 1,500 new U.S. Customs and Border Protection (CBP) personnel, including Border Patrol agents and CBP officers;

(b) over 4,300 new asylum officers and additional U.S. Citizenship and Immigration Services staff to facilitate timely and fair decisions;

(c) 100 new immigration judge teams to help reduce the asylum caseload backlog and adjudicate cases more quickly;

(d) shelter and critical services for newcomers in our cities and States; and

(e) 1,200 new U.S. Immigration and Customs Enforcement personnel for functions including enforcement and deportations.

While the bipartisan legislative proposal did not include everything we wanted, senior officials from my Administration worked closely with the bipartisan group of Senators to ensure that the reforms would adequately address the challenges that we have been facing at our southern border for more than a decade. However, the Congress failed to move forward with this bipartisan legislative proposal.

The Further Consolidated Appropriations Act, 2024 (Public Law 118-47) increased funding for DHS over Fiscal Year 2023, but it did not address the needs identified in various related supplemental requests, nor did it equip the Federal Government with the new authorities from the bipartisan legislative proposal. In May 2024, when the Senate again considered the bipartisan legislative proposal, the Senate failed to advance the measure.

Our broken immigration system is directly contributing to the historic migration we are seeing throughout the Western Hemisphere, exacerbated by poor economic conditions, natural disasters, and general insecurity, and this fact, combined with inadequate resources to keep pace, has once again severely strained our capacity at the border. The result is a vicious cycle in which our United States Border Patrol facilities constantly risk overcrowding, our detention system has regularly been at capacity, and our asylum system remains backlogged and cannot deliver timely decisions, all of which spurs more people to make the dangerous journey north to the United States.

The Congress's failure to deliver meaningful policy reforms and adequate funding, despite repeated requests that they do so, is a core cause of this problem. Under current law, whenever a noncitizen in expedited removal indicates an intention to apply for asylum or a fear of persecution, they are referred for an interview with an asylum officer and cannot be removed through expedited removal if there is a significant possibility that they could establish eligibility for asylum. This screening standard is a requirement imposed by the Congress, but it has not functioned well in predicting ultimate success in asylum proceedings. From 2014 to 2019, 83 percent of individuals referred for an interview with an asylum officer passed the screening stage, meaning that they were not removed pursuant to expedited removal, but less than 25 percent of cases ultimately resulted in a grant of asylum or other protection, often after waiting years to reach a final decision. By imposing a rebuttable presumption of asylum ineligibility on those who cross the border unlawfully, the Lawful Pathways rule has made a meaningful impact in reducing this disparity. The screen-in rate from May 12, 2023, to March 31, 2024, dropped to 52 percent for individuals who are subject to the rebuttable presumption of asylum ineligibility. However, the Lawful Pathways rule alone is inadequate during times of record encounter levels and cannot change the underlying statutory limitations.

Data confirm that the system has been badly strained for many years and is not functioning to provide timely relief for those who warrant it or timely consequences for those without viable protection claims. Due to an outdated and inefficient system and insufficient resources that do not allow for prompt adjudication of claims, too many people have had to be processed by the Border Patrol and released with a notice to appear in removal proceedings before an immigration judge since May 2023. The U.S. Citizenship and Immigration Service affirmative asylum backlog is now over 1 million cases and growing, with over 300,000 applications filed prior to 2021 still pending. At the end of Fiscal Year 2023, there were over 2.4 million cases pending in the immigration courts. Pending cases more than doubled from the end of Fiscal Year 2016 to the end of Fiscal Year 2020 and doubled again between that time and the end of Fiscal Year 2023. Between Fiscal Year 2006 and the end of Fiscal Year 2023, in tandem with historic increases in filings to initiate immigration court proceedings, the immigration courts' pending caseload increased from approximately 170,000 to approximately 2.46 million. During Fiscal Year 2023, immigration judges completed more cases than they ever had before in a single year, but more than twice as many cases were received by the immigration courts than were completed.

The status quo system--the result of outdated laws and inadequate resources--has become a driver for unlawful migration throughout the region and an increasingly lucrative source of income for dangerous transnational criminal organizations and other criminal smuggling organizations that, without countermeasures, will continue to grow in strength and pose significant threats to the safety and security of United States communities and migrants, as well as countries throughout the region.

Considering these trends and the decades-long failure of the Congress to address the problem through systemic reform and adequate funding, and following the Congress's failure to pass the bipartisan legislative proposal, I must exercise my executive authorities to meet the moment. This proclamation answers the call by suspending entry of noncitizens across the southern border during this time of high border crossings. Appropriate exceptions are provided, such as for those who are particularly vulnerable or present pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for safe and orderly processing into the United States. That process will continue to allow for individuals to seek entry to this country each day in a safe and orderly manner, and following their arrival, to seek protection through the appropriate process. This proclamation, in conjunction with steps to be taken by DOJ and DHS, is needed to enhance our ability to address the historic levels of migration and more efficiently process migrants arriving at the southern border given current resource levels.

These actions do not change or fully compensate for the fact that our immigration system is under-resourced and broken, nor do they change the fact that there are significant limits to what can be achieved without the Congress fulfilling its responsibility to help solve the unprecedented challenge that we are facing. No executive action can deliver the significant policy reforms and additional resources that were in the bipartisan legislative proposal. But I will continue to take actions, within these constraints, to address the situation at our southern border.

NOW, THEREFORE, I, JOSEPH R. BIDEN JR., President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (8 U.S.C. 1182(f) and 1185(a)) and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in this proclamation, the entry into the United States of persons described in section 1 of this proclamation under circumstances described in section 2 of this proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1. Suspension and Limitation on Entry.** The entry of any noncitizen into the United States across the southern border is hereby suspended and limited, subject to section 3 of this proclamation. This suspension and limitation on entry shall be effective at 12:01 a.m. eastern daylight time on June 5, 2024. The suspension and limitation directed in this proclamation shall be discontinued pursuant to subsection 2(a) of this proclamation, subject to subsection 2(b) of this proclamation.

**Sec. 2. Applicability of Suspension and Limitation on Entry.** (a) The Secretary of Homeland Security shall monitor the number of daily encounters and, subject to subsection (b) of this section, the suspension and limitation on entry pursuant to

section 1 of this proclamation shall be discontinued at 12:01 a.m. eastern time on the date that is 14 calendar days after the Secretary makes a factual determination that there have been 28 consecutive calendar days of a 7-consecutive-calendar-day average of less than 1,500 encounters, not including encounters described in subsection 4(a)(iii) of this proclamation.

**(b)** Notwithstanding a factual determination made under subsection (a) of this section, the suspension and limitation on entry pursuant to section 1 of this proclamation shall apply at 12:01 a.m. eastern time on the calendar day immediately after the Secretary has made a factual determination that there has been a 7-consecutive-calendar-day average of 2,500 encounters or more, not including encounters described in subsection 4(a)(iii) of this proclamation, until such suspension and limitation on entry is discontinued pursuant to subsection (a) of this section.

**(c)** [revoked by 89 F.R. 80351, § 2]

**Sec. 3. Scope and Implementation of Suspension and Limitation on Entry. (a)** The suspension and limitation on entry pursuant to section 1 of this proclamation shall apply across the southern border to noncitizens, other than those described in subsection (b) of this section, during such times that the suspension and limitation on entry is in effect.

**(b)** The suspension and limitation on entry pursuant to section 1 of this proclamation shall not apply to:

**(i)** any noncitizen national of the United States;

**(ii)** any lawful permanent resident of the United States;

**(iii)** any unaccompanied child as defined in section 279(g)(2) of title 6, United States Code;

**(iv)** any noncitizen who is determined to be a victim of a severe form of trafficking in persons, as defined in section 7102(16) of title 22, United States Code;

**(v)** any noncitizen who has a valid visa or other lawful permission to seek entry or admission into the United States, or presents at a port of entry pursuant to a pre-scheduled time and place, including:

**(A)** members of the United States Armed Forces and associated personnel, United States Government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household;

**(B)** noncitizens who hold a valid visa or who have all necessary documents required for admission consistent with the requirements of section 1182(a)(7) of title 8, United States Code, upon arrival at a port of entry;

**(C)** noncitizens traveling pursuant to the visa waiver program as described in section 1187 of title 8, United States Code; and

**(D)** noncitizens who arrive in the United States at a southwest land border port of entry pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for the safe and orderly entry of noncitizens into the United States;

**(vi)** any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer, based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, urgent humanitarian, and public health interests at the time of the entry or encounter that warranted permitting the noncitizen to enter; and

**(vii)** any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer, due to operational considerations at the time of the entry or encounter that warranted permitting the noncitizen to enter.

(c) An exception under subsection (b) of this section from the suspension and limitation on entry pursuant to section 1 of this proclamation does not affect a noncitizen's inadmissibility under the Immigration and Nationality Act for a reason other than the applicability of this proclamation.

(d) The Secretary of Homeland Security and the Attorney General are authorized to issue any instructions, orders, or regulations as may be necessary to implement this proclamation, including the determination of the exceptions in subsection (b) of this section, and shall promptly consider issuing any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determine are warranted, subject to any exceptions that they determine are warranted.

(e) Nothing in this proclamation shall limit the statutory processes afforded to unaccompanied children upon entering the United States under section 279 of title 6, United States Code, and section 1232 of title 8, United States Code.

**Sec. 4. Definitions. (a)** The term "encounter" refers to a noncitizen who:

(i) is physically apprehended by CBP immigration officers within 100 miles of the United States southwest land border during the 14-day period immediately after entry between ports of entry;

(ii) is physically apprehended by DHS personnel at the southern coastal borders during the 14-day period immediately after entry between ports of entry; or

(iii) is determined to be inadmissible at a southwest land border port of entry.

(b) The term "southern coastal borders" means all maritime borders in Texas, Louisiana, Mississippi, Alabama, and Florida; all maritime borders proximate to the southwest land border, the Gulf of Mexico, and the southern Pacific coast in California; and all maritime borders of the United States Virgin Islands and Puerto Rico.

(c) The term "southwest land border" means the entirety of the United States land border with Mexico.

(d) The term "southern border" means the southwest land border and the southern coastal borders.

**Sec. 5. Severability.** It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the interests of the United States. Accordingly, if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its provisions to any other persons or circumstances shall not be affected thereby.

**Sec. 6. General Provisions. (a)** Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

§ 1182. Inadmissible aliens, 8 USCA § 1182

IN WITNESS WHEREOF, I have hereunto set my hand this third day of June, in the year of our Lord two thousand twenty-four, and of the Independence of the United States of America the two hundred and forty-eighth.

J.R. BIDEN JR.

## PROCLAMATION NO. 10817

<Sept. 27, 2024, 89 F.R. 80351>

### Amending Proclamation 10773

**By the President of the United States of America**

**A Proclamation**

On June 3, 2024, I signed Proclamation 10773 (Securing the Border). That proclamation suspended and limited the entry of certain noncitizens into the United States across the southern border during times of high border crossings, and directed the Secretary of Homeland Security and the Attorney General to promptly consider issuing any instructions, orders, or regulations as might be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determined were warranted. Following that direction, the Secretary of Homeland Security and the Attorney General issued an interim final rule (IFR) that established a limitation on asylum eligibility for certain noncitizens who enter the United States across the southern border during times when Proclamation 10773 and the IFR are designed to be in effect, and revised certain procedures applicable to the expedited removal process to more swiftly apply consequences for irregular migration during those times for noncitizens who do not establish a lawful basis to remain.

Those actions have already produced significant results. Since Proclamation 10773 and the IFR went into effect, and as of the end of the last calendar month, the average number of encounters by the United States Border Patrol at our southwest border between ports of entry has decreased by 59 percent compared to the period after the Circumvention of Lawful Pathways rule began to apply on May 12, 2023, and before Proclamation 10773 and the IFR went into effect. July and August 2024 were the lowest 2 months of encounters between ports of entry since September 2020. While Proclamation 10773 and the IFR have been in effect, and for individuals encountered between southern border ports of entry as of the end of the last calendar month, the Department of Homeland Security has removed or returned 70 percent of single adults and family members, including more than 119,000 individuals to more than 140 countries; has more than tripled the percentage of noncitizens processed through expedited removal; and has decreased the percentage of noncitizens encountered at the southwest border who are released by United States Border Patrol pending their removal proceedings by 52 percent.

Following the issuance of the IFR, the Department of Homeland Security and the Department of Justice (Departments) received and reviewed more than 1,000 comments. Based on their review of those comments and their experience in implementing Proclamation 10773 and the IFR, the Departments have identified two issues related to the thresholds for determining when to apply the suspension and limitation on entry in Proclamation 10773 and the measures described in the IFR.

First, having closely monitored the 7-consecutive-calendar-day average of encounters following the issuance of Proclamation 10773 and the IFR, the Departments have assessed that the current threshold for discontinuing the suspension and limitation on entry in Proclamation 10773 and the measures described in the IFR could be reached following a short-term decrease in the number of encounters at the southern border that does not reflect a sustained decrease in the number of such encounters or an end to the border circumstances in which Proclamation 10773 and the IFR are designed to apply. The Departments are currently considering regulatory action to address this issue as it relates to the measures described in the IFR. With respect to Proclamation 10773, to ensure that the threshold to discontinue the suspension and limitation on entry reflects a sustained

decrease in encounters, I have now determined that the suspension and limitation on entry in that proclamation should be discontinued only after the Secretary of Homeland Security has made a factual determination that there have been 28 consecutive calendar days in which the 7-consecutive-calendar-day average of encounters is less than 1,500.

Second, while Proclamation 10773 and the IFR excluded encounters of unaccompanied children from non-contiguous countries from the calculation of encounters, the Departments have assessed, based on their experience implementing Proclamation 10773 and the IFR, that this exclusion is unwarranted because processing such noncitizens is particularly resource-intensive for our frontline personnel at the southern border. This experience indicates that excluding these noncitizens from the calculation yields inaccurate estimates of system capacity. Again, the Departments are currently considering regulatory action to address this issue as it relates to the measures described in the IFR. I have now concluded that in order to better achieve Proclamation 10773's goal of enhancing our ability to address historic levels of migration and more efficiently process migrants arriving at the southern border, that proclamation should include unaccompanied children from both non-contiguous and contiguous countries in the calculation of encounters. Consistent with section 3(b)(iii) of Proclamation 10773, any unaccompanied children will remain excepted from the suspension and limitation on entry pursuant to section 1 of Proclamation 10773.

NOW, THEREFORE, I, JOSEPH R. BIDEN JR., President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (8 U.S.C. 1182(f) and 1185(a)) and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in Proclamation 10773, as amended by this proclamation, the entry into the United States of persons described in section 1 of Proclamation 10773 under circumstances described in section 2 of Proclamation 10773, as amended by this proclamation, would be detrimental to the interests of the United States, and that the entry of such persons should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1. Amendment to Section 2(a) of Proclamation 10773.** Section 2(a) of Proclamation 10773 is amended to read as follows:

"The Secretary of Homeland Security shall monitor the number of daily encounters and, subject to subsection (b) of this section, the suspension and limitation on entry pursuant to section 1 of this proclamation shall be discontinued at 12:01 a.m. eastern time on the date that is 14 calendar days after the Secretary makes a factual determination that there have been 28 consecutive calendar days of a 7-consecutive-calendar-day average of less than 1,500 encounters, not including encounters described in subsection 4(a)(iii) of this proclamation."

**Sec. 2. Revocation of Section 2(c) of Proclamation 10773.** Section 2(c) of Proclamation 10773 is revoked.

**Sec. 3. Severability.** It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the interests of the United States. Accordingly, if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its provisions to any other persons or circumstances shall not be affected thereby.

**Sec. 4. Effectiveness.** The amendments described in sections 1 and 2 of this proclamation shall be effective if and when there is in effect a final rule promulgated by the Secretary of Homeland Security and the Attorney General that amends the IFR entitled Securing the Border, 89 FR 48,710 (June 7, 2024), consistent with the amendments described in sections 1 and 2 of this proclamation. If, due to court order, the final rule described in the prior sentence cannot be enforced insofar as it makes changes consistent with the amendment described in section 1 of this proclamation, then the amendment described in section 1 of this proclamation will no longer be in effect and section 2(a) of Proclamation 10773 shall continue to apply by its terms. If, due to court order, the final rule described in the first sentence of this section cannot be enforced insofar as it makes changes consistent with the amendment described in section 2 of this proclamation, then the amendment described in section 2 of this proclamation will no longer be in effect and section 2(c) of Proclamation 10773 shall continue to apply by its terms.

§ 1182. Inadmissible aliens, 8 USCA § 1182

---

**Sec. 5. General Provisions. (a)** Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this twenty-seventh day of September, in the year of our Lord two thousand twenty-four, and of the Independence of the United States of America the two hundred and forty-ninth.

J.R. BIDEN JR.

## PROCLAMATION NO. 10888

<Jan. 20, 2025, 90 F.R. 8333>

### Guaranteeing the States Protection Against Invasion

**By the President of the United States of America**

**A Proclamation**

By the authority vested in me as President by the Constitution and the laws of the United States of America, I hereby proclaim:

An essential feature of any sovereign nation is the existence of territorial boundaries and the inherent authority to decide who and what may cross those boundaries. The Supreme Court of the United States has described this power as a "fundamental act of sovereignty," which "stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." U.S. ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 542 (1950). The Supreme Court has recognized the inherent right and duty of the Executive Branch to defend our national sovereignty, stating that "[w]hen Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an inherent executive power." Id.

The Congress has, in establishing "an uniform Rule of Naturalization," created a complex and comprehensive Federal scheme in the Immigration and Nationality Act (INA), 8 U.S.C. 1101 et seq., to control the entry and exit of people and goods across the borders of the United States. In routine circumstances, this complex and comprehensive scheme can protect the national sovereignty of the United States by facilitating the admission of individuals whose presence serves the national interest and preventing the admission of those who do not, such as those aliens who pose threats to public health, section 212(a)(1) of the INA, 8 U.S.C. 1182(a)(1); safety, section 212(a)(2) (8 U.S.C. 1182(a)(2)); and national security, section 212(a)(3) (8 U.S.C. 1182(a)(3)). Prospective immigrants who use the visa system are screened for such health, safety, and security concerns while outside of the United States, and are not permitted to enter the United States until they establish that they are eligible to be admitted as a matter of law and should be admitted as a matter of discretion.

---

§ 1182. Inadmissible aliens, 8 USCA § 1182

But screening under those provisions of the INA can be wholly ineffective in the border environment, where access to necessary information is limited for aliens who have traveled from countries around the world to enter the United States illegally, or when the system is overwhelmed, leading to the unauthorized entry of innumerable illegal aliens into the United States.

Due to significant information gaps--particularly in the border environment--and processing times, Federal officials do not have the ability to verify with certainty the criminal record or national-security risks associated with the illegal entry of every alien at the southern border, as required by section 212(a)(2)-(3) of the INA, 8 U.S.C. 1182(a)(2)-(3). Nor do aliens who illegally cross the southern border readily provide comprehensive background information from their home countries to Federal law enforcement officials.

The public safety and national security risks in such an environment are heightened by the presence of, and control of territory by, international cartels and other transnational criminal organizations on the other side of the southern border, as well as terrorists and other malign actors who intend to harm the United States and the American people. And the risks associated with these issues are greatly exacerbated when the number of aliens illegally crossing the southern border increases to levels that prevent actual operational control of the border.

The same is true for public health, where the Federal Government currently lacks an effective operational capability to screen all illegal aliens crossing the southern border for communicable diseases of public-health concern, as required by section 212(a)(1) of the INA, 8 U.S.C. 1182(a)(1). Effectively no aliens who illegally enter the United States provide Federal officials at the southern border with their comprehensive health information, as a lawful immigrant would. As a result, innumerable aliens potentially carrying communicable diseases of public health significance illegally cross the southern border and enter communities across the United States.

Over the last 4 years, at least 8 million illegal aliens were encountered along the southern border of the United States, and countless millions more evaded detection and illegally entered the United States. The sheer number of aliens entering the United States has overwhelmed the system and rendered many of the INA's provisions ineffective, including those previously described that are intended to prevent aliens posing threats to public health, safety, and national security from entering the United States. As a result, millions of aliens who potentially pose significant threats to health, safety, and national security have moved into communities nationwide.

This ongoing influx of illegal aliens across the southern border of the United States has placed significant costs and constraints upon the States, which have collectively spent billions of dollars in providing medical care and related human services, and have spent considerable amounts on increased law enforcement costs associated with the presence of these illegal aliens within their boundaries.

In joining the Union, the States agreed to surrender much of their sovereignty and join the Union in exchange for the Federal Government's promise in Article IV, Section 4 of the U.S. Constitution, to "protect each of [the States] against Invasion." I have determined that the current state of the southern border reveals that the Federal Government has failed in fulfilling this obligation to the States and hereby declare that an invasion is ongoing at the southern border, which requires the Federal Government to take measures to fulfill its obligation to the States.

The INA provides the President with certain emergency tools. For example, it states that "[w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. 1182(f). This statute "exudes deference to the President in every clause." Trump v. Hawaii, 585 U.S. 667, 684 (2018). Further, the INA renders it unlawful for "any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. 1185(a)(1).

Historically, Presidents have used these statutory authorities to deny entry of designated classes and categories of aliens into the United States through ports of entry. But if the President has the power to deny entry of any alien into the United States, and to impose any restrictions as he may deem appropriate, this authority necessarily includes the right to deny the physical entry of aliens into the United States and impose restrictions on access to portions of the immigration system, particularly when the number of aliens illegally crossing the southern border prevents the Federal Government from obtaining operational control of the border.

The INA does not, however, occupy the Federal Government's field of authority to protect the sovereignty of the United States, particularly in times of emergency when entire provisions of the INA are rendered ineffective by operational constraints, such as when there is an ongoing invasion into the States. The President's inherent powers to control the borders of the United States, including those deriving from his authority to control the foreign affairs of the United States, necessarily include the ability to prevent the physical entry of aliens involved in an invasion into the United States, and to rapidly repatriate them to an alternative location. Only through such measures can the President guarantee the right of each State to be protected against invasion.

By the power vested in me by the Constitution and the laws of the United States, I have determined that the current situation at the southern border qualifies as an invasion under Article IV, Section 4 of the Constitution of the United States. Accordingly, I am issuing this Proclamation based on my express and inherent powers in Article II of the Constitution of the United States, and in faithful execution of the immigration laws passed by the Congress, and suspending the physical entry of aliens involved in an invasion into the United States across the southern border until I determine that the invasion has concluded.

NOW, THEREFORE, I, Donald J. Trump, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby direct as follows:

**Section 1. Suspension of Entry.** I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), that the entry into the United States on or after the date of this order of aliens engaged in the invasion across the southern border is detrimental to the interests of the United States. I therefore direct that entry into the United States of such aliens be suspended until I issue a finding that the invasion at the southern border has ceased.

**Sec. 2. Imposition of Restrictions on Entry for Aliens Invading the United States.** I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), that aliens engaged in the invasion across the southern border of the United States on or after the date of this proclamation are restricted from invoking provisions of the INA that would permit their continued presence in the United States, including, but not limited to, section 208 of the INA, 8 U.S.C. 1158, until I issue a finding that the invasion at the southern border has ceased.

**Sec. 3. Suspension of and Restriction on Entry for Aliens Posing Public Health, Safety, or National Security Risks.** I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), that the entry into the United States, on or after the date of this order, of any alien who fails, before entering the United States, to provide Federal officials with sufficient medical information and reliable criminal history and background information as to enable fulfillment of the requirements of sections 212(a)(1)-(3) of the INA, 8 U.S.C. 1182(a)(1)-(3), is detrimental to the interests of the United States. I therefore direct that entry into the United States of such aliens be suspended and restrict their access to provisions of the INA that would permit their continued presence in the United States, including, but not limited to, section 208 of the INA, 8 U.S.C. 1158.

**Sec. 4. Constitutional Suspension of Physical Entry.** Under the authorities provided to me under Article II of the Constitution of the United States, including my control over foreign affairs, and to effectuate the guarantee of protection against invasion required by Article IV, Section 4, I hereby suspend the physical entry of any alien engaged in the invasion across the southern border of the United States, and direct the Secretary of Homeland Security, in coordination with the Secretary of State and the

Attorney General, to take appropriate actions as may be necessary to achieve the objectives of this proclamation, until I issue a finding that the invasion at the southern border has ceased.

**Sec. 5. Operational Actions to Repel the Invasion.** The Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to repel, repatriate, or remove any alien engaged in the invasion across the southern border of the United States on or after the date of this order, whether as an exercise of the suspension power in section 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), or as an exercise of my delegated authority under the Constitution of the United States, until I issue a finding that the invasion at the southern border has ceased.

**Sec. 6. General Provisions. (a)** Nothing in this proclamation shall be construed to impair or otherwise affect:

  **(i)** the authority granted by law to an executive department or agency, or the head thereof; or

  **(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

 **(b)** This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

 **(c)** This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this twentieth day of January, in the year of our Lord two thousand twenty-five, and of the Independence of the United States of America the two hundred and forty-ninth.

DONALD J.TRUMP

**MEMORANDA OF PRESIDENT**

**DELEGATION OF AUTHORITY UNDER SECTIONS 212(f) AND
215(a)(1) OF THE IMMIGRATION AND NATIONALITY ACT**

<Sept. 24, 1999, 64 F.R. 55809>

**Memorandum for the Attorney General**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a)(1) of the Immigration and Nationality Act, as amended (8 U.S.C. 1182(f) and 1185(a)(1)), and in light of Proclamation 4865 of September 29, 1981 [set out as a note under this section], I hereby delegate to the Attorney General the authority to:

**(a)** Maintain custody, at any location she deems appropriate, and conduct any screening she deems appropriate in her unreviewable discretion, of any undocumented person she has reason to believe is seeking to enter the United States and who is encountered in a vessel interdicted on the high seas through December 31, 2000; and

**(b)** Undertake any other appropriate actions with respect to such aliens permitted by law.

With respect to the functions delegated by this order, all actions taken after April 16, 1999, for or on behalf of the President that would have been valid if taken pursuant to this memorandum are ratified.

This memorandum is not intended to create, and should not be construed to create, any right or benefit, substantive or procedural, legally enforceable by any party against the United States, its agencies or instrumentalities, officers, employees, or any other person, or to require any procedures to determine whether a person is a refugee.

You are authorized and directed to publish this memorandum in the **Federal Register.**

WILLIAM J. CLINTON

### PRESIDENTIAL MEMORANDUM

Memorandum of President of the United States, Mar. 6, 2017, 82 F.R. 16279, which related to increased enforcement of immigration laws, was revoked by Ex. Ord. No. 14013, § 2(b), Feb. 4, 2021, 86 F.R. 8840.

### PRESIDENTIAL MEMORANDUM

<June 14, 2017, 82 F.R. 27965>

### Effective Date in Executive Order 13780

**Memorandum for the Secretary of State[,] the Attorney General[,] the Secretary of Homeland Security[, and] the Director of National Intelligence**

This memorandum provides guidance for the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence in light of two preliminary injunctions that bar enforcement of certain provisions of Executive Order 13780, "Protecting the Nation from Foreign Terrorist Entry into the United States" (Mar. 6, 2017). The preliminary injunction entered by the United States District Court for the District of Maryland, and affirmed in substantial part by the United States Court of Appeals for the Fourth Circuit, bars enforcement of section 2(c) of the Executive Order. The portions of the preliminary injunction entered by the United States District Court for the District of Hawaii that were affirmed by the recent decision of the United States Court of Appeals for the Ninth Circuit bar enforcement of certain provisions of sections 2 and 6 of the Executive Order.

Various provisions of sections 2 and 6 of the Executive Order (as well as sections 3 and 12(c), which delineate the scope of the suspension contained in section 2(c)), refer to the Order's effective date. Section 14 of the Executive Order provides that the Order was effective at 12:01 a.m., eastern daylight time on March 16, 2017. Sections 2 and 6, however, were enjoined before that effective date, and the courts of appeals have affirmed the injunctions with respect to certain provisions of sections 2 and 6. As a result, under the terms of the Executive Order, the effective date of the enjoined provisions (as well as related provisions of sections 3 and 12(c)) is delayed or tolled until those injunctions are lifted or stayed.

In light of questions in litigation about the effective date of the enjoined provisions and in the interest of clarity, I hereby declare the effective date of each enjoined provision to be the date and time at which the referenced injunctions are lifted or stayed with respect to that provision. To the extent it is necessary, this memorandum should be construed to amend the Executive Order.

Because the injunctions have delayed the effective date of section 12(c), no immigrant or nonimmigrant visa issued before the effective date of section 2(c) shall be revoked pursuant to the Executive Order.

I hereby direct the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence to jointly begin implementation of each relevant provision of sections 2 and 6 of the Executive Order 72 hours after

all applicable injunctions are lifted or stayed with respect to that provision, to ensure an orderly and proper implementation of those provisions. Prior to that time, consular officers may issue valid visas to, and the Secretary of Homeland Security may admit, otherwise eligible aliens without regard to sections 2 and 6. If not otherwise revoked, visas and other travel documents issued during this period remain valid for travel as if they were issued prior to the effective date.

DONALD J. TRUMP

**PRESIDENTIAL MEMORANDUM**

<July 26, 2024, 89 F.R. 61341>

**Deferred Enforced Departure for Certain Lebanese Nationals**

**Memorandum for the Secretary of State [and] the Secretary of Homeland Security**

Humanitarian conditions in southern Lebanon have significantly deteriorated due to tensions between Hezbollah and Israel. While I remain focused on de-escalating the situation and improving humanitarian conditions, many civilians remain in danger; therefore, I am directing the deferral of removal of certain Lebanese nationals who are present in the United States.

Pursuant to my constitutional authority to conduct the foreign relations of the United States, I have determined that it is in the foreign policy interest of the United States to defer for 18 months the removal of any Lebanese national subject to the conditions and exceptions provided below.

Accordingly, I hereby direct the Secretary of Homeland Security to take appropriate measures to defer for 18 months the removal of any Lebanese national who is present in the United States on the date of this memorandum, except for those:

(1) who have voluntarily returned to Lebanon after the date of this memorandum;

(2) who have not continuously resided in the United States since the date of this memorandum;

(3) who are inadmissible under section 212(a)(3) of the Immigration and Nationality Act (INA) (8 U.S.C. 1182(a)(3)) or deportable under section 237(a)(4) of the INA (8 U.S.C. 1227(a)(4));

(4) who have been convicted of any felony or two or more misdemeanors committed in the United States, or who meet any of the criteria set forth in section 208(b)(2)(A) of the INA (8 U.S.C. 1158(b)(2)(A));

(5) who are subject to extradition;

(6) whose presence in the United States the Secretary of Homeland Security has determined is not in the interest of the United States or presents a danger to public safety; or

(7) whose presence in the United States the Secretary of State has reasonable grounds to believe would have potentially serious adverse foreign policy consequences for the United States.

I further direct the Secretary of Homeland Security to take appropriate measures to authorize employment for noncitizens whose removal has been deferred, as provided by this memorandum, for the duration of such deferral, and to consider suspending regulatory requirements with respect to F-1 nonimmigrant students who are Lebanese nationals as the Secretary of Homeland Security determines to be appropriate.

§ 1182. Inadmissible aliens, 8 USCA § 1182

J.R. BIDEN JR.

## PRESIDENTIAL MEMORANDUM

<Jan. 15, 2025, 90 F.R. 6749>

**Extending and Expanding Eligibility for Deferred Enforced Departure for Certain Hong Kong Residents**

**Memorandum for the Secretary of State [and] the Secretary of Homeland Security**

The United States supports the human rights and fundamental freedoms of the residents of Hong Kong. The People's Republic of China (PRC) has continued to significantly erode those rights and freedoms. I am therefore directing an extension and expansion of the deferral of removal of certain Hong Kong residents, regardless of country of birth, who are present in the United States.

By unilaterally imposing on Hong Kong the Law of the People's Republic of China on Safeguarding National Security in the Hong Kong Special Administrative Region (NSL) in June 2020, the PRC has undermined the enjoyment of rights and freedoms in Hong Kong, including those protected under the Basic Law and the Sino-British Joint Declaration. Following the NSL's enactment, the PRC has continued its assault on Hong Kong's autonomy, undermining its remaining democratic processes and institutions, imposing limits on academic freedom, and cracking down on freedom of the press. Since June 2020, at least 200 opposition politicians, activists, and protesters have been taken into custody on politically motivated NSL-related charges including secession, subversion, terrorist activities, and collusion with a foreign country or external elements. On November 19, 2024, Hong Kong authorities also sentenced 45 pro-democracy advocates to prison for their peaceful participation in political activities protected under the Basic Law of Hong Kong.

There are compelling foreign policy reasons to extend Deferred Enforced Departure (DED) for an additional period for those residents of Hong Kong presently residing in the United States who were under a grant of DED until February 5, 2025, as well as to defer enforced departure for other Hong Kong residents who arrived in the United States subsequent to the initial grant of DED. The United States is committed to a foreign policy that unites our democratic values with our foreign policy goals, which is centered on the defense of democracy and the promotion of human rights around the world. Offering safe haven for Hong Kong residents who have been deprived of their guaranteed freedoms in Hong Kong furthers United States interests in the region. The United States will continue to stand firm in our support of the people in Hong Kong.

Pursuant to my constitutional authority to conduct the foreign relations of the United States, I have determined that it is in the foreign policy interest of the United States to defer for 24 months the removal of any Hong Kong resident, regardless of country of birth, who is present in the United States on the date of this memorandum, except for those:

(1) who have voluntarily returned to Hong Kong or the PRC after the date of this memorandum;

(2) who have not continuously resided in the United States since the date of this memorandum;

(3) who are inadmissible under section 212(a)(3) of the Immigration and Nationality Act (INA) (8 U.S.C. 1182(a)(3)) or deportable under section 237(a)(4) of the INA (8 U.S.C. 1227(a)(4));

(4) who have been convicted of any felony or two or more misdemeanors committed in the United States, or who meet any of the criteria set forth in section 208(b)(2)(A) of the INA (8 U.S.C. 1158(b)(2)(A));

(5) who are subject to extradition;

§ 1182. Inadmissible aliens, 8 USCA § 1182

(6) whose presence in the United States the Secretary of Homeland Security has determined is not in the interest of the United States or presents a danger to public safety; or

(7) whose presence in the United States the Secretary of State has reasonable grounds to believe would have potentially serious adverse foreign policy consequences for the United States.

I further direct the Secretary of Homeland Security to take appropriate measures to authorize employment for noncitizens whose removal has been deferred, as provided by this memorandum, for the duration of such deferral, including by extending through February 5, 2027, employment authorization for individuals with current employment authorization under prior grants of DED for certain Hong Kong residents, and to consider suspending regulatory requirements with respect to F-1 nonimmigrant students who are Hong Kong residents as the Secretary of Homeland Security determines to be appropriate. The Secretary of Homeland Security shall also provide for the prompt issuance of new or replacement documents in appropriate cases.

The Secretary of Homeland Security is authorized and directed to publish this memorandum in the **Federal Register**.

J.R. BIDEN JR.

Notes of Decisions (2894)

## Footnotes

1    So in original. The semicolon probably should be a comma.

2    So in original. Probably should be a reference to section 1229c of this title.

3    So in original. Probably should be preceded by "ineligible for".

4    So in original.

5    So in original. Probably should be "Secretary's".

6    So in original. Probably should be "(10)(E))".

7    So in original.

8    So in original. Probably should be "or".

9    So in original. Probably should be "clause".

10   So in original. Two subsecs. (t) have been enacted.

8 U.S.C.A. § 1182, 8 USCA § 1182
Current through P.L. 119-18. Some statute sections may be more current, see credits for details.

**End of Document**                            © 2025 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT
220

United States Code Annotated
  Title 8. Aliens and Nationality (Refs & Annos)
    Chapter 12. Immigration and Nationality (Refs & Annos)
      Subchapter II. Immigration
        Part II. Admission Qualifications for Aliens; Travel Control of Citizens and Aliens

8 U.S.C.A. § 1184

§ 1184. Admission of nonimmigrants

Currentness

**(a) Regulations**

**(1)** The admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General may by regulations prescribe, including when he deems necessary the giving of a bond with sufficient surety in such sum and containing such conditions as the Attorney General shall prescribe, to insure that at the expiration of such time or upon failure to maintain the status under which he was admitted, or to maintain any status subsequently acquired under section 1258 of this title, such alien will depart from the United States. No alien admitted to Guam or the Commonwealth of the Northern Mariana Islands without a visa pursuant to section 1182(l) of this title may be authorized to enter or stay in the United States other than in Guam or the Commonwealth of the Northern Mariana Islands or to remain in Guam or the Commonwealth of the Northern Mariana Islands for a period exceeding 45 days from date of admission to Guam or the Commonwealth of the Northern Mariana Islands. No alien admitted to the United States without a visa pursuant to section 1187 of this title may be authorized to remain in the United States as a nonimmigrant visitor for a period exceeding 90 days from the date of admission.

**(2)(A)** The period of authorized status as a nonimmigrant described in section 1101(a)(15)(O) of this title shall be for such period as the Attorney General may specify in order to provide for the event (or events) for which the nonimmigrant is admitted.

**(B)** The period of authorized status as a nonimmigrant described in section 1101(a)(15)(P) of this title shall be for such period as the Attorney General may specify in order to provide for the competition, event, or performance for which the nonimmigrant is admitted. In the case of nonimmigrants admitted as individual athletes under section 1101(a)(15)(P) of this title, the period of authorized status may be for an initial period (not to exceed 5 years) during which the nonimmigrant will perform as an athlete and such period may be extended by the Attorney General for an additional period of up to 5 years.

**(b) Presumption of status; written waiver**

Every alien (other than a nonimmigrant described in subparagraph (L) or (V) of section 1101(a)(15) of this title, and other than a nonimmigrant described in any provision of section 1101(a)(15)(H)(i) of this title except subclause (b1) of such section) shall be presumed to be an immigrant until he establishes to the satisfaction of the consular officer, at the time of application for a visa, and the immigration officers, at the time of application for admission, that he is entitled to a nonimmigrant status under section 1101(a)(15) of this title. An alien who is an officer or employee of any foreign government or of any international organization entitled to enjoy privileges, exemptions, and immunities under the International Organizations Immunities Act, or an alien who is the attendant, servant, employee, or member of the immediate family of any such alien shall not be entitled to apply for or

receive an immigrant visa, or to enter the United States as an immigrant unless he executes a written waiver in the same form and substance as is prescribed by section 1257(b) of this title.

**(c) Petition of importing employer**

**(1)** The question of importing any alien as a nonimmigrant under subparagraph (H), (L), (O), or (P)(i) of section 1101(a)(15) of this title (excluding nonimmigrants under section 1101(a)(15)(H)(i)(b1) of this title) in any specific case or specific cases shall be determined by the Attorney General, after consultation with appropriate agencies of the Government, upon petition of the importing employer. Such petition, shall be made and approved before the visa is granted. The petition shall be in such form and contain such information as the Attorney General shall prescribe. The approval of such a petition shall not, of itself, be construed as establishing that the alien is a nonimmigrant. For purposes of this subsection with respect to nonimmigrants described in section 1101(a)(15)(H)(ii)(a) of this title, the term "appropriate agencies of Government" means the Department of Labor and includes the Department of Agriculture. The provisions of section 1188 of this title shall apply to the question of importing any alien as a nonimmigrant under section 1101(a)(15)(H)(ii)(a) of this title.

**(2)(A)** The Attorney General shall provide for a procedure under which an importing employer which meets requirements established by the Attorney General may file a blanket petition to import aliens as nonimmigrants described in section 1101(a)(15)(L) of this title instead of filing individual petitions under paragraph (1) to import such aliens. Such procedure shall permit the expedited processing of visas for admission of aliens covered under such a petition.

**(B)** For purposes of section 1101(a)(15)(L) of this title, an alien is considered to be serving in a capacity involving specialized knowledge with respect to a company if the alien has a special knowledge of the company product and its application in international markets or has an advanced level of knowledge of processes and procedures of the company.

**(C)** The Attorney General shall provide a process for reviewing and acting upon petitions under this subsection with respect to nonimmigrants described in section 1101(a)(15)(L) of this title within 30 days after the date a completed petition has been filed.

**(D)** The period of authorized admission for--

(i) a nonimmigrant admitted to render services in a managerial or executive capacity under section 1101(a)(15)(L) of this title shall not exceed 7 years, or

(ii) a nonimmigrant admitted to render services in a capacity that involves specialized knowledge under section 1101(a)(15)(L) of this title shall not exceed 5 years.

**(E)** In the case of an alien spouse admitted under section 1101(a)(15)(L) of this title, who is accompanying or following to join a principal alien admitted under such section, the Attorney General shall authorize the alien spouse to engage in employment in the United States and provide the spouse with an "employment authorized" endorsement or other appropriate work permit.

**(F)** An alien who will serve in a capacity involving specialized knowledge with respect to an employer for purposes of section 1101(a)(15)(L) of this title and will be stationed primarily at the worksite of an employer other than the petitioning employer or its affiliate, subsidiary, or parent shall not be eligible for classification under section 1101(a)(15)(L) of this title if--

**(i)** the alien will be controlled and supervised principally by such unaffiliated employer; or

**(ii)** the placement of the alien at the worksite of the unaffiliated employer is essentially an arrangement to provide labor for hire for the unaffiliated employer, rather than a placement in connection with the provision of a product or service for which specialized knowledge specific to the petitioning employer is necessary.

**(3)** The Attorney General shall approve a petition--

**(A)** with respect to a nonimmigrant described in section 1101(a)(15)(O)(i) of this title only after consultation in accordance with paragraph (6) or, with respect to aliens seeking entry for a motion picture or television production, after consultation with the appropriate union representing the alien's occupational peers and a management organization in the area of the alien's ability, or

**(B)** with respect to a nonimmigrant described in section 1101(a)(15)(O)(ii) of this title after consultation in accordance with paragraph (6) or, in the case of such an alien seeking entry for a motion picture or television production, after consultation with such a labor organization and a management organization in the area of the alien's ability.

In the case of an alien seeking entry for a motion picture or television production, (i) any opinion under the previous sentence shall only be advisory, (ii) any such opinion that recommends denial must be in writing, (iii) in making the decision the Attorney General shall consider the exigencies and scheduling of the production, and (iv) the Attorney General shall append to the decision any such opinion. The Attorney General shall provide by regulation for the waiver of the consultation requirement under subparagraph (A) in the case of aliens who have been admitted as nonimmigrants under section 1101(a)(15)(O)(i) of this title because of extraordinary ability in the arts and who seek readmission to perform similar services within 2 years after the date of a consultation under such subparagraph. Not later than 5 days after the date such a waiver is provided, the Attorney General shall forward a copy of the petition and all supporting documentation to the national office of an appropriate labor organization.

**(4)(A)** For purposes of section 1101(a)(15)(P)(i)(a) of this title, an alien is described in this subparagraph if the alien--

**(i)(I)** performs as an athlete, individually or as part of a group or team, at an internationally recognized level of performance;

**(II)** is a professional athlete, as defined in section 1154(i)(2) of this title;

**(III)** performs as an athlete, or as a coach, as part of a team or franchise that is located in the United States and a member of a foreign league or association of 15 or more amateur sports teams, if--

**(aa)** the foreign league or association is the highest level of amateur performance of that sport in the relevant foreign country;

**(bb)** participation in such league or association renders players ineligible, whether on a temporary or permanent basis, to earn a scholarship in, or participate in, that sport at a college or university in the United States under the rules of the National Collegiate Athletic Association; and

**(cc)** a significant number of the individuals who play in such league or association are drafted by a major sports league or a minor league affiliate of such a sports league; or

**(IV)** is a professional athlete or amateur athlete who performs individually or as part of a group in a theatrical ice skating production; and

**(ii)** seeks to enter the United States temporarily and solely for the purpose of performing--

**(I)** as such an athlete with respect to a specific athletic competition; or

**(II)** in the case of an individual described in clause (i)(IV), in a specific theatrical ice skating production or tour.

**(B)(i)** For purposes of section 1101(a)(15)(P)(i)(b) of this title, an alien is described in this subparagraph if the alien--

**(I)** performs with or is an integral and essential part of the performance of an entertainment group that has (except as provided in clause (ii)) been recognized internationally as being outstanding in the discipline for a sustained and substantial period of time,

**(II)** in the case of a performer or entertainer, except as provided in clause (iii), has had a sustained and substantial relationship with that group (ordinarily for at least one year) and provides functions integral to the performance of the group, and

**(III)** seeks to enter the United States temporarily and solely for the purpose of performing as such a performer or entertainer or as an integral and essential part of a performance.

**(ii)** In the case of an entertainment group that is recognized nationally as being outstanding in its discipline for a sustained and substantial period of time, the Attorney General may, in consideration of special circumstances, waive the international recognition requirement of clause (i)(I).

**(iii)(I)** The one-year relationship requirement of clause (i)(II) shall not apply to 25 percent of the performers and entertainers in a group.

**(II)** The Attorney General may waive such one-year relationship requirement for an alien who because of illness or unanticipated and exigent circumstances replaces an essential member of the group and for an alien who augments the group by performing a critical role.

**(iv)** The requirements of subclauses (I) and (II) of clause (i) shall not apply to alien circus personnel who perform as part of a circus or circus group or who constitute an integral and essential part of the performance of such circus or circus group, but only if such personnel are entering the United States to join a circus that has been recognized nationally as outstanding for a sustained and substantial period of time or as part of such a circus.

**(C)** A person may petition the Attorney General for classification of an alien as a nonimmigrant under section 1101(a)(15)(P) of this title.

**(D)** The Attorney General shall approve petitions under this subsection with respect to nonimmigrants described in clause (i) or (iii) of section 1101(a)(15)(P) of this title only after consultation in accordance with paragraph (6).

**(E)** The Attorney General shall approve petitions under this subsection for nonimmigrants described in section 1101(a)(15)(P)(ii) of this title only after consultation with labor organizations representing artists and entertainers in the United States.

**(F)(i)** No nonimmigrant visa under section 1101(a)(15)(P)(i)(a) of this title shall be issued to any alien who is a national of a country that is a state sponsor of international terrorism unless the Secretary of State determines, in consultation with the Secretary of Homeland Security and the heads of other appropriate United States agencies, that such alien does not pose a threat to the safety, national security, or national interest of the United States. In making a determination under this subparagraph, the Secretary of State shall apply standards developed by the Secretary of State, in consultation with the Secretary of Homeland Security and the heads of other appropriate United States agencies, that are applicable to the nationals of such states.

**(ii)** In this subparagraph, the term "state sponsor of international terrorism" means any country the government of which has been determined by the Secretary of State under any of the laws specified in clause (iii) to have repeatedly provided support for acts of international terrorism.

**(iii)** The laws specified in this clause are the following:

**(I)** Section 4605(j)(1)(A) of Title 50 (or successor statute).

**(II)** Section 2780(d) of Title 22.

**(III)** Section 2371(a) of Title 22.

**(G)** The Secretary of Homeland Security shall permit a petition under this subsection to seek classification of more than 1 alien as a nonimmigrant under section 1101(a)(15)(P)(i)(a) of this title.

**(H)** The Secretary of Homeland Security shall permit an athlete, or the employer of an athlete, to seek admission to the United States for such athlete under a provision of this chapter other than section 1101(a)(15)(P)(i) of this title if the athlete is eligible under such other provision.

**(5)(A)** In the case of an alien who is provided nonimmigrant status under section 1101(a)(15)(H)(i)(b) or 1101(a)(15)(H)(ii)(b) of this title and who is dismissed from employment by the employer before the end of the period of authorized admission, the employer shall be liable for the reasonable costs of return transportation of the alien abroad.

**(B)** In the case of an alien who is admitted to the United States in nonimmigrant status under section 1101(a)(15)(O) or 1101(a)(15)(P) of this title and whose employment terminates for reasons other than voluntary resignation, the employer whose offer of employment formed the basis of such nonimmigrant status and the petitioner are jointly and severally liable for the reasonable cost of return transportation of the alien abroad. The petitioner shall provide assurance satisfactory to the Attorney General that the reasonable cost of that transportation will be provided.

**(6)(A)(i)** To meet the consultation requirement of paragraph (3)(A) in the case of a petition for a nonimmigrant described in section 1101(a)(15)(O)(i) of this title (other than with respect to aliens seeking entry for a motion picture or television production), the petitioner shall submit with the petition an advisory opinion from a peer group (or other person or persons of its choosing, which may include a labor organization) with expertise in the specific field involved.

**(ii)** To meet the consultation requirement of paragraph (3)(B) in the case of a petition for a nonimmigrant described in section 1101(a)(15)(O)(ii) of this title (other than with respect to aliens seeking entry for a motion picture or television production), the petitioner shall submit with the petition an advisory opinion from a labor organization with expertise in the skill area involved.

**(iii)** To meet the consultation requirement of paragraph (4)(D) in the case of a petition for a nonimmigrant described in section 1101(a)(15)(P)(i) or 1101(a)(15)(P)(iii) of this title, the petitioner shall submit with the petition an advisory opinion from a labor organization with expertise in the specific field of athletics or entertainment involved.

**(B)** To meet the consultation requirements of subparagraph (A), unless the petitioner submits with the petition an advisory opinion from an appropriate labor organization, the Attorney General shall forward a copy of the petition and all supporting documentation to the national office of an appropriate labor organization within 5 days of the date of receipt of the petition. If there is a collective bargaining representative of an employer's employees in the occupational classification for which the alien is being sought, that representative shall be the appropriate labor organization.

**(C)** In those cases in which a petitioner described in subparagraph (A) establishes that an appropriate peer group (including a labor organization) does not exist, the Attorney General shall adjudicate the petition without requiring an advisory opinion.

**(D)** Any person or organization receiving a copy of a petition described in subparagraph (A) and supporting documents shall have no more than 15 days following the date of receipt of such documents within which to submit a written advisory opinion or comment or to provide a letter of no objection. Once the 15-day period has expired and the petitioner has had an opportunity, where appropriate, to supply rebuttal evidence, the Attorney General shall adjudicate such petition in no more than 14 days. The Attorney General may shorten any specified time period for emergency reasons if no unreasonable burden would be thus imposed on any participant in the process.

**(E)(i)** The Attorney General shall establish by regulation expedited consultation procedures in the case of nonimmigrant artists or entertainers described in section 1101(a)(15)(O) or 1101(a)(15)(P) of this title to accommodate the exigencies and scheduling of a given production or event.

(ii) The Attorney General shall establish by regulation expedited consultation procedures in the case of nonimmigrant athletes described in section 1101(a)(15)(O)(i) or 1101(a)(15)(P)(i) of this title in the case of emergency circumstances (including trades during a season).

**(F)** No consultation required under this subsection by the Attorney General with a nongovernmental entity shall be construed as permitting the Attorney General to delegate any authority under this subsection to such an entity. The Attorney General shall give such weight to advisory opinions provided under this section as the Attorney General determines, in his sole discretion, to be appropriate.

**(7)** If a petition is filed and denied under this subsection, the Attorney General shall notify the petitioner of the determination and the reasons for the denial and of the process by which the petitioner may appeal the determination.

**(8)** The Attorney General shall submit annually to the Committees on the Judiciary of the House of Representatives and of the Senate a report describing, with respect to petitions under each subcategory of subparagraphs (H), (O), (P), and (Q) of section 1101(a)(15) of this title the following:

**(A)** The number of such petitions which have been filed.

**(B)** The number of such petitions which have been approved and the number of workers (by occupation) included in such approved petitions.

**(C)** The number of such petitions which have been denied and the number of workers (by occupation) requested in such denied petitions.

**(D)** The number of such petitions which have been withdrawn.

**(E)** The number of such petitions which are awaiting final action.

**(9)(A)** The Attorney General shall impose a fee on an employer (excluding any employer that is a primary or secondary education institution, an institution of higher education, as defined in section 1001(a) of Title 20, a nonprofit entity related to or affiliated with any such institution, a nonprofit entity which engages in established curriculum-related clinical training of students registered at any such institution, a nonprofit research organization, or a governmental research organization) filing before [1] a petition under paragraph (1)--

(i) initially to grant an alien nonimmigrant status described in section 1101(a)(15)(H)(i)(b) of this title;

(ii) to extend the stay of an alien having such status (unless the employer previously has obtained an extension for such alien); or

(iii) to obtain authorization for an alien having such status to change employers.

**(B)** The amount of the fee shall be $1,500 for each such petition except that the fee shall be half the amount for each such petition by any employer with not more than 25 full-time equivalent employees who are employed in the United States (determined by including any affiliate or subsidiary of such employer).

**(C)** Fees collected under this paragraph shall be deposited in the Treasury in accordance with section 1356(s) of this title.

**(10)** An amended H-1B petition shall not be required where the petitioning employer is involved in a corporate restructuring, including but not limited to a merger, acquisition, or consolidation, where a new corporate entity succeeds to the interests and obligations of the original petitioning employer and where the terms and conditions of employment remain the same but for the identity of the petitioner.

**(11)(A)** Subject to subparagraph (B), the Secretary of Homeland Security or the Secretary of State, as appropriate, shall impose a fee on an employer who has filed an attestation described in section 1182(t) of this title--

    **(i)** in order that an alien may be initially granted nonimmigrant status described in section 1101(a)(15)(H)(i)(b1) of this title; or

    **(ii)** in order to satisfy the requirement of the second sentence of subsection (g)(8)(C) for an alien having such status to obtain certain extensions of stay.

**(B)** The amount of the fee shall be the same as the amount imposed by the Secretary of Homeland Security under paragraph (9), except that if such paragraph does not authorize such Secretary to impose any fee, no fee shall be imposed under this paragraph.

**(C)** Fees collected under this paragraph shall be deposited in the Treasury in accordance with section 1356(s) of this title.

**(12)(A)** In addition to any other fees authorized by law, the Secretary of Homeland Security shall impose a fraud prevention and detection fee on an employer filing a petition under paragraph (1)--

    **(i)** initially to grant an alien nonimmigrant status described in subparagraph (H)(i)(b) or (L) of section 1101(a)(15) of this title; or

    **(ii)** to obtain authorization for an alien having such status to change employers.

**(B)** In addition to any other fees authorized by law, the Secretary of State shall impose a fraud prevention and detection fee on an alien filing an application abroad for a visa authorizing admission to the United States as a nonimmigrant described in section 1101(a)(15)(L) of this title, if the alien is covered under a blanket petition described in paragraph (2)(A).

**(C)** The amount of the fee imposed under subparagraph (A) or (B) shall be $500.

**(D)** The fee imposed under subparagraph (A) or (B) shall only apply to principal aliens and not to the spouses or children who are accompanying or following to join such principal aliens.

**(E)** Fees collected under this paragraph shall be deposited in the Treasury in accordance with section 1356(v) of this title.

**(13)(A)** In addition to any other fees authorized by law, the Secretary of Homeland Security shall impose a fraud prevention and detection fee on an employer filing a petition under paragraph (1) for nonimmigrant workers described in section 1101(a)(15)(H)(ii)(b) of this title.

**(B)** The amount of the fee imposed under subparagraph (A) shall be $150.

**(14)(A)** If the Secretary of Homeland Security finds, after notice and an opportunity for a hearing, a substantial failure to meet any of the conditions of the petition to admit or otherwise provide status to a nonimmigrant worker under section 1101(a)(15)(H)(ii)(b) of this title or a willful misrepresentation of a material fact in such petition--

**(i)** the Secretary of Homeland Security may, in addition to any other remedy authorized by law, impose such administrative remedies (including civil monetary penalties in an amount not to exceed $10,000 per violation) as the Secretary of Homeland Security determines to be appropriate; and

**(ii)** the Secretary of Homeland Security may deny petitions filed with respect to that employer under section 1154 of this title or paragraph (1) of this subsection during a period of at least 1 year but not more than 5 years for aliens to be employed by the employer.

**(B)** The Secretary of Homeland Security may delegate to the Secretary of Labor, with the agreement of the Secretary of Labor, any of the authority given to the Secretary of Homeland Security under subparagraph (A)(i).

**(C)** In determining the level of penalties to be assessed under subparagraph (A), the highest penalties shall be reserved for willful failures to meet any of the conditions of the petition that involve harm to United States workers.

**(D)** In this paragraph, the term "substantial failure" means the willful failure to comply with the requirements of this section that constitutes a significant deviation from the terms and conditions of a petition.

**(d) Issuance of visa to fiancée or fiancé of citizen**

**(1)** A visa shall not be issued under the provisions of section 1101(a)(15)(K)(i) of this title until the consular officer has received a petition filed in the United States by the fiancée or fiancé of the applying alien and approved by the Secretary of Homeland Security. The petition shall be in such form and contain such information as the Secretary of Homeland Security shall, by regulation, prescribe. Such information shall include information on any criminal convictions of the petitioner for any specified crime described in paragraph (3)(B) and information on any permanent protection or restraining order issued against the petitioner related to any specified crime described in paragraph (3)(B)(i). It shall be approved only after satisfactory evidence is submitted by the petitioner to establish that the parties have previously met in person within 2 years before the date

of filing the petition, have a bona fide intention to marry, and are legally able and actually willing to conclude a valid marriage in the United States within a period of ninety days after the alien's arrival, except that the Secretary of Homeland Security in his discretion may waive the requirement that the parties have previously met in person. In the event the marriage with the petitioner does not occur within three months after the admission of the said alien and minor children, they shall be required to depart from the United States and upon failure to do so shall be removed in accordance with sections 1229a and 1231 of this title.

(2)(A) Subject to subparagraphs (B) and (C), the Secretary of Homeland Security may not approve a petition under paragraph (1) unless the Secretary has verified that--

(i) the petitioner has not, previous to the pending petition, petitioned under paragraph (1) with respect to two or more applying aliens; and

(ii) if the petitioner has had such a petition previously approved, 2 years have elapsed since the filing of such previously approved petition.

(B) The Secretary of Homeland Security may, in the Secretary's discretion, waive the limitations in subparagraph (A) if justification exists for such a waiver. Except in extraordinary circumstances and subject to subparagraph (C), such a waiver shall not be granted if the petitioner has a record of violent criminal offenses against a person or persons.

(C)(i) The Secretary of Homeland Security is not limited by the criminal court record and shall grant a waiver of the condition described in the second sentence of subparagraph (B) in the case of a petitioner described in clause (ii).

(ii) A petitioner described in this clause is a petitioner who has been battered or subjected to extreme cruelty and who is or was not the primary perpetrator of violence in the relationship upon a determination that--

(I) the petitioner was acting in self-defense;

(II) the petitioner was found to have violated a protection order intended to protect the petitioner; or

(III) the petitioner committed, was arrested for, was convicted of, or pled guilty to committing a crime that did not result in serious bodily injury and where there was a connection between the crime and the petitioner's having been battered or subjected to extreme cruelty.

(iii) In acting on applications under this subparagraph, the Secretary of Homeland Security shall consider any credible evidence relevant to the application. The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Secretary.

(3) In this subsection:

(A) The terms "domestic violence", "sexual assault", "child abuse and neglect", "dating violence", "elder abuse", and "stalking" have the meaning given such terms in section 3 of the Violence Against Women and Department of Justice Reauthorization Act of 2005.

(B) The term "specified crime" means the following:

(i) Domestic violence, sexual assault, child abuse and neglect, dating violence, elder abuse, stalking, or an attempt to commit any such crime.

(ii) Homicide, murder, manslaughter, rape, abusive sexual contact, sexual exploitation, incest, torture, trafficking, peonage, holding hostage, involuntary servitude, slave trade, kidnapping, abduction, unlawful criminal restraint, false imprisonment, or an attempt to commit any of the crimes described in this clause.

(iii) At least three convictions for crimes relating to a controlled substance or alcohol not arising from a single act.

(e) Nonimmigrant professionals and annual numerical limit

(1) An alien who is a citizen of Canada or Mexico, and the spouse and children of any such alien if accompanying or following to join such alien, who seeks to enter the United States under and pursuant to the provisions of Section D of Annex 16-A of the USMCA (as defined in section 4502 of Title 19) to engage in business activities at a professional level as provided for in such Annex, may be admitted for such purpose under regulations of the Attorney General promulgated after consultation with the Secretaries of State and Labor. For purposes of this chapter, including the issuance of entry documents and the application of subsection (b), such alien shall be treated as if seeking classification, or classifiable, as a nonimmigrant under section 1101(a) (15) of this title. For purposes of this paragraph, the term "citizen of Mexico" means "citizen" as defined in article 16.1 of the USMCA.

(2) In the case of an alien spouse admitted under section 1101(a)(15)(E) of this title, who is accompanying or following to join a principal alien admitted under such section, the Attorney General shall authorize the alien spouse to engage in employment in the United States and provide the spouse with an "employment authorized" endorsement or other appropriate work permit.

(f) Denial of crewmember status in case of certain labor disputes

(1) Except as provided in paragraph (3), no alien shall be entitled to nonimmigrant status described in section 1101(a)(15)(D) of this title if the alien intends to land for the purpose of performing service on board a vessel of the United States (as defined in section 116 of Title 46) or on an aircraft of an air carrier (as defined in section 40102(a)(2) of Title 49) during a labor dispute where there is a strike or lockout in the bargaining unit of the employer in which the alien intends to perform such service.

(2) An alien described in paragraph (1)--

(A) may not be paroled into the United States pursuant to section 1182(d)(5) of this title unless the Attorney General determines that the parole of such alien is necessary to protect the national security of the United States; and

**(B)** shall be considered not to be a bona fide crewman for purposes of section 1282(b) of this title.

**(3)** Paragraph (1) shall not apply to an alien if the air carrier or owner or operator of such vessel that employs the alien provides documentation that satisfies the Attorney General that the alien--

**(A)** has been an employee of such employer for a period of not less than 1 year preceding the date that a strike or lawful lockout commenced;

**(B)** has served as a qualified crewman for such employer at least once in each of 3 months during the 12-month period preceding such date; and

**(C)** shall continue to provide the same services that such alien provided as such a crewman.

**(g) Temporary workers and trainees; limitation on numbers**

**(1)** The total number of aliens who may be issued visas or otherwise provided nonimmigrant status during any fiscal year (beginning with fiscal year 1992)--

**(A)** under section 1101(a)(15)(H)(i)(b) of this title, may not exceed--

**(i)** 65,000 in each fiscal year before fiscal year 1999;

**(ii)** 115,000 in fiscal year 1999;

**(iii)** 115,000 in fiscal year 2000;

**(iv)** 195,000 in fiscal year 2001;

**(v)** 195,000 in fiscal year 2002;

**(vi)** 195,000 in fiscal year 2003; and

**(vii)** 65,000 in each succeeding fiscal year; or

**(B)** under section 1101(a)(15)(H)(ii)(b) of this title may not exceed 66,000.

§ 1184. Admission of nonimmigrants, 8 USCA § 1184

---

**(2)** The numerical limitations of paragraph (1) shall only apply to principal aliens and not to the spouses or children of such aliens.

**(3)** Aliens who are subject to the numerical limitations of paragraph (1) shall be issued visas (or otherwise provided nonimmigrant status) in the order in which petitions are filed for such visas or status. If an alien who was issued a visa or otherwise provided nonimmigrant status and counted against the numerical limitations of paragraph (1) is found to have been issued such visa or otherwise provided such status by fraud or willfully misrepresenting a material fact and such visa or nonimmigrant status is revoked, then one number shall be restored to the total number of aliens who may be issued visas or otherwise provided such status under the numerical limitations of paragraph (1) in the fiscal year in which the petition is revoked, regardless of the fiscal year in which the petition was approved.

**(4)** In the case of a nonimmigrant described in section 1101(a)(15)(H)(i)(b) of this title, the period of authorized admission as such a nonimmigrant may not exceed 6 years.

**(5)** The numerical limitations contained in paragraph (1)(A) shall not apply to any nonimmigrant alien issued a visa or otherwise provided status under section 1101(a)(15)(H)(i)(b) of this title who--

**(A)** is employed (or has received an offer of employment) at an institution of higher education (as defined in section 1001(a) of Title 20), or a related or affiliated nonprofit entity;

**(B)** is employed (or has received an offer of employment) at a nonprofit research organization or a governmental research organization; or

**(C)** has earned a master's or higher degree from a United States institution of higher education (as defined in section 1001(a) of Title 20), until the number of aliens who are exempted from such numerical limitation during such year exceeds 20,000.

**(6)** Any alien who ceases to be employed by an employer described in paragraph (5)(A) shall, if employed as a nonimmigrant alien described in section 1101(a)(15)(H)(i)(b) of this title, who has not previously been counted toward the numerical limitations contained in paragraph (1)(A), be counted toward those limitations the first time the alien is employed by an employer other than one described in paragraph (5).

**(7)** Any alien who has already been counted, within the 6 years prior to the approval of a petition described in subsection (c), toward the numerical limitations of paragraph (1)(A) shall not again be counted toward those limitations unless the alien would be eligible for a full 6 years of authorized admission at the time the petition is filed. Where multiple petitions are approved for 1 alien, that alien shall be counted only once.

**(8)(A)** The agreements referred to in section 1101(a)(15)(H)(i)(b1) of this title are--

**(i)** the United States-Chile Free Trade Agreement; and

**(ii)** the United States-Singapore Free Trade Agreement.

---

**(B)(i)** The Secretary of Homeland Security shall establish annual numerical limitations on approvals of initial applications by aliens for admission under section 1101(a)(15)(H)(i)(b1) of this title.

**(ii)** The annual numerical limitations described in clause (i) shall not exceed--

  **(I)** 1,400 for nationals of Chile (as defined in article 14.9 of the United States-Chile Free Trade Agreement) for any fiscal year; and

  **(II)** 5,400 for nationals of Singapore (as defined in Annex 1A of the United States-Singapore Free Trade Agreement) for any fiscal year.

**(iii)** The annual numerical limitations described in clause (i) shall only apply to principal aliens and not to the spouses or children of such aliens.

**(iv)** The annual numerical limitation described in paragraph (1)(A) is reduced by the amount of the annual numerical limitations established under clause (i). However, if a numerical limitation established under clause (i) has not been exhausted at the end of a given fiscal year, the Secretary of Homeland Security shall adjust upwards the numerical limitation in paragraph (1)(A) for that fiscal year by the amount remaining in the numerical limitation under clause (i). Visas under section 1101(a)(15)(H)(i)(b) of this title may be issued pursuant to such adjustment within the first 45 days of the next fiscal year to aliens who had applied for such visas during the fiscal year for which the adjustment was made.

**(C)** The period of authorized admission as a nonimmigrant under section 1101(a)(15)(H)(i)(b) of this title shall be 1 year, and may be extended, but only in 1-year increments. After every second extension, the next following extension shall not be granted unless the Secretary of Labor had determined and certified to the Secretary of Homeland Security and the Secretary of State that the intending employer has filed with the Secretary of Labor an attestation under section 1182(t)(1) of this title for the purpose of permitting the nonimmigrant to obtain such extension.

**(D)** The numerical limitation described in paragraph (1)(A) for a fiscal year shall be reduced by one for each alien granted an extension under subparagraph (C) during such year who has obtained 5 or more consecutive prior extensions.

**(9)(A)** Subject to subparagraphs (B) and (C), an alien who has already been counted toward the numerical limitation of paragraph (1)(B) during fiscal year 2013, 2014, or 2015 shall not again be counted toward such limitation during fiscal year 2016. Such an alien shall be considered a returning worker.

**(B)** A petition to admit or otherwise provide status under section 1101(a)(15)(H)(ii)(b) of this title shall include, with respect to a returning worker--

  **(i)** all information and evidence that the Secretary of Homeland Security determines is required to support a petition for status under section 1101(a)(15)(H)(ii)(b) of this title;

(ii) the full name of the alien; and

(iii) a certification to the Department of Homeland Security that the alien is a returning worker.

(C) An H-2B visa or grant of nonimmigrant status for a returning worker shall be approved only if the alien is confirmed to be a returning worker by--

(i) the Department of State; or

(ii) if the alien is visa exempt or seeking to change to status under section 1101(a)(15)(H)(ii)(b) of this title, the Department of Homeland Security.

(10) The numerical limitations of paragraph (1)(B) shall be allocated for a fiscal year so that the total number of aliens subject to such numerical limits who enter the United States pursuant to a visa or are accorded nonimmigrant status under section 1101(a)(15)(H)(ii)(b) of this title during the first 6 months of such fiscal year is not more than 33,000.

(11)(A) The Secretary of State may not approve a number of initial applications submitted for aliens described in section 1101(a)(15)(E)(iii) of this title that is more than the applicable numerical limitation set out in this paragraph.

(B) The applicable numerical limitation referred to in subparagraph (A) is 10,500 for each fiscal year.

(C) The applicable numerical limitation referred to in subparagraph (A) shall only apply to principal aliens and not to the spouses or children of such aliens.

(h) Intention to abandon foreign residence

The fact that an alien is the beneficiary of an application for a preference status filed under section 1154 of this title or has otherwise sought permanent residence in the United States shall not constitute evidence of an intention to abandon a foreign residence for purposes of obtaining a visa as a nonimmigrant described in subparagraph (H)(i)(b) or (c), (L), or (V) of section 1101(a)(15) of this title or otherwise obtaining or maintaining the status of a nonimmigrant described in such subparagraph, if the alien had obtained a change of status under section 1258 of this title to a classification as such a nonimmigrant before the alien's most recent departure from the United States.

(i) "Specialty occupation" defined

(1) Except as provided in paragraph (3), for purposes of section 1101(a)(15)(H)(i)(b) of this title, section 1101(a)(15)(E)(iii) of this title, and paragraph (2), the term "specialty occupation" means an occupation that requires--

(A) theoretical and practical application of a body of highly specialized knowledge, and

**(B)** attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States.

**(2)** For purposes of section 1101(a)(15)(H)(i)(b) of this title, the requirements of this paragraph, with respect to a specialty occupation, are--

**(A)** full state licensure to practice in the occupation, if such licensure is required to practice in the occupation,

**(B)** completion of the degree described in paragraph (1)(B) for the occupation, or

**(C)**(i) experience in the specialty equivalent to the completion of such degree, and (ii) recognition of expertise in the specialty through progressively responsible positions relating to the specialty.

**(3)** For purposes of section 1101(a)(15)(H)(i)(b1) of this title, the term "specialty occupation" means an occupation that requires--

**(A)** theoretical and practical application of a body of specialized knowledge; and

**(B)** attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States.

**(j) Labor disputes**

**(1)** Notwithstanding any other provision of this chapter, an alien who is a citizen of Canada or Mexico who seeks to enter the United States under and pursuant to the provisions of Section B, Section C, or Section D of Annex 16-A of the USMCA (as defined in section 4502 of Title 19), shall not be classified as a nonimmigrant under such provisions if there is in progress a strike or lockout in the course of a labor dispute in the occupational classification at the place or intended place of employment, unless such alien establishes, pursuant to regulations promulgated by the Attorney General, that the alien's entry will not affect adversely the settlement of the strike or lockout or the employment of any person who is involved in the strike or lockout. Notice of a determination under this paragraph shall be given as may be required by paragraph 3 of article 16.4 of the USMCA. For purposes of this paragraph, the term "citizen of Mexico" means "citizen" as defined in article 16.1 of the USMCA.

**(2)** Notwithstanding any other provision of this chapter except section 1182(t)(1) of this title, and subject to regulations promulgated by the Secretary of Homeland Security, an alien who seeks to enter the United States under and pursuant to the provisions of an agreement listed in subsection (g)(8)(A), and the spouse and children of such an alien if accompanying or following to join the alien, may be denied admission as a nonimmigrant under subparagraph (E), (L), or (H)(i)(b1) of section 1101(a)(15) of this title if there is in progress a labor dispute in the occupational classification at the place or intended place of employment, unless such alien establishes, pursuant to regulations promulgated by the Secretary of Homeland Security after consultation with the Secretary of Labor, that the alien's entry will not affect adversely the settlement of the labor dispute or the employment of any person who is involved in the labor dispute. Notice of a determination under this paragraph shall be given as may be required by such agreement.

**(k) Numerical limitations; period of admission; conditions for admission and stay; annual report**

**(1)** The number of aliens who may be provided a visa as nonimmigrants under section 1101(a)(15)(S)(i) of this title in any fiscal year may not exceed 200. The number of aliens who may be provided a visa as nonimmigrants under section 1101(a)(15)(S)(ii) of this title in any fiscal year may not exceed 50.

**(2)** The period of admission of an alien as such a nonimmigrant may not exceed 3 years. Such period may not be extended by the Attorney General.

**(3)** As a condition for the admission, and continued stay in lawful status, of such a nonimmigrant, the nonimmigrant--

 **(A)** shall report not less often than quarterly to the Attorney General such information concerning the alien's whereabouts and activities as the Attorney General may require;

 **(B)** may not be convicted of any criminal offense punishable by a term of imprisonment of 1 year or more after the date of such admission;

 **(C)** must have executed a form that waives the nonimmigrant's right to contest, other than on the basis of an application for withholding of removal, any action for removal of the alien instituted before the alien obtains lawful permanent resident status; and

 **(D)** shall abide by any other condition, limitation, or restriction imposed by the Attorney General.

**(4)** The Attorney General shall submit a report annually to the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate concerning--

 **(A)** the number of such nonimmigrants admitted;

 **(B)** the number of successful criminal prosecutions or investigations resulting from cooperation of such aliens;

 **(C)** the number of terrorist acts prevented or frustrated resulting from cooperation of such aliens;

 **(D)** the number of such nonimmigrants whose admission or cooperation has not resulted in successful criminal prosecution or investigation or the prevention or frustration of a terrorist act; and

 **(E)** the number of such nonimmigrants who have failed to report quarterly (as required under paragraph (3)) or who have been convicted of crimes in the United States after the date of their admission as such a nonimmigrant.

**(l) Restrictions on waiver**

**(1)** In the case of a request by an interested State agency. or by an interested Federal agency, for a waiver of the 2-year foreign residence requirement under section 1182(e) of this title on behalf of an alien described in clause (iii) of such section, the Attorney General shall not grant such waiver unless--

**(A)** in the case of an alien who is otherwise contractually obligated to return to a foreign country. the government of such country furnishes the Director of the United States Information Agency with a statement in writing that it has no objection to such waiver;

**(B)** in the case of a request by an interested State agency, the grant of such waiver would not cause the number of waivers allotted for that State for that fiscal year to exceed 30;

**(C)** in the case of a request by an interested Federal agency or by an interested State agency--

**(i)** the alien demonstrates a bona fide offer of full-time employment at a health facility or health care organization, which employment has been determined by the Attorney General to be in the public interest; and

**(ii)** the alien agrees to begin employment with the health facility or health care organization within 90 days of receiving such waiver, and agrees to continue to work for a total of not less than 3 years (unless the Attorney General determines that extenuating circumstances exist, such as closure of the facility or hardship to the alien, which would justify a lesser period of employment at such health facility or health care organization, in which case the alien must demonstrate another bona fide offer of employment at a health facility or health care organization for the remainder of such 3-year period); and

**(D)** in the case of a request by an interested Federal agency (other than a request by an interested Federal agency to employ the alien full-time in medical research or training) or by an interested State agency. the alien agrees to practice primary care or specialty medicine in accordance with paragraph (2) for a total of not less than 3 years only in the geographic area or areas which are designated by the Secretary of Health and Human Services as having a shortage of health care professionals, except that--

**(i)** in the case of a request by the Department of Veterans Affairs, the alien shall not be required to practice medicine in a geographic area designated by the Secretary;

**(ii)** in the case of a request by an interested State agency, the head of such State agency determines that the alien is to practice medicine under such agreement in a facility that serves patients who reside in one or more geographic areas so designated by the Secretary of Health and Human Services (without regard to whether such facility is located within such a designated geographic area), and the grant of such waiver would not cause the number of the waivers granted on behalf of aliens for such State for a fiscal year (within the limitation in subparagraph (B)) in accordance with the conditions of this clause to exceed 10; and

(iii) in the case of a request by an interested Federal agency or by an interested State agency for a waiver for an alien who agrees to practice specialty medicine in a facility located in a geographic area so designated by the Secretary of Health and Human Services, the request shall demonstrate, based on criteria established by such agency, that there is a shortage of health care professionals able to provide services in the appropriate medical specialty to the patients who will be served by the alien.

(2)(A) Notwithstanding section 1258(a)(2) of this title, the Attorney General may change the status of an alien who qualifies under this subsection and section 1182(e) of this title to that of an alien described in section 1101(a)(15)(H)(i)(b) of this title. The numerical limitations contained in subsection (g)(1)(A) shall not apply to any alien whose status is changed under the preceding sentence, if the alien obtained a waiver of the 2-year foreign residence requirement upon a request by an interested Federal agency or an interested State agency.

(B) No person who has obtained a change of status under subparagraph (A) and who has failed to fulfill the terms of the contract with the health facility or health care organization named in the waiver application shall be eligible to apply for an immigrant visa, for permanent residence, or for any other change of nonimmigrant status, until it is established that such person has resided and been physically present in the country of his nationality or his last residence for an aggregate of at least 2 years following departure from the United States.

(3) Notwithstanding any other provision of this subsection, the 2-year foreign residence requirement under section 1182(e) of this title shall apply with respect to an alien described in clause (iii) of such section, who has not otherwise been accorded status under section 1101(a)(27)(H) of this title, if--

(A) at any time the alien ceases to comply with any agreement entered into under subparagraph (C) or (D) of paragraph (1); or

(B) the alien's employment ceases to benefit the public interest at any time during the 3-year period described in paragraph (1)(C).

(m) Nonimmigrant elementary and secondary school students

(1) An alien may not be accorded status as a nonimmigrant under clause (i) or (iii) of section 1101(a)(15)(F) of this title in order to pursue a course of study--

(A) at a public elementary school or in a publicly funded adult education program; or

(B) at a public secondary school unless--

(i) the aggregate period of such status at such a school does not exceed 12 months with respect to any alien, and (ii) the alien demonstrates that the alien has reimbursed the local educational agency that administers the school for the full, unsubsidized per capita cost of providing education at such school for the period of the alien's attendance.

(2) An alien who obtains the status of a nonimmigrant under clause (i) or (iii) of section 1101(a)(15)(F) of this title in order to pursue a course of study at a private elementary or secondary school or in a language training program that is not publicly funded shall be considered to have violated such status, and the alien's visa under section 1101(a)(15)(F) of this title shall be void, if the alien terminates or abandons such course of study at such a school and undertakes a course of study at a public elementary school, in a publicly funded adult education program, in a publicly funded adult education language training program, or at a public secondary school (unless the requirements of paragraph (1)(B) are met).

**(n) Increased portability of H-1B status**

**(1)** A nonimmigrant alien described in paragraph (2) who was previously issued a visa or otherwise provided nonimmigrant status under section 1101(a)(15)(H)(i)(b) of this title is authorized to accept new employment upon the filing by the prospective employer of a new petition on behalf of such nonimmigrant as provided under subsection (a). Employment authorization shall continue for such alien until the new petition is adjudicated. If the new petition is denied, such authorization shall cease.

**(2)** A nonimmigrant alien described in this paragraph is a nonimmigrant alien--

**(A)** who has been lawfully admitted into the United States;

**(B)** on whose behalf an employer has filed a nonfrivolous petition for new employment before the date of expiration of the period of stay authorized by the Attorney General; and

**(C)** who, subsequent to such lawful admission, has not been employed without authorization in the United States before the filing of such petition.

**(o) Nonimmigrants guilty of trafficking in persons**

**(1)** No alien shall be eligible for admission to the United States under section 1101(a)(15)(T) of this title if there is substantial reason to believe that the alien has committed an act of a severe form of trafficking in persons (as defined in section 7102 of Title 22).

**(2)** The total number of aliens who may be issued visas or otherwise provided nonimmigrant status during any fiscal year under section 1101(a)(15)(T) of this title may not exceed 5,000.

**(3)** The numerical limitation of paragraph (2) shall only apply to principal aliens and not to the spouses, sons, daughters, siblings, or parents of such aliens.

**(4)** An unmarried alien who seeks to accompany, or follow to join, a parent granted status under section 1101(a)(15)(T)(i) of this title, and who was under 21 years of age on the date on which such parent applied for such status, shall continue to be classified as a child for purposes of section 1101(a)(15)(T)(ii) of this title, if the alien attains 21 years of age after such parent's application was filed but while it was pending.

**(5)** An alien described in clause (i) of section 1101(a)(15)(T) of this title shall continue to be treated as an alien described in clause (ii)(I) of such section if the alien attains 21 years of age after the alien's application for status under such clause (i) is filed but while it is pending.

**(6)** In making a determination under section 1101(a)(15)(T)(i)(III)(aa) with respect to an alien, statements from State and local law enforcement officials that the alien has complied with any reasonable request for assistance in the investigation or prosecution of crimes such as kidnapping, rape, slavery, or other forced labor offenses, where severe forms of trafficking in persons (as defined in section 7102 of Title 22) appear to have been involved, shall be considered.

**(7)(A)** Except as provided in subparagraph (B), an alien who is issued a visa or otherwise provided nonimmigrant status under section 1101(a)(15)(T) of this title may be granted such status for a period of not more than 4 years.

**(B)** An alien who is issued a visa or otherwise provided nonimmigrant status under section 1101(a)(15)(T) of this title may extend the period of such status beyond the period described in subparagraph (A) if--

**(i)** a Federal, State, or local law enforcement official, prosecutor, judge, or other authority investigating or prosecuting activity relating to human trafficking or certifies that the presence of the alien in the United States is necessary to assist in the investigation or prosecution of such activity;

**(ii)** the alien is eligible for relief under section 1255(l) of this title and is unable to obtain such relief because regulations have not been issued to implement such section; or

**(iii)** the Secretary of Homeland Security determines that an extension of the period of such nonimmigrant status is warranted due to exceptional circumstances.

**(C)** Nonimmigrant status under section 1101(a)(15)(T) of this title shall be extended during the pendency of an application for adjustment of status under section 1255(l) of this title.

**(p) Requirements applicable to section 1101(a)(15)(U) visas**

**(1) Petitioning procedures for section 1101(a)(15)(U) visas**

The petition filed by an alien under section 1101(a)(15)(U)(i) of this title shall contain a certification from a Federal, State, or local law enforcement official, prosecutor, judge, or other Federal, State, or local authority investigating criminal activity described in section 1101(a)(15)(U)(iii) of this title. This certification may also be provided by an official of the Service whose ability to provide such certification is not limited to information concerning immigration violations. This certification shall state that the alien "has been helpful, is being helpful, or is likely to be helpful" in the investigation or prosecution of criminal activity described in section 1101(a)(15)(U)(iii) of this title.

**(2) Numerical limitations**

**(A)** The number of aliens who may be issued visas or otherwise provided status as nonimmigrants under section 1101(a)(15)(U) of this title in any fiscal year shall not exceed 10,000.

**(B)** The numerical limitations in subparagraph (A) shall only apply to principal aliens described in section 1101(a)(15)(U)(i) of this title, and not to spouses, children, or, in the case of alien children, the alien parents of such children.

**(3) Duties of the Attorney General with respect to "U" visa nonimmigrants**

With respect to nonimmigrant aliens described in subsection (a)(15)(U) of section 1101 of this title--

**(A)** the Attorney General and other government officials, where appropriate, shall provide those aliens with referrals to nongovernmental organizations to advise the aliens regarding their options while in the United States and the resources available to them; and

**(B)** the Attorney General shall, during the period those aliens are in lawful temporary resident status under that subsection, provide the aliens with employment authorization.

**(4) Credible evidence considered**

In acting on any petition filed under this subsection, the consular officer or the Attorney General, as appropriate, shall consider any credible evidence relevant to the petition.

**(5) Nonexclusive relief**

Nothing in this subsection limits the ability of aliens who qualify for status under section 1101(a)(15)(U) of this title to seek any other immigration benefit or status for which the alien may be eligible.

**(6) Duration of status**

The authorized period of status of an alien as a nonimmigrant under section 1101(a)(15)(U) of this title shall be for a period of not more than 4 years, but shall be extended upon certification from a Federal, State, or local law enforcement official, prosecutor, judge, or other Federal, State, or local authority investigating or prosecuting criminal activity described in section 1101(a)(15)(U)(iii) of this title that the alien's presence in the United States is required to assist in the investigation or prosecution of such criminal activity. The Secretary of Homeland Security may extend, beyond the 4-year period authorized under this section, the authorized period of status of an alien as a nonimmigrant under section 1101(a)(15)(U) of this title if the Secretary determines that an extension of such period is warranted due to exceptional circumstances. Such alien's nonimmigrant status shall be extended beyond the 4-year period authorized under this section if the alien is eligible for relief under section 1255(m) of this title and is unable to obtain such relief because regulations have not been issued to implement such section and shall be extended during the pendency of an application for adjustment of status under section 1255(m) of this title. The Secretary may grant work authorization to any alien who has a pending, bona fide application for nonimmigrant status under section 1101(a)(15)(U) of this title.

**(7) Age determinations**

**(A) Children**

An unmarried alien who seeks to accompany, or follow to join, a parent granted status under section 1101(a)(15)(U)(i) of this title, and who was under 21 years of age on the date on which such parent petitioned for such status, shall continue to be classified as a child for purposes of section 1101(a)(15)(U)(ii) of this title, if the alien attains 21 years of age after such parent's petition was filed but while it was pending.

**(B) Principal aliens**

An alien described in clause (i) of section 1101(a)(15)(U) of this title shall continue to be treated as an alien described in clause (ii)(I) of such section if the alien attains 21 years of age after the alien's application for status under such clause (i) is filed but while it is pending.

**(q) Employment of nonimmigrants described in section 1101(a)(15)(V)**

**(1)** In the case of a nonimmigrant described in section 1101(a)(15)(V) of this title--

**(A)** the Attorney General shall authorize the alien to engage in employment in the United States during the period of authorized admission and shall provide the alien with an "employment authorized" endorsement or other appropriate document signifying authorization of employment; and

**(B)** the period of authorized admission as such a nonimmigrant shall terminate 30 days after the date on which any of the following is denied:

**(i)** The petition filed under section 1154 of this title to accord the alien a status under section 1153(a)(2)(A) of this title (or, in the case of a child granted nonimmigrant status based on eligibility to receive a visa under section 1153(d) of this title, the petition filed to accord the child's parent a status under section 1153(a)(2)(A) of this title).

**(ii)** The alien's application for an immigrant visa pursuant to the approval of such petition.

**(iii)** The alien's application for adjustment of status under section 1255 of this title pursuant to the approval of such petition.

**(2)** In determining whether an alien is eligible to be admitted to the United States as a nonimmigrant under section 1101(a)(15)(V) of this title, the grounds for inadmissibility specified in section 1182(a)(9)(B) of this title shall not apply.

**(3)** The status of an alien physically present in the United States may be adjusted by the Attorney General, in the discretion of the Attorney General and under such regulations as the Attorney General may prescribe, to that of a nonimmigrant under section 1101(a)(15)(V) of this title, if the alien--

**(A)** applies for such adjustment;

**(B)** satisfies the requirements of such section; and

**(C)** is eligible to be admitted to the United States, except in determining such admissibility, the grounds for inadmissibility specified in paragraphs (6)(A), (7), and (9)(B) of section 1182(a) of this title shall not apply.

**(r) Visas of nonimmigrants described in section 1101(a)(15)(K)(ii)**

**(1)** A visa shall not be issued under the provisions of section 1101(a)(15)(K)(ii) of this title until the consular officer has received a petition filed in the United States by the spouse of the applying alien and approved by the Attorney General. The petition shall be in such form and contain such information as the Attorney General shall, by regulation, prescribe. Such information shall include information on any criminal convictions of the petitioner for any specified crime described in paragraph (5)(B) and information on any permanent protection or restraining order issued against the petitioner related to any specified crime described in subsection[2] (5)(B)(i).

**(2)** In the case of an alien seeking admission under section 1101(a)(15)(K)(ii) of this title who concluded a marriage with a citizen of the United States outside the United States, the alien shall be considered inadmissible under section 1182(a)(7)(B) of this title if the alien is not at the time of application for admission in possession of a valid nonimmigrant visa issued by a consular officer in the foreign state in which the marriage was concluded.

**(3)** In the case of a nonimmigrant described in section 1101(a)(15)(K)(ii) of this title, and any child of such a nonimmigrant who was admitted as accompanying, or following to join, such a nonimmigrant, the period of authorized admission shall terminate 30 days after the date on which any of the following is denied:

**(A)** The petition filed under section 1154 of this title to accord the principal alien status under section 1151(b)(2)(A)(i) of this title.

**(B)** The principal alien's application for an immigrant visa pursuant to the approval of such petition.

**(C)** The principal alien's application for adjustment of status under section 1255 of this title pursuant to the approval of such petition.

**(4)(A)** The Secretary of Homeland Security shall create a database for the purpose of tracking multiple visa petitions filed for fiancé(e)s and spouses under clauses (i) and (ii) of section 1101(a)(15)(K) of this title. Upon approval of a second visa petition under section 1101(a)(15)(K) of this title for a fiancé(e) or spouse filed by the same United States citizen petitioner, the petitioner shall be notified by the Secretary that information concerning the petitioner has been entered into the multiple visa petition tracking database. All subsequent fiancé(e) or spouse nonimmigrant visa petitions filed by that petitioner under such section shall be entered in the database.

**(B)(i)** Once a petitioner has had two fiancé(e) or spousal petitions approved under clause (i) or (ii) of section 1101(a)(15)(K) of this title, if a subsequent petition is filed under such section less than 10 years after the date the first visa petition was filed

§ 1184. Admission of nonimmigrants, 8 USCA § 1184

under such section, the Secretary of Homeland Security shall notify both the petitioner and beneficiary of any such subsequent petition about the number of previously approved fiance(e) or spousal petitions listed in the database.

**(ii)** To notify the beneficiary as required by clause (i), the Secretary of Homeland Security shall provide such notice to the Secretary of State for inclusion in the mailing to the beneficiary described in section 1375a(a)(5)(A)(i) of this title.

**(5)** In this subsection:

**(A)** The terms "domestic violence", "sexual assault", "child abuse and neglect", "dating violence", "elder abuse", and "stalking" have the meaning given such terms in section 3 of the Violence Against Women and Department of Justice Reauthorization Act of 2005.

**(B)** The term "specified crime" means the following:

**(i)** Domestic violence, sexual assault, child abuse and neglect, dating violence, elder abuse, stalking, or an attempt to commit any such crime.

**(ii)** Homicide, murder, manslaughter, rape, abusive sexual contact, sexual exploitation, incest, torture, trafficking, peonage, holding hostage, involuntary servitude, slave trade, kidnapping, abduction, unlawful criminal restraint, false imprisonment, or an attempt to commit any of the crimes described in this clause.

**(iii)** At least three convictions for crimes relating to a controlled substance or alcohol not arising from a single act.

## CREDIT(S)

(June 27, 1952, c. 477, Title II, c. 2, § 214, 66 Stat. 189; Pub.L. 91-225, § 3, Apr. 7, 1970, 84 Stat. 117; Pub.L. 98-454, Title VI, § 602(b), Oct. 5, 1984, 98 Stat. 1737; Pub.L. 99-603, Title III, §§ 301(b), 313(b), Nov. 6, 1986, 100 Stat. 3411, 3438; Pub.L. 99-639, § 3(a), (c), Nov. 10, 1986, 100 Stat. 3542; Pub.L. 100-449, Title III, § 307(b), Sept. 28, 1988, 102 Stat. 1877; Pub.L. 100-525, § 2(l)(1), Oct. 24, 1988, 102 Stat. 2612; Pub.L. 101-649, Title II, §§ 202(a), 205(a), (b), (c)(2), 206(b), 207(b), Nov. 29, 1990, 104 Stat. 5014, 5019, 5020, 5023, 5025; Pub.L. 102-232, Title II, §§ 202(a), 203(b), 204, 205(d), (e), 206(a), (c)(2), 207(a), (c)(1), Title III, § 303(a)(10) to (12), Dec. 12, 1991, 105 Stat. 1737 to 1741, 1748; Pub.L. 103-182, Title III, § 341(b), (c), Dec. 8, 1993, 107 Stat. 2116, redesignated Pub.L. 116-113, Title III, § 311(b), (c) by Pub.L. 116-113, Title V, § 503(b)(1) to (3), Jan. 29, 2020, 134 Stat. 71 and amended by Pub.L. 116-113, Title V, § 503(b)(4)(A), Jan. 29, 2020, 134 Stat. 71; Pub.L. 103-322, Title XIII, § 130003(b)(2), Sept. 13, 1994, 108 Stat. 2025; Pub.L. 103-416, Title II, § 220(b), Oct. 25, 1994, 108 Stat. 4319; Pub.L. 104-208, Div. C, Title III, § 308(e)(1)(D), (2)(B), (f)(1)(G), (H), (3)(B), (g)(5)(A)(i), (7)(A), Title VI, §§ 621, 622(c), 625(a)(1), 671(a)(3)(A), (e)(4)(A), Sept. 30, 1996, 110 Stat. 3009-619 to 3009-621, 3009-623, 3009-695, 3009-699, 3009-721, 3009-723; Pub.L. 105-65, Title I, § 108, Oct. 27, 1997, 111 Stat. 1350; Pub.L. 105-277, Div. C, Title IV, §§ 411(a), 414(a), Oct. 21, 1998, 112 Stat. 2681-642, 2681-651; Pub.L. 106-104, § 2, Nov. 13, 1999, 113 Stat. 1483; Pub.L. 106-311, § 1, Oct. 17, 2000, 114 Stat. 1247; Pub.L. 106-313, Title I, §§ 102(a), 103, 105(a), 108, Oct. 17, 2000, 114 Stat. 1251 to 1253, 1255; Pub.L. 106-386, Div. A, § 107(e)(2), Div. B, Title V, § 1513(c), Oct. 28, 2000, 114 Stat. 1478, 1535; Pub.L. 106-396, Title IV, § 401, Oct. 30, 2000, 114 Stat. 1647; Pub.L. 106-553, § 1(a)(2) [Title XI, §§ 1102(b), (d)(1), 1103(b), (c)(1)], Dec. 21, 2000, 114 Stat. 2762, 2762A-142, 2762A-144, 2762A-145; Pub.L. 107-45, § 1, Oct. 1, 2001, 115 Stat. 258; Pub.L. 107-124, Jan. 16, 2002, 115 Stat. 2402; Pub.L. 107-125, §§ 1, 2(a), Jan. 16, 2002, 115 Stat. 2403; Pub.L. 107-273, Div. C, Title I, § 11018(a), Nov. 2, 2002, 116 Stat. 1825; Pub.L. 107-274, § 2(c), Nov. 2, 2002, 116 Stat. 1923; Pub.L. 108-77, Title IV, §§

402(a)(2), (d)(1), 403, 404, Sept. 3, 2003, 117 Stat. 940, 946, 947; Pub.L. 108-78, Title IV, § 402, Sept. 3, 2003, 117 Stat. 970; Pub.L. 108-193, §§ 4(b)(2), 8(a)(3), Dec. 19, 2003, 117 Stat. 2878, 2886; Pub.L. 108-441, § 1(b) to (d), Dec. 3, 2004, 118 Stat. 2630; Pub.L. 108-447, Div. J, Title IV, §§ 412(a), 413(a), 422(b), 425(a), 426(a), Dec. 8, 2004, 118 Stat. 3351 to 3353, 3356, 3357; Pub.L. 109-13, Div. B, Title IV, §§ 402(a), 403(a), 404(a), 405, Title V, § 501(b), (c), May 11, 2005, 119 Stat. 318 to 322; Pub.L. 109-162, Title VIII, §§ 821(a), (b), (c)(2), 832(a)(1), (2), Jan. 5, 2006, 119 Stat. 3062, 3066, 3067; Pub.L. 109-364, Div. A, Title X, § 1074(a), Oct. 17, 2006, 120 Stat. 2403; Pub.L. 109-463, § 2, Dec. 22, 2006, 120 Stat. 3477; Pub.L. 110-229, Title VII, § 702(b)(1), May 8, 2008, 122 Stat. 860; Pub.L. 110-362, § 2, Oct. 8, 2008, 122 Stat. 4013; Pub.L. 110-457, Title II, § 201(b), (c), Dec. 23, 2008, 122 Stat. 5053; Pub.L. 113-4, Title VIII, §§ 805(a), 807(a), Mar. 7, 2013, 127 Stat. 111, 112; Pub.L. 114-113, Div. F, Title V, § 565, Dec. 18, 2015, 129 Stat. 2523; Pub.L. 116-113, Title III, § 311(b), (c), formerly Pub.L. 103-182, Title III, § 341(b), (c), Dec. 8, 1993, 107 Stat. 2116, redesignated by Pub.L. 116-113, Title V, § 503(b)(1) to (3), Jan. 29, 2020, 134 Stat. 71 and amended by Pub.L. 116-113, Title V, § 503(b)(4)(A), Jan. 29, 2020, 134 Stat. 71; amended Pub.L. 116-113, Title V, § 503(c), Jan. 29, 2020, 134 Stat. 71.)

### TERMINATION OF AMENDMENTS

<For termination of amendment by Pub.L. 108-78, § 107(c), see Sunset Provisions note set out under this section.>

<For termination of amendment by Pub.L. 108-77, § 107(c), see Sunset Provisions note set out under this section.>

<For termination of amendment by Pub.L. 100-449, § 501(c), see Sunset Provisions note set out under this section.>

### TERMINATION OF USMCA (AGREEMENT BETWEEN THE UNITED STATES OF AMERICA, THE UNITED MEXICAN STATES, AND CANADA)

<During any period in which a country ceases to be a USMCA country, this Act and the amendments made by this Act (United States-Mexico-Canada Agreement Implementation Act, Pub.L. 116-113) shall cease to have effect with respect to that country, and on the date on which the USMCA ceases to be in force with respect to the United States, this Act and the amendments made by this Act shall cease to have effect, see Pub.L. 116-113, Title VI, § 621, set out as 19 U.S.C.A. § 4621.>

Notes of Decisions (197)

### Footnotes

1    So in original. The word "before" probably should not appear.

2    So in original. Probably should be "paragraph".

8 U.S.C.A. § 1184, 8 USCA § 1184
Current through P.L. 119-18. Some statute sections may be more current, see credits for details.

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT**

**221**

United States Code Annotated
    Title 8. Aliens and Nationality (Refs & Annos)
        Chapter 12. Immigration and Nationality (Refs & Annos)
            Subchapter II. Immigration
                Part III. Issuance of Entry Documents

8 U.S.C.A. § 1201

§ 1201. Issuance of visas

Currentness

**(a) Immigrants; nonimmigrants**

**(1)** Under the conditions hereinafter prescribed and subject to the limitations prescribed in this chapter or regulations issued thereunder, a consular officer may issue

**(A)** to an immigrant who has made proper application therefor, an immigrant visa which shall consist of the application provided for in section 1202 of this title, visaed by such consular officer, and shall specify the foreign state, if any, to which the immigrant is charged, the immigrant's particular status under such foreign state, the preference, immediate relative, or special immigrant classification to which the alien is charged, the date on which the validity of the visa shall expire, and such additional information as may be required; and

**(B)** to a nonimmigrant who has made proper application therefor, a nonimmigrant visa, which shall specify the classification under section 1101(a)(15) of this title of the nonimmigrant, the period during which the nonimmigrant visa shall be valid, and such additional information as may be required.

**(2)** The Secretary of State shall provide to the Service an electronic version of the visa file of each alien who has been issued a visa to ensure that the data in that visa file is available to immigration inspectors at the United States ports of entry before the arrival of the alien at such a port of entry.

**(b) Registration; photographs; waiver of requirement**

Each alien who applies for a visa shall be registered in connection with his application, and shall furnish copies of his photograph signed by him for such use as may be by regulations required. The requirements of this subsection may be waived in the discretion of the Secretary of State in the case of any alien who is within that class of nonimmigrants enumerated in sections 1101(a)(15)(A), and 1101(a)(15)(G) of this title, or in the case of any alien who is granted a diplomatic visa on a diplomatic passport or on the equivalent thereof.

**(c) Period of validity; renewal or replacement**

**(1) Immigrant visas**

An immigrant visa shall be valid for such period, not exceeding six months, as shall be by regulations prescribed, except that any visa issued to a child lawfully adopted by a United States citizen and spouse while such citizen is serving abroad in the United States Armed Forces, or is employed abroad by the United States Government, or is temporarily abroad on business, shall be valid until such time, for a period not to exceed three years, as the adoptive citizen parent returns to the United States in due course of his service, employment, or business.

**(2) Nonimmigrant visas**

A nonimmigrant visa shall be valid for such periods as shall be by regulations prescribed. In prescribing the period of validity of a nonimmigrant visa in the case of nationals of any foreign country who are eligible for such visas, the Secretary of State shall, insofar as practicable, accord to such nationals the same treatment upon a reciprocal basis as such foreign country accords to nationals of the United States who are within a similar class; except that in the case of aliens who are nationals of a foreign country and who either are granted refugee status and firmly resettled in another foreign country or are granted permanent residence and residing in another foreign country, the Secretary of State may prescribe the period of validity of such a visa based upon the treatment granted by that other foreign country to alien refugees and permanent residents, respectively, in the United States.

**(3) Visa replacement**

An immigrant visa may be replaced under the original number during the fiscal year in which the original visa was issued for an immigrant who establishes to the satisfaction of the consular officer that the immigrant--

**(A)** was unable to use the original immigrant visa during the period of its validity because of reasons beyond his control and for which he was not responsible;

**(B)** is found by a consular officer to be eligible for an immigrant visa; and

**(C)** pays again the statutory fees for an application and an immigrant visa.

**(4) Fee waiver**

If an immigrant visa was issued, on or after March 27, 2013, for a child who has been lawfully adopted, or who is coming to the United States to be adopted, by a United States citizen, any statutory immigrant visa fees relating to a renewal or replacement of such visa may be waived or, if already paid, may be refunded upon request, subject to such criteria as the Secretary of State may prescribe, if--

**(A)** the immigrant child was unable to use the original immigrant visa during the period of its validity as a direct result of extraordinary circumstances, including the denial of an exit permit; and

**(B)** if such inability was attributable to factors beyond the control of the adopting parent or parents and of the immigrant.

**(d) Physical examination**

Prior to the issuance of an immigrant visa to any alien, the consular officer shall require such alien to submit to a physical and mental examination in accordance with such regulations as may be prescribed. Prior to the issuance of a nonimmigrant visa to any alien, the consular officer may require such alien to submit to a physical or mental examination, or both, if in his opinion such examination is necessary to ascertain whether such alien is eligible to receive a visa.

### (e) Surrender of visa

Each immigrant shall surrender his immigrant visa to the immigration officer at the port of entry, who shall endorse on the visa the date and the port of arrival, the identity of the vessel or other means of transportation by which the immigrant arrived, and such other endorsements as may be by regulations required.

### (f) Surrender of documents

Each nonimmigrant shall present or surrender to the immigration officer at the port of entry such documents as may be by regulation required. In the case of an alien crewman not in possession of any individual documents other than a passport and until such time as it becomes practicable to issue individual documents, such alien crewman may be admitted, subject to the provisions of this part, if his name appears in the crew list of the vessel or aircraft on which he arrives and the crew list is visaed by a consular officer, but the consular officer shall have the right to deny admission to any alien crewman from the crew list visa.

### (g) Nonissuance of visas or other documents

No visa or other documentation shall be issued to an alien if (1) it appears to the consular officer, from statements in the application, or in the papers submitted therewith, that such alien is ineligible to receive a visa or such other documentation under section 1182 of this title, or any other provision of law, (2) the application fails to comply with the provisions of this chapter, or the regulations issued thereunder, or (3) the consular officer knows or has reason to believe that such alien is ineligible to receive a visa or such other documentation under section 1182 of this title, or any other provision of law: *Provided*, That a visa or other documentation may be issued to an alien who is within the purview of section 1182(a)(4) of this title, if such alien is otherwise entitled to receive a visa or other documentation, upon receipt of notice by the consular officer from the Attorney General of the giving of a bond or undertaking providing indemnity as in the case of aliens admitted under section 1183 of this title: *Provided further*, That a visa may be issued to an alien defined in section 1101(a)(15)(B) or (F) of this title, if such alien is otherwise entitled to receive a visa, upon receipt of a notice by the consular officer from the Attorney General of the giving of a bond with sufficient surety in such sum and containing such conditions as the consular officer shall prescribe, to insure that at the expiration of the time for which such alien has been admitted by the Attorney General, as provided in section 1184(a) of this title, or upon failure to maintain the status under which he was admitted, or to maintain any status subsequently acquired under section 1258 of this title, such alien will depart from the United States.

### (h) Nonadmission upon arrival

Nothing in this chapter shall be construed to entitle any alien, to whom a visa or other documentation has been issued, to be admitted the [1] United States, if, upon arrival at a port of entry in the United States, he is found to be inadmissible under this chapter, or any other provision of law. The substance of this subsection shall appear upon every visa application.

### (i) Revocation of visas or documents

After the issuance of a visa or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa or other documentation. Notice of such revocation shall be communicated to the Attorney General, and such revocation shall invalidate the visa or other documentation from the date of issuance: *Provided*, That carriers or transportation companies, and masters, commanding officers, agents, owners, charterers, or consignees, shall not be penalized under section 1323(b) of this title for action taken in reliance on such visas or other documentation, unless they received due notice of such revocation prior to the alien's embarkation. There shall be no means of judicial review (including review pursuant to section 2241 of Title 28 or any other habeas corpus provision, and sections 1361 and 1651 of such title) of a revocation under this subsection, except in the context of a removal proceeding if such revocation provides the sole ground for removal under section 1227(a)(1)(B) of this title.

### CREDIT(S)

(June 27, 1952, c. 477, Title II, c. 3, § 221, 66 Stat. 191; Pub.L. 87-301, § 4, Sept. 26, 1961, 75 Stat. 651; Pub.L. 89-236, §§ 11(a), (b), 17, Oct. 3, 1965, 79 Stat. 918, 919; Pub.L. 97-116, § 18(f), Dec. 29, 1981, 95 Stat. 1620; Pub.L. 99-653, § 5(a)(1) to (3), formerly § 5(a) to (c), Nov. 14, 1986, 100 Stat. 3656; renumbered Pub.L. 100-525, § 8(d)(1), Oct. 24, 1988, 102 Stat. 2617; Pub.L. 101-649, Title VI, § 603(a)(9), Nov. 29, 1990, 104 Stat. 5083; Pub.L. 102-232, Title III, § 302(e)(8)(C), Dec. 12, 1991, 105 Stat. 1746; Pub.L. 104-208, Div. C, Title III, § 308(d)(4)(G), (f)(2)(B), Title VI, § 631, Sept. 30, 1996, 110 Stat. 3009-618, 3009-621, 3009-700; Pub.L. 107-173, Title III, § 301, May 14, 2002, 116 Stat. 552; Pub.L. 108-458, Title V, § 5304(a), Dec. 17, 2004, 118 Stat. 3736; Pub.L. 114-70, § 2, Oct. 16, 2015, 129 Stat. 561.)

Notes of Decisions (63)

### Footnotes

1    So in original. Probably should read "admitted to the".

8 U.S.C.A. § 1201, 8 USCA § 1201
Current through P.L. 119-18. Some statute sections may be more current, see credits for details.

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 8. Aliens and Nationality (Refs & Annos)
    Chapter 12. Immigration and Nationality (Refs & Annos)
      Subchapter II. Immigration
        Part IV. Inspection, Apprehension, Examination, Exclusion, and Removal (Refs & Annos)

8 U.S.C.A. § 1227

§ 1227. Deportable aliens

Currentness

**(a) Classes of deportable aliens**

Any alien (including an alien crewman) in and admitted to the United States shall, upon the order of the Attorney General, be removed if the alien is within one or more of the following classes of deportable aliens:

**(1) Inadmissible at time of entry or of adjustment of status or violates status**

**(A) Inadmissible aliens**

Any alien who at the time of entry or adjustment of status was within one or more of the classes of aliens inadmissible by the law existing at such time is deportable.

**(B) Present in violation of law**

Any alien who is present in the United States in violation of this chapter or any other law of the United States, or whose nonimmigrant visa (or other documentation authorizing admission into the United States as a nonimmigrant) has been revoked under section 1201(i) of this title, is deportable.

**(C) Violated nonimmigrant status or condition of entry**

**(i) Nonimmigrant status violators**

Any alien who was admitted as a nonimmigrant and who has failed to maintain the nonimmigrant status in which the alien was admitted or to which it was changed under section 1258 of this title, or to comply with the conditions of any such status, is deportable.

**(ii) Violators of conditions of entry**

Any alien whom the Secretary of Health and Human Services certifies has failed to comply with terms, conditions, and controls that were imposed under section 1182(g) of this title is deportable.

**(D) Termination of conditional permanent residence**

**(i) In general**

Any alien with permanent resident status on a conditional basis under section 1186a of this title (relating to conditional permanent resident status for certain alien spouses and sons and daughters) or under section 1186b of this title (relating to conditional permanent resident status for certain alien entrepreneurs, spouses, and children) who has had such status terminated under such respective section is deportable.

**(ii) Exception**

Clause (i) shall not apply in the cases described in section 1186a(c)(4) of this title (relating to certain hardship waivers).

**(E) Smuggling**

**(i) In general**

Any alien who (prior to the date of entry, at the time of any entry, or within 5 years of the date of any entry) knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law is deportable.

**(ii) Special rule in the case of family reunification**

Clause (i) shall not apply in the case of alien who is an eligible immigrant (as defined in section 301(b)(1) of the Immigration Act of 1990), was physically present in the United States on May 5, 1988, and is seeking admission as an immediate relative or under section 1153(a)(2) of this title (including under section 112 of the Immigration Act of 1990) or benefits under section 301(a) of the Immigration Act of 1990 if the alien, before May 5, 1988, has encouraged, induced, assisted, abetted, or aided only the alien's spouse, parent, son, or daughter (and no other individual) to enter the United States in violation of law.

**(iii) Waiver authorized**

The Attorney General may, in his discretion for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest, waive application of clause (i) in the case of any alien lawfully admitted for permanent residence if the alien has encouraged, induced, assisted, abetted, or aided only an individual who at the time of the offense was the alien's spouse, parent, son, or daughter (and no other individual) to enter the United States in violation of law.

**(F) Repealed. Pub.L. 104-208, Div. C, Title VI, § 671(d)(1)(C), Sept. 30, 1996, 110 Stat. 3009-723**

**(G) Marriage fraud**

An alien shall be considered to be deportable as having procured a visa or other documentation by fraud (within the meaning of section 1182(a)(6)(C)(i) of this title) and to be in the United States in violation of this chapter (within the meaning of subparagraph (B)) if--

(i) the alien obtains any admission into the United States with an immigrant visa or other documentation procured on the basis of a marriage entered into less than 2 years prior to such admission of the alien and which, within 2 years subsequent to any admission of the alien in the United States, shall be judicially annulled or terminated, unless the alien establishes to the satisfaction of the Attorney General that such marriage was not contracted for the purpose of evading any provisions of the immigration laws, or

(ii) it appears to the satisfaction of the Attorney General that the alien has failed or refused to fulfill the alien's marital agreement which in the opinion of the Attorney General was made for the purpose of procuring the alien's admission as an immigrant.

**(H) Waiver authorized for certain misrepresentations**

The provisions of this paragraph relating to the removal of aliens within the United States on the ground that they were inadmissible at the time of admission as aliens described in section 1182(a)(6)(C)(i) of this title, whether willful or innocent, may, in the discretion of the Attorney General, be waived for any alien (other than an alien described in paragraph (4) (D)) who--

(i)(I) is the spouse, parent, son, or daughter of a citizen of the United States or of an alien lawfully admitted to the United States for permanent residence; and

(II) was in possession of an immigrant visa or equivalent document and was otherwise admissible to the United States at the time of such admission except for those grounds of inadmissibility specified under paragraphs (5)(A) and (7)(A) of section 1182(a) of this title which were a direct result of that fraud or misrepresentation.

(ii) is a VAWA self-petitioner.

A waiver of removal for fraud or misrepresentation granted under this subparagraph shall also operate to waive removal based on the grounds of inadmissibility directly resulting from such fraud or misrepresentation.

**(2) Criminal offenses**

**(A) General crimes**

**(i) Crimes of moral turpitude**

Any alien who--

**(I)** is convicted of a crime involving moral turpitude committed within five years (or 10 years in the case of an alien provided lawful permanent resident status under section 1255(j) of this title) after the date of admission, and

**(II)** is convicted of a crime for which a sentence of one year or longer may be imposed,

is deportable.

#### (ii) Multiple criminal convictions

Any alien who at any time after admission is convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial, is deportable.

#### (iii) Aggravated felony

Any alien who is convicted of an aggravated felony at any time after admission is deportable.

#### (iv) High speed flight

Any alien who is convicted of a violation of section 758 of Title 18 (relating to high speed flight from an immigration checkpoint) is deportable.

#### (v) Failure to register as a sex offender

Any alien who is convicted under section 2250 of Title 18 is deportable.

#### (vi) Waiver authorized

Clauses (i), (ii), (iii), and (iv) shall not apply in the case of an alien with respect to a criminal conviction if the alien subsequent to the criminal conviction has been granted a full and unconditional pardon by the President of the United States or by the Governor of any of the several States.

### (B) Controlled substances

#### (i) Conviction

Any alien who at any time after admission has been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of Title 21), other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable.

#### (ii) Drug abusers and addicts

Any alien who is, or at any time after admission has been, a drug abuser or addict is deportable.

**(C) Certain firearm offenses**

Any alien who at any time after admission is convicted under any law of purchasing, selling, offering for sale, exchanging, using, owning, possessing, or carrying, or of attempting or conspiring to purchase, sell, offer for sale, exchange, use, own, possess, or carry, any weapon, part, or accessory which is a firearm or destructive device (as defined in section 921(a) of Title 18) in violation of any law is deportable.

**(D) Miscellaneous crimes**

Any alien who at any time has been convicted (the judgment on such conviction becoming final) of, or has been so convicted of a conspiracy or attempt to violate--

(i) any offense under chapter 37 (relating to espionage), chapter 105 (relating to sabotage), or chapter 115 (relating to treason and sedition) of Title 18 for which a term of imprisonment of five or more years may be imposed;

(ii) any offense under section 871 or 960 of Title 18;

(iii) a violation of any provision of the Military Selective Service Act (50 U.S.C. App. 451 et seq.) or the Trading With the Enemy Act (50 U.S.C. App. 1 et seq.); or

(iv) a violation of section 1185 or 1328 of this title,

is deportable.

(E) Crimes of domestic violence, stalking, or violation of protection order, crimes against children and [1]

**(i) Domestic violence, stalking, and child abuse**

Any alien who at any time after admission is convicted of a crime of domestic violence, a crime of stalking, or a crime of child abuse, child neglect, or child abandonment is deportable. For purposes of this clause, the term "crime of domestic violence" means any crime of violence (as defined in section 16 of Title 18) against a person committed by a current or former spouse of the person, by an individual with whom the person shares a child in common, by an individual who is cohabiting with or has cohabited with the person as a spouse, by an individual similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs, or by any other individual against a person who is protected from that individual's acts under the domestic or family violence laws of the United States or any State, Indian tribal government, or unit of local government.

**(ii) Violators of protection orders**

Any alien who at any time after admission is enjoined under a protection order issued by a court and whom the court determines has engaged in conduct that violates the portion of a protection order that involves protection against credible threats of violence, repeated harassment, or bodily injury to the person or persons for whom the protection order was issued is deportable. For purposes of this clause, the term "protection order" means any injunction issued for the purpose of preventing violent or threatening acts of domestic violence, including temporary or final orders issued by civil or criminal courts (other than support or child custody orders or provisions) whether obtained by filing an independent action or as a pendente lite order in another proceeding.

**(F) Trafficking**

Any alien described in section 1182(a)(2)(H) of this title is deportable.

**(3) Failure to register and falsification of documents**

**(A) Change of address**

An alien who has failed to comply with the provisions of section 1305 of this title is deportable, unless the alien establishes to the satisfaction of the Attorney General that such failure was reasonably excusable or was not willful.

**(B) Failure to register or falsification of documents**

Any alien who at any time has been convicted--

(i) under section 1306(c) of this title or under section 36(c) of the Alien Registration Act, 1940,

(ii) of a violation of, or an attempt or a conspiracy to violate, any provision of the Foreign Agents Registration Act of 1938 (22 U.S.C. 611 et seq.), or

(iii) of a violation of, or an attempt or a conspiracy to violate, section 1546 of Title 18 (relating to fraud and misuse of visas, permits, and other entry documents),

is deportable.

**(C) Document fraud**

**(i) In general**

An alien who is the subject of a final order for violation of section 1324c of this title is deportable.

**(ii) Waiver authorized**

The Attorney General may waive clause (i) in the case of an alien lawfully admitted for permanent residence if no previous civil money penalty was imposed against the alien under section 1324c of this title and the offense was incurred solely to assist, aid, or support the alien's spouse or child (and no other individual). No court shall have jurisdiction to review a decision of the Attorney General to grant or deny a waiver under this clause.

#### (D) Falsely claiming citizenship

##### (i) In general

Any alien who falsely represents, or has falsely represented, himself to be a citizen of the United States for any purpose or benefit under this chapter (including section 1324a of this title) or any Federal or State law is deportable.

##### (ii) Exception

In the case of an alien making a representation described in clause (i), if each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization), the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of making such representation that he or she was a citizen, the alien shall not be considered to be deportable under any provision of this subsection based on such representation.

### (4) Security and related grounds

#### (A) In general

Any alien who has engaged, is engaged, or at any time after admission engages in--

##### (i) any activity to violate any law of the United States relating to espionage or sabotage or to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information,

##### (ii) any other criminal activity which endangers public safety or national security, or

##### (iii) any activity a purpose of which is the opposition to, or the control or overthrow of, the Government of the United States by force, violence, or other unlawful means,

is deportable.

#### (B) Terrorist activities

Any alien who is described in subparagraph (B) or (F) of section 1182(a)(3) of this title is deportable.

#### (C) Foreign policy

**(i) In general**

An alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable.

**(ii) Exceptions**

The exceptions described in clauses (ii) and (iii) of section 1182(a)(3)(C) of this title shall apply to deportability under clause (i) in the same manner as they apply to inadmissibility under section 1182(a)(3)(C)(i) of this title.

**(D) Participated in Nazi persecution, genocide, or the commission of any act of torture or extrajudicial killing**

Any alien described in clause (i), (ii), or (iii) of section 1182(a)(3)(E) of this title is deportable.

**(E) Participated in the commission of severe violations of religious freedom**

Any alien described in section 1182(a)(2)(G) of this title is deportable.

**(F) Recruitment or use of child soldiers**

Any alien who has engaged in the recruitment or use of child soldiers in violation of section 2442 of Title 18 is deportable.

**(5) Public charge**

Any alien who, within five years after the date of entry, has become a public charge from causes not affirmatively shown to have arisen since entry is deportable.

**(6) Unlawful voters**

**(A) In general**

Any alien who has voted in violation of any Federal, State, or local constitutional provision, statute, ordinance, or regulation is deportable.

**(B) Exception**

In the case of an alien who voted in a Federal, State, or local election (including an initiative, recall, or referendum) in violation of a lawful restriction of voting to citizens, if each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization), the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of such violation that he or she was a citizen, the alien shall not be considered to be deportable under any provision of this subsection based on such violation.

**(7) Waiver for victims of domestic violence**

**(A) In general**

The Attorney General is not limited by the criminal court record and may waive the application of paragraph (2)(E)(i) (with respect to crimes of domestic violence and crimes of stalking) and (ii) in the case of an alien who has been battered or subjected to extreme cruelty and who is not and was not the primary perpetrator of violence in the relationship--

(i) [2] upon a determination that--

(I) the alien was acting is [3] self-defense;

(II) the alien was found to have violated a protection order intended to protect the alien; or

(III) the alien committed, was arrested for, was convicted of, or pled guilty to committing a crime--

(aa) that did not result in serious bodily injury; and

(bb) where there was a connection between the crime and the alien's having been battered or subjected to extreme cruelty.

**(B) Credible evidence considered**

In acting on applications under this paragraph, the Attorney General shall consider any credible evidence relevant to the application. The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General.

**(b) Deportation of certain nonimmigrants**

An alien, admitted as a nonimmigrant under the provisions of either section 1101(a)(15)(A)(i) or 1101(a)(15)(G)(i) of this title, and who fails to maintain a status under either of those provisions, shall not be required to depart from the United States without the approval of the Secretary of State, unless such alien is subject to deportation under paragraph (4) of subsection (a).

**(c) Waiver of grounds for deportation**

Paragraphs (1)(A), (1)(B), (1)(C), (1)(D), and (3)(A) of subsection (a) (other than so much of paragraph (1) as relates to a ground of inadmissibility described in paragraph (2) or (3) of section 1182(a) of this title) shall not apply to a special immigrant described in section 1101(a)(27)(J) of this title based upon circumstances that existed before the date the alien was provided such special immigrant status.

**(d) Administrative stay**

(1) If the Secretary of Homeland Security determines that an application for nonimmigrant status under subparagraph (T) or (U) of section 1101(a)(15) of this title filed for an alien in the United States sets forth a prima facie case for approval, the Secretary may grant the alien an administrative stay of a final order of removal under section 1231(c)(2) of this title until

  **(A)** the application for nonimmigrant status under such subparagraph (T) or (U) is approved; or

  **(B)** there is a final administrative denial of the application for such nonimmigrant status after the exhaustion of administrative appeals.

**(2)** The denial of a request for an administrative stay of removal under this subsection shall not preclude the alien from applying for a stay of removal, deferred action, or a continuance or abeyance of removal proceedings under any other provision of the immigration laws of the United States.

**(3)** During any period in which the administrative stay of removal is in effect, the alien shall not be removed.

**(4)** Nothing in this subsection may be construed to limit the authority of the Secretary of Homeland Security or the Attorney General to grant a stay of removal or deportation in any case not described in this subsection.

## CREDIT(S)

(June 27, 1952, c. 477, Title II, c. 4, § 237, formerly c. 5, § 241, 66 Stat. 204; July 18, 1956, c. 629, Title III, § 301(b), (c), 70 Stat. 575; Pub.L. 86-648, § 9, July 14, 1960, 74 Stat. 505; Pub.L. 87-301, § 16, Sept. 26, 1961, 75 Stat. 655; Pub.L. 89-236, § 11(e), Oct. 3, 1965, 79 Stat. 918; Pub.L. 94-571, § 7(e), Oct. 20, 1976, 90 Stat. 2706; Pub.L. 95-549, Title I, § 103, Oct. 30, 1978, 92 Stat. 2065; Pub.L. 97-116, § 8, Dec. 29, 1981, 95 Stat. 1616; Pub.L. 99-570, Title I, § 1751(b), Oct. 27, 1986, 100 Stat. 3207-47; Pub.L. 99-603, Title III, § 303(b), Nov. 6, 1986, 100 Stat. 3431; Pub.L. 99-639, § 2(b), Nov. 10, 1986, 100 Stat. 3541; Pub.L. 99-653, § 7(c), Nov. 14, 1986, 100 Stat. 3657; Pub.L. 100-525, §§ 2(n)(2), 9(m), Oct. 24, 1988, 102 Stat. 2613, 2620; Pub.L. 100-690, Title VII, §§ 7344(a), 7348(a), Nov. 18, 1988, 102 Stat. 4470, 4473; Pub.L. 101-649, Title I, § 153(b), Title V, §§ 505(a), 508(a), 544(b), Title VI, § 602(a), (b), Nov. 29, 1990, 104 Stat. 5006, 5050, 5051, 5061, 5077, 5081; Pub.L. 102-232, Title III, §§ 302(d)(3), 307(h), (k), Dec. 12, 1991, 105 Stat. 1745, 1755, 1756; Pub.L. 103-322, Title XIII, § 130003(d), Sept. 13, 1994, 108 Stat. 2026; Pub.L. 103-416, Title II, §§ 203(b), 219(g), Oct. 25, 1994, 108 Stat. 4311, 4317; Pub.L. 104-132, Title IV, §§ 414(a), 435(a), Apr. 24, 1996, 110 Stat. 1270, 1274; renumbered c. 4, § 237, and amended Pub.L. 104-208, Div. C, Title I, § 108(c), Title III, §§ 301(d), 305(a)(2), 308(d)(2), (3)(A), (e)(1)(E), (2)(C), (f)(1)(L) to (N), (5), 344(b), 345(b), 347(b), 350(a), 351(b), Title VI, § 671(a)(4)(B), (d)(1)(C), Sept. 30, 1996, 110 Stat. 3009-558, 3009-579, 3009-598, 3009-617, 3009-619 to 3009-622, 3009-637 to 3009-640, 3009-721, 3009-723; Pub.L. 106-386, Div. B, Title V, § 1505(b)(1), (c)(2), Oct. 28, 2000, 114 Stat. 1525, 1526; Pub.L. 106-395, Title II, § 201(c)(1), (2), Oct. 30, 2000, 114 Stat. 1634, 1635; Pub.L. 107-56, Title IV, § 411(b)(1), Oct. 26, 2001, 115 Stat. 348; Pub.L. 108-458, Title V, §§ 5304(b), 5402, 5501(b), 5502(b), Dec. 17, 2004, 118 Stat. 3736, 3737, 3740, 3741; Pub.L. 109-13, Div. B, Title I, § 105(a)(1), (b), May 11, 2005, 119 Stat. 309, 310; Pub.L. 109-248, Title IV, § 401, July 27, 2006, 120 Stat. 622; Pub.L. 109-271, § 6(c), Aug. 12, 2006, 120 Stat. 763; Pub.L. 110-340, § 2(c), Oct. 3, 2008, 122 Stat. 3736; Pub.L. 110-457, Title II, §§ 204, 222(f)(2), Dec. 23, 2008, 122 Stat. 5060, 5071.)

Notes of Decisions (2648)

### Footnotes

1    So in original.

2    So in original. No cl. (ii) has been enacted

3    So in original. Probably should be "in".

8 U.S.C.A. § 1227, 8 USCA § 1227
Current through P.L. 119-18. Some statute sections may be more current, see credits for details.

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.