# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN ASSOCIATIONS OF UNIVERSITY PROFESSORS, ET AL., <br><br> *Plaintiffs*, <br><br> v. <br><br> MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, ET AL., <br><br> *Defendants.* | No. 1:25-cv-10685-WGY |

# DEFENDANTS' MOTION FOR A PARTIAL STAY PENDING APPEAL

**<u>TABLE OF CONTENTS</u>**

I. INTRODUCTION ................................................................................................................... 1

II. BACKGROUND ................................................................................................................... 2

III. ARGUMENT ...................................................................................................................... 6

   A.   Defendants are Likely to Succeed on the Merits. ............................................................. 6

      1.   The Government is Likely to Succeed on its Challenges to the Remedies Order .......... 6

         a.   This Court's Remedies Order is Barred by the Channeling and Jurisdiction-Stripping
             Provisions in 8 U.S.C. 1252(b)(9), (g), and (f)(1) ...................................................... 7

         b.   The Remedies Order Violates the Federal Rules of Civil Procedure,
             Infringes on the Operations of Other District Courts,
             and Exceeds the Court's Equitable Authority............................................................. 12

      2.   The Government is Likely To Succeed on the Merits Because the Plaintiffs Lack
         Standing and Are Not Challenging Final Agency Action ........................................... 15

         a.   Plaintiffs Lack Organizational and Associational Standing ..................................... 15

         b.   Plaintiffs did not Challenge Final Agency Action.................................................... 17

   B.   The Government Will Be Irreparably Harmed Absent a Stay Pending Appeal ............... 17

IV. CONCLUSION.................................................................................................................... 20

L.R. 7.1(a)(2) CERTIFICATION

CERTIFICATE OF SERVICE

# **TABLE OF AUTHORITIES**

## **CASES**

**Page(s)**

*AAUP v. Rubio,*
  Slip. Op., No. 25-10685, (D. Mass. Jan. 22, 2026) ................................................................ 1, 2

*AAUP v. Rubio,*
  780 F. Supp. 3d 350 (D. Mass. 2025). .................................................................... 3, 15

*AAUP v. Rubio,*
  802 F. Supp. 3d 120 (D. Mass. 2025) ......................................................... 4, *passim*

*Aguilar v. USICE,*
  510 F.3d 1 (1st Cir. 2007) ......................................................................... 7, 8, 9, 19

*Alexander v. Sandoval,*
  532 U.S. 275 (2001) ........................................................................................ 14

*Avramenkov v. I.N.S.,*
  99 F. Supp. 2d 210 (D. Conn. 2000) ............................................................. 11

*Bennett v. Spear,*
  520 U.S. 154 (1997) ........................................................................................ 17

*Bivens v. Six Unknown Fed. Narcotics Agents,*
  403 U.S. 388 (1971) ........................................................................................ 14

*Bruce v. Citigroup Inc.,*
  75 F.4th 297 (2d Cir. 2023) .......................................................................... 13

*Chamber of Com. of the United States v. Whiting,*
  563 U.S. 582 (2011) ........................................................................................ 15

*FDA v. Alliance,*
  602 U.S. 367 (2024) ........................................................................................ 17

*Fiallo v. Bell,*
  430 U.S. 787 (1977) ........................................................................................ 19

*Garland v. Aleman Gonzalez,*
  596 U.S. 543 (2022) .................................................................................. 10, 11

*Gasperini v. Ctr. For Humanities, Inc.,*
  518 U.S. 415 (1996) ........................................................................................ 13

*Gavez v. Jaddou,*
    52 F.4th 821 (9th Cir. 2022) .......................................................................... 12

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ...................................................................................... 16

*Hernandez v. Mesa,*
    593 U.S. 93 (2020) ........................................................................................ 14

*In re U.S. Dep't of State, et al.,*
    No. 25-1658 (1st Cir.) ..................................................................................... 4

*Jennings v. Rodriguez,*
    583 U.S. 281 (2018) ........................................................................................ 9

*Khalil v. President,*
    164 F.4th 259 (3d Cir. 2026) ....................................................................... 8, 9

*Kleindienst v. Mandel,*
    408 U.S. 753 (1972) ........................................................................................ 3

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
    511 U.S. 375 (1994) ...................................................................................... 12

*Mathews v. Diaz,*
    426 U.S. 67 (1976) ........................................................................................ 19

*Meese v. Keene,*
    481 U.S. 465 (1987) ...................................................................................... 16

*Murthy v. Missouri,*
    603 U.S. 43 (2024) ........................................................................................ 16

*Nat. Treasury Employees Union v. Nixon,*
    492 F.2d 587 (D.C. Cir. 1974) ...................................................................... 18

*Nat'l Rifle Ass'n of Am. v. Vullo,*
    144 F.4th 376 (2d Cir. 2025) ........................................................................ 16

*New Motor Vehicle Bd. v. Orrin W. Fox Co.,*
    434 U.S. 1345 (1977) .................................................................................... 20

*Nieves v. Bartlett,*
    587 U.S. 391 (2019) ...................................................................................... 15

*Nken v. Holder*,
    556 U.S. 418 (2009)................................................................. 6, 17

*Reno v. Am.-Arab Anti-Discrim. Comm.*,
    525 U.S. 471 (1999)........................................................ 7, 10, 12, 19

*Rosaura Bldg. Corp. v. Municipality of Mayaguez*,
    778 F.3d 55 (1st Cir. 2015)........................................................ 16

*Savoury v. U.S. Attorney Gen.*,
    449 F.3d 1307 (11th Cir. 2006) .................................................. 20

*Sofinet v. INS*,
    188 F.3d 703 (7th Cir. 1999) ..................................................... 20

*State of Mississippi v. Johnson*,
    71 U.S. 475 (1866).................................................................... 18

*Steel Co. v. Citizens for Better Environment*,
    523 U.S. 83 (1998)............................................................... 12, 13

*Sullivan v. Carrick*,
    888 F.2d 1 (1st Cir. 1989) ......................................................... 16

*Texas State LULAC v. Elfant*,
    52 F.4th 248 (5th Cir. 2022) ...................................................... 16

*Trump v. Hawaii*,
    585 U.S. 667 (2018).................................................................... 3

*United States v. Martinez-Fuerte*,
    428 U.S. 543 (1976)................................................................... 20

*United States v. Texas*,
    599 U.S. 670 (2023)................................................................... 15

*Victim Rts. L. Ctr. v. U.S. Dep't of Educ.*,
    154 F.4th 5 (1st Cir. 2025) .......................................................... 6

*Younger v. Harris*,
    401 U.S. 37 (1971).................................................................... 19

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017)................................................................... 14

iv

## STATUTES

### Immigration and Nationality Act of 1952, as amended:

8 U.S.C. § 1201(i) ................................................................................................ 11

8 U.S.C. § 1227(a)(1)(B) .................................................................................... 11

8 U.S.C. § 1229a .................................................................................................. 10

8 U.S.C. § 1231 ..................................................................................................... 11

8 U.S.C. § 1231(g) ............................................................................................... 11

8 U.S.C. § 1252(a)(5) ........................................................................................ 7, 8

8 U.S.C § 1252(b)(9) ................................................................................. 1, *passim*

8 U.S.C. § 1252(f)(1) .............................................................................. 6, 10, 11

8 U.S.C. § 1252(g) ..................................................................................... 1, *passim*

8 U.S.C. § 1231 ..................................................................................................... 10

### Intelligence Reform and Terrorism Prevention Act of 2004:
Pub. L. No. 108–458, 118 Stat 3638, 3736 (2004)

Section § 5304 ..................................................................................................... 11

## REGULATIONS

8 C.F.R. § 244.10(a) ............................................................................................ 20

8 C.F.R. § 244.10(b) ............................................................................................ 20

8 C.F.R. § 244.12(a) ............................................................................................ 20

## OTHER AUTHORITIES

Executive Order 14,161, *Protecting the United States from Foreign Terrorists and Other
   National Security and Public Safety Threats,* 90 Fed. Reg. 8451, 8451 ..................................... 2

Executive Order 14,188, *Additional Measures to Combat Anti-Semitism*
   90 Fed. Reg. 8,847, 9,947 ................................................................................................. 2

## <u>FEDERAL RULES OF CIVIL PROCEDURE</u>

Rule 65(d)(2)..............................................................................................................................12

Rule 65 ......................................................................................................................................12

# I. INTRODUCTION

Defendants move the Court to stay its remedy order pending appeal. *See AAUP v. Rubio*, Slip. Op., No. 25-10685, (D. Mass. Jan. 22, 2026), ECF No. 313 (hereinafter "Remedies Order" or "Order"). The Remedies Order is styled as a "declaration" of rights and "sanctions," but it operates as an immediate injunction, creating a new private right of action in the federal district courts under which a class of aliens, described as "Sanction Plaintiffs," may automatically block any immigration-related action they consider "adverse," and correspondingly, without notice, impose the Order's "sanctions" on Defendants. These sanctions include extra-statutory evidentiary requirements and burdens of proof relating to decisions and actions to commence removal proceedings—immigration enforcement actions over which Congress has provided a comprehensive and exclusive remedial scheme. The Remedies Order plainly overrides that scheme, violating the jurisdiction-stripping commands of 8 U.S.C 1252(b)(9) and (g), and disregarding the Immigration and Nationality Act's ("INA") clear prohibition on non-individualized injunctive relief. In other words, it is highly likely to be overturned on appeal. The Court's creation of a new federal cause of action also transgresses the Federal Rules of Civil Procedure and basic principles of notice and fundamental fairness.

Further, the balance of harms and public interest weigh heavily in favor of a stay pending appeal. The Remedies Order creates a regime in which it is impossible for the government to know, at any given point in time, whether its immigration actions involve the Sanction Plaintiffs, the filing of lawsuits envisioned under the Order, and related stays of removal "automatically" triggered—all of which expose the government to potential sanctions and further disruptive, unnecessary litigation. The net effect of the Order, therefore, including its broad and ill-defined set of commands and sanctions, is to chill the government's efforts to carry out the duly enacted

immigration laws against aliens on indisputably lawful grounds unrelated to the exercise of First Amendment rights. In short, the Remedies Order irreparably injures the government's exercise of its immigration enforcement authorities and urgently warrants a partial stay pending appeal.

Defendants respectfully request that the Court resolve this motion by February 23, 2026.

## II. BACKGROUND

In March 2025, Plaintiffs, university faculty and student associations comprising citizen and alien members ("AAUP" and "MESA"), filed suit against various government agencies and officials, alleging, *inter alia*, that Defendants violated the First Amendment to the U.S. Constitution and the Administrative Procedure Act by implementing a so-called "ideological deportation policy" of "arresting, detaining, and deporting" alien students and faculty solely because they have engaged in "pro-Palestinian protests" and related "expression and association." *AAUP v. Rubio*, 25-cv-10685, ECF No. 1 (Complaint) ¶¶ 1, 30, 134, 136, 139.

Plaintiffs alleged that the challenged policy arose from unconstitutional implementation of two executive orders aimed at combatting terrorism and antisemitism. *See id.* ¶ 19; *see also* Executive Order 14,161, *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats* (stating it is U.S. policy to "protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes" 90 Fed. Reg. 8451, 8451); and Executive Order 14,188, *Additional Measures to Combat Anti-Semitism* (responding to an "unprecedented wave of vile anti-Semitic discrimination, vandalism, and violence" against citizens and "especially in our schools and on our campuses," and directing executive agencies to use "all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence," 90 Fed. Reg. 8,847, 9,947.)

Plaintiffs moved for a preliminary injunction ("PI"), but under Rule 65(a)(2) of the FRCP, the Court consolidated the PI hearing with a "trial on the merits." ECF No. 72; *AAUP v. Rubio*, 780 F. Supp. 3d 350, 360-61 n.4 (D. Mass. 2025). The Court construed Defendants' opposition to the PI, which relied heavily on a host of jurisdictional arguments, including an argument that Plaintiffs lacked standing, as a motion to dismiss. *See AAUP*, 780 F. Supp. 3d at 360-61 & n.4.

On April 29, 2025, the Court denied the motion to dismiss in relevant part. *See AAUP*, 780 F. Supp. 3d at 386. On May 21, Defendants moved for a protective order to preclude discovery and trial as inconsistent with the APA, also asserting that any administrative record must be limited by and coextensive with the applicable standard of review set forth in *Kleindienst v. Mandel*, 408 U.S. 753, 769-70 (1972), and its progeny, including *Trump v. Hawaii*, 585 U.S. 667 (2018). ECF No. 94. The Court summarily denied the motion, *ECF No.* 112 (Electronic Order); *see ECF No.* 115 (June 2, 2025, Hearing Tr. at 27-28), and directed the government to file a "full administrative record." *ECF No.* 98 (Electronic Order). Notably, in what became a key focus of Plaintiffs' trial proof, the Court allowed Plaintiffs discovery into the enforcement efforts underway against five prominent Pro-Palestinian/anti-Israel protestors, who are not parties to this case (Mahmoud Khalil, Mohsen Mahdawi, Rumeysa Ozturk, Yunseo Chung, and Badar Khan Suri) (hereinafter, the "Five Individuals"), *ECF No.* 102 (May 22, 2025, Hearing Tr. at 7-8, 10). The Court later credited Plaintiffs' assertions that the Five Individuals were targeted for immigration enforcement based on their constitutionally protected viewpoint.

Following expedited discovery, and the Court's *in camera* and *ex parte* examination of privileged agency materials concerning its immigration enforcement activity relating to pro-Palestine and anti-Israel foreign student protestors in general, and the Five Individuals, in particular, the Court held a nine-day trial in July 2025. *See ECF No.* 231-248 (Trial Transcripts).

3

Mandamus litigation before the First Circuit ensued in the first week of trial, when the Court declared Defendants had "waived" all privileges over the "in camera" documents, handed portions of that material to Plaintiffs' counsel, and threatened to turn over additional material the next day. *See AAUP* Dkt. 206. The First Circuit issued a temporary stay pending consideration of the petition; the Court reconsidered and ruled on certain privilege claims, so the First Circuit ultimately denied the petition. *See In re U.S. Dep't of State, et al.*, No. 25-1658 (1st Cir.).

Trial witnesses included alien members of the Plaintiff organizations who claimed First Amendment chill of their Pro-Palestinian/anti-Israel political viewpoints precipitated by immigration enforcement against the Five Individuals; ICE/HSI agents involved in arresting the Five Individuals; DHS officials overseeing investigation of potential immigration violations associated with campus-related protest activity, and State Department officials involved in student visa revocations, as well as recommendations to the Secretary of State to find that the Five Individuals either warranted revocation of their visas, or were subject to removal for presenting a compelling risk to U.S. foreign policy interests. *See* ECF No. 231-248 (Trial Transcripts).

On September 30, 2025, the Court issued a published memorandum of findings of fact and conclusions of law. *See AAUP v. Rubio*, 802 F. Supp. 3d 120 (D. Mass. 2025). The Court held that aliens have First Amendment rights equal to citizens. *Id.* at 131, 181-84. It rejected Plaintiffs' allegation that Defendants were pursuing an "ideological deportation policy," *id.* at 172-73, instead finding Defendants had implemented an enforcement policy targeting certain alien student protestors for their constitutionally protected expression with the intent of chilling the speech of others and, thus, violating their First Amendment rights. *See id.* at 188. The Court also ruled the enforcement policy violated the APA as contrary to constitutional right, and it was arbitrary and

capricious, as "an unexplained reversal of the agencies' position without accounting for reliance interests" and "without clear statutory authorization." *Id.* at 190-91.

Plaintiffs filed a motion for remedies, which the government opposed, and the Court held a hearing. Plaintiffs sought nationwide declaratory and injunctive relief, and vacatur under the APA, arguing that nationwide relief extending beyond the alien members of their organizations, was necessary to protect their members from further unconstitutional targeting. *AAUP,* Dkt. 277 at 18-19. But Plaintiffs refused to disclose the identities of the members needing such protection to effectuate any such remedy, and the Court accepted that position. *Id.*

The Court issued a remedy order on January 22, 2026, declaring that "Secretaries Noem and Rubio have intentionally and in concert implemented Executive Orders … 14161 and 14188 [in] a viewpoint-discriminatory way to chill protected speech that violated the First Amendment," Order at 2, and also declaring the agencies' unconstitutional enforcement policy to be "of no effect, void, illegal, set aside, and vacated" under the APA.  *Id.* at 3. The court then took it upon itself to order an extraordinary remedy that Plaintiffs *did not even request*.  Specifically, as a "Sanction" the Court ordered that any alien member of the Plaintiffs' organizations[1] has the right to institute a "Sanction Action" in any U.S. District Court, if they have "suffered an adverse immigration action changing [their] immigration status," and that  "it shall be presumed that the alteration in immigration status is in retribution for the exercise … of their First Amendment rights" (hereinafter "Presumption of Unconstitutionality"). Order at 4-5. Such filing triggers an "automatic[] stay" of the Sanction Plaintiff's removal from the United States pending the resolution of the Sanction Action in district court, and any "alteration in immigration status" is "void[ed] unless the

---

[1]  Specifically, the Remedies Order applies to "[a]ny non-citizen member of the plaintiffs AAUP or MESA, who was a member on or after March 25, 2025, and continued as a member through September 30, 2025." Order at 4.

government rebuts the presumption" of retribution. *Id.* at 5-6. The Remedies Order further imposes on the government "the burden affirmatively to ascertain and determine whether such person has filed a Sanctions Action" by checking PACER (which it explained operates as a bar to transferring or otherwise moving such alien outside the jurisdiction of the Sanctions action), *id.* at 7 & n. 7, as well as the burden to overcome the Presumption of Unconstitutionality, to proceed with any further immigration enforcement against a given Sanction Plaintiff. *Id.* at 2-6. Finally, the Court disclaimed "retain[ing] jurisdiction over any Sanction Action … which shall be subject to the jurisdiction of the appropriate" U.S. District Judge presiding in such Action. *Id.* at 7.

## III.    ARGUMENT

A partial stay pending appeal is warranted because the government has a strong likelihood of success on the merits, the balance of harms and public interest favor a stay, and the Remedies Order works irreparable harm to defendants' critical enforcement functions. *Nken v. Holder*, 556 U.S. 418, 426 (2009); *Victim Rts. L. Ctr. v. U.S. Dep't of Educ.*, 154 F.4th 5, 7-8 (1st Cir. 2025).

### A.    Defendants are Likely to Succeed on the Merits.

The government is likely to succeed on the merits of its appeal. The Remedies Order violates multiple provisions of the INA and is otherwise unlawful. Additionally, Plaintiffs lack Article III standing and did not challenge a final agency action.

### 1.    The Government is Likely to Succeed on its Challenges to the Remedies Order.

The Remedies Order violates multiple provisions of the INA and otherwise exceeds this Court's authority. Specifically, the Remedies Order: **(1)** is precluded by the INA's jurisdiction-stripping provisions in 8 U.S.C. §§ 1252(b)(9) and (g); **(2)** transgresses 8 U.S.C. § 1252(f)(1)'s prohibition on non-individualized injunctive relief; **(3)** violates the Federal Rules of Civil Procedure; and **(4)** exceeds the court's equitable powers by creating a new cause of action.

a.    **This Court's Remedies Order is Barred by the Channeling and Jurisdiction-Stripping Provisions in 8 U.S.C. 1252(b)(9), (g), and (f)(1).**

The Remedies Order creates a new cause of action for certain of Plaintiffs' members who experience "an adverse immigration action" and provides that (1) "[u]pon the commencement" of such action, "the Sanction Plaintiff's removal from the United States is automatically **STAYED** during the pendency of the Sanction Act"; and (2) in such action, upon making proof of membership during the relevant period, the adverse immigration action is automatically "void[ed]," unless the government can rebut the presumption that the adverse immigration action was retaliation for First Amendment conduct.  Order 5-6. Those portions of the Remedies Order violate the INA's channeling provisions in 8 U.S.C. § 1252(b)(9) and (g), as well as (f)(1).

**Section 1252(b)(9):**  Congress provided a comprehensive and exclusive remedial scheme over challenges to decisions, actions, and proceedings related to the removal of aliens, that channels all such challenges through the immigration court and any subsequent review in the court of appeals. Section 1252(b)(9) of Title 8 directs that judicial review

> of all **questions of law and fact**, including interpretation and application of constitutional and statutory provisions, arising from any action taken **or proceeding brought to remove an alien from the United States** under this subchapter shall be available only in judicial review of a final order under this section.

8 U.S.C. § 1252(b)(9). And Congress prescribed a single path for judicial review of removal orders: "a petition for review filed with an appropriate court of appeals." § 1252(a)(5). These provisions create "an unmistakable 'zipper' clause" whose "expanse is breathtaking." *Aguilar v. USICE*, 510 F.3d 1, 9 (1st Cir. 2007) (quoting *Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 482-83 (1999)).

The Remedies Order violates these fundamental limitations on the Court's jurisdiction. First, that Order provides that if a "Sanction Plaintiff" brings an action in "United States District

Court" to challenge any "adverse immigration action changing [the plaintiff's] immigration status," the commencement of that "Sanction Action" automatically "stay[s]" "the Sanction Plaintiff's removal" for the duration of the action and presumptively "voids" the alteration of immigration status. Order 4-6. For example, if the Executive revoked the visa of a "Sanction Plaintiff" and commenced removal proceedings, the Remedies Order would automatically stay removal and void the revocation. That directly conflicts with the command of § 1252(b)(9) that "***all***" questions of law and fact" that "arise from ***any*** action taken or proceeding brought to remove an alien from the United States … shall be available ***only*** in judicial review of a final order" to the appropriate court of appeals. 8 U.S.C. § 1252(b)(9); *see id.* § 1252(a)(5). The Remedies Order directs that they be processed through the federal district courts. Section 1252(b)(9) commands that such challenges be channeled through immigration proceedings to the court of appeals.

That follows from the First Circuit's decision in *Aguilar*, which held that § 1252(b)(9) deprived the district court of jurisdiction to review certain claims raised in a habeas petition. 510 F.3d at 9-14. Noting the "breathtaking" scope of § 1252(b)(9), the First Circuit explicitly rejected the petitioners' argument that § 1252(b)(9) did not apply because "the challenged actions occurred prior to the institution of any formal removal proceedings," because "[r]eading the statute" to be limited "to claims that arise from ongoing removal proceedings" would create a rush-to-the-courthouse dynamic and require the Court to re-write the statute. *Id*. at 10.

The Third Circuit in *Khalil v. President*, 164 F.4th 259 (3d Cir. 2026), recently interpreted 8 U.S.C. § 1252(b)(9) to forbid *exactly* this kind of circumvention of § 1252(b)(9)'s channeling function. In that case, Khalil filed a habeas petition alleging that his detention and DHS efforts to remove him violated the First Amendment and due process. *Id*. at 266-67. That court held that § 1252(b)(9) divested the district court of subject-matter jurisdiction over Khalil's habeas petition

and remanded "with instructions to dismiss the petition." *Id*. at 281. Relevant here, the court held that § 1252(b)(9) channels all "questions" "arising from" proceedings to removal an alien, so long as those legal questions can be "meaningfully" reviewed on a petition for review to the relevant court of appeals. *Id*. at 274-75. Importantly, "it is not enough to assert an injury that cannot be remedied later." *Id*. at 275. Applying those principles, the Third Circuit held that each of Khalil's challenges—including his claim that his First Amendment rights were violated—"can [be] litigate[d] … on a [petition for review] after the Board issues a final order of removal." *Id*. at 276.[2]

The Remedies Order is incompatible with those principles. If the government were to initiate removal proceedings against a Sanction Plaintiff, § 1252(b)(9) would require that those claims be channeled through immigration proceedings and ultimately to the relevant court of appeals on a petition for review. Federal district courts lack "any role in that sequence." *Khalil*, 164 F.4th at 274. The Remedies Order's provision for the commencement of proceedings in federal district court to adjudicate those precise issues contravenes § 1252(b)(9).

**Section 1252(g):** For similar reasons, the Remedies Order violates § 1252(g)'s directive that "*no court* shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to [1] *commence proceedings*, [2] adjudicate cases, or [3] execute removal orders against any alien under this chapter," except through a petition for review from a final order of removal filed in a court of appeals. 8 U.S.C. § 1252(g) (emphasis added). By its terms, § 1252(g) prohibits exactly what the Remedies Order requires: litigation in district court to "hear" a "cause or claim" challenging the Executive's "decision or action … to

---

[2] Relying on *Jennings v. Rodriguez*, 583 U.S. 281 (2018), the Third Circuit also held that § 1252(b)(9) applies fully *before* a final order of removal is entered. *See Khalil*, 164 F.4th at 277-78. Before *Jennings*, the First Circuit applied § 1252(b)(9) before issuance of a final order of removal. *See Augilar*, 510 F.3d at 7.

9

commence proceedings" against any alien. *Id*.; *see AAADC*, 525 U.S. at 487 ("challenge to the Attorney General's decision to 'commence proceedings' … falls squarely within § 1252(g)").

In summary, the Remedies Order—specifically, its automatic stay of removal proceedings and "void[ing]" the "alteration in immigration status"—directly contravenes §§ 1252(b)(9) and (g). Those grounds alone justify a stay of this Court's Remedies Order pending appeal.

**Section 1252(f)(1):**  The Remedies Order also violates the separate provision in 8 U.S.C. § 1252(f)(1). That provision states that "no court (other than the Supreme Court) shall have *jurisdiction or authority* to enjoin or restrain the operation of the provisions of part IV of this subchapter … other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." As the Supreme Court held in *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022), § 1252(f)(1) "generally prohibits … injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the . . . provisions." *Id*. at 544.

The Remedies Order violates § 1252(f)(1) by providing that the "removal" of any Sanction Plaintiff is "automatically **STAYED**" upon the commencement of a "Sanction Action." Order 6. There is no question that the INA's provisions under which an alien would be removed—8 U.S.C. §§1229a, 1231—are provisions subject to § 1252(f)(1). Nor can there be any dispute that a "stay[]" of removal "enjoin[s] or restrain[s]" the "operation" of those provisions; by its terms, the Remedies Order "require[s] offices to … refrain from actions that (again in the Government's view) are allowed" by 8 U.S.C. §§ 1229a, 1231. *Aleman Gonzalez*, 596 U.S. at 551.  Finally, the Remedies Order is not limited to "a particular alien," *id*. at 550, but applies prospectively in favor of *all* "Sanction Plaintiffs."  Order 5-6. The automatic stay is a patent violation of § 1252(f)(1).

10

Similarly, by prohibiting the transfer of a Sanction Plaintiff out of the jurisdiction in which the action is filed, Order at 7 & n. 7, the Remedies Order infringes on the government's detention authority under 8 U.S.C. § 1231—a provision of part IV also subject to § 1252(f)(1). *See* 8 U.S.C. § 1231(g) ("The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal."); *Avramenkov v. I.N.S.*, 99 F. Supp. 2d 210, 213 (D. Conn. 2000) ("Congress has squarely placed the responsibility of determining where aliens are to be detained within the sound discretion of the Attorney General."). This is especially true if a Sanction Plaintiff is taken into custody in a jurisdiction that does not have a detention facility, or is being held in a facility that is only suitable for short-term detention. *See* Agudelo Decl. ¶ 12.

Plaintiffs have argued that Section 1252(f)(1) does not bar an injunction against the operation of 8 U.S.C. § 1201(i), concerning the State Department's discretionary authority to revoke visas, because this statute does not appear in Part IV. However, Section 1201(i) contains its own limitation on jurisdiction, precluding judicial review of a revocation under the section, "except in the context of a removal proceeding if such revocation provides the sole ground for removal under § 1227(a)(1)(B) of this title," which is a provision appearing in Part IV. *See* 8 U.S.C. § 1201(i).  Because revocations under § 1201(i) can serve as the basis for a removal charge under a Part IV provision, Section 1227(a)(1)(B) enjoining Defendants from revoking visas under Section 1201(i) would hinder the operation of a covered removal provision, as prohibited by Section 1252(f)(1). *Aleman Gonzalez*, 596 U.S. at 544. Additionally, because the law enacting § 1227(a)(1)(B) amended the INA, rather than merely amending the United States Code, as did the provision at issue in *Gavez v. Jaddou*, it is a "provision of Part IV." *See* Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108–458, § 5304, 118 Stat 3638, 3736 (2004);

*Gavez v. Jaddou*, 52 F.4th 821, 830-31 (9th Cir. 2022) ("[a]lthough some provisions of the [Act] directly amend the INA … § 235(d)(2) does not amend the INA" in the relevant part).

In sum, "[f]ederal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute … which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). This includes jurisdiction to review constitutional issues, which Congress can require to be first adjudicated in other forums. *See AAADC*, 525 U.S. at 482-83. So, where federal courts' lack jurisdiction, they "cannot proceed at all in any cause," including by entering any form of relief, instead, "the only function remaining … is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 93-102 (1998). Accordingly, under 1252(b)(9) and (g), the district court lacked jurisdiction to grant any form of relief and, under 1252(f)(1), it lacked jurisdiction to grant relief acting as an injunction.

> **b.    The Remedies Order Violates the Federal Rules of Civil Procedure, Infringes on the Operations of Other District Courts, and Exceeds the Court's Equitable Authority.**

Apart from exceeding its jurisdiction, the Court's Remedies Order also exceeds this Court's authority in at least three ways. First, the Court's Remedies Order violates Federal Rule of Civil Procedure 65. That rule states unequivocally that an injunction "binds only" "the parties" "who receive *actual notice of it* by personal service or otherwise." Fed. R. Civ. P. 65(d)(2) (emphasis added). The Remedies Order cannot be squared with this basic requirement: It provides for a prospective and "automatic[] **STAY**[]" of any removal proceedings upon "commencement" of an action by a "Sanction Plaintiff" and places "the burden" *on the United States* "affirmatively to ascertain and determine whether such person has filed a Sanction Action in the United States District Courts." Order 7. In other words, the Remedies Order does not require a plaintiff to *notify* the government that it has been sued; as this Court candidly stated, the Remedies Order requires

the government to "check … PACER … to determine whether a Sanction Action has been filed." Order 7 n.7. That mandate—flipping the burden onto the *defendant* to ascertain for itself whether it has been sued—cannot be squared with Rule 65(d)(2), not to mention basic principles of fairness.

Second, the Remedies Order purports to control the proceedings in *other district courts* over which it has no power, with respect to disputes over which this Court concedes it has no jurisdiction. The Order is explicit that this is its effect, providing that a "Sanction Plaintiff" has "a right to institute a proceeding in the United States District Court in which the Sanction Plaintiff resided," and this Court expressly disclaimed "retain[ing] jurisdiction over any [such] action"— providing instead that it "shall be subject to the jurisdiction of the appropriate United States District Judge presiding in such Sanction Action." Order 4, 7. Nonetheless, by its express terms, the Remedies Order purports to direct the outcome of the proceedings *pending before another federal district court* in an action *over which this Court has no jurisdiction*. Except as provided by Congress (*e.g.*, multi-district litigation), federal district courts do not have authority to dictate or control the outcome of proceedings in another federal district court. *See Gasperini v. Ctr. For Humanities, Inc.*, 518 U.S. 415, 430 n.10 (1996) ("If there is a federal district court standard, it must come from the Court of Appeals, not from the … district court judges … , each of whom sits alone and renders decisions not binding on the others."); *see also Bruce v. Citigroup Inc.*, 75 F.4th 297, 303 n.6 (2d Cir. 2023) (holding Bankruptcy Court could not enforce other courts' discharge orders, and that to allow one court to enforce injunctions entered by another court would be a "major departure from the long tradition of equity practice"). That is especially true when the court admittedly has no jurisdiction over the litigation itself. *See Steel Co.*, 523 U.S. at 93-102 ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.") (citation omitted).

13

Finally, the Court's creation of a new cause of action (the "Sanction Action") is not only relief Plaintiffs did not seek, but it exceeds the scope of the Court's equitable authority. The Remedies Order states that a "Sanction Plaintiff"—*i.e.*, "[a]ny non-citizen member of the plaintiffs … who is a member" with the relevant time period "*shall have a right* to institute a proceeding … in the United States District Court in which the Sanction Plaintiff resided." Order 4 (emphasis added). The Supreme Court has repeatedly held that creating federal causes of action—including for constitutional violations—is for Congress, not the courts: "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). This is true "[i]n both statutory and constitutional cases." *Hernandez v. Mesa*, 593 U.S. 93, 101 (2020).

The Remedies Order invades the province of Congress. Congress did not authorize the new "Sanction Action" described in the Order, nor does the Order purport to rely on any congressional authorization. Instead, it invokes *only* the Court's "broad equitable powers of remediation" to "protect certain of the Plaintiffs' non-citizen members from any retribution for the free exercise of their constitutional rights." Order at 4. But the Supreme Court has rejected such a free-floating power of federal courts to "adjust their remedies so as to grant the necessary relief when federally protected rights have been invaded." *Ziglar v. Abbasi*, 582 U.S. 120, 132 (2017) (quoting *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 392 (1971)); *see also Hernandez*, 593 U.S. at 99-101 (same).  The Order violates these fundamental limits on federal court power and transgresses Congress's prerogative in the creation of causes of action.  *Sandoval*, 532 U.S. at 286.

Not only that, the Remedies Order's "Presumption of Unconstitutionality" that operates in the newly created cause of action creates what amounts to a preclearance regime for removal proceedings in direct contravention of the scheme Congress has enacted into law governing the process for removals. The INA creates a comprehensive scheme governing removal proceedings

14

*and* avenues for challenging the grounds for removal. *See Chamber of Com. of the United States v. Whiting*, 563 U.S. 582, 587 (2011) (Congress created a "comprehensive federal statutory scheme for regulation of immigration and naturalization"). The Court's new cause of action—including its presumption of unconstitutionality—has no connection or basis in the immigration laws that Congress has adopted; indeed, by adding new requirements on top of those Congress did specify, the Court's new remedy effectively amended the immigration laws, contrary to fundamental limits on the judicial power. And to make matters worse, the Court's order disregards the presumption of regularity that generally attaches to official acts. *See Nieves v. Bartlett*, 587 U.S. 391, 399-400 (2019) (explaining that when the presumption of regularity is suspended in retaliation cases, the plaintiff has the burden to prove lack of probable cause).

2.    **The Government is Likely To Succeed on the Merits Because the Plaintiffs Lack Standing and Are Not Challenging Final Agency Action.**

a.    **Plaintiffs Lack Organizational and Associational Standing.**

Defendants have a strong likelihood of showing Plaintiffs lacked standing. First, the Court's findings on standing overlook Supreme Court teaching that third parties cannot challenge "the Executive Branch's exercise of enforcement discretion over whether to arrest or prosecute" other people because it is not redressable. *United States v. Texas*, 599 U.S. 670, 676-80 (2023) (holding states could not rely on financial harms to show a redressable injury and federal courts lack jurisdiction over suits challenging enforcement choices owing to the executive's Article II authority). Just as Texas cannot rely on financial harms to compel one mode of immigration enforcement, Plaintiffs cannot sue to forbid one mode of immigration enforcement to combat incidental constitutional harms. Notwithstanding this, the Court never grappled with this potential Article II violation. *See AAUP*, 780 F. Supp. 3d at 378-79; *AAUP*, 802 F. Supp. 3d at 194-99.

Second, retaliation cases "[a]t most, . . . address[] only instances in which a defendant retaliated directly against the plaintiff and for the plaintiff's speech activity, whether by actively punishing or passively refusing to do something for the plaintiff." *Nat'l Rifle Ass'n of Am. v. Vullo*, 144 F.4th 376, 394-95 (2d Cir. 2025). But here, Plaintiffs' retaliation theory was that their non-citizen members (1) had *seen media reports* that non-citizen pro-Palestinian protesters had been arrested, (2) felt anxious that *eventually*, the government might target them because of their support for Palestine, and (3) those non-citizen members then took actions that eventually harmed Plaintiffs. The First Circuit has rejected retaliation claims where a plaintiff had too attenuated a connection to the retaliation. *See Rosaura Bldg. Corp. v. Municipality of Mayaguez*, 778 F.3d 55, 68 (1st Cir. 2015) (noting "attenuated relationship between Rosaura and the parties exercising First Amendment rights … and there is no allegation that the denial of the contract to Rosaura …  would have any material effect on the [speech of] the relatives of shareholders").

Likewise, here, the nexus between the chill and claimed effect is too attenuated, linked only by Plaintiffs' members learning of arrests through public media. "Plaintiff speculat[es] about the decisions of third parties[.] … It is no more than conjecture to assume that [plaintiff] will be subject to [Government]-induced content moderation." *Murthy v. Missouri*, 603 U.S. 43, 57 & 72 (2024); *Meese v. Keene*, 481 U.S. 465, 472 (1987) (holding there must be "specific present objective harm or [specific] threat of future harm); *Sullivan v. Carrick*, 888 F.2d 1, 4 (1st Cir. 1989) (holding threat must not be "indirect, speculative, or too remote").

Third, as to organizational standing, the court noted that MESA's claim is based on a "novel theory:" that its members' chilled speech sufficiently harms the organization—a claim rejected in another circuit. *AAUP*, 802 F. Supp. 3d at 180 n.38 (citing *Texas State LULAC v. Elfant*, 52 F.4th 248, 256-57 (5th Cir. 2022)). Still, the Court found this case to be "unique" like in *Havens*

16

*Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). *AAUP*, 802 F. Supp. 3d at 180 n.38 (relying on *FDA v. Alliance*, 602 U.S. 367, 395 (2024)). But as the Supreme Court explained, *Havens* was "unusual" and should not be extended "beyond its context where plaintiffs had a specific statutory right to certain information. *See Alliance*, 602 U.S. at 396. Here there is no such statutory right.

### b.    Plaintiffs did not Challenge Final Agency Action.

The Court described the "policy" as "Secretaries Noem and Rubio having intentionally and in concert implemented Executive Orders in 14161 and 14188 a viewpoint-discriminatory way to chill protected speech" that "violated the First Amendment." Order at 2. The Court found the policy violated the APA. *See AAUP*, 802 F. Supp. 3d at 175. It determined, notwithstanding these prior findings about the policy's scope, "that there is a procedure of roughly the kind alleged by the [P]laintiffs" which was final because "the agency Public Officials reached the consummation of their decision-making on a matter that determines rights and obligations or from which legal consequences flow." *AAUP*, 802 F. Supp. 3d at 191. In support of this view that the policy was a final action, the Court cited to the "tiger team" that investigated leads relating to campus protests, which resulted in referrals to the DHS National Security Division and the State Department Bureau of Consular Affairs. But this procedure is not a final agency action within the meaning of the APA. The procedure itself reveals its indefinite nature. *Cf. Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (action "must not be of a merely tentative or interlocutory nature"). The "procedure" did not determine the "rights or obligations" of visa-holding aliens. Rather, it was an interim step. The rights or obligations of visa-holding aliens would be determined in removal proceedings.

### B.    The Government Will Be Irreparably Harmed Absent a Stay Pending Appeal.

Defendants will suffer irreparable harm because of the Remedies Order, and the balance of harms, equities, and public interest overwhelmingly favor a stay.  *See Nken*, 556 U.S. at 435.

The Remedies Order will cause irreparable harm to the government. The order places the burden on Defendants "to determine whether a Sanction Action has been filed." Order 6-7. But the government *does not know* the identities of Plaintiffs' members who are encompassed by the Remedies Order, except for the few who testified at trial in this case. *See* Agudelo Decl. ¶ 8. The result is that no matter how diligently Defendants comply with their obligation to monitor PACER, it will be impossible to know whether, at any given point in time, a Sanction Action has been filed. Nor can Defendants possibly know whether the commencement of removal proceedings against an alien—or the transfer of the alien outside the judicial district for completely legitimate reasons (*e.g.*, detention capacity)—violates the "automatic[] STAY" imposed by the Order. *See* Agudelo Decl. ¶ 10-12. In short, the Remedies Order creates a regime in which the government has no way to be assured whether it is complying with the Court's order—potentially exposing Defendants to motions for sanctions or other such filings based on information unknown to the government.

The upshot is that the Remedies Order will chill the government's efforts to enforce the duly enacted immigration laws against aliens on indisputably lawful grounds that do not implicate the First Amendment. *See* Agudelo Decl. ¶ 8, 9. Such chilling effect on the Executive's prerogative and obligation to "take Care that the Laws be faithfully executed" is itself an irreparable harm. U.S. Const., art. II § 3; *see Nat. Treasury Employees Union v. Nixon*, 492 F.2d 587, 604 (D.C. Cir. 1974) (the Take Care clause "does not permit the President to refrain from executing laws duly enacted by the Congress as those laws were construed by the judiciary."); *see also State of Mississippi v. Johnson*, 71 U.S. 475 (1866) ("An attempt on the part of the judicial department of the government to enforce the performance of such [non-ministerial] duties by the President might be justly characterized, in the language of Chief Justice Marshal, as 'an absurd and excessive extravagance.'").

The irreparable harm is worsened by the significant intrusion caused by the commencement of an unknown (and, to the government, unknowable) number of lawsuits across the country by Plaintiffs' members, which will directly interfere with the streamlined immigration proceedings that Congress created to adjudicate challenges to removal. *Supra*, pp. 7-12. This will produce the precise "deconstruction, fragmentation, and hence prolongation of removal proceedings" that Congress deliberately sought to prevent by streamlining removal proceedings. *See AAADC*, 525 U.S. at 485 87. The government will clearly be harmed by this "scattershot" approach, which will further strain the already overburdened immigration system. *See Aguilar*, 510 F.3d at 9.

That harm is particularly acute given the comity between the branches of the federal government that has traditionally required a heightened showing of harm before a court will enjoin an administrative proceeding. *See, e.g., Younger v. Harris*, 401 U.S. 37, 46 (1971). This principle has special salience in the immigration context, where the Supreme Court has long recognized that it is to Congress and the Executive that the Constitution has delegated responsibility over immigration matters. *See Mathews v. Diaz*, 426 U.S. 67, 81 (1976). For that reason, judicial review over immigration matters has been exceedingly narrow. *See, e.g., Fiallo v. Bell*, 430 U.S. 787, 792 (1977). The Court's unjustified expansion of the injunction tramples these principles and, by transcending its narrow remit in immigration cases, it has and continues to cause irreparable harm to the interests and prerogatives of the government.

Finally, "an adverse immigration action changing" a "Sanction Plaintiff's immigration status" is not properly defined in the remedies order and could include changes in immigration status not related to ICE or State Department functions, thereby disrupting the equites of non-party benefits granting agencies, such as USCIS, whose functions fall wholly outside the scope of this lawsuit. For example, one of the Court's hypotheticals treats the denial or revocation of Temporary

Protected Status ("TPS") as an adverse action. *See* Order at 9. TPS applications are adjudicated by

USCIS, see 8 C.F.R. §§ 244.10(a)-(b), 244.12(a), which is not a party to this case, yet a revocation

of TPS could come within the meaning of "an adverse immigration action" and thus impede

USCIS's functions were a Sanction Action to be brought under the Remedies Order.

The balance of harms and public interest also favor a stay pending appeal. Plaintiffs have

yet to show that any of their members suffered an adverse immigration action based on their

protected speech or show a likelihood of such action. By contrast, the public interest in

enforcement of United States immigration laws is significant. *See United States v. Martinez-*

*Fuerte*, 428 U.S. 543, 556-58 (1976)). And the government acts "in the public interest when it

enforces the immigration laws of this country." *Savoury v. U.S. Attorney Gen.*, 449 F.3d 1307,

1320 (11th Cir. 2006); *see Sofinet v. INS*, 188 F.3d 703, 708 (7th Cir. 1999) (weighing "the public

interest in the speedy and effective enforcement of the immigration laws"). Any order that enjoins

a governmental entity from enforcing actions taken pursuant to statutes enacted by the duly elected

representatives of the people constitutes an irreparable injury that weighs heavily against the entry

of injunctive relief. *See New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977).

Here, as shown above, the Court's Order has the effect of restraining legitimate immigration

enforcement, so the public interest, too, tilts in favor of a stay.

## IV. CONCLUSION

For the foregoing reasons, the Court should partially stay its Remedies Order pending the

resolution of the government's appeal—particularly the portion of the Remedies Order creating

the "Sanction Action" and the "automatic stay." The government respectfully requests that the

Court issue a decision resolving this motion by February 23, 2026.

Respectfully Submitted,

BRETT A. SHUMATE                         *Ethan B. Kanter*
*Acting Assistant Attorney General*       ETHAN B. KANTER
                                          *Chief, National Security Unit*
DREW C. ENSIGN                            *Office of Immigration Litigation*
*Deputy Assistant Attorney General*       *P.O. Box 878, Ben Franklin Station*
                                          *Washington, D.C. 20001*

                                          PAUL F. STONE
                                          *Deputy Chief, National Security Unit*
                                          *Office of Immigration Litigation*

                                          LINDSAY M. MURPHY
                                          *Deputy Chief, National Security Unit*
                                          *Office of Immigration Litigation*

*Dated: February 9, 2026*                 *Counsel for Defendants*

## L.R. 7.1(a)(2) CERTIFICATION

I, Ethan B. Kanter, hereby certify that Government counsel conferred with Plaintiffs' counsel regarding this motion on February 9, 2026, and were unable to come to agreement on a stay.

*Date: February 9, 2026*                          By: */s/ Ethan B. Kanter*
                                                  ETHAN B. KANTER
                                                  U.S. Department of Justice

## CERTIFICATE OF SERVICE

I, Ethan B. Kanter, hereby certify that on February 9, 2026, I served this document upon all registered parties via the ECF Notice of Electronic Filing (NEF) system.

*Date: February 9, 2026*                          By: */s/ Ethan B. Kanter*
                                                  ETHAN B. KANTER
                                                  U.S. Department of Justice